# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | |
| Plaintiffs, | Case No. 1:05-CV-11148-PBS |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and MCKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANT MCKESSON CORPORATION'S MOTION TO DISMISS COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

THE ALLEGATIONS OF THE COMPLAINT ................................................................... 3

    A.    The Key Players in the Complaint and the Nature of Their Businesses. ............... 3

        1.    Defendant FDB, a Publisher of Drug Data. ............................................. 3

        2.    Defendant McKesson, a Drug Wholesaler. ............................................. 4

        3.    Retail Pharmacies. ................................................................................ 4

        4.    Drug Manufacturers ............................................................................. 4

        5.    Plaintiffs, Four Employee Benefits Plans. ............................................. 5

    B.    The Unlawful Scheme Alleged in the Complaint. .................................................. 5

ARGUMENT ..................................................................................................................... 7

I.    PLAINTIFFS' FIRST COUNT UNDER RICO SHOULD BE DISMISSED
    FOR FAILURE TO ALLEGE A VIABLE ENTERPRISE AND A
    COHERENT THEORY OF FRAUD. .................................................................... 7

    A.    This Court's Opinion in the MDL Class Case Demonstrates That
        Plaintiffs Here Have Failed to Allege a Viable "Enterprise" Under
        RICO. ................................................................................................... 7

        1.    Plaintiffs Fail to Allege A Common Purpose Shared by FDB
            and McKesson in the Alleged Scheme to Inflate AWPs. ......................... 8

        2.    Plaintiffs Fail to Allege Anything Other than Conclusory,
            Barebones Allegations Regarding Other Enterprise Factors. .................. 10

    B.    Plaintiffs' Allegations of Mail and Wire Fraud Are Illogical and
        Inadequately Pled to Support a RICO Claim. ...................................................... 10

        1.    Plaintiffs' Allegations Regarding the Timing of the Alleged
            Scheme Are Inconsistent And Defeat Any Viable "Scheme to
            Defraud." ............................................................................................ 11

        2.    Plaintiffs Fail to Allege That McKesson Knew That FDB's
            Representations Were False And Thus that McKesson Was a
            "Knowing and Willful" Participant in the Alleged Scheme. ................... 12

        3.    Plaintiffs Fail to Adequately Plead Fraudulent Mail or Wire
            Communications with Particularity. ...................................................... 13

II.     PLAINTIFFS' SECOND AND THIRD COUNTS UNDER CALIFORNIA
        BUSINESS AND PROFESSIONS CODE SECTIONS 17500 AND 17200
        SHOULD BE DISMISSED. ................................................................................14

        A.      Under Massachusetts Choice of Law Principles, California Consumer
                Protection Laws Cannot Be Applied to the Named Plaintiffs' Claims.................14

        B.      Plaintiffs Have Not Stated a Claim For False Advertising Because They
                Do Not Allege That McKesson Made Any Misrepresentation or Knew
                that FDB's Representations Were False...............................................................15

III.    PLAINTIFFS' SIXTH COUNT FOR CIVIL CONSPIRACY SHOULD BE
        DISMISSED.................................................................................................................16

        A.      Plaintiffs Fail to Allege an Actionable "Coercive" Civil Conspiracy. .................17

        B.      Plaintiffs Fail to Allege Any Other Type of Civil Conspiracy..............................17

IV.     TO THE EXTENT PLAINTIFFS' FOURTH OR FIFTH COUNT IS
        ASSERTED AGAINST MCKESSON, IT SHOULD BE DISMISSED.........................19

        A.      Plaintiffs Cannot State a California Consumer Legal Remedies Act
                Claim Against McKesson.....................................................................................19

        B.      Plaintiffs Cannot State a Negligent Misrepresentation Claim Against
                McKesson. ...........................................................................................................19

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**                                                                 **Page(s)**

*Aetna Casualty Sur. Co. v. P & B Autobody*,
    43 F.3d 1546 (1st Cir. 1994)..................................................................................17

*Ahmed v. Rosenblatt*,
    118 F.3d 886 (1st Cir. 1997)..................................................................................13

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
    374 F.3d 23 (1st Cir. 2004)......................................................................................7

*Beal v. Broadard*,
    No. SUC2002-05765-C, 2005 Mass. Super. LEXIS 125,
    19 Mass. L. Rep. 114 (Mass. Super. Ct. Feb. 4, 2005) ........................................20

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir. 1998)....................................................................................11

*California Grocers Ass'n v. Bank of America*,
    22 Cal. App. 4th 205 (1994) ..................................................................................19

*Crellin Techs., Inc. v. Equipmentlease Corp.*,
    18 F.3d 1 (1st Cir. 1994) ...............................................................................14-15, 16

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*,
    777 F. Supp. 228 (S.D.N.Y. 1991)........................................................................11

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
    66 F.3d 604 (3d Cir. 1995) ....................................................................................19

*Emery v. Visa Int'l Service Ass'n*,
    95 Cal. App. 4th 952 (2002) ..................................................................................15

*Fashion House, Inc. v. K Mart Corp.*,
    892 F.2d 1076 (1st Cir. 1989)................................................................................16

*Fleming v. Dane*,
    22 N.E.2d 609 (Mass. 1939) ..................................................................................17

*General Refractories Co. v. Fireman's Fund Ins. Co.*,
    337 F.3d 297 (3d Cir.2003) ...................................................................................18

*Giuliano v. Fulton*,
    399 F.3d 381 (1st Cir. 2005)....................................................................................7

*Grant v. John Hancock Mut. Life Ins. Co.*,
    183 F. Supp. 2d 344 (D. Mass. 2002) .......................................................16, 17, 18

*Hauck Mfg. Co. v. Astec Indus., Inc.*,
    375 F. Supp. 2d 649 (E.D. Tenn. 2004) .................................................................18

*Honeycutt v. First Fed. Bank,*
   278 F. Supp. 2d 893 (W.D. Tenn. 2003) ................................................................19

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   307 F. Supp. 2d 196 (D. Mass. 2004) ............................................... 1, 7, 8, 9, 10

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   230 F.R.D. 61 (D. Mass. 2005) .................................................................. 14, 16

*Klaxon v. Stentor Elec. Mfg. Co.,*
   313 U.S. 487 (1941) ................................................................................14

*Korea Supply Co. v. Lockheed Martin Corp.,*
   29 Cal. 4th 1134 (2003) ...........................................................................15-16

*Kurker v. Hill,*
   689 N.E.2d 833 (Mass. App. Ct. 1998) .............................................................18

*Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.,*
   62 F. Supp. 2d 236 (D. Mass. 1999) .................................................................17

*Maternally Yours, Inc. v. Your Maternity Shop, Inc.,*
   234 F.2d 538 (2d Cir. 1956) .........................................................................16

*McCarthy v. Hawes,*
   12 N.E.2d 722 (Mass. 1938) .........................................................................18

*McLaughlin v. Anderson,*
   962 F.2d 187 (2d Cir. 1992) .........................................................................11

*Neustadt v. Employers Liab. Assurance Corp.,*
   21 N.E.2d 538 (Mass. 1939) .........................................................................17

*N. Bridge Assocs., Inc. v. Boldt,*
   274 F.3d 38 (1st Cir. 2001) .......................................................................7, 13

*Okmyansky v. Herbalife Int'l of America, Inc.,*
   343 F. Supp. 2d 57 (D. Mass. 2004) .................................................................16

*People v. Tierney,*
   253 Cal. App. 2d 1 (1967) ...........................................................................15

*Rodowicz v. Massachusetts Mut. Life Ins. Co.,*
   279 F.3d 36 (1st Cir. 2002)..........................................................................20

*Schlaifer Nance & Co. v. Estate of Andy Warhol,*
   119 F.3d 91 (2d Cir. 1997) ..........................................................................11

*United States v. Griffin,*
   660 F.2d 996 (4th Cir. 1981) ..........................................................................8

*United States v. Rogers,*
   321 F.3d 1226 (9th Cir. 2003) .......................................................................11

*United States v. Turkette*,
  452 U.S. 576 (1981) ..................................................................................................8

## STATUTES AND RULES

18 U.S.C.
  § 1341 ...............................................................................................................11
  § 1343 ...............................................................................................................11
  § 1962(c) .......................................................................................................7, 11

Cal. Bus. & Prof. Code
  § 17200 .........................................................................................................14, 15
  § 17500 .........................................................................................................14, 15

Cal. Civ. Code
  § 1750 ...............................................................................................................19
  § 1761(d) ...........................................................................................................19

Fed. R. Civ. Proc.
  9(b) ...................................................................................................................13
  12(b)(6) .........................................................................................................3, 7

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws § 148 ..................................................14

**INTRODUCTION**

Plaintiffs' complaint alleges an illegal conspiracy by a pharmaceutical wholesaler, defendant McKesson Corporation ("McKesson"), and a publisher of pharmaceutical data, defendant First DataBank ("FDB"), to artificially raise the average wholesale prices ("AWPs") published by FDB for over a thousand brand name prescription drugs. The complaint asserts claims against McKesson under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count I), under two related California consumer protection statutes (Counts II and III), and for civil conspiracy (Count VI).[1]

Plaintiffs' RICO claim should sound familiar to this Court because a nearly identical plaintiff class action (now with three of the four same plaintiffs) was filed several years ago claiming that pharmaceutical manufacturers, rather than a wholesaler, conspired with FDB and other publishers to artificially raise the published AWP and thereby increase the "spread" between AWP and other prices of over a thousand brand name drugs. In that earlier class suit, which is pending before this Court as *In re Pharmaceutical Industry Average Wholesale Price Litigation* ("MDL Class Case"), this Court dismissed a very similar "manufacturer-publisher enterprise" claim under RICO, finding that plaintiffs failed to sufficiently allege, among other things, a viable RICO enterprise and a common purpose of the manufacturers and the publishers to artificially raise the published AWPs. *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 203-05 (D. Mass. 2004) ("*Pharm. II*"). Indeed, this Court held that the AWP spread was an "irrelevant" consideration to AWP publishers whose "financial interest lies in earning money through selling books listing numbers," whatever those numbers may be. *Id.* at 204.

Like the first attempt, this second attempt to allege an illegal RICO enterprise with a publisher of AWPs is equally implausible for the very same reasons — whether an AWP is higher or lower would still be "irrelevant" to FDB, an AWP publisher. The absence of a common purpose is again

---

[1] Although plaintiffs also bring claims under a third California statute, the California Consumer Legal Remedies Act (Count IV), and for negligent misrepresentation (Count V), McKesson is not named in those Counts.

dispositive of plaintiffs' RICO claim. In addition, the complaint fails to adequately plead any of the other factors necessary to establish a RICO enterprise.

In an effort to save this RICO publisher enterprise from the fate of the prior publisher enterprise, plaintiffs contrive new allegations regarding the means used to achieve the ends — that is, inflated AWPs. According to plaintiffs, FDB actively facilitated the inflation of the AWPs it published by scheming with a wholesaler, in this case, McKesson. Allegedly, when McKesson began raising its own prices by 5%, FDB stopped relying on pricing information from wholesalers other than McKesson to calculate its AWPs. Although FDB represented that it surveyed all of the national wholesalers and calculated a weighted average of the wholesalers' own prices, plaintiffs allege that, in reality, FDB was secretly surveying only McKesson. According to plaintiffs, this scheme ensured that FDB's published AWPs would mirror McKesson's own higher prices.

Plaintiffs' own factual allegations, however, are directly in conflict with their newly-minted conspiracy. Thus, the complaint claims that the illegal scheme commenced in late 2001 or early 2002, and it supports this time allegation with a chart showing that the number of AWPs that increased by 5% spiked dramatically in the early months of 2002. Yet later in the complaint plaintiffs affirmatively plead that FDB in fact continued to survey other wholesalers in addition to McKesson through "2002-2003." This admission undermines plaintiffs' entire complaint. Plaintiffs' own chart shows that once FDB began publishing AWPs based solely on McKesson's pricing information, the number of drugs whose AWPs were raised by 5% declined. Indeed, by June or July 2002, this number began dropping precipitously. Accordingly, if plaintiffs are to be believed regarding when the 5% Scheme commenced (in late 2001 or early 2002), then the 5% Scheme was implemented at the very time FDB was continuing to survey multiple wholesalers, defeating the alleged agreement between FDB and McKesson in the first place. If the scheme commenced when plaintiffs claim FDB stopped surveying wholesalers other than McKesson (2002-2003), then the scheme commenced *after* the published AWPs on most drugs had already gone up by 5%, and McKesson's and FDB's conspiratorial conduct did nothing to raise them any further. Either way, plaintiffs' nefarious scheme is nonsensical.

Moreover, even if, contrary to plaintiffs' pleading, FDB had stopped surveying wholesalers other than McKesson earlier, glaring omissions in the complaint still render plaintiffs' RICO claim, and their remaining state law claims as well, untenable. Plaintiffs fail to allege that McKesson knew what FDB was doing to achieve an increase in the published AWPs. Nowhere do plaintiffs specifically allege that McKesson knew that FDB falsely represented the manner in which FDB's AWPs were calculated; nowhere do plaintiffs allege facts to show McKesson knew it was the only wholesaler surveyed by FDB. These pleading omissions, by themselves, confirm the absence of any common purpose supporting a RICO enterprise.

The other, state law claims against McKesson fare no better. Plaintiffs attempt to apply California consumer protection laws to non-California plaintiffs. Under choice of law principles, plaintiffs cannot do so. Plaintiffs' civil conspiracy claim is also deficient under the law of all applicable states. There are no factual allegations of a "peculiar power of coercion" exerted by defendants and, as noted above, no factual allegations to show that McKesson knew about, and substantially assisted, tortious conduct by FDB. No theory of civil conspiracy can stand.

As shown more fully below, each of the Counts alleged against McKesson fails to state a viable claim and all should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## THE ALLEGATIONS OF THE COMPLAINT

### A.    The Key Players in the Complaint and the Nature of Their Businesses.

#### 1.    Defendant FDB, a Publisher of Drug Data.

Plaintiffs allege that defendant FDB is a publisher of drug data, including drug pricing information. (Compl. ¶ 89.) Among the various prices that FDB publishes are the price a drug manufacturer sets as "a baseline for sales to wholesalers," known as "wholesale acquisition cost" ("WAC"), and an industry sticker price for sales between drug wholesalers and pharmacies known as AWP. (*Id.* ¶¶ 29, 34, 83.)

FDB published both an AWP suggested by the manufacturer, the "suggested wholesaler price," or SWP, and an "empirically determined" AWP, which it referred to as Blue Book AWP. WAC and SWP prices published by FDB were supplied to FDB by the drug manufacturer. (*Id.* ¶¶ 29, 34, 100.) The Blue Book AWP, by contrast, was "empirically determined" by FDB from

3

information from wholesalers.  As the complaint alleges, FDB represented that it surveyed national wholesalers to ascertain what markup they applied over WAC for their own "price basis."  FDB would then calculate a "weighted average" of all of the wholesalers' prices based upon wholesaler market share, and used that "average" as FDB's published Blue Book AWP.  (*Id.* ¶¶ 101-02, 111-12.)

### 2.    Defendant McKesson, a Drug Wholesaler.

Defendant McKesson is a drug wholesaler.  (*Id.* ¶ 45.)  Wholesalers purchase drugs in large quantities from manufacturers at WAC (subject to adjustments), sort the drugs by customer needs, and then resell and deliver them to their customers at a price that affords the wholesalers a markup or profit margin (albeit a very slim one) for the services they provide.  (*Id.* ¶¶ 42, 43, 46.)  The complaint alleges that McKesson participated in FDB's wholesaler survey, reporting its own markups over WAC for FDB to use in calculating its published AWP.  (*See id.* ¶ 115.)

### 3.    Retail Pharmacies.

Retail pharmacies purchase drugs from wholesalers and then dispense those drugs to consumers.  Pharmacies are reimbursed for these goods by payments from consumers, third party payors (such as drug benefit plans or government programs), or both.  (*Id.* ¶¶ 54, 59.)  Drug benefit plans typically contract with intermediaries called pharmacy benefit managers ("PBMs") which, among other things, negotiate the prices retail pharmacies will be reimbursed at if the pharmacies agree to the delayed payment and added burdens of dispensing drugs to consumers on drug benefit plans.  (*Id.* ¶ 56.)  The reimbursement rates negotiated between plan sponsors and PBMs, and between PBMs and retailers, are typically based on some percentage off the published AWP for the drug dispensed.  (*See id.* ¶¶ 56, 57, 63.)  Because retail pharmacies typically buy pharmaceuticals from wholesalers based on a markup over WAC, but are reimbursed based on a percentage off of AWP, larger "spreads" between WAC and AWP afford retail pharmacies and other middlemen like PBMs opportunities for larger profits.  (*Id.* ¶ 56.)

### 4.    Drug Manufacturers.

Drug manufacturers produce the branded pharmaceuticals at issue in this action.  (*Id.* ¶¶ 26-27.)  Historically, drug manufacturers were typically designated either a "20% markup" company or a

"25% markup" company, depending on the percentage over WAC that the manufacturer applied to its suggested wholesaler price, or suggested AWP.  (*Id.* ¶¶ 38-39.)

### 5.    Plaintiffs, Four Employee Benefits Plans.

Plaintiffs are four employee benefits plans or associations located in states other than California.  (*Id.* ¶¶ 19-22.)  Plaintiffs seek to represent a national class of "consumers, self-insured employers, health and welfare plans, health insurers and other end payors of prescription drugs" who, from January 1, 2002 through March 15, 2005, "paid any portion of the purchase for a prescription drug at a price calculated by reference to the AWP" that was published by FDB during this time period.  (*Id.* ¶¶ 1, 138.)

### B.    The Unlawful Scheme Alleged in the Complaint.

The thrust of plaintiffs' complaint is a conspiracy by McKesson and FDB to cause FDB to artificially raise by 5% the AWPs it published for certain drugs (the alleged "5% Scheme").  The means alleged to accomplish the ends — the 5% increase — are convoluted at best.  Rather than simply raising by 5% the spread on the AWPs it published, plaintiffs allege that FDB effectuated the 5% increase in a round-about manner.

Specifically, the 5% Scheme was allegedly hatched "in late 2001 or early 2002."  (*Id.* ¶ 113.) At that time, McKesson allegedly began raising by 5% its own markup percentage that it applied to WAC for its base prices on certain drugs — those drugs manufactured by companies that were 20% markup companies (companies whose suggested wholesaler sell price was typically 20% above WAC).  McKesson's increase would thereby convert 20% markup companies into 25% markup companies in McKesson's own database.  (*Id.* ¶ 115.)  When McKesson was surveyed by FDB, McKesson would submit its increased markup, which was 25% over WAC.  (*Id.* ¶ 10.)

For its part, FDB allegedly deceived the public by falsely representing how it "empirically" derived its Blue Book AWP.  Instead of calculating its AWPs from a weighted average based on the markups supplied by all of the national wholesalers, plaintiffs allege that FDB secretly stopped surveying any wholesaler other than McKesson to ensure that FDB's published AWPs would reflect the same 5% increase that McKesson made to its markups.  (*Id.* ¶¶ 112, 115.)  As a result, plaintiffs contend, FDB and McKesson caused FDB's AWPs to be artificially inflated by 5% starting in late

5

2001 or early 2002.  (*Id.* ¶ 113.)  In a graph charting each month from January 1999 through October of 2004, plaintiffs show, in fact, that in the early months of 2002, a significant spike occurred in the number of drugs whose AWPs rose from 20% over WAC to 25% over WAC.

Plaintiffs allege that FDB was motivated to increase the spread between WAC and AWP from 20% to 25% in order to (a) reduce the administrative costs of surveys; (b) incentivize powerful forces in the distribution chain, such as PBMs, to use FDB's AWP as the pricing standard and thereby increase the demand for its reporting services; and (c) hide the fact that certain wholesalers and manufacturers were refusing to provide pricing information to FDB because this fact threatened the use of the AWP system and ultimately the demand for its services.  (*Id.* ¶ 125.)  Plaintiffs claim that McKesson's motivation was to (a) "curry favor with retailers who use McKesson as their wholesaler," and who would receive more in reimbursements from an increased spread; (b) benefit a nationwide network of independent pharmacies to which it is connected; and (c) reduce administrative expenses in reporting AWPs to FDB.  (*Id.* ¶ 124.)[2]

Plaintiffs' own allegations, however, are in direct conflict with the very scheme plaintiffs have alleged.  While plaintiffs allege that the 5% Scheme commenced "in late 2001 or early 2002," (*id.* ¶ 113) later in the complaint plaintiffs allege that wholesalers other than McKesson continued to participate in FDB's surveys through "2002-2003."  (*Id.* ¶ 125(c).)  The spike in the number of AWPs with a 5% increase in early 2002, therefore, could not have been caused by the alleged scheme because at that time, FDB was basing its Blue Book AWP on information from multiple wholesalers. When FDB stopped surveying wholesalers other than McKesson, there was in fact no spike in the number of drugs whose AWPs were raised by 5%, as plaintiffs' own graph shows.  (*See* Ex. A.) Indeed, by June or July 2002, the number of drugs whose AWP rose from 20% to 25% over WAC plunged downward.

_____

[2] While plaintiffs claim that McKesson sought to benefit its retail pharmacy customers through higher published AWPs, plaintiffs also allege that McKesson knew that any such benefit would be short term, because the industry would most likely "move to negotiate third party reimbursement based on WAC plus a fee and get away from AWP altogether."  (*Id.* ¶ 118.)  Thus, according to plaintiffs, McKesson knew that its actions would serve to eliminate altogether the higher AWP reimbursement system upon which its valued retail pharmacy customers allegedly relied.

While plaintiffs do allege that at some point in time McKesson became the only wholesaler who participated in FDB's surveys, even then plaintiffs do not allege any facts to show that McKesson *knew* that it was the only wholesaler participating. To the contrary, while plaintiffs allege that McKesson "was aware" of FDB's representations regarding how it derived its published AWP, conspicuously absent is any corresponding allegation that McKesson knew those representations were false. (Compl. ¶ 174.)

## ARGUMENT

In reviewing a motion to dismiss, the court must "take as true the factual averments contained in the complaint, but eschew any reliance on bald assertions, unsupportable conclusions, and opprobrious epithets." *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004) (internal citation and quotation marks omitted). When plaintiffs' bald assertions and conclusory allegations are stripped away, it is clear that plaintiffs fail to adequately plead any claim for which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).

## I.    PLAINTIFFS' FIRST COUNT UNDER RICO SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A VIABLE ENTERPRISE AND A COHERENT THEORY OF FRAUD.

To state a claim under section 1962(c) of RICO, a plaintiff must allege that defendants were "employed by or associated" with a RICO enterprise and that defendants engaged in the "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." 18 U.S.C. § 1962(c); *Giuliano v. Fulton*, 399 F.3d 381, 386 (1st Cir. 2005). The elements of a RICO claim must be pled with particularity. As this Court has noted, "'a greater degree of specificity is required in RICO cases.'" *Pharm. II*, 307 F. Supp. 2d at 203 (quoting *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 443 (1st Cir. 2000)). Failure to adequately plead any one of the elements is grounds for dismissal. *See N. Bridge Assocs., Inc. v. Boldt*, 274 F.3d 38, 42 (1st Cir. 2001) (stating that each RICO element must be alleged to state a claim).

### A.    This Court's Opinion in the MDL Class Case Demonstrates That Plaintiffs Here Have Failed to Allege a Viable "Enterprise" Under RICO.

Plaintiffs allege the existence of a RICO association-in-fact enterprise consisting of McKesson and FDB. As noted above, the alleged purpose of the enterprise was to inflate FDB's

7

published AWPs by 5%, and to perpetuate the use of AWPs as a benchmark for reimbursement. (Compl. ¶ 152.)  A substantially similar enterprise, with the same stated purpose, was alleged by plaintiffs in the MDL Class Case, and this Court rejected it.  *Pharm. II*, 307 F. Supp. 2d at 203-05. Specifically, this Court found that the manufacturer-publisher enterprise alleged was untenable because (1) the publishers did not share a "common purpose" with the manufacturers in increasing the spread on the AWPs that they published, and (2) the complaint contained only conclusory allegations regarding other factors courts look for in the enterprise analysis, such as systematic linkages, common communication networks, and joint meetings and training sessions between the manufacturers and the publishers.  *Id.* at 204-05.   The very same conclusions apply to the alleged McKesson-FDB enterprise.

> **1.    Plaintiffs Fail to Allege a Common Purpose Shared by FDB and McKesson in the Alleged Scheme to Inflate AWPs.**

An association-in-fact enterprise consists of "a group of persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  Requiring a "common purpose" between enterprise participants operates to "guard against the danger that guilt will be adjudged solely by virtue of associations not so related."  *United States v. Griffin*, 660 F.2d 996, 1000 (4th Cir. 1981).

The complaint in this case specifically alleges four common purposes shared by FDB and McKesson:  "(a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the 5% Spread Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry."  (Compl. ¶ 152.)

Three of these four purposes (a, c, and d) were asserted with almost the exact same words in the Amended Master Consolidated Class Action Complaint ("AMCC") filed in the MDL Class Case (AMCC, filed Jul. 28, 2003, ¶ 624), and the fourth purpose of implementing the 5% Spread Scheme, is really no different than the other three.  All four purposes boil down to a desire to derive increased profits by inflating AWPs and by perpetuating the industry's reliance on them.

This Court held the desire to profit to be an insufficient common purpose, and the desire to inflate AWPs to be unshared by the publishers. Drug manufacturers and publishers "do not share a common purpose more specific than that common to many human endeavors, the reaping of a profit. The publishers are indifferent as to whether the AWP spread exists or not." *Pharm. II*, 307 F. Supp. 2d at 204. Publishers, including FDB, have no economic incentive to increase the AWP spread because the spread is "irrelevant to their financial well being." *Id.* The Court also held that plaintiffs failed to cite "sufficient facts to support the allegation that the publishers know of the fraudulent nature of the AWP's they publish." *Id.*

Here, the alleged McKesson-FDB enterprise suffers from the same lack of common purpose. The newly alleged 5% Scheme suggests nothing more than a common desire by FDB and McKesson to reap a profit. As plaintiffs allege, with the 5% Scheme FDB sought to reduce administrative costs from surveying wholesalers, and to increase the demand for its publishing services. (Compl. ¶ 125.) As for McKesson, plaintiffs allege that its purpose was to "curry favor" with its retail customers and networked pharmacies, and to reduce the administrative expenses involved in reporting AWPs to FDB. (*Id.* ¶ 124.) While FDB and McKesson both sought to reduce their expenses and thus increase their profits, plaintiffs offer no facts to alter this Court's conclusion that it was "irrelevant" to FDB whether AWPs were higher or lower.

Moreover, even if FDB had an interest in "perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry" so as to increase reliance on its published data, plaintiffs' own allegations belie the conclusion that McKesson shared this motivation with FDB. Plaintiffs allege that McKesson knew that its efforts to standardize its markups at 25% over WAC would ultimately lead the industry "to negotiate third party reimbursement based on WAC plus a fee and *get away from AWP altogether*." (*Id.* ¶ 118; emphasis added.) [3]

---

[3] Plaintiffs' allegations in the complaint, including what McKesson knew about the consequences of raising its markup, are based on extensive discovery plaintiffs have already taken of McKesson as a third party in the MDL Class Case. After four depositions, and several subpoenas, plaintiffs fail to offer a coherent conspiracy theory or consistent allegations of fraud as they attempt to convert the failed manufacturer-publisher RICO claim into a wholesaler-publisher RICO claim.

Finally, plaintiffs here do not cite *any* facts to show that McKesson was aware of FDB's allegedly fraudulent misrepresentations regarding how its AWPs were derived. Although the complaint alleges that McKesson "was aware" of FDB's representations regarding its process for deriving AWPs, the complaint conspicuously omits any allegation that McKesson knew that FDB's representations were false. *Id.* ¶ 174; *see Pharm. II*, 307 F. Supp. 2d at 204-05 (pointing to the absence of allegations regarding an enterprise participant's knowledge of the fraud in finding that no RICO enterprise was alleged). Just as with the manufacturer-publisher enterprise that this Court previously dismissed, the requisite element of a common purpose for a McKesson-FDB enterprise has not been alleged.

### 2.    Plaintiffs Fail to Allege Anything Other than Conclusory, Barebones Allegations Regarding Other Enterprise Factors.

In addition to the absence of a common purpose, this Court rejected the manufacturer-publisher enterprise alleged in the MDL Class Case because the allegations regarding other enterprise factors were only conclusory and boilerplate. As the Court noted, the complaint "contains only conclusory allegations concerning systematic linkages and ascertainable structures;" "there are no allegations of a common command structure or any considered response to evolving conditions"; and "[a]llegations of a common communication network beyond the sending of AWP information to be published are barebones." *Pharm. II*, 307 F. Supp. 2d at 205.

Again, the same is true here. Like the MDL Class complaint, this complaint alleges only that "[t]he Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities" and a "common communication network" by which McKesson and FDB shared information on a "regular basis," typically by using the wires and mails to "discuss and agree on an AWP." (Compl. ¶ 153.) Because nothing more is alleged to show a factual basis for an association-in-fact enterprise, the dismissal result in *Pharm. II* is warranted here.

### B.    Plaintiffs' Allegations of Mail and Wire Fraud Are Illogical and Inadequately Pled to Support a RICO Claim.

Even if plaintiffs had properly pled the existence of a viable RICO enterprise, section 1962(c) imposes liability only on defendants that conduct the enterprise's affairs through "a pattern of

racketeering activity." 18 U.S.C. § 1962(c). The "racketeering activity" alleged here consists solely of mail and wire fraud under 18 U.S.C. sections 1341 and 1343. (Compl. ¶ 165.)

To prove mail or wire fraud, plaintiffs must show: (1) a "scheme to defraud," (2) "knowing and willful participation in the scheme with the intent to defraud," and (3) "the use of the mails or interstate wire or radio communication in furtherance of the scheme." *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 66 (1st Cir. 1998) (citing *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir. 1993)). Here, plaintiffs have failed to adequately plead all three elements.

**1.    Plaintiffs' Allegations Regarding the Timing of the Alleged Scheme Are Inconsistent And Defeat any Viable "Scheme to Defraud."**

To allege viable predicate acts of mail or wire fraud, plaintiffs must allege fraudulent acts that amount to a coherent scheme to defraud. A scheme to defraud refers to the overall design to defraud "by means of a common plan or technique." *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003). Where the overall design of the alleged scheme to defraud "defies logic," the fraud allegations cannot support a viable RICO claim. *See Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*, 777 F. Supp. 228, 239 (S.D.N.Y. 1991) (dismissing RICO claim because the alleged mail and wire fraud scheme was "economically unreasonable" and thus, "defie[d] logic," such that no predicate acts of fraud were properly alleged). As the Second Circuit noted, "[a] RICO claim, replete with the ruinous threat of treble damages, can not be assembled by cobbling together plainly inconsistent allegations of fraud." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992); *see also Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) ("inconsistent allegations of fraud cannot be the basis for a RICO claim"). The complaint in this case likewise presents a scheme to defraud that defies logic.

Plaintiffs allege that FDB and McKesson conspired to artificially increase the published AWPs of hundreds of drugs by 5%. The predicate acts of fraud plaintiffs cobble together are (1) McKesson's increase of its own markup to 25% over WAC, and its communication to FDB through an FDB survey of its increased markup, and (2) FDB's publication of AWPs based solely on McKesson's markup, in contravention of its representations to the public. The alleged timing of

these activities, however, is in conflict with the very framework of the scheme alleged, and therefore, plaintiffs fail to plead a "common plan or technique."

Thus, plaintiffs claim the alleged fraud commenced in late 2001 or early 2002, and culminated in the early months of 2002 with a "dramatic" spike in the number of AWPs with a 5% increase. At odds with the scheme, however, is plaintiffs' own pleading that FDB in fact continued to receive pricing information from other wholesalers in addition to McKesson through 2002-2003. (Compl. ¶ 125.) Thus, based on plaintiffs' own allegations, the AWPs published by FDB during the relevant time period of the conspiracy were based on input from multiple wholesalers, in contravention of the alleged scheme itself. In other words, the alleged artificial increase in AWPs experienced in early 2002 could not have resulted from the alleged 5% Scheme. By the time FDB allegedly stopped receiving information from wholesalers other than McKesson, the number of drugs whose published AWPs had increased by 5% had plummeted. (*See* Ex. A.) McKesson's and FDB's alleged fraudulent acts could not have become coordinated into a "common plan or technique" given the facts as plaintiffs allege them. Because plaintiffs have failed to plead a coherent scheme to defraud, there are no viable predicate acts of mail or wire fraud to support the RICO claim.

### 2. Plaintiffs Fail to Allege That McKesson Knew That FDB's Representations Were False and Thus That McKesson Was a "Knowing and Willful" Participant in the Alleged Scheme.

Even if, contrary to plaintiffs' own allegations, FDB stopped surveying wholesalers other than McKesson earlier, plaintiffs' fraud scheme still contains a glaring omission: factual allegations to show that McKesson knew that it was the only wholesaler surveyed, or that FDB's representations regarding its method of deriving AWP were false. As a result, the complaint fails to allege McKesson's "knowing and willful participation in the scheme."

The complaint alleges that FDB knew that McKesson had increased its own markup by 5% on scores of drugs. (*Id*. ¶ 115.) This fact would no doubt be apparent to FDB from its wholesaler survey. The complaint fails, however, to allege any facts to show that McKesson knew it was the only wholesaler being surveyed by FDB. (*See id.* ¶¶ 115, 174.) Indeed, while plaintiffs claim that FDB knew that it was falsely representing how it derived its AWPs (*i.e.*, from a survey of multiple wholesalers) (*id*. ¶ 110), plaintiffs never specifically allege that McKesson was aware that FDB's

12

representations were false.  Instead, plaintiffs only allege that McKesson was aware that "First Data made a series of representations as to the meaning of AWP and how it was derived." (*Id.* ¶ 174.)  For all McKesson knew, it was setting its own prices and reporting them as part of a survey presumably including other industry participants, the majority of whom likewise raised their prices.

> ### 3.    Plaintiffs Fail to Adequately Plead Fraudulent Mail or Wire Communications with Particularity.

RICO pleadings of mail and wire fraud must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b).  *Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997).  Specifically, to pass muster under Rule 9(b), plaintiffs must allege facts regarding "the time, place and content of the alleged mail and wire communications perpetrating that fraud." *N. Bridge Assocs.*, 274 F.3d at 43 (internal citations omitted).  Although the complaint is chock full of allegations, it fails to plead the necessary facts for the fraud alleged.

The complaint, for example, is devoid of facts as to how the allegedly fraudulent scheme was formed, saying only that there was an "agreement."  There are no specific factual allegations describing "the time, place and content" of the alleged communications perpetrating the fraud.  As noted above, there are no factual allegations regarding McKesson's knowledge of the fraud.  Because plaintiffs allege that other wholesalers participated in FDB's surveys until "some point in 2002-2003," neither McKesson nor the Court could possibly know which wire or mail communications made before 2004 were a part of the alleged Scheme and which communications were nothing more than McKesson's lawful participation in a wholesaler survey.  Thus, plaintiffs have failed to adequately allege under RICO any predicate acts of wire or mail fraud by McKesson consistent with Rule 9(b).

## II.   PLAINTIFFS' SECOND AND THIRD COUNTS UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 17500 AND 17200 SHOULD BE DISMISSED.

### A.   Under Massachusetts Choice of Law Principles, California Consumer Protection Laws Cannot Be Applied to the Named Plaintiffs' Claims.

Plaintiffs assert claims against McKesson under two California statutes,[4] making the conclusory allegation that "California courts have ruled that California statutes apply on a nationwide basis to the conduct of California corporations." (Compl. ¶ 177.)  A defendant's principal place of business does not, however, determine which forum's law applies.  The selection of the governing law is analyzed under the forum state's choice of law rules.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 82 (D. Mass. 2005) ("*Pharm. III*"); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-98 (1941).

In *Pharm. III*, this Court applied Massachusetts choice of law rules to similar claims of allegedly fraudulent AWPs in the MDL Class Case.  As in this case, the plaintiffs in *Pharm. III* argued that the consumer protection laws of the states where defendants resided should apply to plaintiffs and all the members of a proposed nationwide class.  *Pharm. III*, 230 F.R.D. at 82-83.  This Court rejected that argument, and concluded that under Massachusetts choice of law rules, the consumer protection statutes of "the home states of the consumers govern."  *Id* at 83.  The Court relied upon three significant factors of the Restatement (Second) of Conflict of Laws ("Restatement") section 148 to determine which state's laws should apply:  the place of action in reliance, the place where misrepresentations were received, and the place of plaintiff's domicile, noting that the first of these factors is the most significant.  *Pharm. III*, at 82-83.  The first factor clearly pointed to each class member's own state.

The Court's choice of law analysis in *Pharm. III* is equally applicable here.  Because none of the named plaintiffs reside in California, California law cannot govern.  Counts II and III invoking California law should therefore be dismissed.  *See Crellin Techs., Inc. v. Equipmentlease Corp.*,

---

[4] The asserted claims are under California Business and Professions Code section 17500 (Count II) and California Business and Professions Code section 17200 (Count III).

18 F.3d 1, 13 (1st Cir. 1994) (holding that a plaintiff's unfair trade practices claim pursuant to a Massachusetts statute was not actionable in the Rhode Island district court where the choice of law analysis dictated that Rhode Island law would apply).

**B.    Plaintiffs Have Not Stated a Claim For False Advertising Because They Do Not Allege That McKesson Made Any Misrepresentation or Knew that FDB's Representations Were False.**

Even if California statutes could apply to this class, the complaint fails to allege the facts necessary to support a false advertising claim in violation of California Business & Professions Code sections 17500 and 17200.  Section 17500 imposes liability on an entity that makes or disseminates any untrue or misleading statement before the public.  Cal. Bus. & Prof. Code § 17500.  Plaintiffs here have not alleged that McKesson made any misleading statements to anyone.  The only false statements made to the public are alleged to have been made by FDB.  (*See* Compl. ¶ 174.) ("First Data made a series of representations as to meaning of AWP and how it was derived, all of which were false.")  Thus, there is no basis for imposing primary liability against McKesson for false advertising.

Instead of alleging an actionable false representation made by McKesson, plaintiffs appear to allege that McKesson is somehow secondarily liable because it "was aware of" representations made by FDB.  (*Id.* ¶ 174.)  Plaintiffs, however, fail to allege that McKesson knew that FDB's representations regarding FDB's derivation of AWP were *false*.  (*Id.*)  To impose secondary liability, the secondary actor must, at a minimum, have known of the primary actor's misrepresentations.  *See Emery v. Visa Int'l Service Ass'n*, 95 Cal. App. 4th 952, 962 (2002) (aider and abettor liability requires that a person must have "knowingly aided" the scheme with "guilty knowledge" of the scheme); *People v. Tierney*, 253 Cal. App. 2d 1, 5-6 (1967) (determining that specific intent is a required element for conspiracy liability).  Plaintiffs, therefore, have not pled any claim of secondary liability against McKesson derived from any false representations made by FDB, and the false advertising claims must be dismissed as to McKesson.[5]

---

[5] Even if plaintiffs could invoke California law, they would not be entitled to the restitution they seek under Business & Professions Code sections 17200 and 17500.  Restitution is only available to restore money to a plaintiff that was wrongfully taken by the defendant.  *See Korea*

(Footnote continues on next page.)

### III.    PLAINTIFFS' SIXTH COUNT FOR CIVIL CONSPIRACY SHOULD BE DISMISSED.

In Count VI of the complaint, plaintiffs bring a claim for civil conspiracy. They do not, however, specify which states' laws apply. To make that determination, this Court must apply the choice-of-law principles of Massachusetts, the forum state. *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n.1 (2d Cir. 1956); *see also Crellin Techs., Inc.*, 18 F.3d at 4. As this Court has noted, for fraud and misrepresentation claims, like the ones underlying plaintiffs' civil conspiracy claim, Massachusetts choice of law rules dictate that the laws of each plaintiff's home state should apply. *Pharm. III*, 230 F.R.D. at 82-83.

The named plaintiffs are located in Massachusetts, Tennessee, and Pennsylvania. Under Massachusetts law, there are two types of civil conspiracy: an extremely limited cause of action for civil conspiracy of a coercive type, and a tort for concerted action where liability is imposed on one individual for the tort of another. *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 362-63 (D. Mass. 2002). Tennessee and Pennsylvania only recognize the second type of civil conspiracy, and for that type, require essentially the same elements as Massachusetts. Because plaintiffs fail to adequately plead either type of civil conspiracy available in Massachusetts (and thus likewise fail to plead a civil conspiracy claim under Tennessee and Pennsylvania law), the civil conspiracy claim should be dismissed. *See Okmyansky v. Herbalife Int'l of America, Inc.*, 343 F. Supp. 2d 57, 61 (D. Mass. 2004) (holding that when nothing turns on a difference between the laws of the interested states, the "court need not decide which body of law governs the dispute"); *see also Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1092 (1st Cir. 1989) ("When a choice-of-law question has been reduced to the point where nothing turns on more precise refinement, that should be the end of the matter.").

---

(Footnote continued from previous page.)

*Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144-49 (2003). In this case, the plaintiff class is not entitled to restitution from McKesson because they did not pay any money to McKesson. Dismissal of these California claims under the choice of law rules or pleading failures will obviate the need for a motion to strike plaintiffs' request for restitution.

### A.    Plaintiffs Fail to Allege an Actionable "Coercive" Civil Conspiracy.

To establish liability for the independent tort of conspiracy, plaintiffs must establish that by "mere force of numbers acting in unison or other exceptional circumstances," the defendants exercised "some peculiar power of coercion of the plaintiff . . . which any individual standing in a like relation to the plaintiff would not have had." *Fleming v. Dane*, 22 N.E.2d 609, 611 (Mass. 1939) (citation omitted). The conduct or coercion must also be unlawful. *See Neustadt v. Employers Liab. Assurance Corp.*, 21 N.E.2d 538, 540-41 (Mass. 1939).

Although plaintiffs allege that defendants conspired to raise the spread between reported WACs and AWPs, plaintiffs fail to identify any particular power that defendants incurred as a result of "force of numbers." *Grant*, 183 F. Supp. 2d. at 363 ("Under the stringent standard set by Massachusetts law for the independent tort of conspiracy, [plaintiff's] claim fails, even if he shows that the participants in each of the separate alleged conspiracies acted 'in unison.' Simply put, there was 'no force of numbers.'") (citation omitted). Plaintiffs also fail to assert any particular power of coercion that defendants possessed over them, or that defendants exercised such a power unlawfully. *Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 245 (D. Mass. 1999) ("The allegations of the complaint do not support this theory, however, because they are insufficient to plead the kind of 'peculiar power of coercion' over the plaintiff that the cause of action for 'true conspiracy' requires"). As a result, plaintiffs have failed to adequately allege a cause of action for the independent tort of conspiracy.

### B.    Plaintiffs Fail to Allege Any Other Type of Civil Conspiracy.

The second theory of civil conspiracy liability under Massachusetts law is "more akin to a theory of common law joint liability in tort." *Aetna Casualty Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994). For liability to attach, there must be, "first, a common design or an agreement between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Id.* The defendant must provide substantial assistance in the

17

tortious act of another, with the knowledge that such assistance is contributing to a common tortious plan. *Kurker v. Hill*, 689 N.E.2d 833, 837 (Mass. App. Ct. 1998).[6]

Here, plaintiffs allege that the defendants conspired to raise the spread between reported WACs and AWPs, to publish the AWPs that were allegedly inflated, and to "perpetuat[e] the use of inflated AWPs on a nationwide basis." (Compl. ¶ 192.) Plaintiffs rely on the alleged violations of RICO, state consumer protection laws, the common law, and acts of mail and wire fraud as the necessary underlying tortious acts.

Plaintiffs fail to adequately plead a cause of action for this second type of civil conspiracy because they essentially reiterate their other claims under the guise of civil conspiracy. Courts have specifically rejected this means of recovery. *See Grant*, 183 F. Supp. 2d at 364 ("Where the allegations of conspiracy add nothing to the underlying tort allegations, the courts have repeatedly held that 'the gist of such an action is not the conspiracy alleged, but the tort committed against the plaintiff.'") (quoting *Putnam v. Adams Comm. Corp.*, No. 84-0355-S, 1987 U.S. Dist. LEXIS 5768, at *24 (D. Mass. June 15, 1987)). Moreover, plaintiffs fail to specify any knowing assistance given by McKesson in the commission of an underlying tort by FDB. This failure to identify an underlying tortious act is fatal to their claim. *See McCarthy v. Hawes*, 12 N.E.2d 722, 725 (Mass. 1938) (holding that "[i]f there is no tort set out as to a single defendant, conspiracy adds nothing" except in cases of coercion). Plaintiffs have therefore failed to adequately state a viable claim under either theory of civil conspiracy, regardless of which state's law applies.

---

[6] The elements required to establish a civil conspiracy claim under Tennessee and Pennsylvania law do not materially differ from the elements required to show liability under this second theory of civil conspiracy. *See Hauck Mfg. Co. v. Astec Indus., Inc.*, 375 F. Supp. 2d 649, 660 (E.D. Tenn. 2004) ("The elements of a cause of action for civil conspiracy under Tennessee common law are (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage."); *General Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) ("In Pennsylvania, to state a cause of action, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.") (citation omitted).

**IV.    TO THE EXTENT PLAINTIFFS' FOURTH OR FIFTH COUNT IS ASSERTED AGAINST MCKESSON, IT SHOULD BE DISMISSED.**

Plaintiffs do not allege in Count IV that McKesson is liable under the California Legal Remedies Act ("CLRA"), California Civil Code section 1750, *et seq*., and explicitly state that this claim is asserted only "against First Data." (Compl. ¶ 182.) Nor do plaintiffs allege that McKesson is liable for negligent misrepresentation in Count V, where plaintiffs do not even mention McKesson and contend only that FDB is liable. (*Id*. ¶¶ 188-190.) To the extent plaintiffs may nevertheless seek to hold McKesson liable for either claim, through any reference in the civil conspiracy claim or by a theory of secondary liability, neither claim can survive scrutiny.

**A.    Plaintiffs Cannot State a California Consumer Legal Remedies Act Claim Against McKesson.**

Any attempt to state a claim against McKesson under the CLRA fails. First, as noted above, California consumer protection laws cannot apply to the non-California named plaintiffs. Second, there is no California authority that establishes any theory of secondary liability under the CLRA. Third, third party payors, such as plaintiffs, have no standing to recover under the CLRA. Only a consumer, which is defined as "an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family or household purposes" may sue under the statute. Cal. Civil Code § 1761(d); *see Cal. Grocers Ass'n v. Bank of America*, 22 Cal. App. 4th 205, 217 (1994). Plaintiffs, as third party payors, do not meet this definition.

**B.    Plaintiffs Cannot State a Negligent Misrepresentation Claim Against McKesson.**

Plaintiffs cannot state a negligent misrepresentation claim against McKesson under either a primary or secondary theory of liability.[7] First, to recover for negligent misrepresentation under Massachusetts law, a plaintiff must show that a defendant made "a false statement of a material fact"

---

[7] A negligent misrepresentation claim under Tennessee and Pennsylvania law is essentially the same as a claim under Massachusetts law. *See Honeycutt v. First Fed. Bank,* 278 F. Supp. 2d 893, 898 (W.D. Tenn. 2003) (Tennessee); *Duquesne Light Co. v. Westinghouse Elec. Corp*., 66 F.3d 604, 619 (3d Cir. 1995) (Pennsylvania). Analysis under Massachusetts law will thus suffice.

and that plaintiff relied on that false statement. *Rodowicz v. Massachusetts Mut. Life Ins. Co.*, 279 F.3d 36, 42 (1st Cir. 2002) (citing *Zimmerman v. Kent*, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991)). Plaintiffs here have not alleged that McKesson made any false statements upon which plaintiffs relied.

Second, a defendant cannot be secondarily liable for the negligence of a primary actor. *See Beal v. Broadard*, No. SUC2002-05765-C, 2005 Mass. Super. LEXIS 125, at **31-32, 19 Mass. L. Rep. 114 (Mass. Super. Ct. Feb. 4, 2005) (concluding that the law does not "permit[] the view" that defendants had conspired to commit the tort of negligence). Thus, plaintiffs cannot plead any negligent misrepresentation claim against McKesson.

## CONCLUSION

The conspiracy alleged is this case is a contrived one, developed after an earlier unsuccessful attempt to attribute it to other players in the pharmaceutical industry. Although the complaint is lengthy, it is devoid of a coherent theory tying McKesson to any scheme to defraud. For each of the reasons set forth above, McKesson respectfully requests that the Counts alleged against it be dismissed for failure to state a legally tenable claim.

<div style="margin-left:40%">

Respectfully submitted,
McKesson Corporation
By its attorneys:

</div>

Dated: October 19, 2005

<div style="margin-left:40%">

 _/s/ Joan M. Griffin_____
Joan M. Griffin, BBO # 549522
Michael P. Twohig, BBO # 648079
Perkins Smith & Cohen LLP
One Beacon Street, 30th Floor
Boston, MA 02108
tel. 617-854-4000
fax 617-854-4040

</div>

Of counsel:

Melvin R. Goldman
Lori A. Schechter
Tiffany Cheung
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
tel. 415-268-7000
fax 415-268-7522

(*pro hac vice* applications pending)

## CERTIFICATE OF SERVICE

I, Michael P. Twohig, hereby certify that a true and accurate copy of the above document was served on the attorney of record for each other party via the Court's electronic filing system and First Class U.S. Mail this 19th day of October, 2005.

 /s/ Michael P. Twohig

21

# EXHIBIT A





Number of NDCs with Spread Change from 20% to 25%, Jan 1999 – Oct 2004

**Complaint ¶ 10**