UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>NEW ENGLAND CARPENTERS )<br>HEALTH BENEFITS FUND, PIRELLI )<br>ARMSTRONG RETIREE )<br>MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE )<br>FUND OF PHILADELPHIA AND )<br>VICINITY; and PHILADELPHIA )<br>FEDERATION OF TEACHERS HEALTH )<br>AND WELFARE FUND, )<br> )<br>            Plaintiffs, )<br> )<br>v. )<br> )<br>FIRST DATABANK, INC., a Missouri )<br>Corporation; and McKESSON )<br>CORPORATION, a Delaware Corporation, )<br> )<br>            Defendants. )<br>_____) | Civil Action No. 1:05-CV-11148-PBS |

<u>PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT MCKESSON
CORPORATION'S MOTION TO DISMISS COMPLAINT</u>

1821.10 0001 MTN.DOC

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     ARGUMENT ..........................................................................................................2

    A.      Plaintiffs Properly Plead McKesson's RICO Violation..............................2

        1.      An overview of Plaintiffs' civil RICO claim and its
necessary elements...........................................................................2

        2.      Plaintiffs properly identify the RICO enterprise..........................2

            a.      The RICO "Enterprise" concept .........................................2

            b.      Plaintiffs sufficiently allege the enterprise's
common purpose ...............................................................3

        3.      Plaintiffs' mail-and-wire-fraud allegations supporting
their RICO claim are logical ............................................................6

        4.      Plaintiffs plead their RICO claim with sufficient particularity...................8

            a.      Rule 9(b)'s requirements...................................................8

            b.      The Complaint outlines the general scheme to defraud..................8

            c.      Plaintiffs sufficiently allege McKesson's knowledge
of the enterprise's illegal purpose ....................................9

            d.      Plaintiffs allege defendants' use of the U.S. mail and
interstate wire communications in furtherance of the
scheme with particularity ................................................10

III.    PLAINTIFFS' SECOND AND THIRD COUNTS UNDER CALIFORNIA
BUSINESS AND PROFESSIONS CODE SECTIONS 17500 AND 17200
PROPERLY STATE A CLAIM AGAINST MCKESSON...............................12

    A.      California Law May Be Applied to Plaintiffs' Claims .........................12

    B.      Plaintiffs Have Alleged That McKesson Made Numerous
Misrepresentations That McKesson Knew Were False .......................15

IV.     PLAINTIFFS HAVE PROPERLY ALLEGED A CIVIL CONSPIRACY
CLAIM ................................................................................................................17

    A.      California Law Applies for the Reasons Previously Stated....................17

B.      In the Alternative, the Law of the Fifty States Should Apply ...............................18

C.      Assuming Massachusetts Law Applies, Defendants' Motion
        Still Fails ..........................................................................................................19

        1.      Plaintiffs have properly pled a civil conspiracy claim under
                Massachusetts law...................................................................................19

V.      CONCLUSION.............................................................................................................20

## TABLE OF AUTHORITIES

## CASES

**Page(s)**

*Aetna Cas. Sur. Co. v. P&B Autobody,*
        43 F.3d 1546 (1st Cir. 1994)...............................................................................2

*Ahmed v. Rosenblatt,*
        118 F.3d 886 (1st Cir. 1997).............................................................................12

*Bank of the West v. Superior Ct.,*
        2 Cal. 4th 1254 (1992).......................................................................................16

*Bliss Valley Props., LLC v. Gedco, LLC,*
        2005 WL 1683749 (Mass. Super. 2005)...........................................................19

*Center Cadillac v. Bank Leumi Trust Co.,*
        808 F. Supp. 213 (S.D.N.Y. 1992)....................................................................11

*Clothesrigger, Inc. v. GTE Corp.,*
        191 Cal. App. 3d 605 (4th Dist. 1987)..............................................................15

*Copperbeech P'ship, Ltd. v. Seegel, Lipshutz & Wilchins, P.C.,*
        2004 WL 1431052 (Mass. Super. 2004)...........................................................19

*Corporacion Insular de Seguros v. Munoz,*
        826 F. Supp. 599 (D.P.R. 1993)..........................................................................9

*Cutler v. Federal Deposit Ins. Corp.,*
        781 F. Supp. 816 (D. Me. 1992)..........................................................................9

*Diamond v. Multimedia Sys., Inc. v. Superior Ct.,*
        19 Cal. 4th 1036 (1999).....................................................................................15

*Emery Corp. v. Century Bancorp., Inc.,*
        588 F. Supp. 15 (D. Mass. 1984).......................................................................13

*Emery v. VISA Int'l Serv. Ass'n,*
        95 Cal. App. 4th 952 (3d Dist. 2002).................................................................16

*Frankenbach v. Rose,*
        2004 WL 221319 (Tenn. Ct. App. 2004)..........................................................20

*George Lussier Enters. v. Subaru of New Eng., Inc.,*
        2000 U.S. Dist. Lexis 1080 (D.N.H. Jan. 13, 2000) ...........................................9

*Goebel v. Schmid Brothers,*
        871 F. Supp. 68 (D. Mass. 1994) ................................................................12, 13

*Grade v. Proctor & Gamble Prods.*,
    866 A.2d 437 (Pa. Super. 2005)................................................................20

*Grant v. John Hancock Mut. Life Ins. Co.*,
    183 F. Supp. 2d 344 (D. Mass. 2002) ..............................................19, 20

*Kesmodel v. Rand*,
    119 Cal. App. 4th 1128 (2d Dist. 2004).............................................17

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004), *cert. denied*,
    125 S. Ct. 877, 160 L. Ed. 2d 825 (U.S. 2005)................................18

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ...................................................................16

*Kuney v. Int'l, S.A. v. DiIanni*,
    746 F. Supp. 234 (D. Mass. 1990) .....................................................8

*Mosier v. Southern California Physician's Ins. Exch.*,
    63 Cal. App. 4th 1022 (2d Dist. 1998)..............................................17

*New England Data Servs., Inc. v. Becher*,
    829 F.2d 286 (1st Cir. 1987)............................................................12

*People v. Tierney*,
    253 Cal. App. 2d 1 (1st Dist. 1967) .............................................16, 17

*In re Pharm. Indus. Average Wholesale Price Litig. ("Pharm. I")*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ........................................ *passim*

*In re Pharm. Indus. Average Wholesale Price Litig. ("Pharm. II")*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ........................................ *passim*

*In re Pharm. Indus. Average Wholesale Price Litig. ("Pharm. III")*,
    230 F.R.D. 61 (D. Mass. 2005).................................................. *passim*

*Pocaro v. Chen*,
    2004 WL 3091558 (Mass. Super. Ct. Nov. 30, 2004) ......................19

*Prudential Ins. Co. v. United States Gypsum*,
    711 F. Supp. 1244 (D.N.J. 1989) ....................................................11

*Putnam v. Adams Committee Corp.*,
    1987 WL 13262 (D. Mass. June 15, 1987) .......................................20

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D. Mass. 2004)......................................................18

*State Farm Fire & Cas. Co. v. Superior Ct.*,
    45 Cal. App. 4th 1093 (2d Dist. 1996).............................................15

*Stone v. Regents of Univ. of Calif.*,
 77 Cal. App. 4th 736 (4th Dist. 1999)...................................................................17

*United States ex rel. Franklin v. Parke-Davis*,
 147 F. Supp. 2d 39 (D. Mass. 2001) ................................................................11

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
 208 F.3d 288 (1st Cir. 2000)...........................................................................18

*Wershba v. Apple Computer*,
 91 Cal. App. 4th 224 (6th Dist. 2001)..............................................................14

1821.10 0001 MTN.DOC

# I.    INTRODUCTION

McKesson's motion to dismiss plaintiffs' RICO claim is premised on the notion that the First Databank-McKesson enterprise is identical to the "hub and spoke" enterprises dismissed in *Pharm. I* and *Pharm. II*.[1]  McKesson's argument completely ignores the specific new facts that demonstrate active participation in a scheme to manipulate the WAC-AWP spread for their benefit.  The enterprise here is not a hub and spoke enterprise, but consists of two entities linked in a linear fashion who joined in a scheme to bump the WAC-to-AWP spread on hundreds of brand-name drugs specifically identified in the Complaint.  The Complaint identifies the time, place, and manner in which the scheme operated and unlike *Pharm I* and *Pharm II* outlines the knowing participation of each defendant and the specific benefits accruing to each from the enterprise's illicit conduct.  This is not a mirror image of the RICO claim dismissed in *Pharm. I* and *Pharm. II* and the elements of RICO have been adequately alleged.

The Complaint also states valid claims under California law, which should apply for reasons not present in *Pharm. I* and *Pharm. II*.  Plaintiffs' claims under California law are not "fraud" claims and do not require proof of reliance, hence *Restatement* § 148 does not apply with the same force as it did in *Pharm. III*.[2]  Both defendants are located in California and the scheme was hatched and executed in California.  California courts have applied California law to a nationwide class where defendants are California corporations and the misconduct emanates from California.  Such an application is consistent with authorities recognizing California's interest in its more liberal consumer laws being applied nationwide.  In these circumstances *Restatement* §§ 6 and 145 would favor application of California law.

---

[1] *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 181 (D. Mass. 2003) ("*Pharm. I*"); and *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 203 (D. Mass. 2004) ("*Pharm. II*").

[2] *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 181 (D. Mass. 2003) ("*Pharm. III*"), 230 F.R.D. 61 (D. Mass. 2005).

The Complaint also states a claim for civil conspiracy under California, Massachusetts, or the laws of fifty states, as it alleges the same basic elements required by all states for stating such a claim: a combination by two or more persons to do a wrongful act.

## II.    ARGUMENT

### A.    Plaintiffs Properly Plead McKesson's RICO Violation

#### 1.    An overview of plaintiffs' civil RICO claim and its necessary elements

Count I (¶¶ 148-71) asserts plaintiffs' claim against McKesson and First Data ("FDB") for violations of § 1962(c) of RICO. The count properly alleges all elements required by the RICO statute, First Circuit precedent, Rule 8(a) and, where applicable, Rule 9(b).

The following chart summarizes the requisite elements of plaintiffs' civil RICO claims and where each element is alleged:

| Elements of Civil RICO Claims: | ¶¶ 148-71 |
| --- | --- |
| "Persons" | ¶¶ 150-51 |
| "Enterprise(s)" | ¶¶ 152-56 |
| "Racketeering Activity" | ¶¶ 157-61 (Mail/Wire Fraud) |
| "Pattern of Racketeering Activity" | ¶¶ 165-68 |
| "Conduct" of Enterprise(s) | ¶¶ 162-64 |
| "Defendants' Motive" | ¶¶ 12, 124-25 |
| "Plaintiffs' Injury" | ¶¶ 169-71 |

#### 2.    Plaintiffs properly identify the RICO enterprise

##### a.    The RICO "Enterprise" concept

To satisfy the "enterprise" element, plaintiffs must allege "either the existence of a legal entity, such as a corporation, or that a group of individuals were associated-in-fact." *Aetna Cas. Sur. Co. v. P&B Autobody*, 43 F.3d 1546, 1557 (1st Cir. 1994); *Pharm. I*, 263 F. Supp. 2d at 181-82.

- 2 -

Among the factors considered in determining whether a RICO association-in-fact enterprise has been properly alleged, are the following: (i) whether the associates have a common purpose; (ii) whether there is "systematic linkage," such as overlapping leadership, structured or financial ties or continuing coordination; (iii) whether there is a common communication network for sharing information on a regular basis; and (iv) whether the associates hold meetings and sessions where important discussions take place.[3]

As set forth below, plaintiffs have specifically alleged the relevant criteria of the FDB/McKesson association-in-fact enterprise to demonstrate the existence of the enterprise, as required by this Court and by the First Circuit. *See Pharm. I*, 263 F. Supp. 2d at 183.

### b.    Plaintiffs sufficiently allege the enterprise's common purpose

McKesson claims that the enterprise here is the same as the publisher enterprises deemed insufficient for RICO purposes in *Pharm I* and *Pharm II*. McKesson is wrong. In *Pharm I*, the Court rejected the proposed publisher enterprises mainly due to precedent rejecting "hub and spoke" enterprises on the grounds that such enterprises lack a common purpose or structure. 263 F. Supp. 2d at 183-84. The Court noted that plaintiffs in *Pharm I* had also failed to allege an enterprise that constituted a continuing unit with a common purpose, or that the publishers benefited from the scheme. *Id*. at 184.

The enterprise here is not a "hub and spoke" enterprise and plaintiffs allege linkage, coordination and common purpose that was lacking in *Pharm. I* and *Pharm. II*. Instead of a rimless wheel that concerned the Court in *Pharm. I*, this association-in-fact is linear in nature and the Complaint alleges how the enterprise functioned to achieve a common purpose. ¶¶ 115, 126,

---

[3] *Pharm. I*, 263 F. Supp. 2d at 183 (citing *Libertad v. Welch*, 53 F.3d 428, 442-43 (1st Cir. 1994), and *Patrick*, 248 F.3d at 19); *Pharm. II*, 307 F. Supp. 2d at 203-04. The Court expressly clarified that no one factor was dispositive. *Pharm. I*, 263 F. Supp. 2d at 183.

- 3 -

130.  McKesson completely ignores the fact this is not a hub and spoke enterprise thus conceding the leadership, structure, and linkage factors and instead focuses on the alleged lack of common purpose.

Plaintiffs' allegations amply meet the *Pharm. I* and *II* test because they allege the detailed knowing participation by both FDB and McKesson.  In late 2001 or early 2002, FDB and McKesson reached agreement on how the WAC-to-AWP markup would be established.  Rather than use data from manufacturers or "survey" multiple wholesalers, FDB entered into an agreement with McKesson to use its mark up factor to determine the WAC-to-AWP spread for a large number of drugs.  As part of this agreement, McKesson, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount.  FDB and McKesson's action had the affect of raising the WAC-to-AWP spread by additional percentage points so as to have a 25% difference between pharmaceutical companies' reported WAC and the FDB published AWP.  This collaboration between FDB and McKesson to raise the WAC-to-AWP was done despite their knowledge that the manufacturers had suggested a 20% markup as appropriate.  ¶¶ 113-30.

Both McKesson and FDB had direct and substantial economic and business reasons for working together.  McKesson implemented this scheme in order to provide a benefit to its important retail pharmacy clients, as well as its own pharmacy-related business.  Pharmacies make a profit on the spread between AWP and their acquisition cost for a drug.  A higher WAC/AWP spread results in increased profits to pharmacies.  ¶ 124.  Thus, an increase in the WAC-to-AWP markup results in larger profits for retailers and McKesson.  ¶ 124(a).  McKesson's own internal documents describe the profitability of increasing spreads, the dynamics of the marketplace that can give rise to increased profits if McKesson were to

- 4 -

implement a scheme to increase spreads, and McKesson's implementation of the scheme.
¶¶ 116-18.

FDB agreed to this scheme in order to ease the burden of having to establish accurate spreads and to curry favor within McKesson so that McKesson would utilize FDB as the pricing source in its contracts with pharmaceutical companies and others in the distribution chain, thereby increasing FDB's business.  FDB also agreed to the scheme as part of an effort to increase the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP.  Thus, each defendant shared common purposes and each acted to achieve those purposes by implementation of the 5% scheme.  ¶ 125.

Plaintiffs thus allege that each defendant specifically benefited from the enterprise's *fraudulent* conduct.  These specific allegations contrast with the generalized common-purpose allegations against multiple publishers that this Court dismissed in the *Pharm. I* (*cf.*, 263 F. Supp. 2d at 185 ("[t]here is no allegation that the publishing companies even benefitted from the 'spread' scheme other than by the profits generated for publishing data provided to them")).  And unlike here, the *Pharm.* plaintiffs were unable to allege that every publisher-defendant knew their AWPs were fraudulent.  *Pharm. II*, 307 F. Supp. 2d at 204.

Another common purpose alleged in the Complaint is "(c) deriving increased profits from the activities of the Enterprise …."  ¶ 152(c).  McKesson argues that this Court previously recognized a broad RICO safe-harbor for "reaping a profit" – without regard to whether such reaping derives from fraud, murder or other illegal conduct.  McKesson is mistaken.  It supports this startling proposition with a flawed reading of *Pharm. II*.  True, this Court concluded that reaping a profit is "common to many human endeavors," and thus the quest for profit *alone* is insufficient as a "common purpose" to support a RICO enterprise allegation.  *Pharm. II*, 307 F.

Supp. 2d at 204.  But the Court plainly recognized the significance of whether the enterprise sought those profits through illegal acts.  *See supra* at 3; *Pharm. II*, 307 F. Supp. 2d at 204-05; *Pharm. I*, 263 F. Supp. 2d at 185.

Plaintiffs here allege that a profit motive was the ultimate motive behind defendants' enterprise.  But, as established above, this was not an objective obtained by innocent means. Plaintiffs allege that defendants pursued these profits by means of well-coordinated misconduct – fraudulent subversion of FDB's published AWP and spread figures notwithstanding the health-care industry's heavy reliance on such figures as a reimbursement benchmark.  ¶¶ 113-30.  The fact that defendants engaged in fraudulent conduct for the purpose of ***making money*** does not legitimize their fraud nor provides refuge for their illegal enterprise.[4]

Finally, McKesson asserts that plaintiffs did not allege that it knew of FDB's fraudulent conduct.  The Complaint in fact alleges such knowledge and does so with the particularity required by Fed. R. Civ. P. 9(b).  *See infra* at 9-10; *see also* ¶¶ 126, 128-29.

### 3.    Plaintiffs' mail-and-wire-fraud allegations supporting their RICO claim are logical

Asserting that plaintiffs' mail-and-wire-fraud allegations supporting their RICO claims are illogical, McKesson fundamentally misstates the allegations.  In doing so, McKesson ignores the perfect logic of this scheme.  Implementing a phony price bump of 5% benefited McKesson's largest customers (¶ 124(a)), its own pharmaceutical business (¶ 124(b)) and benefited FDB by: (a) reducing if not eliminating the costs of calculating AWPs, and (b) established FDB's published AWPs as the preferred choice of PBMs and others who benefit from a higher AWP-WAC spread.  ¶ 125.

---

[4] McKesson's effort to compare these allegation to those dismissed in *Pharm. II*, 307 F. Supp. 2d at 204, thus fails.  Plaintiffs allege much more than a "desire to profit" by FDB and they nowhere allege that FDB had a specific "desire to inflate AWPs."  *Cf.*, Def. Br. at 9.

To be clear, plaintiffs allege that in 2001 or 2002, FDB began ignoring pricing information from manufacturers and wholesalers to calculate AWP – except to use price increases as cover for bumping up the spread to 25%. ¶¶ 9, 113-15, 119-22, 126-28, 134. FDB, in conjunction with McKesson, instead fabricated AWPs (or published McKesson's phony numbers) in order to impose a blanket 25% WAC-AWP spread. ¶¶ 8, 110, 128, 130, 132, 134. It is consistent with these allegations that manufacturers and wholesalers eventually discovered FDB's practice. Many stopped providing pricing information to FDB. ¶¶ 125(c), 130, 137 ("First DataBank is no longer able to obtain information relating to list prices directly from wholesalers"). Plaintiffs allege that this occurred during the period 2002-03. ¶ 125(c).

The critical flaw in McKesson's argument is that nowhere do plaintiffs allege that FDB began rejecting pricing information *at the same time* it ceased using the information to calculate AWPs. The allegation that pricing information may have continued to dribble in for another year or so, and that some wholesalers/manufacturers eventually gave up providing this information, does not conflict with plaintiffs' allegations nor renders them "illogical."

McKesson also takes improper liberty with plaintiffs' allegations. It characterizes the Complaint as alleging that "wholesalers … continued to participate in FDB's surveys through '2002-2003.'" Def. Br. at 6 (citing ¶ 125(c)); *id.* at 13 (no citation, but quoting clause from first sentence of ¶ 125(c)). But ¶ 125(c) does not allege that FDB continued legitimate surveys of wholesalers after it launched the 5% spread scheme.[5] *See also* ¶ 128. Nor do plaintiffs allege, notwithstanding McKesson's misparaphrase, that "at that time [early 2002], FDB was basing its

---

[5] ¶ 125(c) alleges:

At some point in 2002-2003, certain manufacturers and wholesalers refused to provide First Data with pricing information. If First Data publically revealed that certain manufacturers and wholesalers were disavowing AWP, the use of the AWP system could be threatened. By participating in the Scheme and continuing the illusion of surveys, First Data maintained the demand for its services.

Blue Book AWP on information from multiple wholesalers." Def. Br. at 6. Tellingly, McKesson fails to cite any paragraph of the Complaint to support this brazen mischaracterization. In fact, plaintiffs' allegations are consistent throughout the Complaint that once defendants' launched their scheme, FDB relied solely on McKesson for "pricing" figures. ¶ 115.

### 4. Plaintiffs plead their RICO claim with sufficient particularity

#### a. Rule 9(b)'s requirements

The Complaint satisfies Rule 9(b) where "[t]he general outline of the general scheme to defraud … provides the defendant with notice of the grounds on which the plaintiff's claim is based." *Kuney Int'l, S.A. v. DiIanni*, 746 F. Supp. 234, 237 (D. Mass. 1990). This is precisely what the Complaint does here. Consistent with its pattern of selective citation to this Court's *AWP* decisions, McKesson ignores that the Court already rejected the argument that plaintiffs must specifically plead "the time, date and place of specific statements" between the enterprise's participants. *Pharm. II*, 307 F. Supp. 2d at 208 (summarizing *Pharm. I*, 263 F. Supp. 2d at 194). The Court directed plaintiffs to add specificity as to certain issues, which did not include the time, date and place of statements. *Pharm. I*, 263 F. Supp. 2d at 194.[6]

#### b. The Complaint outlines the general scheme to defraud

The Complaint identifies the time the scheme was implemented (¶¶ 113, 115) and identifies the specific drugs at issues. *See* Complaint, Ex. A. It then outlines with precision the operation of the scheme and how the conspirators communicated and implemented the arbitrary WAC-to-AWP markup. ¶¶ 113-30. These allegations more than satisfy Rule 9(b) in the circumstances where the facts underlying the fraud are within defendants' control.

---

[6] The Court required plaintiffs to outline the general scheme and to identify the fraudulent AWPs. Here plaintiffs have identified each drug subject to the arbitrary 5% spread increase. *See* Complaint, Ex. A.

### c.    Plaintiffs sufficiently allege McKesson's knowledge of the enterprise's illegal purpose

McKesson asserts that plaintiffs did not sufficiently plead its knowledge of FDB's illegal activity, but says nothing about the governing pleading standard. Rule 9(b) explicitly permits plaintiffs to allege this knowledge generally. Fed. R. Civ. P. 9(b); *George Lussier Enters. v. Subaru of New Eng., Inc.*, 2000 U.S. Dist. Lexis 1080, at *29 (D.N.H. Jan. 13, 2000); *Cutler v. Federal Deposit Ins. Corp.*, 781 F. Supp. 816, 818 n.5 (D. Me. 1992). Plaintiffs are not required to allege that defendants "knowingly" engaged in the fraud if it is obvious from the facts alleged that the acts were committed knowingly. *See Corporacion Insular de Seguros v. Munoz*, 826 F. Supp. 599, 610 (D.P.R. 1993) (denying motion to dismiss RICO claim because "the Court fails to perceive how participation in the … enterprise alleged … could be anything but 'knowing'").

Plaintiffs more than satisfy this liberal standard. Their allegations demonstrate that McKesson's participation in the enterprise could not have been without knowledge. McKesson misspeaks when it states that "plaintiffs only allege that McKesson was aware that 'FDB made a series of representations as to the meaning of AWP and how it was derived.'" Def. Br. at 13.

But plaintiffs allege far more than that. They allege that McKesson knew full well FDB was generating fraudulent spreads. McKesson (and the rest of the industry) understood the importance that published AWP figures were accurate and substantiated. ¶¶ 93-103. McKesson knew FDB's professed procedures for establishing a drug's AWP and the ensuring WAC-to-AWP spread. ¶¶ 102 (FDB publicly describes procedure), 111 (same). Yet FDB ceded control to McKesson over its publication of AWP and spread information. ¶ 162(d). By agreement with McKesson, FDB used only FDB's information to set the published AWP. ¶ 115. McKesson provided FDB with its WAC-to-AWP spread. ¶ 163. FDB then began publishing the AWP and

spread figures provided by McKesson – figures that McKesson knew were baseless. *Id.* Indeed, this was the scheme's fundamental purpose, and FDB took its instructions from McKesson. ¶ 163. McKesson and FDB also communicated regularly about the scheme's progress (¶¶ 153-54), and agreed as to how to camouflage the scheme. ¶ 126. The conspirators discussed how to handle manufacturers who would not "play" along with the scheme. ¶ 129. These allegations belie McKesson's protestations of ignorance and establish at least that it must have known that FDB's AWP figures were fabricated.

Nor can McKesson feign ignorance by asserting the absence of "any facts to show that McKesson knew it was the only wholesaler being surveyed by FDB." Def. Br. at 12. Plaintiffs in fact allege that whenever a McKesson customer called McKesson that an FDB published AWP was incorrect McKesson – knowing that by agreement what ever it stated was the AWP became FDB's AWP, would immediately call FDB to get it "fixed." ¶ 129. McKesson not only knew that the wholesale pricing figures it provided FDB were fabricated, it knew that they did nothing to verify them ***and*** that, pursuant to their scheme, FDB stopped using pricing information from other wholesalers to determine AWPs. ¶¶ 9, 115, 129-30. Plaintiffs have more than generally alleged McKesson's knowledge of defendants' fraudulent conduct, which is all that Rule 9(b) requires.[7]

### d.   Plaintiffs allege defendants' use of the U.S. mail and interstate wire communications in furtherance of the scheme with particularity

While courts in this Circuit require plaintiffs to allege the circumstances of the mail or wire fraud alleged, that requirement does not, as defendants suggest, require plaintiffs to describe every act of mail or wire fraud in the alleged conspiracy. *Pharm. II*, 307 F. Supp. 2d at 208;

---

[7] FDB knew as well. Plaintiffs amply plead that FDB knew its published AWPs and spreads were false. *E.g.*, ¶ 154. Further, these detailed allegations of McKesson's knowledge support the enterprise allegations.

*United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001) (Saris J.) ("[w]here the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.  Courts … have not placed the bar so high…."). *See also Prudential Ins. Co. v. United States Gypsum*, 711 F. Supp. 1244, 1263 (D.N.J. 1989) (citation omitted) (finding that plaintiffs need not plead the "date, place or time" of the fraud, so long as they inject precision and some measure of substantiation into their allegations of fraud); *Center Cadillac v. Bank Leumi Trust Co.,* 808 F. Supp. 213, 229 (S.D.N.Y. 1992) ("[t]he complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used").

Plaintiffs here have described in sufficient detail the mechanisms of defendants' conspiracy and have sufficiently described how it was accomplished by mail and wire fraud. Notably, the Complaint enumerates at least six ways in which defendants used interstate mail or telecommunication facilities to accomplish the scheme described in the Complaint, including, *inter alia*, disseminating marketing materials about FDB's services to health-care providers, written and spoken exchanges between McKesson and FDB regarding AWPs and markups, e-mails between McKesson and FDB agreeing to manipulate AWPs, and communicating fraudulent AWPs to the government and insurers.  ¶ 161.  These allegations describe the general contents of defendants' communications and to whom they were sent and why.  *Id*.

Moreover, where, as here, plaintiffs allege that the fraudulent use of the mails and wires involved defendants' own sales, research and marketing materials, courts find that many of the

- 11 -

details are peculiarly within the defendants' knowledge.[8]  Plaintiffs here similarly allege that

defendants used the wires and U.S. mails for disseminating marketing materials and therefore

have described the mechanisms of defendants' scheme with sufficient particularity.  *See*, *e.g.*,

¶¶ 102, 111-12, 160, 161(a).[9]

### III.    PLAINTIFFS' SECOND AND THIRD COUNTS UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTIONS 17500 AND 17200 PROPERLY STATE A CLAIM AGAINST MCKESSON

### A.    California Law May Be Applied to Plaintiffs' Claims

California law may be applied to plaintiffs' claims because ***all*** of the misrepresentations

McKesson made emanated from California.  To dispute that California law should be applied to

its conduct, McKesson largely relies on this Court's decision in *Pharm. III*; however, the

reasoning of that decision does not apply to the facts of this case.

In *Pharm. III*, after acknowledging that Massachusetts courts look to the *Restatement*

*(Second) Conflict of Laws* in determining choice of law rules, the Court noted that, under § 148

of the *Restatement*, which relates to "Fraud and Misrepresentation," "the most significant factor

is where the plaintiff acted in reliance on [the] defendant's representation."  230 F.R.D. at 82-3

(quoting *Restatement* § 148 cmt. g).  However, although the facts in *Pharm. III* might have some

similarity to the facts in this case, there are important differences that justify a different result

here.  Indeed, as this Court knows, Massachusetts courts do not mechanically apply the factors

set forth in *Restatement* § 148.  *See Goebel v. Schmid Bros.*, 871 F. Supp. 68, 75 (D. Mass.

---

[8] McKesson's single authority involved a complaint asserting far more conclusory allegations.  *See Ahmed v. Rosenblatt*, 118 F.3d 886, 889 (1st Cir. 1997) (plaintiff alleged only "the bald assertion that the defendants (unspeci-fied) used the U.S. mails to fraudulently convey their interests in [plaintiff's] properties, that the defendants (again unspecified) used the U.S. Postal Service by mailing unspecified materials, and that the defendants used wire communications").

[9] In the event this Court determines that plaintiffs' RICO claims are not pled with sufficient particularity, plaintiffs request permission to conduct additional discovery pursuant to the First Circuit's decision in *New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987), and also request the opportunity to subsequently amend their complaint after completing that discovery.

1994); *Emery Corp. v. Century Bancorp., Inc.*, 588 F. Supp. 15, 18 (D. Mass. 1984) ("the Massachusetts courts have cautiously avoided locking themselves into a mechanical application of Restatement standards") (citing *Cohen v. McDonnell Douglas Corp.*, 450 N.E.2d 581, 586-87 (Mass. 1983)). How the factors are applied in a given case depend on the facts of that case.

In *Pharm. III*, the Court held that the most significant factor to consider was where the class members, Medicare Part B beneficiaries who make co-payments, purchased the relevant physician-administered drugs. 230 F.R.D. at 83 ("The class members purchased physician-administered drugs in reliance on the published AWPs in states where they were receiving treatment from their physicians, typically their places of residence.").

In contrast to *Pharm. III*, the Class proposed here relied on McKesson's misrepresentations in a different manner. In this action, the Class is defined as "[a]ll persons or entities who . . . paid any portion of the purchase for a prescription drug at a price calculated by reference to the AWP ***published by First Data.***" ¶ 138 (emphasis added). The act of reliance at issue here is specifically on FDB's publication of its AWP rather than the manufacturers' publication of inflated AWPs generally. Plaintiffs allege that McKesson knew both (1) that the marketplace used AWP as a benchmark by which to negotiate reimbursement rates and (2) that FDB represented its AWP as being empirically substantiated by "wholesaler surveys." Despite having this knowledge, McKesson arbitrarily increased the WAC-AWP mark-up, knowing it would be cited as a basis for FDB's publication of AWPs. Therefore, under the facts alleged, the act of reliance by the Class was not at the point of sale, where class members paid for the purchase of a drug based on AWP, but at the time of FDB's publication of ***false*** AWPs, and when McKesson made representations that it knew would be relied on based on what FDB told the pharmaceutical marketplace about how it calculated its AWPs.

- 13 -

Comment h to Section 148 of the *Restatement* recognizes the distinction between logistics of the misrepresentations made in *Pharm. III* and the misrepresentations made by McKesson here by providing:

> h. ***The place where the defendant made the false representations.*** This contact is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons or to tangible things (see §§ 146-147). ***The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more.*** When a major part of the representations is made in one state and a lesser part in another, the first state has a more important contact with the occurrence than does the latter.

(Emphasis added.)  Thus, while the location of the defendants' misrepresentations played only a small role in the Court's choice of law analysis in *Pharm. III* because the defendants' misrepresentations had been made across the country when consumers purchased physician-administered drugs, here McKesson's misrepresentations were not made at the time of sale of the drugs whose AWPs McKesson's actions inflated, but rather were made when McKesson reported a fraudulent and inflated WAC-AWP spread from its principal place of business in California.

Indeed, when interpreted along with § 6 of the *Restatement*, as Massachusetts law provides, it is clear that the most relevant factor should be the place McKesson made its misrepresentations.  Section 6(2) provides in pertinent part that in choosing the law to apply this Court must also analyze the relevant policies of California and its interest in the determination of the particular issue.  In that regard, California courts have ruled that California statutes apply on a nationwide basis to the conduct of California corporations such as McKesson where even some of the challenged conduct originates in California.  *See Wershba v. Apple Computer*, 91 Cal. App. 4th 224, 243 (6th Dist. 2001) (holding "a California court may properly apply [§ 17200] to

- 14 -

non-California members of a nationwide class where the defendant is a California corporation and some or all of the challenged conduct emanates from California").[10]  In addition, under California law it would be inconsistent to focus on the location of the plaintiffs' reliance on McKesson's misrepresentations because Section 17200 itself does not require proof of reliance in order to establish a claim.  *See, e.g., State Farm Fire & Cas. Co. v. Superior Ct.*, 45 Cal. App. 4th 1093, 1105 (2d Dist. 1996) ("Finally, the 'fraud' contemplated by section 17200's third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived. . . . This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.") (internal and end citations omitted).[11]

**B.     Plaintiffs Have Alleged That McKesson Made Numerous Misrepresentations That McKesson Knew Were False**

McKesson next claims that plaintiffs' Section 17500 claim should be dismissed because plaintiffs have not alleged that McKesson made any misleading statements.  On the contrary, plaintiffs have alleged not only that McKesson itself made representations about the WAC-AWP spread that McKesson knew to be false, but also that it acted to deliberately conceal its misrepresentations from the Class.  Specifically, the Complaint alleges that:

> • McKesson knew that end payors utilize AWP as a pricing benchmark and view AWP as a reasonably accurate measurement of list and transaction prices.  ¶¶ 5, 136.

---

[10] *See Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 614, 616 (4th Dist. 1987) (California courts apply California's more favorable laws to benefit non-resident plaintiffs when plaintiffs' home states have no interest in denying such recovery); *Diamond v. Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1064 (1999) (California has greater interest in applying UCL to corporations headquartered in California and where the wrongful acts took place in California).

[11] If this Court holds that California law should not be applied to plaintiffs' claims, plaintiffs respectfully request that the Court dismiss the entire case without prejudice so that the case can be refiled in the home state of both defendants.

- Even knowing the effect its actions would have on the Class, McKesson increased the WAC-AWP by 5%, even though "McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace.  Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients."  ¶ 115.

- McKesson concealed the Scheme with FDB by effectuating the increase in WAC-AWP markup at the time some WAC-based price announcement was made by a drug maker.  ¶¶ 9, 126.

- McKesson did not disclose its Scheme with FDB to the pharmaceutical marketplace.  ¶ 136.

Based on the above, plaintiffs have clearly alleged that McKesson made untrue and misleading statements – or statements that it should have known were untrue and misleading – to the Class.

McKesson further claims that plaintiffs have only alleged a theory of derivative liability based on McKesson's awareness of FDB's representations which McKesson claims plaintiffs have not alleged McKesson knew to be false.[12]  But plaintiffs have not alleged a theory of derivative liability; rather, as set forth above, the Complaint alleges that McKesson itself made misrepresentations about the WAC-AWP spread and that it acted deliberately to conceal those misrepresentations from the Class.[13]

---

[12] McKesson further argues in a footnote that plaintiffs are not entitled to restitution under Sections 17200 or 17500 of the California Business & Professions Code because plaintiffs have not received any money from McKesson.  On the contrary, California courts have routinely held that Section 17200 authorizes courts "to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an unfair practice."  *Bank of the West v. Superior Ct.,* 2 Cal. 4th 1254, 1267 (1992).  The case on which McKesson relies for the proposition that restitution is not permitted unless the plaintiff received money from the defendant, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003), does not so hold.  Rather, *Korea Supply* simply held that it was improper to order disgorgement of profits to a fund to be distributed to those **who had not been injured at all**.  *Id.* at 1144-45.  Here, plaintiffs have clearly alleged – and McKesson does not dispute – that the named plaintiffs have been injured by the conduct alleged in the Complaint.

[13] The cases McKesson cites, *Emery v. VISA Int'l Serv. Ass'n*, 95 Cal. App. 4th 952 (3d Dist. 2002) and *People v. Tierney*, 253 Cal. App. 2d 1 (1st Dist. 1967), do not support its argument.  *Emery* held that VISA's mere lending of its logo to allegedly illegal lottery solicitations did not constitute unfair conduct under Section 17200 and *Tierney* merely holds that knowledge of the law being violated is not required to establish specific intent under Section 17500.  Here, plaintiffs' allegations of McKesson's misrepresentations far exceed what the *Emery* plaintiff alleged

- 16 -

## IV.    PLAINTIFFS HAVE PROPERLY ALLEGED A CIVIL CONSPIRACY CLAIM

### A.    California Law Applies for the Reasons Previously Stated

As noted above, California courts have consistently applied California law to a nationwide class where the defendants are California corporations. *Supra* at 14-15 and n.10. Under California law, the elements of a civil conspiracy are:  (1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting.[14] Plaintiffs have sufficiently pled each such element.

With respect to the first and second elements, plaintiffs allege that FDB and McKesson reached an agreement on how the WAC-to-AWP markup would be established for hundreds of brand-name drugs.  ¶ 8, 113-33.  As part of this agreement, FDB used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers as it represented to the public.  *Id.*  Plaintiffs further allege that at the same time, McKesson, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount. ¶¶ 9, 115, 122.  Then, FDB, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace published new AWPs.  *Id.*  Plaintiffs further allege that FDB's action had the effect of raising the WAC-AWP spread.  *Id.*  Clearly, these allegations amply set forth facts regarding the formation and operation of the conspiracy and the wrongful acts.

With respect to the third element, plaintiffs allege that defendants' unlawful conduct

---

regarding VISA and plaintiffs have sufficiently alleged that McKesson knew its representations were false to put McKesson's actions far beyond the purview of *Tierney*.

[14] *Kesmodel v. Rand*, 119 Cal. App. 4th 1128, 1144 (2d Dist. 2004); *Stone v. Regents of Univ. of Calif.*, 77 Cal. App. 4th 736, 748 n.9 (4th Dist. 1999); *Mosier v. Southern California Physician's Ins. Exch.*, 63 Cal. App. 4th 1022, 1048 (2d Dist. 1998).

- 17 -

caused members of the proposed class to make billions of dollars of inflated payments for pharmaceuticals that were subject to the wrongful increase of the WAC-to-AWP markup factor. ¶¶ 1, 14, 16, 119, 169, 170, 185, 196. Clearly, these allegations satisfy the pleading requirements for damages.

**B.      In the Alternative, the Law of the Fifty States Should Apply**

As an alternative argument, plaintiffs assert the Court's analysis in *Pharm. III* is equally applicable to plaintiffs' civil conspiracy claim.

In *Pharm. III,* the Court dealt with the differences in the states' laws by grouping the claims of class members from states with similar laws for trial. *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296-97 (1st Cir. 2000); *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 278-87 (D. Mass. 2004); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."), *cert. denied*, 125 S. Ct. 877, 160 L. Ed. 2d 825 (U.S. 2005).

In light of the Court's holding in *Pharm. III*, this Court should, if California law does not govern, permit plaintiffs to proceed with its civil conspiracy claim under the laws of the fifty states.[15] As set forth above, plaintiffs have alleged the elements of a civil conspiracy that fully comport with California law. To the extent that differences exist in the laws of the fifty states, that issue is appropriately dealt with at the class certification stage; not on a motion to dismiss. And in Appendix A hereto, plaintiffs present a survey demonstrating little variation in the law of civil conspiracy. Therefore, plaintiffs argue in the alternative that they should be permitted to

---

[15] To the extent that plaintiffs' Complaint does not specify the specific state statutes or rule applicable to civil conspiracy claims in the fifty states, and to the extent that this Court deems such pleading necessary, plaintiffs respectfully request leave of court to amend the Complaint accordingly.

proceed with their civil conspiracy claim under the laws of the fifty states.

## C.    Assuming Massachusetts Law Applies, Defendants' Motion Still Fails

### 1.    Plaintiffs have properly pled a civil conspiracy claim under Massachusetts law

Defendant McKesson contends that plaintiffs have failed to properly plead the elements of a civil conspiracy under Massachusetts law.  In Massachusetts, two types of civil conspiracies exist.  *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 362 (D. Mass. 2002). [16]

If the conspiracy lies on a theory of "concerted action," the element of coercion is not required and the plaintiff need only "demonstrate that a combination of persons acted pursuant to an agreement to injure the plaintiff."  *Pocaro v. Chen*, 2004 WL 3091558, at *3 (Mass. Super. Ct. Nov. 30, 2004) (citing *Gutierrez v. Mass. Bay*, 437 Mass. 396, 415 (2002)).

In order to properly plead the second type of conspiracy, "plaintiff must allege, 'first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious acts in furtherance of the agreement.'"  *Copperbeech P'ship, Ltd. v. Seegel, Lipshutz & Wilchins, P.C.,* 2004 WL 1431052 (Mass. Super. 2004) (citing *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1564 (1st Cir. 1994)).  In other words, "a defendant may be held liable for actions done by others pursuant to a common design or with the defendant's substantial assistance or encouragement." *Grant,* 183 F. Supp. 2d at 363 (citations omitted).  Such a scheme has clearly been alleged.  *See* ¶¶ 8, 113, 115, 122, 194.

Clearly, these allegations are sufficient to show "a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage

---

[16] "The element of coercion has been required only if there was no independent basis for imposing tort liability – where the wrong was in the particular combination of the defendants rather than in the tortious nature of the underlying conduct."  *Bliss Valley Props., LLC v. Gedco, LLC*, 2005 WL 1683749, at *5 (Mass. Super. 2005) (citing *Neustadt v. Employers' Liab. Assur. Corp.*, 303 Mass. 321, 325 (1939)).

the achievement of the result."  Therefore, plaintiffs have properly pled a concerted action civil conspiracy claim under Massachusetts law.

Defendant argues that plaintiffs rely upon the violations of RICO, state consumer protection laws, the common law, and acts of mail and wire fraud as the necessary underlying tortious acts.  Def. Br. at 18.  For that reason, defendant asserts that "[c]ourts have specifically rejected this means of recovery" because "they essentially reiterate their other claims under the guise of a civil conspiracy" citing *Grant, supra,* in support of this proposition.  *Id.*  As an initial matter, *Grant* is distinguishable as that court was deciding a motion for summary judgment. 183 F. Supp. 2d at 364.  Moreover, the quoted language from *Grant* comes from *Putnam v. Adams Comm. Corp.,* 1987 WL 13262, at *9 (D. Mass. June 15, 1987), which specifically dealt with the ***first*** type (coercive) of conspiracy, not the ***second*** (concerted action).  Therefore, defendant's reliance on the quoted language is misplaced.  Furthermore, if courts were to accept defendant's argument, it would effectively vitiate ***all*** concerted action civil conspiracy claims because one of the pleading requirements is a tortious act (or acts) done in furtherance of the conspiracy.  *See*, *Copperbeech*, *supra.*  Defendant's argument, therefore, is illogical and must fail.[17][18]

## V.    CONCLUSION

For the reasons set forth above defendants' motion should be denied.

---

[17] To the extent Pennsylvania law applies, the Complaint pleads the necessary elements.  *Grade v. Proctor & Gamble Prods.*, 866 A.2d 437, 440 (Pa. Super. 2005); *and see Frankenbach v. Rose*, 2004 WL 221319, at 20 (Tenn. Ct. App. 2004), if Tennessee law applies.

[18] Counts IV and V are not asserted against McKesson.

DATED:  November 2, 2005

By _____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

1821.10 0001 MTN.DOC

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

## CERTIFICATE OF SERVICE

I, Steve W. Berman, hereby certify that a true and correct copy of the above document was served on the attorney of record for each party via the Court's electronic filing system and First Class Mail this 2nd, November, 2005.

_____/s/ Steve W. Berman_____
Steve W. Berman

Appendix A:
COMPREHENSIVE SURVEY OF STATE CIVIL CONSPIRACY LAW

| STATE | SALIENT ELEMENTS |
|---|---|
| Alabama | A civil conspiracy is a combination of two or more individuals to accomplish a lawful end by unlawful means. *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. Apr. 16, 1993) (citing other cases). |
| Alaska | A civil conspiracy is an agreement of two or more persons, in concerted action, to perform a wrongful act in furtherance of the agreement, resulting in damages. *Summers v. Hagen*, 852 P.2d 1165, 1169 (Alaska May 28, 1993). |
| Arizona | A civil conspiracy is an agreement by two or more people to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means. *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust, Inc.*, 5 P.3d 249, 256 (Ariz. Ct. App. 2000) (quoting *Rowland v. Union Hills Country Club*, 757 P.2d 105, 110 (1988)). |
| Arkansas | "To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive, or immoral means, to the injury of another." *Allen v. Allison*, 2004 Ark. Lexis 157, at *11-12 (Ark. Mar. 11, 2004). |
| California | The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from a wrongful act done in furtherance of the common design. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 456-57 (Cal. 1994) (quoting another case). |
| Colorado | A civil conspiracy involves two or more persons; an object to be accomplished; a meeting of the minds on the object or course of action; an unlawful overt act or unlawful means to a lawful end; and damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). |
| Connecticut | A civil conspiracy is a combination of two or more persons committing an unlawful act or a lawful act by unlawful means, in furtherance of the conspiracy, resulting in damage. *Harp v. King*, 835 A.2d 953, 972-73 (Conn. 2003). |
| Delaware | A civil conspiracy is a confederation or combination of two or more persons; an unlawful act done in furtherance of the conspiracy; and actual damage. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987). |
| District of Columbia | A civil conspiracy is an agreement between two or more persons to participate in an unlawful act, or a lawful act in an unlawful manner, and the commission of an unlawful overt act in furtherance of the common scheme, resulting in damage. *Halberstam v. Welch*, 705 F.2d 472, 477-78 (D.C. Cir. 1983). |
| Florida | A civil conspiracy is a conspiracy between two or more parties to do an unlawful act or to do a lawful act by unlawful means, and the commission of some overt act in pursuance of the conspiracy, resulting in damage. *Florida Fern Growers Ass'n v. Concerned Citizens of Putnam County*, 616 So. 2d 562, 565 (Fla. Dist. Ct. App. 1993). |
| Georgia | A civil conspiracy is a confederation of two or more persons to do an unlawful act, or to do a lawful act by unlawful means, resulting in damages. *Woodruff v. Hughes*, 58 S.E. 551, 552-53 (Ga. Ct. App. 1907). |
| Hawaii | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish a lawful act by unlawful means. *Robert's Haw. School Bus., Inc. v. Laupahoehoe Transp. Co., Inc.*, 982 P.2d 853, 881 n.28 (Haw. July 15, 1999). |
| Idaho | A civil conspiracy is a combination of conspirators to commit a wrongful act resulting in injury. *Dahlquist v. Mattson*, 233 P. 883, 885-86 (Idaho 1925). |
| Illinois | A civil conspiracy is a combination of two or more persons for the purpose of accomplishing an unlawful purpose or a lawful purpose by unlawful means, and the commission of an overt tortious or unlawful act. *Fritz v. Johnston*, 807 N.E.2d 461, 470-71 (Ill. 2004). |
| Indiana | A civil conspiracy is a combination of two or more who, by a concerted action, seek to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means. *Durakool, Inc. v. Mercury Displacements Indus., Inc.*, 422 N.E.2d 680, 682 (Ind. Ct. App. 1981). |
| Iowa | A civil conspiracy is an agreement of two or more persons to accomplish an unlawful purpose, or to accomplish by unlawful means a lawful act. *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002). |
| Kansas | A civil conspiracy is two or more persons with a meeting of the minds on the object or course of action and the commission of an unlawful overt act, resulting in damages. *Citizens State Bank v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979). |

| | |
|---|---|
| Kentucky | A civil conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act by unlawful means. *Smith v. Board of Educ.*, 94 S.W.2d 321, 325 (Ky. 1936). |
| Louisiana | A civil conspiracy is an agreement of two or more persons to do an unlawful act, or to do a lawful act in an unlawful manner, and the commission of an overt act. *State v. McIlhenny*, 9 So. 2d 467, 472-73 (La. 1942). |
| Maine | A civil conspiracy is a combination of two or more persons who, by concerted action, seek to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means. *Cohen v. Bowdoin*, 288 A.2d 106, 109-10 (Me. 1972). |
| Maryland | A civil conspiracy is an agreement of two or more persons to do an unlawful act, or to do a lawful act with unlawful means, resulting in damages. *Hoffman v. Stamper*, 843 A.2d 153, 178-79 (Md. Ct. Spec. App. 2004), *cert. granted*, 851 A.2d 593 (Md. Ct. Spec. App. 2004). |
| Massachusetts | A civil conspiracy is a combination of two or more persons to do an unlawful act or to do a lawful act with unlawful means. *Baron v. Smyly*, 1995 Mass. Super. Lexis 454 (Mass. Sup. Ct. 1995). |
| Michigan | A civil conspiracy is a combination of two or more persons, by some concerted action, to do an unlawful act or to do a lawful act with unlawful means, resulting in damages. *Fenestra Inc. v. Gulf American Land Corp.*, 141 N.W.2d 36, 48-49 (Mich. 1966). |
| Minnesota | A civil conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Lipka v. Minnesota Sch. Employees Ass'n Local 1980*, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995). |
| Mississippi | A civil conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Roussel v. Hutton*, 638 So. 2d 1305, 1315 (Miss. 1994). |
| Missouri | A civil conspiracy is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act, and the commission of an act in furtherance of the conspiracy, resulting in damages. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 780-81, 782-83 (Mo. 1999). |
| Montana | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose with unlawful means, through an overt act resulting in damages. *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1201-02 (Mont. 1975). |
| Nebraska | "A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *Four R Cattle Co. v. Mullins*, 570 N.W.2d 813, 817-18 (Neb. 1997). |
| Nevada | A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998). |
| New Hampshire | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Jay Edwards, Inc. v. Baker*, 534 A.2d 706, 709-710 (N.H. 1987) (quoting a treatise). |
| New Jersey | A civil conspiracy is a combination of two or more persons to commit an unlawful act or to commit a lawful act by unlawful means, and the commission of an act resulting in damage. *Weil v. Express Container Corp.*, 824 A.2d 174, 183 (N.J. Super. Ct. 2003). |
| New Mexico | A civil conspiracy is two or more persons carrying out specific wrongful acts pursuant to a conspiracy, producing damage. *Vigil v. Public Serv. Co.*, 94 P.3d 813 (N.M. Ct. App. 2004). |
| New York | "A civil conspiracy is a concern or combination to defraud or cause injury to persons or property which results in damage to the person or the property of the plaintiff." *Wegman v. Dairylea Cooperative, Inc.*, 376 N.Y.S.2d 728, 736 (N.Y. App. Div. 1975). |
| North Carolina | A civil conspiracy is an agreement between two or more individuals to do an unlawful act, or to do a lawful act in an unlawful way, resulting in injury inflicted by one or more of the conspirators pursuant to a common scheme. *Stetser v. TAP Pharm. Prods. Inc.*, 598 S.E.2d 570 (N.C. Ct. App. 2004) (citing cases). |
| North Dakota | A civil conspiracy is an agreement between two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, inflicting injury upon another with an overt act that results in damage. *Burr v. Kulas*, 564 N.W.2d 631, 637 (N.D. 1997). |
| Ohio | A civil conspiracy is a malicious combination of two or more persons to injure another person or property, resulting in damages. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). |
| Oklahoma | A civil conspiracy is a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. *Gaylord Entertainment Co. v. Thompson*, 958 P.2d 128, 148 (Okla. 1998). |
| Oregon | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, producing damages. *Bonds v. Landers*, 566 P.2d 513, 516 (Or. 1977). |
| Pennsylvania | A civil conspiracy is an agreement between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, along with an overt act which is done in furtherance of the common purpose or design and which produces damage. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). |

| Rhode Island | A civil conspiracy is "a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *Read & Lundy v. Wash. Trust Co.*, 2002 R.I. Super. Lexis 181, at 54-57 (R.I. Super. Ct. Dec. 13, 2002). |
|---|---|
| South Carolina | A civil conspiracy is a combination of two or more persons for the purpose of injuring the plaintiff and which causes the plaintiff special damages. *Hammond v. Butler, Means, Evins & Brown*, 388 S.E.2d 796, 798 (S.C. Jan. 22, 1990). |
| South Dakota | A civil conspiracy is an agreement between two or more persons with a meeting of the minds on an object to be accomplished and the commission of one or more unlawful overt acts, resulting in damages. *Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000). |
| Tennessee | A civil conspiracy is a combination between two or more persons to accomplish, by concert, an unlawful purpose or to accomplish a lawful purpose by unlawful means, producing damage to person or property of the plaintiff through an overt act in furtherance of the conspiracy. *Frankenbach v. Rose*, 2004 Tenn. App. Lexis 81 (Tenn. Ct. App. Feb. 3, 2004) (citing other cases). |
| Texas | A civil conspiracy is an agreement by two or more persons with specific intent to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Juhl v. Airington*, 936 S.W.2d 640, 643-44 (Tex. 1996). |
| Utah | A civil conspiracy is a combination of two or more persons with a meeting of minds on the object or course of action and the commission of an unlawful, overt act resulting in damage. *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1064 (Utah 2002). |
| Vermont | A civil conspiracy is a combination of two or more persons to do an unlawful purpose, or to do a lawful purpose by unlawful means, in which something unlawful is done in furtherance of the agreement and produces damages. *Boutwell v. Marr*, 42 A. 607, 609 (Vt. 1899). |
| Virginia | "A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff." *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984). |
| Washington | A civil conspiracy is an agreement of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Corbit v. J. I. Case Co.*, 424 P.2d 290, 295 (Wash. 1967). |
| West Virginia | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Dixon v. American Indus. Leasing Co.*, 253 S.Ed.2d 150, 152 (W. Va. 1979) (citing treatise). |
| Wisconsin | A civil conspiracy is a combination of two or more persons by some concerted action to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means, along with a wrongful act done pursuant to the conspiracy which results in damages. *Thomas v. Mallett,*, 2004 WI App. 131, *P7-P8 (Wis. Ct. App. 2004). |
| Wyoming | A civil conspiracy is a concerted action of two or more persons resulting in the commission of an underlying tort that produces damages. *Central Wyo. Med. Lab. v. Med. Testing Lab. Inc.*, 43 P.3d 121, 126 (Wyo. 2002); *Jurkovich v. Estate of Tomlinson*, 843 P.2d 1166, 1172 (Wyo. 1992). |