UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS, HEALTH )
BENEFITS FUND; PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; and )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND, )
)
                        Plaintiffs, )
)
           v. )
)
FIRST DATABANK, INC., a Missouri )
corporation; and McKESSON )
CORPORATION, a Delaware corporation, )
)
                  Defendants. )
)

C.A. No. 1:05-CV-11148-PBS

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR**
**LEAVE TO FILE FIRST AMENDED COMPLAINT**
**[REDACTED VERSION]**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND FACTS .............................................................................................. 1

III.  ARGUMENT ................................................................................................................ 15

IV.   CONCLUSION ............................................................................................................ 16

001821-13  119650 V1

## TABLE OF AUTHORITIES

### CASES

*Adorno v. Crowley Towing & Transp. Co.*,
    443 F.3d 122 (1st Cir. 2006)..............................................................................................15

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*,
    357 F.3d 1 (1st Cir. 2004)..................................................................................................15

**Page(s)**

001821-13 119650 V1

## I.    INTRODUCTION

Plaintiffs hereby move the Court for permission to file their First Amended Complaint. Plaintiffs ask leave to incorporate new evidence recently produced by Defendant McKesson Corporation ("McKesson") to support their pre-existing allegations of Defendants' illegal Scheme to artificially increase the markup factor of the Wholesale Acquisition Cost ("WAC") to Average Wholesale Price ("AWP"). Plaintiffs, who are all third-party payors, also in the amended Complaint amend the Class definition to limit it to third-party payors. Additionally, because the newly disclosed evidence shows that Defendants engaged in their illegal Scheme earlier than previously thought, Plaintiffs ask leave to expand the Class Period, beginning August 1, 2001 (originally January 1, 2002) through March 15, 2005. Finally, in the event that the Court finds that California law does not apply to the Class, Plaintiffs ask leave to plead in the alternative the same state law claims under the laws of the Plaintiff and Class members' states of residence.

## II.    BACKGROUND FACTS

Plaintiffs' discovered Defendants' Scheme in the course of discovery in the *AWP* litigation, currently pending before this Court. Deposition testimony and documents produced in response to a subpoena issued in that case revealed that defendants First DataBank ("First Data") and McKesson Corporation ("McKesson") worked in conjunction with each other to increase the WAC/AWP markup on prescription drugs to a standard 25%. Because throughout the industry the AWP serves as the benchmark for third party payments to pharmacies, Defendants' artificial inflation of these figures caused Plaintiffs and the Class to lose hundreds of millions of dollars in

- 1 -

the form of excess payments to pharmacies.[1]  Recently produced documents confirm Plaintiffs' allegations and Defendants' intentional conduct to raise AWPs to benefit pharmacies.

██████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████    This changed when First Data, the leading provider of drug pricing information, stopped publishing manufacturer's suggested sell price and began to rely on wholesalers (who had no incentive to maintain low markups) to provide the data upon which First Data's AWPs were calculated.[4]

In 2000, about the same time that First Data's drug pricing policy changed, McKesson set out to "normalize" the industry by unilaterally imposing a 25% markup on its suggested sell

---

[1] Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification and in Support of Motion For Leave to File First Amended Complaint ("Berman Decl.") at Ex. 1 (Deposition of Patricia Kaye Morgan (January 11, 2005) at 508:4-20 (████████████████████████████████████████████████ ████████████████)); Ex. 2 (Deposition of Bob James (February 23, 2005) at 55:17-56:2 (████████ ██████████████████████████████)); Ex. 3 (████████████████████████████████████████████) (MCKAWQ 0069611-13); Ex. 4 (█████████████████████████████████████████████████████████ █████████████████████████); and Ex. 5 (Deposition of Ramon Crusit (February 23, 2005) at 20:7-26:9 (████ ████████)).

[2] Ex. 3 (AWP Discussion, MCKAWP 0069611).

[3] *Id.*

[4] █████████████████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
[Ex. 6 (FDB-AWP 0044257).]

price for all brand prescription drugs[5] with the intent of changing AWPs. By late 2001,[6] it was

██████████████████████████████████████████"[7] The effects were devastating.

Before 2000, McKesson estimated that only 20% of the prescription drug manufacturers were

25% mark-up companies.[8]  By early 2002, however, McKesson estimated that through

Defendants' efforts 90% of the industry had turned to the 25% markup.[9]  By late 2002,

McKesson estimated that the number had increased to 95%.[10]  In 2004, McKesson estimated that

99% of the prescription drugs were set at a 25% markup.[11]  McKesson acknowledged that

without its efforts, "███████████████████████████"[12] and that the industry shift

"██████ ████████████████████████████████████

██████████"[13]

McKesson, knew that as one of the largest national wholesalers it had "████████████

████████████████████████████████████████████"[14] and, if

it were to succeed, that "████████████████████████"[15]  McKesson also knew it would

not be difficult to impose its suggested sell prices on First Data's published AWPs because First

---

[5] Ex. 7 (MCKAWP 0057171); Ex. 8 (MCKAWP 0047807 (████████████████████████████████

████████████)).

[6] Ex. 9 (MCKAWP 0069608 (quoted below)).

[7] Ex. 10 (MCKAWP 0066465).

[8] Ex. 11 (MCKAWP 0069502).

[9] Ex. 9 (MCKAWP 0069609).

[10] Ex. 11 (MCKAWP 0069502).

[11] Ex. 12 (MCKAWP 0069766).

[12] Ex. 13 (MCKAWP 0069732).

[13] Ex. 14 (MCKAWP 0068599).

[14] Ex. 15 (MCKAWP 0068514).  "Spread" defines the difference between the WAC and AWP in terms of the AWP, *e.g.*, a WAC of 100 and a AWP of 120 represents a spread of 16⅔% (120-100/120).  The markup defines the difference in terms of the WAC, thus in the preceding example the comparison results in a 20% markup (120-100/100).

[15] *Id.* (MCKAWP 0068514).

- 3 -

Data's "wholesaler surveys" were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail.[16]  Initially McKesson merely changed its suggested sell price █████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ "[17]  But when the

competition did not respond as expected or First Data failed to survey the change as quickly as hoped,[18] McKesson decided to take direct action.

McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of only two electronic sources for price information, and although it was █████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████[19]

That Defendants' collusion began as early as August 2001 is documented by an internal memo drafted by Bob James, McKesson's Director of Brand Pharmaceutical Production Management, stating:

---

[16] Ex. 14 (MCKAWP 0068599); Ex. 16 (Declaration of Robert James, ¶ 3); *see also* Ex. 1 (Morgan Dep. at 512:3-9 (████████████████████████████████████████████████████████████████████ ); 529:16-530:12 (████████████████████████ ).

[17] Ex. 15 (MCKAWP 0068514).

[18] *See, e.g.,* Ex. 15 (MCKAWP 0068514 ("████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████ ).

[19] Ex. 17 (MCKAWP 0057415); *see also* Ex. 7 (MCKAWP 0057171 ("███████████████████ ████████████████████████████████████████████████████████████████████ ██████████ ")).

Prior to 2001 First Data and Medispan were jointly owned by the Hearst Corporation.  Following an investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medispan assets.  As part of the divestiture, First Data was required to continue to provide pricing information to Medispan's purchaser for several years.

- 4 -



Erlinda Thomas, Manager of Business Information Services at McKesson, stated in March 2002:



[22] "[redacted]" meant that rather than waiting for FDB to call, McKesson began taking the initiative of reporting to FDB changes to McKesson's suggested sell prices. For example, on November 9, 2001, Bob James writes to Kay Morgan, Manager of Product Knowledge Base Services with First Data:



---

[20] [redacted] Ex. 18 (FDB-AWP 053695).

[21] Ex. 9 (MCKAWP 69608-09).

[22] Ex. 19 (MCKAWP 0035460).

- 5 -


[Ex. 20 (MCKAWP
0068621).]

On other occasions he writes:


[Ex. 21A (MCKAWP 0069857).]

[Ex. 22
(MCKAWP 0001168).]

[23] [Ex. 23
(MCKAWP 0001188).]

Bob James also called Kay Morgan "                                          

                                                                    "[24]    In turn, First Data would inform McKesson of any

updates at First Data to change the markup to 25%.[25]

---

[23] Kay Morgan responds: "

                                  "

[24] Ex. 24 (MCKAWP 0069615).

[25] *See, e.g.,* Ex. 25 (MCKAWP 0069782); Ex. 26 (MCKAWP 0069553 (e-mail from Kay Morgan to Bob
James: ("                                                                          ")).

McKesson's collaboration with First Data was highly effective.  In March 2002, Bob James reports:



[26]

In April he reports that First Data gave up all pretense of conducting a survey for new products: "████████████████████████████████████████████████████"[27]

First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies – by increasing their profits.  In February 2002, Bob James sent Kay Morgan a document he drafted entitled, "AWP Discussion," which explained that 20% markups "████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████"[28]  Later, on May 1, 2002, he writes to her about the "████████████████████████████████████████████

████████████████████████s.[29]  In an e-mail sent to Alicia Nielson, Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002, Bob James enclosed a prior internal communication in which he explained that McKesson had "████

████████████████████████████████████"[30] ███████

█████████████████████████" program, as reported in the following Aventis

---

[26] Ex. 27 (MCKAWP 0042663).
[27] Ex. 24 (MCKAWP 0069616).
[28] Ex. 3 (MCKAWP 0069613).
[29] Ex. 28 (MCKAWP 0069642).
[30] Ex. 29 (MCKAWP 0069775).

e-mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration & Development at Aventis:



Eventually First Data ceased consulting with any other wholesalers and relied entirely on the information that McKesson provided it to determine AWPs.[32]  McKesson was aware that First Data routinely disregarded manufacturer's suggested sell prices – Kay Morgan frequently shared such snubs with her friend Bob James:



[Ex. 21

(MCKAWP 0069586).]

[Ex. 31

(MCKAWP 0001183).]

---

[31] Ex. 30 (AV-BCA-0010336 (emphasis in original)).

[32] Ex. 1 (Morgan Dep. at 508:4-20).                    However, depositions of David Kuehl of AmeriSource Bergman and Jodi Taylor of Cardinal respectively each testified that                    *See* Ex. 30A (Deposition of David Kuehl (Nov. 16, 2004) at 122:8-14; Ex. 30B (Deposition of Jody Taylor (Mar. 3, 2005) at 35:11-36:19 and 81:14-21).

McKesson was also likely aware that its competitors were not sharing information with First Data. It knew, for example, that "█████████████████████████████████████ ████████████████████████"[33] In any case, the active role it took to ensure that First Data published AWPs consistent with McKesson's own pricing policy dispels any illusion that McKesson believed it was involved in fair and objective calculation of AWPs.

        McKesson's sought to hide the scheme. When Brian Ferreira of VPS Retail wrote to Bob James asking him to "█████████████████████████████████████████████ ████████████████████████" he knew better than to respond to the request in writing, writing only: "█████████████████████████████████████████ █████████"[34] McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:



                                             [Ex. 35
(MCKAWP 0068889).]

[John Bonner, Director, McKesson's Branded Rx Product Management and Investment] ████████████████████████████
████████████████████████  [Ex. 10 (MCKAWP 0066465).]

[Bob James] ████████████████████████████████████  [Ex. 36
(MCKAWP 0069591).]

[Bob James to McKesson field associate] ████████████████████
████████████████████  [Ex. 37 (MCKAWP 0069592).]

[McKesson field associate writing to John Bonner] ██████████████
██████████████████████████████

---

[33] Ex. 33 (MCKAWP 0067439).

[34] Ex. 34 (MCKAWP 0069714).



[Ex. 10 (MCKAWP 0066464).]

[McKesson field associate]
[Ex. 13 (MCKAWP 0069732).]

[Bob James]

[Ex. 27 (MCKAWP 0042663).]

[Bob James]

[Ex. 38 (MCKAWP 0065895 (emphasis in original)).]

First Data also knew the importance of keeping the Scheme a secret.  In response to an e-mail inquiry whether electronic drug pricing publishers were increasing the AWP/WAC spread,

---



35

. *See, e.g.,* Ex. 39 (MCKAWP 0068131-2
(Bob James proudly describes his efforts to increase AWP markups: "

); *see also* Ex. 27 (MCKAWP 0042668 (

")); Ex. 10 (MCKAWP 0066466 (e-mail from field associate, "

")); Ex. 9 (MCKAWP 0069609 (Bob James memo: "

")); Ex. 27 (MCKAWP 0042664 (customer service agent to BIS, "

")).

- 10 -

Kay Morgan denies any involvement, adding, " ███████████████████████████

██████████████████████████ ,"[36] She forwarded on the

exchange to Bob James at McKesson, stating, " ████████████████████████████

██████████████████████ ,"[37]

    Nonetheless, McKesson also realized that it could "" ████████████████████

████████████████████████████████████████ ,"[38]

McKesson appreciated that if it failed to inform its customers that it was behind all these changes

" ██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██ ,"[40]  And so it began:

        [To Dan Connolly of Bartell Drugs]: ████████████████

████████████████████████████████████████████████

█████████████ [Ex. 41 (MCKAWP 0069817).]

        [To Dan Connolly]: ███████████████████████████

████████████████████████████████ [Ex. 42

(MCKAWP 0069901).]

        [To David Vucurevich of Rite Aid]: ███████████████

█████████████████████ [Ex. 43

(MCKAWP 0069911).]

---

[36] Ex. 40 (MCKAWP 0069588).

[37] *Id.*

[38] Ex. 38 (MCKAWP 0065895).

[39] *Id.* (MCKAWP 0065895).

[40] Ex. 13 (MCKAWP 0069732).

A field agent reports: "███████████████████████████████"[41] Bob

James realized that the goodwill McKesson established with the pharmacies as a result of

inflating AWPs would give it a substantial edge over its competition:



Bob James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was

looking for an extra-contractual year-end bonus in the neighborhood of $500,000:



Bob James also noted with pleasure that Kay Morgan spoke "███████████████████████

██████████████████████████████████"[44] Other

customers were also appreciative, for example an unnamed customer from Ohio, who called

McKesson "████████████████████████████

██████████████████████████

█████████████████████████

██████████."[45] Med-X Corp.'s Director of Operations, Jerry Howard reviewed the

---

[41] Ex. 13 (MCKAWP 0069732).

[42] Ex. 38 (MCKAWP 0065895).

[43] *Id.* (MCKAWP 0065895 (emphasis, ellipses in original)).

[44] Ex. 44 (MCKAWP 0069669).

[45] Ex. 45 (MCKAWP 0069513).

numbers, put two and two together[46] and "███████████████████████

████████████"[47]

    But the response was not always rosy. McKesson got a little unneeded publicity when it increased the markup on its suggested sell price. Except for a limited number of customers who used the Rx format 95, the system was set so that the greater of the FDB AWP or the McKesson suggested sell price would print on customer invoices.[48] Because McKesson unilaterally increased its suggested sell prices, in many instances that information was printed on customers' invoices, McKesson's customers complained that McKesson was trying to mislead them about their potential profits.[49] McKesson's competitor, Amerisource Bergman, discovered what McKesson was doing and "████████████████████████████████

██████████████████████████"[50] Customers complained that they were losing money because of McKesson.[51] Bob James and the Product Management group took a lot of heat. They worked closely with McKesson's Business Information Services group to correct the invoice problem. They met with large retailers, like Rite Aid, to assure them that they were not losing money and to discuss changes in McKesson's system that would assist Rite Aid.[52]

    "████████████████████████████████████████████████"

Bob James lamented in April 2002, "███████████████████████████

████████████████████████████████████████████████

---

[46] Ex. 13 (MCKAWP 0069732).

[47] Ex. 46 (MCKAWP 0069726).

[48] Ex. 19 (MCKAWP 0035459).

[49] *See supra* note 43.

[50] Ex. 15 (MCKAWP 0068515).

[51] Ex. 24 (MCKAWP 0069615).

[52] *Id.* (MCKAWP 0069615).

- 13 -

 He expressed

frustration in May 2002 when a McKesson customer service agent passed on a customer query

about the increased spread between AWP and ▆▆▆▆▆▆ cost: "▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆"[54]

    Kay Morgan also had her share of frustrations.  In April 2002 she complains: "▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆"[55]  Bob James responds: "▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆"[56]

    McKesson also discovered that some of First Data's AWPs were low because FDB had

no data or inaccurate WAC information.  In May 2002, Bob James observed, "▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"[57]

The previous month Bob James noted, "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆"[58]  To correct this problem it

decided to "▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"

---

[53] *Id.* (MCKAWP 0069616 (ellipses in original)).

[54] Ex. 47 (MCKAWP 0069715).

[55] Ex. 28 (MCKAWP 0069642).

[56] *Id.*

[57] Ex. 35 (MCKAWP 0068889).

[58] Ex. 24 (MCKAWP 0069615).

██████████████████████████████████████████████████"[59] The next month Bob

Roberts reported: "██████████████████████████████████████████

████████████████████"[60]

### III.    ARGUMENT

"Consent to file amended pleadings 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), unless the amendment would be futile or reward undue delay[.]" *Adorno v. Crowley Towing & Transp. Co.*, 443 F.3d 122, 126 (1st Cir. 2006). "[P]ermission is liberally granted where there is no prejudice. It is often granted not only pretrial but [even] after a dismissal for failure to state a claim where the court thinks that the case has some promise and there is some excuse for the delay." *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004).

The factual allegations Plaintiffs seek to add are based on new evidence McKesson produced within the last month; curiously omitted from McKesson's response to the subpoena Plaintiffs issued to it last year in the *AWP* case. Defendants are not prejudiced by the addition of these detailed assertions because they are based on the evidence McKesson produced and consistent with the allegations previously asserted in the original Complaint. The new evidence also supports the extension of the Class Period. Previously, McKesson led Plaintiffs to believe that Defendants did not enter into the conspiracy with each other until the beginning of 2002. An internal memo drafted by McKesson's Director of Brand Pharmaceutical Production Management shows that Defendants "mutually agreed" to raise AWP markups no later than August 2001. Plaintiffs seek to amend the Class Period to commence on August 1, 2001.

Plaintiffs also propose to amend the Class definition as follows:

---

[59] *Id.* (MCKAWP 0069616).

[60] Ex. 44 (MCKAWP 0069669).

*AWP McKesson/First Data Class:*

> All third party payors whose pharmaceutical payments for the
> Subject Drugs were based on AWP during the Class Period. The
> Subject Drugs are all drugs identified in Exhibit A and consist of
> brand name drugs only.

The new definition excludes consumers. Defendants, obviously, are not prejudiced by the

proposed narrower Class definition.

Finally, the Court deferred "ruling on the controlling state law until the class certification

stage."[61] In the event that the Court dismisses Plaintiffs' California claims on choice of law

grounds, the Amended Complaint pleads in the alternative the same claims under the laws of the

Plaintiffs' and Class members' states of residence. Plaintiffs' proposed amended complaint

organizes the claims into groups of states with similar laws. Such groups could then serve as

subclasses, whose state law claims would be tried together. The claims are essentially the same

only pled under the laws of different states; Defendants therefore would not be prejudiced by

their addition.

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs request that the Court grant them leave to file their

Second Amended Complaint.

DATED: July 17, 2006

By **/s/ Steve W. Berman**
    Steve W. Berman
    Sean R. Matt
    Barbara A. Mahoney
    Hagens Berman Sobol Shapiro LLP
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594

---

[61] Court's Order, dated December 1, 2005, Dkt. No. 27.

Thomas M. Sobol (BBO#471770)
Ed Notargiacomo (BBO #567363)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on July 17, 2006.

/s/ Steve W. Berman
Steve W. Berman

001821-13 119650 V1