UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; and DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,<br><br>                              Plaintiffs,<br><br>        v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                              Defendants. | C.A. No. 1:05-CV-11148-PBS |

## FIRST AMENDED CLASS ACTION COMPLAINT
## [REDACTED VERSION]

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................1

II.     JURISDICTION AND VENUE ..................................................................7

III.    PARTIES ......................................................................................................8

        A.      Plaintiffs........................................................................................8

        B.      Defendants ..................................................................................10

IV.     STATEMENT OF FACTS .........................................................................11

        A.      Drug Manufacturers and NDCs ...............................................11

        B.      The Wholesale Acquisition Cost ...............................................12

        C.      The Average Sales Price .............................................................13

        D.      The Average Wholesale Price.....................................................14

        E.      The WAC-to-AWP Spread ..........................................................14

        F.      Drug Wholesalers.......................................................................16

        G.      Wholesaler Sales Transactions ................................................17

        H.      Retail Pharmacy Channel..........................................................17

        I.      The Private End Payors for Prescription Drugs.....................19

        J.      End Payors Drug Reimbursements Are AWP-Based .............19

        K.      Medicaid Drug Reimbursements Are AWP-Based ................21

        L.      Medicare Drug Reimbursements Are AWP-Based .................22

        M.      Private and Public End Payors Rely on Published Drug Pricing Compendia .......23

        N.      The Emergence of First Data and MediSpan as Electronic Data Publishers.........24

        O.      The Merger of First Data and MediSpan Systems.................27

        P.      First Data Gains the Trust of the Pharmaceutical Industry....................29

        Q.      First Data's Representations to Gain Marketplace Reliance on Its Pricing Data ..31

R.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin34

S.    By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse ...........35

T.    Implementation of the Five Percent Spread Scheme ............................................37

U.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme ...58

V.    First Data's 2005 Capitulation ...............................................................................60

V.    CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME......................61

VI.    DEMAND FOR JUDGMENT.........................................................................................85

001821-13  119497 V1

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## I.    INTRODUCTION

1.    This is a proposed national class action brought on behalf of self-insured employers, health and welfare plans, health insurers and other End Payors of prescription drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars of excess payments for those pharmaceuticals.

2.    In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or "AWP." As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.    Each year more than three billion prescriptions are written in the United States. End Payors must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several publishing companies, including First Data. Through these compilations, which are

- 1 -

available in both hard copy or electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement to retailers accordingly.

4.      Health and welfare plans, health insurers and other End Payors for prescription drugs use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices for almost all drugs. Virtually all these entities' contracts governing pharmaceutical reimbursement use AWP as a pricing standard.

5.      First Data, McKesson and pharmaceutical companies know that End Payors utilize AWP as a pricing benchmark and utilize AWP as a reasonably accurate measurement of list and transaction prices in order to negotiate payment terms for drugs used by their constituents.

6.      Until March 15, 2005, First Data represented to those in the pharmaceutical market that it derived the WAC/AWP markup either from manufacturers or by conducting "a survey" of wholesalers whose purpose was to verify prices reported by the manufacturer. First Data further represented throughout the Class Period that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing." McKesson is one of the wholesalers who was "surveyed" by First Data.

7.      Historically, in order to arrive at the AWP for branded drugs, manufacturers and wholesalers applied a markup of 20% or 25% to WAC. Whatever markup was given to a particular branded drug "stuck" with that drug indefinitely. Until 2002, there was variation, supposedly based on manufacturer direction or on First Data's wholesale surveys, in the difference between the WAC to AWP spread for hundreds of brand-name drugs. For example,

- 2 -

manufacturer A might have a markup of 20%, while manufacturer B might utilize a markup of 25%.

8.      In late 2001 or early 2002, the exact time of which is unknown to payors in the pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. As part of this agreement, First Data, to the extent it relied upon information other than that provided directly from various drug manufacturers for certain drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers.

9.      And at the same time, McKesson and First Data, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount. To conceal the scheme, McKesson and First Data agreed to typically effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer. This camouflaged both the associated increase in the WAC to AWP markup and WAC-to-AWP spread and McKesson as the source of the increased markup. McKesson then communicated these new WAC-to-AWP spreads to First Data. First Data, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace, and without reference to the manufacturers' suggested AWPs (or WACs) for these drugs, and without surveying other wholesalers, then published new AWPs with the new WAC-to-AWP markup. First Data's action had the effect of raising the WAC-to-AWP spread by additional percentage points so as to have a 25% difference between pharmaceutical companies' reported WAC and the First Data published AWP. First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or

- 3 -

suggesting a 20% markup as appropriate.  On some occasions, some of the manufacturers secretly questioned this increase, but First Data refused to change the published AWP and the manufacturers failed to take any action to remedy defendant's unjustified raise in AWP.

10.    This collaboration between First Data and McKesson to raise the WAC-to-AWP spreads is referred to as the "Five Percent Spread Scheme" or "Spread Scheme."  The dramatic nature of the Spread Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the Spread Scheme.  The spike in 2002 reflects implementation of the Spread Scheme:



Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004

Note:  "NDC" means National Drug Code and refers to a number assigned to each drug.

11.    Once First Data and McKesson raised the WAC-to-AWP spread to 25% on a given drug, that spread remained in place and still remains in place to this day.

- 4 -

12.     Both McKesson and First Data each had economic and business reasons for reaching an understanding that McKesson would artificially raise the WAC-to-AWP spread and that First Data would publish the increased AWPs and as a result of their own business interests had a common purpose in running the Spread Scheme. A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson implemented this Scheme in order to provide a benefit to those important retail pharmacy clients as well as its own pharmacy related business. For sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug. Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies. Thus, an increase in the WAC-to-AWP markup results in larger profits for retailers and for McKesson's pharmacy-related businesses.

13.     McKesson was proud of its efforts and boasted to its retail clients that McKesson "███████████████████████████████████████" The client was "███████████████████████████████" MCKAWP 0069726. Confirming the secrecy of the Scheme McKesson cautioned that the "███████████████████" and information about it is "███████████████████████████████████████████" but could be described to show "███████████████████████" MCKAWP 0069732. "███████████████" was a McKesson euphemism for the WAC-to-AWP markup Scheme.

14.     First Data agreed to this Scheme to curry favor with McKesson so that McKesson would utilize First Data as the pricing source it has in some of its contracts with pharmaceutical companies and others in the distribution chain, as well as in the pricing database that it provides to its customers, thereby increasing First Data's business. First Data also agreed to the Scheme

- 5 -

as part of an effort to increase the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP. Many of these entities, who make a profit off the spread between AWP and WAC, would be more likely to utilize First Data's service if it had a higher markup or was perceived to be an industry leader with respect to markups. McKesson in turn where it could do so, specified in its dealings with pharmaceutical companies, that First Data's AWP would be the AWP used for contract pricing purposes as opposed to the other published AWPs. Thus, each defendant shared multiple common purposes, though they may have had different reasons for doing so, and each acted to achieve those purposes by implementation of the 5% Scheme.

15.    Health and welfare funds, insurance companies and thousands of third-party payors have contracts that expressly tie their payment for pharmaceuticals to First Data's published AWPs.

16.    As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, thousands of third-party payors and consumers have had their drug prices increased by the Scheme.

17.    Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin, Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium. Given the billions of dollars spent on prescription drugs, a 5% increase in the WAC-to-AWP spread results in a substantial increase in payments for pharmaceuticals. For example, AstraZeneca's Nexium had annual sales

- 6 -

in 2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP spread results in an increase of over $100 million per year in reimbursements for just one drug. Another such drug is Pfizer's Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase imposed by First Data and McKesson, hundreds of millions per year was spent on Lipitor that would not have been absent the Scheme.

18.     In this action, plaintiffs and the Class seek to recover damages incurred from defendants' unlawful acts and practices.

## II.     JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated amount in controversy exceeds five million dollars ($5,000,000). *See* 28 U.S.C. §§ 1332(d)(2) and (6). This Court has personal jurisdiction over the parties because plaintiffs submit to the jurisdiction of the Court and defendants systematically and continually conduct business throughout the Commonwealth of Massachusetts, including marketing, advertising, and sales directed to Massachusetts residents.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) because defendants as corporations are "deemed to reside in any judicial district in which [they are] subject to personal jurisdiction" and because the misrepresentation and material omissions "giving rise to claim[s] occurred" in this District as well as throughout the State of Massachusetts.

## III.    PARTIES

### A.    Plaintiffs

21.    Plaintiff New England Carpenters Health Benefits Fund ("Carpenters") is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). Carpenters maintains its principal place of business in Wilmington, Massachusetts. It provides comprehensive health coverage for over 22,000 participants and beneficiaries in the states of Main, New Hampshire, Vermont, and Massachusetts. During the Class Period, Carpenters has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

22.    Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") is a voluntary employee benefits association maintained pursuant to the federal Employee Retirement Security Act, 29 U.S.C. § 1132, *et seq.* and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990s by many Pirelli retirees for the purpose of providing health and medical benefits to eligible participants and beneficiaries. PBMT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee. During the Class Period, PMBT has been billed for and has paid charges for drugs based on AWP. Since May 1, 2001, PMBT has contracted with ACS/Caremark, a PBM, to administer its drug program for its members. PMBT's contract with its PBM provides that reimbursement is to be based on First Data's published AWP.

- 8 -

23.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, THWF is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). THWF maintains its principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106. It provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period, THWF has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

24.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue Code for the purpose of providing health benefits to eligible participants and beneficiaries. PFTHW maintains its principal place of business in Philadelphia, Pennsylvania. PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000 active participants, and their spouses and dependents. During the Class Period, PFTHW has been billed for and paid charges for drugs. It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

25.     Plaintiff District Council 37 Health & Security Plan is non-ERISA union-sponsored employee welfare benefit plan subject to the reporting requirements of the New York City Controller's Internal Control and Accountability Directive No. 12. The right to bargain for

said welfare benefits is recognized by Section 12-307 of the New York City Collective

Bargaining Law. In addition, under DC 37, the union, there exists two smaller employee welfare

benefit plans, The District Council 37 New York Public Library Health & Security Plan Trust

and The District Council 37 Cultural Institutions Health & Security Plan Trust both of which

were established and are maintained pursuant to §§ 1002(1) and (3) of ERISA. The above-

referenced benefit plans are collectively referred to as "DC 37." As such, DC 37 is a legal entity

entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). DC 37 maintains its

principal place of business in New York, New York. It provides supplemental health benefits,

including a prescription drug benefit for over 350,000 participants and beneficiaries in all but

one state in the United States. During the Class Period, DC 37, through its prescription drug

benefit manager, has been billed for and paid charges for certain of the drugs on attached

Exhibit A, and was injured as a result of the Scheme alleged herein.

**B.      Defendants**

26.     Defendant First Data ("First Data") is a Missouri corporation with its principal

place of business at 1111 Bayhill Drive, San Bruno, California 94066. First Data is a subsidiary

of the Hearst Corporation and is the leading provider of electronic drug information to the

healthcare industry.

27.     Defendant McKesson Corporation is a Delaware corporation with its principal

place of business at McKesson Plaza, One Post Street, San Francisco, California 94101.

McKesson Corporation is the leading provider of supply, information and care management

products and services designed to reduce costs and improve quality across healthcare. Founded

in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 16th largest

industrial company in the United States.

## IV.    STATEMENT OF FACTS

28.    This case involves the unlawful inflation of the "markup" factor between the so-called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or "AWP") of a large number of prescription pharmaceutical products, a scheme implemented in late 2001 and 2002 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data (the nation's most widely used and "trusted" electronic drug data publisher).

### A.    Drug Manufacturers and NDCs

29.    Drug makers manufacture brand name and generic drugs. Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug. After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand name itself remains with the original manufacturer. Drug products not covered by patent protection and produced and/or distributed by many firms are generic drugs. Manufacturers tend to be either brand-name manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

30.    There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug. Prescription drugs are dispensed to patients primarily through four different drug distribution channels: (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion; and (d) other medical providers. This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

31.    All drugs intended for retail pharmacy sale are identified by a National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA") and contains eleven digits. The NDC is used to identify the drug delivered to the patient. The first

- 11 -

five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills). While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (in large part because over the years many drugs and associated NDCs have been phased out).

## B.   The Wholesale Acquisition Cost

32.   Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand. (Generic makers, of course, use more commodity pricing approaches). Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen). The WAC for branded drugs is then published by the manufacturer.

33.   Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain. Thus, while WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for most branded drug sales by manufacturers to national wholesalers. In addition, WAC is a publicly available price for most branded drugs and is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product. And because the wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

- 12 -

34.     WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and as between the wholesaler and the retailer, or between the manufacturer direct to the retailer). Some drug manufacturers have other names for the WAC price such as list price, catalog price, direct price, wholesale net price, or book price.

## C.     The Average Sales Price

35.     After all price concessions are considered, a manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler. The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

36.     Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products, and the average of those net sales prices is usually called the average sales price (or "ASP"). While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[1] Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria. Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers. As a result, for retail pharmaceutical products the exact

---

[1]     The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered. This exception is not relevant here.

relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a particular point in time is not publicly known.

**D.    The Average Wholesale Price**

37.    In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average wholesale price or AWP is a list price used for invoices between drug wholesalers and pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered drugs) and is typically used as a benchmark for the reimbursement by End-Payors for the dispensers' (*e.g.*, retail pharmacies or doctors) acquisition of the drug product. Historically, the AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in effect until a change in price is published.

38.    WAC and AWP differ in that they represent list prices at different levels in the market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

**E.    The WAC-to-AWP Spread**

39.    In the pharmaceutical industry, the amount by which the AWP exceeds the WAC is sometimes known as the WAC/AWP "markup" or "spread" for a particular drug product.

40.    The relationship between AWP and WAC is sometimes expressed as the percentage by which the difference is above WAC (*e.g.*, 20% or 25% above WAC, usually called "the markup") rather than the percentage in which the difference is measured as an amount under AWP (*e.g.*, 16.7% or 20% off AWP, sometimes called the "spread"). In this complaint, we usually refer to the WAC-to-AWP markup in the first sense, *i.e.*, as expressed as a percentage above WAC.

- 14 -

41.    For many years preceding the Scheme alleged in this complaint, the WAC-to-AWP spread for branded drugs had predictably set patterns, and the competitive pricing marketplace for pharmaceuticals had adjusted and accommodated for the patterns. For branded pharmaceuticals, the WAC/AWP spread tended to fall in two quantum places: 20%, and 25%. In other words, in the many years preceding the Scheme alleged in this case, a particular branded drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.16 or 1.20, or 1.25 of the WAC (*e.g.*, $120).

42.    These steps in the WAC/AWP spreads 20%, and 25%, percentages known to McKesson, First Data and others in the pharmaceutical industry as the WAC/AWP markup factors – were commonly associated with particular divisions of pharmaceutical companies. For example, a pharmaceutical division might be designated as a "20% markup" company, while another company working in a different therapeutical area, would be designated as a "25% markup" company.

43.    Another part of the predictable aspects of the WAC/AWP spreads over the years was the ***unchanging*** nature of the WAC/AWP markup for a particular NDC. In other words, if a particular NDC first launched at a 20% markup value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the generic code for that NDC. Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same markup factor associated with that NDC. Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP spread to be changed for any particular NDC, and in the few isolated situations where that did occur, a particular market-based reason existed which was known to all participants in the marketplace (*e.g.*, a merger of drug companies necessitating uniformity of particular prices).

**F.     Drug Wholesalers**

44.     Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans. Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

45.     Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers. Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

46.     The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased. The manufacturer may quote a wholesaler a price close to or at WAC, but typically there will also be a small volume discount or early cash payment discount off that price.

47.     National wholesalers are the primary intermediate level in the retail channel of distribution process accounting for 45.7% of prescription drugs ($98.5 billion) in 2002. Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf. Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

48.     Wholesale drug distribution is heavily concentrated. The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC"). Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution. Collectively they

- 16 -

account for about 97% of drug sales that flow through national wholesalers, and collectively they account for more than 80% of all drug wholesalers (national, regional, and specialty).

**G.    Wholesaler Sales Transactions**

49.    National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers (primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail orders). As a result, sell-side national drug wholesaler margins to retailers tend to be thin (even at times non-existent), with a significant portion of national drug wholesaler revenue instead being derived from buy-side prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

50.    National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

**H.    Retail Pharmacy Channel**

51.    The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market share of dollars for prescription drugs. Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass merchandiser chains) purchase drugs in large enough volumes so that they can bypass the

wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

52.     Regardless whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

53.     When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates to selling specific volumes of drugs or achieving a certain share of a specified market. When purchasing drugs directly from manufacturers, pricing using the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

54.     Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power, and some of these groups further reduce their costs through direct rebate deals offered by manufacturers. In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC but, again, the actual transaction cost is highly variable due to the additional arrangements.

55.     In short, entities in the retail distribution chain (including wholesalers, resellers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC. While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

## I.    The Private End Payors for Prescription Drugs

56.    At the most basic level, prescription drug expenditures are funded by either

private or public sources.  In the United States, more than $200 billion dollars is spent annually

on prescription drugs, and about three quarters of this amount is privately funded.

57.    Private payors for prescription drugs include drug benefit plan sponsors and

consumers.  The drug benefit plan sponsors (who pay for part or all of the cost of prescription

drugs for their covered beneficiaries) include self-insured employers, health and welfare plans,

health insurers and managed care organizations (MCOs).  Most of these plan sponsors reimburse

retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either

health plans or pharmacy benefit management companies) who negotiate discounts with retail

pharmacies and rebates from drug manufacturers.  The vast majority of such purchases are for

out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution

channel.

## J.    End Payors Drug Reimbursements Are AWP-Based

58.    Although retail pharmacies ***purchase*** pharmaceutical products based upon pricing

formulae that employ the WAC, retail pharmacies ***get paid*** (*i.e.* receive reimbursement) from

plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee.

This is a fundamental anomaly of the retail distribution channel for drug products – that retail

pharmacies' ***purchases*** are based on prices pegged to the published WAC, but retail pharmacies'

***reimbursements*** or charges are based on the published AWP.

59.    Health plans typically contract with intermediaries called pharmacy benefit

managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter

adjudicate the numerous transactions that occur during administration of a plan.  Although the

PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured

employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and mail orders. In the contracts between PBMs and plan sponsors, the retail pharmacies' drug ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or "discount."

60.    Brand drug reimbursement for retail pharmacy ingredient cost contained in the contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based reimbursement structure. For example, since 2002, Express Scripts' standard form contract has expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank...." Similarly, Caremark's website states: "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

61.    The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged. Most recently, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector."

62.    Third Party AWP based reimbursement has also been acknowledged by McKesson. For example, in September 2001, James Robert of McKesson, internally noted that

"█████████████████████████████████████████████████████████
████████████████████████████████" MCKAWP 0068514.

63.    In summary, thousands of pharmaceutical reimbursement contracts are based on AWP minus a specified discount.  As a result, a leading expert on pharmaceutical pricing has concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates. All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP."

**K.    Medicaid Drug Reimbursements Are AWP-Based**

64.    Public purchases for prescription drugs provide a variety of programs for low-income and elderly patients, veterans, members of armed services, and federal, state and local government employees.  While public purchaser programs are not directly at issue in this case, the significant reliance on those systems of AWP-based reimbursement underscores the ambiguity and magnitude of reliance on the AWP-based reimbursement system to pay for dispensers' ingredient costs for branded pharmaceutical products.

65.    Medicaid has the most significant impact on prescription drug pricing for out patient drugs.  The Medicaid Program, jointly financed through federal and state funds, is designed to aid certain low-income people and the disabled, and covers about 40 million individuals.  Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-for-service part of the program increased at an average annual rate of 18%, going from $10.2 billion to $23.4 billion.  (While these are significant sums, they amount to less than 10% of the overall annual prescription drug expenditure.)

66.    Medicaid's reimbursement system relies upon the published list prices of drugs (which are largely directly set by manufacturers) to determine pharmacies' reimbursement. States reimburse pharmacies using formulas that are typically based on the average wholesale price or AWP of a drug.  For example, a state might reimburse a pharmacy 85% to 90% of the

- 21 -

average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to cover the pharmacy's other costs.

**L.    Medicare Drug Reimbursements Are AWP-Based**

67.    The other significant public purchaser for prescription drugs is the federal Medicare Program.

68.    Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit. Approximately 450 drugs are covered by Medicare Part B.

69.    Medicare Part B reimburses medical providers 80% of the allowable amount for a drug. The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount. All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount. In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

70.    Some Medicare beneficiaries are able to purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

71.    For many years up to and through 1997, Medicare's reimbursement system for the relatively narrow band of physician-administered drugs sought to estimate providers' acquisition costs by pegging reimbursement to either the estimated acquisition costs or to the national average wholesale price sale price. In practice, carriers that administered the Medicare Program reimbursed physicians and clinics for physician-administered drugs covered by Medicare on the basis of the published wholesale price or AWP.

- 22 -

72. Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statue and implemented by regulation. Beginning in 1998 and until recently, Medicare reimbursed for drugs and biologicals under its program of the reimbursing physician administered drugs based upon 95% of the published average wholesale price.

73. At the end of 2003, Congress enacted the Medicare Modernization Act. Among other things, that changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturers' actual calculation for the average sales price for each drug or biological covered by the program. Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP. Beginning in 2004, Medicare has been transitioning to the ASP-based reimbursement system.

74. In summary, the two largest public purchaser programs for prescription pharmaceuticals -- Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare area).

**M.    Private and Public End Payors Rely on Published Drug Pricing Compendia**

75. The private (and public) pharmaceutical reimbursement systems have at their core critical dependence upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country. Given the breath of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors) given the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort, and given the scores of thousands of available drugs on the market, the private (and public) reimbursement systems for pharmaceuticals depend on the honesty and integrity of the AWP and WAC data provided by drug manufacturers. The reimbursement

- 23 -

systems (including the plan sponsors and consumers who reimburse drug dispenser costs) also rely upon the accuracy and integrity of the pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs.

76.    Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States.  Generally these publications are available in either hard copy format or in electronic media.

77.    Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First Data Bank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct).  While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

78.    In periodically announcing the AWP for each drug, publishers generally report prices that are supplied to them by manufacturers for their respective drugs.  For instance, the forward to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted."  In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices that are faxed directly from the manufacturer.

## N.    The Emergence of First Data and MediSpan as Electronic Data Publishers

79.    In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufactures, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and third-party payors, (*i.e.*,

- 24 -

plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers), through large electronic drug databases.

80.    Drug databases started back in the mid-1970s with the advent of significant drug benefit programs. These programs, along with the pharmacists who are dispensing the drugs and the third-party payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information in order to ensure the accuracy of the claims they were paying.

81.    The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need. As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

82.    During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company," and (2) MediSpan, which had its roots in the printed drug price catalog business.

83.    The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF." The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs. Among many other pieces of quantitative and non-quantitative information contained in the NDDF, are the current and each historical WAC (known in the NDDF as the wholesale net price, or "WHN") and AWP (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

84.     The principal electronic database products sold by MediSpan are based upon its Master Drug Database Files or "MDDF." The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and historical WAC and AWP. Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

85.     Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and third-party payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use intragratable drug data files to determine third-party payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

86.     Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate reference would be more time-consuming, and would increase the

- 26 -

risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

87.     During the 1990's and up to 1998, First Data and MediSpan were substantial, direct competitors within the relevant market of intragratable drug data files in the United States, and faced little or no competition from other firms.  Until 1998, two electronic drug databases – First Data's NDDF and MediSpan's MDDF – played the integral role in providing essentially all electronically-based drug reimbursement transactions in the United States, accounting for billions of transactions each year and many billions of dollars of payments.

88.     Of course, First Data's NDDF and MediSpan's MDDF both contained data fields for critical price points for the approximate 65,000 NDCs then active in the marketplace.[2]  The retail class of trade has primary reliance on these systems for health and reimbursement among the data fields for each active NDC (in the NDDF and the MDDF) information, using the AWP for the associated NDC when seeking reimbursement for drug ingredient cost.

O.     The Merger of First Data and MediSpan Systems

89.     In 1998, the Hearst Corporation caused First Data to be merged with the smaller MediSpan.  After the merger, First Data began the process of combining its NDDF with MediSpan's MDDF (resulting in a product sometimes known as NDDF Plus).  Through this process, the Hearst Corporation caused First Data to become the sole United States provider of intragratable drug data files, including the publication of electronic drug database pricing information such as the WAC and associated AWP for branded pharmaceutical products.  Thus, beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical distribution chain who used electronic database systems used and relied upon the accuracy of

_____

[2] First Data's NDDF also contains historical information and thus, it contains data for almost 200,000 NDCs since many are no longer active in the marketplace.

data from First Data's NDDF and MDDF, including the published WAC and AWP price fields in undertaking reimbursement transactions for billions of dollars of pharmaceutical products.

90.    In 2001, the Federal Trade Commission (after a lengthy investigation) brought suit against the Hearst Corporation and First Data claiming, among other things, that the First Data and MediSpan merger had been unlawful. Shortly thereafter, the Hearst Corporation agreed to the divestiture of the MediSpan assets, culminating in a consent decree late that year. However, by this time, First Data's merger of the NDDF and MDDF, along with changes of personnel and related systems effectuated over the prior three years, was nearly complete. As a result, as part of First Data's divestiture of the MediSpan assets, First Data was required to provide the purchaser of the MediSpan assets with transitional and editorial services for many years into the future.

91.    As a practical matter, therefore, pricing data contained in both the NDDF and the MDDF post-divestiture remained the same. Since 1998 and despite the late 2001 divestiture, First Data has functioned as the sole editor of data populating the only available comprehensive intragratable electronic drug data systems (the NDDF and the MDDF) for the pricing information ubiquitously used in the United States for reimbursement transactions in the retail pharmacy channel for branded drugs.

92.    During the Class Period, all changes in the FDB electronically published AWPs and the WAC-to-AWP spread were the same. The Consent Decree that implemented the divestiture of Medispan from FDB required that FDB continue to provide Medispan with all FDB pricing information until Medispan (now called Facts and Comparisons), was able to develop its own pricing production system. Thus, during the Class Period, when the Scheme described below effectuated an increase in the FDB published spread, this increase also occurred

- 28 -

in the Medispan published prices. FDB and McKesson knew that this would be a consequence of the Scheme.

93.    During the 1990s and up to the end of 2001, both First Data and MediSpan maintained the historical proportion between AWP and WAC when branded price increases were announced. This enabled the publishers (when receiving, for example, information only regarding WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result, the marketplace had predictability, and marketing pricing dynamics had adjusted according to that expected practice.

## P.    First Data Gains the Trust of the Pharmaceutical Industry

94.    Prior to and throughout the Class Period, pharmaceutical End Payors operated on the belief that the AWPs were the result of honest reporting both by the pharmaceutical companies with respect to the publication of their WACs or submission of their suggested AWPs to publishers, and an empirical and professional analysis undertaken by First Data.

95.    The reliance upon the accuracy and legitimacy of First Data's data was not only known to First Data, but used as the foundation of its business model and its marketing and promotion plans. For example, First Data stated:

> -- "For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making."
>
> -- "Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.
>
> -- "[First Data:] A partner you can trust."
>
> -- Trusted Drug Knowledge...Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the

- 29 -

> timely, accurate information they need to support their clinical and
> business decision-making.

96.     First Data promoted its pricing information as "accurate," of "high-quality," and

as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive,

pricing and clinical information on drugs." It also recognizes that its pricing information is

"relied upon by professionals in th[e] industry," and that, "*[t]o be useful to its audience, First*

*Data's data must be accurate and up-to-date.*"

97.     In pleadings filed in the *In re Pharmaceutical Indus. Average Wholesale Pricing*

*Litig.*, MDL No. 1456 (D. Mass.), First Data has admitted that buyers and sellers in the

pharmaceutical marketplace rely on its pricing data: "FDB knows the pharmaceutical industry

well and is relied upon by professionals in that industry to report reliable information."

98.     Throughout the 1990s, First Data gained the trust and reliance of participants in

the pharmaceutical marketplace – most notably pharmacies and the third-party payors that

reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

99.     Throughout all this time, First Data knew, of course, that the primary purposes of

publication of the WAC and of the AWP, and of the associated WAC-to-AWP markup

(embedded in the difference between the AWP and WAC data fields), was to serve as an

electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily

transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was

developed because there had to be some price which all parties could agree upon if machine

processing was to be possible." It is stated elsewhere: "AWP represents the average wholesale

price; the average price a wholesaler would charge a customer for a particular product. The

operative word is *average*. AWP was developed to provide a price at which all parties could

agree upon for electronic processing to be possible."

- 30 -

**Q.    First Data's Representations to Gain Marketplace Reliance on Its Pricing Data**

100.    First Data gained this reliance upon the empirical integrity of its electronic publication of AWP due to the representations it made to its customers and others in the pharmaceutical marketplace regarding how First Data populated the fields of information relating to WAC and AWP.

101.    Among other things, First Data held out that its electronic databases contained accurate field information for the AWP for each NDC. Emphasizing that as to the AWP the "operative word is *average*" (First Data's emphasis), First Data indicated that its empirically derived information was obtained directly from its specific contacts "within each major drug manufacturer/labelers organization." First Data represented that when it was apprised that the AWPs suggested by manufacturers were also those used by the wholesalers, First Data published as the AWP the exact AWP that had been suggested by the manufacturer. On other occasions, First Data represented that its AWPs were based upon empirically determined markup factors obtained by First Data after it undertook a comprehensive and sound survey. In these situations, while the manufacturer effectively established both price points (the WAC and the AWP, since the manufacturer established the WAC and knew of the existing mathematical markup factor resulting in the AWP), First Data held out that its markup factors have been corroborated through empirical research of wholesalers' actual markup of WAC to AWP.

102.    During these years, First Data occasionally published information regarding how it derived the markup factors for the WAC-to-AWP spread. This information always emphasized the empirical nature of the data populating its electronic database. Thus, First Data represented:

> -- That industry changes "have made the wholesale survey
> fundamental in maintaining current pricing data";

- 31 -

-- That when a manufacturer had not provided a suggested
wholesale price for a new product, "wholesaler surveys" were
undertaken in order to derive an empirically based markup actually
used by wholesalers;

-- That wholesaler surveys were also undertaken in order "to
confirm that the markup that First DataBank utilizes for AWP is
representative of the wholesaler industry";

-- In the early 1990s, First DataBank represented that it "surveys a
minimum of five drug wholesalers that represent over two-thirds of
the total dollar volume of drug wholesalers," and that the "number
of surveys performed is increasing";

-- Throughout the 1990s, and again in order to paint a picture that
the markups are empirically derived, First DataBank represented
that because "individual wholesalers may markup each
manufacturer differently, a weighted average, not a consensus
average, is calculated," and that then "the market share held by the
wholesalers surveyed affects the markup proportionally," and that
thereby "a higher degree of certainty is achieved."

-- While in most cases the "surveys" matched current data, where
they did not, "it is the policy that First DataBank will change the
markup on file to report marketplace reality."

103.    First DataBank's representations and marketing efforts regarding empirically

driven markup factors obtained by "wholesaler surveys" continued throughout the 1990s. A late-

1990, widely published editorial by First Data regarding AWP pricing stated:

Average Wholesale Price

I have many conversations regarding what is "AWP" and how does
FDB determined [sic] it. There is much folklore and
misunderstanding as to the determination of AWP and where we
get the data. AWP is the average wholesale price. That is, AWP is
the average of the prices charged by the national drug wholesalers
for a given product (NDC). The operative word is average. AWP
was developed to provide a price which all parties could agree
upon for electronic processing to be possible.

*In order to determine the AWP, First DataBank surveys national
wholesalers to ascertain what they use as a price basis in their
AWP files.* We contact the wholesalers to determine what the
markup should be for a new company or to confirm that the

- 32 -

markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.

***The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume.*** The markup that First DataBank utilizes is representative of wholesalers on a national level. Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup proportionally. Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesale price (SWP) in our determination.

Many are under the impression that the manufacturer sets the AWP. FDB considers the wholesale price suggested by the manufacturer a "Suggested Wholesale Price (SWP)" and has a different data element called "SWP" on the NDDF file for those customers who chose to use the SWP instead of AWP. Frequently, the SWP and AWP are the same; however, we are having more instances where they are differing. We will populate the SWP with the new markup, but will survey the national wholesalers to determine AWP. The AWP will be populated with the wholesaler survey price even if it disagrees with the SWP.

In most cases, the results from surveys match what First DataBank is using. In the instances that they do not, it is policy that First DataBank will change the markup to report marketplace reality. (Emphasis added.)

104.   First Data's representations regarding the accuracy of its electronic publication of

AWP were highly successful. By 1998 (and along with its acquisition of its only competitor,

MediSpan), First Data was the sole provider of comprehensive, intragratable electronic data files

providing AWP information throughout the retail pharmacy distribution chain, including most

private third-party payors. Of course, when marketing its products, First Data made this known

stating that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most

Blue Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

- 33 -

**R.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin**

105.    Also during the 1990s, national wholesalers and drug retailers continued to report

significant declines in margin (despite the overall escalation in drug costs). In order to address

escalating healthcare costs, including the significant rise in prescription drug expenditures, third-

party payors and managed care organizations had, to some extent, placed significant pressure on

national wholesalers and the retail distribution industry, causing widely reported reductions in

margin for wholesalers and retailers.

106.    With this increased pressure on margin, retail pharmacies began to look for ways

to stave off the reduction. To insiders in the pharmaceutical industry, it has long been

recognized, as one manufacturer has stated, that "the AWP-WAC spread is the primary

determinant of the end retail pricing of prescription drugs. As a result, changes in the spread will

have a direct impact on retailer profitability as well as drug expenses for not only consumers but

even more uniformly for health insurers and other third party payors."

107.    Another industry insider stated:

> Payors currently use AWP or average wholesale price as a basis
> for reimbursing retail pharmacy for providing RX's to patients
> with insurance and by retail pharmacy as a basis for pricing cash
> prescriptions. Pharmacy reimbursement – a higher spread
> translates into higher reimbursement to retailers and mail order
> pharmacies. The usual reimbursement formula for private third
> party Medicaid RX's in anchored off of AWP – so a higher
> markup will increase the reimbursement level at least in the short
> term.

108.    In 1998, McKesson tested the waters to see whether increased WAC-to-AWP

spread might help its relations with its retail customers. In March 1998, McKesson announced

that it would begin utilization of First Data's AWP. McKesson knew that which was quietly

known by a few of the national chain drug retailers and First Data itself – that many of the

AWPs, and the timing of the reported AWPs, provided by First Data's electronic files were

often, albeit marginally, higher than other publications. While the stated purpose was to provide customers "with consistency in AWP pricing", McKesson made clear to its retail pharmacy customers "that in almost every case retail prices will go up helping increase gross profit." McKesson even gave instructions to its retail customers as to how to electronically access the changed "markup percentages" in order to access the increased gross profit that would be earned at the expense of plan sponsors and consumers by shifting to First Data publication of AWP.

109.    Following McKesson's switch to exclusive use to First Data data, a handful of the largest national chain drug retailers continued to push for increased AWP/WAC markups on drugs, including increased WAC-to-AWP markups for branded drugs that were not already at the 25% level. In and around 1999, national chains and retailers requested increased AWP spread for branded products, and some of them engaged in practices in order to ensure that the increased markups would occur. For example, some large retailers would refuse to stock drugs that had therapeutic equivalents products if the product only had a 20% markup, and more powerful retailers could lock out the products unless the AWP/WAC spread were adjusted upward.

**S.    By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse**

110.    By late 2001, the First Data editorial process for imputing the WAC/AWP markup factor was susceptible of significant abuse. Although First Data held out to the public that its determination of the WAC/AWP markup factor was empirically driven through multiple sources, in truth there was no empiricism and the WAC/AWP markups for numerous NDCs of retail branded drugs became susceptible to manipulation by First Data and those with whom it worked, most notably McKesson.

111.    The truth about First Data's determination of the WAC/AWP markup is that many of their historical claims were simply false. For example:

-- Although First Data claimed that because "individual wholesalers may markup each manufacturer differently, a weighted average, not a consensus average, is calculated", in fact First Data never undertook weighted averages of reported markups. Thus, First Data's publications over a decade had falsely claimed mathematical precision on empirical data for the markups.

-- Although First Data claimed that it undertook "surveys" , in fact no "surveys" in the reasonable sense of that word were undertaken. First Data's questions were not set forth in a survey design, nor were they even in writing. Responses received were not memorialized in writing. No other paper trail was kept.

-- The purported "surveys" undertaken by First DataBank rarely occurred. When a inquiry was made, it was a monetary phone call lasting only a few moments.

-- Although First Data claimed, during the 1990s was "increasing" in fact the "surveys" were was decreasing given the ongoing consolidation among national drug wholesalers. Moreover, First Data was not taking a calculated average of the markups reported, it only used a "consensus" approach which did not require a response from all the major national wholesalers.

-- During most times during the 1990s, even the wholesalers that were "surveyed" apparently did not know that they were being surveyed. Since the wholesalers themselves purchased their information about AWP from First Data itself, most found circular at best the notion that First Data would "survey" them to find out AWP information that the wholesalers themselves had already purchased from First Data.

-- By around 2000, only a few national wholesalers existed and were on the short list for First Data "surveys." Most of these wholesalers professed never to have participated in First Data "surveys" at any time.  By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson.

112.    First Data continued to mislead its customers and the public about the nature of its

AWP and WAC-to-AWP markup data.  For example, in a 2002 letter to subscribers of its

publication Price Alert, First Data's Kay Morgan describes AWP as follows:

I have had many conversations regarding what "AWP" is and how First Data determines it. There is much folklore and misunderstanding as to the determination of AWP and how we obtain the data.

AWP is the average wholesale price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC), often referred to by First Data as the "Blue Book Price." The operative word is *average*. AWP was developed to provide a price, which all parties could agree upon.

In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what the price is. This is based on their AWP price files. We contact the wholesalers to determine what the markup should be for a new company. *First, DataBank then confirms that the markup is accurate and current.* A survey may be performed on a single NDC number or on a manufacturer's entire product line. In either case, a survey will be performed with all national wholesalers to determine the appropriate AWP.

*With increased numbers of surveys done, the determination represents over two-thirds of the volume of the wholesalers, and is also representative of wholesalers on a national level.* Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup factor proportionally. Therefore, wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesaler price (SWP) in our determination. [Emphasis added.]

113.    This 2002 publication, mimicking the similar 1991 First Data publication of eleven years earlier, continued most of the falsehoods about First Data. In its 2002 website, again First Data claims that its published AWPs result from *surveys* of national wholesalers and that the number of surveys is "increasing."

T.    **Implementation of the Five Percent Spread Scheme**

114.    On the eve of the McKesson and First Data Scheme, McKesson observed that: "[E]verything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's." This would soon change.

115.    The genesis of the conspiracy to raise the WAC-to-AWP markup was FDB's desire to raise the markup or the AWP to "█████████████" MCKAWP 0068514. By "█████" McKesson meant an increase in the margin earned by its retail clients. Thus, in September 2001, McKesson's James Robert in an internal e-mail now marked "Highly Confidential" by McKesson, reported that McKesson chose to increase "██████████ █████████████████████████████████████████████ ████████████████"

116.    Shortly after his September 2001 e-mail, Roberts approached FDB to discuss FDB's willingness to "████████████████████████" MCKAWP 0068599 (marked "Highly Confidential"). "████████████" eventually become one of the buzzwords used by McKesson and FDB to describe their manipulation of the WAC-AWP spreads on hundreds of brand name drugs.

117.    McKesson, knew that as one of the largest national wholesalers it had "█ █████████████████████████████████████████████████ █████" and, if it were to succeed, that "███████████████████████"[3] McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs because First Data's "███████████████" were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail. Initially McKesson merely changed its suggested sell price "████████████████████████████████████████████████ █████████████████████████████████████████████"[4] But when the competition did not respond as expected or First Data failed to survey the change as quickly as hoped, McKesson decided to take direct action.

---

[3] MCKAWP 0068514.

[4] MCKAWP 0068514.

118.    McKesson was aware that First Data had a virtual lock on the determination of

AWPs because it was one of only two electronic sources for price information, and although it

was "not widely known," First Data had "a contract with the Medispan group [the only other

electronic pricing source] requiring that FDB·supply the data over the next 3 or 4 years [i.e.

through 2005 or 2006]. This means that essentially the Medispan data is the First DataBank

data."

119.    In August 2001, despite McKesson's knowledge that AWPs were supposed to be

the result of publisher's surveys of actual wholesale prices, McKesson and FDB "mutually

agreed" to move the AWP or WAC-to-AWP spread on all Searle products from 20% to 25%.

Thereafter, McKesson and First Data agreed to implement a fundamental change in the WAC-to-

AWP markups for branded drugs of all of the major manufacturers.

120.    That defendants' collusion began as early as August 2001 is documented by an

internal memorandum drafted by Bob James, McKesson's Director of Brand Pharmaceutical

Production Management, stating:



---

[5] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup. (FDB-AWP 053695).



121.    Beginning sometime in late 2001 or early 2002, First Data, by agreement with McKesson, limited its' purported "surveys" to McKesson and did not "survey" other wholesalers. First Data agreed to utilize for markup purposes data received from McKesson. At the same time and as part of a common plan, McKesson implemented a 5%[7] increase in the WAC-to-AWP markup for hundreds of brand-name drugs that it distributed. This increase was from 20% above WAC to 25% above WAC for the affected drugs. As part of the agreement and following their agreed course of conduct and common plan, First Data then published the new figures for hundreds of brand-name drugs without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a "weighted average." First Data knew that this increase across the board from 20% to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing "reliable" and "accurate" information as it had promised. McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace. Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients.

---

[6] MCKAWP 69608-09.

[7] Sometimes the increase was more than 5%, as the intent was to raise all markups to 25%. So if a drug was at 18%, it was moved up to 25%.

122.    By November 2001, FDB's Kay Morgan, and McKesson's James Robert, were exchanging e-mails confirming the results of their collaboration:  "" MCKAWP 0068621.

(Marked "Highly Confidential")

123.    McKesson's own internal documents describe the profitability of increasing spreads for its key customers.  Thus, McKesson noted the following:



Most would agree that these improvements are extremely significant.

124.    In December 2001, FDB and McKesson engaged in "discussions" that resulted in an increase in the markups of companies "" MCKAWP 0069608.

125.    McKesson's collaboration with First Data was highly effective.  In March 2002 Bob James reports:

█████████████████████████████████████████[8]

In April he reports that First Data gave up all pretense of conducting a survey for new products:

"████████████████████████████████████████████████████████████"[9]

126.    An increase in the WAC-to-AWP spread directly results in higher prices to

plaintiffs and members of the Class. For example, in the case of AstraZeneca's Prilosec (as

reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72.

The following chart reflects, for a single drug manufactured by certain companies, the AWP

spread increase and related AWP increase:

| Defendant | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

127.    Another way to understand the widespread nature of the change in the WAC-to-

AWP markup as a result of the McKesson-First Data agreement, is to examine the change in the

WAC-to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical

manufacturers over time: The increases, all occurring in hundreds of drugs, among multiple

---

[8] MCKAWP 0042663.

[9] MCKAWP 0069616.

manufacturers, at the same time, could not have happened by chance or independent conduct, but instead are the result of a common plan:

**Number of NDCs Experiencing an WAC/AWP Spread Change from 20% to 25%**



- 43 -











**PFIZER**
**Number of NDCs with Spread Change from 20-25%, 1999 - 2004**



**ELI LILLY**
**Number of NDCs with Spread Change from 20-25%, 1999 - 2004**

001821-13  119497 V1

128.    Examining the Scheme on an annual basis also illustrates the timing and extent of the Scheme's implementation:



129.    The dramatic across the board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data. As noted, McKesson reported the across the WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

130.    First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies -- by increasing their profits. In February 2002 Bob James sent Kay Morgan a document he drafted entitled, "███████████" which explained that 20% markups "█████████████████████████

████" and that "█████████████████████████████████████

████████████████████████████████████"[10]  Later, on May 1, 2002, he

writes to her about the "████████████" the term McKesson coined to refer to its efforts to

impose a uniform 25% markup on all brand prescription drugs.[11]  In an e-mail sent to Alicia

Nielson, Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002

Bob James enclosed a prior internal communication in which he explained that McKesson had

"██████████████████████████████████████"[12]  First Data

enthusiastically embraced the "normalization" program, as reported in the following Aventis e-

mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration &

Development at Aventis:



131.   Eventually First Data ceased consulting with any other wholesalers and relied

entirely on the information that McKesson provided it to determine AWPs.  McKesson was

aware that First Data routinely disregarded manufacturer's suggested sell prices – Kay Morgan

frequently shared such snubs with her friend Bob James:



---

[10] MCKAWP 0069613.

[11] MCKAWP 0069642.

[12] MCKAWP 0069775.



\* \* \* \* \*

132.   ███████████████████████████████████████

███████████████████████████[15]  By early 2002, however, McKesson estimated

that through defendants' efforts ███ of the industry had turned to the ███ markup.[16]  By late

2002, McKesson estimated that the number had increased to ███[17]  In 2004, McKesson

estimated that ███ of the prescription drugs were set at a ███ markup.[18]  McKesson

acknowledged that without its efforts, "███████████████████████████"[19] and that the

industry shift "███████████████████████████████████████████████

███████████████"[20]

133.    Each defendant had a reason to implement this Scheme.  For sales to non-cash

paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit

---

[13] MCKAWP 0069586.

[14] MCKAWP 0001183.

[15] MCKAWP 0069502.

[16] MCKAWP 0069609.

[17] MCKAWP 0069502.

[18] MCKAWP 0069766.

[19] MCKAWP 0069732.

[20] MCKAWP 0068599.

providers based on AWP. Consequently, pharmacies make a profit on the spread between AWP and the actual acquisition cost for the drug. Under this system, a higher WAC/AWP spread results in increased profits to pharmacies. Thus, McKesson and First Data by operation of the Scheme benefits retail pharmacies. "PBMs" (Pharmacy Benefit Manufacturers) also make money off the spread between AWP and WAC. The Scheme also benefited PBMs.

134. Indeed, for several years many of the major retail pharmacies had jointly approached various pharmaceutical manufacturers and urged that they raise the WAC/AWP spread by 5%. The manufacturers did not do so. On information and belief, these same retailers then urged McKesson to do so and McKesson had a strong financial incentive to cooperate with retail pharmacy clients and this incentive was one of the motivating factors for McKesson in terms of implementing the Scheme:

(a)    In recent years, the wholesale drug industry (including McKesson) and retail pharmacies have been economically threatened by the managed care industry. McKesson, as have other wholesalers, has seen their relationships with retail pharmacies as a key to their future. In this regard, over the past five years, the wholesale drug industry and McKesson have sought to compete by downplaying the traditional product distribution functions and by developing new programs to strengthen their retail pharmacy customer base. These include dozens of specialized services ranging from departmental "planogramming" to special contract administration programs for buying groups. The provision of these value-added services is a key element in the campaign by drug wholesalers like McKesson to build the kind of customer loyalty in retailers that will help them to shore up their own sagging profit margins. McKesson offers dozens of value added programs to retail pharmacies, including technology and care management solutions that it offers to "25,000 retail and 5,000 health systems pharmacies

- 50 -

nationwide."[21] McKesson's customers for these programs include "large national chains and community drugstores, as well as hospital pharmacies, outpatient clinics, and other institutional providers."[22] If McKesson could cause First Data to report a higher AWP, McKesson could use this to curry favor with retailers who use McKesson as their wholesaler or other services and to further establish or maintain business ties between retailers and McKesson. As noted in McKesson's 2004 Annual Report, in recent years a significant portion of its revenue growth came from large customers, including such large retail pharmacy chains like Rite-Aid. Rite-Aid represented 8% of McKesson's 2003 revenues. In 2003, Rite-Aid named McKesson its wholesaler of the year. In a 2003 article in Chain Drug Review, McKesson executive Pat Blake described McKesson and retailers as "we're really positioned to be a business partner" due to the company's automation and information technology offered to retailers as well as its Access Health Programs linking retailers with third-party payors. Indeed, Rite-Aid was one of the companies that had asked, without success, certain of the defendant manufacturers to increase the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the results of the Scheme), McKesson offered large retail pharmacy chains a chance to make a profit off the increased spread.

(b)    On occasions McKesson implemented the Scheme at the direction or request of its retail customers and was proud of it. For example, in September 2002, Bartell's complained that an "███████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[21] McKesson website: http://www.pharmaceutical.mckesson.com/wt/home.php.
[22] *Id.*



MCKAWP 0069817. McKesson closed by telling Bartells "█████████████████████

███████████████████████" Thus, the 5% Spread Scheme was a benefit

direct to McKesson's largest clients, many of whom, like Bartell, had previously approached the

drug manufacturers seeking imposition of the 5% increase.

       (c)     Internally McKesson calculated how it could pitch the Scheme's benefits,

new AWPs and larger spreads, to obtain large retail accounts. So, for example, the following

was the pitch to one account:



This benefit was the result of the "FDB process," *i.e.* the Scheme at work.

       (d)     McKesson's "Blue-Chip" customer based includes retail national chains

such as Rite-Aid, Eckerd, Brooks, Albertson's, Safeway and Giant Eagle. Other "Blue-Chip"

clients included "retail small chains," such as Bartells, Bi-Mart, A&P, and Haggen. All of these

blue-chip accounts benefited from the spread and McKesson touted its role in increasing the

spreads.

       (e)     The Scheme also directly benefited McKesson's own pharmacy business.

McKesson has an operation called McKesson Valu-Rite, which consists of a nationwide network

of independent pharmacies that are connected to McKesson. McKesson manages 275

pharmacies in 35 states and employs 900 pharmacists. Again, an increase in the spread was a

direct benefit to these pharmacies by increasing profits off the spread. This in turn also increased

McKesson's profits from its Valu-Rite program.

(f)    Further, by simply raising the spread on hundreds of drugs, McKesson saved money from reductions in administrative expenses in reporting AWPs to First Data. It was far easier to simply flip a switch converting hundreds of drugs from 20% to 25% over WAC than to deal with the drugs one at a time. Thus McKesson had its own interests that were served by the 5% Scheme.

135.    First Data also saw advantages to participating in the 5% Scheme:

(a)    By virtue of reporting a higher AWP, First Data incentivized other powerful forces in the distribution chain to use First Data's AWP as the pricing standard and thereby created greater demand for First Data's reporting services. For example, PBMs in their contracts with end payors often designate which publisher's AWP will be used to set the AWP. PBMs frequently take a percentage of the spread between AWP and acquisition cost so the larger the spread the more profit they make. As of 2002, many if not most of the major PBMs specified the use of First Data. In addition, by virtue of its partnership with McKesson, McKesson designated First Data's AWP to be the pricing standard for the Together Rx program, a prescription drug savings program for Medicare enrollees, thereby again increasing the use of First Data's services. Thus First Data, like McKesson, had its own interests that were served by the 5% Scheme.

(b)    Second, at some point in 2002-2003, certain manufacturers and wholesalers who were angry at the bump in the WAC–to–AWP spread, refused to provide First Data with pricing information. If First Data publicly revealed that certain manufacturers and wholesalers were disavowing the current WAC-to-AWP spread, the use of the AWP system could be threatened which in turn would threaten, if not eliminate the use of First Data's

published prices.  By participating in the Scheme and continuing the illusion of surveys, First Data maintained the demand for its services.

136.    McKesson and First Data also agreed to hide the Scheme by implementing the WAC-to-AWP increases only when the manufacturer increased WAC.  McKesson and First Data were fearful to implement the Scheme without such an increase because such action "would trigger a lot of questions on why there was a change to the item when the MFG (manufacturer) hasn't sent any price changes."  To avoid having end payors ask questions, McKesson and First Data camouflaged the Scheme by imposing the 5% increase when other price changes were reported, thus in effect compounding price increases.  This part of the Scheme is depicted by the following chart showing a dramatic increase in the number of 25% spreads associated with price changes in 2002 and 2003:

**First Data Bank Number of Reported Price Changes at 25% and 20% AWP/WAC Spread Levels, 1989 - 2004**

- 54 -

001821-13  119497 V1

137.    After the scheme was implemented (and despite the flack from some drug manufacturers), First Data and McKesson continued their collaboration to ensure that First Data's WAC/AWP markups mimicked those of McKesson, and vise-versa.

138.    These post-2001 communications were in no sense a "survey" being conducted by First Data.  Indeed, the communications were bilateral, with First Data equally enforcing the new WAC/AWP markup protocol.  And even when disparities were shown in the databases, First Data would counsel against making changes because "it would trigger a lot of questions on why there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changes."

139.    At times, when McKesson was "catching some flack from our large retail friends," McKesson would ensure that both it's and First Data's databases contained the higher WAC/AWP markup.  At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed."

140.    McKesson sought to hide the Scheme.  When Brian Ferreira of VPS Retail wrote to Bob James, asking him to "███████████████████████████████████████████ ███████████████████████████████████" he knew better than to respond to the request in writing, writing only:  "███████████████████████████████████████████ ███████"[23]  McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

███████████████████████████████████████████████████████
███████████████

\* \* \* \* \*

---

[23] MCKAWP 0069714.



* * * * *

* * * * *

* * * * *

* * * * *

* * * * *

* * * * *

---

[24] MCKAWP 0066465.

[25] MCKAWP 0069591.

[26] MCKAWP 0069594.

[27] MCKAWP 0066464.

[28] MCKAWP 0069732.

[29] MCKAWP 0042663.

141.    First Data also knew the importance of keeping the Scheme a secret. In response to an e-mail inquiry whether electronic drug pricing publishers were increasing the AWP/WAC spread, Kay Morgan denies any involvement, adding, "██████████████████████ ██████████████████████████████████"[30] She forwarded on the exchange to Bob James at McKesson, stating, "██████████████████████████ ██████████████████"[31]

142.    When in 2003 one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products", First Data reported to McKesson that this manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data indicated that it would, then, "just assume the markup is 1.25." In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below."

143.    Many insiders in the pharmaceutical industry recognized that the extraordinary, across-the-board increase in the number of drugs that were increased in the WAC/AWP spread from 20 to 25% was a "change... being driven at wholesaler lever" in order to accommodate the large drug retail chains.

144.    First Data's participation in the Scheme is also evidenced, in part, by its conduct with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis filed declarations stating that Novartis regularly communicated its AWP to the Publishers,

---

[30] MCKAWP 0069588.

[31] *Id.*

including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP

published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in

its declaration that since January 18, 2002, First Data has consistently published an AWP that

was 5% higher than the AWP reported by Novartis, or 25% over WAC. However, the Novartis

declaration did not describe anything Novartis had done to remedy First Data's fraudulent

reporting of Novartis' AWP.

**U.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme**

145.    Some branded manufacturers noticed implementation of the Scheme and

immediately appreciated its purpose – to provide additional profit to the wholesalers and retailers

in the pharmacy class of trade. One branded company commented that "First Data, at the

direction of the wholesale industry, has begun to change all branded pharmaceutical products to

a 25 % markup… and that "the spread will be changed as product price changed…." The same

company observed that the "largest negative factory is publicity" since the increase in AWP

would increase end payors prices (even though it may not increase that revenues to

manufacturers).

146.    A different branded manufacturer also observed that the changed WAC/AWP

markup for many branded drugs was "being driven at wholesaler level" and that they are

"reporting 1.25 when companies take a price increase…."

147.    Because branded and generic manufacturers have historically established AWPs

for their NDCs either directly (by suggesting and AWP that was incorporated by First Data and

wholesalers) or indirectly (by setting a WAC and setting or knowing of the markup factor to be

applied to that WAC), manufacturers whose NDCs had been affected by the McKesson/First

Data Scheme, asked First Data for answers as to why the markups had changed for selected

branded products in 2002. In response, First Data generally pushed them off, giving different

answers to different manufacturers. To make matters worse, First Data had counsel for its parent, the Hearst Corporation, write letters to various branded manufacturers' representatives. In these letters, Hearst's lawyers made claims which were false.

148. Ultimately, brand-name manufacturers did nothing in response to the Scheme. First Data and McKesson kept their scheme secret, and almost universally branded manufacturers acquiesced to the results of McKesson/First Data Scheme. Moreover, branded manufacturers took no action to disclose the existence of the inflated AWPs which had been effectuated by the Scheme to change the WAC/AWP markup. As a result, while First Data and McKesson as insiders to the Scheme were well aware of the changed markup factor (and corresponding increase in reimbursement payments being made throughout the country), and while some branded manufacturers were similarly aware that many of their branded products had experienced the WAC/AWP markup change without their explicit request, none of them disclosed this to the marketplace at large. Indeed, some manufacturers republished or utilized the new First Data AWPs in communications to customers or other publishers. In a market where billions of prescriptions are filled each year, where over 65,000 NDCs are actively in the marketplace, and where the WAC/AWP Scheme was sequentially implemented during the course of 2002 and later as price increases imposed by the manufacturers were effectuated, the Scheme went unnoticed to the marketplace at large. Indeed, even when players in the pharmaceutical marketplace noticed the increases in the WAC/AWP spread, they assumed by virtue of the manufacturers' silence that those increases were the result of the actions of those manufacturers.