UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY; and
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE
FUND,

　　　　　　　　　　　　　Plaintiffs,

　　　　v.

FIRST DATABANK, INC., a Missouri
corporation; and McKESSON
CORPORATION, a Delaware corporation,

　　　　　　　　　　　　　Defendants.

CIVIL ACTION: 1:05-CV-11148-PBS

**CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION
FOR PRELIMINARY APPROVAL OF PROPOSED FIRST DATABANK CLASS
SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND APPROVAL OF
NOTICE PLAN**

## I.    INTRODUCTION

The Class Plaintiffs respectfully submit this memorandum in support of the joint motion for an order: (i) preliminarily approving the proposed settlement of this class action as to Defendant First DataBank Inc., ("FDB") only ("Settlement"), (ii) certifying a Settlement Class (as described more fully below), and (iii) approving a notice plan and notices.

The Settlement encompassed by the parties' Settlement Agreement provides: (i) for First DataBank to make changes to its pharmaceutical database by rolling back the markup factor between wholesale average cost ("WAC") and average wholesale price ("AWP") on 8,467 drug formulations ("NDCs") of actively distributed prescriptive pharmaceuticals in the United States (referred to as "Rollback Drugs") from a markup of about 1.25 to a markup of 1.20 (a decrease of AWP of about 4%) and (ii) for FDB to cease the compilation and publication of AWP and BBAWP fields of data as the industry pricing standard within two years from the date of final court approval of the Settlement (subject to certain conditions).  In exchange, First DataBank would be released of liability arising out of or in any way connected with the claims brought or factual allegations made in this action.

Class Plaintiffs and their counsel believe that the Settlement is fair, reasonable, and adequate.  The resolution was reached after dozens of arms-length, intensely fought negotiation sessions spanning over almost one year.  During the confidential negotiations, documents were reviewed and financial information exchanged.  Numerous experts, public prosecuting authorities and lay persons were consulted.  The prospective relief afforded to the class – relief through an effective 4% rollback of the published FDB AWP for about 95% of all retail branded drug transactions – will have enormous financial benefit.  Because FDB has comparatively little assets, any eventual litigation judgment against it (which of course is disputed by FDB) would

net the class far, far less than the projected savings from the rollback. This joint motion seeks

preliminary approval of the Settlement, certification for settlement purposes of the Class and

appointment of Class counsel. The motion also requests that the Court order that notice of the

Settlement be disseminated to the Class, and schedule a hearing to determine whether final

approval of the Settlement should be granted.

The following documents are relied upon in connection with these proceedings:

(1)    Class Plaintiffs' and First Data bank's Joint Motion for Entry of an Order (a)
       Granting Preliminary Approval of the First Data Bank Settlement, (b) Certifying
       a Class for Purposes for Settlement, (c) Directing Issuance of Notice to the class;
       and (d) Scheduling a Final Fairness Hearing;

(2)    Class Plaintiffs' Memorandum of Law in Support of Joint Motion for
       Preliminary Approval of Proposed First DataBank Class Settlement,
       Certification of Settlement Class and Approval of Notice Plan

(3)    Attachment A to Class Plaintiffs' Memorandum of Law in Support of Motion
       Joint Motion for Preliminary Approval of Proposed First DataBank Class
       Settlement, Certification of Settlement Class and Approval of Notice Plan

(4)    Attachment B to Class Plaintiffs' Memorandum of Law in Support of Motion
       Joint Motion for Preliminary Approval of Proposed First DataBank Class
       Settlement, Certification of Settlement Class and Approval of Notice Plan
       FILED UNDER SEAL

(5)    The Settlement Agreement and Release between Class counsel and First
       Databank, Inc, dated August 7, 2006 (filed herewith):

(6)    Exhibit A to the Settlement Agreement, (listing the NDCs for Pharmaceutical
       products subject to adjustment provisions in the Settlement Agreement);

(7)    Exhibit B to the Settlement Agreement, Settlement Notice- Notice of Pendency
       and Proposed Settlement of Class Action and Settlement Hearing;

(8)    Exhibit C to the Settlement Agreement, Summary Notice for Publication;

(9)    Exhibit D to the Settlement Agreement, Proposed Order Granting Preliminary
       Approval of the First Databank, Inc. Settlement, Certifying Class for Purposed
       of Settlement Only, Directing Notice to The Class and Scheduling a Fairness
       Hearing;

(10)    Exhibit E to the Settlement Agreement, Final Order and Judgment Certifying The Class for Purposed of Settlement, Approving of Class Action Settlement, and Dismissing the Action with Prejudice;

(11)    Declaration of Katherine Kinsella (in connection with proposed form of notice to consumers and third party payors and [Proposed] Notice Plan);

(12)    Declaration of Raymond S. Hartman (relating to estimation of cost savings relating to the rollback on the Rollback Drugs);

(13)    Declaration of Thomas M. Sobol in Connection with Motion for Preliminary Approval of Settlement as to Defendant, First Databank, Inc Only - FILED UNDER SEAL;

(14)    Declaration of Steve W. Berman in Support of Plaintiff's Motion for Class Certification and in Support of Motion to file First Amended Complaint (filed July 17, 2006 [Docket #91]);

(15)    Declaration of Susan A. Hayes in Support of Plaintiffs' Motion for Class Certification (filed on July 17, 2006, [Docket #78]);

(16)    Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification (filed on July 17, 2006, [Docket #77]); and

The procedure for preliminary approval of a class action settlement includes setting deadlines for (i) providing notice; (ii) opting out of the Settlement Class; (iii) objecting to the Settlement Agreement or the required award of attorneys' fees, costs and expenses; and (iv) setting a hearing date for final approval. A proposed schedule is set forth below to provide the Court with a timeline for the various steps in the settlement approval process.

| Step | Event | Timing[1] |
|------|-------|-----------|
| 1. | Motion for Preliminary Approval Filed | October 3, 2006 |
| 2. | Notice to be posted on internet | November 20, 2006 |
| 3. | Notice to be mailed to TTPs | November 20, 2006 |
| 4. | Publish Short Form Notice | December 11, 2006 |

[1] These dates will of course, need to be adjusted depending upon the dates set by this Court for the Preliminary Approval hearing and the issuance of this Court's Preliminary Approval Order.

4

| 5. | Deadline for Filing Material for Final Approval and Motion for Attorneys' Fees and Reimbursement of Expenses | February 1, 2007 |
|----|---|---|
| 6. | Postmark deadline for Requests for Exclusion | March 1, 2007 |
| 7. | Postmark deadline for Objections | March 1, 2007 |
| 8. | Deadline for responding to any Objections | March 22, 2007 |
| 9. | Final Fairness Hearing | April 2, 2007 (or at the Court's earliest available date) |

## II.    DESCRIPTION OF THE LITIGATION

### A.    Class Claims

This action was commenced by plaintiffs on June 2, 2005, against two defendants, First DataBank, Inc., ("FDB") and McKesson Corporation, ("McKesson") charging them with wrongfully increasing the so-called WAC-to-AWP markup factor for about 1,600 NDCs of prescription pharmaceuticals through a scheme begun in late 2001 and early 2002, thereby causing members of the proposed class (all persons and entities who had purchased or reimbursed for the subject drugs on the basis of AWP) to make substantial excess payments for those drugs.  Plaintiffs allege that FDB and McKesson wrongfully effectuated the increase in the markup factor in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964 ("RICO") and various state consumer protection law.[2]

The settling defendant, FDB, has denied, and continues to deny, that it committed any violation of law or any wrongdoing and further denies that it has any liability with respect to any of the claims asserted in the First Amended Complaint (the "FAC").  Class counsel continue to prosecute the action against the remaining defendant, McKesson.

### B.    The Class Plaintiffs' Prosecution of the Case

---

[2] The Court is aware of the extensive facts and claims alleged in this action since the Court has already conducted Rule 12(b)(6) proceeding brought by McKesson, and denied McKesson's motion [Order, 05-cv-11148 (PBS), District of Mass, 12-01-05].

The June 2005 filing of this action had been proceeded by more than a year of documentary, financial and testimonial investigation by class counsel regarding the historically aberrant 2002 markup hike for numerous brand name pharmaceuticals.

Since the filing of this case, the matter has been actively litigated. Defendant McKesson moved to dismiss the action under Rule 12(b)(6), and in December of 2005 this Court denied that motion. Plaintiffs have filed a motion to certify the claims and defenses in the action, and further class discovery and briefing is underway. Merits discovery is also well underway.

Both before and after litigation was commenced, significant discovery was obtained directly from FDB. Prior to the litigation and in the context of *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, class counsel obtained from First DataBank records regarding manufacturer and wholesaler communications, drug specific documentation, changes to price data fields, copies of the First DataBank database (known as the "NDDF") and deposed the senior manager at First DataBank responsible for the FDB database. Also prior to this litigation, class counsel worked extensively with health care economists to review and analyze historical FDB and other database information, compare that database to other industry price databases, and analyze the extent of the alleged wrongful conduct.

The parties have been actively engaging in formal and (as to FDB) informal discovery efforts. On July 17, 2006, Plaintiffs' filed Plaintiffs' Motion for Class Certification in the case, along with supporting papers (including the Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification [Docket #77], Declaration of Steve S. Berman in Support of Plaintiffs' Motion for Class Certification and Motion for Leave to File First Amended Complaint [Docket #91] and Declaration of Susan A. Hayes in Support of Plaintiffs' Motion for

Class Certification [Docket #78]. McKesson's opposition papers to the Class Certification

Motion are due on September 29, 2006; the Court has scheduled a hearing in connection with

Class Certification for April 12, 2007.

The allegations in the FAC and the presentation of some of the evidence which is

common to the Class is outlined in Attachment B to this memorandum which with the Court's

assent, is filed under seal.

**C.    History of Settlement Negotiations**

In the fall of 2005, class counsel and representatives of FDB began settlement discussions

in earnest. Since then and for about one year, on a weekly and sometimes daily basis, the parties

negotiated at arms-length the terms of a creative solution which would afford the class enormous

financial and other benefits while being cognizant of the comparatively limited resources

available to First DataBank, a private subsidiary of Hearst Corporation. Of course, class counsel

and representatives of FDB itself participated in virtually all the discussions, but others were

consulted as well. The class plaintiff representatives themselves were consulted through class

counsel over the many months; consumer groups and consumer coalitions participated in

evaluation of the relief; on an informal and non-binding basis, representatives of attorneys'

general offices from over one half dozen states reviewed the terms and negotiations; outside

counsel to some of the U.S. largest private health benefit providers participated directly in some

negotiations and were consulted on all terms. In addition, class counsel assured that no

discussions regarding the issue of attorneys' fees took place until after the substantive terms of

the agreement had been reached in order to assure that there was not even an appearance of

impropriety that might arise from blending substantive issues with the issue of attorneys fees.

### D.     The Risks of Litigation

Throughout the discovery and settlement negotiation process, the Class Plaintiffs have gained an understanding of the case against FDB.  The Class Plaintiffs ultimately agreed to the settlement as to FDB only after evaluating various factors, including certain risks to Plaintiffs' ability to recover a substantial judgment against FDB.  The assessment included an analysis of (i) liability risks as against FDB, (ii) estimates of the potential damages recovery, (iii) the ability of FDB to pay a judgment, and (iv) the benefit of other settlement provisions that might be negotiated.  Each is discussed below.

First, as to liability, the Class Plaintiffs recognized liability risks including[3]: (i) that proofs of wrongful conduct can be elusive, particularly in a business world dominated by electronic communication; (ii) that the litigation is complex, and the results of which are unpredictable; and (iii) FDB is a publisher and not a manufacturer, supplier, wholesaler, or seller of prescription pharmaceuticals.

Second, as to damages, Class Plaintiffs estimate that if Class Plaintiffs are permitted to proceed to trial on the basis of the Class as currently defined in the FAC, a conservative estimate of total, single damage compensatory relief will exceed $8 billion.  This estimate of single

---

[3] While Plaintiffs believe the allegations and damages in the underlying case are realistically measured in the billions of dollars, FDB is a private subsidiary of Hearst Corporation and, when compared to large pharmaceutical companies or pharmaceutical wholesalers such as McKesson, FDB has little financial ability to pay a substantial judgment or cash settlement.  Furthermore, FDB is the most widely used of the few integrated electronic databases capable of providing real-time reconciliation of detailed drug transactions; thus a bankrupting monetary judgment against FDB might disrupt corporate operations of price reporting ubiquitously relied upon at all levels of the retail pharmaceutical markets.

A class is appropriate in this case, as Defendants' course of conduct involves three critical and common elements that bind the Class members together: (1) the use of AWPs as the "industry pricing standard"- virtually all transactions involving the Subject Drugs due to its use of pricing standard in all contracts between PBMs and third-party payors; (2) the increase in the WAC to AWP spread and therefore the AWP contract price for each of the Subject Drugs as a direct result of Defendants' Scheme; and (3) Plaintiffs' and Class members' payment of sums directly tied to the increased AWPs.  Resolution of these common elements from which liability and damage determinations can be made on a class-wide basis is superior to any alternative and will result in achieving substantial justice.

damages for the Class in the FAC is a preliminary estimate, and will be refined during the course

of discovery and expert report submission.

The basis for the preliminary estimate is as follows:

1. The approach starts with the 1,659 NDCs that are the subject of the FAC. It is estimated that the1,659 NDCs represent about 40% of the top 200 retail branded drug transactions.  Although the 1,659 NDCs include other drugs as well, for simplification purposes we use only the 40% of the top 200 retail branded drugs.

2. We then took estimates of the total sales (as opposed to expenditures, which would have been higher as it includes distribution costs as well) associated with these drugs during the Class period, and came to totals of them.  In this situation, we therefore took 40% of the top 200 retail branded drug sales.  To put this in some perspective, total retail branded drug sales during the class period ranged exceeded 125 billion each year.

3. Because the FAC alleges that there was an unlawful increase in the markup on the WAC to arrive at AWP of from 1.20 to 1.25 during a Class period which markup was effectuated at a time of a price increase for each drug, we calculated the amount by which the increased AWP (an effective 4% increase on AWP) increased sales during the Class Period.

4. As a result, our preliminary estimate of single damages during the Class period is almost $7 billion, without interest.  A preliminary estimate is attached as Attachment A.

Class Plaintiffs believe, therefore, that on any view of the facts the damages sought in the

case would be extraordinary.  Class Plaintiffs have attached to the Declaration of Thomas M.

Sobol a work product spreadsheet of the preliminary estimate of single damages.  This

submission is filed under seal with the Court.

The third consideration in evaluating the Settlement was the ability of First DataBank to

pay any eventual substantial judgment that in anyway approximates the estimate of single

damages.  FDB is unlike the other defendant, McKesson.  McKesson is a large public

corporation based in San Francisco, California.  In the most recent SEC Form 10K (for fiscal

year ending March 31, 2006), McKesson reported net revenues of $88.1 billion, $8 billion higher

than the net revenues reported for the prior fiscal year.  "*Annual Report 2006, Form 10K*,"

McKesson Corporation, 31 March 2006, p. 3 (retrieved September 18, 2006 from

http://www.mckesson.com/en_us/McKesson.com/Investors/Annual+Reports/Annual+Reports.ht

ml.)  McKesson also has the ability to withstand payment of a large judgment.  For example, on

January 12, 2005, McKesson announced a $960 million cash settlement to resolve pending

securities litigation.  Id. at 32**.**

      First DataBank is quite a different story.  FDB is a private subsidiary of Hearst

Corporation.  Pre-tax profits of FDB are orders of magnitude less than that of McKesson, and

orders of magnitude less than potential single damages sought in the case.  Because FDB is a

private company, the financial condition of FDB is confidential and competitively sensitive.

Accordingly, an analysis of FDB's ability to pay is set forth in a separate Declaration of Thomas

M. Sobol, filed under seal with this Court on this date.

      Finally, the potential benefits of proceeding forward with litigation (given these risks)

were weighed against the benefits of the proposed settlement.  Class counsel have concluded that

not only is the proposed settlement a fair and just resolution of the Class claims against FDB

only, but indeed the settlement is likely to provide the class with far more financial and

institutional benefits then it could ever hope to achieve from First DataBank even after years of

further litigation.  The critical considerations were:

      First, the rollback.  FDB has agreed to rollback from about 1.25 to 1.20 the markup factor

for 8,487 formulations of drugs.  The provisions of the Settlement, therefore, apply to more

NDCs than set forth in the FAC (the rollback applies to 8,487 NDCs while the FAC relates to

1,659 NDCs).  A detailed estimation has been prepared by Plaintiff's expert healthcare

economist of the potential cost savings that might be realized from the rollback.  That analysis

estimates that the drug coverage represented by the settlement is in excess of 95% of the retail

branded drug transactions in the United States.  See Declaration of Raymond Harman, ¶¶ 9-12.  .

A reduction in the markup factor of 0.05 off the  1.25 which applies to virtually all these drugs

represents a 4% reduction in the stated AWP.  Accordingly, the rollback will effectuate a

national 4% reimbursement rate reduction in almost all retail branded drug transactions

reconciled through the FDB database.  Class counsel had been provided an estimate that the drug

cost savings over the first twelve month effective period of the rollback would be in excess of $4

billion.  This savings in excess of $4 billion to all end payors by reason of the relief effectuated

by this settlement includes about $3.3 billion in estimated savings to private third party payors

and slightly less than $400 million in estimated savings to cash and uninsured payors.

Of course, class counsel recognizes that this is an estimate, and that there are a variety of

factors that may lead to an appreciable increase, or appreciable decrease, in the total amount of

savings effectuated through the rollback.  Be that as it may, class counsel is of the opinion that

the savings effectuated through the rollback will vastly exceed the recoverable and distributable

amount of dollars that might be associated with any judgment that could be obtained against

FDB as a result of continued litigation.

Second, FDB has agreed to cease the publication of the AWP and BBAWP fields within

two years after the effective date of the judgment, but only in the event that significant

competitors in the area of electronic intergratable pharmaceutical databases have ceased the

publication of similar fields.  In effect First DataBank agrees as part of the Settlement that it will

not perpetuate the dissemination of AWP and BBAWP information if others are no longer doing

so.  This institutional reform adds to the growing legislative and policy movements (see, e.g., the

11

Medicare Modernization Act of 2003, phasing out the use of AWPs for Medicare part B reimbursements) that are underway.

Third, a settlement with FDB alone leaves the claims of the class remaining as against the remaining defendant McKesson, a defendant of far larger financial wealth and ability to pay on the substantial judgment class counsel seek to litigate.

### III.     DESCRIPTION OF THE PROPOSED SETTLEMENT

#### A.     The Settlement

There are procedural and substantive aspects to the proposed settlement.

*Procedural*.  First, a preliminary approval hearing would be conducted at which the Court would determine whether to preliminarily approve the settlement, certify a class for settlement purposes, appoint class counsel and approve notice to the class.  Second, during the notice time period notice will issue to the class and class members will be given an opportunity to opt-out of the class or object.  Third, during the period between preliminary approval and the final approval hearing, proposed settlement may be reviewed by various attorneys general (some of whom have already been consulted on an informal, nonbinding basis) for the purposes of determining whether the attorneys general approve, disapprove, or might provide "cold comfort" regarding the allegations against FDB.  Fourth, prior to the final approval hearing date, FDB must make an election (on the basis of opt-outs received and the reaction of attorneys general) as to whether to proceed with the settlement or exercise its termination rights.  Fifth, a final approval hearing would be conducted and, if the Court is so inclined, an order for judgment would enter.  Once the effective date is thereafter reached (as defined in the Settlement Agreement), obligations of FDB under the settlement agreement are triggered.

*Substantive*.  The substantive features of the settlement have previously been discussed.

12

The settlement *does not* require that FDB provide any cash to a fund for settlement of the claims against it. The cash obligations of First DataBank under the settlement are (i) to pay notice and class administrative expenses as may be approved by the Court, and (ii) to pay, subject to Court approval, no more than $950,000 in total attorneys fees, document maintenance charges and litigation expenses. Instead of a cash obligation, First DataBank has agreed to adjust the markup factor in its database for about 8,487 NDCs representing approximately 95% of the retail branded drug expenditures. The obligation to effectuate the rollback only becomes triggered under the Settlement Agreement following Final Approval on the latter of (i) sixty (days) days following the Effective Date of the final judgment, or (ii) 270 days from entry of preliminary approval of the proposed settlement. First DataBank has also agreed to cease the compilation and publication of the AWP and BBAWP fields in its database, an obligation that only becomes triggered no later than two years after the effected date of the court's approval. First DataBank also has obligations to provide information through the maintenance of a data room.

        Although the settlement will, on any view of the situation, save the class (and public payors) very substantial future pharmaceutical reimbursements, no immediate lump sum "common fund" of cash is created by the settlement by which counsel could seek a percentage fee recovery. Thus, there is no "common fund" against which Plaintiffs' counsel may make a request for the payment of a percentage fee. Accordingly, subject to Court approval a separate payment by FDB of attorneys fees, expenses and anticipated future work was separately negotiated (after the substantive terms of the underlying settlement had already been reached). Counsel anticipate that the negotiated amount is less than the actual fees and expenses incurred by counsel in connection with the matter and reflects no upward multiplier for extraordinary results achieved despite the value to the class created by the Settlement.

The Settlement Agreement provides that First DataBank will pay all costs associated with Court-approved notice to the class.

**What is Being Released**

As described fully in the Settlement Agreement, all Class Members (consumers and TPPs that have paid based on FDB's published WAC, AWP or BBAWP) are releasing First DataBank and its various subsidiaries, related entities and personnel from all claims as set forth in the release in the Settlement Agreement.

**B.     Termination**

Defendants and Class Settlement Counsel each have the right to terminate the Settlement if any of the following events occurs: (a) this Court declines to enter the Preliminary Approval Order submitted with this Joint Motion or the Order and Final Judgment finally approving the Settlement; (b) the Order and Final Judgment are modified or reversed in any material respect by the U.S. Court of Appeals or the U.S. Supreme Court; or (c) an alternative judgment, agreed to by the parties, is modified or reversed in any material respect by the U.S. Court of Appeals or the U.S. Supreme Court.  The Settlement Agreement also provides termination rights to First DataBank (i) in the event that a certain level of Class Members seek to exclude themselves from the Class, or (ii) in the event that more than one Attorneys General affirmatively declines to provide First DataBank with a "comfort" letter regarding allegations in the underline action .

## IV.     ARGUMENT

The Class Plaintiffs have fully briefed a Motion for Class Certification as to McKesson, which is pending before the Court.[4]   This brief discusses certification of a Class for purposes of

---

[4] Plaintiffs Incorporate by reference their Memoranda in Support of Class Certification (Docket # 76), and respectfully will not repeat the entire analysis under Rule 23 herein.

settlement.  A class action cannot be compromised or settled without the approval of the Court.

Fed.R.Civ.P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, however, the

Court must determine whether the Plaintiff Class, as agreed to by the parties, may be certified for

purposes of the Settlement. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231,

138 L.E.2d 689 (1997);  *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of*

*Health and Human Services*,  2004 WL 166722, (D.N.H. Jan. 23, 2004).

A court may grant conditional approval of a class action where, as here, the class

proposed satisfies the four prerequisites of Rule 23(a) (numerosity, commonality, typicality and

adequacy), as well as one of the three subsections of Rule 23(b).  *See Amchem*, 521 U.S. at 613.

If the Court determines that a settlement class should be certified, the Court must then

follow a three-step process prior to granting final approval of a proposed settlement.  *Levell v.*

*Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000).  First, the Court must preliminarily

approve the proposed settlement.  *Id.* at 547.  Second, members of the class must then be given

notice of the proposed settlement.  *Id.*  Third*,* a hearing must be held, after which the Court must

decide whether the proposed settlement is fair, adequate, and reasonable to the class as a whole,

and consistent with the public interest.  *Id.*  This protects the Class Members' procedural due

process rights and enables the Court to fulfill its role as the guardian for the Class' interests. The

decision to approve or reject a proposed settlement is committed to the Court's sound discretion.

*City Partnership Co. v. Atlantic Acquisition L.P.,* 100 F.3d 1041, 1043-44 (1st Cir. 1996).

**A.    The Court Should Certify The Proposed Class Pursuant To Rule 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) For Purposes Of Settlement**

**1.    The Requirements of Rule 23(a) Have Been Satisfied**

In order to certify a class "[a] district court must conduct a rigorous analysis of the

prerequisites established by Rule 23." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) *citing General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). "Although this court's analysis should not involve a 'preliminary hearing on the merits,' it may, but need not, 'probe behind the pleadings' to consider other matters, including the probable course of litigation. *In Re Relafen Antitrust Litig.*, 231 F.R.D. 52, 67 (D. Mass. 2005) (Young, J.) (citations omitted).  A plaintiff bears the burden of establishing the elements necessary for class certification: 'the four requirements of Rule 23(a) and one of the several requirements of Rule 23(b)." *Smilow*, 323 F.3d at 38 *citing Amchem*, 521 U.S. 591; *Gukenberger v. Boston Univ*. 957 F.Supp. 306, 325 (D. Mass. 1997) (Saris, J.).  The Rule 23(a) threshold elements are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  *In Re Relafen Antitrust Litig.*, 231 F.R.D. at 67; *Smilow v. Southwestern Bell Mobile Sys, Inc.,* 323 F.3d at 32, *citing Amchem*, 521 U.S. at 613.

In addition to the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, the party seeking to obtain class certification must demonstrate that the action may be maintained under Rule 23(b)(1)(2), or (3).  *In Re Relafen Antitrust Litig.*, 231 F.R.D. at 67, (citation omitted).

Under Rule 23(b)(1) and (2) an action may be maintained as a class action where:

> (1)    the prosecution of separate actions by individual members of the class would create a risk of
>> (A)    Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing class, or

> (B)     Adjudication with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests; or
>
> (2)     the party opposing the class has acted or refused to act on grounds generally applicable the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole

Rule 23(b)(1) and (2).

Here, the parties agree, and the Court should find, that the risk of inconsistent multiple adjudications resulting in incompatible standards of conduct underscore the necessity of class certification.   Rule 23(b)(1).  Moreover, the parties agree that where the Class Plaintiffs allege that FDB's Scheme resulted in their injury and final relief does not relate exclusively to money damages, but rather injunctive relief with respect to the WAC to AWP spread, Rule 23(b)(2) is satisfied and militates toward the Court's finding that class certification is appropriate in this action.  Fed. R. Civ. P. 23(b)(2); *see also* Advisory Committees 1966 Note on subd.(b)(2) of Rule 23 ("This subdivision is intended to reach situations where a party has taken action . . . with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole is appropriate. . . . The subdivision does not extend to cases in which . . . final relief relates exclusively or predominately to money damages.")

"Rule 23(b)(3) permits a class action when 'the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members,' and resolution via class action is 'superior to other available methods for the fair and efficient adjudication of the controversy.'"  *Id.* at 68.  Predominance and superiority are evaluated by reviewing the following "pertinent matters:

17

> (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

*Id.* The list of pertinent factors is "nonexhaustive." *Amchem*, 521 U.S. 616.

One exception to the requirement that this Court conduct a rigorous a Rule 23 analysis is where the parties seek a settlement-only certification. *Smilow*, 323 F.3d at 38. In such a context, the Court need not inquire whether the case would present intractable management problems *Amchem*, at 620 citing Fed. R. Civ. P. 23(b), (c). The other requirement helps protect absentee plaintiffs by blocking overly broad class definitions resulting in heightened attention in the settlement context.

### b. Numerosity

Numerosity requires that the class include so many members that joinder would be impracticable. Fed.R.Civ.P. 23(a)(1). Although there is no magic number of class members that will qualify for class certification, courts have generally found groups of more than fifty to satisfy the numerosity requirement. *Holton v. Rothschild, Unterberg, Towbin,* 118 F.R.D. 280, 282 (D. Mass. 1987) (50 or 60 members "is sufficiently large" to warrant class certification) Precise quantification of class members is not necessary, and a court may make common sense assumptions to support a finding of numerosity). *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985), *cert. denied*, 476 U.S. 1172 (1986) (Court can consider economy, geographic dispersion and ability of individual members to bring suit); *Alba Conte & Herbert Newberg, Newberg on Class Actions* ("Newberg") § 18:2-18:4 (4th ed. 2002).

18

In this case, the proposed Settlement Class consists of in excess of ten thousand entities throughout the United States and many thousands of persons who paid graduated co-payments for the applicable drugs.  A class of this size easily satisfies the numerosity requirement.[5]

### c.  Commonality and Typicality

Generally, the commonality requirement is easily met, provided that at least one common question of law or fact exists.  *In re AWP*, 230 F.R.D. at 78.  The numerous common factual and legal issues to be decided here include, but are not limited to, the following:

a.  Whether AWPs published by First Data are used as a benchmark for negotiating payments by third-party payors for drugs;

b.  Whether Defendants engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs used by Plaintiffs and Class Members as the basis for reimbursement;

c.  Whether Defendants artificially inflated the published AWPs for the drugs that are the subject of the Complaint;

d.  Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the drugs that are identified in the Complaint;

e.  Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class Members;

f.  Whether Defendants formed enterprises for the purpose of carrying out the 5% Scheme;

g.  Whether Defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h.  Whether Defendants' conduct violated RICO and various California

---

[5] Courts within the First Circuit have held numerosity satisfied under far less compelling circumstances than those present here. *George Lussier Enter. v. Subaru of New England Inc.*, 2001 U.S. Dist. LEXIS 12054, 2001 DNH 143 (D.N.H. Aug. 3, 2001) (proposed class of 75 present and former car dealers satisfies the numerosity requirement); see also *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D. Mass. 1984) (class of 160 tenants of Faneuil Hall Marketplace met numerosity requirement); *Silva v. National Telewire Corp.*, 2000 U.S. Dist. LEXIS 13986 (D.N.H. 2000) (finding that class of 130 residents of New Hampshire met numerosity requirement).

statutes and common law; and

i.    Whether Defendants are liable to Plaintiffs and the Class Members for damages for conduct actionable under the various state consumer protection statutes.

In this case, a single set of facts that are alleged would prove the causes of action alleged. The documentary and testimonial evidence applies exclusively or predominantly across the entirety of the Class. Virtually all elements of Plaintiffs' claims involve proof of Defendants' conduct, not the conduct of Class Members. *See In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148, 161, 163-175 (D. Mass. 2003). Plaintiffs' RICO claims all arise from the same series of actions by the Defendants. Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case. *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."); *Advocate Health Care v. Mylan Labs., Inc. (In re Lorazepam & Clorazepate Antitrust Litig.)*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.,* 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug competition); *Kruse v. DuPont Merck Pharm. Co.*, 97-CH-15799, Order (Ill. Cir. Ct., June 7, 2000).

In the present action, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class Members. Plaintiffs and Class Members were all harmed by Defendants' unlawful scheme to manipulate the WAC-to-AWP markup for thousands of brand-named pharmaceuticals. Accordingly, Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).

20

### d. Adequate Representation

The adequacy requirement has two parts:  the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation.  *Andrews v. Bechtel Power Co.*, 780 F.2d 124, 130 (1st Cir. 1985).  Plaintiffs meet both prongs.

### i.     The Four Proposed Class Plaintiff Representatives Are Adequate

The Plaintiffs do not have any interests that are antagonistic to those of the Class.  The central issues in this case are common to the claims of the Plaintiffs and to members of the Class.  Each representative Plaintiff, like each absent Class Member, has a strong interest in proving the existence of the Defendant's scheme to manipulate AWP and their resultant injury arising from paying more for pharmaceutical products.  Plaintiffs have submitted to discovery and worked with counsel for the protection of the Class.  There is no conflict between the Plaintiffs and the Class Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

Representative Plaintiff New England Carpenters Health Benefits Fund ("Carpenters"), with it principal place of business in Wilmington, Massachusetts,  is an employee welfare benefit plan established for the purpose of  providing health benefits to eligible participants and beneficiaries.  Carpenters provides comprehensive health coverage for over 22,000 participants and beneficiaries in the states of Maine, New Hampshire, Vermont, and Massachusetts.  During the Class Period, Carpenters has been billed for and paid charges for drugs.  It reimbursed retail pharmacies for pharmaceuticals on the basis of the FDB published AWP (minus a fixed percentage).  Carpenters, as a consequence, was injured as a result of the 5% Scheme.

Representative Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits

Trust ("PMBT"), with its principal place of business in Goodlettsville, Sumner County, Tennessee, is a voluntary employee benefits association maintained pursuant to the federal Employee Retirement Security Act, 29 U.S.C. § 1132. et seq. and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. (Pirelli") in the early 1990s by many Pirelli retirees for the purpose of providing health and medical benefits to eligible participants and beneficiaries. During the Class Period, PMBT was billed for and has paid charges for drugs based on AWP. Since May 1, 2001, PMBT contracted with ACS/Caremark, a pharmacy benefits manager ("PBM"), administer its drug program for its members. PMBT's contract with its PBM provides that reimbursement is to be based on FDB's published AWP.

Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity (THWF") is an employee welfare benefit plan and employee benefit plan for the purpose of providing health benefits to eligible participants and beneficiaries. THWF has its principal place of business in Philadelphia , Pennsylvania and provides health benefits for over 28,000 participants and beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period THWF was billed for and paid charges for drugs. THWF reimbursed retail pharmacies for pharmaceuticals on the basis of the FDB published AWPs (minus a fixed percentage). THWF, as a consequence, was injured as a result of the scheme.

Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Teachers") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue code for the purpose of providing health benefits to eligible participants and beneficiaries. Teachers maintains its principal place of business in Philadelphia, Pennsylvania, and provides health and prescription drugs benefits to about 20,000 active participants, their spouses and dependents.

22

During the Class Period, Teachers was billed for and paid charges for drugs. Teachers

reimbursed retail pharmacies for pharmaceuticals based on the FDB published AWPs (minus a

fixed percentage). Teachers, as a consequence, was injured as a result of the scheme.

> ii.    **The Four Named TPP Plaintiffs Are Also Adequate Representatives For Private Consumers**.

The five TPP Plaintiffs adequately represent the interests of consumer class members in

the circumstances of this settlement. Here, the class includes only those consumers whose

purchase was based on the FDB AWP (or BBAWP) fields of information. Put differently,

persons who paid flat co-payments are *not* in the class; it is typically consumers who paid drug

coverage *co-insurance* alongside with their health benefit provider who are in the settlement

class.

Case law supports a finding that TPPs like the Class Plaintiffs have claims that are typical

of private co-insurance consumer payers. As per *Priest v. Zayer Corp.*, 118 F.R.D. 552, 553 (D.

Mass. 1988), the claims of TPPs and consumers arise from the same course of conduct and are

based on similar legal theories:

- Both TPPs and consumers made payments on the basis of reimbursement formulas incorporating AWP.

- Both TPPs and consumers suffered the same damage: paying inflated or excessive payments as a direct and proximate result of the Defendants' 5% Scheme.

- Both TPPs and consumers possess the same legal claims against Defendants.

- There is no disparity of "knowledge" between TPPs and consumers in than the Defendants' 5% scheme was unknown to both

*See also Randle v. SpecTran*, 129 F.R.D. 386, 391 (D. Mass 1988); *Fraser v. Jamor League*

23

*Soccer, LLC*, 180 F.R.D. 178, 181 (D. Mass. 1998); *Burstein v. Applied Extrusion Techs*., 153 F.R.D. 488, 491 (D. Mass. 1994) 1 A. Conte and H. Newberg, NEWBERG ON CLASS ACTIONS §3.13 (4th ed. 2002) (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiffs and the class sought to be represented.")

In sum, TPP Plaintiffs have the same incentive to pursue their claims and to settle on favorable terms as consumers. The Plaintiffs in protecting their own interest in negotiating and agreeing to the proposed Settlement necessarily protect and advance the interests of private consumer Class Members because those interests coalesce. There is no conflict between the Class Plaintiffs and private consumers.

With respect to the second prong, Class Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions.[6] The experience of counsel is significant in the pharmaceutical pricing area. See *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. Sept. 28, 2005) (District Court Chief Judge William G. Young approves a $75 million settlement of a nationwide consumer class action); *In re Lupron Mktg. and Sales Practices Litig.* 228 F.R.D. 75 (D. Mass. May 12, 2005) (District Court Judge Richard G. Stearns approves $150 million settlement of consumer antitrust class action); *Nichols, et al. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061, No. 00-6222 (E.D. Pa. Apr. 22, 2005) (District Court Judge John R. Padova approves $65 million consumer and third party payor settlement in an action alleging antitrust violation by the manufacturers of the prescription drug Paxil); *Ryan-House et al. v. GlaxoSmithKline PLC, et al.*, 2005 U.S. Dist. LEXIS 33711, No. 2:02cv422 (E.D. Va. Jan.

---

[6]    The resumes of Plaintiffs' counsel are attached to the pending Motion for Class Certification.

10, 2005) (Judge Henry Coke Morgan, Jr. approves $29 million settlement of antitrust claims alleged by direct purchasers of the prescription drug Augmentin); and *Stop & Shop Supermarket Co., et al. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, No. 03cv4578 (E.D. Pa. May 19, 2005) (Judge Padova approves a $100 million settlement between Direct Purchaser Class and the Defendants for antitrust violations on behalf of the manufacturers of Paxil). Counsel for Plaintiffs have been litigating before this Court in the related *AWP Litigation*[7] and have demonstrated their commitment to vigorous prosecution and protection of their clients' rights. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the proposed Class, and have the financial resources to do so.

### 2.    The Requirements of Rule 23(b)(3) Have Been Satisfied

The Settlement Class should be certified because, in addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3): namely, (1) questions of law or fact common to Class Members predominate over any questions affecting only individual members; and (2) the class action is  superior to other available methods for the fair and efficient adjudication of this matter. *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litigation*, 91 F.R.D. 52, 55 (D. Mass. 1981); *In re Compact Disc*, 216 F.R.D. at 204 (D.Me. 2003).

Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an

---

[7] *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass., order consolidating cases June 16, 2005).

individual basis.  The policies underlying the need for class action litigation require that certification under Rule 23 be "liberally construed."  *Lessard v. Metropolitan Life Ins. Co.,* 103 F.R.D. 608, 610 (D.Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule."); *see also Smilow*, 323 F.3d at 41-42 (classes of consumers "are especially likely to satisfy the predominance requirement").

In this case, all the specific and general issues – Defendants' liability under RICO and consumer protections acts; the formation and fulfillment of the AWP scheme; liability evidence showing across-the-board inflation and effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Certainly, adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action.  A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

### a.  Questions Of Law Or Fact Common To Class Members Predominate Over Any Questions Affecting Only Individual Members

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless."  *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y. 1996).  In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum.  *See Amchem*, 521 U.S. at 624 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws").

26

It is clear that individual issues in this case will not overwhelm the common questions of law or fact, because the central question is whether the Defendants illegally manipulated the WAC-to-AWP spread and, if so, by how much.  There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme to illegally inflate the spread between the WAC and AWP at any trial of this matter.  Further, common proof of pricing, discounting and marketing will apply to all of the Class claims.  The fact that individual Class Members' damages may vary due to quantity of purchases does not defeat predominance.  *See, e.g.*, *In re Master Key Antitrust Litig.,* 528 F.2d 5, 12 n.11 (2d Cir. 1975).

### b.  A Class Action Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of This Matter.

With respect to the superiority requirement, a court must consider these factors: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.  Fed.R.Civ.P. 23(b)(3).  However the U.S. Supreme Court recognized that where a Court is "[c]onfronted with a request for settlement-only class certification, a [local] court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620 (citation omitted).

The large size of the Class, the relatively small potential recovery of most class members, the complexity of the litigation, the cost of the litigation, and similar issues, make a class action the superior method of adjudicating the claims presented here. The interests of Class Members in individually controlling the prosecution of separate claims are outweighed by the efficiency of the class mechanism. It would be a waste of judicial and the parties' resources to require thousands or millions of separate prosecutions. Such an approach would necessarily risk inconsistent adjudications establishing varying standards for identical conduct.

**B.**     **The Court Should Grant Preliminary Approval To The Settlement Agreement And Release**

Plaintiffs respectfully submit, as they will demonstrate at the fairness hearing, that: (i) the Settlement is in all respects fair, reasonable and adequate to the Class; (ii) they have investigated the pertinent legal and factual issues; (iii) continued litigation against FDB will consume additional resources of the parties without offering a better resolution for the class; and (iv) there is no hint of collusion between or among the parties in the settlement negotiations. At the fairness hearing the Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation and the proposed settlement. *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durett v Housing Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *Hawkins*, 2004 WL166722, at *3.

At this stage of the settlement process, the Court conducts only a preliminary evaluation to determine whether the proposed Settlement is within the range of possible final approval, and thus whether notice to the Class of the terms and conditions of the proposed Settlement, and the scheduling of a formal Fairness Hearing, are appropriate. *White v. National Football League*,

822 F.Supp. 1389, 1399 (D. Minn. 1993); *In re NASDAQ Market-Makers Antitrust Litigation*,

176 F.R.D. 99, 102 (S.D.N.Y. 1997).  Thus, the *Manual for Complex Litigation, Third*

("*Manual*") characterizes the preliminary approval inquiry as a court's "initial assessment" of

the fairness of the proposed settlement, made on the basis of written submissions and informal

presentation from the settling parties, and summarizes the preliminary approval criteria as

follows:

> If the preliminary evaluation of the proposed settlement does not
> disclose grounds to doubt its fairness or other obvious deficiencies,
> such as unduly preferential treatment of class representatives or of
> segments of the class, or excessive compensation for attorneys, and
> appears to fall within the range of possible approval, the court
> should direct that notice . . .be given to the Class Members of a
> formal Fairness Hearing, at which arguments and evidence may be
> presented in support of and in opposition to the settlement.

*Manual § 30.41; see also* 2 *Newberg* § 1.25.

    As detailed below, the proposed Settlement falls well within the range of reasonableness,

and thus merits preliminary approval.

    Initially, Class Plaintiffs note that the law has long favored settlement of litigations.  This

is particularly true in class actions and other complex cases where substantial resources can be

conserved by avoiding the time, cost and rigors of prolonged litigation.  In addition, there is an

overriding public interest in favor of settlement of complex class action suits, especially where

the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or

the social or economic policies to be established."  *See, e.g.*, *Donovan v. Estate of Fitzsimmons*,

778 F.2d 298, 307 (7th Cir. 1985).  By supporting the settlement of complex, class action

disputes, the judicial system can help minimize litigation expenses on both sides, reduce the

strain on scarce judicial resources, and avoid the risk of trial to both parties.  *Manual,* §§ 23, 30.4

(Fed. 1995).

These concerns apply with particular force in a case such as this, where thousands of consumers and TPPs throughout the country were subject to paying increased costs for prescription drugs as a result of the Defendants' scheme to unlawfully increase the spread between the WAC and AWP.  The settlement provides very substantial price reductions to the entire class.  Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by each individual consumer, it likely would be available only to those wealthy and sophisticated enough to retain their own lawyers.  The proposed Settlement is the best and only vehicle to assure that all Class Members, regardless of their means, and whether they are consumers or TPPs, receive relief in a prompt and efficient manner.

### 1.    The Proposed Settlement Is Sufficiently Fair, Reasonable And Adequate For Preliminary Approval.

In determining whether the Settlement is fair, reasonable, and adequate to the Class as a whole, several factors should be considered, including: (1) the complexity of the litigation, (2) the posture of the case at the time settlement was proposed, (3) the extent of discovery conducted in the case, (4) the circumstances of the settlement negotiations, (5) the experience of counsel, (6) the relative strength of the plaintiffs' case on the merits, the possible defenses, and other risks in the litigation, (7) the anticipated duration and expense of further litigation, and (8) the reaction of the class and opposition to the settlement.  *Hawkins*, 2004 WL 166722, *citing In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995); *Kovacs v. Ernst & Young*, 927 F.2d 155, 158 (4th Cir. 1991); *Williams v. Vukovich,* 720 F.2d 909, 922-924 (6th Cir. 1983).[8]

---

[8]    While the foregoing criteria will guide the Court's analysis, "[a] class action settlement cannot be measured

As a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.[9]  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976); *United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971).  Accordingly, the Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial.  *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998), *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  It is not the Court's function to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement or to substitute its business judgment for that of the parties who worked out the settlement.  *Argo v. Harris*, 84 F.R.D. 646, 648 (E.D.N.Y. 1979), *quoting Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 361 (S.D.N.Y 1973), *aff'd. on op. below sub nom. Wesson v. Mississippi River Corp.,* 486 F.2d F.2d 1398 (2d Cir. 1973), *cert. denied*, 414 U.S. 1112 (1973).  Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side.  *Id*. at 1200, *quoting Armstrong v. Board of Sch. Dir.,*616 F.2d 305, 315 (7th Cir. 1980).

Within the context of a class action, the role of the Court is heightened.  In order to protect the interests of absentee Class Members, the Court "must independently and objectively

---

precisely against any particular set of factors."  *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 140 (W.D.Ky. 1992), *citing Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1, 6-7 (N.D.Ohio 1982).  Therefore the relevance of the factors set forth above "will vary from case to case."  *Ohio Public Interest Campaign*, 546 F.Supp. at 6-7.

[9] Judge Getzendanner explained in *Alliance to End Repression v. City of Chicago*, supra, at 91 F.R.D. 201: "Some objectors argue that both settlement agreements are fatally defective because they lack more extensive admissions or finding of wrongdoing by the Court.  As the Court stated at the March 13 hearing: 'the whole purpose of the settlement is to avoid adjudication with respect to the activity which is the basis of the complaint.  I think the parties would be stunned if in submitting a class action settlement to the Court, the Court started to decide the issues.  That's why people enter into settlements and I am not going to interfere in the settlement process.'"

analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." NEWBERG § 11.41 at 11-88 (*citing Air Line Stewards v. American Airlines,* 763 F.2d 875 (7th Cir. 1985)). A Court's analysis and determination that a settlement is fair will survive appellate review if the trial court shows that "it has explored comprehensively all relevant factors." *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir. 1983).

It is important to note that an initial presumption of fairness exists if the settlement is recommended by class counsel after arms-length bargaining. *City Partnership Co. v. Atlantic*, *supra*, 100 F.3d 1043, *Newberg* § 11.41 at 453. Here all of the aforementioned factors weigh heavily in favor of preliminary approval. Continuing this complex consumer fraud and RICO litigation against FDB is likely to result in a highly expensive, protracted legal battle, with appeals. Further, the Plaintiffs conducted a substantial investigation, through discovery and otherwise, such that they were well-informed concerning the strengths and weaknesses of their case upon entering into settlement negotiations.

**2.    The Proposed Settlement Is The Result of Arduous, Arm's Length Negotiations Conducted By Highly Experienced Counsel**

There is a presumption of correctness attached to a class settlement reached in arms-length negotiations between experienced, capable counsel. *City Partnership Co. v. Atlantic*, *supra*, 100 F.3d 1043, *see Hawkins*, 2004 WL 166722, at *3; *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975)("While opinion and recommendation of experienced counsel should not be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also*, *Newburg* § 11.41, at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district

judge permissibly focused on the end result of the negotiation. . . . The proof of the pudding was indeed in the eating." *Mars Steel v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 684 (7th Cir. 1987); *see also In re Agent Orange Product Liab. Litig.,* 597 F.Supp. 740, 762 (E.D.N.Y. 1985), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987) (most important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

In the instant action, the parties actively engaged in numerous rounds of negotiations over one year. The negotiations involved submissions of proposals, counter-proposals, evaluation of additional documentation/discovery, preparation and presentation of expert reports, and factual arguments. The parties have worked long and hard to reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best interests of the Class Members.

### 3. Sufficient Discovery Has Been Conducted In This Matter To Allow Counsel To Fairly Investigate The Pertinent Legal And Factual Issues.

A presumption in favor of the proposed Settlement arises when sufficient discovery has been provided and counsel have experience in similar cases. *See Hawkins*, 2004 WL 166722, at *3; *see also City Partnership Co. v. Atlantic Acquisition*, *supra*, 100 F.3d 1043; *Rolland v. Celluci*, 191 F.R.D. 3, 6 (D.Mass. 2000). This factor directs the trial court to consider whether the attorney participating in the settlement negotiations had access to *sufficient information* to appreciate the merits of the class's case." (emphasis added); *In re General Motors Corp.,* 55 F.3d at 783, *cert. denied sub nom.*, *General Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

In this case, Plaintiffs' Counsel were researching the claims against First DataBank and McKesson for many, many months prior to the filing of the complaint in June 2005. Counsel reviewed and analyzed (with health care economists) enormous amounts of pharmaceutical

pricing information in order to conduct a forensic analysis of pharmaceutical price markups over time. Dozens of boxes of documents produced by FDB and its competitors, along with electronic information were analyzed. Counsel also obtained financial information from FDB, information on possible insurance coverage and other documentation regarding the financial and corporate circumstances of FDB. In summary, counsel have been able to conduct discovery and extensive forensic analysis in order to fully investigate the pertinent legal and factual issues against FDB.

**C.    The Court Should Order Notice Be Provided To The Class And Schedule A Full Fairness Hearing**

**1.    Form of Notice**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement. *See Durrett*, 896 F.2d at 604. Rule 23 (e) requires notice of a proposed settlement "in such manner as the court directs." In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). *See Carlough v. Amchem Prod., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause). Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617; *Reppert v. Marvin Lumber and Cedar Co.*, 359 F.3d 53, 56 (1st Cir.2004).

The Manual sets forth several elements of the "proper" content of notice. If these requirements are met a notice satisfies F.R.C.P. 23(c)(2); F.R.C.P. 23(e); and due process, and binds all members of the class. The Notice must:

1.      Describe the essential terms of the Settlement;

2.      Disclose any special benefits or incentives to the class representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.      Explain the procedures for allocating and distributing Settlement funds; and

6.      Prominently display the address of class counsel and the procedure for making inquiries.

*Manual*, ¶ 30.212 (3rd Ed.1995). *See, e.g., Air Lines Stewards and Stewardesses Ass'n Local 550 v. American Airlines,* 455 F.2d 101, 108 (7th Cir. 1972)(notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *accord Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *See Eisen*, 417 U.S. at 173; *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974). The proposed notice program clearly meets this standard.

In the instant action, the Notice to be provided to the Class is clear, precise, informative, and satisfies the requirements governing notice. Further, Plaintiffs' Counsel propose a detailed nationwide Notice Plan designed to reach TPP Class Members in a number of ways. As reflected in the proposed Notice Plan, which was created by a recognized expert, individual notice will be mailed to all TPP Class Members whose addresses can be reasonably ascertained and who can be reached reasonably economically. A website will allow Class Members to reach the Administrator, request Notices and ask questions. An extensive publication of two Summary

Notices will take place in a variety of consumer publications, and also be directed towards

consumers and Third-Party Payors.  Plaintiffs' counsel also propose publishing the full Notice,

the Settlement Agreement and possibly other documents on the website established for purposes

of this Settlement.

 Notice via first class mail, publication in nationwide papers and magazines and website

publication are all avenues for notice that have been approved by various courts.  *See, e.g., White*

*v. NFL,* 822 F.Supp. at 1400 (notice by mail to identified class members and publication once in

*USA Today* "clearly satisfy both Rule 23 and due process requirements"), *aff'd,* 41 F.3d 402 (8th

Cir.1994), *cert. denied,* 515 U.S. 1137 (1995); *Lake v. First Nationwide Bank,* 156 F.R.D. 615,

628 (E.D.Pa. 1994) (approving as reasonable notice by third class mail to identified class

members and publication two times in the national edition of *USA Today* ); *Mullane*, 339 U.S. at

317 ("This Court has not hesitated to approve of resort to publication as a customary substitute in

another class of cases where it is not reasonably possible or practicable to give more adequate

warning."); *see also In re Microstrategy, Inc. Sec. Litig*., 148 F.Supp.2d 654, 669-670 (E.D.Va.

2001)(approving publication of summary notice in nationwide newspapers and posting full

notice on websites maintained by co-lead counsel);  *Mangone v. First USA Bank,* 206 F.R.D. 222

(S.D.Ill. Feb. 2, 2001) (the Court approved Class Notice mailed to the last known address of all

Class Members identified through reasonable effort by  Defendant,  published a Summary Notice

on three separate days in a nationally published newspaper, *USA Today,* published the Class

Notice and other pertinent information on the Internet).

 The proposed Notice clearly meets the requirements of Rule 23(c)(2) and 23(e), in so

much as it meets the new requirements of plain English and ease of reading and includes: (1) the

case caption; (2) a description of the Class; (3) a description of the claims; (4) a description of

the Settlement; (5) the names of counsel for the Class; (6) a statement of the maximum amount

of attorneys' fees that may be sought by Plaintiff's Counsel; (7) the Fairness Hearing date; (8) a

description of Class Members' opportunity to appear at the hearing; (9) a statement of the

procedure and deadline for filing objections to the Settlement; (10) a statement of the procedure

and deadline for filing requests for exclusion; (11) a statement of the consequences of exclusion;

(12) a statement of the consequences of remaining in the Class; and (13) the manner in which to

obtain further information.  *In re Prudential Ins. Co. of Am. Sales Practices Litig*., 962 F.Supp.

450, 496 (D.N.J. 1997).  *See also Manual* § 30.212 (Rule23(e) notice designed to be only a

summary of the litigation and settlement to apprise class members of the right and opportunity to

inspect the complete settlement documents, papers and pleadings filed in the litigation);

Plaintiffs have retained an experienced Notice Administrator to administer notice, have

carefully crafted a detailed Notice Plan and have taken all necessary steps to ensure that the

proposed Notice Plan meets the requisite due process requirements.  Plaintiffs believe that the

proposed Notice will fairly apprise Class Members of the Settlement and their options, and

therefore should be approved by the Court.

## V.    CONCLUSION

For all the above-stated reasons, it is respectfully requested that the Joint Motion be

granted and the Court enter an order: (a) granting Preliminary Approval of the Settlement; (b)

certifying the Settlement Class; (d) appointing Class counsel;(c) scheduling a Fairness Hearing

and establishing all related deadlines; (d) directing that notice be provided to the Class in

accordance with the Plan of Notice, and  (e) ordering a stay of all proceedings in this and other

class actions until the Court renders a final decision regarding the approval of this Settlement.

DATED:  October 4, 2006

By **/s/ Thomas M. Sobol**

Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO# 567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 3, 2006.

**/s/ Thomas M. Sobol**
Thomas M. Sobol

## First DataBank: Summary of Preliminary Damages

| Brand-Name Retail Dollars | 2001[1] | 2002 | 2003 | 2004 | 2005[2] | Total |
|---|---|---|---|---|---|---|
| Total Top 200 Brand-Name Retail Dollars[3] | 48,976,523,160 | 110,967,923,000 | 117,461,960,000 | 117,279,813,000 | 28,830,699,201 | 423,506,918,361 |
| All Other Brand-Name Retail Dollars[3] | 3,984,129,340 | 23,723,872,000 | 24,700,747,000 | 24,121,195,000 | 1,024,711,632 | 77,554,654,972 |
| Complaint Drug Dollars Listed in "Top 200" | 1,230,047,167 | 48,078,216,833 | 61,849,212,083 | 61,365,762,250 | 12,321,862,917 | 184,845,101,250 |
| Complaint Drug Dollars in "All Other" | 100,061,554 | 10,279,585,552 | 13,006,097,802 | 12,621,230,199 | 437,948,319 | 36,444,923,426 |
| Total Brand-Name Retail Dollars Subject to Damages | 1,330,108,720 | 58,357,802,385 | 74,855,309,886 | 73,986,992,449 | 12,759,811,236 | 221,290,024,676 |
| Inflated Markup Percentage | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | |

| Damage Calculation[4] | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| Third-Party Payer Percentage[5] | 77.9% | 79.3% | 78.8% | 78.8% | 78.8% | |
| Third-Party Payer Damages | 41,446,188 | 1,851,109,492 | 2,359,439,368 | 2,332,070,002 | 402,189,250 | 6,986,254,299 |
| Total Class Damages[6] | 41,446,188 | 1,851,109,492 | 2,359,439,368 | 2,332,070,002 | 402,189,250 | 6,986,254,299 |

Notes:

1. 2001 dollars have been multiplied by 5/12 to adjust for the Class Period, which begins August 1, 2001.
2. 2005 dollars have been multiplied by 5/24 to adjust for the Class Period, which ends March 15, 2005.
3. Source: Drug Topics. Top 200 Brand-Name Retail Dollars, 2001-2005 (data based on Verispan data).
4. 2001 damages are limited to the Class Period, which begins August 1, 2001. 2005 damages are limited to the Class Period, which ends March 15, 2005.
5. Third-party payer percentages, source: Novartis, Pharmacy Benefit Report: Facts & Figures, 2002, 2003 and 2004 editions.
6. According to the Complaint, the Class is limited to "all third party payors." Cash payers and Medicaid are therefore excluded from the calculation of Class damages.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY; and
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE
FUND,

                                        Plaintiffs,

                    v.

FIRST DATABANK, INC., a Missouri
corporation; and McKESSON
CORPORATION, a Delaware corporation,

                                        Defendants.

---

C.A. No. 1:05-CV-11148-PBS

**ATTACHMENT B TO CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED FIRST
DATABANK CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS
AND APPROVAL OF NOTICE PLAN (FILED UNDER SEAL)**

**FILED UNDER SEAL**