UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | C.A. No. 1:05-CV-11148-PBS |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT MCKESSON CORPORATION'S MOTION REQUESTING A CASE MANAGEMENT CONFERENCE CONCERNING THE PROPOSED SETTLEMENT WITH FIRST DATABANK**

**(SET FOR HEARING 10/24/2006 AT 10:00 A.M.)**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................................1

II.    ARGUMENT ....................................................................................................................2

    A.    The Court Should Not Delay Notice of the Settlement Class and FDB's
    Published Price Roll-Back .......................................................................................2

        1.    The proposed preliminary-approval schedule conforms to proper
        settlement/certification procedure ...............................................................2

        2.    The reaction of class members – not McKesson – will ensure the
        "rigorous" review McKesson claims is needed ...........................................4

        3.    McKesson mischaracterizes the settlement and the proposed class ............6

    B.    Nor Should the Court Delay the Hearing on Final Approval of the Settlement ......9

III.    CONCLUSION ................................................................................................................9

## I.    INTRODUCTION

In exchange for obtaining dismissal of all claims against it, defendant First Data Bank ("FDB") has agreed to provide relief in the form of a rollback of the WAC-AWP markup on the drugs at issue in this litigation.  This relief will ameliorate in part the effects of the McKesson/FDB spread scheme and is estimated to save the proposed settlement class billions of dollars in the next several years.[1]  Delaying the relief, as non-settling defendant McKesson requests, thus would allow the effects of the spread scheme to continue unabated by requiring the settlement class to continue to pay the artificially inflated prices caused by the scheme at issue.  Simply put, one participant to the scheme, FDB, has agreed to do its part to mitigate future damage.  The other participant, McKesson, seeks to delay such relief.  The sooner the settlement is approved, the faster the savings flow to class members.  One of the named plaintiffs has testified that the potential savings for his fund alone is conservatively $400,000 per year.  *See* discussion *infra*, at p. 6.

Non-settling defendant McKesson thus asks this Court to delay considering the settlement class – ***even preliminarily*** – until after April 12, 2007, when the Court hears Plaintiffs' motion to certify a litigation class seeking damages against McKesson.  But McKesson ignores the narrow function of preliminary or conditional approval of a settlement class – determining whether there is any reason not to notify the proposed class of the proposed settlement.  Full consideration of whether to certify the settlement class comes later, at the final approval hearing.  *See infra* at 1-4.  And in asserting that this Court cannot even preliminarily consider certifying a settlement class until presented with the full record relevant to certifying a damages litigation class, McKesson ignores essential differences between the two proposed

---

[1] *See, e.g.*, Declaration of Raymond S. Hartman, at 5-7 & Table 2 (Doc. 123, filed Oct. 4, 2006).

classes, such as that only the damages class requires a showing of class member injury and

damages.  *See infra* at 6-8.  Approval of the FDB settlement, subject to a final fairness hearing,

thus is appropriate and McKesson's objections should be rejected.

## II.    ARGUMENT

**A.    The Court Should Not Delay Notice of the Settlement Class and FDB's Published Price Roll-Back**

### 1.    The proposed preliminary-approval schedule conforms to proper settlement/certification procedure

McKesson urges the Court to defer preliminary approval, and thus any notification to the

class of the FDB settlement, until after the Court addresses the Plaintiffs' motion to certify a

litigation class against McKesson, which is scheduled for argument on April 12, 2007.  It asserts

as its central theme that the Court's preliminary consideration of a settlement class must await "a

fully developed certification record."  *See* McK. Br. at 1, 3.  But McKesson misunderstands or

distorts the function of granting preliminary approval of a settlement and settlement class.

Conspicuously absent from McKesson's motion is recognition that the preliminary-

approval process functions to determine whether there is reason not to notify the class members

of the proposed settlement and to proceed with a fairness hearing.  *See*, *e.g.*, *Gautreaux v. Pierce*,

690 F.2d 616, 621 n.3 (7th Cir. 1982); *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo.

2006); *Yong Soon Oh v. AT&T Corp.*, 225 F.R.D. 142, 144 (D.N.J. 2004); *see also* 4 A. Conte &

H. Newberg, NEWBERG ON CLASS ACTIONS, § 11:25, at 38 (4th ed. 2002) (hereinafter

"NEWBERG").  Reflecting this purpose, Plaintiffs and FDB propose a procedure for seeking

approval of their settlement and a settlement class that adheres to customary procedures for

seeking court approval of a settlement of claims brought on behalf of an uncertified class.

As the Settling Parties propose, courts commonly certify a settlement class on a

preliminary or conditional basis concurrently with granting preliminary approval of the fairness

of the settlement, deferring final certification of the class until the final fairness hearing.  *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 347 & nn.197-99 (S.D.N.Y. 2005) (citing cases and distinguishing conditional settlement classes from conditional litigation classes barred by 2003 amendments to Rule 23); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 269, 270 (2d Cir. 2006) ("[l]ower courts have, however, continued to employ this practice" (citation omitted); affirming *Denney* district court's ruling that conditional certification of settlement classes survived 2003 amendments to Rule 23(e)).  *See also* MANUAL FOR COMPLEX LITIGATION (FOURTH) ("MCL4th") § 21.612 at 313 (noting that early settlement before certification of a litigation class occurs "quite frequently").  Courts endorse the practice of sending "simultaneous notice of the pendency of a class action and of a proposed settlement to prospective class members."  *See Weinberger v. Kendrick*, 698 F.2d 61, 72 (2d Cir. 1982).

Courts do so because they recognize the "significant benefits to class members" of early settlement and certifying a settlement class.  MCL4TH § 21.612 at 313.  A preliminary, or conditional, certification at that stage provides needed flexibility that can facilitate these settlements.  *Denney*, 230 F.R.D. at 349.  *See also Weinberger*, 698 F.2d at 72 ("[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes. . . [and] most courts have recognized their utility").  Many other authorities hence also approve the practice, *see Denney*, 230 F.R.D. at 347 (citing cases); 4 NEWBERG § 11:26, at 39 (4th ed. 2002).

In light of these benefits, courts regularly make a preliminary determination as to the propriety of certification, at the same time as the preliminary approval of a proposed settlement, and postpone the final decision on certification until the court is ready to evaluate the settlement.  *E.g.*, *Yong Soon Oh*, 225 F.R.D. at 145 (after preliminarily certifying settlement class, court engaged in full Rule 23(a) and (b) analysis in connection with motion for final approval of

settlement); *Denney*, 230 F.R.D. at 349 ("courts regularly make a preliminary determination as to the propriety of certification, at the same time as the preliminary approval of a proposed settlement, postponing the final decision on certification until the court is ready to evaluate the settlement"). They then typically order a combined notice of the certification, opt-out rights and the proposed settlement, and combine the fairness hearing on the proposed settlement with a hearing on class certification. *Id*. (quoting 5-23 MOORE'S FEDERAL PRACTICE – CIVIL § 23.161). And, of course, there is no reason for a court to engage in the full Rule 23(a) and (b) analysis twice, at the preliminary hearing and again at the final hearing. Not even McKesson urges such redundant consideration, and no court has required it.

Further, where the settling defendants and plaintiffs both support certification, there is little risk to a preliminary certification for settlement purposes and a following confirmation of that decision at the fairness hearing. *Denney*, 230 F.R.D. at 348. Preliminary certification of a settlement class "is ***not an end-run around a court's duty to conduct a rigorous analysis*** of the propriety of certification; rather, it is an essential part of the settlement process, and an indispensable tool for the efficient management of complex litigation." *Id*. (emphasis added). Plaintiffs' motion for preliminary approval and supporting affidavits offer more than enough evidence to satisfy the Court's duty before conditionally certifying the proposed settlement class.

## 2.    The reaction of class members – not McKesson – will ensure the "rigorous" review McKesson claims is needed

As added assurance that the settlement and settlement class are fair and appropriate, many class members have already been involved in the settlement negotiations with FDB. As Plaintiffs explained in their memorandum supporting preliminary approval, the plaintiff class representatives themselves were consulted through class counsel over the many months; consumer groups and consumer coalitions participated in evaluating the relief; representatives of

- 4 -

attorneys' general offices from over one half dozen states reviewed the terms and negotiations; outside counsel to some of the U.S.'s largest private health-benefit providers participated directly in some negotiations and were consulted on all terms. *See* Plaintiffs' Br. in Support of Preliminary Approval at 7. Notably, ***none of these parties***, those who have standing, as opposed to McKesson, have asked the Court to delay preliminary approval and class notice or otherwise objected to the proposed approval procedure.

Notably, the class is largely comprised of sophisticated commercial entities that are fully competent to evaluate their claims and the settlement's effect on them. After receiving notice of the proposed settlement, any class members that might choose to intervene in this action to oppose the settlement will help ensure that the Court has before it all the information it needs to perform the requisite "rigorous analysis" before finally certifying the settlement class. The Third Circuit, among others, noted this very result:

> [w]hen the simultaneous notice of the class and the settlement is distributed to the proposed class, objecting class members can still challenge the class on commonality, typicality, adequacy of representation, superiority, and predominance grounds – they are not limited to objections based strictly on the settlement's terms.

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 791 (3d Cir. 1995) (citation omitted). Likewise, if a large number of putative class members elect to preserve their damages claims against FDB by excluding themselves from the settlement, these exclusions might indicate that certifying a settlement class is inappropriate due to intra-class conflicts, atypicality or other certification red flags. The Court thus should expedite notice to the settlement class. The April 12, 2007 hearing on Plaintiffs' motion to certify a litigation class against McKesson is no reason to delay preliminary approval of the settlement class.

So far class members are fully supportive. For example, William J. Einhorn, representative of Plaintiff Teamsters Health & Welfare Fund, analyzed the settlement and estimates that his small fund will save $400,000 a year based on a conservative estimate.[2]

### 3.    McKesson mischaracterizes the settlement and the proposed class

McKesson seeks to delay class notification by mischaracterizing the proposed FDB settlement and settlement class. Highlighting only superficial resemblances, it compares this settlement class to the *AWP* litigation's proposed TPP damages class for self-administered drugs. *See* McK. Br. at 1-2. It also proclaims that the FDB settlement class and Plaintiffs' litigation class seeking damages against McKesson involve "nearly identical issues," including predominance of common issues. *Id*. at 2 (citing *Pharm. III*, 230 F.R.D. at 92). McKesson's vague comparisons, however, are false.

First, the proposed settlement here affords only injunctive relief, while McKesson points to litigation classes seeking damages. Unlike many damages classes, certifying the settlement injunctive class (whether conditionally or finally) will be a simple matter. Predominance of common issues is not an element of an injunctive class under Rule 23(b)(1) and (b)(2). *See* Plaintiffs' Br. at 16-17 (quoting rule). And to the extent predominance must be shown to certify a settlement (b)(3) class in this case, McKesson does not explain why certification for this settlement class must await a full record where settlement class members need not prove injury and damages to share in the published AWP roll-back, assuming that such proof would prevent certification, which it would not.[3] Nor must the Court explore the potential for intra-class conflicts in a settlement's plan of allocation – there is no common fund to distribute, so there is

---

[2] *See* excerpt of testimony attached hereto.

[3] Certifying a settlement class under Rule 23(b)(3) provides a mechanism for a class member to opt out if it wishes to pursue an individual damages claim against FDB.

no allocation plan.  There likewise are no other potential intra-class conflicts.  All class members

share in the settlement relief – the roll back benefits every class member.  And any class member

that is determined to obtain damages from FDB can opt out.

To the extent McKesson tries to identify issues linking the FDB settlement class to the

McKesson litigation class or the *AWP* proposed TPP damages class (*see* McK. Br. at 3-4), the

issues are irrelevant.  McKesson cites class members' individual circumstances, for example, but

these have no bearing where the settlement provides injunctive relief only.  McKesson goes on to

cite an *AWP* class ruling, 230 F.R.D. at 95, which found that while proving the alleged fraud and

defendants' misconduct involved common issues, substantial individual issues relating to proof

of injury and damages undermined Rule 23(b)(3)'s predominance requirement:

> Because of the variability in TPPs' contracts with PBMs, plaintiffs
> are unable to show that each TPP class member paid more than it
> would have in the absence of the fraud via common proof.

But here, settlement class members obtaining the benefit of the injunctive relief need only

establish the defendants' misconduct.  They are not required under this settlement to prove that

they paid more than they would have absent the fraud.  Rather, certifying a class under Rule

23(b)(2), for example, is proper when the legality of a practice is at issue, making injunctive

relief one element in the class suit.  *See* Fed. R. Civ. P. 23, Advisory Committee's Note,

Subdivision (b)(2) (subsection (b)(2) applies where "settling the legality of the [opposing

parties'] behavior with respect to the class as a whole, is appropriate").  As one court stated:

"[T]his requirement is almost automatically satisfied in actions primarily seeking injunctive

relief…. What is important is that the relief sought by the named plaintiff should benefit the

entire class."  *Williams v. Empire Funding Corp.*, 183 F.R.D. 428, 434 (E.D. Pa. 1998).  The

*AWP* class-certification ruling is hence inapposite.

McKesson continues that settlement class members' contracts in the present case are "highly individualized" just like those in *AWP*.  McK. Br. at 3 (citing *AWP*, 230 F.R.D. at 72).  But McKesson does not explain how such contracts could be relevant to the injunctive relief provided in the FDB settlement.  McKesson instead merely vaguely asserts that class-related evidence here will show that "a predominance of individual issues" will preclude certification, but it ignores that "predominance" is not even an element of Rule 23(b)(1) and (b)(2) classes.  And even as to Rule 23(b)(3), McKesson again makes no effort to explain how these purported individual issues could be relevant to the injunctive relief FDB offers in the settlement.

Further, the core inquiries in these two cases are quite different.  In *AWP*, the Court focused on TPP knowledge and the issues of varying levels of knowledge as to the meaning of "average wholesale price" or "AWP."  In this case the relevant inquiry is far simpler.  Every class member used AWP as a reimbursement benchmark.  No class member knew of, nor did any class member negotiate over, the McKesson-FDB scheme.  AWP was increased merely by the illicit McKesson-FDB agreement.  The TPPs had no involvement.  There are no individual issues of knowledge or negotiation; there is, rather, widespread and uniform impact.

Finally, the Court should be wary of McKesson's motives.  The complaint, backed by internal documents, indicates that McKesson implemented this scheme to please its retail clients:

> Here are a few examples of increased profits that our customers should be realizing now and into the future.  The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

|  | Old 16 2/3% spread | New 20% spread |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

- 8 -

McKesson's retail-pharmacy-chain clients will make less as a result of the settlement. McKesson's objections are likely be put forth to protect not only McKesson, but also its clients' interests.

**B.      Nor Should the Court Delay the Hearing on Final Approval of the Settlement**

Although McKesson primarily seeks to delay the Court's preliminary approval until after April 12, 2007, its arguments could also be construed as asking the Court to defer its final consideration of the settlement class until that time.  Plaintiffs have proposed that the Court schedule the hearing on final approval for April 2, 2007.  But beyond their desire that settlement class members reap the benefits of the AWP roll back as soon as possible, it matters little to Plaintiffs whether the Court addresses final approval on April 2 or April 12.

We do note several factors that weigh in favor of the earlier date.  First, the briefing on Plaintiffs' motion to certify a litigation class against McKesson will be completed before April 2, so the Court will have the "fully developed certification record" that McKesson believes is so essential.  Second, much of that record will be irrelevant because it will pertain to class members' proof of injury and damages, which are irrelevant to this settlement class.  Third, as already described, settlement class members that object to the class or the settlement may well intervene to assert their objections, which could provide the adversarial testing of certification that, according to McKesson, would otherwise be missing.  There is, in short, no need to postpone the final approval hearing until April 12, 2007.

### III.      CONCLUSION

Rolling back the AWP markups published by FDB will remedy in part an ongoing harm. McKesson already hid evidence of its misconduct during third-party discovery in the earlier

*AWP* litigation,[4] thereby delaying justice for over a year.  It now attempts to stall further the

AWP roll-back by asking the Court to defer considering even preliminary approval of the

settlement and settlement class until April 2007.  But class members have paid inflated prices

long enough.  The Court should reject McKesson's delay tactic and consider the fairness of the

settlement and propriety of certifying a settlement class on the Settling Parties' proposed

schedule.


DATED:  October 18, 2006                    By_____/s/ Steve W. Berman_____
                                               Steve W. Berman
                                               Sean R. Matt
                                               Barbara A. Mahoney
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Thomas M. Sobol (BBO#471770)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

                                            Elizabeth Fegan
                                            Hagens Berman Sobol Shapiro LLP
                                            60 W. Randolph Street, Suite 200
                                            Chicago, IL  60601
                                            Telephone: (312) 762-9235
                                            Facsimile: (312) 762-9286

---

[4] McKesson received a subpoena in the *AWP* litigation several years ago but produced little of the material that it later produced in this case.  This delayed discovery of McKesson's role.

- 10 -

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 11 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 18, 2006.


_____/s/ Steve W. Berman_____
Steve W. Berman

Confidential

```
 1
 2                      CONFIDENTIAL
 3            UNITED STATES DISTRICT COURT
 4          FOR THE DISTRICT OF MASSACHUSETTS
 5                       -  -  -
 6   NEW ENGLAND CARPENTERS    : CIVIL ACTION
     HEALTH BENEFITS FUND,     :
 7   PIRELLI ARMSTRONG RETIREE :
     MEDICAL BENEFITS TRUST,   :
 8   TEAMSTERS HEALTH & WELFARE:
     FUND OF PHILADELPHIA AND  :
 9   VICINITY AND PHILADELPHIA :
     FEDERATION OF TEACHERS    :
10   HEALTH AND WELFARE FUND,  :
     AND DISTRICT COUNCIL 37   :
11   HEALTH & SECURITY PLAN,   :
                   Plaintiffs  :
12        vs.                  :
                               :
13   FIRST DATABANK, INC.,     :
     a Missouri corporation,   :
14   AND MCKESSON CORPORATION, :
     a Delaware corporation,   :
15             Defendants   :  1:05-11148-PBS
16                       -  -  -
                Philadelphia, Pennsylvania
17
               Thursday, October 5, 2006
18                       -  -  -
19             Videotape deposition of WILLIAM
20        EINHORN, taken pursuant to notice, at the
21        offices of Varallo, Incorporated, 1835
22        Market Street, Suite 600, on the above
23        date, beginning at approximately 9:36
24        a.m., before Cynthia A. Whyte, Registered
25        Professional Reporter and Notary Public.
```

Confidential

Page 226

William J. Einhorn
1     William J. Einhorn
2   about that the drug companies who are parties,
3   party defendants, in the MDL litigation, the
4   MDL AWP litigation, further inflated the AWP
5   for those drugs. Discovery -- and I received
6   regular reports from counsel as to the
7   progress of the action.
8       It was reported that through
9   discovery it was learned that it was not the
10  AWP defendants, but the discovery indicated
11  that it was or could have been a conspiracy by
12  and between First Databank and McKesson.
13      When it was discussed, I authorized
14  counsel on behalf of our Fund to draft an
15  appropriate complaint, and I believe, and I
16  would assume, that other lead plaintiffs in
17  this litigation either spoke with Spector
18  Roseman & Kodroff or their other respective
19  counsel in this case and gave the same advice
20  and direction.
21      The complaint was prepared. I
22  reviewed it. After reviewing it, I authorized
23  counsel to pursue it on behalf of the Fund.
24      The way it differs is that what we
25  thought was the conduct of this survey during

TSG Reporting - Worldwide      877-702-9580

---

Confidential

Page 227

1     William J. Einhorn
2   this period of time, the further increase in
3   AWP pricing from 2001 to 2005, was the conduct
4   of the AWP defendants in the MDL litigation,
5   turned out through discovery in the AWP MDL
6   litigation not to be those defendants but
7   rather McKesson and First Databank.
8       Q.  Are you aware that your lawyers are
9   asking the Court to approve a settlement with
10  FDB in this case?
11      A.  Yes.
12      Q.  What are the terms of that
13  settlement?
14      MR. MACORETTA:  You can answer
15      that question to -- yes, you can answer
16      that question to the extent you know the
17      answer.
18      A.  It is my understanding for a period
19  after March 2005 FDB was taking WAC, wholesale
20  acquisition costs, and increasing it by a
21  multiple of 1.25. And then under the terms of
22  the settlement FDB, among other things, has
23  agreed to roll that back to a multiple of 1.21
24  of WAC in publishing AWP.
25      In addition, it is my understanding

TSG Reporting - Worldwide      877-702-9580

---

Confidential

Page 228

1     William J. Einhorn
2   that over a period of time, I believe it is
3   within two years, First Databank will no
4   longer publish AWP but will publish something
5   else unless industry competition does
6   something else. There are also contingencies
7   in there about opt-outs and who opts out and
8   whether or not separate state attorneys
9   general institute litigation against First
10  Databank or not.
11      Q.  What is your understanding about
12  whether or not FDB is paying any money to
13  members of the class pursuant to the
14  settlement?
15      A.  It is my understanding that FDB will
16  not be paying any money to the members of the
17  class but will, however, be depositing a sum
18  of money to cover attorneys' fees and costs
19  and that FDB will also be responsible for
20  bearing the cost of notice to the proposed
21  class concerning the settlement.
22      Q.  And do you have an understanding as
23  to why under the terms of the settlement FDB
24  is not being asked to pay any money to the
25  members of the class?

TSG Reporting - Worldwide      877-702-9580

---

Confidential

Page 229

1     William J. Einhorn
2       MR. MACORETTA:  Let me object.
3       To the extent you have any
4   understanding of this beyond what counsel
5   has told you, you can answer, but,
6   otherwise, say -- you can answer it to
7   the extent --
8       A.  I do not have any understanding
9   beyond my discussions with counsel on this
10  subject.
11      Q.  So do you consider that you have an
12  obligation to members of the class to satisfy
13  yourself that FDB -- the settlement is
14  obtaining from FDB all compensation for the
15  members of the class that FDB is able to pay?
16      MR. MACORETTA:  Objection. I
17      object to the form. That is not his
18      obligation, but go ahead.
19      A.  I look at things both from -- I
20  don't look at things in a vacuum. I look at
21  the totality of it. And when I look at the
22  totality of it, and this is a settlement,
23  putting aside any retrospective payment, I
24  have to consider prospective savings. And I
25  have calculated that the potential savings

TSG Reporting - Worldwide      877-702-9580

Confidential

Page 230

1          William J. Einhorn
2    from this settlement to my Fund would be
3    approximately $400,000 per year going forward,
4    and if it was that much to my Fund, that it
5    would be similar for other members of the
6    class.
7          So in that respect I believe that my
8    Fund's interest as well as the interests of
9    the class, other class members, are aligned.
10   **Q.  Is it your understanding that when**
11   **pharmacies dispense prescription drugs they**
12   **make a profit on the drugs that they sell?**
13   A.  Well, if they didn't, they wouldn't
14   be in business.
15   **Q.  So don't you expect that to the**
16   **extent pharmacy reimbursements --**
17   A.  I take that back.
18        In some cases in some pharmacies in
19   some chains.  It is not so much making money
20   on the drug; it's getting the people in their
21   store because when they get the people in the
22   store to pick up the drug, they are buying
23   other things that have much higher markups.
24   **Q.  But it is also your understanding**
25   **that the pharmacy is trying to price its**

TSG Reporting - Worldwide     877-702-9580

Confidential

Page 231

1          **William J. Einhorn**
2    **prescription drugs at a level to make more**
3    **than it cost to dispense the drug, isn't it?**
4    A.  Well, I can't answer for a pharmacy
5    because I'm not a pharmacist.  I have never
6    owned a pharmacy.  I have never run a
7    pharmacy.  I'm sure there are a lot of
8    elements that come into play, one of which may
9    be what you have mentioned.
10   **Q.  And don't you anticipate that if the**
11   **amounts that the pharmacies receive in**
12   **reimbursement are reduced as a result of**
13   **lowering the AWP markup, that the pharmacies**
14   **are going to go back to the PBMs and**
15   **renegotiate those PBM reimbursements?**
16   A.  They may.
17   **Q.  But you are assuming that that won't**
18   **happen when you are looking to $400,000 of**
19   **annual benefits for your plan, aren't you?**
20   A.  My estimates were conservative, so,
21   to the extent that they were conservative, it
22   could take into account that variable.
23   **Q.  Well, you say it could have, but it**
24   **didn't, did it --**
25   A.  Yes, I just said.

TSG Reporting - Worldwide     877-702-9580

Confidential

Page 232

1          William J. Einhorn
2    **Q.  -- when you made your estimate?**
3    A.  When I made my estimate, I assumed
4    that given our generic fill rate and given the
5    fact that in the normal course if 45 percent
6    of your dispensed drugs are generic, it still
7    only represents 20 percent of the cost.
8          In recent times our generic fill
9    rate has gone up so I have assumed not 80
10   percent of the cost would represent brand name
11   drugs but rather 65 percent.
12        So when I did my calculations in
13   coming up with the savings of 3 or 4 percent
14   per year -- now it is less than 4 percent; it
15   is closer to 3 percent -- I think that that is
16   conservative and also takes into account that
17   -- also takes into account that there could be
18   some renegotiation.  However, my contract with
19   Express Scripts is based upon AWP minus a
20   stated percentage both for brand and generic.
21   So in that sense I am locked in.
22        MR. FLUM:  I just got a note
23   that we need to change tape.
24        VIDEO TECHNICIAN:  We are now
25   going off the videotape record.  That

TSG Reporting - Worldwide     877-702-9580

Confidential

Page 233

1          William J. Einhorn
2    concludes Videotape No. 3.  The time
3    4:05.
4          (Short recess.)
5          VIDEO TECHNICIAN:  We are now
6    back on the videotape record.  This
7    commences Videotape No. 4.  The time
8    4:16.  You may continue.
9    BY MR. FLUM:
10   **Q.  Mr. Einhorn, when did you first**
11   **learn that there was a proposed settlement**
12   **that had been signed off with FDB?**
13        MR. MACORETTA:  Let me just
14   object.  "Proposed settlement" and
15   "signed off."
16        MR. FLUM:  All right.  I'll
17   rephrase.  I'll rephrase.
18        MR. MACORETTA:  Okay.
19   **Q.  When did you first learn that a**
20   **settlement with FDB had been reached that your**
21   **counsel intended to present to the Court for**
22   **approval?**
23   A.  A couple months ago.
24   **Q.  I take it that the Fund took steps**
25   **to authorize counsel to present the settlement**

TSG Reporting - Worldwide     877-702-9580