UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,<br><br>          Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and MCKESSON CORPORATION, a Delaware corporation,<br><br>          Defendants. | Case No. 1:05-CV-11148-PBS |

**DECLARATION OF MELVIN R. GOLDMAN IN SUPPORT OF DEFENDANT MCKESSON CORPORATION'S OPPOSITION TO JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED FIRST DATABANK CLASS SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS**

I, Melvin R. Goldman, declare as follows:

1.      I am a partner at the law firm of Morrison & Foerster LLP and one of the attorneys of record for McKesson Corporation ("McKesson") in this action.  I submit this declaration in support of McKesson's Opposition to Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement and Certification of Settlement Class.

2.      Attached hereto as Exhibit 1 is a true and correct copy of excerpts from the transcript of the deposition of Dr. Raymond S. Hartman, taken on October 4-5, 2006.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from the Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris dated February 9, 2005.

1

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 18th day of October, 2006, in San Francisco, California.

By:

/s/ Melvin R. Goldman
Melvin R. Goldman

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 18, 2006.

/s/ Lori A. Schechter
Lori A. Schechter

# Exhibit 1

Page 1

1          RAYMOND S. HARTMAN

2       UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF MASSACHUSETTS

4                                    👉 ORIGINAL

5   -------------------------------x

6   NEW ENGLAND CARPENTERS HEALTH

7   BENEFITS FUND, ET AL.,

8            Plaintiffs

9                              Civil Action

10  vs.                        No. 1:05-CV-11148-PBS

11

12  FIRST DATABANK, INC., and

13  McKESSON CORPORATION,

14            Defendants

15  -------------------------------x

16         DEPOSITION OF RAYMOND S. HARTMAN, a

17      witness called by and on behalf of the

18      Defendant McKesson Corporation, taken pursuant

19      Federal Rules of Civil Procedure, before

20      Nicole E. Guilbert, a Notary Public in and for

21      the Commonwealth of Massachusetts, at Bonner,

22      Kiernan, Trebach & Crociata, on Wednesday,

23      October 4, 2006, commencing at 9:46 a.m.

24

25                   VOLUME I

1              RAYMOND S. HARTMAN

2         This deposition is being held at

3    Bonner Kiernan on October 4, 2006 at

4    approximately 9:46 a.m.  My name is Jody

5    Urbati from TSG Reporting, Inc., and I am

6    the legal video specialist.  The court

7    reporter is Nicole Guilbert in association

8    with TSG Reporting.

9        Will counsel please introduce

10   yourselves.

11       MR. GOLDMAN:  Mel Goldman for

12   McKesson.

13       MR. BABBITT:  Chris Babbitt for

14   McKesson.

15       MR. SOBOL:  Thomas Sobol for the

16   class plaintiffs.

17       THE VIDEOGRAPHER:  Will the court

18   reporter please swear in the witness.

19

20       RAYMOND S. HARTMAN, having been

21   satisfactorily identified and duly sworn by

22   the Notary Public, was examined and

23   testified as follows in answer to direct

24   interrogatories:

25

Page 6

RAYMOND S. HARTMAN

1

BY MR. GOLDMAN:

2

3      Q.    Good morning, Dr. Hartman.

4      A.    Good morning.

5      Q.    Dr. Hartman, have you been retained by the
6  plaintiffs' counsel in this case for the purpose of
7  rendering opinions?

8      A.    I have.

9      Q.    And what -- for what purpose have you been
10  retained?

11      A.    I've been retained to -- to analyze the
12  allegations in this matter and render opinions as to the
13  certification of the class as designated in the complaint.

14      Q.    Have you also been retained for the purpose of
15  rendering any opinions with respect to the issue of
16  liability?

17      A.    Not at this time, no.

18      Q.    Have you done any work with respect to the issue
19  of liability?

20      A.    No.

21      Q.    For pursuit of your purpose, did you prepare a
22  declaration in this case?

23      A.    I did.

24      Q.    And before coming here, did you review that
25  declaration?

1          RAYMOND S. HARTMAN

2      Q.    Okay.  And, again, you don't need to know that for

3  purposes of rendering your opinion here, correct?

4      A.    That's correct.

5      Q.    Let's talk about the manufacturers.  Were there

6  manufacturers who were aware of the change in the 5 percent

7  spread?

8      A.    I've been asked to assume that some were.

9      Q.    Let me restate it.  Were there manufacturers who

10  were aware that the spread changed by 5 percent?

11      A.    Yes.

12      Q.    And of them, how many did, how many knew that?

13      A.    I've not done a study of that.

14      Q.    Are you planning to do a study of that?

15      A.    I haven't been asked to.  I could be asked to.

16      Q.    What assumption do you make?  Do you make an

17  assumption a few did, a small percentage, or do you assume

18  all of them whose drugs are listed on Appendix A knew?

19  What's your assumption?

20      A.    It's not necessary -- some knew, some resisted,

21  some acquiesced, but I -- whether the -- whether they --

22  whether half of them knew, whether they all knew, it's --

23  it's not -- it doesn't affect the opinions that I've put

24  forward here as given what I've been asked to assume.

25      Q.    So would it be correct you don't know whether all

RAYMOND S. HARTMAN

2  of the manufacturers whose drugs are listed in Appendix A

3  knew about the 5 percent change when it occurred or just

4  some of them; am I correct?

5      A.    That's correct.

6      Q.    And again, you don't need to know that for

7  purposes of any opinion you're rendering here, correct?

8      A.    For the opinions I'm rendering here, that's

9  correct.

10      Q.    Now, let's take third-party payors.  Did any of

11  them know about the change in the 5 percent at the time it

12  occurred or thereafter?

13      A.    I've seen no evidence that any of them knew of the

14  change.

15      Q.    No, not the question whether you've seen any

16  evidence, but can you tell me what you're assuming for

17  purposes of rendering your opinion, did some or all

18  third-party payors become aware of the change in the 5

19  percent at the time it occurred or thereafter?

20      A.    I'm assuming that the third-party payors continued

21  to get integratable data from First DataBank that included

22  AWPs and WACs.  Their primary focus was on AWP and

23  reimbursement off of AWP for this type of drug.  Whether

24  they then related that to WAC or not, I've made -- I've

25  made no analysis about that or I've made no assumption

1    RAYMOND S. HARTMAN

2    about whether they observed that or not.  The AWP -- the

3    assumption that I have made that flows from the allegations

4    are that that AWP increased from what WAC was and that's

5    what they were working off of.

6        Q.    Would it be correct for purposes of the opinions

7    you're rendering here regarding class certification, you

8    don't need to know whether any third-party payor observed

9    or knew of this 5 percent change at the time it happened or

10   shortly thereafter?

11       A.    For purposes of my analysis and for the -- the

12   opinions that I come to and the conclusions regarding

13   impact and injury, the -- I'm assuming that the allegations

14   about the spread occurred; that the third-party payors were

15   sufficiently locked into contracts or sufficiently locked

16   into ways of doing business that they -- that they worked

17   off of an AWP; and that knowledge -- I don't know whether

18   they knew or if they didn't know, but it would not change

19   my opinions of whether they did or not.

20       Q.    So would it be correct that whether or not

21   third-party payors knew, observed or knew of this 5 percent

22   change in the spread at the time it happened or shortly

23   thereafter, would not make a difference to you in -- for

24   purposes of any opinion you're rendering here; am I

25   correct?

RAYMOND S. HARTMAN

1

2      A.    If -- let's say the following:  If all third-party

3  payors were made aware of this scheme at the time that it

4  happened and it was made clear to them that what they were

5  paying the -- the reimbursements that they were paying

6  increased to the extent that they did, as indicated by my

7  calculations, such that there were an announcement that

8  everybody knew, that could change the assumptions about --

9  about -- of -- about -- that would change my opinions or

10  could change my opinions here.

11      Q.    Is it correct it doesn't make a difference to you

12  whether third-party payors knew or didn't know about the 5

13  percent change?

14      A.    What I'm saying --

15          MR. SOBOL:   Objection; asked and

16          answered.

17          THE WITNESS:   What I'm saying is that

18          what -- the knowledge that they had over

19          this period of time was insufficient to --

20          to lead to any change in what -- what I've

21          -- my conclusions in this report.

22          THE VIDEOGRAPHER:   Here ends Tape 1.

23          Off the record 11:06 a.m.

24          (A brief recess was taken.)

25          THE VIDEOGRAPHER:   Here begins Tape

1                    RAYMOND S. HARTMAN

2         2.   Back on the record 11:17 a.m.

3         Q.   (By Mr. Goldman)   Dr. Hartman, if I wanted to know

4    whether any third-party payor observed or was told about

5    the 5 percent change after it occurred, would there be a

6    way for me to find out?

7         A.   If one wanted to ascertain whether a third-party

8    payor had known of that, was aware of it as soon as it

9    occurred --

10        Q.   Or shortly thereafter.

11        A.   -- or thereafter, one could design a survey to try

12   and ascertain that.

13        Q.   What if I wanted to know if any of the plaintiffs

14   were told or aware or observed this change, is there a way

15   I could find out from them?

16        A.   Well, certainly asking them would be a fairly

17   direct way of finding that out.

18        Q.   Did you think of doing that here?

19        A.   For the purposes of this analysis, I've -- I've

20   been asked to assume what I've been asked to assume, and

21   I've -- I've been asked to rely on what I know of how

22   reimbursement works and how I've observed that over time

23   among third-party payors, and so it wasn't an issue that

24   I've been asked to do here in this -- as part of this

25   analysis.

1                    RAYMOND S. HARTMAN

2        Q.    So do you know whether any plaintiff in this case

3    knew or was told or became aware of the 5 percent change in

4    spread after it occurred or thereafter?

5        A.    I have not been asked to focus on that -- on

6    that -- on that issue.

7        Q.    And again, it wouldn't make a difference to you,

8    would it, in terms of any opinion you're rendering here?

9        A.    Well, factually, whether third-party payors knew

10   or whether they all knew, whether some of them knew,

11   whether none of them knew is hypothetical to what I've --

12   the opinion I'm rendering here.  Based on the facts of what

13   I know of this industry, most of them were unaware of this,

14   that the -- that they all knew or many of them knew run

15   counter to -- and by "know," I mean institutionally make an

16   observation of this and then say:  Look, we've observed

17   this is going on.  We've got to renegotiate our contracts.

18   We've have to take a position we're going to respond to

19   this because of this effect.

20            And based -- so right now we're speaking very

21   hypothetically of know or not know or -- and what that

22   means, but based on the facts of the industry, as I know

23   them, it's -- it -- I would venture that very few would

24   respond institutionally -- understood enough to respond

25   institutionally to this -- to the allegations in this

Page 67

RAYMOND S. HARTMAN

1

2    matter.

3        Q.    Let me -- do you assume, for purposes of the

4    opinion you're giving, that most third-party payors were

5    unaware of the 5 percent change?

6        A.    I'm assuming that per my understanding of this --

7    of this industry, that this was a change that -- that was

8    effectuated in a stealthy a manner as was possible; and

9    that once -- once it was observed, if it were observed,

10   that there were contracts in place with various players

11   that changes could not occur on the part of third-party

12   payors to an observed change in the spread.

13       Q.    Do you assume that most third-party payors were

14   unaware of the 5 percent change?

15       A.    I'm aware of just what I've said.

16       Q.    I know, but with all due respect, I don't believe

17   I've gotten an answer.  Do you assume that most third-party

18   payors were unaware of the 5 percent change?

19       A.    I'm assuming that most third-party payors

20   institutionally could not respond in a way that had any

21   meaning to the 5 percent spread.

22       Q.    I'm not asking you about the response.  That's

23   separately.  I want to know do you assume that most

24   third-party payors were unaware of the 5 percent change?

25       A.    Given the earlier answer, that question is not

Page 68

RAYMOND S. HARTMAN

1

2    relevant and I haven't addressed it.

3        Q.    So would it be correct you make no assumption as

4    to whether some, all, or most third-party payors were aware

5    of the 5 percent change for purposes of any opinion you're

6    giving here?

7                    MR. SOBOL:    Objection; asked and

8                answered.

9                    THE WITNESS:    I'm assuming that the

10               third-party payors are aware of these types

11               of issues in the ways that I've seen in

12               dep -- in enumerable depositions; that

13               there is a general lack of awareness of

14               these kinds of issues on the part of

15               third-party payors.    And so the -- I'm

16               taking -- I'm assuming that the third-party

17               payors behave and know as they -- as they

18               have behaved and known historically, and

19               that's what I assume.

20       Q.    (By Mr. Goldman)    I'm afraid I just don't

21   understand and I need to understand this.    So very -- I

22   understand there's an issue for you about if they knew,

23   could they respond, and I want to put that aside.    I wanted

24   to know do you make an assumption as to whether most

25   third-party payors were unaware of the 5 percent change?

1                    RAYMOND S. HARTMAN

2        A.    I -- I make the assumption -- it's this issue of

3    "most" --

4        Q.    I'm just using -- I'm quoting you.

5        A.    Right.  You are?

6        Q.    Yes, I am.  You said, "Most were unaware, very few

7    were aware."  That's what I have in my notes.

8                    MR. SOBOL:  Objection to the form.

9        Q.    (By Mr. Goldman)  And I don't want you to be bound

10   by that.  My question simply is:  Do you assume that most

11   third-party payors were unaware of the 5 percent change?

12       A.    I -- I assume that many third-party payors were

13   unaware of the third -- of the change based on what I've

14   seen of awareness of third-party payors, period.

15       Q.    Okay.  Now, if you recently read Judge Saris's

16   opinion, you see she refers to a potential of 11,000 of

17   third-party payors being in the MDL class.  There are a lot

18   of third-party payors out there?

19       A.    There are.

20       Q.    Would you be able to tell me, when you say, "many

21   were unaware," what percentage of the total of third-party

22   payors you include as in the group who were unaware for

23   purposes of your assumption?  Is it 50 percent?  75

24   percent?  What -- what constitutes "many"?

25       A.    I would -- I'm -- I'm speculating here.  The --

1           RAYMOND S. HARTMAN

2                MR. SOBOL:  Motion to strike.

3       Q.   (By Mr. Goldman)  You don't know?

4       A.   Well, I -- I'm -- I have opinions but it's -- it's

5   the -- but it -- based -- I would say the preponderance of

6   third-party payors did not have an understanding of this --

7   of this change and this markup based on the types of

8   deposition testimony I've seen, but this is a -- that's

9   merely a guess.

10      Q.   Okay.  I want to stay away from understanding of

11  it, but I want to stay with aware of the 5 percent change

12  in the spread.  Is there a difference in your terminology

13  of "many" as opposed to "preponderance"?

14                MR. SOBOL:  Objection.

15                THE WITNESS:  Yeah.  Many is -- you

16            know, many is, you know, could be 50/50.  I

17            would say --

18      Q.   (By Mr. Goldman)  Over 50 percent?

19      A.   I -- yes.

20      Q.   Over 60 percent?

21      A.   I don't know.

22                MR. SOBOL:  Objection to the form.

23                MR. GOLDMAN:  We got the answer.

24      Q.   (By Mr. Goldman)  Now, was -- there was an effort

25  to you -- you assume, to hide, and my question is:  Was

1          RAYMOND S. HARTMAN

2    that -- do you assume that effort was successful throughout

3    the entire class period; that is, from the time the 5

4    percent was implemented and hidden, it remained hidden from

5    whoever it was being hidden from consistently over a

6    four-year -- four-plus-year period of time or did it -- do

7    you assume it leaked out to some people?

8              MR. SOBOL:  Objection to the form.

9         Q.    (By Mr. Goldman)  What's your assumption?

10        A.    My assumption is the following, and why don't we

11   just, you know, get this on the record, because you keep

12   coming back to it over and over again from different

13   directions: The -- the scheme was entered into as alleged,

14   I'm assuming, in August of 2001; and it didn't affect all

15   drugs at once, so people couldn't have suddenly said, oh,

16   my God, all these drugs are going up, what's going on?  It

17   happened incrementally; as drug prices were being renewed,

18   there would be an increase.

19            Now, as third-party payors and as the people who

20   get the AWP and the WAC data, they will get it, they will

21   -- reimbursements will be paid based on AWP.  That's the

22   major thing that they look at.  As far as I see with

23   reimbursement, negotiations -- the preponderance of

24   negotiations are off of AWP.  So when -- when third-party

25   payors get AWPs, they can get WACs if they want to.  It is

1                    RAYMOND S. HARTMAN

2    question, Dr. Hartman -- I'm not asking in MDL whether it

3    was the only opinion you had, but one of the opinions you

4    had was based upon AWPs for those innovator drugs being

5    artificially inflated by the defendant manufacturers; am I

6    correct?

7        A.    That's correct.

8        Q.    And in this case, one of the opinions or

9    assumptions you're making is the AWPs for the subject

10   drugs, Appendix A, are likewise artificially inflated?

11              MR. SOBOL:  Objection to the form.

12              THE WITNESS:  Well, the way I'd frame

13          it is the following:  Is what I've been

14          asked to -- what I was asked to assume here

15          and I developed formulaic methodologies for

16          analyzing causation and calculating

17          damages, was that their -- that the

18          defendant drug manufacturers strategically

19          set an AWP and an ASP for whatever

20          competitive reasons they wanted to; and

21          that they took advantage of -- and they

22          used that -- that spread between the AWP

23          that they had determined and the ASP to

24          accomplish what they wanted to accomplish.

25              That AWP was something they

Page 80

RAYMOND S. HARTMAN

1

2       determined.  In this matter, I -- what I've

3       been asked to assume is that there were

4       WACs and, essentially, implicit AWPs or

5       markups reported to First DataBank from the

6       manufacturers, and that McKesson and First

7       DataBank incrementally added to an AWP that

8       the manufacturer had wanted -- had

9       determined to --

10      Q.   (By Mr. Goldman)   Yes.

11      A.   -- whatever their strategies were, that's -- they

12 reported it and then it was inflated by --

13      Q.   Yes.

14      A.   Right.  So --

15      Q.   I understand and that's an issue I'm going to

16 actually deal with you with -- later on.

17      A.   I thought you might.

18      Q.   I thought you thought I might.  But this is

19 different.  I'm trying to ask a question about what you did

20 in MDL and what you did here, because I want to understand

21 what the implications are of having an artificially

22 inflated AWP.  So now in MDL, the effect of the

23 artificially inflated AWP was to create an artificial --

24 artificially large spread between AWP and ASP, correct?

25      A.   The -- in -- the matter in the -- the issue in the

RAYMOND S. HARTMAN

1

2    MDL matter was that there were spreads defined as

3    deviations between AWP and ASP that were in excess of what

4    third-party payors understood them to be.

5        Q.    Yes.   And I'm not really going to get into MDL

6    deeply here.

7        A.    That's fine.   That's just -- that's my -- that's

8    what it was.

9        Q.    In MDL it was your view that if -- that the ASP

10   was secret and not known, it was not publicly available

11   information, correct?

12       A.    That's correct.

13       Q.    And it was your opinion in that case, if the third

14   party-payors had been aware of what the ASP was, and

15   therefore the spread between the artificially high AWP and

16   ASP, they would not have put up with it; they would not

17   have reimbursed on the basis of the AWP the way they had;

18   am I correct?

19       A.    If they had better information about what that

20   spread was, as the Medicare Prescription Drug Modernization

21   and Improvement Act or Improvement and Modernization Act

22   and the GAO Pricing Guidelines of 2003 suggest, if there

23   was better information out there and they had some idea of

24   what ASP was, they could have responded in some way to --

25   to the increase in the reimbursements they were paying

RAYMOND S. HARTMAN

2  based on the spread -- on the spread that was not

3  understood by them.

4      Q.   So I now have the foundation for the questions I

5  want to ask.  Tell me economically why is it if the

6  third-party payors had been aware of ASP, what the ASP was

7  and, therefore, the spread between the ASP and these

8  artificially high AWPs, that would have not continued; that

9  spread would not have -- have existed or continued in the

10 marketplace?  What is the economic principle behind that?

11     A.   That that spread would --

12          MR. SOBOL:  I'm sorry.  I'm sorry.

13     Objection.

14     Q.   (By Mr. Goldman)  Yeah.  The spread between the

15 ASP and the -- these inflated AWPs, if it had been known to

16 the third-party payors, what would they have done?

17     A.   Well, I think Dr. Berndt -- I mean let's focus on

18 those drugs that -- for which greater attention was -- was

19 focussed on this issue and what Dr. Berndt has said in

20 various places in his report is that there was -- when the

21 spreads were unknown, when it was not clear what was going

22 on, that there were possibilities for, I think he said,

23 mischief and abuse; and that third-party payors, when they

24 were made aware -- and these were large third-party payors

25 -- were made aware of the size of this spread, they were

1                          RAYMOND S. HARTMAN

2    flabbergasted.  They were reimbursing off of an AWP that

3    was so far above the acquisition costs of the doctor -- of

4    the physicians, they were flabbergasted.

5            Judge Saris referred to these as "the mega

6    spreads."  Now, if I'm a third-party payor and doctors are

7    coming to me and saying, well, look, I want to be

8    reimbursed at AWP less 15 and I know that the doctors are

9    getting this at what is 75 percent below that, so that

10   would be a spread of three or four hundred percent on the

11   ASP, they would have said, I'm not -- you know, I'm not

12   going to pay you AWP less 15.  I'm going to negotiate more

13   aggressively.

14       Q.   And that would have been what would have likely

15   happened if the third-party payors were aware of what ASP

16   actually was, correct?

17       A.   If the third-party payors -- again, we have to --

18   you know, we keep talking a little bit about this is

19   hypothetical in Chicago school, you know, if they knew

20   about this bid of excess fees, you know, there's going to

21   be heat-seeking missiles that go and compete them away.  I

22   think we have to also keep in mind what Dr. Berndt put very

23   well of the importance of being unimportant; that the drug

24   spending generally has been one of the smallest elements of

25   third-party payor reimbursement.  So they haven't had swat

Page 84

1                        RAYMOND S. HARTMAN

2    teams focussing on those kinds of fees in trying to manage

3    them closely.  It's been on hospitals, physicians, other

4    kinds of things.

5            But suppose we're in a state of the world where

6    all that other stuff has been worked out by the third-party

7    payors and they started to know about this information,

8    which does not seem to be the case, as Dr. Berndt suggests

9    over the period of the nineties, over much of the MDL

10   period.  They would use that information to try and

11   negotiate aggressively if they -- if they had known about

12   that.

13      Q.   Okay.  "If they had known about that" meaning

14   about what ASP actually was?

15      A.   That's correct.

16      Q.   So they were missing one of the pieces to know

17   what the spread was; they were missing what the ASP was,

18   correct?  They knew what the AWP was.  They didn't know

19   what the ASP was, correct?

20      A.   That's correct.

21      Q.   And I want to see if you'll agree with me, in our

22   case, unlike what you found there, the spread that we're

23   talking about here, as you point out in the footnote, AWP

24   and WAC, the market -- people in the marketplace can learn

25   both pieces of the equation to know the spread?

1                    RAYMOND S. HARTMAN

2         A.    The -- they can.   The WAC and the AWP is available

3    from the electronic databases.

4         Q.    Now, do you know whether there were steps

5    manufacturers could have taken, if they wanted to, in the

6    face of learning about the 5 percent change in spread?

7                    MR. SOBOL:   Mel, do you mean

8              manufacturers or TPPs?

9                    MR. GOLDMAN:   No.   I'm sorry.   I'm

10             off -- I left TPP.   I'm now going back to

11             the manufacturers --

12                   MR. SOBOL:   Okay.

13                   MR. GOLDMAN:   -- some of whom, as you

14             pointed out, the complaint says were aware

15             of this, complained about it.

16        Q.    (By Mr. Goldman)   And I'm asking were there things

17   manufacturers could have done upon learning of the 5

18   percent change to -- in an attempt to change that, if they

19   had wanted to?

20        A.    Well, I cite, as I know you know, I cite one of an

21   unnamed manufacturer that objected to the new markup and

22   said that they -- there was something that wanted to be --

23   this is in Footnote 12 and it quotes -- it cites a

24   manufacturer in 2003 that said they wouldn't -- they didn't

25   want to report the AWPs, given the fact that the spread had

1                      RAYMOND S. HARTMAN

2    changed and -- or they wanted to put some proviso in there,

3    some language from their counsel.  And then First DataBank

4    said, well, fine, in that case, if you're not going to let

5    us report the AWPs according to our rules, we're going to

6    drop you from the -- from the database.

7         Q.    No.  My question is a little different.  Are there

8    steps that the manufacturers, upon learning of the 5

9    percent, could have taken, if they wanted to, to change

10   that result?

11        A.    I've seen no steps that I have found that suggest

12   to me were sufficiently strong that First DataBank would

13   have -- would have capitulated to those steps.  So absent a

14   type of response where all the manufacturers would say,

15   well, screw you, we're not going to use you -- although

16   there was no other source for electronic databases -- I

17   don't see any steps that realistically were available to

18   them.

19             They tried -- the ones that I do see they tried,

20   didn't work, and they had to be listed on this database --

21        Q.    Could the manufacturers have publicized the change

22   in the spread?

23        A.    The manufacturers could have taken a single

24   manufacturer, could have taken out an ad in the Wall Street

25   Journal saying:  This is what our AWP is.  Now, the problem

RAYMOND S. HARTMAN

1

2    Q.    (By Mr. Goldman)  Do they ever do it based upon a

3  percentage of AWP and the report -- the report deals with

4  this question.  The declaration deals with --

5    A.    I'm understanding --

6    Q.    I have no question.  I have no question.

7    A.    Well, I --

8    Q.    I have no -- if you want to talk, you can talk,

9  but I have no question pending.

10    A.    Well, then I --

11        MR. SOBOL:  He's done lots of

12        volunteering, as you know, anyway --

13        MR. GOLDMAN:  I said go ahead.

14        MR. SOBOL:  But no.  Only if you have

15        to correct prior testimony should you be

16        saying anything right now.

17        THE WITNESS:  Well, I want to clarify

18        prior testimony; that is, what we're

19        talking about now is we're talking in

20        general about how this industry works and

21        where something deviates from or is

22        irrelevant to or orthogonal to my

23        declaration here, I'm making that clear.

24        But otherwise, I'm understanding all of

25        this conversation as being about the

1                          RAYMOND S. HARTMAN

2              industry generally.

3         Q.    (By Mr. Goldman)   Yeah.   I thought I started out

4    by saying you got background in the industry and --

5         A.    You did start out but at times you suddenly slip

6    into specificity, and I'm never quite sure --

7         Q.    I'm just talking about how you understand the

8    industry works.

9         A.    Okay.   We're still at that general level.

10        Q.    And I want to know whether there are rebates paid

11   by -- I haven't asked it but I just want to be clear, am I

12   correct there are rebates during the class period paid by

13   the manufacturer to the PBM which are based upon a

14   percentage of AWP?

15        A.    I would have to go back and look at the contracts

16   to confirm that.

17        Q.    So you don't know?

18        A.    I don't recall.

19        Q.    You did say in your declaration that you have

20   observed rebates of 6 percent times WAC; am I correct?

21        A.    I've observed rebates related to ASP to WAC to

22   AWP, and there's a concordance of those ratios.

23        Q.    All right.   Did -- do you know whether -- where

24   WAC is the -- is the basis for the discount, the percentage

25   of WAC, how many rebates are -- have been -- over the class

1                      RAYMOND S. HARTMAN

2  period have been calculated based upon WAC, rebates from

3  the manufacturer to the PBM?

4       A.    I have -- that would be something that I would

5  look at during the actual damage analysis, but I haven't

6  looked at it to date.

7       Q.    Haven't you assumed that the way in which rebates

8  were calculated by manufacturers to PBMs was based upon WAC

9  and not upon AWP?

10      A.    Not at all.

11      Q.    Would you agree that if AWP was, as alleged,

12 artificially inflated, then there -- and where AWP is the

13 basis for rebates, then the PBM would have received more by

14 way of rebates than before the 5 percent -- the alleged 5

15 percent scheme?

16      A.    Well, I think because you've read my report, you

17 know that I've addressed that issue, and I've allowed for

18 a --

19      Q.    Just -- I'm going to get into all of your

20 calculations.

21      A.    Right.

22      Q.    I'm just asking would it be correct, if the AWP

23 became artificially inflated due to the 5 -- the alleged 5

24 percent scheme, would it be true that a PBM receiving

25 rebates based upon AWP, percentage of AWP, would get more

1                          RAYMOND S. HARTMAN

2   rebates than they did before the scheme?

3       A.    That is true.

4       Q.    Some of the third-party payors have captive PBMs;

5   am I correct?

6       A.    I would have to look at that -- that structural

7   aspect again.   I've --

8       Q.    Hasn't Judge Saris -- you read her opinion

9   recently, correct?

10      A.    I -- the details of that, I've not focussed on

11  sufficiently to respond.

12      Q.    I could be wrong about this and I want to be very

13  careful with Judge Saris's opinions, but didn't she refer

14  to 20 percent -- as much as 20 percent of the TPPs have

15  their own PBMs?

16      A.    I think if you want me to respond to that, you

17  should show me her -- her memorandum in order -- I don't --

18  I don't recall the shifting alliances in this market among

19  different entities, I haven't looked at recently enough to

20  say what the -- what's characterizing patterns or

21  percentages.

22      Q.    Let's assume there are some members of the class

23  who have captive PBMs, whose -- which PBMs receive more --

24  more rebates when the alleged 5 percent scheme went into

25  effect than they would have received absent a scheme.

Page 180

RAYMOND S. HARTMAN

1

2      Should those people be included in the class, from your

3      point of view?

4          A.    The -- the class, as defined, is the class that

5      I've been asked to assume and I have taken as the class and

6      all those members in the class that are -- are included as

7      defined, I've -- given the allegations, I'm taking as being

8      included in the class and -- period.

9          Q.    Well, let's assume what I've just said is correct;

10     that there are third-party payors within a class who have

11     their own PBMs, which PBMs receive more rebates from

12     manufacturers because AWP was allegedly inflated, all

13     right?

14         A.    Mm-hmm.

15         Q.    How would you adjust for that in your formulaic

16     methodology for arriving at aggregate damages on a

17     classwide basis?

18         A.    If -- what I have shown in my formulaic

19     methodology is I've taken a variety of rebates into

20     account, and if the -- the fact that you're posing or the

21     statement that you're -- the assertion you're posing as a

22     fact is true, it would be something that I would also -- I

23     could address in the same way that I've addressed rebate

24     calculations at an aggregate level in order to net out

25     total rebate payments from aggregate classwide damages.

1                        RAYMOND S. HARTMAN

2        A.    I have.

3        Q.    And we are dealing under A it says on page 110,

4    self-administered drugs, which is what our case is about,

5    correct?

6        A.    Correct.

7        Q.    In 205, the first sentence, Professor Berndt said,

8    "Both sides in this matter agree that the content of

9    self-administered drugs, PBMs play a central role." Would

10   you agree with that statement as well?

11       A.    I would.

12       Q.    If you see in 206, he's referring to an excerpt

13   from an FTC, I think he said an opinion it looks like -- in

14   any event, it's the FTC commenting on the transaction

15   between two large PBMs, Care Market and AdvancePCS. Do you

16   remember when that acquisition occurred?

17       A.    I don't.  It was -- you know, my guess is late

18   '90s, early 2000s.

19       Q.    And when it came out, did you happen to look at

20   any of the FTC opinions regarding that transaction or

21   acquisition?

22       A.    I think I did in the context of the MDL matter,

23   but I don't remember looking at it at the time of the --

24   the acquisition and the FTC hearings.

25       Q.    Do you recall learning that the FTC did approve

Page 195

RAYMOND S. HARTMAN

1

2      the merger?

3          A.    I know that it did because or -- I recall Ernie

4      stating that.

5          Q.    Now, in paragraph 206, Professor Berndt appears to

6      be quoting from the FTC's statements regarding -- I guess

7      there's a Footnote 276.  It's a statement to the Federal

8      Trade Commission.  Do you see that in 276?

9          A.    I do.

10         Q.    In the second paragraph, the quotation from the

11     FTC, it says, "At most, the acquisition is likely to

12     increase the bargaining power of the merged PBM and

13     increase its share (and correspondingly reduce the pharmacy

14     shares) of the gains flowing from contracts between PBM and

15     the pharmacies.  It is likely that some of the PBM's

16     increased shares would be passed through to PBM clients.

17     We anticipate that competition among PBMs will remain

18     vigorous in the wake of Care Market/AdvancePCS acquisition

19     and this competition is likely to cause PBMs to pass on at

20     least some of their cost savings to their customers in

21     order to gain or retain their business."

22              Now, I asked you earlier whether you thought

23     competition among PBMs was intense.  Would you agree it was

24     vigorous, there's vigorous competition among PBMs during

25     the class period?

RAYMOND S. HARTMAN

A.    What I would -- in terms of expanding on my
characterization earlier, I would say the following:  That
I know that the FTC had come to this decision; I know that
the FTC, under David Balto, had come to the opposite
conclusion regarding competition and transparency and
whether gains were passed on from PBMs to their clients to
the third-party payors; I know that there has been
aggressive litigation on the part of a variety of states
and some -- some payors against PBMs that they are feeling
that the gains are not being passed on.

So it's -- it is my conclusion that the record is
still not clear on this issue --

Q.    I'm just --

A.    And I'm saying -- they say it's vigorous --

Q.    I'm just on the vigorous part.  I'm going to do
all the rest --

A.    Yeah.  No.  I don't -- I've seen evidence and
opinion that suggests it's not vigorous.

Q.    All right.  Now, when the FTC refers to that the
acquisition may lead to the PBM reducing the pharmacy share
-- you see that?

A.    I did see that, yeah.

Q.    Okay.  It's the next sentence.  It is, "It is
likely that some of the PBMs increased shares would be

Page 197

RAYMOND S. HARTMAN

1

2    passed through to the PBM clients."  Can you see any

3    economic justification for the Federal Trade Commission

4    saying that?

5        A.   Well, I -- I can see political explanations for

6    why the FTC might say that.

7        Q.   I didn't -- sir, I didn't ask political.  I asked

8    you can you see any economic justification for the Federal

9    Trade Commission saying that?

10       A.   I can see that there are arguments on both sides

11   of the issue, and they've taken -- they've taken one, and I

12   have no idea whether it's the -- the notion that PBMs may

13   pass along increased shares to clients is a hypothesis and

14   I see likely -- and I see no reason to judge whether it's

15   likely or unlikely.  I see them taking a position and it's

16   an opinion and I don't see it based on anything more

17   empirical than what is -- what drove the FTC to make other

18   decisions at other times regarding competition among PBMs.

19       Q.   Well, is it your view that it is not likely that

20   some of the PBMs increased shares will be passed on to PBM

21   clients?

22       A.   It's my view that I haven't studied it enough to

23   judge the likelihood and that that likelihood is irrelevant

24   to what I've been asked to do here, so I haven't pursued

25   it.

Page 198

RAYMOND S. HARTMAN

1

2      Q.   Now, it says in the paragraph that follows this

3   quote, "In the context of self-administered drugs

4   therefore, plaintiffs argue," and I'm going to stop there

5   and I'll be happy to demonstrate to you that he's referring

6   to you, "and conclusions appear to be at variance with

7   those of the FTC and my own analysis discussed early in

8   this report.  If competition among PBMs is vigorous" --

9   this is the sentence I want to focus on -- "If competition

10  among PBMs is vigorous, even if the self-administered AWP

11  IDs were artificially inflated, injury and damage to

12  third-party payors do not follow, particularly on a

13  classwide basis."

14          Now, do you see the sentence I'm referring to?

15     A.   I do.

16     Q.   You've read that before; am I correct?

17     A.   I have.

18     Q.   And you disagree with it, don't you?

19     A.   Well, I -- I've seen no evidence that has

20  convinced me that this is a factual description of the

21  world or that Dr. Berndt is correct in this interpretation.

22  And as I say, given what I've been asked to do here, it's

23  irrelevant and I've -- so I haven't focussed on this issue

24  here.

25     Q.   Don't you disagree with this statement?  He's

1                    RAYMOND S. HARTMAN

2        A.    Okay.   Well, I know but you were saying,

3    "plaintiffs."   Now, the --

4        Q.    I'm starting over.

5        A.    Okay.   Let's --

6        Q.    Don't you see that when he talks about plaintiffs,

7    he's really talking about you and your position?

8        A.    Well, I'm too modest.   They -- at that point, he

9    says, plaintiffs' expert.   He doesn't say plaintiffs -- he

10   identifies me specifically.

11       Q.    Yeah.   He quotes from you and he cites you at the

12   top of page 110 where he says what you conclude?

13       A.    Right.

14       Q.    And then he has a citation --

15       A.    That's right.

16       Q.    -- 274?

17       A.    That's right.   He does.

18       Q.    So didn't you, when you read this report by

19   Dr. Berndt, understand he was disagreeing with you?

20       A.    I did understand that Dr. Berndt did disagree with

21   me on a number of issues.

22       Q.    And isn't it true you don't believe he's correct?

23       A.    I -- I disagree with him on this -- on this issue.

24       Q.    All right.   I want to go back to contracts between

25   third-party payors and PBMs, okay.   Are you with me?   I'm

1                    RAYMOND S. HARTMAN

2   moving back to that subject I left.

3        A.    Again, to subjects not part of this report?

4        Q.    It's all in the eyes of the beholder, Dr. Hartman,

5   but I don't want to get into a debate over that with you.

6        A.    Okay.

7        Q.    Now, are you familiar with plans that are called

8   two tier, three tier, or four tier plans?

9        A.    In terms of two tiered, three tiered, four tiered

10  formulary plans, yes.

11       Q.    Yes.  Okay.

12       A.    If that's what you mean.

13       Q.    Tell me what would be a three tier plan.

14       A.    Well, a three tier plan would be a plan that would

15  allow for a particular branded drug to be on a formulary,

16  would be the recommended drug of choice -- well, actually

17  -- well, there probably could be a variety of these, but

18  certainly one form would be one of the tiers would refer to

19  a copay that would be related to a generic form of the

20  drug; the second would be a copay that would be a higher

21  tier that would be related to a branded version of the

22  drug; and the third would be a therapeutic or -- well,

23  there's different -- there's different levels for

24  therapeutic competition, generic competition, and the drug

25  for which the generic exists.  And how the tiering works,

Page 207

1                           RAYMOND S. HARTMAN

2      I'd have to refresh my memory.

3           Q.    Well, that's a good point.   Have you heard of the

4      term "planned design"?

5           A.    Yep.

6           Q.    What is meant by "planned design"?

7           A.    Well, I think it probably means anything you want

8      it to mean.

9           Q.    What does it mean within the context of TPP

10     contracts with PBMs?

11          A.    Well, there's usually a plan that involves

12     reimbursement that -- and a number of other things, and

13     that plan could be very narrow.   It could be a drug benefit

14     plan.   It could be health -- a more broad health management

15     plan.   So I -- I think I've heard it referred to in a

16     variety of contexts.

17          Q.    Well, isn't it correct that the contracts between

18     the TPPs and the PBMs are tailored to meet the specific

19     situation that they're dealing with.   There is no one form

20     fits all contract here.   They're designed to meet the

21     specific situation that the parties want?

22          A.    Well, what I -- what I have seen is the following:

23     That when these negotiations take place, PBMs have a

24     standard pro forma contract with a bunch of options and

25     both -- how many -- how many tiers there will be on the

1                      RAYMOND S. HARTMAN

2    formulary, whether there'll be different drug plans for

3    different groups of payors, what types of additional

4    services might be offered in terms of health management

5    services to groups of payors that might be part of a plan,

6    and they go down this laundry list of what -- what are we

7    going -- what do you -- what are we going to negotiate on

8    this and what are we going to negotiate on that and how

9    much are we going to charge you for it.

10       Q.    Exactly.   Okay.   So now that -- let me come back

11   to a three tier -- a possible three tier arrangement.   Let

12   me throw one out to you.   One tier is for generic drugs and

13   it has one form of copay; the second tier is for preferred

14   or, say, formulary drugs and it has another copay; and the

15   third tier is for nonpreferred drugs and it has another

16   copay.   Does that sound like things you've read or seen as

17   a three tier system within these TPP PBM contracts?

18       A.    It would certainly be one version of a drug plan.

19       Q.    Now, in what I described to you, generic drugs is

20   in one tier, preferred drugs is in another tier, and third

21   tier is nonpreferred drugs.   What would you expect to see

22   with regard to the copay?

23       A.    I would expect to see different copays for the

24   different alternatives.

25       Q.    Lower copays for generic and higher for

1                          RAYMOND S. HARTMAN

2    nonpreferred, correct?

3         A.    That's correct.

4         Q.    That's in order to incent the members to buy the

5    lower priced drugs, correct?

6         A.    Correct.

7         Q.    Now, are these copays typically percentage copays?

8         A.    They're typically flat copays.

9         Q.    Are they sometimes percentage?

10        A.    I'm aware mostly of flat copays.

11        Q.    Okay.  Now, what authority does the third-party

12   payor have during a contract term to move drugs around from

13   one category to another, particularly from preferred to

14   nonpreferred?

15        A.    What authority does a --

16        Q.    Yeah.  During the period of a contract, can the

17   third-party payor decide to adjust its tiers so that what

18   was once in Tier 2 goes into Tier 3 or vice versa?

19        A.    I forget how those -- negotiable those terms are.

20        Q.    What would cause a third-party payor, if they have

21   the ability to change tiers, the drugs within tiers, what

22   would cause them to move one from preferred to nonpreferred

23   or vice versa?

24        A.    What would cause a --

25        Q.    Third-party payor.

Page 210

1                          RAYMOND S. HARTMAN

2         A.    -- third-party payor, certainly the

3    recommendations of -- I think it's a P and T committee.

4    There's something about a committee that reviews the drugs

5    and the efficacy of the drugs.

6         Q.    What about cost, does cost motivate the

7    third-party payor to move drugs from preferred into

8    nonpreferred categories?

9         A.    It could.

10        Q.    Well, during the course of a -- when you say, "it

11   could," wouldn't you expect it to?

12        A.    It would depend on -- on a variety of things and

13   I --

14        Q.    Your -- so it could be a factor, the cost?

15        A.    It could be a factor.

16        Q.    A change in the cost, correct?

17        A.    I would -- I'm -- we're talking about the cost to

18   the -- to the insured?

19        Q.    The third-party payor.

20        A.    It might.   It's --

21        Q.    It might, okay.

22        A.    It might.

23        Q.    When we talk about the cost of the third-party

24   payor for the drug, we're talking about the cost to it

25   paying the PBM for drug reimbursement, are we not?

RAYMOND S. HARTMAN

1

2      A.    The -- the copayers are not a class member and so

3   to the extent that I'm looking at the ingredient cost paid

4   by the third-party payors, the formulaic methodology would

5   stand as it does, given what I've -- given my analysis to

6   date.

7      Q.    Well, you know that the members who pay the copay

8   are not a part of the class, correct?

9      A.    I do.  That's just what I said.

10     Q.    Okay.  So to the extent that they pay for a

11  portion of what you believe the damages is, shouldn't that

12  be subtracted?

13     A.    If the copay is flat and I look at the

14  reimbursement amount and I'm looking -- when I'm applying

15  the data, when I'm applying the units and the amounts paid

16  to IMS data, let's say, they're total dollars per script

17  where it's just the ingredient cost and it doesn't include

18  the copay, I don't have to -- I just have to look at that

19  amount of the ingredient cost.  If I'm looking at a

20  difference between the two amounts, the copay remains -- if

21  I'm looking at the reimbursement amount prior to and after,

22  the dispensing fee will subtract out and the copay will

23  subtract out, and the remaining increase will be on the

24  drug-related cost.

25     Q.    Now, let's suppose the copay is a percentage.  Do

1                        RAYMOND S. HARTMAN

2    you come to the same conclusion?

3        A.    If the copay were a percentage of AWP --

4        Q.    That's right.

5        A.    -- I would have to -- I'd have to look at that.

6        Q.    Well, why would you have to look at that?  Why

7    wouldn't that be just obvious to you that because you've

8    calculated damages on an incremental basis, how much more

9    was being paid as a result of the 5 percent scheme on top

10   of what was paid; that if the copay is a percentage of the

11   AWP, you'd have to deal with it?  Why is that something

12   you'd have to think about?

13                  MR. SOBOL:  Objection to the form.

14                  THE WITNESS:  Well, I would -- I'm

15              not saying that it wouldn't have an effect.

16              I'm saying I would have to look at how --

17              how that effect would work itself out and

18              because that has not entered in here and

19              because all the evidence that I have seen

20              tells me that the copays are flat, it has

21              not been an important issue.  If I were to

22              find that it is an important issue, I

23              would -- I would adjust the formula to take

24              account of that.

25        Q.    (By Mr. Goldman)  Now, how many contracts of TPP

RAYMOND S. HARTMAN

2    PBM contracts are three or four tier contracts with similar

3    kind of categories that we discussed with different copays?

4            MR. SOBOL:  Objection to the form.

5            THE WITNESS:  Well, that's changed

6        over time.  It's up to --

7    Q.  (By Mr. Goldman)  It's increasing?

8    A.   It's increasing, yeah, that's right, but it's --

9    and it's changed over time.  It's increasing and probably

10   by two thousand -- by today -- I don't know.  I've looked

11   at those numbers but I haven't looked recently.

12   Q.   All right.  Now, if we took all of the contracts

13   during the class period annually that are tiered, three and

14   four tiered contracts, how many of them provide for flat

15   copays and how many of them provide for percentage copays?

16           MR. SOBOL:  Objection to the form.

17           THE WITNESS:  The -- I've seen no

18       evidence that the tiered copays relate to

19       proportional copays.

20   Q.   (By Mr. Goldman)  So zero -- zero contracts?

21   A.   I've seen no evidence of --

22   Q.   No.  No, not what you've seen because I don't know

23   what you've seen.  I want to know pervasively, I want to

24   know in the industry, during the class period, annually,

25   how many of these tiered contracts provided for percentage

Page 218

RAYMOND S. HARTMAN

1

2  copays as opposed to flat copays; do you know?

3      A.   I have -- have not -- that has not been a subject

4  of what I needed to do here, so I haven't -- I haven't

5  looked at that.

6      Q.   Well, to the extent there are percentage copays,

7  you would have to address that in your methodology,

8  correct?

9      A.   I don't know that.

10     Q.   You'd have to study that?

11     A.   I'd have to study whether it would need to be

12  implemented to adjust the basic formulaic methodology for

13  the damage calculation.

14     Q.   If I say, professor, it looks obvious it's a

15  percentage copay, you have to subtract it, why would you --

16  why would you disagree with that?

17     A.   Well, what's obvious -- I will generally not make

18  any calculation on the spur of the moment.  I want to think

19  through the implication so --

20     Q.   All right.

21     A.   I'm not going to speculate here, and if that's

22  something that I'm asked to do by counsel, I'll do it.

23     Q.   I want to put aside tiered contracts and just ask

24  whether there are TPP PBM contracts that provide for

25  percentage copays?

Page 233

1                    RAYMOND S. HARTMAN

2    me explain what I mean by that.  It's a multisource drug,

3    brand name drug, and there is a therapeutic equivalent that

4    is a brand name drug at a lower price.  And so the price

5    that you are reimbursed at is the lower priced drug, not

6    the one you purchased.  Do you follow what I'm saying?

7    Have you ever heard of that kind of provision?

8         A.    I'm trying -- not under those terms.

9         Q.    Okay.  Are you familiar with -- well, under any --

10   under some other term?

11        A.    I'm trying to think of cases where there are

12   self-administered branded drugs that are chemically --

13   essentially what you're referring to for a multisource

14   drug, if I understand this hypothetical, is it's not

15   generic.

16        Q.    No, not generic.  It's a brand name drug.

17        A.    It's a brand name drug but it's a licensed brand

18   name drug --

19        Q.    That's right.

20        A.    So it's just the same product but it's licensed?

21        Q.    That's right.  Multisource.

22        A.    Multi -- so it's -- yeah.  And so they're -- okay.

23   So now I understand what you mean by multisource here.  Now

24   if you'd ask the question again.

25        Q.    Sure.  Have you heard of provisions that say where

Page 234

RAYMOND S. HARTMAN

1

2    there's a multisource drug, you will be compensated or

3    reimbursed at the lower of the price -- the price of the

4    lower of the two drugs?  You buy Product A but there's

5    Product B, a therapeutic equivalent brand name.  It's a

6    lower -- it's got a lower AWP.  We're going to reimburse

7    you on the lower AWP?

8        A.   I have not seen contracts with those provisions in

9    a way that -- that resonates.

10       Q.   If there were contracts with those provisions,

11   would your formulistic methodology take that into account?

12       A.   It would need to -- I would want to examine the

13   extent of that existence and then make a determination.

14       Q.   Right now it doesn't take it into account?

15       A.   That's correct.

16       Q.   Capitation agreements, tell me what is meant by a

17   capitation agreement.

18       A.   Capitation agreement is an agreement on the part

19   of third-party payors where they will cover the healthcare

20   costs, as I understand it, of a given individual for a

21   capitated amount over a period of time.

22       Q.   Of the contracts that are involved in the class,

23   how many of them are capitation agreements between TPPs and

24   PBMs?

25       A.   I have not seen information on that -- on that

1                    RAYMOND S. HARTMAN

2     number.

3          Q.    Does your -- does your formulistic methodology

4     take into account capitation agreements?

5                    MR. SOBOL:   Objection to the form.

6                    THE WITNESS:   My formulaic

7               methodology has assumed that all the drugs

8               reimbursed were not subject to those -- to

9               those types of agreements.

10         Q.    (By Mr. Goldman)   And if you wanted to find out

11    how many of the agreements in the class about capitation

12    agreements, how would you go about doing that?

13         A.    I would -- I would want to think about how I would

14    do that most effectively.

15         Q.    If it were a capitation agreement, do you believe

16    that there would have been injury to the third-party payor?

17         A.    It would --

18                    MR. SOBOL:   Objection to the form.

19                    THE WITNESS:   It would depend -- I

20              need to see how the capitation works.

21         Q.    (By Mr. Goldman)   Suppose there's a direct flow

22    through that the TPP pays the PBM exactly what the PBM is

23    paying to the -- to the retailer plus a fee.

24         A.    Mm-hmm.

25         Q.    Now, in that circumstance, do you believe that the

1                    RAYMOND S. HARTMAN

2    TPP was injured?

3                    MR. SOBOL:  Objection to the form.

4                    THE WITNESS:  If the risk was borne

5             for the inflation by someone other than the

6             TPP, then they -- then the TPP would not be

7             injured on that --

8        Q.    (By Mr. Goldman)  Well, specifically, going back

9    to my hypothetical, if the PBM had captured some or all of

10   that profit by lowering the discounts to the retailers --

11   I'm sorry, increasing the discounts to the retailers, then

12   would the TPP have been injured?

13       A.    We're starting to go --

14       Q.    Let me restate it.

15       A.    Let's -- why don't we stick with -- I thought we

16   were talking about capitation.

17       Q.    Let's assume there's a capitation agreement as

18   follows:  The TPP will reimburse the PBM for exactly what

19   the PBM needs to pay the retailer plus a fee, all right?

20       A.    Mm-hmm.

21       Q.    Now, the AWP has gone up, and therefore the

22   reimbursement is larger to the retailer, correct?

23       A.    The -- what is paid to the retailer is larger?

24       Q.    Yep.

25       A.    That's right.

1                     RAYMOND S. HARTMAN

2          Q.   Now, if, in my hypothetical, you assume that, in

3    response, the PBM has increased the discount to the

4    retailer to offset that -- offset all or some of that

5    increased profit, okay, with me, if you assume that --

6          A.   I -- your hypothetical is going so far off field

7    that I don't follow what --

8          Q.   I'm going to try it again.

9          A.   Let me just find out --

10         Q.   No, sir.

11         A.   Are we starting with a capitation agreement on the

12    part of the third-party payor with a PBM?  Is that the

13    start of this?

14         Q.   It is and I'm describing it to you.

15         A.   Okay.

16         Q.   So we're clear by what we mean by "capitation

17    agreement."

18         A.   Okay.

19         Q.   I'm defining it as such:  That the TPP will

20    reimburse the PBM for exactly what the PBM needs to

21    reimburse the retailer for the drugs sold plus a fee.

22         A.   Now, that's not my understanding of a capitation

23    contract.

24         Q.   Tell me what -- tell me your definition of a

25    capitation contract.

Page 276

RAYMOND S. HARTMAN

COMMONWEALTH OF MASSACHUSETTS                    MIDDLESEX, SS.

I, NICOLE E. GUILBERT, a Certified
Shorthand Reporter and Notary Public duly
commissioned and qualified in and for the
Commonwealth of Massachusetts, do hereby
certify that there came before me on the 4th
day of October, 2006, at 9:46 a.m., the person
hereinbefore named, RAYMOND S. HARTMAN, who
provided satisfactory evidence of
identification as prescribed by Executive
Order 455 (03-13) issued by the Governor of
the Commonwealth of Massachusetts, was by me
duly sworn to testify to the truth and nothing
but the truth of his knowledge concerning the
matters in controversy in this cause; that he
was thereupon examined upon his oath, and his
examination reduced to typewriting under my
direction; and that this is a true record of
the testimony given by the witness to the best
of my ability.

I further certify that I am neither
attorney or counsel for, nor related to or
employed by, any of the parties to the action
in which this deposition is taken, and
further, that I am not a relative or employee
of any attorney or counsel employed by the
parties hereto or financially interested in
the action.

My Commission Expires:  May 7, 2010



Nicole E. Guilbert
CSR/Notary Public

Page 279

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2

                      C.A. No.:  1:05-CV-11148-PBS
3                     Volume II
                      Pages 279 to 397
4                     Exhibits: (See Index)

5

6       --------------------------------------
        NEW ENGLAND CARPENTERS HEALTH          )
7       BENEFITS FUND, PIRELLI ARMSTRONG        )
        RETIREE MEDICAL BENEFITS TRUST;         )
8       TEAMSTERS HEALTH & WELFARE FUND OF      )
        PHILADELPHIA AND VICINITY; and          )
9       PHILADELPHIA FEDERATION OF              )
        TEACHERS HEALTH AND WELFARE FUND,       )
10           Plaintiffs,                        )
                                                )
11           -vs-                               )
                                                )
12      FIRST DATABANK, INC., a MISSOURI        )
        CORPORATION, a Delaware Corporation.    )
13           Defendants.                        )
        --------------------------------------
14

15

                  *  *  *  *  *  *  *
16

17           DEPOSITION of DR. RAYMOND S. HARTMAN, called
        as a witness by and on behalf of the Defendants,
18      pursuant to the applicable provisions of the
        Massachusetts Rules of Civil Procedure, before
19      Lisa L. Gross, Registered Professional Reporter and
        Notary Public in and for the Commonwealth of
20      Massachusetts, taken at the offices of Bonner,
        Kiernan, Trebach & Crociata, One Liberty Square,
21      Boston, Massachusetts, on Thursday, October 5, 2006,
        commencing at 9:38 a.m.
22

23

24

25

Page 280

1

APPEARANCES:

2     HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
      BY:  Thomas M. Sobol, Esq.

3     One Main Street
      Fourth Floor

4     Cambridge, Massachusetts 02142
      for the Plaintiffs.

5

      MORRISON, FOERSTER, LLP

6     BY:  Melvin R. Goldman, Esq.
           Christopher E. Babbitt, Esq.

7     425 Market Street
      San Francisco, California 94105-2482

8     for the Defendants.

9     VIDEOGRAPHER:  Jody Urbati

10

11                  I N D E X

12

13    Testimony of:          Direct   Cross   Redirect Recross
      DR. RAYMOND S. HARTMAN

14    (by Mr. Goldman)         281

15

16

17

                     E X H I B I T S

18

       Exhibit No.Description              For I. D.

19    Exhibit 7 Errata to Declaration
                of Raymond S. Hartman                  355

20

      Exhibit 8 Declaration of Susan A. Hayes

21              in Support of Plaintiffs' Motion
                for Class Certification                370

22

      Exhibit 9 Declaration of Raymond S. Hartman:

23              Impact and Cost Savings of The First
                Databank Settlement Agreement          387

24

25

1          DR. RAYMOND S. HARTMAN

2          THE VIDEOGRAPHER:  This is the start of

3  the tape labeled No. 6 of the videotape deposition of

4  Dr. Raymond S. Hartman.

5          Today's date is October 5th, 2006.

6  It's approximately 9:38 a.m.

7          The court reporter today is Lisa

8  Gross.  And those who are present at

9  yesterday's session, are present today.

10          Please begin.

11      DIRECT EXAMINATION BY MR. GOLDMAN:

12  Q.    Good morning, Dr. Hartman.

13  A.    Good morning.

14  Q.    I wanted to go back to your declaration,

15  Exhibit 3, and I would ask just a few

16  questions about it.  After the time that you

17  prepared the declaration and up to --

18          MR. SOBOL:  Exhibit 1?

19          MR. GOLDMAN:  Yes, Exhibit 1.  Sorry.

20  A.    Yes.

21  Q.    After you prepared the declaration,

22  signed it, and up to today, have you done

23  additional work relating to the matters that

24  are -- that are relevant to your report, or

25  declaration?

Page 367

DR. RAYMOND S. HARTMAN

1

2      A.    Right.

3      Q.    Would my damage number under your

4      formula be five percent times WAC for every

5      NDC?

6      A.    Do we have a calculator here?

7      Q.    I would spit it out.  The reason we got

8      4.2 percent is because you assumed 85 percent

9      of AWP of what's reimbursed?

10     A.    No.  We get 4.2 percent from the five

11     percent spread increase.  It doesn't flow from

12     the 85.  It flows -- if you look at paragraph

13     -- I was just going to work that concordance

14     between 21F and 20 -- 20C. 20C flows purely

15     from the five percent inflation Scheme.

16     Q.    If I can take --

17     A.    And that's -- it's not making -- there's

18     nothing about 85 percent here or anything else

19     here (indicating).

20     Q.    In F, the .85 represents 85 percent of

21     AWP, correct?

22     A.    It represents 85 percent of AWP, that's

23     correct.

24     Q.    And that's because you have assumed the

25     15 percent discount?

Page 368

DR. RAYMOND S. HARTMAN

1

2      A.    That's correct.

3      Q.    Okay.  And as such, if it was 100

4   percent, 100 percent of AWP rather than 85

5   percent of the AWP, that is, there is no

6   discount, wouldn't I wind up with a formula

7   which is five percent times WAC?

8      A.    If X were zero, Delta AA would be five

9   percent of WAC.

10     Q.    Isn't the reason you come up with 4.2

11  instead of five percent, is because of the 15

12  percent discount?

13         MR. SOBOL:  Objection to the form.

14     A.    Isn't -- sorry, say that one more time.

15     Q.    Isn't the reason that you come up with

16  4.2 percent --

17     A.    This is back in -- back in 20?

18     Q.    In F.  In 21F.  We have left that, that

19  4.2.  4.2 at F.

20     A.    Okay.  At F.

21     Q.    And isn't the reason that you come up

22  with 4.0425 instead of five, is because you

23  are using the 15 percent from AWP?

24     A.    That's the -- that is the amount using X

25  as equal to .5.

1                  DR. RAYMOND S. HARTMAN

2        Q.    And the reason that you do that is

3   because the effect of the five percent is

4   different -- you don't use five percent

5   because there's a 15 percent discount that's

6   not reimbursed, correct?

7               MR. SOBOL:  Objection to the form.

8        Q.    You can't say that the five-percent

9   Scheme effected all of AWP, because the

10  reimbursement was only for 85 percent of it?

11              MR. SOBOL:  Objection the to the

12  form.

13       Q.    Is that right?

14       A.    That's one way of stating it.

15       Q.    In other words, your math is -- when we

16  take into account this 15 percent, you are

17  just -- we have a lot of algebra here "pre"

18  and "post," but when we take it into the 15

19  percent, you are just using a five percent

20  increase in WAC against every NDC as your

21  calculation?

22       A.    Well, that's -- the whole notion of the

23  Scheme is that AWP increased --

24       Q.    Yeah, I understand.  But why do we need

25  all this, this "pre, post" and all of this

Page 370

DR. RAYMOND S. HARTMAN

1

2    stuff here, isn't it just simply, it's five

3    percent of WAC because of the 15 percent, it's

4    4.25?

5    A.    I would assume that if I had written it

6    that way, people would, except for learned

7    counsel at the table, people would say, how --

8    where did these calculations come from.

9    Q.    Not me, I would say you thought there

10    was a five percent increase in WAC so you

11    applied five percent.  But that's just me.

12    That's just me.

13          So let me show you another document.

14    Let's take a short break.  No.

15          (Discussion off the record.)

16          MR. GOLDMAN:  We will mark next a

17    document entitled Declaration of Susan Hayes in

18    Support of Plaintiffs' Motion for Class

19    Certifications.

20          (Exhibit 8 marked

21          for identification.)

22    Q.    Showing you Exhibit No. 8, Dr. Hartman,

23    and ask you whether you've seen some or all of

24    that document before today?

25    A.    Not that I recall.

DR. RAYMOND S. HARTMAN

1

2    Q.    Do you remember I mentioned Susan Hayes'

3    name to you; this is the Susan Hayes that I

4    was referring to, I just -- I'm being

5    informative.    Okay.

6    A.    This is the Hayes that you were

7    referring to?

8    Q.    Yes.    And I would like you to look at

9    her declaration at -- well, it's on page 9.

10   Do you see at the top, it says 9 of 16, in the

11   right-hand corner at the top.

12   A.    I do.

13   Q.    And it's the paragraph that begins to

14   calculate the impact of the Scheme, "Pharmacy

15   outcome specialists would use simple

16   mathematical formula"; do you see that?

17   A.    I do.

18   Q.    I would ask you, if you could read from

19   there to the next page up until the bolder

20   font heading that says, "A Particular Class

21   Member...," if you could just look at and read

22   that for a moment, and then I would ask you a

23   question.

24              (The witness complies.)

25   Q.    You have had a chance to look at it?

Page 372

1                    DR. RAYMOND S. HARTMAN

2        A.    If you would give me --

3        Q.    Please, take all the time you need.

4        A.    Thank you.

5        Q.    And just let me know when you are done.

6        A.    Sure.

7              (Witness reviews document.)

8        A.    Okay.

9        Q.    Okay.  Now, my question to you is, how

10   does Ms. Hayes' simple mathematical formula

11   for computing aggregates damages in the

12   portion that I have just asked you to read,

13   differ from your formulaic methodology for

14   computing aggregate damages?

15       A.    Upon first blush, and I would -- I would

16   want to look more closely, but it looks like

17   it's accomplishing with an example what I'm

18   doing with a formula.

19       Q.    And so you see in her paragraph 7 on the

20   next page, she says, "In conclusion, the

21   damages in this case can be quickly and easily

22   estimated using simple mathematics"; do you

23   see that?

24       A.    Well, that's what I feel I have done.

25       Q.    And you don't need to be an expert in

Page 373

DR. RAYMOND S. HARTMAN

1

2    econometrics, or in microeconomics or

3    econometrics to come up with the formula that

4    you have come up; am I correct?

5       A.    One would need to -- for me to come up

6    with the formula that I have come up with, I

7    would bring to bear the types of damage

8    calculations, everything that I have done in

9    this industry.  And so that has to do with

10   microeconomics and institutional economics in

11   applying that to this --

12      Q.    Your explanation?

13      A.    Yes.

14      Q.    Your explanation of the formula?

15      A.    Yes.  Right.

16      Q.    But the formula itself, that doesn't

17   require a person to be skilled in econometrics

18   or -- you know what I --

19      A.    It helps to.

20      Q.    It helps.  But you could also be someone

21   that -- who works on audits or reimbursements,

22   like Ms. Hayes, and come up the same formula,

23   it looks like, correct?  Or maybe she saw

24   yours.  Maybe she saw yours.  We don't know.

25   We are going to find out.

1
2
C E R T I F I C A T E

3      I, Lisa Lee Gross, Registered Professional
Reporter and Notary Public duly commissioned and
qualified in and for the Commonwealth of

4  Massachusetts, do hereby certify that there came
before me on the day 5th of October, the person

5  hereinbefore named, who was by me duly sworn to
testify to the truth and nothing but the truth of

6  their knowledge touching and concerning the matters in
controversy in this cause; that they were thereupon

7  examined upon their oath, and their examination
reduced to typewriting under my direction and that the

8  deposition is a true record of the testimony given by
the deponent.

9

10     I further certify that I am neither attorney nor
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is

11  taken, and further that I am not a relative or
employee of any attorney or counsel employed by the

12  parties hereto or financially interested in this
action.

13

14     In Witness Whereof, I have hereunto set my hand
and affixed my seal this 9th day of October, 2006.

15
16     _____
Notary Public

17  My Commission Expires:
January 17, 2011

18
19
20
21
22
23
24
25

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | M.D.L. No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | Civil Action No. 01-12257-PBS |
| LITIGATION | ) | |
| | ) | Judge Patti B. Saris |

REPORT OF INDEPENDENT EXPERT

PROFESSOR ERNST R. BERNDT

TO JUDGE PATTI B. SARIS

FEBRUARY 9, 2005

Exhibit No. 5
Deponent: Hartman
Date: 10|4|06
Nicole E. Guilbert

exerted a market discipline on the behavior of PBMs, generating a market-determined amount of

transparency, and making competition among them "vigorous" in the market for self-

administered drugs, as has been stated repeatedly by the FTC.   By contrast, in the market

environment for physician-administered drugs, a variety of forces – the relatively small dollar

amounts they involve, the ambiguity of whether the claims stem from the medical or drug

component of the health benefit, the troublesome relationships with providers who act as both

buyers and sellers (and prescribers and dispensers) of physician-administered drugs, and the J-

code claims system that has obfuscated the utilization and pricing of individual drug products

and confounded close monitoring -- have together contributed instead to a system lacking checks

and balances and inviting abuse.  Some of that abuse has already been uncovered in this Court

and elsewhere.

## VI.    INITIAL OBSERVATIONS ON THE METHODOLOGY PROPOSED BY DR. HARTMAN, AND ON ISSUES REGARDING CLASS CERTIFICATION

201.      Numerous observers, as well as participants in this litigation, have commented on

how complex and complicated are the relationships among agents interacting in the US

pharmaceutical marketplace.  While that may well be true, it is useful to place today's

environment into historical perspective.

202.      Recall that thirty years ago, patients actually spoke with their pharmacists, and if

they had drug insurance coverage (which most did not), they carefully saved receipts from their

cash/credit card prescription purchases, put them into a shoe box, and then at the end of a quarter

or a year, collected the receipts, filled out forms by pencil, and sent receipts plus forms to their

insurer for reimbursement.   Information technology, screen monitors and modems were not to

be found in this process.

203.    Observers of pharmacy transactions at that time complained frequently about how widely prescription prices varied, not just among pharmacies, but even within pharmacies, depending on what pharmacist filled the prescription. For example, writing in the *Journal of the American Pharmaceutical Association* in 1973, Albert I. Wertheimer summarized his findings on intrapharmacy pricing variability for identical prescriptions dispensed in Buffalo, New York, as follows:

> "It is concluded that many pharmacies all too casually calculate the charges for their services. The charge for pharmaceutical services should not depend upon which pharmacist is on duty or upon the practitioner's mood, but rather upon sound professional and management principles. It is concluded that pharmacy managers fail to accurately convey their fee policies and techniques to their fellow pharmacists at their pharmacy and that far too little attention is paid to the effects of charge inconsistency.
>
> The concept of usual and customary fees is dealt a bitter blow in those pharmacies where there is but one usual and customary component to prescription pricing – randomness."[270]

Four years later, in an article entitled "The Mysteries of Prescription Pricing in Retail Pharmacies" published in the peer-reviewed journal *Medical Care*, the coauthors also report finding substantial interpharmacy price variability, as expected, but also intrapharmacy pricing heterogeneity. They also suggest a possible anti-competitive conspiracy:

> "What is surprising, however, is that the data show that within a two-week period, the price of the same quantity of the same dosage form of the same drug in the same pharmacy also varies by as much as 130 percent. The findings are consistent with the hypothesis of anti-competitive pricing which, by denying consistent price information to the consumer, makes rational purchasing behavior impossible." [271]

While today's health care markets are undoubtedly complex and perhaps even convoluted, it is worth remembering that issues involving the lack of transparency in the pricing of prescription pharmaceuticals have a considerable history in the US, as do the conspiracy theories that attempt

---

[270] Albert I. Wertheimer, "Pricing Pharmaceutical Service – Art, Science or Whim," *Journal of the American Pharmaceutical Association*, Vol. NS13, No. 1, January 1973, p. 12.

[271] S. E. Berki, J. W. Richards, and H. A. Weeks, "The Mysteries of Prescription Pricing in Retail Pharmacies", *Medical Care*, Vol. 15, No. 3, March 1977, p. 241.

to explain them. In this context, it is somewhat ironic that Stephen Schondelmeyer and Marian V. Wrobel have commented that due to the fact that the proportion of self-pay or cash prescriptions has fallen from about 56% in 1992 to about 15%, this has "greatly reduced the pharmacy's pricing flexibility."[272]

204.     I have argued at length in this report that the management and distribution of prescription drugs differs substantially and materially in the self-administered vs. physician-administered market segments. While PBMs have become involved in one way or another in almost all transactions involving self-administered drugs, their role in managing physician-administered transactions is relatively minor, although increasingly they are aligning themselves with specialty pharmacies in the physician-administered market segment. To the best of my knowledge, PBMs did not play any major role in the egregious examples of fraudulent pricing and marketing involving sales of Lupron and Zoladex to physicians. Both Lupron and Zoladex are injectable medicines. Lupron is typically administered in a physician's office as a single intramuscular injection, frequently in the buttock, whereas Zoladex is administered subcutaneously in the upper abdominal wall using an aseptic technique under the supervision of a physician.[273] It is therefore somewhat confusing and misleading when, for example, Plaintiff's

---

[272] Stephen W. Schondelmeyer and Marian V. Wrobel, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices*, Introduction, Final Report, Contract #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, Task Order 1, Cambridge, MA: Abt Associates Inc, August 30, 2004, p. 12.

[273] Various depot formulations of Lupron are pictured on p. 337 and described on pp. 3281-3292 in *Physicians' Desk Reference*, PDR 56 Edition 2002, Montvale NJ: Medical Economics Company; ranging in strength from 3.75 mg to 40 mg (fourth months formulation). The labeling for each of these depot administrations states "LUPRON DEPOT Must Be Administered Under The Supervision Of A Physician (p. 3283 for 3.75 mg depot, p. 3285 for 7.5 mg depot, p. 3287 for three month 11.25mg, p. 3289 for three month 22.25 mg, p. 3291 for four month 30 mg, and p. 3292 for the pediatric 7.5 mg, 11.25 mg and 15 mg formulations. Lupron is also supplied in a 2.8 ml multiple dose vial , with each 0.2 ml containing 1 mg of active ingredient (p. 3280). This formulation can be administered by a patient/parent or health care professional (p. 3281), and is pictured on p. 337. Zoladex injection is pictured on p. 306 of the same PDR 2002, and its 3.6 mg implant and three-month 10.8 mg implant formulations are described on pp. 702-708. Both dosage forms should be administered "into the upper abdominal wall using an aseptic technique under the supervision of a physician" (p. 705 for 3.6 mg implant, p. 708 for 10.8 mg implant (three-month))

*The AWP Litigation: Report of Prof. Ernst R. Berndt*     *February 9, 2005*     109

Expert Dr. Raymond S. Hartman concludes that competition among PBMs is insufficient, citing

as support the physician-administered Lupron scandal:

> "The analyses put forward by Defendants' experts, particularly Dr. Gaier, are flawed and
> insufficient to demonstrate that existing PBM competition, specifically, and provider
> competition, generally, were sufficient to eliminate the AWP scheme. If such
> competition exists, it should have been sufficient to dissipate and eliminate the significant
> payor injury and economic damages found and pled guilty to in the Lupron matter. It
> was not."[274]

This is a massive case, and in dealing with it the distinction between self-administered and

physician-administered drugs is necessary and useful.

### A.    Self-Administered Drugs

205.    Both sides in this matter agree that in the context of self-administered drugs,

PBMs play a central role; I have documented those views earlier in this report. Plaintiffs allege

that competition among PBMs is not effective.[275] The Federal Trade Commission appears to

disagree. While competition among PBMs may not conform to the undergraduate

microeconomics textbook example of a perfectly competitive market (in which all buyers are

either fully or at least equally informed, and everyone is a price taker), federal regulatory

authorities have concluded that PBM competition is "vigorous".

206.    Specifically, over the years the PBM industry has been closely monitored by the

FTC (in both the Clinton and subsequent Bush administrations), and in some cases when it

concluded competition might be harmed, it used its regulatory powers to intervene (e.g., to

require firewalls between drug manufacturers and the PBMs they owned). As late as last year, in

the context of investigating possible anticompetitive effects of horizontal consolidation among

---

[274] *Rebuttal Declaration of Dr. Raymond S. Hartman in Support of Plaintiff's Motion for Class Certification,*
December 16, 2004, pp. 19-20.
[275] See, for example, *Rebuttal Declaration of Dr. Raymond S. Hartman in Support of Plaintiff's Motion for Class
Certification,* December 16, 2004, pp. 19-20, 72-82.

two of the largest PBMs -- the Caremark/ AdvancePCS acquisition -- the FTC allowed the

transaction to go forward, stating:

> "We concluded that these large employers are not likely to encounter anticompetitive
> effects from the acquisition in light of the competition that will exist following this
> transaction. Competition from the remaining independent, full-service PBMs with
> national scope – Medco, Express Scripts, and the merged Caremark/Advance PCS
> {Footnote 3 Not Reproduced} – and significant additional competition from several
> health plans and several retail pharmacy chains offering PBM services should suffice to
> prevent this acquisition from giving rise to a potentially anticompetitive price
> increase..."[276]

> "At most, the acquisition is likely to increase the bargaining power of the merged PBM
> and to increase its shares (and correspondingly reduce the pharmacies' shares) of the
> gains flowing from contracts between the PBM and the pharmacies. It is likely that some
> of the PBM's increased shares would be passed through to PBM clients {Footnote 6 Here
> Reproduced Next}. We anticipate that competition among PBMs will remain vigorous in
> the wake of the Caremark/AdvancePCS acquisition, and that this competition is likely to
> cause PBMs to pass on at least some of their cost savings to their customers in order to
> gain or retain their business."[277]

In the context of self-administered drugs, therefore, Plaintiffs' arguments and conclusions appear

to be at variance with those of the FTC, and my own analysis discussed earlier in this report. If

competition among PBMs is vigorous, even if the self-administered AWPIDs were artificially

inflated, injury and damages to third party payors do not follow, particularly on a class-wide

basis. Since lack of competition among PBMs is crucial to Plaintiff's theory, this would appear

to undermine their allegations, and certainly their assumption of class-wide injury and damages.

Plaintiffs have not, in my judgment, addressed this issue effectively.

207.    In support of their claim that competition among PBMs is not sufficient, Plaintiffs

point to the facts that even as the "spread" between AWP and ASP facing retail and mail order

---

[276] Statement of the Federal Trade Commission, *In the Matter of Caremark Rx, Inc./Advance PCS*, File No. 031
0239, p. 2. Available online at www.ftc.gov/os/caselist/0310239/040211ftcstatement0310239.pdf, last accessed
1/16/05.
[277] Statement of the Federal Trade Commission, *In the Matter of Caremark Rx, Inc./Advance PCS*, File No. 031
0239, p. 3. Available online at www.ftc.gov/os/caselist/0310239/040211ftcstatement0310239.pdf, last accessed
1/16/05.

pharmacies for generic drugs has increased over time, the average reimbursement rates for generic self-administered drugs paid by third party payors to retailers have not fallen commensurately, implying that pharmacies have benefited and that PBMs have not been able provide a competitive market discipline on these generic drug transactions.[278] Plaintiffs' empirical argument that retail (and PBM mail order) "spreads" for generic self-administered drugs have grown more rapidly than have reductions in reimbursements paid by third party payors to retailers is credible. But even if true, this does not necessarily imply a lack of effective competition among PBMs.

208.    As I pointed out earlier in this report, generic drug costs are typically only 10-20% of third party payor total prescription drug costs, and third party payors are understandably gratified whenever they achieve a generic for brand substitution switch. Once having achieved a cost saving from the substantial price difference between a brand and its bioequivalent generic, the third party payor (and or its PBM) understands that the additional, incremental savings it might obtain from negotiating lower generic prices with retailers are likely to be relatively small. However, even when relatively small, those incremental cost savings are present, and perhaps it is that possibility that the FTC referred to in the second paragraph of the above FTC quote when it envisaged possible increased buying power for PBMs resulting from the Caremark/AdvancePCS acquisition. The FTC footnote quoted above also suggests the FTC expected part of the lower prices obtained by PBMs in their dealings with retailers would be passed on to third party payors and their beneficiaries.

209.    In summary, the Plaintiffs' theory in the context of self-administered drugs requires that competition among PBMs be insufficient to prevent injury and damages to third

---

[278] See, for example, *Declaration of Raymond S. Hartman In Support of Plaintiffs' Motion for Class Certification*, September 3, 2004, p. 13.

party payors. In my judgment Plaintiffs have not put forward a convincing argument supporting the notion that competition among PBMs is inadequate. Plaintiffs' contention is also at variance with conclusions reached by the FTC.[279]

210.     There is one other matter that merits attention in this context. Even if Plaintiffs argument concerning lack of competition among PBMs were true, to the extent they owned and operated their own PBMs (and recall that the ownership structure of the PBMs has been and continues to be very diverse), third party payors would seem to me to have benefited from the allegedly fraudulent AWP scheme, and thus they would appear to face conflicts as members of the proposed class. I will not comment on this further.

211.     Issues of typicality, commonality and variability are frequently at the crux of deliberations involving class certification. Before addressing some of those issues, however, I first summarize my understanding of the methodology that Plaintiff's Expert Dr. Raymond Hartman proposes to employ in assessing class-wide liability and damages.

212.     In assessing whether the proposed end-payer classes were damaged, Plaintiffs' Expert Dr. Hartman proposes first to compute the spreads between AWP and ASP "for drugs unaffected by the scheme and fraud", and then use these as "yardsticks" in comparison with spreads observed "for the drugs subject to this litigation". In cases where he determines the latter spreads are larger than the former, Dr. Hartman proposes to employ his yardsticks along with mathematical and algebraic formulae "to determine the spread that would have been used

---

[279] This is not to say that PBMs are currently exempt from litigation and government investigations. See, for example, "The United States Settles Its Anti-Fraud Claims for Injunctive Relief and 20 State Attorneys General Settle Unfair Trade Practices Claims Against Medco Health Solutions: Medco to Provide Price Information to Doctors and Patients and Pay $29 Million Plus To States in Damages, Fees, and Restitution – Federal Damages Case Continues", U. S. Department of Justice press release, April 26, 2004, available online at www.usdoj.gov/usao/pae/News/Pr/2004/apr/medcoinjunctivereliefrelease.pdf, last accessed 12/31/2004.

*The AWP Litigation: Report of Prof. Ernst R. Berndt*    *February 9, 2005*          113