# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## CLERK’S NOTICE

The image of this document is not viewable because it is either SEALED or filed EX PARTE.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,

Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,

Defendants.

C.A. No. 1:05-CV-11148-PBS

**Leave to file granted on October 13, 2006**

**ATTACHMENT B TO CLASS PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED FIRST DATABANK CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND APPROVAL OF NOTICE PLAN (FILED UNDER SEAL)**

**Plaintiffs' Allegations and Evidence**

On July 17, 2006 Plaintiffs filed the First Amended Complaint ("FAC") against both FDB and McKesson. Plaintiffs review below the FAC's allegations and outline below the type of evidence Plaintiffs intend to present on common issues. The recitation highlights the predominance of common issues, typicality of claims and the superiority of the class action as a vehicle for resolving these claims.

**1. AWPs Have Become the Reimbursement Benchmark for All Drugs**

The allegations of the FAC apply to self-administered (sometimes also known as retail chain) pharmaceuticals (as opposed to physician administered drugs). Virtually all participants





in the pharmaceutical distribution chain use AWP as the basis for reimbursement in their contracts with third-party payors for retail drugs. ¶¶ 58-63; Hartman Decl. in Support of Plaintiffs' Motion for Class Certification, p. 3, n.4.

Documents produced by those in the industry confirm this. For example, in a "Pharmacy Industry Overview" presentation by Advance PCS, one of the major PBMs, the presenter described the use of AWP as follows:

- Industry standard used by PBMs
- Manufacturers submit drug price to First Databank
- First Databank accumulates[1]

McKesson has acknowledged that "AWPs are used for third party reimbursement." ¶ 62. Susan Hayes, a specialist who audits contracts between third-party payors and PBMs confirms that AWP is the standard pricing benchmark. Hayes Decl., ¶ 2.[2]

### 2. Obtaining Accurate Information about the WAC/AWP Markup Is Critical to the Pharmaceutical Industry

As outlined in the FAC, this case involves abuse of a somewhat anomalous situation that exists in the retail drug reimbursement area – that while pharmacists and other dispensers almost always *purchase* retail drugs on the basis of a formula tied to the WAC, pharmacists and other dispensers are *reimbursed or paid* on the basis of formula tied to the AWP. Thus, although the AWP is a list price used to charge third party payors and some consumers, it is the WAC, not the AWP, that is tied to pharmacists' actual costs. The percentage by which the AWP exceeds the WAC is known in the pharmaceutical industry as the WAC/AWP "markup" for a particular drug

1 *See* Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification and in Support of Motion to File First Amended Complaint ("Berman Decl.") (Docket # 91), Ex. 48 (BMS/AWP/000125481 at 125509).

2 Berman Decl., Ex. 15 (MCKAWP 0068514).

product. As a result, all other things being equal, the greater the markup, the more pharmacists, large retail chains and PBMs stand to profit from drug sales. ¶¶ 115, 117, 1233.

The WAC/AWP markup is typically either 20% or 25%. Historically, it was set by the drug manufacturer and had predictably set patterns. Pharmaceutical divisions were generally known either as 20% or 25% markup companies. Hartman Decl., ¶ 10. Once a drug was launched, for example by a 20% markup company, it was extraordinarily rare for its percentage markup to be changed, and in the few isolated situations when this did occur, a particular market-based reason existed which was known to all participants in the marketplace (*e.g.*, a merger with a 25% markup company, necessitating uniformity of particular prices). ¶¶ 41-43.

### 3. All Major PBMs Require Plan Sponsors to Reimburse Them for Purchases of Brand Drugs Based on the AWP

During the Class Period in the FAC, August 1, 2001 through March 15, 2005, the major PBMs required plan sponsors, with whom they contracted, to reimburse them for brand-name drugs pursuant to a formula based on AWP.[4] Throughout the Class Period, First DataBank's publication of AWP data remained the source used by all the major PBMs in their dealings.[5] Although the terms of an FTC consent decree required First DataBank to divest itself of its only

---

3 The difference between WAC to AWP should not be confused with a different type of spread, that is, the difference between the actual selling price (or "ASP") and AWP, a spread that is at issue in *In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL 1456*. This distinction was discussed with this Court at a prior hearing in this action. See McKesson in Court Status Conference Transcript, February 9, 2006.

4 Hayes Decl., ¶ 2. The documentary evidence arising from the *AWP* litigation further supports this proposition. Berman Decl., Ex. 49 (AdvancePCS master agreement, CMK-AWP 004247 at 4271, setting AdvancePCS reimbursement formulas for retail and mail order brand-name drug purchases based on AWP); Ex. 50 (Prescription Drug Program Agreement [with Wells Fargo & Co.], CMK-AWP 011499 at 11508-09 (setting Caremark's reimbursement rates for mail order and retail brand-name drugs at AWP); and Ex. 51 (Medco's Integrated Prescription Drug Program Master Agreement, MHS A_0000310 at 322, stating that mail order brand-name drugs are reimbursed based on the AWP and retail purchases of all drugs (brand or generic) are based on AWP or, where applicable, the Maximum Allowable Cost ("MAC"); the contract defines MAC as applying to off-patent drugs, at 311, which appears to be coextensive with generic drugs).

5 Hayes Decl. ¶ 3; Berman Decl., Ex. 52 (Deposition of Gregory Madsen, 30(b)(6) witness for Caremark and AdvancePCS (*In re AWP Litig.*, August 26, 2004) at 71:15-73:9) (stating that Caremark relied exclusively on First Data AWP information"); and Ex. 53 (A Managed Prescription Drug Plan Proposal for Philadelphia Federation of Teachers Health & Welfare Fund, MHS A_0000705 at 743 (stating that Medco relies exclusively on First DataBank for its AWP information)).

competitor, Medispan, beginning in 2002, the prices set by First DataBank continued to be used by Medispan; thus the FDB markups that were part of the scheme spilled over into the Medispan database. Hartman Decl., ¶¶ 14, 17(c), p.10.

Susan Hayes, a specialist in auditing contracting between PBMs and their clients,[6] estimates that 95% of all contracts used AWP, and identifies eleven PBMs, representing a 95% of the market, as having used FDB's AWP alone. Hayes Decl., ¶ 4. Although the proposed Class in the FAC is not limited to plan sponsors who contracted with one of the major PBMs, these contracts illustrate the widespread impact of Defendants' illegal scheme.[7]

**4. McKesson and First DataBank Participated in a Scheme to Artificially Raise the WAC/AWP Markups of Hundreds of Brand-Name Drugs From 20% to 25%**

The market's use of First DataBank's published AWPs was not only known to First DataBank, but used as the foundation of its marketing and promotion plans. The FAC alleges that for all times relevant to this lawsuit, First DataBank knew – and publicly acknowledged – that the primary purpose of its publication of WAC and AWP data was to serve as an electronic basis for the mass-reimbursement of retail and mail order pharmacies for thousands of daily transactions and billions of yearly transactions. FAC, ¶¶ 94-99. To gain the trust of participants in the pharmaceutical industry, First DataBank publicly represented that its AWP information was obtained directly from drug manufacturers or, when not available, through either a comprehensive and sound survey of the major drug wholesalers or a "weighted average" of the national wholesalers. ¶¶ 100-04.

---

6 Hayes Decl., ¶ 1, pp. 1-2.

7 The contracts also demonstrate how easy it would be to prove Class eligibility. For example, all TPPs who contracted with Medco or Caremark during the Class Period and paid for drugs identified in Exhibit A of the Complaint automatically qualify as Class members.

McKesson also knew that AWP served as the basis for reimbursement: "AWP's are only important to our customers because third party reimbursement from the insurance companies is based on AWP minus 15% plus a fee (or something like that)."[8]

With respect to the WAC-to-AWP spread, McKesson acknowledged that previously "everything [had been] straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB [First DataBank] AWP's."[9] That would change beginning sometime in late 2001 or early 2002 when First DataBank, by agreement with McKesson, limited its purported "surveys" to McKesson and did not "survey" other wholesalers.[10]

The Class Period starts in August 2001 when First DataBank and McKesson "mutually agreed" to move the AWP, or WAC to AWP spread, on all Searle products to 25%. ¶ 122. Thereafter, McKesson and First DataBank agreed that they would jointly increase the markup on many brand-name drugs. ¶ 120-21. The change of the markup factor was effectuated by a simple change in the First DataBank database (the "NDDF") – when a price increase in the WAC was announced by a manufacturer, First DataBank *not only* increased the WAC but it also changed the computer code for the markup factor (typically from 1.20 to 1.25). Thus, through a simple manipulation of data entry into the NDDF, all purchasers reimbursement rates were increased due to the ubiquitous reliance upon FDBs database for undertaking reconciliation of retail drug transactions.

---

8 Berman Decl., Ex. 54 (MCKAWP 0068311-12).

9 Berman Decl., Ex. 3 (MCKAWP 0069612).

10 Although First Data claimed that it undertook "surveys," the FAC alleges that in fact no "surveys" in the reasonable sense of that word were undertaken. First Data's questions were not set forth in a survey design, nor were they even in writing. Responses received were not memorialized in writing. No other paper trail was kept. Even the wholesalers that were "surveyed" in the 1990's apparently did not know that they were being surveyed. Most professed never to have participated in First Data "surveys" at any time. By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson.

For its part, McKesson sent hundreds of e-mails, faxes and reports to First DataBank to increase the WAC-to-AWP markup for hundreds of the brand-name drugs it distributed. McKesson knew there was no market justification for the 5% increase in the markup, which it had created out of whole cloth. McKesson was also aware that First DataBank published the McKesson markup figures it received without checking them for accuracy against any other source. *See, e.g.*, ¶ 131. The FAC alleges First DataBank also knew that the information it received from McKesson indicating a markup increase to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase it was not providing the "reliable" and "accurate" information as it had promised.[11] ¶ 130.

Inside McKesson's headquarters, the FAC alleges McKesson acknowledged how the scheme would benefit McKesson's customers:

> Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

| | Old 16 2/3% spread [[12]] | New 20% spread |
|---|---|---|

11 After the Scheme was implemented (and despite the flack from some drug manufacturers), First DataBank and McKesson continued their collaboration to ensure that First DataBank's WAC/AWP markups mimicked those of McKesson, and vise-versa. Even when disparities were shown in the databases, First DataBank would counsel against making changes because "it would trigger a lot of questions on why there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changed." Berman Decl., Ex. 55 (MCKAWP 001243). When a large national chain pharmacy would call McKesson "complaining about" the particular low AWP for a product, and McKesson, in turn, would contact First DataBank in order to get it "fixed." *Id.*, Ex. 22 (MCKAWP 0001168); Ex. 41 (MCKAWP 0069817). In 2003 when one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products," First DataBank reported to McKesson that this manufacturer appeared "to be playing hard ball and [First DataBank] just won't play." *Id.*, Ex. 31 (MCKAWP 0001183). First DataBank indicated that it would, then, just "assume the markup is 1.25." *Id.* In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product was a price that "has not been authorized" by it, First DataBank wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below." *Id.*

12 A footnote to avoid some confusion. The difference between WAC and AWP can be expressed in two different ways. First, it might be expressed as the amount by which the difference is *greater than* the WAC (e.g., a WAC of 100 in a AWP of 125 would mean that the difference, 25, is a 25% increase over the WAC of 100). In some parlance, this is called the "markup". Alternatively, one might describe the difference between WAC and AWP as the amount by which the WAC is *lower than* the AWP (and taking the same example, a WAC of 100 is 25 points lower than an AWP of 125, or 25/125 equates to 20% lower). This in some parlance is typically called the "spread". The markup of 25% equals to a spread of 20%; a markup of 20% equates to a spread of 16-2/3%.

| Lipitor 20mg 90's | $6.86 | $17.18 |
|---|---|---|
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

The FAC alleges both Defendants benefited from the scheme. First DataBank eliminated the costs associated with conducting reliable surveys and calculating the variation in markups. Additionally, by creating a higher WAC/AWP markup, First DataBank created greater demand for its reporting services by entities that stood to benefit from the increased mark-up. The scheme also directly benefited McKesson's own pharmacy business, consisting of a nationwide network of 275 independent pharmacies in 35 states, as well as placing McKesson in a substantially better position with its principal customers, retail pharmacies. ¶¶ 133(a)-(f),171-75.

The FAC shows the dramatic nature of the scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the scheme. The spike in 2002 reflects implementation of the scheme:




As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, end payor drug prices increased enormously during the class period (an estimate is set forth later on this memorandum).

Among the drugs whose prices are artificially inflated by the scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium.

### 5. The Impact of the Scheme Uniformly Effected Class Members and the Impact and Damage Can Be Calculated For Each Class Member

Dr. Hartman has concluded that if the allegations are true the following economic consequences occurred:

a) Those AWPs reported by First DataBank, which were related to their WACs by a spread of 20% prior to the implementation of the scheme, were increased relative to their WACs by 5 percentage points to a spread of 25% as a result of the Scheme.

b) Where reimbursement rates (allowed amount of AA) paid by Class members were determined formulaically by AWP as AA = {"AWP less x%" plus a dispensing fee}, the reimbursement rates were increased for those drugs, relative to the acquisition costs of the providers (which continued to be related to the WACs).

c) The amounts paid by all or substantially all Class members for the relevant pharmaceuticals were inflated.[13]

Or, as stated elsewhere by Dr. Hartman on the issue the class-wide impact:

14. "The impact of the Scheme was class-wide and uniform:

c) Since the Class includes all those and only those payors whose reimbursement rates were determined by AWPs and since the Scheme increased those AWPs, the reimbursement rates on all transactions subject to the Class definition were inflated.

d) The impact was uniform across Class members: ***the AWPs were increased***. Those AWPs were incorporated into the calculation of reimbursement rates for all Class members. AWPs for the subject drugs are published industry-wide and do not vary across segments of the industry. As a result, individual issues concerning variation in the information content of First DataBank's AWPs for particular drugs do not arise."[14] (Emphasis in original.)

13 Hartman Decl., ¶ 12, pp. 4-5.

14 Hartman Decl., ¶ 14, pp. 5-6.