UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT 37 HEALTH AND SECURITY FUND, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |

## MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

At the hearing for preliminary approval of Plaintiffs' settlement with First DataBank, the issue of Plaintiffs' consumer claims was raised. Because the proposed settlement encompasses consumer claims, the Court invited Plaintiffs to amend their Complaint to add Representative Consumers to assert claims on behalf of a Consumer Class. Plaintiffs hereby move for leave to file the Second Amended Complaint, attached as Exhibits A, for that purpose. Attached for the Court's convenience are excerpts of the pages from the Second Amended Complaint highlighting the sections which have changed. Exhibit B, hereto.

"Consent to file amended pleadings 'shall be freely given when justice so requires,' Fed. R. Civ. P. 15(a), unless the amendment would be futile or reward undue delay[.]" *Adorno v.*

- 1 -

*Crowley Towing & Transp. Co*., 443 F.3d 122, 126 (1st Cir. 2006).  "The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits."  *Calderon v. Kansas Dept. of Social and Rehab. Servs*., 181 F.3d 1180, 1185-86 (10th Cir. 1999).  Plaintiffs' motion suffers neither from futility nor undue delay. Introducing a Class of Consumer Endpayors is merely a logical progression from the original complaint filed on behalf of third-party payers.  Nor have Plaintiffs engaged in undue delay in bringing this motion.  Discovery is ongoing; McKesson will have every opportunity to conduct discovery of the Consumer Class and modify its trial strategy accordingly.  *Compare Acosta-Mestre v. Hilton Int'l of P.R*., 156 F.3d 49, 52 (1st Cir. 1998) (plaintiff filed motion to amend when discovery almost closed, and "nearly all the case's pre-trial work was complete," court found it would cause undue delay to allow plaintiff to amend complaint).

At a later date, Plaintiffs will either move to amend their motion to certify the Class to include a Consumer Class or will make a separate motion on behalf of the Consumer Class.

Plaintiffs understand that McKesson will want to possibly depose the consumer plaintiffs and seek discovery from them, and will make that happen, assuming the discovery is reasonable in nature.


DATED:  October 31, 2006                        By  /s/ **Steve W. Berman**
                                                         Steve W. Berman
                                                         Sean R. Matt
                                                         Barbara A. Mahoney
                                                    Hagens Berman Sobol Shapiro LLP
                                                    1301 Fifth Avenue, Suite 2900
                                                    Seattle, WA  98101
                                                    Telephone: (206) 623-7292
                                                    Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Ed Notargiacomo (BBO #567363)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13  137284 V1

## CERTIFICATE PURSUANT TO LOCAL RULE 7.1

Pursuant to Local Rule 7.1(A)(2), the undersigned certifies that counsel for Plaintiffs conferred with counsel for Defendants on the Plaintiffs' motion to amend the Complaint and an agreement could not be reached.

/s/ Steve W. Berman
Steve W. Berman

001821-13 137284 V1

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 31, 2006.

/s/ Steve W. Berman
Steve W. Berman

001821-13 137284 V1

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 1:05-CV-11148-PBS |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) | |

**SECOND AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE .........................................................................7

III.    PARTIES ..............................................................................................................8

        A.      Plaintiffs ...................................................................................................8

        B.      Defendants .............................................................................................11

IV.     STATEMENT OF FACTS ................................................................................11

        A.      Drug Manufacturers and NDCs .........................................................12

        B.      The Wholesale Acquisition Cost ........................................................13

        C.      The Average Sales Price .......................................................................14

        D.      The Average Wholesale Price ..............................................................14

        E.      The WAC-to-AWP Spread ...................................................................15

        F.      Drug Wholesalers...................................................................................16

        G.      Wholesaler Sales Transactions ...........................................................17

        H.      Retail Pharmacy Channel.....................................................................18

        I.      The Private End Payors for Prescription Drugs................................19

        J.      End Payors Drug Reimbursements Are AWP-Based ........................20

        K.      Medicaid Drug Reimbursements Are AWP-Based ...........................22

        L.      Medicare Drug Reimbursements Are AWP-Based ...........................22

        M.      Private and Public End Payors Rely on Published Drug Pricing Compendia .......24

        N.      The Emergence of First Data and MediSpan as Electronic Data Publishers.........25

        O.      The Merger of First Data and MediSpan Systems................................28

        P.      First Data Gains the Trust of the Pharmaceutical Industry....................30

        Q.      First Data's Representations to Gain Marketplace Reliance on Its Pricing Data ..31

R.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin 34

S.    By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse ........... 36

T.    Implementation of the Five Percent Spread Scheme ............................................. 38

U.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme ... 58

V.    First Data's 2005 Capitulation ............................................................................. 60

V.    CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME ...................... 61

VI.    DEMAND FOR JUDGMENT ............................................................................ 90

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts

and beliefs, and upon information and belief as to all matters based upon the investigation of

counsel, allege as follows:

## INTRODUCTION

1.       This is a proposed national class action brought on behalf of consumers, self-

insured employers, health and welfare plans, health insurers and other End Payors of prescription

drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation

("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for

numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby

causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP,

to make billions of dollars of excess payments for those pharmaceuticals.

2.       In the pharmaceutical marketplace, those in the retail distribution chain – national

chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase

drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price

established by manufacturers and used by them and wholesalers to establish prices to retailers.

Although retailers **buy** pharmaceuticals on the basis of WAC, they **get paid** (*i.e.*, get reimbursed)

for branded drugs based on a different benchmark, the average wholesale price or "AWP."  As

the difference between AWP and WAC increases, the larger "spread" affords retailers and other

middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.       Each year more than three billion prescriptions are written in the United States.

End Payors must have a way of determining what the AWP is at any moment in time for the

approximate 65,000 drugs used in the marketplace.  AWPs are therefore compiled and published

by several publishing companies, including First Data.  Through these compilations, which are

available in both hard copy or electronic form, those in the distribution chain can determine the AWP for any given drug and effectuate reimbursement to retailers accordingly.

4.    Consumers, health and welfare plans, health insurers and other End Payors for prescription drugs use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices for almost all drugs.  Virtually all these entities' contracts governing pharmaceutical reimbursement use AWP as a pricing standard.

5.    First Data, McKesson and pharmaceutical companies know that End Payors utilize AWP as a pricing benchmark and utilize AWP as a reasonably accurate measurement of list and transaction prices in order to negotiate payment terms for drugs used by their constituents.

6.    Until March 15, 2005, First Data represented to those in the pharmaceutical market that it derived the WAC/AWP markup either from manufacturers or by conducting "a survey" of wholesalers whose purpose was to verify prices reported by the manufacturer.  First Data further represented throughout the Class Period that AWP represents the "average of prices charged by the national drug wholesalers," and that the number of surveys it was conducting to determine the published AWP was "increasing."  McKesson is one of the wholesalers who was "surveyed" by First Data.

7.    Historically, in order to arrive at the AWP for branded drugs, manufacturers and wholesalers applied a markup of 20% or 25% to WAC.  Whatever markup was given to a particular branded drug "stuck" with that drug indefinitely.  Until 2002, there was variation, supposedly based on manufacturer direction or on First Data's wholesale surveys, in the difference between the WAC to AWP spread for hundreds of brand-name drugs.  For example,

manufacturer A might have a markup of 20%, while manufacturer B might utilize a markup of 25%.

8.       In late 2001 or early 2002, the exact time of which is unknown to payors in the pharmaceutical marketplace, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs.  As part of this agreement, First Data, to the extent it relied upon information other than that provided directly from various drug manufacturers for certain drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers.

9.       And at the same time, McKesson and First Data, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount.  To conceal the scheme, McKesson and First Data agreed to typically effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer.  This camouflaged both the associated increase in the WAC to AWP markup and WAC-to-AWP spread and McKesson as the source of the increased markup.  McKesson then communicated these new WAC-to-AWP spreads to First Data.  First Data, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace, and without reference to the manufacturers' suggested AWPs (or WACs) for these drugs, and without surveying other wholesalers, then published new AWPs with the new WAC-to-AWP markup.  First Data's action had the effect of raising the WAC-to-AWP spread by additional percentage points so as to have a 25% difference between pharmaceutical companies' reported WAC and the First Data published AWP.  First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or

- 3 -

suggesting a 20% markup as appropriate.  On some occasions, some of the manufacturers secretly questioned this increase, but First Data refused to change the published AWP and the manufacturers failed to take any action to remedy defendant's unjustified raise in AWP.

10.    This collaboration between First Data and McKesson to raise the WAC-to-AWP spreads is referred to as the "Five Percent Spread Scheme" or "Spread Scheme."  The dramatic nature of the Spread Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the Spread Scheme.  The spike in 2002 reflects implementation of the Spread Scheme:



**Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004**

**Note**:  "NDC" means National Drug Code and refers to a number assigned to each drug.

11.    Once First Data and McKesson raised the WAC-to-AWP spread to 25% on a given drug, that spread remained in place and still remains in place to this day.

001821-13  136802 V1

12.    Both McKesson and First Data each had economic and business reasons for reaching an understanding that McKesson would artificially raise the WAC-to-AWP spread and that First Data would publish the increased AWPs and as a result of their own business interests had a common purpose in running the Spread Scheme.  A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients.  McKesson implemented this Scheme in order to provide a benefit to those important retail pharmacy clients as well as its own pharmacy related business.  For sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP.  Consequently, pharmacies make a profit on the spread between AWP and their acquisition cost for a drug.  Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies.  Thus, an increase in the WAC-to-AWP markup results in larger profits for retailers and for McKesson's pharmacy-related businesses.

13.    McKesson was proud of its efforts and boasted to its retail clients that McKesson "had been working on AWP expansion with some success."  The client was "very glad that McKesson was doing this."  MCKAWP 0069726.  Confirming the secrecy of the Scheme McKesson cautioned that the "AWP expansion effort" and information about it is "not intended to be handed out to customers" but could be described to show "McKesson is doing our part."  MCKAWP 0069732.  "AWP expansion" was a McKesson euphemism for the WAC-to-AWP markup Scheme.

14.    First Data agreed to this Scheme to curry favor with McKesson so that McKesson would utilize First Data as the pricing source it has in some of its contracts with pharmaceutical companies and others in the distribution chain, as well as in the pricing database that it provides to its customers, thereby increasing First Data's business.  First Data also agreed to the Scheme

- 5 -

as part of an effort to increase the demand for its business among entities in the pharmaceutical distribution chain whose reimbursement is based on AWP.  Many of these entities, who make a profit off the spread between AWP and WAC, would be more likely to utilize First Data's service if it had a higher markup or was perceived to be an industry leader with respect to markups.  McKesson in turn where it could do so, specified in its dealings with pharmaceutical companies, that First Data's AWP would be the AWP used for contract pricing purposes as opposed to the other published AWPs.  Thus, each defendant shared multiple common purposes, though they may have had different reasons for doing so, and each acted to achieve those purposes by implementation of the 5% Scheme.

15.     Health and welfare funds, insurance companies and thousands of third-party payors have contracts that expressly tie their payment for pharmaceuticals to First Data's published AWPs.

16.     As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, thousands of third-party payors and consumers have had their drug prices increased by the Scheme.

17.     Among the drugs whose prices are artificially inflated by the Scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as:  Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin, Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium.  Given the billions of dollars spent on prescription drugs, a 5% increase in the WAC-to-AWP spread results in a substantial increase in payments for pharmaceuticals.  For example, AstraZeneca's Nexium had annual sales

- 6 -

in 2004 of almost $4 billion. A bump of 5% in the WAC-to-AWP spread results in an increase

of over $100 million per year in reimbursements for just one drug. Another such drug is Pfizer's

Lipitor, whose annual sales in 2004 exceeded $10 billion. As a result of the 5% increase

imposed by First Data and McKesson, hundreds of millions per year was spent on Lipitor that

would not have been absent the Scheme.

18.     In this action, plaintiffs and the Class seek to recover damages incurred from

defendants' unlawful acts and practices.

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this class action pursuant to the

Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new

subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a

class of plaintiffs is a citizen of a State different from any Defendants" and the aggregated

amount in controversy exceeds five million dollars ($5,000,000). *See* 28 U.S.C. §§ 1332(d)(2)

and (6). This Court has personal jurisdiction over the parties because plaintiffs submit to the

jurisdiction of the Court and defendants systematically and continually conduct business

throughout the Commonwealth of Massachusetts, including marketing, advertising, and sales

directed to Massachusetts residents.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and (c) because

defendants as corporations are "deemed to reside in any judicial district in which [they are]

subject to personal jurisdiction" and because the misrepresentation and material omissions

"giving rise to claim[s] occurred" in this District as well as throughout the State of

Massachusetts.

## PARTIES

**A.    Plaintiffs**

      **1.    Proposed Class 1 Representatives (Consumers)**

      21.    Plaintiff June Swan is a resident of Corte Madera, California.  Ms. Swan is covered by Aetna and pays a percentage of her drug prices through Aetna.  She takes Celebrex.  As a result, Ms. Swan paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

      22.    Plaintiff Bernard Gorter is a resident of Milwaukie, Oregon.  Mr. Gorter currently pays 40% of the cost of his prescriptions.  He is on Medicare and also has a Medicare supplement in which the state of Oregon pays part of his premium.  Mr. Gorter takes Lipitor, which he has purchased both by mail order and at retail pharmacists.  As a result, Mr. Gorter paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

      23.    Maureen Cowie is a resident of Salinas, California.  Ms. Cowie takes Neurontin, Klonopin, Lipitor and Lotensin.  She has taken all of these drugs for a number of years.  She was covered by Blue Cross when she began taking these drugs and paid 80% of the cost for each.  As a result, Ms. Cowie paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

      **2.    Proposed Class 2 Representatives (Third-party payors)**

      24.    Plaintiff New England Carpenters Health Benefits Fund ("Carpenters") is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries.  As such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  Carpenters maintains its principal place of business in Wilmington, Massachusetts.  It

- 8 -

provides comprehensive health coverage for over 22,000 participants and beneficiaries in the states of Main, New Hampshire, Vermont, and Massachusetts.  During the Class Period, Carpenters has been billed for and paid charges for drugs.  It reimburses retail pharmacies for pharmaceuticals on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

25.     Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("PMBT") is a voluntary employee benefits association maintained pursuant to the federal Employee Retirement Security Act, 29 U.S.C. § 1132, *et seq.* and to the settlement of a federal court action (Case No. 3:94-0573) brought in the United States District Court for the Middle District of Tennessee against Pirelli Armstrong Tire Corp. ("Pirelli") in the early 1990s by many Pirelli retirees for the purpose of providing health and medical benefits to eligible participants and beneficiaries.  PBMT maintains its principal place of business in Goodlettsville, Sumner County, Tennessee.  During the Class Period, PMBT has been billed for and has paid charges for drugs based on AWP.  Since May 1, 2001, PMBT has contracted with ACS/Caremark, a PBM, to administer its drug program for its members.  PMBT's contract with its PBM provides that reimbursement is to be based on First Data's published AWP.

26.     Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity ("THWF") is an employee welfare benefit plan and employee benefit plan established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries.  As such, THWF is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  THWF maintains its principal place of business at Fourth & Cherry Streets, Philadelphia, Pennsylvania 19106.  It

provides comprehensive health coverage for over 28,000 participants and beneficiaries in parts

of Pennsylvania, New Jersey and Delaware.  During the Class Period, THWF has been billed for

and paid charges for drugs.  It reimburses retail pharmacies for pharmaceuticals on the basis of

the published AWPs (minus a fixed percentage) and those AWPs are published by First Data.

27.     Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund

("PFTHW") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal

Revenue Code for the purpose of providing health benefits to eligible participants and

beneficiaries.  PFTHW maintains its principal place of business in Philadelphia, Pennsylvania.

PFTHW provides health benefits, including prescription drug benefits, to approximately 20,000

active participants, and their spouses and dependents.  During the Class Period, PFTHW has

been billed for and paid charges for drugs.  It reimburses retail pharmacies for pharmaceuticals

on the basis of the published AWPs (minus a fixed percentage) and those AWPs are published by

First Data.

28.     Plaintiff District Council 37 Health & Security Plan is non-ERISA union-

sponsored employee welfare benefit plan subject to the reporting requirements of the New York

City Controller's Internal Control and Accountability Directive No. 12.  The right to bargain for

said welfare benefits is recognized by Section 12-307 of the New York City Collective

Bargaining Law.  In addition, under DC 37, the union, there exists two smaller employee welfare

benefit plans, The District Council 37 New York Public Library Health & Security Plan Trust

and The District Council 37 Cultural Institutions Health & Security Plan Trust both of which

were established and are maintained pursuant to §§ 1002(1) and (3) of ERISA.  The above-

referenced benefit plans are collectively referred to as "DC 37."  As such, DC 37 is a legal entity

entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d).  DC 37 maintains its

- 10 -

principal place of business in New York, New York.  It provides supplemental health benefits,

including a prescription drug benefit for over 350,000 participants and beneficiaries in all but

one state in the United States.  During the Class Period, DC 37, through its prescription drug

benefit manager, has been billed for and paid charges for certain of the drugs on attached

Exhibit A, and was injured as a result of the Scheme alleged herein.

**B.      Defendants**

29.      Defendant First Data ("First Data") is a Missouri corporation with its principal

place of business at 1111 Bayhill Drive, San Bruno, California 94066.  First Data is a subsidiary

of the Hearst Corporation and is the leading provider of electronic drug information to the

healthcare industry.

30.      Defendant McKesson Corporation is a Delaware corporation with its principal

place of business at McKesson Plaza, One Post Street, San Francisco, California 94101.

McKesson Corporation is the leading provider of supply, information and care management

products and services designed to reduce costs and improve quality across healthcare.  Founded

in 1833, with annual revenues of more than $50 billion, McKesson ranks as the 16th largest

industrial company in the United States.

STATEMENT OF FACTS

31.      This case involves the unlawful inflation of the "markup" factor between the so-

called wholesale acquisition cost (or "WAC") and the so-called average wholesale price (or

"AWP") of a large number of prescription pharmaceutical products, a scheme implemented in

late 2001 and 2002 by McKesson (the largest U.S. pharmaceutical wholesaler) and First Data

(the nation's most widely used and "trusted" electronic drug data publisher).

C.     **Drug Manufacturers and NDCs**

32.     Drug makers manufacture brand name and generic drugs.  Generally, a drug product that is covered by a patent and thus is manufactured and sold exclusively by one firm is a brand-name drug.  After the patent expires, multiple companies can produce the same drug product in the same manner, but the name of the brand name itself remains with the original manufacturer.  Drug products not covered by patent protection and produced and/or distributed by many firms are generic drugs.  Manufacturers tend to be either brand-name manufacturers or generic drug manufacturers, although some manufacture both types of drugs.

33.     There are approximately 65,000 branded and generic drug products in the United States market, including different dosages of the same drug.  Prescription drugs are dispensed to patients primarily through four different drug distribution channels:  (a) retail pharmacies (including national chain pharmacies, independent pharmacies, supermarket chains, and mail order pharmacies); (b) physicians who administer the drug in an office; (c) home infusion; and (d) other medical providers.  This lawsuit primarily involves branded drugs distributed through the first channel, the retail pharmacies.

34.     All drugs intended for retail pharmacy sale are identified by a National Drug Code ("NDC") that is listed with the United States Food and Drug Administration ("FDA") and contains eleven digits.  The NDC is used to identify the drug delivered to the patient.  The first five digits of the NDC show the identity of the company that manufactured and/or packaged the drug, the middle four digits identify the drug ingredient and dosage, and the last two digits identify the package size (*e.g.*, whether the bottle of pills contained 100 or 1,000 pills).  While there are currently about 65,000 active NDCs, many more NDCs have been issued over time (in large part because over the years many drugs and associated NDCs have been phased out).

- 12 -

D.     **The Wholesale Acquisition Cost**

35.     Branded manufacturers arrive at an original launch price by taking into account research and development costs, launch and marketing costs, competitor prices and estimates of consumer and physician demand.  (Generic makers, of course, use more commodity pricing approaches).  Once an introductory price has been set, the branded manufacturer establishes the wholesale acquisition cost, or "WAC," which is used as a baseline for sales to wholesalers (subject to many adjustments, as will be seen).  The WAC for branded drugs is then published by the manufacturer.

36.     Manufacturers establish the WAC as a baseline for sales to wholesalers and others in the distribution chain.  Thus, while WAC may not represent *actual* acquisition cost (as wholesalers may obtain discounts through volume purchases or special deals, and as wholesalers' customers who also buy based on WAC may receive other price concessions charged back to the manufacturers), it is the baseline for most branded drug sales by manufacturers to national wholesalers.  In addition, WAC is a publicly available price for most branded drugs and is the closest reported price to the actual transaction price between a manufacturer and the wholesaler or other direct purchaser of a drug product.  And because the wholesalers' price to the retail class of trade is also typically based on, or is a function of, the WAC, a change in WAC generally results in a similar percent change in price to both wholesalers and to retail pharmacies.

37.     WACs are typically reported on invoices between the manufacturer and the drug wholesaler (and as between the wholesaler and the retailer, or between the manufacturer direct to the retailer).  Some drug manufacturers have other names for the WAC price such as list price, catalog price, direct price, wholesale net price, or book price.

E.      **The Average Sales Price**

38.      After all price concessions are considered, a manufacturer achieves a net sales price, *i.e.*, a transaction price paid by a pharmacy or provider when purchasing a drug product from either a drug manufacturer or wholesaler.  The net sales price takes into account the invoice price and all on-invoice, as well as off-invoice adjustments for discounts, rebates, purchasing allowances, or other forms of economic consideration.

39.      Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products, and the average of those net sales prices is usually called the average sales price (or "ASP").  While net acquisition prices and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[1]  Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria.  Because ASP is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to ASP are considered proprietary and confidential by drug manufacturers.  As a result, for retail pharmaceutical products the exact relationship of ASP to WAC (or to the average wholesale price or AWP, discussed below) for a particular drug at a particular point in time is not publicly known.

F.      **The Average Wholesale Price**

40.      In addition to causing to be published a wholesale acquisition cost or WAC for branded drugs, over the years branded (and generic) manufacturers have also caused to be

---

[1]   The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered.  This exception is not relevant here.

published an average wholesale price (or "AWP") for prescription pharmaceuticals. The average

wholesale price or AWP is a list price used for invoices between drug wholesalers and

pharmacies (or other appropriate drug dispensers, such as doctors for physician-administered

drugs) and is typically used as a benchmark for the reimbursement by End-Payors for the

dispensers' (*e.g.*, retail pharmacies or doctors) acquisition of the drug product. Historically, the

AWP is set directly or indirectly by the drug manufacturer, with an effective date and remains in

effect until a change in price is published.

     41.    WAC and AWP differ in that they represent list prices at different levels in the

market. WAC represents a list price from manufacturer to wholesaler, while AWP represents a

list price from wholesaler to dispenser (*e.g.*, pharmacy, physician, hospital, or other provider).

**G.    The WAC-to-AWP Spread**

     42.    In the pharmaceutical industry, the amount by which the AWP exceeds the WAC

is sometimes known as the WAC/AWP "markup" or "spread" for a particular drug product.

     43.    The relationship between AWP and WAC is sometimes expressed as the

percentage by which the difference is above WAC (*e.g.*, 20% or 25% above WAC, usually called

"the markup") rather than the percentage in which the difference is measured as an amount under

AWP (*e.g.*, 16.7% or 20% off AWP, sometimes called the "spread"). In this complaint, we

usually refer to the WAC-to-AWP markup in the first sense, *i.e.*, as expressed as a percentage

above WAC.

     44.    For many years preceding the Scheme alleged in this complaint, the WAC-to-

AWP spread for branded drugs had predictably set patterns, and the competitive pricing

marketplace for pharmaceuticals had adjusted and accommodated for the patterns. For branded

pharmaceuticals, the WAC/AWP spread tended to fall in two quantum places: 20%, and 25%.

In other words, in the many years preceding the Scheme alleged in this case, a particular branded

- 15 -

drug NDC would carry both a published WAC (*e.g.*, $100 for a 100 count bottle) and a published AWP at either 1.16 or 1.20, or 1.25 of the WAC (*e.g.*, $120).

45.    These steps in the WAC/AWP spreads 20%, and 25%, percentages known to McKesson, First Data and others in the pharmaceutical industry as the WAC/AWP markup factors – were commonly associated with particular divisions of pharmaceutical companies.  For example, a pharmaceutical division might be designated as a "20% markup" company, while another company working in a different therapeutical area, would be designated as a "25% markup" company.

46.    Another part of the predictable aspects of the WAC/AWP spreads over the years was the ***unchanging*** nature of the WAC/AWP markup for a particular NDC.  In other words, if a particular NDC first launched at a 20% markup value, that NDC would remain as a 20% drug during the lifetime of that NDC, almost as if it were part of the generic code for that NDC.  Thus, the WAC and AWP for that drug moved in parallel fashion (usually up), keeping the same markup factor associated with that NDC.  Indeed, prior to the Scheme alleged in this case, it was extraordinarily rare for the WAC/AWP spread to be changed for any particular NDC, and in the few isolated situations where that did occur, a particular market-based reason existed which was known to all participants in the marketplace (*e.g.*, a merger of drug companies necessitating uniformity of particular prices).

**H.    Drug Wholesalers**

47.    Branded manufacturers' primary customers are wholesalers, although to a much broader extent, manufacturers also sell directly to retail pharmacy chains, mail-order pharmacies, hospital chains and some health plans.  Wholesalers are manufacturers' largest group of purchasers, and wholesale prices depend partially on volume purchased.

- 16 -

48.    Like most other types of wholesalers, pharmaceutical wholesalers purchase goods from manufacturers and then resell them to other purchasers.  Wholesalers, whose main customers are retail and mail-order pharmacies, buy pharmaceuticals in large quantities, sort them by customer needs and disperse them in usable quantities.

49.    The price wholesalers pay to manufacturers for any given product at any given time can fluctuate with the quantity purchased.  The manufacturer may quote a wholesaler a price close to or at WAC, but typically there will also be a small volume discount or early cash payment discount off that price.

50.    National wholesalers are the primary intermediate level in the retail channel of distribution process accounting for 45.7% of prescription drugs ($98.5 billion) in 2002.  Other intermediate channels of distribution include chain warehouses with 32.3% ($69.8 billion) of the market, regional and specialty wholesalers with 9.3% ($20.2 billion) of the market, and group purchasing organizations that usually contract with a wholesaler to perform the distribution function on their behalf.  Only about 12% of prescription sales by drug manufacturers are made directly to providers (*e.g.*, physicians or hospitals) or pharmacies.

51.    Wholesale drug distribution is heavily concentrated.  The three largest wholesalers are Defendant McKesson, Cardinal Health, Inc. ("Cardinal") and AmeriSource Bergen Corporation ("ABC").  Each of these "Big Three" wholesalers has slightly less than one-third of the national market of prescription drug wholesale distribution.  Collectively they account for about 97% of drug sales that flow through national wholesalers, and collectively they account for more than 80% of all drug wholesalers (national, regional, and specialty).

I.    **Wholesaler Sales Transactions**

52.    National drug wholesaling is generally perceived as price competitive, with McKesson, Cardinal and ABC (or their predecessors) competing for business with retailers

- 17 -

(primarily major chain drug retailers, independent pharmacies, supermarket drug retailers, and mail orders). As a result, sell-side national drug wholesaler margins to retailers tend to be thin (even at times non-existent), with a significant portion of national drug wholesaler revenue instead being derived from buy-side prompt pay discounts received from manufacturers and from wholesaler inventorying measures that anticipate price increases.

53.     National drug wholesalers sell branded drugs to the retail class of trade based on prices pegged to the WAC. Given the tendency for narrow margins in the national drug wholesaling business, the published WAC for a manufacturer's retail-channel branded drug is not only a strong market indicator for the wholesaler's buy-side cost for a branded drug, it is also expected that the WAC, subject to certain adjustments, is a reasonable benchmark of the sell-side costs charged by national wholesalers of branded drugs to major pharmacy retailers.

**J.     Retail Pharmacy Channel**

54.     The retail pharmacy channel (including chain drug store companies, independent pharmacies, mail orders and supermarkets), comprise roughly two-thirds of the estimated market share of dollars for prescription drugs. Currently, the four largest drug store chains account for most of the retail pharmacy market share today, and the recent consolidation trend appears to be continuing. Some large national or regional retail chains (including pharmacy, supermarket, mass merchandiser chains) purchase drugs in large enough volumes so that they can bypass the wholesaler and buy directly from the manufacturer, but these direct purchases remain a small portion of the overall picture.

55.     Regardless whether the retail pharmacy is large or small, its purchase of prescription drugs is typically based using WAC as a benchmark, although that benchmark is subject to adjustments such as a variety of discounts, rebates, and direct or indirect offsets to pricing.

- 18 -

56.     When large chain pharmacies buy directly from manufacturers, manufacturers offer these pharmacies both up-front discounts for purchasing their products and back-end discounts and formulary rebates to selling specific volumes of drugs or achieving a certain share of a specified market.  When purchasing drugs directly from manufacturers, pricing using the same WAC benchmark system, but the actual transaction cost varies considerably from the WAC given these other arrangements.

57.     Smaller retail entities, such as independent retail pharmacies and regional retail chains, purchase directly from wholesalers or joint group purchasing organizations ("GPOs") in order to leverage their combined purchasing power, and some of these groups further reduce their costs through direct rebate deals offered by manufacturers.  In making purchases from wholesalers, resellers and manufacturers, the starting benchmark for transactions is the WAC but, again, the actual transaction cost is highly variable due to the additional arrangements.

58.     In short, entities in the retail distribution chain (including wholesalers, resellers (retailers), retail chain pharmacies, independent pharmacies, mail order houses, and GPOs) purchase brand-name drugs based upon WAC.  While the actual transaction purchase price varies from the WAC, WAC acts as the actual baseline for the many millions of transactions by which entities in the retail distribution chain acquire branded drugs.

## K.     The Private End Payors for Prescription Drugs

59.     At the most basic level, prescription drug expenditures are funded by either private or public sources.  In the United States, more than $200 billion dollars is spent annually on prescription drugs, and about three quarters of this amount is privately funded.

60.     Private payors for prescription drugs include drug benefit plan sponsors and consumers.  The drug benefit plan sponsors (who pay for part or all of the cost of prescription drugs for their covered beneficiaries) include self-insured employers, health and welfare plans,

- 19 -

health insurers and managed care organizations (MCOs).  Most of these plan sponsors reimburse

retailers (for retailers' drug purchase costs) through pharmacy benefit administrators (either

health plans or pharmacy benefit management companies) who negotiate discounts with retail

pharmacies and rebates from drug manufacturers.  The vast majority of such purchases are for

out-patient drugs that are self-administered, *i.e.*, drugs distributed through the retail distribution

channel.

**L.     End Payors Drug Reimbursements Are AWP-Based**

61.     Although retail pharmacies ***purchase*** pharmaceutical products based upon pricing

formulae that employ the WAC, retail pharmacies ***get paid*** (*i.e.* receive reimbursement) from

plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee.

This is a fundamental anomaly of the retail distribution channel for drug products – that retail

pharmacies' ***purchases*** are based on prices pegged to the published WAC, but retail pharmacies'

***reimbursements*** or charges are based on the published AWP.

62.     Health plans typically contract with intermediaries called pharmacy benefit

managers ("PBMs") to negotiate prices with manufacturers and retail pharmacies and thereafter

adjudicate the numerous transactions that occur during administration of a plan.  Although the

PBM negotiates prices and adjudicates claims, the plan sponsor (*i.e.*, insurer, self-insured

employee, health and welfare plan) remains at risk for the charges paid to retail pharmacies and

mail orders.  In the contracts between PBMs and plan sponsors, the retail pharmacies' drug

ingredient costs for brand-name drugs are reimbursed at the AWP less a certain percentage, or

"discount."

63.     Brand drug reimbursement for retail pharmacy ingredient cost contained in the

contracts between PBMs and plan sponsors, and PBMs to pharmacies, use an AWP-based

reimbursement structure.  For example, since 2002, Express Scripts' standard form contract has

- 20 -

expressly stated that its reimbursement formula is based on AWP from the "current information provided to ESI by drug pricing services such as First Data Bank...."  Similarly, Caremark's website states:  "For both brand and generic drugs, the pricing formula at retail and mail is based on the discounted Average Wholesale Price (AWP) as reported by First Data.  Caremark loads First Data's updated data into the system on a daily basis."  Other PBMs expressly utilize First Data's published AWPs as the source of AWP pricing to be utilized in payment.

64.     The AWP-based reimbursement benchmark for private payments to the retail class of pharmaceutical trade has long been acknowledged.  Most recently, at a hearing on December 7, 2004, before the United States House of Representatives Committee on Energy and Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has been codified as the benchmark price, by statute and regulations, in the public sector and by contract in the private sector."

65.     Third Party AWP based reimbursement has also been acknowledged by McKesson.  For example, in September 2001, James Robert of McKesson, internally noted that "I think it is important to understand that the AWPs that are used for third party reimbursement are the First Data Bank ("FDB") AWPs."  MCKAWP 0068514.

66.     In summary, thousands of pharmaceutical reimbursement contracts are based on AWP minus a specified discount.  As a result, a leading expert on pharmaceutical pricing has concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates.  All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector and private drug benefit insurance plans are negotiated based upon AWP and discounts from AWP."

M.    **Medicaid Drug Reimbursements Are AWP-Based**

67.    Public purchases for prescription drugs provide a variety of programs for low-income and elderly patients, veterans, members of armed services, and federal, state and local government employees.  While public purchaser programs are not directly at issue in this case, the significant reliance on those systems of AWP-based reimbursement underscores the ambiguity and magnitude of reliance on the AWP-based reimbursement system to pay for dispensers' ingredient costs for branded pharmaceutical products.

68.    Medicaid has the most significant impact on prescription drug pricing for out patient drugs.  The Medicaid Program, jointly financed through federal and state funds, is designed to aid certain low-income people and the disabled, and covers about 40 million individuals.  Between 1997 and 2002, Medicaid expenditures for prescription drugs in the fee-for-service part of the program increased at an average annual rate of 18%, going from $10.2 billion to $23.4 billion.  (While these are significant sums, they amount to less than 10% of the overall annual prescription drug expenditure.)

69.    Medicaid's reimbursement system relies upon the published list prices of drugs (which are largely directly set by manufacturers) to determine pharmacies' reimbursement. States reimburse pharmacies using formulas that are typically based on the average wholesale price or AWP of a drug.  For example, a state might reimburse a pharmacy 85% to 90% of the average wholesale price of a drug plus a fixed dollar amount of $3 to $5 (as dispensing fee) to cover the pharmacy's other costs.

N.    **Medicare Drug Reimbursements Are AWP-Based**

70.    The other significant public purchaser for prescription drugs is the federal Medicare Program.

- 22 -

71.     Until recently, the Medicare Program generally did not cover the cost of out-patient prescription drugs that a Medicare beneficiary self administers (*e.g.*, by swallowing the drug in liquid or pill form).  However, Medicare Part B does cover some drugs, including injectables administered directly by a doctor, certain oral anti-cancer drugs, and drugs furnished under a durable medical equipment benefit.  Approximately 450 drugs are covered by Medicare Part B.

72.     Medicare Part B reimburses medical providers 80% of the allowable amount for a drug.  The remaining 20% is paid by the Medicare Part B beneficiary, and is called the "co-payment" amount.  All medical providers are required by law to bill the 20% co-payment and make attempts beyond merely billing to collect that amount.  In addition, beneficiaries under Part B are required to pay an annual deductible amount before Part B benefits are payable.

73.     Some Medicare beneficiaries are able to purchase private Medigap insurance, which covers, among other things, all or part of the 20% co-payment for Covered Drugs.

74.     For many years up to and through 1997, Medicare's reimbursement system for the relatively narrow band of physician-administered drugs sought to estimate providers' acquisition costs by pegging reimbursement to either the estimated acquisition costs or to the national average wholesale price sale price.  In practice, carriers that administered the Medicare Program reimbursed physicians and clinics for physician-administered drugs covered by Medicare on the basis of the published wholesale price or AWP.

75.     Beginning in 1998, Medicare's practice of reimbursing based upon the published AWP was codified by statue and implemented by regulation.  Beginning in 1998 and until recently, Medicare reimbursed for drugs and biologicals under its program of the reimbursing physician administered drugs based upon 95% of the published average wholesale price.

- 23 -

76.    At the end of 2003, Congress enacted the Medicare Modernization Act.  Among other things, that changed the AWP-based reimbursement system for Medicare to a system based upon each manufacturers' actual calculation for the average sales price for each drug or biological covered by the program.  Interim rules transitioned the AWP-based system with modifications to the percentage off of AWP.  Beginning in 2004, Medicare has been transitioning to the ASP-based reimbursement system.

77.    In summary, the two largest public purchaser programs for prescription pharmaceuticals – Medicaid and Medicare – historically relied upon published average wholesale prices as the fundamental basis upon which to reimburse for branded drug ingredient costs incurred by dispensers (retail pharmacies for Medicaid, and medical providers in the Medicare area).

## O.    Private and Public End Payors Rely on Published Drug Pricing Compendia

78.    The private (and public) pharmaceutical reimbursement systems have at their core critical dependence upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies in the country.  Given the breath of this dependence (private insurance systems covering more than 200 million lives as well as millions of cash payors) given the healthcare system's growing reliance on pharmaceutical products as a treatment of first resort, and given the scores of thousands of available drugs on the market, the private (and public) reimbursement systems for pharmaceuticals depend on the honesty and integrity of the AWP and WAC data provided by drug manufacturers.  The reimbursement systems (including the plan sponsors and consumers who reimburse drug dispenser costs) also rely upon the accuracy and integrity of the pharmaceutical pricing publishers to accurately and fairly publish AWPs and WACs for NDCs.

79.     Several pharmaceutical industry compendia periodically publish the AWPs for active NDCs in the United States.  Generally these publications are available in either hard copy format or in electronic media.

80.     Generally speaking, the two printed compendia include Drug Topics Red Book (the "Red Book") (published by Thompson Healthcare) and American Druggist First Data Bank Annual Director of Pharmaceuticals and Essential Director of Pharmaceuticals (the "Blue Book") (which for several years has been defunct).  While the Red Book is used to determine published AWPs (primarily for physician-administered drugs), and while certain limited electronic information is available regarding Red Book published prices, the Red Book remains primarily an annual printed publication with periodic printed updates.

81.     In periodically announcing the AWP for each drug, publishers generally report prices that are supplied to them by manufacturers for their respective drugs.  For instance, the forward to the 1999 edition of the Red Book states that "all pricing information is supplied and verified by the products' manufacturers, and it should be noted that no independent review of those prices for accuracy is conducted."  In addition, a June 1996 Dow Jones news article reported that Phil Southerd, an associate product manager of the Red Book, stated that Red Book only publishes prices that are faxed directly from the manufacturer.

**P.     The Emergence of First Data and MediSpan as Electronic Data Publishers**

82.     In addition to printed publications of pharmaceutical prices, the AWP for NDCs is also widely made available to manufactures, wholesalers, retailers (including major chain pharmacies, independents, mail orders), pharmacy benefit managers and third-party payors, (*i.e.*, plan sponsors of drug benefit plans such as insurers, Taft-Hartley Funds and self-insured employers), through large electronic drug databases.

- 25 -

83.     Drug databases started back in the mid-1970s with the advent of significant drug benefit programs.  These programs, along with the pharmacists who are dispensing the drugs and the third-party payors (primarily insurance companies) who are paying for them, needed comprehensive and accurate descriptive and pricing information in order to ensure the accuracy of the claims they were paying.

84.     The processing of claims became a massive job as drug prescriptions increased. The need for a consistently accurate and comprehensive drug price database became a major need.  As First Data documents acknowledge, the "specter of inaccurate drug prices drove the database companies to develop techniques to assure the accuracy and comprehensiveness of the data."

85.     During the 1990s, there were only two major electronic drug database companies: (1) First Data, which describes itself as "started as the only purely electronic database company," and (2) MediSpan, which had its roots in the printed drug price catalog business.

86.     The principal products sold by First Data are based upon information contained in its National Drug Database Files, or "NDDF."  The NDDF is a massive electronic database dating back many years and containing scores of fields of information for both active and non-active NDCs.  Among many other pieces of quantitative and non-quantitative information contained in the NDDF, are the current and each historical WAC (known in the NDDF as the wholesale net price, or "WHN") and AWP (set forth in various fields, including an AWP field designated by First Data as Blue Book AWP or "BBAWP") for each NDC.

87.     The principal electronic database products sold by MediSpan are based upon its Master Drug Database Files or "MDDF."  The MDDF electronic database is smaller than the NDDF, but nevertheless contains numerous fields of data for each NDC, including current and

- 26 -

historical WAC and AWP. Both the NDDF and the MDDF are comprehensive, intragratable drug information databases.

88.     Comprehensive, intragratable drug information databases ("intragratable drug data files") are electronic databases containing purportedly comprehensive clinical, pricing, and other information on prescription and non-prescription medicines. Intragratable drug data files are uniquely capable of being readily integrated with other computerized information systems to help pharmacists and third-party payors quickly obtain information important to decisions regarding the prescription, dispensing, price reimbursement and purchase of medicines, and also to automatically provide drug information that patients need for safe use of their drugs. Retail pharmacies and PBMs usually use intragratable drug data files to determine third-party payor reimbursement (when using AWP fields), as well as their own acquisition costs (when using WAC fields).

89.     Drug information in other forms is usually not an adequate substitute for the provision of much information obtainable only in intragratable drug data files. For example, a pharmacist filling a prescription can more quickly and reliably check for harmful drug interactions through an instant, automatic check of a drug data file when he or she enters the prescription into the pharmacy's computer system, than through consulting a separate, unintegrated, and less up-to-date information source such as a book or data on a compact disk. Relying on such a separate reference would be more time-consuming, and would increase the risk that a harmful drug interaction would not be detected until after the patient purchased and used the drug.

90.     During the 1990's and up to 1998, First Data and MediSpan were substantial, direct competitors within the relevant market of intragratable drug data files in the United States,

- 27 -

and faced little or no competition from other firms.  Until 1998, two electronic drug databases –

First Data's NDDF and MediSpan's MDDF – played the integral role in providing essentially all

electronically-based drug reimbursement transactions in the United States, accounting for

billions of transactions each year and many billions of dollars of payments.

91.    Of course, First Data's NDDF and MediSpan's MDDF both contained data fields

for critical price points for the approximate 65,000 NDCs then active in the marketplace.[2]  The

retail class of trade has primary reliance on these systems for health and reimbursement among

the data fields for each active NDC (in the NDDF and the MDDF) information, using the AWP

for the associated NDC when seeking reimbursement for drug ingredient cost.

**Q.     The Merger of First Data and MediSpan Systems**

92.    In 1998, the Hearst Corporation caused First Data to be merged with the smaller

MediSpan.  After the merger, First Data began the process of combining its NDDF with

MediSpan's MDDF (resulting in a product sometimes known as NDDF Plus).  Through this

process, the Hearst Corporation caused First Data to become the sole United States provider of

intragratable drug data files, including the publication of electronic drug database pricing

information such as the WAC and associated AWP for branded pharmaceutical products.  Thus,

beginning in or around 1998 and thereafter, virtually every participant in the pharmaceutical

distribution chain who used electronic database systems used and relied upon the accuracy of

data from First Data's NDDF and MDDF, including the published WAC and AWP price fields in

undertaking reimbursement transactions for billions of dollars of pharmaceutical products.

93.    In 2001, the Federal Trade Commission (after a lengthy investigation) brought

suit against the Hearst Corporation and First Data claiming, among other things, that the First

---

[2] First Data's NDDF also contains historical information and thus, it contains data for almost
200,000 NDCs since many are no longer active in the marketplace.

Data and MediSpan merger had been unlawful.  Shortly thereafter, the Hearst Corporation

agreed to the divestiture of the MediSpan assets, culminating in a consent decree late that year.

However, by this time, First Data's merger of the NDDF and MDDF, along with changes of

personnel and related systems effectuated over the prior three years, was nearly complete.  As a

result, as part of First Data's divestiture of the MediSpan assets, First Data was required to

provide the purchaser of the MediSpan assets with transitional and editorial services for many

years into the future.

94.     As a practical matter, therefore, pricing data contained in both the NDDF and the

MDDF post-divestiture remained the same.  Since 1998 and despite the late 2001 divestiture,

First Data has functioned as the sole editor of data populating the only available comprehensive

intragratable electronic drug data systems (the NDDF and the MDDF) for the pricing

information ubiquitously used in the United States for reimbursement transactions in the retail

pharmacy channel for branded drugs.

95.     During the Class Period, all changes in the FDB electronically published AWPs

and the WAC-to-AWP spread were the same.  The Consent Decree that implemented the

divestiture of Medispan from FDB required that FDB continue to provide Medispan with all

FDB pricing information until Medispan (now called Facts and Comparisons), was able to

develop its own pricing production system.  Thus, during the Class Period, when the Scheme

described below effectuated an increase in the FDB published spread, this increase also occurred

in the Medispan published prices.  FDB and McKesson knew that this would be a consequence

of the Scheme.

96.     During the 1990s and up to the end of 2001, both First Data and MediSpan

maintained the historical proportion between AWP and WAC when branded price increases were

announced.  This enabled the publishers (when receiving, for example, information only regarding WAC changes to a branded drug) to automatically calculate the corresponding AWP. As a result, the marketplace had predictability, and marketing pricing dynamics had adjusted according to that expected practice.

**R.     First Data Gains the Trust of the Pharmaceutical Industry**

97.     Prior to and throughout the Class Period, pharmaceutical End Payors operated on the belief that the AWPs were the result of honest reporting both by the pharmaceutical companies with respect to the publication of their WACs or submission of their suggested AWPs to publishers, and an empirical and professional analysis undertaken by First Data.

98.     The reliance upon the accuracy and legitimacy of First Data's data was not only known to First Data, but used as the foundation of its business model and its marketing and promotion plans.  For example, First Data stated:

> -- "For over two decades, healthcare professionals have come to depend on First DataBank's comprehensive knowledge bases to deliver the timely, accurate drug information they need to support their business and clinical decision-making."

> -- "Thus developers can respond quickly to their customers' demands for reliable, easy-to-access drug information, available on multiple platforms.

> -- "[First Data:] A partner you can trust."

> -- Trusted Drug Knowledge…Comprehensive drug knowledge bases that have been trusted for decades by healthcare professionals – in thousands of installations – to provide the timely, accurate information they need to support their clinical and business decision-making.

99.     First Data promoted its pricing information as "accurate," of "high-quality," and as "set[ting] the standard in the healthcare industry for comprehensive coverage of descriptive, pricing and clinical information on drugs."  It also recognizes that its pricing information is

"relied upon by professionals in th[e] industry," and that, "*[t]o be useful to its audience, First Data's data must be accurate and up-to-date.*"

100.    In pleadings filed in the *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), First Data has admitted that buyers and sellers in the pharmaceutical marketplace rely on its pricing data: "FDB knows the pharmaceutical industry well and is relied upon by professionals in that industry to report reliable information."

101.    Throughout the 1990s, First Data gained the trust and reliance of participants in the pharmaceutical marketplace – most notably pharmacies and the third-party payors that reimbursed them – upon First Data's electronic publication of AWP for each active NDC.

102.    Throughout all this time, First Data knew, of course, that the primary purposes of publication of the WAC and of the AWP, and of the associated WAC-to-AWP markup (embedded in the difference between the AWP and WAC data fields), was to serve as an electronic basis for the mass-reimbursement of retail pharmacies for thousands of daily transactions and billions of yearly transactions. After all, First Data acknowledged: "AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible." It is stated elsewhere: "AWP represents the average wholesale price; the average price a wholesaler would charge a customer for a particular product. The operative word is *average*. AWP was developed to provide a price at which all parties could agree upon for electronic processing to be possible."

**S.    First Data's Representations to Gain Marketplace Reliance on Its Pricing Data**

103.    First Data gained this reliance upon the empirical integrity of its electronic publication of AWP due to the representations it made to its customers and others in the pharmaceutical marketplace regarding how First Data populated the fields of information relating to WAC and AWP.

104.    Among other things, First Data held out that its electronic databases contained accurate field information for the AWP for each NDC.  Emphasizing that as to the AWP the "operative word is **average**" (First Data's emphasis), First Data indicated that its empirically derived information was obtained directly from its specific contacts "within each major drug manufacturer/labelers organization."  First Data represented that when it was apprised that the AWPs suggested by manufacturers were also those used by the wholesalers, First Data published as the AWP the exact AWP that had been suggested by the manufacturer.  On other occasions, First Data represented that its AWPs were based upon empirically determined markup factors obtained by First Data after it undertook a comprehensive and sound survey.  In these situations, while the manufacturer effectively established both price points (the WAC and the AWP, since the manufacturer established the WAC and knew of the existing mathematical markup factor resulting in the AWP), First Data held out that its markup factors have been corroborated through empirical research of wholesalers' actual markup of WAC to AWP.

105.    During these years, First Data occasionally published information regarding how it derived the markup factors for the WAC-to-AWP spread.  This information always emphasized the empirical nature of the data populating its electronic database.  Thus, First Data represented:

> -- That industry changes "have made the wholesale survey fundamental in maintaining current pricing data";
>
> -- That when a manufacturer had not provided a suggested wholesale price for a new product, "wholesaler surveys" were undertaken in order to derive an empirically based markup actually used by wholesalers;
>
> -- That wholesaler surveys were also undertaken in order "to confirm that the markup that First DataBank utilizes for AWP is representative of the wholesaler industry";

-- In the early 1990s, First DataBank represented that it "surveys a minimum of five drug wholesalers that represent over two-thirds of the total dollar volume of drug wholesalers," and that the "number of surveys performed is increasing";

-- Throughout the 1990s, and again in order to paint a picture that the markups are empirically derived, First DataBank represented that because "individual wholesalers may markup each manufacturer differently, a weighted average, not a consensus average, is calculated," and that then "the market share held by the wholesalers surveyed affects the markup proportionally," and that thereby "a higher degree of certainty is achieved."

-- While in most cases the "surveys" matched current data, where they did not, "it is the policy that First DataBank will change the markup on file to report marketplace reality."

106.    First DataBank's representations and marketing efforts regarding empirically driven markup factors obtained by "wholesaler surveys" continued throughout the 1990s. A late-1990, widely published editorial by First Data regarding AWP pricing stated:

Average Wholesale Price

I have many conversations regarding what is "AWP" and how does FDB determined [sic] it. There is much folklore and misunderstanding as to the determination of AWP and where we get the data. AWP is the average wholesale price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is average. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.

***In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files.*** We contact the wholesalers to determine what the markup should be for a new company or to confirm that the markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.

***The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume.*** The markup that First DataBank utilizes is representative of wholesalers on a national level.

Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup proportionally. Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesale price (SWP) in our determination.

Many are under the impression that the manufacturer sets the AWP. FDB considers the wholesale price suggested by the manufacturer a "Suggested Wholesale Price (SWP)" and has a different data element called "SWP" on the NDDF file for those customers who chose to use the SWP instead of AWP. Frequently, the SWP and AWP are the same; however, we are having more instances where they are differing. We will populate the SWP with the new markup, but will survey the national wholesalers to determine AWP. The AWP will be populated with the wholesaler survey price even if it disagrees with the SWP.

In most cases, the results from surveys match what First DataBank is using. In the instances that they do not, it is policy that First DataBank will change the markup to report marketplace reality. (Emphasis added.)

107. First Data's representations regarding the accuracy of its electronic publication of AWP were highly successful. By 1998 (and along with its acquisition of its only competitor, MediSpan), First Data was the sole provider of comprehensive, intragratable electronic data files providing AWP information throughout the retail pharmacy distribution chain, including most private third-party payors. Of course, when marketing its products, First Data made this known stating that it "provides you the same AWP prices used by Aetna, PAID PCS, MEDI, MET, most Blue Cross Blue Shield Plans, wholesalers and approximately 49 Medicaid programs."

**T.    In the Late 1990s, Retailers Looked to the WAC/AWP Spread to Increase Margin**

108. Also during the 1990s, national wholesalers and drug retailers continued to report significant declines in margin (despite the overall escalation in drug costs). In order to address escalating healthcare costs, including the significant rise in prescription drug expenditures, third-

party payors and managed care organizations had, to some extent, placed significant pressure on

national wholesalers and the retail distribution industry, causing widely reported reductions in

margin for wholesalers and retailers.

109.    With this increased pressure on margin, retail pharmacies began to look for ways

to stave off the reduction.  To insiders in the pharmaceutical industry, it has long been

recognized, as one manufacturer has stated, that "the AWP-WAC spread is the primary

determinant of the end retail pricing of prescription drugs.  As a result, changes in the spread will

have a direct impact on retailer profitability as well as drug expenses for not only consumers but

even more uniformly for health insurers and other third party payors."

110.    Another industry insider stated:

> Payors currently use AWP or average wholesale price as a basis
> for reimbursing retail pharmacy for providing RX's to patients
> with insurance and by retail pharmacy as a basis for pricing cash
> prescriptions.  Pharmacy reimbursement – a higher spread
> translates into higher reimbursement to retailers and mail order
> pharmacies.  The usual reimbursement formula for private third
> party Medicaid RX's in anchored off of AWP – so a higher
> markup will increase the reimbursement level at least in the short
> term.

111.    In 1998, McKesson tested the waters to see whether increased WAC-to-AWP

spread might help its relations with its retail customers.  In March 1998, McKesson announced

that it would begin utilization of First Data's AWP.  McKesson knew that which was quietly

known by a few of the national chain drug retailers and First Data itself – that many of the

AWPs, and the timing of the reported AWPs, provided by First Data's electronic files were

often, albeit marginally, higher than other publications.  While the stated purpose was to provide

customers "with consistency in AWP pricing", McKesson made clear to its retail pharmacy

customers "that in almost every case retail prices will go up helping increase gross profit."

McKesson even gave instructions to its retail customers as to how to electronically access the

- 35 -

changed "markup percentages" in order to access the increased gross profit that would be earned at the expense of plan sponsors and consumers by shifting to First Data publication of AWP.

112.    Following McKesson's switch to exclusive use to First Data data, a handful of the largest national chain drug retailers continued to push for increased AWP/WAC markups on drugs, including increased WAC-to-AWP markups for branded drugs that were not already at the 25% level.  In and around 1999, national chains and retailers requested increased AWP spread for branded products, and some of them engaged in practices in order to ensure that the increased markups would occur.  For example, some large retailers would refuse to stock drugs that had therapeutic equivalents products if the product only had a 20% markup, and more powerful retailers could lock out the products unless the AWP/WAC spread were adjusted upward.

**U.      By 2001, First Data WAC-to-AWP Markups Were Susceptible to Abuse**

113.    By late 2001, the First Data editorial process for imputing the WAC/AWP markup factor was susceptible of significant abuse.  Although First Data held out to the public that its determination of the WAC/AWP markup factor was empirically driven through multiple sources, in truth there was no empiricism and the WAC/AWP markups for numerous NDCs of retail branded drugs became susceptible to manipulation by First Data and those with whom it worked, most notably McKesson.

114.    The truth about First Data's determination of the WAC/AWP markup is that many of their historical claims were simply false.   For example:

> -- Although First Data claimed that because "individual
> wholesalers may markup each manufacturer differently, a weighted
> average, not a consensus average, is calculated", in fact First Data
> never undertook weighted averages of reported markups.  Thus,
> First Data's publications over a decade had falsely claimed
> mathematical precision on empirical data for the markups.
>
> -- Although First Data claimed that it undertook "surveys" , in fact
> no "surveys" in the reasonable sense of that word were undertaken.

- 36 -

First Data's questions were not set forth in a survey design, nor
were they even in writing.  Responses received were not
memorialized in writing.  No other paper trail was kept.

-- The purported "surveys" undertaken by First DataBank rarely
occurred.  When a inquiry was made, it was a monetary phone call
lasting only a few moments.

-- Although First Data claimed, during the 1990s was "increasing"
in fact the "surveys" were was decreasing given the ongoing
consolidation among national drug wholesalers.  Moreover, First
Data was not taking a calculated average of the markups reported,
it only used a "consensus" approach which did not require a
response from all the major national wholesalers.

-- During most times during the 1990s, even the wholesalers that
were "surveyed" apparently did not know that they were being
surveyed.  Since the wholesalers themselves purchased their
information about AWP from First Data itself, most found circular
at best the notion that First Data would "survey" them to find out
AWP information that the wholesalers themselves had already
purchased from First Data.

-- By around 2000, only a few national wholesalers existed and
were on the short list for First Data "surveys."  Most of these
wholesalers professed never to have participated in First Data
"surveys" at any time.   By the end of 2001, it appears that
virtually all communications by wholesalers back to First Data
regarding the WAC/AWP markup and/or AWP generally were
expressly prohibited by management with the singular exception of
McKesson.

115.    First Data continued to mislead its customers and the public about the nature of its

AWP and WAC-to-AWP markup data.  For example, in a 2002 letter to subscribers of its

publication Price Alert, First Data's Kay Morgan describes AWP as follows:

I have had many conversations regarding what "AWP" is and how
First Data determines it.  There is much folklore and
misunderstanding as to the determination of AWP and how we
obtain the data.

AWP is the average wholesale price.  That is, AWP is the average
of the prices charged by the national drug wholesalers for a given
product (NDC), often referred to by First Data as the "Blue Book

Price." The operative word is *average*. AWP was developed to provide a price, which all parties could agree upon.

In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what the price is. This is based on their AWP price files. We contact the wholesalers to determine what the markup should be for a new company. ***First, DataBank then confirms that the markup is accurate and current***. A survey may be performed on a single NDC number or on a manufacturer's entire product line. In either case, a survey will be performed with all national wholesalers to determine the appropriate AWP.

***With increased numbers of surveys done, the determination represents over two-thirds of the volume of the wholesalers, and is also representative of wholesalers on a national level***. Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup factor proportionally. Therefore, wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesaler price (SWP) in our determination. [Emphasis added.]

116.    This 2002 publication, mimicking the similar 1991 First Data publication of eleven years earlier, continued most of the falsehoods about First Data. In its 2002 website, again First Data claims that its published AWPs result from ***surveys*** of national wholesalers and that the number of surveys is "increasing."

**V.    Implementation of the Five Percent Spread Scheme**

117.    On the eve of the McKesson and First Data Scheme, McKesson observed that: "[E]verything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's." This would soon change.

118.    The genesis of the conspiracy to raise the WAC-to-AWP markup was FDB's desire to raise the markup or the AWP to "support our customers." MCKAWP 0068514. By "support" McKesson meant an increase in the margin earned by its retail clients. Thus, in September 2001, McKesson's James Robert in an internal e-mail now marked "Highly

- 38 -

Confidential" by McKesson, reported that McKesson chose to increase "the markup on the Park-Davis line (Lipitor) last January, when Pfizer took over.  This was our attempt to raise AWPs to support our customers."

119.    Shortly after his September 2001 e-mail, Roberts approached FDB to discuss FDB's willingness to "normalize the brand product AWPs."  MCKAWP 0068599 (marked "Highly Confidential").  "Normalization" eventually become one of the buzzwords used by McKesson and FDB to describe their manipulation of the WAC-AWP spreads on hundreds of brand name drugs.

120.    McKesson, knew that as one of the largest national wholesalers it had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)" and, if it were to succeed, that "most [of its] customers would love it."[3]  McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs because First Data's "wholesaler surveys" were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail.  Initially McKesson merely changed its suggested sell price "in the hopes that one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items."[4]  But when the competition did not respond as expected or First Data failed to survey the change as quickly as hoped, McKesson decided to take direct action.

121.    McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of only two electronic sources for price information, and although it was "not widely known," First Data had "a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [i.e.

---

[3] MCKAWP 0068514.

[4] MCKAWP 0068514.

- 39 -

through 2005 or 2006].  This means that essentially the Medispan data is the First DataBank data."

    122.    In August 2001, despite McKesson's knowledge that AWPs were supposed to be the result of publisher's surveys of actual wholesale prices, McKesson and FDB "mutually agreed" to move the AWP or WAC-to-AWP spread on all Searle products from 20% to 25%. Thereafter, McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs of all of the major manufacturers.

    123.    That defendants' collusion began as early as August 2001 is documented by an internal memorandum drafted by Bob James, McKesson's Director of Brand Pharmaceutical Production Management, stating:

> After a discussion with FDB last August [2001], we mutually agreed to standardize Searle (16⅔% spread) product line because it had been acquired earlier by Pharmacia (20% spread). There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products.  In December [2001], after several discussions with FDB about our [normalization] strategy we began to move many of the manufacturers with mixed spreads (16⅔ and 20% products in the same line) to a consistent 25% markup.  These were companies like GlaxoSmithKline,[5] AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during January and February when price increases occurred.  Many of the AWP's have been increased by FDB.  Because a large number of price increases occurred, some AWP's were affected twice, once when the price increase[] took effect and then a second time when FDB raised the AWP after the survey process. . . . .  Not all products in these companies have had AWP increases at this point

---

    [5] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup.  (FDB-AWP 053695).

in time.  However, as price increases occur FDB will re-survey those products and make their determination.[6]

124.    Beginning sometime in late 2001 or early 2002, First Data, by agreement with McKesson, limited its' purported "surveys" to McKesson and did not "survey" other wholesalers.  First Data agreed to utilize for markup purposes data received from McKesson.  At the same time and as part of a common plan, McKesson implemented a 5%[7] increase in the WAC-to-AWP markup for hundreds of brand-name drugs that it distributed.  This increase was from 20% above WAC to 25% above WAC for the affected drugs.  As part of the agreement and following their agreed course of conduct and common plan, First Data then published the new figures for hundreds of brand-name drugs without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a "weighted average."  First Data knew that this increase across the board from 20% to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing "reliable" and "accurate" information as it had promised.  McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace.  Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients.

125.    By November 2001, FDB's Kay Morgan, and McKesson's James Robert, were exchanging e-mails confirming the results of their collaboration:  "Hello Kay....  Just went through the Merck items and updated a couple of our items to 25% markup.  However, found some items that you might want to review.  They include Noroxin's Prinvil and Prinzides.  The

---

[6] MCKAWP 69608-09.

[7] Sometimes the increase was more than 5%, as the intent was to raise all markups to 25%. So if a drug was at 18%, it was moved up to 25%.

- 41 -

latter two should probably be consistent with the new AZ 1.5 markups."  MCKAWP 0068621.

(Marked "Highly Confidential")

126.    McKesson's own internal documents describe the profitability of increasing

spreads for its key customers.  Thus, McKesson noted the following:

> Here are a few examples of increased profits that our customers
> should be realizing now and into the future.  The following results
> are based on a reimbursement formula of AWP minus 15% plus a
> $2.00 fee.

|  | Old 16 2/3% spread | New 20% spread |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant.

127.    In December 2001, FDB and McKesson engaged in "discussions" that resulted in

an increase in the markups of companies "like GlaxoSmithKline, AstraZeneca, Aventis, Berlex,

Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novartis, Roche, Schering and several

others."  MCKAWP 0069608.

128.    McKesson's collaboration with First Data was highly effective.  In March 2002

Bob James reports:

> My guess is that things should look very good in the next couple of
> months.  I am working with FDB to point out problem suppliers as
> Erlinda's group [Business Information Services] provides me with
> weekly information comparing our List price with the FDB AWP.
> . . . .  [The] results should have a very positive impact on our
> customers['] profitability.[8]

---

[8] MCKAWP 0042663.

In April he reports that First Data gave up all pretense of conducting a survey for new products: "All new brand vendors will be set up as 1.25 markup factor vendors, both at McK and FDB."[9]

129.    An increase in the WAC-to-AWP spread directly results in higher prices to plaintiffs and members of the Class.  For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72. The following chart reflects, for a single drug manufactured by certain companies, the AWP spread increase and related AWP increase:

| Defendant | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

130.    Another way to understand the widespread nature of the change in the WAC-to-AWP markup as a result of the McKesson-First Data agreement, is to examine the change in the WAC-to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical manufacturers over time:  The increases, all occurring in hundreds of drugs, among multiple manufacturers, at the same time, could not have happened by chance or independent conduct, but instead are the result of a common plan:

---

[9] MCKAWP 0069616.

**Number of NDCs Experiencing an WAC/AWP Spread Change from 20% to 25%**









001821-13 136802 V1





001821-13 136802 V1



131.    Examining the Scheme on an annual basis also illustrates the timing and extent of

the Scheme's implementation:



132.    The dramatic across the board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data.  As noted, McKesson reported the across the WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

133.    First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies – by increasing their profits.  In February 2002 Bob James sent Kay Morgan a document he drafted entitled, "AWP Discussion," which explained that 20% markups "had a negative impact on McKesson's customers' profitability" and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor."[10]  Later, on May 1, 2002, he writes to her about the "normalizing process," the term McKesson coined to refer to its efforts to impose a uniform 25% markup on all brand prescription drugs.[11]  In an e-mail sent to Alicia Nielson, Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002 Bob James enclosed a prior internal communication in which he explained that McKesson had "been normalizing all Brand Rx mark ups at 25% for the suggested sell price."[12]  First Data enthusiastically embraced the "normalization" program, as reported in the following Aventis e-mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration & Development at Aventis:

> First Data Bank has advised me after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to WAC spread [sic, markup].  As a result, First Data Bank has determined to employ a higher 25% AWP to WAC [markup] for all Aventis products.  This will be implements as we

[10] MCKAWP 0069613.

[11] MCKAWP 0069642.

[12] MCKAWP 0069775.

> have price increases.  Immediately *the entire Allegra line will be moved to a 25% [markup] from its current 20%.*  This will be effective immediately.  The most noticeable impact will be that it will be more profitable to the retail pharmacist to dispense Allegra.

134.    Eventually First Data ceased consulting with any other wholesalers and relied entirely on the information that McKesson provided it to determine AWPs.  McKesson was aware that First Data routinely disregarded manufacturer's suggested sell prices – Kay Morgan frequently shared such snubs with her friend Bob James:

> Let's start a list of the hated manufacturers, we will update it weekly or monthly.  Today, Organon is the top of my list.  The person in charge of EDI is trying to tell me to put O in the first position.  McKesson and we have it wrong.  Wound up telling her that the world does not turn around Organon and sending a note to my contact telling him the product was coming off.[13]

* * * * *

> [in response to an e-mail from Gilead Sciences announcing that it would not longer report AWPs for its products and requesting that any publication of an AWP calculated by First Data be accompanied with the statement that the price was not authorized by Gilead, Kay Morgan writes:]  Wonderful.  If we don't report an AWP, the NDC will not be listed.  It is the rules of the database. . . .

> [to Bob James]  FYI –Just thought you should be aware.  They appear to be playing hardball and I just don't play.[14]

135.    Before 2000 McKesson estimated that only 20% of the prescription drug manufacturers were 25% mark-up companies.[15]  By early 2002, however, McKesson estimated that through defendants' efforts 90% of the industry had turned to the 25% markup.[16]  By late

---

[13] MCKAWP 0069586.

[14] MCKAWP 0001183.

[15] MCKAWP 0069502.

[16] MCKAWP 0069609.

2002, McKesson estimated that the number had increased to 95%.[17]  In 2004, McKesson

estimated that 99% of the prescription drugs were set at a 25% markup.[18]  McKesson

acknowledged that without its efforts, "the AWP's most likely would not change"[19] and that the

industry shift "probably speaks to First Data Bank's willingness to work with us to normalize the

brand product AWPs."[20]

136.    Each defendant had a reason to implement this Scheme.  For sales to non-cash

paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit

providers based on AWP.  Consequently, pharmacies make a profit on the spread between AWP

and the actual acquisition cost for the drug.  Under this system, a higher WAC/AWP spread

results in increased profits to pharmacies.  Thus, McKesson and First Data by operation of the

Scheme benefits retail pharmacies.  "PBMs" (Pharmacy Benefit Manufacturers) also make

money off the spread between AWP and WAC.  The Scheme also benefited PBMs.

137.    Indeed, for several years many of the major retail pharmacies had jointly

approached various pharmaceutical manufacturers and urged that they raise the WAC/AWP

spread by 5%.  The manufacturers did not do so.  On information and belief, these same retailers

then urged McKesson to do so and McKesson had a strong financial incentive to cooperate with

retail pharmacy clients and this incentive was one of the motivating factors for McKesson in

terms of implementing the Scheme:

(a)    In recent years, the wholesale drug industry (including McKesson) and

retail pharmacies have been economically threatened by the managed care industry.  McKesson,

---

[17] MCKAWP 0069502.

[18] MCKAWP 0069766.

[19] MCKAWP 0069732.

[20] MCKAWP 0068599.

as have other wholesalers, has seen their relationships with retail pharmacies as a key to their

future.  In this regard, over the past five years, the wholesale drug industry and McKesson have

sought to compete by downplaying the traditional product distribution functions and by

developing new programs to strengthen their retail pharmacy customer base.  These include

dozens of specialized services ranging from departmental "planogramming" to special contract

administration programs for buying groups.  The provision of these value-added services is a key

element in the campaign by drug wholesalers like McKesson to build the kind of customer

loyalty in retailers that will help them to shore up their own sagging profit margins.  McKesson

offers dozens of value added programs to retail pharmacies, including technology and care

management solutions that it offers to "25,000 retail and 5,000 health systems pharmacies

nationwide."[21]  McKesson's customers for these programs include "large national chains and

community drugstores, as well as hospital pharmacies, outpatient clinics, and other institutional

providers."[22]  If McKesson could cause First Data to report a higher AWP, McKesson could use

this to curry favor with retailers who use McKesson as their wholesaler or other services and to

further establish or maintain business ties between retailers and McKesson.  As noted in

McKesson's 2004 Annual Report, in recent years a significant portion of its revenue growth

came from large customers, including such large retail pharmacy chains like Rite-Aid.  Rite-Aid

represented 8% of McKesson's 2003 revenues.  In 2003, Rite-Aid named McKesson its

wholesaler of the year.  In a 2003 article in Chain Drug Review, McKesson executive Pat Blake

described McKesson and retailers as "we're really positioned to be a business partner" due to the

company's automation and information technology offered to retailers as well as its Access

Health Programs linking retailers with third-party payors.  Indeed, Rite-Aid was one of the

---

[21] McKesson website:  http://www.pharmaceutical.mckesson.com/wt/home.php.

[22] *Id.*

companies that had asked, without success, certain of the defendant manufacturers to increase

the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers

apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for

drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the

results of the Scheme), McKesson offered large retail pharmacy chains a chance to make a profit

off the increased spread.

(b)    On occasions McKesson implemented the Scheme at the direction or

request of its retail customers and was proud of it. For example, in September 2002, Bartell's

complained that an "entire line is low ... even the generic side.... Kill them." McKesson

responded by stating that as a follow up Celexa and Lexapro will have an AWP markup of 25%

or a spread of 20% as FDB information is updated. Look for change to happen next week."

MCKAWP 0069817. McKesson closed by telling Bartells "keep smiling [sic] ... and who said

we never listen to our customers and old friends." Thus, the 5% Spread Scheme was a benefit

direct to McKesson's largest clients, many of whom, like Bartell, had previously approached the

drug manufacturers seeking imposition of the 5% increase.

(c)    Internally McKesson calculated how it could pitch the Scheme's benefits,

new AWPs and larger spreads, to obtain large retail accounts. So, for example, the following

was the pitch to one account:

> WAC x old markup of 1.20 ($16^{2/3}$ spread) 19,582,854 (old AWP)
> ... = $326,381 Profit
>
> WAC x new markup of 1.25 (20% spread) = 20,398,806 (new
> AWP) ... = $1,019,940 or **3 times the profit as before** (bold in
> original). MCKAWP 0068312.

This benefit was the result of the "FDB process," *i.e.* the Scheme at work.

(d)       McKesson's "Blue-Chip" customer based includes retail national chains such as Rite-Aid, Eckerd, Brooks, Albertson's, Safeway and Giant Eagle.  Other "Blue-Chip" clients included "retail small chains," such as Bartells, Bi-Mart, A&P, and Haggen.  All of these blue-chip accounts benefited from the spread and McKesson touted its role in increasing the spreads.

(e)       The Scheme also directly benefited McKesson's own pharmacy business. McKesson has an operation called McKesson Valu-Rite, which consists of a nationwide network of independent pharmacies that are connected to McKesson.  McKesson manages 275 pharmacies in 35 states and employs 900 pharmacists.  Again, an increase in the spread was a direct benefit to these pharmacies by increasing profits off the spread.  This in turn also increased McKesson's profits from its Valu-Rite program.

(f)       Further, by simply raising the spread on hundreds of drugs, McKesson saved money from reductions in administrative expenses in reporting AWPs to First Data.  It was far easier to simply flip a switch converting hundreds of drugs from 20% to 25% over WAC than to deal with the drugs one at a time.  Thus McKesson had its own interests that were served by the 5% Scheme.

138.    First Data also saw advantages to participating in the 5% Scheme:

(a)       By virtue of reporting a higher AWP, First Data incentivized other powerful forces in the distribution chain to use First Data's AWP as the pricing standard and thereby created greater demand for First Data's reporting services.  For example, PBMs in their contracts with end payors often designate which publisher's AWP will be used to set the AWP. PBMs frequently take a percentage of the spread between AWP and acquisition cost so the larger the spread the more profit they make.  As of 2002, many if not most of the major PBMs specified

- 53 -

the use of First Data.  In addition, by virtue of its partnership with McKesson, McKesson

designated First Data's AWP to be the pricing standard for the Together Rx program, a

prescription drug savings program for Medicare enrollees, thereby again increasing the use of

First Data's services.  Thus First Data, like McKesson, had its own interests that were served by

the 5% Scheme.

        (b)      Second, at some point in 2002-2003, certain manufacturers and

wholesalers who were angry at the bump in the WAC–to–AWP spread, refused to provide First

Data with pricing information.  If First Data publicly revealed that certain manufacturers and

wholesalers were disavowing the current WAC-to-AWP spread, the use of the AWP system

could be threatened which in turn would threaten, if not eliminate the use of First Data's

published prices.  By participating in the Scheme and continuing the illusion of surveys, First

Data maintained the demand for its services.

        139.     McKesson and First Data also agreed to hide the Scheme by implementing the

WAC-to-AWP increases only when the manufacturer increased WAC.  McKesson and First Data

were fearful to implement the Scheme without such an increase because such action "would

trigger a lot of questions on why there was a change to the item when the MFG (manufacturer)

hasn't sent any price changes."  To avoid having end payors ask questions, McKesson and First

Data camouflaged the Scheme by imposing the 5% increase when other price changes were

reported, thus in effect compounding price increases.  This part of the Scheme is depicted by the

following chart showing a dramatic increase in the number of 25% spreads associated with price

changes in 2002 and 2003:



First Data Bank Number of Reported Price Changes at
25% and 20% AWP/WAC Spread Levels, 1989 - 2004

DRAFT 5-19-05                    Privileged and Confidential                    Page 2 of 5

140. After the scheme was implemented (and despite the flack from some drug manufacturers), First Data and McKesson continued their collaboration to ensure that First Data's WAC/AWP markups mimicked those of McKesson, and vise-versa.

141. These post-2001 communications were in no sense a "survey" being conducted by First Data. Indeed, the communications were bilateral, with First Data equally enforcing the new WAC/AWP markup protocol. And even when disparities were shown in the databases, First Data would counsel against making changes because "it would trigger a lot of questions on why there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changes."

142. At times, when McKesson was "catching some flack from our large retail friends," McKesson would ensure that both it's and First Data's databases contained the higher

- 55 -

WAC/AWP markup.  At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed."

143.     McKesson sought to hide the Scheme.  When Brian Ferreira of VPS Retail wrote to Bob James, asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing, writing only:  "Brian, this is an interesting request. . . .  Please give me a call when it is convenient."[23]  McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

> Confidentially.  Not to pass on.  We have [only] about 470 brand Rx items
>
> * * * * *
>
> [John Bonner, Director, McKesson's Branded Rx Product Management and Investment] Bob James is working with FDB to make this happen over time and I'm not sure it is something we want discussed.  Please contact him before discussing outside the company.[24]
>
> * * * * *
>
> [Bob James] For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential.[25]
>
> * * * * *
>
> [Bob James to McKesson field associate] I would be careful about 'being ahead of the curve with Lilly.  You be the judge on how your customer will interpret.[26]
>
> * * * * *

---

[23] MCKAWP 0069714.

[24] MCKAWP 0066465.

[25] MCKAWP 0069591.

[26] MCKAWP 0069594.

- 56 -

[McKesson field associate writing to John Bonner] My accounts are having issues with us 'Normalizing brand pricing at 25%' . . . . You also mentioned that we should not discuss [this] outside of McKesson, how would you suggest we answer our customers['] questions?[27]

\* \* \* \* \*

[McKesson field associate] Obviously this is not out to the field.[28]

\* \* \* \* \*

[Bob James] Sorry for the extra confusion and questions that have come up from our customers. The (unintended consequences) results [of the normalization process] should have a very positive impact on our customers['] profitability.[29]

\* \* \* \* \*

144.    First Data also knew the importance of keeping the Scheme a secret. In response to an e-mail inquiry whether electronic drug pricing publishers were increasing the AWP/WAC spread, Kay Morgan denies any involvement, adding, "I am most curious as to the source of this rumor. First Data has always used a wholesaler survey to determine AWP."[30]  She forwarded on the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer," to which he responds: "I love it!  You are the best."[31]

145.    When in 2003 one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products", First Data reported to McKesson that this manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data indicated that it would, then, "just assume the markup is 1.25."  In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product

---

[27] MCKAWP 0066464.

[28] MCKAWP 0069732.

[29] MCKAWP 0042663.

[30] MCKAWP 0069588.

[31] *Id.*

- 57 -

was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below."

146. Many insiders in the pharmaceutical industry recognized that the extraordinary, across-the-board increase in the number of drugs that were increased in the WAC/AWP spread from 20 to 25% was a "change… being driven at wholesaler lever" in order to accommodate the large drug retail chains.

147. First Data's participation in the Scheme is also evidenced, in part, by its conduct with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis filed declarations stating that Novartis regularly communicated its AWP to the Publishers, including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in its declaration that since January 18, 2002, First Data has consistently published an AWP that was 5% higher than the AWP reported by Novartis, or 25% over WAC. However, the Novartis declaration did not describe anything Novartis had done to remedy First Data's fraudulent reporting of Novartis' AWP.

**W.    Some Branded Manufacturers' Response to the McKesson/First Data Scheme**

148. Some branded manufacturers noticed implementation of the Scheme and immediately appreciated its purpose – to provide additional profit to the wholesalers and retailers in the pharmacy class of trade. One branded company commented that "First Data, at the direction of the wholesale industry, has begun to change all branded pharmaceutical products to a 25 % markup… and that "the spread will be changed as product price changed…." The same company observed that the "largest negative factory is publicity" since the increase in AWP

would increase end payors prices (even though it may not increase that revenues to manufacturers).

149.    A different branded manufacturer also observed that the changed WAC/AWP markup for many branded drugs was "being driven at wholesaler level" and that they are "reporting 1.25 when companies take a price increase…."

150.    Because branded and generic manufacturers have historically established AWPs for their NDCs either directly (by suggesting and AWP that was incorporated by First Data and wholesalers) or indirectly (by setting a WAC and setting or knowing of the markup factor to be applied to that WAC), manufacturers whose NDCs had been affected by the McKesson/First Data Scheme, asked First Data for answers as to why the markups had changed for selected branded products in 2002. In response, First Data generally pushed them off, giving different answers to different manufacturers. To make matters worse, First Data had counsel for its parent, the Hearst Corporation, write letters to various branded manufacturers' representatives. In these letters, Hearst's lawyers made claims which were false.

151.    Ultimately, brand-name manufacturers did nothing in response to the Scheme. First Data and McKesson kept their scheme secret, and almost universally branded manufacturers acquiesced to the results of McKesson/First Data Scheme. Moreover, branded manufacturers took no action to disclose the existence of the inflated AWPs which had been effectuated by the Scheme to change the WAC/AWP markup. As a result, while First Data and McKesson as insiders to the Scheme were well aware of the changed markup factor (and corresponding increase in reimbursement payments being made throughout the country), and while some branded manufacturers were similarly aware that many of their branded products had experienced the WAC/AWP markup change without their explicit request, none of them

- 59 -

disclosed this to the marketplace at large.  Indeed, some manufacturers republished or utilized

the new First Data AWPs in communications to customers or other publishers.  In a market

where billions of prescriptions are filled each year, where over 65,000 NDCs are actively in the

marketplace, and where the WAC/AWP Scheme was sequentially implemented during the

course of 2002 and later as price increases imposed by the manufacturers were effectuated, the

Scheme went unnoticed to the marketplace at large.  Indeed, even when players in the

pharmaceutical marketplace noticed the increases in the WAC/AWP spread, they assumed by

virtue of the manufacturers' silence that those increases were the result of the actions of those

manufacturers.

**X.      First Data's 2005 Capitulation**

152.    Then, in a March 15, 2005 letter, First Data announced that the unreliable surveys

would be discontinued.  Reviewing its past practices with respect to establishing AWP, First

Data restated that it had conducted surveys to establish AWPs:

> March 15, 2005
>
> **Re:  First DataBank's Blue Book AWP Data**
>
> Dear Customer:
>
> It is our pleasure to serve you as a customer of First DataBank.
> We are writing to make you aware of upcoming changes to First
> DataBank's National Drug Data File Plus™ database, or NDDF
> Plus™, that may impact your use of our products.
>
> In order to publish various drug pricing data fields available
> through its NDDF Plus database and related products, ***First
> DataBank has historically relied on drug manufacturers and
> wholesalers to report or otherwise make available information
> concerning their list price for drugs.***  Unfortunately, First
> DataBank is no longer able to obtain information relating to list
> prices directly from wholesalers in a manner that is consistent with
> First DataBank's editorial standards and policies.  In fact, it is our
> understanding that some wholesalers often do not use catalog or
> list prices as a basis for determining actual transaction prices.  As a

- 60 -

result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. *First DataBank periodically surveyed full-line national wholesalers to determine the average markup applied to a manufacturer's line of products. The average markup of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)* or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value. [Emphasis added.]

### CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME

153.    Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and the Classes comprised of:

**Consumer purchasers**:

All individual persons who paid, or incurred a debt enforceable at the time of judgment in this case to pay, a percentage co-payment for the Subject Drugs during the Class Period pursuant to a plan, which in turn reimbursed the cost of brand-name pharmaceutical drugs based on AWP. The Subject Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[32]

**Third-party Payors:**

All third party payors whose pharmaceutical payments for the Subject Drugs were based on AWP during the Class Period. The

---

[32] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery.

Subject Drugs are all drugs identified in Exhibit A and consist of
brand-name drugs only.[33]

Excluded from the above-listed Classes are:  (a) each defendant and any entity in which any

defendant has a controlling interest, and their legal representatives, officers, directors, assignees

and successors; (b) any co-conspirators; and (c) any governmental entities who purchased such

drugs during the Class Period.

154.    The Class Period is August 1, 2001 to March 15, 2005, when First Data disclosed

that it had stopped surveying wholesalers.[34]

155.    The exact identity of the drugs covered by this lawsuit is capable of being

discovered from the records of First Data and the PBMs identified above.  Based on an

investigation of First Data's databases, the list of such drugs is attached as Exhibit A.[35]

156.    The Consumer Class consists of hundreds of thousands of consumers throughout

the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1).  The

disposition of the claims of the Class Members in a single class action will provide substantial

benefits to all parties and to the Court.

157.    The Third-party payor Class consists of in excess of ten thousand third-party

payors throughout the United States, making individual joinder impractical, in satisfaction of

Rule 23(a)(1).  The disposition of the claims of the Class Members in a single class action will

provide substantial benefits to all parties and to the Court.

158.    The claims of the representative plaintiffs are typical of the claims of the Class, as

required by Rule 23(a)(3), in that the representative plaintiffs include persons and entities who,

---

[33] Plaintiffs reserve the right to modify the Class Definition based on class related discovery
and/or merits discovery.

[34] The exact dates for the Class Period may be refined based upon discovery.

[35] This list may change upon production of information by First Data.

- 62 -

like all Class Members, purchased drugs whose prices were inflated by the 5% price increase.

Such representative plaintiffs, like all Class Members, have been damaged by defendants'

misconduct because, among other things, they paid prices for these drugs that were higher than

they would have been but for defendants' improper actions.

159.    The Class representatives for the Class are all of the plaintiffs.

160.    The factual and legal bases of each defendant's misconduct are common to the

Class Members and represent a common thread of fraud and other misconduct resulting in injury

to plaintiffs and members of the Class.

161.    There are many questions of law and fact common to plaintiffs and the Class, and

those questions predominate over any questions that may affect individual Class Members,

within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(2) and (3).  Common questions of

law and fact include, but are not limited to, the following:

a.    Whether AWPs published by First Data are used as a contractual

benchmark for payments by third-party payors for drugs;

b.    Whether defendants engaged in a course of conduct that improperly

inflated the WAC-to-AWP markup and the ultimate AWPs used by plaintiffs and Class Members

as the basis for reimbursement;

c.    Whether defendants agreed to artificially inflate the published AWPs for

the drugs that are the subject of this complaint;

d.    Whether defendants engaged in a pattern and practice that caused

plaintiffs and Class Members to make inflated payments for the AWPs;

e.    Whether defendants engaged in a pattern of deceptive and/or fraudulent

activity intended to defraud plaintiffs and the Class Members;

- 63 -

f.     Whether defendants formed enterprises for the purpose of carrying out the 5% Scheme;

g.     Whether defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h.     Whether defendants' conduct violated RICO and various California statutes and common law;

i.     Whether defendants are liable to plaintiffs and the Class Members for damages for conduct actionable under the various state consumer protection statutes.

162.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4).  Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither plaintiffs nor their counsel have any interest adverse to those of the Class.

163.    Plaintiffs and members of the Class have all suffered, and will continue to suffer, harm and damages as a result of defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the Courts and the litigants, and promotes consistency and efficiency of adjudication.  Additionally, defendants have acted and failed to act on grounds generally applicable to plaintiffs and the Class and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby

making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(1) and (b)(2).

164.     The (b)2 relief, sought by the Class, would include:

(a)     The submission to Class counsel of a complete electronic copy of the National Drug Database File (the so-called "NDDF"), along with an electronic report showing (i) all markup factor changes for the preceding one-half (1/2) year, and (ii) all changes in a difference greater than 0.5 basis points of the difference between any reported wholesale net price in the NDDF (the so-called field named "WHN," more customarily referred to as the WAC or wholesale acquisition cost) and the stated Blue Book Average Wholesale Price (or so-called "BBAWP");

(b)     Submission to Class counsel full and complete report of any and all editorial changes for the NDDF that effect, directly and/or indirectly, the publication material in any of the price fields of the NDDF;

(c)     A rollback in the NDDF of the markup factor for all drug code formulations ("NDCs") set forth in Exhibit A from the current markup basis (typically 1.25) back to a markup factor of 1.20, and thereby make corresponding adjustments to the BBAWP field;

(d)     A cease and desist of all conduct that causes a non-economically justified increase in the spread, e.g., a markup done for the sole purpose of providing profits to McKesson's retail clients.

## COUNT I

### Violations of 18 U.S.C. § 1962(C)

165.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

166.    This Count, which alleges violations of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), is asserted against the defendants on behalf of the Class.

167.    Plaintiffs, the members of Class, and the defendants are each "persons," as that term is defined in 18 U.S.C. § 1961(3).

168.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the defendants conducted the affairs of certain association-in-fact enterprises identified herein, the affairs of which affected interstate commerce through a pattern of racketeering activity.

### The McKesson-First Data Enterprise

169.    For purposes of this claim, certain RICO "enterprises" are associations-in-fact consisting of (a) First Data and (b) McKesson, including its directors, employees and agents. These associations-in-fact are sometimes collectively referred to herein as the "McKesson – First Data Enterprise."  The Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common or shared purposes of (a) publishing or otherwise disseminating pharmaceutical price information, which all too often includes disseminating false and misleading AWPs; (b) implementing the 5% Spread Scheme; (c) deriving increased profits from the activities of the Enterprise; and (d) perpetuating use of AWPs as a benchmark for reimbursement in the pharmaceutical industry. First Data and McKesson each has a common purpose of perpetuating the use of AWPs as a

Case 1:05-cv-11148-PBS    Document 146-2    Filed 10/31/2006    Page 71 of 113

benchmark for reimbursement in the pharmaceutical industry and a common purpose in inflating the AWPs by 5%.

170.    The Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between McKesson and First Data.  There is a common communication network by which McKesson and First Data shared and continue to share information on a regular basis.  Typically this communication occurred and continues to occur, by use of the wires and mails in which McKesson and First Data will discuss and agree on an AWP.  McKesson and First Data functioned as a continuing unit for the purposes of implementing the 5% Scheme, and when issues arose during the Scheme each agreed to take actions to hide the Scheme and to continue its existence.

171.    At all relevant times, First Data was aware of McKesson's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  First Data was aware that the published AWPs were inflated by the 5% Scheme.  This awareness comes from the following sources:  First, at some point prior to 1992, First Data in some instances obtained markups from wholesalers, which made First Data aware that the reported AWPs were not accurate even absent the 5% Scheme.  Second, as various congressional bodies and government agencies reported on AWP inflation, First Data did not change or challenge manufacturers regarding the self-reported WAC and AWPs, or the markups that First Data used.  Third, First Data stopped even the limited surveys other wholesalers and simply accepted the 5% Scheme, when it knew there was no basis for this bump and actually received letters from certain manufacturers stating that the 5% increase in AWP was not justified.  McKesson and First Data initiated the 5% Scheme in 2001-2002 and continued the Scheme in force in 2003-2004 where

001821-13  136802 V1

additional 5% increases were instituted.  Fourth, McKesson and First Data regularly discussed the Scheme in wires, e-mails and in telephone conversations.

172.    The Scheme went to the point where FDB would suggest to McKesson that it raise its WAC so that a given drug could go to a 25% markup.  Thus, both McKesson and FDB conspiring to effectuate the actual WAC in order to implement the Scheme. MCKAWP 0069553.

173.    The Scheme evolved to such an extent that McKesson would send to FDB, via e-mails, a "screen print" that would indicate the "WAC, markup and suggested sell price," always showing a 25% markup.

174.    The impacts of the Scheme are still in place, *i.e.*, the increased spreads are still being maintained.  As described earlier, for sales to non-cash paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit providers based on AWP.  Consequently, pharmacies make a profit on their spread between AWP and the actual acquisition cost for the drug.  Under this system, a higher WAC-to-AWP spread results in increased profits to pharmacies.  Thus, McKesson and First Data could help deliver greater profits to pharmacies by conspiring to increase AWPs.

175.    This was acknowledged in McKesson's internal mails, where McKesson's executives discussed the positive impact of "normalizing" on McKesson's customers:

> Here is an idea.  Two years later, ***and having had some recent success in raising AWP's***, I think this could be presented to him positively in this way.
>
> Omnicare is looking for ......say $500,000 in benefit from year end deals, even though this was not part of their contract.  We need to ask them to roll up ***or recalculate their reimbursements for last year based on the new AWP's with a 20% spread***.  And......this is not just a one time benefit.  ***They will receive this now and each year going forward until they renegotiate contracts with third parties (and hopefully do not give up this gift).***

- 68 -

*Our successes recently and during this past year includes raising AWP spreads to 20% (markup of 25%) include Parke Davis (division of Pfizer). Searle (division of Pharmacia). GlaxoSmithKline (Glaxo was at 16 2/3%). AstraZeneca, TAP, Berlex,* JOM including Alza and Centocor, parts of Merck and BMS where things were mixed between 16 2/3% and 20%, and more to come. *Some of our friends in retail that I have spoken with are pretty overwhelmed that we would be "driving" this process on their behalf.* Of course, we are not solely responsible for this "normalizing" of AWP's but we have done our part as I have discusses with your previously. I have had conversations with Albertsons and Safeway and a few others.

Remember, "McKesson is doing this to improve our efficiencies in our BIS group." With mixed AWP spreads, our BIS group is required to make manual overrides (for every pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price. It could be stated as a benefit of the Sixth Sigma method of identifying defects. An "unintended consequence" is that the profitability of our customers will be impacted in a appositive way. *They will basically get 3 1/3% more profit on Rx's filled with this new AWP spread. (Just imagine what this would mean on drugs like Lipitor or Prilosec*....

This strategy might be of interest to Jack Fragie, Larry Greco, and others in discussions with our large national accounts, prospective new customers, and buying groups like Servall and IPC (that are continually asking for lower costs, more added value, and discounts beyond their contract language......like Owens programs). *We have an opportunity to "market" our efforts now.* If we do not do this, its possible that some of these accounts will believe that this stuff just happens and the efforts will go unrecognized. In my discussions, one of the comments that was made was "this would certainly be a good reason to renew our agreement with McKesson when its time." Talk about being good partners, wow! This is worth further discussion as we go forward. Maybe, a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit. (Emphasis added.)

176.    Nonetheless McKesson also realized that it could "'market' [its] efforts" by

informing its customers that it was "doing everything possible to 'raise' AWP's when

- 69 -

appropriate."[36]  McKesson appreciated that if it failed to inform its customers that it was behind

all these changes "it's possible that some of these accounts will believe that this stuff just

happens and our efforts will go unrecognized."[37]  As one McKesson executive put it: "This

sounds like something we should at least [be] quietly communicating to our customers in order

to get some mileage from it[.]"[38]  And so it began:

> [To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have
> an AWP markup of 25% or a spread of 20% as soon as FDB
> information is updated.  Look for the change to happen next week.
> Keep smilin[g] . . . and who said we never listen to our customers
> (and old friends)."[39]

> \* \* \* \* \*

> [To Dan Connolly]: Just wanted you to know that Clarinex AWP
> spreads went to 20% this week.  A few weeks ago Celxa went to
> 20% as well.   Fat cat status is just around the corner.")[40]

> \* \* \* \* \*

> [To David Vucurevich of Rite Aid]: P.S. latest AWP changes . . .
> Celexa and Clarinex, working on Lilly and Novo.[41]

177.    A field agent reports:  "Some of the more savy stores like Med-X have taken

notice."[42]  Bob James realized that the goodwill McKesson established with the pharmacies as a

result of inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers about McKesson's efforts
> to "normalize" the AWP markup at 25%], one of the comments
> that was made was "this would certainly be a good reason to renew

---

[36] MCKAWP 0065895.

[37] MCKAWP 0065895.

[38] MCKAWP 0069732.

[39] MCKAWP 0069817.

[40] MCKAWP 0069901.

[41] MCKAWP 0069911.

[42] MCKAWP 0069732.

our agreement with McKesson when its time." Talk about being good partners, wow! This is worth further discussion as we go forward. Maybe a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit.[43]

178.    Bob James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And . . . . . . this is **not just a one time benefit**. They will receive this now and for each year going forward until they renegotiate their contracts with third parties (and hopefully do not give up this gift).[44]

Bob James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let him know how much effort we are putting into this AWP thing to get it right."[45] Other customers were also appreciative, for example an unnamed customer from Ohio, who called McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[46] Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together[47] and "was very ex[c]ited about" McKesson "working on AWP expansion."[48]

---

[43] MCKAWP 0065895.

[44] MCKAWP 0065895 (emphasis, ellipses in original).

[45] MCKAWP 0069669.

[46] MCKAWP 0069513.

[47] MCKAWP 0069732.

[48] MCKAWP 0069726.

179.    The foregoing evidences that First Data and McKesson each was a willing

participant in the enterprise; had a common purpose and interest in the establishment and

operations of the Scheme; and their agreement to a structure wherein First Data and McKesson

agreed on how the operation of the Enterprise would be conducted, *i.e.*, through McKesson's

transmission of increased markups and First Data's publication of those markups.  This structure

was the basis in which the enterprise operated.

**The Defendants' Use of the U.S. Mails and Interstate Wire Facilities**

180.    The Enterprise engaged in and affected interstate commerce because it engaged in

the following activities across state boundaries:  The transmission and publication of false and

misleading information concerning AWPs.

181.    During the Class Period, the defendants' illegal conduct and wrongful practices

were carried out by an array of employees, working across state boundaries, who necessarily

relied upon frequent transfers of documents and information, products and funds by the U.S.

mails and interstate wire facilities.

182.    The nature and pervasiveness of the Scheme, which was orchestrated out of the

corporate headquarters of each defendant, necessarily required those headquarters to

communicate directly and frequently by the U.S. mails and by interstate wire facilities.

183.    Many of the precise dates of defendants' uses of the U.S. mails and interstate wire

facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and

cannot be alleged without access to these defendants' books and records.  Indeed, an essential

part of the successful operation of the Scheme alleged herein depended upon secrecy.  However,

plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud

and wire fraud occurred, and how those acts were in furtherance of the Scheme; plaintiffs describe this below.

184.     The defendants' use of the U.S. mails and interstate wire facilities to perpetrate the 5% Scheme involved thousands of communications throughout the Class Period including, *inter alia*:

(a)     Marketing materials about First Data's services, which First Data, sent to health care providers located across the country;

(b)     Written representations and telephone calls between McKesson and First Data regarding markups and AWPs, which occurred on a regular basis each year;

(c)     Hundreds of e-mails between McKesson and First Data agreeing to or effectuating the implementation of the Scheme said e-mails, included but are not limited to, those identified earlier in this Complaint;

(d)     Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the AWPs were, or that were intended to deter investigations into the true nature of the AWPs or to forestall changes to reimbursement based on something other than AWPs;

(e)     Receipts of increased profits sent through the U.S. mails and interstate wire facilities – the wrongful proceeds of the Scheme; and

(f)     In addition to the above-referenced RICO predicate acts, it was foreseeable to each defendant that First Data would distribute publications containing false AWPs through the U.S. mails and by interstate wire facilities.  Further, each defendant has, in furtherance of the Scheme, communicated through use of the U.S. mails

- 73 -

and by interstate wire facilities with their various local headquarters or divisions. These

uses of the U.S. mails include some of the documents referenced in this Complaint.

**Conduct of the RICO Enterprises' Affairs**

185.    During the Class Period, the defendants have exerted control over the Enterprise

and, in violation of Section 1962(c) of RICO, the defendants have conducted or participated in

the conduct of the affairs of those RICO enterprises, directly or indirectly, in the following ways:

(a)    Each of the defendants had a degree of control concerning the WAC-to-

AWP spread and each had AWPs that First Data reported;

(b)    First Data has directly controlled the creation and distribution of

marketing, sales, and other materials used to inform members of the Class as to the value

of its services;

(c)    McKesson intended that First Data would (and did) distribute their

publications containing false AWPs through the U.S. mails and by interstate wire

facilities; and

(d)    First Data has allowed McKesson to exert control over its organization

knowing that the AWPs were inflated as a result of the 5% Scheme and were not real

numbers. McKesson controlled First Data by virtue of its ability to cause an increase in

the WAC-AWP markup. First Data did so because the reporting of AWPs was, and is, a

major part of its business, and McKesson was integral to First Data's AWP reporting and

to increasing First Data's profits for the reasons set forth herein.

186.    The Enterprise had a hierarchical decision-making structure headed by

McKesson. McKesson issued instructions on how the WAC-to-AWP spread was to be reported

and each Publisher accepted those instructions despite knowing of their falsity.

- 74 -

187.    In violation of Section 1962(c) of RICO, each defendant conducted the affairs of the Enterprise with which it associated by establishing a phony extra 5% WAC-to-AWP spread that First Data then published and disseminated nationwide.

**The Defendants' Pattern of Racketeering Activity**

188.    Each of the defendants conducted and participated in the affairs of the above-referenced Enterprises through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The defendants' pattern of racketeering likely involved thousands of separate instances of use of the U.S. mails or interstate wire facilities in furtherance of their Scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), in which the defendants intended to defraud plaintiffs, members of the Class and other intended victims.

189.    McKesson and First Data calculated and intentionally crafted the Scheme to ensure that plaintiffs and members of the Class would be over-billed for the drugs.  In designing and implementing the 5% Scheme, at all times the defendants were cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies, wholesalers and Publishers in setting the AWPs, as reported by the Publishers.

190.    By intentionally and artificially inflating the AWPs by virtue of the increase in the WAC-to-AWP spread, and by subsequently failing to disclose such practices to the individual patients, health plans and their insurers, the defendants engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

- 75 -

191.    The defendants' racketeering activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive plaintiffs and members of the Class.  Each separate use of the U.S. mails and/or interstate wire facilities employed by the defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including plaintiffs and members of the Class.  Each of the defendants has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its particular Manufacturer-Publisher Enterprise.

**Damages Caused by the Defendants' Five Percent Spread Scheme**

192.    The defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their business or property because plaintiffs and members of the Class have paid many hundreds of millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.

193.    The defendants sent AWP information through the U.S. mails or by interstate wire facilities and reported AWPs and other information by the same methods in furtherance of their 5% Scheme.  Plaintiffs and members of the Class have made inflated payments for drugs based on and/or in reliance on reported and false AWPs.

194.    Under the provisions of Section 1964(c) of RICO, the defendants are jointly and severally liable to plaintiffs and members of the Class for three times the damages that plaintiffs and the Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**APPLICABLE LAW FOR COUNTS II-VII**

195.    Counts II – VII set forth below are asserted under the law of California.

- 76 -

196.    California's consumer protection laws are among the strongest in the country."

*Wershba v. Apple Computer*, 91 Cal. App. 4th 224, 242 (6th Dist. 2001).  To the extent that other

states offer the same protection to consumers as the state of California, there is no real conflict

and California law should apply.  To the extent that other states provide less protections, the

Court should also take into consideration California's avowed interest in policing the conduct of

its own residents for injuries they cause to residents and non-residents alike "to ensure that the

flow of out-of-state capital necessary to the growth of California business will continue."

*Diamond Multimedia Sys. v. Superior Court*, 19 Cal. 4th 1036, 1063-64 (1999).  In similar

circumstances California courts have found it appropriate to certify a national class based on

California state law claims where the misconduct occurred in the State of California.  *Norwest

Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 224-25 (4th Dist. 1999) ("[S]tate

statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful

conduct occurring in California."); *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 618

(4th Dist. 1987) (reversing a trial court's denial of a motion to apply California consumer

protection to a national class, reasoning that "[u]nder certain facts California may have an

important interest in applying its law [to non-residents] to punish and deter the alleged wrongful

conduct.").

## COUNT II

### Untrue and Misleading Advertising
### (Business and Professions Code § 17500, *et seq.*)

197.    The preceding paragraphs of this Complaint are realleged and incorporated by

reference.  Plaintiffs assert this claim on behalf of themselves and the members of the Class.

198.    Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any … corporation

… with intent … to dispose of … personal property … to induce the public to enter into any

- 77 -

obligation relating thereto, to make or disseminate or cause to be made or disseminated before

the public in this state, … any statement … which is untrue or misleading, and which is known,

or which by the exercise of reasonable care should be known, to be untrue or misleading …."

199.    First Data made a series of representations as to the meaning of AWP and how it

was derived, all of which were false.  McKesson was aware of those representations.  Both First

Data and McKesson proceeded to implement a false advertising scheme designed to induce

payors to pay based on the inflated amount.

200.    Pursuant to Bus. & Prof. Code § 17535, plaintiffs and members of the Class are

entitled to the remedies set forth below.

## COUNT III

### Violations of Unfair Competition Law
### (Business and Professions Code § 17200, *et seq.*)

201.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and

incorporate herein by reference each of the allegations contained in the preceding paragraphs of

this Complaint.

202.    Defendants are incorporated, or maintain their principal places of business, in

California.  California courts have ruled that California statutes apply on a nationwide basis to

the conduct of California corporations.

203.    Defendants' actions, as complained of herein, constitute unfair and deceptive

unlawful practices committed in violation of the Unfair Competition Law, Bus. & Prof. Code

§§ 17200 *et seq*.

204.    Defendants violated the "fraudulent" prong of § 17200, the "unfair" prong of

§ 17200, and the "unlawful" prong of § 17200 by engaging in the following conduct:

- 78 -

a.    Defendants' conduct was unfair, unlawful and deceptive in that knowing of the use of AWP by payors, and despite knowledge as to representations that AWPs were established in part by use of surveys, and were "reliable" and "accurate," defendants artificially raised AWPs by increasing as described herein the WAC-to-AWP spread by 5% thereby allowing publication of AWPs that were even more inaccurate and unreliable;

b.    Defendants' conduct was unfair, unlawful and deceptive in that each defendant knew that members of the Class used AWP as a pricing mechanism and that the 5% WAC-to-AWP increase was a phony increase, *i.e.*, it did not represent any true increase in cost prices, and as such would artificially increase pharmaceutical payments by class members.

c.    Defendants' conduct was unfair, unlawful and deceptive in that defendants knew that the 5% WAC-to-AWP increase was not based on any actual change in the average wholesale price, and defendants knew that the increase did not have any other legitimate cost or pricing basis and was implemented solely for defendants' own purposes;

d.    Defendants' conduct was unfair, unlawful and deceptive in that they suppressed, manipulated and concealed information that would reveal the lack of any legitimate economic basis in the 5% increase in the WAC-to-AWP spread; and

e.    Defendants omitted material information known to them in order to induce payors to use an inflated AWP and pay an inflated price for drugs.

205.    All of the conduct alleged herein occurred in defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

206.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by

- 79 -

means of such unfair practices, as provided in Bus. & Prof. Code § 17203 and Civil Code

§ 3345, and for such other relief as set forth below.

## COUNT IV

### Violations of the Consumers Legal Remedies Act
### (Cal. Civ. Code § 1750, *et seq.*)

207.    The preceding paragraphs of this Complaint are realleged and incorporated by

reference.  Plaintiffs assert this claim on behalf of themselves and the members of the Class

against First Data.

208.    Plaintiffs and the members of the Class are payors who are paying for consumers'

purchase of goods for personal, family, or household purposes.

209.    Representing that published AWPs have characteristics, uses, benefits, or qualities

that they do not have, and advertising goods with intent not to sell them as advertised constitutes

unfair or deceptive trade practices under the provisions of the CLRA, Civil Code § 1770 (a)(5),

(7), (8), and (9).

210.    Plaintiffs and the members of the Class have all been directly and proximately

injured by First Data's conduct, and such injury includes payment for drugs inflated by the

Scheme, which drugs plaintiffs and the members of the Class, would not have purchased at the

inflated prices were they truthfully and fully informed of material facts concerning the product.

211.    In accordance with Civil Code § 1780 (a), plaintiffs and members of the Class

seek injunctive and equitable relief as to defendants' violations of the CLRA.  Plaintiffs request

that this Court enter such orders or judgments as may be necessary to restore to any person in

interest any money which may have been acquired by means of such unfair business practices,

and for such other relief as provided in Civil Code § 1780 and the Prayer for Relief.

## COUNT V

### Negligent Misrepresentation

212.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

213.    During the Class Period, First Data made representations concerning its services, which were false and omitted disclosure of material facts as set forth above.

214.    Each Class Member's use of the AWPs published by First Data established the Class' reliance on First Data.

215.    First Data, having issued representations as to its services had a duty to be accurate and breached that duty thereby causing plaintiffs and Class Members to suffer damage.

## COUNT VI

### Civil Conspiracy

216.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

217.    The defendants joined in a conspiracy to raise the spread between reported AWPs and WAC.  Each defendant also agreed to publish or caused to be published AWPs that were inflated as a result.  Each defendant also knew that by agreeing to raise and fix AWPs in this fashion, they were perpetuating the use of inflated AWPs on a nationwide basis.

218.    The defendants consciously conspired and deliberately pursued a common plan or design to commit tortious acts, subjecting each to joint liability.

219.    Defendants each committed unlawful act or acts in furtherance of this conspiracy, including acts violating RICO, state consumer protection laws, the common law and committed acts of mail and wire fraud.  All of these acts were in furtherance of the conspiracy.

001821-13  136802 V1

220.     Plaintiffs are entitled to a presumption of reliance on the false representations, concealments and nondisclosures by the defendants.  Class Members were ignorant of defendants' conduct and were ignorant of the full and true facts suppressed by them, and such reliance was justified.

221.     As a direct, proximate result of this conspiracy, plaintiffs and Class Members have been injured, as they have suffered and continue to suffer economic losses and general and specific damages, all in an amount to be determined according to proof.

COUNT VII

Entitlement to enhanced Relief pursuant to California Civil Code § 3345

222.     The preceding paragraphs of this Complaint are realleged and incorporated by reference.  Civil Code §3345 awards treble damages for unfair and deceptive practices perpetrated against seniors.  This claim is asserted on behalf of a Subclass of Consumer Class members who were over 65 at the time they purchased the Subject Drugs.  June Swan was over 65 years of age at the time she purchased the Subject Drugs.  This Class is referred to as the "Senior Subclass."

223.     Defendants McKesson and First Data knew or should have known that their conduct was directed to the Senior Subclass in that a large percentage of members of the Consumer Class for certain brand-name drugs are over 65 and that any wrongful conduct with respect to the sale of the Subject Drugs was likely to aversely impact such seniors.

224.     As a result of Defendants' Scheme, Plaintiffs and members of the Senior Subclass have suffered economic injury and the loss of assets essential to their health and welfare.

## ALTERNATE COUNT VIII

### Consumer Protection Laws of Various States

225.    The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

226.    In the event California law is not applied on a class-wide basis, defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.  Specifically, the Consumer Class seeks redress under the following statutes, i.e. Plaintiffs allege:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

- 83 -

(h)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0-5-1, *et seq.*;

(m)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445-901, *et seq.*;

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.010, *et seq.*;

- 84 -

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(t)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*,

(v)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*,

(w)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(aa)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(bb)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

(dd)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ee)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(ff)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(gg)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(hh)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ii)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(jj)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 245 1, *et seq.*;

(ll)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

(mm)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

227.    Additionally, the third-party payor Class seeks redress under the following statutes, which allow corporations to bring consumer protection claims, i.e. Plaintiffs allege:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including 4-88-113(f), and 4-88-102(5);

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code 2511, *et seq.*, including 6 Del. Code § 2512;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

001821-13 136802 V1

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, § 11;

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

(n)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

(o)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(p)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

(q)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(r)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

(s)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

(t)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(u)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(v)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(w)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.,* including § 51-15-01(4);

(x)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.,* including § 1345.01(B);

(y)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(z)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.,* including § 646.605(4);

(aa)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.,* including § 201-2(2);

(bb)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.,* including § 39-5-10(9);

(cc)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.,* including § 37-24-1(8);

(dd)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.,* including § 47-18-103(9);

(ee)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.,* including § 17.45(4);

(ff)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(gg)     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.,* including § 19.86.010(1);

(hh)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(ii)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.,* including § 40-12-102(a)(i).

228.     Plaintiffs provided notice of this litigation as required by law.

## ALTERNATE COUNT IX

### Civil Conspiracy

229.     The preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

230.     This Count is asserted based upon the common law of civil conspiracy in the fifty states.

## DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs demand judgment as follows:

A.     The Court determines that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of

- 90 -

Civil Procedure with respect to the claims for damages, and declaring Plaintiffs as

representatives of the Classes and their counsel as counsel for the Classes;

B.     The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.     Plaintiffs and the Class be granted an award of damages in such amount to be

determined at trial, with trebling under Count I;

D.     Plaintiffs and the Class be granted an award of punitive damages in such amount

to be determined at trial;

E.     Defendants be enjoined from continuing the illegal activities alleged herein;

F.     Plaintiffs and the Class recover their costs of suit, including reasonable attorneys'

fees and expenses as provided by law; and

G.     Plaintiffs and the Class be granted such other, further, and different relief as the

nature of the case may require or as may be determined to be just, equitable, and proper by this

Court.


DATED:  October 31, 2006                    By_____/s/ Steve W. Berman_____
                                            Steve W. Berman
                                            Sean R. Matt
                                            Barbara A. Mahoney
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Thomas M. Sobol (BBO #471770)
                                            Edward Notargiacomo (BBO #567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
 Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| MEDICIS DERMATOLOGICS INC | 99207001960 | A/T/S 2% TOPICAL SOLUTION |
| ASTRAZENECA LP | 00310040160 | ACCOLATE 10 MG TABLET |
| ASTRAZENECA LP | 00310040239 | ACCOLATE 20 MG TABLET |
| ASTRAZENECA LP | 00310040260 | ACCOLATE 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053023 | ACCUPRIL 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053040 | ACCUPRIL 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053223 | ACCUPRIL 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053240 | ACCUPRIL 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053523 | ACCUPRIL 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052723 | ACCUPRIL 5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052740 | ACCUPRIL 5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022206 | ACCURETIC 10-12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022006 | ACCURETIC 20-12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071022306 | ACCURETIC 20-25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 62856024330 | ACIPHEX 20 MG TABLET EC |
| JOHNSON & JOHNSON GROUP | 62856024341 | ACIPHEX 20 MG TABLET EC |
| JOHNSON & JOHNSON GROUP | 62856024369 | ACIPHEX 20 MG TABLET EC |
| WATSON LABORATORIES INC | 52544093001 | ACTIGALL 300 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047001 | ACTONEL 30 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047101 | ACTONEL 5 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149047103 | ACTONEL 5 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015104 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015105 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764015106 | ACTOS 15 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030114 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030115 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764030116 | ACTOS 30 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045124 | ACTOS 45 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045125 | ACTOS 45 MG TABLET |
| TAKEDA PHARMACEUTICALS NORTH AMERICA INC | 64764045126 | ACTOS 45 MG TABLET |
| SHIRE US INC | 54092030301 | ADDERALL XR 10 MG CAPSULE SA |
| SHIRE US INC | 54092038701 | ADDERALL XR 20 MG CAPSULE SA |
| SHIRE US INC | 54092039101 | ADDERALL XR 30 MG CAPSULE SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069500 | ADVAIR 100/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069502 | ADVAIR 100/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069600 | ADVAIR 250/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069602 | ADVAIR 250/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069700 | ADVAIR 500/50 DISKUS |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069702 | ADVAIR 500/50 DISKUS |
| KOS PHARMACEUTICALS INC | 60598000890 | ADVICOR 1,000 MG/20 MG TABLET |
| KOS PHARMACEUTICALS INC | 60598000690 | ADVICOR 500 MG/20 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456067299 | AEROBID AEROSOL W/ADAPTER |
| FOREST PHARMACEUTICALS INC | 00456067099 | AEROBID-M AEROSOL W/ADAPTER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068700 | AGENERASE 15 MG/ML ORAL SOLN |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067200 | AGENERASE 150 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067900 | AGENERASE 50 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000160 | AGGRENOX CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025101131 | ALDACTAZIDE 25/25 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025101155 | ALDACTAZIDE 25/25 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025102131 | ALDACTAZIDE 50/50 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025103131 | ALDACTONE 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025103134 | ALDACTONE 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100131 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100151 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025100155 | ALDACTONE 25 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025104131 | ALDACTONE 50 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025104134 | ALDACTONE 50 MG TABLET |
| 3M PHARMACEUTICALS | 00089061012 | ALDARA 5% CREAM |
| ZYBER PHARMACEUTICAL INC | 65224065001 | ALDEX TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 59572030250 | ALKERAN 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110947 | ALLEGRA 180 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110647 | ALLEGRA 30 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088110747 | ALLEGRA 60 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00088109047 | ALLEGRA-D TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088109049 | ALLEGRA-D TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088109055 | ALLEGRA-D TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605051301 | ALLFEN 1,000 MG TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052101 | ALLFEN-DM TABLET SA |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597007017 | ALUPENT 650 MCG INHALER COMP |
| MERRELL PHARMACEUTICALS INC | 00039022110 | AMARYL 1 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022210 | AMARYL 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022211 | AMARYL 2 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022310 | AMARYL 4 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039022311 | AMARYL 4 MG TABLET |
| SANOFI SYNTHELABO INC | 00024542131 | AMBIEN 10 MG TABLET |
| SANOFI SYNTHELABO INC | 00024542134 | AMBIEN 10 MG TABLET |
| SANOFI SYNTHELABO INC | 00024540131 | AMBIEN 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024540134 | AMBIEN 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056100 | AMERGE 1 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056200 | AMERGE 2.5 MG TABLET |
| FERNDALE LABORATORIES INC | 00496077804 | ANALPRAM-HC 1% CREAM |
| FERNDALE LABORATORIES INC | 00496080004 | ANALPRAM-HC 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496082904 | ANALPRAM-HC 2.5% LOTION |
| HOFFMANN LA ROCHE INC | 00004620201 | ANAPROX 275 MG TABLET |
| SANOFI SYNTHELABO INC | 00024008401 | ARALEN PHOSPHATE 500 MG TAB |
| MERRELL PHARMACEUTICALS INC | 00088216030 | ARAVA 10 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| MERRELL PHARMACEUTICALS INC | 00088216130 | ARAVA 20 MG TABLET |
| ASTRAZENECA LP | 00310020130 | ARIMIDEX 1 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046100 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046101 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046163 | ARMOUR THYROID 120 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045701 | ARMOUR THYROID 15 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046200 | ARMOUR THYROID 180 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046201 | ARMOUR THYROID 180 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046301 | ARMOUR THYROID 240 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045800 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045801 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045863 | ARMOUR THYROID 30 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046401 | ARMOUR THYROID 300 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045900 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045901 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045951 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456045963 | ARMOUR THYROID 60 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456046001 | ARMOUR THYROID 90 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141134 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141160 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025141190 | ARTHROTEC 50 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025142134 | ARTHROTEC 75 TABLET EC |
| PFIZER LABORATORIES DIV PFIZER INC | 00025142160 | ARTHROTEC 75 TABLET EC |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149075202 | ASACOL 400 MG TABLET EC |
| ASTRAZENECA LP | 00186001628 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186001631 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186001654 | ATACAND 16 MG TABLET |
| ASTRAZENECA LP | 00186003228 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186003231 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186003254 | ATACAND 32 MG TABLET |
| ASTRAZENECA LP | 00186000431 | ATACAND 4 MG TABLET |
| ASTRAZENECA LP | 00186000831 | ATACAND 8 MG TABLET |
| ASTRAZENECA LP | 00186016228 | ATACAND HCT 16/12.5 MG TAB |
| ASTRAZENECA LP | 00186016254 | ATACAND HCT 16/12.5 MG TAB |
| ASTRAZENECA LP | 00186032228 | ATACAND HCT 32/12.5 MG TAB |
| ASTRAZENECA LP | 00186032254 | ATACAND HCT 32/12.5 MG TAB |
| PFIZER LABORATORIES DIV PFIZER INC | 00049559093 | ATARAX 10 MG/5 ML SYRUP |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008062 | ATROVENT 0.02% SOLUTION |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008130 | ATROVENT 0.03% SPRAY |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008676 | ATROVENT 0.06% SPRAY |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597008214 | ATROVENT INHALER |
| BRISTOL MYERS SQUIBB CO | 00087277515 | AVALIDE 150-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277532 | AVALIDE 150-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277631 | AVALIDE 300-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277632 | AVALIDE 300-12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277215 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277231 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277232 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277235 | AVAPRO 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277315 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277331 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277332 | AVAPRO 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277131 | AVAPRO 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087277132 | AVAPRO 75 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00062208506 | AXERT 12.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00062208006 | AXERT 6.25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00075006037 | AZMACORT INHALER |
| WOMEN FIRST HEALTHCARE INC | 64248000410 | BACTRIM 400-80 MG TABLET |
| WOMEN FIRST HEALTHCARE INC | 64248011710 | BACTRIM DS TABLET |
| FOREST PHARMACEUTICALS INC | 00456060101 | BANCAP HC CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173033602 | BECONASE 42 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046800 | BECONASE 42 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038879 | BECONASE AQ 0.042% SPRAY |
| AXCAN SCANDIPHARM INC | 00068012061 | BENTYL 10 MG CAPSULE |
| AXCAN SCANDIPHARM INC | 00068012516 | BENTYL 10 MG/5 ML SYRUP |
| AXCAN SCANDIPHARM INC | 00068012361 | BENTYL 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00066049425 | BENZACLIN GEL |
| ABBOTT LABORATORIES | 00074336811 | BIAXIN 250 MG TABLET |
| ABBOTT LABORATORIES | 00074258611 | BIAXIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314933001 | BICITRA SOLUTION |
| AAIPHARMA LLC | 00028007201 | BRETHINE 2.5 MG TABLET |
| AAIPHARMA LLC | 00028007210 | BRETHINE 2.5 MG TABLET |
| AAIPHARMA LLC | 00028010501 | BRETHINE 5 MG TABLET |
| AAIPHARMA LLC | 00028010510 | BRETHINE 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024028016 | BRONCHOLATE SYRUP |
| HOFFMANN LA ROCHE INC | 00004012501 | BUMEX 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012511 | BUMEX 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012101 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012111 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004012114 | BUMEX 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004016201 | BUMEX 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004016211 | BUMEX 2 MG TABLET |
| RECKITT BENCKISER HEALTHCARE UK LIMITED | 12496075701 | BUPRENEX 0.3 MG/ML AMPUL |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00087611142 | CAFCIT 20 MG/ML ORAL SOLN |
| NOVARTIS PHARMACEUTICALS CORP | 00078003302 | CAFERGOT SUPPOSITORY |
| PFIZER LABORATORIES DIV PFIZER INC | 00025186131 | CALAN 120 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| PFIZER LABORATORIES DIV PFIZER INC | 00025186152 | CALAN 120 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025177131 | CALAN 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185131 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185151 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025185152 | CALAN 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025190131 | CALAN SR 120 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025190134 | CALAN SR 120 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025191131 | CALAN SR 180 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025191134 | CALAN SR 180 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189131 | CALAN SR 240 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189134 | CALAN SR 240 MG CAPLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025189151 | CALAN SR 240 MG CAPLET SA |
| MERRELL PHARMACEUTICALS INC | 00068003701 | CANTIL 25 MG TABLET |
| AXCAN SCANDIPHARM INC | 58914017110 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017121 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017130 | CARAFATE 1 GM TABLET |
| AXCAN SCANDIPHARM INC | 58914017150 | CARAFATE 1 GM TABLET |
| HOFFMANN LA ROCHE INC | 00004018301 | CARDENE 20 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004018401 | CARDENE 30 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004018022 | CARDENE SR 30 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018091 | CARDENE SR 30 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018122 | CARDENE SR 45 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018191 | CARDENE SR 45 MG CAPSULE SA |
| HOFFMANN LA ROCHE INC | 00004018222 | CARDENE SR 60 MG CAPSULE SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079247 | CARDIZEM 120 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177147 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177155 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177190 | CARDIZEM 30 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177247 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177255 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088177290 | CARDIZEM 60 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088179147 | CARDIZEM 90 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00088179530 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179542 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079549 | CARDIZEM CD 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179630 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179642 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079649 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079650 | CARDIZEM CD 180 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179730 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179742 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079749 | CARDIZEM CD 240 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179830 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088179842 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079849 | CARDIZEM CD 300 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 64455079942 | CARDIZEM CD 360 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177947 | CARDIZEM SR 120 MG CAP SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177747 | CARDIZEM SR 60 MG CAPSULE SA |
| BIOVAIL PHARMACEUTICALS INC | 00088177847 | CARDIZEM SR 90 MG CAPSULE SA |
| ASTRAZENECA LP | 00310070510 | CASODEX 50 MG TABLET |
| ASTRAZENECA LP | 00310070530 | CASODEX 50 MG TABLET |
| ASTRAZENECA LP | 00310070539 | CASODEX 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028015101 | CATAFLAM 50 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000601 | CATAPRES 0.1 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597000701 | CATAPRES 0.2 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001101 | CATAPRES 0.3 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003112 | CATAPRES-TTS 1 PATCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003212 | CATAPRES-TTS 2 PATCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597003334 | CATAPRES-TTS 3 PATCH |
| BRISTOL MYERS SQUIBB CO | 00015303020 | CEENU 10 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303220 | CEENU 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303120 | CEENU 40 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00015303410 | CEENU DOSE PACK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039501 | CEFTIN 125 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173040600 | CEFTIN 125 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038700 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038701 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038742 | CEFTIN 250 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055400 | CEFTIN 250 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055500 | CEFTIN 250 MG/5 ML ORAL SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039400 | CEFTIN 500 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039401 | CEFTIN 500 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039442 | CEFTIN 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772060 | CEFZIL 250 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772150 | CEFZIL 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087772160 | CEFZIL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152031 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152034 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152051 | CELEBREX 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152531 | CELEBREX 200 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152534 | CELEBREX 200 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025152551 | CELEBREX 200 MG CAPSULE |
| SCHERING CORP | 00085094205 | CELESTONE 0.6 MG/5 ML SYRUP |
| FOREST PHARMACEUTICALS INC | 00456401001 | CELEXA 10 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456413008 | CELEXA 10 MG/5 ML SOLUTION |
| FOREST PHARMACEUTICALS INC | 00456402001 | CELEXA 20 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FOREST PHARMACEUTICALS INC | 00456402063 | CELEXA 20 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456404001 | CELEXA 40 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456404063 | CELEXA 40 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026129 | CELLCEPT 200 MG/ML ORAL SUSP |
| HOFFMANN LA ROCHE INC | 00004025901 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004025905 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004025943 | CELLCEPT 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004026001 | CELLCEPT 500 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026043 | CELLCEPT 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071052524 | CELONTIN 300 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071053724 | CELONTIN KAPSEAL 150 MG |
| US PHARMACEUTICAL CORP | 52747014060 | CENOGEN ULTRA CAPSULE |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034549006 | CERUMENEX 10% EAR DROPS |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034549012 | CERUMENEX 10% EAR DROPS |
| FOREST PHARMACEUTICALS INC | 00456412363 | CERVIDIL 10 MG VAGINAL INSRT |
| BAYER CORP PHARMACEUTICAL DIV | 00026855336 | CIPRO 10% SUSPENSION |
| BAYER CORP PHARMACEUTICAL DIV | 00026851106 | CIPRO 100 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851248 | CIPRO 250 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851251 | CIPRO 250 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026855136 | CIPRO 5% SUSPENSION |
| BAYER CORP PHARMACEUTICAL DIV | 00026851348 | CIPRO 500 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851351 | CIPRO 500 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851448 | CIPRO 750 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026851450 | CIPRO 750 MG TABLET |
| SCHERING CORP | 00085126401 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126402 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126403 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085126404 | CLARINEX 5 MG TABLET |
| SCHERING CORP | 00085112802 | CLARITIN 10 MG REDITABS |
| SCHERING CORP | 00085045803 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045804 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045805 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085045806 | CLARITIN 10 MG TABLET |
| SCHERING CORP | 00085122301 | CLARITIN 10 MG/10 ML SYRUP |
| SCHERING CORP | 00085063501 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085063504 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085063505 | CLARITIN-D 12 HOUR TAB SA |
| SCHERING CORP | 00085123301 | CLARITIN-D 24 HOUR TAB SA |
| SCHERING CORP | 00085123302 | CLARITIN-D 24 HOUR TAB SA |
| FERNDALE LABORATORIES INC | 00496085745 | CLINAC BPO 7% GEL |
| MERRELL PHARMACEUTICALS INC | 00068022630 | CLOMID 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012705 | CLOZARIL 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012706 | CLOZARIL 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012605 | CLOZARIL 25 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078012606 | CLOZARIL 25 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019012 | COGNEX 10 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019112 | COGNEX 20 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019212 | COGNEX 30 MG CAPSULE |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630019312 | COGNEX 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078037745 | COMBIPATCH 0.05/0.14 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037742 | COMBIPATCH 0.05/0.14 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037845 | COMBIPATCH 0.05/0.25 MG PTCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078037842 | COMBIPATCH 0.05/0.25 MG PTCH |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001314 | COMBIVENT INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173059500 | COMBIVIR TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173059502 | COMBIVIR TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032705 | COMTAN 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314585002 | CONCERTA 18 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314585102 | CONCERTA 36 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314585202 | CONCERTA 54 MG TABLET SA |
| WATSON LABORATORIES INC | 55515010201 | CONDYLOX 0.5% GEL |
| WATSON LABORATORIES INC | 55515010101 | CONDYLOX 0.5% TOPICAL SOLN |
| WATSON LABORATORIES INC | 55515001424 | CORDRAN 4 MCG/SQ CM TAPE |
| WATSON LABORATORIES INC | 55515001480 | CORDRAN 4 MCG/SQ CM TAPE |
| WATSON LABORATORIES INC | 55515003515 | CORDRAN SP 0.05% CREAM |
| WATSON LABORATORIES INC | 55515003530 | CORDRAN SP 0.05% CREAM |
| WATSON LABORATORIES INC | 55515003560 | CORDRAN SP 0.05% CREAM |
| MONARCH PHARMACEUTICALS INC | 61570020301 | CORGARD 120 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020401 | CORGARD 160 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020001 | CORGARD 20 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020101 | CORGARD 40 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020110 | CORGARD 40 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020201 | CORGARD 80 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570020210 | CORGARD 80 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570017501 | CORZIDE 40/5 TABLET |
| MONARCH PHARMACEUTICALS INC | 61570017601 | CORZIDE 80/5 TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016970 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016975 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016990 | COUMADIN 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017470 | COUMADIN 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017475 | COUMADIN 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017070 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017075 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017090 | COUMADIN 2 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017670 | COUMADIN 2.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017675 | COUMADIN 2.5 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| BRISTOL MYERS SQUIBB CO | 00056017690 | COUMADIN 2.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018870 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018875 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018890 | COUMADIN 3 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016870 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016875 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056016890 | COUMADIN 4 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017270 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017275 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017290 | COUMADIN 5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018970 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018975 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056018990 | COUMADIN 6 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017370 | COUMADIN 7.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00056017375 | COUMADIN 7.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025201131 | COVERA-HS 180 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025201134 | COVERA-HS 180 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025202131 | COVERA-HS 240 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025202134 | COVERA-HS 240 MG TABLET SA |
| ORGANON USA INC | 00052028306 | CYCLESSA 28 DAY TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002430 | CYTADREN 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145120 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145134 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025145160 | CYTOTEC 100 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146131 | CYTOTEC 200 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146134 | CYTOTEC 200 MCG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025146160 | CYTOTEC 200 MCG TABLET |
| HOFFMANN LA ROCHE INC | 00004026948 | CYTOVENE 250 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004027848 | CYTOVENE 500 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030406 | DANOCRINE 100 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030506 | DANOCRINE 100 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030560 | DANOCRINE 200 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024030306 | DANOCRINE 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003305 | DANTRIUM 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003005 | DANTRIUM 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003066 | DANTRIUM 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149003105 | DANTRIUM 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173020155 | DARAPRIM 25 MG TABLET |
| AAIPHARMA LLC | 00002036302 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002036303 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002036333 | DARVOCET-N 100 TABLET |
| AAIPHARMA LLC | 00002035102 | DARVOCET-N 50 TABLET |
| AAIPHARMA LLC | 00002080303 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 00002080333 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 66591062241 | DARVON 65 MG PULVULE |
| AAIPHARMA LLC | 00002311102 | DARVON COMPOUND-65 PULVULE |
| AAIPHARMA LLC | 00002311103 | DARVON COMPOUND-65 PULVULE |
| AAIPHARMA LLC | 00002035333 | DARVON-N 100 MG TABLET |
| AAIPHARMA LLC | 66591063141 | DARVON-N 100 MG TABLET |
| AAIPHARMA LLC | 66591063151 | DARVON-N 100 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138131 | DAYPRO 600 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138134 | DAYPRO 600 MG CAPLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025138151 | DAYPRO 600 MG CAPLET |
| HOFFMANN LA ROCHE INC | 00004026301 | DEMADEX 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026349 | DEMADEX 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026706 | DEMADEX 10 MG/ML AMPUL |
| HOFFMANN LA ROCHE INC | 00004026806 | DEMADEX 10 MG/ML AMPUL |
| HOFFMANN LA ROCHE INC | 00004026501 | DEMADEX 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026549 | DEMADEX 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026401 | DEMADEX 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026449 | DEMADEX 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026201 | DEMADEX 5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004026249 | DEMADEX 5 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033704 | DEMEROL 100 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033504 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033506 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033502 | DEMEROL 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024033206 | DEMEROL 50 MG/5 ML SYRUP |
| PFIZER LABORATORIES DIV PFIZER INC | 00025016109 | DEMULEN 1/35-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025016124 | DEMULEN 1/35-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025008109 | DEMULEN 1/50-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025008124 | DEMULEN 1/50-28 TABLET |
| ABBOTT LABORATORIES | 00074611411 | DEPAKOTE 125 MG SPRINKLE CAP |
| ABBOTT LABORATORIES | 00074621211 | DEPAKOTE 125 MG TABLET EC |
| ABBOTT LABORATORIES | 00074621411 | DEPAKOTE 250 MG TABLET EC |
| ABBOTT LABORATORIES | 00074621511 | DEPAKOTE 500 MG TABLET EC |
| ORGANON USA INC | 00052026106 | DESOGEN 28 DAY TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005305 | DIABETA 1.25 MG TABLET |
| HOECHST ROUSSEL PHARMACEUTICALS DIV | 00039005005 | DIABETA 1.25MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005110 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005111 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005150 | DIABETA 2.5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005210 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005211 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005250 | DIABETA 5 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039005270 | DIABETA 5 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149040560 | DIDRONEL 200 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149040660 | DIDRONEL 400 MG TABLET |
| WATSON LABORATORIES INC | 52544048201 | DILACOR XR 120 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025000 | DILACOR XR 120MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073201 | DILACOR XR 120MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048301 | DILACOR XR 180 MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048305 | DILACOR XR 180 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025100 | DILACOR XR 180MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073301 | DILACOR XR 180MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048401 | DILACOR XR 240 MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544048405 | DILACOR XR 240 MG CAPSULE SA |
| WATSON LABORATORIES INC | 00075025200 | DILACOR XR 240MG CAPSULE SA |
| WATSON LABORATORIES INC | 52544073401 | DILACOR XR 240MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036224 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036232 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036240 | DILANTIN 100 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071221420 | DILANTIN 125 MG/5 ML SUSP |
| PFIZER LABORATORIES DIV PFIZER INC | 00071036524 | DILANTIN 30 MG KAPSEAL |
| PFIZER LABORATORIES DIV PFIZER INC | 00071000724 | DILANTIN 50 MG INFATAB |
| PFIZER LABORATORIES DIV PFIZER INC | 00071000740 | DILANTIN 50 MG INFATAB |
| SCHERING CORP | 00085063401 | DIPROLENE 0.05% GEL |
| SCHERING CORP | 00085063403 | DIPROLENE 0.05% GEL |
| SCHERING CORP | 00085096201 | DIPROLENE 0.05% LOTION |
| SCHERING CORP | 00085096202 | DIPROLENE 0.05% LOTION |
| SCHERING CORP | 00085057502 | DIPROLENE 0.05% OINTMENT |
| SCHERING CORP | 00085057505 | DIPROLENE 0.05% OINTMENT |
| SCHERING CORP | 00085051701 | DIPROLENE AF 0.05% CREAM |
| SCHERING CORP | 00085051704 | DIPROLENE AF 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 17314920001 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920002 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920003 | DITROPAN 5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314920104 | DITROPAN 5 MG/5 ML SYRUP |
| WARNER CHILCOTT INC | 00430083819 | DORYX 100 MG CAPSULE EC |
| WARNER CHILCOTT INC | 00430083620 | DORYX 75 MG CAPSULE EC |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072026006 | DOVONEX 0.005% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072026012 | DOVONEX 0.005% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072254006 | DOVONEX 0.005% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072254012 | DOVONEX 0.005% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072116006 | DOVONEX 0.005% SOLUTION |
| SANOFI SYNTHELABO INC | 00024039202 | DRISDOL 50,000 UNITS CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458003605 | DURAGESIC 100 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003305 | DURAGESIC 25 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003405 | DURAGESIC 50 MCG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458003505 | DURAGESIC 75 MCG/HR PATCH |
| WARNER CHILCOTT INC | 00430278217 | DURICEF 250 MG/5 ML ORAL SUSP |
| WARNER CHILCOTT INC | 00087078446 | DURICEF 500 MG CAPSULE |
| WARNER CHILCOTT INC | 00430278317 | DURICEF 500 MG/5 ML ORAL SUSP |
| RELIANT PHARMACEUTICALS INC | 65726022615 | DYNACIRC 2.5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022625 | DYNACIRC 2.5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022715 | DYNACIRC 5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726022725 | DYNACIRC 5 MG CAPSULE |
| RELIANT PHARMACEUTICALS INC | 65726023610 | DYNACIRC CR 10 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023625 | DYNACIRC CR 10 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023510 | DYNACIRC CR 5 MG TABLET SA |
| RELIANT PHARMACEUTICALS INC | 65726023525 | DYNACIRC CR 5 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004641501 | EC-NAPROSYN 375 MG TABLET EC |
| HOFFMANN LA ROCHE INC | 00004641601 | EC-NAPROSYN 500 MG TABLET EC |
| ASTRAZENECA LP | 00310004010 | ELAVIL 10 MG TABLET |
| ASTRAZENECA LP | 00310004310 | ELAVIL 100 MG TABLET |
| ASTRAZENECA LP | 00310004710 | ELAVIL 150 MG TABLET |
| ASTRAZENECA LP | 00310004730 | ELAVIL 150 MG TABLET |
| ASTRAZENECA LP | 00310004510 | ELAVIL 25 MG TABLET |
| ASTRAZENECA LP | 00310004550 | ELAVIL 25 MG TABLET |
| ASTRAZENECA LP | 00310004110 | ELAVIL 50 MG TABLET |
| ASTRAZENECA LP | 00310004210 | ELAVIL 75 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078037540 | ELIDEL 1% CREAM |
| NOVARTIS PHARMACEUTICALS CORP | 00078037546 | ELIDEL 1% CREAM |
| NOVARTIS PHARMACEUTICALS CORP | 00078037563 | ELIDEL 1% CREAM |
| SANOFI SYNTHELABO INC | 00024079375 | ELIGARD 7.5 MG SYRINGE |
| FOREST PHARMACEUTICALS INC | 00456064808 | ELIXOPHYLLIN GG 100/100 LIQ |
| FOREST PHARMACEUTICALS INC | 00456064816 | ELIXOPHYLLIN GG 100/100 LIQ |
| FOREST PHARMACEUTICALS INC | 00456064508 | ELIXOPHYLLIN-KI ELIXIR |
| JOHNSON & JOHNSON GROUP | 17314930001 | ELMIRON 100 MG CAPSULE |
| SCHERING CORP | 00085056701 | ELOCON 0.1% CREAM |
| SCHERING CORP | 00085056702 | ELOCON 0.1% CREAM |
| SCHERING CORP | 00085085401 | ELOCON 0.1% LOTION |
| SCHERING CORP | 00085085402 | ELOCON 0.1% LOTION |
| SCHERING CORP | 00085037001 | ELOCON 0.1% OINTMENT |
| SCHERING CORP | 00085037002 | ELOCON 0.1% OINTMENT |
| ASTRAZENECA LP | 00186151601 | EMLA CREAM |
| ASTRAZENECA LP | 00186151501 | EMLA CREAM W/TEGADERM |
| ASTRAZENECA LP | 00186151503 | EMLA CREAM W/TEGADERM |
| IMMUNEX CORP | 58406042534 | ENBREL 25 MG KIT |
| IMMUNEX CORP | 58406042541 | ENBREL 25 MG KIT |
| ASTRAZENECA LP | 00186070210 | ENTOCORT EC 3 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173047100 | EPIVIR 10 MG/ML ORAL SOLN |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173047001 | EPIVIR 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066200 | EPIVIR HBV 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066300 | EPIVIR HBV 25 MG/5 ML SOLN |
| JOHNSON & JOHNSON GROUP | 50458027036 | ERGAMISOL 50MG TABLET |
| WARNER CHILCOTT INC | 00430069624 | ERYC 250 MG CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00062118501 | ERYCETTE 2% PLEDGETS |
| FOREST PHARMACEUTICALS INC | 00456063001 | ESGIC TABLET |
| FOREST PHARMACEUTICALS INC | 00535001101 | ESGIC TABLET |
| FOREST PHARMACEUTICALS INC | 00456067801 | ESGIC-PLUS TABLET |
| WARNER CHILCOTT INC | 00430375411 | ESTRACE 0.01% CREAM |
| WARNER CHILCOTT INC | 00430375414 | ESTRACE 0.01% CREAM |
| WARNER CHILCOTT INC | 00430002324 | ESTRACE 1 MG TABLET |
| WARNER CHILCOTT INC | 00430002330 | ESTRACE 1 MG TABLET |
| WARNER CHILCOTT INC | 00430002424 | ESTRACE 2 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083231008 | ESTRADERM 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083231062 | ESTRADERM 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232008 | ESTRADERM 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232062 | ESTRADERM 0.1 MG PATCH |
| PFIZER LABORATORIES DIV PFIZER INC | 00071092815 | ESTROSTEP FE-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071092847 | ESTROSTEP FE-28 TABLET |
| BAXTER HEALTHCARE CORP | 10019035060 | ETHRANE INHALATION |
| SCHERING CORP | 00085052503 | EULEXIN 125 MG CAPSULE |
| SCHERING CORP | 00085052505 | EULEXIN 125 MG CAPSULE |
| SCHERING CORP | 00085052506 | EULEXIN 125 MG CAPSULE |
| ELI LILLY AND CO | 00002416502 | EVISTA 60 MG TABLET |
| ELI LILLY AND CO | 00002416507 | EVISTA 60 MG TABLET |
| ELI LILLY AND CO | 00002416530 | EVISTA 60 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032306 | EXELON 1.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032344 | EXELON 1.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078033931 | EXELON 2 MG/ML ORAL SOLUTION |
| NOVARTIS PHARMACEUTICALS CORP | 00078032406 | EXELON 3 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032444 | EXELON 3 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032506 | EXELON 4.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032544 | EXELON 4.5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032606 | EXELON 6 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078032644 | EXELON 6 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004016103 | FANSIDAR 500/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078024915 | FEMARA 2.5 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00430054414 | FEMHRT 1/5 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00430054423 | FEMHRT 1/5 TABLET |
| WARNER CHILCOTT INC | 00430620140 | FEMRING 0.05 MG VAGINAL RING |
| WARNER CHILCOTT INC | 00430620240 | FEMRING 0.10 MG VAGINAL RING |
| ABBOTT LABORATORIES | 00074707930 | FERO-FOLIC-500 FILMTAB |
| NOVARTIS PHARMACEUTICALS CORP | 00078010305 | FIORINAL CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010308 | FIORINAL CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010705 | FIORINAL/CODEINE #3 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183131 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183150 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025183155 | FLAGYL 250 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025194234 | FLAGYL 375 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025194250 | FLAGYL 375 CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182131 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182150 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025182151 | FLAGYL 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025196130 | FLAGYL ER 750 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045301 | FLONASE 0.05% NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050900 | FLOVENT 100 MCG ROTADISK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049400 | FLOVENT 110 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049800 | FLOVENT 110 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049500 | FLOVENT 220 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049900 | FLOVENT 220 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050400 | FLOVENT 250 MCG ROTADISK |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049100 | FLOVENT 44 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173049700 | FLOVENT 44 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173051100 | FLOVENT 50 MCG ROTADISK |
| JOHNSON & JOHNSON GROUP | 00062154002 | FLOXIN 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062154102 | FLOXIN 300 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062154201 | FLOXIN 400 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456052101 | FLUMADINE 100 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456052708 | FLUMADINE 50 MG/5 ML SYRUP |
| NOVARTIS PHARMACEUTICALS CORP | 00078038205 | FOCALIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078038005 | FOCALIN 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078038105 | FOCALIN 5 MG TABLET |
| SCHERING CORP | 00085140101 | FORADIL AEROLIZER 12 MCG CAP |
| SCHERING CORP | 00085140201 | FORADIL AEROLIZER 12 MCG CAP |
| HOFFMANN LA ROCHE INC | 00004024648 | FORTOVASE 200 MG SOFTGEL CAP |
| NOVARTIS PHARMACEUTICALS CORP | 00078017366 | GLEEVEC 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087607111 | GLUCOPHAGE 1,000 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087606005 | GLUCOPHAGE 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087606010 | GLUCOPHAGE 500 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087607005 | GLUCOPHAGE 850 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087607211 | GLUCOVANCE 1.25/250 MG TAB |
| BRISTOL MYERS SQUIBB CO | 00087607311 | GLUCOVANCE 2.5/500 MG TAB |
| BRISTOL MYERS SQUIBB CO | 00087607411 | GLUCOVANCE 5/500 MG TAB |
| JOHNSON & JOHNSON GROUP | 00062020604 | GRIFULVIN V 125 MG/5 ML SUSP |
| PROMETHEUS LABORATORIES INC | 65483049514 | HELIDAC THERAPY |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| US PHARMACEUTICAL CORP | 52747080060 | HEMOCYTE PLUS CAPSULE |
| US PHARMACEUTICAL CORP | 52747030830 | HEMOCYTE PLUS TABULE |
| US PHARMACEUTICAL CORP | 52747030870 | HEMOCYTE PLUS TABULE |
| US PHARMACEUTICAL CORP | 52747030630 | HEMOCYTE-F TABLET |
| US PHARMACEUTICAL CORP | 52747030670 | HEMOCYTE-F TABLET |
| GILEAD SCIENCES INC | 61958050101 | HEPSERA 10 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068027761 | HIPREX 1 GM TABLET |
| HOFFMANN LA ROCHE INC | 00004022001 | HIVID 0.375 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004022011 | HIVID 0.750 MG TABLET |
| SANOFI SYNTHELABO INC | 00024079202 | HYTAKEROL 0.125 MG CAPSULE |
| ABBOTT LABORATORIES | 00074712530 | IBERET-FOLIC 500 FILMTAB |
| HAWTHORN PHARMACEUTICALS | 63717015003 | ICAR PRENATAL COMBO PACK |
| HAWTHORN PHARMACEUTICALS | 63717011201 | ICAR-C PLUS SR CAPSULE |
| SCHERING CORP | 00085115303 | IMDUR 120 MG TABLET |
| SCHERING CORP | 00085115304 | IMDUR 120 MG TABLET SA |
| SCHERING CORP | 00085330601 | IMDUR 30 MG TABLET SA |
| SCHERING CORP | 00085330603 | IMDUR 30 MG TABLET SA |
| SCHERING CORP | 00085411001 | IMDUR 60 MG TABLET SA |
| SCHERING CORP | 00085411003 | IMDUR 60 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045503 | IMITREX 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052300 | IMITREX 20 MG NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046002 | IMITREX 25 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052400 | IMITREX 5 MG NASAL SPRAY |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173045900 | IMITREX 50 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483059010 | IMURAN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 60793001114 | INTAL INHALER |
| MERRELL PHARMACEUTICALS INC | 00585067302 | INTAL NEBULIZER SOLUTION |
| MERRELL PHARMACEUTICALS INC | 00585067303 | INTAL NEBULIZER SOLUTION |
| HOFFMANN LA ROCHE INC | 00004024515 | INVIRASE 200 MG CAPSULE |
| SCHERING CORP | 00085026301 | K-DUR 10 MEQ TABLET SA |
| SCHERING CORP | 00085026381 | K-DUR 10 MEQ TABLET SA |
| SCHERING CORP | 00085078701 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085078706 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085078710 | K-DUR 20 MEQ TABLET SA |
| SCHERING CORP | 00085078781 | K-DUR 20 MEQ TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00024230110 | KERLONE 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00024230020 | KERLONE 20 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004006801 | KLONOPIN 0.5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004005801 | KLONOPIN 1 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004009801 | KLONOPIN 2 MG TABLET |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072573028 | LAC-HYDRIN 12% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072573038 | LAC-HYDRIN 12% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072570801 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571208 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571214 | LAC-HYDRIN 12% LOTION |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072571401 | LAC-HYDRIN 12% LOTION |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064255 | LAMICTAL 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064360 | LAMICTAL 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173064460 | LAMICTAL 200 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052700 | LAMICTAL 25 MG DISPER TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173063302 | LAMICTAL 25 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052600 | LAMICTAL 5 MG DISPER TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078032882 | LAMISIL 1% SOLUTION |
| NOVARTIS PHARMACEUTICALS CORP | 00078017905 | LAMISIL 250 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078017915 | LAMISIL 250 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028010801 | LAMPRENE 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024255 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024256 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024275 | LANOXIN 125 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024955 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024956 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024975 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173024980 | LANOXIN 250 MCG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173026427 | LANOXIN 50 MCG/ML ELIXIR |
| HOFFMANN LA ROCHE INC | 00004017202 | LARIAM 250 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006710 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006750 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006770 | LASIX 20 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006011 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006013 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006050 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006070 | LASIX 40 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006605 | LASIX 80 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039006650 | LASIX 80 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078017605 | LESCOL 20 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078017615 | LESCOL 20 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078023405 | LESCOL 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078023415 | LESCOL 40 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078035405 | LESCOL XL 80 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00078035415 | LESCOL XL 80 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173063535 | LEUKERAN 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152010 | LEVAQUIN 250 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152050 | LEVAQUIN 250 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152510 | LEVAQUIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045152550 | LEVAQUIN 500 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045153010 | LEVAQUIN 750 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| JOHNSON & JOHNSON GROUP | 00045153050 | LEVAQUIN 750 MG TABLET |
| ASTRAZENECA LP | 00186000231 | LEXXEL 5-2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186000131 | LEXXEL 5-5 MG TABLET SA |
| ASTRAZENECA LP | 00186000168 | LEXXEL 5-5 MG TABLET SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015523 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015534 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015540 | LIPITOR 10 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015623 | LIPITOR 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015640 | LIPITOR 20 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015723 | LIPITOR 40 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071015823 | LIPITOR 80 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091648 | LOESTRIN 21 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091548 | LOESTRIN 21 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091745 | LOESTRIN FE 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091748 | LOESTRIN FE 1.5/30 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091345 | LOESTRIN FE 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071091348 | LOESTRIN FE 1/20 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006602 | LOMOTIL LIQUID |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006131 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006134 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006151 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006152 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025006155 | LOMOTIL TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071073720 | LOPID 600 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071073730 | LOPID 600 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028420133 | LOPRESSOR 1 MG/ML AMPUL |
| NOVARTIS PHARMACEUTICALS CORP | 00028007101 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007110 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007161 | LOPRESSOR 100 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005101 | LOPRESSOR 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005110 | LOPRESSOR 50 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028005301 | LOPRESSOR HCT 100/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028007301 | LOPRESSOR HCT 100/50 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00028003501 | LOPRESSOR HCT 50/25 TABLET |
| FOREST PHARMACEUTICALS INC | 00785635001 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785635050 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785635063 | LORCET 10/650 TABLET |
| FOREST PHARMACEUTICALS INC | 00785112201 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112250 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112263 | LORCET PLUS TABLET |
| FOREST PHARMACEUTICALS INC | 00785112001 | LORCET-HD CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083006330 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006332 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006390 | LOTENSIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007930 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007932 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007990 | LOTENSIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009430 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009432 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083009490 | LOTENSIN 40 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005930 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005932 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005990 | LOTENSIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007230 | LOTENSIN HCT 10/12.5 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007430 | LOTENSIN HCT 20/12.5 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083007530 | LOTENSIN HCT 20/25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005730 | LOTENSIN HCT 5/6.25 TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083225530 | LOTREL 2.5/10 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083226030 | LOTREL 5/10 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00083226530 | LOTREL 5/20 MG CAPSULE |
| SCHERING CORP | 00085092401 | LOTRISONE CREAM |
| SCHERING CORP | 00085092402 | LOTRISONE CREAM |
| SCHERING CORP | 00085080901 | LOTRISONE LOTION |
| BRISTOL MYERS SQUIBB CO | 00015308060 | LYSODREN 500 MG TABLET |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149071001 | MACROBID 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000905 | MACRODANTIN 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000967 | MACRODANTIN 100 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000705 | MACRODANTIN 25 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000805 | MACRODANTIN 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000866 | MACRODANTIN 50 MG CAPSULE |
| PROCTER AND GAMBLE PHARMACEUTICALS INC SUB PROCTER AND GAMBLE CO | 00149000867 | MACRODANTIN 50 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067501 | MALARONE 250-100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173067601 | MALARONE 62.5-25 MG PED TAB |
| WARNER CHILCOTT INC | 00430016624 | MANDELAMINE 500 MG TABLET |
| 3M PHARMACEUTICALS | 00089081521 | MAXAIR AUTOHALER 0.2 MG AERO |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052001 | MAXIFED 700/80 TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605052601 | MAXIFED DM TABLET SA |
| MCR AMERICAN PHARMACEUTICALS INC | 58605051401 | MAXIFED-G TABLET SA |
| OVATION PHARMACEUTICALS INC | 67386080302 | MEBARAL 100 MG TABLET |
| OVATION PHARMACEUTICALS INC | 67386080102 | MEBARAL 32 MG TABLET |
| OVATION PHARMACEUTICALS INC | 67386080202 | MEBARAL 50 MG TABLET |
| BERTEK PHARMACEUTICALS INC | 62794015102 | MENTAX 1% CREAM |
| BERTEK PHARMACEUTICALS INC | 62794015103 | MENTAX 1% CREAM |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066518 | MEPRON 750 MG/5 ML SUSPENSION |
| NOVARTIS PHARMACEUTICALS CORP | 00078005405 | METHERGINE 0.2 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078005303 | METHERGINE 0.2 MG/ML AMPUL |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| 3M PHARMACEUTICALS | 00089020025 | METROGEL-VAGINAL 0.75% GEL |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006601 | MEXITIL 150 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006701 | MEXITIL 200 MG CAPSULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597006801 | MEXITIL 250 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078031190 | MIACALCIN 200 UNITS NASAL SPRA |
| ABBOTT LABORATORIES | 00597003928 | MICARDIS 20 MG TABLET |
| ABBOTT LABORATORIES | 00597004028 | MICARDIS 40 MG TABLET |
| ABBOTT LABORATORIES | 00597004128 | MICARDIS 80 MG TABLET |
| ABBOTT LABORATORIES | 00597004328 | MICARDIS HCT 40/12.5 MG TAB |
| ABBOTT LABORATORIES | 00597004428 | MICARDIS HCT 80/12.5 MG TAB |
| WATSON LABORATORIES INC | 52544062201 | MICROZIDE 12.5 MG CAPSULE |
| XCEL PHARMACEUTICALS | 66490024598 | MIGRANAL 4 MG/ML NASAL SPRAY |
| ORGANON USA INC | 00052028106 | MIRCETTE 28 DAY TABLET |
| ABBOTT LABORATORIES | 00597003001 | MOBIC 15 MG TABLET |
| ABBOTT LABORATORIES | 00597002901 | MOBIC 7.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062171415 | MODICON 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107171427 | MODICON 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062543701 | MONISTAT 3 200 MG VAG SUPP |
| JOHNSON & JOHNSON GROUP | 00062543401 | MONISTAT-DERM 2% CREAM |
| JOHNSON & JOHNSON GROUP | 00062543402 | MONISTAT-DERM 2% CREAM |
| JOHNSON & JOHNSON GROUP | 00062543403 | MONISTAT-DERM 2% CREAM |
| WATSON LABORATORIES INC | 55515025904 | MONODOX 100 MG CAPSULE |
| WATSON LABORATORIES INC | 55515026006 | MONODOX 50 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087015846 | MONOPRIL 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087015885 | MONOPRIL 10 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060942 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060945 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087060985 | MONOPRIL 20 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087120213 | MONOPRIL 40 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087149201 | MONOPRIL HCT 10/12.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087149301 | MONOPRIL HCT 20/12.5 MG TABLET |
| FOREST PHARMACEUTICALS INC | 00456430068 | MONUROL 3 GM SACHET |
| JOHNSON & JOHNSON GROUP | 17314940001 | MYCELEX 10 MG TROCHE |
| JOHNSON & JOHNSON GROUP | 17314940002 | MYCELEX 10 MG TROCHE |
| JOHNSON & JOHNSON GROUP | 17314940003 | MYCELEX 10 MG TROCHE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173071325 | MYLERAN 2 MG TABLET |
| SANOFI SYNTHELABO INC | 00024128704 | MYTELASE 10 MG CAPLET |
| HOFFMANN LA ROCHE INC | 00004631301 | NAPROSYN 250 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004631114 | NAPROSYN 375 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004631014 | NAPROSYN 500 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071027024 | NARDIL 15 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00075150616 | NASACORT AQ NASAL SPRAY |
| MERRELL PHARMACEUTICALS INC | 00075150543 | NASACORT NASAL INHALER |
| SCHERING CORP | 00085119701 | NASONEX 50 MCG NASAL SPRAY |
| WARNER CHILCOTT INC | 00430022723 | NATACHEW TABLET CHEW |
| WARNER CHILCOTT INC | 00430022640 | NATAFORT TABLET |
| SANOFI SYNTHELABO INC | 00024132203 | NEGGRAM 500 MG CAPLET |
| SANOFI SYNTHELABO INC | 00024135901 | NEO-SYNEPHRINE 10% EYE DROP |
| SANOFI SYNTHELABO INC | 00024136201 | NEO-SYNEPHRINE 10% EYE DROP |
| SANOFI SYNTHELABO INC | 00024135801 | NEO-SYNEPHRINE 2.5% EYE DRP |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080324 | NEURONTIN 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080340 | NEURONTIN 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080524 | NEURONTIN 300 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080540 | NEURONTIN 300 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080624 | NEURONTIN 400 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071080640 | NEURONTIN 400 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071041624 | NEURONTIN 600 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071042624 | NEURONTIN 800 MG TABLET |
| ASTRAZENECA LP | 00186502031 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502054 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502082 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186502228 | NEXIUM 20 MG CAPSULE |
| ASTRAZENECA LP | 00186504031 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504054 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504082 | NEXIUM 40 MG CAPSULE |
| ASTRAZENECA LP | 00186504228 | NEXIUM 40 MG CAPSULE |
| KOS PHARMACEUTICALS INC | 60598000301 | NIASPAN 1,000 MG TABLET SA |
| KOS PHARMACEUTICALS INC | 60598000101 | NIASPAN 500 MG TABLET SA |
| KOS PHARMACEUTICALS INC | 60598000201 | NIASPAN 750 MG TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00088111114 | NILANDRON 150 MG TABLET |
| SCHERING CORP | 00085331530 | NITRO-DUR 0.3 MG/HR PATCH |
| SCHERING CORP | 00085331535 | NITRO-DUR 0.3 MG/HR PATCH |
| SCHERING CORP | 00085081930 | NITRO-DUR 0.8 MG/HR PATCH |
| SCHERING CORP | 00085081935 | NITRO-DUR 0.8 MG/HR PATCH |
| JOHNSON & JOHNSON GROUP | 50458022115 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022130 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022160 | NIZORAL 2% CREAM |
| JOHNSON & JOHNSON GROUP | 50458022304 | NIZORAL 2% SHAMPOO |
| JOHNSON & JOHNSON GROUP | 50458022010 | NIZORAL 200 MG TABLET |
| ASTRAZENECA LP | 00310060018 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060060 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060075 | NOLVADEX 10 MG TABLET |
| ASTRAZENECA LP | 00310060412 | NOLVADEX 20 MG TABLET |
| ASTRAZENECA LP | 00310060430 | NOLVADEX 20 MG TABLET |
| ASTRAZENECA LP | 00310060490 | NOLVADEX 20 MG TABLET |
| WATSON LABORATORIES INC | 52544053901 | NORCO 10/325 TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| WATSON LABORATORIES INC | 52544053905 | NORCO 10/325 TABLET |
| WATSON LABORATORIES INC | 52544026528 | NORINYL 1+50-28 TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00025275231 | NORPACE 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025275252 | NORPACE 100 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025276231 | NORPACE 150 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273231 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273234 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025273251 | NORPACE CR 100 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274231 | NORPACE CR 150 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274234 | NORPACE CR 150 MG CAPSULE SA |
| PFIZER LABORATORIES DIV PFIZER INC | 00025274251 | NORPACE CR 150 MG CAPSULE SA |
| MERRELL PHARMACEUTICALS INC | 00068000701 | NORPRAMIN 10 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068002001 | NORPRAMIN 100 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068002150 | NORPRAMIN 150 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001101 | NORPRAMIN 25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001501 | NORPRAMIN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068001901 | NORPRAMIN 75 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062190315 | ORTHO TRI-CYCLEN 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062179615 | ORTHO-CEPT 28 DAY TABLET |
| JOHNSON & JOHNSON GROUP | 00062190115 | ORTHO-CYCLEN 28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062176115 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176104 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176107 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107176127 | ORTHO-NOVUM 1/35-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062133215 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062133220 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107133207 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00107133227 | ORTHO-NOVUM 1/50-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062177115 | ORTHO-NOVUM 10/11-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178115 | ORTHO-NOVUM 7/7/7-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178120 | ORTHO-NOVUM 7/7/7-28 TABLET |
| JOHNSON & JOHNSON GROUP | 00062178122 | ORTHO-NOVUM 7/7/7-28 TABLET |
| WARNER CHILCOTT INC | 00430058214 | OVCON-35 28 TABLET |
| WARNER CHILCOTT INC | 00430058514 | OVCON-50 28 TABLET |
| PAN AMERICAN LABORATORIES INC | 00525942216 | PANCOF HC LIQUID |
| PAN AMERICAN LABORATORIES INC | 00525975816 | PANCOF XP LIQUID |
| JOHNSON & JOHNSON GROUP | 00045034260 | PANCREASE MT 10 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034360 | PANCREASE MT 16 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034660 | PANCREASE MT 20 CAPSULE EC |
| JOHNSON & JOHNSON GROUP | 00045034160 | PANCREASE MT 4 CAPSULE EC |
| PAN AMERICAN LABORATORIES INC | 00525079516 | PANMIST DM SYRUP |
| PAN AMERICAN LABORATORIES INC | 00525076801 | PANMIST JR 595/48 TABLET |
| PAN AMERICAN LABORATORIES INC | 00525079201 | PANMIST LA 795/86 TABLET |
| JOHNSON & JOHNSON GROUP | 00045032560 | PARAFON FORTE DSC 500 MG CPT |
| NOVARTIS PHARMACEUTICALS CORP | 00078001705 | PARLODEL 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078001715 | PARLODEL 2.5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078010205 | PARLODEL 5 MG CAPSULE |
| NOVARTIS PHARMACEUTICALS CORP | 00078010215 | PARLODEL 5 MG CAPSULE |
| SANOFI SYNTHELABO INC | 00024150906 | PEDIACOF LIQUID |
| ZYBER PHARMACEUTICAL INC | 65224017516 | PEDIATEX LIQUID |
| ZYBER PHARMACEUTICAL INC | 65224045716 | PEDIATEX-D LIQUID |
| ATLEY PHARMACEUTICALS INC | 59702015201 | PEDIOX CHEWABLE TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001701 | PERSANTINE 25 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001801 | PERSANTINE 50 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597001901 | PERSANTINE 75 MG TABLET |
| SANOFI SYNTHELABO INC | 00024153502 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153506 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153508 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153524 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024153548 | PHISOHEX 3% CLEANSER |
| SANOFI SYNTHELABO INC | 00024156210 | PLAQUENIL 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117101 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117103 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117105 | PLAVIX 75 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 63653117106 | PLAVIX 75 MG TABLET |
| ASTRAZENECA LP | 00186045228 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045231 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045258 | PLENDIL 10 MG TABLET SA |
| ASTRAZENECA LP | 00186045028 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045031 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045058 | PLENDIL 2.5 MG TABLET SA |
| ASTRAZENECA LP | 00186045128 | PLENDIL 5 MG TABLET SA |
| ASTRAZENECA LP | 00186045131 | PLENDIL 5 MG TABLET SA |
| ASTRAZENECA LP | 00186045158 | PLENDIL 5 MG TABLET SA |
| JOHNSON & JOHNSON GROUP | 17314932201 | POLYCITRA SYRUP |
| JOHNSON & JOHNSON GROUP | 17314932001 | POLYCITRA-K CRYSTALS PACKET |
| JOHNSON & JOHNSON GROUP | 17314932101 | POLYCITRA-K SOLUTION |
| JOHNSON & JOHNSON GROUP | 17314932301 | POLYCITRA-LC SOLUTION S/F |
| BRISTOL MYERS SQUIBB CO | 00087048741 | POLY-VI-FLOR 0.25 MG TAB CHW |
| BRISTOL MYERS SQUIBB CO | 00087046841 | POLY-VI-FLOR 0.5 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087047402 | POLY-VI-FLOR 1 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087048841 | POLY-VI-FLOR/IRON 0.25 MG TB |
| FERNDALE LABORATORIES INC | 00496071603 | PRAMOSONE 1% CREAM |
| FERNDALE LABORATORIES INC | 00496071604 | PRAMOSONE 1% CREAM |
| FERNDALE LABORATORIES INC | 00496072903 | PRAMOSONE 1% LOTION |
| FERNDALE LABORATORIES INC | 00496072904 | PRAMOSONE 1% LOTION |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FERNDALE LABORATORIES INC | 00496072906 | PRAMOSONE 1% LOTION |
| FERNDALE LABORATORIES INC | 00496076304 | PRAMOSONE 1% OINTMENT |
| FERNDALE LABORATORIES INC | 00496071703 | PRAMOSONE 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496071704 | PRAMOSONE 2.5% CREAM |
| FERNDALE LABORATORIES INC | 00496072604 | PRAMOSONE 2.5% LOTION |
| FERNDALE LABORATORIES INC | 00496072606 | PRAMOSONE 2.5% LOTION |
| FERNDALE LABORATORIES INC | 00496077704 | PRAMOSONE 2.5% OINTMENT |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008181 | PRANDIN 0.5 MG TABLET |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008281 | PRANDIN 1 MG TABLET |
| NOVO NORDISK PHARMACEUTICAL INDUSTRIES INC | 00169008481 | PRANDIN 2 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026286251 | PRECOSE 100 MG TABLET |
| BAYER CORP PHARMACEUTICAL DIV | 00026286148 | PRECOSE 50 MG TABLET |
| MONARCH PHARMACEUTICALS INC | 61570012563 | PREFEST TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630042090 | PRENATE ADVANCE TABLET |
| TAP PHARMACEUTICALS INC | 00300154111 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300154119 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300154130 | PREVACID 15 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300730930 | PREVACID 15 MG SUSPENSION DR |
| TAP PHARMACEUTICALS INC | 00300304611 | PREVACID 30 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300304613 | PREVACID 30 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300304619 | PREVACID 30 MG CAPSULE DR |
| TAP PHARMACEUTICALS INC | 00300731130 | PREVACID 30 MG SUSPENSION DR |
| MERRELL PHARMACEUTICALS INC | 00088210003 | PRIFTIN 150 MG TABLET |
| ASTRAZENECA LP | 00186060628 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060631 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060688 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186060682 | PRILOSEC 10 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074228 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074231 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074282 | PRILOSEC 20 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074328 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074331 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074368 | PRILOSEC 40 MG CAPSULE DR |
| ASTRAZENECA LP | 00186074382 | PRILOSEC 40 MG CAPSULE DR |
| SANOFI SYNTHELABO INC | 00024159601 | PRIMAQUINE 26.3 MG TABLET |
| MERCK AND CO INC | 00006010628 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010631 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010658 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010672 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010682 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010687 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006010694 | PRINIVIL 10 MG TABLET |
| MERCK AND CO INC | 00006001528 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006001531 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006001558 | PRINIVIL 2.5 MG TABLET |
| MERCK AND CO INC | 00006020728 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020731 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020758 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020772 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020782 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020787 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006020794 | PRINIVIL 20 MG TABLET |
| MERCK AND CO INC | 00006023758 | PRINIVIL 40 MG TABLET |
| MERCK AND CO INC | 00006001928 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001958 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001982 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001986 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001987 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001994 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006001972 | PRINIVIL 5 MG TABLET |
| MERCK AND CO INC | 00006014531 | PRINZIDE 10/12.5 TABLET |
| MERCK AND CO INC | 00006014558 | PRINZIDE 10/12.5 TABLET |
| MERCK AND CO INC | 00006014031 | PRINZIDE 20/12.5 TABLET |
| MERCK AND CO INC | 00006014058 | PRINZIDE 20/12.5 TABLET |
| MERCK AND CO INC | 00006014231 | PRINZIDE 20/25 TABLET |
| MERCK AND CO INC | 00006014258 | PRINZIDE 20/25 TABLET |
| WYETH DIV WYETH PHARMACEUTICALS INC | 00008084181 | PROTONIX 40 MG TABLET EC |
| WYETH DIV WYETH PHARMACEUTICALS INC | 00008084199 | PROTONIX 40 MG TABLET EC |
| SCHERING CORP | 00085061402 | PROVENTIL 90 MCG INHALER |
| SCHERING CORP | 00085113201 | PROVENTIL HFA 90 MCG INHALER |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310402 | PROZAC 10 MG PULVULE |
| ELI LILLY AND CO | 00002400602 | PROZAC 10 MG TABLET |
| ELI LILLY AND CO | 00002400630 | PROZAC 10 MG TABLET |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310501 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310502 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310507 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310530 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310533 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310581 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310582 | PROZAC 20 MG PULVULE |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777512058 | PROZAC 20 MG/5 ML SOLUTION |
| DISTA PRODUCTS CO DIV ELI LILLY AND CO | 00777310730 | PROZAC 20 MG PULVULE |
| ELI LILLY AND CO | 00002300475 | PROZAC WEEKLY 90 MG CAPSULE |
| ASTRAZENECA LP | 00186091542 | PULMICORT 200 MCG TURBUHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 57844052207 | PURINETHOL 50 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 57844052252 | PURINETHOL 50 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| WARNER CHILCOTT INC | 00430018124 | PYRIDIUM 200 MG TABLET |
| WARNER CHILCOTT INC | 00430018215 | PYRIDIUM PLUS TABLET |
| BERLEX INC | 50419010110 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010111 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010125 | QUINAGLUTE DURA-TABS 324 MG |
| BERLEX INC | 50419010150 | QUINAGLUTE DURA-TABS 324 MG |
| SCHERING CORP | 00085119403 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085132704 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085135105 | REBETOL 200 MG CAPSULE |
| SCHERING CORP | 00085138507 | REBETOL 200 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045081015 | REGRANEX 0.01% GEL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068101 | RELENZA 5 MG DISKHALER |
| ORGANON USA INC | 00052010530 | REMERON 15 MG TABLET |
| ORGANON USA INC | 00052010590 | REMERON 15 MG TABLET |
| ORGANON USA INC | 00052010730 | REMERON 30 MG TABLET |
| ORGANON USA INC | 00052010790 | REMERON 30 MG TABLET |
| ORGANON USA INC | 00052010930 | REMERON 45 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039260 | REMINYL 12 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039960 | REMINYL 4 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458039910 | REMINYL 4 MG/ML ORAL SOL |
| JOHNSON & JOHNSON GROUP | 50458039160 | REMINYL 8 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062018702 | RENOVA 0.02% CREAM |
| JOHNSON & JOHNSON GROUP | 00062018503 | RENOVA 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062018505 | RENOVA 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062057544 | RETIN-A 0.01% GEL |
| JOHNSON & JOHNSON GROUP | 00062057546 | RETIN-A 0.01% GEL |
| JOHNSON & JOHNSON GROUP | 00062016501 | RETIN-A 0.025% CREAM |
| JOHNSON & JOHNSON GROUP | 00062016502 | RETIN-A 0.025% CREAM |
| JOHNSON & JOHNSON GROUP | 00062047542 | RETIN-A 0.025% GEL |
| JOHNSON & JOHNSON GROUP | 00062047545 | RETIN-A 0.025% GEL |
| JOHNSON & JOHNSON GROUP | 00062017512 | RETIN-A 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062017513 | RETIN-A 0.05% CREAM |
| JOHNSON & JOHNSON GROUP | 00062007507 | RETIN-A 0.05% LIQUID |
| JOHNSON & JOHNSON GROUP | 00062027501 | RETIN-A 0.1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062027523 | RETIN-A 0.1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062019002 | RETIN-A MICRO 0.1% GEL |
| JOHNSON & JOHNSON GROUP | 00062019003 | RETIN-A MICRO 0.1% GEL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173011318 | RETROVIR 10 MG/ML SYRUP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173010855 | RETROVIR 100 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173010856 | RETROVIR 100 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173050100 | RETROVIR 300 MG TABLET |
| ASTRAZENECA LP | 00186107509 | RHINOCORT NASAL INHALER |
| PROMETHEUS LABORATORIES INC | 65483009306 | RIDAURA 3 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068051030 | RIFADIN 150 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050830 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050860 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068050861 | RIFADIN 300 MG CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00068052960 | RIFAMATE CAPSULE |
| MERRELL PHARMACEUTICALS INC | 00088057641 | RIFATER TABLET |
| JOHNSON & JOHNSON GROUP | 50458030104 | RISPERDAL 0.25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030150 | RISPERDAL 0.25 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030206 | RISPERDAL 0.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030250 | RISPERDAL 0.5 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030001 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030006 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030050 | RISPERDAL 1 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458030503 | RISPERDAL 1 MG/ML SOLUTION |
| JOHNSON & JOHNSON GROUP | 50458032001 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458032006 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458032050 | RISPERDAL 2 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033001 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033006 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458033050 | RISPERDAL 3 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458035001 | RISPERDAL 4 MG TABLET |
| JOHNSON & JOHNSON GROUP | 50458035006 | RISPERDAL 4 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083000330 | RITALIN 10 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083003430 | RITALIN 20 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083000730 | RITALIN 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083001630 | RITALIN-SR 20 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004014301 | ROCALTROL 0.25 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004014323 | ROCALTROL 0.25 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004014401 | ROCALTROL 0.5 MCG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004911500 | ROCALTROL 1 MCG/ML ORAL SOLN |
| NOVARTIS PHARMACEUTICALS CORP | 00078005805 | SANSERT 2 MG TABLET |
| ELI LILLY AND CO | 00430043514 | SARAFEM 10 MG PULVULE |
| ELI LILLY AND CO | 00430043614 | SARAFEM 20 MG PULVULE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002001 | SERENTIL 10 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002301 | SERENTIL 100 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002101 | SERENTIL 25 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597002504 | SERENTIL 25 MG/ML ORAL CONC |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046400 | SEREVENT 21 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046700 | SEREVENT 21 MCG INHALER |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173046500 | SEREVENT 21 MCG INHLR REFILL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052000 | SEREVENT DISKUS 50 MCG |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173052100 | SEREVENT DISKUS 50 MCG |
| ASTRAZENECA LP | 00310027110 | SEROQUEL 100 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ASTRAZENECA LP | 00310027139 | SEROQUEL 100 MG TABLET |
| ASTRAZENECA LP | 00310027210 | SEROQUEL 200 MG TABLET |
| ASTRAZENECA LP | 00310027239 | SEROQUEL 200 MG TABLET |
| ASTRAZENECA LP | 00310027510 | SEROQUEL 25 MG TABLET |
| ASTRAZENECA LP | 00310027539 | SEROQUEL 25 MG TABLET |
| ASTRAZENECA LP | 00310027439 | SEROQUEL 300 MG TABLET |
| ASTRAZENECA LP | 00310027460 | SEROQUEL 300 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003231 | SERZONE 100 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003931 | SERZONE 150 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003331 | SERZONE 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087004131 | SERZONE 250 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00087003147 | SERZONE 50 MG TABLET |
| SANOFI SYNTHELABO INC | 00024180016 | SKELID 200 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004028857 | SORIATANE 10 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 63032009125 | SORIATANE 25 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 00062546001 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062546002 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 00062546003 | SPECTAZOLE 1% CREAM |
| JOHNSON & JOHNSON GROUP | 50458029515 | SPORANOX 10 MG/ML SOLUTION |
| JOHNSON & JOHNSON GROUP | 50458029001 | SPORANOX 100 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458029004 | SPORANOX 100 MG CAPSULE |
| JOHNSON & JOHNSON GROUP | 50458029028 | SPORANOX 100 MG CAPSULE |
| SCOT TUSSIN PHARMACAL CO INC | 00372004816 | S-T FORTE 2 LIQUID S/F |
| BRISTOL MYERS SQUIBB CO | 00087565041 | STADOL NS 10 MG/ML SPRAY |
| NOVARTIS PHARMACEUTICALS CORP | 00078035205 | STARLIX 120 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078035105 | STARLIX 60 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044010 | SULAR 10 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089139 | SULAR 10 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044110 | SULAR 20 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089239 | SULAR 20 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044210 | SULAR 30 MG TABLET |
| FIRST HORIZON PHARMACEUTICAL CORP | 00310089339 | SULAR 30 MG TABLET SA |
| FIRST HORIZON PHARMACEUTICAL CORP | 59630044310 | SULAR 40 MG TABLET |
| BAXTER HEALTHCARE CORP | 10019064124 | SUPRANE INHALATION LIQUID |
| ODYSSEY PHARMACEUTICALS INC | 65473072001 | SURMONTIL 100 MG CAPSULE |
| ODYSSEY PHARMACEUTICALS INC | 65473071801 | SURMONTIL 25 MG CAPSULE |
| ODYSSEY PHARMACEUTICALS INC | 65473071901 | SURMONTIL 50 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00056047330 | SUSTIVA 100 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00056047492 | SUSTIVA 200 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00056047030 | SUSTIVA 50 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00025016608 | SYNAREL 2 MG/ML NASAL SPRAY |
| SANOFI SYNTHELABO INC | 00024193704 | TALACEN CAPLET |
| SANOFI SYNTHELABO INC | 00024195104 | TALWIN NX TABLET |
| 3M PHARMACEUTICALS | 00089030710 | TAMBOCOR 100 MG TABLET |
| 3M PHARMACEUTICALS | 00089031410 | TAMBOCOR 150 MG TABLET |
| 3M PHARMACEUTICALS | 00089030510 | TAMBOCOR 50 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004080085 | TAMIFLU 75 MG GELCAP |
| HOFFMANN LA ROCHE INC | 00004081095 | TAMIFLU ORAL SUSPENSION |
| HOFFMANN LA ROCHE INC | 00004592001 | TASMAR 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004592101 | TASMAR 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083005230 | TEGRETOL 100 MG TABLET CHEW |
| NOVARTIS PHARMACEUTICALS CORP | 00083005232 | TEGRETOL 100 MG TABLET CHEW |
| NOVARTIS PHARMACEUTICALS CORP | 00083001976 | TEGRETOL 100 MG/5 ML SUSP |
| NOVARTIS PHARMACEUTICALS CORP | 00083002730 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002732 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083002740 | TEGRETOL 200 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083006130 | TEGRETOL XR 100 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00083006230 | TEGRETOL XR 200 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00083006030 | TEGRETOL XR 400 MG TABLET SA |
| SCHERING CORP | 00085125901 | TEMODAR 100 MG CAPSULE |
| SCHERING CORP | 00085125902 | TEMODAR 100 MG CAPSULE |
| SCHERING CORP | 00085124401 | TEMODAR 20 MG CAPSULE |
| SCHERING CORP | 00085124402 | TEMODAR 20 MG CAPSULE |
| SCHERING CORP | 00085125201 | TEMODAR 250 MG CAPSULE |
| SCHERING CORP | 00085125202 | TEMODAR 250 MG CAPSULE |
| SCHERING CORP | 00085124801 | TEMODAR 5 MG CAPSULE |
| SCHERING CORP | 00085124802 | TEMODAR 5 MG CAPSULE |
| ELAN PHARMACEUTICALS INC | 00173043201 | TEMOVATE 0.05% SOLUTION |
| ASTRAZENECA LP | 00310011710 | TENORETIC 100 TABLET |
| ASTRAZENECA LP | 00310011510 | TENORETIC 50 TABLET |
| ASTRAZENECA LP | 00310010110 | TENORMIN 100 MG TABLET |
| ASTRAZENECA LP | 00310010710 | TENORMIN 25 MG TABLET |
| ASTRAZENECA LP | 00310010510 | TENORMIN 50 MG TABLET |
| ASTRAZENECA LP | 00310010534 | TENORMIN 50 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068069761 | TENUATE 25 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00068069861 | TENUATE DOSPAN 75 MG TAB SA |
| MERRELL PHARMACEUTICALS INC | 00068069862 | TENUATE DOSPAN 75 MG TAB SA |
| BRISTOL MYERS SQUIBB CO | 00015111732 | TEQUIN 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015111780 | TEQUIN 200 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015117760 | TEQUIN 400 MG TABLET |
| BRISTOL MYERS SQUIBB CO | 00015117780 | TEQUIN 400 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00062535101 | TERAZOL 3 80 MG SUPPOSITORY |
| JOHNSON & JOHNSON GROUP | 00062535601 | TERAZOL 3 CREAM |
| JOHNSON & JOHNSON GROUP | 00062535001 | TERAZOL 7 CREAM |
| FOREST PHARMACEUTICALS INC | 00456069801 | TESSALON 200 MG CAPSULE |
| FOREST PHARMACEUTICALS INC | 00456068801 | TESSALON PERLE 100 MG CAP |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| FOREST PHARMACEUTICALS INC | 00456068802 | TESSALON PERLE 100 MG CAP |
| JOHNSON & JOHNSON GROUP | 17314460803 | TESTODERM 4 MG/24HR PATCH |
| JOHNSON & JOHNSON GROUP | 17314283603 | TESTODERM 6 MG/24HR PATCH |
| JOHNSON & JOHNSON GROUP | 17314460903 | TESTODERM 6 MG/24HR PATCH |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173088025 | THIOGUANINE TABLOID 40 MG TB |
| FOREST PHARMACEUTICALS INC | 00456005001 | THYROLAR-1 STRENGTH TABLET |
| FOREST PHARMACEUTICALS INC | 00456004501 | THYROLAR-1/2 STRENGTH TAB |
| FOREST PHARMACEUTICALS INC | 00456004001 | THYROLAR-1/4 STRENGTH TAB |
| FOREST PHARMACEUTICALS INC | 00456005501 | THYROLAR-2 STRENGTH TABLET |
| FOREST PHARMACEUTICALS INC | 00456006001 | THYROLAR-3 STRENGTH TABLET |
| JOHNSON & JOHNSON GROUP | 00045041660 | TOLECTIN 600 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045041460 | TOLECTIN DS 400 MG CAPSULE |
| ASTRAZENECA LP | 00186070768 | TONOCARD 400 MG TABLET |
| ASTRAZENECA LP | 00186070968 | TONOCARD 600 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064165 | TOPAMAX 100 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064765 | TOPAMAX 15 MG SPRINKLE CAP |
| JOHNSON & JOHNSON GROUP | 00045064265 | TOPAMAX 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045064565 | TOPAMAX 25 MG SPRINKLE CAP |
| JOHNSON & JOHNSON GROUP | 00045063965 | TOPAMAX 25 MG TABLET |
| ASTRAZENECA LP | 00186109205 | TOPROL XL 100 MG TABLET SA |
| ASTRAZENECA LP | 00186108805 | TOPROL XL 25 MG TABLET SA |
| ASTRAZENECA LP | 00186109005 | TOPROL XL 50 MG TABLET SA |
| HOFFMANN LA ROCHE INC | 00004027301 | TORADOL 10 MG TABLET |
| ROXANE LABORATORIES INC | 00054474825 | TORECAN 10 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039110 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039111 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039150 | TRANDATE 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039210 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039222 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039250 | TRANDATE 200 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039310 | TRANDATE 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039333 | TRANDATE 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483039350 | TRANDATE 300 MG TABLET |
| MERRELL PHARMACEUTICALS INC | 00039007810 | TRENTAL 400 MG TABLET SA |
| MERRELL PHARMACEUTICALS INC | 00039007811 | TRENTAL 400 MG TABLET SA |
| NOVARTIS PHARMACEUTICALS CORP | 00078033605 | TRILEPTAL 150 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033606 | TRILEPTAL 150 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033705 | TRILEPTAL 300 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033706 | TRILEPTAL 300 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078035752 | TRILEPTAL 300 MG/5 ML SUSP |
| NOVARTIS PHARMACEUTICALS CORP | 00078033805 | TRILEPTAL 600 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00078033806 | TRILEPTAL 600 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034051080 | TRILISATE 1,000 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050050 | TRILISATE 500 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050080 | TRILISATE 500 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050550 | TRILISATE 750 MG TABLET |
| PURDUE PHARMACEUTICAL PRODUCTS LP | 00034050580 | TRILISATE 750 MG TABLET |
| SCHERING CORP | 00085070304 | TRINALIN REPETABS |
| WATSON LABORATORIES INC | 52544027428 | TRI-NORINYL 28 TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173069100 | TRIZIVIR TABLET |
| SCOT TUSSIN PHARMACAL CO INC | 00372001816 | TUSSIREX S/F LIQUID |
| SCOT TUSSIN PHARMACAL CO INC | 00372001716 | TUSSIREX SYRUP |
| JOHNSON & JOHNSON GROUP | 00045051360 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051370 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051372 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051373 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051380 | TYLENOL W/CODEINE #3 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051560 | TYLENOL W/CODEINE #4 TABLET |
| JOHNSON & JOHNSON GROUP | 00045051570 | TYLENOL W/CODEINE #4 TABLET |
| JOHNSON & JOHNSON GROUP | 00045050816 | TYLENOL W/CODEINE ELIXIR |
| JOHNSON & JOHNSON GROUP | 00045052660 | TYLOX 5/500 CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045052679 | TYLOX 5/500 CAPSULE |
| JOHNSON & JOHNSON GROUP | 00045065010 | ULTRACET TABLET |
| JOHNSON & JOHNSON GROUP | 00045065060 | ULTRACET TABLET |
| JOHNSON & JOHNSON GROUP | 00045065910 | ULTRAM 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045065960 | ULTRAM 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045065970 | ULTRAM 50 MG TABLET |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072140015 | ULTRAVATE 0.05% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072140050 | ULTRAVATE 0.05% CREAM |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072145015 | ULTRAVATE 0.05% OINTMENT |
| WESTWOOD SQUIBB PHARMACEUTICALS INC | 00072145050 | ULTRAVATE 0.05% OINTMENT |
| ODYSSEY PHARMACEUTICALS INC | 65473070301 | URECHOLINE 10 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070401 | URECHOLINE 25 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473069701 | URECHOLINE 5 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070001 | URECHOLINE 50 MG TABLET |
| JOHNSON & JOHNSON GROUP | 17314922001 | URISPAS 100 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004003822 | VALCYTE 450 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000601 | VALIUM 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000614 | VALIUM 10 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000401 | VALIUM 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000501 | VALIUM 5 MG TABLET |
| HOFFMANN LA ROCHE INC | 00140000514 | VALIUM 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068502 | VALTREX 1 GM CAPLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173093303 | VALTREX 500 MG CAPLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173093356 | VALTREX 500 MG CAPLET |
| SCHERING CORP | 00085073604 | VANCERIL INHALER |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ELI LILLY AND CO | 00002312542 | VANCOCIN HCL 125 MG PULVULE |
| ELI LILLY AND CO | 00002312642 | VANCOCIN HCL 250 MG PULVULE |
| WOMEN FIRST HEALTHCARE INC | 64248015030 | VANIQA 13.9% CREAM |
| JOHNSON & JOHNSON GROUP | 00045068233 | VASCOR 200 MG TABLET |
| JOHNSON & JOHNSON GROUP | 00045068333 | VASCOR 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173032198 | VENTOLIN 90 MCG INH REFILL |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173032188 | VENTOLIN 90 MCG INHALER |
| BRISTOL MYERS SQUIBB CO | 00015309145 | VEPESID 50 MG CAPSULE |
| HOFFMANN LA ROCHE INC | 00004016851 | VERSED 10 MG/5 ML SYRUP |
| HOFFMANN LA ROCHE INC | 00004025001 | VESANOID 10 MG CAPSULE |
| BRISTOL MYERS SQUIBB CO | 00087661443 | VIDEX 100 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087665201 | VIDEX 100 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087665301 | VIDEX 150 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087661543 | VIDEX 167 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087663241 | VIDEX 2 GM PEDIATRIC SOLN |
| BRISTOL MYERS SQUIBB CO | 00087666515 | VIDEX 200 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087665001 | VIDEX 25 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087661643 | VIDEX 250 MG PACKET |
| BRISTOL MYERS SQUIBB CO | 00087663341 | VIDEX 4 GM PEDIATRIC SOLN |
| BRISTOL MYERS SQUIBB CO | 00087665101 | VIDEX 50 MG TABLET CHEWABLE |
| BRISTOL MYERS SQUIBB CO | 00087667117 | VIDEX EC 125 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667217 | VIDEX EC 200 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667317 | VIDEX EC 250 MG CAP SA |
| BRISTOL MYERS SQUIBB CO | 00087667417 | VIDEX EC 400 MG CAP SA |
| AGOURON PHARMACEUTICALS INC | 63010001030 | VIRACEPT 250 MG TABLET |
| AGOURON PHARMACEUTICALS INC | 63010001190 | VIRACEPT POWDER |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004601 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004660 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004661 | VIRAMUNE 200 MG TABLET |
| BOEHRINGER INGELHEIM PHARMACEUTICALS INC | 00597004724 | VIRAMUNE 50 MG/5 ML SUSP |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003158 | VIRAVAN-S SUSPENSION |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003165 | VIRAVAN-S SUSPENSION |
| PEDIAMED TM PHARMACEUTICALS INC | 66346003223 | VIRAVAN-T TABLET CHEWABLE |
| GILEAD SCIENCES INC | 61958040101 | VIREAD 300 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070201 | VIVACTIL 10 MG TABLET |
| ODYSSEY PHARMACEUTICALS INC | 65473070101 | VIVACTIL 5 MG TABLET |
| NOVARTIS PHARMACEUTICALS CORP | 00083232508 | VIVELLE 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232562 | VIVELLE 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232708 | VIVELLE 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00083232762 | VIVELLE 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034342 | VIVELLE-DOT 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034345 | VIVELLE-DOT 0.0375 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034442 | VIVELLE-DOT 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034445 | VIVELLE-DOT 0.05 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034542 | VIVELLE-DOT 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034545 | VIVELLE-DOT 0.075 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034642 | VIVELLE-DOT 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00078034645 | VIVELLE-DOT 0.1 MG PATCH |
| NOVARTIS PHARMACEUTICALS CORP | 00028025801 | VOLTAREN 25 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028005801 | VOLTAREN 25MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028026201 | VOLTAREN 50 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028016201 | VOLTAREN 50MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028026401 | VOLTAREN 75 MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028016401 | VOLTAREN 75MG TABLET EC |
| NOVARTIS PHARMACEUTICALS CORP | 00028020501 | VOLTAREN-XR 100 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173017855 | WELLBUTRIN 100 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173017755 | WELLBUTRIN 75 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094755 | WELLBUTRIN SR 100 MG TAB SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173013555 | WELLBUTRIN SR 150 MG TAB SA |
| OVATION PHARMACEUTICALS INC | 00024225304 | WINSTROL 2 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004110051 | XELODA 150 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004110116 | XELODA 500 MG TABLET |
| HOFFMANN LA ROCHE INC | 00004025652 | XENICAL 120 MG CAPSULE |
| ASTRAZENECA LP | 00186033001 | XYLOCAINE 2% JELLY |
| ASTRAZENECA LP | 00186033036 | XYLOCAINE 2% JELLY |
| ASTRAZENECA LP | 00186036001 | XYLOCAINE 2% VISCOUS SOLN |
| ASTRAZENECA LP | 00186036011 | XYLOCAINE 2% VISCOUS SOLN |
| ASTRAZENECA LP | 00186032001 | XYLOCAINE 4% SOLUTION |
| ASTRAZENECA LP | 00186031521 | XYLOCAINE 5% OINTMENT |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173038354 | ZANTAC 15 MG/ML SYRUP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173042702 | ZANTAC 150 MG EFFERDOSE TAB |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034412 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034414 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034417 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034442 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173034447 | ZANTAC 150 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039306 | ZANTAC 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039340 | ZANTAC 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173039347 | ZANTAC 300 MG TABLET |
| PFIZER LABORATORIES DIV PFIZER INC | 00071023724 | ZARONTIN 250 MG CAPSULE |
| PFIZER LABORATORIES DIV PFIZER INC | 00071241823 | ZARONTIN 250 MG/5 ML SYRUP |
| ASTRAZENECA LP | 00310014110 | ZESTORETIC 10/12.5 TABLET |
| ASTRAZENECA LP | 00310014210 | ZESTORETIC 20/12.5 TABLET |
| ASTRAZENECA LP | 00310014510 | ZESTORETIC 20/25 TABLET |
| ASTRAZENECA LP | 00310013110 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013134 | ZESTRIL 10 MG TABLET |

# Appendix A Drugs by NDC

| FIRM NAME | NDC | DRUG NAME AND DESCRIPTION |
|---|---|---|
| ASTRAZENECA LP | 00310013139 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013173 | ZESTRIL 10 MG TABLET |
| ASTRAZENECA LP | 00310013510 | ZESTRIL 2.5 MG TABLET |
| ASTRAZENECA LP | 00310013210 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013234 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013239 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013273 | ZESTRIL 20 MG TABLET |
| ASTRAZENECA LP | 00310013310 | ZESTRIL 30 MG TABLET |
| ASTRAZENECA LP | 00310013410 | ZESTRIL 40 MG TABLET |
| ASTRAZENECA LP | 00310013010 | ZESTRIL 5 MG TABLET |
| ASTRAZENECA LP | 00310013034 | ZESTRIL 5 MG TABLET |
| ASTRAZENECA LP | 00310013039 | ZESTRIL 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066400 | ZIAGEN 20 MG/ML SOLUTION |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066100 | ZIAGEN 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173066101 | ZIAGEN 300 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173068000 | ZOFRAN 24 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044600 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044602 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044604 | ZOFRAN 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173048900 | ZOFRAN 4 MG/5 ML ORAL SOLN |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044700 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044702 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173044704 | ZOFRAN 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173056900 | ZOFRAN ODT 4 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173057000 | ZOFRAN ODT 8 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173057004 | ZOFRAN ODT 8 MG TABLET |
| ASTRAZENECA LP | 00037721020 | ZOMIG 2.5 MG TABLET |
| ASTRAZENECA LP | 00037721125 | ZOMIG 5 MG TABLET |
| ASTRAZENECA LP | 00310020920 | ZOMIG ZMT 2.5 MG TABLET |
| ASTRAZENECA LP | 00310021321 | ZOMIG ZMT 5 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173099155 | ZOVIRAX 200 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173099156 | ZOVIRAX 200 MG CAPSULE |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173095396 | ZOVIRAX 200 MG/5 ML SUSP |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094955 | ZOVIRAX 400 MG TABLET |
| BIOVAIL PHARMACEUTICALS INC | 00173099341 | ZOVIRAX 5% OINTMENT |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173094555 | ZOVIRAX 800 MG TABLET |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055601 | ZYBAN 150 MG TABLET SA |
| GLAXO WELLCOME DIVISION SMITHKLINE BEECHAM CORP | 00173055602 | ZYBAN 150 MG TABLET SA |
| PROMETHEUS LABORATORIES INC | 65483099110 | ZYLOPRIM 100 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483099310 | ZYLOPRIM 300 MG TABLET |
| PROMETHEUS LABORATORIES INC | 65483099350 | ZYLOPRIM 300 MG TABLET |
| ELI LILLY AND CO | 00002411704 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002411733 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002411760 | ZYPREXA 10 MG TABLET |
| ELI LILLY AND CO | 00002441504 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002441533 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002441560 | ZYPREXA 15 MG TABLET |
| ELI LILLY AND CO | 00002411204 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002411233 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002411260 | ZYPREXA 2.5 MG TABLET |
| ELI LILLY AND CO | 00002442004 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002442033 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002442060 | ZYPREXA 20 MG TABLET |
| ELI LILLY AND CO | 00002411504 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411533 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411560 | ZYPREXA 5 MG TABLET |
| ELI LILLY AND CO | 00002411633 | ZYPREXA 7.5 MG TABLET |
| ELI LILLY AND CO | 00002411660 | ZYPREXA 7.5 MG TABLET |
| ELI LILLY AND CO | 00002445401 | ZYPREXA ZYDIS 10 MG TABLET |
| ELI LILLY AND CO | 00002445485 | ZYPREXA ZYDIS 10 MG TABLET |
| ELI LILLY AND CO | 00002445501 | ZYPREXA ZYDIS 15 MG TAB |
| ELI LILLY AND CO | 00002445585 | ZYPREXA ZYDIS 15 MG TAB |
| ELI LILLY AND CO | 00002445685 | ZYPREXA ZYDIS 20 MG TAB |
| ELI LILLY AND CO | 00002445601 | ZYPREXA ZYDIS 20 MG TABLET |
| ELI LILLY AND CO | 00002445301 | ZYPREXA ZYDIS 5 MG TABLET |
| ELI LILLY AND CO | 00002445385 | ZYPREXA ZYDIS 5 MG TABLET |

# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH )    C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, AFSCME - )
HEALTH & SECURITY PLAN; JUNE )
SWAN; MAUREEN COWIE and BERNARD )
GORTER, )
                               )
                Plaintiffs, )
                               )
            v.                   )
                               )
FIRST DATABANK, INC., a Missouri )
corporation; and McKESSON )
CORPORATION, a Delaware corporation, )
                               )
              Defendants. )

---

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, by and through their counsel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all matters based upon the investigation of counsel, allege as follows:

## INTRODUCTION

1.      This is a proposed national class action brought on behalf of <u>consumers,</u> self-insured employers, health and welfare plans, health insurers and other End Payors of prescription drugs ("End Payors") against First DataBank ("First Data") and McKesson Corporation ("McKesson") for wrongfully increasing the so-called WAC to AWP markup factor for numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Class, whose payments for pharmaceuticals are tied to AWP, to make billions of dollars of excess payments for those pharmaceuticals.

2.      In the pharmaceutical marketplace, those in the retail distribution chain – national chain drug pharmacies, independent pharmacies, mail order houses and other retailers – purchase drugs on the basis of the published wholesale acquisition cost or "WAC," a benchmark price established by manufacturers and used by them and wholesalers to establish prices to retailers. Although retailers *buy* pharmaceuticals on the basis of WAC, they *get paid* (*i.e.*, get reimbursed) for branded drugs based on a different benchmark, the average wholesale price or "AWP." As the difference between AWP and WAC increases, the larger "spread" affords retailers and other middlemen like pharmaceutical benefit managers ("PBMs") opportunities for larger profits.

3.      Each year more than three billion prescriptions are written in the United States. End Payors must have a way of determining what the AWP is at any moment in time for the approximate 65,000 drugs used in the marketplace. AWPs are therefore compiled and published by several publishing companies, including First Data. Through these compilations, which are

001821-13 137731 V1

available in both hard copy or electronic form, those in the distribution chain can determine the

AWP for any given drug and effectuate reimbursement to retailers accordingly.

4.    Consumers, health, and welfare plans, health insurers and other End Payors for

Deleted: Health

prescription drugs use and rely on AWP as a reasonable and accurate indicator of the underlying

transaction prices for almost all drugs.  Virtually all these entities' contracts governing

pharmaceutical reimbursement use AWP as a pricing standard.

5.    First Data, McKesson and pharmaceutical companies know that End Payors

utilize AWP as a pricing benchmark and utilize AWP as a reasonably accurate measurement of

list and transaction prices in order to negotiate payment terms for drugs used by their

constituents.

6.    Until March 15, 2005, First Data represented to those in the pharmaceutical

market that it derived the WAC/AWP markup either from manufacturers or by conducting "a

survey" of wholesalers whose purpose was to verify prices reported by the manufacturer.  First

Data further represented throughout the Class Period that AWP represents the "average of prices

charged by the national drug wholesalers," and that the number of surveys it was conducting to

determine the published AWP was "increasing."  McKesson is one of the wholesalers who was

"surveyed" by First Data.

7.    Historically, in order to arrive at the AWP for branded drugs, manufacturers and

wholesalers applied a markup of 20% or 25% to WAC.  Whatever markup was given to a

particular branded drug "stuck" with that drug indefinitely.  Until 2002, there was variation,

supposedly based on manufacturer direction or on First Data's wholesale surveys, in the

difference between the WAC to AWP spread for hundreds of brand-name drugs.  For example,

001821-13 137731 V1

**PARTIES**

**Plaintiffs**

1.    **Proposed Class 1 Representatives (Consumers)**

21.    Plaintiff June Swan is a resident of Corte Madera, California. Ms. Swan is covered by Aetna and pays a percentage of her drug prices through Aetna. She takes Celebrex. As a result, Ms. Swan paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

22.    Plaintiff Bernard Gorter is a resident of Milwaukie, Oregon. Mr. Gorter currently pays 40% of the cost of his prescriptions. He is on Medicare and also has a Medicare supplement in which the state of Oregon pays part of his premium. Mr. Gorter takes Lipitor, which he has purchased both by mail order and at retail pharmacists. As a result, Mr. Gorter paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

23.    Maureen Cowie is a resident of Salinas, California. Ms. Cowie takes Neurontin, Klonopin, Lipitor and Lotensin. She has taken all of these drugs for a number of years. She was covered by Blue Cross when she began taking these drugs and paid 80% of the cost for each. As a result, Ms. Cowie paid a percentage co-payment based on AWP for a Subject Drug during the Class Period.

2.    **Proposed Class 2 Representatives (Third-party payors)**

24.    Plaintiff New England Carpenters Health Benefits Fund ("Carpenters") is an employee welfare benefit plan established and maintained pursuant to §§ 1002(1) and (3) of ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. As such, Carpenters is a legal entity entitled to bring suit in its own name pursuant to 29 U.S.C. § 1132(d). Carpenters maintains its principal place of business in Wilmington, Massachusetts. It

| Deleted: <#> . |
| Formatted: Heading 9 |

- 8 -

001821-13 137731 V1

result, First DataBank must implement certain changes to its publication of the "Blue Book AWP" pricing data field. Effective immediately, First DataBank will no longer survey drug wholesalers for information relating to their catalog or list prices.

First DataBank historically relied upon wholesalers to provide information relating to their catalog or list prices for purposes of publishing the Blue Book AWP data field. *First DataBank periodically surveyed full-line national wholesalers to determine the average markup applied to a manufacturer's line of products. The average markup of the wholesalers responding to the survey was applied against the Wholesale Acquisition Cost (the manufacturer's list price to wholesalers, also commonly referred to as WAC)* or, if a Wholesale Acquisition Cost was not available, the Direct Price (the manufacturer's list price to non-wholesalers), with the resulting value populating the Blue Book AWP field. In certain instances, wholesalers would accept a manufacturer's suggested wholesale price, in which case the Blue Book AWP and Suggested Wholesale Price data fields would reflect the same value. [Emphasis added.]

**CLASS ACTION ALLEGATIONS FOR THE AWP PAYOR SCHEME**

153.    Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the Classes comprised of:

**Consumer purchasers:**

All individual persons who paid, or incurred a debt enforceable at the time of judgment in this case to pay, a percentage co-payment for the Subject Drugs during the Class Period pursuant to a plan, which in turn reimbursed the cost of brand-name pharmaceutical drugs based on AWP. The Subject Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[32]

**Third-party Payors:**

All third party payors whose pharmaceutical payments for the Subject Drugs were based on AWP during the Class Period. The

_____
[32] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery.

- 61 -

001821-13 137731 V1

Subject Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.[33]

Excluded from the above-listed Classes are: (a) each defendant and any entity in which any defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors; (b) any co-conspirators; and (c) any governmental entities who purchased such drugs during the Class Period.

154.    The Class Period is August 1, 2001 to March 15, 2005, when First Data disclosed that it had stopped surveying wholesalers.[34]

155.    The exact identity of the drugs covered by this lawsuit is capable of being discovered from the records of First Data and the PBMs identified above. Based on an investigation of First Data's databases, the list of such drugs is attached as Exhibit A.[35]

156.    The Consumer Class consists of hundreds of thousands of consumers throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

157.    The Third-party payor Class consists of in excess of ten thousand third-party payors throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class Members in a single class action will provide substantial benefits to all parties and to the Court.

158.    The claims of the representative plaintiffs are typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative plaintiffs include persons and entities who,

---

[33] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery.

[34] The exact dates for the Class Period may be refined based upon discovery.

[35] This list may change upon production of information by First Data.

- 62 -

220. Plaintiffs are entitled to a presumption of reliance on the false representations,

concealments and nondisclosures by the defendants. Class Members were ignorant of

defendants' conduct and were ignorant of the full and true facts suppressed by them, and such

reliance was justified.

221. As a direct, proximate result of this conspiracy, plaintiffs and Class Members

have been injured, as they have suffered and continue to suffer economic losses and general and

specific damages, all in an amount to be determined according to proof.

COUNT VII

Entitlement to enhanced Relief pursuant to California Civil Code § 3345

222. The preceding paragraphs of this Complaint are realleged and incorporated by

reference. Civil Code §3345 awards treble damages for unfair and deceptive practices

perpetrated against seniors. This claim is asserted on behalf of a Subclass of Consumer Class

members who were over 65 at the time they purchased the Subject Drugs. June Swan was over

65 years of age at the time she purchased the Subject Drugs. This Class is referred to as the

"Senior Subclass."

223. Defendants McKesson and First Data knew or should have known that their

conduct was directed to the Senior Subclass in that a large percentage of members of the

Consumer Class for certain brand-name drugs are over 65 and that any wrongful conduct with

respect to the sale of the Subject Drugs was likely to aversely impact such seniors.

224. As a result of Defendants' Scheme, Plaintiffs and members of the Senior Subclass

have suffered economic injury and the loss of assets essential to their health and welfare.

- 82 -

---

Marginal annotations (Word tracked-changes balloons):

- Deleted: <#>.
- Deleted: <#>.
- Deleted: ALTERNATE COUNT VII. Consumer Protection Laws of Various States¶ <#>. The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.¶ <#>. In the event California law is not applied, defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes. Plaintiffs identify
- Deleted: states

## ALTERNATE COUNT VIII

### Consumer Protection Laws of Various States

225.     The preceding paragraphs of this Complaint are realleged and incorporated by reference and asserted by plaintiffs on behalf of themselves and members of the Class.

226.     In the event California law is not applied on a class-wide basis, defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state consumer protection statutes.  Specifically, the Consumer Class seeks redress under the following statutes, i.e. Plaintiffs allege:

> **Deleted:** permit TPP claims

(a)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

(c)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

(e)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

001821-13 137731 V1

(h)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

(j)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

(k)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(l)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0-5-1, *et seq.*;

(m)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

(n)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

(o)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

(p)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445-901, *et seq.*;

(q)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

(r)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mo. Rev. Stat. § 407.010, *et seq.*;

001821-13 137731 V1

(s)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

(t)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(u)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*,

(v)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*,

(w)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(x)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(y)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(z)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

001821-13 137773I V1

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. Tit. 9, § 245 1, *et seq.*;

(ll)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

- 86 -

001821-13 137731 V1

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

227.    Additionally, the third-party payor Class seeks redress under the following statutes, which allow corporations to bring consumer protection claims, i.e. Plaintiffs allege;

> **Formatted:** Heading 9
>
> **Deleted:** laws as set forth below.

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*, including 4-88-113(f), and 4-88-102(5);

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*, including § 6-1-113(1)(c) and § 6-1-102(b);

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*, including § 42-110(a)(3);

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*, including 6 Del. Code § 2512;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*, including § 28-390(1);

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

(i)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*, including § 48-602;

(j)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

(k)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*, including § 13-101(h);

(l)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, § 11;

(m)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, including § 445-902(c);

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*, including § 407.010(5);

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, including § 59-160(1);

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, including § 358A:1(1);

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*, § 56:8-1(d);

**Deleted:** . (i) . Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*, including § 481A-2;¶

**Deleted:** . (l) . Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*,¶ . (m) . Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;¶

- 88 -

(t)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

(u)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

(v)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

(w)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*, including § 51-15-01(4);

(x)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*, including § 1345.01(B);

(y)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

(z)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*, including § 646.605(4);

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*, including § 201-2(2);

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*, including § 39-5-10(9);

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*, including § 37-24-1(8);

(dd)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*, including § 47-18-103(9);

| Deleted: . (ee) . Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*, including § 6-13.1(3);¶ |

- 89 -

001821-13  137731 V1

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*, including § 17.45(4);

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

(gg)    Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*, including § 19.86.010(1);

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*, including § 40-12-102(a)(i).

228.    Plaintiffs provided notice of this litigation as required by law.

## ALTERNATE COUNT IX

### Civil Conspiracy

229.    The preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

230.    This Count is asserted based upon the common law of civil conspiracy in the fifty states.

## DEMAND FOR JUDGMENT

WHEREFORE, plaintiffs demand judgment as follows:

A.    The Court determines that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of

- 90 -

Civil Procedure with respect to the claims for damages, and declaring Plaintiffs as

representatives of the Classes and their counsel as counsel for the Classes;

> | Deleted: plaintiffs |

B.      The conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.      Plaintiffs and the Class be granted an award of damages in such amount to be

determined at trial, with trebling under Count I;

D.      Plaintiffs and the Class be granted an award of punitive damages in such amount

to be determined at trial;

E.      Defendants be enjoined from continuing the illegal activities alleged herein;

F.      Plaintiffs and the Class recover their costs of suit, including reasonable attorneys'

fees and expenses as provided by law; and

G.      Plaintiffs and the Class be granted such other, further, and different relief as the

nature of the case may require or as may be determined to be just, equitable, and proper by this

Court.

DATED: November ___, 2006          By_____/s/ Steve W. Berman_____

> | Deleted: July 17 |

Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

- 91 -

001821-13 137731 V1