UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT 37 HEALTH AND SECURITY FUND,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | CIVIL ACTION: 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' AMENDED MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED FIRST DATABANK CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND APPROVAL OF NOTICE PLAN**

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………………………………1

II.     DESCRIPTION OF THE LITIGATION………………………………….....4

        A.      Class Claims……………………………………………………….....4

        B.      The Class Plaintiffs' Prosecution of the Case……………………..…5

        C.      History of Settlement Negotiations……………………………..…….6

        D.      The Risks of Litigation and Benefits to the Class…………………..…7

        E.      The Proposed Resolution Achieves Significant Benefits For
                Consumers Within The Class………………………………....……..11

        F.      Retrospective, Lump Sum Relief From FDB Consumers Is
                Impractical………………………………………………………….12

III.    DESCRIPTION OF THE PROPOSED SETTLMENT…………………...16

        A.      The Settlement………………………………………………….....16

        B.      What is Being Released……………………………………………...18

        C.      Termination…………………………………………………………..18

IV.     ARGUMENT……………………………………………………………….19

        A.      The Court Should Certify The Proposed Class Pursuant To
                Rule 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) For
                Purposes of Settlement…………………………………....………20

                1.      The Requirements of Rule 23(a) Have Been Satisfied……………..20

                        a. Numerosity……………………………………………….22

                        b. Commonality and Typicality……………………………….23

                        c. Adequate Representation…………………………....……25

                                i. The Five Proposed TPP Class Plaintiff Representatives
                                   Are Adequate……………………………………………25

       ii.  **The Five Named TPP Plaintiffs Are Also Adequate Representatives For Private Consumers**..................28

       iii.  **The Consumer Plaintiffs Are Also Adequate Representatives for Private Consumer**....................30

   2.  **The Requirements of Rule 23(b)(3) Have Been Satisfied**............31

     a.  **Questions of Law or Fact Common to Class Members Predominate Over Any Questions Affecting Only Individual Members**................................................................32

     b.  **A Class Action Is Superior To Other Available Methods For Fair and Efficient Adjudication of This Matter**....................33

**B.**  **The Court Should Grant Preliminary Approval to the Settlement Agreement Release**................................................................33

   1.  **The Proposed Settlement Is Sufficiently Fair, Reasonable and Adequate For Preliminary Approval**..................................36

   2.  **The Proposed Settlement Is The Result of Arduous, Arm's Length Negotiations Conducted By Highly Experienced Counsel**................................................................38

   3.  **Sufficient Discovery Has Been Conducted In This Matter To Allow Counsel To Fairly Investigate The Pertinent and Factual Issues**................................................................39

**C.**  **The Court Should Order Notice Be Provided To The Class and Schedule A Full Fairness Hearing**................................................40

   1.  **Form of Notice**................................................................40

**V.**  **CONCLUSION**................................................................44

# TABLE OF AUTHORITIES

**Cases:**

*Advocate Health Care v. Mylan Labs., Inc.,* 202 F.R.D.12
(D.D.C. 2001)………………………………………………….. ..……………………24
*In Re Agent Orange Product Liab. Litig.,* 597 F.Supp. 740
(E.D.N.Y. 1985)………....………………………………………………………………38
*In Re Agent Orange Product Liab. Litig.* 818 F.2d 226 (2d Cir.
1987)…………....………………………………………………........ ……………………38
*Air Line Stewards v. American Airlines,* 763 F.2d 305
(7th Cir. 1980)………………………………………………………...……………………37
*Air Line Stewards and Stewardesses Ass'n Local 550 v. American
Airlines,* 455 F.2d 101 (7th Cir. 1972)………………………………….....……………………41
*Alliance to end Repression v. City of Chicago,* supra. at 91 F.R.D. 201..... ……………………36
*Amchem Prod., Inc. v. Windsor,* 521 U.S. 591 S.Ct. 2231, 138 L.E.2d
689 (1997)………………………………………………………………19, 20, 22, 32, 33, 40
*Andrews v. Bechtel Power Corp.,* 780 F.2d 124 (1st Cir. 1985)…………... …………………23, 25
*Argo v. Harris,* 84 F.R.D. 646 (E.D.N.Y. 1979)…………………………………………………37
*Armstrong v. Board of Sch. Dir.,* 616 F.2d 305 (7th Cir. 1980)…………......……………………37
*Burstein v. Applied Extrusion Techs.,* 153 F.R.D. 488 (D. Mass. 1994)…………………………29
*Carlough v. Amchem Prod., Inc.,* 158 F.R.D. 314 (E.D. Pa. 1993)……......…………………………40
*City Partnership Co. v. Atlantic Acquisition L.P.,* 100 F.3d 1041
(1st Cir. 1996)……………………………………………………………...…………20, 37, 38, 39
*In Re Compact Disc,* 216 F.R.D. at 204 (D.Me. 2003)……………………………………………31
*Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, (7th Cir. 1985)……......…………………………35
*Duhaime v. John Hancock Mut. Life Ins. Co.,* 183 F. 3d 1
(1st Cir. 1999)………………………………………………………...……………………34
*Durett v. Housing Auth. of City of Providence,* 896 F.2d 600
(1st Cir. 1990)……….....…………………………………………………… ……………34, 40
*E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884 (7th Cir. 1985)…... ……………………37
*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156………………………………...…………………………47
*Flinn v. FMC Corp.,* 528 F.2d 1169 (4th Cir. 1975)…………………………………………………38
*Fraser v. Jamor League Soccer, LLC,* 180 F.R.D. 178 (D. Mass. 1998)…………………………29
*In Re General Motors Corp. Pick-Up Truck Fuel Tank,* 55 F.3d 768
(3d Cir. 1995)...................................................................................................................36, 39
*General Motors Corp., v. French,* 516 U.S. 824 (1995)………………………………………………39
*General Tel. Co. v. Falcon,* 457 U.S. 147 (1982)……………………………………………………20
*George Lussier Enter. v. Subaru of New England, Inc.* 2001 U.S. Dist.
LEXIS 12054, 2001 DNH 143…………………………………………………………………23
*Greenspun v. Bogan,* 492 F.2d 375 (1st Cir. 1974)…………………….....…………………………41
*Grunin v. International House of Pancakes,* 513 F.2d 114
(8th Cir. 1975)………………………………………………………...……………………41
*Grunin v. International House of Pancakes,* 423 U.S. 864 (1975)………....…………………………41
*Gukenberger v. Boston Univ.* 957 F.Supp. 306 (D. Mass. 1997)………… …………………………20

iv

*Hawkins ex rel. Hawkins v. Commissioner of new Hampshire Dept. of
Health and Human Services,* 2004 WL 166722,
(D.N.H. Jan. 23, 2004)……………………………………………………….19, 34, 36, 38, 39
*Holton v. Rothschild, Unterberg, Towbin* 118 F.R.D. 280
(D. Mass. 1987)……………………………………………………………………………….22
*Kovacs v. Ernst & Young,* 927 F.2d 155 (4th Cir. 1991)………………….………………36
*Kruse v. DuPont Merck Pharm. Co.,* 97-CH-15799……………………………………….25
*Lake v. First Nationwide Bank,* 156 F.R.D. 615 (E.D.Pa. 1994)…………………………42
*Lessard v. Metropolitan Life Ins. Co.,* 103 F.R.D. 608 (D. Me. 1984)…………………….31
*Levell v. Monsanto Research Corp.,* 191 F.R.D. 543 (S.D Ohio 2000)…. ………………….19
*Levin v. Mississippi River Corp.,* 59 F.R.D. 353 (S.D.N.Y 1973)………...…………………37
*Lupron Mktg. and Sales Practices Litig.* 228 F.R.D. 75
(D. Mass May 12, 2005)…....................................................……………………29
*Lupron Mktg. and Sales Practices Litig.,* 295 F. Supp. 2d 148
(D. Mass. 2003)……………………………………………………………...…………………24
*M. Berenson Co., Inc., v. Faneuil Hall Marketplace, Inc.,* 100 F.R.D.
468, 470 (D. Mass. 1984)……………………………………………………………………….23
*Malchman v. Davis,* 706 F.2d 426 (2d Cir. 1983)……………………………………………37
*Mangone v. First USA Bank,* 206 F.R.D. 222 (S.D.Ill. Feb. 2, 2001)……. ………………….43
*Mars Steel v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677
(7th Cir. 1987)……………………………………………………………..……………………38
*In Re Master Key Antitrust Litig.,* 528 F.2d 5 (2d Cir. 1975)………………………………33
*In Re Microstrategy, Inc. Sec. Litig.,* 148 F.Supp.2d 654 (E.D. Va. 2001)……………………42
*McCuin v. Secretary of Health and Human Services,* 817 F.2d 161
(1st Cir. 1987)………………………………………………………………...…………………23
*Mowbray v. Waste Mgmt. Holdings, Inc.,* 189 F.R.D. 194
(D. Mass. 1999)………………………………………………………………………………….31
*Mowbray v. Waste Mgmt. Holdings, Inc.,* 208 F.3d 288 (1st Cir. 2000)….………………….31
*Mullane v. Central Hanover Bank & Trust, Co.,* 339 U.S. 306 (1950)…..………………….41, 42
*In Re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493
(S.D.N.Y 1996)…......................................................……………………32
*In Re NASDAQ Market-Makers Antitrust Litigation,* 176 F.R.D. 99
(S.D.N.Y. 1997)…………………………………………………………...……………………34
*Nichols, et. al. v. SmithKline Beecham Corp.,* 2005 U.S. Dist. LEXIS
7061, No. 00-6222 (E.D. Pa. Apr. 22, 2005)……………………………...……………………29
*Ohio Public Interest Campaign v. Fisher Foods, Inc.,* 546 F.Supp. 1
(N.D. Ohio 1982)……………………………………………………………………………….36
*Patterson v. Stovall,* 528 F.2d 108 (7th Cir. 1976)……………………...........……………………36
*Pharmaceutical Industry Average Wholesale Price Litigation,*
MDL No. 1456………………………………………………………………………………….5, 30
*Priest v. Zayer Corp.,* 118 F.R.D. 552 (D. Mass. 1988)……………….......…………………….28
*In Re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450
(D.N.J. 1997)…………………………………………………………………………….37, 43
*Randle v. SpecTran,* 129 F.R.D. 386 (D. Mass. 1988)……………………... …………………….28

*Relafen Antitrust Litig.* 231 F.R.D. 52 (D. Mass. 2005)……………….………………………20, 29

*Reppert v. Marvin Lumber and Cedar Co.,* 359 F. 3d 53 (1st Cir. 2004)… ………………………40

*Rolland v. Celluci,* 191 F.R.D. 3 (D. Mass. 2000)……...................................………………39

*Ryan-House et al. v. GlaxoSmithKline PLC, et al.,* 2005 U.S. Dist.
LEXIS 33711, No. 2:02cv422 (E.D. Va. Jan. 10, 2005)……………….……………………29

*In re Screws Antitrust Litigation,* 91 F.R.D. 52 (D. Mass. 1981)……………………………31

*Silva v. National Telewire Corp.,* 2000 U.S. Dist. LEXIS 13986
(D.N.H. 2000)……………………………………………………….. ………………………23

*Smilow v. Southwestern Bell Mobile Sys., Inc.,* 323 F.3d 32
(1st Cir. 2003)…………………………………………………………... ………………20, 22, 31

*Stop & Shop Supermarket Co., et al v. SmithKline Beecham Corp.,* 2005
U.S. Dist. LEXIS 9705, No. 03cv4578 (E.D. Pa. May 19, 2005)……….... ……………………30

*Synthroid Mktg. Litig.* 188 F.R.D. 295 (N.D. Ill. 1999)…………….......... ……………………24

*United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.,* 447 F.2d
647 (7th Cir. 1971)……………………………………………………….. ………………………26

*Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 248 (D. Del. 2002)….... ……………………24

*Wesson v. Mississippi River Corp.* 486 F.2d 1398 (2d Cir. 1973)……….....………………………37

*White v. National Football League,* 822 F.Supp. 1389 (D. Minn. 1993)… ………………34, 42

*White v. NFL* 41 F.3d 402 (8th Cir. 1994)…………………………………………………………42

*White v. NFL* 515 U.S. 1137 (1995)……………………………………………………………42

*Whitford v. First Nationwide Bank,* 147 F.R.D. 135 (W.D.Ky. 1992)…… ………………………36

*Williams v. Vukovich,* 720 F.2d 909 (6th Cir. 1983)…………………………………………………36

**Statutes**

Employee Retirement Security Act, 29 U.S.C. § 1132……………………... ……………………26

Massachusetts Civil Procedure Rule 12(b)(6)…………………………....... ……………………4, 5

Federal Rules of Civil Procedure Rule 23…………………………19, 20,   21, 22, 25, 40, 43, 44

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964... ……………………..4

# I.    INTRODUCTION

The Class Plaintiffs respectfully submit this memorandum in support of the joint motion for an order: (i) preliminarily approving the proposed settlement of this class action as to Defendant First DataBank Inc., ("FDB") only ("Settlement"), (ii) certifying a Settlement Class (as described more fully below), and (iii) approving a notice plan and notices.

The Settlement encompassed by the parties' Settlement Agreement provides: (i) for First DataBank to make changes to its pharmaceutical database by rolling back the markup factor between wholesale average cost ("WAC") and average wholesale price ("AWP") on 8,467 drug formulations ("NDCs") of actively distributed prescriptive pharmaceuticals in the United States (referred to as "Rollback Drugs") from a markup of about 1.25 to a markup of 1.20 (a decrease of AWP of about 4%) and (ii) for FDB to cease the compilation and publication of AWP and BBAWP fields of data as the industry pricing standard within two years from the date of final court approval of the Settlement (subject to certain conditions).  In exchange, First DataBank would be released of liability arising out of or in any way connected with the claims brought or factual allegations made in this action.

Class Plaintiffs and their counsel believe that the Settlement is fair, reasonable, and adequate.  The resolution was reached after dozens of arms-length, intensely fought negotiation sessions spanning over almost one year.  During the confidential negotiations, documents were reviewed and financial information exchanged.  Numerous experts, public prosecuting authorities and lay persons were consulted.  The prospective relief afforded to the class – relief through an effective 4% rollback of the published FDB AWP for about 95% of all retail branded drug transactions – will have enormous financial benefit.  Because FDB has comparatively little assets, any eventual litigation judgment against it (which of course is disputed by FDB) would

1

net the class far, far less than the projected savings from the rollback. This joint motion seeks preliminary approval of the Settlement, certification for settlement purposes of the Class and appointment of Class counsel. The motion also requests that the Court order that notice of the Settlement be disseminated to the Class, and schedule a hearing to determine whether final approval of the Settlement should be granted.

The following documents are relied upon in connection with these proceedings:

(1)    Class Plaintiffs' and First DataBank's Amended Joint Motion for Entry of an Order (a) Granting Preliminary Approval of the First Data Bank Settlement, (b) Certifying a Class for Purposes for Settlement, (c) Directing Issuance of Notice to the class; and (d) Scheduling a Final Fairness Hearing;

(2)    Class Plaintiffs' Amended Memorandum of Law in Support of Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement, Certification of Settlement Class and Approval of Notice Plan;

(3)    Attachment A to Class Plaintiffs' Memorandum of Law in Support of Motion Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement, Certification of Settlement Class and Approval of Notice Plan ;

(4)    Attachment B to Class Plaintiffs' Memorandum of Law in Support of Motion Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement, Certification of Settlement Class and Approval of Notice Plan;

(5)     The Settlement Agreement and Release between Class counsel and First Databank, Inc, dated August 7, 2006 (filed herewith):

(6)    Exhibit A to the Settlement Agreement, (listing the NDCs for pharmaceutical products subject to adjustment provisions in the Settlement Agreement);

(7)    Exhibit B to the Settlement Agreement, Settlement Notice- Notice of Pendency and Proposed Settlement of Class Action and Settlement Hearing;

(8)    Exhibit C to the Settlement Agreement, Summary Notice for Publication;

(9)    Exhibit D to the Settlement Agreement, Proposed Order Granting Preliminary Approval of the First Databank, Inc. Settlement, Certifying Class for Purposed of Settlement Only, Directing Notice to The Class and Scheduling a Fairness Hearing;

(10)    Exhibit E to the Settlement Agreement, Final Order and Judgment Certifying The Class for Purposed of Settlement, Approving of Class Action Settlement, and Dismissing the Action with Prejudice;

(11)    Declaration of Katherine Kinsella (in connection with proposed form of notice to consumers and third party payors and [Proposed] Notice Plan);

(12)    Declaration of Thomas Glenn (in connection with claims costs and TPP databases);

(13)    Declaration of Raymond S. Hartman (relating to estimation of cost savings relating to the rollback on the Rollback Drugs);

(14)    Declaration of Thomas M. Sobol in Connection with Motion for Preliminary Approval of Settlement as to Defendant, First Databank, Inc Only;

(15)    Declaration of Steve W. Berman in Support of Plaintiff's Motion for Class Certification and in Support of Motion to file First Amended Complaint (filed July 17, 2006 [Docket #91]);

(16)    Declaration of Susan A. Hayes in Support of Plaintiffs' Motion for Class Certification (filed on July 17, 2006, [Docket #78]);

(17)    Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification (filed on July 17, 2006, [Docket #77]); and

The procedure for preliminary approval of a class action settlement includes setting deadlines for (i) providing notice; (ii) opting out of the Settlement Class; (iii) objecting to the Settlement Agreement or the required award of attorneys' fees, costs and expenses; and (iv) setting a hearing date for final approval.  A proposed schedule is set forth below to provide the Court with a timeline for the various steps in the settlement approval process.

| __Step__ | __Event__ | __Timing__[1] |
|------|-------|--------|
| 1. | Amended Motion for Preliminary Approval Filed | November 1, 2006 |
| 2. | Preliminary Order entered no later than November 10, 2006 | November 10, 2006 |
| 3. | Notice to be posted on internet | November 20, 2006 |

---

[1] These dates will of course, need to be adjusted depending upon the dates set by this Court for the Preliminary Approval hearing and the issuance of this Court's Preliminary Approval Order.

| 4. | Notice to be mailed to TTPs | November 20, 2006 |
| 5. | Publish Short Form Notice | December 11, 2006 |
| 6. | Deadline for Filing Material for Final Approval and Motion for Attorneys' Fees and Reimbursement of Expenses | February 1, 2007 |
| 7. | Postmark deadline for Requests for Exclusion | March 1, 2007 |
| 8. | Postmark deadline for Objections | March 1, 2007 |
| 9. | Deadline for responding to any Objections | March 22, 2007 |
| 10. | Final Fairness Hearing | April 2, 2007 (or at the Court's earliest available date) |

## II.    DESCRIPTION OF THE LITIGATION

### A.    Class Claims

This action was commenced by plaintiffs on June 2, 2005, against two defendants, First DataBank, Inc., ("FDB") and McKesson Corporation, ("McKesson") charging them with wrongfully increasing the so-called WAC-to-AWP markup factor for about 1,600 NDCs of prescription pharmaceuticals through a scheme begun in late 2001 and early 2002, thereby causing members of the proposed class (all persons and entities who had purchased or reimbursed for the subject drugs on the basis of AWP) to make substantial excess payments for those drugs.  Plaintiffs allege that FDB and McKesson wrongfully effectuated the increase in the markup factor in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964 ("RICO") and various state consumer protection law.[2]

---

[2] The Court is aware of the extensive facts and claims alleged in this action since the Court has already conducted Rule 12(b)(6) proceeding brought by McKesson, and denied McKesson's motion [Order, 05-cv-11148 (PBS), District of Mass, 12-01-05].

4

The settling defendant, FDB, has denied, and continues to deny, that it committed any violation of law or any wrongdoing and further denies that it has any liability with respect to any of the claims asserted in the First Amended Complaint (the "FAC").  Class counsel continues to prosecute the action against the remaining defendant, McKesson.

**B.    The Class Plaintiffs' Prosecution of the Case**

The June 2005 filing of this action had been preceded by more than a year of documentary, financial and testimonial investigation by class counsel regarding the historically aberrant 2002 markup hike for numerous brand name pharmaceuticals.

Since the filing of this case, the matter has been actively litigated.  Defendant McKesson moved to dismiss the action under Rule 12(b)(6), and in December of 2005 this Court denied that motion.  Plaintiffs have filed a motion to certify the claims and defenses in the action, and further class discovery and briefing is underway.  Merits discovery is also well underway.

Both before and after litigation was commenced, significant discovery was obtained directly from FDB.  Prior to the litigation and in the context of *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, class counsel obtained from First DataBank records regarding manufacturer and wholesaler communications, drug specific documentation, changes to price data fields, copies of the First DataBank database (known as the "NDDF") and deposed the senior manager at First DataBank responsible for the FDB database.  Also prior to this litigation, class counsel worked extensively with health care economists to review and analyze historical FDB and other database information, compare that database to other industry price databases, and analyze the extent of the alleged wrongful conduct.

The parties have been actively engaging in formal and (as to FDB) informal discovery efforts.  On July 17, 2006, Plaintiffs filed Plaintiffs' Motion for Class Certification in the case,

5

along with supporting papers (including the Declaration of Raymond S. Hartman in Support of

Plaintiffs' Motion for Class Certification [Docket #77], Declaration of Steve S. Berman in

Support of Plaintiffs' Motion for Class Certification and Motion for Leave to File First Amended

Complaint [Docket #91] and Declaration of Susan A. Hayes in Support of Plaintiffs' Motion for

Class Certification [Docket #78].  McKesson's opposition papers to the Class Certification

Motion are due this month; the Court has scheduled a hearing in connection with Class

Certification for April 12, 2007.

 The allegations in the FAC and the presentation of some of the evidence which is

common to the Class is outlined in Attachment B to this memorandum.

### C.    History of Settlement Negotiations

 In the fall of 2005, class counsel and representatives of FDB began settlement discussions

in earnest.  Since then and for about one year, on a weekly and sometimes daily basis, the parties

negotiated at arms-length the terms of a creative solution which would afford the class enormous

financial and other benefits while being cognizant of the comparatively limited resources

available to First DataBank, a private subsidiary of Hearst Corporation.  Of course, class counsel

and representatives of FDB itself participated in virtually all the discussions, but others were

consulted as well.  The class plaintiff representatives themselves were consulted through class

counsel over the many months; consumer groups and consumer coalitions participated in

evaluation of the relief; on an informal and non-binding basis, representatives of attorneys'

general offices from over one half dozen states reviewed the terms and negotiations; outside

counsel to some of the U.S. largest private health benefit providers participated directly in some

negotiations and were consulted on all terms.  In addition, class counsel assured that no

discussions regarding the issue of attorneys' fees took place until after the substantive terms of

the agreement had been reached in order to assure that there was not even an appearance of impropriety that might arise from blending substantive issues with the issue of attorneys' fees.

### D.    The Risks of Litigation and Benefits to the Class

Throughout the discovery and settlement negotiation process, the Class Plaintiffs have gained an understanding of the case against FDB. The Class Plaintiffs ultimately agreed to the settlement as to FDB only after evaluating various factors, including certain risks to Plaintiffs' ability to recover a substantial judgment against FDB. The assessment included an analysis of (i) liability risks as against FDB, (ii) estimates of the potential damages recovery, (iii) the ability of FDB to pay a judgment, and (iv) the benefit of other settlement provisions that might be negotiated. Each is discussed below.

First, as to liability, the Class Plaintiffs recognized liability risks including[3]: (i) that proofs of wrongful conduct can be elusive, particularly in a business world dominated by electronic communication; (ii) that the litigation is complex, and the results of which are unpredictable; and (iii) FDB is a publisher and not a manufacturer, supplier, wholesaler, or seller of prescription pharmaceuticals.

---

[3] While Plaintiffs believe the allegations and damages in the underlying case are realistically measured in the billions of dollars, FDB is a private subsidiary of Hearst Corporation and, when compared to large pharmaceutical companies or pharmaceutical wholesalers such as McKesson, FDB has little financial ability to pay a substantial judgment or cash settlement. Furthermore, FDB is the most widely used of the few integrated electronic databases capable of providing real-time reconciliation of detailed drug transactions; thus a bankrupting monetary judgment against FDB might disrupt corporate operations of price reporting ubiquitously relied upon at all levels of the retail pharmaceutical markets.

A class is appropriate in this case, as Defendants' course of conduct involves three critical and common elements that bind the Class members together: (1) the use of AWPs as the "industry pricing standard"- virtually all transactions involving the Subject Drugs due to its use of pricing standard in all contracts between PBMs and third-party payors; (2) the increase in the WAC to AWP spread and therefore the AWP contract price for each of the Subject Drugs as a direct result of Defendants' Scheme; and (3) Plaintiffs' and Class members' payment of sums directly tied to the increased AWPs. Resolution of these common elements from which liability and damage determinations can be made on a class-wide basis is superior to any alternative and will result in achieving substantial justice.

Second, as to damages, Class Plaintiffs estimate that if they are permitted to proceed to trial on the basis of the Class as currently defined in the FAC, a conservative estimate of total, single damage compensatory relief will exceed $7 billion. *See* Attachment A to this memorandum. This estimate of single damages for the Class in the FAC is a preliminary estimate, and will be refined during the course of discovery and expert report submission.

The basis for the preliminary estimate is as follows:

    1.    The approach starts with the 1,659 NDCs that are the subject of the FAC. It is estimated that the 1,659 NDCs represent about 40% of the top 200 retail branded drug sales. Although the 1,659 NDCs include other drugs as well, for simplification purposes we use only the 40% of the top 200 retail branded drug sales.

    2.    We then took estimates of the total sales (as opposed to expenditures, which would have been higher as it includes distribution costs as well) associated with these drugs during the Class period, and came to totals of them. In this situation, we therefore took 40% of the top 200 retail branded drug sales. To put this in some perspective, total retail branded drug sales during the class period ranged exceeded an average of $125 billion each year.

    3.    Because the FAC alleges that there was an unlawful increase in the markup on the WAC to arrive at AWP from 1.20 to 1.25 during a Class period (which markup was effectuated at a time of a price increase for each drug), we calculated the amount by which the increased AWP (an effective 4% increase on AWP) increased sales during the Class Period.

    4.    As a result, our preliminary estimate of single damages during the Class period is almost $7 billion, without interest. A preliminary estimate is attached as Attachment A.

Class Plaintiffs believe, therefore, that on any view of the facts the damages sought in the case would be extraordinary.

The third consideration in evaluating the Settlement was the ability of First DataBank to pay any eventual substantial judgment that in anyway approximates the estimate of single damages. FDB is unlike the other defendant, McKesson. McKesson is a large public

corporation based in San Francisco, California.  In the most recent SEC Form 10K (for fiscal

year ending March 31, 2006), McKesson reported net revenues of $88.1 billion, $8 billion higher

than the net revenues reported for the prior fiscal year.  "*Annual Report 2006, Form 10K*,"

McKesson Corporation, 31 March 2006, p. 3 (retrieved September 18, 2006 from

http://www.mckesson.com/en_us/McKesson.com/Investors/Annual+Reports/Annual+Reports.ht

ml.)  McKesson also has the ability to withstand payment of a large judgment.  For example, on

January 12, 2005, McKesson announced a $960 million cash settlement to resolve pending

securities litigation.  *Id*. at 32**.**

First DataBank is quite a different story.  FDB is a private subsidiary of Hearst

Corporation.  Pre-tax profits of FDB are orders of magnitude less than that of McKesson, and

orders of magnitude less than potential single damages sought in the case.  Based on a review of

recent financials for First DataBank, a fair estimate of its annual pre-tax profit is $19 million per

year.  *See* Declaration of Tomas M. Sobol, filed herewith.  (The financials of FDB were

previously filed under seal with this Court after an order was entered permitting counsel to do

so).  Because FDB is a private company, the financial condition of FDB is confidential and

competitively sensitive.  Nevertheless, the $19 million in pretax profit figure has been disclosed

to permit class members an opportunity to understand an important dynamic of the proposed

resolution.

Finally, the potential benefits of proceeding forward with litigation (given these risks)

were weighed against the benefits of the proposed settlement.  Class counsel have concluded that

not only is the proposed settlement a fair and just resolution of the Class claims against FDB

only, but indeed the settlement is likely to provide the class with far more financial and

institutional benefits then it could ever hope to achieve from First DataBank even after years of

further litigation.  The critical considerations were:

First, the rollback.  FDB has agreed to rollback from about 1.25 to 1.20 the markup factor for 8,487 formulations of drugs – more than twice the number of drugs at issue in the litigation effort itself.  The provisions of the Settlement, therefore, apply to more NDCs than set forth in the FAC (the rollback applies to 8,487 NDCs while the FAC relates to 1,659 NDCs).  A detailed estimation has been prepared by Plaintiffs' expert healthcare economist of the potential cost savings that might be realized from the rollback.  That analysis estimates that the drug coverage represented by the settlement is in excess of 95% of the retail branded drug transactions in the United States.  *See* Declaration of Raymond Harman, ¶¶ 9-12, filed herewith.  A reduction of 0.05 off the 1.25 markup factor applies to virtually all these drugs and represents a 4% reduction in the stated AWP.  Accordingly, the rollback will effectuate a national 4% reimbursement rate reduction in almost all retail branded drug transactions reconciled through the FDB database.  Class counsel had been provided an estimate that the drug cost savings *over the first twelve month effective period of the rollback would be in excess of $4 billion*.  This savings in excess of $4 billion to all end payors by reason of the relief effectuated by this settlement *includes* about $3.3 billion in estimated savings to private third party payors and *slightly less than $400 million in estimated savings to cash and uninsured payors*.

Of course, class counsel recognizes that this is an estimate, and that there are a variety of factors that may lead to an appreciable increase, or appreciable decrease, in the total amount of savings effectuated through the rollback.  Be that as it may, class counsel is of the opinion that the savings effectuated through the rollback will vastly exceed the recoverable and distributable amount of dollars that might be associated with any judgment that could be obtained against FDB as a result of continued litigation.

Second, FDB has agreed to cease the publication of the AWP and BBAWP fields within two years after the effective date of the judgment, but only in the event that significant competitors in the area of electronic intergratable pharmaceutical databases have ceased the publication of similar fields.  In effect First DataBank agrees as part of the Settlement that it will not perpetuate the dissemination of AWP and BBAWP information if others are no longer doing so.  This institutional reform adds to the growing legislative and policy movements (*see, e.g*., the Medicare Modernization Act of 2003, phasing out the use of AWPs for Medicare part B reimbursements) that are underway.

Third, a settlement with FDB alone leaves the claims of the class remaining as against the remaining defendant McKesson, a defendant of far larger financial wealth and ability to pay on the substantial judgment class counsel seek to litigate.

## E.     The Proposed Resolution Achieves Significant Benefits For Consumers Within The Class

The proposed resolution achieves significant benefits for consumers within the Class by (i) reducing by an effective 4% the AWP for most widely used prescription pharmaceuticals, and (ii) implementing a requirement that the largest drug price publisher, FDB, discontinue the publication of AWP two years after the effective date of the Settlement.  The latter prospective relief feature helps reduce arbitrary abuse of the WAC-to-AWP markup, whereby aiding in the prevention of further unwanted overpayments for consumers whose co-payments are based upon coinsurance.

Based on the relatively conservative consumptions, class plaintiffs' economists estimate that in the first twelve months of the effective date of the rollback, consumers will save almost $400 million in pharmaceutical costs – an amount which is about twenty times the annual pre-tax

profit of FDB. Even if the actual savings prove to be lower than this estimate, the savings from

the Settlement will always exceed any amount consumers could hope to achieve in any separate,

lump sum settlement with FDB.

Moreover, the rollback effectuates savings to consumers through the automatic reduction

in AWP. No cumbersome and administratively efficient claims process is necessary. Thus,

while certainly some market changes will occur by reason of the implementation of the rollback,

it can be fairly concluded that many more consumers will benefit from actual savings

implemented by the settlement and might otherwise be able to recover.

Finally, because it appears that co-insurance consumer contributions are growing as a

form of consumer contribution to prescription drug expenditures, the forward-looking rollback

plays a greater, direct benefit to consumers. This is particularly the case since the settlement

effectuates a rollback for more than twice the number of drugs that are at issue in the litigation

itself (i.e., could be proven to have been wrongfully inflated during the class period).

**F.       Retrospective, Lump Sum Relief From FDB For Consumers Is Impractical.**

It might be observed that there may be a narrow band of consumers who paid co-

insurance during the class period but, looking into the future, no longer are paying co-insurance

payments. Or there may be consumers in the class who would prefer retrospective, lump sum of

relief. After thorough consideration, retrospective, lump sum relief *as against First DataBank*

for consumers was considered to be wholly impracticable given the small financial resources

FDB has to pay a judgment. We explain as follows.

First DataBank made clear during settlement negotiations that any sizeable lump sum

cash requirement against FDB to the Class (all third party payors in the Untied States and likely

millions of consumer) would likely lead to Chapter 11 proceedings. And even in those

12

proceedings, FDB had limited assets (about $19 million in pre-tax profit) to contribute.  There was no immediate settlement option of a lump sum cash settlement.  Thus, one must compare the prospective relief in the proposed Settlement to the remaining option – proceeding forward to trial with the hope of obtaining a monetary lump sum judgment against First DataBank, that would likely result in a bankruptcy.

We compare the prospective benefits in the Settlement to the practicality of the distribution of retrospective, lump sum monetary award for consumers.  Given the limited financial resources of First DataBank (about $19 million pre-tax) and the relatively small share of consumer damages to TPP damages, and comparing FDB's limited resources against the costs of consumer claims adjudication, a retrospective, lump sum award is an impractical approach to providing dollars back into the pockets of consumers.  We demonstrate this impracticality in the following ways.

First, we posit the question: "How much might all consumers who paid co-insurance co-payments receive as a group from a lump sum award, and how much would it cost to notify the class members of that award?"  In answering the question, we make a series of assumptions or estimates that greatly exaggerate the size any potential consumer recovery in order to demonstrate the impracticality:

> 1.     Assume a retrospective, lump sum collection from FDB that has a *distributable net* of $20 million dollars to the Class as a whole[4];

---

[4] This assumption exaggerates the size of net recoverable assets against First DataBank.  Because (i) the pre-tax income of FDB is approximately $19 million per year, (ii) any judgment would require that administration fees and expenses over and above the net distributable amount, and (iii) the likely consequence of a judgment approximating or exceeding this amount would result in a Chapter 11 bankruptcy proceedings by First DataBank, the assumption of a $20 million net distributable proceeds from a judgment against FDB is conservative for these purposes.

2.      Assume that of all private insurance, 25% of plans provide for a co-insurance co-payment arrangement for the drug benefit[5];

3.      Assume that for those co-insurance payors, the usual co-insurance payment is 25% of the drug cost[6];

4.      One then allocates the distributable proceeds ($20 million) between third party payors and those consumers who paid co-insurance (i.e., the two groups most directly affected by the markup scheme).  The co-insurance portion of the 6.25% is $1.25 million in distributable proceeds for the several million consumers who paid co-insurance (while this is likely a higher co-insurance portion, we provide it to demonstrate the conservative nature of the analysis);

5.      Assume the costs for notice to the consumer class of co-insurance consumers is $1.5 million[7];

6.      Accordingly, even before estimating claims adjudication costs along with the costs associated with mailing individual checks, under even conservative assumptions the distributable amount of dollars to consumer co-insurance payors ($1.25 million) will be less than the cost of notice ($1.5 million) to those very same consumers.  Thus, before considering other costs, more would be spent in notifying the class members as a whole than would be distributed to the class members.

Second, we posit the question: "What would an example of a payment to a consumer who

---

[5] Studies provide empirical information regarding the comparative prevalence of different co-payment arrangements for prescription drug benefits in private health plans. See The Henry J. Kaiser Family Foundation, Employer Health Benefits 2006 Annual Survey Retrieved Oct. 31, 2006, from http://www.kff.org/insurance/7527/index.cfm.  (estimating number of health plans and programs that provide for co-insurance).  Flat co-payment or tiered co-payment arrangements are the most usual, and many plans offer no co-insurance co-payment arrangement at all.  Nevertheless, some empirical information shows that for some plans co-insurance was projected to increase to as much as 22-26%.  During the Class period the percentage of co-insurance arrangements is likely markedly less that 25%, thus the 25% assumption is conservative for these purposes.

[6] Studies provide empirical information regarding the average amount of percentage for the co-insurance requirement for drug benefits in health plans. See The Novartis Pharmacy Benefit Report, Fact & Figures 2004 Edition (estimating average percentage co-insurance for prescription drug plans). Our inquiries demonstrate that the usual percentage co-insurance requirement is 20%, some plans may require higher percentage payments.  The assumption of the average percentage co-insurance requirement being 25% is conservative for these purposes.

[7] The cost associated with a national publication notice program for consumers has been provided to the Court in this and other cases, and in all situations has exceeded $1.5 million.

had a large co-insurance bill look like under a retrospective, lump sum award as against FDB?:"

1. Assume a consumer who pays 25% of the cost of a long-term maintenance drug costing $100 per month for three years.[8] That person, will have spent $900 in co-insurance payments;

2. Assume that the scheme at issue in the case led to a 4% overpayment in co-insurance (i.e., the amount of the overpayment due to a change in the markup factor from 1.20 to 1.25);

3. On the basis of the total payments and this percentage, the total single damage overcharges incurred by this hypothetical consumer would be $36.

4. Assume (as before) a retrospective, lump sum collection from FDB of a net distributable $20 million to the Class as a whole;

5. Assume the Class damages as a whole are $7 billion[9];

6. As a result, the $20 million recovered from FDB represents a 0.29% of all damages; accordingly, if every party that suffered damages filed a claim (they would not, in an adjustment we make momentarily) then the ratable share of the hypothetical consumer's $36 in single damages of the $20 million settlement would be about $0.10.

7. Of course, not everyone who suffered damages files a claim, and in some circumstances consumers might negotiate allocation treatment so as not to have their claims diluted by the presence of TPP claims. On this more favorable-to-consumers basis, an allocation of $1.25 million (*see* earlier example) to all consumer co-insurers, and assuming the payment of only 200,000 claims, then the average claim amount would be $6.25. For the hypothetical consumer, would he/she were to receive this $6.25 *before considering costs.*

8. The average cost to administer such claims, however, exceeds this average payment amount. Claims adjudication for consumer claims varies, but is estimated at as much as over $40 per claim to as little as $9 per claim. *See* Declaration of Thomas Glen (providing examples of other consumer drug settlements and the average handling costs for each claim). Even with all assumptions favorable to consumers, the average consumer amount ($6.25) would

---

[8] The drugs at issue in the case include prescriptions for chronic and acute conditions; chronic conditions, of course, last longer and therefore we use that conservative assumption. The percentage of 25% is conservative (*see* earlier footnotes), and the $100 per month cost, steadily for over three years, is also conservative for these purposes.

[9] The preliminary estimate of single damages, and the methodology, is set forth in Attachment A to this Memorandum.

be less than the cost of administering the process estimate of average claim expenditures ($9).

As these two examples demonstrate, each component of lump sum class adjudication – class notice and class administration – standing alone exceeds the distributable amount available to consumers under even the most exaggerated circumstance of a lump sum payment by First DataBank.  Put simply, more would be spent in trying to effectuate a retrospective, lump sum award for consumers in a claim as against First DataBank (given First DataBank's limited resources) than could ultimately go back to the consumers themselves.  Of course, the problem is compounded by the fact that if a lump sum award is pressed as against FDB, that award would not likely be distributed for years to come.  At bottom, class counsel are of the opinion that a lump sum retrospective award as against First DataBank is wholly impracticable.

## III.     DESCRIPTION OF THE PROPOSED SETTLEMENT

### A.     The Settlement

There are procedural and substantive aspects to the proposed settlement.

*Procedural*.  First, a preliminary approval hearing would be conducted at which the Court would determine whether to preliminarily approve the settlement, certify a class for settlement purposes, appoint class counsel and approve notice to the class.  Second, during the notice time period notice will issue to the class and class members will be given an opportunity to opt-out of the class or object.  Third, during the period between preliminary approval and the final approval hearing, proposed settlement may be reviewed by various attorneys general (some of whom have already been consulted on an informal, nonbinding basis) for the purposes of determining whether the attorneys general approve, disapprove, or might provide "cold comfort" regarding the allegations against FDB.  Fourth, prior to the final approval hearing date, FDB must make an

16

election (on the basis of opt-outs received and the reaction of attorneys general) as to whether to proceed with the settlement or exercise its termination rights. Fifth, a final approval hearing would be conducted and, if the Court is so inclined, an order for judgment would enter. Once the effective date is thereafter reached (as defined in the Settlement Agreement), obligations of FDB under the settlement agreement are triggered.

*Substantive.* The substantive features of the settlement have previously been discussed. The settlement *does not* require that FDB provide any cash to a fund for settlement of the claims against it. The cash obligations of First DataBank under the settlement are (i) to pay notice and class administrative expenses as may be approved by the Court, and (ii) to pay, subject to Court approval, no more than $950,000 in total attorneys fees, document maintenance charges and litigation expenses. Instead of a cash obligation, First DataBank has agreed to adjust the markup factor in its database for about 8,487 NDCs representing approximately 95% of the retail branded drug expenditures. The obligation to effectuate the rollback only becomes triggered under the Settlement Agreement following Final Approval on the latter of (i) sixty (days) days following the Effective Date of the final judgment, or (ii) 270 days from entry of preliminary approval of the proposed settlement. First DataBank has also agreed to cease the compilation and publication of the AWP and BBAWP fields in its database, an obligation that only becomes triggered no later than two years after the effected date of the court's approval. First DataBank also has obligations to provide information through the maintenance of a data room.

Although the settlement will, on any view of the situation, save the class (and public payors) very substantial future pharmaceutical reimbursements, no immediate lump sum "common fund" of cash is created by the settlement by which counsel could seek a percentage fee recovery. Accordingly, subject to Court approval a separate payment by FDB of attorneys

17

fees, expenses and anticipated future work was separately negotiated (after the substantive terms of the underlying settlement had already been reached). Counsel anticipate that the negotiated amount is less than the actual fees and expenses incurred by counsel in connection with the matter and reflects no upward multiplier for extraordinary results achieved despite the value to the class created by the Settlement.

The Settlement Agreement provides that First DataBank will pay all costs associated with Court-approved notice to the class.

### A.    What is Being Released

As described fully in the Settlement Agreement, all Class Members (consumers and TPPs that have paid based on FDB's published WAC, AWP or BBAWP) are releasing First DataBank and its various subsidiaries, related entities and personnel from all claims as set forth in the release in the Settlement Agreement.

### B.    Termination

Defendants and Class Settlement Counsel each have the right to terminate the Settlement if any of the following events occurs: (a) this Court declines to enter the Preliminary Approval Order submitted with this Joint Motion or the Order and Final Judgment finally approving the Settlement; (b) the Order and Final Judgment are modified or reversed in any material respect by the U.S. Court of Appeals or the U.S. Supreme Court; or (c) an alternative judgment, agreed to by the parties, is modified or reversed in any material respect by the U.S. Court of Appeals or the U.S. Supreme Court. The Settlement Agreement also provides termination rights to First DataBank (i) in the event that a certain level of Class Members seek to exclude themselves from the Class, or (ii) in the event that more than one Attorneys General affirmatively declines to provide First DataBank with a "comfort" letter regarding allegations in the underline action .

18

## IV.    ARGUMENT

The Class Plaintiffs have fully briefed a Motion for Class Certification as to McKesson, which is pending before the Court.[10]   This brief discusses certification of a Class for purposes of settlement.  A class action cannot be compromised or settled without the approval of the Court. Fed.R.Civ.P. 23(e).  Prior to addressing the adequacy of a proposed Settlement, however, the Court must determine whether the Plaintiff Class, as agreed to by the parties, may be certified for purposes of the Settlement. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.E.2d 689 (1997);  *Hawkins ex rel. Hawkins v. Commissioner of New Hampshire Dept. of Health and Human Services*,  2004 WL 166722, (D.N.H. Jan. 23, 2004).

A court may grant conditional approval of a class action where, as here, the class proposed satisfies the four prerequisites of Rule 23(a) (numerosity, commonality, typicality and adequacy), as well as one of the three subsections of Rule 23(b).  *See Amchem*, 521 U.S. at 613.

If the Court determines that a settlement class should be certified, the Court must then follow a three-step process prior to granting final approval of a proposed settlement.  *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543 (S.D. Ohio 2000).  First, the Court must preliminarily approve the proposed settlement.  *Id.* at 547.  Second, members of the class must then be given notice of the proposed settlement.  *Id.*  Third*,* a hearing must be held, after which the Court must decide whether the proposed settlement is fair, adequate, and reasonable to the class as a whole, and consistent with the public interest.  *Id.*  This protects the Class Members' procedural due process rights and enables the Court to fulfill its role as the guardian for the Class' interests. The decision to approve or reject a proposed settlement is committed to the Court's sound discretion.

---

[10] Plaintiffs Incorporate by reference their Memoranda in Support of Class Certification (Docket # 76), and respectfully will not repeat the entire analysis under Rule 23 herein.

19

*City Partnership Co. v. Atlantic Acquisition L.P.,* 100 F.3d 1041, 1043-44 (1st Cir. 1996).

A.    **The Court Should Certify The Proposed Class Pursuant To Rule 23(a), 23(b)(1), 23(b)(2) and 23(b)(3) For Purposes Of Settlement**

1.    **The Requirements of Rule 23(a) Have Been Satisfied**

In order to certify a class "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) *citing General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). "Although this court's analysis should not involve a 'preliminary hearing on the merits,' it may, but need not, 'probe behind the pleadings' to consider other matters, including the probable course of litigation. *In Re Relafen Antitrust Litig.*, 231 F.R.D. 52, 67 (D. Mass. 2005) (Young, J.) (citations omitted). A plaintiff bears the burden of establishing the elements necessary for class certification: 'the four requirements of Rule 23(a) and one of the several requirements of Rule 23(b)." *Smilow*, 323 F.3d at 38 *citing Amchem*, 521 U.S. 591; *Gukenberger v. Boston Univ*. 957 F.Supp. 306, 325 (D. Mass. 1997) (Saris, J.). The Rule 23(a) threshold elements are: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *In Re Relafen Antitrust Litig.*, 231 F.R.D. at 67; *Smilow v. Southwestern Bell Mobile Sys, Inc.,* 323 F.3d at 32, *citing Amchem*, 521 U.S. at 613.

In addition to the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, the party seeking to obtain class certification must demonstrate that the action may be maintained under Rule 23(b)(1)(2), or (3). *In Re Relafen Antitrust Litig.*, 231 F.R.D. at 67, (citation omitted).

Under Rule 23(b)(1) and (2) an action may be maintained as a class action where:

> (1)     the prosecution of separate actions by individual members of the class would create a risk of
>
>> (A)     Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing class, or
>>
>> (B)     Adjudication with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests; or
>
> (2)     the party opposing the class has acted or refused to act on grounds generally applicable the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole

Rule 23(b)(1) and (2).

Here, the parties agree, and the Court should find, that the risk of inconsistent multiple adjudications resulting in incompatible standards of conduct underscore the necessity of class certification.   Rule 23(b)(1).  Moreover, the parties agree that where the Class Plaintiffs allege that FDB's Scheme resulted in their injury and final relief does not relate exclusively to money damages, but rather injunctive relief with respect to the WAC to AWP spread, Rule 23(b)(2) is satisfied and militates toward the Court's finding that class certification is appropriate in this action.  Fed. R. Civ. P. 23(b)(2); *see also* Advisory Committees 1966 Note on subd.(b)(2) of Rule 23 ("This subdivision is intended to reach situations where a party has taken action . . . with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole is appropriate. . . . The subdivision does not extend to cases in which . . . final relief relates exclusively or predominately

to money damages.")

"Rule 23(b)(3) permits a class action when 'the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members,' and resolution via class action is 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* at 68.  Predominance and superiority are evaluated by reviewing the following "pertinent matters:

> (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

*Id.*  The list of pertinent factors is "nonexhaustive."  *Amchem*, 521 U.S. 616.

One exception to the requirement that this Court conduct a rigorous a Rule 23 analysis is where the parties seek a settlement-only certification.  *Smilow*, 323 F.3d at 38.  In such a context, the Court need not inquire whether the case would present intractable management problems *Amchem*, at 620 citing Fed. R. Civ. P. 23(b), (c).  The other requirement helps protect absentee plaintiffs by blocking overly broad class definitions resulting in heightened attention in the settlement context.

### a.  Numerosity

Numerosity requires that the class include so many members that joinder would be impracticable.  Fed.R.Civ.P. 23(a)(1).  Although there is no magic number of class members that will qualify for class certification, courts have generally found groups of more than fifty to satisfy the numerosity requirement.  *Holton v. Rothschild, Unterberg, Towbin,* 118 F.R.D. 280, 282 (D. Mass. 1987) (50 or 60 members "is sufficiently large" to warrant class certification)

Precise quantification of class members is not necessary, and a court may make common sense assumptions to support a finding of numerosity). *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 167 (1st Cir. 1987); *see also Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 131-32 (1st Cir. 1985), *cert. denied*, 476 U.S. 1172 (1986) (Court can consider economy, geographic dispersion and ability of individual members to bring suit); *Alba Conte & Herbert Newberg, Newberg on Class Actions* ("Newberg") § 18:2-18:4 (4th ed. 2002).

In this case, the proposed Settlement Class consists of in excess of ten thousand entities throughout the United States and hundreds of thousands of persons who paid graduated co-payments for the applicable drugs. A class of this size easily satisfies the numerosity requirement.[11]

### b. Commonality and Typicality

Generally, the commonality requirement is easily met, provided that at least one common question of law or fact exists. *In re AWP*, 230 F.R.D. at 78. The numerous common factual and legal issues to be decided here include, but are not limited to, the following:

<blockquote>

a.    Whether AWPs published by First Data are used as a benchmark for negotiating payments by third-party payors for drugs;

b.    Whether Defendants engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs used by Plaintiffs and Class Members as the basis for reimbursement;

c.    Whether Defendants artificially inflated the published AWPs for the drugs that are the subject of the Complaint;

</blockquote>

---

[11] Courts within the First Circuit have held numerosity satisfied under far less compelling circumstances than those present here. *George Lussier Enter. v. Subaru of New England Inc.*, 2001 U.S. Dist. LEXIS 12054, 2001 DNH 143 (D.N.H. Aug. 3, 2001) (proposed class of 75 present and former car dealers satisfies the numerosity requirement); see also *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D. Mass. 1984) (class of 160 tenants of Faneuil Hall Marketplace met numerosity requirement); *Silva v. National Telewire Corp.*, 2000 U.S. Dist. LEXIS 13986 (D.N.H. 2000) (finding that class of 130 residents of New Hampshire met numerosity requirement).

d.     Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class Members to make inflated payments for the drugs that are identified in the Complaint;

e.     Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class Members;

f.     Whether Defendants formed enterprises for the purpose of carrying out the 5% Scheme;

g.     Whether Defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h.     Whether Defendants' conduct violated RICO and various California statutes and common law; and

i.     Whether Defendants are liable to Plaintiffs and the Class Members for damages for conduct actionable under the various state consumer protection statutes.

In this case, a single set of facts that are alleged would prove the causes of action alleged. The documentary and testimonial evidence applies exclusively or predominantly across the entirety of the Class.  Virtually all elements of Plaintiffs' claims involve proof of Defendants' conduct, not the conduct of Class Members.  *See In re Lupron Mktg. and Sales Practices Litig.*, 295 F. Supp. 2d 148, 161, 163-175 (D. Mass. 2003).  Plaintiffs' RICO claims all arise from the same series of actions by the Defendants.  Various other courts have certified nationwide classes in drug pricing cases involving schemes not dissimilar to those alleged in this case.  *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 248 (D. Del. 2002) ("Several other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs."); *Advocate Health Care v. Mylan Labs., Inc. (In re Lorazepam & Clorazepate Antitrust Litig.)*, 202 F.R.D. 12 (D.D.C. 2001) (conspiracy to prevent competition and raise price of drugs); *In re Synthroid Mktg. Litig.,* 188 F.R.D. 295 (N.D. Ill. 1999) (drug manufacturer alleged to have suppressed information in order to protect generic drug

24

competition); *Kruse v. DuPont Merck Pharm. Co.*, 97-CH-15799, Order (Ill. Cir. Ct., June 7, 2000).

In the present action, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class Members. Plaintiffs and Class Members were all harmed by Defendants' unlawful scheme to manipulate the WAC-to-AWP markup for thousands of brand-named pharmaceuticals. Accordingly, Plaintiffs' interests are not only "typical" of the absent Class Members, they are identical and easily satisfy Rule 23(a)(3).

### c.  Adequate Representation

The adequacy requirement has two parts:  the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Co.*, 780 F.2d 124, 130 (1st Cir. 1985). Plaintiffs meet both prongs.

### i.    The Five Proposed TPP Class Plaintiff Representatives Are Adequate

The Plaintiffs do not have any interests that are antagonistic to those of the Class. The central issues in this case are common to the claims of the Plaintiffs and to members of the Class. Each representative Plaintiff, like each absent Class Member, has a strong interest in proving the existence of the Defendant's scheme to manipulate AWP and their resultant injury arising from paying more for pharmaceutical products. Plaintiffs have submitted to discovery and worked with counsel for the protection of the Class. There is no conflict between the Plaintiffs and the Class Members, so Plaintiffs satisfy the requirements of Rule 23(a)(4).

Representative Plaintiff New England Carpenters Health Benefits Fund ("Carpenters"),

25

with it principal place of business in Wilmington, Massachusetts, is an employee welfare benefit

plan established for the purpose of providing health benefits to eligible participants and

beneficiaries. Carpenters provides comprehensive health coverage for over 22,000 participants

and beneficiaries in the states of Maine, New Hampshire, Vermont, and Massachusetts. During

the Class Period, Carpenters has been billed for and paid charges for drugs. It reimbursed retail

pharmacies for pharmaceuticals on the basis of the FDB published AWP (minus a fixed

percentage). Carpenters, as a consequence, was injured as a result of the 5% Scheme.

Representative Plaintiff Pirelli Armstrong Tire Corporation Retiree Medical Benefits

Trust ("PMBT"), with its principal place of business in Goodlettsville, Sumner County,

Tennessee, is a voluntary employee benefits association maintained pursuant to the federal

Employee Retirement Security Act, 29 U.S.C. § 1132. et seq. and to the settlement of a federal

court action (Case No. 3:94-0573) brought in the United States District Court for the Middle

District of Tennessee against Pirelli Armstrong Tire Corp. (Pirelli") in the early 1990s by many

Pirelli retirees for the purpose of providing health and medical benefits to eligible participants

and beneficiaries. During the Class Period, PMBT was billed for and has paid charges for drugs

based on AWP. Since May 1, 2001, PMBT contracted with ACS/Caremark, a pharmacy benefits

manager ("PBM"), administer its drug program for its members. PMBT's contract with its PBM

provides that reimbursement is to be based on FDB's published AWP.

Plaintiff Teamsters Health & Welfare Fund of Philadelphia and Vicinity (THWF") is an

employee welfare benefit plan and employee benefit plan for the purpose of providing health

benefits to eligible participants and beneficiaries. THWF has its principal place of business in

Philadelphia , Pennsylvania and provides health benefits for over 28,000 participants and

beneficiaries in parts of Pennsylvania, New Jersey and Delaware. During the Class Period

26

THWF was billed for and paid charges for drugs. THWF reimbursed retail pharmacies for pharmaceuticals on the basis of the FDB published AWPs (minus a fixed percentage). THWF, as a consequence, was injured as a result of the scheme.

Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("Teachers") is a voluntary employee benefits plan organized pursuant to § 501(c) of the Internal Revenue code for the purpose of providing health benefits to eligible participants and beneficiaries. Teachers maintains its principal place of business in Philadelphia, Pennsylvania, and provides health and prescription drugs benefits to about 20,000 active participants, their spouses and dependents. During the Class Period, Teachers was billed for and paid charges for drugs. Teachers reimbursed retail pharmacies for pharmaceuticals based on the FDB published AWPs (minus a fixed percentage). Teachers, as a consequence, was injured as a result of the scheme.

Plaintiff District Council 37 Health & Security Plan is non-ERISA union-sponsored employee welfare benefit plan subject to the reporting requirements of the New York City Controller's Internal Control and Accountability Directive No. 12. The right to bargain for said welfare benefits is recognized by Section 12-307 of the New York City Collective Bargaining Law. In addition, under DC 37, the union, there exists two smaller employee welfare benefit plans, The District Council 37 New York Public Library Health & Security Plan Trust and The District Council 37 Cultural Institutions Health & Security Plan Trust both of which were established and are maintained pursuant to §§ 1002(1) and (3) of ERISA. The above-referenced benefit plans are collectively referred to as "DC 37." DC 37 maintains its principal place of business in New York, New York. It provides supplemental health benefits, including a prescription drug benefit for over 350,000 participants and beneficiaries in all but one state in the United States. During the Class Period, DC 37, through its prescription drug benefit manager,

has been billed for and paid charges for certain of the drugs based on the FDB published AWPs

(minus a fixed percentage). As a consequence, DC 37 injured as a result of the scheme.

<ul>
<li>ii.  <strong>The Five Named TPP Plaintiffs Are Also Adequate Representatives For Private Consumers</strong>.</li>
</ul>

Although there are specific consumer representatives for the consumers in the proposed

settlement class (see next section), the five TPP Plaintiffs adequately represent the interests of

consumer class members in the circumstances of this settlement. Here, the class includes only

those consumers whose purchase was based on the FDB AWP (or BBAWP) fields of

information. Put differently, persons who paid flat co-payments are *not* in the class; it is

typically consumers who paid drug coverage *co-insurance* alongside with their health benefit

provider who are in the settlement class.

Case law supports a finding that TPPs like the Class Plaintiffs have claims that are typical

of private co-insurance consumer payers. As per *Priest v. Zayer Corp.*, 118 F.R.D. 552, 553 (D.

Mass. 1988), the claims of TPPs and consumers arise from the same course of conduct and are

based on similar legal theories:

- Both TPPs and consumers made payments on the basis of reimbursement formulas incorporating AWP.

- Both TPPs and consumers suffered the same damage: paying inflated or excessive payments as a direct and proximate result of the Defendants' 5% Scheme.

- Both TPPs and consumers possess the same legal claims against Defendants.

- There is no disparity of "knowledge" between TPPs and consumers in than the Defendants' 5% scheme was unknown to both

*See also Randle v. SpecTran*, 129 F.R.D. 386, 391 (D. Mass 1988); *Fraser v. Jamor League*

*Soccer, LLC*, 180 F.R.D. 178, 181 (D. Mass. 1998); *Burstein v. Applied Extrusion Techs*., 153 F.R.D. 488, 491 (D. Mass. 1994) 1 A. Conte and H. Newberg, NEWBERG ON CLASS ACTIONS §3.13 (4th ed. 2002) (the typicality requirement is usually met "when it is alleged that the same unlawful conduct was directed at or affected both the named plaintiffs and the class sought to be represented.")

In sum, TPP Plaintiffs have the same incentive to pursue their claims and to settle on favorable terms as consumers.  The Plaintiffs in protecting their own interest in negotiating and agreeing to the proposed Settlement necessarily protect and advance the interests of private consumer Class Members because those interests coalesce.  There is no conflict between the Class Plaintiffs and private consumers.

With respect to the second prong, Class Plaintiffs have retained counsel with substantial experience in prosecuting nationwide consumer class actions.[12]  The experience of counsel is significant in the pharmaceutical pricing area.  See *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. Sept. 28, 2005) (District Court Chief Judge William G. Young approves a $75 million settlement of a nationwide consumer class action); *In re Lupron Mktg. and Sales Practices Litig.* 228 F.R.D. 75 (D. Mass. May 12, 2005) (District Court Judge Richard G. Stearns approves $150 million settlement of consumer antitrust class action); *Nichols, et al. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061, No. 00-6222 (E.D. Pa. Apr. 22, 2005) (District Court Judge John R. Padova approves $65 million consumer and third party payor settlement in an action alleging antitrust violation by the manufacturers of the prescription drug Paxil); *Ryan-House et al. v. GlaxoSmithKline PLC, et al.*, 2005 U.S. Dist. LEXIS 33711, No. 2:02cv422 (E.D. Va. Jan.

---

[12]    The resumes of Plaintiffs' counsel are attached to the pending Motion for Class Certification.

10, 2005) (Judge Henry Coke Morgan, Jr. approves $29 million settlement of antitrust claims alleged by direct purchasers of the prescription drug Augmentin); and *Stop & Shop Supermarket Co., et al. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, No. 03cv4578 (E.D. Pa. May 19, 2005) (Judge Padova approves a $100 million settlement between Direct Purchaser Class and the Defendants for antitrust violations on behalf of the manufacturers of Paxil). Counsel for Plaintiffs have been litigating before this Court in the related *AWP Litigation*[13] and have demonstrated their commitment to vigorous prosecution and protection of their clients' rights. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the proposed Class, and have the financial resources to do so.

       iii.    **The Consumer Plaintiffs Are Also Adequate Representatives for Private Consumer.**

       In addition, the Second Amended Complaint (filed on October 31, 2006, with a motion for leave to amend as indicated at the October 24, 2006, hearing) now has [the number of consumers], consumer plaintiff representatives. Each of these consumer representatives are adequate representatives of the class. Each of the consumers purchased a subject drug through co-insurance co-payments during the class period, and therefore they suffered damage as a result of the alleged misconduct. Each of the consumer representatives have reviewed the purposed terms of the settlement, and have done so in tandem with the Prescription Access Litigation project, a consumer coalition that works with consumers and third party payors in the United States in order to assure the adequate representation of consumers in the litigation[14].

---

       [13] *In re Pharm. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS (D. Mass., order consolidating cases June 16, 2005).

       [14] For example, Plaintiff June Swan pays a percentage of her Celebrx drug through Aetna. As a result, Ms. Swan paid a percentage co-payment based on AWP for a Subject Drug during the Class Period. Plaintiff Bernard Gorter currently pays 40% of the cost of his Lipitor prescription. He is on Medicare and also has a Medicare supplement in which the state of Oregon pays part of his premium. As a result, Mr. Gorter paid a percentage co-

### 2.    The Requirements of Rule 23(b)(3) Have Been Satisfied

The Settlement Class should be certified because, in addition to having satisfied the prerequisites of Rule 23(a), the Class also satisfies those of Rule 23(b)(3): namely, (1) questions of law or fact common to Class Members predominate over any questions affecting only individual members; and (2) the class action is  superior to other available methods for the fair and efficient adjudication of this matter.  *Mowbray v. Waste Mgmt. Holdings, Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws Antitrust Litigation*, 91 F.R.D. 52, 55 (D. Mass. 1981); *In re Compact Disc*, 216 F.R.D. at 204 (D.Me. 2003).

Class actions have long been recognized by the courts as an essential tool for adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis.  The policies underlying the need for class action litigation require that certification under Rule 23 be "liberally construed."  *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D.Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule."); *see also Smilow*, 323 F.3d at 41-42 (classes of consumers "are especially likely to satisfy the predominance requirement").

---

payment based on AWP for a Subject Drug during the Class Period.  Maureen Cowie takes Neurontin, Klonopin, Lipiot and Lotensin.  She was covered by Blue Cross when she began taking these drugs and paid 80% of the cost for each.  As a result, Ms. Cowie paid a percentage co-payment based on AWP for a Subject Drug during Class Period.

In this case, all the specific and general issues – Defendants' liability under RICO and consumer protections acts; the formation and fulfillment of the AWP scheme; liability evidence showing across-the-board inflation and effect on the Class; aggregate damages to the Class as a whole – are common, uniform, and applicable to all Class Members. Certainly, adjudication of Plaintiffs' and Class Members' claims can be done most efficiently as a class action.  A class action is the superior method of adjudicating the nearly identical claims of the many Class Members in this case because it reduces variations and inconsistencies in the adjudication of similar claims, effectively utilizes judicial resources and economically allows for the adjudication of many claims involving an identical complex scheme and legal theory.

### a. Questions Of Law Or Fact Common To Class Members Predominate Over Any Questions Affecting Only Individual Members

The Rule 23(b) predominance inquiry is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).  In determining whether common questions of law or fact predominate, the Court should determine if the various claims of the Plaintiffs are sufficiently cohesive to justify treating them all in one, single judicial forum. *See Amchem*, 521 U.S. at 624 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of antitrust laws").

It is clear that individual issues in this case will not overwhelm the common questions of law or fact, because the central question is whether the Defendants illegally manipulated the WAC-to-AWP spread and, if so, by how much.  There is no doubt that the Plaintiffs would present common evidence regarding the existence and scope of the alleged scheme to illegally inflate the spread between the WAC and AWP at any trial of this matter.  Further, common proof

of pricing, discounting and marketing will apply to all of the Class claims.  The fact that
individual Class Members' damages may vary due to quantity of purchases does not defeat
predominance.  *See, e.g.*, *In re Master Key Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975).

> **b.  A Class Action Is Superior To Other Available Methods For The Fair And
> Efficient Adjudication Of This Matter.**

With respect to the superiority requirement, a court must consider these factors: (a) the
interest of members of the class in individually controlling the prosecution or defense of separate
actions; (b) the extent and nature of any litigation concerning the controversy already
commenced by or against members of the class; (c) the desirability or undesirability of
concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be
encountered in the management of a class action.  Fed.R.Civ.P. 23(b)(3).  However the U.S.
Supreme Court recognized that where a Court is "[c]onfronted with a request for settlement-only
class certification, a [local] court need not inquire whether the case, if tried, would present
intractable management problems, for the proposal is that there be no trial."  *Amchem*, 521 U.S.
at 620 (citation omitted).

The large size of the Class, the relatively small potential recovery of most class members,
the complexity of the litigation, the cost of the litigation, and similar issues, make a class action
the superior method of adjudicating the claims presented here.  The interests of Class Members
in individually controlling the prosecution of separate claims are outweighed by the efficiency of
the class mechanism.  It would be a waste of judicial and the parties' resources to require
thousands or millions of separate prosecutions.  Such an approach would necessarily risk
inconsistent adjudications establishing varying standards for identical conduct.

**B**.    **The Court Should Grant Preliminary Approval To The Settlement Agreement And
Release**

Plaintiffs respectfully submit, as they will demonstrate at the fairness hearing, that: (i) the Settlement is in all respects fair, reasonable and adequate to the Class; (ii) they have investigated the pertinent legal and factual issues; (iii) continued litigation against FDB will consume additional resources of the parties without offering a better resolution for the class; and (iv) there is no hint of collusion between or among the parties in the settlement negotiations. At the fairness hearing the Court must undertake a detailed assessment of the terms of the Settlement, the interests of the Class Members as well as any third parties that might be affected by the settlement, and the circumstances of the litigation and the proposed settlement. *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durett v Housing Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *Hawkins*, 2004 WL166722, at *3.

At this stage of the settlement process, the Court conducts only a preliminary evaluation to determine whether the proposed Settlement is within the range of possible final approval, and thus whether notice to the Class of the terms and conditions of the proposed Settlement, and the scheduling of a formal Fairness Hearing, are appropriate. *White v. National Football League*, 822 F.Supp. 1389, 1399 (D. Minn. 1993); *In re NASDAQ Market-Makers Antitrust Litigation*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). Thus, the *Manual for Complex Litigation, Third* ("*Manual*") characterizes the preliminary approval inquiry as a court's "initial assessment" of the fairness of the proposed settlement, made on the basis of written submissions and informal presentation from the settling parties, and summarizes the preliminary approval criteria as follows:

> If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies,

34

> such as unduly preferential treatment of class representatives or of
> segments of the class, or excessive compensation for attorneys, and
> appears to fall within the range of possible approval, the court
> should direct that notice . . .be given to the Class Members of a
> formal Fairness Hearing, at which arguments and evidence may be
> presented in support of and in opposition to the settlement.

*Manual* § 30.41; *see also* 2 *Newberg* § 1.25.

As detailed below, the proposed Settlement falls well within the range of reasonableness, and thus merits preliminary approval.

Initially, Class Plaintiffs note that the law has long favored settlement of litigations. This is particularly true in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost and rigors of prolonged litigation. In addition, there is an overriding public interest in favor of settlement of complex class action suits, especially where the substantive issues of the case "reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established." *See, e.g.*, *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 307 (7th Cir. 1985). By supporting the settlement of complex, class action disputes, the judicial system can help minimize litigation expenses on both sides, reduce the strain on scarce judicial resources, and avoid the risk of trial to both parties. *Manual,* §§ 23, 30.4 (Fed. 1995).

These concerns apply with particular force in a case such as this, where thousands of consumers and TPPs throughout the country were subject to paying increased costs for prescription drugs as a result of the Defendants' scheme to unlawfully increase the spread between the WAC and AWP. The settlement provides very substantial price reductions to the entire class. Individual litigation would clog the courts of this and many other states; would take years to resolve; and, given the relatively modest amount of damages suffered by each individual

35

consumer, it likely would be available only to those wealthy and sophisticated enough to retain their own lawyers.  The proposed Settlement is the best and only vehicle to assure that all Class Members, regardless of their means, and whether they are consumers or TPPs, receive relief in a prompt and efficient manner.

>   1.    **The Proposed Settlement Is Sufficiently Fair, Reasonable And Adequate For Preliminary Approval.**

In determining whether the Settlement is fair, reasonable, and adequate to the Class as a whole, several factors should be considered, including: (1) the complexity of the litigation, (2) the posture of the case at the time settlement was proposed, (3) the extent of discovery conducted in the case, (4) the circumstances of the settlement negotiations, (5) the experience of counsel, (6) the relative strength of the plaintiffs' case on the merits, the possible defenses, and other risks in the litigation, (7) the anticipated duration and expense of further litigation, and (8) the reaction of the class and opposition to the settlement.  *Hawkins*, 2004 WL 166722, *citing In re General Motors Corp. Pick-Up Truck Fuel Tank*, 55 F.3d 768, 785 (3d Cir. 1995); *Kovacs v. Ernst & Young*, 927 F.2d 155, 158 (4th Cir. 1991); *Williams v. Vukovich,* 720 F.2d 909, 922-924 (6th Cir. 1983).[15]

As a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement.[16]  *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976);

---

[15]    While the foregoing criteria will guide the Court's analysis, "[a] class action settlement cannot be measured precisely against any particular set of factors."  *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 140 (W.D.Ky. 1992), *citing Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1, 6-7 (N.D.Ohio 1982).  Therefore the relevance of the factors set forth above "will vary from case to case."  *Ohio Public Interest Campaign*, 546 F.Supp. at 6-7.

[16]    Judge Getzendanner explained in *Alliance to End Repression v. City of Chicago*, supra, at 91 F.R.D. 201: "Some objectors argue that both settlement agreements are fatally defective because they lack more extensive admissions or finding of wrongdoing by the Court.  As the Court stated at the March 13 hearing: 'the whole purpose of the settlement is to avoid adjudication with respect to the activity which is the basis of the complaint.  I think the parties would be stunned if in submitting a

*United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.*, 447 F.2d 647, 655 (7th Cir. 1971). Accordingly, the Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998), *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). It is not the Court's function to reopen and enter into negotiations with the litigants in the hope of improving the terms of the settlement or to substitute its business judgment for that of the parties who worked out the settlement. *Argo v. Harris*, 84 F.R.D. 646, 648 (E.D.N.Y. 1979), *quoting Levin v. Mississippi River Corp.,* 59 F.R.D. 353, 361 (S.D.N.Y 1973), *aff'd. on op. below sub nom. Wesson v. Mississippi River Corp.,* 486 F.2d F.2d 1398 (2d Cir. 1973), *cert. denied*, 414 U.S. 1112 (1973). Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *Id*. at 1200, *quoting Armstrong v. Board of Sch. Dir.,*616 F.2d 305, 315 (7th Cir. 1980).

Within the context of a class action, the role of the Court is heightened. In order to protect the interests of absentee Class Members, the Court "must independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." Newberg § 11.41 at 11-88 (*citing Air Line Stewards v. American Airlines,* 763 F.2d 875 (7th Cir. 1985)). A Court's analysis and determination that a settlement is fair will survive appellate review if the trial court shows that "it has explored comprehensively all relevant factors." *Malchman v. Davis,* 706 F.2d 426,

---

class action settlement to the Court, the Court started to decide the issues. That's why people enter into settlements and I am not going to interfere in the settlement process.'"

433 (2d Cir. 1983).

It is important to note that an initial presumption of fairness exists if the settlement is recommended by class counsel after arms-length bargaining. *City Partnership Co. v. Atlantic*, *supra*, 100 F.3d 1043, *Newberg* § 11.41 at 453. Here all of the aforementioned factors weigh heavily in favor of preliminary approval. Continuing this complex consumer fraud and RICO litigation against FDB is likely to result in a highly expensive, protracted legal battle, with appeals. Further, the Plaintiffs conducted a substantial investigation, through discovery and otherwise, such that they were well-informed concerning the strengths and weaknesses of their case upon entering into settlement negotiations.

**2.    The Proposed Settlement Is The Result of Arduous, Arm's Length Negotiations Conducted By Highly Experienced Counsel**

There is a presumption of correctness attached to a class settlement reached in arms-length negotiations between experienced, capable counsel. *City Partnership Co. v. Atlantic*, *supra*, 100 F.3d 1043, *see Hawkins*, 2004 WL 166722, at *3; *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975)("While opinion and recommendation of experienced counsel should not be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement."); *see also*, *Newburg* § 11.41, at 87-89.

The United States Court of Appeals for the Seventh Circuit, in approving a class action settlement, noted that "[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation. . . . The proof of the pudding was indeed in the eating." *Mars Steel v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 684 (7th Cir. 1987); *see also In re Agent Orange Product Liab. Litig.,* 597 F.Supp. 740, 762 (E.D.N.Y. 1985), *aff'd in part, rev'd in part on other grounds*, 818 F.2d 226 (2d Cir. 1987) (most

important concern for the court in reviewing a settlement of a class action is the strength of the plaintiffs' case if it were fully litigated).

In the instant action, the parties actively engaged in numerous rounds of negotiations over one year. The negotiations involved submissions of proposals, counter-proposals, evaluation of additional documentation/discovery, preparation and presentation of expert reports, and factual arguments. The parties have worked long and hard to reach a resolution of this matter, and Plaintiffs submit it is fair, appropriate, and in the best interests of the Class Members.

### 3.     Sufficient Discovery Has Been Conducted In This Matter To Allow Counsel To Fairly Investigate The Pertinent Legal And Factual Issues.

A presumption in favor of the proposed Settlement arises when sufficient discovery has been provided and counsel have experience in similar cases. *See Hawkins*, 2004 WL 166722, at *3; *see also City Partnership Co. v. Atlantic Acquisition*, *supra*, 100 F.3d 1043; *Rolland v. Celluci*, 191 F.R.D. 3, 6 (D.Mass. 2000). This factor directs the trial court to consider whether the attorney participating in the settlement negotiations had access to *sufficient information* to appreciate the merits of the class's case." (emphasis added); *In re General Motors Corp.,* 55 F.3d at 783, *cert. denied sub nom.*, *General Motors Corp. v. French,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

In this case, Plaintiffs' Counsel were researching the claims against First DataBank and McKesson for many, many months prior to the filing of the complaint in June 2005. Counsel reviewed and analyzed (with health care economists) enormous amounts of pharmaceutical pricing information in order to conduct a forensic analysis of pharmaceutical price markups over time. Dozens of boxes of documents produced by FDB and its competitors, along with electronic information were analyzed. Counsel also obtained financial information from FDB,

39

information on possible insurance coverage and other documentation regarding the financial and corporate circumstances of FDB. In summary, counsel have been able to conduct discovery and extensive forensic analysis in order to fully investigate the pertinent legal and factual issues against FDB.

**C.    The Court Should Order Notice Be Provided To The Class And Schedule A Full Fairness Hearing**

**1.    Form of Notice**

Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement. *See Durrett*, 896 F.2d at 604. Rule 23 (e) requires notice of a proposed settlement "in such manner as the court directs." In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). *See Carlough v. Amchem Prod., Inc*., 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause). Under Rule 23(c)(2), notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem*, 521 U.S. at 617; *Reppert v. Marvin Lumber and Cedar Co.*, 359 F.3d 53, 56 (1st Cir.2004).

The Manual sets forth several elements of the "proper" content of notice. If these requirements are met a notice satisfies F.R.C.P. 23(c)(2); F.R.C.P. 23(e); and due process, and binds all members of the class. The Notice must:

1.    Describe the essential terms of the Settlement;

40

2.      Disclose any special benefits or incentives to the class representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the Settlement, and the method for objection to and/or opting out of the Settlement;

5.      Explain the procedures for allocating and distributing Settlement funds; and

6.      Prominently display the address of class counsel and the procedure for making inquiries.

*Manual*, ¶ 30.212 (3rd Ed.1995). *See, e.g., Air Lines Stewards and Stewardesses Ass'n Local 550 v. American Airlines,* 455 F.2d 101, 108 (7th Cir. 1972)(notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process); *accord Grunin v. International House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *See Eisen*, 417 U.S. at 173; *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950) ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it."); *Greenspun v. Bogan*, 492 F.2d 375, 382 (1st Cir. 1974). The proposed notice program clearly meets this standard.

In the instant action, the Notice to be provided to the Class is clear, precise, informative, and satisfies the requirements governing notice. Further, Plaintiffs' Counsel propose a detailed nationwide Notice Plan designed to reach TPP Class Members in a number of ways. As reflected in the proposed Notice Plan, which was created by a recognized expert, individual notice will be mailed to all TPP Class Members whose addresses can be reasonably ascertained and who can be reached reasonably economically. A website will allow Class Members to reach the Administrator, request Notices and ask questions. An extensive publication of two Summary

41

Notices will take place in a variety of consumer publications, and also be directed towards consumers and Third-Party Payors. Plaintiffs' counsel also propose publishing the full Notice, the Settlement Agreement and possibly other documents on the website established for purposes of this Settlement.

As to third party payors, the Notice is direct mail notice consisting of mailing the Notice of Proposed Class Action Settlement to potential Class members to inform them of their rights and how they may participate in the Class Action. This direct Notice will be sent to approximately 40,000 Third Party Payors whose names and addresses are readily available. Additionally, direct notice will be mailed to all callers to the toll-free information line who request Notice of proposed class action settlement. The toll-free number for this information line will appear prominently in the published forms of Notice. Class members may also download the Notice in PDF format from the Notice website.

As to consumers of individuals who used a branded or generic prescription drug, the notice will be made through national consumer magazines, newspaper supplements and national newspapers. The Notice to consumers will be inserted into 962 newspapers reaching every major medial market in the Country. The proposed Notice plan for consumers reach an estimated 82.6% of Drug Consumers age 35 and older and an estimated 81.2% of all Drug Consumers approximated 3.4 times they are exposed to the advertising vehicle carrying the Notice message.

Notice via first class mail, publication in nationwide papers and magazines and website publication are all avenues for notice that have been approved by various courts. *See, e.g., White v. NFL,* 822 F.Supp. at 1400 (notice by mail to identified class members and publication once in *USA Today* "clearly satisfy both Rule 23 and due process requirements"), *aff'd,* 41 F.3d 402 (8th

42

Cir.1994), *cert. denied,* 515 U.S. 1137 (1995); *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 628 (E.D.Pa. 1994) (approving as reasonable notice by third class mail to identified class members and publication two times in the national edition of *USA Today* ); *Mullane*, 339 U.S. at 317 ("This Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning."); *see also In re Microstrategy, Inc. Sec. Litig*., 148 F.Supp.2d 654, 669-670 (E.D.Va. 2001)(approving publication of summary notice in nationwide newspapers and posting full notice on websites maintained by co-lead counsel);  *Mangone v. First USA Bank,* 206 F.R.D. 222 (S.D.Ill. Feb. 2, 2001) (the Court approved Class Notice mailed to the last known address of all Class Members identified through reasonable effort by  Defendant,  published a Summary Notice on three separate days in a nationally published newspaper, *USA Today,* published the Class Notice and other pertinent information on the Internet).

Class counsel have investigated the feasibility of seeking to compile massive databases of consumers' addresses in order to provide them an individual, mailed notice of the proposed settlement.  Such a nationwide program is wholly impracticable.  In order to access names and addresses of persons who have paid co-insurance for one or more of the hundreds of NDCs at issue, a massive program of data acquisition from many scores of third party payors would be necessary, and the end result of that process would be, nevertheless, a wholly incomplete and costly mass of information.  This impracticality is spelled out further in the Declaration of Thomas Glenn, filed herewith.

The proposed Notice clearly meets the requirements of Rule 23(c)(2) and 23(e), in so much as it meets the new requirements of plain English and ease of reading and includes: (1) the case caption; (2) a description of the Class; (3) a description of the claims; (4) a description of

the Settlement; (5) the names of counsel for the Class; (6) a statement of the maximum amount

of attorneys' fees that may be sought by Plaintiff's Counsel; (7) the Fairness Hearing date; (8) a

description of Class Members' opportunity to appear at the hearing; (9) a statement of the

procedure and deadline for filing objections to the Settlement; (10) a statement of the procedure

and deadline for filing requests for exclusion; (11) a statement of the consequences of exclusion;

(12) a statement of the consequences of remaining in the Class; and (13) the manner in which to

obtain further information.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp.

450, 496 (D.N.J. 1997).  *See also Manual* § 30.212 (Rule23(e) notice designed to be only a

summary of the litigation and settlement to apprise class members of the right and opportunity to

inspect the complete settlement documents, papers and pleadings filed in the litigation);

Plaintiffs have retained an experienced Notice Administrator to administer notice, have

carefully crafted a detailed Notice Plan and have taken all necessary steps to ensure that the

proposed Notice Plan meets the requisite due process requirements.  Plaintiffs believe that the

proposed Notice will fairly apprise Class Members of the Settlement and their options, and

therefore should be approved by the Court.  Moreover, the Plaintiffs' notice plan is far superior

and achieves the goal of effective notice to the consumer class than a plan that contemplates

requiring TTPs to provide consumer names and addresses to the Notice Administrator.  Such a

plan would result in an impracticable notice plan given the inherent open-ended and

undeterminable variables of costs, time and ability to adequately identify class consumers from

the databases from the 46,000 TPPs cross referenced with over 1,600 prescription

pharmaceuticals relative to this litigation and a percentage co-payment during the class period.

## V.    CONCLUSION

For all the above-stated reasons, it is respectfully requested that the Joint Motion be

granted and the Court enter an order: (a) granting Preliminary Approval of the Settlement; (b)

certifying the Settlement Class; (d) appointing Class counsel;(c) scheduling a Fairness Hearing

and establishing all related deadlines; (d) directing that notice be provided to the Class in

accordance with the Plan of Notice, and  (e) ordering a stay of all proceedings in this and other

class actions until the Court renders a final decision regarding the approval of this Settlement.


DATED: November 1, 2006

By  /s/ **Thomas M. Sobol**
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO# 567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003


Steve W. Berman
Sean R. Matt
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594


Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson, Esq.
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
215-230-8043
215-230-8735 (fax)


Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 4, 2006.

<u>      /s/ **Thomas M. Sobol**    </u>
Thomas M. Sobol

# First DataBank: Summary of Preliminary Damages

| Brand-Name Retail Dollars | 2001[1] | 2002 | 2003 | 2004 | 2005[2] | Total |
|---|---|---|---|---|---|---|
| Total Top 200 Brand-Name Retail Dollars[3] | 48,976,523,160 | 110,957,923,000 | 117,461,960,000 | 117,279,813,000 | 28,830,699,201 | 423,506,918,361 |
| All Other Brand-Name Retail Dollars[3] | 3,984,129,340 | 23,723,872,000 | 24,700,747,000 | 24,121,195,000 | 1,024,711,632 | 77,554,654,972 |
| Complaint Drug Dollars Listed in "Top 200" | 1,230,047,167 | 48,078,216,633 | 61,849,212,083 | 61,365,762,250 | 12,321,862,917 | 184,845,101,050 |
| Complaint Drug Dollars in "All Other" | 100,061,554 | 10,279,585,552 | 13,006,097,802 | 12,621,230,199 | 437,948,319 | 36,444,923,426 |
| Total Brand-Name Retail Dollars Subject to Damages | 1,330,108,720 | 58,357,802,385 | 74,855,309,886 | 73,986,992,449 | 12,759,811,236 | 221,290,024,676 |
| Inflated Markup Percentage | 4.0% | 4.0% | 4.0% | 4.0% | 4.0% | |

| Damage Calculation[4] | 2001 | 2002 | 2003 | 2004 | 2005 | Total |
|---|---|---|---|---|---|---|
| Third-Party Payer Percentage[5] | 77.9% | 79.3% | 78.8% | 78.8% | 78.8% | |
| Third-Party Payer Damages | 41,446,188 | 1,851,109,492 | 2,359,439,368 | 2,332,070,002 | 402,189,250 | 6,986,254,299 |
| Total Class Damages[6] | 41,446,188 | 1,851,109,492 | 2,359,439,368 | 2,332,070,002 | 402,189,250 | 6,986,254,299 |

Notes:

1. 2001 dollars have been multiplied by 5/12 to adjust for the Class Period, which begins August 1, 2001.
2. 2005 dollars have been multiplied by 5/24 to adjust for the Class Period, which ends March 15, 2005.
3. Source: Drug Topics, Top 200 Brand-Name Retail Dollars, 2001-2005 (data based on Verispan data).
4. 2001 damages are limited to the Class Period, which begins August 1, 2001. 2005 damages are limited to the Class Period, which ends March 15, 2005.
5. Third-party payer percentages, source: Novartis, Pharmacy Benefit Report: Facts & Figures, 2002, 2003 and 2004 editions.
6. According to the Complaint, the Class is limited to "all third party payors." Cash payers and Medicaid are therefore excluded from the calculation of Class damages.

Preliminary Damage Calculation: For Discussion Purposes ONLY
Privileged and Confidential Information

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE
FUND, and DISTRICT 37 HEALTH AND
SECURITY FUND

                   Plaintiffs,

    v.

FIRST DATABANK, INC., a Missouri
corporation; and McKESSON
CORPORATION, a Delaware corporation,

                Defendants.

C.A. No. 1:05-CV-11148-PBS

**ATTACHMENT B TO CLASS PLAINTIFFS' AMENDED MEMORANDUM OF LAW
IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED
FIRST DATABANK CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT
CLASS AND APPROVAL OF NOTICE PLAN**

    **Plaintiffs' Allegations and Evidence**

    On July 17, 2006 Plaintiffs filed the First Amended Complaint ("FAC") against both

FDB and McKesson.  Plaintiffs review below the FAC's allegations and outline below the type

of evidence Plaintiffs intend to present on common issues.  The recitation highlights the

predominance of common issues, typicality of claims and the superiority of the class action as a

vehicle for resolving these claims.

1.    **AWPs Have Become the Reimbursement Benchmark for All Drugs**

The allegations of the FAC apply to self-administered (sometimes also known as retail chain) pharmaceuticals (as opposed to physician administered drugs). Virtually all participants in the pharmaceutical distribution chain use AWP as the basis for reimbursement in their contracts with third-party payors for retail drugs. ¶¶ 58-63; Hartman Decl. in Support of Plaintiffs' Motion for Class Certification, p. 3, n.4.

Documents produced by those in the industry confirm this. For example, in a "Pharmacy Industry Overview" presentation by Advance PCS, one of the major PBMs, the presenter described the use of AWP as follows:

- Industry standard used by PBMs

- Manufacturers submit drug price to First Databank

- First Databank accumulates[1]

McKesson has acknowledged that "AWPs are used for third party reimbursement." ¶ 62. Susan Hayes, a specialist who audits contracts between third-party payors and PBMs confirms that AWP is the standard pricing benchmark. Hayes Decl., ¶ 2.[2]

2.    **Obtaining Accurate Information about the WAC/AWP Markup Is Critical to the Pharmaceutical Industry**

As outlined in the FAC, this case involves abuse of a somewhat anomalous situation that exists in the retail drug reimbursement area – that while pharmacists and other dispensers almost always *purchase* retail drugs on the basis of a formula tied to the WAC, pharmacists and other dispensers are *reimbursed or paid* on the basis of formula tied to the AWP. Thus, although the AWP is a list price used to charge third party payors and some consumers, it is the WAC, not the

---

[1] *See* Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification and in Support of Motion to File First Amended Complaint ("Berman Decl.") (Docket # 91), Ex. 48 (BMS/AWP/000125481 at 125509).

[2] Berman Decl., Ex. 15 (MCKAWP 0068514).

AWP, that is tied to pharmacists' actual costs.  The percentage by which the AWP exceeds the

WAC is known in the pharmaceutical industry as the WAC/AWP "markup" for a particular drug

product.  As a result, all other things being equal, the greater the markup, the more pharmacists,

large retail chains and PBMs stand to profit from drug sales.  ¶¶ 115, 117, 1233.

The WAC/AWP markup is typically either 20% or 25%.  Historically, it was set by the

drug manufacturer and had predictably set patterns.  Pharmaceutical divisions were generally

known either as 20% or 25% markup companies.  Hartman Decl., ¶ 10.  Once a drug was

launched, for example by a 20% markup company, it was extraordinarily rare for its percentage

markup to be changed, and in the few isolated situations when this did occur, a particular market-

based reason existed which was known to all participants in the marketplace (*e.g.*, a merger with

a 25% markup company, necessitating uniformity of particular prices).  ¶¶ 41-43.

### 3.  All Major PBMs Require Plan Sponsors to Reimburse Them for Purchases of Brand Drugs Based on the AWP

During the Class Period in the FAC, August 1, 2001 through March 15, 2005, the major

PBMs required plan sponsors, with whom they contracted, to reimburse them for brand-name

drugs pursuant to a formula based on AWP.[4]  Throughout the Class Period, First DataBank's

publication of AWP data remained the source used by all the major PBMs in their dealings.[5]

---

[3] The difference between WAC to AWP should not be confused with a different type of spread, that is, the difference between the actual selling price (or "ASP") and AWP, a spread that is at issue in *In re Pharmaceutical Industry Average Wholesale Price Litigation, MDL 1456*.  This distinction was discussed with this Court at a prior hearing in this action.  See McKesson in Court Status Conference Transcript, February 9, 2006.

[4] Hayes Decl., ¶ 2.  The documentary evidence arising from the *AWP* litigation further supports this proposition.  Berman Decl., Ex. 49 (AdvancePCS master agreement, CMK-AWP 004247 at 4271, setting AdvancePCS reimbursement formulas for retail and mail order brand-name drug purchases based on AWP); Ex. 50 (Prescription Drug Program Agreement [with Wells Fargo & Co.], CMK-AWP 011499 at 11508-09 (setting Caremark's reimbursement rates for mail order and retail brand-name drugs at AWP); and Ex. 51 (Medco's Integrated Prescription Drug Program Master Agreement, MHS A_0000310 at 322, stating that mail order brand-name drugs are reimbursed based on the AWP and retail purchases of all drugs (brand or generic) are based on AWP or, where applicable, the Maximum Allowable Cost ("MAC"); the contract defines MAC as applying to off-patent drugs, at 311, which appears to be coextensive with generic drugs).

[5] Hayes Decl. ¶ 3; Berman Decl., Ex. 52 (Deposition of Gregory Madsen, 30(b)(6) witness for Caremark and AdvancePCS (*In re AWP Litig.*, August 26, 2004) at 71:15-73:9) (stating that Caremark relied exclusively on First Data AWP information"); and Ex. 53 (A Managed Prescription Drug Plan Proposal for Philadelphia Federation of

Although the terms of an FTC consent decree required First DataBank to divest itself of its only competitor, Medispan, beginning in 2002, the prices set by First DataBank continued to be used by Medispan; thus the FDB markups that were part of the scheme spilled over into the Medispan database.  Hartman Decl., ¶¶ 14, 17(c), p.10.

Susan Hayes, a specialist in auditing contracting between PBMs and their clients,[6] estimates that 95% of all contracts used AWP, and identifies eleven PBMs, representing a 95% of the market, as having used FDB's AWP alone.  Hayes Decl., ¶ 4.  Although the proposed Class in the FAC is not limited to plan sponsors who contracted with one of the major PBMs, these contracts illustrate the widespread impact of Defendants' illegal scheme.[7]

### 4.  McKesson and First DataBank Participated in a Scheme to Artificially Raise the WAC/AWP Markups of Hundreds of Brand-Name Drugs From 20% to 25%

The market's use of First DataBank's published AWPs was not only known to First DataBank, but used as the foundation of its marketing and promotion plans.  The FAC alleges that for all times relevant to this lawsuit, First DataBank knew – and publicly acknowledged – that the primary purpose of its publication of WAC and AWP data was to serve as an electronic basis for the mass-reimbursement of retail and mail order pharmacies for thousands of daily transactions and billions of yearly transactions.  FAC, ¶¶ 94-99.  To gain the trust of participants in the pharmaceutical industry, First DataBank publicly represented that its AWP information was obtained directly from drug manufacturers or, when not available, through either a

---

Teachers Health & Welfare Fund, MHS A_0000705 at 743 (stating that Medco relies exclusively on First DataBank for its AWP information)).

6 Hayes Decl., ¶ 1, pp. 1-2.

7 The contracts also demonstrate how easy it would be to prove Class eligibility.  For example, all TPPs who contracted with Medco or Caremark during the Class Period and paid for drugs identified in Exhibit A of the Complaint automatically qualify as Class members.

comprehensive and sound survey of the major drug wholesalers or a "weighted average" of the national wholesalers.  ¶¶ 100-04.

McKesson also knew that AWP served as the basis for reimbursement:  "AWP's are only important to our customers because third party reimbursement from the insurance companies is based on AWP minus 15% plus a fee (or something like that)."[8]

With respect to the WAC-to-AWP spread, McKesson acknowledged that previously "everything [had been] straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB [First DataBank] AWP's."[9]  That would change beginning sometime in late 2001 or early 2002 when First DataBank, by agreement with McKesson, limited its purported "surveys" to McKesson and did not "survey" other wholesalers.[10]

The Class Period starts in August 2001 when First DataBank and McKesson "mutually agreed" to move the AWP, or WAC to AWP spread, on all Searle products to 25%.  ¶ 122.  Thereafter, McKesson and First DataBank agreed that they would jointly increase the markup on many brand-name drugs.  ¶ 120-21.  The  change of the markup factor was effectuated by a simple change in the First DataBank database (the "NDDF") – when a price increase in the WAC was announced by a manufacturer, First DataBank *not only* increased the WAC but it also changed the computer code for the markup factor (typically from 1.20 to 1.25).  Thus, through a simple manipulation of data entry into the NDDF, all purchasers reimbursement rates were

---

8 Berman Decl., Ex. 54 (MCKAWP 0068311-12).

9 Berman Decl., Ex. 3 (MCKAWP 0069612).

10 Although First Data claimed that it undertook "surveys," the FAC alleges that in fact no "surveys" in the reasonable sense of that word were undertaken.  First Data's questions were not set forth in a survey design, nor were they even in writing.  Responses received were not memorialized in writing.  No other paper trail was kept. Even the wholesalers that were "surveyed" in the 1990's apparently did not know that they were being surveyed. Most professed never to have participated in First Data "surveys" at any time.  By the end of 2001, it appears that virtually all communications by wholesalers back to First Data regarding the WAC/AWP markup and/or AWP generally were expressly prohibited by management with the singular exception of McKesson.

increased due to the ubiquitous reliance upon FDBs database for undertaking reconciliation of retail drug transactions.

For its part, McKesson sent hundreds of e-mails, faxes and reports to First DataBank to increase the WAC-to-AWP markup for hundreds of the brand-name drugs it distributed. McKesson knew there was no market justification for the 5% increase in the markup, which it had created out of whole cloth. McKesson was also aware that First DataBank published the McKesson markup figures it received without checking them for accuracy against any other source. *See*, *e.g.*, ¶ 131. The FAC alleges First DataBank also knew that the information it received from McKesson indicating a markup increase to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase it was not providing the "reliable" and "accurate" information as it had promised.[11] ¶ 130.

Inside McKesson's headquarters, the FAC alleges McKesson acknowledged how the scheme would benefit McKesson's customers:

> Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

| | Old 16 2/3% spread [12] | New 20% spread |
|---|---|---|

---

11 After the Scheme was implemented (and despite the flack from some drug manufacturers), First DataBank and McKesson continued their collaboration to ensure that First DataBank's WAC/AWP markups mimicked those of McKesson, and vise-versa. Even when disparities were shown in the databases, First DataBank would counsel against making changes because "it would trigger a lot of questions on why there was a change to the item when the MFG [*i.e.*, manufacturer] hasn't sent any price changed." Berman Decl., Ex. 55 (MCKAWP 001243). When a large national chain pharmacy would call McKesson "complaining about" the particular low AWP for a product, and McKesson, in turn, would contact First DataBank in order to get it "fixed." *Id.*, Ex. 22 (MCKAWP 0001168); Ex. 41 (MCKAWP 0069817). In 2003 when one manufacturer indicated that it would "no longer report average wholesale prices (AWP) for its products," First DataBank reported to McKesson that this manufacturer appeared "to be playing hard ball and [First DataBank] just won't play." *Id.*, Ex. 31 (MCKAWP 0001183). First DataBank indicated that it would, then, just "assume the markup is 1.25." *Id.* In this situation, when the manufacturer wanted to be assured that any disclosure of an AWP associated with its product was a price that "has not been authorized" by it, First DataBank wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below." *Id.*

12 A footnote to avoid some confusion. The difference between WAC and AWP can be expressed in two different ways. First, it might be expressed as the amount by which the difference is *greater than* the WAC (e.g., a WAC of 100 in a AWP of 125 would mean that the difference, 25, is a 25% increase over the WAC of 100). In

| | | |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

The FAC alleges both Defendants benefited from the scheme. First DataBank eliminated the costs associated with conducting reliable surveys and calculating the variation in markups. Additionally, by creating a higher WAC/AWP markup, First DataBank created greater demand for its reporting services by entities that stood to benefit from the increased mark-up. The scheme also directly benefited McKesson's own pharmacy business, consisting of a nationwide network of 275 independent pharmacies in 35 states, as well as placing McKesson in a substantially better position with its principal customers, retail pharmacies. ¶¶ 133(a)-(f),171-75.

The FAC shows the dramatic nature of the scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the scheme. The spike in 2002 reflects implementation of the scheme:

---

some parlance, this is called the "markup". Alternatively, one might describe the difference between WAC and AWP as the amount by which the WAC is *lower than* the AWP (and taking the same example, a WAC of 100 is 25 points lower than an AWP of 125, or 25/125 equates to 20% lower). This in some parlance is typically called the "spread". The markup of 25% equals to a spread of 20%; a markup of 20% equates to a spread of 16-2/3%.





As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, end payor drug prices increased enormously during the class period (an estimate is set forth later on this memorandum).

Among the drugs whose prices are artificially inflated by the scheme are some of the top brand-name drugs used by hundreds of millions of Americans, such as: Allegra (a leading allergy drug), Azmacort (a leading asthma drug), Celebrex (a leading arthritis/pain medicine), Coumadin (a leading anticoagulant), Flonase (a leading asthma drug), Lipitor (the world's top selling drug, a statin), Neurontin (a leading pain medication), Nexium (a leading reflux drug), Prevacid (a leading ulcer/reflux drug) and Valium.

**5.    The Impact of the Scheme Uniformly Effected Class Members and the Impact and Damage Can Be Calculated For Each Class Member**

Dr. Hartman has concluded that if the allegations are true the following economic consequences occurred:

a) Those AWPs reported by First DataBank, which were related to their WACs by a spread of 20% prior to the implementation of the scheme, were increased relative to their WACs by 5 percentage points to a spread of 25% as a result of the Scheme.

b) Where reimbursement rates (allowed amount of AA) paid by Class members were determined formulaically by AWP as AA = {"AWP less x%" plus a dispensing fee}, the reimbursement rates were increased for those drugs, relative to the acquisition costs of the providers (which continued to be related to the WACs).

c) The amounts paid by all or substantially all Class members for the relevant pharmaceuticals were inflated.[13]

Or, as stated elsewhere by Dr. Hartman on the issue the class-wide impact:

14. "The impact of the Scheme was class-wide and uniform:

c) Since the Class includes all those and only those payors whose reimbursement rates were determined by AWPs and since the Scheme increased those AWPs, the reimbursement rates on all transactions subject to the Class definition were inflated.

d) The impact was uniform across Class members: ***the AWPs were increased***. Those AWPs were incorporated into the calculation of reimbursement rates for all Class members. AWPs for the subject drugs are published industry-wide and do not vary across segments of the industry. As a result, individual issues concerning variation in the information content of First DataBank's AWPs for particular drugs do not arise."[14]  (Emphasis in original.)

---

13 Hartman Decl., ¶ 12, pp. 4-5.

14 Hartman Decl., ¶ 14, pp. 5-6.