UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and AFSCME DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS |

**DECLARATION OF THOMAS R. GLENN**

THOMAS R. GLENN, hereby declares that:

1. I am the Senior Vice President and Chief Operating Officer of Complete Claim Solutions, LLC ("CCS"). CCS was hired by Plaintiff's Counsel to serve as Notice Administrator in this Action.

2. I submit this declaration at the request of Plaintiff's Counsel in support of the proposed Notice Program in connection with the above-captioned litigation pending in the United States District Court for the District of Massachusetts.

3. I make this declaration based upon my personal knowledge and upon information provided by Plaintiff's Counsel, my associates and staff. This information is of a type reasonably relied upon in the field of legal claims administration, notice dissemination and settlement implementation. If called as a witness, I would testify competently to the following.

### **Expertise**

4.      Since its inception in 1998, CCS has administered class action Notice Programs for approximately 70 actions. CCS's founder and President, Dawn E. Addazio, has more than 18 years of experience in implementing high-volume and complex claims settlements/administrations, and is often called upon to provide operational reviews, value added consulting, testing and auditing services for "troubled" settlements. Cumulatively, Ms. Addazio has overseen administration practices on hundreds of settlements involving both simple and high profile cases (e.g. SEC disgorgement funds, treasury auctions, State Attorneys General refund programs, consumer, third-party payor, antitrust, securities, derivatives, insurance and other financial cases).

5.      In my capacity as Senior Vice President and Chief Operating Officer for CCS, I oversee the implementation of the Notice Programs and Settlement administration processes working closely with Ms. Addazio, our service providers, our project managers and our Vice President of Quality Assurance to ensure accuracy, efficacy and timeliness of the administration processes and programs. I have more than 15 years of senior management experience in the litigation support services and information technology industries.

6.      CCS has served as Claims and/or Notice Administrator for classes of other Third-Party Payor Prescription Drug Antitrust Cases including: *In re Lorazepam and Clorazepate Antitrust Litigation* (MDL No. 98-1232); *In re Cardizem CD Antitrust Litigation* (MDL No. 1278); *Vista Healthplan, Inc. and Ramona Sakiestewa v. Bristol-Myers Squibb Co. and American BioScience, Inc.*(Civil Action No. 1:10CV01295 (EGS)(AK)); *In re: Lupron® Marketing and Sales Practices Litigation* (MDL No. 1430); *In re: Terazosin Hydrochloride Antitrust Litigation* (MDL Docket No. 1317); *In re Warfarin Sodium Antitrust Litigation* (MDL No. 98-1232 (SLR)); *Elizabeth Blevins v. Wyeth-Ayerst Laboratories, Inc. and American Home Products Corp.*, (Sup. Ct. of CA San Francisco County, Case No. 324380); *Cipro Cases I and II* (Sup. Ct. of CA, County of San Diego Nos. 4154 and 4220) and *Rosemarie Ryan House, et al. v. GlaxoSmithKline PLC and SmithKline Beecham Corporation* (Docket No. 2:02cv442).

### The Proposed Notice Program

7. CCS understands that the Court is considering a Consumer notice program which would require Third-Party Payors ("TPPs"), Third Party Administrators ("TPAs")[1], and Pharmacy Benefit Managers ("PBMs") (collectively, TPPs) being subpoenaed or otherwise ordered by the Court to provide CCS with the names and addresses of their members who have eligible purchases in this litigation. CCS would then mail the Notice and claim forms to these individual consumers.

### The Impracticality of a Third-Party Payor Direct Notice Program

8. CCS has never implemented a notice program requiring at least 43,500 TPPs to coordinate and provide the names and addresses of individual consumers who purchased any number of 1,600 different National Drug Codes ("NDCs"), nor is CCS aware of a plan of this scale being completed by any other Notice Administrator. Based on my experience, I foresee the following components to such a Third-Party Payor Direct Notice Program which illuminate its problems indicative of its impracticability:

   (a) First, CCS would work with each of the approximately 43,500 TPPs (however, there may be multiple self-insured plans per TPP) in our proprietary TPP Mailing Database and with Third-Party Payors who contact CCS as a result of a published notice to devise and implement a method specific to each TPP's transaction records to capture potential Consumer Class members from each of their respective databases. The task of contacting and coordinating with this volume of TPPs is necessarily time-consuming;

   (b) Second, due to Federal and State confidentiality protections, including privacy rules enacted pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), the identity of pharmaceutical consumer purchasers is confidential and cannot be disclosed without patients' consent. Therefore, based on CCS's experience an additional time-consuming step will be added to the notice process. The HIPAA component would require the TPPs to send notices directly to each of their consumers in order to obtain his or her consent to disclosure of his or her identity;

---

[1] TPAs provide administrative service to TPPs. However, some TPPs also provide TPA services to self-insured plans. as well as being a TPP.

(c) Third, after receiving the Consumer Class member information from the TPPs, CCS would review and load the data into a segregated mailing database; and

(d) Fourth, CCS would mail notices and claim forms to each potential Consumer Class member.

### Analysis of the Effectiveness of a Third-Party Payor Direct Notice Program

9. A Third-Party Payor Direct Notice program in this litigation would require contacting at least 43,500 TPPs and the analysis of over 1,600 NDCs with respect to identifying consumers who purchased any number of the more than 1,600 prescription pharmaceuticals subject to this case. As a result, a Third-Party Payor Direct Notice program in this case would be impracticable. That is, a notice plan of this type would be fraught with many uncertainties and variables which would make it nearly impossible to estimate the amount of time and expense required to implement it. In addition, the complexity of this matter, specifically in properly identifying potential Class members coupled with confidentiality and privacy issues, does not guarantee a reach[2] that is better than the published notice program approved in similar settlements and proposed by Plaintiffs' counsel in this litigation.

10. First and foremost among CCS's opinion that the proposed Third-Party Payor Direct Notice program is impracticable is the concern that it is difficult to estimate the amount of time needed to complete the notice requirement. Moreover, many of the TPAs and PBMs in our TPP Mailing Database may also have agreements and confidentiality provisions with their various clients and/or members which could limit CCS's ability to obtain the names and addresses of Class members from the various TPAs. Additionally, each of the TPAs' or PBMs' clients (e.g., self-insured plans), which number in the tens of thousands, would also have to give consent for the release of their members' names and addresses who may be potential Consumer Class members. Many of the TPPs may in turn require agreements or releases with CCS that would have to be in place before the names and addresses of potential Consumer Class members are provided to CCS and the notice mailed to their members. This would add an additional layer of time consumed in procuring releases and agreements in order to obtain the names and addresses

---

[2] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

of Consumer Class members. Furthermore, based on CCS's experience in other settlements where we have requested data from TPPs (usually in support of their claim amounts) the TPP typically requires a minimum of sixty (60) days to create and produce the data – and in many instances sometimes up to 120 days is required. Although CCS has not implemented this type of plan in the past, based on our experience in Third-Party Payor Prescription Drug Antitrust cases, we estimate that completion of the process discussed herein may take up to or even exceed 12 months.

11.    Second, the costs associated with a Third-Party Payor Direct Notice program are nearly impossible to estimate. As stated above, CCS has never taken part in a Third-Party Payor Notice program of this magnitude nor is it aware of any other Notice Administrator who has. With respect to its fees, CCS would charge on a time and materials basis to: (a) work with at least 43,500 TPPs to obtain data and (b) perform quality assurance ("QA") checks on the data received to reasonably ensure that the file contains only potential Consumer Class members. Given a Third-Party Payor Direct Notice program of this size, CCS has no way of forecasting how much TPPs (and/or their PBMs) would charge for performing the necessary archival research and any other applicable charges, such as the TPP's I.T., administrative, and possibly legal fees, to provide the data requested. CCS, in turn, would perform its own QA audits on the data received to assure its integrity, completeness, and lack of unnecessary duplication.

12.    Third (and related to the cost issues stated in ¶11, above), is the complexity of this matter which involves over 1,600 NDCs. Purchases made on a percentage co-payment as opposed to a flat-rate co-payment could potentially lead to over-inclusion of non-class members and ineligible purchases (i.e., those made outside the class period, flat co-payment, or improper or missing NDCs).

13.    Fourth, as alluded to above in ¶10, CCS foresees HIPAA and other privacy issues, requiring agreements between and among TPPs, TPAs, PBMs, and their members and clients, and possibly CCS, leading to further uncertainties related to timing and cost issues of such a Third-Party Payor Direct Notice program.

14. Fifth, based on CCS's experience, the reach of a Third-Party Payor Direct Notice program may, in fact, be less effective than a traditional notice program with a publication notice component. In other words, requesting Consumer Class members' name and address data from TPPs has the potential to lead to a high number of duplicative records. In addition, the proposed notice program does not provide any notice whatsoever to uninsured class members who may nonetheless have valid claims for their purchases of prescription pharmaceuticals included in the 1,600 NDCs subject to this litigation.

15. One final consideration is CCS's TPP Mailing Database itself. It should be noted that we do not claim that this database contains the names and addresses of every TPP in the United States. However, in other settlements which CCS has administered with traditional notice programs, the courts have deemed that the TPP Mailing Database is a reasonable resource to be used in conjunction with a publication notice program.

16. Even if CCS were to work solely with the top ten (10) largest TPPs in a Third-Party Payor Direct Notice program, we estimate that a reach of substantially less than 50% would result with this approach. By contrast, CCS estimates that a traditional notice program, like that proposed by Plaintiffs' Counsel, would reach a minimum of 80% of potential Consumer Class members.

### Conclusion

17. Due to the open-ended and undeterminable variables of cost, time, and reach discussed above – coupled with the complexity of the matter itself and confidentiality issues – in our opinion, CCS believes the a Third-Party Payor Direct Notice program would be less effective, more costly, and require far more time to implement than if more resources were devoted to a traditional notice program, and is simply not practicable.

Further your affiant sayeth not.

*[Signature and Notarial Acknowledgment on following pages]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of November 2006.

By: _____
Thomas R. Glenn

STATE OF FLORIDA

Palm Beach County, ss.                                                November 1, 2006

On this 1st day of November, 2006, before me, the undersigned notary public, personally appeared Thomas R. Glenn (name of document signer), ~~proved to me through satisfactory evidence of identification, which were~~ _known to me_, to be the person whose name is signed on the preceding or attached document in my presence.

_____
Notary Public
My Commission Expires: 11-25-09



ERIC P. LACHANCE
MY COMMISSION # DD 490949
EXPIRES: November 25, 2009
Bonded Thru Notary Public Underwriters