UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |

## PLAINTIFFS' AMENDED MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

# TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   PLAINTIFFS' ALLEGATIONS AND EVIDENCE..........................................................3

    A.   Accurate AWP Information is Critical to the Health Care Industry ......................3

    B.   McKesson and First Data Participated in a Scheme to Artificially Raise the
         WAC/AWP Markups of Hundreds of Brand-Name Drugs from 20% to 25% ........4

    C.   The Impact of the Scheme Uniformly Effected Class Members and the Impact
         and Damage Can Be Calculated For Each Class Member......................................6

III.  THE COURT SHOULD CERTIFY THE CASE AS A CLASS ACTION UNDER
      RULE 23(a)(b)(3) ................................................................................................7

    A.   Plaintiffs Satisfy the Rule 23(a) Prerequisites to Class Certification .....................7

        1.   The Class meets the numerosity requirement because joinder of all
             members is impracticable ...........................................................................8

        2.   The Commonality requirement is met because questions of law and
             fact are common to all Class members ........................................................8

        3.   Plaintiffs meet the typicality requirement because their claims arise
             from the same course of conduct alleged by the Class ................................9

        4.   Plaintiffs meet the adequacy requirement because their interests will
             not conflict with those of other Class members and because they have
             chosen, qualified, experienced counsel, who are capable of vigorously
             conducting the proposed litigation.............................................................10

    B.   Plaintiffs Meet the Requirement of Rules 23(b)(3) ...............................................11

        1.   Common questions predominate over individual issues...........................11

        2.   A class action is superior to the adjudication of hundreds or thousands
             of separate individual cases ....................................................................13

        3.   Plaintiffs do not require an Individualized Calculation of Damages.........15

        4.   State law issues are manageable and create common issues .....................16

            (a)   Statutory Claims.........................................................................16

            (b)   California Courts Approve Class Treatment of These Types of
                  Claims .......................................................................................18

(c)     Conspiracy .....................................................................................19

5.     Variability of plan cost-saving devices does not affect TPP Plaintiffs'
standing nor does it create case manageability issues ..............................20

IV.     CONCLUSION............................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Andrews v. Bechtel Power Corp.*,
    780 F.2d 124 (1st Cir. 1985) ............................................................10

*Anunziato v. eMachines, Inc.*,
    402 F. Supp. 2d 1133 (C.D. Cal. 2005) ...........................................17

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*,
    869 P.2d 454 (Cal. 1994) .................................................................19

*Bank of the West v. Superior Court*,
    833 P.2d 545 (Cal. 1992) .................................................................18

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    36 F. Supp. 2d 560 (E.D.N.Y. 1999) .........................................20, 21

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ...........................................................20

*Californians for Disability Rights v. Mervyn's LLC*,
    39 Cal. 4th 223, 138 P.3d 207 (2006) .............................................17

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ..................................................13

*Carnegie v. Household Int'l., Inc.*,
    376 F.3d 656 (7th Cir. 2004), *cert. denied*, 543 U.S. 1051 (2005)....................................13

*Carter v. Berger*,
    777 F.2d 1173 (7th Cir. 1985) .........................................................21

*Chattanooga Foundry & Pipe Works v. Atlanta*,
    203 U.S. 390 (1906).........................................................................21

*Clothesrigger, Inc. v. GTE Corp.*,
    191 Cal. App. 3d 605, 236 Cal. Rptr. 605 (4th Dist. 1987) ........16, 19

*Coffin v. Bowater Inc.*,
    228 F.R.D. 397 (D. Me. 2005).........................................................11

*Committee on Children's Television, Inc. v. General Foods Corp.*,
    673 P.2d 660 (Cal. 1983) .................................................................17

*Corbett v. Super. Ct.*,
        101 Cal. App. 4th 649 (2002) .......................................................................19

*Desiano v. Warner-Lambert Co.*,
        326 F.3d 339 (2d Cir. 2003)..........................................................................20

*Eisenberg v. Gagnon*,
        766 F.2d 770 (3d Cir. 1985)............................................................................7

*In re Folding Carton Antitrust Litig.*,
        75 F.R.D. 727 (N.D. Ill. 1977) .......................................................................13

*Forbush v. J.C. Penney Co.*,
        994 F.2d 1101 (5th Cir. 1993) .........................................................................9

*Helfend v. Southern California Rapid Transit Dist.*,
        465 P.2d 61 (Cal. 1970) .................................................................................20

*Kidron v. Movie Acquisition Corp.*,
        40 Cal. App. 4th 1571, 47 Cal. Rptr. 2d 752 (2d Dist. 1995) ..........................19

*Lessard v. Metropolitan Life Ins. Co.*,
        103 F.R.D. 608 (D. Me. 1984) ..........................................................................7

*Massachusetts Mut. Life Ins. Co. v. Superior Court*,
        97 Cal. App. 4th 1282, 119 Cal. Rptr. 2d 190 (4th Dist. 2002)..................17, 18

*McCuin v. Secretary of Health & Human Svcs.*,
        817 F.2d 161 (1st Cir. 1987)............................................................................8

*Mullen v. Treasure Chest Casino, L.L.C.*,
        186 F.3d 620 (5th Cir. 1999) .........................................................................13

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
        235 F.R.D. 127 (D. Me. 2006)...................................................................15, 16

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
        259 F.3d 154 (3d Cir. 2001).............................................................................9

*Occidental Land, Inc. v. Superior Court*,
        18 Cal. 3d 355, 556 P.2d 770 (1976) .............................................................17

*Pepsico, Inc. v. Cal. Sec. Cans*,
        238 F. Supp. 2d 1172 (C.D. Cal. 2002) ..........................................................16

*Pfizer, Inc. v. Superior Court*,
   141 Cal. App. 4th 290, 45 Cal. Rptr. 3d 840 (2d. Dist. 2006) ..........................................17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass. 2005) ............................................................................ *passim*

*Quacchia v. DaimlerChrysler Corp.*,
   122 Cal. App. 4th 1442, 19 Cal. Rptr. 3d 508 (1st Dist. 2004) ...................................16, 17

*In Re Relafin Antitrust Litig.*,
   221 F.R.D. 260 (D. Mass. 2004)........................................................................8, 14

*In re Revco Sec. Litig.*,
   142 F.R.D. 659 (N.D. Ohio 1992) ..................................................................................14

*Sav-On Drug Stores, Inc. v. Super. Ct.*,
   34 Cal. 4th 319 (2004) ..................................................................................................18

*Schwab v. Philip Morris USA, Inc.*,
   2005 U.S. Dist. Lexis 27469 (E.D.N.Y. Nov. 14, 2005) ..................................................16

*Schwartz v. TXU Corp.*,
   2005 U.S. Dist. Lexis 27077 (N.D. Tex. Nov. 8, 2005) ..................................................13

*Smilow v. Southwestern Bell Mobile Sys.*,
   323 F.3d 32 (1st Cir. 2003)..................................................................................8, 11, 16

*Swack v. Credit Suisse First Boston*,
   230 F.R.D. 250 (D. Mass 2005).........................................................................................8

*In re Tobacco II Cases*,
   142 Cal. App. 4th 891 (47 Cal. Rptr. 3d 917 (4th Dist. 2006)..........................................17

*Todorov v. DCH Healthcare Auth.*,
   921 F.2d 1438 (11th Cir. 1991) ......................................................................................20

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002), *aff'd* 391 F.3d (3d Cir. 2004) ........................................20

*Waste Management Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000)...............................................................................................2

*Wilner v. Sunset Life Ins. Co.*,
   78 Cal. App. 4th 952, 93 Cal. Rptr. 2d 413 (2000)...........................................................17

## STATUTES

Cal. Bus. & Prof. Code § 17200 *et seq* ....................................................................16, 17, 18

Cal. Bus. & Prof. Code § 17500 ...............................................................................16, 18

Cal. Civ. Code § 1750 ...............................................................................................16, 18

Cal. Civ. Code § 3345 .....................................................................................................18

## MISCELLANEOUS

Restatement (Second) of Torts § 920A(2) .......................................................................21

# I.    PRELIMINARY STATEMENT

In their Second Amended Complaint (the "SAC"), and in their Proffer of Evidence in Support of Motion for Class Certification ("Proffer"), Plaintiffs set forth the scheme that Defendants[1] used to mark up the spread between the Average Wholesale Price ("AWP") and the wholesale acquisition cost ("WAC") for hundreds of brand-name drugs.[2]  By changing the computer code to effectuate an increase in the WAC-to-AWP markup in the First DataBank database, by the flick of a switch Defendants uniformly and on a class-wide basis inflated the prices paid by third-party payors and consumers for the brand-name pharmaceuticals whose purchase price was formulaically tied to AWP.

A class is appropriate in this case as Defendants' course of conduct involves three critical and common elements that bind Class members together:  (1) the use of AWPs as the "industry pricing standard" in virtually all transactions involving the Marked Up Drugs due to its use as a pricing standard in contracts for third-party payor ("TPPs") reimbursements; (2) the increase in the WAC-to-AWP spread and therefore the AWP contract price for each of the Marked Up Drugs; and (3) Plaintiffs' and Class members' payment of sums directly tied to the increased AWPs.  Resolution of these common elements from which liability and damage determinations can be made on a class-wide basis is superior to any alternative and will result in achieving substantial justice.

The requirements of Fed. R. Civ. P. 23(a) are easily satisfied here.[3]

---

[1] "Defendants" as used herein refers to McKesson and First DataBank.

[2] Such drugs are referred to as "Marked Up Drugs" and are identified in Exhibit A to the Second Amended Complaint ("SAC").  All "¶" references cited herein, unless otherwise specified, are to the Second Amended Complaint.

[3] Plaintiffs reserve the right to modify the Class Definition based on class related discovery and/or merits discovery or based on the opposition to the Class motion.  Since McKesson has refused to identify the basis for its opposition to this Motion despite a timely discovery request asking it to do so, fairness requires an opportunity to modify the Class Definition if necessary in response to the opposition.

Virtually all elements of Plaintiffs' and the Class members' claims involve use of the exact same documentary and testimonial evidence of Defendants' conduct, including the role of each Defendant in the creation and implementation of the Scheme, and Plaintiffs' and Class members' payments based upon the same altered computer database-derived AWPs. Defendants' conduct uniformly applied to all Class members. Each Class member will seek to use the same evidence to prove the exact same facts: (1) an AWP based reimbursement; (2) the existence of the McKesson-FDB Mark Up Scheme; and (3) the uniform impact on payment. In such circumstances, Rule 23(a)'s requirements of numerosity, common issues and the typicality of Plaintiffs and the Class' claims are satisfied.

Rule 23(b)(3) is also easily satisfied because "a sufficient constellation of common issues binds class members together," and these common issues predominate. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). The issues surrounding the increase of the WAC-to-AWP spread, and payment based upon AWPs, certainly present a constellation of common issues. The issues that concerned the Court in *AWP* are not present here. This case is far simpler. It involves just brand name self-administered drugs without the complication raised by the inclusion of generic or physician-administered drugs in the proposed *AWP* Class. And unlike the situation in AWP, there is no evidence of varying degrees of knowledge among Class members as to the Scheme. Further, there is no evidence of varying levels of sophistication that lead to "negotiations" over the increase in the WAC-AWP markup. Rather, as demonstrated by testimony from the dozens of witnesses McKesson has deposed, no one was aware of the Scheme or negotiated on any aspect of the markup. Injury and damages will be shown by evidence applicable to the entire Class. Plaintiffs have submitted the Declaration of Raymond S. Hartman in Support of their Motion for Class Certification. Dr. Hartman explains that class-

wide data is available to demonstrate that Defendants' unlawful Scheme injured all Class

members, that injury can be proven on a class-wide basis, and standard formulaic methodologies

may be deployed to calculate damages to the Class.[4]  Plaintiffs have submitted a trial plan

demonstrating that the trial of this case as a Class is manageable.

Common issues also predominate for Plaintiffs' state law claims and such claims do not

present manageability problems.  As set forth in Plaintiffs' Motion for a Ruling on the

Controlling State Law,[5] both Defendants are California corporations and California courts have

expressed a strong interest in applying California consumer statutory and common laws on a

nationwide basis in these circumstances.  Class certification based on the law of one state is

manageable and common issues predominate under state law as well.

## II.      PLAINTIFFS' ALLEGATIONS AND EVIDENCE

Plaintiffs review below the SAC's allegations that establish class-wide issues, and

Plaintiffs sample below the type of evidence Plaintiffs can present at trial to demonstrate how

those common issues can be proven on a class-wide basis.  Plaintiffs are also filing concurrently

with this memorandum a proffer of evidence common to the Class.  The recitation highlights the

predominance of common issues, typicality of claims and the superiority of the class action as a

vehicle for resolving these claims.

## A.      Accurate AWP Information is Critical to the Health Care Industry

Throughout the industry AWP is the benchmark used by endpayors to reimburse

pharmacies for the cost of brand name pharmaceutical drugs.  ¶ 40.  Virtually all participants in

the pharmaceutical distribution chain use AWP as the basis for reimbursement in their contracts

---

[4] Declaration of Raymond S. Hartman ("Hartman Decl."), Section II.D., ¶¶ 13-15

[5] Plaintiffs have previously filed a motion for a ruling on the applicable state law.  *See* Docket Nos. 73-74.

with third-party payors.  ¶¶ 61-66; Hartman Decl., p. 3, n.4.[6]  McKesson itself has acknowledged

that "AWPs are used for third party reimbursement."  ¶ 65.  Although the AWP is a list price

used for invoices between drug wholesalers and pharmacies, it is the Wholesale Acquisition Cost

("WAC"), not the AWP, which is the measure of pharmacists' actual costs.  The percentage by

which the AWP exceeds the WAC is known to wholesalers, publishers and drug companies as

the WAC/AWP "markup" for a particular drug product.  The greater the markup, the more the

pharmacists and large retail chains stand to profit from drug sales.  ¶¶ 118, 120, 126.[7]

**B.    McKesson and First Data Participated in a Scheme to Artificially Raise the WAC/AWP Markups of Hundreds of Brand-Name Drugs from 20% to 25%**

The market's use of First Data's published AWPs was not only known to First Data, but

used as the foundation of its marketing and promotion plans.  For all times relevant to this

lawsuit, First Data knew – and publicly acknowledged – that the primary purpose of its

publication of WAC and AWP data was to serve as an electronic basis for the mass-

reimbursement of retail and mail order pharmacies for thousands of daily transactions and

billions of yearly transactions.  ¶¶ 97-102.  To gain the trust of participants in the pharmaceutical

industry, First Data until March 2005, publicly represented that its AWP information was

obtained directly from drug manufacturers or through a comprehensive and sound survey of the

major drug wholesalers.  ¶¶ 103-07.

---

[6] Declaration of Steve W. Berman in Support of Plaintiffs' Amended Memorandum in Support of Class Certification ("Berman Decl."), Ex. 15 (MCKAWP 0068514) ("[I]t is important to understand that the AWP's that are used for third party reimbursement are the First Data Bank (FDB) AWP's."); *see also* Berman, Ex. 54 (Rule 30(b)(6) deposition of Hewitt Associates through Matthew Aaron Gibbs at 196:19-197:7 (testifying that he had never seen a PBM contract that did not provide for ingredient cost based on AWP)); and Ex. 55 (Deposition of Donny Dowlen, employee of Southern Benefits Administrators and 30(b)(6) witness for Pirelli Armstrong Retiree Medical Benefits Trust at 130:12-15 (testifying that in his experience all Taft-Hartley funds reimburse for pharmaceutical purposes based on AWP)).

[7] *See* Berman Decl., Ex. 15 where FDB employee James Robert discusses McKesson's success at raising the markup which "most customers would love" because they understand the profitability associated with higher AWPs.

McKesson also knew that AWP served as the basis for reimbursement: "AWP's are only important to our customers because third party reimbursement from the insurance companies is based on AWP minus 15% plus a fee (or something like that)."[8] McKesson acknowledged that with respect to the WAC-to-AWP spread previously "everything [had been] straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB [First Data] AWP's."[9] This consistency changed in late 2001 when First Data, by agreement with McKesson, limited its purported "surveys" to McKesson and did not "survey" other wholesalers, and agreed to change the markup on brand name drugs.

Thus, the Class Period starts in August 2001 when FDB and McKesson "mutually agreed" to increase the AWP on the products of one manufacturer, J.D. Searle, to create a 25% WAC to AWP spread. ¶ 123. Thereafter, McKesson and FDB agreed that they would jointly increase the markup on many other brand-name drugs. ¶ 124. McKesson knew there was no market justification for the 5% increase in the markup and that First Data published the new McKesson markup figures it received without checking them for accuracy against any other source. *See*, *e.g.*, ¶ 134. First Data also knew that the information it received from McKesson indicating a markup increase to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing the "reliable" and "accurate" information as it had promised. ¶ 133.

The Scheme directly benefited McKesson's pharmacy business, a nationwide network of 275 independent pharmacies in 35 states, as well as placing McKesson in a substantially better position with its principal customers, retail pharmacies. ¶¶ 137(a)-(f), 174-78.[10]

---

[8] Berman Decl., Ex. 54 (MCKAWP 0068311).
[9] Berman Decl., Ex. 3 (MCKAWP 0069612).
[10] Deep inside McKesson's headquarters it acknowledged how the Scheme would benefit McKesson's customers:

Class members do not have the ability to track WAC/AWP markups on a drug by drug basis, and there is no evidence that any of them were aware that the Scheme had been implemented and was ongoing.[11]

## C. The Impact of the Scheme Uniformly Effected Class Members and the Impact and Damage Can Be Calculated For Each Class Member

Dr. Hartman has concluded that if the allegations are true the following economic consequences occurred:

    a)    Those AWPs reported by FDB, which were related to their WACs by a spread of 20% prior to the implementation of the Scheme, were increased

---

Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

|  | Old 16 2/3% spread | New 20% spread |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant. ¶ 126.

[11] This is evident not only from the testimony of Plaintiffs, but also from the many third-party witnesses McKesson has subpoenaed. Berman Decl., Ex. 54 (Hewitt Associates, Gibbs Dep. at 195:21-196:13 (testifying that he was unaware of the increased WAC/AWP markup, was unaware of Defendants' Scheme until he read about First DataBank's proposed settlement of this lawsuit in the newspaper and prior to the publication of the news article no clients contacted him asking him to renegotiate their PBM contracts on the basis of the increased markup)); Ex.56 (Deposition of H. Eric Cannon, 30(b)(6) witness for Select Health at 58:7-15; 89:21-90:5; 143:9-144 (testifying that neither he nor his office tracked the WAC/AWP markup and that while he expected that AWP would change as a result of inflation or other market factors, he did not expect it to change as a result of conscious manipulation)); Ex. 57 (Deposition of Andrea Grande, 30(b)(6) witness for Harvard Pilgrim Healthcare at 47:8-13; 102:9-103:2 (testifying that she was not aware of any increase in the spread between WAC and AWP, nor was she aware of Defendants' Scheme)); Ex.58 (Deposition of James T. Kenney, Pilgrim's second 30(b)(6) witness at 90:15-91:3 (testifying that he was unaware of the Scheme before receiving subpoena in this case)); Ex. 59 (Deposition of Tina Wong, 30(b)(6) witness for Blue Cross Blue Shields of Montana at 190:22-192:5 (testifying that she did not undertake any analysis of trends in AWP and that tracking increases in AWP was not a necessary part of her job)); Ex. 60 (Deposition of Earl W. Seymour, 30(b)(6) witness for Pirelli Armstrong Retirees Medical Benefits Trust at 76:20-77:2 (testifying that he had not known about Defendants' misconduct before reviewing the complaint)); Ex. 55 (Dowlen Dep. at 49:14-21; 134:20-135:3 (testifying that he was not aware of an increase in the WAC/AWP markup and did not know about Defendants' Scheme)); Ex. 61 (Deposition of William Einhorn, 30(b)(6) witness for Teamsters Health and Welfare Fund of Philadelphia at 106:2-8 (testifying that he was unaware of the increase in the WAC/AWP markup)); Ex. 62 (Deposition of Arthur Steinburg, 30(b)(6) witness for Philadelphia Federation of Teachers ("Teachers") at 56:10-16 (testifying that other than reviewing the invoices from its PBM, Teachers does not monitor the cost of prescription drugs)); and Ex. 63 (Deposition of Rosaria Esperon, 30(b)(6) for District 37 at 143:10-15 (testifying that District 37's PBM, ESI, did not inform her whether there had been increases in the WAC/AWP markup)).

relative to their WACs by 5 percentage points to a spread of 25% as a result of the Scheme.

b)    Where reimbursement rates (allowed amount of AA) paid by Class members were determined formulaically by AWP as AA = {"AWP less x%" plus a dispensing fee}, the reimbursement rates were increased for those drugs, relative to the acquisition costs of the providers (which continued to be related to the WACs).

c)    The amounts paid by all or substantially all Class members for the relevant pharmaceuticals were inflated.[12]

Or, as stated elsewhere by Dr. Hartman on the issue the class-wide impact:

The impact of the Scheme was class-wide and uniform:

c)    Since the Class includes all those and only those payors whose reimbursement rates were determined by AWPs and since the Scheme increased those AWPs, the reimbursement rates on all transactions subject to the Class definition were inflated.

d)    The impact was uniform across Class members: **the AWPs were increased**. Those AWPs were incorporated into the calculation of reimbursement rates for all Class members. AWPs for the subject drugs are published industry-wide and do not vary across segments of the industry. As a result, individual issues concerning variation in the information content of FDB's AWPs for particular drugs do not arise.[13] (Emphasis in original.)

### III.    THE COURT SHOULD CERTIFY THE CASE AS A CLASS ACTION UNDER RULE 23(a)(B)(3)[14]

## A.    Plaintiffs Satisfy the Rule 23(a) Prerequisites to Class Certification

This Court is familiar with the standards applicable to class certification and the liberal

policy underlying Rule 23, requiring the Court to resolve any doubts in favor of certification.[15]

---

[12] Hartman Decl., ¶ 12, pp. 4-5.

[13] Hartman Decl., ¶ 14, pp. 5-6. In connection with the FDB settlement, Dr. Hartman illustrated and modeled the effect of this increase. *See* Declaration of Raymond Hartman: Impact and Cost Savings of the First DataBank Settlement Agreement at ¶¶ 7-8, 12 (Dkt. No. 123).

[14] On August 28, 2006, Plaintiffs served McKesson with an interrogatory asking for any factual basis McKesson had for opposing the elements of Rule 23. *See* Berman Decl., Ex. 64. McKesson refused to answer. *See* Berman Decl., Ex. 65.

[15] *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 77 (D. Mass. 2005) ("*In re AWP*").

To obtain class certification, the plaintiff must establish the four elements of Rule 23(a)(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation – as well as one of the several elements of Rule 23(b). *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003).

### 1. The Class meets the numerosity requirement because joinder of all members is impracticable

Numerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable, given the relevant circumstances. *In Re Relafin Antitrust Litig.*, 221 F.R.D. 260, 267 (D. Mass. 2004). Precise quantification of class members is not necessary; the Court may make common sense assumptions to support a finding of numerosity. *McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987). "[F]orty individuals [are] generally found to establish numerosity." *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass. 2005). Plaintiffs estimate that there are hundreds of thousands of consumers who meet the Consumer Class definition. Plaintiffs further estimate that there are tens of thousands of members of the TPP Class, including third-party insurers, health and welfare plans and self-insurers. ¶ 153. This is more than enough to satisfy Rule 23(a)(1).

### 2. The Commonality requirement is met because questions of law and fact are common to all Class members

Generally, the commonality requirement is easily met, provided that at least one common question of law or fact exists. *In re AWP*, 230 F.R.D. at 78. The numerous common factual and legal issues to be decided include, but are not limited to, the following:

  a. Whether AWPs published by First Data are used as a benchmark for negotiating payments by third-party payors for drugs;

  b. Whether Defendants engaged in a course of conduct that improperly inflated the WAC-to-AWP markup and the ultimate AWPs used by

Plaintiffs and Class members as the basis for reimbursement;

c.    Whether Defendants' conduct by the extent of the markup artificially inflated the published AWPs for the drugs that are the subject of this complaint;

d.    Whether Defendants engaged in a pattern and practice that caused Plaintiffs and Class members to make inflated payments for the AWPs;

e.    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity intended to defraud Plaintiffs and the Class members;

f.    Whether Defendants formed enterprises for the purpose of carrying out the 5% Scheme;

g.    Whether Defendants used the U.S. mails and interstate wire facilities to carry out the 5% Scheme;

h.    Whether Defendants' conduct violated RICO and various California statutes and common law; and

i.    Whether Defendants are liable to Plaintiffs and the Class members for damages for conduct actionable under the various state consumer protection statutes.

These questions easily establish the existence of commonality required by Rule 23.

> **3.    Plaintiffs meet the typicality requirement because their claims arise from the same course of conduct alleged by the Class**

Typicality is not a demanding test. *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993). Plaintiffs meet this burden when class members' claims are based on the same legal theory as the representative plaintiffs and when class members allege to have been injured by the same course of conduct as that which allegedly injured the representatives. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 184 (3d Cir. 2001).

Plaintiffs have met both elements. Like the proposed TPP Class members, TPP Plaintiffs were all required to reimburse pharmacies for drugs dispensed to their plan members at a

formula based on AWP (*i.e.*, AWP less __%). ¶¶ 24-28[16]; Hartman Decl., *passim*. Like the proposed Consumer Class members, Consumer Plaintiffs each paid for or incurred a debt for a percentage co-payment for the Marked Up Drugs pursuant to a plan, which in turn reimbursed the cost of the Marked Up Drugs based on AWP. ¶¶ 21-23. Plaintiffs and absent Class members alike made excessive payments based on inflated AWP figures that were inflated by the markup. The types of claims and the manner in which Plaintiffs will prove Defendants' complicity in the Scheme to raise AWPs will be the same or essentially the same for any member of the proposed Class. These similarities establish a sufficient nexus for the purposes of Rule 23(a)(3).

> **4.     Plaintiffs meet the adequacy requirement because their interests will not conflict with those of other Class members and because they have chosen, qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation**

The adequacy requirement has two parts: the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). Plaintiffs meet both prongs. They have retained counsel with substantial experience in prosecuting nationwide consumer class actions. Counsel for Plaintiffs have been litigating before this Court in the related *AWP Litigation* and have demonstrated their commitment to vigorous prosecution and protection of their clients' rights. Indeed it is as a direct result of their role in the *AWP Litigation* that counsel uncovered this fraud. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the proposed

---

[16] *See* contracts of the named TPP Plaintiffs, Berman Decl., Ex. 66 (Carpenter's PBM contract with Medco, Schedule A, ¶ 1 (CARP-00328)); Ex. 67 (DC 37's PBM contract with NPA, Appendix C (D37 0496)); Ex. 68 (DC 37's PBM contract with ESI, Exhibit A, II (B) (D37 517)); Ex. 69 (Pirelli's PBM contract with AdvancePCS, Exhibit B (PIRELLI-FDB 0000187)); Ex. 70 (Teachers PBM contract with NPA, Appendix F (PFTHW-FDB 000197)); Ex. 71 (Teacher's PBM contract with ESI, Exhibit A (PFTHW-FDB 000183)); and Ex. 72 (Teamster's PBM contract with GPP, ¶ 3 (THWF 1852)).

Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Class.

**B.      Plaintiffs Meet the Requirement of Rules 23(b)(3)**

The standard set forth in Rule 23(b)(3) is not overly burdensome on plaintiffs seeking class certification and should be freely granted. *Coffin v. Bowater Inc*., 228 F.R.D. 397, 406 (D. Me. 2005).

**1.      Common questions predominate over individual issues**

"The Rule 23(b)(3) predominance test does not require "that all issues be common to the class," *Smilow*, 323 F.3d at 39, but rather that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *In re AWP*, 230 F.R.D. at 81. The existence of numerous legal and factual issues common to the Plaintiffs and the proposed Class members alike, *supra*, cannot be reasonably doubted, but Plaintiffs anticipate that McKesson will claim that the same deficiencies the Court found in *AWP*, when it declined to certify a class of TPPs paying for self-administered drugs, are present in the proposed TPP Class, too.

The situation here could not be further removed from *AWP*. There the TPPs alleged that drug manufacturers conspired with PBMs to defraud TPPs because the difference between the published AWPs and the pharmacists' average acquisition costs (ASPs) exceeded Class members' expectations of the size of the markup. The individual TPPs' knowledge of the meaning and use of the term "AWP" in the industry and their expectation was a critical issue because the plaintiffs in the *AWP* case alleged they were defrauded in their negotiations and contractual relations with PBMs. 230 F.R.D. at 94. The TPPs' relative sophistication and ability to leverage more favorable deals from a highly competitive PBM market was also a critical feature in *AWP* because they were factors in determining whether the TPPs reasonably relied on AWP. *Id.* Finally, the Court concluded that while the TPP Plaintiffs articulated a single source

of injury, they failed to show that the harm was sufficiently similar to justify a class action. The Court declined to certify the class, reasoning that if it were to proceed, it "would have to look at each arrangement between the PBM and the manufacturer with respect to each TPP for each [identified drug] to determine whether there was a fraudulent relationship that had a baseline impact on the drug reimbursement rates paid by the TPP." *Id*. at 94.

By contrast the harm to the Class in the current case is uniform and simple: Class members paid too much for the Marked Up Drugs because they utilized an AWP that had been raised by the Defendants' scheme. The Scheme involved only two parties, McKesson and First Databank, working in secret to artificially raise the price of AWPs to a uniform 25% over WAC. There is no evidence that any Plaintiff or potential Class member knew of the Scheme.[17] Thus, unlike the *AWP* case, McKesson has failed to defeat uniformity by showing difference degrees of knowledge. Nor is TPPs' individual knowledge and understanding of AWP a relevant factor in this litigation; the fraud occurred outside of any negotiations or contractual relations where such knowledge would be a factor. Nor are leverage and sophistication issues in this case. As McKesson itself acknowledged, by changing the AWP data published by First DataBank, Defendants changed the AWPs throughout the market extending to purchases that went beyond those based on FDB's AWPs.[18] Plaintiffs' ability to negotiate a better PBM contract therefore would not have prevented Class members' injury.[19] Finally, any added difficulties by the presence of generic drugs or the physician administered drugs are not present here. ***Here, in sum, two companies by agreement and a flick of the switch at FDB, changed the payment for millions of transactions at a cost to the Class in the billions of dollars***. Thus factual anomalies,

---

[17] *See supra* note 11.

[18] Berman Decl., Ex. 73 (MCKAWP 0057171) (noting that Medi-Span follows FDB because "Medispan . . . get[s] their data from FDB.").

[19] And indeed, the evidence is to the contrary.

that the Court found fatal to the certification of a Class of End Payors of self-administered drugs

in *AWP*, are notably absent here.

> 2.   **A class action is superior to the adjudication of hundreds or thousands of separate individual cases**

Class actions are superior when individual actions would be wasteful, duplicative, present

managerial difficulty or be adverse to judicial economy. *Mullen v. Treasure Chest Casino,*

*L.L.C.*, 186 F.3d 620, 627 (5th Cir. 1999). "The more claimants there are, the more likely a class

action is to yield substantial economies in litigation." *Carnegie v. Household Int'l, Inc.*, 376

F.3d 656, 661 (7th Cir. 2004), *cert. denied*, 543 U.S. 1051 (2005). Class actions also are favored

when "class members claim the same injury, from the same event, from the same defendant over

the same period of time," *Schwartz v. TXU Corp.*, 2005 U.S. Dist. Lexis 27077, at *55 (N.D.

Tex. Nov. 8, 2005); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 351 (E.D.

Mich. 2001), or when they would benefit the public at large "by providing an additional deterrent

beyond that afforded either by public enforcement or by single-party private enforcement." *In re*

*Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations

omitted).

All these factors militate in favor of certification. Defendants engaged in one single

Scheme over the course of the Class Period to defraud an estimated 11,000 TPP Class members

and hundreds of thousands of Consumer Class members. Separate trials would tax the Courts'

limited resources, present the risk of inconsistent results and fail to have the same deterrent effect

on Defendants.

The non-exclusive factors identified by Fed. R. Civ. P. 23(b)(3)[20] also favor Class treatment in this case. The interest in proceeding as a Class generally prevails over the interest of individual Class members proceeding alone when a denial of certification would prevent some Class members having their day in court. The small damages claims available to the Consumer Plaintiffs and Taft Hartley type Class members "suggests that class members' "interest . . . in individually controlling the prosecution or defense of separate actions,' Fed. R. Civ. P. 23(b)(3)(A), is limited – if not nonexistent." *In re Relafen Antitrust Litig.*, 221 F.R.D. at 288. The same holds true for thousands of Taft Hartley Funds in the TPP Class, who lack the resources to devote to presentation of this case on an individual basis.[21] *Cf.*, *In re Revco Sec. Litig.*, 142 F.R.D. 659, 669-70 (N.D. Ohio 1992) (granting motion to certify class, noting that at least one potential class member, the University of California, had concluded that bringing a lawsuit on its own behalf would be "cost prohibitive," reasoning that "[w]hile members of the class may be capable of litigating separate actions, Rule 23 has no restrictions on wealth"). Thus the interest in proceeding as a Class prevails over the interest of any potential Class members, who wish to proceed individually and who may opt out of the Class if they so wish.

The second and third superiority factors (*i.e.*, the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class, and the desirability or undesirability of concentrating the litigation of the claims in the particular forum) also support certification. This lawsuit is the first, and to Plaintiffs' knowledge, only existing lawsuit concerning the controversy at hand. This Court is now very familiar with many of the

---

[20] Fed. R. Civ. P. 23(b)(3) identifies the following nonexclusive factors "pertinent" to evaluating superiority: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

[21] *See, e.g.*, Berman Decl., Ex. 56 (Ecklund Aff., ¶ 9; Steinberg Aff., ¶ 9; Ryan Aff., ¶¶ 8-9; Brecht Aff., ¶ 8).

factual and legal issues involved in this action through the *AWP* case and is best suited to preside over the current case. The fourth factor, manageability, is easily met here based on the constellation of common facts and proof required by each Class member.

### 3.     Plaintiffs do not require an Individualized Calculation of Damages

Plaintiffs cannot foresee any manageability problems and have filed a Trial Plan indicating how the trial can proceed on a classwide basis. "[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *In re AWP*, 230 F.R.D. at 86. Plaintiffs anticipate no significant obstacles requiring an individualized calculation of damages. If the Class establishes liability, Plaintiffs will be able to calculate the aggregate damages of the TPP and Consumer Classes by applying a formula set forth by Plaintiffs' expert, Dr. Raymond Hartman.[22] Aggregate damages can be calculated using industry-wide survey information available from IMS or Verispan.[23] IMS, for example, tracks the total retail method of payment by NDC according to the method of payment, *i.e.* cash purchases, payments by TPPs, by Medicaid and governmental agencies, "so that one is able to adjust the numbers of units that would be subject to the class definition using data sources."[24] Once aggregate liability is determined in a single, class-wide adjudication; allocation of the award is made later, administratively, upon the submission of claims, according to a court-approved formula. *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 235 F.R.D. 127,

---

[22] Dr. Hartman's original formula is set forth in Section B of the Hartman Declaration, ¶¶ 20-25. Dr. Hartman proposed a variation of this formula at his deposition. Berman Decl., Ex. 74 (Hartman Dep. at 360:2-361:8). The chief difference is that the latter version does not require the assumption of a 13-18% discount off of AWP. Dr. Hartman described in the *AWP* case how consumer damages can be calculated and would apply a similar method here.

[23] Verispan and IMS provide industry-wide survey information on total reimbursement at retail of the Marked Up Drugs. Hartman Decl. ¶ 15(c); Berman Decl., Ex. 74 (Hartman Dep. at 115:11-18).

[24] Berman Decl., Ex. 74 (Hartman Dep. at 241:13-19).

143 (D. Me. 2006).[25]  In any event, "the need for individualized proceedings on damages does not necessarily defeat class certification because the Court has the authority to certify a class for liability only pursuant to Rule 23 (c)(4)(A) and decertify the class for damages," as needed.  *In re AWP*, 230 F.R.D. at 91.[26]

### 4.    State law issues are manageable and create common issues

As set forth below, Class actions are an appropriate and manageable vehicle for the resolution of Plaintiffs' California statutory and common law claims.[27]  *See*, *e.g.*, *Clothesrigger, Inc. v. GTE Corp*., 191 Cal. App. 3d 605, 610, 236 Cal. Rptr. 605 (4th Dist. 1987) (certification of a national class alleging fraud, negligent misrepresentation and unfair business practices).

### (a)    Statutory Claims

To prove their statutory false advertising, unfair competition and consumer legal remedies claims, Cal. Bus. & Prof. Code §§ 17500, 17200 and Cal. Civ. Code 1750, Plaintiffs need only prove that Defendants made a deceptive statement to induce Class members to make payments based on AWP information, *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002), *Quacchia v. DaimlerChrysler Corp*., 122 Cal. App. 4th 1442, 1450, 19

---

[25] This process is well suited to class-actions because it "eliminates the need for repetitive litigation of individual damage claims, while allowing courts to hold defendants liable for the entirety of the harm caused by them and to compensate those harmed. . . . [Otherwise] to insist upon proof of individual claims [would] enable [the defendant] to benefit from the cumbersome nature of legal proceedings and the lack of sophistication and indolence of the consumer, and [would] reward [its] foresight in stealing from the multitude in small amounts." *Schwab v. Philip Morris USA, Inc*., 2005 U.S. Dist. Lexis 27469, at *11-12 (E.D.N.Y. Nov. 14, 2005) (quoting *Bruno v. Superior Court*, 127 Cal. App. 3d 120, 127, 179 Cal. Rptr. 342 (Cal. Ct. App. 1981)); *see also* Plaintiffs' Trial Plan.

[26] *See also Smilow*, 323 F.3d at 40 ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.").

[27] Plaintiffs anticipate that McKesson will argue that the law of the states of Class members' place of residence controls the Class members' state law claims and that the application of the laws of fifty states would render this case so unmanageable as to require the Court to deny certification.  For the reasons set forth in their Motion for a Ruling on the Controlling State Law, Plaintiffs contend that the law of California applies to the entire Class and hereby incorporate by reference the arguments contained therein.  Even if the Court concludes that the laws of the Class members' states of residence control, certification is still appropriate.  To the extent that the state laws differ, the Court may certify subclasses of claims based on state laws with essentially the same requirements.  Attached as Exhibits 51-53 to the Berman Declaration is an analysis of the various state laws at issue that supports certification of the state law counts set forth in the FAC, should California law not apply.

Cal. Rptr. 3d 508 (1st Dist. 2004) and that Class members lost money or property as a result of such misconduct.  *Anunziato v. eMachines, Inc.*, 402 F. Supp. 2d 1133, 1136-37 (C.D. Cal. 2005); *Massachusetts Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292, 119 Cal. Rptr. 2d 190 (4th Dist. 2002) ("California courts have repeatedly held that relief under the UCL is available without individualized proof of deception, reliance and injury.")[28].  Any act that violates § 17500 also constitutes a violation of the California Unfair Competition Law. § 17200.[29]  As with Plaintiffs' common law claims, the causation element of Plaintiffs' § 1750 claim does not make it unsuitable for class treatment.[30]  "Causation as to each class member is commonly proved more likely than not by materiality.  That showing will undoubtedly be conclusive as to most [if not all] of the class."  *Massachusetts Mut. Life Ins. Co.*, 97 Cal. App. 4th at 1292.

To prevail on their statutory claims Plaintiffs must prove that Defendants engaged in an illegal Scheme to artificially raise AWP markups, knowing that their conduct would cause Class members' prescription drugs costs to increase, that one or more Defendants made a material false representation of the integrity of First Data's pricing information,[31] and that Plaintiffs made

---

[28] The California Supreme Court recently held that a 2004 ballot initiative (Proposition 64) "left entirely unchanged the substantive rules governing business and competitive conduct."  *Californians for Disability Rights v. Mervyn's LLC*, 39 Cal. 4th 223, 232, 138 P.3d 207 (2006).  Indeed, the California Supreme Court has granted review of two Court of Appeal decisions holding that class members must now establish reliance under the UCL.  *See Pfizer, Inc.  v. Superior Court*, 141 Cal. App. 4th 290, 45 Cal. Rptr. 3d 840 (2d Dist. 2006), *review granted Nov. 1, 2006*; *In re Tobacco II Cases*, 142 Cal. App. 4th 891, 47 Cal. Rptr. 3d 917 (4th Dist. 2006), *review granted Nov. 1, 2006*.  Neither case is citable as precedent pursuant to Rule 977(a) of the California Rules of Court.  In any event, however the California Supreme Court opines in *Pfizer* and *Tobacco II* (*Mervyn's* indicates reversal is likely), neither Court of Appeal decision forecloses the well-established use of inference to establish classwide reliance based on the materiality of the misrepresentations.  *See, e.g., Occidental Land, Inc. v. Super. Ct.*, 18 Cal. 3d 355, 556 P.2d 770 (1976); *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th 952, 93 Cal. Rptr. 2d 413 (2000).

[29] Additionally, § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

[30] Plaintiffs' § 17200 and § 17500 claims do not have a causation element.  *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660 (Cal. 1983).

[31] It is not necessary to prove a false statement to violate § 17200.  Unfair conduct is sufficient to violate the Unfair Competition Law.

excessive payments for prescription drugs in reliance on the integrity of First Data's pricing

information.  Because common issues prevail and individualized proof of reliance and damages

play little or no role, class action is an appropriate vehicle for these claims.  *See Sav-On Drug*

*Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 96 P.3d 194 (2004).  "In any event, a class action

is not inappropriate simply because each member of the class may at some point be required to

make an individual showing as to his or her eligibility for recovery or as to the amount of his or

her damages."  *Id*. at 333.

Additionally, Consumer Plaintiffs seek enhanced relief on behalf of a subclass of Senior

Consumer Class members.  Cal. Civ. Code § 3345.  To obtain such relief, Plaintiffs need only

prove Defendants knew or should have known that their conduct was directed to the Senior

Subclass in that a large percentage of members of the Consumer Class for certain Marked Up

Drugs are over 65 and that any wrongful conduct with respect to the sale of the Marked Up

Drugs was likely to aversely impact such seniors.  Cal. Civ. Code § 3345(b).  Plaintiff June Swan

is currently 78 years old and was a senior at the time Defendants engaged in their conspiracy.

### (b)    California Courts Approve Class Treatment of These Types of Claims

Class actions are an appropriate and manageable vehicle for the resolution of Plaintiffs'

false advertising and unfair competition claims pursuant to Cal. Bus. & Prof. Code §§ 17200 *et*

*seq.* and 17500 *et seq.*, because these statutory causes of action provide relief "without

individualized proof of deception, reliance, and injury[.]"  *Bank of the West v. Superior Court*,

833 P.2d 545, 553 (Cal. 1992).  California courts routinely certify §§ 17200, 17500, and 1750

claims for class treatment.  *See, e.g., Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319

(2004) (reversing Court of Appeal writ directing trial court to vacate order granting certification

of § 17200 claim seeking recovery for drug pricing scheme); *Mass Mut. Life Ins. Co. v. Superior*

*Court*, 97 Cal. App. 4th at 1294 (affirming certification of §§ 17200 and 1750 claims: "the

ultimate question of whether the undisclosed [or affirmatively misrepresented] information was material [i]s a common question of fact suitable for treatment in a class action"); *Corbett v. Super. Ct.*, 101 Cal. App. 4th 649, 670 (2002) (referring to the "common practice . . . of certifying UCL [§ 17200] claims in appropriate cases").

A class action is also an appropriate vehicle to resolve Class members' common law claims for conspiracy and negligent misrepresentation, *see Clothesrigger*, 191 Cal. App. 3d at 610 (certification of a national class alleging fraud, negligent misrepresentation and unfair business practices) because under the facts alleged in this case, individual reliance is more or less subsumed in the proof of damages. If Class members can prove they paid excessive fees based on inflated AWPs reported by First Data, they have proven both individual reliance and injury.

Even if the Court concludes that the laws of the Class members' states of residence control, certification is still appropriate. To the extent that the state laws differ, the Court may certify subclasses of claims based on state laws with essentially the same requirements. The precise grouping of states is a matter that is currently pending before the Court in *AWP*.

**(c)    Conspiracy**

Technically, "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 869 P.2d 454, 457 (Cal. 1994). To prevail, Plaintiffs must "provide substantial evidence of three elements": (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Kidron v. Movie Acquisition Corp*., 40 Cal. App. 4th 1571, 1581, 47 Cal. Rptr. 2d 752 (2d Dist. 1995). If the evidence supports Plaintiffs' allegations that Defendants agreed to and took steps to carry out their illegal Scheme to artificially inflate AWP markups,

each Defendant shares liability for the harm caused by the conduct of the other in carrying out

that Scheme.

### 5.    Variability of plan cost-saving devices does not affect TPP Plaintiffs' standing nor does it create case manageability issues

McKesson will likely argue that some of the TPP Plaintiffs lack standing because they

may have passed on some or all of their losses onto their beneficiaries in the form of higher

deductibles, premiums, and reduced benefits in the form of lower caps.  This argument overlooks

established precedent recognizing the economic reality that TPPs, like consumers, pay for

prescription drugs and incur a direct economic injury from falsely inflated costs regardless of

how they later recoup their losses from changes to their benefits plans.[32]  Nor does the variation

of such cost-saving measures create a manageability issue because such measures are legally

irrelevant, whether to establish Class members' standing or to calculate damages.  As a matter of

federal and state law, Defendants are not entitled to a reduction of liability for any costs that

TPPs were able to recoup from their beneficiaries in the form of increased premiums, higher

deductibles and the like.  *Helfend v. Southern California Rapid Transit Dist.*, 465 P.2d 61, 63

(Cal. 1970) ("California has long adhered to the doctrine that if an injured party receives some

compensation for his injuries from a source wholly independent of the tortfeasor, such payment

---

[32] "[C]ourts have long recognized the right of HBPs [Health Benefit Providers] to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices."  *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 (2d Cir. 2003).  *See also Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1455 (11th Cir. 1991) ("If the radiologists or DCH are acting anticompetitively and are charging an inflated price, then the patients, their insurers, or the government, all of whom are interested in ensuring that consumers pay a competitive price, may bring an action to enjoin such practice."); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 65 F.3d 1406, 1414-15 (7th Cir. 1995) ("Blue Cross paid Marshfield Clinic directly, in accordance with Blue Cross's contractual obligations to its insureds, and if it paid too much because the Clinic violated the antitrust laws then it ought to be allowed to sue to recover these damages."); and *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 570 (E.D.N.Y. 1999) (Virtually all wrongs committed against businesses, including antitrust, securities, and RICO violations, are ultimately passed on to consumers in the form of higher costs or reduced services or both.  Under American law, nevertheless, the right to bring a RICO or antitrust action devolves to the injured business which initially sustained the economic damages," *i.e.* Blue Cross); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 259 (D. Del. 2002) ("The TPPs here, as much as the consumers, could be considered 'the target of DuPont's antitrust violation,' in that they were the end parties absorbing the overcharges for the drugs."), aff'd 391 F.3d (3d Cir. 2004).

should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor."); *see also* Restatement (Second) of Torts § 920A(2); *Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390, 399 (1906).[33]  As a corollary to this rule, federal courts provide that in RICO actions, only "the directly injured party" has standing, and it "should receive a complete recovery" for all harm caused by the defendant's illegal conduct even if the directly injured party has passed on some or even all of its costs onto its customers or other third-parties. *Carter v. Berger*, 777 F.2d 1173, 1176 (7th Cir. 1985).[34]

TPPs and consumers are both direct purchasers.  They both engaged in the exact same transaction – retail payments of Marked Up Drugs – and suffered the same injury as a result of Defendants' manipulation of the AWP for the Marked Up drugs – they paid more than they otherwise would have paid for the Marked Up Drugs.  As direct purchasers, both Consumer and TPP Class members are entitled to recover the total damages they directly incurred as a result of Defendants' illegal conduct, *i.e.* the full amount that they overpaid for the Marked Up Drugs.  Accordingly, differences in plan structures, which allow some TPPs to pass on their costs to their beneficiaries, have no legal relevance in this case and therefore will have no affect on this Court's ability to manage the case.

---

[33] Justice Holmes wrote: "[a] man is injured in his property when his property is diminished. . . . When a man is made poorer by an extravagant bill we do not regard his wealth as a unity, or the tort, if there is one, as directed against that unity as an object.  We do not go behind the person of the sufferer.  We say that he has been defrauded or subjected to duress, or whatever it may be, and stop there."  *Chattanooga Foundry,* 203 U.S. at 398-99.

[34] As a practical matter courts recognize that

"concentrating the entire right to recover in the hands of the directly injured party promotes deterrence. . . . . The person with the best opportunity to uncover a violation is the one directly injured; he has access to the essential facts that may be concealed from others.  How is the buyer of a building to know that bricks were the subject of a cartel, or the taxpayer to learn that employees of the Board of Appeals have been bribed?  The party with a right to recover the whole loss has the right incentives to investigate potential violations and pursue litigation; people with small stakes neither investigate nor litigate in the ordinary course.  Even if some champion discovered the wrong (but who would have the right incentives to be the detective?), 'only a small fraction would be likely to come forward to collect their damages.'"

*Carter*, 777 F.2d at 1176 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977)); *accord Blue Cross & Blue Shield of N.J. v. Philip Morris.*, 36 F. Supp. 2d at 570.

### IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to certify the proposed Classes.

DATED:  December 20, 2006

By /s/ Steve W. Berman
  Steve W. Berman
  Sean R. Matt
  Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Ed Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 20, 2006.


/s/ Steve W. Berman_____
Steve W. Berman