UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,

Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,

Defendants.

C.A. No. 1:05-CV-11148-PBS

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' AMENDED MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION AND PLAINTIFFS' PROFFER OF EVIDENCE COMMON TO THE CLASS**

I, Steve W. Berman, hereby declare that:

1. I am a partner of Hagens Berman Sobol Shapiro LLP, resident in its Seattle, Washington, office, and I am one of counsel for the Plaintiffs in the above-captioned matter. I submit this declaration in support of Plaintiffs' Amended Memorandum in Support of Class Certification and Plaintiffs' Proffer of Evidence Common to the Class.

2. Attached are true and correct copies of the following Exhibits:

| Exhibit No. | Description |
|---|---|
| 1 | Deposition of Patricia Kay Morgan dated January 11, 2005 and January 12, 2002 (excerpts only) taken in *In re Pharmaceutical Average Wholesale Pricing Litig.*, |

| | |
|---|---|
| | No. 01-12257 (D. Mass.). |
| 2 | Deposition of Bob James dated February 23, 2005 (excerpts only) taken in *In re Pharmaceutical Average Wholesale Pricing Litig.*, No. 01-12257 (D. Mass.). |
| 3 | AWP Discussion (MCKAWP 0069611-13). |
| 4 | Collection of Emails To and From Bob James [Ex. 4 to James Deposition]. |
| 5 | Deposition of Ramon Crusit dated February 23, 2005 (excerpts only) taken in *In re Pharmaceutical Average Wholesale Pricing Litig.*, No. 01-12257 (D. Mass.). |
| 6 | Letter to Kay Morgan from Kyle Bush (Baxter) dated July 11, 2001 (FDB-AWP 044257-58). |
| 7 | Email from Robert James to Anthony Dolan dated May 3, 2004 (MCKAWP 0057171-73). |
| 8 | Email Erlinda Thomas to Beth Boyd dated January 19, 2005 (MCKAWP 0047807-08). |
| 9 | Memorandum to Greg Yonko from Bob James dated March 22, 2002 (MCKAWP 0069608-10). |
| 10 | Email from John Bonner to Debbi Jarosch dated February 11, 2002 (MCKAWP 0066464-66). |
| 11 | Email from Robert James to Dale James, John Bonner & Erlinda Thomas dated November 21, 2002 (MCKAWP 0069502-03). |
| 12 | Email Exchanged dated December 8, 2004 from Brian Ferreira dated December 8, 2004 (MCKAWP 0069766-70). |
| 13 | Email from Robert James to Dan Pantano dated May 24, 2004 (MCKAWP 0069732-34). |
| 14 | Email from Robert James to Greg Yonko dated October 9, 2001 (MCKAWP 0068599-601). |
| 15 | Email from Robert James to Larry Secrest dated September 18, 2001 (MCKAWP 0068514-15). |
| 16 | Declaration of Robert James dated December 14, 2004. |
| 17 | Email from Tyler Jones dated February 19, 2002 (MCKAWP 0057413-19). |
| 18 | Letter to Joseph Hirschmann from David Moules dated March 1, 2002 (FDB-AWP 053695-98). |
| 19 | Emails (MCKAWP 0035457-60). |
| 20 | Email from Robert James to Kay Morgan dated November 9, 2002 (MCKAWP 0068621). |
| 21 | Email to Kay Morgan from Bob James dated February 6, 2002 (MCKAWP 0069586-87). |
| 21A | Email from Robert James to Kay Morgan dated September 30, 2002 (MCKAWP 0069857). |
| 22 | Email Exchange Between Robert James and Kay Morgan dated June 26, 2003 (MCKAWP 0001168-70). |
| 23 | Email Exchange Between Robert James and Kay Morgan dated December 8, 2003 (MCKAWP 0001188-89). |
| 24 | Email from Robert James to Greg Yonko dated April 25, 2002 (MCKAWP 0069615-16). |
| 25 | Email from Robert James to Erlinda Thomas and Ramon Crusit dated August 6, |

| | |
|---|---|
| | 2002 (MCKAWP 0069782). |
| 26 | Email from Kay Morgan to Robert James dated December 19, 2002 (MCKAWP 0069553-45). |
| 27 | Email from Robert James dated March 15, 2002 (MCKAWP 0042663-70). |
| 28 | Email from Robert James to Kay Morgan dated May 1, 2002 (MCKAWP 0069642). |
| 29 | Email Exchange dated July 31, 2002 (MCKAWP 0069774-75). |
| 30 | Email from Guerdon Green dated March 11, 2002 (AV-BCA-0010336). |
| 31 | Email Exchange dated November 6 and November 7 (MCKAWP 0001182-84). |
| 32 | NOT USED |
| 33 | Email from John Bonner to Tony Davoren dated November 5, 2004 (MCKAWP 0067439-40). |
| 34 | Email from Robert James to Brian Ferreira dated May 13, 2002 (MCKAWP 0069714). |
| 35 | Email from Robert James to Ed Bisller and John Bonner dated May 3, 2002 (MCKAWP 0068889). |
| 36 | Email from Robert James to Dale James dated February 15, 2002 (MCKAWP 0069591). |
| 37 | Email Exchange Between Robert James to Dale James dated February 15, 2002 (MCKAWP 0069592-93). |
| 38 | Email from Robert James to Greg Yonko dated January 7, 2002 (MCKAWP 0065895). |
| 39 | Email from Robert James dated July 28, 2004 (MCKAWP 0068130-34). |
| 40 | Email from Kay Morgan to Ned Hanson dated Februa0ry 8 ,2002 (MCKAWP 0069588-89). |
| 41 | Email from Robert James to Dan Connolly dated September 5, 2002 (MCKAWP 0069817). |
| 42 | Email from Robert James to Dan Connelly dated October 11, 2002 (MCKAWP 0069901). |
| 43 | Email from Robert James to David Vucurevich with attachment dated October 25, 2002 (MCKAWP 0069911-13). |
| 44 | Email from Robert James to Erlinda Thomas with attachment dated May 3, 2002 (MCKAWP 0069669-706). |
| 45 | Email from Larry Secrest to Robert James dated November 27, 2002 (MCKAWP 0069513). |
| 46 | Email from Jeff Wallis to Robert James dated May 21, 2002 (MCKAWP 0069726). |
| 47 | Email from Robert James to Kristi Jones dated May 14, 2002 (MCKAWP 0069715-16). |
| 48 | Email from Robert James to Allen Watanabe dated August 10, 2001 (MCKAWP 0068311-12). |
| 49 | Email from Kay Morgan to Robert James dated July 21, 2004 (MCK 001243). |
| 50 | Affidavits of Christopher E. Brecht, William K. Ecklund, Daniel Ryan, and Arthur Steinberg. |
| 51 | Chart of Comprehensive Survey of State Negligent Misrepresentation Law. |

| | |
|---|---|
| 52 | Chart of Comprehensive Survey of State Civil Conspiracy Law. |
| 53 | Chart of Comprehensive Survey of State Consumer Protection Statutes with Consumer Protection Statutes for Each State Attached. |
| 54 | 30(b)(6) Deposition Notice of Matthew Aaron Gibbs, Hewitt Associates dated October 27, 2006 (excerpts only). |
| 55 | Deposition of Donney Dowlen dated October 19, 2006 (excerpts only). |
| 56 | Deposition of Eric Cannon dated October 11, 2005 (excerpts only). |
| 57 | Deposition of Andrea Grande dated October 11, 2006(excerpts only). |
| 58 | Deposition of James T. Kenney dated October 11, 2006 (excerpts only). |
| 59 | Deposition of Tina Wong dated November 14, 2006 (excerpts only). |
| 60 | Deposition of Earl W. Seymour dated October 19, 2006 (excerpts only). |
| 61 | Deposition of William Einhorn dated October 5, 2006 (excerpts only). |
| 62 | Deposition of Arthur Steinberg dated October 18, 2006 (excerpts only). |
| 63 | Deposition of Rosaria Esperon dated November 6, 2006 (excerpts only). |
| 64 | Plaintiffs' First Set Interrogatories to McKesson dated August 28, 2006 (pertinent pages only). |
| 65 | Defendant McKesson Corporation's Response to Plaintiffs' First Set of Interrogatories And Fifth Request for Production of Documents, Titled "Fourth Request for Production of Documents," Served On August 28, 2006 dated October 2, 2006 (pertinent pages only). |
| 66 | Integrated Prescription Drug Program Master Agreement between Medco Health Solutions and National Labor Alliance of Health Care Coalition (CARP-00317; CARP-00328) (pertinent pages only). |
| 67 | Agreement for Prescription Drug Management Services Between National Prescription Administrators and DC37 Health & Security Plan (D37 0480; D37 0496) (pertinent pages only). |
| 68 | Express Scripts Pharmacy Benefit Management Agreement (D37 0505; D37 0517) (pertinent pages only), |
| 69 | Advance PCS Managed Pharmaceutical Benefit Agreement (PIRELLI-FDB 0000161; PIRELLI-FDB 0000172; PIRELLI-FDB 0000187) (pertinent pages only). |
| 70 | Amendment to the Agreement to Provide Prescription Plan Administration Between National Prescription Administrators and Philadelphia Federation of Teachers (PFTHW-FDB 000197) (pertinent page only) |
| 71 | Express Scripts Managed Prescription Program Agreement (PFTHW-FDB 000164; PFTHW-FDB 00183) (pertinent pages only). |
| 72 | Prescription Drug Services Provider Agreement (THWF 1852; THWF 1854) (pertinent pages only). |
| 73 | Email from Robert James to Anthony Dolan re: Potential Discontinuance of First Data Bank's Average Wholesale is Price List-DSCP (MCKAWP 0057171). |
| 74 | Deposition of Raymond S. Hartman, Ph.D dated October 4, 2006 (excerpts only). |

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 20th day of December, 2006.

**/s/ Steve W. Berman**
STEVE W. BERMAN

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 20, 2006.

/s/ Steve W. Berman
Steve W. Berman

# EXHIBIT 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

----------------------------x

In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) MDL No. 1456 ) CIVIL ACTION NO. 01-CV-12257-PBS

Vol. 2

-----------------------------)

THIS DOCUMENT RELATES TO ALL ACTIONS )

-----------------------------x

IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

-------------------------------------

ROBERT J. SWANSTON, Individually and on behalf of himself and all others Similarly situated, )

Plaintiff, )

v. ) Case No. CV2002-004988

TAP PHARMACEUTICAL PRODUCTS, INC., et al., )

Defendants. )

-------------------------------------

CONTINUED VIDEOTAPED DEPOSITION OF
PATRICIA KAY MORGAN
New York, New York
Wednesday, January 12, 2005

Data Bank receiving information regarding markups from McKessen?

A. Yes, we were.

Q. Was First Data Bank receiving any information regarding markups from any other company other than McKessen in that time period?

A. No, sir, we were not.

Q. As of today does First Data Bank receive information regarding markups from a company other than McKessen?

A. No, we do not.

Q. How long has it been the case that First Data Bank receives information regarding markups only from McKessen?

MR. SCHULZ: Objection, asked and answered. I think we went through all this yesterday and nailed down the dates to the best of her recollection.

A. It would have been toward the end of 2003, going forward.

Q. And I believe that you've exhausted your recollection on this, but apart from the

A. The documentation didn't start until 2004 sometime, so...

Q. So it's an unwritten survey, right?

A. Correct.

Q. With unwritten questions, correct?

A. Correct.

Q. That does not occur in a manner other than by phone, correct?

A. Correct.

Q. And with Cardinal it's with Tom -- somebody, we don't know his last name, right?

A. I don't recall.

Q. And with McKessen it's with Ramon, who doesn't speak very good English, and Bob James. Correct?

A. I don't want to convey that he doesn't speak very good English. I said he's from -- he's Filipino. I don't understand him very well.

Q. Okay, whose English is not well understood by the recipient at First Data Bank of the information?

were on the same time zone.

Q. In addition to the fact that they were in the same time zone, did you find that for other reasons, for instance Ramon and/or Bob were more responsive in terms of picking up the phone or answering your inquiries, as opposed to other people?

A. No, I could not say that.

Q. Did any of the wholesalers -- I know that you've answered questions about contracts, but did First Data Bank ever pay any of the wholesalers for the time that you were taking out of their otherwise normal work activities when you were undertaking these surveys?

A. Not to my knowledge.

Q. During any given normal month, how much time do you think it took Ramon and/or Bob James away from their normal work activities to answer your questions in response to surveys you and your employees were undertaking?

A. I couldn't even begin to estimate.

Q. Well, would it be more or less than a

week of their time every month?

A. It certainly would not occupy a week of their time.

Q. Would it take a day of every month out of their schedule?

A. I would hesitate to say that it would take an hour.

Q. During any given month?

A. Correct.

Q. I assume the same answer for the other wholesalers, too, correct?

A. Correct.

Q. In terms of the division of responsibility in your department, would you say that you personally performed more or less than about half of the wholesaler surveys that are conducted over time?

A. And do you want to put a time frame on that?

Q. I do, actually, because if it changes over time, I would like to know what the change is. So I guess when you first started working

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
--o0o--

In re: PHARMACEUTICAL, ) No. MDL DOCKET NO.
INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
PRICE LITIGATION ) 01CV12257-PBS
)
____________________________)
THIS DOCKET RELATES TO ALL )
ACTIONS )
____________________________)

HIGHLY CONFIDENTIAL
DEPOSITION OF BOB JAMES
WEDNESDAY, FEBRUARY 23, 2005
VOLUME I

Deposition of BOB JAMES, taken on behalf of Plaintiffs, at 201 California Street, 17th Floor, San Francisco, California, commencing at 11:40 a.m., on Wednesday, February 23, 2005, before RICHARD M. RAKER, CSR No. 3445, Certified Shorthand Reporter.

APPEARANCES OF COUNSEL:

THE WEXLER FIRM LLP
BY: JENNIFER FOUNTAIN CONNOLLY, ESQ.
One North LaSalle Street
Suite 2000
Chicago, Illinois 60602
(312) 346-2222

COVINGTON & BURLING
BY: MARK LYNCH, ESQ.
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-5544
(By telephone)

KAYE SCHOLER LLP
BY: SAUL P. MORGENSTERN
425 Park Avenue
New York, New York 10022
(212) 836-7210

COOPER, WHITE & COOPER LLP
BY: STEPHEN KAUS, ESQ.
201 California Street
17th Floor
San Francisco, California 94111
(415) 433-1900

KIRBY McINERNEY & SQUIRE, LLP
BY: JAMES P. CARROLL, ESQ.
830 Third Avenue
New York, New York 10022
(212) 317-2300

SHOOK, HARDY & BACON
BY: CHRISTY A. PULIS, ESQ.
NICHOLAS P. MIZELL, ESQ.
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
(By telephone)

ROPES & GRAY
BY: ERIC P. CHRISTOFFERSON, ESQ.
One International Place
Boston, Massachusetts 02110
(617) 951-7050

I N D E X

WITNESS: BOB JAMES

| EXAMINATION | PAGE |
|---|---|
| BY MS. CONNOLLY | 5 |
| BY MR. CARROLL | 141 |
| BY MR. CHRISTOFFERSON | 145 |

EXHIBITS: (Retained by counsel)

| Exhibit | Description | PAGE |
|---|---|---|
| Exhibit James 001 | Declaration | 29 |
| Exhibit James 002 | Document | 73 |
| Exhibit James 003 | Document Response | 93 |
| Exhibit James 004 | Document Bate numbered MCK 001145 | 1C |
| Exhibit James 005 | Document | 135 |

James, Bob 2/23/2005 11:40:00 AM

53

BY MS. CONNOLLY:
Q. From WAC to AWP.
A. Since AWP is an average and we buy that from First Databank, no reason to think about markup to AWP. Our markup is to our suggested sell only.
Q. So in paragraph 4 of your declaration when you say that you're knowledgeable about the suggested markups, the markups that you're referring to are the markups from WAC to suggested sales price.
A. Yeah.
Q. In your conversations with First Databank, have you ever discussed providing to them a markup from WAC to AWP?
A. No.
Q. Have you personally ever provided a percentage markup from WAC to AWP to First Databank?
A. The information that we provide is WAC markup to suggested sell.
Q. And then at the end of that sentence when you say that "providing this markup information would be extremely rare and would concern specific substances only," what do you mean by "specific

54

substances only"?
A. Let me read the sentence.
Q. Okay.
A. I would take that to mean that there were rare occasions where a manufacturer asked me anything about our markup and what it meant. In other words, our markup doesn't go to AWP. That's an average. Our markup is used internally to determine suggested sell price.
MR. KAUS: I think this is referring to questions from FDB? Are you reading it as -- looking at it now, maybe it's ambiguous. But I understood this to mean questions from FDB. Are you reading it as questions from customers?
MS. CONNOLLY: No. No. I thought it meant -- I think your answer was regard to manufacturer inquiries, but I think this declaration talks about questions from FDB.
MR. KAUS: Right.
BY MS. CONNOLLY:
Q. Is that correct?
A. Restate that.

55

Q. Well, I think we would have to -- unfortunately without realtime, we'd have to read back your answer. But when you were giving your previous answer, you were referring to you had gotten very few inquiries from manufacturers regarding the markup to suggested selling price.
A. Okay. No reason for First Databank to call me and ask me if what I was marking up to -- AWP to their number. Now, obviously a math calculation could be done, but I was never asked by them to do a calculation on that as the benchmark number at McKesson was the suggested sell number.
If I gave them AWP, it was their AWP that I got from them. And from time to time, there were questions about that based on timing of the price increase, et cetera.
Q. So I'm going to do a dangerous thing and try to summarize your testimony just so we can move on, and you can correct me if I'm wrong.
The -- McKesson did standardize in approximately 2001 the markup from WAC to suggested selling price, and that standard markup was

56

25 percent, correct?
A. That's correct.
Q. When you speak with First Databank, you have not provided them a WACup -- a markup -- a WACup -- from WAC to AWP, correct?
A. No, I don't recall. I mean, they're the ones that have the AWP. I'm not trying to avoid the question. I'm trying to, you know, just give you a correct answer.
They don't call me and say, Bob, what is your markup to our AWP? I mean, I could do the math. If the numbers were the same, they would be the same. In other words, if our suggested sell coincidentally happened to be the same number as the AWP, then the markup would be the same.
We've had no questions from them about, well, why do you use this markup or that markup? I mean, no discussions like that at all. And my understanding in the survey process, I believe them to -- when they did the survey and they asked Ramon or whoever, What is your suggested sell price? Or, What is your markup?

# EXHIBIT 3

# AWP DISCUSSION

AWP = Average Wholesale Price. **AWP by definition is an average.**
AWP is not set by wholesalers, suppliers, or First DataBank (FDB)... ....because it is an average.

Historically BRAND Rx Companies were set up with either a 20% or 25% Markup. This markup was consistent across any given company's product line, i.e. Merck was always a 25% markup company using a factor of 1.25 times the Wholesale Acquisition Cost (WAC). Lilly was traditionally a 20% markup or a 1.20 factor company. Manufacturers usually suggested and published AWP prices based on these traditional markups as well. Wholesalers are not required to use these suggestions or historical markups, but usually did.

There is no McKesson AWP. By definition, this is an average. McKesson uses the Suggested Sell or Retail List Price, which is often the same as the FDB AWP. This contributes to the confusion which results in the terminology being used inaccurately when people refer to the "McKesson AWP".

Several years ago Rx Brand product was actually sold at the Suggested Sell Price or Retail List Price, or AWP, if the FDB figure was the same as the McKesson Sell or List Price. As the industry became more and more competitive, customer purchase agreements began to discount this figure. Gradually, this pricing migrated to a Cost Plus (i.e. WAC plus 2%, etc.) or in some extreme cases, a Cost Minus agreement. AWP no longer has any impact on the wholesale business; however, it is critically important to our customers.

The process to determine the AWP and AWP Spreads (the spread is the difference between the WAC and the AWP and is expressed as a percentage) is as follows:

1. Each wholesaler sets their own Suggested Sell Price or List Price for New BRAND Products.

2. FDB "surveys" the national wholesalers and establishes the average in the following way.

    - If two out of three are at a 25% markup, then 25% is used to determine the FDB AWP, or
    - If two out of three are at a 20% markup, then 20% is used to determine the FDB AWP.

3. FDB inputs the results in their database as the AWP.

    - This, along with other information, is downloaded to retail, wholesale, and managed care customers on a daily, weekly, or monthly basis.
    - Occasionally the timing of the download affects the accuracy of the data at the customer level.

4. FDB re-surveys items from time to time to ensure that the database remains accurate.

MCKAWP 0069611
HIGHLY CONFIDENTIAL

5. The AWP spread is calculated by taking the difference of the WAC and AWP and dividing by the AWP. With Brand products, a 25% markup or 1.25 factor results in a 20% spread. A 20% markup or 1.20 factor results in a 16 2/3% spread.

The following examples should clarify the calculations:

| | | | |
|---|---|---|---|
| Example #1: | WAC = $100. | Markup = 25% | Spread = 20% |
| Calculation: | $100. X 1.25 factor | = $125. | |
| | $125. Minus $100. | = $25. difference | |
| | $25. divided by $125. | = 0.20 or <u>20% spread</u> | |
| Example #2: | WAC = $100. | Markup = 20% | Spread = 16 2/3% |
| Calculation: | $100. X 1.20 factor | = $120. | |
| | $120. Minus $100. | = $20. difference | |
| | $20. divided by $120. | = 0.1667 or <u>16 2/3% spread</u> | |

Managed Care or Third Party Insurance reimbursement is normally based on an "AWP minus a % plus a dispensing fee" formula. A typical reimbursement formula for Brand Rx would be AWP minus 15% plus a $2.00 fee. It's important to understand the significance of having a greater AWP spread. If a product carries a 16 2/3% spread (or 20% markup), it would not be as profitable as one that carried a 20% spread (or 25% markup). The following calculations should help clarify some of this terminology:

To illustrate the impact on profitability, use the two examples above and add a reimbursement formula of AWP – 15% plus a $2.00 dispensing fee.

| | | | |
|---|---|---|---|
| Example #3 | WAC = $100. | AWP = $125. | Spread = 20% |
| Calculation : | AWP $125. - 15% (or times 0.85) = $106.25 | | |
| | $106.25 minus cost of $100. = $6.25 plus $2.00 fee = $8.25 | | |
| | Therefore Profit = **<u>$8.25 (with 20% spread)</u>** | | |
| Example #4 | WAC = $100. | AWP = $120. | Spread = 16 2/3% |
| Calculation: | AWP $120. – 15% (or times 0.85) = $102.00 | | |
| | $102.00 minus cost of $100. = $2.00 plus $2.00 fee = $4.00 | | |
| | Therefore Profit = **<u>$4.00 (with 16 2/3% spread)</u>** | | |

It's important to note, **the product with the 20% spread is $4.25 more profitable.** More than double!

Everything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's. In this world of mergers and acquisitions things began to change. Companies sold off and acquired products. Mergers and buy outs resulted in companies having product lines with both 1.25 and 1.20 factors. The resulting

MCKAWP 0069612
HIGHLY CONFIDENTIAL

combinations of companies with mixed markups and spreads became very confusing as new products came to market. Manufacturers began to "game the system" by trying to suggest AWP's that would put them in a favorable position with managed care and also give them a "competitive advantage". These phenomena often had a negative impact on McKesson customers' profitability because it resulted in a 16 2/3% AWP spread. Manual overrides in wholesaler system databases were often required to input FDB AWP's that were different from the wholesaler Suggested Sell or Retail List Price. This created tremendous inefficiencies in our processes. In an attempt to improve efficiency, McKesson has chosen to "normalize" the markups in the Brand Rx area resulting in a consistent 25% markup or use of a 1.25 factor. This serves to level the playing field and should reduce manipulation of the system by the manufacturers.

There are some unintended consequences. First, customers may potentially benefit because this process provides the opportunity for increased profitability if managed care contracts remain as they are today. **Please note that just because McKesson increases markups to 25% does not mean that the AWP will increase. Remember, McKesson does not set AWP. This is an average that is determined by a FDB survey.**

Secondly, as this normalization process gains momentum there is a possibility that managed care will begin to negotiate contracts deeper than AWP minus 15%. It's likely they may attempt to go to AWP minus 19%, which they cannot do today because of the mixed spreads of 16 2/3% and 20%. Most likely the industry will see a move to negotiate third party reimbursement based on WAC plus a fee and get away from AWP altogether.

MCKAWP 0069613
HIGHLY CONFIDENTIAL

# EXHIBIT 4

**Melissa Batchelder**

---

**From:** James, Robert [Robert.James@mckhboc.com]
**Sent:** Wednesday, February 04, 2004 9:46 AM
**To:** 'Morgan, Kay'
**Cc:** Mayorchuk, Galina
**Subject:** WAC Differences
**Attachments:** Galina AWP issue.xls

Hello Kay, we have a customer driving us crazy of these two items. Would appreciate when you have a minute if you could take a look at these items to see if the WAC can be updated. We could supply you documentation if necessary to substantiate the current WAC in our system.

Please see the attached file (which is an excerpt from the file I sent to you last week) and let me know what you think.

We always appreciate your help.......as you know.

Thanks

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104
Phone 415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

**Melissa Batchelder**

**From:** James, Robert [Robert.James@mckhboc.com]
**Sent:** Wednesday, February 04, 2004 2:01 PM
**To:** 'Morgan, Kay'
**Subject:** RE: WAC Differences

48.366 time 1.25= 60.46 Sugg Sell.

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Wednesday, February 04, 2004 1:13 PM
**To:** James, Robert
**Subject:** RE: WAC Differences

Sigh! We have Cetylite on as 1 times S. Would you happen to have an AWP?

Thanks,

Kay

-----Original Message-----
**From:** James, Robert [mailto:Robert.James@McKesson.com]
**Sent:** Wednesday, February 04, 2004 12:13 PM
**To:** 'Morgan, Kay'; Mayorchuk, Galina
**Subject:** RE: WAC Differences

Thank you.

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Wednesday, February 04, 2004 12:11 PM
**To:** Mayorchuk, Galina; James, Robert
**Cc:** Morgan, Kay
**Subject:** RE: WAC Differences

Got it. Thanks and we will take care of it.

Kay

-----Original Message-----
**From:** Mayorchuk, Galina [mailto:Galina.Mayorchuk@McKesson.com]
**Sent:** Wednesday, February 04, 2004 12:03 PM
**To:** James, Robert
**Cc:** Kay Morgan (Kay_Morgan@firstdatabank.com)
**Subject:** RE: WAC Differences
**Importance:** High

**Melissa Batchelder**

---

**From:** Morgan, Kay [Kay_Morgan@firstdatabank.com]
**Sent:** Friday, June 11, 2004 12:21 PM
**To:** James, Robert
**Subject:** FW: Draft Agreement with McKesson
**Attachments:** McKesson Price Updates.doc

Bob,

Here is a draft of an agreement between McKesson and First DataBank for McKesson to provide pricing information electronically to First DataBank. Please review and let me know if this is sufficient for your technical people to begin working with Todd Alexander on the formatting of the information.

Let me know if you have any questions or concerns.

Thanks,

Kay

---

This e-mail message is intended only for the personal use of the recipient(s) named above. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify First DataBank San Bruno Support (Helpdesk@firstdatabank.com) immediately by e-mail and delete the original message.

---

# McKesson Price File

McKesson agrees to provide First DataBank with information on the prices it has for pharmaceutical products. The terms of this agreement are:

**Data Content:** McKesson will provide First DataBank with an electronic file of price information that will contain the following data elements:

NDC Number (11 digit format)
Product Name
Package Size
Case Pack Quantity
Average Wholesale Price (AWP)
AWP Effective Date
Wholesale Acquisition Cost (WAC)
WAC Effective Date

The media and transmission format are to be determined by Systems Support staff of both corporations.

For new product additions without confirmed pricing, McKesson will use a standard value such as $99,999.99 for the price so it is understood that these are not confirmed prices and reconciliation will not be attempted.

Either party may contact the other for information on prices prior to receipt of the electronic file.

Other data elements maybe included upon the mutual agreement of both parties.

**Frequency:** McKesson will provide First DataBank with
- daily file of price changes electronically
- weekly file of all products electronically
- one time full file electronically of all products in advance for First DataBank evaluation
- paper McKesson Catalogs on a quarterly basis

**Utilization:** First DataBank will compare the information provided by McKesson to the data on the NDDF file and will reconcile the discrepancies for products that are on both files. McKesson will be advised of the discrepancies in the McKesson file by phone or e-mail to the Content Support Personnel. Discrepancies on the McKesson file could be:
- Case pack quantity differences for which First DataBank has documentation of the case pack quantity.
- Prices that have not been updated per manufacturer notification. The documentation from the manufacturer will be provided to McKesson for verification.

# EXHIBIT 5

Crusit, Ramon 2/23/2005 9:52:00 AM

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
--o0o--

In re: PHARMACEUTICAL, ) No. MDL DOCKET NO.
INDUSTRY AVERAGE WHOLESALE ) CIVIL ACTION
PRICE LITIGATION ) 01CV12257-PBS
)
________________________)
)
THIS DOCKET RELATES TO ALL )
ACTIONS )
________________________)

HIGHLY CONFIDENTIAL
DEPOSITION OF RAMON CRUSIT
WEDNESDAY, FEBRUARY 23, 2005
VOLUME I

Deposition of RAMON CRUSIT, taken on behalf of Plaintiffs, at 201 California Street, 17th Floor, San Francisco, California, commencing at 9:52 a.m., on Wednesday, February 23, 2005, before RICHARD M. RAKER, CSR No. 3445, Certified Shorthand Reporter.

2

APPEARANCES OF COUNSEL:

THE WEXLER FIRM LLP
BY: JENNIFER FOUNTAIN CONNOLLY, ESQ.
One North LaSalle Street
Suite 2000
Chicago, Illinois 60602
(312) 346-2222

COVINGTON & BURLING
BY: MARK LYNCH, ESQ.
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-5544
(By telephone)

KAYE SCHOLER LLP
BY: SAUL P. MORGENSTERN
425 Park Avenue
New York, New York 10022
(212) 836-7210

3

COOPER, WHITE & COOPER LLP
BY: STEPHEN KAUS, ESQ.
201 California Street
17th Floor
San Francisco, California 94111
(415) 433-1900

KIRBY McINERNEY & SQUIRE, LLP
BY: JAMES P. CARROLL, ESQ.
830 Third Avenue
New York, New York 10022
(212) 317-2300

SHOOK, HARDY & BACON
BY: CHRISTY A. PULIS, ESQ.
NICHOLAS P. MIZELL, ESQ.
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
(By telephone)

ROPES & GRAY
BY: ERIC P. CHRISTOFFERSON, ESQ.
One International Place
Boston, Massachusetts 01220
(617) 951-7050

4

INDEX

WITNESS: RAMON CRUSIT

| EXAMINATION | PAGE |
|---|---|
| BY MS. CONNOLLY | 5 |
| BY MR. CARROLL | 44 |

EXHIBITS: (NONE)

Crusit, Ramon 2/23/2005 9:52:00 AM

17

A. AWP will still be the same.
Q. The same as what?
A. The current one. We are attaching the AWP. We are not touching the wholesale costs and the AWP, just the percentage.
Q. So this document that you received, this was an internal McKesson document?
A. Yes, that's McKesson.
Q. Did anyone ever communicate to you where the percentage markup data that was on this type of document came from?
A. No.
Q. Do you have independent knowledge of where that percentage comes from?
A. No. It was just given to us by our manager to input it.
Q. And you said that the special project started about 2004, sometime last year; is that correct?
A. No. It started maybe 2003. I think -- that's my memory, seems like.
Q. And prior to 2003, did you have any role

18

in entering the markup percentage?
A. No.
Q. Do you know if anyone else at McKesson had that role?
A. No, I don't think so.
Q. Was it ever explained to you why, beginning in approximately 2003, McKesson took it upon itself to enter this markup percentage?
A. I don't know. I don't have any knowledge about it.
Q. Do you know anyone at McKesson who would have that knowledge?
A. No.
Q. Now, we've been talking about your entering this markup percentage. Where were you entering the markup percentage into?
A. In our system.
Q. Do you know the name of your system?
A. DITM.
Q. And what does "DITM" stand for?
MR. KAUS: If you don't know, you don't know.

19

THE WITNESS: I forgot about it.
BY MS. CONNOLLY:
Q. Okay. Do you have any understanding about what other McKesson computer systems interact with DITM?
A. No.
Q. Do you have any understanding whether the data that's entered into DITM is ultimately made available to McKesson's customers?
A. As far as I know, it goes to all our different distribution centers.
Q. But you don't know the names of the particular computer systems that they go into?
A. No.
Q. What is your understanding of the markup that you're entering?
MR. KAUS: Do you understand the question?
THE WITNESS: Yeah, I understand the question, but I don't know of my knowledge what's -- what that means to us. I'm just following whatever was in there already.

20

BY MS. CONNOLLY:
Q. So you don't understand, when you're entering a markup percentage, what it is a percentage markup from?
A. Not -- I have limited knowledge on those markups.
Q. Okay. Has anyone at First Databank ever called to inquire about what markups were for various products or for a manufacturer's product line?
A. Yes.
Q. Who is that person who contacted you?
A. That's Kaye Morgan.
Q. And what did Ms. Morgan call to ask you?
A. She asked me mostly on our markup.
Q. And does she ask you for a markup for a specific product or for a manufacturer --
A. Both.
Q. -- or some other -- both?
A. (Witness nods head.)
Q. How often does Ms. Morgan call to ask you for this information?
A. Maybe twice a month or -- twice a month

and about three or four times a month e-mail.
Q. So she calls you about twice a month and then e-mails you about an additional three or four times a month?
A. Yeah.
MR. KAUS: And I think we really need to establish a time frame, because it's not happening now obviously. So --
MS. CONNOLLY: Right.
MR. KAUS: -- if you could set a foundation for that, I'd appreciate it.
MR. MORGENSTERN: If she's calling him now at home or --
MS. CONNOLLY: That was my next line of questioning.
MR. MORGENSTERN: That would be a different case.
BY MS. CONNOLLY:
Q. For what period of time was Ms. Morgan making these calls?
A. Not -- maybe as far as -- as far as I know, maybe 2003.

Q. And did that continue up until the time you left?
A. No. I had not received any call from her for quite a while. E-mail sometimes.
Q. When was the last call -- approximately when was the last call you remember receiving from her?
A. If I'm not mistaken, maybe last year.
Q. So early 2004?
A. Yes.
Q. I believe that Kimber Tate at her deposition testified that she didn't believe you had spoken to Ms. Morgan for approximately a year and a half. Is that accurate?
MR. MORGENSTERN: Object to the form of the question.
THE WITNESS: I can't remember.
BY MS. CONNOLLY:
Q. So your best recollection is your last conversation was early 2004?
A. That's right.
Q. What about the e-mails you received from

Ms. Morgan, when was the last e-mail that you received from her?
A. If I remember right, must be last year. Maybe middle of last year, I guess. Maybe middle of last year.
Q. So approximately June or July 2004?
A. Yes.
Q. When you had -- let's take the telephone calls first. When you had telephone calls with Ms. Morgan, about how long did they last?
A. Few minutes. Two minutes, three minutes.
Q. And what did she ask you?
A. About AWP. Markup on AWP.
Q. She asked you for both the markup and for McKesson's AWP?
A. Either one. First markup or AWP.
Q. And when she asked you for that information, where did you go to look for it?
A. In DITM. In my system, the computer.
Q. And is there a field called "AWP" in that computer?

A. There is.
Q. And is there a field called "Markup" in that computer?
A. There is.
Q. And then as far as the e-mails that you were getting from Ms. Morgan, what did they ask you for?
A. Just markup for that particular item or line.
Q. Did she ever ask you for an AWP in an e-mail?
A. Yes.
Q. So in both cases, the telephone calls and the e-mails, she was asking you for either AWP or the markup?
A. That's correct.
Q. Was there a reason that you stopped communicating with Ms. Morgan approximately June or July of 2004?
A. No, there was no reason. I'm just wondering that -- there was no more e-mail, no more calls, so maybe I assumed that everything is correct.

# EXHIBIT 6

Hyland Immuno

Baxter Healthcare Corporation
1627 Lake Cook Road
Deerfield, Illinois 60015
800.241.5360

**Baxter**

July 11, 2001

Ms. Kay Morgan
First DataBank
The Hearst Corporation
1111 Bayhill Drive
Suite 350
San Bruno, CA 94066

Dear Ms. Morgan:

On June 14, 2001, Hyland Immuno submitted a List Price notification letter to Alisha Nielsen. On June 21, we contacted Ms. Nielsen informing her that the list price data published in your database was incorrect. We followed up with a facsimile cover letter on that day which stated our understanding and definition of list price. I later that same day spoke with you directly and informed you that First DataBank incorrectly published our new list price update. During our conversation you clearly stated that manufacturers would no longer establish list prices (AWP). Thereafter, on June 21, you provided us with an email which included the following definition of AWP:

> AWP is the average **wholesale** price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product (NDC). The operative word is ***average***. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.

As I am sure you are aware, we have heard numerous, confusing and inconsistent definitions for terms such as AWP. First DataBank's "new" definition, suggesting that AWP is transaction-based, is a radical departure from our understanding of AWP and the actions previously demonstrated by First DataBank. First DataBank has previously accepted list price updates directly from Hyland Immuno and published them accordingly. Hyland Immuno has always recognized that both the manufacturer's suggested price, as well as AWP, represent list prices. The actual prices paid by healthcare providers may vary either above (depending upon the third-party source) or below those reported prices.

1314879 v2; S6KF02!.DOC

**Baxter**

With respect to First DataBank's new definition of AWP, Hyland Immuno does not set and is not aware of the prices wholesalers charge retailers for Hyland Immuno therapies. Indeed, the therapies for which Hyland Immuno has established new List Prices are not sold to full-line wholesalers for sale on their own account. Clearly, if First DataBank is surveying "wholesalers" as suggested by your email, you are aware of this fact. Hyland Immuno sells its therapies to several different classes of trade, including biological distributors, homecare companies, and hospitals, at prices discounted below its list prices. Since these classes of trade are not wholesalers, surveying them for purposes of setting AWP, as now defined by First DataBank, would also result in First DataBank publishing inaccurate prices.

As a result of your new interpretation of AWP, First DataBank is incorrectly publishing the List Prices for Hyland Immuno's therapies. (see attached copies of First DataBank entries for Hyland Immuno therapies). Your current price list shows an AWP approximately 25% above the List Price we submitted. For example, Hyland Immuno's new List Price for Hemofil M AHF is $0.98 per unit, and you are reporting an AWP of $1.23 per unit. Our other therapies show errors of similar magnitude. I again request that First DataBank correct this error by reducing the prices being reported for Hyland Immuno's therapies to reflect the List Prices as submitted. Further, while we do sell these therapies to biological distributors, they are not sold to full-line wholesalers and, thus, do not have WAC prices. For your convenience, I have enclosed a copy of Hyland Immuno's June 14, 2001 List Price notification letter.

Sincerely,

Kyle A. Bush

Kyle A. Bush
Hyland Immuno Division
Baxter Healthcare
1627 Lake Cook Road
Deerfield, IL 60015

MMD/mgm
Enclosure

1314879 v2; S6KF02!.DOC

# EXHIBIT 7

**From:** James, Robert
**Sent:** Monday, May 03, 2004 3:47 PM
**To:** Dolan, Anthony
**Subject:** FW: Potential Discontinuance of First Data Bank's Average Wholesa le Price List--DSCP Pharmaceutical Prime Vendor Program

Here is a long winded answer. You can wordsmith a response from the text below.

Bob James

-----Original Message-----
From: James, Robert
Sent: Friday, April 23, 2004 8:08 AM
To: Yonko, Greg; Flach, Paul; Felton, Jeff; Longwell, Sharon; Cardenas, Debbie
Subject: RE: Potential Discontinuance of First Data Bank's Average Wholesa le Price List--DSCP Pharmaceutical Prime Vendor Program

The short answer is McKesson is using a standard 25% markup on Brand Rx (not on generics) and has been for the last four years. I believe that our generics group just uses the AWP that the supplier gives them and then everything is adjusted as necessary when we get the FDB downloads so at the end of the day, we are sending out the FDB AWP.

FDB raised a test balloon at their recent conference in SFO. They received a lot of feedback and pushback from several customer segments. Medco responded strongly stating that they would have to re-negotiate over 100,000 contracts (probably a gross exaggeration) and other said similar things. The problem is once contracts are re-opened, then everything is on the table. Most third parties do not want to do that.

FDB is trying to get CMS, Medicaid, and other large players to sit down and work through the issue. My take on this is FDB is tired of getting all the phone calls and the allegations about the AWP process, just like we are. I spoke with their President and CEO and Kay Morgan last week about this situation. They are not going to do anything soon.

FDB will most likely not discontinue their AWP process for the next 12 to 18 months to give the industry time to figure out what they want to do with reimbursements. As far as I know, Medispan will do the same since they get their data from FDB. However, RedBook is a different deal. RedBook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a mark up of 1.20 which provides a 16 2/3% AWP spread. If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.

As I mentioned above, McKesson has been using a 25% markup on brand Rx items for the past four years. This is used to get our List Price or Suggested Sell price, which is the price that is surveyed by FDB to determine the average or AWP. Brand Rx has really normalized over the past couple of years at a 25% markup or 20% spread. There are some items that remain at the old markups and AWP's because there have been no price increases. Procrit is a good example. It carries a 16 2/3% spread. The real problem is generics. AWP are suggested by the supplier and usually are 10-15% lower than the brand. The opening spreads range from 28% to 32% AWP to WAC and lower contract pricing increases the spread from there as increased competition comes to the market. Eventually, MAC pricing takes over with generics.

Bob James

-----Original Message-----
From: Yonko, Greg
Sent: Friday, April 23, 2004 7:37 AM

# EXHIBIT 8

**From:** Boyd, Beth
**Sent:** Thursday, July 07, 2005 12:49 PM
**To:** Thomas, Erlinda
**Cc:** Bolger, Phil
**Subject:** FW: Urgent WAC and AWP procedures

**Importance:** High

Erlinda,

This is what we need to revisit and discuss on Monday (I sent a meeting request) to discuss the ins and outs of WAC and AWP.

Thank You,

Beth Boyd-Kolb
McKesson
Support Services
HS Account Manager
1220 Senlac Dr.
Carrollton, TX 75006
972-446-4960 (phone)
972-446-5337 (fax)

**From:** Thomas, Erlinda
**Sent:** Wednesday, January 19, 2005 11:50 AM
**To:** Boyd, Beth
**Cc:** 'Bolger, Phil'; Kiyan, Kevin
**Subject:** RE: Urgent WAC and AWP procedures
**Importance:** High

Beth,

Our suppliers are the source of our WAC information. Regarding AWP, FDB is our source of information for items with NDC# mostly are RX items..

Our mark up is not coming from our suppliers. Suppliers has nothing to do on how we mark up our items. It is the Product Management team who make the decisions on our mark up.

Sorry, we do not have written documentation on pricing.

Thanks,

Erlinda L. Thomas
McKesson Corp.
Manager Business Information Services
Tel# 415 983 8524
Fax# 415 983 9082
*erlinda.thomas@mckesson.com*

**From:** Boyd, Beth

# EXHIBIT 9

McKESSON
Empowering Healthcare

# Memorandum

**To:** Greg Yonko
**From:** Bob James
**Date:** March 22, 2002

**Subject:** Response to AWP Changes

---

About two years ago we were challenged to improve efficiencies in our systems, processes, and execution of our Brand Rx Programs. One of the inefficiencies that we looked at was the number of manual overrides that were required to keep an accurate First DataBank (FDB) Average Wholesale Price (AWP) field in our system. Each time a pricing activity took place, a manual override was necessary when the Suggested Sell or Retail List Price was different from the FDB AWP. This took place several thousand times a year and increased the risk of errors. A decision was made to attempt to standardize our Brand Rx markups at 25% by using a 1.25 factor times the Wholesale Acquisition Cost (WAC).

Historically, Brand Rx products were marked up at either 20% using a 1.20 factor or marked up at 25% using the 1.25 factor. Manufacturers were either one or the other and product lines were consistent. Over the years as companies were bought or merged or as products were sold off, their product lines became mixed and contained products with both 20% and 25% markups. This caused some confusion when new products were launched. It was unclear whether a 20% markup or a 25% markup should be used. Manufacturers began to "game the system" by suggesting AWP's that were equal to or lower than those of competing products. This had a negative impact on our customers profitability by effectively lowering the predominant AWP spreads to 16 2/3% by using the 20% markup more often than the 25% markup.

Please see the accompanying AWP Discussion document to understand the process used to determine AWP's and the supporting calculations to illustrate and clarify the importance of AWP spread to our customers' profitability.

We began to set Suggested Sell Prices with a 25% markup for Brand Rx products in mid 2000. In January of 2001 when Pfizer (20% spreads) officially took over Parke-Davis (16 2/3% spreads) we called Pfizer and asked what their position was relative to Parke-Davis spreads. They responded to several questions with "we are Pfizer, we have one price". We huddled and made the decision to change all Parke-Davis products to a 25% markup to match the Pfizer products. This meant that our Suggested Sell prices for both product lines used the 25% markup. This had no immediate impact on the AWP. However, 12 months later when the next price increase was expected, FDB re-surveyed the line and this resulted in increased AWP's on all of the Parke-Davis products which then gave all of the Pfizer products a 20% spread.

We also changed the markups to 25% on Alza's Concerta products last June at the request of the manufacturer. They wrote us a letter requesting this action and we passed it along to FDB telling them that McKesson was going to honor this request and the changes were made. After a discussion with FDB last August, we mutually agreed to standardized the Searle (16 2/3% spread) product line because it had been acquired earlier by Pharmacia (20% spread). There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products. In December, after several discussions with FDB about our business efficiency improvement strategy we began to move many of the manufacturers with mixed AWP spreads (16 2/3% and 20% products in the same line) to a consistent 25% markup. These were companies like GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novartis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.

First DataBank re-surveyed most of these companies during January and February when price increases occurred. Many of the AWP's have been increased by FDB. Because a large number of price increases occurred, some AWP's were affected twice, once when the price increased took effect and then a second time when FDB raised the AWP after the survey process. I am told by FDB that 90% of the brand Rx companies are now listed as 1.25 factor or 25% markup companies. Not all products in these companies have had AWP increases at this point in time. However, as price increases occur FDB will re-survey those products and make their determination.

Some interesting (and sometimes unfortunate) things have happened at McKesson during this normalization process. When the direction was given to BIS to increase our Suggested Sell or Retail List markups to 25% many of these new figures were inadvertently keyed into the AWP field in our DITM system. These inaccurate AWP amounts then appeared on some invoices (not all customers use the AWP, and some use the Suggested Sell price). When customers then compared this with FDB AWP's from third party insurance programs, they discovered that our figure was not accurate. It was overstated. When this was discovered, we reacted immediately and had our BIS group restore the FDB AWP. BIS has been given clear direction not to change the AWP figure until a change comes from FDB in our weekly downloads. This took place in mid February. This correction may have appeared as if McKesson was "lowering" AWP's but this took place only in the McKesson system. FDB actual AWP's were not affected nor was reimbursement from third party insurance companies.

Customers were invoiced correctly as invoice costs are based on WAC plus markup in customer's contract with McKesson. If customer invoices pull the Suggested Sell figure, customers saw the increased markup of 25% on brand Rx. If customer invoices pull the AWP figure, then customers saw increased AWP's and then decreased AWP's when the FDB figures were restored. Special Note: **customer reimbursement was not affected. They were still reimbursed correctly from the FDB AWP in the third party database.**

There is much confusion surrounding the AWP determination process, the AWP appearing in the EconoLink system, and the Suggested Sell or AWP that may appear on some invoices. Although there have been many questions from customers and field sales personnel most understand and appreciate what is happening through this normalization process when it is explained and they understand it. There are many positives that we can take away from the events surrounding this issue over the past few months. There is a much greater understanding of AWP's, their determination, and of our EconoLink systems, and updating our information systems. We are beginning to realize some of this improved efficiency in BIS and most importantly our customers are beginning to see improved profitability resulting from increase AWP spreads.

Here are a few examples of increased profits that our customers should be realizing now and into the future. The following results are based on a reimbursement formula of AWP minus 15% plus a $2.00 fee.

| | Old 16.2/3% spread | New 20% spread |
|---|---|---|
| **Lipitor 20mg 90's** | $6.86 | $17.18 |
| **Prilosec 20mg 30's** | $4.22 | $8.92 |
| **Allegra 60mg 100's** | $3.97 | $8.16 |
| **Advair Diskus 500/50 60dose** | $5.11 | $11.70 |
| **Betaseron (previously a flat $7.00 fee)** | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant.

# EXHIBIT 10

**From:** Bonner, John
**Sent:** Thursday, February 21, 2002 8:46 AM
**To:** James, Robert
**Subject:** FW: Pricing / AWP

*Bob................*

**John Bonner**
**McKesson Supply Management**
**Director, *Branded Rx* Product Management and Investment**
**415-983-8363 voice**
**415-732-2584 FAX**

Please note new e-mail address is john.bonner@mckesson.com

All McKesson associates are now using McKesson.com again. Mail with the McKHBOC.com domain will eventually fail. Please change your records

-----Original Message-----
**From:** Janus, Barbara
**Sent:** Monday, February 18, 2002 1:23 PM
**To:** Bonner, John
**Subject:** FW: Pricing / AWP

John,
My accounts are having many issues with us "Normalizing brand pricing at 25%" You had mentioned that no billplan is based from AWP, that is not the problem, the problem stems from the fact that their pharmacy systems are being update through FDB and those updates are still at the normal 16 2/3%, therefore, the AWP's are not matching their sticker or Econolink. I don't see how this can make the pharmacy more profitable when 3rd parties are paying based off of AWP minus %, and are using FDB to update prices, even if an account would submit a higher AWP the insurances companies are not going to reimburse at the higher rate. This is also a concern for the few customers they have paying cash, typically the pharmacist bills those customer from AWP, if they use our pricing their patients will be paying more for their meds, these patients do price shop..

You also mentioned that we should not discuss outside of Mckesson, how would you suggest we answer our customers questions?

Your support is greatly appreciated...

-----Original Message-----
**From:** Bonner, John
**Sent:** Monday, February 11, 2002 6:09 PM
**To:** Jarosch, Debbie
**Cc:** James, Robert
**Subject:** RE: Pricing / AWP

***aWp (W stands for Wholesalers) Some manufacturers don't/won't even supply AWP.***

***We are trying to <u>Normalize</u> brand pricing at 25%. As time goes by all pricing services will pick up on these changes as they average in.***

MCKAWP 0066464
CONFIDENTIAL

*Medispan is owned by First Data Bank and should see the changes eventually.*

*Please don't use language that we are trying to increase AWP's with customers. We don't want to be viewed as increasing prices but in favor of normalizing branded items at a flat 25% mark-up that will level the playing field from vendor to vendor.*

*I really don't see what problem you customer is experiencing in the negative. Higher AWPs should make the pharmacy more profitable. I know of no billplans still in use that bill customer based on AWP.*

*Bob James is working with FDB to make this happen over time and I'm not sure it is something we want discussed.*

*Please contact him before discussing outside the company.*

*thanks*

John Bonner
McKesson Supply Management
Director, *Branded Rx* Product Management and Investment
415-983-8363 voice
415-732-2584 FAX

Please note new e-mail address is john.bonner@mckesson.com

All McKesson associates are now using McKesson.com again. Mail with the McKHBOC.com domain will eventually fail. Please change your records

-----Original Message-----
**From:** Jarosch, Debbie
**Sent:** Monday, February 11, 2002 1:22 PM
**To:** Bonner, John
**Subject:** FW: Pricing / AWP

John,
Can you please give me some details on the below infomaiton? How can we (McKesson) increase AWP without the Manufacturers input and how will the new AWP's get into the customer's pharmacy system via Medispan?

***Debbie Jarosch, RSM Carol Stream***
***audex 1-800-804-4584 x 3854***
***fax 414-327-5602***

-----Original Message-----
**From:** Lau, Mary
**Sent:** Monday, February 11, 2002 12:23 PM
**To:** Jarosch, Debbie; Schueler, Nancy; Badtke, John; Ankenbauer, Kenny; Jakes, Dick; Lindgren, Karl
**Cc:** Janus, Barbara
**Subject:** RE: Pricing / AWP

I received a response to an email last week from John Bonner. He mentioned that McK is working to

Increase the spread on AWP to a uniform 25% on branded RX. One of the benefits of this will increase reimbursements to our customers from third parties.

Mary Lau
District Sales Manager, Carol Stream 109/ LaCrosse 175
708-822-9684 cell
708-403-6607 fax

-----Original Message-----
**From:** Jarosch, Debbie
**Sent:** Monday, February 11, 2002 7:56 AM
**To:** Lau, Mary
**Cc:** Janus, Barbara
**Subject:** Pricing / AWP
**Importance:** High

Mary,
Barb and I have gotten the same phone calls from one of our customers.

My AWP is going up, however, my cost is staying the same. This is happening on many items.

What could be causing this?

*Debbie Jarosch, RSM Carol Stream*
*audex 1-800-804-4584 x 3854*
*fax 414-327-5602*

MCKAWP 0066466
CONFIDENTIAL

# EXHIBIT 11

**From:** James, Dale
**Sent:** Thursday, November 21, 2002 7:55 AM
**To:** James, Robert; Bonner, John; Thomas, Erlinda
**Subject:** RE: Pricing Question

Thank you! EXACTLY what I needed!

Have a great day...

dj

-----Original Message-----
**From:** James, Robert
**Sent:** Thursday, November 21, 2002 9:50 AM
**To:** James, Dale; Bonner, John; Thomas, Erlinda
**Subject:** RE: Pricing Question

Good morning Dale.........Two answers.

The average spread between WAC and AWP for the generic drugs is probably around 55% to 60%. Some go as high as 90% (that's why payors came up with Maximum Allowable Cost or MAC pricing, also referred to as Federal Upper Limit or FUL) Initial spreads for new generics are in the range of 30% and then increase as competition comes to the marketplace and WAC prices are lowered. Although, typically WAC prices for generics don't move too much. The manufacturers just initiate contract prices which effectively lower the WAC price without actually lowering it.......if that makes sense.

Historically, for brand Rx items there have been two spreads, 16 2/3% (or 20% markup) and 20% (or 25% markup). If you go back a couple of years, about 80% of the brand drugs carried a 16 2/3% spread. Today, everything is different. I am guessing, but its pretty close, about 95% of the brand drugs now carry a 20% spread. This could be verified by First DataBank. There are many reasons for this and the explanation is too long for this e-mail. If you are curious and want to discuss, just give me a call and I would be happy to share what I know about the transition and the process.

Take care.

Bob James
Director, Brand Pharmaceutical Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104
415-983-8755, fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** James, Dale
**Sent:** Thursday, November 21, 2002 6:55 AM
**To:** Bonner, John; James, Robert; Thomas, Erlinda
**Subject:** Pricing Question

Can anyone tell me what the "average" spread is between WAC and AWP on Rx items? I'm hearing from an outside source that it's 15%, but I would have thought it would be more in the 16-18% range.....possibly even higher.

Thank You

MCKAWP 0069502
CONFIDENTIAL

# EXHIBIT 12

**From:** Ferreira, Brian
**Sent:** Wednesday, December 08, 2004 11:29 AM
**To:** Cardenas, Debbie
**Cc:** Puccetti, Joy; Pasquale, Pete; James, Robert; Hilliard, Andy
**Subject:** RE: Net Brand RX Exception for Econo# 1220524

Thanks for the quick response. Have a great holiday season !

Brian

-----Original Message-----
**From:** Cardenas, Debbie
**Sent:** Wednesday, December 08, 2004 2:28 PM
**To:** Ferreira, Brian
**Cc:** Puccetti, Joy; Pasquale, Pete; James, Robert; Hilliard, Andy
**Subject:** RE: Net Brand RX Exception for Econo# 1220524

Thanks Brian, I am not involved if the item is not a Brand RX net priced slow mover. I did not have a chance to look it up and just assumed since it was sent to me.

Please carry on with your conversation with Bob James to resolve this situation.

-----Original Message-----
**From:** Ferreira, Brian
**Sent:** Wednesday, December 08, 2004 11:20 AM
**To:** Cardenas, Debbie
**Cc:** Puccetti, Joy; Pasquale, Pete
**Subject:** Net Brand RX Exception for Econo# 1220524

Deb,
This is the item we're trying to load as a local contract. We were told that it is not a Slow Mover and was not part of the Net Billed initiative. Did we misinterpret these messages? I'm leaving the office for an appointment in Philly and I'll try to reach you later this afternoon.

Thanks,
Brian
-----Original Message-----
**From:** James, Robert
**Sent:** Tuesday, November 16, 2004 1:59 PM
**To:** Ferreira, Brian; Yonko, Greg
**Cc:** Pasquale, Pete; Petrus, Susan
**Subject:** RE: Tincture of Opium 1220524

This product is sold at list because it is a C2 narcotic, not because its a slow mover. All C2's at McK are list only products which may have made sense years ago, but really doesn't today because 99% of our customers get around list only by their buy plans or contracts. All (with few exceptions) brand products are marked up 25% to get suggested sell or list price. The reason is ultimately, this is the markup that creates a 20% spread.....which is the norm for 99% of all brand pharmaceuticals. This also makes our sugg sell and AWP the same number in most cases which makes BIS much more efficient in updating pricing actions.

MCKAWP 0069766
HIGHLY CONFIDENTIAL

# EXHIBIT 13

**From:** James, Robert
**Sent:** Friday, May 24, 2002 9:20 AM
**To:** Pantano, Dan
**Subject:** RE: AWP expansion

Dan, I do have some information that I put together for educational purposes. It certainly is NOT INTENDED to be handed out to customers but intended to just provide some basic knowledge about the AWP mystery and what the impact might be for our customers if this were to increase. We obviously cannot say that McKesson is raising the AWP's. First DAtabank uses a survey process to determine the AWP. Two out of three of the national wholesalers have to be at a 25% markup on a brand drug in order for that to become the AWP. McKesson "is doing our part" by raising our markup to 25% on brand product to establish our Suggested Sell or Retail List Price which is the price that FDB surveys. Without us doing this, the AWP's most likely would not change.

I would be happy to discuss this with you and provide you some information for your group.

Take care and have a great weekend.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Pantano, Dan
**Sent:** Thursday, May 23, 2002 12:26 PM
**To:** James, Robert
**Subject:** FW: AWP expansion

Bob,
This sounds like something we should be at least quietly communicating to our customers in order to get some mileage from it but this is the first I have heard about it. Do you have more info on it so I can share with my team.

Dan

-----Original Message-----
**From:** Wallis, Jeff
**Sent:** Wednesday, May 22, 2002 1:43 PM
**To:** Pantano, Dan
**Cc:** Thomas, Jon
**Subject:** RE: AWP expansion

Dan,
What Bob explained to me a few months ago is we (mckesson) are working to "expand" the margin between AWP and cost. Most vendors are 16 2/3 off AWP vendors. Merck is 20% as are some other direct vendors. Bob has been doing some work with moving the margin from 16 2/3 to around 20 and in some cases 25% off AWP. From what I understand we also needed help from CAH and or ABC to help make this change. I am not completely versed on this but the bottom line is it has helped take some of the drugs and really made a positive impact on the reimbursements for our stores. With a lot of the contracts at AWP-15 to AWP -18% if we can add a few percent to the AWP it helps our customers. Some of the more sav vy stores like Med-X have taken notice. Willie Osborn also noticed this on a few items. Obviously this is not out to the field and I'm sure Bob is still working hard on this project. If you want the real deal on this then Bob James is the expert. I was just lucky to be on a couple conference calls in which Bob talked about this project and thus could talk fairly intelligently to Med-X when Jerry Howard mentioned his margins going up.

Jeff

MCKAWP 0069732
CONFIDENTIAL

# EXHIBIT 14

**From:** James, Robert
**Sent:** Tuesday, October 09, 2001 8:59 AM
**To:** Yonko, Greg
**Subject:** RE: AWP Change

Greg,

This probably speaks to First Data Bank's willingness to work with us to normalize the brand product AWP's. I believe the industry should be moving toward cost plus (WAC) a dispensing fee. WAC and direct prices are published and easily verified. Brand AWP's usually have either a 16 2/3% or a 20% spread (AWP to WAC) whereas generics are all over the map and can vary from a 28%-30% introductory spread to as much as 80% to 90% on a mature product. This variance is what lead to MAC pricing (maximum allowable cost or federal upper limit (FUL)) which is a fixed reimbursement per tablet/capsule,etc. no matter what the cost.

Typical reimbursements in retail for brand products would be as low as AWP -15% plus a $2.00 fee and for generics, they can be like AWP -40% plus a fee, or MAC priced at a fixed rate.

AWP really has no impact on our wholesale business but certainly does on our customers' third party reimbursements. As you know we have been doing everything possible to raise AWP's where we can and we have had some recent success with FDB as we discussed. I am looking into the inflation of AWP's on repackaged product where the repackager has used their own NDC code which is different from the manufacturer's. This scenario would explain why Merck Medco and others are able to bid AWP minus 20-22% and still be profitable. I am told that this is also commonly done with distributors to physician's offices as well, but I have no direct knowledge of this practice.

Greg, we get many questions from our sales people and our customers about AWP's. The following is an excerpt from a recent response:

The customer had asked the question, why is the AWP different from the Sugg Sell or List Price on their tickets. This can be confusing because reimbursement is based on FDB AWP and not McKesson Sell Price.

The easy answer is to have the customer choose to print the actual First Data Bank AWP on the tickets.

This figure is "an average" of the 3 major wholesalers. For brand pharmaceuticals, its usually 16 2/3% or a 20% spread from the AWP to WAC. If 2 out of 3 are at 20%, then that is what FDB uses. If McKesson's sugg sell is at a 25% markup (or 20% spread) the numbers are the same. If McKesson's sugg sell is at a 20% markup, then the numbers would be different......McKesson's would be lower in this case. Remember, McKesson does not set AWP, we set List Price or Sugg Sell Price. AWP by definition is an "average wholesale price". This is arrived at by FDB by doing a phone survey in the couple of weeks following a new product introduction or a price increase.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755. Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Yonko, Greg
**Sent:** Tuesday, October 09, 2001 8:05 AM
**To:** James, Robert
**Subject:** FW: AWP Change

bob what is your opinion on this subject. see below.

# EXHIBIT 15

**From:** James, Robert
**Sent:** Tuesday, September 18, 2001 8:03 AM
**To:** Secrest, Larry
**Cc:** Ryan, Mary; Beall, Kim; Yonko, Greg; Thomas, Erlinda
**Subject:** RE: AWP Variance

Larry, this may seem complicated but it is not. First, I think that it is important to understand that the AWP's that are used for third party reimbursements are the First Data Bank (FDB) AWP's. FDB determines the AWP by surveying the three national wholesalers on Brand Pharmaceuticals (generics are somewhat different) and taking the average, e.g. if 2 out 3 are at 16 2/3% spread then that is the FDB published AWP, if 2 out of 3 are at 20%, then that is what is published. In your example below, McKesson chose to increase the markup on the Park-Davis line (Lipitor) last January when Pfizer took them over. This was our attempt to raise the AWP's to support our customers. The other two wholesalers did not do this.( I am told by FDB that the Parke-Davis products from Pfizer will most likely have AWP's increased to 20% this January when price increases typically take place........this will then be the same as the McK figure)

McKesson lists the FDB AWP's in our DITM file. The confusion can be mitigated by having customers use this AWP on their pricing tickets, etc. Keep in mind that AWP is the Average Wholesale Price. The McKesson price you are citing is our Sell Price or List Price. By definition the McKesson price is not an average of anything, but just our markup on WAC and in most cases it equals the FDB figure. Our customer's business is not ar risk because of this List Price. Its at risk because they have agreed to contracts of AWP minus 15% and sometimes more. These reimbursements are figured across the industry from the FDB figure. Most pharmacists know that and understand it well. Its been awhile since I used the Econolink system but it seems to me it lists the figure as Sell Price or List Price. If it says McK AWP, we should have some discussion about it. The true AWP is the First Data Bank figure. This can be confusing because the McK Sell Price and the FDB AWP are often the same.

McKesson keeps this differential in our system in hopes that if one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items, the AWP will be increased and our customer will benefit substantially. We have just had some recent successes. The AWP spreads were recently increased by FDB on Concerta, and the Searle items from Pharmacia and also Genotropin from Pharmacia. Yesterday, we raised the markups on the Aventis line on some of the old RPR products to 25% markup. There are more coming. I believe that we have an opportunity to "normalize" the AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread) and most customers would love it. The chains certainly are aware of this and are very appreciative of our efforts because they understand the profitability associated with higher AWP's.

Sorry, for the long-winded response. If you would like to discuss this further, please give me a call. I don't recall talking with Mike Ryan but I can assure you that I have never suggested a manual override in a customers system. However, I have suggested that when customers select what information they want on their pricing tickets that they choose the FDB AWP so that they know what their reimbursements will be based on.

Larry, the examples above are from the DITM screens where all the set up information resides.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Secrest, Larry
**Sent:** Tuesday, September 18, 2001 6:53 AM
**To:** Thomas, Erlinda; James, Robert
**Cc:** Ryan, Mary; Beall, Kim; Yonko, Greg

**Subject:** AWP Variance
**Importance:** High

Erlinda,

We have recently run into a situation where Amerisource has pointed out to some of our customers in the Michigan market that we "manipulate" AWPs on selected items. We have found some examples of this issue which have been pointed out to us by a few select customers where, apparently, this is an issue.
As I am gathering information I find that with items such as Lipitor and Advair, our AWP listed on the invoice is different than what we show on Econolink, what McKesson Pharmacy Systems uses, what First Data Bank/Medispan uses and what our competitors use.

| | Mck AWP | Econolink AWP | Cardinal AWP |
|---|---|---|---|
| Advair Diskus 250-50mg 60 | 135.74 | 130.31 | 130.31 |
| Lipitor 20mg 90 | 294.79 | 283.00 | 283.00 |
| Lipitor 40mg 90 | 327.93 | 314.81 | 314.81 |

The customers who find this an issue are demanding that we correct this immediately and indicate that their business is at risk if we don't.
I understand that Mike Ryan has spoken with you about this and that the solution that he was given was to manually change these AWPs within the customer's system. This doesn't sound like a rational solution.

Help me understand why we do this and what other solutions are available to correct this.

Please respond asap.

Thanks
Larry

MCKAWP 0068515
HIGHLY CONFIDENTIAL

# EXHIBIT 16

# DECLARATION OF ROBERT JAMES

Robert James declares:

1. I am the Vice President, Brand Rx Product Management for McKesson Corporation. In that position, my responsibility is to work with suppliers to introduce new prescription drugs and to develop marketing programs.

2. McKesson purchases pricing information from First DataBank ("FDB") to populate fields in the computer programs that McKesson uses in its business and that it supplies to customers. McKesson's customers receive information both from McKesson and from FDB, a publisher that serves the pharmaceutical industry.

3. From time to time, I would say on an average of no more than once a month, Kay Morgan of FDB contacts me with a question about gaps in FDB's information. I try to answer those questions as best I can and occasionally forward them to others at McKesson. Generally the questions are generated by a pharmacy that has encountered difficulty in billing or by our own field sales people acting at the request of a customer. Generally, the questions concern a particular item and generally they concern WAC, the price at which McKesson acquires drugs from the manufacturers. Examples of the issues are new products for which FDB does not have information or disparities in information between FDB and other sources.

4. Since McKesson obtains the AWP from FDB, very few questions concern AWP. I am knowledgeable on the suggested markups of various drug companies and it is possible that I would have answered a question about that or McKesson's suggested sales price, but this would be extremely rare and would concern specific substances only. Sometimes there would be a disparity between the AWP passed on by McKesson and that

DEPOSITION EXHIBIT 12-23-05 BLRS 001 spherion

# EXHIBIT 17

robert.james@mckesson.com

-----Original Message-----
From: Breazeale, David
Sent: Wednesday, February 06, 2002 3:22 PM
To: James, Robert; Castaldo, Ron; Coker, Marc
Cc: Thomas, Erlinda; Mayorchuk, Galina; Jones, Tyler
Subject: RE: AWP discrepancies

All -- EconoLink reflects the AWP that is on the central DITM item database, which is maintained as Ron describes. We simply forward the AWP from DITM to the EconoLink customer. Galina might be able to review any apecific cases that the customer has in mind for possible correction.

Thanks... Dave

-----Original Message-----
From: James, Robert
Sent: Wednesday, February 06, 2002 2:48 PM
To: Castaldo, Ron; Coker, Marc
Cc: Breazeale, David; Thomas, Erlinda
Subject: RE: AWP discrepancies

This is all true. however its not widely known that FDB has a contract with the Medispan group requiring that FDB supply the data for the next 3 or 4 years. This means that essentially the Medispan data is the First DataBAnk data.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street--8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Castaldo, Ron
Sent: Wednesday, February 06, 2002 11:14 AM
To: Coker, Marc
Cc: James, Robert; Breazeale, David; Thomas, Erlinda
Subject: RE: AWP discrepancies

Marc -

FirstDataBank purchased Medispan some time ago. I recently read that FDB sold Medispan to Facts & Comparisons. The Medispan data is DIFFERENT than the FirstDataBank NDDF files that we receive. Our AWP is based on the NDDF file, not the Medispan file.

McKesson receives the NDDF file on a weekly basis and updates the AWP field. There are times where McKesson has received a new WAC from the supplier and FDB has not updated their system yet to give us the new AWP.

Erlinda Thomas' group (BIS) processes the above files and updates the DITM system.

Econolink then reads DITM for the AWP. David Breazeale, with EconoLink, can give you a

# EXHIBIT 18

March 1, 2002

GlaxoSmithKline
Three Franklin Plaza
P.O. Box 13619
Philadelphia, PA
19101-3619

Tel. 215 751 4000
Fax. 215 751 3400
www.gsk.com

By Overnight Mail

Mr. Joseph L. Hirschmann
President
First DataBank, Inc.
1111 Bayhill Drive
San Bruno, CA 94066

Re: Recent Change by First DataBank in the Mathematical Formula Used to Determine Average Wholesale Price of Certain GlaxoSmithKline Drugs

Dear Mr. Hirschmann:

We have recently learned that, in January, First DataBank apparently changed the mathematical formula used to determine the Average Wholesale Price ("AWP") for certain GlaxoWellcome heritage drugs manufactured by GlaxoSmithKline ("GSK"). This unexpected change in how AWP is calculated for these drugs has led to confusion among certain of our customers as to the reasons for the change. We write to learn the basis for this change in the formula.

On January 9, 2002, GSK reported an increase in Wholesale Acquisition Cost ("WAC") for a range of products, including the Glaxo Wellcome heritage products listed in Exhibit A (the "Listed Products").[1] As you know, GSK does not report an AWP for its products. Rather, First DataBank and other pricing services determine AWP based, to our understanding, on surveys of wholesalers. Historically, First DataBank has determined the AWP for Glaxo Wellcome heritage products to be WAC times 1.20.

On January 17, 2002, First DataBank published new AWPs for the Listed Products that appear to reflect the use of a new formula -WAC times 1.25 - in determining the AWP for these products. In addition, on January 14, 2002, First DataBank published a new AWP for the GSK drug Advair based on this new formula, although GSK had not reported an increase in WAC for Advair in January.

[1] ...you know, WAC, previously referred to by Glaxo Wellcome, Inc., as Net Wholesale Price ...("...P"), is the listed price available to wholesalers and warehousing chains, and does not include ...t pay, stocking or distribution allowances, or other discounts, rebates, or chargebacks. The ...rice may not represent the charges that are actually charged to other customers, including ...y distributors.

FDB-AWP 053695
HIGHLY CONFIDENTIAL

# EXHIBIT 19

(unintended consequences) results should have a very positive impact on our customers profitability.

Hope this helps. Call me if you have questions.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755 Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Thomas, Erlinda
Sent: Thursday, March 14, 2002 2:29 PM
To: Puccetti, Joy; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy
Cc: Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; James, Robert
Subject: RE: AWP's on Invoice's Incorrect

All,

FDB is our source of information for our AWP. We run a focus program once a week to compare FDB's WAC price and McKesson's WAC price. If they are equal or different by only 5% we follow or updated the AWP manually to equal to FDB.

In about a month or two Product Management decided to increase our mark up by 5% from 20% to 25% which resulted in a few items where our list price is higher than the AWP.

Product Management is working closely with FDB to adjust their mark up. FDB have been changing their mark up to match with our mark up. Eventually our list price will equal to FDB's AWP.

*Erlinda L. Thomas*
Manager
Business Information Services
McKesson Corp.
1 Post Street
San Francisco, CA 94104
Phone: (415) 983-8524
Fax: (415)983-9082

# EXHIBIT 20

**From:** James, Robert
**Sent:** Friday, November 09, 2001 12:12 PM
**To:** Kay Morgan (E-mail)
**Subject:** Merck AWP's

Hello Kay..............Just went through the Merck items and updated a couple of our items to 25% markup. However, found some items that you might want to review. They include Noroxin's, Prinivil and Prinzide's. The latter two, should probably be consistent with the new AZ 1.25 markups.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street--8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

# EXHIBIT 21

**From:** James, Robert
**Sent:** Wednesday, February 06, 2002 12:33 PM
**To:** 'Morgan, Kay'
**Subject:** RE: [Fwd: Price_Probe.xls]

I just love it. I had that conversation yesterday. First the Organon rep, then our EDI team, etc. I basically left it that if they didn't change the NDC configuration we weren't going to be able to transmit the information.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management McKesson One Post Street--8th Floor San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
Sent: Wednesday, February 06, 2002 11:00 AM
To: James, Robert
Subject: RE: [Fwd: Price_Probe.xls]

Lets start a list of hated manufacturers, we will update it weekly or monthly. Today, Organon is at the top of my list. The person in charge of EDI is trying to tell me to put the 0 in the first position. McKesson and we have it wrong. Wound up telling her the world does not turn around Organon and sending a note to my contact telling him the product was coming off.

-----Original Message-----
From: James, Robert [mailto:Robert.James@McKesson.com]
Sent: Wednesday, February 06, 2002 7:46 AM
To: Kay Morgan (E-mail)
Subject: FW: [Fwd: Price_Probe.xls]

<< Message: Price_Probe.xls >> Hello Kay, this note is from BMS and basically is saying that FDB shows BMS at a 20.5% mark up while McKesson is showing a 25% mark up. I am assuming that they are looking at current information and I thought we took care of this several weeks ago. Ain't it Great!

Take care.

Bob James
Director-Brand Pharmaceutical Product Management McKesson One Post Street--8th Floor San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Jane Heiney [mailto:jane.heiney@bms.com]
Sent: Wednesday, February 06, 2002 6:31 AM
To: Robert.James@mckhboc.com
Cc: Rob E Ranker
Subject: [Fwd: Price_Probe.xls]

MCKAWP 0069586
CONFIDENTIAL

# EXHIBIT 21A

A

**From:** James, Robert
**Sent:** Monday, September 30, 2002 8:54 AM
**To:** Kay Morgan (E-mail)
**Subject:** Clarinex

Good Morning......

Even the Schering folks would like to see the AWP raised on Clarinex. Last time I spoke with Chuck, I gave him the standard response about process.

Take care.

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Mcdonald, Charles [mailto:charles.mcdonald@spcorp.com]
Sent: Monday, September 30, 2002 8:30 AM
To: James, Robert
Subject:

Bob is there some way that we can get the AWP adjusted for CLARINEX to be consistant with CLARITIN and the other competing non-sedating antihistamines, any help you can give us in this area would be greatly appreciated.

Chuck McDonald
Trade Director
Schering Plough Corp.
Ph: (661) 287-9969
Fx: (661) 287-9211

*****************************************************************
This message and any attachments is solely for the intended recipient. If you are not the intended recipient, disclosure, copying, use, or distribution of the information included in this message is prohibited -- please immediately and permanently delete this message.

# EXHIBIT 22

**Melissa Batchelder**

**From:** James, Robert [Robert.James@mckhboc.com]
**Sent:** Thursday, June 26, 2003 4:33 PM
**To:** 'Morgan, Kay'
**Subject:** RE: Just a reminder

Thank you.

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Thursday, June 26, 2003 4:34 PM
**To:** James, Robert
**Subject:** RE: Just a reminder

Well, we fixed the first ones (Ziac, etc. ) that we discussed and they were suppose to take care of this one at the same time. Looks like they blew this one. Too late for this week's database. We'll get it tomorrow. I am trying to watch too many things.

Kay

-----Original Message-----
**From:** James, Robert [mailto:Robert.James@McKesson.com]
**Sent:** Thursday, June 26, 2003 4:21 PM
**To:** 'Morgan, Kay'
**Subject:** Just a reminder

Rite Aid called this morning complaining about the Diamox AWP. Just wondered if you had a chance to get to it yet?

Take care.

Bob James
-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Tuesday, June 17, 2003 5:49 PM
**To:** James, Robert
**Subject:** RE: Thank you.

It would have been nice if Barr would have sent us the same letter they sent you. We got the new NDCs, then we got the letter from Wyeth to discontinue the old ones. We did link them but if was after the fact, so the pricing did not update. Taken care of today. We got the Diamox as well.

Kay

-----Original Message-----
**From:** James, Robert [mailto:Robert.James@McKesson.com]
**Sent:** Tuesday, June 17, 2003 9:46 AM
**To:** 'Morgan, Kay'
**Subject:** Thank you.

# EXHIBIT 23

**Melissa Batchelder**

**From:** James, Robert [Robert.James@mckhboc.com]
**Sent:** Monday, December 08, 2003 9:35 AM
**To:** 'Morgan, Kay'
**Subject:** RE: Duragesic AWP's

Thank you for your help. Take care.

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Monday, December 08, 2003 9:34 AM
**To:** James, Robert
**Subject:** RE: Duragesic AWP's

Bob,

We are in sync. Janssen still suggests on some items and perhaps this is one but as you know, Manufacturer suggested is not the same as AWP. Don't know who is complaining (Janssen?) but FDB and McKesson match.

Kay

-----Original Message-----
**From:** James, Robert [mailto:Robert_James@McKesson.com]
**Sent:** Monday, December 08, 2003 9:26 AM
**To:** Kay Morgan (kay_morgan@firstdatabank.com); Alisha Nielsen (alisha_nielsen@firstdatabank.com)
**Cc:** Hayes, Connie
**Subject:** Duragesic AWP's

Good morning......

We've had a couple of inquiries from the field asking us to correct our AWP's. J&J and one of the other wholesales are saying that the McKesson AWP's are incorrect. We have them marked up 25% like the rest of the J&J line. When you have a minute, would you verify that our file matches the FDB file.

| SELLING DESCRIPTION | | ITEM | SU | COST | SELL-PR |
|---|---|---|---|---|---|
| DURAGESIC PATCH 25MCG/HR | 5 | 1889401 | CT | 0060.58 | 0075.72 |
| DURAGESIC PATCH 50MCG/HR | 5 | 1889468 | CT | 0106.70 | 0133.37 |
| DURAGESIC PATCH 75MCG/HR | 5 | 1889526 | CT | 0162.76 | 0203.45 |
| DURAGESIC PATCH 100MCG/HR | 5 | 1889583 | CT | 0216.01 | 0270.01 |

Thank you.

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104

# EXHIBIT 24

**From:** James, Robert
**Sent:** Thursday, April 25, 2002 4:16 PM
**To:** Yonko, Greg
**Cc:** Bonner, John; Castaldo, Ron; Thomas, Erlinda; Bissler, Ed; Secrest, Larry; Morrissey, Dave; Thomas, Jon
**Subject:** AWP Situation Status

Hello Greg.......I understand the frustration that everyone seems to be having over the AWP's. I am frustrated too, but I believe we can fix the process. First of all, you need to know that **we have made no proactive changes to our data since February** when we set the rule for BIS not to change the AWP field in DITM unless it is verifiable from our Saturday First DataBank download, except for the call you asked me to make on behalf of VitaRx on Avonex and Copaxone......which resulted in a $500K profit improvement for Vita Rx. FYI, Kay Morgan, FDB confirmed today that this had been done.

Warren Schram from Schram's Pharmacy in Michigan complained to Larry Secrest about the Zovirax and stated that our WAC and AWP were wrong and that he was losing money because of McKesson. I understand that Warren has called John Hammergren a couple of times in the last few weeks about similar things. The facts are as follows:

**McKesson WAC of 62.41 and the AWP of 78.01 ARE CORRECT** as verified by First Databank today.

There was a cost change on 1-2-02 from 49.53 to 62.41.

He also mentioned an **AWP of 74.89 from the Redbook which has not been updated.**

Econolink: this system is updated the Monday following the Saturday McKesson FDB download. If the customer gets daily Econolink downloads, they will see it the next day. If they get weekly updates, they will see it the following week.

Invoices and tickets: Schram's should see either the Sugg. Sell or the AWP depending on the option they have selected. In this case with Zovirax, it makes no difference. The figures are the same, both 78.01.

Warren stated that he is losing money on reimbursement from Great Lakes something and Michigan Medicaid

He is receiving 48.00 from Great Lakes and 52.00 from Medicaid.

(these are most likely based on the old cost and AWP instead of the new price effective in Jan 02)

Larry stated that **Schram's has accepted new contracts on these plans at Minus 18% plus 1.75 fee**

**These are not McKesson issues but rather issues with third parties.**

Warren might want to contact these third parties and check up on the AWP they are using in their system. It could be wrong. If this is the case, he should resubmit the billing.

Sorry this long winded, but this is not a straight forward scenario. The following is a recap of what is going on with McKesson systems and AWP to the best of my knowledge. Greg, we also spent an hour on the phone with Ed Bissler and RiteAid's Steve Goodman and Mike Podgurski. They have been helpful in pointing out areas that need to be addressed. We held a conference call meeting this morning with Ed Bissler, Erlinda Thomas, Pia Castillo, Ron Castaldo, John Bonner and myself and went over the Rite Aid contract with their expectations. We are changing some rules in BIS to accomplish this ASAP. Once we assess the magnitude of the project we may come to you to get support to get some temp help in accomplish this by a May 17 deadline. We may move this up if we believe we can fix it faster than we believe today.

The following is a summary of activity on the subject of AWP:

1. There is a movement in the industry to normalize the brand Rx markup at 25% to create a 20% AWP spread.
2. 90% of vendors have been moved to a 1.25 markup factor at FDB
3. Actual AWP changes have been occurring around price increases and FDB re-surveying the market
4. We are working with FDB to improve "their accuracy" on WAC pricing because ours seems to be extremely accurate.
5. FDB has been taking things like 6x28 packs of BC's down to the unit by dividing and rounding. When this is rolled up to our package size, there has been a cost difference of a few cents. This has made the AWP's off a bit. This has been corrected at FDB. We will be sharing information with FDB on WAC price changes in order to make us both more accurate.
6. McKesson has had no new proactive changes since last February except as noted above with Avonex and Copaxone.
7. New McKesson BIS Rule: AWP will not change in DITM unless the change is verifiable in FDB Saturday download......except when there is a price increase and then McK will change the AWP field with the same markup as FDB had used previously.

MCKAWP 0069615
HIGHLY CONFIDENTIAL

8. New McKesson BIS Rule: We will monitor (weekly) the items where the FDB WAC and the McK WAC are different and send information to FDB to discover why. These items should be corrected quickly once we discover the reason it is happening and correct the process if necessary.
9. All new brand vendors will be set up as 1.25 markup factor vendors, both at McK and FDB.
10. BIS will assess needs to improve this process and maintain it. Erlinda may make staffing recommendations based on this.
11. McKesson is currently getting weekly FDB downloads. Our competition and many of our retail customers (Rite Aid) are getting daily downloads which in some cases makes us look inaccurate. I would recommend that we change to daily downloads. I am told that our competition may be getting some advantage in more timely price increase information allowing them to place timely orders.
12. Econolink system is updated weekly from our Saturday FDB download. Information is available the following Monday for customers that get daily Econolink Updates, the following week for customers getting weekly updates.....providing they update their Econolink systems as directed.
13. Econolink is pulling the FDB AWP figure from DITM. System does not look at Sugg Sell or Retail List.
14. Customers currently have two options for selecting information that appears on Invoices and Price Tickets:
   A. They may select to have Sugg. Sell or Retail List appear 100% of the time.
   B. They may select to have Sugg. Sell or AWP, whichever is greater appear on invoice and price tickets. (this option may be problematic with changes going on, in that AWP may be lower than suggested sell and customer really needs or wants to have AWP)
   C. New Business Request in to have a third option to show AWP 100% of the time. This makes the most sense of all of these in my opinion since so much confusion exists surrounding AWP and reimbursements. I am told that an estimate was given that this could take 6 to 12 months to accomplish with current staffing and priorities. This seems unacceptable to our field sales folks since most believe this would alleviate the confusion about pricing and AWP's.
15. The sizing and timing of this business request is being looked at by Judy's group as they re-prioritize their work.
16. I have asked Judy Schnabel to think about the possibility of changing Option A above to 100% AWP because this would give us the quick fix. In time, Option B will be okay because Brand AWP and Sugg Sell will likely be the same number.
17. Most of the confusion surrounding AWP's is not new. This has been going on for years. The awareness level is increasing as our customers are looking at everything imaginable to improve their profitability because of the decreasing trend in third party reimbursement rates. As noted above, Schram's Pharmacy has accepted reimbursement plans that are AWP Minus 18% plus a $1.75 fee. This is the environment that we live in today.
18. On a positive note: we are looking into and trying to understand every aspect of this process here at McKesson which is resulting in greatly improved understanding and accuracy in the information that is provided to our customers.
19. Also, few people seem to understand the positive impact on our customers' profitability......including some of them. This is extremely significant and people need to understand this impact. Just one example with Lipitor 20mg 90s: with the old 16 2/3% spread a customer would make $6.86 profit, with the new 20% spread a customer will enjoy $17.18 profit.....and that is awesome!!
20. We may need to have a meeting to discuss moving forward with the BR for Option C for supplying AWP on invoices and tickets. There seems to be an urgency to get this done. We may need your help to give it high priority with Judy's group.

Let me know if you have questions or need additional information.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755. Fax 415-732-2951
robert.james@mckesson.com

MCKAWP 0069616
HIGHLY CONFIDENTIAL

# EXHIBIT 25

**From:** James, Robert
**Sent:** Tuesday, August 06, 2002 4:51 PM
**To:** Thomas, Erlinda; Crusit, Ramon
**Cc:** Castillo, Pia
**Subject:** FW: Manufacturer

Please change the markup on Reliant to 25% on sugg. sell only. The AWP's will only change when a change comes through from First Databank.

Thank you.

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
Sent: Tuesday, August 06, 2002 4:43 PM
To: James, Robert
Subject: FW: Manufacturer

FYI

-----Original Message-----
From: Morgan, Kay
Sent: Tuesday, August 06, 2002 4:43 PM
To: Castro, Theresa
Cc: Nielsen, Alisha
Subject: Manufacturer

Please change the mark-up on Reliant 65726 to 1.25

Thanks

Kay

MCKAWP 0069782
CONFIDENTIAL

# EXHIBIT 26

**From:** Morgan, Kay [Kay_Morgan@firstdatabank.com]
**Sent:** Thursday, December 19, 2002 7:41 AM
**To:** James, Robert
**Subject:** RE: Levoxyl.....Our Friends at Monarch

Bob,

Levoxyl went to "brand priced" with the last price increase. I really would like to see them at a 1.25 mark-up so we would need a WAC adjustment.

FYI - Novo going to 1.25 today. Can't have their products at 1.2 and Lilly at 1.25. Funny how both had price increases announced today.

Kay

-----Original Message-----
From: James, Robert [mailto:Robert.James@McKesson.com]
Sent: Thursday, December 19, 2002 7:32 AM
To: Kay Morgan (E-mail)
Subject: Levoxyl.....Our Friends at Monarch

Hello Kay........sorry to bother you with this again, but just wanted to confirm that Levoxyl is listed as a "generic" but still has an opportunity to raise the price as we had discussed previously and be classified as a "brand".

Thanks for taking the time. Take care.

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Miller, Jim [mailto:JMiller@kingpharm.com]
Sent: Tuesday, December 17, 2002 11:53 AM
To: 'robert.james@mckhboc.com'
Subject: Levoxyl

Good afternoon and Happy Holidays,

I heard from Joey that you heard, now this is third hand, that Levoxyl had been changed back to generic? can you confirm that for me? We are trying to decide what to do if it is a brand with FDB. It would be hard to reverse the price increase to take it back to generic without repercussions. It would also not be in our best interest to just lower the AWP to the old price as that would cut the reimbursement for the pharmacists and kill the product. I got the formulae to make the correct decision about any price increase but then our guys used the wrong formulae. They figured it on WAC and not AWP. This hurt us. Any suggestions as to how to get out of this revolting situation?

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please

MCKAWP 0069553
CONFIDENTIAL

# EXHIBIT 27

**From:** Puccetti, Joy
**Sent:** Saturday, March 16, 2002 3:56 PM
**To:** James, Robert; Thomas, Erlinda
**Cc:** Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy
**Subject:** RE: AWP's on Invoice's incorrect

**Importance:** High

Bob: I appreciate the update and clarification. Has this been communicated to the field? If not, would you be willing to work with me and put something out to our sales team so they are better prepared to deal with their customer's concerns?

Kerry: your thoughts about moving my original request through the BR process?

Joy Puccetti
*National System Support Center*
(425)712-3504 - Phone
(425)712-3520 - Fax

-----Original Message-----
**From:** James, Robert
**Sent:** Friday, March 15, 2002 11:13 AM
**To:** Puccetti, Joy; Thomas, Erlinda
**Cc:** Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy
**Subject:** RE: AWP's on Invoice's Incorrect

Joy, Its really happening the other way around. McKesson is normalizing our Sugg Sell or Retail List, and AWP increases usually happen when FDB re-surveys the wholesalers after price increases. They set the AWP where 2 out 3 of the national wholesalers are using the same markup. We just happen to be improving our process to eliminate the need to override AWP's with each pricing activity in the future. I spoke with FDB earlier this week and they stated that about 90% of the vendors have been changed to 25% markup and use a 1.25 factor (times the WAC). Some of the detail needs to catch up with individual sku's as price increases occur. The remaining vendors should be done in over the next quarter.

My guess is that things should look very good in the next couple of months. I am working with FDB to point out problem suppliers as Erlinda's group provides me the weekly information comparing our List Price with the FDB AWP. Sorry for the extra confusion and questions that have come up from our customers. The (unintended consequences) results should have a very positive impact on our customers profitability.

Hope this helps. Call me if you have questions.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755 Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Puccetti, Joy
**Sent:** Thursday, March 14, 2002 4:40 PM
**To:** Thomas, Erlinda
**Cc:** Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; James, Robert; Wahl, Kerry; Florence,

Evelyn; Schnabel, Judy
**Subject:** RE: AWP's on Invoice's Incorrect

Erlinda: thanks for the update. Can you or our product managers give us some idea when all of our LIST prices will be adjusted to match FDB's AWP?

If this is something that will take months or years to clean-up, we seriously need to consider offering our customers the option of overriding List prices
through DCUS (L:2)..

Joy Puccetti
*National System Support Center*
(425)712-3504 - Phone
(425)712-3520 - Fax

-----Original Message-----
**From:** Thomas, Erlinda
**Sent:** Thursday, March 14, 2002 2:29 PM
**To:** Puccetti, Joy; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy
**Cc:** Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; James, Robert
**Subject:** RE: AWP's on Invoice's incorrect

All,

FDB is our source of information for our AWP. We run a focus program once a week to compare FDB's WAC price and McKesson's WAC price If they are equal or different by only 5% we follow or updated the AWP manually to equal to FDB.

In about a month or two Product Management decided to increase our mark up by 5% from 20% to 25% which resulted in a few items where our list price is higher than the AWP.

Product Management is working closely with FDB to adjust their mark up. FDB have been changing their mark up to match with our mark up. Eventually our list price will equal to FDB's AWP.

*Erlinda L. Thomas*
Manager
Business Information Services
McKesson Corp.
1 Post Street
San Francisco, CA 94104
Phone: (415) 983-8524
Fax: (415)983-9082
email: Erlinda.Thomas@McKesson.com <mailto:Erlinda.Thomas@McKesson.com>

-----Original Message-----
**From:** Puccetti, Joy
**Sent:** Thursday, March 14, 2002 1:05 PM
**To:** Wahl, Kerry; Thomas, Erlinda; Florence, Evelyn; Schnabel, Judy
**Cc:** Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie
**Subject:** RE: AWP's on Invoice's Incorrect
**Importance:** High

Kerry: the design has been in place for many years but the impact has been minimal (1-2 calls/months). I believe the impact is greater now due to how AWP/List is being managed today. We are receiving several calls each day.

-----Original Message-----
**From:** Morris, Jo An
**Sent:** Wednesday, March 06, 2002 11:21 AM
**To:** Allen, Linda; VanAuken, Karin
**Cc:** Harre, Kelly
**Subject:** RE: AWP's on Invoice's incorrect
**Importance:** High

Linda,

Thanks for sharing this with me.

The question I have is why up until recently did the Invoice and the computer system match? What prompted the change?

This same question has come up with Statscript Pharmacy and Community Drug. I think with Community we went in and made a change.

?????

Please advise back....

Thanks

JoAn Morris
Inside Sales Support Rep
STL DC 183
800-261-8005 Telephone
816-245-0329 Fax

-----Original Message-----
**From:** Allen, Linda
**Sent:** Wednesday, March 06, 2002 9:03 AM
**To:** Morris, Jo An
**Subject:** FW: AWP's on Invoice's incorrect
**Importance:** High

Here is the info I have on the Nelson AWP issue.

Linda

-----Original Message-----
**From:** VanAuken, Karin
**Sent:** Tuesday, March 05, 2002 3:19 PM
**To:** VanAuken, Karin; Thomas, Jon; Pantano, Dan
**Cc:** Wallis, Jeff; Hiatt, Pat; Hollingsworth, Ed; Milsow, Dennis; Allen, Linda
**Subject:** RE: AWP's on Invoice's incorrect

I found a little problem with our solution below. AWP will always show unless list is higher, then list will show. In talking with Joy she said we can fix the sticker so it will always show AWP, but this won't fix the invoice. She tells me that we would have to unique price the items to always have awp and that would have to be monitored closely in case of price changes. So I guess what I am trying to say is this is a system problem and doesn't look like an easy fix is available.

Thanks

*Karin VanAuken, SA*

# EXHIBIT 28

**From:** James, Robert
**Sent:** Wednesday, May 01, 2002 7:47 AM
**To:** 'Morgan, Kay'
**Subject:** RE: NACDS

I agree, I just picked another (3rd one) terse message from my boss about "fixing" the AWP issue. This has nothing to do with the normalizing process. For twenty years or more McKesson has shown customers Suggested Sell 100% of the time on invoices and pricing tickets OR Suggested Sell or AWP, whichever is greater.......dumb! We have a business request in now to get AWP 100% of the time but you know ITD folks take their time. This isn't even my job but we'll wave our magic wand and just fix it.

I think I am using the same string of swear words.

Just Livin the Dream, Keep Smilin.

Bob James
Director-Brand Pharmaceutical Product Management McKesson One Post Street--8th Floor San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
Sent: Tuesday, April 30, 2002 10:10 PM
To: James, Robert
Subject: NACDS

ARGHH!!!!! Lilly told our CEO and COO that we were setting AWP. I thought we had worked very well with Lilly. Also, Wyeth is still complaining about Protonix. I am getting tired. Don't ask me of what as a stream of swear words will proceed the what.

Kay

MCKAWP 0069642
CONFIDENTIAL

# EXHIBIT 29

**From:** James, Robert
**Sent:** Wednesday, July 31, 2002 5:26 PM
**To:** Alisha Nielsen (E-mail)
**Subject:** FW: DME Company = Therasense 99073

Darrell and Gabby concur. We can move this vendor to 1.25. Just confirm and I will pass it along.

Thanks

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Carreon, Gabby
Sent: Wednesday, July 31, 2002 4:37 PM
To: Rawlings, Darrell; James, Robert
Subject: RE: DME Company = Therasense 99073

Bob -

Go ahead and proceed. I believe Darrell meant " NO " issues.

Gabby Carreon
Sr. Product Manager HHC
McKesson
Tel 415-983-7136
Fax 415-732-2633
gabby.carreon@mckesson.com

-----Original Message-----
From: Rawlings, Darrell
Sent: Wednesday, July 31, 2002 4:15 PM
To: James, Robert; Carreon, Gabby
Subject: RE: DME Company = Therasense 99073

Gabby...I have now issues with this

Darrell D. Rawlings
Director, Home Health Care Product Management
Managing HHC, Diabetic and Hospital durable products
One Post Street, 8th floor
San Francisco, CA 94104
Phone-(415) 983-9118
FAX- (415) 732-2633

-----Original Message-----
From: James, Robert
Sent: Wednesday, July 31, 2002 4:14 PM
To: Rawlings, Darrell; Carreon, Gabby
Subject: FW: DME Company = Therasense 99073

MCKAWP 0069774
CONFIDENTIAL

Question from First DataBank. They are wanting our input on changing the AWP markup on the Therasense products from 1.20 to 1.25. This provides a greater spread for our customers and make these items more profitable. We have been normalizing all Brand Rx mark ups at 25% for the suggested sell price.

This looks very reasonable. Call me if you have questions.

Thanks

Bob James
Director, Brand Pharmaceutical Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104
415-983-8755, fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Nielsen, Alisha [mailto:Alisha_Nielsen@firstdatabank.com]
Sent: Wednesday, July 31, 2002 4:00 PM
To: James, Robert
Subject: DME Company = Therasense 99073

Hello Bob,

As requested. Please evaluate the mark-up for a DME company called Therasense (99073).
Currently they are on a 1.2 (20%) mark-up, they are seeking a 1.25 (25%) mark-up for competitive reasons.

Please forward to the person responsible and let me know if we can make the change.

As always....... Thank you!

Alisha Nielsen
Senior Research Associate
Product Knowledge Base Services
P 650-246-2819
F 650-827-4578

MCKAWP 0069775
CONFIDENTIAL

# EXHIBIT 30

**Chrenko, Pauline PH/US**

**From:** Green, Guerdon PH/US
**Sent:** Monday, March 11, 2002 12:10 PM
**To:** Forrester, Glenn PH/US
**Cc:** Caron, Carolle, PH/CA; Harmon, Mary PH/US; Brewer, Tyrone PH/US; Stansbury, Brent PH/US; Pickhardt, Dave PH/US; Cervione, John PH/US; Brunken, Claire PH/US; Spurr, Robert PH/US; Chick, Stacy PH/US; McDermott, Jim PH/US; Chrenko, Pauline PH/US/EXT; Cervione (E-mail); Graham, Russ PH/US; Johnston, Mark PH/US; Laws, Lillie PH/US; Leonardi, Joseph PH/US; Merida, Jerry PH/US; Shaner, Jim PH/US; Wagner, Jeff PH/US
**Subject:** AWP to WAC spread as reported by First Data Bank

**Importance:** High
**Sensitivity:** Private

Glenn,

First Data Bank has advised me that after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to WAC spread. As a result, First Data Bank has determined to employ a higher 25% AWP to WAC spread for *all* Aventis' products. This will be implemented as we have price increases. Immediately *the entire Allegra line will be moved to a 25% spread from it's current 20%.* This will be effective immediately. The most noticeable impact will be that it will be more profitable for the retail pharmacist to dispense Allegra.

Should you have additional questions, please feel free to call.

Regards,

GR

Guerdon R. Green
Director, Trade Administration & Development
Aventis Pharmaceuticals
908-243-6833
guerdon.green@aventis.com

AV-BCA-0010336

CONFIDENTIAL
Document produced pursuant to the Protective Order in In Re Pharmaceutical Industry Average Wholesale Price Litigation, Case No. 01-CV-12257, MDL 1456

# EXHIBIT 30A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\- - -

| | | |
|---|---|---|
| IN RE: | : | MDL 146 |
| PHARMACEUTICAL INDUSTRY | : | |
| AVERAGE WHOLESALE PRICE | : | CIVIL ACTION |
| LITIGATION | : | 01-CV-12257 PBS |

\- - -

Oral deposition of DAVID KUEHL, taken pursuant to notice, held at the Law Firm of Buchanan Ingersoll, 1835 Market Street, Philadelphia, Pennsylvania, on Tuesday, November 16, 2004, beginning at approximately 9:10 a.m., before Lorraine M. Edwards, Court Reporter and Commission of Deeds, in and for the State of Pennsylvania, and Notary Public, in and for the State of New Jersey, there being present.

\- - -

Q I'm sorry?

A It looks like they would be expecting to receive some kind of survey from First Data Bank.

Q Do you know what kind of survey that would be?

A I don't know specifically, no.

Q Do you know whether or not First Data Bank takes survey of ABC?

A ABC currently does not participate in any First Data Bank surveys.

Q What do you mean by "currently"? Did it ever?

A Not that I know of.

Q Do you know whether or not First Data Bank requested ABC to participate in any surveys?

A I believe they have, yes.

Q When?

A I don't know.

Q Does this go back to the time that you were at Bergen?

# EXHIBIT 30B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

In re: PHARMACEUTICAL :MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE :CIVIL ACTION NO.

PRICE LITIGATION :01CV12257-PBS

- - - - - - - - - - - - - - - - x

Thursday, March 3, 2005

Washington, D.C.

HIGHLY CONFIDENTIAL

ATTORNEYS' EYES ONLY

Deposition of JODY TAYLOR, commencing at 11:11 a.m., held at the offices of Sonnenschein, Nath & Rosenthal LLP, 1301 K Street, N.W., Third Floor, Washington, D.C., before Keith Wilkerson, a notary public in and for the District of Columbia.

Q. So you're not aware whether Cardinal uses First Data Bank's suggested wholesale price field for any reason?

A. No.

Q. What about a field called calculated wholesale price?

A. Again, there are so many pricing fields that FDB gives us, and they were programmed before 1998, so I don't know which fields the programmers were told to pick up.

Q. What is your understanding of how First Data Bank obtains its First Data Bank AWP?

MR. MORGENSTERN: Object to the form of the question.

MR. STEPHENS: Objection. Lack of foundation.

THE WITNESS: I know that they tell everyone that they survey the wholesalers. I've been in meetings where they're told everyone that before.

BY MS. CONNOLLY:

Q. Based on your testimony today, I would

assume that you do not believe that to be the case.

MR. MORGENSTERN: Object to the form of the question.

MR. STEPHENS: Objection.

THE WITNESS: I know that's not the case, and I've even talked with FDB about that.

BY MS. CONNOLLY:

Q. What type of discussions have you had with FDB about that?

A. In our meeting after the presentation, where they've told everyone that they survey the wholesalers, I've said, well, you know that we don't provide information on AWP. They've confirmed that yes, they know Cardinal doesn't supply AWP, but they didn't say all wholesalers.

Q. So their response to you is that their representation is accurate because they do not say that they survey all wholesalers?

A. Yes.

Q. In what type of meetings were you at where First Data Bank represented that it surveyed wholesalers?

large book that explains the fields that FDB has. She's pulled that from that information.

Q. So do you have any understanding whether the Blue Book average wholesale price is what Cardinal uses for the First Data Bank AWP?

A. No, I do not.

(Cardinal Exhibit Taylor 007 was marked for identification.)

BY MS. CONNOLLY:

Q. I'll just note for the record that Cardinal 7 is Cardinal Health/SLB 0740409 to 040411.

A. Okay. I'm ready.

Q. I want to start with your instruction to Amy Malone on the second page of this e-mail that we're not supposed to inform FDB of our AWPs. Is this explanation that you're giving to Amy the same policy that we talked about this morning, that Cardinal does not provide AWP or markup information to First Data Bank?

A. Yes, it is.

Q. And this is the policy pursuant to which

# EXHIBIT 31

**Melissa Batchelder**

**From:** James, Robert [Robert.James@mckhboc.com]
**Sent:** Friday, November 07, 2003 2:33 PM
**To:** 'Morgan, Kay'
**Subject:** RE: Hepsera WAC Increase

I'm just trying call you.

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Friday, November 07, 2003 1:28 PM
**To:** James, Robert
**Subject:** RE: Hepsera WAC Increase

Thanks. Levathroid?

Kay

-----Original Message-----
**From:** James, Robert [mailto:Robert.James@McKesson.com]
**Sent:** Friday, November 07, 2003 1:23 PM
**To:** 'Morgan, Kay'
**Subject:** RE: Hepsera WAC Increase

Kay, this screen print indicates the WAC, markup, and "suggested sell price" that was put into the system yesterday.

| EFF-DT | IP | RSN | PU | PUD | COST | MKUP% | SELL-PR |
|---|---|---|---|---|---|---|---|
| 110603 | * | A | EA | 001 | 00444.1800 | 025.00 | 00555.2250 |

Bob James

-----Original Message-----
**From:** Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
**Sent:** Thursday, November 06, 2003 8:14 PM
**To:** James, Robert
**Subject:** Hepsera WAC Increase

Bob,

I have had better days. Thought you might enjoy this and I assume the mark-up is 1.25. Also, would like to discuss the Levathroid. We got some NDCs on and made a mess from H_____. Wanted to find out how you were handling.

Thanks

Kay

CONFIDENTIAL

-----Original Message-----
**From:** Morgan, Kay
**Sent:** Thursday, November 06, 2003 4:24 PM
**To:** Breen, Jim
**Subject:** Hepsera WAC Increase

FYI - Just thought you should be aware. They appear to be playing hardball and I just don't play. I will be out next week.

Kay

-----Original Message-----
**From:** Nielsen, Alisha **On Behalf Of** Morgan, Kay
**Sent:** Thursday, November 06, 2003 3:51 PM
**To:** 'Kristie Banks'
**Subject:** RE: Hepsera WAC Increase

Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. The database does not allow for statements such as your attornerys wrote below. We can update the WAC but at the present time, based on the strong wording below, the current AWP that Gilead reported will remain on the file. Sorry that we could not have discussed this before hand.

Kay

-----Original Message-----
**From:** Kristie Banks [mailto:kbanks@gilead.com]
**Sent:** Thursday, November 06, 2003 3:29 PM
**To:** Morgan, Kay
**Subject:** RE: Hepsera WAC Increase

Hi Kay,

Gilead Sciences, Inc. will no longer report Average Wholesale Prices (AWP) for its products. Should your service intend to calculate AWP for any Gilead product and include the result of any such independent calculation when listing Gilead product prices, Gilead hereby requests that the AWP calculation be accompanied by the following statement: "This price has not been authorized by Gilead Sciences, Inc."

Please let us know if you have any issues updating the new WAC provided.

I will be out of the office tomorrow (Friday, Nov. 7, 2003). If you need additional infomation, please feel free to contact me Monday.

*Regards,*

*Kristie Banks*

**CONFIDENTIAL**

# EXHIBIT 32
# NOT USED

# EXHIBIT 33

**From:** Bonner, John
**Sent:** Friday, November 05, 2004 10:13 AM
**To:** Davoren, Tony
**Cc:** Hom, Lillian; James, Robert
**Subject:** RE: CR-5 Spread Issue

*Tony,*

*don't waste your time on this strategy*

*Brand WAC is $40.95 traditional brand 25% markup to AWP is takes it to $51.19 which is just where it belongs and is currently.*

*Many brand manufacturers don't set AWP any more and cannot. They are not wholesalers. Current legal issues have brand manufactures running away from meddling with AWP.*

*Whenever you have a generic item with less than 35-40% spread, the retailers loose their shorts because payors reimburse generics at AWP less 30% and more.*

*John Bonner*
*Director Product Management, Branded Rx*
*McKesson Drug*
*One Post St. 20th floor*
*San Francisco, CA 94104*

*voice 415-983-8363*
*FAX 415-732-2584*
*cell 925-708-6731*

-----Original Message-----
**From:** Davoren, Tony
**Sent:** Friday, November 05, 2004 10:01 AM
**To:** Bonner, John
**Cc:** Hom, Lillian
**Subject:** FW: CR-5 Spread Issue

John

Can you forward to your contact at SOLVAY PHARMACEUTICAL and see if they will raise their AWP on their brand item?

Tony

-----Original Message-----
**From:** Gary Skalski [mailto:gary.skalski@globalphar.com]
**Sent:** Friday, November 05, 2004 8:43 AM
**To:** Richard Matchett (AOL)
**Subject:** FW: CR-5 Spread Issue

Rich, I will talk to Dave on Monday to discuss. Mc Kesson cannot make much money with this spread. Nevertheless, I do not think we will want to lower our WAC for this item. Speak to you Monday. Use lower

# EXHIBIT 34

**From:** James, Robert
**Sent:** Monday, May 13, 2002 12:40 PM
**To:** Ferreira, Brian
**Subject:** RE: AWP Increases

Brian, this is an interesting request. I would like to talk with you so that I am clear. I just tried your office, they said you were on-line now. Please give me a call when its convenient.

Thanks.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Ferreira, Brian
**Sent:** Monday, May 13, 2002 12:29 PM
**To:** James, Robert
**Cc:** Gavatorta, Jim
**Subject:** AWP Increases

Bob,
Please provide the list of items and/or manufacturers that were included in the AWP standardization process. We have a few MPS accounts that have requested the data so that they can adjust their pricing. We need this by Thursday, May 16 if at all possible.

Thanks,
Brian

Brian Ferreira
VPS Retail
Delran,NJ

# EXHIBIT 35

**From:** Bissler, Ed
**Sent:** Friday, May 03, 2002 12:29 PM
**To:** James, Robert; Bonner, John
**Subject:** RE: Innolet

Great news, Bob. Thanks for your help!

-----Original Message-----
**From:** James, Robert
**Sent:** Friday, May 03, 2002 2:56 PM
**To:** Bissler, Ed; Bonner, John
**Subject:** RE: Innolet

But Ed, these won't match FDB AWP's. Just kidding.

Confidentially: Not to pass on. We have about 470 brand Rx items where McK and FDB AWP's do not match....which is really pretty. Most are hospital products which RA would not use. Most of the problem here is that FDB does not have a WAC (just using 00.00. We are providing them our figures and they will input them next week. This will get us very close to being on the money. I will keep you posted.

Keep Smilin

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street--8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Bissler, Ed
**Sent:** Friday, May 03, 2002 11:45 AM
**To:** James, Robert; Bonner, John
**Subject:** FW: Innolet

Fyi...

-----Original Message-----
**From:** Michael Podgurski [<mailto:mpodgurski@riteaid.com>]
**Sent:** Friday, May 03, 2002 12:57 PM
**To:** Bissler, Ed
**Cc:** mbover@riteaid.com
**Subject:** Innolet

Effective immediately, please change the AWP on the listed NDC's to $0.01 and hold through 7-7-02.(July 7,2002)

NDC #00169-2314-21 for Innolet-N
NDC #00169-2317-21 for Innolet 70/30

Any questions, please contact me.

# EXHIBIT 36

**From:** James, Robert
**Sent:** Friday, February 15, 2002 2:54 PM
**To:** James, Dale
**Cc:** Bonner, John; Yonko, Greg
**Subject:** Follow Up on AWP

Dale, I am just going to forward an earlier response to you. For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential. If you want to discuss further, please call me.

What we are seeing is a "normalizing process" for the brand Rx items. As you know, suppliers do not set AWP, wholesalers do not set AWP, and neither does FDB. Wholesalers set their individual markups or Suggested Sell or List Price as in the case of McKesson. I am not sure what the other wholesalers call their sell price. This is done independently. FDB takes a survey of at least the three national wholesalers and if 2 out of 3 are at a 25% mark up, then that becomes the AWP. If 2 out of 3 are at a 20% mark up, then that becomes the AWP. Remember, AWP, by definition is an average. No one entity "sets the average"......as much as some suppliers would like to. There is no McKesson AWP....because by definition its an average (sorry for the redundancy) We only have a Sugg. Sell or List Price. Often this figure is the same as the FDB AWP and people get the terminology confused. The AWP in our system should be the FDB AWP resulting from their surveys and given to us in their weekly downloads.

We are ahead of the curve on Lilly and planned to be. Sorry your customer doesn't understand the whole process. McKesson product management is trying to make our business process more efficient and reduce the number of manual overrides that are required when the FDB AWP is different from our Sugg Sell or List Price. As a result we have chosen to move to a markup of 1.25 rather than 1.20 which would lower the AWP spreads and would hurt our customers profitability.

Reimbursements from third party are made from the FDB AWP (and not the McK Sell or List). McKesson changing the Sugg Sell does not impact the customer's reimbursement, it will be based on the AWP in the third party system which also comes from FDB.

I think it is very positive for the industry and most people will be delighted when they understand what is going on and how the process works.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

MCKAWP 0069591
CONFIDENTIAL

# EXHIBIT 37

**From:** James, Robert
**Sent:** Friday, February 15, 2002 3:51 PM
**To:** James, Dale
**Subject:** RE: Follow Up on AWP

Thanks Dale......

You may do either. However, I would be careful about "being ahead of the curve with Lilly." You be the judge on how your customer will interpret. In a few months I would expect to see most brand product at a 25% mark up. If you need to respond to a lot of this type of thing, I would be happy to get into things a little more to give you more information.

Take care and have a great weekend.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** James, Dale
**Sent:** Friday, February 15, 2002 3:22 PM
**To:** James, Robert
**Cc:** Bonner, John; Yonko, Greg; Longwell, Sharon
**Subject:** RE: Follow Up on AWP

Good explanation. Can I share this with a customer??? If not, am I allow to "wordsmith" this just slightly and send it out as my explanation of our AWP?

Thank You

Dale James
<< OLE Object: Paintbrush Picture >>
Support Services
Carrollton, Tx.

Phone: 972-446-4452 Fax: 972-446-5337 Page: 888-862-9537

-----Original Message-----
**From:** James, Robert
**Sent:** Friday, February 15, 2002 4:54 PM
**To:** James, Dale
**Cc:** Bonner, John; Yonko, Greg
**Subject:** Follow Up on AWP

Dale, I am just going to forward an earlier response to you. For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential. If you want to discuss further, please call me.

What we are seeing is a "normalizing process" for the brand Rx items. As you know, suppliers do not set AWP, wholesalers do not set AWP, and neither does FDB. Wholesalers set their individual markups or Suggested Sell or List Price as in the case of McKesson. I am not sure what the other wholesalers call their sell price. This is done independently. FDB takes a survey of at least the three national wholesalers and if 2 out of 3 are at a 25% mark up, then that becomes the AWP. If 2 out of 3 are at a 20% mark up, then that becomes the AWP. Remember, AWP, by definition is an average. No one entity "sets the average".....as much as some suppliers would like to. There is no McKesson AWP....because by definition its an average (sorry for the redundancy) We only have a Sugg. Sell or List

Price. Often this figure is the same as the FDB AWP and people get the terminology confused. The AWP in our system should be the FDB AWP resulting from their surveys and given to us in their weekly downloads.

We are ahead of the curve on Lilly and planned to be. Sorry your customer doesn't understand the whole process. McKesson product management is trying to make our business process more efficient and reduce the number of manual overrides that are required when the FDB AWP is different from our Sugg Sell or List Price. As a result we have chosen to move to a markup of 1.25 rather than 1.20 which would lower the AWP spreads and would hurt our customers profitability.

Reimbursements from third party are made from the FDB AWP (and not the McK Sell or List). McKesson changing the Sugg Sell does not impact the customer's reimbursement, it will be based on the AWP in the third party system which also comes from FDB.

I think it is very positive for the industry and most people will be delighted when they understand what is going on and how the process works.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

# EXHIBIT 38

**From:** James, Robert
**Sent:** Monday, January 07, 2002 10:21 AM
**To:** Yonko, Greg
**Cc:** Fragie, Jack; Greco, Larry
**Subject:** Omnicare Year End Deals

Greg,

I have been thinking about our discussion about Omnicare wanting some benefit from our "year end" deals, even though its not written in their contract. A couple of years ago I was pulled into a conference call with Steve somebody (I think) and our McKesson MHS sales person, about how we were hurting them with our AWP's. He came on very strong and was going to call John Hammergren, etc. We calmed him down by explaining our process and tried to make him understand that we were really their advocates and were doing everything possible to "raise" AWP's when appropriate. I haven't heard anything since.

Here is an idea. Two years later, and having had some recent success in raising AWP's, I think this could be presented to him positively in this way.
Omnicare is looking for ......say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And.....this is **not just a one time benefit**. They will receive this now and each year going forward until they renegotiate contracts with third parties (and hopefully do not give up this gift).
Our successes recently and during this past year include raising AWP spreads to 20% (markup of 25%) include Parke Davis (division of Pfizer), Searle (division of Pharmacia), GlaxoSmithKline (Glaxo was at 16 2/3%), AstraZeneca, TAP, Berlex, JOM including Alza and Centocor, parts of Merck and BMS where things were mixed between 16 2/3% and 20%, and more to come. Some of our friends in retail that I have spoken with are pretty overwhelmed that we would be "driving" this process on their behalf. Of course, we are not solely responsible for this "normalizing" of AWP's but we have done our part as I have discussed with you previously. I have had conversations with Albertsons and Safeway and a few others.

Remember, **"McKesson is doing this to improve our efficiencies in our BIS group."** With mixed AWP spreads, our BIS group is required to make manual overrides (for every pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price. It could be stated as a benefit of the Sixth Sigma method of identifying defects. An "unintended consequence" is that the profitability of our customers will be impacted in a positive way. They will basically get 3 1/3% more profit on Rx's filled with this new AWP spread. (Just imagine what this would mean on drugs like Lipitor or Prilosec.) Another "unintended consequence" is that it would give Managed Care a potential opportunity to contract deeper........in other words, take the AWP minus 15% contracts to AWP minus 19%. They can't do that today because of the mixed AWP spreads.

This strategy might be of interest to Jack Fragie, Larry Greco, and others in discussions with our large national accounts, prospective new customers, and buying groups like Servall and IPC (that are continually asking for lower costs, more added value, and discounts beyond their contract language.....like Owens programs). We have an opportunity to "market" our efforts now. If we do not do this, its possible that some of these accounts will believe that this stuff just happens and the efforts will go unrecognized. In my discussions, one of the comments that was made was "this would certainly be a good reason to renew our agreement with McKesson when its time." Talk about being good partners, wow! This is worth further discussion as we go forward. Maybe, a proactive strategy like this will soften some of the activity around asking for lower costs and more benefit.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

MCKAWP 0065895
HIGHLY CONFIDENTIAL

# EXHIBIT 39

McKesson's. Just for kicks, I assumed a 70% gross margin for JOM and calculated their Omnicare profit also.

**Omnicare total JOM**
Total reimbursement profit based on new AWP spread = $5,567,176
McKesson total discount of 273 BP from WAC = $2,431,742
**Total profit $7,998,918**

**McKesson total JOM**
Prompt pay of 220 BP = $1,959,646
IMA of 112 BP = $997,639
**Total = $2,957,258**
**Less**
McKesson discount to Omnicare of 273 BP = $2,431,742
McKesson cost to handle of 170 BP = $1,514,272
**Total = $3,946,014**

**JOM Omnicare**
Gross margin of 70% = $62,352,377
**Less**
Prompt pay to McKesson of 220 BP = $1,959,646
IMA to McKesson of 112 BP = $997,639
Assumed discount to Omnicare of 9% =$8,016,734
**Total $10,974,019**

**McKesson net profit to distribute JOM to Omnicare = ($988,756)**
**Omnicare total profit for buying product from McKesson and reimbursements = $7,998,918**
**JOM profit for selling to Omnicare thru McKesson = $51,378,358**

-----Original Message-----
**From:** James, Robert
**Sent:** Wednesday, July 28, 2004 2:19 PM
**To:** Stubbs, Andrew; Boyd, Beth; Hanks, Jason; Cardenas, Debbie; Bolger, Phil
**Cc:** Felton, Jeff; Petrus, Susan; Torres, Martha
**Subject:** RE: JOM - Omnicare positioning for support Sales $ Summary

Please see below for the workup of what the impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years ago J & J products were all 16 2/3% AWP spread products. Today, almost all of them are 20% spread. Procrit just changed last month.

Just for this example we'll roll up these figures to WAC (amounts given divided by .982) and look at profitability assuming all third party Rx's based on AWP minus 15% (any additional fee would remain constant so we won't use a fee in this example because we don't have the number of transactions).

1. Procrit Net Sales of $16,025,302 / .982 = WAC of $16,319,045
   WAC x old markup of 1.20 (16 2/3% spread) $19,582,854 (old AWP)
   AWP - 15%= 19,582,854 x.85= $16,645,426 minus WAC $16,319,045= $326,381 Profit

2. $16.319,045 WAC x new markup of 1.25 (20% spread) = $20,398,806 (new

AWP)

AWP - 15%= $20,398,806 x .85 = $17,338,985 minus WAC of $16,319,045= $1,019,940

or 3 times the profit as before

3. All JOM Net Sales of $87,471,478 / .982= $89,074,825 WAC

WAC x 1.20 = $106,889,790 (old AWP)

$106,889,790 x .85= $90,856,322 minus $89,074,825 WAC= $1,781,497 Profit

4. $89,074,825 WAC x 1.25 = $111,343,531 (new AWP)

AWP - 15%= $111,343,531 x .85= $94,642,001 minus $89,074,825 WAC = $5,567,176 Profit

or more than 3 times the profit as before.

We're a nice advocate to have around. This example is just to provide background to our team so everyone realizes the impact of increasing AWP's.......Not by McKesson, but by the FDB process.

Call me if you questions.

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 20th Floor
San Francisco, CA. 94104
Phone 415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Stubbs, Andrew
Sent: Wednesday, July 28, 2004 12:20 PM
To: Boyd, Beth; Hanks, Jason; Cardenas, Debbie; James, Robert; Bolger, Phil
Cc: Felton, Jeff; Petrus, Susan
Subject: RE: JOM - Omnicare positioning for support Sales $ Summary

All- Here's a summary of the JOM Sales, Procrit Sales, and Remicade Sales for all of Omnicare for April 04 through June 04.

Jason- just a reminder.... all the Omnicare sales are priced at -1.80.

All JOM Sales: $87,471,478.22
Procrit Sales: $16,025,302.46
Remicade Sales: $129,553.06

I have all the detail in a massive 22mb file, but I'm not sending that to everybody (just Jason). If you do need that file, please let me know and I'll send it separately.

# EXHIBIT 40

**From:** James, Robert
**Sent:** Friday, February 08, 2002 3:14 PM
**To:** 'Morgan, Kay'
**Subject:** RE: Spread between AWP and WAC

I love it!

You are the best. Just remember, ignorance never takes a holiday........or maybe it was incompetence.

Just livin the dream! You have a great weekend as well.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management McKesson One Post Street--8th Floor San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Morgan, Kay [mailto:Kay_Morgan@firstdatabank.com]
Sent: Friday, February 08, 2002 3:09 PM
To: James, Robert
Subject: FW: Spread between AWP and WAC

Thought you might want to see my answer.

Need to discuss Forest and Berlex. Hopefully someone there has straightened out the new Organon Sanofi product.

Have a great weekend.

-----Original Message-----
From: Morgan, Kay
Sent: Friday, February 08, 2002 2:58 PM
To: 'Ned.Hanson@fhs.com'
Cc: 'Cathy Reilly'
Subject: RE: Spread between AWP and WAC

I am most curious as to the source of this rumor. First DataBank has always used a wholesaler survey to determine AWP. Therefore, the database does not increase the spread but reports the data based on the policies.
It is fair to say that overtime, the mark-up (word spread is incorrect as spread is 16 2/3 and 20% which leads to further suspicion about this rumor) has moved from 20 to 25%. We survey the wholesalers and decide when we are going to apply the new mark-up. As we discussed, we knew 00071 (formerly Parke-Davis) was going to a 1.25 mark-up at the next price increase. When the merger was complete, we called the wholesalers for what was to happen to Parke-Davis products. I am sure you can appreciate that we cannot divulge the results of our surveys prior to implementation. We do not always wait till price changes. If the wholesalers move to 25% before a price change, we will change the mark-up then and re-key the prices with the date of the survey.
I cannot predict what will happen over time. I can only tell you that based on what I have seen, the mark-ups are moving to 25%. Much of this is due to mergers within the industry. Pfizer bought Parke-Davis, Abbott bought Knoll, Pharmacia bought Searle, Glaxo Smith Kline, well hard to say who bought who. In any event, all the purchases were by 25%

MCKAWP 0069588
CONFIDENTIAL

mark-up companies of 20% mark-up companies. The 25% mark-up seems obvious. While I have not run the numbers, we have more than 3/4 1.25 mark-up.
In summary, I cannot verify your information and in fact would say that it is untrue for First DataBank. Again, we survey wholesalers to determine the mark-up they are applying to a product line.
Hope that answers your question. Please do not share with me the responses you receive from anyone else as it could be misperceived.
Kay
-----Original Message-----
From: Ned.Hanson@fhs.com [mailto:Ned.Hanson@fhs.com]
Sent: Friday, February 08, 2002 2:37 PM
To: kay_morgan@firstdatabank.com
Subject: Spread between AWP and WAC

Kay,

I enjoyed talking to you last week. I have been tasked with determining how AWPs are initiated and maintained and their relationship with WAC pricing. It is interesting being in an industry for as long as I have and discovering there is much I was (and still am) ignorant about when it comes to AWP. I thought I knew everthing there was to know about this important piece of data.

We were told that all Drug Database companies are increasing their spread between AWP and WAC from 20% to 25%. We also were told it is only being done when WAC price changes are made. Therefore, over time, all drugs will have a 25% spread between AWP and WAC.

Can you verify this?
If it is true, can you tell me when this started and how far the process is? Is it 90% complete or 10%?

Just so you know, I am contacting Medispan and Micromedex also and asking them the same questions.

Thanks.
Ned

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential and prohibited from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message along with any attachments, from your computer. Thank you

# EXHIBIT 41

**From:** James, Robert
**Sent:** Thursday, September 05, 2002 3:10 PM
**To:** 'Dan Connolly'
**Subject:** See, we listen!!

Most of their stuff looks okay but I am running a new file and will follow up and let you know.

PAY ATTENTION NOW: follow up from our NACDS conversation.

Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for change to happen next week.

Keep Smilin........and who said we never listen to our customers (and old friends).

Take care.

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Dan Connolly [mailto:danc@bartelldrugs.com]
Sent: Thursday, August 29, 2002 4:24 PM
To: BOB JAMES (E-mail)
Subject: Low AWP companies

Galderma...entire line is low...even the generic side. It must be 15% above WAC. Kill them.

Thank you,
Dan Connolly

MCKAWP 0069817
CONFIDENTIAL

# EXHIBIT 42

**From:** James, Robert
**Sent:** Friday, October 11, 2002 1:29 PM
**To:** 'Dan Connolly'
**Subject:** RE: See, we listen!!

Just wanted you to know that Clarinex AWP spreads went to 20% this week. A few weeks ago, Celexa went to 20% as well.

Fat Cat status is just around the corner.

Take care.

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Dan Connolly [mailto:danc@bartelldrugs.com]
Sent: Thursday, September 05, 2002 4:48 PM
To: James, Robert
Subject: RE: See, we listen!!

tHANKS....I GUESS I HAVE STIRRED THINGS UP WITH THE FORREST PEOPLE...ALL YOU HAVE TO TELL THEM IS THAT WE AREN'T GOING TO STOCK LEXAPRO AND PUT IT ON SPECIAL ORDER ONLY LIKE OXYCONTIN.

SCHERING REP CALLED AND WANTED TO KNOW WHAT I WAS GOING TO DO TO MOVE THE CLARITIN BUSINESS TO CLARINEX...NOT A THING I REPLIED...THE AWP/TO COST IS MUCH BETTER ON ZYRTEC, ALLEGRA AND CLARITIN...AND OTC CLARITIN REPRESENTED A NEW PROFIT CENTER FOR OUR STORES....SHE IS GOING TO TALK TO HER BOSS ABOUT GETTING THE CLARINEX AWP CHANGED...

NEXT COMPANY...00299- GALDERMA...short awp's too...

THANKS.

-----Original Message-----
From: James, Robert [mailto:Robert.James@McKesson.com]
Sent: September 05, 2002 3:10 PM
To: 'Dan Connolly'
Subject: See, we listen!!

Most of their stuff looks okay but I am running a new file and will follow up and let you know.

PAY ATTENTION NOW: follow up from our NACDS conversation.

Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for change to happen next week.

Keep Smilin........and who said we never listen to our customers (and old friends).

MCKAWP 0069901
CONFIDENTIAL

Take care.

Bob James
Director, Brand Pharmaceutical Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104
415-983-8755, fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Dan Connolly [mailto:danc@bartelldrugs.com]
Sent: Thursday, August 29, 2002 4:24 PM
To: BOB JAMES (E-mail)
Subject: Low AWP companies

Galderma...entire line is low...even the generic side. It must be 15% above WAC. Kill them.

Thank you,
Dan Connolly

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

MCKAWP 0069902
CONFIDENTIAL

# EXHIBIT 43

**From:** James, Robert
**Sent:** Friday, October 25, 2002 4:15 PM
**To:** David Vucurevich (E-mail)
**Subject:** FW: STOCKING LETTER FOR ZETIA

**Importance:** High

**Attachments:** 20208294(1)-8.5x11.pdf

20208294(1)-8.5x11.pdf (64 KB)...

Hello Dave......just got your vm from yesterday. We were out for training on "change management" for our new buying system.

I think you have been sent the info on Zetia by now, but just in case you haven't, here is the communication from Merck. If you have any questions, please call me Monday AM or leave a message and I'll get back to you as soon as I can.

Hope all is going well. Take care.

P.S. latest AWP changes....Celexa and Clarinex, working on Lilly and Novo

Bob James
Director, Brand Pharmaceutical Product Management McKesson One Post Street, 8th Floor San Francisco, CA 94104 415-983-8755, fax 415-732-2951 robert.james@mckesson.com

-----Original Message-----
From: Sullivan, Emmett J. [mailto:emmett_sullivan@merck.com]
Sent: Tuesday, October 08, 2002 9:13 PM
To: James, Robert
Subject: STOCKING LETTER FOR ZETIA
Importance: High

Bob, we can discuss the attached at our meeting today. See you at 8:30 AM.
E

<<20208294(1)-8.5x11.pdf>>
>
>

------------------------------------------------------------------------------
Notice: This e-mail message, together with any attachments, contains information of Merck & Co., Inc. (Whitehouse Station, New Jersey, USA) that may be confidential, proprietary copyrighted and/or legally privileged, and is intended solely for the use of the individual or entity named on this message. If you are not the intended recipient, and have received this message in error, please immediately return this by e-mail and then delete it.
==============================================================================



October 2002

Dear Wholesaler:

On behalf of Merck/Schering-Plough Pharmaceuticals, Merck is pleased to announce a special introductory offer for ZETIA™ (ezetimibe), which will be coming to the market soon. We are extending this offer to **wholesaler customers only** to encourage prebooking of orders, thus ensuring that retail customers have access through their primary wholesalers to this new product, immediately on availability. ZETIA is the first prescription medicine to be submitted to the FDA for approval by Merck/Schering-Plough Pharmaceuticals.

Merck/Schering-Plough Pharmaceuticals is an independent joint venture between Merck & Co., Inc., and Schering-Plough Corporation formed in May 2000 to develop and market products worldwide (excluding Japan). **Under the joint venture agreement, Merck is the contracting and distribution agent for Merck/Schering-Plough Pharmaceuticals.**

**Special Introductory Offer on Your First Purchase of ZETIA:**

This special introductory offer provides a ***3% off-invoice discount*** plus 90 days total dating on your first order only.

| Type of Order | Date of Call | Off-Invoice Discount | Prompt Payment Discount | Extended Dating | Total Dating |
|---|---|---|---|---|---|
| First order | October 7–31, 2002 | 3% Discount (First order only) | 2% Discount (Standard) | Additional 60 Days | 90 Days |

Promptly stock ZETIA at retail outlets and receive an additional ***6% distribution allowance*** based on total bottles stocked <u>within</u> 8 business days of receipt of product from your Merck Order Fulfillment Center. A minimum of 2 bottles and a maximum of 4 bottles (30 count) is permitted per store.

To receive this ***6% discount,*** only wholesalers are permitted to execute the shipping or autoshipment of product directly to the retail stores and provide appropriate documentation of shipment.*

Please send the following information within 30 days of shipment, on diskette in spreadsheet format (preferably Microsoft Excel 97 or lower), to Merck & Co., Inc., Order Management Center, Attn: Stocking Incentive for ZETIA, PO Box 4, ZB-750, West Point, PA 19486-0004, or e-mail the following information to the Merck Order Management Center at omcmerck@merck.com:

- Store name, address, quantity shipped per store (2–4 bottles per outlet), and date of shipment* per store.

All standard terms and conditions apply.

**Place an order by calling the Merck Order Management Center at 1-800-MERCK-RX (1-800-637-2579) or FAX 1-215-652-6700.**

**Update Your Systems to Include ZETIA**

Take this opportunity to update your order systems to include ZETIA with the product specifications and prices provided below:

| ZETIA 10-mg Package Size | NDC Number | Order Code | Catalog Price |
|---|---|---|---|
| Unit-of-use bottle of 30 tablets | 66582-414-31 | 03861-31 | TBA |
| Unit-of-use bottle of 90 tablets **(Not available at launch)** | 66582-414-54 | 03861-54 | TBA |
| Bulk bottle of 500 tablets **(Not available at launch)** | 66582-414-74 | 03861-74 | TBA |
| Hospital unit-dose package of 100 tablets (10 blister cards of 10 tablets) **(Not available at launch)** | 66582-414-28 | 03861-28 | TBA |

**Please insert this sheet into Merck Price List No. 91.**

*Date of shipment must be on or before the 7th business day following receipt of product from your Merck Order Fulfillment Center.

MCKAWP 0069912
CONFIDENTIAL



Zetia™
(ezetimibe)

**Carton Dimensions and Weights**

| ZETIA 10 mg | Package Type | Outside Dimensions Inches (Approx) | | | Weight (Approx) |
|---|---|---|---|---|---|
| | | Depth | Width | Height | |
| Unit-of-use bottle of 30 | Individual Unit (1 Bottle) | 1 5/8 | 1 7/16 | 2 7/8 | 0.8 oz |
| | Overwrapped Bundle (12 Bottles) | 6 1/2 | 4 7/16 | 2 7/8 | 9.7 oz |
| | Shipping Case (288 Bottles) | 14 3/8 | 13 3/4 | 12 3/4 | 16.24 lb |
| Unit-of-use bottle of 90 | Individual Unit (1 Bottle) | 1 5/8 | 1 7/16 | 2 7/8 | 1.0 oz |
| | Overwrapped Bundle (12 Bottles) | 6 1/2 | 4 7/16 | 2 7/8 | 12.1 oz |
| | Shipping Case (288 Bottles) | 14 3/8 | 13 3/4 | 12 3/4 | 19.92 lb |
| Bulk bottle of 500 | Individual Unit (1 Bottle) | 2 | 1 7/8 | 3 | 2.6 oz |
| | Overwrapped Bundle (12 Bottles) | 8 | 5 1/2 | 2 29/32 | 31.2 oz |
| | Shipping Case (48 Bottles) | 11 7/8 | 8 3/4 | 6 7/8 | 8.33 lb |
| Hospital unit dose | Carton (10 Blister Cards) | 3 1/8 | 1 1/4 | 4 5/8 | 2.3 oz |
| | Shipping Case (40 Cartons) | 16 5/16 | 8 9/16 | 10 1/8 | 6.53 lb |

Contact Merck to place an order by calling the Merck Order Management Center at 1-800-MERCK-RX (1-800-637-2579) or FAX 1-215-652-6700.

For product and service information, please call the Merck National Service Center at 1-800-NSC-MERCK (1-800-672-6372) or contact your National Account Executive or the Business Manager responsible for your account.

Sincerely,

G. Paul Payton

G. Paul Payton, RPh
Executive Director
Merck & Co., Inc.
Pharmacy/Wholesalers

ZETIA is a trademark of MSP Marketing Services (C) LLC

©Merck/Schering-Plough Pharmaceuticals, 2002

20252931(1) 10/02 ZET PFA

MERCK / Schering-Plough Pharmaceuticals

Printed in USA
Minimum 10% Recycled Paper

# EXHIBIT 44

**From:** James, Robert
**Sent:** Friday, May 03, 2002 1:58 PM
**To:** Thomas, Erlinda
**Cc:** Castaldo, Ron
**Subject:** AWP / Mark up Changes

**Attachments:** AWP Brand FDB comp 4-26-02.xls

Erlina, please change the following items on the attached file.

McKesson Markup— Green color background, change to 25% markup so ONLY Suggested Sell Field will be increased.

First DataBank AWP--change all Green color background FDB AWP's in our system.

Kay Morgan has agreed to use our WAC prices where they show none presently.. This is positive. I also discussed the tape to tape idea we discussed the other day. She is also talking with ERic Sorkin at RiteAid to let him know how much effort we are putting into this AWP thing to get it right.

Erlinda: I have discussed these actions with Ron Castaldo in case you have any questions.

Thanks for all your help (and your team's help). Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

AWP Brand FDB comp 4-26-02.xls...

MCKAWP 0069669
CONFIDENTIAL

# EXHIBIT 45

**From:** Secrest, Larry
**Sent:** Wednesday, November 27, 2002 1:27 PM
**To:** James, Robert
**Cc:** Hamik, Bill
**Subject:** Increased AWPs

Bob,

I received a call from a customer in OH earlier this week who does a lot of fertility drug business. He indicated that some time back, he had had to walk away from doing business with certain drugs because the AWP/Cost spread were in the 15-16% range and it was not feasible for him to try to make any money at it. He called to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of about 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts. His thoughts are, unless he missed something, that he would once again, try to get into doing business with some of these items.

The items he gave me were: Lupron Depo, Avonex, Copaxal, Peg Intron, Intron, Rematron, Procrit (I hope I have all of these names correct). He stated that most Schering injectibles had increased.

Can you give me your feedback on this as to whether we in fact did assist in these changes, if they are truly changes, and if this will remain the case?

Thanks
Larry

# EXHIBIT 46

**From:** James, Robert
**Sent:** Tuesday, May 21, 2002 12:56 PM
**To:** Yonko, Greg
**Cc:** Bonner, John
**Subject:** FW: AWP expansion

fyi........Its great that someone would take the time to send in something positive. This is what makes it worth while. Maybe they are starting to get it out in the field.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street--8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Wallis, Jeff
**Sent:** Tuesday, May 21, 2002 9:52 AM
**To:** James, Robert
**Cc:** Thomas, Jon
**Subject:** AWP expansion

Bob,

I had a real nice meeting with Med-X Corp last week. They are a 22 store chain of ours doing about 50M per year with us. Jerry Howard, the director of operations, mentioned his margins on RX have increased recently for the first time in a LONG time. He was very exited about it when I mentioned we had been working on AWP expansion with some success he was even more happy that McKesson was looking out for our customers. He was very glad that McKesson was doing this and would love to talk more about it. I told him we have an expert in that area and maybe I could have you call Jerry. Would you be interested in talking to a customer of ours about the process we are undertaking with trying to expand the AWP margins. If not that's fine. I just thought this is a real positve for our customers that they need to be more aware of. Let me know and I can set up a call if your interested in talking to Med-X about this.

Jeff Wallis
DSM OKC DC
Office- 405-688-4027
cell -405-833-0728
audix 4155

# EXHIBIT 47

**From:** James, Robert
**Sent:** Tuesday, May 14, 2002 9:14 AM
**To:** Jones, Kristi
**Subject:** RE: AWP Spread

They should be saying Thank you. The AWP's were increased at First DataBank, therefore an increase in spread from 16 2/3% to 20%. The explanation is too long to write in an e-mail.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management McKesson One Post Street--8th Floor San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
From: Jones, Kristi
Sent: Tuesday, May 14, 2002 9:04 AM
To: James, Robert
Subject: FW: AWP Spread

Bob,

Can you take a look at the attached spreadsheet and let me know the reason for the increase in spread between AWP and PrecisionRX's cost?

Thanks,

Kristi Jones
Account Manager, Customer Relations
McKesson Corporation
972/446-5899
800/369-0039 X5899
972/446-5493 fax
kristi.jones@mckesson.com

"The information attached or enclosed are extracts of sales history data that McKessonHBOC keeps in the ordinary course of business. Subject only to purchases from McKessonHBOC. All of the attached or enclosed documents are confidential. You should not release these documents or information contained in these documents to any third-party without McKessonHBOC's express written consent."

-----Original Message-----
From: Linda.Rutledge@Wellpoint.com [mailto:Linda.Rutledge@Wellpoint.com]
Sent: Tuesday, May 14, 2002 10:31 AM
To: Jones, Kristi
Subject: AWP Spread

Kristi,

I've attached a portion of Alana's analysis. Can you please advise why the difference in the AWP spread (18 vrs 21) between 12/01 and 4/02?

# EXHIBIT 48

From: James, Robert
Sent: Friday, August 10, 2001 4:40 PM
To: Watanabe, Allen
Cc: Gates, Dick; Crusit, Ramon
Subject: RE: AWP vs List

Allen, the best way to handle this is to have the customer ask for the actual AWP (First Data Bank supplies this figure) to on the tickets instead of the list price or sell price. The whole thing can be confusing in that the Average Wholesale Price or AWP is actually determined by FDB by doing a survey of the three national wholesalers, Cardinal, Bergen, and McKesson. If two out of three are at a 16.667% spread and McK is at a 20% spread, the actual AWP will be 16.667%. In this case, there is a difference between the McK list price and the actual AWP. If two out of three were at 20%, then the AWP (FDB) would be at 20% and the McK list price and the AWP would be the same. AWP's are only important to our customers because third party reimbursement from the insurance companies is based on AWP minus 15% plus a fee (or something like that). The AWP has no impact on our business.

The challenge is to educate our customers about the McKesson Sell Price/ List Price. It is not really the AWP but is confusing because sometimes it is the same because of the process described above.

However, I just took a look at some of the Merck items. Merck should be at at 20% spread on almost everything, the ones you point out are at a 16.667% spread. First Data Bank data needs to be checked and I will follow up when time permits.

Hope this helps, but its not always black or white.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKessonHBOC
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckhboc.com

-----Original Message-----
From: Watanabe, Allen
Sent: Friday, August 10, 2001 3:36 PM
To: James, Robert
Cc: Gates, Dick
Subject: AWP vs List

Hi Bob,

Ramon Crucit suggested that I contact you to see if you can assist me with the following issue:

A customer has brought it to my attention that when ordering Prinivil 10mg 100's, his price sticker shows $105.36 as that AWP. However, $105.36 is our list price, not the AWP. Our system shows the AWP as $101.15. It is my understanding that our system is designed to put the higher of the two (list vs AWP) on our price stickers. This gives the pharmacist the wrong information because he has no idea that it is our "list price", and therefore, takes it as the AWP. Can we do anything to change the list price to match the AWP ? What is the best way to address this issue?

Below are some examples of List vs AWP.

| Econo# | Description | | List | AWP |
|---|---|---|---|---|
| 370-0374 | Prinivil 5mg | 100 | 102.04 | 97.96 |

# EXHIBIT 49

**Melissa Batchelder**

---

**From:** Morgan, Kay [Kay_Morgan@firstdatabank.com]
**Sent:** Wednesday, July 21, 2004 9:58 AM
**To:** James, Robert
**Subject:** RE: Remicade AWP

Hi Bob,

They (Centocor) are a 25% company. However, they have not had any price changes on this Remicade product since 2001.... prior to the mark up. I'll bring this to Kays attention. Not sure if should would want to take action on it right now because it would trigger a lot of questions on why there was a change to the item when the MFG hasn't sent any price changes.

Have a wonderful day!
Alisha Nielsen

-----Original Message-----
**From:** James, Robert [mailto:Robert.James@McKesson.com]
**Sent:** Wednesday, July 21, 2004 9:10 AM
**To:** Morgan, Kay
**Subject:** Remicade AWP

Kay, when you have a minute would you check the AWP on Remicade. We show 691.61 in the system which reflects a 30% markup. Our Suggested Sell is 665.01 showing a 25% markup.

```
EFF-DT    IP RSN PU PUD      COST          MKUP%     SELL-PR
051804        K  EA 001 00532.0100   025.00    00665.0125
000000             000 00000.0000    000.00    00000.0000

          AVG-RETAIL   MFG-RETAIL      AWP       CS-QTY-SELL
(CONT):   00000.00     00000.00     00691.6100     00100
```

Please advise. Thank you.

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 20th Floor
San Francisco, CA. 94104
Phone 415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

---

This e-mail message is intended only for the personal use of the recipient(s) named above. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify First DataBank San Bruno Support (Helpdesk@firstdatabank.com) immediately by e-mail and delete the original message.

# EXHIBIT 50

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris |
|---|---|

**AFFIDAVIT OF CHRISTOPHER E. BRECHT OF CARDAY ASSOCIATES, INC., FUND ADMINISTRATOR FOR MAN-U SERVICE CONTRACT TRUST FUND**

I, Christopher E. Brecht, under the penalty of perjury, hereby declare as follows:

1. I am the Chief Operating Officer of Carday Associates, Inc., which serves as administrator of the Man-U Service Contract Trust Fund. ("MAN-U"). I have full knowledge of the matters stated herein, and could and would testify hereto if necessary.

2. MAN-U is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 186(c)(5), and as defined by section 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et seq.

3. MAN-U's office from which it pays medical benefits, including benefits for prescription drugs, is located in Beltsville, Maryland.

4. Pursuant to the Agreement and Declaration of Trust under which it was created, MAN-U provides comprehensive health care benefits to approximately 1200 persons, consisting of participants who are employed under various collective bargaining agreements and their dependents. MAN-U's participants and beneficiaries are employed

throughout the United States and made purchases of defendants' drugs in, among other states, Pennsylvania, Maryland and Delaware.

5. MAN-Us health and medical benefits are provided under written benefit plans. MAN-U has generally provided prescription drug coverage under its prescription benefit program as follows:

a. In the early 1990s, MAN-U contracted with Prescription Drugs Inc. ("PDI"), a pharmacy benefit manager, to administer MAN-U's prescription drug plan. Under the terms of the contract, MAN-U paid PDI the average wholesale price ("AWP") for all brand name prescription drug purchases made by its members as well as a professional and administrative fee for the PBM's services.

b. In approximately March 1993, MAN-U contracted with Associated Prescription Services ("APS"), a pharmacy benefit manager, to administer MAN-U's prescription drug plan. With respect to this arrangement, MAN-U paid its PBM for all brand name prescription drug purchases made by its members at a price based on the average wholesale price ("AWP"). APS was later acquired by ValueRX, and ValueRX was later acquired by Express Scripts, Inc.

c. As of September 1, 1999, MAN-U contracted with Express Scripts, Inc. ("ESI"), a pharmacy benefit manager, to administer MAN-U's prescription drug plan. Under the terms of this contract, MAN-U pays ESI for all brand name and generic prescription drug purchases made by its members at a price based on AWP. MAN-U also pays ESI for all mail order purchases made by its members at a priced based on AWP.

6. During the Class Period, MAN-U paid for certain pharmaceuticals, based on AWP, that were manufactured by each of the Defendants as set forth at Appendix B of the AMCC.

7. MAN-U has been actively involved in the prosecution of this litigation and has enlisted the assistance of skilled and experienced class action counsel. MAN-U's interests are not antagonistic to the interests of the members of the proposed Class.

8. MAN-U does not have the economic ability or incentive to prosecute a case of this magnitude individually against such well-financed defendants in this litigation and therefore believes that a class action is a superior way in which to redress the wrongs alleged as to MAN-U and the other members of the class it seeks to represent.

Christopher E. Brecht
Chief Operations Officer
Carday Associates, Inc.

Subscribed to before me this 1st day of September, 2004.

Deborah L. Albright
Notary Public
My Commission expires Nov. 1, 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION

This Document Relates to ALL ACTIONS.

MDL No. 1456

Master File No. 01-CV-12257-PBS

Judge Patti B. Saris

**DECLARATION OF WILLIAM K. ECKLUND, ESQ.**

I, William K. Ecklund, under the penalty of perjury, hereby declare as follows:

1. I am counsel for Plaintiff Twin Cities Bakery Workers Health and Welfare Fund ("TCBW"). I have represented TCBW since 1981. I have full knowledge of the matters stated herein, and would testify hereto, if necessary.

2. TCBW is a jointly administered Taft-Hartley Fund established and maintained pursuant to Section 302(c)(5) of the LMRA, and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries.

3. TCBW maintains its principal place of business in Eagan, Minnesota.

4. Pursuant to the Second Restated Agreement and Declaration of Trust of Twin Cities Bakery Workers Health and Welfare Fund, dated February 1, 1986, TCBW provides comprehensive health benefits, including prescription drug benefits, to approximately 1500 active participants, as well as retirees, spouses and dependants.

5. TCBW's participants are generally employed in retail and wholesale positions in the baking industry. TCBW's participants (and their beneficiaries) have

purchased Defendants' drugs in several states, including Minnesota, Iowa, North Dakota, South Dakota and Wisconsin.

6. TCBW's health and medical benefits are provided under a written benefit plan ("the Plan"). The Plan has generally provided prescription drug coverage under its prescription benefit program as follows:

a. Prior to July 1, 2003, TCBW (through its third-party administrator, Formula Corporation) administered its own prescription drug benefit program and paid for prescription drugs under that program based on the published average wholesale price ("AWP") less 10 percent, plus a dispensing fee, less the co-pay of the Plan participant.

b. As of July 1, 2003, TCBW contracted with Caremark Inc. ("Caremark"), a pharmacy benefits manager, to administer TCBW's prescription drug benefit program. Under the terms of the contract, TCBW pays Caremark as follows:

National Retail Pharmacy Network

1. For all brand name prescription drug purchases made through Caremark's National Retail Pharmacy Network, TCBW pays the lesser of: (a) AWP less 15%, plus a dispensing fee of $2.00, less the co-pay of the Plan participant; or (b) the pharmacy's usual and customary price, less the co-pay of the Plan participant.

2. For all generic drug purchases made through Caremark's National Retail Pharmacy Network, TCBW pays the lesser of: (a) the Maximum Allowable Cost as determined from time to time by Caremark, plus a dispensing fee of $2.00, less the co-pay of the Plan participant; or (b) the pharmacy's usual and customary price, less the co-pay of the Plan participant.

Mail Service Pharmacy

3. For all brand name prescription drug purchases made through Caremark's Mail Service Pharmacy, TCBW pays Caremark AWP less 23%, less the co-pay of the Plan participant.

4. For all generic prescription drug purchases made through Caremark's Mail Service Pharmacy, TCBW pays Caremark AWP less 60%, less the co-pay of the Plan participant.

5. During the Class Period, TCBW paid for certain pharmaceuticals, based on AWP, that were manufactured by each of the Defendants as set forth at Appendix B of the AMCC.

6. TCBW has been actively involved in the prosecution of this litigation and has enlisted the assistance of skilled and experienced class action counsel. TCBW's interests are not antagonistic to the interests of the members of the proposed Class.

7. TCBW does not have the ability or incentive to prosecute a case of this magnitude individually against the well-financed Defendants in this litigation and therefore believes that a class action is a superior way in which to redress the wrongs alleged as to TCBW and the other members of the class it seeks to represent.

William K. Ecklund, Esq.
Counsel for Twin Cities Bakery Workers
Health and Welfare Fund

Subscribed to before me this 30th day
of August, 2004.

Notary Public

CYNTHIA L. DOERR
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES
JANUARY 31, 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **MDL No. 1456**<br>**CIVIL ACTION: 01-CV-12257-PBS**<br>**Judge Patti B. Saris** |

**THIS DOCUMENT RELATES TO**
**ALL CLASS ACTIONS**

**AFFIDAVIT OF DANIEL RYAN, FUND ADMINISTRATOR OF UNITED FOOD AND COMMERCIAL WORKERS UNIONS AND EMPLOYERS MIDWEST HEALTH BENEFITS FUND**

I, Daniel W. Ryan, on oath, depose and state as follows:

1. I am the Fund Administrator of United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund ("UFCW"). I have full knowledge of the matters stated herein, and could and would testify hereto if necessary.

2. UFCW is an "employee welfare benefit plan" and "employee benefit plan" maintained pursuant to section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 186(c)(5), and as defined by section 1002(1) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et seq. UFCW's office from which it pays medical benefits, including benefits for prescription drugs, is located in Cook County, Illinois.

3. Pursuant to the Trust Agreement under which it was created, UFCW provides comprehensive health care benefits to approximately 25,000 participants who are employed under various collective bargaining agreements ("employees"), and

their dependants, as well as retirees. UFCW's participants and beneficiaries are generally employed at retail food stores, are located throughout the United States and made purchases of defendants' drugs in, among other states, Arizona, California, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Missouri, Michigan, Nevada, North Carolina, New York, Oklahoma, Tennessee, Virginia and Wisconsin.

4. UFCW's health and medical benefits are provided under written benefit plans. When a participant has Medicare coverage, in addition to one of UFCW's plans, UFCW will reimburse claims as follows:

    a. When the employee works at a store with 20 or more employees, UFCW provides primary coverage and Medicare pays secondary.

    b. When the employee works at a store with 19 or less employees, Medicare provides primary coverage and UFCW provides secondary coverage.

5. The 20 percent co-payment under Medicare Part B is, and has been, an eligible expense under UFCW's plans during the Class Period.

6. For those without Medicare Part B coverage, UFCW has generally provided prescription drug coverage under its prescription benefit program as follows:

    a. Prior to December 1, 2000, UFCW administered its own prescription drug plan and paid for prescription drugs under that plan based on the published average wholesale price ("AWP") of the drug less a discount.

    b. As of December 1, 2000, UFCW contracted with National Prescription Administrators, Inc. ("NPA"), a pharmacy benefit manager, to administer

UFCW's prescription drug plan. UFCW paid NPA for all brand name prescription drug purchases made by its members at AWP less 13 percent.

c. In 2002, Express Scripts, Inc. ("ESI") purchased NPA and served as UFCW's PBM until December 31, 2003, under the same terms as governed the Fund's relationship with NPA.

d. As of January 1, 2004, UFCW has contracted with National Medical Health Card Systems, Inc. ("NMHC Rx"), a pharmacy benefit manager. Under the terms of the contract, UFCW pays NMHC Rx for all network brand name prescription drug purchases made by its members at AWP less 15.5 percent, all network generic purchases made by its members at AWP less 58.8 percent, and all mail order purchases made by its members at AWP less 21 percent for brand name and AWP less 55 percent for generic drugs.

7. During the Class Period, UFCW paid for certain pharmaceuticals, based on AWP, that were manufactured by each of the Defendants as set forth at Appendix B of the AMCC.

8. UFCW has been actively involved in the prosecution of this litigation and has enlisted the assistance of skilled and experienced class action counsel. UFCW's interests are not antagonistic to the interests of the members of the proposed Class.

9. UFCW does not have the economic ability or incentive to prosecute a case of this magnitude individually against such well-financed defendants and therefore believes that a class is a superior device.

Daniel W. Ryan, Fund Administrator

Subscribed to before me this 31st day of August, 2004.

Notary Public

OFFICIAL SEAL
LOURDES YOUNUS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 10-3-2004

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | **MDL No. 1456**<br><br>**CIVIL ACTION: 01-CV-12257-PBS**<br><br>**Judge Patti B. Saris** |

**AFFIDAVIT OF ARTHUR STEINBERG, LEAD COORDINATOR OF PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND**

I, Arthur Steinberg, under the penalty of perjury, hereby declare as follows:

1. I am the Lead Coordinator of the Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW"). I have full knowledge of the matters stated herein, and could and would testify hereto if necessary.

2. PFTHW is a health and welfare fund organized pursuant to section 501(c) of the Internal Revenue Code for the purpose of providing health care benefits to eligible participants and beneficiaries.

3. PFTHW's office from which it administers health care benefits, including benefits for prescription drugs, is located in Philadelphia, Pennsylvania.

4. Pursuant to the Agreement and Declaration of Trust under which PFTHW was created, PFTHW provides comprehensive health care benefits to approximately 20,000 active participants, and their spouses and dependants, who made purchases of defendants' drugs in, among other states, Pennsylvania, Arizona, California, Delaware, Maine, Massachusetts, Michigan, Nevada, New Jersey, New York, Tennessee, Vermont, West Virginia and Wisconsin.

5.      PFTHW's health care benefits are provided under written benefit plans.

6.      During the Class Period, PFTHW has provided prescription drug coverage under its prescription benefit program as follows:

a.      As of May 1, 1986, PFTHW contracted with National Prescription Administrators, Inc. ("NPA"), a pharmacy benefit manager, to administer PFTHW's network pharmacy prescription drug plan. Under the terms of the contract, PFTHW paid NPA for all network prescription drug purchases made by its members based on the published AWP.

b.      As of October 29, 1996, PFTHW and NPA amended their prior agreement to administer PFTHW's network prescription drug plan. Under the amended contract, PFTHW paid NPA for all network brand name drug purchases made by its members at AWP less 13 percent and all generic prescription drug purchases made by its members at the lesser of AWP less 13 percent or MAC.

c.      On or about 1991, PFTHW contracted with Health Care Services, Inc. ("HCS"), a pharmacy benefit manager, to administer PFTHW's mail service pharmacy prescription drug plan. Under the terms of the contract, PFTHW paid HCS for all mail service brand name prescription drug purchases made by its members at AWP minus 9.5 percent, and all mail service generic prescription drug purchases at AWP minus 30 percent. Later, Value Rx, Inc. acquired HCS and continued to administer the mail service contract under the terms of that agreement.

d.      As of June 1, 1997, PFTHW contracted with ValueRx Pharmacy Program, Inc. ("ValueRx"), a pharmacy benefit manager, to administer PFTHW's mail service pharmacy prescription drug plan. Under the terms of the contract, PFTHW paid

ValueRx for all mail service brand name prescription drug purchases made by its members at AWP less 14 percent, and all mail service generic prescription drug purchases made by its members at AWP less 40 percent. Thereafter, Express Scripts, Inc. ("ESI") acquired Value Rx and continued to administer the mail service contract under the terms of the ValueRx agreement.

e.    As of May 1, 2002, PFTHW contracted with Express Scripts, Inc. ("ESI"), a pharmacy benefit manager, to administer PFTHW's network and mail service pharmacy prescription drug plans.  Under the terms of the contract, PFTHW paid ESI for all network brand name prescription drug purchases made by its members at AWP less 16 percent, and all mail service brand name prescription drug purchases made by its members at AWP less 21 percent, and all mail service generic prescription drug purchases made by its members at AWP less 50 percent.

7. During the Class Period, PFTHW paid for certain pharmaceuticals, based on AWP, that were manufactured by each of the Defendants as set forth at Appendix B of the AMCC.

8. PFTHW has been actively involved in the prosecution of this litigation and has enlisted the assistance of skilled and experienced class action counsel.  PFTHW's interests are not antagonistic to the interests of the members of the proposed Class.

9. PFTHW does not have the ability or incentive to prosecute a case of this magnitude individually against the well-financed defendants in this litigation and

therefore believes that a class action is a superior way in which to redress the wrongs

alleged as to PFTHW and the other members of the class it seeks to represent.

Arthur Steinberg
Lead Coordinator

Subscribed to before me this 31st day of August, 2004.

Notary Public

NOTARIAL SEAL
KATHLEEN M. JOHNSON, Notary Public
City of Philadelphia, Phila. County
My Commission Expires Feb. 12, 2005

# EXHIBIT 51

# COMPREHENSIVE SURVEY OF STATE NEGLIGENT MISREPRESENTATION LAW

| STATE | SALIENT ELEMENTS |
|---|---|
| Alabama | "The elements of a misrepresentation claim are (a) a false representation of an existing material fact; (b) a representation (1) that the speaker knew was false when made, (2) that was made recklessly and without regard to its truth or falsity, or (3) that was made by telling the listener that the speaker had knowledge that the representation was true while having no such knowledge; (c) reliance by the listener on the representation, coupled with deception by it; (d) the reasonableness of that reliance under the circumstances; and (e) damage to the listener proximately resulting from his or her reasonable reliance." *City of Prattville v. Carter*, 831 So. 2d 622, 628 (Ala. Civ. App. 2002) |
| Alaska | "The following elements are required to establish negligent misrepresentation: (1) the party accused of the misrepresentation must have made the statement in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, (2) the representation must supply false information, (3) there must be justifiable reliance on the false information supplied, and (4) the accused party must have failed to exercise reasonable care or competence in obtaining or communicating the information." *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 670-71 (Alaska 2002) (internal quotations, citations omitted). |
| Arizona | "To prove negligent misrepresentation, the [plaintiffs] must establish that (1) the [defendant], in the course of business, gave incorrect information for the guidance of others in their business transactions; (2) CFCS intended, or could reasonably foresee, that the [plaintiffs] would rely on that information; (3) the [defendant] failed to exercise reasonable care in obtaining or communicating that information; (4) the [plaintiffs] relied on that incorrect information; (5) the [plaintiffs'] reliance was justified; and (6) the [plaintiffs'] reliance was a cause of their damages." *Taeger v. Catholic Family & Community Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999). |
| Arkansas | "The elements of a cause of action for misrepresentation are: (1) a false representation of a material fact; (2) knowledge or belief on the part of the person making the representation that the representation is false; (3) an intent to induce the other party to act or refrain from acting in reliance on the misrepresentation; (4) a justifiable reliance by the other party; and (5) resulting damages." *O'Mara v. Dykema*, 942 S.W.2d 854, 857 (Ark. 1997); |
| California | "In order to recover on a claim of negligent misrepresentation, the plaintiff must prove misrepresentation of a past or existing material fact, without reasonable ground for believing it to be true and with intent to induce another's reliance on the fact misrepresented, ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed, and resulting damage." *Shamsian v. Atlantic Richfield Co.*, 107 Cal. App. 4th 967 (Cal. Ct. App. 2003). |
| Colorado | "To establish a claim for negligent misrepresentation, it must be shown that the defendant supplied false information to others in a business transaction, and failed to exercise reasonable care or competence in obtaining or communicating information on which other parties justifiably relied." *Mehaffy, Rider, Windholz & Wilson v. Central Bank, N.A.*, 892 P.2d 230, 236 (Colo. 1995). |
| Connecticut | "[A]n action for negligent misrepresentation requires the plaintiffs in the present case to prove that Dress Barn made a misrepresentation of fact, that Dress Barn knew or should have known that it was false, that the plaintiff reasonably relied upon the misrepresentation, and that the plaintiffs suffered pecuniary harm as a result thereof." *Glazer v. Dress Barn, Inc.*, 873 A.2d 929, 954 (Conn. 2005). |
| Delaware | "To successfully assert a claim for negligent misrepresentation, plaintiff must adequately plead: (1) the defendant had a pecuniary duty to provide accurate information; (2) the defendant supplied false information; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information." *Unisuper Ltd. v. News Corp.*, 2005 Del. Ch. LEXIS 205, 2005 WL 3529317, at *36 (Del. Ch. Dec. 20, 2005). |
| District of Columbia | "To prove a claim for negligent misrepresentation, one must show: (1) that defendant made a false statement or omitted a fact that he had a duty to disclose; (2) that it involved a material issue; and (3) that defendant reasonably relied upon the false statement or omission to his detriment for the period of time at issue in this case." *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C. Ct. App. 1999). |
| Florida | "To prove negligent misrepresentation, it must be shown that (1) there was a misrepresentation of material fact; (2) the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representer intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation." *Baggett v. Electricians Local 915 Credit Union*, 620 So. 2d 784, 786 (Fla. Dist. Ct. App. 1993). |
| Georgia | "To prove negligent misrepresentation, a plaintiff must show that (1) the defendant negligently supplied false information to foreseeable persons, known or |



| | |
|---|---|
| | unknown, (2) such persons reasonably relied upon that false information, and (3) economic injury proximately resulted from such reliance." *Boeing Co. v. Blane Int'l Group, Inc.*, 624 S.E.2d 227, 231 (Ga. Ct. App. 2005). |
| Hawaii | "Our case law indicates that a negligent misrepresentation requires that (1) false information be supplied as a result of the failure to exercise reasonable care or competence in communicating the information; (2) the person for whose benefit the information is supplied suffered the loss; and (3) the recipient relies upon the misrepresentation." *Zanakis-Pico v. Cutter Dodge, Inc.*, 47 P.3d 1222, 1249 n.11 (Haw. 2002) (internal quotations, citations omitted). |
| Idaho | Adopts the Restatement test of negligent misrepresentation, § 552 ("One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."), but declining to adopt the Restatement's liability limitations. *Idaho Bank & Trust Co. v. First Bancorp*, 772 P.2d 720, 722 (Idaho 1989). |
| Illinois | "The elements of a cause of action for negligent misrepresentation are similar and are: (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party resulting from such reliance, (6) when the party making the statement is under a duty to communicate accurate information." *Roe v. Jewish Children's Bureau*, 790 N.E.2d 882, 893 (Ill. App. Ct. 2003). |
| Indiana | Indiana courts have adopted Restatement (2d) Torts § 552 but have so far declined "to recognize a duty exists to support the tort of negligent misrepresentation outside the limited context of an employment relationship." *Tri-Professional Realty v. Hillenburg*, 669 N.E.2d 1064, 1068 (Ind. Ct. App. 1996). |
| Iowa | "The elements for the tort of negligent misrepresentation are: (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Barske v. Rockwell Int'l Corp.*, 514 N.W.2d 917, 924 (Iowa 1994). |
| Kansas | Holding "that a cause of action for negligent misrepresentation as defined in § 552 is recognized in the state of Kansas." *Mahler v. Keenan Real Estate*, 876 P.2d 609, 616 (Kan. 1994). |
| Kentucky | "Because we find § 552 to be consistent with Kentucky case law, we join the majority of jurisdictions and hereby adopt § 552's standards for negligent misrepresentation claims in this jurisdiction." *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 582 (Ky. 2004). |
| Louisiana | "Louisiana negligent misrepresentation cases are evaluated using the duty-risk analysis. . . . . Plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached." *Daye v. GMC*, 720 So. 2d 654, 659 (La. 1998). |
| Maine | Adopting "section 552 of the Restatement (Second) of Torts as the appropriate standard for negligent misrepresentation claims." *Perry v. H.O. Perry & Son Co.*, 711 A.2d 1303, 1305 (Me. 1998). |
| Maryland | "[O]n a claim for negligent misrepresentation, the plaintiff must prove: (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that his statement [would] be acted upon by the plaintiff; (3) the defendant had knowledge that the plaintiff [would] probably rely on the statement, which, if erroneous, [would] cause loss or injury; (4) the plaintiff, justifiably, [took] action in reliance on the statement; and (5) the plaintiff suffered damage proximately caused by the defendants' negligence." *Goldstein v. Miles*, 859 A.2d 313, 332 (Md. Ct. Spec. App. 2004). |
| Massachusetts | "In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplied false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others, (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Savers Prop. & Cas. Ins. Co. v. Admiral Ins. Agency, Inc.*, 61 Mass. App. Ct. 158, 169 (2004) (quotations, brackets, citation omitted). |
| Michigan | "A claim for negligent misrepresentation requires plaintiff to prove 'that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.'" *Fejedelem v. Kasco*, 711 N.W.2d 436, 437 (Mich. Ct. App. 2006) (quotations, citation omitted). |
| Minnesota | "Minnesota has adopted the definition of negligent misrepresentation found in the Restatement (Second) Torts § 552." *Florenzano v. Olson*, 387 N.W.2d 168, 174 n.3 (Minn. 1986). |
| Mississippi | "To recover on a cause of action based on negligent misrepresentation, [the plaintiff] must prove by a preponderance of the evidence: 1) a misrepresentation or omission of a fact; 2) that the representation or omission is material or significant; 3)failure to exercise reasonable care on the part of the defendant; 4) reasonable reliance on the misrepresentation or omission; and 5) damages as a direct result of such reasonable reliance." *Levens v. Campbell*, 733 So. 2d 753, 762 (Miss. 1999). |

| | |
|---|---|
| Missouri | To prevail on a claim of negligent misrepresentation, "Plaintiff had to prove: (1) the speaker supplied information in the course of his or her business; (2) due to the speaker's failure to exercise reasonable care, the information was false; (3) the information was intentionally provided for the guidance of a limited group of persons in a particular business transaction; and (4) in justifiably relying on such information, the listener suffered a pecuniary loss." *Gurley v. Montgomery First Nat'l Bank, N.A.*, 160 S.W.3d 863, 867 (Mo. Ct. App. 2005). |
| Montana | The "elements of a claim for negligent misrepresentation [are that]: a) the defendant made a representation as to a past or existing material fact; b) the representation must have been untrue; c) regardless of its actual belief, the defendant must have made the representation without any reasonable ground for believing it to be true; d) the representation must have been made with the intent to induce the plaintiff to rely on it; e) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation; f) the plaintiff, as a result of its reliance, must sustain damage." *Yellowstone II Dev. Group, Inc. v. First Am. Title Ins. Co.*, 20 P.3d 755, 771-72 (Mont. 2001). |
| Nebraska | Adopting Restatement (2d) Torts Section 552. *Gibb v. Citicorp Mortgage*, 518 N.W.2d 910, 921 (Neb. 1994). |
| Nevada | Recognizing "the Restatement (Second) of Torts § 552 definition of the tort of negligent misrepresentation." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998). |
| New Hampshire | "The essential elements of negligent misrepresentation are a negligent misrepresentation by the defendant of a material fact and justifiable reliance by the plaintiff." *Ingaharro v. Blanchette*, 440 A.2d 445, 447 (N.H. 1982). |
| New Jersey | "To establish their claim sounding in negligent misrepresentation, plaintiffs must prove that an incorrect statement was negligently made and justifiably relied upon to recover damages for economic loss or injury sustained as a consequence of that reliance." *H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 143 (N.J. 1983). |
| New Mexico | The Court recognizes the tort of negligent misrepresentation as "articulated in the Restatement (Second) of Torts Section 552 (1977)." *First Interstate Bank v. Foutz*, 764 P.2d 1307, 1314 (N.M. 1988). |
| New York | To prevail on a claim of negligent misrepresentation, plaintiffs must prove that defendants "established and enhanced a special relationship with them which imposed upon these defendants a duty to exercise reasonable care to impart correct information," that the "information was false and . . . plaintiffs relied upon that information to their detriment." *Lawrence v. Houston*, 172 A.D.2d 923, 924 (N.Y. App. Div. 1991). |
| North Carolina | "To prove a claim of negligent misrepresentation, plaintiffs must show: (1) in the course of a business or other transaction in which an individual has a pecuniary interest, (2) defendants '"supplied false information for the guidance of others (3) without exercising reasonable care in obtaining or communicating the information." *Everts v. Parkinson*, 555 S.E.2d 667, 676 (N.C. Ct. App. 2001).' |
| North Dakota | Although the North Dakota has declined to determine "the required elements of negligent misrepresentation," *Lund v. North Dakota State Highway Dep't*, 403 N.W.2d 25, 28 (N.D. 1987), it has recognized a statutory claim pursuant to N.D. Cent. Code § 9-03-08(2) for relief based on negligent misrepresentation. *Bourgois v. Montana-Dakota Utils. Co.*, 466 N.W.2d 813, 818 (N.D. 1991). The statute defines fraud in the form of negligent misrepresentation as "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true." |
| Ohio | Adopting the Restatement (2d) Torts § 552 test of negligent misrepresentation. *Delman v. Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989). |
| Oklahoma | Adopting the Restatement (2d) Torts § 552 test of negligent misrepresentation. *Stroud v. Arthur Andersen & Co.*, 37 P.3d 783, 793-94 (Okla. 2001). |
| Oregon | To prevail on a claim for negligent misrepresentation the plaintiff must prove a special relationship with the defendants, i.e. that the party owing the duty of care is, at least in part acting to further the economic interests of the person to whom the duty of care is owed. *Onita Pac. Corp. v. Trustees. of Bronson*, 843 P.2d 890, 897 (Or. 1992) (en banc). Additionally, the plaintiff must demonstrate losses that were "the foreseeable result of [the] alleged unreasonable misrepresentations." *Allstate Ins. Co. v. Tenant Screening Servs.*, 914 P.2d 16, 21 (Or. Ct. App. 1995). |
| Pennsylvania | Adopting the Restatement (2d) Torts § 552 test of negligent misrepresentation. *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366, 367 (Pa. 1977). |
| Rhode Island | To prevail on a claim of negligent misrepresentation plaintiff must "establish the following elements: (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Francis v. Am. Bankers Life Assur. Co.*, 861 A.2d 1040, 1046 (R.I. 2004) (internal quotations, citations omitted). |
| South Carolina | To establish liability for negligent misrepresentation, the plaintiff must show "(1) the defendant made a false representation to the plaintiff; (2) the defendant had |

| | |
|---|---|
| | a pecuniary interest in making the representation; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation." *Sauner v. Public Serv. Auth.*, 581 S.E.2d 161, 166 (S.C. 2003) (internal quotations, citations omitted). |
| South Dakota | "[N]egligent misrepresentation occurs whenever one party makes (1) a misrepresentation, (2) without reasonable grounds for believing the statement to be true, (3) with the intent to induce a particular action by another party, and the other party (4) changes position with actual and justifiable reliance on the statement, and (5) suffers damage as a result." *Fisher v. Kahler*, 641 N.W.2d 122, 126-27 (S.D. 2002). |
| Tennessee | Tennessee has adopted Section 552 of the Restatement (Second) of Torts "as the guiding principle in negligent misrepresentation actions against other professionals and business persons." *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn. 1991). |
| Texas | "The elements of a cause of action for [negligent misrepresentation] are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.24 (Tex. 2002) (quotations, citation omitted). |
| Utah | "[A] party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury when the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact." *Price-Orem Inv. Co. v. Rollins, Brown & Gunnell*, 713 P.2d 55, 59 (Utah 1986). |
| Vermont | Vermont has adopted the definition of negligent misrepresentation from the Restatement (Second) of Torts § 552. *Hedges v. Durrance*, 834 A.2d 1, 5 (Vt. 2003). |
| Virginia | *Bay Point Condo. Ass'n v. RML Corp.*, 52 Va. Cir. 432, 443 (Va. Cir. Ct. 2000) (declining to recognize a separate cause of action for negligent misrepresentation in the absence of an affirmative Virginia Supreme Court decision recognizing such an action); *accord Lesner Pointe Condo. Ass'n v. Harbour Point Bldg. Corp.*, 61 Va. Cir. 609, 615 (Va. Cir. Ct. 2002). |
| Washington | To prevail on a claim of negligent misrepresentation, a plaintiff must prove: 1) that the defendant supplied information for the guidance of others in their business transactions that was false; (2) that the defendant knew or should have known that the information was supplied to guide the plaintiff in business transactions; (3) that the defendant was negligent in obtaining or communicating false information; (4) that the plaintiff relied on the false information supplied by the defendant; (5) that the plaintiff's reliance on the false information supplied by the defendant was justified (that is, that reliance was reasonable under the surrounding circumstances); and (6) that the false information was the proximate cause of damages to the plaintiff. *Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619, 623 (Wash. 2002). |
| West Virginia | Adopting Section 552 of the Restatement (Second) of Torts (1977). *First Nat'l Bank v. Crawford*, 182 W. Va. 107, 110 (W. Va. 1989). |
| Wisconsin | To prevail on a negligent misrepresentation claim, the plaintiff must prove "(1) a duty of care or voluntary assumption of a duty on the part of the defendant; (2) a breach of that duty, i.e., failure to exercise ordinary care in making the representation or in ascertaining the facts; (3) a causal link between the conduct and the injury; and (4) actual loss or damage as a result of the injury." *Hatleberg v. Norwest Bank Wis.*, 283 Wis. 2d 234, 255-56, 700 N.W.2d 15 (Wis. 2005). |
| Wyoming | Adopting Section 552 of the Restatement (Second) of Torts (1977). *Mueller v. Zimmer*, 124 P.3d 340, 355 (Wyo. 2005). |

# EXHIBIT 52

# COMPREHENSIVE SURVEY OF STATE CIVIL CONSPIRACY LAW

| STATE | SALIENT ELEMENTS |
|---|---|
| Alabama | A civil conspiracy is a combination of two or more individuals to accomplish a lawful end by unlawful means. *Triple J Cattle, Inc. v. Chambers*, 621 So. 2d 1221, 1225 (Ala. 1993) (citing other cases). |
| Alaska | A civil conspiracy is an agreement of two or more persons, in concerted action, to perform a wrongful act in furtherance of the agreement, resulting in damages. *Summers v. Hagen*, 852 P.2d 1165, 1169 (Alaska 1993). |
| Arizona | A civil conspiracy is an agreement by two or more people to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means. *Baker ex rel. Hall Brake Supply, Inc. v. Stewart Title & Trust, Inc.*, 5 P.3d 249, 256 (Ariz. Ct. App. 2000) (quoting *Rowland v. Union Hills Country Club*, 757 P.2d 105, 110 (1988)). |
| Arkansas | "To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive, or immoral means, to the injury of another." *Allen v. Allison*, 2004 Ark. Lexis 157, at *11-12 (Ark. Mar. 11, 2004). |
| California | The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from a wrongful act done in furtherance of the common design. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 456-57 (Cal. 1994) (quoting another case). |
| Colorado | A civil conspiracy involves two or more persons; an object to be accomplished; a meeting of the minds on the object or course of action; an unlawful overt act or unlawful means to a lawful end; and damages as to the proximate result. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). |
| Connecticut | A civil conspiracy is a combination of two or more persons committing an unlawful act or a lawful act by unlawful means, in furtherance of the conspiracy, resulting in damage. *Harp v. King*, 835 A.2d 953, 972-73 (Conn. 2003). |
| Delaware | A civil conspiracy is a confederation or combination of two or more persons; an unlawful act done in furtherance of the conspiracy; and actual damage. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987). |
| District of Columbia | A civil conspiracy is an agreement between two or more persons to participate in an unlawful act, or a lawful act in an unlawful manner, and the commission of an unlawful overt act in furtherance of the common scheme, resulting in damage. *Halberstam v. Welch*, 705 F.2d 472, 477-78 (D.C. Cir. 1983). |
| Florida | A civil conspiracy is a conspiracy between two or more parties to do an unlawful act or to do a lawful act by unlawful means, and the commission of some overt act in pursuance of the conspiracy, resulting in damage. *Florida Fern Growers Ass'n v. Concerned Citizens of Putnam County*, 616 So. 2d 562, 565 (Fla. Dist. Ct. App. 1993). |
| Georgia | A civil conspiracy is a confederation of two or more persons to do an unlawful act, or to do a lawful act by unlawful means, resulting in damages. *Woodruff v. Hughes*, 58 S.E. 551, 552-53 (Ga. Ct. App. 1907). |
| Hawaii | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish a lawful act by unlawful means. *Robert's Haw. School Bus., Inc. v. Laupahoehoe Transp. Co., Inc.*, 982 P.2d 853, 881 n.28 (Haw. 1999). |
| Idaho | A civil conspiracy is a combination of conspirators to commit a wrongful act resulting in injury. *Dahlquist v. Mattson*, 233 P. 883, 885-86 (Idaho 1925). |
| Illinois | A civil conspiracy is a combination of two or more persons for the purpose of accomplishing an unlawful purpose or a lawful purpose by unlawful means, and the commission of an overt tortious or unlawful act. *Fritz v. Johnston*, 807 N.E.2d 461, 470-71 (Ill. 2004). |
| Indiana | A civil conspiracy is a combination of two or more who, by a concerted action, seek to accomplish an unlawful purpose, or to accomplish some lawful purpose by unlawful means. *Durakool, Inc. v. Mercury Displacements Indus., Inc.*, 422 N.E.2d 680, 682 (Ind. Ct. App. 1981). |
| Iowa | A civil conspiracy is an agreement of two or more persons to accomplish an unlawful purpose, or to accomplish by unlawful means a lawful act. *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159, 174 (Iowa 2002). |
| Kansas | A civil conspiracy is two or more persons with a meeting of the minds on the object or course of action and the commission of an unlawful overt act, resulting in damages. *Citizens State Bank v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979). |
| Kentucky | A civil conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act by unlawful means. *Smith v. Board of Educ.*, 94 S.W.2d 321, 325 (Ky. 1936). |

001821-13 118495 v1

| | |
|---|---|
| Louisiana | A civil conspiracy is an agreement of two or more persons to do an unlawful act, or to do a lawful act in an unlawful manner, and the commission of an overt act. *State v. McIlhenny*, 9 So. 2d 467, 472-73 (La. 1942). |
| Maine | A civil conspiracy is a combination of two or more persons who, by concerted action, seek to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means. *Cohen v. Bowdoin*, 288 A.2d 106, 109-10 (Me. 1972). |
| Maryland | A civil conspiracy is an agreement of two or more persons to do an unlawful act, or to do a lawful act with unlawful means, resulting in damages. *Hoffman v. Stamper*, 843 A.2d 153, 178-79 (Md. Ct. Spec. App. 2004), *cert. granted*, 851 A.2d 593 (Md. Ct. Spec. App. 2004). |
| Massachusetts | A civil conspiracy is a combination of two or more persons to do an unlawful act or to do a lawful act with unlawful means. *Baron v. Smyly*, 1995 Mass. Super. Lexis 454 (Mass. Super. Ct. 1995). |
| Michigan | A civil conspiracy is a combination of two or more persons, by some concerted action, to do an unlawful act or to do a lawful act with unlawful means, resulting in damages. *Fenestra Inc. v. Gulf American Land Corp.*, 141 N.W.2d 36, 48-49 (Mich. 1966). |
| Minnesota | A civil conspiracy is a combination of persons to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Lipka v. Minnesota Sch. Employees Ass'n Local 1980*, 537 N.W.2d 624, 632 (Minn. Ct. App. 1995). |
| Mississippi | A civil conspiracy is a combination of persons for the purpose of accomplishing an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Roussel v. Hutton*, 638 So. 2d 1305, 1315 (Miss. 1994). |
| Missouri | A civil conspiracy is an agreement or understanding between persons to do an unlawful act, or to use unlawful means to do a lawful act, and the commission of an act in furtherance of the conspiracy, resulting in damages. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 780-81, 782-83 (Mo. 1999). |
| Montana | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose with unlawful means, through an overt act resulting in damages. *Duffy v. Butte Teachers' Union*, 541 P.2d 1199, 1201-02 (Mont. 1975). |
| Nebraska | "A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means." *Four R Cattle Co. v. Mullins*, 570 N.W.2d 813, 817-18 (Neb. 1997). |
| Nevada | A civil conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co.*, 971 P.2d 1251, 1256 (Nev. 1998). |
| New Hampshire | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. *Jay Edwards, Inc. v. Baker*, 534 A.2d 706, 709-710 (N.H. 1987) (quoting a treatise). |
| New Jersey | A civil conspiracy is a combination of two or more persons to commit an unlawful act or to commit a lawful act by unlawful means, and the commission of an act resulting in damage. *Weil v. Express Container Corp.*, 824 A.2d 174, 183 (N.J. Super. Ct. 2003). |
| New Mexico | A civil conspiracy is two or more persons carrying out specific wrongful acts pursuant to a conspiracy, producing damage. *Vigil v. Public Serv. Co.*, 94 P.3d 813 (N.M. Ct. App. 2004). |
| New York | "A civil conspiracy is a concern or combination to defraud or cause injury to persons or property which results in damage to the person or the property of the plaintiff." *Wegman v. Dairylea Cooperative, Inc.*, 376 N.Y.S.2d 728, 736 (N.Y. App. Div. 1975). |
| North Carolina | A civil conspiracy is an agreement between two or more individuals to do an unlawful act, or to do a lawful act in an unlawful way, resulting in injury inflicted by one or more of the conspirators pursuant to a common scheme. *Stetser v. TAP Pharm. Prods. Inc.*, 598 S.E.2d 570 (N.C. Ct. App. 2004) (citing cases). |
| North Dakota | A civil conspiracy is an agreement between two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means, inflicting injury upon another with an overt act that results in damage. *Burr v. Kulas*, 564 N.W.2d 631, 637 (N.D. 1997). |
| Ohio | A civil conspiracy is a malicious combination of two or more persons to injure another person or property, resulting in damages. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). |
| Oklahoma | A civil conspiracy is a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means. *Gaylord Entm't Co. v. Thompson*, 958 P.2d 128, 148 (Okla. 1998). |
| Oregon | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means, producing damages. *Bonds v. Landers*, 566 P.2d 513, 516 (Or. 1977). |
| Pennsylvania | A civil conspiracy is an agreement between two or more persons to do an unlawful act, or to do a lawful act by unlawful means, along with an overt act which is done in furtherance of the common purpose or design and which produces damage. *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). |
| Rhode Island | A civil conspiracy is "a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose." *Read & Lundy v. Washington Trust Co.*, 2002 R.I. Super. Lexis 181, at 54-57 (R.I. Super. Ct. Dec. 13, 2002). |

| State | Definition |
|---|---|
| South Carolina | A civil conspiracy is a combination of two or more persons for the purpose of injuring the plaintiff and which causes the plaintiff special damages. *Hammond v. Butler, Means, Evins & Brown*, 388 S.E.2d 796, 798 (S.C. Jan. 22, 1990). |
| South Dakota | A civil conspiracy is an agreement between two or more persons with a meeting of the minds on an object to be accomplished and the commission of one or more unlawful overt acts, resulting in damages. *Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000). |
| Tennessee | A civil conspiracy is a combination between two or more persons to accomplish, by concert, an unlawful purpose or to accomplish a lawful purpose by unlawful means, producing damage to person or property of the plaintiff through an overt act in furtherance of the conspiracy. *Frankenbach v. Rose*, 2004 Tenn. App. Lexis 81 (Tenn. Ct. App. Feb. 3, 2004) (citing other cases). |
| Texas | A civil conspiracy is an agreement by two or more persons with specific intent to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Juhl v. Airington*, 936 S.W.2d 640, 643-44 (Tex. 1996). |
| Utah | A civil conspiracy is a combination of two or more persons with a meeting of minds on the object or course of action and the commission of an unlawful, overt act resulting in damage. *Waddoups v. Amalgamated Sugar Co.*, 54 P.3d 1054, 1064 (Utah 2002). |
| Vermont | A civil conspiracy is a combination of two or more persons to do an unlawful purpose, or to do a lawful purpose by unlawful means, in which something unlawful is done in furtherance of the agreement and produces damages. *Boutwell v. Marr*, 42 A. 607, 609 (Vt. 1899). |
| Virginia | "A civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, resulting in damage to the plaintiff." *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984). |
| Washington | A civil conspiracy is an agreement of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Corbit v. J. I. Case Co.*, 424 P.2d 290, 295 (Wash. 1967). |
| West Virginia | A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Dixon v. American Indus. Leasing Co.*, 253 S.Ed.2d 150, 152 (W. Va. 1979) (citing treatise). |
| Wisconsin | A civil conspiracy is a combination of two or more persons by some concerted action to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means, along with a wrongful act done pursuant to the conspiracy which results in damages. *Thomas v. Mallett*, 685 N.W. 2d 791 (Wis. Ct. App. 2004). |
| Wyoming | A civil conspiracy is a concerted action of two or more persons resulting in the commission of an underlying tort that produces damages. *Central Wyo. Med. Lab. v. Med. Testing Lab. Inc.*, 43 P.3d 121, 126 (Wyo. 2002); *Jurkovich v. Estate of Tomlinson*, 843 P.2d 1166, 1172 (Wyo. 1992). |

# COMPREHENSIVE SURVEY OF STATE CONSUMER PROTECTION STATUTES[1]

| STATE | PROVIDES ONLY A "LAUNDRY LIST" OF PROHIBITED PRACTICES WITH RELEVANT PROHIBITIONS CITED | BROADLY PROHIBITS "UNFAIR" OR "DECEPTIVE" ACTS OR PRACTICES | SCIENTER OR RELIANCE REQUIRED |
|---|---|---|---|
| Alabama | | Ala. Code § 8-19-5(27) ("The following deceptive acts or practices in the conduct of any trade or commerce are...unlawful: ... Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."); *see also* Ala. Code § 8-19-5(5), (11) for applicable "laundry list" items. | |
| Alaska | | Alaska Stat. § 45.50.471 ("Unfair or deceptive acts or practices in the conduct of trade or commerce are...unlawful."). | |
| Arizona | | A.R.S. § 44-1522, subd. A ("The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent[2] that others rely upon such . . . is an unlawful practice"). | Reliance required. *See, e.g., Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). |
| Arkansas | | Ark. Code § 4-88-107(a) ("Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to . . . (10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade . . ."); *see also* Ark. Code § 4-88-107(a)(1) for applicable "laundry list" item ("Knowingly making a false representation as to the characteristics, . . . source . . or certification of goods"). | Scienter required for Ark. Code 54-88-107(a)(1) but not for § 4-88-107(a)(10). |
| California | Cal. Civ. Code § 1770 et seq. ("The following...unfair or deceptive acts or practices...are unlawful: ... (5) Representing that goods ... have ... characteristics ... which they do not have ... (7) Representing that goods...are of a particular standard...if they are of another... (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions...."). | Cal. Bus. & Prof. Code § 17200 ("unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising"). | |

[1] For the Court's convenience, a copy of each of the statutes cited below is attached at Exhibit 59 to the Berman Declaration.

[2] This "intent" language has been held not to require specific intent to deceive. *Flagstaff Med. Ctr., Inc. v. Sullivan*, 773 F. Supp. 1325, 1361 (D. Ariz. 1991).

| | | | |
|---|---|---|---|
| Colorado | Colo. Rev. Stat. § 6-1-105(1) ("A person engages in deceptive trade practice when…such person…(e) Knowingly makes a false representation as to the characteristics … of goods…(g) Represents that goods … are of a particular standard [or] quality … if he knows or should know that they are of another" … (l) Makes false or misleading statements of fact concerning the price of goods). | | Scienter required by Colo. Rev. Stat. § 6-1-105(1). |
| Connecticut | | Conn. Gen. Stat. § 42-110b(a) ("No person shall engage in unfair competition or unfair or deceptive acts or practices in the conduct of any trade or commerce."). | |
| Delaware | | 6 Del. Code § 2513(a) ("The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice."). | |
| District of Columbia | D.C. Code § 28-3904 ("It shall be a violation…, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to: (a) represent that goods or services have … characteristics that they do not have…(d) represent that goods… are of a particular standard…if in fact they are of another; (e) misrepresent as to a material fact if such failure tends to mislead; (f) fail to state a material fact if such failure tends to mislead … (j) make false or misleading representations of fact concerning … the price in comparison to price of competitors or one's own price at a past or future time….."). | | |
| Florida | | Fla. Stat. Ann. § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Georgia | | Ga. Code. Ann. § 10-1-393(a) ("Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in the trade or commerce are…unlawful."). | Reliance required. *Lynas v. Williams*, 454 S.E. 2d 570 (Ga. Ct. App., 1995). |
| Hawaii | Haw. Rev. Stat. § 481A-3(a) ("A person engages in a deceptive trade practice when…the person…(5) Represents that goods … have … characteristics…that they do not have…; (7) Represents that goods … are of a particular standard … if they are of another…(11) Makes false or misleading statements of fact concerning the … existence of, or amounts of price reductions, (12) Engages in any other conduct which similarly creates a likelihood of confusion or of | | |

| | | | |
|---|---|---|---|
| | misunderstanding."). | | |
| Idaho | | Idaho Code § 48-603 ("The following.unfair or deceptive acts or practices…are…unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is: … (17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer…."). *See also* Idaho Code § 48-603(5), (7), and (11) for applicable "laundry list" items ("(5) Representing that goods … have … characteristics…that they do not have…; (7) Representing that goods … are of a particular standard … if they are of another…(11) Making false or misleading statements of fact concerning the … existence of, or amounts of price reductions"). | |
| Illinois | | 815 ILCS 505/2 ("[U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are … unlawful whether any person has in fact been misled, deceived or damaged thereby."). | |
| Indiana | Ind. Code § 24-5-0.5-3(a) ("The following acts or representations … are deceptive acts…(1) That such subject of a consumer transaction has … characteristics … it does not have which the supplier knows or should reasonably know it does not have. (2) That such subject of a consumer transaction is of a particular standard … if it is no and if the supplier knows or should reasonably know that it is not…."). | | Scienter required by the terms of the statute. *See also McKinney v. State*, 693 N.E.2d 65, 68 (Ind. 1998).<br><br>Reliance required by the terms of the statute. *See* Ind. Code § 24-5-0.5-4 (damages may be sought by party "relying upon an uncured or incurable deceptive act"). |
| Iowa | | Iowa Code § 714.16.2(a) ("The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission … whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice."). | |
| Kansas | | Kan. Stat. Ann. § 50-626(a) ("No supplier shall engage in any deceptive act or practice in connection with a consumer transaction."); *see also* Kan. Stat. Ann. § 50- | Scienter required for Kan. Stat. Ann. § 50-626(b) but not § 50-626(a). |

| | | | |
|---|---|---|---|
| | | 626(b) (containing "laundry list" of applicable examples). | |
| Kentucky | | Ky. Rev. Stat. § 367.170(1) ("Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Louisiana | | La. Rev. Stat. § 51:1405 ("[U]nfair, or deceptive acts or practices in the conduct of any trade or commerce are…unlawful."). | |
| Maine | | Me. Rev. Stat. Tit. 5 § 207 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Maryland | | Md. Com. Law Code §§ 13-303, 13-301 ("A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle" which includes any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"). *See also* Md. Com. Law Code § 13-301(2), (3), (8) and (9) for applicable "laundry list" items. | |
| Massachusetts | | Mass. Gen. L. ch. 93A, § 2 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Michigan | Mich. Comp. Laws § 445.903 ("Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows…(c) Representing that goods … have characteristics .. that they do not have … (e) Representing that goods … are of a particular standard … if they are of another … (i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer … (bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. (cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."). | | |
| Minnesota | Minn. Stat. § 325D.44 ("A person engages in a deceptive trade practice when, in the course of his business…the person … (5) represents that goods or services have … characteristics … that they do not have … (7) represents that goods … are of a particular standard … if they are of another … (11) makes false or misleading | | |

| | | | |
|---|---|---|---|
| | statements of fact concerning the reasons for, existence of, or amounts of price reductions … (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"). | | |
| Mississippi | | Miss. Code Ann. § 75-24-5(1) ("[U]nfair or deceptive trade practices in or affecting commerce are prohibited"); *see also* Miss. Code Ann. § 75-24-5(2)(e), (g) and (k) for applicable "laundry list" items. | |
| Missouri | | Mo. Rev. Stat. § 407.020.1 ("The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale … of any merchandise in trade or commerce …is…an unlawful practice."). | |
| Montana | | Mont. Code § 30-14-103 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."). | |
| Nebraska | | Neb. Rev. Stat. § 59-1602 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."). | |
| Nevada | Nev. Rev. Stat. § 598.0915 ("A person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he…(5) Knowingly makes a false representation as to the characteristics … of goods … (7) Represents that goods … are of a particular standard … if he knows or should know that they are of another … (13) Makes false or misleading statements of fact concerning the price of goods … or amounts of price reductions … (15) Knowingly makes any other false representation in a transaction. …"); *see also* Nev. Rev. Stat. § 598.0923(2), (3) ("A person engages in a 'deceptive trade practice' when in the course of his business or occupation he knowingly … (2) Fails to disclose a material fact in connection with the sale … of goods … (3) Violates a state or federal statute or regulation relating to the sale … of goods …..") | | Scienter required by the terms of Nev. Rev. Stat. § 598-0915. |
| New Hampshire | | N.H. Rev. Stat. § 358-A:2 ("It shall be unlawful for any person to use…any unfair or deceptive act or practice in the conduct of any trade or commerce ….") | |
| New Jersey | | N.J. Rev. Stat. § 56:8-2 ("The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission…, whether or not any person has in fact been | |

| | | | |
|---|---|---|---|
| | | misled, deceived or damaged thereby, is…an unlawful practice."). | |
| New Mexico | | N.M. Stat. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."). | |
| New York | | N.Y. Gen. Bus. Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade, or commerce…are…unlawful."). | |
| North Carolina | | N.C. Gen. Stat. § 75-1.1(a) ("[U]nfair or deceptive acts or practices in or affecting commerce are…unlawful."). | |
| North Dakota | | N.D. Cent. Code § 51-15-02 ("The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon … whether or not any person has in fact been misled, deceived, or damaged thereby is … an unlawful practice."). | |
| Ohio | | Ohio Rev. Code § 1345.02(a) ("No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."). | |
| Oklahoma | | Okla. Stat. Tit. 15 §§ 752(13) ("'Deceptive trade practice' means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."); (14) ("'Unfair trade practice' means any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."). *See also* Okla. Stat. Tit. 15 § 753(5), (7), (11) and (20) for applicable "laundry list" items. | Scienter required for Okla. Stat. Tit. 15 § 753 but not § 722. |
| Oregon | Or. Rev. Stat. § 646.608(1) ("A person engages in an unlawful practice when…the person…(e) Represents that … goods … have … characteristics … that they do not have … (g) Represents that … goods … are of a particular standard … if they are of another … (j) Makes false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions … (u) Engages in any other unfair or deceptive conduct in trade or commerce."). | | Scienter required for some subsections of Or. Rev. Stat. § 646.608. |
| Pennsylvania | Pa. Stat. Tit. 73, § 201-2(4) ("'[U]nfair or deceptive acts or practices' means … (v) Representing that goods … have … characterstics … that they do not have … (vii) Representing that goods … are of a particular standard … if they are of another … (xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (xxi) Engaging in any other | | |

| | | | |
|---|---|---|---|
| | fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."). | | |
| Rhode Island | | R.I. Gen. Laws § 6-13.1-2, § 6-13.1-1(5)(xiii) and (xiv) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful," which means, among other things, "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect[.]"); *see also* R.I. Gen. Laws § 6-13.1-1(5)(v), (vii), (xi) and (xii) for applicable "laundry list" items. | |
| South Carolina | | S.C. Code § 39-5-20 (a) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."). | |
| South Dakota | | S.D. Codified Laws § 37-24-6 ("It is a deceptive act or practice for any person to: (1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact … regardless of whether any person has in fact been mislead, deceived, or damaged thereby[.]"). | Scienter required by terms of S.D. Codified Laws Ann. § 37-26-6. |
| Tennessee | | Tenn. Code Ann. § 47-18-104(a) ("Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices…."). | |
| Texas | | Tex. Bus. & Com. Code § 17.46(a) ("False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are … unlawful[.]"). | |
| Utah | | Utah Code § 13-11-4(1) ("A deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter…."). | Scienter required for Utah Code Ann. § 13-11-4(2) but not § 13-11-4(1). |
| Vermont | | Vt. Stat. Tit. 9 § 2453 ("[U]nfair or deceptive acts or practices in commerce are … unlawful."). | |
| Virginia | Va. Code § 59.1-200 ("The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are…unlawful: … (5) Misrepresenting that goods or services have certain … characteristics … (6) Misrepresenting that goods … are of a particular standard …(9) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction …."). | | |
| Washington | | RCW 19.86.020 ("[U]nfair or deceptive acts or | |

| | | | |
|---|---|---|---|
| | | practices in the conduct of any trade or commerce are … unlawful."). | |
| West Virginia | | W. Va. Code § 46A-6-104 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful."). | |
| Wisconsin | | Wis. Stats. § 100.18(1) ("No person, firm, corporation or association … with intent to sell [or] distribute … merchandise … shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public … any assertion, representation or statement of fact which is untrue, deceptive or misleading."). | |
| Wyoming | | Wyo. Stat. § 40-12-105(a) ("A person engages in a deceptive trade practice…when, in the course of his business and in connection with a consumer transaction, he knowingly … (xv) Engages in unfair or deceptive acts or practices."). *See also* Wyo. Stat. § 40-12-105(a)(iii) and (iv) for applicable "laundry list" items. | Scienter required by the terms of Wyo. Stat. § 40-12-105(a).<br><br>Reliance required. *See* Wyo. Stat. § 40-12-108(a). |

# EXHIBIT 53

# COMPREHENSIVE SURVEY OF STATE CONSUMER PROTECTION STATUTES[1]

| STATE | PROVIDES ONLY A "LAUNDRY LIST" OF PROHIBITED PRACTICES WITH RELEVANT PROHIBITIONS CITED | BROADLY PROHIBITS "UNFAIR" OR "DECEPTIVE" ACTS OR PRACTICES | SCIENTER OR RELIANCE REQUIRED |
|---|---|---|---|
| Alabama | | Ala. Code § 8-19-5(27) ("The following deceptive acts or practices in the conduct of any trade or commerce are...unlawful: ... Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."); *see also* Ala. Code § 8-19-5(5), (11) for applicable "laundry list" items. | |
| Alaska | | Alaska Stat. § 45.50.471 ("Unfair or deceptive acts or practices in the conduct of trade or commerce are...unlawful."). | |
| Arizona | | A.R.S. § 44-1522, subd. A ("The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent[2] that others rely upon such . . . is an unlawful practice"). | Reliance required. *See, e.g., Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). |
| Arkansas | | Ark. Code § 4-88-107(a) ("Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to . . . (10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade . . ."); *see also* Ark. Code § 4-88-107(a)(1) for applicable "laundry list" item ("Knowingly making a false representation as to the characteristics, . . . source . . or certification of goods"). | Scienter required for Ark. Code 54-88-107(a)(1) but not for § 4-88-107(a)(10). |
| California | Cal. Civ. Code § 1770 et seq. ("The following...unfair or deceptive acts or practices...are unlawful: ... (5) Representing that goods ... have ... characteristics ... which they do not have ... (7) Representing that goods...are of a particular standard...if they are of another... (13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions....."). | Cal. Bus. & Prof. Code § 17200 ("unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising"). | |

[1] For the Court's convenience, a copy of each of the statutes cited below is attached at Exhibit 59 to the Berman Declaration.

[2] This "intent" language has been held not to require specific intent to deceive. *Flagstaff Med. Ctr., Inc. v. Sullivan*, 773 F. Supp. 1325, 1361 (D. Ariz. 1991).

| | | | |
|---|---|---|---|
| Colorado | Colo. Rev. Stat. § 6-1-105(1) ("A person engages in deceptive trade practice when…such person…(e) Knowingly makes a false representation as to the characteristics … of goods…(g) Represents that goods … are of a particular standard [or] quality … if he knows or should know that they are of another" … (l) Makes false or misleading statements of fact concerning the price of goods). | | Scienter required by Colo. Rev. Stat. § 6-1-105(1). |
| Connecticut | | Conn. Gen. Stat. § 42-110b(a) ("No person shall engage in unfair competition or unfair or deceptive acts or practices in the conduct of any trade or commerce."). | |
| Delaware | | 6 Del. Code § 2513(a) ("The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice."). | |
| District of Columbia | D.C. Code § 28-3904 ("It shall be a violation…, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to: (a) represent that goods or services have … characteristics that they do not have…(d) represent that goods… are of a particular standard…if in fact they are of another; (e) misrepresent as to a material fact if such failure tends to mislead; (f) fail to state a material fact if such failure tends to mislead … (j) make false or misleading representations of fact concerning … the price in comparison to price of competitors or one's own price at a past or future time…."). | | |
| Florida | | Fla. Stat. Ann. § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Georgia | | Ga. Code. Ann. § 10-1-393(a) ("Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in the trade or commerce are…unlawful."). | Reliance required. *Lynas v. Williams*, 454 S.E. 2d 570 (Ga. Ct. App., 1995). |
| Hawaii | Haw. Rev. Stat. § 481A-3(a) ("A person engages in a deceptive trade practice when…the person…(5) Represents that goods … have … characteristics…that they do not have…; (7) Represents that goods … are of a particular standard … if they are of another…(11) Makes false or misleading statements of fact concerning the … existence of, or amounts of price reductions, (12) Engages in any other conduct which similarly creates a likelihood of confusion or of | | |

| | | | |
|---|---|---|---|
| | misunderstanding."). | | |
| Idaho | | Idaho Code § 48-603 ("The following unfair or deceptive acts or practices...are...unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is: ... (17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer...."). *See also* Idaho Code § 48-603(5), (7), and (11) for applicable "laundry list" items ("(5) Representing that goods ... have ... characteristics...that they do not have...; (7) Representing that goods ... are of a particular standard ... if they are of another...(11) Making false or misleading statements of fact concerning the ... existence of, or amounts of price reductions"). | |
| Illinois | | 815 ILCS 505/2 ("[U]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are ... unlawful whether any person has in fact been misled, deceived or damaged thereby."). | |
| Indiana | Ind. Code § 24-5-0.5-3(a) ("The following acts or representations ... are deceptive acts...(1) That such subject of a consumer transaction has ... characteristics ... it does not have which the supplier knows or should reasonably know it does not have. (2) That such subject of a consumer transaction is of a particular standard ... if it is no and if the supplier knows or should reasonably know that it is not...."). | | Scienter required by the terms of the statute. *See also McKinney v. State*, 693 N.E.2d 65, 68 (Ind. 1998).<br><br>Reliance required by the terms of the statute. *See* Ind. Code § 24-5-0.5-4 (damages may be sought by party "relying upon an uncured or incurable deceptive act"). |
| Iowa | | Iowa Code § 714.16.2(a) ("The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission ... whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice."). | |
| Kansas | | Kan. Stat. Ann. § 50-626(a) ("No supplier shall engage in any deceptive act or practice in connection with a consumer transaction."); *see also* Kan. Stat. Ann. § 50- | Scienter required for Kan. Stat. Ann. § 50-626(b) but not § 50-626(a). |

| | | | |
|---|---|---|---|
| | | 626(b) (containing "laundry list" of applicable examples). | |
| Kentucky | | Ky. Rev. Stat. § 367.170(1) ("Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Louisiana | | La. Rev. Stat. § 51:1405 ("[U]nfair, or deceptive acts or practices in the conduct of any trade or commerce are…unlawful."). | |
| Maine | | Me. Rev. Stat. Tit. 5 § 207 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Maryland | | Md. Com. Law Code §§ 13-303, 13-301 ("A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle" which includes any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"). *See also* Md. Com. Law Code § 13-301(2), (3), (8) and (9) for applicable "laundry list" items. | |
| Massachusetts | | Mass. Gen. L. ch. 93A, § 2 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are…unlawful"). | |
| Michigan | Mich. Comp. Laws § 445.903 ("Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows…(c) Representing that goods … have characteristics .. that they do not have … (e) Representing that goods … are of a particular standard … if they are of another … (i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer … (bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is. (cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."). | | |
| Minnesota | Minn. Stat. § 325D.44 ("A person engages in a deceptive trade practice when, in the course of his business…the person … (5) represents that goods or services have … characteristics … that they do not have … (7) represents that goods … are of a particular standard … if they are of another … (11) makes false or misleading | | |

| | | | |
|---|---|---|---|
| | statements of fact concerning the reasons for, existence of, or amounts of price reductions … (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"). | | |
| Mississippi | | Miss. Code Ann. § 75-24-5(1) ("[U]nfair or deceptive trade practices in or affecting commerce are prohibited"); *see also* Miss. Code Ann. § 75-24-5(2)(e), (g) and (k) for applicable "laundry list" items. | |
| Missouri | | Mo. Rev. Stat. § 407.020.1 ("The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale … of any merchandise in trade or commerce …is…an unlawful practice."). | |
| Montana | | Mont. Code § 30-14-103 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."). | |
| Nebraska | | Neb. Rev. Stat. § 59-1602 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."). | |
| Nevada | Nev. Rev. Stat. § 598.0915 ("A person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he…(5) Knowingly makes a false representation as to the characteristics … of goods … (7) Represents that goods … are of a particular standard … if he knows or should know that they are of another … (13) Makes false or misleading statements of fact concerning the price of goods … or amounts of price reductions … (15) Knowingly makes any other false representation in a transaction. …"); *see also* Nev. Rev. Stat. § 598.0923(2), (3) ("A person engages in a 'deceptive trade practice' when in the course of his business or occupation he knowingly … (2) Fails to disclose a material fact in connection with the sale … of goods … (3) Violates a state or federal statute or regulation relating to the sale … of goods ….."). | | Scienter required by the terms of Nev. Rev. Stat. § 598-0915. |
| New Hampshire | | N.H. Rev. Stat. § 358-A:2 ("It shall be unlawful for any person to use…any unfair or deceptive act or practice in the conduct of any trade or commerce …."). | |
| New Jersey | | N.J. Rev. Stat. § 56:8-2 ("The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission…, whether or not any person has in fact been | |

| | | | |
|---|---|---|---|
| | | misled, deceived or damaged thereby, is…an unlawful practice."). | |
| New Mexico | | N.M. Stat. § 57-12-3 ("Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."). | |
| New York | | N.Y. Gen. Bus. Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade, or commerce…are…unlawful."). | |
| North Carolina | | N.C. Gen. Stat. § 75-1.1(a) ("[U]nfair or deceptive acts or practices in or affecting commerce are…unlawful."). | |
| North Dakota | | N.D. Cent. Code § 51-15-02 ("The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon … whether or not any person has in fact been misled, deceived, or damaged thereby is … an unlawful practice."). | |
| Ohio | | Ohio Rev. Code § 1345.02(a) ("No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction."). | |
| Oklahoma | | Okla. Stat. Tit. 15 §§ 752(13) ("'Deceptive trade practice' means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."); (14) ("'Unfair trade practice' means any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."). *See also* Okla. Stat. Tit. 15 § 753(5), (7), (11) and (20) for applicable "laundry list" items. | Scienter required for Okla. Stat. Tit. 15 § 753 but not § 722. |
| Oregon | Or. Rev. Stat. § 646.608(1) ("A person engages in an unlawful practice when…the person…(e) Represents that … goods … have … characteristics … that they do not have … (g) Represents that … goods … are of a particular standard … if they are of another … (j) Makes false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions … (u) Engages in any other unfair or deceptive conduct in trade or commerce."). | | Scienter required for some subsections of Or. Rev. Stat. § 646.608. |
| Pennsylvania | Pa. Stat. Tit. 73, § 201-2(4) ("'[U]nfair or deceptive acts or practices' means … (v) Representing that goods … have … characterstics … that they do not have … (vii) Representing that goods … are of a particular standard … if they are of another … (xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (xxi) Engaging in any other | | |

| | | | |
|---|---|---|---|
| | fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."). | | |
| Rhode Island | | R.I. Gen. Laws § 6-13.1-2, § 6-13.1-1(5)(xiii) and (xiv) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful," which means, among other things, "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect[.]"); *see also* R.I. Gen. Laws § 6-13.1-1(5)(v), (vii), (xi) and (xii) for applicable "laundry list" items. | |
| South Carolina | | S.C. Code § 39-5-20 (a) ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."). | |
| South Dakota | | S.D. Codified Laws § 37-24-6 ("It is a deceptive act or practice for any person to: (1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact … regardless of whether any person has in fact been mislead, deceived, or damaged thereby[.]"). | Scienter required by terms of S.D. Codified Laws Ann. § 37-26-6. |
| Tennessee | | Tenn. Code Ann. § 47-18-104(a) ("Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices…."). | |
| Texas | | Tex. Bus. & Com. Code § 17.46(a) ("False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are … unlawful[.]"). | |
| Utah | | Utah Code § 13-11-4(1) ("A deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter…."). | Scienter required for Utah Code Ann. § 13-11-4(2) but not § 13-11-4(1). |
| Vermont | | Vt. Stat. Tit. 9 § 2453 ("[U]nfair or deceptive acts or practices in commerce are … unlawful."). | |
| Virginia | Va. Code § 59.1-200 ("The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are…unlawful: … (5) Misrepresenting that goods or services have certain … characteristics … (6) Misrepresenting that goods … are of a particular standard …(9) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions … (14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction ….."). | | |
| Washington | | RCW 19.86.020 ("[U]nfair or deceptive acts or | |

| | | | |
|---|---|---|---|
| | | practices in the conduct of any trade or commerce are … unlawful."). | |
| West Virginia | | W. Va. Code § 46A-6-104 ("[U]nfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful."). | |
| Wisconsin | | Wis. Stats. § 100.18(1) ("No person, firm, corporation or association … with intent to sell [or] distribute … merchandise … shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public … any assertion, representation or statement of fact which is untrue, deceptive or misleading."). | |
| Wyoming | | Wyo. Stat. § 40-12-105(a) ("A person engages in a deceptive trade practice…when, in the course of his business and in connection with a consumer transaction, he knowingly … (xv) Engages in unfair or deceptive acts or practices."). *See also* Wyo. Stat. § 40-12-105(a)(iii) and (iv) for applicable "laundry list" items. | Scienter required by the terms of Wyo. Stat. § 40-12-105(a).<br><br>Reliance required. *See* Wyo. Stat. § 40-12-108(a). |

*Code of Ala. § 8-19-5*

MICHIE'S ALABAMA CODE
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH 2003 SECOND SPECIAL SESSION ***
*** ANNOTATIONS CURRENT THRU MAY 14, 2004 ***

TITLE 8. COMMERCIAL LAW AND CONSUMER PROTECTION
CHAPTER 19. DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Code of Ala. § 8-19-5 (2004)

§ 8-19-5. Deceptive acts in trade or commerce prohibited

The following deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:

(1) Passing off goods or services as those of another, provided that this section shall not prohibit the private labeling of goods or services.

(2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(3) Causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services.

(4) Using deceptive representations or designations of geographic origin in connection with goods or services.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(6) Representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, secondhand, or altered to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased, provided that this subdivision shall not apply to new goods which have been reconditioned, reclaimed, or repaired and such fact is disclosed to the purchaser.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(8) Disparaging the goods, services, or business of another by false or misleading representation of fact.

(9) Advertising goods or services with intent not to sell them as advertised.

(10) Advertising goods or services with intent not to supply reasonably expectable public demand unless the advertisement discloses a limitation of quantity.

(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions.

(12) Knowingly failing to identify flood, water, fire, or accidentally damaged goods as damaged goods if they are damaged to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased, provided, that this subdivision shall not apply to accidentally damaged new goods where the goods are reconditioned, reclaimed, or repaired to substantially their original condition and such fact is disclosed to the purchaser.

(13) Knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service.

(14) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction.

(15) Disconnecting, turning back, replacing, or resetting the odometer of any motor vehicle so as to reduce the number of miles indicated on the odometer gauge with the intent of deception.

(16) Advertising of any sale by falsely representing that a person is going out of business.

(17) After receipt of payment for goods or services, failing to ship the goods or furnish such services within the time advertised or otherwise represented or, if no specific time is advertised or represented, failing to ship the goods or furnish such services within 30 days, unless within the applicable time period the seller provides the buyer with the option to either cancel the sales agreement and receive a refund of all previous payments to the seller or to extend the date to a specific date proposed by the seller. Any refund shall be mailed or delivered to the buyer within 10 business days after the seller receives written notification from the buyer of the buyer's option to cancel the sales agreement and receive the refund.

(18) Using or employing a chain referral sales plan in connection with the sale or offering for sale of goods, merchandise, or anything of value, involving a sales technique, plan, arrangement, or agreement in which the buyer or prospective buyer is offered the opportunity to purchase merchandise or goods and in connection with the purchase receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for furnishing to the seller the names of other prospective buyers, if the receipt of the compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchased the goods, merchandise, or anything of value.

(19) Selling or offering to sell, either directly or associated with the sale of goods or services, a right to participation in a pyramid sales structure. As used herein, "pyramid sales structure" includes any plan or operation for the sale or distribution of goods, services, or other property wherein a person for consideration acquires the opportunity to receive a pecuniary benefit, which is based primarily upon the inducement of additional persons by that person, and others, regardless of number, to participate in the same plan or operation, and is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed. For purposes of this subdivision, "consideration" shall not include payments made for sales demonstration equipment and materials furnished on a nonprofit basis for use in making sales and not for resale wherein such payments amount to less than one hundred dollars ($ 100) annually.

(20) In connection with any seller-assisted marketing plan, either misrepresenting the amount or extent of earnings to result therefrom, or misrepresenting the extent or nature of the market for the goods or services, or both, sold or delivered in connection with the plan, or misrepresenting that the seller of the plan will repurchase all or part of the goods or services, or both, sold or delivered in connection with the plan, or failing to deliver goods or services, or both, within the time represented. As used herein, "seller-assisted marketing plan" includes any plan, scheme, or system in which for a consideration a buyer acquires goods or services, or both, together with a plan, scheme, or system for

the resale of said goods or services, or both.

(21) Intentionally misrepresenting that a warranty or guarantee confers or involves certain rights or remedies.

(22) In selling a new motor vehicle, failing to disclose material damage to the motor vehicle as prescribed hereafter:

a. Each manufacturer, importer, or distributor of new motor vehicles sold or transferred to a motor vehicle dealer in this state, shall notify the motor vehicle dealer in writing prior to delivery of the vehicle of any material damage to the vehicle which is known to the manufacturer, importer, or distributor, and which was sustained or incurred by the motor vehicle at any time after the manufacturing process is complete but prior to delivery of the vehicle to the dealer.

b. In selling a new motor vehicle, each motor vehicle dealer in this state shall notify the purchaser in writing at the time of sale of any material damage to the vehicle which is known to the motor vehicle dealer and which was sustained or incurred by the motor vehicle at any time after the manufacturing process is complete, but prior to delivery of the vehicle to the purchaser.

c. For purposes of this section, "material damage" means damage sustained or incurred by a motor vehicle, whether corrected or uncorrected, which cost to repair exceeds three percent of the manufacturer's suggested retail price of the vehicle based upon the dealer's retail repair cost or the sum of $ 500, whichever is greater. Damage to tires, glass, bumpers, and in-dash audio equipment shall not be considered in determining the cost of repair if those components are replaced by identical manufacturer's original equipment. The failure of a manufacturer, importer, distributor, or motor vehicle dealer to give notice of damage below the threshold constituting "material damage" shall not provide grounds for revocation of the sale nor shall such failure constitute a material misrepresentation or omission of fact.

d. Each manufacturer, importer, or distributor of new motor vehicles shall indemnify and hold harmless the motor vehicle dealer obtaining a vehicle from the manufacturer, importer, or distributor from and against any liability, including reasonable attorneys' fees, which the motor vehicle dealer may have to the purchaser of the vehicle as a result of damage to the new motor vehicle which was known to the manufacturer, importer, or distributor, which occurred prior to delivery of the vehicle to the dealer, and which was not disclosed in writing to the dealer prior to delivery of the vehicle. This indemnity obligation of the manufacturer, importer, or distributor shall apply regardless of whether the damage constitutes "material damage" as defined herein.

(23) Affixing an Alabama revenue stamp, including local municipal or county stamps, to, or upon, any package of cigarettes, or selling or holding for sale any package of cigarettes to which an Alabama revenue stamp, including local municipal or county stamps, has been affixed, if:

a. The package differs in any respect with the requirements of the Federal Cigarette Labeling and Advertising Act (15 U.S.C. Sec. 1331 and following), for the placement of labels, warnings, or any other information upon a package of cigarettes that is to be sold within the United States;

b. The package is labeled "For Export Only," "U.S. Tax Exempt," "For Use Outside U.S.," or similar wording indicating that the manufacturer did not intend that the product be sold in the United States;

c. The package, or a package containing individually stamped packages, has been altered by adding or deleting the wording, labels, or warnings described in paragraph a. or b. of this subdivision;

d. With respect to the cigarettes any person is not in compliance with 15 U.S.C. Sec. 1335a (relating to submission of ingredient information to federal authorities), 19 U.S.C. Sec. 1681-1681b (relating to imports of certain cigarettes), 26 U.S.C. Sec. 5754 (relating to previously exported tobacco products), or any other federal law or implementing federal regulations; or

e. The package in any way violates federal trademark or copyright laws.

For the purposes of this subdivision, the term "package" means a pack, carton, or container of any kind in which cigarettes are offered for sale, sold, or otherwise distributed, or intended for distribution, to consumers. Also for the purposes of this subdivision, the term "Alabama revenue stamp" means the stamp or stamps by the use of which the tax levied under Article 1 of Chapter 25 of Title 40, is paid.

(24) Engaging in the sale, distribution, possession, acquisition, importation, or transportation of any cigarettes that do not comply with all applicable requirements imposed by or pursuant to federal law and federal implementing regulations.

(25) Engaging in a scheme or artifice to defraud by telephone communication. For purposes of this subdivision, a "scheme or artifice to defraud" means a systematic, ongoing course of conduct with the specific intent to defraud one or more persons in order to obtain property from that person by a telephone communication; and "telephone communication" means the transmission of information by the use of the telephone, with the specific intent of defrauding a person by a material misrepresentation and obtaining property from that person as a result of the fraud. Puffing or puffery does not constitute a scheme or artifice to defraud.

(26) Making any communication by telephone directly to another person which offers to the other person a gift, award, or prize, where the person making the communication has actual knowledge at the time of making the communication that the communication was materially false and the person making the communication specifically intended to deprive the other person of real or personal property as a result of the false communication.

(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

Source: Legal > States Legal - U.S. > Alabama > Statutes & Regulations > **AL - Code of Alabama**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 5:45 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Alaska Stat. § 45.50.471*

ALASKA STATUTES
Copyright © 2004 by The State of Alaska
and Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THRU ALL 2003 SESSIONS ***
*** ANNOTATIONS CURRENT THRU OPINIONS DECIDED AS OF APRIL 30, 2004 ***

TITLE 45. TRADE AND COMMERCE
CHAPTER 50. COMPETITIVE PRACTICES AND REGULATION OF COMPETITION
ARTICLE 3. UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Alaska Stat. § 45.50.471 (2004)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT**
LEXSEE 2004 AK. ALS 151 -- See section 13.
LEXSEE 2004 AK. ALS 55 -- See section 1.
LEXSEE 2004 AK. ALS 57 -- See section 2.

Sec. 45.50.471. Unlawful acts and practices

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.

(b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:

(1) fraudulently conveying or transferring goods or services by representing them to be those of another;

(2) falsely representing or designating the geographic origin of goods or services;

(3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services;

(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(5) representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, secondhand, or seconds;

(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(7) disparaging the goods, services, or business of another by false or misleading representation of fact;

(8) advertising goods or services with intent not to sell them as advertised;

(9) advertising goods or services with intent not to supply reasonable expectable public demand, unless the advertisement prominently discloses a limitation of quantity;

(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;

(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged;

(13) failing to deliver to the customer at the time of an installment sale of goods or services, a written order, contract, or receipt setting out the name and address of the seller and the name and address of the organization that the seller represents, and all of the terms and conditions of the sale, including a description of the goods or services, which shall be stated in readable, clear, and unambiguous language;

(14) representing that an agreement confers or involves rights, remedies or obligations which it does not confer or involve, or which are prohibited by law;

(15) knowingly making false or misleading statements concerning the need for parts, replacement, or repair service;

(16) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction;

(17) basing a charge for repair in whole or in part on a guaranty or warranty rather than on the actual value of the actual repairs made or work to be performed on the item without stating separately the charges for the work and the charge for the guaranty or warranty, if any;

(18) disconnecting, turning back or resetting the odometer of a vehicle to reduce the number of miles indicated;

(19) using a chain referral sales plan by inducing or attempting to induce a consumer to enter into a contract by offering a rebate, discount, commission, or other consideration, contingent upon the happening of a future event, on the condition that the consumer either sells, or gives information or assistance for the purpose of leading to a sale by the seller of the same or related goods;

(20) selling or offering to sell a right of participation in a chain distributor scheme;

(21) selling, falsely representing or advertising meat, fish or poultry which has been frozen as fresh food;

(22) failing to comply with AS 45.02.350;

(23) failing to comply with AS 45.45.130 -- 45.45.240;

(24) counseling, consulting or arranging for future services relating to the disposition of a body upon death whereby certain personal property, not including cemetery lots and markers, will be furnished or the professional services of a funeral director or embalmer will be furnished, unless the person receiving money or property deposits the money or property, and money or property is received, within five days

of its receipt, in a trust in a financial institution whose deposits are insured by an instrumentality of the federal government designating the institution as the trustee as a separate trust in the name only of the person on whose behalf the arrangements are made with a provision that the money or property may only be applied to the purchase of designated merchandise or services and should the money or property deposited and any accrued interest not be used for the purposes intended on the death of the person on whose behalf the arrangements are made, all money or property in the trust shall become part of that person's estate; upon demand by the person on whose behalf the arrangements are made, all money or property in the trust including accrued interest, shall be paid to that person; this paragraph does not prohibit the charging of a separate fee for consultation, counseling or arrangement services if the fee is disclosed to the person making the arrangement; any arrangement under this paragraph which would constitute a contract of insurance under AS 21 is subject to the provisions of AS 21;

(25) failing to comply with the terms of AS 45.50.800 -- 45.50.850 (Alaska Gasoline Products Leasing Act);

(26) failing to comply with AS 45.30 relating to mobile home warranties and mobile home parks;

(27) failing to comply with AS 14.48.060(b)(13);

(28) dealing in hearing aids and failing to comply with AS 08.55;

(29) violating AS 45.45.910(a), (b), or (c);

(30) failing to comply with AS 45.50.473;

(31) violating the provisions of AS 45.45.400;

(32) knowingly selling a reproduction of a piece of art or handicraft that was made by a resident of the state unless the reproduction is clearly labeled as a reproduction; in this paragraph, "reproduction" means a copy of an original if the copy is

(A) substantially the same as the original; and

(B) not made by the person who made the original;

(33) violating AS 08.66 (motor vehicle dealers);

(34) violating AS 08.66.200 -- 08.66.350 (motor vehicle buyers' agents);

(35) violating AS 45.63 (telephonic solicitations);

(36) violating AS 45.68 (charitable solicitations);

(37) violating AS 45.50.474 (on board promotions);

(38) referring a person to a dentist or a dental practice that has paid or will pay a fee for the referral unless the person making the referral discloses at the time the referral is made that the dentist or dental practice has paid or will pay a fee based on the referral;

(39) advertising that a person can receive a referral to a dentist or a dental practice without disclosing in the advertising that the dentist or dental practice to which the person is referred has paid or will pay a fee based on the referral if, in fact, the dentist or dental practice to which the person is referred has paid or will pay a fee based on the referral;

(40) violating AS 45.50.477(a) -- (c);

(41) failing to comply with AS 45.50.475;

(42) violating AS 45.35 (lease-purchase agreements);

(43) violating AS 45.25.400 -- 45.25.590 (motor vehicle dealer practices);

(44) violating AS 45.66 (sale of business opportunities);

(45) violating AS 08.18.023(b) or 08.18.152;

(46) violating AS 45.50.479 (limitations on electronic mail).

(c) The unlawful acts and practices listed in (b) of this section are in addition to and do not limit the types of unlawful acts and practices actionable at common law or under other state statutes.

(d) *[Repealed, § 21 ch 166 SLA 1978.]*

Source: Legal > States Legal - U.S. > Alaska > Statutes & Regulations > **AK - Alaska Statutes**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 5:56 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*A.R.S. § 44-1522*

ARIZONA REVISED STATUTES
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT IS CURRENT THRU THE 2ND SP. SESSION OF THE 46TH LEGISLATURE *
* ANNOTATIONS CURRENT THROUGH MAY 20, 2004 *

TITLE 44. TRADE AND COMMERCE
CHAPTER 10. COMPETITION AND COMPETITIVE PRACTICES
ARTICLE 7. CONSUMER FRAUD

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

A.R.S. § 44-1522 (2004)

§ 44-1522. Unlawful practices; intended interpretation of provisions

A. The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

B. The violation of chapter 9, article 16 or chapter 19, article 1 of this title is declared to be an unlawful practice and subject to enforcement under this article.

C. It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade commission and the federal courts to 15 United States Code sections 45, 52 and 55(a) (1).

Source: Legal > States Legal - U.S. > Arizona > Statutes & Regulations > **AZ - Arizona Revised Statutes Annotated**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:01 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*A.C.A. § 4-88-107*

ARKANSAS CODE OF 1987 ANNOTATED OFFICIAL EDITION 2004
Copyright © 1987-2004 by The State of Arkansas
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2003 LEGISLATIVE SESSION ***
*** ANNOTATIONS CURRENT THROUGH JANUARY 14, 2004 ***

TITLE 4. BUSINESS AND COMMERCIAL LAW
SUBTITLE 7. CONSUMER PROTECTION
CHAPTER 88. DECEPTIVE TRADE PRACTICES
SUBCHAPTER 1. GENERAL PROVISIONS

**GO TO THE ARKANSAS CODE ARCHIVE DIRECTORY**

A.C.A. § 4-88-107 (2003)

§ 4-88-107. Deceptive and unconscionable trade practices generally

(a) Deceptive and unconscionable trade practices made unlawful and prohibited by this chapter include, but are not limited to, the following:

(1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;

(2) Disparaging the goods, services, or business of another by false or misleading representation of fact;

(3) Advertising the goods or services with the intent not to sell them as advertised;

(4) Refusal of a retailer to deliver to a customer purchasing any electronic or mechanical apparatus the record of warranty and statement of service availability which the manufacturer includes in the original carton or container of the product or the refusal to make available on request information relating thereto;

(5) The employment of bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell, evidenced by:

(A) A refusal to show or a disparagement of the advertised product;

(B) The requirement of a tie-in sale or other undisclosed conditions precedent to the purchase;

(C) A demonstration of a defective product; or

(D) Other acts demonstrating an intent not to sell the advertised product or services;

(6) Knowingly failing to identify flood, water, fire, or accidentally damaged goods as to such damages;

(7) Making a false representation that contributions solicited for charitable purposes shall be spent in a specific manner or for specified purposes;

(8) Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest

because of:

(A) Physical infirmity;

(B) Ignorance;

(C) Illiteracy;

(D) Inability to understand the language of the agreement; or

(E) A similar factor;

(9) The offering for sale, assembly, or drafting of any trust document, including a living trust, by a nonlawyer, excluding the marketing, assembly, and funding by bank trust departments and trust companies;

(10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade; and

(11) (A) Displaying or causing to be displayed a fictitious or misleading name or telephone number on an Arkansas resident's telephone caller identification service.

(B) Subdivision (a)(11)(A) of this section does not apply to the transmission of a caller identification service by a telecommunications provider.

(b) The deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

Source: Legal > States Legal - U.S. > Arkansas > Statutes & Regulations > **AR - Arkansas Code Annotated**
View: Custom
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:04 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

CALIFORNIA CODES
**CIVIL CODE**
SECTION **1750**-1756

**1750**. This title may be cited as the Consumers Legal Remedies Act.

1751. Any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void.

1752. The provisions of this title are not exclusive. The remedies provided herein for violation of any section of this title or for conduct proscribed by any section of this title shall be in addition to any other procedures or remedies for any violation or conduct provided for in any other law.

Nothing in this title shall limit any other statutory or any common law rights of the Attorney General or any other person to bring class actions. Class actions by consumers brought under the specific provisions of Chapter 3 (commencing with Section 1770) of this title shall be governed exclusively by the provisions of Chapter 4 (commencing with Section 1780); however, this shall not be construed so as to deprive a consumer of any statutory or common law right to bring a class action without resort to this title. If any act or practice proscribed under this title also constitutes a cause of action in common law or a violation of another statute, the consumer may assert such common law or statutory cause of action under the procedures and with the remedies provided for in such law.

1753. If any provision of this title or the application thereof to any person or circumstance is held to be unconstitutional, the remainder of the title and the application of such provision to other persons or circumstances shall not be affected thereby.

1754. The provisions of this title shall not apply to any transaction which provides for the construction, sale, or construction and sale of an entire residence or all or part of a structure designed for commercial or industrial occupancy, with or without a parcel of real property or an interest therein, or for the sale of a lot or parcel of real property, including any site preparation incidental to such sale.

1755. Nothing in this title shall apply to the owners or employees of any advertising medium, including, but not limited to, newspapers, magazines, broadcast stations, billboards and transit ads, by whom any advertisement in violation of this title is published or disseminated, unless it is established that such owners or employees had knowledge of the deceptive methods, acts or practices declared to

be unlawful by Section 1770.

1756.   The substantive and procedural provisions of this title shall
only apply to actions filed on or after January 1, 1971.

CALIFORNIA CODES
**CIVIL CODE**
SECTION **1760**-1761

**1760.** This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.

1761. As used in this title:

(a) "Goods" means tangible chattels bought or leased for use primarily for personal, family, or household purposes, including certificates or coupons exchangeable for these goods, and including goods which, at the time of the sale or subsequently, are to be so affixed to real property as to become a part of real property, whether or not severable therefrom.

(b) "Services" means work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods.

(c) "Person" means an individual, partnership, corporation, limited liability company, association, or other group, however organized.

(d) "Consumer" means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes.

(e) "Transaction" means an agreement between a consumer and any other person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement.

(f) "Senior citizen" means a person who is 65 years of age or older.

(g) "Disabled person" means any person who has a physical or mental impairment which substantially limits one or more major life activities.

(1) As used in this subdivision, "physical or mental impairment" means any of the following:

(A) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss substantially affecting one or more of the following body systems: neurological; muscoloskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; or endocrine.

(B) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairment, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, and emotional illness.

(2) "Major life activities" means functions such as caring for one' s self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(h) "Home solicitation" means any transaction made at the consumer'

s primary residence, except those transactions initiated by the consumer. A consumer response to an advertisement is not a home solicitation.

CALIFORNIA CODES
**CIVIL CODE**
SECTION 1770

**1770.** (a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

(1) Passing off goods or services as those of another.

(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.

(3) Misrepresenting the affiliation, connection, or association with, or certification by, another.

(4) Using deceptive representations or designations of geographic origin in connection with goods or services.

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

(6) Representing that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand.

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(8) Disparaging the goods, services, or business of another by false or misleading representation of fact.

(9) Advertising goods or services with intent not to sell them as advertised.

(10) Advertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity.

(11) Advertising furniture without clearly indicating that it is unassembled if that is the case.

(12) Advertising the price of unassembled furniture without clearly indicating the assembled price of that furniture if the same furniture is available assembled from the seller.

(13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions.

(14) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.

(15) Representing that a part, replacement, or repair service is needed when it is not.

(16) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

(17) Representing that the consumer will receive a rebate, discount, or other economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(18) Misrepresenting the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction with a consumer.

(19) Inserting an unconscionable provision in the contract.

(20) Advertising that a product is being offered at a specific price plus a specific percentage of that price unless (1) the total

price is set forth in the advertisement, which may include, but is not limited to, shelf tags, displays, and media advertising, in a size larger than any other price in that advertisement, and (2) the specific price plus a specific percentage of that price represents a markup from the seller's costs or from the wholesale price of the product. This subdivision shall not apply to in-store advertising by businesses which are open only to members or cooperative organizations organized pursuant to Division 3 (commencing with Section 12000) of Title 1 of the Corporations **Code** where more than 50 percent of purchases are made at the specific price set forth in the advertisement.

(21) Selling or leasing goods in violation of Chapter 4 (commencing with Section 1797.8) of Title 1.7.

(22) (A) Disseminating an unsolicited prerecorded message by telephone without an unrecorded, natural voice first informing the person answering the telephone of the name of the caller or the organization being represented, and either the address or the telephone number of the caller, and without obtaining the consent of that person to listen to the prerecorded message.

(B) This subdivision does not apply to a message disseminated to a business associate, customer, or other person having an established relationship with the person or organization making the call, to a call for the purpose of collecting an existing obligation, or to any call generated at the request of the recipient.

(23) The home solicitation, as defined in subdivision (h) of Section 1761, of a consumer who is a senior citizen where a loan is made encumbering the primary residence of that consumer for the purposes of paying for home improvements and where the transaction is part of a pattern or practice in violation of either subsection (h) or (i) of Section 1639 of Title 15 of the United States **Code** or subsection (e) of Section 226.32 of Title 12 of the **Code** of Federal Regulations.

A third party shall not be liable under this subdivision unless (1) there was an agency relationship between the party who engaged in home solicitation and the third party or (2) the third party had actual knowledge of, or participated in, the unfair or deceptive transaction. A third party who is a holder in due course under a home solicitation transaction shall not be liable under this subdivision.

(b) (1) It is an unfair or deceptive act or practice for a mortgage broker or lender, directly or indirectly, to use a home improvement contractor to negotiate the terms of any loan that is secured, whether in whole or in part, by the residence of the borrower and which is used to finance a home improvement contract or any portion thereof. For purposes of this subdivision, "mortgage broker or lender" includes a finance lender licensed pursuant to the California Finance Lenders Law (Division 9 (commencing with Section 22000) of the Financial **Code**), a residential mortgage lender licensed pursuant to the California Residential Mortgage Lending Act (Division 20 (commencing with Section 50000) of the Financial **Code**), or a real estate broker licensed under the Real Estate Law (Division 4 (commencing with Section 10000) of the Business and Professions **Code**).

(2) This section shall not be construed to either authorize or prohibit a home improvement contractor from referring a consumer to a mortgage broker or lender by this subdivision. However, a home improvement contractor may refer a consumer to a mortgage lender or broker if that referral does not violate Section 7157 of the Business and Professions **Code** or any other provision of law. A mortgage lender or broker may purchase an executed home improvement contract

Case 1:05-cv-11148-PBS Document 180-4 Filed 12/20/2006 Page 30 of 61

if that purchase does not violate Section 7157 of the Business and Professions **Code** or any other provision of law. Nothing in this paragraph shall have any effect on the application of Chapter 1 (commencing with Section 1801) of Title 2 to a home improvement transaction or the financing thereof.

CALIFORNIA CODES
**CIVIL CODE**
SECTION 1780-1784

1780. (a) Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section **1770** may bring an action against that person to recover or obtain any of the following:

(1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).

(2) An order enjoining the methods, acts, or practices.

(3) Restitution of property.

(4) Punitive damages.

(5) Any other relief that the court deems proper.

(b) (1) Any consumer who is a senior citizen or a disabled person, as defined in subdivisions (f) and (g) of Section 1761, as part of an action under subdivision (a), may seek and be awarded, in addition to the remedies specified therein, up to five thousand dollars ($5,000) where the trier of fact does all of the following:

(A) Finds that the consumer has suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct.

(B) Makes an affirmative finding in regard to one or more of the factors set forth in subdivision (b) of Section 3345.

(C) Finds that an additional award is appropriate.

(2) Judgment in a class action by senior citizens or disabled persons under Section 1781 may award each class member that additional award if the trier of fact has made the foregoing findings.

(c) An action under subdivision (a) or (b) may be commenced in the county in which the person against whom it is brought resides, has his or her principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred.

In any action subject to the provisions of this section, concurrently with the filing of the complaint, the plaintiff shall file an affidavit stating facts showing that the action has been commenced in a county described in this section as a proper place for the trial of the action. If a plaintiff fails to file the affidavit required by this section, the court shall, upon its own motion or upon motion of any party, dismiss the action without prejudice.

(d) The court shall award court costs and attorney's fees to a prevailing plaintiff in litigation filed pursuant to this section. Reasonable attorney's fees may be awarded to a prevailing defendant upon a finding by the court that the plaintiff's prosecution of the action was not in good faith.

1781. (a) Any consumer entitled to bring an action under Section 1780 may, if the unlawful method, act, or practice has caused damage to other consumers similarly situated, bring an action on behalf of himself and such other consumers to recover damages or obtain other relief as provided for in Section 1780.

(b) The court shall permit the suit to be maintained on behalf of all members of the represented class if all of the following conditions exist:

(1) It is impracticable to bring all members of the class before the court.

(2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members.

(3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class.

(4) The representative plaintiffs will fairly and adequately protect the interests of the class.

(c) If notice of the time and place of the hearing is served upon the other parties at least 10 days prior thereto, the court shall hold a hearing, upon motion of any party to the action which is supported by affidavit of any person or persons having knowledge of the facts, to determine if any of the following apply to the action:

(1) A class action pursuant to subdivision (b) is proper.

(2) Published notice pursuant to subdivision (d) is necessary to adjudicate the claims of the class.

(3) The action is without merit or there is no defense to the action.

A motion based upon Section 437c of the **Code** of **Civil** Procedure shall not be granted in any action commenced as a class action pursuant to subdivision (a).

(d) If the action is permitted as a class action, the court may direct either party to notify each member of the class of the action. The party required to serve notice may, with the consent of the court, if personal notification is unreasonably expensive or it appears that all members of the class cannot be notified personally, give notice as prescribed herein by publication in accordance with Section 6064 of the Government **Code** in a newspaper of general circulation in the county in which the transaction occurred.

(e) The notice required by subdivision (d) shall include the following:

(1) The court will exclude the member notified from the class if he so requests by a specified date.

(2) The judgment, whether favorable or not, will include all members who do not request exclusion.

(3) Any member who does not request exclusion, may, if he desires, enter an appearance through counsel.

(f) A class action shall not be dismissed, settled, or compromised without the approval of the court, and notice of the proposed dismissal, settlement, or compromise shall be given in such manner as the court directs to each member who was given notice pursuant to subdivision (d) and did not request exclusion.

(g) The judgment in a class action shall describe those to whom the notice was directed and who have not requested exclusion and those the court finds to be members of the class. The best possible notice of the judgment shall be given in such manner as the court directs to each member who was personally served with notice pursuant to subdivision (d) and did not request exclusion.

1782. (a) Thirty days or more prior to the commencement of an action for damages pursuant to this title, the consumer shall do the following:

(1) Notify the person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 of the particular alleged violations of Section 1770.

(2) Demand that the person correct, repair, replace, or otherwise rectify the goods or services alleged to be in violation of Section 1770.

The notice shall be in writing and shall be sent by certified or registered mail, return receipt requested, to the place where the transaction occurred or to the person's principal place of business within California.

(b) Except as provided in subdivision (c), no action for damages may be maintained under Section 1780 if an appropriate correction, repair, replacement, or other remedy is given, or agreed to be given within a reasonable time, to the consumer within 30 days after receipt of the notice.

(c) No action for damages may be maintained under Section 1781 upon a showing by a person alleged to have employed or committed methods, acts, or practices declared unlawful by Section 1770 that all of the following exist:

(1) All consumers similarly situated have been identified, or a reasonable effort to identify such other consumers has been made.

(2) All consumers so identified have been notified that upon their request the person shall make the appropriate correction, repair, replacement, or other remedy of the goods and services.

(3) The correction, repair, replacement, or other remedy requested by the consumers has been, or, in a reasonable time, shall be, given.

(4) The person has ceased from engaging, or if immediate cessation is impossible or unreasonably expensive under the circumstances, the person will, within a reasonable time, cease to engage, in the methods, act, or practices.

(d) An action for injunctive relief brought under the specific provisions of Section 1770 may be commenced without compliance with subdivision (a). Not less than 30 days after the commencement of an action for injunctive relief, and after compliance with subdivision (a), the consumer may amend his or her complaint without leave of court to include a request for damages. The appropriate provisions of subdivision (b) or (c) shall be applicable if the complaint for injunctive relief is amended to request damages.

(e) Attempts to comply with this section by a person receiving a demand shall be construed to be an offer to compromise and shall be inadmissible as evidence pursuant to Section 1152 of the Evidence Code. Furthermore, these attempts to comply with a demand shall not be considered an admission of engaging in an act or practice declared unlawful by Section 1770. Evidence of compliance or attempts to comply with this section may be introduced by a defendant for the purpose of establishing good faith or to show compliance with this section.


1783. Any action brought under the specific provisions of Section 1770 shall be commenced not more than three years from the date of the commission of such method, act, or practice.


1784. No award of damages may be given in any action based on a method, act, or practice declared to be unlawful by Section 1770 if the person alleged to have employed or committed such method, act, or practice (a) proves that such violation was not intentional and resulted from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid any such error and (b) makes an

appropriate correction, repair or replacement or other remedy of the
goods and services according to the provisions of subdivisions (b)
and (c) of Section 1782.

CALIFORNIA CODES
BUSINESS AND **PROFESSIONS CODE**
SECTION **17200**-17210

**17200.** As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and **Professions Code**.

17201. As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

17201.5. As used in this chapter:
(a) "Board within the Department of Consumer Affairs" includes any commission, bureau, division, or other similarly constituted agency within the Department of Consumer Affairs.
(b) "Local consumer affairs agency" means and includes any city or county body which primarily provides consumer protection services.

17202. Notwithstanding Section 3369 of the Civil **Code**, specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition.

17203. Injunctive Relief--Court Orders
Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the **Code** of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

17204. Actions for Injunctions by Attorney General, District Attorney, County Counsel, and City Attorneys
Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the

Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition.

17204.5.   In addition to the persons authorized to bring an action pursuant to Section 17204, the City Attorney of the City of San Jose, with the annual consent of the Santa Clara County District Attorney, is authorized to prosecute those actions.
    This section shall remain in effect until such time as the population of the City of San Jose exceeds 750,000, as determined by the Population Research Unit of the Department of Finance, and at that time shall be repealed.

17205.   Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state.

17206.   Civil Penalty for Violation of Chapter
    (a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city, or city and county, having a population in excess of 750,000, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, or, with the consent of the district attorney, by a city attorney in any city and county, in any court of competent jurisdiction.
    (b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.
    (c) If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the General Fund. If the action is brought by a district attorney or county counsel, the penalty collected shall be paid to the treasurer of the county in which the judgment was entered. Except as provided in subdivision

(e), if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered. The aforementioned funds shall be for the exclusive use by the Attorney General, the district attorney, the county counsel, and the city attorney for the enforcement of consumer protection laws.

(d) The Unfair Competition Law Fund is hereby created as a special account within the General Fund in the State Treasury. The portion of penalties that is payable to the General Fund or to the Treasurer recovered by the Attorney General from an action or settlement of a claim made by the Attorney General pursuant to this chapter or Chapter 1 (commencing with Section 17500) of Part 3 shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support investigations and prosecutions of California's consumer protection laws, including implementation of judgments obtained from such prosecutions or investigations and other activities which are in furtherance of this chapter or Chapter 1 (commencing with Section 17500) of Part 3.

(e) If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of any reasonable expenses incurred by the board shall be paid to the Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the Treasurer. The amount of any reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county that funds the local agency.

(f) If the action is brought by a city attorney of a city and county, the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment was entered for the exclusive use by the city attorney for the enforcement of consumer protection laws. However, if the action is brought by a city attorney of a city and county for the purposes of civil enforcement pursuant to Section 17980 of the Health and Safety **Code** or Article 3 (commencing with Section 11570) of Chapter 10 of Division 10 of the Health and Safety **Code**, either the penalty collected shall be paid entirely to the treasurer of the city and county in which the judgment was entered or, upon the request of the city attorney, the court may order that up to one-half of the penalty, under court supervision and approval, be paid for the purpose of restoring, maintaining, or enhancing the premises that were the subject of the action, and that the balance of the penalty be paid to the treasurer of the city and county.

17206.1. (a) In addition to any liability for a civil penalty pursuant to Section 17206, any person who violates this chapter, and the act or acts of unfair competition are perpetrated against one or more senior citizens or disabled persons, may be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which may be assessed and recovered in a civil action as prescribed in Section 17206.

Subject to subdivision (d), any civil penalty shall be paid as

prescribed by subdivisions (b) and (c) of Section 17206.
     (b) As used in this section, the following terms have the
following meanings:
     (1) "Senior citizen" means a person who is 65 years of age or
older.
     (2) "Disabled person" means any person who has a physical or
mental impairment which substantially limits one or more major life
activities.
     (A) As used in this subdivision, "physical or mental impairment"
means any of the following:
     (i) Any physiological disorder or condition, cosmetic
disfigurement, or anatomical loss substantially affecting one or more
of the following body systems:  neurological; muscoloskeletal;
special sense organs; respiratory, including speech organs;
cardiovascular; reproductive; digestive; genitourinary; hemic and
lymphatic; skin; or endocrine.
     (ii) Any mental or psychological disorder, such as mental
retardation, organic brain syndrome, emotional or mental illness, and
specific learning disabilities.  The term "physical or mental
impairment" includes, but is not limited to, such diseases and
conditions as orthopedic, visual, speech and hearing impairment,
cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis,
cancer, heart disease, diabetes, mental retardation, and emotional
illness.
     (B) "Major life activities" means functions such as caring for one'
s self, performing manual tasks, walking, seeing, hearing, speaking,
breathing, learning, and working.
     (c) In determining whether to impose a civil penalty pursuant to
subdivision (a) and the amount thereof, the court shall consider, in
addition to any other appropriate factors, the extent to which one or
more of the following factors are present:
     (1) Whether the defendant knew or should have known that his or
her conduct was directed to one or more senior citizens or disabled
persons.
     (2) Whether the defendant's conduct caused one or more senior
citizens or disabled persons to suffer:  loss or encumbrance of a
primary residence, principal employment, or source of income;
substantial loss of property set aside for retirement, or for
personal or family care and maintenance; or substantial loss of
payments received under a pension or retirement plan or a government
benefits program, or assets essential to the health or welfare of the
senior citizen or disabled person.
     (3) Whether one or more senior citizens or disabled persons are
substantially more vulnerable than other members of the public to the
defendant's conduct because of age, poor health or infirmity,
impaired understanding, restricted mobility, or disability, and
actually suffered substantial physical, emotional, or economic damage
resulting from the defendant's conduct.
     (d) Any court of competent jurisdiction hearing an action pursuant
to this section may make orders and judgments as may be necessary to
restore to any senior citizen or disabled person any money or
property, real or personal, which may have been acquired by means of
a violation of this chapter.  Restitution ordered pursuant to this
subdivision shall be given priority over recovery of any civil
penalty designated by the court as imposed pursuant to subdivision
(a), but shall not be given priority over any civil penalty imposed
pursuant to subdivision (a) of Section 17206.  If the court
determines that full restitution cannot be made to those senior
citizens or disabled persons, either at the time of judgment or by a
future date determined by the court, then restitution under this

subdivision shall be made on a pro rata basis depending on the amount
of loss.


17206.5.  In addition to the persons authorized to bring an action
pursuant to Section 17206, the City Attorney of the City of San Jose,
with the annual consent of the Santa Clara County District Attorney,
is authorized to prosecute those actions.
     This section shall remain in effect until such time as the
population of the City of San Jose exceeds 750,000, as determined by
the Population Research Unit of the Department of Finance, and at
that time shall be repealed.


17207.  (a) Any person who intentionally violates any injunction
prohibiting unfair competition issued pursuant to Section 17203 shall
be liable for a civil penalty not to exceed six thousand dollars
($6,000) for each violation.  Where the conduct constituting a
violation is of a continuing nature, each day of that conduct is a
separate and distinct violation.  In determining the amount of the
civil penalty, the court shall consider all relevant circumstances,
including, but not limited to, the extent of the harm caused by the
conduct constituting a violation, the nature and persistence of that
conduct, the length of time over which the conduct occurred, the
assets, liabilities, and net worth of the person, whether corporate
or individual, and any corrective action taken by the defendant.
     (b) The civil penalty prescribed by this section shall be assessed
and recovered in a civil action brought in any county in which the
violation occurs or where the injunction was issued in the name of
the people of the State of California by the Attorney General or by
any district attorney, any county counsel authorized by agreement
with the district attorney in actions involving violation of a county
ordinance, or any city attorney in any court of competent
jurisdiction within his or her jurisdiction without regard to the
county from which the original injunction was issued.  An action
brought pursuant to this section to recover civil penalties shall
take precedence over all civil matters on the calendar of the court
except those matters to which equal precedence on the calendar is
granted by law.
     (c) If such an action is brought by the Attorney General, one-half
of the penalty collected pursuant to this section shall be paid to
the treasurer of the county in which the judgment was entered, and
one-half to the State Treasurer.  If brought by a district attorney
or county counsel the entire amount of the penalty collected shall be
paid to the treasurer of the county in which the judgment is
entered.  If brought by a city attorney or city prosecutor, one-half
of the penalty shall be paid to the treasurer of the county in which
the judgment was entered and one-half to the city, except that if the
action was brought by a city attorney of a city and county the
entire amount of the penalty collected shall be paid to the treasurer
of the city and county in which the judgment is entered.
     (d) If the action is brought at the request of a board within the
Department of Consumer Affairs or a local consumer affairs agency,
the court shall determine the reasonable expenses incurred by the
board or local agency in the investigation and prosecution of the
action.
     Before any penalty collected is paid out pursuant to subdivision
(c), the amount of the reasonable expenses incurred by the board
shall be paid to the State Treasurer for deposit in the special fund

of the board described in Section 205.  If the board has no such
special fund, the moneys shall be paid to the State Treasurer.  The
amount of the reasonable expenses incurred by a local consumer
affairs agency shall be paid to the general fund of the municipality
or county which funds the local agency.


17208.  Any action to enforce any cause of action pursuant to this
chapter shall be commenced within four years after the cause of
action accrued.  No cause of action barred under existing law on the
effective date of this section shall be revived by its enactment.


17209.  If a violation of this chapter is alleged or the application
or construction of this chapter is in issue in any proceeding in the
Supreme Court of California, a state court of appeal, or the
appellate division of a superior court, each person filing any brief
or petition with the court in that proceeding shall serve, within
three days of filing with the court, a copy of that brief or petition
on the Attorney General, directed to the attention of the Consumer
Law Section at a service address designated on the Attorney General's
official Web site for service of papers under this section or, if no
service address is designated, at the Attorney General's office in
San Francisco, California, and on the district attorney of the county
in which the lower court action or proceeding was originally filed.
Upon the Attorney General's or district attorney's request, each
person who has filed any other document, including all or a portion
of the appellate record, with the court in addition to a brief or
petition shall provide a copy of that document without charge to the
Attorney General or the district attorney within five days of the
request.  The time for service may be extended by the Chief Justice
or presiding justice or judge for good cause shown.  No judgment or
relief, temporary or permanent, shall be granted or opinion issued
until proof of service of the brief or petition on the Attorney
General and district attorney is filed with the court.


17210.  (a) For purposes of this section, "hotel" means any hotel,
motel, bed and breakfast inn, or other similar transient lodging
establishment, but it does not include any residential hotel as
defined in Section 50519 of the Health and Safety Code.  "Innkeeper"
means the owner or operator of a hotel, or the duly authorized agent
or employee of the owner or operator.
   (b) For purposes of this section, "handbill" means, and is
specifically limited to, any tangible commercial solicitation to
guests of the hotel urging that they patronize any commercial
enterprise.
   (c) Every person (hereinafter "distributor") engages in unfair
competition for purposes of this chapter who deposits, places,
throws, scatters, casts, or otherwise distributes any handbill to any
individual guest rooms in any hotel, including, but not limited to,
placing, throwing, leaving, or attaching any handbill adjacent to,
upon, or underneath any guest room door, doorknob, or guest room
entryway, where either the innkeeper has expressed objection to
handbill distribution, either orally to the distributor or by the
posting of a sign or other notice in a conspicuous place within the

lobby area and at all points of access from the exterior of the premises to guest room areas indicating that handbill distribution is prohibited, or the distributor has received written notice pursuant to subdivision (e) that the innkeeper has expressed objection to the distribution of handbills to guest rooms in the hotel.

(d) Every person (hereinafter "contractor") engages in unfair competition for purposes of this chapter who causes or directs any other person, firm, business, or entity to distribute, or cause the distribution of, any handbill to any individual guest rooms in any hotel in violation of subdivision (c) of this section, if the contractor has received written notice from the innkeeper objecting to the distribution of handbills to individual guest rooms in the hotel.

(e) Every contractor who causes or directs any distributor to distribute, or cause the distribution of, any handbills to any individual guest rooms in any hotel, if the contractor has received written notice from the innkeeper or from any other contractor or intermediary pursuant to this subdivision, objecting to the distribution of handbills to individual guest rooms in the hotel has failed to provide a written copy of that notice to each distributor prior to the commencement of distribution of handbills by the distributor or by any person hired or retained by the distributor for that purpose, or, within 24 hours following the receipt of the notice by the contractor if received after the commencement of distribution, and has failed to instruct and demand any distributor to not distribute, or to cease the distribution of, the handbills to individual guest rooms in any hotel for which such a notice has been received is in violation of this section.

(f) Any written notice given, or caused to be given, by the innkeeper pursuant to or required by any provision of this section shall be deemed to be in full force and effect until such time as the notice is revoked in writing.

(g) Nothing in this section shall be deemed to prohibit the distribution of a handbill to guest rooms in any hotel where the distribution has been requested or approved in writing by the innkeeper, or to any individual guest room when the occupant thereof has affirmatively requested or approved the distribution of the handbill during the duration of the guest's occupancy.

CALIFORNIA CODES
BUSINESS AND **PROFESSIONS CODE**
SECTION **17500**-17509

**17500.** It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine.

**17500**.1. Notwithstanding any other provision of law, no trade or professional association, or state agency, state board, or state commission within the Department of Consumer Affairs shall enact any rule, regulation, or **code** of professional ethics which shall restrict or prohibit advertising by any commercial or professional person, firm, partnership or corporation which does not violate the provisions of Section **17500** of the Business and **Professions Code**, or which is not prohibited by other provisions of law.

The provisions of this section shall not apply to any rules or regulations heretofore or hereafter formulated pursuant to Section 6076.

**17500**.3. (a) It is unlawful for any person to solicit a sale or order for sale of goods or services at the residence of a prospective buyer, in person or by means of telephone, without clearly, affirmatively and expressly revealing at the time the person initially contacts the prospective buyer, and before making any other statement, except a greeting, or asking the prospective buyer any other questions, that the purpose of the contact is to effect a sale, by doing all of the following:

(1) Stating the identity of the person making the solicitation.
(2) Stating the trade name of the person represented by the person

making the solicitation.

(3) Stating the kind of goods or services being offered for sale.

(4) And, in the case of an "in person" contact, the person making the solicitation shall, in addition to meeting the requirements of paragraphs (1), (2) and (3), show or display identification which states the information required by paragraphs (1) and (2) as well as the address of the place of business of one of such persons so identified.

(b) It is unlawful for any person, in soliciting a sale or order for the sale of goods or services at the residence of a prospective buyer, in person or by telephone, to use any plan, scheme, or ruse which misrepresents his true status or mission for the purpose of making such sale or order for the sale of goods or services.

(c) In addition to any other penalties or remedies applicable to violations of this section, the intentional violation of this section shall entitle persons bound to a contract, when there was a sales approach or presentation or both in which such intentional violation of this section took place, to damages of two times the amount of the sale price or up to two hundred fifty dollars ($250), whichever is greater, but in no case shall such damages be less than fifty dollars ($50); provided, however, that as a condition precedent to instituting such action hereunder against the person represented by the person making the solicitation, the aggrieved party shall, in writing, demand that the person represented by the solicitor terminate such contract and return any and all payments made thereunder, and that the person represented by the solicitor shall have refused within a reasonable time, such termination and return. If the person represented by the person making the solicitation elects to terminate, he shall return to the aggrieved party payments received for any and all goods, and for services not rendered, and upon return of such payments, the aggrieved party shall return any and all goods received under the contract. For the purposes of this section, a reasonable time shall mean 20 business days from the date of demand. This subdivision shall not apply to a cause of action commenced under any other provision of law, including, but not limited to, a cause of action commenced pursuant to Section 382 of the **Code** of Civil Procedure or Section 1781 of the Civil **Code**.

Any rights under this subdivision shall be waived if subsequent to the signing of the contract the party bound by the contract states that identification, as required by this section, was given.

(d) Persons represented by the person making the solicitation shall keep and maintain copies of all demands for termination for violation of this section for a period of one year from date of receipt. Failure to maintain such records shall create a presumption affecting the burden of proof that demand for termination had been properly made.

(e) Where any provision of law provides a penalty for the violation of any offense specified in this section, it shall be a defense to the imposition of such penalty as to any defendant who did not commit the act or acts constituting the offense that such defendant did not know, and with the exercise of reasonable care could not have known, that the act was committed, which constitutes the violation of this section.

(f) As used in this section "person" includes any individual, firm, partnership, corporation, association or other organization, but does not include any nonprofit charitable organization, or any person selling any intangibles, or any items defined in Section 1590 (a)(1), of Title 18 of the California Administrative **Code** as it read on July 15, 1972.

   (g) This section shall not prohibit nor authorize the enactment by the governing body of any city, county, or city and county, of ordinances relating to home solicitations which are more restrictive of such solicitation than the provisions of this section.

**17500.5.** (a) It is unlawful for any person, firm, corporation or association to falsely represent by advertisement the quantity of any article so advertised that will be sold to any one customer on his demand in a single transaction, and willfully or negligently to fail to include in such advertisement a statement that any restriction that is in fact put upon the quantity of any article so advertised that is sold or offered for sale to any one customer on his demand in a single transaction.

(b) Any person, firm, corporation, or association who, by means of such false or negligent advertisement or publicity, induces any individual retail purchaser and consumer to enter any place of business designated therein seeking to buy any article so advertised or publicized, and then refuses to sell to such person the article at the price advertised in any quantity then available for sale on said premises, shall be liable to each person so induced and refused, for the losses and expenses thereby incurred, and the sum of fifty dollars ($50) in addition thereto.

(c) Nothing in this section shall affect any right a seller may have to refuse to extend credit to a customer, and this section shall not be applicable to a customer purchasing for resale.

(d) The provisions of subdivision (b) are applicable only to actions brought in the name of, and on behalf of, a single plaintiff and shall not be applicable in multiple plaintiff or class actions.

17501. For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

17502. This article does not apply to any visual or sound radio broadcasting station, to any internet service provider or commercial online service, or to any publisher of a newspaper, magazine, or other publication, who broadcasts or publishes, including over the Internet, an advertisement in good faith, without knowledge of its false, deceptive, or misleading character.

17504. (a) Any person, partnership, corporation, firm, joint stock company, association, or organization engaged in business in this state as a retail seller who sells any consumer good or service which

is sold only in multiple units and which is advertised by price
shall advertise those goods or services at the price of the minimum
multiple unit in which they are offered.
   (b) Nothing contained in subdivision (a) shall prohibit a retail
seller from advertising any consumer good or service for sale at a
single unit price where the goods or services are sold only in
multiple units and not in single units as long as the advertisement
also discloses, at least as prominently, the price of the minimum
multiple unit in which they are offered.
   (c) For purposes of subdivisions (a) and (b), "consumer good"
means any article which is used or bought for use primarily for
personal, family, or household purposes, but does not include any
food item.
   (d) For the purposes of subdivisions (a) and (b), "consumer
service" means any service which is obtained for use primarily for
personal, family, or household purposes.
   (e) For purposes of subdivisions (a) and (b), "retail seller"
means an individual, firm, partnership, corporation, joint stock
company, association, organization, or other legal relationship which
engages in the business of selling consumer goods or services to
retail buyers.


17505.  No person shall state, in an advertisement of his goods,
that he is a producer, manufacturer, processor, wholesaler, or
importer, or that he owns or controls a factory or other source of
supply of goods when such is not the fact, and no person shall in any
other manner misrepresent the character, extent, volume, or type of
his business.


17505.2.  (a) It is unlawful for a person to represent himself or
herself as a recreation therapist, to represent the services he or
she performs as recreation therapy, or to use terms set forth in
subdivision (c) in connection with his or her services, name, or
place of business, unless he or she meets all of the following
requirements:
   (1) Graduation from an accredited college or university with a
minimum of a baccalaureate degree in recreation therapy or in
recreation and leisure studies with a specialization in recreation
therapy.  Alternatively, a person who does not have one of the
preceding degrees may qualify if he or she has a baccalaureate degree
in a specialization acceptable for certification or eligible for
certification by any accrediting body specified in paragraph (2).
   (2) Current certification or eligibility for certification as a
recreation therapist by the California Board of Recreation and Park
Certification or by the National Council for Therapeutic Recreation
Certification, Inc.
   (b) No person shall represent himself or herself as a recreation
therapist assistant, or represent the services he or she performs as
being in any way related to recreation therapy, unless he or she at a
minimum has current certification, or has eligibility for
certification, by the California Board of Recreation and Park
Certification or by the National Council for Therapeutic Recreation
Certification, Inc., as a recreation therapist assistant.
   (c) A person who does not meet the requirements of subdivision (a)
or (b) may not use any of the following words or abbreviations in
connection with his or her services, name, or place of business:
   (1) Recreation therapist registered.

(2) Recreation therapist certified.
(3) Certified therapeutic recreation specialist.
(4) Recreation therapist.
(5) Recreation therapist assistant registered.
(6) Certified therapeutic recreation assistant.
(7) RTR.
(8) RTC.
(9) CTRS.
(10) RT.
(11) RTAR.
(12) CTRA.
(d) For purposes of subdivision (c), the abbreviation RT shall not
be construed to include rehabilitation therapist or respiratory
therapist.
(e) Any person injured by a violation of this section may bring a
civil action and may recover one thousand five hundred dollars
($1,500) for the first violation and two thousand five hundred
dollars ($2,500) for each subsequent violation.  This is the sole
remedy for a violation of this section.


17506.  As used in this chapter, "person" includes any individual,
partnership, firm, association, or corporation.


17506.5.  As used in this chapter:
(a) "Board within the Department of Consumer Affairs" includes any
commission, bureau, division, or other similarly constituted agency
within the Department of Consumer Affairs.
(b) "Local consumer affairs agency" means and includes any city or
county body which primarily provides consumer protection services.


17507.  It is unlawful for any person, firm, corporation or
association to make an advertising claim or representation pertaining
to more than one article of merchandise or type of service, within
the same class of merchandise or service, if any price set forth in
such claim or representation does not clearly and conspicuously
identify the article of merchandise or type of service to which it
relates.  Disclosure of the relationship between the price and
particular article of merchandise or type of service by means of an
asterisk or other symbol, and corresponding footnote, does not meet
the requirement of clear and conspicuous identification when the
particular article of merchandise or type of service is not
represented pictorially.


17508.  (a) It shall be unlawful for any person doing business in
California and advertising to consumers in California to make any
false or misleading advertising claim, including claims that (1)
purport to be based on factual, objective, or clinical evidence, that
(2) compare the product's effectiveness or safety to that of other
brands or products, or that (3) purport to be based on any fact.
(b) Upon written request of the Director of Consumer Affairs, the
Attorney General, any city attorney, or any district attorney any
person doing business in California and in whose behalf advertising

claims are made to consumers in California, including claims that (1) purport to be based on factual, objective, or clinical evidence, that (2) compare the product's effectiveness or safety to that of other brands or products, or that (3) purport to be based on any fact, shall provide to the department or official making the request evidence of the facts on which such advertising claims are based. Any such request shall be made within one year of the last day on which such advertising claims were made.

Any city attorney or district attorney who makes a request pursuant to this subdivision shall give prior notice of such request to the Attorney General.

(c) The Director of Consumer Affairs, Attorney General, any city attorney, or any district attorney may, upon failure of an advertiser to respond by adequately substantiating the claim within a reasonable time, or if such Director of Consumer Affairs, Attorney General, city attorney, or district attorney shall have reason to believe that any such advertising claim is false or misleading, do either or both of the following: (1) seek an immediate termination or modification of the claim by the person in accordance with Section 17535, (2) disseminate information, taking due care to protect legitimate trade secrets, concerning the veracity of such claims, or why such claims are misleading, to the consumers of this state.

(d) The relief provided for in subdivision (c) is in addition to any other relief which may be sought for a violation of this chapter. Section 17534 shall not apply to violations of this section.

(e) Nothing in this section shall be construed to hold any newspaper publisher or radio or television broadcaster liable for publishing or broadcasting any advertising claims referred to in subdivision (a), unless such publisher or broadcaster is the person making such claims.

(f) The plaintiff shall have the burden of proof in establishing any violation of this section.

(g) If an advertisement is in violation of subdivision (a) and Section 17500, the court shall not impose a separate civil penalty pursuant to Section 17536 for the violation of subdivision (a) and the violation of Section 17500 but shall impose a civil penalty for the violation of either subdivision (a) or Section 17500.


17509.  (a) Any advertisement, including any advertisement over the Internet, soliciting the purchase or lease of a product or service, or any combination thereof, that requires, as a condition of sale, the purchase or lease of a different product or service, or any combination thereof, shall conspicuously disclose in the advertisement the price of all those products or services.  This requirement shall not in any way affect the provisions of Sections 16726 and 16727, with respect to unlawful buying arrangements.

(b) Subdivision (a) does not apply to any of the following:

(1) Contractual plans or arrangements complying with this paragraph under which the seller periodically provides the consumer with a form or announcement card which the consumer may use to instruct the seller not to ship the offered merchandise.  Any instructions not to ship merchandise included on the form or card shall be printed in type as large as all other instructions and terms stated on the form or card.  The form or card shall specify a date by which it shall be mailed by the consumer (the "mailing date") or received by the seller (the "return date") to prevent shipment of the offered merchandise.  The seller shall mail the form or card either at least 25 days prior to the return date or at least 20 days prior

to the mailing date, or provide a mailing date of at least 10 days after receipt by the consumer, except that whichever system the seller chooses for mailing the form or card, shall be calculated to afford the consumer at least 10 days in which to mail his or her form or card.    The form or card shall be preaddressed to the seller so that it may serve as a postal reply card or, alternatively, the form or card shall be accompanied by a return envelope addressed to seller.    Upon the membership contract or application form or on the same page and immediately adjacent to the contract or form, and in clear and conspicuous language, there shall be disclosed the material terms of the plan or arrangement including all of the following:

(A) That aspect of the plan under which the subscriber shall notify the seller, in the manner provided for by the seller, if the seller does not wish to purchase or receive the selection.

(B) Any obligation assumed by the subscriber to purchase a minimum quantity of merchandise.

(C) The right of a contract-complete subscriber to cancel his or her membership at any time.

(D) Whether billing charges will include an amount for postage and handling.

(2) Other contractual plans or arrangements not covered under subdivision (a), such as continuity plans, subscription arrangements, standing order arrangements, supplements, and series arrangements under which the seller periodically ships merchandise to a consumer who has consented in advance to receive that merchandise on a periodic basis.

(c) This section shall not apply to the publisher of any newspaper, periodical, or other publication, or any radio or television broadcaster, or the owner or operator of any cable, satellite, or other medium of communication who broadcasts or publishes, including over the Internet, an advertisement or offer in good faith, without knowledge of its violation of subdivision (a).

*C.R.S. 6-1-105*

COLORADO REVISED STATUTES

*** THIS SECTION IS CURRENT THROUGH THE 2003 SUPPLEMENT (2003 SESSIONS) ***

TITLE 6. CONSUMER AND COMMERCIAL AFFAIRS
FAIR TRADE AND RESTRAINT OF TRADE
ARTICLE 1. COLORADO CONSUMER PROTECTION ACT
PART 1. CONSUMER PROTECTION - GENERAL

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

C.R.S. 6-1-105 (2003)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT**
LEXSEE 2004 Colo. HB 1125 -- See section 2.
LEXSEE 2004 Colo. SB 127 -- See section 2.

6-1-105. Deceptive trade practices

(1) A person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person:

(a) Knowingly passes off goods, services, or property as those of another;

(b) Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;

(c) Knowingly makes a false representation as to affiliation, connection, or association with or certification by another;

(d) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

(f) Represents that goods are original or new if he knows or should know that they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(g) Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

(h) Disparages the goods, services, property, or business of another by false or misleading representation of fact;

(i) Advertises goods, services, or property with intent not to sell them as advertised;

(j) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(k) Advertises under the guise of obtaining sales personnel when in fact the purpose is to first sell a product or service to the sales personnel applicant;

(l) Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

(m) Fails to deliver to the customer at the time of an installment sale of goods or services a written order, contract, or receipt setting forth the name and address of the seller, the name and address of the organization which he represents, and all of the terms and conditions of the sale, including a description of the goods or services, stated in readable, clear, and unambiguous language;

(n) Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

(I) Refusal to show the goods or property advertised or to offer the services advertised;

(II) Disparagement in any respect of the advertised goods, property, or services or the terms of sale;

(III) Requiring tie-in sales or other undisclosed conditions to be met prior to selling the advertised goods, property, or services;

(IV) Refusal to take orders for the goods, property, or services advertised for delivery within a reasonable time;

(V) Showing or demonstrating defective goods, property, or services which are unusable or impractical for the purposes set forth in the advertisement;

(VI) Accepting a deposit for the goods, property, or services and subsequently switching the purchase order to higher-priced goods, property, or services; or

(VII) Failure to make deliveries of the goods, property, or services within a reasonable time or to make a refund therefor;

(o) Knowingly fails to identify flood-damaged or water-damaged goods as to such damages;

(p) Solicits door-to-door as a seller, unless the seller, within thirty seconds after beginning the conversation, identifies himself or herself, whom he or she represents, and the purpose of the call;

(p.3) to (p.7) Repealed.

(q) Contrives, prepares, sets up, operates, publicizes by means of advertisements, or promotes any pyramid promotional scheme;

(r) Advertises or otherwise represents that goods or services are guaranteed without clearly and conspicuously disclosing the nature and extent of the guarantee, any material conditions or limitations in the guarantee which are imposed by the guarantor, the manner in which the guarantor will perform, and the identity of such guarantor. Any representation that goods or services are "guaranteed for life" or have a "lifetime guarantee" shall contain, in addition to the other requirements of this paragraph (r), a conspicuous disclosure of the meaning of "life" or "lifetime" as used in such representation (whether that of the purchaser, the goods or services, or otherwise). Guarantees shall not be used which under normal conditions could not be practically fulfilled or which are for such a period of time or are otherwise of such a nature as to have the capacity and tendency of misleading purchasers or prospective purchasers into believing that the goods or services so guaranteed have a greater degree of serviceability, durability, or performance capability in actual use than is true in fact. The provisions of this paragraph (r) apply not

only to guarantees but also to warranties, to disclaimer of warranties, to purported guarantees and warranties, and to any promise or representation in the nature of a guarantee or warranty; however, such provisions do not apply to any reference to a guarantee in a slogan or advertisement so long as there is no guarantee or warranty of specific merchandise or other property.

(s) and (t) Repealed.

(u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction;

(v) Disburses funds in connection with a real estate transaction in violation of section 38-35-125 (2), C.R.S.;

(w) Repealed.

(x) Violates the provisions of sections 6-1-203 to 6-1-205 or of part 7 of this article;

(y) Fails, in connection with any solicitation, oral or written, to clearly and prominently disclose immediately adjacent to or after the description of any item or prize to be received by any person the actual retail value of each item or prize to be awarded. For the purposes of this paragraph (y), the actual retail value is the price at which substantial sales of the item were made in the person's trade area or in the trade area in which the item or prize is to be received within the last ninety days or, if no substantial sales were made, the actual cost of the item or prize to the person on whose behalf any contest or promotion is conducted; except that, whenever the actual cost of the item to the provider is less than fifteen dollars per item, a disclosure that "actual cost to the provider is less than fifteen dollars" may be made in lieu of disclosure of actual cost. The provisions of this paragraph (y) shall not apply to a promotion which is soliciting the sale of a newspaper, magazine, or periodical of general circulation, or to a promotion soliciting the sale of books, records, audio tapes, compact discs, or videos when the promoter allows the purchaser to review the merchandise without obligation for at least seven days and provides a full refund within thirty days after the receipt of the returned merchandise or when a membership club operation is in conformity with rules and regulations of the federal trade commission contained in 16 C.F.R. 425.

(z) Refuses or fails to obtain all governmental licenses or permits required to perform the services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer;

(aa) Fails, in connection with the issuing, making, providing, selling, or offering to sell of a motor vehicle service contract, to comply with the provisions of article 11 of title 42, C.R.S.;

(bb) Repealed.

(cc) Engages in any commercial telephone solicitation which constitutes an unlawful telemarketing practice as defined in section 6-1-304;

(dd) Repealed.

(ee) Intentionally violates any provision of article 10 of title 5, C.R.S.;

(ee.5) to (ff) Repealed.

(gg) Fails to disclose or misrepresents to another person, a secured creditor, or an assignee by whom such person is retained to repossess personal property whether such person is bonded in accordance with section 4-9-629, C.R.S., or fails to file such bond with the attorney general;

(hh) Violates any provision of article 16 of this title;

(ii) Repealed.

(jj) Represents to any person that such person has won or is eligible to win any award, prize, or thing of value as the result of a contest, promotion, sweepstakes, or drawing, or that such person will receive or is eligible to receive free goods, services, or property, unless, at the time of the representation, the person has the present ability to supply such award, prize, or thing of value;

(kk) Violates any provision of article 6 of this title;

(ll) Knowingly makes a false representation as to the results of a radon test or the need for radon mitigation;

(mm) Violates section 35-27-113 (3) (e), (3) (f), or (3) (i), C.R.S.;

(nn) Repealed.

(oo) Fails to comply with the provisions of section 35-80-108 (1) (a), (1) (b), or (2) (f), C.R.S.;

(pp) Violates article 9 of title 42, C.R.S.;

(qq) Repealed.

(rr) Violates the provisions of part 8 of this article;

(ss) Violates any provision of part 33 of article 32 of title 24, C.R.S., that applies to the installation of manufactured homes;

(tt) Violates any provision of part 9 of this article;

(uu) Violates section 38-40-105, C.R.S.

(2) Evidence that a person has engaged in a deceptive trade practice shall be prima facie evidence of intent to injure competitors and to destroy or substantially lessen competition.

(3) The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

Service: **Get by LEXSTAT®**
Citation: **colo rev stat 6-1-105**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:13 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Conn. Gen. Stat. § 42-110b*

LEXISNEXIS (TM) CONNECTICUT ANNOTATED STATUTES

* THIS DOCUMENT IS CURRENT THROUGH THE JAN. 6, 2003 SPECIAL SESSION *

TITLE 42. BUSINESS, SELLING, TRADING AND COLLECTION PRACTICES
CHAPTER 735a UNFAIR TRADE PRACTICES

**GO TO CONNECTICUT STATUTES ARCHIVE DIRECTORY**

Conn. Gen. Stat. § 42-110b (2003)

§ 42-110b. Unfair trade practices prohibited. Legislative intent.

(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a)(1) of the Federal Trade Commission Act (15 USC 45 (a)(1)), as from time to time amended.

(c) The commissioner may, in accordance with chapter 54, establish by regulation acts, practices or methods which shall be deemed to be unfair or deceptive in violation of subsection (a) of this section. Such regulations shall not be inconsistent with the rules, regulations and decisions of the federal trade commission and the federal courts in interpreting the provisions of the Federal Trade Commission Act.

(d) It is the intention of the legislature that this chapter be remedial and be so construed.

Source: Legal > States Legal - U.S. > Connecticut > Statutes & Regulations > **CT - LexisNexis Connecticut Annotated Statutes**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:18 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*6 Del. C. § 2513*

DELAWARE CODE ANNOTATED
Copyright © 2004 by The State of Delaware
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH 74 DEL. LAWS, CH 408 ***
*** ANNOTATIONS CURRENT THROUGH JULY 7, 2004 ***

TITLE 6. COMMERCE AND TRADE
SUBTITLE II. OTHER LAWS RELATING TO COMMERCE AND TRADE
CHAPTER 25. PROHIBITED TRADE PRACTICES
SUBCHAPTER II. CONSUMER FRAUD

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

6 Del. C. § 2513 (2004)

§ 2513. Unlawful practice

(a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice. It shall also be an unlawful practice to misrepresent the geographic location of a business or supplier which raises or sells flowers and/or ornamental plants by:

(1) Listing a local telephone number in a local telephone directory if:

a. Calls to the telephone number are routinely forwarded or otherwise transferred to a business location that is outside the calling area covered by the local telephone directory other than to counties contiguous to this State; and

b. The listing fails to identify the locality and state of the supplier's business; or

(2) Listing a fictitious business name or an assumed business name in a local telephone directory if:

a. The name misrepresents the supplier's geographic location; and

b. The listing fails to identify the locality and state of the supplier's business.

(b) This section shall not apply:

(1) To the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher or operator has no knowledge of the intent, design or purpose of the advertiser; or

(2) To any advertisement or merchandising practice which is subject to and complies with the rules and regulations, of and the statutes administered by, the Federal Trade Commission; or

(3) To matters subject to the jurisdiction of the Public Service Commission, or of the Insurance Commissioner of this State.

(c) [Deleted.]


Service: **Get by LEXSTAT®**
Citation: **6 del code 2513**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:19 PM EDT


About LexisNexis | Terms and Conditions


Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*D.C. Code § 28-3904*

LEXIS DISTRICT OF COLUMBIA CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THRU ACT 15-387; 51 DCR 2830, MARCH 19, 2004 ***
*** ANNOTATIONS CURRENT THROUGH MARCH 25, 2004 ***

TITLE 28. COMMERCIAL INSTRUMENTS AND TRANSACTIONS
SUBTITLE II. OTHER COMMERCIAL TRANSACTIONS
CHAPTER 39. CONSUMER PROTECTION PROCEDURES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

D.C. Code § 28-3904  (2004)

§ 28-3904. Unlawful trade practices

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

(a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have;

(c) represent that goods are original or new if in fact they are deteriorated, altered, reconditioned, reclaimed, or second hand, or have been used;

(d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(f) fail to state a material fact if such failure tends to mislead;

(g) disparage the goods, services, or business of another by false or misleading representations of material facts;

(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;

(i) advertise or offer goods or services without supplying reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition which has no tendency to mislead;

(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;

(k) falsely state that services, replacements, or repairs are needed;

(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices;

(m) harass, or threaten a consumer with any act other than legal process, either by telephone, cards, or letters;

(n) cease work on, or return after ceasing work on, an electrical or mechanical apparatus, appliance, chattel or other goods, or merchandise, in other than the condition contracted for, or to impose a separate charge to reassemble or restore such an object to such a condition without notification of such charge prior to beginning work on or receiving such object;

(o) replace parts or components in an electrical or mechanical apparatus, appliance, chattel or other goods, or merchandise when such parts or components are not defective, unless requested by the consumer;

(p) falsely state or represent that repairs, alterations, modifications, or servicing have been made and receiving remuneration therefor when they have not been made;

(q) fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement, or other evidence of indebtedness which the consumer may execute;

(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:

(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;

(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;

(4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors;

(s) pass off goods or services as those of another;

(t) use deceptive representations or designations of geographic origin in connection with goods or services;

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

(v) misrepresent the authority of a salesman, representative or agent to negotiate the final terms of a transaction;

(w) offer for sale or distribute any consumer product which is not in conformity with an applicable consumer product safety standard or has been ruled a banned hazardous product under the federal Consumer Product Safety Act (15 U.S.C.S. §§ 2051-83), without holding a certificate issued in

accordance with section 14(a) of that Act to the effect that such consumer product conforms to all applicable consumer product safety rules (unless the certificate holder knows that such consumer product does not conform), or without relying in good faith on the representation of the manufacturer or a distributor of such product that the product is not subject to a consumer product safety rule issued under that Act;

(x) sell consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District of Columbia Code, or by operation or requirement of federal law;

(y) violate any provision of the District of Columbia Consumer LayAway Plan Act (section 28-3818);

(z) violate any provision of the Rental Housing Locator Consumer Protection Act of 1979 (section 28-3819) or, if a rental housing locator, to refuse or fail to honor any obligation under a rental housing locator contract;

(z-1) violate any provision of Chapter 46 of this title;

(aa) violate any provision of sections 32-404, 32-405, 32-406, and 32-407;

(bb) refuse to provide the repairs, refunds, or replacement motor vehicles or fails to provide the disclosures of defects or damages required by the Automobile Consumer Protection Act of 1984;

(cc) violate any provision of the Real Property Credit Line Deed of Trust Act of 1987; or

(dd) violate any provision of title 16 of the District of Columbia Municipal Regulations.

(ee) violate any provision of Chapter 16A of Title 31.

Service: **Get by LEXSTAT®**
Citation: **dc code 28-3904**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:21 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Fla. Stat. § 501.204*

LexisNexis (R) Florida Annotated Statutes
Copyright (c) 2004 by Matthew Bender & Company, Inc. a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2003 LEGISLATION ***
*** ANNOTATIONS CURRENT THROUGH AUGUST 11, 2004 ***

TITLE 33. REGULATION OF TRADE, COMMERCE, INVESTMENTS, AND SOLICITATIONS
CHAPTER 501. CONSUMER PROTECTION
PART II. DECEPTIVE AND UNFAIR TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Fla. Stat. § 501.204 (2003)

§ 501.204. Unlawful acts and practices

(1) Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2001.

Service: **Get by LEXSTAT®**
Citation: **fla stat ann 501.204**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:23 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

OFFICIAL CODE OF GEORGIA ANNOTATED
Copyright 2006 by The State of Georgia
All rights reserved.

*** Current Through the 2006 Regular Session ***
*** Annotations Current Through April 14, 2006 ***

TITLE 10. COMMERCE AND TRADE
CHAPTER 1. SELLING AND OTHER TRADE PRACTICES
ARTICLE 15. DECEPTIVE OR UNFAIR PRACTICES
PART 2. FAIR BUSINESS PRACTICES ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*O.C.G.A. § 10-1-393* (2006)

§ 10-1-393. Unfair or deceptive practices in consumer transactions unlawful; examples

(a) Unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful.

(b) By way of illustration only and without limiting the scope of subsection (a) of this Code section, the following practices are declared unlawful:

(1) Passing off goods or services as those of another;

(2) Causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causing actual confusion or actual misunderstanding as to affiliation, connection, or association with or certification by another;

(4)(A) Using deceptive representations or designations of geographic origin in connection with goods or services. Without limiting the generality of the foregoing, it is specifically declared to be unlawful:

(i) For any nonlocal business to publish in any local telephone classified advertising directory any advertisement containing a local telephone number for the business unless the advertisement clearly states the nonlocal location of the business; or

(ii) For any nonlocal business to cause to be listed in any nonclassified advertising local telephone directory a local telephone number for the business if calls to the number are routinely forwarded or otherwise transferred to the nonlocal business location that is outside the calling area covered by such local telephone directory and the listing fails to state clearly the principal place of business of the nonlocal business.

(B) For purposes of this paragraph, the term:

(i) "Local" or "local area" refers to the area in which any particular telephone directory is distributed free of charge to some or all telephone service subscribers.

(ii) "Local telephone classified advertising directory" refers to any telephone classified advertising directory which is distributed free of charge to some or all telephone subscribers in any area of the state and includes such directories distributed by telephone service companies as well as such directories distributed by other parties.

(iii) "Local telephone number" refers to any telephone number which is not clearly identifiable as a long-distance telephone number and which has a three-number prefix typically used by the local telephone service company for telephones physically located within the local area.

(iv) "Nonclassified advertising local telephone directory" refers to any telephone directory which is distributed free of charge to some or all telephone subscribers in any area of the state and which does not contain classified advertising and includes such directories distributed by telephone service companies as well as such directories distributed by other parties.

(v) "Nonlocal business" refers to any business which does not have within the local area a physical place of business providing the goods or services which are the subject of the advertisement or listing in question;

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(6) Representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

(7) Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another;

(8) Disparaging goods, services, or business of another by false or misleading representation;

(9) Advertising goods or services with intent not to sell them as advertised;

(10) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Making false or misleading statements concerning the reasons for, existence of, or amounts of price reductions;

(12) Failing to comply with the provisions of *Code Section 10-1-393.2* concerning health spas;

(13) Failure to comply with the following provisions concerning career consulting firms:

(A) A written contract shall be employed which shall constitute the entire agreement between the parties, a fully completed copy of which shall be furnished to the consumer at the time of its execution which shows the date of the transaction and the name and address of the career consulting firm;

(B) The contract or an attachment thereto shall contain a statement in boldface type which complies substantially with the following:
"The provisions of this agreement have been fully explained to me and I understand that the services to be provided under this agreement by the seller do not include actual job placement."

The statement shall be signed by both the consumer and the authorized representative of the seller;

(C) Any advertising offering the services of a career consulting firm shall contain a statement which contains the following language: "A career consulting firm does not guarantee actual job placement as one of its services.";

(14) Failure of a hospital or long-term care facility to deliver to an inpatient who has been discharged or to his or her legal representative, not later than six business days after the date of such discharge, an itemized statement of all charges for which the patient or third-party payor is being billed;

(15) Any violation of *49 U.S.C. Sections 32702* through 32704 and any violation of regulations prescribed under *49 U.S.C. Section 32705*. Notwithstanding anything in this part to the contrary, all such actions in violation of such federal statutes or regulations shall be consumer transactions and consumer acts or practices in trade or commerce;

(16) Failure to comply with the following provisions concerning promotions:

(A) For purposes of this paragraph, the term:

(i) "Conspicuously," when referring to type size, means either a larger or bolder type than the adjacent and surrounding material.

(ii) "In conjunction with and in immediate proximity to," when referring to a listing of verifiable retail value and odds for each prize, means that such value and odds must be adjacent to that particular prize with no other printed or pictorial matter between the value and odds and that listed prize.

(iii) "Notice" means a communication of the disclosures required by this paragraph to be given to a consumer that has been selected, or has purportedly been selected, to participate in a promotion. If the original notice is in writing, it shall include all of the disclosures required by this paragraph. If the original notice is oral, it shall include all of the disclosures required by this paragraph and shall be followed by a written notice to the consumer of the same disclosures. In all cases, written notice shall be received by the consumer before any agreement or other arrangement is entered into which obligates the consumer in any manner.

(iv) "Participant" means a person who is offered an opportunity to participate in a promotion.

(v) "Promoter" means the person conducting the promotion.

(vi) "Sponsor" means the person on whose behalf the promotion is conducted in order to promote or advertise the goods, services, or property of that person.

(vii) "Verifiable retail value," when referring to a prize, means:

(I) The price at which the promoter or sponsor can substantiate that a substantial number of those prizes have been sold at retail by someone other than the promoter or sponsor; or

(II) In the event that substantiation as described in subdivision (I) of this division is not readily available to the promoter or sponsor, no more than three times the amount which the promoter or sponsor has actually paid for the prize.

(A.1) Persons who are offered an opportunity to participate in a promotion must be given a notice as required by this paragraph. The written notice must be given to the participant either prior to the person's traveling to the place of business or, if no travel by the participant is necessary, prior to any seminar, sales presentation, or other presentation, by whatever name denominated. Written notices may be delivered by hand, by mail, by newspaper, or by periodical. Any offer to participate made through any other medium must be preceded by or followed by the required notice at the required time. It is the intent of this paragraph that full, clear, and meaningful disclosure shall be made to the participant in a manner such that the participant can fully study and understand the disclosure prior to deciding whether to travel to the place of participation or whether to allow a presentation to be made in the participant's home; and that this paragraph be liberally construed to effect this purpose. The notice requirements of this paragraph shall be applicable to any promotion offer made by any person in the State of Georgia or any promotion offer made to any person in the State of Georgia;

(B) The promotion must be an advertising and promotional undertaking, in good faith, solely for the purpose of advertising the goods, services, or property, real or personal, of the sponsor. The notice shall contain the name and address of the promoter and of the sponsor, as applicable. The promoter and the sponsor may be held liable for any failure to comply with the provisions of this paragraph;

(C) A promotion shall be a violation of this paragraph if a person is required to pay any money including, but not limited to, payments for service fees, mailing fees, or handling fees payable to the sponsor or seller or furnish any consideration for the prize, other than the consideration of traveling to the place of business or to the presentation or of allowing the presentation to be made in the participant's home, in order to receive any prize; provided, however, that the payment of any deposit made in connection with an activity described in subparagraph (B) of paragraph (22) of this subsection shall not constitute a requirement to pay any money under this subparagraph;

(D) Each notice must state the verifiable retail value of each prize which the participant has a chance of receiving. Each notice must state the odds of the participant's receiving each prize if there is an element of chance involved. The odds must be clearly identified as "odds." Odds must be stated as the total number of that particular prize which will be given and of the total number of notices. The total number of notices shall include all notices in which that prize may be given, regardless of whether it includes notices for other sponsors. If the odds of winning a particular prize would not be accurately stated on the basis of the number of notices, then the odds may be stated in another manner, but must be clearly stated in a manner which will not deceive or mislead the participant regarding the participant's chance of receiving the prize. The verifiable retail value and odds for each prize must be stated in conjunction and in immediate proximity with each listing of the prize in each place where it appears on the written notice and must be listed in the same size type and same boldness as the prize. Odds and verifiable retail values may not be listed in any manner which requires the participant to refer from one place in the written notice to another place in the written notice to determine the odds and verifiable retail value of the particular prize. Verifiable retail values shall be stated in Arabic numerals;

(E) Upon arriving at the place of business or upon allowing the sponsor to enter the participant's home, the participant must be immediately informed which, if any, prize the participant will receive prior to any seminar, sales presentation, or other presentation; and the prize, or any voucher, certificate, or other evidence of obligation in lieu of the prize, must be given to the participant at the time the participant is so informed;

(F) No participant shall be required or invited to view, hear, or attend any sales presentation, by whatever name denominated, unless such requirement or invitation has been conspicuously disclosed to the participant in the written notice in at least ten-point boldface type;

(G) Except in relation to an activity described in subparagraph (B) of paragraph (22) of this subsection, in no event shall any prize be offered or given which will require the participant to purchase additional goods or services, including shipping fees, handling fees, or any other charge by whatever name denominated, from any person in order to make the prize conform to what it reasonably appears to be in the mailing or delivery, unless such requirement and the additional cost to the participant is clearly disclosed in each place where the prize is listed in the written notice using a statement in the same size type and boldness as the prize listed;

(H) Any limitation on eligibility of participants must be clearly disclosed in the notice;

(I) Substitutes of prizes shall not be made. In the event the represented prize is unavailable, the participant shall be presented with a certificate which the sponsor shall honor within 30 days by shipping the prize, as represented in the notice, to the participant at no cost to the participant. In the event a certificate cannot be honored within 30 days, the sponsor shall mail to the participant a valid check or money order for the verifiable retail value which was represented in the notice;

(J) In the event the participant is presented with a voucher, certificate, or other evidence of obligation as the participant's prize, or in lieu of the participant's prize, it shall be the responsibility of the sponsor to honor the voucher, certificate, or other evidence of obligation, as represented in the notice, if the person who is named as being responsible for honoring the voucher, certificate, or other evidence of obligation fails to honor it as represented in the notice;

(K) The geographic area covered by the notice must be clearly stated. If any of the prizes may be awarded to persons outside of the listed geographical area or to participants in promotions for other sponsors, these facts must be clearly stated, with a corresponding explanation that every prize may not be given away by that particular sponsor. If prizes will not be awarded or given if the winning ticket, token, number, lot, or other device used to determine winners in that particular promotion is not presented to the promoter or sponsor, this fact must be clearly disclosed;

(L) Upon request of the administrator, the sponsor or promoter must within ten days furnish to the administrator the names, addresses, and telephone numbers of persons who have received any prize;

(M) A list of all winning tickets, tokens, numbers, lots, or other devices used to determine winners in promotions involving an element of chance must be prominently posted at the place of business or distributed to all participants if the seminar, sales presentation, or other presentation is made at a place other than the place of business. A copy of such list shall be furnished to each participant who so requests;

(N) Any promotion involving an element of chance which does not conform with the provisions of this paragraph shall be considered an unlawful lottery as defined in *Code Section 16-12-20*. The administrator may seek and shall receive the assistance of the prosecuting attorneys of this state in the commencement and prosecution of persons who promote and sponsor promotions which constitute an unlawful lottery;

(O) Any person who participates in a promotion and does not receive an item which conforms with what that person, exercising ordinary diligence, reasonably believed that person should have received based upon the representations made to that person may bring the private action provided for in *Code Section 10-1-399* and, if that person prevails, shall be awarded, in addition to any other recovery provided under this part, a sum which will allow that person to purchase an item at retail which reasonably conforms to the prize which that person, exercising ordinary diligence, reasonably believed that person would receive; and

(P) In addition to any other remedy provided under this part, where a contract is entered into while participating in a promotion which does not conform with this paragraph, the contract shall be voidable by the participant for ten business days following the date of the participant's receipt of the prize. In order to void the contract, the participant must notify the sponsor in writing within ten business days following the participant's receipt of the prize;

(17) Failure to furnish to the buyer of any campground membership or marine membership at the time of purchase a notice to the buyer allowing the buyer seven days to cancel the purchase. The notice shall be on a separate sheet of paper with no other written or pictorial material, in at least ten-point boldface type, double spaced, and shall read as follows:

"Notice to the Buyer

Please read this form completely and carefully. It contains valuable cancellation rights.

The buyer or buyers may cancel this transaction at any time prior to 5:00 P.M. of the seventh day following receipt of this notice.

This cancellation right cannot be waived in any manner by the buyer or buyers.

Any money paid by the buyer or buyers must be returned by the seller within 30 days of cancellation.

To cancel, sign this form, and mail by certified mail or statutory overnight delivery, return receipt requested, by 5:00 P.M. of the seventh day following the transaction. Be sure to keep a photocopy of the signed form and your post office receipt.

Seller's Name

Address to which cancellation is to be mailed

I (we) hereby cancel this transaction.

Buyer's Signature

Buyer's Signature

Date

Printed Name(s) of Buyer(s)

Street Address

City, State, ZIP Code"

(18) Failure of the seller of a campground membership or marine membership to fill in the seller's name and the address to which cancellation notices should be mailed on the form specified in paragraph (17) of this subsection;

(19) Failure of the seller of a campground membership or marine membership to cancel according to the terms specified in the form described in paragraph (17) of this subsection;

(20)(A) Representing that moneys provided to or on behalf of a debtor, as defined in *Code Section 44-14-162.1* in connection with property used as a dwelling place by said debtor, are a loan if in fact they are used to purchase said property and any such misrepresentation upon which is based the execution of a quitclaim deed or warranty deed by that debtor shall authorize that debtor to bring an action to reform such deed into a deed to secure debt in addition to any other right such debtor may have to cancel the deed pursuant to *Code Section 23-2-2*, 23-2-60, or any other applicable provision of law.

(B) Advertising to assist debtors whose loan for property the debtors use as a dwelling place is in default with intent not to assist them as advertised or making false or misleading representations to such a debtor about assisting the debtor in connection with said property.

(C) Failing to comply with the following provisions in connection with the purchase of property used as a dwelling place by a debtor whose loan for said property is in default and who remains in possession of this property after said purchase:

(i) A written contract shall be employed by the buyer which shall summarize and incorporate the entire agreement between the parties, a fully completed copy of which shall be furnished to the debtor at the time of its execution. Said contract shall show the date of the transaction and the name and address of the parties; shall state, in plain and bold language, that the subject transaction is a sale; and shall indicate the amount of cash proceeds and the amount of any other financial benefits that the debtor will receive;

(ii) This contract shall contain a statement in boldface type which complies substantially with the following:

"The provisions of this agreement have been fully explained to me. I understand that under this agreement I am selling my house to the other undersigned party."

This statement shall be signed by the debtor and the buyer;

(iii) If a lease or rental agreement is executed in connection with said sale, it shall set forth the amount of monthly rent and shall state, in plain and bold language, that the debtor may be evicted for failure to pay said rent. Should an option to purchase be included in this lease, it shall state, in plain and bold language, the conditions that must be fulfilled in order to exercise it; and

(iv) The buyer shall furnish to the seller at the time of closing a notice to the seller allowing the seller ten days to cancel the purchase. This right to cancel shall not limit or otherwise affect the seller's right to cancel pursuant to *Code Section 23-2-2*, 23-2-60, or any other applicable provision of law. The notice shall serve as the cover sheet to the closing documents. It shall be on a separate sheet of paper with no other written or pictorial material, in at least ten-point boldface type, double spaced, and shall read as follows:

"Notice to the Seller

Please read this form completely and carefully. It contains valuable cancellation rights.

The seller or sellers may cancel this transaction at any time prior to 5:00 P.M. of the tenth day following receipt of this notice.

This cancellation right cannot be waived in any manner by the seller or sellers.

Any money paid to the seller or sellers must be returned by the seller within 30 days of cancellation.

To cancel, sign this form, and return it to the buyer by 5:00 P.M. of the tenth day following the transaction. It is best to mail it by certified mail or statutory overnight delivery, return receipt requested, and to keep a photocopy of the signed form and your post office receipt.

Buyer's Name

Address to which cancellation

is to be returned

I (we) hereby cancel this transaction.

Seller's Signature

Seller's Signature

Date

Printed Name(s) of Seller(s)

Street Address

City, State, ZIP Code"

(D) The provisions of subparagraph (C) of this paragraph shall only apply where all three of the following conditions are present:

(i) A loan on the property used as a dwelling place is in default;

(ii) The debtor transfers the title to the property by quitclaim deed, limited warranty deed, or general warranty deed; and

(iii) The debtor remains in possession of the property under a lease or as a tenant at will;

(21) Advertising a telephone number the prefix of which is 976 and which when called automatically imposes a per-call charge or cost to the consumer, other than a regular charge imposed for long-distance telephone service, unless the advertisement contains the name, address, and telephone number of the person responsible for the advertisement and unless the person's telephone number and the per-call charge is printed in type of the same size as that of the number being advertised;

(22) Representing, in connection with a vacation, holiday, or an item described by terms of similar meaning, or implying that:

(A) A person is a winner, has been selected or approved, or is in any other manner involved in a select or special group for receipt of an opportunity or prize, or that a person is entering a contest, sweepstakes, drawing, or other competitive enterprise from which a winner or select group will receive an opportunity or prize, when in fact the enterprise is designed to make contact with prospective customers, or in which all or a substantial number of those entering such competitive enterprise receive the same prize or opportunity; or

(B) In connection with the types of representations referred to in subparagraph (A) of this paragraph, representing that a vacation, holiday, or an item described by other terms of similar meaning, is being offered, given, awarded, or otherwise distributed unless:

(i) The item represented includes all transportation, meals, and lodging;

(ii) The representation specifically describes any transportation, meals, or lodging which is not included; or

(iii) The representation discloses that a deposit is required to secure a reservation, if that is the case.

The provisions of this paragraph shall not apply where the party making the representations is in compliance with paragraph (16) of this subsection;

(23) Except in relation to an activity which is in compliance with paragraph (16) or (22) of this subsection, stating, in writing or by telephone, that a person has won, is the winner of, or will win or receive anything of value, unless the person will receive the prize without obligation;

(24)(A) Conducting a going-out-of-business sale for more than 90 days.

(B) After the 90 day time limit in subparagraph (A) of this paragraph has expired, continuing to do business in any manner contrary to any representations which were made regarding the nature of the going-out-of-business sale.

(C) The prohibitions of this paragraph shall not extend to any of the following:

(i) Sales for the estate of a decedent by the personal representative or the personal representative's agent, according to law or by the provisions of the will;

(ii) Sales of property conveyed by security deed, deed of trust, mortgage, or judgment or ordered to be sold according to the deed, mortgage, judgment, or order;

(iii) Sales of all agricultural produce and livestock arising from the labor of the seller or other labor under the seller's control on or belonging to the seller's real or personal estate and not purchased or sold for speculation;

(iv) All sales under legal process;

(v) Sales by a pawnbroker or loan company which is selling or offering for sale unredeemed pledges of chattels as provided by law; or

(vi) Sales of automobiles by an auctioneer licensed under the laws of the State of Georgia;

(25) The issuance of a check or draft by a lender in connection with a real estate transaction in violation of *Code Section 44-14-13*;

(26) With respect to any individual or facility providing personal care services:

(A) Any person or entity not duly licensed or registered as a personal care home formally or informally offering, advertising to, or soliciting the public for residents or referrals;

(B) Any personal care home, as defined in subsection (a) of *Code Section 31-7-12*, offering, advertising, or soliciting the public to provide services:

(i) Which are outside the scope of personal care services; and

(ii) For which it has not been specifically authorized.

Nothing in this subparagraph prohibits advertising by a personal care home for services authorized by the Department of Human Resources under a waiver or variance pursuant to subsection (b) of *Code Section 31-2-4*;

(C) For purposes of this paragraph, "personal care" means protective care and watchful oversight of a resident who needs a watchful environment but who does not have an illness, injury, or disability which requires chronic or convalescent care including medical and nursing services.

The provisions of this paragraph shall be enforced following consultation with the Department of Human Resources which shall retain primary responsibility for issues relating to licensure of any individual or facility providing personal care services;

(27) Mailing any notice, notification, or similar statement to any consumer regarding winning or receiving any prize in a promotion, and the envelope or other enclosure for the notice fails to conspicuously identify on its face that the contents of the envelope or other enclosure is a commercial solicitation and, if there is an element of chance in winning a prize, the odds of winning as "odds";

(28) Any violation of the rules and regulations promulgated by the Department of Driver Services pursuant to subsection (e) of *Code Section 40-5-83* which relates to the consumer transactions and business practices of DUI Alcohol or Drug Use Risk Reduction Programs, except that the Department of Driver Services shall retain primary jurisdiction over such complaints;

(29) With respect to any consumer reporting agency:

(A) Any person who knowingly and willfully obtains information relative to a consumer from a consumer reporting agency under false pretenses shall be guilty of a misdemeanor;

(B) Any officer or employee of a consumer reporting agency who knowingly and willfully provides information concerning an individual from the agency's files to a person not authorized to receive that information shall be guilty of a misdemeanor; and

(C) Each consumer reporting agency which compiles and maintains files on consumers on a nation-wide basis shall furnish to any consumer who has provided appropriate verification of his or her identity two complete consumer reports per calendar year, upon request and without charge;

(29.1) With respect to any credit card issuer:

(A) A credit card issuer who mails an unsolicited offer or solicitation to apply for a credit card and who receives by mail a completed application in response to the solicitation which lists an address that is not substantially the same as the address on the solicitation may not issue a credit card based on that application until steps have been taken to verify the applicant's valid address to the same extent required by regulations prescribed pursuant to subsection (l) of *31 U.S.C. Section 5318.* Any person who violates this paragraph commits an unlawful practice within the meaning of this Code section; and

(B) Notwithstanding subparagraph (A) of this paragraph, a credit card issuer, upon receiving an application, may issue a credit card to a consumer or commercial customer with whom it already has a business relationship provided the address to which the card is mailed is a valid address based upon information in the records of the credit card issuer or its affiliates;

(30) With respect to any individual or facility providing home health services:

(A) For any person or entity not duly licensed by the Department of Human Resources as a home health agency to regularly hold itself out as a home health agency; or

(B) For any person or entity not duly licensed by the Department of Human Resources as a home health agency to utilize the words "home health" or "home health services" in any manner including but not limited to advertisements, brochures, or letters. Unless otherwise prohibited by law, nothing in this subparagraph shall be construed to prohibit persons or entities from using the words "home health" or "home health services" in conjunction with the words "equipment," "durable medical equipment," "pharmacy," "pharmaceutical services," "prescription medications," "infusion therapy," or "supplies" in any manner including but not limited to advertisements, brochures, or letters. An unlicensed person or entity may advertise under the category "home health services" in any advertising publication which divides its advertisements into categories, provided that:

(i) The advertisement is not placed in the category with the intent to mislead or deceive;

(ii) The use of the advertisement in the category is not part of an unfair or deceptive practice; and

(iii) The advertisement is not otherwise unfair, deceptive, or misleading.

For purposes of this paragraph, the term "home health agency" shall have the same definition as contained in *Code Section 31-7-150,* as now or hereafter amended. The provisions of this paragraph shall be enforced by the administrator in consultation with the Department of Human Resources; provided, however, that the administrator shall not have any responsibility for matters or functions related to the licensure of home health agencies;

(30.1) Failing to comply with the following provisions in connection with a contract for health care services between a physician and an insurer which offers a health benefit plan under which such physician provides health care services to enrollees:

(A) As used in this paragraph, the term:

(i) "Enrollee" means an individual who has elected to contract for or participate in a health benefit plan for that individual or for that individual and that individual's eligible dependents and includes that enrollee's eligible dependents.

(ii) "Health benefit plan" means any hospital or medical insurance policy or certificate, health care plan contract or certificate, qualified higher deductible health plan, health maintenance organization subscriber contract, any health benefit plan established pursuant to Article 1 of Chapter 18 of Title 45, or any managed care plan.

(iii) "Insurer" means a corporation or other entity which is licensed or otherwise authorized to offer a health benefit plan in this state.

(iv) "Patient" means a person who seeks or receives health care services under a health benefit plan.

(v) "Physician" means a person licensed to practice medicine under Article 2 of Chapter 34 of Title 43.

(B) Every contract between a physician and an insurer which offers a health benefit plan under which that physician provides health care services shall be in writing and shall state the obligations of the parties with respect to charges and fees for services covered under that plan when provided by that physician to enrollees under that plan. Neither the insurer which provides that plan nor the enrollee under that plan shall be liable for any amount which exceeds the obligations so established for such covered services.

(C) Neither the physician nor a representative thereof shall intentionally collect or attempt to collect from an enrollee any obligations with respect to charges and fees for which the enrollee is not liable and neither such physician nor a representative thereof may maintain any action at law against such enrollee to collect any such obligations.

(D) The provisions of this paragraph shall not apply to the amount of any deductible or copayment which is not covered by the health benefit plan.

(E) This paragraph shall apply to only such health benefit plan contracts issued, delivered, issued for delivery, or renewed in this state on or after July 2, 2001.

(31) With respect to telemarketing sales:

(A) For any seller or telemarketer to use any part of an electronic record to attempt to induce payment or attempt collection of any payment that the seller or telemarketer claims is due and owing to it pursuant to a telephone conversation or series of telephone conversations with a residential subscriber. Nothing in this paragraph shall be construed to:

(i) Prohibit the seller or telemarketer from introducing, as evidence in any court proceeding to attempt collection of any payment that the seller or telemarketer claims is due and owing to it pursuant to a telephone conversation or series of telephone conversations with a residential subscriber, an electronic record of the entirety of such telephone conversation or series of telephone conversations; or

(ii) Expand the permissible use of an electronic record made pursuant to 16 C.F.R. Part 310.3(a)(3), the Federal Telemarketing Sales Rule.

(B) For purposes of this paragraph, the term:

(i) "Covered communication" means any unsolicited telephone call or telephone call arising from an unsolicited telephone call.

(ii) "Electronic record" means any recording by electronic device of, in part or in its entirety, a telephone conversation or series of telephone conversations with a residential subscriber that is initiated by a seller or telemarketer in order to induce the purchase of goods, services, or property. This term shall include, without limitation, any subsequent telephone conversations in which the seller or telemarketer attempts to verify any alleged agreement in a previous conversation or previous conversations.

(iii) "Residential subscriber" means any person who has subscribed to residential phone service from a local exchange company or the other persons living or residing with such person.

(iv) "Seller or telemarketer" means any person or entity making a covered communication to a residential subscriber for the purpose of inducing the purchase of goods, services, or property by such subscriber. This term shall include, without limitation, any agent of the seller or telemarketer, whether for purposes of conducting calls to induce the purchase, for purposes of verifying any calls to induce the purchase, or for purposes of attempting to collect on any payment under the purchase;

(32) Selling, marketing, promoting, advertising, providing, or distributing any card or other purchasing mechanism or device that is not insurance or evidence of insurance coverage and that purports to offer or provide discounts or access to discounts on purchases of health care goods or services from providers of the same or making any representation or statement that purports to offer or provide discounts or access to discounts on purchases of health care goods or services from providers of the same, when:

(A) Such card or other purchasing mechanism or device does not contain a notice expressly and prominently providing in boldface type that such discounts are not insurance; or

(B) Such discounts or access to such discounts are not specifically authorized under a separate contract with a provider of health care goods or services to which such discounts are purported to be applicable; or

(33)(A) For any person, firm, partnership, association, or corporation to issue a gift certificate, store gift card, or general use gift card without:

(i) Including the terms of the gift certificate, store gift card, or general use gift card in the packaging which accompanies the certificate or card at the time of purchase, as well as making such terms available upon request; and

(ii) Conspicuously printing the expiration date, if applicable, on the certificate or card and conspicuously printing the amount of any dormancy or nonuse fees on:

(I) The certificate or card; or

(II) A sticker affixed to the certificate or card.

A gift certificate, store gift card, or general use gift card shall be valid in accordance with its terms in exchange for merchandise or services.

(B) As used in this paragraph, the term:

(i) "General use gift card" means a plastic card or other electronic payment device which is usable at multiple, unaffiliated merchants or service providers; is issued in an amount which amount may or may not be, at the option of the issuer, increased in value or reloaded if requested by the holder; is purchased or loaded on a prepaid basis by a consumer; and is honored upon presentation by merchants for goods or services.

(ii) "Gift certificate" means a written promise that is usable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo; is issued in a specified amount and cannot be increased in value on the face thereof; is purchased on a prepaid basis by a consumer in exchange for payment; and is honored upon presentation for goods or services by such single merchant or affiliated group of merchants that share the same name, mark, or logo.

(iii) "Store gift card" means a plastic card or other electronic payment device which is usable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo; is issued in a specified amount and may or may not be increased in value or reloaded; is purchased on a prepaid basis by a consumer in exchange for payment; and is honored upon presentation for goods or services by such single merchant or affiliated group of merchants that share the same name, mark, or logo.

(c) A seller may not by contract, agreement, or otherwise limit the operation of this part notwithstanding any other provision of law.

(d) Notwithstanding any other provision of the law to the contrary, the names, addresses, telephone numbers, social security numbers, or any other information which could reasonably serve to identify any person making a complaint about unfair or deceptive acts or practices shall be confidential. However, the complaining party may consent to public release of his or her identity by giving such consent expressly, affirmatively, and directly to the administrator or administrator's employees. Nothing contained in this subsection shall be construed to prevent the subject of the complaint, or any other person to whom disclosure to the complainant's identity may aid in resolution of the complaint, from being informed of the identity of the complainant, to prohibit any valid discovery under the relevant discovery rules, or to prohibit the lawful subpoena of such information.

**HISTORY:** Ga. L. 1975, p. 376, § 3; Ga. L. 1978, p. 2001, § 2; Ga. L. 1982, p. 3, § 10; Ga. L. 1982, p. 1689, § § 2, 4; Ga. L. 1983, p. 1298, § 1; Ga. L. 1984, p. 22, § 10; Ga. L. 1984, p. 463, § 1; Ga. L. 1985, p. 149, § 10; Ga. L. 1985, p. 938, § 2; Ga. L. 1985, p. 1183, § 1; Ga. L. 1986, p. 405, § 2; Ga. L. 1986, p. 1313, § 2; Ga. L. 1987, p. 794, § 2; Ga. L. 1987, p. 1386, § 2; Ga. L. 1988, p. 13, § 10; Ga. L. 1988, p. 399, § § 1-3; Ga. L. 1988, p. 983, § 1; Ga. L. 1988, p. 1657, § 1; Ga. L. 1989, p. 14, § 10; Ga. L. 1989, p. 560, § 3; Ga. L. 1989, p. 1606, § 1; Ga. L. 1990, p. 1653, § 2; Ga. L. 1991, p. 94, § 10; Ga. L. 1992, p. 1129, § 1; Ga. L. 1992, p. 2139, § 1; Ga. L. 1993, p. 91, § 10; Ga. L. 1993, p. 1076, § § 1, 2; Ga. L. 1993, p. 1676, § 1; Ga. L. 1995, p. 729, § 1; Ga. L. 1996, p. 1030, § 1; Ga. L. 1997, p. 143, § 10; Ga. L. 1997, p. 1507, § 1; Ga. L. 1998, p. 643, § 1; Ga. L. 2000, p. 557, § 1; Ga. L. 2000, p. 1181, § 1; Ga. L. 2000, p. 1589, § 3; Ga. L. 2001, p. 4, § 10; Ga. L. 2001, p. 1170, § 2; Ga. L. 2004, p. 149, § 1; Ga. L. 2005, p. 334, § 4-2/HB 501; Ga. L. 2005, p. 1183, § 2/SB 13.

**NOTES:**
THE 1998 AMENDMENT, effective July 1, 1998, and applicable to acts and offenses committed on or after July 1, 1998, rewrote paragraph (4) of subsection (b).

THE 2000 AMENDMENTS. --The first 2000 amendment, effective July 1, 2000, in subsection (b), deleted "or" at the end of paragraph (30), substituted "; or" for the period at the end of paragraph (31), and added paragraph (32). The second 2000 amendment, effective July 1, 2000, inserted "including, but not limited to, payments for service fees, mailing fees, or handling fees payable to the sponsor or seller" in subparagraph (b)(16)(C). The third 2000 amendment, effective July 1, 2000, and applicable with respect to notices delivered on or after July 1, 2000, in subsection (b), substituted "cer-

*HRS § 481A-3*

MICHIE'S HAWAII REVISED STATUTES ANNOTATED
Copyright(c) 2004 Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** STATUTES CURRENT THRU THE 2003 REGULAR AND SPECIAL SESSIONS ***
*** ANNOTATIONS CURRENT THRU DECEMBER 17, 2003 ***

DIVISION 2. BUSINESS
TITLE 26. TRADE REGULATION AND PRACTICE
CHAPTER 481A. UNIFORM DECEPTIVE TRADE PRACTICE ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

HRS § 481A-3 (2003)

[§ 481A-3]. Deceptive trade practices

(a) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:

(1) Passes off goods or services as those of another;

(2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6) Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparages the goods, services, or business of another by false or misleading representation of fact;

(9) Advertises goods or services with intent not to sell them as advertised;

(10) Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or

(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

(b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

Service: **Get by LEXSTAT®**
Citation: **haw rev stat 481A-3**
View: Custom
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:27 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Idaho Code § 48-603*

Idaho Code
Copyright 1948-2004 by Matthew Bender & Company, Inc. one of the LEXIS Publishing companies.
All rights reserved.

***** STATUTES CURRENT THROUGH THE 2004 SESSION *****
***** ANNOTATIONS CURRENT THROUGH MARCH 25, 2004 *****

GENERAL LAWS
TITLE 48. MONOPOLIES AND TRADE PRACTICES
CHAPTER 6. CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Idaho Code § 48-603 (2004)

§ 48-603. Unfair methods and practices

The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past, or is:

(1) Passing off goods or services as those of another;

(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) Using deceptive representations or designations of geographic origin in connection with goods or services;

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

(6) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparaging the goods, services, or business of another by false or misleading representation of fact;

(9) Advertising goods or services with intent not to sell them as advertised;

(10) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) Obtaining the signature of the buyer to a contract when it contains blank spaces to be filled in after it has been signed;

(13) Failing to deliver to the consumer at the time of the consumer's signature a legible copy of the contract or of any other document which the seller or lender has required or requested the buyer to sign, and which he has signed, during or after the contract negotiation;

(14) Making false or misleading statements of fact concerning the age, extent of use, or mileage of any goods;

(15) Promising or offering to pay, credit or allow to any buyer or lessee, any compensation or reward in consideration of his giving to the seller or lessor the names of prospective purchasers or lessees, or otherwise aiding the seller or lessor in making a sale or lease to another person, if the earning of the rebate, discount or other value is contingent upon the occurrence of an event subsequent to the time the buyer or lessee agrees to buy or lease;

(16) Representing that services, replacements or repairs are needed if they are not needed, or providing services, replacements or repairs that are not needed;

(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer;

(18) Engaging in any unconscionable method, act or practice in the conduct of trade or commerce, as provided in section 48-603C, Idaho Code, provided, however, that the provisions of this subsection shall not apply to a regulated lender as that term is defined in subsection (37) of section 28-41-301, Idaho Code;

(19) Taking advantage of a disaster or emergency declared by the governor under chapter 10, title 46, Idaho Code, or the president of the United States under the provisions of the disaster relief act of 1974, 42 U.S.C. section 5121 et seq., by selling or offering to sell to the ultimate consumer fuel or food, pharmaceuticals, or water for human consumption at an exorbitant or excessive price; provided however, this subsection shall apply only to the location and for the duration of the declaration of emergency. In determining whether a price is exorbitant or excessive, the court shall take into consideration the facts and circumstances including, but not limited to:

(a) A comparison between the price paid by the alleged violator for the fuel, food, pharmaceuticals, or water and the price for which the alleged violator sold those same items to the ultimate consumer immediately before and after the period specified by the disaster or emergency declaration;

(b) Additional costs of doing business incurred by the alleged violator because of the disaster or emergency;

(c) The duration of the disaster or emergency declaration.

Notwithstanding anything to the contrary contained elsewhere in the act, no private cause of action exists under this subsection.

Service: **Get by LEXSTAT®**
Citation: **Idaho code 48-603**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:29 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*815 ILCS 505/2*

ILLINOIS COMPILED STATUTES ANNOTATED
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH PUBLIC ACT 93-698 ***
*** MAY 10, 2004 ANNOTATION SERVICE ***

CHAPTER 815.  BUSINESS TRANSACTIONS
DECEPTIVE PRACTICES
CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

**GO TO THE CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

815 ILCS 505/2  (2004)

[Prior to 1/1/93 cited as: Ill. Rev. Stat., Ch. 121 1/2, para. 262]

§ 815 ILCS 505/2.  [Unfair competition and deceptive practices]

   Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not
limited to the use or employment of any deception fraud, false pretense, false promise,
misrepresentation or the concealment, suppression or omission of any material fact, with intent that
others rely upon the concealment, suppression or omission of such material fact, or the use or
employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act",
approved August 5, 1965 [815 ILCS 510/2], in the conduct of any trade or commerce are hereby
declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In
construing this section consideration shall be given to the interpretations of the Federal Trade
Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act [15
U.S.C. § 45].

   Service: **Get by LEXSTAT®**
   Citation: **815 ilcs 505/2**
   View: **Custom**
   Segments: Text
   Date/Time: Thursday, September 2, 2004 - 6:30 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Burns Ind. Code Ann. § 24-5-0.5-3*

BURNS INDIANA STATUTES ANNOTATED
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** (STATUTES CURRENT THROUGH 2004 2ND REGULAR SESSION OF THE 113TH GENERAL ASSEMBLY)
***
*** ANNOTATIONS CURRENT THROUGH MARCH 31, 2004 ***

TITLE 24.  TRADE REGULATIONS; CONSUMER SALES AND CREDIT
ARTICLE 5.  CONSUMER SALES
CHAPTER 0.5.  DECEPTIVE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Burns Ind. Code Ann. § 24-5-0.5-3  (2004)

§ 24-5-0.5-3. Deceptive acts

(a) The following acts or representations as to the subject matter of a consumer transaction, made either orally or in writing by a supplier, are deceptive acts:

(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

(3) That such subject of a consumer transaction is new or unused, if it is not and if the supplier knows or should reasonably know that it is not.

(4) That such subject of a consumer transaction will be supplied to the public in greater quantity than the supplier intends or reasonably expects.

(5) That replacement or repair constituting the subject of a consumer transaction is needed, if it is not and if the supplier knows or should reasonably know that it is not.

(6) That a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not.

(7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction he does not have, and which the supplier knows or should reasonably know that he does not have.

(8) That such consumer transaction involves or does not involve a warranty, a disclaimer of warranties, or other rights, remedies, or obligations, if the representation is false and if the supplier knows or should reasonably know that the representation is false.

(9) That the consumer will receive a rebate, discount, or other benefit as an inducement for entering into a sale or lease in return for giving the supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, if earning the benefit, rebate, or discount is contingent upon the occurrence of an event subsequent to the time the consumer agrees to the

purchase or lease.

(10) That the supplier is able to deliver or complete the subject of the consumer transaction within a stated period of time, when the supplier knows or should reasonably know he could not. If no time period has been stated by the supplier, there is a presumption that the supplier has represented that he will deliver or complete the subject of the consumer transaction within a reasonable time, according to the course of dealing or the usage of the trade.

(11) That the consumer will be able to purchase the subject of the consumer transaction as advertised by the supplier, if the supplier does not intend to sell it.

(12) That the replacement or repair constituting the subject of a consumer transaction can be made by the supplier for the estimate the supplier gives a customer for the replacement or repair, if the specified work is completed and:

(A) the cost exceeds the estimate by an amount equal to or greater than ten percent (10%) of the estimate;

(B) the supplier did not obtain written permission from the customer to authorize the supplier to complete the work even if the cost would exceed the amounts specified in clause (A);

(C) the total cost for services and parts for a single transaction is more than seven hundred fifty dollars ($ 750); and

(D) the supplier knew or reasonably should have known that the cost would exceed the estimate in the amounts specified in clause (A).

(13) That the replacement or repair constituting the subject of a consumer transaction is needed, and that the supplier disposes of the part repaired or replaced earlier than seventy-two (72) hours after both:

(A) the customer has been notified that the work has been completed; and

(B) the part repaired or replaced has been made available for examination upon the request of the customer.

(14) Engaging in the replacement or repair of the subject of a consumer transaction if the consumer has not authorized the replacement or repair, and if the supplier knows or should reasonably know that it is not authorized.

(15) The act of misrepresenting the geographic location of the supplier by listing a fictitious business name or an assumed business name (as described in IC 23-15-1) in a local telephone directory if:

(A) the name misrepresents the supplier's geographic location;

(B) the listing fails to identify the locality and state of the supplier's business;

(C) calls to the local telephone number are routinely forwarded or otherwise transferred to a supplier's business location that is outside the calling area covered by the local telephone directory; and

(D) the supplier's business location is located in a county that is not contiguous to a county in the calling area covered by the local telephone directory.

(16) The act of listing a fictitious business name or assumed business name (as described in IC 23-15-1) in a directory assistance database if:

(A) the name misrepresents the supplier's geographic location;

(B) calls to the local telephone number are routinely forwarded or otherwise transferred to a supplier's business location that is outside the local calling area; and

(C) the supplier's business location is located in a county that is not contiguous to a county in the local calling area.

(17) That the supplier violated IC 24-3-4 concerning cigarettes for import or export.

(18) That a supplier knowingly sells or resells a product to a consumer if the product has been recalled, whether by the order of a court or a regulatory body, or voluntarily by the manufacturer, distributor, or retailer unless the product has been repaired or modified to correct the defect that was the subject of the recall.

(b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such representation thereon or therein, or who authored such materials, and such other suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false.

(c) If a supplier shows by a preponderance of the evidence that an act resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the error, such act shall not be deceptive within the meaning of this chapter.

(d) It shall be a defense to any action brought under this chapter that the representation constituting an alleged deceptive act was one made in good faith by the supplier without knowledge of its falsity and in reliance upon the oral or written representations of the manufacturer, the person from whom the supplier acquired the product, any testing organization, or any other person provided that the source thereof is disclosed to the consumer.

(e) For purposes of subsection (a)(12), a supplier that provides estimates before performing repair or replacement work for a customer shall give the customer a written estimate itemizing as closely as possible the price for labor and parts necessary for the specific job before commencing the work.

(f) For purposes of subsection (a)(15), a telephone company or other provider of a telephone directory or directory assistance service or its officer or agent is immune from liability for publishing the listing of a fictitious business name or assumed business name of a supplier in its directory or directory assistance database unless the telephone company or other provider of a telephone directory or directory assistance service is the same person as the supplier who has committed the deceptive act.

(g) For purposes of subsection (a)(18), it is an affirmative defense to any action brought under this chapter that the product has been altered by a person other than the defendant to render the product completely incapable of serving its original purpose.

Service: **Get by LEXSTAT®**
Citation: **ind code 24-5-0.5-3**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:33 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Iowa Code § 714.16*

CODE OF IOWA 2003

*** THIS DOCUMENT IS CURRENT THROUGH THE 2004 EDITION (2003 LEGISLATION) ***

TITLE XVI. CRIMINAL LAW AND PROCEDURE
SUBTITLE 1. CRIME CONTROL AND CRIMINAL ACTS
CHAPTER 714. THEFT, FRAUD, AND RELATED OFFENSES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Iowa Code § 714.16 (2003)

714.16 Consumer frauds.

1. Definitions:

*a.* The term *"advertisement"* includes the attempt by publication, dissemination, solicitation, or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise.

*b.* *"Buyer"*, as used in subsection 2, paragraph *"h"*, means the person to whom the water system is being sold, leased, or rented.

*c.* *"Consumer information pamphlet"* means a publication which explains water quality, health effects, quality expectations for drinking water, and the effectiveness of water treatment systems.

*d.* *"Consummation of sale"* means completion of the act of selling, leasing, or renting.

*e.* *"Contaminant"* means any particulate, chemical, microbiological, or radiological substance in water which has a potentially adverse health effect and for which a maximum contaminant level (MCL) or treatment technique requirement or an action level established in lieu of a maximum contaminant level (MCL), has been specified in the national primary drinking water regulations.

*f.* *"Deception"* means an act or practice which has the tendency or capacity to mislead a substantial number of consumers as to a material fact or facts.

*g.* *"Label"*, as used in subsection 2, paragraph *"h"*, means the written, printed, or graphic matter permanently affixed or attached to or printed on the water treatment system.

*h.* *"Manufacturer's performance data sheet"* means a booklet, document, or other printed material containing, at a minimum, the information required pursuant to subsection 2, paragraph *"h"*.

*i.* The term *"merchandise"* includes any objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services.

*j.* The term *"person"* includes any natural person or the person's legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof.

*k.* The term *"sale"* includes any sale, offer for sale, or attempt to sell any merchandise for cash or on credit.

*l.* *"Seller"*, as used in subsection 2, paragraph *"h"*, means the person offering the water treatment system for sale, lease, or rent.

*m.* The term *"subdivided lands"* refers to improved or unimproved land or lands divided or proposed to be divided for the purpose of sale or lease, whether immediate or future, into five or more lots or parcels; provided, however, it does not apply to the leasing of apartments, offices, stores or similar space within an apartment building, industrial building or commercial building unless an undivided interest in the land is granted as a condition precedent to occupying space in said structure.

*n.* *"Unfair practice"* means an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces.

*o.* *"Water treatment system"* means a device or assembly for which a claim is made that it will improve the quality of drinking water by reducing one or more contaminants through mechanical, physical, chemical, or biological processes or combinations of the processes. As used in this paragraph and in subsection 2, paragraph *"h"*, each model of a water treatment system shall be deemed a distinct water treatment system.

2. *a.* The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise or the solicitation of contributions for charitable purposes, whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

It is deceptive advertising within the meaning of this section for a person to represent in connection with the lease, sale, or advertisement of any merchandise that the advertised merchandise has certain performance characteristics, accessories, uses, or benefits or that certain services are performed on behalf of clients or customers of that person if, at the time of the representation, no reasonable basis for the claim existed. The burden is on the person making the representation to demonstrate that a reasonable basis for the claim existed.

A retailer who uses advertising for a product, other than a drug or other product claiming to have a health related benefit or use, prepared by a supplier shall not be liable under this section unless the retailer participated in the preparation of the advertisement; knew or should have known that the advertisement was deceptive, false, or misleading; refused to withdraw the product from sales upon the request of the attorney general pending a determination of whether the advertisement was deceptive, false, or misleading; refused upon the request of the attorney general to provide the name and address of the supplier; or refused to cooperate with the attorney general in an action brought against the supplier under this section.

*"Material fact"* as used in this subsection does not include repairs of damage to or adjustments on or replacements of parts with new parts of otherwise new merchandise if the repairs, adjustments or replacements are made to achieve compliance with factory specifications and are made before sale of the merchandise at retail and the actual cost of any labor and parts charged to or performed by a retailer for any such repairs, adjustments and parts does not exceed three hundred dollars or ten percent of the actual cost to a retailer including freight of the merchandise, whichever is less, providing that the seller posts in a conspicuous place notice that repairs, adjustments or replacements will be disclosed upon request. The exemption provided in this paragraph does not apply to the concealment, suppression or omission of a material fact if the purchaser requests disclosure of any repair, adjustment or replacement.

*b.* The advertisement for sale, lease or rent, or the actual sale, lease, or rental of any merchandise at a price or with a rebate or payment or other consideration to the purchaser which is contingent upon the procurement of prospective customers provided by the purchaser, or the procurement of sales, leases, or rentals to persons suggested by the purchaser, is declared to be an unlawful practice rendering any obligation incurred by the buyer in connection therewith, completely void and a nullity. The rights and obligations of any contract relating to such contingent price, rebate, or payment shall be interdependent

and inseverable from the rights and obligations relating to the sale, lease, or rental.

*c.* It is an unlawful practice for any person to advertise the sale of merchandise at reduced rates due to the cessation of business operations and after the date of the first such advertisement remain in business under the same or substantially the same ownership, or under the same or substantially the same trade name, or to continue to offer for sale the same type of merchandise at the same location for more than one hundred twenty days. As used in this paragraph *"person"* includes a person who acquires an ownership interest in the business either within sixty days before the initial advertisement of the sale or at any time after the initial advertisement of the sale. In addition, a person acquiring an ownership interest shall comply with paragraph *"g"* if the person adds additional merchandise to the sale.

*d.* (1) No person shall offer or advertise within this state for sale or lease, any subdivided lands without first filing with the real estate commission true and accurate copies of all road plans, plats, field notes, and diagrams of water, sewage, and electric power lines as they exist at the time of the filing, however, this filing is not required for a subdivision subject to section 306.21 or chapter 354. A filing shall be accompanied by a fee of fifty dollars for each subdivision included, payable to the real estate commission.

(2) False or misleading statements filed pursuant to subparagraph (1) or section 306.21 or chapter 354, and advertising, offers to sell, or contracts not in substantial conformity with the filings made pursuant to section 306.21 or chapter 354 are unlawful.

*e.* Any violations of chapter 123 or any other provisions of law by a manufacturer, distiller, vintner, importer, or any other person participating in the distribution of alcoholic liquor or beer as defined in chapter 123.

*f.* A violation of a provision of sections 535C.1 through 535C.10 is an unlawful practice.

*g.* It is an unlawful practice for a person to acquire directly or indirectly an interest in a business which has either gone out of business or is going out of business and conduct or continue a going-out-of-business sale where additional merchandise has been added to the merchandise of the liquidating business for the purposes of the sale, unless the person provides a clear and conspicuous notice in all advertisements that merchandise has been added. The advertisement shall also state the customary retail price of the merchandise that has been added or brought in for the sale. The person acquiring the interest shall obtain a permit to hold the sale before commencing the sale. If the sale is to be held in a city which has an ordinance regulating going-out-of-business sales, then the permit shall be obtained from the city. If the sale is to be located outside of a city or in a city which does not have an ordinance regulating going-out-of-business sales, then the permit shall be obtained from the county in which the proposed sale is to be held. The county board of supervisors shall prescribe the procedures necessary to obtain the permit. The permit shall state the percentage of merchandise for sale that was obtained from the liquidating business and the percentage of merchandise for sale that was added from other sources. The permit or an accurate reproduction of the permit shall be clearly and conspicuously posted at all entrances to the site of the sale and at all locations where sales are consummated. A person who violates this paragraph, including any misrepresentation of the presence and the percentage of additional merchandise that had been added to that of the liquidating company, is liable for a civil penalty of not to exceed one thousand dollars for each day of each violation. The civil penalties collected shall be deposited in the general fund of the political entity which prosecutes the violation. The civil penalty is in addition to and not in lieu of any criminal penalty. A political entity enforcing this paragraph may obtain a preliminary injunction without posting a bond to enjoin a violation of paragraph *"c"* and this paragraph pending a hearing.

This paragraph does not prohibit a city or county from adopting an ordinance prohibiting the conducting of a going-out-of-business sale in which additional merchandise is added to the merchandise of the liquidating business for the purposes of the sale.

*h.* It is an unlawful practice for a person to sell, lease, rent, or advertise the sale, lease, or rental of a

water treatment system in this state, for which claims or representations of removing health-related contaminants are made, unless the water treatment system:

(1) Has been performance tested by a third-party testing agency that has been authorized by the Iowa department of public health. Alternatively, in lieu of third-party performance testing of the manufacturer's water treatment system, the manufacturer may rely upon the manufacturer's own test data after approval of the data by an accepted third-party evaluator as provided in this subparagraph. The Iowa department of public health shall review the qualifications of a third-party evaluator proposed by the manufacturer. The department may accept or reject a proposed third-party evaluator based upon the required review. If a third-party evaluator, accepted by the Iowa department of public health, finds that the manufacturer's test data is reliable, adequate, and fairly presented, the manufacturer may rely upon that data to satisfy the requirements of this subparagraph after filing a copy of the test data and the report of the third-party evaluator with the Iowa department of public health. The testing agency shall use, or the evaluator shall review for the use of, approved methods of performance testing determined to be appropriate by the state hygienic laboratory.

(2) Has met the performance testing requirements specified in the testing protocol.

(3) Bears a conspicuous and legible label stating, *"IMPORTANT NOTICE -- Read the Manufacturer's Performance Data Sheet"* and is accompanied by a manufacturer's performance data sheet.

The manufacturer's performance data sheet shall be given to the buyer and shall be signed and dated by the buyer and the seller prior to the consummation of the sale of the water treatment system. The manufacturer's performance data sheet shall contain information including, but not limited to:

(a) The name, address, and telephone number of the seller.

(b) The name, brand, or trademark under which the unit is sold, and its model number.

(c) Performance and test data including, but not limited to, the list of contaminants certified to be reduced by the water treatment system; the test influent concentration level of each contaminant or surrogate for that contaminant; the percentage reduction or effluent concentration of each contaminant or surrogate; where applicable, the maximum contaminant level (MCL) or a treatment technique requirement or an action level established in lieu of a maximum contaminant level (MCL) specified in the national primary drinking water regulations; where applicable, the approximate capacity in gallons; where applicable, the period of time during which the unit is effective in reducing contaminants based upon the contaminant or surrogate influent concentrations used for the performance tests; where applicable, the flow rate, pressure, and operational temperature of the water during the performance tests.

(d) Installation instructions.

(e) The recommended operational procedures and requirements necessary for the proper operation of the unit including, but not limited to, electrical requirements; maximum and minimum pressure; flow rate; temperature limitations; maintenance requirements; and where applicable, replacement frequencies.

(f) The seller's limited warranty.

(4) Is accompanied by the consumer information pamphlet compiled by the Iowa department of public health.

The consumer information pamphlet provided to the buyer of a water treatment system shall be compiled by the Iowa department of public health, reviewed annually, and updated as necessary. The consumer information pamphlet shall be distributed to persons selling water treatment systems and the costs of the consumer information pamphlet shall be borne by persons selling water treatment systems. The Iowa

department of public health shall adopt rules pursuant to chapter 17A and charge all fees necessary to administer this section.

*i.* It is an unlawful practice for a person to sell, lease, rent, or advertise the sale, lease, or rental of a water treatment system in this state for which false or deceptive claims or representations of removing health-related contaminants are made.

*j.* It is an unlawful practice for a person to make any representation or claim that the seller's water treatment system has been approved or endorsed by any agency of the state.

*k.* It is an unlawful practice for a supplier to commit a deceptive act or practice under chapter 537B.

*l.* It is an unlawful practice for a repair facility or manufacturer or distributor of aftermarket crash parts, as defined in section 537B.4, to commit a deceptive act or practice under chapter 537B.

*m.* It is an unlawful practice for a person to advertise the sale of wood products without disclosing information which may affect the price of the product.

An advertisement for all plywood and dimension lumber products shall include the grade and species, in accordance with federal products standards 1 and 20, and the measure. The products advertised shall also be labeled according to the federal products standards.

An advertisement for any other wood product shall include the grade and species, according to the applicable federal product standards, and the measure. These products need not be labeled.

An advertisement for any wood products must also include the following:

(1) The condition of the wood product, including but not limited to the following designations:

(a) Green.

(b) Kiln-dried.

(c) Air-dried or partially air-dried.

(2) Whether the wood product consists of seconds, culls, shop grade, or ungraded material.

Use of any contrived or unrecognized grading standard is prohibited, and any factors affecting the final delivered price of the products shall be disclosed and displayed in a conspicuous place.

This paragraph applies only to persons who offer wood products for sale in the ordinary course of business, except that this paragraph does not apply to any person who produces rough-sawed lumber, commonly referred to as native lumber, in this state. For purposes of this paragraph:

*"Dimension lumber"* means softwood lumber nominally referred to as *"two inch by four inch"* or greater.

*"Labeling"* means all labels and other written, printed, branded, or graphic matter upon any building material.

*"Plywood"* means a structural material consisting of sheets or chips of wood glued or cemented together.

*"Wood products"* means any wood products derived from trees as a result of any work or manufacturing process upon the wood, and intended primarily for use as a building material.

*n.* (1) It is an unlawful practice for a person to misrepresent the geographic location of a supplier of a service or product by listing a fictitious business name or an assumed business name in a local telephone

directory or directory assistance database if all of the following apply:

(a) The name purportedly represents the geographic location of the supplier.

(b) The listing does not identify the address, including the city and state, of the supplier.

(c) Calls made to a local telephone number are routinely forwarded to or otherwise transferred to a business location that is outside the local calling area covered by the local telephone directory or directory assistance database.

(2) A telephone company, provider of directory assistance, publisher of a local telephone directory, or officer, employee, or agent of such company, provider, or publisher shall not be liable in a civil action under this section for publishing in any directory or directory assistance database the listing of a fictitious or assumed business name of a person in violation of subparagraph (1) unless the telephone company, directory assistance provider, directory publisher, or officer, employee, or agent of the company, provider, or publisher is the person committing such violation.

(3) For purposes of this paragraph:

(a) *"Local telephone directory"* means a telephone classified advertising directory or the business section of a telephone directory that is distributed free of charge to some or all telephone subscribers in a local area.

(b) *"Local telephone number"* means a telephone number that has a three-number prefix used by the provider of telephone service for telephone customers physically located within the area covered by the local telephone directory in which the number is listed. The term does not include long distance numbers or 800, 888, or 900 exchange numbers listed in the telephone directory.

3. When it appears to the attorney general that a person has engaged in, is engaging in, or is about to engage in any practice declared to be unlawful by this section or when the attorney general believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in or is about to engage in, any such practice, the attorney general may:

*a.* Require such person to file on such forms as the attorney general may prescribe a statement or report in writing under oath or otherwise, as to all the facts and circumstances concerning the sale or advertisement of merchandise by such person, and such other data and information as the attorney general may deem necessary;

*b.* Examine under oath any person in connection with the sale or advertisement of any merchandise;

*c.* Examine any merchandise or sample thereof, record, book, document, account or paper as the attorney general may deem necessary; and

*d.* Pursuant to an order of a district court impound any record, book, document, account, paper, or sample of merchandise that is produced in accordance with this section, and retain the same in the attorney general's possession until the completion of all proceedings in connection with which the same are produced.

4. *a.* To accomplish the objectives and to carry out the duties prescribed by this section, the attorney general, in addition to other powers conferred upon the attorney general by this section, may issue subpoenas to any person, administer an oath or affirmation to any person, conduct hearings in aid of any investigation or inquiry, prescribe such forms and promulgate such rules as may be necessary, which rules shall have the force of law.

*b.* Subject to paragraph *"c"*, information, documents, testimony, or other evidence provided to the attorney general by a person pursuant to paragraph *"a"* or subsection 3, or provided by a person as

evidence in any civil action brought pursuant to this section, shall not be admitted in evidence, or used in any manner whatsoever, in any criminal prosecution or forfeiture proceeding against that person. If a criminal prosecution or forfeiture proceeding is initiated in a state court against a person who has provided information pursuant to paragraph *"a"* or subsection 3, the state shall have the burden of proof that the information provided was not used in any manner to further the criminal investigation, prosecution, or forfeiture proceeding.

*c.* Paragraph *"b"* does not apply unless the person has first asserted a right against self-incrimination and the attorney general has elected to provide the person with a written statement that the information, documents, testimony, or other evidence at issue are subject to paragraph *"b"*. After a person has been provided with such a written statement by the attorney general, a claim of privilege against self-incrimination is not a defense to any action or proceeding to obtain the information, documents, testimony, or other evidence. The limitation on the use of evidence in a criminal proceeding contained in this section does not apply to any prosecution or proceeding for perjury or contempt of court committed in the course of the giving or production of the information, documents, testimony, or other evidence.

5. Service by the attorney general of any notice requiring a person to file a statement or report, or of a subpoena upon any person, shall be made personally within this state, but if such cannot be obtained, substituted service therefor may be made in the following manner:

*a.* Personal service thereof without this state; or

*b.* The mailing thereof by registered mail to the last known place of business, residence or abode within or without this state of such person for whom the same is intended; or

*c.* As to any person other than a natural person, in the manner provided in the Rules of Civil Procedure as if a petition had been filed; or

*d.* Such service as a district court may direct in lieu of personal service within this state.

6. If a person fails or refuses to file a statement or report, or obey any subpoena issued by the attorney general, the attorney general may, after notice, apply to the Polk county district court or the district court for the county in which the person resides or is located and, after hearing, request an order:

*a.* Granting injunctive relief, restraining the sale or advertisement of any merchandise by such persons.

*b.* Dissolving a corporation created by or under the laws of this state or revoking or suspending the certificate of authority to do business in this state of a foreign corporation or revoking or suspending any other licenses, permits, or certificates issued pursuant to law to such person which are used to further the allegedly unlawful practice.

*c.* Granting such other relief as may be required until the person files the statement or report, or obeys the subpoena.

7. A civil action pursuant to this section shall be by equitable proceedings. If it appears to the attorney general that a person has engaged in, is engaging in, or is about to engage in a practice declared to be unlawful by this section, the attorney general may seek and obtain in an action in a district court a temporary restraining order, preliminary injunction, or permanent injunction prohibiting the person from continuing the practice or engaging in the practice or doing an act in furtherance of the practice. The court may make orders or judgments as necessary to prevent the use or employment by a person of any prohibited practices, or which are necessary to restore to any person in interest any moneys or property, real or personal, which have been acquired by means of a practice declared to be unlawful by this section, including the appointment of a receiver in cases of substantial and willful violation of this section. If a person has acquired moneys or property by any means declared to be unlawful by this section and if the cost of administering reimbursement outweighs the benefit to consumers or consumers entitled to the reimbursement cannot be located through reasonable efforts, the court may order disgorgement of

moneys or property acquired by the person by awarding the moneys or property to the state to be used by the attorney general for the administration and implementation of this section. Except in an action for the concealment, suppression, or omission of a material fact with intent that others rely upon it, it is not necessary in an action for reimbursement or an injunction, to allege or to prove reliance, damages, intent to deceive, or that the person who engaged in an unlawful act had knowledge of the falsity of the claim or ignorance of the truth. A claim for reimbursement may be proved by any competent evidence, including evidence that would be appropriate in a class action.

In addition to the remedies otherwise provided for in this subsection, the attorney general may request and the court may impose a civil penalty not to exceed forty thousand dollars per violation against a person found by the court to have engaged in a method, act, or practice declared unlawful under this section; provided, however, a course of conduct shall not be considered to be separate and different violations merely because the conduct is repeated to more than one person. In addition, on the motion of the attorney general or its own motion, the court may impose a civil penalty of not more than five thousand dollars for each day of intentional violation of a temporary restraining order, preliminary injunction, or permanent injunction issued under authority of this section. A penalty imposed pursuant to this subsection is in addition to any penalty imposed pursuant to section 537.6113. Civil penalties ordered pursuant to this subsection shall be paid to the treasurer of state to be deposited in the general fund of the state.

8.  When a receiver is appointed by the court pursuant to this section, the receiver shall have the power to sue for, collect, receive and take into possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, derived by means of any practice declared to be illegal and prohibited by this section, including property with which such property has been mingled if it cannot be identified in kind because of such commingling, and to sell, convey, and assign the same and hold and dispose of the proceeds thereof under the direction of the court. Any person who has suffered damages as a result of the use or employment of any unlawful practices and submits proof to the satisfaction of the court that the person has in fact been damaged, may participate with general creditors in the distribution of the assets to the extent the person has sustained out-of-pocket losses. In the case of a partnership or business entity, the receiver shall settle the estate and distribute the assets under the direction of the court. The court shall have jurisdiction of all questions arising in such proceedings and may make such orders and judgments therein as may be required.

9.  Subject to an order of the court terminating the business affairs of any person after receivership proceedings held pursuant to this section, the provisions of this section shall not bar any claim against any person who has acquired any moneys or property, real or personal, by means of any practice herein declared to be unlawful.

10.  A civil action pursuant to this section may be commenced in the county in which the person against whom it is brought resides, has a principal place of business, or is doing business, or in the county where the transaction or any substantial portion of the transaction occurred, or where one or more of the victims reside.

11.  In an action brought under this section, the attorney general is entitled to recover costs of the court action and any investigation which may have been conducted, including reasonable attorneys' fees, for the use of this state.

12.  If any provision of this section or the application thereof to any person or circumstances is held invalid, the invalidity shall not affect other provisions of applications of the section which can be given effect without the invalid provision or application and to this end the provisions of this section are severable.

13.  The attorney general or the designee of the attorney general is deemed to be a regulatory agency under chapter 692 for the purpose of receiving criminal intelligence data relating to violations of this section.

14.  This section does not apply to the newspaper, magazine, publication, or other print media in which the advertisement appears, or to the radio station, television station, or other electronic media which disseminates the advertisement if the newspaper, magazine, publication, radio station, television station, or other print or electronic media has no knowledge of the fraudulent intent, design, or purpose of the advertiser at the time the advertisement is accepted; and provided, further, that nothing herein contained shall apply to any advertisement which complies with the rules and regulations of, and the statutes administered by the federal trade commission.

15.  The attorney general may bring an action on behalf of the residents of this state, or as parens patriae, under the federal Telemarketing and Consumer Fraud and Abuse Prevention Act, Pub. L. No. 103-297, and pursue any and all enforcement options available under that Act. Subsequent amendments to that Act which do not substantially alter its structure and purpose shall not be construed to affect the authority of the attorney general to pursue an action pursuant to this section, except to the extent the amendments specifically restrict the authority of the attorney general.

Service: **Get by LEXSTAT®**
Citation: **iowa code 714.16.2**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:35 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*K.S.A. § 50-626*

KANSAS STATUTES ANNOTATED

*** THIS DOCUMENT IS CURRENT THROUGH THE 2003 SUPPLEMENT ***

CHAPTER 50. UNFAIR TRADE AND CONSUMER PROTECTION
ARTICLE 6. CONSUMER PROTECTION
CONSUMER PROTECTION

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

K.S.A. § 50-626 (2003)

50-626. Deceptive acts and practices.

(a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

(1) Representations made knowingly or with reason to know that:

(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;

(B) the supplier has a sponsorship, approval, status, affiliation or connection that the supplier does not have;

(C) property is original or new, if such property has been deteriorated, altered, reconditioned, repossessed or is second-hand or otherwise used to an extent that is materially different from the representation;

(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;

(E) the consumer will receive a rebate, discount or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, if receipt of benefit is contingent on an event occurring after the consumer enters into the transaction;

(F) property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation; or

(G) use, benefit or characteristic of property or services has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof or substantiation represented to exist;

(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;

(4) disparaging the property, services or business of another by making, knowingly or with reason to know, false or misleading representations of material facts;

(5) offering property or services without intent to sell them;

(6) offering property or services without intent to supply reasonable, expectable public demand, unless the offer discloses the limitation;

(7) making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions, or the price in comparison to prices of competitors or one's own price at a past or future time;

(8) falsely stating, knowingly or with reason to know, that a consumer transaction involves consumer rights, remedies or obligations;

(9) falsely stating, knowingly or with reason to know, that services, replacements or repairs are needed;

(10) falsely stating, knowingly or with reason to know, the reasons for offering or supplying property or services at sale or discount prices;

(11) sending or delivering a solicitation for goods or services which could reasonably be interpreted or construed as a bill, invoice or statement of account due, unless:

(A) Such solicitation contains the following notice, on its face, in conspicuous and legible type in contrast by typography, layout or color with other printing on its face:

"THIS IS A SOLICITATION FOR THE PURCHASE OF GOODS OR SERVICES AND NOT A BILL, INVOICE OR STATEMENT OF ACCOUNT DUE. YOU ARE UNDER NO OBLIGATION TO MAKE ANY PAYMENTS UNLESS YOU ACCEPT THIS OFFER"; and

(B) such solicitation, if made by any classified telephone directory service not affiliated with a local telephone service in the area of service, contains the following notice, on its face, in a prominent and conspicuous manner:

"________________________________ IS NOT AFFILIATED WITH

(name of telephone directory service)

ANY LOCAL TELEPHONE COMPANY"; and

(12) using, in any printed advertisement, an assumed or fictitious name for the conduct of such person's business that includes the name of any municipality, community or region or other description of the municipality, community or region in this state in such a manner as to suggest that such person's business is located in such municipality, community or region unless: (A) Such person's business is, in fact, located in such municipality, community or region; or (B) such person includes in any such printed advertisement the complete street and city address of the location from which such person's business is actually conducted. If located outside of Kansas, the state in which such person's business is located also shall be included. The provisions of this subsection shall not apply to the use of any trademark or service mark registered under the laws of this state or under federal law; any such name that, when applied to the goods or services of such person's business, is merely descriptive of them; or any such name that is merely a surname. Nothing in this subsection shall be construed to impose any liability on any publisher when such publisher had no knowledge the business was not, in fact, located in such municipality, community or region.

Get a Document - by Citation - K.S.A. § 50-626

Page 3 of 3

Service: **Get by LEXSTAT®**
Citation: **kan stat ann 50-626**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:37 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

https://www.lexis.com/research/retrieve?_m=976c4238ab395bff21fb07b860c29cc1&_tstamp=3271617... 9/2/2004

*KRS § 367.170*

KENTUCKY REVISED STATUTES ANNOTATED
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE 2003 REGULAR SESSION ***
*** ANNOTATIONS CURRENT THROUGH APRIL 16, 2004 ***

TITLE XXIX. COMMERCE AND TRADE
CHAPTER 367. CONSUMER PROTECTION
CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

KRS § 367.170 (2004)

§ 367.170. Unlawful acts

(1) Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2) For the purposes of this section, unfair shall be construed to mean unconscionable.

Service: **Get by LEXSTAT®**
Citation: **ky rev stat 367.170**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:38 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*La. R.S. 51:1405*

LOUISIANA STATUTES

*** THIS DOCUMENT IS CURRENT THROUGH THE 2003 SUPPLEMENT, 2002 SESSIONS ***
*** July 2004 Annotation Service ***

LOUISIANA REVISED STATUTES
TITLE 51. TRADE AND COMMERCE
CHAPTER 13. UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

**GO TO LOUISIANA STATUTES ARCHIVE DIRECTORY**

La. R.S. 51:1405 (2004)

§ 1405 Unfair acts or practices; interpretation and rule making authority

A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

B. The director may make rules and regulations interpreting the provisions of this Chapter consistent with the provisions in R.S. 51:1 through R.S. 51:461.1, inclusive, and shall submit such rules and regulations to the attorney general. Upon approval by the attorney general, such rules and regulations shall be adopted in the form and manner prescribed by R.S. 49:951 et seq. The validity or applicability of a rule may be determined in an action for declaratory judgment in the district court of the parish in which the division is located or in the parish in which the plaintiff resides or is domiciled. Appeals may be had from any ruling of a district court in accordance with the Code of Civil Procedure, except that such appeals shall be given preference and heard in priority to other appeals.

C. The director and his employees are entitled to receive reimbursement for expenses actually and necessarily incurred in the performance of their duties.

Service: **Get by LEXSTAT®**
Citation: **la rev stat 51:1405**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:39 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*5 M.R.S. § 207*

MAINE REVISED STATUTES

*** THIS DOCUMENT IS CURRENT THRU 2003 FIRST SPECIAL SESSION OF 121ST LEGISLATURE ***

TITLE 5. ADMINISTRATIVE PROCEDURES AND SERVICES
PART 1. STATE DEPARTMENTS
CHAPTER 10. UNFAIR TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

5 M.R.S. § 207 (2003)

§ 207. Unlawful acts and conduct

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.

1. INTENT. It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1) ), as from time to time amended.

2. RULES AND REGULATIONS. The Attorney General may make rules and regulations interpreting this section. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act) as from time to time amended. Evidence of a violation of a rule or regulation made by the Attorney General shall constitute prima facie evidence of an act or practice declared to be unlawful by this chapter in any action thereafter brought under this chapter.XLR.CJS C.J.S. Trade-Marks, Trade-Names, and Unfair Competition § 380.

Service: **Get by LEXSTAT®**
Citation: **me rev stat tit 5 @ 207**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:40 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Md. COMMERCIAL LAW Code Ann. § 13-303*

ANNOTATED CODE OF MARYLAND
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE 2003 SESSION ***
*ANNOTATIONS CURRENT THROUGH DECISIONS POSTED ON LEXIS AS OF APRIL 30, 2004*

COMMERCIAL LAW
TITLE 13. CONSUMER PROTECTION ACT
SUBTITLE 3. UNFAIR OR DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Md. COMMERCIAL LAW Code Ann. § 13-303 (2003)

§ 13-303. Practices generally prohibited

A person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in:

(1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;

(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;

(3) The extension of consumer credit; or

(4) The collection of consumer debts.

Service: **Get by LEXSTAT®**
Citation: **md com law code 13-303**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:43 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Md. COMMERCIAL LAW Code Ann. § 13-301*

ANNOTATED CODE OF MARYLAND
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE 2003 SESSION ***
*ANNOTATIONS CURRENT THROUGH DECISIONS POSTED ON LEXIS AS OF APRIL 30, 2004*

COMMERCIAL LAW
TITLE 13. CONSUMER PROTECTION ACT
SUBTITLE 3. UNFAIR OR DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Md. COMMERCIAL LAW Code Ann. § 13-301 (2003)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT**
LEXSEE 2004 Md. ALS 437 -- See section 1.
LEXSEE 2004 Md. ALS 25 -- See section 1.

§ 13-301. Unfair or deceptive trade practices defined

Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

(ii) A merchant has a sponsorship, approval, status, affiliation, or connection which he does not have;

(iii) Deteriorated, altered, reconditioned, reclaimed, or secondhand consumer goods are original or new; or

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

(3) Failure to state a material fact if the failure deceives or tends to deceive;

(4) Disparagement of the goods, realty, services, or business of another by a false or misleading representation of a material fact;

(5) Advertisement or offer of consumer goods, consumer realty, or consumer services:

(i) Without intent to sell, lease, or rent them as advertised or offered; or

   (ii) With intent not to supply reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition;

   (6) False or misleading representation of fact which concerns:

      (i) The reason for or the existence or amount of a price reduction; or

      (ii) A price in comparison to a price of a competitor or to one's own price at a past or future time;

   (7) Knowingly false statement that a service, replacement, or repair is needed;

   (8) False statement which concerns the reason for offering or supplying consumer goods, consumer realty, or consumer services at sale or discount prices;

   (9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

      (i) The promotion or sale of any consumer goods, consumer realty, or consumer service; or

      (ii) A contract or other agreement for the evaluation, perfection, marketing, brokering or promotion of an invention; or

      (iii) The subsequent performance of a merchant with respect to an agreement of sale, lease, or rental;

   (10) Solicitations of sales or services over the telephone without first clearly, affirmatively, and expressly stating:

      (i) The solicitor's name and the trade name of a person represented by the solicitor;

      (ii) The purpose of telephone conversation; and

      (iii) The kind of merchandise, real property, intangibles, or service solicited;

   (11) Use of any plan or scheme in soliciting sales or services over the telephone that misrepresents the solicitor's true status or mission;

   (12) Use of a contract related to a consumer transaction which contains a confessed judgment clause that waives the consumer's right to assert a legal defense to an action;

   (13) Use by a seller, who is in the business of selling consumer realty, of a contract related to the sale of single family residential consumer realty, including condominiums and town houses, that contains a clause limiting or precluding the buyer's right to obtain consequential damages as a result of the seller's breach or cancellation of the contract;

   (14) Violation of a provision of:

      (i) This title;

      (ii) An order of the Attorney General or agreement of a party relating to unit pricing under Title 14, Subtitle 1 of this article;

      (iii) Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act;

      (iv) Title 14, Subtitle 3 of this article, the Maryland Door-to-Door Sales Act;

(v) Title 14, Subtitle 9 of this article, Kosher Products;

(vi) Title 14, Subtitle 10 of this article, Automotive Repair Facilities;

(vii) Section 14-1302 of this article;

(viii) Title 14, Subtitle 11 of this article, Maryland Layaway Sales Act;

(ix) Section 22-415 of the Transportation Article;

(x) Title 14, Subtitle 20 of this article;

(xi) Title 14, Subtitle 15 of this article, the Automotive Warranty Enforcement Act;

(xii) Title 14, Subtitle 21 of this article;

(xiii) Section 18-107 of the Transportation Article;

(xiv) Title 14, Subtitle 22 of this article, the Maryland Telephone Solicitations Act;

(xv) Title 14, Subtitle 23 of this article, the Automotive Crash Parts Act;

(xvi) Title 10, Subtitle 6 of the Real Property Article;

(xvii) Title 10, Subtitle 8 of the Real Property Article;

(xviii) Title 14, Subtitle 25 of this article, the Hearing Aid Sales Act;

(xix) Title 14, Subtitle 26 of this article, the Maryland Door-to-Door Solicitations Act;

(xx) Title 14, Subtitle 31 of this article, the Maryland Household Goods Movers Act; or

(15) Act or omission that relates to a residential building and that is chargeable as a misdemeanor under or otherwise violates a provision of the Energy Conservation Building Standards Act, Title 7, Subtitle 4 of the Public Utility Companies Article.

Service: **Get by LEXSTAT®**
Citation: **md com law code 13-301**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:46 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*ALM GL ch. 93A, § 2*

ANNOTATED LAWS OF MASSACHUSETTS
Copyright (c) 2004 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH CHAPTER 261, 8/9/04 ***

PART I. ADMINISTRATION OF THE GOVERNMENT
TITLE XV. REGULATION OF TRADE
CHAPTER 93A. REGULATION OF BUSINESS PRACTICES FOR CONSUMERS PROTECTION

**GO TO MASSACHUSETTS CODE ARCHIVE DIRECTORY**

ALM GL ch. 93A, § 2 (2004)

§ 2. Unfair Methods of Competition, etc., Declared Unlawful; Legislative Intent; Rules and Regulations.

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

(c) The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.

Service: **Get by LEXSTAT®**
Citation: **mass gen l ch 93a @ 2**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 6:49 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*MCLS § 445.903*

MICHIGAN COMPILED LAWS SERVICE
Copyright (c) 2003 by Matthew Bender & Company, Inc.
one of the LEXIS Publishing companies
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH P.A. 310, 8/27/04 ***

CHAPTER 445  TRADE AND COMMERCE
MICHIGAN CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

MCLS § 445.903

MCL § 445.903

§ 445.903.    Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce; rules.

 Sec. 3. (1) Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful and are defined as follows:
 (a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.
 (b) Using deceptive representations or deceptive designations of geographic origin in connection with goods or services.
 (c) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.
 (d) Representing that goods are new if they are deteriorated, altered, reconditioned, used, or secondhand.
 (e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.
 (f) Disparaging the goods, services, business, or reputation of another by false or misleading representation of fact.
 (g) Advertising or representing goods or services with intent not to dispose of those goods or services as advertised or represented.
 (h) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity in immediate conjunction with the advertised goods or services.
 (i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.
 (j) Representing that a part, replacement, or repair service is needed when it is not.
 (k) Representing to a party to whom goods or services are supplied that the goods or services are being supplied in response to a request made by or on behalf of the party, when they are not.
 (l) Misrepresenting that because of some defect in a consumer's home the health, safety, or lives of the consumer or his or her family are in danger if the product or services are not purchased, when in fact the defect does not exist or the product or services would not remove the danger.
 (m) Causing a probability of confusion or of misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction.
 (n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.
 (o) Causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if

credit is extended in a transaction.

(p) Disclaiming or limiting the implied warranty of merchantability and fitness for use, unless a disclaimer is clearly and conspicuously disclosed.

(q) Representing or implying that the subject of a consumer transaction will be provided promptly, or at a specified time, or within a reasonable time, if the merchant knows or has reason to know it will not be so provided.

(r) Representing that a consumer will receive goods or services "free" or "without charge", or using words of similar import in the representation, without clearly and conspicuously disclosing with equal prominence in immediate conjunction with the use of those words the conditions, terms, or prerequisites to the use or retention of the goods or services advertised.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(t) Entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, unless the waiver is clearly stated and the consumer has specifically consented to it.

(u) Failing, in a consumer transaction that is rescinded, canceled, or otherwise terminated in accordance with the terms of an agreement, advertisement, representation, or provision of law, to promptly restore to the person or persons entitled to it a deposit, down payment, or other payment, or in the case of property traded in but not available, the greater of the agreed value or the fair market value of the property, or to cancel within a specified time or an otherwise reasonable time an acquired security interest.

(v) Taking or arranging for the consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, if the merchant knows or has reason to know that the statement is not true.

(w) Representing that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a transaction, if the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

(x) Taking advantage of the consumer's inability reasonably to protect his or her interests by reason of disability, illiteracy, or inability to understand the language of an agreement presented by the other party to the transaction who knows or reasonably should know of the consumer's inability.

(y) Gross discrepancies between the oral representations of the seller and the written agreement covering the same transaction or failure of the other party to the transaction to provide the promised benefits.

(z) Charging the consumer a price that is grossly in excess of the price at which similar property or services are sold.

(aa) Causing coercion and duress as the result of the time and nature of a sales presentation.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

(dd) Subject to subdivision (ee), representations by the manufacturer of a product or package that the product or package is 1 or more of the following:

(i) Except as provided in subparagraph (ii), recycled, recyclable, degradable, or is of a certain recycled content, in violation of guides for the use of environmental marketing claims , 16 C.F.R. part 260 .

(ii) For container holding devices regulated under part 163 of the natural resources and environmental protection act, 1994 PA 451, MCL 324.16301 to 324.16303, representations by a manufacturer that the container holding device is degradable contrary to the definition provided in that act.

(ee) Representing that a product or package is degradable, biodegradable, or photodegradable unless it can be substantiated by evidence that the product or package will completely decompose into elements found in nature within a reasonably short period of time after consumers use the product and dispose of the product or the package in a landfill or composting facility, as appropriate.

(ff) Offering a consumer a prize if in order to claim the prize the consumer is required to submit to a sales presentation, unless a written disclosure is given to the consumer at the time the consumer is notified of the prize and the written disclosure meets all of the following requirements:

(i)  Is written or printed in a bold type that is not smaller than 10-point.
(ii) Fully describes the prize, including its cash value, won by the consumer.
(iii) Contains all the terms and conditions for claiming the prize, including a statement that the consumer is required to submit to a sales presentation.
(iv) Fully describes the product, real estate, investment, service, membership, or other item that is or will be offered for sale, including the price of the least expensive item and the most expensive item.
(gg) Violating 1971 PA 227, MCL 445.111 to 445.117, in connection with a home solicitation sale or telephone solicitation, including, but not limited to, having an independent courier service or other third party pick up a consumer's payment on a home solicitation sale during the period the consumer is entitled to cancel the sale .
(2) The attorney general may promulgate rules to implement this act under the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328. The rules shall not create an additional unfair trade practice not already enumerated by this section. However, to assure national uniformity, rules shall not be promulgated to implement subsection (1)(dd) or (ee).


    Service: **Get by LEXSTAT®**
   Citation: **mich comp laws 445.903**
      View: **Custom**
  Segments: Text
 Date/Time: Thursday, September 2, 2004 - 8:42 PM EDT


About LexisNexis | Terms and Conditions


Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*§ 407.020 R.S.Mo.*

LEXISNEXIS (R) MISSOURI ANNOTATED STATUTES

*** THIS SECTION IS CURRENT THROUGH ALL 2003 LEGISLATION ***
*** ANNOTATIONS CURRENT THROUGH JUNE 8, 2004 ***

TITLE 26. TRADE AND COMMERCE
CHAPTER 407. MERCHANDISING PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

§ 407.020 R.S.Mo. (2004)

§ 407.020. Unlawful practices, penalty--exceptions

1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice. The use by any person, in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri of the fact that the attorney general has approved any filing required by this chapter as the approval, sanction or endorsement of any activity, project or action of such person, is declared to be an unlawful practice. Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

2. Nothing contained in this section shall apply to:

(1) The owner or publisher of any newspaper, magazine, publication or printed matter wherein such advertisement appears, or the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher or operator has no knowledge of the intent, design or purpose of the advertiser; or

(2) Any institution or company that is under the direction and supervision of the director of the department of insurance, director of the division of credit unions, or director of the division of finance, unless the directors of such divisions specifically authorize the attorney general to implement the powers of this chapter or such powers are provided to either the attorney general or a private citizen by statute.

3. Any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by this section with the intent to defraud shall be guilty of a class D felony.

4. It shall be the duty of each prosecuting attorney and circuit attorney in their respective jurisdictions to commence any criminal actions under this section, and the attorney general shall have concurrent original jurisdiction to commence such criminal actions throughout the state where such violations have occurred.

5. It shall be an unlawful practice for any long-term care facility, as defined in section 660.600, RSMo, except a facility which is a residential care facility I or a residential care facility II, as defined in section 198.006, RSMo, which makes, either orally or in writing, representation to residents, prospective residents, their families or representatives regarding the quality of care provided, or systems or methods utilized for assurance or maintenance of standards of care to refuse to provide copies of documents which reflect the facility's evaluation of the quality of care, except that the facility may remove

information that would allow identification of any resident. If the facility is requested to provide any copies, a reasonable amount, as established by departmental rule, may be charged.

6. Any long-term care facility, as defined in section 660.600, RSMo, which commits an unlawful practice under this section shall be liable for damages in a civil action of up to one thousand dollars for each violation, and attorney's fees and costs incurred by a prevailing plaintiff, as allowed by the circuit court.

Service: **Get by LEXSTAT®**
Citation: **mo rev stat 407.020.1**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:47 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Minn. Stat. § 325D.44*

LEXISNEXIS (TM) MINNESOTA ANNOTATED STATUTES

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2003 LEGISLATION ***
*** July 1, 2004 Annotation Service ***

Trade Regulations, Consumer Protection
CHAPTER 325D RESTRAINT OF TRADE
UNIFORM DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Minn. Stat. § 325D.44 (2003)

325D.44 Deceptive trade practices

Subdivision 1. A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(9) advertises goods or services with intent not to sell them as advertised;

(10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) in attempting to collect delinquent accounts, implies or suggests that health care services will be withheld in an emergency situation; or

(13) engages in any other conduct which similarly creates a likelihood of confusion or of

misunderstanding.

Subd. 2. In order to prevail in an action under sections 325D.43 to 325D.48, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

Subd. 3. This section does not affect unfair, deceptive, or misleading trade practices otherwise actionable at common law or under other statutes of this state.

Service: **Get by LEXSTAT®**
Citation: **minn stat 325D.44**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:45 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Miss. Code Ann. § 75-24-5*

MISSISSIPPI CODE of 1972 ANNOTATED
Copyright © 2004 by THE STATE OF MISSISSIPPI
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2004 LEGISLATION ***
*** STATE COURT ANNOTATIONS CURRENT THROUGH APRIL 27, 2004 ***

TITLE 75. REGULATION OF TRADE, COMMERCE AND INVESTMENTS
CHAPTER 24. REGULATION OF BUSINESS FOR CONSUMER PROTECTION
GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Miss. Code Ann. § 75-24-5 (2004)

§ 75-24-5. Prohibited acts or practices

(1) Unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce are prohibited. Action may be brought under Section 75-24-5(1) only under the provisions of Section 75-24-9.

(2) Without limiting the scope of subsection (1) of this section, the following unfair methods of competition and unfair or deceptive trade practices or acts in the conduct of any trade or commerce are hereby prohibited:

(a) Passing off goods or services as those of another;

(b) Misrepresentation of the source, sponsorship, approval, or certification of goods or services;

(c) Misrepresentation of affiliation, connection, or association with, or certification by another;

(d) Misrepresentation of designations of geographic origin in connection with goods or services;

(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

(f) Representing that goods are original or new if they are reconditioned, reclaimed, used, or secondhand;

(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(h) Disparaging the goods, services, or business of another by false or misleading representation of fact;

(i) Advertising goods or services with intent not to sell them as advertised;

(j) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(k) Misrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions;

( l ) Advertising by or on behalf of any licensed or regulated health care professional which does not specifically describe the license or qualifications of the licensed or regulated health care professional.

Service: **Get by LEXSTAT®**
Citation: **miss code ann 75-24-5**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:46 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Mont. Code Anno., § 30-14-103*

MONTANA CODE ANNOTATED

*** THIS DOCUMENT IS CURRENT THROUGH THE 2003 SESSION ***

TITLE 30 TRADE AND COMMERCE
CHAPTER 14 UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION
PART 1 CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Mont. Code Anno., § 30-14-103 (2003)

30-14-103 Unlawful practices.

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

Service: **Get by LEXSTAT®**
Citation: **mont code 30-14-103**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:48 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*R.R.S. Neb. § 59-1602*

REVISED STATUTES OF NEBRASKA ANNOTATED
Copyright (c) 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH THE 2003 REGULAR SESSION ***
*** NOVEMBER 2003 ANNOTATION SERVICE ***

CHAPTER 59.  MONOPOLIES AND UNLAWFUL COMBINATIONS
ARTICLE 16.  CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

R.R.S. Neb. § 59-1602  (2003)

§ 59-1602. Unfair competition; practices; unlawful

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.

Service: **Get by LEXSTAT®**
Citation: **neb rev stat 59-1602**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:48 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*NRS § 598.0915*

NEVADA REVISED STATUTES ANNOTATED
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THRU ALL 2003 LEGISLATION ***
*** (ANNOTATIONS CURRENT FROM CASES POSTED ON LEXIS.COM THROUGH APRIL 25, 2004) ***

TITLE 52. TRADE REGULATIONS AND PRACTICES
CHAPTER 598. DECEPTIVE TRADE PRACTICES
GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

NRS § 598.0915 (2004)

§ 598.0915. "Deceptive trade practice" defined

A person engages in a "deceptive trade practice" if, in the course of his business or occupation, he:

1. Knowingly passes off goods or services for sale or lease as those of another person.

2. Knowingly makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease.

3. Knowingly makes a false representation as to affiliation, connection, association with or certification by another person.

4. Uses deceptive representations or designations of geographic origin in connection with goods or services for sale or lease.

5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith.

6. Represents that goods for sale or lease are original or new if he knows or should know that they are deteriorated, altered, reconditioned, reclaimed, used or secondhand.

7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he knows or should know that they are of another standard, quality, grade, style or model.

8. Disparages the goods, services or business of another person by false or misleading representation of fact.

9. Advertises goods or services with intent not to sell or lease them as advertised.

10. Advertises goods or services for sale or lease with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity.

11. Advertises goods or services as being available free of charge with intent to require payment of undisclosed costs as a condition of receiving the goods or services.

12. Advertises under the guise of obtaining sales personnel when the purpose is to first sell or lease goods or services to the sales personnel applicant.

13. Makes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions.

14. Fraudulently alters any contract, written estimate of repair, written statement of charges or other document in connection with the sale or lease of goods or services.

15. Knowingly makes any other false representation in a transaction.

16. Knowingly falsifies an application for credit relating to a retail installment transaction, as defined in NRS 97.115.

Service: **Get by LEXSTAT®**
Citation: **nev rev stat 598.0915**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:49 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*NRS § 598.0923*

NEVADA REVISED STATUTES ANNOTATED
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THRU ALL 2003 LEGISLATION ***
*** (ANNOTATIONS CURRENT FROM CASES POSTED ON LEXIS.COM THROUGH APRIL 25, 2004) ***

TITLE 52. TRADE REGULATIONS AND PRACTICES
CHAPTER 598. DECEPTIVE TRADE PRACTICES
GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

NRS § 598.0923 (2004)

§ 598.0923. "Deceptive trade practice" defined

A person engages in a "deceptive trade practice" when in the course of his business or occupation he knowingly:

1. Conducts the business or occupation without all required state, county or city licenses.

2. Fails to disclose a material fact in connection with the sale or lease of goods or services.

3. Violates a state or federal statute or regulation relating to the sale or lease of goods or services.

4. Uses coercion, duress or intimidation in a transaction.

Service: **Get by LEXSTAT®**
Citation: **nev rev stat 598.0923**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:50 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*RSA 358-A:2*

NEW HAMPSHIRE REVISED STATUTES ANNOTATED
Copyright (c) 2004 Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** STATUTES CURRENT THRU THE 2003 SESSION ***
*** ANNOTATIONS CURRENT THROUGH CASES DECIDED DECEMBER 5, 2003 ***

TITLE XXXI.  TRADE AND COMMERCE
CHAPTER 358-A.  REGULATION OF BUSINESS PRACTICES FOR CONSUMER PROTECTION

**GO TO THE CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

RSA 358-A:2 (2003)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT**
LEXSEE 2004 NH ALS 228 -- See section 1.

§ 358-A:2. Acts Unlawful

It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:

I. Passing off goods or services as those of another;

II. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

III. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

IV. Using deceptive representations or designations of geographic origin in connection with goods or services;

V. Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that such person does not have;

VI. Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

VII. Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

VIII. Disparaging the goods, services, or business of another by false or misleading representation of fact;

IX. Advertising goods or services with intent not to sell them as advertised;

X. Advertising goods or services with intent not to supply reasonably expectable public demand, unless

the advertisement discloses a limitation of quantity;

X-a. Failing to disclose the legal name, street address, and telephone number of the business under RSA 361-B:2-a;

XI. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or

XII. Conducting or advertising a going out of business sale:

(a) Which lasts for more than 60 days;

(b) Within 2 years of a going out of business sale conducted by the same person at the same location or at a different location but dealing in similar merchandise;

(c) Which includes any goods, wares, or merchandise purchased or received 90 days prior to commencement of the sale or during the duration of the sale and which are not ordinarily sold in the seller's course of business;

(d) Which includes any goods, wares, or merchandise ordered for the purpose of selling or disposing of them at such sale and which are not ordinarily sold in the seller's course of business;

(e) Which includes any goods, wares, or merchandise consigned for the purpose of selling or disposing of them at such sale;

(f) Without conspicuously stating in any advertisement for any such sale, the date such sale is to commence or was commenced;

(g) Upon the conclusion of which, that business is continued under the same name or under a different name at the same location; or

(h) In a manner other than the name implies.

Paragraph XIII effective until January 1, 2004; see also paragraph XIII set out below.

XIII. Selling gift certificates having a face value of less than $ 100 to purchasers which contain expiration dates. Gift certificates having a face value of $ 100 or more shall expire when escheated to the state as abandoned property pursuant to RSA 471-C. This paragraph shall not apply to gift certificates for which monetary consideration is not given or that are distributed to a consumer for promotional purposes. Nor shall this paragraph apply to season passes or coupons that are nonrefundable and nonredeemable.

Paragraph XIII effective January 1, 2004; see also paragraph XIII set out above.

XIII. Selling gift certificates having a face value of less than $ 100 to purchasers which contain expiration dates. Gift certificates having a face value of $ 100 or more shall expire when escheated to the state as abandoned property pursuant to RSA 471-C. Dormancy fees, latency fees, or any other administrative fees or service charges that have the effect of reducing the total amount for which the holder may redeem a gift certificate are prohibited. This paragraph shall not apply to season passes.

XIV. Pricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition.

Service: **Get by LEXSTAT®**
Citation: **n.h. rev stat 358-A:2**
View: **Custom**

Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:51 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*N.J. Stat. § 56:8-2*

LexisNexis (TM) New Jersey Annotated Statutes

*** THIS DOCUMENT IS CURRENT THROUGH P.L. 2004 CHAPTER 64 ***
*** ANNOTATIONS CURRENT THROUGH JULY 26, 2004 ***

TITLE 56. TRADE NAMES, TRADE-MARKS AND UNFAIR TRADE PRACTICES
CHAPTER 8. FRAUDS, ETC., IN SALES OR ADVERTISEMENTS OR MERCHANDISE

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

N.J. Stat. § 56:8-2 (2004)

§ 56:8-2. Fraud, etc., in connection with sale or advertisement of merchandise or real estate as unlawful practice

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.

Service: **Get by LEXSTAT®**
Citation: **nj rev stat 56:8-2**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:52 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*N.M. Stat. Ann. § 57-12-3*

MICHIE'S ANNOTATED STATUTES OF NEW MEXICO
Copyright 2003 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2003 LEGISLATION ***
*** ANNOTATIONS CURRENT THRU 2004-NMCA-022 AND 2004-NMSC-004 ***

CHAPTER 57. TRADE PRACTICES AND REGULATIONS
ARTICLE 12. UNFAIR TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

N.M. Stat. Ann. § 57-12-3 (2004)

§ 57-12-3. Unfair or deceptive and unconscionable trade practices prohibited

Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful.

Service: **Get by LEXSTAT®**
Citation: **nm stat 57-12-3**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:53 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*NY CLS Gen Bus § 349*

NEW YORK CONSOLIDATED LAW SERVICE
Copyright (c) 2004 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

** THIS SECTION IS CURRENT THROUGH CH. 262, 08/02/2004 **
** WITH THE EXCEPTION OF CHS. 1-3, 50, 51, 53-60, 94, 109, 138, 143, 146, 151, 156, 162, 170,
171, 186, 190, 198, 207 and 210-259 **

GENERAL BUSINESS LAW
ARTICLE 22-A.  CONSUMER PROTECTION FROM DECEPTIVE ACTS AND PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

NY CLS Gen Bus § 349  (2004)

§ 349.  Deceptive acts and practices unlawful

   (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing
of any service in this state are hereby declared unlawful.

   (b) Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm,
corporation or association or agent or employee thereof has engaged in or is about to engage in any of
the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the
people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any
moneys or property obtained directly or indirectly by any such unlawful acts or practices. In such action
preliminary relief may be granted under article sixty-three of the civil practice law and rules.

   (c) Before any violation of this section is sought to be enjoined, the attorney general shall be required to
give the person against whom such proceeding is contemplated notice by certified mail and an
opportunity to show in writing within five business days after receipt of notice why proceedings should
not be instituted against him, unless the attorney general shall find, in any case in which he seeks
preliminary relief, that to give such notice and opportunity is not in the public interest.

   (d) In any such action it shall be a complete defense that the act or practice is, or if in interstate
commerce would be, subject to and complies with the rules and regulations of, and the statutes
administered by, the federal trade commission or any official department, division, commission or agency
of the United States as such rules, regulations or statutes are interpreted by the federal trade
commission or such department, division, commission or agency or the federal courts.

   (e) Nothing in this section shall apply to any television or radio broadcasting station or to any publisher
or printer of a newspaper, magazine or other form of printed advertising, who broadcasts, publishes, or
prints the advertisement.

   (f) In connection with any proposed proceeding under this section, the attorney general is authorized to
take proof and make a determination of the relevant facts, and to issue subpoenas in accordance with
the civil practice law and rules.

   (g) This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not
subject to any other law of this state, and shall not supersede, amend or repeal any other law of this
state under which the attorney general is authorized to take any action or conduct any inquiry.

   (h) In addition to the right of action granted to the attorney general pursuant to this section, any person

who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice [fig 1] , an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

Service: **Get by LEXSTAT®**
Citation: **ny gen bus law 349**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:53 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*N.C. Gen. Stat. § 75-1.1*

GENERAL STATUTES OF NORTH CAROLINA
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THROUGH THE 2003 REGULAR AND FIRST AND SECOND EXTRA SESSIONS ***
*** ANNOTATIONS CURRENT THROUGH MAY 12, 2004 ***

CHAPTER 75. MONOPOLIES, TRUSTS AND CONSUMER PROTECTION
ARTICLE 1. GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

N.C. Gen. Stat. § 75-1.1 (2004)

§ 75-1.1. Methods of competition, acts and practices regulated; legislative policy

(a) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(b) For purposes of this section, "commerce" includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession.

(c) Nothing in this section shall apply to acts done by the publisher, owner, agent, or employee of a newspaper, periodical or radio or television station, or other advertising medium in the publication or dissemination of an advertisement, when the owner, agent or employee did not have knowledge of the false, misleading or deceptive character of the advertisement and when the newspaper, periodical or radio or television station, or other advertising medium did not have a direct financial interest in the sale or distribution of the advertised product or service.

(d) Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim.

Service: **Get by LEXSTAT®**
Citation: **nc gen stat 75-1.1**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:55 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*N.D. Cent. Code, § 51-15-02*

NORTH DAKOTA CENTURY CODE
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THROUGH THE 2003 GENERAL AND SPECIAL SESSIONS ***
*** ANNOTATIONS CURRENT THROUGH JUNE 16, 2004 ***

TITLE 51. SALES AND EXCHANGES
CHAPTER 51-15. UNLAWFUL SALES OR ADVERTISING PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

N.D. Cent. Code, § 51-15-02 (2003)

§ 51-15-02. Unlawful practices -- Fraud -- Misrepresentation

The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

Service: **Get by LEXSTAT®**
Citation: **nd cent code 51-15-02**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:55 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*ORC Ann. 1345.02*

PAGE'S OHIO REVISED CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH LEGISLATION APPROVED THROUGH AUGUST 5, 2004 ***
*** ANNOTATIONS CURRENT THROUGH JULY 1, 2004 ***

TITLE 13. COMMERCIAL TRANSACTIONS -- OHIO UNIFORM COMMERCIAL CODE
CHAPTER 1345. CONSUMER SALES PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

ORC Ann. 1345.02 (2004)

Review Court Orders which may amend this Rule.

§ 1345.02. Unfair or deceptive consumer sales practices prohibited

(A) No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction.

(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:

(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;

(2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

(3) That the subject of a consumer transaction is new, or unused, if it is not;

(4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;

(5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;

(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

(7) That replacement or repair is needed, if it is not;

(8) That a specific price advantage exists, if it does not;

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or

other rights, remedies, or obligations if the representation is false.

(C) In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45(a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended.

(D) No supplier shall offer to a consumer or represent that a consumer will receive a rebate, discount, or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers, or otherwise helping the supplier to enter into other consumer transactions, if earning the benefit is contingent upon an event occurring after the consumer enters into the transaction.

(E) (1) No supplier, in connection with a consumer transaction involving natural gas service or public telecommunications service to a consumer in this state, shall request or submit, or cause to be requested or submitted, a change in the consumer's provider of natural gas service or public telecommunications service, without first obtaining, or causing to be obtained, the verified consent of the consumer. For the purpose of this division and with respect to public telecommunications service only, the procedures necessary for verifying the consent of a consumer shall be those prescribed by rule by the public utilities commission for public telecommunications service under division (D) of section 4905.72 of the Revised Code. Also, for the purpose of this division, the act, omission, or failure of any officer, agent, or other individual, acting for or employed by another person, while acting within the scope of that authority or employment, is the act or failure of that other person.

(2) Consistent with the exclusion, under 47 C.F.R. 64.1100(a)(3), of commercial mobile radio service providers from the verification requirements adopted in 47 C.F.R. 64.1100, 64.1150, 64.1160, 64.1170, 64.1180, and 64.1190 by the federal communications commission, division (E)(1) of this section does not apply to a provider of commercial mobile radio service insofar as such provider is engaged in the provision of commercial mobile radio service. However, when that exclusion no longer is in effect, division (E)(1) of this section shall apply to such a provider.

(3) The attorney general may initiate criminal proceedings for a prosecution under division (C) of section 1345.99 of the Revised Code by presenting evidence of criminal violations to the prosecuting attorney of any county in which the offense may be prosecuted. If the prosecuting attorney does not prosecute the violations, or at the request of the prosecuting attorney, the attorney general may proceed in the prosecution with all the rights, privileges, and powers conferred by law on prosecuting attorneys, including the power to appear before grand juries and to interrogate witnesses before grand juries.

Service: **Get by LEXSTAT®**
Citation: **ohio rev code 1345.02**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:56 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*15 Okl. St. § 752*

OKLAHOMA STATUTES, ANNOTATED BY LEXISNEXIS (R)

*** THIS DOCUMENT IS CURRENT THROUGH THE 2004 SUPPLEMENT, 2003 SESSIONS ***
*** July 2004 Annotation Service ***

TITLE 15.  CONTRACTS
CHAPTER 20.  CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

15 Okl. St. § 752 (2004)

§ 752.  Definitions

As used in the Oklahoma Consumer Protection Act:

1. "Person" means a natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity;

2. "Consumer transaction" means the advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented;

3. "Credit card" means any instrument or device, whether known as a credit card, credit plate, charge plate or by any other name, issued with or without fee by an issuer for the use of the cardholder in obtaining money, goods, services or anything else of value on credit. All credit cards lawfully issued shall be considered the property of the cardholders or the issuer for all purposes;

4. "Debit card" means any instrument or device, whether known as a debit card or by any other name, issued with or without fee by an issuer for the use of the cardholder in depositing, obtaining or transferring funds from a consumer banking electronic facility;

5. "Documentary material" means the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording, wherever located;

6. "Examination" when used in reference to documentary material includes the inspection, study, or copying of any such material, and the taking of testimony under oath, or acknowledgment in respect to any such documentary material or copy thereof;

7. "Merchandise" includes any object, ware, good, commodity, intangible, real estate, or service;

8. "Closing out sale" means any offer to sell, or actual sale, to the public of goods, wares, or merchandise on the implied or direct representation that the sale is in anticipation of the termination of a business at its present location, or that the sale is being held other than in the ordinary course of business. It also shall mean but shall not be limited to any sale held or advertised as a "closing out sale", "going out of business sale", "discontinuance of business sale", "quitting business sale", "sell out", "liquidation", "loss of lease sale", "must vacate sale", "forced out of business sale", "fire sale", "smoke and water damage sale", "adjustment sale", "creditor's sale", "bankrupt sale", "insolvent sale", "mortgage sale", or other like or similar title;

9. "Advertisement" means any advertisement or announcement published in the news media including but not limited to the radio, television, newspapers, handbills, and mailers;

10. "License" means the written authorization issued by the court clerk of the district court in any county in this state to any person to conduct a closing out sale;

11. "Clerk" means the court clerk of the district court of any county of this state in which a person applying for a license intends to conduct a closing out sale;

12. "Automatic dial announcing device" means automatic equipment that:

a. stores telephone numbers to be called, or has a random or sequential number generator capable of producing numbers to be called,

b. conveys a prerecorded or synthesized voice message to the number called, and

c. is used for the purpose of offering any goods or services for sale or conveying information regarding such goods or services;

13. "Deceptive trade practice" means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person. Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral;

14. "Unfair trade practice" means any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers;

15. "Cemetery" means any land or structure in this state dedicated to or used, or intended to be used, for the interment of human remains; and

16. "Deceptive use of another's name in notification or solicitation" occurs when a business, or a person acting on its behalf, engages in the following activity:

a. through advertisement, solicitation or other notification, either verbally or through any other means, informs a consumer of the availability of any type of goods or services that are not free,

b. the name of an unrelated and unaffiliated person is mentioned in any manner,

c. the goods or services mentioned are not actually provided by the unrelated and unaffiliated person whose name is mentioned,

d. the business on whose behalf the notification or solicitation is made does not have a consensual right to mention the name of the unrelated and unaffiliated person, and

e. neither the actual name nor trade name of the business on whose behalf the notification or solicitation is being made is stated, nor the actual name or trade name of any actual provider of the goods or services is stated, so as to clearly identify for the consumer a name that is distinguishable and separate from the name of the unrelated and unaffiliated person whose name is mentioned in

any manner in the notification or solicitation, and thereby a misleading implication or ambiguity is created, such that a consumer who is the recipient of the advertisement, solicitation or notification may reasonably but erroneously believe:

(1) that the goods or services whose availability is mentioned are made available by or through the unrelated and unaffiliated person whose name is mentioned, or

(2) that the unrelated and unaffiliated person whose name is mentioned is the one communicating with the consumer.

Service: **Get by LEXSTAT®**
Citation: **okla stat tit 15 @752**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:57 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*15 Okl. St. § 753*

OKLAHOMA STATUTES, ANNOTATED BY LEXISNEXIS (R)

*** THIS DOCUMENT IS CURRENT THROUGH THE 2004 SUPPLEMENT, 2003 SESSIONS ***
*** July 2004 Annotation Service ***

TITLE 15. CONTRACTS
CHAPTER 20. CONSUMER PROTECTION ACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

15 Okl. St. § 753 (2004)

§ 753. Unlawful practices

A person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act, Section 751 et seq. of this title, when, in the course of the person's business, the person:

1. Represents, knowingly or with reason to know, that the subject of a consumer transaction is of a particular make or brand, when it is of another;

2. Makes a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction;

3. Makes a false or misleading representation, knowingly or with reason to know, as to affiliation, connection, association with, or certification by another;

4. Makes a false or misleading representation or designation, knowingly or with reason to know, of the geographic origin of the subject of a consumer transaction;

5. Makes a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;

6. Represents, knowingly or with reason to know, that the subject of a consumer transaction is original or new if the person knows that it is reconditioned, reclaimed, used, or secondhand;

7. Represents, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another;

8. Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;

9. Advertises, knowingly or with reason to know, the subject of a consumer transaction with intent not to supply reasonably expected public demand, unless the advertisement discloses a limitation of quantity;

10. Advertises under the guise of obtaining sales personnel when in fact the purpose is to sell the subject of a consumer transaction to the sales personnel applicants;

11. Makes false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction;

12. Employs "bait and switch" advertising, which consists of an offer to sell the subject of a consumer transaction which the seller does not intend to sell, which advertising is accompanied by one or more of the following practices:

    a. refusal to show the subject of a consumer transaction advertised,

    b. disparagement of the advertised subject of a consumer transaction or the terms of sale,

    c. requiring undisclosed tie-in sales or other undisclosed conditions to be met prior to selling the advertised subject of a consumer transaction,

    d. refusal to take orders for the subject of a consumer transaction advertised for delivery within a reasonable time,

    e. showing or demonstrating defective subject of a consumer transaction which the seller knows is unusable or impracticable for the purpose set forth in the advertisement,

    f. accepting a deposit for the subject of a consumer transaction and subsequently charging the buyer for a higher priced item, or

    g. willful failure to make deliveries of the subject of a consumer transaction within a reasonable time or to make a refund therefor upon the request of the purchaser;

13. Conducts a closing out sale without having first obtained a license as required in this act, Section 751 et seq. of this title;

14. Resumes the business for which the closing out sale was conducted within one (1) year from the expiration date of the closing out sale license;

15. Falsely states, knowingly or with reason to know, that services, replacements or repairs are needed;

16. Violates any provision of the Oklahoma Health Spa Act, Section 2000 et seq. of Title 59 of the Oklahoma Statutes;

17. Violates any provision of the Home Repair Fraud Act, Section 765.1 et seq. of this title;

18. Violates any provision of the Consumer Disclosure of Prizes and Gifts Act, Section 996.1 et seq. of Title 21 of the Oklahoma Statutes;

19. Violates any provision of Section 755.1 of this title or Section 1847a of Title 21 of the Oklahoma Statutes;

20. Commits an unfair or deceptive trade practice as defined in Section 752 of this title;

21. Violates any provision of Section 169.1 of Title 8 of the Oklahoma Statutes in fraudulently or intentionally failing or refusing to honor the contract to provide certain cemetery services specified in the contract entered into pursuant to the Perpetual Care Fund Act;

22. Misrepresents a mail solicitation as an invoice or as a billing statement;

23. Offers to purchase a mineral or royalty interest through an offer that resembles an oil and gas lease and that the consumer believed was an oil and gas lease;

24. Refuses to honor gift certificates, warranties, or any other merchandise offered by a person in a consumer transaction executed prior to the closing of the business of the person without providing a purchaser a means of redeeming such merchandise or ensuring the warranties offered will be honored by another person;

25. Knowingly causes a charge to be made by any billing method to a consumer for services which the person knows was not authorized in advance by the consumer;

26. Knowingly causes a charge to be made by any billing method to a consumer for a product or products which the person knows was not authorized in advance by the consumer;

27. Violates Section 752A of this title;

28. Makes deceptive use of another's name in notification or solicitation, as defined in Section 752 of this title;

29. Falsely states or implies that any person, product or service is recommended or endorsed by a named third person; or

30. Falsely states that information about the consumer, including but not limited to, the name, address or phone number of the consumer has been provided by a third person, whether that person is named or unnamed.

Service: **Get by LEXSTAT®**
Citation: **15 Okl. St. § 753**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 8:58 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

11 of 25 DOCUMENTS

OREGON REVISED STATUTES

*** THIS DOCUMENT IS CURRENT THROUGH THE 2005 REGULAR SESSION OF THE 73RD LEGISLATIVE ASSEMBLY ***
*** ANNOTATIONS CURRENT THROUGH APRIL 5, 2006 ***

TITLE 50. TRADE REGULATIONS AND PRACTICES
CHAPTER 646. TRADE PRACTICES AND ANTITRUST REGULATION
UNLAWFUL TRADE PRACTICES

**GO TO OREGON REVISED STATUTES ARCHIVE DIRECTORY**

*ORS § 646.608* (2006)

646.608. Unlawful business, trade practices; proof; Attorney General's rules.

(1) A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

(a) Passes off real estate, goods or services as those of another.

(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

(c) Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another.

(d) Uses deceptive representations or designations of geographic origin in connection with real estate, goods or services.

(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have.

(f) Represents that real estate or goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand.

(g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if they are of another.

(h) Disparages the real estate, goods, services, property or business of a customer or another by false or misleading representations of fact.

(i) Advertises real estate, goods or services with intent not to provide them as advertised, or with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity.

(j) Makes false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions.

(k) Makes false or misleading representations concerning credit availability or the nature of the transaction or obligation incurred.

(L) Makes false or misleading representations relating to commissions or other compensation to be paid in exchange for permitting real estate, goods or services to be used for model or demonstration purposes or in exchange for submitting names of potential customers.

(m) Performs service on or dismantles any goods or real estate when not authorized by the owner or apparent owner thereof.

(n) Solicits potential customers by telephone or door to door as a seller unless the person provides the information required under *ORS 646.611*.(o) In a sale, rental or other disposition of real estate, goods or services, gives or offers to give a rebate or discount or otherwise pays or offers to pay value to the customer in consideration of the customer giving to the person the names of prospective purchasers, lessees, or borrowers, or otherwise aiding the person in making a sale, lease, or loan to another person, if earning the rebate, discount or other value is contingent upon occurrence of an event subsequent to the time the customer enters into the transaction.

(p) Makes any false or misleading statement about a prize, contest or promotion used to publicize a product, business or service.

(q) Promises to deliver real estate, goods or services within a certain period of time with intent not to deliver them as promised.

(r) Organizes or induces or attempts to induce membership in a pyramid club.

(s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for real estate, goods or services.

(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity.

(u) Engages in any other unfair or deceptive conduct in trade or commerce.

(v) Violates any of the provisions relating to auction sales, auctioneers or auction marts under *ORS 698.640*, whether in a commercial or noncommercial situation.

(w) Manufactures mercury fever thermometers.

(x) Sells or supplies mercury fever thermometers unless the thermometer is required by federal law, or is:

(A) Prescribed by a person licensed under ORS chapter 677; and

(B) Supplied with instructions on the careful handling of the thermometer to avoid breakage and on the proper cleanup of mercury should breakage occur.

(y) Sells a thermostat that contains mercury unless the thermostat is labeled in a manner to inform the purchaser that mercury is present in the thermostat and that the thermostat may not be disposed of until the mercury is removed, reused, recycled or otherwise managed to ensure that the mercury does not become part of the solid waste stream or wastewater. For purposes of this paragraph, "thermostat" means a device commonly used to sense and, through electrical communication with heating, cooling or ventilation equipment, control room temperature.

(z) Sells or offers for sale a motor vehicle manufactured after January 1, 2006, that contains mercury light switches.

(aa) Violates the provisions of *ORS 803.375*, *803.385* or *815.410* to *815.430*.

(bb) Violates *ORS 646.850 (1)*.

(cc) Violates any requirement of *ORS 646.661* to *646.686*.

(dd) Violates the provisions of *ORS 128.801* to *128.898*.

(ee) Violates *ORS 646.883* or *646.885*.

(ff) Violates any provision of *ORS 646.195*.(gg) Violates *ORS 646.569*.

(hh) Violates the provisions of *ORS 646.859*.

(ii) Violates *ORS 759.290*.

(jj) Violates *ORS 646.872*.

(kk) Violates *ORS 646.553* or *646.557* or any rule adopted pursuant thereto.

(LL) Violates *ORS 646.563*.

(mm) Violates *ORS 759.690* or any rule adopted pursuant thereto.

(nn) Violates the provisions of *ORS 759.705*, *759.710* and *759.720* or any rule adopted pursuant thereto.

(oo) Violates *ORS 646.892* or *646.894*.

(pp) Violates any provision of *ORS 646.249* to *646.259*.

(qq) Violates *ORS 646.384*.

(rr) Violates *ORS 646.871*.

(ss) Violates *ORS 822.046*.

(tt) Violates *ORS 128.001*.

(uu) Violates *ORS 646.649 (2)* to (4).

(vv) Violates *ORS 646.877 (2)* to (4).

(ww) Violates *ORS 87.686*.

(xx) Violates *ORS 646.651*.

(yy) Violates *ORS 646.879*.

(zz) Violates *ORS 646.402* or any rule adopted under *ORS 646.402* or *646.404*.

(aaa) Violates *ORS 180.440 (1)*.

(bbb) Commits the offense of acting as a vehicle dealer without a certificate under *ORS 822.005*.

(ccc) Violates *ORS 87.007 (2)* or (3).

(ddd) Violates *ORS 92.405 (1)*, (2) or (3).

(eee) Engages in an unlawful practice under *ORS 646.648*.

(2) A representation under subsection (1) of this section or *ORS 646.607* may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

(3) In order to prevail in an action or suit under *ORS 646.605* to *646.652*, a prosecuting attorney need not prove competition between the parties or actual confusion or misunderstanding.

(4) An action or suit may not be brought under subsection (1)(u) of this section unless the Attorney General has first established a rule in accordance with the provisions of ORS chapter 183 declaring the conduct to be unfair or deceptive in trade or commerce.

(5) Notwithstanding any other provision of *ORS 646.605* to *646.652*, if an action or suit is brought under subsection (1)(aaa) of this section by a person other than a prosecuting attorney, relief is limited to an injunction and the prevailing party may be awarded reasonable attorney fees.

**HISTORY:** 1971 c.744 § 7 (enacted in lieu of 646.615); 1973 c.235 § 2; 1973 c.513 § 1; 1975 c.437 § 1; 1977 c.195 § 2; 1979 c.503 § 4; 1983 c.404 § 5; 1985 c.251 § 10a; 1985 c.538 § 3; 1985 c.694 § 8; 1985 c.729 § 22; 1987 c.626 § 5; 1989 c.273 § 7; 1989 c.451 § 4; 1989 c.458 § 3; 1989 c.621 § 4; 1989 c.622 § 7; 1989 c.623 § 3; 1989 c.913 § 1; 1991 c.532 § 25; 1991 c.672 § 8; 1993 c.58 § 3; 1993 c.283 § 10; 1993 c.582 § 11; 1993 c.645 § 10; 1993 c.700 § 2; 1995 c.713 § 6; 1995 c.788 § 2; 1997 c.132 § 6; 1997 c.806 § 2; 1999 c.194 § 9; 1999 c.400 § 4; 1999 c.669 § 3; 1999 c.719 § 3; 1999 c.875 § 3; 2001 c.924 § § 11,13; 2001 c.969 § 5; 2003 c.133 § § 1,2; 2003 c.486 § § 2,3; 2003 c.778 § § 4,5; 2003 c.801 § § 18,19; 2005 c.42 § § 1,2; 2005 c.799 § § 2,3

PERMANENT EDITION ANNOTATIONS:

CASENOTES:

*73 P.S. § 201-2*

PENNSYLVANIA STATUTES, ANNOTATED BY LEXISNEXIS(R)

* THIS SECTION IS CURRENT THROUGH ACT 36 OF THE 2004 LEGISLATIVE SESSION *
*** AUGUST 2004 ANNOTATION SERVICE ***

PENNSYLVANIA STATUTES
TITLE 73. TRADE AND COMMERCE
CHAPTER 4. FAIR TRADE, AND BUSINESS PRACTICES
UNFAIR COMPETITION, ACTS OR PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

73 P.S. § 201-2 (2004)

§ 201-2. Definitions

As used in this act.

(1) "DOCUMENTARY MATERIAL" means the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription or other tangible document or recording, wherever situate.

(2) "PERSON" means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities.

(3) "TRADE" and "COMMERCE" mean the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth.

(4) "UNFAIR METHODS OF COMPETITION" and "UNFAIR OR DECEPTIVE ACTS OR PRACTICES" mean any one or more of the following:

(i) Passing off goods or services as those of another;

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

(iv) Using deceptive representations or designations of geographic origin in connection with goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(vi) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand;

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods

are of a particular style or model, if they are of another;

(viii) Disparaging the goods, services or business of another by false or misleading representation of fact;

(ix) Advertising goods or services with intent not to sell them as advertised;

(x) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(xii) Promising or offering prior to time of sale to pay, credit or allow to any buyer, any compensation or reward for the procurement of a contract for purchase of goods or services with another or others, or for the referral of the name or names of another or others for the purpose of attempting to procure or procuring such a contract of purchase with such other person or persons when such payment, credit, compensation or reward is contingent upon the occurrence of an event subsequent to the time of the signing of a contract to purchase;

(xiii) Promoting or engaging in any plan by which goods or services are sold to a person for a consideration and upon the further consideration that the purchaser secure or attempt to secure one or more persons likewise to join the said plan; each purchaser to be given the right to secure money, goods or services depending upon the number of persons joining the plan. In addition, promoting or engaging in any plan, commonly known as or similar to the so-called "CHAIN-LETTER PLAN" or "PYRAMID CLUB." The terms "CHAIN-LETTER PLAN' ' or "PYRAMID CLUB" mean any scheme for the disposal or distribution of property, services or anything of value whereby a participant pays valuable consideration, in whole or in part, for an opportunity to receive compensation for introducing or attempting to introduce one or more additional persons to participate in the scheme or for the opportunity to receive compensation when a person introduced by the participant introduces a new participant. As used in this subclause the term "CONSIDERATION" means an investment of cash or the purchase of goods, other property, training or services, but does not include payments made for sales demonstration equipment and materials for use in making sales and not for resale furnished at no profit to any person in the program or to the company or corporation, nor does the term apply to a minimal initial payment of twenty-five dollars ($ 25) or less;

(xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;

(xv) Knowingly misrepresenting that services, replacements or repairs are needed if they are not needed;

(xvi) Making repairs, improvements or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing;

(xvii) Making solicitations for sales of goods or services over the telephone without first clearly, affirmatively and expressly stating:

(A) the identity of the seller;

(B) that the purpose of the call is to sell goods or services;

(C) the nature of the goods or services; and

(D) that no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered. This disclosure must be made before or in conjunction with the

description of the prize to the person called. If requested by that person, the telemarketer must disclose the no-purchase/no-payment entry method for the prize promotion;

(xviii) Using a contract, form or any other document related to a consumer transaction which contains a confessed judgment clause that waives the consumer's right to assert a legal defense to an action;

(xix) Soliciting any order for the sale of goods to be ordered by the buyer through the mails or by telephone unless, at the time of the solicitation, the seller has a reasonable basis to expect that it will be able to ship any ordered merchandise to the buyer:

(A) within that time clearly and conspicuously stated in any such solicitation; or

(B) if no time is clearly and conspicuously stated, within thirty days after receipt of a properly completed order from the buyer, provided, however, where, at the time the merchandise is ordered, the buyer applies to the seller for credit to pay for the merchandise in whole or in part, the seller shall have fifty days, rather than thirty days, to perform the actions required by this subclause;

(xx) Failing to inform the purchaser of a new motor vehicle offered for sale at retail by a motor vehicle dealer of the following:

(A) that any rustproofing of the new motor vehicle offered by the motor vehicle dealer is optional;

(B) that the new motor vehicle has been rustproofed by the manufacturer and the nature and extent, if any, of the manufacturer's warranty which is applicable to that rustproofing;

The requirements of this subclause shall not be applicable and a motor vehicle dealer shall have no duty to inform if the motor vehicle dealer rustproofed a new motor vehicle before offering it for sale to that purchaser, provided that the dealer shall inform the purchaser whenever dealer rustproofing has an effect on any manufacturer's warranty applicable to the vehicle. This subclause shall not apply to any new motor vehicle which has been rustproofed by a motor vehicle dealer prior to the effective date of this subclause.

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

Service:  **Get by LEXSTAT®**
Citation:  **pa stat tit 73 @ 201-2**
View:  **Custom**
Segments:  Text
Date/Time:  Thursday, September 2, 2004 - 9:00 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*R.I. Gen. Laws § 6-13.1-2*

GENERAL LAWS OF RHODE ISLAND
Copyright © 2004 by The State of Rhode Island and Providence Plantations
and Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE JANUARY 2003 SESSION ***
*** ANNOTATIONS CURRENT THROUGH MAY 28, 2004 ***

TITLE 6. COMMERCIAL LAW -- GENERAL REGULATORY PROVISIONS
CHAPTER 13.1. DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

R.I. Gen. Laws § 6-13.1-2 (2004)

§ 6-13.1-2. Unlawful acts or practices

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful.

Source: Legal > / . . . / > **RI - General Laws of Rhode Island**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:10 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*R.I. Gen. Laws § 6-13.1-1*

GENERAL LAWS OF RHODE ISLAND

Copyright © 2004 by The State of Rhode Island and Providence Plantations
and Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE JANUARY 2003 SESSION ***
*** ANNOTATIONS CURRENT THROUGH MAY 28, 2004 ***

TITLE 6. COMMERCIAL LAW -- GENERAL REGULATORY PROVISIONS
CHAPTER 13.1. DECEPTIVE TRADE PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

R.I. Gen. Laws § 6-13.1-1 (2004)

§ 6-13.1-1. Definitions

As used in this chapter:

(1) "Documentary material" means the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording wherever situated.

(2) "Examination" of documentary material includes the inspection, study, or copying of any documentary material, and the taking of testimony under oath or acknowledgment in respect of any documentary material or copy of any documentary material.

(3) "Person" means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

(4) "Trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce directly or indirectly affecting the people of this state.

(5) "Unfair methods of competition and unfair or deceptive acts or practices" means any one or more of the following:

(i) Passing off goods or services as those of another;

(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(iii) Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

(iv) Using deceptive representations or designations of geographic origin in connection with goods or services;

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status,

affiliation, or connection that he or she does not have;

(vi) Representing that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand; and if household goods have been repaired or reconditioned, without conspicuously noting the defect which necessitated the repair on the tag which contains the cost to the consumer of the goods;

(vii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(viii) Disparaging the goods, services, or business of another by false or misleading representation of fact;

(ix) Advertising goods or services with intent not to sell them as advertised;

(x) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(xi) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;

(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer;

(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect;

(xv) Advertising any brand name goods for sale and then selling substituted brand names in their place;

(xvi) Failure to include the brand name and or manufacturer of goods in any advertisement of the goods for sale, and, if the goods are used or secondhand, failure to include the information in the advertisement;

(xvii) Advertising claims concerning safety, performance, and comparative price unless the advertiser, upon request by any person, the consumer council, or the attorney general, makes available documentation substantiating the validity of the claim;

(xviii) Representing that work has been performed on or parts replaced in goods when the work was not in fact performed or the parts not in fact replaced; or

(xix) Failing to separately state the amount charged for labor and the amount charged for services when requested by the purchaser as provided for in § 44-18-12(b)(3).

Source: Legal > / . . . / > RI - General Laws of Rhode Island
View: Custom
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:11 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*S.C. Code Ann. § 39-5-20*

CODE OF LAWS OF SOUTH CAROLINA ANNOTATED
Copyright (c) 2003, The State of South Carolina

*** THIS DOCUMENT IS CURRENT THROUGH THE 2003 SESSION (2003 SUPPLEMENT) ***

TITLE 39. TRADE AND COMMERCE
CHAPTER 5. UNFAIR TRADE PRACTICES
ARTICLE 1. GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

S.C. Code Ann. § 39-5-20 (2003)

§ 39-5-20. Unfair methods of competition and unfair or deceptive acts or practices unlawful; application of interpretations of Federal act.

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

Service: **Get by LEXSTAT®**
Citation: **sc code 39-5-20**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:11 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*S.D. Codified Laws § 37-24-6*

SOUTH DAKOTA CODIFIED LAWS
Copyright © 1968-2003 by The State of South Dakota
All rights reserved.

*** STATUTES CURRENT THROUGH THE 2003 SPECIAL SESSION ***
*** ANNOTATIONS CURRENT THROUGH 2003 SD 23 ***

TITLE 37. TRADE REGULATION
CHAPTER 37-24. DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

S.D. Codified Laws § 37-24-6 (2003)

§ 37-24-6. Deceptive acts or practices -- Each act as Class 2 misdemeanor -- Subsequent acts

It is a deceptive act or practice for any person to:

(1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby;

(2) Advertise price reductions without satisfying one of the following:

(a) Including in the advertisement the specific basis for the claim of a price reduction; or

(b) Offering the merchandise for sale at the higher price from which the reduction is taken for at least seven consecutive business days during the sixty-day period prior to the advertisement.

Any person advertising consumer property or services in this state, which advertisements contain representations or statements as to any type of savings claim, including reduced price claims and price comparison value claims, shall maintain reasonable records for a period of two years from the date of sale and advertisement, which records shall disclose the factual basis for such representations or statements and from which the validity of any such claim be established. However, these reasonable record provisions do not apply to the sale of any merchandise which:

(a) Is of a class of merchandise that is routinely advertised on at least a weekly basis in newspapers, shopping tabloids, or similar publications; and

(b) Has a sales price before price reduction that is less than fifteen dollars per item;

(3) Represent a sale of merchandise at reduced rates due to the cessation of business operations and after the date of the first advertisement remain in business under the same, or substantially the same, ownership or trade name, or continue to offer for sale the same type of merchandise at the same location for more than one hundred twenty days;

(4) Give or offer a rebate, discount, or anything of value to an individual as an inducement for selling consumer property or services in consideration of giving the names of prospective purchasers or otherwise aiding in making a sale to another person, if the earning of the rebate, discount, or other thing of value is contingent upon the occurrence of an event subsequent to the time the individual agrees to the sale;

(5) Engage in any scheme or plan for disposal or distribution of merchandise whereby a participant pays a valuable consideration for the chance to receive compensation primarily for introducing one or more additional persons into participation in the planner's scheme or for the chance to receive compensation when the person introduced by the participant introduces a new participant;

(6) Send, deliver, provide, mail, or cause to be sent, delivered, provided, or mailed any unordered consumer property or service, or any bill or invoice for unordered consumer property or service provided;

(7) Advertise a rate, price, or fee for a hotel, motel, campsite, or other lodging accommodation which is not in fact available to the public under the terms advertised. It is not a violation of this subdivision to establish contract rates which are different than public rates;

(8) Charge a rate, price, or fee for a hotel, motel, campsite, or other lodging accommodation which is different than the rate, price, or fee charged on the first night of the guest's stay unless, at the initial registration of the guest, a written notification of each price, rate, or fee to be charged during the guest's reserved continuous stay is delivered to the guest and an acknowledgment of receipt of the notice is signed by the guest and kept by the innkeeper for the same period of time as is required by § 34-18-21;

(9) Knowingly and intentionally fail to mail to a future guest a written confirmation of the date and rates of reservations made for any accommodation at a hotel, motel, campsite, or other lodging accommodation when a written request for confirmation is received from the future guest;

(10) Refuse to return or reverse the charge for a deposit upon any hotel, motel, campsite, or other lodging accommodation which is canceled by the guest more than thirty days before the date of the reservation. The innkeeper may establish a policy requiring a longer time for notice of cancellation or a handling fee in the event of cancellation, which may not exceed twenty-five dollars, if the policy is in writing and is delivered or mailed to the guest at or near the making of the reservation;

(11) Knowingly advertise or cause to be listed through the internet or in a telephone directory a business address that misrepresents where the business is actually located or that falsely states that the business is located in the same area covered by the telephone directory. This subdivision does not apply to a telephone service provider, an internet service provider, or a publisher or distributor of a telephone directory, unless the conduct proscribed in this subdivision is on behalf of the provider, publisher, or distributor;

(12) Sell, market, promote, advertise, or otherwise distribute any card or other purchasing mechanism or device that is not insurance that purports to offer discounts or access to discounts from pharmacies for prescription drug purchases if:

(a) The card or other purchasing mechanism or device does not expressly state in bold and prominent type, prevalently placed, that discounts are not insurance;

(b) The discounts are not specifically authorized by a separate contract with each pharmacy listed in conjunction with the card or other purchasing mechanism or device; or

(c) The discount or access to discounts offered, or the range of discounts or access to the range of discounts, is misleading, deceptive, or fraudulent, regardless of the literal wording; or

The provisions of this subdivision do not apply to a customer discount or membership card issued by a store or buying club for use in that store or buying club.

(13) Send or cause to be sent an unsolicited commercial electronic mail message that does not include in the subject line of such message "ADV:" as the first four characters. If the message contains information that consists of explicit sexual material that may only be viewed, purchased, rented, leased, or held in possession by an individual eighteen years of age and older, the subject line of each message

shall include "ADV:ALT" as the first eight characters. An unsolicited commercial electronic mail message does not include a message sent to a person with whom the initiator has an existing personal or business relationship or a message sent at the request or express consent of the recipient.

Each act in violation of this section is a Class 2 misdemeanor. Any subsequent conviction of an act in violation of this statute, which occurs within two years is a Class 1 misdemeanor. Any subsequent conviction of an act in violation of this statute, which occurs within two years of a conviction of a Class 1 misdemeanor pursuant to this statute, is a Class 6 felony.

Service: **Get by LEXSTAT®**
Citation: **sd cod laws 37-24-6**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:13 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

TENNESSEE CODE ANNOTATED
Copyright (c) 2005 by The State of Tennessee
All rights reserved

*** CURRENT THROUGH THE 2005 SESSION ***
*** ANNOTATIONS CURRENT THROUGH SEPTEMBER 30, 2005 ***

TITLE 47. COMMERCIAL INSTRUMENTS AND TRANSACTIONS
CHAPTER 18. CONSUMER PROTECTION
PART 1. CONSUMER PROTECTION ACT OF 1977

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*Tenn. Code Ann. § 47-18-104* (2005)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT** LEXSEE 2005 Tn. SB 3218 -- See section 1.
LEXSEE 2005 Tn. SB 3667 -- See section 1.
LEXSEE 2005 Tn. SB 2336 -- See section 1.

47-18-104. Unfair or deceptive acts prohibited

(a) Unfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices and are Class B misdemeanors.

(b) Without limiting the scope of subsection (a), the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:

(1) Falsely passing off goods or services as those of another;

(2) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services. This subdivision (b)(2) does not prohibit the private labeling of goods and services;

(3) Causing likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another. This subdivision (b)(3) does not prohibit the private labeling of goods or services;

(4) Using deceptive representations or designations of geographic origin in connection with goods or services;

(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;

(6) Representing that goods are original or new if they are deteriorated, altered to the point of decreasing the value, reconditioned, reclaimed, used or secondhand;

(7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(8) Disparaging the goods, services or business of another by false or misleading representations of fact;

(9) Advertising goods or services with intent not to sell them as advertised;

(10) Advertising goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;

(13) Representing that a service, replacement or repair is needed when it is not;

(14) Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction;

(15) Failing to disclose that a charge for the servicing of any goods in whole or in part is based on a predetermined rate or charge, or guarantee or warranty, instead of the value of the services actually performed;

(16) Disconnecting, turning back, or resetting the odometer of any motor vehicle so as to reduce the number of miles indicated on the odometer gauge, except as provided for in *§ 39-14-132(b)*;

(17) Advertising of any sale by falsely representing that a person is going out of business;

(18) Using or employing a chain referral sales plan in connection with the sale or offer to sell of goods, merchandise, or anything of value, which uses the sales technique, plan, arrangement or agreement in which the buyer or prospective buyer is offered the opportunity to purchase goods or services and, in connection with the purchase, receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for furnishing to the seller the names of other prospective buyers if the receipt of compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchases the merchandise or goods;

(19) Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve; provided, that nothing in this subdivision (b)(19) shall be construed to alter the implied warranty of merchantability as defined in *§ 47-2-314*;

(20) Selling or offering to sell, either directly or associated with the sale of goods or services, a right of participation in a pyramid distributorship. As used in this subdivision (b)(20), a "pyramid distributorship" means any sales plan or operation for the sale or distribution of goods, services or other property wherein a person for a consideration acquires the opportunity to receive a pecuniary benefit, which is not primarily contingent on the volume or quantity of goods, services or other property sold or delivered to consumers, and is based upon the inducement of additional persons, by such person or others, regardless of number, to participate in the same plan or operation;

(21) Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services;

(22) Using any advertisement containing an offer to sell goods or services when the offer is not a bona fide effort to sell the advertised goods or services. An offer is not bona fide, even though the true facts are subsequently made known to the buyer, if the first contact or interview is secured by deception;

(23) Representing in any advertisement a false impression that the offer of goods has been occasioned by a financial or natural catastrophe when such is not true, or misrepresenting the former price, savings, quality or ownership of any goods sold;

(24) Assessing a penalty for the prepayment or early payment of a fee or charge for services by a utility or company which has been issued a franchise license by a municipal governing body to provide services. Nothing in this subdivision (b)(24) shall be construed to prohibit a discount from being offered for early payment of the applicable fee or charge for services. This subdivision (b)(24) does not apply to a utility or company whose billing statement reflects charges both for service previously rendered and in advance of services provided;

(25) Discriminating against any disabled individual, as defined by *§ § 47-18-802(b)* and *55-21-102(1)*, in violation of the Tennessee Equal Consumer Credit Act of 1974, compiled in part 8 of this chapter. This subdivision (b)(25) does not apply to any creditor or credit card issuer regulated by the department of financial institutions. The division shall refer any complaint against such a creditor or credit card issuer involving the Equal Consumer Credit Act to such department for investigation and disposition;

(26) Violating the provisions of § 65-5-206;

(27) Engaging in any other act or practice which is deceptive to the consumer or to any other person;

(28) (A) (i) Failing of a motor vehicle repair facility to return to a customer any parts which were removed from the motor vehicle and replaced during the process of repair if the customer, at the time repair work was authorized, requested return of such parts; provided, that any part retained by the motor vehicle repair facility as part of a trade-in agreement or core charge agreement for a reconditioned part need not be returned to the customer unless the customer agrees to pay the facility the additional core charge or other trade-in fee; and provided further, that any part required to be returned to a manufacturer or distributor under a warranty agreement or any part required by any federal or state statute or rule or regulation to be disposed of by the facility need not be returned to the customer; or

(ii) Failing of a motor vehicle repair facility to permit inspection of any parts retained by the repair facility if the customer, at the time repair work was authorized, expressed the customer's desire to inspect such parts; provided, that if, after inspection, the customer requests return of such parts, the restrictions set forth in subdivision (b)(28)(A)(i) shall apply;

(B) (i) Failing of a motor vehicle repair facility to post in a prominent location notice of the provisions of this subdivision (b)(28); or

(ii) Failing of a motor vehicle repair facility to print on the repair contract notice of the provisions of this subdivision (b)(28);

(C) The motor vehicle repair facility need not retain any parts not returned to the customer after the motor vehicle has been returned to the customer;

(29) Advertising that a business is "going out of business" more than ninety (90) days before such business ceases to operate;

(30) Failing to comply with *§ § 6-55-401 -- 6-55-413*, where a municipality has adopted the regulations of liquidation sales pursuant to *§ 6-55-413*;

(31) Offering lottery winnings in exchange for making a purchase or incurring a monetary obligation pursuant to *§ 47-18-120*;

(32) The act of misrepresenting the geographic location of a florist by listing a fictitious business name or an assumed business name in a local telephone directory if:

(A) The name misrepresents the florist's geographic location; or

(B) The listing fails to identify the locality and state of the florist's business; and

(C) Calls to the local telephone number are routinely forwarded or otherwise transferred to a florist's business location that is outside the calling area covered by the local telephone directory; and

(D) The florist's business location is located in a county that is not contiguous to a county in the calling area covered by the local telephone directory; and

(E) The florist does not have a business location or branch, or an affiliate, subsidiary, or agent of the florist does not have a business location or branch, in the local calling area or county contiguous to the local calling area;

The provisions of this subdivision (b)(32) shall not apply to a telecommunications service provider or to the publisher or distributor of a local telephone directory unless such act is on behalf of such telecommunications service provider or on behalf of the publisher or distributor of such local telephone directory;

(33) Advertising that a person is an electrician for hire when such person has not been licensed by a local jurisdiction to perform electrical work within such jurisdiction or by the state as a limited licensed electrician or contractor, as appropriate or, if no such licenses are then available, such person is not registered with the state;

(34) Unreasonably raising prices or unreasonably restricting supplies of essential goods, commodities or services in direct response to a crime, act of terrorism, war, or natural disaster, regardless of whether such crime, act of terrorism, war, or natural disaster occurred in the state of Tennessee;

(35) Representing that a person is a licensed contractor when such person has not been licensed as required by *§ 62-6-103* or *§ 62-37-104*; or, acting in the capacity of a "contractor" as defined in *§ § 62-6-102(3)(A), 62-6-102(5)* or *62-37-103(5)*, and related rules and regulations of the state of Tennessee, or any similar statutes, rules and regulations of another state, while not licensed;

(36) (A) Using any advertisement for a workshop, seminar, conference, or other meeting that contains a reference to a living trust or a revocable living trust, or that otherwise offers advice or counsel on estate taxation unless such advertisement also includes the information required in this subdivision (b)(36);

(B) An advertisement as provided in this subdivision (b)(36) shall, at a minimum, include the following:

(i) The maximum exclusion for federal estate tax purposes and the maximum exemption for state inheritance tax purposes for the year in which the advertisement appears;

(ii) Includes a statement that certain property, including real property, insurance proceeds, deposit accounts, stocks and retirement fund, may be taxable or not taxable, depending on how legal title is held or beneficiary designation is made, or both;

(iii) Includes a statement that certain property may be transferred through several different means including, but not limited to, joint ownership of property with rights of survivorship, joint deposit accounts, beneficiary designations or elections permitted under retirement plans, insurance policies, trusts, or wills; and

(iv) A statement that before creating any transfer through a living trust, revocable living trust, or otherwise, the individual should seek advice from an attorney, accountant or other tax professional to determine the true tax impact and ensure that assets are properly transferred into any trust;

(C) The disclosure required in this subdivision (b)(36) shall be printed in not less than 10-point type;

(D) The provisions of this subdivision (b)(36) shall not apply to an advertisement by any attorney, law firm, bank, savings institution, trust company, or registered securities broker-dealer which is directed to clients or customers of such person with whom such person has had a client or customer relationship within the prior two (2) years. The provisions of this subdivision (b)(36) shall also not apply to any continuing education seminars or conferences conducted for the benefit of bankers, attorneys, accountants, or other professional financial advisors;

(37) Refusing to accept the return of clothing or accessories sold at retail directly to a purchaser, who seeks to return the same for any reason for refund or credit; provided, that:

(A) The purchaser presents the clothing or accessories within the retailer's prescribed period for return of merchandise;

(B) The purchaser presents satisfactory proof of purchase;

(C) The merchandise is, in no way, damaged and exhibits no sign of wear or cleaning;

(D) All tags and stickers affixed or attached to the merchandise at the time of sale remain affixed or attached at the time of return; and

(E) The sale of the merchandise was not marked, advertised or otherwise characterized as "final", "no return", "no refunds", or in any manner reasonably indicating that the merchandise would not be accepted for return;

(38) Requiring the purchaser to present that purchaser's driver license as a prerequisite for accepting the return of clothing or accessories for refund or credit, notwithstanding compliance with the conditions set forth in subdivision (b)(37), unless such a requirement is for the purpose of preventing fraud and abuse;

(39) (A) Engaging in the business of debt adjusting and:

(i) Failing to disburse all funds to the appropriate creditors within thirty (30) days of receipt of the funds from the debtor,less any contributions or fees not prohibited by subdivisions (b)(39)(A)(iii)-(vi);

(ii) Failing to maintain a separate trust account for the receipt of any funds from debtors and the disbursement of the funds to creditors on behalf of the debtors;

(iii) Accepting a contribution or fee exceeding seventy-five dollars ($ 75.00) from a debtor for an initial set up;

(iv) Accepting a consultation contribution or fee exceeding fifty dollars ($ 50.00) per calendar year from a debtor;

(v) Accepting a periodic contribution or fee from a debtor that exceeds the greater of eight and one half percent (8.5%) of the amount paid by a debtor each month for distribution to the debtor's creditors or thirty dollars ($ 30.00);

(vi) Charging the debtor a bad check handling fee in excess of twenty dollars ($ 20.00);

(vii) Failing to obtain and at all times maintain insurance coverage for errors and omissions, employee dishonesty, depositor's forgery, and computer fraud, with a minimum limit of one hundred thousand dollars ($ 100,000) and that names the division of consumer affairs of the department of commerce and insurance and the consumer protection division of the office of the attorney general as additional interested parties;

(viii) Failing to provide, prior to the execution of a contract,agreement debt management or adjustment plan, the following statement, printed in bold and capital letters, following which shall be an area on the information statement for the consumer to sign and date the information statement:

With respect to my credit history, I understand that my participation in the DMP may affect my credit report either favorably or unfavorably according to my creditor's policies with respect to the DMP and my payment history prior to and during my participating in the DMP. I also understand that, for any joint accounts, my spouse's credit rating may affect my credit rating either favorably or unfavorably;

(B) The fees or contributions described in subdivisions (b)(39)(A)(iii)-(v) may be adjusted on an annual basis by the amount no greater than the equivalent to any increase in the consumer price index, all urban consumers, not seasonally adjusted, 1982-84 = 100, published by the United States department of labor, bureau of labor statistics;

(C) For the purposes of this subdivision (b)(39), "debt adjusting" means doing business in debt adjusting, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts to do any of the following:

(i) Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;

(ii) Receive from the debtor and disburse to the debtor's creditors any money or other thing of value; or

(iii) Solicit business and advertise as a debt adjuster;

(D) The following persons shall not be considered adjusters for the purposes of this subdivision (b)(39):

(i) Any attorney-at-law of this state;

(ii) Any person who is a regular, full-time employee of a debtor, and who acts as an adjuster of the employer's debts;

(iii) Any person acting pursuant to any order or judgment of court, or pursuant to authority conferred by any law of this state or of the United States;

(iv) Any person who is a creditor of the debtor, or an agent of one (1) or more creditors of the debtor, and whose services in adjusting the debtor's debts are rendered without cost to the debtor;

(v) Any person who, at the request of a debtor, arranges for or makes a loan to the debtor, and who, at the authorization of the debtor, acts as an adjuster of the debtor's debts in the disbursement of the proceeds of the loan, without compensation for the services rendered in adjusting the debts; and

(vi) Any charitable, religious or educational organization,determined to be exempt from taxation under § (501)(c)(3) of the Internal Revenue Code that is not in the business of debt adjusting; and

(40) Representing that a person, or such person's agent, authorized designee or delegee for hire, has conducted a foreclosure on real property, when such person knew or should have known that a foreclosure was not actually conducted on the real property.

(c) The following are among the acts or practices which will be considered in determining if an offer to sell goods or services is not bona fide:

(1) Refusal to reasonably show, demonstrate or sell the goods or services offered in accordance with the terms of the offer;

(2) Disparagement by acts or words of the advertised goods or services or disparagement with respect to the guarantee, credit terms, availability of service, repairs or parts, or in any other respect, in connection with the advertised goods or services;

(3) Failure to make available at all outlets listed in the advertisement a sufficient quantity of the advertised goods or services to meet reasonably expectable public demand, unless the advertisement clearly and conspicuously discloses that the availability of a particular good is limited and/or the goods or services are available only at designated outlets, or unless the advertisement discloses that a particular good is to be closed out or offered for a limited time. In the event of an inadequate inventory, issuing of "rain checks" for goods or offering comparable or better goods at the sale price may be considered a good faith effort to make the advertised goods available, unless there is a pattern of inadequate inventory or unless the inadequate inventory was intentional. If rain checks are offered, the goods must be delivered within a reasonable time;

(4) Refusal to take orders or give rain checks for the advertised goods or services, when the advertisement does not disclose their limited quantity or availability to be delivered within a reasonable period of time;

(5) Showing or demonstrating goods or services which are defective, unusable or impractical for the purpose represented or implied in the advertisement when such defective, unusable or impractical nature is not fairly and adequately disclosed in the advertisement; and

(6) Use of a sales plan or method of compensating or penalizing salespersons designed to prevent or discourage them from selling the advertised goods or services. This does not prohibit compensating salespersons by use of a commission.

(d) The fact that a seller occasionally sells the advertised goods or services at the advertised price does not constitute a defense when the seller's overall purpose is to engage in bait and switch tactics.

(e) Nothing in *§ 47-18-103(1)* or subdivisions (b)(21)-(23) and subsections (c) and (d) shall prevent a seller from advertising goods and services with the hope that consumers will buy goods or services in addition to those advertised.

**HISTORY:** Acts 1977, ch. 438, § 4; 1986, ch. 860, § § 2-4; 1988, ch. 974, § 2; 1989, ch. 498, § § 1, 2; 1989, ch. 591, § 113; 1990, ch. 675, § 2; 1990, ch. 1030, § 33; 1990, ch. 1041, § 1; 1990, ch. 1050, § § 1-4; 1991, ch. 264, § 1; 1991, ch. 507, § 2; 1992, ch. 803, § 1; 1992, ch. 890, § 1; 1993, ch. 180, § 1; 1993, ch. 402, § 1; 1997, ch. 234, § 2; 1998, ch. 627, § 3; 1999, ch. 473, § 2; 2000, ch. 643, § 1; 2002, ch. 849, § 8; 2004, ch. 492, § 1; 2004, ch. 637, § 1; 2005, ch. 134, § 1; 2005, ch. 199, § 1; 2005, ch. 272, § 1.

**NOTES:**

COMPILER'S NOTES. Acts 1990, ch. 675, § 3 provided that the amendment by that act apply only to telephone calls which originate in Tennessee and which are billed to an address located within Tennessee.

The reference to "any handicapped individual" has been changed to "any disabled individual," pursuant to Acts 1994, ch. 634, § 1, which so amended *§ 55-21-102*.

Acts 1997, ch. 234, § 4 provided that the act take effect July 1, 1997. The act was returned without the governor's signature and became effective under the provisions of Tenn. Const., art. III, § 18.

Acts 2005, ch. 134, § 2 provided that, notwithstanding any provision of § 1 of that act to the contrary, return denials are permitted for the purpose of preventing fraud and abuse.

Section 501(c)(3), referred to in this section, is codified at *26 U.S.C. § 501*(c)(3).

AMENDMENTS. The 2002 amendment added (b)(34).

The 2004 amendment by ch. 492 added (b)(35).

The 2004 amendment by ch. 637 added (b)(36).

The 2005 amendment by ch. 134 added (b)(37) and (b)(38).

The 2005 amendment by ch. 199 added (b)(39).

The 2005 amendment by ch. 272 added (b)(40).

EFFECTIVE DATES. Acts 2002, ch. 849, § 18. July 4, 2002.

Acts 2004, ch. 492, § 3. July 1, 2004.

TEXAS STATUTES AND CODES ANNOTATED BY LEXISNEXIS(R)

*** THIS DOCUMENT IS CURRENT THROUGH THE 2005 2ND CALLED SESSION ***
*** Annotations current through May 26, 2006 ***

BUSINESS AND COMMERCE CODE
TITLE 2. COMPETITION AND TRADE PRACTICES
CHAPTER 17. DECEPTIVE TRADE PRACTICES
SUBCHAPTER E. DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Bus. & Com. Code § 17.46* (2005)

§ 17.46. Deceptive Trade Practices Unlawful

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

(b) Except as provided in Subsection (d) of this section, the term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts:

(1) passing off goods or services as those of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;

(4) using deceptive representations or designations of geographic origin in connection with goods or services;

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand;

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(8) disparaging the goods, services, or business of another by false or misleading representation of facts;

(9) advertising goods or services with intent not to sell them as

advertised;

(10) advertising goods or services with intent not to supply a reasonable expectable public demand, unless the advertisements disclosed a limitation of quantity;

(11) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions;

(12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(13) knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

(14) misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction;

(15) basing a charge for the repair of any item in whole or in part on a guaranty or warranty instead of on the value of the actual repairs made or work to be performed on the item without stating separately the charges for the work and the charge for the warranty or guaranty, if any;

(16) disconnecting, turning back, or resetting the odometer of any motor vehicle so as to reduce the number of miles indicated on the odometer gauge;

(17) advertising of any sale by fraudulently representing that a person is going out of business;

(18) advertising, selling, or distributing a card which purports to be a prescription drug identification card issued under Section 4151.152, Insurance Code, in accordance with rules adopted by the commissioner of insurance, which offers a discount on the purchase of health care goods or services from a third party provider, and which is not evidence of insurance coverage, unless:

(A) the discount is authorized under an agreement between the seller of the card and the provider of those goods and services or the discount or card is offered to members of the seller;

(B) the seller does not represent that the card provides insurance coverage of any kind; and

(C) the discount is not false, misleading, or deceptive;

(19) using or employing a chain referral sales plan in connection with the sale or offer to sell of goods, merchandise, or anything of value, which uses the sales technique, plan, arrangement, or agreement in which the buyer or prospective buyer is offered the opportunity to purchase merchandise or goods and in connection with the purchase receives the seller's promise or representation that the buyer shall have the right to receive compensation or consideration in any form for

furnishing to the seller the names of other prospective buyers if receipt of the compensation or consideration is contingent upon the occurrence of an event subsequent to the time the buyer purchases the merchandise or goods;

(20) representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve, provided, however, that nothing in this subchapter shall be construed to expand the implied warranty of merchantability as defined in Sections 2.314 through 2.318 and Sections 2A.212 through 2A.216 to involve obligations in excess of those which are appropriate to the goods;

(21) promoting a pyramid promotional scheme, as defined by Section 17.461;

(22) representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced;

(23) filing suit founded upon a written contractual obligation of and signed by the defendant to pay money arising out of or based on a consumer transaction for goods, services, loans, or extensions of credit intended primarily for personal, family, household, or agricultural use in any county other than in the county in which the defendant resides at the time of the commencement of the action or in the county in which the defendant in fact signed the contract; provided, however, that a violation of this subsection shall not occur where it is shown by the person filing such suit he neither knew or had reason to know that the county in which such suit was filed was neither the county in which the defendant resides at the commencement of the suit nor the county in which the defendant in fact signed the contract;

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

(25) using the term "corporation," "incorporated," or an abbreviation of either of those terms in the name of a business entity that is not incorporated under the laws of this state or another jurisdiction;

(26) selling, offering to sell, or illegally promoting an annuity contract under Chapter 22, Acts of the 57th Legislature, 3rd Called Session, 1962 (Article 6228a-5, Vernon's Texas Civil Statutes), with the intent that the annuity contract will be the subject of a salary reduction agreement, as defined by that Act, if the annuity contract is not an eligible qualified investment under that Act; or

(27) taking advantage of a disaster declared by the governor under Chapter 418, Government Code, by:

(A) selling or leasing fuel, food, medicine, or another necessity at an exorbitant or excessive price; or

(B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel, food, medicine, or another necessity.

(c)(1) It is the intent of the legislature that in construing Subsection (a) of this section in suits brought under Section 17.47 of this subchapter the courts to the extent possible will be guided by Subsection (b) of this section and the interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act *[15 U.S.C.A. § 45*(a)(1) ].

(2) In construing this subchapter the court shall not be prohibited from considering relevant and pertinent decisions of courts in other jurisdictions.

(d) For the purposes of the relief authorized in Subdivision (1) of Subsection (a) of Section 17.50 of this subchapter, the term "false, misleading, or deceptive acts or practices" is limited to the acts enumerated in specific subdivisions of Subsection (b) of this section.

**HISTORY:** Stats. 1995 74th Leg. Sess. Chs. 414, 463, effective September 1, 1995; Stats. 2001 77th Leg. Sess. Ch. 962, effective September 1, 2001, Ch. 1229, effective June 1, 2002; Stats. 2003 78th Leg. Sess. Ch. 1276, effective September 1, 2003; Stats. 2005 79th Leg. Sess., Ch. 728 (H.B. 2018), § 11.101, effective Sept. 1, 2005.

**NOTES:**

2005 amendment, corrected the section reference in (b)(18).

LexisNexis (R) Notes:

CASE NOTES

1. To the extent that an employee attempted to recover damages related to lost compensation benefits allegedly caused by an insurer's misrepresentations or deceptive trade practices, the Texas Worker's Compensation Act provided her exclusive means of recovery. However, to the extent that she tried to recover damages that were unrelated to lost compensation caused by the purported misrepresentation and deceptive conduct pursuant to Tex. *Bus. & Com. Code Ann. § 17.46(a)* of the Texas Deceptive Trade Practices Act and Tex. *Ins. Code Ann. § 21.21*, the Worker's Compensation Act was inapplicable, and the employee did not have to exhaust any administrative remedy. *Escajeda v. Cigna Ins. Co., 934 S.W.2d 402, 1996 Tex. App. LEXIS 4467 (Tex. App. Amarillo 1996).*

2. A representative of an estate is not a consumer under Tex. *Bus. & Com. Code Ann. § § 17.46(a), 17.50(a)(1)*, (2), and (3) because such a cause of action did not survive the death of the original consumer. *Lukasik v. San Antonio Blue Haven Pools, 21 S.W.3d 394, 2000 Tex. App. LEXIS 889 (Tex. App. San Antonio 2000).*

3. Substantial misrepresentations rather than puffery by car dealer justified recovery for mental anguish, and car purchaser was a consumer and could recover under the Deceptive Trade Practices-Consumer Protection Act, Tex. *Bus. & Com. Code Ann. § 17.46(b)(5)* and (7), against auto manufacturer. *Milt Ferguson Motor Co. v. Zeretzke, 827 S.W.2d 349, 1991 Tex. App. LEXIS 3279 (Tex. App. San Antonio 1991).*

1 of 1 DOCUMENT

UTAH CODE ANNOTATED
Copyright 2006 by Matthew Bender & Company, Inc. a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THROUGH THE 2006 THIRD SPECIAL SESSION. ***
*** ANNOTATIONS CURRENT THROUGH 2006 UT 27 (5/4/2006); 2006 UT APP 180 (5/4/2006) AND MAY 17, 2006 (FEDERAL CASES). ***

TITLE 13. COMMERCE AND TRADE
CHAPTER 11. CONSUMER SALES PRACTICES

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

*Utah Code Ann. § 13-11-4* (2006)

§ 13-11-4. Deceptive act or practice by supplier

(1) A deceptive act or practice by a supplier in connection with a consumer transaction violates this chapter whether it occurs before, during, or after the transaction.

(2) Without limiting the scope of Subsection (1), a supplier commits a deceptive act or practice if the supplier knowingly or intentionally:

(a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;

(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

(c) indicates that the subject of a consumer transaction is new, or unused, if it is not, or has been used to an extent that is materially different from the fact;

(d) indicates that the subject of a consumer transaction is available to the consumer for a reason that does not exist;

(e) indicates that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;

(f) indicates that the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;

(g) indicates that replacement or repair is needed, if it is not;

(h) indicates that a specific price advantage exists, if it does not;

(i) indicates that the supplier has a sponsorship, approval, or affiliation the supplier does not have;

(j) (i) indicates that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies, or obligations, if the representation is false; or

(ii) fails to honor a warranty or a particular warranty term;

(k) indicates that the consumer will receive a rebate, discount, or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, if receipt of the benefit is contingent on an event occurring after the consumer enters into the transaction;

(l) after receipt of payment for goods or services, fails to ship the goods or furnish the services within the time advertised or otherwise represented or, if no specific time is advertised or represented, fails to ship the goods or furnish the services within 30 days, unless within the applicable time period the supplier provides the buyer with the option to:

(i) cancel the sales agreement and receive a refund of all previous payments to the supplier if the refund is mailed or delivered to the buyer within ten business days after the day on which the seller receives written notification from the buyer of the buyer's intent to cancel the sales agreement and receive the refund; or

(ii) extend the shipping date to a specific date proposed by the supplier;

(m) except as provided in Subsection (3)(b), fails to furnish a notice meeting the requirements of Subsection (3)(a) of the purchaser's right to cancel a direct solicitation sale within three business days of the time of purchase if:

(i) the sale is made other than at the supplier's established place of business pursuant to the supplier's personal contact, whether through mail, electronic mail, facsimile transmission, telephone, or any other form of direct solicitation; and

(ii) the sale price exceeds $ 25;

(n) promotes, offers, or grants participation in a pyramid scheme as defined under Title 76, Chapter 6a, Pyramid Scheme Act;

(o) represents that the funds or property conveyed in response to a charitable solicitation will be donated or used for a particular purpose or will be donated to or used by a particular organization, if the representation is false;

(p) if a consumer indicates the consumer's intention of making a claim for a motor vehicle repair against the consumer's motor vehicle insurance policy:

(i) commences the repair without first giving the consumer oral and written notice of:

(A) the total estimated cost of the repair; and

(B) the total dollar amount the consumer is responsible to pay for the repair, which dollar amount may not exceed the applicable deductible or other copay arrangement in the consumer's insurance policy; or

(ii) requests or collects from a consumer an amount that exceeds the dollar amount a consumer was initially told the consumer was responsible to pay as an insurance deductible or other copay arrangement for a motor vehicle repair under Subsection (2)(p)(i), even if that amount is less than the full amount the motor vehicle insurance policy requires the insured to pay as a deductible or other copay arrangement, unless:

(A) the consumer's insurance company denies that coverage exists for the repair, in which case, the full amount of the repair may be charged and collected from the consumer; or

(B) the consumer misstates, before the repair is commenced, the amount of money the insurance policy requires the consumer to pay as a deductible or other copay arrangement, in which case, the supplier may charge and collect from the consumer an amount that does not exceed the amount the insurance policy requires the consumer to pay as a deductible or other copay arrangement;

(q) includes in any contract, receipt, or other written documentation of a consumer transaction, or any addendum to any contract, receipt, or other written documentation of a consumer transaction, any confession of judgment or any waiver of any of the rights to which a consumer is entitled under this chapter;

(r) charges a consumer for a consumer transaction that has not previously been agreed to by the consumer;

(s) solicits or enters into a consumer transaction with a person who lacks the mental ability to comprehend the nature and consequences of:

(i) the consumer transaction; or

(ii) the person's ability to benefit from the consumer transaction;

(t) solicits for the sale of a product or service by providing a consumer with an unsolicited check or negotiable instrument the presentment or negotiation of which obligates the consumer to purchase a product or service, unless the supplier is:

(i) a depository institution under Section 7-1-103;

(ii) an affiliate of a depository institution; or

(iii) an entity regulated under Title 7, Financial Institutions Act; or

(u) sends an unsolicited mailing to a person that appears to be a billing, statement, or request for payment for a product or service the person has not ordered or used, or that implies that the mailing requests payment for an ongoing product or service the person has not received or requested.

(3) (a) The notice required by Subsection (2)(m) shall:

(i) be a conspicuous statement written in dark bold with at least 12 point type on the first page of the purchase documentation; and

(ii) read as follows: "YOU, THE BUYER, MAY CANCEL THIS CONTRACT AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY (or time period reflecting the supplier's cancellation policy but not less than three business days) AFTER THE DATE OF THE TRANSACTION OR RECEIPT OF THE PRODUCT, WHICHEVER IS LATER".

(b) A supplier is exempt from the requirements of Subsection (2)(m) if the supplier's cancellation policy:

(i) is communicated to the buyer; and

(ii) offers greater rights to the buyer than Subsection (2)(m).

**HISTORY:** L. 1973, ch. 188, § 4; 1983, ch. 55, § 1; 1983, ch. 58, § 5; 1985, ch. 250, § 1; 1987, ch. 105, § 3; 1995, ch. 237, § 1; 1998, ch. 194, § 1; 1999, ch. 21, § 8; 2001, ch. 196, § 1; 2004, ch. 55, § 2; 2005, ch. 18, § 2; 2005, ch. 27, § 1; 2006, ch. 115, § 1.

**NOTES:**

AMENDMENT NOTES. --The 2001 amendment, effective April 30, 2001, added Subsections (2)(q) and (r); in Subsection (2)(m), substituted "personal contact, whether through mail, electronic mail, facsimile transmission, telephone, or any other form of direct solicitation" for "mail, telephone, or personal contact"; and made related changes.

The 2004 amendment, effective March 15, 2004, added Subsection (2)(s) and made related changes.

The 2005 amendment by ch. 18, effective March 8, 2005, added Subsection (2)(j)(ii) and made related changes; subdivided Subsection (2)(l) and made a stylistic change; subdivided Subsection (2)(m), adding the exception to the beginning and the reference to Subsection (3)(a) and moving the cancellation policy information from Subsection (2)(m)(ii) to Subsection (3); and made stylistic changes.

The 2005 amendment by ch. 27, effective May 2, 2005, added Subsection (2)(t) and made related and stylistic changes.

The 2006 amendment, effective May 1, 2006, added Subsection (2)(u).

CROSS-REFERENCES. --Identity fraud, criminal provisions, § 76-6-1101 et seq.

NOTES TO DECISIONS

ANALYSIS

Cause of action.
-- Misrepresentation of warranty.
Transactions with other suppliers.
Cited.

CAUSE OF ACTION.

-- MISREPRESENTATION OF WARRANTY.

Claim that roof shingle manufacturer, through its literature or agent, made an express warranty to homeowner and later tried to disclaim or ignore that warranty and supplant it with a limited written warranty stated a cause for relief under Subsection (2)(j). *State ex rel. Division of Consumer Protection v. GAF Corp., 760 P.2d 310 (Utah 1988).*

*9 V.S.A. § 2453*

VERMONT STATUTES ANNOTATED
Copyright© 2004 by LEGISLATIVE COUNCIL OF THE GENERAL ASSEMBLY
FOR THE STATE OF VERMONT

*** STATUTES CURRENT THROUGH THE 2003 SESSION ***
*** ANNOTATIONS OF DECISIONS FROM THE VERMONT SUPREME COURT
THROUGH DECEMBER 24, 2002 (174 VT. REPORTS) ***

TITLE NINE. COMMERCE AND TRADE
PART 3. SALES, ASSIGNMENTS AND SECURED TRANSACTIONS
CHAPTER 63. CONSUMER FRAUD
SUBCHAPTER 1. GENERAL PROVISIONS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

9 V.S.A. § 2453 (2003)

§ 2453. Practices prohibited; antitrust and consumer fraud

(a) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.

(b) It is the intent of the legislature that in construing subsection (a) of this section, the courts of this state will be guided by the construction of similar terms contained in section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States.

(c) The attorney general shall make rules and regulations, when necessary and proper to carry out the purposes of this chapter, relating to unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce. The rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the federal courts interpreting the Federal Trade Commission Act.

(d) Violation of a rule or regulation as made by the attorney general is prima facie proof of the commission of an unfair or deceptive act in commerce.

(e) The provisions of subsections (a), (c) and (d) of this section shall also be applicable to real estate transactions.

Service: Get by LEXSTAT®
Citation: vt stat tit 9 @2453
View: Custom
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:15 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

CODE OF VIRGINIA
Copyright (c) 2006 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved

*** CURRENT THROUGH THE 2006 REGULAR SESSION, Acts 2006, cc. 1 to 947 ***
*** ANNOTATIONS CURRENT THROUGH APRIL 1, 2006 ***

TITLE 59.1. TRADE AND COMMERCE
CHAPTER 17. VIRGINIA CONSUMER PROTECTION ACT

**GO TO CODE OF VIRGINIA ARCHIVE DIRECTORY**

*Va. Code Ann. § 59.1-200* (2006)

§ 59.1-200. Prohibited practices

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

1. Misrepresenting goods or services as those of another;

2. Misrepresenting the source, sponsorship, approval, or certification of goods or services;

3. Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another;

4. Misrepresenting geographic origin in connection with goods or services;

5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

7. Advertising or offering for sale goods that are used, secondhand, repossessed, defective, blemished, deteriorated, or reconditioned, or that are "seconds," irregulars, imperfects, or "not first class," without clearly and unequivocally indicating in the advertisement or offer for sale that the goods are used, secondhand, repossessed, defective, blemished, deteriorated, reconditioned, or are "seconds," irregulars, imperfects or "not first class";

8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised.

In any action brought under this subdivision, the refusal by any person, or any employee, agent, or servant thereof, to sell any goods or services advertised or offered for sale at the price or upon the terms advertised or offered, shall be prima facie evidence of a violation of this subdivision. This paragraph shall not apply when it is clearly and conspicuously stated in the advertisement or offer by which such goods or services are advertised or offered for sale, that the supplier or offeror has a limited quantity or amount of such goods or services for sale, and the supplier or offeror at the time of such advertisement or offer did in fact have or reasonably expected to have at least such quantity or amount for sale;

9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

10. Misrepresenting that repairs, alterations, modifications, or services have been performed or parts installed;

11. Misrepresenting by the use of any written or documentary material that appears to be an invoice or bill for merchandise or services previously ordered;

12. Notwithstanding any other provision of law, using in any manner the words "wholesale," "wholesaler," "factory," or "manufacturer" in the supplier's name, or to describe the nature of the supplier's business, unless the supplier is actually engaged primarily in selling at wholesale or in manufacturing the goods or services advertised or offered for sale;

13. Using in any contract or lease any liquidated damage clause, penalty clause, or waiver of defense, or attempting to collect any liquidated damages or penalties under any clause, waiver, damages, or penalties that are void or unenforceable under any otherwise applicable laws of the Commonwealth, or under federal statutes or regulations;

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction;

15. Violating any provision of *§ 3.1-796.78*, *3.1-796.79*, or *3.1-796.82*, relating to the sale of certain animals by pet dealers which is described in such sections, is a violation of this chapter;

16. Failing to disclose all conditions, charges, or fees relating to:

a. The return of goods for refund, exchange, or credit. Such disclosure shall be by means of a sign attached to the goods, or placed in a conspicuous public area of the premises of the supplier, so as to be readily noticeable and readable by the person obtaining the goods from the supplier. If the supplier does not permit a refund, exchange, or credit for return, he shall so state on a similar sign. The provisions of this subdivision shall not apply to any retail merchant who has a policy of providing, for a period of not less than 20 days after date of purchase, a cash refund or credit to the purchaser's credit card account for the return of defective, unused, or undamaged merchandise upon presentation of proof of purchase. In the case of merchandise paid for by check, the purchase shall be treated as a cash purchase and any refund may be delayed for a period of 10 banking days to allow for the check to clear. This subdivision does not apply to sale merchandise that is obviously distressed, out of date, post season, or otherwise reduced for clearance; nor does this subdivision apply to special order purchases where the purchaser has requested the supplier to order merchandise of a specific or unusual size, color, or brand not ordinarily carried in the store or the store's catalog; nor shall this subdivision apply in connection with a transaction for the sale or lease of motor vehicles, farm tractors, or motorcycles as defined in *§ 46.2-100*;

b. A layaway agreement. Such disclosure shall be furnished to the consumer (i) in writing at the time of the layaway agreement, or (ii) by means of a sign placed in a conspicuous public area of the premises of the supplier, so as to be readily noticeable and readable by the consumer, or (iii) on the bill of sale. Disclosure shall include the conditions, charges, or fees in the event that a consumer breaches the agreement;

16a. Failing to provide written notice to a consumer of an existing open-end credit balance in excess of $ 5 (i) on an account maintained by the supplier and (ii) resulting from such consumer's overpayment on such account. Suppliers shall give consumers written notice of such credit balances within 60 days of receiving overpayments. If the credit balance information is incorporated into statements of account furnished consumers by suppliers within such 60-day period, no separate or additional notice is required;

17. If a supplier enters into a written agreement with a consumer to resolve a dispute that arises in connection with a consumer transaction, failing to adhere to the terms and conditions of such an agreement;

18. Violating any provision of the Virginia Health Spa Act, Chapter 24 (*§ 59.1-294* et seq.) of this title;

19. Violating any provision of the Virginia Home Solicitation Sales Act, Chapter 2.1 (*§ 59.1-21.1* et seq.) of this title;

20. Violating any provision of the Automobile Repair Facilities Act, Chapter 17.1 (*§ 59.1-207.1* et seq.) of this title;

21. Violating any provision of the Virginia Lease-Purchase Agreement Act, Chapter 17.4 (*§ 59.1-207.17* et seq.) of this title;

22. Violating any provision of the Prizes and Gifts Act, Chapter 31 (*§ 59.1-415* et seq.) of this title;

23. Violating any provision of the Virginia Public Telephone Information Act, Chapter 32 (*§ 59.1-424* et seq.) of this title;

24. Violating any provision of *§ 54.1-1505*;

25. Violating any provision of the Motor Vehicle Manufacturers' Warranty Adjustment Act, Chapter 17.6 (*§ 59.1-207.34* et seq.) of this title;

26. Violating any provision of *§ 3.1-949.1*, relating to the pricing of merchandise;

27. Violating any provision of the Pay-Per-Call Services Act, Chapter 33 (*§ 59.1-429* et seq.) of this title;

28. Violating any provision of the Extended Service Contract Act, Chapter 34 (*§ 59.1-435* et seq.) of this title;

29. Violating any provision of the Virginia Membership Camping Act, Chapter 25 (*§ 59.1-311* et seq.) of this title;

30. Violating any provision of the Comparison Price Advertising Act, Chapter 17.7 (*§ 59.1-207.40* et seq.) of this title;

31. Violating any provision of the Virginia Travel Club Act, Chapter 36 (*§ 59.1-445* et seq.) of this title;

32. Violating any provision of *§ § 46.2-1231* and *46.2-1233.1*;

33. Violating any provision of Chapter 40 (*§ 54.1-4000* et seq.) of Title 54.1;

34. Violating any provision of Chapter 10.1 (*§ 58.1-1031* et seq.) of Title 58.1;

35. Using the consumer's social security number as the consumer's account number with the supplier, if the consumer has requested in writing that the supplier use an alternate number not associated with the consumer's social security number;

36. Violating any provision of Chapter 18 (*§ 6.1-444* et seq.) of Title 6.1;

37. Violating any provision of *§ 8.01-40.2*;

38. Violating any provision of Article 7 (*§ 32.1-212* et seq.) of Chapter 6 of Title 32.1;

39. Violating any provision of Chapter 34.1 (*§ 59.1-441.1* et seq.) of this title;

40. Violating any provision of Chapter 10.2 (*§ 6.1-363.2* et seq.) of Title 6.1;

41. Violating any provision of the Virginia Post-Disaster Anti-Price Gouging Act, Chapter 46 (*§ 59.1-525* et seq.) of this title;

42. Violating any provision of Chapter 47 (*§ 59.1-530* et seq.) of this title;

43. Violating any provision of *§ 59.1-443.2*;

44. Violating any provision of Chapter 48 (*§ 59.1-533* et seq.) of this title; and

45. *(Effective January 1, 2007)* Violating any provision of Chapter 20 (§ 6.1-474 et seq.) of Title 6.1.

B. Nothing in this section shall be construed to invalidate or make unenforceable any contract or lease solely by reason of the failure of such contract or lease to comply with any other law of the Commonwealth or any federal statute or regulation, to the extent such other law, statute, or regulation provides that a violation of such law, statute, or regulation shall not invalidate or make unenforceable such contract or lease.

**HISTORY:** 1977, c. 635; 1979, c. 304; 1981, c. 205; 1983, c. 173; 1986, c. 432; 1987, cc. 462 to 464; 1988, cc. 24, 534; 1989, cc. 689, 703; 1990, c. 584; 1991, cc. 300, 605, 608, 630, 654; 1992, cc. 278, 545, 768; 1993, cc. 455, 760; 1994, cc. 261, 400, 655; 1995, c. 10; 1998, c. 848; 2000, cc. 880, 901; 2002, cc. 217, 897; 2003, cc. 800, 1003; 2004, cc. 784, 790, 798, 817; 2005, cc. 269, 303, 640, 861; 2006, c. 399.

**NOTES:**

CROSS REFERENCES. --For provision that violations of Article 7 (*§ § 32.1-212* et seq.) of Chapter 6 of Title 32.1, relating to bedding and upholstered furniture, constitute a prohibited practice under *§ 59.1-200* and are subject to the enforcement provisions of *§ § 59.1-196* et seq., see *§ 32.1-226*.

EDITOR'S NOTE. --Acts 2002, c. 897, cl. 2, provides: "That the provisions of this act may result in a net increase in periods of imprisonment or commitment. Pursuant to § 30-19.1:4, the estimated amount of the necessary appropriation

*Rev. Code Wash. (ARCW) § 19.86.020*

ANNOTATED REVISED CODE OF WASHINGTON
Copyright © 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** STATUTES CURRENT THROUGH 2004 C 1 ***
*** ANNOTATIONS CURRENT THROUGH MAY 25, 2004 ***

TITLE 19. BUSINESS REGULATIONS -- MISCELLANEOUS
CHAPTER 19.86. UNFAIR BUSINESS PRACTICES -- CONSUMER PROTECTION

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Rev. Code Wash. (ARCW) § 19.86.020 (2004)

§ 19.86.020. Unfair competition, practices, declared unlawful

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Service: **Get by LEXSTAT®**
Citation: **rcw 19.86.020**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:17 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*W. Va. Code § 46A-6-104*

WEST VIRGINIA CODE ANNOTATED
Copyright (c) 2004 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** (CURRENT THROUGH 2003 SECOND EXTRAORDINARY SESSION) ***
*** ANNOTATIONS CURRENT THROUGH DECEMBER 22, 2003 ***

CHAPTER 46A. WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
ARTICLE 6. GENERAL CONSUMER PROTECTION

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

W. Va. Code § 46A-6-104 (2003)

§ 46A-6-104. Unlawful acts or practices

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Service: **Get by LEXSTAT®**
Citation: **w va code 46A-6-104**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:18 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Wis. Stat. § 100.18*

LEXISNEXIS (R) WISCONSIN ANNOTATED STATUTES

*** THIS DOCUMENT IS CURRENT THROUGH ALL 2003 LEGISLATION ***
*** JUNE 2004 ANNOTATION SERVICE ***

AGRICULTURE; FOODS AND DRUGS; MARKETS
CHAPTER 100. MARKETING; TRADE PRACTICES

**GO TO THE CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Wis. Stat. § 100.18 (2003)

**STATUS: CONSULT SLIP LAWS CITED BELOW FOR RECENT CHANGES TO THIS DOCUMENT**
LEXSEE 2003 Wis. ALS 326 -- See section 62.

100.18. Fraudulent representations.

(1) No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

(2)

(a) In advertising or otherwise representing the sale or furnishing of any property or services combined with or conditioned on the purchase of any other property or services described in such advertisement or other representation, it is deceptive for a retailer to:

1. Fail to state the price or amount which must be paid for the property or services included in such sale, along with any other condition to the receipt of such property or services, if the advertisement or representation does not refer to the price of the property or services as the "regular price". The price or amount which must be paid shall be set forth clearly, conspicuously and in such manner that the total price or amount to be paid may be readily ascertained.

2. Sell the property or services at more than the regular price or fail to state any other condition to the receipt of the property or services included in the sale, if the advertisement or representation refers to the price of the property or services as the "regular price".

3. Mark up the regular price of the property or services which must be purchased.

4. Substitute property or services of inferior value or quality for the property or services which must be purchased.

(b) This subsection does not apply to advertisements or representations concerning custom-made property.

(c) In this subsection, "regular price" means the lowest price for the same quantity and quality of product or the same services, at which the seller or advertiser of the product or services openly and actively sold the product or services in the geographic trade area of the advertisement or representation during the sellers or advertisers most recent and regular 30-day course of business.

(3) It shall be deemed deceptive advertising, within the meaning of this section, for any person, firm or corporation, engaged in the business of buying or selling new or secondhand furs, wearing apparel, jewelry, furniture, pianos, phonographs, or other musical instruments, motor vehicles, stocks, or generally any form of property, real, personal or mixed, or in the business of furnishing any kind of service or investment, to advertise such articles, property or service for sale or purchase, in any manner indicating that the sale or purchase is being made by a private party or householder not engaged in such business. And every such firm, corporation or association, engaged in any such business, in advertising goods, property or service for sale or purchase, shall affirmatively and unmistakably indicate and state that the seller or purchaser is a business concern and not a private party.

(3m) It is deceptive advertising to represent the retailing of merchandise to be a selling-out or closing-out sale if the merchandise is not of a bankrupt, insolvent, assignee, liquidator, adjuster, trustee, personal representative, receiver, wholesaler, jobber, manufacturer, or of any business that is in liquidation, that is closing out, closing, or disposing of its stock, that has lost its lease or has been or is being forced out of business, or that is disposing of stock on hand because of damage by fire, water, or smoke. This subsection does not apply to any "closing-out sale" of seasonable merchandise or any merchandise having a designated model year if the person conducting the sale is continuing in business.

(5) Any person, firm, corporation or association engaged in any business mentioned in sub. (3), or in any other kind of business, whether conducting such business in a store, business block, residence or other building, shall at all times keep a conspicuous sign posted on the outside of his or her establishment and another conspicuous sign in the salesroom, which sign shall clearly state the name of the association, corporation or individual who actually owns said merchandise, property or service which is being offered to the public and not the name of any other person; provided, however, that the exterior sign shall not be required where the seller has no control over the exterior of the premises where such business is conducted.

(6) All advertising which shows or in any manner relates to the price at which motor fuel is offered for sale at retail, except multiple gallon computers attached to or forming a part of any dispensing equipment shall show only (a) the single gallon unit price including all applicable taxes in one amount or (b) the single gallon product price, the taxes applicable thereto, and the total single gallon unit price including all applicable taxes. In any such advertising, all numerals which represent either price or taxes shall be of the same type and size except that fractions of a cent shall be shown in figures one-half the height, width and prominence of the whole numbers.

(8) Every wholesaler and every other person selling or distributing motor fuel in this state shall keep posted in a conspicuous place, most accessible to the public at his or her place of business, and on every pump from which delivery is made directly into the fuel tank attached to a motor vehicle, a placard showing the net selling price per gallon of all grades of motor fuel and the amount of all taxes per gallon thereon. On pumps or other dispensing equipment from which motor fuel is sold and delivered directly into fuel supply tanks attached to motor vehicles, such posting shall be in figures not less than one inch high, except that no such placard shall be required on a computer pump whereon the total net selling price per gallon including all taxes is legibly shown on its face. Except for sales to drivers of motor vehicles used by physically disabled persons under s. 100.51 (5), all sales shall be made at the posted price. Delivery slips shall also show the net selling price per gallon of all grades of motor fuel and the amount of all taxes per gallon thereon. If the wholesaler or person has more than one place of business in this state, the wholesaler or person shall post that placard at all of his or her places of business. All

prices posted shall remain in effect for at least 24 hours after they are posted. It shall be considered deceptive advertising to advertise or represent in any manner the price of motor fuel offered for sale at retail to be less than the price so posted on each pump.

(9)

(a) It is deemed deceptive advertising, within the meaning of this section, for any person or any agent or employee thereof to make, publish, disseminate, circulate or place before the public in this state in a newspaper or other publication or in the form of book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label or over any radio or television station or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to the purchase, sale, hire, use or lease of real estate, merchandise, securities, service or employment or to the terms or conditions thereof which advertisement, announcement, statement or representation is part of a plan or scheme the purpose or effect of which is not to sell, purchase, hire, use or lease the real estate, merchandise, securities, service or employment as advertised.

(b) This section does not apply to the owner, publisher, printer, agent or employee of a newspaper or other publication, periodical or circular, or of a radio or television station, who in good faith and without knowledge of the falsity or deceptive character thereof, publishes, causes to be published or takes part in the publication of such advertisement.

(9m) It is deemed deceptive advertising to misrepresent the nature of a local energy resource system under s. 101.175

(10)

(a) It is deceptive to misrepresent the nature of any business by use of the words manufacturer, factory, mill, importer, wholesaler or words of similar meaning, in a corporate or trade name or otherwise.

(b) It is deceptive to represent the price of any merchandise as a manufacturers or wholesalers price, or a price equal thereto, unless the price is not more than the price which retailers regularly pay for the merchandise. The effective date of this subsection shall be January 1, 1962.

(10m) It is deceptive or misleading advertising for a person who sells new motor vehicles to compare new motor vehicle selling prices, including the offered prices or the actual sale prices, to the manufacturers suggested retail price for that vehicle unless it is clearly and conspicuously disclosed that the latter price is a manufacturers suggested retail price and may not represent actual sale prices.

(10r) It is deceptive and misleading for a person who is conducting business in a community or region from a location outside that community or region to use the name of the community or region, or other description of the community or region, in the corporate or trade name of the business or in any other information that is published if the use of the name or description of the location creates the misrepresentation that the business is located in the community or region.

(11)

(a) The department of agriculture, trade and consumer protection shall enforce this section. Actions to enjoin violation of this section or any regulations thereunder may be commenced and prosecuted by the department in the name of the state in any court having equity jurisdiction. This remedy is not exclusive.

(b)

2. Any person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees, except that no attorney fees may be recovered from a person licensed under ch. 452 while that person is engaged in real estate practice, as defined in s. 452.01 (6)

Any person suffering pecuniary loss because of a violation by any other person of any injunction issued under this section may sue for damages therefor in any court of competent jurisdiction and shall recover twice the amount of such pecuniary loss, together with costs, including reasonable attorney fees, except that no attorney fees may be recovered from a person licensed under ch. 452 while that person is engaged in real estate practice, as defined in s. 452.01 (6)

3. No action may be commenced under this section more than 3 years after the occurrence of the unlawful act or practice which is the subject of the action. No injunction may be issued under this section which would conflict with general or special orders of the department or any statute, rule or regulation of the United States or of this state.

(c)

1. Whenever the department has reason to believe that a person is in possession, custody or control of any information or documentary material relevant to the enforcement of this section it may require that person to submit a statement or report, under oath or otherwise, as to the facts and circumstances concerning any activity in the course of trade or commerce; examine under oath that person with respect to any activity in the course of trade or commerce; and execute in writing and cause to be served upon such person a civil investigative demand requiring the person to produce any relevant documentary material for inspection and copying.

2. The department, in exercising powers under this subsection, may issue subpoenas, administer oaths and conduct hearings to aid in any investigation.

3. Service of any notice by the department requiring a person to file a statement or report, or service of a subpoena upon a person, or service of a civil investigative demand shall be made in compliance with the rules of civil procedure of this state.

4. If a person fails to file any statement or report, or fails to comply with any civil investigative demand, or fails to obey any subpoena issued by the department, such person may be coerced as provided in s. 885.12, except that no person shall be required to furnish any testimony or evidence under this subsection which might tend to incriminate the person.

(d) The department or the department of justice, after consulting with the department, or any district attorney, upon informing the department, may commence an action in circuit court in the name of the state to restrain by temporary or permanent injunction any violation of this section. The court may in its discretion, prior to entry of final judgment, make such orders or judgments as may be necessary to restore to any person any pecuniary loss suffered because of the acts or practices involved in the action, provided proof thereof is submitted to the satisfaction of the court. The department and the department of justice may subpoena persons and require the production of books and other documents, and the department of justice may request the department to exercise its authority under par. (c) to aid in the investigation of alleged violations of this section.

(e) In lieu of instituting or continuing an action pursuant to this section, the department or the department of justice may accept a written assurance of discontinuance of any act or practice alleged to be a violation of this section from the person who has engaged in such act or practice. The acceptance of such assurance by either the department or the department of justice shall be deemed acceptance by the other state officials enumerated in par. (d) if the terms of the assurance so provide. An assurance entered into pursuant to this section shall not be considered evidence of a violation of this section, provided that violation of such an assurance shall be treated as a violation of this section, and shall be subjected to all the penalties and remedies provided therefor.

(12)

(a) This section does not apply to the insurance business.

(b) This section does not apply to a person licensed as a broker or salesperson under s. 452.09 while that person is engaged in real estate practice, as defined in s. 452.01 (6), unless that person has directly made, published, disseminated, circulated or placed before the public an assertion, representation or statement of fact with the knowledge that the assertion, representation or statement of fact is untrue, deceptive or misleading.

Service: **Get by LEXSTAT®**
Citation: **wis stats 100.18**
View: **Custom**
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:18 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*Wyo. Stat. § 40-12-105*

WYOMING STATUTES ANNOTATED
Copyright © 2004 by The State of Wyoming
All rights reserved.

* THIS DOCUMENT REFLECTS CHANGES RECEIVED THROUGH THE 2003 REGULAR SESSION *
* ANNOTATIONS CURRENT THROUGH DECEMBER 12, 2003 *

TITLE 40. TRADE AND COMMERCE
CHAPTER 12. CONSUMER PROTECTION
ARTICLE 1. IN GENERAL

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

Wyo. Stat. § 40-12-105 (2003)

§ 40-12-105. Unlawful practices

(a) A person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly:

(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories or uses it does not have;

(ii) Represents that he has a sponsorship, approval or affiliation he does not have;

(iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not;

(iv) Represents that merchandise is available to the consumer for a reason that does not exist;

(v) Represents that merchandise has been supplied in accordance with a previous representation, if it has not; except that this subsection does not apply to merchandise supplied to the recipient by mistake or merchandise of equal or greater value supplied as a reasonably equivalent substitute for unavailable merchandise previously ordered by the recipient;

(vi) Represents that replacement or repair is needed, if it is not;

(vii) Makes false or misleading statements of fact concerning the price of merchandise or the reason for, existence of, or amounts of a price reduction;

(viii) Represents that a consumer transaction involves a warranty, a disclaimer of warranties, particular warranty terms, or other rights, remedies or obligations if the representation is false;

(ix) Represents that the consumer will receive a rebate, discount or other benefit as an inducement for entering into a consumer transaction in return for giving the supplier the names of prospective consumers or otherwise helping the supplier to enter into other consumer transactions, if receipt of the benefit is contingent upon an event occurring after the consumer enters into the transaction;

(x) Advertises merchandise with intent not to sell it as advertised;

(xi) Advertises merchandise with intent not to supply reasonably expectable public demand, unless the advertisement discloses the limitation;

(xii) Represents that merchandise is original or new if he knows that it is deteriorated, damaged, altered, reconditioned, reclaimed, used or secondhand. For purposes of this subsection, the terms "original" or "new" include merchandise previously sold but returned within a reasonable time by the consumer for full credit if such merchandise is not damaged or deteriorated;

(xiii) Advertises under the guise of obtaining sales personnel when in fact the purpose of the advertisement is to sell merchandise to the sales personnel applicants;

(xiv) Employs "bait and switch" advertising which consists of an offer to sell merchandise which the seller does not intend to sell, which advertising is accompanied by one (1) or more of the following practices:

(A) Refusal to show the merchandise advertised;

(B) False disparagement in any respect of the advertised merchandise or the terms of sale;

(C) Requiring undisclosed tie-in sales or other undisclosed conditions to be met prior to selling the advertised merchandise;

(D) Knowingly showing or demonstrating defective merchandise which is unusable or practicable for the purpose set forth in the advertisement;

(E) Accepting a deposit for the merchandise and subsequently charging the buyer for a higher priced item without his consent; or

(F) Willful failure to either make deliveries of the merchandise or to make a refund therefor.

(xv) Engages in unfair or deceptive acts or practices.

Service: Get by LEXSTAT®
Citation: wyo stat 40-12-105
View: Custom
Segments: Text
Date/Time: Thursday, September 2, 2004 - 9:19 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT 54

THE FOLLOWING FILE IS NOT AN OFFICIAL TRANSCRIPT. IT IS INTENDED ONLY TO AID IN CASE PREPARATION. THE FINAL TRANSCRIPT WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE.

FROM THIS ROUGH DRAFT TRANSLATION, YOU MAY SEE ERRORS AND OMISSIONS. THIS IS NOT AN UNUSUAL PROCESS, AND THESE ERRORS AND OMISSIONS WILL BE CORRECTED ON THE FINAL TRANSCRIPT.

Rule 30(b)(6) Deposition of Hewitt Associates
through MATTHEW AARON GIBBS
October 27, 2006

THE VIDEOGRAPHER: My name is Scot Ziarko, in association with A-1 Legal Video and my address is Lockport, Illinois. This deposition is taking place on October 27th, 2006. The time is now 9:27 a.m.

The location of this deposition is 200 North Columbus, Chicago, Illinois. This deposition is taken in the matter of New England Carpenters Health Benefits Fund, et al., versus First Databank, Inc., et al., Case 1:05-CV-11148-PBS.

The deponent's name is Matthew Gibbs. This

Q. So it's your understanding that they --

A. My understanding, yeah, it's a corporate relations standard response, correct.

Q. Have you reviewed the complaint in this case at all?

A. Not to any detail, no.

Q. Have you seen a copy of it?

A. I don't know what I -- I think all that I've looked at is the results of the settlement, which I think contained some of the complaint, but I think I -- I'm very sure I didn't read into all of that.

Q. That's understandable. It's quite lengthy.

Allow me just to represent to you for the record that that complaint alleges that First Databank and McKesson engaged in a conspiracy to increase the markup between WAC and AWP from 20 to 25 percent. We'll just take that as an assumption.

Were you aware prior to seeing the Wall Street Journal article or prior to seeing the materials associated with the FDB settlement that there had been such a conspiracy?

A. No.

Q. Were you aware that in sometime in late 2001 or 2002 that there had been an increase in WAC-to-AWP markups for a variety of branded retail drugs from 20 to 25 percent?

A. No.

Q. Prior to seeing the article in the Wall Street Journal, did any of your clients contact you because they were aware of an increase in the WAC-to-AWP markup from 20 to 25 percent?

A. Prior to?

Q. Yes.

A. No clients contacted me.

Q. So no clients contacted you in between 2001 and 2002 asking you to renegotiate their PBM contracts on the basis of the increase in markup between WAC and AWP?

A. That's correct, no clients contacted me.

Q. During your employment at Hewitt, have you ever seen a PBM contract that did not provide for ingredient cost based on AWP reimbursement?

MR. GOLDMAN: Can I here that again?

(The record was read by the reporter.)

BY THE WITNESS:

A. That did not provide -- so it was an other

cost basis besides AWP?

BY MS. CONNOLLY:

Q. Right, exactly.

A. I have not seen one as of yet, no.

Q. Did you see one while you were employed at Walgreen's Health Initiative that was not AWP based?

A. I never saw one.

Q. You heard of one?

A. I heard that they existed.

Q. Do you recall what time period that would have been?

A. I -- sometime between 2000 and 2004.

Q. Okay. Do you recall the reimbursement basis that someone told you existed in that contract?

A. I had heard it was a reference base price contract.

Q. Okay. Has any of your Hewitt clients ever asked you to track AWP for either an individual drug or a class of drugs?

A. No.

Q. Have they ever asked you to track the WAC-to-AWP spread for a specific drug or a class of drugs?

A. No.

MS. CONNOLLY: I have nothing further. Thank you.

FURTHER EXAMINATION

BY MR. GOLDMAN:

Q. You say you read about the complaint but didn't have a copy of it?

A. I have the PDF, and I don't know if that what I have -- it's the settlement which has a portion of the -- I don't know if it's the full complaint. It probably isn't, because that's probably 10 boxes

# EXHIBIT 55

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, ET AL.,

Plaintiffs,

vs.

FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,

Defendants.

CASE NO. 1:05-CV-11148

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
DONNY DOWLEN
Taken on Behalf of the Defendants
October 19, 2006

A. It's increased.
**Q. That --**
A. The percentage.
**Q. The discount factor?**
A. From -- it seems like I started, it was AWP minus 10 percent, and it's increased to, like, 15 or 16 percent.
**Q. In 2000, do you recall what the range was?**
A. I do not.
**Q. How frequently does your company put out bids to PBMs for brand name drug pricing and service -- related services?**
A. Not very often. Again, we know -- we deal with enough PBMs to know what pricing is available, and so there's very little -- in all honesty, there's very little difference in cost -- in pricing from the PBMs. And when one calls me trying to sell their -- you know, trying to get us to look at their -- their company, you know, and I -- in all honesty, I tell them, there's not very much difference in the pricing, and the biggest difference to me is the service that you provide to our clients.
**Q. Is the -- is there any variation in reimbursement rates for brand name drugs among**

**different brand name drugs?**
MS. CONNOLLY: Objection to form.
THE WITNESS: I don't know.
BY MR. KAUFMANN:
**Q. Sure. Does -- does one set of brand name drugs command AWP minus 12 and another AWP minus 15, for example?**
A. Well, again, all I know is the contracted price that we get for the drugs -- there's only one contracted price.
**Q. Okay.**
A. Only one AWP that's --
**Q. Have you ever worked with PBMs that provide different contracted prices for different brand name drugs?**
A. I have not.
**Q. Are you aware of that existing in the industry?**
A. I do not know that.
**Q. Okay. Do any of your clients have generic caps that they use?**
A. No.
**Q. What do you understand generic caps to be?**
A. I'm not sure what that implies. I presume you're talking about a limitation dollar-wise on

generic -- I'm not sure what you mean by that.
**Q. Okay. We'll come back to that.**
A. Okay.
**Q. If a generic equivalent -- let me rephrase that.**
**If a chemically equivalent generic is available and a pharmacist writes a prescription for -- well, I'll try it one more time.**
**If a physician writes a prescription for a generic drug and there's a chemically equivalent generic available, do your clients pay reimbursements ever just on the generic rate?**
MS. CONNOLLY: Objection to form.
THE WITNESS: If the doctor writes a prescription for a brand medicine and there's a generic equivalent available, no. I think that's what you were trying to ask. Yeah.
BY MR. KAUFMANN:
**Q. Other than having a different copay for generics versus brand, is there anything that the Pirelli Armstrong trust does to encourage its members to use equivalent generics?**
A. No.
**Q. Other than copays, are you aware of any other mechanisms to allocate costs between third**

**party payers and consumers?**
MS. CONNOLLY: Objection to form.
THE WITNESS: Other than copays?
BY MR. KAUFMANN:
**Q. Yes, sir.**
A. No. That's -- that's the primary structure we have.
**Q. What do you understand AWP to be?**
A. Average wholesale price.
**Q. And how is it you understand it's determined?**
A. In all honesty, I'm not sure how it's determined.
**Q. Are you aware that in the litigation that you're testifying in today that there's an allegation that there was a scheme to increase average wholesale prices?**
A. That's my understanding.
**Q. Do you have any knowledge of facts that would suggest such a scheming actually existed?**
A. I do not.
**Q. Do you know at what rate pharmacies purchase drugs?**
A. I do not.
**Q. Are you familiar with the term WAC, W-A-C?**

those -- in that report. I didn't have specific information at the time. But historically I know what type of information is in this report.

BY MS. CONNOLLY:

**Q. Okay. Thank you.**

**You previously testified in response to one of Mr. Kaufmann's questions that you believe Southern Benefits to be a unique company because you work with Taft-Hartley funds. Do you re- — recall that testimony?**

A. I do.

**Q. To your knowledge and based on your experience, do all Taft-Hartley funds reimburse for pharmaceutical purchases based on AWP?**

A. To my knowledge, yes.

**Q. Also in response to one of Mr. Kaufmann's questions, you -- you testified that when you're looking at analysis of drug usage that you couldn't track trends because they didn't track pricing for specific drugs or specific classes of drugs. Do you recall that testimony?**

A. Uh-huh.

MR. KAUFMANN: Object to the form of the question.

BY MS. CONNOLLY:

**Q. You also told Mr. Kaufmann that you were not aware that anyone had done that type of analysis unless a PBM had done that analysis. Do you recall that testimony?**

A. Right.

MR. KAUFMANN: Object to the form of the question.

BY MS. CONNOLLY:

**Q. Have you ever seen any type of analysis that fits that description, that covers pricing on a per drug or per drug class basis that was performed by a PBM?**

A. I have not.

**Q. Do you regularly receive any report that would fit that description in the course of working at Southern Benefits?**

A. I do not.

**Q. You previously told Mr. Kaufmann that it was your guess that AWP was used as a benchmark because it was an industrywide standard used by PBMs. Do you recall that testimony?**

A. Yes.

MR. KAUFMANN: Object to the form of the question.

BY MS. CONNOLLY:

**Q. Have you ever seen a PBM contract that did not provide for AWP reimbursement?**

MR. KAUFMANN: Object to the form of the question.

THE WITNESS: I have not.

BY MS. CONNOLLY:

**Q. You were -- in the context of discussing Exhibit 9 with Mr. Kaufmann, you went through a variety of factors that the actuary had recommended to the fund, and yet the board had declined not to accept. Do you recall that testimony?**

A. Right.

**Q. Has there ever been any cost control method that you thought was appropriate for the Pirelli fund that the board declined to adopt?**

A. No.

**Q. You were also looking at Exhibit 9 -- let me pull that out -- with Mr. Kaufmann, and you were looking at specifically pages 12 and 13 of that report.**

A. Yes.

**Q. Do you recall talking to Mr. Kaufmann about that report?**

A. I do.

**Q. And you told him that this data could be used to better manage the cost of the fund. Do you recall that testimony?**

A. I do.

**Q. Assume for the time being that the allegations in the complaint are correct and that AWP was fraudulently inflated by at least five percent. Had that been the case, could you have seen that AWP inflation in the data that you are looking at in Exhibit 9?**

MR. KAUFMANN: Object to the form of the question.

THE WITNESS: No.

BY MS. CONNOLLY:

**Q. Could you have seen that inflation in any type of data that is made available to you on a regular basis in the capacity of working at Southern Benefits?**

MR. KAUFMANN: Object to the form of the question.

THE WITNESS: No.

BY MS. CONNOLLY:

**Q. You previously testified that you learned about the terms of the FDB settlement today,**

**correct?**
A. I did.
**Q. Who else was present during that conversation with legal counsel?**
A. The three of us and Earl -- Earl Seymour.
**Q. Mr. Kaufmann asked you whether you had learned of the five percent increase in AWP. Do you recall your answer to that testimony?**
MR. KAUFMANN: Object to the form of the question.
THE WITNESS: I recall him asking, yes.
BY MS. CONNOLLY:
**Q. Yes. Do you recall that you testified that you were not aware of the five percent increase in AWP?**
A. Until I learned about it today.
**Q. Right.**
A. Okay.
**Q. To the best of your knowledge, is there any data that is made available to you on a regular basis that could have made you aware of the five percent increase to AWP --**
MR. KAUFMANN: Object --

BY MS. CONNOLLY:
**Q. -- across the board?**
A. No.
MR. KAUFMANN: Object to the form of the question.
THE WITNESS: No.
MS. CONNOLLY: I have no further questions.
MR. KAUFMANN: Okay.

EXAMINATION

BY MR. KAUFMANN:
**Q. I want to follow up on the last series of questions and have you go back and look at -- at -- well, you know what, we don't even need to look at that.**
A. Okay.
**Q. Do you get information from any source that tells you the cost to the plan of any specific drugs that are reimbursed by the plan?**
A. The cost to whom?
**Q. The cost to the plan.**
A. Oh, I get a -- yes, I get a report from the PBM.
**Q. Okay. And so, for example, if we take the No. 1 drug that's listed on Page 13 of Exhibit 9,**

**Lipitor, do you see that? If we look at Lipitor --**
A. Yes.
**Q. -- you get -- you get a report from the PBM that shows the cost per unit of that drug?**
A. I do.
**Q. Okay. And how often do you get that report?**
A. I get that once a month.
**Q. Okay. You get that once a month. You also -- do you get -- if you took that report and you took the cost of that drug per unit, could you plot that on a graph and see the trend in the cost of that drug?**
A. You could.
**Q. Okay. Is that ever something that you've done?**
A. No.
**Q. If you plotted the cost of that drug to the trust on a month-to-month basis, could you see increases and decreases in the cost of that drug to the trust?**
A. Yes.
**Q. And could you see the magnitude of those increases?**

A. Yes.
**Q. Okay. Now, before you testified -- well, let me -- let me rephrase that.**
**At the break, did you have the opportunity to talk to counsel about your testimony?**
A. Yes.
**Q. Did you have an opportunity to talk to counsel about the questions that Ms. Connolly would be asking you on rebuttal?**
MS. CONNOLLY: I'm -- don't answer that. I'm instructing you not to answer.
THE WITNESS: I'll defer to my counsel's recommendation.
MR. KAUFMANN: Okay. I have no further questions.
MS. CONNOLLY: I just have one follow-up question.

EXAMINATION

BY MS. CONNOLLY:
**Q. The type of chart that Mr. Kaufmann was describing charting costs, have you ever done a chart of that type?**
A. No.
**Q. Would you ever have any reason in making recommendations to the fund about their drug costs**

# EXHIBIT 56

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-o-

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, ET AL., : Civil Action No.: 1:05-CV011148-PBS

Plaintiffs,

-v-

FIRST DATABANK, INC., and McKESSON CORPORATION, : Deposition of: H. ERIC CANNON

Defendants,

-o-

Place: TEMPEST REPORTING, INC.
230 South 500 East
Suite 530
Salt Lake City, Utah 84102

Date: October 11, 2006
9:55 a.m.

Reporter: Ariel Mumma, CSR/RPR

-o-

A. Yes.

**Q. Is it also true that you don't need to know what the difference is between WAC and AWP, in order to negotiate the contract off of AWP as low as you can go?**

A. Correct.

**Q. Have you ever looked at the difference between WAC and AWP?**

A. I have looked at the difference from the standpoint of when I look at a product in the database, I see two prices, one being AWP, and one being WAC.

Have I calculated the percent difference, have I done some formal analysis, have I had formal discussions? No.

**Q. When you say in the database, what database are you referring to?**

A. I'm referring to the database we utilize for drug pricing and reference information, which is Medi-Span.

**Q. And for how long have you used the Medi-Span database?**

A. Since 1999.

**Q. So were you using the Medi-Span database when Medi-Span and First DataBank were owned by the**

**same entity?**

A. I believe so.

**Q. And your contract was in fact with First DataBank during that time period; am I correct?**

A. The contracts with First DataBank and Medi-Span are handled by the I.T. side of our business. The exact details of those contracts, I am not familiar with.

**Q. Who at SelectHealth utilizes the database that you receive from Medi-Span? And when I say who you can tell me by departments.**

A. I don't know that I can give you a complete list. Actuary and underwriting.

**Q. Is that one department or two?**

A. That would be two.

The people that maintain our data warehouse, the researchers that go against those data warehouses, I.T. personnel.

(There was a discussion held off the record.)

**Q. BY MS. SCHECHTER: Is there a finance department?**

A. Yes.

**Q. Do they utilize the database?**

A. Not that I currently know.

**Q. What does the research department do?**

A. Within Intermountain Health Care, there are specific departments within the hospitals that may conduct research; there is an arm within the company that conducts population-based research, and they may be using those databases not only for -- in the claims data there's only an NDC number in the actual file that comes acrost in the -- in the NCPDP format.

In order to apply a name to a particular number, or in order to put that into a particular therapeutic category, there needs to be a linkage with the database, and in their research efforts they make those linkages.

**Q. Does the research department track drug pricing trends?**

A. Drug pricing trends? No. They may look at health care cost by disease state or by area.

And an example would be: As a global company, Intermountain Health Care has clinical initiatives in the areas of diabetes and asthma, or clinical initiatives in the area of cardiovascular disease, and they may track drug cost in that particular disease state as a factor of total overall cost of treating the disease state.

They may look at the implications of clinical guidelines or protocols on overall cost

outcome. But do they track actual drug cost trends? No.

**Q. How about the actuary or underwriting department; do they track actual costs of drugs?**

A. They track the cost of drugs as it relates to utilization of the pharmacy benefit, so they're looking at -- for a particular employer, overall their cost increased, say, 10 percent; and part of that 10 percent increase was an inflation in the overall cost of the product, part of that 10 percent increase would be an increase in utilization of a particular product.

**Q. The analysis that you just described, is that done employer plan by employer plan?**

A. We track drug expense by employer.

I have never seen us -- on an individual employer basis, say, you have a 10-percent trend and seven of that was inflation. It's -- it's globally for an entire membership.

**Q. Have you seen reports that track trends in the costs of drugs across all of your membership?**

A. I have not seen reports.

**Q. Are such reports created?**

A. Reports are created that track -- take -- I take that back.

I've seen reports that track per-member

**that something that SelectHealth has the final say on?**

A. The final say resides with the employer.

**Q. So each employer could have a plan unique unto itself?**

A. Yes.

**Q. And SelectHealth has, I gather, numerous different plan designs in place, then, depending on what the employer wants?**

A. Right. And let me clarify: When I say plan design is left to the employer, I would be talking about large employer groups.

For our small employer group of business and our individual group of business, we have a variety of products that have different benefits levels; and an employer selects one of those available products, but does not have the ability to customize ice or change what those products are.

So in the case of small employers, you could say SelectHealth has the ultimate determination in benefit design, although an employer selects which of those products they buy.

**Q. And how do your employer customers compensate SelectHealth?**

A. Our customers compensate SelectHealth through the payment of premium.

Now, premium is composed of two parts: For a fully-insured group, it would be the part of the premium that's used to pay medical expense; and then there's an administrative component on top of that, and the administrative component would compensate SelectHealth for the administrative functions they provide.

In the case of a self-funded employer, there's only the administrative component.

**Q. And is that an annual premium that they pay?**

A. Yes.

**Q. And what is the premium based on?**

A. Their previous medical expense experience.

**Q. And the number of lives covered?**

A. Yes.

(Exhibit 7 was marked for identification.)

**Q. BY MS. SCHECHTER: The court reporter has just handed you what's been marked Exhibit 7. It's Bates Number SelectHealth/NEC 126. Do you recognize this document?**

A. Yes.

**Q. What is it?**

A. It is our contractual agreement with First DataBank.

**Q. And has this document been created in the ordinary course of business?**

A. Yes.

**Q. And maintained in the ordinary course of business?**

A. Yes.

**Q. Did you have any involvement in negotiating this contract?**

A. No.

**Q. Who negotiated this contract?**

A. That would be our I.T. department.

**Q. And is -- is this -- well, does this contract represent your subscription with First DataBank for the Medi-Span database?**

A. I can't say one way or the other. I know that originally they were separate, then they were together, and now they're separate again.

When I asked I.T. for a copy of the Medi-Span agreement, last I heard they were still looking for it, and they're not sure who has it, although -- I don't know -- I guess I don't know the answer.

**Q. Do you know what information SelectHealth receives from First DataBank under this contract?**

A. I have seen the tables that contain data.

Now, I also know there's additional CDs of information that come. The exact content and nature of or the extent, I don't -- I don't know that.

**Q. Do you know if the data includes AWP?**

A. Yes.

**Q. Yes, it does?**

A. Yes.

**Q. Do you know if it includes WAC?**

A. Where available, yes.

**Q. When you say where available, what do you mean?**

A. There have been instances where I've come across products in the database that have an AWP price and no WAC price.

**Q. Is that often?**

A. I don't know that I can comment on the frequency, other than I know it happens.

**Q. And do you know anything in response to seeing that there's a missing WAC?**

A. No.

**Q. You don't need to know the WAC --**

A. No.

**Q. -- for anything you do in your job?**

A. No.

**Q. Do you know how First DataBank derives its**

**AWP?**

A. No.

**Q. Do you need to know that for any aspect of your job?**

A. No.

**Q. Have you ever heard any representations made by First DataBank about their AWP?**

A. No.

**Q. Have you ever looked to see if First DataBank's AWPs are the same or different than any other publishers?**

A. I specifically have not looked to find instances where they are different. I have been told that differences do exist between Medi-Span, First DataBank, Redbook.

**Q. And in the course of your job, is it important for you to know what those differences are?**

A. No.

**Q. Who has told you that there are differences among the publishers in what the AWPs published are?**

A. I don't know that I can give you names. I've seen presentations at national meetings; I've seen presentations or talked to particular individuals within PBMs that have said they've seen differences.

**Q. And do you know what the nature of those differences are; in other words, is one typically higher or lower than the other?**

A. I don't know that you can say one is always higher or one is always lower. There's discrepancies. So, you know, one database may have one product a little higher, another may have it a little lower, and things may even out on it elsewhere. I -- I can't say.

**Q. Do you know if anybody, other than yourself at SelectHealth, has ever looked at the differences in publishers' AWPs?**

A. No.

**Q. Let me ask that.**

**Do you -- do you know that nobody has, or you just don't know one way or the other?**

A. Of my current staff, I know no one has looked at the differences.

**Q. And is that because it doesn't matter to anybody on your staff what they need to do for their jobs?**

A. It does not matter, yes.

**Q. You indicated that some of the manufacturer contracts that you have negotiated are based upon WAC and some are based upon AWP. Do you**

**recall that?**

A. Yes.

**Q. Has that changed over time; in other words, the percentage that fall in the WAC category and the percentage that falls in the AWP category?**

A. I don't know that I can comment. We've always had some that were based on WAC, we've always had some based on AWP. Has that ratio changed? I don't know.

**Q. Have you had the experience that any one manufacturer has changed from having WAC-based rebates to AWP-based rebates, or vice versa?**

A. I don't recall.

**Q. How frequently do -- what is the term of the contract that you have with manufacturers for rebates?**

A. That is variable.

**Q. So some are shorter than others?**

A. The shortest would be one year; the longest would be -- we have a four-year agreement with someone -- four-year agreement with someone.

**Q. Do those agreements also have termination-without-cause provisions?**

A. Some do, some do not.

One does not.

**Q. Most do?**

A. All but one.

**Q. All but one.**

**Have you had any manufacturer exercise a termination-without-cause provision?**

A. No.

**Q. Has SelectHealth ever exercised a termination-without-cause provision with a manufacturer?**

A. Yes.

**Q. Have the financial terms of your contracts with manufacturers changed over time?**

A. Yes.

**Q. Have they gotten more favorable for SelectHealth over time?**

A. They go both ways.

**Q. Some do, some don't?**

A. Yes.

(Exhibit 8 was marked for identification.)

**Q. BY MS. SCHECHTER: I'm going to show you what the court reporter has marked as Exhibit 8, and ask you to take a look at that.**

**It is SelectHealth/NEC 148 through 162.**

**Do you recognize this document?**

A. Yes.

A. Yes.

**Q. Okay. Can you take a few minutes to read the article.**

A. Okay.

**Q. Or would you please take a few minutes to read the article.**

VIDEOGRAPHER: Would you like to go off?

MS. MAHONEY: I don't think it's necessary. (Pause)

(There was a discussion held off the record.)

MS. MAHONEY: In that case, let's go off the record.

VIDEOGRAPHER: Going off the record, 3:13. (Pause)

We're back on the record. The time is 3:18.

**Q. BY MS. MAHONEY: Eric, you stated earlier that your reimbursement rates to pharmacies is based on AWP; is that correct?**

A. Yes.

**Q. And you also stated earlier that you would expect AWP increases would be based on such indications as inflation and various market -- market factors --**

MS. SCHECHTER: Object- --

**Q. BY MS. MAHONEY: -- is that right?**

MS. SCHECHTER: Objection to the form of the question.

MS. KINGMAN: You can respond. If she objects you can respond, if you know.

THE WITNESS: Why don't you repeat the question.

MS. MAHONEY: Sure.

**Q. Did you state earlier that you had expectations that the AWP would change on the basis of inflation?**

MS. SCHECHTER: Objection to the form of the question.

A. Yes.

**Q. BY MS. MAHONEY: Did you state earlier that AWP would change on the basis of other market factors?**

MS. SCHECHTER: Objection to the form of the question.

A. Yes.

**Q. BY MS. MAHONEY: Did you have any expectations that the AWP would increase on the basis of manipulation?**

MS. SCHECHTER: Objection. Calls for speculation. Objection to the form of the question.

A. No.

**Q. BY MS. MAHONEY: If you could turn to Page 4 of Exhibit 19. The first -- first full paragraph beginning with "an internal email on January 7th, 2002," there are three paragraphs in the Wall Street Journal article that purport to quote from McKesson documents.**

**In reading this article, were you surprised by the recitation?**

**(There was a discussion held off the record.)**

MS. SCHECHTER: Objection to the form of the question.

A. I'm not surprised by anything I read in the newspaper anymore; and given that this is an ongoing legal issue, I guess I often struggle in that what I see in the paper is one side of the story, and I don't know the details behind that.

Was I surprised to see comments like this in an email? No.

MS. MAHONEY: No further questions.

MS. SCHECHTER: I have just a few. It won't take that long.

*

*

*

RE-EXAMINATION

BY MS. SCHECHTER:

**Q. Had you read this article before?**

A. Not fully, no.

**Q. Does this article refresh your recollection about any facts?**

A. No.

MS. SCHECHTER: I have nothing further.

VIDEOGRAPHER: Okay. This concludes the deposition. The time is 3:21.

MS. SCHECHTER: We'll follow the same procedures that we've been following with the other deposition. The witness can have 30 days to review the transcript once he receives it, and make any corrections. Does everyone agree?

MS. KINGMAN: If you'll send the copy to my office, it's on the card I gave you. Then I can make sure he gets it.

(The deposition was concluded at 3:22 p.m.)

* * *

# EXHIBIT 57

ANDREA GRANDE

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - X

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, et al.,

Plaintiffs,

v. Civil Action

FIRST DATABANK, INC., and No. 1:05-CV-11148-PBS

McKESSON CORPORATION,

Defendants.

- - - - - - - - - - - - - - - - X

VOLUME I Pages 1-106

VIDEOTAPED DEPOSITION OF ANDREA GRANDE, a witness called by counsel for the Defendant, McKesson Corporation, taken before Kimberly A. Smith, Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Bonner, Kiernan, Trebach & Crociata, LLP, One Liberty Square, Boston, Massachusetts 02109, on Wednesday, October 11, 2006, commencing at 1:30 p.m.

ANDREA GRANDE

BY MR. FLUM:

**Q. And what do you understand "WAC" to be a reference to?**

MR. SOBOL: Objection.

MR. PEZZULICH: Objection.

THE WITNESS: Again, it's the price of a drug.

BY MR. FLUM:

**Q. Do you have any further understanding about what price for the drug "WAC" is referring to?**

MR. SOBOL: Objection.

MR. PEZZULICH: Objection.

THE WITNESS: Again, it's another form of pricing the drug.

BY MR. FLUM:

**Q. Do you have any understanding as to whether WAC is different from AWP?**

A. I know it's a different number.

**Q. Do you have any understanding about the relationship between WAC and AWP?**

MR. SOBOL: Objection.

MR. PEZZULICH: Objection.

THE WITNESS: I know it's typically less.

ANDREA GRANDE

BY MR. FLUM:

**Q. WAC is typically less; is that right?**

A. From my understanding.

**Q. Do you have any understanding as to how WAC is determined?**

A. No.

**Q. Are you aware of whether there has been any increase in the spread between WAC and AWP in the period since you have been the manager for corporate pharmacy programs?**

MR. PEZZULICH: Objection.

THE WITNESS: No.

BY MR. FLUM:

**Q. In the pile in front of you is Exhibit 1. Exhibit 1 is a document that was produced by Harvard Pilgrim in response to our subpoena. It's entitled "PharmaCare Management Services, Inc. Agreement." It's Bates numbered HP/NEC 0698 through 739.**

**My first question to you is whether you've seen this document before?**

A. No.

**Q. So you worked on the -- Let me withdraw that.**

**So in 1999 were you involved with a**

ANDREA GRANDE

**process to retain a new PBM for Harvard Pilgrim?**

A. I was brought into the process midstream, pretty much at the end.

**Q. And who was the incumbent --**

A. I don't even --

**Q. -- PBM at that time?**

A. I don't remember her name, who was the project manager.

**Q. No. Who was the incumbent PBM?**

A. Oh, I'm sorry. PharmaCare.

**Q. As part of that project, did you ever look through the existing PharmaCare agreement?**

A. No, I did not.

**Q. Did you talk with anyone about the terms of the existing PharmaCare agreement?**

A. Specifically, no.

**Q. Generally?**

A. As part of the PBM process, there was a review of rates, so that was the extent of my exposure.

**Q. And did that review of rates include a review of the bids by prospective new PBMs in comparison to the rates that PharmaCare was providing?**

ANDREA GRANDE

A. Yes.

**Q. Who prepared that review?**

A. I'm not sure.

**Q. Did Harvard Pilgrim hire an outside consultant to assist in that review?**

A. I'm not sure.

**Q. Do you remember that Mercer was involved?**

A. I'm not sure.

**Q. Do you remember giving a deposition about -- Let me withdraw that.**

**You testified that you previously gave a deposition --**

A. Yes.

**Q. -- in a case pending in Boston?**

A. Yes.

**Q. I'm going to read you some of the testimony from that deposition.**

A. Sure.

**Q. This is beginning on page 30, at line 15. The question was --**

MR. SOBOL: I'm sorry. I didn't -- well, I did mean to interrupt you, but I didn't mean to be rude.

Can you put in the record the date of

ANDREA GRANDE

**tier of a retail branded drug from Tier 2 to Tier 3 solely because it was costing Pilgrim more money than it wanted to pay?**

A. No.

**Q. Are you familiar with the allegations in this lawsuit?**

A. Specifically, no.

**Q. Another less long question, but probably long nevertheless. I'll represent to you that in this lawsuit the plaintiffs, who seek to represent third-party payers in the United States, allege that the drug wholesaler, McKesson, and the drug pricing publisher, First DataBank, conspired together to change the difference between WAC and AWP on about 40 percent of all retail branded drugs, resulting in -- and to do that secretly, resulting in the AWP being about four percent higher than it otherwise would have been if McKesson and First DataBank hadn't gotten together and secretly changed the data in First DataBank's database, okay?**

**Assuming that what I've just said is a fair characterization of the allegations in the lawsuit, before my telling you what this lawsuit was about, had you ever heard of that before?**

ANDREA GRANDE

A. No.

MR. SOBOL: I have nothing further.

EXAMINATION

BY MR. FLUM:

**Q. Just one or two quick follow-up questions.**

**Going back to the issue of changing the tier placement of a drug within the formulary, has cost of the drug to Harvard -- to Harvard Pilgrim ever been a factor, even if it's not the sole factor, in a decision to move a drug from Tier 2 to Tier 3?**

MR. SOBOL: Objection to the form.

MR. PEZZULICH: Objection.

THE WITNESS: As I stated earlier, as part of the P&T committee and the review, it's always a balance of clinical and cost. So it's never one or the other. It's always a combination of the two.

MR. FLUM: I have nothing further.

MR. SOBOL: Thanks.

THE VIDEOGRAPHER: Here ends Tape 2 and today's deposition. Off the record, 3:59 p.m.

(Deposition concluded at 3:59 p.m.)

ANDREA GRANDE

CERTIFICATE

I, Kimberly A. Smith, a Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the deposition of ANDREA GRANDE, who was first duly sworn, taken at the place and on the date hereinbefore set forth.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING COURT REPORTER.

Signed and sealed this 13th day of October, 2006.

____________________________

KIMBERLY A. SMITH, CRR, RDR

ANDREA GRANDE

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Matthew C. Pezzulich, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Paul Flum, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

# EXHIBIT 58

JAMES T. KENNEY, JR.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, et al.,

Plaintiffs,

v. Civil Action

FIRST DATABANK, INC., and No. 1:05-CV-11148-PBS

McKESSON CORPORATION,

Defendants.

- - - - - - - - - - - - - - - - x

VOLUME I Pages 1-94

VIDEOTAPED DEPOSITION OF JAMES T. KENNEY, JR., a witness called by counsel for the Defendant, McKesson Corporation, taken before Kimberly A. Smith, Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Bonner, Kiernan, Trebach & Crociata, LLP, One Liberty Square, Boston, Massachusetts 02109, on Wednesday, October 11, 2006, commencing at 10:04 a.m.

Page 90

JAMES T. KENNEY, JR.

**this past Friday, sir?**

A. No.

**Q. Drawing your attention to an article in the upper right-hand corner that addresses certain pharmaceutical issues, do you see that, sir?**

A. Yes.

**Q. Will you please take a moment and read the first six paragraphs of that article.**

A. Out loud or --

**Q. No.**

A. -- silently?

**Q. To yourself.**

A. Okay.

Okay.

**Q. Prior to the time -- Let's make sure we get the time frame correct -- prior to the time that you first learned that Harvard Pilgrim had received a subpoena in connection with this lawsuit, were you aware of allegations that the wholesaler, McKesson Corporation, and the publisher, First DataBank, had conspired to secretly increase the markup factors between average wholesale price -- excuse me -- average wholesale -- yes -- average wholesale price and the WAC in order to secretly increase profits to**

TSG Reporting - Worldwide 877-702-9580

Page 91

JAMES T. KENNEY, JR.

**pharmacies and pharmacy benefit managers?**

A. No.

MR. SOBOL: Thank you. I have nothing further.

MR. FLUM: I have nothing.

THE VIDEOGRAPHER: Here ends today's deposition. Off the record, 12:39 p.m.

(Deposition concluded at 12:38 p.m.)

TSG Reporting - Worldwide 877-702-9580

Page 92

JAMES T. KENNEY, JR.

CERTIFICATE

I, Kimberly A. Smith, a Certified Realtime Reporter, Registered Diplomate Reporter, and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the deposition of JAMES T. KENNEY, JR., who was first duly sworn, taken at the place and on the date hereinbefore set forth.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING COURT REPORTER.

Signed and sealed this 13th day of October, 2006.

______________________________

KIMBERLY A. SMITH, CRR, RDR

TSG Reporting - Worldwide 877-702-9580

Page 93

JAMES T. KENNEY, JR.

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Matthew C. Pezzulich, Esquire.

When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Paul Flum, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself. Add additional sheets if necessary. Please refer to the above instructions for Errata Sheet distribution information.

TSG Reporting - Worldwide 877-702-9580

# EXHIBIT 59

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS BENEFITS FUND, et al.

Plaintiffs,

vs.

FIRST DATABANK and MCKESSON CORPORATION,

Defendants.

Civil Action No. 1:05-CV-11148-PBS

Taken at 404 Fuller Avenue
Helena, Montana
Tuesday, November 14, 2006 - 9:15 a.m.

D E P O S I T I O N
OF
TINA WONG

Reported by Mary R. Sullivan, RPR, RMR, Freelance Court Reporter and Notary Public, State of Montana, residing in Missoula, Montana.

3:18, it's November 14th, we're on the record.

**Q. (By Mr. Styant-Browne) Ms. Wong, you testified about a number of quarterly site visits that ESI does to Blue Cross/Blue Shield. Do you recollect that testimony?**

A. I do.

**Q. And I think you said that as part of that process, ESI would put together a binder with reports?**

A. Yes.

**Q. And samples of those reports, the documents that were put to you previously that I don't think were ever marked as exhibits, but which were of various dates of reports generated by ESI.**

A. Yes.

**Q. And you testified about the ingredient costs in those reports. Do you recollect that testimony?**

A. Yes.

**Q. What did you mean by ingredient costs?**

A. Ingredient costs in those reports is our discounted ingredient cost, so it's showing AWP minus our discount.

**Q. Okay. And you testified that on occasions the reports would make a comparison between the AWP discount in that quarter as compared to a previous quarter. Do you recollect that testimony?**

A. Yes.

**Q. Do you recollect whether any of the reports showed a comparison over a longer period than two quarters?**

A. You know, there could have been. I--I couldn't tell you specifically without looking at each report.

**Q. Do you recollect yourself ever undertaking an analysis of the trend of AWP over a period of a year or more?**

A. No, I've never done that.

**Q. Okay. Did you ever undertake an analysis of the trend of AWP prices in respect to any particular drug or group of drugs?**

A. No, I've never done that.

**Q. And is that consistent with your testimony that the AWP was not an important factor for you to consider as part of your duties?**

A. Well, it's important to us in that that's what--you know, that's the amount that we pay--it's a discounted amount off of AWP what we pay the pharmacy, so it's important in that aspect, but I don't monitor--I've never monitored the increase of AWP over--over time.

**Q. Yeah, the question was badly phrased, I**

**should have asked does it reflect your previous testimony that the calculation of AWP was not an important factor for you to consider as part of your task.**

A. Yes, correct.

**Q. Okay. Now, you testified at some length about the various plan designs which involved passing on certain or all of the costs of drug increases to either the employer or the member. Do you recollect that testimony?**

A. Yes.

**Q. And an example of that was I think the mandatory generic pricing policy; is that correct?**

A. Yes.

**Q. And was the effect of that to pass on all of the costs of the brand drug in circumstances where the member chose that drug and there was a generic available?**

MS. CHEUNG: Objection to form.

A. Well, again, it really depends on the outcome, because if they select the brand-name drug, then they're also paying the cost difference between the brand and the generic, so they're ultimately paying almost the entire cost of the prescription, so--but if they're--they do select the generic drug, then, you

know, they're saving money, the plan's saving money and so is--therefore the group would be saving money, so it really depends on the outcome of the prescription.

**Q. (By Mr. Styant-Browne) Well, I think in my hypothesis the member was electing to use the brand drug even though the generic was available.**

A. Okay.

**Q. Explain to me the way it works in terms of who bears the increased cost of that script.**

A. Well, if they're on a mandatory generic policy and the member chooses the brand-name drug over the generic, they're paying the brand-name co-pay plus the cost difference between the generic and the brand, so therefore, they're almost paying the entire cost of the brand-name prescription, so in--and really it would depend on the drug specifically and--and--and the negotiated prices on who ends up paying more for it because, you know, depending on the drug, it might be somewhat of a wash.

**Q. And--**

A. But the member definitely, if they're selecting the brand-name drug, they definitely are paying the co-pay.

**Q. And is it possible for you to calculate where there's that particular plan design, namely in this**

# EXHIBIT 60

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, ET AL., | ) | |
| Plaintiffs, | ) | |
| vs. | ) | CASE NO. 1:05-CV-11148 |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | ) | |
| Defendants. | ) | |

CONFIDENTIAL
VIDEOTAPED DEPOSITION OF
EARL W. SEYMOUR
Taken on Behalf of the Defendants
October 19, 2006

group of pharmacies within the Des Moines area and a chain to -- I gave those names to Donny Dowlen and Southern Benefits to work with that said they would accept the mail order prices.

And so I was fortunate enough that we were able to develop a contract with them in the same regards of the mail order, and our people could walk into the pharmacy and get their 90-day supply.

**Q. What chain is that?**

A. Hy-Vee Drug.

**Q. Have you been able to negotiate similar discounts with pharmacies in other locations?**

A. No.

**Q. Have you --**

A. I actually had about, I believe, five different pharmacies in Des Moines that would accept those prices. Hy-Vee happened to be a chain that covers Iowa, into Minnesota, into Illinois, I believe into Missouri. But it covered a wide section that really benefited our people.

**Q. Have you ever tried to negotiate similar deals with other pharmacies?**

A. Where?

**Q. Anyplace.**

A. I have not other than my particular location.

**Q. Do you know if anyone else on behalf of the trust has tried to do that?**

A. I couldn't give you a definitive answer with it. I'm sure some of the board members looked at it in their area, but that's a difficult nut to crack.

**Q. Have you ever had a policy for mandatory generics?**

A. No.

**Q. Why not?**

A. Because a doctor may prescribe a name brand drug, and I as a board member don't think that -- you know, that's a doctor recommendation to his patient. I think that I as a board member should be able to see that our participants have access to a pharmacy benefit. They may have to pay a higher copay, but at least it won't break their bank.

**Q. Have you ever -- well, let me rephrase that.**

**You have a two-tier copay; is that right?**

A. Yes.

**Q. Have you ever considered a three-tier**

**copay?**

A. Why?

**Q. Maybe you can ask Mr. Dowlen that. But let me ask you the question of have you ever considered a three-tier copay?**

A. Not that I recall.

MR. KAUFMANN: I think that's all that I have for you, sir. We're going to have to talk to Mr. Dowlen. There may be things that he says, no, no, no, you got to go back to Mr. Seymour. I don't know that and -- or there may be document issues. So I reserve the right to call you again, but I think that we can move on to Mr. Dowlen.

Thank you.

MS. CONNOLLY: I just have one follow-up question for you, Mr. Seymour.

EXAMINATION

BY MS. CONNOLLY:

**Q. Prior to reviewing the complaint in this case, did you have any knowledge of the alleged fraud within it?**

A. Was I aware there was a legal action prior to --

**Q. No, were you aware of the facts that were**

**go -- that were alleged in the complaint?**

A. No.

MR. KAUFMANN: Let -- I'm sorry.

MS. CONNOLLY: Okay. I have nothing further. I did want to note for the record that I would like to mark this confidential under the protective order.

MR. KAUFMANN: That's fine. I'm sorry. The questions that you asked reminded me of something I did forget to ask.

EXAMINATION

BY MR. KAUFMANN:

**Q. Sir, are you familiar at all with the settlement that is proposed between plaintiffs and First DataBank?**

A. No.

**Q. Have you in any way been consulted with regard to the settlement?**

A. No.

MR. KAUFMANN: Okay. Thank you.

THE VIDEOGRAPHER: Go off the record?

MR. KAUFMANN: Off the record.

MS. CONNOLLY: Yeah.

THE VIDEOGRAPHER: Okay. This mark the end of Tape No. 2. The time on the monitor is

# EXHIBIT 61

00001

CONFIDENTIAL
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
- - -

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY AND PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, AND DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,
Plaintiffs : CIVIL ACTION

vs.

FIRST DATABANK, INC., a Missouri corporation, AND MCKESSON CORPORATION, a Delaware corporation,
Defendants : 1:05-11148-PBS

- - -

Philadelphia, Pennsylvania

Thursday, October 5, 2006

- - -

Videotape deposition of WILLIAM EINHORN, taken pursuant to notice, at the offices of Varallo, Incorporated, 1835 Market Street, Suite 600, on the above date, beginning at approximately 9:36 a.m., before Cynthia A. Whyte, Registered Professional Reporter and Notary Public.

00002

APPEARANCES:

JOHN A. MACORETTA, ESQUIRE
Spector Roseman & Kodroff
1818 Market Street
Suite 2500
Philadelphia, PA 19103
(215) 496-0300
jmacoretta@srk-law.com
Counsel for Plaintiff

PAUL FLUM, ESQUIRE
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7335
PAULFLUM@MOFO.COM
Counsel for Defendant

- - -

markups from WAC to AWP for certain NDCs from 20 percent to 25 percent?

A. I believe that occurred after a certain period of time and that there were actually two items, one that just involved First Databank and one that involved First Databank and McKesson. One was the survey and one was First Databank's position, okay, we are no longer going to do this survey. We are just going to take whatever WAC is and increase it by a multiple of 1.25.

00106

William J. Einhorn

Q. And had you heard from any source other than your counsel that First Databank had increased the AWP by a multiple of 1.25?

Let me try that again. Let me give you a question that you can answer.

A. The answer to the question that you just posed is no.

Q. No?

A. Other than through counsel, no.

Q. Thank you.

Before you put Exhibit 4 away, this was the only copy of a report of top drugs by cost that I saw in the documents that your counsel produced. Why did this one get retained in your files, if you know?

A. It was presented to the trustees. The others I may have produced, looked at, and just discarded.

Q. So your practice was typically to run a report and, after you had finished with it, to discard it?

A. Yes.

Q. Is there a file that you've kept of information about the Fund's prescription drug

00107

William J. Einhorn

program that you have presented to the trustees over the years? In other words --

A. There would not be a separate file, no. If it was included in a meeting book, it would be included in that particular meeting book.

Q. And have you kept the meeting books?

A. Yes.

Q. Going back how far?

A. 1957.

Q. So you've got copies of all the meeting books back to '57 in the Fund's files today; is that right?

A. Yes.

Q. And did you --

A. They are -- I should stop. They may be in -- we recently moved our offices in April of this year. Okay? And many of those

# EXHIBIT 62

00001

HIGHLY CONFIDENTIAL
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - -

NEW ENGLAND CARPENTERS : CIVIL ACTION
HEALTH BENEFITS FUND, :
PIRELLI ARMSTRONG RETIREE :
MEDICAL BENEFITS TRUST, :
TEAMSTERS HEALTH & WELFARE:
FUND OF PHILADELPHIA AND :
VICINITY AND PHILADELPHIA :
FEDERATION OF TEACHERS :
HEALTH AND WELFARE FUND, :
AND DISTRICT COUNCIL 37 :
HEALTH & SECURITY PLAN, :
Plaintiffs :
vs. :
:
FIRST DATABANK, INC., :
a Missouri corporation, :
AND MCKESSON CORPORATION, :
a Delaware corporation, :
Defendants : 1:05-11148-PBS

- - -

Philadelphia, Pennsylvania
Wednesday, October 18, 2006

- - -

Videotape deposition of ARTHUR STEINBERG, taken pursuant to notice, at the offices of Varallo, Incorporated, 1835 Market Street, Suite 600, on the above date, beginning at approximately 9:31 a.m., before Cynthia A. Whyte, Registered Professional Reporter and Notary Public.

00002

APPEARANCES:

MARC H. EDELSON, ESQUIRE
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
(215) 230-8043
Counsel for Plaintiffs

PAUL FLUM, ESQUIRE
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
(415) 268-7335
PAULFLUM@MOFO.COM
Counsel for Defendant McKesson Corporation

ALSO PRESENT: AL SKIPPER
Video Technician

- - -

00056

Arthur Steinberg

to bottom line costs?
A. No, I don't.
Q. You don't look at utilization of particular drugs, for instance?
A. No, we really don't.
Q. Do you look at pricing trends for particular drugs or categories of drugs?
A. No.
Q. So other than looking at the invoices that come in every two weeks, is there anything else that you do to monitor the cost of the prescription drug benefit? And I'm focusing on the period from 2000 to the present.
A. No.
Q. Does the Fund -- let me come at it this way: Under the contract with Express Scripts does the Fund receive any reports of prescription drug utilization by your members?
A. It comes with the monthly bill or the -- actually I guess it is a biweekly bill.
Q. And what reports come with the biweekly bill?
A. It's just a detailed claims summary

00057

Arthur Steinberg

backup, so it has the name of the person, the drug, the quantity dispensed, the price.
Q. So just line by line every prescription --
A. Yes.
Q. -- filled for the period?
And is that in electronic form or hard copy or both?
A. Both.
Q. And I take it that's the -- well, so what happens to the hard copy and the electronic forms after you have reviewed them every two weeks?
A. You keep them up in the bookkeeping office for -- I don't know for how long. And the electronic ones we just started to receive recently, so they are obviously easier to store. They are on a disk.
Q. When you say "recently," when did you begin receiving the electronic form?
A. I can't remember for sure. I mean we don't have a whole lot of them up there.
Q. And they come on a CD?
A. Yes.

00058

Arthur Steinberg

Q. Does Express Scripts, or, rather, during the period 2002 to the present has Express Scripts provided any other reports regarding prescription drug utilization by your members?
A. I'm trying to think. I'm sure there are some reports that I've requested and looked at, but obviously I didn't retain them.
Q. What do you remember requesting from

# EXHIBIT 63

CONFIDENTIAL ROUGH ASCII NOT A FINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, ET AL., )
)
Plaintiff, )
)
vs. ) Case No.
) 1:05-CV-11148
FIRST DATABANK, INC., a Missouri corporation, and )
McKESSON CORPORATION, a Delware corporation, )
)
Defendant. )
--------------------------------)

CONFIDENTIAL VIDEOTAPED
DEPOSITION OF ROSARIA ESPERON
New York, New York
Monday, November 6, 2006

Reported by:
FRANCIS X. FREDERICK, CSR, RPR, RMR
JOB NO. 8695

ROUGH DRAFT - NOT A FINAL

Page 142

CONFIDENTIAL ROUGH ASCII NOT A FINAL

what the issue was.

**Q. And in connection with that discussion about Express Scripts transitioning your plan from the NPA system to the Express Scripts system, did Express Scripts say that part of that change was going to involve a switch in the source of AWP from Red Book to First Databank?**

A. No. That was not said at that time.

**Q. So your recollection is that there was a mention at the meeting you had with Express Scripts in 2002 or early 2003 about changing the benchmark, the source of the benchmark from Red Book to First Databank; is that right?**

A. Yes.

**Q. And you don't remember anything more that was said about it?**

A. No. Because I mean the conversation basically was focused on how much money we can save but it wasn't -- the source of where the AWP -- what the source was wasn't important at that moment so I don't -- you

TSG Reporting - Worldwide 877-702-9580

ROUGH DRAFT - NOT A FINAL

Page 143

CONFIDENTIAL ROUGH ASCII NOT A FINAL

know, there was really no more discussion about it.

**Q. Did the -- did anyone representing Express Scripts ever say to you that by switching the source of the AWP benchmark from Red Book to First Databank your plan was going to save money?**

A. No. They never said that to us.

**Q. Did anyone from Express Scripts ever say to you that that they had noticed that there had been increases in the spreads between wholesale acquisition cost and AWP as reported by First Databank?**

A. No. I wish they had.

**Q. And so I take it nobody from Express Scripts said to you that they were going to be increasing the discounts that they were offering to your plan to reflect those increases in the spread between wholesale acquisition cost and AWP as reported by First Databank?**

A. No. They never told us anything about the spreads or never disclosed anything about that.

TSG Reporting - Worldwide 877-702-9580

ROUGH DRAFT - NOT A FINAL

Page 144

CONFIDENTIAL ROUGH ASCII NOT A FINAL

**Q. All right. But they did tell you that going forward they were willing to give your plan higher percentaging discounts off AWP?**

MR. NALVEN: Objection.

A. They said that they were willing to give us in range of 20, 21 percent, for retail drugs. Brand name retail drugs.

**Q. And was there any discussion about how Express Scripts was able to offer those higher discounts?**

A. They basically made it clear that their volume of business made it possible for them to give us these greater discounts.

**Q. Did you ever get those discounts? Discounts on the ranges they said they were offering?**

A. I believe we did.

**Q. And what's the basis for your belief that you were getting those higher discounts?**

A. Well --

MR. NALVEN: Objection.

A. Most recently we concluded our

TSG Reporting - Worldwide 877-702-9580

ROUGH DRAFT - NOT A FINAL

Page 145

CONFIDENTIAL ROUGH ASCII NOT A FINAL

relationship with them and our contract with them called for those percentages. And at this point I believe that we got the percentages but we have not done an audit to verify that we got those percentages.

**Q. All right. So it's your belief that there was a writing that amended that PBM contract that specified the higher discounts in the ranges that the Express Scripts representatives had offered to you at the meeting you've been describing?**

A. Yes. A document different from this (indicating), yes.

**Q. And did you review that document in preparing for the deposition?**

A. I skimmed it, yes.

**Q. And do you remember that it referred to discounts in the range of 20 to 21 percent off AWP for retail prescriptions?**

A. Yes.

**Q. Just so I understand, it's your understanding that that document has been produced by your lawyers to us?**

A. I believe so.

TSG Reporting - Worldwide 877-702-9580

37

# EXHIBIT 64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,

Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri Corporation; and McKESSON CORPORATION, a Delaware Corporation,

Defendants

Case No. 1:05-CV-11148-PBS

**PLAINTIFFS' FIRST SET OF INTERROGATORIES TO McKESSON**

Pursuant to Rules 33 of the Federal Rules of Civil Procedure and the Local Rules of the District Court for the District of Massachusetts, Plaintiffs hereby request that Defendant McKesson Corporation ("McKesson") and their attorneys respond to the following Interrogatories within thirty (30) days of service. These interrogatories are continuing in nature and require supplemental answers to the greatest extent permitted by Fed. R. Civ. P. 26(e).

## I. DEFINITIONS

1. "You" or "Your" means McKesson responding to these Interrogatories and any of its subsidiaries, divisions, affiliates, officers, directors, employees or agents, including, but not limited to, attorneys and accountants.

    i.    a statement of the privilege asserted and each and every fact or basis upon

which a privilege is claimed or on which the document is otherwise

withheld.

7.    Notwithstanding the assertion of any objection to production, if a document

contains non-objectionable or non-privileged matter, please produce that document, redacting

that portion for which the objection is asserted, provided that the identification requested in

paragraphs (h) and (i) above are furnished.

## IV.    DOCUMENTS TO BE PRODUCED

Please produce all documents identified in your responses to Interrogatory Nos. 1-6.

DATED: August 28, 2006

By **/s/ Steve W. Berman**
    Steve W. Berman
    Sean R. Matt
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

# EXHIBIT 65

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,

Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,

Defendants.

Civil Action No. 1:05-CV-11148-PBS

**DEFENDANT MCKESSON CORPORATION'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND FIFTH REQUEST FOR PRODUCTION OF DOCUMENTS, TITLED "FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS," SERVED ON AUGUST 28, 2006**

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, Defendant McKesson Corporation ("McKesson"), by its attorneys, Morrison & Foerster LLP, objects to and responds to Plaintiffs' First Set of Interrogatories and Fifth Request for Production of Documents to McKesson ("Requests"), [1] as propounded by Plaintiffs, as follows:

[1] Plaintiffs sent their "Third Request for Production of Documents to McKesson" on July 28, 2006. On August 7, 2006, plaintiffs sent another document identically titled "Plaintiffs' Third Request for Production of Documents to McKesson," which contained document requests different from plaintiffs' July 28, 2006 document requests. Thus, McKesson has referred to plaintiffs' August 7, 2006 request as Plaintiffs' Fourth Request for Production of Documents. McKesson responded to this set of requests on September 11, 2006. McKesson will therefore refer to this set of requests served on August 28, 2006 as "Plaintiffs' Fifth Request for Production of Documents to McKesson."

List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the prerequisites to a class action pursuant to Federal Civil Procedure Rule 23(a).

**RESPONSE TO NO. 1:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 2:**

With respect to Your response to Interrogatory No. 1, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 2:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and witness supporting every fact underlying any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will identify the documents and witnesses on which McKesson relies.

**INTERROGATORY NO. 3:**

List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the requirements of Federal Civil Procedure Rule 23(b) to maintain a class action.

**RESPONSE TO NO. 3:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 4:**

With respect to Your response to Interrogatory No. 3, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 4:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and every witness supporting every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for

class certification, McKesson's submissions filed in support of its opposition will identify the documents and witnesses on which McKesson relies.

**INTERROGATORY NO. 5:**

List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the requirements of Federal Civil Procedure Rule 23(c) to certify a class action.

**Response to Interrogatory No. 5:**

McKesson objects to this interrogatory on the grounds that it is vague and ambiguous to the extent that plaintiffs have not asserted a claim that they have satisfied the requirements of Rule 23(c) of the Federal Rules of Civil Procedure. McKesson further objects to this interrogatory as premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(c), particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent that McKesson asserts a "claim" that plaintiffs have failed to satisfy Rule 23(c) of the Federal Rules of Civil Procedure, McKesson's submissions in support of such a "claim" will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 6:**

With respect to Your response to Interrogatory No. 6, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 6:**

McKesson objects to this interrogatory on the grounds that it is vague and ambiguous to the extent that plaintiffs have not asserted a claim that they have satisfied the requirements of Rule 23(c) of the Federal Rules of Civil Procedure. McKesson further objects to this interrogatory as premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and every witness supporting every fact that supports

Dated: October 2, 2006

MORRISON & FOERSTER LLP

By: [signature]
Tiffany Cheung

Attorneys for Defendant
McKESSON CORPORATION

**CERTIFICATE OF SERVICE**

I certify that a true copy of this document was served on October 2, 2006 via e-mail to:

| | | |
|---|---|---|
| Steve W. Berman<br>Elizabeth Fegan<br>Thomas M. Sobol<br>steve@hbsslaw.com<br>beth@hbsslaw.com<br>Tom@hbsslaw.com<br><br>*Counsel for Plaintiffs* | George E. Barrett<br>Edmund L. Carey<br>Gerald E. Martin<br>Timothy L. Miles<br>gbarrett@barrettjohnston.com<br>tcarey@barrettjohnston.com<br>jmartin@barrettjohnston.com<br>tmiles@barrettjohnston.com<br><br>*Counsel for Plaintiffs* | Kenneth A. Wexler<br>Jennifer Fountain Connolly<br>kaw@wtwlaw.us<br>jfc@wtwlaw.us<br>Jeffrey Kodroff<br>John Macoretta<br>jkodroff@srk-law.com<br>jmacoretta@srk-law.com<br><br>*Counsel for Plaintiffs* |
| Mark Redman<br>mredman@hearst.com<br><br>*Counsel for First DataBank* | | |

[signature]
Tiffany Cheung

sf-2192406

# EXHIBIT 66

EXECUTION COPY

# INTEGRATED PRESCRIPTION DRUG PROGRAM MASTER AGREEMENT

THIS AGREEMENT is entered into as of the 1st day of January, 2003, (the "Effective Date") between Medco Health Solutions, Inc., located at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417 and The National Labor Alliance of Health Care Coalitions, Inc., located at Post Office Box 1196, Pleasant Valley, New York 12569-1196 (hereinafter "ALLIANCE" or "NLAHCC").

WHEREAS, the NLAHCC desire for prescription drug benefit services to be provided to Member Funds under separate agreements to be executed between Medco Health Solutions, Inc., and the applicable Member Fund; and

WHEREAS, Medco Health Solutions, Inc. provides prescription drug benefits programs and, in connection therewith, has established networks of participating retail pharmacies and operates a system for the processing, fulfillment, and payment of claims for prescription drugs furnished by such pharmacies; and

WHEREAS, Medco Health Solutions, Inc.'s home delivery pharmacy subsidiaries are licensed pharmacies which provide prescription drugs via a home delivery service; and

WHEREAS, NLAHCC and Participating Member Funds desire to retain the services of Medco Health Solutions, Inc. and its subsidiaries (collectively, "Medco Health"), to provide a prescription drug benefit program (the "Program") including, but not limited to, retail and home delivery pharmacy services for eligible persons, point-of-care, physician office communications, and cost containment initiatives developed and implemented by Medco Health, which may include communications with prescribers, patients and/or participating pharmacies, and financial incentives to participating pharmacies for their participation in such initiatives (collectively, "PBM Services").

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1. DEFINITIONS

1.1. "AWP" means the average wholesale price of the Covered Drug, as set forth in the current price list in recognized sources such as First DataBank's National Drug Data File, or other nationally recognized source determined by Medco Health, or the direct cost listed in those instances in which only the direct cost is listed. Under the Retail Pharmacy Program, AWP is based on the package size submitted. Under the Home Delivery Pharmacy Program, AWP is based on package sizes of 100 units for capsules and tablets, and 16 oz. quantities for liquids (or smaller quantities, if such quantities are not available), and all other Covered Drugs will be priced as individual units or smallest package size available (e.g., per vial, per suppository, etc.). If First DataBank or other applicable source changes the methodology for calculating AWP in a way that materially changes the economics of the Program, the parties agree to modify the Program Pricing Terms to preserve the parties' relative economics before such changed methodology.

1.2. "Brand Name Drugs" means single or multisource brand drugs as set forth in First Databank's National Drug Data File (or such other nationally recognized source reasonably determined by Medco Health), but excluding those drugs billed as generics under the Agreement.

1.3. "Coalition" means one of the member organizations that comprise the NLAHCC.

1.4. "Contract Year" means the full twelve (12) month period commencing on the Effective Date, and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

# SCHEDULE A
# PROGRAM PRICING TERMS

Effective February 7, 2003, each Participating Member Fund through Union Labor Life will pay Medco Health for services provided by Medco Health under the Program as follows:

1. **RETAIL PHARMACY PROGRAM CLAIMS** - Each Participating Member Fund through Union Labor Life will pay Medco Health for Covered Drugs dispensed by Participating Pharmacies and submitted by Participating Pharmacies via TelePAID or on paper in an amount equal to the lowest of (i) the pharmacy's usual and customary price, as submitted ("U&C"), (ii) the maximum allowable cost ("MAC"), where applicable, plus the Dispensing Fee set forth below, or (iii) an annual AWP discount of minus (-)15%, plus the Dispensing Fee set forth below. The calculation of the annual AWP discount above will include Covered Drugs priced at the U&C price of the Participating Pharmacy. Payment by each Participating Member Fund through Union Labor Life is subject to the applicable Copayment/Coinsurance or other coverage features set forth in the Plan Design designated by each Participating Member Fund through Union Labor Life under the Retail Pharmacy Program.

1.1 Dispensing Fee - The Dispensing Fee per prescription or authorized refill will be $2.25 for Brand Name Drugs without MAC pricing, and $2.25 for Generic Drugs and Brand Name Drugs that are billed at MAC, consistent with the applicable Plan Design for each Group.

1.2 Copayment/Coinsurance - The Copayment/Coinsurance amount for each prescription or authorized refill will be as designated for each Group in the applicable Plan Design(s).

1.3 Minimum Charge at Retail –Each Participating Member Fund through Union Labor Life agrees there may be a minimum charge at retail for a Covered Drug of the lower of (a) the U&C or (b) the applicable Copayment. For prescriptions or refills where this minimum charge applies, there will be no charge/credit to such Participating Member Fund under this Section 1.

2. **HOME DELIVERY PHARMACY PROGRAM CLAIMS** - Each Participating Member Fund through Union Labor Life will pay Medco Health for Covered Drugs dispensed by Medco Health under the Home Delivery Pharmacy Program in an amount equal to an Ingredient Cost plus Dispensing Fee for each Covered Drug dispensed, less the applicable Copayment/Coinsurance amount, as such terms are defined below:

2.1 Ingredient Cost - The Ingredient Cost is AWP minus (-)21% for Brand Name Drugs and AWP minus (-)55% for Generic Drugs.

2.2 Dispensing Fee - The Dispensing Fee per prescription or authorized refill is $0.00. Dispensing Fees are inclusive of postage. If postage rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the Dispensing Fee will be increased to reflect such increase(s).

2.3 Copayment/Coinsurance - The Copayment/Coinsurance amount for each prescription or refill dispensed by Medco Health under the Home Delivery Pharmacy Program will be as designated for each Participating Member Fund in the applicable Plan Design(s). The Copayment/Coinsurance amount will be the minimum charge for the prescription or refill dispensed by Medco Health under the Program.

3. **SPECIALTY DRUG CLAIMS**

Notwithstanding anything to the contrary in Sections 1 and 2 above and elsewhere in the Agreement, each Participating Member Fund through Union Labor Life will pay Medco Health for those Covered Drugs

# EXHIBIT 67

CONFIDENTIAL

**AGREEMENT**
**FOR**
**PRESCRIPTION DRUG MANAGEMENT SERVICES**
**BETWEEN**
**NATIONAL PRESCRIPTION ADMINISTRATORS, INC.**
**AND**
**DC37 HEALTH & SECURITY PLAN**

**THIS AGREEMENT** is made by and between National Prescription Administrators, Inc. ("NPA"), a New Jersey corporation, located at 711 Ridgedale Avenue, East Hanover, New Jersey 07936 and DC37 Health & Security Plan ("Sponsor").

**WITNESSETH THAT:**

**A.** NPA is engaged in the business of managing prescription drug programs, including claims processing and related services, for sponsors, their cardmembers and eligible dependents.

**B.** Sponsor desires to provide a prescription drug program in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants contained herein, NPA and Sponsor agree as follows:

ARTICLE 1
**DEFINITIONS**

The following capitalized terms, including their single and plural forms, shall have the meanings set forth below:

**"Agreement"** means this Agreement for Prescription Drug Management Services, including all appendices hereto, as may be amended from time to time.

**"AWP"** means the average wholesale price of the prescription drug dispensed, as established by reference to *Drug Topics' Redbook.*

**"Cardmember"** means an Eligible Person in whose name and to whom an Identification Card is issued.

**"CFI"** means Central Fill, Inc. and/or CFI of New Jersey, Inc.

**D37 0480**

**"Claim"** means a request for reimbursement of prescription drugs dispensed by a Participating Provider and submitted to NPA in an electronic form through the *NPAS®* Electronic Claims Management System or other format acceptable to NPA.

**"Direct Reimbursement Claim"** means a request for reimbursement of prescription drugs dispensed by a Provider and submitted by a Cardmember in a pre-printed form acceptable to NPA.

CONFIDENTIAL

APPENDIX C

## REIMBURSEMENT FEE SCHEDULE

**A. Drug Program.** Reimbursement for each prescription dispensed by a Par will be based upon the lower of (1) Participating Provider's usual and custo posted price and (2) the ingredient cost, plus a dispensing fee.

1. The ingredient cost for generic drugs subject to maximum allowable cost limits will be NPA's Generic Maximum Price. The annual average composite discount will be a computed AWP, less 62%

2. The ingredient cost for all brand and other drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| INGREDIENT COST | DISPENSING FEE |
|---|---|
| AWP, less a minimum of 13%, with an effective annual computed average rate of AWP, less 16% | An average of $2.00 for Participating Providers located in New York and an amount not in excess of the Medicaid rate for Participating Providers located in all other states |

Participating Providers also will be eligible to receive an additional dollar ($1.00) for each prescription that is compounded. NPA will guarantee the effective rates as long as market conditions remain static and the current participating pharmacies and pharmacy chains remain in operation.

NPA will provide reports reflecting compliance with the above effective discounts within sixty (60) days after each anniversary of this Agreement.

**B. Mail Order Program.** Reimbursement for each mail order prescription dispensed by CFI will be based upon the ingredient cost, plus a dispensing fee. The ingredient cost for Betaseron and other brand drugs available on a restricted basis will be based upon CFI's usual and customary price. The ingredient cost for all drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| | |
|---|---|
| Brand Drugs<br>Single source discount from 100% AWP<br>Dispensing Fee/Rx | <br>18%<br>$1.50 |
| Generic Drugs<br>Composite Discount from<br>Average AWP of All Generics in Class<br>Dispensing Fee/Rx | <br>50% or<br>MAC<br>$1.50 |

D37 0496

If rates for postage or delivery increase during the term of this Agreement, the dispensing fee will be increased accordingly.



# EXHIBIT 68

OCT-04-2006 WED 02:36 PM FAX NO. P. 03

**EXPRESS SCRIPTS, INC.**
**PHARMACY BENEFIT MANAGEMENT AGREEMENT**

THIS PHARMACY BENEFIT MANAGEMENT AGREEMENT ("Agreement") made to be effective January 1, 2004 ("Effective Date"), is entered into by and between EXPRESS SCRIPTS, INC., on behalf of itself and its subsidiaries (collectively referred to as "ESI"), and DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, organized under the laws of the State of New York ("Plan") for the purpose of setting forth the terms on which ESI will provide pharmacy benefit management services to Plan. The parties agree as follows:

**SECTION I - DEFINITIONS**

The following terms shall have the meanings set forth below:

"Benefit Design Form" or "EBD" means a prescription drug benefit summary form ESI has provided to Plan which, when completed and approved by Plan, will describe the essential features adopted by Plan for the prescription drug components of its Plan(s).

"Copayment" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible) as indicated on the EBD.

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products (if applicable), and other items that are covered under the Plan, as indicated on the EBD.

"Eligibility Files" means the list submitted by Plan to ESI in reasonably acceptable on-line, tape, FTP, electronic or disk format indicating persons eligible for drug benefit coverage services under the Plan.

"ESI Specialty Pharmacy" means a duly licensed pharmacy owned or operated by ESI or its subsidiaries where Specialty Products are dispensed for, and delivered to, Members.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Plan, which is selected and adopted by Plan.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended.

"ID Card" means ESI's standard single purpose (NCPDP format) printed identification card containing the applicable ESI logo or other mutually acceptable method of identifying ESI as the provider of pharmacy benefit services.

"Mail Service Pharmacy" means a duly licensed pharmacy operated by ESI or its subsidiaries, other than the ESI Specialty Pharmacy, where prescriptions are filled and delivered to Members via the mail service.

"Member" means each person who is eligible, as determined solely by Plan, to receive prescription drug benefits as indicated in the Eligibility Files.

"Member Submitted Claim" means (i) a paper claim submitted by a Member for Covered Drugs dispensed by a pharmacy other than a Participating Pharmacy, (ii) a paper claim submitted by a Member for Covered Drugs for which the Member paid cash, or (iii) subrogation claims submitted by the United States or any state under Medicaid or similar government health care programs.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI has executed an agreement to provide Covered Drugs to Members.

"Pharmacy" or "Pharmacies" refers from time to time to any or all Participating Pharmacies, Mail Service Pharmacy, Specialty Network Pharmacies or ESI Specialty Pharmacy as the context of the provision dictates.

"Plan" means Plan's applicable welfare benefit plan(s) that contains a prescription drug benefit.

This Agreement is confidential and may not be disclosed to any other party without the express written consent of both parties.

92316v3

D37 0505

HIGHLY CONFIDENTIAL

- Each Generic Drug Prescription Drug Claim ingredient cost will be calculated at the lesser of the applicable MRA, U&C, or AWP discount price in determining the discount achieved for purposes of the guarantee, including 100% Member Copayment.

- ESI will pay the difference of Sponsor's net cost for any shortfall between the actual result and the guaranteed result. Any excess achieved in any other guarantee offered pursuant to this Agreement will be used to make up for, and offset, a shortfall in the MRA guarantee.

B. **Brand Guarantee**

ESI guarantees a minimum average discount of AWP-15.25% on brand Covered Drugs dispensed through Participating Pharmacies, to be applied, measured and reconciled in the aggregate on an annual basis within ninety (90) days of the end of the Sponsor's contract year.

The guarantee will be calculated as: [1-(total discounted AWP ingredient cost (excluding dispensing fees and claims with ancillary charges, and prior to application of Copayments) of applicable Prescription Drug Claims for the annual period divided by total undiscounted AWP ingredient cost (both amounts will be calculated as of the date of adjudication) for the annual period)]. OTC products and Specialty Products shall be excluded from the guarantee.

The guarantee is further subject to the following:

- Each Drug Prescription Drug Claim ingredient cost will be calculated at the lesser of the applicable U&C or AWP discount price in determining the discount achieved for purposes of the guarantee, including 100% Member Copayment.

- ESI will pay the difference of Sponsor's net cost for any shortfall between the actual result and the guaranteed result. Any excess achieved in any other guarantee offered pursuant to this Agreement will be used to make up for, and offset, a shortfall in the brand guarantee.

III. **Mail Service Pharmacy Pricing**

| | Less than 25% Mail Service Pharmacy Utilization(1) | Minimum 25% but Less Than 30% Mail Service Pharmacy Utilization(1) | Minimum 30% Mail Service Pharmacy Utilization(1) |
|---|---|---|---|
| | 1-90 Day Supply | 1-90 Day Supply | 1-90 Day Supply |
| Brand Ingredient Cost | 23% | 24% | 25% |
| Generic Ingredient Cost | 23% | 24% | 25% |
| Brand Dispensing Fee/Rx | $0.00 | $0.00 | $0.00 |
| Generic Dispensing Fee/Rx | $0.00 | $0.00 | $0.00 |
| Administrative Fee/Rx | $0.00 | $0.00 | $0.00 |
| Minimum Rate/Rx | $0.00 | $0.00 | $0.00 |

(1) In the fifth month after execution of this Agreement and in subsequent six month intervals, ESI will determine the semi-annual Mail Service Pharmacy utilization percentage (number of Mail Service Pharmacy prescriptions divided by the sum of the number of Participating Pharmacy prescriptions plus the number of Mail Service Pharmacy prescriptions) and implement the Mail Brand and Mail Generic discounts outlined in the schedule above for the subsequent six months.

- If the Mail Order utilization percentage is less than 25%, the Mail Brand and Mail Generic Discount will be AWP-23%.

# EXHIBIT 69

ADVANCEPCS, L.P.

MANAGED PHARMACEUTICAL BENEFIT AGREEMENT

THIS AGREEMENT (the "**Agreement**") is made as of May 1, 2001 (the "**Effective Date**") by and between PIRELLI ARMSTRONG TIRE CORPORATION ("**Customer**") and AdvancePCS, L.P. ("**AdvancePCS**"), for the purpose of delineating the terms and conditions under which AdvancePCS will provide certain managed pharmaceutical benefit services to Customer. All capitalized terms will have the meanings given in this Agreement or in Section 11 of this Agreement.

AGREEMENT

1. **STATEMENT OF SERVICES/ADVANCEPCS OBLIGATIONS**

1.1. **Services.** AdvancePCS will provide Customer the services, including the Base Services (those Services described in Exhibit A—Sections 1, 3, 4 (other than 4B and 4E), 5, 6, 9, 10 (other than 10B), and 12) and such other services listed in Exhibit A hereto which are selected by Customer pursuant to the implementation documents (collectively the "**Services**"). AdvancePCS may change the Services upon 30 days' prior written notice to Customer, subject to Customer's right to terminate under Section 8.2.2 of this Agreement. Services will not be discontinued or materially reduced except upon the mutual agreement of the parties. Customer acknowledges that AdvancePCS may upgrade and make minor modifications to the Services without notice to Customer.

1.2. **Compliance with Law.** AdvancePCS will comply with all Laws applicable to it and the Services it provides under this Agreement. Customer has no responsibility to advise AdvancePCS regarding its compliance with any applicable Law. AdvancePCS makes no representation or warranty that the Plan Design selected by Customer is in compliance with any Law that applies to Customer.

1.3. **AdvancePCS Indemnity.** Subject to the limitations set forth in Section 6.4 of this Agreement, AdvancePCS will indemnify and hold harmless Customer for, from and against any and all costs, losses or damages Customer may incur as a result of AdvancePCS' failure to perform any of its obligations under this Agreement.

2. **FEES AND PAYMENT**

2.1. **Fees.** Customer will pay to AdvancePCS the Administrative Fees listed in Exhibit B, as applicable. AdvancePCS will invoice Customer for such Administrative Fees monthly, and payment is due within 10 days of Customer's receipt of the invoice.

2.1.1. AdvancePCS assesses a minimum monthly charge of $750.00 for the Base Services. Each month AdvancePCS will review Customer's charges for Base Services, and if they are found to be less than the $750.00 minimum, AdvancePCS will invoice Customer for the difference on the following month's statement.

2.2. **Rates for Prescription Claims.** Customer will pay for Covered Items dispensed to Members by the mail service pharmacy or the Network Providers, as the case may be, at

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

11.1. "AdvancePCS" shall mean the corporation AdvancePCS and any subsidiaries or affiliates thereof.

11.2. "AWP" means the average wholesale price of the drug dispensed as set forth in the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference that AdvancePCS may select from time to time. The applicable AWP for Claims submitted by retail Network Providers is based on the average AWP for each drug.

11.3. "Covered Items" means the prescription drug benefits for which Members are eligible pursuant to Customer's drug benefit plan.

11.4. "Change in Law" means any (i) change in or adoption of any Law, (ii) change in the judicial or administrative interpretation of any Law, or (iii) change in the enforcement of any Law, occurring after the date Customer is implemented or the Effective Date, whichever is earlier.

11.5. "Claims" means those claims processed through the RECAP® System or otherwise transmitted or processed in accordance with the terms of this Agreement in connection with the Plan Design.

11.6. "Law" means any federal, state, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

11.7. "Maximum Allowable Cost (MAC). AdvancePCS will use one or more of its proprietary maximum allowable cost pricing schedules ("MAC Lists") to establish an upper limit reimbursement price for certain multiple-source drugs dispensed under the Plan without regard to the specific manufacturer whose product is dispensed. The MAC Lists shall include generic drugs based on their common substitution, bioequivalency rating, and general availability. Customer agrees to accept any one of AdvancePCS' MAC Lists, as amended from time to time in AdvancePCS' discretion, for the purpose of pricing drugs in connection with this Agreement. Customer acknowledges that certain of AdvancePCS' national provider networks may utilize one or more of AdvancePCS' MAC Lists.

11.8. "Member" means an individual that Customer has designated in writing (or by electronic, tape or other means approved by AdvancePCS) to AdvancePCS as eligible for Covered Items under the terms of the Plan Design.

11.9. "Network Provider" means a provider which has agreed to provide certain pharmacy Services to Members in accordance with the terms of its agreement with AdvancePCS.

11.10. "Plan Design" means the processing parameters and other information concerning Customer's drug benefit plan, which Customer has disclosed to AdvancePCS pursuant to Section 3.1 of this Agreement, and which AdvancePCS will use to process Claims under this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose

PIRELLI-FDB 0000172
CONFIDENTIAL

***EXHIBIT B***
***ADMINISTRATIVE FEES***

**Pirelli Armstrong Tire Corporation**
**Effective May 1, 2001**

As consideration for the Services selected by Customer pursuant to the Implementation Documents and described in Exhibit A, Customer will pay to AdvancePCS the fees set forth below:

| | | |
|---|---|---|
| Base Services - | Per Processed POS Claim | $0.32* |
| | Performance or other standard AdvancePCS Mail Program | $0.00* |

Retail Claim Rates

**Carrier W224, Groups 0100, 0200, 0300, and 0400 ONLY**
Brand: AWP-14% + $2.00 dispensing fee
Generic: AWP-14% + $2.50 dispensing fee or MAC + $2.50 dispensing fee, whichever is applicable

**Carrier W224, Group 0500 ONLY**
Brand: AWP-19% + $1.90 dispensing fee
Generic: AWP-35% + $1.90 dispensing fee or MAC + $1.90 dispensing fee, whichever is applicable

Mail Service Claim Rates
Brand: AWP- 20% + $0.00 dispensing fee
Generic: AWP- 50% + $0.00 dispensing fee

Member Submitted Claim Rates (Unless specified otherwise in Implementation Documents)

**Carrier W224, Groups 0100, 0200, 0300, and 0400 ONLY**
Brand: AWP-14% + $2.50 dispensing fee
Generic: AWP-14% + $2.50 dispensing fee or MAC + $2.50 dispensing fee, whichever is applicable

**Carrier W224, Group 0500 ONLY**
Brand: AWP-19% + $1.90 dispensing fee
Generic: AWP-35% + $1.90 dispensing fee or MAC + $1.90 dispensing fee, whichever is applicable

| Additional Services | | Fee |
|---|---|---|
| Section 2 | - Member Service/Toll Free Member Services | $.13/Claim** |
| Section 4B | - Paper Claim Direct Submission | $1.50/Claim |
| Section 4B | - Preprocessed Direct Claims | $2.50/Claim |
| Section 4E | - Medicaid Claim tape submission | $1.50/Claim |
| | Medicaid Claim paper submission | $2.50/Claim |
| Section 7 | - Managed Access/Managed Drug Limitations | $2.50 Per Authorization*** |
| Section 8 | - Prior Authorization/Formulary Exception (PA/FE) | $30.00/Request |
| Section 10B | - Paper Claim Direct Submission (on-line) | $.80/Claim |
| Section 11A | - Production, Postage, and Distribution Costs for Formulary Booklets and Physician Newsletters | $125/quarter payable within 10 days of receipt of notice. |
| Section 11F | - AdvancePCS' Rebate Percentage | 20%**** |
| Section 12 | - Mail Service Claims | See above |
| Section 13A | - Paper Eligibility Submission | $.02/Claim |
| Section 13B | - Decentralized Administration | $.02/Claim |
| Section 13C | - Claim Detail Report via Paper | $.02/Claim |
| Section 13D | - Card Reissuance | $.50/Card |
| Section 13E | - CAT/BAT Tapes | $100.00/Each |
| Section 13F | - Custom CAT/BAT Tapes | Subject to Customer Specific Programming charge |
| Section 13G | - Case Set-Up | $20.00/group |
| Section 13H | - Carrier/Group Rebate Reports on Tape | $100.00/Each |
| Section 13I | - Customer Specific Programming | $110.00/Hour |

[Continued on Next Page]

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

# EXHIBIT 70

# Amendment
# to the
# Agreement to Provide
# Prescription Plan Administration
# Between
# National Prescription Administrators, Inc.
# and
# Philadelphia Federation of Teachers

This Amendment between NATIONAL PRESCRIPTION ADMINISTRATORS, INC., and PHILADELPHIA FEDERATION OF TEACHERS amends the Agreement implemented May 1, 1996 between the parties.

WITNESSETH:

WHEREAS, the parties wish to amend the Agreement as follows:

APPENDIX F

REIMBURSEMENT FEE SCHEDULE

Reimbursement per prescription will be the following:

- Ingredient Cost, plus scheduled reimbursement fee.
- NPA's Generic Maximum Price plus professional fee.
- Average Wholesale Price (AWP), less thirteen percent (13%) plus professional fee.
- NPA's Generic Maximum Price plus professional fee.
- In all cases reimbursement will be based on the lower of the scheduled amount or the Participating Provider's Usual and Customary, Advertised or Posted Price.
- The maximum ingredient cost of the AWP, less thirteen percent (13%) as established by Medical Economics, Drug Topics or Redbook, updated weekly from magnetic tape.

The reimbursement fee schedule follows:

| CLASSIFICATION: | I | II | III | IV | V |
|---|---|---|---|---|---|
| ALL STATES: | 2.25 | 2.40 | 2.60 | 2.75 | 3.25 |

Compounded prescriptions will be reimbursed an additional $1.00.

PFTHW-FDB 000197

COPAYMENT:

The copayment per prescription, payable by the cardmember, will be as follows:

| Sponsor No. 130 - Actives: | $5.50 per Brand name prescription<br>$3.50 per Generic prescription |
|---|---|

NPA®

# EXHIBIT 71

# EXPRESS SCRIPTS, INC.
# MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT ("Agreement") is entered into as of May 1, 2002 ("Effective Date"), by and among EXPRESS SCRIPTS, INC., on behalf of itself and its subsidiaries (collectively referred to as "ESI"), and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, organized under the laws of the Commonwealth of Pennsylvania ("Sponsor") for the purpose of setting forth the terms on which ESI will provide prescription drug benefit management services to Sponsor.

## SECTION I - DEFINITIONS

The following terms shall have the meanings set forth below:

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as determined by ESI from the most current information provided to ESI by drug pricing services such as First Data Bank or other source nationally recognized in the retail prescription drug industry selected by ESI. The applicable AWP for prescriptions filled in the Mail Service Pharmacy will be the AWP for the lesser of: (i) the NDC code for the package size from which the prescription drug was dispensed or (ii) package sizes of 100 units or 16 ounce quantities, or the next larger quantity if such specified quantities are not available.

"Covered Drug(s)" means those prescription drugs, supplies and other items that are covered under the Plan as indicated on the DBW. Specialty Injectables are not Covered Drugs.

"Drug Benefit Worksheet" or "DBW" means a prescription drug benefit summary form ESI has provided to Sponsor which, when completed and signed by Sponsor, will describe the essential elements of Sponsor's pharmacy benefit plan ("Plan").

"Eligibility Files" means the list submitted by Sponsor to ESI indicating persons eligible for drug benefit coverage services under the Plan.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Sponsor which classifies items for purposes of benefit design and coverage decisions.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is accepted by the U.S. Food and Drug Administration as therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient. For purposes of pricing, the designation of a product as "brand" or "generic" and/or subject to MRA is determined by ESI under its standard policies which take into account

This Agreement is confidential and may not be disclosed to any other party without the express written consent of both parties.

**EXHIBIT A**

**PRESCRIPTION DRUG PROGRAM FEES**

Sponsor shall pay to ESI the amounts set forth below, net of Member Contributions, (on a Prescription Drug Claim basis unless expressly provided otherwise):

Plan Design:
➢ 2-tier benefit design programs utilizing the ESI 500 Formulary

1. Prescription claims through Participating Pharmacies:

A. Ingredient Cost and Dispensing Fee - PERxCare®

The lower of:

(1) An ingredient cost of AWP less 16% or, if lower, or MRA, plus a dispensing fee of $1.55 per prescription drug claim, plus incentive fee, plus applicable sales or excise tax or other governmental surcharge, if any; or

(2) The U&C of the Participating Pharmacy dispensing the prescription drugs, plus applicable sales or excise tax or other governmental surcharge, if any.

C. Claims Administration Fee: $0.20 per submitted claim.

D. Miscellaneous:

(1) If ESI pays a particular Participating Pharmacy a higher rate because Sponsor has requested such pharmacy be included in the network, the rate charged to Sponsor shall be the net ingredient cost plus the dispensing fee paid by ESI to such pharmacy, plus applicable sales or excise tax or other governmental surcharge, if any.

(2) If any change in Federal or applicable state law or regulation (including the interpretation of existing laws or regulations by a court or administrative agency or extension of a prescription drug benefit under Medicare) occurs during the term, and in consequence thereof ESI increases payments for Covered Drugs to Participating Pharmacies in the applicable jurisdiction under its provider agreements, the Prescription Drug Program fees set forth above will be increased by the same amount.

2. Prescription claims submitted through Mail Service Pharmacy:

A. 1-34 Days' Supply.

PFTHW-FDB 000183

# EXHIBIT 72

PRESCRIPTION DRUG SERVICES PROVIDER AGREEMENT

AGREEMENT made this 31st day of January 2003, by and among the Teamsters Health and Welfare Fund of Philadelphia and Vicinity, with offices at 4th & Cherry Streets, Philadelphia, Pennsylvania 19106 (the "Fund") and General Prescription Programs, Inc. a *Delaware* corporation with its principal offices at 61 Freeman Street, 5th Floor, Newark, New Jersey 07105 ("GPP").

WHEREAS, the Fund desires to provide certain prescription drug services for its eligible participants and their beneficiaries (hereinafter referred to as Participants);

WHEREAS, GPP is engaged in the business of performing certain administrative services in connection with the administration of prescription drug plans; and

WHEREAS, the Fund originally entered into an Agreement in 1986 with GPP to administer a high quality prescription drug program in a competent and efficient manner and at a reasonable price, and the Fund and GPP desire to continue the relationship on the terms and conditions set forth herein;

NOW THEREFORE, the parties hereto, in consideration of the mutual promises and duties set forth, each intending to be legally bound, do agree as follows:

1. APPOINTMENT

a. GPP is hereby reappointed as the Pharmacy Benefit Manager of the Prescription Drug Program ("the Program") and GPP accepts such appointment.

2. DUTIES AND RESPONSIBILITIES

a. In General

i. GPP shall provide the following administrative services for eligible Participants:

1. Arrange for a network of pharmacies in the United States *which* who will accept the Fund's identification card (a "Prescription Card") as payment for prescription drugs to eligible Participants;

2. Pay to the participating pharmacies the amounts properly due and owing;

3. Develop and maintain an on-line eligibility system whereby participating pharmacies have a network computer link to GPP's eligibility files. GPP shall be responsible for updating the eligibility information within twenty-four (24) hours of the transmission of same from the Fund, except for weekends and official federal and state holidays in New Jersey, in which case the twenty-four (24) hour period shall run from the beginning of the next business day following the weekend or official federal or state holiday. Participant eligibility is based on the date that a prescription is filled. In

pharmacies within ten (10) days of its receipt of properly itemized bill documenting the amounts paid by GPP, the date payments were made, the names and social security numbers of the individuals on behalf of whom payments were made and such other information as may reasonably be requested by the Fund.

ii. GPP shall pay to participating pharmacies an amount equal to the Cost of prescriptions filled plus the dispensing fee (not to exceed Two Dollars and Twenty Five Cents ($2.25) in Pennsylvania) for each prescription that is filled for an eligible Participant, less the amount of any co-payment received by the pharmacy by an eligible Participant. The dispensing fee payable to pharmacies outside of the Commonwealth of Pennsylvania shall be as low as GPP may in good faith negotiate and shall not exceed the maximum dispensing fee permitted by Medicaid. GPP shall provide to the Fund a list of the applicable dispensing fees for the states of New Jersey, New York and Delaware for such other states as the Fund may from time to time request. *The amount of the dispensing fee shall be the lesser of the dispensing fee negotiated between GPP and the pharmacy or the submitted dispensing fee of that pharmacy. In no case shall GPP keep a differential between the submitted dispensing fee and the dispensing fee billed to the Fund. (This means that if GPP pays a dispensing fee of $1.99 for a prescription drug at a retail pharmacy, the Fund shall be responsible for a payment equaling a dispensing fee of $1.99 for that prescription drug.)*

3. COST OF PRESCRIPTIONS TO THE FUND (the "Cost")

a. It is understood by the parties that a major reason that the Fund has entered into this Agreement is to enable it to pay for prescription drugs at a price below the Average Wholesale Price, as that term is commonly understood in the pharmaceutical industry. Specifically, GPP represents that its charges to the Fund (the "Cost") for prescription drugs shall not exceed the following (reduced by the amount of the co-payment):

- Brand-name drugs - effective rate of AWP less 16.6 percent.
- Generic drugs - HCFA MAC or, for prescription drugs for which there does not exist a HCFA MAC price, the lowest reduction from AWP as GPP reasonably may negotiate. In determining the price for generic drugs, AWP shall mean the average wholesale cost of all generic drugs with the same chemical formula.

*3. Cost of Prescriptions to the Fund*

*a. It is understood by the parties that a major reason that the Fund has entered into this Agreement is to enable it to pay for prescription drugs at*

# EXHIBIT 73

**From:** James, Robert
**Sent:** Monday, May 03, 2004 3:47 PM
**To:** Dolan, Anthony
**Subject:** FW: Potential Discontinuance of First Data Bank's Average Wholesa le Price List--DSCP Pharmaceutical Prime Vendor Program

Here is a long winded answer. You can wordsmith a response from the text below.

Bob James

-----Original Message-----
From: James, Robert
Sent: Friday, April 23, 2004 8:08 AM
To: Yonko, Greg; Flach, Paul; Felton, Jeff; Longwell, Sharon; Cardenas, Debbie
Subject: RE: Potential Discontinuance of First Data Bank's Average Wholesa le Price List--DSCP Pharmaceutical Prime Vendor Program

The short answer is McKesson is using a standard 25% markup on Brand Rx (not on generics) and has been for the last four years. I believe that our generics group just uses the AWP that the supplier gives them and then everything is adjusted as necessary when we get the FDB downloads so at the end of the day, we are sending out the FDB AWP.

FDB raised a test balloon at their recent conference in SFO. They received a lot of feedback and pushback from several customer segments. Medco responded strongly stating that they would have to re-negotiate over 100,000 contracts (probably a gross exaggeration) and other said similar things. The problem is once contracts are re-opened, then everything is on the table. Most third parties do not want to do that.

FDB is trying to get CMS, Medicaid, and other large players to sit down and work through the issue. My take on this is FDB is tired of getting all the phone calls and the allegations about the AWP process, just like we are. I spoke with their President and CEO and Kay Morgan last week about this situation. They are not going to do anything soon.

FDB will most likely not discontinue their AWP process for the next 12 to 18 months to give the industry time to figure out what they want to do with reimbursements. As far as I know, Medispan will do the same since they get their data from FDB. However, RedBook is a different deal. RedBook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a mark up of 1.20 which provides a 16 2/3% AWP spread. If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.

As I mentioned above, McKesson has been using a 25% markup on brand Rx items for the past four years. This is used to get our List Price or Suggested Sell price, which is the price that is surveyed by FDB to determine the average or AWP. Brand Rx has really normalized over the past couple of years at a 25% markup or 20% spread. There are some items that remain at the old markups and AWP's because there have been no price increases. Procrit is a good example. It carries a 16 2/3% spread. The real problem is generics. AWP are suggested by the supplier and usually are 10-15% lower than the brand. The opening spreads range from 28% to 32% AWP to WAC and lower contract pricing increases the spread from there as increased competition comes to the market. Eventually, MAC pricing takes over with generics.

Bob James

-----Original Message-----
From: Yonko, Greg
Sent: Friday, April 23, 2004 7:37 AM

# EXHIBIT 74

RAYMOND S. HARTMAN

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

--------------------------------x

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, ET AL.,

Plaintiffs

Civil Action

vs. No. 1:05-CV-11148-PBS

FIRST DATABANK, INC., and McKESSON CORPORATION,

Defendants

--------------------------------x

DEPOSITION OF RAYMOND S. HARTMAN, a witness called by and on behalf of the Defendant McKesson Corporation, taken pursuant Federal Rules of Civil Procedure, before Nicole E. Guilbert, a Notary Public in and for the Commonwealth of Massachusetts, at Bonner, Kiernan, Trebach & Crociata, on Wednesday, October 4, 2006, commencing at 9:46 a.m.

VOLUME I

RAYMOND S. HARTMAN

it finally.

MR. GOLDMAN: Go ahead.

THE WITNESS: Are you guys ready?

MR. SOBOL: Done. Sorry.

THE WITNESS: No. I kind of enjoy you guys getting into the colloquy. The assumption of the 15 percent, if I were focussing -- again, this is a representative calculation. If I were focussing on the -- all reimbursements which -- for all of the named drugs in the complaint, mail order would certainly be a venue that I would want to look at.

And there would be -- since they -- the reimbursements for mail order are also related to AWP, there would be a way of calculating what those damages would be. The terms of this -- if I -- suppose we found out that 15 percent of the units reimbursed were for mail order, this -- this formula would apply to the nonmail order and there would be a slightly different -- there'd be a different variation.

RAYMOND S. HARTMAN

Rather than 15 percent, something else would be used for mail order, but I didn't -- I didn't break that out here. It would be something that would be very easily extended at the time of calculating the damages.

**Q. (By Mr. Goldman) So the formula at pages 11 and 12 are not meant to reflect how you would compute damages in this case, but just to be a representative way to do it?**

A. No. It's how I would compute damages in this case. It identifies the data sources and the -- and the -- how those data sources will be used, and the primary data sources that I see are the -- are First DataBank AWPs and WACs and using publicly available information, either the national sales perspective or the national prescription audit from IMS, which would have total reimbursements at retail with the national prescription audit.

And if I'm using total reimbursements at retail and I can break it up by mail order and by nonmail order, all I have to do is apply the percentage increase in AWP to those -- that total, and I'll be able to come up with damages. What I've done here is I've identified basic formulaic methodologies and I've made aggregate assumptions, and this could easily be extended and

RAYMOND S. HARTMAN

disaggregated to two groups, mail order and nonmail order. It could be done using the national sales perspective data from IMS and WAC data, and that's the way this is written.

It could be used -- it could be implemented using other IMS data.

**Q. You cited Young's declaration and you cited Judge Saris's opinion in support of your 85 AWP -- 85 percent of AWP; am I correct?**

A. That's correct.

**Q. And when you did that, you realized that you were relying on sources that did not apply to mail order?**

A. Well, mail order is the -- the types of reimbursement for mail order differ from the contracts that are written through network pharmacies.

**Q. My question is: Did you realize you were citing sources which were not referring to mail order?**

A. I was citing the sources that I was citing.

**Q. Did you realize that they did not -- that they were not referring to mail order?**

A. I was using the sources to make clear the simplicity with which to go from the sources for the set of drugs that both Judge Saris was referring to and Mr. Young were referring to and I'm referring to and Dr. Berndt was referring to for this calculation here.

RAYMOND S. HARTMAN

**Q. Did you realize the 13 to 18 percent you were referring to was not what was applicable to mail order?**

A. I hadn't --

**Q. This is really one I think you can tell me yes or no on.**

A. I hadn't -- I hadn't -- I would realize it because I know it, but it wasn't -- I didn't -- at this stage of showing a formulaic methodology, I could have gotten very detailed and broke out mail order and nonmail order. I could have done all kinds of stuff. And I didn't -- I just didn't pursue that.

MR. GOLDMAN: A few more questions about the class and then maybe we can take a break. It's 12:35.

MR. SOBOL: Your deposition.

MR. GOLDMAN: I'm just going to keep going for a while then, for a little while.

**Q. (By Mr. Goldman) Did you understood -- did you understand HMOs to be included in the class?**

A. The entities that are included in the class are going to be those entities which are third-party payors. Now, if you're referring to entities, say, such as Blue Cross Blue Shield of Massachusetts, which at some time had a staff model and -- but also had a reimbursement arm, it

RAYMOND S. HARTMAN

A. Well, a contract that is capitated is that a third-party payor will engage -- will contract with a manage care organization and say: I'm going to pay you $3,000 a year to manage the healthcare costs --

**Q. Flat fee.**

A. -- flat fee and that's a capitated fee --

**Q. Okay.**

A. And so I don't know what --

**Q. I can see --**

A. Whatever you're talking about, I have no clue --

**Q. I can see the confusion and that's fine. So let's take a capitation agreement --**

A. Which capitation agreement?

**Q. As you've defined it.**

A. Okay. So we got --

**Q. Do you see a way in which the alleged 5 percent scheme would have injured a TPP?**

A. In the case of a capitated contract of that sort, the person that would bear the risk of the overcharge there would be the person providing the service under the capitation agreement.

**Q. I'm going to leave the issue at -- there. I'm going to turn to a new subject.**

MR. SOBOL: Can we just take a short,

RAYMOND S. HARTMAN

few-minute break?

MR. GOLDMAN: Sure.

THE VIDEOGRAPHER: Here ends Tape 4. Off the record 4:22 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER: Here begins Tape Number 5. Back on the record 4:32 p.m.

**Q. (By Mr. Goldman) With regard to the drugs on Appendix A in our case, do you know how many of them are multisource drugs which have therapeutic equivalents?**

A. I have not studied that, no.

**Q. Do you know whether all drugs are listed on Appendix A are covered by every one of the plans of third-party payors that are in the class?**

A. That would be a study that would arise, I would argue, during the damage calculations, so I haven't yet attempted to ascertain that -- that detail.

**Q. How would we go about finding out the answer?**

A. I would have to determine that there -- there are publicly available sources of information about retail method of payment from places like IMS. There -- to the extent that I would look to other sources, I would have to address that at that stage.

**Q. Does your formula address drugs that are not**

RAYMOND S. HARTMAN

**covered by a plan? I mean do we know under your -- your methodology whether or not it's a covered drug or not?**

MR. SOBOL: Objection to the form.

THE WITNESS: Well, the class is defined as -- as all third-party payors and, as I've understood it, whose pharmaceutical payments for the subject drugs were based on AWP. So if what you're saying is there were some -- some units purchased that were either not subject to their AWP or were not --

**Q. (By Mr. Goldman) Not covered --**

A. -- not --

**Q. Not covered by the plan. You know, you get a booklet what's covered and these -- and I asked you to suppose there are drugs on Appendix A that are not covered by some plans. Does your -- does your formulistic methodology address that?**

A. Well, someone is reimbursing for some of these drugs based on an AWP and that's either going to be a third-party payor, and it includes all third-party payors, or some other payor, like we've talked about the PBMs under capitated plans who may end up being exposed and paid for that. Now, those PBMs are not part of the class and I --

RAYMOND S. HARTMAN

the -- there's going to be a group of the universe of all units sold by an NDC, they're either going to be reimbursed by third-party payors or some other entity.

And so I'm not quite sure --

**Q. Well, suppose -- I don't want to keep using my wife here, but my wife goes and buys a drug and our payor says, no, we don't cover that drug, so we're not going to reimburse you for that drug --**

A. So it will be a cash -- it will be a cash -- it will be self-paid.

**Q. Yeah. We paid for it.**

A. Okay. Well, that's -- yeah. There's data to identify by IMS tracks the -- by NDC or by drug a retail method of payment, the amounts that are by cash, by third-party payors, by other entities, by Medicaid, by governmental entities, so that one is able to adjust the numbers of units that would be subject to the class definition using data sources.

**Q. How does your data reveal whether my wife got paid later by the insurance company or not?**

A. The -- I would have to look at the way IMS gathers this information, but they gather the information in their survey instruments --

**Q. I know --**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.: 1:05-CV-11148-PBS
Volume II
Pages 279 to 397
Exhibits: (See Index)

---

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,
Plaintiffs,

-vs-

FIRST DATABANK, INC., a MISSOURI CORPORATION, a Delaware Corporation.
Defendants.

---

* * * * * * *

DEPOSITION of DR. RAYMOND S. HARTMAN, called as a witness by and on behalf of the Defendants, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Lisa L. Gross, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at the offices of Bonner, Kiernan, Trebach & Crociata, One Liberty Square, Boston, Massachusetts, on Thursday, October 5, 2006, commencing at 9:38 a.m.

DR. RAYMOND S. HARTMAN

**Q. Then tell me what the alternative variations are in a way -- and please try and do that in a way that I can understand, if you are able.**

A. Okay. The one that is the simplest, is if you look at equation 21D, and you look at the -- I will use the notational terms here, the variable names, Delta AA, if that's all right with you. And I would divide that by the allowed amount post-Scheme. So that actually -- that's what the increase was relative to the observed reimbursement rate.

So you will see in paragraph 21D, that relative to the pre-reimbursement rates, calculated as they are, it's 4.2 percent.

If I take the amount that the inflation caused in reimbursement rates relative to what they actually are in the amounts paid in the IMS data, it's 4 percent.

So I said, oh, this -- rather than "pre," I should have put "post" in here. I would have a four percent increase relative to what IMS reports total dollars spent on drugs. And I said, I don't even need units now, I can

DR. RAYMOND S. HARTMAN

use the IMS data, I can get units from the IMS, but I can get dollars, too. And I don't even need the range of the 13 to 18 percent.

So as I looked at it I said, "Oh, that would have been an easier way of using the same data." I mean, I can do it either way, and I probably would do it both ways.

**Q. So had you thought about what you just described to me at the time that you wrote this errata sheet?**

A. Of course.

**Q. And is there a reason why you didn't set out what you just told me in your sheets so I would have had it even as late as yesterday?**

A. I thought -- it's something that I thought would be more of a burden.

**Q. You didn't want to burden me?**

A. I have great sympathy for you, Counselor.

**Q. All right. So are there any other alternative variations other than the one that you just stated?**

A. Probably.

**Q. That you have in mind?**

DR. RAYMOND S. HARTMAN

A. None that occurred to me as I was reviewing this. Those two seemed sufficient. But, again, there are a variety of ways of coming at this and looking at differences between pre-and-post worlds and looking at the actual data that exists. And the IMS data is a very rich resource and at an aggregate wide level. And I have the price data from First Databank. And there may be another way that occurs once the damage analysis is undertaken. But they are all standard ways that economists use going to markets as a whole to calculate effects of things in markets.

**Q. Now, I would like you to look -- it's about time we got to looking at your actual formula for computing on a formulaic basis aggregates damages in this case.**

**So let's look at pages 11 and 12. So I'm looking at paragraph 20, and I see you have computed there 4.2 percent. And when I use what's in here, Professor, the 4.2, I realize in your errata that you made some changes and rounding off and so forth, so bear that in mind, you don't have to -- you will not need to**

DR. RAYMOND S. HARTMAN

**explain to me that in your errata sheet, that you made some correction to this, okay.**

A. Okay. Well --

**Q. We all have that in mind, we have that in the record.**

A. Okay. Good.

**Q. So in paragraph 20D, you said, "Hence, the Scheme increased AWP by 4.2 percent for every relative NDC."**

A. That's correct.

**Q. Now, I have this question: Do you go on to use that statistic, AWP increased by 4.2 percent for the purpose of -- for your formulaic methodology for computing aggregate damages, because I didn't see where that led, that 4.2 percent. I'm going to stop. Just, that's by way of background. There are two 4.2 percent calculations -- strike that. I'm going to strike what I said before.**

A. Actually, I would --

MR. SOBOL: There's no question before you.

**Q. There's no question.**

**There are two 4.2 calculations, one**

# EXHIBIT 12

**From:** Ferreira, Brian

**Sent:** Wednesday, December 08, 2004 11:29 AM

**To:** Cardenas, Debbie

**Cc:** Puccetti, Joy; Pasquale, Pete; James, Robert; Hilliard, Andy

**Subject:** RE: Net Brand RX Exception for Econo# 1220524

Thanks for the quick response. Have a great holiday season !

Brian

-----Original Message-----
**From:** Cardenas, Debbie
**Sent:** Wednesday, December 08, 2004 2:28 PM
**To:** Ferreira, Brian
**Cc:** Puccetti, Joy; Pasquale, Pete; James, Robert; Hilliard, Andy
**Subject:** RE: Net Brand RX Exception for Econo# 1220524

Thanks Brian, I am not involved if the item is not a Brand RX net priced slow mover. I did not have a chance to look it up and just assumed since it was sent to me.

Please carry on with your conversation with Bob James to resolve this situation.

-----Original Message-----
**From:** Ferreira, Brian
**Sent:** Wednesday, December 08, 2004 11:20 AM
**To:** Cardenas, Debbie
**Cc:** Puccetti, Joy; Pasquale, Pete
**Subject:** Net Brand RX Exception for Econo# 1220524

Deb,
This is the item we're trying to load as a local contract. We were told that it is **not** a Slow Mover and was not part of the Net Billed initiative. Did we misinterpret these messages? I'm leaving the office for an appointment in Philly and I'll try to reach you later this afternoon.

Thanks,
Brian
-----Original Message-----
**From:** James, Robert
**Sent:** Tuesday, November 16, 2004 1:59 PM
**To:** Ferreira, Brian; Yonko, Greg
**Cc:** Pasquale, Pete; Petrus, Susan
**Subject:** RE: Tincture of Opium 1220524

This product is sold at list because it is a C2 narcotic, not because its a slow mover. Redacted which may have made sense years ago, but really doesn't today because 99% of our customers get around list only by their buy plans or contracts. All (with few exceptions) brand products are marked up 25% to get suggested sell or list price. The reason is ultimately, this is the markup that creates a 20% spread.....which is the norm for 99% of all brand pharmaceuticals. This also makes our sugg sell and AWP the same number in most cases which makes BIS much more efficient in updating pricing actions.

# EXHIBIT 39

Case 1:05-cv-11148-PBS Document 180-42 Filed 12/22/2006 Page 2 of 3

McKesson's. Just for kicks, I assumed a 70% gross margin for JOM and calculated their Omnicare profit also.

**Omnicare total JOM**

Redacted

**McKesson total JOM**

Redacted

**JOM Omnicare**

Redacted

Redacted

-----Original Message-----
**From:** James, Robert
**Sent:** Wednesday, July 28, 2004 2:19 PM
**To:** Stubbs, Andrew; Boyd, Beth; Hanks, Jason; Cardenas, Debbie; Bolger, Phil
**Cc:** Felton, Jeff; Petrus, Susan; Torres, Martha
**Subject:** RE: JOM - Omnicare positioning for support Sales $ Summary

Please see below for the workup of what the impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years ago J & J products were all 16 2/3% AWP spread products. Today, almost all of them are 20% spread. Procrit just changed last month.

Just for this example we'll roll up these figures to WAC (amounts given divided by .982) and look at profitability assuming all third party Rx's based on AWP minus 15% (any additional fee would remain constant so we won't use a fee in this example because we don't have the number of transactions).

Redacted

Case 1:05-cv-11148-PBS Document 180-2 Filed 12/22/2006 Page 8 of 3

Redacted

or 3 times the profit as before

Redacted

or more than 3 times the profit as before.

We're a nice advocate to have around. This example is just to provide background to our team so everyone realizes the impact of increasing AWP's.......Not by McKesson, but by the FDB process.

Call me if you questions.

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 20th Floor
San Francisco, CA. 94104
Phone 415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
**From:** Stubbs, Andrew
**Sent:** Wednesday, July 28, 2004 12:20 PM
**To:** Boyd, Beth; Hanks, Jason; Cardenas, Debbie; James, Robert; Bolger, Phil
**Cc:** Felton, Jeff; Petrus, Susan
**Subject:** RE: JOM - Omnicare positioning for support Sales $ Summary

All- Here's a summary of the JOM Sales, Procrit Sales, and Remicade Sales for all of Omnicare for April 04 through June 04.

Jason- just a reminder.... Redacted

Redacted

I have all the detail in a massive 22mb file, but I'm not sending that to everybody (just Jason). If you do need that file, please let me know and I'll send it separately.