UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS, HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | C.A. No. 1:05-CV-11148-PBS |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**PLAINTIFFS' PROFFER OF EVIDENCE COMMON TO THE CLASS
IN SUPPORT OF CLASS CERTIFICATION**

# I.    STATEMENT OF FACTS COMMON TO THE CLASS

Plaintiffs' discovered Defendants' Scheme in the course of discovery in the *AWP Litigation*, currently pending before this Court.  Deposition testimony and documents produced in response to a subpoena issued in that case revealed that Defendants First DataBank ("First Data") and McKesson Corporation ("McKesson") worked in conjunction with each other to increase the WAC/AWP markup on brand name prescription drugs from 20% to a standard 25%. Thus, with the flick of a switch at FDB, Defendants' artificial markup caused Plaintiffs and the Class to lose billions of dollars in the form of excess payments to pharmacies.[1]  Recently produced documents confirm Plaintiffs' allegations and Defendants' intentional conduct to raise AWPs to benefit McKesson's retail client.  Because the Court will want to see some proffer as to how liability can be established at trial on a classwide basis, Plaintiffs do so below.

## A.    FDB and McKesson Agree to Raise the WAC – AWP Spread

Historically, brand pharmaceutical companies were set up as 20% or 25% markup companies, who uniformly applied their respective markup across the company's product line.[2] Although higher markups made the drugs more appealing to pharmacies because they could reap a greater profit, manufacturers also had an incentive to maintain the lower markups because it gave them a "competitive advantage" in the form of "more favorable treatment by managed care."[3]

---

[1] All exhibits referenced herein are attached to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification ("Berman Decl.").  Ex. 1 (Deposition of Patricia Kaye Morgan (January 11, 2005) at 508:4-20 (admitting that from 2003 until the present First Data relied solely on McKesson's markup information)); Ex. 2 (Deposition of Bob James (February 23, 2005) at 55:17-56:2 (Q: "[T]o summarize your testimony. . . McKesson did standardize in approximately 2001 the markup from WAC to suggested selling price, and that standard markup was 25%, correct?  A: "That's correct.")); Ex. 3 (document entitled "AWP Discussion") (MCKAWQ 0069611-13); Ex. 4 (collection of e-mails, including exchanges between Bob James and Kay Morgan regarding pricing information); and Ex. 5 (Deposition of Ramon Crusit (February 23, 2005) at 20:7-26:9 (discussing phone calls and e-mails he and his co-worker received from First Data requesting markups information)).

[2] Ex. 3 (AWP Discussion, MCKAWP 0069611).

[3] *Id.*

In 2000, McKesson set out to "normalize" the industry by unilaterally imposing a 25% markup on its suggested sell price for all brand prescription drugs[4] with the intent of changing AWPs. By late 2001,[5] it was "working with FDB [First Data] to make this happen over time."[6] The effects were widespread. Before 2000, McKesson estimated that only 20% of the prescription drug manufacturers were 25% markup companies.[7] By early 2002, however, McKesson estimated that through Defendants' joint efforts described below, 90% of brand name drugs were at the 25% markup.[8] By late 2002, McKesson estimated that the joint FDB/McKesson effort had increased the number to 95%.[9] In 2004, McKesson estimated that 99% of the prescription drugs were set at a 25% markup.[10] McKesson acknowledged that without its efforts, "the AWP's most likely would not change"[11] and that the industry shift "probably speaks to First Data Bank's willingness to work with us to normalize the brand product AWPs."[12]

McKesson, knew that as one of the largest national wholesalers it had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)"[13] and, if

---

[4] Ex. 7 (MCKAWP 0057171); Ex. 8 (MCKAWP 0047807 ("Our mark up is not coming from our suppliers. Suppliers [have] nothing to do [with] how we mark up our items. It is the Product Management team who make[s] the decision on our mark up.")).

[5] Ex. 9 (MCKAWP 0069608 (quoted below)).

[6] Ex. 10 (MCKAWP 0066465).

[7] Ex. 11 (MCKAWP 0069502).

[8] Ex. 9 (MCKAWP 0069609).

[9] Ex. 11 (MCKAWP 0069502).

[10] Ex. 12 (MCKAWP 0069766).

[11] Ex. 13 (MCKAWP 0069732).

[12] Ex. 14 (MCKAWP 0068599).

[13] Ex. 15 (MCKAWP 0068514). "Spread" defines the difference between the WAC and AWP in terms of the AWP, *e.g.*, a WAC of 100 and a AWP of 120 represents a spread of 16⅔% (120-100/120). The markup defines the difference in terms of the WAC, thus in the preceding example the comparison results in a 20% markup (120-100/100).

3

it were to succeed, that "most [of its] customers would love it."[14]  McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs because First Data's "wholesaler surveys" were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail.[15]  Initially McKesson merely changed its suggested sell price "in hopes that one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items."[16]  But when the competition did not respond as expected or First Data failed to survey the change as quickly as hoped,[17] McKesson decided to take direct action.

McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of only two electronic sources for price information, and although it was "not widely known," First Data had "a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [i.e. through 2005 or 2006].  This means that essentially the Medispan data is the First DataBank data."[18]

---

[14] *Id.* (MCKAWP 0068514).

[15] Ex. 14 (MCKAWP 0068599); Ex. 16 (Declaration of Robert James, ¶ 3); *see also* Ex. 1 (Morgan Dep. at 512:3-9 (admitting that all surveys were conducted informally without written questions and generally by a phone call); 529:16-530:12 (conceding that responding to First Data's "survey" would require less than an hour of the wholesalers' time per month).

[16] Ex. 15 (MCKAWP 0068514).

[17] *See, e.g.,* Ex. 15 (MCKAWP 0068514 ("McKesson chose to increase the markup on the Park-Davis line (Lipitor) [in January 2001] when Pfizer took them over.  This was our [McKesson's] attempt to raise the AWP's to support our customers.  The other two wholesalers did not do this.  (I [Bob James, Director, Brand Pharmaceutical Production Management, McKesson] am told by FDB that the Parke-Davis products from Pfizer will most likely have the AWP's increased to 20% this January [2002] when price increases typically take place . . . . this will then be the same as the McK figure."  (ellipsis in original)).

[18] Ex. 17 (MCKAWP 0057415); *see also* Ex. 7 (MCKAWP 0057171 ("[Medispan gets] . . . its data from FDB. However, Redbook is a different deal.  Redbook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a markup of 1.20 which provides a 16 ⅔% AWP spread.  If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.")).

Prior to 2001 First Data and Medispan were jointly owned by the Hearst Corporation.  Following an investigation and lawsuit brought by the Federal Trade Commission Hearst agreed to a divestiture of Medispan assets.  As part of the divestiture, First Data was required to continue to provide pricing information to Medispan's purchaser for several years.

**B.    The Collusion Begins in 2001**

That Defendants' collusion began as early as August 2001 and is documented by an

internal memo drafted by Bob James, McKesson's Director of Brand Pharmaceutical Production

Management, stating:

> After a discussion with FDB last August [2001], we mutually
> agreed to standardize Searle (16⅔% spread) product line because it
> had been acquired earlier by Pharmacia (20% spread). There
> seemed to be momentum in the industry to move to a normalized
> markup of 25% on brand Rx products.  In December [2001], after
> several discussions with FDB about our [normalization] strategy
> we began to move many of the manufacturers with mixed spreads
> (16⅔ and 20% products in the same line) to a consistent 25%
> markup.  These were companies like GlaxoSmithKline,[19]
> AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM,
> and 3M, Forest, Novertis, Roche, Schering and several others.
> These were mixed product lines and we just set their Suggested
> Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during
> January and February when price increases occurred.  Many of the
> AWP's have been increased by FDB.  Because a large number of
> price increases occurred, some AWP's were affected twice, once
> when the price increase[] took effect and then a second time when
> FDB raised the AWP after the survey process. . . .  Not all products
> in these companies have had AWP increases at this point in time.
> However, as price increases occur FDB will re-survey those
> products and make their determination.[20]

Erlinda Thomas, Manager of Business Information Services at McKesson, stated in March 2002:

"Product Management is working closely with FDB to adjust their mark up.  FDB have been

changing their mark up to match with our mark up.  Eventually our list price will [be] equal to

FDB's AWP."[21]  "Working closely" meant that rather than waiting for FDB to call, McKesson

began taking the initiative of reporting to FDB changes to McKesson's suggested sell prices.  For

---

[19] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup.  Ex. 18 (FDB-AWP 053695).

[20] Ex. 9 (MCKAWP 69608-09).

[21] Ex. 19 (MCKAWP 0035460).

example, on November 9, 2001, Bob James writes to Kay Morgan, Manager of Product

Knowledge Base Services with First Data:

> Hello Kay . . . . . . . . .Just went through the Merck items and updated a couple of our items to 25% markup.  However, I found some items that you might want to review.  They include Noroxin's, Prinivil and Prinzide's.  The latter two, should probably be consistent with the new AZ 1.25 markups.  [Ex. 20 (MCKAWP 0068621).]

On other occasions he writes:

> Hello Kay, this note is from BMS [Bristol-Myers Squibb] and is basically saying that FDB shows BMS at a 20.5% mark up while McKesson is showing a 25% mark up.  I am assuming that they are looking at current information and I though we took care of this several weeks ago.  Ain't it Great.  [Ex. 21 (MCKAWP 0069586).]

> Good morning . . . .

> Even the Schering folks would like to see the AWP raised on Clarinex.  Last time I spoke with Chuck I gave him the standard response about process.  [Ex. 21A (MCKAWP 0069857).]

> Rite Aid called this morning complaining about Diamox AWP. Just wondered if you had a change to get to it yet?  [Ex. 22 (MCKAWP 0001168).]

> Good morning . . . .

> We've had a couple of inquiries from the field asking us to correct our AWP's.  J&J and one of the other wholesalers are saying that the McKesson AWP's are incorrect.  We have them marked up 25% like the rest of the J&J line.  When you have a minute, would you verify that our file matches the FDB file.[22]  [Ex. 23 (MCKAWP 0001188).]

Bob James also called Kay Morgan "on behalf of VitaRx on Avonex and Copaxone" and

reported that it "result[ed] in a $500K profit improvement for VitaRx.  FYI.  Kay Morgan, FDB

---

[22] Kay Morgan responds: "We are in sync.  Janssen still suggests [sell price] on some items and perhaps this is one but as you know Manufacturer suggested is not the same as AWP.  Don't know who is complaining (Janssen?) but FDB and McKesson match."

confirmed today that this had been done."[23]  In turn, First Data would inform McKesson of any updates at First Data to change the markup to 25%.[24]

McKesson's collaboration with First Data was highly effective.  In March 2002, Bob James reports:

> My guess is that things should look very good in the next couple of months.  I am working with FDB to point out problem suppliers as Erlinda's group [Business Information Services] provides me with weekly information comparing our List price with the FDB AWP. . . . . [The] results should have a very positive impact on our customers['] profitability.[25]

In April he reports that First Data gave up all pretense of conducting a survey for new products: "All new brand vendors will be set up as 1.25 markup factor vendors, both at McK and FDB."[26]

## C.    The Spread Markup Benefits McKesson's Clients

First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies – by increasing their profits.  In February 2002, Bob James sent Kay Morgan a document he drafted entitled, "AWP Discussion," which explained that 20% markups "had a negative impact on McKesson's customers' profitability" and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor."[27]  Later, on May 1, 2002, he writes to her about the "normalizing process," the term McKesson coined to refer to its efforts to impose a uniform 25% markup on all brand prescription drugs.[28]  In an e-mail sent to Alicia Nielson,

---

[23] Ex. 24 (MCKAWP 0069615).

[24] *See, e.g.*, Ex. 25 (MCKAWP 0069782); Ex. 26 (MCKAWP 0069553 (e-mail from Kay Morgan to Bob James: ("FYI – Novo is going to 1.25 today.  Can't have their products at 1.2 and Lilly at 1.25.")).

[25] Ex. 27 (MCKAWP 0042663).

[26] Ex. 24 (MCKAWP 0069616).

[27] Ex. 3 (MCKAWP 0069613).

[28] Ex. 28 (MCKAWP 0069642).

Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002, Bob

James enclosed a prior internal communication in which he explained that McKesson had "been

normalizing all Brand Rx mark ups at 25% for the suggested sell price."[29]  First Data

enthusiastically embraced the "normalization" program, as reported in the following Aventis

e-mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration &

Development at Aventis:

> First Data Bank has advised me after surverying the wholesalers,
> they few manufacturers that there are very few manufacturers that still have a
> 20% AWP to WAC spread [sic, markup].  As a result, First Data
> Bank has determined to employ a higher 25% AWP to WAC
> [markup] for all Aventis products.  This will be implements as we
> have price increases.  Immediately *the entire Allegra line will be
> moved to a 25% [markup] from its current 20%.*  This will be
> effective immediately.  The most noticeable impact will be that it
> will be more profitable to the retail pharmacist to dispense
> Allegra.[30]

Eventually First Data ceased consulting with any other wholesalers and relied entirely on

the information that McKesson provided it to determine AWPs.[31]  McKesson was aware that

First Data routinely disregarded manufacturer's suggested sell prices – Kay Morgan frequently

shared such snubs with her friend Bob James:

> Let's start a list of the hated manufacturers, we will update it
> weekly or monthly.  Today, Organon is the top of my list.  The
> person in charge of EDI is trying to tell me to put O in the first
> position.  McKesson and we have it wrong.  Wound up telling her
> that the world does not turn around Organon and sending a note to
> my contact telling him the product was coming off.  [Ex. 21
> (MCKAWP 0069586).]

---

[29] Ex. 29 (MCKAWP 0069775).

[30] Ex. 30 (AV-BCA-0010336 (emphasis in original)).

[31] Ex. 1 (Morgan Dep. at 508:4-20).  Kay Morgan testified that as of 2003 First Data relied only on McKesson as the source for its AWP "calculations."  However, depositions of David Kuehl of AmeriSource Bergman and Jodi Taylor of Cardinal respectively each testified that their companies did not provide data for which FDB could derive AWP information.  *See* Ex. 30A (Deposition of David Kuehl (Nov. 16, 2004) at 122:8-14); Ex. 30B (Deposition of Jody Taylor (Mar. 3, 2005) at 36:8-19 and 81:14-21).

> [in response to an e-mail from Gilead Sciences announcing that it
> would not longer report AWPs for its products and requesting that
> any publication of an AWP calculated by First Data be
> accompanied with the statement that the price was not authorized
> by Gilead, Kay Morgan writes:]  Wonderful.  If we don't report an
> AWP, the NDC will not be listed.  It is the rules of the database.
> . . . . [to Bob James]  FYI–Just thought you should be aware.  They
> appear to be playing hardball and I just don't play.  [Ex. 31
> (MCKAWP 0001183).]

McKesson was also likely aware that its competitors were not sharing information with First

Data.  It knew, for example, that "[c]urrent legal issues have brand manufacture[r]s running

away from meddling with AWP."[32]  In any case, the active role it took to ensure that First Data

published AWPs consistent with McKesson's own pricing policy dispels any illusion that

McKesson believed it was involved in fair and objective calculation of AWPs.

**D.      Hiding the Scheme**

McKesson sought to hide the scheme.  When Brian Ferreira of VPS Retail wrote to Bob

James asking him to "[p]lease provide the list of items and/or manufacturers that were included

in the AWP standardization process," he knew better than to respond to the request in writing,

writing only:  "Brian, this is an interesting request. . . .  Please give me a call when it is

convenient."[33]  McKesson knew that if it did not keep its manipulations of the AWPs a secret,

there would be serious repercussions:

> Confidentially.  Not to pass on.  We have [only] about 470 brand
> Rx items where McK and FDB AWP's do not match. . . .  [Ex. 35
> (MCKAWP 0068889).]
>
> [John Bonner, Director, McKesson's Branded Rx Product
> Management and Investment] Bob James is working with FDB to
> make this happen over time and I'm not sure it is something we
> want discussed.  Please contact him before discussing outside the
> company.  [Ex. 10 (MCKAWP 0066465).]

---

[32] Ex. 33 (MCKAWP 0067439).

[33] Ex. 34 (MCKAWP 0069714).

[Bob James] For obvious reasons we don't want to write a memo and send it out because it would not be kept confidential.  [Ex. 36 (MCKAWP 0069591).]

[Bob James to McKesson field associate] I would be careful about 'being ahead of the curve with Lilly.'  You be the judge on how your customer will interpret. [Ex. 37 (MCKAWP 0069592).]

[McKesson field associate writing to John Bonner] My accounts are having issues with us 'Normalizing brand pricing at 25%' . . . . You also mentioned that we should not discuss [this] outside of McKesson, how would you suggest we answer our customers['] questions?  [Ex. 10 (MCKAWP 0066464).]

[McKesson field associate] Obviously this is not out to the field. [Ex. 13 (MCKAWP 0069732).]

[Bob James] Sorry for the extra confusion and questions that have come up from our customers.  The (unintended consequences) results [of the normalization process] should have a very positive impact on our customers['] profitability.  [Ex. 27 (MCKAWP 0042663).]

[Bob James] Remember, **"McKesson is doing this to improve our inefficiencies in our BIS group."**  With mixed AWP spreads, our BIS group is required to make manual overrisdes (for our pricing activity) to input the First Data Bank AWP whenever there is a difference from our Suggested Sell or List Price.  It could be stated as a benefit of the Sixth Sigma method of identifying defects.  An "unintended consequence" is that the profitability of our customers will be impacted in a positive way.  They will basically get 3⅓% more profit on Rx's filled with this new AWP spread.  (Just imagine what this would mean on drugs like Lipitor or Prilosec.)[34]  [Ex. 38 (MCKAWP 0065895 (emphasis in original)).]

---

[34] The idea that McKesson's collaboration with First Data would have been justified if it was merely acting to reduce its administrative costs is both ludicrous and, of course, untrue.  *See, e.g.,* Ex. 39 (MCKAWP 0068131-2 (Bob James proudly describes his efforts to increase AWP markups:  "Three years ago [in 2001] J&J products were all 16⅔% AWP spread products.  Today almost all of them are 20% spread.  Procrit just changed last month. [Illustrates how the change has resulted in a tripling of its customers' profits for both Procrit and J&J products] . . . . We're a nice advocate to have around.") (ellipsis in original)); *see also* Ex. 27 (MCKAWP 0042668 (e-mail from field associate regarding the massive problems generated by McKesson's "normalization" project, which resulted in large numbers of customer complaints because it appeared to the customers that McKesson had provided them inaccurate AWP data:  "The question I have is why up until recently did the Invoice and the computer system match?  What prompted the change?")); Ex. 10 (MCKAWP 0066466 (e-mail from field associate, "Barb and I have gotten the same phone calls from one of our customers.  My AWP is going up, however, my cost is staying the same.  This is happening on many items.")); Ex. 9 (MCKAWP 0069609 (Bob James memo: "Some interesting (and

001821-13 145330 V1

First Data also knew the importance of keeping the Scheme a secret. In response to an e-mail inquiry whether electronic drug pricing publishers were increasing the AWP/WAC spread, Kay Morgan denies any involvement, adding, "I am most curious as to the source of this rumor. First Data has always used a wholesaler survey to determine AWP."[35] She forwarded on the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer," to which he responds: "I love it! You are the best."[36]

Nonetheless, McKesson also realized that it could "'market' [its] efforts" by informing its customers that it was "doing everything possible to 'raise' AWP's when appropriate."[37] McKesson appreciated that if it failed to inform its customers that it was behind all these changes "it's possible that some of these accounts will believe that this stuff just happens and our efforts will go unrecognized.[38] As one McKesson executive put it: "This sounds like something we should at least [be] quietly communicating to our customers in order to get some mileage from it[.]"[39] And so it began:

> [To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as soon as FDB information is updated. Look for the change to happen next week. Keep smilin[g] . . . and who said we never listen to our customers (and old friends)." [Ex. 41 (MCKAWP 0069817).]

---

sometimes unfortunate) things have happened at McKesson during this normalization process. When the direction was given to BIS to increase our Suggested Sell or Retail List markups to 25% many of these new figures were inadvertently keyed into the AWP field in our DITM system. These inaccurate AWP amounts appeared on some invoices (not all customers use the AWP and some use the Suggested Sell price). When customers then compared this with FDB AWP's from third party insurance programs, they discovered that our figure was not accurate. It was overstated.")); Ex. 27 (MCKAWP 0042664 (customer service agent to BIS, "Can you or our product managers give us some idea when all our LIST prices will be adjusted to match FDB's AWP? If this is something that will take months or years to clean-up, we seriously need to consider offering our customers the option of overriding List prices. . . . We are receiving several calls each day.")).

[35] Ex. 40 (MCKAWP 0069588).

[36] *Id.*

[37] Ex. 38 (MCKAWP 0065895).

[38] *Id.* (MCKAWP 0065895).

[39] Ex. 13 (MCKAWP 0069732).

11

> [To Dan Connolly]:  Just wanted you to know that Clarinex AWP
> spreads went to 20% this week.  A few weeks ago Celxa went to
> 20% as well.  Fat cat status is just around the corner.")  [Ex. 42
> (MCKAWP 0069901).]

> [To David Vucurevich of Rite Aid]:  P.S. latest AWP changes . . .
> Celexa and Clarinex, working on Lilly and Novo.  [Ex. 43
> (MCKAWP 0069911).]

A field agent reports:  "Some of the more savy stores like Med-X have taken notice."[40]  Bob

James realized that the goodwill McKesson established with the pharmacies as a result of

inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers about McKesson's efforts
> to "normalize" the AWP markup at 25%], one of the comments
> that was made was "this would certainly be a good reason to renew
> our agreement with McKesson when its time."  Talk about being
> good partners, wow!  This is worth further discussion as we go
> forward.  Maybe a proactive strategy like this will soften some of
> the activity around asking for lower costs and more benefit.[41]

Bob James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was

looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year
> end deals,  even though this was not part of their contract.  We
> need to ask them to roll up or recalculate their reimbursements for
> last year based on the new AWP's with a 20% spread.  And . . . . . .
> this is **not just a one time benefit**.  They will receive this now and
> for each year going forward until they renegotiate their contracts
> with third parties (and hopefully do not give up this gift).[42]

Bob James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let

him know how much effort we are putting into this AWP thing to get it right."[43]  Other

customers were also appreciative, for example an unnamed customer from Ohio, who called

---

[40] Ex. 13 (MCKAWP 0069732).

[41] Ex. 38 (MCKAWP 0065895).

[42] *Id.* (MCKAWP 0065895 (emphasis, ellipses in original)).

[43] Ex. 44 (MCKAWP 0069669).

McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[44]  Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together[45] and "was very ex[c]ited about" McKesson "working on AWP expansion."[46]

But the response was not always rosy.  McKesson got a little unneeded publicity when it increased the markup on its suggested sell price.  Except for a limited number of customers who used the Rx format 95, the system was set so that the greater of the FDB AWP or the McKesson suggested sell price would print on customer invoices.[47]  Because McKesson unilaterally increased its suggested sell prices, in many instances that information was printed on customers' invoices, McKesson's customers complained that McKesson was trying to mislead them about their potential profits.[48]  McKesson's competitor, Amerisource Bergman, discovered what McKesson was doing and "pointed out to some of [McKesson's] customers in the Michigan market that [McKesson] "manipulate[s]" AWPs on selected items."[49]  Customers complained that they were losing money because of McKesson.[50]  Bob James and the Product Management group took a lot of heat.  They worked closely with McKesson's Business Information Services group to correct the invoice problem.  They met with large retailers, like Rite Aid, to assure them

---

[44] Ex. 45 (MCKAWP 0069513).

[45] Ex. 13 (MCKAWP 0069732).

[46] Ex. 46 (MCKAWP 0069726).

[47] Ex. 19 (MCKAWP 0035459).

[48] *See supra* note 43.

[49] Ex. 15 (MCKAWP 0068515).

[50] Ex. 24 (MCKAWP 0069615).

13

that they were not losing money and to discuss changes in McKesson's system that would assist Rite Aid.[51]

"[F]ew people seem to understand the positive impact on our customer's profitability," Bob James lamented in April 2002, "including some of them.  Just one example with Lipitor 20 mg 90s:  with the old 16⅔% spread a customer would make $6.86 profit, with the new 20% spread a cutomer will enjoy $17.18 profit . . . and that . . . is awesome!!"[52]  He expressed frustration in May 2002 when a McKesson customer service agent passed on a customer query about the increased spread between AWP and PrecisionRx's cost:  "They should be saying Thank You."[53]

Kay Morgan also had her share of frustrations.  In April 2002 she complains:  "Arghh!!!! Lilly told our CEO and COO that we were setting AWP.  I thought we had worked very well with Lilly.  Also Wyeth is still complaining about Protonix.  I am getting tired.  Don't ask me of what as a stream of swear words will proceed the what."[54]  Bob James responds:  "I agree, I just picked another (3rd one) terse message from my boss about 'fixing' the AWP issue. . . .  I think I am using the same string of swear words."[55]

McKesson also discovered that some of First Data's AWPs were low because FDB had no data or inaccurate WAC information.  In May 2002, Bob James observed, "Most of the problem here [*i.e.* any remaining discrepancies between McKesson's suggested sell prices and FDB's AWPs] is that FDB does not have a WAC (just using 00.00.  We are providing them our

---

[51] *Id.* (MCKAWP 0069615).

[52] *Id.* (MCKAWP 0069616 (ellipses in original)).

[53] Ex. 47 (MCKAWP 0069715).

[54] Ex. 28 (MCKAWP 0069642).

[55] *Id.*

14

figures and they will input them next week.  This will get us very close to being on the money."[56]
The previous month Bob James noted, "We are working with FDB to improve "their accuracy"
on WAC pricing because ours seems to be extremely accurate."[57]  To correct this problem it
decided to "monitor (weekly) the items where the FDB WAC and McK WAC are different and
send information to FDB to discover why.  These items should be corrected quickly once we
discover the reason it is happening and correct the process if necessary."[58]  The next month Bob
Roberts reported:  "Kay Morgan has agreed to use our WAC prices where they show none
presently.  This is positive."[59]

### E.    The Impact On The Class

McKesson documents also evidence the common impact on the Classes.  Internally
McKesson calculated how it could pitch the Scheme's benefits, new AWPs and larger spreads, to
obtain large retail accounts.  So, for example, the following was the pitch to one account:

> WAC x old markup of 1.20 ($16^{2/3}$ spread) 19,582,854 (old AWP)
> ... = $326,381 Profit
>
> WAC x new markup of 1.25 (20% spread) = 20,398,806 (new
> AWP) ... = $1,019,940 or **3 times the profit as before** (bold in
> original).  MCKAWP 0068312.

This benefit was the result of the "FDB process," *i.e.* the Scheme at work.

Another way to understand the widespread nature of the change in the WAC-to-AWP
markup as a result of the McKesson-First Data agreement, is to examine the change in the WAC-
to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical
manufacturers over time:  The increases, all occurring in hundreds of brand drugs, among

---

[56] Ex. 35 (MCKAWP 0068889).

[57] Ex. 24 (MCKAWP 0069615).

[58] *Id.* (MCKAWP 0069616).

[59] Ex. 44 (MCKAWP 0069669).

multiple manufacturers, at the same time, could not have happened by chance or independent conduct, but instead are the result of a common plan:

**Number of NDCs Experiencing an WAC/AWP Spread Change from 20% to 25%**



001821-13 145330 V1

16









001821-13 145330 V1





This increase had the effect of increasing prices to class members whose payments are tied to AWP.  Each of the TPP plaintiffs had such ties to AWP.  For example, Pirelli's contract

provides that it will pay based on an AWP supplied by FDB.[60]  Philadelphia Federation of

Teachers uses ESI as a PBM, and its AWP comes from FDB (Ex. 71 at PFTHW-FDB 000164)

and it pays at AWP – 16% (at PFTHW-FDB 000183).[61]

## **CONCLUSION**

The foregoing facts will be used to prove the claims of Plaintiffs and all Class members.


DATED:  December 20, 2006                    By  /s/ **Steve W. Berman**
                                                  Steve W. Berman
                                                  Sean R. Matt
                                                  Barbara A. Mahoney
                                             Hagens Berman Sobol Shapiro LLP
                                             1301 Fifth Avenue, Suite 2900
                                             Seattle, WA  98101
                                             Telephone: (206) 623-7292
                                             Facsimile: (206) 623-0594

                                             Thomas M. Sobol (BBO#471770)
                                             Hagens Berman Sobol Shapiro LLP
                                             One Main Street, 4th Floor
                                             Cambridge, MA  02142
                                             Telephone: (617) 482-3700
                                             Facsimile: (617) 482-3003


                                             Elizabeth Fegan
                                             Hagens Berman Sobol Shapiro LLP
                                             60 W. Randolph Street, Suite 200
                                             Chicago, IL  60601
                                             Telephone: (312) 762-9235
                                             Facsimile: (312) 762-9286

                                             Jeffrey Kodroff
                                             John Macoretta
                                             Spector, Roseman & Kodroff, P.C.
                                             1818 Market Street, Suite 2500
                                             Philadelphia, PA  19103
                                             Telephone: (215) 496-0300
                                             Facsimile: (215) 496-6611

---

[60] *See* Ex. 69, at PIRELLI-FDB 0000161, 172, 187 (AWP – 14% for brand name drugs)

[61] *See also* Carpenters Agreement, Ex.66 at CARP 00317 (using FDB's AWPs) and 00328 (AWP – 15%).

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 20, 2006.


/s/ Steve W. Berman
Steve W. Berman

001821-13  145330 V1