IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN, MAUREEN COWIE, JUNE SWAN, and BERNARD GORTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and MCKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Case No. 1:05-CV-11148-PBS |

**DEFENDANT MCKESSON CORPORATION'S RESPONSE TO
PLAINTIFFS' PROFFER OF EVIDENCE AND
COUNTER-PROFFER REGARDING EVIDENCE ON INDIVIDUAL ISSUES**

**[REDACTED VERSION]**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................... 1

I.     PLAINTIFFS' PROFFER OF EVIDENCE IS IRRELEVANT TO
      THE DISPOSITIVE ISSUES IN THE CLASS MOTION................... 1

II.   PROOF OF CAUSATION AND INJURY REQUIRES
      EVIDENCE FROM EACH CLASS MEMBER AND THE
      PARTIES WITH WHOM THEY CONTRACTED................................ 4

     •    Competition in the Market for PBM Services Resulted in
          Improved Financial Terms for TPPs. .......................................... 4

     •    TPPs Learned of the Increase in FDB's AWP-WAC Ratios
          from PBMs Who Were in a Position to Extract from Retail
          Pharmacies and Share with TPPs Any Resulting Profits. ............. 6

     •    TPPs Also Learned of the Increases in the AWP-WAC Ratio
          from Consultants, Auditors, and Industry Participants. ................. 9

     •    TPPs Learned of or Obtained Information about Increases in
          the AWP-WAC Ratio on their Own........................................... 9

     •    Material Terms and Variations in Contracts Between TPPs and
          PBMs Counteracted Alleged AWP Inflation. ............................. 10

     •    TPP Contracts with PBMs Changed During the Class Period. .... 11

     •    Plan Design Mechanisms Automatically Counteracted Alleged
          AWP Inflation. ....................................................................... 14

     •    TPPs Revised Their Plan Designs to Counteract Alleged AWP
          Increases.................................................................................. 15

     •    Self-Administered Prescription Drugs Were Dispensed at U&C
          Prices Below Discounted AWPs................................................ 16

     •    Reported AWPs Varied among the Three Major Publishers. ....... 17

CONCLUSION ..................................................................................... 17

Case 1:05-cv-11148-PBS    Document 192    Filed 01/24/2007    Page 3 of 21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Pharmaceutical Industry Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005) ..................................................................................... 1

*In re Polymedica Corp. Secs. Litig.*,
432 F.3d 1 (1st Cir. 2005) ............................................................................................ 1

## STATUTES

Federal Rules of Civil Procedure
Rule 23 ........................................................................................................................... 1

# INTRODUCTION

Plaintiffs' "proffer" of "common evidence" attempts to mask the obvious deficiencies in their class certification motion. It focuses almost exclusively on defendants' alleged conduct, but fails to address the numerous individual issues of causation and injury that will overwhelm any trial. This will be the case even when *all* of the evidence regarding defendants' conduct is accurately presented, not simply the excised and incomplete evidence plaintiffs misleadingly cobble together. This response to plaintiffs' proffer will therefore describe some of the evidence regarding the individual issues of causation and injury that would be essential if this case were to be tried as a class action. In so doing, it will show that plaintiffs' proffer of "common evidence" is illusory. Common issues do not predominate, and the proposed class should not be certified.

## I.   PLAINTIFFS' PROFFER OF EVIDENCE IS IRRELEVANT TO THE DISPOSITIVE ISSUES IN THE CLASS MOTION.

At the class certification stage, a court may consider merits evidence, such as plaintiffs' proffer of evidence regarding defendants' conduct, only if it will affect the class determination. In "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 77 (D. Mass. 2005) ("*Pharm. III*") (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (internal citation omitted)). To determine whether plaintiffs have satisfied the Rule 23 requirements, a court may "test disputed premises" through reviewing merits evidence "if and when the class action would be proper on one premise but not another." *In re Polymedica Corp. Secs. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005) (citation omitted). This is not the case here.

Plaintiffs' proffer deals only with the merits of certain liability issues and ignores the individual issues of causation and damages that this Court held precluded certification of the very same classes in the AWP MDL. *Pharm. III* at 95. Thus, while defendants' alleged conduct may constitute a "common" issue, plaintiffs' proffer of evidence avoids the causation and .

1

damages issues that will be dispositive. McKesson's proffer will therefore address these dispositive issues based on the discovery to date.[1]  However, before turning to these relevant causation and impact issues, McKesson makes the following brief observation about plaintiffs' liability proffer.

Plaintiffs allege here that First DataBank ("FDB") actively facilitated the inflation of the AWPs it published by scheming with a wholesaler, in this case, McKesson, to increase the WAC-AWP markup from 20% to 25%.  Allegedly, when McKesson began raising its own prices by 5%, FDB stopped relying on pricing information from wholesalers other than McKesson to calculate its AWPs.  Although FDB represented that it surveyed the three national wholesalers and calculated a weighted average of the wholesalers' own prices, plaintiffs allege that, in reality, FDB was secretly surveying only McKesson, and McKesson knew that.  According to plaintiffs, this scheme ensured that FDB's published AWPs would mirror McKesson's own higher prices.

Yet materially omitted from plaintiffs' patchwork of documents is any evidence addressing McKesson's purported knowledge of FDB's scheme to raise prices by surveying only McKesson.  This, of course, would be the crucial element for any alleged agreement or enterprise between McKesson and FDB to fraudulently set AWPs in this case.  The omission is critical because the evidence is to the contrary.

First, before this lawsuit was ever filed, FDB's most knowledgeable witness testified unequivocally that it never told McKesson that it was at times the only wholesaler whose internal company pricing information FDB surveyed to derive its AWPs.  *See* Ex. 7A (Morgan Dep. 537:6-10)[2] ("Q: Does McKesson know that it is the only wholesaler that you are surveying for purposes of the markup?  A: No, I have never told them that.").[3]  McKesson's lack of knowledge

---

[1] Discovery is continuing and may reveal other facts and evidence that addresses these issues.

[2] The Response to Plaintiffs' Proffer of Evidence and Counter-Proffer of Evidence on Individual Issues uses the abbreviations in the Table of Abbreviations attached to McKesson's Opposition to Class Certification.

[3] Declaration of Lori A. Schechter, Ex. 7A.  All documents and testimony cited in McKesson's proffer are attached as exhibits to the Schechter Declaration and referred to hereinafter solely as "Ex. ____."

2

Case 1:05-cv-11148-PBS    Document 192    Filed 01/24/2007    Page 6 of 21

was verified most recently at the October 24, 2006, hearing on the proposed settlement between plaintiffs and FDB. In response to the Court's direct question on the issue, FDB's counsel again affirmed that FDB never told McKesson that it was the only wholesaler surveyed. (*See* Settlement Hr'g Tr. 66:25-67:4.)

Second, contemporaneous documents whose excerpts plaintiffs selectively quote also establish that McKesson believed for years that it was one of three national wholesalers being surveyed by FDB, consistent with FDB's public representations regarding its AWP derivation process. *See, e.g.*, Email from Robert James to Greg Yonko, et al., April 23, 2004, MCKAWP 0057171 (Exhibit 7 to Berman Decl.); Email from Robert James to Allen Watanabe, August 10, 2001, MCKAWP 0068311 (Exhibit 48 to Berman Decl.); Email from Robert James to Dale James, February 15, 2002, MCKAWP 0069591 (Exhibit 36 to Berman Decl.). Indeed, like other industry participants, McKesson subscribed to FDB's AWP publication services, believing that the AWPs FDB published were based on collective industry information, not McKesson's information, alone. Why else would they agree to pay tens of thousands of dollars for the data?

Third, since plaintiffs contend that FDB was a "monopolist" that could use its position "to raise the spread between AWP and WAC" on its own (Hartman Decl. ¶ 14), FDB did not need McKesson to accomplish AWP inflation and standardization in the first place. Thus, based on plaintiffs' own allegations, plaintiffs' fraud claim is wholly inconsistent at its core.

In any event, even when the unedited record of defendants' conduct is presented, the common elements of proof will still be outweighed by the class-member-by-class-member evidence required to prove causation and injury. Thus, if plaintiffs' misleading proffer demonstrates anything at all, it is that the common evidence will take up just a small percentage of the issues that will need to be addressed for all claims and defenses. The next section provides a glimpse of why this is so.

Case 1:05-cv-11148-PBS   Document 192   Filed 01/24/2007   Page 7 of 21

## II.   PROOF OF CAUSATION AND INJURY REQUIRES EVIDENCE FROM EACH CLASS MEMBER AND THE PARTIES WITH WHOM THEY CONTRACTED.

As explained in McKesson's brief in opposition to the class motion, the evidence developed thus far illustrates the individual issues on causation and injury that will need to be resolved for each class member. Plaintiffs' proffer of common evidence does not address the class-member-by-class-member examination required not just for damages, but to determine whether each class member suffered any impact from the alleged artificial inflation in AWPs.[4] Set forth below is McKesson's proffer of some of the evidence on individual issues, varying from class member to class member, that will be necessary for any trial of the claims and defenses in this case.

- **Competition in the Market for PBM Services Resulted in Improved Financial Terms for TPPs.**

     1.   The PBM market is highly competitive.



     2.   As a result of this competition, a primary objective of one of the largest PBMs, Express Scripts, was to achieve the best pricing terms in pharmacy contracts that would, in turn, allow ESI to offer competitive pricing to its clients. *See* Ex. 6A (Ignaczak Decl. ¶ 17). ESI renegotiated pharmacy contracts to obtain steeper discounts before, during, and at the end of a contract term when available in the current market conditions. Since 2002, there has been a

---

[4] Plaintiffs' only proffer of common evidence purportedly addressing causation is (a) one e-mail purportedly describing how a retailer could profit from an increased spread; (b) charts with no identified source, purporting to show the "number of NDCs with spread change from 20-25%, 1999-2004"; and (c) a sample of contracts entered into by some of the named TPP plaintiffs. See Pl. Proffer 15-20. Causation is not shown even on an individual basis, let alone a class-wide basis from this evidence because it does not show that increases in the WAC-AWP spread led to TPPs or consumers paying higher prices. Moreover, plaintiffs' proffer of individual contracts illustrates that each TPP contract will need to be examined to determine, among other things, if a class member's contract contained any number of financial provisions that could affect the impact of an AWP increase, including the AWP-based reimbursement formula, rebates, fees, and the like.

trend of increasing discounts off AWP in the payment terms contained in ESI's pharmacy

contracts. *See id.* ¶18. Similarly, ███████████████████████████████

████████████████████████████████████████████████████████

████████

3.   Competition in the PBM market allowed TPPs to pressure PBMs to offer TPPs the

most competitive prices under current market conditions. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

4.   Competitive market forces and rising AWPs led to reduced fees and increased

discounts off AWP over time in PBM-TPP contracts, including mid-contract. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

5.   PBMs engaged in a highly competitive bidding process for TPP contracts.  For

example, ███████████████████████████████████████████████████

████████████████ solicited requests for proposals for PBM services during the class period.

█████████████████ retained a benefits consultant, the Segal Company, to assist with analyzing

the proposals submitted in response to the RFP.   Segal prepared written analyses of the

responses that highlight the highly competitive nature of the process.  ████████████████

██████████

6.   PBMs passed through profits squeezed from pharmacies by increasing the

percentage of rebates shared with TPPs. *See, e.g.,* ████████████████████████

████████████████████████████████████████████████████████

Case 1:05-cv-11148-PBS   Document 192   Filed 01/24/2007   Page 9 of 21



7.    PBMs took steps on their own to reduce net costs to TPPs to counteract AWP increases, including by negotiating steeper discounts off AWP, increasing rebates, and increasing the use of mail order. *See, e.g.,* Ex. 15A (MEDCO 00195) ("Based on average wholesale price (AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5% in 2002, a level significantly higher than in years past. Working on behalf of its clients, Medco Health was able to offset this inflation through pharmacy discounts, rebates, and increased use of the home delivery (mail) pharmacies, where unit costs are significantly lower. As a result, the net increase in unit costs for Medco Health's clients was 5.5 percent (net of AWP discounts and rebates), a full percentage point lower than the increase in AWP.").

- **TPPs Learned of the Increase in FDB's AWP-WAC Ratios from PBMs Who Were in a Position to Extract from Retail Pharmacies and Share with TPPs Any Resulting Profits.**

8.    For example, as early as January 2002, Express Scripts learned that the AWPs for specific drugs had increased without a corresponding increase in the WACs for those drugs. *See*



6



10.

11.    On March 15, 2002, Express Scripts personnel spoke with FDB personnel by phone.

12.

13.

14.    After Express Scripts learned about the increases in AWP-WAC ratios, Express Scripts disseminated a client alert,



15.    ESI's client alert was sent to TPPs.

16.    ESI received follow up inquiries from several clients regarding this notice.  Some clients responded requesting additional information to assess the impact of these changes.  *See* Ex. 6B (Macinski Decl. ¶ 6).

17.

18.    ESI has renegotiated pharmacy contracts to obtain steeper discounts before, during, and at the end of a contract term when available in the current market conditions.  *See* Ex. 6A (Ignaczak Decl. ¶ 18).  Additionally, plaintiffs' former expert, Susan Hayes, testified

█████████████████████████████████████████████

█████████████████████████ In approximately the last quarter of 2002, employees in

Caremark's pharmacy contracting department learned from Caremark's finance department that

the spreads on a large number of brand name drugs increased from 20% to 25%. *See* Ex. 4A

(Madsen Decl. ¶ 3). Caremark considered FDB's increased WAC-AWP ratios in its negotiations

with pharmacies. *See id.*

- **TPPs Also Learned of the Increases in the AWP-WAC Ratio from Consultants, Auditors, and Industry Participants.**

19. █████████████, an employer-plan TPP, learned that FDB's AWPs

were higher than Redbook's AWPs from its claims auditor, ██████, during an audit of

administration of ████████ 2001-2002 claims. The audit report states:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

20. ████████, another TPP, learned from its claims processor, ████████

that FDB's AWPs were unusually higher than the AWPs published by Redbook.

███████████████████████

- **TPPs Learned of or Obtained Information about Increases in the AWP-WAC Ratio on their Own.**

21. ████████ a TPP, noticed that its rebates spiked in January 2002 and heard about

the AWP increase ████████████████████████ In March 2002, after confirming the

increases in AWP-WAC ratios with the drug manufacturer AstraZeneca, it alerted its PBM,

████████ of the unusual increase in AWPs and pressured ████████ to strategize

cost control measures to address this increase.

22. Some TPPs, particularly large and sophisticated TPPs, subscribed to FDB and

therefore received WAC and AWP pricing information directly from FDB. These include: ████

██████████████████████████████████████████████████ and John Deere Health

Care Inc. (now part United Healthcare) (Ex. 13A (Sidwell Dep. 62:13-63:1)). TPPs with access

to FDB data could readily observe the differences between WAC and AWP, both prices were

published. *See* Ex. 8A (Hartman Dep. 55:13-24).

23.   Some TPPs carefully track drug trends and could observe the increasing drug costs

allegedly caused by the increased AWP-WAC ratios. *See, e.g.*, 13A (Sidwell Dep. 53:13-22)

(John Deere monitors claims processed on a daily basis, its costs per claim, many other drug

trends); Ex. 21A (Cannon Dep. 11:2-17) (SelectHealth tracks "national trends," "internal trends,"

and "contracting trends across the country.").

24.   Each of the three largest PBMs published reports that highlighted the anomalous

increase in AWPs in 2002.  Medco's May 2003 Drug Trend Report reported that the 2002 AWP

increases were "significantly higher than in years past." *See* Ex. 15A (MEDCO 000195).

██████ June 2003 ██████████ characterized the 2002 increases as ██████████

while the October 2003 edition reported that 2003 price increases were ██████████████████

██████ Express Scripts Drug Trend Reports indicate that certain drugs showed unusual spikes in

the cost of particular Appendix A drugs in 2002.  For example, in 1999, 2000, and 2001, Express

Scripts reported percentage increases in Claritin 10 mg at 2.5%, 8.8% and 9.3%, respectively.

Then in 2002, the cost of Claritin spiked to 21.2%, a significant increase compared with previous

years. *See* Ex. 6V (ESI-277-00012370-72).

- **Material Terms and Variations in Contracts Between TPPs and PBMs
  Counteracted Alleged AWP Inflation.**

25.   TPPs automatically received greater rebate payments as a result of the increased

AWP-WAC ratios when rebate contracts were based on a percentage of AWPs. ██████████

██████████████████████████ (stating that the increase in AWP markups increased the drug

manufacturer ████████████████████████████████



Several manufacturers offered rebates based on AWP during the class period.

26. Some TPP-PBM contracts mandated that the parties renegotiate reimbursement rates in response to material changes in drug industry practice. For example, two named plaintiffs, ████████████ and New England Carpenters, had such provisions in their PBM contracts with AdvancePCS. *See, e.g.,* Ex. 16B (CARP-00028),

27. Some TPPs had "most favored pricing" provisions in their contracts, ensuring that their reimbursement rates would equal the most competitive rates offered by the PBM to a similarly situated TPP. For example, named plaintiff New England Carpenters had "most favored pricing" under its contract with Medco, negotiated through the NLAHCC labor coalition. *See, e.g.,* Ex. 16C (CARP-00072);

- **TPP Contracts with PBMs Changed During the Class Period.**

28. TPP's contracts and negotiations changed over time, responding to competitive forces and available information regarding increased AWPs.

11



███ In April 2002, Express Scripts ("ESI") acquired NPA and assumed control of the contract with ███ ███ ███ The mail order discounts and reduced fees are memorialized in an exchange of correspondence in the spring of 2003. Thereafter, effective January 1, 2004, ███ requested and received still another round of price concessions that reduced ingredient costs for brand-name prescription drugs at retail and mail order by an additional 2%-3%. ███ achieved an overall decrease of 11.2% in its prescription drug cost per member per month in 2001. *See* Ex. 5H (D37 01406) ███

29.   Industry publications confirm that TPPs[5] were able to negotiate lower net reimbursement rates over the class period. *See, e.g.*, Ex. 17B (2006 PBMI Report at 4-5) (reporting that discounts off AWP increased and dispensing fees decreased from 2001 to 2005); Ex. 17A (2004 PBMI Report at 7) (reporting that administrative fees decreased from 2001 to 2003); *id.* at 10 (reporting that TPPs' share of manufacturer rebates increased from 2001 to 2003); 10A ███

───────────────

[5] ███



30.   TPPs were able to negotiate new and improved reimbursement contracts during the class period when their contracts expired. *See, e.g.*, Hartman Dep. 141:8-23 (contracts expired during class period); Ex. 16B (CARP 00026-58), Ex. 16C (CARP 00059-90) (named plaintiff New England Carpenters negotiated new contract after expiration);

negotiated new contract after expiration).

31.   Some TPPs were able to terminate their PBM contracts without cause over the class period, and either switch PBMs or renegotiate more favorable reimbursement rates with their current PBMs under threat of termination. For example,                         had a termination-without-cause provision in its PBM contract.

through its benefits consultant, solicited bids only from PBMs that would allow it to terminate without cause.

32.

Case 1:05-cv-11148-PBS   Document 192   Filed 01/24/2007   Page 17 of 21



33.  Some TPPs focused on bottom-line calculations of net cost (taking into account discounts, dispensing fees, rebates, administrative fees, and various other terms), not on any fixed relationship between WAC and AWP.

Ex. 13A

(Sidwell Dep. at 69:12-70:5) ("[T]o me it's a mathematical calculation of what is the lowest net cost. Whether it's a lower AWP and then a lower rebate or whether it's a higher AWP and a bigger rebate, we're worried about the net cost line.").

- **Plan Design Mechanisms Automatically Counteracted Alleged AWP Inflation.**

34.  TPPs required members to pay varying degrees of their drug costs directly through a variety of plan designs, reducing the amount borne by the TPP. *See, e.g.*, Ex. 17B (2006 PBMI Report at 8, Table 13) (reporting that members pay an average of 27% of drug costs directly, but that this portion varies from 1% to 51% depending on the plan design of the TPP).

35.  Some TPPs imposed deductibles so that their members would directly pay a certain fixed amount of drug costs before the TPP's coverage began. For example, used a deductible during the class period.

14

36.  Some TPPs excluded certain categories of Appendix A drugs, such as contraceptives, from coverage so that their members would bear the full cost of such drugs directly.  For example, ███████████████        had such an exclusion. ████████

████████████████████████████████████████████████████████

37.  Some TPPs excluded drugs with over-the-counter alternatives from coverage so that their members would bear the full cost of the prescription alternatives directly.  For example,

████████████████████████████████████████████████████████

38.  Some TPPs adopted "generic caps" under which members were required to pay directly the difference in price between a branded drug and its generic therapeutic equivalent. For example, named plaintiffs New England Carpenters and ████████████ had such provisions.  *See, e.g.*, Ex. 16D (CARP-00132-33); Ex. 16A (Buckley Dep. 58:8-59:21); ████████

████████████████████

- **TPPs Revised Their Plan Designs to Counteract Alleged AWP Increases.**

39.  TPPs had a variety of plan design components at their disposal and could modify them over time in response to changing conditions.  For example, ████████████████ ████████████████████ sought to reduce costs during the class period, their benefits consultants recommended various options.

████████████████████████████████████████████████████████

PBMs made similar recommendations. ████████████████

████████ recommending that TPP clients implement various programs to promote the use of cost-effective drugs, including tiered copays, a step-therapy program, among others); Ex. 15A (MEDCO 000228) (Medco recommending use of cost-sharing mechanisms, generic incentives, and drug exclusions as ways to reduce costs); ████████████████ recommending variations on copay structure, drug exclusions, and generic incentives as ways to reduce costs).

40.   Some TPPs increased copays to increase the portion of drug costs that their members pay directly. *See, e.g.,* Ex. 17A (2006 PBMI Report at 8-9) (reporting that both retail and mail order copays increased over the class period); ████████████████ ████████████ increased copays in 2001 and 2002); Exs. 22D, 22E (THWF 0150, 0183) (named plaintiff Teamsters increased copays from 2001 to 2003), Ex. 10A ████████████████ (testifying that TPPs increase copays ████████ to reduce costs to the TPP).

41.   Some TPPs with multi-tiered copay designs moved drugs from a more-favored tier to a less-favored tier so that their members would directly bear a higher portion of the cost of less-favored drugs. For example, ████████████ moved prescription proton pump inhibitors and non-sedating antihistamines into their own tier during the class period. ████ ████████

42.   Changes in plan design had a material impact on net costs to TPPs during the class period. For example, ████████████ was able to reduce its drug costs from 2001 to 2002, the first year of the alleged conspiracy. ████████████ ████████████

- **Self-Administered Prescription Drugs Were Dispensed at U&C Prices Below Discounted AWPs**

43.   TPP-PBM contracts typically provide for reimbursement at the lesser of (i) AWP minus a fixed percentage or (ii) the pharmacy's usual and customary ("U&C") price. ████

███████████████████████████████████████████████ Ex. 16C (CARP-

00073, 00059-90).  U&C prices are set by pharmacies in response to local competition in order

to create walk-in business. ███████████████████████████████████████████

████████████████████████████ PBMs estimated that, all told, ████████ of the

prescriptions dispensed through their retail networks were reimbursed at U&C, rather than the

AWP-based formula. ████████████████████████████████████████

████

- **Reported AWPs Varied among the Three Major Publishers.**

    44.   FDB was not the sole source of AWPs used for reimbursements throughout the class

period. ████████████████████████████████████████████████████

used Redbook as its pricing source for part of the class period);

(the PBM ███████████████████████ used Redbook as its pricing source); Affidavit of

Doreen Weber ¶ 2) (Docket No. 79) (former employee of AdvancePCS stating that FDB was the

pricing source for only 60% of claims processed by AdvancePCS, with Medispan used as the

pricing source for the remainder).

    45.   FDB, Medispan, and Redbook regularly published different AWPs for identical

drugs. ████████████████████████████████████ prepared in 2002

showing variations in top 100 NDCs among FDB, Medispan, and Redbook).  Variations between

the publishers continue to this day.  *See* Ex. 5J (DC37 05545-5548) (2005 newsletter from the

Pharmacy Benefit Management Institute reporting that prices differ between the three sources for

15% - 20% of prescription drugs, and that Redbook continued to use the "historical" markup of

20% unless it was instructed otherwise by the manufacturer).

## CONCLUSION

As this proffer of evidence makes clear, there are a myriad of individual issues that

McKesson will be entitled to examine with respect to each class member before impact of the

alleged increase in the AWP-WAC ratios can be shown.  These issues, rather than the common one proffered by plaintiffs, will predominate in any trial of this case.  Class certification must therefore be denied.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
tel. 415-268-7000
fax 415-268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
One Liberty Square
Boston, MA 02109
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated:  January 24, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 24, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

18