UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Civil Action:  1:05-CV-11148-PBS <br><br> Judge Patti B. Saris |

**DEFENDANT MCKESSON CORPORATION'S MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S JANUARY 25, 2007 ORDER REGARDING MCKESSON'S MOTION FOR LEAVE TO FILE UNDER SEAL**

Defendant McKesson Corporation ("McKesson") respectfully moves the Court to reconsider part of its January 25, 2007 Order denying McKesson leave to file under seal certain documents and information submitted in connection with McKesson's class opposition papers. Specifically, McKesson seeks reconsideration with respect to only a discrete set of third party documents that contain confidential business information warranting the Court's protection, which were attached as Exhibits 4H, 4M, 4I, 6C through 6F, 6H through 6J, 6M through 6O, 6Q,

6R, 6T, 6U, 15B through 15F, and 21B to the Declaration of Lori A. Schechter in Support of McKesson Corporation's Memorandum in Opposition to Class Certification ("Schechter Class Declaration"). In support of this motion, McKesson states as follows:

1. On January 24, 2007, in conjunction with McKesson's opposition to plaintiffs' motion for class certification and as required by the protective order entered by the Court, McKesson moved for leave to file under seal documents and testimony that plaintiffs and third parties had designated as "Confidential" or "Highly Confidential." McKesson did not seek leave to file any of McKesson's own documents or testimony under seal.

2. On January 25, 2007, the Court denied McKesson's motion for leave to file under seal, stating: "You have to prove that the business information should be protected."

3. McKesson therefore submits this motion for reconsideration solely on behalf of the third parties that produced the confidential information contained in the documents described below. Such confidential information of third parties is entitled to heightened protection. *See Rossbach v. Rundle*, 128 F. Supp. 2d 1348, 1352 (S.D. Fla. 2000) ("When the sensitive information pertains to non-parties who are not public figures, the balancing of interests in favor of protecting the privacy of the non-parties and against uninhibited access to the records is strengthened."); *see also United States v. Snyder*, 187 F. Supp. 2d 52, 63 (N.D.N.Y. 2002) ("The privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation.") (citation omitted).

4. Exhibits 4H, 4M, 4I, 6C through 6E, 6O, 6Q, 6U, 15B through 15F, and 21B to the Schechter Class Declaration contain or reflect highly sensitive contracting terms, including pricing and financial terms, the disclosure of which would risk competitive injury to the third parties that negotiated or agreed to these terms. McKesson seeks leave to file these documents under seal and to publicly file versions that redact only the discrete, confidential terms of these contracts:

a.  Exhibit 4H to the Schechter Class Declaration is a contract between Caremark and its client, State Farm Mutual Automobile Insurance, dated January 1, 2002. A proposed redacted version for public filing is attached hereto as **Exhibit A**.

b.  Exhibit 4M to the Schechter Class Declaration is a contract between Caremark and its client, SBC Communications, dated July 1, 2003. A proposed redacted version for public filing is attached hereto as **Exhibit B**.

c.  Exhibit 4I to the Schechter Class Declaration is a contract between PCS Health Systems and its client, Principal Life Insurance Company, dated February 1, 2001. A proposed redacted version for public filing is attached hereto as **Exhibit C**.

d.  Exhibit 6C to the Schechter Class Declaration is a contract between National Prescription Administrators, Inc. and its client, District Council 37 Health & Security Plan ("DC 37"), signed January 15, 2002. A proposed redacted version for public filing is attached hereto as **Exhibit D**.

e.  Exhibit 6D to the Schechter Class Declaration is a letter to National Prescription Administrators from its client, DC 37, regarding a proposal to reduce DC 37's administrative fees, dated April 8, 2003. A proposed redacted version for public filing is attached hereto as **Exhibit E**.

f.  Exhibit 6E to the Schechter Class Declaration is a letter from Express Scripts to its client, DC 37, regarding pricing changes effective May 1, 2003. A proposed redacted version for public filing is attached hereto as **Exhibit F**.

g.  Exhibit 6O to the Schechter Class Declaration is a letter to National Prescription Administrators from its client, DC 37, regarding DC 37's administrative fees, dated April 8, 2003. A proposed redacted version for public filing is attached hereto as **Exhibit G**.

h.  Exhibit 6Q to the Schechter Class Declaration is an Express Scripts pharmacy benefit management proposal for its potential client, DC 37, dated October 12,

2004.  A proposed redacted version for public filing is attached hereto as **Exhibit H.**

    i.    Exhibit 6U to the Schechter Class Declaration is a National Prescription Administrators, Inc. proposal to its potential client, UFCW Unions and Employers Midwest Health Benefits Fund, dated March 13, 2000.  A proposed redacted version for public filing is attached hereto as **Exhibit I**.

    j.    Exhibits 15B and 15C to the Schechter Class Declaration are contracts between Medco and its client, Moyer Packing Company.  Proposed redacted versions for public filing are attached hereto as **Exhibits J and K**, respectively.

    k.    Exhibit 15D, 15E, and 15F to the Schechter Class Declaration are contracts between Medco and its client, Operating Engineers Local 66.  Proposed redacted versions for public filing are attached hereto as **Exhibits L, M, and N**, respectively.

    l.    Exhibit 21B to the Schechter Class Declaration is a contract between Boehringer Ingelheim Pharmaceuticals, Inc. and IHC Health Plan regarding rebate payments made to IHC Health Plan, effective April 1, 2002.  A proposed redacted version for public filing is attached hereto as **Exhibit O**.

5.    Exhibits 6F, 6H through 6J, 6M, 6N, 6R, and 6T to the Schechter Class Declaration reveal the identities of Express Scripts's ("ESI") clients or constitute internal documents reflecting business analyses or strategies for responding to drug pricing trends and market forces on behalf of ESI's clients, information which ESI keeps confidential and protects from public disclosure.  These Exhibits contain information that reflect ESI's internal business analyses and competitive strategies related to the services it offers to its clients.  McKesson seeks leave to redact only this highly sensitive information from any public filings in this case in order to avoid commercial injury to a third party in these proceedings.  Attached hereto as **Exhibits P through W** are proposed redacted versions of Exhibits 6F, 6H through 6J, 6M, 6N, 6R, and 6T, respectively, to the Schechter Class Declaration.

6.      Exhibit 6B to the Schechter Class Declaration is a declaration of Christina Macinski regarding increases in First DataBank's average wholesale prices that were observed by ESI.  Many of the competitively sensitive documents described above were also attached to this declaration.  McKesson requests that a corrected declaration without the attachments be substituted for the current version of Exhibit 6B.  A corrected declaration is attached hereto as **Exhibit X**.

7.      Paragraph 14 of the Protective Order mandates that any document or pleading containing the type of confidential material referenced above be filed under seal.  McKesson hereby seeks to comply with the terms of the Protective Order upon which third parties relied when they produced documents in response to subpoenas served in this action.

In sum, McKesson respectfully requests leave (1) to file under seal Exhibits 4H, 4M, 4I, 6C through 6F, 6H through 6J, 6M through 6O, 6Q, 6R, 6T, 6U, 15B through 15F, and 21B to the Schechter Class Declaration and to publicly file the redacted versions of these exhibits that are attached hereto as **Exhibits A-W**; and (2) to replace Exhibit 6B to the Schechter Class Declaration with the corrected Declaration of Christina Macinski that is attached hereto as **Exhibit X**.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter

Melvin R. Goldman (*pro hac vice*)        John Kiernan
Lori A. Schechter (*pro hac vice*)          Nicole Johnson
Paul Flum (*pro hac vice*)                     Bonner Kiernan Trebach & Crociata
Tiffany Cheung (*pro hac vice*)             One Liberty Square
Morrison & Foerster LLP                        Boston, MA 02109
425 Market Street                                  Telephone: (617) 426-3900
San Francisco, CA 94105-2482             Facsimile: (617) 426-0380
Telephone:  (415)268-7000
Facsimile:  (415) 268-7522

Dated:  February 20, 2007

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I, Lori A. Schechter, counsel of record for defendant McKesson Corporation, hereby certify that McKesson's counsel conferred with counsel for plaintiffs in an effort to resolve the issue referred to in this motion, and that the parties have not been able to reach agreement with respect thereto.

/s/ Lori A. Schechter
Lori A. Schechter

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each other party via the Court's electronic filing system on February 20, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

# Exhibit A

**CAREMARK INC.**
**PRESCRIPTION SERVICE DIVISION**
**PRESCRIPTION BENEFIT MANAGEMENT AGREEMENT**

#003754483

This Prescription Benefit Management Agreement (the "Agreement"), dated as of January 1, 2002 (the "Effective Date"), is between Caremark Inc., Prescription Service Division, a California corporation ("Caremark") and State Farm Mutual Automobile Insurance Company, its subsidiaries and affiliates, ("State Farm").

1.      **Definitions.**

"AWP" means the average wholesale price for a standard package size of a Prescription drug as established by First Data Bank or other nationally available reporting service of pharmaceutical prices.

"Covered Member" means an individual eligible to receive benefits under the Plan.

"Covered Member Profile" means a specific history of drugs dispensed or processed by Caremark for a Covered Member or otherwise provided to Caremark. This history shall include information on drugs dispensed, allergies, and the Covered Member's general health condition, if available.

"Gross Cost" means the cost to State Farm for a Prescription as set forth in this Agreement, which is the discounted drug cost plus dispensing fees and taxes.

"Plan" means the plan sponsored by State Farm describing the prescription drug coverage or other pharmaceutical benefits.

"Prescription" means a lawful written, electronic or verbal order of a health care practitioner licensed to prescribe medication.

2.      **Caremark Services.** Caremark shall manage State Farm's prescription benefit, including the provision of the following products and services in accordance with the Plan design features communicated by State Farm to Caremark:

a.      Mail Service Pharmacy.

(i)      Fill Prescriptions during normal business hours, subject to the professional judgment of the dispensing pharmacist;

(ii)      Based upon the Prescription and applicable law, provide up to a ninety (90) day supply for each Prescription; and

(iii)      Provide computerized drug interaction monitoring of Covered Members based upon the Covered Members' Profile and, subject to prescriber approval and applicable law, provide pharmaceutical cost containment services, including generic and therapeutic substitutions.

b.      Retail Pharmacy.

(i)      Provide a network of retail pharmacies in agreed-upon geographic areas to service Covered Members;

(ii)      Process prescription drug claims and make reimbursement payments to pharmacies; and

(iii)      Provide to retail pharmacies in Caremark's network computerized drug interaction monitoring of Covered Members based upon the Covered Member Profile.

c.      Claims Processing.      For paper prescription drug claims submitted for reimbursement by Covered Members:

(i)      Process prescription drug claims and make any appropriate reimbursement payments to Covered Members; and

(ii)      Distribute explanation-of-benefits letters to Covered Members.

d.      Customer Service.      Operate toll-free customer service lines from 7:30 a.m. to 9:00 p.m., Monday through Friday (excluding holidays) and from 8:00 a.m. to noon on Saturdays, Central Time, and provide automated customer service at all other times.      Caremark shall also provide emergency pharmacist services twenty-four hours each day.

e.      Formulary Program. (i) Provide a supply of Caremark's formulary brochures listing Caremark's preferred brand-name product in each of a number of therapeutic categories; (ii) periodically distribute the brochures directly to prescribers; and (iii) contact prescribers, as appropriate, to obtain

1

CMK-AWP 011582
HIGHLY CONFIDENTIAL

approval for substitution of formulary drugs. State Farm acknowledges that State Farm has the sole discretion and authority to determine the formulary for the Plan. Caremark may hold contracts with the manufacturers of products covered under this Agreement and in connection with such contracts, Caremark may have a financial relationship with such manufacturers and may receive rebates from such manufacturers. In addition, Caremark may contact Covered Members regarding therapeutic compliance, therapeutic education or similar programs.

f. Maintenance of Records/Audit. Maintain such records of Prescriptions dispensed as required by law. Such records may be reviewed by State Farm or its representatives upon reasonable request and at State Farm's expense (including Caremark's reasonable expenses); provided, however, that no such review shall relate to records for Prescriptions dispensed or claims adjudicated more than one (1) year from the date of service. Compliance with random or specific data sampling requests require sixty (60) days prior written notice. In the case of review by representatives of State Farm, such representatives shall agree in writing to abide by the confidentiality provisions of this Agreement. State Farm shall maintain eligibility records for Covered Members for a period of one (1) year from the date of service. Such eligibility records may be reviewed by Caremark upon the same terms and conditions as are applicable to State Farm's right of review stated above. Except as required by law, Caremark shall not make any of its records available to others for any purpose other than the provision of products and services under this Agreement; provided, however, such data may be combined and used by Caremark in preparing statistical analysis reports or for other business purposes that may be made available to others, in which event information pertaining to State Farm or Covered Members shall not be identifiable.

3.    Joint Obligations.

a.    Communications. Distributions or reprints after the initial mailing of implementation kits or customized materials shall be at State Farm's expense. Custom materials require three (3) weeks to produce following State Farm approval. Any identification cards issued shall include Caremark's name and toll free 800 number.

b. Eligibility Data. State Farm shall furnish Caremark with Covered Member eligibility data in an agreed-upon medium in the format requested by Caremark. If State Farm submits eligibility data in a format other than that requested by Caremark, State

Farm shall incur a fee at Caremark's then prevailing rate. Thereafter, State Farm shall furnish Caremark with eligibility updates on a periodic basis as State Farm deems necessary. Beginning five (5) business days after an eligibility update has been received by Caremark, State Farm shall not be liable to Caremark for ineligible persons. Caremark shall not be responsible for any Prescriptions filled or processed for any ineligible persons due to incorrect eligibility data provided to Caremark. Caremark shall honor any retroactive Covered Member eligibility termination data provided effective on the date such data is entered into Caremark's system.

c. Plan Changes. State Farm shall notify Caremark in writing at least ninety (90) days in advance of any changes in the Plan, third party administrator or insurance carrier that results in a change of any of the services provided by Caremark under the terms of this Agreement. If such changes have a material impact on Caremark's obligations under this Agreement, then State Farm agrees to negotiate in good faith appropriate relief for Caremark.

4.    Obligations of State Farm.

a. Payment. State Farm shall pay Caremark in accordance with the fee schedule set forth on Exhibit B.

b. Control of Plan. State Farm shall have sole authority to control and administer the Plan. Nothing in this Agreement shall be deemed to confer upon Caremark the status of fiduciary as defined in the Employee Retirement Income Security Act of 1974, as amended, or any responsibility for the terms or validity of the Plan. State Farm has the sole right to resolve disputed claims and shall promptly inform Caremark of such resolution. State Farm represents that it is legally entitled to have Caremark perform the services described in this Agreement or the exercise by State Farm (or any third party designated by State Farm) of its audit rights or other rights to receive Covered Member-specific data.

5.    Billing and Funding.

a. Billing and Funding. Caremark shall invoice State Farm on the schedule set forth on Exhibit D to this Agreement. All payments by State Farm shall be made via electronic fund transfer or Automated Clearing House ("ACH") debit within five (5) business days after State Farm receives an invoice from Caremark. Late payment shall bear a service fee of one and one-half percent (1.5%) for each thirty (30) days that payment is late (or, if less,

2

CMK-AWP 011583
HIGHLY CONFIDENTIAL

the highest rate allowed by law), which shall be prorated for partial months. Unless otherwise agreed to by the parties, Caremark shall retain cash management responsibilities over the Claims Payments (defined below) to assure prompt payment to the servicing pharmacies.

b. **Payment of Claims and Reimbursements.** Caremark shall periodically notify State Farm of the amount of funds Caremark is required to pay under Sections 2.b.ii and 2.c.i of this Agreement (such payments, collectively, "Claims Payments"). Upon receipt of such notice, State Farm shall promptly transfer such funds to Caremark by wire transfer or ACH debit in accordance with instructions provided by a duly authorized Caremark representative. Caremark shall not be required to render Claims Payments until and unless such funds have been received by Caremark, and Caremark and its retail pharmacy network may immediately suspend performance under this Agreement for failure of State Farm to provide such funds as required.

Notwithstanding the foregoing, in the event that Caremark elects to render Claims Payments prior to its receipt of such funds from State Farm, such election shall not constitute a waiver of Caremark's right to suspend performance or of State Farm's obligation to render payment to Caremark either as to that payment or as to any other payment, nor shall such election serve to establish a course of dealing or a course of performance between Caremark and State Farm.

6.   **Term and Termination.**

a.   **Term and Termination.** This Agreement shall expire three (3) years from the Effective Date ("Initial Term"). The term shall be automatically renewed for additional one (1) year periods ("Renewal Term"). Either party may terminate this Agreement with ninety (90) days prior written notice after the initial term of this Agreement or: (a) in the event of a material breach by the other party upon written notice to the other party unless the breach is cured within thirty (30) days of the termination notice; or (b) in the event of the voluntary or involuntary bankruptcy, dissolution or insolvency of the other party.

b.   **Termination Prior to the End of Initial Term.** The pricing set forth in this Agreement is based upon a contract term of three (3) years. Should State Farm cease to offer any pharmacy benefit to its agents and associates covered by the Plan prior to the end of the Initial Term or a Renewal Term, State Farm may terminate Caremark's services upon ninety

(90) days written notice. In the event State Farm should cease to offer this Plan prior to the end of the Initial Term of the Agreement, State Farm agrees not to directly contract with another Prescription Benefit Manager and shall make reasonable effort not to indirectly contract with another Prescription Benefit Manager prior to the Initial Term. State Farm shall be obligated to pay all fees incurred prior to termination.

c.   **Obligations Upon Termination.** In the event of termination of this Agreement for any reason, Caremark shall continue to process mail service Prescriptions not requiring clarification and electronically-submitted retail claims that are received prior to the termination date. Caremark shall also process paper claims for which it receives complete information and that were incurred prior to termination for a period of one hundred eighty (180) days following the termination date, except where requested not to do so by State Farm. State Farm shall remain liable for all fees incurred through the periods described in this Section. State Farm shall also be responsible for the following expenses at Caremark's prevailing rates: (i) forwarding Prescriptions or claims to the new vendor, (ii) production and distribution of communication materials requested by State Farm, and/or new vendor (iii) programming requirements for the new vendor, and (iv) special reports requested by State Farm.

7.   **Miscellaneous.**

a.   **Infringement Indemnification.** Anything in the Agreement to the contrary notwithstanding, Caremark at its own expense shall defend and hold State Farm fully harmless against any action asserted against State Farm (and specifically including costs and reasonable attorneys' fees associated with any such action) to the extent that it is based on a claim that use of the subject matter being purchased by State Farm under the Agreement produced or manufactured by Caremark and for the services provided by Caremark under this Agreement (the "Product") within the scope of this Agreement infringes any patent, copyright, license or other proprietary right of any third party. State Farm shall promptly notify Caremark in writing of any such claim. If as a result of any claim of infringement against any patent, copyright, license or other proprietary right of any third party, State Farm is enjoined from using the Product, or if Caremark believes that the Product is likely to become the subject of a claim of infringement, Caremark at its option and expense will procure the right for State

3

CMK-AWP 011584
HIGHLY CONFIDENTIAL

Farm to continue to use the Product, or replace or modify the Product so as to make it non-infringing.

b. Assignment. Anything in the Agreement to the contrary notwithstanding, Caremark may not assign its duties under the Agreement to any other entity, including an entity which affiliates or merges with or acquires Caremark, except when such assignment is approved in advance by State Farm in writing, which approval State Farm may in its sole discretion grant or deny.

Anything in the Agreement to the contrary notwithstanding, State Farm may not assign its duties under the Agreement to any other entity, including an entity which affiliates or merges with or acquires State Farm, except when such assignment is approved in advance by Caremark in writing, which approval Caremark may in its sole discretion grant or deny.

c. Hold Harmless. Anything in the Agreement to the contrary notwithstanding, each party agrees that it shall indemnify and hold the other party fully harmless against any loss, damages, claims, or expenses of any kind whatsoever sustained or incurred by a third party (including costs and reasonable attorneys' fees) as a result of the negligent or intentional acts or omissions of the indemnifying party, and in the case of State Farm from any Plan design issues (such as drug coverage matters) of State Farm, for which recovery is sought against (such as drug coverage matters) the other party.

d. Taxes. State Farm shall pay any legally imposed sales/use taxes. Under no circumstances shall State Farm be liable for any penalties, fines, or other such charges incurred due to the failure of Caremark to pay when due any taxes owed by it under the Agreement or due to the failure of Caremark to notify State Farm of any taxes owed by State Farm under the Agreement. State Farm shall not be required to pay or reimburse Caremark for taxes based upon the net income or franchise of Caremark, nor for taxes imposed upon Caremark solely by reason of Caremark's doing business in or being incorporated in the jurisdiction imposing such taxes.

If State Farm contests or attempts to avoid or reduce any such taxes, penalties, fines or other charges, Caremark shall cooperate with State Farm in good faith and shall, at State Farm's request and expense, file any related document. Caremark shall pass to State Farm any tax refund and related interest it receives based on State Farm's previous payment

or reimbursement of applicable taxes and related interest.

e. Force Majeure. Neither party shall be liable for any delays in performance hereunder due to circumstances beyond its control including, but not limited to, acts of nature, acts of governments, delays in transportation, and delays in delivery or inability of suppliers to deliver. Either party shall have the option to terminate any and all obligations under the Agreement as amended by so notifying the other party in writing if the delay in performance exceeds thirty (30) days from the originally agreed upon performance date.

f. Limitation of Liability. EXCEPT FOR THE PROVISIONS OF SECTION 7.c (HOLD HARMLESS) AND SECTION 7.a (INFRINGEMENT INDEMNIFICATION), ANYTHING IN THE AGREEMENT TO THE CONTRARY NOTWITHSTANDING, UNDER NO CIRCUMSTANCES WHATSOEVER SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER. EXCEPT FOR THE PROVISIONS OF SECTION 7.c (HOLD HARMLESS) AND SECTION 7.a (INFRINGEMENT INDEMNIFICATION), IN NO EVENT WHATSOEVER SHALL EITHER PARTY'S TOTAL LIABILITY TO THE OTHER FOR ANY OTHER DAMAGES WHATSOEVER EXCEED ONE MILLION DOLLARS ($1,000,000.00).

g. Arbitration.

(i). Any controversy or claim arising out of or relating to the Agreement as amended shall be submitted to non-binding arbitration in accordance with the Center for Public Resources Rules for Non-Administered Arbitration of Business Disputes, by three arbitrators, of whom each party shall appoint one and the third shall be chosen by the other two. The arbitration shall be governed by the United States Arbitration Act, 9 USC §§1-16, and judgment may be entered by any court having jurisdiction thereof. The place of arbitration shall be Chicago, Illinois. The arbitrators are empowered to award damages in accordance with Section 7 (Limitation of Liability), and may not award punitive damages.

(ii). Either party may initiate litigation upon thirty (30) days' written notice to the other party.

4

CMK-AWP 011585
HIGHLY CONFIDENTIAL

h. Governing Law. This Agreement (and any attachments, addenda and supplements thereto), shall be governed by the laws of the State of Illinois without regard to its conflict of laws rules.

i. No Waiver. It is expressly understood that if either party on any occasion fails to adhere to any term of this Agreement, and the other party does not enforce that term, the failure to enforce on that occasion shall not prevent enforcement on any other occasion.

j. Notices. Any notice given under this Agreement shall be deemed received if in writing, and if sent by hand delivery, facsimile transmission, receipt confirmed, overnight courier that provides confirmation of delivery, or certified mail, return receipt requested, to the applicable party at its address set forth with its signature to this Agreement, or to such other address or to the attention of such other person as either party may designate in writing pursuant to this Section. Mailed notices shall be deemed received three (3) business days following mailing.

k. Confidentiality.

(i) The parties expressly acknowledge that in the course of their performance hereunder, they may learn or have access to certain confidential, patent, copyright, business, trade secret, proprietary or other like information or products of the other party or of third parties, including but not limited to the other party's vendors, consultants, suppliers or customers (the "Information"). Anything in the Agreement to the contrary notwithstanding, the parties expressly agree that they will keep strictly confidential any such Information.

(ii) State Farm and Caremark agree that, for the purposes of the Agreement, third parties whose duties for State Farm or as a subcontractor for Caremark in performing Caremark's duties under this Agreement require access to the Information provided under the Agreement shall have access to the Information as required by such duties, provided that: (1) such third parties have agreed in writing with either State Farm or Caremark, in terms no less protective than the confidentiality obligations of the Agreement, to keep confidential the Information; (2) such third parties have agreed in writing with either State Farm or Caremark not to use the Information for their own benefit or for the benefit of any person or entity besides State Farm; and (3) State Farm, when allowing such third parties access to Caremark's Information, will not exceed the license or use restrictions in the Agreement.

(iii) Caremark agrees not to use a third party's Information for its own benefit or the benefit of any person besides State Farm.

(iv) For purposes of this Section 7, the term "Disclosing Party" shall refer to the party to the Agreement providing the Information to the other party, and the term "Receiving Party" shall refer to the party receiving the Information in the course of its performance under the Agreement. The term "Information" shall not include products or information that: (i) are in the public domain or in the possession of the Receiving Party without restriction at the time of receipt under the Agreement; (ii) are used or released with the prior written approval of the Disclosing Party; (iii) are independently developed by the Receiving Party, or (iv) are ordered to be produced by a court of competent jurisdiction or appropriate regulatory authority, but in such case the Receiving Party producing the Information agrees to notify the Disclosing Party immediately and cooperate with the Disclosing Party in asserting a confidential or protected status for the Information.

(v) Notwithstanding the foregoing, each party shall be entitled to retain one (1) copy of such Information, for the sole purpose of verifying compliance with this agreement, provided, however, that the Receiving Party shall return all such Information and copies of Information, or destroy such Information and copies of Information and certify to the Disclosing Party that it has done so, within a year of the date of the service; and provided further that Caremark may retain its copy of the weekly invoicing tape it provides to State Farm for a maximum of seven (7) years from the date Caremark provides it to State Farm. The provisions of this Section 7 shall survive termination of the Agreement.

(vi) Each party agrees to comply with all applicable state and federal laws and regulations relating to privacy and security of personal health data, including any and all regulations issued under the Health Insurance Portability and Accountability Act (HIPAA). Each party shall cooperate with the other party in taking such reasonable steps and executing all documents reasonably requested by the other party to comply with all such state and federal laws and regulations. Each party agrees to promptly notify the other orally and in writing of its discovery of any personal data in its possession which is improperly used, copied or removed by anyone except an authorized representative of such party with respect to matters covered by this Agreement.

5

CMK-AWP 011586
HIGHLY CONFIDENTIAL

l.  Excluded Products. This Agreement does not require Caremark to dispense those drugs to which Caremark has no access. If authorized by State Farm, Caremark shall dispense biotechnical and biological drugs and specialty drugs to Covered Members from its mail service pharmacies. The pricing for biotechnical and biological drugs and specialty drugs shall be as set forth in Exhibit B.

m.  Counterparts. This Agreement may be executed in counterparts; each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

n.  Exhibits. The following exhibits are made a part of this Agreement:

Exhibit A - Performance Guarantees

Exhibit B - State Farm Payments
Exhibit C - Clinical Programs
Exhibit D – Reports
Exhibit E – RxNavigator Services
Exhibit F – Caremark Credits

o.  Use of State Farm Name. Anything in the Agreement to the contrary notwithstanding, Caremark expressly agrees that it shall not disclose or otherwise identify State Farm or any of its subsidiaries or affiliates orally or in any of Caremark's advertising, publications, or other media, which is displayed or disseminated to Caremark's customers or other parties.

\* \* \* \* \*

Authorized representatives of the parties have signed this Agreement.

CAREMARK INC.
PRESCRIPTION SERVICE DIVISION
2211 Sanders Road
Northbrook, Illinois  60062

LEGAL REVIEW

*A. D. FRAZIER*
Signature

PRESIDENT & COO
Printed or Typed Name

Title

8-7-02
Date

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANIES
One State Farm Plaza
Bloomington, Illinois  61710

*David L Power*
Signature

David L. Powcy
Printed or Typed Name

AVP - HR
Title

8/16/0~
Date

6

CMK-AWP 011587
HIGHLY CONFIDENTIAL

**EXHIBIT A**

**PERFORMANCE GUARANTEES**

1.  Retail Generic Utilization Rate. Caremark guarantees that State Farm's ███████ as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter. Caremark and State Farm may, upon mutual written agreement, amend the percentage on an annual basis.

2.  Mail Generic Utilization Rate. Caremark guarantees that State Farm's Mail generic utilization rate will be a minimum ███ as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter. Caremark and State Farm may, upon mutual written agreement, amend the percentage on an annual basis.

3.  Retail Generic Substitution Rate. Caremark guarantees that State Farm's retail generic substitution rate will be a minimum ███ as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter. Caremark and State Farm may, upon mutual written agreement, amend the percentage on an annual basis.

4.  Mail Generic Substitution Rate. Caremark guarantees that State Farm's mail generic substitution rate will be a minimum ███ as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter. Caremark and State Farm may, upon mutual written agreement, amend the percentage on an annual basis.

5.  Mail Service Prescription Accuracy. Caremark guarantees that its accuracy in dispensing Covered Members' Prescriptions from its mail service pharmacy (correct drug, correct strength and correct dosage form) shall be at least ████ as measured on a quarterly basis. Should Caremark fail to

meet the above-stated standard by 0.0035 of a percentage point or more for any given quarter, Caremark shall credit State Farm ████ for each quarter.

6.  Mail Turnaround Time (No Intervention). Caremark guarantees that within an average of ███ working days of receipt, it shall dispense and ship ███ of all Covered Members' mail service pharmacy Prescriptions not requiring intervention or clarification, as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter.

7.  Mail Turnaround Time (Intervention). Caremark guarantees that within an average of ███ working days of receipt, it shall dispense and ship ███ of all Covered Members' mail service pharmacy Prescriptions requiring intervention or clarification, as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall pay State Farm ████ for each quarter.

8.  Retail Network Pharmacy Access. Caremark guarantees that ███ of Covered Members shall reside within ten (10) miles of a retail pharmacy in Caremark's network, if any retail pharmacy is located within ten (10) miles of Covered Members (whether or not in Caremark's network of retail pharmacies), as measured once during each contract year. Should Caremark fail to meet the above-stated standard for any given contract year, Caremark shall pay State Farm ████ for each contract year.

9.  Report Card. Caremark shall supply a "Report Card" to State Farm annually to be completed by State Farm. Caremark agrees to pay State Farm ████ if the average rating is below ██ on the measurement scale.

10. Annual State Farm Survey. Caremark guarantees that it shall achieve at least an overall satisfaction rating of ██ on a scale of

A-1

CMK-AWP 011588
HIGHLY CONFIDENTIAL

1-5, as measured by an independent customer third party satisfaction surveyor, on an annual basis (as measured on a calendar year basis). Should Caremark fail to meet the above-stated guarantee for any contract year, Caremark shall credit State Farm ▮▮▮ for each contract year.

11. **Annual Participant Survey.** Caremark and State Farm will coordinate a mutually agreed upon State Farm specific independent participant satisfaction survey to be performed on an annual calendar year basis and will achieve at least ▮▮ satisfaction rating among participants. Failure to achieve a satisfaction rating of ▮▮ or more will result in a penalty of ▮▮ for each contract year.

12. **Paper Claims Financial Accuracy.** Caremark guarantees that the paper claims adjudication accuracy rate for Covered Members' claims shall be ▮▮ correct with respect to financial adjudication, as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall credit State Farm ▮▮ for each quarter.

13. **Management Report Accuracy.** Caremark guarantees that ▮▮ of the financial and statistical data reported in State Farm's quarterly management reports shall accurately reflect the data in Caremark's claims files, as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall credit State Farm ▮▮ for each quarter.

14. **Plan Administration Accuracy.** Caremark guarantees that State Farm's Plan Design will be implemented with ▮▮ accuracy. State Farm will be responsible for reporting any failure to meet the above stated guarantee to Caremark on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall credit State Farm ▮▮ for each quarter.

15. **Phone Abandonment Rate.** Caremark guarantees that all Covered Members' calls to Caremark's toll-free customer service lines shall be answered with an abandonment rate of ▮▮ or less, as measured on a quarterly basis. Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall credit State Farm ▮▮ for each quarter.

16. **Phone Average Speed of Answer.** Caremark guarantees that all Covered Members' calls to Caremark's toll-free customer service lines shall be answered within an average time of ▮▮ Should Caremark fail to meet the above-stated standard for any given quarter, Caremark shall credit State Farm ▮▮ for each quarter.

17. **Caremark Performance Evaluation Form.** Caremark and State Farm will maintain a Caremark Performance evaluation form mutually agreed upon by both parties on a quarterly basis throughout the length of the contract.

18. **Caremark Guarantee Credit Timeliness.** The Caremark Guarantee credits set forth in this Exhibit A shall be made within ▮▮ of the end of each contract quarter or year as applicable. Should Caremark fail to meet the above guarantee, Caremark shall credit State Farm ▮▮ for each contract quarter or year not achieved, as specified above.

19. **Caremark Credit Timeliness.** The Caremark Credits set forth in Exhibit F shall be made within ▮▮ of he end of each contract quarter. Should Caremark fail to meet the above guarantee, Caremark shall credit State Farm ▮▮ for each ▮▮ days that payment is late (or, if less, the highest rate allowed by law).

*Caremark shall credit State Farm for any required penalty amounts within ninety (90) days of the end of any quarter or contract year, as applicable.*

A - 2

CMK-AWP 011589
HIGHLY CONFIDENTIAL

SF

## EXHIBIT B

### STATE FARM PAYMENTS

1.     <u>Mail Service Pharmacy</u>.  Effective 1/1/02, for each Prescription dispensed by Caremark through one of its mail service pharmacies to a Covered Member, State Farm shall pay Caremark the fees set forth below:



| Mail | Year 2002 | Year 2003 | Year 2004 |
|---|---|---|---|
| Brand-name drugs and Non-MAC drugs | ■■■■■ | ■■■■■ | ■■■■■ |
| Generic Substitutes | MAC* | MAC* | MAC* |
| Shipping and Dispensing fee | ■■ | ■■ | ■■ |

less the Covered Member copayment as established by State Farm.  State Farm is also responsible for the payment of any applicable sales or use tax.  The minimum charge per Prescription shall be the applicable Covered Member copayment. In the event a Covered Member submits to Caremark a copayment in an insufficient amount, and Caremark is unable to collect the correct copayment amount from the Covered Member, then Caremark reserves the right to invoice State Farm for the amount of the uncollected copayment(s) on a regular basis. In the event that the Covered Member copayment exceeds the Prescription charge, Caremark shall credit Covered Member the difference.

2.     <u>Retail Pharmacy</u>. For each Prescription billed to State Farm, electronically processed and dispensed to a Covered Member through Caremark's retail pharmacy network, State Farm shall pay Caremark the fees set forth below:



| Retail | Year 2002 | Year 2003 | Year 2004 |
|---|---|---|---|
| Brand-name drugs and Non-MAC drugs | ■■■■■ | ■■■■■ | ■■■■■ |
| Generic Substitutes | MAC* | MAC* | MAC* |
| Dispensing fee | ■■ | ■■ | ■■ |

less the Covered Member copayment as established by State Farm. Covered Member shall pay the lesser of the usual & customary pricing or the copayment. State Farm shall also pay any applicable sales or use tax. The above prices are based on the participation of a full and complete Caremark retail pharmacy network.

CMK-AWP 011590
HIGHLY CONFIDENTIAL

3. Claims Processing. For each claim processed by Caremark, State Farm shall pay Caremark the fees set forth below:

| Processed Claims | Year 2002 | Year 2003 | Year 2004 |
| --- | --- | --- | --- |
| Electronically Paid Claims | [redacted] | [redacted] | [redacted] |
| Paper Claims | [redacted] | [redacted] | [redacted] |

per processed paper prescription claim, plus any applicable sales or use tax. State Farm shall pay Caremark for each processed prescription claim reimbursed to a Covered Member in accordance with Plan design less the applicable Covered Member paper claim copayment as established by State Farm. These fees would not apply to electronically submitted claims that were denied, regardless of the reason for denial.

4. Clinical Programs. State Farm shall pay the Clinical Program fees set forth below once it reaches a combined total savings of [redacted] per contract year for CustomCare – Mail and Proactive Generic Utilization Management and CustomCare - Retail services. State Farm reserves the right to re-evaluate the following Clinical Programs based upon the Pharmacy Outcomes Specialists Audit Report in Q1, 2002.

a. CustomCare – Mail and Proactive Generic Utilization Management.

i. State Farm shall pay Caremark [redacted] of all savings realized as a result of Caremark providing the CustomCare – Mail and Proactive Generic Utilization Management services described in Exhibit C-1. State Farm shall be invoiced monthly. Savings will apply for a period of up to twelve (12) months after the intervention for CustomCare – Mail and Proactive Generic Utilization Management.

ii. Savings realized shall be calculated as follows:

A. Conversions. When Caremark intervenes and obtains the prescriber's approval to dispense a drug, dosage, or quantity of medication different than what was originally prescribed, savings will be calculated. No intervention will take place unless Caremark also obtains the first and last name of the person conveying the prescriber's authorization. Savings are calculated as the difference between the Gross Cost of the original prescription and the Gross Cost of the dispensed prescription. Savings realized for any refills of the converted prescription and for any subsequent prescriptions for the converted product written by the same prescriber for the same patient will be incurred at the time the drug is dispensed.

B. Discontinued Prescriptions. In certain situations, Caremark may obtain prescriber approval to not dispense an original Prescription received. In such situations, Caremark shall return the Prescription to the Covered Member and the savings realized shall be calculated as the Gross Cost of the original Prescription (not including any refill(s) indicated). In other situations, Caremark may obtain prescriber approval to dispense the original Prescription, but to discontinue one or more of the refills indicated. In such situations, the savings realized shall be the Gross Cost of the refill(s) authorized to be discontinued, and such savings realized shall be recognized at the time that the authorization for discontinuation is given. In the event that the discontinued Prescription is resumed during the time period during which savings for refill(s) were realized, Caremark shall credit State Farm for the time period during which savings were realized but the Prescription was resumed. No intervention will take place under any situation, unless Caremark also obtains the first and last name of the person conveying the prescriber's authorization.

b. CustomCare - Retail.

i. State Farm shall pay Caremark [redacted] of all savings realized as a result of Caremark's performance of the CustomCare - Retail services described in Exhibit C-2. State Farm shall be invoiced monthly. Savings realized will be calculated as described in subsections (ii) and (iii) below.

SF

ii.  Savings realized shall be calculated as follows:  For each intervention letter sent to a Covered Member's prescriber suggesting alternative therapy within a particular therapeutic category, a savings period shall be tracked beginning with the first prescription dispensed following the date of the prescriber's approval and extending for the lesser of (a) the average length of therapy for a therapeutic class or (b) three hundred sixty-five (365) days for non-controlled substances and one hundred eighty (180) days for controlled substances.  When Caremark intervenes and obtains the prescriber's approval to dispense a drug, dosage, or quantity of medication different than what was originally prescribed, savings will be calculated.  Savings are calculated as the difference between the Gross Cost of the original prescription and the Gross Cost of the dispensed prescription.  Savings is realized for any refills of the converted prescription and for any subsequent prescriptions for the converted product written by the same prescriber for the same patient.

iii.  Discontinued Prescriptions.  In certain situations, Caremark may obtain prescriber approval to discontinue one or more of the refills indicated.  In such situations, the savings realized shall be the Gross Cost of the refill(s) authorized to be discontinued, and such savings realized shall be recognized at the time that the authorization for discontinuation is given.  In the event that the discontinued Prescription is resumed during the time period which savings for refill(s) were realized, Caremark shall credit State Farm for the time period during which savings were realized but the Prescription was resumed.

5. ██████████████████████████

6.    Special Fees.  Custom computer services shall be provided at State Farm's request at Caremark's prevailing rate.  Analytical and other ad hoc services to support such custom computer services shall also be provided at Caremark's prevailing rate.

7.    Caremark's Therapeutic Services Division ("CTS") Services.  For each Prescription dispensed by CTS to a Covered Member, State Farm shall pay Caremark at a rate of ██████████████████████████████████ unless it appears on Attachment B-1, except those drugs that are not available to Caremark at pricing at least as favorable as ██████████████████████████████  Those drugs shall be priced at ██████████████  With the consent of State Farm, pricing may be adjusted to reflect changes in the marketplace during the contract term.  If shipping fees increase during the term of this Agreement the shipping fee shall be increased by the same amount.  State Farm is also responsible for the payment of any applicable sales or use tax.

███████████████████████████████████

CMK-AWP 011592
HIGHLY CONFIDENTIAL

**ATTACHMENT B-1**
**Fee Schedule**

Caremark Therapeutic Service's Contract Rates to State Farm Insurance include:

- All necessary infusion ancillary supplies and Safe Toss ™ waste disposal
- 24 hr. on call clinical support
- Cliniscan® Home Infusion Monitoring System
- Product delivery nationwide
- Patient training, education and evaluation
- Specialized medical ancillary supplies

| HEMOPHILIA - *Factor Concentrates* | NDC Code | AWP (2/02) | Contracted Rate | HCPCS Billing Code | Dispensing Fee |
|---|---|---|---|---|---|
| *Factor VIII (Recombinant)* | | | | | |
| Recombinate® 250 u/vial | 00944-2938-01 | $1.63 | | J7192 | |
| Recombinate® 500 u/vial | 00944-2938-02 | $1.63 | | J7192 | |
| Recombinate® 1000 u/vial | 00944-2938-03 | $1.63 | | J7192 | |
| | | | | | |
| Kogenate FS® 250 u/vial | 00026-0372-20 | $1.41 | | J7192 | |
| Kogenate FS® 500 u/vial | 00026-0372-30 | $1.41 | | J7192 | |
| Kogenate FS® 1000 u/vial | 00026-0372-50 | $1.41 | | J7192 | |
| | | | | | |
| Helixate FS® 250 u/vial | 00053-8130-01 | $1.39 | | J7192 | |
| Helixate FS® 500 u/vial | 00053-8130-02 | $1.39 | | J7192 | |
| Helixate FS® 1000 u/vial | 00053-8130-04 | $1.39 | | J7192 | |
| | | | | | |
| Refacto® 250 u/vial | 58394-0007-01 | $1.36 | | J7192 | |
| Refacto® 500 u/vial | 58394-0006-01 | $1.36 | | J7192 | |
| Refacto® 1000 u/vial | 58394-0005-01 | $1.36 | | J7192 | |
| *Factor VIII (Monoclonal)* | | | | | |
| Hemofil®-M | 00944-2935-01 | $1.23 | | J7190 | |
| | | | | | |
| Monoclate® P | 00053-7656-01 | $0.95 | | J7190 | |
| Monoclate® P | 00053-7656-02 | $0.95 | | J7190 | |
| Monoclate® P | 00053-7656-04 | $0.95 | | J7190 | |
| | | | | | |
| Monarc M® | 52769-0460-01 | $0.93 | | J7190 | |
| *Factor VIII (Other)* | | | | | |
| Humate®-P (vWD) | 00053-7620-05 | $0.94 | | J7190 | |
| Humate®-P (vWD) | 00053-7620-10 | $0.94 | | J7190 | |
| Humate®-P (vWD) | 00053-7620-20 | $0.94 | | J7190 | |
| | | | | | |
| Alphanate® SDHT | 49669-4600-02 | $0.90 | | J7190 | |
| | | | | | |
| Koate DVI 250 u/vial | 00026-0665-20 | $0.92 | | J7190 | |
| Koate DVI 500 u/vial | 00026-0665-30 | $0.92 | | J7190 | |
| Koate DVI 1000 u/vial | 00026-0665-50 | $0.92 | | J7190 | |
| *Factor IX (Recombinant)* | | | | | |
| Benefix® 1000 u/vial | 58394-0001-01 | $1.18 | | J7195 | |
| Benefix® 500 u/vial | 58394-0002-01 | $1.18 | | J7195 | |
| Benefix® 250 u/vial | 58394-0003-01 | $1.18 | | J7195 | |
| *Factor IX (Monoclonal/High Purity)* | | | | | |
| Mononine® | 00053-7668-01 | $1.18 | | J7193 | |
| Mononine® | 00053-7668-02 | $1.18 | | J7193 | |
| Mononine® | 00053-7668-04 | $1.18 | | J7193 | |

CMK-AWP 011593
HIGHLY CONFIDENTIAL

## ATTACHMENT B-1

| | | | | |
|---|---|---|---|---|
| Alphanine® SDVF | 49669-3600-02 | $1.10 | | J7193 |
| *Factor IX (Other)* | | | | |
| Konyne-80 500 u/vial | 00026-0626-20 | $0.50 | | J7194 |
| Konyne-80 1000 u/vial | 00026-0626-50 | $0.50 | | J7194 |
| Proplex® T | 00944-0581-01 | $0.44 | | J7194 |
| Bebulin® VH | 64193-0244-02 | $0.73 | | J7194 |
| **HEMOPHILIA - Factor Concentrates - Con't** | **NDC Code** | **AWP (2/02)** | | **HCPCS Billing Code** |
| Profilnine SD | 49669-3200-02 | $0.75 | | J7194 |
| Profilnine SD | 49669-3200-03 | $0.75 | | J7194 |
| *Inhibitor Therapies* | | | | |
| Autoplex®-T | 59730-6059-07 | $1.50 | | J7198 |
| Feiba®-VH | 64193-0222-04 | $1.91 | | J7198 |
| NovoSeven® 1.2 (units expressed in micrograms) | 00169-7060-01 | $1.40 | | J7199 |
| NovoSeven® 4.8 (units expressed in micrograms) | 00169-7062-01 | $1.40 | | J7199 |
| Hyate-C | 55688-0106-02 | $2.20 | | J7191 |
| **HEMOSTATIC AGENTS** | **NDC Code** | **AWP (2/02)** | | **HCPCS Billing Code** |
| DDAVP 0.1 mg tabs | 00075-0016-00 | $2.47 | | J2597 |
| DDAVP 0.2 mg tabs | 00075-0026-00 | $3.03 | | J2597 |
| DDAVP 4mcg/ml 10 ml vial | 00075-2451-53 | $270.00 | | J2597 |
| DDAVP 4mcg/ml 1 ml amp (each) | 00075-2451-01 | $26.67 | | J2597 |
| DDAVP 15 mcg / ml, 2ml, 5's | 00075-0945-02 | $972.01 | | J2597 |
| Stimate® 2.500 ml (nasal spray) | 00053-2453-00 | $575.00 | | J3490 |
| **IMMUNE DISORDERS** *Immunoglobulins* | **NDC Code** | **AWP (2/02)** | | **HCPCS Billing Code** |
| Venoglobulin® S 10% 5 gm | 49669-1622-01 | $475.00 | | J3490 |
| Venoglobulin® S 10% 10 gm | 49669-1623-01 | $950.00 | | J3490 |
| Venoglobulin® S 10% 20 gm | 49669-1624-01 | $1,900.00 | | J3490 |
| Venoglobulin® S 5% 2.5 gm | 49669-1612-01 | $225.00 | | J3490 |
| Venoglobulin® S 5% 5 gm | 49669-1613-01 | $450.00 | | J3490 |
| Venoglobulin® S 5% 10 gm | 49669-1614-01 | $900.00 | | J3490 |
| Polygam® S/D 2.5 gm | 52769-0471-72 | $223.75 | | J3490 |
| Polygam® S/D 5 gm | 52769-0471-75 | $447.50 | | J3490 |
| Polygam® S/D 10 gm | 52769-0471-80 | $895.00 | | J3490 |
| Gamimune® -N 10% SD 1 gm | 00026-0648-12 | $90.00 | | J3490 |
| Gamimune® -N 10% SD 2.5 gm | 00026-0648-15 | $225.00 | | J3490 |
| Gamimune® -N 10% SD 5 gm | 00026-0648-20 | $450.00 | | J3490 |
| Gamimune® -N 10% SD 10 gm | 00026-0648-71 | $900.00 | | J3490 |
| Gamimune® -N 10% SD 20 gm | 00026-0648-24 | $1,800.00 | | J3490 |

CMK-AWP 011594
HIGHLY CONFIDENTIAL

## ATTACHMENT B-1

| | NDC Code | AWP (2/02) | | HCPCS Billing Code |
|---|---|---|---|---|
| Gamimune® -N 5% SD .5 gm | 00026-0646-12 | $45.00 | | J3490 |
| Gamimune® -N 5% SD 2.5 gm | 00026-0646-20 | $225.00 | | J3490 |
| Gamimune® -N 5% SD 5 gm | 00026-0646-71 | $450.00 | | J3490 |
| Gamimune® -N 5% SD 10 gm | 00026-0646-24 | $900.00 | | J3490 |
| Gamimune® -N 5% SD 12.5 gm | 00026-0646-25 | $1,125.00 | | J3490 |
| | | | | |
| **IMMUNE DISORDERS  - Con't** *Immunoglobulins* | **NDC Code** | **AWP (2/02)** | | **HCPCS Billing Code** |
| Gammagard® S/D .5 gm | 00944-2620-01 | $81.00 | | J3490 |
| Gammagard® S/D 2.5 gm | 00944-2620-02 | $298.13 | | J3490 |
| Gammagard® S/D 5 gm | 00944-2620-03 | $596.25 | | J3490 |
| Gammagard® S/D 10 gm | 00944-2620-04 | $1,192.50 | | J3490 |
| | | | | |
| Gammar® P IV 1.0 gm | 00053-7486-01 | $65.00 | | J3490 |
| Gammar® P IV 2.5 gm | 00053-7486-02 | $162.50 | | J3490 |
| Gammar® P IV 5 gm | 00053-7486-05 | $325.00 | | J3490 |
| Gammar® P IV 5 gm, 6's | 00053-7486-06 | $1,950.00 | | J3490 |
| Gammar® P IV 10 gm | 00053-7486-10 | $650.00 | | J3490 |
| | | | | |
| Iveegam-EN® 5 gm, ea. | 64193-0250-50 | $510.00 | | J3490 |
| | | | | |
| Sandoglobulin   1.0 GM | 00078-0120-94 | $91.38 | | J3490 |
| Sandoglobulin  12.0 GM | 00078-0244-93 | $697.25 | | J3490 |
| Sandoglobulin  3.0 GM | 00078-0122-95 | $184.28 | | J3490 |
| Sandoglobulin  6.0 GM | 00078-0124-96 | $348.63 | | J3490 |
| | | | | |
| Panglobulin 6gm | 52769-0268-66 | $495.00 | | J3490 |
| Panglobulin 12gm | 52769-0269-72 | $990.00 | | J3490 |
| | | | | |
| Cytogam 2.5mg | 60574-3101-01 | $622.30 | | J3490 |
| | | | | |
| **Specialty Rh Immunoglobulin** | **NDC Code** | **AWP (2/02)** | | **HCPCS Billing Code** |
| WinRho® S/D 120mcg./600 IU vial | 60492-0021-01 | $142.00 | | J2792 |
| WinRho® S/D 300mcg./1,500 IU vial | 60492-0023-01 | $324.50 | | J2792 |
| WinRho® S/D 1000mcg./5000 IU vial | 60492-0024-01 | $1,081.50 | | J2792 |
| *Interferon gamma-1b* | | | | |
| Actimmune® (100mcg) | 64116-0011-01 | $237.04 | | J9216 |
| Actimmune® (12 x 0.5ml vial, 3 mill. Units) | 64116-0011-12 | $2,585.85 | | J9216 |

**CLINICAL SERVICES:**
Nursing Services
Caremark will refer any medically necessary nursing services to State Farm's contracted nursing agencies.  Nursing services will be billed separately by those agencies.

CMK-AWP 011595
HIGHLY CONFIDENTIAL



# Exhibit B

Caremark Inc.                                              Agreement No. 03029608
SBC Communications Inc.

Memorandum of Understanding
between
Caremark Inc.
and
SBC Communications Inc.

This Memorandum of Understanding ("MOU") is between Caremark Inc., a California corporation ("Caremark") and SBC Communications Inc., a Delaware corporation ("SBC").

WHEREAS: There is currently in full force and effect between Caremark and SBC, a Prescription Drug Services Agreement, No. 00012907, effective January 1, 2001 as amended (the "Agreement"); and

WHEREAS: The parties are currently negotiating a modification to the Agreement ("Amendment No. 4") with the intent of signing Amendment No. 4 as soon as reasonably practicable and before December 31, 2003; and

WHEREAS: The parties have agreed that Amendment No. 4 1) will reflect the parties agreement herein that the Agreement term has been extended beyond December 31, 2003 for an indefinite, or in other words, evergreen term, and 2) will incorporate the price terms described herein, which shall remain firm and in effect for a term beginning on July 1, 2003 (with certain price revisions noted below beginning on October 1, 2003) and ending on December 31, 2008 (unless the Agreement is sooner Terminated or Canceled); and

WHEREAS: During the time in which Amendment No. 4 is being negotiated, the parties agree to establish that 1) the revised price terms memorialized in this MOU shall become effective July 1, 2003 (with certain price revisions noted below beginning on October 1, 2003), and 2) that certain other terms and conditions shall be incorporated into Amendment 4 when it is finalized.

NOW THEREFOR, the parties, intending to be legally bound, hereby agree as follows:

PROPRIETARY INFORMATION
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and subsidiary companies, and their third party representatives, except under written agreement

1

HIGHLY
CONFIDENTIAL         CMK-AWP 013201

Caremark Inc.                                    Agreement No.  03029608
SBC Communications Inc.

1.  **Prescription Benefit Management Services and Agreement.**  Caremark will continue to
provide a managed pharmacy benefit program to SBC, administering SBC's prescription benefits
in accordance with the applicable SBC Plans and SBC's Plan design features as communicated
by SBC to Caremark.

2.  Section 3.32 (Term of Agreement) of the Agreement is hereby deleted and a new Section 3.32
(Term of Agreement) is substituted as follows:

> **"This Agreement shall become effective January 1, 2001 ("Effective Date")
> and shall remain in full force and effect until Terminated or Cancelled as
> provided herein."**

3.  **Pricing and Payment Terms.**  The following prices have been agreed to by SBC and
Caremark and will be effective as of July 1, 2003:

    a.  **Retail Pharmacy Network:**  Using Caremark's existing National Retail Network,
      i.      Brand drugs will be charged at AWP ▓▓▓▓

      ii.    Generic drugs will be charged at the Caremark MAC, as amended
             from time to time, or at AWP ▓▓▓ where the generic drug
             dispensed is not included in the Caremark MAC.

      iii.   Dispensing fees will be ▓▓▓ per brand drug prescription and
             ▓▓▓ per generic drug prescription.

      iv.   The overall value to SBC of retail generic drug performance will
             be no less than AWP ▓▓▓ on an annual aggregate basis.  (By way
             of example, if AWP charges to SBC for generic drugs total
             ▓▓▓▓▓▓ and ▓▓▓ of that amount is discounted at AWP ▓▓▓
             the remaining ▓▓▓▓ must be discounted in the aggregate at no
             less than AWP ▓▓▓ to achieve an overall discount of AWP ▓▓▓▓

    b.  **Mail Service:**
      i.      Brand drugs will be charged at AWP ▓▓▓▓

      ii.    Generic drugs will be charged at AWP ▓▓▓▓

      iii.   Plus a dispensing fee of ▓▓▓ and shipping fee of ▓▓▓  If
             shipping fees increase during the term of the Agreement the
             shipping fee shall be increased by the same amount.

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and
subsidiary companies, and their third party representatives, except under written agreement

**HIGHLY
CONFIDENTIAL**          CMK-AWP 013202

Caremark Inc.                                              Agreement No.  03029608
SBC Communications Inc.

   c.   **Specialty Drugs:**

Hemophilia medications dispensed by Caremark will be charged at AWP ███; IGIV dispensed by Caremark will be charged at AWP ███ All other specialty drugs dispensed by Caremark will be charged at AWP ███ with current exceptions.  The dispensing fee for Specialty Drugs is ███ and shipping fee is ███ If shipping fees increase during the term of the Agreement, the shipping fee shall be increased by the same amount.

   d.   **Preferred Brand Discount:**

**Effective July 1, 2003 through September 30, 2003:**

     i.   Rebates for populations on a two-tier benefit structure will be ███ for each Preferred brand name mail prescription and ███ for each Preferred brand name retail prescription.

    ii.   Rebates for populations on a three-tier benefit structure will be ███ per each Preferred brand name mail prescription and a discount of ███ per each Preferred brand retail prescription.

**Effective October 1, 2003:**

     i.   Rebates for populations on a two-tier benefit structure will be ███ for each Preferred brand name mail prescription and ███ per each Preferred brand name retail prescription.

    ii.   Rebates for populations on a three-tier benefit structure will be ███ for each Preferred brand name mail prescription and ███ for each Preferred brand name retail prescription.

   e.   **Paper Claim Fee:** ███ per paid paper prescription claim.

   f.   **Innovation Credit:**  Caremark shall add to the Innovation Credit balance existing as of June 30, 2003 so that effective July 1, 2003 the outstanding balance of the Innovation Credit shall be increased to a total of ███

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and subsidiary companies, and their third party representatives, except under written agreement

**HIGHLY
CONFIDENTIAL**                    **CMK-AWP 013203**

Caremark Inc.                                          Agreement No. 03029608
SBC Communications Inc.

### 4. Caremark Specialty Management; Non-Kaiser HMO Lives.

**a.** <u>Caremark Specialty Management – SBC Non-Bargained Populations</u>. Both parties intend to include SBC's non-bargained populations under Caremark Specialty management on an exclusive basis, with a view toward implementing such by January 1, 2004 unless SBC determines that there are significant obstacles which make such inclusion not to be in the best interests of SBC and/or the Plans. Any exclusive arrangement, if implemented by SBC, will exclude specialty drugs provided through medical/surgical arrangements unless and until SBC expressly agrees otherwise in writing. SBC intends to seriously evaluate, with the intent of making, medical/surgical specialty drugs exclusive to Caremark.

**b.** <u>Caremark Specialty Management – SBC Bargained Populations</u>. Both parties intend to include SBC's bargained populations under Caremark Specialty management on an exclusive basis unless SBC determines that there are significant obstacles which make such inclusion not to be in the best interests of SBC and/or the Plans. To the degree an exclusive arrangement is allowed within the context of SBC's bargaining efforts, SBC will include this topic in its discussions with bargaining units that take place during 2003 and 2004 with a view toward implementing an exclusive arrangement by January 1, 2005. Any exclusive arrangement, if implemented by SBC, will exclude specialty drugs provided through medical/surgical arrangements unless and until SBC expressly agrees otherwise in writing. SBC intends to seriously evaluate, with the intent of making, medical/surgical specialty drugs exclusive to Caremark.

**c.** <u>Non-Kaiser HMO Lives</u>. Both parties intend to include SBC's non-Kaiser HMO lives under Caremark's prescription benefit management with a view toward implementing such by January 1, 2005 unless SBC determines that there are significant obstacles which make such inclusion not to be in the best interests of SBC and/or the Plans. It is the understanding of the parties that such lives will be included only to the extent SBC is not economically disadvantaged by so doing. On or around October 1, 2004 SBC will provide Caremark an estimate of the number of lives that would be added through this effort (if in fact such change is implemented by SBC).

**d.** With respect to paragraphs a. through c. above in this Section, the following applies: In the event that SBC determines that any changes referenced above would not be in the best interests of SBC and/or the Plans, SBC agrees to share its perceived obstacles with Caremark and agrees to work with Caremark in evaluating whether any practicable and reasonable methods can be employed to alter SBC's determination. Notwithstanding anything to the contrary herein, Caremark acknowledges that SBC is under no obligation to make any of the changes discussed above and Caremark shall have no claim whatsoever against SBC should SBC not agree to make any of the changes.

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and subsidiary companies, and their third party representatives, except under written agreement

4

**HIGHLY CONFIDENTIAL**      CMK-AWP 013204

Caremark Inc.
SBC Communications Inc.

Agreement No.  03029608

5.  **Cancellation and Termination.**
     **a.  Of MOU.**  This MOU may be Cancelled or Terminated under the same rules set forth in Section 3.3 (Cancellation and Termination) of the Agreement.

     **b.  Of Agreement.**  Caremark acknowledges that the execution and delivery of this MOU and any extension or modification to the Agreement via Amendment No. 4 shall be without prejudice to SBC's power to Terminate the Agreement, for convenience and without liability, upon thirty (30) days prior written notice as provided in the Agreement.  SBC continues to retain this power irrespective of the revised pricing (and associated savings) which Caremark extends to SBC under this MOU and any extension and modification of the Agreement.

6.  **Confidentiality.**  The terms stated herein are proprietary and confidential.  Neither party shall disclose the terms of this MOU, including pricing and payment terms, to any third party, except to their respective Affiliates, or to their respective contractors or agents who have a need to know in the performance of services for Caremark or SBC, as the case may be, and who are covered by an appropriate confidentiality agreement prior to accessing such Information.

7.  **Effective Date; Term of MOU.**
     **a.**  This MOU shall become effective upon the later of:  i) July 1, 2003 or, ii) the date that it is fully signed by both parties ("Effective Date").

     **b.**  This MOU shall automatically expire upon the date that Amendment No. 4 is fully signed by both parties.  In such event, Amendment No. 4 shall retroactively supersede this MOU unless the parties agree otherwise.

8.  **Miscellaneous.**
     **a.**  SBC hereby discloses to Caremark its intent to continue to investigate health care initiatives, including prescription drug opportunities or arrangements as may be proposed to SBC from time to time, by third parties.

     **b.**  Notwithstanding the recitals herein which address pricing in effect through December 31, 2008 Caremark acknowledges that SBC contemplates revisiting Caremark's pricing and/or conducting benchmarking of market rates for pharmacy benefit management, on or before July 1, 2006.

     **c.**  Capitalized terms herein, which are otherwise not defined, shall have the same meanings as set forth in the Agreement.

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and
subsidiary companies, and their third party representatives, except under written agreement

5

HIGHLY
CONFIDENTIAL          CMK-AWP 013205

Caremark Inc.
SBC Communications Inc.

Agreement No.  03029608

    **d.**  In the event of any conflict or inconsistency between the terms of the Agreement and this MOU, this MOU shall control but only for purposes of resolving such conflict or inconsistency.

    **e.**  Except as otherwise modified above, all other terms and conditions of the Agreement shall continue in full force and effect, including but not limited to, performance guarantees; fiduciary status; invoicing and payment; and termination obligations.

<div align="center">(Signature page follows)</div>

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and subsidiary companies, and their third party representatives, except under written agreement

<div align="center">6</div>

**HIGHLY CONFIDENTIAL**          CMK-AWP 013206

Caremark Inc.
SBC Communications Inc.

Agreement No.  03029608

**IN WITNESS WHEREOF, the parties hereto have caused this MOU to be executed by their respective duly authorized representatives.**

Caremark Inc.

By: _Rube l Charlin For,_

Print Name:  A. D. Frasier

Title:  Chief Executive Officer

Date Signed: _7-1-03_

SBC Communications Inc.

By: _[signature]_

Print Name:  Maureen Merkle

Title:  President – Procurement
SBC Services, Inc. for and on behalf of
SBC Communications Inc.

Date Signed: _6-30-03_

**PROPRIETARY INFORMATION**
The information contained in this Agreement is not for use or disclosure outside Caremark, SBC, their Affiliates and
subsidiary companies, and their third party representatives, except under written agreement

7

**HIGHLY
CONFIDENTIAL**       **CMK-AWP 013207**

# Exhibit C

## AMENDMENT TO AGREEMENT

This Amendment to Agreement (this "Amendment") is made and entered into to be effective as of February 1, 2001 by and between AdvancePCS Health, L.P., a Delaware limited partnership, as an indirect wholly owned subsidiary of AdvancePCS, a Delaware corporation, together with its affiliates ("AdvancePCS"), and PRINCIPAL LIFE INSURANCE COMPANY ("Customer").

WHEREAS, PCS Health Systems, Inc. is now known as AdvancePCS.

WHEREAS, the parties have entered into a certain Agreement for services effective November 17, 1990 (the "Agreement") as well as the following addenda, all of which shall be referred to herein collectively as "the Agreement":

- RECAP® Addendum to Agreement effective November 17, 1990
- DUR Addendum to Agreement effective July 1, 1992
- Extension of Agreement effective January 1, 1993
- MIP2 Addendum to Agreement effective February 15, 1994
- RDUR and Formulary Addendum to Agreement effective April 1, 1994
- Managed Mail Services Addendum to Agreement effective May 10, 1995
- Exclusive Health Addendum to Agreement dated October 9, 1995
- Addendum to Agreement dated October 1, 1996
- Event Based Performance Rx℠ Addendum to Agreement dated February 25, 1997
- Amendment to Agreement effective December 1, 1998
- Internet Link License Agreement signed by Customer on May 4, 1999

WHEREAS, the parties desire to amend the Agreement effective February 1, 2001 on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by reference, and in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.   Section 8 of the Agreement is hereby amended and restated as follows:  Duration and Termination.  This Agreement shall run for the term of February 1, 2001 through December 31, 2006 and shall thereafter automatically renew for one (1) year terms unless either party notifies the other of its intent to not to renew within one hundred twenty (120) days of the end of the current term.  After the second anniversary of the Agreement, either party may terminate this Agreement upon one hundred twenty (120) days' prior written notice to the other party; provided, however, in the event of any termination of the Agreement, other than as a result of a default by AdvancePCS, prior to December 31, 2006, Customer shall reimburse to AdvancePCS any amount paid out of the Pharmacy Account Fund beyond the pro-rata portion calculated from the time of termination to February 1, 2001 based on the five year initial term, and AdvancePCS shall retain any principal amounts not yet disbursed to Customer at the date of any such termination.

Termination may be made effective immediately upon written notice by either party in the event of an assignment for the benefit of creditors, petition in bankruptcy, appointment of a receiver or trustee..

Principal_022802.doc                                      1

HIGHLY
CONFIDENTIAL     CMK-AWP 012815

Furthermore, either party may terminate this Agreement if the other party materially breaches this Agreement and such breach continues without cure for a period of sixty days after the terminating party provides written notice to the breaching party specifying the nature of the breach.

2.  Fee Exhibits. All prior fee schedules are replaced effective February 1, 2001, or such other effective date as indicated on Exhibit B, with the fee schedule which is attached hereto as Exhibit B and incorporated herein by this reference.

3.  Re:Solve. The terms and provisions regarding Re:Solve contained in Exhibit B of the Amendment to Agreement dated December 1, 1998 shall be amended by replacing the three Re:Solve workstations with four Microstrategy user identification numbers for the web based service at no charge to Customer.

4.  Pharmacy Account Fund.

(A) Establishment. AdvancePCS will establish an account known as the Pharmacy Account Fund ("the Fund") in the amount of ███████ The Fund represents a reimbursement to Customer of expenses associated with the operation and administration of Customer's pharmacy programs. Said expenses include but are not limited to issuance of pharmacy ID cards, pharmacy mailings, staff responsible for administering and overseeing pharmacy programs, and compliance activities associated with pharmacy programs.

AdvancePCS will establish the Fund in an account at Bank of America bearing interest at the 3-month U.S. Treasury Bill rate as reflected on the 15th of each month. Said rate will be applied to the average daily balance of the Fund for the following month. Interest will be compounded annually. AdvancePCS will make interest payments to the Fund each July 1 for the term of this Amendment. Interest at the above-described rate will begin accruing on the Fund effective July 1, 2001.

AdvancePCS may not close the bank account holding the Fund, nor may AdvancePCS move the Fund to another account or bank, without first giving Customer fifteen (15) business days advance written notice of its intentions. In the event Customer objects to the action proposed by AdvancePCS, the parties will use their best efforts to negotiate a mutually agreeable solution.

(B) Rebate Share. As outlined in Exhibit B, Customer's rebate retention rate for its insured- and National Accounts-administered blocks of business is ███████ ("Rebate Share") effective August 1, 2001. The Rebate Share for Customer's insured-administered block will be apportioned into two categories: (i) ███████ allocated to Customer ("Fund Allocation") will be deposited in the Fund at monthly rebate intervals; and (ii) the remaining ███████ allocated to Customer will be transferred to Customer as part of its normal, customized rebate process. The entire ███████ rebate retention rate on Customer's National Accounts-administered block of business will be transferred to Customer as part of its normal, customized rebate process.

Principal_022802.doc

2

HIGHLY
CONFIDENTIAL

CMK-AWP 012816

(C) Termination

(1)     In the event of any termination of the Agreement prior to December 31, 2006, other than as a result of a default by AdvancePCS;

(a)     Customer will reimburse to AdvancePCS any amount paid to it  from the Fund beyond the pro-rata portion which accrued from February 1, 2001 to the date of termination, based on a February 1, 2001 to December 31, 2006 contract term;

(b)     Customer will be entitled to any pro-rata portion of the Fund which accrued from February 1, 2001 to the date of termination, based on a February 1, 2001 to December 31, 2006 contract term which Customer has not yet collected as of the date of termination; and

(c)     AdvancePCS will be entitled to retain any of the original ███ ███ in principal remaining in the Fund upon termination, subject to Customer's entitlement to those funds described in subsection 4(C)(1)(b) above.

(2)     Should the Agreement terminate prior to December 31, 2006 as a consequence of the default of AdvancePCS, Customer will be entitled to any of the original ████ in principal remaining in the Fund at termination of the Agreement and AdvancePCS shall have no claim thereon.

(3)     In the event this Agreement is terminated, for any reason, Customer will be entitled to (a) all Fund Allocations, including those amounts which are accrued but unpaid; and (b) all interest on the Fund, including any accrued but unpaid interest.

AdvancePCS will pay any Fund Allocations and accrued but unpaid interest into the Fund within thirty (30) days of said termination.

(D)     Fund Disbursements. Customer may request disbursements, in any amount, from the Fund for expenses described in paragraph 4(a) above, by submitting a written request to Customer's AdvancePCS sales representative (or his or her designee). Customer shall maintain a written detail of the accounting of such expenses and shall make said accounting available to AdvancePCS in connection with an outside audit, subpoena or investigation upon reasonable request. AdvancePCS will provide the requested funds to Customer via wire transfer to an account specified by Customer within two (2) business days of receipt of Customer's request. AdvancePCS may not deny a request for disbursement from the Fund for any reason.

(E)     Reports and Audit. AdvancePCS will provide Customer with quarterly reports reflecting, among other things, additions and deletions from the Fund and the Fund balance. Details regarding content, format and transmission of said quarterly reports will be agreed to by the parties. Customer may inspect and audit AdvancePCS business records regarding the Fund. AdvancePCS will fully cooperate with representatives of Customer and with consultants or accountants hired by Customer to

HIGHLY
CONFIDENTIAL                    CMK-AWP 012817

conduct any such inspection or audit. Such audits will be at Customer's sole expense and shall only be made during normal business hours, following fifteen (15) business days written notice, without undue interference to AdvancePCS' business activity, and in accordance with reasonable audit practices. If a completed audit reveals a discrepancy, then Customer will deliver to AdvancePCS written notice setting forth in reasonable detail the basis of such discrepancy. The parties will use reasonable efforts to resolve the discrepancy within thirty (30) days following delivery of the notice, and such resolution will be final, binding and conclusive upon the parties. Upon a final and conclusive determination of an underpayment by AdvancePCS to Customer revealed by an audit procedure, AdvancePCS will pay said sum to Customer within fifteen (15) business days of the delivery of the conclusive audit findings.

5.    Data Integration/Developmental Pool. Upon receiving medical data in an appropriate format, AdvancePCS will create a pool of integrated medical and pharmacy data for Customer. Upon completion of such integration, AdvancePCS will create a pool of funds in an amount equal to ▮▮▮ per Member per year that may be used by Customer solely toward the purchase of data mining access, report generation, and AdvancePCS health improvement programs. For the purpose of charging against the development pool, AdvancePCS will charge its standard programming fee of ▮▮▮▮▮▮▮▮. Unused monies for any given year will be applied to the next year. Upon termination of the Agreement any unused monies will be forfeited by Customer.

6.    Health Website Development. Consumer Health Interactive (CHI). AdvancePCS will pay Customer up to a maximum of ▮▮▮▮ per year for development and maintenance of a custom website for Customer as specified in the draft of the agreement between Customer and CHI (the "CHI Agreement") dated October 1, 2001. Customer agrees to pay CHI in accordance with the terms of the CHI Agreement. Any amounts not used in any given contract year will be applied to future years, provided that such amounts shall be available only with respect to expenses actually incurred by Customer pursuant to the CHI Agreement.

7.    Mail Program. Customer agrees to use reasonable good faith efforts to add AdvancePCS' Mail Program to its fully insured business and to continue implementation of mail order in ASO groups.

8.    Performance Standards. Exhibit C of the Amendment to Agreement dated December 1, 1998 shall be deleted in its entirety and replaced with Exhibit C attached hereto.

9.    Specialty Drugs. Certain drugs that become available on the market from time to time will be priced separately from, and not be subject to the contracted rate for prescription Claims due to, among other things, specialized manufacturer processes, limited availability or extraordinary shipping requirements. Such drugs presently include biotechnology drugs, such as Avonex, compounds, and injectables. AdvancePCS will periodically provide Customer with a list of such drugs, and their corresponding rates (which are generally no less than ▮▮▮▮▮. Participating Pharmacies and AdvancePCS' mail order pharmacies, subject to the exceptions previously set forth above, will dispense these drugs to Members unless Customer's Plan Design would otherwise exclude these drugs or unless Customer notifies AdvancePCS in writing of its objection. Specialty Drugs shall be excluded from the Retail Network Rate

Principal_022802.doc                                    4

HIGHLY
CONFIDENTIAL            CMK-AWP 012818

Guarantee.

10. **Plan Design Disclosure.** Customer or its self-funded customers, as applicable, will provide Members with information regarding calculation of copayments, coinsurance, deductibles or other out-of-pocket amounts payable by a Member under the Plan Design. For purposes of this paragraph, Plan Design is defined as the claim processing parameters of Customer's drug benefit plan(s) which Customer has communicated to AdvancePCS and which AdvancePCS will use in processing drug benefit claims under this Agreement.

11. **Disclosure.** AdvancePCS will be responsible for determining what, if any, disclosures it is required to make to Members, Customer, and/or Customer's customers under applicable law regarding Rebates, discounts, allowances or incentive payments received or given by AdvancePCS from or to, including but not limited to, drug manufacturers, pharmacies, Customer or others. Customer will be responsible for determining what, if any, disclosures it is required to make to Members or Customer's customers under applicable law regarding Rebates, discounts, allowances or incentive payments which Customer receives or pays pursuant to this Agreement. Should a party determine it is required to make a disclosure as outlined in this paragraph, said party shall make said disclosure but not until after it has given the other party at least 21 days' advance notice of its intention to make a disclosure.

12. **Confidentiality.**

(A) **Generally.** AdvancePCS and Customer hereby acknowledge that in the course of performing their duties under this Agreement or otherwise, each of them may have access to confidential and proprietary information which relates to the other party's business ("the Confidential Information"). Confidential Information includes personal, financial, and health information about individuals who have applied for or purchased health, prescription drug and/or financial products or financial services from Customer. Confidential Information does not include information that (i) is provided to AdvancePCS in a form that is de-identified in the manner set forth in the HIPAA Privacy Rule or (ii) has been de-identified by AdvancePCS in the manner set forth in the HIPAA Privacy Rule or, prior to the effective date thereof, in a manner required by applicable Law. However, until such time as the information is finally formatted into an aggregate de-identified state, any Confidential Information included in the de-identified information will be afforded the protections of Confidential Information described in this paragraph except that AdvancePCS may use such Confidential Information to the extent necessary to de-identify it in accordance with this paragraph. Each party agrees it will keep all Confidential Information strictly confidential; and that they will not use or disclose to any affiliate or third party, either orally or in writing, any Confidential Information for any purpose other than the purpose for which the Confidential Information was provided to the other. Without limiting any of the foregoing, the parties agree to take all precautions that are reasonably necessary to protect the security of the Confidential Information. The parties agree to restrict access to the Confidential Information to those employees who need to know that information to perform their duties under this Agreement. Each party further agrees that upon request of the other party or upon termination of this Agreement, it will, to the extent reasonably feasible, return to that party or destroy all tangible items

HIGHLY CONFIDENTIAL        CMK-AWP 012819

containing any Confidential Information, including all copies, abstractions and compilations thereof, without retaining any copies of the items required to be returned or destroyed. The obligations of this paragraph extend to the employees, agents, affiliates and contractors of each party, and each party shall inform such persons of their obligations hereunder.

(B) Notification Obligation. Upon learning of any unauthorized disclosure or use of any Confidential Information, the disclosing party shall notify the other party promptly and cooperate fully with said party to protect its Confidential Information.

(C) Disclosure Required by Law. If a party believes it is required by law or by a subpoena or court order to disclose any of the other party's Confidential Information, then the party, prior to any disclosure, shall promptly notify the party whose Confidential Information is to be disclosed, in writing, attaching a copy of the subpoena, court order, or other demand and shall make all reasonable efforts to allow the party whose Confidential Information is to be disclosed, an opportunity to seek a protective order or other judicial relief.

(D) Compliance with Law. In connection with its performance under this Agreement, each party agrees to comply with all applicable laws, including but not limited to laws protecting the privacy of non-public personal information about individuals.

(E) Survival. The provisions of this Agreement relating to confidentiality shall survive termination or expiration of this Agreement.

113. **Change in Law.** The parties will attempt to equitably adjust the terms of this Agreement to take into account any Change in Law or any change in drug industry practice that materially alters the rights or obligations of either party under this Agreement. If the parties are unable to agree upon an equitable adjustment within one hundred and twenty (120) days after either party notifies the other of such a Change in Law or change in drug industry practice, this Agreement will automatically terminate. For purposes of this Agreement, Change in Law shall mean any (i) change in or adoption of any Law, (ii) change in the judicial or administrative interpretation of any Law, or (iii) change in the enforcement of any Law, occurring after the date Customer is implemented or the Effective Date, whichever is earlier.

14. **Prior Authorization/Formulary Exception ("PA/FE").** AdvancePCS may provide Customer with a form of prospective drug utilization review known as the PA/FE Program. AdvancePCS will supply a list of suggested criteria for review, modification, and/or adoption by Customer. Customer will have final approval over the criteria to be utilized, which will be evidenced in writing by Customer. AdvancePCS will administer the criteria as approved by Customer. No changes will be made to the criteria except pursuant to Customer's written request. From time to time, new information on a specific drug therapy will become available. This new information may make it necessary or desirable to modify existing PA/FE criteria. AdvancePCS will notify Customer of changes to the criteria. If Customer does not wish to accept the proposed changes to the PA criteria, Customer agrees to notify AdvancePCS in writing within ten business days and may terminate this Agreement as established in Paragraph 1 hereof or adopt the customized criteria for a mutually

HIGHLY
CONFIDENTIAL        CMK-AWP 012820

agreed upon fee. Customer shall be deemed to have approved any proposed changes to the criteria unless it notifies AdvancePCS in writing of its objection. AdvancePCS will accept PA/FE requests from physicians and will approve or deny such requests in accordance with the PA/FE criteria approved by Customer. AdvancePCS will make clinical pharmacists available to provide professional support to the PA/FE unit as AdvancePCS determines necessary to evaluate PA/FE requests and clarify Customer's PA/FE criteria. AdvancePCS' PA/FE unit will notify the physician who submitted the PA/FE request of the coverage determination for such request. Approvals will be entered in the appropriate AdvancePCS claim management system. AdvancePCS' clinical pharmacists will review denials on a regular basis to assist Customer in determining whether PA/FE criteria and/or processes warrant modification. Denial reports will be furnished to Customer upon request for decisions regarding updates to PA/FE criteria. Reports of approvals and denials will be produced on a quarterly basis and included in quarterly reporting to Customer.

Customer agrees that under no circumstances shall AdvancePCS be responsible or otherwise liable to Customer with respect to any and all awards, losses, claims, suits, damages, liability, judgments, fines, penalties, settlement amounts, and expenses, including reasonable attorneys' fees (collectively, "Damages") arising from or as a result of AdvancePCS' decision to authorize or deny coverage of any drug in accordance with the Plan Design, except to the extent that any Damages arise from AdvancePCS' failure to apply the Plan Design under the PA/FE Program. For purposes of this Agreement, "Plan Design" means the processing parameters and other information concerning Customer's drug benefit plan, which Customer has disclosed to AdvancePCS, and which AdvancePCS will use to process Claims under this Agreement.

15. Event Based PerformanceRx Addendum. Except with respect to Customer groups that remain on any network other than the Customer specific network contemplated by this Amendment. Sections 1.3 and 1.8 of the Event Based PerformanceRx Addendum are hereby deleted in their entirety, and the Fees listed in the Addendum are superceded by those listed in Exhibit B attached hereto.

16. Ratification. Except as modified and amended by this Amendment and to the extent not inconsistent therewith, all terms and conditions of the Agreement shall remain in full force and effect and are hereby ratified, affirmed and approved.

HIGHLY CONFIDENTIAL    CMK-AWP 012821

IN WITNESS HEREOF, the parties hereto have executed this Amendment to be executed by their respective officers or representatives duly authorized so to do.

PRINCIPAL LIFE INSURANCE
COMPANY

By: _____
      Dexter R. Bodin

Title:   Director

Date:   March 1, 2002

ADVANCEPCS HEALTH L.P.
By:  AdvancePCS Health Systems, LLC, its
General Partner

By: _____
      David A. George

Title:   President

Date:   3-13-02

Principal_022802.doc

8

HIGHLY
CONFIDENTIAL

CMK-AWP 012822

*EXHIBIT B*
*ADMINISTRATIVE FEES*

**PRINCIPAL LIFE INSURANCE COMPANY**
**Effective February 1, 2001**

As consideration for the Services selected by Customer pursuant to the Implementation Documents and described in Exhibit A, Customer shall pay to AdvancePCS the fees set forth below:

**BASE SERVICES** –Per Paid or Denied POS Claim,
    Performance or other standard AdvancePCS·Mail Program         ▮

**RETAIL CLIENT SPECIFIC NETWORK·EFFECTIVE AS OF AUGUST 1, 2001[1]**

  **Retail Network Discounts *(cases* with Performance Rx)**
  • Brand-Name Products:    Lower of (a) ▮▮▮▮▮ or (b) ▮▮▮
    ▮▮▮▮ or (c) usual and customary (U&C)
  • Generic Products: Lower of  (a) ▮▮▮▮▮ or (b) ▮▮▮▮

  **Retail Network Discounts *(cases* without Performance Rx)**
  • Brand-Name Products:    Lower of (a) ▮▮▮▮▮ or (b) ▮▮▮
    ▮▮▮▮ or (c) usual and customary (U&C)
  • Generic Products: Lower of (a) ▮▮▮▮▮ or (b) ▮▮▮▮

The MAC list will be equal to or better than the MAC list in place for Customer prior to this Amendment. Above network pricing will be effective 8/1/01.

**Retail Network Rate Guarantee**

Network Rate Guarantee of ▮▮▮▮▮ for claims adjudicated using Performance Rx and ▮▮▮▮ for claims adjudicated without Performance Rx (together the "Guaranteed Rate"). This guarantee applies to all claims that pay at something other than the MAC or U & C price. For the purposes of the network rate guarantee, AdvancePCS will duplicate the PN13 network. In such circumstances where duplication of PN13 hampers or impedes AdvancePCS' ability to perform general network development and network management activities, Customer will be notified and appropriate, alternate plans will be subsequently discussed and mutually agreed upon. This guarantee includes all Performance Rx program fees and pharmacy incentives fees. The network rate guarantee is contingent upon all Customer groups participating in the retail client-specific network including MCS logic, subject to the following exception:

    **up to 15,000 Customer members TOTAL may suppress MCS logic.
    **within the 15,000 member limit, the following group numbers will have MCS logic suppressed and will receive the client-specific network rate stated above at the point-of-

---

[1]  These rates represent the overall network rate delivered.  AdvancePCS will bill Customer based on this overall network rate, and AdvancePCS will be solely responsible for ensuring payment to each pharmacy at the appropriate contractual rate, subject to receipt of payment from Customer as set forth in this Agreement.

**HIGHLY**
**CONFIDENTIAL**                    **CMK-AWP 012823**




*EXHIBIT B*
*ADMINISTRATIVE FEES*

sale (Customer's group numbers 0189, 2302, 2303, and 2304);
\*\*within the 15,000 member limit, any other group suppressing MCS logic will have point-of-sale rates of ███████████ dispensing fee for claims adjudicated using Performance Rx and a ███ dispensing fee for claims adjudicated without Performance Rx.

Outside the 15,000 member limit, any groups wishing to suppress MCS logic will receive retail network discounts of ███████████ dispensing fee for claims adjudicated using Performance Rx and a ███ dispensing fee for claims adjudicated without Performance Rx.

This rate guarantee excludes pharmacies which are not in the PN-13 Network, Specialty Drugs, and any claims adjudicated at the ███████████████

## MAIL SERVICE

**Mail Service Reimbursement Rates:**
- Brand-Name Products: ██████████ dispensing fee
- Generic Products:  Lower of  (a) ████████  or (b) ██████████ dispensing fee

| ADDITIONAL SERVICES | FEE |
|---|---|
| Member Service/Toll Free Member Services (retail) | |
| Paper Claim\|Direct Submission | |
| Preprocessed Direct Claims | |
| Medicaid Processing (tape or paper submission) | |
| Managed Access/Managed Drug Limitations | |
| Prior Authorization/Medical Exception (PA/FE) | ████████ |
| Maximum Allowable Cost | |
| Paper Claim Direct Submission (on-line) | |
| AdvancePCS' Rebate Percentage (as of 4/1/01) | See below\*\* |
| AdvancePCS' Rebate Percentage (as of 8/1/01) | See below\*\* |
| Mail Service Reimbursement | See above |
| Paper Eligibility Submission | |
| Decentralized Administration | |
| Claim Detail Report via Paper | |
| Card Reissuance within a 24-month period | ████████ |
| CAT/BAT Tapes | |
| Case Set-Up | |
| Coordination of Benefits | |
| Customer Specific Programming | |
| Report Review, handling, postage and printing | |

Note:  Charges not identified above will be negotiated upon request.

\*As a condition for providing ███████████████████ Customer agrees to use reasonable good faith efforts to add AdvancePCS' Mail Program to its fully insured business, and to

HIGHLY
CONFIDENTIAL          CMK-AWP 012824

continue placement of mail order in ASO groups.

** Rebate share will be as follows:
       Prior to 4/1/01:
       Effective 4/1/01 through 7/31/01:    LCM Levels 4 and 5, █████████████
                                      LCM Levels 2 and 3, ███████████████
       Effective 8/01/01:              All LCM levels, ███ to AdvancePCS, ███ to Customer

For processing purposes, Rebates will be disbursed to Customer at the ███ rate beginning on 07/01/01, however, Customer will reimburse AdvancePCS those amounts payable to AdvancePCS based on the Rebate share effective through 7/31/01 set forth above.  As of the beginning of the first quarter of 2002, AdvancePCS will invoice Customer in the form of a miscellaneous charge form, along with a detailed Rebate report for such period, for such amount.  Such payments will be due and payable to AdvancePCS in accordance with the terms of the Agreement.

As of January 1, 2002, AdvancePCS will provide Customer with a guaranteed *net* rebate per Claim, in aggregate, as follows:

| Level of Clinical Management | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| LCM 3 – Retail Claims | ██████████████████████████████ | | | | |
| LCM 3 – Mail Claims | ██████████████████████████████ | | | | |
| LCM 4 – Retail Claims | ██████████████████████████████ | | | | |
| LCM 4 – Mail Claims | ██████████████████████████████ | | | | |
| LCM 4E – Retail Claims | ██████████████████████████████ | | | | |
| LCM 4E – Mail Claims | ██████████████████████████████ | | | | |

Principal_022202.doc

10



*EXHIBIT B*
*ADMINISTRATIVE FEES*

In the event that Rebates collected are less than the Guaranteed Rebate Amount in aggregate, AdvancePCS shall pay to Customer the amount of any deficiency; provided, however, that if at any time during the term of this Agreement, AdvancePCS' ability to collect Rebates under its Rebate contracts with Manufacturers, either currently in existence or entered into after the date of this Agreement, is materially adversely impacted by legislative, regulatory, judicial action, or a change in drug industry practice, AdvancePCS shall be released from its obligation to pay the Guaranteed Rebate Amount and shall be required to pay Customer only Customer's share of the actual Rebates collected. This Rebate guarantee will be in effect for the period beginning August 1, 2001, and ending December 31, 2006, and is contingent upon Customer's acceptance of and continued participation in AdvancePCS Mail with Customer's current Plan design parameters, and alignment with AdvancePCS' Formulary and full adoption of AdvancePCS' Performance Drug List (PDL). In the event of a change with respect to any of the foregoing criteria, AdvancePCS will evaluate the impact of such change and will adjust the Guaranteed Rebate Amount accordingly after input and discussions with Customer.

***Charge for recreated/historic tapes will be quoted upon request.

**Contingency.**    All prices are contingent upon Customer's current Plan Design and formulary management and intervention programs, as well as Member enrollment and utilization of pharmacy services.

**Handling Costs.** Customer is in all events responsible for any postage costs or other mailing and handling-related costs (including, without limitation, mailing charges associated with Explanation of Benefits or Requests for Information) incurred by AdvancePCS in connection with the provision of Services or additional services.

HIGHLY
CONFIDENTIAL          CMK-AWP 012826

<div align="right">

*EXHIBIT C*
*PERFORMANCE STANDARDS*

</div>

### Definitions and Limitations Applicable to the Performance Standard

Unless otherwise indicated in the performance standards, the following performance standards are effective as of September 1, 2001, (prior guarantees in place between the dates of 1/1/01 and 8/31/01 are waived) provided that the parties have executed an Agreement as set below, and are subject to the definitions and limitations set forth below.

### Definitions:

For purposes of the performance standards herein, (i) *Agreement* shall mean that certain agreement between Customer and AdvancePCS regarding the provision of pharmacy benefit management services, (ii) *Business Day* shall mean AdvancePCS' Normal Business Hours on any day other than (x) a Saturday or Sunday or (y) a day on which AdvancePCS' Scottsdale Location is closed for general business purposes, (iii) a *Force Majeure Event* shall mean an event that prevents AdvancePCS from satisfying a performance standard, in whole or in part, as a result of causes beyond AdvancePCS' reasonable control including, without limitation, acts of God, war, civil disturbance, court order, governmental intervention, Change in Law, nonperformance by Customer or any third party, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment, (iv) *Normal Business Hours* shall mean 7:00 a.m. Scottsdale, Arizona time through 5:00 p.m. Scottsdale, Arizona time on any given Business Day, which hours may change from time to time in AdvancePCS' discretion, (v) *Scottsdale Location* shall mean 9501 East Shea Boulevard, Scottsdale, Arizona 85260, and (vi) *Performance Guarantee Plan Year* shall mean September 1 through August 31 of consecutive calendar years.

### Limitations:

AdvancePCS shall attempt diligently to maintain its performance at the levels represented herein; provided, however, that failure to achieve or maintain the levels set forth herein shall not constitute a default for purposes of the termination provisions set forth in the Agreement. Notwithstanding the foregoing, the material and repeated failure of AdvancePCS to achieve or maintain the levels set forth in standards 15, 17, 18, 19, 20, 21, 22, 23, 27, 32, and 33 may constitute a default, and AdvancePCS shall have sixty (60) days to cure upon written notice of such default or Customer may terminate this Agreement. The proposed performance standards will be equitably adjusted by the parties to the extent AdvancePCS has suffered a Force Majeure Event during the applicable measurement period.

Notwithstanding AdvancePCS' failure to satisfy a performance standard that is measured for all AdvancePCS customers utilizing the same process platform, AdvancePCS shall be deemed to have satisfied a performance standard regarding the Customer if it satisfies that standard with respect to the Customer only.

AdvancePCS' obligations to meet the performance standards herein are subject to the terms and conditions set forth in the Agreement, and in the event of any conflict between the terms hereof and the terms of the Agreement, the terms of the Agreement shall control and govern the obligations of the parties with respect to such matters.

The penalty for each performance standard shall be as set forth below; provided, however, the penalties in aggregate shall not exceed ████████████ per performance guarantee plan year.

If AdvancePCS fails to meet the proposed standards, the penalties described herein shall be the sole and exclusive remedy available to Customer for such failure. To the extent permitted by law, any statutory

**HIGHLY CONFIDENTIAL**          **CMK-AWP 012827**

EXHIBIT C
PERFORMANCE STANDARDS

remedies that are inconsistent with the provisions hereof are waived. If any period covered by the Agreement is less than the period covered by the proposed performance standard, and AdvancePCS has not met such performance standard for such period, the penalty associated with such failure shall be prorated to reflect the actual period during which the Agreement was in effect. AdvancePCS will submit a measurement report to Customer within ninety (90) days after the end of the performance guarantee plan year. If financial penalties are involved, payment must be requested by Customer in writing within ninety (90) days of receiving the end of year performance guarantee report, and AdvancePCS will pay within ninety (90) days thereafter.

Unless otherwise indicated with respect to a specific performance standard, AdvancePCS' satisfaction of the proposed performance standards shall be (i) monitored internally by AdvancePCS on a monthly basis for all AdvancePCS customers utilizing the same process platform, (ii) measured by AdvancePCS on a performance guarantee plan-year basis for all AdvancePCS customers utilizing the same process platform, and (iii) reported to Customer quarterly.

1.  **Enrollment – On-Line.** Eligibility information submitted to AdvancePCS on-line by its customers will become effective promptly after the last character of such information is transmitted by customers to AdvancePCS.

    AdvancePCS will be excused from its obligation to meet this standard with respect to any submission of eligibility information which is not readable, in whole or in part, due to circumstances beyond the control of AdvancePCS.

    Penalty: ███████

2.  **Enrollment – Tape, Cartridge, Diskette, Telecom, Positive File**

    Eligibility information submitted to AdvancePCS by its customers in a machine-readable form via a 3420 tape reel, 3480 or 3490 cartridge, or diskette, for the purpose of maintaining the eligibility file will become effective, on average, within ████████████ following the Business Day that AdvancePCS has received complete and accurate information from its customers.

    Eligibility information submitted to AdvancePCS by its customers in a machine readable form via telecommunications prior to 1:00 p.m. Scottsdale, Arizona time for the purpose of maintaining the eligibility file will become effective, on average, within ████████ (which ████████ shall include the Business Day that such eligibility information is submitted by its customers) after receipt of complete and accurate information by AdvancePCS. For eligibility information submitted in a machine-readable form via telecommunications after 1:00 p.m. Scottsdale, Arizona time on a given Business Day, such eligibility information will become effective, on average, within ████████ following the Business Day that AdvancePCS has received complete and accurate information from its customers.

    With respect to eligibility counts of four hundred thousand (400,000) or less, AdvancePCS will compare, if requested, customers' eligibility information as represented in AdvancePCS' database against a submission of customers' entire eligibility file. Such comparison will be completed and any required changes implemented, on average, within ████████ following the Business Day that AdvancePCS has received complete and accurate information in a machine-readable form from its customers. If the eligibility count is (400,001) or more, AdvancePCS will schedule and

HIGHLY
CONFIDENTIAL                · CMK-AWP 012828

EXHIBIT C
PERFORMANCE STANDARDS

perform the compare of customers' eligibility information during non-peak system hours. Such comparison will be completed and any required changes implemented, on average, within ▮▮▮▮▮ following the Business Day that AdvancePCS has received complete and accurate information in a machine-readable form from its customers.

AdvancePCS will be excused from its obligation to meet this standard with respect to any submission of eligibility information which (i) is not submitted in a format mutually agreed to by the parties, (ii) is not readable, in whole or in part, due to circumstances beyond the control of AdvancePCS or (iii) includes incomplete, inaccurate or other information which causes questions to arise with respect to the submission.

Penalty:    ▮▮▮▮

3.  **Enrollment – Paper.**  Eligibility information submitted to AdvancePCS by its customers in a paper format for the purpose of maintaining the eligibility file (*i.e.*, containing only changes in eligibility status rather than all eligibility information) will become effective, on average, within ▮▮▮▮ following the Business Day that AdvancePCS has received complete and accurate information from its customers.

AdvancePCS will be excused from its obligation to meet this standard with respect to any submission of eligibility information which (i) is not submitted in a format mutually agreed to by the parties or (ii) includes incomplete, inaccurate or other information which causes questions to arise with respect to the submission.

Penalty:    ▮▮▮▮

4.  **Card Production.**  AdvancePCS and Customer agree that the following data elements will be printed on each ID card: Name of employee, ID number, carrier number and group number. AdvancePCS will achieve ▮▮▮▮▮ accuracy in printing these data elements on the ID cards from the eligibility data supplied electronically by Customer. ID cards will be mailed within ▮▮▮▮▮ following the Business Day that AdvancePCS has received complete and accurate eligibility information from Customer and such information has been inputted in AdvancePCS' system. The applicable performance period shall not commence until customers have (i) provided AdvancePCS with the appropriate member addresses and mailing supplies and (ii) approved the cardstock to be used by AdvancePCS.

AdvancePCS will be excused from its obligation to meet this standard with respect to any identification cards if the corresponding eligibility information (i) is not submitted in a format mutually agreed to by the parties, (ii) is not readable, in whole or in part, due to circumstances beyond the control of AdvancePCS or (iii) includes incomplete, inaccurate or other information which causes questions to arise with respect to the corresponding eligibility information.

Penalty:    ▮▮▮▮

5.  **Group Adds.**  AdvancePCS will implement additions of new groups for its customers on AdvancePCS' system, on average, within ▮▮▮▮▮▮ following the Business Day that AdvancePCS receives complete and accurate information from its customers regarding such additions, including, without limitation, any documents signed by its customers that AdvancePCS may reasonably request.

HIGHLY
CONFIDENTIAL          CMK-AWP 012829

*EXHIBIT C*
*PERFORMANCE STANDARDS*

Penalty: ███

6. **Group Changes/Terminations.** AdvancePCS will implement changes (including terminations) with respect to its customers' groups on AdvancePCS' system, on average, within ███████ ███ following the Business Day that AdvancePCS receives complete and accurate information from its customers regarding such changes, including, without limitation, any documents signed by its customers that AdvancePCS may reasonably request.

Penalty: ███

7. **Member Satisfaction Survey.** Upon Customer request, AdvancePCS will develop, in consultation with Customer, a client specific survey for Customer's members. This effort would require Customer to provide AdvancePCS with either 1) a list of Customer's AdvancePCS members which includes their telephone numbers and/or addresses, or 2) written permission to download the names, addresses and/or telephone numbers of Customer's AdvancePCS members from AdvancePCS' data base (this assumes, that the AdvancePCS Member data includes telephone numbers). The cost to develop and conduct such survey will be AdvancePCS' responsibility. The specific methodology, design, questions and timeframe for developing and administering the survey and survey questions will be mutually agreed upon by the parties. This standard shall only apply to survey questions pertaining directly to AdvancePCS.

Customer Satisfaction will be rated on a scale of 1 to 5 (1=least satisfied; 5=most satisfied). ███ ██████████ of responses will achieve an overall rating of at least 3, 4 or 5. This guarantee is limited to one survey per performance guarantee plan year.

Penalty: ███

8. **Paper Claims Processing Accuracy.** Assuming AdvancePCS receives complete and accurate information regarding a claim, ████████████████ of the paper claims submitted to AdvancePCS will be priced in accordance with Customer's plan guidelines.

Penalty: ███

9. **Paper Claims Processing Turn-Around Time.** AdvancePCS will respond to ████████ ███ of all paper claims received from customers' plan members, within ███ following the Business Day that AdvancePCS receives such paper claim. For purposes of this standard, AdvancePCS' time to respond begins upon receipt by AdvancePCS of a paper claim that is addressed to AdvancePCS' Scottsdale Location and ends upon the earlier of such time as (i) a response has been deposited in the United States mail or with another nationally recognized carrier, (ii) a response has been transmitted to a plan member through a form of transmission mutually acceptable to the parties or (iii) a AdvancePCS representative has contacted a plan member by telephone. AdvancePCS will be deemed to have responded to a paper claim that requires further clarification or information from a plan member if AdvancePCS notifies the plan member, within the above time period, that further clarification or information is required.

Penalty: ███

10. **Claims Adjustments.** Upon receipt of complete and accurate information regarding adjustments,

HIGHLY
CONFIDENTIAL          CMK-AWP 012830





**EXHIBIT C**
**PERFORMANCE STANDARDS**

AdvancePCS claims administration shall adhere to the following:

Major RX adjustments ████████████
Batch adjustments
Claims adjustments
(reprocessed claims for individuals)

Penalty: ██████

11. **System Availability.** The online claims processing system will be available for access by AdvancePCS' contracted pharmacies ████████████████ of the time during which it is scheduled to be accessible. AdvancePCS shall measure such accessibility against a schedule made available by AdvancePCS to pharmacies from time to time. Availability shall be determined based on the percentage of time that pharmacies are able to access the online claims processing system through AdvancePCS' dedicated or switched network interfaces.

AdvancePCS shall schedule twelve (12) hours or less of maintenance with respect to the online claims processing system during any given calendar month.

Penalty: ██████

12. **System Response Time.** The online claims processing system will respond to transactions submitted electronically by AdvancePCS' contracted pharmacies, on average, within ██████ seconds or less. For purposes of this standard, *response time* shall mean the time commencing immediately after receipt of the last character of a transaction submitted by a pharmacy until the time the first character of the response is sent to a pharmacy.

Penalty: ██████

13. **AdvancePCS Mail Service Prescription Accuracy Rate.** The accuracy rate for all mail order prescriptions dispensed to plan members will be at least ████████████████ ██████. Notwithstanding the foregoing, an error will not include immaterial matters such as generic substitution not addressed, incorrect spelling of a plan member's name on label, or incorrect spelling of a physician's name. An error will be deemed to include incorrect patient, inappropriate directions, incorrect strength or incorrect medication in the container.

Penalty: ██████

14. **Pharmacy Help Desk.** Telephone inquiries made during Pharmacy Help Desk hours from AdvancePCS' contracted pharmacies will be answered, on average, in ██████ seconds or less by a representative. No more than ████████████ of all telephone inquiries during these hours will be abandoned by a pharmacy. Additionally, no more than ████████████ of all telephone inquiries during these hours from pharmacies will be blocked due to AdvancePCS' failure to maintain its system. For purposes of this standard, telephone inquiries shall be deemed abandoned if pharmacies terminate the call prior to being connected to a representative. Telephone inquiries shall be deemed blocked if pharmacies are not able to connect to a representative.

Penalty: ██████

**HIGHLY**
**CONFIDENTIAL**                    **CMK-AWP 012831**

*EXHIBIT C*
*PERFORMANCE STANDARDS*

15. **Managed Access®.** AdvancePCS will implement Managed Access updates for its customers on AdvancePCS' system within ███████████ following the Business Day that AdvancePCS receives complete and accurate information from its customers regarding such updates, including, without limitation, any documents signed by its customers that AdvancePCS may reasonably request.

Penalty: ████████████████████

16. **Pharmacy Network Access.** Assuming the Customer's Original Submission as hereafter defined, ██████████ of Plan Members will have access to a network pharmacy within five miles of their residence. The foregoing guarantee is based upon the zip code information submitted with the original eligibility information for Plan Members in connection with implementing the Services (the *Original Submission*). AdvancePCS will take reasonable steps to ensure adequate levels of pharmacy access are achieved for Customer's Plan Members subject to pharmacies' standard termination rights set forth in the AdvancePCS Provider Agreement. This standard shall only apply to members who have an active retail pharmacy within five (5) miles of their residence.

Penalty: ████████

17. **AdvancePCS Mail Service Shipping, Clean Prescriptions.** ████████████████ of all pharmacist-approved Clean Prescriptions (non-Exception Prescriptions) will be shipped within ████████ after the Business Day such prescription is received. Exception Prescriptions may include, among other things, follow up activities related to drug utilization review issues, and calls to prescribers to clarify or question a prescription order or request approval for a generic substitution or a therapeutic interchange.

Penalty: ████████ per performance guarantee plan quarter, measured on a quarterly basis and paid annually. In addition, failure to meet this standard on a performance guarantee plan year basis will result in any quarterly penalties incurred being multiplied by a factor of four (4). In no case will performance guarantee plan year penalties exceed ████████ across all guarantees.

18. **AdvancePCS Mail Service Shipping, Exception Prescriptions.** ████████████████ of all pharmacist-approved Exception Prescriptions will be shipped within ████████████ after the Business Day such prescription is received. Exception Prescriptions may include, among other things, follow up activities related to drug utilization review issues, and calls to prescribers to clarify or question a prescription order or request approval for a generic substitution or a therapeutic interchange.

Penalty: ████████ per performance guarantee plan quarter, measured on a quarterly basis and paid annually. In addition, failure to meet this standard on a performance guarantee plan year basis will result in any quarterly penalties incurred being multiplied by a factor of four (4). In no case will performance guarantee plan year penalties exceed ████████ across all guarantees.

19. **Client Services Administration Calls.** Telephone inquiries during Normal Business Hours from customers placed to a designated integrated client team at AdvancePCS' Scottsdale Location will be answered by a representative, on average, in ████████████ or less after customers have requested, via an Interactive Voice Response, to speak to a representative (a *Representative Request Inquiry*). Further, no more than ████████████ of all Representative Request Inquiries during Normal Business Hours will be abandoned, and no telephone inquiries during Normal Business

HIGHLY
CONFIDENTIAL                    CMK-AWP 012832

EXHIBIT C
PERFORMANCE STANDARDS

Hours from customers will be blocked, due to AdvancePCS' failure to maintain its system. For purposes of this standard, Representative Request Inquiries shall be deemed abandoned if customers terminate the call prior to either being connected to a representative or completing a call within the Interactive Voice Response. Telephone inquiries shall be deemed blocked if customers are not able to connect to an Interactive Voice Response or a representative.

Penalty: █████████████████████████

20. **Member Services Calls.**

*For September 2001 through December 2001, the following will apply:*
For customers that elect AdvancePCS' Member Services, telephone inquiries made during Member Services hours from plan members will be answered, on average, in ████████ or less by either a representative or an Interactive Voice Response. No more than ████████ of all telephone inquiries during these hours will be abandoned by plan members. Additionally, no more than ████████ of all telephone inquiries during these hours from plan members will be blocked due to AdvancePCS' failure to maintain its system. For purposes of this standard, telephone inquiries shall be deemed abandoned if plan members terminate the call prior to being connected to either a representative or an Interactive Voice Response. Telephone inquiries shall be deemed blocked if plan members are not able to connect to a representative or an Interactive Voice Response.

*Beginning January 2002, the following will apply:*
For customers that elect AdvancePCS' Member Services, telephone inquiries made during Member Services hours from plan members will be answered, on average, in ████████ or less by a representative. No more than ████████ of all telephone inquiries during these hours will be abandoned by plan members. Additionally, no more than ████████ of all telephone inquiries during these hours from plan members will be blocked due to AdvancePCS' failure to maintain its system. For purposes of this standard, telephone inquiries shall be deemed abandoned if plan members terminate the call prior to being connected to a representative. Telephone inquiries shall be deemed blocked if plan members are not able to connect to a representative.

Penalty: ████████ per performance guarantee plan quarter, measured on a quarterly basis and paid annually. In addition, failure to meet this standard on a performance guarantee plan year basis will result in any quarterly penalties incurred being multiplied by a factor of four (4). In no case will performance guarantee plan year penalties exceed ████████ across all guarantees.

21. **Member Services Call Quality.** AdvancePCS will provide to Customer on an annual basis a measurement of the quality of service provided by the Member Services unit in place at AdvancePCS. This data will be obtained via regular phone monitors completed for each staff member. These monitors will include measurement in the following areas: (a) accuracy of information provided and CSR knowledge of customers' benefit design and program specifics; (b) CSR demonstration of understanding the issue and accountability for resolution; (c) CSR courtesy and communication skills, including the use of appropriate greeting, the use of appropriate language, tone and clarity; and (d) CSR professionalism. The monitors will be conducted by a member of the Member Services management team, and will be tracked within a database and/or recorded on a written form. AdvancePCS will achieve an overall quality rating of at least ████

Penalty: ████████ per performance guarantee plan quarter, measured on a quarterly basis and paid annually. In addition, failure to meet this standard on a performance guarantee plan year basis will result in any quarterly penalties incurred being multiplied by a factor of four (4). In no case will

HIGHLY
CONFIDENTIAL          CMK-AWP 012833

EXHIBIT C
PERFORMANCE STANDARDS

performance guarantee plan year penalties exceed ██████ across all guarantees.

22. **Prior Authorization Review.** AdvancePCS will review a prior authorization request based on the clinical criteria established by its customers. AdvancePCS will process prior authorization request made by physicians within ██████ on average, following the Business Day a telephone request is received by a duly authorized representative of AdvancePCS between 7:00 a.m. through 4:00 p.m. Scottsdale, Arizona, time on any given Business Day. These hours may change from time to time at AdvancePCS' discretion. Any prior authorization request requiring physician review or denial as a result of State, Federal, or URAC guidelines will be returned to Customer.

    Penalty: ██████ per performance guarantee plan quarter, measured on a quarterly basis and paid annually. In addition, failure to meet this standard on a performance guarantee plan year basis will result in any quarterly penalties incurred being multiplied by a factor of four (4). In no case will performance guarantee plan year penalties exceed ██████ across all guarantees.

23. **Member Issue Resolution.** AdvancePCS will respond to ██████ of all written correspondence received from Customer's members within ██████ following the Business Day on which AdvancePCS receives such correspondence. Further, AdvancePCS will respond to ██████ of all written correspondence received from Customer's members within ██████ following the Business Day on which AdvancePCS receives such correspondence.

    For purposes of this standard, AdvancePCS' time to respond begins upon receipt of written correspondence by the appropriate party at AdvancePCS' Dallas Location and ends when the first of the following events occurs:

    i. a response has been deposited in the United States Mail or with another nationally recognized carrier;
    ii. a response has been telecopied or sent to the member by e-mail (or such other form of transmission mutually acceptable to the parties); or
    iii. an AdvancePCS representative has contacted the member by telephone.

    AdvancePCS will be deemed to have responded to written correspondence that requires further clarification or information from Customer's plan members if AdvancePCS notifies the member, within the above time period, that further clarification or information is required.

    Customer and AdvancePCS will cooperate in the investigation and resolution of all complaints. Further, AdvancePCS will provide Customer with that information required to be maintained by Customer regarding customer complaints for purposes of reporting to regulatory authorities. AdvancePCS will make a report of customer complaints to Customer on at least a quarterly basis.

    Penalty: ██████ per performance guarantee plan year

24. **Plan Design.** AdvancePCS will implement new or revised plan designs for its customers on AdvancePCS' system, on average, within ██████ following the Business Day that AdvancePCS receives complete and accurate information from its customers regarding the plan design, including, without limitation, any documents signed by its customers that AdvancePCS may reasonably request (including, without limitation, any confirmation reports).

Principal_022202.doc                    15

HIGHLY
CONFIDENTIAL          CMK-AWP 012834



*EXHIBIT C*
*PERFORMANCE STANDARDS*

New or revised plan designs that require software or hardware changes to AdvancePCS' system are excluded from this standard. In such an event, AdvancePCS and its customers will agree upon a mutually acceptable time frame.

Penalty: ███

25. **Standard Electronic Claims Processing.** ████████████ of the claims submitted electronically through the online claims processing system will be priced in accordance with customers' plan guidelines as entered into the online claims processing system.

Penalty: ███

26. **CAT Tapes.** AdvancePCS will transmit (telecommunicate) weekly detailed claim data no later than ████████ after the cycle close, and the file of data will contain data fields in the AdvancePCS standard 500 byte layout. AdvancePCS guarantees the accuracy of the claims data that AdvancePCS is responsible for. This does not include data received by AdvancePCS from sources other than AdvancePCS.

Penalty: ███

27. **Formulary** – AdvancePCS' national formulary (the "AdvancePCS Formulary") will be implemented in AdvancePCS' system for customers, on average, within ████████ after receipt of finalized client requirements on a Formulary Request form. If a customer desires to utilize a formulary that is different from the AdvancePCS Formulary and such formulary is currently coded into AdvancePCS' system (an "Existing Formulary"), such Existing Formulary will be implemented for customers, on average, within ████████ after receipt of finalized client requirements on a Formulary Request form. All other formularies will be implemented for customers, on average, within ████████ after receipt of finalized client requirements on a Formulary Request form. For purposes of this standard, "implemented" shall mean that AdvancePCS' system can process and adjudicate customers' claims in a manner consistent with the appropriate formulary.

The foregoing time frames shall not commence until AdvancePCS has received (i) complete and accurate information regarding a formulary that is sufficient for AdvancePCS to code it's system and (ii) such other information as may be reasonably required by AdvancePCS from time to time. Additionally, the foregoing time frames shall be tolled during such time as AdvancePCS is waiting for a response from customers to any recommendations that may be made by AdvancePCS to customers related to a formulary. Quarterly Pharmacy and Therapeutic Committee updates will be completed within ████████ of receipt of complete and accurate client requirements.

In summary, formulary implementations require the following lead times once final client requirements are received:
Open or Closed Formulary with no messaging = ██████
Open or Closed Formulary with messaging = ██████
Open or Closed Formulary with tiered co-pay = ██████

Penalty: ████ per performance guarantee plan year

28. **Standard Customer Reporting.** AdvancePCS will mail Customer its standard cycle reports, on

Principal_022202.doc                                16

**HIGHLY
CONFIDENTIAL**                    **CMK-AWP 012835**

*EXHIBIT C*
*PERFORMANCE STANDARDS*

average, within ████████████ following the last Business Day of each of AdvancePCS' standard claims processing cycles. AdvancePCS will mail Customer its standard month end reports, on average, within ████████ following the close of the first standard claims processing cycle of the following month. For purposes of these standards, AdvancePCS shall be deemed to have satisfied this standard if AdvancePCS deposits such reports, addressed to Customer, into the United States mail or with another nationally recognized carrier within the applicable time period.

Penalty: ████████

29. **Ad Hoc Reports Requested by Clinical Manager.** Ad hoc clinical reports will be provided within ████████████ of receipt of complete and accurate information from Customer. This guarantee is subject to mutually agreed upon exceptions.

Penalty: ████████

30. **Benefit Design Reviews (BDR's).** BDR's will be completed within ████████████ of receipt of complete and accurate information from Customer. This guarantee is subject to mutually agreed upon exceptions.

Penalty: ████████

31. **Weekly Prioritization Meetings and Development of an Issue Grid/Account Team Resolution.** Meetings between Customer and the designated Account Team will be held as mutually agreed upon by Customer and AdvancePCS. If mutually identified as necessary, an Issue Grid will be developed for tracking ongoing requests. Prioritization and timeframes for delivery of projects will be discussed. For purposes of this standard, an "issue" is any inquiry or directive from Customer requiring action on the part of the AdvancePCS Account Team. Any issues identified will be responded to within ████████████ and logged on the Issues Grid for either documentation or action.

Penalty: ████████

32. **Pharmacy Audits.** Each performance guarantee plan year AdvancePCS will perform field audits of not less than ████████ pharmacies that have entered into a provider agreement with AdvancePCS (Advance*PCS Pharmacies*) and rank within the top one hundred sixty (160) pharmacies in volume for Customer. Such audits will be in accordance with AdvancePCS' current standard targeting and auditing processes, the terms of the Agreement, and the terms of the provider agreement. At least ████████ of these audits will be performed on-site.

Penalty: ████████ per performance guarantee plan year.

33. **Client Services Issue Resolution.** ████████████████ of correspondence or phone calls received from Customer contacts to AdvancePCS Client Services will be acknowledged with ████████ ████████████ of receipt and ████████████ will be resolved or detailed in an action plan for resolution within ████████████ of receipt.

For purposes of this standard, AdvancePCS' time to respond to written correspondence begins upon receipt by AdvancePCS of written correspondence that is addressed to a designated integrated client team at its Scottsdale Location. Time to respond to written correspondence or phone calls ends upon

Principal_022202.doc                                    17

HIGHLY
CONFIDENTIAL                     CMK-AWP 012836



*EXHIBIT C*
*FORMANCE STANDARDS*

the earlier of such time as (i) a response has been deposited in the United States Mail or with another nationally recognized carrier, (ii) a response has been telecopied or sent by e-mail to customer (or such other form of transmission mutually acceptable to the parties), or (iii) an AdvancePCS representative has contacted customer by telephone.

For issues that require further clarification or information from Customer contacts, AdvancePCS will have met this guarantee if AdvancePCS notifies Customer, within the above timeframe, that further clarification or information is required.

Penalty: ███████ per performance guarantee plan year.

34. **Account Team Follow-up.** After each meeting, a list of deliverables will be provided by the close of the next Business Day. All follow-up work will be completed within ███████, subject to mutually agreed upon exceptions.

Penalty: ███████ per performance guarantee plan year.

35. **Customer Pharmacy Team Satisfaction.** Annually, AdvancePCS will develop, in consultation with Customer, a client specific evaluation for Customer's Pharmacy Team. The specific methodology, design, questions and timeframe for developing and administering the evaluation and evaluation questions will be mutually agreed upon by the parties. Areas reviewed may include the following:
- Overall service
- Tracking and issue resolution
- Open, proactive communication
- Platform changes and impact to PLIC
- Meeting clinical needs
- Meeting operation needs
- Meeting strategic needs

Penalty: ███████ per performance guarantee plan year.

**HIGHLY
CONFIDENTIAL**          CMK-AWP 012837

# Exhibit D

 

## AGREEMENT
## FOR
## PRESCRIPTION DRUG MANAGEMENT SERVICES
## BETWEEN
## NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
## AND
## DC37 HEALTH & SECURITY PLAN

**THIS AGREEMENT** is made by and between National Prescription Administrators, Inc. ("NPA"), a New Jersey corporation, located at 711 Ridgedale Avenue, East Hanover, New Jersey 07936 and DC37 Health & Security Plan ("Sponsor").

### WITNESSETH THAT:

**A.** NPA is engaged in the business of managing prescription drug programs, including claims processing and related services, for sponsors, their cardmembers and eligible dependents.

**B.** Sponsor desires to provide a prescription drug program in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE,** in consideration of the mutual covenants contained herein, NPA and Sponsor agree as follows:

### ARTICLE 1
### DEFINITIONS

The following capitalized terms, including their single and plural forms, shall have the meanings set forth below:

**"Agreement"** means this Agreement for Prescription Drug Management Services, including all appendices hereto, as may be amended from time to time.

**"AWP"** means the average wholesale price of the prescription drug dispensed, as established by reference to *Drug Topics' Redbook*.

**"Cardmember"** means an Eligible Person in whose name and to whom an Identification Card is issued.

**"CFI"** means Central Fill, Inc. and/or CFI of New Jersey, Inc.

**"Claim"** means a request for reimbursement of prescription drugs dispensed by a Participating Provider and submitted to NPA in an electronic form through the *NPAS®* Electronic Claims Management System or other format acceptable to NPA.

**"Direct Reimbursement Claim"** means a request for reimbursement of prescription drugs dispensed by a Provider and submitted by a Cardmember in a pre-printed form acceptable to NPA.



"**Eligible Person**" means each participant and dependent identified by Sponsor in accordance with the terms and conditions of this Agreement as eligible to receive prescription drug benefits.

"**Identification Card**" means a card containing specific information related to the Cardmember and Sponsor's plan. An Identification Card is not intended and shall not be construed to create proof of an individual's eligibility for prescription drug benefits.

"**Local Participating Provider**" means a Participating Provider located in the geographical area of the Cardmember.

"**Participating Provider**" means a Provider that has entered into a written agreement with NPA to participate in one or more networks.

"**Provider**" means a corporation or other legal entity that owns or operates a licensed, retail pharmacy.

"**Sponsor**" means DC37 Health & Security Plan.

"**Sponsor's Plan Description**" means a description of the benefits available to Eligible Persons and limitations thereto, provided by Sponsor in a form acceptable to NPA or confirmed by NPA in writing and otherwise amended and updated from time to time in accordance with the provisions of this Agreement.

## ARTICLE 2
## PRESCRIPTION DRUG PROGRAM SERVICES

**A.  Program Materials.** NPA will provide Identification Cards, NPA and CFI standard descriptive brochures, the Q&A Formulary, Q&A Generics and Direct Reimbursement Claim forms to Sponsor or Cardmembers, as Sponsor may elect. All costs of distributing and mailing such materials to Cardmembers and producing Identification Cards shall be the responsibility of Sponsor.

**B.  Prescription Drug Program.** Eligible Persons may, subject to the provisions of this Agreement and each Participating Provider's agreement with NPA, purchase prescription drugs from Participating Providers upon presentation of their Identification Cards and payment of their copayments or deductibles.

> **1.  Provider Solicitations and Classification.** NPA will solicit Local Participating Providers to assure that an adequate number are available to furnish Cardmembers prescription service. A form of Participating Provider Agreement is attached as Appendix A. NPA also will classify each Participating Provider according to the professional services available to Eligible Persons through the use of the NPA Profile Classification Plan, a sample of which is attached as Appendix B.

> **2.  Provider Manual.** Local Participating Providers will be furnished with a Provider manual, which will include Sponsor's plan information and applicable reimbursement information from Appendix C.



2

**3. Provider Directory.** NPA will provide Sponsor with a current list including all Local Participating Providers.

**4. Toll-Free Pharmacy Line.** NPA will maintain a toll-free telephone line available to Participating Providers.

**5. Provider Peer Review.** NPA will maintain a Provider Peer Review structure to serve as a review and appeal medium available to Providers.

**6. Provider Audits.** NPA will audit Participating Providers to verify claim payments and report to Sponsor material areas of discrepancy. NPA will return all Sponsor moneys recovered. NPA shall not be required to commence litigation for the collection of such discrepancies.

**C. Claims Processing.** Subject to Sponsor's funding of claims in accordance with this Agreement, NPA will accept and process all Claims and Direct Reimbursement Claims and reimburse Participating Providers and Cardmembers according to the Sponsor's Plan Description and the Reimbursement Fee Schedule in Appendix C. NPA will forward Direct Reimbursement Claims in excess of ████ to Sponsor for review prior to payment. NPA will transmit to submitting Participating Providers brief explanations of the reason or reasons for denial of Claims and within thirty (30) days of receipt, report to submitting Cardmembers the status of all pended or denied Direct Reimbursement Claims. If any person is overpaid or underpaid on one or more Claims or Direct Reimbursement Claims, then NPA will take reasonable steps to recover any such overpayments and adjust any such underpayments. NPA shall not be required to commence litigation to recover any such overpayments.

**D. Formulary.** The *NPASelect*[SM] Formulary is a list of drug products that physicians and other health care providers may use to prescribe, subject to their professional medical judgment and applicable law.

1. Sponsor agrees to participate in the *NPASelect*[SM] Formulary, cooperate with NPA and use its best efforts to facilitate Eligible Persons' utilization of the *NPASelect*[SM] Formulary and related formulary management programs. Sponsor further agrees not to enter or participate in any other formulary, rebate or discount program or contract related to drug products dispensed to Eligible Persons in connection with this Agreement.

2. NPA will maintain and update the *NPASelect*[SM] Formulary through its Pharmacy and Therapeutics Committee and implement formulary management programs, such as the *Preferred Dispensing*[SM] and *Patient Direct*[SM] Programs, through physician, pharmacy and patient analysis, communication and intervention. NPA also will distribute and update formulary materials and submit to manufacturers detailed experience reports and billings on Sponsor's behalf.

3. Rebates are received from certain drug manufacturers as a result of the inclusion of their products in the *NPASelect*[SM] Formulary and potentially on other drug products not included in the *NPASelect*[SM] Formulary and are based upon the dispensing of each manufacturer's formulary drugs under Sponsor's program. NPA will provide Sponsor ████████████████ of such rebates received by NPA. Sponsor's share of such rebates may be setoff by NPA against Sponsor's overdue, outstanding balances. NPA



3

and its associated mail order pharmacies receive and retain additional non-rebate chargebacks, credits, discounts, fees and reimbursements from certain drug manufacturers as a result of various commitments, services and programs.

4. NPA guarantees Sponsor shall receive the rebates specified in Appendix E, for claims approved for rebate during the initial term of this Agreement; provided, the manufacturer programs and agreements existing as of September 1, 2001 remain in full force and effect. Sponsor acknowledges that NPA has relied upon Sponsor's plan design as of September 1, 2001 including, but not limited to, its mandatory generic reimbursement program and three-tier copayment, and further agrees that if such plan design is changed by Sponsor in a manner that materially affects NPA's duties or obligations or cost of performance in connection with such rebate guarantee, then the parties will discuss such changes and renegotiate the guarantee if necessary. Subject to these acknowledgements and covenants and the performance by Sponsor of all its obligations under this Agreement, NPA agrees to such rebate guarantee.

5. Sponsor agrees that NPA shall not have any liability or obligation to Sponsor or its Eligible Persons for any failure by any manufacturer to pay any rebates, any breach of an agreement related to the transactions contemplated by this Agreement by any manufacturer, or any negligence or willful misconduct of any manufacturer.

**E. Patient Health Management Program.**

1. Sponsor agrees to participate in NPA's Patient Health Management Program so long as there are demonstrable cost savings to Sponsor and as determined by Sponsor. This program will include components of risk assessment, member education, physician education and intervention, and outcomes analysis.

2. NPA will provide an evaluation, under the risk assessment component of this program, of Eligible Persons who have conditions identified in Portfolios I and II below, or additional diseases or conditions introduced over the course of this Agreement. The risk assessment evaluation will determine those Eligible Persons with the conditions in Portfolios I and II and assess various aspects of their health status and pharmaceutical care. As a result of the risk assessment component of this program, NPA will mail Eligible Persons educational brochures and related literature with the intent of enhancing their health status and awareness for those Eligible Persons from whom Sponsor has obtained their consent to participate. Sponsor will be made aware of the member mailings prior to their distribution. NPA will also, as a component of this program, contact physicians regarding the treatment plan identified through the pharmacy claims data or health status information obtained in the risk assessment component of this program, for purposes of educating the physician concerning the program or recommendations which are intended to enhance the health status or pharmaceutical care of the Eligible Person.

3. NPA agrees to provide Sponsor periodic status reports. NPA further agrees to provide Sponsor an *Outcomes Analysis*, in which NPA will develop disease state baselines and analyze the effect of NPA's intervention activities upon prescription drug utilization,



4

medical cost savings and quality of patient care. NPA will utilize data reported by Eligible Persons in addition to medical claims data, if any, provided by Sponsor in NPA's preparation of the *Outcomes Analysis*. Sponsor agrees to provide NPA medical claims data with ICD diagnosis codes, to the extent such data is readily available and in a format acceptable to NPA, subject to data and format limitations of Sponsor's third party providers. NPA will provide Sponsor the *Outcomes Analysis* within six (6) months after the close of the first program year and each program year thereafter. NPA and its representatives may publish NPA's findings in benefits, medical or pharmacy journals. Subject to confidentiality and other limitations of federal and state law, the *Outcomes Analysis* and articles will include de-identified patient information from Eligible Persons.

4. Conditions and Portfolios, which apply, include the following:

| Portfolio I | Portfolio II |
|---|---|
| Low-Back Pain | Allergic rhinitis |
| Benign prostatic hyperplasia | Depression |
| Cardiovascular Risk Reduction | Pain/migraine management |
| Hypercholesterolemia | Women's health |
| Hypertension | SilverCare |
| Ulcer/gastro-esophageal reflux disorder | |

**F. Clinical Communications.** THE CLINICAL AND EDUCATIONAL INFORMATION PROVIDED IN ALL WRITTEN AND ORAL COMMUNICATIONS IS INTENDED ONLY AS A SUPPLEMENT TO, AND NOT A SUBSTITUTE FOR, THE KNOWLEDGE, SKILL, AND JUDGMENT OF THE PHYSICIANS AND PHARMACISTS PROVIDING ELIGIBLE PERSONS HEALTH CARE. SUBJECT TO SPONSOR'S PLAN DESIGN, THE DECISIONS TO PRESCRIBE AND DISPENSE ANY DRUG WILL BE MADE SOLELY BY THE PHYSICIAN AND PHARMACIST, RESPECTIVELY.

**G. Toll-Free Customer Service Line.** NPA will maintain a toll-free telephone line available to Eligible Persons.

**H. On-Line Access.** NPA will provide Sponsor on-line access to NPA's eligibility and claim databases regarding Sponsor's Eligible Persons for the purpose of allowing Sponsor to access and update eligibility records and access claims data. Sponsor shall comply with any and all policies and procedures established by NPA with respect to such access.

**I. Reports.** NPA will provide Sponsor not less frequently than monthly the standard reports described below:



Sponsor agrees to review each such report and notify NPA in writing of any errors or objections within thirty (30) days of receipt of each such report except that Sponsor may later correct or reconcile such information. Until Sponsor notifies NPA of any errors or objections, NPA shall have the right to rely upon the information contained in the report. NPA will provide Sponsor,



5

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY                    ESI-414-00001715

upon request, reports regarding patterns of utilization, costs and quality control and, at a cost to be agreed upon by the parties in writing, optional or specialty reports.

**J. Performance Guarantees.** Sponsor agrees that damages for breach of items 1, 2, and 3 of the performance standards described in Appendix E are not readily ascertainable and all monies assessed against NPA in accordance with such paragraphs in Appendix E are liquidated damages, which shall be accepted in lieu of any other relief (whether in contract, tort, equity or otherwise). Sponsor further agrees that for purposes of Appendix E, "annual fees" means NPA's per claim administrative fees and, further, that liquidated damages for any contract year shall not exceed such fees for such year. Sponsor acknowledges that NPA has relied upon Sponsor's plan design as of September 1, 2001, including, but not limited to, its mandatory generic reimbursement program and three-tier copayment, and further agrees that if such plan design is changed by Sponsor in a manner that materially affects NPA's duties or obligations or cost of performance in connection with such performance standards, then the parties will discuss such changes and renegotiate the performance guarantees if necessary. Subject to these acknowledgements and covenants and the performance by Sponsor of all its obligations under this Agreement, NPA agrees to such performance standards through the initial term of this Agreement.

## ARTICLE 3
### SPONSOR INFORMATION AND RESPONSIBILITIES

**A. Eligibility.** Sponsor will provide NPA complete listings in a format mutually agreeable to NPA and Sponsor: (1) of the individuals to become Cardmembers and Eligible Persons on the effective date for the commencement of benefits; and (2) on a continuing basis, of all new Cardmembers and Eligible Persons and all individuals who become ineligible together with effective dates.

**B. Eligible Person Authorizations.** Sponsor represents and warrants that it shall obtain all Eligible Person authorizations necessary for NPA to perform the services under this Agreement.

**C. Plan Information.** Sponsor agrees to provide NPA all information that NPA may reasonably require to fulfill its duties and obligations under this Agreement. Sponsor represents and warrants that all such information shall be true, accurate and complete and consistent with the benefits available to Eligible Persons.

**D. Change in Benefits.** Sponsor agrees to notify NPA in writing of all changes in prescription drug benefits, including, but not limited to, changes in copayments, covered drugs and exclusions, by notifying NPA's account executive in writing of such changes and providing a new or updated Plan Description. NPA will advise Sponsor of the anticipated implementation dates of the proposed benefit changes, and such benefit changes, which are so implemented, shall be deemed incorporated into this Agreement as of the date of implementation.

**E. Control of Plan.** Sponsor is the plan administrator for purposes of this Agreement. Sponsor shall control its plan and retain the sole, discretionary authority to review the denial of prescription drug claims disputed by Providers or Eligible Persons and referred to Sponsor by NPA, which shall refer all such disputes to Sponsor and may rely upon its instructions.





6

## ARTICLE 4
## CLAIMS PAYMENTS AND ADMINISTRATIVE CHARGES

**A. Claims Payments.** Sponsor shall fund all prescription drug claims and services as provided in this Agreement, including, but not limited to, Appendix C, and together with its Eligible Persons, shall have sole financial responsibility for all such claims and services and all applicable sales, use and similar taxes assessed at the point of sale. NPA will reimburse Participating Providers and Cardmembers for all valid Claims and Direct Reimbursement Claims three (3) times monthly from funds transferred by Sponsor to NPA's claims payment account. Sponsor agrees to have cleared funds in NPA's possession on the date(s) checks are mailed, in amounts sufficient to cover all such checks. On or about the seventeenth (17th) working day of the first and each succeeding month, NPA will submit a statement to Sponsor which will reconcile the funds sent by Sponsor with the actual disbursements made by NPA. The parties will establish the procedure by which such cleared funds will be received by NPA.

**B. Administrative Charges.** On or about the seventeenth (17th) working day of each month, NPA will submit to Sponsor an invoice setting forth the administrative charges pursuant to Appendix D covering services for the month. Sponsor will pay this invoice prior to the end of the month the invoice is dated.

## ARTICLE 5
## TERM OF AGREEMENT AND TERMINATION

**A. Term.** This Agreement shall become effective September 1, 2001 and continue in full force and effect for an initial term of three (3) years, and shall continue for additional terms of one (1) year each unless either party terminates this Agreement upon not less than ninety (90) days' written notice prior to the expiration of any term.

**B. Termination.** Either Sponsor or NPA may terminate this Agreement, at any time, if either:

(1) Upon not less than sixty (60) days' written notice if the other party makes an assignment for the benefit of creditors, is the subject of a voluntary or involuntary petition for bankruptcy or is adjudged to be insolvent or bankrupt, or a receiver or trustee is appointed for any portion of its property; or

(2) Upon not less than sixty (60) days' written notice if the other party commits a material breach (including, but not limited to, NPA's failure to pay claims or provide ther services) under this Agreement, unless the breach is cured prior to the expiration of such notice. Notwithstanding the foregoing, Sponsor may terminate this Agreement with or without cause, upon providing not less than ninety (90) days' written notice after the first year of this Agreement.

Notwithstanding the foregoing, Sponsor may terminate this Agreement with or without cause, upon providing not less than ninety (90) days' written notice after the first year of this Agreement.

The rights and remedies set forth in this paragraph are in addition to the rights and remedies available to each party under law or in equity.



7

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY                ESI-414-00001717

**C. Effect of Termination.** The rights and obligations of the parties arising as a result of services provided prior to termination shall remain in full force and effect following termination.

**D. Claims Processing after Termination; Return of Deposit.** Subject to Sponsor's funding of claims and payment of administrative charges and expenses in accordance with this Agreement, NPA will process and pay Claims and Direct Reimbursement Claims covering prescriptions dated prior to the effective termination of this Agreement for a period of six (6) months following such termination.

<div align="center">

**ARTICLE 6**
**RECORDS, INFORMATION AND OWNERSHIP**

</div>

**A. Maintenance of Records and Audits.** NPA shall maintain true and correct records for a period of seven (7) years from the date of each claim under this Agreement. Sponsor or its agent may, at its expense, examine and audit eligibility and claims records, and such agent may review specifically requested rebate contract information and rebate submissions maintained pursuant to this Agreement, subject to confidentiality and other limitations of federal and state law, confidentiality agreements with third parties and execution of a mutually acceptable confidentiality agreement by Sponsor, such accounting firm and NPA. Such examinations and audits may be conducted at a mutually convenient time and during NPA's normal business hours. Sponsor agrees to pay NPA at a reasonable hourly rate for the time its personnel dedicate to support an audit in excess of forty (40) hours per audit.

**B. Ownership and Use of Records.** All records developed, prepared or maintained by a party shall be the sole property of that party. NPA shall provide Sponsor a copy of NPA's Sponsor records at Sponsor's request.

**C. NPA's Programs and Procedures.** NPA's programs, operations, procedures, software, reporting packages, user documentation and related information shall remain the sole and exclusive property of NPA. Sponsor shall not use or disclose any such items to any third party, during or after the term of this Agreement, without NPA's express written consent. Sponsor agrees to return all such items to NPA upon termination of this Agreement.

**D. Trademarks and Service Marks.** NPA retains all rights, title, interest and license in and reserves the right to use and control the use of the words "APPROVED INDICATIONS," "BRANDSELECT," "NATIONAL PRESCRIPTION ADMINISTRATORS, INC.," "NPA," "NPAS," "NPASELECT," "PATIENT DIRECT," "PREFERRED DISPENSING," and all other symbols, trademarks, logotypes, service marks and domain names hereafter established by NPA. No other right, title, interest or license with respect to such items shall be created or granted except by a written agreement executed by both parties.

**E. Patient Information.** Sponsor and NPA agree to treat as confidential all patient-identifying information.

**F. Cardmember Communications.** While this Agreement is in full force and effect and for a period of twelve (12) months following its termination, NPA will not contact, engage in direct marketing, provide educational material or communicate with Cardmembers, except to respond



8

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001718

to Cardmember inquiries regarding individual medical claim or member services issues or as expressly contemplated by this Agreement or allowed by law.

**G. Development of Programs and Services.** Subject to the foregoing restrictions set forth in this Article, NPA may use and adapt all information obtained in connection with this Agreement for the purposes of submitting sales or marketing proposals, rendering services to prospective and existing clients and developing ancillary data for programs complementary to the programs and services provided hereunder or new products and services that may be outside the scope of this Agreement.

## ARTICLE 7
## NON-LIABILITY; INDEMNIFICATION; INSURANCE

**A. Non-Liability; Indemnification.** NPA shall not have any liability or obligation whatsoever (whether in contract, law, equity or otherwise) for any negligence, wrongful act, error or omission of any health care provider, practitioner, physician, pharmacy, pharmaceutical manufacturer or distributor of pharmaceuticals or any of their officers, directors, partners, employees or agents receiving or providing goods or services pursuant to this Agreement, nor shall NPA have any such liability or obligation for any injury, loss or damage sustained as a result of any such person's providing or failure to provide medical or pharmaceutical goods or services pursuant to this Agreement. This provision shall survive the termination of this Agreement.

**B. Indemnification.** Subject to paragraph A above, NPA shall defend, indemnify and hold harmless Sponsor against any and all claims, liabilities, losses and damages caused by NPA's failure to pay prescription drug benefits, claims or services timely funded by Sponsor or from NPA's negligence. Sponsor shall defend, indemnify and hold harmless NPA against any and all claims, liabilities, losses and damages caused by Sponsor's failure to fund timely prescription drug benefits, claims or services or from Sponsor's negligence. Each party agrees to notify the other party in writing as soon as possible after the notification of such claims and cooperate in the defense of any lawsuit or adversary proceeding.

**C. Insurance.** NPA agrees to maintain commercial general liability and employee dishonesty coverage in amounts not less than $1 million per occurrence and in the aggregate and excess umbrella coverage in amounts not less than $15 million per occurrence and in the aggregate and to name Sponsor as an additional insured of such coverage. NPA further agrees to require its exclusive mail service provider to maintain commercial general liability (including druggist liability) coverage in amounts not less than $1 million per occurrence and in the aggregate and excess umbrella coverage in amounts not less than $30 million per occurrence and in the aggregate and to name Sponsor as an additional insured of such coverage. NPA further agrees to provide Sponsor certificates of insurance within thirty (30) days of execution of this Agreement and from time to time thereafter upon request.

## ARTICLE 8
## GENERAL PROVISIONS

**A. Notices.** All notices related to this Agreement shall be in writing and shall be deemed given if sent by certified mail, return receipt requested postage prepaid, or by recognized overnight delivery service, addressed to National Prescription Administrators, Inc. at 711 Ridgedale



9

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY                    ESI-414-00001719

Avenue, East Hanover, New Jersey 07936, attention: Richard O. Ullman, President; or DC37 Health & Security Plan, 125 Barclay Street, New York, New York 10007-2179, attention: Roslyn Yasser, Administrator; or any other address designated by Sponsor or NPA by like notice to the other party. Any notice given in the manner set forth in this paragraph shall be deemed received on the date evidenced on the return receipt card or, in the case of overnight delivery service, other proof of delivery.

**B. Exclusivity; Similar Services.** NPA shall be Sponsor's exclusive provider of prescription drug programs while this Agreement is in full force and effect. NPA may perform similar services for other organizations and this Agreement shall not prevent NPA from performing such similar services.

**C. Relationship of Parties.** The parties acknowledge that NPA is an independent contractor providing services, and no provision in this Agreement is intended to create or shall be construed to create any employment relationship, partnership, joint venture or agency relationship between the parties.

**D. No Third Party Beneficiaries.** This Agreement is not a third party beneficiary contract. No provision of this Agreement is intended to create or shall be construed to create any third party beneficiary rights in any person, including, but not limited to, any Participating Provider or Eligible Person.

**E. Change in Law.** In the event of any change in state or federal laws or regulations, including any judicial or administrative interpretation thereof, which materially alters the rights, duties or obligations of either party under this Agreement, the parties will work in good faith toward mutually acceptable modifications of this Agreement. If the parties are unable to agree upon mutually acceptable modifications, then either Sponsor or NPA may terminate this Agreement upon not less than six (6) months' written notice.

**F. Force Majeure.** No party will be considered as having breached this Agreement or be held liable for any failure or delay in the performance of any or all of its duties or obligations under this Agreement if prevented from doing so by a cause or causes beyond its control. Such causes may include acts of God or public enemy; fires; floods; storms; earthquakes; riots; strikes; boycotts; lock-outs; war and war operations; restraints of government; failure of common or contract carriers; failure or fluctuations of power, heat, air conditioning or communication equipment or lines; software failures; or other circumstances beyond such party's control.

**G. Assignment.** Neither party may assign this Agreement without the other party's express written consent.

**H. Waiver.** The waiver of any breach of any term or provision of this Agreement shall not constitute a waiver of any subsequent breach of the same term or provision or any other term or provision hereof.

**I. Invalidity.** If any term or provision of this Agreement is found or held invalid or unenforceable by any court or agency of competent jurisdiction, such invalidity or lack of enforceability shall not affect the remainder of such term or provision or any other term or provision of this Agreement.



10

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001720

**J. Governing Law; Selection of Forum; Venue; Personal Jurisdiction.** This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to choice-of-law principles. All actions in connection with this Agreement shall be brought in and before a federal or state court located in New York. The parties waive all objections to such actions or a forum based upon venue or personal jurisdiction.

**K. Headings.** Article and paragraph headings are included for convenience only and shall not be used in any way to construe this Agreement.



11

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY                    ESI-414-00001721

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.

**SPONSOR:  DC37 HEALTH & SECURITY PLAN**

BY: _ELLIOT SEIDE, Chairman / Board / Trustee_
 Print or Type Name            Title

_[signature]_
 Authorized Signature

This Agreement is accepted by NPA this _15th_ day of ~~September, 2001~~ January 2002 at East Hanover, New Jersey.

**NPA:  NATIONAL PRESCRIPTION ADMINISTRATORS, INC.**

BY: _[signature]_
 Allan Zimmerman
 Senior Executive Vice President and General Manager

12

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001722

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.

**SPONSOR: DC37 HEALTH & SECURITY PLAN**

BY: _____

       Print or Type Name        Title

 

      _____

       Authorized Signature

This Agreement is accepted by NPA this _15th_ day of January, 2002 at East Hanover, New Jersey.

**NPA: NATIONAL PRESCRIPTION ADMINISTRATORS, INC.**

BY: _____

       Allan Zimmerman

       Senior Executive Vice President and General Manager



12

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY      ESI-414-00001723

APPENDIX A

**PROVIDER AGREEMENT**

**NPA**®    Provider Account No.

FOR OFFICE USE

AGREEMENT FOR PROVIDER PARTICIPATION
BETWEEN
NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
AND

*Please print or type:*

NAME_____

ADDRESS_____

CITY_____

STATE _____ ZIP _____

PHARMACY LICENSE NO. _____

IRS NUMBER _____

DEA NUMBER _____

PROPRIETORSHIP ☐    PARTNERSHIP ☐    CORPORATION ☐

OWNER(S)/PRINCIPAL(S) _____

_____

_____

_____

This Agreement is made and dated as of this_____ day of
_____,00___, by and between NATIONAL PRE-
SCRIPTION ADMINISTRATORS, INC., a New Jersey corporation and the
undersigned Participating Provider named above.

-1-



13

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001724

## APPENDIX B

### NPA PROFILE CLASSIFICATION PLAN



**NATIONAL PRESCRIPTION ADMINISTRATORS, INC.**

## PROVIDER

## PROFILE CLASSIFICATION PLAN



14

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY                ESI-414-00001725

## APPENDIX C

### REIMBURSEMENT FEE SCHEDULE

**A. Drug Program.** Reimbursement for each prescription dispensed by a Participating Provider will be based upon the lower of (1) Participating Provider's usual and customary, advertised or posted price and (2) the ingredient cost, plus a dispensing fee.

1. The ingredient cost for generic drugs subject to maximum allowable cost limits will be NPA's Generic Maximum Price. The annual average composite discount will be a computed AWP, less ████

2. The ingredient cost for all brand and other drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| INGREDIENT COST | DISPENSING FEE |
|---|---|
| ████████████████ | ████████████████ |

████████████████████ NPA will guarantee the effective rates as long as market conditions remain static and the current participating pharmacies and pharmacy chains remain in operation.

NPA will provide reports reflecting compliance with the above effective discounts within sixty (60) days after each anniversary of this Agreement.

**B. Mail Order Program.** Reimbursement for each mail order prescription dispensed by CFI will be based upon the ingredient cost, plus a dispensing fee. The ingredient cost for Betaseron and other brand drugs available on a restricted basis will be based upon CFI's usual and customary price. The ingredient cost for all drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| | |
|---|---|
| Brand Drugs<br>   Single source discount from 100% AWP<br>   Dispensing Fee/Rx | ████ |
| Generic Drugs<br>   Composite Discount from<br>   Average AWP of All Generics in Class<br>   Dispensing Fee/Rx | ████ |

If rates for postage or delivery increase during the term of this Agreement, the dispensing fee will be increased accordingly.



15

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001726

**APPENDIX D**

**ADMINISTRATIVE CHARGES**

The administrative charges for the contract services **DC37 HEALTH & SECURITY PLAN** will pay **NATIONAL PRESCRIPTION ADMINISTRATORS, INC.** are as follows:

| SERVICE | 7/1/2001 FEES | 7/1/2002 FEES | 7/1/2003 FEES |
|---|---|---|---|
| 1. (a) Basic Retail Administrative Fee - Option 1<br>Includes *Patient Direct Program<br>Per Rx Paid – Network<br>Per Rx Paid - Non-Network (Paper) | ■ | ■ | ■ |
| Basic Fee - Option 2*<br>Per Rx Paid – Network<br>Per Rx Paid - Non-Network (Paper) | ■ | ■ | ■ |
| 1. (b) Basic Mail Order Administrative Fee<br>Per Rx Paid | ■ | ■ | ■ |
| 2. Customer Service<br>Toll Free Phone Line (Member Service)<br>Toll Free Phone Line (Mail Service)<br>Toll Free Phone Line (Pharmacy Help Desk)<br>On-Line CRT Interface (see notes)<br>Internet Access | ■<br>■ | ■<br>■ | ■<br>■ |
| 3. Drug Utilization Review<br>Prospective/Concurrent<br>Retrospective<br>Prior Authorization (Standard) | ■ | ■ | ■ |
| 4. Data Reporting<br>Standard Reports<br>Ad Hoc Reports<br>On-Line Access –Ad Hoc Reports | ■ | ■ | ■ |
| 5. MAC Program Administration | ■ | ■ | ■ |
| 6. Formulary Administration | ■ | ■ | ■ |
| 7. ID Cards<br>Original<br>Each Additional | ■ | ■ | ■ |
| ■ | | | |





16

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001727

| | | | |
|---|---|---|---|
| Patient education letters<br>♦ Explanation of Prescription Benefits Letter (EOPB).<br>♦ Central Fill Notification Letter (CFN)<br>♦ Coordination of Benefits Letter<br>♦ Targeted employee listing of non-formulary medications | ■ | ■ | ■ |
| COB Adjudication | ■ | ■ | ■ |
| Disease Management (per portfolio) | ■ | ■ | ■ |
| Physician Practice Pattern Analysis (optional) | ■ | ■ | ■ |
| Standard paid claims tape | ■ | ■ | |
| Destruction of card stock | ■ | ■ | ■ |
| Customization of plastic ID Cards | ■ | ■ | ■ |
| Customization of back side of plastic ID Cards | ■ | ■ | ■ |
| Programming requests | ■ | ■ | ■ |

*Utilization of *Patient Direct*[SM] Program. The *Patient Direct*[SM] Program employs discount coupons, drug cost comparisons and other products to encourage member use of formulary medications. Selection of this program allows NPA to contact patients directly through the mail encouraging them to discuss preferred drug selection with their physician.







17

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001728

**APPENDIX E**

**PERFORMANCE STANDARDS**

1. **On-Line Claims Processing:**
   a. **Financial Accuracy** – The dollar amount of claims paid accurately divided by total dollars paid
      Standard: ███████████████

      Penalty:        <u>Percent Accurate</u>        <u>% of Annual Fees</u>

      ███████████        ████

   b. **Coding Accuracy**
      Standard: ████ of claims should be processed without procedural or payment errors

      Penalty:        <u>Error Rate</u>        <u>% of Annual Fees</u>
                      <u>Less than 3%</u>        0%

      ███████████        ███

2. **Membership Satisfaction:**
   a. **Telephone Response Time**
      Standard: On average, ████ or more of eligible persons' calls received during each calendar year will be answered within ████████

      Penalty: ████████████████████

   b. **Problem Resolution:**
      Standard: ████████ or more of all eligible persons' written inquiries received during each calendar year will be responded to by NPA within ████████████ of all eligible persons' written inquiries received during each calendar year will be responded to by NPA within ████████

      Penalty: ████████████████████

   c. **General Member Survey Results**
      Standard: ████████ or more of surveyed eligible persons will provide NPA a satisfactory rating. Such a survey will be conducted by NPA ████████

      Penalty: 1% of annual fees for each 1% below 95% prorata [1]

[1] ████████████████████████████





18

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY        ESI-414-00001729

**3.  Date Reporting:**

    **a.  Deliver standard reports within 45 days of end of reporting period**
        **Standard:**        ███████████ of standard utilization reports will be mailed within ████████ after the end of each reporting period.

        **Penalty:**     ██████████

    **b.  Deliver annual reports, regulatory documentation within 90 days of plan year**
        **Standard:**        ███████████ of annual reports will be mailed within ███ after the end of each plan year.

        **Penalty:**     ██████████

**4.  Network Utilization Management**

        **a.  UR Savings Results**
        **Standard:**     Sponsor will save not less than ██████ of an amount equal to its contracted net ingredient costs on an annual basis so long as Sponsor facilitates the implementation of NPA's current DUR programs, including the concurrent, retrospective, prior authorization and Patient Health Management Programs.

        **Penalty:**     ████████████

**5.  Rebate Management**

        **Standard:**     ███████████████████████████████

        **Penalty:**     ███████████████





19

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

# Exhibit E

REC'V 4/15/03

125 Barclay St., New York, N.Y. 10007-2179 ● Telephone: (212) 815-1300



# Health &
# DC 37 Security
# Plan

April 8, 2003

Ms. Nancy Treglia-Saidac
National Prescription Administrators, Inc.
711 Ridgedale Avenue
East Hanover, New Jersey    07936

Re:    Reduction in Administrative Fees

Dear Ms. Treglia-Saidac:

This letter will serve to inform you that, the DC 37 Health and Security Plan accepts your proposal to reduce the Plan's administrative fees, to reflect the following, effective April 15, 2003:

| Pricing Feature | Current Fee | Proposed Fee |
|---|---|---|
| Administrative Fee—Retail | ▮ | ▮ |
| Administrative Fee –Mail Order | ▮ | ▮ |
| Formulary Administrative Fee | ▮ | ▮ |
| Mail Order Brand Discount | ▮ | ▮ |
| Mail Order Dispensing Fee | ▮ | |

Based upon your analysis, the total estimated savings to the Plan, as the result of implementing these changes will be ▮

If you have any questions or comments, feel free to contact Ernestine Walker at (212) 815-1306.

Very truly yours,

Rosaria R. Esperon
Administrator

EXHIBIT
DC-10
4/6/06

EW:ew
cc:    C. Chin-Marshall, J. Thoens, L. Albergo, G. Dean, W. Chang, O. Wade, L. Griffin, File

ROSARIA R. ESPERON, ADMINISTRATOR, LILLIAN ROBERTS, CHAIR, OLIVER GRAY, CO-CHAIR,
TRUSTEES: MAGDA DEJESUS, CLAUDE FORT, LENORA GATES, SHIRLEY REVELLS, JOHN TOWNSEND
Established by District Council 37, American Federation of State, County & Municipal Employees, AFL-CIO

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY            ESI-414-00001731

# Exhibit F



April 17, 2003

Ms. Rosa Esperon
Administrator
DC 37
125 Barclay Street
New York, NY 10007

RE:    New Pricing Proposal

Dear Rosa,

As you know, NPA was acquired by Express Scripts (ESI) on April 12, 2002. At your request to revisit our contracted pricing with DC37, below is a summary of the proposed changes we have offered. By covering more than 50 million lives, ESI is capable of offering a more comprehensive and competitive proposal to clients due to our negotiating power with the retail pharmacies and drug manufacturers, as well as economies of scale due to our size.

In addition to enhancements to the pricing, DC37 will experience improvements in technology through the systems, web based tools, reporting and educational information as well as training opportunities when you fully migrate to the ESI Anchor system.

We do value the long standing relationship and wish to continue this now as ESI. Although we would not normally adjust any contracted fees during the term of a current contract, we have reviewed the fees for DC 37 in response to your request to do so and, effective May 1, 2003, will make the following pricing changes:

|  | Current | Proposed |
|---|---|---|
| **Administrative Fee Retail:** |  |  |
| **Administrative Fee Mail:** | | |
| **Formulary Management Fee:** | | |
| **Mail Brand Discount:** | | |
| **Mail Dispensing Fee:** | | |



HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001740

Ms. Rose Esperon
March 31, 2003
Page II

All other contracted pricing components will remain the same as you have currently. This proposed pricing represents an estimated savings of ▓▓▓▓▓▓

Due to an increase in generic utilization and the use of newly approved over the counter products, the total dollar amount of Rebates we receive on your behalf has declined on a per claim basis. We will continue to provide you with ▓▓▓ of all rebates received. However, ESI will reduce the per claim minimum guarantee from ▓▓▓▓▓▓ per claim, for all claims. This change will eliminate the need for ESI to fund a portion of the rebates, which I don't believe was your expectation when the original pricing was put in place.

We would appreciate the opportunity to discuss these changes with you in person. If you should have any further questions or require additional information, please do not hesitate to contact me at 973-503-1050.

Sincerely,

*Ellen J. Perlman*

Ellen J. Perlman
Vice President , Labor Account Management

Cc:    John Rasulo
       Nancy Treglia-Saidac
       Marilyn Gordon

EXPRESS SCRIPTS®

NPA
A division of Express Scripts

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY        ESI-414-00001741

# Exhibit G

REC'v 4/15/03

125 Barclay St., New York, N.Y. 10007-2179 ● Telephone: (212) 815-1300

B-1

# Health & DC37 Security Plan

April 8, 2003

Ms. Nancy Treglia-Saidac
National Prescription Administrators, Inc.
711 Ridgedale Avenue
East Hanover, New Jersey    07936

Re:    Reduction in Administrative Fees

Dear Ms. Treglia-Saidac:

This letter will serve to inform you that, the DC 37 Health and Security Plan accepts your proposal to reduce the Plan's administrative fees, to reflect the following, effective April 15, 2003:

| Pricing Feature | Current Fee | Proposed Fee |
|---|---|---|
| Administrative Fee—Retail | ▮ | ▮ |
| Administrative Fee.—Mail Order | ▮ | ▮ |
| Formulary Administrative Fee | ▮ | ▮ |
| Mail Order Brand Discount | ▮ | ▮ |
| Mail Order Dispensing Fee | ▮ | ▮ |

Based upon your analysis, the total estimated savings to the Plan, as the result of implementing these changes will be ▮

If you have any questions or comments, feel free to contact Ernestine Walker at (212) 815-1306.

Very truly yours,

Rosaria R. Esperon
Administrator

EW:ew
cc:    C. Chin-Marshall, J. Thoens, L. Albergo, G. Dean, W. Chang, O. Wade, L. Griffin, File

ROSARIA R. ESPERON, ADMINISTRATOR, LILLIAN ROBERTS, CHAIR, OLIVER GRAY, CO-CHAIR,
TRUSTEES: MAGDA DEJESUS, CLAUDE FORT, LENORA GATES, SHIRLEY REVELLS, JOHN TOWNSEND

Established by District Council 37, American Federation of State, County & Municipal Employees, AFL-CIO

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002411

# Exhibit H



**EXPRESS SCRIPTS**
*Charting the Future of Pharmacy*

PHARMACY BENEFIT MANAGEMENT SERVICES

PROPOSAL

FOR

DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN

OCTOBER 12, 2004

Copyright © 2004, Express Scripts, Inc.   All rights reserved.

This document is proprietary and confidential and cannot be copied or reproduced without prior written permission of Express Scripts, Inc.
This document has been delivered to the recipient solely for the purpose of permitting the recipient to evaluate a potential relationship with Express Scripts, Inc. All other uses are prohibited.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY            ESI-414-00002561

# Section III: Financial Exhibits & Quotation Format

## Administrative Fees and Agreements

1. **Complete the table(s) below for all plan years requested. Based an assumed 2,700,000 annual Rxs, provide total estimated annual fees. If listed services are included in general claim processing fee, indicate "included" on the corresponding line. For optional services explain how fees will be charged (what basis) and suggested fee levels.**

   Express Scripts is offering the Plan three different pricing options. The table below is based on the pricing in the Traditional pricing option. Please refer to the *Pricing Proposal* for detailed information regarding all three pricing options.

Plan Effective Date: March 1, 2005

| Service | Retail Network Only | | |
|---|---|---|---|
| | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| 1. Basic Retail Fee | | | |
| Per Rx Paid – Retail Network | ■ | ■ | ■ |
| Per Rx Paid - Non-Network (paper) | | | |
| Per Member Per Month (Alternate) | | | |
| 2. Customer Service | | | |
| Toll Free Phone Line | ■ | ■ | ■ |
| • Express-Scripts.com for Members | | | |
| • Express-Scripts.com for Clients | | | |
| • Express Choice enrollment option | | | |
| 3. DUR | | | |
| Prospective/Concurrent | | | |
| • Concurrent DUR | ■ | ■ | ■ |
| • Emerging Therapeutic Issues Management | | | |
| Retrospective | | | |
| • Retrospective DUR [1] | ■ | ■ | ■ |
| • Retrospective DUR for Seniors [1] | | | |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY     ESI-414-00002562

ADMINISTRATIVE FEES AND AGREEMENTS

| Retail Network Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| 4.  Data Reporting | | | |
| Standard Reports | | | |
| • Web-enabled Client Reporting-produced by the [client] | ■ | ■ | ■ |
| • Web-enabled Client Reporting- produced by Express Scripts | ■ | ■ | ■ |
| • Billing Reports | ■ | ■ | ■ |
| • Annual Strategic Account Plan Report | | | |
| Ad Hoc Reports | | | |
| • Ad Hoc Reports produced using Web-enabled Parametric Reporting | ■ | ■ | ■ |
| • Custom Ad Hoc Reporting | | | |
| • High Utilizer & Case Management Report | ■ | ■ | ■ |
| On-Line Access | | | |
| • Up to 5 digital certificates | ■ | ■ | ■ |
| • More than 5 certificates | | | |
| • Software Training for Access to Online systems | ■ | ■ | ■ |
| 5.  Formulary Administration | ■ | ■ | ■ |
| • Communication with physicians and/or members to promote formulary compliance | | | |
| 6.  ID Cards | | | |
| Original | ■ | ■ | ■ |
| Each Additional | | | |

District Council 37 Health & Security Plan
October 12, 2004

2

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002563

ADMINISTRATIVE FEES AND AGREEMENTS

| Retail Network Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| Optional Services | | | |
| EOB Statements | ■ | ■ | ■ |
| COB Adjudication | | | |
| Disease Management | | | |
| • Level 1 Care Management: Web-based | ■ | ■ | ■ |
| • Level 2 Care Management: Asthma [1] | | | |
| • Level 2 Care Management: Cardiovascular Disease [1] | ■ | ■ | ■ |
| • Level 2 Care Management: CHF [1] | | | |
| • Level 2 Care Management: Depression [1] | | | |
| • Level 2 Care Management: Diabetes [1] | | | |
| • Level 2 Care Management: GI Disease [1] | | | |
| • Level 2 Care Management: Hypertension [1] | | | |
| • Level 2 Care Management: Migraine [1] | | | |

District Council 37 Health & Security Plan
October 12, 2004

3

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002564

ADMINISTRATIVE FEES AND AGREEMENTS

| Retail Network Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| Other* | | | |
| • Drug Choice Management [(3)] | ■ | ■ | ■ |
| • Administrative Prior Authorization [(3)] | | | |
| • Prior Authorization – Clinical Base List [(3)] | | | |
| • Prior Authorization – Clinical Supplemental List | ■ | ■ | ■ |
| • Clinical Prior Authorization – Clinical Overrides | | | |
| • Step Therapy Package | | | |
| Individual Step Therapy Modules | | | |
| • ACE inhibitors and Angiotensin-2 receptor blockers (ARBs) | ■ | ■ | ■ |
| • Non-steroidal anti-inflammatory drugs (NSAIDs) and COX-2s | | | |
| • Proton Pump Inhibitors (PPIs) | ■ | ■ | ■ |
| • Selective serotonin reuptake inhibitors (SSRIs) | | | |
| • Glucophage XR | | | |
| • Leukotriene Pathway Inhibitors | ■ | ■ | ■ |
| • Topical Immunomodulators | | | |
| • Strattera | | | |
| • Disease Modifying Antirheumatic Drugs (DMARDs Enbrel, Humira, and Kineret) | | | |
| • OTC Non-sedating Antihistamines | ■ | ■ | ■ |
| • Xopenex | | | |
| • HMG | | | |
| • Zetia | | | |
| • Other Antidepressants | | | |
| Note: Prices for new modules will be established upon development. | | | |
| • Drug Quantity Management | | | |
| • Physician Consultation – Client Specific | ■ | ■ | ■ |
| • Standard Trend Management Package | | | |
| • Enhanced Trend Package (see Pricing Proposal for details. | | | |

* List, explain, and provide suggested cost of any optional services being proposed.

District Council 37 Health & Security Plan
October 12, 2004

4

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002565

ADMINISTRATIVE FEES AND AGREEMENTS

Plan Effective Date: March 1, 2005

| Mail Order Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| 1. Basic Mail Order Fee<br>Per Rx Paid – Mail<br>Per Rx Paid – Non-Network (paper) | ■ | ■ | ■ |
| 2. Customer Service<br>Toll Free Phone Line<br>• Express-Scripts.com for Members<br>• Express-Scripts.com for Clients<br>• Express Choice enrollment option | ■ | ■ | ■ |
| 3. DUR<br>Prospective/Concurrent<br>• Concurrent DUR<br>• Emerging Therapeutic Issues Management<br>Retrospective<br>• Retrospective DUR [1]<br>• Retrospective DUR for Seniors [1] | ■ | ■ | ■ |

District Council 37 Health & Security Plan
October 12, 2004

5

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002566

ADMINISTRATIVE FEES AND AGREEMENTS

| Mail Order Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| 4.  Data Reporting | | | |
| Standard Reports | | | |
| • Web-enabled Client Reporting-produced by [Client] | ■ | ■ | ■ |
| • Web-enabled Client Reporting- produced by Express Scripts | ■ | ■ | ■ |
| • Billing Reports | ■ | ■ | ■ |
| • Annual Strategic Account Plan Report | | | |
| Ad Hoc Reports | | | |
| • Ad Hoc Reports produced using Web-enabled Parametric Reporting | ■ | ■ | ■ |
| • Custom Ad Hoc Reporting | | | |
| • RxPredict$ | | | |
| High Utilizer & Case Management Report | | | |
| On-Line Access | | ■ | ■ |
| • Up to 5 digital certificates | ■ | ■ | ■ |
| • More than 5 certificates | ■ | ■ | ■ |
| • Software Training for Access to Online systems | ■ | ■ | |
| 5.  Formulary Administration | | | |
| • Communication with physicians and/or members to promote formulary compliance | ■ | ■ | ■ |
| 6.  ID Cards | | | |
| Original | | | |
| Each Additional | ■ | ■ | ■ |

District Council 37 Health & Security Plan
October 12, 2004

6

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002567

| Mail Order Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| Optional Services | | | |
| EOB Statements | ■■■■■■ | ■■■■■■ | ■■■■■■ |
| COB Adjudication | | | |
| Disease Management | | | |
| • Level 1 Care Management: Web-based | ■■■■■■ | ■■■■■■ | ■■■■■■ |
| • Level 2 Care Management: Asthma [1] | | | |
| • Level 2 Care Management: Cardiovascular Disease [1] | ■■■■■■ | ■■■■■■ | ■■■■■■ |
| • Level 2 Care Management: CHF [1] | | | |
| • Level 2 Care Management: Depression [1] | | | |
| • Level 2 Care Management: Diabetes [1] | | | |
| • Level 2 Care Management: GI Disease [1] | | | |
| • Level 2 Care Management: Hypertension [1] | | | |
| • Level 2 Care Management: Migraine [1] | | | |

**District Council 37 Health & Security Plan**
October 12, 2004

7

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002568

ADMINISTRATIVE FEES AND AGREEMENTS

| Mail Order Only | | | |
|---|---|---|---|
| Service | 3/1/2005 Fees | 3/1/2006 Fees | 3/1/2007 Fees |
| **Other*** | | | |
| • Drug Choice Management [3] | ■ | ■ | ■ |
| • Administrative Prior Authorization [3] | | | |
| • Prior Authorization – Clinical Base List [3] | | | |
| • Prior Authorization – Clinical Supplemental List | ■ | ■ | ■ |
| • Clinical Prior Authorization – Clinical Overrides | | | |
| • Step Therapy Enhanced Package | | | |
| **Individual Step Therapy Modules** | | | |
| • ACE Inhibitors and Angiotensin-2 receptor blockers (ARBs) | ■ | ■ | ■ |
| • Non-steroidal anti-inflammatory drugs (NSAIDs) and COX-2s | ■ | ■ | ■ |
| • Proton Pump Inhibitors (PPIs) | | | |
| • Selective serotonin reuptake inhibitors (SSRIs) | | | |
| • Glucophage XR | | | |
| • Leukotriene Pathway Inhibitors | ■ | ■ | ■ |
| • Topical Immunomodulators | | | |
| • Strattera | | | |
| • Disease Modifying Antirheumatic Drugs (DMARDs Enbrel, Humira, and Kineret) | | | |
| • OTC Non-sedating Antihistamines | ■ | ■ | ■ |
| • Xopenex | | | |
| • HMG | | | |
| • Zetia | | | |
| • Other Antidepressants | | | |
| Note: Prices for new modules will be established upon development. | | | |
| • Drug Quantity Management | ■ | ■ | ■ |
| • Physician Consultation – Client Specific | | | |
| • Standard Trend Management Package | | | |
| • Enhanced Trend Package (see Pricing Proposal for details.) | | | |

**List, explain, and provide suggested cost of any optional services being proposed.**

District Council 37 Health & Security Plan
October 12, 2004                                                    8

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002569

2.  Detail all services and supplies that are covered under your basic fees.

Express Scripts' administrative services covered under the basic fees include:

| | |
|---|---|
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional charge |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee  (avail. upon request) |
| | No additional fee |
| | No additional fee |
| | No additional fee |
| | No additional fee |

District Council 37 Health & Security Plan
October 12, 2004

9

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY     ESI-414-00002570

*ADMINISTRATIVE FEES AND AGREEMENTS*

The following clinical and trend management programs are also covered under the basic fees:





HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY     ESI-414-00002571

| | |
|---|---|
| **Blood Glucose Meter Program**<br>Retrospective program targeting utilizers of non-formulary strips and providing them with information on free meters that use formulary strips. | No charge, if client covers strips |

3. Detail all additional fees/charges not covered under your basic fees (printing, booklets, associated postage, start up costs, etc). Be sure to list all charges. Otherwise, we will assume that the fees that you quote include all services and supplies that could reasonably be expected to be provided during the course of your administration of the plan.

An additional fee/charge will be applied for the following services and programs as outlined in the *Pricing Proposal*:



- ♦ Eligibility submission
  - Manual/hardcopy submission
- ♦ Member Submitted Paper Claims Processing
- ♦ COB (Coordination of Benefits)
  - Medicare Coordination (+65 population)

- ♦ Pharmacy Audit Recoveries

- ♦ Web-based Client Reporting — produced by ESI
- ♦ Custom Ad-Hoc Reporting

- ♦ Digital Certificates
  - More than 5 certificates

## Clinical Management Programs



Report available to clients for the purposes of identifying members predicted to have high medical expenditures in the following six months.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002572



| Daily and weekly physician communication targeting multiple utilization issues. <br>• Drug-Drug Interactions <br>• Drug-Patient Interactions <br>• Drug-Disease Interactions <br>• Drug-Pregnancy Interactions <br>• Drug Overutilization <br>• Drug Underutilization <br>• Duplicate Therapy <br>• Addictive Substances <br>• Oxycontin <br>• Long term hypnotics | |
| Weekly physician intervention to identify inappropriate utilization issues in the senior population <br>• Polypharmacy <br>• Drugs of Concern | |
| Disease and/or therapy specific, physician and patient letter based interventions. | |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002573

## Trend Management Programs

Pricing and guarantees for the all Trend Management programs below may need to be adjusted based on PICA coverage. Implementation of Step Therapy programs are contingent of coverage of the first line agents.



**Drug Quantity Management**
Ensure that the quantity of units supplied in each prescription remains consistent with clinical dosing guidelines and a Sponsor's benefit design
- Standard per Rx
- Select per Rx (optional)
- Select per day supply (optional)

Note: List of drugs subject to change at the discretion of ESI

**High Utilizer & Case Management Report**
Identifies members who are at high risk for hospitalization or increased medical/pharmacy cost. Drug/disease targeting report including member detail

**Physician Consultation – Client Specific**
Express Scripts pharmacists conduct client-specific one-on-one phone consultations with selected physicians. Physician consultation focused on sponsor formulary brand and generic products.

**Prior Authorization – Clinical Supplemental List**
Intervene to support appropriate use at the point of service through pre-established clinical criteria.
- Antifungals (Diflucan, Lamisil, Sporanox)
- Penlac
- Wellbutrin SR
- Forteo (teriparatide)
- Amevive (alefacept)
- Remicade (infliximab)
- Raptiva (efalizumab)
- FluMist
- Xolair (omalizumab)
- Topamax (topiramate)
- Zonegran (zonisamide)
- DMARDS (Enbrel, Kineret, Humira)
- Provigil

Note: List of drugs subject to change at the discretion of ESI

District Council 37 Health & Security Plan
October 12, 2004

13

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002574



| | |
|---|---|
| **Prior Authorization – Other Clinical Overrides**<br>(e.g. Non-standard prior authorization medications, medical exceptions) | |
| **Step Therapy Enhanced Trend Package Modules**<br>Intervene to support use of less expensive and clinically appropriate medications at the point of service.<br><br>**Or Individual Step Therapy Modules**<br>  -ACE Inhibitors and Angiotensin-2 receptor blockers (ARBs)<br>  -Non-steroidal anti-inflammatory drugs (NSAIDs) and COX-2s<br>  -Proton Pump Inhibitors (PPIs)<br>  -Selective serotonin reuptake inhibitors (SSRIs)<br>  -Metformin<br>  -Leukotriene Pathway Inhibitors<br>  -Topical Immunomodulators<br>  -Strattera<br>  -OTC Non-sedating Antihistamines<br>  -Xopenex<br>  -HMG – Low Dose<br>  -Zetia<br>  -Other Antidepressants<br><br>Note: Prices for new modules will be established upon development. | |

| | |
|---|---|
| **Enhanced Trend Package**<br>  • Basic Trend Programs:<br>    ○ Web-Based Member, Physician, and Pharmacist Education<br>    ○ Concurrent Drug Utilization Review<br>    ○ Mail Service Promotion<br>    ○ Prior Authorization – Clinical Base List<br>    ○ Drug Choice Management<br>  • Prior Authorization – Clinical Supplemental List<br>  • Drug Quantity Management<br>    ○ Standard per Rx<br>    ○ Select per Rx (optional)<br>    ○ Select per day supply (optional)<br>  • Step Therapy – Enhanced Trend Package Modules<br>    ○ ACE Inhibitors, Angiotensin-2 receptor blockers (ARBs), COX-2 Inhibitors, Non-steroidal anti-inflammatory drugs (NSAIDs), Proton Pump Inhibitors (PPIs), Selective serotonin reuptake inhibitors (SSRIs), Glucophage XR, Leukotriene Pathway Inhibitors, Strattera, Topical Immunomodulators<br>  • *RapidResponse* Member Support for Step Therapy | |

Each of the services and programs listed above is also included in the *Pricing Proposal*.

District Council 37 Health & Security Plan
October 12, 2004

14

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002575

## Less than 34-Day Supply at Mail

Mail service pharmacy prescriptions with less than a 35-day supply will be priced with

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4. **Will there be any additional charges if the plan of benefits is restructured or new classes of eligible members are added? If so, how are these charges determined and state amount of charges?**

   Pricing is based on the benefit plan and data provided in the RFP. If benefit changes are required, Express Scripts will work with the Plan to provide the appropriate rates.

5. **Confirm that your proposal is binding for a minimum of 180 days upon receipt.**

   Confirmed. Quoted fees and services (other than Disease Management administered via LifeMasters) are valid for 180 days from the date of the proposal; such fees are thereafter guaranteed for the term of a three (3) year contract. However, the price quoted is subject to an acceptable credit review and is contingent on execution of a definitive contract.

   LifeMasters® quoted fees are subject to annual revision on anniversary date of 6-1-05.

6. **Confirm that all aspects of your proposal (including fees, discounts rebates, etc.) are guaranteed for each 12-month policy period offered.**

   Confirmed. Quoted fees and services (other than Disease Management administered via LifeMasters) are valid for 180 days from the date of the proposal; such fees are thereafter guaranteed for the term of a three (3) year contract. However, the price quoted is subject to an acceptable credit review and is contingent on execution of a definitive contract.

   LifeMasters® quoted fees are subject to annual revision on anniversary date of 6-1-05.

7. **Fees must be self-supporting. Please confirm that your fees are not subject to change if the Plan elects to unbundle any services.**

   Quoted fees are based on an integrated retail and mail service program.

8. **Fees are assumed to be based on an incurred (date filled) basis. Will you offer to pay claims on an immediate paid claim basis (i.e. run-in)? If so, how will fees vary if the client requests you begin paying claims regardless of incurral date?**

   As a current client, this would not apply should the Plan choose to remain with Express Scripts.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002576

9.  Confirm that your fees include the cost of claims incurred/filled during the effective
    dates of this contract regardless of when they are actually processed and paid (run-
    out)?

    Yes. Fees include the cost of claims incurred/filled during the effective dates of this
    contract regardless of when they are actually processed and paid. Please refer to the
    following excerpt from our Pharmacy Benefit Management Agreement:

    7.2. (f) Obligations Upon Termination. Sponsor shall notify Members of the timing of
    any transition to a successor pharmacy benefit manager at least thirty (30) days prior to
    the effective date of such termination. Sponsor or its agent shall pay ESI in accordance
    with this Agreement for all claims for Covered Drugs dispensed and services provided to
    Sponsor and Members on or before the effective date of termination ("Termination
    Date"). ESI shall continue filing for Rebates for claims incurred prior to the Termination
    Date and shall pay Sponsor Rebates for such claims in accordance with the Rebate
    payment schedule set forth in Exhibit B. Claims submitted by Pharmacies or Member-
    Submitted Claims filed with ESI after the Termination Date shall be processed and
    adjudicated in accordance with a mutually determined run-off plan. Notwithstanding the
    preceding, ESI may require that Sponsor pay a reasonable deposit in the event ESI is
    requested to process after the Termination Date claims incurred on or prior to such date.

10. List any other related services that you offer that have not been requested. Provide
    charges and fees for these services.

    Express Scripts will provide the Plan

## Clinical Program Manager

Your Clinical Program Manager, Andrew Kosonocky, under the direction of Marilyn
Gordon, Senior Director of Clinical Program Management, will continue his
responsibilities in implementing, measuring and monitoring all clinical programs and
services that the Plan will receive from Express Scripts. The Plan will continue to
receive personalized clinical plans that take into account your utilization patterns,
member culture, financial and service goals and ensure that drugs are utilized safely,
appropriately and rationally. This personalized clinical plan will be incorporated into
regular strategic planning sessions your account management team will present.

## Benefit Analysis and Consultative Services

The Benefit Analysis and Consultative Services team member will provide continual
Plan-specific analysis and subsequent financial consultation on opportunities to leverage

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002577

your benefit plan design. In addition to studying and monitoring the Plan's drug trends, your Benefit Analysis and Consultative Services team member will provide benchmarks that compare the Plan's drug trend and utilization patterns with clients of similar industry and demographics. Benefits and program solutions, as well as decision support, will be provided directly by this benefit analyst, aiding both the Plan and the other members of your account management team to pinpoint opportunities for change.

# Member Communications Online Catalog

Express Scripts' Member Communications program features an online catalog of member-facing materials the Plan can download or order and then distribute to members to inform and educate them about their mail service benefit, generic drugs and the plan options available to them. The Plan can receive direct access to the catalog through the Client portal at Express-Scripts.com. Express Scripts' Account Management professionals will provide a user name and password.

Materials in the online catalog range from letter and newsletter article templates to emails for internal distribution to the Plan members. They also include brochures, postcards, hand-outs and transition/new member information, as well as a variety of targeted member communications that can be customized and sent to selected members. The catalog is regularly updated with new materials and tools to accommodate our client's needs.

Topics covered within the catalog include:

*Welcome to Express Scripts* — These communications educate new members about their benefit and introduce Express Scripts as their PBM.

*Website promotion* — Members are encouraged to learn more about their benefits by using the Member Portal at Express-Scripts.com.

*Mail Service Pharmacy* — Informs members about the benefits of our Mail Service Pharmacy — from potential savings to the convenience of home delivery — and tells them how to get started.

*Generics Adoption* — These communications provide information on generic prescription drugs and their many benefits.

*Plan Design Change* — Explains changes in plan design, how these changes will impact members and what the member needs to do.

*Express Choice* – If providing your members with multiple prescription plan options, these communications help them evaluate and select the plan that best meets their needs.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002578

Express Preview – These communications promote the online tool available to help members understand their upcoming plan (and prescription costs), before the plan is live.

*News* — Provides top stories on prescription drugs and the drug industry.

## Physician Connectivity Overview

Express Scripts has partnered with several electronic prescribing companies to provide pharmacy benefit and prescription information at the point of prescribing. Through these point-of-care technology vendors, physicians have access to member-specific information that, when applied during the prescription writing process, helps achieve several shared objectives, which include:

- Enhanced member safety (through the delivery of medication history, increase avoidance of adverse drug events)
- Management of formulary compliance
- Recommendations of low cost alternatives (e.g., generic substitution)
- Addressing benefit issues at the point of care (e.g., prior authorization)

### Point of Care Connectivity Strategy

Express Scripts actively promotes point of care connectivity. The principle goals of connectivity are to facilitate enhanced safety, quality and savings opportunities on behalf of clients and members by delivering pharmacy benefit and prescription information at the point of care.

Express Scripts is a founding member of an industry network known as RxHub. RxHub was founded in conjunction with two other dominant PBMs to create universal transactions and infrastructure through which benefit and prescription information can be shared among PBMs, physicians and pharmacies. These transaction sets and infrastructure are fully functional and Express Scripts leverages these capabilities to enable clients, members and physicians the opportunity to enhance quality care, manage trend and improve service.

Express Scripts continuously monitors the pipeline of vendors coming to market and encourages each vendor to certify with RxHub and thereby receive access to Express Scripts members' benefit and prescription information. If the Plan is interested in physician connectivity, the Express Scripts business development team will work with you to identify opportunities that best suit your needs.

### Advantages of Connectivity

Currently, physicians, members and clients can benefit from connectivity technology in two ways:

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY     ESI-414-00002579

- Workflow efficiency - reduction in pharmacy call-backs and rework associated with rejects. This reduction equates to less work for physicians and faster service for members.

- Greater patient safety - drug interactions will be alerted through the technology and illegibility is no longer an issue. This increase in safety benefits physicians, members and clients.

## 11. Confirm that fees quoted are <u>not</u> contingent upon any of the following:

- **Minimum enrollment or utilization requirements.**

  Although quoted fees are based on the data and assumptions provided in the RFP, as stated in the enclosed *Pricing Proposal* under the Pricing Assumptions and Rate Guarantee, "Express Scripts reserves the right to amend the price quotation ... if there is a material change in the number of persons included in the prescription drug program or any material change in the benefit plan from that which was originally presented to Express Scripts and upon which this price quotation is based."

- **Participation in any supplemental programs.**

  The proposed pricing <u>is not contingent</u> on participation in any supplemental programs. However, the Plan acknowledges its requirement to adopt the applicable Express Scripts Formulary identified in the *Pricing Proposal* in order to be eligible for rebates offered, whether rebates are paid or applied.

- **Direct communication with patient population.**

  The fees quoted are not contingent upon direct communication with the patient population, unless the Plan elects to implement the GenericsWork program. However, Express Scripts takes great pride in our ability to effectively communicate the pharmaceutical benefit, emerging issues, trends and programs to the Plan's members.

## 12. Fees must be based on only "true" claim transactions. Please confirm that your quoted fees will be charged on only "true" transactions that would generate a payment.

Express Scripts defines a "true claim" as a "paid claim" - one that has been received, processed and adjudicated and payment or an Explanation of Benefits (EOB) has been issued.

Administrative fees are charged for paid ("true") claims only. Express Scripts does not charge for rejected, reprocessed, or returned claims.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002580

13. Will your stated administrative fees change should the Plan decide to award administration of the Retail and/or Mail Order portions of the program to separate vendors?

Quoted fees are based on an integrated retail and mail service plan. If unbundled, associated fees will change appropriately.

14. Do you offer risk-sharing arrangements, whereby clients' self-fund claims up to a predetermined claim maximum liability? Are there any group size requirements to be eligible for risk sharing arrangements?

Express Scripts is not licensed as an insurance company and is offering a fee-for-service program. However, upon request, we will entertain a risk-sharing program in which we place some portion of our administrative fees at risk. Requirements for these programs may vary from state to state and will be researched and discussed in detail when a specific group or state is indicated and this type of program is requested.

15. Describe how your risk sharing arrangements work. Do you set a targeted incurred claim cost level, and share the claim liability above the targets and the savings below the target? Can the amount or percentage of shared claim liability be varied (i.e. 50%/50%, 75%/25%)? Can the risk sharing arrangement include a maximum liability point (i.e., 120% of expected incurred claims), in which any claim exceeding this point would be the total liability of the carrier?

Express Scripts is not licensed as an insurance company and is offering a fee-for-service program. However, upon request, we will entertain a risk-sharing program in which we place some portion of our administrative fees at risk. Requirements for these programs may vary from state to state and will be researched and discussed in detail when a specific group or state is indicated and this type of program is requested.

16. Describe how targeted incurred claims are determined. Will you allow the client to audit the actual calculations? Are target claim levels based on per capita levels, per member levels, or aggregate levels?

Express Scripts is not licensed as an insurance company and is offering a fee-for-service program. However, upon request, we will entertain a risk-sharing program in which we place some portion of our administrative fees at risk. Requirements for these programs may vary from state to state and will be researched and discussed in detail when a specific group or state is indicated and this type of program is requested.

17. For how many clients do you currently provide risk-sharing arrangements? When was the first such arrangement implemented?

Express Scripts does not provide risk-sharing for any of its clients.

District Council 37 Health & Security Plan
October 12, 2004

20

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002581

18. As an alternative to sharing claim liability, are you willing to put a portion of your retention charges or administrative fees at risk in connection to stated claim costs savings estimates that are made in your proposal? If so, please explain in detail. Will the amount of retention charges/administrative fees at risk be set on a dollar for dollar basis with claim costs that exceed the savings estimate?

Express Scripts is willing to work with the Plan to provide savings estimates based on the pricing options and clinical programs implemented by the Plan.

District Council 37 Health & Security Plan
October 12, 2004

21

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002582

## Prescription Reimbursement

1. **Provide the reimbursement formula that you will guarantee for all members in all locations.**

   Please note that for Multi-Source Brand and Generic drugs the guaranteed discounts are to be expressed on a two tier basis. Tier one includes all drugs containing a HCFA-FUL unit cost price. The Tier one discount needs to be expressed as a guaranteed variance from the HCFA-FUL price regardless of AWP Costs. For tier two, Multi-Source Brand and Generic drugs without HCFA-FUL prices, a straight guaranteed discount from AWP can be provided.

   Express Scripts is offering the Plan three different pricing options. The table below is based on the pricing in the Traditional pricing option. Please refer to the *Pricing Proposal* for detailed information regarding all three pricing options.



| Single Source Brand Drugs * | | |
|---|---|---|
| 1) Discount from 100% AWP | | |
| 2) Dispensing Fee/Rx | | |
| 3) Projected percentage of Total Ingredient Costs | | |
| **Multi-Source Brand and Generic Drugs** | | |
| Tier One – Drugs with HCFA-FUL Prices | | |
| 4) Composite Discount from FUL Price | | |
| 5) Dispensing Fee Per Rx | | |
| 6) Projected percentage of Total Ingredient Costs | | |
| Tier Two – Drugs without HCFA-FUL Prices | | |
| 7) Composite Discount From AWP Price | | |
| 8) Dispensing Fee Per Rx | | |
| 9) Projected percentage of Total Ingredient Costs | | |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002583

## *HCFA-FUL Guarantee – Standard Retail Network*

### Retail

### Single Source Brands

Express Scripts will guarantee a weighted average discount from 100% AWP of at least ███ and an average Dispensing Fee per Rx of no more than ███ for all Single-Source Brands prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ███ and may vary depending on drug mix and utilization.

### Multi Source Brand and Generic Drugs – Tier 1

For all prescriptions (excluding Single Source Brands) where a HCFA-FUL Price exists, Express Scripts guarantees the aggregate discounted ingredient cost will be no more than ███ of the HCFA-FUL Price and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ███ for all brand prescriptions with HCFA-FUL price and no more than ███ for all generic prescriptions with HCFA-FUL price. The actual composite variance achieved by Express Scripts will be calculated by taking the aggregate ESI ingredient cost per unit for these prescriptions divided by the aggregate HFCA-FUL per unit ingredient cost for these prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be ███ and may vary depending on drug mix and utilization.

### Multi Source Brand and Generic Drugs – Tier 2

For all prescriptions (excluding Single Source Brands) where there is no HCFA-FUL Price, Express Scripts guarantees the aggregate discounted ingredient cost from 100% AWP of at least ███ and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ███ for all brand prescriptions that do not have a HCFA-FUL price and no more than ███ for all generic prescriptions that do not have a HCFA-FUL price. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ███ and may vary depending on drug mix and utilization.

### Mail Service

### Single Source Brands

Express Scripts will guarantee a weighted average discount from 100% AWP of at least ███ and an average Dispensing Fee per Rx of no more than ███ for all Single-Source Brands prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ███ and may vary depending on drug mix and utilization.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002584

## Multi Source Brand and Generic Drugs – Tier 1

For all prescriptions (excluding Single Source Brands) where a HCFA-FUL Price exists, Express Scripts guarantees the aggregate discounted ingredient cost will be no more than ▊▊ of the HCFA-FUL Price and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ▊▊ for all prescriptions with HCFA-FUL price. The actual composite variance achieved by Express Scripts will be calculated by taking the aggregate ESI ingredient cost per unit for these prescriptions divided by the aggregate HFCA-FUL per unit ingredient cost for these prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be ▊▊ and may vary depending on drug mix and utilization.

## Multi Source Brand and Generic Drugs – Tier 2

For all prescriptions (excluding Single Source Brands) where there is no HCFA-FUL Price, Express Scripts guarantees the aggregate discounted ingredient cost from 100% AWP of at least ▊▊ and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ▊▊ for all prescriptions that are not Single-Source Brand drugs and that do not have a HCFA-FUL price. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ▊▊ and may vary depending on drug mix and utilization.

These guarantees are based on the implementation on an Express Scripts Network and with a generics preferred program. The maximum annual penalty will be capped at ▊▊ Any overage in one guarantee may be used to offset any shortfall in another guarantee. This guarantee is valid for the first year of the contract. They will be restated for each subsequent year based on factors including but not limited to drugs new to generic status, changes to the HCFA-FUL price if any, and trend.

### Definitions of Discounts:

**\*Single Source Brand** - Stated brand discounts must be based on a percentage off of the lowest priced unit AWP listed for the drug and dosage dispensed at the time of service (per First Databank)

**MS Brand and Generics** - All FUL discounts are minimum guarantees based on HCFA-FUL unit cost in effect at time of adjudication and reflected in First databank.

All AWP discounts are Minimum Guarantees based on the actual 11 digit NDC dispensed. All discount guarantees must be independently verifiable by a third party using a nationally recognized source of time sensitive AWP and HCFA-FUL pricing data.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY            ESI-414-00002585

| | | |
|---|---|---|
| **Single Source Brand Drugs** * | | |
| 1) Discount from 100% AWP | ■ | ■ |
| 2) Dispensing Fee/Rx | | |
| 3) Projected percentage of Total Ingredient Costs | | |
| **Multi-Source Brand and Generic Drugs** | | |
| Tier One – Drugs with HCFA-FUL Prices | | |
| 4) Composite Discount from FUL Price | ■ | ■ |
| 5) Dispensing Fee Per Rx | | |
| 6) Projected percentage of Total Ingredient Costs | | |
| Tier Two – Drugs without HCFA-FUL Prices | | |
| 7) Composite Discount From AWP Price | ■ | ■ |
| 8) Dispensing Fee Per Rx | | |
| 9) Projected percentage of Total Ingredient Costs | | |

## HCFA-FUL Guarantee – Restrictive Retail Network

### Retail

### Single Source Brands

Express Scripts will guarantee a weighted average discount from 100% AWP of at least ■
and an average Dispensing Fee per Rx of no more than ■ for all Single-Source Brands
prescriptions. The projected percentage of District Council 37 Health & Security Plan's total
ingredient cost is estimated to be about ■ and may vary depending on drug mix and
utilization.

### Multi Source Brand and Generic Drugs – Tier 1

For all prescriptions (excluding Single Source Brands) where a HCFA-FUL Price exists,
Express Scripts guarantees the aggregate discounted ingredient cost will be no more than
■ of the HCFA-FUL Price and Express Scripts further guarantees an average Dispensing

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY                 ESI-414-00002586

Fee per Rx of no more than ▮ for all brand prescriptions with HCFA-FUL price and no more than ▮ for all generic prescriptions with HCFA-FUL price. The actual composite variance achieved by Express Scripts will be calculated by taking the aggregate ESI ingredient cost per unit for these prescriptions divided by the aggregate HPCA-FUL per unit ingredient cost for these prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be ▮ and may vary depending on drug mix and utilization.

## Multi Source Brand and Generic Drugs – Tier 2

For all prescriptions (excluding Single Source Brands) where there is no HCFA-FUL Price, Express Scripts guarantees the aggregate discounted ingredient cost from 100% AWP of at least ▮ and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ▮ for all brand prescriptions that do not have a HCFA-FUL price and no more than ▮ for all generic prescriptions that do not have a HCFA-FUL price. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ▮ and may vary depending on drug mix and utilization.

## Mail Service

## Single Source Brands

Express Scripts will guarantee a weighted average discount from 100% AWP of at least ▮ and an average Dispensing Fee per Rx of no more than ▮ for all Single-Source Brands prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ▮ and may vary depending on drug mix and utilization.

## Multi Source Brand and Generic Drugs – Tier 1

For all prescriptions (excluding Single Source Brands) where a HCFA-FUL Price exists, Express Scripts guarantees the aggregate discounted ingredient cost will be no more than ▮ of the HCFA-FUL Price and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ▮ for all prescriptions with HCFA-FUL price. The actual composite variance achieved by Express Scripts will be calculated by taking the aggregate ESI ingredient cost per unit for these prescriptions divided by the aggregate HPCA-FUL per unit ingredient cost for these prescriptions. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be ▮ and may vary depending on drug mix and utilization.

## Multi Source Brand and Generic Drugs – Tier 2

For all prescriptions (excluding Single Source Brands) where there is no HCFA-FUL Price, Express Scripts guarantees the aggregate discounted ingredient cost from 100% AWP of at least ▮ and Express Scripts further guarantees an average Dispensing Fee per Rx of no more than ▮ for all prescriptions that are not Single-Source Brand drugs and that do not have a HCFA-FUL price. The projected percentage of District Council 37 Health & Security Plan's total ingredient cost is estimated to be about ▮ and may vary depending on drug mix and utilization.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002587

These guarantees are based on the implementation on an Express Scripts Network and with a generics preferred program. The maximum annual penalty will be capped at ████████ Any overage in one guarantee may be used to offset any shortfall in another guarantee. This guarantee is valid for the first year of the contract. They will be restated for each subsequent year based on factors including but not limited to drugs new to generic status, changes to the HCFA-FUL price if any, and trend.

**Definitions of Discounts:**

**\*Single Source Brand** - Stated brand discounts must be based on a percentage off of the lowest priced unit AWP listed for the drug and dosage dispensed at the time of service (per First Databank)

**MS Brand and Generics** - All FUL discounts are minimum guarantees based on HCFA-FUL unit cost in effect at time of adjudication and reflected in First databank.

All AWP discounts are Minimum Guarantees based on the actual 11 digit NDC dispensed. All discount guarantees must be independently verifiable by a third party using a nationally recognized source of time sensitive AWP and HCFA-FUL pricing data.

2.  In addition to guaranteed discount levels, we are requesting that a guaranteed cost per unit (pill) be provided during the initial plan year for the medications most commonly used by the Plan's participants. We are also requesting that a maximum percentage increase for each of these medications be provided for the second and third years.

    Tables providing the top 100 medications, including dosage, script volume and days supply dispensed during the last plan year are provided on the enclosed data disk as files Top100Actives.XLS and Top100Retirees.XLS.

    Initial year maximum cost and subsequent year maximum increase guarantees are requested for both retail and mail order, and for both brand name and generic medications.

    Express Scripts is providing multiple pricing options based on the plan designs, formulary and clinical programs. Express Scripts is willing to add a guarantee cost per unit once the plan design, formulary and supporting clinical programs have been implemented.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00002588

3.  What is your source for AWP (average wholesale price)?  How often are prices updated?  How often are network ingredient costs, dispensing fees, capitations and out-of-network allowances updated?

Express Scripts uses First DataBank's Blue Book, which is maintained online and updated daily, to determine AWP.

At retail, the AWP for the package size used in filling each prescription is attached to the claim at the time of fill.  Therefore, AWP is not based upon a standard package size.

The applicable AWP for prescriptions dispensed by the mail service pharmacy will be the standard package size, which is 100 units or 16 ounce quantities, or the next larger quantity if such specified quantities are not available.

The offered AWP discounts, administration fees and the dispensing fees included in the *Pricing Proposal* are guaranteed for a ▮▮▮▮▮▮▮▮▮▮ of a signed and fully executed Pharmacy Benefit Management Agreement.

## Capitation

Express Scripts is not licensed as an insurance company and is offering a fee-for-service program.  However, upon request, we will entertain a risk-sharing program in which we place some portion of our administrative fees at risk.  Requirements for these programs may vary from state to state and will be researched and discussed in detail when a specific group or state is indicated and this type of program is requested.

## Out-of-Network

The Plan's benefit design also allows members to be reimbursed for prescriptions filled by out-of-network pharmacies.  The member pays full price for the prescription at the point-of-service and submits a paper claim along with the pharmacy receipt for reimbursement to Express Scripts.

Express Scripts does not determine usual and customary (U&C) pricing for out-of-network pharmacies.  U&C is a price determined by each pharmacy for that day.  It is the price the pharmacy would charge a cash customer for a particular drug.

4.  Verify that your AWP discounts on brand name prescriptions at retail and mail order will be guaranteed based upon a discount percentage applied to the lowest unit cost for the strength and form of drug being dispensed on the fill date.

The AWP discounts at retail and mail service are based upon a discount percentage applied to the prescription dispensed on the fill date.

District Council 37 Health & Security Plan
October 12, 2004

28

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY             ESI-414-00002589

5. Verify that all of the AWP discounts contained in your proposal will be guaranteed for the term of the contract, based on the AWP from First Databank on the date that the medication is dispensed.

Yes. Quoted fees and services (other than Disease Management administered via LifeMasters®) are valid for ▮▮▮ from the date of the proposal; such fees are thereafter guaranteed for the term of a ▮▮▮ contract.

LifeMasters® quoted fees are subject to annual revision on anniversary date of 6-1-05.

6. What percent of your network pharmacy contracts will include the "lesser of retail price, MAC price or discounted price" provision? _____ % How do you determine that plan members always receive this lowest price? What procedures are established to ensure that the pharmacy is in compliance with this provision?

One hundred percent (100%) of Express Scripts' network pharmacy agreements include the "lesser of retail price, MAC price, or discounted price." Furthermore, the Express Scripts Pharmacy Provider Agreement contractually requires all network pharmacies to submit the current U&C price as of the date the claim was submitted for processing, including any cash discounts as applicable. The U&C price is a NCPDP standard field and the claim will receive an online rejection for failure to submit this price.

## Price Determination

The Express Scripts online adjudication system will price the claim at the lower of contracted rate or U&C price, except in instances where the member is paying the full cost of the medication (zero balance due from the client). In that case, the member will pay the lower of the U&C price or their plan copay. If the pharmacy submits a U&C price lower than any contracted rate (AWP, MAC, etc.), the system will adjudicate the claim at the lower price. The Express Scripts Audit and Compliance Team also tracks U&C fill rates and maintains these statistics as an audit trigger. Chain and independent pharmacy U&C fill rates are compared to peer group fill rates as well as the Express Scripts book-of-business rates and outliers identified and targeted for intervention. As needed, Express Scripts' auditors also contact pharmacies anonymously to obtain cash prices to verify against current claims submission amounts for outlier pharmacies. Specialized audit techniques are performed on pharmacies identified as having below normal U&C rates.

## Compliance Through Audits

Pharmacy compliance is also ensured through the Express Scripts network auditing program. This aggressively managed quality assurance and educational system has been designed to increase the overall effectiveness and quality of our pharmacy networks. The

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002590

pharmacy audit program involves ongoing review of the entire claims database, identification of outlier claims and several audit procedures. The end result is the best performing network pharmacies available for use by our clients and their members.

7. **Will you guarantee on a dollar for dollar basis that the average, realized AWP discounts for brand and generic drugs and quoted dispensing fees will be no less than those quoted at Retail and Mail Order for the life of the contract?**

The brand medication discounts and brand and generic dispensing fees quoted in this proposal are guaranteed on a dollar-for-dollar basis. In addition, Express Scripts guarantees that if the retail U&C pricing is lower than our guaranteed brand medication discount or generic MAC price, the additional savings accrued will be passed on to the Plan.

8. **Is the guarantee discount a minimum guarantee or a fixed guarantee? In other words, if some network pharmacies provide greater discounts are they passed on to the client?**

Our discount is a fixed guarantee that will not change if network pharmacies provide greater discounts. Every prescription will adjudicate at the lower of your proposed AWP discount, MRA rate, or the usual and customary charge determined by the pharmacy.

## Pass-Through Versus Guaranteed (i.e., "spread") Pricing

Express Scripts is prepared to offer either pass-through or spread pricing. We work with plan sponsors to determine the pricing arrangement that best fits their needs.

Most retail pharmacy networks are contracted with different stores receiving different rates. For example, one store (or chain of stores) might be contracted to offer brand drugs at AWP minus 13% plus a $2.20 dispensing fee; another might contract at AWP minus 11% plus a $2.50 dispensing fee.

In a pass-through arrangement, the plan sponsor is billed at the rate negotiated for the store at which the prescription is filled. This arrangement means that the overall discount and dispensing fee charges will depend on which stores the plan's members utilize.

Some plan sponsors prefer a fixed or guaranteed discount and dispensing fee across all stores. The difference between the amount the store is paid and the plan sponsor is billed is sometimes referred to as "spread." When a plan sponsor is billed more than the pharmacy is paid, the spread is "positive;" when a plan sponsor is billed less than the pharmacy is paid, the spread is "negative." When averaged by utilization across all the stores in a network, the overall spread may be positive or negative.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002591

Negative spreads are generally offset by other sources of PBM revenue. Generic fill rates tend to increase over time, and the spread is typically positive for generics (i.e., PBMs pay pharmacies less than they bill the plan sponsor). Thus, PBMs using spread pricing may set their brand discounts such that they lose money during the first year of a contract, and make it back in later years. This approach may be advantageous to the plan sponsor, as it incentivizes the PBM to promote generic products. Note that because pass-through pricing eliminates the possibility to offset negative brand spread with positive spread on generics, pass-through brand discounts are typically not as deep as the brand discounts available with spread pricing.

Some PBMs accept "ancillary" funding from pharmacy manufacturers to promote specific brand products. These funds can be used to offer deeper brand discounts than would otherwise be possible. Note, however, that such funding does not incentivize the PBM to promote the use of generic drugs, and therefore may not be in the plan sponsor's overall interest. Because we seek to align our interests with those of our plan sponsors, Express Scripts does not accept pharmaceutical manufacturer funding for programs promoting the use of specific drugs.

9. **Will your organization offer straight pass through pricing on discounts and rebates for both retail and mail order? If so, describe the nature of the arrangement.**

Express Scripts has included a pass through pricing option in the *Pricing Proposal*. Please refer to the *Pricing Proposal* for terms and conditions of the pass through pricing option.

10. **Identify all sources of revenue, and the reason for such revenue, which will be received by your company as a direct or indirect result of your work performed under contract with the Plan. Include any income received from any source, including pharmacies, drug manufacturers and any other person, corporation or group interacting with your company.**

Express Scripts provides clients with a detailed disclosure of our sources of revenue and financial relationships with drug manufacturers through our 10Q report. A copy of this report has been provided in *Exhibit I*.

11. **Quantify the value of the lesser of provision (U&C) in terms of additional percentage savings above stated discount percentages?**

Express Scripts identifies the values of U&C to be up to an additional ███ discount off the brand AWP. U&C is not controlled by any PBM and is subject to change at any time by the pharmacy providers. U&C is driven solely by the competitiveness of the pharmacy provider's marketplace for a specific drug at a specific time in order to create walk-in business for their store. Client is not charged the dispensing fee on U&C claims.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002592

12. **Does your organization have specific alliances with, business interests or any financial interest in any retail pharmacy providers?  If yes, describe in detail the nature of the alliance and possible impacts/benefits to the Plan.**

No.  Express Scripts does not have specific alliances, business interests or any financial interest in any retail pharmacy providers.

13. **Does your organization own any stock or interests in any drug manufacturers?  If yes, describe in detail the nature of the interest(s).**

No.  Express Scripts does not own any stock or interests in any drug manufacturers.

14. **Do any manufacturers or pharmacies own any stock or interest in your organization?**

No.  Drug manufacturers do not own any stock or interests in Express Scripts.  Express Scripts stock is publicly traded on the NASDAQ as ESRX.  NYLIFE, LLC, a wholly owned subsidiary of New York Life Insurance Company, owns approximately 15.03% of Express Scripts stock and Capital Research and Management Company owns approximately 13.66% of Express Scripts stock.  Capital Research and Management Company provides investment advice to the Growth Fund of America, which owns an additional 5.9% of Express Scripts stock.

15. **Do you retain any spread between payments made to network pharmacies and what the client ultimately is charged for each claim?  If so describe in detail and quantify the additional AWP discount percentage which you retain and provide language in your agreements with the pharmacies which describes what type of spreads are taken from the local pharmacies.**

Yes.  The Express Scripts network contracting process is structured in such a way that Express Scripts can be assured of achieving the most attractive pricing in any given geographic area.  As a result of this process, Express Scripts negotiates terms for reimbursement with both chain and independent pharmacies.  These terms typically vary between chain and independent, as well as by region.  The rates ultimately reflect the relative leverage of the parties in the negotiation for a given geographic service area.  This, in concert with Express Scripts' buying cooperative approach, assures us of attaining an attractive cost basis in any given service area where a substantial client presence is maintained.

The guaranteed AWP discounts and dispensing fees proposed to the client for the proposed network are not equal to the actual contracted prescription reimbursement agreement each network pharmacy has with Express Scripts.  Typically, the network pharmacy has agreed to accept a deeper discount from AWP than the discount from AWP being offered to the client.  The network pharmacies generally receive a higher average retail dispensing fee (averaged between brand and generic) than the guaranteed

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY                ESI-414-00002593

dispensing fee offered to the client. Express Scripts refers to the differential between the guaranteed discounts and dispensing fees and the network pharmacy-contracted discounts and dispensing fees as spread (positive or negative). The impact of spread in the pricing formula allows Express Scripts to fund, at the point of sale, a portion of the expense incurred administering the plan while providing market-competitive discounts, dispensing fees, administrative fees, and rebate-sharing arrangements.

Pharmacists cannot charge more than the amount determined by the Express Scripts online adjudication system, which uses all components of the member's benefit set-up. All Express Scripts retail network pharmacies have contractually agreed to set reimbursement levels. Please refer to the cost quotation for your proposed pricing.

16. **With respect to all pricing formulas presented, will you agree to permit an audit, by client representatives, at your expense, of any portion of your operations that impact on the Plan's contract including but not limited to verification of reimbursement prices shown in this proposal?**

We have provided a Pharmacy Management Fund of up to ▮▮▮▮ and the Plan can utilize this to offset the expenses associated with an audit. Please refer to the Pricing Proposal for detailed information regarding the Pharmacy Management Fund.

Express Scripts recognizes the importance of sponsors ensuring the integrity of their business relationship by engaging from time to time in audits of their financial arrangements with Express Scripts. We will make every reasonable effort to address sponsor concerns by facilitating a responsive and responsible audit process.

Provided that a PBM agreement has been duly executed by the sponsor and sponsor's account does not reflect a delinquent balance at the commencement or during an audit, sponsor may inspect prescription drug claims data and billing records relating to the prescription drug program once each year.

If sponsor selects an auditor that also has been appointed by Express Scripts' shareholders to conduct the independent audit of Express Scripts, then such firm must provide to Express Scripts a letter stating that such engagement performed on behalf of sponsor shall in no way infringe upon said firm's independence with respect to Express Scripts' audit. Such letter must be signed by the audit firm and approved by the engagement audit partner performing the Express Scripts audit. In the event Express Scripts in good faith believes that is has a conflict of interest with the auditor, Express Scripts shall have the right to require that sponsor use another auditor to conduct the audit.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00002594

All audits shall be conducted in accordance with Express Scripts' Audit Protocol. Please refer to *Exhibit 2*. All audits will be conducted during normal business hours at Express Scripts' offices upon 30 days prior written notice. Due to extraordinary demands placed on Express Scripts' staff during the annual renewal period of December and January, no audits may be initiated or conducted during these months. ████████████ The audit's scope must stay within the standard audit protocol. Audit materials or documentation Express Scripts provides will be confined to sponsor-specific information. Contractual information (e.g., reimbursement rates and fees) concerning pharmacies and other providers of products and services, which is proprietary and confidential to Express Scripts, will not be disclosed to the sponsor or auditor.

## Audit Confidentiality Agreement

Before an approved third-party auditor conducts an audit, Express Scripts requires the auditor to sign a standard confidentiality agreement. (A sample confidentiality agreement is provided as *Exhibit 3*.) If the sponsor or the third-party auditor requests member information, we construe that request as the sponsor's authorization to disclose member information to the auditor. The sponsor is required to indemnify Express Scripts against any liability from that disclosure.

17. **Describe the Retail network pharmacy reimbursement process in detail. If out-of-network benefits are to be offered, describe how out-of-network providers are reimbursed. Do you determine and define a "reasonable and customary" charge for medications from out-of-network pharmacies?**

Express Scripts processes over ████ of network claims electronically. Standard pharmacy remittances are paid twice a month in a 30-day average time frame that is based on Express Scripts' receipt of a valid claim. Remittances are scheduled daily according to the standard Express Scripts remittance schedule, subject to change at Express Scripts' sole discretion. Scheduled reimbursement dates for pharmacy providers are pre-determined sequentially for chain pharmacies and by state codes for independent pharmacies.

Participating pharmacies can receive remittance detail via paper, cartridge, or file transfer protocol (FTP). Remittances are mailed from Express Scripts via Zip Mail and the United States Postal Service.

Payments made to pharmacies include all prescriptions filled by the store or chain regardless of the client.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002595

## Out-of-Network

The Plan's benefit design also allows members to be reimbursed for prescriptions filled by out-of-network pharmacies. The member pays full price for the prescription at the point-of-service and submits a paper claim along with the pharmacy receipt for reimbursement to Express Scripts.

Express Scripts does not determine usual and customary (U&C) pricing for out-of-network pharmacies. U&C is a price determined by each pharmacy for that day. It is the price the pharmacy would charge a cash customer for a particular drug.

18. **Are there financial incentives to network pharmacies, physicians and other providers that are tied to utilization rates, compliance goals, quality of care outcomes or other performance results? If so, please explain and include any incentive-based dispensing fees, bonuses, withholds, retroactive capitations, etc.**

Selected Express Scripts networks are negotiated to align incentives and reimburse retail pharmacies with higher dispensing fees for generics vs. brands. Also, Express Scripts' network pharmacies can receive performance incentives based on maximization of generic utilization. Participating pharmacies receive generic incentives for exceeding the Express Scripts base generic fill rate (i.e., all of prescriptions dispensed, the percentage of prescription dispensed with generics). These rates are determined by the network's average generic fill rate of prescriptions dispensed the previous quarter. When a pharmacy fills a generic over a brand product, Express Scripts responds by increasing the generic dispensing fee based on the current generic incentive fee scale.

It is important to note that savings amounts realized by plan sponsors as a result of a pharmacy's increase in generic fill rate varies widely and is impacted by a broad variation in factors such as client size, geographic location, plan design (i.e., mandatory generics), population (i.e. retirees) and therapeutic mix (the mix of expensive or less expensive drugs and drug strengths used by the plan sponsor's covered members). However, given the typical cost difference of ▓▓ between multi-source brands (i.e., brands with a generic equivalent available) and their generic counterparts, promoting the use of generics represents a significant opportunity for savings to the plan sponsor.

19. **Are there instances where members would be charged the greater of discounted ingredient costs plus dispensing fee or the plan copayment amount? If yes, will you be willing to waive this provision at retail and mail order?**

No. Members of the Plan will continue to receive the lower of ingredient costs plus dispensing fee or the Plan's copayment amount. The Express Scripts online adjudication system will price the claim at the lower of contracted rate or U&C price, except in instances where the member is paying the full cost of the medication (zero balance due

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002596

from the client). In that case, the member will pay the lower of the U&C price or their plan copay.

It is important to note that your members will <u>never</u> pay more than an uninsured customer would pay at the retail pharmacy.

## Mail Services

Express Scripts administers a minimum charge in the mail service pharmacy. This minimum charge is priced on a per claim basis and affects relatively few mail service claims. It is important to note that the claim will not be rejected at the mail service; the claim price will simply be adjusted to the minimum charge. Also, the member will never pay more than their standard copayment. Should members have any questions regarding the minimum charge, all of our Patient Care Advocates are trained to answer questions.

20. **Describe any financial incentives you are willing to offer the Plan based on increased Internet refill utilization and/or automated phone system refill in recognition of the inherent cost savings.**

The Plan is currently realizing savings through their current benefit design utilizing a mandatory mail program.

21. **What pricing basis do you propose at mail order for capsules, tablets (unit base) and liquids (oz.)?**

Express Scripts uses First DataBank's Blue Book, which is maintained online and updated daily, to determine AWP. Express Scripts selected First DataBank for its technological capabilities, its ability to update daily and for the accuracy of the data.

The applicable AWP for prescriptions dispensed by the mail service pharmacy will be the standard package size, which is 100 units or 16 ounce quantities, or the next larger quantity if such specified quantities are not available.

The ability to use a source other than First DataBank for AWP depends on the source.

22. **Provide an example, using actual drugs and current AWP prices, of the proposed mail order pricing basis when:**

A.  Stated pricing basis quantities are available

B.  Stated pricing basis quantities are not readily available

Please refer to *Exhibit 4* for the requested analysis.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002597

23. **How many distinct MAC listings do you currently administer? What are their average AWP discount yield levels based on latest available data?**

   We maintain multiple MRA lists, the majority of which are client specific MRA lists. Express Scripts recommends the use of our standard MAC/MRA list. Express Scripts MRA pricing provides discounts off generic AWPs up to ███████ with an overall average ranging between ███████ off generic AWPs. The actual effective rate that any client may see could vary from the overall effective discount estimated by as much as ███████ due to utilization and drug mix.

24. **Provide the name, location, and ownership information of the mail order facility that will be servicing this account.**

   Express Scripts' mail service program was established in 1986. We own and operate mail service facilities located in St. Louis, Missouri; Tempe, Arizona (2); Albuquerque, New Mexico; Philadelphia, Pennsylvania; Troy, New York; and Harrisburg, Pennsylvania. The Plan's members will continue to utilize our Harrisburg facility for mail service prescriptions.

25. **Will you guarantee a minimum MAC Generic discount at Retail and Mail Order? If yes, what discount levels will you guarantee for the full contract term?**

   Express Scripts is offering multiple pricing options with various discounts and MAC guarantees. Please refer to the *Pricing Proposal* for pricing options and MAC guarantees.

26. **Complete the following table based on the MAC list being proposed for the Plan:**



27. **Provide the number of generic products for which you have a MAC price for each MAC list you administer. What percentage of all generics dispensed does this represent?**

   As of September 1, 2004, the standard Express Scripts MAC/MRA list covers ███████ (GCNs), representing ███ individual drugs and/or combinations, and approximately ███████ active NDCs. An MRA list contains individual drugs and/or drug combinations,

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002598

as well as different dosages for an individual drug. Therefore, an individual drug may appear on an MRA list as two or three entries, one for each strength and/or dosage form. Express Scripts' MRA list includes a significantly larger number of products as compared to other PBMs.

**28. What is the current weighted average MAC Price per day of therapy for all generic drugs dispensed in your retail pharmacies for the last 12 months?**

Express Scripts does not measure and track a weighted average MAC price per unit because it is dependent upon the number of drugs on the MAC list. We cover a significantly larger number of products on our MAC list as compared to other PBMs and greater than ▓▓▓▓▓▓ of all submitted generic prescriptions are subject to Express Scripts' MAC pricing. The bottom line is that the Express Scripts' MAC list saves our clients money.

**29. Does your MAC listing include Multi-Source Brand drugs? If yes, what is the average AWP discount realized on these products? Will you pass these additional savings along to the Plan?**

Yes. If the plan design supports the inclusion of multi-source brand drugs and the appropriate DAW codes are utilized, (that is a mandatory generic program is in place) then the multi-source brand equivalent of each generic drug on the MAC list will be subject to MAC pricing, unless the brand is specifically excluded from the MAC.

Express Scripts uses First DataBank to determine which products are generic, single-source and multi-source. For multi-source products that have a MAC price, the ultimate billed classification is dependent on the generic program in place (mandatory, restricted, voluntary). When there is no ancillary penalty charged to the member, the drug is priced as a brand. When an ancillary charge (a restricted or mandatory generic program) is applied, then the drug is priced as a generic.

**30. Can you customize your MAC price list for this client? Would the savings increase if select pharmacies were removed from the network for this client? If so explain and quantify additional savings.**

Express Scripts does not recommend customizing our MRA/MAC price list for the Plan because the MAC list is created and maintained to ensure that all parties (such as the client and pharmacy) receive a fair and equitable price. Express Scripts is offering the Plan a pricing strategy using our Express Scripts networks. The ultimate goal is to reduce the cost of prescriptions to the member and limiting network access reduces the price of the prescription and increases savings. We would not recommend implementing a more deeply discounted MRA because that would serve to discourage pharmacies from encouraging generic utilization.

District Council 37 Health & Security Plan
October 12, 2004

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002599

**31. Do your MAC price lists vary contractually between network pharmacies? If yes, why?**

No. The Plan's maximum reimbursement amount is consistent no matter what pharmacy the member visits.

**32. Do you retain any "spread" between MAC pricing obtained at retail pharmacies versus MAC discounted costs billed to clients?**

Yes. The guaranteed AWP discounts and dispensing fees proposed to the client for the proposed network are not equal to the actual contracted prescription reimbursement agreement each network pharmacy has with Express Scripts. Typically, the network pharmacy has agreed to accept a deeper discount from AWP than the discount from AWP being offered to the client. The network pharmacies generally receive a higher average retail dispensing fee (averaged between brand and generic) than the guaranteed dispensing fee offered to the client. Express Scripts refers to the differential between the guaranteed discounts and dispensing fees and the network pharmacy-contracted discounts and dispensing fees as spread (positive or negative). The impact of spread in the pricing formula allows Express Scripts to fund, at the point of sale, a portion of the expense incurred administering the plan while providing market-competitive discounts, dispensing fees, administrative fees and rebate-sharing arrangements.

Pharmacists cannot charge more than the amount determined by the Express Scripts online adjudication system, which uses all components of the member's benefit set-up. All Express Scripts retail network pharmacies have contractually agreed to set reimbursement levels. Please refer to the enclosed *Pricing Proposal* for details about the pricing being offered.

**33. Do plans/members always pay the MAC price for applicable generics regardless of the pharmacies acquisition costs?**

The member will pay the lesser of U&C, MAC and the AWP discount.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY      ESI-414-00002600

## Formulary Savings and Rebates

1. **Do you currently administer a voluntary, incentive based or mandatory formulary for retail and mail order clients? If yes, you must complete the formulary management section of the questionnaire. [provide rebate information separately for retail and mail order, if applicable]**

Yes. Express Scripts works with its clients in a consultative capacity to design a prescription drug benefit program that meets the client's needs. The Plan can balance choice and cost management through the applied formulary benefit design. Express Scripts offers the following formulary benefit plan designs:

*Standard* — A standard formulary benefit allows members to receive non-formulary brands without any financial penalty. Pharmacists receive online messaging that identifies preferred brand alternatives for the prescribed non-formulary drug.

*Incented* — This formulary benefit encourages the use of preferred brand alternatives by giving members a financial incentive to request preferred brands. Higher copays are applied to claims for non-formulary drugs. The Plan currently utilizes a three-tier benefit using the Express Scripts National Preferred Formulary.

*Closed* — In the case of a closed therapeutic class, only formulary alternatives are covered by the pharmacy benefit. While non-formulary drugs are not covered, members can still receive them by paying the full price.

2. **What dollar rebate per prescription will you offer the plan sponsor at retail and mail order? What percentage of the total expected rebate does this amount represent?**

| | | | | |
|---|---|---|---|---|
| Voluntary (open) Formulary: | | | | |
| Incentive Based Formulary: | | | | |
| Mandatory (closed) Formulary: | | | | |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002601

| | | |
|---|---|---|
| Voluntary (open) Formulary: | ██████████████████ | |
| Incentive Based Formulary: | ████ | ████ |
| Mandatory (closed) Formulary: | ████ | ████ |

*Rebate must be expressed as a percentage of all Rxs dispensed.*

3. **The guarantee of minimum rebate and percentage amount is guaranteed for [_____] number of plan years.**

   Express Scripts' proposed rebates are guaranteed for the duration of ████████ with a signed and fully executed Pharmacy Benefit Management Agreement.

4. **Confirm that the guaranteed minimum rebate is provided for all prescriptions dispensed (retail and mail).**

   Confirmed. The guaranteed minimum rebate is provided for all prescriptions dispensed (retail and mail).

5. **Formulary drugs represent what percent of all prescriptions dispensed for plans with an open formulary program? Retail _____% , Mail Order_____%.**

   Express Scripts' formulary drugs comprise ████████ of the number of medications dispensed and ████████ of total prescription costs, based on book-of-business statistics. These percentages do not vary based on retail versus mail service utilization.

6. **Do you receive any manufacturer revenues in addition to formulary rebates? If so:**

   A. **Define in detail what services are performed in exchange for these revenues.**

   B. **What was the total amount of this revenue in calendar year 2003?**

   C. **Are these revenues shared with clients?**

   The development of Express Scripts' formularies is independent of any manufacturer influence or input. Formulary support programs, such as Drug Choice Management, which encourage the use of low cost generics and formulary brands, are done without any outside manufacturer funding.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002602

*PRESCRIPTION REIMBURSEMENT*

7. **Please provide your formulary drug switching success rates in the following format: A therapy start means a member has not yet filled a prescription for the drug in question. A non-start means a member that has filled a prescription for the drug in question :**

Retail (Therapy Starts)_____%

Retail (Non-Starts)       _____%

Mail Order (Therapy Starts)_____%

Mail Order (Non-Starts)     _____%

DCM will shift from physician letters, faxes, and/or calls to letters informing patients about savings opportunities. With the exception of generic substitution programs for chemically equivalent drugs, we will no longer be contacting physicians to request a change to prescriptions. Instead, we will rely on informed patient choice. Letters to patients will include information on possible savings and how to ask a physician about making a prescription change. This transition will be complete by 10/1/2004.

DCM will shift from targeting retail and mail prescriptions to targeting only mail prescriptions in communicating with patients about opportunities to save money when clinically appropriate.

8. **Do you receive formulary rebates from manufacturers of generic drugs? If yes, verify that these rebates will also be returned to the Plan at the same level as rebates derived from brand name medications.**

No. Express Scripts receives rebates from manufacturers on brand drugs only. Please refer to the *Pricing Proposal* for the specific details on the rebate program offered to the Plan.

9. **Will you provide 100% pass through to the Plan on all rebates and manufacturer market share/marketing allowance?**

Express Scripts negotiates separate manufacturing data fees that are not included in the rebate calculation. Express Scripts contracts with manufacturers to provide certain services and computer software related to rebate program administration. These arrangements are separate from rebate agreements. Express Scripts charges fees for these services and software licenses. These fees, which we retain, do not exceed ██ percent of the AWP of the drugs for which rebates are payable under our agreements.

Express Scripts retains ████ of the manufacturer's data fees for all of the pricing options offered to the Plan in our *Pricing Proposal*. However, we are willing to provide alternative pricing options in which Express Scripts would share the manufacturer's data fees with the Plan if you choose to pursue this route.

District Council 37 Health & Security Plan
October 12, 2004

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY                ESI-414-00002603

Cost Per Day by AHFS Therapy Class Analysis

**10.** Based on your standard open formulary and current claims data, complete the table below using the AHFS codes indicated:

## *Book of Business Statistics*

| | | | | | |
|---|---|---|---|---|---|
| 240400 Cardiac | 240400 Cardiac Drugs | ■ | ■ | ■ | Amiodarone HCL, Flecainide Acetate, Propafenone HCL |
| 240600 Antilipemic | 240600 Antilipimec Agents | ■ | ■ | ■ | Lipitor, Zocor, Pravachol |
| 280804 NSAIDS | 280804 NSAIDs | ■ | ■ | ■ | Vioxx, Celebrex, Bextra |
| 281604 Antidepressants | 281604 Antidepressants | ■ | ■ | ■ | Zoloft, Effexor XR, Fluoxetine HCL |
| Antivirals 81800 520406 (Ophthalmic) 840606 (topical anti inflammatory) | 081800 Antiretrovirals | ■ | | | Valtrex, Pegasys, Combivir |
| 40000 Antihistamines | 040000 Antihistamines | ■ | ■ | ■ | Allegra, Zyrtec, Clarinex |
| 564400 (retired) 561600 (digestants) 562400 (old H2) GI Drugs | 562800 Antiulcer Agents and Anti Suppressants | ■ | ■ | ■ | Nexium, Prevacid, Omeprazole |
| 82200 Quinolones (retired) | 081218 Quinolones | ■ | | ■ | Levaquin, Ciprofloxacin HCL, Cipro |
| 682092 (Misc. antidiabetic) Antidiabetic | 682000 Antidiabetic Agents | ■ | ■ | ■ | Actos, Metformin HCL, Avandia |
| 81212 Macrolides | 081212 Macrolides | ■ | | ■ | Zithromax, Biaxin XL, Biaxin |
| 100000 Antineoplastic | 100000 Antineoplastic Agents | ■ | ■ | ■ | Gleevec, Tamoxifen Citrate, Temodar |
| 81228 Hypotensives (wrong Number, correlates with antiantifungals) | 240800 Hypotensive Agents | ■ | ■ | ■ | Clonidine HCL, Catapres-TTS3, Catapres-TTS2 |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00002604

## COST PER DAY BY AHFS THERAPY CLASS ANALYSIS

| | | | | | |
|---|---|---|---|---|---|
| 281608 Antipsychotics | 281608 Antipsychotic Agents | ■ | ■ | ■ | Zyprexa, Seroquel, Risperdal |
| 81216 Penicillins | 081216 Penicillins | ■ | ■ | ■ | Amox TR/Potassium Clavulanate, Augmentin ES-600, Augmentin XR |
| 681604 Estrogens | 681604 Estrogens | ■ | ■ | ■ | Premarin, Prempro, Vivelle-DOT |

### DC 37-Specific Statistics

| | | | | | |
|---|---|---|---|---|---|
| 240400 Cardiac | 240400 Cardiac Drugs | ■ | ■ | ■ | Amiodarone HCL, Digoxin, Digitek |
| 240600 Antilipemic | 240600 Antilipmec Agents | ■ | ■ | ■ | Lipitor, Zocor, Pravachol |
| 280804 NSAIDS | 280804 NSAIDs | ■ | | ■ | Vioxx, Celebrex, Bextra |
| 281604 Antidepressants | 281604 Antidepressants | ■ | ■ | ■ | Zoloft, Effexor XR, Paroxetine HCL |
| Antivirals 81800 520406 (Ophthalmic) 840606 (topical anti inflammatory) | 081800 Antiretrovirals | ■ | | | Valtrex, Copegus, Combivir |
| 40000 Antihistamines | 040000 Antihistamines | ■ | ■ | ■ | Allegra, Zyrtec, Clarinex |
| 564400 (retired) 561600 (digestants) 562400 (old H2) GI Drugs | 562800 Antiulcer Agents and Anti Suppressants | ■ | ■ | ■ | Nexium, Prevacid, Aciphex |
| 82200 Quinolones (retired) | 081218 Quinolones | ■ | ■ | ■ | Levaquin, Ciprofloxacin HCL, Avelox |
| 682092 (Misc. antidiabetic) Antidiabetic | 682000 Antidiabetic Agents | ■ | ■ | ■ | Actos, Metformin HCL, Avandia |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002605

COST PER DAY BY AHFS THERAPY CLASS ANALYSIS

| | | | | | |
|---|---|---|---|---|---|
| 81212 Macrolides | 081212 Macrolides | █ | █ | █ | Zithromax, Biaxin XL, Biaxin |
| 100000 Antineoplastic | 100000 Antineoplastic Agents | █ | █ | █ | Casodex, Iressa, Xeloda |
| 81228 Hypotensives (wrong Number, correlates with antiantifungals) | 240800 Hypotensive Agents | █ | █ | █ | Clonidine HCL, Catapres-TTS3, Catapres-TTS2 |
| 281608 Antipsychotics | 281608 Antipsychotic Agents | █ | █ | █ | Zyprexa, Seroquel, Risperdal |
| 81216 Penicillins | 081216 Penicillins | █ | █ | █ | Amox TR/Potassium Clavulanate, Amoxicillin, Augmentin XR |
| 681604 Estrogens | 681604 Estrogens | █ | █ | █ | Premarin, Estriol, Estrace |

*Average rebate per prescription is proprietary information.

**Note:** District Council 37 has lower generic penetration for GI drugs and NSAIDs compared to Book of Business numbers due to their OTC Exclusion policy. This policy does not allow coverage of prescription medication when an OTC medication is available in a lower strength, thereby excluding medications such as omeprazole, ibuprofen, and naproxen. Express Scripts has recommended a revision of this policy plus implementation of Step Therapy so the Fund can maximize generic savings in these categories.

## Book of Business Statistics

| | | | | | |
|---|---|---|---|---|---|
| 240400 Cardiac | 240400 Cardiac Drugs | █ | █ | █ | Amiodarone HCL, flecainide Acetate, Propafenone HCL |
| 240600 Antilipemic | 240600 Antilipemic Agents | █ | █ | █ | Lipitor, Zocor, Pravachol |
| 280804 NSAIDS | 280804 NSAIDs | █ | █ | █ | Celebrex, Vioxx, Bextra |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002606

COST PER DAY BY AHFS THERAPY CLASS ANALYSIS

| | | | | | |
|---|---|---|---|---|---|
| 281604 Antidepressants | 281604 Antidepressants | ■ | ■ | | Zoloft, Effexor XR, Fluoxetine HCL |
| Antivirals 81800 520406 (Ophthalmic) 840606 (topical anti inflammatory) | 081800 Antiretrovirals | ■ | ■ | ■ | Valtrex, Combivir, Trizivir |
| 40000 Antihistamines | 040000 Antihistamines | ■ | | ■ | Allegra, Zyrtec, Clarinex |
| 564400 (retired) 561600 (digestants) 562400 (old H2) GI Drugs | 562800 Antiulcer Agents and Anti Suppressants | ■ | ■ | ■ | Nexium, Prevacid, Omeprazole |
| 82200 Quinolones (retired) | 061216 Quinolones | ■ | ■ | ■ | Cipro, Levaquin, Tequin |
| 682092 (Misc. antidiabetic) Antidiabetic | 682000 Antidiabetic Agents | ■ | ■ | ■ | Actos, Metformin HCL, Avandia |
| 81212 Macrolides | 061212 Macrolides | ■ | ■ | | Zithromax, Biaxin, Biaxin XL |
| 100000 Antineoplastic | 100000 Antineoplastic Agents | ■ | ■ | ■ | Tamoxifen Citrate, Methotrexate, Arimadex |
| 81228 Hypotensives (wrong Number, correlates with antiantifungals) | 240600 Hypotensive Agents | ■ | ■ | ■ | Clonidine HCL, Catapres-TTS3, Catapres-TTS2 |
| 281608 Antipsychotics | 281608 Antipsychotic Agents | ■ | ■ | | Zyprexa, Seroquel, Risperdal |
| 81216 Penicillins | 081216 Penicillins | ■ | ■ | | Amox TR/Potassium Clavulanate, Amoxicillin, Augmentin XR |
| 681604 Estrogens | 681604 Estrogens | ■ | ■ | ■ | Premarin, Prempro, Femhrt |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002607

COST PER DAY BY AHFS THERAPY CLASS ANALYSIS

## DC 37-Specific Statistics

| | | | | | |
|---|---|---|---|---|---|
| 240400 Cardiac | 240400 Cardiac Drugs | ■ | ■ | ■ | Amiodarone HCL, Flecainide Acetate, Digoxin |
| 240600 Antilipemic | 240600 Antilipemic Agents | ■ | ■ | ■ | Lipitor, Zocor, Pravachol |
| 280804 NSAIDS | 280804 NSAIDs | ■ | ■ | ■ | Celebrex, Vioxx, Bextra |
| 281604 Antidepressants | 281604 Antidepressants | ■ | ■ | ■ | Zoloft, Effexor XR, Paroxetine HCL |
| Antivirals 81800 520406 (Ophthalmic) 840606 (topical anti inflammatory) | 081800 Antiretrovirals | ■ | ■ | ■ | Combivir, Viread, Sustiva |
| 40000 Antihistamines | 040000 Antihistamines | ■ | ■ | ■ | Allegra, Zyrtec, Clarinex |
| 564400 (retired) 561600 (digestants) 562400 (old H2) GI Drugs | 562800 Antiulcer Agents and Anti Suppressants | ■ | | | Nexium, Prevacid, Aciphex |
| 82200 Quinolones (retired) | 081218 Quinolones | ■ | ■ | ■ | Cipro, Levaquin, Tequin |
| 682092 (Misc. antidiabetic) Antidiabetic | 682000 Antidiabetic Agents | ■ | ■ | | Actos, Metformin HCL, Avandia |
| 81212 Macrolides | 081212 Macrolides | ■ | ■ | | Zithromax, Biaxin, Biaxin XL |
| 100000 Antineoplastic | 100000 Antineoplastic Agents | ■ | ■ | | Tamoxifen Citrate, Casodex, Arimedex |
| 81228 Hypotensives (wrong Number, correlates with antiantifungals) | 240600 Hypotensive Agents | ■ | ■ | | Clonidine HCL, Catapres-TTS3, Catapres-TTS2 |
| 281608 Antipsychotics | 281608 Antipsychotic Agents | ■ | ■ | | Zyprexa, Seroquel, Risperdal |
| 81216 Penicillins | 081216 Penicillins | ■ | ■ | ■ | Amox TR/Potassium Clavulanate, Amoxicillin, Penicillin V Potassium |

District Council 37 Health & Security Plan
October 12, 2004

47

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002608

COST PER DAY BY AHFS THERAPY CLASS ANALYSIS

| | | | | | Premarin, Prempro, |
|---|---|---|---|---|---|
| 681604 Estrogens | 681604 Estrogens | | | | Estrace |

*Average rebate per prescription is proprietary information.

Note: District Council 37 has lower generic penetration for GI drugs and NSAIDs compared to Book of Business numbers due to their OTC Exclusion policy. This policy does not allow coverage of prescription medication when an OTC medication is available in a lower strength, thereby excluding medications such as omeprazole, ibuprofen, and naproxen. Express Scripts has recommended a revision of this policy plus implementation of Step Therapy so the Fund can maximize generic savings in these categories.

11. What is the estimated percent savings in reduced brand ingredient cost if members are 100% compliant with your standard formulary? Express as a percent of average retail brand ingredient cost/Rx.

Depending on client, plan design, drug mix and other factors, the estimated savings is ███ percent. As DC37 already has ███ formulary compliance, achieving ███ compliance would result in savings a the lower range of this estimate.

12. If you require a formulary management fee, indicate amount or percentage proposed. Provide each fee or administrative charge separately.

Express Scripts does not anticipate a charge for formulary management as part of our pricing offer.

13. Other than the fees noted above do you guarantee that 100% all rebates collected be passed through to this client?

Express Scripts agrees to pass through ███ of the rebates collected.

14. Will you agree to an AWP per day guarantee arrangement whereby the Plan's AWP per day of therapy amounts by AHFS code would be predetermined based upon your review of retrospective data?

Express Scripts is providing multiple pricing options based on plan designs, formulary and clinical programs. Express Scripts is willing to provide a guarantee arrangement once plan design and supporting clinical programs are implemented.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00002609

## Premium Rates and Administration Fees

1. Confirm that your rates/fees are guaranteed for the twelve-month period beginning on the policy effective date. Confirm that your rates/fees will be guaranteed for each succeeding full twelve-month period. Verify that this provision will be included in your contract.

   Yes. Quoted fees and services (other than Disease Management administered via LifeMasters®) are valid for ▮▮▮▮▮ from the date of the proposal; such fees are thereafter guaranteed for the term of a ▮▮▮▮▮ Pharmacy Benefit Management Agreement. The pricing quoted is contingent on the execution of a definitive agreement.

   LifeMasters® quoted fees are subject to annual revision on anniversary date of 6-1-05.

2. What underwriting requirements are imposed in conjunction with any premium/fee guarantee offered in question #1?

   The following underwriting requirements apply:

   - Pricing will be effective on 01/01/2005 or upon execution of contract, whichever is later.

   - Express Scripts will be the exclusive provider of PBM services.

   - None of the membership to be enrolled is based on a 100% copayment benefit plan.

   - This price quotation is subject to an acceptable credit review and is contingent on execution of a definitive contract.

   - Express Scripts reserves the right to amend the price quotation set forth herein if there is a material change in the number of persons included in the prescription drug program or any material change in the benefit plan from that which was originally presented to Express Scripts and upon which this price quotation is based.

   - Quoted fees and services (other than Disease Management administered via LifeMasters®) are valid for ▮▮▮▮▮ from the date of the proposal; such fees are thereafter guaranteed for the term of a ▮▮▮▮▮ contract.

   LifeMasters® quoted fees are subject to annual revision on anniversary date of 06/01/2005.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002610

3. Confirm that your contract will include a provision stating that changes in the premium structure for the coverage in force may be instituted only as of a renewal rate anniversary.

Not applicable as Express Scripts is not offering a premium structure but a fee for service pricing arrangement.

4. Confirm that your contract will provide for 90 days' advance written notice of renewal rates.

Yes. Express Scripts will provide 90-days advance written notice of renewal rates.

5. When are premiums/fees due and what is the grace period for payment of premium under your policy? If premium is paid beyond the grace period, is a penalty and/or interest charge assessed? If yes, please explain in detail. Are there any options available with respect to the grace period? If so, please explain the option(s) and any charge that is made for them.

Express Scripts will continue to bill the Plan at the end of each billing period, three times per month, for our program fees less any credits. Payment from the Plan will continue to be via wire transfer.

## Past Due Payments

Past due payments refer to payments that remain unpaid by the predetermined due date of the applicable invoice. Standardly, any amounts not paid by the due date thereof shall bear interest of the rate of prime + 2% per annum based on the Wall Street Journal as of the due date being imposed, or if lower, the highest rate permitted by law. In the event that a client's account is past due for two consecutive months, Express Scripts may require a deposit in an amount equal to the average monthly invoice amount for the previous three months, or if three months of history is not available, the actual billing history.

In our relationship with the Plan.

6. What portion of the administrative expenses would you be willing to index to the general CPI index for renewal calculations?

Express Scripts is offering multiple pricing options.

7. **Will you guarantee trend factors, per capita claim costs for specific therapies or any other factors used in future policy renewals? If so, explain financial implications and terms.**

Express Scripts typically does not guarantee trend factors, per capita claims for specific therapies used in future renewals as your member demographics, drug mix, drug utilization and physician prescribing patterns may vary. However, we can provide analysis and make recommendations to assist you in cost-saving measures based on data and utilization we obtain each plan year. Express Scripts also tries to come to arrangements that align interests and incentives so that we only make money when the client saves money.

## Trend Management Programs

We offer two Trend Management program alternatives with guaranteed savings: The goal of our programs is to manage Sponsor's drug trend via effective cost management techniques.

Enhanced Trend Package, which includes a base set of trend programs that are available individually at no additional charge plus an expanded set of programs available for an additional package fee and with a maximum savings guarantee.

Individual Trend Programs, which allows any combination of programs, including the base components offered in the Enhanced Trend Package.

Based on the current District Council 37 Health & Security Plan, Express Scripts guarantees measurable annual pharmacy cost savings of ███████ for the clinical and trend services listed below. Additional, Express Scripts will include Step Therapy modules for DMARDs, Symbyax, and Other Antidepressants as part of the Enhanced Trend Package price of ██████ Savings guarantee is based on current participation in the PICA program and 90-day limit on PPI coverage. Guaranteed savings apply to selected programs where there is a clear and measurable connection between the intervention and the resulting change in drug spend. Implemented across the ██████ lives in the District Council 37 Health & Security Plan Program, annual guaranteed savings would total approximately ██████

District Council 37 Health & Security Plan
October 12, 2004

51

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002612

| | | |
|---|---|---|
| **Enhanced Trend Package**<ul><li>Basic Trend Programs:<ul><li>Web-Based Member, Physician, and Pharmacist Education</li><li>Concurrent Drug Utilization Review</li><li>Mail Service Promotion</li><li>Prior Authorization – Clinical Base List</li><li>Drug Choice Management</li></ul></li><li>Prior Authorization – Clinical Supplemental List</li><li>Drug Quantity Management<ul><li>Standard per Rx</li><li>Select per Rx (optional)</li><li>Select per day supply (optional)</li></ul></li><li>Step Therapy – Enhanced Trend Package Modules<ul><li>ACE Inhibitors, Angiotensin-2 receptor blockers (ARBs), COX-2 Inhibitors, Non-steroidal anti-inflammatory drugs (NSAIDs), Proton Pump Inhibitors (PPIs), Selective serotonin reuptake inhibitors (SSRIs), Glucophage XR, Leukotriene Pathway Inhibitors, Strattera, Topical Immunodilators</li></ul></li><li>*RapidResponse* Member Support for Step Therapy</li></ul> | ▮▮▮▮ | ▮▮▮▮ |

## Savings Guarantee Notes for Enhanced Trend Package:

1. Program-specific reports will be provided to validate savings generated and annual review and settlement of guarantee performance. Savings are calculated on client drug spend only (net of member copay) and do not include inferred medical savings. Clients are reimbursed ▮▮▮ of any savings shortfall, determined on an annual basis. All savings calculations are based on the methodology described below. Savings calculations do not account for rebate gain or loss that may result from implementation of these programs. However, if client elects to implement this package, rebate guarantees may be reduced.

2. This guarantee represents an aggregate of all trend programs listed. No program will be implemented without client approval. In order to obtain the full savings guarantee, client must agree to the implementation of all programs listed above, as well as to ESI recommended standards for selection of target drugs or therapeutic classes, intervention, criteria, override criteria, and procedure protocols. As part of continuous improvement, ESI may add programs or implement modifications to the programs, including changes in ESI recommended standards, upon prior notice to the client.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002613

3. On an annual basis, programs will be re-evaluated for estimated savings impact in light of changes in clinical practice or market conditions. Any changes to the potential impact of the program in subsequent years will be re-evaluated with the client and the guarantee and fees will be adjusted accordingly based on mutually agreeable terms.

4. If member counts vary by more than ███ or client experiences other demographic changes with a material impact on PMPM drug cost, Express Scripts may adjust the guarantee. ESI has the right to modify the guarantee for clients with restrictive formularies and/or with member cost share of greater than ███.

5. Programs may be implemented at any time without a guarantee, in which case individual program fees will apply.

6. The Savings Calculation Methodology is as follows: Savings for programs in the trend package are based on actual Member edits that occur in the relevant time period. For example, with prior authorization, savings are equal to the number of Members with edits multiplied by the percentage who do not have a claim within 30 days, multiplied by the average client cost per claim and by the average expected number of prescriptions for that drug over the next year (empirically based), then divided by total Member months for the period during which the interventions took place. A full description of the savings methodology for all programs is available from Sponsor's ESI Account Management Team.

7. Pricing and guarantees for programs may need to be adjusted due to PICA coverage.

8. Pricing and guarantees are subject to change for plans than do not cover affected drugs.

| | | |
|---|---|---|
| ███████████████████████████████████████ | | |
| **Drug Choice Management**[1] | ████████ | ████████ |
| A.  Support appropriate selection of cost-effective mail order medications through retrospective member interventions. | | |
| B.  Annual Formulary Notification mailings to affected retail and mail members on maintenance, single-source brands. | | |
| **Drug Quantity Management**<br>Ensure that the quantity of units supplied in each prescription remains consistent with clinical dosing guidelines and a Sponsor's benefit design.<br>•  Standard per Rx<br>•  Select per Rx (optional)<br>•  Select per day supply (optional)<br><br>Note: List of drugs subject to change at the discretion of ESI | ████████ | ████████ |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002614

| | | |
|---|---|---|
| **High Utilizer & Case Management Report** Identifies members who are at high risk for hospitalization or increased medical/pharmacy cost. Drug/disease targeting report including member detail | ▮ | ▮ |
| **Physician Consultation – Client Specific** Express Scripts pharmacists conduct client-specific one-on-one phone consultations with selected physicians. Physician consultation focused on sponsor formulary brand and generic products. | ▮ | ▮ |
| **Prior Authorization–Administrative**[1] Manage plan benefits and drug costs by ensuring appropriate prescribing and use by members<br>  • Non-clinical PA<br>  • Lost/stolen overrides<br>  • Vacation supplies | ▮ | ▮ |
| **Prior Authorization – Clinical Base List** Intervene to support appropriate use at the point of service through pre-established clinical criteria.<br>• Botulinum toxin type A (Botox), Myobloc (botulinum toxin type B)<br>• Epoetin alfa (Epogen and Procrit), Darbopoetin alfa (Aranesp)<br>• Somatropin and Somatrem (growth hormone – Humatope, Nutropin, Genotropin, Norditropin, Nutropin AQ, Saizea, Protropin, and Serostim)<br>• Alpha-1-proteinase inhibitor (Prolastin)<br>• Tretinoin (Retin-A, Avita, Altinac)<br>• Becaplermin (Regranex)<br>• Tazarotene (Tazorac)<br><br>Note: List of drugs subject to change at the discretion of ESI. | ▮ | ▮ |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY    ESI-414-00002615

| | | |
|---|---|---|
| **Prior Authorization – Clinical Supplemental List**<br>Intervene to support appropriate use at the point of service through pre-established clinical criteria.<br>• Antifungals (Diflucan, Lamisil, Sporanox)<br>• Penlac<br>• Wellbutrin SR<br>• Forteo (teriparatide)<br>• Amevive (alefacept)<br>• Remicade (infliximab)<br>• Raptiva (efalizumab)<br>• FluMist<br>• Xolair (omalizumab)<br>• Topamax (topiramate)<br>• Zonegran (zonisamide)<br>• DMARDS (Enbrel, Kineret, Humira)<br>• Provigil<br><br>Note: List of drugs subject to change at the discretion of ESI | ■■■■■ | ■■■■■ |
| **Prior Authorization – Other Clinical Overrides**<br>(e.g. Non-standard prior authorization medications, medical exceptions) | ■■■■■ | ■■■■■ |
| **Step Therapy Enhanced Trend Package Modules**<br>Intervene to support use of less expensive and clinically appropriate medications at the point of service.<br><br>**Or Individual Step Therapy Modules**<br>-ACE inhibitors and Angiotensin-2 receptor blockers (ARBs)<br>-Non-steroidal anti-inflammatory drugs (NSAIDs) and COX-2s<br>-Proton Pump Inhibitors (PPIs)<br>-Selective serotonin reuptake inhibitors (SSRIs)<br>-Metformin<br>-Leukotriene Pathway Inhibitors<br>-Topical Immunomodulators<br>-Strattera<br>-OTC Non-sedating Antihistamines<br>-Xopenex<br>-HMG – Low Dose<br>-Zetia<br>-Other Antidepressants<br><br>Note: Prices for new modules will be established upon development. | ■■■■■ | ■■■■■ |
| **Blood Glucose Meter Program**<br>Retrospective program targeting utilizers of non-formulary strips and providing them with information on free meters that use formulary strips. | ■■■■■ | ■■■■■ |

(1)  Implemented as of effective date. Remaining programs implemented at Sponsor's written option.

District Council 37 Health & Security Plan
October 12, 2004

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002616

## Savings Guarantee Notes for Enhanced Trend Package:

1. Program-specific reports will be provided to validate savings generated and annual review and settlement of guarantee performance. Savings are calculated on client drug spend only (net of member copay) and do not include inferred medical savings. Clients are reimbursed ▮▮▮▮ of any savings shortfall, determined on an annual basis. All savings calculations are based on the methodology described below. Savings calculations do not account for rebate gain or loss that may result from implementation of these programs. However, if client elects to implement this package, rebate guarantees may be reduced.

2. This guarantee represents an aggregate of all trend programs listed. No program will be implemented without client approval. In order to obtain the full savings guarantee, client must agree to the implementation of all programs listed above, as well as to ESI recommended standards for selection of target drugs or therapeutic classes, intervention, criteria, override criteria, and procedure protocols. As part of continuous improvement, ESI may add programs or implement modifications to the programs, including changes in ESI recommended standards, upon prior notice to the client.

3. On an annual basis, programs will be re-evaluated for estimated savings impact in light of changes in clinical practice or market conditions. Any changes to the potential impact of the program in subsequent years will be re-evaluated with the client and the guarantee and fees will be adjusted accordingly based on mutually agreeable terms.

4. If member counts vary by more than ▮▮▮▮ or client experiences other demographic changes with a material impact on PMPM drug cost, Express Scripts may adjust the guarantee. ESI has the right to modify the guarantee for clients with restrictive formularies and/or with member cost share of greater than ▮▮▮▮

5. Programs may be implemented at any time without a guarantee, in which case individual program fees will apply.

6. The Savings Calculation Methodology is as follows: Savings for programs in the trend package are based on actual Member edits that occur in the relevant time period. For example, with prior authorization, savings are equal to the number of Members with edits multiplied by the percentage who do not have a claim within 30 days, multiplied by the average client cost per claim and by the average expected number of prescriptions for that drug over the next year (empirically based), then divided by total Member months for the period during which the interventions took place. A full description of the savings methodology for all programs is available from Sponsor's ESI Account Management Team.

7. Pricing and guarantees for programs may need to be adjusted due to PICA coverage.

8. Pricing and guarantees are subject to change for plans than do not cover affected drugs.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY     ESI-414-00002617

## Alternative Financial Exhibits

[Complete if applicable]

Not applicable.

**Monthly Capitation/Insured Rates:** Provide the monthly capitation premium rates (if applicable). Indicate if the capitation includes mail order benefits.

Policy Year

| Active | Year 1 | Year 2 | Year 3 |
|--------|--------|--------|--------|
| Single | $ | $ | |
| Family | $ | $ | |

Policy Year

| Pre-65 Retirees | Year 1 | Year 2 | Year 3 |
|-----------------|--------|--------|--------|
| Single | $ | $ | |
| Family | $ | $ | |

Policy Year

| Post-65 Retirees | Year 1 | Year 2 | Year 3 |
|------------------|--------|--------|--------|
| Single | $ | $ | |
| Family | $ | $ | |

## Stop Loss or Risk Sharing

| Stop Loss Quotes: Complete if stop loss coverage is requested | | |
|---|---|---|
| | **Year 1** | **Year 2** |
| Aggregate stop loss point | $_____ | $_____ |
| Monthly Premium Rate | | |
| Employee | $_____ | $_____ |
| Dependent | $_____ | $_____ |

**Notes:**
- Rate splits should be based on client feedback or current rate structure.
- Aggregate stop loss point equals per capita dollar amount that caps clients claim liability.
- Any underwriting limitations or requirements can be noted here or in the underwriting issues section of the questionnaire.

District Council 37 Health & Security Plan
October 12, 2004

57

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002618

## Section IV:  Network Access

**Complete the following Table based on current network pharmacy and member zip codes.**

| | | |
|---|---|---|
| 1. (a) Total # of Pharmacies<br>(b) Total # of Members Used in GeoAccess Match<br>(c) Total # of Pharmacies Within 2 Miles to Plan Member<br>(d) Total # Pharmacies Within 5 Miles<br>(e) Average Travel Distance Per Member<br>(f) Number and Percent of Pharmacies with 24-Hour Access | ████████ | ████████ |
| 2. For each zip code within the following counties, from above provide (a-e) (include county totals)<br><br>New York:<br>   • Manhattan<br>   • Queens<br>   • Brooklyn (Kings)<br>   • Bronx<br>   • Staten Island (Richmond)<br>   • Westchester<br>   • Rockland<br>   • Nassau<br>   • Suffolk<br>   • Upstate New York<br><br>New Jersey<br>   • Essex<br>   • Union<br>   • Hudson<br>   • Bergen<br><br>Florida<br>   • Provide separately for each County<br>Puerto Rico<br><br>Provide state-by state for additional locations with members | See spreadsheets *Exhibit 5* entitled *"Counties"* & *"Access by State"* | See spreadsheets in *Exhibit 5* entitled *"Counties"* & *"Access by State"* |

3. **Provide copy of current pharmacy directory (National Directory).**

   Please refer to *Exhibit 6* for an electronic copy of our pharmacy directory.

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY                    ESI-414-00002619

4.  Provide GeoAccess reports for 1 pharmacy within 1 mile of participants residence, 2 pharmacies within 1 mile, and 2 pharmacies within 5 miles.

    Please refer to *Exhibit 5* for the requested GeoAccess reports.

5.  List hours of operations of mail service facility.

    Members of the Plan will continue to utilize our Harrisburg, Pennsylvania mail facility. The operating hours of this facility are 8:00 a.m. – 9:00 p.m., Monday through Friday.

6.  Is your proposed network available nationwide, including Puerto Rico?

    Yes. Express Scripts' network includes Puerto Rico.

7.  Will your organization be able to make available mail order Internet pharmacy access? If so, define guidelines and oversight role of PBM in the process, including compliance with HIPAA regulations.

    Yes. Through Express-Scripts.com for Members new and refill prescriptions may be ordered through Express Scripts Mail Service Pharmacy. After accessing the member portal, members can select between new, refill, transfer, and order status from their homepage. Members may also update their mail service pharmacy member profile or view previous mail service pharmacy orders.

### New Prescriptions

Express Scripts requires a physician signature on all prescriptions dispensed. Once the member logs into the secure member ID and password web page, new prescriptions may be ordered by selecting "New" from the "Prescription Services" listed on the left side of the web page or "Order New" from the "My Prescriptions" drop down menu.

If the member has a written prescription from their physician, the member can print a mail-in form and mail the completed form and prescription to Express Scripts. If the member does not have a written prescription, the member can print or download a fax form and have the prescribing physician fax the completed form to Express Scripts.

### Refills

Refills are ordered by selecting "Refill" from the "Prescription Services" listed on the left side of the web page or "Order Refills" from the "My Prescriptions" drop down menu, after logging into www.express-scripts.com.

A current listing of prescription on file for the member is listed. Prescriptions not available, at that time, for a refill are marked with and asterisk (*). Billing information entered into the member's profile is applied to the order and a refill confirmation page is

District Council 37 Health & Security Plan
October 11, 2004

2

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00002620

displayed for the member to print for their records. If desired, the member can update their profile and/or billing information at any time.

## Transferring Prescriptions

Since orders placed through the Internet are dispensed through our mail service pharmacy, procedures for transition from retail to Express Scripts Mail Service Pharmacy are similar. Members have several choices when transferring prescriptions between PBMs or from retail to mail service:

- Members print or download the prescription order form to forward to their physician and ask him or her to call or fax current prescription to Express Scripts' toll-free mail service number.

- Members contact their physician and ask him or her for a new prescription requesting the maximum days supply allowed by the health plan (90 days maximum) which they can mail to Express Scripts with the printed or downloaded prescription order form at their convenience.

## Checking Order Status

By logging onto www.express-script.com, members can view the status of mail service pharmacy orders. Members can view status by selecting "Order Status" from the "Prescription Services" listed on the left side of the web page or "Check Order Status" from the "My Prescriptions" drop down menu.

## Privacy and Security

Privacy and security issues play an important role in pharmacy benefit management. Members and clients may be assured that confidential information is well protected; Express Scripts has worked diligently and proactively to address these issues using the highest level of security available. Through our collaborations with Express Scripts' Chief Compliance Officer, we ensure that our Internet policies, processes, and products comply with Health Insurance Portability and Accountability Act (HIPAA) provisions as they become finalized.

Express Scripts employs web security standards that include:



HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00002621



Current Client

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00002622

# Exhibit I

# National Prescription Administrators, Inc. (NPA)

### Prescription Benefit Management Program

## UFCW Unions and Employers
## Midwest Health Benefits Fund

### Table Of Contents

|  | Page |
|---|---|
| Executive Summary | 1 |
| **Exhibit B.-Questionnaire** | |
| A. General Description of Services | 6 |
| B. Retail Pharmacy Network | 35 |
| C. Mail Order Prescription Drug Program | 53 |
| D. Prospective and Retrospective Drug Utilization Review | 61 |
| E. MAC Pricing | 82 |
| F. Passive Formulary and Manufacturers' Rebates | 83 |
| G. Innovative Approaches | 88 |
| H. Pricing Formulas and Fees | 103 |
| **Exhibit D-Top Pharmacy Chains** | |
| **Exhibit E-Top 15 Drugs** | |
| **Exhibit F-Top 30 Generic Drugs** | |
| **Exhibit G** | |

| Exhibits | Section |
|---|---|
| NPA Corporate Organizational Chart | 1 |
| Sample Administrative Invoice and Brochure | 2 |
| Sample Administrative Contract | 3 |
| Pharmacy Listing for the State of Illinois | 4 |
| Eligibility Tape Format | 5 |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

March 13, 2000

Ms. Deborah Mechanik
Senior Health Analyst
The Segal Company
101 North Wacker Drive
Suite 500
Chicago, IL 60606-7376

RE:    UFCW Unions and Employers Midwest Health Benefits Fund RFP

Dear Deborah:

National Prescription Administrators® (NPA) is pleased to submit our proposal to administer an integrated retail prescription drug card and mail order program; for UFCW Unions and Employers Midwest Health Benefits Fund. NPA is a union-based company with a strong presence in the Midwest as well as nationally. We are focused on superior service and excellence in overall performance. Our local Chicago based account management team is prepared to implement this program for UFCW Unions and their members effective September 1, 2000.

NPA's strength is our commitment to unions. We are proud of our members who are active in AFSCME Council 90. These members are pharmacists, pharmacy technicians, data and card production staff, as well as support staff. NPA's expertise with Taft-Hartley Health and Welfare Funds is firmly grounded with 21 years of experience. As an independent pharmacy benefit manager, our focus is the UFCW's best interest in managing the Fund's prescription dollars. Other PBM's are focused on parent pharmaceutical sales and shift of market shares to their products (the implementation dollars offered by pharmaceutically owned PBM's are at the cost of increased use of expensive products; when other manufacturers have clinically equivalent brands), parent companies in the retail pharmacy business; that are encumbered by corporate goals of increasing utilization and/or financial problems within the chain structure, and parent companies that are insurance product driven. NPA has successfully switched and managed union accounts such as the State of Illinois, Mack Truck and the Peoria School District from other PBM's. Our mission is clear and the beneficiaries are the Trustees, union leadership and members of UFCW Unions and Employers Midwest Health Fund.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002641



Ms. Deborah Mechanik
March 13, 2000
Page 2

NPA's number one ranking for overall performance and customer service by the Pharmacy Benefit Management Institute for a fourth consecutive year came from positive feedback of the above accounts as well as AFSCME Chapter 31, IBEW Local 701, IBEW Local 364, Plumbers Local 130, Pipefitters Local 597 and UFCW funds. NPA works in a focused and collaborative manner with pharmacies that have the common mission of serving our customers; we offer flexibility with networks and pharmacies that are union friendly. Our proposal includes cost savings in ingredient costs, competitive dispensing fees, guaranteed rebates for both retail and mail and competitive administrative fees and discounts. NPA is a proven leader with a singular mission superior performance and customer service; while managing the Fund's pharmacy dollars and trend in drug spend. We are prepared to partner with our union brothers and sisters in UFCW Unions and Employers Midwest Health and Benefit Fund. I am available at (630) 969-1439.

Respectfully,

*Raj A. King*

Raj A. King
Director of Sales

Cc: Allen A. Ehrhardt, Senior Vice President, The Segal Company
     Rob FitzPatrick, Vice President of Labor Accounts
     Ellen Perlman, Senior Vice President of Sales and Marketing
     Chris Ruegg, Vice President of Sales

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002642



6

## A.    General Description of Services

1.    Please state the name and address of your organization.

National Prescription Administrators, Inc.
711 Ridgedale Avenue
East Hanover, New Jersey 07936

2.    Please state the location of the office which will be responsible for services provided to the Fund.

Servicing of the Fund's plan, including account management and customer service issues will be handled by our regional office in Chicago, Illinois. General servicing including claims processing issues, clinical services (drug utilization review, formulary, disease management, MAC programs), provider enrollment, pharmacy HelpDesk, provider audit, systems, data management, financial issues and mail service pharmacy issues will continue to be handled from NPA Corporate Headquarters in East Hanover, New Jersey.

3.    How is your organization structured?    What is the form of the organization (corporation, proprietorship, etc.)?

NPA as a parent corporation, supports the following companies and divisions. In combination, each provides NPA clients the ultimate in benefit programs.

| Central Fill, Inc. | Mail Service Pharmacy |
|---|---|
| CFI NJ | Mail Service Pharmacy |
| BeneCard Services, Inc. | Third Party Administrator |
| National Plastic Printing, Inc. | Plastic Card Production |
| National Vision Administrators | Vision Plan Administration |
| National Dental Administrators | Dental Plan Administration |

NPA is a totally independent PBM not affiliated with any pharmaceutical manufacturer, HMO or parent company. We are able to objectively manage the Fund's prescription drug program and focus on your needs, rather than the needs of stockholders or parent pharmaceutical companies.

* Unlike PBM's which are owned by pharmaceutical companies, NPA objectively evaluates new and existing drug products and does not needlessly promote more expensive drugs to satisfy parent pharmaceutical companies sales demands.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY      ESI-277-00002643

7

* Unlike PBM's which are owned by large pharmacy chains, NPA has no vested interest in increasing the number of prescriptions, which are dispensed. Consequently, NPA aggressively manages a pharmacy audit program, which focuses on eliminating pharmacy fraud and abuse issues.

  * Unlike PBM's which are publicly traded, NPA focuses on the management of your prescription drug benefit, instead the short-term interests of shareholders.

We have no products to sell only services to provide. Our independent status allows us to focus all of our resources towards serving our clients as opposed to shareholders or unrelated primary business interests. As an independent entity, we sit on the side of the table that results in the best value for NPA clients.

NPA does not enlist the services of any subcontractors for assistance in administering any portion of our point-of-sale retail or mail service programs. We believe the best service can only be delivered by an organization with total control over all facets of your plan. We will not allow our clients' needs to compete with a subcontractor's other clients.

An organizational chart detailing NPA's corporate structure has been included for your review as exhibit 1.

   4.    **Please list the specific officers and employees who will be responsible for the management of this case and their experience and background.**

**Ms. Karen McCartan, Regional Manager,** will be the Fund's Account Manager. Ms. McCartan is located at NPA's regional service office in Chicago, Illinois. She is responsible for the implementation of new clients' plans as well as the ongoing service of current clients. She recommends plan design changes, discusses statistical data, and participates in presentations to both prospective and current clients. She has complete authority regarding the day to day administrative responsibilities of current accounts including, but not limited to: reviewing brochures, enrollment data, pharmacy issues, plan limits and caps, and accounting; providing NPA's eligibility tape format; identifying and resolving discrepancies; and establishing service meeting schedules.

Ms. McCartan joined NPA in 1996 as a Customer Service Representative; was promoted to a Consultant for NPA in which she located and set-up space for the Chicago office, and then to her current position.

Ms. McCartan has previous experience as a teaching assistant at the University of Illinois at Urbana-Champaign and was awarded a university fellowship and teaching award for that year.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002644

8

Ms. McCartan earned a bachelor's degree in Rhetoric and Communications, graduating Summa Cum Laude from Temple University in Philadelphia.

Ms. McCartan will report directly to Ms. Nancy Treglia.

**Ms. Nancy Treglia, Assistant Vice President, Customer Relations,** is responsible for overseeing personnel in NPA's satellite offices and all National Business Coalition on Health (NBCH) accounts.

Ms. Treglia joined NPA in 1990 as a Customer Service Representative. Her display of commitment led to several promotions including Supervisor of Customer Service, Coordinator of Customer Service, Account Executive and then to her current position. She has contributed to the development of many projects and new procedure implementations within the customer service department.

Her prior experience includes 11 years in the retail industry, working at several major department stores for Revlon. Her responsibilities included hiring and training staff, performing inventory control, as well as other duties.

In 1998 Ms. Treglia received the Today's Women In Industry (TWIN) Award for outstanding achievement.

NPA's account servicing team will be supported by the following qualified professionals from each of our operational support areas:

| Clinical Services Team |
| --- |

**Mr. Robert Voytovich, Pharm.D., NPA Senior Vice President, Professional Services,** will be assigned as the Clinical Services Team Leader. Mr. Voytovich is responsible for the management and supervision of NPA's Professional Services activities including drug utilization review programs, patient health management (disease management) initiatives, prior authorization, physician profiling and education programs, formulary initiatives, and provider network development and management. Mr. Voytovich brings 30 years of pharmacy experience to our organization in the retail, hospital and HMO venues. He also serves as a distinguished member of the NPA Pharmacy and Therapeutics Committee. He will report directly to NPA's President and has complete authority to assign additional clinical resources to the Fund's account as necessary.

**Clinical Services Manager – Mr. Peter Grieger, R.Ph., NPA Senior Vice President, Pharmacy Programs,** is assigned to handle daily clinical issues surrounding your program. Mr. Grieger manages all clinical programs including generic programs, utilization review, prior authorization, physician profiling and patient education

9

programs. Mr. Grieger also serves as a member of the NPA Pharmacy and Therapeutics Committee as a specialist in cardiovascular pharmacotherapy.

Mr. Grieger is responsible for the management and supervision of NPA's professional services and professional relations activities. These include Drug Utilization Review programs, Patient Health Management (Disease Management) initiatives, corporate and client drug formulary, new product development and provider network development and support.

He joined NPA in 1987 as Vice President of Professional Services. Mr. Grieger was responsible for drug utilization review and the development and maintenance of drug formulary. He also served as Chairman of NPA's Pharmacy and Therapeutics Committee (P&T) in which he is a member of and is also currently a member of the Quality Improvement Committee (QIC).

Mr. Grieger has 24 years of experience in pharmacy practice and 21 years of experience in prescription benefit program administration. His prior positions include Vice President at Heritage Information Systems, where he developed and implemented Pharmacy Audit Programs; Program Analyst for the Pennsylvania Department of Aging, where he monitored contractor performance in claim processing, provider/claimant enrollment and provider field audits; and Pharmacy Consultant handling retail and commercial insurance for Blue Cross of Lehigh Valley, Blue Cross of Ohio and Pilgrim Health Applications.

Mr. Grieger earned a bachelor's degree from the Philadelphia College of Pharmacy and Science and is a registered pharmacist licensed in Pennsylvania. He is a member of the American Pharmaceutical Association, the Academy of Managed Care Pharmacy, the American Society of Consultant Pharmacists and the Association for Pharmacoeconomics and Outcomes Research.

**Patient Education Manager** – Mr. David Brodsky, R.Ph., Assistant Vice President, Patient Health Management/DUR, is responsible for overseeing the daily operations for Patient Health Management; maintaining and updating current Patient Health Management modules; administrative duties for Demand Management Activities; development of new Patient Health Management Programs; and management of DUR development at NPA's East Hanover facility.

Prior to joining NPA in November of 1998, he was employed with Eger Health Care and Rehabilitation Center of Staten Island as Director of Pharmaceutical Services from 1993-1998. As Director he was responsible for acquisitions, dispensing, storage, control and management of pharmaceuticals and review of all policies and procedures related to the operation of the pharmacy department in New York City.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002646

10

Mr. Brodsky possesses 11 years experience in the health industry. He is an active member of the American Society of Consultant Pharmacists, New York Directors of Long-Term Care, NPA's Pharmacy and Therapeutics Committee and Quality Improvement Committee.

Mr. Brodsky, a registered pharmacist, earned a bachelor's degree in Pharmacy from the Arnold and Marie Schwartz College of Pharmacy in Brooklyn, NY and a master's degree in Public Administration with a focus on healthcare from Long Island University's School of Business in Brooklyn, NY.

**Professional Services Manager - Mr. Ronald J. Smith, R.Ph., NPA Vice President, Clinical Services,** assumes responsibility for all generic pricing, generic appeals and prior authorization issues. He is also responsible for directing, planning and coordinating the professional services department, which encompasses all drug utilization review and generic MAC pricing as well as special claims, prior authorization, formulary management and research grants.

Mr. Smith joined NPA in 1983, beginning as a pharmacist and then advancing to Director, before being promoted to his current position. In addition to his overall responsibilities, he is also currently involved with such projects as the Antibiotic Disease Management Program, the Mandatory Generic Plan, the Therapeutic Plan, Prior Authorization Programs, the Pharmacy and Therapeutics Committee and various Drug Utilization Review projects. Previously, he was a union contract negotiator for health benefits and also has experience in hospital, chain and independent pharmacies.

Mr. Smith serves as a preceptor with Rutgers College of Pharmacy, St. John's University College of Pharmacy and Philadelphia College of Pharmacy externship programs, which develop students' knowledge of prescription benefit management in the areas of Drug Utilization Review, Formulary Management, Patient Health Management and other relative areas.

Mr. Smith earned a bachelor's degree from St. John's University, NY and teaching certification from Montclair State College in NJ. He is a member of the New Jersey Pharmacists Association and the Bergen County Pharmacists Association. Mr. Smith is a registered pharmacist licensed in New Jersey and is also a former member of the New Jersey State Board of Pharmacy.

**Network Services Manager – Mr. Joseph P. Giglietta R.Ph., NPA Assistant Vice President, Professional Relations Department,** is responsible for solicitation, development and communication with NPA's 50,000 credentialled pharmacies nationwide. He also coordinates activities for on-line transmissions from our pharmacy network. His department responds to all inquiries, problems and/or complaints and communicates information on new programs and clients to all participating providers.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002647

11

Mr. Giglietta is also responsible for the solicitation, development and communication with NPA's pharmacies nationwide. His department responds to all inquiries, problems and/or complaints and communicates information on new programs and clients to all participating providers.

Mr. Giglietta brings 28 years of pharmacy experience to NPA. His previous industry experience includes a position as Staff Pharmacist for Genovese Drugs and Field Representative at Hoffman-LaRoche Pharmaceuticals.

In addition, he was employed by Legend Pharmaceuticals, Inc., for ten years, where he served as Secretary, Vice President, Board Member, Executive Board Member, as well as Chairman of various committees. He was founder and president of Regal Pharmacy in New York, where his responsibilities included pharmacy services, healthcare counseling and the supervision and management of pharmacists and sales staff.
Prior to NPA, Mr. Giglietta was employed as Consultant Pharmacy Director for NYLCare Health Plans of New York, Inc., where he played a critical role in identifying and implementing administrative reforms, resulting in cost savings of over one million dollars.

In addition to fulfilling the duties of his current position, Mr. Giglietta is a member of the NPA Quality Improvement Committee (QIC) and the NPA Institute.

Mr. Giglietta earned a bachelor's degree from St. John's University in New York and is a registered pharmacist licensed in New York.

**Formulary Services Manager – Mr. Paul DeBree, R.Ph., NPA Senior Vice President, Industry Relations,** is NPA's Formulary Services Manager. Mr. DeBree is responsible for all formulary decisions and rebate contract negotiations. He reports to Mr. Steve Nicoletos, NPA Executive Vice President, Finance and Administration. He is also responsible for Formulary Programs, Innovative Industry Programs, Joint Ventures, Special Program Development and Contracting.

Mr. DeBree joined NPA in 1992 and has extensive experience with professional relations, audit compliance and drug utilization and evaluation. Mr. DeBree has 26 years of managed pharmacy experience. He serves on several committees at NPA, including the Executive Committee, the Quality Improvement Committee (QIC) and the Pharmacy and Therapeutics Committee (P&T).

Mr. DeBree is a graduate of the University of Connecticut and earned a master's degree from Pepperdine University in Malibu, CA. Mr. DeBree is a registered pharmacist licensed in Connecticut and Texas. He is also a member of the National Council of

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002648

12

Prescription Drug Programs (NCPDP) and the Academy of Managed Care Pharmacy (AMCP).

| Technical Services Team |
| --- |

Mr. **Michael Perry**, NPA's Chief Information Officer, has more than 15 years experience in all phases of systems design and programming for the health care industry. Mr. Perry is responsible for all business process re-engineering initiatives and systems design and implementation. He is also responsible for maintaining the integrity of all systems software, monitoring and testing all program modifications, maintaining the quality of all output products and enforcing and maintaining documentation standards. Mr. Perry led the Y2K team to ensure NPA's Year 2000 and HIPAA compliance.

Mr. Perry will have complete authority to assign additional technology resources to the Fund's account as necessary. Mr. Perry is the recipient of the GIGA Silver Award for knowledge management systems. He also oversees NPA's information technology, data processing and data services departments.

Working in the healthcare industry for 15 years, Mr. Perry joined NPA in 1998 at his present position. He has been familiar with NPA since 1989 from his previous position as Vice President of Planning, Development and MIS at CFI, NPA's mail order facility. There, He was responsible for business process re-engineering initiatives, systems design and implementation.

In 1997 Mr. Perry was honored with the GIGA Silver Award for knowledge management systems and the AIIM Process Innovation Award for healthcare.

Mr. Perry earned a bachelor's degree in Finance/Accounting from Penn State University in Harrisburg, PA.

**Information Systems Manager – Mr. Brendan Rhatigan, NPA Vice President, Data Services,** is NPA's Information Systems Manager. Mr. Rhatigan supervises all data center operations to ensure that communications objectives are met and sound operational standards and procedures are followed. Mr. Rhatigan is also responsible for developing strategic plans for future hardware and software needs to provide support for NPA's growth.

Mr. Rhatigan manages four data centers. He ensures that communication objectives are met and sound operational standards and procedures are followed. Mr. Rhatigan is responsible for developing strategic plans for future hardware and software needs to provide support for NPA's growth.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002649

13

Joining NPA in 1993, Mr. Rhatigan has an additional 24 years experience in data processing management that includes relocating mainframe data centers with minimal downtime and supervising a staff of over 30.

Mr. Rhatigan places high importance on the training of his staff and as a result, has instituted a "Lunch and Learn" program at NPA. These are one-hour classes that include video training on various software packages. He is also a member of NPA's Quality Assurance Committee and is a mentor at St. John's University.

Mr. Rhatigan earned a bachelor's degree from St. Francis College in Brooklyn, NY and an MBA from St. John's University in Staten Island, NY. He is currently working on his dissertation towards completing a doctorate degree in Executive Management from Kennedy Western University in Boise, ID.

**Operations Manager**- Ms. Meelane Mark, NPA Assistant Vice President, Operations, is responsible for NPA's claims operation including subscriber claims screening and batching. She oversees the processing of pharmacy claims from receipt, data entry, processing and final storage. Additionally, Ms. Mark serves as NPA's Internal Auditor. Her responsibilities includes investigation of internal procedures, claims processing and special projects.

**Mail Service Manager** - Mr. Don Schell, R.Ph., President, Central Fill, Inc. (CFI) is NPA's Mail Service Team Leader and is the Founder and President of CFI. He is also Senior Vice President at NPA. He joined NPA as a Corporate Consultant in 1978 and was promoted to his present position in 1987.

Mr. Schell's professional background includes seven years retail chain store management experience with Peoples Drug Stores and 26 years at PAID Prescriptions, beginning as National Director of Pharmacy Audits and then promoted to Vice President and General Manager. While working with NPA as a Corporate Consultant, Mr. Schell was also President of Pennsylvania Prescriptions, Inc.

He also worked extensively with a community pharmacy chain, Emerald Drug Stores, with a specialty in areas of long-term care, home IV therapy and community pharmacy services.

In 1992, Mr. Schell was recognized as Ernst and Young Entrepreneur of the Year.

Mr. Schell earned a bachelor's degree from Temple University in Philadelphia, PA and is a registered pharmacist licensed in Delaware, Pennsylvania and New Jersey.

Mr. Schell assumes overall responsibility for the operation of NPA's two mail service pharmacies.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002650

14

| Financial Services Team |
|---|

Mr. Steve Nicoletos, NPA Executive Vice President, Finance and Administration, is NPA's Financial Services Team Leader. Mr. Nicoletos assumes overall responsibility for NPA's accounting, financial and budgetary functions. He also directs NPA's Human Resources and Purchasing Departments and oversees NPA's finance, legal and human resource departments. He is also responsible for internal auditing, Real Estate and risk management.

Mr. Nicoletos joined NPA in 1984. He was previously employed in public accounting. Prior to that, he was Manager of Accounting Systems for the National Council on Compensation Insurance where he directed the installation and conversion of in-house automated accounting systems.

Mr. Nicoletos earned a bachelor's degree from William Paterson University of New Jersey, and an MBA from Fairleigh Dickinson University. He is a member of the American Institute of CPA's, the New Jersey Society of CPA's and the Institute of Internal Auditors.

**Audit Services Manager – Ms. Laurie Cincola, NPA Assistant Vice President, Audit Programs,** is responsible for all audit services including development, maintenance, and continued enhancement of NPA's audit programs and services as well as procedures, pharmacy claims analysis and fraud detection, electronic systems enhancements and contract audit services.

Ms. Cincola joined NPA in 1997 as the Internal Audit Manager with the finance department. In March of 1998 she was promoted to her current position.

Ms. Cincola has 17 years experience in audit management. Prior to NPA, she was employed by Starlink Communications as General Manager of Operations/Credit Assurance. Ms. Cincola was also employed for over 10 years with AT&T Credit Corporation. She began there as Portfolio Asset Manager, was promoted to Audit Manager, and then Recovery Manager. Her responsibilities as Recovery Manager included the coordination of asset management from the repossession to the sale of equipment, managing and auditing outside collection agencies, negotiating favorable settlements, reviewing national outside collection agency work and facilitating litigation proceedings.

In addition to fulfilling the duties of her current position, Ms. Cincola is a member of NPA's Quality Improvement Committee.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002651

15

Ms. Cincola earned a bachelor's degree in Business Administration from the University of South Florida.

5.    How long has your organization been providing retail pharmacy network services? Mail order prescription drug programs? Prescription drug utilization review (DUR) services?

NPA has been providing retail pharmacy and DUR services since our inception in 1978. Our integrated point-of-service retail/mail service programs have been administered since the founding of CFI in 1980.

6.    If your firm is incorporated, in what state? What is the formal name of your organization as registered in that state?

NPA became incorporated in the State of New Jersey on November 14, 1978 and is registered under the name National Prescription Administrators, Incorporated.

7.    How many clients use your retail pharmacy program and how many covered persons does this represent? How many clients and covered persons use your mail order pharmacy program? Please provide this information for your national program and separately for Illinois.

NPA provides retail pharmacy services to 3,569 sponsoring organizations totaling 7 million covered lives. CFI provides mail pharmacy services to 1,000+ sponsoring organizations totaling 2.9 million covered lives.

NPA provides services to 45 sponsoring locations in the State of Illinois totaling 296,124 covered lives.

8.    Submit a list of at least three multiemployer Taft-Hartley benefit funds for which you are presently providing the types of services for which you are bidding. Please indicate the number of covered members of each, the length of time each has been your client and the name and telephone number of a contact person.

Mr. Wendell W. Young, III
UFCW Local 1776 and Participating Employers
Health and Welfare Fund
3031 B. Walton Road
Norristown, PA 19401
Telephone: (610) 941-9400
Implementation Date: October 1998
12,000 Enrolled Lives
Retail and Formulary Services

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002652

16

Mr. Gerald L. Hill
Administrator
**Local 23 and Employees Benefit Fund**
345 Southpointe Boulevard
Suite 200
Canonsburg, PA 15317
Telephone: (800) 423-3863
Implementation Date: June 1997
7,595 Enrolled Lives
Retail, Mail and Formulary Services

Ms. Eileen Campbell
Information services
**Tri-State UFCW Employee Benefit Fund**
3455 Southpointe Boulevard
Suite 200
Canonsburg, PA 15317
Telephone: (724) 743-4260
Implementation Date: November 1999
Enrolled Lives:
Retail, Mail and Formulary Services

9. **Have the services of your firm been terminated by any client during the past three (3) years? If so, please provide the names, addresses, phone numbers and contact persons for the three largest clients which have terminated and the reasons for which they terminated.**

Mr. Tommy Teague
Administrator
**Pennsylvania Employees Benefit Trust Fund**
150 South 43rd Street
Suite 1
Harrisburg, PA 17111-5700
Telephone: (717) 561-4750

Mr. Tony Roberts
Claims Administrator
**Philadelphia American Life Insurance Company**
200 West Lake Park Boulevard
Suite 1341
Houston, TX 77079
Telephone: (281) 368-7381

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002653

17

Ms. Eleanor Tilson
Administrator
1199 National Benefit Fund
for Health and Human Service Employees
330 West 42nd Street
6th Floor
New York, NY 10036
Telephone: (212) 307-7500

10.    Do you carry comprehensive general and professional liability insurance? In what amounts? And with whom?

Yes. NPA and CFI maintain the following liability coverage:

| Carrier | Type of Coverage | Events Covered | Limits Conditions |
|---|---|---|---|
| American Motorists Insurance Company | Commercial General Liability | General Aggregate | $2,000,000 |
| | | Products Comp/Op Agg | $2,000,000 |
| | | Personal Injury | $1,000,000 |
| | | Each Occurrence | $1,000,000 |
| | | Fire damage (Any one fire) | $1,000,000 |
| | | Medical Expenses (Any one person) | $100,000 |
| | Automobile Liability | Combined Single Limit | $1,000,000 |
| | Fire & Allied | | Replacement Cost |
| | Employee Dishonesty | Theft/Embezzlement | Up to $1,000,000 |
| Federal Insurance Company | Umbrella Policy | Each Occurrence | $20,000,000 |
| | | Aggregate | $20,000,000 |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002654

18

| Carrier | Type of Coverage | Events Covered | Limits Conditions |
|---------|------------------|----------------|-------------------|
| American Manufacturers Mutual Insurance Company | Workers Compensation an Employers Liabilit | Each Accident | $100,000 |
| | | Disease- Policy Limit | $500,000 |
| | | Disease – Each Employee | $100,000 |

11.  Would you include in the contract a hold harmless provision that relieves the Trustees and the Fund of any liability resulting from a dispute or difference of opinion between your organization and the members participating in the program?

Yes. NPA will include in the contract a hold harmless provision that relieves the trustees and the Fund of any liability resulting from a dispute difference in opinion between our organization and the members participating in the program.

NPA is responsible for, and agrees to indemnify and hold harmless, the Fund from damages to property or injuries, (including death) to any person(s) and any other losses, damages, expenses, claims, demands, suits and actions by any party against the Fund based on the negligence of NPA.

We are willing to hold harmless the Fund from damages related to our negligence. Our job is to prudently manage the Fund's prescription dollars according to the plan design and plan parameters approved by the trustees. Disputes arising from members, where NPA is not at fault, will most likely be a result of dissatisfaction with the plan requirements. In this instance, hold harmless would not apply.

12.  Does your organization mandate plan design? If yes, in what way?

No.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002655

19

13.   Please describe in detail the methods available for the Fund to remit ingredient costs, dispensing fees, and administrative costs. Are the bills for administrative fees submitted to the Fund Office separately from the ingredient costs and dispensing fees?   Which method do you recommend to the Fund?

Claims are paid to pharmacies and members three times per month, on approximately the first, 11st and 21st calendar days of the month. Cleared funds from the client must be available in NPA's Claims Payment Account on these specified days in an amount sufficient to cover the checks issued. Clients have three methods by which to fund the payment of their claims:

1. Wire Transfer - Under the wire transfer arrangement, an NPA representative will call and/or fax a request to wire transfer funds for claims that have been processed in the current check cycle. The summary total page will also be faxed to substantiate the request for funds. The client then wires this money to NPA on either the same day or no later than the next business day.

2. Deposit Account - Under the deposit account method, the client leaves an amount on deposit with NPA equal to the estimated monthly claims dollar amount. NPA will use this money to fund the checks that are sent to pharmacies and members on each tri-monthly payment cycle. After the third cycle, approximately the 27th of each month, NPA will send a reconciling statement of the deposit account to the client, itemizing the amount of claims paid and the amount of funds received. Then, the deposit must be replenished to bring the account back to the required deposit level by the first of the following month, so that funds are available for the first payment cycle.

The initial deposit account is computed by multiplying the number of eligible members by the estimated average prescription cost per member. Once the plan has been operational for a few months, the deposit is adjusted to reflect actual claims activity.

3. ACH Direct Debit - NPA has the ability to directly debit client bank accounts through the Automated Clearing House. This method works in the same way as a wire transfer, except NPA rather than the client, initiates the transfer. The ACH Direct Debit process begins with written authorization from you indicating the name and transit routing number of your financial institution and your account number. When we receive the agreement, we can begin immediately.

Clients are provided with a "Valid Prescription by Cardmember" and "Prescription Summarized by Member" Report, which lists the individual prescriptions received by members at the end of the month. The reports provide a complete audit trail of the

20

individual prescriptions, the members who received the prescriptions, the pharmacies used and the reference number that NPA used to pay the claims. This report can be sent to you either with each payment cycle or at the end of the month.

An invoice for administrative fees payable to NPA will continue to be sent monthly after the third claims payment cycle, (approximately the 21st of each month). This is due by the first of the following month. There is no grace period. Under the terms of the NPA contract, no late charges will be assessed. However, if sufficient funds are not available to cover the payment cycle, provider and member reimbursements cannot be made. Should the Fund choose to utilize a third party administrator NPA can forward the invoice to the administrator.

No. Bills for administrative fees are not submitted separately from the ingredient costs and dispensing fees.

    **14.    Is your billing submitted on tape, diskette or hard copy?**

Administrative billing statements will be mailed to the Fund on hard copy. Claims payment tapes are available at a charge of ▉ per tape.

    **15.    Please provide a sample contract for an integrated retail and mail order prescription drug program.**

NPA's sample administrative contract has been included for your review as exhibit 2.

    **16.    Provide samples of your standard reports which permit analysis of the retail drug program and the mail order drug program and which display the results of your drug utilization review program. Is there a charge for your standard reports? Are ad hoc reports available, and, if so, at what cost?**

The Retrospective DUR Program uses numerous management reports that aid in the screening of member utilization patterns to ultimately target members for DUR intervention. The specific reports include:

**Drug Usage Report.** This report allows the user to rank members according to predetermined utilization criteria. Each client specific report lists the members identification number (social security number) and members name (last name, first name). Members are ranked in order of resource utilization by the following criteria:

- Total amount paid
- Number of prescriptions
- Average dollar amount per prescription

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002657

- Number of pharmacies visited
- Number of different drugs appearing on the member's profile (NDC count)
- Predominant therapeutic category appearing on the member's profile
- Percent generic drugs prescribed
- Percent controlled drugs prescribed
- Percent of drugs refilled too soon

NPA's DUR staff use this report to identify members who exhibit a questionable utilization pattern that may result in an intervention.

**Ten Day Report** is a screening tool used to identify those members who exhibit a utilization pattern that may be reflective of a fraud or abuse situation. Specifically this report lists all members who meet the following screening criteria:

- More than ten prescriptions received within a ten day period
- More than $500 expended within a ten day period
- More than three pharmacies utilized within a ten day period
- More than four controlled substances obtained within a ten day period

Each of these parameters can be changed to meet different review objectives or to increase or decrease the number of members listed.

**NEHATCH Report.** This report can be selected for a specific client or all clients. It is drug specific to the NDC number level and lists all members who have obtained the selected drug during the pre-selected time period. The data includes name and NDC number of the selected drug, name and identification number of all members who have received the target drug, member's gender and birthdate, number of pharmacies used, number of prescriptions dispensed, dollar amount paid and the prescribing physicians (up to three) by DEA number. This report is useful in identifying users and members of specifically targeted drugs.

**NEABUSE Report** can be selected for a specific client or all clients. It is therapeutic category specific and lists all members (and dependents) that have obtained one or more drugs from the target category during the specified time frame. The report sorts members in the same fashion as the previously described Drug Usage Report.

**Therapeutic Category Usage Report.** This screening tool lists members receiving drugs from two specifically identified therapeutic categories concurrently. It is useful in identifying members who may be the subject of a potential drug/drug or drug/disease interaction.

**Abnormal Quantity Usage Report** can be selected by specific drug (NDC number) or therapeutic category. It lists all members who have received the selected drug or

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002658

22

therapeutic category in a quantity above or below the pre-selected level. This report allows the user to screen members for potential non-compliance to critical drug regimens. Usage above a specified quantity level may be indicative of a possible non-compliance (overutilization) or abuse situation. Usage below a specified quantity level may be indicative of a possible non-compliance (underutilization) situation. The report data includes:

- Name of the member
- Gender
- Date of birth
- Quantity
- Date of the first claim
- Member DEA number (up to a total of three)

NDC Frequency Report ranks the top 200 drugs used in the plan. Ranking may be selected by dollar amount or by claim volume. This report assists in the development of cost management strategies directed toward specific drugs.

Therapeutic Category Frequency Report is a version of the NDC Frequency where the top therapeutic categories are listed.

Standard DUR reports are included in our administrative fees. Ad hoc reports will be billed based in your needs.

17. Can your organization provide on-line access to utilization data? Can you provide management reports that can isolate the components of cost increases in the prescription drug benefit? For example, increases in utilization, development of trends, physician outliners, high patient utilizers and/or possible abusers? Is there an extra fee for any of them?

NPA offers the Fund two primary on-line query systems to obtain information:

**I) Script-Data™ Ad-Hoc Reporting System**

One of the advantages of an on-line, real time connection into the NPA system is the ability for any of your plans or sites to generate member profiles and to manipulate the data within the profile in seconds and at the touch of a button. Member profiles list the physician and pharmacy as well as all claims history and eligibility information. Before printing a profile, data can be sorted by drug, therapeutic category, physician, pharmacy and date of service.

ScriptData™ is NPA's PC based data management system, allowing clients to have both summary and detailed information at their fingertips. Utilizing a user friendly "point

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002659

23

and click" interface, the user can easily retrieve information on their plan for any number of uses:

- Identify areas where cost saving interventions can be made
- Identify physicians prescribing high-cost and non-formulary drugs
- Identify physicians whose prescribing falls outside the norm for their specialty
- Evaluate the effect of plan design on expenditure and utilization
- Identify costly disease states that would benefit from management programs
- Evaluate utilization among sites/locations/clients using HEDIS guidelines

A mouse click on any button will give the related "data cascade." The cascade you choose is entirely dependent on the task at hand. For example, if you are interested in seeing which disease states represent the greatest cost and utilization, you would enter the "Diagnosis Analysis" cascade. Similarly, if you are interested in evaluating Formulary compliance or generic utilization among plan physicians, you would choose either the "Physician Ranking" or "Specialty Analysis" cascade.

Within each area, you can drill down to achieve greater detail. The Diagnosis Analysis provides the user with a comparison of disease states/conditions and the cost and drug utilization of each. You can easily view those drug classes, which make up the treatments for a particular disease state, by double clicking on the condition of interest. At this level, you can see how differing treatments compare in terms of cost and utilization frequency. In this example, you can see that calcium channel blockers (CCB) are used twice as often as ACE inhibitors. CCBs are more expensive per day and per claim to use. In many cases there are therapeutic reasons for lower utilization of less expensive options.

The drugs within any selected class are another double-click away. This screen illustrates how closely related drugs are being utilized in comparison with each other. This can be useful in identifying formulary/non-formulary utilization within a class of drugs.

In addition to identifying the use of particular drugs, you can identify who is prescribing them. For example, you can identify those doctors prescribing non-formulary or high cost medications. By accessing their address or fax number (included in the ScriptData™ distribution), you can create a merge file for use with a word processor to create targeted communication pieces.

Associated within each doctor's record is an "intervention tracking system" which allows the user to record for, and the outcome of, any physician contact. Reports can later be generated as reminders of due follow-ups or an assessment of productivity or program success.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     ESI-277-00002660

24

Other data cascades within ScriptData™ work similarly. As you can see, ScriptData™ can provide you with all the data needed to more effectively manage your prescription benefit expenditures. Minimum hardware requirements for ScriptData™ include a 486 based processor running at 33mHz with at least 12MB RAM. Hard disk requirements vary with group size. Slower machines may be used to run ScriptData™; however, there will be a degradation of performance speed.

## II) On-line Access to NPA's Prescription Data for On-line, Real-time Queries:

NPA has on-line ad hoc reporting capabilities via a Seagate crystal reporting application which can run in WEB browsers. This on-line, real time query capability will provide a window of access to prescription program experience. NPA has developed this reporting tool to analyze several areas of prescription benefit plans including clinical, utilization and financial management, and executive summary reporting.

NPA's ad hoc reporting system will allow the Fund to query a variety of criteria specific for your needs including: paid claims data, physician, pharmacy, patient and drug information for your entire book of business or by plan location.

This unique capability will permit the Fund to schedule reports, retain results and download or export these results for a specific time period in a variety of formats.

Costs are relative to the Fund's access requirements.

NPA, in our commitment to offer a cost-effective prescription program and provide the highest quality of healthcare available, produces the following standard reports for clients. The reports, available as noted, are designed to offer at-a-glance, substantial information regarding the experience of the plan. The reports also are used to evaluate the program and to plan for future cost savings. NPA's experts are available to help in the analysis.

All claims information becomes part of a client specific data base and is used to generate management reports and analyze the plan's experience NPA's standard reports meet the basic needs of our clients. However, NPA leads the industry in providing special reports upon clients' request.

Our commitment for any report that adds to our standard package is to absorb the design and programming cost of that report. Reports that do not fit in their category are charged based on the resources needed to produce the report.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002661

25

# FINANCIAL REPORTS

The following comprehensive reports are provided after each claims payment cycle and reflect the plan's complete experience during that time, and are included with the monthly invoice statement.

- **Valid Prescription By Member:** Identifies identification number, name, date of service, prescription number, drug code, quantity, days' supply, net requested reimbursement, net maximum amount, net paid amount and member copayment for each prescription. The information can be sorted alphabetically or by identification number on paper, microfiche or tape. Also included are current prescription claims summarized by eligibility code indicating the number of prescriptions filled and total paid amount. Current prescription claims are summarized by pharmacy class, number of prescriptions, net requested reimbursement amount, net processed reimbursement and average net processed amount per prescription. This report illustrates where benefit dollars are being spent.

Clients whose plan includes an up-front deductible should note the following: Claims that are needed to complete an up-front deductible requirement will appear twice on the Valid Prescription by Member Report. The first time, the prescription number is preceded by a dollar sign ($). This indicates a "bridge claim." The amount requested is the full amount of the claim. The maximum amount and reimbursed amount for the claim is $0.00. The copayment is the amount that was required to meet the deductible requirements. The second time, the prescription number is not preceded by a dollar sign. The requested amount is again the full amount of the claim. The maximum amount and reimbursed amounts appear after the deductible and copayments. The copayment is based on the balance of the claim after the deductible was met. e.g. a claim totals $75.00. The member has a $25.00 up front deductible and a 20% copayment. The claim appears once preceded by a dollar sign, requested amount $75.00. Reimbursed and maximum amounts are $0.00. Copayment is $25.00. The claim appears again without a dollar sign. Requested amount is still $75.00. Maximum amount and requested amount is $40.00. Copayment is $10.00. ($75.00-$25.00 deductible = $50.00x20%=$10.00). The member pays the pharmacist $35.00 ($25.00 deductible + $10.00 copayment) and is reimbursed $40.00 by the client.

- **Prescription Summarized By Member:** This report is available either alphabetically or by identification number. It identifies the dollar amounts processed for the current cycle and the client plan year-to-date totals by member. An asterisk identifies when a certain dollar amount has been reached by a member for those clients whose plan includes an annual maximum. With this report, clients keep track of year-to-date totals of moneys spent by members.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002662

26

## MANAGEMENT REPORTS - Available upon request.

The following reports assist in analyzing the cost of the program and evaluating the results based on the actual utilization by member. These reports are also valuable in future planning for increased cost savings.

- **Date of Service Vs. Date of Payment:** This lag report provides a rolling 12-month total with monthly breakdowns of total net dollar amount expended, total number of claims, average cost per prescription, average cost per Member and utilization on an incurred vs. processed claims basis. This report alone will serve a majority of the plans financial reporting needs. **Available monthly.** This report may also be requested providing average costs and utilization by lives.

- **Dollar Range Utilization Report:** The purpose of this report is to view expenditures within specific annual dollar range e.g., 0-$50, $50-$100 etc. At-a-glance, the client receive the impact that deductibles or program maximums will have on expenditures, members and claims. Also included are the average ages of the population, average cost per prescription, total dollars and cost per user vs. member. **Available monthly.**

- **Generic Equivalent Report:** Offers a rolling twelve month, breakdown and annual total of generic utilization. It provides total number of claims, total net costs for brand name drugs with no generic equivalents, brands with generic equivalents, generics, and the potential savings if generic substitution had occurred. This report helps the client track the success of generic incentives and initiatives. **Available monthly.** Clients whose plan designs include the NPA Generic Reimbursement plan or a DAW feature should not use this report. The Generic Savings report is more appropriate for those plans.

- **Generic Savings Report:** This report is ideal for clients whose plan design includes the NPA Generic Reimbursement Plan or a Dispense as Written (DAW) plan design feature. Like the Generic Equivalent Report, this two-page report summarizes the claims by single-source brand, multi-source brand and generic claims. This report provides additional claims data as follows: The multi-source brand claims are separated by those paid as brand (DAW override or client prior authorization override) and those reimbursed as generics. The report compares the difference in cost between generics and the brand form (savings) and the lost savings through overrides. This report is based on payment dates. **Available monthly.** This report also provides this information for retail claims and CFI mail order claims separately.

- **Claims by Relationship Report:** This report breaks out experience by member, spouse and dependent categories including claims, net costs, average cost per

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002663

27

prescription and census count in each category and total. Important in underwriting analysis. Available monthly.

- **Claims by Pharmacy Report:** This report provides a summary of the number of claims, total net prescription costs and average net cost per prescription by pharmacy class (I-V, direct reimbursement to member or mail order) for a rolling 12 month period. Available monthly.

- **Drug Analysis/Benefit Analysis Report:** This report provides utilization and net prescription costs by age demographics, and is broken out by members, spouses, dependents and for all eligible lives for a rolling 12 month period. Available monthly.

- **Multiple Sponsor Report:** A listing of all plan members whose identification number is listed under any other NPA client. This report assists in accumulating and tracking coordination of benefits information.

## UTILIZATION REVIEW REPORTS

The following reports are used internally by NPA the professional services staff for in-depth analysis of drug utilization in the plan. Analysis of these reports is the first step in the thorough investigation of potential fraud or abuse in the program. The following reports are available on request. ($) indicates report is at additional charge

- **Drug Usage Reports By Member:** This report is run monthly to rank members by the number of prescriptions used, total amount paid, average dollar amount per prescription, number of pharmacies used by member, therapeutic category frequency, generic drug frequency, controlled drug frequency and excessive refills. These reports show high-end users and potential abusers *at-a-glance*. Produced monthly.

- **Member Profile:** This report represents an all-inclusive, detailed report showing all claims and statistical information covering a specific member and his or her dependents. Available on request. This report is produced at a $0.50 per profile cost.

- **Drug Usage Reports by Pharmacy:** This report ranks the top 500 pharmacies in the following categories:

  1. Number of prescriptions
  2. Total dollar amount reimbursed
  3. Average prescription cost
  4. Number of members

28

5.   Prescription per member
6.   Percentage of claims over maximum computed formula
7.   Refill percentage
8.   Refill too soon percentage
9.   Generic percentage (high)
10.  Generic percentage (low)
11.  Control drug percentage

A grid listing, in pharmacy provider number order ranks the pharmacy by specific abuse categories. This report not only benefits NPA's drug utilization review staff but also benefits our pharmacy auditors by identifying who the potential abusers are and what type of abuse is occurring. Available on request.

- **($) Physician Profiling Systems:** This report ranks members within specialty by criteria, such as generic substitution rate, controlled substance usage, cost per member, potential generic savings not realized and percentage of formulary usage. Useful in developing PPOs and identifying physicians for direct intervention by NPA pharmacists. Available on request.

- **($) Physician Profile by Specialty:** A new report that ranks specialty, prescriptions, paid amount average per member, percentage of generics and dollars per member per month. Available monthly.

- **($) Physicians by Site/Geographic Profile:** This report ranks physicians by specialty, by site and by therapeutic category. It will capture the number of prescriptions, paid amount, average day supply, cost per day and percentage of generics. Available monthly.

- **($) Therapeutic Category Frequency Report:** This report provides detailed plan experience by the type of drugs used by total ingredient costs. Perfect starting point for formulary development and DUR effects to change prescribing habits to less expensive equivalent medications. Available on request.

- **NDC Frequency Report:** This report ranks the top 200 drugs by ingredient costs spent or by claims. It identifies the types of drugs obtained most and assists in the development of cost management strategies. Available monthly.

## ELIGIBILITY REPORTS

The following reports feature eligibility data, a key to the integrity of the plan. NPA is a leader within the industry in its methods of acquiring, maintaining and reporting eligibility information. ($) indicates report at additional charge.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002665

29

- **Teleprocessing Audit Trail:** This report is used to maintain overall integrity of the database and is of particular use should the client use an on-line connection and update eligibility through a CRT. The report includes the date, time, and which staff member input any new information into the system. The NPA system also provides an on-line audit trail for every record on the plan's file. Available each cycle, three times per month and utilized by those NPA clients with direct on-line, real time access to NPA's database in their own offices.

- **Master File Comparison Report:** The Master File Comparison Report is generated each time an eligibility tape is applied, to provide a hard copy of what the file looked like immediately before application, and what changes were reflected in the tape. This is used to check the accuracy of eligibility updates and changes. Produced after each file is compared.

- **($)Eligibility Listing Report:** This report may be produced for eligible only, ineligible only or both eligible and ineligible. It may be sorted in alphabetical or identification number order, with or without location breaks. Information included on this report includes identification number, member name, 'slot' number indicating member, spouse or dependent, individual's first name, date of birth, relationship code indicating gender and relationship to member, address, eligibility (coverage) code, and effective date of eligibility. A second eligibility code and date indicates the previous status. A 9 code followed by 00/00/00 for the date indicates no change from original eligibility status. Available on request.

- **($)Overage Dependent Listing:** This report indicates the dependents who are reaching the maximum age coverage and the date. Available on request.

### SPECIALTY REPORTS

The following reports are for clients whose plan includes an **Annual Maximum (Cap).** It should be noted these reports are available upon request and produced at an additional cost of $0.50 per letter or profile.

- **($) High Limit Letters:** Letters when an individual or family approaches the annual maximum. Produced at the close of each billing cycle.

- **($) Audit Profiles:** All claims which meet the family's and/or individual's year-to-date maximum. Available only at the end of each month when they reach their cap.

The following reports are available for clients whose plan design includes an **up-front deductible:**

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY      ESI-277-00002666

30

- **Major Medical Contribution Report:** This report lists each member (and/or dependent) who has contributed towards the deductible requirement, whether an individual deductible or family. The total amount applied toward the deductible requirement is listed. If an individual and/or family has met the requirement, the amount is indicated with a star. This report provides the number of deductibles met, and the number of contributing individuals by location, and client. Available on request.

- **Out of Pocket Expenses Report:** This report lists each member's identification or identification number, and each family member with the total out of pocket expenses paid during the report period. This amount includes deductible and copayment expenses. This report subtotals by location and totals by client. Available on request.

The following reports have been specially developed to meet the needs of our clients who are HMO based, or have similar reporting requirements.

- **($)Hedis Report:** This report provides comparison of usage and costs for each location compared to the clients totals by age demographics. Available on request.

- **($)Therapeutic Category Report:** This report is a usage report by therapeutic category, and is available by members or by lives. For each therapeutic category the report indicate number of claims, number of claims per 1000 members (or lives) net costs, net cost pmpm (or plpm) and claims pmpy (or plpy) on a rolling 12 month period. Available monthly.

- **DOS/DOP Report by lives:** The DOS/DOP report has the same information included on standard DOS/DOP report, however utilization & costs are by lives rather than by member. Available monthly.

- **Drug Usage Report by Patient:** This report is similar to the Drug Usage by member report, however, this report ranks the top 500 members on a rolling 12 month period. Available monthly on request.

- **Quarterly Prescription Drug Program Analysis Report:** This report provides a summary of several key statistical data for each location, compared to the client overall data, and NPA's book of business data for a particular three month period, and the corresponding twelve month period. Available upon request.

The following report is available for those clients who utilize the NPAY℠ Program.

- **NPAY℠ Claims Year to Date Summary by Fund any Location:** This report provides member identification #, last name, member first name, slot number, eligibility code, and amount paid by member plan year to date, based on client or location plan year. Summarizes by location and fund. **Available monthly upon request.**

It should be noted other standard management reports are suitable for *NPAY℠* programs, as the amount indicated on the reports are the amounts paid by the members: Date of Service/Date of Payment, NDC or Therapeutic Category Frequency reports, Generic Equivalent report, and the Drug Analysis/Benefit Analysis report.

## OTHER SPECIALTY REPORTS

- **($) Coordination of Benefits Report:** Indicates the members whose spouse and/or dependents have primary coverage elsewhere, which NPA COB option has been selected by the client, if primary coverage is under another NPA client, and the rule of coverage code. **Available on request.**

- **($) Prior Authorization Report:** Lists members who have prior authorization overrides, the type of override and the effective start and stop dates for the override. **Available on request.**

- **($) Location Listing Report:** Lists each location which is set-up separately, indicating copayments, plan number, type of coverage (family, member only, no coverage, etc.) CFI information, if applicable, and card effective start and end dates. **Available on request.**

- **($) CFI Notification Letters (CFN's):** Used to identify members obtaining maintenance medications through retail pharmacies which could be obtained through the CFI Mail Order Pharmacy Service. These letters are directed to the member and are produced on the client's letterhead. There is a ▇▇▇▇▇▇ per letter. The text of the letter may be altered at no additional cost. **Available on request.**

- **($) Explanation of Prescription Benefit (EOPB's):** Provides a summary of prescriptions processed for each member. This allows each family to audit his or her own claims, returning any discrepancies to NPA for additional research. EOPB's are produced at a ▇▇▇▇▇ per letter. **Available on request.**

- **($) Recovery Letters:** These letters are for those clients whose cards are not imprinted with *NPAS®* electronic claims management system.. If a valid card is presented to an NPA pharmacy that is not on-line with NPA, the claim is filled, and reimbursed in "good faith" when a member or dependent is no longer

32

eligible. Recovery notices are produced to allow the client to recover these good faith payments from the member. There is a ▮▮▮▮▮▮▮ for those notices per letter. Produced cyclically.

- **($) Retro-term Recovery Notices:** Produced when a client notifies NPA of a retro-active termination, and claims have been processed for dates of service between the retroactive termination effective date and the notification date to allow the client to recover these funds. Produced at a ▮▮▮▮▮▮▮ per letter.

*($) indicates report at additional charge.*

18. **Do you have employee communications materials available about your retail program? Your mail order program? An integrated program? Is there an extra fee for them?**

Yes. Standard member communication materials are included in NPA's base administrative fee. The introduction of the program, with effective communication materials, is vital to the member's positive perception of the program.

At the start of the program, NPA will provide each member with an introductory package of communication materials. Each introductory piece is concise, easy-to-read and informative. The standard package includes:

An **Introductory Letter** announcing the program from the appropriate person in the organization, printed on company stationary and written to all members. Your NPA account executive will work with you to draft the introductory letter to all covered individuals that welcomes them to the plan and outlines the benefits the plan provides them. We recommend that this letter be included with the initial mailing of identification cards.

A **Prescription Benefit Plan Brochure** explaining where to go for the benefit and how to use the card

An **NPA Identification Card** and jacket stuffer imprinted with eligibility information and emphasizing the importance of keeping your personnel offices informed of any change.

A **Pharmacy Solicitation Card** for members to complete if they want NPA to solicit a non-participating pharmacy to join the network.

A **Question and Answer Brochure** that focuses specifically on the use of generics.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY    ESI-277-00002669

33

A "Pocket Formulary" and Q&A Brochure explaining the NPASelect℠ Formulary Program.

In addition, the following optional enclosures are available, depending on plan options:

A CFI Brochure explaining how to use the mail service pharmacy.

**Member profile and Mail Service Order Envelope** providing a medical history to the mail service pharmacy when the first prescription is ordered.

**Antibiotics & You** - A new optional brochure addressing 16 commonly asked questions regarding antibiotic usage is now available.

Our internal communication department also has the ability to write and produce customized pieces as required. Any additional charges will be based on your requirements.

If all benefits information is communicated in a single benefits booklet, then we can compose the text. NPA's communications department will also write periodic articles for inclusion in company newsletters or other publications.

NPA will distribute materials based on the Fund's requirements. The most expedient method is to mail packets directly to the member's home address. NPA can also arrange to deliver these materials to each the Fund location for direct distribution at your offices. Although this is a labor-intensive effort, we are flexible enough to accommodate this request.

Standard communication materials are included in our base administrative fees. Customization of communication materials will be billed based on your requirements.

19.    The Fund currently has one card for their medical and prescription drug plan. Is your organization willing to accommodate this request?

Yes. NPA owns and operates our own proprietary plastics and identification card company/facility and would be very interested in providing the card production service for the Fund. However, should the Fund choose to produce their own identification cards, the following items must be included on the card:

- the client's name
- the client's sponsor number
- the member's name
- the member's social security number or company identifier number
- the NPA logo

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002670

34

- the *NPAS®* logo

20.    The Fund office must reimburse Public Aid when a member uses a
       Public Aid card.  Can your organization perform this function?  At a
       minimum, the Fund's claims system must be able to interface with your
       system to determine what should be paid.

Yes.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        ESI-277-00002671

**B. Retail Pharmacy Network**

1. **Please submit a current listing of participating pharmacies in the state of Illinois and for each network being proposed. How many participating pharmacies are there? What percentage of total pharmacies in this geographic area is represented by your participating pharmacies?**

NPA's provider directory for the State of Illinois has been included as exhibit 4.

NPA has a total of ▮▮▮ pharmacies in our open network in the State of Illinois, which equates to ▮▮ of the available pharmacies in the State. There are ▮▮ of these pharmacies who participate in our *SelectNet*SM network which compose ▮▮ of our open network.

2. **Please describe in detail the prescription dispensing routines of your pharmacies. In addition to a description of the overall process, please advise how your pharmacies address the following issues:**
   - **plan dispensing limitations including quantity and dosage guidelines**
   - **excluded drug lists**
   - **prescription drug utilization review programs**
   - **physician/pharmacist communications**
   - **drug-to-drug interaction**
   - **generic over brand name dispensing**
   - **irregularities in the prescribing or receiving of drugs**
   - **unusual medication supply requests**
   - **out-of-stock drugs.**

In order for a member to access prescription services, they must present an identification card and valid prescription at an NPA participating pharmacy. If the member is new to the pharmacy, the pharmacist will ask the member if they have any existing medical conditions or allergies that the pharmacist should be made aware of. The pharmacist will enter the member's identification number, name and address and the relevant medical information into their pharmacy's computer system.

The claim for the prescription will be submitted electronically to NPA. Our system ensures that plan-dispensing limitations are complied with, that the drug is covered under the program and that the member is eligible.

All claims entering the *NPAS®* system are adjudicated in an on-line, real-time environment. Each field submitted is checked for valid values, as defined in the NCPDP specifications. Once the claim reaches the system, the following takes place:

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY         ESI-277-00002672

36

1. The service date is validated. It must fall within the last 20 calendar days for *NPAS®* claims and meet the client's requirements for claims if submitted in any other manner.

2. The member record is then accessed.

3. Coordination of Benefits requirements is determined.

4. The member's plan must be in force as of the date-of-service.

5. Member eligibility is determined as of the date-of-service.

6. The member is searched for by name and date of birth to see if the member is eligible for benefits on the date-of-service.

7. The pharmacy is accessed by the NABP number to see if it is a participating provider and allowed to submit claims for this client.

8. The NDC records are accessed to determine if the medication is covered.

9. Year-to-date maximum benefit limitations are applied (per member or family).

10. The claim is checked against the member's history to confirm if a refill is valid to fill.

11. Therapeutic, concurrent DUR procedures are performed (*NPAS®* only).

12. Quantity and days supply limitations are applied.

13. Generic substitution requirements are applied.

14. Formulary limitations are applied.

15. Plan limitations on this drug category are applied (e.g. is the duration of therapy for nicotine patches exceeded).

16. Prior authorization allowances are reviewed (i.e. has this drug received prior-approval for this member?).

17. DAW override rules are checked.

18. MAC pricing is applied for submitted generic.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002673

37

19.  PPO logic is accessed by client and pharmacy number.

20.  Amount of AWP is accessed from the drug file as of the date-of-service.

21.  The pricing components (copayments, dispensing fees, discounts, formulary incentives) are retrieved from the NPA master files.

22.  The high limit calculation is performed and compared to the submitted amount of the claim.

23.  U&C prices are checked and compared to the lower of the submitted amount or high limit calculation.

24.  Up-front deductible requirements are applied.

25.  Maximum limitations are checked.

26.  Claim is paid or rejected.

27.  All master files are updated.

The pharmacist receives a non-coded message, which describe DUR findings and relevant claim information (e.g. drug not covered, member ineligible, etc.). NPA custom tailors its messages to make them easily understood by the pharmacist. In addition, *NPAS®* tells the pharmacist how much money to collect from the member. This price is calculated automatically and is based on predetermined pricing parameters and specific plan design options.

If a message is returned to the pharmacist identifying potential problems with the prescribed medication, the pharmacist will consult with the member to determine whether the member is still taking the prior medications that flagged the conflict. If the member is still utilizing the medication, the pharmacist will contact the physician to reconcile the utilization review information with the member's prescription regimen. The pharmacist will make suggestions to the physician regarding alternate therapy, if in fact a change in medication is necessary.

Pharmacies in the network average at least two deliveries of medication per day. Many use multiple wholesalers as opposed to one source as a safeguard to protect themselves from the inconvenience of back orders.

If a situation should occur that a network pharmacy is out of a medication after their daily deliveries, they will obtain the out of stock medication by contacting another local pharmacy and picking it up that same day.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          ESI-277-00002674

Members and network pharmacies also have the option of contacting NPA's toll-free number for help in an out of stock situation. NPA representatives will call other providers in the area to locate a pharmacy with the medication in stock. If the NPA representative is unable to locate a pharmacy with the medication we will ask the member's permission to call his/her physician, take a telephone prescription and ship the medication overnight from our mail service pharmacy.

3.    How is eligibility verified?  Can your system accept the eligibility list on tape or diskette?  Please describe the critical fields or types of information needed for the eligibility file.

Accurate and timely eligibility information is the key to effectively managing any benefit program. Our anticipation is that eligibility information will be on magnetic tape, either round or cartridge, with indicators or designators to separate members into status groupings. Each group will carry an indicator in the member's record to determine eligibility according to your requirements. Any number of groups or subdivisions can be accommodated. NPA is completely flexible in transferring eligibility information and subsequent eligibility updates. NPA offers you the following options:

- Magnetic Tape cartridge or round
- Nightly downloads from your CPU to NPA's CPU to AT&T Easy Link mailbox
- Nightly downloads from your PC to NPA's system to AT&T Easy Link mailbox
- On-line terminal connection to your facilities allowing for eligibility to be updated instantly in an on line, and real time environment
- Weekly or monthly magnetic tape applications
- Hard copy

NPA can implement an Electronic Data Interchange (EDI) with the Fund to accept changes in eligibility information in EDI 834 standard.  Eligibility information can be transferred on a nightly basis to NPA through a number of different options, as mentioned above.  We can work directly from mainframe to mainframe using RJE capabilities or dial into a PC at the Fund on a nightly basis using a TRACS software package.

We also have the ability to work with the AT&T Easy Link to allow transmittal of eligibility information to an NPA electronic mailbox for retrieval by NPA on a daily basis. The advantage of the Value Added Network is that protocols are unimportant in terms of the need for standardization between the sending and receiving organization. Regardless of the individual capabilities, information can be sent into the Value Added Network that will act as the intermediary to ensure that data is recognizable on the receiving end.

39

Even with the EDI interchange, we suggest the periodic application of full-file eligibility tapes to ensure that your eligibility on the NPA system is always identical to that on your own system.

Eligibility data can also be accepted monthly via magnetic tape as a full file replacement. All incoming tapes as well as hard copy printouts of electronic transmissions are received by our sponsor control analysts. These individuals are responsible for coordinating tape applications with the computer operations area as well as reviewing tape edits and communicating to the client any issues relating to the application of eligibility information.

NPA currently accommodates interim updates to member eligibility information via fax or mail.

Ninety-five percent of electronically transmitted eligibility updates will be posted within two business days after NPA's receipt of accurate, complete and legible information provided in a format acceptable to NPA. More rapid eligibility changes can be handled via on-line, real time terminal access from your offices directly to your database on the NPA System.

CFI is treated as any other pharmacy in NPA's network. NPA is the only organization in the prescription administration industry that offers on-line eligibility services as a stand-alone service.

Since CFI is connected on-line to NPA's host computer, all eligibility data is available to our mail order pharmacy.

NPA's eligibility tape format has been included for your review as exhibit 5.

4.    Does your record-keeping system permit interface with and access to the prescription histories being simultaneously established at other participating pharmacies? If such intrapharmacy communication exists, how are the plan dispensing limitations accommodated?

Yes. We have a primary and secondary history file. We maintain 18 months of claims in the primary history file. All older claims are maintained on the secondary history file. Both files are accessible on-line and access to the secondary file is gained through a toggle key. Off-line data is available on flat disk files and on tape files. On-line data is used primarily for customer service support and all pertinent data elements necessary for that function are maintained on-line. Off-line files used for reporting contain a more comprehensive list of data elements. Our historical off-line files are available for an unlimited amount of time.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002676

40

Our on-line, real time member database maintains unlimited claims history for members and all their dependents. Every maintenance and claim transaction is recorded in our database and is available on-line to the Fund through a CRT terminal.

Regardless of whether a prescription is filled at any network or mail service pharmacy, the claim instantly becomes part of the member's profile and will be scanned against all incoming claims for duplications and potential therapeutic conflicts.

The following data elements are maintained on-line, for each member/dependent covered by the employer group:

- Member Name/Address
- Member Identification Number
- Member Plan and Group Number
- Member Effective Date
- Member Birth Date
- Member Sex
- Member Relationship codes
- Hypersensitivities
- Prescription Number
- Date of Dispensing/Quantity Dispensed
- Physician Identifier
- Drug Entity/Strength and Dosage Form
- Pharmacy Identifier

Member profiles are updated with the dispensing of each prescription both at the retail pharmacy and through our mail service pharmacy.

Dispensing limits are handled on-line by computing the amount of medication remaining from prior prescriptions, if any, and applying an algorithm to the current prescription based on the quantity proposed to be dispensed and the days supply. When a claim exceeds plan limits, a message is sent back to the pharmacy indicating that dispensing limits will not allow the prescription to be covered under the plan.

5.    What systems are in place for cross-checking a retail pharmacy fill request with the prescriptions filled through the mail order drug program for the same patient?

The most important aspect of NPA's administration is that we carry eligibility files through the entire claims processing cycle. All eligibility is verified and maintained in our on-line, real time electronic claims management system, *NPAS®*. Participating pharmacies submit claims electronically via *NPAS®* for on-line, real time eligibility

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002677

41

verification, drug utilization review and claims adjudication while the member is in the pharmacy. Daily updates ensure that the most up-to-date eligibility information is used for claims adjudication. Claims are transmitted to NPA from the pharmacy's computer and adjudicated in seconds, virtually eliminating ineligibles who attempt to improperly use their prescription drug cards.

Since CFI is connected on-line to NPA's host computer, you will not need to send additional eligibility information to the mail order provider. As a result, all Drug Utilization Review, eligibility checking and claims management functions are performed in an on-line, real time environment, accessing all of your members' claims histories, whether or not their prescriptions were obtained at a community pharmacy or through the mail.

6.    The Fund office currently processes about 300 paper claims per month, reimbursing the member what he/she would have been paid had their card been used.    How does your organization handle direct reimbursement (paper claims)? What would be your basis for payment?

Direct claims are received at NPA and keyed into the claims system on the day it is received. Since we produce three check cycles per month, all valid direct claims are processed for payment within ten days of receipt. This rapid turnaround eliminates member inquiries and creates high levels of satisfaction with the plan.

Mail is received daily, Monday through Friday. All out of network claims are manually reviewed, batches are established and batch numbers are assigned. Those claims that do not meet the requirements will be date stamped and a rejection form will be attached explaining the problem. Generally, rejected claims will be returned to the member or client for correction or denial of payment on the same day that they were received.

Batches contain from 100 to 250 claims and are put in boxes in order by the postmark date. The boxes are distributed daily in date and batch order to keyers in data entry from the first edit department.

Direct claims are verified against the same master files as electronic claims. If a discrepancy is identified, the claim is manually reviewed and research is done for missing information (e.g. drug name provided but not the NDC number). If the claim cannot be "saved," it is returned directly to the member with a request for the missing information. Since all direct claims are keyed on the same day received, requests for "additional information" are sent to members within 24-hours of receipt of the claim.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002678

42

Direct claim form completion requires submission of the following data:

- Client number
- Member social security number
- Member's first name
- Date of birth
- Status
- Date Prescription filled
- Prescription number
- Metric quantity
- Days supply
- NDC # and drug description
- Total charge

All processed claims are kept in batch order and sent to batch control in date order. Batches are held on-site for six months for ready access. Then, they are sent to an off site warehouse for storage. We maintain a claims librarian whose sole function is to ensure the integrity of the claims storage system.

Pending claims are maintained in sequence and sent to the final edit department for subsequent correction. If claims are processed, the batches are completed and sent to batch control.

Pended claims are either corrected and processed by our final edit department or sent to professional services or professional relations if prior approval, diagnosis or special review is required.

The rejected claims that cannot be processed after the second check are date stamped and a rejection form is attached explaining why the claim was not processed. Again, rejected claims will be returned to the member for correction on the same day they are received.

A special member utilization report is run to identify those individuals who submit a large number of direct claims. Given the ready availability of network pharmacies, high direct claim usage may indicate an area where

- Pharmacy solicitation should take place.
- A member with a pharmacy that does not fill third party plans (rare)
- There is potential fraud.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        ESI-277-00002679

43

NPA's pharmacists review the top direct claim submitters and contact both pharmacies and physicians to determine if all prescriptions were appropriately prescribed and dispensed.

**7.     How are member complaints and problems handled?**

Depending on the nature of the problem or complaint, our customer service department or professional relations staff, located at NPA corporate headquarters in East Hanover, New Jersey, will address the issue and work with you and or your members to resolve any problems.

One example of how a problem might be handled is as follows: Members may call NPA to inquire why they received a lower reimbursement than they submitted for a particular drug. Our customer service representatives have immediate access to all members' files and plan designs via on-line, real time terminals on their desks. In seconds, they can retrieve the members' records and explain that because their plan has a generic reimbursement component, they are responsible for paying the copayment as well as the difference between the brand received and the generic drug price.

A member can either send NPA a written inquiry or call our toll-free number. Our representatives have immediate on-line access to all members' records and plan design. Ninety-five percent of all questions are resolved within the same day. If a written response is needed, we guarantee a maximum of three days for a response.

**8.     What is your generic fill rate for the retail program?**

NPA's generic fill rate is currently ████

**9.     Describe in detail the program and procedures for auditing individual pharmacies which participate in your network.  Will you permit an audit by an external auditor at the request of the Fund?  Will you bear the cost?**

Network quality management is handled through an aggressive internal and on-site pharmacy audit program that is a standard part of our administrative services. NPA employs a full staff of pharmacy auditors, both internal auditors and field auditors who monitor network statistics and claim submissions.

Pharmacies are selected for audit from a monthly statistical comparison report. The Pharmacy Abuse Report is specially designed to identify abnormal dispensing patterns. The top 2,500 pharmacies on the report are comparatively ranked on specific criteria across 32 areas of potential abuse. Norms are established for each area and careful attention is paid to those providers deviating from the norm in a direction associated

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002680

44

with abnormal billing practices. The rankings are done both on a client and state specific basis. The report identifies those pharmacies demonstrating billing patterns of a potentially fraudulent nature and has proven to be an extremely effective auditing tool. A summary grid, reflecting each pharmacy's comparative rank in all categories, is included in the last section of the report. Pharmacies are selected for audit based on the relationship between their respective rankings in any of the following categories:

1.  **Number of Prescriptions** - Total number of claims paid to the pharmacy during the most recent 12 months. Lists the stores in descending order from highest to lowest. *Pharmacies billing a high number of claims will be selected when one or more additional triggers are evident.*

2.  **Total Amount Paid** -The dollar value paid to the pharmacy on behalf of the clients.

3.  **Average Prescription Price** - The average price per billed prescription. The national average for a prescription is $30.11.

4.  **Number of Members** - The number of NPA members who had prescriptions filled in the pharmacy.

5.  **Average Number of Prescriptions Per Member** - The average number of prescriptions paid for per member. The average in this category is eight to ten prescriptions per member. A number greater than the average could indicate that fraudulent claims are being submitted or that there are a few members who are receiving more prescriptions than the national average. *Pharmacies exceeding the average will be selected when one or more additional triggers are evident.*

6.  **Average Amount Per Member** - The average dollar cost accumulated per member. The national annual average for a prescription per member is $301.14. If the average prescription is greater than the average, it could indicate the pharmacy has many expensive drugs billed. The auditor's role is to validate these prescriptions. *Pharmacies billing a high number of claims will be selected when one or more additional triggers are evident.*

7.  **High Limit Frequency** - The percentage of prescriptions submitted for the maximum amount allowed under a specific plan. This identifies such potential Usual and Customary (U&C) violations, such as a pharmacy consistently billing at the plan's maximum reimbursement level. This may indicate that we are not receiving true U&C prices from this store. *Pharmacies billing at the maximum amount will automatically trigger an on-site audit.*

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002681

45

8. **High Limit Infrequency** - Ranks pharmacies from low to high in regard to the percentage of claims billed at the maximum amount allowed under a specific plan. It is unusual for a very high percentage of claims to be billed below the maximum. This may indicate a pharmacist who believes that by billing low, he or she can avoid detection of other fraudulent practices (e.g. billing for prescriptions they never filled).

9. **High Limit 50% and Over** - Ranks all pharmacies that currently bill for the maximum amount allowed on more than 50% of their submissions.

10. **Refill Percentage** - Ranks pharmacies from high to low according to the percentage of claims submitted as refills. The average in this category is about 32%. A high number could indicate that either the pharmacy truly does receive a great deal of members refilling prescriptions or that the pharmacist could be submitting fraudulent refills. *Pharmacies billing a high number of refill claims will be selected when one or more additional triggers are evident.*

11. **Refill Too Soon Percentage** - Ranks pharmacies from high to low according to the percentage of claims submitted too soon for refill. Electronic submission eliminates most early refills; however, we generally allow an override if the refill or second prescription is filled in the same pharmacy to accommodate lost or damaged medication, change in doses and creams and ointments for which "days supply" is difficult to accurately predict. The national average in this category should not exceed ten percent of the total prescriptions billed. This could be an indicator that the pharmacist is submitting false claims. *Pharmacies billing a high number of refill too soon claims will be selected when one or more additional triggers are evident.*

12. **Generic Drug Frequency** - Ranks pharmacies from high to low, according to the percentage of claims submitted for generic products. An average in this area is about 41.3%. If this number is low, it could be an indication that the pharmacist did not substitute generically when permitted. *Pharmacies billing a low number of generics will be selected when one or more additional triggers are evident.*

13. **Generic Drug Infrequency** - Ranks pharmacies from low to high according to the number of claims submitted for generic products. An average in this area is about 15-20%. A low number could indicate that the pharmacist did not substitute generically when permitted. *Pharmacies billing a low number of generics will be selected when one or more additional triggers are evident.*

14. **Control Drug Frequency** - Ranks pharmacies from high to low according to the number of claims submitted for controlled drugs.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002682

46

15. **Formulary Drug Infrequency** - New category designed to identify pharmacies with low formulary compliance. The auditor will not act on this category but will refer to an NPA Peer Review Committee.

16. **Formulary Drug Frequency** - The percentage of claims that were paid as an NPA formulary drug. It demonstrates formulary compliance and enables NPA to put together a network of high compliance formulary stores.

17. **Most Frequently Dispensed Therapeutic Category** - Identifies the most frequently billed therapeutic category. Explains high average prescription costs.

18. **Single Source Percentage** - Ranks pharmacies from high to low and the percentage of claims that do not have generic equivalent.

19. **Multi-source Percentage** - Ranks pharmacies from high to low where a multi-source brand was billed when a generic is available.

20. **Average Paid Refill** - Ranks pharmacies from high to low in regard to the average prescription price for refill drugs. Compares average prescription price and refill percentage to identify pharmacies that are only refilling high dollar medications.

21. **Average Quantity** - Ranks pharmacies from high to low on the average number of units per claim billed. Identifies pharmacies that are over billing on quantities.

22. **Average Days Supply** - Ranks pharmacies from high to low on the average days' supply per claim billed. Identifies prescription splitting or cut quantities. The average in this category is 24 days. A low days' supply could indicate possible overbilling due to either exceeding plan parameters or a pharmacist who is increasing the quantities prescribed by the physician. A large number of prescriptions for members with 34 days or 100 units plan parameters could also indicate a high number in this area.

23. **Days Elapsed** - Measures the number of refills filled on the exact refill day.

24. **Average Elapsed Days per Refill** - Measures the number of days between refills.

25. **NPAS® Percent Pro-Fee** - Shows the percentage of the time pharmacists are asking for the maximum amount of the professional fee allowed by the plan. Indicates pharmacies that are not submitting U&C.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002683

47

26. **Denial Override** – Indicates the percentage of claims in which the pharmacist used an override code to get the claim paid before the refill algorithm was met.

27. **Percent DEA Compliance** – Provides the percentage of claims submitted with an invalid DEA or a pseudo DEA number.

28. **U&C Frequency Percent** – Shows the percentage of claims paid based on the U&C submission.

29. **U&C Infrequency** – Provides the percentage of claims paid based on the contracted price.

30 **Percentage Package Size** – Provides the percentage of claims paid based on an NDC of a package equal to or less than 100.

31. **NPAS® Rejection** – Indicates the percentage of the total number of claims submitted by a pharmacy that were rejected (regardless of reason).

32. **DAW 01 Frequency** – Provides the percentage of claims with a DAW code of 01, which indicates DAW per physician.

Those stores selected for on-site audits are notified in writing two weeks in advance.

Once the audit is scheduled, the director of audits orders a Pharmacy Profile Report and assigns a field auditor who will be responsible for conducting the actual audit. The pharmacy profile contains a one-year claims history as submitted by the pharmacy. The last page of the profile contains a summary sheet of statistics, reflecting the reasons why the store was selected for audit.

### On-site Audit

The field audit is a three-part process. The first part occurs upon arrival, when the auditor conducts an interview with the owner or supervising pharmacist to verify the level of service offered to the public. An audit classification criteria form is completed. The results of this interview either invalidate or confirm the provider's current classification level. Should a pharmacy not be providing the services required of its class, any increase in dispensing fee received as a result of their mis-classification will be charged back to the pharmacy and credited to the appropriate clients. The pharmacy will either be removed from the panel or reclassified as the situation warrants.

The second part of the audit is the claim validation process. On-site, the auditors compare the actual prescription to the paid claim information on the computer generated profile. Specific areas reviewed are as follows.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002684

48

- Name of person receiving medication match
- Date of service match
- Drug dispensed
- Quantity of medications match
- Unauthorized refills.

The more common discrepancies found by the auditors are:

- Generic dispensed/brand billed
- Fraudulent refills
- Overbilled quantities
- Prescription splitting
- Duplicate billing
- Phantom claims (no prescription on file)
- Refills not recorded
- DEA number submitted does not match member
- Verification of U&C prices
- Member signature not on required signature log.

Each auditor is required to check a minimum of ten percent of the total prescription volume or 300 prescriptions, whichever is greater. Any pharmacy that bills less than 300 prescriptions must have every claim checked before the auditor leaves the store. If discrepancies are frequent, the auditor will continue to validate claims until all prescriptions have been checked for the year. For pharmacies that bill in excess of $150,000 in claims, the auditor will determine the number of prescriptions to be checked in relation to the Selection Criteria Summary on the profile. When a discrepancy is found, the auditor notes it on an Audit Review Report.

The third part of the audit is to verify U&C pricing. The auditor obtains the price, for the top 20 brand and generic medications, from the pharmacy's computer system. Once the list is complete, the auditor matches the obtained price to the price paid and notes any discrepancies.

After the auditor has finished checking prescriptions, filled out the classification sheet and obtained U&C prices, all discrepancies will be reviewed with the pharmacist. This will allow any problems to be discussed and possibly resolved before the audit is closed. If, at the time of the audit, there were prescriptions the auditor or the pharmacist could not locate, the auditor will leave a complete list with the pharmacist and request copies of the prescriptions. Also, the auditor will explain what steps are necessary for the pharmacist to take corrective action.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002685

49

When the audit is complete the follow-up process begins. The auditor will contact members and physicians by mail to check the validity of any claims not validated on-site. Upon completion of the follow-up process, the auditor details all discrepancies in the form of provider charge backs. Any dollars recovered through charge backs are returned to the affected clients.

## Internal Audits

A host of internal audits are performed by the NPA internal audit staff on a daily basis.

**Claims Audits** - Internal claim audits are conducted by telephone to monitor selected areas of concern at pharmacies. Internal reports have been developed that assist the internal audit staff in identifying fraudulent claims.

1.  <u>Decimal Claims Report</u> - Used to chargeback overbilled claims submitted for medications in decimal quantities.

2.  <u>Time Transaction Audit Report</u> - Lists all claims submitted after the pharmacy was closed. An internal auditor will telephone a pharmacy to check if this was an emergency fill.

3.  Quantity Greater than 200 Report

4.  Cyclical Overutilization Report

5.  Greater than 68 vs. 200 Quantity Report

6.  Non Divisible Days Supply

All of the above reports were internally developed and are exclusive to NPA.

**U&C Audits** - All pharmacies are reviewed for potential U&C violations.

In addition to the recovery of funds, pharmacies that have violated U&C requirements receive a written warning and are put on notice that any future violations will result in termination as an NPA provider.

**Classification Audits** - Internal classification audits will be conducted for those pharmacies whose volumes do not warrant a field audit and for Class V pharmacies whose refill percentage and generic percentage do not meet acceptable compliance as required.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002686

50

An internal classification letter will be mailed to the pharmacy along with an internal classification questionnaire. The pharmacy will be given two weeks from the date of the letter to respond. Failure to respond within that time period will lead to one follow-up notification letter. This letter will request the same information as the original letter but will also inform the provider that failure to respond the second time will be interpreted as noncompliance. This will result in an automatic downgrade to Class I status. The documentation will be reviewed and appropriate action will be taken.

Letters will be sent to the pharmacy informing the pharmacy of the potential downgrade but allowing them two weeks to forward documentation disputing findings.

A follow-up audit review, exclusive to NPA, is performed by the internal audit staff to track changes in dispensing habits for those pharmacies where on-site audits were conducted six months previously.

Finally, using standard pharmacy selection criteria, random store profiles are also generated and examined on an internal basis. Based on the information reviewed, the auditor will request copies of prescriptions from pharmacies and certain verification of those prescriptions from members and members. Last year nearly one million dollars were recovered as a result of internal auditing.

In addition to our on-site and internal auditing program, providers are identified for audit through referrals.

**Referrals from Drug Utilization Review (DUR) Area** – DUR identifies individual members obtaining similar medication from the same or multiple pharmacies. At times, several members are identified who appear to be obtaining the same group of expensive prescriptions from one or a set of the same pharmacies. This indicates potential fraud. This information is transmitted to the audit department and will automatically result in on-site audits being scheduled for those pharmacies.

**Referrals from Customer Service** – Complaints from members about a particular provider are forwarded to the audit department for review. Auditors have uncovered instances of collusion between pharmacists and physicians. NPA institutes action to recover payments, credits the client, terminates the provider and/or notifies appropriate licensing agencies.

**Referrals from Members** – Explanation of Prescription Benefits (EOPB) Letters are a valuable program option which provides the opportunity for a "self audit" of prescriptions paid on behalf of each member and their family. In addition to showing the member the total dollar value of his or her benefit, this document provides a line by line history of each prescription and where it was obtained. Although, many EOPB's are

51

returned which warrant no further action, we receive hundreds of these documents back per year indicating that certain medications were never received as shown on the EOPB. Audits are scheduled and requests for prescription copies initiated based on suspect returned EOPBs.

When the auditor, either field or internal, is satisfied that they have investigated all possible fraudulent activities, a Discrepancy Report will be filed. The Discrepancy Report identifies each recalculated claim by client, yielding separate totals for each client. The pharmacy is billed and payment is expected within ten days. At the end of each month, 100% of all monies collected during the previous audit month are credited back to each client as an audit credit.

NPA routinely audits a minimum of five percent of its full access, open network pharmacies. In 1998, NPA audited ███ pharmacies nationwide. Approximately ███ of these audits are conducted in the field.

As a result of NPA's aggressive auditing program, NPA recovered more than ███ ███ in 1998. Audit savings average ███ per pharmacy audited. One hundred percent of these monies were returned to our clients.

NPA guarantees that we will audit not less than ███ of retail participating providers.

NPA agrees to cooperate with any periodic audits. Many of our clients have selected their own accounting and auditing firms to verify the quality of NPA's controls, always to their satisfaction. We will review any recommendations or criticisms that result from the audit process and make changes to our procedures as necessary. There will be no additional charge for cooperating with your auditors. NPA reserves the right to request a signed statement of confidentiality from your auditors.

   10.   Would your organization be willing to design and maintain a custom network for the Fund? If so , how would this affect your fees?

Yes. NPA has developed customized retail networks to meet a client's specific requirements. Our administrative fees will not be affected.

   11.   Would your organization be willing to contract with additional pharmacies if there are geographic locations where members live which do not provide access to one of your pharmacies?

Yes. Each member has the ability to request the addition of a pharmacy. Your member is provided with a pharmacy solicitation card in their introductory communication materials. Members can simply fill in the name, address and phone number of the pharmacy they would like added to the network and forward it to NPA. An immediate

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002688

52

contact will be made to solicit participation. About ███ of the pharmacies contacted via this method agree to participate.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     ESI-277-00002689

53

## C.    Mail Order Prescription Drug Program

### 1.    Where is your mail order pharmacy located?

Founded in 1980, CFI is the exclusive mail service pharmacy used by NPA. CFI dispenses prescriptions nationally from two state-of-the-art facilities:

* CFI in Harrisburg, Pennsylvania is located at 4415 Lewis Road.
* CFI in New Jersey is located at our Corporate Headquarters at 711 Ridgedale Avenue in East Hanover.

CFI in Harrisburg will dispense prescriptions for your members.

### 2.    How is eligibility verified? Can your system accept the eligibility list on tape or diskette?   Please describe the critical fields or types of information needed for the eligibility file.

Since CFI submits claims electronically to NPA, eligibility is verified in the same on-line, real time manner as at the retail pharmacy.

The NPA and CFI system is totally integrated so you will only need to transmit eligibility once to NPA. Once applied to the NPA system, the information will be immediately available to both retail and mail service pharmacies.

Accurate and timely eligibility information is the key to effectively managing any benefit program. Our anticipation is that eligibility information will be on magnetic tape, either round or cartridge, with indicators or designators to separate members into status groupings. Each group will carry an indicator in the member's record to determine eligibility according to your requirements. Any number of groups or subdivisions can be accommodated. NPA is completely flexible in transferring eligibility information and subsequent eligibility updates. NPA offers you the following options:

* Magnetic Tape cartridge or round
* Nightly downloads from your CPU to NPA's CPU to AT&T Easy Link mailbox
* Nightly downloads from your PC to NPA's system to AT&T Easy Link mailbox
* On-line terminal connection to your facilities allowing for eligibility to be updated instantly in an on line, and real time environment
* Weekly or monthly magnetic tape applications
* Hard copy

NPA can implement an Electronic Data Interchange (EDI) with the Fund to accept changes in eligibility information in EDI 834 standard.  Eligibility information can be

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002690

54

transferred on a nightly basis to NPA through a number of different options, as mentioned above. We can work directly from mainframe to mainframe using RJE capabilities or dial into a PC at the Fund on a nightly basis using a TRACS software package.

We also have the ability to work with the AT&T Easy Link to allow transmittal of eligibility information to an NPA electronic mailbox for retrieval by NPA on a daily basis. The advantage of the Value Added Network is that protocols are unimportant in terms of the need for standardization between the sending and receiving organization. Regardless of the individual capabilities, information can be sent into the Value Added Network that will act as the intermediary to ensure that data is recognizable on the receiving end.

Even with the EDI interchange, we suggest the periodic application of full-file eligibility tapes to ensure that your eligibility on the NPA system is always identical to that on your own system.

Eligibility data can also be accepted monthly via magnetic tape as a full file replacement. All incoming tapes as well as hard copy printouts of electronic transmissions are received by our sponsor control analysts. These individuals are responsible for coordinating tape applications with the computer operations area as well as reviewing tape edits and communicating to the client any issues relating to the application of eligibility information.

NPA currently accommodates interim updates to member eligibility information via fax or mail.

Ninety-five percent of electronically transmitted eligibility updates will be posted within two business days after NPA's receipt of accurate, complete and legible information provided in a format acceptable to NPA. More rapid eligibility changes can be handled via on-line, real time terminal access from your offices directly to your database on the NPA System.

CFI is treated as any other pharmacy in NPA's network. NPA is the only organization in the prescription administration industry that offers on-line eligibility services as a stand-alone service.

A copy of NPA's eligibility tape format has already been included as exhibit 5 as requested.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        ESI-277-00002691

55

3.    **What is the turnaround time between receipt of a prescription and shipment of the filled prescription?**

Ninety percent or more of all orders filled in connection with "clean" prescription orders not requiring pharmacy intervention will be mailed within 3 business days after receipt of such orders.

4.    **Describe in detail the process involved in getting a mail order prescription filled.  List each step beginning with the initial contact with the mail order pharmacy.  Clearly identify the parts of the process that involve written communication by the member.  Do you offer any alternative to communications in writing?  Be specific about those steps in the fill process when a pharmacist is involved rather than when a pharmacy technician is involved.**

Ease of use makes the program attractive to your members. An order envelope will be sent to members at the time of their original enrollment. To order or refill a prescription by mail, your members need only follow the directions printed on the mail service order envelope.

Members simply:

1)    Complete the member, prescription, shipping label and "safety cap" information and sign the form.
2)    Enclose and mail the appropriate copayment to CFI (and original prescription, if applicable).

In addition to credit cards, CFI accepts personal checks, and money orders. Payment in the form of cash will be accepted, but is not recommended.

CFI recognizes that we must provide our members and clients with the most advanced mail order pharmaceutical services well into the next century. Recent advances in technology have far surpassed what was available only a few years ago. Therefore, we have moved both CFI pharmacies to more modern facilities and have revised our systems and procedures. The two CFI facilities utilize identical technology. A relational database, open system architecture and client server system support our processes. All programs have been mainstreamed to utilize new data processing tools as they become available and share medication information with other agencies as required.

Prescription orders received at CFI are handled in a tightly controlled environment. Three registered pharmacists and two quality control technicians are required to be involved in the verification, filling, checking and re-checking process of each

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002692

56

prescription. This system guarantees accuracy and professional control from start to finish. CFI provides a three-business day turnaround time for routine prescriptions.

CFI's routine dispensing model is based on technician entry of prescriptions into the computer. Each entered element is checked twice. A pharmacist is the final prescription entry checker. All technicians are under appropriate pharmacist supervision.

1. **Order Entry Preparation** is the sorting of envelopes by client, separation of rush orders, orders containing only refills and information directed to a particular CFI employee.

2. **Deposit Entry** primarily involves removing and accounting of checks utilizing a computer terminal.

3. The function of **Order Entry** is to ensure that member and order information is accurate and current. The order entry clerk inputs the following member specific information: preferred shipper, shipping address, allergy information, safety cap information and adult signature. In addition, the clerk identifies the prescription as either new or refill and checks the prescription for signs of tampering such as ink spots, erasures or alterations.

4. The **Item Entry** is the data entry process in which information from the prescription is entered into the computer. This process verifies the member information and enters the prescription specific information including drug name, quantity, directions, refills and DAW codes. The prescription is again checked for tampering.

5. The order envelope, prescription and any other documentation in the envelope is scanned and imaged for presentation on computer terminals. Through this process, a digital duplicate of the original prescription is created. The paper copy of the original prescription is filed by prescription number and date for future retrieval. Any necessary comments are entered by a registered pharmacist and are permanently retrievable with the prescription image. The date the prescription is dispensed and the name of the dispensing pharmacist are maintained in our computer records. Additionally, when required, information pertaining to the address of the member, DEA number of physician and the date the prescription was issued is maintained and retrievable along with the prescription image. Prescription information is maintained for at least seven years. The most recent 24-month history is maintained on-line for immediate review.

6. **Quality Check #1** is performed by a quality control technician and verifies the member name and address.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002693

57

7. Quality Check #2 verifies the member, drug and member directions information as well as the quantity, refill indicator and physician name and DEA number.

8. Quality Check #3 is performed by a registered pharmacist accessing the member profile. Various computer checks are performed, including:

   1. Over or under doses
   2. Allergies
   3. Drug interactions
   4. Drug-medical condition contraindications
   5. Duration of therapy
   6. Duplication therapy
   7. Early refills
   8. Therapy appropriateness based on age and sex
   9. Plan parameters

   All therapeutic considerations are routed to the pharmacist.

   For new prescriptions, the member, drug, member directions, quantity, refill indicator and dosing guidelines are examined. For refill prescriptions, the pharmacist verifies the original request to confirm refills are available.

9. The **Tote Induction** area, staffed by highly trained pharmacy technicians, electronically receives orders that have been approved by prescription entry quality control personnel, including the pharmacist of record. A prescription label and routing slip are produced, put into a container and placed on a conveyor belt. The prescription label will contain, but is not limited to:

   1. Member's name
   2. Drug name and strength
   3. Directions for use
   4. Date of dispensing
   5. Physician's name
   6. Refills remaining
   7. Initials of the dispensing pharmacist
   8. Manufacturer

   Pharmex warning labels will also be attached to the prescription container as appropriate.

9. The **Traditional and Baker Fill** areas are where a pharmacy technician places the medication into vials and affixes the appropriate label on the vial or package. The prescription label is bar-coded to identify the correct drug. When this bar-code is

58

scanned in the baker fill area, the computer will choose the drug and quantity. Seventy percent of all scripts are filled in the baker fill area. In the traditional fill area, the bar-code on the prescription label is scanned and must match with the bar-code on the manufacturer's label for the selected medication. In the traditional fill area 14% of all scripts are filled. Approximately 16% of all scripts are filled with pre-packaged medications. These steps help CFI ensure accuracy.

10. A Pharmacist verifies that the medication in the container matches the prescription by comparing the drug to a digital, computer image of the actual prescription product. CFI maintains a complete computer imaged drug file. By scanning the bar-code placed on the prescription label, the CFI pharmacist can view on screen a digital, two-sided image of the medication and can visually compare the color, shape, size and any other pertinent markings or imprints. This pharmacist is also responsible for applying a tamper-proof safety tape.

11. A pharmacy technician inserts member counseling messages and Patient Drug Inserts (PDI) about the prescribed medication into both new and refilled prescriptions. PDIs describe the therapeutic benefit of the medication and related precautions. All PDIs comply with the requirements of OBRA 90.

12. The final phase of the dispensing process is located in the shipping area where the correct number of items are with the order. The order will be passed to a computerized manifesting station. It is now ready for shipment. If an item needs to be shipped under refrigeration, we will include a cold pack and make arrangements with the member for it to be shipped overnight delivery. Orders for refrigerated items will be filled and packed in the control room.

Orders for controlled drugs are filled in a separate, secured area. At CFI, all policies and procedures comply with the requirements of the Controlled Substances Act of 1970, the prospective DUR, the member counseling standards of OBRA '90 and all state pharmacy laws and regulations. We also meet all of the standards as outlined in the American Managed Care Pharmacy Association (AMCPA) Pharmacy Practice Standards published in 1990. Approximately eight percent of prescriptions are filled in the secured controlled drug area.

CFI's customer service department is able to immediately retrieve the imaged prescriptions and a complete history tracking a prescription through our system. A toll-free telephone number is provided to all customers. A registered pharmacist will answer questions or concerns about any medication and is available 24-hours a day, 365 days a year.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002695

59

5. **What is the maximum supply that you will dispense at one time?**

CFI recommends a 90-day supply, however up to one years' worth of medication for one requested prescription can be dispensed at one time.

6. **How long can a drug be dispensed before a new prescription is required? Is it possible to dispense a small initial supply, then the balance of the 90-day supply after it is certain no drug reaction has occurred?**

Prescriptions remain valid up to one year from their initial writing. "Starter dose" programs are also available. Trial dose programs are available which will allow the pharmacist to dispense a small initial supply (normally 30 days), then the balance of the 90-day supply after it is certain no drug reaction has occurred.

7. **What are your internal controls to see that a correct prescription has been dispensed and charged to the Fund?**

CFI's philosophy is to provide our clients with the most cost effective quality oriented mail order pharmacy benefit. Our quality assurance and quality control programs focus on our administrative capabilities and dispensing procedures.

---

### ADMINISTRATIVE CAPABILITIES

**Experience and Training**
All pharmacy technicians are required to have a high school diploma or equivalent and are encouraged to participate in pharmacy technician certification programs.

Most CFI pharmacy technicians have been hired with broad pharmacy experience from retail, hospital or mail service settings. Previous pharmacy technician experience is required for those technicians that work in our quality control or item entry department. For technicians that perform dispensing functions, we often promote qualified individuals from within the organization.

CFI hires registered pharmacists with at least two years experience in a retail environment. As a prerequisite for hiring, pharmacists are required to present an original of their valid license. Each candidate is thoroughly checked for any previous violations listed with the Board of Pharmacy. All interviews require references from previous employers. References are telephoned to verify consistency of employment, work history, long and short term career goals, work attitude and ethics and personal strengths and weaknesses. A neat and professional appearance is also required.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002696

60

All CFI pharmacists and technicians are subject to a four week, in-house training program to ensure they are familiar with the operation of all equipment, including computers, bar-coding devices, baker cells, etc. Extensive procedural training is conducted. In addition, manufacturers frequently conduct training seminars in-house to keep technicians and pharmacists up to date on the latest technologies.

All employees function in a probationary mode for two weeks under the direct supervision of a senior representative, technician or pharmacist to ensure quality standards are met.

All pharmacists are required to complete 30 hours of continuing education bi-annually to maintain their licenses. Pharmacy technicians are also required to take approved continuing education programs given in-house.

CFI pharmacists and pharmacy technicians participate in continuing education programs on an individual basis. CFI offers accredited correspondence programs in conjunction with manufacturers such as Squibb, Schein, Novartis, Roche, Abbott, Schering, Merck/Sharpe & Dohme, Burroughs/Welcome, Johnson & Johnson, Parke Davis, Wyeth and Glaxo to name a few. Currently, CFI has in excess of 60 such programs available to our pharmacists.

Additionally, CFI offers live, continuing education seminars for the professional staff. Recently provided seminars are:

| | |
|---|---|
| CRIXIVAN: A TREATMENT FOR HIV DISEASE<br>Sponsored by Merck/Sharpe & Dohme<br>Presented as a remote speaker presentation | 0 credits |
| THE ABUSE OF B-ADRENERIC AEROSOLS<br>Sponsored by Boehringer<br>Lecture by John Stauffer, MD | 0 credits |
| PHARMACOTHERAPEUTICS UPDATE<br>Sponsored by Merck, Sharp, & Dohme<br>Lecture by Dan Hussar, Ph.D. | 2 credits |
| AN UPDATE ON ANTITHROMBIC THERAPY<br>and ATRIAL FIBRILLATION<br>Sponsored by Dupont<br>Lectured by Linda Kitlinski, R.Ph., Dupont | 2 credits |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002697

61

Pharmacists are also encouraged to participate in the functions of his or her professional organizations at the state, local and national levels. Membership in recognized pharmacy organizations is reimbursed to the member by CFI.

---

### QUALITY PROCESSING

CFI is dedicated to maintaining quality and efficiency throughout our entire dispensing process. CFI's dispensing procedures include extensive quality control measures prior to the "actual dispensing" of medication.

CFI mail service facilities use a bar-code tracking system. Each order is bar-coded immediately when received at the facility. The bar-code stays on the member's envelope from the time of receipt to the time the order leaves the facility. The system serves three main functions:

- To track the prescription through every phase of filling
- To eliminate the data entry errors
- To accurately report data

All staff members have their own identifying bar-code number. If a problem should arise, preventing prescription fill, the bar-code is scanned and placed into a special bin that also is bar-coded and scanned. The person who detected the problem is identified. The number is translated into text-bearing information that includes the person's name and location in the building where the problem was found.

The filling phase in which the prescription was delayed is also identified. When the pharmacist calls the prescribing physician or the member, all information is available on how to rectify the problem as quickly as possible.

Multiple checking procedures provide maximum accuracy. The repeated involvement of up to four different registered pharmacists throughout the process assures professional judgement.

At the order entry level, the member and order information is entered and verified. The following member specific information is entered: preferred shipper, shipping address, allergy information, safety cap information and adult signature. In addition, the clerk will identify the prescription as either new or a refill and check the prescription for such signs of tampering as ink spots, erasures or alterations

At the item entry level, a quality control clerk data enters the prescription information including: drug name, quantity, member directions, refills and DAW codes into the computer.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002698

62

CFI's quality check #1 is performed by a quality control technician and verifies the member name and address. Quality check #2 verifies the member, drug, directions, quantity, refill indicator, physician name and DEA number and may be performed by a registered pharmacist.

Quality Check #3 is always performed by a registered pharmacist who accesses the member profile. DUR is performed, including: over or under doses, allergies, drug interactions, drug-medical condition contraindications, duration of therapy, duplication therapy, early refills, therapy appropriateness based on age and sex and plan parameters.

## QUALITY DISPENSING

CFI is prepared to provide our clients and their members with the most advanced mail order pharmaceutical service well into the next century. Recent advances in technology have prompted CFI to upgrade our systems and procedures over the past three years. CFI now offers a completely paperless dispensing process that results in superior dispensing efficiency and accuracy.

Computer technology allows CFI to produce a digital duplicate of the order envelope, prescription and all other documentation. These images produce the prescription specific information that is available to each CFI customer service representative throughout the dispensing process to address medication questions and shipping information, etc.

Advances in dispensing technology have allowed CFI to incorporate automated baker cell units into our process. Currently 65% of the prescriptions filled at CFI are dispensed from baker cell units. Utilizing baker cell units assures dispensing accuracy. Each baker cell unit is bar-coded for the medication it contains. Therefore, the pharmacy technician scanning the bar-code on the prescription will receive an accurate match with the appropriate baker cell. Further, each baker cell unit has a display box for one unit of the medication for visual verification by the pharmacy technician. Each baker cell is fitted to accommodate dispensing of a specific medication and can not be utilized for any other medication as it will not "fit" the dispensing plate.

The final step in CFI's dispensing process offers the most innovative quality check available. CFI has internally developed a digitally image drug file to ensure the final quality step. Photographs of more than 5,000 drugs are available to the final check pharmacist to verify and correct medication strength.

This is the most extensive computer imaged drug file in the nation. By scanning the bar-code affixed to the prescription package, a CFI pharmacist can view on screen a digital,

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002699

63

two-sided image of the medication and visually compare the color, shape, size and any other pertinent markings or imprints.

CFI maintains high levels of security for all prescription orders for controlled medications. Controlled drugs are filled in a separate, secured area, and those prescription orders, including several medications in addition to controlled medications, are packaged, sealed and shipped from our secured area.

CFI's mailing procedures are safe and tamper-proof. As an added safeguard, delivery via UPS is utilized for controlled substances and shipped in unmarked containers.

The computer system utilized by CFI maintains an audit log of each person that performs a task with the prescription order as the order moves through the facility. When a problem with the order is discovered, the individual that performed the task or tasks creating the problem is identified.

CFI maintains a ▓▓▓▓ dispensing accuracy rate as a result of the quality assurance and quality control programs described above.

8.   Does your system have the capability of determining or tracking irregularities in the prescribing or receiving of drugs or interaction between drugs that adversely affect the patient? Can these same issues be determined or tracked between the retail program and the mail order program for the same patient?

Yes. CFI and ▓▓▓ of our participating retail pharmacies are directly linked to a common member database on the NPA system. Before a prescription is dispensed at the mail service or community pharmacy, the member's complete prescription history is scanned for potential therapeutic conflicts as well as adherence to all plan eligibility rules. All review takes place in an on-line, real time environment, while updating one comprehensive database instantaneously. The result is comprehensive claims and therapeutic management using all prescription information, regardless of the source. DUR is enhanced, since meaningful DUR cannot be performed without complete prescription profiles.

9.   What is your generic fill rate for mail order drugs?

CFI's clients are currently realizing an ▓▓▓ overall generic fill rate in our mail service program.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002700

64

10.   If an individual has lost eligibility under the Fund, is it possible for that
      member to continue to receive maintenance drugs with your company
      and be billed directly?  If so, what would be the cost to the individual?
      What would be the cost (if any) to the Fund?

Yes.  Pricing will be the same as that offered to the Fund.

11.   How are patients advised that their prescriptions are about to run out?
      How much advance notice is given?

Should CFI dispense the last refill of a prescription, CFI's billing statement will indicate
"There are no refills remaining on this prescription.  If you need more, show this label
to your doctor.  If appropriate, your doctor can attach this label to his/her prescription
blank and sign."  It is the responsibility of the member to phone or visit their physician.

12.   What delivery system do you use (UPS, Postal Service, Federal Express)?
      If you use the Postal Service, do you use first or third class mail?  Is
      there a charge to the member for postage or for the delivery service?

All medications are shipped in unmarked packages via UPS, U.S. First Class Mail,
Priority Mail, Express Mail or Fed Ex. Three situations determine why and when each
carrier is used:

- CFI responds to members' requests, if they have a preference.
- For all post office boxes, US First Class Mail must be used because UPS does not
  deliver to post office boxes.
- The weight of the package and location of the member determines the mailing
  method. Generally, for all packages weighing less than 11 ounces, CFI sends via
  First Class Mail. For all packages weighing more than 11 ounces and less than
  two pounds, CFI sends via priority mail. Packages weighing more than two
  pounds, CFI sends via UPS. Each carrier makes pick-ups twice each day.

The preferred route for all controlled substances is UPS, but Schedule III, IV and V may
be sent first class.

CFI's mailing procedures are safe and tamper-proof. As an added safeguard, each
prescription vial is sealed with a tamper-resistant tape. Additionally, glass containers
will be wrapped in bubble wrap.

Items requiring refrigeration are packed in blue ice and shipped in insulated
envelopes/boxes. All items requiring refrigeration are shipped via UPS Next Day Air or
Federal Express depending on the zone and next day delivery time.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002701

65

Frozen items generally are not included in the maintenance type medications. However, in the rare instance that a member should require such an item, CFI will arrange for the medication to be shipped in dry ice as required

Any packages shipped UPS with a declared value of $1,000 or more will be insured. Packages sent by U.S. Mail are not insured as a rule.

Unless the member requests a specific form of mailing, such as overnight, CFI shipping charges are included in the CFI dispensing fee. Charges for special shipping requests such as overnight, that are not normally shipped by such means, are charged to the member. The member agrees in advance to pay for the additional charges.

13. **Do you have a toll-free telephone number that members can use? When is your telephone service available? Can they speak directly with a pharmacist?**

Yes. Mail service members will call CFI in New Jersey at 1-800-628-0717. CFI customer service department will handle all inquires regarding mail service prescriptions including date received, date shipped, method of shipment, prescription cost, etc. To ensure member privacy and confidentiality, members always have access to a registered pharmacist 24-hours a day, 365 days a year for clinical counseling.

14. **What systems are in place for cross-checking a mail order maintenance prescription fill request with prescriptions submitted to retail direct access pharmacies for fill?**

Since CFI submits claims electronically to NPA, eligibility is verified in the same on-line, real time manner as at the retail pharmacy.

The NPA and CFI system is totally integrated so you will only need to transmit eligibility once to NPA. Once applied to the NPA system, the information will be immediately available to both retail and mail service pharmacies.

15. **Are mail order quantities, prices and discounts made available at the retail pharmacy network level for members who have run out of their medications while awaiting receipt of the mail order?**

No. However, we do have the capability to administer a mail drug program at the retail level.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002702

66

16.    Can the Fund have a mandatory rule that <u>all</u> prescriptions for more than
       a thirty (30) days supply must be filled through the mail order program?

Yes.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002703

**D.   Prospective and Retrospective Drug Utilization Review (DUR)**

The Fund desires a prescription DUR program that monitors both the retail prescription drug program and mail order drug program.  Please provide detailed information about your prospective and retrospective DUR.

1.   **Please describe your prescription DUR program in detail.  In addition to a description of the program and how it functions, please advise how your DUR program addresses the following issues:**
   – quality and cost of patient's recommended therapy
   – physician prescribing patterns
   – pharmacy dispensing practices
   – therapeutic and dosing regimes
   – generic monitoring

NPA has developed and implemented a comprehensive, clinically oriented DUR Program to provide for quality member care while concurrently managing and containing the costs of pharmaceutical service. The program's objectives are to identify instances of inappropriate or questionable patterns of drug use, detect instances of fraud and abuse, promote rational cost-effective prescribing and to achieve a long-term positive impact on physician prescribing habits.

The successful achievement of this objective will minimize the needless expenditure of healthcare dollars that result from inappropriate or less-than optimal drug therapy. Most importantly, the process will provide a means toward better member care and the long-term, immeasurable benefits of increased quality of life and productivity. DUR will also reduce the need for future, more expensive, healthcare measures.

The approach to NPA's comprehensive DUR program is characterized by three levels of effort, each with its own operational methodology, but designed to fully integrate and support each other. It is a highly structured program that reviews, analyzes and interprets patterns of medication usage measured against predetermined therapeutic criteria and practice standards. The process of evaluation, interpretation and intervention takes place concurrently at the point of service, retrospectively by means of individual member drug history reviews, and prospectively through physician education.

Specific DUR activities currently performed for NPA clients include: (1) concurrent (2) retrospective, and (3) prospective. Applying all three levels provides for a comprehensive approach to managing drug utilization. By definition concurrent DUR identifies questionable or inappropriate utilization immediately at the point of dispensing via electronic edits and alert messages transmitted to the pharmacist before the prescription is dispensed to the member. The edits allow the dispensing pharmacist

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002704

62

to reevaluate the prescription order for the member and determine whether the prescription should be dispensed, whether the physician should be alerted to a potential problem, or whether the member should be further counciled. The retrospective DUR component is a comprehensive analysis of a member's drug history in order to identify inappropriate patterns of care that are of a more complex nature. Pharmacists and specially trained pharmacy technicians conduct the analysis via a desk review. It is designed to complement the concurrent DUR process and is composed of three major review areas which include: clinical issues, program fraud and drug abuse issues, and opportunities to encourage the use of formulary preferred products. The prospective DUR component seeks to influence the prescribing of preferred drug products, increased generic use and optimal formulary compliance by analyzing physician practice patterns and communicating these issues to physicians via written, telephone, or face-to-face consultation sessions.

In the retrospective and prospective components of NPA's program, a unique method of physician communication is applied when a member's pattern of drug use falls outside the established standards of appropriate medication protocols. It is the objective of this communication tool not only to identify the existence of a therapeutic problem, but also to effect a change in the physician's prescribing patterns resulting in a positive therapeutic outcome.

NPA's Drug Utilization Review Process focuses on the three most significant areas of concern in a typical prescription benefit program, namely intentional fraud and abuse, inappropriate or harmful therapeutic drug regimens, and needlessly expensive drug regimens.

An approach has been developed to address these concerns; an approach that utilizes:

- A professional review staff of pharmacists and technicians
- A panel of consultant pharmacists and physicians of varying professional backgrounds to provide an additional dimension of expertise
- A variety of management reports that identify cases requiring review
- The ability to access a member's drug history in an on-line, real time data base environment for timely intervention
- A unique mechanism of provider communication to identify the problem, provide current medical information and provide the means for physician feedback including the gathering of epidemiologic and demographic data regarding a specific case

The management reports are the tools that allow us to identify and attach utilization problems from three different perspectives.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002705

63

From a member perspective we can identify physician's prescribing patterns and compare these individual patterns with the norms for all physicians within a certain specialty group.

From the member perspective we are able to rank individual beneficiaries within client groups to compare their drug use within norms or average values of utilization.

From the perspective of specific drug or drug therapeutic class we can identify the utilization levels of the individual drugs themselves by ranking their usage values within specific client groups.

Using this three tiered approach to identifying utilization problems allows NPA the ability to identify a variety of aberrant usage patterns and the flexibility to adapt our DUR process to the unique issues and management objectives of each individual client. Thus our DUR process has evolved into a series of modules, each modules specific to the drug, therapeutic category, or utilization patterns that may be unique to an individual case.

Central to all of NPA's DUR modules is the communication to the physicians. This consists of a complete and current drug history profile detailing the drugs, dates of service, and the various providers; a detailed analysis and discussion of the therapeutic problem; supporting documentation excerpted from current medical literature; cost comparison charts for specific therapeutic categories (e.g. Step care therapy module); and a questionnaire used as a vehicle for guiding the physician in his/her analysis of the profile and documenting the information germane to the case.

NPA's goal is to provide the physician with all the information necessary to make a more rational prescribing choice in the future.

A typical response received from a physician would be them receiving information that appears valid. However, given a member's unique medical needs; no change in medication regimen will take place Regardless of the response, the DUR process incorporates a case reevaluation at the three month post review interval and again at the six-month post review interval to quantify the success of the NPA intervention.

The final product is a case file that provides the documentation necessary for the benefit administrator to reach a decision on the appropriate adjudication of the problem.

The final outcome is the elimination of fraudulent or abusive patterns of drug use and a shift toward a more medically appropriate and cost effective drug regimen.

Each review module has shown its own degree of success or effectiveness. Interventions in the areas of fraud and abuse of overutilization of controlled substances have

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002706

64

dramatic success, as do certain therapeutic review modules such as the anti-ulcer agents. Others have fairly modest success rates such as the cholesterol lowering drug modules.

It is a fact that the majority of interventions result in a beneficial therapy change. While the change is often to a less expensive therapy, it is always to a more appropriate one.

The effectiveness of the NPA DUR Program is measured by a continuing statistical evaluation of the process.

The NPA drug utilization program is a model for any ideal DUR program. It is designed to be comprehensive enough to integrate with various utilization management strategies inherent in typical drug formulary, disease management, demand management or case management program goals and objectives.

The operational methology inherent in the drug utilization program is designed to be flexible enough so any one or all modules of the program can be implemented as either a stand alone management strategy or as an integral component of a broader based utilization management strategy such as a disease management of case management program.

| Concurrent Drug Utilization Review Program |
| --- |

NPA's concurrent DUR program provides our clients with member specific utilization review. NPA provides our members with a greater depth of clinical information as exemplified by variety of edits as well as information about more ranges of severity levels. The goal of the Concurrent DUR Program is to provide information to assist the pharmacist in their decision making process.

The NPA clinical database is updated on a regular basis. In addition, NPA tests claims on a regular basis to ensure the information in the clinical database is valid.

NPA subdivides Concurrent DUR into the following component areas:

> Administrative
> Clinical
> Refill Too Soon

Upon transmission of a claim the NPA process involves screening the claim for possible administrative rejection.

The administrative edits generally are a function of plan design and include, but are not limited to, edits such as card not valid, dependent over age, duplicate claim, eligibility

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002707

65

expired, NDC not allowed, member ineligible, YTD max/plan limits and others. If a
claim is rejected for administrative reasons a pharmacy can not override the denial.
NPA recognizes that in certain circumstances a client may decide to authorize payment
for a drug that is normally excluded or person that is no longer eligible. If a client so
chooses, NPA can set up a real time electronic authorization.

If a claim passes through the administrative edits the claim then is screened for possible
refill to soon conflicts and clinical DUR conflicts.

**Refill To Soon:** NPA recognizes the difficulties that may arise by use of a flat
percentage logic, (example no refill before 75% of the prescription is used). As a means
of dealing with real world utilization patterns, NPA uses a progressive algorithm that
works based on the day's supply for the initial prescription. A prescription bearing a
one to seven days supply can be refilled once 50% of the prescription has been used.
This algorithm progresses up to a 30 days supply. Once a prescription bears a 30 days
supply, or greater, 75% of the prescription must be used before a refill is allowed. NPA
has the ability to completely block refills based on the early refill edit, but we offer the
flexibility of allowing the same pharmacy to dispense an early refill if the member
provides a valid reason. An example of an early refill is the member increasing the
prescription's dose schedule. In the event the refill or additional filling request comes
from a second pharmacy, a pharmacy override will not work. This mechanism is in
place to ensure prescription shopping so overutilization does not occur.

### Concurrent Clinical DUR Edits

**Drug To Drug Interaction:** Upon receiving a claim, the drug is matched with other
prescriptions the individual member is using. The database screens the combinations
for possible drug to drug interactions. If a potential conflict exists a message goes back
to the dispensing pharmacy. The response message provides information about the
conflicting drug, severity level and other issues. If a pharmacy requires more
information NPA has a HelpDesk and clinical pharmacists present.

**Therapeutic Duplication:** The transmitted claim is run through the person's medication
profile. The process involves matching the information for the transmitted claim with
information for prescriptions currently on the member's profile. If the member's current
use exhibits claims in a similar therapeutic category a warning message goes back to the
pharmacy.

**Incorrect Dosage:** Upon receiving a claim, the daily dosage is determined by dividing
the quantity by the day's supply. The resulting daily dose is compared with the drug
information database. The database contains information concerning maximum and
minimum daily dose. In the event the claim's daily dose is outside the norm for the
drug a warning message goes back to the pharmacy. NPA offers a client the option of

66

not paying a claim until a pharmacist documents the action taken and resultant outcome.

**Drug To Disease Interactions:** Upon receiving a claim, the drug is matched with other prescriptions the member is using. The database contains information concerning transmitted drugs that may experience conflicts. This information is matched against the claims currently in the member's history. The database contains information concerning probable disease states for the claims in the member's history. If a match is found a warning message goes back to the pharmacy. The warning message provides the severity level, the conflicting disease and other data.

**Dose Range Check:** Determines if the dosage and duration of therapy for the transmitted claim as evidenced by the drug, quantity and day's supply fall within the established norms of the drug. If a potential exception is found a warning message goes back to the pharmacy. The warning message provides the severity level, conflicting disease and other data.

**Drug To Pregnancy:** NPA uses a woman's age as a possible pregnancy marker. Our experience demonstrates this is clinically more supportable than using prenatal vitamins as a marker. This experience is borne out because not all clients pay for vitamins. In some cases a pregnant female may use a nonprescription vitamin. The transmitted claim matches the member information to determine if the female is of childbearing years. If yes, the drug database is screened to determine if a potential drug pregnancy conflict exists for the drug. If a potential conflict exists a warning message goes back to the pharmacy. The message provides a precaution if pregnant warning along with the severity level of the potential conflict.

**Drug To Age:** The NPA Drug Age edit consists of two parts, a Geriatric conflict module and a Pediatric Conflict module. The transmitted claim matches the member information to determine if the member's age corresponds to a potential Geriatric or Pediatric conflict for the drug. If a conflict exists the appropriate warning message goes back to the pharmacy along with a severity level.

**Underutilization:** NPA addresses underutilization by use of it's Minimum Daily Dose edit and Dose Range Check edit.

**Overutilization:** NPA addresses overutilization by use of it's Maximum Daily Dose edit, Dose Range Check edit, Early Refill edit and Duplicate Therapy edit. If, after matching the transmission with medications appearing in the individual member's medication profile, potential conflict is found a warning message goes back to the pharmacy. The nature of the potential conflict determines the type of response message and potential outcome. For example, coming in very early results in a Refill Too Soon message whereas a transmission for the same drug obtained at another pharmacy

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY       ESI-277-00002709

67

results in a Duplicate Therapy message and rejection. A transmission for a drug in a therapeutic class, but not the same drug, already being used by the member results in a Therapeutic Duplication caution message to the pharmacy.

**Drug Lactation:** This edit uses logic similar to Drug Pregnancy. NPA uses a women's age as a marker for potential lactation. If the transmitted claim has a lactation warning, a caution and severity level goes back to the pharmacy.

During 1999, NPA achieved a savings of ████████ for the Fund in concurrent DUR. This includes:

- ████████ in administrative edits
- ████████ in clinical edits
- ████████ in "refill too soon" edits

Please refer to exhibit 6 for NPA's concurrent DUR savings reports.

| Retrospective Drug Utilization Review Program |
|---|

NPA's retrospective DUR program takes a multilevel approach to identifying, communicating and resolving instances of questionable therapeutic drug regimens. It is an approach that analyzes patterns of utilization from the member's perspective as well as the unique prescribing habits and the pharmaceutical care provided by the physician. Each level of the program is defined by its objectives, types of review modules performed and levels of administrative detail.

<u>Clinical or Therapeutic Approach:</u>

This phase of the review process focuses on the application of predetermined pharmacologic and epidemiologic standards to an individual member's medication profile. Those member drug profiles that exceed the standards are flagged for review and provider contact is limited. Some of the standards applied in this phase include:

- Appropriate daily dose specific to drug
- Appropriate duration of therapy specific to drug
- Dose or duration of therapy specific to drug and member age
- Multiple drugs within same or similar therapeutic category used concurrently
- Drug-Drug Interactions
- Drug-Disease Interactions
- Drug-Age Incompatibilities
- Drug-Sex Incompatibilities
- Multiple members and/or pharmacy providers

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002710

68

- Overutilization
- Underutilization

## Cost-effective Therapeutic Alternative

The second level of NPA's retrospective DUR program addresses issues of cost containment, where needlessly expensive drug regimens are identified and physicians are encouraged to change the therapy to an equally appropriate but more cost effective protocol. The specific DUR modules used in the control prescription program include therapeutic categories of drugs that contain a large number of agents from which a physician can select an appropriate therapeutic alternative. These may include but are not limited to: the Histamine Antagonist anti ulcer agents, Antibiotics, Nonsteroidal Anti-inflammatory analgesics, Antihyperlipidemic drugs, Antihypertensive agents, Antidepressants, and inhaled Asthma products.

## Fraud and Abuse

The third level of retrospective DUR embraces the identification of fraud or abuse and is focused on the beneficiary. All member drug utilization histories are electronically screened. Each member is ranked by specific utilization criteria such as dollar amount spent, number of prescriptions used, number of pharmacy providers used, percent generic used, percent controlled drug usage, and others. Members are selected for review based on predetermined ranking criteria. For example, members who rank high in number of prescriptions, percent controlled drug and number of pharmacies used may be candidates for overutilization or fraud/abuse review modules. The electronic screening process also identifies members who exhibit a pattern of use that reflect questionable concurrent drug use signaling potential drug-to-drug interactions or inappropriate duplicative therapy. The initial screening may also reveal individuals who are at risk for a drug-to-disease conflict of drug-age conflict. Essentially, the screening process will identify each member whose drug utilization reflects a questionable pattern of care as defined by the predetermined clinical criteria incorporated in each DUR review module.

Once a member has been flagged for a DUR intervention, NPA's DUR case management process is initiated. The cornerstone to the process is member communication. The communication may involve written material or telephone contact. The tools used to communicate the utilization issue(s) to the prescribing physician include an alert letter explaining the specific problems that have been identified, a clinical monograph, an excerpt from current relevant medical literature which further defines and supports the perceived issue, the members drug history profile, and a brief questionnaire whose completion and return serves as case documentation. Each component of the physician communication is produced by NPA's automated DUR process. The physician alert letter, the corresponding member profile, appropriate

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002711

69

monograph (s) and questionnaire are printed and mailed according to the specific member identified as a review target and the specific issue (s) identified during the electronic screening process. Quality control procedures are in place to insure integrity of the automated process and accuracy of the material being sent.

Registered NPA pharmacists supervise the quality control process as well as pharmacist supervised pharmacy technicians.

Once a member has been flagged as an active case and the review process has been initiated, retrospective follow up outcome studies are performed subsequent to the review to determine whether any positive, negative or neutral outcome has been achieved. These outcomes are totaled and reported statistically to the Drug Program's client.

All levels of the DUR process including the development of the clinical review criteria, the content of the alert letters, the clinical monographs, and questionnaires are produced by an in-house professional staff of registered pharmacists. The product of NPA's staff pharmacies, research and eventually compilation is reviewed and approved through consensus of NPA Pharmacy, Therapeutics Committee and by an ad-hoc Advisory Panel of physicians composed of clinicians of various specialties and practice settings.

Upon approval of the P&T Committee and the Physician Advisory Panel, the various DUR modules and procedures are implemented. NPA's staff pharmacists and highly trained pharmacy technicians conduct reviews on an on-going basis, under a pharmacists' supervision in NPA's professional services department.

The typical client can expect an annual cost savings associated with NPA's retrospective DUR process equal to ██████ per case review.

---

**Prospective Drug Utilization Review Program**

---

The prospective DUR or physician profiling component to NPA's DUR program seeks to identify and trend physician prescribing patterns. Analysis of physician prescribing habits identifies members who practice outside the usual patterns of pharmaceutical care. These members practice contrary to the established plan goals of formulary or generic prescribing levels. A series of statistical reports are the tools used by our DUR staff to rank each physician by certain prescribing criteria such as formulary compliance, generic prescribing, dollar amount prescribed, number of prescriptions, dollar amount per member, etc. Other reporting tools include: (1) physician profile that lists the top twenty therapeutic categories and individual drugs prescribed by an individual physician. It also tabulates prescribing statistics and compares these to normative prescribing patterns to the physician's specialist peers. (2)

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

70

Physician/member usage report which identifies a members' individual members and the specific drugs prescribed for them. At an additional cost to the client, NPA can offer an ad-hoc reporting package known as Script-Data™ that provides instantaneous access to physician as well as plan wide utilization data. It provides extensive data sort capabilities and allows the user to identify prescribing and utilization trends from general therapeutic category or physician specialist level down to individual drug and member level at the touch of a button.

Some of the issues addressed when reviewing physician prescribing patterns are:

- The administration of expensive medications where equally effective yet less costly therapeutic alternatives can be considered

- The appropriate use of a step care drug treatment protocol when treating certain medical conditions

- Drug formulary compliance

- Lack of generic drug prescribing

Analyses of physician utilization reports identify member outliners. Once identified, an intervention letter describing the issue, a physician report card illustrating the problem and an excerpted literature monograph for education support is mailed to the physician. The physician is asked to respond. After an adequate time interval (to allow for prescribing changes) a reevaluation is conducted. If the reevaluation determines that no significant change in prescribing has taken place, a second communication is sent followed up with a phone call to the physician. Physicians who are extreme outliners (top 3 to 5 percentile) are communicated to by telephone or at the option of the client, by an on-site face to face visit.

To date only two of our current clients have opted for the physician intervention program. Therefore, experience data is limited and reflects the activity based on the prescription volumes of those specific clients.

Success rate is measured by the number of positive responses elicited from the physician. A positive response would be one that reflects a members' agreement with the objectives of the intervention and a willingness to reevaluate his/her prescribing regimen when appropriate for the individual member.

A clinical pharmacist or Pharm.D. visits a physician onsite. During the meeting the pharmacist discusses the selected issue(s) providing the physician with a detailed analysis of the report card and a review of the educational material pertinent to the topic at hand. The session is a question and answer period lasting from 15 to 30

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002713

minutes. It is expected that this type of intensive interaction will produce a significant improvement in overall physician compliance. Since the top five percent of members usually account for 25 to 30% of expenditures and that the top five percent is the target for face-to-face intervention, we anticipate an additional five to ten percent reduction in overall costs.

> 2.    Please list the credentials of the staff that performs the prescription DUR and describe their roles in the process.    What are their qualifications?

NPA is differentiated from other pharmacy benefit managers in that its clinical programs are fully integrated. Each component such as concurrent and retrospective DUR, disease management, physician profiling, or formulary initiatives, is linked by common goals concerning drug compliance and the optimal use of preferred drug products. NPA employs coordinating methodologies for identification of intervention opportunities. The clinical initiatives combined compose NPA's Patient Health Management Program.

NPA's clinical and pharmacy programs are directed by **Robert M. Voytovich, Pharm. D., Senior Vice President of Professional Services.** Mr. Voytovich's responsibilities include Drug Utilization Review, Patient Health Management, NPA's Pharmacy and Therapeutics Committee and Network Management. Mr. Voytovich is a new addition to the NPA team. He brings 30 years of pharmacy experience to our organization in the retail, hospital and HMO venues.

His previous experience includes working for both McCoubrie Pharmacy and Sunray Drugs as a Staff Pharmacist, Underwood Memorial Hospital as the Director of Pharmacy and HIP Health Plan of New Jersey as Director of Pharmacy Operations.

He is actively involved in professional activities and is a member of the American Society of Health System Pharmacists (ASHP), the New Jersey Society of Hospital Pharmacists (NJSHP). In addition, he served as President of this affiliation. Also, Mr. Voytovich serves on the legislative committee of the Academy of Managed Care Pharmacists (AMCP). Additionally, he is an adjunct faculty member at Rutgers College of Pharmacy in New Jersey.

Mr. Voytovich has been the recipient of several awards within his realm of expertise including Merck Sharp & Dohme Pharmacist Achievement Award in 1988, Ciba-Geigy Leadership Award in 1988 and the New Jersey Society of Hospital Pharmacists Achievement Award in 1988.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002714

72

He was appointed to the advisory boards of Abbott Labs in 1994, Pfizer Labs in 1995, Rhone Polenc Rorer in 1993 and currently serves on the Rutgers College of Pharmacy Trustee/Advisory Committee which he has been a member of since 1994.

During his career, Mr. Voytovich has authored and co-authored numerous articles in pharmacy and medical publications. His most recent appeared in the American Journal of Managed Care in March of 1997 and analyzed the use of antifungal drugs in the treatment of nail fungus.

In addition, he is a notable presenter within the pharmacy community and has presented on topics concerning hospital and managed care issues.

Mr. Voytovich earned a bachelor's degree and a doctor of pharmacy degree from the Philadelphia College of Pharmacy and Science in Philadelphia, PA. He completed an administrative residency at Thomas Jefferson University Hospital and is a licensed pharmacist in New Jersey and Pennsylvania.

**Peter Grieger, R. Ph., Senior Vice President Clinical Services,** holds a BS in Pharmacy from the Philadelphia College of Pharmacy and Science. Mr. Grieger has more than 20 years experience in prescription benefit program administration and pharmacy practice.

During the last nine years, Mr. Grieger has held various positions with NPA. Currently, as Senior Vice President of Pharmacy Programs, his responsibilities include the management and supervision of NPA's Professional Services and Professional Relations activities. These include Drug Utilization Review programs, Patient Health Management (Disease Management) initiatives, corporate and client drug formulary, new product development, provider network development and support. He is a member of the NPA Pharmacy and Therapeutics Committee and his specialty is cardiovascular pharmacotherapy.

Mr. Grieger was selected as a member of the Health Care Financing Administration's Expert Advisory Panel, charged with the development of criteria and standards for benzodiazepine use. Additionally, he was selected to serve on an expert panel of clinicians called upon to develop drug use review criteria for the antidepressant drug Pamelor under the auspices of the Sandoz Pharmaceutical Company and the Philadelphia College of Pharmacy and Science.

Current memberships include the American Pharmaceutical Association, Academy of Managed Care Pharmacy, American Society of Consultant Pharmacists and Association for Pharmacoeconomics and Outcomes Research.

**Ronald J. Smith, R.Ph., Vice President Clinical Services,** is a registered pharmacist in the State of New Jersey. Mr. Smith's responsibilities at NPA include the directing,

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY         ESI-277-00002715

73

planning and coordinating of the Professional Services Department. He is directly responsible for all drug utilization review. In addition, Mr. Smith's department handles all claims requiring professional review criteria and claims requiring a pharmacist's response.

Holding a BS in Pharmacy from St. John's University, Mr. Smith is a former member of the New Jersey State Board of Pharmacy and was a union contract negotiator for health benefits. He also has experience in hospital, chain and independent pharmacies.

**Edward Burdzy, R.Ph.,** currently holds the position of **Director of Professional Services** at NPA. His responsibilities involve conducting and supervising Retrospective Drug Utilization Review, management of the Concurrent Drug Utilization Review Program and compliance intervention for the Accupril, Pravachol and Lescol® programs (multiple year programs dedicated to improving the overall health and disease outcome in hypertensives and antilipidemics). Additionally, Mr. Burdzy resolves inquiries requiring professional evaluation from clients, members and pharmacies. He is also a member of NPA's Pharmacy and Therapeutic Committee and is responsible for respiratory and urological drugs.

He joined the NPA staff in 1986 as Coordinator of Professional Services. In that capacity, he conducted Retrospective DUR and provided feedback for questions requiring a pharmacist's knowledge. His accomplishments include coordinating, quantifying and reporting on a Pilot Retrospective Drug Utilization Program designed to document the savings realized from Retrospective Drug Utilization Review. The Pilot Program was a project conducted in cooperation with The New Jersey Medical Society, The New Jersey Pharmaceutical Society and Rutgers University College of Pharmacy. The final results of the Pilot Program appeared in the New Jersey Journal of Pharmacy.

Mr. Burdzy was also responsible for enhancing the reporting associated with Concurrent Drug Utilization Review and developing new reports designed to identify and preclude certain types of fraudulent activity.

Additionally, he was instrumental in NPA obtaining research grants from two major international pharmaceutical companies, Eli Lilly and Hoescht Marion Roussel. The grants funded studies dedicated to improving compliance in patients not compliant with their prescription therapy. Mr. Burdzy successfully completed, quantified and reported on both studies. Additionally, he presented a poster demonstration at the 1996 American Academy Family Physician's Conference. He has over eighteen years professional experience, including more than ten years experience in Pharmacy Benefit Management.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002716

74

He holds a bachelor's degree from the New Jersey College of Pharmacy and is a registered pharmacist licensed in the State of New Jersey. He is also a member of the New Jersey Pharmacist Association and the Passaic County Pharmacist Association.

Joseph Casey, R.Ph., as Coordinator of Professional Services, is responsible for overseeing the prior authorization process, including determinations and implementation. He reviews and authorizes pharmacy claims, which require professional judgment, handles drug file maintenance and provides support to NPA's Customer Service and Professional Relations Departments. Mr. Casey also interfaces with the pharmacy community on a daily basis to answer any questions the pharmacists may have concerning the NPA program.

Mr. Casey has been employed at NPA since 1988 and has 37 years of industry experience, including working as a pharmacist-in-charge, manager and owner of numerous retail pharmacies. He was instrumental in the development of both the NPA Formulary and our automated drug utilization review process. He is also a member of NPA's Pharmacy and Therapeutics Committee and the New Jersey Pharmaceutical Association.

He holds a bachelor's degree from Fordham University, Bronx, NY. Mr. Casey is a registered pharmacist licensed in both New Jersey and New York.

David Brodsky, R.Ph., Assistant Vice President of Patient Health Management/DUR, is responsible for overseeing the daily operations for Patient Health Management; maintaining and updating current Patient Health Management Modules; administrative duties for Demand Management Activities; development of new Patient Health Management Programs; and management of DUR development at NPA's East Hanover facility.

Prior to joining NPA in November of 1998, he was employed with Eger Health Care and Rehabilitation Center of Staten Island as Director of Pharmaceutical Services from 1993-1998. As Director he was responsible for acquisitions, dispensing, storage, control and management of pharmaceuticals and review of all policies and procedures related to the operation of the pharmacy department in New York City.

Mr. Brodsky possesses 11 years experience in the health industry. He is an active member of the American Society of Consultant Pharmacists, New York Directors of Long-Term Care, NPA's Pharmacy and Therapeutics Committee and Quality Improvement Committee.

Mr. Brodsky, a registered pharmacist, earned a bachelor's degree in Pharmacy from the Arnold and Marie Schwartz College of Pharmacy in Brooklyn, NY and a master's

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002717

75

degree in Public Administration with a focus on healthcare from Long Island University's School of Business in Brooklyn, NY.

Russell G. Jayne,  Pharm. D., holds a position of Clinical Pharmacist at NPA. Mr. Jayne's responsibilities include involvement in Prior Authorization process and Patient Health Management program. He interfaces with physicians to obtain information determining the need of certain high cost therapies requiring prior authorization and he assists in identifying potential patients for Patient Health Management Program.

He has earned a bachelor's degree and a doctor of pharmacy degree from the Philadelphia College of Pharmacy and Science and is a registered pharmacist licensed in the State of New Jersey. He is also a member of NPA Pharmacy and Therapeutics Committee (P&T) and American Society of Health System Pharmacists (ASHP) and American Pharmacy Association. (APHA).

NPA's Supervisor of DUR is responsible for overseeing the work of DUR Examiners and Senior Secretaries at NPA headquarters in East Hanover, New Jersey.

DUR Examiners are responsible for reviewing the patient profiles and preparing  the correspondence for both sponsors and physicians based on the information extracted from the NPA system.

    3.    Is utilization review performed on all prescriptions?  If not, what criteria are used to select the prescriptions reviewed?

Yes. All prescriptions, whether submitted by the mail service or a retail pharmacy, are screened at the point-of-sale for drug-drug, drug-disease, drug-pregnancy, drug-age and drug-lactation interactions, high and low dosage, excessive utilization and early refills. Retrospective review scans, via computer review, all patient profiles to identify those individuals in need of physician contact. The resulting profiles are reviewed by an NPA pharmacist who will initiate contact with the member.

    4.    Please advise as to what criteria are used in the retrospective review program to evaluate prescriptions.

Once specific patients have been identified, an NPA clinical pharmacist evaluates each profile to determine whether a real need exists for further action.  This includes a review of all other medications in the profile which might explain the overall medication regimen, the patient's age as well as prior reviews which may have been conducted. The criteria for review are documented in the response to question 3 above.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY        ESI-277-00002718

76

5.   Please describe your assessment and intervention procedures for dealing with prescribing physicians and pharmacies. Who is responsible for communication? To whom are these communications directed?

NPA's process for the analysis and evaluation of physician practice patterns is designed to be flexible enough to identify pharmacy resource utilization and patterns of care from multiple perspectives. The cornerstone of the Prospective DUR Program is the flexible reporting capabilities inherent in the process. Applying one or more of the various management reports, a typical utilization analysis can be performed at the client level, practice site level, physician specialty level and at the individual physician level.

Once the initial analysis has been performed and a questionable pattern of care has been identified, the physician intervention process is initiated. The intervention methodology relies on targeted communications to the physician via written, verbal or on-site exchange of clinical information. The primary reporting tool used in the communication methodology includes: the Prescribing Physician Profile (Report Card), intervention letter and supporting documentation excerpted from current medical literature. The overall objective of the process seeks to alter physician prescribing practices to achieve positive member care and economic outcome.

Potential intervention candidates are selected through an initial screening of physician utilization practice patterns. These patterns are reflected in various management reports which rank physicians according to predetermined utilization criteria. Physicians can be ranked within their specialty, within practice site, geographically (by state) or overall within the entire plan. Additional reports can target physician prescribing habits with regard to specific drugs or classes of drugs. Specific reports include:

**Physician Ranking Report.** This report allows the user to rank physicians within their respective specialty, according to their plan participation or non-participation and/or by specific drugs. Individual members are ranked by the following utilization criteria:

- Total amount paid
- Number of prescriptions
- Average dollar amount per prescription
- Number of members served
- Number of prescriptions per member
- Average number of prescriptions per member
- Percent generic drugs prescribed
- Percent of potential dollars saved if generics are optimally prescribed
- Percent controlled drugs prescribed
- Percent of drugs refilled too soon

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          ESI-277-00002719

77

- Percent of drugs refilled

The report includes criteria totals and normative data for each specialty. Thus an individual physician's prescribing data can be compared to his or her peers. The Physician Usage Report can be produced by selected date ranges but is typically requested for a current 12 month history. It is client specific but, as an option, can be requested for multiple or all clients. It lists the physician's name, Drug Enforcement Agency (DEA) number and practice site code. This report is used by the DUR staff to target those physicians who are ranked high in one or more of the ranking categories and exhibit a potential for questionable prescribing habits that may have a negative impact on the plan.

**Physician Specialty Ranking Report.** This management tool tabulates various utilization criteria by physician specialty. Its format is similar to the Physician Ranking Report and is used to identify those specialties that have a predominant economic or utilization impact on the plan's program. Each specialty is ranked in order of high to low by the following criteria:

- Total amount paid
- Number of prescriptions
- Average dollar amount per prescription
- Number of dosage units prescribed
- Average days supply
- Average daily prescription cost
- Number of members served
- Average dollar amount per member
- Percent generics prescribed
- Percent of potential dollars saved if generics are optimally prescribed
- Total ingredient cost
- Percentage of the total of all prescriptions prescribed
- Number of prescriptions per utilizing life per month
- Percent non-formulary

The report concludes with plan summary data for each criteria. This report is useful in targeting those specialties who are ranked high in one or more of the ranking categories and may have a negative impact on the plan. Once a specialty or multiple specialties have been isolated for intervention, the user can narrow down individual physician levels to determine which specific members within the specialty exhibit the greatest impact on the plan.

**Site Code Ranking Report.** This report has the same format and ranking criteria as the Physician Specialty Ranking Report. It tabulates the various utilization criteria by

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002720

78

practice site and will identify the site code as well as the site name. The user can identify those practice sites that have a significant impact on the plan's program. Upon selecting specific target practice sites the user can narrow down individual physician levels to determine which specific members within the practice site exhibit the greatest impact on the plan.

**Comparative Members Analysis Report by Specialty.** Sort selections include: date range, specific client, specialty (up to ten or all), individual members by DEA number (up to ten or all) and specific therapeutic categories (from 1 to 999). With this report the user can identify by specialty the typical therapeutic categories and the individual drugs within those categories that are being prescribed. The report is useful in identifying a physician's or specialty's drug choices, both formulary and non-formulary. The physician or specialty data is compared to plan or specialty normative values in the following areas:

- Percent of non-formulary prescribing
- Percent of generic prescribing

The user can isolate specific drugs within therapeutic categories to target for compliance to formulary and/or generic prescribing goals.

**Abnormal Quantity Usage Report.** This reporting tool identifies the members and their members who are utilizing specifically targeted drugs at a level above or below a pre-selected quantity. It is useful in identifying instances of non-compliance or overutilization from the physician's prescribing habits and the member's utilization.

**Prescribing Physician Profile (Report Card).** The Report Card identifies the prescribing patterns of an individual physician. It is selected by specific physician DEA number and is available for either an individual plan or all plans within a specified date range. The physicians name, address, specialty (when available) and number of members served is documented. There are two parts to this report.

A. The first part provides the physician's data comparative to the overall prescribing experience and that of his or her specialty group. The comparative data includes:

- Average age of member
- Total number of prescriptions.
- Total dollar amount paid
- Average dollar amount per prescription
- Dollar amount per utilizing member per month
- Prescriptions per utilizing member per month
- Percent generic
- Percent formulary

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002721

- Percent dispense as written (DAW)

B. **The second part lists the top 25 drugs dispensed by the physician and tabulates each drug according to the following:**

- Number of dosage units prescribed
- Number of prescriptions
- Percent of total prescriptions
- Total dollar expenditure
- Percent of total dollar expenditure
- Average dollars per prescription

The Report Card is the cornerstone to all physician communications. This physician profile may also accompany the Physician/Member Activity Report in members intervention initiatives.

**Physician/Member Activity Report.** This particular report is physician specific in that it lists each member for whom the physician prescribed and the individual drugs they prescribed for those members. The user may select this report by specific date range, specific drugs, specific client or all clients. The data includes: the selected physician's name, address, phone number and DEA number; while the prescribing detail includes: member identification number, client number, member name, prescription date, prescription number, paid amount, quantity, day supply, drug name and dispensing pharmacy. The report is useful in allowing the user to illustrate for the physician individual members who are receiving the specific drugs that may be the subject of an intervention.

A **Physician Usage Report** is a PC based report that is generated on request on a quarterly basis. Its' purpose is to tract the effectiveness of NPA's physician intervention efforts. The report measures a targeted physician's prescribing criteria in every quarter and compares the quarterly data with the previous three quarters. The typical prescribing criteria that is measured includes: total dollar amount, average dollar per prescription and dollars spent per utilizing member per month. The report has two sections. The first contains quarterly prescribing statistics that tabulate by quarter the number of members served, total prescriptions, average member age, total dollars expended, average dollars per prescription, dollars per utilizing member per month, prescriptions per utilizing member per month, percent generic prescribed, percent formulary prescribed and percent DAW. The second section contains a graphical representation of any three of those criteria as selected by the client.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY      ESI-277-00002722

30

6.    Do you correspond with prescribing physicians? On what percentage of prescriptions? What degree of success have you had in changing prescribing patterns? What are the costs savings generated through this practice? How is this cost savings calculated?

Yes. NPA has an extensive program for communication to physicians based on potential therapeutic problems as well as choice of medication. Physician communication is also an integral part of the NPA*Select*<sup>SM</sup> Formulary Program, where a preferred list of medications is used to communicate cost effective alternatives to prescribing physicians. The percentage of claims on which a physician communication is made varies based on the reason for the intervention i.e., therapeutic problem vs. formulary management. The success rates also vary based on the type of communication.

Overall, we have a ▇▇ success rate in achieving the desired results of our physician communication. In abuse and addiction, where members have received prescriptions for multiple controlled substances from multiple physicians, our success rate is ▇▇ This is realized in terms of having therapy discontinued or altered. In our compliance monitoring segment of DUR, we identify those members who are underutilizing their medications and not receiving the therapeutic effect of their prescriptions. Our success in terms of impacting compliance of these individuals is ▇▇

In our formulary management program, we know that for each prescription that is switched from a non-formulary to a formulary drug will save on average ▇▇ for our clients. These cost savings are calculated by comparing the cost per day of therapy of competing products within a therapeutic category.

Calculation of savings for the DUR portion of the program is derived by using a four month pre-intervention snapshot of the member's profile and a four month post intervention snapshot of the profile. The medication usage in dollars and tablets is compared to the pre-intervention levels and savings are calculated based on the difference between the two usage levels.

7.    What ongoing quality assurance measures are taken?

The major quality assurance issues in physician contact situations are the accuracy of the information presented as well as the review of the results of the process to improve outcomes. The former issue is handled through the NPA P&T committee which meets quarterly. As mentioned above, each member of the P&T committee is an expert in one or more therapeutic categories. Our internal experts make exhaustive searches of the literature for all relevant information in their areas of expertise. Each member is in charge of the physician communication content for their area of expertise and has the

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002723

81

responsibility for oversight and footnoting of all information that is used in that area of the drug utilization program.

All incoming physician responses are reviewed and filed in the appropriate patient file. Each intervention is entered into the NPA system and programmed to reappear when the post review period has been completed so that any changes in prescribing patterns can be identified and quantified. Each month these profiles are reviewed by NPA staff and entered into our system to provide statistics on the level of success of each intervention. This information is used by the P&T committee to eliminate certain interventions as well as enhance the communication materials utilized for other physician contact.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002724

94

## E.  MAC Pricing

### 1.  From what source is your MAC pricing list developed?

The *RedBook* database information system, supplied by Medical Economics, Inc., provides product information on over 116,000 products. Included are all FDA approved active NDC's for prescription and reimbursable over-the-counter products. The *RedBook* database contains the most current information available on a drug, including: current drug pricing history, product and manufacturer name, average wholesale price, DEA classification, desi indicator, therapeutic category, generic cross reference code, orange book code and other pertinent data.

### 2.  Who are the people involved in that development?  What are their credentials?

Ronald J. Smith, R.Ph., Vice President of Professional Services, is responsible for directing, planning and coordinating the professional services department, which encompasses all drug utilization review and generic MAC pricing as well as special claims, prior authorization, formulary management and research grants.

Mr. Smith joined NPA in 1983, beginning as a pharmacist and then advancing to Director, before being promoted to his current position. In addition to his overall responsibilities, he is also currently involved with such projects as the Antibiotic Disease Management Program, the Mandatory Generic Plan, the Therapeutic Plan, Prior Authorization Programs, the Pharmacy and Therapeutics Committee and various Drug Utilization Review projects. Previously, he was a union contract negotiator for health benefits and also has experience in hospital, chain and independent pharmacies.

Mr. Smith serves as a preceptor with Rutgers College of Pharmacy, St. John's University College of Pharmacy and Philadelphia College of Pharmacy externship programs, which develop students' knowledge of prescription benefit management in the areas of Drug Utilization Review, Formulary Management, Patient Health Management and other relative areas.

Mr. Smith earned a bachelor's degree from St. John's University, NY and teaching certification from Montclair State College in NJ. He is a member of the New Jersey Pharmacists Association and the Bergen County Pharmacists Association. Mr. Smith is a registered pharmacist licensed in New Jersey and is also a former member of the New Jersey State Board of Pharmacy.

95

**3. What criteria are used to select what generics and what prices will be included on your MAC list?**

NPA's Generic Maximum Price (GMP) Program is our proprietary version of MAC pricing. All generic drug claims are paid at the lower of the pharmacy's usual and customary (U&C) price or NPA GMP price, which is based on the most often purchased size of the dispensed product. This price is determined using a composite of the acquisition cost of generic entities in *Medical Economics'* *RedBook*. Our NPA GMP pricing provides an overall discount of ▮▮ below *RedBook* AWP.

Our goal in developing GMP prices is to keep generic prices low while always being able to identify a nationally available source of medication that can be purchased below the GMP price. Given the disparities between the Average Wholesale Price (AWP) of generics and their purchase prices, both AWP and Average Generic Price (AGP) are considerably higher than is necessary to reimburse for a generic. In analyzing pricing such as the HCFA-MAC, we found that the level of reimbursement was in many cases sufficiently reduced to provide our clients with reasonable prices for generics. However, we were uncomfortable with simply assigning reimbursement to an outside methodology over which we have no control.

Upon determination of nationwide availability by three manufacturers, a GMP (MAC) price is established on the date of nationwide availability to immediately capture savings. The price is then reviewed monthly, or more frequently, to ensure the best available price is provided to the client.

NPA's GMP pricing keeps generic reimbursement at a low but reasonable number so as not to discourage generic dispensing. If pharmacists call in with concerns about generic availability in their area, we are always able to refer them to a source where they can more efficiently purchase their medications. Should a change in the marketplace occur where a particular low-cost generic is removed from the market, we will adjust our pricing to reflect these changes.

By handling generic pricing in-house, we can respond much more quickly than if we were locked into an outside-published source. NPA effectively controls GMP by validating pricing of each generic drug at least quarterly. To accomplish the review of GMP, we divide generic drugs into two categories:

1. Stable generic drugs - those generic drugs that have been available for more than one year and are not subject to significant or frequent pricing change.

2. Active generic drugs - generic drugs that have recently been released and/or are subject to frequent and significant price changes resulting from market forces.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002726

96

Stable drug prices are checked quarterly to detect expected minor variations in price. Specifically:

Stable generic drugs in the range A-I are checked the first month of each quarter.

Stable generic drugs in the range J-R are checked the second month of each quarter.

Stable generic drugs in the range S-Z are checked the third month of each quarter.

Active generic drugs, generally released within the most recent 12-months, are subject to frequent price changes and are checked monthly or more frequently as required.

GMP's are checked against the following pricing sources:

- HCFA
- Bergen Brunswig Generic Price List
- Bindley Western
- Medi-Span Generic Buying and Reimbursement Guide
- Medical Economics' *RedBook* updates
- First Data Bank Price Alert
- CFI Information on Direct pricing
- Pricing schedules from the following generic manufacturers:
  (1) Watson; (2) Lederle; (3) Geneva; (4) Mylan; (5) Schein;
  (6) Lemmon; and (7) others.

In all cases, the lower of the HCFA generic price or the nationally available manufacturer generic price will be used to establish the NPA GMP. Therefore, the NPA GMP is never higher than the HCFA price and is frequently lower.

NPA maintains a current record of the patent expiration dates of all branded drugs scheduled to lose patent protection during the next three years. One month prior to the patent expiration date, *RedBook* and generic drug manufacturer product information is checked to determine the date of nationwide drug availability.

4. How often is the list updated?

Stable drug prices are checked quarterly to detect expected minor variations in price. Specifically:

Stable generic drugs in the range A-I are checked the first month of each quarter.

Stable generic drugs in the range J-R are checked the second month of each quarter.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002727

97

Stable generic drugs in the range S-Z are checked the third month of each quarter.

Active generic drugs, generally released within the most recent 12-months, are subject to frequent price changes and are checked monthly or more frequently as required.

5.  How many drugs are on the list?

The vice president of professional services at NPA is charged with maintaining generic pricing for 790 line items by surveying the market for actual acquisition costs and analyzing pricing scenarios currently used by other programs and sources (e.g., HCFA, First Data Bank).

6.  Apply your MAC to the generic drugs found in the data contained in Exhibit G and provide the difference in total ingredient cost using your MAC compared with the arrangement that the Fund had in place at the time the claims were incurred.

NPA will provide the generic drug data from Exhibit G under separate cover by March 20, 2000 as requested.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002728

98

**F.**     **Passive Formulary and Manufacturers' Rebates**

**1.  How was your formulary developed?**

Development and maintenance of the NPA*Select*[SM] Formulary is the responsibility of the NPA P&T Committee.

The formulary decision process requires the use of pharmacoeconomic data. In addition to per day pricing, P&T Committee members take into account all available information concerning associated medical outcomes, required physician visits, required lab visits and ancillary supplies/medications needed. To achieve this goal, the P&T members utilize a PC based pharmacoeconomic modeling toll which analyzes drug costs as well as the costs associated with adverse events, titration, discontinuation and therapy switches. Drugs which are completely unique are included on the formulary unless they offer no demonstrated therapeutic benefit. In the initial evaluation, medications are only eliminated from the formulary that do not offer the same therapeutic advantages as other drugs within that category. At this stage, cost is not a consideration. The NPA P&T Committee use only clinical criteria to select formulary medications.

The NPA P&T Committee serves in an educational and advisory capacity and does not dictate drug therapy. Their main objective is to evaluate and make recommendations for inclusions of therapeutically sound and cost-effective medications to the NPA*Select*[SM] Formulary.

All P&T recommendations require the approval of NPA's Physician Board. The NPA Physician Board has extensive experience in ambulatory care in geriatric medicine, internal medicine, gastroenterology, endocrinology, cardiology and rheumatology.

The NPA*Select*[SM] Formulary is updated quarterly. The NPA P&T Committee makes recommendations for initial inclusion in the formulary and provides ongoing review of all new medications before they reach the marketplace. This scrutiny provides unique opportunities to design programs to handle high cost therapies, for example in the area of genetically engineered medications, before they are available to the member population at large.

**2.  Who are the people involved in that development?  What are their credentials?**

All decisions begin with a team of NPA staff pharmacists who have more than 60 years of collective experience in the clinical review of prescribing regimens. These pharmacists have a wide range of specialties and extensive clinical backgrounds.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002729

99

Specialties include:

| Allergies | Geriatric Medicine | Nuclear Medicine |
|---|---|---|
| Cardiology | Immunology | Pediatrics |
| Critical Care | Infectious Disease | Pharmacology/Pharmacotherapy |
| Family Medicine | Internal Medicine | Pulmonary |

Each P&T Committee member is required to maintain an active knowledge of currently accepted therapies and disease pathophysiologies on a limited number of therapeutic areas. This is achieved via the regular review of leading medical journals, conferences and texts. Additionally, our on-going relationship with leading pharmaceutical manufacturers ensures we receive early notification of drugs eligible for release to the market. This concentrated effort ensures that the latest developments in clinical outcomes research and new pharmaceutical products are addressed in a timely fashion.

Prior to each P&T Committee meeting, committee members are required to review their assigned therapeutic categories for any new drugs, studies or information regarding those categories or products. Based on this review, the member may elect to recommended a product as preferred for the specific therapeutic category. The specific product will then be presented to the Committee. The in-house pharmacy panel evaluates the product and makes a recommendation. The recommendation and supporting data is then forwarded to the physician panel for a second evaluation. Only a consensus vote by the pharmacy and physician panel is sufficient to deem a product as preferred for a specific therapeutic category.

Below is a list of the members of our P&T Committee along with a brief listing of their experience:

| Credentials | Specialty | Board Certified in |
|---|---|---|
| M.D., M.S.<br>Associate Professor<br>Hershey, PA | Family Medicine, Geriatric Medicine, Preventive Medicine | American Board of Family Practice, Certificate of Added Qualifications in Geriatric Medicine |
| M.S., R.Ph., D.O., F.A.A.O.L.<br>Harrisburg, PA | Internal Medicine, Infectious Diseases | Infectious Diseases, Internal Medicine |

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002730

100

| Credentials | Specialty | Board Certified in |
|---|---|---|
| M.D., F.A.C.C., F.C.C.P., F.A.C.P. Assistant Attending Physician Department of Medicine/Cardiology Philadelphia, PA Long Branch, NJ | Internal Medicine, Cardiovascular Disease, Critical Care Medicine | American Board of Internal Medicine, Cardiovascular Disease, Critical Care Medicine |
| M.D. Attending Staff, Internal/ Nuclear Medicine Delmar, NY | Internal Medicine, Nuclear Medicine, Anesthesiology, Acute & Chronic Pain Management | Anesthesiology, Internal Medicine, Nuclear Medicine |
| M.D. Clinical Associate Professor of Pediatrics Aurora, CO | Pediatrics, Allergy & Immunology | American Board of pediatrics, American Board of Allergy & Immunology |
| Pharm. D. Associate Professor of Pharmacy Practice and Department of Continuing Pharmaceutical Education Oklahoma City, OK | Clinical/Consulting Services Pharmacotherapy/ Pharmacology (Adult intern medicine/ geriatrics) | |
| M.D., P.A. Ophthalmologist Sarasota, FL | Ophthalmology | American Board of Ophthalmology, National Board of medical Examiners |

3. **What criteria are used to select what prescription drugs will be included on your formulary?**

The evaluation of products for our preferred drug list takes into consideration a variety of criteria. Benefits of the product are considered in terms of drug cost and efficacy, but we also consider the effect a product will have on medical costs and member compliance. The criteria established to select preferred drug products is as follows:

**Efficacy:** The results of published studies showing the efficacy of products when treating the indicated condition are included in the determination of a preferred product.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002731

· 101

**Side-Effect Profile:** Comparison of products within a therapeutic category involves the incidence of similar side effects. Products with a less frequent incidence of occurrence are looked upon more favorably. Additionally, the severity of side effects and the discontinuation rate from studies as a result of side effects are also factors we consider in the evaluation process.

**Cost-Effectiveness:** The cost-effectiveness of a product is used only when available. As studies are performed in the marketplace and cost-effectiveness of a product is determined and published, we then apply this data to our population and determine the feasibility of this claim within our organization. The data is also incorporated into our product evaluation and used as one of the determining factors in defining a preferred product.

**Outcomes:** Outcomes are used, but only when available in published studies. This data is then incorporated into our product evaluation.

**Pricing:** AWP pricing per day, per dose and per course of therapy are considered when evaluating a product. Products are compared on these factors and rebates are included when available.

**Dosage Adjustment:** This is evaluated to determine the feasibility of use in immuno-compromised members as well as in elderly members. Dosage adjustments for renal and hepatic impairment are considered. Products which are suitable for all members receive a more favorable recommendation.

**Dosing:** The daily dosing of products is considered in the evaluation. Non-compliance is a major factor in escalating medical and drug costs and products which are dosed to alleviate this problem are looked upon more favorably (i.e. once or twice daily).

### 4. How often is it updated?

The NPA*Select*SM Formulary is updated quarterly. Each member of the P&T Committee is accountable for a specific therapeutic category and for the therapeutic integrity of that category. Members of the committee are required to keep informed of current changes including new drugs, new indications, deletions, OTC changes, studies and specific information pertinent to changes within their category. The P&T Committee makes recommendations for initial inclusion in the formulary and provides ongoing review of all new medications before they reach the marketplace. This scrutiny provides unique opportunities to design programs to handle high cost therapies, for example in the area of genetically engineered medications, before they are available to the member population at large.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     ESI-277-00002732

102

**5.  With how many manufacturers do you have rebate arrangements?  Please identify them.**

NPA currently has rebate agreements with 50 pharmaceutical manufacturers:

| 3M | Hoechst Marion Roussel | Pharmacia & Upjohn |
|---|---|---|
| Abbott | Johnson & Johnson | Purdue-Frederick |
| Allergan | Jones | Roberts |
| Astra | Knoll | Sanofi |
| Athena Neurosciences | Kos | Schering |
| Bayer | Lilly | Schwarz |
| Berlex | Medicis | Searle |
| Bertex | Mission | Serono |
| Biogen | Novartis | Smith Kline Beecham |
| Boeringher-Ingelheim | Novo-Nordisk | Wallace |
| Bristol Myers Squibb | Oclassen | Watson |
| Carnrick | Organon | Wyeth Ayerst |
| Dura | Otsuka | Zeneca |
| Ferring | Parke Davis | |
| Glaxo Wellcome | Pfizer | |

All of our manufacturer's contracts are covered by confidentiality clauses which prohibit us from disclosing the terms and conditions of rebate agreements.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002733

88

## G.    Innovative Approaches

This section of the specification is provided to allow you to expand upon any aspects of your company's programs which could benefit the Fund when providing prescription drugs to participants and dependents.

1.    Have you implemented any innovative cost containment measures in the last two (2) years?  If yes, please describe these measures and how they distinguish you from your competitors.

Yes. NPA utilizes a wide portfolio of cost containment programs, services and strategies for our clients that have been successful at reducing pharmacy trend.  These generally fall into three categories; administrative, clinical and benefit design.

Our administrative strategies include network discounts, specialty network management, claims processing efficiency and accuracy, MAC Program management and other related administrative activities aimed at lowering costs for our clients.  All of our customers benefit from NPA's management as part of our core services typically offered to clients.  Of the administrative strategies listed, the most demonstrable advantages over our competition include: a) NPA's proprietary MAC Program which is averaging ████ below AWP and b) NPA's usual and customary pricing methodology.

Our clinical strategies include Formulary Management, Disease State Management Programs, Prior Authorization, Step-Care Therapy Management, Physician Education and Comprehensive Drug Utilization Review.  Of these strategies, those that are demonstrably superior to the competition include the NPA Disease State Management Program, Retrospective Drug Utilization Review Program and our Formulary Support Programs.  Our Disease State Management Programs are estimated to save in excess of ████████ while our Retrospective DUR Programs typically save between ████████ per patient intervention per year.

Our benefit design strategies include total flexibility in plan design, numerous copayment options including three-tier copayments, creative mail service options and blockbuster drug management.  Our "T-Plan" option was the first in the industry and remains an innovative mechanism to control prescription costs by effectively setting a maximum reimbursement for branded drugs within therapeutic classes.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002734

89

2.    **What cost savings was generated for your clients by the implementation of these innovative measures?  How is this cost savings calculated?**

Examples of our successes include the following:

---

*CASE STUDY #1*

This large State Government Program awarded NPA its business in July 1997.  With over 200,000 covered lives, this State Government Program had experienced double-digit trends in their prescription costs for the preceding two years.  In 1996, the trend was 22% annually from 1995, and in 1997, the trend was an astonishing 25% from 1996.

During the first year of NPA's program management ending July 1998, we reduced the trend to only 7% while keeping the existing benefit design of the plan intact.

NPA's success resulted from superior administrative strategies as previously described, and a select number of our clinical program strategies.  In regard to administrative strategies, NPA paid for only those members who were eligible to receive services, accurately applied the appropriate edits at the point-of-service and utilized our aggressive MAC and usual & customary pricing programs to reduce costs.

In addition, NPA implemented an array of "soft" formulary support programs to enhance the effectiveness of the NPA*Select*SM Formulary.  At the request of this customer, these programs focused on appropriate physician education and conversions rather than patient involvement or benefit design changes.

This account is so impressed with our cost containment and patient sensitivity, that they are seriously considering implementing our NPA Disease Management Program. This customer now has confidence that NPA is able to manage the cost, quality and level of customer satisfaction they expected from their PBM.

---

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002735

90

---

**CASE STUDY #2**

This 20,000 life self-insured employer group located in Pennsylvania awarded NPA their PBM business in August of 1997. Prior to NPA, this client utilized a PBM owned by a pharmaceutical company and experienced trends of approximately 20% annually in their prescription benefit program.

NPA's initial analysis of this program indicated that this client had a significant number of members who were clearly abusing certain drugs, drug classes, or who were in need of pharmacist intervention because of inappropriate drug therapy or therapy combinations. Through NPA's proprietary Retrospective DUR Program, NPA's clinical DUR staff aggressively analyzed the utilization patterns of their members and performed retrospective DUR interventions. Between September 1997 and December 1998, a total of 2,236 reviews were completed. Of these 2,236 reviews 2,095 were determined to be "actionable" cases. These interventions, primarily focused on the physician, resulted in a documented savings of $544,700, or approximately $260 savings per case reviewed.

This particular client is now considering implementing a series of Disease State Management Programs aimed at some of the specific areas of abuse which were identified during this retrospective DUR process.

---

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002736

91

---

**CASE STUDY #3**

Over the last year, this existing NPA managed care client, totaling 115, 000 covered
lives, located in Virginia experienced less than anticipated success as a for-profit HMO.
Consequently, new senior management of the HMO was hired with the expressed
intent of turning the operation around and ensuring its profitability. Since every area of
health care delivery was part of this new initiative, the HMO requested NPA's
assistance in designing the most appropriate strategies to reduce their prescription drug
expenditures.

During several meetings NPA staff discussed the various options and anticipated
impact of pharmacy cost containment strategies. The management of the HMO decided
to "close the formulary" by therapeutic class.

Working with the HMO medical management, NPA and the HMO agreed on the most
appropriate therapeutic classes to "close". NPA then designed a thorough, customized
implementation plan for this HMO. This implementation plan not only was designed
to keep customer service issues to a minimum, but also to protect the integrity of the
program from a quality of care perspective.

During the first three months of the program, three therapeutic classes were closed
resulting in a savings of $201,710 or $13.56 per prescription.

This program continues to be a successful containment of this HMO's prescription
costs, while maintaining quality of care and a significant contribution to the turnaround
of this managed health care plans' profitability.

---

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002737

92

**CASE STUDY #4**

NPA provides prescription benefits to many union health and welfare trust funds in New York City totaling over one million covered lives. Within this client base, NPA offered our Disease State Management Programs to a coalition representing four of these unions, totaling 800,000 covered lives.

NPA's initiative was to save the coalition benefit dollars by communicating awareness of health care issues and maintaining benefit design. Over a 12 month period savings are estimated to be $2.1 million in direct drug program savings, $2.5 million for indirect drug savings and $2 million in medical cost savings.

NPA's Patient Health Modules define noncompliance to specific predetermined, therapeutic guidelines and suboptimal treatment outcomes that result in direct patient interventions. Another trigger for patient review and intervention is a aberrant or inappropriate drug utilization pattern as identified by NPA's concurrent and retrospective DUR criteria. The illnesses currently addressed by the patient health management modules include; Asthma, Diabetes, Benign Prostatic Hyperplasia (BPH), Ulcer and Related Disease, Hypertension and Hypercholesterolemia. Each module has a specific and well-defined treatment algorithm and outcome objective.

These dramatic results are possible because our NPA's Clinical Programs minimize the needless expenditure of healthcare dollars due to inappropriate or less-than optimal drug therapy. Most importantly, the process provides a means toward better member care and the long-term, more difficult to measure benefits of increased quality of life, productivity, reduced absenteeism and need for future more expensive health care measures. NPA's clinical process is a highly structured and ongoing program that reviews, analyzes and interprets patterns of medication usage measured against predetermined therapeutic criteria and standards.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002738

93

3.    Is there an additional fee for this service?

Yes. There is an additional fee for NPA's Patient Health Management programs. The costs associated with each program in Portfolios 1 and 2 are outlined below:

*Portfolio One*
**Asthma**
**Diabetes**
**Hypertension**
**High Cholesterol**
**Ulcer & Related Disease**
**Benign Prostatic Hyperplasia (BPH)**
**All** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **$0.35 plpm**

*Portfolio Two*
**Depression**
**Allergic Rhinitis**
**Women's Health**
**Pain Management**
**All** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **$0.35 plpm**

**The cost for both Portfolios I and II is $0.60 plpm**

4.    Based on your general knowledge, do you have suggestions about how to restructure the pharmacy program for the Fund to achieve a more effective managed pharmacy program?    For example, does your pharmacy program have a mandatory generic substitution feature?

NPA recommends the following plan design changes to more effectively manage the Fund's prescription benefit program:

- Implement the "greater of" as part of the retail copayment, e.g., the greater of $5 or 10% of the generic and the greater of $5 of 20% for brands. This copayment structure may result in savings up to ▉▉ over the percentage copayment.
- Implement the NPA Generic Reimbursement Plan. Under this plan, the member is responsible for the cost difference for the multisource brand and the generic equivalent, plus a copayment, when a multisource brand is dispensed instead of the generic equivalent. Only the copayment is paid if a generic form or a brand single source brand form is obtained. This plan feature may result in savings of 5-8% of program costs.

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY          ESI-277-00002739

94

- Implement a non-formulary disincentive copayment, such as 40-50% retail, and $60-$75 for mail order. This type of program may result in savings up to ███████ of program costs.

All of the above plan design features estimated savings will vary according to actual usage, drug mix, prescribing patterns and conditions being treated. The estimated savings may not be cumulative.

The majority of NPA's major clients currently subscribe to the NPA Generic Reimbursement Program. With this option, the decision to use a brand name or generic drug remains with the participant and physician. However, reimbursement is made at generic pricing levels for multi-source brand prescription drugs that could have been filled with a generic equivalent. This program encourages generic use, allows freedom of prescription drug choice and completely maximizes your generic savings.

Our system flags a multi-source brand prescription that has a generic available and prompts the pharmacist to check whether a generic substitute is appropriate. For DAW prescriptions, the CFI pharmacist will actually make a call to the physician to request substitution.

The NPA Generic Reimbursement Plan is administered as follows:

- If a participant obtains a brand name drug which does not have an existing FDA approved generic drug equivalent, he or she will only be responsible to pay his or her pharmacist the applicable copayment.

- If a participant obtains a generic drug, he or she will only be responsible to pay the applicable copayment.

- If a participant chooses or their physician indicates "dispense as written" for a brand name drug which has an existing FDA approved generic equivalent, the participant will be responsible to pay the cost difference between the brand name drug and the generic equivalent plus the applicable copayment.

    5.    **Will you model changes in plan design, using current claims experience? Do you charge for this? If yes, how much?**

Yes. NPA's proposed changes for your plan design are included as exhibit 7.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     ESI-277-00002740

95

6. Do you have a disease management program? If yes, what diseases are included? What diseases are in the pilot or planning stages for inclusion? Do you charge clients who wish to participate? Do you have any data regarding the effectiveness of your disease management program?

Yes. At NPA, we view our Patient Health Management (PHM) Program as an accumulation of efforts designed to improve the level of healthcare while controlling overall healthcare expenditures for patients with a particular disease state. While many organizations limit their efforts to raising physician awareness or providing informational materials, NPA continues to be on the forefront of patient health by providing more accurate and meaningful levels of patient centered care over four important areas:

1) **Risk assessment:** NPA will meet with members of the organization to determine which health concerns are foremost among their members. Once these key diseases are cited, the members will be provided with an opportunity to self assess their health status and understanding of their disease state. The information obtained from these assessments are then used to stratify the members according to the severity of their disease, with the most severely ill members given highest priority within the program. NPA also uses this self-reported data to assess the members' current medical care and their opinions about the quality of the medical care they are currently receiving.

2) **Preventative care, wellness and healthy lifestyles:** NPA goes far beyond token efforts to help change members' behaviors. In this portion of our program, we promote wellness and the maintenance of a healthy lifestyle through various educational venues which include, but are not limited to, quarterly educational reading materials, intense small group instructions, and health fairs. All our educational materials are highly focused and concentrate on teaching self-management skills such as weight reduction and stress management. They also stress educating the members as to what can aggravate their disease and steps they can take to keep their condition from worsening. The summary message to the members is an admonition to take an active role in the management of their condition and retake control of their lives.

3) **Interventions:** Through personal evaluation of the member's current therapy, our PHM staff can determine whether the drug protocols used by a physician are optimal or if a member is not compliant with their drug regimens. When other drugs or therapies would either be more effective, or equally effective and less costly, NPA will intervene by contacting the member's physician and alerting them to the appropriate alternatives. If non-compliance with a drug regimen is detected, NPA will alert both the patient and their physician to this problem. Our intervention to

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY     ESI-277-00002741

96

the physician will discuss alternative modes of treatment and suggestions for increasing member awareness of the importance of keeping the proper regimen. Our intervention to the member consists of a monthly "refill reminder" to encourage them to refill their prescriptions on time. Also, depending on the module they are enrolled in, the members will also receive certain "clinical reminders" indicating to them when it is time to have certain tests or exams performed.

4) **Outcomes and quality of life:** Important information established at the inception of the program through the members' self-reported assessment, are re-assessed periodically throughout the program to track improvement. These re-assessments are thoroughly analyzed to measure actual disease improvement and the quality of the functioning of members within the program. After each re-assessment, the members are re-stratified as necessary and given the appropriate level of intervention.

Thoroughly integrated, all four components form the whole picture of our multi-faceted program. NPA's PHM Program can also be further distinguished by the following:

1) **The use of national prescribing and medical guidelines:** All our modules are based on the current national recommendations from the various medical and pharmaceutical societies. They have a sound, unbiased clinical basis, which represents the opinions of the experts in the various disease states and does not reflect any loyalty to any other corporate body.

2) **Patient-focused therapy evaluations:** Each member is looked at individually by a member of the PHM staff that has been specially trained in the therapy of a specific disease state. Therefore, our interventions are not arbitrary but reflect the understanding and expertise of the reviewer.

3) **Demand Management/Telephone Outreach:** Each member is contacted by our trained PHM staff at the beginning of the program to provide any necessary help in filling out the assessment form. They are also contacted after every educational mailing to confirm that they received the materials and understand them. Any questions about the program or the educational materials will also be answered at this time.

4) **The ability to provide smaller group instruction:** Through our various partnerships, NPA can offer numerous opportunities for group instruction. These sessions can provide time for screening for co-morbidities, discussions on medical therapy and providing intense member oriented education about actively living with various diseases.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002742

97

5) **Meaningful outcomes measurements:** Through our interventions with both members and physicians, NPA is able to measure the impact of PHM in three distinct categories:

- *Clinical:* by obtaining the proper clinical markers from the member's physician
- *Economic:* by analyzing your overall prescription and medical utilization as well as the specific utilization of medications within the disease states contained within your program
- *Humanistic:* by communicating frequently with your members to assess the quality of their functioning

Once the PHM Program is underway, NPA will provide quarterly updates to the client detailing the member's responses to the assessment forms and any clinical intervention that were made on the members' behalf. At these quarterly updates, the program can be thoroughly reviewed, and necessary changes can be made to improve the program's quality and efficacy.

Our substantial PHM Programs are flexible and can be custom tailored to meet the special needs of your organization within each of the areas detailed above. Our overall goal is always to design a measurably successful disease management program that is best for you, and that will meet your financial, quality of care and member relations needs.

We currently offer PHM Programs in the following areas:

1) **Asthma:**

- *Risk Assessment* – Patient survey to ascertain current health status, asthma severity and quality-of-life.
- *Preventative Care/Wellness* – Patient educational campaign to raise understanding of proper inhaler technique, peak-flow meter use, self-management measures; patient education about home or environmental control of asthma triggers to prevent acute asthmatic attacks.
- *Interventions* – Therapy management interventions with physicians to ensure patient's drug therapy utilizes optimal medications (i.e. proper use of inhaled anti-inflammatory medications in place of over use of symptomatic/episodic inhalers such as the bronchodilators through utilization review measures); physician communication efforts designed to improve compliance with NHLBI prescribing guidelines (i.e. asthma algorithm or step-care guide to assist physicians); compliance monitoring and interventions

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002743

98

- *Outcomes/Quality of Life* – Baseline and annual patient questionnaire to help determine the following measures:
    - improvement in patient's understanding of asthma
    - improvement in patient's self-management skills
    - improvement in asthma control
    - improvement in productivity (reduced loss of school and/or work days)
    - improvement in patient's quality-of-life
    - patient satisfaction with the program

2) **Hyperlipidemia (elevated cholesterol levels)**

- *Risk Assessment* – Cardiovascular risk factor assessment to assist patient and physician in determining risk for developing heart disease
- *Preventative Care/Wellness* – Patient education materials to encourage cholesterol screening; patient education on role of diet, exercise and drug therapy in the treatment of high cholesterol
- *Interventions* – Compliance monitoring and interventions; monitor therapy to prevent or eliminate potentially dangerous drug-interaction with cholesterol therapy; encourage use of most cost-effective lipid lowering therapy
- *Outcomes/Quality of Life* – Improvement in compliance to therapy for better cholesterol control; improvement on reaching targeted cholesterol level; baseline and annual patient health status acquired via feedback from self-assessment patient questionnaire.

3) **Diabetes**

- *Risk Assessment* – Patient survey to ascertain current health status for customization of educational efforts
- *Preventative Care/Wellness* – Patient education to improve self-management skills and understanding of disease (i.e. importance of diet, exercise, eye exam and foot care); retinopathy awareness program to encourage annual eye-exams to improve early detection and treatment of retinal changes; self-monitoring education and blood glucose monitor trade-in program
- *Interventions* – Therapy management interventions with physicians to ensure optimal treatment of co-morbidities (i.e. use of ACE-Inhibitors for hypertension also has protective effects against renal complications of diabetes); encourage use of most cost-effective medications; compliance monitoring and interventions
- *Outcomes/Quality of Life* – Baseline and annual patient health status acquired via feedback from self-assessment patient questionnaire; improvement in compliance to annual eye exam; improvement in compliance to therapy; improvement in glycemic control; utilization rate of ACE-Inhibitors in patients with concomitant hypertension

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002744

99

4)  **Hypertension (elevated blood pressure levels)**

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
  - *Preventative Care/Wellness* – Education of patients to increase knowledge of hypertension, its etiology and its risks; education on the role of diet, exercise and drug therapy in hypertension treatment
  - *Interventions* – Physician detailing campaign to encourage cost-effective prescribing; compliance monitoring and refill reminders; monitoring for drug-drug and drug-disease interactions blood pressure and weight record diary to assist patient with self-management skills
  - *Outcomes/Quality of Life* – Baseline and annual patient health status acquired via feedback from self-assessment questionnaire; improve patients understanding of hypertension and lifestyle modification changes to control it; improve blood pressure control (via feedback from self-assessment patient questionnaire); improve compliance to prescribed long-term therapy

5)  **Ulcer and related diseases**

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
- *Preventative Care/Wellness* – Education of ulcer patients to increase understanding of disease and encourage *H. pylori* testing where appropriate; education of GERD patients concerning role of lifestyle and diet changes in treatment
- *Interventions* – Educate patients and physicians of possible *H. pylori* (a bacteria) correlation; Encourage use of antibiotic therapy against *H. pylori-caused* ulcers; therapy management interventions to encourage appropriate use of cost-effective agents for *non-H. pylori* ulcers and GERD (esophageal reflux) and use of OTC medications for dyspepsia
- *Outcomes/Quality of Life* – Baseline and annual patient health status acquired via feedback from self-assessment patient questionnaire; number of patients ceasing anti-secretory therapy; number of recurrent ulcer patients implementing antibiotic therapy

6)  **Women's Health/Osteoporosis**

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
- *Preventative Care/Wellness* – Education on etiology, risk factors and prevention of osteoporosis; education on the role of menopause in osteoporosis; education on benefits and risks of HRT Education on treatment of osteoporosis
- *Interventions* – Drug therapy management to improve adherence to long term therapy; physician education of possible secondary osteoporosis due to other medication therapy/disease states; mammogram reminders to patients

HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

100

- *Outcomes/Quality of Life* – Baseline and annual risk assessment; improve patient understanding of osteoporosis and its management; increased patient compliance rate to therapy; increased mammography screening rate

### 7) Depression

- *Risk Assessment* – Self-assessment survey and quality of life; physician assessment of those patients already on anti-depressant medications
- *Preventative Care/Wellness* – Education on understanding mental health and depression; education on depression therapies; education on importance of taking anti-depressants regularly; education on sleep problems associated with depression; provide resource for obtaining more information and support groups available for depression☐
- *Interventions* – Drug therapy management to improve adherence and response to anti-depressants; physician education of possible drug interactions/side effects when appropriate; physician education of clinical guidelines and approved FDA uses for anti-depressants
- *Outcomes/Quality of Life* – Improve patient understanding of depression its management; increased use of national clinical guidelines for the treatment of depression; patients maintained on optimum therapy with optimum response; decrease unwarranted long term anti-depressant medication usage; decrease the number of patients on ineffective anti-depressant therapy; decreased overall anti-depressant prescription costs

### 8) Allergic Rhinitis

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
- *Preventative Care/Wellness* – Education on lifestyle changes to avoid allergens that induce allergy symptoms; education on treating allergy symptoms with promotion of OTC as first line therapy; education on the importance of treating their symptoms and avoidance of over-medicating with multiple medications
- *Interventions* – Promotion of OTC as first line therapy; drug therapy management to decrease over-utilization of medication; promote adherence to long-term controllers (when appropriate) to prevent allergy attacks; promote proper treatment with medications that treat the patients reported symptoms
- *Outcomes/Quality of Life* – Baseline and annual patient health status acquired via feedback from self-assessment questionnaire; improve patients understanding of allergic rhinitis and how to prevent attacks/symptoms; increased use of national step therapy guidelines, including first line therapy with OTC medications; patients maintained on optimum therapy based on their allergy symptoms; decreased overall allergic rhinitis prescription medication costs (use of OTC first, reduced duplicate therapy); decreased crossover rate of patients with allergic rhinitis to asthma

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002746

101

### 9) Arthritis

- *Risk Assessment* – Self-assessment of baseline severity of condition and quality of life
  - *Preventative Care/Wellness* – Educate patients regarding non-drug treatments of arthritis; encourage lifestyle changes to reduce intensity of arthritis pain; prevent adverse drug reactions due to misuse of medications
  - *Interventions* – Drug therapy management interventions with physicians to promote the most cost-effective treatment options; promote the use of single drug therapy to minimize risks of drug interaction and enhance compliance
  - *Outcomes/Quality of Life* – Baseline and annual risk assessment to determine disease severity and patient quality of life; improve quality of life by reducing pain and improving sleep patterns; improve patients understanding of disease/condition; reduce total costs associated with treating arthritis

### 10) Migraines

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
- *Preventative Care/Wellness* – Educate patients regarding OTC treatments of migraines; encourage lifestyle changes to reduce triggers of migraines; prevent adverse drug reactions due to misuse of medications
- *Interventions* – Drug therapy management interventions with physicians to promote the most cost-effective treatment options; promote the use of single drug therapy, when appropriate, to minimize risks of drug interaction and enhance compliance; physician education of possible drug interactions/side effects when appropriate
- *Outcomes/Quality of Life* – Baseline and annual risk assessment to determine disease severity and patient quality of life; improve quality of life by reducing pain and improving patient productivity (reduced loss of school and/or work days); improve patients understanding of disease/condition; reduce total costs associated with treating migraines

### 11) Congestive Heart Failure

- *Risk Assessment* – Self-assessment to ascertain baseline quality of life issues
- *Preventative Care/Wellness* – Education of patients to increase knowledge of congestive heart failure and its etiology; education of the role of lifestyle changes such as diet and exercise in congestive heart failure; education of the role of drug therapy in congestive heart failure treatment
- *Interventions* – Physician detailing campaign to encourage cost-effective prescribing; compliance monitoring and refill reminders; monitoring for drug-drug and drug-disease interactions; physician education as to the role of beta blockers and ACE inhibitors in congestive heart failure
- *Outcomes/Quality of Life* – Baseline and annual patient health status acquired via feedback from self-assessment questionnaire; improve patients understanding of

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002747

102

congestive heart failure and lifestyle modifications to control it; improve compliance to prescribed long-term therapy

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002748

103

### H. Pricing Formulas and Fees

Please submit separate fee quotations for each network being proposed.

1. What pricing guide does your organization use for your pharmacy programs?

| Source | Retail | Mail Order |
|---|---|---|
| Medispan | | |
| First Data Bank | | |
| Other | √ | √ |

How often is this standard updated for your retail program? For your mail order program?

The *RedBook* pricing file is maintained on-line by a pharmacist in our professional services department. The file is updated weekly by magnetic tape. An exception report is generated weekly, which is reviewed to check and validate any changes made to the file by the update tape. Any pricing inconsistencies are remedied immediately at NPA and then handled directly.

2. Please indicate your retail pricing formula for the ingredient component. Does the price formula include maximum allowable cost (MAC), average wholesale price (AWP), formulary or usual, reasonable and customary charges? On what is the MAC based? What discount is applied for generic drugs, for brand drugs?

Ingredient prices are based on AWP as posted in Medical Economics' *RedBook* on the prescription's date of service. Specifically, 100% of all pharmacies have agreed to accept reimbursement as follows:

In NPA's open access network:

Brands are reimbursed at the lower of the pharmacy's U&C, advertised or posted price or AWP minus ▮ plus a dispensing fee of ▮ This combination of cost controls result in an average net savings of ▮ below the AWP for branded medications.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002749

104

Generics are reimbursed at the lower of the pharmacy's U&C, advertised or posted price or NPA's Generic Maximum Price (GMP), our proprietary version of MAC pricing, plus an average dispensing fee of ██ This combination of cost controls results in up to ██ below AWP.

NPA's GMP Program is our proprietary version of MAC pricing. All generic drug claims are paid at the lower of the pharmacy's usual and customary (U&C) price or NPA GMP price, which is based on the most often purchased size of the dispensed product. This price is determined using a composite of the acquisition cost of generic entities in Medical Economics' *RedBook*. Our NPA GMP pricing provides an overall discount of ██ below *RedBook* AWP.

In the rare instances when a generic drug is not included in the NPA GMP Program, the ingredient cost will be reimbursed at the lesser of the pharmacy's U&C or the negotiated discount (In this case, AWP minus ██ plus a dispensing fee for NPA's Open network, and AWP minus ██ for our SelectNet[SM]).

The base administrative fees are ██ per paid electronic claim and ██ per paid paper claim.

3. For what period of time is this retail formula guaranteed?

These costs are guaranteed for ██ and valid for ██ from date of cover letter.

4. Is there a dispensing fee in your retail program? What is it? Is the dispensing fee the same for all pharmacies, or is it an average? If it is an average, what is the range of dispensing fees? How often is the dispensing fee changed or updated? Is the dispensing fee guaranteed for a specified period of time? If so, how long is the fee guaranteed?

Yes. The dispensing fee for the retail program is ██ These costs are guaranteed for ██ ██████████ from date of cover letter.

5. Would the retail pricing formula change if mail order is not used by the Fund? If so, please state this pricing formula?

105

6.  Please indicate your mail order pricing formula for the ingredient component. Does the pricing formula include MAC, formulary, AWP or usual, reasonable and customary charges? On what is the MAC based? What discount is applied for brand name and for generics? Is there a mail order administrative fee or fee for postage? If so, what is it?

For CFI's mail service pharmacy, brands will be reimbursed at AWP minus █████ plus a dispensing fee of █████ Generics will be reimbursed at AWP minus █████ plus a dispensing fee of █████ There is a minimum charge of █████ per prescription. ███████████████████████

7.  How long is your pricing formula for mail order prescriptions guaranteed?

These costs are guaranteed for ███████████████████ from date of cover letter.

8.  Is there a dispensing fee in your mail order program? How is the dispensing fee determined? How often is the dispensing fee changed or updated? Is the dispensing fee guaranteed for a specified period of time? If so, how long is the fee guaranteed?

The dispensing fee for our mail order program is █████ These costs are guaranteed for ███ ██████████████████ from date of cover letter.

9.  What is the approximate discount from AWP represented by your generic MAC?

Our NPA GMP pricing provides an overall discount of █████ below *RedBook* AWP.

10. Quote your monthly administrative fee separately for each program component and an aggregate monthly fee for the integrated program you present. If there is a difference in fees for processing paper claims (compared to electronically submitted claims), what is it? Do you charge an administrative fee for mail-order claims?

**Administrative Fee for Retail Card and Mail Service Program**

*   Base administrative fee    █████ per paid electronic claim
    █████ per paid paper claim

████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY    ESI-277-00002751

106

**11.** Do you assess the pharmacies an administrative fee for participation in the network? If yes, what is the amount and how is it calculated?

There is a ███ transmission fee per paid claim which grants access to your database and sponsor master file to adjudicate claims on file. ████████████████ ████████████████████ It is deducted directly from a pharmacies check.

**12.** Do you reimburse participating pharmacies at rates other than those negotiated with the Fund? If so, please describe.

███████████████████████████████████████████████████████

**13.** Also quote your fees for standard or ad hoc reports, if any, and for employee communications materials. If there is a separate fee for your drug utilization review program, state it also.

███████████████████████████████████████████████████████

For any customized report that adds to our standard package, NPA's commitment is to absorb the cost of design and programming of that report. Reports that do not fit into this category are charged based on the programming time needed to produce the report. If no programming is required, the standard charge for producing these reports is ████ Programming charges are billed at ████ per hour.

Customization of implementation and/or communication materials will be billed based on your requirements.

**14.** Are all of the fees quoted in this section guaranteed for one year? Can they be guaranteed for more than one year? If so, for how long?

These costs are guaranteed for ██████████████████ from date of cover letter.

Any renewal rate fee adjustments will be made on the Fund's policy anniversary date. All renewal information will be presented to the Fund at least 90 days before the renewal date.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

107

**15.    Are there any additional fees other than those specified above which might be charged to the client? If so, please identify them in detail.**

**One-Time Enrollment Fees**

* ████████████████████████████████████████████████

* A fee of ████ will be charged for additional/replacement cards.

* Customized master plate with your organization's name and/or logo, the one-time fee of ██ per color.

**Optional Costs**

NPA*Select*[SM] formulary program services include:

* NPA*Select*[SM] formulary development and ongoing maintenance
* Distribution and update of formulary to participating pharmacies
* NPA P&T Committee review of all new drugs entering the market
* Ongoing update of NPA*Select*[SM] formulary
* Detailed experience reporting to all manufacturers
* Quarterly program reports and rebate payments
* Physician and pharmacy analysis and intervention to increase formulary usage
* Ongoing negotiation with drug manufacturers to expand the program for additional savings
* Postage for all participant mailings, brochures and formulary summaries will be billed at actual cost
* Targeted participant listing of non-formulary medications is ████ per listing

| | |
|---|---|
| % Rebates Returned to the Fund | ████████████ |
| % Rebates Retained by NPA | |
| Retail Rebate Guarantee | |
| Mail Order Rebate Guarantee | |

Rebates are attributable only to formulary brand medications. NPA's guarantee is conditioned on you exercising "best efforts" in formulary compliance including the distribution of educational materials to participants to enhance formulary compliance. This guarantee will not apply should you implement an *NPAY*[SM] or Mandatory Generic Reimbursement Program. Further, should changes in the healthcare environment take place at the national level, this could eliminate the availability of rebates from pharmaceutical manufacturers and administrative fees will need to be re-addressed.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY         ESI-277-00002753

108

- Master plate for customized back of identification card, the one-time fee of ▓▓▓.

- A fee of ▓▓▓ per paid claim for Coordination of Benefits (COB). All options which require the generation and mailing of a letter and/or bill to either the carrier or the participant will be charged at ▓▓▓ for each letter generated. Postage for the mailing is billed at actual cost. This assumes that you will handle receipt of funds and any subsequent collection efforts.

- Customization of implementation and/or communication materials will be billed based on your requirements.

- An optional terminal, AT&T data lines and modems will be billed according to your needs.

- Explanation of Prescription Benefits (EOPB) Letter, which lists participant's prescriptions used in a given period, available generic counterparts and the potential generic savings. The fee for each letter (not including postage) is ▓▓▓

- Central Fill Notification (CFN) Letter that reminds a participant of the added benefit of the mail order pharmacy. The fee for each letter (not including postage) is ▓▓▓

16.   Do you permit your formulary to be implemented on a voluntary basis? On average, what do you anticipate the per-prescription rebate to be? Please provide this estimate based on total prescriptions dispensed, not just on those which are dispensed under the formulary.

Yes. NPA offers four levels of formulary participation with various rebate potential.

| Plan Design | Rebate per Rx |
|---|---|
| Level 1 Open Design | |
| Level 2 Managed | |
| Level 3 Restrictive | |
| Level 4 Closed | |

Level 1: NPA*Select*[SM] Formulary is a managed formulary that is open in design. Participation requires distribution of formulary education material to members, prescribing physicians, and pharmacies plus participation in our Brand Select Dispensing program. This level of participation has less than ▓▓▓ difference (or no difference) in copayment to increase formulary usage. For example:

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY          ESI-277-00002754

109

generics and Multisource brands
formulary brands
non-formulary brands

**Level 2:** The next level utilizes supplemental formulary programs to increase formulary usage. In addition to the education materials and Brand Select Dispensing program, this level of formulary management includes a three-tier copayment structure that allows for a minimum ▮▮▮ differential between non-formulary and formulary brand medications. A ▮▮▮ differential is recommended to qualify for higher tier rebates offered from some pharmaceutical manufacturers. A ▮▮▮ differential can offer savings comparable to a closed formulary due to the increased rebates added to the increased member copayment offsetting the cost of non-formulary products. Also offered at this level are the Multisource Dispensing program and the Patient Direct program. An example of a copayment structure is:

generics and Multisource brands
formulary brands
or ▮▮▮ non-formulary drug cost (whichever is greater)

**Level 3:** The third available level of formulary design is a restrictive formulary. All programs designed in the second level apply. In addition, therapeutic category restrictions are offered in selected high cost categories with a range of drug choices. It requires selection of Preferred drugs in place of high cost non-formulary drugs. The concept is similar to a closed formulary by specifically excluding payment for expensive drugs in these groups. (A tiered copayment can be applied to these groups also. Rebates per Rx would depend on categories selected and differential.) The rebate per Rx listed above is based on selection of at least the first three groups below:

> Gastrointestinal ($H_2$-antagonists and PPIs)
> Allergy (Non-Sedating Antihistamines and Nasal Steroids)
> Cardiovascular (Statins and Ace Inhibitors)
> Diabetic (Glucose Test Strips and Insulin)
> Pain and CNS (NSAIDs and SSRIs and related drugs)
> Lifestyle (MSD, Smoking Cessation, Oral Contraceptives)

**Level 4:** Formulary Closure is the most effective formulary management tool. Closing a formulary limits the prescription benefit to only those drugs listed in the formulary. This will result in the highest rebate per Rx but is associated with higher administrative costs for the client from Prior Authorization requirements.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY        ESI-277-00002755

110

17.    Is the administrative fee charged for all electronic communications or
       for only dispensed prescriptions?  Please explain in detail.

HIGHLY CONFIDENTIAL - ATTORNEY'S ONLY          ESI-277-00002756

# Exhibit J

IF SERVICES COMMENCE PRIOR TO THE EXECUTION
OF THIS AGREEMENT, ALL TERMS AND CONDITIONS
OF THE AGREEMENT SHALL BE APPLICABLE.

# INTEGRATED
# PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS AGREEMENT is entered into as of the 1st day of January, 1998, (the "Effective Date") among PAID Prescriptions, L.L.C., located at 399 Jefferson Road, Parsippany, New Jersey 07054 ("PAID"), Merck-Medco Rx Services of New Jersey, L.L.C., located at 399 Jefferson Road, Parsippany, New Jersey 07054 ("Rx SERVICES") and Moyer Packing Company, located at 249 Allentown Road, Souderton, Pennsylvania 18964 ("MOYER").

WHEREAS, PAID and its affiliates provide managed prescription drug benefit programs and, in connection therewith, PAID has established networks of participating retail pharmacies and has developed and operates a system for the processing, fulfillment and payment of claims for prescription drugs furnished by such pharmacies; and

WHEREAS, Rx SERVICES is a licensed pharmacy affiliated with PAID which provides prescription drugs via mail service; and

WHEREAS, MOYER provides a prescription drug benefit to MOYER's employees, and their qualified dependents and desires to retain the services of PAID and Rx SERVICES to provide a managed care prescription drug benefit program (the "Program") consisting of retail and mail service pharmacy services for eligible persons pursuant to the terms and provisions contained herein and cost containment initiatives developed and implemented by PAID and Rx SERVICES which may include communications with prescribers, patients and/or participating pharmacies, and financial incentives to participating pharmacies for their participation in such initiatives.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1.   DEFINITIONS

1.1   "AWP" means the average wholesale price of the Covered Drug dispensed, as set forth in the current price list in recognized sources such as Blue Book and its supplements, or other nationally recognized pricing source determined by PAID, or the direct cost listed in those instances in which only the direct cost is listed. Under the Retail Pharmacy Program, AWP is based on the package size submitted. Under the Mail Service Program, AWP is based on package sizes of 100 units or 16 oz. quantities, or smaller quantities if such quantities are not available.

1.2   "Contract Year" means the full twelve (12) month period commencing on the Effective Date and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

1.3   "Covered Drugs" mean all drugs which, under state or federal law, require a prescription. Excluded from Covered Drugs are (i) cosmetic drugs, (ii) appliances, devices, bandages, heat lamps, braces, splints, and artificial appliances and (iii) health and beauty aids, cosmetics and dietary supplements ("Exclusions"). Additional Covered Drugs and/or Exclusions shall be designated by MOYER in Schedules A-1 and A-2 hereto.

1.4   "Eligible Person" means each employee of MOYER, and their qualified dependents.

14353_3

HIGHLY CONFIDENTIAL

MHS   A__0005138

1.5    "Mail Service Program" means the program described in Section 4 in which Eligible Persons may mail a prescription along with the applicable Copayment/Coinsurance to Rx SERVICES for dispensing via mail service.

1.6    "Minimum Enrollment" means an enrollment of not less than 750 Eligible Persons under the Program.

1.7    "Participating Pharmacy" means a retail pharmacy that has entered into an arrangement with PAID to participate in PAID's network of pharmacies servicing MOYER's Program.

1.8    "Plan Design" means Program drug coverage, days supply limitation, Copayment/Coinsurance, Formulary (including Formulary drug selection and relative cost indication) and other Program specifications applicable to the Program set forth in this Agreement or otherwise agreed to, in writing, between the parties.

1.9    "Retail Pharmacy Program" means the program described in Section 3 in which Eligible Persons may purchase Covered Drugs from a Participating Pharmacy upon verification of Program eligibility and payment of the applicable Copayment/Coinsurance, and the claim is submitted by the Participating Pharmacy to PAID for payment in accordance with this Agreement and the applicable PAID Participating Pharmacy agreement.

1.10   "TelePAID® System" or "TelePAID®" means PAID's real time, on-line system for adjudicating prescription drug claims submitted by Participating Pharmacies.

## 2.    MOYER FURNISHED INFORMATION

MOYER shall promptly furnish to PAID, in a format acceptable to PAID, all information necessary for PAID and Rx SERVICES to render the services set forth herein.  Such information shall include, but is not limited to:

2.1    A list of Eligible Persons, and subsequent timely additions and deletions to such list as changes occur.

2.2    Designation, in writing, of those Plan Design features to be determined by MOYER under the Retail Pharmacy Program and Mail Service Program.  The Plan Design, and any modification thereto, is subject to the prior approval of PAID and Rx SERVICES, which approval shall not be unreasonably withheld.

2.3    The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program.

2.4    The type, number and description of PAID Identification Cards required for the Retail Pharmacy Program.

## 3.    RETAIL PHARMACY PROGRAM

The specific features of the Retail Pharmacy Program are as follows:

16353_1

- 2 -

HIGHLY CONFIDENTIAL

MHS    A__0005139

3.1  Program Coverage - The Program coverage (Covered Drugs/Exclusions) and days supply limitation applicable to the Retail Pharmacy Program as designated by MOYER are set forth in Schedule A-1.

3.2  Participating Pharmacy Networks - PAID shall maintain a Participating Pharmacy Network reasonably necessary to provide services under the Retail Pharmacy Program

3.3  Identification Cards - PAID shall produce Identification Cards for those Eligible Persons designated by MOYER with an accompanying explanatory brochure and provide direct reimbursement claim forms for use by Eligible Persons who have not received or who have lost their Identification Cards.  PAID will distribute Identification Cards and claim forms to MOYER for distribution by MOYER to Eligible Persons.  All costs associated with distributing and/or mailing such materials are the responsibility of MOYER.

3.4  Claim Adjudication - PAID shall adjudicate claims for prescription drug benefits in accordance with PAID's TelePAID System and pay approved claims in accordance with the applicable Plan Design.  Disapproved claims shall be transmitted to the submitting pharmacy with a brief explanation of the cause or causes for disapproval.

3.5  Claim Disputes - Any questions involving Program procedures or relating to applicable benefits shall be resolved prior to payment by PAID, and payment may be delayed following receipt of a claim pending resolution of such questions   Subject to the terms and conditions herein, MOYER shall make the final determination regarding payment of all submitted claims.  Should MOYER determine that a previously disapproved claim should be paid, and so direct PAID, payment of such claim shall be accomplished promptly by PAID.  PAID shall promptly refer to MOYER all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

3.6  Administrative Services - PAID shall provide, as applicable, the Base Administrative Services and the Additional Administrative Services set forth in Schedule B

3.7  Pricing - The Program Pricing Terms applicable to the Retail Pharmacy Program are set forth in Schedule B.

## 4.  MAIL SERVICE PROGRAM

4.1  Program Coverage

4.1.1  The Program coverage (Covered Drugs/Exclusions) and days supply limitation applicable to the Mail Service Program as designated by MOYER are set forth in Schedule A-2

4.1.2  A 90 day supply of Covered Drugs per prescription or refill may be dispensed by Rx SERVICES subject to the professional judgment of the dispensing pharmacist, limitations imposed on controlled substances and manufacturer's recommendations.  Prescriptions may be refilled providing the prescription so states  Prescriptions will not be filled (i) more than 12 months after issuance, (ii) more than 6 months after issuance for controlled substances, or (iii) if prohibited by applicable law or regulation.

16,653_1

- 3 -

HIGHLY CONFIDENTIAL

MHS    A__0005140

4.2    Dispensing Procedures

    4.2.1    Rx SERVICES shall dispense Covered Drugs to Eligible Persons, and dispense generic drugs when authorized, and in accordance with applicable law and regulations in the state in which Rx SERVICES' pharmacy is located, and in accordance with the terms and provision of this Agreement.

    4.2.2    All matters pertaining to the dispensing of Covered Drugs or the practice of pharmacy in general are subject to the professional judgment of the dispensing pharmacist.

    4.2.3    Any drug which cannot be dispensed in accordance with Rx SERVICES' dispensing protocols, or which requires special recordkeeping procedures, may be excluded from coverage by Rx SERVICES

    4.2.4    In the event that it becomes impracticable, for reasons of a force majeure or otherwise, for Rx SERVICES to dispense prescriptions to Eligible Persons under the Program, Rx SERVICES shall notify MOYER, and use reasonable efforts to have Program prescriptions dispensed from an affiliated mail service pharmacy, subject to applicable laws and regulations.

4.3    Pricing - The Program Pricing Terms applicable to the Mail Service Program are set forth in Schedule B.

## 5.    CUSTOMER SERVICE

PAID and Rx SERVICES, as applicable, will provide MOYER with the following:

5.1    Pre-addressed envelopes for use by Eligible Persons in mailing their prescriptions to Rx SERVICES.

5.2    Upon receipt of notice from an Eligible Person that a Covered Drug dispensed by Rx SERVICES under the Mail Service Program was not received in the normal course, Rx SERVICES will redispense and mail a replacement to the Eligible Person.

5.3    A toll free customer service telephone line will be made available for use by Eligible Persons that have questions about the Program.

5.4    PAID's standard management/utilization reports.

## 6.    FORMULARY

MOYER shall be a participating plan sponsor in the Preferred Prescriptions Formulary[1] as set forth below for the term of this Agreement.

6.1    Preferred Prescriptions Formulary - The Preferred Prescriptions Formulary is a prescription drug formulary administered by PAID which lists FDA approved drugs that have been evaluated for inclusion in the Preferred Prescriptions Formulary. The drugs included on the Preferred Prescriptions Formulary will be modified by PAID from time to time as a result of factors

---

[1]    The Preferred Prescriptions Formulary is a service mark of Merck-Medco Managed Care, L.L.C.

HIGHLY CONFIDENTIAL

MHS    A 0005141

including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations. PAID will implement PAID's formulary management program, which may include cost containment initiatives, communications with Eligible Persons, Participating Pharmacies and/or physicians, and financial incentives to Participating Pharmacies for their participation. Compliance with the Preferred Prescriptions Formulary and PAID's formulary management program will result in Formulary Rebates as set forth below. PAID reserves the right to modify or replace the Preferred Prescriptions Formulary (including any modification or replacement, the "Formulary") and Formulary compliance methods and cost containment initiatives consistent with good pharmacy practice. MOYER agrees that PAID will be the exclusive Formulary administrator for MOYER's prescription drug benefit programs during the term of this Agreement. MOYER is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by PAID.

6.2    Formulary Savings - Merck-Medco Managed Care, L.L.C. and its affiliates (collectively "Medco") receive Formulary Rebates from certain drug manufacturers as a result of the inclusion of such manufacturer's branded products on the Formulary ("Formulary Rebates"). Medco also conducts therapeutic interchange programs for formulary drugs which will lead to cost savings, measured on an AWP basis ("AWP Savings"). (Formulary Rebates and AWP Savings are jointly referred to as "Formulary Savings").

## REDACTED

6.3    In the event that government action or a change in law or regulation or a change in the interpretation of law or regulation or actions by any drug manufacturers have a material adverse affect on the availability of Formulary Savings, Medco may modify the Program Pricing Terms.

## 7.    BILLING/PAYMENT

7.1    PAID shall provide MOYER with a bi-weekly consolidated invoice for services provided by PAID and Rx SERVICES under the Program, in accordance with the Program Pricing set forth in Schedule B. All invoices shall be paid in full by MOYER within two (2) business days of receipt by wire transfer, electronic debit or other method approved by PAID in writing.

7.2    MOYER shall pay PAID for administrative products and services provided by PAID under the Program in accordance with the Administrative Fee provisions set forth in Schedule B. PAID will provide MOYER with an Administrative Fee invoice in accordance with PAID's four (4) week administrative fee cycle. There is a minimum charge of $250.00 per Administrative Fee invoice. MOYER shall pay Administrative Fee invoices in full within fifteen (15) days of the invoice date.

7.3    PAID may revise the Program pricing terms set forth in Schedule B during the term of this Agreement upon sixty (60) days prior written notice to MOYER. If any such Program pricing revision is unacceptable to MOYER, MOYER shall notify PAID, in writing, within fifteen (15) days of MOYER's receipt of notice of the pricing revision. If the parties are unable to agree on a mutually acceptable pricing, either party may terminate this Agreement upon sixty (60) days prior written notice to the other party provided such notice is given prior to the effective date of the proposed pricing revision.

7.4    MOYER shall pay to PAID, on or before the Effective Date, a deposit equal to two (2) months anticipated claims experience, which amount may be periodically modified by PAID based on

HIGHLY CONFIDENTIAL                    MHS    A_0005142

MOYER's actual claims experience and enrollment. This deposit may be used by PAID to offset the failure by MOYER, for any reason, to make any payments pursuant to the terms of this Agreement and does not, in any way, limit other remedies available to PAID or Rx SERVICES. The deposit, to the extent not utilized to offset any payment default by MOYER under this Agreement, shall be returned to MOYER within one hundred and eighty (180) days following termination of this Agreement.

7.5     Failure by MOYER to make any payments in accordance with the terms of this Agreement shall constitute a payment default. Notwithstanding Section 10.3 of this Agreement, if MOYER fails to cure any such payment default within five (5) days, in addition to other available remedies, PAID may terminate this Agreement upon notice to MOYER. There shall be a late payment fee of 1% per month on the balance due on all late payments over five (5) days past due. MOYER shall reimburse PAID for all collection costs incurred by PAID as a result of any payment default by MOYER under this Agreement

## 8.   RECORDS

8.1     PAID and Rx SERVICES shall maintain all records relating to services performed under this Agreement as required by applicable law. Such records shall be in their original form, on microfilm, microfiche or other form determined by PAID. The records may be examined and audited by MOYER, or its representative reasonably acceptable to PAID and subject to execution of a confidentiality agreement, throughout the calendar year in which they are established and for a period of one (1) calendar year thereafter, subject to applicable confidentiality provisions and legal requirements. Subject to Section 9.2, PAID and Rx SERVICES may retain copies of such records for their own use. Any audit by MOYER may be conducted annually upon adequate prior written notice, and during regular business hours.

8.2     MOYER shall furnish its most recent audited financial statement to PAID prior to the Effective Date of this Agreement and thereafter shall furnish its annual audited financial statement to PAID within ninety (90) days after the end of each fiscal year of MOYER that this Agreement is in effect.

## 9.   CONFIDENTIAL INFORMATION

9.1     MOYER shall not disclose any information or knowledge concerning PAID's or Rx SERVICES' operations, procedures and/or the terms of this Agreement, which is hereby deemed confidential information, except as otherwise required by law. If confidential information of a party is disclosed to or otherwise acquired by the other party, such information shall be held in confidence and surrendered by the acquiring party to the disclosing party upon the termination of this Agreement or upon prior written request by the disclosing party. Neither MOYER, PAID nor Rx SERVICES may under any circumstances utilize the service marks, trademarks or tradenames of any other party to this Agreement, or any service marks, trademarks or tradenames so similar as likely to cause confusion, without the prior express written approval of such other party. The programs implemented by PAID and/or Rx SERVICES shall remain the sole property of PAID and Rx SERVICES, and shall only be used by MOYER in connection with the Program and only so long as PAID and Rx SERVICES administer the Program.

9.2     PAID, Rx SERVICES and MOYER shall comply with all applicable laws and regulations regarding patient confidentiality. PAID and Rx SERVICES shall not furnish any patient identifiable or MOYER identifiable data or information to any third party without the express

16359_1

- 6 -

HIGHLY CONFIDENTIAL                MHS   A__0005143

written consent of MOYER, except as reasonably necessary to implement and operate the Program and fulfill its obligations pursuant to this Agreement or as required by applicable law.

9.3     Medco's agreements with pharmaceutical manufacturers are subject to confidentiality agreements. Any audits conducted pursuant to Section 8 1 above shall not include any portion of such pharmaceutical manufacturer agreements.

## 10.     TERM OF AGREEMENT

10.1     This Agreement shall remain in effect for an Initial Term of two (2) years from the Effective Date and thereafter shall automatically renew for successive one (1) year terms unless either party gives written notice, at least ninety (90) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term. Notwithstanding the termination of this Agreement, PAID and Rx SERVICES agree to continue to render services hereunder and MOYER agrees to pay for services of PAID and Rx SERVICES in accordance with the terms of this Agreement for any claims incurred for prescription drug benefits by Eligible Persons while this Agreement was in force.

10.2     Notwithstanding the foregoing, either party may terminate this Agreement at any time upon at least ninety (90) days prior written notice to the other party

10.3     In the event of a material breach of this Agreement, the party alleging such breach shall give written notice thereof to the other parties. If such breach is not cured within sixty (60) days of receipt of such notice, the non-breaching party may terminate this Agreement upon written notice to the other party.

## 11.     FORCE MAJEURE

Neither PAID, Rx SERVICES nor MOYER shall be deemed to have breached this Agreement or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement if prevented from doing so by a cause or causes beyond its control. Without limiting the generality of the foregoing, such causes include acts of God or the public enemy, fires, floods, storms, earthquakes, riots, boycotts, strikes, lock-outs, wars and war-operations, restraints of government, power or communication line failure or other circumstances beyond such party's control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction or change of law or regulation or change in the interpretation thereof subsequent to the execution of this Agreement.

## 12.     INDEMNIFICATION/LIMITATION OF LIABILITY

12 1     PAID and Rx SERVICES agree to indemnify and hold MOYER, its directors, officers and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from services rendered by PAID or Rx SERVICES pursuant to this Agreement to the extent the claim or cause of action arises out of PAID's or Rx SERVICES' negligence or willful misconduct, provided that (a) MOYER has given reasonable notice to PAID or Rx SERVICES of the claim or cause of action, and (b) no Indemnified Party has, by act or failure to act, compromised PAID's or Rx SERVICES' position with respect to the resolution or defense of the claim or cause of action.

12.2     MOYER agrees to indemnify and hold PAID and Rx SERVICES, their affiliates, and their respective directors, officers and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from negligence or willful

16353_8

- 7 -

HIGHLY CONFIDENTIAL                    MHS   A__0005144

misconduct of MOYER, including without limitation, the disclosure and/or use of Program data or information provided by PAID and/or Rx SERVICES to MOYER, provided that (a) the Indemnified Party has given reasonable notice to MOYER of the claim or cause of action, and (b) no Indemnified Party has, by act or failure to act, compromised MOYER's position with respect to the resolution or defense of the claim or cause of action.

12.3    Rx SERVICES and PAID shall maintain, during the term of this Agreement, liability coverage with limits not less than $1,000,000 per occurrence and in the aggregate per policy year, with excess liability coverage in an amount not less than $5,000,000 per policy year. Evidence thereof shall be furnished to MOYER upon request

12.4    Except as provided in Section 12.1 above, in no event shall PAID, Rx SERVICES or any affiliated company, or their directors, officers or employees be responsible in any manner for any claim, loss or damage sustained as a result of the provision of or failure to provide pharmaceutical goods or services or any other action or failure to act by any retail pharmacy or pharmaceutical providers.

12.5    The liability of PAID or Rx SERVICES to MOYER for any acts or omissions by PAID or Rx SERVICES in the performance of their obligations hereunder shall be limited to the amount of administrative fees paid by MOYER to PAID during the prior twelve (12) month period.

12.6    In no event shall PAID, Rx SERVICES or MOYER be liable to each other for incidental, consequential or exemplary damages.

## 13.   EXCLUSIVITY

PAID and Rx SERVICES shall be the exclusive providers and administrators of prescription drug benefits to MOYER while this Agreement is in effect. Nothing contained herein, however, shall prohibit PAID or Rx SERVICES or any affiliated entity from providing or administering prescription drug benefits and related programs and services to any other entity while this Agreement is in effect.

## 14.   GENERAL

14.1    Independent Contractor - The relationship among PAID, Rx SERVICES and MOYER shall solely be that of independent contractors engaged in the operation of their own respective businesses.

14.2    Assignment - This Agreement may not be assigned by any party without the express prior written consent of the other parties which consent shall not be unreasonably withheld provided, however, that services to be performed by PAID or Rx SERVICES hereunder may be performed by their subsidiaries, affiliates and/or designees.

14.3    No Third Party Beneficiary - This Agreement has been entered into solely for the benefit of MOYER, PAID and Rx SERVICES, and is not intended to create any legal, equitable or beneficial interest in any third party or to vest in any third party any interest as to enforcement or performance.

14.4    Notices - All notices required under this Agreement shall be in writing and sent by First Class mail postage paid, facsimile or overnight delivery addressed as follows:

- 8 -

16355_1

HIGHLY CONFIDENTIAL

MHS    A__0005145

If to MOYER:         Moyer Packing Company
                        249 Allentown Road
                        Souderton, PA 18964
                        Attention: Susan Hunter

If to PAID or
Rx SERVICES:      Merck-Medco Managed Care, L.L.C.
                        100 Summit Avenue
                        Montvale, NJ 07645
                        Attention: James H. Cooper
                        Senior Vice President – Legal

14.5   Amendments - This Agreement may be amended only in writing when signed by a duly authorized representative of each party.

14.6   Financial Responsibility - In the event PAID has reasonable grounds to believe that MOYER may be unable to meet its payment obligations under this Agreement as they become due, PAID may request information and/or reasonable assurances (including a deposit) from MOYER as to its financial responsibility. In the event that such information or assurances are not furnished to PAID within five (5) days, or are not satisfactory in PAID's reasonable judgment, PAID and Rx SERVICES may immediately terminate this Agreement.

14.7   Plan Design - The Program pricing terms and performance standards set forth in this Agreement are based upon the Plan Designs, Minimum Enrollment and Program specifications agreed to between the parties as reflected in this Agreement and as otherwise hereafter agreed to by the parties in writing. Any modification of the Plan Designs or Program specifications is subject to PAID's prior approval, which approval shall not be unreasonably withheld. Any such modification or failure to maintain Minimum Enrollment may result in a retroactive modification by PAID of the Program pricing terms. MOYER shall provide Eligible Persons with at least thirty (30) days prior notice of approved Plan Design changes.

14.8   Tax - Any sales, use or other tax imposed on items dispensed, or services provided hereunder, shall be the sole responsibility of MOYER.

14.9   Governing Law - This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey. However, all matters relating to the operations of Rx SERVICES shall be governed by the laws of the state in which Rx SERVICES' pharmacy is located.

14.10   Enforceability - The invalidity or unenforceability of any of the terms or provisions hereof shall not affect the validity or enforceability of any other term or provision.

14.11   Section Headings - Section headings are inserted for convenience only and shall not be used in any way to construe the terms of this Agreement.

14.12   Waiver - The waiver of any breach or violation of any term or provision hereof shall not constitute a waiver of any subsequent breach or violation of the same or any other term or provision.

14.13   Entire Agreement - This Agreement, together with the Schedules hereto, embodies the entire understanding of the parties in relation to the subject matter hereof, supersedes any prior agreement among the parties in relation to the subject matter hereof, and no other agreement, understanding, or representation, verbal or otherwise, relative to the subject matter hereof exists among the parties at the time of execution of this Agreement.

16353_1

- 9 -

HIGHLY CONFIDENTIAL        MHS  A_0005146

14.14   <u>Survival</u> - The provisions of Sections 7.5, 9 and 12 and the last sentence of Section 10.1 shall survive the termination of this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date indicated below.

**PAID PRESCRIPTIONS, L.L.C.**

BY: _James H. Cooper_
       James H. Cooper

TITLE:<u>Vice President - Contracts</u>

DATE: _1/22/08_

**MERCK-MEDCO Rx SERVICES
OF NEW JERSEY, L.L.C.**

BY: _James H. Cooper_
       James H. Cooper

TITLE:<u>Vice President - Contracts</u>

DATE: _1/22/08_

16353_1-6/10/98
(Original 4208.3-1/13/98)

**MOYER PACKING COMPANY**

BY: _Susan E. Hunter_

TITLE:_Health Benefits Mgr._

DATE: _11/18/98_

- 10 -

16353_1

**HIGHLY CONFIDENTIAL**          MHS    A__0005147

**PAID PLAN 5N:** Pharmacy     **MOYER PACKING**

**COVERED DRUGS:**
The following are covered benefits unless listed as an exclusion below:
- o    Federal Legend Drugs
- o    State Restricted Drugs
- o    Compounded Medications of which at least one ingredient is a Federal Legend Drug
- o    Insulin
- o    Insulin Needles and Syringes
- o    Legend Prenatal and Pediatric Fluoride Vitamins
- o    Hematinics
- o    Retin-A® through age 25
- o    Viagra® for males age 50 and over (limit 30 days or 8 tablets whichever is less per claim)

**EXCLUSIONS:**
The following are excluded from coverage unless <u>specifically</u> listed as a benefit under "Covered Drugs ".
- o    Non-Federal Legend Drugs
- o    All Contraceptive medications or devices
- o    Fertility Medications
- o    Smoking Deterrents
- o    Anorexiants
- o    Amphetamines
- o    Growth Hormones
- o    Chemotherapeutic Agents
- o    Legend Vitamins (except for those listed above)
- o    Topical Fluoride Products
- o    Retin-A® at age 26 and over
- o ·  Immunizing agents, biologicals, blood or blood plasma products
- o    Drugs whose sole purpose is to promote or stimulate hair growth (i.e. Rogaine®, Propecia®) or for cosmetic purposes only (i.e. Renova®)
- o    Therapeutic devices or appliances
- o    Drugs labeled "Caution-limited by federal law to investigational use", or experimental drugs, even though a charge is made to the individual.
- o    Medication for which the cost is recoverable under any Workers' Compensation or Occupational Disease Law or any State or Governmental Agency, or medication furnished by any other Drug or medical Service for which no charge is made to the member.
- o    Medication which is to be taken by or administered to an individual, in whole or in part, while he or she is a patient in a licensed hospital, rest home, sanitarium, extended care facility, skilled nursing facility, convalescent hospital, nursing home or similar institution which operates on its premises or allows to be operated on its premises, a facility for dispensing pharmaceuticals.
- o    Any prescription refilled in excess of the number of refills specified by the physician, or any refill dispensed after one year from the physician's original order.

**DISPENSING LIMITS:**
- o    The amount of drug which is to be dispensed per prescription or refill will be in quantities prescribed up to and including a 30 day supply or 120 units, whichever is <u>LESS</u>.

Paid Plan 5N/kp
5/19/98

HIGHLY CONFIDENTIAL     MHS    A_0005148

**PAID PLAN UK:**                    **MOYER PACKING**

**COVERED DRUGS:**
The following are covered benefits unless listed as an exclusion below.
- Federal Legend Drugs
- State Restricted Drugs
- Compounded Medications of which at least one ingredient is a Federal Legend Drug
- Insulin
- Insulin Needles and Syringes
- Legend Prenatal and Pediatric Fluoride Vitamins
- Hematinics
- Retin-A® through age 25
- Viagra® for males age 50 and over (limit 90 days or 24 tablets whichever is less per claim)

**EXCLUSIONS:**
The following are excluded from coverage unless specifically listed as a benefit under "Covered Drugs".
- Non-Federal Legend Drugs
- ALL contraceptive medications or devices
- Fertility Medications
- Smoking Deterrents
- Anorexiants
- Amphetamines
- Growth Hormones
- Chemotherapeutic Agents
- Legend Vitamins (except for those listed above)
- Topical Fluoride Products
- Retin-A® at age 26 and over
- Immunizing agents, biologicals, blood or blood plasma products
- Drugs whose sole purpose is to promote or stimulate hair growth (i.e. Rogaine®, Propecia®) or for cosmetic purposes only (i.e Renova®)
- Therapeutic devices or appliances
- Drugs labeled "Caution-limited by Federal Law to investigational use", or experimental drugs, even though a charge is made to the individual.
- Medication for which the cost is recoverable under any Workers' Compensation or Occupational Disease Law or any State or Governmental Agency, or medication furnished by any other Drug or Medical Service for which no charge is made to the member.
- Medication which is to be taken by or administered to an individual, in whole or in part, while he or she is a patient in a licensed hospital, rest home, sanitarium, extended care facility, skilled nursing facility, convalescent hospital, nursing home or similar institution which operates on its premises or allows to be operated on its premises, a facility for dispensing pharmaceuticals.
- Any prescription refilled in excess of the number of refills specified by the physician, or any refill dispensed after one year from the physician's original order.

**DISPENSING LIMITS:**
- The amount of drug which is to be dispensed per prescription or refill will be in quantities prescribed up to a 90 day supply.

Paid Plan UK/kp
5/19/98

MHS    A_0005149

HIGHLY CONFIDENTIAL

<u>**SCHEDULE B**</u>
<u>**PROGRAM PRICING TERMS**</u>

MOYER shall pay PAID for services provided by PAID and Rx SERVICES under the Program as follows:

1.    <u>**RETAIL PHARMACY PROGRAM CLAIMS**</u> -

REDACTED

2.    <u>**MAIL SERVICE PROGRAM CLAIMS**</u> -

REDACTED

3.    <u>**ADMINISTRATIVE FEES**</u>

REDACTED

- 13 -

15353_1

HIGHLY CONFIDENTIAL                    MHS    A__0005150

**BASE ADMINISTRATIVE SERVICES**

- Administration of eligibility submitted via tape or telecommunication in PAID's standard format
- One eligibility printout per re-enrollment
- Dependent Eligibility Certification System (DECS)
- Administration of PAID's standard plan designs
- Client support system (CAS) for on-line access to current eligibility and claims history (equipment, installation and line charges are responsibility of MOYER)
- Integrated Program claims history tape every two weeks
- Twelve month on-line claims history retention
- One identification card issued per employee or retiree
- Concurrent Drug Utilization Review (DUR)
- High Utilization Component Level I of Retrospective DUR (Alert Module)
- Access capability to support client managed prior authorization activities
- Coordination of Benefits Level I
- PAID Standard$^{PLUS}$Report Package
- Computer generated directory of Participating Pharmacies for use at each major plan sponsor location
- PAID Pharmacy Audit Program - Level I
- 24 hour access to an Rx SERVICES pharmacist via a toll-free customer service telephone line

3.2     MOYER shall also pay for Additional Administrative Services requested by MOYER and provided by PAID under the Program as follows:

**ADDITIONAL ADMINISTRATIVE SERVICES**

- Extra Identification Cards

- Direct reimbursement claims adjudication:
  - Standard direct reimbursement claim forms
  - Handling and postage expense of direct reimbursement checks and EOBs

- Extended claims history retention

- Set-up and load of historical claims from prior vendor, supplied in PAID format

- Annual Prescription Benefit Record (PBR)

(continued)

REDACTED

16353_1

- 14 -

HIGHLY CONFIDENTIAL          MHS    A__0005151

| ADDITIONAL ADMINISTRATIVE SERVICES (continued) | |
| --- | --- |
| • Additional ad-hoc report production, re-programming and testing of non-standard client requirements | REDACTED |
| • High Utilization Management Level II component of Retrospective DUR (Investigation Module) | |
| • Therapeutic Retrospective DUR | |
| • Hard copy eligibility submission | |
| • Mailings direct to members or plan location | |

NOTE: Charges for additional services not listed above will be determined by PAID and quoted upon request.

16393_1

- 15 -

HIGHLY CONFIDENTIAL

MHS     A__0005152

# Exhibit K

IF SERVICES COMMENCE PRIOR TO THE L_____UTION
OF THIS AGREEMENT, ALL TERMS AND CONDITIONS
OF THE AGREEMENT SHALL BE APPLICABLE.

# INTEGRATED PRESCRIPTION DRUG PROGRAM AGREEMENT
# ADDENDUM

This ADDENDUM is entered into as of the 1st day of January, 2000, among PAID Prescriptions, L.L.C., located at 399 Jefferson Road, Parsippany, New Jersey 07054 ("PAID"), Merck-Medco Rx Services of New Jersey, L.L.C., located at 399 Jefferson Road, Parsippany, NJ 07054 ("Rx SERVICES") and Moyer Packing Company, located at 249 Allentown Road, Souderton, PA 18964 ("MOYER").

WHEREAS, PAID, Rx SERVICES and MOYER entered into an Integrated Prescription Drug Program Agreement dated January 1, 1998 (together with any subsequent addenda, the "Integrated Agreement"), whereby MOYER retained the services of PAID and Rx SERVICES to provide an integrated retail pharmacy/mail service prescription drug program for Eligible Persons pursuant to the terms and conditions contained therein; and

WHEREAS, the parties desire to amend the Integrated Agreement.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual premises set forth herein, the parties agree as follows:

1.  **TERM** - Effective January 1, 2000, the first sentence of Section 10.1 is amended to read in its entirety as follows

    "The Initial Term of the Agreement is extended through December 31, 2002 and thereafter shall automatically renew for successive one (1) year terms unless either party gives written notice at least ninety (90) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term.

2.  **PROGRAM PRICING** - Effective January 1, 2000 Schedule B to the Integrated Agreement shall be deleted in its entirety and replaced with the new Schedule B attached hereto as Attachment 1.

3.  **FORMULARY**

    Effective January 1, 2000 Section 6 of the Integrated Agreement is deleted in its entirety and replaced with the following:

24692 1

HIGHLY CONFIDENTIAL

MHS    A__0005153

## 6. FORMULARY

MOYER shall be a participating plan sponsor in the PAID Preferred Prescriptions Formulary[SM1] as set forth below for the term of this Agreement. MOYER shall provide PAID with advanced notice of each Group that will participate in the Preferred Prescriptions Formulary.

6.1   Preferred Prescriptions Formulary - The Preferred Prescriptions Formulary is a prescription drug formulary administered by PAID which lists FDA approved drugs that have been evaluated for inclusion in the Preferred Prescriptions Formulary. The drugs included on the Preferred Prescriptions Formulary will be modified by PAID from time to time as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations. PAID will implement PAID's formulary management program, which may include cost containment initiatives, communications with Eligible Persons, Participating Pharmacies and/or physicians, and financial incentives to Participating Pharmacies for their participation. Compliance with the Preferred Prescriptions Formulary and PAID's formulary management program will result in Formulary Rebates as set forth below. PAID reserves the right to modify or replace the Preferred Prescriptions Formulary (including any modification or replacement, the "Formulary") and formulary compliance methods and cost containment initiatives consistent with good pharmacy practice. MOYER agrees that PAID will be the exclusive formulary administrator for MOYER's prescription drug benefit programs during the term of the Agreement. MOYER is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by PAID.

6.2   Formulary Savings - Merck-Medco Managed Care, L.L.C. and its affiliates (collectively "Medco") receive Formulary Rebates from certain drug manufacturers as a result of the inclusion of such manufacturer's branded products on the Formulary ("Formulary Rebates"). Medco also conducts therapeutic interchange programs for formulary drugs which will lead to cost savings, measured on an AWP basis ("AWP Savings"). (Formulary Rebates and AWP Savings are jointly referred to as "Formulary Savings").

# REDACTED

6.3   In the event that government action or change in law or regulation or a change in the interpretation of law or regulation or actions by any drug manufacturers have a material adverse affect on the availability of Formulary Savings, Medco may modify the Program Pricing Terms."

---

[1]   The Preferred Prescriptions Formulary is a service mark of Merck-Medco Managed Care, L.L.C.

24692.1

HIGHLY CONFIDENTIAL          MHS    A__0005154

4.    **GENERAL**

Except as specifically modified by this Addendum, all of the terms and conditions of the Integrated Agreement shall remain in full force and effect. All capitalized terms used herein shall be defined as set forth in the foregoing Integrated Agreement unless otherwise defined herein.

**PAID PRESCRIPTIONS, L.L.C.**

BY: _George Shiebler_

TITLE: _Vice President, Contracting_

DATE: _o/A/2/00_

**MERCK-MEDCO Rx SERVICES OF NEW JERSEY, L.L.C.**

BY: _George Shiebler_

TITLE: _Vice President, Contracting_

DATE: _o/A/2/00_

24692.1 (1/5/00)

**MOYER PACKING COMPANY**

BY: _Susan E. Hunter_

TITLE: _Benefits Manager_

DATE: _8/4/00_

24692 1

HIGHLY CONFIDENTIAL                MHS    A__0005155

## ATTACHMENT 1

### SCHEDULE B
### PROGRAM PRICING TERMS

MOYER shall pay PAID for services provided by PAID and Rx SERVICES under the Program as follows:

1. <u>RETAIL PHARMACY PROGRAM CLAIMS</u> ·

REDACTED

2. <u>MAIL SERVICE PROGRAM CLAIMS</u> ·

REDACTED

3. <u>SPECIALTY DRUG CLAIMS</u> ·

24692 1

HIGHLY CONFIDENTIAL                    MHS     A__0005156

# REDACTED

## 4.   ADMINISTRATIVE FEES

### BASE ADMINISTRATIVE SERVICES

- Administration of eligibility submitted via tape or telecommunication in Merck-Medco's standard format.
- One eligibility printout per re-enrollment
- Dependent Eligibility Certification System (DECS)
- Client Access Support (CAS) for on-line access to current eligibility and claims history (equipment, installation and line charges are responsibility of MOYER)
- Administration of Merck-Medco's standard plan designs
- Merck-Medco claim history tape every two weeks (Integrated card/mail service claims)
- Twelve month on-line claims history retention
- One identification card per Eligible employee or retiree
- Concurrent Drug Utilization Review (DUR)
- High Utilization Component Level I of Retrospective DUR (Alert Module)
- Access capability to support client managed prior authorization activities
- Coordination of Benefits Level I
- PAID Report Package
- Computer generated directory of Participating Pharmacies for use at each major plan MOYER location
- PAID Pharmacy Audit Program - Level I
- Toll-free telephone access to Customer Service for the Program for use by Eligible Person, benefits personnel and physicians
- 24 hour access to a Merck-Medco pharmacist via toll-free telephone service

4.2   MOYER shall pay for Additional Administrative Services to be provided by SYSTEMED as mutually agreed upon by the parties. (NOTE charges for services not specified will be determined by SYSTEMED and quoted upon request.)

### ADDITIONAL ADMINISTRATIVE SERVICES

- Extra Identification Cards
- Direct reimbursement claims adjudication:
    - Standard direct reimbursement claim forms
    - Handling and postage expense of direct reimbursement checks and EOBs

**REDACTED**

- Extended claims history retention
- Set-up and load of historical claims from prior vendor, supplied in PAID format
- Ad-hoc report production, re-programming and testing of non-standard client requirements

24692 1

HIGHLY CONFIDENTIAL              MHS    A__0005157

**ADDITIONAL ADMINISTRATIVE SERVICES**

- High Utilization Management Level II component of Retrospective DUR (Investigation Module)
- Therapeutic Retrospective DUR
- Hard copy eligibility submission
- Mailings direct to members or plan location

REDACTED

24692.1

HIGHLY CONFIDENTIAL

MHS    A__0005158

## SCHEDULE C
## SPECIALTY DRUGS

Betaseron
Ceredase
Cerezyme
Copaxone
Helixate

24692.1

HIGHLY CONFIDENTIAL

MHS    A__0005159

# Exhibit L

IF SERVICES COMMENCE PRIOR TO THE EXECUTION
OF THIS AGREEMENT, ALL TERMS AND CONDITIONS
OF THE AGREEMENT SHALL BE APPLICABLE.

# INTEGRATED
# PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS AGREEMENT is entered into as of the 1st day of November, 1994, (the "Effective Date") among PAID Prescriptions, Inc., located at 1900 Pollitt Drive, Fair Lawn, New Jersey 07410 ("PAID"), Flex Rx of Pennsylvania, Inc, located at 1810 Lincoln Highway, North Versailles, Pennsylvania 15137 ("FLEXRX") and Operating Engineers Local 66, located at 611 Thompson Run Road, Monroeville, Pennsylvania 15146 ("LOCAL 66").

WHEREAS, LOCAL 66 provides a prescription drug benefit to LOCAL 66's members, and their qualified dependents; and

WHEREAS, PAID has established networks of participating retail pharmacies ("Participating Pharmacies") and has developed and operates a system for the processing, fulfillment and payment of claims for prescription drugs furnished by Participating Pharmacies; and

WHEREAS, FLEXRX is a licensed pharmacy affiliated with PAID which provides prescription drugs via mail service; and

WHEREAS, LOCAL 66 desires to retain the services of PAID and FLEXRX to provide a managed care prescription drug benefit program (the "Program") consisting of retail and mail service pharmacy services for Eligible Persons pursuant to the terms and provisions contained herein and cost containment initiatives developed and implemented by PAID and FLEXRX which may include communications with prescribers, patients and/or Participating Pharmacies, and financial incentives to Participating Pharmacies for their participation in such initiatives; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1.   DEFINITIONS

1.1   "AWP" means the average wholesale price of the Covered Drug dispensed, as set forth in the current price list in recognized sources such as Blue Book and its supplements, or other nationally recognized pricing source determined by PAID, or the direct cost listed in those instances in which only the direct cost is listed. Under the Retail Pharmacy Program, AWP is based on the package size submitted. Under the Mail Service Program, AWP is based on package sizes of 100 units or 16 oz. quantities, or smaller quantities if such quantities are not available

1.2   "Contract Year" means the full twelve (12) month period commencing on the Effective Date and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

1.3   "Covered Drugs" mean all drugs which, under state or federal law, require a prescription. Excluded from Covered Drugs are (i) cosmetic drugs, (ii) appliances, devices, bandages, heat lamps, braces, splints, and artificial appliances and (iii) health and beauty aids, cosmetics and dietary supplements ("Exclusions"). Additional Covered Drugs and/or Exclusions shall be designated by LOCAL 66 in Schedules A-1 and A-2, as applicable.

1.4   "Eligible Person" means each member of LOCAL 66, and their qualified dependents.

1.5   "Mail Service Program" means the program described in Section 4 in which Eligible Persons may mail a prescription along with the applicable Copayment/Coinsurance to FLEXRX for dispensing via mail service.

HIGHLY CONFIDENTIAL

MHS     A__0005160

1 6     "Participating Pharmacy" means a retail pharmacy that has entered into an agreement with PAID to participate in PAID's Coordinated Care Network II ("CCNII").

1 7     "Plan Design" means the Covered Drugs/Exclusions, Copayment/Coinsurance and other Program specifications applicable to the Program.

1 8     "Retail Pharmacy Program" means the program described in Section 3 in which Eligible Persons may purchase Covered Drugs from a Participating Pharmacy upon presentation of a plastic Identity Card and payment of the applicable Copayment/Coinsurance, and the claim is submitted by the Participating Pharmacy to PAID for payment in accordance with the applicable PAID Participating Pharmacy Agreement.

## 2.    LOCAL 66 FURNISHED INFORMATION

LOCAL 66 shall promptly furnish to PAID, in a format compatible with PAID's data processing system, all information necessary for PAID and FLEXRX to render the services set forth herein. Such information shall include, but is not limited to:

2 1     A list of Eligible Persons, and subsequent timely additions and deletions to such list as changes occur.

2 2     Designation, in writing, of the Plan Design selected by LOCAL 66 under the Retail Pharmacy Program and Mail Service Program.

2.3     The method of payment to be used by PAID in making payments to Eligible Persons who submit claims for direct reimbursement.

2.4     The type, number and description of PAID Identification Cards required for the Retail Pharmacy Program.

## 3.    RETAIL PHARMACY PROGRAM

3.1     <u>Program Coverage</u> - The Program coverage (Covered Drugs/Exclusions) for the Retail Pharmacy Program is set forth on Schedule A-1.

3.2     <u>Services</u> - PAID shall perform the following services under the Retail Pharmacy Program:

3.2.1     Produce PAID Identification Cards for those Eligible Persons designated by LOCAL 66 with an accompanying explanatory brochure, and provide direct reimbursement claim forms for use by Eligible Persons who have not received or who have lost their PAID Identification Cards. PAID will distribute Identification Cards and claim forms to LOCAL 66 or Eligible Persons, as determined by LOCAL 66. All costs associated with distributing and/or mailing such materials is the responsibility of LOCAL 66.

3.2.2     Adjudicate claims for prescription drug benefits in accordance with PAID's TelePAID system. Disapproved claims shall be transmitted to the submitting pharmacy with a brief explanation of the cause or causes for disapproval. Should LOCAL 66 determine that a previously disapproved claim should be paid, and so direct PAID, payment of such claim shall be accomplished promptly by PAID.

- 2 -

HIGHLY CONFIDENTIAL      MHS    A_0005161

3.2.3    Make available to each Participating Pharmacy (or chain headquarters for Participating Pharmacies belonging to a chain) a description of the Plan Design applicable to LOCAL 66.

3.2.4    Prepare and provide to LOCAL 66 PAID's standard management/utilization reports.

3.2.5    Provide administrative services as set forth on Schedule B.

3.3    Claim Disputes - Any questions involving Program procedures or relating to applicable benefits shall be resolved prior to payment by PAID, and payment may be delayed following receipt of a claim pending resolution of such questions.  In such cases, PAID will notify LOCAL 66 and/or the Eligible Person of the question at issue and may rely on instructions from LOCAL 66 regarding payment.  Subject to the terms and conditions herein, LOCAL 66 shall make the final determination regarding payment of all submitted claims.  PAID shall promptly refer to LOCAL 66 all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

3.4    Pricing - The Program Pricing Terms applicable to the Retail Pharmacy Program are set forth on Schedule B hereto.

# 4.    MAIL SERVICE PROGRAM

4.1    Program Coverage

4.1.1    The Program coverage (Covered Drugs/Exclusions) for the Mail Service Program is set forth on Schedule A-2.  Covered Drugs under the Mail Service Program must be prescribed by a doctor, dentist, osteopath or podiatrist.  LOCAL 66 shall communicate any modifications of Program coverage to Eligible Persons in a manner reasonably acceptable to FLEXRX, at least thirty (30) days prior to the effective date of such modification.

4.1.2    A maximum of a 90 day supply of Covered Drugs per prescription or refill will be dispensed by FLEXRX subject to the professional judgment of the dispensing pharmacist, limitations imposed on controlled substances and manufacturer's recommendations.  Prescriptions may be refilled providing the prescription so states.  Prescriptions will not be filled (i) more than 12 months after issuance, (ii) more than 6 months after issuance for controlled substances, or (iii) if prohibited by applicable law or regulation.

4.2    Dispensing Procedures

4.2.1    FLEXRX shall dispense Covered Drugs to Eligible Persons, and dispense generic equivalent drugs when authorized, in accordance with applicable law and regulations in the state in which FLEXRX's pharmacy is located, and in accordance with the terms and provision of this Agreement.

4.2.2    All matters pertaining to the dispensing of Covered Drugs or the practice of pharmacy in general are subject to the professional judgment of the dispensing pharmacist.

4.2.3    Any drug which cannot be dispensed in accordance with FLEXRX's customary dispensing protocols, or which requires special recordkeeping procedures, may be excluded from coverage by FLEXRX upon prior written notice to LOCAL 66.

- 3 -

HIGHLY CONFIDENTIAL                    MHS    A__0005162

4.2.4   In the event that it becomes impracticable, for reasons of a force majeure or otherwise, for FLEXRX to dispense prescriptions to Eligible Persons under the Program, FLEXRX shall notify LOCAL 66, and use reasonable efforts to have Program prescriptions dispensed from an affiliated mail service pharmacy, subject to applicable laws and regulations.

4.3   <u>Customer Service</u>

4.3.1   FLEXRX will supply LOCAL 66 with pre-addressed envelopes for use by Eligible Persons in mailing their prescriptions to FLEXRX.

4.3.2   FLEXRX will make available a toll free (800) customer service telephone line for use by Eligible Persons.

4.4   <u>Pricing</u> - The Program Pricing Terms applicable to the Mail Service Program are set forth on Schedule B.

## 5.   FORMULARY

LOCAL 66 shall be a participating plan sponsor in the PAID Preferred Prescriptions Formulary as set forth in Schedule C for the term of this Agreement.

## 6.   BILLING/PAYMENT

6.1   PAID shall provide LOCAL 66 with a bi-weekly consolidated invoice for services provided by PAID and FLEXRX under the Program, in accordance with the Program Pricing set forth on Schedule B. All invoices shall be paid by LOCAL 66 within forty-eight (48) hours of receipt by (i) wire transfer, (ii) pre-authorized checks or electronic debits, or (iii) electronic funds transfer.

6.2   LOCAL 66 shall pay PAID for administrative products and services provided by PAID under the Program in accordance with the Administrative Fee provisions set forth in Schedule B. PAID will provide LOCAL 66 with an Administrative Fee invoice in accordance with PAID's four (4) week administrative fee cycle. There is a minimum charge of $250.00 per Administrative Fee invoice. LOCAL 66 shall pay Administrative Fee invoices within fifteen (15) days of the invoice date.

6.3   PAID may revise the Program pricing terms set forth in Schedule B during the term of this Agreement upon sixty (60) days prior written notice to LOCAL 66. If any such Program pricing revision is unacceptable to LOCAL 66, LOCAL 66 shall notify PAID, in writing, within fifteen (15) days of LOCAL 66's receipt of notice of the pricing revision. If the parties are unable to agree on a mutually acceptable pricing, either party may terminate this Agreement upon sixty (60) days prior written notice to the other party provided such notice is given prior to the effective date of the proposed pricing revision.

6.4   Failure by LOCAL 66 to make any payments in accordance with the terms of this Agreement shall constitute a payment default. Notwithstanding Section 9.2 of this Agreement, if LOCAL 66 fails to cure any such payment default within five (5) days, in addition to other available remedies, PAID may withhold issuance or reissuance of PAID Identification Cards, or may terminate this Agreement upon notice to LOCAL 66. There shall be a late payment fee of 1% per month on the balance due on all late payments over fifteen (15) days past due. LOCAL 66 shall reimburse PAID for all collection costs incurred by PAID as a result of any payment default by LOCAL 66 under this Agreement.

- 4 -

HIGHLY CONFIDENTIAL                    MHS    A__0005163

## 7.  RECORDS

7.1    PAID and FLEXRX shall maintain all records relating to services performed under this Agreement as required by applicable law. Such records shall be in their original form, on microfilm, microfiche or other form determined by PAID. These records may be examined and audited by LOCAL 66 throughout the calendar year in which they are established and for a period of one (1) calendar year thereafter. PAID and FLEXRX may retain copies of such records for their own use provided, however, that PAID and FLEXRX may not disclose any LOCAL 66 or patient identifiable data or information without LOCAL 66's express written consent, unless required by applicable law. Any audit by LOCAL 66 may be conducted upon adequate prior written notice, at reasonable intervals, and during regular business hours.

7.2    LOCAL 66 shall furnish its most recent audited financial statement to PAID prior to the Effective Date of this Agreement and thereafter shall furnish its annual audited statement to PAID within ninety (90) days after the end of each fiscal year of LOCAL 66 that this Agreement is in effect.

## 8.  CONFIDENTIAL INFORMATION

LOCAL 66 shall not disclose any information or knowledge concerning PAID's or FLEXRX's operations, procedures and/or the terms of this Agreement, which is hereby deemed confidential information, except as otherwise required by law. It is agreed that all computer programs, including, without limitation, data processing programs, flowcharts, routines, subroutines, databanks, and formulae relating to the processing handling, or treatment of data developed or used by PAID or FLEXRX in the processing and payment of claims or dispensing of drugs pursuant to this Agreement shall be and remain the property of PAID and FLEXRX and, if disclosed to or otherwise acquired by LOCAL 66, shall be held in confidence and surrendered by LOCAL 66 to PAID or FLEXRX upon the termination of this Agreement or upon prior written request. The provisions of this Section 8 shall survive the termination of this Agreement.

## 9.  TERM OF AGREEMENT

9.1    This Agreement shall remain in effect for an Initial Term of three (3) years from the Effective Date and thereafter shall automatically renew for successive one (1) year terms unless either party gives written notice at least one hundred eighty (180) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term. Notwithstanding the termination of this Agreement, PAID and FLEXRX agree to continue to render services hereunder and LOCAL 66 agrees to pay for such services in accordance with the terms of this Agreement for any claims incurred for prescription drug benefits by Eligible Persons while this Agreement was in force.

9.2    In the event of a material breach of this Agreement, the party alleging such breach shall give written notice thereof to the other parties. If such breach is not cured within sixty (60) days of such notice, the non-breaching party may terminate this Agreement upon written notice to the other party.

## 10.  FORCE MAJEURE

Neither PAID, FLEXRX nor LOCAL 66 shall be deemed to have breached this Agreement or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement if prevented from doing so by a cause or causes beyond its control. Without limiting the generality of the foregoing, such causes include acts of God or the public enemy, fires, floods, storms, earthquakes, riots,

- 5 -

HIGHLY CONFIDENTIAL    MHS    A_0005164

boycotts, strikes, lock-outs, wars and war-operations, restraints of government, power or communication line failure or other circumstances beyond such party's control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction or change of law or regulation subsequent to the execution of this Agreement.

## 11.  INDEMNIFICATION/LIMITATION OF LIABILITY

11.1    PAID and FLEXRX agree to indemnify and hold LOCAL 66, its officers and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from services rendered by PAID or FLEXRX pursuant to this Agreement to the extent the claim or cause of action arises out of PAID's or FLEXRX's negligence or willful misconduct, provided that (a) LOCAL 66 has given reasonable notice to PAID or FLEXRX of the claim or cause of action and (b) no Indemnified Party has, by act or failure to act, compromised PAID's or FLEXRX's position with respect to the resolution or defense of the claim or cause of action.

11.2    FLEXRX and PAID shall maintain, during the term of this Agreement, liability insurance with limits not less than $1,000,000 per occurrence and in the aggregate per policy year, with excess liability coverage in an amount not less than $5,000,000 per policy year.  Evidence thereof shall be furnished to LOCAL 66 upon request

11.3    Except as provided in Section 11.1 above, in no event shall PAID or any affiliated company, or their directors, officers or employees be responsible in any manner for any claim, loss or damage sustained as a result of the provision of or failure to provide pharmaceutical goods or services or any other action or failure to act by any retail pharmacy or pharmaceutical providers pursuant to this Agreement.

11.4    The liability of PAID or FLEXRX to LOCAL 66 for any acts or omissions by PAID in the performance of its obligations hereunder shall be limited to the amount of administrative fees paid by LOCAL 66 to PAID during the prior twelve (12) month period.

11.5    In no event shall PAID, FLEXRX or LOCAL 66 be liable to each other for incidental, consequential or exemplary damages

## 12.  EXCLUSIVITY

PAID and FLEXRX shall be the exclusive providers of prescription drug benefits to LOCAL 66 while this Agreement is in effect.  Nothing contained herein, however, shall prohibit PAID or FLEXRX from providing prescription drug benefits to any other entity while this Agreement is in effect.

## 13.  GENERAL

13.1    Independent Contractor - The relationship among PAID, FLEXRX and LOCAL 66 shall solely be that of independent contractors engaged in the operation of their own respective businesses.

13.2    Assignment - This Agreement may not be assigned by any party without the express prior written consent of the other parties which consent shall not be unreasonably withheld provided, however, that services to be performed by PAID or FLEXRX hereunder may be performed by their subsidiaries and affiliates.

- 6 -

HIGHLY CONFIDENTIAL                    MHS    A__0005165

13.3    No Third Party Beneficiary – This Agreement has been entered into solely for the benefit of LOCAL 66, PAID and FLEXRX, and is not intended to create any legal, equitable or beneficial interest in any third party or to vest in any third party any interest as to enforcement or performance.

13.4    Notices – All notices required under this Agreement shall be in writing and sent by First Class mail, postage paid, addressed as follows:

If to LOCAL 66:

Operating Engineers Local 66
611 Thompson Run Road
Monroeville, PA  15146
Attention:  Jeff Resso

If to PAID or
FLEXRX

Medco Containment Services, Inc.
100 Summit Avenue
Montvale, NJ  07645
Attention:  James H. Cooper
Executive Vice President – Legal

13.5    Amendments – This Agreement may be amended only in writing when signed by a duly authorized representative of each party.

13.6    Financial Responsibility – In the event PAID has reasonable grounds to believe that LOCAL 66 may be unable to meet its payment obligations under this Agreement as they become due, PAID may request information and/or reasonable assurances (including a deposit) from LOCAL 66 as to its financial responsibility.  In the event that such information or assurances are not furnished to PAID within five (5) days, or are not satisfactory in PAID's reasonable judgment, PAID and FLEXRX may immediately terminate this Agreement.

13.7    Plan Design – The Program pricing set forth on Schedule B is based upon the Plan Designs and Program specifications agreed to between the parties as reflected in this Agreement.  Any material modification of the Plan Designs or Program specifications is subject to PAID's prior approval, which approval shall not be unreasonably withheld, and may result in a pricing change by PAID.

13.8    Tax – Any sales, use or other tax imposed on Covered Drugs dispensed, or services provided hereunder, shall be the sole responsibility of LOCAL 66.

13.9    Governing Law – This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.  However, all matters relating to the operations of FLEXRX shall be governed by the laws of the state in which FLEXRX's pharmacy is located.

13.10   Enforceability – The invalidity or unenforceability of any of the terms or provisions hereof shall not affect the validity or enforceability of any other term or provision.

13.11   Section Headings – Section headings are inserted for convenience only and shall not be used in any way to construe the terms of this Agreement.

13.12   Waiver – The waiver of any breach or violation of any term or provision hereof shall not constitute a waiver of any subsequent breach or violation of the same or any other term or provision.

– 7 –

HIGHLY CONFIDENTIAL

MHS    A_0005166

13.13    Entire Agreement – This Agreement, together with the Schedules hereto, embodies the entire understanding of the parties in relation to the subject matter hereof, and no other agreement, understanding, or representation, verbal or otherwise, relative to the subject matter hereof exists among the parties at the time of execution of this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date indicated below.

**PAID PRESCRIPTIONS, INC.**

BY: _James H. Cooper_
　　　　　　James H. Cooper

TITLE: Exec. Vice President-Legal

DATE: _1/2/98_

**OPERATING ENGINEERS LOCAL 66**

BY: _Joseph E. Beasley_

TITLE: _Chairman_

DATE: _Dec. 23. 1997_

**FLEX RX OF PENNSYLVANIA, INC.**

BY: _James H. Cooper_
　　　　　　James H. Cooper

TITLE: Exec. Vice President-Legal

DATE: _1/2/98_

7235.1-11/25/97
(Original 4208.1-9/15/94)

- 8 -

HIGHLY CONFIDENTIAL

MHS    A__0005167

## SCHEDULE A-1
## RETAIL PHARMACY PROGRAM
## COVERED DRUGS/EXCLUSIONS

[TO BE PROVIDED]

- 9 -

HIGHLY CONFIDENTIAL

MHS    A__0005168

**SCHEDULE A-2**
**MAIL SERVICE PROGRAM**
**COVERED DRUGS/EXCLUSIONS**

**[TO BE PROVIDED]**

- 10 -

HIGHLY CONFIDENTIAL                    MHS     A__0005169

## SCHEDULE B
## PROGRAM PRICING TERMS

LOCAL 66 shall pay PAID for services provided by PAID and FLEXRX under the Program as follows:

**1.     RETAIL PHARMACY PROGRAM CLAIMS** -

REDACTED

**2.     MAIL SERVICE PROGRAM CLAIMS** -

REDACTED

**3.     ADMINISTRATIVE FEES**          REDACTED

### BASE ADMINISTRATIVE SERVICES

- Concurrent Drug Utilization Review
- One Identification Card issued per member
- Claim Payment Summary Report every two weeks

- 11 -

HIGHLY CONFIDENTIAL

MHS    A__0005170

- Incurred Claims Report every four weeks
- Handling and postage expense of direct reimbursement checks
- Standard direct reimbursement claim forms
- Computer generated directory of Participating Pharmacies for use at each major plan sponsor location
- Audit of Participating Pharmacies and return of funds to clients where appropriate
- Claims History tape every two weeks
- Fraud and Abuse Reports

3.2    LOCAL 66 shall also pay for Additional Administrative Services provided by PAID under the Program as mutually agreed, as follows:

### ADDITIONAL ADMINISTRATIVE SERVICES

- For each re-enrollment

- Extra Identification Card for eligibles

- Dependent Eligibility Certification System ("DECS")

- Microfiche copy of paid claims detail

- On-line access to current eligibility and claims history

- Eligibility not submitted on tape (Groups over 1,000 eligibles only)

- Enhanced Retrospective DUR

- Hot stamping of customer's logo on Identification Card (Minimum group size of 500)

- Additional eligibility printout of cardholders

- Mailings direct to employees

- Delivery charges to each major sponsor location

- Special printing or color supplies for Identification Cards

- Special Drug Program Brochure

    NOTE:  Charges for additional services not listed above will be determined by PAID and quoted upon request.

7235.1
(Original 4208.1)

- 12 -

HIGHLY CONFIDENTIAL                    MHS    A__0005171

## SCHEDULE C

1. **PREFERRED PRESCRIPTIONS FORMULARY** - The Preferred Prescriptions Formulary℠ is a prescription drug formulary administered by PAID which lists FDA approved drugs that have been evaluated for inclusion in the Preferred Prescriptions Formulary. The drugs included on the Preferred Prescriptions Formulary will be modified from time to time as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations. PAID will implement PAID's formulary compliance programs and cost containment initiatives, which may include communications with Eligible Persons, participating pharmacies and/or physicians, and financial incentives to participating pharmacies for their participation in such initiatives. Compliance with the Preferred Prescriptions Formulary and PAID's formulary compliance programs will result in Formulary Rebates to LOCAL 66 as set forth below. PAID reserves the right to modify or replace the Preferred Prescriptions Formulary (including any modification or replacement, the "Formulary") and formulary compliance methods and cost containment initiatives consistent with good pharmacy practice. LOCAL 66 agrees that PAID will be the exclusive formulary administrator for LOCAL 66's prescription drug benefit programs during the term of the Agreement. LOCAL 66 is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by PAID.

2. **FORMULARY REBATES** - Formulary Rebates are received from certain drug manufacturers as a result of the inclusion of such manufacturer's products on the Formulary ("Formulary Rebates").

## REDACTED

---

℠ The Preferred Prescriptions Formulary is a service mark of Managed Care, Inc., a subsidiary of Medco Containment Services, Inc.

7235.1

- 13 -

HIGHLY CONFIDENTIAL           MHS     A_0005172

# Exhibit M

IF SERVICES COMMENCE PRIOR TO THE EXL          J
OF THIS AGREEMENT, ALL TERMS AND CONDITIONS
OF THE AGREEMENT SHALL BE APPLICABLE.

# ADDENDUM TO
# INTEGRATED PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS ADDENDUM is entered into as of the 1st day of October, 1997 among PAID Prescriptions, L.L.C. (formerly PAID Prescriptions, Inc.), located at 399 Jefferson Road, Parsippany, New Jersey 07054 ("PAID"), Merck-Medco Rx Services of Pennsylvania No 2, L.L.C., located at 1810 Lincoln Highway, North Versailles, Pennsylvania 15137 ("Rx SERVICES"), and Operating Engineers Local 66, located at 611 Thompson Run Road, Monroeville, Pennsylvania 15146 ("LOCAL 66").

WHEREAS, the parties entered into an Integrated Prescription Drug Program Agreement dated as of October 1, 1994;

WHEREAS, the parties desire to amend the Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows

## 1.    TERM OF AGREEMENT

Effective October 1, 1997, the first sentence of Section 9.1 is amended to read in its entirety as follows:

"The term of the Agreement is extended through September 30, 2000, and thereafter shall automatically renew for successive one (1) year terms unless either party gives written notice at least one hundred eighty (180) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term."

## 2.    RETAIL PHARMACY PROGRAM CLAIMS

Effective January 1, 1998, Section 1 of Schedule B is revised to read in its entirety as follows:

"1.    RETAIL PHARMACY PROGRAM CLAIMS

REDACTED

15466_1

HIGHLY CONFIDENTIAL          MHS    A__0005173

3.    **MAIL SERVICE PROGRAM CLAIMS**

Effective January 1, 1998, Sections 2.1 through 2.3 of Schedule B are revised to read in their entirety as follows:

REDACTED

4.    **ADMINISTRATIVE FEES**

Effective January 1, 1998, Section 4 of Schedule B is revised to read in its entirety as follows:

REDACTED

5.    **FORMULARY REBATES**

Effective January 1, 1998, Section 2 of Schedule D is deleted and replaced by the following Section 2:

"2.    Formulary Savings - Merck-Medco Managed Care, L.L.C. and its affiliates (collectively "Medco") receive Formulary Rebates from certain drug manufacturers as a result of the inclusion of such manufacturer's branded products on the Formulary ("Formulary Rebates"). Medco also conducts therapeutic interchange programs for formulary drugs which will lead to cost savings, measured on an AWP basis ("AWP Savings"). (Formulary Rebates and AWP Savings are jointly referred to as "Formulary Savings".)

REDACTED

15466_1                                        - 2 -

HIGHLY CONFIDENTIAL                    MHS    A__0005174

Except as modified by this Addendum, the terms of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the 1st of July, 1997.

**PAID PRESCRIPTIONS, L.L.C.**

BY: _James H. Cooper_
    James H. Cooper

TITLE: Vice President-Contracts

DATE: _12/2/98_

**MERCK-MEDCO Rx SERVICES OF
PENNSYLVANIA NO. 2, L.L.C.**

BY: _James H. Cooper_
    James H. Cooper

TITLE: Vice President-Contracts

DATE: _12/2/98_

**OPERATING ENGINEERS LOCAL 66**

BY: _Joseph E. Beasley_

TITLE: _chairman_

DATE: _Dec. 23, 1997_

15466_1 (12/11/97)

15466_1

- 3 -

**HIGHLY CONFIDENTIAL**

MHS    A_0005175

# Exhibit N

IF SERVICES COMMENCE PRIOR TO THE EXECU.
OF THIS AGREEMENT, ALL TERMS AND CONDITIONS
OF THE AGREEMENT SHALL BE APPLICABLE.

# ADDENDUM TO
# INTEGRATED PRESCRIPTION DRUG PROGRAM AGREEMENT

This ADDENDUM is entered into as of the 1st day of October, 2000, among PAID Prescriptions, L.L.C., located at 399 Jefferson Road, Parsippany, New Jersey 07054 ("PAID"), Merck-Medco Rx Services of Pennsylvania No. 2, L.L.C., located at 1810 Lincoln Highway, North Versailles, Pennsylvania 15137 ("Rx SERVICES") and Operating Engineers Local 66, located at 611 Thompson Run Road, Monroeville, PA 15146 ("LOCAL 66").

WHEREAS, PAID, Rx SERVICES and LOCAL 66 entered into an Integrated Prescription Drug Program Agreement dated November 1, 1994 (together with any subsequent addenda, the "Integrated Agreement"), whereby LOCAL 66 retained the services of PAID and Rx SERVICES to provide an integrated retail pharmacy/mail service prescription drug program for Eligible Persons pursuant to the terms and conditions contained therein; and

WHEREAS, the parties desire to amend the Integrated Agreement.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual premises set forth herein, the parties agree as follows:

1. **TERM** - Effective October 1, 2000, the first sentence of Section 9 1 is amended to read in its entirety as follows:

   "The Initial Term of the Agreement is extended through September 30, 2003 and thereafter shall automatically renew for successive one (1) year terms unless either party gives written notice at least one hundred eighty (180) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term.

2. **DEFINITIONS**

   2.1.  "Claims Adjudication Accuracy Rate" means the percentage of (i) claims adjudicated by PAID via TelePAID in a Contract Year that do not contain a material adjudication error, divided by (ii) the total number of claims adjudicated by PAID via TelePAID in such Contract Year.

   2.2.  "Dispensing Accuracy Rate" means the percentage of (i) all prescriptions dispensed by Rx SERVICES in a Contract Year less those prescriptions dispensed by Rx SERVICES in such Contract Year which are reported to Rx SERVICES and verified as having been dispensed with the incorrect drug or strength, divided by (ii) all prescriptions dispensed by Rx SERVICES in such Contract Year.

   2.3.  "Non-Protocol Prescriptions" means prescriptions for Covered Drugs received by Rx SERVICES that are in stock and which do not require physician or patient contact or other non-standard procedures prior to dispensing by Rx SERVICES.

   2.4.  "TelePAID System Availability Rate" means the percentage of normal operating hours that the TelePAID System is operational, excluding scheduled maintenance time, measured on an annual basis.

   2.5.  "Telephone Abandonment Rate" means the percentage of (i) the number of incoming telephone calls received by the customer service telephone line during a Contract Year which are abandoned by the caller after thirty (30) seconds, divided by (ii) the total number of incoming telephone calls received by the customer service telephone line during such Contract Year.

26689 1

HIGHLY CONFIDENTIAL                    MHS    A_0005177

3.     **PROGRAM PRICING** – Effective October 1, 2000, Schedule B to the Integrated Agreement is hereby deleted and replaced with the new Schedule B attached hereto as Attachment I.

4.     **CUSTOMER SERVICE**

4.1.     TelePAID will be available 99.5% of normal service hours each Contract Year, subject to scheduled maintenance time ("TelePAID System Availability Rate").

4.2.     The Dispensing Accuracy Rate for each Contract Year shall be 99.99% or greater.

4.3.     Rx SERVICES will dispense all Non-Protocol Prescriptions received each Contract Year within an average of three (3) business days following receipt. All prescriptions received each Contract Year will either be dispensed, or returned to the applicable Eligible Person with an explanation as to why it could not be dispensed, within an average of five (5) business days following receipt by Rx SERVICES.

4.4.     PAID will prepare and provide to LOCAL 66 PAID's standard management/utilization reports. Billing Detail Reports will be mailed to LOCAL 66 within five (5) business days following the end of the applicable claims cycle report period. Incurred Claims Reports will be mailed within thirty (30) business days following the end of the applicable claims cycle reporting period. Standard$^{PLUS}$ Reports will be mailed to LOCAL 66 within thirty (30) business days following the month's end for monthly reports, and forty five (45) business days following the quarter's end for quarterly reports. Ad hoc reports will be prepared and provided as mutually agreed to by LOCAL 66 and PAID, at the then applicable programming charge.

4.5.     Rx SERVICES and PAID will make available a dedicated toll-free customer service telephone line for use by Eligible Persons under the Program. The target Average Speed of Answer ("ASA") of the customer service telephone line each Contract Year shall be thirty (30) seconds or less from the initial ring. The Telephone Abandonment Rate of the customer service telephone line shall be 5% or less of all incoming calls received during each Contract Year.

4.6.     The Claims Adjudication Accuracy Rate for each Contract Year shall be 97.9% or greater.

5.     **FORMULARY** – Effective October 1, 2000, Section 5 to the Integrated Agreement is hereby deleted in its entirety and replaced with the following:

"5.     **FORMULARY** – LOCAL 66 shall be a participating plan sponsor in the PAID Preferred Prescriptions Formulary[1] as set forth below for the term of this Agreement. LOCAL 66 shall provide PAID with advanced notice of each Group that will participate in the Preferred Prescriptions Formulary.

5.1.     Preferred Prescriptions Formulary - The Preferred Prescriptions Formulary is a prescription drug formulary administered by PAID which lists FDA approved drugs that have been evaluated for inclusion in the Preferred Prescriptions Formulary. The drugs included on the Preferred Prescriptions Formulary will be modified by PAID from time to time as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations. PAID will implement PAID's formulary management program, which may include cost containment initiatives, communications with Eligible Persons, Participating Pharmacies and/or physicians, and financial incentives to Participating Pharmacies for their participation. Compliance with

---

[1]     The Preferred Prescriptions Formulary is a service mark of Merck-Medco Managed Care, L.L.C.

2

HIGHLY CONFIDENTIAL                              MHS     A_0005178

the Preferred Prescriptions Formulary and PAID's formulary management program will result in Formulary Rebates as set forth below. PAID reserves the right to modify or replace the Preferred Prescriptions Formulary (including any modification or replacement, the "Formulary") and formulary compliance methods and cost containment initiatives consistent with good pharmacy practice  LOCAL 66 agrees that PAID will be the exclusive formulary administrator for LOCAL 66's prescription drug benefit programs during the term of the Agreement. LOCAL 66 is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by PAID.

5.2     Formulary Savings - Merck-Medco Managed Care, L.L.C. and its affiliates (collectively "Medco") receive Formulary Rebates from certain drug manufacturers as a result of the inclusion of such manufacturer's branded products on the Formulary ("Formulary Rebates"). Medco also conducts therapeutic interchange programs for formulary drugs which will lead to cost savings, measured on an AWP basis ("AWP Savings"). (Formulary Rebates and AWP Savings are jointly referred to as "Formulary Savings")

REDACTED

6.     **GENERAL**

Except as specifically modified by this Addendum, all of the terms and conditions of the Integrated Agreement shall remain in full force and effect. All capitalized terms used herein shall be defined as set forth in the foregoing Integrated Agreement unless otherwise defined herein.

3

26689 1

HIGHLY CONFIDENTIAL

MHS     A__0005179

**PAID PRESCRIPTIONS, L.L.C.**

BY: _George Shuebler_

TITLE: _Vice President, Contracting_

DATE: _8/29/00_

**MERCK-MEDCO Rx SERVICES
OF PENNSYLVANIA, NO. 2, L.L.C.**

BY: _George Shuebler_

TITLE: _Vice President, Contracting_

DATE: _8/29/00_

26689.1 (7/28/00)

**OPERATING ENGINEERS LOCAL 66**

BY _Dennis C. Maroun_

TITLE: _CHAIRMAN_

DATE: _AUGUST 10, 2000_

4

26689.1

HIGHLY CONFIDENTIAL        MHS    A__0005180

<u>**ATTACHMENT I**</u>

<u>**SCHEDULE B**</u>
<u>**PROGRAM PRICING TERMS**</u>

LOCAL 66 shall pay PAID for services provided by PAID and Rx SERVICES under the Program as follows:

1.      <u>**RETAIL PHARMACY PROGRAM CLAIMS**</u>.

REDACTED

2.      <u>**MAIL SERVICE PROGRAM CLAIMS**</u>.

REDACTED

REDACTED

3.      <u>**SPECIALTY DRUG CLAIMS**</u>.

26689 1

HIGHLY CONFIDENTIAL               MHS     A__0005181

## 4.   ADMINISTRATIVE FEES

### BASE ADMINISTRATIVE SERVICES

- Administration of eligibility submitted via tape or telecommunication in Merck-Medco's standard format.
- One eligibility printout per re-enrollment
- Dependent Eligibility Certification System (DECS)
- Client Access Support (CAS) for on-line access to current eligibility and claims history (equipment, installation and line charges are responsibility of LOCAL 66)
- Administration of Merck-Medco's standard plan designs
- Merck-Medco claim history tape every two weeks (Integrated card/mail service claims)
- Twelve month on-line claims history retention
- One identification card per Eligible employee or retiree (Two cards per family)
- Concurrent Drug Utilization Review (DUR)
- High Utilization Component Level I of Retrospective DUR (Alert Module)
- Access capability to support client managed prior authorization activities
- Coordination of Benefits Level I
- PAID Report Package
- Computer generated directory of participating pharmacies for use at each major plan LOCAL 66 location
- PAID Pharmacy Audit Program - Level I
- Toll-free telephone access to Customer Service for the Program for use by Eligible Person, benefits personnel and physicians
- 24 hour access to a Merck-Medco pharmacist via toll-free telephone service

4.2.   LOCAL 66 shall pay for Additional Administrative Services to be provided by PAID as mutually agreed upon by the parties. (NOTE: charges for services not specified will be determined by SYSTEMED and quoted upon request.)

### ADDITIONAL ADMINISTRATIVE SERVICES

- Extra Identification Cards
- Direct reimbursement claims adjudication:
  - Standard direct reimbursement claim forms
  - Handling and postage expense of direct reimbursement checks and EOBs
- High Utilization Management Level II component of Retrospective DUR (Investigation Module)        REDACTED
- Therapeutic Retrospective DUR
- Hard copy eligibility submission
- Mailings direct to members or plan location

6

26689.1

HIGHLY CONFIDENTIAL          MHS   A_0005182

5.    **<u>PERFORMANCE PENALTIES</u>**

REDACTED

26689.1

HIGHLY CONFIDENTIAL                    MHS    A__0005183

6.    **NET EFFECTIVE DISCOUNT GUARANTEE**

REDACTED

8

26689 1

HIGHLY CONFIDENTIAL                    MHS     A__0005184

## SCHEDULE C
## SPECIALTY DRUGS

Betaseron
Ceredase
Cerezyme
Copaxone
Helixate

9

26689.1

HIGHLY CONFIDENTIAL

MHS    A__0005185

# Exhibit O



**Boehringer Ingelheim**

## AMENDMENT TO AGREEMENT

This is an Amendment to the AGREEMENT ("Agreement") having a term of April 1, 2000 through March 31, 2002 by and between Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") and IHC Health Plan, Inc. ("MCO").

BIPI and MCO agree as follows:

1. The term of the Agreement shall be extended for a period of one (1) quarter, from April 1, 2002 through June 30, 2002, for only those products as specified in Attachments A-1, A-3, and A-8.

2. The parties acknowledge and agree that the Agreement is terminated March 31, 2002 relative to all Products other than those specified in Attachments A-1, A-3, and A-8.

3. Except as provided above, all terms and conditions of the Agreement shall remain in full force and effect.

In witness whereof, BIPI and MCO have caused this Amendment to be duly executed in duplicate as of the date and year stated.

**BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.**

By: _Gregg Ciarelli_

Name:   Gregg Ciarelli

Title:   Head, Sales and Contract Administration

Date:   _8/5/02_

**IHC HEALTH PLAN, INC.**

By: _Stephen L. Barlow_

Name: _Stephen L. Barlow_

Title: _UP / Medical Director_
_IHC Health Plans_

Date: _7/15/02_

SEL_HLTH / NEC_0379



## AMENDMENT TO AGREEMENT

This Amendment (the "Amendment"), effective as of October 1, 2001 (the "Amendment Effective Date"), is entered into by and between Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") and IHC Health Plan, Inc. ("MCO").

### RECITALS

1. BIPI and Customer are parties to the Agreement.

2. BIPI and Customer wish to amend the Agreement.

1. The Agreement is amended as follows:

   a) Attachment A7 shall be added hereto.

   b) Section 2.1(a) is amended by inserting "Aggrenox®", after the statement "including but not limited to: "

   c) Under Section 5.1(a), "A-7" is inserted after the following statement "A-2, A-4, A-6".

2. <u>Ratification.</u> Except as modified and amended by this Amendment and to the extent not inconsistent therewith, all terms and conditions of the Agreement shall remain in full force and effect and are hereby ratified, affirmed and approved.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized representatives to become effective as of the Amendment Effective Date.

| IHC Health Plan, Inc.<br>By: | Boehringer Ingelheim Pharmaceuticals, Inc. |
|---|---|
| By: _Stephen L. Barlow_ | By: _Gregg Ciarelli_ |
| Name: Stephen L. Barlow, MD | Name: Gregg Ciarelli |
| Title: V.P., Medical Director | Title: Head, Sales and Contract Administration |
| Date: 1/22/02 | Date: 1/28/02 |

SEL_HLTH / NEC_0380

Attachment A-8

# BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.
# AGGRENOX REBATE SCHEDULE

## Intermountain Health Plan

| Therapeutic Class: Antiplatelet | Utilization Data | | |
|---|---|---|---|
| | From - To | | |
| | Unit of Measure | Base Units | Market Share % |
| AGGRENOX® 00597-0001-60 | Capsule | N/A | N/A |
| PLAVIX® 63653-1171-06 63653-1171-01 63653-1171-05 63653-1171-03 | Tablet | N/A | N/A |
| TICLID® 00004-0018-23 00004-0018-22 00004-0018-14 | Tablet | N/A | N/A |
| generic ticlopidine (all currently marketed NDC's) | | N/A | N/A |
| TOTAL THERAPEUTIC CLASS: | | | |

| Term: | 10/1/01-3/31/02 |
|---|---|
| | Rebate % off WAC |
| Base Rebate | ▮▮▮▮▮▮▮ |

All rebates are contingent upon Aggrenox® receiving and maintaining 2nd Tier Equal Formulary Status as defined in Section 2.1a. New Products (both branded and generic) will be added upon FDA approval to the above therapeutic class for the purposes of calculating market share.

-14-

SEL_HLTH / NEC_0381


Boehringer
Ingelheim

Mr. Ben Johnson
Pharmacy Contract Manager
Intermountain Health Care
36 South State Street #1900
Salt Lake City, UT 84111

**Boehringer Ingelheim**
**Pharmaceuticals, Inc.**

January 29, 2002

Dear Mr. Johnson:

Per the request of Mr. Paul Cline, BIPI's Area Manager, I have enclosed one
original of our current contract with your company for your files.

**David M. Marciniszyn**
Telephone (203)-798-5558
Telefax (203) 791-6189
E-Mail dmarcini@rgd.boehringer-
ingelheim.com

If you have any questions or need further information, please contact Mr. Cline at
(623) 551-9303.

We look forward to our continued professional relationship.

900 Ridgebury Rd./P.O. Box 368
Ridgefield, CT 06877-0368
Telephone (203) 798-9988
Telefax (203) 791-6234

Sincerely,

Mr. David Marciniszyn
Contract Analyst

Cc:    Paul Cline

$4/1/00 - 3/31/02$

# AGREEMENT BETWEEN IHC HEALTH PLAN, INC.
# AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.

THIS AGREEMENT (the "Agreement") is made by and between Boehringer Ingelheim Pharmaceuticals, Inc., a Delaware corporation with its principal place of business at 900 Ridgebury Road, P.O. Box 368, Ridgefield, Connecticut 06877 ("BIPI"), and IHC Health Plan, INC. a Company with its principal place of business at 36 South State Street, Suite 1900, Salt Lake City, Utah 84111 ("MCO").

## W I T N E S S E T H:

WHEREAS, MCO is a managed care organization which owns and/or provides management services to managed care organizations, manages the provision of pharmaceutical benefits to health care plan sponsors and enrollees, and utilizes various programs and services, including formulary control and pharmaceutical manufacturer rebates, to encourage cost-effective prescribing;

WHEREAS, BIPI provides rebates in consideration for MCO's formulary control and offers performance based rebates in consideration for MCO's proven ability to control market share, and its willingness to engage in and develop numerous product programs, and other marketing, distribution and promotional activities designed to encourage the cost-effective, medically appropriate therapeutic management of pharmaceutical products, including those of BIPI and its affiliates and designees;

WHEREAS, BIPI manufactures, markets, and distributes prescription drug products to pharmacies and other entities which use such products; and

WHEREAS, BIPI and MCO desire to enter into this Agreement in order to facilitate the cost-effective and medically appropriate utilization of the Products, as hereinafter defined;

NOW, THEREFORE, for and in consideration of the covenants and undertakings hereinafter set forth, BIPI and MCO hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms shall have the following meanings when used herein (any term defined in the singular shall have the same meaning when used in the plural and vice versa):

1.1  "Products" shall mean any product manufactured by BIPI and/or its affiliates and designees, specified on the BIPI Product List attached hereto as Exhibit I, as modified from time to time.

1.2  "Confidential Information" shall have the meaning set forth in Section 8.3 hereof.

1.3  "Covered Payor/Covered Plan" shall mean any health maintenance organization, preferred provider organization, indemnity insurance carrier, other health benefits plan or program (whether prepaid, fee-for-service, employer self-funded or insured), or governmental agency or authority which provides full or partial coverage for medical care, including pharmaceutical benefits, to eligible individuals, and which has entered or subsequently enters into a written agreement with MCO pursuant to which MCO assists in the management and administration of such entity's Pharmacy Benefit Program.  All Covered Payors/Covered Plans must be specified on the list attached hereto as Exhibit II, as modified from time to time.

1.4  "Covered Claim" shall mean any legitimate claim by a Covered Person for pharmacy benefits to which such person is entitled pursuant to a Covered Plan.

04/28/00

1

SEL_HLTH / NEC_0383

1.5 "Covered Person" shall mean any individual who is entitled to participate in a Covered Plan's Pharmacy Benefit Program, including all eligible and enrolled subscribers, enrollees, or beneficiaries, and, if permitted by the Covered Plan, such individuals' eligible and enrolled family dependents. "Covered Persons" do not include those individuals whose pharmaceutical needs are reimbursed either directly or indirectly in whole or in part under any federal or state program, including, but not limited to Medicaid or Medicare, Medi Cal, Pace, Con Pace or individuals not considered full risk patients by MCO.

1.6 "Product Information Programs" shall mean any program that is designed to encourage cost-effective, medically appropriate therapeutic management for medications, including appropriate length of therapy, dosing and patient compliance.

1.7 "Formulary" shall mean a listing of Prescription Drug Products included under MCO's and/or a Covered Payor's or Covered Plan's Pharmacy Benefit Program.  Unless otherwise indicated, the term "Formularies" shall refer to all Formularies maintained by MCO and/or by Covered Payors/Covered Plans.

1.8 "Formulary Committee" shall mean the advisory committee and/or any pharmacy and therapeutics or other committee or committees comprised of medical personnel and other professionals which are responsible for the development and monitoring of a Formulary.

1.9 "Formulary Coverage" shall have the meaning set forth in Section 2.1 hereof.

1.10 "Party" shall mean BIPI or MCO, as the context requires, and "Parties" shall mean BIPI and MCO.

1.11 "Pharmacy Benefit Program" shall mean any benefit package, program or plan pursuant to which MCO's and/or a Covered Payor's or Covered Plan's members are offered the provision of Prescription Drug Products as a covered benefit of the Covered Plan.

1.12 "Prescription Drug Product" shall mean any multi-source or brand name medication, drug product, or pharmaceutical which is approved by the U.S. Food and Drug Administration ("FDA") and which is required by federal and/or state law to be dispensed only pursuant to a written or oral order directed by a physician or any other authorized healthcare provider to a pharmacy.

1.13 "Rebate" shall mean any rebate payment described as such in Section 5.1 hereof.

1.14 "Reporting Period" shall have the meaning set forth in Section 4.2 hereof.

1.15 "Utilization Report" shall mean the report specified in Section 4.2 hereof to be submitted to BIPI by MCO on a quarterly basis for the fifty (50) United States, including Puerto Rico.

04/28/00

2

SEL_HLTH / NEC_0384

**ARTICLE 2**
**OBLIGATIONS OF THE PARTIES**

2.1    "MCO's Obligations": The following obligations apply to MCO.  Subject to the terms and conditions hereof, MCO's obligations with respect to this Agreement shall include the following:

(a)    "Formulary Coverage"  MCO agrees to provide Formulary and/or Preferred Formulary Coverage for all of Products, including but not limited to: Atrovent ® MDI, Catapres TTS ®-1, Catapres TTS ®-2, Catapres TTS ® -3, Combivent ®MDI, Flomax ®,  Oramorph ® SR, Marinol ® and Viramune ® . MCO shall use best efforts to encourage the use of Products when appropriate and efficacious to all Covered Payors and/or Covered Plans which maintain their own formularies.  MCO shall provide preferred status for Products with respect to marketing materials, promotional activities, and other incentives or efforts to encourage the use of particular products in any therapeutic category for which such Products are listed on Formulary.  MCO shall use best efforts to Covered Payors/Covered Plans to provide no greater incentive (such as higher reimbursements or lower co-payments as part of MCO's three-tiered co-pay system) for the dispensing or use of any brand name competitor product on a Formulary than is provided for the dispensing or use of a Product for the same therapeutic indication. MCO shall ensure that Covered Payors/Covered Plans adhere to MCO's formulary maintenance procedures for Products.

(b)    Compliance Programs.  MCO shall implement Formulary compliance programs which support the medically appropriate use of Products in the applicable therapeutic categories.  These programs may include co-pay incentives and the use of written materials, messages, telecommunications or other forms of communication to participating pharmacies, Covered Persons, physicians and/or other interested MCO Covered Payor/Covered Plan personnel.

(c)    Participation in Product Information Programs.  MCO and BIPI shall develop and implement Product Information Programs designed to encourage cost-effective, medically appropriate therapeutic management for medications, including appropriate length of therapy, dosing and patient compliance. The term "Product Information Program" includes, but is not limited to any disease or outcome management program, algorithm, treatment protocol, treatment guideline, drug utilization evaluation program, drug utilization review program and/or similar collaborative marketing programs.

(d)    Communications Regarding Products.  MCO agrees to work together with BIPI to ensure that patients and prescribers have access to Products and to information encouraging best medical practices with respect to the utilization of Products.

(e)    Meetings.  MCO agrees to meet at least once a quarter with the personnel of BIPI, or its affiliates, or designees to discuss the status of this Agreement, address any significant business issues, product developments, data issues, and to identify potential ways in which the relationship between MCO and BIPI may be optimized in a mutually acceptable manner.

(f)    Prior Authorization.  No Discounts or Rebates shall be paid for any Products which require prior authorization.

(g)    Medicare and Medicaid Patients.  MCO represents and warrants that all of its patients for whom services are paid for by the Medicare or Medicaid programs, or other state or federal programs, including, but not limited to Pace, ConnPace, and EPI, either in whole or in part, are covered by so-called "risk contracts" under which MCO receives a fixed payment to supply medical services to such Plan Members, and that such fixed payment is in no way affected by or related to the actual price for Products that are the subject of this Agreement.

2.2    "BIPI's Obligations" Subject to the terms and conditions hereof, BIPI's obligations with respect to this Agreement shall include the following:

(a)    Pay Rebate Amounts:  Subject to the provisions of Article 4 and Article 5, BIPI shall pay MCO an amount equal to the Rebate Amounts earned by MCO in the applicable quarter, which Rebate Amounts shall be determined and paid in accordance with the terms and conditions set forth in this Agreement and which are in consideration of MCO's compliance with the conditions of this Agreement.

SEL_HLTH / NEC_0385

(b) <u>Medicare and Medicaid Exclusion.</u>  No Rebates shall be payable by BIPI for any Products dispensed to an individual who is not a Covered Person.

(c) <u>Product Information Programs.</u>  BIPI shall work with MCO to develop and implement Product Information Programs.

(d) <u>Communication.</u>   BIPI agrees to work together with MCO to ensure that MCO personnel have access to the Products and to information encouraging best medical practices with respect to the utilization of the Products.

### ARTICLE 3
### MAINTENANCE OF FORMULARIES

3.1 <u>Formulary Status of Products.</u>  Exhibit II attached hereto accurately and completely sets forth the Formulary status as of the Effective Date of all Products for each Covered Payor/Covered Plan, including the effective date and termination date of the Covered Payor/ Covered Plan's pharmacy benefits relationship with MCO. MCO shall update the information provided on this Exhibit II no less than quarterly.

3.2 <u>Addition of Products to Formularies.</u>  New Products (including, without limitation, new chemical entities as well as new dosage forms of currently marketed products) will be reviewed for Formulary status and voted upon by the Formulary Committee within 60 days of BIPI providing MCO with clinical and economic data and information concerning the product.

3.3 <u>Deletion of Products from Formularies.</u>  Prior notification must be received within thirty (30) days if Products noted above are removed from any formulary.

3.4 <u>Ongoing Formulary Review Process.</u>  BIPI shall have the right, upon reasonable notice to MCO, to make presentations to MCO's pharmacy personnel as appropriate concerning Products and their therapeutic uses and consistent with the medically appropriate utilization of Products.

3.5 <u>Other Changes to Formularies.</u>  At least thirty (30) days prior to (a) adding a name brand product to any of the therapeutic categories specified on Exhibit I on any Formulary, and/or (b) adding a product that is the generic equivalent of a Product to any Formulary, MCO shall notify BIPI or its designee or affiliate of the proposed Formulary change and provide BIPI with "first right of refusal" in submitting information about any relevant name brand and/or generic Products.  Such information may include a proposal to modify the Rebates applicable to a Product or to adopt a generic Product as the generic product under consideration. In evaluating any such proposal, MCO shall consider price, as well as product availability, continuity of supply and other such factors.

### ARTICLE 4
### REPORTING REQUIREMENTS

4.1  <u>Initial Reports and Quarterly Updates.</u>  MCO shall provide BIPI with the following information on or prior to the effective date of this Agreement and shall update such information on a quarterly basis in conjunction with the submission of quarterly Rebate claims:

(a)  A list of all Covered Payors/Covered Plans (attached hereto as Exhibit II);

(b)  A list of each Formulary maintained by MCO Covered Payor/Covered Plan (and a copy thereof) together with information as to the status of Products on such Formulary (attached hereto as Exhibit II);

(c)  Baseline enrollment and utilization data from MCO for each Covered Payor/Covered Plan for the most recent twelve month period prior to the effective date for which data is available (attached hereto as Attachments A-1 through A-7).

(d)  Within thirty (30) days of the execution of this agreement by MCO, MCO shall furnish to BIPI's designated account representative copies of any and all Formulary Books distributed to providers with updates provided as issued.

04/28/00

4

SEL_HLTH / NEC_0386

4.2 <u>Utilization Report</u>. MCO shall, within sixty (60) days following the end of each calendar quarter ("Reporting Period") submit to BIPI either a written report or a computer report, in a format acceptable to both Parties ("Utilization Report"), identifying the enrollment and utilization for the Reporting Period for each Product within the therapeutic class. The Utilization Report shall include only those claims for Covered Persons for which reimbursement was paid by MCO and/or Covered Payor/Covered Plan.

4.3 <u>Utilization Report Format and Data Elements</u>. Each Utilization Report shall be submitted in a written report and/or computer readable format and shall contain all of the information shown on, and be in substantially the same form as Attachments B-1 through B-6, attached hereto and made a part hereof. The parties agree that the therapeutic classes as set forth in Attachments B-1 through B-6 shall be modified quarterly to reflect changes in the marketplace with the addition of new products, deletion of products or generic versions of products identified in the therapeutic class. MCO shall use its best efforts to provide script level data for Products in a form acceptable to both parties and in accordance with NCPDP standards.

4.4 <u>Commitments To Improve Utilization Data</u>. MCO shall use best efforts to improve on an ongoing basis the quality of utilization information, use state of the art technologies for gathering and compiling utilization information, including such industry standards as NCPDP standards for data interchange, and provide BIPI with clinical reports summarizing utilization, if available.

## ARTICLE 5
## REBATES

5.1 <u>Rebates</u>. BIPI shall pay to MCO the following Rebates in the amounts and for the Products specified in the Rebate Schedule attached hereto as Attachments A-1 through A-7, provided MCO complies with all provisions of this Agreement. Rebates will be calculated based on the AWP/WAC prices that are in effect as of the first day of the calendar quarter.

(a) <u>Flat Rebate</u>. A Flat Rebate which shall be paid in the amounts and for each BIPI Product specified in Attachments A-2, A-4, A-6, provided that such BIPI Product is dispensed to Covered Persons during the Reporting Period and MCO provides a Utilization Report which contains all the information shown on and in substantially the same format as Attachments B-2, B-4, and B-6, hereto.

(b) <u>Market Share Rebate</u>. BIPI shall pay a performance based Market Share Rebate which shall be paid for each BIPI Product specified in Attachment A-1, A-3, and A-5 and which shall be calculated as follows:

(i) The total volume (aggregate for all Plans) of such BIPI Product dispensed to MCO Covered Persons during the reporting period; multiplied by

(ii) The Rebate percentage specified for the MCO market share of the BIPI Product.

For each Reporting Period for which a market share Rebate is requested, MCO shall, in addition to its Utilization Report, submit separate market share Utilization Reports, in compliance with Article 4 of this Agreement.

5.2 <u>Minimum Payable Rebates</u>. Notwithstanding the foregoing, if the aggregate Rebate amount payable to MCO in a given Reporting Period is less than $500, BIPI has the option to accrue the Rebate amount into the next Reporting Period.

5.3 <u>Modification</u>. BIPI shall have the right to renegotiate the Rebate terms of this Agreement if MCO enrollment or Rebate claims fluctuate by more than ███████████████ in a ninety (90) day period between consecutive Reporting Periods.

5.4 <u>Rebate Conditions</u>.
(a) No Rebates shall be due from BIPI with respect to a Covered Payor/Covered Plan which terminates its pharmacy benefits relationship with MCO after the date of such termination. MCO shall report any termination of a Covered Payor/Covered Plan to BIPI on Exhibit II, and shall not submit utilization data to BIPI with respect to such Covered Payor/Covered Plan after the date of termination.

5

SEL_HLTH / NEC_0387

(b) No Rebates shall be due from BIPI if MCO and/or the Covered Payor/Covered Plan engages in any program inconsistent with utilization of Products, including, without limitation, any Maximum Allowable Cost ("MAC"), and "counter detailing" active generic substitution program.

(c) No Rebates shall be due by BIPI on any BIPI Product Claim Submission from a Covered Payor/Covered Plan which does not have or has deleted a BIPI contracted Product as specified in Section 2.1 from their Formulary, except as required by applicable law or for medical inappropriateness.

## ARTICLE 6
### PAYMENT TERMS

6.1 <u>Timing and Mode of Transfer</u>. BIPI shall pay to MCO the total amount of Rebates due for each Reporting Period within sixty (60) days of receiving the Utilization Report relating to such Reporting Period.

6.2 <u>Incomplete Claims</u>. Data submissions that are incomplete or that contain apparent discrepancies may delay the payment of the Rebates beyond the specified period. BIPI shall have no obligation for claims that are not submitted as part of a Utilization Report in accordance with the terms and conditions of this Agreement or claims for non Covered Persons.

6.3 <u>Claim Adjustments.</u> After submission of the Utilization Report for a Reporting Period, MCO shall only be entitled to make, and BIPI shall only be required to process, one (1) adjustment to the Utilization Report prior to the end of the next Reporting Period. BIPI shall have no obligation to process or liability to pay any amounts reported as adjustments thereafter.

6.4 <u>Adjustments for Overpayment</u>. MCO shall make adjustments for any overpayments by BIPI within thirty (30) days of the time when MCO discovers or is notified of such overpayment, said payments to be made by check for value. Any overpayment amount may be credited toward or set-off against amounts subsequently due under this Agreement. Notwithstanding the foregoing, MCO shall not be entitled to rebates pursuant to this Agreement during any Reporting Period with respect to (I) the product volume of any Product for which a Covered Payor/Covered Plan excludes such Product from its formulary or which otherwise restricts access to such Product during such contract quarter; or (ii)any Product which is reimbursed by Medicaid, or any state public assistance program or for which BIPI must pay a rebate to the government pursuant to legislation for Medicare.

## ARTICLE 7
### REPRESENTATIONS AND WARRANTIES

7.1 <u>Representations and Warranties of MCO and BIPI</u>. MCO and BIPI hereby represent and warrant to each other the following:

(a) This Agreement, when executed and delivered by MCO and BIPI in accordance with the provisions hereof, will be a legal, valid and binding obligation of MCO and BIPI, enforceable against MCO and BIPI in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the enforcement of creditors' rights generally and by limitations on the availability of specific performance and other equitable remedies against MCO or BIPI.

(b) All persons who will execute this Agreement on behalf of MCO or BIPI have been duly authorized to do so by all necessary action.

04/28/00

6

SEL_HLTH / NEC_0388

7.2 MCO represents and warrants to BIPI and its designees or affiliates that it will use hardware and software systems in which the occurrence in or use of dates on or after January 1, 2000 ("Millennial Dates") will not adversely affect in any material way any Confidential Information, any data developed for BIPI as part of any work undertaken by MCO on behalf of BIPI or any other data or information otherwise owned by BIPI pursuant to this Agreement, or MCO's performance under this Agreement, including, but not limited to date-dependent data, computations, output or other informational functions (including, without limitation, calculating, comparing and sequencing). MCO further represents and warrants that it will use hardware and software systems which will process, create, store and output information related to or including Millennial Dates without any material error or omissions and at no additional costs to BIPI. At BIPI's request, MCO will provide evidence which demonstrates that its hardware and software systems have been adequately tested and shown to meet the requirements of this paragraph.

## ARTICLE 8
## ADDITIONAL COVENANTS OF THE PARTIES

8.1 Accurate Data. MCO acknowledges that BIPI shall be relying on information provided by MCO to determine the amount of Rebates paid to MCO. MCO warrants that all information provided to BIPI by MCO, including the baseline enrollment and utilization data required by Section 4.1(c) and any information provided in any Utilization Reports, shall be true and correct.

8.2 Access to Products. MCO covenants that all physicians and other health care professionals licensed to prescribe pharmaceuticals and biologicals shall have access to Products consistent with applicable licensing laws, subject to MCO's Covered Payor's/Covered Plan's medical and pharmacy procedures for use by Covered Persons.

8.3 Confidentiality. The terms and provisions of this Agreement are strictly confidential. Each Party agrees not to disclose the terms or provisions of this Agreement to any person (except to affiliates of the Parties hereto and except by MCO as reasonably necessary to market and implement its programs and fulfill its obligations hereunder) without the prior written consent of the other Party, unless disclosure is required by applicable law or regulations. As used herein "Confidential Information" shall mean any and all information, data, technical or non-technical, concerning the Products and both partys' procedures and operational programs which are disclosed under this Agreement and which the disclosing Party considers to be and treats as proprietary and confidential. These obligations of confidentiality shall not apply to information which was known to the receiving party at the time of disclosure, which is or becomes generally known to the public through no fault attributable to either party, or which is hereafter made available to the receiving party by a third party having a right to do so.

8.4 Insurance. MCO maintains and shall maintain adequate general and professional liability insurance, which coverage is in full force and effect and will continue in full force and effect throughout the term of this Agreement without any additional action.

8.5 Indemnification. MCO agrees to indemnify and hold BIPI harmless from and against any and all losses, claims, penalties, suits and judgments or property damage, bodily injury or death arising from MCO's breach or violation of this Agreement or any state or federal law, regulation or requirement regarding the provision of pharmaceutical benefits with respect to the Products.

8.6 Indemnification for Misbranding or Adulteration.

(a) BIPI guarantees that the articles comprising each shipment or other delivery of the Products pursuant to this Agreement shall, as of the date of such shipment from BIPI or its affiliate or designee, not be adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, or within the meaning of any applicable state or municipal law in which the definitions of "adulteration" and "misbranding" are substantially the same as those contained in said Federal Food, Drug and Cosmetic Act, as such laws are constituted and effective at the time of such shipment or delivery, and will not be an article which may not under the provisions of Sections 404, 505 or 512 of the Federal Food, Drug and Cosmetic Act be introduced into interstate commerce.

(b) BIPI agrees to indemnify and hold MCO harmless from and against any and all losses, claims, penalties, suits and judgments or property damage, bodily injury or death (other than for court costs and attorney's fees) arising solely as the result of a breach of the guarantee set forth in Section 8.6(a) above.

7

04/28/00

SEL_HLTH / NEC_0389

**BOOKS AND RECORDS**

9.1 <u>Recordkeeping Requirements</u>. During the term of this Agreement and for one (1) year thereafter, or longer if state law requires, MCO and BIPI shall maintain a complete and accurate set of detailed records (and MCO shall require Covered Payors/Covered Plans and pharmacies to maintain a complete and accurate set of detailed records) with respect to:

    (a) Prescription utilization records for all Products on MCO Covered Payor/Covered Plan Formularies;
    (b) Products dispensed or administered to Covered Persons;
    (c) Lists of Covered Persons by category or number (and not by name) and their eligibility dates; and
    (d) Other materials used by MCO to determine or verify reimbursements due to Covered Plans or pharmacies for Products dispensed or administered.

9.2 <u>Audit Rights</u>.

    (a) BIPI shall be entitled, upon reasonable notice to MCO, to audit the books and records of MCO, including script level data available electronically with encrypted individual patient data, for purposes of verifying the accuracy of Utilization Reports and otherwise ensuring compliance with the obligations of MCO to provide Formulary Coverage for the Products, provided that such audit occurs during the normal business hours of MCO.

    (b) MCO shall be entitled, upon reasonable notice to BIPI, to audit the books and records of BIPI for purposes of verifying the accuracy of Rebate payments, provided that such audit occurs during the normal business hours of BIPI.

    (c) The Parties agree that all audited information shall be confidential and subject to the confidentiality provisions of this Agreement.

**ARTICLE 10**
**TERM AND TERMINATION**

10.1 <u>Term</u>. The term of this agreement is from **April 1, 2000 to March 31, 2002**. This Agreement may be extended or renewed at the option of either Party for a period of up to one (1) year, provided that the other Party agrees in writing to such extension or renewal.

10.2 <u>Termination</u>. In addition to the termination rights otherwise provided for in this Agreement, either Party shall have the right to terminate this Agreement upon the giving of fourteen (14) days notice to the other Party in the event of a breach of any of the terms of this Agreement which breach remains uncured for a period of thirty (30) days after the breaching Party receives notice of the breach. This Agreement may also be terminated by either party immediately if either party becomes insolvent, is dissolved or liquidated, makes a general assignment for the benefit of creditors, files or has filed against it a petition in bankruptcy, or has a receiver appointed for a substantial part of its assets or by BIPI. Upon termination, BIPI shall have no liability for Rebates relating to utilization of Products after the date of termination. This Agreement may be terminated at any time for any reason by either party upon sixty (60) days prior written notice.

10.3 <u>Survival of Certain Rights upon Expiration or Termination</u>. All rights granted to and obligations undertaken by the Parties hereunder shall terminate immediately upon the expiration or termination of this Agreement except as for:    (a) The obligation of each Party to pay any and all Rebates or other consideration accrued hereunder prior to such expiration or termination; (b) The confidentiality obligations set forth in Article 8, surviving for three (3) years following such expiration or termination; (c) indemnification obligations set forth in Article 8, surviving one (1) year following such expiration or termination; (d) record-keeping requirements set forth in Article 9, surviving three (3) years following such expiration or termination or longer if state law requires; (e) The audit rights set forth in Article 9,surviving one (1) year following such expiration or termination; and(f) dispute resolution procedures set forth in Article 11 below in respect of any matter arising prior to such expiration or termination.

**ARTICLE 11**
**DISPUTE RESOLUTION**

8

03/25/00

SEL_HLTH / NEC_0390

11.1 Judicial Resolution of Disputes.  The Parties irrevocably submit to the exclusive jurisdiction of the courts of any United States federal court sitting in the State of Connecticut in any action or proceeding relating to this Agreement, and irrevocably agree that, in the event that any dispute or disagreement arising under this Agreement is not resolved mutually by the parties, all claims in respect thereof may be heard and determined in an action or proceeding in any such United States federal court.  The Parties agree that any such action or proceeding shall be heard by a judge and hereby irrevocably and unconditionally waive any right to a jury trial in such action or proceeding.

11.2 Payment Obligations.  BIPI's obligation to pay any and all disputed Rebates or fees for service to MCO under this Agreement shall be stayed during the pendency of the dispute resolution proceedings of which such payments are a subject.

### ARTICLE 12
### MISCELLANEOUS

12.1 Right to Discontinue Products.  BIPI shall have the right, in its sole discretion, to discontinue the manufacture, sale or distribution of any BIPI Product at any time, or to limit quantities thereof.

12.2 Patient Confidentiality.  Patient confidentiality will be maintained in accordance with federal, state and local laws with respect to any information transferred between MCO and BIPI.

12.3 Publicity.  Each Party shall maintain the confidentiality of all provisions of this Agreement and neither Party shall make any public announcement or disclosure of this Agreement or its terms without the prior written consent of the other Party except as required by any applicable law or regulation based upon the written advice of counsel and then only with prior notice to the other Party as far in advance as reasonably possible.

12.4 Relationship of the Parties.  Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency or joint venture relationship between the Parties hereto.

12.5 Applicable Law.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Connecticut, U.S.A., without taking into account its conflict of laws rules or principles.

12.6 Counterparts.  This Agreement may be executed simultaneously in any number of counterparts.  Any single counterpart or set of counterparts signed in either case by all of the Parties hereto shall constitute a full and binding Agreement for all purposes.

12.7   Notification.  Any notices or other communications hereunder shall be in writing and (a) personally delivered, (b) sent by postage prepaid first-class post (if inland) or airmail (if overseas), or (c) transmitted by telex, telecopy or cable at the following address (or such other address as such Party may designate from time to time in writing):

| **If To MCO** | **If To BIPI** | **Copy to BIPI Account Manager** |
|---|---|---|
| Intermountain Health Care | 900 Ridgebury Road | Manfred Anhold |
| Ben Johnson | P.O. Box 368 | 2146 S. Parfet Drive |
| 36 South State Street | Ridgefield, CT 06877 | Lakewood, CO 80227 |
| Suite 1900 | | |
| Salt Lake City, UT 84111 | | |
| | Attn: Wendy Pavia | |
| | Cc: General Counsel | |
| Attention: Mr. Johnson | | Attention: Manfred Anhold |
| Telephone: (810) 442-3473 | Telephone: (203) 798-4734 | Telephone: (303) 988-4202 |
| Fax  (801) 442-3006 | Facsimile: (203) 791-6189 | Fax  (303) 988-1939 |

12.8 Force Majeure.  Should any circumstance beyond the reasonable control of either MCO or BIPI occur which delays or renders impossible the performance of their obligations under this Agreement on the dates

SEL_HLTH / NEC_0391

herein provided for, such obligation shall be postponed for such time as such performance necessarily has had to be suspended or delayed on account thereof. Events of force majeure shall include, without limitation, war, revolution, invasion, insurrection, riots, mob violence, sabotage or other civil disorders, acts of God, strikes or other labor disputes, acts, laws, regulations or rules of any government or governmental agency, limitations imposed by exchange control regulations or foreign investment regulations or similar regulations, severe data system failure beyond BIPI's or MCO's control, and any other circumstances beyond the reasonable control of either MCO or BIPI, the obligations of whom are affected thereby.

12.9    Binding Effect; Assignment. MCO may not assign all or part of this Agreement without the prior written consent of BIPI. For purposes of this Agreement, a substantial change in ownership or control of MCO shall be deemed to be an event of assignment requiring the prior written consent of BIPI. A substantial change in ownership control shall include, but not be limited to, the sale to any third party or third parties of all or substantially all of the assets relating to MCO's business; or the sales or spin-off, directly or indirectly, to any third party or third parties, or a beneficial interest in fifty percent (50%) or more of the outstanding equity securities or other ownership interest of MCO or any affiliate of MCO which own all or substantially all of the assets relating to MCO's business.

12.10   Entire Agreement. The terms and conditions herein contained, together with the terms and conditions of the other documents attached as Attachments and Exhibits hereto, constitute the entire agreement between the Parties relating to the subject matter of this Agreement and shall supersede all previous communications between the Parties with respect to the subject matter of this Agreement. Neither Party has entered into this Agreement in reliance upon any representation, warranty or undertaking of the other Party that is not set out or referred to in this Agreement.

12.11   Severability. If any provision of this Agreement is held illegal or unenforceable in a judicial proceeding, such provision shall be severed from this Agreement and shall be inoperative; and the remainder of this Agreement shall remain binding on the Parties hereto.

12.12   No Waiver of Rights. No failure or delay on the part of either Party in the exercise of any power or right hereunder shall operate as a waiver thereof. No single or partial exercise of any right or power hereunder shall operate as a waiver of such right or of any other right or power. The waiver by either Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach hereunder. All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available at law or in equity.

12.13   No Third Party Rights. This Agreement shall not be deemed or construed in any way to result in the creation of any rights or obligations in any person not a Party to this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized officers as of the date and year first above written.

| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. | | IHC Health Plan | |
|---|---|---|---|
| By: | _(signature)_ | By: | _(signature)_ |
| Name: | Gregg Ciarelli | Name: | G. David Richards, MD |
| Title: | Head of Pricing, Contracting And Marketing Controlling | Title: | Medical Director IHC Health Plans |
| Date: | _5/1/00_ | Date: | _4-25-00_ |

10

03/25/00

SEL_HLTH / NEC_0392

Attachment A-1

**MARKET SHARE PERFORMANCE REBATE SCHEDULE**

**Intermountain Health Care**

| Therapeutic Class: Bronchodilator | Unit of Measure | Utilization Data | | | | Term: | 4/1/2000 - 3/31/2002 |
|---|---|---|---|---|---|---|---|
| | | From - To | 1/1/99 - 12/31/99 | | | Market Share % | Base Rebate % off AWP |
| | | Base Units | Market Share % | | | | |
| ATROVENT® MDI COMPLETE 00597-0082-14 | Gram | ■ | ■ | | | ■ | ■ |
| COMBIVENT® MDI COMPLETE 00597-0013-14 | Gram | ■ | ■ | | | ■ | ■ |
| Total: | | ■ | ■ | | | | |

**ALL REBATES ARE CONTINGENT UPON ATROVENT® MDI AND COMBIVENT® MDI BEING MAINTAINED ON FORMULARY.**

Attachment A-2

### FLAT PERFORMANCE REBATE SCHEDULE

**Intermountain Health Care**

| THERAPEUTIC CLASS: | UTILIZATION FOR MOST RECENT 4 QUARTERS | | | | TERM: 4/1/00 - 3/31/02 | |
|---|---|---|---|---|---|---|
| | FROM - TO | | 1/1/99 - 12/31/99 | | MARKET | |
| CENTRALLY ACTING | UNIT OF | BASE | | MARKET | SHARE % | REBATE % Off AWP |
| ANTI-HYPERTENSIVES | MEASURE | UNITS | | SHARE % | | |
| CATAPRES-TTS®-1 00597-0031-12 | PATCH | ■ | | ■ | N/A | ■ |
| CATAPRES-TTS®-2 00597-0032-12 | PATCH | ■ | | ■ | N/A | ■ |
| CATAPRES-TTS®-3 00597-0033-34 | PATCH | ■ | | ■ | N/A | ■ |

ALL REBATES ARE CONTINGENT UPON CATAPRES- TTS® MDI BEING MAINTAINED ON FORMULARY.

SEL_HLTH / NEC_0394

Attachment A-3

# MARKET SHARE REBATE SCHEDULE

## Intermountain Health Care

| Therapeutic Class: BPH & ANTI-HYPERTENSIVE | Unit of Measure | Base Units | Market Share % | | Market Share % | Rebate % off AWP |
|---|---|---|---|---|---|---|
| | | **Utilization Data** | | | **Term:** | **4/1/00 - 3/31/02** |
| | | From - To | 1/1/99 - 12/31/99 | | | |
| FLOMAX® 00597-0058-01 00597-0058-10 | Capsule | ■ | ■ | | ■ | ■ |
| CARDURA® 00049-2750-66 00049-2760-66 00049-2770-66 00049-2780-66 | Tablet | ■ | ■ | | | |
| HYTRIN® 00074-3805-13 00074-3806-13 00074-3807-13 00074-3808-13 | Capsule | ■ | ■ | | | |
| MINIPRESS® 00663-4310-71 00663-4370-71 00663-4380-71 | Capsule | ■ | ■ | | | |
| PROSCAR® 00006-0072-31 00006-0072-58 | Tablet | ■ | ■ | | | |
| alpha blockers generic (all currently marketed NDC's) | Tablet | ■ | ■ | | | |
| TOTAL THERAPEUTIC CLASS: | | ■ | ■ | | | |

ALL REBATES ARE CONTINGENT UPON FLOMAX® BEING MAINTAINED ON FORMULARY.

ATTACHMENT A-4

*FLAT REBATE SCHEDULE*
*DRUG UTILIZATION DATA*

## Intermountain Health Plan

| THERAPEUTIC CLASS: ANTIEMETIC | | | UTILIZATION FOR MOST RECENT 4 QUARTERS | | | | Term: 4/1/00 - 3/31/02 | |
| | | | FROM - TO | | 1/1/99 - 12/31/99 | | | |
| PRODUCT DESCRIPTION | DOSAGE FORM | NDC # | UNIT OF MEASURE | BASE UNITS | MARKET SHARE % | | MARKET SHARE % | REBATE % OFF WAC* |
| MARINOL® | | | | | | | | |
| 2.5 MG | CAP | 0054-2601-11 | MG | | | | | |
| 2.5 MG | CAP | 0054-2601-21 | MG | | | | ■ | ■ |
| 2.5 MG | CAP | 0054-2601-25 | MG | | | | | |
| 5.0 MG | CAP | 0054-2602-11 | MG | | ■ | | | |
| 5.0 MG | CAP | 0054-2602-25 | MG | | | | | |
| 10 MG | CAP | 0054-2603-21 | MG | | | | | |
| 10 MG | CAP | 0054-2603-11 | MG | | | | | |

**ALL REBATES ARE CONTINGENT UPON MARINOL® BEING MAINTAINED ON FORMULARY**

\* Wholesale Acquisition Cost (WAC) that is in effect on the first day of the calendar quarter.

SEL_HLTH / NEC_0396

ATTACHMENT A-5

*MARKET SHARE AND REBATE SCHEDULE*
DRUG UTILIZATION DATA

## Intermountain Health Plan

| PRODUCT DESCRIPTION | DOSAGE FORM | NDC # | UNIT OF MEASURE | BASE UNITS | MARKET SHARE % |
|---|---|---|---|---|---|
| **THERAPEUTIC CLASS:** LONG ACTING OPIOIDS (ORAL SOLID) (MORPHINE SULFATE SR) | | | UTILIZATION FOR MOST RECENT 4 QUARTERS FROM - TO  1/1/99 - 12/31/99 | | |
| **ORAMORPH SR®** | | | | | |
| 15 MG | TAB | 0054-8790-24 | MG | | |
| 15 MG | TAB | 0054-4790-25 | MG | | |
| 15 MG | TAB | 0054-4790-29 | MG | | |
| 30 MG | TAB | 0054-8805-24 | MG | | |
| 30 MG | TAB | 0054-4805-19 | MG | | |
| 30 MG | TAB | 0054-4805-25 | MG | | |
| 30 MG | TAB | 0054-4805-27 | MG | | |
| 60 MG | TAB | 0054-8792-11 | MG | | |
| 60 MG | TAB | 0054-4792-25 | MG | | |
| 100 MG | TAB | 0054-8793-11 | MG | | |
| 100 MG | TAB | 0054-4793-25 | MG | | |
| **TOTAL ORAMORPH SR** | | | | 0 | |
| **MS CONTIN®** | | | | | |
| 15 MG CR | TAB | 0034-0514-25 | MG | | |
| 15 MG CR | TAB | 0034-0514-10 | MG | | |
| 15 MG CR | TAB | 0034-0514-90 | MG | | |
| 30 MG CR | TAB | 0034-0515-25 | MG | | |
| 30 MG CR | TAB | 0034-0515-50 | MG | | |
| 30 MG CR | TAB | 0034-0515-10 | MG | | |
| 30 MG CR | TAB | 0034-0515-45 | MG | | |
| 30 MG CR | TAB | 0034-0515-90 | MG | | |
| 60 MG CR | TAB | 0034-0516-25 | MG | | |
| 60 MG CR | TAB | 0034-0516-10 | MG | | |
| 60 MG CR | TAB | 0034-0516-90 | MG | | |
| 100 MG CR | TAB | 0034-0517-25 | MG | | |
| 100 MG CR | TAB | 0034-0517-10 | MG | | |
| 100 MG CR | TAB | 0034-0517-90 | MG | | |
| 200 MG CR | TAB | 0034-0513-25 | MG | | |
| 200 MG CR | TAB | 0034-0513-10 | MG | | |
| **TOTAL MS CONTIN** | | | | 0 | |
| **Oxycontin** | | | | | |
| 10MG | TAB | 59011-0100-10 | MG | | |
| 10MG | TAB | 59011-0100-25 | MG | | |
| 20MG | TAB | 59011-0103-10 | MG | | |
| 20MG | TAB | 59011-0103-25 | MG | | |
| 40MG | TAB | 59011-0105-10 | MG | | |
| 40MG | TAB | 59011-0105-25 | MG | | |
| 80MG | TAB | 59011-0107-10 | MG | | |
| 80MG | TAB | 59011-0107-25 | MG | 0 | |
| **OXYCONTIN** | | | | 0 | |
| **TOTAL THERAPEUTIC CLASS** | | | | 0 | |

| Term: 4/1/00 - 3/31/02 | |
|---|---|
| MARKET SHARE % | REBATE % OFF WAC* |

**ALL REBATES ARE CONTINGENT ORAMORPH® BEING MAINTAINED ON FORMULARY.**

\* Wholesale Acquisition Cost (WAC) that is in effect on the first day of the calendar quarter.

SEL_HLTH / NEC_0397

*REBATE SCHEDULE*
DRUG UTILIZATION DATA

Intermountain Health Plan

| THERAPEUTIC CLASS: ANTIRETROVIRAL (NNRTI) | UTILIZATION FOR MOST RECENT 4 QUARTERS | | | | CONTRACT TERM: | 4/1/00 - 3/31/02 |
|---|---|---|---|---|---|---|
| | FROM – TO | 1/1/99 - 12/31/99 | | | MARKET SHARE % | REBATE % OFF WAC* |
| | UNIT OF MEASURE | BASE UNITS | MARKET SHARE % | | | |
| VIRAMUNE® 0054-8647-25 | Tablet | 0 | | | N/A | ■ |
| VIRAMUNE® 0054-4647-25 | Tablet | 0 | | | N/A | ■ |
| VIRAMUNE® 0054-4647-21 | Tablet | 0 | | | N/A | ■ |

ALL REBATES ARE CONTINGENT UPON VIRAMUNE® BEING MAINTAINED ON FORMULARY.

* Wholesale Acquisition Cost (WAC) that is in effect on the first day of the calendar quarter.

SEL_HLTH / NEC_0398

Attachment B-1

Intermountain Health Plan
Quarter: xx/xx/00 - xx/xx/02

DETAIL DRUG UTILIZATION BY PRODUCT BY PLAN
Market Share Rebate Performance Contract

Therapeutic class : BRONCHODILATORS MDI

| Product Description Plan Name | Unit of Measure | Smallest Dispensable quantity | 11 digit NDC | Plan ID | Plan HIN # | Formulary Status On/Off | Retail Usage Rx Quantity | Unit Quantity | Mail Order Rx Quantity | Unit Quantity | Total Usage Rx Quantity | Unit Quantity | Total Market Share % Obtained |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Grams | | Grams | | Grams | |
| ATROVENT® MDI COMPLETE | Gram | 14 grams | 00597-0082-14 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | |
| COMBIVENT® MDI COMPLETE | Gram | 14 grams | 00597-0013-14 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | |
| TOTAL: | | | | | | | | | | | | | 100.0% |

* All Rebates are contingent upon BIPI's products being maintained on Formulary.
* Unit quantity reported on this attachment must be at the correct unit of measure (i.e. a gram, a patch) and be in multiples of the smallest dispensable quantity.
* Market Share is calculated at the product sub-total level.

SEL_HLTH / NEC_0399

Attachment B-3

**Intermountain Health Plan**
**Quarter: xx/xx/06 - xx/xx/02**
**DETAIL DRUG UTILIZATION BY PRODUCT BY PLAN**
**Market Share Rebate Performance Contract**

| Product Description Plan Name | Unit of Measure | Smallest Dispensable quantity | 11 digit NDC | Plan ID | Plan HN # | Formulary Status On/Off | Retail Usage Rx Quantity | Retail Usage Unit Quantity | Mail Order Rx Quantity | Mail Order Unit Quantity | Total Usage Rx Quantity | Total Usage Unit Quantity | Total Market Share % Obtained by NDC | Total Market Share % Obtained by Product |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Therapeutic class : BPH & ANTIHYPERTENSIVES** | | | | | | | | | | | | | | |
| FLOMAX 0.4mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 100 capsules | 00597-0058-01 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| FLOMAX 0.4mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 1,000 capsules | 00597-0058-10 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| CARDURA 1mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00049-2750-66 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| CARDURA 1mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00049-2750-68 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| CARDURA 2mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00049-2770-66 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| CARDURA 4mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00049-2770-66 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| CARDURA 8mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00049-2780-66 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| HYTRIN 1mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 100 capsules | 00074-3805-13 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| HYTRIN 1mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 100 capsules | 00074-3806-13 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| HYTRIN 2mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 100 capsules | 00074-3806-13 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| HYTRIN 5mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 100 capsules | 00074-5807-13 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| HYTRIN 5mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 250 capsules | 00074-5807-13 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| MINIPRESS 1mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 250 capsules | 00069-4310-71 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| MINIPRESS 2mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 250 capsules | 00069-4310-71 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| MINIPRESS 5mg | | | | | | | | | | | | | | |
| List Individual Plans | Capsule | 250 capsules | 00069-4390-71 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| PROSCAR 5mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 30 tablets | 00006-0072-31 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| PROSCAR 5mg | | | | | | | | | | | | | | |
| List Individual Plans | Tablet | 100 tablets | 00006-0072-58 | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| alpha blockers generic | | | | | | | | | | | | | | |
| List Individual Plans | Capsules or Tablets | | All Available NDCs | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | N/A | |
| **TOTAL** | | | | | | | | | | | | | 100.0% | 100.0% |

* All Rebates are contingent upon FLOMAX being maintained on Formulary.
* Unit quantity reported on this attachment must be at the correct unit of measure (i.e. a gram, a patch, tablet, capsule) and be in multiples of the smallest dispensable quantity.

Attachment B-4

**Intermountain Health Plan**
**Quarter: xx/xx/00 - xx/xx/02**
**DETAIL DRUG UTILIZATION BY PRODUCT BY PLAN**
**Flat Rebate Contract**

| Product Description Plan Name | Unit of Measure | Smallest Dispensable quantity | 11 digit NDC | Plan ID | Plan HN # | Formulary Status On/Off | Retail Usage | | MailOrder | | Total Usage | | Total Market Share % Obtained by NDC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Rx Quantity | Unit Quantity | Rx Quantity | Unit Quantity | Rx Quantity | Unit Quantity | |
| | | | | | | | Caps/Tabs | | Caps/Tabs | | Caps/Tabs | | |
| **Therapeutic class : Antiemetic** | | | | | | | | | | | | | |
| Marinol® 2.5mg | Capsule | 25 capsules | 0064-2601-11 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 2.5mg | Capsule | 60 capsules | 0064-2601-21 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 2.5mg | Capsule | 100 capsules | 0064-2601-28 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 5mg | Capsule | 25 capsules | 0064-2602-11 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 5mg | Capsule | 100 capsules | 0064-2602-25 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 10mg | Capsule | 25 capsules | 0064-2603-11 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| Marinol® 10mg | Capsule | 60 capsules | 0064-2603-21 | | | | | | | | | | N/A |
| List Individual Plans | | | | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| TOTAL | | | | | | | | | | | | | 100.0% |

* All Rebates are contingent upon BIP's products being maintained on Formulary.
* Unit quantity reported on this attachment must be at the correct unit of measure (i.e. a ml) and be in multiple of the smallest dispensable quantity.
* The total quantity reported on this attachment must equal the amount reported on the MCO invoice.

Intermountain Health Plan
Quarter: xx/xx/00 - xx/xx/02

DETAIL DRUG UTILIZATION BY PRODUCT BY PLAN

Attachment B-5

| Product Description Plan Name | Unit of Measure | Smallest Dispensable quantity | 11 digit NDC | Plan ID | Plan HH # | Formulary Status On/Off | Retail Usage Rx Quantity | Caps/Tabs Unit Quantity | Mail Order Rx Quantity | Caps/Tabs Unit Quantity | Total Usage Rx Quantity | Unit Quantity | Total Market Share % Obtained |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Therapeutic class 1 LONG ACTING OPIOIDS (ORAL SOLID)** | | | | | | | | | | | | | |
| ORAMORPH SR® 15mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 100 | 0054-4790-25 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 15mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 4X25RN | 0054-8790-24 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 30mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 500 | 0054-4790-29 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 30mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 60 | 0054-4805-19 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 30mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 250 | 0054-4805-27 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 30mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 100 | 0054-4805-25 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 30mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 4X25RN | 0054-8805-24 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 60mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 100 | 0054-4792-25 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 60mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 1X25RN | 0054-8792-11 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 100mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 100 | 0054-4793-25 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| ORAMORPH SR® 100mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 1X25RN | 0054-8793-11 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |
| MS CONTIN® 15mg | | | | | | | | | | | | | |
| List Individual Plans | Tablets | 100 | 0034-0514-10 | | | | | | | | | | N/A |
| Sub-Total: | | | | | | | | | | | | | N/A |

| Product | | Unit | Qty | NDC | | | | |
|---|---|---|---|---|---|---|---|---|
| MS CONTIN® 15mg | List Individual Plans | Tablets | 500 | 00034-0514-60 | | | | |
| | Sub-Total | | | | | | | |
| MS CONTIN® 15mg | List Individual Plans | Tablets | 4X25RN | | | | | |
| | Sub-Total | | | | | | | |
| MS CONTIN® 30mg | List Individual Plans | Tablets | 50 | 00034-0515-50 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 30mg | List Individual Plans | Tablets | 100 | 00034-0515-10 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 30mg | List Individual Plans | Tablets | 250 | 00034-0515-45 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 30mg | List Individual Plans | Tablets | 500 | 00034-0515-60 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 30mg | List Individual Plans | Tablets | 1X25RN | 00034-0515-25 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 60mg | List Individual Plans | Tablets | 100 | 00034-0516-10 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 60mg | List Individual Plans | Tablets | 500 | 00034-0516-90 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 60mg | List Individual Plans | Tablets | 1X25RN | 00034-0516-25 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 100mg | List Individual Plans | Tablets | 100 | 00034-0517-10 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 100mg | List Individual Plans | Tablets | 1X25RN | 00034-0517-25 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 200mg | List Individual Plans | Tablets | 100 | 00034-0519-10 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| MS CONTIN® 200mg | List Individual Plans | Tablets | 1X25RN | 00034-0513-25 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| OXYCONTIN 10MG | List Individual Plans | Tablets | 100 | 59011-0100-10 | | | | N/A |
| | Sub-Total | | | | | | | N/A |
| OXYCONTIN 10MG | | Tablets | 25 UDP | 59011-0100-25 | | | | N/A |

SEL_HLTH / NEC_0403

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| List Individual Plans | | | | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 20MG List Individual Plans | Tablets | 100 | 59011-0103-10 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 20MG List Individual Plans | Tablets | 25 UDP | 59011-0103-25 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 40MG List Individual Plans | Tablets | 100 | 59011-0105-10 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 40MG List Individual Plans | Tablets | 25 UDP | 59011-0105-25 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 80MG List Individual Plans | Tablets | 100 | 59011-0107-10 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| OXYCONTIN 80MG List Individual Plans | Tablets | 25 UDP | 59011-0107-25 | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| all generically available morphine cont solid products | | | | | | | | | |
| List Individual Plans | | | | | | | | | |
| Sub-Total: | | | | | | | | | NA |
| TOTAL | | | | | | | | | 100.0% |

* All Rebates are contingent upon BIFPs products being maintained on Formulary.
* Unit quantity reported on this attachment must be at the correct unit of measure (i.e. a gram, a patch) and be in multiples of the smallest dispensable quantity.
* Market Share is calculated at the product sub-total level.

SEL_HLTH / NEC_0404

Intermountain Health Plan
Quarter: xx/xx/00 - xx/xx/02

**DETAIL DRUG UTILIZATION BY PRODUCT BY PLAN**
**Flat Rebate Contract**

Attachment B-6

| Product Description Plan Name | Unit of Measure | Smallest Dispensable quantity | 11 digit NDC | Plan ID | Plan H/H # | Formulary Status On/Off | Retail Usage Rx Quantity | Unit Quantity Caps/Tabs | Mail Order Rx Quantity | Unit Quantity Caps/Tabs | Total Usage Rx Quantity | Unit Quantity Caps/Tabs | Total Market Share % Obtained by NDC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Therapeutic class : Antiretroviral (NNRTI)** | | | | | | | | | | | | | |
| Viramune® 200mg | Tablet | | 0054-4647-25 | | | | | | | | | | |
| List Individual Plans | | | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | |
| Viramune® 200mg | Tablet | | 0054-4647-25 | | | | | | | | | | |
| List Individual Plans | | | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | |
| Viramune® 200mg | Tablet | | 0054-4647-21 | | | | | | | | | | |
| List Individual Plans | | | | | | | | | | | | | |
| Sub-Total: | | | | | | | | | | | | | |
| **TOTAL** | | | | | | | | | | | | | 100.0% |

* All Rebates are contingent upon BI/PRs products being maintained on Formulary.
* Unit quantity reported on this attachment must be at the correct unit of measure (i.e. a gram, a patch) and be in multiples of the smallest dispensable quantity.
* Market Share is calculated at the product sub-total level.

SEL_HLTH / NEC_0405

## FORMULARY LISTING OF PRODUCTS
### Intermountain Health Plan

Exhibit I

| Product Description | Therapeutic Category |
|---|---|
| ATROVENT® MDI COMPLETE | Bronchodilator-Anticholinergic/COPD |
| COMBIVENT® MDI COMPLETE | Bronchodilator-Beta Adrenergic Agonist/Asthma & Anticholinergic/COPD |
| CATAPRES-TTS® | Cardiovascular-Antihypertensive |
| FLOMAX® | Benign Prostatic Hyperplasia (BPH) and Antihypertensive |
| MARINOL® | Antiemetic |
| ORAMORPH® | Analgesic Narcotics |
| VIRAMUNE® | Antiretroviral |

SEL_HLTH / NEC_0406

Exhibit B
FORMULARY STATUS OF PRODUCTS
Intermountain Health Plan

# Exhibit P

*FDB fw*

**Roberts, Pamela (STL)**

| | |
|---|---|
| **From:** | Sundar, Heather (STL) |
| **Sent:** | Friday, April 05, 2002 3:42 PM |
| **To:** | Soderstrom, Ryan (BLM); Lynch, Julie (BLM); Frear, Raulo (BLM); Neville, Everette (BLM) |
| **Cc:** | Gilbride, Nancy (BLM); Hughes, Mark (BLM); Ignaczak, Ed (BLM); Sommer, Sue (BLM); |
| | Wingate, Beth (STL); Palmer, Marc (STL); Bascomb, Stuart L. (STL) |
| **Subject:** | Client Memo Re: AWP changes |

[icon] 4-5 Final MEMOtoClients on AWP...

This documents discusses the changes FDB has issued regarding AWP. It is intended for clients. ███████████████████████████ ███████ and Fred T. Raulo will have ETI distribute this as well.

Thanks,
Heather

*Heather D. Sundar, PharmD*
*Corporate Clinical Program Coordinator*
*Express Scripts*
*1-800-332-5455 x 67227*

1

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001753

April 5, 2002

## <u>Average Wholesale Price Increases</u>

Pharmaceutical manufacturers make price changes throughout the year.   As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe.  Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%.  The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost ("WAC") and AWP for certain drugs.  In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.

Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC. As this trend indicates, it is more important now than ever to put cost management strategies in place.

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY             ESI-414-00001754

# Exhibit Q

*First Date Ref. for*

**Roberts, Pamela (STL)**

| | |
|---|---|
| From: | Macinski, Chris (STL) |
| Sent: | Thursday, March 28, 2002 8:32 AM |
| To: | Soderstrom, Ryan (BLM) |
| Cc: | Bascomb, Stuart L. (STL) |
| Subject: | RE: AWP changes |
| | |
| Importance: | High |

*To all Chris to Sur*

Ryan, here is what we know at this time:

a.  ***Situation overview/status*** - Until recently AWP changes occurred in conjunction with WAC changes. It only became apparent to ESI within the last week that AWP changes were occurring without WAC changes. At that time we called our vendor and asked why. Their response was that the wholesalers, who they survey to get the AWP, felt that the new AWP was a more accurate depiction of where the AWP should be set. That they felt that with the mergers and acquisitions that have taken place within the drug industry, a need for equalization and standardization of the AWP was necessary. They also mentioned that the wholesalers may have felt this was necessary due to a government inquiry into AWP practices that has taken place recently. At that time we began an inquiry to ascertain the number of items and financial impact that this could have on us and our clients. ███████████████████████ (we had started this in response to 3 drugs that were aware of approximately 6 weeks ago).

b.  ***Client Impact*** - We are currently working on this. We have discovered that this impacts about 830 NDCs either positively or negatively. 650 NDCs are impacted positively. We are currently working on the financial impact of those drugs. We will then determine the average percentage impact to our clients.

c.  ***ESI Impact -*** ███████████████████████████████████████████████████

d.  ***Industry Repercussions -*** There are many. Our entire industry is based on AWP. If the AWP becomes an unreliable factor, a pricing paradigm shift may be required. ██████████████████

e.  ***Near-term downside/upside -*** ████████████████████████████████████████████

f.  ***Long-term downside/upside -*** At the very least trend will increase. At the worst, government price controls will be instituted. ████████████████████████████████████

This will enable us to continue business as usual.

——Original Message——
| | |
|---|---|
| From: | Soderstrom, Ryan (BLM) |
| Sent: | Tuesday, March 12, 2002 5:28 PM |
| To: | Macinski, Chris (STL) |
| Subject: | FW: AWP changes |

FYI

——Original Message——
| | |
|---|---|
| From: | Soderstrom, Ryan (BLM) |
| Sent: | Tuesday, March 12, 2002 2:04 PM |
| To: | Neville, Everette (BLM); Fontanez, Carmen (BLM); Hill, James J. (STL); Stults, Kathy (BLM); Sommer, Sue (BLM) |
| Cc: | Wulfestad, Kent (BLM); Nickels, Don (BLM); Legg, Jeffrey (BLM); Dohm, Jason (BLM); Lynch, Julie (BLM); Zarin, Larry P. (STL) |
| Subject: | RE: AWP changes |

Everett/Jim -

Recommend you both co-lead a SWAT team comprising HMS/Segment/Finance/Legal representation to determine items below. Once all the information is "available," CorpComm will do a write-up on it for exec/legal/segment input, sign-off, etc. Stuart should be positioned as the executive sponsor of this initiative.

Ryan

——Original Message——
| | |
|---|---|
| From: | Neville, Everette (BLM) |
| Sent: | Tuesday, March 12, 2002 1:55 PM |

1

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001762

To:      Soderstrom, Ryan (BLM); Fontanez, Carmen (BLM); Hill, James J. (STL); Stults, Kathy (BLM); Sommer, Sue (BLM)
Cc:      Wulfestad, Kent (BLM); Nickels, Don (BLM); Legg, Jeffrey (BLM); Dohm, Jason (BLM); Lynch, Julie (BLM); Zarin, Larry P. (STL)
Subject: RE: AWP changes

Jim, can you point Ryan in the right direction.
Ryan, I would be happy to work with you as would I am sure Kathy Stultz and one of Carmen's Sr Directors
(maybe Mary Ellen or Marian?)

I think we need to shoot for having something this week

Everett

----Original Message----
From:    Soderstrom, Ryan (BLM)
Sent:    Tuesday, March 12, 2002 1:47 PM
To:      Neville, Everette (BLM); Fontanez, Carmen (BLM); Hill, James J. (STL); Stults, Kathy (BLM); Sommer, Sue (BLM)
Cc:      Wulfestad, Kent (BLM); Nickels, Don (BLM); Legg, Jeffrey (BLM); Dohm, Jason (BLM); Lynch, Julie (BLM); Zarin, Larry P. (STL)
Subject: RE: AWP changes

Yes, there should be a unified corporate message on this issue.

1. Is there some "point group" or content experts that can provide us information around the following:
     a. situation overview/status
     b. client impact
     c. ESI impact
     d. industry repercussions
     e. near-term downside/upside
     f. long-term downside/upside

One we have consensus and information around these elements - Corporate Communications can develop a
communication for executive/legal/segment review and input, then bring it to the next level for syndication and
distribution.

Ryan
75160

----Original Message----
From:    Neville, Everette (BLM)
Sent:    Tuesday, March 12, 2002 1:35 PM
To:      Soderstrom, Ryan (BLM); Fontanez, Carmen (BLM); Hill, James J. (STL); Stults, Kathy (BLM); Sommer, Sue
         (BLM)
Cc:      Wulfestad, Kent (BLM); Nickels, Don (BLM); Legg, Jeffrey (BLM); Dohm, Jason (BLM)
Subject: AWP changes
Importance: High

All,
I just spoke with David Huebner and was informed (at least partially) of the First Data Bank AWP
situation. As I understand it First Data Bank has recalculated the way it reports AWP on January 1 2002.
The effect of this is an immediate increase in trend for our clients, increase in rebates, increase in admin
fee etc. Dave also mentioned that Pharma was balking at the increase and talking about class action
suits against First Data Bank.

This has a very high impact potential for out clients. We need to get together a message to be proactive
with our clients. I think that our window of time is very short - we already have one client up in arms that
we did not tell them earlier.

Ryan - should this be a corporate initiative? Jim can you provide more of the details?

Everett

2

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001763

# Exhibit R

FDB

Stuart – here are some ~~See Chris~~ additional AWP analyses.

① ~~to~~ the Top 100 drugs. separated by these that are common on the list of Top 100 and those ~~where~~ the WAC increase was less than the AWP increase.

② The remainder are reports showing Dec 2001 utilization at Feb 2002 AWP's. ████████████ ████████████████████████████ . This includes all brands & generics.

Chris
3/29/02

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY          ESI-414-00001768

| # | NDC | Drug Name | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 71015623 | LIPITOR 10MG | 311610 | 13476538 | 2.30930 | 2.30930 | 2.30933 | 2.30933 | $31,121,369.20 | $31,121,773.50 | $31,121,773.50 |
| 3 | 18007423 | PRILOSEC 20MG | 298844 | 10304878 | 4.61460 | 4.61467 | 4.61467 | 4.43000 | $47,551,967.10 | $47,552,688.43 | $45,849,723.64 |
| 4 | 30030461 | PREVACID 30MG | 233028 | 9904218 | 4.45540 | 4.27700 | 4.27700 | 4.27700 | $44,127,262.88 | $44,127,262.88 | $42,360,340.39 |
| 8 | 71016623 | LIPITOR 20MG | 160001 | 70700053 | 3.37330 | 3.37333 | 3.37333 | 3.37333 | $23,849,409.78 | $23,849,621.89 | $23,849,621.89 |
| 15 | 17304530 | FLONASE 50MCG | 121456 | 2279457 | 3.86960 | 3.86908 | 3.86908 | 3.71600 | $8,820,358.86 | $8,820,085.33 | $8,468,182.76 |
| 23 | 28881361 | CIPRO 500MG | 88701 | 1650611 | 4.32730 | 4.32733 | 4.32733 | 4.95210 | $7,143,554.44 | $7,143,803.99 | $8,174,991.15 |
| 26 | 31001311 | ZESTRIL 10MG | 85072 | 3825515 | 1.09480 | 1.09486 | 1.09486 | 1.06100 | $4,188,388.67 | $4,188,213.83 | $4,056,749.42 |
| 28 | 17901355 | WELLBUTRIN SR 150MG | 84109 | 5325160 | 1.83310 | 1.83317 | 1.83317 | 1.76983 | $9,781,906.23 | $9,781,532.47 | $9,371,358.72 |
| 38 | 31001321 | ZESTRIL 20MG | 72351 | 3628880 | 1.15980 | 1.15981 | 1.15989 | 1.13590 | $4,210,225.21 | $4,210,297.61 | $4,123,180.69 |
| 46 | 74288680 | BIAXIN 500MG | 55259 | 1129087 | 4.14290 | 4.14360 | 4.14300 | 4.14300 | $10,163,423.28 | $10,163,423.51 | $10,163,423.55 |
| 56 | 71080524 | NEURONTIN 300MG | 47476 | 5314083 | 1.40650 | 1.40650 | 1.40560 | 1.28630 | $7,488,907.71 | $7,488,488.12 | $6,880,203.73 |
| 60 | 71083223 | ACCUPRIL 20MG | 46218 | 2115079 | 1.12560 | 1.12560 | 1.12658 | 1.12658 | $2,380,732.92 | $2,380,048.32 | $2,380,048.32 |
| 62 | 31001301 | ZESTRIL 5MG | 45174 | 2049985 | 1.16630 | 1.16630 | 1.16533 | 1.02760 | $2,388,709.18 | $2,388,709.18 | $2,106,441.27 |
| 67 | 30015413 | PREVACID 15MG | 42424 | 1872849 | 4.37210 | 4.37210 | 4.37200 | 4.19733 | $8,188,065.83 | $8,188,065.83 | $7,860,965.29 |
| 79 | 14807100 | MACROBID 100MG | 37684 | 674448 | 1.88380 | 1.88380 | 1.88390 | 1.88390 | $1,270,592.59 | $1,270,592.59 | $1,270,592.59 |
| 84 | 17304500 | IMITREX 50MG | 34963 | 462098 | 17.17360 | 17.17360 | 17.17833 | 16.48667 | $7,935,781.45 | $7,935,781.45 | $7,618,467.23 |
| 87 | 71063623 | ACCUPRIL 40MG | 33996 | 1641175 | 1.12660 | 1.12660 | 1.12656 | 1.12656 | $1,847,306.58 | $1,847,306.93 | $1,847,240.83 |
| 97 | 71083023 | ACCUPRIL 10MG | 31356 | 1400292 | 1.12560 | 1.12560 | 1.12656 | 1.12656 | $1,576,112.68 | $1,576,112.66 | $1,576,112.66 |
| | | Weighted Total AWP Dollars | | | | | | | | $226,907,399.89 | $223,507,605.08 |
| | | $ Variance from FDB | | | | | | | | 1,762,287.63 | 5,161,862.35 |
| | | % Variance from FDB | | | | | | | | 0.771% | 2.257% |

Other Top 100 Drugs

| # | NDC | Drug Name | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 47 | 87607111 | GLUCOPHAGE 1000MG | 54921 | 4185810 | 1.42290 | 1.42290 | 1.42292 | 1.61220 | $5,955,989.05 | $5,956,072.77 | $5,748,362.88 |
| 5 | 85045603 | CLARITIN 10MG | 204436 | 7476218 | 2.61710 | 2.61710 | 2.66710 | 2.66710 | $21,817,628.83 | $21,817,822.33 | $19,947,822.23 |
| 6 | 25162651 | CELEBREX 200MG | 186149 | 9171884 | 2.75290 | 2.75290 | 2.75286 | 2.64280 | $25,249,279.46 | $25,248,912.55 | $24,239,455.04 |
| 9 | 601008 | VIOXX 25MG | 172580 | 6669037 | 2.75190 | 2.75188 | 2.75188 | 2.64180 | $18,187,408.92 | $18,187,276.74 | $17,459,753.55 |
| 10 | 62180315 | ORTHO TRI-CYCLEN 7-7-7 | 159390 | 5352519 | 1.15940 | 1.15935 | 1.15935 | 1.15935 | $9,205,710.53 | $9,205,442.90 | $9,205,442.90 |
| 10 | 46087056 | PREMPRO 0.625-2.5 | 156142 | 6482973 | 1.23320 | 1.16131 | 1.18131 | 1.18131 | $7,994,802.30 | $7,994,802.30 | $7,655,400.83 |
| 11 | 46087061 | PREMARIN 0.625MG | 157519 | 7643835 | 0.71080 | 0.71080 | 0.71075 | 0.75540 | $5,575,397.92 | $5,575,005.75 | $5,925,232.66 |
| 12 | 77731050 | PROZAC 20MG | 146376 | 7496026 | 3.11280 | 3.11283 | 3.11283 | 3.11280 | $23,333,629.73 | $23,333,846.81 | $23,333,629.73 |
| 13 | 68951066 | ZYRTEC 10MG | 139113 | 4874278 | 1.91770 | 1.91767 | 1.91767 | 2.03630 | $9,347,402.92 | $9,347,246.99 | $9,935,240.65 |
| 14 | 87606005 | GLUCOPHAGE 500MG | 136636 | 3502746 | 0.78260 | 0.78260 | 0.81100 | 0.78260 | $10,567,249.02 | $10,962,879.48 | $10,567,249.02 |
| 16 | 30321120 | PAXIL 20MG | 116701 | 4559672 | 2.82360 | 2.82360 | 2.82367 | 2.71140 | $12,876,186.55 | $12,875,573.77 | $12,363,636.84 |
| 17 | 69153008 | NORVASC 5MG | 116093 | 4870140 | 1.46110 | 1.46110 | 1.45111 | 1.45111 | $7,067,060.15 | $7,067,108.88 | $7,067,108.88 |
| 18 | 49490066 | ZOLOFT 50MG | 106454 | 4386683 | 2.52080 | 2.52080 | 2.52076 | 2.52060 | $11,057,775.04 | $11,057,760.51 | $11,057,960.61 |
| 19 | 46086791 | PREMARIN 0.625MG | 102702 | 3800917 | 0.72830 | 0.72830 | 0.72825 | 0.72825 | $2,768,207.85 | $2,768,017.81 | $2,768,017.61 |

| # | Code | Drug | Code2 | Code3 | Price1 | Price2 | Price3 | Amount1 | Amount2 | Amount3 |
|---|------|------|-------|-------|--------|--------|--------|---------|---------|---------|
| 20 | 49491086 | ZOLOFT 100MG | 95701 | 3832219 | 2.62000 | 2.62078 | 2.62080 | $9,660,267.66 | $9,660,104.37 | $9,660,267.66 |
| 21 | 45840200? | CELEXA 20MG | 91668 | 3563300 | 2.31440 | 2.24700 | 2.24700 | $9,246,901.52 | $8,006,735.10 | $8,006,735.10 |
| 22 | 6915406? | NORVASC 10MG | 90985 | 3772863 | 2.17440 | 2.17444 | 2.17444 | $8,203,713.31 | $8,203,884.22 | $8,203,884.22 |
| 30 | 18610805 | TOPROL XL 50MG | 81890 | 3380283 | 0.73860 | 0.67980 | 0.65200 | $2,497,223.71 | $2,304,034.58 | $2,209,812.52 |
| 31 | 6174061 | ZOCOR 20MG | 80035 | 3077929 | 4.13270 | 4.13267 | 4.16333 | $12,720,157.18 | $12,720,064.84 | $12,814,434.14 |
| 32 | 85111970 | NASONEX 50MCG | 76685 | 1481683 | 3.76650 | 3.62000 | 3.52000 | $5,590,786.68 | $5,216,659.36 | $5,215,559.36 |
| 33 | 49350078 | DIFLUCAN 150MG | 76489 | 124295 | 12.86230 | 12.86250 | 12.86250 | $1,600,690.19 | $1,600,715.04 | $1,600,715.04 |
| 34 | 85063501 | CLARITIN-D 12 HOUR 120-5MG | 76513 | 3765555 | 1.64310 | 1.60230 | 1.50230 | $8,220,045.42 | $5,687,039.28 | $5,687,039.28 |
| 35 | 85123301 | CLARITIN-D 24 HOUR 240-10MG | 76330 | 2502720 | 3.28400 | 3.00430 | 3.00430 | $8,223,937.92 | $7,518,821.70 | $7,518,821.70 |
| 36 | 46065800 | ULTRAM 50MG | 74570 | 3888166 | 0.99920 | 0.99817 | 0.85250 | $5,863,470.47 | $5,863,294.42 | $5,002,610.66 |
| 37 | 3517805 | PRAVACHOL 20MG | 72557 | 3068875 | 2.78110 | 2.78111 | 2.78111 | $8,534,848.26 | $8,534,878.95 | $8,534,878.95 |
| 38 | | | | | | | | | | |
| 39 | 46086881 | PREMARIN 1.25MG | 70048 | 3125171 | 1.01770 | 1.01769 | 1.04630 | $3,180,465.27 | $3,180,455.27 | $3,278,116.76 |
| 24 | 25542131 | AMBIEN 10MG | 88073 | 2698606 | 2.57430 | 2.57433 | 2.55300 | $6,947,021.43 | $10,139,602.62 | $8,889,541.12 |
| 26 | 29906812 | AUGMENTIN 876-125MG | 87600 | 1805432 | 5.61010 | 5.61000 | 5.38650 | $7,448,460.35 | $10,139,602.62 | $9,733,858.83 |
| 28 | 45152560 | LEVAQUIN 500MG | 86695 | 887192 | 8.88710 | 8.88571 | 8.87520 | $7,448,460.35 | $7,445,469.03 | $7,066,602.44 |
| 27 | 88110247 | ALLEGRA 60MG | 86598 | 4863246 | 1.18360 | 1.18376 | 1.18360 | $5,745,272.61 | $5,745,175.55 | $5,744,301.97 |
| 40 | 88109047 | ALLEGRA-D 120-60MG | 86717 | 3274117 | 1.32380 | 1.32388 | 1.33380 | $4,334,603.50 | $4,334,838.01 | $4,333,621.26 |
| 41 | 85078701 | K-DUR 20MEQ | 87701 | 4116388 | 0.58010 | 0.58000 | 0.58460 | $2,387,916.88 | $2,387,834.35 | $2,408,440.42 |
| 42 | 88110847 | ALLEGRA 180MG | 64016 | 2190681 | 2.35160 | 2.25740 | 2.25740 | $3,151,151.22 | $3,045,017.55 | $3,045,017.55 |
| 43 | 43107003 | SYNTHROID 100MCG | 63765 | 2978887 | 0.34900 | 0.34468 | 0.40680 | $1,039,631.56 | $1,039,571.99 | $1,211,811.23 |
| 44 | 17304400 | SEREVENT 21MCG | 62475 | 1054101 | 5.89570 | 5.88638 | 5.88638 | $8,214,663.27 | $8,214,325.95 | $8,214,325.95 |
| 48 | 43107003 | SYNTHROID 50MCG | 65416 | 2314029 | 0.30330 | 0.30325 | 0.35960 | $701,845.00 | $701,729.29 | $832,124.83 |
| 49 | 17304900 | FLOVENT 110MCG | 61600 | 834396 | 5.42950 | 5.42923 | 5.42923 | $4,530,353.08 | $4,530,127.80 | $4,530,127.80 |
| 60 | 13830304 | XALATAN 0.005% | 50944 | 1737727 | 21.20000 | 20.02000 | 20.02000 | $4,191,812.40 | $3,958,494.54 | $3,968,494.54 |
| 51 | 6011731 | SINGULAIR 10MG | 49936 | 1620256 | 2.91420 | 2.91433 | 2.64200 | $4,721,760.04 | $4,721,960.67 | $4,280,716.35 |
| 52 | 8083301 | EFFEXOR XR 75MG | 49933 | 2487324 | 1.36970 | 1.36967 | 2.61630 | $3,406,887.80 | $3,406,813.06 | $6,607,686.78 |
| 53 | 29906012 | AUGMENTIN 600-125MG | 49716 | 1090088 | 4.06130 | 5.29267 | 4.03700 | $4,301,274.09 | $5,605,403.28 | $4,275,538.28 |
| 54 | 48156068 | GLUCOTROL XL 10MG | 49387 | 2962895 | 0.75000 | 0.74898 | 0.76000 | $2,222,171.25 | $2,222,062.73 | $2,222,171.26 |
| 55 | 3519410 | PRAVACHOL 40MG | 48896 | 2188798 | 4.34650 | 4.34656 | 4.34656 | $9,513,610.51 | $9,513,741.83 | $9,513,741.83 |
| 2 | 68306075 | ZITHROMAX 250MG | 294902 | 1787462 | 7.18190 | 7.18222 | 7.18222 | $12,837,201.53 | $12,837,834.34 | $12,837,945.33 |
| 57 | 82178115 | ORTHO-NOVUM 7-7-7 | 46240 | 1581454 | 1.16170 | 1.16178 | 1.17060 | $1,837,175.11 | $1,837,270.00 | $1,851,260.05 |
| 58 | 48113003 | SYNTHROID 125MCG | 46148 | 2052286 | 0.40660 | 0.40566 | 0.47650 | $833,022.89 | $832,940.60 | $977,914.28 |
| 59 | 18610905 | TOPROL XL 100MG | 45499 | 2037013 | 0.97970 | 0.97987 | 0.97960 | $1,995,661.64 | $1,995,600.53 | $1,995,457.93 |
| 98 | 25590131 | AMBIEN 5MG | 30956 | 977418 | 2.07660 | 2.07660 | 2.07560 | $2,028,728.80 | $2,028,728.80 | $2,028,728.80 |
| 99 | 58210032 | TOPROL XL 200MG | 30375 | 1900337 | 1.42430 | 1.42430 | 1.42430 | $2,707,362.14 | $2,707,362.14 | $2,707,362.14 |
| 100 | 6073661 | ZOCOR 10MG | 30296 | 1161065 | 2.52730 | 2.52733 | 2.52733 | $2,934,334.30 | $2,934,369.13 | $2,934,369.13 |
| 88 | 38022310 | AMARYL 4MG | 33631 | 1920450 | 0.87470 | 0.87470 | 0.87470 | $1,679,817.62 | $1,679,817.62 | $1,679,817.62 |
| 88 | 83226530 | LOTREL 20-5MG | 33544 | 1476492 | 2.03360 | 2.03360 | 2.03360 | $3,000,560.63 | $3,000,560.63 | $3,000,560.63 |
| 88 | 63653171 | PLAVIX 75MG | 33111 | 1294746 | 3.94440 | 3.94444 | 3.80244 | $5,107,047.91 | $5,107,047.91 | $4,293,193.86 |
| 91 | 45097508 | PREMPRO 0.625-5MG | 32549 | 1286374 | 1.23320 | 1.18131 | 1.18131 | $2,335,456.02 | $2,335,456.02 | $1,523,150.40 |
| 91 | 68421030 | VIAGRA 50MG | 32386 | 2432202 | 9.55920 | 9.58933 | 9.58933 | $2,332,112.62 | $2,332,144.23 | $2,332,144.23 |
| 93 | 8083601 | EFFEXOR XR 150MG | 32198 | 1397548 | 2.86000 | 2.86000 | 2.86000 | $3,983,011.80 | $3,983,011.80 | $3,983,011.80 |
| 94 | 45640400? | CELEXA 40MG | 31870 | 1137661 | 2.41500 | 2.39170 | 2.34480 | $2,720,943.81 | $2,720,943.81 | $2,687,587.51 |
| 95 | 28321013 | PAXIL 10MG | 31820 | 1197130 | 2.70580 | 2.70633 | 2.59800 | $3,239,792.92 | $3,239,828.83 | $3,110,143.74 |

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001770

| Rank | NDC | Drug | | | | | | Weighted Total AWP Dollars | $ Variance from FDB | % Variance from FDB |
|---|---|---|---|---|---|---|---|---|---|---|
| 96 | 85113201 | PROVENTIL HFA 105MCG | 31638 | 2773353 | 5.42540 | 5.05672 | 5.06872 | $1,504,760.97 | $1,402,496.46 | $1,402,496.46 |
| 85 | 56017270 | COUMADIN 5MG | 34787 | 1717864 | 0.71360 | 0.71364 | 0.71360 | $1,225,867.75 | $1,225,936.46 | $1,225,685.99 |
| 88 | 86112802 | CLARITIN 10MG | 34733 | 1125510 | 3.36330 | 3.07533 | 3.07533 | $3,785,427.78 | $3,461,314.67 | $3,461,314.67 |
| 80 | 25152031 | CELEBREX 100MG | 38449 | 2346870 | 1.84230 | 1.84230 | 1.57660 | $3,854,284.60 | $3,854,284.60 | $3,700,075.24 |
| 81 | 9484402 | DETROL 2MG | 35870 | 2504773 | 1.63100 | 1.51733 | 1.51733 | $4,085,284.76 | $3,800,567.22 | $3,800,567.22 |
| 82 | 2871601 | HUMULIN 70/30 70-30U/ML | 38574 | 873472 | 2.65600 | 2.65600 | 2.65600 | $2,319,941.63 | $2,319,941.63 | $2,319,941.63 |
| 83 | 69153072 | NORVASC 5MG | 35477 | 1575845 | 1.45110 | 1.45111 | 1.42210 | $2,286,418.46 | $2,286,434.22 | $2,240,724.76 |
| 84 | 60748017 | ZOCOR 40MG | 42106 | 1722456 | 4.16330 | 4.16330 | 4.16333 | $7,171,101.00 | $7,171,101.08 | $7,171,152.74 |
| 69 | 82538001 | TRIPHASIL-28 6.5-10 | 41917 | 1475347 | 1.13180 | 1.09484 | 1.09464 | $1,669,797.73 | $1,614,973.84 | $1,614,973.84 |
| 70 | 83400001 | DIOVAN 80MG | 41310 | 1808907 | 1.39770 | 1.39767 | 1.39750 | $2,528,435.11 | $2,528,380.64 | $2,528,073.31 |
| 71 | 8257602 | ALESSE-28 0.1-0.02 | 41307 | 1406650 | 1.21680 | 1.17679 | 1.17679 | $1,711,490.04 | $1,656,213.97 | $1,656,213.97 |
| 72 | 62856024330 | ACIPHEX 20MG | 41157 | 1637726 | 4.08330 | 3.82000 | 3.82000 | $8,687,322.49 | $8,419,882.00 | $8,419,882.00 |
| 73 | 69312019 | ZITHROMAX 200MG/5ML | 41083 | 682987 | 2.02870 | 2.02867 | 2.02867 | $1,323,429.02 | $1,323,409.43 | $1,323,409.43 |
| 74 | 62190115 | ORTHO-CYCLEN 0.25-0.035 | 40775 | 1387470 | 1.49100 | 1.49085 | 1.17080 | $2,088,717.77 | $2,088,648.40 | $1,624,172.38 |
| 75 | 6093631 | FOSAMAX 10MG | 38917 | 1646030 | 2.31800 | 2.31300 | 2.22033 | $3,817,143.57 | $3,807,267.39 | $3,654,729.79 |
| 76 | 29609261 | AUGMENTIN 400-57MG/5 | 39913 | 4335294 | 0.69370 | 0.69380 | 0.70690 | $3,007,393.45 | $3,006,969.82 | $3,064,619.33 |
| 77 | 48109003 | SYNTHROID 150MCG | 38865 | 1766807 | 0.41800 | 0.41861 | 0.49060 | $738,764.26 | $738,781.84 | $862,870.71 |
| 78 | 2416530 | EVISTA 60MG | 38893 | 1418700 | 2.32470 | 2.32487 | 2.32487 | $3,288,051.89 | $3,288,009.33 | $3,289,009.33 |
| 63 | 46086481 | PREMARIN 0.9MG | 44554 | 1944868 | 0.90780 | 0.90733 | 0.90780 | $1,704,424.50 | $1,704,482.84 | $1,704,424.50 |
| 64 | 49155066 | GLUCOTROL XL 5MG | 44228 | 2479791 | 0.37910 | 0.37912 | 0.37900 | $940,068.77 | $940,138.36 | $939,840.78 |
| 65 | 597005801 | FLOMAX 0.4MG | 44209 | 1965968 | 1.84310 | 1.77230 | 1.70140 | $3,606,028.03 | $3,465,546.14 | $3,327,868.84 |
| 66 | 43901314 | COMBIVENT 103-18MCG | 43853 | 826350 | 3.23540 | 3.23540 | 3.23537 | $2,993,877.39 | $2,993,849.63 | $2,993,849.63 |
| 61 | 48106003 | SYNTHROID 75MCG | 46181 | 1938799 | 0.33820 | 0.33819 | 0.37000 | $655,682.43 | $655,701.82 | $768,703.20 |

Legend:
Weighted Total AWP Dollars
$ Variance from FDB
% Variance from FDB

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001771

# Exhibit S

**Roberts, Pamela (STL)**

| | |
|---|---|
| **From:** | Neville, Everette (BLM) |
| **Sent:** | Tuesday, March 19, 2002 8:27 AM |
| **To:** | Bascomb, Stuart L. (STL) |
| **Cc:** | Sommer, Sue (BLM); Roberts, Pamela (STL) |

Stuart,

Sue requested that I supply you with the information concerning ▮▮▮▮▮ request for information related to the First Data Bank AWP issue.  Below are is a synopsis of what has occured to date listed in chronological order.

- ▮▮▮▮▮ rebates go up dramatically in January 2002 relative to December 2001. ▮▮▮▮▮ has heard from the AZ rep that First Data Bank has adjusted AWPs.

- ▮ sends a strongly worded e-mail complaining about ESI's lack of consultation to him.

- I call and discuss the issue with ▮▮▮▮▮ mistakingly believed that ESI new about this in early January and did not inform him. He also thought that all Brands were raised on 1/1/02.  I explain to him (last Friday) that we just found out about the issue and that to date a limited number of drugs have been increased and that those were not all done in January. ▮ is placated but says that he expects us to provide him with information that he can use to educate his management. Basically, he wants to know how many drug to date? is this likely to continue? what will be the trend impact to him?  I have promised to get back with him later this week.

- Of note, ▮ actually heard this from more than one pharma company but did not pay it any attention (figuring it was a pharma ploy to rationalize a formulary change) until his rebates went up.  The actual cause of the rebate increase was not the AWP issue but PSG BACA options.

At this point several of the CPMs have been told versions of this information by pharma reps. I have given them all a high level view and instructed them not to discuss with their clients until they get direction in the form of talking points from management. It is only a matter of time before this becomes widely known by our clients since pharma is openly discussing this with them.

For reference I have included the section of ▮ e-mail related to the FDB issue:

```
*    Many manufacturer AWP / WAC prices were adjusted (5%-10%?) to reflect a WAC/ AWP
spread change made industry wide...16 2/3rds to 20 or 25????  Contracting
lingo.
*    This is March (end of 1st qtr) and have been preaching that the
success of ESI will largely be measured by helping me control, measure,
report Rx trend.  When was ESI going to tell me that the 14.6% trend I have
booked for ▮▮▮▮▮ drug benefit for calendar year 2002 may not happen
due to a industry wide WAC/ AWP change???  The change took place 1/1/2002!!
          Bottom line: lack of communication and a clear lack of
understanding on what is important to a client in    managing and
controlling drug trend.   I may be blowing this WAC/ AWP change out of
proportion (please tell      me I am wrong).   Right or wrong: ESI
management needs to better support my ESI team by supplying them  with
information they need to communicate ( rebate and industry information) ,
including Rx     management options and tools.  As I say, over and over , you
are my eyes and ears to Rx management     across the country.  Every new
management idea and tool should be brought  to your clients.  I may
listen to 100 of them and not like 97, but the 3 we agree on may make the
difference!  And in the end you    have served the client by giving us
the ideas and tools to manage! :

     Let's talk

>
>
```



HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY        ESI-414-00001794

# Exhibit T

*First Data Bank file*

**Express Scripts, Inc.**

# Memo

**To:**     Stuart Bascomb

**From:**   Chris Macinski

**CC:**     Beth Wingate

**Date:**   03/11/02

**Re:**     AWP and FDB

---

Stuart,

Approximately, six weeks ago, we became aware from the manufacturer that three drugs had had AWP increases without underlying cost changes. We called FDB and requested that the AWP be corrected. The response, at that time, was that the wholesalers via a survey set the AWP and that it did not matter what a manufacturer felt the AWP should be. They have a field in their data that gives the manufacturers suggested wholesale price, but this is not used in the final determination of what the AWP will be. They were very clear that to change the AWP to what the manufacturer suggested would not be a practice that they utilized.

At that time, I began researching vendors of AWP in case we were to determine that the philosophies of FDB were against our philosophies of drug pricing. I have determined that there are three major providers of AWP, First DataBank, Medispan and Micromedex. We are currently receiving data feeds from both First DataBank and Medispan. I have requested meetings with First DataBank and Micromedex. I will try to set up a meeting with Medispan also. We should determine the pricing philosophies of all of these vendors.

Friday, Jim Hill came to my office to report that he had just been talking with ████ They have determined that the increase in their AWP will increase the rebates and data fee that is paid to ESI by approximately ████ per month. They are requesting a contract change to utilize WAC plus versus AWP as the basis of our rebate and data fee calculations. I immediately called FDB to determine why they had increased an entire vendor. Below is the response.

The wholesalers feel that due to mergers and other pressures in the marketplace, they do not see a justification for having varying markups (by drug) within a manufacturer. The wholesalers also feel that a WAC plus 25% may be the best way to equalize the AWP. She (Kay Morgan of FDB) went on to say that it is very possible that we will see more vendors moved to the WAC plus 25% method of creating AWP. She also said that much of this has been prompted by the federal government inquiry into AWP for injectable drugs.

They have no interest in changing their philosophy.

● Page 1

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY            ESI-414-00001807

I have been researching other vendors of AWP for the past 3 to 4 weeks. I have information from Micromedex and Medispan (Facts & Comparisons.)

Micromedex's pricing policy is the following: They report what manufacturers give them as the Suggested Wholesale Price (SWP). On those manufacturers that do not give SWP, they set the AWP using historical ratios and the most consistent markups that the manufacturer wants. They feel that this philosophy makes the most sense, in light of government inquiry, to keep the manufacturer at the heart of the source of AWP.

Micromedex also said that they have heard from many PBM's since the first of the year.

Medispan's pricing policy is the following: They survey wholesalers and manufacturers (primarily wholesalers) and set the pricing from the results. (I am concerned that this is the same philosophy as FDB to some extent.)

I am trying to set up meetings with FDB, Micromedex and Medispan. Both FDB and Micromedex have said that they could meet at NCPDP. However, Micromedex is trying to set up a meeting sometime within the next 2 weeks. Medispan will call me back.

I am having Jodi De Jong run a comparison of the AWP's from Medispan and FDB. Micromedex will be happy to send us a file to do the same comparison with after we talk.

I am working with Jim Hill and Don Hagen to calculate the financial impact on rebates for George Paz and Joe Plum.

Next Steps:

- Evaluate impact (ESI, Pharma, Client)

- Meet with Vendors

- Solicit industry feedback (PCMA, Retail, Pharma, etc)

- Review contracts (Provider, Client, and Pharma)

● Page 2

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY

ESI-414-00001808

# Exhibit U

# Internal Memo



**EXPRESS SCRIPTS®**
*Charting the Future of Pharmacy*

*Executive Offices*

13900 Riverport Drive
Maryland Heights, MO 63043    <u>**FOR INTERNAL PURPOSES ONLY. DO NOT DISTRIBUTE**</u>
www.express-scripts.com
314.770.1666

**TO:**    Sales and Account Management

**FROM:**    Executive Offices

**CC:**    Bascomb, Stuart; Palmer Marc; Ignaczak, Ed; Sommer, Sue

**DATE:**    March 18, 2002

**SUBJECT:**    Average Wholesale Price (AWP) --- Industry Development

Some recent increases in reported Average Wholesale Price (AWP) across a number of therapy classes exceed increases in Wholesale Acquisition Costs (WAC). To date, the AWPs of such frequently prescribed drugs as Lipitor, Prevacid, Prilosec and Zestril, among others, have been affected.

Traditionally, AWP increases correspond to increases in WAC, which is the price quoted by manufacturers to wholesalers. According to First Data Bank, our pricing service, the recent adjustments were made to reflect a more consistent relationship between WAC and AWP across branded products. First Data Bank advises us that consolidation in the pharmaceutical manufacturing industry has driven many of these changes.

*Talking Points for Client Inquiries*

- We are aware of these changes in AWP and are analyzing the magnitude of the drug-cost impact on our clients and their members. Preliminary indicators suggest an overall impact across all therapy classes at approximately ▇▇▇ We have deployed a team of our most senior analysts to conduct a thorough study of these increases.

- It is premature at this point to draw any conclusions or recommend any specific course of action. We will have more definitive guidance for clients when we have more fully analyzed the data.

*Communication to Clients*

Please see the attached copy of a notification to our clients that is being distributed this week.

HIGHLY CONFIDENTIAL ATTORNEY's EYES ONLY    ESI-414-00001827

# Exhibit V

| | |
|---|---|
| **From:** | Abe, Karen (BLM) |
| **Sent:** | Monday, April 22, 2002 3:07 PM |
| **To:** | ▮▮▮▮▮▮ |
| **Cc:** | Anderson, Stephanie (BLM) |
| **Subject:** | AWP Info |
| **Attachments:** | AWP increase AL8.doc |



AWP increase
AL8.doc (25 KB)

*Karen L. Abe, RPh, MBA*
*Clinical Program Manager*
*Express-Scripts, Inc*
*kabe1@express-scripts.com*
*PH:  (360) 848-0680*
*FAX: (360) 848-0664*

1

ESI-414-00003693

**URGENT: EMERGING THERAPEUTIC ISSUES COMMUNICATION**

April 22, 2002

Dear Robert:

RE: Average Wholesale Price Increases

Pharmaceutical manufacturers make price changes throughout the year. As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe. Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%. The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost (WAC) and AWP for certain drugs. In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.

Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC. As this trend indicates, it is more important now than ever to put cost management strategies in place.

If we can answer any questions, or if you are interested in the Emerging Therapeutic Issues program and are currently not enrolled, please contact me at your convenience.

Sincerely,

Karen L. Abe, Clinical Program Manager
(360) 848-0680

cc: Stephanie Anderson

CONFIDENTIAL

ESI-414-00003694

# Exhibit W

| | |
|---|---|
| **From:** | Ptacek, Mary (BLM) |
| **Sent:** | Monday, April 15, 2002 9:48 AM |
| **To:** | |
| **Cc:** | |
| | Eichelberger, Bernadette (BLM); Edmunds, Sharon (STL); Crawford, Sue (BLM) |
| **Subject:** | AWP Increases |
| **Attachments:** | FDB_Impacted_NDC_List.xls |

Gary,

Here is additional information regarding the AWP increase that Kent Wuflestad called you about last week.  Let me know if you have
any questions.

Mary

**RE:  AWP Increase Announcement**

Pharmaceutical manufacturers make price changes throughout the year.   As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe. Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%. The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost (WAC) and AWP for certain drugs.  In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.   Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC.  As this trend indicates, it is more important now than ever to put cost management strategies in place.

Attached is a list of the products that had an AWP increase above a corresponding increase in WAC  throught the end of February.  To date the increases should result in an increase in trend to clients of 0.7 to 0.9%.  IF these increases are applied to all drugs that currently are WAC +16% (they would be raised to WAC+ 20%) then the trend impact would be in the 1.2 to 1.5% range.



FDB_Impacted_ND
C_List.xls (34 ...

1

NDC List for NDCs experiencing an unequal change in AWP and WAC
(AWP changed in excess of WAC)
Source: PriceCheck PC (First Data Bank)

| | | | |
|---|---|---|---|
| 00074258611 | BIAXIN | TAB 500MG | ABBOTT |
| 00074336811 | BIAXIN | TAB 250MG | ABBOTT |
| 00173033602 | BECONASE NA | AER INHALER | ALLEN&HAN |
| 00173038879 | BECONASE AQ | SPR 0.042% | ALLEN&HAN |
| 00173045301 | FLONASE | SPR 0.05% | ALLEN&HAN |
| 00310060412 | NOLVADEX | TAB 20MG | ASTZEN |
| 00310013410 | ZESTRIL | TAB 40MG | ASTZEN |
| 00310013510 | ZESTRIL | TAB 2.5MG | ASTZEN |
| 00310014110 | ZESTORETIC | TAB 10/12.5 | ASTZEN |
| 00310040239 | ACCOLATE | TAB 20MG | ASTZEN |
| 00310013010 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013034 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013039 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013110 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013134 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013139 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013173 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013210 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013234 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013239 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013273 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013310 | ZESTRIL | TAB 30MG | ASTZEN |
| 00310014210 | ZESTORETIC | TAB 20-12.5 | ASTZEN |
| 00310014510 | ZESTORETIC | TAB 20-25MG | ASTZEN |
| 00310040160 | ACCOLATE | TAB 10MG | ASTZEN |
| 00310040260 | ACCOLATE | TAB 20MG | ASTZEN |
| 00310089110 | SULAR | TAB 10MG CR | ASTZEN |
| 00310089139 | SULAR | TAB 10MG CR | ASTZEN |
| 00310089210 | SULAR | TAB 20MG CR | ASTZEN |
| 00310089239 | SULAR | TAB 20MG CR | ASTZEN |
| 00310089310 | SULAR | TAB 30MG CR | ASTZEN |
| 00310089339 | SULAR | TAB 30MG CR | ASTZEN |
| 00310089410 | SULAR | TAB 40MG CR | ASTZEN |
| 00310070510 | CASODEX | TAB 50MG | ASTZEN |
| 00310070530 | CASODEX | TAB 50MG | ASTZEN |
| 00310060060 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060430 | NOLVADEX | TAB 20MG | ASTZEN |
| 00310060018 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060075 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060490 | NOLVADEX | TAB 20MG | ASTZEN |
| 00186000131 | LEXXEL | TAB 5-5MG | ASTZEN LP |
| 00186000231 | LEXXEL | TAB 5-2.5MG | ASTZEN LP |
| 00186000168 | LEXXEL | TAB 5-5MG | ASTZEN LP |
| 00186107008 | RHINOCORT | SUS AQUA | ASTZEN LP |
| 00186107509 | RHINOCORT | AER 32MCG | ASTZEN LP |
| 00186502031 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186504031 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186502054 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186502228 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186504054 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186504228 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186074231 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186060628 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186060668 | PRILOSEC | CAP 10MG CR | ASTZEN LP |

CONFIDENTIAL

ESI-414-00003781

| | | | |
|---|---|---|---|
| 00186060682 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186074228 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074282 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074328 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074331 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074368 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074382 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186060631 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00075150543 | NASACORT | AER 55MCG/AC | AVENTIS |
| 00026286151 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026286148 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026851248 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851251 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851348 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851351 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851448 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855136 | CIPRO | SUS 5G/100ML | BAYER PHA |
| 00026286251 | PRECOSE | TAB 100MG | BAYER PHA |
| 00026851450 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855336 | CIPRO | SUS 10GM/100 | BAYER PHA |
| 00026286351 | PRECOSE | TAB 25MG | BAYER PHA |
| 00026851106 | CIPRO CYSTIT TAB 100MG | | BAYER PHA |
| 00087015846 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087015885 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087060942 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060945 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060985 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087120213 | MONOPRIL | TAB 40MG | BMS-PC |
| 00087149201 | MONOPRIL HCT TAB 10/12.5 | | BMS-PC |
| 24208027509 | OPTIPRANOLOL SOL 0.3% OP | | BSCH & LM |
| 00173045003 | IMITREX | TAB 100MG | CERENEX |
| 00173045900 | IMITREX | TAB 50MG | CERENEX |
| 00173040106 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040206 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040100 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040200 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040101 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040201 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 50242002608 | NUTROPIN AQ INJ 5MG/ML | | GENENTECH |
| 50242003235 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003249 | NUTROPIN | INJ 5MG | GENENTECH |
| 50242003441 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003450 | NUTROPIN | INJ 10MG | GENENTECH |
| 50242003654 | NUTROPIN | KIT DEPOT | GENENTECH |
| 00173058502 | VALTREX | TAB 1GM | GLAXOSMIT |
| 00173093303 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173093356 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173013555 | WELLBUTRIN TAB 150MG SR | | GLAXOSMIT |
| 00173094755 | WELLBUTRIN TAB 100MG SR | | GLAXOSMIT |
| 00173069500 | ADVAIR DISKU MIS 100/50 | | GLAXOSMIT |
| 00173069502 | ADVAIR DISKU MIS 100/50 | | GLAXOSMIT |
| 00173069602 | ADVAIR DISKU MIS 250/50 | | GLAXOSMIT |
| 00173069700 | ADVAIR DISKU MIS 500/50 | | GLAXOSMIT |
| 00173069702 | ADVAIR DISKU MIS 500/50 | | GLAXOSMIT |
| 00173069600 | ADVAIR DISKU MIS 250/50 | | GLAXOSMIT |
| 00083006230 | TEGRETOL XR TAB 200MG | | NOVARTIS |
| 00083006030 | TEGRETOL XR TAB 400MG | | NOVARTIS |
| 00083006130 | TEGRETOL XR TAB 100MG | | NOVARTIS |
| 00078017915 | LAMISIL | TAB 250MG | NOVARTIS |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 00078017905 | LAMISIL | TAB 250MG | NOVARTIS |
| 00078035105 | STARLIX | TAB 60MG | NOVARTIS |
| 00078035205 | STARLIX | TAB 120MG | NOVARTIS |
| 00149047101 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149047001 | ACTONEL | TAB 30MG | P&G PHARM |
| 00149047103 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149075202 | ASACOL | TAB 400MG EC | P&G PHARM |
| 00149040560 | DIDRONEL | TAB 200MG | P&G PHARM |
| 00149040660 | DIDRONEL | TAB 400MG | P&G PHARM |
| 00149071001 | MACROBID | CAP 100MG | P&G PHARM |
| 00071014423 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071014445 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071015523 | LIPITOR | TAB 10MG | PFIZER US |
| 00071022006 | ACCURETIC | TAB 20/12.5 | PFIZER US |
| 00071022206 | ACCURETIC | TAB 10/12.5 | PFIZER US |
| 00071022306 | ACCURETIC | TAB 20/25MG | PFIZER US |
| 00071080340 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071080540 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071041624 | NEURONTIN | TAB 600MG | PFIZER US |
| 00071042624 | NEURONTIN | TAB 800MG | PFIZER US |
| 00071052723 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071052740 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071053023 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053040 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053223 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053240 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053523 | ACCUPRIL | TAB 40MG | PFIZER US |
| 00071080524 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071015623 | LIPITOR | TAB 20MG | PFIZER US |
| 00071015640 | LIPITOR | TAB 20MG | PFIZER US |
| 00071080624 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080640 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080324 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071015723 | LIPITOR | TAB 40MG | PFIZER US |
| 00071015823 | LIPITOR | TAB 80MG | PFIZER US |
| 00071091348 | LOESTRIN FE | TAB 1/20 | PFIZER US |
| 00071091548 | LOESTRIN | TAB 1/20-21 | PFIZER US |
| 00071091648 | LOESTRIN 21 | TAB 1.5/30 | PFIZER US |
| 00071091745 | LOESTRIN FE | TAB 1.5/30 | PFIZER US |
| 00071091748 | LOESTRIN FE | TAB 1.5/30 | PFIZER US |
| 00071092815 | ESTROSTEP FE | TAB | PFIZER US |
| 00071092847 | ESTROSTEP FE | TAB | PFIZER US |
| 00029152611 | BACTROBAN | OIN NASAL 2% | SK BEECHA |
| 00032170801 | PROMETRIUM | CAP 100MG | SOLVAY |
| 00300154111 | PREVACID | CAP 15MG DR | TAP |
| 00300154119 | PREVACID | CAP 15MG DR | TAP |
| 00300304611 | PREVACID | CAP 30MG DR | TAP |
| 00300304613 | PREVACID | CAP 30MG DR | TAP |
| 00300304619 | PREVACID | CAP 30MG DR | TAP |
| 00300154130 | PREVACID | CAP 15MG DR | TAP |
| 00300370201 | PREVPAC | MIS | TAP |
| 00072140050 | ULTRAVATE | CRE 0.05% | WEST-SQUI |
| 00072145050 | ULTRAVATE | OIN 0.05% | WEST-SQUI |
| 00072571208 | LAC-HYDRIN | LOT 12% | WEST-SQUI |
| 00072026006 | DOVONEX | CRE 0.005% | WEST-SQUI |
| 00072026012 | DOVONEX | CRE 0.005% | WEST-SQUI |
| 00072140015 | ULTRAVATE | CRE 0.05% | WEST-SQUI |
| 00072145015 | ULTRAVATE | OIN 0.05% | WEST-SQUI |
| 00072254006 | DOVONEX | OIN 0.005% | WEST-SQUI |

CONFIDENTIAL

ESI-414-00003783

| 00072254012 | DOVONEX | OIN 0.005% | WEST-SQUI |
| 00072573028 | LAC-HYDRIN | CRE 12% | WEST-SQUI |
| 00072573038 | LAC-HYDRIN | CRE 12% | WEST-SQUI |
| 00072116006 | DOVONEX | SOL 0.005% | WEST-SQUI |
| 00072571214 | LAC-HYDRIN | LOT 12% | WEST-SQUI |

CONFIDENTIAL

ESI-414-00003784

# Exhibit X

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND; PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE FUND;
DISTRICT COUNCIL 37, AFSCME-HEALTH
& SECURITY PLAN; JUNE SWAN;
MAUREEN COWIE and BERNARD GORTER,

       Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri
corporation, and MCKESSON CORPORATION,
a Delaware corporation,

       Defendants.

Case No. 1:05-CV-11148-PBS

## DECLARATION OF CHRISTINA F. MACINSKI

I, Christina F. Macinski, declare as follows:

    1.      I have worked for Express Scripts ("ESI") for over 15 years and have held the position of Vice President of Pricing and Analytics since December 2001. I am fully familiar with the facts set forth in this Declaration based upon my personal knowledge, research and discussions with other knowledgeable ESI employees.

    2.      ESI is a pharmacy benefit management company ("PBM"). ESI provides services to entities such as employers, health plan sponsors, unions, coalitions, insurance companies, HMOs, and third party administrators ("Contracting Party" or "Contracting Parties" refers to any ESI client or clients who contract with ESI for pharmacy benefit management services).

    3.      In the first quarter of 2002, ESI observed that the average increase in the average wholesale price ("AWP") as published by First DataBank ("FDB") for certain prescription drugs was higher than in previous years. About this time, some of ESI's Contracting Parties also advised ESI that they had noticed or heard about this increase from pharmaceutical manufacturers and asked ESI to investigate.

    4.      ESI contacted FDB in March 2002 and was advised that the increase in FDB's AWPs occurred in part due to routine increases in drug prices at the beginning of the year. AWP generally is adjusted when the wholesale acquisition cost ("WAC") of a drug increases, which normally occurs in January. Some AWPs, however, increased without an underlying increase in WAC. In those instances, FDB advised that it applied a 25% markup over the WAC. FDB advised that it believed that it was necessary to increase the ratio to establish a more consistent relationship between WAC and AWP across branded products. It also advised that the change was prompted by several factors, including mergers between drug companies and the need to establish more pricing stability in Medicare and Medicaid. FDB informed ESI that ESI could release information about these increased ratios to anyone.

    5.      In April 2002, ESI began to notify Contracting Parties of the increase in AWPs and the increase in the WAC-AWP ratios used by FDB for certain drugs.

    6.      ESI received follow up inquiries from several Contracting Parties regarding this notice. Some Contracting Parties responded requesting additional information to assess the impact of these changes. .

I declare under penalty for perjury that the foregoing is true and accurate to the best o my knowledge.

Executed this _19_ day of February 2007

*Christina F. Macinski*

Christina F. Macinski

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | |
| Plaintiffs, | Civil Action:  1:05-CV-11148-PBS |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**[PROPOSED] ORDER GRANTING MCKESSON CORPORATION'S
MOTION FOR PARTIAL RECONSIDERATION
OF THE COURT'S JANUARY 25, 2007 ORDER REGARDING MCKESSON'S
MOTION FOR LEAVE TO FILE UNDER SEAL**

On February 20, 2007, McKesson Corporation ("McKesson") filed a Motion for

Partial Reconsideration of the Court's January 25, 2007 Order Regarding McKesson's

Motion for Leave to File Under Seal.  McKesson seeks leave to file under seal a discrete

set of third party documents and to publicly file redacted versions that redact only the

confidential information contained in those documents.  The Court, having considered all

documents in support and opposition thereto, hereby GRANTS McKesson's Motion for

Partial Reconsideration and grants leave for McKesson: (1) to file under seal Exhibits 4H,

4M, 4I, 6C through 6F, 6H through 6J, 6M through 6O, 6Q, 6R, 6T, 6U, 15B through

15F, and 21B to the Declaration of Lori A. Schechter in Support of McKesson

Corporation's Memorandum in Opposition to Class Certification ("Schechter Class

Declaration"), and to publicly file redacted versions of these exhibits; and (2) to replace

Exhibit 6B to the Schechter Class Declaration with a corrected Declaration of Christina

Macinski.


IT IS SO ORDERED.


DATED: _____          _____
                                        Hon. Patti B. Saris
                                        United States District Court Judge