UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST,
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY,
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE FUND,
DISTRICT COUNCIL 37, AFSCME - HEALTH
& SECURITY PLAN, JUNE SWAN,
MAUREEN COWIE and BERNARD GORTER,

    Plaintiffs,

  v.

FIRST DATABANK, INC., a Missouri
corporation, and McKESSON CORPORATION,
a Delaware corporation,

    Defendants.

Civil Action: 1:05-CV-11148-PBS

Judge Patti B. Saris

[FILED UNDER SEAL]

**DEFENDANT MCKESSON CORPORATION'S RESPONSE TO
PLAINTIFFS' PROFFER OF EVIDENCE AND
COUNTER-PROFFER REGARDING EVIDENCE ON INDIVIDUAL ISSUES**

**[AMENDED REDACTED VERSION PURSUANT TO ELECTRONIC COURT
ORDERS FILED JANUARY 25, 2007 AND FEBRUARY 23, 2007]**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................II

I.    PLAINTIFFS' PROFFER OF EVIDENCE IS IRRELEVANT TO
      THE DISPOSITIVE ISSUES IN THE CLASS MOTION....................................1

II.   PROOF OF CAUSATION AND INJURY REQUIRES
      EVIDENCE FROM EACH CLASS MEMBER AND THE
      PARTIES WITH WHOM THEY CONTRACTED. ............................................4

      •   Competition in the Market for PBM Services Resulted in
          Improved Financial Terms for TPPs............................................................4

      •   TPPs Learned of the Increase in FDB's AWP-WAC Ratios
          from PBMs Who Were in a Position to Extract from Retail
          Pharmacies and Share with TPPs Any Resulting Profits...............................6

      •   TPPs Also Learned of the Increases in the AWP-WAC Ratio
          from Consultants, Auditors, and Industry Participants....................................9

      •   TPPs Learned of or Obtained Information about Increases in
          the AWP-WAC Ratio on their Own. ...............................................................9

      •   Material Terms and Variations in Contracts Between TPPs and
          PBMs Counteracted Alleged AWP Inflation. ...............................................10

      •   TPP Contracts with PBMs Changed During the Class Period......................11

      •   Plan Design Mechanisms Automatically Counteracted Alleged
          AWP Inflation.............................................................................................14

      •   TPPs Revised Their Plan Designs to Counteract Alleged AWP
          Increases......................................................................................................15

      •   Self-Administered Prescription Drugs Were Dispensed at U&C
          Prices Below Discounted AWPs....................................................................16

      •   Reported AWPs Varied among the Three Major Publishers. ........................17

CONCLUSION......................................................................................................17

# TABLE OF AUTHORITIES

## CASES

Page(s)

*In re Pharmaceutical Industry Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)...................................................................................................1

*In re Polymedica Corp. Secs. Litig.*,
    432 F.3d 1 (1st Cir. 2005)........................................................................................................1

## STATUTES

Federal Rules of Civil Procedure
    Rule 23 ....................................................................................................................................1

## INTRODUCTION

Plaintiffs' "proffer" of "common evidence" attempts to mask the obvious deficiencies in their class certification motion. It focuses almost exclusively on defendants' alleged conduct, but fails to address the numerous individual issues of causation and injury that will overwhelm any trial. This will be the case even when *all* of the evidence regarding defendants' conduct is accurately presented, not simply the excised and incomplete evidence plaintiffs misleadingly cobble together. This response to plaintiffs' proffer will therefore describe some of the evidence regarding the individual issues of causation and injury that would be essential if this case were to be tried as a class action. In so doing, it will show that plaintiffs' proffer of "common evidence" is illusory. Common issues do not predominate, and the proposed class should not be certified.

## I.    PLAINTIFFS' PROFFER OF EVIDENCE IS IRRELEVANT TO THE DISPOSITIVE ISSUES IN THE CLASS MOTION.

At the class certification stage, a court may consider merits evidence, such as plaintiffs' proffer of evidence regarding defendants' conduct, only if it will affect the class determination. In "determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 77 (D. Mass. 2005) ("*Pharm. III*") (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (internal citation omitted)). To determine whether plaintiffs have satisfied the Rule 23 requirements, a court may "test disputed premises" through reviewing merits evidence "if and when the class action would be proper on one premise but not another." *In re Polymedica Corp. Secs. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005) (citation omitted). This is not the case here.

Plaintiffs' proffer deals only with the merits of certain liability issues and ignores the individual issues of causation and damages that this Court held precluded certification of the very same classes in the AWP MDL. *Pharm. III* at 95. Thus, while defendants' alleged conduct may constitute a "common" issue, plaintiffs' proffer of evidence avoids the causation and

1

damages issues that will be dispositive. McKesson's proffer will therefore address these dispositive issues based on the discovery to date.[1] However, before turning to these relevant causation and impact issues, McKesson makes the following brief observation about plaintiffs' liability proffer.

Plaintiffs allege here that First DataBank ("FDB") actively facilitated the inflation of the AWPs it published by scheming with a wholesaler, in this case, McKesson, to increase the WAC-AWP markup from 20% to 25%. Allegedly, when McKesson began raising its own prices by 5%, FDB stopped relying on pricing information from wholesalers other than McKesson to calculate its AWPs. Although FDB represented that it surveyed the three national wholesalers and calculated a weighted average of the wholesalers' own prices, plaintiffs allege that, in reality, FDB was secretly surveying only McKesson, and McKesson knew that. According to plaintiffs, this scheme ensured that FDB's published AWPs would mirror McKesson's own higher prices.

Yet materially omitted from plaintiffs' patchwork of documents is any evidence addressing McKesson's purported knowledge of FDB's scheme to raise prices by surveying only McKesson. This, of course, would be the crucial element for any alleged agreement or enterprise between McKesson and FDB to fraudulently set AWPs in this case. The omission is critical because the evidence is to the contrary.

First, before this lawsuit was ever filed, FDB's most knowledgeable witness testified unequivocally that it never told McKesson that it was at times the only wholesaler whose internal company pricing information FDB surveyed to derive its AWPs. *See* Ex. 7A (Morgan Dep. 537:6-10)[2] ("Q: Does McKesson know that it is the only wholesaler that you are surveying for purposes of the markup? A: No, I have never told them that."). [3] McKesson's lack of knowledge

---

[1] Discovery is continuing and may reveal other facts and evidence that addresses these issues.

[2] The Response to Plaintiffs' Proffer of Evidence and Counter-Proffer of Evidence on Individual Issues uses the abbreviations in the Table of Abbreviations attached to McKesson's Opposition to Class Certification.

[3] Declaration of Lori A. Schechter, Ex. 7A. All documents and testimony cited in McKesson's proffer are attached as exhibits to the Schechter Declaration and referred to hereinafter solely as "Ex. ____."

was verified most recently at the October 24, 2006, hearing on the proposed settlement between plaintiffs and FDB. In response to the Court's direct question on the issue, FDB's counsel again affirmed that FDB never told McKesson that it was the only wholesaler surveyed. (*See* Settlement Hr'g Tr. 66:25-67:4.)

Second, contemporaneous documents whose excerpts plaintiffs selectively quote also establish that McKesson believed for years that it was one of three national wholesalers being surveyed by FDB, consistent with FDB's public representations regarding its AWP derivation process. *See, e.g.*, Email from Robert James to Greg Yonko, et al., April 23, 2004, MCKAWP 0057171 (Exhibit 7 to Berman Decl.); Email from Robert James to Allen Watanabe, August 10, 2001, MCKAWP 0068311 (Exhibit 48 to Berman Decl.); Email from Robert James to Dale James, February 15, 2002, MCKAWP 0069591 (Exhibit 36 to Berman Decl.). Indeed, like other industry participants, McKesson subscribed to FDB's AWP publication services, believing that the AWPs FDB published were based on collective industry information, not McKesson's information, alone. Why else would they agree to pay tens of thousands of dollars for the data?

Third, since plaintiffs contend that FDB was a "monopolist" that could use its position "to raise the spread between AWP and WAC" on its own (Hartman Decl. ¶ 14), FDB did not need McKesson to accomplish AWP inflation and standardization in the first place. Thus, based on plaintiffs' own allegations, plaintiffs' fraud claim is wholly inconsistent at its core.

In any event, even when the unedited record of defendants' conduct is presented, the common elements of proof will still be outweighed by the class-member-by-class-member evidence required to prove causation and injury. Thus, if plaintiffs' misleading proffer demonstrates anything at all, it is that the common evidence will take up just a small percentage of the issues that will need to be addressed for all claims and defenses. The next section provides a glimpse of why this is so.

## II.   PROOF OF CAUSATION AND INJURY REQUIRES EVIDENCE FROM EACH CLASS MEMBER AND THE PARTIES WITH WHOM THEY CONTRACTED.

As explained in McKesson's brief in opposition to the class motion, the evidence developed thus far illustrates the individual issues on causation and injury that will need to be resolved for each class member.  Plaintiffs' proffer of common evidence does not address the class-member-by-class-member examination required not just for damages, but to determine whether each class member suffered any impact from the alleged artificial inflation in AWPs.[4] Set forth below is McKesson's proffer of some of the evidence on individual issues, varying from class member to class member, that will be necessary for any trial of the claims and defenses in this case.

- **Competition in the Market for PBM Services Resulted in Improved Financial Terms for TPPs.**

1.   The PBM market is highly competitive. *See, e.g.*, Ex. 4B (Madsen Dep. 165:10-18) (Caremark); Ex. 4C (Thigpen Dep. 60:2-61:13.) (Caremark); Ex. 22A (Einhorn Dep. 155:21-157:12, 165:10-18) (Teamsters Health and Welfare Fund of Philadelphia ("Teamsters")); Ex. 19A (Dowlen Dep. 43:22-44:11) (Pirelli Armstrong Retiree Medical Benefits Trust ("Pirelli")) (Q: "In your experience, do PBMs compete pretty aggressively against each other.  A: Oh, yeah, very competitive business.").

2.   As a result of this competition, a primary objective of one of the largest PBMs, Express Scripts, was to achieve the best pricing terms in pharmacy contracts that would, in turn, allow ESI to offer competitive pricing to its clients. *See* Ex. 6A (Ignaczak Decl. ¶ 17).  ESI renegotiated pharmacy contracts to obtain steeper discounts before, during, and at the end of a contract term when available in the current market conditions.  Since 2002, there has been a

---

[4] Plaintiffs' only proffer of common evidence purportedly addressing causation is (a) one e-mail purportedly describing how a retailer could profit from an increased spread; (b) charts with no identified source, purporting to show the "number of NDCs with spread change from 20-25%, 1999-2004"; and (c) a sample of contracts entered into by some of the named TPP plaintiffs. See Pl. Proffer 15-20.  Causation is not shown even on an individual basis, let alone a class-wide basis from this evidence because it does not show that increases in the WAC-AWP spread led to TPPs or consumers paying higher prices.  Moreover, plaintiffs' proffer of individual contracts illustrates that each TPP contract will need to be examined to determine, among other things, if a class member's contract contained any number of financial provisions that could affect the impact of an AWP increase, including the AWP-based reimbursement formula, rebates, fees, and the like.

trend of increasing discounts off AWP in the payment terms contained in ESI's pharmacy contracts. *See id.* ¶18. Similarly, another large PBM, Caremark, negotiated with pharmacies to obtain the best possible pricing terms it could obtain in the market. *See* Ex. 4B (Madsen Dep. 149:3-9.)

3.    Competition in the PBM market allowed TPPs to pressure PBMs to offer TPPs the most competitive prices under current market conditions. *See, e.g.,* Ex. 19A (Dowlen Dep. 52:3-15) ("Q. Have you ever gone to a PBM and said, you're going to lose the business of this payer if you don't decrease the cost or increase the discount? A. Yes. Q. And what kind of response have you gotten in -- in those circumstances? A. It depends on how big of a client you're talking about and if you have a basis for what you're asking for. Such as, your competition is offering this; this is what I can get at the marketplace. Unless you meet that pricing, then we'll have to move the client.").

4.    Competitive market forces and rising AWPs led to reduced fees and increased discounts off AWP over time in PBM-TPP contracts, including mid-contract. *See, e.g.,* Ex. 19A (Dowlen Dep. 43:22-46:7); Ex. 6D (ESI-414-00001731), Ex. 6E (ESI-414-00001740), Ex. 60 (ESI-414-00002411) (ESI agreed to reduce fees mid-contract and increased the mail order brand discount from ███████████████████████

5.    PBMs engaged in a highly competitive bidding process for TPP contracts. For example, named plaintiff District Council 37 (Ex. 6P (ESI-414-00002432), Ex. 6Q (ESI-414-00002561-622) solicited requests for proposals for PBM services during the class period. District Council 37 retained a benefits consultant, the Segal Company, to assist with analyzing the proposals submitted in response to the RFP. Segal prepared written analyses of the responses that highlight the highly competitive nature of the process. *See, e.g.,* Ex. 5I (DC37 04737-63).

6.    PBMs passed through profits squeezed from pharmacies by increasing the percentage of rebates shared with TPPs. *See, e.g.,* Ex. 15B (MHS A_0005138-52), Ex. 15C (MHS A_0005153-59) (the Moyer Packing Company / PAID Prescriptions LLC contracts where

████████████████████████████████ Ex. 4J (CMK-
AWP012850-53), Ex. 4K (CMK-AWP012857-75), Ex. 4I (CMK-AWP012815-37) (increases in
pass-through percentage of rebates); Ex. 15D (MHS A_0005160-72), Ex. 15E (MHS
A_0005173-75), Ex. 15F (MHS A_0005177-85) (same).

      7.     PBMs took steps on their own to reduce net costs to TPPs to counteract AWP
increases, including by negotiating steeper discounts off AWP, increasing rebates, and increasing
the use of mail order. *See, e.g.,* Ex. 15A (MEDCO 00195) ("Based on average wholesale price
(AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5% in 2002, a
level significantly higher than in years past. Working on behalf of its clients, Medco Health was
able to offset this inflation through pharmacy discounts, rebates, and increased use of the home
delivery (mail) pharmacies, where unit costs are significantly lower. As a result, the net increase
in unit costs for Medco Health's clients was 5.5 percent (net of AWP discounts and rebates), a
full percentage point lower than the increase in AWP.").

- **TPPs Learned of the Increase in FDB's AWP-WAC Ratios from PBMs Who Were
  in a Position to Extract from Retail Pharmacies and Share with TPPs Any Resulting
  Profits.**

      8.     For example, as early as January 2002, Express Scripts learned that the AWPs for
specific drugs had increased without a corresponding increase in the WACs for those drugs. *See*
Ex. 6M (ESI-414-00001807).

      9.     As it became apparent that FDB had increased the ratio between its published
AWPs and WACs, Express Scripts initiated an internal review to compare the AWP information
published by the three main publishers, FDB, Medispan, and Redbook. *See* Exs. 6L, 6M (ESI-
414-00001805-1808). Express Scripts' internal review indicated that as of March 2002, 830
NDCs had been affected, with the AWPs for 650 NDCs going up and the remaining 180 going
down. *See* Ex. 6H (ESI-414-00001762).

10.      On or before March 11, 2002, Kay Morgan, an FDB employee, told Express Scripts that "it is very possible that we will see more vendors moved to the WAC plus 25% method of creating AWP." *See* Ex. 6M (ESI-414-00001807).

11.      On March 15, 2002, Express Scripts personnel spoke with FDB personnel by phone. FDB explained that AWP increases would happen with the next increase in WAC: "If the survey shows that the AWP should be moved to WAC plus 25% then it will be moved at the next WAC increase. . . . AWP adjustments are made when a price increase occurs." *See* Ex. 6K (ESI-414-00001802). First Databank said Express Scripts "could release this information to anyone [it] wanted to." *See* Ex. 6K (ESI-414-00001802). An internal Express Scripts memorandum prepared after the call with FDB states: "According to First Data Bank, our pricing service, the recent adjustments were made to reflect a more consistent relationship between WAC and AWP across branded products." *See* Ex. 6N (ESI-414-00001827).

12.      In turn, Express Scripts personnel understood that all AWPs would eventually be moved to WAC + 25%. An internal email from March 22, 2002 states: "The analysis from Dec to Feb of last year has been completed. This study has shown that the increase is approximately 1% higher in 2002 than it was in 2001. I believe this confirms what FDB had to say on the conference call FRiday [sic] that these type of changes primarily started in January of 2002. My guess is that *we will see them continue to be adjusted until all manufacturers and drugs are at the WAC + 25% range.*" *See* Ex. 6G (ESI-414-00001760 (emphasis added)).

13.      Express Scripts anticipated in March 2002 that it would have to negotiate steeper discounts to accommodate the AWP increases: "If the AWP becomes an unreliable factor, a pricing paradigm shift may be required. ███████████████████

███████████████████████████████████    *See* Ex. 6H   (ESI-414-00001762.)

14.      After Express Scripts learned about the increases in AWP-WAC ratios, Express Scripts disseminated a client alert, entitled "Average Wholesale Price Increases," for distribution to clients beginning in April 2002. The alert states:

> Pharmaceutical manufacturers make price changes throughout the
> year. As we have documented in Express Scripts' annual *Drug
> Trend Report*, for the last four years the average increase in
> Average Wholesale Price ("AWP") has exceeded 5%. The first
> wave of price increases typically take place in the January through
> February timeframe. Over the last couple of years these increases
> have averaged 1 to 1.5%. This year, however, the increase for the
> period January through February timeframe is closer to 2.5%. The
> increase for this period also includes an adjustment to increase the
> difference between wholesale acquisition cost ("WAC") and AWP
> for certain drugs. In other words, a little less than half of the total
> increase is due to AWP increases that are in excess of the
> corresponding increase in WAC.
>
> Upon our inquiry to our pricing service, First Data Bank (the
> industry's primary source for AWP information), the recent AWP
> adjustments were made to establish a more consistent relationship
> with WAC. As this trend indicates, it is more important now than
> ever to put cost management strategies in place.

*See* Ex. 6F (ESI-414-00001754).

15.    ESI's client alert was sent to TPPs. *See* Exs. 6R, 6T (ESI-414-00003693-94, 3780-
84). In some cases, the alert was sent beneath a headline indicating "Urgent! Emerging
Therapeutics Issue Communication." *See* Ex. 6R  (ESI-414-00003694).

16.    ESI received follow up inquiries from several clients regarding this notice. Some
clients responded requesting additional information to assess the impact of these changes. *See*
Ex. 6B (Macinski Decl. ¶ 6).

17.    In March 2002, ESI noted that "[a]t this point several of the CPMs have been told
versions of this information by pharma reps. . . . It is only a matter of time before this becomes
widely known by our clients since pharma is openly discussing this with them." *See* Ex. 6J (ESI-
414-00001794).

18.    ESI has renegotiated pharmacy contracts to obtain steeper discounts before, during,
and at the end of a contract term when available in the current market conditions. *See* Ex. 6A
(Ignaczak Decl. ¶ 18). Additionally, plaintiffs' former expert, Susan Hayes, testified that if
PBMs understood that retailer pharmacies were making more profits due to the alleged scheme,

the "logical assumption" is that PBMs would negotiate to get better deals from retailers. *See* Ex.
10A (Hayes Dep. 294:12-19). In approximately the last quarter of 2002, employees in
Caremark's pharmacy contracting department learned from Caremark's finance department that
the spreads on a large number of brand name drugs increased from 20% to 25%. *See* Ex. 4A
(Madsen Decl. ¶ 3). Caremark considered FDB's increased WAC-AWP ratios in its negotiations
with pharmacies. *See id.*

- **TPPs Also Learned of the Increases in the AWP-WAC Ratio from Consultants,
  Auditors, and Industry Participants.**

19.    Peabody Energy Corporation, an employer-plan TPP, learned that FDB's AWPs
were higher than Redbook's AWPs from its claims auditor, KPMG, during an audit of Medco's
administration of Peabody's 2001-2002 claims. The audit report states: "KPMG reviewed the
First DataBank and Red Book WAC and AWP unit prices. The AWP unit prices were usually a
25% markup over WAC. There were some cases the markup was 20%. For 12 out of the top 30
mail order NDCs, the FDB markup over WAC was 25% while the Red Book markup over WAC
was 20%." *See* Ex. 14A (KPMG 0305-0312).

20.    Humana, another TPP, learned from its claims processor, Argus Health Systems,
that FDB's AWPs were unusually higher than the AWPs published by Redbook. *See* Ex. 12A
(Fleming Dep. at 158:13 – 160:11-15).

- **TPPs Learned of or Obtained Information about Increases in the AWP-WAC Ratio
  on their Own.**

21.    ████████████ a TPP, noticed that its rebates spiked in January 2002 and heard about
the AWP increase "from more than one pharma company." In March 2002, after confirming the
increases in AWP-WAC ratios with the drug manufacturer AstraZeneca, it alerted its PBM,
Express Scripts, of the unusual increase in AWPs and pressured Express Scripts to strategize
cost control measures to address this increase. *See* Ex. 6J ( ESI-414-00001794.)

22.    Some TPPs, particularly large and sophisticated TPPs, subscribed to FDB and
therefore received WAC and AWP pricing information directly from FDB. These include: Aetna

9

(Ex. 1A (Jackson Dep. 188:2-7)), Blue Cross Blue Shield of Montana (Ex. 3A (Wong MDL Dep. 17:19-18:6 (Sept. 28, 2004)), Humana Inc. (Ex. 12B (Fleming MDL Dep. at 19:9-22)), and John Deere Health Care Inc. (now part United Healthcare) (Ex. 13A (Sidwell Dep. 62:13-63:1)). TPPs with access to FDB data could readily observe the differences between WAC and AWP, both prices were published. *See* Ex. 8A (Hartman Dep. 55:13-24).

23.    Some TPPs carefully track drug trends and could observe the increasing drug costs allegedly caused by the increased AWP-WAC ratios. *See, e.g.*, 13A (Sidwell Dep. 53:13-22) (John Deere monitors claims processed on a daily basis, its costs per claim, many other drug trends); Ex. 21A (Cannon Dep. 11:2-17) (SelectHealth tracks "national trends," "internal trends," and "contracting trends across the country.").

24.    Each of the three largest PBMs published reports that highlighted the anomalous increase in AWPs in 2002. Medco's May 2003 Drug Trend Report reported that the 2002 AWP increases were "significantly higher than in years past." *See* Ex. 15A (MEDCO 000195). Caremark's June 2003 TrendsRx Quarterly characterized the 2002 increases as "larger than normal," while the October 2003 edition reported that 2003 price increases were "close to 2001 levels and 2% below the AWP anomaly of 2002." *See* Exs. 4D, 4E (CMK-AWP 0001793, 1797.) Express Scripts Drug Trend Reports indicate that certain drugs showed unusual spikes in the cost of particular Appendix A drugs in 2002. For example, in 1999, 2000, and 2001, Express Scripts reported percentage increases in Claritin 10 mg at 2.5%, 8.8% and 9.3%, respectively. Then in 2002, the cost of Claritin spiked to 21.2%, a significant increase compared with previous years. *See* Ex. 6V (ESI-277-00012370-72).

- **Material Terms and Variations in Contracts Between TPPs and PBMs Counteracted Alleged AWP Inflation.**

25.    TPPs automatically received greater rebate payments as a result of the increased AWP-WAC ratios when rebate contracts were based on a percentage of AWPs. *See, e.g.*, Ex. 6M (ESI-414-00001807-1808) (stating that the increase in AWP markups increased the drug manufacturer ███ "rebates and data fee that is paid to Express Scripts by approximately

███████ per month"). Several manufacturers offered rebates based on AWP during the class period. *See, e.g.*, Ex. 21B (SELHLTH/NEC 0379-407) (rebates paid to SelectHealth for Atrovent were based on AWP).

26.    Some TPP-PBM contracts mandated that the parties renegotiate reimbursement rates in response to material changes in drug industry practice. For example, two named plaintiffs, Pirelli-Armstrong and New England Carpenters, had such provisions in their PBM contracts with AdvancePCS. *See, e.g.*, Ex. 16B (CARP-00028), Ex. 19B (PIRELLI-FDB 0000163) ("If there occurs a material change in drug industry practice which materially alters the rights and obligations of AdvancePCS under this Agreement, the parties will attempt to equitably adjust the pricing under this Agreement. If the parties are unable to agree upon an equitable adjustment, this Agreement will terminate on 60 days after notice by either party of such termination."). *See also* Ex. 9A (HP/NEC 0995-96; HP/NEC 0988-1070) (permitting renegotiations in response to an "adjustment event," defined to include any event that affects total contract costs by 0.75%, and making any renegotiated terms retroactive to date of event).

27.    Some TPPs had "most favored pricing" provisions in their contracts, ensuring that their reimbursement rates would equal the most competitive rates offered by the PBM to a similarly situated TPP. For example, named plaintiff New England Carpenters had "most favored pricing" under its contract with Medco, negotiated through the NLAHCC labor coalition. *See, e.g.*, Ex. 16C (CARP-00072); *see also* Ex. 11A (HCCCC-AWP0254-55) (HCCCC coalition enforced "most favored pricing" provision to lower reimbursement rates from 1999 to 2002).

• **TPP Contracts with PBMs Changed During the Class Period.**

28.    TPP's contracts and negotiations changed over time, responding to competitive forces and available information regarding increased AWPs. Named plaintiff District Council 37 Health & Security Plan ("DC37") entered into a three-year contract with National Prescription Administrators ("NPA") effective September 1, 2001, with discounts of 13% off of AWP for branded retail drugs and 18% off of AWP for branded mail order drugs. *See* Ex..5C (D37 0496,

11

0480-500). In April 2002, Express Scripts ("ESI") acquired NPA and assumed control of the contract with DC37. In late 2002 or early 2003, during the second year of a three-year contract, DC37 and ESI entered into discussions regarding pricing concessions. *See* Esperon Dep. 5A (122:5-136:7). Specifically, DC37 wanted, and ESI offered, greater discounts and lower dispensing and administrative fees.[5] The mail order discounts and reduced fees are memorialized in an exchange of correspondence in the spring of 2003. Thereafter, effective January 1, 2004, District Council 37 requested and received still another round of price concessions that reduced ingredient costs for brand-name prescription drugs at retail and mail order by an additional ███ *See* Ex. 6D (ESI-414-00001731), Ex. 6E (1740-41); Ex. 5B (D37 0447, 0446-0461); Ex. 5A (Esperon Dep. 133:5-136:7). District Council 37 achieved an overall decrease of 11.2% in its prescription drug cost per member per month in 2001. *See* Ex. 5H (D37 01406) ("The overall decrease [was] due to the change in the prescription drug benefit effective July 1, 2001.").

29.    Industry publications confirm that TPPs were able to negotiate lower net reimbursement rates over the class period. *See, e.g.,* Ex. 17B (2006 PBMI Report at 4-5) (reporting that discounts off AWP increased and dispensing fees decreased from 2001 to 2005); Ex. 17A (2004 PBMI Report at 7) (reporting that administrative fees decreased from 2001 to 2003); *id.* at 10 (reporting that TPPs' share of manufacturer rebates increased from 2001 to 2003); 10A (Hayes Dep. 220:7–223:6) (attributing decrease in reimbursement rates to industry's successful response to the artificial AWP increase alleged by plaintiffs); Ex. 4L (CMK-AWP-013102-76), Ex. 4M (013201-207) (TPP received ██ increase in discount off AWP in 2003);

---

[5] *See, e.g.,* Ex. 5A (Esperon Dep. 192:3-193:16) ("Q. At the meeting you had with Express Scripts representatives in late 2002, early 2003, did they offer to reduce their administrative fees? A. Yes. Q. And is the proposal that's set out in your April 8th, 2003 letter the offer that Express Scripts made at the meeting? A. Yes. Q. And does your April 8th letter also reflect a proposal Express Scripts made at that meeting to reduce the formulary administrative fee? A. Yes. Q. And does the letter also reflect a proposal by Express Scripts at that meeting to increase the mail order brand discount? A. Yes. ... Q. Does the increase of the mail order brand discount from AWP minus 18 percent to AWP minus 20 percent that's set out in your April 8th letter reflect the offer that Express Scripts made at your meeting with them in late 2002, early 2003? ... A. I believe it does. Q. And those are the numbers that they offered at that meeting? A. I believe so. ... Q. And did Express Scripts also offer at your meeting in late 2002 or early 2003 to eliminate the mail order dispensing fee? A. Yes.")

Ex. 4G (CMK-AWP-011559-76), Ex. 4H (011582-95) (TPP increased discount off AWP by
███ per year from 1999 to 2004).

   30.   TPPs were able to negotiate new and improved reimbursement contracts during the
class period when their contracts expired. *See, e.g.*, Hartman Dep. 141:8-23 (contracts expired
during class period); Ex. 16B (CARP 00026-58), Ex. 16C (CARP 00059-90) (named plaintiff
New England Carpenters negotiated new contract after expiration); Ex. 22F (THWF 1849-1863);
Ex. 22G (THWF 3199-3244) (named plaintiff Teamsters negotiated new contract after
expiration).

   31.   Some TPPs were able to terminate their PBM contracts without cause over the class
period, and either switch PBMs or renegotiate more favorable reimbursement rates with their
current PBMs under threat of termination. For example, named plaintiff Teamsters had a
termination-without-cause provision in its PBM contract. *See, e.g.*, Ex. 22F (THWF 1861)
("Either party may terminate this Agreement for any reason, or no reason, upon sixty (60) days'
advance written notice.") Named plaintiff District Council 37, through its benefits consultant,
solicited bids only from PBMs that would allow it to terminate without cause. *See, e.g.*, Ex. 5I
(DC37 04740, DC37 04737-04763) ("Each vendor was also requested to agree to a three-year
contract, granting the Plan the right to terminate the contract, for any reason, upon 60-days
advance written notice. These provisions provide the Plan with the benefit [of] guaranteed
discounts, fees, and rebates while retaining the ability to consider other proposals if there is a
significant change in the competitiveness of the PBM marketplace.")

   32.   Plaintiffs' withdrawn industry expert noted that the size of discounts off AWP in
reimbursement contracts increased over the class period and opined that the increase was
attributable to FDB's decision to increase the markup. *See* Ex. 10A (Hayes Dep. 221:9-16) (Q:
"Can you think of any other reason why the discounts have gotten larger over time other than the
fact that the cost of drugs went up? A: Well, I think now looking back on it, I think it was
because the spread between WAC and AWP has increased. Q: Because of the allegations in the
complaint? A: Yes.").) Ms. Hayes suggested that the discounts increased as a natural

consequence of the larger spread, regardless of whether TPPs had known about any increases in AWP-WAC ratios. *See id.* (Hayes Dep. 222:17-223:5) (Q: "And because the retailers made more money, how did that wind up having an effect on the discount between the payor and the PBM? A: Because if the discount stayed the same, they would continue to make more money, they could then decrease the discount a little bit more to PBMs, and then PBMs to plan sponsors, because the spread -- you know, their cost to buy was going down.").)

33.    Some TPPs focused on bottom-line calculations of net cost (taking into account discounts, dispensing fees, rebates, administrative fees, and various other terms), not on any fixed relationship between WAC and AWP. *See* Ex. 10A (Hayes Dep. 263:16-265:15) (TPPs consider "total package" of "price-related terms"); Ex. 18A (A. Steinberg Dep. 38:2-7) (named plaintiff Teachers "just looked at the flat out bottom line of what it would cost"); Ex. 5A (Esperon Dep. 156:6-161:6); Ex. 22A (W. Einhorn Dep. 119:10-120:23, 123:6-125:12); Ex. 13A (Sidwell Dep. at 69:12-70:5) ("[T]o me it's a mathematical calculation of what is the lowest net cost. Whether it's a lower AWP and then a lower rebate or whether it's a higher AWP and a bigger rebate, we're worried about the net cost line.").

- **Plan Design Mechanisms Automatically Counteracted Alleged AWP Inflation.**

34.    TPPs required members to pay varying degrees of their drug costs directly through a variety of plan designs, reducing the amount borne by the TPP. *See, e.g.,* Ex. 17B (2006 PBMI Report at 8, Table 13) (reporting that members pay an average of 27% of drug costs directly, but that this portion varies from 1% to 51% depending on the plan design of the TPP).

35.    Some TPPs imposed deductibles so that their members would directly pay a certain fixed amount of drug costs before the TPP's coverage began. For example, named plaintiff Pirelli used a deductible during the class period. *See, e.g.,* Ex. 19C (PIRELLI-FDB 0000307-308) (member pays 100% of costs up to $250/year, copay amount between $250 and $1000/year, and TPP pays everything over $1000/year).

36.   Some TPPs excluded certain categories of Appendix A drugs, such as contraceptives, from coverage so that their members would bear the full cost of such drugs directly.   For example, named plaintiff Teamsters had such an exclusion.  *See, e.g.,* Ex. 22C (THWF 0030) ("The Fund will not pay any of the cost for . . . . Contraceptives."); Ex. 22A (Einhorn Dep. 79:21-90:18) (same).

37.   Some TPPs excluded drugs with over-the-counter alternatives from coverage so that their members would bear the full cost of the prescription alternatives directly.   For example, named plaintiff District Council 37 had such an exclusion.  *See, e.g.,* DC37 06402 ("[N]either Prilosec 20 mg; the higher doses of prescription strength Prilosec, nor its generic counterpart – omeprazole – will be covered by the Prescription Drug Benefit, when Prilosec OTC becomes available.").

38.   Some TPPs adopted "generic caps" under which members were required to pay directly the difference in price between a branded drug and its generic therapeutic equivalent.   For example, named plaintiffs New England Carpenters and District Council 37 had such provisions.  *See, e.g.,* Ex. 16D (CARP-00132-33); Ex. 16A (Buckley Dep. 58:8-59:21); Ex. 5A (Esperon Dep. 129:19 – 132:13).

- **TPPs Revised Their Plan Designs to Counteract Alleged AWP Increases.**

39.   TPPs had a variety of plan design components at their disposal and could modify them over time in response to changing conditions.   For example, when named plaintiffs New England Carpenters and District Council 37 sought to reduce costs during the class period, their benefits consultants recommended various options.  *See, e.g.,* Ex. 20A (SEGAL-CARPENTER-000293-299) (recommending a prior-authorization program, a "step-therapy" program, quantity limits, and increased copays, each resulting in cost reductions to the fund of 1.3% to 25%); Exs. 5D, 5E (D37 0705-A, D37 -711-A) (recommending various increases in copays and the introduction of a step-therapy program projected to save the fund between $37.4 million and $42.2 million).   PBMs made similar recommendations.  *See, e.g.,* Ex. 6W (ESI-277-00012600)

(Express Scripts recommending that TPP clients implement various programs to promote the use of cost-effective drugs, including tiered copays, a step-therapy program, among others); Ex. 15A (MEDCO 000228) (Medco recommending use of cost-sharing mechanisms, generic incentives, and drug exclusions as ways to reduce costs); Ex. 4F (CMK-AWP 001964-1965) (Caremark recommending variations on copay structure, drug exclusions, and generic incentives as ways to reduce costs).

40.    Some TPPs increased copays to increase the portion of drug costs that their members pay directly. *See, e.g.,* Ex. 17A (2006 PBMI Report at 8-9) (reporting that both retail and mail order copays increased over the class period); Exs. 19D, 19E (PIRELLI-FDB 0000329, 0000340) (named plaintiff Pirelli-Armstrong increased copays in 2001 and 2002); Exs. 22D, 22E (THWF 0150, 0183) (named plaintiff Teamsters increased copays from 2001 to 2003), Ex. 10A (Hayes Dep. 230:2-231:7, 251:22-252:13) (testifying that TPPs increase copays "all the time" to reduce costs to the TPP).

41.    Some TPPs with multi-tiered copay designs moved drugs from a more-favored tier to a less-favored tier so that their members would directly bear a higher portion of the cost of less-favored drugs. For example, named plaintiff Teamsters moved prescription proton pump inhibitors and non-sedating antihistamines into their own tier during the class period. *See, e.g.,* Ex. 22A (Einhorn Dep. 48:18-53:2).

42.    Changes in plan design had a material impact on net costs to TPPs during the class period. For example, named plaintiff District Council 37 was able to reduce its drug costs from 2001 to 2002, the first year of the alleged conspiracy. *See, e.g.,* Ex. 5H (D37 01405-01407); Ex. 5A (Esperon Dep. 381:20-385:24); *see also* Ex. 5F (D37 0859, 0831-869) (audit report attributing reduction in 2002 drug trend in part to increased discounts).

- **Self-Administered Prescription Drugs Were Dispensed at U&C Prices Below Discounted AWPs**

43.    TPP-PBM contracts typically provide for reimbursement at the lesser of (i) AWP minus a fixed percentage or (ii) the pharmacy's usual and customary ("U&C") price. *See, e.g.,*

Ex. 5C (D37 0496, 0480-500); Ex. 18B (PFTHW-FDB 000045, 000027-56); Ex. 16C (CARP-00073, 00059-90). U&C prices are set by pharmacies in response to local competition in order to create walk-in business. *See, e.g.,* Ex. 5L (DC37 06975, 06973-90) ("U&C is driven solely by competitive in the pharmacy provider's marketplace for a specific drug at a specific time in order to create walk-in business in their store.") PBMs estimated that, all told, 8% to 10 % of the prescriptions dispensed through their retail networks were reimbursed at U&C, rather than the AWP-based formula. *See* Ex. 5G (DC37 1067-68, 1064-69); Ex. 5A (Esperon Dep. 448:18-457:17).

- **Reported AWPs Varied among the Three Major Publishers.**

44.    FDB was not the sole source of AWPs used for reimbursements throughout the class period. *See, e.g.,* Ex. 6C (ESI-414-00001711, 1711-1730) (named plaintiff District Council 37 used Redbook as its pricing source for part of the class period); Ex. 6U (ESI-414-277-00002749) (the PBM National Prescription Administrators used Redbook as its pricing source); Affidavit of Doreen Weber ¶ 2) (Docket No. 79) (former employee of AdvancePCS stating that FDB was the pricing source for only 60% of claims processed by AdvancePCS, with Medispan used as the pricing source for the remainder).

45.    FDB, Medispan, and Redbook regularly published different AWPs for identical drugs. *See, e.g.,* Ex. 6I (ESI-414-00001768-1771) (Express Scripts document prepared in 2002 showing variations in ████████ among FDB, Medispan, and Redbook). Variations between the publishers continue to this day. *See* Ex. 5J (DC37 05545-5548) (2005 newsletter from the Pharmacy Benefit Management Institute reporting that prices differ between the three sources for 15% - 20% of prescription drugs, and that Redbook continued to use the "historical" markup of 20% unless it was instructed otherwise by the manufacturer).

## CONCLUSION

As this proffer of evidence makes clear, there are a myriad of individual issues that McKesson will be entitled to examine with respect to each class member before impact of the

alleged increase in the AWP-WAC ratios can be shown. These issues, rather than the common one proffered by plaintiffs, will predominate in any trial of this case. Class certification must therefore be denied.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
tel. 415-268-7000
fax 415-268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
One Liberty Square
Boston, MA 02109
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: March 2, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 2, 2007.

/s/ Lori A. Schechter
Lori A. Schechter