UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
NEW ENGLAND CARPENTERS HEALTH           )
BENEFITS FUND, PIRELLI ARMSTRONG        )
RETIREE MEDICAL BENEFITS TRUST,         )
TEAMSTERS HEALTH & WELFARE FUND         )
OF PHILADELPHIA AND VICINITY, and       )
PHILADELPHIA FEDERATION OF              )
TEACHERS HEALTH AND WELFARE FUND,       )
                                        )    Case No. 1:05-CV-11148-PBS
                    Plaintiffs,         )
                                        )
v.                                      )
                                        )
FIRST DATABANK, INC., a Missouri        )
Corporation; and McKESSON CORPORATION,  )
a Delaware Corporation,                 )
                                        )
                    Defendants          )
_____ )

**REPLY DECLARATION OF STEVE W. BERMAN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Steve W. Berman, hereby declare that:

1.     I am a partner of Hagens Berman Sobol Shapiro LLP, resident in its Seattle,

Washington, office, and I am one of counsel for the plaintiffs in the above-captioned matter.  I

submit this reply declaration in support of Plaintiffs' Motion for Class Certification.

2.     Attached are true and correct copies of the following exhibits:

| Exhibit | Description |
|---------|-------------|
| 1. | Excerpts from the Deposition of John R. Freeberry, dated May 20, 2004, taken in *In re Pharmaceutical Average Wholesale Pricing Litig.*, No. 01-12257 (D. Mass.) |
| 2. | Excerpts from a John Freeberry document regarding "Pricing News specs" (AZ0463637) |
| 3. | Email from John Freeberry, dated March 13, 2001 (AZ0432026) (Plaintiffs' Exhibit 139) |
| 4. | Email from Diane Ortiz, dated September 20, 2002 (MDL-CEN00103689) |
| 5. | Email exchange between Harry Goldenberg and Erin Conley, dated April 15-16, 2002 (ESI-414-00001875-1876) |
| 6. | Email from John Bonner, dated July 29, 2004 (MCKAWP 0076289) |
| 7. | Email from Robert James, dated October 9, 2001 (MCKAWP 0068599) |
| 8. | Excerpt from a McKesson Monthly Status Report, dated December 2002 (MCKAWP 0071671) |
| 9. | Email from Robert James dated March 15, 2002 (MCKAWP 0042663) |
| 10. | Email from Robert James, dated June 17, 2002 (MCKAWP 0084485) |
| 11. | Email from Robert James, dated September 18, 2001 (MCKAWP 0068514) |
| 12. | Email from Robert James, dated April 20, 2004 (MCKAWP 0071694) |
| 13. | Excerpt from an internal document entitled "AWP Discussion" (MCKAWP 0069612) |
| 14. | Email from Robert James, dated April 12, 2002 (MCKAWP 0084327) |
| 15. | Excerpt from an Email from Robert James, dated April 25, 2002 (MCKAWP 0069616) |
| 16. | Email from Robert James, dated July 28, 2004 (MCKAWP 0068131-32) **{REDACTED}** |
| 17. | Excerpts from the Deposition of William Fleming, dated November 9, 2006 |

| Exhibit | Description |
|---------|-------------|
| 18. | Letter from Jennifer Chase, regarding Average Wholesale Price Increases, dated April 13, 2002 (ESI-414-00003745) |
| 19. | Email from Jason Dohm, dated April 16, 2002 (ESI-414-00004101) |
| 20. | Email from Kent Waflestad, dated May 13, 2002 (ESI-414-00003711-12) |
| 21. | Excerpts from the Deposition of Tina Wong, dated November 14, 2006 |
| 22. | Excerpts from the Deposition of Andrea Grande, dated October 11, 2006 |
| 23. | Excerpts from the Deposition of James T. Kenney, Jr., dated October 11, 2006 |
| 24. | Excerpts from the Deposition of H. Eric Cannon, dated October 11, 2006 |
| 25. | Excerpts from the Deposition of Matthew Gibbs, dated October 27, 2006 |
| 26. | Excerpts from the Deposition of Donny Dowlen, dated October 19, 2006 |
| 27. | Excerpts from the Depositions of Rosaria Esperon, dated November 16, 2006 and January 8, 2007 |
| 28. | Excerpts from the Deposition of Earl W. Seymour, dated October 19, 2006 |
| 29. | Excerpts from the Deposition of William Einhorn, dated October 5, 2006 |

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of March, 2007.

/s/ Steve W. Berman
STEVE W. BERMAN

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on March 19, 2007.

/s/ Steve W. Berman
Steve W. Berman

# Exhibit 1

Page 1

H I G H L Y   C O N F I D E N T I A L

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------X

IN RE PHARMACEUTICAL INDUSTRY ) MDL No. 1456

AVERAGE WHOLESALE PRICE       ) CIVIL ACTION:

LITIGATION                    ) 01-CV-12257-PBS

                              ) Judge Patti B. Saris

-----------------------------X
THIS DOCUMENT RELATES TO      )

01-CV-12257-PBS and 01-CV-339 )
-----------------------------X


            THURSDAY, MAY 20, 2004


        Deposition of JOHN RICHARD FREEBERRY, held

at the Law Offices of McCarter & English, 919 North

Market Street, Suite 1800, Wilmington, DE, before

Cindy Sebo of Spherion Deposition Services, Notary

Public in and for the State of Maryland.

39b4e154-9b8d-41d9-8a5b-4f4a764c09ba

| Page 118 | Page 120 |
|---|---|
| 1  provide to pharmacies that has details on<br>2  individual brands, that is -- kind of goes to the<br>3  patient, take this twice a day or drowsy, those<br>4  kind of things.<br>5       So sometimes they have information<br>6  that's incorrect for our brands, and sometimes I<br>7  get involved in communicating that information --<br>8  facilitating that communication with Kay Morgan,<br>9  so -- and that happens sporadically once or twice<br>10  a year.<br>11     Q    Other than during the dispute and the<br>12  regular communications that you would send to<br>13  First DataBank related to price changes or for new<br>14  brands, are there any other occasions that -- that<br>15  you speak with or correspond with Kay Morgan<br>16  related to pricing?<br>17     A    On a routine basis that --<br>18     Q    At any time?<br>19     A    The one time that occurs to me, she<br>20  called in 2002 to say they were changing the<br>21  spreads on all of our brands.<br>22     Q    When did that conversation occur? | 1  remember the specifics.  It was a year and a half<br>2  ago.<br>3       And she's -- I think she probably -- I<br>4  can't remember what her response was.  I just<br>5  don't remember.  I'm sorry.<br>6     Q    Did you have a problem with the change?<br>7     A    Yes.<br>8     Q    What -- tell me why you had a problem<br>9  with the change.<br>10     A    The problem was they were artificially<br>11  raising our prices to our customers, and we were<br>12  very worried about the -- our managed care<br>13  customers, increasing our product costs to them.<br>14     Q    Did you express that you had a problem<br>15  with the change to Ms. Morgan at the time of the<br>16  call?<br>17     A    I'm sure I did.  I just don't remember<br>18  the conversation.<br>19     Q    What did you do after receipt of the<br>20  information?<br>21     A    We -- I informed others at our<br>22  organization at -- senior level people. |

| Page 119 | Page 121 |
|---|---|
| 1     A    It happened early 2002, January,<br>2  February.  I can't recall when.<br>3     Q    When did this conversation take place<br>4  in relation to your conversation with<br>5  Mr. Fullerton?<br>6     A    It was subsequent to that.<br>7     Q    Your conversation with Ms. Morgan was<br>8  after your conversation?<br>9     A    Yes, right.<br>10     Q    Had you sent Ms. Morgan anything --<br>11  what prompted her call to you?<br>12     A    She called me, told me they were making<br>13  these changes.  She wanted to alert me to that<br>14  fact.<br>15     Q    What specifically did she tell you?<br>16     A    She said we decided to change all<br>17  branded products that were 20 percent spread to<br>18  25 percent.<br>19     Q    What was your response?<br>20     A    I said, why are you doing that?  I'm<br>21  trying to recall what her response was.  Of<br>22  course, I must have asked her why.  I can't | 1     Q    Who?<br>2     A    In managed care and in -- in -- I don't<br>3  remember who else.  Managed Care was involved.  I<br>4  guess my superiors.<br>5     Q    Who exactly did you inform?<br>6     A    I know Marian McCourt was -- was a key<br>7  person.  There may have been Jeff Alverson, I<br>8  guess.  Some people in Finance.<br>9     Q    How did you inform them -- actually,<br>10  was there anybody else that you informed other<br>11  than Marian, Jeff and some people in Finance?<br>12     A    I can't remember.  I may have included<br>13  Stuart or Legal Department.  I just don't<br>14  remember.<br>15     Q    How did you communicate -- how did you<br>16  inform these persons of what Ms. Morgan had told<br>17  you?<br>18     A    I suspect it was an E-mail, but I don't<br>19  remember.<br>20     Q    Do you recall any responses that you<br>21  received?<br>22     A    We met as a group.  We talked about it. |

31 (Pages 118 to 121)

39b4e154-9b8d-41d9-8a5b-4f4a764c09ba

# Exhibit 2

## How the spread impacts the industry and healthcare system

- Price Perceptions- as stated earlier, the AWP is typically used to compare prices so a higher spread inflates the prices of pharmaceutical products. As an example, the new AWP price for Nexium 40mg capsules is $4.32- it would have been $4.14 without the spread change.
- Pharmacy reimbursement- a higher spread translates into higher reimbursement to retailers and mail order pharmacies. The usual reimbursement formula for private third party and Medicaid RX's is anchored off of AWP- so a higher mark-up will increase the reimbursement level at least in the short term. In the longer term payers will no doubt adjust the reimbursement formulas to account for the higher spread.
- Contracting Rebates- if contracts specify rebates as a percent discount off of AWP vs WAC the rebate dollars will be impacted. An increase from 20% to 25% will represent a 4.2% increase in rebates for these contracts. Also, it is possible the increased spread can affect "best price" by increasing the discount on contracts based on AWP.
- Price Comparisons- since the AWP is used to compare the prices of competing products the change in spread will cause price differences to appear greater or lesser depending on the specific situation. For example, for competing products with the same spread before the change, the difference will be exacerbated if the spread changed for only one product. For example, the AWP for Nexium was 5.6 % greater than Aciphex. After the spread change it is 10.2% higher because Aciphex have not yet raised prices in 2002 and the spread remains at 20%. However, according to FirstDataBank the spread for all branded products will changed to 25% by the end of the 1st Qtr 2002.

## Impact of Changing the Spread from 20% to 25%

### Short Term Impact

Because patient cost is, in part, tied to AWP, overall, the impact is similar to the industry raising the price of every pharmaceutical 5%, but not collecting any of that revenue.

The largest negative factor is publicity that will misrepresent the actual amount of price increase that is occurring in the pharmaceutical industry. Families USA and other groups will almost certainly compare the AWP of products last year to the AWP this year and claim that the industry has raised prices 10% or more while inflation is in the 2-3% range. They may not report the fact that this move was not prompted by the pharmaceutical industry and that the pharmaceutical industry is not benefitting from it.

This can only exacerbate the negative publicity to the Pharmaceutical Industry in this current environment where the cost of pharmaceuticals is of concern to all. This is especially true when prices in the US are compared to Canada and other countries.

Also, to the extent that contracts discounts are anchored off of AWP, increased rebates and/or best price penalties are a possibility. (We are currently assessing AZ contracts in this regard)

### Longer Term

In the longer term, changing the spread for many products so that they are all similar will probably be a benefit to the industry and healthcare system. There just is not any good rationale for having different

AZ0463637

# Exhibit 3

**Redacted**

| | |
|---|---|
| **From:** | Freeberry, John |
| **Sent:** | Tuesday, March 13, 2001 8:56 AM |
| **To:** | Dominianni, Connie; Gupta, Mahendra M; Milby, Mark |
| **Cc:** | Harrison, Sarah S; Kowash, Kaylor P; Rickards, Mark L; Beamish, Don G; Hickey, Michael P; Lyons, Tom J |
| **Subject:** | Change in AWP Spread |

As you know, there has been a lot of discussion/criticism of the spread between the Wholesaler Acquisition Cost and the Average Wholesale Price (AWP). Most of the concern relates to the Medicare reimbursement of medications used in MD offices- where inflated AWP's provide profit to physicians and increased cost to the Medicare program. Because of these concerns, FirstDataBank- the major pricing service that provides WAC and AWP prices to the healthcare industry-is attempting to force consistency in the AWP spread at the manufacturer level. Since most of our products have a 20% AWP markup over WAC we are considered a "20% spread" manufacturer. AstraZenca has a mix of spreads as a result of the different product lines and pricing policies of our former companies.

FirstDataBank's approach to achieve consistency is to change the spread of individual products when the price changes. As indicated in the attached spreadsheet, this happened with several products - mostly hospital products-with our February price change.

For retail products, the higher AWP spread (ie 25% vs 20%) provides additional profit to retail and chain pharmacies on the one hand, but increased cost to payers on the other. Because of the greater influence of managed care vs pharmacy, we have recommended the lower spread for most of our products.

Regarding the hospital products, do you see any significant advantage/disadvantage to having a 25% vs a 20% spread?



AZspreadchg.xls

John R. Freeberry
Pricing Strategy
302-886-1457



DEPOSITION
EXHIBIT
Freeberry J
10/4/05    JP

Plaintiffs' Exhibit
**139**
01-12257-PBS

1

HIGHLY CONFIDENTIAL                                    AZ0432026

# Exhibit 4

-----Original Message-----
**From:** Ortiz, Diane [JANUS]
**Sent:** Friday, September 20, 2002 12:15 PM
**To:** Sheffield, David [Corp.] [JJCUS]; Gorsky, Alex [JANUS]
**Cc:** Szabo, John [JJCUS]; Mehrotra, Louise [JANUS]; Buto, Kathy [JJCUS]; Holleman, Jerry [JJCUS]
**Subject:** AWP Reporting issue: an overview

Dave, Alex; Louise asked me to share with you an overview of the current situation regarding AWP reporting:

### Issue:

With the price action of 1Q 2002, it was discovered that First Data Bank (FDB) published AWPs higher than what was recommended by the J&J operating companies, moving most products from a 20% spread to a 25% spread (vs. list). Examining AWP prices in Dec 2001 and June 2002 indicate a much greater price increase than the manufacturer intended (a 5% increase in list price would translate into 9.3% price increase at the AWP level, including the increase in spread). For example:

| Timeframe: | Dec 2001 | June 2002 | Result |
|---|---|---|---|
| Spread: | 20% | 25% | |
| Price Action: | | +5% LP (Q1) | |
| List price: | $100 | $105 | +$5 (+5%) |
| AWP | $120 | $131.25 | +$11.25 (+9.3%) |

Since AWP is the basis for reimbursement in many segments, this action will increase the strain on multiple payers. The inflated AWPs would benefit pharmacists under Medicaid payment procedures and since AWP is the primary basis of Medicaid reimbursement, the impact to states could be significant. From a Medicare perspective, Congress is actively considering moving away from AWP for payment purposes; J&J has offered assistance in this effort.

### Status:

A white paper is being developed by an outside consultant that J&J will provide to key stakeholders (potentially CMS, state Medicaid directors, key managed care organizations, etc.) to alert them to these discrepancies and the lack of control the manufacturer has over the published AWPs. The J&J team working on the paper includes: Kathy Schroeher, Kathy Buto, Jerry Holleman, Pat Molino, Bruce Colligen, and Diane Ortiz with input from OC finance and trade relations contacts. The draft paper is currently under review by legal.

### Background:

AWPs are not defined in law or regulation and are considered vague, artificial prices established and manipulated at the discretion of the manufacturer but are the cornerstone of a larger pricing infrastructure. AWP is intended to represent the average price at which wholesalers sell drugs to physicians, pharmacies, and other customers. It is considered a flawed pricing mechanism that, although not widely understood, plays a pivotal role in the overall prescription drug pricing and reimbursement systems. (NHPF Issue Brief, June 7, 2002)

When probed by various J&J contacts, FDB provided contradictory responses....ranging from: the use of survey methods and techniques have not changed: the data is what it is...to the other end of the spectrum....it was a deliberate action: "J&J will be a +25% company" as would other 20% companies to standardize data collection and reporting requirements on FDB. There was not much detail provided regarding survey techniques. J&J trade relations believe the major wholesalers are surveyed and two out of the three majors would be enough to change the price point. From a wholesaler perspective the theory exists that this would be a way to enamor themselves with the retail pharmacies, as greater profits would be realized by the pharmacists.

### Summary:

Inflated AWPs will increase the cost of prescription drugs to the commercial and public payers, putting additional pressure particularly on the state budgets. Manufacturers will come under increased pressure regarding price, which will continue to feed the tide of prior authorization, supplemental rebates and reference price schemes. Although manufacturers cannot control the data FDB publishes, the public, which includes Congress, believes they can and the manufacturers are held responsible for such increases.

Please let me know if you have any questions or require additional information. thanks.

*Diane M. Ortiz*

2

**HIGHLY CONFIDENTIAL**

# Exhibit 5

| From: | Conley, Erin (STL) |
|---|---|
| Sent: | Monday, April 29, 2002 3:45 PM |
| To: | 'Goldenberg, Harry A.' |
| Cc: | Orvis, Traci (BLM); Zopfi, Arnie (BLM) |
| Subject: | RE: Emerging Therapeutic Issues - AWP PRICE INCREASES |

Hello -

We've looked at your data to further analyze this request.

For PHC it appears that for first quarter 2002, the increase in ingredient cost that we attribute to these AWP adjustments is ~$178,000 (1.17%).  For PHT, its less (fewer brands) at ~$124,000 (0.60%).

The drugs that have seen the largest adjustments are Lipitor, Prilosec, Prevacid, and Nexium.

I hope this will help.

Erin

-----Original Message-----
From: Goldenberg, Harry A. [mailto:HAGOLDEN@CovHlth.com]
Sent: Tuesday, April 16, 2002 3:34 PM
To: 'Conley, Erin (STL)'; Goldenberg, Harry A.
Cc: Orvis, Traci (BLM); Zopfi, Arnie (BLM)
Subject: RE: Emerging Therapeutic Issues - AWP PRICE INCREASES


It does but, I need a little more.
What does this translate into total dollars higher cost, presuming current utilization rates and membership? And the same figure pmpm?

I want to be able to tell our CEO and Board what to expect in the format they will want that information.
Thanks.

Harry Goldenberg, MD
Vice President of Medical Management
PHP Companies, Inc./Cariten Healthcare

> -----Original Message-----
> From:     Conley, Erin  (STL) [SMTP:EConley@express-scripts.com]
> Sent:     Tuesday, April 16, 2002 7:53 AM
> To: 'Goldenberg, Harry A.'
> Cc: Orvis, Traci (BLM); Zopfi, Arnie (BLM)
> Subject:  RE: Emerging Therapeutic Issues - AWP PRICE INCREASES
>
> To date the increases should result in an additional increase in trend
> to our clients of 0.7 to 0.9% (above what we normally expect ingredient cost
> increases to be).    IF these increases are applied to ALL drugs that
> currently are WAC +16% (they would be raised to WAC+ 20%) then the
> trend impact would be in the 1.2 to 1.5% range.  (again, meaning trend
> increase above and beyond what we would normally expect).
>
> Does this help?
>
> Erin
>
> -----Original Message-----

1

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY           ESI-414-00001875

```
> From: Goldenberg, Harry A. [mailto:HAGOLDEN@CovHlth.com]
> Sent: Monday, April 15, 2002 5:38 PM
> To: 'Conley, Erin (STL)'; Goldenberg, Harry A.
> Cc: Zopfi, Arnie (BLM); Orvis, Traci (BLM)
> Subject: RE: Emerging Therapeutic Issues - AWP PRICE INCREASES
>
>
> Erin,
> At current utilization rates, what do you estimate the "damage" will
> be in pharmacy dollars over a year driven by these price increased?
> (Total dollars based on current membership and pmpm cost increase.)
> Thanks.
>
> Harry Goldenberg, MD
> Vice President of Medical Management
> PHP Companies, Inc./Cariten Healthcare
>
> > -----Original Message-----
> > From:    Conley, Erin  (STL) [SMTP:EConley@express-scripts.com]
> > Sent:    Monday, April 15, 2002 12:41 PM
> > To:      'hagolden@covhlth.com'
> > Cc:      Zopfi, Arnie (BLM); Orvis, Traci (BLM)
> > Subject:      FW:  Emerging Therapeutic Issues - AWP PRICE INCREASES
> >
> > > Hello -
> > >
> > > Please see attached notification regarding recent increases in
> > > AWP, greater than anticipated.  Please distribute as appropriate
> > > to
> > interested
> > > parties in your organization.
> > >
> > > Thank you,
> > > Erin
> > >
> > >  <<AWP increase notification.doc>>
> > >
> > >
> > > Erin L. Conley, Pharm.D.
> > > Clinical Program Manager
> > > Managed Care Division
> > > phone. 314-919-4628
> > > fax. 314-919-4664
> > > econley@express-scripts.com
> > >  << File: AWP increase notification.doc >>
> >
> This E-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended
> only for the use of the Individual(s) named above.  If you are not the
> intended recipient of this E-mail, or the employee or agent
> responsible for delivering it to the intended recipient, you are
> hereby notified that any dissemination or copying of this E-mail is
> strictly prohibited.  If you have received this E-mail in error,
> please immediately notify us at (865) 374-4900 or notify us by E-mail
> at hdesk@covhlth.com.
>
This E-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of
the Individual(s) named above.  If you are not the intended recipient of this E-mail, or
the employee or agent responsible for delivering it to the intended recipient, you are
hereby notified that any dissemination or copying of this E-mail is strictly prohibited.
If you have received this E-mail in error, please immediately notify us at (865) 374-4900
or notify us by E-mail at hdesk@covhlth.com.
```

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00001876

# Exhibit 6

| From: | Coppolo, Benjamin |
| Sent: | Friday, July 30, 2004 5:07 AM |
| To: | Bonner, John |
| Subject: | RE: Price change |
| | |
| Sensitivity: | Confidential |

Thanks for the information.

Ben Coppolo
McKesson Corporation

8129 Arlington Texas
817-652-7668

-----Original Message-----

| From: | Bonner, John |
| Sent: | Thursday, July 29, 2004 5:44 PM |
| To: | Coppolo, Benjamin |
| Subject: | RE: Price change |
| Sensitivity: | Confidential |

*We try to "push" the AWP up to 25% above WAC rather than 20%.  This may cause your customer some short term reimbursement pain with the payors but in the long run, if AWP at First Data Bank goes from 20% to 25%, your customer will benefit.*

*Most payors reimburse pharmacies at AWP minus 15 to 17%.  The higher AWP markup percentage, the more they are paid by the insurance company.   Pharmacies barely break even on items with 20% AWPs.*

*John Bonner*
*Director Product Management, Branded Rx*
*McKesson Drug*
*One Post St. 20th floor*
*San Francisco, CA 94104*

*Voice  415-983-8363*
*FAX   415-732-2584*
*cell    925-786-6731*

-----Original Message-----

| From: | Coppolo, Benjamin |
| Sent: | Thursday, July 29, 2004 3:26 PM |
| To: | Bonner, John |
| Cc: | Shurden, Jacob; Wright, Tim |
| Subject: | RE: Price change |

John

I was unaware of how the AWP price was derived and had a question from a customer) regarding the AWP price on this particular product.  I was under the impression that we may have the wrong price in our system due to a change from the vendor.  If this is the correct price that we get the product for then the AWP does need to be changed.  Sorry for the confusion.

Ben Coppolo

1

MCKAWP  0076289
CONFIDENTIAL

# Exhibit 7

| | |
|---|---|
| **From:** | James, Robert |
| **Sent:** | Tuesday, October 09, 2001 8:59 AM |
| **To:** | Yonko, Greg |
| **Subject:** | RE: AWP Change |

Greg,

This probably speaks to First Data Bank's willingness to work with us to normalize the brand product AWP's. I believe the industry should be moving toward cost plus (WAC) a dispensing fee. WAC and direct prices are published and easily verified. Brand AWP's usually have either a 16 2/3% or a 20% spread (AWP to WAC) whereas generics are all over the map and can vary from a 28%-30% introductory spread to as much as 80% to 90% on a mature product. This variance is what lead to MAC pricing (maximum allowable cost or federal upper limit (FUL)) which is a fixed reimbursement per tablet/capsule,etc. no matter what the cost.

Typical reimbursements in retail for brand products would be as low as AWP -15% plus a $2.00 fee and for generics, they can be like AWP -40% plus a fee, or MAC priced at a fixed rate.

AWP really has no impact on our wholesale business but certainly does on our customers' third party reimbursements. As you know we have been doing everything possible to raise AWP's where we can and we have had some recent success with FDB as we discussed. I am looking into the inflation of AWP's on repackaged product where the repackager has used their own NDC code which is different from the manufacturer's. This scenario would explain why Merck Medco and others are able to bid AWP minus 20-22% and still be profitable. I am told that this is also commonly done with distributors to physician's offices as well, but I have no direct knowledge of this practice.

Greg, we get many questions from our sales people and our customers about AWP's. The following is an excerpt from a recent response:

The customer had asked the question, why is the AWP different from the Sugg Sell or List Price on their tickets. This can be confusing because reimbursement is based on FDB AWP and not McKesson Sell Price.

The easy answer is to have the customer choose to print the actual First Data Bank AWP on the tickets.

This figure is "an average" of the 3 major wholesalers. For brand pharmaceuticals, its usually 16 2/3% or a 20% spread from the AWP to WAC. If 2 out of 3 are at 20%, then that is what FDB uses. If McKesson's sugg sell is at a 25% markup (or 20% spread) the numbers are the same. If McKesson's sugg sell is at a 20% markup, then the numbers would be different........McKesson's would be lower in this case. Remember, McKesson does not set AWP, we set List Price or Sugg Sell Price. AWP by definition is an "average wholesale price". This is arrived at by FDB by doing a phone survey in the couple of weeks following a new product introduction or a price increase.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755,  Fax 415-732-2951
robert.james@mckesson.com

    -----Original Message-----

| | |
|---|---|
| **From:** | Yonko, Greg |
| **Sent:** | Tuesday, October 09, 2001 8:05 AM |
| **To:** | James, Robert |
| **Subject:** | FW: AWP Change |

bob what is your opinion on this subject.. see below.

1

MCKAWP  0068599
HIGHLY CONFIDENTIAL

# Exhibit 8

**Monthly Status Report**

**McKESSON**
*Empowering Healthcare*

Underline_On the horizon:

- Pfizer just received the approval on Relpax for migraines. This has been a huge success in Europe the past several years. FDA required additional clinical information and trials, which ultimately delayed launch in the U.S. This product is expected to ship in early February and should become another blockbuster.

- Aventis just received approval on their new antibiotic, Ketek, which will compete with Pfizer's Zithromycin. We do not have pricing yet but expect this to come by the end of the week. This product will ship the first week in February. Ketek is also expected to be a blockbuster.

- Merck is close to approval on a new anti-emesis drug for cancer patients that should be another big success.

Underline_Current Initiatives:

- We are still working with Abbott to recover the 1% return allowance paid to Mckesson for the QW purchases and RxPak. These amount to just under $1,000,000 for QW and about $1,385,000 for RxPak. Today, these allowances are going into a general fund and are not being captured where they belong. QW has between $200,000 and $300,000 worth of returns that have to be discarded. The allowance is meant to offset these situations.

- The ZLB Immune Globulin situation has been resolved. We were able to negotiate a return and re-order on the entire amount of short-dated and expired product. This effort saved McKesson a write-off of about $1,300,000. Kim Hindley-Shaw and Scott Bradford were intimately involved in this process and we could not have resolved this situation without their help.

- We have had some recent success in getting some movement in AWP's on Lilly and Novo products. Our retail customers should begin seeing huge improvement in profitability when dispensing these products over the next few months. Both companies have had AWP spreads increased to 20% from 16 2/3%, which will be realized as price increases, occur.

- Our new marketing group has been spending some time working with us on updating our Prefer Rx Marketing Program and is preparing for a re-launch. We have added some new items and they are working on refreshing our marketing materials and educational material for our field sales folks. We have also recently added Albertson's to this group of participating stores.

- We are currently looking at some analysis of the Abbott pricing structure to see if it makes sense to get rid of the list only feature that has been used for years and take advantage of Abbott's two tier pricing strategy. (They are the lasts in the industry to use the two tier pricing). This could potentially create a substantial amount of net

---

MCKAWP 0071671
HIGHLY CONFIDENTIAL

# Exhibit 9

| From: | Puccetti, Joy |
|---|---|
| Sent: | Saturday, March 16, 2002 3:56 PM |
| To: | James, Robert; Thomas, Erlinda |
| Cc: | Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy |
| Subject: | RE: AWP's on Invoice's incorrect |
| | |
| Importance: | High |

Bob: I appreciate the update and clarification. Has this been communicated to the field? If not, would you be willing to work with me and put something out to our sales team so they are better prepared to deal with their customer's concerns?

Kerry: your thoughts about moving my original request through the BR process?

Joy Puccetti
*National System Support Center*
(425)712-3504 – Phone
(425)712-3520 – Fax

-----Original Message-----
| From: | James, Robert |
|---|---|
| Sent: | Friday, March 15, 2002 11:13 AM |
| To: | Puccetti, Joy; Thomas, Erlinda |
| Cc: | Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; Wahl, Kerry; Florence, Evelyn; Schnabel, Judy |
| Subject: | RE: AWP's on Invoice's incorrect |

Joy, its really happening the other way around. McKesson is normalizing our Sugg Sell or Retail List, and AWP increases usually happen when FDB re-surveys the wholesalers after price increases. They set the AWP where 2 out of 3 of the national wholesalers are using the same markup. We just happen to be improving our process to eliminate the need to override AWP's with each pricing activity in the future. I spoke with FDB earlier this week and they stated that about 90% of the vendors have been changed to 25% markup and use a 1.25 factor (times the WAC). Some of the detail needs to catch up with individual sku's as price increases occur. The remaining vendors should be done in over the next quarter.

My guess is that things should look very good in the next couple of months. I am working with FDB to point out problem suppliers as Erlinda's group provides me the weekly information comparing our List Price with the FDB AWP. Sorry for the extra confusion and questions that have come up from our customers. The (unintended consequences) results should have a very positive impact on our customers profitability.

Hope this helps. Call me if you have questions.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755   Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----
| From: | Puccetti, Joy |
|---|---|
| Sent: | Thursday, March 14, 2002 4:40 PM |
| To: | Thomas, Erlinda |
| Cc: | Cullenward, Eric; Pantano, Dan; Thomas, Jon; Oliverson, Kathie; Friedman, Leslie; James, Robert; Wahl, Kerry; Florence, |

1

MCKAWP 0042663
HIGHLY CONFIDENTIAL

# Exhibit 10

| From: | James, Robert |
|---|---|
| Sent: | Monday, June 17, 2002 8:13 AM |
| To: | Yonko, Greg; Dolan, Anthony |
| Cc: | Bonner, John; Sacino, Claudia; Miller, Mark (CAR); Booth, Tim |
| Subject: | RE: Albertsons Contract Renewal |

I would like to see Albertsons participate in our Prefer Rx program at a priority 02 level which would mean that their own contract prices would take precedence over our price. We could use priority 01 which would mean that they would get the lower of the two prices, however, we would need to look into contract compliance issues and be sure about the way we set it up.

I know that Albertsons both recognizes and appreciates our efforts with the AWP situation. This has most likely had a very positive impact on their gross profits. On their insurance based business this equates to lowering cost of goods about 3 1/3% on those items that previously had a 16 2/3% spread...... which previously had been about 80% of the Rx products. I am wondering if this can be leveraged in any way. Worst case, it should be no less than a tie-breaker if the situation gets to that point.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755, Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----

| From: | Yonko, Greg |
|---|---|
| Sent: | Friday, June 14, 2002 5:47 PM |
| To: | Dolan, Anthony |
| Cc: | Bonner, John; Sacino, Claudia; James, Robert; Miller, Mark (CAR); Booth, Tim |
| Subject: | RE: Albertsons Contract Renewal |

We will be in touch..

To the team, any suggestions, ideas, etc.. please foward to me, they should be both positive comments as well as process improvement opportunites

Greg

-----Original Message-----

| From: | Dolan, Anthony |
|---|---|
| Sent: | Thursday, June 13, 2002 3:26 PM |
| To: | Yonko, Greg |
| Subject: | Albertsons Contract Renewal |

Hello Greg,

I'm starting the thought process for our contract renewal with Albertsons and I was wondering if there is anything that you would recommend that we could do differently?

Go ahead and think outside the box.

Thanks

Anthony F. Dolan
Vice President Retail National Accounts

1

MCKAWP 0084485
CONFIDENTIAL

# Exhibit 11

| | |
|---|---|
| **From:** | James, Robert |
| **Sent:** | Tuesday, September 18, 2001 8:03 AM |
| **To:** | Secrest, Larry |
| **Cc:** | Ryan, Mary; Beall, Kim; Yonko, Greg; Thomas, Erlinda |
| **Subject:** | RE: AWP Variance |

Larry,  this may seem complicated but it is not. First, I think that it is important to understand that the AWP's that are used for third party reimbursements are the First Data Bank (FDB) AWP's. FDB determines the AWP by surveying the three national wholesalers on Brand Pharmaceuticals (generics are somewhat different) and taking the average, e.g. if 2 out 3 are at 16 2/3% spread then that is the FDB published AWP, if 2 out of 3 are at 20%, then that is what is published. In your example below, McKesson chose to increase the markup on the Park-Davis line (Lipitor) last January when Pfizer took them over. This was our attempt to raise the AWP's to support our customers. The other two wholesalers did not do this.( I am told by FDB that the Parke-Davis products from Pfizer will most likely have AWP's increased to 20% this January when price increases typically take place........this will then be the same as the McK figure)

McKesson lists the FDB AWP's in our DITM file. The confusion can be mitigated by having customers use this AWP on their pricing tickets, etc. Keep in mind that AWP is the Average Wholesale Price. The McKesson price you are citing is our Sell Price or List Price. By definition the McKesson price is not an average of anything, but just our markup on WAC and in most cases it equals the FDB figure. Our customer's business is not ar risk because of this List Price. Its at risk because they have agreed to contracts of AWP minus 15% and sometimes more. These reimbursements are figured across the industry from the FDB figure. Most pharmacists know that and understand it well. Its been awhile since I used the Econolink system but it seems to me it lists the figure as Sell Price or List Price. If it says McK AWP, we should have some discussion about it. The true AWP is the First Data Bank figure. This can be confusing because the McK Sell Price and the FDB AWP are often the same.

McKesson keeps this differential in our system in hopes that if one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items, the AWP will be increased and our customer will benefit substantially. We have just had some recent successes. The AWP spreads were recently increased by FDB on Concerta, and the Searle items from Pharmacia and also Genotropin from Pharmacia. Yesterday, we raised the markups on the Aventis line on some of the old RPR products to 25% markup. There are more coming. I believe that we have an opportunity to "normalize" the AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread) and most customers would love it. The chains certainly are aware of this and are very appreciative of our efforts because they understand the profitability associated with higher AWP's.

Sorry, for the long-winded response. If you would like to discuss this further, please give me a call. I don't recall talking with Mike Ryan but I can assure you that I have never suggested a manual override in a customers system. However, I have suggested that when customers select what information they want on their pricing tickets that they choose the FDB AWP so that they know what their reimbursements will be based on.

Larry, the examples above are from the DITM screens where all the set up information resides.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755.  Fax 415-732-2951
robert.james@mckesson.com

-----Original Message-----

| | |
|---|---|
| **From:** | Secrest, Larry |
| **Sent:** | Tuesday, September 18, 2001 6:53 AM |
| **To:** | Thomas, Erlinda; James, Robert |
| **Cc:** | Ryan, Mary; Beall, Kim; Yonko, Greg |

1

MCKAWP  0068514
HIGHLY CONFIDENTIAL

# Exhibit 12

| From: | James, Robert |
|---|---|
| Sent: | Tuesday, April 20, 2004 1:20 PM |
| To: | 'Chad Lucero' |
| Cc: | Sacino, Claudia; Poulos, Matt; Torres, Martha; John Schohl (jschohl@medicis.com) |
| Subject: | Medicis AWP's |

Chad, McKesson treats all Brand Rx suppliers and products alike. We mark each product  25% ( WAC x 1.25) to get our Suggested Sell Price or List Price and let the process take over. We never sell at this price, its just a benchmark. However, this is the price that is surveyed by FDB and if the other wholesalers are at the same mark up, which most are, then that becomes the AWP markup and ultimately the AWP.

The reason we did this five years ago was to create business efficiencies and consistency in our BIS department, instead of having them come to us to ask what the markup was on a specific drug. Mark ups ranged from 20% to 33% and were inconsistent within suppliers as they merged or acquired product from another supplier.  Most of the game playing has stopped and things have pretty much normalized at a 20% spread ( 1.25 markup) for Brand Rx, which has been extremely beneficial for our customers. This being said, you can still "set your AWP" by setting your WAC cost appropriately so that a 25% markup on top will get you the AWP that you desire. It's as simple as "pegging your desired AWP" based on company goals and the competitive landscape and multiplying by 0.80 which becomes your WAC price. {Example: say you want to set your AWP at $125.00, then x 0.80= $100.00 for WAC price. That gets multiplied by 1.25 which = $125.00). Why do you want to take the profitability away from the retail pharmacies by trying to use a spread of 16 2/3% when almost all other companies are getting a 20% spread. If you have any doubts about what I am saying, please contact Scott Johnson at Albertsons, Dave Vucurevich or Greg Drew at Rite Aid, Frank Seagraves at Wal Mart, or Frank Scorpiniti at Longs.

Medicis and all other Brand suppliers are considered as 25% markups or 20% spreads.

Please call me if you have questions. I will be happy to explain it to you. Take care.

Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 8th Floor
San Francisco, CA 94104
Phone  415-983-8755,  Fax 415-732-2951
robert.james@mckesson.com


-----Original Message-----
From: Poulos, Matt
Sent: Monday, April 19, 2004 1:23 PM
To: 'Chad Lucero'; Torres, Martha
Cc: James, Robert; Sacino, Claudia
Subject: RE: Medicis AWP's


Chad,

Martha Torres is the contact for this end of the business.

Please contact Martha she will be able to discuss with you.

Matt

1

MCKAWP 0071694
CONFIDENTIAL

# Exhibit 13

5. The AWP spread is calculated by taking the difference of the WAC and AWP and dividing by the AWP. With Brand products, a 25% markup or 1.25 factor results in a 20% spread. A 20% markup or 1.20 factor results in a 16 2/3% spread.

The following examples should clarify the calculations:

| Example #1: | WAC = $100. | Markup = 25% | Spread = 20% |
|---|---|---|---|
| Calculation: | $100. X 1.25 factor | = $125. | |
| | $125. Minus $100. | = $25. difference | |
| | $25. divided by $125. | = 0.20 or 20% spread | |

| Example #2: | WAC = $100. | Markup = 20% | Spread = 16 2/3% |
|---|---|---|---|
| Calculation: | $100. X 1.20 factor | = $120. | |
| | $120. Minus $100. | = $20. difference | |
| | $20. divided by $120. | = 0.1667 or 16 2/3% spread | |

Managed Care or Third Party Insurance reimbursement is normally based on an "AWP minus a % plus a dispensing fee" formula. A typical reimbursement formula for Brand Rx would be AWP minus 15% plus a $2.00 fee. It's important to understand the significance of having a greater AWP spread. If a product carries a 16 2/3% spread (or 20% markup), it would not be as profitable as one that carried a 20% spread (or 25% markup). The following calculations should help clarify some of this terminology:

To illustrate the impact on profitability, use the two examples above and add a reimbursement formula of AWP – 15% plus a $2.00 dispensing fee.

| Example #3 | WAC = $100. | AWP = $125. | Spread = 20% |
|---|---|---|---|
| Calculation : | AWP $125. - 15% (or times 0.85) = $106.25 | | |
| | $106.25 minus cost of $100. = $6.25 plus $2.00 fee = $8.25 | | |
| | Therefore Profit = **$8.25 (with 20% spread)** | | |

| Example #4 | WAC = $100. | AWP = $120. | Spread = 16 2/3% |
|---|---|---|---|
| Calculation: | AWP $120. – 15% (or times 0.85) = $102.00 | | |
| | $102.00 minus cost of $100. = $2.00 plus $2.00 fee = $4.00 | | |
| | Therefore Profit = **$4.00 (with 16 2/3% spread)** | | |

It's important to note, **the product with the 20% spread is $4.25 more profitable.** More than double!

Everything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's. In this world of mergers and acquisitions things began to change. Companies sold off and acquired products. Mergers and buy outs resulted in companies having product lines with both 1.25 and 1.20 factors. The resulting

AWP discussion.doc                          2

MCKAWP 0069612
HIGHLY CONFIDENTIAL

# Exhibit 14

**From:**        James, Robert
**Sent:**        Friday, April 12, 2002 2:55 PM
**To:**          Lirette, Karl; Clinkscales, Paul
**Cc:**          Yonko, Greg
**Subject:**     Avonex & Copaxone

Just a note to let everyone know that "I am told" that the mark up on Avonex and both the old and new sku's of Copaxone will be changed to 25% (to create a 20% spread on WAC/AWP) next week. This will appear in the McKesson First DataBank download one week from tomorrow (if everything works properly) and then the changes will be made in DITM for the following week. Yes!!

Also, I am told that the big insurance companies will have this updated within a couple of days of receiving FDB information, but the States only update monthly so that may take a little longer depending on the timing. This should make a significant contribution to your profitability as illustrated by the following example using a reimbursement of AWP – 15% plus $2.00 fee.

Avonex    at 16 2/3% spread, profit would be $18.42..........and now at a 20% spread, profit would be $51.31....not bad!
        This is an increase of $32.89 per script.

Copaxone at 16 2/3% spread, profit would be $19.72..........and now at a 20% spread, profit would be $57.39....pretty good!
        This is an increase of $37.67 per script.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street–8th Floor
San Francisco, CA 94104
415-983-8755,  Fax 415-732-2951
robert.james@mckesson.com

1

MCKAWP 0084327
CONFIDENTIAL

# Exhibit 15

8.    New McKesson BIS Rule: We will monitor (weekly) the items where the FDB WAC and the McK WAC are different and send    information to FDB to discover why. These items should be corrected quickly once we discover the reason it is happening and   correct the process if necessary.

9.    All new brand vendors will be set up as 1.25 markup factor vendors, both at McK and FDB.

10.    BIS will assess needs to improve this process and maintain it. Erlinda may make staffing recommendations based on this.

11.    McKesson is currently getting weekly FDB downloads. Our competition and many of our retail customers (Rite Aid) are getting daily downloads which in some cases makes us look inaccurate. I would recommend that we change to daily downloads. I am    told our competition may be getting some advantage in more timely price increase information allowing them to place    timely orders.

12.    Econolink system is updated weekly from our Saturday FDB download. Information is available the following Monday for    customers that get daily Econolink Updates, the following week for customers getting weekly updates.....providing they update    their Econolink systems as directed.

13.    Econolink is pulling the FDB AWP figure from DITM. System does not look at Sugg Sell or Retail List.

14.    Customers currently have two options for selecting information that appears on Invoices and Price Tickets:

    A.    They may select to have Sugg. Sell or Retail List appear 100% of the time.

    B.    They may select to have Sugg. Sell or AWP, whichever is greater appear on invoice and price tickets.

            (this option may be problematic with changes going on, in that AWP may be lower than suggested sell and                        customer really needs or wants to have AWP)

    C.    New Business Request in to have a third option to show AWP 100% of the time. This makes the most sense                of all of these in my opinion since so much confusion exists surrounding AWP and reimbursements. I am told                        that an estimate was given that this could take 6 to 12 months to accomplish with current staffing and                        priorities. This seems unacceptable to our field sales folks since most believe this would alleviate the                confusion about pricing and AWP's.

15.    The sizing and timing of this business request is being looked at by Judy's group as they re-prioritize their work.

16.    I have asked Judy Schnabel to think about the possibility of changing Option A above to 100% AWP because this would give  us the quick fix. In time, Option B will be okay because Brand AWP and Sugg Sell will likely be the same number.

17.    Most of the confusion surrounding AWP's is not new. This has been going on for years. The awareness level is increasing as    our customers are looking at everything imaginable to improve their profitability because of the decreasing trend in third party    reimbursement rates. As noted above, Schram's Pharmacy has accepted reimbursement plans that are AWP Minus 18% plus    a $1.75 fee. This is the environment that we live in today.

18.    On a positive note: we are looking into and trying to understand every aspect of this process here at McKesson which is    resulting in greatly improved understanding and accuracy in the information that is provided to our customers.

19.    Also, few people seem to understand the positive impact on our customers' profitability......including some of them. This is    extremely significant and people need to understand this impact. Just one example with Lipitor 20mg 90s: with the old

16 2/3% spread a customer would make $6.86 profit, with the new 20% spread a customer will enjoy $17.18 profit.....and that    is awesome!!

20.    We may need to have a meeting to discuss moving forward with the BR for Option C for supplying AWP on invoices and    tickets. There seems to be an urgency to get this done. We may need your help to give it high priority with Judy's group.

Let me know if you have questions or need additional information.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street—8th Floor
San Francisco, CA 94104
415-983-8755,  Fax 415-732-2951
robert.james@mckesson.com

2

MCKAWP  0069616
HIGHLY CONFIDENTIAL

# Exhibit 16

McKesson's. Just for kicks, I assumed a 70% gross margin for JOM and calculated their Omnicare profit also.

**Omnicare total JOM**
Redacted

**McKesson total JOM**
Redacted

**JOM Omnicare**
Redacted

Redacted

-----Original Message-----

| | |
|---|---|
| **From:** | James, Robert |
| **Sent:** | Wednesday, July 28, 2004 2:19 PM |
| **To:** | Stubbs, Andrew; Boyd, Beth; Hanks, Jason; Cardenas, Debbie; Bolger, Phil |
| **Cc:** | Felton, Jeff; Petrus, Susan; Torres, Martha |
| **Subject:** | RE: JOM - Omnicare positioning for support Sales $ Summary |

Please see below for the workup of what the impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years ago J & J products were all 16 2/3% AWP spread products. Today, almost all of them are 20% spread. Procrit just changed last month.

Just for this example we'll roll up these figures to WAC (amounts given divided by .982) and look at profitability assuming all third party Rx's based on AWP minus 15% (any additional fee would remain constant so we won't use a fee in this example because we don't have the number of transactions).

Redacted

2

Redacted

or **3 times the profit as before**

Redacted

or **more than 3 times the profit as before**.

We're a nice advocate to have around. This example is just to provide background to our team so everyone realizes the impact of increasing AWP's........Not by McKesson, but by the FDB process.

Call me if you questions.


Bob James
Vice President, Brand Rx Product Management
McKesson
One Post Street, 20th Floor
San Francisco, CA. 94104
Phone 415-983-8755,  Fax 415-732-2951
robert.james@mckesson.com


-----Original Message-----
| | |
|---|---|
| **From:** | Stubbs, Andrew |
| **Sent:** | Wednesday, July 28, 2004 12:20 PM |
| **To:** | Boyd, Beth; Hanks, Jason; Cardenas, Debbie; James, Robert; Bolger, Phil |
| **Cc:** | Felton, Jeff; Petrus, Susan |
| **Subject:** | RE: JOM - Omnicare positioning for support Sales $ Summary |

All- Here's a summary of the JOM Sales, Procrit Sales, and Remicade Sales for all of Omnicare for April 04 through June 04.

Jason- just a reminder.... Redacted

Redacted


I have all the detail in a massive 22mb file, but I'm not sending that to everybody (just Jason). If you do need that file, please let me know and I'll send it separately.

3

MCKAWP  0068132

# Exhibit 17

Confidential

1          UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF MASSACHUSETTS

3

4 NEW ENGLAND  CARPENTERS HEALTH BENEFITS

5 FUND, et al.:

6                                    PLAINTIFF(s),

7

8 V.

9          CIVIL ACTION 1:05-CV-11148-PBS

10

11 FIRST DATABANK, INC., a Missouri corporation, and

12 MCKESSON CORPORATION, a Delaware corporation,

13

14                              DEFENDANT(s).

15 _____

16  CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

17

18        FOR THE DEFENDANT,

19        MCKESSON CORPORATION:

20   The Video Deposition of William Fleming, taken in

21 the above-styled matter at Greenebaum, Doll &

22 McDonald, PLLC, 101 South Fifth Street, 3500 National

23 City Tower, Louisville, Kentucky, on the 9th day of

24 November, 2006, beginning at 9:24 a.m.

25

Confidential

Page 158

1  Q. Okay. And not exactly, but in rough terms,
2  when we're talking AWP minus 16 2/3 versus WAC
3  plus 20, we're talking about the same relationship,
4  just going both ways; correct?
5  A. Okay.
6  Q. Okay. Now, for Humana's business, have
7  you ever analyzed or looked at the ratio between
8  AWP and WAC?
9  A. We try to -- we do try to understand that
10  and the -- so that we understand the context of
11  our -- where we go with our contracting strategies
12  with the retailers.
13  Q. Okay. And -- and how do you go about
14  trying to understand what -- what WAC-to-AWP
15  ratios are?
16  A. Well, you know, historically -- you know,
17  we believe that that number was in the 20 range,
18  and it --
19  Q. And when you say -- AWP minus 20?
20  A. Yes.
21  Q. Okay.
22  A. So that we could -- and we know that they
23  bought, again, less than WAC, so that -- now, that
24  WAC -- let's call it AWP minus 22, for fun, that the
25  value of -- of retailer buying -- you know, at right

TSG Reporting - Worldwide    877-702-9580

Confidential

Page 160

1  as the Pricing strategy and -- and deliver that as a
2  value. Because of whatever change happened of
3  this relationship, whenever -- whenever that
4  happened a few -- few -- several months and
5  several quarters before that.
6  Q. In -- in August of '04 --
7  A. It was summer of --
8  Q. Okay.
9  A. I won't say August; it was summer some
10  time.
11  Q. Okay. In summer of '04, did Argus report
12  to you that they had an understanding that the
13  WAC-to-AWP or AWP-to-WAC ratio had increased
14  for some reporting services?
15  A. Yes.
16  Q. Okay. Did they tell you specifically that
17  they understood that the ratio between WAC and
18  AWP had increased for First DataBank?
19  A. I don't recall specifically.
20  Q. Okay. And did they tell that you they had
21  a different adjudication method that compensated
22  for that reporting of higher -- a higher WAC-to-AWP
23  ratio by one of the services?
24  A. They were in, pitching their wares, about
25  their ability to help provide a lever to help with

TSG Reporting - Worldwide    877-702-9580

Confidential

Page 159

1  volumes from the wholesaler, paying the bills at the
2  right time that there's a -- let's call it a 2 percent
3  value, that some retailers buy at AWP minus 22,
4  maybe 23, maybe 21, but some place less than --
5  than WAC.
6  And -- and understanding that allows us to
7  understand margin expectations, strategies that the
8  retailers no longer have to make their profit, to sell
9  the pills.
10  We believed over time that that relationship
11  has generally been that they buy at that 20-off and,
12  you know, it's only been since this -- summer of '04
13  that we found out something -- something may have
14  happened pre that, and the way we found out was
15  through Argus, our current claims processor. We
16  were with Caremark at the time; and we were in an
17  RFP -- starting the RFP process.
18  And they were talking about a product they
19  had, or developing, they were in the process of
20  launching to effectively take -- and I forget exactly
21  how it worked; I don't think they had a name for it.
22  But effectively to take, in the adjudication process,
23  the ability to adjudicate Drug X based upon the
24  lowest of two or three pricing sources, whether it's
25  First DataBank, Medi-Span, Red Book, and use that

TSG Reporting - Worldwide    877-702-9580

Confidential

Page 161

1  some of those cost increases. They also, however,
2  acknowledged, because we brought it up -- I -- I
3  remember bringing it up -- that I'm uncomfortable
4  with changing how we do that with our retail
5  relationships: A, I didn't know if we could even do
6  it, because at the time, I didn't know whether our
7  contract spelled out the source we used. But, B, in
8  the spirit of our relationships with the retailers, I --
9  you know, my belief is we -- we need to make sure
10  they understand all these components, because
11  price is a big thing. And if you're going to change
12  the source, you're going to change something, I
13  think the -- the business partner, if you will,
14  needs -- needs to know that.
15  And I -- I wasn't comfortable -- clearly, we
16  weren't using Argus at the time; but I was -- wasn't
17  comfortable with trying to implement that.
18  We -- we did go -- take that philosophy and,
19  and I recall, talk with Caremark about it. And I
20  believe, at the time, Caremark had just been
21  through the acquisition. I'm getting my time lines
22  mixed up, but I think Caremark had just formed its
23  new self. And you know, they had no desire to look
24  at that type of methodology, or of product.
25  And -- and then our RP process took over. And

TSG Reporting - Worldwide    877-702-9580

41

Confidential

Page 162

1  I believe Argus did ultimately launch that product
2  for a few members, but I think it -- it fell by the
3  wayside pretty quickly, because many of the
4  retailers challenged it.
5     Q. When you went with Argus, did you use
6  that technique of using the alternative sources of
7  AWP for adjudication?
8     A. No. The -- the industry standard is --
9  for -- largely for -- for claims processing,
10 adjudication, is First DataBank. And that's -- you
11 know, in talking with our retailers, that's -- that's
12 what most of them expect.
13    Q. Okay. Prior to your discussions with
14 Argus in the summer of '04, did you have any
15 reason to believe that the report by First DataBank
16 of the WAC-to-AWP spread had increased? Or, let
17 me rephrase that.
18    Before your discussions with Argus in the
19 summer of '04, did you have any reason to believe
20 that First DataBank had changed what it uses, the
21 spread between WAC and AWP, in its reporting?
22    MR. KODROFF: Objection.
23    A. Looking at -- looking back on time, and
24 you know, I think we've learned from the past, as --
25 you know, you think of the -- when you're in the
TSG Reporting - Worldwide    877-702-9580

Confidential

Page 163

1  heat of the battle of '01, '02, '03, the year you're
2  in, and you look at trends in inflation and what's
3  happening, there's things that happen that you can't
4  explain, but you feel like something is going on.
5     And I recall saying -- you know, us talking
6  about it, here within Humana, that our inflation
7  number feels to be a little higher. But we couldn't
8  explain it. Was it drug mix? You know. Is -- is
9  there -- you know, is there a -- is there a brand-to-
10 generic-mix issue that we don't understand? Is
11 there a -- you know, within-the-brand issue we don't
12 understand that's happening?
13    You know, there could be a number of things
14 going on. And it's hard to tell at that point in time.
15    Looking back, I remember the "Aha" moment, in
16 talking with Argus that day, and going "Huh. Well,
17 that's what -- that explains some of our increase
18 that we saw, that we couldn't -- maybe that explains
19 some of our increase we saw, that we couldn't
20 explain," is this -- something happened with the
21 mix, or with the -- that ratio; we didn't know about
22 it.
23 BY MR. KAUFMANN:
24    Q. Have you ever gone back to test whether
25 historically, before summer of '04, there were
TSG Reporting - Worldwide    877-702-9580

Confidential

Page 164

1  increases in the WAC-to-AWP ratio that affected
2  reports of AWP?
3     A. No.
4     Q. If the reimbursement rates for pharmacies
5  remained static, would an increase in the ratio
6  between WAC and AWP lead to greater payment to
7  the pharmacies?
8     MR. ST. PHILLIP: Objection.
9     Wait. Can you read that back for me?
10    THE REPORTER: M-hm. Yes, sir.
11    "If the reimbursement rates for pharmacies
12 remained static, would an increase in the ratio
13 between WAC and AWP," hold on, that. . .
14    MR. KAUFMANN: Increase.
15    THE REPORTER: -- "lead to greater
16 payment to the pharmacies?"
17    A. As the -- that ratio changes -- as it
18 increases, and assuming that my reimbursement
19 level that I pay to the pharmacy doesn't change,
20 doesn't go up and doesn't go down, the pharmacy
21 would receive a higher reimbursement from us on a
22 total-dollar basis. And assuming they're buying at
23 a less-dollar-basis, they make more money.
24 BY MR. KAUFMANN:
25    Q. Once you had your meeting with Argus in
TSG Reporting - Worldwide    877-702-9580

Confidential

Page 165

1  the summer of '04, did you take any steps to
2  restructure the way you do business, in any way, to
3  compensate for your belief then that the WAC-to-
4  AWP ratio had increased?
5     A. You know, we -- we talked with Caremark
6  about that type of program. We were in the middle
7  of an R -- we were starting an RFP process in the
8  summer of '04, to figure out where we want our
9  claims processing to be.
10    I don't -- we did talk with MedCo as part of that
11 RFP process. I don't know if we talked directly with
12 MedCo about that type of program. But I suspect
13 someone within my shop probably did.
14    As I think about the other things that we did --
15 you know, as part of our ongoing strategy, we -- we
16 always are going to look to get a better price from
17 the retailer, the drug manufacturer, I mean, the
18 vendor. We're going to -- we're always going to
19 look for better prices.
20    This is, you know, a -- a small piece of, if we
21 believe something happened, it allows us to, you
22 know, keep putting pressure on the retailers, but
23 it -- it's no different than today, if I -- you know, as
24 I talk with CVS today or Walgreen's or whomever,
25 I'm always looking -- going to ask for a better deal.
TSG Reporting - Worldwide    877-702-9580

42

Confidential

Page 274

1   A.  At the time, I didn't know it happened.
2   BY MR. KODROFF:
3   Q.  I – I didn't ask whether you knew it
4   happened.  You know it happened – sitting here
5   today, you know that it did happen?
6       MR. KAUFMANN:  Object to the form of
7   the question.
8   A.  Yes.
9   BY MR. KODROFF:
10  Q.  And sitting here today, do you believe that
11  that caused Humana to pay more money?
12  A.  Yes.
13      MR. KAUFMANN:  Object to the form of
14  the question.
15  BY MR. KODROFF:
16  Q.  At any time, did you know that there was
17  an agreement between FDB and McKesson to
18  normalize all WAC'd AWP spreads at 1 point 25?
19  A.  No.
20  Q.  Is there any way you could have found that
21  out?
22  A.  I wish they would have told me.
23  Q.  Me, too.
24  Earlier today, you talked about regular
25  monitoring of the cost of prescription drugs, which

TSG Reporting – Worldwide    877-702-9580

Confidential

Page 275

1   you did on a – I believe you said a yearly basis.
2   And there were a couple of occasions or irregularly
3   you would change – it would change if there was –
4   something new happened, a major relook; is that
5   correct?
6   A.  That's correct.
7   Q.  Was an increase of cost of a particular
8   drug ever a reason to reexamine a drug placement
9   within a tier?
10  A.  Aberrant pricing will – it could be a
11  trigger.
12  Q.  Was the pricing change that occurred
13  between 2000 and – late 2001 and early 2002 that
14  we've been talking about, was that ever a – an
15  aberrant condition causing to you reexamine drug
16  placement?
17      MR. KAUFMANN:  Object to the form of
18  the question.
19  A.  If – if I knew it was happening, we could
20  have identified – perhaps identified it.  We didn't
21  know it was happening until it was too – til years
22  later.
23  BY MR. KODROFF:
24  Q.  So you – it was not a factor in making –
25  A.  No.

TSG Reporting – Worldwide    877-702-9580

Confidential

Page 276

1   Q.  – a reexamination?
2   A.  No.
3   Q.  Have you ever changed a drug from one
4   tier to another solely based upon cost?
5   A.  I can't think of a specific incidence where
6   that would have occurred.
7   Q.  I just want to clear something up.  You
8   earlier talked about that you checked – tracked,
9   excuse me, it's late in the day, tracked changes in
10  AWPs once a year.
11  You then used language – I believe you said
12  you would have liked to have done it twice a year?
13  A.  [nods head]
14  Q.  Did you ever actually do it twice a year?
15  A.  I think we made some valiant attempts, but
16  we never got a second analysis done.  The reason
17  for twice a year, as we do the – I say "we."  The
18  underwriters and actuaries do the pricing twice
19  yearly for year – for the next 18-month's worth of
20  benefits.  So we like to try to tie that stuff
21  together.  But doing that level of AWP work is a
22  pretty – pretty labor intensive.  And so we –
23  we've – we've only really been able to successfully
24  get it done in a robust way that we felt confident in
25  using on yearly basis.

TSG Reporting – Worldwide    877-702-9580

Confidential

Page 277

1   Q.  And do you usually do it the same time
2   every year?
3   A.  We try.
4   Q.  And when is that?
5   A.  Usually in the first part of the year, by –
6   by the April cycling.
7   Q.  You talked about, for the period 2001
8   through 2005, most rebates were based on WAC
9   rather than AWP; correct?
10  A.  That's correct.
11  Q.  Could you put a percentage – what
12  percentage of rebates were based upon WAC?
13  A.  I'm sure it's 95 percent plus.
14  Q.  And it was consistent through that entire
15  time frame?
16  A.  I – I've got to believe so.  I have no – I
17  have no reason to believe otherwise.
18  Q.  So that if at any time WAC stayed the
19  same but AWP increased, that would have no effect
20  on your rebates?
21  A.  We wouldn't see it.
22  Q.  You not only wouldn't see it, there was
23  just – you'd got no
24  A.  Right.
25  Q.  – benefit from that?

TSG Reporting – Worldwide    877-702-9580

Confidential

Page 282

1    A.  It's possible we could have gone to a
2  retailer and tried to get a better deal during the
3  term of a contract, based upon a marketplace
4  happening.  We are largely driven by us getting
5  more business in the area of what have you.
6    I -- I can't think of an instance where we would
7  ever have been able to go to a railer because Drug
8  X increased in price, you know, by some percent
9  around AWP.
10      MR. KODROFF: I have no further
11  questions.  Thank you.
12      MR. ST. PHILLIP: This is going to back
13  and forth --
14      THE WITNESS: Okay.
15      MR. ST. PHILLIP: -- for the game, you
16  know.
17      MR. KODROFF: It's called tennis.
18  REEXAMINATION
19  BY MR. KAUFMANN:
20    Q.  Mr. Kodroff asked you if you had known
21  about an increase in the WAC-to-AWP ratio as
22  published by First Database, that you might have
23  done something different.
24    Do you recall that question and your answer?
25    A.  I don't think he asked it in that --

Confidential

Page 283

1      MR. KODROFF: Object to the form.
2  BY MR. KAUFMANN:
3    Q.  Do -- do you recall testifying that had you
4  known about an increase in the WAC-to-AWP spread
5  as published by First Databank, that you would have
6  done something differently?
7    A.  If we -- if someone would have come to us
8  and said that that re -- relationship is changing,
9  then that would have given us a different
10  perspective to go to a retailer and say,
11  "Something's change.  Let's renegotiate the terms
12  of our contract." No one came to us and said that.
13      MR. KAUFMANN: That's all I have.
14      MR. KODROFF: I'm done.
15      THE VIDEOGRAPHER: Any further
16  questions or comments for the video record?
17      MR. KAUFMANN: Yeah, I do.  I just want
18  to make one comment.  I -- based upon the
19  deposition today, I think that there may be a
20  number of documents which were relevant to our
21  subpoena that we may want.  I need to confer with
22  my colleagues, and I'll get back or one of my
23  colleagues will get back to Mr. St. Phillip.
24    I understand that his position is -- is that he's
25  produced what the company is going to produce,

Confidential

Page 284

1  and that we're done.  And we may have to fight
2  about that.  But -- but I'll let him speak for
3  himself --
4      MR. ST. PHILLIP: Yeah.  I mean, from --
5      MR. KAUFMANN: -- about that.
6      MR. ST. PHILLIP: -- from my perspective,
7  we are absent class members who are entitled to be
8  protected from discovery in toto.  And that we have
9  volunteered information and have volunteered
10  sufficient information to give you a flavor for
11  Humana's business over this time period.
12    But that's -- having provided the documentation
13  that we have and providing Mr. Fleming for a long
14  time today, that we've reached the limits that we're
15  going to in cooperation.
16      THE VIDEOGRAPHER: Anything further?
17      MR. KAUFMANN: No.
18      MR. KODROFF: No.
19      THE VIDEOGRAPHER: The time is
20  approximately 5:01 p.m.  This deposition is now
21  concluded.
22    Please stand by.
23  [WHEREUPON, the Video Deposition of William
24  Fleming concludes at 5:01 p.m.]
25  .

Confidential

Page 285

1        C A P T I O N
2    The Video Deposition of William Fleming,
3  taken in the matter, on the date, and at the time
4  and place set out on the title page hereof.
5    It was requested that the deposition be
6  taken by the reporter and that same be reduced to
7  typewritten form.
8    It was agreed by and between counsel and
9  the parties that the Deponent will read and sign the
10  transcript of said deposition.
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .

# Exhibit 18

**URGENT! EMERGING THERAPEUTIC ISSUES COMMUNICATION**

Date: April 13, 2002

Dear Marianne:

**RE: Average Wholesale Price Increases**

Pharmaceutical manufacturers make price changes throughout the year.   As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe.   Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%. The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost (WAC) and AWP for certain drugs.   In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.

Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC.   As this trend indicates, it is more important now than ever to put cost management strategies in place.

If we can answer any questions, or if you are interested in the Emerging Therapeutic Issues program and are currently not enrolled, please contact me at your convenience.

Sincerely,


Jennifer Chase, Pharm.D.


CC: Jay Nanney

# Exhibit 19

| | |
|---|---|
| **From:** | Dohm, Jason (BLM) |
| **Sent:** | Tuesday, April 16, 2002 11:31 AM |
| **To:** | Edwin Hedblom, Pharm.D. (E-mail); Mike Anderson (E-mail) |
| **Cc:** | McDougle, Cathy (BLM); Rees, Rhonda (BLM); Quam, Gail (BLM) |
| **Subject:** | ESI AWP Increases Memorandum |
| **Attachments:** | AWP Increase Memo.doc |

Ed and Mike:

Please take a look at the attached memo. First Data Bank has been making a greater number of AWP adjustments than usual this year, many of which are not being driven by the manufacturer. The memo describes our finding. Let me know if you have any questions or if you would like me to set up a meeting to discuss this information further.

Jason

𝕎

AWP Increase
Memo.doc (45 KB)

Jason G. Dohm, Pharm.D.
Director, Clinical Analysis and Strategies Team (CAST)
Managed Care Division
Express Scripts
Phone (952) 837-5313
Fax (952) 837-7136

1

CONFIDENTIAL

ESI-414-00004101

# Exhibit 20

| From: | Wuflestad, Kent (BLM) |
|---|---|
| Sent: | Tuesday, May 14, 2002 9:23 AM |
| To: | 'Dang-Nguyen, MyNgoc (CBC)'; Wuflestad, Kent (BLM) |
| Cc: | Vargo, Harry (BLM); Becker, Kim (BLM) |
| Subject: | RE: FDB AWP |

MyNgoc,
The CBC analysis is done. Since your go-live date was 1/1/02 and 4Q01 is the baseline, we had to choose a client similar to CBC who was with ESI in 4Q01 as the AWP baseline for this measurement. This won't be exact, but it should give us a pretty good ballpark figure.

1Q02 Trend Impact:      1.17%
1Q02 $ Impact           $27,600 (if the AWP for the affected products had stayed the same as they were in 4Q01, your 1Q02 drug costs would have been $27,600 less)

The person I spoke with this morning confirmed that most of the products that will be impacted were changed in 1Q02. The 3 products that contributed most significantly to trend and $ increases across our book of business are Lipitor, Prilosec, and Prevacid.

If you are interested in another analysis at the end of 2Q02 please let me know and we can run it again in July. Thanks!

Kent

-----Original Message-----
From: Dang-Nguyen, MyNgoc (CBC) [mailto:MyNgoc.Dang-Nguyen@CapBlueCross.COM]
Sent: Tuesday, May 14, 2002 8:23 AM
To: Wuflestad, Kent M. R.Ph. (ESI)
Cc: Vargo, Harry (ESI); Becker, Kim R.Ph. (ESI)
Subject: RE: FDB AWP


Thanks Kent for the update. I will share your follow-up with the group.
--myngoc

MyNgoc Dang-Nguyen, Pharm.D.
Director, Pharmacy Services
Capital Blue Cross
Phone 717.541.6140
Fax 717.651-4221
Email myngoc.dang-nguyen@capbluecross.com

IMPORTANT: This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law. If you are not the intended recipient, you should delete this message. Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.


-----Original Message-----
From: Wuflestad, Kent (BLM) [SMTP:kent.wuflestad@express-scripts.com]
Sent: Monday, May 13, 2002 6:38 PM
To: 'MyNgoc Dang-Nguyen'
Cc: Vargo, Harry (BLM); Becker, Kim (BLM)

1

CONFIDENTIAL                    ESI-414-00003711

**Subject:**    FDB AWP

MyNgoc,

Here's the information I have been able to gather in response to your
requests last week:

1. Can we run the AWP impact report specific to CBC?
Yes, the report is being pulled - Kim and I have both contacted the person
responsible for the report. I expected to have it today, but it's not going
to happen today. I will contact him again in the morning and give you an
update tomorrow.

2. What other services establish AWP's and how were they impacted?
The other major services are Medispan and Redbook. Both Medispan and
Redbook AWP's were also impacted.

3. How does FDB establish AWP's?

I discussed this question with someone in our network services department
and she provided some history and clarification. In the past, manufacturers
established their own WAC and Wholesale Price because many pharmacies
ordered direct from the manufacturer. Currently very few manufacturers
establish Wholesale Price - they leave that up to the wholesalers. In our
research, the 2 primary providers of AWP - FDB and Medispan - both use the
same method to establish AWP: they survey wholesalers. Based on this
information, I think I miscommunicated the cause of the increases when we
talked last week. FDB says they have not changed - they set AWP by
surveying wholesalers and taking an average of the wholesale price from
those wholesalers. The AWP on the impacted products increased because the
average of the wholesaler's prices for these products increased.
Standardization of the % difference between WAC and AWP to add consistency
after acquisitions and mergers is still the primary reason for the change,
but the increase in AWP is ultimately at the wholesaler level.

4. What are the next round of drugs that will be impacted?

We believe that most of the drugs that will be impacted have already been
changed. I'm still trying to get more specifics and I'll get back to you as
soon as I know more.

Thanks,
Kent

2

CONFIDENTIAL

ESI-414-00003712

# Exhibit 21

1                 UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

2

3    NEW ENGLAND CARPENTERS BENEFITS      )

     FUND, et al.                          )

4                                          )

              Plaintiffs,                  )

5                                          )  Civil Action

          vs.                              )  No. 1:05-CV-11148-PBS

6                                          )

     FIRST DATABANK and MCKESSON           )

7    CORPORATION,                          (

                                           )

8              Defendants.                 )

                                           )

9

10

11

12                Taken at 404 Fuller Avenue

                       Helena, Montana

13          Tuesday, November 14, 2006 - 9:15 a.m.

14

15

16                 D E P O S I T I O N

17                          OF

18                      TINA WONG

19

20

21

22

23

24        Reported by Mary R. Sullivan, RPR, RMR, Freelance

     Court Reporter and Notary Public, State of Montana,

25   residing in Missoula, Montana.

1    3:18, it's November 14th, we're on the record.
2        Q.  (By Mr. Styant-Browne)  Ms. Wong, you
3    testified about a number of quarterly site visits that
4    ESI does to Blue Cross/Blue Shield.  Do you recollect
5    that testimony?
6        A.  I do.
7        Q.  And I think you said that as part of that
8    process, ESI would put together a binder with reports?
9        A.  Yes.
10       Q.  And samples of those reports, the documents
11   that were put to you previously that I don't think were
12   ever marked as exhibits, but which were of various
13   dates of reports generated by ESI.
14       A.  Yes.
15       Q.  And you testified about the ingredient costs
16   in those reports.  Do you recollect that testimony?
17       A.  Yes.
18       Q.  What did you mean by ingredient costs?
19       A.  Ingredient costs in those reports is our
20   discounted ingredient cost, so it's showing AWP minus
21   our discount.
22       Q.  Okay.  And you testified that on occasions
23   the reports would make a comparison between the AWP
24   discount in that quarter as compared to a previous
25   quarter.  Do you recollect that testimony?

1        A.  Yes.
2        Q.  Do you recollect whether any of the reports
3    showed a comparison over a longer period than two
4    quarters?
5        A.  You know, there could have been.  I--I
6    couldn't tell you specifically without looking at each
7    report.
8        Q.  Do you recollect yourself ever undertaking an
9    analysis of the trend of AWP over a period of a year or
10   more?
11       A.  No, I've never done that.
12       Q.  Okay.  Did you ever undertake an analysis of
13   the trend of AWP prices in respect to any particular
14   drug or group of drugs?
15       A.  No, I've never done that.
16       Q.  And is that consistent with your testimony
17   that the AWP was not an important factor for you to
18   consider as part of your duties?
19       A.  Well, it's important to us in that that's
20   what--you know, that's the amount that we pay--it's a
21   discounted amount off of AWP what we pay the
22   pharmacy, so it's important in that aspect, but I don't
23   monitor--I've never monitored the increase of AWP
24   over--over time.
25       Q.  Yeah, the question was badly phrased, I

1    should have asked does it reflect your previous
2    testimony that the calculation of AWP was not an
3    important factor for you to consider as part of your
4    task.
5        A.  Yes, correct.
6        Q.  Okay.  Now, you testified at some length
7    about the various plan designs which involved passing
8    on certain or all of the costs of drug increases to
9    either the employer or the member.  Do you recollect
10   that testimony?
11       A.  Yes.
12       Q.  And an example of that was I think the
13   mandatory generic pricing policy; is that correct?
14       A.  Yes.
15       Q.  And was the effect of that to pass on all of
16   the costs of the brand drug in circumstances where the
17   member chose that drug and there was a generic
18   available?
19           MS. CHEUNG:  Objection to form.
20       A.  Well, again, it really depends on the
21   outcome, because if they select the brand-name drug,
22   then they're also paying the cost difference between
23   the brand and the generic, so they're ultimately paying
24   almost the entire cost of the prescription, so--but if
25   they're--they do select the generic drug, then, you

1    know, they're saving money, the plan's saving money and
2    so is--therefore the group would be saving money, so it
3    really depends on the outcome of the prescription.
4        Q.  (By Mr. Styant-Browne)  Well, I think in my
5    hypothesis the member was electing to use the brand
6    drug even though the generic was available.
7        A.  Okay.
8        Q.  Explain to me the way it works in terms of
9    who bears the increased cost of that script.
10       A.  Well, if they're on a mandatory generic policy
11   and the member chooses the brand-name drug over
12   the generic, they're paying the brand-name co-pay plus
13   the cost difference between the generic and the brand,
14   so therefore, they're almost paying the entire cost of
15   the brand-name prescription, so in--and really it would
16   depend on the drug specifically and--and--and the
17   negotiated prices on who ends up paying more for it
18   because, you know, depending on the drug, it might be
19   somewhat of a wash.
20       Q.  And--
21       A.  But the member definitely, if they're
22   selecting the brand-name drug, they definitely are
23   paying the co-pay.
24       Q.  And is it possible for you to calculate where
25   there's that particular plan design, namely in this

# Exhibit 22

1                    ANDREA GRANDE

2              UNITED STATES DISTRICT COURT

3                DISTRICT OF MASSACHUSETTS

4

5     - - - - - - - - - - - - - - - X

6     NEW ENGLAND CARPENTERS HEALTH

7     BENEFITS FUND, et al.,

8                    Plaintiffs,

9        v.                        Civil Action

10    FIRST DATABANK, INC., and        No. 1:05-CV-11148-PBS

11    McKESSON CORPORATION,

12                    Defendants.

13    - - - - - - - - - - - - - - - X

14

15    VOLUME I                      Pages 1-106

16

17        VIDEOTAPED DEPOSITION OF ANDREA GRANDE,

18    a witness called by counsel for the Defendant,

19    McKesson Corporation, taken before Kimberly A. Smith,

20    Certified Realtime Reporter, Registered Diplomate

21    Reporter, and Notary Public in and for the

22    Commonwealth of Massachusetts, at the Law Offices of

23    Bonner, Kiernan, Trebach & Crociata, LLP, One Liberty

24    Square, Boston, Massachusetts 02109, on Wednesday,

25    October 11, 2006, commencing at 1:30 p.m.

ANDREA GRANDE

1
2  BY MR. FLUM:
3      Q.  And what do you understand "WAC" to be a
4  reference to?
5          MR. SOBOL:  Objection.
6          MR. PEZZULICH:  Objection.
7          THE WITNESS:  Again, it's the price of a
8  drug.
9  BY MR. FLUM:
10     Q.  Do you have any further understanding about
11 what price for the drug "WAC" is referring to?
12         MR. SOBOL:  Objection.
13         MR. PEZZULICH:  Objection.
14         THE WITNESS:  Again, it's another form of
15 pricing the drug.
16 BY MR. FLUM:
17     Q.  Do you have any understanding as to whether
18 WAC is different from AWP?
19     A.  I know it's a different number.
20     Q.  Do you have any understanding about the
21 relationship between WAC and AWP?
22         MR. SOBOL:  Objection.
23         MR. PEZZULICH:  Objection.
24         THE WITNESS:  I know it's typically less.
25

ANDREA GRANDE

1
2  BY MR. FLUM:
3      Q.  WAC is typically less; is that right?
4      A.  From my understanding.
5      Q.  Do you have any understanding as to how WAC
6  is determined?
7      A.  No.
8      Q.  Are you aware of whether there has been any
9  increase in the spread between WAC and AWP in the
10 period since you have been the manager for corporate
11 pharmacy programs?
12         MR. PEZZULICH:  Objection.
13         THE WITNESS:  No.
14 BY MR. FLUM:
15     Q.  In the pile in front of you is Exhibit 1.
16 Exhibit 1 is a document that was produced by Harvard
17 Pilgrim in response to our subpoena.  It's entitled
18 "PharmaCare Management Services, Inc. Agreement."
19 It's Bates numbered HP/NEC 0698 through 739.
20         My first question to you is whether
21 you've seen this document before?
22     A.  No.
23     Q.  So you worked on the -- Let me withdraw
24 that.
25         So in 1999 were you involved with a

ANDREA GRANDE

1
2  process to retain a new PBM for Harvard Pilgrim?
3      A.  I was brought into the process midstream,
4  pretty much at the end.
5      Q.  And who was the incumbent --
6      A.  I don't even --
7      Q.  -- PBM at that time?
8      A.  I don't remember her name, who was the
9  project manager.
10     Q.  No.  Who was the incumbent PBM?
11     A.  Oh, I'm sorry.  PharmaCare.
12     Q.  As part of that project, did you ever look
13 through the existing PharmaCare agreement?
14     A.  No, I did not.
15     Q.  Did you talk with anyone about the terms of
16 the existing PharmaCare agreement?
17     A.  Specifically, no.
18     Q.  Generally?
19     A.  As part of the PBM process, there was a
20 review of rates, so that was the extent of my
21 exposure.
22     Q.  And did that review of rates include a
23 review of the bids by prospective new PBMs in
24 comparison to the rates that PharmaCare was
25 providing?

ANDREA GRANDE

1
2      A.  Yes.
3      Q.  Who prepared that review?
4      A.  I'm not sure.
5      Q.  Did Harvard Pilgrim hire an outside
6  consultant to assist in that review?
7      A.  I'm not sure.
8      Q.  Do you remember that Mercer was involved?
9      A.  I'm not sure.
10     Q.  Do you remember giving a deposition
11 about -- Let me withdraw that.
12         You testified that you previously
13 gave a deposition --
14     A.  Yes.
15     Q.  -- in a case pending in Boston?
16     A.  Sure.
17     Q.  I'm going to read you some of the testimony
18 from that deposition.
19     A.  Sure.
20     Q.  This is beginning on page 30, at line 15.
21 The question was --
22         MR. SOBOL:  I'm sorry.  I didn't -- well,
23 I did mean to interrupt you, but I didn't mean to be
24 rude.
25         Can you put in the record the date of

Page 102

ANDREA GRANDE

1
2    tier of a retail branded drug from Tier 2 to Tier 3
3    solely because it was costing Pilgrim more money than
4    it wanted to pay?
5        A.  No.
6        Q.  Are you familiar with the allegations in
7    this lawsuit?
8        A.  Specifically, no.
9        Q.  Another less long question, but probably
10   long nevertheless.  I'll represent to you that in
11   this lawsuit the plaintiffs, who seek to represent
12   third-party payers in the United States, allege that
13   the drug wholesaler, McKesson, and the drug pricing
14   publisher, First DataBank, conspired together to
15   change the difference between WAC and AWP on about
16   40 percent of all retail branded drugs, resulting
17   in -- and to do that secretly, resulting in the AWP
18   being about four percent higher than it otherwise
19   would have been if McKesson and First DataBank hadn't
20   gotten together and secretly changed the data in
21   First DataBank's database, okay?
22              Assuming that what I've just said is
23   a fair characterization of the allegations in the
24   lawsuit, before my telling you what this lawsuit was
25   about, had you ever heard of that before?

TSG Reporting - Worldwide    877-702-9580

Page 103

ANDREA GRANDE

1
2        A.  No.
3        MR. SOBOL:  I have nothing further.
4              EXAMINATION
5    BY MR. FLUM:
6        Q.  Just one or two quick follow-up questions.
7              Going back to the issue of changing
8    the tier placement of a drug within the formulary,
9    has cost of the drug to Harvard -- to Harvard Pilgrim
10   ever been a factor, even if it's not the sole factor,
11   in a decision to move a drug from Tier 2 to Tier 3?
12       MR. SOBOL:  Objection to the form.
13       MR. PEZZULICH:  Objection.
14       THE WITNESS:  As I stated earlier, as part
15   of the P&T committee and the review, it's always a
16   balance of clinical and cost.  So it's never one or
17   the other.  It's always a combination of the two.
18       MR. FLUM:  I have nothing further.
19       MR. SOBOL:  Thanks.
20       THE VIDEOGRAPHER:  Here ends Tape 2 and
21   today's deposition.  Off the record, 3:59 p.m.
22       (Deposition concluded at 3:59 p.m.)
23
24
25

TSG Reporting - Worldwide    877-702-9580

Page 104

ANDREA GRANDE

1
2        C E R T I F I C A T E
3
4        I, Kimberly A. Smith, a Certified Realtime
5    Reporter, Registered Diplomate Reporter, and Notary
6    Public in and for the Commonwealth of Massachusetts,
7    do hereby certify that the foregoing is a true and
8    accurate transcript of my stenographic notes of the
9    deposition of ANDREA GRANDE, who was first duly
10   sworn, taken at the place and on the date
11   hereinbefore set forth.
12       I further certify that I am neither attorney or
13   counsel for, nor related to or employed by any of the
14   parties to the action in which this deposition was
15   taken, and further that I am not a relative or
16   employee of any attorney or counsel employed in this
17   case, nor am I financially interested in this action.
18       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
19   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
20   MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
21   DIRECTION OF THE CERTIFYING COURT REPORTER.
22       Signed and sealed this 13th day of October, 2006.
23
24   _____
25       KIMBERLY A. SMITH, CRR, RDR

TSG Reporting - Worldwide    877-702-9580

Page 105

ANDREA GRANDE

1
2    ERRATA SHEET DISTRIBUTION INFORMATION
3    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
4
5
6        ERRATA SHEET DISTRIBUTION INFORMATION
7        The original of the Errata Sheet has been
8    delivered to Matthew C. Pezzulich, Esquire.
9        When the Errata Sheet has been completed by the
10   deponent and signed, a copy thereof should be
11   delivered to each party of record and the ORIGINAL
12   forwarded to Paul Flum, Esquire, to whom the original
13   deposition transcript was delivered.
14
15
16        INSTRUCTIONS TO DEPONENT
17       After reading this volume of your deposition,
18   please indicate any corrections or changes to your
19   testimony and the reasons therefor on the Errata
20   Sheet supplied to you and sign it.  DO NOT make marks
21   or notations on the transcript volume itself.  Add
22   additional sheets if necessary.  Please refer to the
23   above instructions for Errata Sheet distribution
24   information.
25

TSG Reporting - Worldwide    877-702-9580

# Exhibit 23

Page 1

1          JAMES T. KENNEY, JR.

2        UNITED STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4

5   - - - - - - - - - - - - - - - X

6   NEW ENGLAND CARPENTERS HEALTH

7   BENEFITS FUND, et al.,

8              Plaintiffs,

9      v.                        Civil Action

10  FIRST DATABANK, INC., and      No. 1:05-CV-11148-PBS

11  McKESSON CORPORATION,

12             Defendants.

13  - - - - - - - - - - - - - - - X

14

15  VOLUME I                      Pages 1-94

16

17     VIDEOTAPED DEPOSITION OF JAMES T. KENNEY, JR.,

18  a witness called by counsel for the Defendant,

19  McKesson Corporation, taken before Kimberly A. Smith,

20  Certified Realtime Reporter, Registered Diplomate

21  Reporter, and Notary Public in and for the

22  Commonwealth of Massachusetts, at the Law Offices of

23  Bonner, Kiernan, Trebach & Crociata, LLP, One Liberty

24  Square, Boston, Massachusetts 02109, on Wednesday,

25  October 11, 2006, commencing at 10:04 a.m.

JAMES T. KENNEY, JR.

1            JAMES T. KENNEY, JR.
2 BY MR. FLUM:
3     **Q. To your understanding, what's the**
4 **difference between contract price and WAC in the**
5 **Amerisource Bergen system?**
6        MR. SOBOL: Objection to form.
7        MR. PEZZULICH: Objection.
8        THE WITNESS: I can't tell what that is by
9 looking at the system.
10 BY MR. FLUM:
11     **Q. Are the two numbers different?**
12     A. Contract price is typically less than WAC.
13     **Q. When you have had occasion to consult the**
14 **Amerisource Bergen system to compare contract price**
15 **to AWP, have you noticed any trends in the markup?**
16        MR. PEZZULICH: Objection as to form.
17        MR. SOBOL: Objection.
18        THE WITNESS: No, other than just price
19 increases over the years, normal price increases.
20 BY MR. FLUM:
21     **Q. Have you noticed that the percentage**
22 **markups for any of the drugs that you have been**
23 **looking at have increased over the years?**
24     A. Not specifically, no.
25     **Q. So other than information that you received**

1            **JAMES T. KENNEY, JR.**
2 **from manufacturers that you've testified about and**
3 **information in the Amerisource Bergen system that you**
4 **testified about, do you have any other information**
5 **about the range of markups of 16-2/3 to 25 percent**
6 **for prescription drugs -- brand prescription drugs**
7 **that you've testified to?**
8        MR. SOBOL: Object to form.
9        MR. PEZZULICH: Objection.
10        THE WITNESS: No.
11 BY MR. FLUM:
12     **Q. Over the years have you come to any**
13 **understanding as to whether certain manufacturers**
14 **used a 20 percent markup of AWP over WAC?**
15        MR. PEZZULICH: Objection.
16        THE WITNESS: I mean, most manufacturers
17 would have the same markup through -- for the full
18 product line, so I can't recall a specific one that's
19 20.
20 BY MR. FLUM:
21     **Q. So was there a standard markup that you are**
22 **familiar with that manufacturers have used over the**
23 **years for their product line of brand drugs?**
24        MR. PEZZULICH: Objection.
25        MR. SOBOL: Objection.

1            JAMES T. KENNEY, JR.
2        THE WITNESS: It varies by manufacturer.
3 BY MR. FLUM:
4     **Q. In that 16-2/3 to 25 percent range?**
5     A. Um-hum.
6     **Q. That's a "yes"?**
7     A. Yes.
8     **Q. And in your experience, have the**
9 **manufacturers been clustered in any particular point**
10 **in that 16-2/3 to 25 percent range?**
11        MR. PEZZULICH: Objection as to form.
12        MR. SOBOL: Objection.
13        THE WITNESS: No.
14 BY MR. FLUM:
15     **Q. In the work that you do negotiating rebate**
16 **contracts with manufacturers, have you ever had**
17 **occasion to renegotiate a contract in response to a**
18 **price change?**
19     A. No.
20     **Q. Have you ever had occasion to renegotiate a**
21 **rebate contract in response to a change in**
22 **utilization by the members of Harvard Pilgrim?**
23        MR. PEZZULICH: Objection.
24        THE WITNESS: I would say yes.
25

1            JAMES T. KENNEY, JR.
2 BY MR. FLUM:
3     **Q. Can you describe for me the circumstances**
4 **in which you have gone back and attempted to**
5 **renegotiate a price change in response to a**
6 **utilization change?**
7     A. Well, I guess we need to define
8 "renegotiate." I interpret that to mean when a
9 contract expires, we negotiate a new one. I don't
10 negotiate midstream in contracts. When they
11 terminate, then that, to me, would be a
12 renegotiation.
13     **Q. I appreciate the clarification. So during**
14 **the life of a contract, you've never had occasion to**
15 **go back and try to renegotiate the terms of a rebate**
16 **agreement; is that right?**
17     A. No. I'm sure I have, yes, renegotiated
18 terms during the life of a contract.
19     **Q. And do the terms you've renegotiated in the**
20 **life of a contract include the price term?**
21     A. Yes.
22     **Q. And have you been successful in doing that?**
23        MR. PEZZULICH: Objection.
24        THE WITNESS: Yes.
25

Page 90

JAMES T. KENNEY, JR.

1        JAMES T. KENNEY, JR.
2    this past Friday, sir?
3        A.   No.
4        Q.   Drawing your attention to an article in the
5    upper right-hand corner that addresses certain
6    pharmaceutical issues, do you see that, sir?
7        A.   Yes.
8        Q.   Will you please take a moment and read the
9    first six paragraphs of that article.
10       A.   Out loud or --
11       Q.   No.
12       A.   -- silently?
13       Q.   To yourself.
14       A.   Okay.
15           Okay.
16       Q.   Prior to the time -- Let's make sure we get
17   the time frame correct -- prior to the time that you
18   first learned that Harvard Pilgrim had received a
19   subpoena in connection with this lawsuit, were you
20   aware of allegations that the wholesaler, McKesson
21   Corporation, and the publisher, First DataBank, had
22   conspired to secretly increase the markup factors
23   between average wholesale price -- excuse me --
24   average wholesale -- yes -- average wholesale price
25   and the WAC in order to secretly increase profits to

TSG Reporting - Worldwide    877-702-9580

---

Page 91

1        JAMES T. KENNEY, JR.
2    pharmacies and pharmacy benefit managers?
3        A.   No.
4           MR. SOBOL:  Thank you.  I have nothing
5    further.
6           MR. FLUM:  I have nothing.
7           THE VIDEOGRAPHER:  Here ends today's
8    deposition.  Off the record, 12:39 p.m.
9           (Deposition concluded at 12:38 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

---

Page 92

1        JAMES T. KENNEY, JR.
2        C E R T I F I C A T E
3
4       I, Kimberly A. Smith, a Certified Realtime
5    Reporter, Registered Diplomate Reporter, and Notary
6    Public in and for the Commonwealth of Massachusetts,
7    do hereby certify that the foregoing is a true and
8    accurate transcript of my stenographic notes of the
9    deposition of JAMES T. KENNEY, JR., who was first
10   duly sworn, taken at the place and on the date
11   hereinbefore set forth.
12      I further certify that I am neither attorney or
13   counsel for, nor related to or employed by any of the
14   parties to the action in which this deposition was
15   taken, and further that I am not a relative or
16   employee of any attorney or counsel employed in this
17   case, nor am I financially interested in this action.
18      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
19   DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY
20   MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
21   DIRECTION OF THE CERTIFYING COURT REPORTER.
22      Signed and sealed this 13th day of October, 2006.
23
24   _____
25      KIMBERLY A. SMITH, CRR, RDR

TSG Reporting - Worldwide    877-702-9580

---

Page 93

1        JAMES T. KENNEY, JR.
2    ERRATA SHEET DISTRIBUTION INFORMATION
3    DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
4
5
6        ERRATA SHEET DISTRIBUTION INFORMATION
7       The original of the Errata Sheet has been
8    delivered to Matthew C. Pezzulich, Esquire.
9       When the Errata Sheet has been completed by the
10   deponent and signed, a copy thereof should be
11   delivered to each party of record and the ORIGINAL
12   forwarded to Paul Flum, Esquire, to whom the original
13   deposition transcript was delivered.
14
15
16        INSTRUCTIONS TO DEPONENT
17      After reading this volume of your deposition,
18   please indicate any corrections or changes to your
19   testimony and the reasons therefor on the Errata
20   Sheet supplied to you and sign it.  DO NOT make marks
21   or notations on the transcript volume itself.  Add
22   additional sheets if necessary.  Please refer to the
23   above instructions for Errata Sheet distribution
24   information.
25

TSG Reporting - Worldwide    877-702-9580

# Exhibit 24

Page 1

1                  UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

                              -O-

4

5  NEW ENGLAND CARPENTERS HEALTH  :   Civil Action No.:

   BENEFITS FUND, ET AL.,              1:05-CV011148-PBS

6                                  :

              Plaintiffs,

7                                  :

        -v-

8                                  :

   FIRST DATABANK, INC., and

9  McKESSON CORPORATION,          :   Deposition of:

                                      H. ERIC CANNON

10            Defendants,    :

11

12                            -O-

13

14            Place:        TEMPEST REPORTING, INC.

15                          230 South 500 East

16                           Suite 530

17                          Salt Lake City, Utah 84102

18

19            Date:         October 11, 2006

20                          9:55 a.m.

21

22            Reporter:     Ariel Mumma, CSR/RPR

23

24

25                            -O-

1  A.   Yes.
2  Q.   **Is it also true that you don't need to**
3  **know what the difference is between WAC and AWP, in**
4  **order to negotiate the contract off of AWP as low as**
5  **you can go?**
6  A.   Correct.
7  Q.   **Have you ever looked at the difference**
8  **between WAC and AWP?**
9  A.   I have looked at the difference from the
10 standpoint of when I look at a product in the
11 database, I see two prices, one being AWP, and one
12 being WAC.
13      Have I calculated the percent difference,
14 have I done some formal analysis, have I had formal
15 discussions?  No.
16 Q.   **When you say in the database, what**
17 **database are you referring to?**
18 A.   I'm referring to the database we utilize
19 for drug pricing and reference information, which is
20 Medi-Span.
21 Q.   **And for how long have you used the**
22 **Medi-Span database?**
23 A.   Since 1999.
24 Q.   **So were you using the Medi-Span database**
25 **when Medi-Span and First DataBank were owned by the**

1  same entity?
2  A.   I believe so.
3  Q.   **And your contract was in fact with First**
4  **DataBank during that time period; am I correct?**
5  A.   The contracts with First DataBank and
6  Medi-Span are handled by the I.T. side of our
7  business.  The exact details of those contracts, I am
8  not familiar with.
9  Q.   **Who at SelectHealth utilizes the database**
10 **that you receive from Medi-Span?  And when I say who,**
11 **you can tell me by departments.**
12 A.   I don't know that I can give you a
13 complete list.  Actuary and underwriting.
14 Q.   **Is that one department or two?**
15 A.   That would be two.
16      The people that maintain our data
17 warehouse, the researchers that go against those data
18 warehouses, I.T. personnel.
19 (There was a discussion held off the record.)
20 Q.   **BY MS. SCHECHTER:  Is there a finance**
21 **department?**
22 A.   Yes.
23 Q.   **Do they utilize the database?**
24 A.   Not that I currently know.
25 Q.   **What does the research department do?**

1  A.   Within Intermountain Health Care, there
2  are specific departments within the hospitals that may
3  conduct research; there is an arm within the company
4  that conducts population-based research, and they may
5  be using those databases not only for -- in the claims
6  data there's only an NDC number in the actual file
7  that comes acrost in the -- in the NCPDP format.
8       In order to apply a name to a particular
9  number, or in order to put that into a particular
10 therapeutic category, there needs to be a linkage with
11 the database, and in their research efforts they make
12 those linkages.
13 Q.   **Does the research department track drug**
14 **pricing trends?**
15 A.   Drug pricing trends?  No.  They may look
16 at health care cost by disease state or by area.
17      And an example would be:  As a global
18 company, Intermountain Health Care has clinical
19 initiatives in the areas of diabetes and asthma, or
20 clinical initiatives in the area of cardiovascular
21 disease, and they may track drug cost in that
22 particular disease state as a factor of total overall
23 cost of treating the disease state.
24      They may look at the implications of
25 clinical guidelines or protocols on overall cost

1  outcome.  But do they track actual drug cost trends?
2  No.
3  Q.   **How about the actuary or underwriting**
4  **department; do they track actual costs of drugs?**
5  A.   They track the cost of drugs as it relates
6  to utilization of the pharmacy benefit, so they're
7  looking at -- for a particular employer, overall their
8  cost increased, say, 10 percent; and part of that 10
9  percent increase was an inflation in the overall cost
10 of the product, part of that 10 percent increase would
11 be an increase in utilization of a particular product.
12 Q.   **The analysis that you just described, is**
13 **that done employer plan by employer plan?**
14 A.   We track drug expense by employer.
15      I have never seen us -- on an individual
16 employer basis, say, you have a 10-percent trend and
17 seven of that was inflation.  It's -- it's globally
18 for an entire membership.
19 Q.   **Have you seen reports that track trends in**
20 **the costs of drugs across all of your membership?**
21 A.   I have not seen reports.
22 Q.   **Are such reports created?**
23 A.   Reports are created that track -- take --
24 I take that back.
25      I've seen reports that track per-member

Page 142

1    A.   Yes.
2    Q.   Okay.  Can you take a few minutes to read
3  the article.
4    A.   Okay.
5    Q.   Or would you please take a few minutes to
6  read the article.
7         VIDEOGRAPHER:  Would you like to go off?
8         MS. MAHONEY:  I don't think it's
9  necessary.  (Pause)
10   (There was a discussion held off the record.)
11        MS. MAHONEY:  In that case, let's go off
12  the record.
13        VIDEOGRAPHER:  Going off the record, 3:13.
14  (Pause)
15        We're back on the record.  The time is
16  3:18.
17    Q.   BY MS. MAHONEY:  Eric, you stated earlier
18  that your reimbursement rates to pharmacies is based
19  on AWP; is that correct?
20    A.   Yes.
21    Q.   And you also stated earlier that you would
22  expect AWP increases would be based on such
23  indications as inflation and various market -- market
24  factors --
25        MS. SCHECHTER:  Object- --

TSG Reporting - Worldwide    877-702-9580

Page 143

1    Q.   BY MS. MAHONEY:  -- is that right?
2         MS. SCHECHTER:  Objection to the form of
3  the question.
4         MS. KINGMAN:  You can respond.  If she
5  objects you can respond, if you know.
6         THE WITNESS:  Why don't you repeat the
7  question.
8         MS. MAHONEY:  Sure.
9    Q.   Did you state earlier that you had
10  expectations that the AWP would change on the basis of
11  inflation?
12        MS. SCHECHTER:  Objection to the form of
13  the question.
14    A.   Yes.
15    Q.   BY MS. MAHONEY:  Did you state earlier
16  that AWP would change on the basis of other market
17  factors?
18        MS. SCHECHTER:  Objection to the form of
19  the question.
20    A.   Yes.
21    Q.   BY MS. MAHONEY:  Did you have any
22  expectations that the AWP would increase on the basis
23  of manipulation?
24        MS. SCHECHTER:  Objection.  Calls for
25  speculation.  Objection to the form of the question.

TSG Reporting - Worldwide    877-702-9580

Page 144

1    A.   No.
2    Q.   BY MS. MAHONEY:  If you could turn to
3  Page 4 of Exhibit 19.  The first -- first full
4  paragraph beginning with "an internal email on
5  January 7th, 2002," there are three paragraphs in the
6  Wall Street Journal article that purport to quote from
7  McKesson documents.
8         In reading this article, were you
9  surprised by the recitation?
10   (There was a discussion held off the record.)
11        MS. SCHECHTER:  Objection to the form of
12  the question.
13    A.   I'm not surprised by anything I read in
14  the newspaper anymore; and given that this is an
15  ongoing legal issue, I guess I often struggle in that
16  what I see in the paper is one side of the story, and
17  I don't know the details behind that.
18        Was I surprised to see comments like this
19  in an email?  No.
20        MS. MAHONEY:  No further questions.
21        MS. SCHECHTER:  I have just a few.  It
22  won't take that long.
23              *
24              *
25              *

TSG Reporting - Worldwide    877-702-9580

Page 145

1         RE-EXAMINATION
2  BY MS. SCHECHTER:
3    Q.   Had you read this article before?
4    A.   Not fully, no.
5    Q.   Does this article refresh your
6  recollection about any facts?
7    A.   No.
8         MS. SCHECHTER:  I have nothing further.
9         VIDEOGRAPHER:  Okay.  This concludes the
10  deposition.  The time is 3:21.
11        MS. SCHECHTER:  We'll follow the same
12  procedures that we've been following with the other
13  deposition.  The witness can have 30 days to review
14  the transcript once he receives it, and make any
15  corrections.  Does everyone agree?
16        MS. KINGMAN:  If you'll send the copy to
17  my office, it's on the card I gave you.  Then I can
18  make sure he gets it.
19   (The deposition was concluded at 3:22 p.m.)
20              *     *     *
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

# Exhibit 25

Matthew Gibbs – ASCII (00052330).TXT

1

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
     NEW ENGLAND CARPENTERS HEALTH    )
 3   BENEFITS FUND, PIRELLI           )
     ARMSTRONG RETIREE MEDICAL        )
 4   BENEFITS TRUST, TEAMSTERS        )
     HEALTH & WELFARE FUND OF         )
 5   PHILADELPHIA AND VICINITY,       )
     PHILADELPHIA FEDERATION OF       )
 6   TEACHERS HEALTH AND WELFARE      )
     FUND, and DISTRICT COUNCIL 37    )
 7   HEALTH & SECURITY PLAN           )
                                      )
 8               Plaintiffs,          ) Civil Action
                                      )
 9       -vs-                         ) No. 1:05-CV-11148-PBS
                                      )
10   FIRST DATABANK, INC., a          )
     Missouri Corporation; and        )
11   McKESSON CORPORATION, a          )
     Delaware Corporation,            )
12                                    )
                 Defendants.          )
13
14       The RULE 30(b)(6) videotaped deposition of HEWITT
15   ASSOCIATES LLC through MATTHEW A. GIBBS, called for
16   examination, taken pursuant to the Federal Rules of Civil
17   Procedure of the United States District Courts pertaining
18   to the taking of depositions, taken before NANCY L.
19   BISTANY, a Notary Public within and for the County of
20   Cook, State of Illinois, and a Certified Shorthand
21   Reporter of said state, CSR No. 84-1857, at 200 North
22   Columbus Drive, Chicago, Illinois, on October 27, 2006, at
23   9:27 a.m.
                       C O N F I D E N T I A L
24              PURSUANT TO PROTECTIVE ORDER

          BISTANY REPORTING SERVICE   (312) 280-0825
```

2

```
 1   PRESENT:
```

Matthew Gibbs - ASCII (00052330).TXT

3       Q.      Have you reviewed the complaint in this case

4    at all?

5       A.      Not to any detail, no.

6       Q.      Have you seen a copy of it?

7       A.      I don't know what I -- I think all that I've

8    looked at is the results of the settlement, which I think

9    contained some of the complaint, but I think I -- I'm very

10   sure I didn't read into all of that.

11      Q.      That's understandable.  It's quite lengthy.

12              Allow me just to represent to you for the

13   record that that complaint alleges that First Databank and

14   McKesson engaged in a conspiracy to increase the markup

15   between WAC and AWP from 20 to 25 percent.  We'll just

16   take that as an assumption.

17              Were you aware prior to seeing the Wall

18   Street Journal article or prior to seeing the materials

19   associated with the FDB settlement that there had been

20   such a conspiracy?

21      A.      No.

22      Q.      Were you aware that in sometime in late 2001

23   or 2002 that there had been an increase in WAC-to-AWP

24   markups for a variety of branded retail drugs from 20 to

                    BISTANY REPORTING SERVICE  (312) 280-0825

                                                                208


1    25 percent?

2       A.      No.

3       Q.      Prior to seeing the article in the Wall

4    Street Journal, did any of your clients contact you

5    because they were aware of an increase in the WAC-to-AWP

6    markup from 20 to 25 percent?

                              Page 181

# Exhibit 26

Confidential

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH          )

BENEFITS FUND, ET AL.,                 )

                                       )

                      Plaintiffs,      )

vs.                                    ) CASE NO.

                                       ) 1:05-CV-11148

FIRST DATABANK, INC., a Missouri       )

corporation, and McKESSON             )

CORPORATION, a Delaware               )

corporation,                          )

                                       )

                      Defendants.      )

                                       )

        CONFIDENTIAL

        VIDEOTAPED DEPOSITION OF

        DONNY DOWLEN

        Taken on Behalf of the Defendants

        October 19, 2006

Confidential

Page 134

1  correct?
2  A.    I did.
3  Q.    Who else was present during that
4  conversation with legal counsel?
5  A.    The three of us and Earl -- Earl Seymour.
6  Q.    Mr. Kaufmann asked you whether you had
7  learned of the five percent increase in AWP.  Do
8  you recall your answer to that testimony?
9         MR. KAUFMANN:  Object to the form of
10 the question.
11        THE WITNESS:  I recall him asking,
12 yes.
13 BY MS. CONNOLLY:
14 Q.    Yes.  Do you recall that you testified
15 that you were not aware of the five percent
16 increase in AWP?
17 A.    Until I learned about it today.
18 Q.    Right.
19 A.    Okay.
20 Q.    To the best of your knowledge, is there
21 any data that is made available to you on a
22 regular basis that could have made you aware of
23 the five percent increase to AWP --
24        MR. KAUFMANN:  Object --
25

Confidential

Page 135

1  BY MS. CONNOLLY:
2  Q.    -- across the board?
3  A.    No.
4         MR. KAUFMANN:  Object to the form of
5  the question.
6         THE WITNESS:  No.
7         MS. CONNOLLY:  I have no further
8  questions.
9         MR. KAUFMANN:  Okay.
10        E X A M I N A T I O N
11 BY MR. KAUFMANN:
12 Q.    I want to follow up on the last series of
13 questions and have you go back and look at --
14 at -- well, you know what, we don't even need to
15 look at that.
16 A.    Okay.
17 Q.    Do you get information from any source
18 that tells you the cost to the plan of any
19 specific drugs that are reimbursed by the plan?
20 A.    The cost to whom?
21 Q.    The cost to the plan.
22 A.    Oh, I get a -- yes, I get a report from
23 the PBM.
24 Q.    Okay.  And so, for example, if we take the
25 No. 1 drug that's listed on Page 13 of Exhibit 9,

Confidential

Page 136

1  Lipitor, do you see that?  If we look at
2  Lipitor --
3  A.    Yes.
4  Q.    -- you get -- you get a report from the
5  PBM that shows the cost per unit of that drug?
6  A.    I do.
7  Q.    Okay.  And how often do you get that
8  report?
9  A.    I get that once a month.
10 Q.    Okay.  You get that once a month.  You
11 also -- do you get -- if you took that report and
12 you took the cost of that drug per unit, could you
13 plot that on a graph and see the trend in the cost
14 of that drug?
15 A.    You could.
16 Q.    Okay.  Is that ever something that you've
17 done?
18 A.    No.
19 Q.    If you plotted the cost of that drug to
20 the trust on a month-to-month basis, could you see
21 increases and decreases in the cost of that drug
22 to the trust?
23 A.    Yes.
24 Q.    And could you see the magnitude of those
25 increases?

Confidential

Page 137

1  A.    Yes.
2  Q.    Okay.  Now, before you testified -- well,
3  let me -- let me rephrase that.
4         At the break, did you have the opportunity
5  to talk to counsel about your testimony?
6  A.    Yes.
7  Q.    Did you have an opportunity to talk to
8  counsel about the questions that Ms. Connolly
9  would be asking you on rebuttal?
10        MS. CONNOLLY:  I'm -- don't answer
11 that.  I'm instructing you not to answer.
12        THE WITNESS:  I'll defer to my
13 counsel's recommendation.
14        MR. KAUFMANN:  Okay.  I have no
15 further questions.
16        MS. CONNOLLY:  I just have one
17 follow-up question.
18        E X A M I N A T I O N
19 BY MS. CONNOLLY:
20 Q.    The type of chart that Mr. Kaufmann was
21 describing charting costs, have you ever done a
22 chart of that type?
23 A.    No.
24 Q.    Would you ever have any reason in making
25 recommendations to the fund about their drug costs

# Exhibit 27

Page 1

1

2       IN THE UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF MASSACHUSETTS

4           Case No. 1:05-CV-11148-PBS

5

  NEW ENGLAND CARPENTERS HEALTH  )
6 BENEFITS FUND; PIRELLI          )
  ARMSTRONG RETIREE BENEFITS      )
7 TRUST; TEAMSTERS HEALTH &       )
  WELFARE FUND OF PHILADELPHIA    )
8 AND VICINITY; and PHILADELPHIA )
  FEDERATION OF TEACHERS HEALTH   )
9 AND WELFARE FUND,               )
                                  )
10             Plaintiffs,        )
                                  )
11        vs.                     )
                                  )
12 FIRST DATABANK, INC., a        )
   Missouri corporation, and      )
13 McKESSON CORPORATION, a        )
   Delaware corporation,          )
14                                )
               Defendants.        )
15 ------------------------------)

16

17

18        CONFIDENTIAL VIDEOTAPED

19       DEPOSITION OF ROSARIA ESPERON

20          New York, New York

21       Monday, November 6, 2006

22

23

24 Reported by:
   FRANCIS X. FREDERICK, CSR, RPR, RMR
25 JOB NO. 8695

Page 142

R. ESPERON - CONFIDENTIAL

1
2  cost?
3      A.   Nothing was said.  But --
4  specifically.  But we understood that Express
5  Scripts had not fully transferred all of the
6  NPA clients on to whatever system it was
7  using.  Apparently Express Scripts was using a
8  different system, a different platform for
9  computers, et cetera, and we were still in the
10  NPA arrangement at the time that we had that
11  meeting.
12      So the merger or buy-up, whatever
13  it was, had happened but all the systems had
14  not actually been transferred or the clients
15  had not been transferred to Express Scripts'
16  method of business.
17      **Q.   Did the Express Scripts**
18  **representatives say anything at the meeting**
19  **about switching over to the Express Scripts**
20  **systems going forward?**
21      A.   Yes.
22      **Q.   And what did they say?**
23      A.   They said that they would be doing
24  that.  And that they had planned to follow up
25  with us in terms of having there

TSG Reporting - Worldwide      877-702-9580

Page 143

R. ESPERON - CONFIDENTIAL

1
2  representatives come over to train our
3  in-house inquiry personnel to answer for
4  questions for our members on the utilization
5  of that system and giving us access to that
6  system so that we could, you know, see it
7  live; that is, when a member would call up our
8  office and say I'm at the drugstore, I'm
9  having problems, we'd be able to go in and see
10  what the issue was.
11      **Q.   And in connection with that**
12  **discussion about Express Scripts transitioning**
13  **your plan from the NPA system to the Express**
14  **Scripts system, did Express Scripts say that**
15  **part of that change was going to involve a**
16  **switch in the source of AWP from Redbook to**
17  **First Databank?**
18      A.   No.  That was not said at that
19  time.
20      **Q.   All right.  So your recollection**
21  **is that there was a mention at the meeting you**
22  **had with Express Scripts in 2002 or early 2003**
23  **about changing the benchmark, the source of**
24  **the benchmark from Redbook to First Databank;**
25  **is that right?**

TSG Reporting - Worldwide      877-702-9580

Page 144

R. ESPERON - CONFIDENTIAL

1
2      A.   Yes.
3      **Q.   And you don't remember anything**
4  **more that was said about it.**
5      A.   No.  Because, I mean, the
6  conversation basically was focused on how much
7  money we can save but it wasn't -- the source
8  of where the AWP -- what the source was wasn't
9  important at that moment so I don't -- you
10  know, there was really no more discussion
11  about it.
12      **Q.   Did the -- did anyone representing**
13  **Express Scripts ever say to you that by**
14  **switching the source of the AWP benchmark from**
15  **Redbook to First Databank your plan was going**
16  **to save money?**
17      A.   No.  They never said that to us.
18      **Q.   Did anyone from Express Scripts**
19  **ever say to you that they had noticed that**
20  **there had been increases in the spreads**
21  **between wholesale acquisition cost and AWP as**
22  **reported by First Databank?**
23      A.   No.  I wish they had.
24      **Q.   And so I take it nobody from**
25  **Express Scripts said to you that they were**

TSG Reporting - Worldwide      877-702-9580

Page 145

R. ESPERON - CONFIDENTIAL

1
2  **going to be increasing the discounts that they**
3  **were offering to your plan to reflect those**
4  **increases in the spread between wholesale**
5  **acquisition cost and AWP as reported by First**
6  **Databank?**
7      A.   No.  They never told us anything
8  about the spreads or never disclosed anything
9  about that.
10      **Q.   All right.  But they did tell you**
11  **that going forward they were willing to give**
12  **your plan higher percentage discounts off AWP.**
13      MR. NALVEN:  Objection.
14      A.   They said that they were willing
15  to give us in the range of 20, 21 percent, for
16  retail drugs.  Brand name retail drugs.
17      **Q.   And was there any discussion about**
18  **how Express Scripts was able to offer those**
19  **higher discounts?**
20      A.   They basically made it clear that
21  their volume of business made it possible for
22  them to give us these greater discounts.
23      **Q.   Did you ever get those discounts?**
24  **Discounts on the ranges that they had said**
25  **they were offering?**

TSG Reporting - Worldwide      877-702-9580

```
 1                     CONFIDENTIAL
 2         IN THE UNITED STATES DISTRICT COURT
 3          FOR THE DISTRICT OF MASSACHUSETTS
 4             CASE NO. 1:05-CV-11148-PBS
 5

   NEW ENGLAND CARPENTERS HEALTH  )
 6 BENEFITS FUND; PIRELLI          )
   ARMSTRONG RETIREE BENEFITS      )
 7 TRUST; TEAMSTERS HEALTH &       )
   WELFARE FUND OF PHILADELPHIA    )
 8 AND VICINITY; AND PHILADELPHIA  )
   FEDERATION OF TEACHERS HEALTH   )
 9 & WELFARE FUND,                 )
                                   )
10         Plaintiffs,             )
                                   )
11      vs.                        )
                                   )
12 FIRST DATABANK, INC., a         )
   Missouri corporation, and       )
13 MCKESSON CORPORATION, a         )
   Delaware corporation,           )
14                                 )
              Defendants.          )
15 _____)
16
17            CONFIDENTIAL VIDEOTAPED
18     CONTINUED DEPOSITION OF ROSARIA ESPERON
19              New York, New York
20            Monday, January 8, 2007
21
22
23 Reported by:
   LYNN VAN DEN HENDE
24 RPR, CSR, RMR, CRR, CLR
   JOB NO. 9738
25
```

Page 512

1    Confidential - R. Esperon
2    And I did not go directly to the Plan
3  office until I believe it was either April 29 or
4  May 1 of 2002.
5    So there was a two week period when
6  I -- when I was actually in the administrative
7  offices of the union getting myself familiar with
8  all manner of documents and what have you before
9  I was actually introduced to the staff and
10  actually went to the offices of the Plan.
11    **Q.   How would you describe the financial**
12  **condition of the Plan in April of 2002?**
13    A.   I would describe the financial
14  condition at that time as relatively solvent.
15    It had about $180 million in reserves.
16    The Plan projections at that time had
17  been that it would -- that the income would meet
18  expenses, so that we wouldn't have to go into the
19  reserves.
20    And it was -- it was in generally good
21  condition because of the different changes that
22  the prior administration had implemented with
23  respect to the prescription drug benefit and
24  other changes that had happened throughout the
25  Plan.

TSG Reporting - Worldwide    877-702-9580

Page 513

1    Confidential - R. Esperon
2    **Q.   Are these changes that you're**
3  **referring to changes that were implemented to**
4  **reduce the cost of providing the prescription**
5  **drug benefit?**
6    A.   Yes.  They had made changes to change
7  the co-pay that I testified to earlier, just
8  prior to my getting involved.
9    **Q.   Just prior to April of 2002?**
10    A.   Yes.
11    In 2000 I believe, in 2000 they made
12  some changes.  And they had reduced what they had
13  anticipated in terms of paying out for
14  prescription drugs.
15    **Q.   Now you're aware that First Databank**
16  **published AWPs for drugs that -- I'm sorry, let**
17  **me start that again.  You're aware that First**
18  **Databank published AWPs that -- let me try that**
19  **again.**
20    **You're aware that First Databank's**
21  **published AWPs for drugs beginning in late 2001**
22  **and into 2002 reflected a spread between the WAC**
23  **and the AWP that had been enlarged from 20**
24  **percent to 25 percent, aren't you?**
25    MR. FLUM:  Objection.

TSG Reporting - Worldwide    877-702-9580

Page 514

1    Confidential - R. Esperon
2    Leading.  No foundation.
3    A.   Yes, I am aware of that.
4    **Q.   And how did you become aware of that?**
5    A.   I became aware of that because our
6  organization is a member of another organization
7  that has as its object monitoring the prices of
8  prescription drugs.
9    And so in the regular course of
10  attending those meetings my staff attended and
11  came back and advised us that there had been a
12  presentation made, advised me in particular that
13  there had been a presentation made, and that
14  there was this evidence that had been discussed
15  at this meeting about how there had been an
16  additional amount of -- of -- that is, an
17  additional percent added to what otherwise was
18  the average wholesale price and how that was
19  impacting all of the plans across the country.
20    And so that's how I became aware of
21  it.
22    **Q.   And can you put a date on when it was**
23  **that you became aware of the enlargement of First**
24  **Databank's published AWP?**
25    A.   I believe it was sometime in 2005.

TSG Reporting - Worldwide    877-702-9580

Page 515

1    Confidential - R. Esperon
2    **Q.   And when in 2005 did that take place?**
3    A.   It was either in the late summer or
4  early fall, I believe.
5    You know, I can't recall exactly, but
6  sometime in that period.
7    **Q.   What information did you have -- did**
8  **anyone at DC37 have prior to the events that you**
9  **just described concerning the enlargement of the**
10  **First Databank published AWP WAC spread amount**
11  **that took -- the enlargement that took place in**
12  **2001 and 2002?**
13    MR. FLUM:  Objection.
14    Compound.  No foundation.
15    A.   No, I had no information whatsoever
16  before that.
17    **Q.   So the first that you found out about**
18  **the change in the WAC/AWP spread and FBB**
19  **published AWPs was in 2005?**
20    MR. FLUM:  Leading.
21    A.   Yes.
22    **Q.   And are you aware of whether anyone at**
23  **DC37 had any information prior to the time that**
24  **it was reported to you?**
25    A.   No, I'm not aware that anybody at DC37

TSG Reporting - Worldwide    877-702-9580

1           Confidential - R. Esperon
2  had any information, otherwise they would have
3  disclosed it.
4       Q.   Do you believe that the -- that the
5  actions taken by First Databank and the
6  defendant, McKesson, in this case, to cause the
7  WAC/AWP spread to be enlarged in 2001 and 2002
8  caused harm to the DC37 Plan?
9           MR. FLUM:  Objection.
10          Leading.  Assumes facts.
11      A.   I do believe it caused harm.  It was
12 obvious.
13          Because our -- our expenditure
14 increased significantly.  We wound up with this
15 huge deficit that we were facing.
16          And it was all because of the increase
17 in the cost of the prescription drugs.
18          Nothing else in our -- in our benefits
19 increased by quite the amount that this
20 prescription drug benefit was -- was escalating.
21      Q.   Are you aware of the amount that DC37
22 Plan currently has in its reserve?
23      A.   Yes.
24      Q.   And what is that amount?
25      A.   Well we currently have about $145

1           Confidential - R. Esperon
2  million in reserve.
3       Q.   How has that amount changed between
4  2001 and the present?
5       A.   Well if you take into account what we
6  would have made in terms of investment gains and
7  if you take into account what we withdrew over
8  the course of the last five years, the amount has
9  changed by, I would say, over 70 or $80 million.
10      Q.   Changed in which direction?
11      A.   Down, downward.
12          As I indicated to you, when I got
13 there, there were $180 million in the reserves.
14          If that had not been touched and we
15 would have continued to get investment increases
16 and we had been able to just keep our money
17 there -- I mean, the market has done so much
18 better.
19          We did pretty well in the bond market,
20 which is where the majority of our money was
21 invested during the, you know, '03, '04, '05
22 years.
23          It was only in '06 that we started to
24 not do so well in the bond market.
25          We would have got -- we would have at

1           Confidential - R. Esperon
2  least an additional $90 million in that account.
3           And we don't because we had to spend
4  it because of this prescription drug benefit.
5       Q.   And is it your understanding that DC37
6  had to spend its reserve on the prescription drug
7  benefit because of the actions taken by First
8  Databank and the defendant, McKesson, as are set
9  forth in the complaint in this case?
10          MR. FLUM:  Objection.
11          Leading.  Argumentative.  Assumes
12 facts.
13      A.   It is my belief that if -- if the
14 average wholesale price of the prescription drugs
15 that we would pay had not been artificially
16 inflated, we would not have paid that extra
17 amount of money.
18          Why would we?  We would have been
19 insane to do that.
20      Q.   Mr. Flum showed you some documents
21 that reflected cost analysis for the prescription
22 drug benefit that had been provided to DC37 and
23 had been reviewed by you over the years in which
24 you were an administrator of DC37.
25          Do you recall that?

1           Confidential - R. Esperon
2       A.   Yes, I do recall.
3       Q.   Are you aware of whether you or anyone
4  at DC37, from the period 1999 to the present, had
5  access to the database that is published by First
6  Databank reflecting First Databank's published
7  AWPs?
8       A.   No one at DC37 had then, nor has it
9  today.
10      Q.   Is there any -- does anyone at DC37
11 have access to AWP and/or WAC information on a
12 drug-by-drug NDC basis for the drugs that are
13 included in DC37's prescription drug benefit?
14      A.   No, nobody.  No one has access to that
15 information at District Council 37.
16      Q.   Could you describe generally the kinds
17 of financial information relating to the
18 prescription drug benefit that you had access to
19 or that DC37 in general had access to during the
20 time that you were the administrator of the fund?
21      A.   The only financial data that we have
22 available and that we've had continuously is that
23 which is provided to us by the prescription
24 benefit manager with respect to what our members
25 have utilized, how much the member paid and how

58

# Exhibit 28

Confidential

Page 1

1         IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4   NEW ENGLAND CARPENTERS HEALTH        )
    BENEFITS FUND, ET AL.,               )
5                                        )
                        Plaintiffs,      )
6   vs.                                  ) CASE NO.
                                         ) 1:05-CV-11148
7   FIRST DATABANK, INC., a Missouri     )
    corporation, and McKESSON           )
8   CORPORATION, a Delaware              )
    corporation,                         )
9                                        )
                        Defendants.      )
10                                       )

11

12       CONFIDENTIAL

13       VIDEOTAPED DEPOSITION OF

14       EARL W. SEYMOUR

15       Taken on Behalf of the Defendants

16       October 19, 2006

17

18

19

20

21

22

23

24

25

Confidential

Page 74

1  group of pharmacies within the Des Moines area and
2  a chain to -- I gave those names to Donny Dowlen
3  and Southern Benefits to work with that said they
4  would accept the mail order prices.
5          And so I was fortunate enough that we were
6  able to develop a contract with them in the same
7  regards of the mail order, and our people could
8  walk into the pharmacy and get their 90-day
9  supply.
10 Q.    What chain is that?
11 A.    Hy-Vee Drug.
12 Q.    Have you been able to negotiate similar
13 discounts with pharmacies in other locations?
14 A.    No.
15 Q.    Have you --
16 A.    I actually had about, I believe, five
17 different pharmacies in Des Moines that would
18 accept those prices. Hy-Vee happened to be a
19 chain that covers Iowa, into Minnesota, into
20 Illinois, I believe into Missouri. But it covered
21 a wide section that really benefited our people.
22 Q.    Have you ever tried to negotiate similar
23 deals with other pharmacies?
24 A.    Where?
25 Q.    Anyplace.

TSG Reporting - Worldwide    877-702-9580

---

Confidential

Page 75

1  A.    I have not other than my particular
2  location.
3  Q.    Do you know if anyone else on behalf of
4  the trust has tried to do that?
5  A.    I couldn't give you a definitive answer
6  with it. I'm sure some of the board members
7  looked at it in their area, but that's a difficult
8  nut to crack.
9  Q.    Have you ever had a policy for mandatory
10 generics?
11 A.    No.
12 Q.    Why not?
13 A.    Because a doctor may prescribe a name
14 brand drug, and I as a board member don't think
15 that -- you know, that's a doctor recommendation
16 to his patient. I think that I as a board member
17 should be able to see that our participants have
18 access to a pharmacy benefit. They may have to
19 pay a higher copay, but at least it won't break
20 their bank.
21 Q.    Have you ever -- well, let me rephrase
22 that.
23          You have a two-tier copay; is that right?
24 A.    Yes.
25 Q.    Have you ever considered a three-tier

TSG Reporting - Worldwide    877-702-9580

---

Confidential

Page 76

1  copay?
2  A.    Why?
3  Q.    Maybe you can ask Mr. Dowlen that. But
4  let me ask you the question of have you ever
5  considered a three-tier copay?
6  A.    Not that I recall.
7          MR. KAUFMANN: I think that's all
8  that I have for you, sir. We're going to have to
9  talk to Mr. Dowlen. There may be things that he
10 says, no, no, no, you got to go back to
11 Mr. Seymour. I don't know that and -- or there
12 may be document issues. So I reserve the right to
13 call you again, but I think that we can move on to
14 Mr. Dowlen.
15         Thank you.
16         MS. CONNOLLY: I just have one
17 follow-up question for you, Mr. Seymour.
18         E X A M I N A T I O N
19 BY MS. CONNOLLY:
20 Q.    Prior to reviewing the complaint in this
21 case, did you have any knowledge of the alleged
22 fraud within it?
23 A.    Was I aware there was a legal action prior
24 to --
25 Q.    No, were you aware of the facts that were

TSG Reporting - Worldwide    877-702-9580

---

Confidential

Page 77

1  go -- that were alleged in the complaint?
2  A.    No.
3          MR. KAUFMANN: Let -- I'm sorry.
4          MS. CONNOLLY: Okay. I have nothing
5  further. I did want to note for the record that I
6  would like to mark this confidential under the
7  protective order.
8          MR. KAUFMANN: That's fine. I'm
9  sorry. The questions that you asked reminded me
10 of something I did forget to ask.
11         E X A M I N A T I O N
12 BY MR. KAUFMANN:
13 Q.    Sir, are you familiar at all with the
14 settlement that is proposed between plaintiffs and
15 First DataBank?
16 A.    No.
17 Q.    Have you in any way been consulted with
18 regard to the settlement?
19 A.    No.
20         MR. KAUFMANN: Okay. Thank you.
21         THE VIDEOGRAPHER: Go off the record?
22         MR. KAUFMANN: Off the record.
23         MS. CONNOLLY: Yeah.
24         THE VIDEOGRAPHER: Okay. This mark
25 the end of Tape No. 2. The time on the monitor is

TSG Reporting - Worldwide    877-702-9580

# Exhibit 29

```
00001
 1
 2                    CONFIDENTIAL
 3            UNITED STATES DISTRICT COURT
 4          FOR THE DISTRICT OF MASSACHUSETTS
 5                     -   -   -
 6   NEW ENGLAND CARPENTERS   : CIVIL ACTION
     HEALTH BENEFITS FUND,    :
 7   PIRELLI ARMSTRONG RETIREE :
     MEDICAL BENEFITS TRUST,   :
 8   TEAMSTERS HEALTH & WELFARE:
     FUND OF PHILADELPHIA AND  :
 9   VICINITY AND PHILADELPHIA :
     FEDERATION OF TEACHERS    :
10   HEALTH AND WELFARE FUND,  :
     AND DISTRICT COUNCIL 37   :
11   HEALTH & SECURITY PLAN,   :
                   Plaintiffs  :
12            vs.             :
                              :
13   FIRST DATABANK, INC.,    :
     a Missouri corporation,   :
14   AND MCKESSON CORPORATION, :
     a Delaware corporation,   :
15            Defendants  :  1:05-11148-PBS
16                     -   -   -
                 Philadelphia, Pennsylvania
17
                 Thursday, October 5, 2006
18                     -   -   -
19            Videotape deposition of WILLIAM
20   EINHORN, taken pursuant to notice, at the
21   offices of Varallo, Incorporated, 1835
22   Market Street, Suite 600, on the above
23   date, beginning at approximately 9:36
24   a.m., before Cynthia A. Whyte, Registered
25   Professional Reporter and Notary Public.
```

00106

```
 1                    William J. Einhorn

 2        Q.   And had you heard from any source

 3   other than your counsel that First Databank

 4   had increased the AWP by a multiple of 1.25?

 5             Let me try that again.  Let me give

 6   you a question that you can answer.

 7        A.   The answer to the question that you

 8   just posed is no.

 9        Q.   No?

10        A.   Other than through counsel, no.

11        Q.   Thank you.

12             Before you put Exhibit 4 away, this

13   was the only copy of a report of top drugs by

14   cost that I saw in the documents that your

15   counsel produced.  Why did this one get

16   retained in your files, if you know?

17        A.   It was presented to the trustees.

18   The others I may have produced, looked at, and

19   just discarded.

20        Q.   So your practice was typically to

21   run a report and, after you had finished with

22   it, to discard it?

23        A.   Yes.

24        Q.   Is there a file that you've kept of

25   information about the Fund's prescription drug
```