UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>                              Plaintiffs,<br><br>          v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                              Defendants. | C.A. No. 1:05-CV-11148-PBS |

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO MCKESSON'S MOTION TO COMPEL
INTERROGATORY RESPONSES**

I, Steve W. Berman, hereby declare that:

1.       I am a partner of Hagens Berman Sobol Shapiro LLP ("HBSS"), resident in its

Seattle, Washington, office, and I am one of counsel for the Plaintiffs in the above-captioned

matter.  I submit this declaration in support of Plaintiffs' Opposition to McKesson's Motion to

Compel Interrogatory Responses.

2.       On August 28, 2006, Plaintiffs served a set of interrogatories on McKesson,

asking it to reveal the evidence on which it intended to rely in its opposition to Plaintiffs' motion

to certify the class.  Because of the adjusted briefing schedule, which did not require McKesson

to respond to Plaintiffs' motion, filed July 17 until November 20, McKesson would have four months to respond to Plaintiffs' brief. Plaintiffs served these interrogatories to avoid being ambushed by the plethora of evidence that McKesson was likely to have gathered in that time. McKesson refused to answer them. A copy of Plaintiffs' interrogatories and McKesson's objections are attached as Exhibit 1.

3.      As part of their initial disclosures, pursuant to Rule 26, Plaintiffs identified numerous persons likely to have knowledge of the facts of the case; the list of potential witnesses totaled eight pages. Attached as Exhibit 2 are Plaintiffs' initial disclosures. By comparison McKesson's own disclosures, attached as Exhibit 3, were relatively spare.

4.      McKesson documents MCKAWP 0057415 and MCKAWP 0057171 are attached as Exhibits 4 and 5 respectively.

5.      In the Second Amended Complaint Plaintiffs identify several individuals likely to have been involved in the events described therein as well as numerous communications, most identified by Bates label, which disclose the names of still more individuals likely to have knowledge of the facts of the case. Attached as Exhibit 6 is a collection of excerpts from the FAC, showing the numerous communications Plaintiffs have identified in the complaint.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of March 2007.


                                        /s/ Steve W. Berman
                                        STEVE W. BERMAN

001821-13  159880 V1

## CERTIFICATE OF SERVICE

I, Steve W. Berman, hereby certify that a true and correct copy of the above document was served on the attorney of record for each party via the Court's electronic filing system this 19th day of March, 2007.

By  **/s/ Steve W. Berman**
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

001821-13 159880 V1

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | Civil Action No. 1:05-CV-11148-PBS |

**DEFENDANT MCKESSON CORPORATION'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND FIFTH REQUEST FOR PRODUCTION OF DOCUMENTS, TITLED "FOURTH REQUEST FOR PRODUCTION OF DOCUMENTS," SERVED ON AUGUST 28, 2006**

Pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure, Defendant McKesson Corporation ("McKesson"), by its attorneys, Morrison & Foerster LLP, objects to and responds to Plaintiffs' First Set of Interrogatories and Fifth Request for Production of Documents to McKesson ("Requests"), [1] as propounded by Plaintiffs, as follows:

---

[1] Plaintiffs sent their "Third Request for Production of Documents to McKesson" on July 28, 2006. On August 7, 2006, plaintiffs sent another document identically titled "Plaintiffs' Third Request for Production of Documents to McKesson," which contained document requests different from plaintiffs' July 28, 2006 document requests. Thus, McKesson has referred to plaintiffs' August 7, 2006 request as Plaintiffs' Fourth Request for Production of Documents. McKesson responded to this set of requests on September 11, 2006. McKesson will therefore refer to this set of requests served on August 28, 2006 as "Plaintiffs' Fifth Request for Production of Documents to McKesson."

sf-2192406

## GENERAL OBJECTIONS TO INTERROGATORIES

1.    McKesson objects to the definitions of "You" and "Yours" to the extent they purport to require the furnishing of documents or information in the possession, custody, or control of persons or entities other than McKesson.

2.    McKesson objects to the definition of "Identify" as overly broad and unduly burdensome.

3.    McKesson objects to the Definitions and Rules of Construction, both individually and collectively, to the extent they seek to create any obligation to provide information or documents in a manner not required under the Federal Rules of Civil Procedure or other applicable law.  McKesson expressly disclaims any such obligation and objects to any attempt to impose any further or greater obligation upon it to collect or produce information or to supplement these responses, except as may be imposed by law, regulation, or court order.

4.    McKesson objects to each interrogatory to the extent it seeks information that is not within McKesson's possession, custody or control.

5.    McKesson objects to each interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege. If any information subject to a privilege, immunity, or protection is inadvertently disclosed by McKesson, such disclosure does not constitute a waiver of any privilege, immunity, or protection.

6.    McKesson objects to each interrogatory to the extent it seeks information that is publicly available or readily available to the plaintiff.

7.    McKesson's investigation is continuing and it reserves the right to amend, modify, or supplement its responses.

Subject to and without waiver of the foregoing general objections, McKesson provides the following responses to specific interrogatories:

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES
## INTERROGATORY NO. 1:

2

List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the prerequisites to a class action pursuant to Federal Civil Procedure Rule 23(a).

**RESPONSE TO NO. 1:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 2:**

With respect to Your response to Interrogatory No. 1, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 2:**

McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and witness supporting every fact underlying any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will identify the documents and witnesses on which McKesson relies.

3

**INTERROGATORY NO. 3:**

      List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the requirements of Federal Civil Procedure Rule 23(b) to maintain a class action.

**RESPONSE TO NO. 3:**

      McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing.  McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine.  Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for class certification, McKesson's submissions filed in support of its opposition will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 4:**

      With respect to Your response to Interrogatory No. 3, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 4:**

      McKesson objects to this interrogatory on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and every witness supporting every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine.  Subject to and without waiver of the foregoing general and specific objections, to the extent McKesson opposes plaintiffs' motion for

4

class certification, McKesson's submissions filed in support of its opposition will identify the documents and witnesses on which McKesson relies.

**INTERROGATORY NO. 5:**

List in detail all facts upon which You base Your claim, if any, that Plaintiffs are not able to satisfy the requirements of Federal Civil Procedure Rule 23(c) to certify a class action.

**Response to Interrogatory No. 5:**

McKesson objects to this interrogatory on the grounds that it is vague and ambiguous to the extent that plaintiffs have not asserted a claim that they have satisfied the requirements of Rule 23(c) of the Federal Rules of Civil Procedure. McKesson further objects to this interrogatory as premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every fact that supports any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(c), particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson also objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent that McKesson asserts a "claim" that plaintiffs have failed to satisfy Rule 23(c) of the Federal Rules of Civil Procedure, McKesson's submissions in support of such a "claim" will contain the facts and legal arguments on which McKesson relies.

**INTERROGATORY NO. 6:**

With respect to Your response to Interrogatory No. 6, identify all documents and witnesses supporting such facts, if any.

**RESPONSE TO NO. 6:**

McKesson objects to this interrogatory on the grounds that it is vague and ambiguous to the extent that plaintiffs have not asserted a claim that they have satisfied the requirements of Rule 23(c) of the Federal Rules of Civil Procedure. McKesson further objects to this interrogatory as premature, overly broad and unduly burdensome, including to the extent that it seeks the identification of every document and every witness supporting every fact that supports

sf-2192406

any "claim" that Plaintiffs cannot satisfy the requirements to certify a class action pursuant to Rule 23(c), particularly at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent that McKesson asserts a "claim" that plaintiffs have failed to satisfy Rule 23(c) of the Federal Rules of Civil Procedure, McKesson's submissions in support of such a "claim" will identify the documents and witnesses on which McKesson relies.

## OBJECTIONS TO DEFINITIONS IN REQUEST FOR PRODUCTION

1.    McKesson objects to the definition of "Document(s)" on the grounds that this definition is overly broad and unduly burdensome, including to the extent it purports to broaden the definition in Local Rule 26.5(c)(2). McKesson further objects to this definition on the ground that it seeks original documents or purports to require the production of documents in a specific medium or format.

2.    McKesson objects to the definition of "All documents" on the grounds that this definition is overly broad and unduly burdensome. McKesson further objects to this definition to the extent that it seeks original documents or purports to require the production of documents in the possession, custody, or control of persons or entities other than McKesson.

3.    McKesson objects to the definition of "You" and "Your" to the extent it purports to require the production of documents in the possession, custody, or control of persons or entities other than McKesson.

4.    McKesson objects to the definition of "Person" as overly broad and unduly burdensome, including to the extent it  purports to broaden the definition provided in Local Rule 26.5(c)(6).

5.    McKesson objects to the definition of "Concerning" as overly broad and unduly burdensome, including to the extent it purports to broaden the definition provided in Local Rule 26.5(c)(7). McKesson further objects to the definition to the extent it purports to require the

6

production of documents "relating to" and "pertaining to" the subject of a request. Use of either of these terms in a request renders the request overly broad, unduly burdensome, vague, and ambiguous.

6. McKesson objects to the definition of "Meeting" as overly broad and unduly burdensome.

7. McKesson objects to the definition of "Communication" and "communications" as overly broad and unduly burdensome, including to the extent it purports to broaden the definition provided in Local Rule 26.5(c)(1). McKesson further objects to the definition to the extent it purports to require the production of communications that have not been recorded in a "Document."

## OBJECTIONS TO INSTRUCTIONS IN REQUEST FOR PRODUCTION

1. McKesson objects to Instruction No. 1 as oppressive and unduly burdensome to the extent it purports to require McKesson to produce documents in the possession, custody, or control of persons or entities other than McKesson.

2. McKesson objects to Instruction No. 2 as oppressive and unduly burdensome, including to the extent it purports to require the production of the original of each document and to the extent it purports to require the production of documents in a specific medium or format.

3. McKesson objects to Instruction No. 3 as oppressive and unduly burdensome, including to the extent it purports to require McKesson to permit Plaintiffs to inspect any file drawer, filing cabinet, or any other storage device where documents responsive to these requests are maintained at the time of the inspection of such documents.

4. McKesson objects to Instruction No. 4 as oppressive and unduly burdensome, including to the extent it purports to require the production of documents in a specific medium or format.

5. McKesson objects to Instruction No. 5 as oppressive and unduly burdensome. When McKesson states that it will produce documents, McKesson will undertake a reasonably diligent search of its files and will produce responsive documents, if any such documents exist.

7

6.     McKesson objects to Instruction No. 6 as oppressive and unduly burdensome, including to the extent it purports to require, for documents withheld on the grounds of privilege or work product, a statement of each and every fact or basis upon which a privilege is claimed or on which the document is withheld.

7.     McKesson objects to Instruction No. 7 as oppressive and unduly burdensome, including to the extent it purports to require, for documents redacted on the grounds of privilege or work product, a statement of each and every fact or basis upon which a privilege is claimed or on which the document is redacted.

## GENERAL OBJECTIONS

1.     McKesson objects to the Definitions and Instructions, both individually and collectively, to the extent they seek to create an obligation to provide information or documents in a manner not required by the Federal Rules of Civil Procedure, the Local Rules for the District of Massachusetts, or other applicable law. McKesson expressly disclaims any such obligation and objects to any attempt to impose any further or greater obligation upon it to collect or produce documents or information or to supplement these responses, except as may be imposed by law, regulation, or court order.

2.     McKesson objects to each request to the extent it seeks documents that are not within its possession, custody, or control. When McKesson states that it will produce documents in response to a request, it will produce non-privileged documents within the possession, custody, or control of McKesson that have been identified after a reasonable investigation of its files.

3.     McKesson objects to each request to the extent it seeks documents or information protected by the attorney-client privilege, work product doctrine, or any other applicable privilege, or by any constitutional, statutory, or regulatory proscription against disclosure. If any documents or information subject to a privilege, immunity, protection, or proscription are inadvertently disclosed by McKesson, such disclosure does not constitute a waiver of any privilege, immunity, protection, or proscription.

8

sf-2192406

4.     McKesson objects to the production of any information or documents to the extent such production would be inconsistent with a confidentiality agreement, a protective order in another action or proceeding, or some other restriction on production. McKesson also objects to each request to the extent it seeks the production of the proprietary information of third parties or of information that is subject to confidentiality or other contractual obligations to third parties that prohibit or restrict McKesson's disclosure of such information.

5.     McKesson objects to each request to the extent it seeks information and/or documents that are publicly available or readily available to Plaintiffs.

6.     These responses are made solely for the purposes of this action. By responding and providing documents, McKesson does not concede the relevance or materiality of the request or of the subject to which such request refers. McKesson's response is made expressly subject to, and without in any way waiving or intending to waive, any questions or objections as to the competence, relevance, materiality, privilege or admissibility as evidence or for any other purpose, of any of the information referred to or produced or of the responses given herein, or of the subject matter thereof. Further, the objections and/or responses given herein are made subject to McKesson's right to object to any proceedings involving or relating to the subject matter of the corresponding request.

7.     A response by McKesson that it will produce information and/or documents in response to a particular request is not a representation that any information or documents responsive to that request exist, but only that such information and/or documents will be produced if they are located after McKesson conducts a reasonable search of those files that are likely to contain responsive information and/or documents. Further, a response that McKesson will produce responsive information and/or documents (or the production of any information and/or documents in response to a particular request) is not a representation that McKesson adopts, accepts, affirms, or admits the assertions, contentions, or definitions used or made in connection with the definitions, instructions, or requests.

9

8.     No admission of any kind or nature is to be implied or inferred from these objections and/or responses. The fact that any individual request has been answered should not be taken as an admission, concession, or as evidence of the existence of any facts set forth or assumed by each request.

9.     McKesson objects to these Requests to the extent that they seek documents and/or information not created and/or maintained in McKesson's usual course of business.

10.     McKesson's investigation is continuing, and it reserves the right to amend, modify, or supplement its responses.

## RESPONSES TO REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1:**

Please produce all documents identified in your responses to Interrogatory Nos. 1-6.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

McKesson objects to this request on the grounds that it is premature, overly broad and unduly burdensome, including to the extent that it seeks the production of all responsive documents at this stage of the litigation when discovery on class issues is ongoing. McKesson further objects to this request to the extent it seeks the production of documents protected from disclosure by the attorney-client privilege or work product doctrine. Subject to and without waiver of the foregoing general and specific objections, to the extent that McKesson asserts "claims" that plaintiffs have not satisfied the requirements of Rule 23(a), (b), or (c) of the Federal Rules of Civil Procedure, McKesson will produce at the appropriate time, documents supporting such "claims."

10

Dated: October 2, 2006                    MORRISON & FOERSTER LLP

                                   By:  _____
                                        Tiffany Cheung

                                        Attorneys for Defendant
                                        McKESSON CORPORATION


## CERTIFICATE OF SERVICE

I certify that a true copy of this document was served on October 2, 2006 via e-mail to:

| | | |
|---|---|---|
| Steve W. Berman<br>Elizabeth Fegan<br>Thomas M. Sobol<br>steve@hbsslaw.com<br>beth@hbsslaw.com<br>Tom@hbsslaw.com<br><br>*Counsel for Plaintiffs* | George E. Barrett<br>Edmund L. Carey<br>Gerald E. Martin<br>Timothy L. Miles<br>gbarrett@barrettjohnston.com<br>tcarey@barrettjohnston.com<br>jmartin@barrettjohnston.com<br>tmiles@barrettjohnston.com<br><br>*Counsel for Plaintiffs* | Kenneth A. Wexler<br>Jennifer Fountain Connolly<br>kaw@wtwlaw.us<br>jfc@wtwlaw.us<br>Jeffrey Kodroff<br>John Macoretta<br>jkodroff@srk-law.com<br>jmacoretta@srk-law.com<br><br>*Counsel for Plaintiffs* |
| Mark Redman<br>mredman@hearst.com<br><br>*Counsel for First DataBank* | | |

                                   _____
                                   Tiffany Cheung

11

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,<br><br>                    Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri Corporation; and McKESSON CORPORATION, a Delaware Corporation,<br><br>                    Defendants | Civil Action No. 1:05-CV-11148-PBS |

## PLAINTIFFS' RULE 26 DISCLOSURE

Pursuant to Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure plaintiffs hereby make the following initial disclosures.

The following disclosures are made based upon the current understanding of the facts in this matter and the disclosures herein are based on information reasonably available to plaintiffs as of this date. Plaintiffs reserve the right to supplement, amend or modify these disclosures as new information becomes available.

001821-13 98851 V1

By making these disclosures, plaintiffs neither (1) represents that they have identified every document, tangible thing or witness possibly relevant to this lawsuit; (2) represents that disclosed witnesses necessarily have current knowledge of the identified areas of information; (3) waives its right to object to the production of any document, tangible thing, or any other information (including witness testimony) on the basis of any privilege, the work product doctrine, relevance, undue burden or any other valid objections; (4) nor concedes defendants are entitled to any of the documents, tangible things or individuals cited herein.

A.    **Individuals Now Known to be Likely to Have Information that Plaintiffs May Use to Support Their Claims or Defenses**

1.    **Plaintiffs**

As set forth below, plaintiffs' employees may be contacted only through plaintiffs' counsel of record.  The following table identifies codes used to designate the "Areas of Information" for each identified individual:

<u>Code</u>  <u>Category</u>

1.    Payments by Plaintiff

2.    Plaintiffs' Organizational Structure

| Name & Last Known Title | Last Known Address & Telephone Number | Area of Information |
|---|---|---|
| Plaintiff New England Carpenters Health Benefits Fund<br>    Employee<br>    1.   Jim Buckley | c/o Plaintiffs' Counsel | 1, 2 |
| Plaintiff Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ("PMBT")<br>    Employee<br>    1.   Earl Wayne Seymour<br>    2.   John Johnson | c/o Plaintiffs' Counsel | 1, 2 |

| Plaintiff Teamsters of Philadelphia<br>Employee<br>1. William Einhorn | c/o Plaintiffs' Counsel | 1, 2 |
|---|---|---|
| Plaintiff Philadelphia Federation of Teachers<br>Employee<br>1. Arthur Steinberg | c/o Plaintiffs' Counsel | 1, 2 |

2.      **Persons other than plaintiffs**

        **Code**   **Category**

        1.      Submission of WACs or AWPs to Publishers

        2.      Communications with Publishers

| Name & Title | Address & Telephone Number | Area of Information |
|---|---|---|
| 3M Pharmaceuticals | 3M Corporate Headquarters<br>3M Center<br>St. Paul, MN  55144-1000<br>(888) 364-3577 | 1, 2 |
| AAI Pharma LLC | 2320 Scientific Park Dr.<br>Wilmington, NC  28405<br>(910) 254-7000 | 1, 2 |
| Abbott Laboratories | 100 Abbot Park Rd.<br>Abbot Park, IL  60064-6100<br>(847) 937-6100 | 1, 2 |
| Agouron Pharmaceuticals | 10350 N. Torrey Pines Rd., Ste 100<br>La Jolla, CA  92037-1018<br>(858) 622-3000 | 1, 2 |
| Amgen Inc. | One Amgen Center Dr.<br>Thousand Oaks, CA  91320-1799<br>(805) 447-1000 | 1, 2 |
| Amerisource Bergen Corporation | 1300 Morris Drive, Suite 100<br>Chesterbrook, PA  19087<br>(800) 829-3132 | 1, 2 |

001821-13 98851 V1

| Axcan Scandipharm Inc. | 22 Inverness Center Parkway<br>Birmingham, AL 35242<br>(205) 991-8085 | 1, 2 |
|---|---|---|
| Astra USA, Inc. | 1800 Concord Pike<br>Wilmington, DE 19850-5437<br>(302) 886-3000 | 1, 2 |
| AstraZeneca Pharmaceuticals LP | 1800 Concord Pike<br>Wilmington, DE 19850-5437<br>(302) 886-3000 | 1, 2 |
| Aventis Pharmaceuticals Inc. | 300 Somerset Corporate Boulevard<br>Bridgewater, NJ 08807<br>(908) 231-4000 | 1, 2 |
| Bayer Corporation | 100 Bayer Road<br>Pittsburgh, PA 15205-9741<br>(412) 777-2000 | 1, 2 |
| Berlex Inc. | 340 Changebridge Rd.<br>PO Box 1000<br>Montville, NJ 07045-1000<br>(973) 487-2000 | 1, 2 |
| Bertek Pharmaceuticals Inc. | 3711 Collins Ferry Rd.<br>Morgantown, WV 26505<br>(304) 285-6420 | 1, 2 |
| Biogen IDEC MA Inc. | 14 Cambridge Center<br>Cambridge, MA 02142<br>(617) 679-2000 | 1, 2 |
| Biovail Pharmaceuticals Inc. | 700 Route 202/206<br>N. Bridgewater, NJ 08807<br>(908) 927-1400 | 1, 2 |
| Boehringer Ingelheim Pharmaceuticals Inc. | 900 Ridgebury Rd.<br>P.O. Box 368<br>Ridgefield, CT 06877<br>(203) 798-9988 | 1, 2 |

- 4 -

| Bristol-Myers Squibb Company | 345 Park Avenue<br>New York, NY 10154-0037<br>(212) 546-4000 | 1, 2 |
|---|---|---|
| Cardinal Health, Inc. | 7000 Cardinal Place<br>Dublin, OH 43017<br>(614) 757-5000 | 1, 2 |
| CVS Corp. | One CVS Drive<br>Woonsocket, RI 02895<br>(401) 765-1500 | 1, 2 |
| Dey LP | 2751 Napa Valley Corporate Dr.<br>Napa, CA 94558<br>(707) 224-3200 | 1, 2 |
| Eckerd | 50 Service Avenue<br>Warwick, RI 02886<br>(401) 825-3900 | 1, 2 |
| Eli Lilly & Co. | Lilly Corporate Center<br>Indianapolis, IN 46285<br>(317) 276-2000 | 1, 2 |
| Ferndale Laboratories Inc. | 780 W. Eight Mile Rd.<br>Ferndale, MI 48220<br>(248) 548-0900 | 1, 2 |
| First Horizon Pharmaceutical Corp. | 6195 Shiloh Rd.<br>Alpharetta, GA 30005<br>(770) 442-9707 | 1, 2 |
| Forest Pharmaceuticals Inc. | 13600 Shoreline Dr.<br>St. Louis, MO 63045<br>(314) 493-7000 | 1, 2 |
| Genentech Inc. | 1 DNA Way<br>South San Francisco, CA 94080-4990<br>(650) 225-1000 | 1, 2 |
| Gilead Sciences Inc. | 333 Lakeside Dr.<br>Foster City, CA 94404<br>(650) 574-3000 | 1, 2 |

- 5 -

| Glaxo Wellcome – Division of SmithKline Beecham Corp. | GlaxoSmithKline<br>One Franklin Plaza<br>P.O. Box 7929<br>Philadelphia, PA 19101<br>(888) 825-5249 | 1, 2 |
|---|---|---|
| Hawthorn Pharmaceuticals | P.O. Box 2248<br>Madison, MS 39130<br>(888) 455-5253 | 1, 2 |
| HealthCard Purchasing Partners International, LLC | 125 E. John Carpenter Freeway<br>Irving, TX 75062-2324<br>(888) 538-4662 | 1, 2 |
| Hoechst Roussell Pharmaceuticals | P.O. Box 2500, Route 202/206<br>Somerville, NJ 08876-1258<br>(800) 422-4779 | 1, 2 |
| Hoffman La Roche Inc. | 340 Kingsland St.<br>Nutley, NJ 07110<br>(973) 235-5000 | 1, 2 |
| Hollister Stier Laboratories LLC | 3525 N. Regal<br>Spokane, WA 99207<br>(509) 489-5656 | 1, 2 |
| Hospira Inc. | 275 N. Field Dr.<br>Lake Forest, IL 60045<br>(224) 212-2000 | 1, 2 |
| Johnson & Johnson Group | One Johnson & Johnson Plaza<br>New Brunswick, NJ 08901<br>(732) 524-0400 | 1, 2 |
| KOS Pharmaceuticals Inc. | 1 Cedar Brook Dr.<br>Cranbury, NJ 08512-3618<br>(609) 495-0500 | 1, 2 |
| McKesson Corporation | One Post Street<br>San Francisco, CA 94104-5296<br>(415) 983-8300 | 1, 2 |
| MCR American Pharmaceuticals Inc. | 16255 Aviation Loop<br>Brooksville, FL 34604<br>(352) 754-8587 | 1, 2 |

001821-13 98851 V1

| | | |
|---|---|---|
| Medicis Dermatologics Inc. | 8125 N. Hayden Rd.<br>Scottsdale, AZ 85258<br>(602) 808-8800 | 1, 2 |
| Merck & Co. Inc. | One Merck Dr.<br>P.O. Box 100<br>Whitehouse Station, NJ 08889-0100<br>(908) 423-1000 | 1, 2 |
| Merrell Pharmaceuticals Inc. | | 1, 2 |
| Monarch Pharmaceuticals Inc. | 501 5th St.<br>Bristol, TN 37620<br>(800) 776-3637 | 1, 2 |
| Novartis Pharmaceuticals Corp. | One Health Plaza<br>East Hanover, NJ 07936-1080<br>(888) 669-6682 | 1, 2 |
| Novo Nordisk Pharmaceutical Industries Inc. | 100 College Rd. West<br>Princeton, NJ 08540 | 1, 2 |
| Odyssey Pharmaceuticals Inc. | 200 Park Ave.<br>Florham Park, NJ 07932<br>(877) 427-9068 | 1, 2 |
| Organon USA Inc. | 56 Livingston Ave.<br>Roseland, NJ 07068<br>(973) 325-4500 | 1, 2 |
| Ovation Pharmaceuticals Inc. | 4 Parkway North<br>Deerfield, IL 60015<br>(847) 282-1000 | 1, 2 |
| Pan American Laboratories Inc. | Pamlab, LLC<br>4099 Highway 190<br>Covington, LA 70433<br>(985) 893-4097 | 1, 2 |
| Pediamed TM Pharmaceuticals Inc. | 782 Springdale Dr., Ste 120<br>Exton, PA 19341 | 1, 2 |
| Pfizer Inc. | 235 East 42nd Street<br>New York, NY 10017<br>(212) 733-2323 | 1, 2 |

- 7 -

| | | |
|---|---|---|
| Procter & Gamble Pharmaceuticals Inc. | 17 Eaton Ave.<br>Norwich, NY 13815<br>(800) 448-4878 | 1, 2 |
| Prometheus Laboratories Inc. | 9410 Carroll Park Dr.<br>San Diego, CA 92121<br>(888) 423-5227 | 1, 2 |
| Purdue Pharmaceutical Products LP | 100 Connecticut Ave.<br>Norwalk, CT 06856<br>(203) 588-8000 | 1, 2 |
| Reckitt Benckiser Healthcare UK Limited | Dansom Lane<br>Hull<br>East Yorkshire<br>HU8 7DS, UK<br>01482 326151 | 1, 2 |
| Reliant Pharmaceuticals Inc. | 110 Allen Rd.<br>Liberty Corner, NJ 07938<br>(908) 580-1200 | 1, 2 |
| Rite-Aid | 30 Hunter Lane<br>Camp Hill, PA 17011<br>(717) 761-2633 | 1, 2 |
| Roxane Laboratories Inc. | 900 Ridgebury Rd.<br>P.O. Box 1088<br>Ridgefield, CT 06877<br>(800) 520-1631 | 1, 2 |
| Sanofi Synthelabo Inc. | 300 Somerset Corporate Bldg.<br>Bridgewater, NJ 08807-2854<br>(800) 981-2491 | 1, 2 |
| Schering-Plough Corporation | 2000 Galloping Hill Road<br>Kenilworth, NJ 07033-0530<br>(908) 298-4000 | 1, 2 |
| SmithKline Beecham Corporation, d/b/a/ GlaxoSmithKline | One Franklin Plaza<br>Philadelphia, PA 19105 | 1, 2 |

- 8 -

| | | |
|---|---|---|
| Takeda Pharmaceuticals North America Inc. | 475 Half Day Rd.<br>Lincolnshire, IL 60069<br>(847) 383-3000 | 1, 2 |
| TAP Pharmaceutical Products, Inc. | 675 North Field Drive<br>Lake Forest, IL 60045<br>(847) 582-2000 | 1, 2 |
| US Pharmaceutical Corp. | 2104-C Mellon Ct.<br>Decatur, GA 30035 | 1, 2 |
| Voluntary Hosps America Inc. | 220 E. Las Colinas<br>Irving, TX 75014-0909<br>(972) 830-0000 | 1, 2 |
| Walgreens | 200 Wilmot Road<br>Deerfield, IL 60015<br>(847) 914-2500 | 1, 2 |
| Wal-Mart Stores, Inc. | 702 SW Eighth Street<br>Bentonville, AR 72716<br>(479) 273-4000 | 1, 2 |
| Warner Chilcott Inc. | Rockaway 80 Corporate Center<br>100 Enterprise Dr., Ste 280<br>Rockaway, NJ 07866<br>(973) 442-3200 | 1, 2 |
| Watson Laboratories Inc. | 311 Bonnie Circle<br>Corona, CA 92880<br>(951) 493-5300 | 1, 2 |
| Westwood Squibb Pharmaceuticals Inc. | 100 Forest Ave.<br>Buffalo, NY 14213<br>(716) 887-3400 | 1, 2 |
| Women First Healthcare Inc. | 12220 El Camino Real, Ste 400<br>San Diego, CA 92130<br>(858) 509-1171 | 1, 2 |
| Wyeth Inc. | Five Giralda Farms<br>Madison, NJ 07940<br>(973) 660-5000 | 1, 2 |

001821-13 98851 V1

| | | |
|---|---|---|
| Wyeth Pharmaceuticals Inc. | 500 Arcola Road<br>Collegeville, PA  19426<br>(610) 902-1200 | 1, 2 |
| Xcel Pharmaceuticals | Valeant Plaza<br>3300 Hyland Ave.<br>Costa Mesa, CA  92626<br>(800) 548-5100 | 1, 2 |
| Zyber Pharmaceuticals Inc. | P.O. Box 40<br>Gonzales, LA  70707-0040<br>(800) 793-2145 | 1, 2 |
| Zeneca Inc. | 1800 Concord Pike<br>Wilmington, DE  19850-5437<br>(302) 886-3000 | 1, 2 |
| ZLB Behring LLC | 1020 First Avenue<br>P.O. Box 61501<br>King of Prussia, PA  19406-0901<br>(610) 878-4000 | 1, 2 |

**B.     Documents, Data Compilations, and Tangible Things That Are in Plaintiffs' Possession, Custody, or Control that Plaintiffs May Use to Support Its Claims or Defenses**

| Category of documents, data compilations, tangible things ("Documents") | Location of Information |
|---|---|
| Databases of AWP and WACs | Plaintiffs' Counsel |
| McKesson's Annual Reports and other public reports | McKesson |
| Documents produced in the AWP litigation by McKesson, First Data, Cardinal, Amerisource, Medispan | Plaintiffs' Counsel |
| Deposition testimony of FDB, McKesson employees | Plaintiffs' Counsel |
| Documents relied upon by Dr. Hartman in the AWP litigation | Plaintiffs' Counsel |
| Information on McKesson's website | McKesson |
| The Novartis declarations referred to in ¶ 132 of the FAC | Novartis and Plaintiffs' Counsel |
| The documents referenced in ¶¶ 130, 133 of the FAC | Plaintiffs' Counsel |
| Marketing materials about First Data's services, which | First Data |

- 10 -

| | |
|---|---|
| First Data sent to health care providers located across the country | |
| Written representations and telephone calls between McKesson and First Data regarding markups and AWPs, which occurred on a regular basis each year | First Data/McKesson |
| E-mails between McKesson and First Data agreeing to or effectuating the implementation of the Scheme | McKesson/First Data |
| Depositions in AWP MDL case of First Data, McKesson and Cardinal employees | Plaintiffs' Counsel |
| Transactional Data regarding plaintiffs' payment for subject drugs | Plaintiffs' Counsel |
| Teamsters of Phildadelphia's Document Production | *In re Average Wholesale Pricing Litigation*, MDL No. 1456 (D. Mass.) |
| Deposition of William Einhorn taken on February 25, 2004 | *In re Average Wholesale Pricing Litigation*, MDL No. 1456 (D. Mass.) |
| PMBT's Trust documents | Plaintiffs' Counsel |
| Full and Summary Plan Descriptions | Plaintiffs' Counsel |
| Amendments to the Plan documents | Plaintiffs' Counsel |
| Contracts with Pharmacy Benefit Management organizations | Plaintiffs' Counsel |
| Correspondence between PMBT and Pharmacy Benefit Management organizations | Plaintiffs' Counsel |
| Claims and usage Data, and supporting documentation | Plaintiffs' Counsel |

**C.     Computation of Damages**

Pursuant to Fed. R. Civ. P. 26(a)(1)(C), plaintiffs seek compensatory and punitive

damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, expert witness

fees and other costs, and any other further relief as the Court deems just and proper, including

any extraordinary, equitable and/or injunctive relief as permitted by law or equity to attack,

impound or otherwise restrict defendants' assets to assure that plaintiffs have an effective

remedy.

- 11 -

Plaintiffs cannot yet provide a calculation of the total amount of damages to be claimed by the proposed Class because no Class has yet been certified, nor have plaintiffs retained an expert to testify as to the damages sustained by the Class. Plaintiffs therefore have not yet computed the total amount of damages to be claimed in this action. Plaintiffs will disclose their expert damage analysis within the time required by Fed. R. Civ. P. 26(a)(2) and supplement these disclosures at the time and in the manner required by Fed. R. Civ. P. 26(e) or at such other time as may be established by the Court.

**D.    Insurance Agreements**

N/A

DATED:  March 15, 2006

By___/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone:  (615) 244-2202
Facsimile:  (615) 252-3798

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2006, a true and correct copy of the above document was served upon the following attorneys of record via e-mail:

| | |
|---|---|
| George E. Barrett<br>Gerald E. Martin<br>Timothy L. Miles<br>Edmund L. Carey<br>Barrett, Johnston & Parsley<br>217 Second Avenue North<br>Nashville, TN 37201<br>gbarrett@barrettjohnston.com<br>jmartin@barrettjohnston.com<br>tmiles@barrettjohnston.com<br>tcarey@barrettjohnston.com<br><br>*Attorneys for Plaintiffs* | Jeffrey L. Kodroff<br>John Macoretta<br>Spector, Roseman & Kodroff, P.C.<br>1818 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>jkodroff@srk-law.com<br>jmacoretta@srk-law.com<br><br>*Attorneys for Plaintiffs* |
| Kenneth A. Wexler<br>Jennifer Fountain Connolly<br>The Wexler Firm LLC<br>One N. LaSalle Street, Suite 2000<br>Chicago, IL 60602<br>kawexler@wexlerfirm.com<br>jfconnolly@wexlerfirm.com<br><br>*Attorneys for Plaintiffs* | Thomas M. Sobol<br>Hagens Berman Sobol Shapiro LLP<br>One Main Street, 4th Floor<br>Cambridge, MA 02142<br>Tom@hbsslaw.com<br><br>*Attorneys for Plaintiffs* |
| Elizabeth Fegan<br>Hagens Berman Sobol Shapiro LLP<br>60 W. Randolph Street, Suite 200<br>Chicago, IL 60601<br>beth@hbsslaw.com<br><br>*Attorneys for Plaintiffs* | Marc H. Edelson<br>Allan Hoffman<br>Hoffman & Edelson<br>45 West Court Street<br>Doylestown, PA 18901<br>medelson@hofedlaw.com<br><br>*Attorneys for Plaintiffs* |

- 14 -

| | |
|---|---|
| Michael P. Twohig<br>Joan M. Griffin<br>Burns & Levinson LLP<br>One Beacon Street<br>30th Floor<br>Boston, MA 02108-3106<br>jgriffin@pscboston.com<br>mtwohig@burnslev.com<br><br>*Attorneys for Defendants* | Lori A. Schechter<br>Melvin R. Goldman<br>Tiffany Cheung<br>Morrison & Foerster<br>425 Market Street<br>San Francisco, CA 94105-2482<br>415-268-7000<br>Fax: 415-268-7522<br>lschechter@mofo.com<br>MGoldman@mofo.com<br>tcheung@mofo.com<br><br>*Attorneys for Defendants* |

By    /s/ Steve W. Berman

- 15 -

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | |
| Plaintiffs, | Civil Action No. 05-CV-11148-PBS |
| v. | |
| FIRSTDATABANK, INC., a Missouri Corporation, and MCKESSON CORPORATION, a Delaware Corporation, | |
| Defendants. | |

## MCKESSON'S RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendant McKesson Corporation ("McKesson") makes these initial disclosures and objections ("Initial Disclosures"). McKesson's Initial Disclosures are based on information that is presently reasonably available to McKesson. McKesson's investigation in this matter is ongoing and it thus reserves the right to present witnesses, documents, and evidence in addition to that which is disclosed herein. Moreover, to the extent required, pursuant to Federal Rule of Civil Procedure 26(e)(1), McKesson will supplement its Initial Disclosures as necessary and at the appropriate times.

# DISCLOSURES

**I.    IDENTITY OF PERSONS LIKELY TO HAVE DISCOVERABLE INFORMATION THAT MCKESSON MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES IN THIS ACTION**

McKesson identifies the following individuals pursuant to Rule 26(a)(1)(A).  In addition to the individuals listed below, McKesson states that representatives of the plaintiffs and of third parties, including pharmacy benefit managers, pharmaceutical manufacturers, and other third party payors, whose identities are not currently known, are likely to have discoverable information that McKesson may use to support its defenses. McKesson does not consent to Plaintiffs' communications with its employees and does not consent to or authorize any communications otherwise prohibited by any applicable rule of professional conduct.  Plaintiffs' contact with McKesson's employees should take place solely through McKesson's counsel of record.  Similarly, witnesses identified in these Initial Disclosures may possess information or knowledge protected by the attorney-client privilege, the work product doctrine, and/or other applicable legal privileges and protections.  By listing witnesses, McKesson does not waive its right to assert any applicable privilege or protection at an appropriate time.  McKesson furthermore does not concede that the individuals listed herein necessarily have discoverable information regarding the claims or defenses in this action, but has identified such individuals reading broadly its disclosure obligations:

| Identity | Contact | Basis for Disclosure |
|---|---|---|
| Erlinda Thomas | Via McKesson's counsel of record | Ms. Thomas is likely to have information regarding McKesson's price databases. |
| Pia Castillo | Via McKesson's counsel of record | Ms. Castillo is likely to have information regarding McKesson's price databases. |

| Jack Fragie | Via McKesson's counsel of record | Mr. Fragie is likely to have discoverable information regarding McKesson's communications with customers. |
|---|---|---|
| Robert James | Via McKesson's counsel of record | Mr. James is likely to have discoverable information regarding McKesson's price databases and the relationship between McKesson and First DataBank. |
| Kay Morgan | Unknown | Ms. Morgan is likely to have discoverable information regarding First DataBank's wholesaler surveys and the relationship between McKesson and First DataBank. |

II.    **DESCRIPTION BY CATEGORY AND LOCATION OF DOCUMENTS, DATA COMPILATIONS, AND TANGIBLE THINGS IN MCKESSON'S POSSESSION, CUSTODY OR CONTROL AND WHICH MCKESSON MAY USE TO SUPPORT ITS CLAIMS OR DEFENSES**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(B), McKesson identifies the

following categories of documents and tangible things that are in its possession, custody,

or control and that it may use to support its defenses in this action. The documents and

tangible things generally are maintained at McKesson's headquarters in San Francisco,

California:

1.    Documents related to McKesson's price databases;

2.    Documents related to First DataBank and its publication of Average Wholesale Price (AWP);

3.    Documents related to the relationship between McKesson and First DataBank.

The categories of documents referenced as part of these Initial Disclosures may

include documents protected by the attorney-client privilege, the work product doctrine,

and/or other applicable legal privileges and protections. By identifying these categories

of documents, McKesson does not waive its right to assert, at an appropriate time, any

applicable privilege or protection to the production of any particular document.

McKesson reserves its right to object to the production of any documents within the

sf-2095956

described categories on any basis permitted by the Federal Rules of Civil Procedure.

Furthermore, the categories disclosed may include documents which contain confidential

or proprietary information.  Such documents will not be produced absent an appropriate

protective order entered by the Court.

**III.     ANY INSURANCE AGREEMENT UNDER WHICH ANY PERSON CARRYING ON AN INSURANCE BUSINESS MAY BE LIABLE TO SATISFY PART OR ALL OF A JUDGMENT OR TO INDEMNIFY OR REIMBURSE FOR PAYMENTS MADE TO SATISFY THE JUDGMENT**

On the basis of its review to date, McKesson believes itself to be self-insured to

the extent of the claims here asserted.  Supplementation consistent with Federal Rule of

Civil Procedure 26(a)(1)(D) will be made if McKesson comes to believe that a person

carrying on an insurance business may be liable to satisfy part or all of a judgment which

may be entered in the action or to indemnify or reimburse for payments made to satisfy

such a judgment.

Dated: March 15, 2006

By: _____
Melvin R. Goldman

JOAN M. GRIFFIN
MICHAEL P. TWOHIG
PERKINS, SMITH & COHEN LLP
One Beacon Street, 30th Floor
Boston, MA 02108
Telephone: 617.854.4000
Facsimile: 617.854.4040

MELVIN R. GOLDMAN
LORI A. SCHECHTER
TIFFANY CHEUNG
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorneys for Defendant*
*MCKESSON CORPORATION*

sf-2095956

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the following attorneys of record on March 15, 2006 via e-mail:

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Steve@hbsslaw.com

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
Tom@hbsslaw.com

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286
beth@hbsslaw.com

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
jkodroff@srk-law.com
jmacoretta@srk-law.com

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735
medelson@hofedlaw.com

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
kawexler@wexlerfirm.com
jfconnolly@wexlerfirm.com

George E. Barrett
Edmund L. Carey, Jr.
Gerald E. Martin
Timothy L. Miles
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
gbarrett@barrettjohnston.com
tcarey@barrettjohnston.com
jmartin@barrettjohnston.com
tmiles@barrettjohnston.com

Tiffany Cheung

# EXHIBIT 4

robert.james@mckesson.com

-----Original Message-----
From: Breazeale, David
Sent: Wednesday, February 06, 2002 3:22 PM
To: James, Robert; Castaldo, Ron; Coker, Marc
Cc: Thomas, Erlinda; Mayorchuk, Galina; Jones, Tyler
Subject: RE: AWP discrepancies


All -- EconoLink reflects the AWP that is on the central DITM item database, which is
maintained as Ron describes.  We simply forward the AWP from DITM to the EconoLink
customer.  Galina might be able to review any specific cases that the customer has in mind
for possible correction.

Thanks...  Dave

-----Original Message-----
From: James, Robert
Sent: Wednesday, February 06, 2002 2:48 PM
To: Castaldo, Ron; Coker, Marc
Cc: Breazeale, David; Thomas, Erlinda
Subject: RE: AWP discrepancies


This is all true, however its not widely known that FDB has a contract with the Medispan
group requiring that FDB supply the data for the next 3 or 4 years. This means that
essentially the Medispan data is the First DataBank data.

Take care.

Bob James
Director-Brand Pharmaceutical Product Management
McKesson
One Post Street--8th Floor
San Francisco, CA 94104
415-983-8755,    Fax 415-732-2951
robert.james@mckesson.com


-----Original Message-----
From: Castaldo, Ron
Sent: Wednesday, February 06, 2002 11:14 AM
To: Coker, Marc
Cc: James, Robert; Breazeale, David; Thomas, Erlinda
Subject: RE: AWP discrepancies


Marc -

FirstDataBank purchased Medispan some time ago.  I recently read that FDB sold Medispan to
Facts & Comparisons.  The Medispan data is DIFFERENT than the FirstDataBank NDDF files
that we receive.  Our AWP is based on the NDDF file, not the Medispan file.

McKesson receives the NDDF file on a weekly basis and updates the AWP field.  There are
times where McKesson has received a new WAC from the supplier and FDB has not updated
their system yet to give us the new AWP.

Erlinda Thomas' group (BIS) processes the above files and updates the DITM system.

Econolink then reads DITM for the AWP.  David Breazeale, with EconoLink, can give you a

3

MCKAWP 0057415
HIGHLY CONFIDENTIAL

# EXHIBIT 5

| | |
|---|---|
| **From:** | James, Robert |
| **Sent:** | Monday, May 03, 2004 3:47 PM |
| **To:** | Dolan, Anthony |
| **Subject:** | FW: Potential Discontinuance of First Data Bank's Average Wholesale Price List–DSCP Pharmaceutical Prime Vendor Program |

Here is a long winded answer. You can wordsmith a response from the text below.

Bob James

-----Original Message-----
From: James, Robert
Sent: Friday, April 23, 2004 8:08 AM
To: Yonko, Greg; Flach, Paul; Felton, Jeff; Longwell, Sharon; Cardenas, Debbie
Subject: RE: Potential Discontinuance of First Data Bank's Average Wholesale Price List--DSCP Pharmaceutical Prime Vendor Program

The short answer is McKesson is using a standard 25% markup on Brand Rx (not on generics) and has been for the last four years. I believe that our generics group just uses the AWP that the supplier gives them and then everything is adjusted as necessary when we get the FDB downloads so at the end of the day, we are sending out the FDB AWP.

FDB raised a test balloon at their recent conference in SFO. They received a lot of feedback and pushback from several customer segments. Medco responded strongly stating that they would have to re-negotiate over 100,000 contracts (probably a gross exaggeration) and other said similar things. The problem is once contracts are re-opened, then everything is on the table. Most third parties do not want to do that.

FDB is trying to get CMS, Medicaid, and other large players to sit down and work through the issue. My take on this is FDB is tired of getting all the phone calls and the allegations about the AWP process, just like we are. I spoke with their President and CEO and Kay Morgan last week about this situation. They are not going to do anything soon.

FDB will most likely not discontinue their AWP process for the next 12 to 18 months to give the industry time to figure out what they want to do with reimbursements. As far as I know, Medispan will do the same since they get their data from FDB. However, RedBook is a different deal. RedBook publishes the AWP's that the manufacturers give them (which is not an average, nor determined by process) or use a mark up of 1.20 which provides a 16 2/3% AWP spread. If our customers are allowing language to be put into their contracts allowing Redbook AWP's for reimbursement, they are not being very wise.

As I mentioned above, McKesson has been using a 25% markup on brand Rx items for the past four years. This is used to get our List Price or Suggested Sell price, which is the price that is surveyed by FDB to determine the average or AWP. Brand Rx has really normalized over the past couple of years at a 25% markup or 20% spread. There are some items that remain at the old markups and AWP's because there have been no price increases. Procrit is a good example. It carries a 16 2/3% spread. The real problem is generics. AWP are suggested by the supplier and usually are 10-15% lower than the brand. The opening spreads range from 28% to 32% AWP to WAC and lower contract pricing increases the spread from there as increased competition comes to the market. Eventually, MAC pricing takes over with generics.

Bob James

-----Original Message-----
From: Yonko, Greg
Sent: Friday, April 23, 2004 7:37 AM

1

MCKAWP 0057171
CONFIDENTIAL

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME - )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br> )<br>                         Plaintiffs, )<br> )<br> )<br>            v. )<br> )<br>FIRST DATABANK, INC., a Missouri )<br>corporation; and McKESSON )<br>CORPORATION, a Delaware corporation, )<br> )<br>                         Defendants. ) | C.A. No. 1:05-CV-11148-PBS<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**[Leave to File Granted November 22, 2006]** |

## SECOND AMENDED CLASS ACTION COMPLAINT

expressly stated that its reimbursement formula is based on AWP from the "current information
provided to ESI by drug pricing services such as First Data Bank...." Similarly, Caremark's
website states: "For both brand and generic drugs, the pricing formula at retail and mail is based
on the discounted Average Wholesale Price (AWP) as reported by First Data. Caremark loads
First Data's updated data into the system on a daily basis." Other PBMs expressly utilize First
Data's published AWPs as the source of AWP pricing to be utilized in payment.

64.    The AWP-based reimbursement benchmark for private payments to the retail
class of pharmaceutical trade has long been acknowledged. Most recently, at a hearing on
December 7, 2004, before the United States House of Representatives Committee on Energy and
Commerce, a former Senior Vice President of Aventis Pharmaceuticals, testified that "AWP has
been codified as the benchmark price, by statute and regulations, in the public sector and by
contract in the private sector."

65.    Third Party AWP based reimbursement has also been acknowledged by
McKesson. For example, in September 2001, James Robert of McKesson, internally noted that
"I think it is important to understand that the AWPs that are used for third party reimbursement
are the First Data Bank ("FDB") AWPs." MCKAWP 0068514.

66.    In summary, thousands of pharmaceutical reimbursement contracts are based on
AWP minus a specified discount. As a result, a leading expert on pharmaceutical pricing has
concluded that "AWP is the glue that binds the system of pharmaceutical reimbursement rates.
All or predominantly all, reimbursement rates for pharmaceuticals purchased under public sector
and private drug benefit insurance plans are negotiated based upon AWP and discounts from
AWP."

- 21 -

Price." The operative word is *average*. AWP was developed to provide a price, which all parties could agree upon.

In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what the price is. This is based on their AWP price files. We contact the wholesalers to determine what the markup should be for a new company. *First, DataBank then confirms that the markup is accurate and current.* A survey may be performed on a single NDC number or on a manufacturer's entire product line. In either case, a survey will be performed with all national wholesalers to determine the appropriate AWP.

*With increased numbers of surveys done, the determination represents over two-thirds of the volume of the wholesalers, and is also representative of wholesalers on a national level.* Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup factor proportionally. Therefore, wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesaler price (SWP) in our determination. [Emphasis added.]

116.    This 2002 publication, mimicking the similar 1991 First Data publication of eleven years earlier, continued most of the falsehoods about First Data. In its 2002 website, again First Data claims that its published AWPs result from *surveys* of national wholesalers and that the number of surveys is "increasing."

## V.    Implementation of the Five Percent Spread Scheme

117.    On the eve of the McKesson and First Data Scheme, McKesson observed that: "[E]verything was straight forward for many years. Manufacturers' product lines were very consistent in their markups, and so were the FDB AWP's." This would soon change.

118.    The genesis of the conspiracy to raise the WAC-to-AWP markup was FDB's desire to raise the markup or the AWP to "support our customers." MCKAWP 0068514. By "support" McKesson meant an increase in the margin earned by its retail clients. Thus, in September 2001, McKesson's James Robert in an internal e-mail now marked "Highly

- 38 -

Confidential" by McKesson, reported that McKesson chose to increase "the markup on the Park-Davis line (Lipitor) last January, when Pfizer took over. This was our attempt to raise AWPs to support our customers."

119.    Shortly after his September 2001 e-mail, Roberts approached FDB to discuss FDB's willingness to "normalize the brand product AWPs." MCKAWP 0068599 (marked "Highly Confidential"). "Normalization" eventually become one of the buzzwords used by McKesson and FDB to describe their manipulation of the WAC-AWP spreads on hundreds of brand name drugs.

120.    McKesson, knew that as one of the largest national wholesalers it had "an opportunity to 'normalize' AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread)" and, if it were to succeed, that "most [of its] customers would love it."[3] McKesson also knew it would not be difficult to impose its suggested sell prices on First Data's published AWPs because First Data's "wholesaler surveys" were not to be taken seriously and consisted of nothing more than a brief phone call or e-mail. Initially McKesson merely changed its suggested sell price "in the hopes that one of the other wholesalers happens to raise their markup on an item (maybe due to pressure from retail customers), and FDB happens to resurvey the items."[4] But when the competition did not respond as expected or First Data failed to survey the change as quickly as hoped, McKesson decided to take direct action.

121.    McKesson was aware that First Data had a virtual lock on the determination of AWPs because it was one of only two electronic sources for price information, and although it was "not widely known," First Data had "a contract with the Medispan group [the only other electronic pricing source] requiring that FDB supply the data over the next 3 or 4 years [i.e.

---

[3] MCKAWP 0068514.

[4] MCKAWP 0068514.

through 2005 or 2006]. This means that essentially the Medispan data is the First DataBank data."

122.    In August 2001, despite McKesson's knowledge that AWPs were supposed to be the result of publisher's surveys of actual wholesale prices, McKesson and FDB "mutually agreed" to move the AWP or WAC-to-AWP spread on all Searle products from 20% to 25%. Thereafter, McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs of all of the major manufacturers.

123.    That defendants' collusion began as early as August 2001 is documented by an internal memorandum drafted by Bob James, McKesson's Director of Brand Pharmaceutical Production Management, stating:

> After a discussion with FDB last August [2001], we mutually agreed to standardize Searle (16⅔% spread) product line because it had been acquired earlier by Pharmacia (20% spread). There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products. In December [2001], after several discussions with FDB about our [normalization] strategy we began to move many of the manufacturers with mixed spreads (16⅔ and 20% products in the same line) to a consistent 25% markup. These were companies like GlaxoSmithKline,[5] AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during January and February when price increases occurred. Many of the AWP's have been increased by FDB. Because a large number of price increases occurred, some AWP's were affected twice, once when the price increase[] took effect and then a second time when FDB raised the AWP after the survey process. . . . . Not all products in these companies have had AWP increases at this point

_____

[5] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup. (FDB-AWP 053695).

- 40 -

in time. However, as price increases occur FDB will re-survey those products and make their determination.[6]

124.    Beginning sometime in late 2001 or early 2002, First Data, by agreement with McKesson, limited its' purported "surveys" to McKesson and did not "survey" other wholesalers. First Data agreed to utilize for markup purposes data received from McKesson. At the same time and as part of a common plan, McKesson implemented a 5%[7] increase in the WAC-to-AWP markup for hundreds of brand-name drugs that it distributed. This increase was from 20% above WAC to 25% above WAC for the affected drugs. As part of the agreement and following their agreed course of conduct and common plan, First Data then published the new figures for hundreds of brand-name drugs without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a "weighted average." First Data knew that this increase across the board from 20% to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing "reliable" and "accurate" information as it had promised. McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace. Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients.

125.    By November 2001, FDB's Kay Morgan, and McKesson's James Robert, were exchanging e-mails confirming the results of their collaboration: "Hello Kay.... Just went through the Merck items and updated a couple of our items to 25% markup. However, found some items that you might want to review. They include Noroxin's Prinvil and Prinzides. The

---

[6] MCKAWP 69608-09.

[7] Sometimes the increase was more than 5%, as the intent was to raise all markups to 25%. So if a drug was at 18%, it was moved up to 25%.

001821-13 136802 V1

latter two should probably be consistent with the new AZ 1.5 markups." MCKAWP 0068621.

(Marked "Highly Confidential")

126.    McKesson's own internal documents describe the profitability of increasing

spreads for its key customers. Thus, McKesson noted the following:

> Here are a few examples of increased profits that our customers
> should be realizing now and into the future. The following results
> are based on a reimbursement formula of AWP minus 15% plus a
> $2.00 fee.

|  | Old 16 2/3% spread | New 20% spread |
|---|---|---|
| Lipitor 20mg 90's | $6.86 | $17.18 |
| Prilosec 20mg 30's | $4.22 | $8.92 |
| Allegra 60mg 100's | $3.97 | $8.16 |
| Advair Diskus 500/50 60dose | $5.11 | $11.70 |
| Befaseron (previously a flat $7.00 fee) | $20.00 | $58.25 |

Most would agree that these improvements are extremely significant.

127.    In December 2001, FDB and McKesson engaged in "discussions" that resulted in

an increase in the markups of companies "like GlaxoSmithKline, AstraZeneca, Aventis, Berlex,

Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novartis, Roche, Schering and several

others." MCKAWP 0069608.

128.    McKesson's collaboration with First Data was highly effective. In March 2002

Bob James reports:

> My guess is that things should look very good in the next couple of
> months. I am working with FDB to point out problem suppliers as
> Erlinda's group [Business Information Services] provides me with
> weekly information comparing our List price with the FDB AWP.
> . . . . [The] results should have a very positive impact on our
> customers['] profitability.[8]

---

[8] MCKAWP 0042663.

001821-13 136802 V1

In April he reports that First Data gave up all pretense of conducting a survey for new products: "All new brand vendors will be set up as 1.25 markup factor vendors, both at McK and FDB."[9]

129.   An increase in the WAC-to-AWP spread directly results in higher prices to plaintiffs and members of the Class.  For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72. The following chart reflects, for a single drug manufactured by certain companies, the AWP spread increase and related AWP increase:

| Defendant | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|---|---|---|---|---|---|---|---|
| Abbott | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| AstraZeneca | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| Aventis | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| BMS | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| GSK | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| J&J (Janssen) | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| Novartis | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

130.   Another way to understand the widespread nature of the change in the WAC-to-AWP markup as a result of the McKesson-First Data agreement, is to examine the change in the WAC-to-AWP markup of all drugs manufactured by the following illustrative pharmaceutical manufacturers over time:  The increases, all occurring in hundreds of drugs, among multiple manufacturers, at the same time, could not have happened by chance or independent conduct, but instead are the result of a common plan:

---

[9] MCKAWP 0069616.

132.    The dramatic across the board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data. As noted, McKesson reported the across the WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

133.    First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers -- the pharmacies -- by increasing their profits. In February 2002 Bob James sent Kay Morgan a document he drafted entitled, "AWP Discussion," which explained that 20% markups "had a negative impact on McKesson's customers' profitability" and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor."[10] Later, on May 1, 2002, he writes to her about the "normalizing process," the term McKesson coined to refer to its efforts to impose a uniform 25% markup on all brand prescription drugs.[11] In an e-mail sent to Alicia Nielson, Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002 Bob James enclosed a prior internal communication in which he explained that McKesson had "been normalizing all Brand Rx mark ups at 25% for the suggested sell price."[12] First Data enthusiastically embraced the "normalization" program, as reported in the following Aventis e-mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration & Development at Aventis:

> First Data Bank has advised me after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to WAC spread [sic, markup]. As a result, First Data Bank has determined to employ a higher 25% AWP to WAC [markup] for all Aventis products. This will be implements as we

---

[10] MCKAWP 0069613.

[11] MCKAWP 0069642.

[12] MCKAWP 0069775.

- 48 -

001821-13 136802 V1

have price increases.  Immediately *the entire Allegra line will be
moved to a 25% [markup] from its current 20%.*  This will be
effective immediately.  The most noticeable impact will be that it
will be more profitable to the retail pharmacist to dispense Allegra.

134.    Eventually First Data ceased consulting with any other wholesalers and relied

entirely on the information that McKesson provided it to determine AWPs.  McKesson was

aware that First Data routinely disregarded manufacturer's suggested sell prices – Kay Morgan

frequently shared such snubs with her friend Bob James:

Let's start a list of the hated manufacturers, we will update it
weekly or monthly.  Today, Organon is the top of my list.  The
person in charge of EDI is trying to tell me to put O in the first
position.  McKesson and we have it wrong.  Wound up telling her
that the world does not turn around Organon and sending a note to
my contact telling him the product was coming off.[13]

\* \* \* \* \*

[in response to an e-mail from Gilead Sciences announcing that it
would not longer report AWPs for its products and requesting that
any publication of an AWP calculated by First Data be
accompanied with the statement that the price was not authorized
by Gilead, Kay Morgan writes:]  Wonderful.  If we don't report an
AWP, the NDC will not be listed.  It is the rules of the
database. . . .

[to Bob James]  FYI –Just thought you should be aware.  They
appear to be playing hardball and I just don't play.[14]

135.    Before 2000 McKesson estimated that only 20% of the prescription drug

manufacturers were 25% mark-up companies.[15]  By early 2002, however, McKesson estimated

that through defendants' efforts 90% of the industry had turned to the 25% markup.[16]  By late

---

[13] MCKAWP 0069586.

[14] MCKAWP 0001183.

[15] MCKAWP 0069502.

[16] MCKAWP 0069609.

- 49 -

2002, McKesson estimated that the number had increased to 95%.[17]  In 2004, McKesson

estimated that 99% of the prescription drugs were set at a 25% markup.[18]  McKesson

acknowledged that without its efforts, "the AWP's most likely would not change"[19] and that the

industry shift "probably speaks to First Data Bank's willingness to work with us to normalize the

brand product AWPs."[20]

     136.    Each defendant had a reason to implement this Scheme.  For sales to non-cash

paying customers, pharmacies are reimbursed by health plans and other pharmacy benefit

providers based on AWP.  Consequently, pharmacies make a profit on the spread between AWP

and the actual acquisition cost for the drug.  Under this system, a higher WAC/AWP spread

results in increased profits to pharmacies.  Thus, McKesson and First Data by operation of the

Scheme benefits retail pharmacies.  "PBMs" (Pharmacy Benefit Manufacturers) also make

money off the spread between AWP and WAC.  The Scheme also benefited PBMs.

     137.    Indeed, for several years many of the major retail pharmacies had jointly

approached various pharmaceutical manufacturers and urged that they raise the WAC/AWP

spread by 5%.  The manufacturers did not do so.  On information and belief, these same retailers

then urged McKesson to do so and McKesson had a strong financial incentive to cooperate with

retail pharmacy clients and this incentive was one of the motivating factors for McKesson in

terms of implementing the Scheme:

          (a)    In recent years, the wholesale drug industry (including McKesson) and

retail pharmacies have been economically threatened by the managed care industry.  McKesson,

---

[17] MCKAWP 0069502.

[18] MCKAWP 0069766.

[19] MCKAWP 0069732.

[20] MCKAWP 0068599.

- 50 -

companies that had asked, without success, certain of the defendant manufacturers to increase the WAC/AWP spread by 5%. McKesson agreed to the 5% Scheme when the manufacturers apparently would not (notwithstanding the manufacturers' own inflation of AWPs and WACs for drugs specified in the ongoing AWP litigation and their, at a minimum, acquiescence to the results of the Scheme), McKesson offered large retail pharmacy chains a chance to make a profit off the increased spread.

(b)    On occasions McKesson implemented the Scheme at the direction or request of its retail customers and was proud of it. For example, in September 2002, Bartell's complained that an "entire line is low ... even the generic side.... Kill them." McKesson responded by stating that as a follow up Celexa and Lexapro will have an AWP markup of 25% or a spread of 20% as FDB information is updated. Look for change to happen next week." MCKAWP 0069817. McKesson closed by telling Bartells "keep smiling [sic] ... and who said we never listen to our customers and old friends." Thus, the 5% Spread Scheme was a benefit direct to McKesson's largest clients, many of whom, like Bartell, had previously approached the drug manufacturers seeking imposition of the 5% increase.

(c)    Internally McKesson calculated how it could pitch the Scheme's benefits, new AWPs and larger spreads, to obtain large retail accounts. So, for example, the following was the pitch to one account:

> WAC x old markup of 1.20 ($16^{2/3}$ spread) 19,582,854 (old AWP) ... = $326,381 Profit
>
> WAC x new markup of 1.25 (20% spread) = 20,398,806 (new AWP) ... = $1,019,940 or **3 times the profit as before** (bold in original). MCKAWP 0068312.

This benefit was the result of the "FDB process," *i.e.* the Scheme at work.

- 52 -

WAC/AWP markup. At other times, a large national chain pharmacy would call "complaining about" the particular AWP for a product, and McKesson, in turn, would contact First Data in order to get it "fixed."

143.    McKesson sought to hide the Scheme. When Brian Ferreira of VPS Retail wrote to Bob James, asking him to "[p]lease provide the list of items and/or manufacturers that were included in the AWP standardization process," he knew better than to respond to the request in writing, writing only: "Brian, this is an interesting request. . . . Please give me a call when it is convenient."[23] McKesson knew that if it did not keep its manipulations of the AWPs a secret, there would be serious repercussions:

> Confidentially. Not to pass on. We have [only] about 470 brand
> Rx items
>
> * * * * *
>
> [John Bonner, Director, McKesson's Branded Rx Product
> Management and Investment] Bob James is working with FDB to
> make this happen over time and I'm not sure it is something we
> want discussed. Please contact him before discussing outside the
> company.[24]
>
> * * * * *
>
> [Bob James] For obvious reasons we don't want to write a memo
> and send it out because it would not be kept confidential.[25]
>
> * * * * *
>
> [Bob James to McKesson field associate] I would be careful about
> 'being ahead of the curve with Lilly. You be the judge on how
> your customer will interpret.[26]
>
> * * * * *

---

[23] MCKAWP 0069714.

[24] MCKAWP 0066465.

[25] MCKAWP 0069591.

[26] MCKAWP 0069594.

- 56 -

[McKesson field associate writing to John Bonner] My accounts
are having issues with us 'Normalizing brand pricing at 25%' . . . .
You also mentioned that we should not discuss [this] outside of
McKesson, how would you suggest we answer our customers[']
questions?[27]

\* \* \* \* \*

[McKesson field associate] Obviously this is not out to the field.[28]

\* \* \* \* \*

[Bob James] Sorry for the extra confusion and questions that have
come up from our customers. The (unintended consequences)
results [of the normalization process] should have a very positive
impact on our customers['] profitability.[29]

\* \* \* \* \*

144. First Data also knew the importance of keeping the Scheme a secret. In response

to an e-mail inquiry whether electronic drug pricing publishers were increasing the AWP/WAC

spread, Kay Morgan denies any involvement, adding, "I am most curious as to the source of this

rumor. First Data has always used a wholesaler survey to determine AWP."[30] She forwarded on

the exchange to Bob James at McKesson, stating, "I thought you might want to see my answer,"

to which he responds: "I love it! You are the best."[31]

145. When in 2003 one manufacturer indicated that it would "no longer report average

wholesale prices (AWP) for its products", First Data reported to McKesson that this

manufacturer appeared "to be playing hard ball and [First Data] just won't play." First Data

indicated that it would, then, "just assume the markup is 1.25." In this situation, when the

manufacturer wanted to be assured that any disclosure of an AWP associated with its product

---

[27] MCKAWP 0066464.

[28] MCKAWP 0069732.

[29] MCKAWP 0042663.

[30] MCKAWP 0069588.

[31] *Id.*

was a price that "has not been authorized" by it, First Data wrote back stating: "Wonderful. If we don't report an AWP, the NDC will not be listed. It is the rules of the database. That database does not allow for statements such as your attorneys wrote below."

146.    Many insiders in the pharmaceutical industry recognized that the extraordinary, across-the-board increase in the number of drugs that were increased in the WAC/AWP spread from 20 to 25% was a "change... being driven at wholesaler lever" in order to accommodate the large drug retail chains.

147.    First Data's participation in the Scheme is also evidenced, in part, by its conduct with respect to AWPs reported to First Data from certain manufacturers. For example, in *In re Pharmaceutical Indus. Average Wholesale Pricing Litig.*, MDL No. 1456 (D. Mass.), Novartis filed declarations stating that Novartis regularly communicated its AWP to the Publishers, including First Data and that for the period March 27, 2000 through August 21, 2002, the AWP published for its drugs was 20% higher than the WAC Novartis reported. Novartis then stated in its declaration that since January 18, 2002, First Data has consistently published an AWP that was 5% higher than the AWP reported by Novartis, or 25% over WAC. However, the Novartis declaration did not describe anything Novartis had done to remedy First Data's fraudulent reporting of Novartis' AWP.

**W.     Some Branded Manufacturers' Response to the McKesson/First Data Scheme**

148.    Some branded manufacturers noticed implementation of the Scheme and immediately appreciated its purpose – to provide additional profit to the wholesalers and retailers in the pharmacy class of trade. One branded company commented that "First Data, at the direction of the wholesale industry, has begun to change all branded pharmaceutical products to a 25 % markup... and that "the spread will be changed as product price changed...." The same company observed that the "largest negative factory is publicity" since the increase in AWP

- 58 -

appropriate."[36]  McKesson appreciated that if it failed to inform its customers that it was behind

all these changes "it's possible that some of these accounts will believe that this stuff just

happens and our efforts will go unrecognized."[37]   As one McKesson executive put it: "This

sounds like something we should at least [be] quietly communicating to our customers in order

to get some mileage from it[.]"[38]  And so it began:

> [To Dan Connolly of Bartell Drugs]: Celexa and Lexapro will have
> an AWP markup of 25% or a spread of 20% as soon as FDB
> information is updated.  Look for the change to happen next week.
> Keep smilin[g] . . . and who said we never listen to our customers
> (and old friends)."[39]

> *  *  *  *  *

> [To Dan Connolly]: Just wanted you to know that Clarinex AWP
> spreads went to 20% this week.  A few weeks ago Celxa went to
> 20% as well.   Fat cat status is just around the corner.")[40]

> *  *  *  *  *

> [To David Vucurevich of Rite Aid]: P.S. latest AWP changes . . .
> Celexa and Clarinex, working on Lilly and Novo.[41]

177.   A field agent reports:  "Some of the more savy stores like Med-X have taken

notice."[42]  Bob James realized that the goodwill McKesson established with the pharmacies as a

result of inflating AWPs would give it a substantial edge over its competition:

> In my discussions [with select customers about McKesson's efforts
> to "normalize" the AWP markup at 25%], one of the comments
> that was made was "this would certainly be a good reason to renew

---

[36] MCKAWP 0065895.

[37] MCKAWP 0065895.

[38] MCKAWP 0069732.

[39] MCKAWP 0069817.

[40] MCKAWP 0069901.

[41] MCKAWP 0069911.

[42] MCKAWP 0069732.

001821-13 136802 V1

> our agreement with McKesson when its time." Talk about being
> good partners, wow! This is worth further discussion as we go
> forward. Maybe a proactive strategy like this will soften some of
> the activity around asking for lower costs and more benefit.[43]

178.    Bob James proposed disclosing McKesson's efforts to customer Omnicare who purportedly was looking for an extra-contractual year-end bonus in the neighborhood of $500,000:

> Omnicare is looking for . . . . . . say $500,000 in benefit from year
> end deals, even though this was not part of their contract. We
> need to ask them to roll up or recalculate their reimbursements for
> last year based on the new AWP's with a 20% spread. And . . . . . .
> this is **not just a one time benefit**. They will receive this now and
> for each year going forward until they renegotiate their contracts
> with third parties (and hopefully do not give up this gift).[44]

Bob James also noted with pleasure that Kay Morgan spoke "with Eric Sorkin at RiteAid to let him know how much effort we are putting into this AWP thing to get it right."[45] Other customers were also appreciative, for example an unnamed customer from Ohio, who called McKesson "to say that he was looking at some of these items again and found that the spread appears to have increased significantly on most of these items to the area of 20-21%. He wondered if we had any part in doing this and, if so, he wanted to let us know that he really appreciated our efforts."[46] Med-X Corp.'s Director of Operations, Jerry Howard reviewed the numbers, put two and two together[47] and "was very ex[c]ited about" McKesson "working on AWP expansion."[48]

---

[43] MCKAWP 0065895.

[44] MCKAWP 0065895 (emphasis, ellipses in original).

[45] MCKAWP 0069669.

[46] MCKAWP 0069513.

[47] MCKAWP 0069732.

[48] MCKAWP 0069726.