UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | Civil Action: 1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**DEFENDANT MCKESSON CORPORATION'S OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR LEAVE TO FILE MEMORANDUM IN EXCESS OF TWENTY PAGES**

McKesson Corporation ("McKesson") opposes Plaintiffs' motion for leave to file a 25-page Reply Memorandum in Support of Plaintiffs' Motion for Class Certification, and seeks to correct the factual inaccuracies in Plaintiffs' motion:

1.      At the February 9, 2006 status conference, Plaintiffs requested that the Court impose strict page limits on class briefing in this case in light of the voluminous submissions in the AWP MDL case, where Plaintiffs but not McKesson is a party. Counsel for Plaintiffs, Thomas Sobol, stated, "I mean, in AWP it was outrageous what the parties did to this Court in

terms of the volume of information we gave you. . . . So there have to be reasonable limits on both parties in terms of how much paper we're allowed to deluge you with and how much time we're allowed to, you know, pull out certain kinds of issues." (Status Conf. Tr. at 7:20-8:1, Feb. 9, 2006, (attached hereto as Exhibit A).) The Court agreed to Plaintiffs' request and imposed a 20-page limit on the parties' motion and opposition, and a 10-page limit on the parties' reply and surreply on class certification. (*Id.* at 14:17-22.)

2. On December 20, 2006, Plaintiffs filed an Amended Motion for Class Certification with a 22-page brief, and declarations in support thereof. Plaintiffs also filed a 20-page Proffer of Evidence, a 7-page Trial Plan, and continued to rely on a previously filed 9-page Motion for Determination of Controlling State Law. [Docket Nos. 178-83, 73-74.]

3. On January 24, 2007, McKesson filed a 20-page opposition brief and declarations in support thereof. In addition, McKesson responded to Plaintiffs' Proffer of Evidence, Trial Plan, and Motion for Determination of Controlling State Law. [Docket Nos. 188-95.] Contrary to the assertion in Plaintiffs' Motion for an oversized brief, McKesson did not file a 78-page class opposition brief, or any document that was not a response to a document Plaintiffs filed with their Amended Motion.

4. On March 19, the day Plaintiffs filed their reply brief, Plaintiffs requested McKesson's assent to an additional five pages for their reply brief. McKesson agreed on the condition that the same page limit would apply to McKesson's surreply, subject to Court approval. McKesson did so with the understanding that it was stipulating to a 15-page reply brief and a 15-page surreply.

5. McKesson defers to this Court's determination regarding the appropriate length for reply and surreply briefs, and respectfully requests that any relief from the page limits previously established by the Court apply to both sides' submissions.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone:  (415)268-7000
Facsimile:  (415) 268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
One Liberty Square
Boston, MA 02109
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated:  March 19, 2007

## CERTIFICATE OF SERVICE

I, Lori A. Schechter, hereby certify that a true and correct copy of this document was served on the attorneys of record for each party via the Court's electronic filing system this 19th day of March 2007.

/s/ Lori A. Schechter
Lori A. Schechter

# Exhibit A

Page 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
 3    NEW ENGLAND CARPENTERS HEALTH )
      BENEFITS FUND, et al,         )
 4                                  )
                  Plaintiffs        )
 5                                  )
            -VS-                    ) CA No. 05-11148-PBS
 6                                  ) Pages 1 - 23
      FIRST DATABANK, INC.,         )
 7    a Missouri Corporation;       )
      and McKESSON CORPORATION,     )
 8    a Delaware Corporation,       )
                                    )
 9                Defendants        )
10
11
                         STATUS CONFERENCE
12
                BEFORE THE HONORABLE PATTI B. SARIS
13                  UNITED STATES DISTRICT JUDGE
14
15
                                 United States District Court
16                               1 Courthouse Way, Courtroom 19
                                 Boston, Massachusetts
17                               February 9, 2006, 3:30 p.m.
18
19
20
21
22
                            LEE A. MARZILLI
23                    CERTIFIED REALTIME REPORTER
                      United States District Court
24                    1 Courthouse Way, Room 3205
                          Boston, MA  02210
25                         (617)345-6787
```

Page 2

1  APPEARANCES:
2      THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP,
   One Main Street, Fourth Floor, Cambridge, Massachusetts,
3  02142, for the Plaintiffs.
4      JOHN A. MACORETTA, ESQ., Spector, Roseman & Kodroff,
   1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
5  19103, for the Plaintiffs.
6      LORI A. SCHECHTER, ESQ., Morrison & Foerster, LLP,
   425 Market Street, San Francisco, California, 94105-2482, for
7  McKesson.
8      JOAN M. GRIFFIN, ESQ., Burns & Levinson,
   One Beacon Street, Boston, Massachusetts, 02108, for
9  McKesson.
10     MARK C. REDMAN, ESQ., The Hearst Corporation,
   1345 Avenue of The Americas, New York, New York, 10105,
11 in-house counsel for The Hearst Corporation.

Page 3

1           PROCEEDINGS
2      THE CLERK: The case of New England Carpenters
3  Health Benefits Fund, et al V. First Databank, Incorporated,
4  et al, Civil Action No. 05-11148, will now be heard before
5  this Court. Will counsel please identify themselves for the
6  record.
7      MR. SOBOL: Good afternoon, your Honor. Tom Sobol
8  for plaintiffs.
9      MR. MACORETTA: Good afternoon, your Honor. John
10 Macoretta for the plaintiffs.
11     MS. SCHECHTER: Good afternoon, your Honor. Lori
12 Schechter for McKesson.
13     MS. GRIFFIN: Joan Griffin also for McKesson.
14     MR. REDMAN: Mark Redman, in-house counsel at The
15 Hearst Corporation, which is the parent company of First
16 Databank.
17     THE COURT: Thank you. Where are we in this case,
18 the plaintiffs? Then I'll hear from defendants.
19     MR. SOBOL: Where we are, your Honor, is there are
20 two defendants. You've ruled on a 12(b)(6) motion as to
21 McKesson back in December, us, the case ready to go forward
22 vis-a-vis McKesson. There are settlement discussions that
23 are under way with the other defendant, First Databank.
24     The issue before your Honor today is what to do
25 vis-a-vis scheduling. I think that there are three issues

Page 4

1  about readiness: First, where are we with the settlement,
2  number one? Number two, what's the case, just briefly,
3  generally about so you have an idea about what kind of more
4  discovery needs to be done apart from AWP? And then, three,
5  what's my pitch going forward?
6      So as to those, as we reported to you, your Honor,
7  we are in very active discussions with First Databank. We
8  don't have an agreement yet. There are some discussions
9  which are planned in the next week, and we believe that we
10 should be able to report back to the Court, cross our
11 fingers --
12     THE COURT: What's the claim against First Databank
13 again? Is it the basic publishing claim?
14     MR. SOBOL: Yes. First Databank is the publisher.
15 McKesson is the wholesaler. The counts are the same against
16 each of the defendants, and the underlying wrongful conduct
17 that they allege, that we allege, is that the upper bound of
18 the reimbursement amount, the amount between AWP and WAC, was
19 increased from a markup factor of .20 to .25 beginning in
20 January of 2002 for both defendants.
21     We're in active negotiations with First Databank.
22 I'm crossing our fingers. We hope to be able to tell the
23 Court whether or not we will or won't have an agreement by
24 next week.
25     THE COURT: Oh, all right.

Page 5

1      MR. SOBOL: By next week. Now, if that slips a
2  couple of days, it's going to be because people are making
3  sure that they get all the appropriate authorizations to
4  either accept or decline, which is also appropriate for the
5  parties to do here. You know, people have to make a decision
6  not to settle too on the basis of the terms we talked about.
7  So that's where we are vis-a-vis the settlement.
8      Second, in terms of the case itself, the plaintiffs
9  see this as a much more narrow case. We have two
10 defendants. We've got a narrower time period. There's one
11 basic act, which is the increase of this markup factor by
12 McKesson and First Databank during this period of time.
13     In the underlying AWP case, your Honor, we've
14 already had depositions of McKesson, two other wholesalers,
15 First Databank, and all of them have produced some amount of
16 documents. So it's not as if we're even beginning fresh with
17 discovery either. That's why the plaintiffs have proposed a
18 schedule which essentially has us filing for class
19 certification in the summer, for us closing fact discovery
20 the end of the summer, and for proceedings, you know, to go
21 essentially along those lines.
22     So the issue before your Honor is twofold: First,
23 should we delay any more than vis-a-vis McKesson to push the
24 case forward? And the plaintiffs, we say "no," there's no
25 reason to do that. First Databank will either know we don't

Page 6

 1  have a settlement with them in a very, very short period of
 2  time. If it turns out there's no settlement with them, First
 3  Databank will be able to answer the complaint or file a
 4  motion and catch up with where we are with McKesson.
 5      THE COURT: Who represents First Databank?
 6      MR. SOBOL: Mr. Redman, who is counsel for the
 7  parent company, The Hearst Corporation. He's here.
 8      MR. REDMAN: Your Honor, we have not picked outside
 9  counsel yet for this case. We've been focusing all of our
10  energy right now at this point on the settlement discussions
11  with Mr. Sobol's firm.
12      THE COURT: If you were a betting man, is there a
13  greater than equal chance of settlement?
14      MR. REDMAN: I think we do have a greater than
15  equal chance of settlement, yes.
16      MR. SOBOL: A betting man. Just doesn't play NHL
17  hockey, though, I hope. So essentially we don't see that as
18  a reason to wait. I don't think we need to talk anymore
19  about that. Our schedule is aggressive, we admit, but,
20  frankly, given the kind of --
21      THE COURT: How can I do a schedule like that
22  realistically when I'm doing both Neurontin and AWP and I'm
23  going to trial on 9/11?
24      MR. SOBOL: Well, this is our schedule, your Honor,
25  not your schedule.

Page 7

 1      THE COURT: I know. Just at some level I've got to
 2  start ruling.
 3      MR. SOBOL: Well, I'll answer that seriously, your
 4  Honor, because I know your schedule very well. And let me
 5  say this: One way to deal --
 6      THE COURT: How is this all here? I mean, this was
 7  a related case, is this it?
 8      MR. SOBOL: It was seen by some as related because
 9  it has something to do with AWP, and it got filed here, and
10  it got over here. I even sent letters, you may remember,
11  apologizing, at least implicitly apologizing to the Court
12  about how it was being treated as related.
13      In answering, though, that question seriously about
14  the docket, your Honor, which obviously I have to be mindful
15  of because if I'm the plaintiff, I'm asking the judicial
16  resources of this court, I have to be mindful of that, let me
17  say this: One way to keep down the amount of work also is to
18  have the parties have firm filing deadlines vis-a-vis class
19  discovery; you know, the amount of paper that we're allowed
20  to send you. I mean, in AWP it was outrageous what the
21  parties did to this Court in terms of the volume of
22  information we gave you. It was not plausible that we could
23  have you read that. So there have to be reasonable limits on
24  both parties in terms of how much paper we're allowed to
25  deluge you with and how much time we're allowed to, you know,

Page 8

 1  pull out certain kinds of issues.
 2      THE COURT: So you want to move us forward,
 3  whatever my schedule is, you want to move forward?
 4      MR. SOBOL: Correct.
 5      THE COURT: And you want it more aggressive, and
 6  they want it less aggressive, and we'll just reach some sort
 7  of deadlines rather than just stay --
 8      MR. SOBOL: Correct, right. So I'll let
 9  Ms. Schechter then talk to you about it.
10      MS. SCHECHTER: Thank you, your Honor. Let me
11  address some of the things that Mr. Sobol said. First
12  Databank and McKesson are alleged to be in a RICO
13  enterprise. They're the only two participants alleged to be
14  in the enterprise. And the allegations as to both parties
15  are essentially the same, that they are part and parcel of a
16  plan and scheme.
17      Now, there are actually more causes of action
18  against First Databank than there are against McKesson, and
19  it seems somewhat incongruous to say we can go forward with
20  one of these parties when they're alleged to be together in a
21  scheme and not go forward with the other at the same time.
22  That is why we said in the meet-and-confer process that we
23  were having with the plaintiffs over scheduling that it
24  didn't make sense to set out a schedule until we knew what
25  the status --

Page 9

 1      THE COURT: I am going to set out a schedule, and
 2  I'm going to accommodate -- you know, I'm going to set it for
 3  everyone, and it will be broad enough so that if the
 4  settlement discussions fall apart, it will include First
 5  Databank, because they're only talking about another week
 6  when they know, and so I don't want to call you all back in
 7  here.
 8      MS. SCHECHTER: Well, and that's fine, and that's
 9  the first we heard that, obviously, because we had not been
10  told what's going on at all. So with that in mind, I have
11  come with a proposed schedule that we can work off of because
12  I think the one that the plaintiffs propose does not take
13  into account many things that need to happen.
14      I'll also say about a comment Mr. Sobol made that
15  he's been in the AWP case for several years, and he has the
16  depositions of all the wholesalers. Well, McKesson is not in
17  that case. McKesson hasn't seen those depositions, and we
18  will --
19      THE COURT: Is it a generic?
20      MS. SCHECHTER: McKesson is a wholesaler.
21      THE COURT: It's a wholesaler. I'm sorry, I've had
22  so many of these. So you've not been brought in on any of
23  these?
24      MS. SCHECHTER: Correct, correct, McKesson has not
25  had access to any of that discovery. McKesson has been

Page 10

1  informed enough to realize that in the AWP MDL, there was an
2  extensive factual record developed and put before the Court
3  with respect to class certification to certify the very same
4  class that Mr. Sobol seeks to certify here, a third-party
5  payor class along with a consumer class for self-administered
6  drugs. Your Honor denied that class but did it based upon a
7  full record. And obviously McKesson would like the
8  opportunity to develop a comparable record, although we think
9  you would reach the same conclusion. We obviously need to
10 have that record.
11      Now, one thing Mr. Sobol did not mention is that
12 the plaintiffs, the day before our status conference
13 statement was due, did file another action in California.
14 I'm sorry we didn't mention it in our papers. We didn't know
15 about it. They didn't send that to us.
16      THE COURT: So I can send this to California?
17      MS. SCHECHTER: Well, it's yet to be seen what's
18 going to happen with that. They said in their papers they're
19 going to move to transfer that case here.
20      THE COURT: Sure. I mean, unfortunately I do know
21 a lot about it. It's just at this point I've got a huge
22 amount, and I know everybody understands it, and I'll just
23 have to adjust, given what I'm doing in all these pricing
24 cases. But what schedule do you want?
25      MS. SCHECHTER: Let me, if I could -- thank you.

Page 11

1       THE COURT: I should probably have it. It's just
2  I've been busy. Has this been filed?
3       MS. SCHECHTER: No, your Honor.
4       THE COURT: So I won't be too apologetic.
5       MS. SCHECHTER: The schedule that we did file was
6  before we knew there was a California case, before we knew
7  that the settlement was imminent, and so in light of the
8  developments that have happened since we filed, we thought
9  we'd better go back to the drawing board.
10      THE COURT: No, no, let's just jump right into
11 this. When can you -- I'm going to do both. How long do you
12 think you need? I'm not going to start with the class
13 discovery and then do substantive discovery. We can run them
14 in parallel, in tandem. And so how long do you think you
15 need? It's true, you're not as familiar as Mr. Sobol. I
16 think he dreams little AWPs jumping over fences. So how long
17 do you need?
18      MS. SCHECHTER: Well, the plaintiffs proposed that
19 they would file their class motion in June, and our proposal
20 is not that much different. We were going to propose the
21 first week in July.
22      THE COURT: But how long do you need in discovery?
23      MS. SCHECHTER: Well, we would finish our class
24 discovery by that time.
25      THE COURT: No, you're not hearing me. I don't

Page 12

1  want to structure it that way.
2       MS. SCHECHTER: Well, you don't have to set a
3  cutoff for that, but I think we would need to do fact
4  discovery afterward.
5       THE COURT: That all discovery was cut off, what
6  would --
7       MS. SCHECHTER: So taking into account the class
8  discovery, the class motion, your Honor's ruling on the
9  motion, and all the third-party discovery that we think would
10 be anticipated, we think we might need until February to
11 complete all of the fact discovery.
12      THE COURT: February of?
13      MS. SCHECHTER: Of '07, basically between now and
14 next -- almost a year.
15      THE COURT: That's not so unreasonable, given where
16 AWP is. AWP has taken me three years, more.
17      MR. SOBOL: Well, first, let's be sure we're
18 talking about the same thing. We're talking about fact
19 discovery for the whole case.
20      THE COURT: For the whole case.
21      MR. SOBOL: Our view is that it's not necessarily
22 that long because the comparison isn't AWP. In the AWP case,
23 we took the deposition of McKesson. McKesson knows what it
24 said. So apart from finding some more things about what
25 people at McKesson knew or didn't know, that's what this case

Page 13

1  is about, internally at their own company, and then whatever
2  follow-up needs to be done in First Databank. But as
3  Ms. Schechter said, because it's two defendants and the
4  allegations are what happened vis-a-vis First Databank and
5  McKesson, it's really not all that involved. But --
6       MS. SCHECHTER: But as -- I'm sorry.
7       MR. SOBOL: -- in comparison. And because McKesson
8  knows what happened at its own deposition, it's not as if it
9  needs to know -- you know, the rest of the AWP case isn't
10 relevant to it. I mean, it just doesn't have anything to do
11 with the AWP case. There was markup factors that occurred.
12      THE COURT: Yes, that's why this will take one year
13 rather than five years. So let me do this. Fact discovery
14 deadline 1/31/07, is that a real date?
15      THE CLERK: Do you have an '07 calendar, Judge?
16      THE COURT: Here we go.
17      THE CLERK: It is.
18      THE COURT: All right, yes, that is a real date.
19 Now, you're going to run that in tandem with class
20 discovery. Do you have some real -- who's serving as the
21 proposed class representatives? Is this just a third-party
22 payor case?
23      MR. SOBOL: This is just third-party payors, and we
24 have the three, you know, funds that have already been named,
25 and we have proposed that we could file our class

Page 14

1  certification motion on June 1.
2      THE COURT: Fine.
3      MS. SCHECHTER: Your Honor, can I respond to that?
4  The complaint alleges both a consumer class and a third-party
5  payor class, so I'm not sure what Mr. Sobol means. He
6  doesn't have a class rep.
7      THE COURT: I tell you what. Move to dismiss it,
8  okay? If he doesn't have a class rep, then you'll have to
9  adjust for whether that's appropriate or not.
10     MS. SCHECHTER: But he has said that the California
11 case where he has now put two class consumers --
12     THE COURT: Well, then when I get to it, I'll get
13 to it. If he wants to file it by June 1, that's fine. Any
14 class discovery you do should be before then. But right now,
15 only three proposed class reps, take those right away.
16 Now, okay, so any class motion. And if the other case comes,
17 when it comes in, I'll worry about it. So your motion for
18 class cert for the plaintiffs, June 1, limited to 20 pages;
19 opposition, 7/1/06 for the opposition, limited to 20 pages.
20 Reply and surreply is limited to 10 pages, 14 days and
21 14 days, so we'll say 7/15/06, 7/30/06 for the reply and the
22 surreply. So then we should set up a hearing on motions for
23 class cert in September.
24     MS. SCHECHTER: Does your Honor want to build in
25 any time for experts on the class issue --

Page 15

1      THE COURT: No.
2      MS. SCHECHTER: -- as was done in the MDL?
3      THE COURT: Unless I -- that was just different.
4  And if I become persuaded that I don't understand it, I'll
5  back it off, but right now I'm not seeing that.
6      MS. SCHECHTER: Okay. I mean, we will seek to
7  present some of the very same evidence that was presented to
8  show that the self-administered class for TPPs cannot be
9  certified in the same manner that your Honor has already
10 ruled.
11     THE COURT: That may be true, I mean, because I
12 really understand it now. I mean, the expert helped me
13 through the industry.
14     MS. SCHECHTER: I don't mean the independent
15 expert. I was just saying that the parties are going to push
16 forth expert reports, and the plaintiffs had contemplated
17 that in their order, and we'll need to take their
18 depositions. That's all, that's all I was suggesting.
19     THE COURT: So play it out a little bit more for
20 me. What do you mean? The experts on what? On --
21     MS. SCHECHTER: On class certification issues.
22     THE COURT: On what issue?
23     MS. SCHECHTER: Well, for example, the
24 relationships between the PBMs and the TPPs and how it might
25 affect the pricing that goes into this, the fact that --

Page 16

1      THE COURT: Sure, all the things I saw last time.
2  Anything new?
3      MS. SCHECHTER: Correct, but McKesson has not
4  developed that evidence. We haven't even seen that evidence.
5      THE COURT: I think it's either all publicly
6  available, and if it's not, move to either make it publicly
7  available or to come in under the protective order.
8      MS. SCHECHTER: Okay, that would work for us
9  because we don't have access to it because of the protective
10 order.
11     THE COURT: But if you read my opinion, I mean,
12 there may be new things because you're a wholesale level, and
13 I dealt before with different levels, but we talked quite a
14 bit about wholesale. Just I understand it better, and I may
15 not decide to hire an independent expert.
16     MS. SCHECHTER: I'm just suggesting we would put in
17 an expert report.
18     THE COURT: Oh, I'm assuming you will. That's fair
19 enough. You don't know yet who your expert is?
20     MS. SCHECHTER: No, we do not.
21     MR. REDMAN: Your Honor, we would probably do the
22 same. Again, it is a little different with a publisher
23 actually in the case this time as opposed to on the fringes,
24 so I just wanted to --
25     MS. SCHECHTER: So the issue only becomes, is the

Page 17

1  briefing schedule sufficient so that if the parties want to
2  take the experts' depositions after the report comes in --
3  I'm happy to live with it, but it does give everyone --
4      THE COURT: It's hard to say. I mean --
5      MS. SCHECHTER: Okay, well, that's fine, and if
6  there's an issue, we'll raise it later.
7      THE COURT: Now, on the overall fact discovery,
8  I've got 1/31/07. For sure, there will be need for experts
9  at the liability stage.
10     MR. SOBOL: So we would be prepared to file our
11 liability experts on the day that fact discovery closes.
12 It's also what our proposal has suggested to your Honor, so
13 the plaintiffs can go forward on liability --
14     THE COURT: I don't want to wait until the end of
15 the fact discovery to begin expert designations. I don't
16 know that we need to wait that long.
17     MR. SOBOL: We're happy to do it well before then
18 too, your Honor.
19     MS. SCHECHTER: For the reports or for the
20 disclosures? For the reports?
21     THE COURT: Yes. I don't know that we need to wait
22 until the end.
23     MS. SCHECHTER: That's fine with us so long as the
24 plaintiff's expert doesn't say they cannot complete their
25 conclusions until they have all the discovery. We don't want

Page 18

1   to have that be a wasted effort.
2       THE COURT: Yes, but here's what I don't want is to
3   give you a full year for fact discovery and start with
4   another half a year with experts. That's what I don't want
5   to do. So I'm going to do this at the tail end here, which
6   is, I'm going to have -- why don't we say November 15 for
7   plaintiff's designation, '06, and 12/15/06 for defendant's
8   expert designation. And then why don't we just say, I don't
9   know, something like along the lines of 3/9/07 to finish up
10  any depositions, so the depositions can come in after the
11  close of all fact discovery. And if you need to tinker at
12  all with these adjustments based on discovery, you'll let me
13  know. Motion for summary judgment, April 9, '07; opposition,
14  5/9/07, once again the 20-page limitations. And then the
15  hearing would be, in case you're busy, something along the
16  lines of June of '07 or July of '07.
17      THE CLERK: June 27 at 2:00 p.m., '07.
18      THE COURT: Anyone busy? Now, listen, as far as
19  I'm concerned, you can by agreement adjusts these dates
20  internally, as long as I end up at a hearing on a motion for
21  summary judgment on June 27, '07. So just agree to it.
22      Now let me ask you: Why would I certify,
23  Mr. Sobol, a class on self-administered drugs here in a way
24  that I wouldn't in the other one? Is there something
25  different here?

Page 19

1       MR. SOBOL: Oh, yes, yes. The reason you didn't
2   certify a class for the self-administered drug in the AWP
3   area is essentially twofold: First, you believed that it was
4   difficult to track the rebates that were going back to
5   whichever members of the third-party payors; and, second,
6   that there might be knowledge differences within the
7   third-party payors regarding whether or not the spread
8   existed or not. Neither of those two issues apply here.
9   First, this case doesn't have anything to do about hidden
10  rebates and how the rebates dropped down the actual selling
11  price. In this case, we're talking about only the top piece
12  between WAC and AWP, and so there's no rebate issue here at
13  all.
14      Second, because we're talking about a disguised
15  increase with price increases beginning in 2002 going forward
16  of the difference between WAC and AWP, there's no knowledge
17  issue at all about how big the spread is generally --
18      THE COURT: None of that confusion on the "but for"
19  spread and how complicated that is?
20      MR. SOBOL: Right. So the big issues, to be
21  predictable, that we'll have when we're here at whatever
22  hearing date we select for class certification will be that
23  the plaintiffs will say this isn't AWP because those issues
24  are implied, and McKesson will say the opposite.
25      THE COURT: Okay. And at least by this period of

Page 20

1   time, which is what's helpful to me, I should say, even if I
2   buy all your theories, I should be done with classes one,
3   two, and three of all track one, and I should be done by this
4   time period, so this is going to -- I don't know what happens
5   with class. At some point I need to discuss it with the
6   whole crew what to do with the second group of defendants.
7       MR. SOBOL: Right. Did we -- Mr. Macoretta tells
8   me -- did we pick a date for the hearing on class
9   certification?
10      THE CLERK: No.
11      MS. GRIFFIN: Sometime in September, but I don't
12  think we got a date.
13      THE COURT: Sometime in September, '06, for class
14  cert.
15      THE CLERK: September 19 at 2:00 p.m.
16      THE COURT: Let me ask you, on the other case, is
17  there likely to be an appeal?
18      MR. SOBOL: Yes, I'm just wondering that. We're
19  very close to it, your Honor, I think.
20      THE COURT: Because that does affect how things
21  might run. You don't know?
22      MR. SOBOL: Well, there won't be from the
23  plaintiffs. That, I know. And I think -- I haven't heard
24  anything at all from the defendants, so I can't predict it.
25      THE COURT: I don't get those notices anymore with

Page 21

1   our new fancy-schmancy CM/ECF.
2       All right, so that's it, right? You're going to
3   let me know, right? If you settle, does that affect things
4   at all? If First Databank settles, are you engaged in
5   settlement discussions, or do you want to be?
6       MS. SCHECHTER: We have not been, your Honor.
7       THE COURT: Do you want to be?
8       MS. SCHECHTER: At this point, I don't think we do.
9       THE COURT: All right, well, I sort of don't make
10  it optional eventually, but not right from the get-go, so
11  when should I send you to mediation? Is this Eric Green?
12  Who's doing it for you all?
13      MR. SOBOL: We haven't agreed or talked about
14  that. I would suggest, your Honor, in the fall.
15      THE COURT: No, but who's doing it with First
16  Databank?
17      MR. REDMAN: We're doing it in-house, your Honor.
18      THE COURT: Oh, I see. Eric Green is fabulous, as
19  you know, very professional. I mean, we have excellent
20  magistrate judges who do it, but this is such a huge and
21  complicated case.
22      MR. SOBOL: I'd also suggest, your Honor, given his
23  experience in the AWP case, it might help him with this.
24      THE COURT: Eric Green would be one person, but if
25  that's not someone who is satisfactory to you, you could go

Page 22

1  to the magistrate judge, or anyone else that you think you
2  might want.
3      MS. SCHECHTER: That's fine, your Honor, I'm happy
4  to discuss it with my client.
5      THE COURT: Okay, so we'll do that, why don't we
6  say by October 31, '06. Does that give you all enough time
7  to -- you've seen the class cert thing play out, you've seen
8  the discovery play out, okay?
9      MR. SOBOL: Thank you.
10     THE COURT: By 10/31. Who's this case paired with,
11 do you know? Does this go down to a magistrate judge?
12     MR. SOBOL: It has not yet, no.
13     THE COURT: Do you know, Robert? The two that make
14 sense are either -- it's probably Judge Bowler, who fully
15 understands, although she's probably had more than her --
16     THE CLERK: Judge Collings is the magistrate judge
17 paired in this case.
18     THE COURT: All right, so he's excellent, as are
19 they all. So you can either go with him, or if you think it
20 makes more sense to have it transferred to Judge Bowler as
21 part of the related, she's been doing --
22     MR. SOBOL: A lot.
23     THE COURT: A lot. But let me make this
24 recommendation: If you decide to stick with Judge Collings,
25 she would be a particularly good person to try to mediate it,

Page 23

1  simply because she has such familiarity with the AWP piece of
2  it, and she's also a good mediator. So one way to do it
3  would be to stick with Collings and use her as a mediator.
4  But if you wanted to switch to her for the magistrate, why
5  don't you talk about it and ask me within a week, and I'll
6  see what I can do as a related case, okay?
7      MR. SOBOL: Thank you.
8      THE COURT: Thank you.
9      MR. REDMAN: Your Honor, if I may, just one small
10 point. As I said, we haven't hired outside counsel yet. If
11 you would just consider this to be a special appearance and
12 not a general appearance on behalf of First Databank. So I
13 don't want to essentially waive the rights --
14     THE COURT: You'll always be special.
15     MR. REDMAN: Thank you very much.
16     (Adjourned, 4:00 p.m.)
17
18
19
20
21
22
23
24
25

1   C E R T I F I C A T E
2
3
    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS   ) ss.
    CITY OF BOSTON              )
5
6
7
8       I, Lee A. Marzilli, Official Federal Court
9  Reporter, do hereby certify that the foregoing transcript,
10 Pages 1 through 23 inclusive, was recorded by me
11 stenographically at the time and place aforesaid in Civil
12 Action No. 05-11148-PBS, New England Carpenters Health
13 Benefits Fund Vs. First Databank, Inc., et al, and thereafter
14 by me reduced to typewriting and is a true and accurate
15 record of the proceedings.
16      In witness whereof I have hereunto set my hand this
17 20th day of February, 2006.
18
19
20
21
22
23  _____
    LEE A. MARZILLI, CRR
24  OFFICIAL FEDERAL COURT REPORTER
25