UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN, JUNE SWAN, MAUREEN COWIE and BERNARD GORTER, | Civil Action: 1:05-CV-11148-PBS |
| | Judge Patti B. Saris |
| Plaintiffs, | [FILED UNDER SEAL] |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**DECLARATION OF LORI A. SCHECHTER IN SUPPORT OF McKESSON CORPORATION'S SURREPLY IN OPPOSITION TO CLASS CERTIFICATION**

**[REDACTED VERSION]**

I, Lori A. Schechter, declare as follows:

1.    I am a partner in the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action. I submit this declaration in support of McKesson's memorandum in opposition to class certification.

2.    True and correct copies of documents and deposition transcript excerpts produced to McKesson in this action are attached as exhibits to this declaration as follows:

| Tab | Producing Party or Witness Affiliation | Description |
|---|---|---|
| | Blue Cross Blue Shield Montana (TPP) | |
| 23 | | Deposition of Tina Wong dated November 14, 2006 |
| | Express Scripts, Inc. (PBM) | |
| 24A | | Email exchange between ██████████ and E. Conley at Express Scripts, dated April 15, 2002 (ESI-414-00001870-74) |
| 24B | | E-mail from K. Abe at Express Scripts to T. Wong and R. Arnold at Blue Cross & Blue Shield of Montana, dated April 22, 2002 (ESI-414-00003677-78) |
| 24C | | Email from ████████ to K. Wuflestad at Express Scripts, dated May 7, 2002 (ESI-414-00003722-28) |
| 24D | | Email exchange between ██████████ and J. Chase at Express Scripts, dated April 17, 2002 and April 25, 2002 (ESI-414-00003758-59) |
| 24E | | Email from ████████████ to S. Crawford at Express Scripts, dated May 14, 2002 (ESI-414-00003785-86) |
| 24F | | E-mail from ████████ to E. Conley at Express Scripts, dated April 16, 2002 (ESI-414-00004109) |

| Tab | Producing Party or Witness Affiliation | Description |
|-----|------------------------------------------|-------------|
|     | **Dr. Hartman (Plaintiffs' Expert)** |             |
| 25  |                                          | Deposition of Raymond S. Hartman, dated October 4, 2006 and October 5, 2006 |
|     | **Susan Hayes (Plaintiffs' Expert)** |             |
| 26  |                                          | Deposition of Susan Hayes, dated October 26, 2006 |
|     | **Hewitt Associates LLC (Benefits Consultant)** |       |
| 27  |                                          | Deposition of Matthew Gibbs dated October 27, 2006 |
|     | **Johnson & Johnson** |             |
| 28  |                                          | Email from R. Fair to A. Ianucci, M. Peterson, and M. Wright at ███████████, dated May 9, 2002 (MDL-███) |
|     | **ProMedica (TPP)** |             |
| 29  |                                          | E-mail from M. Chen at Express Scripts to N. Kanwal at ProMedica, dated February 27, 2007 (PROMEDICA/NEC 00006-8). |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of May, 2007, in San Francisco, California.

/s/ Lori A. Schechter
Lori A. Schechter

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each other party via overnight mail on May 7, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

# Exhibit 23

1            UNITED STATES DISTRICT COURT

            DISTRICT OF MASSACHUSETTS

2

3  NEW ENGLAND CARPENTERS BENEFITS      )

   FUND, et al.                         )

4                                       )

           Plaintiffs,                  )

5                                       )  Civil Action

       vs.                              )  No. 1:05-CV-11148-PBS

6                                       )

   FIRST DATABANK and MCKESSON          )

7  CORPORATION,                         (

                                        )

8          Defendants.                  )

                                        )

9

10

11

12            Taken at 404 Fuller Avenue

                 Helena, Montana

13      Tuesday, November 14, 2006 - 9:15 a.m.

14

15

16            D E P O S I T I O N

17                    OF

18                 TINA WONG

19

20

21

22

23

24     Reported by Mary R. Sullivan, RPR, RMR, Freelance

   Court Reporter and Notary Public, State of Montana,

25 residing in Missoula, Montana.

1    benefit changes, different things that we could do to

2    help lower our pharmacy trend.

3        Q.    Do you remember when that financial review

4    happened or did it happen over a period of time?

5        A.    Yeah, it definitely--during, you know, those

6    two years, yes.

7        Q.    Okay.  And during that financial review, ESI

8    noted for you that your trend was higher than normal?

9        A.    Well, yes, and I guess slowly, you know, in

10   the years previous to that it had slowly--I mean, it

11   had always been increasing, but I guess just in a

12   more--at an increased rate in those, you know, couple

13   years.

14       Q.    And in reaction to that increased rate, did

15   Blue Cross/Blue Shield of Montana implement some

16   changes in order to control costs in the 2000 to 2001

17   period?

18       A.    You know, we discussed a lot of different

19   options at that time, and did kind of plan for some

20   clinical programs for the next couple years that we

21   were going to roll out.  We also--I think--I want to

22   say roughly 2003, I think, we ended up making a--our--

23   increasing our co-payments on our drugs.  So, yeah, I

24   mean, we definitely thought of some different things

25   that we could do to help control some of our costs.

1    Kind of steer drugs--or steer members also towards more

2    generic drugs, because even at that time we were

3    looking at, you know, trying to increase our generic

4    utilization.

5         Q.    So you started discussing it in the 2002,

6    2001 time period, but didn't implement it until later.

7         A.    Right.

8         Q.    Okay.  And the clinical programs you were

9    discussing include the step therapy we were talking

10   about--

11        A.    Yes.

12        Q.    --and the prior authorization we were talking

13   about?

14        A.    Correct.

15        Q.    The other things that you were discussing

16   during this time period, you said co-pays, changing

17   co-pays?

18        A.    Uh-huh.

19        Q.    Anything else that you discussed during this

20   time period?

21        A.    I think also during that time period was when

22   we discussed implementing a mandatory generic

23   program instead of--we had just a restricted generic

24   program, so we got a little bit more aggressive, you

25   know, when there was a generic available, then a

1    Blue Cross and Blue Shield of Montana.

2        A.    No.

3        Q.    Okay.  Have you had discussions with anyone

4    else about the differences between WAC and AWP?

5        A.    Yes, and specifically with Mark Eichler, our

6    pharmacy consultant--

7        Q.    Uh-huh.

8        A.    --and then my previous deposition two years

9    ago.

10        Q.    Uh-huh.  And what did you discuss with Mark

11    Eichler?

12        A.    You know, just trying to, you know, get--this

13    was, you know, many years ago, but just trying to get

14    an understanding of, you know, where--what WAC meant

15    and AWP and just kind of the relationship.  It's pretty

16    much where I got my information from.

17        Q.    So your understanding of the difference

18    between WAC and AWP comes from Mark?

19        A.    Yes.

20        Q.    And did he tell you anything else about the

21    relationship between WAC and AWP that we haven't

22    already discussed?

23        A.    No, he didn't.

24        Q.    When did you have this discussion with him?

25        A.    It--you know, it's--I want to say roughly,

1    you know, 1997, maybe.  It's been a long time.

2        Q.    So your understanding of WAC and AWP haven't

3    changed since then?

4        A.    No, I don't think so.

5        Q.    Why don't we take our lunch break, if that's

6    okay with you--

7        A.    That's fine.

8        Q.    --since it's almost noon.

9            MS. CHEUNG:  Why don't we go off the record.

10            THE VIDEOGRAPHER:  Okay.  The time is 11:55.

11    We're off the record.

12            (Whereupon, the deposition was in recess at

13    11:55 a.m., and subsequently reconvened at 12:34 p.m.,

14    and the following proceedings were had and entered of

15    record:)

16            THE VIDEOGRAPHER:  We're on the record.  The

17    time is 12:34.

18        Q.    (By Ms. Cheung)  Welcome back.

19        A.    Thank you.

20        Q.    Before the break, we were discussing

21    differences between WAC and AWP, do you remember

22    that?

23        A.    Yes.

24        Q.    Can you tell me whether Blue Cross/Blue

25    Shield of Montana has ever looked at pharmacy

Page 203

CERTIFICATE

STATE   OF   MONTANA )
                         :   ss.
County of Missoula )

        I, Mary Sullivan, Freelance Court Reporter and
Notary Public for the State of Montana, residing in
Missoula, Montana, do hereby certify:

        That I was duly authorized to and did report
the deposition of TINA WONG in the above-entitled
cause;

        That the reading and signing of the deposition
by the witness have been expressly reserved.

        That the foregoing pages of this testimony
constitute a true and accurate transcription of my
stenotype notes of the testimony of said witness.

        I further certify that I am not an attorney
nor counsel of any of the parties; nor a relative or
employee of any attorney or counsel connected with the
action, nor financially interested in the action.

        IN WITNESS WHEREOF, I have hereunto set my
hand on this the 21st day of November, 2006.

                        _____
                        Mary Sullivan, RPR, RMR
                        Freelance Court Reporter
                        Notary Public, State of Montana
                        Residing in Missoula, Montana
                        My Commission expires:  4-06-10

# Exhibit 24A

| From: | Conley, Erin (STL) |
|---|---|
| Sent: | Monday, April 15, 2002 12:21 PM |
| To: | |
| Cc: | Barklage, Sandy (STL) |
| Subject: | FW: FDB_Impacted_NDC_List.xls |

| Attachments: | FDB_Impacted_NDC_List.xls |



This is the list of drugs that our analysis has shown were increased greater than the corresponding WAC increase. This is a list of those increased through the end of February. We will complete another analysis later if this situation continues to show increasing AWPs relative to WACs. To date the increases should result in an increase in trend to our clients of ███████ IF these increases are applied to all drugs that currently are WAC +16% (they would be raised to WAC+ 20%) then the trend impact would be in the ████████ range.

Please reserve distribution of this list to only those that truly need this level of detail.



FDB_Impacted_ND
C_List.xls (27...

This file includes only the NDCs that had a change in AWP in excess of any change in WAC, December 2001 vs. February 2002. In other words, if both the AWP and WAC moved in tandem, then they were excluded from this list. Our attempt was to capture only those NDCs that had an AWP change influenced by the FDB policy change.

Erin,
This is "ugly" news! When can we get some "drill-down" specifics per therapeutic category to revise our expense trends and start strategizing management approaches? ██████

| Tracking: | Recipient |
|---|---|
| | ████████████████ |
| | Barklage, Sandy (STL) |

1

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00001870

NDC List for NDCs experiencing an unequal change in AWP and WAC
(AWP changed in excess of WAC)
Source: PriceCheck PC (First Data Bank)

| NDC | Label | Description | Mfgr |
|---|---|---|---|
| 00074258611 | BIAXIN | TAB 500MG | ABBOTT |
| 00074336811 | BIAXIN | TAB 250MG | ABBOTT |
| 00173033602 | BECONASE NA | AER INHALER | ALLEN&HAN |
| 00173038879 | BECONASE AQ | SPR 0.042% | ALLEN&HAN |
| 00173045301 | FLONASE | SPR 0.05% | ALLEN&HAN |
| 00310060412 | NOLVADEX | TAB 20MG | ASTZEN |
| 00310013410 | ZESTRIL | TAB 40MG | ASTZEN |
| 00310013510 | ZESTRIL | TAB 2.5MG | ASTZEN |
| 00310014110 | ZESTORETIC | TAB 10/12.5 | ASTZEN |
| 00310040239 | ACCOLATE | TAB 20MG | ASTZEN |
| 00310013010 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013034 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013039 | ZESTRIL | TAB 5MG | ASTZEN |
| 00310013110 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013134 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013139 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013173 | ZESTRIL | TAB 10MG | ASTZEN |
| 00310013210 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013234 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013239 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013273 | ZESTRIL | TAB 20MG | ASTZEN |
| 00310013310 | ZESTRIL | TAB 30MG | ASTZEN |
| 00310014210 | ZESTORETIC | TAB 20-12.5 | ASTZEN |
| 00310014510 | ZESTORETIC | TAB 20-25MG | ASTZEN |
| 00310040160 | ACCOLATE | TAB 10MG | ASTZEN |
| 00310040260 | ACCOLATE | TAB 20MG | ASTZEN |
| 00310089110 | SULAR | TAB 10MG CR | ASTZEN |
| 00310089139 | SULAR | TAB 10MG CR | ASTZEN |
| 00310089210 | SULAR | TAB 20MG CR | ASTZEN |
| 00310089239 | SULAR | TAB 20MG CR | ASTZEN |
| 00310089310 | SULAR | TAB 30MG CR | ASTZEN |
| 00310089339 | SULAR | TAB 30MG CR | ASTZEN |
| 00310089410 | SULAR | TAB 40MG CR | ASTZEN |
| 00310070510 | CASODEX | TAB 50MG | ASTZEN |
| 00310070530 | CASODEX | TAB 50MG | ASTZEN |
| 00310060060 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060430 | NOLVADEX | TAB 20MG | ASTZEN |
| 00310060018 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060075 | NOLVADEX | TAB 10MG | ASTZEN |
| 00310060490 | NOLVADEX | TAB 20MG | ASTZEN |
| 00186000131 | LEXXEL | TAB 5-5MG | ASTZEN LP |
| 00186000231 | LEXXEL | TAB 5-2.5MG | ASTZEN LP |
| 00186000168 | LEXXEL | TAB 5-5MG | ASTZEN LP |
| 00186107008 | RHINOCORT | SUS AQUA | ASTZEN LP |
| 00186107509 | RHINOCORT | AER 32MCG | ASTZEN LP |
| 00186502031 | NEXIUM | CAP 20MG | ASTZEN LP |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          EISI-414-00001871

| | | | |
|---|---|---|---|
| 00186504031 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186502054 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186502228 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186504054 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186504228 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186074231 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186060628 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186060668 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186060682 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186074228 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074282 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074328 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074331 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074368 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074382 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186060631 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00075150543 | NASACORT | AER 55MCG/AC | AVENTIS |
| 00026286151 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026286148 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026851248 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851251 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851348 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851351 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851448 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855136 | CIPRO | SUS 5G/100ML | BAYER PHA |
| 00026286251 | PRECOSE | TAB 100MG | BAYER PHA |
| 00026851450 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855336 | CIPRO | SUS 10GM/100 | BAYER PHA |
| 00026286351 | PRECOSE | TAB 25MG | BAYER PHA |
| 00026851106 | CIPRO CYSTIT | TAB 100MG | BAYER PHA |
| 00087015846 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087015885 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087060942 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060945 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060985 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087120213 | MONOPRIL | TAB 40MG | BMS-PC |
| 00087149201 | MONOPRIL HCT | TAB 10/12.5 | BMS-PC |
| 24208027509 | OPTIPRANOLOL | SOL 0.3% OP | BSCH & LM |
| 00173045003 | IMITREX | TAB 100MG | CERENEX |
| 00173045900 | IMITREX | TAB 50MG | CERENEX |
| 00173040106 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040208 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040100 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040200 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040101 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040201 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 50242002608 | NUTROPIN AQ | INJ 5MG/ML | GENENTECH |
| 50242003235 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003249 | NUTROPIN | INJ 5MG | GENENTECH |
| 50242003441 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003450 | NUTROPIN | INJ 10MG | GENENTECH |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY

ESI-414-00001872

| | | | |
|---|---|---|---|
| 50242003654 | NUTROPIN | KIT DEPOT | GENENTECH |
| 00173056502 | VALTREX | TAB 1GM | GLAXOSMIT |
| 00173093303 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173093356 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173013555 | WELLBUTRIN | TAB 150MG SR | GLAXOSMIT |
| 00173094755 | WELLBUTRIN | TAB 100MG SR | GLAXOSMIT |
| 00173069500 | ADVAIR DISKU | MIS 100/50 | GLAXOSMIT |
| 00173069502 | ADVAIR DISKU | MIS 100/50 | GLAXOSMIT |
| 00173069602 | ADVAIR DISKU | MIS 250/50 | GLAXOSMIT |
| 00173069700 | ADVAIR DISKU | MIS 500/50 | GLAXOSMIT |
| 00173069702 | ADVAIR DISKU | MIS 500/50 | GLAXOSMIT |
| 00173069600 | ADVAIR DISKU | MIS 250/50 | GLAXOSMIT |
| 00083006230 | TEGRETOL XR | TAB 200MG | NOVARTIS |
| 00083006030 | TEGRETOL XR | TAB 400MG | NOVARTIS |
| 00083006130 | TEGRETOL XR | TAB 100MG | NOVARTIS |
| 00078017915 | LAMISIL | TAB 250MG | NOVARTIS |
| 00078017905 | LAMISIL | TAB 250MG | NOVARTIS |
| 00078035105 | STARLIX | TAB 60MG | NOVARTIS |
| 00078035205 | STARLIX | TAB 120MG | NOVARTIS |
| 00149047101 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149047001 | ACTONEL | TAB 30MG | P&G PHARM |
| 00149047103 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149075202 | ASACOL | TAB 400MG EC | P&G PHARM |
| 00149040560 | DIDRONEL | TAB 200MG | P&G PHARM |
| 00149040660 | DIDRONEL | TAB 400MG | P&G PHARM |
| 00149071001 | MACROBID | CAP 100MG | P&G PHARM |
| 00071014423 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071014445 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071015523 | LIPITOR | TAB 10MG | PFIZER US |
| 00071022006 | ACCURETIC | TAB 20/12.5 | PFIZER US |
| 00071022206 | ACCURETIC | TAB 10/12.5 | PFIZER US |
| 00071022306 | ACCURETIC | TAB 20/25MG | PFIZER US |
| 00071080340 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071080540 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071041624 | NEURONTIN | TAB 600MG | PFIZER US |
| 00071042624 | NEURONTIN | TAB 800MG | PFIZER US |
| 00071052723 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071052740 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071053023 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053040 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053223 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053240 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053523 | ACCUPRIL | TAB 40MG | PFIZER US |
| 00071080524 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071015823 | LIPITOR | TAB 20MG | PFIZER US |
| 00071015640 | LIPITOR | TAB 20MG | PFIZER US |
| 00071080624 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080640 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080324 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071015723 | LIPITOR | TAB 40MG | PFIZER US |
| 00071015823 | LIPITOR | TAB 80MG | PFIZER US |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY          ESI-414-00001873

| | | |
|---|---|---|
| 00071091348 | LOESTRIN FE  TAB 1/20 | PFIZER US |
| 00071091548 | LOESTRIN    TAB 1/20-21 | PFIZER US |
| 00071091648 | LOESTRIN 21  TAB 1.5/30 | PFIZER US |
| 00071091745 | LOESTRIN FE  TAB 1.5/30 | PFIZER US |
| 00071091748 | LOESTRIN FE  TAB 1.5/30 | PFIZER US |
| 00071092815 | ESTROSTEP FE TAB | PFIZER US |
| 00071092847 | ESTROSTEP FE TAB | PFIZER US |
| 00029152611 | BACTROBAN   OIN NASAL 2% | SK BEECHA |
| 00032170801 | PROMETRIUM  CAP 100MG | SOLVAY |
| 00300154111 | PREVACID    CAP 15MG DR | TAP |
| 00300154119 | PREVACID    CAP 15MG DR | TAP |
| 00300304611 | PREVACID    CAP 30MG DR | TAP |
| 00300304613 | PREVACID    CAP 30MG DR | TAP |
| 00300304619 | PREVACID    CAP 30MG DR | TAP |
| 00300154130 | PREVACID    CAP 15MG DR | TAP |
| 00300370201 | PREVPAC     MIS | TAP |
| 00072140050 | ULTRAVATE   CRE 0.05% | WEST-SQUI |
| 00072145050 | ULTRAVATE   OIN 0.05% | WEST-SQUI |
| 00072571208 | LAC-HYDRIN  LOT 12% | WEST-SQUI |
| 00072026006 | DOVONEX     CRE 0.005% | WEST-SQUI |
| 00072026012 | DOVONEX     CRE 0.005% | WEST-SQUI |
| 00072140015 | ULTRAVATE   CRE 0.05% | WEST-SQUI |
| 00072145015 | ULTRAVATE   OIN 0.05% | WEST-SQUI |
| 00072254006 | DOVONEX     OIN 0.005% | WEST-SQUI |
| 00072254012 | DOVONEX     OIN 0.005% | WEST-SQUI |
| 00072573028 | LAC-HYDRIN  CRE 12% | WEST-SQUI |
| 00072573038 | LAC-HYDRIN  CRE 12% | WEST-SQUI |
| 00072116006 | DOVONEX     SOL 0.005% | WEST-SQUI |
| 00072571214 | LAC-HYDRIN  LOT 12% | WEST-SQUI |

HIGHLY CONFIDENTIAL ATTORNEY'S EYES ONLY        ESI-414-00001874

# Exhibit 24B

**From:** Abe, Karen (BLM)
**Sent:** Monday, April 22, 2002 3:02 PM
**To:** 'Tina Wong'; 'Roy Arnold, MD'
**Cc:** O'Brien, Julie (BLM)
**Subject:** AWP Info

**Attachments:** AWP increase BMT.doc

AWP increase
BMT.doc (25 KB)

*Karen L. Abe, RPh, MBA*
*Clinical Program Manager*
*Express-Scripts, Inc*
*kabe1@express-scripts.com*
*PH:  (360) 848-0680*
*FAX: (360) 848-0664*

1

ESI-414-00003677

## URGENT!   EMERGING THERAPEUTIC ISSUES COMMUNICATION

April 22, 2002


Tina Wong, Pharmacy Coordinator
Dr. Roy Arnold, Sr. VP
Blue Cross Blue Shield of Montana



Dear Tina and Dr. Arnold:

**RE:  Average Wholesale Price Increases**

Pharmaceutical manufacturers make price changes throughout the year.   As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe.   Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%.  The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost (WAC) and AWP for certain drugs.   In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.

Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC.  As this trend indicates, it is more important now than ever to put cost management strategies in place.


Sincerely,




Karen L. Abe, Clinical Program Manager
(360) 848-0680

cc:  Julie Obrien

CONFIDENTIAL

# Exhibit 24C

| From: | ██████████████████████████████ |
|---|---|
| Sent: | Tuesday, May 07, 2002 3:29 PM |
| To: | Wuflestad, Kent M. R.Ph. (ESI) |
| Cc: | Vargo, Harry (ESI); Becker, Kim R.Ph. (ESI) |
| Subject: | FW: First DataBank AWP Increases |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Flagged |

Attachments:        AWP Increases Memo.doc; FDB_Impacted_NDC_List.xls

  

AWP Increases      FDB_Impacted_ND
Memo.doc (23 KB)... C_List.xls (23 ...

Kent:

Thanks for making yourself available in such short notice for our discussion on First DataBank AWP increases.  We look forward to your assistance on calculating ████ specific trend impact due to this change as well as any update on this item.



IMPORTANT:  This message (including any attachments) contains confidential information intended for a specific individual and purpose, and is protected by law.  If you are not the intended recipient, you should delete this message.  Any disclosure, copying, or distribution of this message, or the taking of any action based on it, is strictly prohibited.

-----Original Message-----
From:  Wuflestad, Kent (BLM)  [SMTP:kent.wuflestad@express-scripts.com]
Sent:  Wednesday, April 17, 2002 11:17 AM
To:    ████████████████████████
Cc:    Becker, Kim (BLM); Vargo, Harry (BLM)
Subject:    First DataBank AWP Increases

Hi ████████████

In follow-up to our conversation last week, I'm sending two attachments with information on the First Data Bank AWP changes.

> The first attachment explains a change that has occurred in First Data
> Bank's approach to establishing AWP pricing for claims processing.   The
> second attachment includes a listing of drugs that have been impacted by
> the FDB changes so far.
>
> In a nutshell, First Data Bank provides ESI with information we use to

1

> process claims, such as NDC number, package size, AWP price, etc.
> Recently, FDB has begun to standardize their AWP calculation process
> across all manufacturers, which has resulted in an increase in AWP prices.
> The AWP changes that have occured to date have resulted in an increase in
> trend of ███████ IF these AWP changes are applied to all drugs that
> have AWP's equal to WAC + 16% (they would be raised to WAC + 20%), the
> trend impact would be expected to be in the ███████ range.
>

If you have any further questions, please don't hesitate to call me.

> Kent
> <<AWP Increases Memo.doc>>  <<FDB_Impacted_NDC_List.xls>>
>
>
>
> <<AWP Increases Memo.doc>>  <<FDB_Impacted_NDC_List.xls>>

2

CONFIDENTIAL

ESI-414-00003723

**URGENT EMERGING THERAPEUTIC ISSUES COMMUNICATION**

Date: April 15, 2002



Dear █████████████

**RE: Average Wholesale Price Increases**

Pharmaceutical manufacturers make price changes throughout the year.  As we have documented in Express Scripts' annual *Drug Trend Report*, for the last four years the average increase in Average Wholesale Price ("AWP") has exceeded 5%. The first wave of price increases typically take place in the January through February timeframe.   Over the last couple of years these increases have averaged 1 to 1.5%. This year, however, the increase for this period January through February timeframe is closer to 2.5%.  The increase for this period also includes an adjustment to increase the difference between wholesale acquisition cost (WAC) and AWP for certain drugs.  In other words a little less than half of the total increase is due to AWP increases that are in excess of the corresponding increase in WAC.

Upon our inquiry to our pricing service, First Data Bank (the industry's primary source for AWP information), the recent AWP adjustments were made to establish a more consistent relationship with WAC.  As this trend indicates, it is more important now than ever to put cost management strategies in place.

If we can answer any questions, or if you are interested in the Emerging Therapeutic Issues program and are currently not enrolled, please contact me at your convenience.

Sincerely,

Kent Wuflestad, R.Ph.
Director, Clinical Program Management
952-837-5334

C: ████████████████████████████
    Stephanie Anderson, Melisse Stenzel-Torres – Express Scripts

CONFIDENTIAL

NDC List for NDCs experiencing an unequal change in AWP and WAC
(AWP changed in excess of WAC)
Source: PriceCheck PC (First Data Bank)

| NDC | Product Name | Manuf |
|---|---|---|
| 00074258611 | BIAXIN      TAB 500MG | ABBOTT |
| 00074336811 | BIAXIN      TAB 250MG | ABBOTT |
| 00173033602 | BECONASE NA AER INHALER | ALLEN&HAN |
| 00173038879 | BECONASE AQ SPR 0.042% | ALLEN&HAN |
| 00173045301 | FLONASE     SPR 0.05% | ALLEN&HAN |
| 00310060412 | NOLVADEX    TAB 20MG | ASTZEN |
| 00310013410 | ZESTRIL .   TAB 40MG | ASTZEN |
| 00310013510 | ZESTRIL     TAB 2.5MG | ASTZEN |
| 00310014110 | ZESTORETIC  TAB 10/12.5 | ASTZEN |
| 00310040239 | ACCOLATE    TAB 20MG | ASTZEN |
| 00310013010 | ZESTRIL     TAB 5MG | ASTZEN |
| 00310013034 | ZESTRIL     TAB 5MG | ASTZEN |
| 00310013039 | ZESTRIL     TAB 5MG | ASTZEN |
| 00310013110 | ZESTRIL     TAB 10MG | ASTZEN |
| 00310013134 | ZESTRIL     TAB 10MG | ASTZEN |
| 00310013139 | ZESTRIL     TAB 10MG | ASTZEN |
| 00310013173 | ZESTRIL     TAB 10MG | ASTZEN |
| 00310013210 | ZESTRIL     TAB 20MG | ASTZEN |
| 00310013234 | ZESTRIL     TAB 20MG | ASTZEN |
| 00310013239 | ZESTRIL     TAB 20MG | ASTZEN |
| 00310013273 | ZESTRIL     TAB 20MG | ASTZEN |
| 00310013310 | ZESTRIL     TAB 30MG | ASTZEN |
| 00310014210 | ZESTORETIC  TAB 20-12.5 | ASTZEN |
| 00310014510 | ZESTORETIC  TAB 20-25MG | ASTZEN |
| 00310040160 | ACCOLATE    TAB 10MG | ASTZEN |
| 00310040260 | ACCOLATE    TAB 20MG | ASTZEN |
| 00310089110 | SULAR       TAB 10MG CR | ASTZEN |
| 00310089139 | SULAR       TAB 10MG CR | ASTZEN |
| 00310089210 | SULAR       TAB 20MG CR | ASTZEN |
| 00310089239 | SULAR       TAB 20MG CR | ASTZEN |
| 00310089310 | SULAR       TAB 30MG CR | ASTZEN |
| 00310089339 | SULAR       TAB 30MG CR | ASTZEN |
| 00310089410 | SULAR       TAB 40MG CR | ASTZEN |
| 00310070510 | CASODEX     TAB 50MG | ASTZEN |
| 00310070530 | CASODEX     TAB 50MG | ASTZEN |
| 00310060060 | NOLVADEX    TAB 10MG | ASTZEN |
| 00310060430 | NOLVADEX    TAB 20MG | ASTZEN |
| 00310060018 | NOLVADEX    TAB 10MG | ASTZEN |
| 00310060075 | NOLVADEX    TAB 10MG | ASTZEN |
| 00310060490 | NOLVADEX    TAB 20MG | ASTZEN |
| 00186000131 | LEXXEL      TAB 5-5MG | ASTZEN LP |
| 00186000231 | LEXXEL      TAB 5-2.5MG | ASTZEN LP |
| 00186000168 | LEXXEL      TAB 5-5MG | ASTZEN LP |
| 00186107008 | RHINOCORT   SUS AQUA | ASTZEN LP |
| 00186107509 | RHINOCORT   AER 32MCG | ASTZEN LP |
| 00186502031 | NEXIUM      CAP 20MG | ASTZEN LP |

CONFIDENTIAL

ESI-414-00003725

| | | | |
|---|---|---|---|
| 00186504031 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186502054 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186502228 | NEXIUM | CAP 20MG | ASTZEN LP |
| 00186504054 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186504228 | NEXIUM | CAP 40MG | ASTZEN LP |
| 00186074231 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186060628 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186060668 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186060682 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00186074228 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074282 | PRILOSEC | CAP 20MG CR | ASTZEN LP |
| 00186074328 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074331 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074368 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186074382 | PRILOSEC | CAP 40MG CR | ASTZEN LP |
| 00186060631 | PRILOSEC | CAP 10MG CR | ASTZEN LP |
| 00075150543 | NASACORT | AER 55MCG/AC | AVENTIS |
| 00026286151 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026286148 | PRECOSE | TAB 50MG | BAYER PHA |
| 00026851248 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851251 | CIPRO | TAB 250MG | BAYER PHA |
| 00026851348 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851351 | CIPRO | TAB 500MG | BAYER PHA |
| 00026851448 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855136 | CIPRO | SUS 5G/100ML | BAYER PHA |
| 00026286251 | PRECOSE | TAB 100MG | BAYER PHA |
| 00026851450 | CIPRO | TAB 750MG | BAYER PHA |
| 00026855336 | CIPRO | SUS 10GM/100 | BAYER PHA |
| 00026286351 | PRECOSE | TAB 25MG | BAYER PHA |
| 00026851106 | CIPRO CYSTIT TAB 100MG | | BAYER PHA |
| 00087015846 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087015885 | MONOPRIL | TAB 10MG | BMS-PC |
| 00087060942 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060945 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087060985 | MONOPRIL | TAB 20MG | BMS-PC |
| 00087120213 | MONOPRIL | TAB 40MG | BMS-PC |
| 00087149201 | MONOPRIL HCT TAB 10/12.5 | | BMS-PC |
| 24208027509 | OPTIPRANOLOL SOL 0.3% OP | | BSCH & LM |
| 00173045003 | IMITREX | TAB 100MG | CERENEX |
| 00173045900 | IMITREX | TAB 50MG | CERENEX |
| 00173040106 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040206 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040100 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040200 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 00173040101 | ACLOVATE | CRE 0.05% | ELAN PHAR |
| 00173040201 | ACLOVATE | OIN 0.05% | ELAN PHAR |
| 50242002608 | NUTROPIN AQ INJ 5MG/ML | | GENENTECH |
| 50242003235 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003249 | NUTROPIN | INJ 5MG | GENENTECH |
| 50242003441 | NUTROPIN | KIT DEPOT | GENENTECH |
| 50242003450 | NUTROPIN | INJ 10MG | GENENTECH |

ESI-414-00003726

| | | | |
|---|---|---|---|
| 50242003654 | NUTROPIN | KIT DEPOT | GENENTECH |
| 00173056502 | VALTREX | TAB 1GM | GLAXOSMIT |
| 00173093303 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173093356 | VALTREX | TAB 500MG | GLAXOSMIT |
| 00173013555 | WELLBUTRIN | TAB 150MG SR | GLAXOSMIT |
| 00173094755 | WELLBUTRIN | TAB 100MG SR | GLAXOSMIT |
| 00173069500 | ADVAIR DISKU | MIS 100/50 | GLAXOSMIT |
| 00173069502 | ADVAIR DISKU | MIS 100/50 | GLAXOSMIT |
| 00173069602 | ADVAIR DISKU | MIS 250/50 | GLAXOSMIT |
| 00173069700 | ADVAIR DISKU | MIS 500/50 | GLAXOSMIT |
| 00173069702 | ADVAIR DISKU | MIS 500/50 | GLAXOSMIT |
| 00173069600 | ADVAIR DISKU | MIS 250/50 | GLAXOSMIT |
| 00083006230 | TEGRETOL XR | TAB 200MG | NOVARTIS |
| 00083006030 | TEGRETOL XR | TAB 400MG | NOVARTIS |
| 00083006130 | TEGRETOL XR | TAB 100MG | NOVARTIS |
| 00078017915 | LAMISIL | TAB 250MG | NOVARTIS |
| 00078017905 | LAMISIL | TAB 250MG | NOVARTIS |
| 00078035105 | STARLIX | TAB 60MG | NOVARTIS |
| 00078035205 | STARLIX | TAB 120MG | NOVARTIS |
| 00149047101 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149047001 | ACTONEL | TAB 30MG | P&G PHARM |
| 00149047103 | ACTONEL | TAB 5MG | P&G PHARM |
| 00149075202 | ASACOL | TAB 400MG EC | P&G PHARM |
| 00149040560 | DIDRONEL | TAB 200MG | P&G PHARM |
| 00149040660 | DIDRONEL | TAB 400MG | P&G PHARM |
| 00149071001 | MACROBID | CAP 100MG | P&G PHARM |
| 00071014423 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071014445 | FEMHRT 1/5 | TAB | PFIZER US |
| 00071015523 | LIPITOR | TAB 10MG | PFIZER US |
| 00071022006 | ACCURETIC | TAB 20/12.5 | PFIZER US |
| 00071022206 | ACCURETIC | TAB 10/12.5 | PFIZER US |
| 00071022306 | ACCURETIC | TAB 20/25MG | PFIZER US |
| 00071080340 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071080540 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071041624 | NEURONTIN | TAB 600MG | PFIZER US |
| 00071042624 | NEURONTIN | TAB 800MG | PFIZER US |
| 00071052723 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071052740 | ACCUPRIL | TAB 5MG | PFIZER US |
| 00071053023 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053040 | ACCUPRIL | TAB 10MG | PFIZER US |
| 00071053223 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053240 | ACCUPRIL | TAB 20MG | PFIZER US |
| 00071053523 | ACCUPRIL | TAB 40MG | PFIZER US |
| 00071080524 | NEURONTIN | CAP 300MG | PFIZER US |
| 00071015623 | LIPITOR | TAB 20MG | PFIZER US |
| 00071015640 | LIPITOR | TAB 20MG | PFIZER US |
| 00071080624 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080640 | NEURONTIN | CAP 400MG | PFIZER US |
| 00071080324 | NEURONTIN | CAP 100MG | PFIZER US |
| 00071015723 | LIPITOR | TAB 40MG | PFIZER US |
| 00071015823 | LIPITOR | TAB 80MG | PFIZER US |

CONFIDENTIAL

| | | |
|---|---|---|
| 00071091348 | LOESTRIN FE  TAB 1/20 | PFIZER US |
| 00071091548 | LOESTRIN    TAB 1/20-21 | PFIZER US |
| 00071091648 | LOESTRIN 21 TAB 1.5/30 | PFIZER US |
| 00071091745 | LOESTRIN FE  TAB 1.5/30 | PFIZER US |
| 00071091748 | LOESTRIN FE  TAB 1.5/30 | PFIZER US |
| 00071092815 | ESTROSTEP FE TAB | PFIZER US |
| 00071092847 | ESTROSTEP FE TAB | PFIZER US |
| 00029152611 | BACTROBAN    OIN NASAL 2% | SK BEECHA |
| 00032170801 | PROMETRIUM  CAP 100MG | SOLVAY |
| 00300154111 | PREVACID    CAP 15MG DR | TAP |
| 00300154119 | PREVACID    CAP 15MG DR | TAP |
| 00300304611 | PREVACID    CAP 30MG DR | TAP |
| 00300304613 | PREVACID    CAP 30MG DR | TAP |
| 00300304619 | PREVACID    CAP 30MG DR | TAP |
| 00300154130 | PREVACID    CAP 15MG DR | TAP |
| 00300370201 | PREVPAC     MIS | TAP |
| 00072140050 | ULTRAVATE   CRE 0.05% | WEST-SQUI |
| 00072145050 | ULTRAVATE   OIN 0.05% | WEST-SQUI |
| 00072571208 | LAC-HYDRIN  LOT 12% | WEST-SQUI |
| 00072026006 | DOVONEX    CRE 0.005% | WEST-SQUI |
| 00072026012 | DOVONEX    CRE 0.005% | WEST-SQUI |
| 00072140015 | ULTRAVATE   CRE 0.05% | WEST-SQUI |
| 00072145015 | ULTRAVATE   OIN 0.05% | WEST-SQUI |
| 00072254006 | DOVONEX    OIN 0.005% | WEST-SQUI |
| 00072254012 | DOVONEX    OIN 0.005% | WEST-SQUI |
| 00072573028 | LAC-HYDRIN  CRE 12% | WEST-SQUI |
| 00072573038 | LAC-HYDRIN  CRE 12% | WEST-SQUI |
| 00072116006 | DOVONEX    SOL 0.005% | WEST-SQUI |
| 00072571214 | LAC-HYDRIN  LOT 12% | WEST-SQUI |

ESI-414-00003728

# Exhibit 24D

**To:**  ████████████████████

**Cc:**

**Subject:**     RE: FDB AWP Increases

████████

It isn't clear yet what the rebate advantage will be of increasing your copayments so
there is a $20.00 differential.   When ESI sent out contracting information to our
manufacturers to assit them with their 2003 contracts, we added an addtional option that
we think  a lot manufacturers will find attractive. ████████████████████████████
████████████████████████████████████████ We anticipate a lot of uptake
on this.

-----Original Message-----
From: ████████████████████████████████████████
Sent: Thursday, April 25, 2002 9:30 AM
To: 'jennifer.chase@express-scripts.com'
Subject: FW: FDB AWP Increases


HI Jenny,

Welcome back.
Please review ████████████ questions and additionally what manufacturer programs are
there available that we may be able to take advantage of if ████ should decide to increase
the differential between our co-payments?

Thanks,

████████████████

-----Original Message-----
From: ████████████████
Sent: Wednesday, April 17, 2002 2:40 PM
To: ████████████████████
Subject: FW: FDB AWP Increases



Please make this a topic of discussion for your monthly call. Will specific
step programs help? Will Generics also rise due to these increases?
Advise!
████████████
-----Original Message-----
From: Chase, Jennifer (BLM) [mailto:jennifer.chase@express-scripts.com]
Sent: Saturday, April 13, 2002 1:22 PM
To: ████████████████████
Cc: ████████████████████; Grochal, Janice (BLM)
Subject: FW: FDB AWP Increases


> Give me a call if you wish to discuss.
> JC
>  <<AWP increase.doc>>
>
>
> Jennifer Chase, Pharm.D.
> Managed Care Division
> 952.837.7784
> jennifer.chase@express-scripts.com

1

CONFIDENTIAL            ESI-414-00003758

```
>
> CONFIDENTIALITY NOTICE: If you have received this e-mail in error, please
> immediately notify the sender by e-mail at the address shown. This e-mail
> transmission may contain confidential information. This information is
> intended only for the use of the individual(s) or entity to whom it is
> intended even if addressed incorrectly. Please delete it from your files
> if you are not the intended recipient. Thank you for your compliance.
>
>
>
>
***********************************************************************
The information contained in this message and any attachments are intended
only for the use of the individual or entity to which it is addressed, and
may contain information that is PRIVILEGED, CONFIDENTIAL and exempt from
disclosure under applicable law. If you have received this message in error,
you are prohibited from copying, distributing, or using the information.
Please contact the sender immediately by return e-mail and delete the
original message from your system.
```

CONFIDENTIAL

ESI-414-00003759

# Exhibit 24E

**From:** ████████████████████████████
**Sent:** Tuesday, May 14, 2002 4:45 PM
**To:** 'Crawford, Sue (BLM)'
**Subject:** RE: AWP increases from FDB

Hi Sue-

Sorry it took so long to get back to you.  I spoke with Tim and it would be good to get the AWP model you discussed. It may be too late for Q4, but this will come in handy as they look to Q1 of next year if we can't make use of it now.

Your new number for ingredient cost is much closer to what we came up with (we were ██████ so we are only █████ off or so).  I am going to ask my folks to take another look at how they pulled this to make sure there is no "noise", but I think we are close enough to be comfortable.  Unless anything comes to our attention that would cause another look at the reconciliation (I'm still waiting for the AWP info., but the member split makes me comfortable with the figures you had), my sense is that we just work toward a payback of ██████  Since we took the prospective adjustment approach, we will just have to make sure we take this into consideration if we change the discount in the next few months once we get a better sense as to how 2002 is shaping up.

Thanks for the update on the insured / ASC mix.  I only used the numbers Matt provided to let the group here know that we were not seeing any significant swings from what we expected (i.e. somewhere around ███ ).

Let's plan for 12:00 my time tomorrow.  Feel free to call my number.

Thanks,

██████

-----Original Message-----
From: Crawford, Sue (BLM) [mailto:sue.m.crawford@express-scripts.com]
Sent: Monday, May 13, 2002 2:15 PM
To: ████████████████████
Subject: AWP increases from FDB

Mark - I spoke with people in my department to see if there was any updated information regarding the FDB increases to the AWP.  I was told that the increase to expect is still in the ███████████ range.  I did find out however that St. Louis has built a model to look at the drugs in question on a client specific basis to get a more precise estimate of the impact.  Would this be beneficial for the 4q pricing meeting or is it too late?  Let me know and I will request that St. Louis run the model for ███████████

I also looked into the reconciliation numbers for total ingredient costs, all lines of business, that you were questioning on the reconciliation exhibit.
I did find a problem on my end.  The number that I reported was the billed ingredient costs + dispensing fees plus any applicable taxes.  This is incorrect.  Only the actual ingredient cost should be adjusted to reflect the "earned discounted amount" (although technically one could argue that the tax could be overstated if it was calculated on the higher adjudicated amounts).  Anyway, the resulting variance in the settlement is right at ██████ for the ██████████ contract term.  I can't really explain what happened other than when we in UW/Finance talk about "ingredient cost", we typically add in the dispensing fees.  I checked to see what was done at the last reconciliation and we only adjusted the calculated costs which makes sense.
The dispensing fees always remain a constant in the pricing.   The correct ingredient cost for all lines of business should have been ██████████████  Is this number more in line with what you are looking at on your end?  If so, we'll have to talk about how this needs to be addressed.

CONFIDENTIAL

ESI-414-00003785

Finally, the percentage of insured to self-insured business based on AWP retail brand spend that Matt reported to you was overstated.  Through February, the number is actually ████ vs. Matt's number of ████.  He looked at generic spend in error.  The files for March are running now so I can update this calculation as soon as I get them if you'd like.

Susan Crawford
Regional Finance Manager
Managed Care Division

Email: sue.m.crawford@express-scripts.com
Phone: 952.837.5119
Fax: 952.837.7161

2

CONFIDENTIAL

ESI-414-00003786

# Exhibit 24F

| From: | Orvis, Traci (BLM) |
|---|---|
| | Tuesday, April 16, 2002 3:57 PM |
| To: | Judy A. Myers (E-mail); Susan Feliciano (E-mail) |
| Subject: | FW: Emerging Therapeutic Issues - AWP PRICE INCREASES |

fyi..

-----Original Message-----
From: ████████████████████████████
Sent: Tuesday, April 16, 2002 3:56 PM
To: 'Conley, Erin (STL)'
Cc: Zopfi, Arnie (BLM); Orvis, Traci (BLM); ████████████████████████
██████████████████
Subject: RE: Emerging Therapeutic Issues - AWP PRICE INCREASES


Erin,
I'd like to put some quantity limits in place where we have none but should
and, make some of our existing edits more stringent. We'll need to start
with our fully funded plans and move to the self-funded afterwards. I'd also
like to try this in TennCare and see what the TC Solutions Unit will let us
get away with.

I'd like to move quickly on this. What are your recommendations?
Thanks.
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

> -----Original Message-----
> From:       Conley, Erin  (STL) [SMTP:EConley@express-scripts.com]
> Sent:       Monday, April 15, 2002 12:41 PM
> To:    ████████████████████
> Cc: Zopfi, Arnie (BLM); Orvis, Traci (BLM)
> Subject:  FW:  Emerging Therapeutic Issues - AWP PRICE INCREASES
>
> > Hello -
> >
> > Please see attached notification regarding recent increases in AWP,
> > greater than anticipated.  Please distribute as appropriate to
> interested
> > parties in your organization.
> >
> > Thank you,
> > Erin
> >
> >  <<AWP increase notification.doc>>
> >
> >
> > Erin L. Conley, Pharm.D.
> > Clinical Program Manager
> > Managed Care Division
> > phone. 314-919-4628
> > fax. 314-919-4664
> > econley@express-scripts.com
> >  << File: AWP increase notification.doc >>
>
This E-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only
for the use of the Individual(s) named above.  If you are not the intended

CONFIDENTIAL

recipient of this E-mail, or the employee or agent responsible for
delivering it to the intended recipient, you are hereby notified that any
dissemination or copying of this E-mail is strictly prohibited.  If you have
received this E-mail in error, please immediately notify us at (865)
374-4900 or notify us by E-mail at hdesk@covhlth.com.

CONFIDENTIAL

ESI-414-00004110

# Exhibit 25



Page 1

1                        RAYMOND S. HARTMAN

2                UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF MASSACHUSETTS

4

5    -------------------------------x

6    NEW ENGLAND CARPENTERS HEALTH

7    BENEFITS FUND, ET AL.,

8              Plaintiffs

9                                    Civil Action

10   vs.                            No. 1:05-CV-11148-PBS

11

12   FIRST DATABANK, INC., and

13   McKESSON CORPORATION,

14             Defendants

15   -------------------------------x

16          DEPOSITION OF RAYMOND S. HARTMAN, a

17     witness called by and on behalf of the

18     Defendant McKesson Corporation, taken pursuant

19     Federal Rules of Civil Procedure, before

20     Nicole E. Guilbert, a Notary Public in and for

21     the Commonwealth of Massachusetts, at Bonner,

22     Kiernan, Trebach & Crociata, on Wednesday,

23     October 4, 2006, commencing at 9:46 a.m.

24

25                       VOLUME I

Page 62

RAYMOND S. HARTMAN

1

2  of the manufacturers whose drugs are listed in Appendix A

3  knew about the 5 percent change when it occurred or just

4  some of them; am I correct?

5      A.   That's correct.

6      Q.   And again, you don't need to know that for

7  purposes of any opinion you're rendering here, correct?

8      A.   For the opinions I'm rendering here, that's

9  correct.

10     Q.   Now, let's take third-party payors.  Did any of

11 them know about the change in the 5 percent at the time it

12 occurred or thereafter?

13     A.   I've seen no evidence that any of them knew of the

14 change.

15     Q.   No, not the question whether you've seen any

16 evidence, but can you tell me what you're assuming for

17 purposes of rendering your opinion, did some or all

18 third-party payors become aware of the change in the 5

19 percent at the time it occurred or thereafter?

20     A.   I'm assuming that the third-party payors continued

21 to get integratable data from First DataBank that included

22 AWPs and WACs.  Their primary focus was on AWP and

23 reimbursement off of AWP for this type of drug.  Whether

24 they then related that to WAC or not, I've made -- I've

25 made no analysis about that or I've made no assumption

1                    RAYMOND S. HARTMAN

2    about whether they observed that or not.  The AWP -- the

3    assumption that I have made that flows from the allegations

4    are that that AWP increased from what WAC was and that's

5    what they were working off of.

6         Q.   Would it be correct for purposes of the opinions

7    you're rendering here regarding class certification, you

8    don't need to know whether any third-party payor observed

9    or knew of this 5 percent change at the time it happened or

10   shortly thereafter?

11        A.   For purposes of my analysis and for the -- the

12   opinions that I come to and the conclusions regarding

13   impact and injury, the -- I'm assuming that the allegations

14   about the spread occurred; that the third-party payors were

15   sufficiently locked into contracts or sufficiently locked

16   into ways of doing business that they -- that they worked

17   off of an AWP; and that knowledge -- I don't know whether

18   they knew or if they didn't know, but it would not change

19   my opinions of whether they did or not.

20        Q.   So would it be correct that whether or not

21   third-party payors knew, observed or knew of this 5 percent

22   change in the spread at the time it happened or shortly

23   thereafter, would not make a difference to you in -- for

24   purposes of any opinion you're rendering here; am I

25   correct?

1                    RAYMOND S. HARTMAN

2        A.    If -- let's say the following:  If all third-party

3    payors were made aware of this scheme at the time that it

4    happened and it was made clear to them that what they were

5    paying the -- the reimbursements that they were paying

6    increased to the extent that they did, as indicated by my

7    calculations, such that there were an announcement that

8    everybody knew, that could change the assumptions about --

9    about -- of -- about -- that would change my opinions or

10   could change my opinions here.

11       Q.    Is it correct it doesn't make a difference to you

12   whether third-party payors knew or didn't know about the 5

13   percent change?

14       A.    What I'm saying --

15            MR. SOBOL:  Objection; asked and

16            answered.

17            THE WITNESS:  What I'm saying is that

18            what -- the knowledge that they had over

19            this period of time was insufficient to --

20            to lead to any change in what -- what I've

21            -- my conclusions in this report.

22            THE VIDEOGRAPHER:  Here ends Tape 1.

23   Off the record 11:06 a.m.

24            (A brief recess was taken.)

25            THE VIDEOGRAPHER:  Here begins Tape

Page 65

1                          RAYMOND S. HARTMAN

2          2.   Back on the record 11:17 a.m.

3          Q.   (By Mr. Goldman)  Dr. Hartman, if I wanted to know

4    whether any third-party payor observed or was told about

5    the 5 percent change after it occurred, would there be a

6    way for me to find out?

7          A.   If one wanted to ascertain whether a third-party

8    payor had known of that, was aware of it as soon as it

9    occurred --

10         Q.   Or shortly thereafter.

11         A.   -- or thereafter, one could design a survey to try

12   and ascertain that.

13         Q.   What if I wanted to know if any of the plaintiffs

14   were told or aware or observed this change, is there a way

15   I could find out from them?

16         A.   Well, certainly asking them would be a fairly

17   direct way of finding that out.

18         Q.   Did you think of doing that here?

19         A.   For the purposes of this analysis, I've -- I've

20   been asked to assume what I've been asked to assume, and

21   I've -- I've been asked to rely on what I know of how

22   reimbursement works and how I've observed that over time

23   among third-party payors, and so it wasn't an issue that

24   I've been asked to do here in this -- as part of this

25   analysis.

Page 66

RAYMOND S. HARTMAN

1

2    Q.    So do you know whether any plaintiff in this case

3    knew or was told or became aware of the 5 percent change in

4    spread after it occurred or thereafter?

5    A.    I have not been asked to focus on that -- on

6    that -- on that issue.

7    Q.    And again, it wouldn't make a difference to you,

8    would it, in terms of any opinion you're rendering here?

9    A.    Well, factually, whether third-party payors knew

10   or whether they all knew, whether some of them knew,

11   whether none of them knew is hypothetical to what I've --

12   the opinion I'm rendering here.  Based on the facts of what

13   I know of this industry, most of them were unaware of this,

14   that the -- that they all knew or many of them knew run

15   counter to -- and by "know," I mean institutionally make an

16   observation of this and then say:  Look, we've observed

17   this is going on.  We've got to renegotiate our contracts.

18   We've have to take a position we're going to respond to

19   this because of this effect.

20         And based -- so right now we're speaking very

21   hypothetically of know or not know or -- and what that

22   means, but based on the facts of the industry, as I know

23   them, it's -- it -- I would venture that very few would

24   respond institutionally -- understood enough to respond

25   institutionally to this -- to the allegations in this

1                          RAYMOND S. HARTMAN

2    matter.

3        Q.    Let me -- do you assume, for purposes of the

4    opinion you're giving, that most third-party payors were

5    unaware of the 5 percent change?

6        A.    I'm assuming that per my understanding of this --

7    of this industry, that this was a change that -- that was

8    effectuated in a stealthy a manner as was possible; and

9    that once -- once it was observed, if it were observed,

10   that there were contracts in place with various players

11   that changes could not occur on the part of third-party

12   payors to an observed change in the spread.

13       Q.    Do you assume that most third-party payors were

14   unaware of the 5 percent change?

15       A.    I'm aware of just what I've said.

16       Q.    I know, but with all due respect, I don't believe

17   I've gotten an answer.  Do you assume that most third-party

18   payors were unaware of the 5 percent change?

19       A.    I'm assuming that most third-party payors

20   institutionally could not respond in a way that had any

21   meaning to the 5 percent spread.

22       Q.    I'm not asking you about the response.  That's

23   separately.  I want to know do you assume that most

24   third-party payors were unaware of the 5 percent change?

25       A.    Given the earlier answer, that question is not

Page 68

RAYMOND S. HARTMAN

1

2    relevant and I haven't addressed it.

3    Q.    So would it be correct you make no assumption as

4    to whether some, all, or most third-party payors were aware

5    of the 5 percent change for purposes of any opinion you're

6    giving here?

7                    MR. SOBOL:   Objection; asked and

8              answered.

9                    THE WITNESS:   I'm assuming that the

10             third-party payors are aware of these types

11             of issues in the ways that I've seen in

12             dep -- in enumerable depositions; that

13             there is a general lack of awareness of

14             these kinds of issues on the part of

15             third-party payors.  And so the -- I'm

16             taking -- I'm assuming that the third-party

17             payors behave and know as they -- as they

18             have behaved and known historically, and

19             that's what I assume.

20    Q.    (By Mr. Goldman)   I'm afraid I just don't

21    understand and I need to understand this.  So very -- I

22    understand there's an issue for you about if they knew,

23    could they respond, and I want to put that aside.  I wanted

24    to know do you make an assumption as to whether most

25    third-party payors were unaware of the 5 percent change?

1                    RAYMOND S. HARTMAN

2        A.   I -- I make the assumption -- it's this issue of

3    "most" --

4        Q.   I'm just using -- I'm quoting you.

5        A.   Right.  You are?

6        Q.   Yes, I am.  You said, "Most were unaware, very few

7    were aware."  That's what I have in my notes.

8                    MR. SOBOL:  Objection to the form.

9        Q.   (By Mr. Goldman)  And I don't want you to be bound

10   by that.  My question simply is:  Do you assume that most

11   third-party payors were unaware of the 5 percent change?

12       A.   I -- I assume that many third-party payors were

13   unaware of the third -- of the change based on what I've

14   seen of awareness of third-party payors, period.

15       Q.   Okay.  Now, if you recently read Judge Saris's

16   opinion, you see she refers to a potential of 11,000 of

17   third-party payors being in the MDL class.  There are a lot

18   of third-party payors out there?

19       A.   There are.

20       Q.   Would you be able to tell me, when you say, "many

21   were unaware," what percentage of the total of third-party

22   payors you include as in the group who were unaware for

23   purposes of your assumption?  Is it 50 percent?  75

24   percent?  What -- what constitutes "many"?

25       A.   I would -- I'm -- I'm speculating here.  The --

1                        RAYMOND S. HARTMAN

2               MR. SOBOL:  Motion to strike.

3        Q.  (By Mr. Goldman)  You don't know?

4        A.   Well, I -- I'm -- I have opinions but it's -- it's

5   the -- but it -- based -- I would say the preponderance of

6   third-party payors did not have an understanding of this --

7   of this change and this markup based on the types of

8   deposition testimony I've seen, but this is a -- that's

9   merely a guess.

10       Q.   Okay.  I want to stay away from understanding of

11  it, but I want to stay with aware of the 5 percent change

12  in the spread.  Is there a difference in your terminology

13  of "many" as opposed to "preponderance"?

14               MR. SOBOL:  Objection.

15               THE WITNESS:  Yeah.  Many is -- you

16          know, many is, you know, could be 50/50.  I

17          would say --

18       Q.  (By Mr. Goldman)  Over 50 percent?

19       A.   I -- yes.

20       Q.   Over 60 percent?

21       A.   I don't know.

22               MR. SOBOL:  Objection to the form.

23               MR. GOLDMAN:  We got the answer.

24       Q.  (By Mr. Goldman)  Now, was -- there was an effort

25  to you -- you assume, to hide, and my question is:  Was

1                              RAYMOND S. HARTMAN

2     that -- do you assume that effort was successful throughout

3     the entire class period; that is, from the time the 5

4     percent was implemented and hidden, it remained hidden from

5     whoever it was being hidden from consistently over a

6     four-year -- four-plus-year period of time or did it -- do

7     you assume it leaked out to some people?

8                    MR. SOBOL:   Objection to the form.

9         Q.   (By Mr. Goldman)   What's your assumption?

10        A.   My assumption is the following, and why don't we

11    just, you know, get this on the record, because you keep

12    coming back to it over and over again from different

13    directions: The -- the scheme was entered into as alleged,

14    I'm assuming, in August of 2001; and it didn't affect all

15    drugs at once, so people couldn't have suddenly said, oh,

16    my God, all these drugs are going up, what's going on?   It

17    happened incrementally; as drug prices were being renewed,

18    there would be an increase.

19             Now, as third-party payors and as the people who

20    get the AWP and the WAC data, they will get it, they will

21    -- reimbursements will be paid based on AWP.   That's the

22    major thing that they look at.   As far as I see with

23    reimbursement, negotiations -- the preponderance of

24    negotiations are off of AWP.   So when -- when third-party

25    payors get AWPs, they can get WACs if they want to.   It is

1                           RAYMOND S. HARTMAN

2   not my understanding -- I've seen no evidence that there

3   are people -- third-party payors -- within third-party

4   payor claim department that are looking at WAC/AWP spreads

5   and saying -- and monitoring this like a radar screen and

6   that they're locked onto it.

7         So this is something that's slowly diffused

8   through the system over the NDCs as they show up in my

9   Figure 1, and the important thing to these third-party

10  payors was AWP.  Now, they could get WAC if they wanted to.

11  So anybody could know if they got the data.  The question

12  is:  Did it interest them, was it their job to go out and

13  follow this and then report to somebody to say, hey, look

14  what's going on here.  We've got to do something about

15  this.

16        And what I'm saying is that given the fact that

17  they did this at a time when price changes normally came

18  about, it was not something that they said:  On January 1,

19  2002, we're raising all of these prices.  That would have

20  drawn attention to the third-party payors.  So it was done

21  incrementally.  It was done stealthily.  Anybody -- you

22  know, question of knowing, anybody could go out and get

23  that data, but were people looking at that?  The

24  preponderance of people were not looking at that, is my

25  understanding as I understand the way reimbursement is done

1                    RAYMOND S. HARTMAN

2    here, and that -- that some people may have started to

3    understand this, but institutionally they were locked into

4    contracts that were determined to be P less whatever and

5    rebates.

6         And so there was an inertia of any kind of --

7    there was an inertia in an understanding.  There was an

8    inertia in a response.  And all these different, you know,

9    do they know this, do they know that, how many, blah, blah,

10   blah, that's what characterizes all my understanding of all

11   of the third-party payors.

12   Q.    So would it be fair to say from what you said that

13   over the class period, that there were more and more people

14   learning about the 5 percent increase in the spread?

15             MR. SOBOL:  Objection.

16             THE WITNESS:  I don't know.

17             MR. SOBOL:  Motion --

18   Q.    (By Mr. Goldman)  You don't know?

19             MR. SOBOL:  Objection.

20             THE WITNESS:  I --

21             MR. SOBOL:  Wait a second, Ray.

22        Objection.  This has been asked and

23        answered repeatedly for the past 15

24        minutes, and it's also beyond the scope of

25        what he's -- he has said he is asked in his

RAYMOND S. HARTMAN

1

2    based on the spread -- on the spread that was not

3    understood by them.

4        Q.   So I now have the foundation for the questions I

5    want to ask.  Tell me economically why is it if the

6    third-party payors had been aware of ASP, what the ASP was

7    and, therefore, the spread between the ASP and these

8    artificially high AWPs, that would have not continued; that

9    spread would not have -- have existed or continued in the

10   marketplace?  What is the economic principle behind that?

11       A.   That that spread would --

12            MR. SOBOL:  I'm sorry.  I'm sorry.

13       Objection.

14       Q.   (By Mr. Goldman)  Yeah.  The spread between the

15   ASP and the -- these inflated AWPs, if it had been known to

16   the third-party payors, what would they have done?

17       A.   Well, I think Dr. Berndt -- I mean let's focus on

18   those drugs that -- for which greater attention was -- was

19   focussed on this issue and what Dr. Berndt has said in

20   various places in his report is that there was -- when the

21   spreads were unknown, when it was not clear what was going

22   on, that there were possibilities for, I think he said,

23   mischief and abuse; and that third-party payors, when they

24   were made aware -- and these were large third-party payors

25   -- were made aware of the size of this spread, they were

RAYMOND S. HARTMAN

1

2    flabbergasted.  They were reimbursing off of an AWP that

3    was so far above the acquisition costs of the doctor -- of

4    the physicians, they were flabbergasted.

5         Judge Saris referred to these as "the mega

6    spreads."  Now, if I'm a third-party payor and doctors are

7    coming to me and saying, well, look, I want to be

8    reimbursed at AWP less 15 and I know that the doctors are

9    getting this at what is 75 percent below that, so that

10   would be a spread of three or four hundred percent on the

11   ASP, they would have said, I'm not -- you know, I'm not

12   going to pay you AWP less 15.  I'm going to negotiate more

13   aggressively.

14       Q.   And that would have been what would have likely

15   happened if the third-party payors were aware of what ASP

16   actually was, correct?

17       A.   If the third-party payors -- again, we have to --

18   you know, we keep talking a little bit about this is

19   hypothetical in Chicago school, you know, if they knew

20   about this bid of excess fees, you know, there's going to

21   be heat-seeking missiles that go and compete them away.  I

22   think we have to also keep in mind what Dr. Berndt put very

23   well of the importance of being unimportant; that the drug

24   spending generally has been one of the smallest elements of

25   third-party payor reimbursement.  So they haven't had swat

Page 84

RAYMOND S. HARTMAN

1

2    teams focussing on those kinds of fees in trying to manage

3    them closely.  It's been on hospitals, physicians, other

4    kinds of things.

5           But suppose we're in a state of the world where

6    all that other stuff has been worked out by the third-party

7    payors and they started to know about this information,

8    which does not seem to be the case, as Dr. Berndt suggests

9    over the period of the nineties, over much of the MDL

10   period.  They would use that information to try and

11   negotiate aggressively if they -- if they had known about

12   that.

13       Q.    Okay.  "If they had known about that" meaning

14   about what ASP actually was?

15       A.    That's correct.

16       Q.    So they were missing one of the pieces to know

17   what the spread was; they were missing what the ASP was,

18   correct?  They knew what the AWP was.  They didn't know

19   what the ASP was, correct?

20       A.    That's correct.

21       Q.    And I want to see if you'll agree with me, in our

22   case, unlike what you found there, the spread that we're

23   talking about here, as you point out in the footnote, AWP

24   and WAC, the market -- people in the marketplace can learn

25   both pieces of the equation to know the spread?

1                    RAYMOND S. HARTMAN

2        A.    The -- they can.    The WAC and the AWP is available

3    from the electronic databases.

4        Q.    Now, do you know whether there were steps

5    manufacturers could have taken, if they wanted to, in the

6    face of learning about the 5 percent change in spread?

7                    MR. SOBOL:    Mel, do you mean

8              manufacturers or TPPs?

9                    MR. GOLDMAN:    No.   I'm sorry.   I'm

10              off -- I left TPP.   I'm now going back to

11              the manufacturers --

12                    MR. SOBOL:   Okay.

13                    MR. GOLDMAN:   -- some of whom, as you

14              pointed out, the complaint says were aware

15              of this, complained about it.

16        Q.    (By Mr. Goldman)   And I'm asking were there things

17    manufacturers could have done upon learning of the 5

18    percent change to -- in an attempt to change that, if they

19    had wanted to?

20        A.    Well, I cite, as I know you know, I cite one of an

21    unnamed manufacturer that objected to the new markup and

22    said that they -- there was something that wanted to be --

23    this is in Footnote 12 and it quotes -- it cites a

24    manufacturer in 2003 that said they wouldn't -- they didn't

25    want to report the AWPs, given the fact that the spread had

Page 143

RAYMOND S. HARTMAN

2      haven't looked at this because it was not

3      relevant to what I was asked to do, given

4      what I was asked to assume, so I can't --

5      you know, what I --

6    Q.    (By Mr. Goldman)   I'm moving on.

7    A.    I'd look where I would have to look.

8    Q.    I'm moving on.

9    A.    Okay.

10    Q.    So can you tell me among these contracts, that is

11  all the contracts that were, as I say, legally extant, that

12  existed during the class period, what the typical

13  termination provision is in those contracts or is there a

14  typical termination period?

15    A.    Asked and answered.

16    Q.    You don't know?

17    A.    I didn't look at that.   It was not relevant to

18  what I was asked to do.

19    Q.    So as far as being locked into a contract as a

20  part -- as opposed to not being able to understand or deal

21  with or -- with what was happening, I'm talking about being

22  locked into a contract that you can't get out of, wouldn't

23  it make a difference to you whether or not the contract was

24  terminable?

25    A.    If I had seen evidence of any type of response

Page 144

RAYMOND S. HARTMAN

1
2    that would suggest to me that -- that that was necessary, I
3    -- that would be something that would -- would -- I would
4    -- I could look at if -- when I got to the stage of
5    liability or where that would arise in the analysis.  For
6    purposes of this analysis, what I've been asked to assume
7    is that there was -- there was this scheme, the third-party
8    payors were not able to respond to this scheme, and that
9    comported with -- I found no evidence that contradicted
10   that set of assumptions.  And I certainly didn't -- I just
11   saw no evidence that third-party payors were responding in
12   a way either with contract renewals or with some kind of
13   renegotiation at all, period.
14        Q.    Would it be correct, you don't need to know what
15   the nature of the termination provisions of any are in
16   these contracts in order to render the opinions you're
17   giving here?
18        A.    Given what I've been asked to assume, that is
19   not -- I do not need to look at that.
20        Q.    All right.  Do you know whether there -- these
21   contracts are amendable?
22        A.    I would -- no.  I -- all contracts, I would
23   assume, have some ability to amend but I've not --
24        Q.    Again, whether or not they were amendable or
25   whether they were amended during the class period would not

Page 212

1                    RAYMOND S. HARTMAN

2              THE WITNESS:  I've seen no evidence

3         of -- in this particular case of this

4         particular set of allegations that it did.

5         Q.   (By Mr. Goldman)  Have you asked -- have you asked

6    counsel to provide you with discovery or any information on

7    this subject?

8         A.   At this point, nothing more than what I've

9    received with the -- with the complaint.

10        Q.   Have you gone out to look at it to see what the

11   answer to my question would be?

12        A.   I will assume that it -- at the stage of

13   liability, if I'm asked to do it, that's when I would do

14   that.

15        Q.   How did you treat copays in your -- in your

16   formulaic methodology for computing aggregate damages?

17        A.   I -- I looked only at ingredient costs and the

18   plan was to look at ingredient costs.

19        Q.   Why didn't you take into account copays?

20        A.   Because I was -- because the copays, for the most

21   part, are unrelated to the effects of the scheme.

22        Q.   How do you know that they're unrelated?

23        A.   Because everything I've seen tells me that the --

24   for this set of drugs, copays are flat for the

25   self-administered branded drugs.

Page 213

RAYMOND S. HARTMAN

1

2    Q.    Tell me everything upon which you base the

3    statement that, for the most part, copays are flat.

4    A.    Every --

5              MR. SOBOL:  Objection to the form.

6              THE WITNESS:  Every case and every --

7         we're not talking about

8         physician-administered drugs here?

9    Q.    (By Mr. Goldman)  No.  We're talking about

10   self-administered.

11   A.    Self-administered drugs.  I have seen nothing that

12   I recall that shows me -- that tells me in -- for private

13   sector third-party payors that copays are coinsurance, that

14   they vary with the AWP --

15   Q.    Okay.  I want you to assume they are flat for the

16   moment.  If they are flat, why shouldn't they be taken into

17   account in your formulaic methodology?

18             MR. SOBOL:  Objection to the form.

19             THE WITNESS:  Well, if I take -- in

20        the same way that I've been asked to assume

21        and seen nothing to the contrary that the

22        reimbursement is determined by the allowed

23        amount, which is an allowed amount for the

24        ingredient cost, and then there's a

25        dispensing fee and then there's a copay

Page 276

1                    RAYMOND S. HARTMAN
2    COMMONWEALTH OF MASSACHUSETTS                    MIDDLESEX, SS.
3

4            I, NICOLE E. GUILBERT, a Certified
     Shorthand Reporter and Notary Public duly
5    commissioned and qualified in and for the
     Commonwealth of Massachusetts, do hereby
6    certify that there came before me on the 4th
     day of October, 2006, at 9:46 a.m., the person
7    hereinbefore named, RAYMOND S. HARTMAN, who
     provided satisfactory evidence of
8    identification as prescribed by Executive
     Order 455 (03-13) issued by the Governor of
9    the Commonwealth of Massachusetts, was by me
     duly sworn to testify to the truth and nothing
10   but the truth of his knowledge concerning the
     matters in controversy in this cause; that he
11   was thereupon examined upon his oath, and his
     examination reduced to typewriting under my
12   direction; and that this is a true record of
     the testimony given by the witness to the best
13   of my ability.
             I further certify that I am neither
14   attorney or counsel for, nor related to or
     employed by, any of the parties to the action
15   in which this deposition is taken, and
     further, that I am not a relative or employee
16   of any attorney or counsel employed by the
     parties hereto or financially interested in
17   the action.
18
19   My Commission Expires:  May 7, 2010
20
21
22
23
                        Nicole E. Guilbert
                        CSR/Notary Public
24
25

Page 279

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No.:  1:05-CV-11148-PES
Volume II
Pages 279 to 397
Exhibits: (See Index)

**ORIGINAL**

---------------------------------------

NEW ENGLAND CARPENTERS HEALTH          )
BENEFITS FUND, PIRELLI ARMSTRONG       )
RETIREE MEDICAL BENEFITS TRUST;        )
TEAMSTERS HEALTH & WELFARE FUND OF     )
PHILADELPHIA AND VICINITY; and         )
PHILADELPHIA FEDERATION OF             )
TEACHERS HEALTH AND WELFARE FUND,      )
        Plaintiffs,                    )
                                       )
        -vs-                           )
                                       )
FIRST DATABANK, INC., a MISSOURI       )
CORPORATION, a Delaware Corporation.   )
        Defendants.                    )
---------------------------------------

            *   *   *   *   *   *   *

        DEPOSITION of DR. RAYMOND S. HARTMAN, called
as a witness by and on behalf of the Defendants,
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before
Lisa L. Gross, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at the offices of Bonner,
Kiernan, Trebach & Crociata, One Liberty Square,
Boston, Massachusetts, on Thursday, October 5, 2006,
commencing at 9:38 a.m.

DR. RAYMOND S. HARTMAN

1

2      Q.    And the reason that you do that is

3      because the effect of the five percent is

4      different -- you don't use five percent

5      because there's a 15 percent discount that's

6      not reimbursed, correct?

7                MR. SOBOL:  Objection to the form.

8      Q.    You can't say that the five-percent

9      Scheme effected all of AWP, because the

10     reimbursement was only for 85 percent of it?

11               MR. SOBOL:  Objection the to the

12     form.

13     Q.    Is that right?

14     A.    That's one way of stating it.

15     Q.    In other words, your math is -- when we

16     take into account this 15 percent, you are

17     just -- we have a lot of algebra here "pre"

18     and "post," but when we take it into the 15

19     percent, you are just using a five percent

20     increase in WAC against every NDC as your

21     calculation?

22     A.    Well, that's -- the whole notion of the

23     Scheme is that AWP increased --

24     Q.    Yeah, I understand.  But why do we need

25     all this, this "pre, post" and all of this

Page 370

1                          DR. RAYMOND S. HARTMAN

2      stuff here, isn't it just simply, it's five

3      percent of WAC because of the 15 percent, it's

4      4.25?

5       A.    I would assume that if I had written it

6      that way, people would, except for learned

7      counsel at the table, people would say, how --

8      where did these calculations come from.

9       Q.    Not me, I would say you thought there

10     was a five percent increase in WAC so you

11     applied five percent.  But that's just me.

12     That's just me.

13               So let me show you another document.

14     Let's take a short break.  No.

15               (Discussion off the record.)

16               MR. GOLDMAN:  We will mark next a

17     document entitled Declaration of Susan Hayes in

18     Support of Plaintiffs' Motion for Class

19     Certifications.

20               (Exhibit 8 marked

21               for identification.)

22      Q.    Showing you Exhibit No. 8, Dr. Hartman,

23     and ask you whether you've seen some or all of

24     that document before today?

25      A.    Not that I recall.

Page 397

1           C E R T I F I C A T E
2

I, Lisa Lee Gross, Registered Professional
3   Reporter and Notary Public duly commissioned and
qualified in and for the Commonwealth of
4   Massachusetts, do hereby certify that there came
before me on the day 5th of October, the person
5   hereinbefore named, who was by me duly sworn to
testify to the truth and nothing but the truth of
6   their knowledge touching and concerning the matters in
controversy in this cause; that they were thereupon
7   examined upon their oath, and their examination
reduced to typewriting under my direction and that the
8   deposition is a true record of the testimony given by
the deponent.
9

I further certify that I am neither attorney nor
10  counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is
11  taken, and further that I am not a relative or
employee of any attorney or counsel employed by the
12  parties hereto or financially interested in this
action.
13

In Witness Whereof, I have hereunto set my hand
14  and affixed my seal this 9th day of October, 2006.
15
16  _____
Notary Public
17  My Commission Expires:
January 17, 2011
18
19
20
21
22
23
24
25

# Exhibit 26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ORIGINAL

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) Civil Action |
| | ) |
| -vs- | ) No. 1:05-CV-11148-PBS |
| | ) |
| FIRST DATABANK, INC., a Missouri Corporation; and McKESSON CORPORATION, a Delaware Corporation, | ) ) ) ) ) |
| Defendants. | ) ) |

The videotaped deposition of SUSAN ALLENE HAYES, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before NANCY L. BISTANY, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, CSR No. 84-1857, at 200 North Columbus Drive, Chicago, Illinois, on October 26, 2006, at 9:29 a.m.

C O N F I D E N T I A L

PURSUANT TO PROTECTIVE ORDER

1    BY MR. GOLDMAN:

2        Q.    Sure.  You testified in Ohio regarding

3    rebates and what you'd expect to find in agreements and

4    understandings of payors and PBMs regarding those terms,

5    correct?

6        A.    Yes.

7        Q.    And I'm just wondering if you have in your

8    library or your database information that goes to what are

9    the normal provisions or terms in a payor-PBM contract?

10       A.    No.

11       Q.    You refer in your declaration to having seen

12    many of them, correct?

13       A.    That's correct.

14       Q.    Hundreds, correct?

15       A.    Correct.

16       Q.    Either you or people who work for you have

17    seen them?

18       A.    Correct.

19       Q.    And is there anything in your -- in your firm

20    at POS in your library, your database or anywhere else

21    which will show what is contained in those hundreds of

22    contracts you're familiar with?

23       A.    No.  Our methodology at POS -- I mean, we're

24    a very small office, a little bit bigger than this room

1    guide, I've never seen something like that.

2    Q.    All right. So let me describe a subject, and

3    that would be reimbursement to pharmacies for the drugs

4    that they sell, reimbursement by PBMs.  And another would

5    be payment by payors to PBMs for drugs purchased by their

6    members from retail pharmacies.  So I'm talking about

7    self-administered drugs.

8        Are you aware of any publications that are

9    authoritative in either of those two areas or both?

10   A.    I mean, I think I've seen articles on those.

11   I don't think there's any, like, ongoing, every month

12   publication regarding those issues.

13   Q.    Do you feel you're an expert on the subject,

14   the first part of my equation, reimbursement of retail

15   pharmacies for the drugs they sell by -- reimbursement by

16   PBMs of retail pharmacies for the drugs they sell?

17   A.    I believe I'm expert in that area.  I believe

18   I understand how that works.

19   Q.    And what's -- how did you come to have that

20   understanding, through the audit process?

21   A.    Through the audit process as well as, you

22   know, working for Walgreen's Corporation and knowing, you

23   know, how retail pharmacies are reimbursed; through,

24   again, PBM audits, through my understanding of the

1    industry, through talking to PBMs about how they reimburse

2    retail network pharmacies.  On-the-job training I guess

3    you would say.

4        Q.    And the same would be true for how payors

5    reimbursed PBMs for the drugs that their insureds or

6    members purchase from retail pharmacies?

7        A.    And I think my expertise in that category is

8    probably greater than the former.

9        Q.    It arises out of the audit work you've done?

10       A.    Yes.

11       Q.    And the litigation support work you've done?

12       A.    Yes.

13       Q.    Now, is there any article that you've written

14   or book that you've been a participant in that I could

15   look at that would be pertinent or relevant to opinions

16   you're giving in this case?

17             And you have your -- you have a list of the

18   books and articles.  Are there any there that I would look

19   at that would be informative or relevant to what you're

20   giving opinions about here?

21       MS. FEGAN:  What are you looking for?

22       THE WITNESS:  My --

23       MS. FEGAN:  Your CV?

24       THE WITNESS:  Yes.

1      A.    Well, wouldn't First Databank know that?

2      Q.    I'm asking you if you have seen any

3  information?

4      A.    No.

5      Q.    Have you heard any speeches or received any

6  information from any other source about the extent to

7  which payors during the period I'm referring to subscribed

8  to First Databank data?

9      A.    You know, let me just say, it's virtually

10  unheard of that a plan sponsor would ever go by First

11  Databank information.  It's just not done.

12          It's expensive.  They don't have the staff to

13  do anything with it.  They don't have the expertise to

14  understand it if they had it.

15          So I can't say emphatically that there has

16  never been a plan sponsor to buy a First Databank.  I'm

17  sure there's somebody out there, but I've never heard

18  anything written about it.  I've never talked to anybody

19  about it.  It's just not done in the industry.  I'm an

20  expert in the industry.  It's just not done.

21      Q.    Well, I understand you're an expert.  I'm

22  just trying to get the basis for your expert opinion.

23  Okay.

24          Is there anything more that you based it on

1    was doing, and they would negotiate a better deal.

2            Whether they did or didn't, I have no idea.

3    BY MR. GOLDMAN:

4        Q.    Yeah, but see, you're an expert.  I'm asking

04:03:05PM  5    you what you would assume would happen, okay, based upon

6    your knowledge of the industry.  You say you're holding

7    yourself out as an expert.

8            You told me the second category, the one

9    that's not pass-through but is based on the spread, is the

04:03:15PM  10    more prevalent type of arrangement, correct?

11        A.    Yes.

12        Q.    So assuming that's the arrangement, if the

13    PBM understood that the retailer was not making more

14    profit due to this 5 percent, don't you believe they would

04:03:26PM  15    go in there and negotiate better terms for the PBM in the

16    face of that?

17        A.    That would be a logical assumption.  Whether

18    it happened, I'm not sure, but that -- one would assume

19    that.

04:03:36PM  20        Q.    The PBMs are fairly sophisticated, smart

21    people, correct?

22        A.    Correct.

23        Q.    And they're quite interested in profit margin

24    for themselves; isn't that your opinion?

1    STATE OF ILLINOIS  )

2                       )  SS:

3    COUNTY OF C O O K  )

4

5            I, NANCY L. BISTANY, a Notary Public within and

6    for the County of Cook, State of Illinois, and a Certified

7    Shorthand Reporter of said state, do hereby certify:

8            That previous to the commencement of the

9    examination of the witness, the witness was duly sworn to

10   testify the whole truth concerning the matters herein;

11           That the foregoing deposition transcript was

12   reported stenographically by me, was thereafter reduced to

13   typewriting under my personal direction and constitutes a

14   true record of the testimony given and the proceedings

15   had;

16           That the said deposition was taken before me at

17   the time and place specified;

18           That the reading and signing by the witness of

19   the deposition was agreed upon as stated herein;

20           That the deposition terminated at 5:19 p.m.;

21           That I am not a relative or employee or attorney

22   or counsel, nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor interested

24   directly or indirectly in the outcome of this action.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2    and affix my seal of office at Chicago, Illinois, this

3    29th day of October, 2006.

4

5

6

7

8          Notary Public, Cook County, Illinois

9    My Commission expires December 16, 2009.

10    CSR No. 84-1857.

11

12

13          Official Seal
          Nancy L Bistany
          Notary Public State of Illinois
          My Commission Expires 12/16/2009

14

15

16

17

18

19

20

21

22

23

24

# Exhibit 27

1      UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
2
   NEW ENGLAND CARPENTERS HEALTH    )
3  BENEFITS FUND, PIRELLI           )
   ARMSTRONG RETIREE MEDICAL        )
4  BENEFITS TRUST, TEAMSTERS        )
   HEALTH & WELFARE FUND OF         )
5  PHILADELPHIA AND VICINITY,       )
   PHILADELPHIA FEDERATION OF       )
6  TEACHERS HEALTH AND WELFARE      )
   FUND, and DISTRICT COUNCIL 37    )
7  HEALTH & SECURITY PLAN           )
                                    )
8              Plaintiffs,          )  Civil Action
                                    )
9       -vs-                        )  No. 1:05-CV-11148-PBS
                                    )
10 FIRST DATABANK, INC., a          )
   Missouri Corporation; and        )
11 McKESSON CORPORATION, a          )        ORIGINAL
   Delaware Corporation,            )
12                                  )
               Defendants.          )
13

14      The RULE 30(b)(6) videotaped deposition of HEWITT

15 ASSOCIATES LLC through MATTHEW A. GIBBS, called for

16 examination, taken pursuant to the Federal Rules of Civil

17 Procedure of the United States District Courts pertaining

18 to the taking of depositions, taken before NANCY L.

19 BISTANY, a Notary Public within and for the County of

20 Cook, State of Illinois, and a Certified Shorthand

21 Reporter of said state, CSR No. 84-1857, at 200 North

22 Columbus Drive, Chicago, Illinois, on October 27, 2006, at

23 9:27 a.m.

            C O N F I D E N T I A L
24      PURSUANT TO PROTECTIVE ORDER

```
 1    actually have a scorecard when you're doing the

 2    competitive bid process to rate one bidder over another,

 3    am I correct?

 4         A.    That's correct.

 5         Q.    And Hewitt developed its own scorecard, am I

 6    correct, for that purpose?

 7         A.    We have a template that we review with the

 8    client and adjust the weightings according to their

 9    specifications.

10         Q.    Why is it that utilization management is more

11    important than forecast cost?

12         MS. CONNOLLY:  Objection to form.

13    BY MR. GOLDMAN:

14         Q.    I mean, I would think cost would be number

15    one, and I'm wondering why it isn't?

16         A.    Well -- keep going?

17         Q.    Yes.

18         A.    My opinion as a -- as, I guess, a clinician

19    here, is that if all you look at is the up-front cost of a

20    drug, who cares if you're dispensing the most expensive

21    one at the end of the day?  What matters is are you

22    dispensing the most affordable drug?

23              The discounts become less important.  If you

24    have a great discount, and you dispense the most expensive
```

1  drug, that really only gets -- doesn't get you much if

2  there were more affordable alternatives that should have

3  been dispensed in the long run.

4      Q.    So on your scorecard or your template

5  scorecard, would you actually give a score to the forecast

6  cost?

7      A.    We would assign a weighting, yes.

8      Q.    And the same thing for the utilization

9  management?

10      A.    Based on the responses, yes, that are

11  provided.

12      Q.    Under your current template, what is the

13  ratio difference -- the ratio between scoring -- what is

14  the highest score you can get on forecast costs and the

15  highest score you can get on -- is there a way to weight

16  these two that way through your scorecard?

17      A.    Absolutely.  So each -- again, it's a

18  template, and you've got these various buckets.  And based

19  on where the client is in terms of maybe they don't want

20  to do utilization management, which does occur --

21  financials is obviously going to weigh heavier -- we can

22  adjust those based on whatever the client's independent

23  strategy is going to be.

24      Q.    Okay.  Now, I want to focus on forecasting

1    STATE OF ILLINOIS   )

2                        )   SS:

3    COUNTY OF C O O K   )

4

5         I, NANCY L. BISTANY, a Notary Public within and

6    for the County of Cook, State of Illinois, and a Certified

7    Shorthand Reporter of said state, do hereby certify:

8         That previous to the commencement of the

9    examination of the witness, the witness was duly sworn to

10   testify the whole truth concerning the matters herein;

11        That the foregoing deposition transcript was

12   reported stenographically by me, was thereafter reduced to

13   typewriting under my personal direction and constitutes a

14   true record of the testimony given and the proceedings

15   had;

16        That the said deposition was taken before me at

17   the time and place specified;

18        That the reading and signing by the witness of

19   the deposition was agreed upon as stated herein;

20        That the deposition terminated at 2:00 p.m.;

21        That I am not a relative or employee or attorney

22   or counsel, nor a relative or employee of such attorney or

23   counsel for any of the parties hereto, nor interested

24   directly or indirectly in the outcome of this action.

*BISTANY REPORTING SERVICE  (312) 280-0825*

```
 1          IN WITNESS WHEREOF, I do hereunto set my hand

 2    and affix my seal of office at Chicago, Illinois, this

 3    31st day of October, 2006.

 4

 5

 6

 7

 8          Notary Public, Cook County, Illinois

 9          My Commission expires December 16, 2009.

10          CSR No. 84-1857.

11

12                              Official Seal
                                Nancy L Bistany
13                        Notary Public State of Illinois
                      My Commission Expires : 2/16/2009
14

15

16

17

18

19

20

21

22

23

24
```

# Exhibit 28

| | |
|---|---|
| **From:** | Fair, Rick [OMP] |
| **Sent:** | Thursday, May 09, 2002 5:47 AM |
| **To:** | Larkin, Cristina [OMP]; Borgia, Mike [HCS] |
| **Cc:** | Peterson, Mark [OMP]; Inserra, Robert [OMP]; Dugan, Patrick [OMP]; Quimbayo, Yancy [OMP]; Russell, Dale [OMP]; Moreland, Jennifer [HCS] |
| **Subject:** | FW: AWP |

Cristina & Mike,

Given that our ███████████████████████ this will have potentially large impact on ████████ and Medicaid Best Price. Can we take the position with ████ that we will pay rebates as a % of our recommended wholesale price in lieu of First Databank's AWP? If not, we will need to assess the potential financial exposure and then get together to determine our options and action steps.

Let me know.

Rick

---

Rick Fair
Director, National Accounts
Ortho-McNeil Pharmaceutical, Inc.
Phone: (908) 218-6217
Fax: (908) 218-7017

-----Original Message-----

| | |
|---|---|
| **From:** | Fair, Rick [OMP] |
| **Sent:** | Thursday, May 09, 2002 6:44 AM |
| **To:** | Iannucci, Art [OMP]; Peterson, Mark [OMP]; Wright, Marla [OMP] |
| **Cc:** | Russell, Dale [OMP]; Valcarcel, Luis [OMP]; Gribbin, Tim [OMP] |
| **Subject:** | AWP |

Team,

You should be aware of a recent development that will affect our customers. By way of background, First Databank is the company that tracks NDCs and pharma pricing information and publishes it to the industries (PBMs, managed care, retail, and pharma manufacturers). They do this via survey of wholesalers. Traditionally, wholesalers have used our recommended wholesale price, which is 20% higher than our WAC (or DLP in J&J parlance) for all OMP products except those acquired from Alza (we inherited those with a recommended 25% mark-up). Some other manufacturers have priced their products at 25% higher than WAC, benefiting the retailer who gets paid on AWP.

Recently, a couple of the major wholesalers have begun moving our products to 25% mark-ups, and First Databank's survey has picked this up. Many of our prices are now being published with a 25% markup. This will look like a price increase to our customers, even though OMP has taken no overt action. I would ask that you have the team keep an ear out with their customers and provide any information regarding any managed care response to us. We heard Joe Sinopoli from Harvard Pilgrim mention this at the ORTHO EVRA launch, and he indicated they are in the process of renegotiating their retail contracts because of this, potentially to a WAC+% agreement in lieu of AWP-%. We clearly don't want to draw attention to higher pricing, but if it comes up, our customers should know that this is not an OMP pricing action.

Let me know if you have questions.

Rick

---

Rick Fair
Director, National Accounts
Ortho-McNeil Pharmaceutical, Inc.
Phone: (908) 218-6217
Fax: (908) 218-7017

1

MDL-HCS00268584

# Exhibit 29

# Kanwal MD, Neeraj

**From:**    Chen, Michael Z. (STL) [MZChen@express-scripts.com]
**Sent:**    Tuesday, February 27, 2007 2:42 PM
**To:**      Kanwal MD, Neeraj
**Subject:** RE: First DataBank Litigation

Hey Dr Kanwal

I think when you take the utilization of the 8500 drugs and the 4% and spread it across the entire DIV it amount to we gave you 1.5% relief across all your medications not just the 4% of the targeted brands.
Thats why the impact in 02 was only .7-.9%  I asked about the impact of the 8500 drugs.  Our internal teams are aware that you want this.  My problem is that I dont know whats in that bucket yet.  I am trying to come up with some kind of estimate for you but I am at a loss. Thats why you dont have this data yet.

I have to come to paramount at the end of March. Let me see what Jennifer's schedule is.  If I can squeeze the meeting in earlier I will do a conference call.

I will work on this today.

Mike

---

**From:** Kanwal MD, Neeraj [mailto:Neeraj.KanwalMD@ProMedica.org]
**Sent:** Tuesday, February 27, 2007 1:29 PM
**To:** Chen, Michael Z. (STL)
**Subject:** RE: First DataBank Litigation

My advice is that I wouldn't pass that stuff around your office, it will be misinterpreted, it was for your info only so you can see what I read about.

The bottom line is that you folks want us to pay the same or more while listed prices are going down. I understand your points about our discounts, but it wasn't 4%. Where is the other 2.5%?.  I will await your company "sell." Are you and Jennifer scheduling a call or coming to Toledo?

---

**From:** Chen, Michael Z. (STL) [mailto:MZChen@express-scripts.com]
**Sent:** Tuesday, February 27, 2007 2:24 PM
**To:** Kanwal MD, Neeraj
**Subject:** RE: First DataBank Litigation

Hi Dr Kanwal

Thanks for the info.  I will pass it on.  It kind of explains why everyone is so hot about this topic but doesnt actually Hartman doesnt really go into detail on the 15% discount rate or why it exists in the first place.  The fact is that AWP is not a credible reference and that PBMs negotiate a discounted rate based on market supply and demand is not a part of his paper.

He assumes that if the AWP is adjusted that all things remain equal in his calculation.  Thats a problem for us for the reasons we discussed before.  In 02 the industry put in a price shock, as a result we had to go out and recontract with pharmacies to get the money back to you....that is the basis of the analysis I sent you a while back.  In 04 we got you rate relief in the amount of about 1.5%  That was well above the .7-.9% impact we forecasted back then of the 4% increase.

PROMEDICA/NEC 00006

4/17/2007

Ordering the previous analysis was risky to me. (nobody else took this approach) I was not sure if the data I got was going to make matters worse but I put my faith in the PBM business model and rolled the dice. Fortunately, it turned out that we did reduce the impact to Paramount in 04, most likely by squeezing the pharmacies out of the margin they previously benefitted from and moving some money around too. Thats why the pharmacies are refusing to accept the adjustment today.

To me, the crux of this argument revolves around whether you think pharmacy pricing is an efficient market. Without PBMs it surely wouldnt be. But with PBMs I think there is enough efficiency to address the above issues (albeit not real time like the stock market) I dont think adding another price shock is the answer to this issue.

Lets see what the AWP guys (internally) think of this.

Thanks
Mike


---

**From:** Kanwal MD, Neeraj [mailto:Neeraj.KanwalMD@ProMedica.org]
**Sent:** Tuesday, February 27, 2007 11:52 AM
**To:** Chen, Michael Z. (STL)
**Subject:** FW: First DataBank Litigation


This is for your info, incase your people haven't been sharing some of the info regarding the proposed awp settlement. This touches on the expected savings, pushback and one person's belief on outcome. I have other documents from the settlement, and can share them for your interest. The expectation remains that pricing will fall from first data bank and all FDB based pricing will fall.

We will see how effective your contracts are in dealing with the pushback from pharmacies who will naturally resist a price reduction. Did you set up a date with Jennifer to come to Toledo?


– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

EMAIL CONFIDENTIALITY NOTICE

This Email message, and any attachments, may contain confidential patient health information that is legally protected. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of this message is strictly prohibited.

If you have received this information in error, please notify the sender immediately by replying to this message and delete the message from your system.


******* Confidentiality Notice *******

4/17/2007

*This email, its electronic document attachments, and the contents of its website linkages may contain confidential health information. This information is intended solely for use by the individual or entity to whom it is addressed. If you have received this information in error, please notify the sender immediately and arrange for the prompt destruction of the material and any accompanying attachments.*

------------------------------------------------

EMAIL CONFIDENTIALITY NOTICE

This Email message, and any attachments, may contain confidential patient health information that is legally protected. This information is intended only for the use of the individual or entity named above. The authorized recipient of this information is prohibited from disclosing this information to any other party unless required to do so by law or regulation and is required to destroy the information after its stated need has been fulfilled. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of this message is strictly prohibited.

If you have received this information in error, please notify the sender immediately by replying to this message and delete the message from your system.

PROMEDICA/NEC 00008