UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37; AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>                Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                Defendants. | C.A. No. 1:05-CV-11148-PBS |

**PLAINTIFFS' AMENDED SUPPLEMENT TO THE
CLASS CERTIFICATION RECORD[1]**

---

[1] This is filed in response to the Court's Order dated August 1, 2007 granting McKesson's motion to strike. The exhibits originally submitted on July 26, 2007 are not being changed.

At the conclusion of the class certification hearing, the Court allowed additional briefing to address the discovery the parties had yet to complete at the time of the hearing. Specifically, the Court was interested in any evidence that might show if PBMs knew of the McKesson-FDB scheme and had acted to mitigate the impact of the scheme on class members. The additional discovery conducted, including the deposition of only *a single PBM*, Express Scripts, Inc. ("ESI"), contradicts nearly every argument McKesson made during the hearing.

A.   **There is no Original or Supplemental Evidence of Retrospective Relief**

- There is no supplemental evidence that any PBM/TPP contract negotiation involved redress for damages already incurred.[2]

- ESI's witness repeatedly testified that any rate recovery or cost saving measures ESI implemented were part of its normal business model to reduce its clients' drug costs.[3]

B.   **No Supplemental Evidence Supports the Application of "Berndt's" PBM Competition Analysis to this Case**

- Since the class certification argument, of the 40[4] or more PBMs in the United States, McKesson has deposed only *one*.

   1.   **Medco was told by FDB that AWPs were set by surveys. Accordingly there is no evidence that Medco told TPPs of the scheme or competed to reduce the scheme's impact**[5]

   2.   **Caremark, a major PBM did not alert its TPP clients to the Scheme**

- Caremark was telling its clients that the spread increase in 2002 was an "Anomaly" and not part of an unlawful scheme the effects of which should be immediately recouped.[6/7]

- There is no supplemental evidence of efforts by Caremark to eliminate past or future damages.

---

[2] Ex. 26 (Deposition of William Kiefer, ESI 30(b)(6) witness ("Keifer Rough Tr.") at 202:11-19) (unaware of such attempts).

[3] *See* Ex. 26 at 207:24-208:14. *See also id.* at 209:4-8.

[4] Ex. 20.

[5] *See* Ex. 2.

[6] Ex. 5 (CMK–AWP 001793).

[7] Ex. 6 (CMK–AWP 001860 at 1862; 001871 noting large increase in 2002).

### 3. ESI, the only PBM McKesson deposed, did not tell its clients about the scheme

- ESI told a limited group of TPPs that a change in the WAC to AWP ratio had occurred. McKesson claimed in oral argument that this communication went to one-third of all TPPs in the United States.[8] In fact it went to a subset of ESI clients.[9]

- ESI became aware of the increase in 2002.[10] It was told that the "wholesalers" felt the "new AWP was a more accurate depiction."[11]

- ESI had no understanding that the WAC-AWP increase was the result of a scheme between FDB and McKesson.[12] It therefore did not tell its clients about it. "*We didn't know that information*."[13]

- ESI acknowledged the TPPs would receive an "*increased trend in direct relation to the increase in AWP*"![14] ESI did an extensive analysis of the increase because it believed its clients would be affected by it.[15/16]

### C. No Evidence Exists That TPPs "Got the Money Back"

- There is no credible evidence, supplemental or otherwise, that any TPP recouped any or all past damages.[17/18]

- McKesson did not depose or obtain recoupment evidence from Medco, Caremark or any other PBMs.

- The ESI witness saw *no* documents informing clients that ESI intended to get back the full amount of the McKesson-FDB price fix.[19]

---

[8] Ex. 1 at 26:20-21.

[9] Ex. 26 (Keifer Rough Tr. at 45:17-46:19).

[10] Ex. 22 (ESI-414-00001762).

[11] Ex. 22 at 00001762.

[12] Ex. 26 (Keifer Rough Tr. at 129:3-130:9).

[13] *Id.* at 163:25-164:12 (emphasis added).

[14] Ex. 22 at 00001762 subparagraph d.

[15] Ex. 26 (Keifer Rough Tr. at 185:2-17).

[16] Ex. 24.

[17] ESI calculated the impact on BCBS Massachusetts at $4.1 million for just one quarter. *See* Ex. 23 at p. 2.

[18] *See* Exs. 24 and 25.

[19] Ex. 26 (Keifer Rough Tr. at 227:2-7).

- To the extent ESI gave new mid-contract rates to DC 37, a named plaintiff in this case, the new rates were *not* given to compensate DC 37 for the FDB-AWP increases.[20]

### D. There is no Evidence PBMs Actually Told TPP Class Members About the Scheme

- McKesson asserted that "PBMs actually told the third party payors about this."[21] No supplemental evidence shows any PBM told any TPP about the scheme.[22]

### E. The New Evidence From Blue Shield of California Shows Common Impact

- Blue Shield of California ("BSC") noticed the price increase on its own[23] and understood that as a result "the industry in general was paying more for drugs"[24] and knew the increase was "causing significant financial – additional costs."[25]

- An analysis was done documenting the impact of the FDB-AWP price increase for all of BSC's drugs.[26]

- By December 2003, BSC changed to Redbook which was reporting a lower WAC to AWP spread.[27] BSC calculated that it would save in 2004 $21 million as a result.[28]

- McKesson lied to BSC about the scheme, *claiming that increases were the result of manufacturers' actions*.[29]

- BSC found itself locked into an FDB-AWP-based contract with ESI from 2002 to 2005 for all mail order drugs. It was thus unable to avoid the impact of the scheme.[30/31]

---

[20] *Id.* at 144:18-22.

[21] Ex. 1 at 26:19-21.

[22] Ex. 2, 5, 6 and 26 (Keifer Rough Tr. at 163:25- 164:12).

[23] Ex. 7 (Deposition of Nancy Stalker ("Stalker Dep.") at 57, 166).

[24] *Id*. at 60-61 (proof of common impact).

[25] *Id*. at 64-65 (proof of common impact and damages coming at a time after which Willig and McKesson claim all damage was recouped).

[26] Ex. 8 (BSC 00124). This analysis conforms to Dr. Hartman's opinion and modeling of across the board impacts and completely refutes Willig's claim that this was all recouped.

[27] Ex. 7 (Stalker Dep. at 166-67).

[28] *Id*. at 166 and Ex. 9 (BSC 00119-20).

[29] Ex. 11 (BSC 00125).

[30] Ex. 7 (Stalker Dep. at 194:13-21, 196:5-11).

[31] *Id*. at 198. BSC was unaware that McKesson was involved in the increase. *Id.* at 201-202.

**F.    The New Connecticare Documents Show Common Issue of Impact/Damages**

- Connecticare was frustrated with the fact that ESI has not explained the increase.[32]

- It calculated a "whopping" increase in drug prices between 2001 to 2002 for the top 200 brand-name drugs.[33]

- Connecticare received an e-mail from ESI saying the increase was to "establish a more consistent relationship with WAC."[34] ESI attached a list of all brand-name drugs whose prices were impacted.[35] Connecticare continued to analyze the cost impact on hundreds of brand-name drugs.[36]

**G.    There Is No Supplemental Evidence On the Consumer Class**

As to the consumer class, there is no supplemental evidence showing consumer knowledge or that consumers recouped damages or were not commonly impacted.

DATED:  August 1, 2007

By /s/ Steve W. Berman
   Steve W. Berman
   Nicholas Styant-Browne
   Barbara A. Mahoney
   Hagens Berman Sobol Shapiro LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol (BBO #471770)
   Ed Notargiacomo (BBO #567636)
   Hagens Berman Sobol Shapiro LLP
   One Main Street, 4th Floor
   Cambridge, MA  02142
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003

---

[32] Ex. 14 (CONNECTICARE/NEC 00022).

[33] Ex. 15 (CONNECTICARE/NEC 00028-29).

[34] Ex. 16 (CONNECTICARE/NEC 00030).

[35] *Id*. at CONNECTICARE/NEC 00030-34.

[36] Ex. 17 (CONNECTICARE/NEC 00045-73 at 0047, *e.g.*, Lipitor for one quarter $308,729, $270,711, $108,942 (varying mgs); Prilosec 20 mg $297,684, Prevacid $157,810 (51)).

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 N. Boulevard, Suite B
Oak Park, IL 60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson, Esq.
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on August 1, 2007.

                                        /s/ Steve W. Berman
                                        Steve W. Berman