UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT 37 HEALTH AND SECURITY FUND, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> Plaintiff, <br><br> v. <br><br> MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC. <br><br> Defendant. | Civil Action No. 07-CV-10988 |

**PLAINTIFF'S RESPONSE TO THE COURT'S TWO QUESTIONS RAISED IN CONJUNCTION WITH THE ORDER GRANTING MOTION TO APPROVE JOINT FDB/MEDISPAN NOTICES AND RESCHEDULING THE FINAL FAIRNESS HEARING**

I.    Modification of the Phrase "Will Affect" to "May Affect"

Plaintiffs counsel and Kathy Kinsella have reviewed the TPP and Consumer Long Forms to change "will affect" to "may affect."  There are no references to "will affect" in the TTP Long Form and no modifications were needed.  The Consumer Long Form has two references to "will affect."  Plaintiffs changed the Consumer Long Form headline to read "may affect."  However, the reference to "will affect" in Section 3 refers to the consequence of a Court decision to allow this lawsuit to proceed as a class action.  Plaintiffs understand that if the action is allowed to proceed as a class action, all decisions made with respect to the class action will affect everyone in the class.  For this reason, Plaintiffs have not modified Section 3.  However, if the Court requires the change, Plaintiffs will make the change. Plaintiffs have attached a copy of the modified Consumer Long Form to Plaintiffs' Response to the Court's Questions as. Exhibit A

II.    Plaintiffs' Basis for Arguing that the Settlement will Result in
       Consumers Saving in the "Billions"

Plaintiffs' basis for asserting that the settlement of claims in the above captioned actions will result in consumers saving billions of dollars is supported by the declaration of Dr. Raymond Hartman filed in the First Databank action and also attached as Exhibit A to Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Medispan Settlement, Certification of Settlement Class and Approval of Notice Plan.  In his Declaration Dr. Hartman stated that the estimated savings during the first 12 months of the rollback of the markup factor by 4% would likely be in excess of $4 billion.  Hartman Declaration, 1, 7.  Dr. Hartman's Declaration is attached to Plaintiffs' Response to the Court's Questions as Exhibit B.

Moreover, Plaintiffs asserted in their Memorandum of Law in Support of Motion for Preliminary Approval of Proposed Medispan Settlement, Certification of Settlement Class and Approval of Notice Plan, that "Class Plaintiff[s] estimate that if they are permitted to proceed to trial on the basis of the Class as currently defined in the Complaint, a conservative estimate of total, single damage compensatory relief will exceed $7 billion. Mem. of Law in Support of Preliminary Approval of Proposed Medispan Settlement, at 6. The Plaintiffs' basis for their preliminary estimate is as follows:

> 1.      The approach starts with the 1,659 NDCs that are the subject of the Complaint. It is estimated that the 1,659 NDCs represent about 40% of the top 200 retail branded drug sales. Although the 1,659 NDCs include other drugs as well, for simplification purposes we use only the 40% of the top 200 retail branded drug sales.
>
> 2.      We then took estimates of the total sales (as opposed to expenditures, which would have been higher as it includes distribution costs as well) associated with these drugs during the Class period, and came to totals of them. In this situation, we therefore took 40% of the top 200 retail branded drug sales. To put this in some perspective, total retail branded drug sales during the class period ranged exceeded an average of $125 billion each year.
>
> 3.      Because the Complaint alleges that there was an unlawful increase in the markup on the WAC to arrive at AWP from 1.20 to 1.25 during a Class period (which markup was effectuated at a time of a price increase for each drug), we calculated the amount by which the increased AWP (an effective 4% increase on AWP) increased sales during the Class Period.
>
> 4.      As a result, our preliminary estimate of single damages during the Class period is almost $7 billion, without interest.

Id. at 6-7.

III.    <u>Scheduling the Final Fairness Hearing to be Held on January 21, 2008</u>

After consultation with the Court's Clerk concerning re-scheduling the Fairness Hearing, Plaintiffs respectfully request that the Court hold the Fairness Hearing on January 21, 2008,

at 2:00 PM. Plaintiffs have attached revised proposed orders Directing Notice to the Class

and scheduling a Fairness Hearing in both of the above captioned matters reflecting the

proposed hearing date. Plaintiffs have attached copies of the revised proposed orders to

Plaintiffs' Response to the Court's Questions as Exhibits C and D.


DATED: August 17, 2007                By:   /s/ Thomas M. Sobol
                                      Thomas M. Sobol (BBO#471770)
                                      Hagens Berman Sobol Shapiro LLP
                                      One Main Street, 4th Floor
                                      Cambridge, MA  02142
                                      Telephone: (617) 482-3700
                                      Facsimile: (617) 482-3003

                                      Steve W. Berman, Esq.
                                      Sean R. Matt, Esq.
                                      Hagens Berman Sobol Shapiro LLP
                                      1301 Fifth Avenue, Suite 2900
                                      Seattle, WA  98101
                                      Telephone: (206) 623-7292
                                      Facsimile: (206) 623-0594

                                      Elizabeth Fegan, Esq.
                                      Hagens Berman Sobol Shapiro LLP
                                      820 North Boulevard, Suite B
                                      Oak Park, IL 60301
                                      Telephone: (708) 776-5600
                                      Facsimile: (708) 776-5601


                                      Jeffrey Kodroff, Esq.
                                      John Macoretta, Esq.
                                      Spector, Roseman & Kodroff, P.C.
                                      1818 Market Street, Suite 2500
                                      Philadelphia, PA  19103
                                      Telephone: (215) 496-0300
                                      Facsimile: (215) 496-6611

Marc H. Edelson, Esq.
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler, Esq.
Amber Nesbitt, Esq.
Jennifer Fountain Connolly, Esq.
The Wexler Firm LLP
55 West Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

## CERTIFICATE OF SERVICE

I, Gregory H. Matthews, hereby certify that I caused a true and correct copy of the foregoing document(s) to be served in the manner indicated upon all the parties listed below on this 17th day of August, 2007.

## <u>VIA OVERNIGHT MAIL</u>

Kevin E. Sharkey
KENNA, JOHNSTON & SHARKEY
69 Bay Street
Manchester, NH 03104
Tel: 603 622-3222
Fax: 603-669-6574
Email: ke.sharkey@verizon.net

Sheldon T. Zenner
Karl Barnickol
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe St.
Chicago, Ill. 60661-3693
Tel: 312-902-5476
Fax: 312-577-8995 (fax)
Email: sheldon.zenner@kattenlaw.com
        Karl.barnickol@kattenlaw.com

*Counsel for Medi-Span, a division of Wolters Kluwer Health, Inc.*

Shiela Birnbaum
Thomas Fox
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, N.Y. 10036
Tel: 212-735-2000
Fax: 212-735-2000
Email: TFOX@skadden.com
        SBIRNBAU@skadden.com

*Counsel for First DataBank, Inc.*

93

# If You Paid for All or Part of Your Prescription Drugs

*Class Action Settlements May Affect What Consumers Pay for Thousands of Drugs in the Future.*

———————

There are proposed Settlements of two lawsuits concerning what consumers pay for prescription drugs.

### What Are the Settlements About?

First Data Bank ("FDB") and Medi-Span publish data that may be used to determine consumer drug prices, reimbursement costs and co-pays for hundreds of drugs.

The lawsuits claim that FDB wrongfully inflated the Average Wholesale Price ("AWP") for thousands of drugs. This information was reported in FDB and Medi-Span's printed and electronic databases. Therefore, some consumers and insurers allegedly overpaid for thousands of drugs.

### Am I Included in the Settlements?

Persons who paid for all or part of their prescription drugs costs (from approximately 2000 to present) based on AWP pricing are included. If you paid a fixed co-payment you are not included.

### What Do the Settlements Provide?

There is no money for consumers now. However, billions of dollars in drug costs may be saved in the future. That is because FDB and Medi-Span will lower the mark up on thousands of drugs and will stop publishing the AWP data within two to three years.

### What Should I do?

Get the complete information below and read it. Then you can decide on your legal rights to:

- Remain in the Settlements by doing nothing. You will be bound by the Court's rulings but you can object to or comment on the Settlements.

- Exclude yourself and keep your right to sue FDB and Medi-Span.

You must exclude yourself or object/comment in writing by **December 21, 2007** as explained in the detailed Notice.

Court-appointed Counsel represents you. They will be paid by FDB. You can also hire your own attorney and appear in Court.

The Court will decide whether to approve the Settlements at the Fairness Hearings on January 21, 2008 at 2:00 p.m.

**This is only a Summary of the Settlements.
For the *Notice of Proposed Class Action Settlements*:**

**Call: 1-800-960-2381   Access: www.FDBMediSpanSettlement.com**

**Write: FDB/Medi-Span Settlement Administrator
c/o Complete Claim Solutions, P.O. Box 24730, West Palm Beach, FL 33416**

## Declaration of Raymond S. Hartman
## Impact and Cost Savings of the First Databank Settlement Agreement

### Executive Summary

I have been asked by Plaintiffs' Counsel to assess the economic impact of the First Databank Settlement Agreement. I find that the impact is substantial. In fact, I conclude that through the first year of implementation total cost savings to end-payers will likely be in excess of $4 billion.

### I.    Qualifications

1.    My name is Raymond S. Hartman. I have previously presented my qualifications to this Court in this matter, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*.[1] In performing this analysis, I have relied upon the materials listed in Attachment A.

### II.    Purpose and Overview

2.    I have been asked by Counsel to assess the impact of the terms outlined in First DataBank's Settlement Agreement and Release[2] and to perform a preliminary calculation of the savings that will be realized as a result of the *FDB Settlement Agreement* if it is approved by the Court. I have been asked by Counsel to calculate these savings for a one-year period commencing in the spring of 2007.[3] The *FDB Settlement Agreement* outlines a process by which First DataBank will "adjust, i.e., change, the WAC to AWP Markup it utilizes for all pharmaceuticals listed on <u>Exhibit A</u> to 1.20."[4] The majority of these drugs are currently listed with an AWP/WAC markup of 1.25.[5]

---

[1] Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, July 14, 2006 (hereafter *"Hartman FDB Declaration"*).

[2] Settlement Agreement and Release, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, August 2006 (hereafter *"FDB Settlement Agreement"*).

[3] I have been advised by Counsel to assume that the effective date of the *FDB Settlement Agreement* will occur in the spring of 2007.

[4] *FDB Settlement Agreement*, p. 19. Exhibit A of the Agreement was generated by First DataBank and contains 8,486 unique NDCs subject to this agreement.

[5] I understand that Exhibit A contains a complete list of all current NDCs in the FDB database that are on a markup-basis and have a markup greater than 1.20. Based on an electronic Excel file produced by FDB ("Roll Back NDCs DRAFT 2006 09 07.xls") which contains the markup for each NDC, I have found that over 94% of the NDCs listed in Exhibit A are currently at a markup of at least 1.25.

3.    The *FDB Settlement Agreement* originated from the allegations that Defendants McKesson Corporation (McKesson) and First DataBank (FDB) recognized and wrongfully exploited the relationship between the two most important list prices in pharmaceutical markets – the AWP and the WAC.  As alleged in the *Complaint* and described in the *FDB Settlement Agreement*:

> "Plaintiffs have alleged, *inter alia*, that Defendants, including First DataBank, wrongfully increased the so-called WAC to AWP markup factor applied to numerous prescription pharmaceuticals through a scheme begun in late 2001 and 2002, thereby causing members of the proposed Private Payor Class, whose payments for pharmaceuticals are tied to the published AWP, to make substantial excess payments for those pharmaceuticals."[6]

The alleged 5% Scheme increased the WAC to AWP markup to 1.25 beginning in late 2001 and 2002.

## III.    AWP, WAC and Reimbursement Rates

4.    The AWP and WAC list prices are the bases for most transaction prices in the pharmaceutical marketplace.  The AWP has been and continues to be an important basis for drug reimbursement in this market.[7]  For branded self-administered drugs, which are the only drugs included in my cost savings calculations described in this Declaration,[8] the AWP is the basis for reimbursement.  By definition, the savings resulting from the *FDB Settlement Agreement* will therefore include those branded self-administered drugs for

---

[6] *FDB Settlement Agreement*, pp. 1-2.

[7] This Court has recognized this importance.  In her Memorandum and Order re: Motion for Class Certification, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, August 16, 2005, Judge Saris states (at p. 7), "Throughout the class period, from 1991 to the present, AWP has been the pricing benchmark for most pharmaceutical sales in the United States.  (Hartman Decl. attach. D ¶¶ 29-30; Schondelmeyer ¶ 36.)"  In forming her opinion, Judge Saris relied upon Professor Ernst Berndt, who noted in his February 9, 2005 Report: "AWP has served as a reference or focal point, an industry standard for baseline reimbursement, and as such a fictional benchmark price from which discounts are frequently specified, directly or indirectly" (¶ 16); and "Recall that pharmacies are typically reimbursed by health plans/insurers/PBMs for drugs they dispense on the basis of a relatively simple formula, such as AWP - X% plus dispensing fee plus (occasionally) administrative fees. … [A]lmost all single source brand drugs are contractually reimbursed using AWP" (at ¶¶ 49 & 55). Ernst R. Berndt, Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, February 9, 2005.

   In a report prepared for the Centers for Medicare and Medicaid Services (CMS), Schondelmeyer and Wrobel describe the prevalence of WAC and AWP and the industry's reliance on AWP for prescription drug reimbursement at retail (Schondelmeyer and Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., June 21, 2004, pp. 4, 15-16, 23).

[8] Exhibit A includes additional product types, including generic drugs, physician-administered drugs, OTC drugs and other products that have not been included in my calculation of cost savings.

which the reimbursement rate was determined by reference to the AWP published by FDB.

5.      For the branded self-administered drugs listed in Exhibit A to the *FDB Settlement Agreement* and included in my cost savings calculations, the AWP determines the amount paid to providers (retail pharmacies and other retailers), in most cases through contracts negotiated with intermediaries (PBMs).  The related WAC determines the cost of the pharmaceutical goods sold by those providers. The AWP and WAC therefore are important market signals for innovator drug companies and important economic factors for providers and intermediaries.

## IV.      Industry Reliance upon FDB AWP Data

6.      Given the recent trend to computerize the calculation and processing of drug claims, accessible and easily interactive AWP data bases are crucial to efficient claims administration.[9]  FDB has been recognized as offering the best data base with those characteristics, and reliance upon FDB AWP data became standard practice by the end of the 1990s. These facts have been recognized by the Federal Trade Commission (FTC) in their recent forced divestiture of MediSpan from FDB.[10]  This market reliance continued after the FTC forced divestiture of MediSpan in late 2001, due to a data sharing agreement that continued until 2004. [11]

7.      According to the terms described in detail in the *FDB Settlement Agreement* and summarized above, if approved by the Court, First DataBank has agreed to adjust the markup for all NDCs listed in Exhibit A downward to 1.20.[12]  Everything else equal, this will have the effect of reducing not only the WAC to AWP markup, but also all drug reimbursement amounts based on AWP.  Table 1 illustrates an example of this change in WAC to AWP markup and its impact on industry reimbursement rates.  If the WAC is equal to $100, the implied pre-settlement AWP would be $125 (assuming the common 1.25 markup).  If FDB adjusts the markup to 1.20 according to the *FDB Settlement Agreement*, the AWP will change to $120.  This decrease in AWP from $125 to $120 can also be described as a negative 4% change in the AWP $(((120-125)/125)*100 = -4.0\%)$.

8.      Table 1 also illustrates the effect on reimbursement rates.  Assume that there is a third-party insurer that reimburses for branded self-administered drugs at retail according

---

[9]  See *Hartman FDB Declaration*, footnote 19.

[10]  Complaint for Permanent Injunction and Other Equitable Relief Pursuant to Section 7A(g)(2) of the Clayton Act and Section 13(b) of the Federal Trade Commission Act, *Federal Trade Commission v. The Hearst Trust, The Hearst Corporation and First Databank, Inc.*, United States District Court for the District of Columbia, Civ. No. 1:01CV00734.  The background for and discussion of this merger and the FTC's requirement for divestiture are discussed in the *Complaint* at ¶¶ 84-98.  See also *Hartman FDB Declaration*, ¶ 17.

[11]  To be specific, until October 2, 2004.

[12]  The *FDB Settlement Agreement* states (at p. 19) that the change to a 1.20 markup will go into effect "no later than (1) sixty (60) days after the Effective Date of this Agreement, or (2) 270 days from the entry by the Settlement Court of a Preliminary Approval Order."  The Effective Date is defined on pp. 15-16 of the *FDB Settlement Agreement*.

to contract terms set at AWP minus 15%. In the pre-settlement world, this insurer would reimburse 15% off of the AWP of $125, or $106.25. In the post-settlement world, this insurer reimburses at the same 15% off of AWP, but now at a lower AWP of $120, which translates to a reimbursement of $102.00. This decrease in reimbursement saves the insurer $4.25, which equals a 4% savings in reimbursement.[13]

### Table 1: FDB Markup Change and Effect on Reimbursement Rates

| Pre-Settlement | |
|---|---|
| FDB WAC | $100.00 |
| FDB AWP | $125.00 |
| Markup | 1.25 |
| Reimbursement at AWP - 15% | $106.25 |
| **Post-Settlement** | |
| FDB WAC | $100.00 |
| FDB AWP | $120.00 |
| Markup | 1.20 |
| Reimbursement at AWP - 15% | $102.00 |
| **Cost Savings** | |
| Percent Savings based on AWP | 4.00% |
| Percent Savings based on Reimbursement Amount | 4.00% |

---

[13] The savings would be 4% for any value of the discount (X%) off AWP used in the reimbursement formula.

## V.    The Formulaic Methodology for Calculating Cost Savings

9.    Given the pervasive market reliance upon FDB price data noted by the FTC and continuing through 2004 due to the data sharing agreement mentioned above, it is reasonable to infer that the FDB AWP for those drugs (delineated by NDC) listed in Exhibit A will still be the basis for reimbursement rates paid for all or substantially all payments for branded self-administered drugs. However, absent more complete market share information, I make the conservative assumption that only two-thirds (66.67%) of total retail dollars paid for the drugs listed in Exhibit A will be reimbursed based on the AWPs listed in FDB and affected by the *FDB Settlement Agreement* over 2007.[14]

10.    I have limited my analysis of cost savings to include only those branded self-administered drugs listed in Exhibit A to the *FDB Settlement Agreement*. To estimate the total dollars reimbursed for this set of drugs, I examined the "Top 200 brand-name drugs by retail dollars in 2005."[15] I found that the branded self-administered drugs listed in Exhibit A account for 184 of the Top 200 brand-name drugs. Total retail dollar sales in 2005 for these 184 drugs totaled approximately $116 billion or 96.6% of the total Top 200 brand-name drug sales. In addition to the Top 200 drugs, there was close to $24 billion in retail spending on all other brand-name drugs. I have assumed that the

---

[14]  I believe this adjustment conservative for the following reasons. The only real competitor to FDB with an equivalent interactive database product is MediSpan. As noted above, FDB and MediSpan have had equivalent AWPs, WACs and mark-ups, based upon the data-sharing agreement in place through October 2, 2004 (see footnote 11 above). While I have not conducted supporting analysis, I believe that the AWPs and WACs of these two data providers have tracked closely through the present and that few entities have switched entirely to MediSpan, for the reasons of institutional inertia discussed in footnote 19 below.

In light of the announced settlement and the size of the savings implied to payers, it is possible that retailers would attempt to pressure PBMs (which negotiate the contract terms between TPPs and retailers, including *discounts off AWPs* and the *source of the AWP*) to shift from FDB to MediSpan for the source of AWP, since MediSpan is not subject to the settlement agreement. It is also possible that retailers would attempt to renegotiate the percentage discount off FDB's AWP, to defeat the reduction in the allowed amount to be reimbursed. While possible, *given the public nature* of both the FTC 2001 divestiture of MediSpan from FDB and of this settlement, and given the very recent increased attentiveness of CMS with passage of the Medicare Prescription Drug Improvement and Modernization Act, it is unlikely that such strategic shifts to MediSpan and such attempts to renegotiate reimbursement formulae *would go unnoticed and unchallenged* by TPPs and by Medicaid, certainly over the next calendar year.

Put differently, my reduction of scripts subject to savings allows for *one third* of the market to shift (or to have already shifted) to MediSpan and/or renegotiate contracts. I believe this to be a larger shift than will actually occur. Since TPP negotiations will predominantly determine the AWPs used by PBMs and retailers (i.e., retaining FDB list prices), those same AWPs will determine U&C basis for cash payers. If retailers ignore the lower AWPs imposed by the settlement and merely keep U&C at the pre-settlement level (related to pre-settlement AWPs) for all cash transactions, then no cash payers will benefit from the settlement. Since cash payers account for 9% of all payers (see Table 2 of this Declaration), then my reduction of 33.3% is much larger than implied by an exclusion of all cash payers. Exclusion of 33.3% allows another 24.3% (1/4) to switch or have switched to MediSpan for whatever reason.

[15]  *Drug Topics*, Top 200 Brand-Name Drugs by Retail Dollars in 2005. Sales data for the top 200 drugs is based on the Verispan's Vector One®: National Retail Survey.

remaining drugs in Exhibit A account for the same percentage of these dollars as do the 184 drugs of the Top 200.[16]

11.     I thereby calculate an estimated total of $138 billion dollars in retail spending on the drugs listed in Exhibit A. In order to estimate total retail spending on branded self-administered drugs for 2007, I have assumed an annual growth rate of 7% for such spending.[17] Therefore, total retail spending on the drugs listed in Exhibit A conservatively will equal approximately $158 billion in 2007. Assuming that two-thirds of these dollars spent were reimbursed with reference to the FDB AWPs, total retail dollars subject to the markup adjustment will be $106 billion.

12.     As demonstrated in Table 1 above, the savings for all payers that pay or reimburse based on AWP will equal 4% of their spending. For example, the third-party insurer who reimbursed $106.25 in the pre-settlement world will save $4.25 (or 4% of $106.25) as a result of the adjustment to AWP.[18,19] I have allocated total retail spending to three different end-payer groups, including: Private Third-Party Payers, Medicaid and Uninsured Cash Payers.[20] Each of these payers reimburses based on contracts, statutes or

---

[16] A complete list of assumptions made in the analysis can be found in Attachment B to this Declaration.

[17] This is a conservative estimate given the historical, recent and forecasted growth trends in the pharmaceutical industry. An estimate appearing in the journal *Health Affairs* forecasts growth to be closer to 11% over the next few years (S. Heffler, *et al.*, "U.S. Health Spending Projections for 2004-2014," *Health Affairs – Web Exclusive*, February 23, 2005, pp. W5–77-79 and Exhibit 2).

[18] This hypothetical is consistent with calculated cost savings per script. Specifically, I estimate total cost savings in Table 2 ($4 billion) for 2/3 of all scripts filled (roughly 1.0 billion). This implies an average savings of approximately $4.00/script or 4% of an average price of $100.00 (total brand units were about 1.5 billion in 2005 and the average brand price per script was $95.30; see *Drug Topics*, Top 200 Brand-Name Drugs by Units and Dollars, 2005).

[19] Inherent in this analysis is the assumption that the reimbursement formulae negotiated market-wide (including those for retail pharmacies, private TPPs and other market participants) will not adjust in the short-run (over 2007) to defeat the impact of the *FDB Settlement Agreement* and FDB's reduction of the WAC to AWP markup. This assumption is reasonable for the following reasons, some of which have been introduced in footnote 14 above. First, the relationships governing reimbursement practices and procedures, market-wide, are complex and slow to change and will be subject to very public scrutiny after this settlement. Second, established reimbursement contracts and statutes have fixed durations. Third, the costs associated with implementing changes to the overall reimbursement structure and individual reimbursement algorithms used by market participants are substantial. Fourth, strategies developed by individual market participants to reverse the effects of the settlement will be developed individually and over time, as different market participants assess their strategic alternatives, observe the strategies of other market participants and ultimately implement their consequential strategies. As a result, it is fair to assume that inertia in the retail market and among market participants will allow for the substantial cost savings calculated in this Declaration. It is highly unlikely that the interested market participants will be able to reverse and defeat the effects of the settlement within one year, with possible exceptions discussed in footnote 14. Since I am only estimating the benefits of a settlement, the effects of which may have impacts lasting for many years, *for a single year under conservative assumptions*, I believe my calculation of savings to be conservative.

[20] Novartis, Pharmacy Benefit Report: Facts & Figures, 2004 edition, Figure 1: Retail Market Share by Payer Type: 2003, p. 23. The introduction of Medicare Part D prescription drug coverage on January 1, 2006 has increased spending by Medicare in the form of premiums paid to private TPPs. However, I understand that Medicare Part D does not directly reimburse for prescription drugs at retail (i.e., does not process claims for prescription drugs covered under Part D). Therefore, all drug purchases covered by Medicare Part D will be reflected in the Private TPP category. Medicare does however share some

retail practices in relation to AWP, and will therefore realize the 4% savings when FDB adjusts the AWP/WAC markup according to the *FDB Settlement Agreement*. The estimated savings for each of these end-payer groups is calculated in Table 2 for 2007.[21]

**Table 2**
**Calculation of Cost Savings by Payer Type (2007$)**

| Payer Type | Payer % | Retail Spending | Savings % | Savings Amount |
|---|---|---|---|---|
| Private TPPs[22] | 78.8% | $83,236,653,205 | 4.0% | $3,329,466,128 |
| Medicaid | 11.9% | $12,570,002,197 | 4.0% | $502,800,088 |
| Cash/Uninsured | 9.3% | $9,823,615,163 | 4.0% | $392,944,607 |
| Totals | | $105,630,270,565 | | $4,225,210,823 |

I declare that this declaration is true and correct.

Raymond S. Hartman
Executed on September 27, 2006

---

financial risk related to drug spending with the private TPPs so that reductions in spending by private Part D coverage providers may also yield some savings for Medicare. For example, should an individual participating in one of the Medicare designated Part D insurance plans reach a catastrophic level of drug use (i.e., where their out of pocket expenditures exceed $3,600), Medicare would then cover 80% of any drug spending above $3,600. In this case Medicare could benefit from decreased reimbursement rates. I understand that relatively few individuals are expected to exceed $3,600 in out-of-pocket pharmaceutical expenditures.

See Heffler, *et al.*, *op. cit.*, for an estimate of the Medicare portion of prescription drug retail spending (pp. W5–77-79 and Exhibit 5).

[21] Note that if cash payers are foreclosed from benefiting from the savings induced by the settlement (see footnote 14 above), the total benefits in Table 2 would remain the same but would accrue only to the TPPs and Medicaid.

[22] As described in Attachment B (see note 12 of the Attachment), TPP rebates may be affected by the FDB Settlement Agreement. To the extent that managed care rebates are calculated as a percentage of AWP and passed on from PBMs to TPPs, total savings for the TPP payer category would decrease by the loss of rebate dollars. If we make the conservative assumption that *all* managed care rebates are calculated as 5% of AWP and that *all* rebates paid to PBMs are passed through to TPPs, total TPP saving would decrease by approximately $166 million, resulting in total cost savings of $4,058,737,516.

## Attachment A: Materials Relied Upon

### Legal Documents and Materials

Complaint for Permanent Injunction and Other Equitable Relief Pursuant to Section 7A(g)(2) of the Clayton Act and Section 13(b) of the Federal Trade Commission Act, *Federal Trade Commission v. The Hearst Trust, The Hearst Corporation and First Databank, Inc.*, United States District Court for the District of Columbia, Civ. No. 1:01CV00734.

Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, July 14, 2006.

Ernst R. Berndt, Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, February 9, 2005.

FDB Excel file: "Roll Back NDCs DRAFT 2006 09 07.xls".

Memorandum and Order re: Motion for Class Certification, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, August 16, 2005,

Settlement Agreement and Release, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, August 2006.

### Other Documents

Drug Topics, "Top 200 Brand-Name Drugs by Retail Dollars in 2005," (http://www.drugtopics.com/drugtopics/data/articlestandard/drugtopics/082006/309440/article.pdf).

Drug Topics, "Top 200 Brand-Name Drugs by Retail Units in 2005," (http://www.drugtopics.com/drugtopics/data/articlestandard/drugtopics/102006/311294/article.pdf).

Heffler, Stephen, Sheila Smith, Sean Keehan, Christine Borger, M. Kent Clemens, and Christopher Truffer, "U.S. Health Spending Projections for 2004-2014," *Health Affairs – Web Exclusive*, February 23, 2005.

Novartis, *Pharmacy Benefit Report: Facts & Figures*, New Jersey: 2004 edition.

Schondelmeyer, Stephen W. and Marian V. Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Abt Associates, Inc., June 21, 2004.

**Attachment B: Notes and Assumptions**

1. Exhibit A includes 8,486 NDCs (approximately 2,000 drugs).

2. All NDCs listed in Exhibit A are assumed to be at a 1.25 markup. Based on my review of the electronic file generated by FDB, it appears that over 94% of the NDCs listed in Exhibit A are currently set at a markup of *at least 1.25*. The remaining NDCs have a markup between 1.20 and 1.25. It is assumed that the markup factor utilized by FDB for each drug listed in Exhibit A is consistent across all NDCs for that drug, and therefore all retail dollars associated with that drug are included in my cost savings analysis.

3. I assume that FDB will decrease the WAC to AWP markup from 1.25 to 1.20 for all 8,486 NDCs listed in Exhibit A on the date defined by the *FDB Settlement Agreement* (see footnote 12 above). I have been directed to assume that the effective date of the *FDB Settlement Agreement* will occur in the spring of 2007 (see footnote 3 above).

4. Generic drugs and non-prescription retail drugs (e.g., physician-administered drugs and OTC products) listed in Exhibit A have not been included in this analysis.

5. Total brand-name retail dollars in 2005 totaled $143 billion.

6. A subset of 184 of the approximately 2,000 drugs listed in Exhibit A accounts for 96.6% of the Top 200 brand-name retail dollars ($115.6 billion). I assume that the remaining bulk of drugs in Exhibit A (roughly 1,800 drugs) account for 96.6% of all other brand-name retail dollars ($22.8 billion). Therefore, total brand-name retail dollars for all drugs listed in Exhibit A equal $138 billion in 2005.

7. Assuming that drug spending will increase at an estimated annual rate of 7% from 2005 to 2007, total brand-name retail dollars for the drugs listed in Exhibit A will reach $158 billion in 2007.

8. It is assumed that two-thirds of all retail payments and reimbursements are based on FDB AWPs and subject to the *FDB Settlement Agreement*. Therefore, total brand-name retail dollars subject to the *FDB Settlement Agreement* will be $106 billion in 2007.

9. Total 2007 brand-name retail dollars subject to the *FDB Settlement Agreement* are broken out by payer type based on percentages found in Novartis, *Pharmacy Benefit Report: Facts & Figures*, 2004 edition.

10. It is assumed that when FDB decreases the WAC to AWP markup from 1.25 to 1.20 according to the *FDB Settlement Agreement*, all payers realize a 4.0% savings.

11. This analysis assumes that all current retail pricing formulae and reimbursement contracts remain constant for the year 2007 following FDB's adjustment to the WAC to AWP markup, subject to the caveats put forward in footnotes 14 and 19. It also assumes that the pricing strategies of innovator drug companies determining ASP and WAC do not change in 2007, while making no assumption about possible changes thereafter.

Declaration of Dr. Hartman on Impact and Cost Savings of FDB Settlement Agreement
Privileged and Confidential: Subject to Protective Order
Page 9

12. Rebates to managed care are typically paid through PBMs in the form of access, administrative, performance and/or market share rebates. The rebate amounts are often determined as a percentage of manufacturers' list prices, either WAC or AWP. If rebates are calculated as a percentage of WAC, ***there will be no change*** in rebates, given the preceding assumption. If calculated off AWPs, the savings calculation must be adjusted as follows. If the rebates are X% of AWP (where, for example, we let X% = 5%) and the savings implied by the settlement are 4% of AWP, then we must reduce the calculation of the savings induced by the *FDB Settlement Agreement* by 0.2% (0.04*0.05); the savings are therefore 3.8% (0.04 – 0.04*0.05) of total spending. The same adjustment would be required if rebates are calculated as a percentage of spending. These calculations conservatively assume that ***all*** managed care rebates are calculated as 5% of AWP and that ***all*** rebates paid to PBMs are passed through to TPPs.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT 37 HEALTH AND SECURITY FUND,<br><br>                                Plaintiffs,<br><br>        v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                                Defendants. | C.A. No. 1:05-CV-11148-PBS |

**[PROPOSED, UPDATED] ORDER DIRECTING NOTICE TO THE
CLASS AND SCHEDULING A FAIRNESS HEARING**

WHEREAS, this matter has come before the Court pursuant to Class Counsel and

FDB's Joint Motion for Preliminary Approval of Proposed Settlement, Certification of

Class for Purposes of Settlement Only, and Approval of Form and Manner of Notice filed

November 1, 2006 (the "FDB Settlement Motion"); and

WHEREAS, the Court finds that it has jurisdiction over these actions and each of

the parties for purposes of settlement and that venue is proper in this district; and

WHEREAS, this Court has issued prior orders dated November 14, 2006,

November 22, 2006 and June 6, 2007 relating to FDB Settlement Motion:

**IT IS HEREBY ORDERED THAT**:

     **I.        Approval of Notice**

The Court finds that direct Notice to the members of the class that are consumers is not feasible given the number, lack of available lists, and the costs of such notice in relation to the nature and estimated range of amounts of the claims of class members who are consumers. Therefore, the Court directs that Notice be provided to the Class in accord with Rule 23(d)(2) and 23(d)(5) and the requirements of due process. Therefore, the Court approves the form and content of the Joint FDB/Medi-Span Settlement Notice Program for mailing and the abbreviated Notice for publication, substantially in the forms attached to the Declaration of Katherine Kinsella dated August 6, 2007, as satisfying the requirements of Rule 23 and due process for the entire putative class.

## II.    Approval of Notice Plan

The Court directs that Kinsella Communications be confirmed to act as the Notice Agent (as defined in the Settlement Agreement and Release) and directs the Notice Agent to disseminate the Notice as set forth in the Joint FDB/Medi-Span Settlement Notice Program, which is designed to achieve a reasonable reach and frequency commensurate with the reach and frequency sought in other pharmaceutical pricing litigation and which satisfies the requirements of Rule 23 and due process:

(a)    Publication of the Form of Notice for Publication on dates and in publications substantially as set forth in the Exhibits to the Declaration of Katherine Kinsella dated August 6, 2007, based on Court approval by August 15, 2007;

(b)    Distribution by direct mail of the Form of Notice for Mailing to all TPP Class Members that can be identified by reasonable means or who have requested a copy, which mailing shall be placed in the mail no later than September 10, 2007;

(c)    Distribution by direct mail of the Form of Notice for Mailing to the Attorney General of each State of the United States;

2

(d)    Development and management of a toll free number with an automated system providing information about the Proposed Settlement, with the ability to request copies of the Notice or the PSA, during the period from September 10, 2007 until the Final Approval; and

(e)    Development and management of a website to provide information and permit the review and downloading of the Notice, PSA and exhibits, during the period from September 10, 2007 until Final Approval.

### III.    <u>Fairness Hearing</u>

The Court directs that a hearing be scheduled for January 21, 2008 at 2:00 PM, on final settlement approval (the "Fairness Hearing") before this Court, at the, United States District Court for the District of Massachusetts, One Courthouse Way, Boston, Massachusetts 02210, to consider, *inter alia*, the following: (a) whether the Class should be certified, for settlement purposes only; and (b) the fairness, reasonableness and adequacy of the settlement. Objectors to the Proposed Settlement may be heard at the Fairness Hearing, however, no objector shall be heard and no papers or briefs submitted will be accepted or considered by the Court unless on or before December 21, 2007, any such objector: (1) has filed with the Clerk of the Court <u>in writing</u> a notice of any such objector's intention to appear personally, or, if such objector intends to appear by counsel, such counsel files a notice of appearance; (2) such objector personally or by counsel, to any of the applications before the Court, submits a written statement describing in full the basis for such objector's opposition, and attaches any supporting documentation and a list of any and all witnesses or experts whom such objector shall present to the Court; and (3) has served, on or before  December 21, 2007, copies of such notice(s), statement(s), documentation, and list(s) together with copies of any other papers or brief(s) that objector files with the Court or wishes the Court to consider at the Fairness Hearing, upon: (i) Thomas M. Sobol, Hagens Berman Sobol Shapiro LLP, One Main St., 4th

Floor, Cambridge, MA 02142, Class Counsel; (ii) Steve W. Berman, Hagens Berman

Sobol Shapiro LLP, 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101, Class Counsel;

(iii) Jeffrey L. Kodroff, Spector, Roseman & Kodroff, P.C., 1818 Market Street, Suite

2500, Philadelphia, PA 19103, Class Counsel; and (iv) Sheila L. Birnbaum, Skadden,

Arps, Slate, Meagher, & Flom LLP, 4 Times Square, New York, NY 10036, Counsel for

First DataBank, Inc.

### IV.    Request For Exclusion From the Class

The Court further directs that any putative Class member wishing to exclude himself,

herself or itself from the proposed Class, must sign a written request to be excluded

containing the information set forth in the Notice, and any such exclusion request must be

mailed to the Notice Agent at the following address FDB/Medi-Span Litigation

Administrator c/o Complete Claims Solutions LLC, West Palm Beach, Florida 33416 and

postmarked (no metered postmarks) on or before December 21, 2007.

**SO ORDERED**.

DATED: Boston, Massachusetts
This ___ day of _____, 2007

_____
Patti B. Saris, Judge
United States District Court

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC.<br><br>                    Defendant. | Civil Action No. 07-CV-10988 |

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF THE
MEDI-SPAN SETTLEMENT, CERTIFYING CLASS FOR PURPOSES OF
SETTLEMENT ONLY, DIRECTING NOTICE TO THE CLASS AND
<u>SCHEDULING A FAIRNESS HEARING</u>**

WHEREAS, this matter has come before the Court pursuant to Class Counsel and Medi-Span's Joint Motion for Preliminary Approval of Proposed Settlement, Certification of Class for Purposes of Settlement Only, and Approval of Form and Manner of Notice filed May, 25, 2007 (the "Medi-Span Joint Motion"); and

WHEREAS, the Court finds that it has jurisdiction over these actions and each of the parties for purposes of settlement pursuant and that venue is proper in this district:

**IT IS HEREBY ORDERED THAT**:

    **I.**    **Preliminary Approval of the Settlement Agreement
    <u>and Certification of Settlement Classes</u>**

1.    The terms of the Settlement Agreement and Release between plaintiffs and defendant Medi-Span, dated May 22, 2007, including all exhibits thereto as filed on May 25, 2007 (the "Proposed Settlement Agreement" or "Proposed Settlement") are

preliminarily approved, subject to further consideration thereof at the Fairness Hearing provided for below.

2.          The Court finds, on a preliminary basis for settlement purposes only, that the Rule 23 factors are present and that certification of the Class, as defined and set forth below, is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) and 23(b)(2):

> "Class" or "Private Payor Class" is defined as follows:
>
>> All individual persons or entities who, during the Class Period, made purchases and/or paid, whether directly, indirectly, or by reimbursement, for all or part of the purchase price of prescription pharmaceuticals, including, but not limited to, those pharmaceuticals listed on the attached Exhibit A, where any or all of the purchase price, reimbursement or payment amount was based in any part on the Average Wholesale Price, Blue Book Average Wholesale Price, or similar data published or disseminated by First DataBank, Inc., electronically or otherwise, and which such Average Wholesale Price, Blue Book Average Wholesale Price, or similar data published or disseminated by First DataBank, Inc., electronically or otherwise, in whole or part, was based on a FDB wholesale survey. Excluded from the class are Defendants, their respective present and former, direct and indirect, parents, subsidiaries, divisions, partners and affiliates; the United States government, its officers, agents, agencies and departments; the States of the United States and their respective officers, agents, agencies and departments; and all other local governments and their officers, agents, agencies, and departments.
>>
>> This is to clarify further that those entities that own or operate businesses referred to commonly as pharmacy benefit managers ("PBMs") and who as part of their business operation contract with ultimate Third Party Payors of a prescription pharmaceutical benefit to perform certain services in the administration and management of that prescription pharmaceutical benefit for those ultimate Third-Party Payors are not class members under the Private Payor Class definition of this settlement. The class includes the ultimate Third Party Payors providing the prescription pharmaceutical benefit and not the PBMs with which those Third Party Payors contract with to administer or manage that prescription benefit on behalf of the class members, unless such PBMs are the fiduciary of the Third Party Payors or by contract assumed, in whole or in part, the insurance risk of that prescription pharmaceutical benefit during the Class Period.

The Class Period is from December 19, 2001 through the date the Settlement Court enters a Final Order and Judgment in the Class Action.

## II        Class Representative

The Court preliminarily appoints the following as class representative:  District Council 37 Health and Security Plan.

## III.        Approval of Notice

The Court finds that direct Notice to the members of the class that are consumers is not feasible given the number, lack of available lists, and the costs of such notice in relation to the nature and estimated range of amounts of the claims of class members who are consumers.  Therefore, the Court directs that Notice be provided to the Class in accord with Rule 23(d)(2) and 23(d)(5) and the requirements of due process.  Therefore, the Court approves the form and content of the Joint FDB/Medi-Span Settlement Notice Program for mailing and the abbreviated Notice for publication, substantially in the forms attached to the Declaration of Katherine Kinsella dated August 6, 2007, as satisfying the requirements of Rule 23 and due process for the entire putative class.

## IV.        Approval of Notice Plan

The Court directs that Kinsella Communications be confirmed to act as the Notice Agent (as defined in the Settlement Agreement and Release) and directs the Notice Agent to disseminate the Notice as set forth in the Joint FDB/Medi-Span Settlement Notice Program, which is designed to achieve a reasonable reach and frequency commensurate with the reach and frequency sought in other pharmaceutical pricing litigation and which satisfies the requirements of Rule 23 and due process:

(a)    Publication of the Form of Notice for Publication on dates and in publications substantially as set forth in the Exhibits to the Declaration of Katherine Kinsella dated August 6, 2007 based on Court approval by August 15, 2007;

(b)    Distribution by direct mail of the Form of Notice for Mailing to all TPP Class Members that can be identified by reasonable means or who have requested a copy, which mailing shall be placed in the mail no later than September 10, 2007;

(c)    Distribution by direct mail of the Form of Notice for Mailing to the Attorney General of each State of the United States;

(d)    Development and management of a toll free number with an automated system providing information about the Proposed Settlement, with the ability to request copies of the Notice or the PSA, during the period from September 10, 2007 until the Final Approval; and

(e)    Development and management of a website to provide information and permit the review and downloading of the Notice, PSA and exhibits, during the period from September 10, 2007 until Final Approval.

## V.    Appointment of Class Counsel

The Court preliminarily finds that the following counsel fairly and adequately represent the interests of the putative Class and hereby appoints the following law firms as Class Counsel pursuant to Rule 23(g): Hagens Berman Sobol Shapiro LLP; Spector Roseman & Kodroff, P.C.; Wexler Toriseva Wallace LLP; and Edelson & Associates, LLC as Class Counsel for the putative Class.

## VI.    Fairness Hearing

The Court directs that a hearing be scheduled for January 21, 2008 at 2:00 PM, on final settlement approval (the "Fairness Hearing") before this Court, at the, United States District Court for the District of Massachusetts, One Courthouse Way, Boston, Massachusetts 02210, to consider, *inter alia*, the following: (a) whether the Class should be certified, for settlement purposes only; and (b) the fairness, reasonableness and

adequacy of the settlement. Objectors to the Proposed Settlement may be heard at the Fairness Hearing, however, no objector shall be heard and no papers or briefs submitted will be accepted or considered by the Court unless on or before December 21, 2007, any such objector: (1) has filed with the Clerk of the Court <u>in writing</u> a notice of any such objector's intention to appear personally, or, if such objector intends to appear by counsel, such counsel files a notice of appearance; (2) such objector personally or by counsel, to any of the applications before the Court, submits a written statement describing in full the basis for such objector's opposition, and attaches any supporting documentation and a list of any and all witnesses or experts whom such objector shall present to the Court; and (3) has served, on or before December 21, 2007, copies of such notice(s), statement(s), documentation, and list(s) together with copies of any other papers or brief(s) that objector files with the Court or wishes the Court to consider at the Fairness Hearing, upon: (i) Thomas M. Sobol, Hagens Berman Sobol Shapiro LLP, One Main St., 4th Floor, Cambridge, MA 02142, Class Counsel, (ii) Steve W. Berman, Hagens Berman Sobol Shapiro LLP, 1301 Fifth Avenue, Suite 2900, Seattle, WA 98101, Class Counsel, (iii) Jeffrey L. Kodroff, Spector, Roseman & Kodroff, P.C., 1818 Market Street, Suite 2500, Philadelphia, PA 19103, Class Counsel, and (iv) Sheldon T. Zenner, Esq., Katten Muchin Roseman LLP, 525 West Monroe Street, Chicago, IL 60661-3693, Counsel for Medi-Span.

### VII.    <u>Request For Exclusion From the Class</u>

The Court further directs that any putative Class member wishing to exclude himself, herself or itself from the proposed Class, must sign a written request to be excluded containing the information set forth in the Notice, and any such exclusion request must be

mailed to the Notice Agent at the following address FDB/Medi-Span Litigation Administrator c/o Complete Claims Solutions LLC, West Palm Beach, Florida 33416 and postmarked (no metered postmarks) on or before December 21, 2007.

**SO ORDERED**.

DATED: Boston, Massachusetts
This ___ day of _____, 2007

_____
Patti B. Saris, Judge
United States District Court