UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, et al.        )
             Plaintiffs,     )
                            )
        v.                   )  CIVIL ACTION NO. 05-11148-PBS
                            )
FIRST DATABANK, INC. and     )
McKESSON CORPORATION,        )
             Defendants.     )
_____ )
```

**MEMORANDUM AND ORDER**

August 27, 2007

Saris, U.S.D.J.

## I. INTRODUCTION

In this proposed national class action, plaintiffs allege that First DataBank, Inc. and McKesson Corporation engaged in a racketeering enterprise to fraudulently state the "average wholesale price" for numerous prescription pharmaceuticals beginning in late 2001, in violation of 18 U.S.C. § 1964 and California state law.[1]

After hearing, pursuant to Fed. R. Civ. P. 23(a) & (b)(3), I

---

[1] Plaintiffs seek certification of their claims under RICO, 18 U.S.C. § 1962(c) (Count I), and under California law (Counts II-IV and VI-VII). The complaint asserts claims based on California's False Advertising Statute, Cal. Bus. & Prof. Code § 17500 (Count II); California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 (Count III); The Consumers Legal Remedies Act, Cal. Civ. Code § 1750 (Count IV); the common law of negligent misrepresentation and civil conspiracy (Counts V and VI); and Cal. Civ. Code § 3345 (Count VII), which provides for enhanced relief for unfair practices directed to senior citizens.

certify the following two classes for a period covering August 1, 2001 to March 15, 2005:

> Class 1, Consumer Purchasers: All individual persons who paid, or incurred a debt enforceable at the time of judgment in this case to pay, a percentage co-payment for the Marked Up Drugs during the Class Period based on AWP, pursuant to a plan, which in turn reimbursed the cost of brand-name pharmaceutical drugs based on AWP.  The Marked Up Drugs include all of the drugs identified in Exhibit A to the Second Amended Complaint and consist of certain brand-name drugs only; and

> Class 2, Third-Party Payors:  All third-party payors (1) the pharmaceutical payments of which were based on AWP during the Class Period; (2) that made reimbursements for drugs based on an AWP that was marked up from 20 to 25% during the term of its contract with its PBM or with another entity involved in drug reimbursement; and (3) that used First DataBank or Medispan for determining the AWP of the marked up drugs.  The Marked Up Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.

> Excluded from the Class are (a) each defendant and any entity in which any defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors; (b) any co-conspirators; and (c) any governmental entities that purchased such drugs during the class period.

At this juncture, Class 1 is certified for liability and for damages, but Class 2 is only certified for liability and for equitable relief.  I defer deciding whether to certify the TPP class for purposes of damages until plaintiffs propose a feasible aggregate damage methodology for TPPs.

The "Marked Up Drugs" identified in the class definition are brand-name, self-administered drugs sold through retail pharmacies, including mail order.

## II. BACKGROUND FACTS

The Second Amended Complaint, Proffer of Evidence, and expert reports of Robert D. Willig,[2] defendant's expert, and of Raymond Hartman,[3] plaintiffs' expert, provide evidence to support the following facts, many of which are disputed. I have also considered certain facts established during the related multidistrict litigation. See In re Pharm. Industry Average Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005) ("Pharm. I"); see also In re Pharm. Industry Average Wholesale Price Litig., 491 F. Supp. 2d 20 (D. Mass. 2007) ("Pharm. II").

### A.    The Spread (AWP)

Each year, more than three billion prescriptions are written in the United States for approximately 65,000 drugs. The common pricing benchmark for virtually all drug reimbursement transactions during the class period was "Average Wholesale Price" ("AWP"). AWPs were compiled and published in drug pricing compendia by three publishing companies, including defendant First DataBank ("FDB"), which had a virtual monopoly as an electronic source for drug pricing information. Medispan,

---

[2] Defendant's expert Willig is a Professor of Economics and Public Affairs at the Woodrow Wilson School and the Economics Department at Princeton University.

[3] Plaintiffs' expert Hartman is the Director and President of Greylock McKinnon Associates, an economic consulting and litigation support firm located in Cambridge, Massachusetts. He specializes in healthcare economics, and he has participated in many of the AWP cases before this Court.

3

another publisher, received its electronic data from FDB.[4]

Pharmacy Benefit Managers ("PBMs") play a critical role in the reimbursement of drugs. There are approximately 11,000 TPPs, which include large insurers like Aetna and Blue Cross-Blue Shield, and small, unsophisticated health and welfare plans, the so-called Taft-Hartley Plans, which receive payments from employers under collective bargaining agreements. Nearly all TPPs contract with PBMs to assist in the reimbursement process. PBMs are the "800-pound gorillas of pharmaceutical reimbursement" and their relationships with TPPs are heavily negotiated and highly individualized. See Pharm. I, at 71. TPPs negotiate drug pricing discounts with PBMs based on AWP, and PBMs negotiate discounts with the pharmacy networks based on AWP. Sometimes TPPs negotiate directly with pharmacies for reimbursement rates. Typically TPPs enter into a contract with PBMs to reimburse pharmacies at AWP minus 15 to 17 percent plus a dispensing fee. Competition among PBMs for the business of TPPs is fierce.

AWP is an artificial price, which sophisticated market participants like PBMs and larger insurers understood during the class period was not a true average of wholesale prices, or an average sales price. Historically, drug manufacturers reported

_____

[4] Plaintiffs have also brought class actions against FDB and Medispan. The Court has given preliminary approval to proposed nation-wide class settlements for the cases against these defendants.

the AWP to the publisher at a markup of 20% or 25% from the
Wholesale Acquisition Cost ("WAC") for branded single-source,
self-administered drugs.  Manufacturers typically sell drugs to
wholesalers on the basis of "WAC."  Wholesalers sell drugs to
retail pharmacies based on WAC plus or minus a factor that
generates a margin for the wholesaler.  Sometimes, manufacturers
only reported a "WAC," and then suggested the appropriate markup
for the publishers to generate the AWP.  Typically, the
publishing company played no independent role in establishing
AWP, other than applying this formulaic markup to the
manufacturer's price.

The retail distribution chain includes national chain drug
pharmacies, independent pharmacies, mail order houses, and other
retailers.  Although retailers buy pharmaceuticals on the basis
of WAC, they get reimbursed by TPPs and consumers for branded
drugs based on a percentage of AWP, as described above.  In this
litigation, the difference between WAC, what retailers pay to
acquire drugs, and what consumers and TPPs pay to the retailers
for the drugs, is called the "spread."  Retailers make their
profit from the spread.  As the difference between AWP and WAC
increases, the profit to retail and chain pharmacies like
Albertsons, Rite Aid and WalMart increases; as AWP rises the cost
to payors, including those consumers who must make co-payments
based on a percentage of AWP, increases as well.  Although higher

WAC to AWP markups made the drugs more appealing to pharmacies because they could reap a greater profit, manufacturers also had an incentive to maintain the lower markups because it gave them better treatment by managed care.

## B.  **The Scheme**

Beginning in late 2001, First DataBank and McKesson reached a secret agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs.  McKesson and First DataBank, raised the WAC to AWP spread from 20% to 25% for over four hundred brand-name drugs that previously had received only the 20% markup.  To conceal the scheme, McKesson and First DataBank agreed to effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer. This timing camouflaged both the increase in the WAC to AWP markup and concealed McKesson as the source of the increased markup.

McKesson gave the following example of the increased profit a retailer would make from the larger spread:

> It's important to understand the significance of having a greater AWP spread.  If a product carries a 16 2/3% spread (or 20% markup), it would not be as profitable as one that carried a 20% spread (or 25% markup).  The following calculations should help clarify some of this terminology:
>
> ```
> Example #3      WAC =$100        AWP = $125        Spread = 20%
>   Calculation:  AWP $125 - 15% (or times 0.85) = $106.25
>                 $106.25 minus cost of $100 = $6.25 plus $2.00
>                 fee = $8.25
>                 Therefore profit = $8.25 (with 20% spread)
>
> Example #4      WAC =$100        AWP = $120      Spread = 16 2/3%
> ```

6

```
Calculation:     AWP $120 - 15% (or times 0.85) = $102.00
                 $102.00 minus cost of $100 = $6.25 plus $2.00 fee =
                 $4.00
                 Therefore profit = $4.00 (with 16 2/3% spread)
```

    It's important to note, the product with the 20% spread
    is $4.25 more profitable.  More than double!

For a real life example, according to McKesson's documents, the
markup increased the profit on Lipitor (70 mg 90s) from $6.86 to
$17.18.  (BRD, Ex. 15.)

    McKesson communicated these new WAC to AWP markups to First
DataBank, which then published AWPs with the new 25% WAC to AWP
markup.  First DataBank published the 25% spreads despite receipt
of information, in some instances, directly from manufacturers
specifying or suggesting a 20% markup as appropriate.  When some
manufacturers like Johnson & Johnson questioned this markup
because it would "increase the cost of prescription drugs to the
commercial and public payers, putting additional pressure
particularly on the state budgets" (BRD Ex. 4), First DataBank
refused to change the published AWP.

    Until March 15, 2005, First DataBank publicly and falsely
represented that its AWP information was obtained directly from
drug manufacturers or through a survey of the three national
wholesalers.  (Compl. ¶¶ 152-54 (alleging that FDB "restated [to
its customers] that it had conducted surveys to establish AWPs"
but instead published false prices, later disclosing that it has
ceased to conduct these surveys of the market.))  FDB was a
monopolist that could use its position to raise the spread

between AWP and WAC.

McKesson had economic reasons for engaging in this alleged markup scheme. A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson implemented this scheme in order to provide a greater spread to those important retail pharmacy clients like Rite Aid and Walmart as well as its own pharmacy related businesses. McKesson boasted that the increase in AWP resulted in "more than 3 times the profit as before." (Pl.'s Mem. Supp. Class Cert. Ex. 39, Ex. 9 (giving examples of increased profits for its customers "now and into the future").)

Before 2000, McKesson estimated that only 20% of the prescription drug manufacturers used a 25% markup for their drugs. Remarkably, by the end of 2002, that figure had risen to 95% of prescription drugs! Indeed, by 2004, McKesson estimated that 99% of the prescription drugs were set at the higher 25% markup. As a result of this artificial increase in the markup of the WAC to AWP spread from 20% to 25%, thousands of TPPs, public entities and consumers have had their drug prices increased. In plaintiffs' words, "one simple agreement and a flick of the computer switch" raised the spread on hundreds of brand-named, self-administered drugs.

### III. RULE 23 STANDARD

Rule 23(a) sets forth several prerequisites to a class

8

action.  A class may be certified only if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representatives will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Plaintiffs seek to certify a class pursuant to Rule 23(b)(3), which provides that an action may be maintained only if, additionally,

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

"The 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 624 (1997).  The "predominance criterion" is "far more demanding" than the commonality requirement." Id. at 623-24.  Thus, each court must struggle with the significance of the "uncommon questions." Id.  Differences in applicable state law may compound the disparities.  Id.  "Predominance is a test readily

9

met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." Id. However, courts must exercise caution when "the individual stakes are high and disparities among members great." Id.

A district court must conduct a "rigorous analysis" to determine whether a proposed class meets the exacting prerequisites established by Rule 23. Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003). In determinating the propriety of a class action, the Court must evaluate whether the requirements of Rule 23 are met, not whether plaintiffs will prevail on the merits. Waste Mgt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000). However, as a practical matter, a district court must engage in a case-specific analysis that goes outside the pleadings in order to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." Id. at 297-98; see also Tardiff v. Knox County, 365 F.3d 1, 4-5 (1st Cir. 2004). ("It is sometimes taken for granted that the complaint's allegations are necessarily controlling; but class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another."). Thus, the First Circuit has recently reconfirmed that the district court is entitled to look beyond the pleadings in its

resolution of the class certification questions.  <u>In re</u>
<u>Polymedica Corp. Sec. Litig.</u>, 432 F.3d 1, 6 (1st Cir. 2005).

## IV. DISCUSSION

### A.    Rule 23(a)

McKesson does not contest that the plaintiffs have satisfied
the four requirements in Rule 23(a).  The numerosity requirement
is easily met.  Plaintiffs estimate that there are hundreds of
thousands of consumers who meet the Class 1 definition, and tens
of thousands of members of the TPP Class, including third-party
insurers, health and welfare plans, and self-insurers in Class 2.
There are an estimated 11,000 TPP class members.

Likewise, there are common factual issues: whether the WAC
to AWP margin was increased as a result of an agreement between
First DataBank and McKesson; whether this agreement was a RICO
enterprise; and whether they engaged in deceptive and/or
fraudulent activity using the United States mails and interstate
wire facilities.  In cases involving fraudulent statements or
misrepresentations, courts generally favor certification where
the misrepresentations were materially uniform.  <u>See</u> <u>Moore v.</u>
<u>PaineWebber, Inc.</u>, 306 F.3d 1247, 1253-56 (2d Cir. 2002) (stating
that Third, Fourth, Fifth, Sixth, and Seventh Circuits follow
this approach, with some variation).  Here, there was an alleged
uniform misrepresentation by FDB, specifically the statement that
its AWP information was obtained directly from drug manufacturers

11

or based on a survey of major drug wholesalers.  (Compl. ¶¶ 152-154.)  Based on these issues, the Court finds that the second Rule 23(a) requirement has been satisfied.

The typicality prerequisite is also met.  The named plaintiffs here were either consumers who purchased drugs at the inflated markup figure or TPPs who were under contract with a PBM during the class period and purchased these more expensive drugs. A clear and distinct relationship exists between the injury to the named plaintiffs and the conduct affecting the two classes. In other words, all members of the two classes, including the named plaintiffs, suffered harm resulting from the across the board 5% markup of drugs.

Finally, the adequacy prong is satisfied.  Plaintiffs have retained vigorous counsel with substantial experience in prosecuting nation-wide consumer class actions, including the related AWP litigation.  Indeed it is as a direct result of their role in the AWP litigation that counsel uncovered this alleged fraud.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the proposed classes, and have the financial resources to do so.  In addition, neither named plaintiffs nor their counsel have any interest adverse to those of the class.

**B.**    **The Uncommon Questions**

The primary thrust of the challenge to class certification

involves the Rule 23(b)(3) predominance inquiry.  McKesson argues
that common questions do not predominate over uncommon ones
because: (1) each TPP possessed a different degree of knowledge
about the alleged 5% AWP markup scheme; (2) each TPP had unique
contract terms with its PBMs that were negotiated and re-
negotiated at varying times and in different manners; and (3)
each member of the class must, therefore, establish causation of
harm and damages in a different manner.

**1.    The Consumer Class**

Plaintiffs propose a consumer class that includes all
consumers who paid a co-pay based on a percentage of AWP.  As the
Supreme Court stated in <u>Amchem</u>, the predominance test is most
easily met in consumer fraud cases.  <u>Amchem</u>, 521 U.S. at 624.
There is no allegation of any disparate knowledge by class
members.[5]  Defendant points out that there are differences in how
different plans calculate co-pays.  However, "[w]here common
questions predominate regarding liability, then courts generally
find the predominance requirement to be satisfied even if
individual damages issues remain," for "[t]he individuation of
damages in consumer class actions is rarely determinative under

---

[5] The class consists only of members who made percentage co-
payments under a plan.  Therefore consumers whose flat co-
payments were increased when TPPs shifted the burden of the AWP
increase onto them will not participate in class remedies under
this class definition.  Similarly, plaintiffs have not requested
that the class include consumers without insurance who paid the
full "usual and customary" retail price.

Rule 23(b)(3)." <u>Smilow</u>, 323 F.3d at 40; <u>see also</u> <u>Tardiff</u>, 365

F.3d at 6-7 (affirming class certification even if formula

damages or a practical solution cannot be determined, the court

would "enter a judgment of liability leaving class members to

pursue damages in separate suits"); <u>Carnegie v. Household Int'l,</u>

<u>Inc.</u>, 376 F.3d 656, 661 (7th Cir. 2004) (affirming RICO class

certification and suggesting procedural mechanisms available at

later stage to cope with issues of whether particular members

were defrauded and extent of individual damages).

### 2. **The TPP Class**

A closer question involves the TPPs because of differences

between the size and sophistication of the plans.

With respect to its first point about differential

knowledge, McKesson has proffered no evidence that any TPP or PBM

had actual knowledge of the alleged fraudulent scheme. Defendant

points to evidence that a major PBM, Express Scripts, Inc., had

knowledge about the systemic markup in early 2002 and conveyed

the knowledge to member TPPs. (Scheckter Ex. 6W.) Specifically,

one memo from Express Scripts dated March 18, 2002 stated:

> Some recent increases in Reported Average Wholesale Price
> (AWP) across a number of therapy classes exceed increases
> in Wholesale Acquisition Costs (WAC). According to First
> DataBank, our pricing service, the recent adjustments
> were made to reflect WAC and AWP across brands of
> products. First DataBank advises that consolidation in
> the pharmaceutical manufacturing industry has driven many
> of these changes.

(<u>Id.</u>) Caremark, another PBM, took these spreads into account

when negotiating its contracts with pharmacies.  (Id. at Ex. 4A.)
Moreover, McKesson argues that some TPPs like Blue Shield of
California learned of spread increases perhaps as early as late
2001.  Plaintiffs respond that other major PBMs did not alert its
clients to the changes.  The fact that some TPPs had knowledge
via the PBMs of the 5% increase in the WAC to AWP markup in drugs
does not defeat class certification on a RICO claim because there
was no knowledge of the alleged unfair and/or deceptive scheme.

McKesson's better argument is that each TPP in the proposed
class had unique contracts with its PBMs for pharmaceuticals, and
that these variations in how TPPs purchased and reimbursed for
drugs would render any common inquiry into causation or damages
fruitless.  In the related multi-district litigation, plaintiffs'
expert Dr. Hartman testified that some TPPs employed "heat
seeking missiles" in their contracts to automatically reduce
their costs in the event that AWPs increased.  Dr. Willig refers
to these contracts as "self-adjusting" or "pass throughs."
According to defendant, for example, some plans have rebates
which increased as AWP increased, or had reimbursement caps.  Dr.
Willig states that "the TPPs had a wide variety of mechanisms to
protect themselves from an artificial rise in some AWP levels,
and that individual TPPs used different means to counteract
artificial rise in some AWP levels resulting from the alleged
Scheme."  (Willig Exp. Report 5.)

15

Other TPPs directly pushed back against the price increases by renegotiating their contracts with the PBMs. ESI testified that in renegotiating, amending, and renewing contracts, the FDB spread increases were important factors considered, and that other PBMs were acting in similar manner. As such, McKesson argues that some TPPs were able to recoup losses through aggressive pricing re-negotiations, by obtaining additional discounts, increasing rebate pass-through provisions, lower dispensing fees, and changing to a reimbursement formula of (WAC + %) rather than an (AWP - %) benchmark. Defendant's expert, Dr. Willig, supported this position by stating that as AWPs rose the discounts off AWPs paid by TPPs increased over the class period. (Willig Exp. Report ¶ 48, ¶ 8.) Some TPPs shifted costs to consumers, increasing their co-pays. Still others did nothing, perhaps unaware of the AWP markup or contractually unable to mitigate the price increase. Due to all of these variables, McKesson argues that class certification is inappropriate here because issues of damages and causation are governed by substantially different contracts over the entire class period of 3.5 years, and plaintiffs would require an individualized calculation of damages for each TPP.

Plaintiffs dispute defendant's argument that TPPs possessed sufficient knowledge of the 5% markup scheme to renegotiate effectively their contracts in a manner sufficient to mitigate

fully the effects of the shift in AWP, and argue that there is no evidence that any TPP recouped all the monetary loss resulting from the increase by retroactive contract amendments. They rely on the expert report of Dr. Hartman that concludes that "[t]he impact was uniform across class members. The AWPs were increased." (Hartman Decl. ¶ 14.) With respect to contract renegotiations, plaintiffs urge this court to follow antitrust caselaw involving manipulation of baseline prices in price fixing conspiracy cases:

> [M]any cases have held that even if there is considerable variety in pricing because of individual price negotiations, class plaintiffs may succeed in proving classwide impact by showing that the minimum baseline for beginning negotiations, or the range of prices which resulted from negotiation, was artificially raised (or slowed in its descent) by the collusive actions of the defendants.

In re Commercial Tissue Prods., 183 F.R.D. 589, 595 (N.D. Fla. 1998) (citing cases). They argue that the jacked-up AWP similarly created an artificial baseline for subsequent negotiations with PBMs and pharmacies and therefore can be presumed to have a class-wide impact.

The need for individualized damage hearings is not necessarily a show-stopper. Dr. Willig emphasizes that there will be "market adjustments to a change in an artificial price measurement such as AWP" (Willig Exp. Report ¶ 38), but he does not dispute that most of these adjustments would take time. For example, he gives the examples of a three-year contract between a

Express Scripts and DC 37, a class plaintiff, entered in
September 2001.  The contract was amended in Spring 2003 to
provide greater discounts and lower dispensing and administrative
fees.  (<u>Id.</u> at ¶ 48).  Similarly, the Caremark/SBC three-year
contract was entered into on January 1, 2001 with a retail brand
reimbursement of AWP minus fourteen percent plus a dispensing fee
of $2.00; it was amended as of July 1, 2003 with a new retail
reimbursement of AWP minus sixteen percent plus a dispensing fee
of $1.50.  (<u>Id.</u>)  Willig gave other examples of contracts which
gave higher discounts with AWP and/or lower dispensing fees in
response to higher AWPs over the class period.  Dr. Willig
explains that the "speed" of adjustment to the increase in the
AWP/WAC ratio will depend on a TPP's knowledge or access to
information and differences in negotiating power.  (<u>Id.</u> at ¶¶ 52-
53.)

     The Court can address the predominance concerns flagged by
McKesson by defining the class to include only those TPPs which
had contracts based on AWP before the start of the scheme, and
would not include any damages for drug reimbursements for drugs
under contract, renegotiated or amended during the class period
to provide price adjustments.  This class definition would
address McKesson's primary concerns about TPPs that renegotiated
their contracts with PBMs as a result of knowledge about the
increase in AWPs because a TPP would be able to collect damages
resulting from an increase in a specific drug's AWP only during

the term of the contract in effect at the time of the fraudulent markup, not after the contract was renegotiated.

This class definition and limitation on damages would not address the plaintiffs' argument that the allegedly fraudulent markup affected the baseline for all drug negotiations. However, the antitrust caselaw is not fully applicable here because of the unique role played by PBMs. While there is no evidence that PBMs knew about the collusion to increase the WAC/AWP markup, PBMs are highly sophisticated entities, and the record supports defendant's contention that they knew about the dramatic bump in AWP pricing in 2002 and had the power and financial incentive to institute contract pricing mechanisms with pharmacies to bring reimbursement costs back to the status quo for client TPPs. It was just a matter of time. Therefore, the baseline antitrust analogy does not fully work.

Defendant points out that some TPPs may have mitigated during the contract term by shifting some of the costs to beneficiaries, but this fact does not preclude class certification. "[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 137-39 (2d Cir. 2001) (holding that defense that individual plaintiffs may have mitigated damages by urging customers to use forms of payment other than defendant's cards

19

did not cause individual issues to predominate).

McKesson also argues that some plans exclude from coverage categories of Appendix A drugs, that other plans cap reimbursements for certain brand drugs that are also in generic form, and still others had rebates which increased as AWP increased.  However, an administrator could readily adjust damages based on these objective factors.  "Where damages can be completed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification."  <u>Pharm. I</u>, 230 F.R.D. at 86.

## C.   <u>Superiority/Manageability</u>

McKesson argues that this class action would be a management nightmare involving 11,000 jury trials for each TPP.  At each trial, in McKesson's view, the jury would have to examine (1) knowledge of and response to spread increases; (2) the bundle of TPP/PBM contract terms; (3) whether claims were paid based on AWP; (4) whether FDB was the source for AWP; and (5) whether each Appendix A drug was covered.

Pointing to the difficulty in resolving individual issues of state law and the alleged flaws in plaintiffs' "aggregate damages" methodology, McKesson questions whether "a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3)

(emphasis added).

Rule 23(b)(3) requires a class action to be superior to other available methods of dispute resolution for the fair and expedient resolution of the matter. "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem, 521 U.S. at 615 (citation omitted). "[A] class action has to be unwieldy indeed before it can be pronounced an inferior alternative--no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied--to no litigation at all." Carnegie, 376 F.3d at 661. "A key factor in making this [superiority] determination is manageability, which focuses on pragmatic concerns." Pharm. I, 230 F.R.D. at 90.

For the consumer class, one difficult issue, as McKesson rightly notes, involves resolving potential differences in state consumer law. When dealing with variations in state laws, courts have concerns about case manageability. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 529 (3d Cir. 2004). However, plaintiffs can address these concerns by grouping state laws in a case management plan. Id. The parties engage in vigorous debate as to whether California law can apply to this nation-wide class.

21

This Court need not resolve the dispute because this Court can certify a nation-wide class under federal RICO law at this juncture, thus obviating difficult questions of choice of law. If the RICO cause of action fails to survive motion for summary judgment and the Court decides that California law does not apply, plaintiffs will have to propose groupings of state consumer protection laws, and a case management plan based on these clusters.

McKesson also argues that the class action vehicle is not superior with respect to TPPs because the plaintiffs' theory of aggregate damages, which would be required for this class litigation, is inaccurate and unworkable, and that damages must be determined TPP by TPP.  In particular, defendant claims that the aggregate damages calculation offered by plaintiffs' expert Dr. Hartman is flawed because his report fails to accurately assess all the pricing factors McKesson's expert deems relevant to calculating an aggregate damages figure.  McKesson complains that the proposed formula is "based on the critical assumption that no contract term or market condition changed in the 3 and ½ year class period as a result of artificially inflated AWP's." (Def. Opp'n Memo p. 17).  Specifically, defendant argues that Hartman's "zero knowledge – zero mitigation" damages model proceeds on the flawed assumptions that when McKesson and First DataBank changed the AWP markup, no other contract terms or market conditions changed.  See Sikes v. Teleline, Inc., 281 F.3d

22

1350, 1365 (11th Cir. 2002) (reversing certification of RICO class because aggregate damages calculation would "allow recovery ... greater than that caused by the offending conduct"); Bell Atlantic Corp. v. AT&T Corp., 339 F.3d 294, 304-05 (5th Cir. 2003) (denying certification because aggregate formula failed to account for "[n]umerous factors.").

Dr. Hartman has proposed that aggregate damages can be easily calculated using industry-wide survey information available from IMS or Verispan.[6] IMS, for example, tracks the total retail method of payment for each NDC, arranged by the method of payment and party of payment. These databases track payments by TPPs, by Medicaid, and by other governmental agencies, "so that one is able to adjust the numbers of units that would be subject to the class definition using data sources." In this manner, Dr. Hartman opines that the Court can first determine damages in the aggregate, looking to each NDC that was impacted by the 5% price increase to determine how much was overpaid across the board for these drugs. He also states he can deduct against the damage calculation any reduction in the rebate payments had the scheme not occurred on a class-wide formulaic basis. Defendant argues that the aggregate methodology proposed by Hartman for the TPPs would lead to an overstatement of damages because it failed to consider certain factors like

---

[6] Verispan and IMS provide industry-wide survey information on total reimbursement at retail of the marked up drugs.

subsequent contract negotiations.

Plaintiffs have a persuasive argument that the alleged fraud had a class-wide impact because the AWP baseline for negotiation of new contracts was fraudulently increased. However, as explained above, PBMs and TPPs typically have complex highly individualized negotiated contracts which involve a bundle of trade-offs. Dr. Hartman's methodology for calculating aggregate damages would lead to a significant overstatement because it fails to consider key provisions in contracts that are renegotiated and renewed. Individualized trials or hearings on damages for renewed and renegotiated contracts in the proposed individualized allocations with aggregate damages would be a morass. Unlike the consumer class, there would be no simple formula to apply to the bundle of adjustments in response to the increase in the WAC/AWP formula.

At this stage of litigation, "plaintiffs' burden is to present the Court with a likely method for determining class damages." In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 324 (E.D. Mich. 2001) (quoting In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 693 (N.D. Ga. 1991)) (emphasis added). As the Court stated in the AWP case, "[t]he important question in a class certification context is whether after a sneak preview of the issues, the expert approach appears fundamentally flawed – an issue usually vetted more fully at a Daubert hearing based on a more detailed record." Pharm. I, 230

F.R.D. at 90; see also Smilow, 323 F.3d at 40-41 (suggesting that a court could properly certify a class under a plausible theory of damages while leaving open the possibility of subsequent decertification if a fuller record disproves the theory).

Based upon this record, this Court is satisfied that his theory of aggregate impact is sufficiently well-founded for the consumer class to allow this case to proceed as a class action. However, I am not persuaded that the aggregate methodology works with respect to the proposed class of TPPs. As I understand the methodology, it includes contracts that were renegotiated after the large bump-up in early 2002. Dr. Hartman may submit an aggregate damage methodology which includes only those contracts in effect when the scheme took place and excludes reimbursements under contracts renegotiated in response to the increase. Another alternative would be to only include damages for one year after the large increase in 2002 took effect. As a practical matter, the large TPPs can protect their own interests and can opt out if this approach does not adequately compensate them. If an aggregate damage methodology is not feasible, the Court will certify the consumer class for liability and damages and the TPP class for liability and equitable relief only.

### V. ORDER

Plaintiffs' motion to certify the consumer class [Docket No. 178] is **ALLOWED**. The Court will defer ruling on the TPP class.

The marked up drugs include all of the drugs identified in Exhibit A to the Second Amended Complaint and consist of certain brand-name drugs only.

**S/PATTI B. SARIS**
PATTI B. SARIS
United States District Judge