UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br>NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND; PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37; AFSCME - )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br>                 )<br>              Plaintiffs, )<br>                 )<br>            v. )<br>                 )<br>FIRST DATABANK, INC., a Missouri )<br>corporation; and McKESSON )<br>CORPORATION, a Delaware corporation, )<br>                 )<br>              Defendants. )<br>_____ ) | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' REPORT IN ADVANCE OF
SEPTEMBER 20 STATUS CONFERENCE**

The Court has set a status conference to address the scheduling of a trial in light of the class certification opinion.  Plaintiffs proposed schedule is set forth below after a brief statement of relevant issues bearing on the schedule.

**A.    Further Expert Work That Has Been Done**

The Court ruled that it was not yet persuaded that the aggregate damage methodology worked on the TPP side of the case.  8/27/07 Order at 25.  Subsequently, on September 14, 2007, Dr. Hartman submitted his expert report.

In that report, Dr. Hartman analyzed IMS actual transaction data for each NDC and was able to calculate based on actual data whether (1) TPPs paid more as a result of the FDB-McKesson price hike, (2) whether that inflation continued throughout the Class Period, and (3) whether there is evidence in the actual prices paid by TPPs of a push back as a result of purported renegotiations of contracts.  The actual data shows an increase in price ***throughout*** the Class Period and no "push back."

Attached for example is Table 1 of Dr. Hartman's report.[1]  Table 1 picks four drugs that McKesson focused on in opposing class certification:  Lipitor, Plavix, Prevacid and Wellbutrin. For each drug there was a price change one to six months after the markup that did not decrease throughout the Class Period.  For example, Lipitor's actual acquisition cost relative to WAC increased by 3.43% after the price hike, and remained there or higher for the 24 months following the illegal markup.  The same holds true for each of the drugs:

> With the implementation of the Scheme in January 2002 for these four drugs, reimbursement amounts paid by Class members relative to WAC (AA/WAC) ***increased immediately***, by the following amounts:  Lipitor 10mg by 3.94%, Lipitor 20mg by 4.22%, Plavix 75mg by 4.38%, Prevacid 30mg by 4.75%, and Wellbutrin SR 150mg by 3.92%.  If I measure the inflation in months 2-7 after implementation of the Scheme, the mark-ups for

---

[1] Table 1 is attached hereto as Exhibit A.

these five drug/dosages increased by the following amounts: 4.04%, 4.31%, 4.52%, 4.86% and 3.94%.

With each increase in WAC after January 2002 through the end of 2004 for these five drug/dosages, reimbursement rates (AA) increased by the amount of the WAC *plus the incrementally inflated mark-up induced by the Scheme*. The pattern of these increases is summarized on a monthly basis in Figures 1.a)-1.e) and for each of five six-month periods after January 2002 in Table 1. In both cases, *there is evidence of a uniformly inflated mark-up over two years. There is no mathematical or economic evidence of a push-back or mitigation of the inflation*.[2]

Further Dr. Hartman has done an analysis of the PBM industry in the context of the issues in this case which present a far different motivation for PBMs than that of AWP.[3] He has uncovered evidence as to why PBMs did not inform TPPs of the Scheme or claw back the price increase. The essence is as follows: PBMs make more money on the spread via their mail order business than they do from TPPs, hence they had no motive to renegotiate.[4] Indeed, plaintiffs hope to provide Dr. Hartman and this Court with a document produced by ESI in the ESI MDL, withheld in this case, that is a complete and shocking refutation of McKesson's argument that TPPs were motivated to recoup the increase for their clients which resulted in widespread renegotiations.

Added to this new work is the report of Dr. McDonough, a pharmacy benefits consultant, that was also served on September 14, 2008. Dr. McDonough was involved in several of the contracts McKesson claims were "renegotiations reacting to knowledge of the Scheme." She will refute such knowledge existed as to these contracts or that she saw any evidence of renegotiations based on the knowledge of the Scheme during the class period. Dr. McDonough also explains that the average PBM contract is three years in length and that, even if a TPP was

---

[2] Expert Report of Raymond S. Hartman at ¶¶ 32-33 (emphasis in original).

[3] Attachment E to the Hartman Expert Report attached hereto as Exhibit B.

[4] Attachment E at ¶¶ 18-21.

aware of the Scheme, and happened to be at the end of a contract term, it would take a

considerable amount of time to put together an RFP, negotiate new contract terms and ultimately

change reimbursement amounts.

Based on the foregoing, plaintiffs believe the Court will accept, after hearing the

evidence, the TPP aggregate damage model for the entire Class.  Alternatively, the Court can

choose to cut damages two years after the Scheme was implemented.  The Court might find two

years as an appropriate class period as it took Blue Cross of California, one of the few who

discovered the price hike (as opposed to the Scheme itself), two years to mitigate.  Dr. Hartman

has modeled damages year by year.[5]

**B.        The Scope of the Trial**

Plaintiffs believe the trial should include all classes.  Since this is a bench trial there is no

need to repeat the trial for the TPPs at a later date.  If the Court ultimately rejects the aggregate

damage model the TPP class will still benefit from the finding of liability and causation.  As the

Court recognized, when the switch was flipped and prices increased, all contacts were impacted

for some period of time.  8/27/07 Order at 24.  Thus, if no damages are awarded due to the

aggregation/renegotiation issue, at least the TPPs will have the benefit of a liability verdict.

Those that choose to then file damage claims could do so and would not have to prove liability

and impact again.

**C.        The Usual and Customary Class**

After the Court's order dropped a footnote excluding U&C payors from the Class,

Dr. Hartman and Class Counsel began working on the issue of whether U&C consumers should

be excluded from the Class.  Dr. Hartman opines that this class was equally impacted, suffered

damages and comprised the most vulnerable group.  Dr. Hartman thus opines:

---

[5] *See* Ex. C hereto, Summary of Damages By Year from Hartman Report.  If the Court rejects
the full Class Period or two year period, Hartman has calculated damages for one year.

Upon reviewing the Court's order regarding usual and customary (U&C) charges, I raised this issue with class counsel.  There is no doubt in my mind that customers paying U&C were impacted and my original class certification analysis implicitly included such customers.  It was not until the Court flagged this issue that I realized the definition of the Class did not include such class members, as I believe it should have.  I have demonstrated in my March 2007 Declaration that well-recognized sources of pharmaceutical industry data have documented that U&C payments by uninsured cash payers are, on average, related to and greater than AWP over the Class Period.  These sources can be used to calculate how U&C payments have been related to AWP in a formulaic way.  Therefore, as a matter of economics, uninsured cash payers were impacted, injured and damaged on a Class-wide basis by the inflation of AWP.  Indeed, the bulk of consumer damages are in this group, and these are the most vulnerable of payors.  I address the issue of the relationship of U&C payments to AWP in greater detail in Attachment F, Section IV.  [Expert Report of Raymond Hartman at ¶ 10.]

The GAO took note of the price increase to this class, although it did not know the cause was the McKesson-FDB Scheme:[6]



Annual Percentage Change in Average Usual and Customary
Prices for Drugs Frequently Used by Medicare Enrollees,
January 2000 through June 2004

Source: GAO analysis based on data from PACE, EPIC, and BCBS FEP.

Notes:  Prices from PACE and EPIC are for 77 prescription drugs frequently used by Medicare enrollees in BCBS FEP in 2003. Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

*The change in average usual and customary prices from January 2004 through June 2004 is extrapolated as an annual percentage change.

---

[6] GAO Report is attached hereto as Exhibit D.

- 4 -

Thus plaintiffs propose filing a motion to add this class of most vulnerable and clearly impacted consumers.  Only limited discovery will be required and such discovery can be completed rapidly.  It comprises of obtaining the data from Verispan, a company partially owned by McKesson.

Plaintiffs therefore have allotted time to file a supplemental class motion for this class.

**D.     An Alternative is a Two Day Evidentiary Hearing on Class Certification**

The Court's ruling on the aggregate damage issue and the duration of the Class is enormous.  As an alternative to deciding this in the context of a trial, plaintiffs suggest a two day evidentiary hearing in December.  The experts would each have three hours and the Court could inquire as well.  After this presentation, the Court would be in a better position to decide the aggregate damage issue for TPPs.

**E.     The Proposed Schedule**

Plaintiffs believe the case should be trial ready for a bench trial of all Classes by May 2008.  Plaintiffs' proposed schedule is as follows:

| 1. | Plaintiffs' Expert Report | 9/14/07 |
|---|---|---|
| 2. | Defendants' Expert Report | 11/2/07 |
| 3. | Plaintiffs' Experts' Reply | 11/30/07 |
| 4. | Motion for Class Certification on U&C, not to exceed ten pages | 12/1/07 |
| 5. | Summary Judgment Motions | 12/3/07 |
| 6. | Opposition to U&C Class Motion not to exceed ten pages | 1/4/08 |
| 7. | Reply on U&C Class Motion not to exceed ten pages | 1/21/08 |
| 8. | Summary Judgment Opposition | 1/11/08 |
| 9. | Summary Judgment Reply | 1/31/08 |

| 10. | Summary Judgment Hearing | 2/26, 27, 28 or 29 |
| 11. | Trial | 5/1/08-5/9/08 |

DATED:  September 19, 2007

By **/s/ Steve W. Berman**

    Steve W. Berman
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Ed Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 N. Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile: (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson, Esq.
Edelson & Associates, LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 6 -

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13  197005 V1

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on September 19, 2007.


  /s/ Steve W. Berman_____
Steve W. Berman

# EXHIBIT A

**Table 1**
**Summary of the Scheme Impact for Selected Drugs and Strengths Identified by Dr. Willig (%)**

|  | Lipitor 10MG | Lipitor 20MG | Plavix 75MG | Prevacid 30MG | Wellbutrin SR 150MG | All 4 Drugs |
|---|---|---|---|---|---|---|
| **Comparing the Average of the 6 Months Prior to Date of Markup to the Average of the 1-6 Months After the Date of Markup** | | | | | | |
| Change in AA/WAC | 3.94 | 4.22 | 4.38 | 4.75 | 3.92 | 4.24 |
| Percent Increase in AA/WAC | 3.43 | 3.74 | 3.83 | 4.20 | 3.40 | 3.72 |
| | | | | | | |
| **Comparing the Average of the 6 Months Prior to Date of Markup to the Average of the 2-7 Months After the Date of Markup** | | | | | | |
| Change in AA/WAC | 4.04 | 4.31 | 4.52 | 4.86 | 3.94 | 4.34 |
| Percent Increase in AA/WAC | 3.52 | 3.82 | 3.95 | 4.30 | 3.42 | 3.80 |
| | | | | | | |
| **Comparing the Average of the 6 Months Prior to Date of Markup to the Average of the 7-12 Months After the Date of Markup** | | | | | | |
| Change in AA/WAC | 4.19 | 4.44 | 4.55 | 4.85 | 3.60 | 4.33 |
| Percent Increase in AA/WAC | 3.65 | 3.93 | 3.97 | 4.29 | 3.12 | 3.79 |
| | | | | | | |
| **Comparing the Average of the 6 Months Prior to Date of Markup to the Average of the 13-18 Months After the Date of Markup** | | | | | | |
| Change in AA/WAC | 3.77 | 4.49 | 4.40 | 4.62 | 4.03 | 4.26 |
| Percent Increase in AA/WAC | 3.29 | 3.98 | 3.85 | 4.08 | 3.50 | 3.74 |
| | | | | | | |
| **Comparing the Average of the 6 Months Prior to Date of Markup to the Average of the 19-24 Months After the Date of Markup** | | | | | | |
| Change in AA/WAC | 4.08 | 4.70 | 4.22 | 4.97 | 3.46 | 4.29 |
| Percent Increase in AA/WAC | 3.56 | 4.17 | 3.69 | 4.39 | 3.00 | 3.76 |
| | | | | | | |

35.     Finally, I pool monthly time series for all Appendix-A drugs to test the hypothesis of a systematic push-back or recoupment across these drugs.  I do the same for my sample of non-Appendix-A drugs.[29]  I find that if I assume that push-back is common across all drugs in each sample, there is a very small and at times statistically significant negative time trend, as I discuss in Attachment F.  However, standard statistical tests demonstrate that a common explanation of changes in d and df is rejected by the data.

---

[29]  The samples I have been able to use are discussed in detail in Attachment F.

# EXHIBIT B

**ATTACHMENT E**

**ATTACHMENT E**

**COMPETITION**

## I.  MCKESSON'S PARADIGM OF COMPETITION IGNORES MARKET REALITIES

1.      McKesson would like the Court to believe that the alleged fraud had no impact on the Class because competitive forces quickly eliminated any windfall conferred by the inflation of published AWPs.  In particular, McKesson's counsel argued as follows:

> "I want to rest on this proposition: When you get to the issue of impact, the question is, and you know this about the PBMs, the 800-pound gorillas: There is vigorous competition among them. Dr. Hartman, he may be smart, but he's wrong about the absence of vigorous competition. Dr. Berndt is correct. They are going to pass that money back to the TPPs, sure as shooting, just as Dr. Berndt said they would, and that's the final point."[1]

2.      In essence, McKesson asserts that PBMs compete so aggressively, or so "fiercely,"[2] for TPP business that they could not afford to retain, or to allow the retailers in their networks to retain, the windfall profits that resulted from the alleged fraud by FDB and McKesson.

3.      The notion that competition will chase out all excess profits may be appropriate for a commodity market, such as steel or agricultural products, but is wholly inappropriate to the markets at hand.  To explain why PBM competition does not dissipate the profits that PBMs and retailers earn as a result of inflated AWPs I appeal both to economic theory and empirical evidence.

4.      From a theoretical perspective, there are several key aspects of PBM competition that together constrain the competitive performance of the market.  First, the PBMs and their client TPPs that are most informed and capable of competing are typically large buyers; each set has some market power.  This implies that the relationship between the TPPs and the PBMs is one of bargaining rather than a competitive market solution where the PBMs are "price takers".  Moreover, this bargaining is undertaken in an environment of asymmetric information that favors the PBMs.  Any analysis and conclusion about the impact of the fraud based on competitive market reasoning is therefore at odds with standard economic theory.

## II.  BARGAINING MODEL UNDER ASYMMETRIC INFORMATION

5.      The competitive market logic that McKesson would like the Court to accept is as follows: buyers (here TPPs) shop on the basis of price and only need to know the price at which the seller offers the product (or service) and competition among sellers should drive prices down to long-run average costs.  ***This reasoning is not correct in***

---

[1] *Motion/Status Hearing*, p. 48.

[2] *Memorandum and Order*, p. 4.

***bargaining models that better describe the relationship between TPPs and PBMs.***
In a Nash or Roth-Nash model of bargaining, for example, the "reservation" position (the
market position a party could achieve if no agreement were reached) is relevant to
determining the outcome of a bargain. Here, if a TPP bargaining with a PBM believed
the PBM were forgoing profits of X by not striking a deal, the outcome would be
different than if the TPP thought the PBM were forgoing profits of 10X. In particular,
the TPP would bargain more aggressively if it thought the PBM had more to lose. Thus,
to the extent that the level of overall profits that a PBM will earn on a contract is
unobservable, the PBM can negotiate a more favorable contract, and even in the presence
of competition, can earn substantial margins. ***Thus, it is in the PBMs self-interest to
keep unobservable, or to hide, an increase in profits due to a particular event or set
of events, when those profits are being earned at the expense of TPPs, which is the
case here.***[3]

6.      McKesson's counsel further claim that the TPPs would have offset the sudden
increase in AWPs through other features of the contract (in particular, increased
discounts); this assertion is also flawed. If PBMs operated in a "fiercely" competitive
market, a "participation constraint" (e.g., a zero, or fixed profit constraint that would be
necessary to induce the PBM to sign the contract) would indeed imply that higher net
payments in one part of a contract would be compensated for by lower payments in
another.

7.      In a bargaining situation, this is not true. A new source of hidden profits, as
alleged in this matter, would effectively change the bargaining results of the two parties;
it would alter the division of the surplus between the two parties in bargaining (using the
Roth-Nash model described above). Therefore, McKesson's actions to increase the
spread to retailers would not be compensated for by discounts elsewhere but instead will
result in higher net payments by TPPs (and harm to Class members).

8.      The foregoing theoretical discussion of bargaining matches closely the
institutional realities of the PBM market. Generally, TPPs hire PBMs through a request
for proposal (RFP) process to undertake a task on their behalf – to manage their
pharmacy benefit. While the TPPs can observe what their contracted rates are as a
function of AWP as well as the total amount they are spending once the contract is in
place, they cannot observe numerous dimensions of the tasks undertaken by the PBMs.
For example, TPPs cannot observe the magnitude of rebates (or other payments) that the
PBM earns from pharmaceutical manufacturers related to formulary status and market
share of various brand name drugs, nor can they observe how aggressively the PBM
promotes generic substitution. Likewise, unless the TPPs somehow knew how to track
AWP and WAC prices over time for the drugs at issue, they could not observe the alleged
AWP inflation resulting from the Scheme. ***Discovery materials in this matter
demonstrate that very few TPPs track AWPs and WACs in this fashion.***[4] In light of

---

[3]  This fact is admitted by ESI internal strategic documents, presented at length in Attachment D, ¶¶ 12-14:
"The client [TPPs] will see an increased trend [cost] in direct relation to the increase in AWP. … The
client [TPPs] will see an increase in drug costs. Members will pay more for % copay plans, they will meet
their deductibles and caps sooner."

[4]  See Attachment D, ¶ 39.

the small percentage of total health care spending at issue and the numerous other factors that might push monthly drug spending up or down, even a sophisticated TPP would have had a difficult time determining whether such an observed increase was part of general health care spending growth, the reflection of new drug launches or seasonal increases in utilization. With thousands of drugs and millions of claims, TPPs faced an enormous monitoring problem concerning PBM and retailer behavior.

9.     Another institutional feature of the PBM service market that causes a departure from the frictionless competitive ideal held out by McKesson is the fact of switching costs. There are fixed costs associated with putting out an RFP, evaluating bids, and in the event of a switch, disseminating new information to members and establishing protocols for electronic data interchange. PBM contracts are therefore typically long term, which softens any price competition that might arise between PBMs. This notion of competition is analogous to that observed in physician markets, where doctor-patient relationships inhibit patient willingness to shop around for better prices or quality. Such "monopolistic" competition, as it is referred to in the economics literature, permits PBMs (like physicians) to maintain high profit margins even where there is a low level of market concentration.

## III.    PBM PAYMENTS, HENCE INCENTIVES, ARE DIRECTLY LINKED TO AWP

10.     The second theoretical reason to doubt that PBM competition could defeat the alleged fraud is the manner in which PBMs are paid. As understood by this Court, the allowable amounts public and private insurers reimburse PBMs for branded pharmaceuticals are related formulaically to AWP. As a result, PBMs can profit *in their pharmacy benefit management line of business* from increased AWPs as follows.

   a) PBMs negotiate contracts with third-party payers (TPPs) and with retailers regarding reimbursement rates paid **by** TPPs and paid **to** retailers. The PBMs are the middlemen and benefit from that position. These negotiated reimbursement rates are tied to the AWP (or another list price formulaically related to AWP).

   b) The difference between what PBMs pay retailers and what they are paid by TPPs is the "retail spread," which is a function of AWP. Suppose, for example, that a PBM reimburses its retailers AWP-15% and is reimbursed by a TPP at AWP-13%. In this hypothetical case, the retail spread is 2% of AWP.

   c) As a result, PBMs benefit from any increase in AWP – the higher the AWP of a drug, the larger the absolute dollar spread. Therefore, all things equal, PBMs will have an incentive to allow AWP inflation to go unnoticed by the TPPs.

11.     More importantly, the calculations above reflect payments to an independent PBM for drugs dispensed through their retail network pharmacies. However, many PBMs, particularly the largest PBMs that were the most likely to know of the impacts of the Scheme, are often divisions of health care industry conglomerates, which own PBMs, mail order and retail pharmacies. *When a PBM is affiliated with a mail-order pharmacy and/or a retail pharmacy (e.g., ESI, Caremark and Medco Health; see Table E-1), the PBM affiliate earns the entire retail margin increased by the Scheme*

*and faces the same incentives as the retailers who conspired to induce and perpetuate the alleged fraud.*

**IV.    EMPIRICAL EVIDENCE ON PBM COMPETITION AND COMPETITIVE OUTCOMES**

12.    The theory described above and framed in the context of key institutional features of the PBM market is supported by the empirical evidence. I describe four major categories of evidence that definitively controvert the assertion that PBMs compete to reduce TPP spending on prescription drug spending.

### A.  The Changing Composition and Nature of Services Offered by PBMs

13.    In a recent report in *Managed Care Magazine*, one observer described the evolution of PBM services and competition as follows:

> "Initially, the goal of the PBM was to simplify the administration of benefits for health plan members and to provide some cost-management services. … In the early 1990s, as electronic point-of-sale (POS) claims processing became prevalent, PBMs began to shift their dependence on revenue from claim processing to other sources, including manufacturer rebates, selling data to manufacturers, and selling mail order and retail drugs. PBMs found that health plans and employers were more interested in lower administrative fees, because the result of pharmacy-cost reduction appeared to be too difficult to measure. This practice created a price war among PBMs for business from large health plans and resulted in a perception of POS pharmacy claims as a commodity….Gradually, the PBM industry shifted to aggressive strategies of seeking revenues from alternative sources to compensate for selling benefit administration services at lower costs. PBMs that could not buy or build mail order capabilities quickly turned to other revenue sources. These included the sale of claims data to drug manufacturers and repricing of the retail network, known as spread pricing (fees gained through continual negotiation of lower rates with the pharmacy network that are not passed on to the health plan or employer). Today, revenue from POS claims processing provides little to no margin for PBMs."[5]

14.    The quotation clearly identifies those PBM functions subject to competition, perhaps even "fierce" price competition – the vigorous competition for claims processing and other administrative services. However, the "price war among PBMs for business" is not a competition on the margin of total pharmacy benefit costs as McKesson would suggest, but only on the narrow margin of administrative fees "because the result of pharmacy-cost reduction was too difficult to measure." The inability of health plans to

---

[5]  See: Steve Martin, "PBM Industry Today: Who's Managing Drug Costs?", *Managed Care Magazine*, Dec. 2001, http://www.managedcaremag.com/archives/0112/0112.pbmfuture.html, accessed August 29, 2007.

accurately measure a PBM's reduction in pharmacy cost makes it impossible for this to be the basis for the same degree or type of competition.

### B. Changing Market Structure and Conduct

15.     In spite of this business evidence, McKesson still argues that PBM conduct is **competitively "sufficient,"** based in part upon the analysis of Dr. Berndt and indirectly the FTC.[6]   However, **reliance upon a single FTC report is risky**, since other FTC studies have come to the opposite conclusion.   For example, the FTC has opined elsewhere that PBMs are characterized by a lack of sufficient competition and a lack of transparent information.[7]   This latter FTC opinion is certainly more in tune with the business realities identified above (¶¶ 13-14) than is the FTC study cited by Dr. Berndt.

> "Competitive concerns have arisen in the PBM market – a highly concentrated industry in which the four largest firms hold about a combined 80% market share.  The market for full-service PBM providers capable of bidding on Medicare contracts is even more concentrated.  Moreover, concentration in the market has increased substantially over the past decade.  Substantial costs have prevented any successful entry into the PBM market for quite some time, and substantial switching costs create obstacles for plan sponsors to change PBMs.
>
> The situation is one in which PBMs can act opportunistically – easily increasing prices or decreasing service.   Indeed, the Federal Trade Commission (FTC) placed the two largest PBMs – Merck and PCS – under regulatory consent orders to prevent opportunistic conduct that would harm consumers.[8]   The FTC found [among other things] that 1) there was a national market of PBMs with very few competitors; 2) PBMs had the ability and incentive to engage in exclusionary conduct; [and] 3) there was the potential for collusion among PBMs….
>
> PBMs consistently decline to provide systematic and complete payment information to their plan sponsors."

If the FTC is a reliable authority on PBM market structure, conduct and workable competition, earlier opinions by the FTC stating that PBMs are not competitive should be given weight equal to those FTC opinions suggesting that competition is sufficient.

16.     While I have noted above that lack of concentration does not, in the presence of switching costs, necessarily yield competitive behavior, it is nonetheless of interest to examine this dimension of PBM market structure.  Table E.1 presents information for the top 10 PBMs, their corporate identities and their market shares over 2002 to 2005.  Table

---

[6]  At ¶ 162 and footnote 213, Dr. Berndt in his February 2005 Report to this Court claims that "the FTC has taken a strong position believing that competition among PBMs is sufficient."

[7]  David A. Balto, "Competitive Concerns and Price Transparency in the PBM Market," *Update Journal of the Food and Drug Law Institute*, September/October 2003, p.35-36.

[8]  Eli Lily, 61 Fed. Reg. 31, 117 (FTC July 31, 1996); Merck & Co., 63 Fed. Reg. 46,451 (FTC Sept. 1, 1998).

E.1 also identifies the top 50 PBMs in 2002. Table E.1 demonstrates that the concentration of the top 10 increases somewhat with mergers and acquisitions. The sum of the market shares of the top 10 increases from 72.6% in 2002 to 76.1% in 2005.

17.   More importantly, the horizontal mergers, which have increased the market concentration of the top 10 modestly, have been accompanied by considerable vertical integration over the past decade. Particular concern has been expressed over PBMs becoming vertically integrated with mail order or retail pharmacies.[9] Table E.1 identifies where possible all horizontal and vertical mergers and acquisitions of relevance.

### C.  Sources of PBM Revenues and the Nature of Competition

18.   The vertical consolidation reflected in Table E.1 is corroborated by data on sources of revenue that PBMs report publicly. Figures E.1 and E.2 display the sources of revenue for Medco Health Solutions (Medco) and Express Scripts, Inc. (ESI). For Medco, net revenues associated with retail sales is the largest source of revenue, followed by mail order. Combined, net revenues associated with product sales are approximately 100 times larger than revenues obtained through service fees (e.g., to client TPPs). Moreover, client (TPP) service fees are only about half of all service fees, with the remainder derived from pharmaceutical manufacturers. Similar patterns are apparent in the ESI data, where service fees represent less than 1% of net revenues. ***Given the enormous base of product-related revenues relative to other sources of revenues, it is simply not credible to suggest that PBMs would be moved to dissipate the alleged markup (of approximately 4%) on drug reimbursement and the resulting increase in profit of "more than 3 times the profit as before."***[10]

---

[9]  For one recent and telling example, in "CVS, Caremark to Merge, Create Drug Giant -- Analysts question whether $21b deal will aid consumers," *Boston Globe,* November 2, 2006, Jeffrey Krasner states the following:

"CVS Corp. of Woonsocket, R.I., the nation's largest drugstore chain, said it plans to buy pharmacy-benefit manager Caremark Rx. Inc. of Nashville in a $21 billion all-stock deal, creating a drug distribution powerhouse. But analysts wonder whether the merged entity will use its purchasing clout to benefit consumers. 'Caremark and CVS combined have the power to negotiate better prices from the drug manufacturers. The question is: Will they pass those savings on to consumers?' said Hussain Mooraj, life sciences research director at AMR Research in Boston. 'If you're a payer for healthcare, you've got to wonder if you're going to be getting as good a deal with CVS' as with other stores, said Richard Frank, Professor of Healthcare Policy at Harvard Medical School. 'I'd think twice about doing business with them.' ….   Pharmacy-benefit managers are drug industry middlemen who negotiate prices and supply drugs to large group of beneficiaries such as health plans, employers, and unions. Traditionally, [when they were independent of mail order and retail pharmacies] they have worked to cut the cost of drugs supplied by chains like CVS. … [With the merger], Caremark gives CVS a large mail-order pharmacy business. … CVS has grown rapidly through acquisitions. In 2004, it acquired about 1,200 Eckerd drugstores from that chain's parent, JC Penney Co. This year, it bought more than 700 stores from the Albertson's grocery chain. It has 6,200 stores in 43 states."

Going forward, the profits earned by these substantial mail order and retail pharmacy organizations from TPP payments certainly will be balanced against the amounts that the PBM can earn from these same TPPs. ***Returns to pharmacy will certainly blunt competitive behavior of the PBM (Caremark) on behalf of its client TPPs.***

[10]  *Memorandum and Order*, p. 8 (emphasis added).

---

19.     The lack of transparency that has characterized PBM financials and payer concerns about conflicts of interests inherent in the PBM business model precipitated Federal and State lawsuits directed at major PBMs including Medco and ESI.[11] Following a settlement of these matters, Medco released some additional information regarding sources of revenue and profits.  Medco's data show that even after the litigation (2004) it retained 40.5% of rebates.[12] A recent FTC analysis using confidential data on a sample of PBMs found similarly high average rebate retention rates with several companies retaining significantly more than half of rebates.  PBMs ability to retain such a large share of rebates suggests that PBMs do not in fact compete away excess profits from obscured revenue streams.

### D.  Measures of PBM Profits

20.     A final source of confirmation that PBMs did not eliminate the harm to TPPs from the AWP inflation comes from the PBMs' own reckoning of the impact the outcome of this litigation might have on profitability.  In its 2006 Annual Report, ESI noted the likely negative impact on profit margins that would come from FDB's possible reduction of AWPs – both in its mail order business and on the retail pharmacy side.  ***If reversing the fraud would reduce retail and mail-order profits, then by simple logic it must be true that the Class was harmed when the AWPs were inflated – and continued to be harmed until the point in time at which the inflation was removed***.

> *"Changes in industry pricing benchmarks could materially impact our financial performance.*
>
> Contracts in the prescription drug industry, including our contracts with retail pharmacy networks and with PBM and specialty pharmacy clients, generally use certain published benchmarks to establish pricing for prescription drugs. These benchmarks include AWP, average manufacturer price and wholesale acquisition cost.  Most of our client contracts utilize the AWP standard.
>
> Recent events have raised uncertainties as to whether payors, pharmacy providers, PBMs and others in the prescription drug industry will continue to utilize AWP as it has previously been calculated or whether other pricing benchmarks will be adopted for establishing prices within the industry.
>
> Specifically, in the recently announced proposed settlement in the case of *New England Carpenters Health Benefits Fund, et al. v. First DataBank, et al.*, Civil Action No. 1:05-CV-11148-PBS (D. Mass.), a civil class action case brought against First DataBank ("FDB"), one of several companies that report data on prescription drug prices, FDB has agreed to reduce the reported AWP of certain drugs by four percent. At this time the proposed

---

[11]   See p. xvii and footnotes 10 & 11 to that page in Federal Trade Commission, "*Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies,*" August 2005.  As with many FTC reports, I note that conflicting interpretations of the results of this report remain to be settled.

[12]   Lawrence W. Abrams, "Quantifying Medco's Business Model", 4/5/2005. http://www.nu-retail.com/quantifying_Medco_business_model.pdf, accessed September 3, 2007.

settlement has received preliminary but not final court approval. We cannot predict the outcome of the case or, if the settlement is approved, the precise timing of any of the proposed AWP changes.

In the absence of any mitigating action on our part, the proposed reduction in FDB's AWP would have a material adverse effect on the margin we earn on home delivery transactions. It may also create disruption in our retail networks due to the adverse impact on AWP-based retail pharmacy pricing. However, most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse effect of this proposed reduction in FDB's reported AWP."[13]

21.     The last paragraph of this notification bears particular scrutiny. It essentially states that ESI, which had clearly profited from the increases in Spread resulting from the Scheme simply would not allow those profits to be taken away: ***"Most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse effect of this proposed reduction in FDB's reported AWP."*** This certainly makes perfectly clear which entity has the bargaining strength in the relationship between PBMs (here ESI) and their TPPs. In light of this confident assertion, McKesson's and Dr. Willig's assertion that TPPs had the competitive power to push-back the impacts of the Scheme is simply not credible.

## V.     CONCLUSIONS

22.     McKesson's expert and counsel suggest that the "invisible hand" of competition would wipe away any trace of impact left by the alleged fraud.  These claims do not withstand scrutiny.   They are supported neither by economic theory nor empirical evidence.  Specifically,

   a) The evidence put forward to date demonstrate that only two of all PBMs in the country knew of the increased Spreads induced by the Scheme; see ¶ 22 of Attachment D.   These two PBMs are among the three largest and most sophisticated in the country.

   b) Only one, ESI, of these two PBMs exhibited a response directed at its TPP clients. ***No other PBMs exhibited any response directed toward its client TPPs.*** Furthermore, ESI did not demonstrate a willingness or an effort to renegotiate the terms of its contracts with its client TPPs.  Instead, it sent out a vanilla letter saying that the Spread had increased for "certain drugs."  ESI did not say how many drugs constituted "certain drugs;" ESI directed its staff not to proactively offer any relevant information unless asked by TPP clients; ESI did not propose specific methods by which the TPPs could mitigate the impacts of the Spread.

   c) This lack of any revealed response by PBMs should not be surprising.  First, most PBMs did not know of the impacts of the Scheme.  Second, those that did know

---

[13]  See Express Scripts, Inc., Annual Report 2006, p. 21.

of the impacts of the Scheme and/or were most likely to know were the largest PBMs. The three cited by McKesson were the three largest in the country in 2005; see Table E.1. These large PBMs are precisely those most likely to be part of large health care conglomerates, which offer PBM services, mail-order pharmacy and at times retail pharmacy, among other services.

d) ***The corporate entities owning these PBMs benefited from the Scheme***, as the internal strategic documents of ESI demonstrate; see ¶¶ 12-14 of Attachment D. As Figures E.1 and E.2 demonstrate, Medco Health and ESI earn the majority of the revenue (hence profit) from mail order and network pharmacy lines of business.[14] Since the Scheme was estimated by McKesson to increase profit on retail pharmacy sales (and by inference profits on mail-order pharmacy sales) by "3 times", it is not credible to argue that PBMs (and their corporate owners) would compete away those profits in an attempt to add, on the margin, to their already substantial number of client TPPs and number of insured lives. If they did behave in this fashion, there would certainly arise the possibility of shareholder litigation for mismanagement. But the shareholders need not worry; as made clear by PBM statements to their shareholders (e.g., ESI's Annual Report, footnote 13 above) the corporate entities that benefited from the Scheme did not intend to let those benefits be taken away, either through competition or legal settlement.

e) Put simply, the Court must carefully reflect upon what it believes to be the notion of "fierce competition." In undergraduate textbooks on microeconomics, "fierce competition" means that many competitors in a horizontal market for a single simple product compete until they just cover costs; that is, until they compete away "excess profits."

f) That notion of "fierce competition" is simply not appropriate here. Competition is much more nuanced. It involves balancing profits earned by health care conglomerates across a variety of related lines of business in a variety of markets. The competition in each of these markets is constrained by institutional realities, bargaining and Roth-Nash equilibria. A PBM, and its corporate ownership, will "compete fiercely" to maximize profits across all lines of business. In the case of those large vertically-integrated PBMs that knew of the impacts of the Scheme, profit maximization resulted from taking the profits induced by the Scheme at the pharmacy rather than giving them up in an effort to gain (or retain) a few TPPs.

---

[14] This has been noted more broadly. As I have cited elsewhere, "Examination of the sources of revenue for PBMs reveals that PBMs make more money from manufacturer revenue than they make from employer/client fees. Other major sources of revenue include revenue from pharmacy discounts not passed on to the end payer. Some analysts have raised concerns about the potential conflict of interest faced by PBMs with more revenue from drug manufacturers [and pharmacies] than from the employer or client. Another potential conflict of interest results from a PBM promoting their own pharmacy (a mail order pharmacy) while at the same time reviewing prices and processing prescription claims of community pharmacies." See Stephen W. Schondelmeyer and Marion V. Wrobel, "Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices," Final Report, Abt Associates Inc., Prepared for Centers for Medicare and Medicaid Services, August 30, 2004, p. 13.

---

g) These theoretical and empirical analyses are buttressed by the econometric analysis of reimbursement data that I have put forward in Attachment F. If the competition were as fierce as McKesson is trying to convince the Court, we should see push-back, either quickly or within a year or two of the implementation of the Scheme. ***We do not see push-back through the end of my data, November 2004.***

TABLE E.1
LIST OF PBMs, 2002 AND 2005

| Name | 2005* | | 2002** | | Owns Mail Order | Owns Retail Pharm | Notes on Mergers & Acquisitions |
| | Rank | Market Share | Rank | Market Share | | | |
|---|---|---|---|---|---|---|---|
| Caremark Rx, Inc. | 1 | 19% | 5 | 5.2% | Y | Y | Retail acquired through CVS merger 2006 [1] |
| Medco Managed Care | 2 | 13% | 2 | 14.1% | Y | Y | Merck spin-off 2003 [2]; Owns specialty pharmacy [3] |
| Express Scripts, Inc. | 3 | 11% | 3 | 10.9% | Y | Y | Owns specialty pharmacies [4] |
| WellPoint Pharmacy Management | 4 | 7% | 4 | 7.0% | Y | | Bought PrecisionRx in 2000, and was purchased by Anthem in 2004 [5] |
| PharmaCare Management Services, Inc. | 5 | 6% | 10 | 2.6% | Y | Y | Wholly owned subsidiary of CVS [6] |
| MedImpact Healthcare Systems, Inc. | 6 | 6% | 6 | 5.2% | | | |
| Argus Health Systems, Inc. | 7 | 5% | 7 | 5.2% | | | |
| RxStrategies, Inc. | 8 | 3% | N/A | N/A | | | |
| ACS State Healthcare | 9 | 3% | 16 | 1.4% | | | |
| Health Trans | 10 | 3% | N/A | N/A | | | |
| AdvancePCS | | | 1 | 16.3% | Y | Y | Purchased by Caremark in 2003 [7] |
| Eckerd Health Services | | | 8 | 3.5% | Y | Y | Purchased in a two-way deal by Caremark and Canadian Jean Coutu Group (owners of Brooks) in 2003 [8] |
| First Health Services Corporation | | | 9 | 2.7% | | | |
| WebMD Corporation | | | 11 | 2.6% | | | |
| Aetna US Healthcare Pharmacy Management | | | 12 | 2.4% | | | |
| Pharmacy Services Group | | | 13 | 2.4% | Y | | Owns mail order service called RxUniverse [9] |
| ScripSolutions | | | 14 | 2.0% | Y | Y | Owns specialty pharmacy [10] |
| National Prescription Administrators, Inc. (NPA) | | | 15 | 1.6% | Y | | Bought by Express Scripts (ESI) in 2002 [11] |
| Prescription Solutions | | | 17 | 1.2% | Y | | Owned by UnitedHealth Group [12] |
| Health Information Designs, Inc. | | | 18 | 1.1% | | | |
| RxAmerica | | | 19 | 1.0% | Y | Y | Owned by Longs Drug Stores Corporation [13] |
| Anthem Prescription Management, L.L.C. | | | 20 | 1.0% | Y | | Changed name to WellPoint after acquiring WellPoint in 2004 [14]. |
| Prime Therapeutics, Inc. | | | 21 | 0.9% | Y | | Own mail order service called PrimeMail [15] |
| Managed Pharmacy Benefits Inc. (MPB) | | | 22 | 0.8% | | Y | Owned by Medicine Shoppe International, Inc [16] |
| RxPRIME | | | 23 | 0.7% | Y | | Owned by CIGNA [17] |
| US Script | | | 24 | 0.7% | Y | | In January 2006 Centene Corp., a managed care provider, purchased US Script [18] |

| Name | 2005* | | 2002** | | Owns Mail Order | Owns Retail Pharm | Notes on Mergers & Acquisitions |
| | Rank | Market Share | Rank | Market Share | | | |
|---|---|---|---|---|---|---|---|
| AddHealth, Inc. | | | 25 | 0.7% | | | |
| National Medical Health Card Systems | | | 26 | 0.5% | Y | Y | Owns specialty pharmacy [19] |
| Health Resources, Inc. | | | 27 | 0.5% | | | |
| Walgreens Health Initiatives | | | 28 | 0.5% | Y | Y | [20] |
| Systemed, L.L.C | | | 29 | 0.4% | Y | Y | Subsidiary of Medco Health [21] |
| RESTAT | | | 30 | 0.4% | | | Owned by the F. Dohmen Company [22] |
| Pharmaceutical Care Network (PCN) | | | 31 | 0.4% | | | Bought by National Medical Health Card Systems, Inc. in March 2005 [23] |
| WMS Prescription Drug Plans | | | 32 | 0.3% | Y | Y | Wal-Mart mail-order pharmacy services are owned and operated by Walmart [24] |
| Certifax Pharmacy Services | | | 33 | 0.3% | | | Mail-order service bought by Walgreens in 1999 [25] |
| Pequot Pharmaceutical Network[R] (PRxN[R]) | | | 34 | 0.3% | Y | | Wholly owned by Mashantucket Pequot Tribal Nation [26] |
| IPS (Immediate Pharmaceutical Services) | | | 35 | 0.3% | Y | | [27] |
| SMCRx | | | 36 | 0.3% | Y | Y | Subsidiary of Safeway [28] |
| Inteq Group Inc., The | | | 37 | 0.3% | Y | | [29] |
| Northwest Pharmacy Services (NWPS) | | | 38 | 0.3% | | | |
| Claimspro Management Services, Inc. | | | 39 | 0.3% | Y | Y | Purchased by Pharmacare (CVS) in 2007 [30 |
| National Pharmaceutical Services | | | 40 | 0.3% | Y | | Owned by Pharmaceutical Technologies [31] |
| Prime Med Pharmacy Services, Inc. | | | 41 | 0.2% | | | Subsidiary of Med Diversified Inc. [32] |
| Centrus-Pharmacy Benefits Management | | | 42 | 0.2% | | | Bought by National Medical Health Card in 2003 [33] |
| United Provider Services | | | 43 | 0.1% | | | Subsidiary of Pharmacare (CVS) [34]. |
| FFI Health Services | | | 44 | 0.1% | | | Acquired by Advance Paradigm, Inc. in 2000 [35] |
| Pharmacy ADVANTAGE System | | | 45 | 0.1% | | | Changed name to Catalyst Rx [36] |
| Universal Rx | | | 46 | 0.1% | | | |
| Medical Matrix Inc. | | | 47 | 0.1% | | | |
| Pharmacy Provider Services Corporation | | | 48 | 0.1% | | | |
| PharMerica | | | 49 | 0.1% | | | Kindred Healthcare Inc. and AmerisourceBergen merged creating PharMerica in July 2007 [37] |
| Maxor National Pharmacy Services Corporation | | | 50 | 0.1% | Y | Y | [38] |

**Sources:**

* "Pharmacy Benefit Management: PBM Market Share," AIS Market Data, 2006, http://web.archive.org/web/20060616055435/aishealth.com/MarketData/PharmBenMgmt/PBM_market01.html, Accessed on July 11, 2007.

** Atlantic Information Services, "A Guide to Drug Cost Management Strategies: Recent Results, Current Practices, Future Plans," 2002, p. 355-6.

[1] Sandra Guy, "Walgreens shrugs as rival CVS buys Caremark for $21.3 billion", *Chicago Sun Times*, Nov.2, 2006, http://findarticles.com/p/articles/mi_qn4155/is_20061102/ai_n16831888, Accessed August 7, 2007.
[2] Merck website, "Important U.S. Federal Income Tax Information concerning the Medco Health Solutions, Inc. Stock Distribution", http://www.merck.com/finance/shareholders_letter.pdf, Accessed
August 8, 2007
[3] Medco acquired Accredo Health Group, one of the nation's largest specialty pharmacies in 2005. Accerdo Health Group website, "Investor Relations",
http://www.accredohealthgroup.com/investors/, Accessed on September 10, 2007.
[4] ESI acquired CuraScript, a specialty pharmacy, in 2004. In 2005, ESI acquired Priority Healthcare in 2005 and converted its name to CuraScripts after the purchase.
CuraScript website, "Who We Are," http://www.curascript.com/content/about_us.htm, Accessed August 13, 2007
"Express Scripts to Buy Priority Healthcare Corp. for 0.71 Times Revenue", Weekly Corporate Growth Report, Aug.1, 2005,
http://findarticles.com/p/articles/mi_qa3755/is_200508/ai_n14877578, accessed August 13, 2007
[5] Deborah Belgum, "WellPoint Out to Buy Online Drug Provider – Wellpoint Health Networks Inc. RxAmerica inc – Brief Article", *Los Angeles Business Journal*, Oct 23, 2000, http://findarticles.com/p /articles/mi_m5072/is_43_22/ai_66812215, Accessed July 13, 2007.
Julie Appleby, "$16.4 billion Anthem, WellPoint merger clears final hurdle", *USA Today*, November 2004. http://findarticles.com/p/articles/mi_kmusa/is_200411/ai_n8610332, Accessed August 7, 2007.
[6] PharmaCare website, "About us", http://www.pharmacare.com/about/index.jsp, Accessed July 13, 2007.
[7] Keith Russell, "Caremark/Advance PCS merger is complete", *Tennessean*, March 25, 2004, http://tennessean.com/business/archives/04/03/48811652.shtml?Element_ID=48811652, Accessed 08/08/07.
[8] Mark Albright, "Eckerd Buyout is Official", St.Petersburg Times, April 6, 2004, http://www.sptimes.com/2004/04/06/Business/Buyout_of_Eckerd_is_o.shtml, Accessed August 7, 2007.
[9] Pharmacy Services Group website, "Pharmacy Services", http://www.psgpbm.com/pharmservices/pharmservices.asp#mailorder, Accessed September 10, 2007.
[10] David Walker Jr., "Fully-integrated medical and pharmacy aligns incentives, improves outcomes; preventative medicine could evolve from the reactionary status quo to lower trend cost and provide more effective delivery. (The Pharmacy Benefit).(Industry Overview)", *Managed Healthcare Executive*, May 1, 2002, http://www.encyclopedia.com/doc/1G1-87351736.html, Accessed September 10, 2007.
[11] Express Scripts website, "Corporate Overview," Express-scripts.com, 2007, http://www.express-scripts.com/ourcompany/pressroom/corporateoverview/corporateOverview.pdf, Accessed July 13, 2007
[12] "PBM Mail Order Rx Services Are Expanding, But The Cost Savings Are Not Clear", *Drug Benefit News*, November 17, 2006,
http://www.aispub.com/DrugCosts/DBN_PBM_Mail_Order_Services_Expanding.html, Accessed September 9, 2007.
[13] RxAmerica website, "RxAmerica recognizes 10 years of success", February 3, 2005,

http://www.rxamerica.com/press_success.html, Accessed September 9, 2007.

[14] Anthem website, "Anthem Prescription Management is now WellPoint NextRx", 2007, https://www.wellpointrx.com/shared/noapplication/f0/s0/t0/pw_ad085303.pdf, Accessed August 7, 2007

[15] Prime Theraputics website, About Us: List of Services, http://www.primetherapeutics.com/aboutservices.htm, Accessed September 11, 2007.

[16] Express Scripts Inc, Annual Report (10-K), March 1, 2003, http://sec.edgar-online.com/2003/04/01/0000885721-03-000015/Section2.asp, Accessed September 10, 2007.

[17] "Company News; CIGNA Healthcare Buys Mail-Order Drug Company" *New York Times*, October 5, 1993, http://query.nytimes.com/gst/fullpage.html?res=9F0CE2DF103BF936A35753C1A965958260, Accessed September 11, 2007.

[18] US Script website, "History", http://www.usscript.com/history.html, Accessed September 10, 2007

[19] National Medical health Card Systems website, Corporate Background, http://www.nmhc.com/aboutUs/about_us.asp, Accessed September 10, 2007

[20] Walgreens website, "Cost savings and member support: Walgreens Mail Service Pharmacy", http://www.walgreenshealth.com/whc/clientPortal/mpharm/jsp/mpharm_home.jsp, Accessed September 10, 2007

[21] Medco website, "Making pharmacy work for plan sponsors with fewer than 15,000 employees", http://www.medco.com/medco/corporate/home.jsp?ltSess=y&articleID=CorpSystemed, Accessed September 11, 2007

[22] Restat website, "WE MAXIMIZE HEALTH BENEFIT VALUE", http://www.restat.com/information/index.cfm, Accessed September 10, 2007

[23] "NMHC Acquires Pharmaceutical Care Network; NMHC Continues Consolidation Strategy and Adds 1.3 Million Lives", *Business Wire*, March 5, 2004, http://findarticles.com/p/articles/mi_m0EIN/is_2005_March_7/ai_n11853265, Accessed September 10, 2007

[24] Wal-Mart website, "Mail Order Pharmacy", http://www.walmart.com/catalog/catalog.gsp?cat=538875, Accessed September 10, 2007

[25] "Certifax purchase bolsters Walgreen mail-order clout", *Drug Store News*, September 22, 1999, http://findarticles.com/p/articles/mi_m3374/is_15_21/ai_56082631, Accessed September 10, 2007

[26] Pequot website, "Fact Sheet About PRxN", http://www.prxn.com/AboutUs.aspx, Accessed September 10, 2007

[27] Health Executive website, "Corporate Spotlight: Immediate Pharmaceutical Services", http://www.healthexecutive.com/spotlights/feb_2006/sl_ips.asp, Accessed September 10, 2007

[28] SXC website, Press Release: "SYSTEMS XCELLENCE RENEWS ASP CONTRACT WITH SMCRx INC.", August 15, 2002, http://www.sxc.com/Downloads/Press/2002Press/August15.htm , Accessed September 10, 2007

[29] "National Medical Health Card Systems buys Texas firm", *Long Island Business News*, April 9, 2004,  http://findarticles.com/p/articles/mi_qn4189/is_20040409/ai_n10169693, Accessed September 12, 2007

[30] Phone Conversation with Claimspro Customer Service Center, Sept. 10, 2007

[31] Pharmaceutical Technologies website, "Smart Solutions", http://www.pti-nps.com/aboutus.aspx?pid=solutions, Accessed September 12, 2007

[32] Med Diversified, SEC 10-Q/A filling, September 14, 2001, http://sec.edgaronline.com/2001/11/15/0000912057-01-539984/Section2.asp, Accessed September 11, 2007

[33] National Medical Health Card Systems, SEC 10-K Filling, September 29, 2003, http://sec.edgar-online.com/2003/09/29/0000813562-03-000008/Section76.asp, Accessed September 11, 2007

[34] Better Living Now website, "Health Insurance Plans We Accept: United Provider Services" http://www.betterlivingnow.com/main/custsupport/insaddress.cfm?CLNT=018&GROUP=,

Accessed September 12, 2007

[35] Epocrates website, News Room: "Epocrates and Advance Paradigm, Inc. to Provide Formulary Data to Doctors via Mobile Devices", August 10, 2000, http://www.eppocrates.com/company/news/10037.html, Accessed September 11, 2007

[36] Georgia Partnership for Caring website, "What's New", http://www.gacares.org/what's_new.htm, Accessed September 10, 2007

[37] Reuters website, AmerisourceBergen Corp. Company Description, http://www.investor.reuters.com/business/BusCompanyFullDesc.aspx?ticker=ABC&symbol=ABC &target=%2fbusiness%2fbuscompany%2fbuscompfake%2fbuscompdescr, Accessed September 12, 2007

[38] Maxor website, "Welcome to Maxor Pharmacies", http://www.maxor.com/pharmacy/, Accessed September 10, 2007

FIGURE **E.1**

SOURCES OF NET REVENUES FOR MEDCO HEALTH SOLUTIONS



**Source:**

Medco Health Solutions Inc., 2005 Annual Report, p.22

**FIGURE E.2**
**SOURCES OF NET REVENUES FOR EXPRESS SCRIPTS, INC. (ESI)**



**Source:**

Express Scripts 2005 Annual Report, p. 43.

# EXHIBIT C

58.     Aggregate total damages are calculated using the IMS reimbursement data and the percentage mark-ups calculated above.  Figure F.5 demonstrates how total aggregate damages are allocated among those payer groups for whom impact and injury are clear and for whom damages can be apportioned (see also the notes to Exhibit F.3).  I attribute and calculate those damages as follows.  Total damages arise on reimbursement by TPPs, uninsured cash payers and Medicaid insureds.  I exclude damages under Medicaid.  However, I calculate damages to uninsured cash payers, because as a matter of economics, those payers were impacted and injured and their aggregate damages can be calculated.  I have discussed how those damages (U&C-based) are formulaically related to Scheme in ¶¶ 30.b) & 37 and footnotes 9 & 33 above.  Those damages account for 9.3% of the total.  78.8% of the total is accounted for TPPs generally, of which 74.4% is non-governmental.[51]  Of this remaining 74.4%, 87% have flat copays while 13% have coinsurance.  The Scheme will have had a *de minimis* effect on formulary placement; therefore, the flat copay amounts will not change.  The total damages will therefore have been borne by the TPPs and are compensable to the TPPs.  Of the 13% of TPPs with coinsurance, coinsurance accounts on average for 25% of the reimbursement.  Hence, 25% of these damages will have been borne by the consumers and are compensable to them; 75% of these damages will have been borne by the TPPs and are compensable to them.

59.     Using this attribution formulation and the other components of my model I have been able to decompose total damages into these constituent groups.  That allocation appears in Exhibits F.3.a-F.3.d and Tables F.2-F.4, in current and constant (June 2007) dollars.

**Table F.2: Summary of Damages Through March 2005**

**(all figures in millions $)**

| Class | Total Nominal Damages | Total Damages with Prejudgment Interest |
|---|---|---|
| Class 1: Consumers Paying Coinsurance | $188 M | $214 M |
| Class 2: Third-Party Payers | $5,437 M | $6,845 M |
| Proposed Class 3: Uninsured Cash Payers | $722 M | $822 M |
| **Total** | **$6,348 M** | **$7,880 M** |

---

[51]  4.4% of all TPP reimbursement reflects other government entities.

**Table F.3: Summary of Damages Through March 2004**

**(all figures in millions $)**

| Class | Total Nominal Damages | Total Damages with Prejudgment Interest |
|---|---|---|
| Class 1: Consumers Paying Coinsurance | $124 M | $142 M |
| Class 2: Third-Party Payers | $3,586 M | $4,614 M |
| Proposed Class 3: Uninsured Cash Payers | $476 M | $547 M |
| **Total** | **$4,187 M** | **$5,303 M** |

**Table F.4: Summary of Damages Through March 2003**

**(all figures in millions $)**

| Class | Total Nominal Damages | Total Damages with Prejudgment Interest |
|---|---|---|
| Class 1: Consumers Paying Coinsurance | $63 M | $73 M |
| Class 2: Third-Party Payers | $1,825 M | $2,399 M |
| Proposed Class 3: Uninsured Cash Payers | $242 M | $281 M |
| **Total** | **$2,131 M** | **$2,753 M** |

60.    A further adjustment to TPP damages could be made if the rebates received by TPPs increased as a result of the Scheme. Rebates to third-party payers are typically paid through PBMs in the form of access, administrative, performance and/or market share rebates. The rebate amounts are often determined as a percentage of manufacturers' list prices, either WAC or AWP. Rebates paid by manufacturers to PBMs are generally about 5% of drug spending.[52] However, not all rebates paid to PBMs flow through to the

---

[52]  See Kaiser Family Foundation, Prepared by Mathematica Policy Research, Inc., *The Role of PBMs in Managing Drug Costs: Implications for a Medicare Drug Benefit*, January 2000, p. 20 and Congressional Budget Office, *Prescription Drug Pricing in the Private Sector*, January 2007, p. 16. See also David H.

TPP.  Although the amount of rebate pass-through, i.e. the percentage of rebate dollars passed through to the TPP, is typically a closely-guarded secret among PBMs, one study found that among a subset of surveyed PBMs, the amount of rebate pass-through ranged from 9% to 75%, with a median of 54%.[53]  Therefore, on average, TPPs receive about 2.7% of drug spending as rebates (i.e., 5% * 54% = 2.7%).

61.    If rebates are calculated as a percentage of WAC, there will be no change in rebates due to the scheme.  If calculated off of AWPs, the damages calculation can be adjusted as follows.  TPPs receive rebates that are on average about 2.7% of total drug spending.  If we make the conservative assumption that *all* of these rebates are calculated as a percentage off of AWP, then damages should be adjusted downward by 2.7%.  Therefore, total nominal damages in Table F.2 for TPPs have been reduced by $151 million.  I reduce total nominal damages to TPPs in Tables F.3 and F.4 analogously.

Kreling, "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager (PBM) Efforts, Effects, and Implications, A background report prepared for the Department of Health and Human Services Conference on Pharmaceutical Pricing Practices, Utilization and Costs," August 8-9, 2000, Georgetown University, Washington, DC available at http://aspe.hhs.gov/health/reports/Drug-papers/Kreling-Final.htm, accessed September 7, 2007.

[53] See Federal Trade Commission, *Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies*, August 2005, p. 59, Table III-1.  Data cited are from 2002 and 2003.  Note that the pass-through percentage is 1 – the PBM retention rates cited in this document.

# EXHIBIT D



**G A O**
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

October 6, 2004

The Honorable Olympia J. Snowe
Chair
Committee on Small Business and Entrepreneurship
United States Senate

The Honorable Ron Wyden
Ranking Minority Member
Subcommittee on Consumer Affairs and Product Safety
Committee on Commerce, Science, and Transportation
United States Senate

Subject: *Prescription Drugs: Trends in Usual and Customary Prices for Drugs*
*Frequently Used by Medicare and Non-Medicare Enrollees*

This report responds to your request for information on trends in prices for
prescription drugs frequently used by Medicare beneficiaries and other individuals
with health insurance. We obtained data from two state pharmaceutical assistance
programs for the elderly—Pennsylvania's Pharmaceutical Assistance Contract for the
Elderly (PACE) and New York's Elderly Pharmaceutical Insurance Coverage
(EPIC)—on the usual and customary prices reported by retail pharmacies for
selected drugs.[1] The usual and customary price is the undiscounted price individuals
without drug coverage would pay. We tracked monthly price trends from January
2000 through June 2004 for a total of 99 drugs, which include 77 drugs frequently used
by Medicare enrollees in Blue Cross and Blue Shield Association's (BCBS) Federal
Employee Program (FEP) and 79 drugs frequently used by non-Medicare enrollees in
BCBS FEP. We also compared the price trends during this period separately for the
52 brand drugs and 47 generic drugs. Our analyses are limited to the usual and
customary prices reported by retail pharmacies in Pennsylvania to the PACE program
and by retail pharmacies in New York to the EPIC program for the 99 drugs. We
performed our work from April 2004 through October 2004 in accordance with
generally accepted government auditing standards. (See enc. I for a description of
our scope and methodology.)

---

[1]We used data from PACE and EPIC because they were two of the largest state pharmaceutical
assistance programs, collected data from pharmacies on usual and customary prices for drugs, and
had historical price data available since 2000.

Overall, we found that the average usual and customary prices for 77 prescription drugs frequently used by Medicare enrollees increased 21.8 percent from January 2000 through June 2004, a 4.6 percent average annual rate of increase. During the same period, the average usual and customary prices for 79 drugs frequently used by non-Medicare enrollees increased at a similar rate—22.8 percent, a 4.8 percent average annual rate of increase. (See enc. II for the annual percentage change in average usual and customary prices for drugs frequently used by Medicare enrollees, and enc. III for the monthly trend in these prices for drugs frequently used by Medicare enrollees and those frequently used by non-Medicare enrollees.) We also found that average usual and customary prices for 52 frequently used brand drugs increased about three times faster than for 47 frequently used generic drugs. Specifically, from January 2000 through June 2004, the average usual and customary prices for the brand drugs increased 26.4 percent, a 5.5 percent average annual rate of increase, whereas prices for generic drugs increased 8.3 percent, a 1.8 percent average annual rate of increase. (See enc. IV for the annual change in average usual and customary prices for brand and generic drugs.)

- - - - -

As agreed with your offices, unless you publicly announce its contents earlier, we plan no further distribution of this report until 7 days after its date. At that time, we will send copies of this report to relevant congressional committees and other interested members. The report is also available at no charge on GAO's Web site at http://www.gao.gov. If you or your staff have any questions regarding this report, please call me at (202) 512-7119 or John E. Dicken at (202) 512-7043. Rashmi Agarwal, Andrea Kastin, Matthew L. Puglisi, and Daniel Ries were major contributors to this report.

*Laura A. Dummit*

Laura A. Dummit
Director, Health Care—Medicare Payment Issues

Enclosures - 4

Enclosure I

Enclosure I

## Scope and Methodology

We used data from BCBS to determine the 100 prescription drugs most frequently dispensed through retail pharmacies in 2003 for Medicare enrollees and the 100 most frequently dispensed for non-Medicare enrollees in the BCBS FEP.[1]  Combined, these represented 133 different drugs.[2]

We obtained average monthly usual and customary prices reported by retail pharmacies to Pennsylvania's PACE from January 2000 through June 2004 and New York's EPIC from August 2000 through June 2004.[3][4]  We collected prices based on a common number of units (such as pills), typically for a 30-day supply.  Based on combined PACE and EPIC data, 99 of the 133 drugs we selected had prices reported during the entire period from January 2000 through June 2004.  We analyzed price trends from January 2000 through June 2004 for these 99 drugs.

Of the 99 drugs, 77 were among those most frequently used by BCBS FEP Medicare enrollees, and 79 were among those most frequently used by BCBS FEP non-Medicare enrollees.  We first determined the total number of prescriptions in 2003 for these drugs provided to Medicare enrollees and provided to non-Medicare enrollees in BCBS FEP.  Separately for drugs frequently used by Medicare and by non-Medicare enrollees, we calculated the share of the total number of prescriptions attributed to each drug.  The price of each drug was then weighted by its relative share of total Medicare or total non-Medicare prescriptions in 2003 to calculate the average price for Medicare drugs and for non-Medicare drugs.  We standardized these averages to create a Medicare and a non-Medicare price index, with a value of 100 as of January 2003.

We also analyzed trends in usual and customary prices for brand and generic drugs separately.  Of the 99 drugs, 52 were brand drugs and 47 were generic drugs.  Similar to our calculation of Medicare and non-Medicare price indexes, we calculated indexes for brand drugs and generic drugs based on each drug's share of the total number of brand or generic prescriptions dispensed to BCBS FEP enrollees in 2003.

---

[1] BCBS FEP covered nearly 55 million prescriptions dispensed to enrolled federal employees, retirees, and their dependents at retail pharmacies in 2003, including 21 million prescriptions for FEP enrollees who were also Medicare beneficiaries.  The 99 drugs that we included in our analyses represented about 33 percent of total prescriptions dispensed to BCBS FEP enrollees in 2003.

[2] Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

[3] PACE covered more than 9 million prescriptions and EPIC covered nearly 10 million prescriptions dispensed to mostly low-income seniors in 2003.

[4] We merged price data from PACE and EPIC for August 2000 through June 2004, but report price data from PACE alone for January 2000 through July 2000.  Because the average of the usual and customary prices reported by PACE and by EPIC were nearly identical, we do not believe that including the EPIC data in August 2000 notably affected the price trend.

**GAO-05-104R  Prescription Drug Price Trends**

Enclosure I                                                    Enclosure I

Our analyses are limited to the usual and customary prices reported by retail
pharmacies in Pennsylvania to the PACE program and by retail pharmacies in New
York to the EPIC program for the 99 drugs. We reviewed the reliability of data from
PACE, EPIC, and BCBS, including ensuring that the price trends and frequently used
drugs were consistent with other data sources, and determined that the data were
sufficiently reliable for our purposes. We performed our work from April 2004
through October 2004 in accordance with generally accepted government auditing
standards.

Enclosure II                                                      Enclosure II

### Annual Percentage Change in Average Usual and Customary Prices for Drugs Frequently Used by Medicare Enrollees, January 2000 through June 2004



Source: GAO analysis based on data from PACE, EPIC, and BCBS FEP.

Notes:  Prices from PACE and EPIC are for 77 prescription drugs frequently used by Medicare enrollees in BCBS FEP in 2003. Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

[a]The change in average usual and customary prices from January 2004 through June 2004 is extrapolated as an annual percentage change.

5                                              **GAO-05-104R  Prescription Drug Price Trends**

Enclosure III                                              Enclosure III

**Index of Average Usual and Customary Prices for Drugs Frequently
Used by Medicare and Non-Medicare Enrollees in BCBS FEP,
by Month, January 2000 through June 2004**



Note: Index includes prices from PACE and EPIC for 77 prescription drugs frequently used by Medicare enrollees and 79
prescription drugs frequently used by non-Medicare enrollees in BCBS FEP in 2003. Drugs with the same name but different
dosages and forms (such as tablets or capsules) were counted as unique drugs.

6                                              **GAO-05-104R  Prescription Drug Price Trends**

Enclosure IV                                                    Enclosure IV

**Annual Change in Average Usual and Customary Prices for Brand and Generic Drugs Frequently Used by Enrollees in BCBS FEP, January 2000 through June 2004**



Source: GAO analysis based on data from PACE, EPIC, and BCBS FEP.

Notes:  Prices from PACE and EPIC are for 52 brand prescription drugs and 47 generic prescription drugs frequently used by BCBS FEP enrollees in 2003.  Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

[a]The change in average usual and customary prices from January 2004 through June 2004 is extrapolated as an annual percentage change.

(290426)

7                                          **GAO-05-104R  Prescription Drug Price Trends**

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: <br><br> U.S. Government Accountability Office <br> 441 G Street NW, Room LM <br> Washington, D.C. 20548 <br><br> To order by Phone:  Voice:  (202) 512-6000 <br> TDD:  (202) 512-2537 <br> Fax:  (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: <br><br> Web site: www.gao.gov/fraudnet/fraudnet.htm <br> E-mail: fraudnet@gao.gov <br> Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov(202) 512-4400 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7125 <br> Washington, D.C. 20548 |
| **Public Affairs** | Jeff Nelligan, Managing Director, NelliganJ@gao.gov (202) 512-4800 <br> U.S. Government Accountability Office, 441 G Street NW, Room 7149 <br> Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER

### Annual Percentage Change in Average Usual and Customary Prices for Drugs Frequently Used by Medicare Enrollees, January 2000 through June 2004



Source: GAO analysis based on data from PACE, EPIC, and BCBS FEP.

Notes:  Prices from PACE and EPIC are for 77 prescription drugs frequently used by Medicare enrollees in BCBS FEP in 2003. Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

[a]The change in average usual and customary prices from January 2004 through June 2004 is extrapolated as an annual percentage change.