UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN, JUNE SWAN, MAUREEN COWIE and BERNARD GORTER, | Civil Action: 1:05-CV-11148-PBS |
| Plaintiffs, | Judge Patti B. Saris |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**MCKESSON CORPORATION'S RESPONSE
TO DR. HARTMAN'S SEPTEMBER 14, 2007 SUBMISSION
REGARDING THE COURT'S CLASS CERTIFICATION ORDER**

*[REDACTED]*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................. 4

I.      DR. HARTMAN OFFERS NO BASIS FOR THIS COURT TO REVERSE ITS ORDER REJECTING DR. HARTMAN'S PREVIOUSLY SUBMITTED AGGREGATE DAMAGES METHODOLOGY. ................................................ 4

     A.    IMS Sales Data Do Not Show That TPPs And PBMs Were Unable To "Push Back" Against Higher AWPs, As Dr. Hartman Incorrectly Asserts. .......... 4

     B.    PBM Ownership Of Mail Order Pharmacies Does Not Undermine The Court's Finding That Competition Among PBMs Is "Fierce." ............................ 7

     C.    Dr. Hartman's Assertion That McKesson Has Not Shown That TPPs And PBMs All Knew About The AWP Spread Increases Is Irrelevant And Incorrect. ................................................................................................. 10

II.     DR. HARTMAN'S DAMAGES CALCULATIONS FAIL TO EXCLUDE REIMBURSEMENTS UNDER TPP-PBM CONTRACTS THAT WERE RENEGOTIATED OR RENEWED DURING THE CLASS PERIOD. .................... 14

III.    CALCULATION OF DAMAGES TO THE CONSUMER COPAY CLASS PRESENTS THE SAME INDIVIDUAL ISSUES AS THE TPP DAMAGES CLASS.    17

CONCLUSION ............................................................................................. 19

## TABLE OF AUTHORITIES

### CASES

*Green v. Kinney Shoe Corp.,*
  715 F. Supp. 1122 (D.D.C. 1989) ............................................................................14

*In re Air Crash Disaster at New Orleans,*
  795 F.2d 1230 (5th Cir. 1986) ..............................................................................14

*In re Pharmaceutical Industry Average Wholesale Price Litigation*
  230 F.R.D. 61 (D. Mass. 2005) ..............................................................................8

### OTHER AUTHORITIES

4 J. Weinstein & M. Berger, *Weinstein's Federal Evidence*
  § 702.03[3] (2006) ..................................................................................................14

# INTRODUCTION

On August 28, 2007, the Court issued its ruling on plaintiffs' motion for class certification ("Class Order"). The decision was based on more than a year of briefing, and on evidence obtained up until the close of discovery on July 31, 2007. In the Class Order, the Court certified a class of consumers who paid a percentage co-pay for branded drugs for liability and damages over a 3-1/2 year period ( "co-pay class" or Class 1), and a class of TPPs for liability and equitable relief only for the same time period ("TPP class" or Class 2). The Court declined to certify the TPP class for damages because it was "not persuaded that the aggregate methodology [proposed by Dr. Hartman] works with respect to the proposed class of TPPs." (Class Order 25.) Among other shortcomings, the Court found that plaintiffs' proposed damages methodology "includes contracts that were renegotiated after the large bump-up in early 2002," and accordingly "would lead to a significant overstatement" of damages. (*Id.* at 24-25.) The Court rejected as an unworkable "morass" plaintiffs' proposed solution to hold 11,000 "[i]ndividualized trials or hearings on damages for renewed and renegotiated contracts." (*Id.* at 4, 24.)

On September 20, 2007, at the case management conference, plaintiffs submitted portions of a new, over 300-page-long single-spaced expert report from Dr. Hartman, in which Dr. Hartman concludes that the Court's Class Order was in error, and that Dr. Robert Willig, McKesson's economic expert, was mistaken.[1] On the basis of Dr. Hartman's new report, plaintiffs seek a reversal of the Court's Class Order. There are three grounds on which Dr. Hartman claims error, but they boil down to a single thesis that has already been rejected by

---

[1] *See* Class Plaintiffs' Report in Advance of September 20 Status Conference, Docket No. 319, filed September 19, 2007. Plaintiffs served (but did not file) Dr. Hartman's entire expert report on September 14, 2007. McKesson is submitting the entirety of Dr. Hartman's September 14 Report with this Response, along with the Report of plaintiffs' new industry expert, Kimberly McDonough, as Exhibits A and B, respectively, to the Flum Declaration. Although Dr. Hartman's and Ms. McDonough's reports also address liability and damages issues, this response is limited to class issues. McKesson and its experts will respond to Dr. Hartman's and Ms. McDonough's liability and damages opinions at the designated time.

the Court: that there was zero knowledge and zero mitigation by TPPs of the WAC-AWP spread increase published by FDB.

The first, and to Dr. Hartman, the "most important" reason the Court erred, is reflected in a new statistical analysis Dr. Hartman has undertaken using IMS data to show that TPPs did not recoup any of the costs attributable to the spread increases over the Class Period. In other words, Dr. Hartman asserts there was no "push-back" by TPPs through contract renegotiations or renewals. But Dr. Hartman's analysis and conclusion are based on a fundamental error in interpreting the IMS data he uses. The IMS data Dr. Hartman relies on reports *payments to pharmacies by PBMs, not payments by TPPs.* IMS data therefore says nothing about TPP reimbursement rates or whether TPPs recouped any of the costs from higher AWPs. In short, Dr. Hartman's analysis is not just flawed; it is totally irrelevant to the proposition he seeks to support.

Second, Dr. Hartman claims that TPPs received zero recoupment because, contrary to the Court's findings (Class Order 4), competition among PBMs for TPP business was not "fierce." To the contrary, according to Dr. Hartman, there is no competition among them at all. This is because PBMs face conflicts of interest arising from their integrated mail order pharmacies that stood to profit from the spread increases. From this he concludes that PBMs had no incentive either to inform TPPs of the spread increase, or to share the benefits they derived from the spread increase with TPP clients. Dr. Hartman previously raised this and similar principal-agent conflict arguments; the evidence refutes it; economic principles oppose it; and the Court has already rejected it. Indeed, the Court found that PBMs "had the power and financial incentive to institute contract pricing mechanisms with pharmacies to bring reimbursement costs back to the status quo for client TPPs." (Class Order 19.)

Third, Dr. Hartman purports to make a factual finding, based on his assessments of emails and other discovery in MDL and this case, that "only one [TPP]            knew of the increased Spreads reported by FDB," (Hartman Report ¶ 50), and that PBM information sharing with TPPs on this issue was too inadequate to count (*id.* at ¶¶ 43-47). TPP knowledge,

2

however, was irrelevant to the Court's rejection of Dr. Hartman's aggregate damage methodology. In all events, Dr. Hartman's conclusions as a self-appointed fact finder are directly contradicted by the evidence. This whole exercise by Dr. Hartman only serves to underscore how individual and fact-intensive are the issues regarding damages.

In its Class Order, the Court gave plaintiffs one more opportunity to submit a "feasible" methodology that could avoid the problems that precluded class certification on TPP damages. Specifically, the Court allowed Dr. Hartman to "submit an aggregate damage methodology which includes only those contracts in effect when the scheme took place and excludes reimbursements under contracts renegotiated in response to the increase." (Class Order 25.) The Court noted that "[a]nother alternative would be to only include damages for one year after the large increase in 2002 took effect." (*Id.*)

Dr. Hartman's new report ignores both alternatives outlined by the Court and advances instead damage calculations using his original damage methodology for the full Class Period and for three new time periods: (1) August 2001 to March 2005; (2) August 2001 to March 2004; (3) August 2001 to March 2003; and (4) an unspecified period using his monthly calculations of damages. As Dr. Willig points out, each of Dr. Hartman's time alternatives suffers from the very same flaws that lead the Court to reject his original 3-1/2 year period: Dr. Hartman's aggregate damage methodology overestimates damages by failing to exclude price adjustments TPPs were able to obtain through renegotiations, amendments or renewals which mitigated the effect of increased AWPs. (Class Order 18.)

Thus, no change is warranted in the Court's original Class Order based upon Dr. Hartman's new report. On the other hand, as both Dr. Hartman and Dr. Willig agree, the same reasoning that lead the Court to deny a damages class for TPPs likewise applies to the percentage co-pay class. Unlike the percentage co-pay class of Medicare recipients certified in the MDL, here the co-pay is not a percentage of AWP, but of the net cost to the TPP in reimbursing drug costs. Since calculation of that net cost is an overwhelmingly individualized fact issue for the TPP class, it necessarily also is an individualized fact issue for the co-pay class.

3

Accordingly, McKesson respectfully requests that the Court modify its Order to deny a damage class for the co-pay class as well.

## ARGUMENT

I.  **DR. HARTMAN OFFERS NO BASIS FOR THIS COURT TO REVERSE ITS ORDER REJECTING DR. HARTMAN'S PREVIOUSLY SUBMITTED AGGREGATE DAMAGES METHODOLOGY.**

This Court invited Dr. Hartman to present a damages methodology that excludes reimbursements under renegotiated or renewed contracts. In response, Dr. Hartman asserts that the same aggregate damages methodology that he previously submitted to the Court meets that requirement because, he claims, there was no TPP mitigation or "fierce" PBM competition, and no TPP knowledge of the increase in AWP spreads. Dr. Hartman is wrong on all counts.

A.  **IMS Sales Data Do Not Show That TPPs And PBMs Were Unable To "Push Back" Against Higher AWPs, As Dr. Hartman Incorrectly Asserts.**

The cornerstone of Dr. Hartman's latest report is his reliance on IMS data, which he claims refutes the Court's conclusion that renegotiations in TPP-PBM contracts create an individual fact issue. (Hartman Report. ¶ 25.) Dr. Hartman says that IMS drug reimbursement data is "one of the most comprehensive surveys of reimbursement *paid by TPPs*, uninsured cash payers and Medicaid...." (*Id.* at ¶ 26; emphasis added.) As explained in his report, Dr. Hartman compared pharmacy reimbursements, as reported by IMS, with WAC and AWP, as reported by FDB, to determine whether TPPs "pushed back" over the Class Period and obtained better reimbursement rates as a percentage of AWP. (*Id.* at ¶¶ 25-27.) According to Dr. Hartman, that comparison shows that retail reimbursements "track consistently with AWP rather than WAC." (*Id.* at 28.) Thus, Dr. Hartman asserts that his analysis of the IMS data conclusively rebuts that TPPs are able to "push-back" against or recoup from the reimbursement increases induced by the Scheme. (*Id.* at ¶¶ 28-30.) This "no push-back" contention is critical to Dr. Hartman. Indeed, his aggregate damages model depends on the proposition that no TPP was able to mitigate the impact of higher AWPs by pushing back on PBM reimbursements.

But Dr. Hartman's IMS analysis and conclusion are erroneous. First and foremost, Dr. Hartman's "no TPP push-back" opinion is based on a fundamental error about the IMS data itself. The IMS data does *not* reflect what TPPs pay in reimbursement to PBMs, as Dr. Hartman contends. Instead, it reflects what PBMs pay in reimbursement to retail pharmacies. (Expert Declaration of Robert D. Willig ("Willig Decl.") ¶¶ 31-32, filed herewith.)

According to IMS itself IMS obtains data on pharmacy reimbursements from a sample panel of retail, mail order, and long term care pharmacies. (Declaration of Darrell Philpot (Senior Director, Advance Analytics for IMS). ¶ 4.) IMS asks these pharmacies to report the amounts they "directly receive from consumers and public and private payors for dispensing prescriptions drugs." (*Id.* at ¶ 5.) Therefore, as Mr. Philpot explains:

> For transactions where the pharmacy receives reimbursement from a PBM, the pharmacy reports what the pharmacy received from the PBM, and IMS records this amount as a payment from a private payor. ***IMS data does not capture any information on the amounts paid by a third party payor to a PBM, and these payments are not reflected in data provided through the NPA or any other service offered by IMS.***

(*Id.;* emphasis added.) Thus, any changes in the relationship between reimbursements as reported by IMS, and AWP or WAC as reported by FDB, reflect changes in the contracts between PBMs and retail pharmacies, not changes in the contracts between PBMs and TPPs. (Willig Decl. ¶ 31-32.) Accordingly, the IMS data say nothing about whether TPPs mitigated or recouped the cost of higher AWP/WAC spreads from their PBMs, and therefore cannot establish that there was no TPP pushback, as Dr. Hartman misleadingly claims.

The fact that the IMS data are irrelevant to Dr. Hartman's "no TPP push-back" theory is reason enough to reject his analysis. But there are other reasons as well. For even if the IMS data had reported reimbursements by TPPs to pharmacies (and it does not), Dr. Willig has identified other flaws in Dr. Hartman's analysis that defeat Dr. Hartman's "no push-back" opinion. (Willig Report ¶¶ 34-42.) These flaws include, among many, the fact that the IMS data

Dr. Hartman uses include only changes in discounts off AWP and dispensing fees, and not other market responses, and the presence of other short-comings in the data affecting his conclusion.[2]

Dr. Hartman's IMS data are not altogether irrelevant, however, as they show that PBMs "squeezed" out of retailers any financial benefit they obtained from the spread increase. As Dr. Willig explains, the IMS data does show evidence of this squeezing of retailers by PBMs (Willig Decl. ¶¶43-51), a fact that has been well-documented in this case by the testimony of major national retailers that plaintiffs deposed,[3] and conceded by Dr. Hartman in his new report. (*See* Willig Decl. ¶¶ 22-23.) Even plaintiffs' new industry expert —Kimberly McDonough (who replaced Ms. Susan Hayes) — also agrees. (McDonough Report 13, Flum Decl. Ex. B.) ("As the PBM industry learned of the change in AWP to WAC ratio[s], they were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for increased profit margins."). Plaintiffs' first industry expert, Susan Hayes, also agreed that TPPs "pushed back" and got better pricing in response to AWP spread increases, (Hayes Dep. 221:9-16, Flum Decl. Ex. AA), but she was fired her after this candid admission.

In sum, the IMS data do not support the "zero mitigation" assumption underlying Dr. Hartman's aggregate damages methodology. The data therefore provide no basis for this

---

[2] As Dr. Willing notes, market responses also include changes in administrative fees, and rebate pass-through percentages. A statistical analysis that measures only two possible market responses — changes in ingredient discounts and dispensing fee — does not establish that there is no evidence of push back, as Dr. Hartman claims. Only by analyzing all data regarding all aspects of reimbursements on a TPP-by-TPP basis would Dr. Hartman be in a position to opine that there is no TPP push back and that members of the TPP class were not able to mitigate the impact of higher AWP spreads. (Willig Decl. ¶¶ 35-37.) In addition, nearly one-third of the pharmacies whose reimbursement data appear in IMS's standard NPA product report AWP rather than true net reimbursement. (Philpot Decl. ¶ 6.) The reimbursements reported by these pharmacies necessarily increase with AWP, which serves to dilute the evidence of push back in the reported data. (Willig Decl. ¶ 41.) Evidence of push-back in the IMS data is further diluted by IMS's inclusion of reimbursements under Medicaid and by cash payors, who would have different bargaining characteristics than PBMs or TPPs. (*Id.* at ¶40.)

[3] Vucurevich (Rite Aid) Dep. 49:10-15 (███████████████████████████████████ ███████) [Flum Decl. Ex. Y]; Scorpiniti (Longs) Dep. 32:17-33:1; 35:2-37:4 (since 2000, profits have declined on prescription drugs for the industry and for Longs because of aggressive rate reduction by managed care) (Flum Decl. Ex. Z).

Court to reverse its finding that Dr. Hartman's aggregate damages methodology overstates damages by failing to exclude TPP reimbursements under contracts that were renegotiated or renewed during the Class Period.

### B.    PBM Ownership Of Mail Order Pharmacies Does Not Undermine The Court's Finding That Competition Among PBMs Is "Fierce."

Dr. Hartman's latest report also attempts to rehabilitate his aggregate damages model by reasserting a purported principal-agent conflict of interest created by some PBMs' ownership of mail order and retail pharmacies.[4]   According to Dr. Hartman, PBMs that are part of vertically integrated health care companies stood to make more money on their related mail order and retail pharmacy businesses as a result of higher AWP spreads.  Dr. Hartman therefore asserts, contrary to this Court's finding in the Class Order, that *those PBMs will not compete fiercely for TPP business.*"  (Hartman Report Attachment D at ¶ 31; original emphasis.)  In the absence of competition, Dr. Hartman says, it is "wishful thinking" to believe that "all necessary information will be shared with TPPs and that all overcharges will be recouped."  (*Id.* at ¶ 32.)  Dr. Hartman needs this theory to support his position that there were no market responses to the change in AWP/WAC spreads over the full class period.  Here again, Dr. Hartman's analysis is in error.

As Dr. Willig explains (Willig Decl. ¶¶ 14-28), Dr. Hartman in wrong in claiming that conflicts posed by vertically integrated PBMs' ownership of pharmacy businesses establishes that PBMs do not compete for TPPs.  To the contrary, as long as there is *any* competition among

---

[4] Dr. Hartman's PBM mail order conflict point is hardly new.  Indeed, he raised principal-agent conflicts, including the conflict posed by PBM ownership of mail order pharmacies, in his Rebuttal Report in support of plaintiffs' motion for class certification in this case.  (Hartman Rebuttal Decl. Attachment C at ¶¶ 3-9 & nn.3, 21, Docket No. 218-2 (noting, among other things, the "potential conflict of interest" that results from "a PBM promoting their own...mail order pharmacy," which "provides a clear incentive for PBMs not to inform their mail order clients of the Scheme").)  Dr. Hartman made a similar point in the related MDL proceeding, where he argued that PBMs "substitute higher cost drugs in the mail order context" in order "to obtain higher rebates or greater AWP-based administrative fees."  *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 94 (D. Mass. 2005) ("*Pharm. III*").  In neither case did the Court find that Dr. Hartman's PBM mail order conflict argument was a sufficient ground to disregard Dr. Berndt's view that competition among PBMs was "vigorous," or to permit a finding that a TPP damages class for self-administered drugs could be certified.

PBMs, PBMs have an incentive to share profits resulting from higher AWP spreads so as not to lose TPP clients. (*Id.* at ¶¶ 15-17.)

In particular, Dr. Hartman's PBM conflict theory rests on a flawed proposition — that vertically integrated PBMs were in a position to unilaterally retain all the profits generated by higher AWP/WAC spreads. Dr. Hartman claims that a vertically integrated PBM had an incentive to withhold from its TPP clients increased profits from higher AWP spreads in order to maximize profits on its mail order and retail pharmacy businesses. But Dr. Hartman ignores the fact that vertically integrated PBMs need to compete against each other for TPP business. For Dr. Hartman's conflict theory to work, the five vertically integrated PBMs identified in his report would have to conspire among themselves not to share information about the spread increase or to negotiate lower prices with TPPs. (Willig Decl. ¶ 20.) Moreover, there are five other PBMs identified in Dr. Hartman's Report that were not vertically integrated. Plaintiffs would also need to establish yet another conspiracy not to share the benefit of higher AWP spreads, this time among all 10 PBMs — the five vertically integrated PBMs and the five non-vertically integrated PBMs. (Willig Decl. ¶ 20 and nn. 27, 28.) Of course, no such evidence exists nor has such claims ever been made in this case.

To support his mail order conflict thesis, Dr. Hartman makes the further erroneous claim that a vertically integrated PBM's profits from its TPP business are small in relation to its mail order and retail pharmacy businesses. (Willig Decl. ¶26 and n. 39.) That assertion rests on a misreading of the relevant data. As Dr. Willig explains, Dr. Hartman fails to recognize that the non-service categories of TPP revenue, including mail order revenue, reflect money earned from sales to TPP clients, and thus depend on the overall volume of TPP business. Thus, far from squelching competition, mail order integration actually creates an incentive for PBMs to reduce prices to TPPs to protect existing business that is threatened by other PBMs or to try to gain new TPP business. When a vertically integrated PBM loses TPP customers to a competitor, it also loses the mail order and retail pharmacy revenue associated with that client. (Willig Decl. ¶¶ 26-28.)

Actually, Dr. Hartman's conflict theory itself usefully demonstrates the need to determine damages on a TPP-by-TPP basis, since each TPP's ability to mitigate the impact of higher AWP spreads depends on the TPP's bargaining power and sophistication. Dr. Willig states:

> The most important implication of Dr. Hartman's theory that PBMs benefit from the alleged scheme and that they have market power (*i.e.,* competition is not "fierce") is that his theory supports my position that PBMs' relationships with retail pharmacies and TPPs creates individual issues in determination of impact and damages.

(Willig Decl. ¶ 24.)

Dr. Hartman's claim that integrated PBMs would not have passed on increased profits to TPPs because of the PBMs' mail order businesses is also refuted by the named plaintiffs' own experience. Plaintiff District Council 37 contracted with one of the vertically integrated PBMs that Dr. Hartman discusses in his report — Express Scripts — during the class period. According to Dr. Hartman's conflict of interest theory, Express Scripts would not have advised District Council 37 of the increases in AWP spreads during 2002, because it was in Express Script's economic interest not to share the increased profits the higher AWP spreads generated for its mail order pharmacy business. Express Script's conduct, as documented by District Council 37's outside benefits consultant, the Segal Company, flatly contradicts Dr. Hartman's conflict theory. As discussed in Segal's pre-litigation audit of District Council 37's 2002 claims data, Express Scripts' discounts on District Council 37's mail order purchases of brand name drugs averaged ▮▮▮ during 2002 — *over* ▮▮ *greater than the rate guaranteed in its contract,* and nearly ▮▮▮ higher than the average mail order discounts District Council 37 received during 2001. Express Scripts subsequently offered District Council 37 even larger mail order discounts — in the range of ▮▮▮▮ — in return for extending its contract. (Schechter Decl. Ex. 5F at D37 0836, Docket No. 206-17 and 206-18; Esperon Dep. 316:12-318:21, Flum Decl. Ex. P.)[5]

---

[5] Nor was District Council 37's experience an isolated incident. Blue Shield of California renegotiated its mail order contract with Express Scripts in December 2002 to increase discounts

*[Footnote continued on following page.]*

Moreover, the named plaintiffs' experience in conducting RFPs during the class period refutes Dr. Hartman's claim that PBMs do not compete for TPP business. During the class period, all of the named plaintiffs except Pirelli Trust conducted RFPs for new PBM contracts. Each of these RFPs generated multiple responses offering pricing improvements. (Flum Decl. ¶ 9 and Exs. R - X.) For example, named plaintiff Philadelphia Teachers Fund ran an RFP in 2002. The Fund received at least four responses. At the conclusion of the RFP, the Fund entered into a new PBM contract, effective May 2002, that improved its pricing on brand name drugs from ███████████████. (*Id.* at ¶ 9(d); Steinberg Dep. 158:17-161:24, Flum Decl. Ex. X.) In sum, Dr. Hartman's new report provides no basis for the Court to reverse its finding that PBM competition for TPP business is "fierce."

### C.    Dr. Hartman's Assertion That McKesson Has Not Shown That TPPs And PBMs All Knew About The AWP Spread Increases Is Irrelevant And Incorrect.

Dr. Hartman's new report also takes up the issue of TPP and PBM knowledge of the 5% spread increase, particularly in his lengthy Attachment D. (*See* Hartman Report, Attachment D (44 pages).) On this issue Dr. Hartman criticizes McKesson and its expert for asserting that "all" TPPs and PBMs knew about the spread increase, and for failing to prove this. (Hartman Report ¶¶ 38, 41.) According to Dr. Hartman, based on *his review of the evidence*, only one TPP knew about the spread increase (*id.* at ¶ 50), and PBM sharing of information about the spread increase was minimal at best (*id.* at ¶¶ 43-47). If Dr. Hartman intended his recitation of the "knowledge" evidence to be a ground for attacking the Court's Class Order, it is completely misguided. If Dr. Hartman meant only to share his summation of the evidence in his self-appointed role of fact-finder, it is simply wrong. Indeed, Dr. Hartman's dissection of the evidence confirms that resolution of the factual dispute regarding TPP knowledge will require an individualized, TPP-by-TPP examination at trial.

---

*[Footnote continued from previous page.]*

on brand name prescription drugs from ████████. (Stalker Dep. 115:24-119:8, Flum Decl. Ex. Q.)

In the Class Order, the Court did not decline to certify a damages class for TPPs based on the disparate knowledge among TPPs of the AWP/WAC spread increase. Although the Court noted that McKesson raised the issue of disparate knowledge among TPPs, the Court did not base its ruling on this issue. (Class Order 15 ("The fact that some TPPs had knowledge via the PBMs of the 5% increase in the WAC to AWP markup in drugs does not defeat class certification . . . .").) Dr. Hartman's renewed attack on the evidence of knowledge is therefore irrelevant, not only to what the Court asked Dr. Hartman to do, but also to this Court's determination of the class issue.

Dr. Hartman's recitation of the record is not accurate in any event. To begin with, McKesson and Dr. Willig did not assert that "all" TPPs knew of the spread increase. (Willig Decl. App. 3 at ¶¶ 2-4.)[6] Rather, Dr. Willig and McKesson asserted that disparate TPP knowledge creates individualized issues regarding how TPPs responded to the spread increase and thus whether each TPP was impacted. Such issues cannot be addressed on a class-wide basis. (*Id*; *see also* January 2007 Expert Report of Robert D. Willig ¶ 73, Docket No. 193-2; McKesson Corporation's Memorandum in Opposition to Class Certification section II at 7-11, March 2, 2007 Docket No. 205; McKesson Corporation's Surreply in Opposition to Class Certification section I at 1-13, May 7, 2007 Docket No. 251.)

It is Dr. Hartman who took the extreme position that *none* of the TPPs knew of the alleged scheme and that *none* of the TPPs were able to take any action to mitigate its effects (though Dr. Hartman now apparently concedes that at least *one* TPP knew of the spread increase). As Dr. Willig has explained, Dr. Hartman needs there to be no knowledge of the spread increase on the part of the TPPs and no ability for TPPs to mitigate AWP inflation.

---

[6] Dr. Hartman quotes McKesson's counsel at the class certification hearing stating, "They all knew, they all were told; the PBMs all knew it. They knew this difference occurred. They told the TPPs this." (Hartman Report ¶ 41.) Dr. Hartman misleadingly omits the rest of McKesson's counsel's statement at the next page of the transcript: "Now, did every single one? Did that happen to every single one? No. Do I know how many exactly? No. We won't know until we know – if we have a trial ..., we'd have to take each person on the stand, and we'd have to test their credibility . . . ." (5/22/07 Hearing Tr. 46:15-19, Flum Decl. Ex. BB.)

Otherwise, even under his own theories, Dr. Hartman's aggregate damages methodology fails. (Willig Decl. App. 3 at ¶ 3.) Indeed, if TPPs had knowledge of the increased spreads then, as Dr. Hartman testified in the MDL, TPPs would employ "heat seeking missiles" to negotiate the increase away, and individual issues of mitigation would defeat any formulaic aggregate damage model Dr. Hartman could put forward.[7]

In any event, contrary to Dr. Hartman's renewed assertion, what the record evidence plainly shows is that *many* TPPs did have knowledge of the spread increase from a variety of sources. (*See* Appendix A to this brief for a summary of evidence revealing TPP knowledge of spread increases.) For example, Dr. Hartman asserts that "McKesson's counsel introduce[d] no deposition testimony" to support the assertion that TPPs had knowledge of the spread increases. (Hartman Report Attachment D at ¶ 38). Yet the record includes ███████████████ testimony that it learned of the spread increases by evaluating its own data in "early 2002, maybe even late 2001," and that it met with other large TPPs who had also independently made the same observation. (███████████████████).

In addition, Dr. Hartman concludes, based upon his review of the evidence, that only 26 TPPs received notification of the spread increase from their PBM, Express Scripts. (Hartman Report ¶ 46.) Dr. Hartman's "finding" of fact is directly contradicted by the testimony of Express Scripts that it sent its April 2002 "Urgent Alert" regarding the FDB's changed spreads to "████████████" of its TPP clients. (Kiefer Dep. 53:15-55:9, Flum Decl. Ex. CC.) The Alert was sent across all client divisions and through Express Scripts' Emerging Therapeutic Issues program. (*Id.*) As Express Scripts' corporate designee testified, the Emerging Therapeutic Issues program provides periodic updates of information to clients that

---

[7] *See e.g.*, Class Order 15 (noting Dr. Hartman's concession in the related multi-district litigation); McKesson Corporation's Memorandum in Opposition to Class Certification 7-8, Docket No. 205 (explaining why Dr. Hartman's "heat seeking missiles" analogy concedes individual issues for TPPs with knowledge of the spread increase); Declaration of Rosaria Esperon from named plaintiff DC 37 at ¶ 8, March 15, 2007, Docket No. 222 (stating that if she had known about the spread increases "DC 37 would have demanded that our reimbursement for pharmaceuticals provided to members of the Unions be reduced accordingly.").

enlist in the program, and he was "  " (*Id.* at 186:21-187:22). Even after the Alert was sent, Express Scripts testified that it was " ▮▮▮▮▮▮▮▮▮▮ " and that " ▮▮▮▮▮ In fact, ▮▮▮▮▮▮▮ (*Id.* at 69:23-70:19.)

The examples of evidence cited in Appendix A shows that Express Scripts was not the only source of information to TPPs regarding the spread increase, since some TPPs learned about it from claims administrators or manufacturers, and still others learned about it through the "buzz" among TPPs. (*See* Appendix A.) Yet from all this evidence, Dr. Hartman concludes that based upon his review, which he lays out TPP by TPP, *only one* TPP ( ▮▮▮▮ ) knew about the spread increase. (Hartman Report ¶ 50.) To reach this conclusion, Dr. Hartman not only ignores testimony in the record, he also takes it upon himself to construe people's meaning and intent in emails and other documents. Indeed, Dr. Hartman concludes, *without any witness testimony to rely on,* that Express Scripts intentionally sent a vague Alert to its TPP clients regarding the WAC-AWP spread increase. (Hartman Report Attachment D at ¶¶ 15, 22 & 33.)

Dr. Hartman's partisan "fact-finding" opinions, however, go well beyond the proper role of an economic expert. As McKesson previously demonstrated, courts routinely reject such efforts to cloak what is nothing more than a lawyer's argument under the guise of purported expert testimony.[8] (*See* McKesson Corporation's Surreply in Opposition to Class Certification 8 *and* App. B, Docket No. 251 (refuting Dr. Hartman's "findings" regarding TPP knowledge and response). More importantly, Dr. Hartman's conclusions regarding TPP knowledge could only be made by reviewing the evidence on a TPP-by-TPP basis. Indeed, his criticism that McKesson

---

[8] *See* 4 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 702.03[3] (2006); *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("trial courts must be wary lest the expert become nothing more than an advocate of policy before the jury. Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *Green v. Kinney Shoe Corp.*, 715 F. Supp. 1122, 1123 (D.D.C. 1989) ("expert testimony should not be admissible when the proposed testimony infringes on one of the decisions that is entrusted solely to the jury . . . .").

did not depose more TPPs to offer "a more complete analysis of what TPPs actually did know" proves that the issue of knowledge can only be resolved at trial by looking at each TPP's actual experience.

More to the point, Dr. Willig has previously demonstrated that knowledge of the spread increase or of the alleged scheme was not necessary for TPPs to have mitigated the effects of the alleged scheme. (*See e.g.* Willig Decl. App. 3, ¶¶ 7-10.) Thus, whether *all* PBMs informed *all* TPPs of the spread increase or *all* TPPs learned of it in other ways is beside the point. As the Court's own independent expert, Dr. Berndt, explained, if published AWPs for self-administered drugs were artificially inflated, as alleged, PBMs, with their superior bargaining power, would capture any excess profit obtained by retail pharmacies and pass some of these savings on to their TPP clients. (*See* Berndt Report ¶ 206, previously submitted as Schechter Decl. Ex. 2A, Docket No. 206-3 and 206-4.) As Dr. Willig states, "a TPP does not need to have specific knowledge of the alleged scheme or the change in the AWP/WAC ratio." (Willig Decl. App. 3 at ¶ 6.) Rather, "[t]he relevant issue is how much leverage a TPP has in negotiations with its current or potential PBMs." (*Id.*) It is this leverage that will determine the extent to which a TPP can mitigate the effects of the spread increase, and that is decidedly an individual issue. Dr. Hartman's attack on the evidence of knowledge is simply irrelevant to the Court's Class Order.

## II.    DR. HARTMAN'S DAMAGES CALCULATIONS FAIL TO EXCLUDE REIMBURSEMENTS UNDER TPP-PBM CONTRACTS THAT WERE RENEGOTIATED OR RENEWED DURING THE CLASS PERIOD.

Not only does Dr. Hartman's report fail to justify using his previous aggregate damages model for the entire 3-1/2 year period, it also fails to offer a new, "feasible" alternative, as invited by the Court's Class Order. (Class Order 2.) The Court rejected Dr. Hartman's first aggregate damages methodology because it "includes contracts that were renegotiated after the large bump-up in early 2002." (*Id.* at 25.) In response to McKesson's showing that "TPPs

directly pushed back against the price increases" by "renegotiating, amending, and renewing" PBM contracts (*id.* at 16), the Court specifically held that TPP damages should exclude:

> damages for drug reimbursements for drugs under contract, renegotiated or amended during the class period to provide price adjustments.

(*Id.* at 18.) In other words, a "feasible" damages methodology would need to identify and exclude TPPs that were able to obtain price adjustments through renegotiation with their PBMs to mitigate the impact of higher AWP spreads.

The Court accordingly permitted Dr. Hartman another chance to submit a new aggregate damages methodology that, alternatively, either (1) "includes only those contracts in effect when the scheme took place and excludes reimbursements under contracts renegotiated in response to the increase," or (2) includes "damages for one year after the large increase in 2002 took effect." (*Id.* at 25.) Dr. Hartman's latest report does neither.

Dr. Hartman does not even attempt to respond to the first alternative. To do that, Dr. Hartman's aggregate damages model would need to do two things: (1) include only reimbursements under PBM contracts that were in existence at time of the inception of the alleged scheme on August 1, 2001; and (2) exclude reimbursements under contracts (in force on August 1) that were amended or renegotiated in response to the spread increase after that date. Both criteria are fact-intensive and require examination of all contracts between the class of 11,000 TPPs and their PBMs over the entire 3-1/2 year class period. Did any TPP renegotiate its contract with its PBM? If so, did the renegotiations include a price adjustment to mitigate the effect of the spread increase? If so, when and by how much?

Thus, Dr. Hartman's failure to address this alternative is not surprising. As Dr. Willig explains, Dr. Hartman's aggregate damages model inevitably fails to draw a distinction between reimbursements under contracts in place at the beginning of the class period and reimbursements under contracts that were amended, renegotiated, or renewed thereafter. Each TPP's response to higher AWP spreads can only be assessed by looking at its individual contracts and relationship

with its PBM. (Willig Decl. ¶¶ 63-66.) Even Dr. Hartman concedes as much. (Hartman Report, Attachment D at ¶ 38.)

As explained by Dr. Willig, Dr. Hartman's alternative 1-1/2—year and 2-1/2—year damage models overstate damages for the very same reason that his rejected 3-1/2—year model did: Dr. Hartman's methodology fails to exclude reimbursements under TPP-PBM contracts which were price-adjusted to mitigate the effect of the spread increases through renegotiation or contract renewal.[9] (Willig Decl. ¶¶ 71-73.) Arbitrarily ending the Class Period one or two years sooner does absolutely nothing to change the situation.[10] (Id.)

In sum, each of Dr. Hartman's alternative damage calculations utilizes the very same methodology that the Court has already rejected. Dr. Hartman fails to account for the fact that competition among PBMs led to contract renegotiations and renewals that ameliorated the effect of the spread increase for some TPPs. Which TPPs, when and by how much are distinctively individual TPP-by-TPP fact issues. Dr. Hartman's continuing to ask the Court to solve his problem by finding that no such competition exists simply flies in the face of overwhelming evidence and economic theory to the contrary.

---

[9] For example, Dr. Hartman's aggregate calculations of TPP damages through March 2003 include *all reimbursements by four of the five named plaintiffs* — District Council 37, Philadelphia Teachers, Pirelli, and Philadelphia Teamsters — even though each plaintiff entered into a new PBM contract during the truncated damages period covered by Dr. Hartman's models. Named plaintiff District Council 37 entered into a new PBM contract effective September 1, 2001. Named plaintiffs Philadelphia Teachers and Pirelli both entered into new PBM contracts effective May 1, 2002. Named plaintiff Philadelphia Teamsters entered into a new PBM contract effective January 1, 2003. (Flum Decl. ¶ 4.)

[10] Relying on plaintiffs' new industry expert Kimberly McDonough, Dr. Hartman claims that because most TPP-PBM contracts are for a three-year term, his calculation of damages through March 2004 is "very conservative." (Hartman Report ¶ 73 & n.56.) Whether or not TPP-PBM contracts are typically for a three year term — a point that is in serious dispute (*see* Willig Decl. App. 2) — is irrelevant. Dr. Hartman's calculations through March 2004 would be conservative only if he had excluded reimbursements under contracts that were renewed or renegotiated during that period.

### III. CALCULATION OF DAMAGES TO THE CONSUMER COPAY CLASS PRESENTS THE SAME INDIVIDUAL ISSUES AS THE TPP DAMAGES CLASS.

The Class Order treated the co-pay class differently from the TPP class. The differential treatment of these classes was apparently based on the assumption that the "morass" of "[i]ndividualized trials or hearings on damages for renewed and renegotiated [TPP-PBM] contracts" that would be required for the TPP class, would not be required for the co-pay class. (Class Order 4, 24.) In other words, while "no simple formula" could take into account "the bundle of adjustments in response to the increase in the WAC/AWP formula" for TPPs, the consumer co-pay class did not require the same highly individualized analysis. (*Id.*) Dr. Hartman's new report, however, concedes that this is not the case. To the contrary, as McKesson argued in its class opposition submissions, any alleged damages for the percentage co-pay class are derivative of the damages alleged for the TPP class. Thus, the same individual issues that preclude a damage class for Class 2, likewise preclude certification of a damages class for Class 1.

Dr. Hartman's new report explains why the calculation of damages for Class 1 is dependent upon a feasible methodology for calculation of damages for Class 2:

> I note also that calculation of damages to Class 1 requires the calculation of damages to Class 2, since the damages to Class 1 are simply a percentage of the damages (paid as coinsurance) to the TPPs/insurers that insure those consumers. In order for Class 1 to be certified for liability and damages, I (and any economist) require calculation of the damages to the TPPs insuring those consumers.

(Hartman Report ¶ 12.) Plaintiffs' new expert, Kimberly McDonough, likewise concedes that "[u]nder a co-insurance program, the member's cost is reflected as a percentage of the health plan's total pharmacy cost for each prescription." (McDonough Report 9.) Thus, contrary to the assumption underlying the differential treatment of Class 1 and Class 2, the calculation of Class 1 damages are not a simple formula based upon the AWP of the drugs purchased. Instead, the

calculation of damages must take into account the renegotiations, renewals and amendments in the contracts each Class 1 member's TPP had with its PBM during the class period.

In this regard, the consumer percentage co-pay class in this case differs from the consumer co-pay class the Court certified in the Medicare context in the MDL. In the Medicare context, consumers pay 20% of the reimbursement formula set by statute (95% of AWP). Thus, consumers pay a formulaic percentage of AWP (20% of 95% of AWP), and no examination of reimbursement terms needed to be undertaken. In the private insurance context, by contrast, consumers pay a percentage of whatever their TPP negotiated. Not only does the percentage co-pay vary by plan, as this Court noted in the Class Order (Class Order 13), the contractual discounts off AWP, the dispensing fee, and other financial terms vary TPP-by-TPP and contract-by-contract because of TPP-PBM contract renewals, renegotiations and amendments. The amount of damages any consumer paying a percentage co-pay suffered is thus affected by the terms and changes in its TPP's contracts.

In declining to certify the proposed TPP class, the Court found that "Dr. Hartman's methodology for calculating aggregate damages would lead to a significant overstatement because it fails to consider key provisions in contracts that are renegotiated and renewed." (*Id.* at 24.) The same will necessarily be true for the percentage co-pay class here, and plaintiffs' own experts concede this. Accordingly, McKesson respectfully requests that the Class Order regarding Class 1 be modified to deny a damage class.[11]

---

[11] The Court correctly noted at the September 20, 2007 status conference that less time was spent on the consumer class issues in the class certification briefing than on the individual issues affecting the TPP class. (9/20/07 Hearing Tr. 14:8-18, Flum Decl. Ex. DD.) Instead, the prior briefing simply argued that the issues for the two classes were the same. For example, in noting that plaintiffs had failed to propose "a means of calculating damages to the putative consumer class," McKesson explained that "all of the individual issues precluding calculation of TPP impact and damages on a class-wide basis likewise apply to the alleged consumer class in this case." (McKesson's Surreply 17 n. 18. Docket No. 251.) This same point was set forth in McKesson's slide presentation at the class hearing entitled "Percentage Co-Pay Class Is Derivative of TPP Class." (*See* Slide 28 Flum Decl. Ex. EE (noting that "Co-pay class reimbursements are subject to the same TPP-PBM contracts").) Plaintiffs' experts have now confirmed this.

## CONCLUSION

Dr. Hartman's new report fails to offer any feasible methodology for certifying a TPP damage class. His new analysis of IMS data does not prove what he says it proves, and his renewed efforts to pick apart the record evidence underlying the Class Order's factual findings are unavailing. Dr. Hartman's new report does confirm, however, that the alleged damages sustained by the consumer co-pay class are derivative of those sustained by the TPP class. As a result, Dr. Hartman's aggregate damages methodology cannot pass muster for that class either.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
James P. Bennett (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415)268-7000
Facsimile: (415) 268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
One Liberty Square
Boston, MA 02109
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: October 15, 2007.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 15, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

# Appendix A

Evidence of PBM and TPP Knowledge of Spread Increases

| Entity | Date of Knowledge[1] | Description | Citation | Court Docket Entry |
|---|---|---|---|---|
| Express Scripts, Inc. | first quarter of 2002 | Declaration of Christina Macinski, Vice President of Pricing and Analytics, stating that ESI observed the spread increases early in 2002, and thereafter began notifying its clients about the spread increases. | McKesson's Opposition to Class Certification ("Class Opp."), Schechter Decl., Ex. 6B. | Document 206-63, pp. 9-11 (filed 3/2/07) |
| Caremark | fourth quarter of 2002 | Declaration of Gregory Madsen, Senior Vice President of Retail Services, stating that by the "last quarter of 2002" he learned about the spread increases from a Caremark colleague, and took them into account in negotiations with pharmacies. | Class Opp., Schechter Decl., Ex. 4A. | Document 206-5, pp. 7-8 (filed 3/2/07) |
| ███████ | July 5, 2002 | Email correspondence between ███████ and ███████ describing how ███████ worked with ███████ to "identify the impact of the increased AWP/WAC spread in 2002." | McKesson's First Supplement of the Class Certification Record ("First Supp."), Ex. B ███ 122, non-Bates labeled attachment.) | Document 282-3 (unredacted version filed under seal) (filed 7/6/07) |
| Hundreds if not Thousands of TPP Subscribers to ████ ████ | April 2002 | ███████ Vice President and General Manager of the ███████ Commercial Division for ███████ testified that the ███████ Letter was sent to "hundreds and hundreds of clients I'm sure, if not thousands," that it went to "the vast majority of clients," and that "I'm frankly not aware of a client who has chosen not to get ███ mailings] it." | Second Supp., Ex. 1 ███████ Dep. 53:11-55:9; 186:21-189:23.) | Document 304-2 (filed under seal) (filed 8/2/07) |
| Various TPP clients of ESI | April 8-22, 2002 | Dr. Hartman compiled record documents confirming receipt of the April 2002 ESI Letter by at least the following TPPs: ███████████ | Hartman Report, Ex. D.1. | Filed herewith as Exhibit A to the Declaration of Paul Flum |

[1] This is the latest date by which the entity learned of FDB's spread increases.

1

| Entity | Date of Knowledge[1] | Description | Citation | Court Docket Entry |
|---|---|---|---|---|
| ██████████ | | ██████████ "multiple client recipients", ██ "and unidentified ██████ others." | | |
| █ | April 15, 2002 | Email correspondence between ESI and █ where TPP expressed intent to "revise our expense trends, and start strategizing management approaches." | Surreply, Schechter Decl. Ex. 24A (ESI-414-00001870-74.) | Document 248-3, p. 2 (unredacted version filed under seal) (filed 5/7/07) |
| █ | April 16, 2002 | Internal email and attached memo shows that █ learned of the spread increases no later than April 16, 2002, and scheduled a "meeting with ESI next week to explore our options . . . regarding this critical issue." | "First Supp." Ex. A █ MCKESSON █ 578-580.) | Document 282-2, pp. 3-4 McKesson 579-580) (unredacted version filed under seal) (filed 7/6/07) |

2

| Entity | Date of Knowledge[1] | Description | Citation | Court Docket Entry |
|---|---|---|---|---|
| Humana, Inc. | Summer 2004 | Deposition testimony stating that in response to an RFP run by Humana, a bid from Argus Health Systems, Inc. proposed using a claims adjudication method that would avoid FDB's spread increases by paying reimbursements at the lesser of FDB, Medispan, or Red Book AWP. | Class Opp., Schechter Decl. Ex. 12A (Fleming Dep. 158:13-160:15.) | Document 206-36, pp. 25-27 (filed 3/2/07) |
| Peabody Energy Corp. | October 7, 2003 | Audit of Peabody's claims history by KPMG, reporting that many of FDB's AWPs were at a 25% markup over WAC, while Red Book's AWPs were a 20% markup. | Class Opp., Schechter Decl. Ex. 14A (KPMG 305-312.) | Document 206-36, pp. 42-50 (filed 3/2/07) |
| ConnectiCare | April 7, 2002 | Jeffrey Casberg, Director of Pharmacy Services at ConnectiCare, reported that "a change in the 'spread' between AWP and direct or WAC pricing . . . has been a 'buzz' topic at recent meetings with other peers in the industry." | First Supp., Ex. C (CONNECTICARE/NEC 28-29.) | Document 282-4, p. 2 (filed 7/6/07) |
| Health Net, Inc. | January 25, 2002 | Chart and spreadsheet identifying spread increases and decreases for certain drugs in January 2002. | First Supp., Ex. E (HNI/NEC 0100-106.) | Document 282-6, pp. 2-8 (unredacted version filed under seal) (filed 7/6/07) |
| Health Net, Inc. | February 1, 2002 | Meeting agenda for a February 1, 2002: "Follow-up Meeting [on] AWP – WAC Margin Spread," containing the agenda item "Discuss possible response areas," including renegotiation via "Manufacturer contracting" and "Pharmacy contracting." | First Supp., Ex. F (HNI/NEC 0093-94.) | Document 282-7, p. 2 (unredacted version filed under seal) (filed 7/6/07) |

3

| Entity | Date of Knowledge | Description | Citation | Court Docket Entry |
|---|---|---|---|---|
| ▉ | "early 2002, maybe even late 2001" | ▉ Vice President of Pharmacy Services, ▉ discovered the ▉ testified that spread increases on its own in "early 2002, maybe even late 2001." | Second Supp., Ex. 2 (▉ Dep. 69:3-76:2.) | Document 304-3 (filed under seal) (filed 8/2/07) |
| ▉ | "late 2002 or early 2003" | ▉ of ▉ testified that she attended a meeting with representatives from ▉ and ▉ to discuss the spread increases. | Second Supp., Ex. 2 (▉ Dep. 74:18-76:22.) | Document 304-3 (filed under seal) (filed 8/2/07) |
| Harvard Pilgrim | Before May 9, 2002 | An internal Ortho-McNeil email reported that Joe Sinopoli of Harvard Pilgrim mentioned the 5% spread increases at a meeting for the "launch" of Ortho Evra, and that Harvard Pilgrim was thus "in the process of renegotiating their retail contracts because of this." | Surreply, Schechter Decl. Ex. 28 (MDL-▉) | Document 248-12, p. 2 (unredacted version filed under seal) (filed 5/7/07) |
| ▉ | April 15, 2002 | Upon receipt of the ESI letter, the Vice President of Medical Management asked ESI what its "recommendations" are for responding to the increases, and stated, "I'd liked to move quickly on this." | Surreply, Schechter Decl. Ex. 24F (ESI-414-00004109-10.) | Document 248-8, p. 2 (unredacted version filed under seal) (filed 5/7/07) |

4