UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | Civil Action: 1:05-CV-11148-PBS   Judge Patti B. Saris |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**DECLARATION OF PAUL FLUM IN SUPPORT OF MCKESSON CORPORATION'S RESPONSE TO DR. HARTMAN'S SEPTEMBER 14, 2007 SUBMISSION REGARDING THE COURT'S CLASS CERTIFICATION ORDER**

**[REDACTED]**

I, Paul Flum, declare as follows:

1.      I am a partner of the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action. I am familiar with the record that has been built through discovery in this case. I submit this declaration in support of

1

McKesson Corporation's Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order.

**The Hartman and McDonough Expert Reports**

2.       On September 14, 2007, plaintiffs served upon McKesson the Expert Report of Raymond S. Hartman and the Expert Report of Kimberly P. McDonough, hereinafter respectively the "Hartman Report" and the "McDonough Report." True and correct copies of the Hartman Report and the McDonough Report are attached hereto as Exhibits A and B, respectively.

**Variability in Dates and Terms of Named Plaintiffs' Reimbursement Contracts**

3.       There are five named TPP plaintiffs in this case.  Between them they had twelve PBM contracts in effect between 2000 and the present.  As shown in Table 1, which summarizes the relevant terms of the contracts, only two of them had a January effective date.  The effective dates of the other contracts are spread across the calendar.  Similarly, only six out of the twelve contracts summarized in Table 1 were for a term of three years.

4.       Named plaintiff Teamsters Health and Welfare Fund, █████████████

██████████████████████████████████████████████████████

**Table 1:  Effective Dates and Terms of Named Plaintiffs' Reimbursement Contracts (2000 – present)**

| Named Plaintiff | PBM | Effective Date | Term | Source | Bates No. | Ex. |
|---|---|---|---|---|---|---|
| PFTHWF | NPA, Inc. | May 1, 1996-Apr. 30, 2002 | 1yr, 1yr auto renewals | Steinberg Dep., Ex. 11 | PFTHW 0078-96, at 79 (date), 86 (term) | C |
| | ████ | █████████ | ███████ | Steinberg Dep., Ex. 12 | PFTHW 1894-1912 at 1894 (date), 1897 (term) | D |
| | ESI, Inc. | May 1, 2002-present | 3yrs, 1yr auto renewal | Steinberg Dep., Ex. 13 (copy filed as Class Opp., Schechter Decl. Ex 18B) | PFTHW 0027-56 at 27 (date), 56 (term) | E |

| Named Plaintiff | PBM | Effective Date | Term | Source | Bates No. | Ex. |
|---|---|---|---|---|---|---|
| Teamsters | ■■■■ | ■■■■ | ■■■■ | MDL Einhorn Dep. | Feb. 25, 2004 MDL Dep. 202:14-204:7 | F |
| | GPP, Inc. | Jan. 1, 2003-Aug. 31, 2005 | 2yrs, 2yr auto renewal | Einhorn Dep., Ex. 6 | THWF1849-63, at 1861 (date), 1861 (term) | G |
| | ESI, Inc. | Sept. 1, 2005-present | Through 5/31/09, 1yr auto renewal | Einhorn Dep., Ex. 14 | THWF3199-3244, at 3199 (date), 3210 (term) | H |
| Pirelli | ■■■■ | ■■■■ | ■■■■ | Seymour Dep., Ex. 4 | CMK-NECarp 000097-118, at 97 (date), 105 (term) | I |
| | Advance PCS | May 1, 2002-present | 3yrs, 1yr auto renewal | Seymour Dep., Ex. 3 | Pirelli-FDB 0000161-188, at 161 (date), 169 (term) | J |
| DC 37 | NPA/ESI, Inc. (ESI acquired NPA in April 2002) | Sept. 1, 2001-June 30, 2006 | 3yrs, 1yr auto renewal | Esperon Dep., Ex. 3 | D37 0480-500, at 486 (date and term) | K |
| | ■■■■ | ■■■■ | ■■■■ | Esperon Dep., Ex. 33 | D37 0012-76 at 15 (effective date), 40 (term) | L |
| NEC | PCS, Inc. | Sept. 1, 1990-Mar. 31, 2001 | 1yr, 1yr auto renewal | Buckley Dep., Ex. 4 | Carp 00003-16 at 3 (date), 9 (term) | M |
| | Advance PCS | Apr. 1, 2001-June 30, 2005 | 3yrs, 3yr auto renewal | Buckley Dep., Ex. 6 | Carp 00025-58 at 26 (date), 34 (term) | N |
| | Medco | July 1, 2005-present | 3yrs, 1yr auto renewal | Buckley Dep., Ex. 8 | Carp 00059-088 at 59 (date), 68 (term) | O |

5.     A true and correct copy of each of the reimbursement contracts and deposition excerpts cited in Table 1 is attached hereto as Exhibits C-O.

**Express Scripts Gave Higher Mail Order Discounts to Plaintiff District Council 37 in 2002**

6.     In 2003, The Segal Company, a pharmacy benefits consultant, performed an audit of named plaintiff District Council 37's ("DC 37") prescription drug benefit as administered by DC 37's PBM, NPA, Inc. (later acquired by Express Scripts, Inc. ("ESI")).  With regard to DC

37's mail order benefit, the audit found that although ESI was contractually bound to provide a discount of AWP-18%, it actually provided a discount of AWP-18.73% in calendar year 2001, and AWP-21.11% in calendar year 2002. (D37 0836.) A true of true and correct copy of the Segal audit report is attached as Exhibit FF.

7.    During the class period ESI offered DC 37 

(Esperon Jan. 8, 2007 Dep., 316:12-318:21) (

) A true and correct excerpt of the transcript of Rosaria Esperon's January 8, 2007 deposition is attached hereto as Exhibit P.

8.    In December 2002 ESI renegotiated its mail order contract with Blue Shield of California,                                                                    . (Stalker Dep. 115:24-119:8.) A true and correct excerpt of the transcript of Nancy Stalker's July 17, 2007 deposition is attached hereto as Exhibit Q.

**The Named Plaintiffs Conducted RFPs to Take Advantage of PBM Competition**

9.    During the Class Period, all of the named plaintiffs except Pirelli Trust issued Requests for Proposals ("RFPs") to take advantage of the competition in the PBM market. (*Contra* Hartman Report. ¶ 65.) All of those RFPs received multiple bids, offering the TPPs pricing improvements.



(a) <u>District Council 37</u>:

(Esperon Nov. 6, 2006 Dep. 171:8-172:24; 207:9-208:8.)

(Esperon Dep. Ex. 7.) Segal prepared a similar document in 2005 summarizing the fifteen PBMs that submitted bids. (Esperon Dep. Ex. 12.)

(Esperon Dep. 243:5-245:5.) A true and correct excerpt of the transcript of Rosaria Esperon's November 6, 2006 deposition is attached hereto as Exhibit R.

True and correct copies of Exhibits 7 and 12 of the Esperon deposition are attached hereto as Exhibits S and T, respectively.

(b) <u>New England Carpenters</u>:  Segal conducted an RFP for New England Carpenters in 2003-2004 that produced nine PBM bids, at least five of which offered pricing improvements.  (Buckley Dep. Ex. 24 at CARP 02154, 02157.)  A true and correct copy of Exhibit 24 of the Buckley deposition is attached hereto as Exhibit U.

(c) <u>Philadelphia Teamsters Health & Welfare Fund</u>:  Philadelphia Teamsters conducted an RFP ███████████████████████████ (Einhorn Dep. 111:20-113:16.)  Teamsters conducted another RFP ████████████ ██████████████████████████████ (Einhorn Dep. Ex. 13 at THWF3171.)  A true and correct excerpt of the transcript of William Einhorn's October 5, 2006 deposition is attached hereto as Exhibit V.  A true and correct copy of Exhibit 13 to that deposition is attached hereto as Exhibit W.

(d) <u>Philadelphia Teachers Health & Welfare Fund</u>:  Philadelphia Teachers conducted an RFP ████ (Steinberg Dep. 176:17-177:3.)  Teachers solicited and received bids from ██████████████████████████ (Steinberg Dep. 158:17-161:24.)  A true and correct excerpt of the transcript of Arthur Steinberg's October 18, 2006 deposition is attached hereto as Exhibit X.

## Evidence that PBMs Squeezed Retailer Margins in Response to Higher AWP Spreads

10.    Plaintiffs noticed the deposition of Rite-Aid in this case.  Rite-Aid's designated witness, David Vucurevich, was asked whether "anybody ever stated that increasing AWPs would be beneficial to Rite Aid," in the pharmacy's internal discussions.  He responded that "████████████████████████████████████████████ ████████████████████████████████████████

███ (Vucurevich Dep. 48:17-50:6.) A true and correct excerpt of the transcript of David Vucurevich's May 16, 2007 deposition is attached hereto as Exhibit Y.

11.     Plaintiffs noticed the deposition of Longs Drug Stores in this case. Longs designated witness, Frank Scorpiniti, testified that "[a]ggressive reduction of reimbursement rates from managed care have driven the downward trend [in profit margins] for the industry and for Longs" throughout the period from 2000 to the present. (Scorpiniti Dep. 32:17-34:17; 42:23-43:17.) A true and correct excerpt of the transcript of Frank Scorpiniti's May 17, 2007 deposition is attached hereto as Exhibit Z.

**Other Documents**

12.     Attached hereto as Exhibit AA are true and correct copies of the caption page and page 221 to the October 26, 2006 Deposition of Susan Allene Hayes.

13.     Attached hereto as Exhibit BB are true and correct copies of the caption page and page 46 of the transcript of the May 22, 2007 Hearing on Class Certification.

14.     Attached hereto as Exhibit CC are true and correct copies of the caption page and pages 53-55, 69-70, and 186-187 of the Deposition of the July 24, 2007 Deposition of William K. Kiefer.

15.     Attached hereto as Exhibit DD are true and correct copies of the caption page and pages 14 and 18 of the transcript of the September 20, 2007 Status Conference.

16.     Attached hereto as Exhibit EE is a true and correct copy of Slide 28 presented by McKesson at the May 22, 2007 Hearing on Class Certification.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of October, 2007, in San Francisco, California.


By:  /s/ Paul Flum
     _____

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 15, 2007.

/s/Lori A. Schechter
Lori A. Schechter

# Exhibit A

# Filed Under Seal

# Exhibit B

# Filed Under Seal

# Exhibit C

Steve -
Do you have a
copy? etc?
3rd fl. rear?



NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

711 RIDGEDALE AVENUE    /    EAST HANOVER, NEW JERSEY 07936    /    (201) 503-1000

November 19, 1996

Mr. Jack Steinberg
Chairperson
Philadelphia Federation of Teachers
1816 Chestnut Street
Philadelphia, PA  19103

Re:   Philadelphia Federation of Teachers
      Sponsor No.    130-134

Dear Mr. Steinberg:

Enclosed is an executed copy of the Amendment to the Agreement To Provide
Prescription Plan Administration Between National Prescription Administrators,
Inc., and Philadelphia Federation of Teachers.

We look forward to a continuing working relationship.  If I can be of any further
assistance to you at any time, please do not hesitate to contact me.

Sincerely,

Stacey Tabor
Vice President
of Customer Relations

ST/cam

Enclosures

cc    Mr. Richard Ullman
      Mr. Steve Nicoletos

EXHIBIT
Teachers Fund
11
CW  10/18/06



EXHIBIT
PFTHW 8

PFTHW 0078

Amendment
to the
Agreement to Provide
Prescription Plan Administration
Between
National Prescription Administrators, Inc.
and
Philadelphia Federation of Teachers

This Amendment between NATIONAL PRESCRIPTION ADMINISTRATORS, INC., and PHILADELPHIA FEDERATION OF TEACHERS amends the Agreement implemented May 1, 1996 between the parties.

WITNESSETH:

WHEREAS, the parties wish to amend the Agreement as follows:

APPENDIX F

REIMBURSEMENT FEE SCHEDULE

Reimbursement per prescription will be the following:

- Ingredient Cost, plus scheduled reimbursement fee.

- NPA's Generic Maximum Price plus professional fee.

- Average Wholesale Price (AWP), less thirteen percent (13%) plus professional fee.

- NPA's Generic Maximum Price plus professional fee.

- In all cases reimbursement will be based on the lower of the scheduled amount or the Participating Provider's Usual and Customary, Advertised or Posted Price.

- The maximum ingredient cost of the AWP, less thirteen percent (13%) as established by Medical Economics, Drug Topics or Redbook, updated weekly from magnetic tape.

The reimbursement fee schedule follows:

| CLASSIFICATION: | I | II | III | IV | V |
|---|---|---|---|---|---|
| ALL STATES: | 2.25 | 2.40 | 2.60 | 2.75 | 3.25 |

Compounded prescriptions will be reimbursed an additional $1.00.

COPAYMENT:

The copayment per prescription, payable by the cardmember, will be as follows:

Sponsor No. 130 - Actives:        $5.50 per Brand name prescription
                                  $3.50 per Generic prescription



PFTHW 0079

Sponsor No. 131 - Per Diems:      $5.50 per Brand name prescription
                                        $3.50 per Generic prescription

Sponsor No. 132 - Retiree:         $15.00 per Brand name prescription
                                        $5.00 per Generic prescription

Sponsor No. 133 - Private Sector:    $6.00 per Brand name prescription
                                        $3.00 per Generic prescription

Sponsor No. 134 - Public Sector:     $6.00 per Brand name prescription
                                        $3.00 per Generic prescription

**SPONSOR:**

**PHILADELPHIA FEDERATION OF TEACHERS:**

By:    JACK  STEINBERG      CHAIRPERSON
       Print or Type                          Title

             Authorized Signature

This Amendment is accepted this **29** th day of **OCTOBER** , 19 **96** at
East Hanover, New Jersey.

NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

By:                               
     Richard O. Ullman, President



PFTHW 0080

ID:201-505-1085                      MAR 21 '97  13:55  No.013 P.02

# AGREEMENT TO PROVIDE

## PRESCRIPTION PLAN ADMINISTRATION

### BETWEEN

### NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

### AND

SPONSOR:   PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND

WELFARE FUND

ADDRESS:   1816 CHESTNUT STREET

CITY/STATE:   PHILADELPHIA, PENNSYLVANIA        ZIP 19103-4999

THIS AGREEMENT, made by and between NATIONAL PRESCRIPTION ADMINISTRATORS, INC. (NPA), A New Jersey corporation and the undersigned Sponsor named above.

### WITNESSETH THAT:

A.   NPA is engaged in the business of administering prescription drug plans for Sponsors' ~~~~~~ ers and their eligible dependents, through a ~~~~~~ rticipating Providers.

B.   ~~~~~~ de for its Cardmembers prescription benefits a~ ~~~~~~ ription included herewith an Appendix A or a revi~ ~~~~~~ ich the parties subsequently agree.

NOW THEREFORE, in consideration of the mutual covenants contained herein, NPA and the undersigned Sponsor agree as follows:

PFTHW 0081

# ARTICLE 1

## DEFINITIONS

SPONSOR'S PLAN DESCRIPTION:  A description of the benefits the Sponsor

agrees to provide for Cardmembers, and limitations thereto.

CARDMEMBER:  A person in whose name to whom an identification card is

issued.

ELIGIBLE:  A Cardmember and his or her dependents whose benefits are

provided by Sponsor.

IDENTIFICATION CARD:  An embossed card containing specific information

concerning the Cardmember and keys to the Plan and benefits to

to which Eligibles are entitled.

DIRECT REIMBURSEMENT CLAIMS:  A claim form to reimburse Cardmembers

directly for services rendered.

CLAIM FORM:  A pharmacy claim form or other format acceptable to NPA for

the transfer of information required by NPA for validating and

processing.

PROVIDER:  A Corporation, Partnership or Proprietorship that owns a

licensed pharmacy.

PARTICIPATING PROVIDER:  A Provider who has entered into a written

contract with NPA.

LOCAL PARTICIPATING PROVIDER:  A Participating Provider located in the

geographical area of the Cardmember.

PFTHW 0082

- 2 -

## ARTICLE II

### Responsibilities of

### NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

NATIONAL PRESCRIPTION ADMINISTRATORS, INC., will

A.   Provide an Identification Card for each Cardmember.

B.   Provide a standard descriptive brochure for each Cardmember describing the Plan and Cardmember's rights and obligations thereunder.

C.   Solicit Local Participating Providers to assure that an adequate number are available to furnish prescription service to Cardmembers and their eligible dependents.   A form of Participating Provider Agreement is attached hereto as Appendix B.

D.   Classify each Participating Provider according to the professional services available to Cardmembers through the use of NPA Profile Classification Plan Application, a sample of which is attached hereto as Appendix C.

E.   Provide Sponsor with a current list including all Local Participating Providers at least quarterly.

F.   Furnish each Local Participating Provider with a Provider Manual which will include the Sponsors Plan Description, Appendix A.

G.   Provide direct reimbursement claim forms to Sponsor for distribution to the Cardmembers to claim reimbursement where necessary.

PFTHW 0083

- 3 -

H.   Accept for processing all Claim Forms received from Participating Providers or Cardmembers for payment or denial according to the Plan Description, Appendix A.

I.   Reimburse Participating Providers and Cardmembers according to the fee schedule Appendix F for all valid prescriptions and report the status of all pended or denied claims within thirty (30) days of receipt.

J.   Use the Drug Topics RedBook Average Wholesale Prices updated weekly to determine the maximum allowable drug ingredient cost.

K.   Retain original claim forms for a period of three (3) years from the date payment was made.   Retain microfilm copies of claims for a period of five (5) years from the date of payment.

L.   Provide the regular reports described in Appendix D attached hereto not less frequently than monthly.   Provide optional or special reports or studies at a cost to agreed upon by the parties in writing.

M.   Notify Sponsor concerning each instance of a Cardmember obtaining prescription service through the use of an Identification Card after eligibility has elapsed, but prior to the card's embossed expiration date.

N.   Utilize a Provider Peer Review structure to serve as a review and appeal medium for claim and program disputes arising from the administration of this plan.

O.   Provide various reports to the Sponsor to include but not be limited to the patterns of utilization, program costs, and quality control.

PFTHW 0084

- 4 -

F.   Perform in-store audits of participating providers to verify the claim payments and report back to the Sponsor any areas of discrepancy.

## ARTICLE III

### Responsibilities of

### SPONSOR

The undersigned Sponsor will:

A.   Provide for NPA listings, in a format mutually agreeable to NPA and the Sponsor: 1) of the individuals to become Cardmembers on the effective date for the commencement of benefits; and 2) on a continuing basis, of all new individuals who become eligible and all who become ineligible, together with effective dates.

B.   Pay NPA for claims and services as provided in Article IV and in Appendix B attached hereto.

## ARTICLE IV

### CLAIMS PAYMENTS

A.   NPA will reimburse Participating Providers and Cardmembers for all valid prescriptions three times monthly from Sponsor's funds on deposit in NPA's claim payment account.  Sponsor agrees to deposit with NPA an amount equal to the estimated claims expenditures for a one month period on the plan's effective date.  On or about the seventeenth

PETHW 0085

- 5 -

working day of the first and each succeeding mouth NPA will submit an
invoice to Sponsor which will reconcile the deposit amount with the
actual disbursements for the month, and which will include estimated
disbursements for the subsequent month.  Sponsor will pay this invoice
prior to the end of the month the invoice was dated.

## ADMINISTRATIVE CHARGES

On or about the seventeenth working day of the first and each
succeeding month NPA will submit an invoice to Sponsor setting forth
adminitrative charges covering services for the month as specified in
Appendix E hereto.  Sponsor will pay this invoice prior to the end of
the month the invoice was dated.

## ARTICLE V

## TERM OF AGREEMENT AND TERMINIATION

This Agreement will become effective on the date it is
accepted in Clifton, New Jersey by a duly authorized agent of NPA and
will continue in full force and effect for an initial term of one year,
and unless terminated, shall continue from year to year.  This Agreement
may be terminated by either party, at any time, following the initial
term by giving ninety (90) days written notice to the other party.

PFTHW 0086

- 6 -

During any such ninety (90) day period all terms and conditions hereof shall remain in full force and effect.

Claims covering valid prescriptions dated prior to the termination date hereof will be processed and paid by NPA for a period not to exceed six months following the termination date, provided Sponsor continues to make the payments specified in Article IV and Appendix E hereof.

## ARTICLE VI

### RECORDS AND OWNERSHIP

NPA shall maintain and keep true and correct books and records of all transactions under this Agreement and the Sponsor or its designated representative will be granted access to these books and records upon reasonable written notice.

The ownership of all books, records, claim forms, programs and other such information pertaining to the administration of the Plan remain the property of NPA.

## ARTICLE VII

### GENERAL PROVISIONS

1.  Notices: All Notices relating to this Agreement or the subject matter shall be in writing and sent by ordinary mail addressed

PFTHW 0087

- 7 -

to the other party at the address shown in this Agreement or to any
other party in the same manner as that provided for giving any notice.

2.    Similar Services:  NPA may perform similar services for other
organizations and this Agreement shall not prevent NPA from performing
such similar services.

3.    Non-liability:  NPA desires and will use its best efforts to
assure and maintain a high degree of professional competence among its
Participating Providers.  However, NPA shall under no circumstances be
liable for any negligence, wrongful act, error or omission of any
person, pharmacist, pharmacy manufacturer or distributor of
pharmaceuticals nor their employees receiving or providing goods or
services pursuant hereto, nor shall NPA assume any responsibility in any
manner for any claim, loss or damage sustained by any person as a result
of providing or the failure to provide pharmaceutical service or goods
pursuant to the terms of this Agreement, and Sponsor agrees to render
and save harmless NPA from any and all such claims, demands or
liability.

4.    Trademarks:  NPA retains all rights, title and interest in and
reserves the right to use and control the use of the works NATIONAL
PRESCRIPTION ADMINISTRATORS, INC., NPA and all symbols, trademarks,
logotypes and service marks presently existing or hereafter established.

PFTHW 0088

ID:201-503-1085                    MAR 21'97  13:56 No.013 P.10

- 8 -

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.


SPONSOR:

BY: _____
    Print or Type                    Title


    _____
    Authorized Signature


NPA:

    This Agreement is accepted this _____ day of _____,

19 _____, at Clifton, New Jersey.

NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

    BY: _____
        Authorized Signature


    TITLE: _____

PFTHW 0089

- 9 -

APPENDIX A

EFFECTIVE DATE FOR COMMENCEMENT OF BENEFITS    MAY 1, 1986

PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND

RPA PLAN III

Benefits to which Cardmembers and their eligible dependents are entitled:

Prescription service for the following covered items, subject to the exclusions and limitations set forth herein.

COVERED ITEMS:

- Federal Legend Drugs
- State Restricted Drugs
- Compounded prescriptions
- Insulin on prescription
- Injectibles
- Federal Legend Oral Contraceptives
- Insulin syringes and needles on prescription

EXCLUSIONS:

- Items lawfully obtainable without a prescription
- Devices and Appliances
- Prescriptions covered without charge under Federal, State or Local programs, to include Workmen's Compensation
- Any charge for the administration of a drug or insulin
- Investigational or experimental drugs
- Unauthorized refills
- Immunization agents, biological sera, blood or plasma
- Medication for an eligible confined to a rest home, nursing, sanitarium, extended care facility, hospital or similar entity
- Any charge where the usual and customary charge is less than the Cardmembers deductible
- Any charge above the usual and customary, advertised or posted price, whichever is less than the scheduled amount

QUANTITY LIMITATIONS:

- As prescribed, up to and including a 34 days supply or 100 units, whichever is greater.

PFTHW 0090

- 13 -

APPENDIX E

ADMINISTRATIVE CHARGES

The administrative charges for the contract services

---

PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND

---

will pay NATIONAL PRESCRIPTION ADMINISTRATORS, INCORPORATED follows:

| | |
|---|---|
| $ 0.57 | for each paid claim. |
| $ 0.57 | per cardmember set up charge. |
| $ 0.30 | per identification card listing the individual dependents. |
| $ 0.50 | per each "Explanation of Prescription Benefits" statement issued. |
| | Any special requests to provide additional services will be charged as agreed by both parties, in writing. |
| | The postage for the distribution of the identification cards and the cardmember "Explanation of Prescription Benefits" is charged at actual cost. |
| $75.00 | plate charge to customize the plastic identification cards. |

PFTHW 0091

- 10 -

APPENDIX B

PROVIDER AGREEMENT

PFTHW 0092

- 11 -

APPENDIX C

CLASSIFICATION APPLICATION

PFTHW 0093

- 12 -

APPENDIX D

REPORTS

VALID PRESCRIPTION BY MEMBER

PRESCRIPTION SUMMARIZED BY MEMBER

PFTHW 0094

- 14 -

## APPENDIX F

### REIMBURSEMENT FEE SCHEDULE

Reimbursement per prescription will be the following:

- Ingredient Cost, plus scheduled reimbursement fee.

- Insulin - ingredient cost plus 30% of the ingredient cost.

- In all cases reimbursement will be based on the lower of the scheduled amount or the Participating Provider's usual and customary, advertised or posted price.

- The maximum ingredient cost of the "AWP" as established by Medical Economics, Drug Topics or Redbook, updated weekly from magnetic tape.

The reimbursement fee schedule follows:

CLASSIFICATION          I          II          III          IV          V

          All other states will be reimbursed the Medicaid level.

Compounded prescriptions will be reimbursed an additional $1.00.

Deductible:  The deductible per prescription is $_____ payable by the Cardmember.

PFTHW 0095

NATIONAL PRESCRIPTION ADMINISTRATORS, INCORPORATED

Listing of Members & Dependents Report

This report can be selected to include just eligibles or all of the people on file. The following is included on the report:

Date:        Date of latest information on file

Location:    Number assigned to the cardmembers in a
             specific experience designation.

Social Security
Number:      Member's

Last Name:   Member's

Person Number:   01 Cardmember
                 02 Spouse
                 03 - 09 Dependents

First Name:  Follows the person number

Birth Date:  Person's Date of Birth

Relation Code:   Follows Birthdate          1- Male Member
                                            2- Male Spouse
                                            3- Male Child
                                            4- Female Member
                                            5- Female Spouse
                                            6- Female Child
                                            7- Student
                                            8- Handicapped
                                            9- Ineligible

Address:     Street, City, State and Zip

Eligibility:     The number preceding the eligibility date
                 shows the member's current status.

                                            1- Family Coverage
                                            2- Member & Spouse
                                            3- Single Coverage
                                            4- Member & Dependents
                                               (No Spouse)
                                            9- Ineligible

The date following the eligibility code is the date the cardmember's
eligibility status became effective.

The second eligibility code and date indicate the previous status.

PFTHW 0098

# Exhibit D

# Filed Under Seal

EXPRESS SCRIPTS, INC.
MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT

THIS MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT ("Agreement") is entered into as of May 1, 2002 ("Effective Date"), by and among EXPRESS SCRIPTS, INC., on behalf of itself and its subsidiaries (collectively referred to as "ESI"), and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, organized under the laws of the Commonwealth of Pennsylvania ("Sponsor") for the purpose of setting forth the terms on which ESI will provide prescription drug benefit management services to Sponsor.

## SECTION I - DEFINITIONS

The following terms shall have the meanings set forth below:

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug as determined by ESI from the most current information provided to ESI by drug pricing services such as First Data Bank or other source nationally recognized in the retail prescription drug industry selected by ESI. The applicable AWP for prescriptions filled in the Mail Service Pharmacy will be the AWP for the lesser of: (i) the NDC code for the package size from which the prescription drug was dispensed or (ii) package sizes of 100 units or 16 ounce quantities, or the next larger quantity if such specified quantities are not available.

"Covered Drug(s)" means those prescription drugs, supplies and other items that are covered under the Plan as indicated on the DBW. Specialty Injectables are not Covered Drugs.

"Drug Benefit Worksheet" or "DBW" means a prescription drug benefit summary form ESI has provided to Sponsor which, when completed and signed by Sponsor, will describe the essential elements of Sponsor's pharmacy benefit plan ("Plan").

"Eligibility Files" means the list submitted by Sponsor to ESI indicating persons eligible for drug benefit coverage services under the Plan.

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Sponsor which classifies items for purposes of benefit design and coverage decisions.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is accepted by the U.S. Food and Drug Administration as therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient. For purposes of pricing, the designation of a product as "brand" or "generic" and/or subject to MRA is determined by ESI under its standard policies which take into account

HIGHLY
CONFIDENTIAL

This Agreement is confidential and may not be disclosed to any other party without the express written consent of both parties.

ESI Legal: 80579-1

various factors, including but not limited to, FDA status, the pricing differential between AWP and wholesale acquisition cost ("WAC"), availability and price of therapeutically equivalent drugs and generic exclusivity periods under the Waxman-Hatch Act. ✓//

"ID Card" means ESI's standard single purpose (NCPDP format) printed identification card containing information about the prescription drug benefits to which the Member is entitled and the applicable ESI pharmacy network logos or other method of identifying the fact that ESI is the provider of prescription drug benefit services in a form acceptable to ESI.

"Mail Service Pharmacy" means a duly licensed pharmacy operated by ESI or its subsidiaries, where prescriptions are filled and delivered to Members via the mail service.

"Maximum Reimbursement Amount" or "MRA" means the maximum price for generic drugs which is equivalent to a discount off of AWP up to 80% with an average range of 45% to 65%, depending upon Client's actual generic drug mix. ESI, in its sole discretion, determines and periodically updates the MRA to reflect changes in generic drug prices.

"Member" means each person who is eligible as determined solely by Sponsor to receive prescription drug benefits as indicated in the Eligibility Files.

"Member Confidential Information" means a Member's name, date of birth and social security number, Member-specific medical or prescription information and any other Member-identifiable demographic information which may be deemed to be confidential from time to time under federal or state law.

"Member Contribution" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible) as indicated on the DBW.

"Member Submitted Claim" means (i) a claim submitted by a Member for Covered Drugs dispensed by a pharmacy other than a Participating Pharmacy; (ii) a claim for Covered Drugs filled at a Participating Pharmacy for which the Member paid cash; or (iii) subrogation claims submitted by the United States or any state under Medicaid or similar government health care programs.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI has executed an agreement to provide Covered Drugs to Members.

"Prescription Drug Claim" means a Member Submitted Claim or claim for payment submitted to ESI by a Participating Pharmacy, or Mail Service Pharmacy as a result of dispensing Covered Drugs to a Member.

"Rebates" means retrospective rebates or discounts which are paid to ESI pursuant to the terms of a contract with a pharmaceutical manufacturer, and directly attributable to the utilization of

HIGHLY
CONFIDENTIAL

PFTHW-FDB
000028

certain pharmaceuticals by Members. Rebates do not include administrative fees, software or data fees paid by pharmaceutical manufacturers to ESI.

"Rebate Program" means ESI's manufacturer rebate program under which ESI contracts with pharmaceutical manufacturers for Rebates payable on selected Covered Drugs, as such program may change from time to time.

"Specialty Injectables" means those biotech and other prescription drug products identified on Exhibit B that require special ordering, handling and/or Member services.

"Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy.

## SECTION II - ESTABLISHMENT OF THE PRESCRIPTION DRUG PROGRAM

2.1    Exclusivity.    Sponsor shall use ESI as the exclusive provider of prescription drug benefits, including pharmacy network management, claims processing, Mail Service Pharmacy, formulary development and rebate management during the term of this Agreement.

2.2    Eligibility of Members.

(a)    Sponsor shall provide ESI with an initial Eligibility File and updates thereof under a mutually agreeable time frame containing the names of all Members and any other information specified by ESI that is necessary to administer the program. All Eligibility Files shall be submitted on-line, or on tape, FTP, electronic media or disk format that is acceptable to ESI. Non-conforming formats may be subject to additional charges as set forth in Exhibit A.

(b)    Sponsor shall pay all claims for Covered Drugs dispensed to a Member on or before the later of (i) the date of the Member's termination, or (ii) the date three (3) business days after ESI receives notification of the Member's termination in an Eligibility File or other written notice, or the date one (1) business day after ESI receives such notification on-line or electronically. Sponsor shall be solely responsible for ensuring the accuracy of its Eligibility Files, and shall be obligated to pay ESI for claims accepted by ESI for Members shown as eligible on the date the claim was adjudicated, unless ESI negligently accepted the claims. Sponsor bears the risk of fraudulent claims submitted by Members or by unauthorized persons using a Member's ID Card or identification number.

2.3    Drug Benefit Worksheet.

(a)    Prior to the provision of any services under this Agreement, Sponsor will submit a completed and executed DBW prepared with the assistance of ESI. By signing the DBW, Sponsor certifies that the DBW accurately depicts the pharmacy benefit provisions of the Plan. Sponsor is solely responsible for timely communication of the terms of the Plan to its Members

**HIGHLY**
**CONFIDENTIAL**

**PFTHW-FDB**
**000029**

prior to the effective date of such provisions; and shall assume any liability arising in connection with its benefit design.

(b)    If Sponsor elects to change certain benefit design features of the Plan after initial setup, including but not limited to changes in Member Contributions, Covered Drugs, prior authorization requirements, or otherwise, such change shall be communicated in writing by Sponsor to ESI by submitting a new or revised DBW. ESI will acknowledge the request in writing and notify Sponsor of the proposed implementation date of the benefit design change or that such change cannot be implemented as requested. In addition, Sponsor shall be responsible for notifying its Members of the change prior to its effective date. ESI will not be responsible or otherwise liable to Sponsor or a Member for costs or other damages for failing to make a benefit design change not communicated to ESI as provided in this Section.

2.4    _Web-Based Tools._  Subject to the following, Members and Sponsor shall have access to Express Choice™ on-line, web-based tools (as updated and enhanced from time to time) that provide Member pre-enrollment features such as pharmacy locator, and post-enrollment features such as personalized pharmacy benefit information, prescription ordering and status, customer service and prescription history. Express Choice also offers Sponsor features such as eligibility, utilization information, and management reporting.

(a)    _Planner._  Upon the request of Sponsor, ESI and Sponsor will develop and initiate a choice enrollment feature permitting Members to plan a personalized benefit (e.g., copayments, network and formulary choices) upon benefit enrollment ("Planner").

(b)    _Links._  ESI and Sponsor may develop interfaces or links within the Sponsor website to Express Choice and from Express Choice to Sponsor. Such links shall permit Member access to ESI-hosted, co-branded webpages through which Members may order mail order prescription refills, check order status of mail order prescriptions, use the pharmacy locator function, access drug information and engage in other transactions related to the Program.

(c)    _Sign-on Integration._  Sponsor shall have the option to integrate its Member sign-on capabilities into a single sign-on feature at Sponsor's site enabling the subscribing Member to log-on to Sponsor's site ("Sponsor's Site"), and then directly access Express Choice without another log-on requirement. Such integration shall be implemented in accordance with the terms and conditions set forth in ESI's Sign-on Integration Manual ("Manual"), a copy of which will be provided to Sponsor, and which is incorporated in this Agreement in its entirety. As more fully described in the Manual, sign-on integration will require Sponsor to:

(i)    authenticate the Member on the Sponsor Site before Member is passed to Express Choice through the link;

(ii)    transfer to ESI required data fields (e.g., names and email address);

(iii)    support security processes (e.g., 128 bit encryption) and procedures to protect data being transmitted to ESI; and

**HIGHLY CONFIDENTIAL**

ESI Legal: 80579-1

**PFTHW-FDB
000030**

(iv)     include content on the Sponsor Site proximate to the link introducing ESI, Express Choice and the pharmacy benefit in general in order to clarify who ESI is in relation to Sponsor and the Member, and to minimize confusion as to the information available on Express Choice. ESI shall work with Sponsor to develop the content for the welcome area and shall include example language for Sponsor's use in the Manual. The welcome area content must be approved by ESI, which approval shall not unreasonably be withheld.

(d)     Costs. Each party shall bear its own costs and expenses in making any software modifications to its own website as may be required to integrate the other party's software so as to facilitate the provision of services contemplated herein. Sponsor also agrees to cooperate with ESI as reasonably necessary to aid in the development of custom content and linking needs.

## SECTION III - PBM SERVICES

3.1     Pharmacy Network.

(a)     Mail Service Pharmacy. If included in the Plan, Members may have prescriptions filled through the Mail Service Pharmacy. Upon presentation of a prescription by a Member, the Mail Service Pharmacy shall determine whether the Member is eligible under the Plan and whether the prescription is for a Covered Drug. Prescriptions will be dispensed in a quantity not to exceed a 90-day supply, unless otherwise specified in the DBW. If included in the Plan, Specialty Injectables and supplies shall be shipped via overnight courier to the Member or physician within two (2) business days of receipt of a prescription and any physician clarification. The Mail Service Pharmacy shall charge and collect from each Member the applicable Member Contribution based on the DBW. Refill reminders and on-line ordering shall be available to Members. ESI may promote the use of the Mail Service Pharmacy to Members through coupons or other financial incentives at ESI's cost and upon Sponsor's approval of such materials.

(b)     Participating Pharmacies. Upon presentation of an ID Card, Members may obtain prescriptions for Covered Drugs through the Participating Pharmacy network named on Exhibit A. ESI will make available an updated list of Participating Pharmacies in such network(s) on-line via Express Choice. Any additions or deletions to the network shall be in ESI's sole discretion; provided that ESI shall provide written notice to Sponsor of such deletions and additions that materially affect the access of Members to Participating Pharmacies. Each Participating Pharmacy is required to verify the Member's eligibility through ESI's on-line claims processing system. Participating Pharmacies will dispense prescriptions to Members in a quantity not to exceed a 34-day supply unless otherwise specified in the DBW. ESI shall direct Participating Pharmacies to charge and collect the applicable Member Contribution from Members for each Covered Drug dispensed; provided, a Member's Contribution charged for a Covered Drug shall be the lesser of the applicable copayment (or coinsurance) set forth on the DBW, or the U&C.

HIGHLY
CONFIDENTIAL

PFTHW-FDB
000031

ESI Legal: 80579-1

(c)    Requirements for Participation. ESI shall require each Participating Pharmacy to meet ESI's participation requirements, including but not limited to, licensure, insurance and provider agreement requirements. ESI does not direct or exercise any control over the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy. Participating Pharmacies are independent contractors of ESI, and ESI shall have no liability to Sponsor, any Member or any other person or entity for any act or omission of any Participating Pharmacy or its agents or employees.

(d)    Audits of Participating Pharmacies. ESI shall maintain criteria, which it may amend from time to time, to establish when and how a Participating Pharmacy shall be audited to determine compliance with its agreement with ESI. The audit may be conducted by ESI's internal auditors or its outside auditors, and at the pharmacy or at ESI by a review of electronically transmitted claims. To compensate ESI for the cost of conducting such audits, ESI shall retain an audit fee from any recovered overpayments attributable to the Plan detected in the audit in the amount set forth in Exhibit A. Any balance of recovered overpayments will be paid to Sponsor. ESI shall attempt recovery of overpayments through offsets or demand of amounts due. ESI shall not be required to institute litigation to recover any overpayments.

(e)    Pharmacy Help Desk. ESI will provide 24-hours a day, 7-days a week telephone support via a toll-free number and Internet web site to assist Participating Pharmacies with Member eligibility verification and questions regarding reimbursement, Covered Drug benefits under Sponsor's Plan or other related concerns.

3.2    Claims Processing.

(a)    On-Line Claims Processing. ESI will perform claims processing services for Covered Drugs dispensed by a Participating Pharmacy and Mail Service Pharmacy. Such services include (i) verifying eligibility; (ii) performing DUR subject to Section 3.4(a); (iii) calculating benefits in accordance with the DBW; and (iv) adjudicating the claims. In all cases, Sponsor shall have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Plan, including determining whether any rejected or disputed claim shall be allowed.

(b)    Member Submitted Claims. If provided on the DBW, ESI shall process Member Submitted Claims. The Member (or Medicaid agency, as the case may be) shall be responsible for submitting such claims directly to ESI on a form provided by ESI within the time period set forth on the DBW. ESI shall process Prescription Drug Claims submitted by Members and Medicaid agencies and, if appropriate, ESI shall reimburse such Member or agency on behalf of Sponsor, the lesser of the amount invoiced or the amount ESI would have reimbursed the applicable Member for such claim in accordance with the applicable DBW. Sponsor shall reimburse ESI for all amounts paid to Members and Medicaid agencies under this Section and the applicable Member Submitted Claim administrative fee set forth in Exhibit A.

(c)    Call Center. ESI will provide 24-hours a day, 7-days a week toll-free number, IVR and Internet support to assist Sponsor, Sponsor's agents and Members with Member

**HIGHLY**
**CONFIDENTIAL**

PFTHW-FDB
000032

eligibility and benefits verification, location of Participating Pharmacies or other related Member concerns.

3.3    Program Management.

(a)    General Support and Consultative Services. ESI shall provide to Sponsor general support and consultative services regarding pharmacy benefit design, general drug use and cost data, pharmacy network design, Member communications, formulary design and implementation.

(b)    Management Information. Subject to the terms of the license set forth on Exhibit C, ESI will provide Sponsor its standard management information report package, and shall license to Sponsor access to Express Choice and the Applications identified on Exhibit C. Sponsor shall be responsible for obtaining any necessary hardware and shall bear the cost of all other charges, of any type, including but not limited to any telecommunication charges associated with such reporting and on-line access. Some or all of the reporting capabilities provided through the Applications may be available directly through Express Choice in the future. In such event, the terms and conditions set forth in Exhibit C shall continue to apply to the access through Express Choice or any proprietary management reporting tools.

(c)    Customized Reporting. At the request of Sponsor, ESI may develop special reporting packages and special program set-up requirements for ESI's standard hourly rate for such services, as set forth in Exhibit A. Sponsor agrees to make its personnel available to define the scope of Sponsor's programming needs and to participate in the testing and validation of any such custom programming projects.

3.4    Medication Management. ESI will provide clinically-based medication management programs and services, including drug utilization review, prior authorization, formulary development and management services and emerging therapeutic issue notification. Unless otherwise expressly stated, such programs are provided at no charge.

(a)    Drug Utilization Review (DUR). If Sponsor provides ESI with Members' named dependents in the Eligibility Files, ESI shall perform a standard concurrent DUR analysis of each prescription filled through the Mail Service Pharmacy or submitted for processing on-line by a Participating Pharmacy in order to assist the pharmacist in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage. ESI shall implement the retrospective DUR program to identify therapies outside established clinical guidelines or that present a risk to the Member. ESI shall notify the subject Member, prescriber, pharmacy, case manager or medical director, as appropriate under established guidelines, for such person(s) to take further action at their professional discretion. ESI's DUR processes are educational programs designed to enhance information available to the pharmacist in filling prescriptions, and are based only on the current claim for Covered Drugs and such Member information as has been previously provided to ESI and is available in ESI's on-line claims processing system. Furthermore, the DUR process depends, in part, on clinical drug data and information on dispensing practices provided to ESI by third-party vendors, and is limited to certain drugs and certain analytical criteria that are

HIGHLY CONFIDENTIAL

PFTHW-FDB
000033

established by ESI from time to time. ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member. Accordingly, ESI assumes no liability for Sponsor or any other person in connection with the DUR processes, including, without limitation, the failure of the DUR process to identify a prescription that results in injury to a Member.

(b)  Prior Authorization.  ESI shall provide prior authorization ("PA") services for drugs designated on the DBW for the fees set forth on Exhibit A. Development and maintenance of custom protocols for products included in ESI's PA program or for additional products identified by Sponsor shall be subject to additional fees as set forth in Exhibit A. Prior authorized drugs must meet Sponsor-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs, except that Sponsor authorizes ESI to approve coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines. The PA program shall include medical exception reviews and overrides, as appropriate, quantity limits, nonformulary determinations and benefit exclusions as specified and directed by Sponsor. In determining whether to authorize dispensing of such drug under the PA Program, ESI shall apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from sources deemed reliable to ESI at the time that the prescription is to be dispensed, and upon such prior authorization Guidelines. Sponsor acknowledges that prior authorization programs are based on objective criteria and the limited amount of patient information available to ESI. ESI shall not undertake, and is not required hereunder, to determine medical necessity to make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the physician. Appeals and final determinations to confirm or override a denial shall be made by Sponsor or its designated external review agent.

(c)  Drug Choice Management.  ESI shall contact Participating Pharmacies and physicians to promote preferred product therapeutic substitution opportunities through informational messages to Participating Pharmacies and communications to physicians. In all cases the prescribing physician, in consultation with the Member, shall have final authority over the drug that is dispensed to the Member. ESI shall provide Sponsor with a copy of the preferred product list and will notify Sponsor of any changes thereto.

(d)  Authorization to Contact.  Sponsor agrees to permit ESI to contact Members, Members' physicians, Sponsor case managers and Participating Pharmacies to perform the services provided by ESI hereunder. Sponsor shall provide ESI with street and email addresses and such other information as may be reasonably necessary to facilitate such communications.

(e)  Supplemental Clinical Programs.  ESI offers supplemental clinical programs in the areas of therapy initiation and compliance, disease management, and enhanced drug choice management and education, among others, for additional fees. Sponsor may elect to implement one or more of such programs by indicating its election on the DBW. Certain of the supplemental clinical programs may be funded in whole or in part by pharmaceutical manufacturers and the fees may be adjusted accordingly. Sponsor acknowledges that if there is

no external funding available, Sponsor may participate in a program at its own expense. Sponsor election and substitution of supplemental clinical programs shall be in accordance with ESI's then current requirements for such programs.

3.5    Rebate Program.

(a)    ESI will negotiate with drug manufacturers regarding the terms of the Rebate Program and will arrange for the payment of Rebates to Sponsor or to credit administrative or other fees of Sponsor, with respect to utilization of certain Covered Drugs by Members. Sponsor shall be eligible to participate in the Rebate Program and receive Rebates in the amounts set forth on Exhibit A upon meeting the following requirements: (i) Sponsor's election of, and conformance to, a Formulary under the Rebate Program and any plan design requirements associated therewith (e.g., implementation of drug choice management programs and/or qualifying 3-tier copayment benefit design); (ii) distribution of the Formulary (or a summary thereof) to Members and physicians, as applicable; (iii) communication to such parties concerning the Formulary, including an indication, if distributed to Members, that Members furnish the Formulary to their physicians; (iv) Sponsor complies with other reasonable, generally applicable requirements for participation in the Rebate Program, as are communicated by ESI to Sponsor from time to time.

(b)    Sponsor understands that its eligibility to receive payments (or the amount of payments) for Rebates may change over time due to changes in its Plan; changes in ESI contracts with pharmaceutical manufacturers; changes in laws governing prescription drug pricing (including Rebates) or the selection of certain services, such as prior authorization or open formulary management. Sponsor further acknowledges that certain Member Submitted Claims, 100% copay plans not offered in connection with a health plan benefit, and Specialty Injectables may not be eligible for Rebates.

(c)    ESI will pay to Sponsor an amount calculated as the percentage or per Prescription Drug Claim amount of the Rebates it receives from drug manufacturers and attributable to prescription drugs utilized by Members, all as provided for on Exhibit A. Such payment shall be made on a quarterly basis within 150 days following the end of each quarterly period; provided, however, that ESI shall make quarterly payments as provided herein only to the extent of the allocable Rebate payments it receives as of 120 days following the end of the quarterly period. Payments equal to allocable Rebate amounts that ESI receives later than 120 days following the end of a quarter shall be included by ESI in the next quarterly payment. Sponsor acknowledges and agrees that it shall not have a right to interest on, or the time value of, any Rebate payments received by ESI or moneys payable under this Section. In addition to any deposit required under Section 7.5, ESI may delay payment of Rebates to allow for final adjustments upon termination of this Agreement.

(d)    Sponsor acknowledges that it may be eligible for Rebates under this Agreement only so long as Sponsor, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts or rebates on pharmaceutical products or programs for claims processed by ESI pursuant to this Agreement, without the prior written consent of ESI. In the

event that Sponsor negotiates or arranges with a pharmaceutical manufacturer for Rebates or similar discounts, but without limiting ESI's right to other remedies, ESI may terminate this Agreement according to the terms of the material default under Section 7.2. In the event of termination of this Agreement under this Section 3.5(d), ESI shall be entitled to keep 100% of any and all Rebates to Sponsor which have not been paid to Sponsor as of the effective date of termination.

## SECTION IV - FEES; BILLING AND PAYMENT

4.1    Billing and Payments.

(a)    Fees, Billing.    ESI will bill Sponsor twice per month for all applicable fees specified in Exhibit A ("Fees") as follows:

(i)    Covered Drugs dispensed by the Mail Service Pharmacy, Participating Pharmacies, and, if applicable, for Member-Submitted Claims, less applicable Member Contributions; and

(ii)    for all other applicable Fees.

(b)    Payment.    Sponsor shall be responsible to ESI for timely payment of all Fees. Sponsor agrees to pay ESI by wire or ACH transfer within fourteen (14) business days from the date of Sponsor's receipt of the ESI invoice.    Sponsor shall be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees. Any amounts not paid by the due date thereof shall bear interest at the rate of eighteen percent (18%) per annum (1.5% per month) or, if lower, the highest interest rate permitted by law. If Sponsor disputes any item on any invoice, Sponsor shall state the amount in dispute in writing within thirty (30) days of the date of the invoice.  Sponsor shall pay the full amount owed and shall notify ESI of the disputed amount.

(c)    Deposit.    In the event the Sponsor is delinquent in payment of Fees for two (2) consecutive billing cycles, ESI shall have the sole option to require that the Sponsor provide to ESI a deposit in an amount equal to the average monthly billing amount. The average monthly billing amount will be based on the average of the last three (3) months of billing history or if three (3) months billing history is not available the most recent month of billing history will be the basis. ESI shall retain the deposit until the termination of this Agreement, and may apply amounts to unpaid balances from time to time.    Any balance remaining upon termination following any run-off provisions, shall be promptly returned to the Sponsor upon payment of all Fees due as of such termination following any run-off provisions.

(d)    Payment by Member for Mail Service. Members shall pay their applicable Member Contributions to ESI prior to the dispensing of a prescription through the Mail Service Pharmacy. Sponsor shall have the option, as indicated on the DBW, to bear responsibility for payment to ESI of any billed and unpaid Member Contributions in the event Sponsor desires ESI to fill the Member's prescription without prepayment.

**HIGHLY
CONFIDENTIAL**

4.2    <u>Sponsor Audits</u>.

(a)    Provided that this Agreement has been duly executed by Sponsor, Sponsor or Sponsor's third party auditor, as approved by ESI ("Auditor"), may inspect prescription drug claim data and billing records relating to the Plan's drug benefit once each year. All audits shall be conducted during normal business hours at ESI offices upon sixty (60) days' prior notice. ESI may designate the specific dates of availability for the audit, none of which may be in December or January. Any and all costs and expenses associated with Sponsor's audit shall be borne by Sponsor. The scope of any audit shall not exceed the standard audit protocol set forth on <u>Exhibit D</u>. Results of the most recent SAS-70 audit will be provided to the Sponsor, and the audit may not include any control areas for which ESI has obtained a favorable SAS-70 audit. Audit materials or documentation provided by ESI will be confined to Sponsor-specific information or other information as provided in ESI's sole discretion. Contractual information concerning Participating Pharmacies, manufacturers and other providers of products and services to ESI is proprietary and confidential to ESI and will not be disclosed to Sponsor or Auditor.

(b)    ESI requires its form of confidentiality agreement to be signed by any Auditor prior to commencing the audit. Any requests by Sponsor to permit an Auditor to perform an audit shall constitute Sponsor's direction and authorization to ESI to disclose Member information to the Auditor, and Sponsor shall indemnify ESI for any liability associated with such disclosure.

4.3    <u>Claims Data Retention</u>. ESI will maintain Sponsor's claims data supporting invoices for Covered Drugs adjudicated by ESI during the term of this Agreement for a period of twenty-four (24) months in their original forms, and thereafter on microfilm, microfiche or other form determined by ESI for an additional five (5) years. Upon request of Sponsor, ESI shall provide such data to Sponsor in a format determined by ESI. ESI shall use reasonable efforts to cooperate with Sponsor for purposes of meeting Sponsor's reporting and ERISA retention obligations under applicable law; provided that after expiration of the retention period, ESI shall dispose of such data in accordance with its standard policies and practices and applicable state and federal law.

# SECTION V - RECORDS; CONFIDENTIALITY

5.1    <u>Use of Prescription Drug Records</u>.

(a)    Member Confidential Information will be obtained by ESI in providing services under this Agreement (e.g., through adjudication of Prescription Drug Claims through the Mail Service Pharmacy and Participating Pharmacies and medication management programs) and such confidential information will be obtained from and/or distributed to Sponsor, Participating Pharmacies and Members' physicians for drug utilization evaluation and other purposes relating to the prescription benefits management services provided hereunder. Member de-identified data is used in connection with the Rebate Program. Sponsor hereby permits ESI to use Member Confidential Information solely to perform its obligations under this Agreement.

**HIGHLY CONFIDENTIAL**

**PFTHW-FDB 000036**

(b)     Sponsor grants ESI permission to use both during and after the term of this Agreement and/or transfer to third parties the anonymized (completely non-Member identifiable) drug and related medical data collected by ESI or provided to ESI by Sponsor for research, provider profiling and other databases for benchmarking, drug trend, cost analyses, cost comparisons or other business purposes of ESI and its affiliates. ESI shall retain full ownership rights over all compilations, analyses and reports prepared by ESI (other than those reports prepared specifically for Sponsor under this Agreement).

5.2     <u>Confidentiality of Member Information.</u>

(a)     ESI shall maintain confidentiality of Member Confidential Information to the extent required by applicable law and regulations. In no event will ESI release or disclose to third parties Member Confidential Information (other than as permitted by Section 8.4) when using the data as set forth in Section 5.1(a) without the approval of the subject Member.

(b)     Sponsor shall maintain the confidentiality of any Member Confidential Information in accordance with any applicable laws and regulations. Sponsor hereby represents and warrants to ESI that, as sponsor of a health plan, Sponsor is legally entitled to receive Member Confidential Information relating to the Member's prescription drug utilization. Sponsor further represents and warrants that it has or shall obtain the Member authorizations required, if any, for ESI to perform the services under this Agreement and release Member Confidential Information to Sponsor. All Member Confidential Information, records, reports and other data provided by ESI to Sponsor under this Agreement are solely for Sponsor's use in managing its health benefit plans, and ESI disclaims all liability arising out of Sponsor's receipt, use or dissemination of such information, records, reports or data.

(c)     ESI and Sponsor acknowledge that the United States Department of Health and Human Services published final medical records privacy regulations under 45 CFR Part 164 ("HIPAA Rules") on December 28, 2000. Sponsor recognizes that as a health plan it is designated a Covered Entity under the HIPAA Rule. ESI recognizes that in its capacity as a pharmacy benefit manager contracting with Sponsor, ESI may be considered a "Business Associate," (as defined in the HIPAA Rule) or, in some instances, a "Provider" and a Covered Entity. As such, Sponsor and ESI will be required to comply with applicable sections of the HIPAA Rule prior to the final compliance date designated by law. Each party will use its reasonable best efforts to work with the other during the implementation period to ensure that ESI and Sponsor comply with all applicable requirements of the law, including entering into a Business Associate agreement no later than the final compliance date. Such compliance will include, where applicable, a requirement that ESI's subcontractors or agents, if any, agree to such written contractual provisions as Sponsor and ESI develop.

5.3     <u>Proprietary Information.</u> Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise public: (a) with respect to ESI: reporting packages, proprietary applications, system formats, databanks, clinical or formulary management operations

**HIGHLY
CONFIDENTIAL**

**PFTHW-FDB
000037**

or programs, information concerning rebates, retrospective DUR guidelines and other system information, Express Choice, licensed Applications, Documentation and Information, as defined in Exhibit C, clinical and other manuals, prescription drug evaluation criteria, information and documents related to drug choice management, drug pricing information, and Participating Pharmacy agreements; and (b) with respect to Sponsor: Sponsor Member information files, business operations and strategies. Neither party shall use the other's Proprietary Information, or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent. Upon termination of this Agreement, each party shall cease using the other's Proprietary Information, and all such information shall be returned or destroyed upon the owner's direction.

5.4     Trademarks. Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and servicemarks, whether presently existing or later established (collectively "Marks"). No party shall use the other party's Marks in advertising or promotional materials or otherwise without the owner's prior written consent; provided, however, that the parties may publicize the fact that ESI provides prescription drug benefit management services to Sponsor.

## SECTION VI - LIABILITY INSURANCE; COMPLIANCE WITH LAW

6.1     Liability Insurance. Each party shall maintain such policies of general liability, professional liability and other insurance of the types and in amounts customarily carried by their respective businesses. Proof of such insurance shall be available upon request. ESI agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, commercial general liability insurance coverage in an amount of not less than $1,000,000 per occurrence, and $2,000,000 in the aggregate. ESI also agrees to maintain pharmacist's professional liability insurance coverage in an amount not less than $1,000,000 per claim and in the aggregate for protection from such claims for bodily injury as may arise from operation of the Mail Service Pharmacy under this Agreement. ESI does not maintain liability insurance on behalf of any Participating Pharmacy, but does require such Participating Pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESI, to have in place a self-insurance program.

6.2     Compliance with Law; Change in Law.

(a)     Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. Sponsor shall be responsible for any governmental or regulatory charges and taxes imposed upon benefit management services provided hereunder, other than taxes based on the net income of ESI. If ESI's performance of its duties under this Agreement is made materially more burdensome or expensive due to a change in federal, state or local laws or regulations or the interpretation thereof, the parties shall negotiate an appropriate adjustment to the fees paid to ESI. If the parties cannot agree on an adjusted fee, then ESI may terminate the Prescription Drug Program on thirty (30) days' prior written notice to Sponsor.

**PFTHW-FDB**

**000038**

**HIGHLY CONFIDENTIAL**

(b)    Sponsor shall ensure that its activities in regard to the drug benefits provided to its Members are in compliance with the Employee Retirement Income Security Act, as amended, 29 U.S.C. §1001 et seq. ("ERISA"). Sponsor acknowledges and agrees that it is responsible for disclosing to Members any and all information relating to the program as required by law to be disclosed, including any information relating to the calculation of Member Contributions, and any other program coverage and eligibility requirements in connection with the program, and any other information concerning commissions, rebates, discounts or provider discounts referred to in Section 6.3 hereof.  In providing services under this Agreement, Sponsor acknowledges and agrees that ESI is not acting on behalf of any welfare benefit plan (as defined in Section 3(1) of ERISA) or participating in such plans, or as a fiduciary (as defined in Section 3.21(a) of ERISA) of Sponsor's drug plan, and Sponsor shall not name ESI as a plan fiduciary. ESI has no power to make any decisions as to Plan policy, interpretations, practices or procedures, but rather provides administrative services within a framework of policies, guidelines, interpretations, rules, practices, and procedures chosen by Sponsor.  Sponsor acknowledges that ESI does not have discretionary authority or control respecting management of the Plan and does not exercise any authority or control respecting management or disposition of the assets of the program, if any exist.  Sponsor further acknowledges that all such discretionary authority is retained by Sponsor or some other person or entity.

6.3    Disclosure of Certain Financial Matters.  ESI provides certain administrative services and computer software to drug manufacturers participating in the Rebate Program.   Such manufacturers pay ESI a fee for such services and software. ESI also enters into separate arrangements with manufacturers for the license of anonymized and aggregated drug utilization data and related software, as well as for formulary compliance programs and other educational programs. These arrangements are separate from Rebate agreements, and the fees for these products are negotiated separately ("Manufacturer Administrative and Data Fees").  In addition, ESI contracts with Participating Pharmacies at various rates that are renegotiated from time to time, and charges Sponsor at a uniform rate that may be greater or less than the actual rate paid to Participating Pharmacies.  In negotiating such fees and rates, ESI acts on its own behalf, and not for the benefit of or as agent for Sponsor, Members or the Plan. Except for the Rebate amounts set forth in Exhibit A, if any, Sponsor acknowledges and agrees that ESI will retain all Manufacturer Administrative and Data Fees, any portion of Rebates and interest thereon not payable to Sponsor and all Participating Pharmacy discounts, if any, in addition to any administrative and other fees paid by Sponsor. Sponsor acknowledges for itself, its Members and the Plan that, except as may be expressly provided herein, neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such discounts or payments.

**PFTHW-FDB
000039**

**HIGHLY
CONFIDENTIAL**

## SECTION VII – TERM AND TERMINATION; DEFAULT AND REMEDIES

7.1    Term.  The initial term of this Agreement shall begin on the Effective Date, and shall continue for a period of three (3) years, and may be terminated earlier or extended in accordance with the terms hereof.  Not less than ninety (90) days prior to the end of the initial or any renewal term of this Agreement either party may notify the other party in writing that it wishes to terminate this Agreement effective as of the end of the then current term.  If no such written notification is given, this Agreement shall continue with the same terms and conditions as set forth herein for an additional one (1) year term, subject to the right of termination as otherwise provided herein.

7.2    Termination.

(a)    Breach or Default.  Either party may give the other written notice of a material, substantial and continuing breach of this Agreement.  If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party.  If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event shall such period exceed sixty (60) days.

(b)    Non-Payment.  Notwithstanding Section 7.2(a), ESI may terminate or suspend its performance hereunder immediately and cease providing or authorizing provision of Covered Drugs to Members without any written notice if Sponsor fails to pay ESI or provide a deposit, if required, in accordance with the terms of this Agreement.  ESI also may suspend Mail Service Pharmacy services to a Member who is in default of payment of any Member Contributions to such pharmacy.

(c)    Insolvency.  To the extent permitted by applicable law, ESI may terminate this Agreement, or suspend performance hereunder, upon the insolvency of Sponsor, and Sponsor may terminate this Agreement upon the insolvency of ESI.  The "insolvency" of a party shall mean the filing of a petition commencing a voluntary or involuntary case (if such case is an involuntary case, then only if such case is not dismissed within sixty (60) days from the filing thereof) against such party under the United States Bankruptcy Code; a general assignment by such party for the benefit of creditors; the inability of such party to pay its debts as they become due; such party's seeking or consenting to, or acquiescence in, the appointment of any trustee, receiver or liquidation of it, or any material part of its property; or a proceeding under any receivership, composition, readjustment, liquidation, insolvency, dissolution, or like law or statute, which case or proceeding is not dismissed or vacated within sixty (60) days.

**HIGHLY CONFIDENTIAL**

**PFTHW-FDB 000040**

7.3    Remedies.

(a)    A party's right to terminate this Agreement under this Section 7 shall not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

(b)    Neither party shall be liable in any manner for any delay to perform its obligations hereunder which are beyond a party's reasonable control, including, without limitation, any delay or failure due to strikes, labor disputes, riots, earthquakes, storms, floods or other extreme weather conditions, fires, explosions, acts of God, embargoes, war or other outbreak of hostilities, government acts or regulations, or the failure or inability of carriers, suppliers, delivery services, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder.

(c)    Each party's liability to the other hereunder shall in no event exceed the actual proximate losses or damages caused by breach of this Agreement. In no event shall either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

7.4    Indemnification.

(a)    ESI will indemnify and hold Sponsor harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions, including claims of infringement of any intellectual property rights ("Claims") which may be asserted against, imposed upon or incurred by Sponsor and arising as a result of (i) ESI's negligent acts or omissions or willful misconduct, (ii) ESI's breach of its confidentiality obligations under Section 5.2(a), or (iii) Sponsor's use of or access to the Applications (as defined in Exhibit C), unless Sponsor has modified or altered the Applications without ESI's written consent. This subsection 7.4(a) shall not be construed to impose liability on ESI to the extent inconsistent with other provisions of this Agreement, including but not limited to Sections 3.1(c), 3.4 (a), 6.2, and 7.3(b).

(b)    Sponsor will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of Sponsor's (i) negligent acts or omissions or willful misconduct, (ii) benefit design and coverage decisions, (iii) breach of its representations and confidentiality obligations under Section 5.2(b), or (iv) from any use Sponsor may make of Member Confidential Information provided to Sponsor by ESI.

(c)    The party seeking indemnification shall notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and

shall tender the defense of such claim to the indemnifying party. No party shall indemnify the other with respect to any claim settled without the indemnifying party's written consent.

7.5   **Obligations Upon Termination**. Sponsor or its agent shall pay ESI in accordance with this Agreement for all claims for Covered Drugs dispensed and services provided to Sponsor and Members on or before the effective date of termination ("Termination Date"). Claims submitted by Participating Pharmacies or Member-Submitted Claims filed with ESI after the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan. Notwithstanding the preceding, ESI may request that Sponsor pay a reasonable deposit in the event ESI is requested to process after the Termination Date claims incurred on or prior to such date. Sponsor shall notify Members of the timing of any transition to a successor pharmacy benefit manager at least thirty (30) days prior to the effective date of such termination.

7.6   **Survival**. The parties' rights and obligations under the last sentences of Sections 3.1(c), 3.4(a); and Articles IV and V; and Sections 6.2, 7.3(b) and (c), 7.4 and 7.5 shall survive the termination of this Agreement for any reason.

## SECTION VIII - MISCELLANEOUS

8.1   **Notice**. Any notice or document required or permitted to be delivered pursuant to this Agreement must be in writing and shall be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or at such other address as such party shall specify from time to time by written notice delivered in accordance herewith:

>   Express Scripts, Inc.
>   Attn: President
>   13900 Riverport Drive
>   Maryland Heights, Missouri 63043
>   With copy to Legal Department
>   Fax No. (314) 702-7120

>   Philadelphia Federation of Teachers
>   Health and Welfare Fund
>   Attn: Jack Steinberg
>   1816 Chestnut Street
>   Philadelphia, Pennsylvania 19103
>   Fax No. (215) 587-6708

8.2   **Independent Parties**. No provision of this Agreement is intended to create or shall be construed to create any relationship between ESI and Sponsor other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither party, nor any of their respective representatives, shall be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party shall have the

**PFTHW-FDB 000042**

right to make any representations concerning the duties, obligations or services of the other except as consistent with the express terms of this Agreement or as otherwise authorized in writing by the party about which such representation is asserted.

8.3    Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto; provided that this Agreement may not be assigned by Sponsor without the prior written consent of ESI, which consent shall not unreasonable be withheld.  ESI may assign this Agreement or delegate any rights or obligation hereunder to a wholly-owned subsidiary of ESI, provided however, that ESI retains full responsibility and liability for the performance of the Agreement.

8.4    Subcontractors.  Sponsor agrees that ESI may delegate certain of its duties hereunder (e.g., database management functions, printing and postal fulfillment) to independent contractors; provided that (i) any such independent contractor enters into a confidentiality agreement no less extensive than the confidentiality provisions of this Agreement, and (ii) ESI retains full responsibility and liability for the performance of the subcontracted service.  Participating Pharmacies do not constitute subcontractors of ESI for purposes of this section, and ESI's obligations with respect to Participating Pharmacies are governed solely by Section 3.1 hereof.

8.5    Integration; Amendments.  This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof.  No modification, alteration, or waiver of any term, covenant, or condition of this Agreement shall be valid unless in writing and signed by both parties or the agents of the parties who are authorized in writing.

8.6    Choice of Law; Venue.  This Agreement shall be construed and governed in all respects according to the laws in the State of Missouri, without regard to the rules of conflict of laws thereof.  Any legal action regarding this Agreement shall be brought in the State of Missouri in St. Louis County.

8.7    Waiver.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy shall not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

8.8    Severability.  In the event that any provision of this Agreement is invalid or unenforceable, such invalid or unenforceable provision shall not invalidate or affect the other provisions of this Agreement which shall remain in effect and be construed as if such provision were not a part hereof; provided that if the invalidation or unenforceability of such provision shall, in the opinion of either party to the Agreement, have a material effect on such party's rights or obligations under this Agreement, then the Agreement may be terminated by such party upon thirty (30) days written notice by such party to the other party.

8.9    Third Party Beneficiary Exclusion.  This Agreement is not a third party beneficiary contract, nor shall this Agreement create any rights on behalf of Members as against ESI.

HIGHLY
CONFIDENTIAL

**PFTHW-FDB**

**000043**

Sponsor and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.


IN WITNESS WHEREOF, the undersigned have executed this Managed Prescription Drug Program Agreement as of the day and year first above written.

EXPRESS SCRIPTS, INC.

PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND


By:_____
Printed Name:_____
Title:_____
Date: _____

By:_____
Printed Name:_____
Title:_____
Phone:_____
Fax:_____
Federal ID Number:_____
Date: _____

**HIGHLY CONFIDENTIAL**

PFTHW-FDB
000044

<u>**EXHIBIT A**</u>

**PRESCRIPTION DRUG PROGRAM FEES**

Sponsor shall pay to ESI the amounts set forth below, net of Member Contributions, (on a Prescription Drug Claim basis unless expressly provided otherwise):

Plan Design:
➢ 2-tier benefit design programs utilizing the ESI 500 Formulary

1.      Prescription claims through Participating Pharmacies:

      A.      <u>Ingredient Cost and Dispensing Fee</u> - PERxCare®

            The lower of:

            (1)      An ingredient cost of AWP less 16% or, if lower, or MRA, plus a dispensing fee of $1.55 per prescription drug claim, plus incentive fee, plus applicable sales or excise tax or other governmental surcharge, if any; or

            (2)      The U&C of the Participating Pharmacy dispensing the prescription drugs, plus applicable sales or excise tax or other governmental surcharge, if any.

      C.      <u>Claims Administration Fee:</u> $0.20 per submitted claim.

      D.      Miscellaneous:

            (1)      If ESI pays a particular Participating Pharmacy a higher rate because Sponsor has requested such pharmacy be included in the network, the rate charged to Sponsor shall be the net ingredient cost plus the dispensing fee paid by ESI to such pharmacy, plus applicable sales or excise tax or other governmental surcharge, if any.

            (2)      If any change in Federal or applicable state law or regulation (including the interpretation of existing laws or regulations by a court or administrative agency or extension of a prescription drug benefit under Medicare) occurs during the term, and in consequence thereof ESI increases payments for Covered Drugs to Participating Pharmacies in the applicable jurisdiction under its provider agreements, the Prescription Drug Program fees set forth above will be increased by the same amount.

2.      <u>Prescription claims submitted through Mail Service Pharmacy:</u>

      A.      1-34 Days' Supply.

**PFTHW-FDB
000045**

The same ingredient cost and dispensing fee rates in Section 1.A. for Participating Pharmacies.

B.     35-90 Days' Supply.

  (1)     Ingredient Cost:

          Brand Drugs:        AWP less 21%, plus applicable sales or excise tax or other governmental surcharge, if any

          Generic Drugs:      AWP less 50%, plus applicable sales or excise tax or other governmental surcharge, if any

  (2)     Dispensing Fee:

          $0.00 per Prescription Drug Claim, subject to adjustment from time to time for reasonable increases in postage and delivery charges upon notice to Sponsor.

C.     Claims Administration Fee (1-90 days' supply):

       $0.00 per submitted claim.

D.     Minimum:  Notwithstanding the preceding rates, if the calculation of the cost of the claim is less than ESI's then current minimum mail rate ("Minimum Rate"), then ESI will charge the greater of the AWP discount price, or the Minimum Rate.

E.     Specialty Injectables.

       If included in the Plan, the ingredient cost, dispensing and claims administration fees for Specialty Injectable products dispensed by ESI shall be as set forth in Exhibit B.

3.   Member Submitted Claims:

  A.     Ingredient Cost and Dispensing Fee:  The fees set forth in this Exhibit A, Section 1 or such other amount set forth in the DBW.

  B.     Claims Administration Fee:  $1.50 per submitted claim.

4.   Audit of Participating Pharmacies:  ESI's fee shall be 20% of any recovered overpayments attributable to Sponsor.

HIGHLY
CONFIDENTIAL

**PFTHW-FDB
000046**

5.    Prior Authorization Fees:

    A.    PA Program

        The following eight (8) base PA drugs* at no charge

- Dextroamphetamine sulfate, dextroamphetamine saccharate, amphetamine sulfate and amphetamine asparate – Adderall
- Epoetin alfa – Epogen and Procrit
- Methamphetamine - Desoxyn tablets/gradumets, and Dextroamphetamine – Dexedrine tablets/Spansule capsules
- Somatropin and Somatrem – Humatrope, Nutropin, Genotropin, Norditropin, Nutropin AQ, Saizen, Protropin and Serostim
- Alpha-1-proteinase inhibitor – Prolastin
- Imiglucerase – Cerezyme
- Desmopressin acetate – DDAVP intranasal solution and tablets and Stimate intranasal solution
- Darbepoetin - Aranesp

        *Subject to change upon notice

    B.    Clinical PA Program - Additional drugs other than the eight base listed above or other clinical prior authorizations (e.g., non-formulary overrides, medical exceptions, etc.) - $20.00 per request

        In those states where state or federal laws or regulations require involvement of a physician in the prior authorization process, the fee shall be $25.00 per prior authorization request.

    C.    Administrative PA – (non-clinical prior authorizations, vacation overrides, etc.) – no charge.

    D.    Custom PA (optional) – Customized protocols for prior authorization - $1,000.00 one time development charge per product and $20.00 per request.

    E.    The cost of an external appeal process, if any, shall be borne by Sponsor.

6.    Drug Choice Management Fee:    Percentage of savings retained by ESI:   25%

7.    Manual Eligibility Fee: If ESI must create or maintain a Member eligibility file by manually entering employee data or if the format is inconsistent with ESI's standard requirements, there will be a $1.00 per Member implementation fee.

8.    Implementation Package.

**HIGHLY
CONFIDENTIAL**

**PFTHW-FDB
000047**

◆ Standard Member Communication
(includes 2 standard ID cards)

- Mailed to Plan Sponsor            No Charge
- Mailed directly to Members        No Charge
- Replacement Cards                 $0.25/card

◆ Optional Member Communication

- Should Sponsor elect to recard Members
during any term of this Agreement, the
following additional fees apply:    $1.00/standard Resin ID card
                                    $2.00/non-standard ID card

9.    Management Reports:
      (other than the Standard Management Information Reports provided pursuant to Section
      3.3(b))

      A.    Additional Reports - $150.00 per report.

      B.    Ad Hoc (customized) programming or reporting fees:  $150 per hour with a
            minimum fee of $500.

10.   Rebate:

ESI will remit to Sponsor the amounts greater of (a) 80% of the Rebates paid to ESI by
pharmaceutical manufacturers with respect to qualifying Covered Drugs dispensed to Members,
or (b)(i) $3.00 per rebateable Prescription Drug Claim filled through a Participating Pharmacy,
and (ii) $5.00 per rebateable Prescription Drug Claim filled through the Mail Service Pharmacy
of the Rebates paid to ESI by pharmaceutical manufacturers with respect to qualifying Covered
Drugs dispensed to Members, and ESI will retain the balance of Rebates.

**PFTHW-FDB**

**000048**

**HIGHLY
CONFIDENTIAL**

### EXHIBIT B

### SPECIALITY INJECTABLES

1.  Prescription claims for Specialty Injectables dispensed from the Mail Service Pharmacy:

A.  Ingredient Cost.

| BRAND DRUG NAME | THERAPEUTIC CLASS | INGREDIENT COST (% DISCOUNT OFF AWP) |
|---|---|---|
| Enbrel | A & IS | 16.00% |
| Sandostatin | A & IS | 16.00% |
| Zoladex | A & IS | 16.00% |
| Hylagan | Arthritis | 16.00% |
| Synvisc | Arthritis | 16.00% |
| Aranesp | Erythroid Stimulant | 16.00% |
| Epogen | Erythroid Stimulant | 16.00% |
| Kineret | Erythroid Stimulant | 16.00% |
| Procrit | Erythroid Stimulant | 16.00% |
| Genotropin | Growth Hormone | 16.00% |
| Geref | Growth Hormone | 16.00% |
| Humatrope | Growth Hormone | 16.00% |
| Norditropin | Growth Hormone | 16.00% |
| Nutropin | Growth Hormone | 16.00% |
| Nutropin AQ | Growth Hormone | 16.00% |
| Nutropin Depot | Growth Hormone | 16.00% |
| Protropin | Growth Hormone | 16.00% |
| Saizen | Growth Hormone | 16.00% |
| Serostim | Growth Hormone | 16.00% |
| Alphanine SD | Hemostatic | 16.00% |
| Bebulin | Hemostatic | 16.00% |
| Benefix | Hemostatic | 16.00% |
| Helixate FS | Hemostatic | 16.00% |
| Hemophil M | Hemostatic | 16.00% |
| Humate RIC | Hemostatic | 16.00% |
| Humate P | Hemostatic | 16.00% |
| Kogenate FS | Hemostatic | 16.00% |
| Monoclate P | Hemostatic | 16.00% |
| Mononine | Hemostatic | 16.00% |
| Novoseven | Hemostatic | 16.00% |
| Proplex T | Hemostatic | 16.00% |
| Profilnine SD | Hemostatic | 16.00% |

HIGHLY
CONFIDENTIAL

ESI Legal: 80579-1

PFTHW-FDB
000049

| BRAND DRUG NAME | THERAPEUTIC CLASS | INGREDIENT COST (% DISCOUNT OFF AWP) |
|---|---|---|
| Fragmin | Heparin | 16.00% |
| Lovenox | Heparin | 16.00% |
| A.P.L. | Infertility | 16.00% |
| Antagon | Infertility | 16.00% |
| Cetrotide | Infertility | 16.00% |
| Chorex | Infertility | 16.00% |
| Factrel | Infertility | 16.00% |
| Fertinex | Infertility | 16.00% |
| Follistim | Infertility | 16.00% |
| Gonal-F | Infertility | 16.00% |
| Humegon | Infertility | 16.00% |
| Novarel | Infertility | 16.00% |
| Ovidrel | Infertility | 16.00% |
| Pergonal | Infertility | 16.00% |
| Pregnyl | Infertility | 16.00% |
| Profasi | Infertility | 16.00% |
| Repronex | Infertility | 16.00% |
| Synarel | Infertility | 16.00% |
| Alferon N | Interferons | 16.00% |
| Actimmune | Interferons | 16.00% |
| Avonex | Interferons | 16.00% |
| Betaseron | Interferons | 16.00% |
| Infergen | Interferons | 16.00% |
| Intron A | Interferons | 16.00% |
| Peg Intron | Interferons | 16.00% |
| Rebetol | Interferons | 16.00% |
| Rebetron | Interferons | 16.00% |
| Roferon A | Interferons | 16.00% |
| Neumega | Interleukin | 16.00% |
| Proleukin | Interleukin | 16.00% |
| Copaxone | MS | 16.00% |
| Leukine | Myeloid Stimulant | 16.00% |
| Neupogen | Myeloid Stimulant | 16.00% |
| Lupron | OB/GYN | 16.00% |
| Remicade | Other | 16.00% |
| Bay Rho-D | Other | 16.00% |
| Rhogam | Other | 4.00% |
| Synagis | RSV | 16.00% |

**PFTHW-FDB**
**000050**

**HIGHLY CONFIDENTIAL**

(1)    The above injectables list is subject to amendment from time to time as other Specialty Injectable products become available.

(2)    Such ingredient cost shall be AWP minus the percentage discount set forth above, plus applicable sales or excise tax or other governmental surcharge, if any.

B.    <u>Dispensing Fee</u>:  $1.55 per Prescription Drug Claim for Specialty Injectables. This fee is subject to adjustment from time to time for reasonable increases in postage and delivery charges upon notice to Sponsor.

C.    In the event that a generic equivalent for Specialty Injectables listed on this <u>Exhibit B</u> becomes available, the parties may negotiate an amendment to the pricing of such product. Sponsor acknowledges that some Specialty Injectables may be subject to availability from the pharmaceutical manufacturer or otherwise because they are in "short supply," subject to "recall" or subject to "allocation", as such terms are commonly used in the pharmacy industry. Notwithstanding anything to the contrary, if ESI's acquisition cost is increased as a result of such factors, the rate charged to Sponsor shall be ESI's acquisition cost for such drug, plus the dispensing fee set forth in this <u>Exhibit B</u>, plus applicable sales or excise tax or other governmental surcharge.

D.    ESI retains 100% of any Rebates generated by Specialty Injectables, if any.

**HIGHLY CONFIDENTIAL**

**PFTHW-FDB 000051**

## EXHIBIT C

## LICENSE TERMS AND CONDITIONS

1.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Applications" shall mean ESI's proprietary applications listed on <u>Attachment C-1</u> attached hereto, and any and all updates, upgrades, improvements and modifications, amendments to such Applications which are executed by both parties, including the servers, web site hosting and computer program(s) comprising or hosting such Applications and/or certain tangible media on which such programs are recorded.

"Authorized Site(s)" shall mean the locations or CPUs identified on <u>Attachment C-1</u> attached hereto.

"Documentation" shall mean all specifications and other supporting documentation for or related to the Applications provided to Sponsor by ESI.

"Information" shall mean all information and/or data collected, accumulated, assembled, compiled, formulated, derived, reported, produced, and/or provided by ESI to Sponsor, and which will or may be made available to Sponsor under this Agreement. Notwithstanding anything to the contrary contained herein, the term "Information" shall not include any information or data related to a "Member," including but not limited to "Member Confidential Information," as such terms are defined in the Agreement.

2.    <u>License</u>.

(a)    ESI hereby grants to Sponsor, for a term to expire on the date of termination or expiration of the PBM Agreement, solely for Sponsor's (and, in the case of Express Choice, Members') use pursuant to the terms and conditions hereof, and without the right to alienate, assign, sub-license, or otherwise transfer all or any part of the rights so granted, a limited, personal, revocable, non-exclusive, non-assignable, non-transferable license to access and/or use the Applications.

(b)    The Applications, Documentation, and/or Information are and shall remain the sole and exclusive property of ESI, and Sponsor shall not have or acquire any right or interest in or to the Applications, Documentation, and/or Information except for the limited rights expressly granted herein.

(c)    ESI owns all right, title and interest in and to any and all derivative works of the Applications, Documentation and/or Information, and any and all updates, upgrades, modifications, changes, alterations, edits, conversions, improvements, or the like, to said the Applications, Documentation and Information. Any and all derivative works of the Applications, Documentation and/or Information, and any and all updates, upgrades, modifications, changes, alterations, edits, conversions, improvements, or the like, made to the Applications, Documentation and/or Information, shall be treated under and subject to the confidentiality provisions set forth in Section 4 below.

**HIGHLY**
**CONFIDENTIAL**

**PFTHW-FDB**
**000052**

ESI Legal: 80579-1

3.    <u>Use Of Applications</u>.

(a)    Sponsor shall only use the Applications on equipment at an Authorized Site which is under the direct control of the Sponsor and the Sponsor shall only permit its bona fide employees to operate the Applications, unless otherwise approved by ESI in writing.

(b)    Sponsor shall only use the Applications for its internal purposes, and in no event shall Sponsor use or knowingly permit the use of the Applications, Documentation, Information, and/or any data or information derived therefrom, for any other purpose, or on behalf of any other provider of pharmacy benefit services or any other services.

(c)    Sponsor agrees not to reverse engineer, reverse compile, de-compile, or disassemble the Applications in any manner or form and will not either itself or permit others to create or attempt to create by reverse engineering, reverse compiling, de-compiling, disassembling or otherwise, the source programs or any part thereof from the object programs or from other information made available from ESI under this Agreement or otherwise (whether oral, written, tangible or intangible).

(d)    Sponsor may not copy, reproduce or duplicate the Applications, Documentation, and/or Information, and/or any tangible media containing the Applications, Documentation, and/or Information, in any manner or form, in whole or in part. Sponsor shall prevent and not permit any third parties, persons or entities from copying, reproducing, duplicating, examining, inspecting, studying, and/or reviewing the Applications, Documentation, and/or Information. Sponsor's violation of any provision of this Section 3(d) shall constitute a material breach of this Agreement, misappropriation of ESI's intellectual property rights, and possible copyright infringement.

(e)    All copies of the programs which constitute all or a portion of the Applications and all Documentation, whether in printed or machine readable form, and whether on storage media or otherwise, and all legends, trademarks, service marks, and copyright notices contained on or in the Applications or Documentation as delivered to Sponsor by ESI shall be considered part of the Applications and Documentation subject to this Agreement.

(f)    Sponsor shall not remove from, alter, modify or deface any copyright notice, trademark, service mark, logo, name, decal or imprint affixed to or on the Applications, Documentation, and/or Information including, but not limited to, those which identify ESI or any other party as the source of origin of such goods, products, Applications, Documentation and/or Information.

(g)    Sponsor shall not attempt to register any copyrights, register any trademarks or service marks, or apply for any patent or other intellectual property protection for the Applications, Documentation and/or Information, any segments or portions thereof, or any marks, logos, names, decals or imprints associated therewith.

(h)    Sponsor is specifically prohibited from and may not modify, alter, amend, or otherwise change the Applications in any way or manner, except as expressly permitted by ESI in writing. Any attempts by Sponsor to modify, alter, amend or otherwise change the Applications without ESI's prior written consent and direction shall be a material breach of this Agreement and at Sponsor's sole risk and expense, and in no event shall ESI have any obligation or duty to support or maintain any such modification, alteration, amendment, or other changes to the Applications, and all warranties with respect to the Applications shall immediately terminate. ESI shall not be responsible or liable in any manner whatsoever for Application failures, errors or any non-conformance to Application documentation or specifications which occur as a result of any unauthorized modification, alteration, amendment or other

**HIGHLY
CONFIDENTIAL**

**PFTHW-FDB
000053**

change to the Applications so made by Sponsor. Sponsor shall assume any and all responsibility and liability, of any kind or nature, and agrees to indemnify, defend, and hold ESI harmless for any such liability, which arises out of any use of Applications modified, altered, amended or otherwise changed by or on behalf of Sponsor.

(i)     Sponsor acknowledges and agrees that any violation of any term, condition or provision of this Section 3 would cause ESI irreparable harm for which there would be no adequate remedy at law, and that ESI shall be entitled to preliminary and other injunctive relief against any such violation. Such injunctive relief shall be in addition to, and in no way shall limit, any other rights or remedies which ESI may have at law or in equity including, but not limited to, damages.

4.     Confidentiality/Proprietary Information. Sponsor acknowledges that the Applications, Documentation and Information are confidential and proprietary products and processes, that they embody valuable trade secrets, and that ESI has certain intellectual property rights in and to the Applications and Documentation, including but not limited to copyrights, trade secrets, patent rights, trademarks and service marks. Sponsor understands that ESI's rights in and to the Applications and Documentation extend to the intellectual processes, procedures, apparatus, and to the original works of authorship, expressions and articulations contained in the Applications and Documentation, and that no right, title or interest, except for the limited license set forth herein, is conveyed or transferred to Sponsor in any way or manner by this Agreement or in or by any schedule or addenda hereto.

5.     Delivery and Installation.     Installation of the Applications is the responsibility of Sponsor, however, Sponsor may obtain Applications related installation assistance from ESI via telephone. ESI may provide Sponsor with on-site training as ESI, in its sole discretion, deems necessary.

6.     Limited Warranty

(a)     ESI warrants that the Applications will perform substantially in accordance with ESI's specifications for the term of the Agreement at an Authorized Site in an environment which conforms with ESI's specifications. In the event Sponsor advises ESI in writing during such period of any alleged failure of the Applications to perform substantially in accordance with ESI's specifications, ESI, at its sole option, will either repair or replace the Applications. ESI's warranty obligations under this Agreement are specifically and expressly limited to either the repair or replacement of the Applications. ESI shall not be responsible for, and this warranty shall not apply to, operator errors, Sponsor hardware defects, failure or incompatibility, operating system or third-party applications failures, or problems due to changes or modifications in the Applications made by or on behalf of Sponsor. Sponsor shall fully reimburse ESI on a time and materials basis for time ESI spends at Sponsor's facility investigating alleged problems which are determined by ESI, in ESI's sole discretion, not to be covered by the warranty.

(b)     ESI MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OR ARISING OUT OF COURSE OF PERFORMANCE, CUSTOM, INDUSTRY STANDARD, OR USAGE IN TRADE, INCLUDING, BUT NOT LIMITED TO MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

7.     LIMITATION OF LIABILITY.  IN NO EVENT SHALL ESI BE LIABLE TO SPONSOR, REGARDLESS OF THE FORM OF A CAUSE OF ACTION WHETHER IN CONTRACT, TORT OR UNDER A STATUTE, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE OR STRICT LIABILITY.  IN NO EVENT WILL ESI BE RESPONSIBLE AND/OR LIABLE TO SPONSOR OR ANY OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL.

CONSEQUENTIAL OR PUNITIVE DAMAGES OR OTHER DAMAGES OF ANY KIND TO SPONSOR OR ANY OTHER PARTY, INCLUDING, BUT NOT LIMITED TO, FOR LOSS OF DATA, LOSS OF USE, LOSS OF PROFITS, INVASION OF PRIVACY, OR THE LIKE, EVEN IF ESI HAS BEEN ADVISED IN ADVANCE OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES, EXCEPT FOR CLAIMS COVERED UNDER SECTION 6 OF THIS AGREEMENT. The terms and provisions of this Section 7 shall survive the termination and/or expiration of the Agreement for any reason.

8. <u>Termination.</u>

(a) Subject to any other terms or provisions of the Agreement, this License may be terminated at any time upon written notice by ESI to Sponsor if:

(i) Sponsor makes any successful or unsuccessful attempts to copy, reproduce or duplicate the Applications, Documentation and/or Information, except as permitted herein, or to use the Applications on systems or at locations not permitted under the terms of this Agreement, unless Sponsor has sought and received the prior written consent to do so from ESI.

(ii) Sponsor makes any successful or unsuccessful attempt to reverse engineer, reverse compile, de-compile, or disassemble one or more Applications; or if Sponsor attempts to, directly or indirectly, alienate, assign, sub-license, or otherwise transfer this Agreement or all or any part of the rights granted to Sponsor hereunder, without ESI's prior written consent, such action being deemed to be a material breach of this Agreement.

(b) Upon the termination, cancellation or expiration of this License or the Agreement, Sponsor shall immediately cease using the Applications and, if applicable, shall return to ESI all copies of the Applications and tangible media on which such computer programs are recorded and all copies of the Documentation and Information, accompanied by a certificate by an officer of Sponsor confirming that the items so returned constitute all of the copies or counterparts (in whole or in part) of the Applications, tangible media on which such computer programs are recorded, and all copies of the Documentation and Information, and that Sponsor has not retained or disposed of any copies or counterparts thereof.

**PFTHW-FDB**

**000055**

**HIGHLY**
**CONFIDENTIAL**

ESI Legal: 80579-1

Attachment C-1

A.     Authorized Sites:

B.     Applications:

☐     RxWorkbench*
☐     Express Choice
☐     _____
☐     _____
☐     _____

*   Sponsor acknowledges and understands that until RxWorkbench is available through Express Choice, its use of RxWorkbench is expressly limited to the operation and use of only one (1) copy of the Application and one (1) copy of the Documentation per each five (5) users at each Authorized Site.

HIGHLY
CONFIDENTIAL

**PFTHW-FDB
000056**

BSI Legal: 80579-1

Exhibit F

Filed Under Seal

# Exhibit G

# GENERAL PRESCRIPTION PROGRAMS, INC.
## 5th Floor
## 61 FREEMAN STREET
## NEWARK, NEW JERSEY 07105
-------------
### (973) 589 - 5000

November 14, 2003

William Einhorn, Administrator
Teamsters Health and Welfare Fund
of Philadelphia and Vicinity
4th and Cherry Streets
Philadelphia, Pennsylvania 19106-1899

Dear Bill:

Enclosed is the copy of the Agreement.

In order to reflect the actual operation presently in place, we have made slight alterations to the Agreement.

Additions to the Agreement have been italicized and deletions have been underlined.

Comments on each change are as follows:

First paragraph

    General Prescription Programs, Inc. is a Delaware corporation and not a New Jersey corporation.

Section 2. Duties and Responbilities
    a. In General
        i.

        6.    Since we have been providing service to your Fund, the plan has operated in the manner which is indicated in the italicized insertion.

            Now that your Fund has a differentiation between brand and generic drugs, you may wish to continue as you have in the past. The copayment differentiation may actually be superior to anything else in motivating people to use generic drugs. The reason for this can best be seen in the following example:

            The physician prescribes for a member Lopid 600 mg (AWP $ 1.72 per tablet). The physician also indicates that the drug must be dispensed as written. The member goes to his pharmacy. The

THWF 1849

pharmacist indicates that the member's program only reimburses for generic drugs. The member then must pay the difference between the generic Lopid 600 mg (GPP MAC $ .32 per tablet) and the brand name Lopid. Since the physician insisted on the brand name drug, the physician should be contacted. In many instances if the pharmacist is unable to reach the physician or if the physician does not like to be bothered with telephone calls, then when the pharmacist does reach the physician, or next time the member goes to the physician, in order to avoid a hassle, the physician may prescribe a drug such as Tricor 160 mg (AWP $ 3.19 per tablet). This drug is in a similar therapeutic class as Lopid except it is under patent protection, and as such it would cost the Fund far more money.

8. An exclusive toll free number was not in effect in the past and there were never any service issues in this regard.

Section 2. Duties and Responsibilities

    b. Reimbursement

        ii. In the past, our mandate has been that every pharmacy in Pennsylvania and throughout the United States be available to the membership. For the most part, dispensing fees are $2.25 or lower. The one main exception is CVS pharmacies which will not accept a lower dispensing fee. In our opinion, they should not be part of the program.

        Our policy, unlike our competitors, is to never have a "spread" or "markup" at any of the retail pharmacies. Exactly the amount we are charged is exactly the amount the Fund is billed. We negotiate with the pharmacies to provide the Fund with the greatest discounts. As such, many pharmacies have lower dispensing fees than $2.25 which is passed on to the Fund.

Section 3. Cost of Prescriptions to the Fund (the "cost")

As we indicated above, our policy, unlike our competitors, is to never have a "spread" or "markup" at any of the retail pharmacies. Exactly the amount we are charged is exactly the amount the Fund is billed. We negotiate with the pharmacies to provide the Fund with the greatest discounts. This is extremely important. If the Fund elects to utilize those pharmacies where we have negotiated guaranteed discounts of AWP less 16% on brand name drugs, discounts of close to AWP less 18% could be achieved. The reason for this is that we reimburse the pharmacies the lower of the submitted price or our negotiated reimbursement rate, whichever is lower. It has been our experience that this reduces overall ingredient cost by close to 2%.

Many of our competitors "play games" with pharmacy discounts by establishing a strategic alliances with certain chains and co-promoting brand name pharmaceuticals. We do not do this. Therefore, any discounts that we achieve

THWF 1850

for the Fund is a "true" discount.

Since the Fund wishes to utilize every pharmacy in the United States, as opposed to our guaranteed best discount pharmacies, we believe that the new insertion would reflect the plan more accurately.

4.    Administrative costs and fees

iii.    Postage
As we have indicated in the past, we believe very strongly that mail order increases the cost of a prescription drug program.    At present, the program does not utilize mail order service; however, if they did wish to utilize that service, we have indicated that the actual US Postal Service/United Parcel Service/Airborne Express would be charged.

8.    Utilization reports

a.    As the Fund is aware, we are providing any necessary reports in any requested media to the Fund.  Since we would do this for the Fund at any time indicated, we changed it to a mutually agreed time interval as opposed to a fixed time interval.

13.    Term

a.    This Agreement may be terminated at any time with or without cause, as indicated in b. of this section, prior or subsequent to the expiration of the biannual period of the Agreement.  This would provide the necessary flexibility to the Fund if there is to be a transition period to a new company.  More specifically, the members would be protected with full coverage and these services would continue uninterrupted.    The continuation of these services would be pursuant to the ongoing Agreement and there would not be undue pressure and hast to enter into a final and binding Agreement with a new pharmacy benefit company. This give the Fund added flexibility.

If there are any questions in regard to this, please do not hesitate to contact me.

Sincerely,

Joel Grodman, RP

## PRESCRIPTION DRUG SERVICES PROVIDER AGREEMENT

**AGREEMENT** made this 31st day of January 2003, by and among the Teamsters Health and Welfare Fund of Philadelphia and Vicinity, with offices at 4th & Cherry Streets, Philadelphia, Pennsylvania 19106 (the "Fund") and General Prescription Programs, Inc. a *Delaware* corporation with its principal offices at 61 Freeman Street, 5th Floor, Newark, New Jersey 07105 ("GPP").

**WHEREAS,** the Fund desires to provide certain prescription drug services for its eligible participants and their beneficiaries (hereinafter referred to as Participants);

**WHEREAS,** GPP is engaged in the business of performing certain administrative services in connection with the administration of prescription drug plans; and

**WHEREAS,** the Fund originally entered into an Agreement in 1986 with GPP to administer a high quality prescription drug program in a competent and efficient manner and at a reasonable price, and the Fund and GPP desire to continue the relationship on the terms and conditions set forth herein;

**NOW THEREFORE,** the parties hereto, in consideration of the mutual promises and duties set forth, each intending to be legally bound, do agree as follows:

1.   **APPOINTMENT**

    a.   GPP is hereby reappointed as the Pharmacy Benefit Manager of the Prescription Drug Program ("the Program") and GPP accepts such appointment.

2.   **DUTIES AND RESPONSIBILITIES**

    a.   **In General**

        i.   GPP shall provide the following administrative services for eligible Participants:

            1.   Arrange for a network of pharmacies in the United States *which* *who* will accept the Fund's identification card (a "Prescription Card") as payment for prescription drugs to eligible Participants;

            2.   Pay to the participating pharmacies the amounts properly due and owing;

            3.   Develop and maintain an on-line eligibility system whereby participating pharmacies have a network computer link to GPP's eligibility files. GPP shall be responsible for updating the eligibility information within twenty-four (24) hours of the transmission of same from the Fund, except for weekends and official federal and state holidays in New Jersey, in which case the twenty-four (24) hour period shall run from the beginning of the next business day following the weekend or official federal or state holiday. Participant eligibility is based on the date that a prescription is filled. In

THWF 1852

order to determine eligibility for paper claims, GPP must establish the database so that GPP can access eligibility with respect to an 18-month period to take into account the potential lag time between the date the prescription is filled and the date a claim is filed.

4. Issue Prescription Cards to the Participants as directed by the Fund in a format satisfactory to the Fund;

5. Monitor the usage of prescription drugs filled through the Program to ensure that neither pharmacists nor Participants are abusing the Program, and provide periodic reports to the Fund.

6. Provide informational packets in a format approved by the Fund that explain the Program, including the three-tiered participant copayment, the amount of which is established from time to time by the Fund. GPP accepts the Fund's policy to not reimburse more than the generic cost of a drug (less applicable co-payment) when there is a generic equivalent drug, absent a written statement of medical necessity for a brand-name from the prescribing physician, and the other basic terms and conditions of the Program. *It being understood that a statement on the prescription of dispense as written would be considered a statement of medical necessity.*

7. Develop a system that will enable the Fund to access GPP's computer records of the Fund's eligibility files.

8. <u>Maintain a special toll-free ("800") number for the exclusive use of Fund Participants.</u>

9. Make good faith efforts to expand the network of pharmacies that participate in the program on an ongoing basis.

10. Send representatives to attend meetings at the Fund's request to report on the Program and industry developments and to respond to questions concerning the operation of the Program.

11. Make recommendations to the Fund with respect to possible improvements in the Program, including changes in the plan design.

b. <u>Reimbursement</u>

i. The Fund shall reimburse GPP for the cost of prescriptions, as defined below, (including dispensing fees) filled by participating

THWF 1853

pharmacies within ten (10) days of its receipt of properly itemized bill documenting the amounts paid by GPP, the date payments were made, the names and social security numbers of the individuals on behalf of whom payments were made and such other information as may reasonably be requested by the Fund.

ii.    GPP shall pay to participating pharmacies an amount equal to the Cost of prescriptions filled plus the dispensing fee (not to exceed Two Dollars and Twenty Five Cents ($2.25) in Pennsylvania) for each prescription that is filled for an eligible Participant, less the amount of any co-payment received by the pharmacy by an eligible Participant. The dispensing fee payable to pharmacies outside of the Commonwealth of Pennsylvania shall be as low as GPP may in good faith negotiate and shall not exceed the maximum dispensing fee permitted by Medicaid. GPP shall provide to the Fund a list of the applicable dispensing fees for the states of New Jersey, New York and Delaware for such other states as the Fund may from time to time request. *The amount of the dispensing fee shall be the lesser of the dispensing fee negotiated between GPP and the pharmacy or the submitted dispensing fee of that pharmacy. In no case shall GPP keep a differential between the submitted dispensing fee and the dispensing fee billed to the Fund. (This means that if GPP pays a dispensing fee of $1.99 for a prescription drug at a retail pharmacy, the Fund shall be responsible for a payment equaling a dispensing fee of $1.99 for that prescription drug.)*

3.    **COST OF PRESCRIPTIONS TO THE FUND (the "Cost")**

a.    It is understood by the parties that a major reason that the Fund has entered into this Agreement is to enable it to pay for prescription drugs at a price below the Average Wholesale Price, as that term is commonly understood in the pharmaceutical industry. Specifically, GPP represents that its charges to the Fund (the "Cost") for prescription drugs shall not exceed the following (reduced by the amount of the co-payment):

-    Brand-name drugs - effective rate of AWP less 16.6 percent.

-    Generic drugs - HCFA MAC or, for prescription drugs for which there does not exist a HCFA MAC price, the lowest reduction from AWP as GPP reasonably may negotiate. In determining the price for generic drugs, AWP shall mean the average wholesale cost of all generic drugs with the same chemical formula.

**3.**    *Cost of Prescriptions to the Fund*

a.    *It is understood by the parties that a major reason that the Fund has entered into this Agreement is to enable it to pay for prescription drugs at*

*a price below the Average Wholesale Price ("AWP"). AWP shall be determined with reference to the price cited by FirstData Bank on the date that the drug was dispensed with respect to the appropriate NDC Code and the actual package size, not standard package size and other factors that the Trustees deem appropriate. Specifically, GPP represents that its charges to the Fund (the "Cost") for prescription drugs shall not exceed the following (reduced by the amount of the co-payment):*

> *Brand-name drugs: The lesser of the negotiated AWP discount between the pharmacy or the amount actually paid by GPP for the prescription drug dispensed to the Fund's participant or beneficiary. (This means that if GPP pays AWP -23% for a prescription drug at a retail pharmacy, the Fund shall be responsible for a payment equaling AWP -23% for that prescription drug.)*
>
> *Generic drugs: HCFA MAC, now referred to as FUL, or, for prescription drugs for which a FUL price does not exist, GPP shall negotiate the lowest reduction from AWP. This price is referred to as the GPP MAC price which in no event shall be more than three times the Wholesale Acquisition Cost (WAC) or Net Wholesale Unite Price*
>
> *(WHN_P) as defined by First Databank (The Hearst Corporation, 111 Bayhill Drive, San Bruno, California 94066) on the date the drug was dispensed.*
>
> *In no case shall GPP keep a differential between the cost of the prescription submitted and the cost of the prescription billed to the Fund.*

4.   **ADMINISTRATIVE COSTS AND FEES**

    a.   The Fund shall pay to GPP, as compensation for its services the following fees:

        i.   Prescription Card Usage Fees
Where the eligible Participant uses the Prescription Card at a participating pharmacy, the Fund shall pay to GPP the sum of Sixty cents ($0.60) for each Prescription that is processed on behalf of an eligible Participant. Where an ineligible Participant presents a Prescription Card to a participating pharmacy, and GPP is charged for such attempted use, the Fund shall pay to GPP an amount not to exceed the lower of GPP's actual cost, or Twenty-Five cents ($0.25).

THWF 1855

ii.    <u>Paper Claims</u>

Where an eligible Participant submits a claim for reimbursement to the Prescription Drug Administrator instead of using a Prescription Card, the Fund shall pay to GPP the sum of One Dollar and Fifty Cents ($1.50) for each eligible claim processed. The Participant shall only be reimbursed by GPP the price of a generic equivalent of any drug (less the amount of applicable copayment) unless the Participant's physician states in writing that a brand name drug is medically necessary.

iii.   <u>Postage</u>

The parties agree to bear the cost of postage for the various mailings GPP performs on behalf of the Fund as specifically set forth in this Agreement. By the term "postage" the parties mean the actual cost to GPP as charged by the outside carrier for 1) check payments to vendors; 2) direct reimbursements to Participants; 3) letters to physicians or other providers; and 4) general postage charged for matters directly necessary to the administration of the Fund's prescription plan; *5) the exact cost of mailing/delivery of dispensed prescriptions to Participants.* The Fund will make payment for the postage by reimbursing GPP for those postage expenses actually incurred and properly documented.

iv.    <u>Charges for Prescription Cards</u>

GPP will charge the Fund thirty cents ($0.30) for each Prescription Card as requested directly by the Fund. GPP may charge the fund its actual cost incurred for postage or UPS charges for delivery of cards. GPP shall not provide additional cards to Participants except upon the request of the Fund.

v.     <u>Payment by Fund</u>

In all cases, the Fund shall pay on a monthly basis administrative costs and fees by separate check within fifteen (15) days of receipt of an itemized bill from GPP. This bill shall include such information as may be requested by the Fund.

vi.    <u>No Other Charges</u>

Except as specifically set forth in this Agreement, the Fund shall pay no other fees or charges to GPP.

5.    **SCOPE OF COVERAGE**

a.    In general, the Program covers all prescription drugs which are "medically necessary" as determined under the Fund's Plan. Prescriptions for drugs the retail cost of which would exceed $1,500 per prescription must be pre-certified under the Fund's Managed Care Program.

*THWF 1856*

b. The Fund will neither pay nor reimburse GPP for the processing of claims relating to drugs which require pre-certification unless the prescription is first approved under the Fund's managed care program.

6. **BONDING AND INSURANCE**

a. GPP will obtain a fidelity bond in the amount of Five Hundred Thousand Dollars ($500,000.00) naming the Fund as beneficiary in the event of the loss of Fund assets on account of theft, embezzlement, or dishonesty by an employee, owner, agent, or independent contractor of GPP.

b. GPP will provide to the Fund a copy of liability insurance policy shall be acceptable to the Fund (covering both negligence and errors and omissions of GPP, its agents and employees) relating to their activities in connection with the Program in an amount not less than One Million Dollars ($1,000,000.00). GPP also will provide to the Fund a copy of liability insurance which insurance policy shall be acceptable to the Fund (covering negligence, including malpractice, and errors and omissions of GPP, its agents and employees) in an amount not less than Five Million Dollars ($5,000,000.00).

7. **FORMULARY, REBATE, ALLOWANCES, ETC.**

a. Joel Grodman individually, and on behalf of GPP, represents that neither he, GPP, nor any person who is an agent or employee or owner of GPP, nor any person related to Joel Grodman or to any agent, employee or owner of GPP are receiving or will receive any money or any thing of value (whether in the form of cash, property, research grants, credits, services, advertising allowances or otherwise) from any pharmaceutical manufacturer, distributor, or other person or entity that engages directly or indirectly in the business of providing goods or services related to the pharmaceutical business that he, she, or it would not have received but for the Fund's participation in the Program. The foregoing representation shall not be construed to preclude that acceptance of manufacturer's allowances or rebates with respect to the purchase of any items covered under the Program, so long as one hundred percent of such amounts are passed through and credited to the Fund. To the extent any such amounts are received by any other entity and to the extent they relate to the Fund's participation in the Prescription Program, they shall be paid to the Fund. This representation is continuing in nature and shall survive this Agreement. In the event this Section 7 is breached, Joel Grodman and GPP shall pay to the Fund the fair market value of any amounts received by them or a related party, together with interest at a rate equal to the interest rate that the Internal Revenue Service charges on tax underpayments.

8. **UTILIZATION REPORTS**

a. GPP shall provide to the Fund utilization reports on a *mutually agreed basis*. These reports shall set forth the total number of prescriptions

filled, the number of participants using the Program, the number of prescriptions filled at each of the participating pharmacies, the average cost of prescriptions filled, the average number of prescriptions filled per Participant, and such other information as may be requested by the Fund, including information concerning the mail order program. GPP agrees to provide to the Fund on a monthly basis claim utilization information on a magnetic tape in a form acceptable to the Fund. In addition, GPP will provide to the Fund specific information concerning prescriptions filled on behalf of any Participant and such other information as may be requested from time to time by the Fund.

9. **AUDIT RIGHT**

    a.    GPP agrees to maintain adequate books and records concerning all financial and accounting activities of the Program. All such records, including all relevant background documentation, shall be open to inspection and audit upon reasonable notice by the Fund or an authorized representative thereof, including the Fund's counsel, or designated audit agent.

    b.    On an annual basis, GPP shall provide to the Fund at the Fund's request, a Statement on Auditing Standards (SAS) No. 70, Type II audit report.

10. **PRIVACY**

    a.    Fund and GPP agree to comply with the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as set forth in Title 45, Parts 160 and 164 of the Code of Federal Regulations (the "CFR").

    b.    **Definitions.** Capitalized terms not otherwise defined in this Section 10 of the Agreement shall have the meanings given to them in Title 45, Parts 160 and 164 of the CFR and are incorporated herein by reference.

    c.    **Use and Disclosure of Protected Health Information.** GPP shall use and/or disclose Protected Health Information ("PHI") only to the extent necessary to satisfy GPP's obligation under the Agreement.

    d.    **Prohibition on Unauthorized Use or Disclosure of PHI.** GPP shall not use or disclose any PHI received from or on behalf of Fund, except as permitted or required by the Agreement, as required by law or as otherwise authorized in writing by Fund. GPP shall comply with: (a) Title 45, Part 164 of the CFR; (b) State laws, rules and regulations applicable to PHI not preempted pursuant to Title 45, Part 160, Subpart B of the CFR or the Employee Retirement Income Security Act of 1974 ("ERISA") as amended; and (c) Fund's health information privacy and security policies and procedures.

    e.    **GPP's Operations.** GPP may use PHI it creates or receives for or from Fund only to the extent necessary for GPP's proper management and administration or to carry out GPP's legal responsibilities. GPP may disclose such PHI as necessary for GPP's proper management and

THWF 1858

administration or to carry out GPP's legal responsibilities only if:

 i. The disclosure is required by law; or

 ii. GPP obtains reasonable assurance, evidenced by written contract, from any person or organization to which GPP shall disclose such PHI that such person or organization shall;

  1. Hold such PHI in confidence and use or further disclose it to the person or organization or as required by law; or

  2. Notify GPP (who shall in turn promptly notify Fund) of any instance of which the person or organization becomes aware in which the confidentiality of such PHI was breached.

f. **Data Aggregation Services.** GPP may use PHI to provide Data Aggregation Services related to Fund's Health Care Operations.

g. **PHI Safeguards.** GPP shall develop, implement, maintain and use appropriate administrative, technical and physical safeguards to prevent the improper use or disclosure of any PHI received from or on behalf of Fund.

h. **Electronic Health Information Security and Integrity.** GPP shall develop, implement, maintain and use appropriate administrative, technical and physical security measures in compliance with Section 1173 (d) of the Social Security Act, Title 42, Section 1320d-2(d) of the United States Code and Title 45, Part 142 of the CFR to preserve the integrity and confidentiality of all electronically maintained or transmitted Health Information received from or on behalf of Fund pertaining to an individual. GPP shall document and keep these security measures current.

i. **Protection of Exchanged Information in Electronic Transactions.** If GPP conducts any Standard Transactions for or on behalf of Fund, GPP shall comply, and shall require any subcontractor or agent conducting such Standard Transaction to comply, with each applicable requirement of Title 45, Part 162 of the CFR. GPP shall not enter into or permit its subcontractors or agents to enter into any Trading Partner Agreement in connection with the conduct of Standard Transactions for or on behalf of Fund that: (a) changes the definition, Health Information condition or use of a Health Information element or segment in a Standard; (b) adds any Health Information elements or segments to the maximum defined Health Information set; (c) uses any code or Health Information elements that are either marked "not used" in the Standard's Implementation Specifications or are not in the Standard's Implementation Specification(s); or (d) changes the meaning or intent of the Standard's Implementation Specification(s).

j. **Subcontractor and Agents.** GPP shall require each of its subcontractors or agents to whom GPP may provide PHI received from, or created or received by GPP on behalf of Fund to agree to written contractual provisions that impose at least the same obligations to protect such PHI as are imposed on GPP by the Agreement.

k. **Access to PHI.** GPP shall provide access, at the request of Fund, to PHI

in a Designated Record Set, to Fund or, as directed by Fund, to an individual to meet the requirements under Title 45, Part 164, Subpart E, Section 164.524 of the CFR and applicable state law. GPP shall provide access in the time and manner set forth in Fund's health information privacy and security policies and procedures.

l.    **Amending PHI.** GPP shall make any amendment(s) to PHI in a Designated Record Set that Fund directs or agrees to pursuant to Title 45, Part 164, Subpart E, Section 164.526 of the CFR at the request of Fund or an Individual, and in the time and manner set forth in Fund's health information privacy and security policies and procedures.

m.    **Accounting of Disclosures of PHI.**

    i.    GPP shall document such disclosures of PHI and information related to such disclosures as would be required for Fund to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with Title 45, Part 164, Subpart E, Section 164.528 of the CFR.

    ii.    GPP agrees to provide Fund or an individual, in the time and manner set forth in Fund's health information privacy and security policies and procedures, information collected in accordance with Section 11(a) above, to permit Fund to respond to a request by and individual for an accounting of disclosures of PHI in accordance with Title 45, Part 164, Subpart E, Section 164.528 of the CFR.

n.    **Access to Books and Records.** GPP shall make its internal practices, books and records relating to the use and disclosure of PHI received from or on behalf of Fund available to Fund and to DHHS or its designee for the purpose of determining Fund's compliance with the Privacy Rule.

o.    **Reporting.** GPP shall report to Fund any use or disclosure of PHI not authorized by the Agreement, by law, or in writing by Fund. GPP shall make the report to Fund's Privacy Official not less than 24 hours after GPP learns of such unauthorized use or disclosure; (b) identify the PHI used or disclosed; (c) identify who made the unauthorized use or received the unauthorized disclosure; (d) identify what GPP has done or shall do to mitigate any deleterious effect of the unauthorized use or disclosure; (e) identify what corrective action GPP has taken or shall take to prevent future similar unauthorized use or disclosure; and (f) provide such other information, including a written report, as reasonably requested by Fund's Privacy Official.

p.    **Mitigation.** GPP agrees to mitigate, to the extent practicable, any harmful effect hat is known to GPP of a use or disclosure of PHI by GPP in violation of the requirements of the Agreement.

q.    **Termination for Cause.** Upon Fund's knowledge of a material breach by GPP, Fund shall:

    i.    Provide an opportunity for GPP to cure the breach or end the violation and terminate if GPP does not cure the breach or end the violation within the time specified by Fund.

    ii.    Immediately terminate the Agreement if GPP has breached a

THWF 1860

material term of the Agreement and cure is not possible.

    iii.    If neither termination nor cure is feasible, Fund shall report the violation to DHHS.

r.    **Return or Destruction or Health Information**.

    i.    Except as provided in Section 17(b) below, upon termination, cancellation, expiration or other conclusion of the Agreement, GPP shall return to Fund or destroy all PHI received from Fund, or created or received by GPP on behalf of Fund. This provision shall apply to PHI that is in the possession of subcontractors or agents of GPP. GPP shall retain no copies of the PHI.

    ii.    In the event that GPP determines that returning or destroying the PHI is infeasible, GPP shall provide to Fund notification of the conditions that make return or destruction infeasible. Upon verification by Fund that the return or destruction of PHI is infeasible, GPP shall extend the protections of the Agreement to such PHI and limit further uses and disclosures of PHI to those purposes that make the return or destruction infeasible. Upon verification by Fund that the return or destruction of PHI is infeasible, GPP shall extend the protections of the Agreement to such PHI and limit further uses and disclosure of PHI to those purpose that make the return or destruction infeasible, for so long as GPP maintains such PHI.

s.    **Automatic Amendment**. Upon the effective date of any amendment to the regulations promulgated by HHS with respect to PHI, the Agreement shall automatically amend such that the obligations imposed on GPP as a GPP remain in compliance with such regulations.

11.    **INVESTIGATIONS**

    a.    GPP shall promptly notify the Fund of any dealings with federal or state investigators and provide sufficient information to the Fund so that the Fund may determine whether such investigations impact GPP's relationship with the Fund.

12.    **INDEMNIFICATION**

    a.    GPP agrees to indemnify the Fund and the Trustees for any damages, claims, or injuries (including legal fees and costs) arising out of their activities in connection with the Fund's Prescription Card and mail order programs.

13.    **TERM**

    a.    The term of this Agreement shall be from January 1, 2003 through December 31, 2004 *and shall be renewed biannually*.

    b.    Notwithstanding the preceding, this Agreement may be terminated by either party at any time either for Cause or not for Cause under the following conditions. Either party may terminate this Agreement for any reason, or no reason, upon sixty (60) days' advance written notice. Any

THWF 1861

party may terminate this Agreement for Cause upon two (2) days' advance written notice. For purposes of this Agreement, the terms Cause with respect to a party to this Agreement, shall mean (1) the insolvency or bankruptcy of the party, (ii) a criminal conviction of any individual or entity who is a principal owner or officer of a party, or (iii) any action or inaction by a party which likely could cause the Trustees of the Fund to breach their fiduciary duties to the Fund if the action (or inaction) were not remedied.

c.    This Agreement may be amended by the mutual written agreement of the parties.

14.    **NOTICES**

a.    All notices required or contemplated by this Agreement shall be sent by Certified Mail, Return Receipt Requested, to each of the parties, addressed as follows:

**TO THE FUND:**
Teamsters Health & Welfare Fund of Philadelphia and Vicinity
4th & Cherry Streets
Philadelphia, PA 19106
ATTENTION: William J. Einhorn, Administrator

**TO GPP:**
General Prescription Programs, Inc.
61 Freeman Street
5th Floor
Newark, New Jersey 07105
ATTENTION: Joel Grodman, Chairman of the Board

15.    **RESOLUTION OF DISPUTES**

a.    In the event of any dispute arising between the Fund and GPP, the dispute shall be resolved by an impartial arbitrator who is a member of the Labor/ERISA panel, and who is selected pursuant to the Labor/ERISA Arbitration Rules of, the American Arbitration Association. Arbitration shall be held in the Philadelphia, Pennsylvania area, unless the parties mutually consent to another location. Each party shall pay one-half of the arbitration expenses, as well as its own costs. Not withstanding the preceding, in the event the Fund is a defendant in a lawsuit brought by a Fund Participant or beneficiary, the Fund may sue GPP or any other party, who may be liable for damages to the Participant in the suit or who may be liable to the Fund under the indemnification provision of this Agreement.

16.    **INTERPRETATION**

a.    This Agreement is made in the Commonwealth of Pennsylvania. Except

THWF 1862

to the extent preempted by ERISA or other federal law, this Agreement shall be governed and interpreted according to the laws of the Commonwealth of Pennsylvania.

17. **ASSIGNMENT**

a.    Except as expressly provided herein, none of the parties herein, none of the parties hereto shall assign any of their rights or obligations under this Agreement to any other party without the prior written consent of the parties affected thereby.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed this _____ day of January 2003, by and through their authorized agents and representatives.

GENERAL PRESCRIPTION PROGRAMS, INC.

BY: _____

    JOEL GRODMAN, CHAIRMAN OF THE BOARD

TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY

BY: _____

    WILLIAM J. EINHORN, ADMINISTRATOR

THWF 1863

# Exhibit H

**FUND AGREEMENT**
**EXPRESS SCRIPTS, INC.**
**MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT**

THIS MANAGED PRESCRIPTION DRUG PROGRAM AGREEMENT ("Agreement") is entered into as of September 1, 2005 ("Effective Date"), by and between EXPRESS SCRIPTS, INC., ("ESI") and TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, a health and welfare fund ("Fund") for the purpose of setting forth the terms on which ESI will provide prescription drug benefit management services to Fund.

## RECITALS

A.      ESI is a pharmacy benefit management company that provides retail pharmacy network and claims processing services, mail and specialty pharmacy services and formulary and rebate management services to health plans, such as Fund;

B.      Fund is a member of the Delaware Valley Health Care Coalition (the "Coalition") which has entered into an Umbrella Agreement with ESI as of June 1, 2003, as amended ("Umbrella Agreement"); and

C.      The Umbrella Agreement sets forth, among other things, certain terms and conditions by which ESI would provide pharmacy benefit management services to Fund, which terms and conditions are incorporated in this Agreement.

NOW THEREFORE, for and in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

## TERMS OF AGREEMENT

SECTION I - DEFINITIONS

The following terms shall have the meanings set forth below:

"Copayment" means that portion of the charge for each Covered Drug dispensed to the Member that is the responsibility of the Member (e.g., copayment, coinsurance and/or deductible) as indicated on the DBW.

"Covered Drug(s)" means those prescription drugs, supplies, Specialty Products (if applicable), and other items that are covered under the Plan as indicated on the DBW. Specialty Products are Covered Drugs.

"DVHCC MAC" means the maximum amount charged the Fund for certain multi-source generic drugs, which amount typically is an average discount range of between 45% and 65%, which discount depends upon the Fund's actual generic drug mix. ESI determines and periodically updates the drug products on the DVHCC MAC list to reflect changes in generic drug availability and price.

"Drug Benefit Worksheet" or "DBW" means a prescription drug benefit summary form ESI has provided to Fund which, when completed and signed by Fund, will describe the essential elements of Fund's pharmacy benefit plan ("Plan").

"Eligibility Files" means the list submitted by Fund to ESI indicating persons eligible for drug benefit coverage services under the Plan.

"ESI Specialty Pharmacy" means CuraScript Pharmacy, Inc. or another pharmacy wholly-owned or operated by ESI or its wholly-owned subsidiaries that primarily dispenses Specialty Products. For purposes of this Agreement, the ESI Specialty Pharmacy is not considered a Mail Service Pharmacy.

10550Sv5

EXHIBIT
Teamsters Fund
14
CW 10/05/06

**Highly Confidential**
**THWF3199**

"Formulary" means the list of FDA-approved prescription drugs and supplies developed by ESI's Pharmacy and Therapeutics Committee and/or customized by Fund which classifies items for purposes of benefit design and coverage decisions.

"Fund" shall mean a health and welfare fund, or other health plan entity representing collectively bargained individuals, that is in good standing with the Coalition.

"Funded Plan" means a Plan whereby the Fund is responsible for a portion of the cost of Covered Drugs and other applicable fees.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as amended, and any and all applicable regulations promulgated thereunder.

"ID Card" means ESI's standard single purpose (NCPDP format) printed identification card containing information about the prescription drug benefits to which the Member is entitled and the applicable ESI pharmacy network logos or other method of identifying the fact that ESI is the provider of prescription drug benefit services in a mutually acceptable form.

"Mail Service Pharmacy" means a duly licensed pharmacy operated by ESI or its subsidiaries, where prescriptions are filled and delivered to Members via the mail service.

"Manufacturer Administrative Fees" means those administrative fees paid by pharmaceutical manufacturers to, or otherwise retained by, ESI pursuant to a contract between ESI and the manufacturer and directly in connection with ESI's administering, invoicing, allocating and collecting the Rebates for plans under the Rebate Program.

"Member" means each person who is eligible as determined solely by Fund to receive prescription drug benefits under the Plan as indicated in the Eligibility Files including a Medicare Member.

"Member Submitted Claim" means (i) a claim submitted by a Member for Covered Drugs dispensed by a pharmacy other than a Participating Pharmacy; (ii) a claim for Covered Drugs filled at a Participating Pharmacy for which the Member paid cash; or (iii) subrogation claims submitted by the United States or any state under Medicaid or similar government health care programs.

"Participating Pharmacy" means any licensed retail pharmacy with which ESI has executed an agreement to provide Covered Drugs to Members.

"Prescription Drug Claim" means a Member Submitted Claim or claim for payment submitted to ESI by a Participating Pharmacy, or Mail Service Pharmacy as a result of dispensing Covered Drugs to a Member.

"Protected Health Information" and "PHI" means a Member's name, address and social security number, date of birth, Member-specific medical or prescription information and any other Member-Identifiable demographic information which may be deemed to be confidential from time to time under federal or state law, including HIPAA.

"Rebate Program" means ESI's manufacturer rebate program under which ESI contracts with pharmaceutical manufacturers for Rebates payable on selected Covered Drugs, as such program may change from time to time.

"Rebates" means retrospective discounts and rebates that are paid to ESI, or otherwise retained by ESI, pursuant to the terms of a rebate contract negotiated independently by ESI with a pharmaceutical manufacturer, and directly attributable to the utilization of certain pharmaceuticals by Members. Rebates do not include product discounts, or similar remuneration received by subsidiary pharmacies of ESI.

"Specialty Products" means those biotech or injectable prescription drug products requiring special handling and Member services, including, but not limited to, those Specialty Products listed in the

Highly Confidential
THWF3200

Specialty Product section of Exhibit B (as that list is periodically modified in accordance with Exhibit B from time to time).

"UM Company" means an independent, third party utilization management company that ESI contracts with to provide appeal services at Fund's option as further described in Section 3.2(c).

"Usual and Customary Price" or "U&C" means the retail price charged by a Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy.

"Utilization Fee" or "Fees" means a per Prescription Drug Claim amount adopted by corporate resolution of the Coalition and paid by the Fund to the Coalition, which payment is facilitated by ESI out of Rebate amounts due to the Fund as provided in Section 4.1(e) herein. Utilization Fees are not payable on Network Access Plans.

## SECTION II - ESTABLISHMENT OF THE PRESCRIPTION DRUG PROGRAM

2.1    Exclusivity.

(a)    Fund shall use ESI as the exclusive provider of prescription drug benefits, including retail pharmacy network management, claims processing, Mail Service Pharmacy, formulary development and rebate management during the term of this Agreement. Pharmacy reimbursement rates, administrative fees and Rebates are conditioned on ESI's exclusive status hereunder. Nothing herein shall require the Fund to use ESI Specialty Pharmacy for Specialty Products; provided that the Fund may elect to have its Members use ESI Specialty Pharmacy for Specialty Products for the rates set forth in Exhibit B. Members may obtain Specialty Products from Participating Pharmacies. In no event shall Specialty Products be dispensed from the Mail Service Pharmacy.

(b)    If the Fund does not elect to use ESI retrospective DUR or disease management programs, ESI shall provide data, as directed by the subject Fund, to disease management or medical vendors endorsed and recognized by the Fund performing such retrospective DUR or disease management programs. The Fund acknowledges and agrees that retrospective DUR and/or disease management programs undertaken by it shall not conflict with, or contradict, the terms and conditions of this Agreement, including, but not limited to the Formulary services and Rebate Program described therein. Further, to the extent Fund elects to use on-site clinics or pharmacies to dispense prescription drugs to Members and such use materially reduces (i) Rebates generated by Fund hereunder, (ii) the number of Covered Drug claims submitted on-line, and/or (iii) Formulary compliance, then ESI shall have the right to negotiate equitable modifications to the reimbursement rates, administrative fees and/or Rebates, as appropriate.

2.2    Eligibility of Members. ESI shall not implement Fund's prescription drug benefit program unless Fund has executed this Agreement.

(a)    Fund shall provide ESI with an initial Eligibility File and updates thereof under a mutually agreeable time frame containing the names of all Members and any other information specified by ESI that is necessary to administer the program. All Eligibility Files shall be submitted on-line, or on tape, FTP, electronic media or disk format that is acceptable to ESI. Non-conforming formats may be subject to additional charges as set forth in Exhibit A. If eligibility for Specialty Products is not provided through the Eligibility Files, ESI shall verify eligibility (and any prior authorization requirements) under Fund's medical benefit.

(b)    Fund shall pay all claims for Covered Drugs dispensed to a Member on or before the later of (i) the date of the Member's termination, or (ii) the date three (3) business days after ESI receives notification of the Member's termination in an Eligibility File or other written notice, or the date one (1) business day after ESI receives such notification on-line or electronically. Fund shall be solely responsible for ensuring the accuracy of its Eligibility Files, and shall be obligated to pay ESI for claims

Highly Confidential
THWF3201

accepted by ESI for Members shown as eligible on the date the claim was adjudicated, unless ESI negligently accepted the claims. Fund bears the risk of fraudulent claims submitted by Members or by unauthorized persons using a Member's ID Card or identification number unless prior notice relating thereto has been given to ESI by Fund.

### 2.3    Drug Benefit Worksheet.

(a)    Prior to the provision of any services under this Agreement, Fund will submit a completed and executed DBW prepared with the assistance of ESI. By signing the DBW, Fund certifies that the DBW accurately depicts the pharmacy benefit provisions of the Plan. Fund is solely responsible for timely communication of the terms of the Plan to its Members prior to the effective date of such provisions.

(b)    If Fund elects to change certain benefit design features of the Plan after initial setup, including but not limited to changes in Copayments, Covered Drugs, prior authorization requirements, or otherwise, such change shall be communicated in writing in advance by Fund to ESI by submitting a new or revised DBW. ESI will acknowledge the request in writing and notify Fund of the proposed implementation date of the benefit design change. In addition, Fund shall be responsible for notifying its Members of the change prior to its effective date. ESI will not be responsible or otherwise liable to Fund or a Member for costs or other damages for failing to make a benefit design change not communicated to ESI as provided in this Section.

### 2.4    Web-Based Tools.

(a)    Subject to the following, Members, Fund and Participating Pharmacies shall have access to ESI's suite of on-line, web-based tools (as updated and enhanced from time to time by ESI). Members may be able to access certain features such as personalized pharmacy benefit information, prescription ordering and status, customer service and prescription history, and Fund may have features such as eligibility, utilization information, and management reporting applications. Participating Pharmacies will also have access to ESI's on-line tools for pharmacists, as updated and enhanced from time to time. Fund shall be responsible for obtaining any necessary hardware and shall bear the cost of any telecommunication charges associated with its on-line access.

(b)    Links. ESI and Fund may develop interfaces or links within the Fund website to ESI.com for Members and from ESI.com for Members to the Fund website. Such links shall permit Member access to ESI-hosted, co-branded webpages through which Members may order mail order prescription refills, check order status of mail order prescriptions, use the pharmacy locator function, access drug information and engage in other transactions and tools, as updated and enhanced from time to time. Each party shall bear its own costs and expenses in making any software modifications to its own website as may be required to integrate the other party's software so as to facilitate the provision of services contemplated herein. Fund also agrees to cooperate with ESI as reasonably necessary to aid in the development of custom content and linking needs.

### SECTION III - PBM SERVICES

### 3.1    Pharmacy Network.

(a)    Mail Service Pharmacy. If included in the Plan, Members may have prescriptions filled through the Mail Service Pharmacy. Upon presentation of a prescription by a Member, the Mail Service Pharmacy shall determine whether the Member is eligible under the Plan and whether the prescription is for a Covered Drug. Prescriptions will be dispensed in a quantity not to exceed a 90-day supply, unless otherwise specified in the DBW. If the prescription and applicable law do not prohibit substitution of a Generic Drug equivalent, if any, to the prescribed drug, or if the Mail Service Pharmacy obtains the consent of the prescriber, the Mail Service Pharmacy shall dispense the Generic Drug substitute to the Member. The Mail Service Pharmacy shall charge and collect from each Member the applicable Copayment based on the DBW. Refill reminders and on-line ordering shall be available to Members. Consistent with the HIPAA privacy rules, ESI may promote the use of the Mail Service Pharmacy to

Highly Confidential
THWF3202

Members through coupons or other financial incentives at ESI's cost. Refill reminders and on-line ordering shall be available to Members at no additional cost to the Member or Fund.

(b)    Specialty Products.  Members may have Specialty Products filled through ESI Specialty Pharmacy and/or Participating Pharmacies as described in Exhibit B.

(c)    Participating Pharmacies.  Upon presentation of an ID Card, Members may obtain prescriptions for Covered Drugs through the Participating Pharmacy network named on Exhibit A. ESI will make available an updated list of Participating Pharmacies in such network(s) on-line via Express Choice. Any additions or deletions to the network shall be in ESI's sole discretion; provided that ESI shall provide written notice to Fund of such deletions or additions that materially affect the access of Members to Participating Pharmacies. Each Participating Pharmacy is required to verify the Member's eligibility through ESI's on-line claims processing system. Participating Pharmacies will dispense prescriptions to Members in a quantity not to exceed a 34-day supply unless otherwise specified in the DBW. ESI shall direct Participating Pharmacies to charge and collect the applicable Copayment from Members for each Covered Drug dispensed; provided, a Member's Contribution charged for a Covered Drug shall be the lesser of the applicable Copayment or the U&C. ESI agrees that it will solicit the participation of those pharmacies that are not currently participating in ESI's network, at the request of the Funds. If the pharmacy does not agree to the network rates offered, it is the Fund's decision whether to pay what the pharmacy will accept for participation.

(d)    Requirements for Participation.  ESI shall require each Participating Pharmacy to meet ESI's participation requirements, including but not limited to, licensure, insurance and provider agreement requirements. ESI does not direct or exercise any control over the professional judgment exercised by any pharmacist in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy. Participating Pharmacies are independent contractors of ESI, and ESI shall have no liability to Fund, any Member or any other person or entity for any act or omission of any Participating Pharmacy or its agents or employees.

(e)    Audits of Participating Pharmacies.  ESI shall maintain criteria, which it may amend from time to time, to establish when and how a Participating Pharmacy shall be audited to determine compliance with its agreement with ESI. Such criteria shall be provided to the Fund upon request. ESI shall conduct audits in accordance with such criteria. The audit may be conducted by ESI's internal auditors or its outside auditors, and at the pharmacy or at ESI by a review of electronically transmitted claims. To compensate ESI for the cost of conducting such audits, ESI shall retain an audit fee from any recovered overpayments attributable to the Plan detected in the audit in the amount set forth in Exhibit A. Any balance of recovered overpayments will be paid to Fund. ESI shall attempt recovery of overpayments through offsets or demand of amounts due. ESI shall not be required to institute litigation to recover any overpayments.

(f)    Pharmacy Help Desk.  ESI will provide telephone support via a toll-free number and Internet web site to assist Participating Pharmacies with Member eligibility verification and questions regarding reimbursement, Covered Drug benefits under Fund's Plan or other related concerns.

3.2    Claims Processing.

(a)    On-Line Claims Processing.  ESI will perform claims processing services for Covered Drugs dispensed by a Participating Pharmacy and Mail Service Pharmacy. Such services include (i) verifying eligibility; (ii) performing DUR subject to Section 3.4(a); (iii) calculating benefits in accordance with the DBW; and (iv) adjudicating the claims. In all cases, Fund shall have the final responsibility for all decisions with respect to coverage of a Prescription Drug Claim and the benefits allowable under the Plan, including determining whether any rejected or disputed claim shall be allowed.

(b)    Member Submitted Claims.  If provided on the DBW, ESI shall process Member Submitted Claims. The Member (or Medicaid agency, as the case may be) shall be responsible for submitting such claims directly to ESI on a form provided by ESI within the time period set forth on the

5

Highly Confidential
THWF3203

DBW. ESI shall process Prescription Drug Claims submitted by Members and Medicaid agencies and, if appropriate, ESI shall reimburse such Member or agency on behalf of Fund, the lesser of the amount invoiced or the amount ESI would have reimbursed the applicable Member for such claim in accordance with the applicable DBW. Claim review and processing periods and the content of EOBs shall conform to ERISA claims rules as applicable to Fund. Fund shall reimburse ESI for all amounts paid to Members and Medicaid agencies under this Section and the applicable Member Submitted Claim administrative fee set forth in Exhibit A.

    (c)    Claims for Benefits.

        (i)    Processing. ESI agrees that the processing of initial "claims for benefits" (as that term is defined in 29 CFR Part 2560) for Member-Submitted Claims and prior authorization requests shall be conducted in a manner consistent with the requirements for claim processing set forth in Section 503 of ERISA and regulations promulgated thereunder, and in a timely manner to enable the Fund to meet its obligations with respect to consideration and determination of adverse claim determinations in connection of such claims for benefits.

        (ii)    Appeals. ESI will not conduct any appeals of denied "claims for benefits." However, if Fund does not desire to conduct appeals itself, Fund may elect to have ESI facilitate appeals through the UM Company. The UM Company has agreed to conduct appeals on behalf of self-insured ERISA plans doing business with ESI. If Fund elects to have Member appeals facilitated through ESI, so long as ESI maintains its contractual relationship with the UM Company, Member appeals received by ESI will be routed directly to the UM Company. The UM Company will be responsible for conducting the appeal on behalf of the Fund in accordance with applicable law, and if an appeal is denied, the UM Company will be responsible for sending a denial letter to the Member in accordance with applicable law. Fund will be responsible for paying ESI the appeal fees described in Exhibit A. Fund acknowledges and agrees that: (1) the UM Company, and not ESI, will be conducting appeals on behalf of Fund; (2) the UM Company is an independent contractor of ESI, and ESI does not in any way control or direct the UM Company with respect to appeals conducted by the UM Company; (3) ESI is not acting as a fiduciary in connection with the appeals being conducted by the UM Company, and ESI shall not be named by Fund as a fiduciary in connection with such appeals; (4) ESI shall not be responsible for overseeing the UM Company's appeal process (except that ESI shall require the UM Company to contractually agree that it will conduct appeals in accordance with applicable law and Fund's plan), and ESI shall not be liable for any injury or damages arising as a result of the UM Company's negligence or otherwise; (5) the UM Company shall have full authority and discretion to conduct appeals for which it has been designated by Fund and shall have full authority and discretion to interpret the terms of Fund's plan with respect to those appeals and to make findings of fact with respect to those appeals; and (6) Fund will forward to the UM Company all relevant plan language necessary for the UM Company to conduct appeals.

    (d)    Call Center. ESI will provide 24-hours a day, 7-days a week toll-free number, IVR and Internet support to assist Fund, Fund's agents and Members with Member eligibility and benefits verification, location of Participating Pharmacies or other related Member concerns.

3.3    Program Management.

    (a)    General Support and Consultative Services. ESI shall provide to Fund general support and consultative services regarding pharmacy benefit design, general drug use and cost data, pharmacy network design, Member communications, formulary design and implementation.

    (b)    Program Reporting. ESI shall make available to Fund ESI's standard management information reporting applications. These applications include a quarterly Executive Report package, key statistics, and a pre-formatted report library. At the request of Fund, ESI may develop special reporting packages at ESI's standard hourly rate for such services, as set forth in Exhibit A. Fund agrees to make its personnel available to define the scope of Fund's reporting needs and to participate in the testing and

105505v5

6

Highly Confidential
THWF3204

validation of any such projects. Upon request, ESI shall provide Fund the actual electronic claims data for all claims transactions in a mutually agreeable format.

3.4    <u>Medication Management</u>. ESI will provide clinically-based medication management programs and services, including drug utilization review, prior authorization, formulary development and management services and emerging therapeutic issue notification. Unless otherwise expressly stated, such programs are provided at no charge.

     (a)    <u>Clinical Programs</u>. ESI shall provide to Fund general support and consultative services regarding pharmacy benefit and formulary design, drug monographs, prior authorization criteria, and drug utilization review, as well as those clinical programs identified on <u>Exhibit C</u> and selected by the Fund, some of which may require payment of additional fees as set forth in <u>Exhibit C</u>. In addition, ESI may contact Participating Pharmacies and physicians to promote preferred product therapeutic substitution opportunities for both preferred brand and generic drugs through informational messages to Participating Pharmacies and communications to Members and/or physicians. In all cases the prescribing physician, in consultation with the Member, shall have final authority over the drug that is dispensed to the Member. ESI shall provide Fund with a copy of the preferred product list and will notify Fund of any changes thereto. ESI shall report to Fund the actual savings achieved by Fund through preferred product substitution and ESI shall receive a portion of such savings as set forth in <u>Exhibit C</u> for the cost of administering the program.

     (b)    <u>Drug Utilization Review (DUR)</u>. If Fund provides ESI with Members' named dependents in the Eligibility Files, ESI shall perform a standard concurrent DUR analysis of each prescription filled through the Mail Service Pharmacy or submitted for processing on-line by a Participating Pharmacy in order to assist the pharmacist in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage. ESI may perform certain retrospective reviews for additional fees as set forth on <u>Exhibit C</u> upon request of Fund and shall communicate the results of such reviews, if warranted, to a Member's physician or Fund, in accordance with standard guidelines. ESI's DUR processes are educational programs designed to enhance information available to the pharmacist in filling prescriptions, and are based only on the current claim for Covered Drugs and such Member information as has been previously provided to ESI and is available in ESI's on-line claims processing system. Furthermore, the DUR process depends, in part, on clinical drug data and information on dispensing practices provided to ESI by third-party vendors, and is limited to certain drugs and certain analytical criteria that are established by ESI from time to time. ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member. Accordingly, ESI assumes no liability to Fund or any other person in connection with the DUR processes, including, without limitation, the failure of the DUR process to identify a prescription that results in injury to a Member. Nothing in this Section shall operate to relieve ESI of the customary professional obligations of the dispensing pharmacists at its Mail Service Pharmacies.

     (c)    <u>Prior Authorization</u>. ESI shall provide prior authorization ("PA") services for drugs designated on the DBW for the fees set forth on <u>Exhibit C</u>. Development and maintenance of custom protocols for products included in ESI's PA program or for additional products identified by Fund shall be subject to additional fees as set forth in <u>Exhibit C</u>. Prior authorized drugs must meet Fund-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs, except that Fund authorizes ESI to approve coverage for an otherwise excluded use in the event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines. The PA program shall include exception reviews and overrides, as appropriate, for quantity limits, nonformulary determinations and benefit exclusions as specified and directed by Fund. In determining whether to authorize coverage of such drug under the PA Program, ESI shall apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from sources deemed reliable to ESI at the time that the prescription is to be dispensed, and upon such prior authorization Guidelines. Fund acknowledges that prior authorization programs are based on objective criteria and the limited amount of patient information available to ESI. ESI shall not undertake, and is not required hereunder, to determine medical necessity to make diagnoses or substitute ESI's judgment for the professional

**Highly Confidential**
**THWF3205**

judgment and responsibility of the physician.  Appeals and final determinations to confirm or override a denial shall be made by Fund or its designated external review agent.

(d)    Clinical Savings Guarantee.  Exhibit C sets forth a group of clinical programs, which if implemented by a Fund with a minimum of Members, ESI will guarantee a per Member per month ("PMPM") savings ("Savings Guarantee").  The savings shall be measured in accordance with the terms set forth in Exhibit C on an annual basis.  ESI will provide on request experience and utilization data to support savings and will permit Fund to verify claimed savings amounts.

(e)    Authorization to Contact.  Consistent with HIPAA, Fund agrees to permit ESI to contact Members, Members' physicians, Fund case managers and Participating Pharmacies to perform the services provided by ESI on behalf of the Fund hereunder.  Fund shall provide ESI with street and email addresses and such other information as may be reasonably necessary to facilitate such communications.

3.5    Rebate Program.  ESI will pay to Fund the amounts set forth on Exhibit D.

3.6    Performance Standards.

(a)    ESI will comply with the performance standards set forth on Exhibit F hereto. Notwithstanding, the Effective Date hereof, measurement of the Performance standards shall commence as of the first of the month following execution of this Agreement.  In the event that any failure by ESI to meet any performance standard is due to a force majeure as defined in Section 7.3(c), failure of Fund to perform its obligations under this Agreement, or actions or inactions of Fund that adversely impact ESI's ability to maintain the subject standard (e.g., faulty eligibility, changes in benefit design not adequately communicated to Members and benefit designs that substantially change the Members' rights under the Plan), ESI shall be excused from compliance with such performance standards until such circumstances have been resolved and any existing backlogs or other effects therefrom have been eliminated.  In determining whether ESI has complied with the performance standards, any claims that were disallowed by ESI but allowed by Fund shall be disregarded.  This shall not be interpreted to permit ESI not to process claims for Covered Drugs in accordance with this Agreement.  Mail Service Pharmacy Performance Standards shall not apply to ESI Specialty Pharmacy or Specialty Products.

(b)    Within forty-five (45) days after the end of each measurement period, ESI shall provide Fund with a report (a) assessing ESI's performance under each performance standard, and (b) if ESI did not meet a performance standard, calculating the applicable amount due to the Coalition.  The Fund hereby authorizes ESI to pay penalty amounts due, if any, to the Coalition (or as otherwise mutually agreed by Coalition and ESI) on an annual basis within 60 days of each anniversary of the Agreement.  In no event shall the sum of the payments to the Coalition as a result of ESI's failure to meet the performance standards in any quarter exceed 50% of the aggregate claims administration fees payable by all Coalition Funds to ESI in any quarter for such period.  The payments set forth in Exhibit F shall be Fund's sole monetary remedy for any failure by ESI to meet a performance standard and the Fund may look only to Coalition for an allocation of the penalty to it, as applicable.

## SECTION IV - FEES; BILLING AND PAYMENT

4.1    Billing and Payments.

(a)    Fees, Billing.  ESI will bill Fund twice per month for all applicable fees specified in the Exhibits as follows:

(i)    for the reimbursement for Covered Drugs dispensed by the Mail Service Pharmacy, ESI Specialty Pharmacy, Participating Pharmacies, and, if applicable, for Member-Submitted Claims, less applicable Copayments ("Covered Drug Reimbursement"); and

(ii)    for all other applicable administrative and clinical fees ("Administrative Fees," Covered Drug Reimbursement and Administrative Fees to be collectively referred to as "Fees").

(b)    Payment.  Fund shall be responsible to ESI for timely payment of all Fees.  Fund agrees to pay ESI by wire or ACH transfer, pre-authorized debit from Fund's designated bank account within two (2) business days from the date of Fund's receipt of the ESI invoice.  Fund shall be responsible for all costs of collection, and agrees to reimburse ESI for such costs and expenses, including reasonable attorneys' fees.  Any amounts not paid by the due date thereof shall bear interest at the rate of twelve percent (12%) per annum (1.0% per month) or, if lower, the highest interest rate permitted by law.  Should Fund dispute any claim submitted with an invoice, Fund shall provide ESI, at the time of payment, written identification of such claim(s) and the reasons(s) for any dispute with respect to such claim(s).  Fund however will pay ESI for the entire claims invoice.  If ESI does not respond within thirty (30) days or if each party mutually agrees, Fund may deduct the disputed amount on its next payment.  The parties will meet to resolve any such disputed claims within thirty (30) days.  If resolution is not met within thirty (30) days of such dispute, ESI and Fund will escalate the unresolved issue to each parties' senior staff to discuss.  Any claims for Specialty Products that have been prior authorized or pre-certified by Fund shall not be subject to retroactive denial of payment for any reason.

(c)    Deposit.  In the event the Fund is delinquent in payment of Fees for two (2) consecutive billing cycles, ESI shall have the sole option to require that the Fund provide to ESI a deposit in an amount equal to the average monthly billing amount.  The average monthly billing amount will be based on the average of the last three (3) months of billing history or if three (3) months billing history is not available the most recent month of billing history will be the basis.  ESI shall retain the deposit until the termination of this Agreement, and may apply amounts to unpaid balances from time to time.  Any balance remaining upon termination following any run-off provisions, shall be promptly returned to the Fund upon payment of all Fees due as of such termination following any run-off provisions.

(d)    Payment by Member for Mail Service.  Members shall pay their applicable Member Copayments to ESI prior to the dispensing of a prescription through the Mail Service Pharmacy and ESI Specialty Pharmacy.

(e)    Utilization Fees.  Fund hereby authorizes and directs ESI to pay to Coalition a Utilization Fee in the amount of $0.25 per Prescription Drug Claim, or such other amount established by the Coalition and communicated to ESI in writing, out of any Rebate amounts due to Fund hereunder.  Utilization Fees are not payable on Network Access Funds.  Such payments shall be made to Coalition on a quarterly basis or as provided under the Umbrella Agreement.  Changes in the amount of the Utilization Fee shall be effective as of the first day of the month following notice to ESI by Fund or the Coalition of the change.  Fund shall hold ESI harmless in connection with any dispute between the Fund and the Coalition over the Utilization Fee.  ESI shall not pay a Utilization Fee to Coalition, retroactively or otherwise, for Prescription Drug Claims processed prior to Fund's signature of this Agreement, or if the Fund revokes authorization for payment.  Should the Fund cease to be a member in good standing of the Coalition, then the Utilization Fee shall no longer be paid to the Coalition effective as of the first day of the month following written notice to ESI of the status of Coalition membership.

4.2    Fund Audits.  Provided that this Agreement has been duly executed by Fund, Fund may inspect prescription drug claim data and billing records relating to the Plan's drug benefit once each year.  Any and all costs and expenses associated with the Fund's audit shall be borne by Fund.  The scope of any audit shall not exceed the standard audit protocol set forth on Exhibit G.  Any requests by Fund to permit an Auditor to perform an audit shall constitute Fund's direction and authorization to ESI to disclose PHI to the Auditor, and Fund shall indemnify ESI for any liability associated with such disclosure.

4.3    Claims Data Retention.  ESI will maintain Fund's claims data supporting invoices for Covered Drugs adjudicated by ESI during the term of this Agreement for a period of twenty-four (24) months in their original forms, and thereafter on microfilm, microfiche or other form determined by ESI for an additional five (5) years.  Upon request of Fund, ESI shall provide such data to Fund in a format determined by ESI.  ESI shall use reasonable efforts to cooperate with Fund for purposes of meeting

Highly Confidential
THWF3207

Fund's reporting and ERISA retention obligations under applicable law; provided that after expiration of the retention period, ESI shall retain or dispose of such data in accordance with its standard policies and practices and applicable state and federal law, including HIPAA.

## SECTION V - RECORDS; CONFIDENTIALITY

5.1    Confidentiality.

Subject to the applicability of Exhibit E as relates to the confidentiality, use and disclosure of PHI under the applicable privacy provisions of the Health Insurance Portability and Accountability Act ("HIPAA"), ESI and Fund acknowledge and agree as follows:

(a)    Protected Health Information will be obtained by ESI in providing services under this Agreement and such confidential information will be obtained from and/or distributed to Fund, Participating Pharmacies and Members' physicians for drug utilization evaluation and other purposes relating to the benefit management services provided to Fund and its Members. Member de-identified data is used in connection with the Rebate Program. Fund hereby permits ESI to use Member Confidential Information solely to perform its obligations under this Agreement. Fund also directs ESI to provide only de-identified (or aggregate) Member information to the Coalition. ESI shall maintain confidentiality of PHI to the extent required by applicable law and regulations. In no event will ESI release or disclose to third parties PHI (other than as permitted by Section 8.4) when using the data as set forth in this Section 5.1(a) without the written approval of Fund or the applicable Member.

(b)    Fund grants ESI permission to use both during and after the term of this Agreement and/or transfer to third parties the anonymized PHI (Member de-identified in accordance with HIPAA requirements) drug and related medical data collected by ESI or provided to ESI by Fund for research, provider profiling and other databases for benchmarking, drug trend, cost analyses, cost comparisons or other business purposes of ESI and its affiliates. ESI shall retain full ownership rights over all compilations, analyses and reports prepared by ESI (other than those reports prepared specifically for Fund under this Agreement).

(c)    Fund shall maintain the confidentiality of any PHI in accordance with any applicable laws and regulations. Fund hereby represents and warrants to ESI that, as a sponsor of a health plan, Fund is legally entitled to provide PHI to ESI, and further to receive PHI relating to the Member's prescription drug utilization from ESI. Fund further represents and warrants that it has or shall obtain the Member consents required, if any, for ESI to perform the services under this Agreement and release PHI to Fund. All PHI, records, reports and other data provided by ESI to Fund under this Agreement are solely for Fund's use in managing its health benefit plans, and ESI disclaims all liability arising out of Fund's receipt, use or dissemination of such information, records, reports or data.

5.2    Proprietary Information. Each party agrees that information of the other party, including, but not limited to the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise public: (a) with respect to ESI: reporting and system applications, Express Choice, system formats, databanks, clinical or formulary management operations or programs, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information, and Participating Pharmacy agreements; and (b) with respect to Fund: Fund Member information files (including Member utilization data), business operations and strategies. Neither party shall use the other's Proprietary Information, or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent. Upon termination of this Agreement, each party shall cease using the other's Proprietary Information, and all such information shall be returned or destroyed upon the owner's direction.

5.3    Trademarks. Each party acknowledges each other party's sole and exclusive ownership of its respective trade names, commercial symbols, trademarks, and servicemarks, whether presently existing or later established (collectively "Marks"). No party shall use the other party's Marks in advertising or

Highly Confidential
THWF3208

promotional materials or otherwise without the owner's prior written consent; provided, however, that the parties may publicize the fact that ESI provides prescription drug benefit management services to Fund.

## SECTION VI - LIABILITY INSURANCE; COMPLIANCE WITH LAW

6.1    <u>Liability Insurance</u>.  Each party shall maintain such policies of general liability, professional liability and other insurance of the types and in amounts customarily carried by their respective businesses.  Proof of such insurance shall be available upon reasonable request.  ESI agrees, at its sole expense, to maintain during the term of this Agreement or any renewal hereof, comprehensive general liability insurance coverage in an amount of not less than $2,000,000 per claim, and 4,000,000 in the aggregate.  ESI also agrees to maintain pharmacist's professional liability insurance in an amount not less than $1,000,000 per claim, 2,000,000 in the aggregate for protection from such claims for bodily injury as may arise from operation of the Mail Service Pharmacy under this Agreement.  ESI does not maintain liability insurance on behalf of any Participating Pharmacy, but does contractually require such Participating Pharmacies to maintain a minimum amount of commercial liability insurance or, when deemed acceptable by ESI, to have in place a self-insurance program.

6.2    <u>Compliance with Law; Change in Law</u>.

(a)    Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits.  Fund shall be responsible for any governmental or regulatory charges and taxes imposed upon benefit management services provided hereunder, other than taxes based on the net income of ESI.  If ESI's performance of its duties under this Agreement is made materially more burdensome or expensive due to a change in federal, state or local laws or regulations or extension of a prescription drug benefit under Medicare, or the interpretation thereof, the parties shall negotiate an appropriate adjustment to the fees paid to ESI.  If the parties cannot agree on an adjusted fee, then either party may terminate the Agreement on thirty (30) days' prior written notice to the other.

(b)    Fund shall ensure that its activities in regard to the drug benefits provided to its Members are in compliance with the Employee Retirement Income Security Act, as amended, 29 U.S.C. §1001 et seq. ("ERISA"), if applicable.  Fund acknowledges and agrees that it is responsible for disclosing to Members any and all information relating to the program as required by law to be disclosed, including any information relating to the calculation of Copayments, and any other program coverage and eligibility requirements in connection with the program, and any other information concerning commissions, Utilization Fees, Rebates, discounts or provider discounts referred to in Section 6.3 hereof.  In providing services under this Agreement, Fund acknowledges and agrees that ESI is not acting on behalf of any welfare benefit plan (as defined in Section 3(1) of ERISA) or participating in such plans, or as a fiduciary (as defined in Section 3.21(a) of ERISA) of Fund's drug plan, and Fund shall not name ESI as a plan fiduciary.  ESI has no power to make any decisions as to Plan policy, interpretations, practices or procedures, but rather provide administrative services within a framework of policies, guidelines, interpretations, rules, practices, and procedures chosen by Fund.  Fund acknowledges that ESI does not have discretionary authority or control respecting management of the Plan and does not exercise any authority or control respecting management or disposition of the assets of the program, if any exist.  Fund further acknowledges that all such discretionary authority is retained by Fund or some other person or entity.

6.3    <u>Disclosure of Certain Financial Matters</u>.  In addition to the administrative fees paid to ESI by Fund, ESI derives margin from fees and revenue in one or more of the ways as further described in the ESI Financial Disclosure to PBM Clients set forth in <u>Exhibit H</u> hereto ("Financial Disclosure").  In negotiating any of the fees and revenues described in the Financial Disclosure or in this Agreement, ESI acts on its own behalf, and not for the benefit of or as agent for Fund, Members or the Plan.  Except for the Rebate amounts set forth in <u>Exhibit D</u>, if any, Fund acknowledges and agrees that ESI will retain all interest, Rebate administrative fees, revenues, any portion of Rebates thereon not payable to Fund, and all Participating Pharmacy discounts, if any, in addition to any administrative and other fees paid by Fund.  Fund acknowledges for itself, its Members and the Plan that, except as may be expressly provided

**Highly Confidential**
**THWF3209**

herein, neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such discounts or payments. ESI will not knowingly solicit or encourage manufacturers to increase ESI's administrative fees or other ancillary revenue from manufacturers via a reduction in Rebates.

## SECTION VII - TERM AND TERMINATION; DEFAULT AND REMEDIES

7.1    Term.

(a)    The initial term of this Agreement shall begin on September 1, 2005 and shall end on May 31, 2009, and may be terminated earlier or extended in accordance with the terms hereof ("Initial Term"). Not less than ninety (90) days prior to the end of the Initial Term or any renewal term of this Agreement either party may notify the other party in writing that it wishes to terminate this Agreement effective as of the end of the then current term. If no such written notification is given, this Agreement shall continue with the same terms and conditions as set forth herein for an additional one (1) year term, subject to the right of termination as otherwise provided herein.

(b)    The Fund may terminate this Agreement upon not less than ninety (90) days' written notice in the event that the terms and conditions of this Agreement and the services provided by ESI hereunder have become disadvantageous within the meaning of 29 CFR 2550.408b-2 in the Fund's discretion.

(c)    Except as provided in Subsection 7.1(b) and (c), in no event will this Agreement be terminated "without cause" prior to the expiration of the Initial Term or any renewal term.

7.2    Termination.

(a)    Breach or Default. Either party may give the other written notice of a material, substantial and continuing breach of this Agreement. If the breaching party has not cured said breach within thirty (30) days from the date such notice was sent, this Agreement may be terminated at the option of the non-breaching party. If the amount of time commercially reasonable for the breach to be cured is longer than thirty (30) days, this Agreement may not be terminated by the non-breaching party pursuant to this provision until such commercially reasonable period of time has elapsed; provided, however, that in no event shall such period exceed sixty (60) days.

(b)    Non-Payment. Notwithstanding Section 7.2(a), ESI may terminate or suspend its performance hereunder and cease providing or authorizing provision of Covered Drugs to Members upon forty-eight (48) hours written (via certified mail or overnight confirmed delivery) and verbal (voice mail message shall deemed to be verbal notice) notice to the Fund if the Fund fails to pay ESI or provide a deposit, if required, in accordance with the terms of this Agreement. ESI also may suspend Mail Service Pharmacy and/or ESI Specialty Pharmacy services to a Member who is in default of payment of any Copayments or Deductibles in the applicable pharmacy.

(c)    Insolvency. To the extent permitted by applicable law, ESI may terminate this Agreement, or suspend performance hereunder, upon the insolvency of Fund, and Fund may terminate this Agreement upon the insolvency of ESI. The "insolvency" of a party shall mean the filing of a petition commencing a voluntary or involuntary case (if such case is an involuntary case, then only if such case is not dismissed within sixty (60) days from the filing thereof) against such party under the United States Bankruptcy Code; a general assignment by such party for the benefit of creditors; the inability of such party to pay its debts as they become due; such party's seeking or consenting to, or acquiescence in, the appointment of any trustee, receiver or liquidation of it, or any material part of its property; or a proceeding under any receivership, composition, readjustment, liquidation, insolvency, dissolution, or like law or statute, which case or proceeding is not dismissed or vacated within sixty (60) days.

Highly Confidential
THWF3210

7.3     Remedies.

(a)     A party's right to terminate this Agreement under this Section 7 shall not be exclusive of any other remedies available to the terminating party under this Agreement or otherwise, at law or in equity.

(b)     If ESI has reasonable grounds for insecurity as to the ability of Fund to meet its financial commitments because of Fund's financial data, or state or federal regulatory agency statements, findings or notice, ESI may require Fund to provide security to ESI in accordance with Section 4.1(c).

(c)     Neither party shall be liable in any manner for any delay to perform its obligations hereunder which are beyond a party's reasonable control, including, without limitation, any delay or failure due to strikes, labor disputes, riots, earthquakes, storms, floods or other extreme weather conditions, fires, explosions, acts of God, embargoes, war or other outbreak of hostilities, government acts or regulations, or the failure or inability of carriers, suppliers, delivery services, or telecommunications providers to provide services necessary to enable a party to perform its obligations hereunder.

(d)     Each party's liability to the other hereunder shall in no event exceed the actual proximate losses or damages caused by breach of this Agreement. In no event shall either party or any of their respective affiliates, directors, employees or agents, be liable for any indirect, special, incidental, consequential, exemplary or punitive damages, or any damages for lost profits relating to a relationship with a third party, however caused or arising, whether or not they have been informed of the possibility of their occurrence.

7.4     Indemnification.

(a)     ESI will indemnify and hold Fund harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorney fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions, including claims of infringement of any intellectual property rights ("Claims") which may be asserted against, imposed upon or incurred by Fund and arising as a result of (i) ESI's negligent acts or omissions or willful misconduct, (ii) ESI's breach of this Agreement, or (iii) Fund's use of or access to any ESI proprietary reporting and system applications, unless Fund has modified or altered the applications without ESI's written consent. This Section 7.4(a) shall not be construed to impose liability on ESI to the extent inconsistent with other provisions of this Agreement, including but not limited to Sections 3.1(d), 3.4(b) and 7.3(c).

(b)     Fund will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of Fund's (i) negligent acts or omissions or willful misconduct, (ii) benefit design and coverage decisions, (iii) breach of this Agreement, or (iv) from any disclosure of PHI to Coalition, or use Fund or Coalition may make of PHI provided to Fund by ESI.

(c)     The party seeking indemnification shall notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and shall tender the defense of such claim to the indemnifying party. No party shall indemnify the other with respect to any claim settled without the other party's written consent.

7.5     Obligations Upon Termination.     Fund or its agent shall pay ESI in accordance with this Agreement for all valid Prescription Drug Claims for Covered Drugs dispensed and services provided to Fund and Members on or before the effective date of termination ("Termination Date"). Valid Claims submitted by Participating Pharmacies or valid Member-Submitted Claims filed with ESI after the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan. Notwithstanding the preceding, ESI may request that Fund pay a reasonable deposit in the event ESI is requested to process after the Termination Date claims incurred on or prior to such date. Fund

Highly Confidential
THWF3211

shall notify Members of the timing of any transition to a successor pharmacy benefit manager at least thirty (30) days prior to the effective date of such termination.

7.6    Survival.  The parties' rights and obligations under the last sentences of Sections 3.1(d), 3.4(b); and Articles IV and V; and Sections 6.2, 7.3(c) and (d), 7.4 and 7.5 shall survive the termination of this Agreement for any reason.

## SECTION VIII - MISCELLANEOUS

8.1    Notice.  Any notice or document required or permitted to be delivered pursuant to this Agreement, including under Section 7.2(b) must be in writing and shall be deemed to be effective upon mailing and must be either (a) deposited in the United States Mail, postage prepaid, certified or registered mail, return receipt requested, or (b) sent by recognized overnight delivery service, in either case properly addressed to the other party at the address set forth below, or at such other address as such party shall specify from time to time by written notice delivered in accordance herewith:

> Express Scripts, Inc.
> Attn:  President
> 13900 Riverport Drive
> Maryland Heights, Missouri 63043
> With copy to Legal Department
> Fax No. (314) 702-7120

> Teamsters Health & Welfare Fund of Philadelphia and Vicinity
> Attn: William Einhorn, Administrator
> 4th and Cherry Street
> Philadelphia, Pennsylvania 19106-1899

8.2    Independent Parties.  No provision of this Agreement is intended to create or shall be construed to create any relationship between ESI and Fund other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement. Neither party, nor any of their respective representatives, shall be construed to be the partner, agent, fiduciary, employee, or representative of the other and neither party shall have the right to make any representations concerning the duties, obligations or services of the other except as consistent with the express terms of this Agreement or as otherwise authorized in writing by the party about which such representation is asserted.

8.3    Successors and Assigns.  This Agreement will be binding upon, and inure to the benefit of and be enforceable by, the respective successors and permitted assigns of the parties hereto; provided that this Agreement may not be assigned by Fund without the prior written consent of ESI, which consent shall not unreasonable be withheld.  ESI may assign this Agreement or delegate any rights or obligation hereunder to a wholly-owned subsidiary of ESI, provided however, that ESI retains full responsibility and liability for the performance of the Agreement.

8.4    Subcontractors.  Fund agrees that ESI may delegate certain of its duties hereunder (e.g., database management functions, printing and postal fulfillment) to independent contractors; provided that (i) any such independent contractor enters into a confidentiality agreement no less extensive than the confidentiality provisions of this Agreement, and (ii) ESI retains full responsibility and liability for the performance of the subcontracted service. Participating Pharmacies do not constitute subcontractors of ESI for purposes of this section, and ESI's obligations with respect to Participating Pharmacies are governed solely by Section 3.1 hereof.

8.5    Integration; Amendments.  This Agreement and any Exhibits hereto constitute the entire understanding of the parties hereto and supersedes any prior oral or written communication between the parties with respect to the subject matter hereof.  No modification, alteration, or waiver of any term,

14

**Highly Confidential**
**THWF3212**

covenant, or condition of this Agreement shall be valid unless in writing and signed by both parties or the agents of the parties who are authorized in writing.

8.6    Choice of Law.  This Agreement shall be construed and governed in all respects according to the laws in the State of New Jersey, without regard to the rules of conflict of laws thereof and to the extent not pre-empted or superseded by federal law or regulation..

8.7    Waiver.  The failure of either party to insist upon the strict observation or performance of this Agreement or to exercise any right or remedy shall not be construed as a waiver of any subsequent breach of this Agreement or impair or waive any available right or remedy.

8.8    Severability.  In the event that any provision of this Agreement is invalid or unenforceable, such invalid or unenforceable provision shall not invalidate or affect the other provisions of this Agreement which shall remain in effect and be construed as if such provision were not a part hereof; provided that if the invalidation or unenforceability of such provision shall, in the opinion of either party to the Agreement, have a material effect on such party's rights or obligations under this Agreement, then the Agreement may be terminated by such party upon thirty (30) days written notice by such party to the other party.

8.9    Third Party Beneficiary Exclusion.  This Agreement is not a third party beneficiary contract, nor shall this Agreement create any rights on behalf of Members as against ESI.  Fund and ESI reserve the right to amend, cancel or terminate this Agreement without notice to, or consent of, any Member.

Highly Confidential
THWF3213

IN WITNESS WHEREOF, the undersigned have executed this Managed Prescription Drug Program Agreement as of the day and year first written below by both signatory parties.

**EXPRESS SCRIPTS, INC.**

By: _____

Printed Name: _____

Title: _____
Date: _____11-30-0_____

Ed Ignaczak
Sr. Vice President
Sales & Account Management
Phone: 314-702-7169
Fax: 314-702-7055

**TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY**

By: _____

Printed Name: _WILLIAM J. EINHORN_

Title: _ADMINISTRATOR_

Phone: _215 923 6300 X1170_

Fax: _215 931-1141_

Federal ID Number: _23-1392600_

Date: _11/22/05_

RECEIVED NOV 2 8 2005

105505v5

16

**Highly Confidential**
**THWF3214**

## EXHIBIT A

### PHARMACY REIMBURSEMENT

Fund shall pay to ESI the amounts set forth below, net of applicable Copayments. Sales or excise tax or other governmental surcharge, if any, shall be the responsibility of Fund. If ESI pays a particular Participating Pharmacy a higher rate because Fund has requested such pharmacy be included in the network, the rate charged to Fund shall be the net ingredient cost plus the dispensing fee paid by ESI to such pharmacy, plus applicable sales or excise tax or other governmental surcharge, if any.

Participating Pharmacies may elect not to participate in networks for plans that adopt mandatory mail benefit designs, and ESI makes no representation regarding Participating Pharmacy access in relation to plan designs with a mandatory mail feature. As such, notwithstanding anything stated otherwise in the Agreement or any Exhibit, in the event Fund adopts a mandatory mail program, any Participating Pharmacy access guarantees or standards described in this Agreement will not apply, and, if Fund's adoption of the mandatory mail program will have a material adverse financial impact on ESI because pharmacies may refuse to service programs with a mandatory mail feature, the parties will in good faith renegotiate the pricing set forth in this Agreement to account for such adverse impact."

For purposes of this Exhibit A, the terms:

"Average Wholesale Price" or "AWP" means the average wholesale price of a prescription drug at the time of dispensing as identified by drug pricing services such as First Data Bank or other source nationally recognized in the retail prescription drug industry selected by ESI for all clients. The applicable AWP for prescriptions filled in the Mail Service Pharmacy will be the AWP for the lesser of: (i) the NDC code for the package size from which the prescription drug was dispensed, or (ii) package sizes of 100 units or 16 ounce quantities, or the next larger quantity if such specified quantities are not available.

"Compound Drugs" means a customized medication derived from two or more raw chemicals, powders and devices, of which at least one ingredient is a federal legend drug, prepared by a pharmacist according to a doctor's specifications.

"Generic Drug" means a prescription drug, whether identified by its chemical, proprietary, or non-proprietary name, that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient(s) and approved by the FDA. The designation of a product as "generic" and/or subject to MAC ("Maximum Allowable Cost") is determined by ESI using data elements provided by First DataBank or other source nationally recognized in the retail drug industry.

"Network Access Program" means a program in which Members obtain prescriptions through Participating Pharmacies and bear the full cost of the Covered Drugs and whereby the Fund is not responsible for any portion of the cost of Covered Drugs.

"Single Source Generic Drug" means a Generic Drug licensed and currently marketed from only one non repackager generic labeler within a generic class number (GCH).

**Highly Confidential**
**THWF3215**

The rates set forth below are conditioned on the adoption by Fund of the specified Copayment structure and Formulary:

I.    **Participating Pharmacy Reimbursement Rates  (This Pricing does Not Apply To Specialty Products)**

| 3-Tier Plan Design with $15 or greater Copay Differential or Any other tiered plan design ESI National Preferred Formulary or Modified 2-Tier Performance List | Minimum 50,000 Participating Pharmacies | Maximum 40,000 Participating Pharmacies | Maximum 30,000 Participating Pharmacies | 84 - 90 Days Supply at Participating Pharmacies |
|---|---|---|---|---|
| Brand Ingredient Cost | The lower of AWP -16% or U&C | The lower of AWP -17% or U&C | The lower of AWP -17.5% or U&C | AWP -19% |
| Generic Ingredient Cost(1) | The lower of AWP -40%, DVHCC MAC, or U&C | | | |
| Compound Drugs Ingredient Cost | Lesser of AWP – 40%, DVHCC MAC, or U&C | | | |
| Dispensing Fee/Rx (2) | $1.45 | $1.45 | $1.45 | $1.00 |
| Administrative Fee/Rx | $0.30 | $0.30 | $0.30 | $0.30 |

(1) Subject to Generic Guarantee set forth below.
(2) No dispensing fee applied to U&C claims.

**Generic Guarantee**

ESI guarantees a minimum average generic discount of AWP-53% on Generic Drugs that are Covered Drugs dispensed through Participating Pharmacies to be applied, measured and reconciled in the aggregate on an annual basis (beginning with the date of implementation) within ninety (90) days of the end of the Fund's twelve (12) month period.

The guarantee will be calculated as:  [1-(total discounted AWP ingredient cost (excluding dispensing fees and claims with ancillary charges, and prior to application of Copayments) of applicable Prescription Drug Claims for the annual period divided by total undiscounted AWP ingredient cost (both amounts will be calculated as of the date of adjudication) for the annual period)].  Generic Drugs subject to patent litigation actions, Single Source products, OTC products and Specialty Products shall be excluded from the guarantee.

The guarantee is further subject to the following:

•    To the extent Fund changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the generic discount achieved.  Such material impact will be demonstrated and reviewed with Fund prior to implementing any change(s).

Highly Confidential
THWF3216

- Each Generic Drug Prescription Drug Claim ingredient cost will be calculated at the lesser of the applicable DVHCC MAC, U&C, or AWP discount price in determining the discount achieved for purposes of the guarantee, including 100% Member Copayment.

- ESI will pay the difference of Fund's net cost for any shortfall between the actual result and the guaranteed result. Only Rebate overages pursuant to this Agreement will be used to make up for, and offset, a shortfall in this guarantee.

II.   **Mail Service Pharmacy Pricing (This Pricing Does Not Apply To Specialty Products)**

| | |
|---|---|
| **Brand Ingredient Cost** <br> *Single Source Generic Drugs are priced as brands* | AWP -24% |
| **Generic Ingredient Cost** | The lesser of AWP -40% or DVHCC MAC |
| **Compound Drug Ingredient Cost** | Combined AWP plus applicable service fee |
| **Dispensing Fee / Rx** <br> *Subject to changes in postal rates upon advance notice* | $0.00 |
| **Minimum Rate / Rx** | $8.99 |
| **Administrative Fee** | $0.00 |

(1)  Subject to Generic Guarantee set forth below.

### 1.   Generic Guarantee

ESI guarantees a minimum average generic discount of AWP-55% on Generic Drugs dispensed through Mail Service Pharmacy, to be applied, measured and reconciled in the aggregate on an annual basis (beginning with the date of implementation) within ninety (90) days of the end of the Fund's twelve (12) month period.

The guarantee will be calculated as: [1-(total discounted AWP ingredient cost (excluding dispensing fees and claims with ancillary charges, and prior to application of Copayments) of applicable Prescription Drug Claims for the annual period divided by total undiscounted AWP ingredient cost (both amounts will be calculated as of the date of adjudication) for the annual period)]. Generic Drugs subject to patent litigation actions, Single Source products, OTC products and Specialty Products shall be excluded from the guarantee.

The guarantee is further subject to the following:

- To the extent Fund changes its benefit design or Formulary during the term of the Agreement, the guarantee will be equitably adjusted if there is a material impact on the generic discount achieved. Such material impact will be demonstrated and reviewed with Fund prior to implementing any change(s).

- Each Generic Drug Prescription Drug Claim ingredient cost will be calculated at the lesser of the applicable DVHCC MAC, U&C, or AWP discount price in determining the discount achieved for purposes of the guarantee, including 100% Member Copayment.

- ESI will pay the difference of Fund's net cost for any shortfall between the actual result and the guaranteed result. Only Rebate overages pursuant to this Agreement will be used to make up for, and offset, a shortfall in this guarantee.

105505v5

**Highly Confidential**
**THWF3217**

## III.    Administrative Fees

| PBM Services | Fee |
|---|---|
| ♦   Assigned Account Team | No additional fee |
| ♦   Customer Service for Members | No additional fee |
| ♦   Eligibility submission<br>• Electronic/on-line submission<br>• Manual/hardcopy submission<br><br>• FSA Feeds | No additional fee<br>$1.00/Member submission (applicable to initial implementation only)<br>No additional fee |
| ♦   Software Training for Access to Our On-Line System(s) | No additional fee |
| ♦   Electronic Claims Processing | No additional fee |
| ♦   Member Submitted Paper Claims Processing | $1.50/claim |
| ♦   COB (Coordination of Benefits)<br>• Standard Process (reject for primary carrier)<br>• Medicare Coordination (+65 population) | No additional fee<br>$0.06 per claim |
| ♦   Plan Setup | No additional charge |
| **Participating Pharmacies** | |
| ♦   Pharmacy Audit Recoveries | 20% of audit recoveries |
| ♦   Pharmacy Help Desk | No additional fee |
| ♦   Pharmacy Network Management | No additional fee |
| ♦   Pharmacy Reimbursement | No additional fee |
| ♦   Network Development Upon Request | No additional fee |
| **Mail Services** | |
| ♦   Benefit Education | No additional fee |
| ♦   Prescription Delivery – standard | No additional fee |
| **Reporting Services** | |
| ♦   Web-based Client Reporting – produced by Fund | No additional fee |
| ♦   Web-based Client Reporting – produced by ESI | $100 per report |
| ♦   Ad hoc desk top parametric reports | No additional fee |
| ♦   Additional Reports<br>• Billing Reports<br>• Annual Strategic Account Plan Report | No additional fee<br>No additional fee |
| ♦   Custom Ad-Hoc Reporting | $150 per hour, with a minimum of $500 |
| ♦   Claims detail extract file electronic (NCPDP format) | No additional fee (avail. upon request) |
| **Formulary Support Services** | |
| ♦   Annual Formulary Communications<br>• Posted at www.express-scripts.com<br>• Mailed to Members' homes | No additional fee<br>No additional fee |

**Highly Confidential**<br>**THWF3218**

| Web Site | Fee |
|---|---|
| ♦    Digital Certificates<br>        •   Up to 5 certificates<br>        •   More than 5 certificates | No additional fee<br>Up to $150 for additional users |
| ♦    Express-Scripts.com for Clients—access to reporting tools,<br>        eligibility update capability, contact directory, sales and<br>        marketing information, and benefit and enrollment support | No additional fee |
| ♦    Express-Scripts.com for Members—access to benefit, drug,<br>        health and wellness information; prescription ordering capability;<br>        and customer service | No additional fee |
| ♦    Express Choice℠ enrollment option—available during open<br>        enrollment to enable Members to evaluate prescription benefit<br>        plan options. | No additional fee |
| **Implementation Package and Member Communications** | |
| ♦    Implementation Support | No additional charge |
| ♦    Member Packets  (Includes 2 standard resin ID cards)<br>        •   Mailed to Fund<br>        •   Mailed directly to Members<br>        •   Replacement Cards<br>        •   Customized materials | <br>No additional charge<br>No additional charge<br>No additional charge<br>Priced upon request |
| **Appeals by UM Company** | |
|        •   Clinical appeals<br>        •   Non-clinical appeals | $350 per review<br>$160 per review |

Highly Confidential<br>THWF3219

## EXHIBIT B

### SPECIALTY PRODUCTS

- All Specialty Product pricing is based upon the discount off of AWP for each Specialty Product, as published by First Data Bank or other nationally recognized AWP source selected by ESI (with prior notice to Fund with regard to any change in AWP source), on the date of dispensing. Pricing also is based on electronic claims adjudication through ESI, using a National Council for Prescription Drug Programs format. Fund shall pay ESI for the Specialty Products in accordance with the payment terms described in the Agreement and the Specialty Product pricing specified below.

- In no event shall the Mail Service Pharmacy or Participating Pharmacy pricing specified above be applied to Specialty Products, regardless of the pharmacy from which they are dispensed.

- Each Specialty Product included on the applicable list below, including updates implemented as described in the following bullet point, will be considered a Covered Drug under Fund's Plan subject to the applicable pricing below unless Fund has designated such Specialty Product as a non-Covered Drug in Fund's DBW on file with ESI or Fund has affirmatively elected in the DBW not to cover any Specialty Products. If both the ESI Specialty Pharmacy Exclusive Option and the Open Option are included below, Fund must select in the DBW which option will apply or that Fund does not desire to cover Specialty Products, and until such time as Fund makes such election in its DBW the ESI Specialty Pharmacy Exclusive Option will apply by default.

- The list of Specialty Products below is subject to addition, deletion, or modification from time to time upon thirty (30) days advance written notice to Fund. ESI's written notice will indicate the specific change and the AWP pricing associated with the change to be paid by Fund. If Fund desires to reject the change, it must notify ESI in writing within thirty (30) days from the date of ESI's notice that Fund does not accept the change to the list. If Fund rejects the change, the change will not be implemented for Fund. If, however, Fund does not reject the change by notifying ESI in writing within the aforementioned thirty (30) day notice period, the change will thereafter become immediately effective for Fund and the list included herein will be deemed modified accordingly to reflect such change, and Fund acknowledges and agrees to the same. Notwithstanding the foregoing, if Fund requests that a new Specialty Product not included on the Specialty Product list be available hereunder for a Member before the expiration of the aforementioned thirty (30) day ESI notice period, or Fund's Plan immediately covers the new Specialty Product even if the new Specialty Product is not included on the applicable Specialty Product list below, such Specialty Product will be considered a Covered Drug and priced to Fund at ESI's standard specialty rate for that new Specialty Product without advance notice to Fund, and Fund agrees to pay the same.

- Some Specialty Products may be subject to availability from the pharmaceutical manufacturer or because they are in short supply or subject to recall or allocation. Efforts will be made to find alternative supply channels or pharmacies and the pricing below may need to be modified until the short supply situation is corrected, with such modification effective upon advance written notice to Fund by ESI.

If Fund desires to make Specialty Products available under this Agreement, it should select one of the following on its DBW:

### OPTION 1 – ESI Specialty Pharmacy – Exclusive

Under this pricing option, Specialty Products will only be filled through ESI Specialty Pharmacy. Specialty Products will not be available through either Participating Pharmacies or the Mail Service Pharmacy. If a Member attempts to fill a prescription for a Specialty Product through a Participating Pharmacy the claim will reject with a "NDC not covered" message. The pharmacy will provide the Member with the ESI Specialty Pharmacy phone number. If a Member submits a prescription for a Specialty Product to the

Mail Service Pharmacy, the claim will reject with a "NDC not covered" message and ESI will automatically transfer the prescription to ESI Specialty Pharmacy.

| Specialty Products - Exclusive | Ingredient Cost – % Off AWP | Dispensing Fee |
|---|---|---|
| ESI Specialty Pharmacy | See Table below | $0.00 |

| Product | % OFF AWP | Product | % OFF AWP | Product | % OFF AWP |
|---|---|---|---|---|---|
| ABRAXANE | -18% | FOLLISTIM AQ | -19% | ONXOL | -35% |
| ACTHAR | -18% | FORTAZ | -18% | OVIDREL | -19% |
| ADRUCIL | -18% | FORTEO | -18% | PACLITAXEL | -35% |
| ADVATE | -25% | FRAGMIN | -18% | PAMIDRONATE | -35% |
| ALDURAZYME | -18% | FUZEON | -18% | PAMIDRONATE DISODIUM | -35% |
| ALFERON-N | -18% | GAMIMUNE | -35% | PANGLOBULIN | -35% |
| ALIMTA | -18% | GAMMAGARD | -35% | PARAPLATIN | -18% |
| ALKERAN | -18% | GAMMAR P | -35% | PEGASYS | -18% |
| ALOXI | -18% | GAMUNEX | -35% | PEG-INTRON | -18% |
| ALPHANATE | -32% | GEMZAR | -18% | PERGONAL | -19% |
| ALPHANINE | -32% | GENOTROPIN | -19% | PLENAXIS | -18% |
| AMEVIVE | -18% | GEREF | -19% | POLYGAM | -35% |
| ANZEMET | -18% | GLEEVEC | -18% | PREGNYL | -19% |
| ARANESP | -18% | GONAL-F | -19% | PROCRIT | -18% |
| AREDIA | -18% | GONAL-F RFF | -19% | PROFASI | -19% |
| ARIXTRA | -18% | HELIXATE | -30% | PROFILNINE | -25% |
| AUTOPLEX | -29% | HEMOFIL | -35% | PROGESTERONE | -19% |
| AVASTIN | -18% | HERCEPTIN | -18% | PROLEUKIN | -18% |
| AVONEX | -18% | HUMATE-P | -32% | PROPLEX | -5% |
| BAYGAM | -35% | HUMATROPE | -19% | PROTROPIN | -19% |
| BAYHEP | -18% | HUMEGON | -19% | PULMOZYME | -18% |
| BAYRHO-D | -30% | HUMIRA | -18% | RAPTIVA | -18% |
| BEBULIN | -9% | HYCAMTIN | -18% | REBETOL | -18% |
| BENEFIX | -20% | IFEX | -18% | REBETRON | -18% |
| BETASERON | -18% | IFOSFAMIDE | -35% | REBIF | -18% |
| BICILLIN | -18% | INFERGEN | -18% | RECOMBINATE | -31% |
| BICNU | -18% | INNOHEP | -18% | REFACTO | -17% |
| BLEOMYCIN | -35% | INTRON | -18% | REMICADE | -18% |
| BLEOMYCIN SULFATE | -35% | IRESSA | -18% | REPRONEX | -19% |
| BOTOX | -19% | IVEEGAM | -35% | RHOGAM | -30% |
| BRAVELLE | -19% | KINERET | -18% | RIBAVIRIN | -40% |
| CAMPATH | -18% | KOATE-DVI | -37% | RIMSO-50 | -18% |
| CAMPTOSAR | -18% | KOGENATE | -38% | RISPERDAL CONSTA | -18% |
| CARBOPLATIN | -35% | KYTRIL | -18% | RITUXAN | -18% |
| CEREZYME | -15% | LEUCOVORIN | -35% | ROCEPHIN | -18% |
| CETROTIDE | -19% | LEUKINE | -18% | ROFERON-A | -18% |
| CISPLATIN | -35% | LEUPROLIDE | -35% | SAIZEN | -19% |
| COPAXONE | -18% | LEUPROLIDE ACETATE | -35% | SANDOSTATIN | -18% |
| COPEGUS | -18% | LEUSTATIN | -18% | SENSIPAR | -18% |
| CYTARABINE | -35% | LOVENOX | -18% | SEROSTIM | -18% |

Highly Confidential
THWF3221

| Product | % OFF AWP | Product | % OFF AWP | Product | % OFF AWP |
|---|---|---|---|---|---|
| CYTOGAM | -18% | LUPRON | -18% | TARCEVA | -18% |
| CYTOXAN | -18% | LUPRON DEPOT | -18% | TAXOTERE | -18% |
| DACARBAZINE | -35% | LUPRON DEPOT-PED | -18% | TEMODAR | -18% |
| DESFERAL | -18% | MESNA | -35% | TEV-TROPIN | -19% |
| DOXIL | -18% | MESNEX | -18% | THALOMID | -18% |
| DOXORUBICIN | -35% | MITOMYCIN | -35% | THERACYS | -18% |
| DOXORUBICIN HCL | -35% | MONARC-M | -37% | THIOTEPA | -35% |
| ELIGARD | -18% | MONOCLATE-P | -27% | THYROGEN | -18% |
| ELLENCE | -18% | MONONINE | -27% | TICE | -18% |
| ELOXATIN | -18% | MUSTARGEN | -18% | TOBI | -18% |
| ELSPAR | -18% | MYLOTARG | -18% | TYSABRI | -18% |
| ENBREL | -18% | MYOBLOC | -18% | VELCADE | -18% |
| ENGERIX | -18% | NABI-HB | -18% | VENOGLOBULIN | -35% |
| ENGERIX-B | -18% | NAVELBINE | -18% | VIDAZA | -18% |
| EPOGEN | -18% | NEULASTA | -18% | VINCASAR | -35% |
| ERBITUX | -18% | NEUMEGA | -18% | VINCRISTINE | -35% |
| ETHYOL | -18% | NEUPOGEN | -18% | VINORELBINE TARTRATE | -35% |
| ETOPOPHOS | -18% | NIPENT | -18% | WINRHO | -35% |
| ETOPOSIDE | -35% | NORDITROPIN | -19% | XELODA | -18% |
| FABRAZYME | -18% | NORDIFLEX | -19% | XOLAIR | -18% |
| FACTREL | -19% | NOVANTRONE | -18% | ZANOSAR | -18% |
| FEIBA | -37% | NOVAREL | -19% | ZAVESCA | -18% |
| FERTINEX | -19% | NOVOSEVEN | -37% | ZINECARD | -18% |
| FLUDARABINE | -35% | NUTROPIN | -19% | ZOFRAN | -18% |
| FLUDARABINE PHOSPHATE | -35% | NUTROPIN AQ | -19% | ZOLADEX | -18% |
| FLUOROURACIL | -35% | ONCASPAR | -18% | ZOMETA | -18% |
| FOLLISTIM | -19% | ONTAK | -18% | ZORBTIVE | -19% |

## OPTION 2 – Participating Pharmacy Network and ESI Specialty Pharmacy - Open

Under this pricing option, Specialty Products may be filled through either ESI Specialty Pharmacy or Participating Pharmacies. They will not be available through the Mail Service Pharmacy. If Fund utilizes other specialty pharmacies, an additional $0.30 claims administrative fee per Prescription Drug Claim will be charged.

| Specialty Products - Open | Ingredient Cost – % Off AWP | Dispensing Fee |
|---|---|---|
| Participating Pharmacy | -15% | $2.00 |
| ESI Specialty Pharmacy | See Table below | $0.00 |

| Product | ESI % OFF AWP | Product | ESI % OFF AWP | Product | ESI % OFF AWP |
|---|---|---|---|---|---|
| ABRAXANE | -16% | FOLLISTIM AQ | -16% | ONXOL | -30% |
| ACTHAR | -16% | FORTAZ | -16% | OVIDREL | -16% |
| ADRUCIL | -16% | FORTEO | -16% | PACLITAXEL | -30% |

105505v5

Highly Confidential
THWF3222

| Product | ESI % OFF AWP | Product | ESI % OFF AWP | Product | ESI % OFF AWP |
|---|---|---|---|---|---|
| ADVATE | -25% | FRAGMIN | -16% | PAMIDRONATE | -30% |
| ALDURAZYME | -16% | FUZEON | -16% | PAMIDRONATE DISODIUM | -30% |
| ALFERON-N | -16% | GAMIMUNE | -25% | PANGLOBULIN | -25% |
| ALIMTA | -16% | GAMMAGARD | -25% | PARAPLATIN | -16% |
| ALKERAN | -16% | GAMMAR P | -25% | PEGASYS | -16% |
| ALOXI | -16% | GAMUNEX | -25% | PEG-INTRON | -16% |
| ALPHANATE | -32% | GEMZAR | -16% | PERGONAL | -16% |
| ALPHANINE | -32% | GENOTROPIN | -16% | PLENAXIS | -16% |
| AMEVIVE | -16% | GEREF | -16% | POLYGAM | -25% |
| ANZEMET | -16% | GLEEVEC | -16% | PREGNYL | -16% |
| ARANESP | -16% | GONAL-F | -16% | PROCRIT | -16% |
| AREDIA | -16% | GONAL-F RFF | -16% | PROFASI | -16% |
| ARIXTRA | -16% | HELIXATE | -30% | PROFILNINE | -25% |
| AUTOPLEX | -29% | HEMOFIL | -35% | PROGESTERONE | -16% |
| AVASTIN | -16% | HERCEPTIN | -16% | PROLEUKIN | -16% |
| AVONEX | -16% | HUMATE-P | -32% | PROPLEX | -5% |
| BAYGAM | -25% | HUMATROPE | -16% | PROTROPIN | -16% |
| BAYHEP | -16% | HUMEGON | -16% | PULMOZYME | -16% |
| BAYRHO-D | -25% | HUMIRA | -16% | RAPTIVA | -16% |
| BEBULIN | -9% | HYCAMTIN | -16% | REBETOL | -16% |
| BENEFIX | -20% | IFEX | -16% | REBETRON | -16% |
| BETASERON | -16% | IFOSFAMIDE | -30% | REBIF | -16% |
| BICILLIN | -16% | INFERGEN | -16% | RECOMBINATE | -31% |
| BICNU | -16% | INNOHEP | -16% | REFACTO | -17% |
| BLEOMYCIN | -30% | INTRON | -16% | REMICADE | -16% |
| BLEOMYCIN SULFATE | -30% | IRESSA | -16% | REPRONEX | -16% |
| BOTOX | -16% | IVEEGAM | -25% | RHOGAM | -25% |
| BRAVELLE | -16% | KINERET | -16% | RIBAVIRIN | -30% |
| CAMPATH | -16% | KOATE-DVI | -37% | RIMSO-50 | -16% |
| CAMPTOSAR | -16% | KOGENATE | -38% | RISPERDAL CONSTA | -16% |
| CARBOPLATIN | -30% | KYTRIL | -16% | RITUXAN | -16% |
| CEREZYME | -15% | LEUCOVORIN | -30% | ROCEPHIN | -16% |
| CETROTIDE | -16% | LEUKINE | -16% | ROFERON-A | -16% |
| CISPLATIN | -30% | LEUPROLIDE | -30% | SAIZEN | -16% |
| COPAXONE | -16% | LEUPROLIDE ACETATE | -30% | SANDOSTATIN | -16% |
| COPEGUS | -16% | LEUSTATIN | -16% | SENSIPAR | -16% |
| CYTARABINE | -30% | LOVENOX | -16% | SEROSTIM | -16% |
| CYTOGAM | -18% | LUPRON | -16% | TARCEVA | -16% |
| CYTOXAN | -16% | LUPRON DEPOT | -16% | TAXOTERE | -16% |
| DACARBAZINE | -30% | LUPRON DEPOT-PED | -16% | TEMODAR | -16% |
| DESFERAL | -16% | MESNA | -30% | TEV-TROPIN | -16% |
| DOXIL | -16% | MESNEX | -16% | THALOMID | -16% |
| DOXORUBICIN | -30% | MITOMYCIN | -30% | THERACYS | -16% |
| DOXORUBICIN HCL | -30% | MONARC-M | -37% | THIOTEPA | -30% |
| ELIGARD | -16% | MONOCLATE-P | -27% | THYROGEN | -16% |
| ELLENCE | -16% | MONONINE | -27% | TICE | -16% |
| ELOXATIN | -16% | MUSTARGEN | -16% | TOBI | -16% |

105505v5

25

**Highly Confidential**
**THWF3223**

| Product | ESI % OFF AWP | Product | ESI % OFF AWP | Product | ESI % OFF AWP |
|---|---|---|---|---|---|
| ELSPAR | -16% | MYLOTARG | -16% | TYSABRI | -16% |
| ENBREL | -16% | MYOBLOC | -16% | VELCADE | -16% |
| ENGERIX | -16% | NABI-HB | -16% | VENOGLOBULIN | -25% |
| ENGERIX-B | -16% | NAVELBINE | -16% | VIDAZA | -16% |
| EPOGEN | -16% | NEULASTA | -16% | VINCASAR | -30% |
| ERBITUX | -16% | NEUMEGA | -16% | VINCRISTINE | -30% |
| ETHYOL | -16% | NEUPOGEN | -16% | VINORELBINE TARTRATE | -30% |
| ETOPOPHOS | -16% | NIPENT | -16% | WINRHO | -25% |
| ETOPOSIDE | -30% | NORDITROPIN | -16% | XELODA | -16% |
| FABRAZYME | -16% | NORDIFLEX | -16^ | XOLAIR | -16% |
| FACTREL | -16% | NOVANTRONE | -16% | ZANOSAR | -16% |
| FEIBA | -37% | NOVAREL | -16% | ZAVESCA | -16% |
| FERTINEX | -16% | NOVOSEVEN | -37% | ZINECARD | -16% |
| FLUDARABINE | -30% | NUTROPIN | -16% | ZOFRAN | -16% |
| FLUDARABINE PHOSPHATE | -30% | NUTROPIN AQ | -16% | ZOLADEX | -16% |
| FLUOROURACIL | -30% | ONCASPAR | -16% | ZOMETA | -16% |
| FOLLISTIM | -16% | ONTAK | -16% | ZORBTIVE | -16% |

105505v5

**Highly Confidential**
**THWF3224**

## EXHIBIT C

## CLINICAL PROGRAMS

**Trend Management Programs**

ESI offers two Trend Management program alternatives:

Enhanced Trend Package, which includes a base set of trend programs that are available individually at no additional charge plus an expanded set of programs available for an additional package fee and with a maximum savings guarantee.

Individual Trend Programs, which allows any combination of programs, including the base components offered in the Enhanced Trend Package.

Guarantees are based on the number of Members the Fund implementing the trend management programs has:

- Tier 1 = 10,000 + Members
- Tier 2 = 5,000 – 9,999 Members
- Tier 3 = 3,500 – 4,999 Members
- Tier 4 = 0 – 3,499 Members

| ENHANCED TREND PACKAGE | Fee | Guaranteed Savings |
|---|---|---|
| Enhanced Trend Package<br>• Basic Trend Programs:<br>  o Web-Based Member, Physician, and Pharmacist Education<br>  o Concurrent Drug Utilization Review<br>  o Mail Service Promotion<br>  o Prior Authorization – Clinical Base List<br>  o Drug Choice Management<br>• Prior Authorization – Clinical Supplemental List<br>• Drug Quantity Management<br>  o Standard per Rx<br>  o Select per Rx (optional)<br>  o Select per day supply (optional)<br>• Step Therapy – Enhanced Trend Package Modules<br>  o ACE Inhibitors, Angiotensin-2 receptor blockers (ARBs), COX-2 Inhibitors, Non-steroidal anti-inflammatory drugs (NSAIDs), Proton Pump Inhibitors (PPIs), Selective serotonin reuptake inhibitors (SSRIs), Glucophage XR, Leukotriene Pathway Inhibitors, Strattera, Topical Immunodilators<br><br>• *RapidResponse* Member Support for Step Therapy | $ 0.20 PMPM | Tier 1 - $1.50 PMPM for all programs in the Enhanced Trend Package<br><br>Tier 2 - $1.00 PMPM for all programs in the Enhanced Trend Package<br><br>Tier 3 - $0.20 PMPM for all programs in the Enhanced Trend Package<br><br>Tier 4 - no guarantee available |

| INDIVIDUAL TREND PROGRAMS | Fee | Guaranteed Savings |
|---|---|---|
| Select from individual programs listed below in alphabetical order. | | |
| Drug Choice Management[1]<br>Support appropriate selection of cost-effective medications through active interventions. | No additional charge | Not available |

**Highly Confidential**<br>**THWF3225**

| | | |
|---|---|---|
| **Drug Quantity Management**<br>Ensure that the quantity of units supplied in each prescription remains consistent with clinical dosing guidelines and a Fund's benefit design<br>• Standard per Rx<br>• Select per Rx (optional)<br>• Select per day supply (optional)<br>Note: List of drugs subject to change at the discretion of ESI | $0.02 PMPM | Tier 1 - $0.10 PMPM<br>Tier 2 - $0.05 PMPM<br>Tier 3 - $0.02 PMPM<br>Tier 4 - no guarantee available |
| **High Utilizer & Case Management Report**<br>Identifies Members who are at high risk for hospitalization or increased medical/pharmacy cost. Drug/disease targeting report including Member detail | $150/report | Not available |
| **Physician Consultation – Client Specific**<br>Express Scripts pharmacists conduct client-specific one-on-one phone consultations with selected physicians. Physician consultation focused on Fund's formulary brand and generic products. | $100 per targeted physician with a minimum of 100 physicians. | Details available upon request |
| **Prior Authorization-Administrative**[1]<br>Manage plan benefits and drug costs by ensuring appropriate prescribing and use by Members<br>• Non-clinical PA<br>• Lost/stolen overrides<br>• Vacation supplies | No additional charge | Not available |
| **Prior Authorization – Clinical Base List**<br>Intervene to support appropriate use at the point of service through pre-established clinical criteria.<br>• Botulinum toxin type A (Botox), Myobloc (botulinum toxin type B)<br>• Epoetin alfa (Epogen and Procrit), Darbopoetin alfa (Aranesp)<br>• Somatropin and Somatrem (growth hormone – Humatrope, Nutropin, Genotropin, Norditropin, Nutropin AQ, Saizen, Protropin, and Serostim)<br>• Alpha-1-proteinase inhibitor (Prolastin)<br>• Tretinoin (Retin-A, Avita, Altinac)<br>• Becaplermin (Regranex)<br>• Tazarotene (Tazorac)<br><br>Note: List of drugs subject to change at the discretion of ESI. | No additional charge | Not available |
| **Prior Authorization – Clinical Supplemental List**<br>Intervene to support appropriate use at the point of service through pre-established clinical criteria.<br>• Antifungals (Diflucan, Lamisil, Sporanox)<br>• Penlac<br>• Forteo (teriparatide)<br>• Amevive (alefacept)<br>• Remicade (infliximab)<br>• Raptiva (efalizumab)<br>• FluMist<br>• Xolair (omalizumab)<br>• Topamax (topiramate)<br>• Zonegran (zonisamide)<br><br>Note: List of drugs subject to change at the discretion of ESI | $0.05 PMPM | Tier 1 - $0.30 PMPM<br>Tier 2 - $0.15 PMPM<br>Tier 3 - $0.05 PMPM<br>Tier 4 - no guarantee available |
| **Prior Authorization – Other Clinical Overrides**<br>(e.g. Non-standard prior authorization medications, medical exceptions) | $20/request<br>$25/physician review | Not available |

**Highly Confidential**<br>**THWF3226**

| Step Therapy Enhanced Trend Package Modules<br>Intervene to support use of less expensive and clinically appropriate medications at the point of service. | $0.13 PMPM | Tier 1 - $1.10 PMPM<br>Tier 2 - $0.80 PMPM<br>Tier 3 - $0.13 PMPM<br>Tier 4 - no guarantee |
|---|---|---|
| **Or Individual Step Therapy Modules** | | Tier 1 - as follows |
|   -ACE Inhibitors and Angiotensin-2 receptor blockers (ARBs) | $0.01 PMPM | $0.03 PMPM |
|   -Non-steroidal anti-inflammatory drugs (NSAIDs) and COX-2s | $0.05 PMPM | $0.15 PMPM |
|   -Proton Pump Inhibitors (PPIs) | $0.08 PMPM | $0.24 PMPM |
|   -Selective serotonin reuptake inhibitors (SSRIs) | $0.04 PMPM | $0.12 PMPM |
|   -Glucophage XR | $0.01 PMPM | Not available |
|   -Leukotriene Pathway Inhibitors | $0.01 PMPM | Not available |
|   -Topical Immunomodulators | $0.01 PMPM | Not available |
|   -Strattera | $0.01 PMPM | Not available |
|   -Disease Modifying Antirheumatic Drugs (DMARDs -Enbrel, Humira, and Kineret) | $0.01 PMPM | Not available |
|   -OTC Non-sedating Antihistamines | $0.05 PMPM | Not available |
|   -Xopenex | $0.01 PMPM | Not available |
|   -HMG | $0.02 PMPM | Not available |
|   -Zetia | $0.01 PMPM | Not available |
|   -Other Antidepressants | $0.02 PMPM | Not available |
| Note: Prices for new modules will be established upon development. | | Tiers 2, 3, and 4 - no guarantee available for individual modules |

(1)  Implemented as of effective date. Remaining programs implemented at Fund's written option.

**Guaranteed Savings Notes:**

1.  Program-specific reports will be provided to validate savings generated and annual review and settlement of Guarantees Savings performance. Savings are calculated on client drug spend only (net of Member copay) and do not include inferred medical savings. Clients are reimbursed 100% of any savings shortfall, determined on an annual basis. All savings calculations are based on the methodology described below. Savings calculations do not account for rebate gain or loss that may result from implementation of these programs. However, if client elects to implement this package, rebate guarantees may be reduced.

2.  This Guarantee Savings represents an aggregate of all trend programs listed. No program will be implemented without client approval. In order to obtain the full Guaranteed Savings, client must agree to the implementation of all programs listed above, as well as ESI recommended standards for selection of target drugs or therapeutic classes, intervention, criteria, override criteria, and procedure protocols. As part of continuous improvement, ESI may add programs or implement modifications to the programs, including changes in ESI recommended standards, upon prior notice to the client.

3.  On an annual basis, programs will be re-evaluated for estimated savings impact in light of changes in clinical practice or market conditions. Any changes to the potential impact of the program in subsequent years will be re-evaluated with the client and the Guaranteed Savings and fees will be adjusted accordingly based on mutually agreeable terms.

4.  If Member counts vary by more than 15% or client experiences other demographic changes with a material impact on PMPM drug cost, ESI may adjust the Guarantee Savings. ESI has the right to modify the Guaranteed Savings for clients with restrictive formularies and/or with member cost share of greater than 50%.

5.  Programs may be implemented at any time without a Guaranteed Savings, in which case individual program fees will apply.

6.  The Savings Calculation Methodology is as follows: Savings for programs in the trend package are based on actual Member edits that occur in the relevant time period. For example, with prior authorization, savings are equal to the number of Members with edits multiplied by the percentage who do not have a claim within 30 days, multiplied by the average client cost per claim and by the average expected number of prescriptions for that drug over the next year (empirically based), then divided by total Member months for the period during which the interventions took place. A full description of the savings methodology for all programs is available from client's ESI Account Management Team.

Highly Confidential<br>THWF3227

Clinical Management Programs

| Safety Management | | |
|---|---|---|
| Program Name | Description | Fees (additional per claim administrative fee, except as noted) |
| Concurrent DUR-Clinical | Point-of-service edits for the most important drug- and Member-specific pharmaceutical care issues | No additional charge |
| Emerging Therapeutic Issues Management | Rapid communication to alert physicians, Members, and clients about significant patient-safety related issues (drug withdrawals, black box warnings, and class I recalls). Proactively alerts our clients to new drugs that are anticipated to have a significant impact on pharmacy cost. | No additional charge |
| RxPredict$ | Report available to clients for the purposes of identifying Members predicted to have high medical expenditures in the following six months. | $0.05 PMPM for six months each time the report is run (e.g. 100,000 Members * $0.05 PMPM * 6 mos). A subsequent charge will occur with the second report. There is a minimum charge of $3000 |
| Retrospective DUR | Daily and weekly physician communication targeting multiple utilization issues.<br>• Drug-Drug Interactions<br>• Drug-Patient Interactions<br>• Drug-Disease Interactions<br>• Drug-Pregnancy Interactions<br>• Drug Overutilization<br>• Drug Underutilization<br>• Duplicate Therapy<br>• Addictive Substances<br>• Oxycontin<br>• Long term hypnotics | No additional charge |
| Retrospective DUR for Seniors | Weekly physician intervention to identify inappropriate utilization issues in the senior population<br>• Polypharmacy<br>• Drugs of Concern | $0.02 / claim |

| Care Management | | |
|---|---|---|
| Program Name | Description | Fees |
| Care Management (Level 1) Member Portal | Disease specific education on more than 40 disease states accessed through member portal. Includes e-bulletins and personal reminders. | No additional charge |
| Care Management (Level 2) | Disease and/or therapy specific, physician and patient letter based interventions. | $0.01/Claim – Asthma<br><br>$0.01/Claim – Cardiovascular Disease<br><br>$0.02/Claim – CHF<br><br>$0.02/Claim – Depression<br><br>$0.01/Claim – Diabetes<br><br>$0.03/Claim – GI Disease<br><br>$0.02/Claim – Hypertension<br><br>$0.02/Claim – Migraine<br><br>*Note: Fee shall be added to, then current, claims administration fees for retail and mail claims.* |

Highly Confidential
THWF3228

### *Disease Management Administered via LifeMasters®*

Disease Management programs are administered via LifeMasters®. These programs provide an integrated, comprehensive, approach to helping members manage their chronic conditions. Using this integrated approach, participants are identified for enrollment on the claims data and stratified to *Mediated* or *Instructional* level programs. Mailed interventions and telephonic education and coaching sessions by registered nurses are provided to the member. Mailed and faxed interventions are provided to the physician. Program goals include improvement in self reported quality of life indicators, increased compliance with treatment regimens, decrease in adverse clinical symptoms, and cost savings through appropriate use of medical resources.

| Groups with between 10,000 - 24,999 Lives Program | Mediated (High/Moderate Severity) PEPM* | Instructional (Low Severity) PEPM* |
|---|---|---|
| Congestive Heart Failure (CHF) | $172.60 | $17.83 |
| Chronic Obstructive Pulmonary Disease (COPD) | $183.93 | $17.83 |
| Coronary Artery Disease (CAD) | $158.18 | $14.38 |
| Diabetes | $143.73 | $12.08 |
| Asthma | $127.58 | $9.78 |
| Hypertension | $113.24 | $9.20 |
| Musculoskeletal Pain | $142.05 | $9.20 |
| **Groups with between 25,000 - 49,999 Lives Program** | **Mediated (High/Moderate Severity) PEPM*** | **Instructional (Low Severity) PEPM*** |
| Congestive Heart Failure (CHF) | $165.10 | $17.05 |
| Chronic Obstructive Pulmonary Disease (COPD) | $175.93 | $17.05 |
| Coronary Artery Disease (CAD) | $151.31 | $13.75 |
| Diabetes | $137.48 | $11.55 |
| Asthma | $122.03 | $9.35 |
| Hypertension | $108.32 | $8.80 |
| Musculoskeletal Pain | $135.87 | $8.80 |
| **Groups with between 50,000 – 100,000 Lives Program** | **Mediated (High/Moderate Severity) PEPM*** | **Instructional (Low Severity) PEPM*** |
| Congestive Heart Failure (CHF) | $157.59 | $16.28 |
| Chronic Obstructive Pulmonary Disease (COPD) | $167.94 | $16.28 |
| Coronary Artery Disease (CAD) | $144.43 | $13.13 |
| Diabetes | $131.23 | $11.03 |
| Asthma | $116.49 | $8.93 |
| Hypertension | $103.39 | $8.40 |
| Musculoskeletal Pain | $129.70 | $8.40 |
| **Groups with under 10,000 or Over 100,000 Lives Program** | **Mediated (High/Moderate Severity) PEPM*** | **Instructional (Low Severity) PEPM*** |
| Congestive Heart Failure (CHF) Chronic Obstructive Pulmonary Disease (COPD) Coronary Artery Disease (CAD) Diabetes Asthma Hypertension Musculoskeletal Pain | TBD | TBD |

**Enrolled Member** is defined as a "suitable member" by the LifeMasters® contract with Express Scripts. A suitable member is identified via medical or pharmacy claims data, presumed to have a diagnosis of at least one disease state, and not meeting the criteria of an excluded member.

**Highly Confidential**
**THWF3229**

## EXHIBIT D

### REBATES

**A.**     Subject to the terms and conditions set forth below, ESI will pay to Fund an amount equal to the greater of 90% of Rebates paid to ESI with respect to qualifying Covered Drugs dispensed to Members, or the following:

| | 3-Tier Plan Design with $15.00 or greater Copay Differential ESI National Preferred Formulary or Modified 2-Tier Performance List | | All other tiered plan designs ESI National Preferred Formulary | | Network Access Program (100% Copay) |
|---|---|---|---|---|---|
| | Participating Pharmacies and ESI Specialty Pharmacy | Mail Service Pharmacy | Participating Pharmacies and ESI Specialty Pharmacy | Mail Service Pharmacy | |
| Rebate Guarantee Per Prescription Drug Claim[1] | $2.55 | $9.50 | $1.90 | $5.10 | $0.00 |

[1] If ESI has the right to seek amendment to the Rebate Guarantee when clinical programs are implemented that affect Rebates including but not limited to Step Therapy. If the Formulary is changed to High Performance Formulary, there is no Rebate Guarantee. Rebates will be used to make up for and affect a shortfall in any other guarantee offered pursuant to this Agreement.

**B.     Conditions of the Rebate Program**

1.     Rebates are conditioned upon (a) Fund's election of, and conformance to, the applicable Formulary identified above and qualifying copayment benefit designs); (b) distribution of the Formulary (or a summary thereof) to Members and/or physicians, as applicable; (c) 100% of Members included in the applicable benefit plan design(s); and (d) Fund's compliance with other reasonable, generally applicable requirements for participation by all clients in the Rebate Program, as are communicated by ESI to Fund from time to time.

2.     Certain Member Submitted Claims and OTC products, Plans that do not meet eligibility requirements set forth in herein, claims older than 180 days, as well as claims for 100% copayment (cash and carry) plans not offered in connection with a health plan benefit, may not be eligible for Rebates.

3.     ESI and Fund each understand that market conditions, patent status and other factors may influence Formulary decisions from time to time. If (a) Fund changes its Formulary, benefit designs, implements clinical programs or otherwise takes an action that has the effect of lowering the amount of Rebates earned by Fund (whether between the date of the Cost Proposal dated July, 2005 and the Effective Date, or during the Term), or (b) Rebate revenue is materially decreased because of brand products moving off-patent to generic status, a mutually agreed upon equitable adjustment to the Rebate will be made as of the effective date of such event. ESI shall provide Fund with supporting information regarding the impact of the applicable changes(s).

4.     Guarantees are calculated in the aggregate. ESI shall retain all actual Rebates and Manufacturer Administrative Fees, but Fund shall be entitled to receive an amount equal to the allocable

share above, subject to the terms and conditions. ESI retains all actual Rebates and Manufacturer Administrative Fees in excess of any guarantee, if applicable. Discounts and similar remuneration received by ESI's wholly-owned subsidiaries are not considered "Manufacturer Administrative Fees". Amounts representing the Rebates allocated to Fund pursuant to the terms of this Agreement, as specified above, shall be paid on a quarterly basis approximately 150 days following the end of each quarterly period; provided, however, that ESI shall make quarterly payments as provided herein only to the extent of the Rebate payments it receives approximately 120 days following the end of the quarterly period. If Rebates allocated to Fund pursuant to this Agreement are not paid within 30 days past the already specified 150 days following the end of each quarterly period, Fund may contact ESI Corporate Finance to apply the unpaid Rebates to its accounts receivable account. These amounts would then be posted as a credit and applied to future charges on Fund's account provided, however, that ESI is required to make quarterly payments as described herein. Rebate amounts that ESI receives later than 120 days following the end of a quarter shall be included by ESI in the next quarterly payment. ESI retains all right, title and interest to any and all actual Rebates and Manufacturer Administrative Fees received from manufacturers, except that ESI shall pay Fund amounts equal to the Rebate amounts allocated to Fund, as specified above, from ESI's general assets (neither Fund, its Members, nor Fund's plan retains any beneficial interest in ESI's general assets). Fund acknowledges and agrees that neither it, its Members, nor its Plan shall have a right to interest on, or the time value of, any Rebate or Manufacturer Administrative Fee payments received by ESI during the collection period or moneys payable under this Section. No Rebates shall be paid until this Agreement is executed by Fund. ESI shall have the right to apply Fund's Rebate amounts to unpaid Fees, and shall have the right to delay payment of Rebates to allow for final adjustments upon termination of this Agreement. ESI is obligated to pay Rebates for qualifying Covered Drugs filled during the term of the Agreement even if the Agreement has terminated.

5.    Fund acknowledges that it may be eligible for Rebates under this Agreement only so long as Fund, its affiliates, or its agents do not contract directly or indirectly with anyone else for discounts, utilization limits, rebates or other financial incentives on pharmaceutical products or formulary programs for claims processed by ESI pursuant to the Agreement, without the prior written consent of ESI. In the event that Fund negotiates or arranges with a pharmaceutical manufacturer for Rebates or similar discounts for any Covered Drugs hereunder, but without limiting ESI's right to other remedies, ESI may immediately withhold any Rebates earned by, but not yet paid to, Fund as necessary to prevent duplicative rebates on Covered Drugs. To the extent Fund knowingly negotiates and/or contracts for discounts or rebates on claims for Covered Drugs without prior written approval of ESI, such activity shall be deemed to be a material breach of this Agreement, entitling ESI to suspend payment of Rebates hereunder and to renegotiate the terms and conditions of this Agreement.

Highly Confidential
THWF3231

**EXHIBIT E**

**BUSINESS ASSOCIATE AGREEMENT**

1.     **Definitions.**

(a)     "Compliance Date(s)" shall mean the date established by HHS or the United States Congress for effective date of applicability and enforceability of the HIPAA Rules.

(b)     "Designated Record Set" shall mean a group of records maintained by or for Plan that is (i) the medical records and billing records about individuals maintained by or for Plan, (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for Plan to make decisions about individuals.

(c)     "HIPAA Rules" means the collective privacy, transaction and security regulations promulgated pursuant to the Health Insurance Portability and Accountability Act, as codified at 45 CFR Parts 160, 162 & 164.

(d)     "Health Plan" or "Plan" shall have the same meaning as the term "Health Plan" in 45 CFR 160.103.

(e)     "Individual" shall have the same meaning as the term "individual" in 45 CFR § 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

(f)     "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR § 164.501, limited to the information created or received by ESI from or on behalf of Plan.

(g)     "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, as they exist now or as they may be amended.

(h)     "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.501.

(i)     "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

(j)     "Security Standards" shall mean the Security Standards, 45 C.F.R. parts 160, 162 and 164, to be effective no later than April 20, 2005, as they exist now or as they may be amended.

(k)     "Transaction Standards" shall mean the Standards for Electronic Transactions, 45 C.F.R. 160 and 162, as they exist now or as they may be amended.

Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in 45 CFR §§ 160.103 and 164.501.

2.     **General Use and Disclosure Provisions.**  ESI and the Plan acknowledge and agree as follows:

(a)     Except as otherwise limited in this Agreement, ESI may use and disclose PHI to properly provide, manage and administer the services required under the PBM Agreement and consistent with applicable law to assist the Plan in its operations, as long as such use or disclosure would not violate the HIPAA Rules if done by the Plan.

(b)     ESI will take reasonable efforts to limit requests for, use and disclosure of PHI to the minimum necessary to accomplish the intended request, use or disclosure.

**Highly Confidential**
**THWF3232**

**EXHIBIT E**

**BUSINESS ASSOCIATE AGREEMENT**

1.  **Definitions.**

   (a)   "Compliance Date(s)" shall mean the date established by HHS or the United States Congress for effective date of applicability and enforceability of the HIPAA Rules.

   (b)   "Designated Record Set" shall mean a group of records maintained by or for Plan that is (i) the medical records and billing records about individuals maintained by or for Plan, (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (iii) used, in whole or in part, by or for Plan to make decisions about individuals.

   (c)   "HIPAA Rules" means the collective privacy, transaction and security regulations promulgated pursuant to the Health Insurance Portability and Accountability Act, as codified at 45 CFR Parts 160, 162 & 164.

   (d)   "Health Plan" or "Plan" shall have the same meaning as the term "Health Plan" in 45 CFR 160.103.

   (e)   "Individual" shall have the same meaning as the term "individual" in 45 CFR § 164.501 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

   (f)   "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR § 164.501, limited to the information created or received by ESI from or on behalf of Plan.

   (g)   "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, as they exist now or as they may be amended.

   (h)   "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.501.

   (i)   "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

   (j)   "Security Standards" shall mean the Security Standards, 45 C.F.R. parts 160, 162 and 164, to be effective no later than April 20, 2005, as they exist now or as they may be amended.

   (k)   "Transaction Standards" shall mean the Standards for Electronic Transactions, 45 C.F.R. 160 and 162, as they exist now or as they may be amended.

   Terms used, but not otherwise defined, in this Addendum shall have the same meaning as those terms in 45 CFR §§ 160.103 and 164.501.

2.  **General Use and Disclosure Provisions.**  ESI and the Plan acknowledge and agree as follows:

   (a)   Except as otherwise limited in this Agreement, ESI may use and disclose PHI to properly provide, manage and administer the services required under the PBM Agreement and consistent with applicable law to assist the Plan in its operations, as long as such use or disclosure would not violate the HIPAA Rules if done by the Plan.

   (b)   ESI will take reasonable efforts to limit requests for, use and disclosure of PHI to the minimum necessary to accomplish the intended request, use or disclosure.

**Highly Confidential**
**THWF3233**

(c)    Except as otherwise limited in this Agreement:

(i)    ESI may use PHI for the proper management and administration of ESI or to carry out ESI's legal responsibilities.

(ii)    ESI may disclose PHI to third parties for the proper management and administration of ESI or to carry out the legal responsibilities of ESI, provided that the disclosures are Required by Law, or ESI obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies ESI of any instances of which it is aware in which the confidentiality of the information has been breached.

(iii)    ESI may use PHI to perform Data Aggregation services on behalf of the Plan as permitted by 45 CFR 164.504(e)(2)(i)(B).

(d)    ESI agrees to promptly notify the Plan if ESI has knowledge that PHI has been used or disclosed by ESI in a manner that violates applicable law.

(e)    ESI agrees to use appropriate safeguards, consistent with applicable law, to prevent use or disclosure of PHI in a manner that would violate this Agreement. ESI shall provide the Plan with such information concerning such safeguards as the Plan may reasonably request from time to time.

(f)    ESI agrees to mitigate, to the extent practicable, any harmful effect that is known to ESI of a use or disclosure of PHI by ESI in violation of this Agreement or the PBM Agreement.

(g)    ESI agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by ESI on behalf of the Plan agrees to the same restrictions and conditions that apply through this Agreement to ESI with respect to such information.

(h)    Within fifteen (15) business days of a request from the Plan, ESI shall provide access to the Plan to PHI in a Designated Record Set in order to meet the requirements under 45 CFR 164.524. If ESI receives a request directly from an Individual, or if the Plan requests that access be provided to the Individual, ESI shall provide access to the Individual to PHI in a Designated Record Set within thirty (30) days in order to meet the requirements under 45 CFR 164.524.

(i)    Within sixty (60) business days of a request of the Plan or subject Individual, ESI agrees to make any appropriate amendment(s) to PHI in a Designated Record Set that the Plan directs or agrees to pursuant to 45 CFR 164.526.

(j)    Within thirty (30) business days of a proper request by the Plan, ESI agrees to document and make available to the Plan, for a reasonable cost-based fee (under conditions permitted by HIPAA if an Individual requests an accounting more than once during a twelve month period), such disclosures of PHI and information related to such disclosures necessary to respond to such request for an accounting of disclosures of PHI, exclusive of those disclosures for payment, treatment or healthcare operations, in accordance with 45 CFR 164.528. Within sixty (60) days of proper request by subject Individual, ESI agrees to document and make available to the Individual the information described above. ESI shall retain copies of any accountings for a period of six (6) years from the date the accounting was created.

(k)    Within fifteen (15) business days of a request of the Plan, ESI agrees to restrict use or disclosure of PHI agreed to by the Plan on behalf of an Individual in accordance with 45 CFR 164.522.

(l)    ESI agrees to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by ESI on behalf of, the Plan available to the Plan within ten (10) business days, or at the request of the Plan or the Secretary of HHS ("Secretary"), to the Secretary in a time and manner directed by the Secretary, for purposes of the Secretary determining the Plan's compliance with the HIPAA Rules.

Highly Confidential
THWF3234

3.    **Plan Obligations.**

(a)    Plan shall notify ESI of any limitation(s) in the notice of privacy practices of Plan in accordance with 45 C.F.R. §164.520, to the extent that such limitation may affect ESI's use or disclosure of PHI.

(b)    Plan shall notify ESI of any changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect ESI's use or disclosure of PHI.

(c)    Plan shall notify ESI of any restriction to the use or disclosure of PHI that Plan has agreed to in accordance with 45 C.F.R. §164.522, to the extent that such restriction may affect ESI's use or disclosure of PHI.

(d)    Plan shall not request that ESI use or disclose PHI in any manner that would exceed that which is minimally necessary under the HIPAA Rules or that would not be permitted by a Covered Entity.

(e)    Plan agrees that it will have entered into "Business Associate Agreements" with any third parties (e.g., case managers, brokers or third party administrators) to which the Plan directs and authorizes ESI to disclose PHI.

4.    **Transactions Standards.**    The HIPAA Rules provide for certain Transactions Standards for transfer of data between trading partners.  While certain of the standards may or may not be adopted by the Plan (e.g., for eligibility), ESI will be prepared to accept the following in accordance with 45 CFR Part 162.1502:  ASC X12N 834 – Benefit Enrollment and Maintenance.  In addition, to the extent applicable, ESI shall comply with other applicable transactions standards for claims processing functions between ESI and provider pharmacies.   The parties each hereby agree that it shall not change any definition, data condition or use of a data element or segment in a standard, add any data elements or segment to the maximum defined data set, use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the implementation specification, or change the meaning or intent of the implementation specification.

5.    **Security Standards.**  To the extent that ESI creates, receives, maintains or transmits electronic PHI, ESI shall:

(a)    Implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic PHI that ESI creates, receives, maintains or transmits on behalf of the Plan as required by the Security Standards;

(b)    Ensure that any agent, including a subcontractor, to whom ESI provides electronic PHI agrees to implement reasonable and appropriate safeguards to protect the PHI; and

(c)    Promptly report to Plan any Security Incident, as determined by ESI, involving electronic PHI of which ESI becomes aware.

6.    **Breach; Termination.**

(a)    Without limiting the termination rights of the parties pursuant to the PBM Agreement, upon the Plan's knowledge of a material breach by ESI of this Agreement, the Plan shall notify ESI of such breach and ESI shall have thirty (30) days to cure such breach.  In the event ESI does not cure the breach, or cure is infeasible, the Plan shall have the right to immediately terminate this Agreement and the PBM Agreement.  If cure of the material breach is infeasible, Plan shall report the violation to the Secretary.

(b)    To the extent feasible, upon termination of the PBM Agreement for any reason, ESI shall, and shall cause any subcontractors and agents to, return or destroy and retain no copies of all PHI received from, or created or received by ESI on behalf of, the Plan.  If return or destruction of such

**Highly Confidential**
**THWF3235**

information is not feasible, ESI shall continue to limit the use or disclosure of such information as set forth in this Agreement as if the PBM Agreement had not been terminated.

7.    **Indemnification**.  ESI will indemnify and hold harmless Plan from and against any claim, cause of action, liability, damage, cost or expense, including reasonable attorneys' fees and court or proceeding costs, arising out of or in connection with any (a) unauthorized use or disclosure of PHI, (b) failure in security measures affecting PHI (after the Security Standard Compliance Date); or (c) other material breach of the terms of this Agreement by ESI or any person or entity under ESI control.  Indemnification is conditioned upon the Plan notifying the ESI in writing promptly upon learning of any claim for which indemnification may be sought hereunder, and shall tender the defense of such claim to ESI.  ESI shall not be required to indemnify Plan if any claim is settled without ESI's written consent.

8.    **Miscellaneous**.

(a)    **Amendment**.  The parties acknowledge that the foregoing provisions are designed to comply with the mandates of the HIPAA Rules.  Should the provisions of the HIPAA Rules change or be amended after the date of this Agreement, the parties shall engage in negotiations to amend the provisions of this Agreement to comply with such changes or amendments.  If the parties fail to agree on reasonable amendment to the provisions of this Agreement, either party may terminate this Agreement upon ninety (90) days written notice.

(b)    **Effect on PBM Agreement**.  Except as relates to the use, security and disclosure of PHI and electronic transactions, this Agreement is not intended to change the terms and conditions of, or the rights and obligations of the parties under, the PBM Agreement.

(c)    **No Third-Party Beneficiaries**.  Nothing express or implied in the PBM Agreement or in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations or liabilities whatsoever.

(d)    **Interpretation**.  Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits the Plan to comply with the HIPAA Rules.

(e)    **Effective Date**.  This Agreement shall be effective as of the applicable Compliance Dates or the effective date of the PBM Agreement, whichever is later.

**Highly Confidential**
**THWF3236**

## EXHIBIT F

## PERFORMANCE STANDARDS

Fund shall not be implemented unless ESI has received a signed Agreement from Fund. In addition, Performance Standards are not measured for, or otherwise applicable to, a Fund not in good standing with the Coalition.

All standards, excluding the implementation standards, are for the initial term of the Agreement and apply to all Funds of the Coalition in the aggregate. In no event shall the sum of the payments to all Funds, as a result of ESI's failure to meet any performance standards, exceed $100,000 annually. The performance standards are based on a minimum enrollment of 150,000 Members (of all Funds) on May 30, 2003.

| Call Center Service Feature - Customer Service Call - Average Speed of Answer Standard |
| --- |
| ESI guarantees that calls will be answered in an annual average of 30 seconds or less with the exception of a failure in a third party communication system. This standard is predicated on the installation of a toll free telephone number unique to the Coalition. This standard will be measured and reported quarterly. |

| Penalty |
| --- |
| $10,000 annually |

| Call Center Service Feature - Customer Service Response Time - Blockage Rate - Busy Signal Standard |
| --- |
| ESI will guarantee an annual blockage rate of 2% or less with the exception of a failure in a third party communication system. Blockage is defined as a caller receiving a busy signal. This standard is predicated on the installation of a toll-free number unique to the Coalition. This standard will be measured and reported quarterly. |

| Penalty |
| --- |
| $10,000 annually |

**Highly Confidential**
**THWF3237**

**Call Center Service Feature – Customer Service Response Time to Written Inquiry**

**Standard**

ESI will guarantee that annually 95% or more of written inquiries will be responded to within 5 business days, and that annually 100% of written inquiries will be responded to within 10 business days. This standard will be measured and reported quarterly.

**Penalty**

$10,000 annually.

**Call Center Service Feature – Response Time, Percent Calls Abandoned**

**Standard**

Annual call abandonment rate will be 4% or less with the exception of a failure in a third party communication system. Abandonment rates do not include calls terminated by members in less than 30 seconds. This standard is predicated on the installation of a toll-free number unique to the Coalition. This standard will be measured and reported quarterly.

**Penalty**

$10,000 annually

**Mail Service Pharmacy Feature – Turnaround Time for Routine Prescriptions**

**Standard**

ESI guarantees dispensing and shipping (or return) of prescriptions not subject to intervention with an annual average of 2 business days of receipt of the order at ESI's Pharmacy. "Interventions" include all calls to members or prescribers to clarify the prescriber's direction, to obtain consent for formulary programs, generic or therapeutic substitution, or otherwise. This standard will be measured and reported quarterly.

**Penalty**

$10,000 annually

Highly Confidential
THWF3238

| Data Systems Service Feature - System Availability |
|---|
| **Standard** |
| ESI guarantees an annual average 99% system availability of the point of sale adjudication system.<br><br>This standard excludes systems downtime attributed to regularly scheduled systems maintenance or systems downtime attributed to telecommunications failure or other circumstances outside the control of ESI. This standard will be measured and reported quarterly. |
| **Penalty** |
| $10,000 annually |

| Reporting Service Feature - Timely Production of Management Reports |
|---|
| **Standard** |
| ESI guarantees the following time schedule for access:<br><br>**On-Line Reporting – RxWorkbench:** Access to the on-line reporting data will be available within and annual average of 10 days after the billing cycle. This standard will be measured and reported quarterly. |
| **Penalty** |
| $10,000 annually |

**Highly Confidential**
**THWF3239**

**Reporting Service Feature - Timely Production of Management Reports**

**Standard**

ESI guarantees the following time schedule:

**Standard Printed Management Reports:** The reports provided on a quarterly basis will be produced within an annual average of 45 days after the end of the quarter. This standard will be measured and reported quarterly.

**Penalty**

$10,000 annually

**Eligibility Service Feature - Timeliness of Installations**

**Standard**

ESI guarantees that electronic eligibility files will be installed and eligibility status will be effective within an annual average of two (2) business days of receipt. This standard is contingent upon receipt of clean eligibility data delivered in an agreed upon format. This standard will be measured and reported quarterly.

**Penalty**

$10,000 annually

Highly Confidential
THWF3240

## EXHIBIT G

### STANDARD AUDIT PROTOCOL

Audits include claim data reviewed in excess of 3 months and address broad operational areas including claim pricing accuracy, formulary compliance, concurrent eligibility and rebate compliance. General claim inquiries which do not require an audit can be initiated by contacting a member of the Fund's account management team at any time. Therefore, nothing in this protocol should be interpreted to restrict Fund's ability to request ESI to investigate and /or review specific issues or problems identified by Fund at any time.

1. **Audit Prerequisites:**

A. Fund's account with ESI may not reflect a delinquent balance, except amounts reasonably in dispute.

B. Fund should supply written notification to begin an audit. ESI will begin pulling data necessary to perform the audit in a time frame not to exceed thirty (30) days. Due to the extraordinary demands placed on ESI's staff during the annual renewal period of December and January, no audits may be conducted during such months.

C. If Fund elects to use an independent auditor (as reasonably approved by ESI and as not having a conflict of interest with ESI), such auditor must execute a mutually agreed upon Confidentiality Agreement, substantially in the form of Appendix 1 hereto, prior to ESI supplying any data requested to perform an audit.

2. **Prescription Drug Claims:**

A. If requested, ESI will supply Fund or its Auditor with claim detail history on CD-ROM or other mutually agreed upon media in NCPDP (National Council for Prescription Drug Programs) standard fields.

B. The audit scope will cover up to the twenty-four (24) months immediately preceding the audit. Requests for older data may be subject to additional fees in order to retrieve data from off-site storage.

C. Typically, most audits can be performed remotely via transfer of data on CD-ROM, hardcopy documents, etc. Any requested on-site audits shall be conducted during normal business hours at ESI offices.

D. Audit materials or documentation provided by ESI will be limited to Fund-specific information.

E. Other ESI documentation (i.e. policies and procedures) requested during the course of the audit other than that needed to determine the accuracy of Fund claims payments will be provided at ESI's reasonable discretion.

F. Contractual information (e.g., reimbursement rates and fees) concerning Participating Pharmacies, manufacturers and other providers of products and services that are proprietary and confidential to ESI and will not be disclosed.

G. Results of ESI's most recent SAS 70 audit conducted by a national accounting firm will be provided upon request. The audit may not re-perform a SAS 70 control audit for areas that ESI has obtained a SAS 70 audit. However, this does not preclude the Fund or its Auditor from obtaining a reasonable understanding from ESI personnel of any areas covered within the SAS 70 audit.

H. All Fund-specific data, including claims detail and any copies of claims (or compilations thereof) supplied by ESI may be retained by Fund or Auditor.

**Highly Confidential
THWF3241**

3.   Rebates – Preferred Savings Grid and Market Share

A.   The scope of any rebate audit should not exceed two (2) quarters during the twelve (12) month period immediately preceding the audit.

B.   ESI's contracts with pharmaceutical manufacturers for drug product rebates are highly confidential and proprietary. Fund may audit payments under rebate contracts constituting not more than 25% of total rebate payments to Fund, but in no event more than seven (7) manufacturer contracts.   Fund may select the manufacturer contracts to be audited, and ESI will use reasonable best efforts to obtain manufacturer consent to disclosure of such contracts where such consent is required. In the event that a manufacturer does not agree to allow a Fund or its Auditor to review the applicable pricing components, then ESI will try to secure permission from another manufacturer of the Fund's choice.   If the initial review warrants additional quarterly periods and/or additional manufacturer agreements to be audited, Fund and ESI shall mutually determine the scope and process for such further audit.   In addition, Fund may review the confidentiality provisions of the manufacturer agreement, if desired

C.   ESI will permit Fund or its Auditor (while on-site) to review the applicable pricing components of the manufacturer rebate agreements which are relevant and necessary to audit the calculation of the rebate payments made to Fund by ESI for the selected drugs.

D.   Fund should bring, or otherwise supply its auditor with, the most recent Allocation Report (PSG) or Fund Share Report (MS), which should be brought to the on-site rebate audit.  Additional fees ($150.00 per programming hour) may be charged to Fund if ESI is asked to re-produce these reports.

E.   Neither Fund nor its Auditor will be permitted to copy or retain any such manufacturer agreements (in part or in whole) or documents provided or made available by ESI in connection with the rebate audit. Fund or its Auditor will be entitled to take and retain notes to the extent necessary to document any identified exceptions.  ESI shall be entitled to review any notes to affirm compliance with this paragraph.

4.   Request for Verification or Explanation of Disputed Claims (both drug claim and rebate audits)

A.   After ESI has supplied the claims data, the Fund or its Auditor should provide ESI with a written report stating the entire error population and dollar amount associated with the errors. In addition to the written report, Fund or Auditor should provide an electronic extrapolation of errors representative of the entire population of errors not to exceed a compilation of 200 (hereafter referred to as "representative sample").

B.   ESI will attempt to research and investigate the "representative sample" within thirty (30) days.  If additional time is required, ESI will notify Fund or its Auditor of the additional time needed within these thirty (30) days.

C.   Overpayments or underpayments shall be paid and/or credited by ESI (or the Fund, as the case may be) promptly.

D.   Automatic closure of the audit will occur if Fund or Auditor fails to communicate research updates within 180 days of ESI supplying the data needed to perform the audit.

Highly Confidential
THWF3242

**EXHIBIT H**

**FINANCIAL DISCLOSURE TO ESI PBM CLIENTS**

Express Scripts is a provider of pharmaceutical benefits management ("PBM") and other related services to thousands of client groups including managed care organizations, health insurers, employer groups, third party administrators and government entities. Express Scripts' subsidiary companies, some of which provide services related to supporting our PBM services, include ESI Mail Pharmacy Service, Inc., CuraScript Pharmacy, Inc., Express Scripts Specialty Distribution Services, Inc., and Phoenix Marketing Group, LLC. This disclosure provides an overview of the revenue sources that allow us to deliver competitive pricing arrangements to our clients.

Express Scripts offers its clients, either directly or through its subsidiary companies, a variety of services related to the management of prescription drug benefits. The specific services provided to each client are documented under the Pharmacy Benefit Management Agreement, or other similar agreement, with our client. Express Scripts' PBM services typically include claims processing and adjudication, pharmacy network contracting and management, formulary development and management, rebate management and administration, trend management, and clinical program development and fulfillment. Some of our clients also utilize our mail service pharmacy to provide their members with convenient access to safe and affordable prescription drugs through home delivery. In addition to the administrative fees paid to us by our clients for these core PBM services, Express Scripts derives revenue from other sources, including arrangements with pharmaceutical manufacturers and retail pharmacies. Some of this revenue relates to utilization of products by members of the clients for whom we provide PBM services.

Network Pharmacies – Express Scripts contracts for its own account with retail pharmacies to dispense prescription drugs to members of the clients for whom we provide PBM services. The rates paid by Express Scripts to these pharmacies differ from one network of pharmacies to the next, and among pharmacies within a network. Express Scripts generally contracts with clients to be paid an ingredient cost for drugs dispensed in a given retail network selected by the client at a uniform rate that applies to all pharmacies in the selected network. Thus, where the rate paid by a client exceeds the rate negotiated with a particular pharmacy, Express Scripts will realize a positive margin on the applicable prescription. The reverse may also be true, resulting in negative margin for Express Scripts. In addition, when Express Scripts receives payment from a client before payment to a pharmacy is due, Express Scripts retains the benefit of the use of the funds between these payments.

Manufacturer Rebates and Associated Administrative Fees – Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product. Express Scripts often pays all or a portion of the rebates it receives to a client based on the client's PBM services agreement. Express Scripts retains the financial benefit of the use of any funds held until payment is made to a client. In connection with our maintenance and operation of the systems and other infrastructure necessary for managing and administering the rebate process, Express Scripts also receives administrative fees from pharmaceutical manufacturers participating in the rebate program discussed above. The services provided to participating manufacturers include making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.

Pharmacy Dispensing and Distribution – Express Scripts has several licensed pharmacy subsidiaries, including our specialty pharmacies. These entities purchase prescription drug inventories, either directly from manufacturers or from drug wholesalers, for dispensing to patients or for distribution to physician offices. Purchase discounts off the acquisition cost of

**Highly Confidential**
**THWF3243**

these products are made available by manufacturers in the form of both up-front and retrospective discounts. Such discounts are not considered part of the rebates paid to Express Scripts by manufacturers in connection with our rebate program. While rebates are directly attributable to the utilization of pharmaceutical products by individuals who receive benefits from clients for whom we provide PBM services, product acquisition price discounts are based on a pharmacy's inventory needs and, in the case of specialty pharmacies, the performance of related patient care service obligations. The purchase discounts obtained by these facilities are not based on any client's benefit design. When an Express Scripts subsidiary pharmacy dispenses or distributes a product from its inventory, the purchase price paid for the dispensed product, including applicable dispensing fees, may be greater or less than the pharmacy's acquisition cost for the product net of purchase discounts. In general, our pharmacies realize an overall positive margin between this net acquisition cost and the amounts paid for the dispensed products.

Pharmaceutical Program Services – Our specialty pharmacies, including CuraScript Pharmacy, Inc. and Express Scripts Specialty Distribution Services, Inc., receive compensation from manufacturers for their administration of programs related to the distribution of certain pharmaceutical products. This compensation is based on the fair market value of the services provided and is unrelated to the drug formulary development process or drug utilization applicable to the clients for whom we provide PBM services. Examples of these services include (i) administering patient assistance programs for indigent patients; (ii) administering product sample distribution programs; and (iii) dispensing prescription medications to patients enrolled in clinical trials.

Data Reporting – Express Scripts sells certain data resulting from its PBM and pharmacy services to healthcare data aggregators and similar entities from time to time. We do not sell any data unless we are permitted to do so by the terms of our client contract and by applicable patient privacy laws. In addition, as a condition to receiving access to certain products, a specialty pharmaceutical manufacturer often will require a purchasing specialty pharmacy to report selected information to the manufacturer regarding the pharmacy's service levels and other de-identified dispensing-related data with respect to patients who receive such manufacturer's product. A portion of the discounts or other compensation made available to our specialty pharmacies represents compensation for such reporting. All such reporting activities are conducted in compliance with applicable patient privacy laws.

Other Pharmaceutical Manufacturer Services – Phoenix Marketing Group, LLC specializes in the provision of sample fulfillment, sample accountability, alternative sampling, direct mail fulfillment, and literature fulfillment services for pharmaceutical manufacturers. Because its services involve only warehousing and fulfillment-related functions, this subsidiary entity does not review products clinically and it never uses, sells or has access to Express Scripts' client or member information. Compensation paid to Phoenix Marketing Group, LLC by pharmaceutical manufacturers is based on the fair market value of such services, as established most often through an "RFP" process, and any such compensation is unrelated to the drug formulary development process or drug utilization applicable to the clients for whom Express Scripts provides PBM services.

July, 2005

THIS EXHIBIT REPRESENTS ESI'S CURRENT FINANCIAL POLICIES. THIS EXHIBIT MAY NOT BE REVISED OR MODIFIED. ESI MAY PERIODICALLY UPDATE ITS FINANCIAL DISCLOSURES TO REFLECT CHANGES IN ITS BUSINESS PROCESSES.

Highly Confidential
THWF3244

# Exhibit I

# Filed Under Seal

# Exhibit J



ADVANCEPCS, L.P.

MANAGED PHARMACEUTICAL BENEFIT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of May 1, 2001 (the "Effective Date") by and between PIRELLI ARMSTRONG TIRE CORPORATION ("Customer") and AdvancePCS, L.P. ("AdvancePCS"), for the purpose of delineating the terms and conditions under which AdvancePCS will provide certain managed pharmaceutical benefit services to Customer. All capitalized terms will have the meanings given in this Agreement or in Section 11 of this Agreement.

## A G R E E M E N T

### 1.    STATEMENT OF SERVICES/ADVANCEPCS OBLIGATIONS

**1.1.    Services.** AdvancePCS will provide Customer the services, including the Base Services (those Services described in Exhibit A—Sections 1, 3, 4 (other than 4B and 4E), 5, 6, 9, 10 (other than 10B), and 12) and such other services listed in Exhibit A hereto which are selected by Customer pursuant to the implementation documents (collectively the "Services"). AdvancePCS may change the Services upon 30 days' prior written notice to Customer, subject to Customer's right to terminate under Section 8.2.2 of this Agreement. Services will not be discontinued or materially reduced except upon the mutual agreement of the parties. Customer acknowledges that AdvancePCS may upgrade and make minor modifications to the Services without notice to Customer.

**1.2.    Compliance with Law.** AdvancePCS will comply with all Laws applicable to it and the Services it provides under this Agreement. Customer has no responsibility to advise AdvancePCS regarding its compliance with any applicable Law. AdvancePCS makes no representation or warranty that the Plan Design selected by Customer is in compliance with any Law that applies to Customer.

**1.3.    AdvancePCS Indemnity.** Subject to the limitations set forth in Section 6.4 of this Agreement, AdvancePCS will indemnify and hold harmless Customer for, from and against any and all costs, losses or damages Customer may incur as a result of AdvancePCS' failure to perform any of its obligations under this Agreement.

### 2.    FEES AND PAYMENT

**2.1.    Fees.** Customer will pay to AdvancePCS the Administrative Fees listed in Exhibit B, as applicable. AdvancePCS will invoice Customer for such Administrative Fees monthly, and payment is due within 10 days of Customer's receipt of the invoice.

    **2.1.1.** AdvancePCS assesses a minimum monthly charge of $750.00 for the Base Services. Each month AdvancePCS will review Customer's charges for Base Services, and if they are found to be less than the $750.00 minimum, AdvancePCS will invoice Customer for the difference on the following month's statement.

**2.2.    Rates for Prescription Claims.** Customer will pay for Covered Items dispensed to Members by the mail service pharmacy or the Network Providers, as the case may be, at

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a ationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000161
CONFIDENTIAL

the rates set forth in Exhibit B attached hereto, unless otherwise previously or hereafter hardcoded for different pricing at Customer's request.

2.2.1.     AdvancePCS has established a payment cycle for payments to Network Providers or Members for Covered Items, and following each cycle, AdvancePCS will invoice Customer for the amount due based on Claims submitted. AdvancePCS may change this payment cycle during the term of this Agreement, to a period determined by AdvancePCS in its sole discretion, upon 10 days' prior written notice to Customer.

2.2.2.     Within two (2) days of receipt of such invoice, Customer will wire transfer the invoiced amount to such account as AdvancePCS may designate from time to time.

2.2.3.     The amount that Customer pays to AdvancePCS under this Section 2.2 is not an asset of Customer's prescription benefit plan. AdvancePCS has no obligation to Customer or Customer's prescription benefit plan with respect to the interest or other earnings, if any, received by AdvancePCS with respect to these amounts.

2.2.4.     When Customer has made payment to AdvancePCS in full as described in this Section 2.2: (i) AdvancePCS will release Customer from any responsibility for the payment of any amounts owing to Network Providers or Members; and (ii) AdvancePCS will indemnify, defend and hold harmless Customer for, from and against any claims or demands from Network Providers or Members arising out of AdvancePCS' failure to remit amounts to Network Providers or Members as payment for Covered Items dispensed.

2.3.  **Certain Remedies.** Notwithstanding Section 9 of this Agreement, if Customer fails to pay AdvancePCS by the due date any amount owing hereunder, AdvancePCS, after making a good faith effort to collect and upon immediate written notice to Customer via facsimile to the facsimile number provided in this Agreement, may do any or all of the following:

2.3.1.     Suspend performance of any and all of AdvancePCS' obligations under or in connection with this Agreement, including AdvancePCS' obligation to process Claims using the RECAP System;

2.3.2.     Immediately advise Network Providers that the RECAP System is not available in connection with the Plan Design;

2.3.3.     Apply all or any portion of any security posted by Customer with AdvancePCS to Customer's delinquent account; or

2.3.4.     Set off against any amounts otherwise payable to Customer under this Agreement (including, if AdvancePCS is providing Formulary Services to Customer, any Rebates AdvancePCS receives from a Manufacturer on behalf of Customer) any amounts due from Customer under this Agreement.

2.4.  **Security.** If at any time during the term of this Agreement AdvancePCS reasonably determines, based on Claims volume, payment record or Customer's latest financial

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000162
CONFIDENTIAL

information, that Customer may have difficulty meeting its financial commitments under this Agreement, AdvancePCS may require Customer to provide security in an amount and form that AdvancePCS deems necessary. Customer will provide such security within 10 days of AdvancePCS' request. Additionally, Customer will furnish audited financial statements to AdvancePCS upon AdvancePCS' request. AdvancePCS will keep these audited financial statements confidential and will use them solely for internal review purposes to determine credit requirements.

2.5. **Pricing Changes.**

2.5.1.    After the Initial Term of this Agreement, AdvancePCS may change the Administrative Fees applicable to the Plan Design after giving Customer 60 days' written notice. Any change will take effect on the first day of the month following the 60 day notice period. Customer may object to an increase in Administrative Fees by providing written notice to AdvancePCS at least 30 days before the expiration of the 60 day notice period. If the parties cannot agree on an appropriate Administrative Fee, the Agreement will terminate at the end of the 60 day notice period. If Customer does not timely object, Customer will have no right to terminate this Agreement based on the pricing change.

2.5.2.    The rates provided to Customer in this Agreement are subject to certain Plan Design requirements. If there occurs a material change in drug industry practice which materially alters the rights and obligations of AdvancePCS under this Agreement, the parties will attempt to equitably adjust the pricing under this Agreement. If the parties are unable to agree upon an equitable adjustment, this Agreement will terminate on 60 days after notice by AdvancePCS of such termination.

3.    **CUSTOMER OBLIGATIONS**

3.1.    **Plan Design Information; Member Eligibility.**  Throughout the term of this Agreement, Customer, at its expense, will provide AdvancePCS all information concerning Customer's Plan Design and Members needed to perform the Services, including, without limitation, processing parameters and Member enrollment and eligibility updates. This information must be complete and accurate, provided timely and in a format and media approved by AdvancePCS. (Member enrollment and eligibility information is collectively referred to as **"Eligibility Information"**).

3.2.    **Reports.**  AdvancePCS may provide Customer with reports showing (i) all or some portion of the Plan Design information submitted to AdvancePCS, (ii) Member enrollment or eligibility data, (iii) Claims or billing activity during a specific period, or (iv) any action(s) taken by AdvancePCS in performing Services. Customer will review all such reports and notify AdvancePCS in writing of any errors or objections within 45 days of receipt of the report. Until Customer notifies AdvancePCS of any errors or objections, AdvancePCS will be entitled to rely on the information contained in the report. If Customer does not notify AdvancePCS of any errors or objections within the 45 day period, the information contained in the report will be deemed accurate, complete and acceptable to Customer.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000163
CONFIDENTIAL

3.3. **Drug Classification.** Customer agrees to accept the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference that AdvancePCS may select from time to time as the source for purposes of classifying drugs (e.g., legend vs. over the counter, brand vs. generic) in connection with this Agreement.

3.4. **Member Authorizations.** Customer has obtained, or will obtain, all Member authorizations required by Law, for AdvancePCS to perform the Services (including, without limitation, AdvancePCS audits of Network Providers and the Services required by Exhibit A Sections 5(B), 5(C), 6 and 11(C)).

3.5. **Customer Indemnity.** Subject to the limitations of Section 6.4 of this Agreement, Customer will indemnify and hold harmless AdvancePCS for, from and against any and all costs, losses or damages that AdvancePCS may incur as a result of Customer's failure to perform any of its obligations under this Agreement.

3.6. **Compliance with Law.** Customer will comply with all Laws applicable to its prescription drug benefit plan. AdvancePCS has no responsibility to advise Customer about Customer's compliance with any applicable Law including, without limitation, the Employee Retirement Income Security Act ("ERISA") or the Americans with Disabilities Act ("ADA"). Customer will also disclose to Members any and all matters relating to the Plan Design that are required by Law to be disclosed, including information relating to the calculation of copayments, coinsurance amounts, deductibles or any other amounts that are payable by a Member in connection with the Plan Design; and Rebates or other discounts on pharmaceutical products if Customer has selected Formulary Services, irrespective of whether Customer retains or allows AdvancePCS or others to retain all or a portion of any Rebates or discounts.

4. **USE AND ACCESS TO INFORMATION**

4.1. **Use of Information.** Subject to Section 5 of this Agreement, AdvancePCS and Customer may use the information obtained in connection with Claims ("**Claims Information**"), as well as Eligibility Information, in any manner they deem appropriate; except that each party and its agents, employees and contractors must maintain the confidentiality of this information (including the identity of any Member or Customer) to the extent required by applicable Law, and may not use this information in any manner prohibited by Law. Each party is responsible for its own use of the Claims Information and Eligibility Information, and will indemnify and hold harmless the other party for, from and against any and all costs, losses and damages incurred as a result of such use, including any claim by an employee or former employee of Customer or any of its affiliates under Law that protects the rights of such employees or their beneficiaries, including, without limitation, ERISA and the ADA.

4.2. **Access to Records.** AdvancePCS will maintain records of the Claims Information for 7 years after the dispensing date. These records will be in a format and media deemed appropriate by AdvancePCS. Customer may audit, review and duplicate the Claim billing information used by AdvancePCS to invoice Customer under this Agreement. AdvancePCS may audit, review and duplicate the Claims Information, and any other records Customer may have regarding the Claims Information made in connection with this Agreement. Reasonable prior written notice must be provided before an audit to the

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000164
CONFIDENTIAL

party holding the applicable information or records.  All audits will be at the auditing party's expense, must occur during regular business hours at the place of business of the holder of the information, are subject to all Laws regarding confidentiality, and are subject to the provisions of Section 5 of this Agreement.  The party requesting duplication will pay the other party its reasonable duplicating costs.

4.3.  **Third Party Records Request.**

   4.3.1.    If a Member or a Member's agent or designee requests to review or duplicate any Records, AdvancePCS will refer the requestor to Customer, and Customer may then request the Records in accordance with Section 4.2 of this Agreement.

   4.3.2.    If either party receives a court order, subpoena or governmental request for Records, the party will use its best efforts to timely notify the other party of the receipt of such request and provide an opportunity to respond. The receiving party may comply with such order, subpoena or request. If such order, subpoena or request relates directly to the other party's business (or in the case of Customer to a Member's Records) and not to the complying party's business generally, the complying party is entitled to reimbursement from the other party for its reasonable compliance costs.

4.4.  **Product Development.**  Subject to Section 4.1 of this Agreement, AdvancePCS, its agents, employees and contractors may use, reproduce, or adapt any information obtained under this Agreement or any prior agreement with Customer, to render services to clients and to develop new products and services which may be outside the scope of this Agreement. Any work, compilation, processes, or inventions developed by AdvancePCS or its agents, employees or contractors under this Section 4.4 is deemed AdvancePCS' Confidential Information under Section 5.1 of this Agreement.

5.    **INTELLECTUAL PROPERTY**

5.1.  **Proprietary Information.** In connection with this Agreement, each party may disclose to the other party certain proprietary or confidential technical and business information, databases, trade secrets, and innovations belonging to the disclosing party (**"Confidential Information"**), the value of which might be lost if the proprietary nature or confidentiality of such Confidential Information is not maintained. Each party agrees to the following provisions:

   5.1.1.    For the purposes of this Section 5, this Agreement and any exhibits, amendments or addenda attached hereto are deemed Confidential Information.

   5.1.2.    Each party reserves all rights to its Confidential Information, including all proprietary and novel features.  Neither party will disclose any of the other party's Confidential Information nor use any of the other party's Confidential Information to benefit itself or others except to the extent expressly authorized in this Agreement.

   5.1.3.    Each party will treat all Confidential Information as confidential; will disclose Confidential Information only to its employees who have a need to know in order to accomplish the purpose permitted in this Agreement and who

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000165
CONFIDENTIAL

themselves agree not to disclose it to anyone; will not (except to the extent expressly authorized by this Agreement) disclose Confidential Information to anyone outside of AdvancePCS or Customer; and will not copy or reproduce any written materials or tangible items provided by the other party unless expressly authorized to do so in writing. AdvancePCS and Customer each will take at least all measures it employs with respect to information of its own that it regards as confidential and proprietary, to preserve and protect the confidentiality or proprietary nature of any Confidential Information and to prevent it from falling into the public domain or into the possession of persons not bound to maintain its confidentiality.

5.1.4.    All Confidential Information will remain the property of the disclosing party. The receiving party will return all written or tangible materials, and all copies thereof, upon request of the disclosing party.

5.1.5.    The receiving party will not be liable for any disclosure or use of any Confidential Information if the Confidential Information is publicly available or later becomes publicly available other than through a breach of this Agreement, or if the Confidential Information is shown by written documentation to be known to the receiving party on the date of execution of this Agreement. Confidential Information may be disclosed pursuant to a bona fide subpoena if the party receiving the bona fide subpoena has given the other party immediate written notice of receipt of the subpoena so that the other party can objection or otherwise intervene as it deems proper.

5.2.  **RECAP.**    AdvancePCS owns the compilations of information contained in: (i) AdvancePCS' RECAP System, including, but not limited to, all printouts and copies, as well as any prior or future versions by any name; (ii) all other databases developed by AdvancePCS or its designees in connection with performing drug benefit services or utilization review; or (iii) the Services. In addition, these compilations are protected by copyright owned by AdvancePCS.

5.3.  **Remedies.** Any unauthorized disclosure or use of Confidential Information would cause AdvancePCS or Customer immediate and irreparable injury or loss. Accordingly, if either party fails to comply with this Section 5, the other party will be entitled to specific performance including immediate issuance of a temporary restraining order or preliminary injunction enforcing this Agreement, and to judgment for damages (including reasonable attorneys' fees) caused by the breach, and to any other remedies provided by Law.

6.    **WARRANTY, LIMITATION OF LIABILITY**

6.1.  **Warranty.** This Agreement is not a contract for the sale of goods. AdvancePCS will perform the Services in a good and workmanlike manner in accordance with the customs, practices and standards of providers skilled in the industry. EXCEPT AS WARRANTED IN THIS SECTION 6.1, ADVANCEPCS DISCLAIMS ALL EXPRESS AND ALL IMPLIED WARRANTIES OF ANY KIND, INCLUDING THE SUITABILITY FOR ANY PARTICULAR PURPOSE OF THE DATA GENERATED THROUGH THE RECAP SYSTEM.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000166
CONFIDENTIAL

80.9    05:01  9005  71  ʎɐW

6.2. **Force Majeure.** Except for obligations set forth in Section 2 of this Agreement, the parties are excused from performance under this Agreement to the extent such party is prevented from performing any obligation, in whole or in part, as a result of causes beyond its reasonable control, including, acts of God, war, civil disturbance, court order, governmental intervention, Change in Law, nonperformance by the other party or any third party, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment. Any nonperformance under this Section 6.2 will not constitute a default or a ground for termination of this Agreement.

6.3. **Change in Law.** The parties will attempt to equitably adjust the terms of this Agreement to take into account any Change in Law that materially alters the rights or obligations of either party under this Agreement. If the parties are unable to agree upon an, equitable adjustment within 60 days after either party notifies the other of a Change in Law, this Agreement will automatically terminate.

6.4. **Limitations of Liability.**

    6.4.1.    Neither Customer nor AdvancePCS (nor any of their affiliates, directors, employees, agents, successors or assigns) will be liable to the other under this Agreement:

        6.4.1.1. for any claim, demand, loss, attorneys' fees, costs, expenses, or liabilities of any kind arising from the acts or omissions of any pharmacy, pharmacist or provider that performs any Services in connection with this Agreement; or

        6.4.1.2. for any indirect, special, incidental or consequential damages, even if informed of their possibility.

    6.4.2.    AdvancePCS (or any of its affiliates, directors, employees, agents, successors or assigns) will not be liable to Customer under this Agreement for any amount, arising out of one or more claims, which in the aggregate would exceed the Administrative Fees Customer paid to AdvancePCS during the 1 year period preceding the date on which the claim(s) first arose.

    6.4.3.    Neither Customer nor AdvancePCS (nor any of their affiliates, directors, employees, agents, successors or assigns) will be liable for any claim which is asserted by the other party more than 90 days after the other party is or reasonably should have been aware of such claim.

    6.4.4.    If Customer has chosen not to receive those reports described in Section 3.2 or Exhibit A of this Agreement, AdvancePCS (or any of its affiliates, directors, employees, agents, successors or assigns) will not be liable for any claim which Customer reasonably would have been aware of if Customer had been receiving such reports.

7. **FORMULARY SERVICES.** If Customer selects Formulary Services, the provisions of this Section 7 will apply.

    7.1.    **Formulary Fees.** Customer will pay to AdvancePCS a fee in an amount equal to the percentage set forth in Exhibit B multiplied by the Rebates collected by AdvancePCS in

PATC-6-3.doc (07/02/2001)        7

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000167
CONFIDENTIAL

connection with this Agreement. In lieu of billing Customer for these fees, AdvancePCS may retain the amount due from the Rebates collected by AdvancePCS on behalf of Customer.

7.2. **Formulary Limitations.** As used herein and in Exhibit A, "**Manufacturer**" means a pharmaceutical company that has contracted with AdvancePCS (or its affiliate or agent) to offer discounts for pharmaceutical products in connection with AdvancePCS' Formulary Services.

    7.2.1.    Customer and AdvancePCS waive, release, and forever discharge each other from any claims, demands, losses, attorneys' fees, costs, expenses and liabilities of any nature, whether known or unknown, arising from:

        7.2.1.1. a Manufacturer's failure to pay any Rebate;

        7.2.1.2. a Manufacturer's breach of an agreement related to this Agreement; or

        7.2.1.3. a Manufacturer's negligence or misconduct.

    7.2.2.    AdvancePCS may receive fees or other compensation from Manufacturers, including, without limitation, administrative fees not exceeding 3% of the cost of the pharmaceutical products dispensed to Members, and fees for property provided or Services rendered to a Manufacturer (which may include providing physicians clinical messages consistent with the Performance Drug List). The term Rebates as used in this Agreement does not include these fees, which belong exclusively to AdvancePCS. In addition, AdvancePCS Mail, a mail service program provided by an affiliated mail service facility ("**AdvancePCS Mail**") may negotiate on its own behalf directly with Manufacturers for discounts, including rebated discounts based on market share or other factors. The term Rebates as used in the Agreement does not include these discounts which belong exclusively to AdvancePCS Mail.

7.3. **Formulary Ownership.** The AdvancePCS Formulary contains AdvancePCS proprietary information and AdvancePCS owns all rights to the AdvancePCS Formulary, including but not limited to, rights associated with publication, trade secrets, copyrights, trademarks and patents. Any rights that Customer may have in the AdvancePCS Formulary are hereby assigned to AdvancePCS. Accordingly, copies of the AdvancePCS Formulary in any medium distributed to Customer and its participating physicians remain the property of AdvancePCS and may be used only by Customer and such participating physicians for the purposes and transactions contemplated by this Agreement. Other than as expressly authorized in this Agreement, Customer may not distribute or disclose copies of the AdvancePCS Formulary to anyone, except as reasonably necessary for performance of this Agreement. Customer may not distribute or disclose copies of the AdvancePCS Formulary to any competitor of AdvancePCS.

7.4. **Formulary Renegotiation.** If, after the Effective Date of this Agreement, there occurs any Change in Law which materially affects AdvancePCS' ability to perform Formulary Services; or a change in drug industry practice which causes a substantial reduction in the Rebates available under this Agreement, either party may renegotiate the Formulary

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose

PIRELLI-FDB 0000168
CONFIDENTIAL

Services and Formulary Fees by providing written notice to the other party.   For purposes of this Section 7.4, a "**substantial reduction**" of Rebates means that Rebates available for a particular year, after AdvancePCS attempts diligent collection of Rebates, are less than 80% of the actual Rebates paid or payable during the initial year of this Agreement. Termination of Formulary Services will not terminate this Agreement as a whole.

8.   **TERM AND TERMINATION OF AGREEMENT**

8.1.   **Term.**  This Agreement is for an initial term of 3 years from the Effective Date (the "**Initial Term**"), and will automatically continue in effect for successive 1 year terms thereafter, subject to the remaining provisions of this Section 8.

8.2.   **Termination.**  This Agreement may be terminated as follows:

8.2.1.   By either party, with or without cause, at the end of the Initial Term or any renewal term, by giving written notice to the other party 60 days prior to the end of such Initial Term or renewal term;

8.2.2.   By Customer, at its option, if AdvancePCS changes the Services under Section 1.1 of this Agreement, such termination to be effective on the proposed date the change would take effect;

8.2.3.   Automatically, if the parties are unable to agree on (i) changes in Administrative Fees under Section 2.5.1 of this Agreement, (ii) an equitable adjustment under Section 2.5.2 of this Agreement; or (iii) an equitable adjustment under Section 6.3 of this Agreement;

8.2.4.   By either party if the other party defaults in its performance of this Agreement.  The terminating party must provide the defaulting party 30 days' prior written notice, specifying the nature of the default. This Agreement will not terminate under this subsection if the defaulting party cures the default within the 30 day period;

8.2.5.   By AdvancePCS (notwithstanding subsection 8.2.4 of this Agreement) on 2 days' prior written notice to Customer, if Customer fails (i) to timely make any payment required under this Agreement, unless Customer cures that default within the two-day period, or (ii) to provide or maintain security under Section 2.4 of this Agreement;

8.2.6.   By either party, at its option, if any court, governmental or regulatory agency issues to the other party an order or finding of impairment or insolvency, or an order to cease and desist from writing business. The party receiving notice of an order or finding must provide the other party written notice within 2 business days of receipt; or

8.2.7.   By either party if the other party :  (i) makes an assignment for the benefit of creditors; (ii) has a petition filed (whether voluntary or involuntary) under Title 11 of the United States Code, or any other similar statute now or hereafter in effect; (iii) has a receiver, custodian, conservator or trustee appointed with respect to all or a substantial part of its property; or (iv) has a

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose

PIRELLI-FDB 0000169
CONFIDENTIAL

proceeding commenced against it which substantially impairs performance hereunder.

**8.3. Survival.** Sections 4, 5 and 6 of this Agreement, and obligations arising under this Agreement prior to the effective date of termination will survive termination.

**8.4. Pre-Termination Claims.** In the event this Agreement terminates for any reason, Customer, at its option, may elect to have AdvancePCS continue to provide Services for up to 12 months with respect to Claims incurred but not reported as of the effective date of termination. AdvancePCS' compensation for these Services will be in accordance with the terms in effect as of the effective date of termination.

## 9.   NOTICES

All notices under this Agreement must be in writing, delivered in person, sent by certified mail, delivered by air courier, or transmitted by facsimile and confirmed in writing (by air courier or certified mail) to a party at the facsimile number and address shown in this Agreement. A party may notify the other party of any changes in the listed address or facsimile number in accordance with the provisions of this Section 9. The parties may also transmit notices electronically, when proper arrangements are made in advance to facilitate such communications and provide for their security and verification. All notices are effective upon receipt.

Notices to AdvancePCS must be addressed as follows:

AdvancePCS, L.P.
11350 McCormack Road
Executive Plaza II, Suite 1000
Hunt Valley, MD  21031
Attn:  Executive Vice President, Client Management
Fax No.: (410) 785-2595

With a copy to the General Counsel at AdvancePCS, L.P., 9501 East Shea Boulevard, Scottsdale, AZ  85260-6719 address and the following Fax No.:  (480) 314-8231.

Notices to Customer must be addressed as follows:

Pirelli Armstrong Tire Corporation
c/o Southern Benefit Administrators
907 Two Mile Parkway – Building C
Goodlettsville, Tennessee 37072
Attn: Mr. Danny Dowlen, Vice President, Southern Benefit Administrators
Fax No.: (615) 859-0324

## 10.   MISCELLANEOUS

**10.1. Interpretation; Amendment; Counterparts.** This Agreement (including exhibits, schedules, attachments, implementation documents, any addendum to this Agreement or such other documents AdvancePCS may require from time to time to implement Services, all collectively referred to as "**Implementation Documents**") constitutes the entire understanding and obligation of the parties with respect to the Services and supersedes any prior agreements, writings, or understandings, whether oral or written.

PATC-6-3.doc (07/02/2001)                        10

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000170
CONFIDENTIAL

The headings in this Agreement are used only for convenience of reference and do not affect the meaning or interpretation of any provision. The parties may amend this Agreement only through a properly executed writing authorized by both parties. This Agreement may be executed in several counterparts, all of which taken together constitute a single agreement between the parties.

10.2. **Binding Effect; Assignment.** This Agreement is binding on the parties and their respective successors and permitted assigns. Neither party may assign this Agreement, in whole or in part, without the prior written consent of the other (which consent will not be unreasonably withheld); except that AdvancePCS may assign this Agreement, in whole or in part, to any entity that controls, is controlled by, or is under common control with AdvancePCS.

10.3. **Independent Contractor; Third Parties.** The parties to this Agreement are independent contractors, and have no other legal relationship under or in connection with this Agreement. No term or provision of this Agreement is for the benefit of any person who is not a party hereto (including, without limitation, any Member or broker), and no such party will have any right or cause of action hereunder.

10.4. **Waivers.** Any failure by a party to comply with any covenant, agreement or condition herein or in any other agreements or instruments executed and delivered hereunder may be waived in writing by the party in whose favor such obligation or condition runs; except that failure to insist upon strict compliance with any such covenant, agreement or condition will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.5. **Severability.** In the event any term or provision of this Agreement is declared to be invalid or illegal for any reason, this Agreement will remain in full force and effect and will be interpreted as though such invalid or illegal provision were not a part of this Agreement. The remaining provisions will be construed to preserve the intent and purpose of this Agreement and the parties will negotiate in good faith to modify any invalidated provisions to preserve each party's anticipated benefits.

10.6. **Enforcement Costs.** If either party institutes an action or proceeding to enforce any rights arising under this Agreement, the party prevailing in such action or proceeding will be paid all reasonable attorneys' fees and costs to enforce such rights by the other party, such fees and costs to be set by the court, not by a jury, and to be included in the judgment entered in such proceeding.

10.7. **Governing Law.** This Agreement must be governed by and construed in accordance with the laws of the State of Arizona, without regard to applicable conflict of law rules.

10.8. **Authority.** Each party represents and warrants that it has the necessary power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement.

11.    **DEFINITIONS**

The following terms and phrases, when capitalized, have the meanings set forth below.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000171
CONFIDENTIAL

11.1. **"AdvancePCS"** shall mean the corporation AdvancePCS and any subsidiaries or affiliates thereof.

11.2. **"AWP"** means the average wholesale price of the drug dispensed as set forth in the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference that AdvancePCS may select from time to time. The applicable AWP for Claims submitted by retail Network Providers is based on the average AWP for each drug.

11.3. **"Covered Items"** means the prescription drug benefits for which Members are eligible pursuant to Customer's drug benefit plan.

11.4. **"Change in Law"** means any (i) change in or adoption of any Law, (ii) change in the judicial or administrative interpretation of any Law, or (iii) change in the enforcement of any Law, occurring after the date Customer is implemented or the Effective Date, whichever is earlier.

11.5. **"Claims"** means those claims processed through the RECAP® System or otherwise transmitted or processed in accordance with the terms of this Agreement in connection with the Plan Design.

11.6. **"Law"** means any federal, state, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

11.7. **"Maximum Allowable Cost (MAC)".** AdvancePCS will use one or more of its proprietary maximum allowable cost pricing schedules ("MAC Lists") to establish an upper limit reimbursement price for certain multiple-source drugs dispensed under the Plan without regard to the specific manufacturer whose product is dispensed. The MAC Lists shall include generic drugs based on their common substitution, bioequivalency rating, and general availability. Customer agrees to accept any one of AdvancePCS' MAC Lists, as amended from time to time in AdvancePCS' discretion, for the purpose of pricing drugs in connection with this Agreement. Customer acknowledges that certain of AdvancePCS' national provider networks may utilize one or more of AdvancePCS' MAC Lists.

11.8. **"Member"** means an individual that Customer has designated in writing (or by electronic, tape or other means approved by AdvancePCS) to AdvancePCS as eligible for Covered Items under the terms of the Plan Design.

11.9. **"Network Provider"** means a provider which has agreed to provide certain pharmacy Services to Members in accordance with the terms of its agreement with AdvancePCS.

11.10.     **"Plan Design"** means the processing parameters and other information concerning Customer's drug benefit plan, which Customer has disclosed to AdvancePCS pursuant to Section 3.1 of this Agreement, and which AdvancePCS will use to process Claims under this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose

PIRELLI-FDB 0000172
CONFIDENTIAL

05/17/06  10:28 FAX 6158590324          Southern Benefit                    ☒014

11.11.     "Rebate(s)" means, for any period, all rebates, reimbursements, or other discounts received under a pharmaceutical manufacturer's discount program with respect to pharmaceutical products dispensed to a Member under the Plan Design for such period.

11.12.     "RECAP®" or "RECAP System" means AdvancePCS' proprietary remote electronic claims adjudication process.

[This space intentionally left blank.]

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than in evaluating entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000173
CONFIDENTIAL

05/17/06  10:28 FAX 6158590324          Southern Benefit          ☒015

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or agents as of the date first above written.

PIRELLI ARMSTRONG TIRE
CORPORATION

By: _____

Title: _Chairman / Secretary_____

Date: ___8-7-01_____

ADVANCEPCS, L.P.
By: AdvancePCS, General Partner

By: _____
     David A. George

Title: __President_____

Date: __Sept 12, 01_____

              AB

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

May 17 2006 10:51                          P.16

PIRELLI-FDB 0000174
CONFIDENTIAL

05/17/06  10:28 FAX 6158590324          Southern Benefit                              ☑016

*EXHIBIT A*
*DESCRIPTION OF SERVICES*

Below is a listing of Services provided under the base administrative fee or available for an additional fee. The Services are subject to change, at AdvancePCS' discretion, as provided in the Agreement. Capitalized terms not defined herein will have the meanings used in the Agreement.

1.    **PHARMACY MANAGEMENT**

A.    **Network Providers.** AdvancePCS has created a network of pharmacies (Network Providers) that Members will have access to, which have agreed to perform pharmacy Services for Members in accordance with the Plan Design and the terms of the Network Provider Agreement. As provided for in the Network Provider Agreement, Network Providers may choose, in certain limited circumstances, not to perform pharmacy Services for Members under this Agreement; however, no Network Provider may serve only some Members or provide only certain drugs unless (i) such Network Provider does not provide such drugs to any Members, or (ii) such Network Provider deems the provisions of pharmacy Services to a given Member contrary to the Network Provider's professional judgment. AdvancePCS may provide Network Providers with Plan Design information in such format and media as AdvancePCS deems appropriate for the purpose of assisting such Network Providers in providing Covered Items to Members.

B.    **Retail Network Auditing.** AdvancePCS will perform the following audits of retail Network Providers on behalf of Customer. Customer will not have the right to independently audit Network Providers.

–    **Statistical Auditing.** AdvancePCS will perform a periodic computerized analysis of those retail Network Providers handling a significant number of Claims which compares their Claims activity to the Claims activity of similar pharmacies. From this analysis, AdvancePCS will select pharmacies for, among other things, field audits.

–    **Field Auditing.** Each year during the term of the Agreement, AdvancePCS will perform field audits of retail Network Providers selected by AdvancePCS, to examine a retail Network Provider's compliance with its retail Network Provider Agreement. Any additional audit by AdvancePCS of any pharmacies selected by Customer will be additional services subject to additional charges.

–    **Audit Discrepancies.** To the extent AdvancePCS determines, as the result of its auditing procedures, that amounts have been overpaid to pharmacies for Claims submitted ("Audit Discrepancies"), AdvancePCS will make reasonable attempts to collect such Audit Discrepancies and any Audit Discrepancies so collected will be returned to Customer; provided, however, that AdvancePCS will retain 10% of such collected Audit Discrepancies to cover AdvancePCS' collection costs. AdvancePCS will notify Customer of any audit discrepancy that is greater than $1,000 after AdvancePCS determines such audit discrepancy to be reasonably uncollectible by AdvancePCS. AdvancePCS will not be required to institute litigation to collect any Audit Discrepancies. AdvancePCS' obligation to attempt collection will be AdvancePCS' sole obligation and liability with respect to remedying such Audit Discrepancies.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000175
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

C.   **Pharmacy Help Desk and Voice Response Unit.**  AdvancePCS will provide assistance to Network Providers through the RECAP Pharmacy Help Desk and AdvancePCS' voice response unit during those hours of operation established by AdvancePCS.

2.   **MEMBER SERVICE/TOLL FREE MEMBER SERVICES**

AdvancePCS will make available to Members a toll free number during those hours of operation established by AdvancePCS from time to time.  Staff will be available to answer Members' questions on Plan Design eligibility, Plan Design guidelines, deductible status and required copay levels, maximum benefit status, status of an identification card order, instructions for completing a Direct Claim (as defined in Section 4B below) form and status of Direct Claims.

3.   **ELIGIBILITY SERVICES**

A.   **Identification Cards.**   AdvancePCS will design one identification card layout and provide Customer with a proof of final design layout.   Customer will provide AdvancePCS with camera-ready artwork for the logo or logos that Customer wants to appear on the identification card.  All identification cards will include the AdvancePCS or RECAP name and logo.  For each Member, AdvancePCS will generate standard AdvancePCS cards in such final design.

B.   **Eligibility File.**  Based upon the information provided by Customer to AdvancePCS pursuant to Section 3.1, AdvancePCS will maintain an eligibility file identifying current Members and certain other information regarding such Members.

4.   **CLAIMS PROCESSING**

A.   **Provider Submitted Point of Sale ("POS") Claims.**  AdvancePCS will accept Claims submitted by Network Providers to AdvancePCS via the RECAP System (or as otherwise permitted under the Network Provider Agreement) and process such Claims in accordance with this Section 4A as follows:

–     AdvancePCS will enter into the RECAP System those portions of the Plan Design information as are necessary for AdvancePCS to perform automated Claims processing Services in accordance with this Agreement, including information regarding deductibles, copays, Member or Customer out-of-pocket maximums, benefit maximums and other features of the Plan Design to be used in processing Claims (collectively, **"Processing Parameters"**).

–     AdvancePCS will instruct Network Providers to transmit certain prescription, eligibility, and Plan Design information to AdvancePCS when the Member presents a Plan identification card, and if the RECAP System is unavailable, as soon as possible after the system becomes available.  If the RECAP System is unavailable, the Network Providers may submit the prescription at a later time and/or call the AdvancePCS RECAP Help Desk to verify eligibility.

–     AdvancePCS will perform RECAP System edits and transmit to such Network Provider the Claim status, the copay/coinsurance/deductible amount (if applicable), and any applicable DUR (as defined in Section 5A below) or other messages.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000176
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

—    Customer acknowledges that Network Providers will collect from the Member at
the point of sale the lesser of the applicable copay/coinsurance/deductible
amount or the usual and customary price of that pharmacy.

—    Certain drugs that become available on the market from time to time will be
priced separately from, and thus not subject to the contracted rate for
prescription Claims due to, among other things, specialized manufacturer
processes, limited availability or extraordinary shipping requirements. Such
drugs presently include biotechnology drugs, such as Betaseron and Avonex,
compounds, and injectables. AdvancePCS will provide Customer with a list of
such drugs, and their corresponding rates (which are generally no less than full
AWP), upon request. Network Providers, subject to the exceptions previously set
forth in Section 1-A of this Exhibit A, Description of Services, will dispense
these drugs to Members unless Customer's Plan Design would otherwise
exclude these drugs or Customer notifies AdvancePCS in writing of its
objection.

B.    **Member Submitted Claims.** AdvancePCS will accept Claims submitted by Members
directly to AdvancePCS when such Members submit Claims properly completed on
AdvancePCS' standard paper claim form ("**Standard Claim Form**") together with proof
of payment. AdvancePCS will process such Claims ("**Direct**" or "**Paper**" Claims) as
follows:

—    Receive, microfilm and assign a sequential, unique document number to each
Standard Claim Form;

—    Data-enter the information from the Standard Claim Form;

—    Perform the system edits described below to the extent information has been
made available to AdvancePCS, except that DUR and provider validation edits
will not be performed;

—    Produce and mail: Explanation of Benefits ("EOBs") to Members for allowable
claims, together with checks for the agreed upon reimbursement amounts; and

—    Produce and mail: Requests for Information ("RFIs") for Claims that are
rejected because they are ineligible for payment.

—    Direct or Paper Claims which are not properly completed and require additional
processing by AdvancePCS will be subject to the Preprocessed Direct Claims
fee set forth in Exhibit B.

C.    **System Edits.** For Claims submitted, except as otherwise provided herein, AdvancePCS
will perform the following claim edits or such other claim edits as AdvancePCS shall
deem proper from time to time:

—    Member Eligibility
—    Ineligible Drug
—    Duplicate Prescriptions
—    Provider Validation
—    Incorrect Price

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a
relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000177
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

- Plan Design Eligibility
- Missing/Invalid Data
- Managed Access® (if applicable)
- DUR (if applicable)
- Stale Date
- Claim Cost
- Excluded Drug

**D.**    **Taxes.**  Customer will pay to AdvancePCS such tax amounts as submitted by pharmacies for Covered Items dispensed to Members.

**E.**    **Medicaid Processing.**  Customer acknowledges that Medicaid agencies may submit Claims for, on behalf of and/or in the name of a Member and such Claims will be treated as any other Claims from Members; provided, however, that (i) the amount paid to such Medicaid agency will be the lesser of the amount invoiced by the agency or the amount AdvancePCS would have reimbursed a Member for such Claim in accordance with the Plan Design, and (ii) the Administrative Fee for processing Claims submitted by Medicaid agencies will be invoiced at the rate set forth in Exhibit B. Any amounts paid by AdvancePCS to Medicaid agencies will be deemed benefits under the Plan Design, and Customer will pay AdvancePCS for such amounts in accordance with Section 2.2 of the Agreement.

**5.**    **DRUG UTILIZATION REVIEW ("DUR")**

**A.**    **QUANTUM Alert® Services.**  AdvancePCS will provide its QUANTUM Alert automated concurrent DUR Services for POS transactions. The QUANTUM Alert system currently includes edits relating to excessive utilization; drug-drug interactions; therapeutic duplications; insufficient drug doses; excessive drug doses; drug-age conflicts; drug-pregnancy advisories; drug-disease contraindications; late refills; and controlled substance issues.

If a POS transaction fails the excessive utilization edit, AdvancePCS will send to the pharmacist an on-line message indicating Claim denial and an "Excessive Utilization" alert.

In certain instances, a Claim that is denied for excessive utilization may actually represent appropriate drug therapy as determined by the applicable physician or pharmacist in his/her professional judgment.  For example, the early refill may be necessary because of an increase in dose, change in prescribing instructions, etc.  In these instances, the pharmacist will exercise his/her professional judgment to either (i) dispense the prescribed drugs and instruct the Member to submit a Direct Claim for reimbursement or (ii) call AdvancePCS and direct AdvancePCS to override the denial edit.

Clinical and quality of care issues detected by the other DUR edits do not affect Claim payment, but result in transmission of a warning or alert message transmitted at the time of dispensing to the pharmacist as part of the paid Claim response from AdvancePCS. Network Providers are directed to review the Quantum Alert messages as they are received and to use their professional judgment as to whether action is required.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000178
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

**B.**  **Retrospective DUR Services.** AdvancePCS will provide to Customer AdvancePCS' retrospective DUR services, including RxReview™ and Clinical Consulting. Such services are designed to provide useful clinical information to physicians, and include written communications as well as personal visits with physicians by AdvancePCS' Clinical Specialists. These communications to physicians include summaries of current clinical studies, formulary recommendations, and may include patient profiles and targeted interventions. Customer has or will obtain any authorizations required by Law, and will make all disclosures required by Law, for AdvancePCS to perform the retrospective DUR services.

**C.**  **Rebate Related Services.** To obtain Rebates from Manufacturers, AdvancePCS will provide, on behalf of Customer, AdvancePCS' Retrospective DUR Services as described in Section 5B. AdvancePCS also will make available its quarterly physician newsletter for distribution to physicians by Customer. At Customer's request, Customer's logo or other identification may be incorporated into the newsletters. If Customer adopts a Custom Formulary, Customer will be responsible for distributing these newsletters, and completing and returning to AdvancePCS a Verification of Distribution form, which may be required by certain Manufacturers as a condition of paying Rebates. If Customer adopts AdvancePCS' National Formulary, AdvancePCS will be responsible for the distribution of these newsletters to physicians, and to provide Manufacturers with verification of such distribution, as may be necessary.

In addition to these Services, AdvancePCS may propose other interventions that are designed to increase Rebates and/or reduce the costs of Covered Items under this Agreement. Customer may decline to allow such interventions, but AdvancePCS will not be responsible for any loss of economic benefit that results from the failure to implement the proposed interventions. Nor will AdvancePCS be liable if any Manufacturer refuses to pay Rebates as a result of Customer's failure to distribute physician newsletters or other communications recommended by AdvancePCS, or Customer's failure to complete and return to AdvancePCS a Verification of Distribution form.

**D.**  **Limitations.** The information generated in connection with DUR Services is intended as an economical supplement to, and not a substitute for, the knowledge, expertise, skill, and judgment of physicians, pharmacists, or other health care providers in patient care. Providers are individually responsible for acting or not acting upon information generated and transmitted through the DUR Services, and for performing Services in each jurisdiction consistent with the scope of their licenses. Except as set forth in Section 5B above, in performing DUR Services, AdvancePCS will not, and is not required by this Agreement to deny Claims or require physician, pharmacist or patient compliance with any norm or suggested drug regimen, or in any way substitute AdvancePCS' judgment for the professional judgment or responsibility of the physician or pharmacist.

AdvancePCS' DUR Services are highly automated. Any focused professional review would also be based upon automated analysis of Member's profiles. Therefore, the DUR Services are necessarily limited by the amount and type of patient information available to AdvancePCS. Meaningful patient information which may not be available to AdvancePCS includes, but is not limited to, patient diagnoses, utilization of drugs obtained without utilizing the RECAP System or otherwise not included in the patients'

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000179
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

profile or Claim data. AdvancePCS will have no obligation to acquire information concerning any patient beyond the information that is included in Customer's eligibility records or the Claim data submitted by Network Providers in connection with the Plan.

AdvancePCS will update DUR databases on a reasonable basis to reflect changes in available standards for pharmaceutical prescribing; provided, however, no database will contain all currently available information on accepted medical practice or prescribing practices.

6.    PERFORMANCE RX® PROGRAM

Under AdvancePCS' Performance Rx® prescription management program, AdvancePCS and the Network Providers will work together to encourage the use of Preferred Drugs by (i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Member and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by AdvancePCS as a clinically appropriate and economically advantageous subset of the AdvancePCS clinical formulary, as revised by AdvancePCS from time to time.

7.    MANAGED ACCESS® MANAGED DRUG LIMITATIONS

A.    **Rejection of Claims Requiring Prior Authorization.** Under AdvancePCS' Managed Access program, for those drug/Member situations, which are identified as requiring a coverage override, AdvancePCS will reject all Claims submitted unless a Managed Access record has been entered into AdvancePCS' system. The Managed Access record will allow for overrides of:

    --    Plan Design parameters
    --    Drugs requiring prior authorization

B.    **Limitation of Dispensing to Specific Providers.** Under AdvancePCS Managed Access program, for those drug/Member situations that are identified as requiring an access limitation, AdvancePCS will authorize only those Claims submitted by specified providers for which a Managed Access record has been entered into AdvancePCS' system.

The Managed Access record will allow for lock-ins to:

    --    A specific physician
    --    A specific pharmacy
    --    A specific chain

The Managed Access record will allow for lock-ins to these specific providers for:

    --    All drugs
    --    Drugs at:
        --    The GC (Generic Class Number)
        --    The UC (Uniform System of Classification)
        --    The ND (National Drug Code)
        --    The LS (Legal Structure)

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000180
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

C.    **Managed Access/Record.** Customer will notify AdvancePCS of Members for whom an authorization has been made by completing a Managed Access enrollment form. Upon the establishment of prior authorization record for a Member and payment of applicable fees, future Claims for that Member and the specified drug or drug class, as the case may be, will be processed and paid until the expiration of the authorization record.

D.    **Managed Drug Limitations.** Under AdvancePCS' Managed Drug Limitations ("MDL") program, limitations on drug coverage may be established for categories of drugs, which are otherwise included in the Plan Design or are included subject to coverage override, as described above. Claims for these drugs will be rejected if dispensing the drugs would cause any applicable MDL to be exceeded. MDLs may be established by various criteria, including specified time periods, accumulations, and/or Claims types.

E.    **Limitation on Services.** Customer acknowledges that AdvancePCS' Managed Access and Managed Drug Limitations programs are automated non-discretionary processing techniques intended to provide better management of Customer's drug benefits based on objective criteria and the limited amount of patient information available to AdvancePCS. AdvancePCS will not undertake, and is not required hereunder, to determine medical necessity, appropriateness of therapies, to make diagnoses or substitute AdvancePCS' judgment for the professional judgment and responsibility of the physician. Any action taken by AdvancePCS authorizing or denying Claims for those drugs requiring coverage override will be pursuant to written instructions received from Customers.

8.    **PRIOR AUTHORIZATION/FORMULARY EXCEPTION ("PA/FE")**

AdvancePCS agrees to provide Customer with a form of prospective drug utilization review known as the PA/FE Program. AdvancePCS will supply a list of suggested criteria for review, modification and/or adoption by Customer. Customer will have final approval over the criteria to be utilized, which will be evidenced by a writing signed by Customer. AdvancePCS will administer the criteria as approved by Customer. If Customer does not wish to accept the proposed changes to the PA criteria, Customer agrees to notify AdvancePCS in writing within ten (10) business days and may terminate this Agreement, pursuant to Section 8.2.2 of this Agreement or adopt the customized criteria for a mutually agreed upon fee. Customer shall be deemed to have approved any proposed changes to the criteria unless it notifies AdvancePCS in writing of its objection.

AdvancePCS will accept PA/FE requests from physicians and will approve or deny such requests in accordance with the PA/FE criteria approved by Customer. AdvancePCS will make clinical pharmacists available to provide professional support to the PA/FE unit as AdvancePCS determines necessary to evaluate PA/FE requests and clarify Customer's PA/FE criteria. AdvancePCS' PA/FE unit will notify the physician who submitted the PA/FE request of the coverage determination for such request.

Approvals will be entered in the appropriate AdvancePCS claim management system. AdvancePCS' clinical pharmacists will review denials on a regular basis, to assist Customer in determining whether PA/FE criteria and/or processes warrant modification. Denial reports will be furnished to Customer upon request for decisions regarding updates to PA/FE criteria.

PATC-6-3.doc (07/02/2001)                    21

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000181
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

Reports of approvals and denials will be produced on a quarterly basis and included in quarterly reporting to Customer.

## 9.   MAC SELECTION

Customer may choose from among various options for the administration of Customer's MAC program.  Depending upon the option selected, Customer may specify whether or not the Member will pay the difference in cost (in addition to any applicable copayment) when the Member request to have a brand dispensed when a generic equivalent is available.  Customer may also specify whether Customer or the Member will pay the difference in cost when a brand is dispensed because the prescribing physician has indicated "dispense as written".

## 10.   MANAGEMENT REPORTING

A.   **Standard Management Reports.**   AdvancePCS will provide Customer with AdvancePCS' standard management reports in connection with the Services provided hereunder, which reports may change from time to time at AdvancePCS' discretion. Customer may elect to receive some or all of the standard management reports made available by AdvancePCS.

B.   **On-Line Data Reporting/Editing.**   AdvancePCS will make available to Customer AdvancePCS' Client On-Line Inquiry System, pursuant to which Customer will have on-line access to inquire, update Plan Design information, and, if applicable, input Claims. Customer is responsible for providing any hardware necessary for access to the Client On-Line Inquiry System and for paying all fees for telecommunication access.

Customer agrees that AdvancePCS may rely on information entered into the Client On-Line Inquiry System through the use of a Log-On ID.  Customer further agrees to indemnify AdvancePCS for, from and against any and all costs, losses or damage that arise, or are alleged to arise, (i) as a result of such reliance by AdvancePCS or (ii) out of Customer's use of the Client On-Line Inquiry System.

Customer will comply with all rules AdvancePCS establishes from time to time in connection with the On-Line Services and sign any addendum required by AdvancePCS for the use of such Services.  Direct or Paper Claims submitted On-Line will be subject to the Paper Claim Direct Submission fee set forth in Exhibit B.

## 11.   FORMULARY SERVICE

Upon request from Customer, AdvancePCS will perform the following Services (the **"Formulary Services"**) for the fees set forth on Exhibit B attached hereto.

A.   **Establishment of Formulary.**  AdvancePCS will work with Customer to effect the adoption, distribution and implementation of a drug formulary based on the AdvancePCS formulary (the **"Formulary"**).  AdvancePCS and Customer will use diligent efforts to ensure the prompt adoption and distribution of the Formulary.  Charges for AdvancePCS' production and distribution or shipping of Formulary are set forth in Exhibit A.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000182
CONFIDENTIAL

*EXHIBIT A*
*DESCRIPTION OF SERVICES*

    –    **AdvancePCS' Clinical Formulary and Prescribing Guidelines ("National Formulary").** For customers adopting AdvancePCS' National Formulary as the Formulary, AdvancePCS will distribute each edition of the Formulary and updates to its providers.

    –    **Custom Formulary.** For customers utilizing a custom formulary, AdvancePCS will ship the custom formularies to Customer. Customer will use diligent, good faith efforts to ensure the prompt distribution of the formulary and updates to its chosen providers. The cost of postage and distribution of the formulary and any subsequent updates thereto or reports hereunder, to Customer's chosen providers, will be borne by Customer. If Customer fails to distribute such formulary updates in a timely manner, Customer will be liable to AdvancePCS for any loss of Rebates and will hold AdvancePCS harmless for, from and against the same.

**B.**    **Updating of Formulary.** AdvancePCS will work with Customer to provide for the annual review, updating, and distribution of the Formulary, to address changes to the Formulary made desirable by changes in the pharmaceutical industry, new legislation and regulations, the experience of Customer and its providers with the Formulary, current medical literature and new recommendations developed by AdvancePCS based on its research and experience.

**C.**    **Rebate Related Utilization Review.** To obtain Rebates from Manufacturers, AdvancePCS will perform on behalf of Customer, AdvancePCS' Retrospective DUR program as described in Section 5C.

In addition to the Retrospective DUR Program, AdvancePCS may propose other interventions from time to time which are designed to increase Rebates and/or reduce the costs of Covered Items under this Agreement. Customer may decline to allow such interventions, but in such event AdvancePCS will not be responsible for any loss of economic benefit which results from the failure to implement the proposed interventions.

**D.**    **Rebate Contracts.** AdvancePCS will attempt to contract with certain Manufacturers for Rebate programs. Customer acknowledges that whether and to what extent Manufacturers are willing to provide Rebates to Customers will depend upon the Plan Design adopted by Customer, and other aspects of Customer's Plan Design, as well as AdvancePCS receiving sufficient information regarding each Claim submitted to Manufacturers for Rebates.

**E.**    **Other Rebate Arrangements.** With respect to Members covered under this Agreement, Customer will not participate in any other formulary or similar discount program (including any such program which may be available through a mail order pharmacy designated by Customer) during the term of the Agreement and will not itself create any formulary during the term of the Agreement. Also, with respect to such Members, Customer agrees not to enter into any direct or indirect contracts with pharmaceutical Manufacturers for discounts during the term of the Agreement or any extension thereof. Nothing in this section will prohibit Customer from entering into arrangements with other pharmaceutical management companies offering formulary Services after the term of the Agreement.

**F.**    **Rebates.**

---

PATC-6-3.doc (07/02/2001)                          23

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose

**PIRELLI-FDB 0000183**
**CONFIDENTIAL**

EXHIBIT A
DESCRIPTION OF SERVICES

— On behalf of Customer, AdvancePCS will receive the Rebates paid by Manufacturers to Customer. AdvancePCS will make payments of such Rebates once each calendar quarter as follows: within 60 days of the beginning of each quarter, AdvancePCS will pay to Customer all Rebates received by AdvancePCS during the prior quarter, if any, net of the fees retained by AdvancePCS pursuant to Section 2.

— Along with each payment of Rebates, AdvancePCS will provide a report to Customer that includes the Manufacturer's name, the number of prescriptions and/or amount of dollar purchases for each Manufacturer, and the total amount of Rebates paid by each Manufacturer.

— Upon reasonable prior written notice, AdvancePCS agrees that an independent third party, at Customer's expense, will have the right, subject to reasonable business limitations, to audit volume discount contracts from Manufacturers from time to time, provided that Customer will give AdvancePCS adequate assurance, which may include at AdvancePCS' option the signing of a confidentiality agreement by Customer and the independent third party, that Customer and such third party will hold in confidence any information obtained through the audit. AdvancePCS will make the contracts available for such auditing purposes at its offices during normal hours of operation.

— As consideration for the Formulary, the negotiation, collection and distribution of Rebates and other Services provided by AdvancePCS under this Agreement, Customer will pay to AdvancePCS a fee in an amount equal to the percentage set forth in Exhibit B multiplied by the Rebates collected by AdvancePCS in connection with this Agreement. In lieu of billing Customer for the fees provided for in this section, AdvancePCS may retain those amounts from any Rebates collected by AdvancePCS on behalf of Customer in connection with this Agreement.

## 12. PERFORMANCE MAIL OR OTHER STANDARD ADVANCEPCS MAIL PROGRAM

**Services.** AdvancePCS will provide to Customer AdvancePCS' Performance Mail Program or other standard AdvancePCS Mail Program that includes mail order pharmacy Services which are provided by AdvancePCS Mail. AdvancePCS may make changes to such program from time to time so long as such changes do not materially alter any of the provisions of this document.

AdvancePCS will provide to Customer, and Customer will distribute to Members, program start-up kits which explain to Members how to use the program, and such other materials as Members will require to begin using the program.

AdvancePCS Mail will receive prescriptions from Members via the U.S. mail or commercial carrier at an address(es) specified by AdvancePCS from time to time. Subject to and in accordance with the Plan Design and applicable Law, AdvancePCS Mail will dispense Covered Drugs in accordance with those prescriptions and mail the Covered Drugs to Members at addresses designated by such Members, so long as such addresses are located in the United States.

AdvancePCS Mail will provide to Members toll-free telephone access to a pharmacist and

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000184
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

customer service representative.  Access to a pharmacist pursuant to the foregoing will be available to Members twenty-four (24) hours per day, seven (7) days per week.  The fee for this toll-free telephone access is included in the base fee for AdvancePCS Mail Service, when applicable.

For Covered Items provided by AdvancePCS through the AdvancePCS Performance Mail Program or other standard AdvancePCS Mail Program, Customer will pay to AdvancePCS the amount set forth on Exhibit B hereto.  Certain drugs that become available on the market from time to time will not be subject to the contracted rate for prescription Claims due to, among other things, specialized manufacturer processes, limited availability or extraordinary shipping requirements and may not be available through AdvancePCS Mail.  Such drugs presently include biotechnology drugs such as Betaseron and Avonex and compounds.  AdvancePCS will provide Customer with a list of such drugs, and their corresponding rates (which are generally no less than full AWP), upon request.  AdvancePCS Mail will dispense these drugs to Members unless Customer's Plan Design would otherwise exclude these drugs or Customer notifies AdvancePCS in writing.

Customer acknowledges that AdvancePCS Mail may from time to time to engage in therapeutic interchanges in accordance with applicable Law.

AdvancePCS Mail will dispense drugs even if the prescription is not accompanied by the correct copay/deductible/coinsurance amount and Customer will be liable to AdvancePCS for such amounts if reasonable collection efforts by AdvancePCS fail.

13.    **OTHER ADDITIONAL SERVICES**

Upon request from Customer, AdvancePCS will perform the following Services for the fees set forth on Exhibit B attached hereto.

A.    **Paper Eligibility Submission.**  AdvancePCS will maintain eligibility information regarding Members submitted by Customer in a manual form (other than tape or telecommunication) from time to time.

B.    **Decentralized Administration.**  AdvancePCS will provide Customer with client service support to more than one Customer contact or location.

C.    **Claim Detail Report via Paper.**  AdvancePCS will provide Customer with a printout of AdvancePCS' standard Claims Detail Report.

D.    **Card Reissuance.**  AdvancePCS will reissue cards for Members upon request.  If cards are reissued, Customer will pay the fee set forth in Exhibit B.

E.    **CAT/BAT.**  AdvancePCS will provide Customer with detailed Claim and/or administrative billing information through AdvancePCS' standard claims activity transmission or tape ("CAT") and/or AdvancePCS' standard billing activity transmission or tape ("BAT").  Charge for recreated/historic tapes will be quoted upon request.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000185
CONFIDENTIAL

EXHIBIT A
DESCRIPTION OF SERVICES

**F.   Custom CAT/BAT.**  If Customer requests a custom CAT/BAT, AdvancePCS will charge Customer the standard hourly rate set forth in Exhibit B for such custom CAT/BAT.

**G.   Case Set-Up.**  Customer may submit a written request to establish one or more new groups under Customer's Plan Design. Customer will pay AdvancePCS the Case Set-Up fee for each new group that AdvancePCS establishes for Customer.

**H.   Carrier/Group Rebate Reports on Tape.**  AdvancePCS will provide Customer with a detailed Carrier/Group Rebate tape through AdvancePCS' standard Carrier/Group layout.

**I.   Customer-Specific Programming.**  If Customer will request Services or changes to Services that require customized programming or systems work, AdvancePCS will attempt to estimate to Customer the time and cost for completion of such work. If Customer authorizes AdvancePCS to perform such work, Customer will pay AdvancePCS the cost of performing such work at the programming rate set forth on Exhibit B.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000186
CONFIDENTIAL

*EXHIBIT B*
*ADMINISTRATIVE FEES*

Pirelli Armstrong Tire Corporation
Effective May 1, 2001

As consideration for the Services selected by Customer pursuant to the Implementation Documents and described in Exhibit A, Customer will pay to AdvancePCS the fees set forth below:

| | | |
|---|---|---|
| Base Services - | Per Processed POS Claim | $0.32* |
| | Performance or other standard AdvancePCS Mail Program | $0.00* |

Retail Claim Rates
**Carrier W224, Groups 0100, 0200, 0300, and 0400 ONLY**
Brand:    AWP-14% + $2.00 dispensing fee
Generic:  AWP-14% + $2.50 dispensing fee or MAC + $2.50 dispensing fee, whichever is applicable

**Carrier W224, Group 0500 ONLY**
Brand:    AWP-19% + $1.90 dispensing fee
Generic:  AWP-35% + $1.90 dispensing fee or MAC + $1.90 dispensing fee, whichever is applicable

Mail Service Claim Rates
Brand:    AWP- 20% + $0.00 dispensing fee
Generic:  AWP- 50% + $0.00 dispensing fee

Member Submitted Claim Rates (Unless specified otherwise in Implementation Documents)
**Carrier W224, Groups 0100, 0200, 0300, and 0400 ONLY**
Brand:    AWP-14% + $2.50 dispensing fee
Generic:  AWP-14% + $2.50 dispensing fee or MAC + $2.50 dispensing fee, whichever is applicable

**Carrier W224, Group 0500 ONLY**
Brand:    AWP-19% + $1.90 dispensing fee
Generic:  AWP-35% + $1.90 dispensing fee or MAC + $1.90 dispensing fee, whichever is applicable

| Additional Services | | Fee |
|---|---|---|
| Section 2 | - Member Service/Toll Free Member Services | $.13/Claim** |
| Section 4B | - Paper Claim Direct Submission | $1.50/Claim |
| Section 4B | - Preprocessed Direct Claims | $2.50/Claim |
| Section 4E | - Medicaid Claim tape submission | $1.50/Claim |
| | Medicaid Claim paper submission | $2.50/Claim |
| Section 7 | - Managed Access/Managed Drug Limitations | $2.50 Per Authorization*** |
| Section 8 | - Prior Authorization/Formulary Exception (PA/FE) | $30.00/Request |
| Section 10B | - Paper Claim Direct Submission (on-line) | $.80/Claim |
| Section 11A | - Production, Postage, and Distribution Costs for Formulary Booklets and Physician Newsletters | $125/quarter payable within 10 days of receipt of notice. |
| Section 11F | - AdvancePCS' Rebate Percentage | 20%**** |
| Section 12 | - Mail Service Claims | See above |
| Section 13A | - Paper Eligibility Submission | $.02/Claim |
| Section 13B | - Decentralized Administration | $.02/Claim |
| Section 13C | - Claim Detail Report via Paper | $.02/Claim |
| Section 13D | - Card Reissuance | $.50/Card |
| Section 13E | - CAT/BAT Tapes | $100.00/Each |
| Section 13F | - Custom CAT/BAT Tapes | Subject to Customer Specific Programming charge |
| Section 13G | - Case Set-Up | $20.00/group |
| Section 13H | - Carrier/Group Rebate Reports on Tape | $100.00/Each |
| Section 13I | - Customer Specific Programming | $110.00/Hour |

[Continued on Next Page]

PATC-6-3.doc (07/02/2001)

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

E.23    ᵃᵉ:ᵒᴵ  ᵈᵒᵒᴢ ᴵᴵ ᵍᴾᴹ

PIRELLI-FDB 0000187
CONFIDENTIAL

05/17/06  10:34 FAX 6158590324          Southern Benefit                    ☒029

<u>Additional Payment Terms:</u>
Note: Charges not identified above will be quoted upon request.

Finance Charges: Invoices are assessed finance charges at the rate of 1.5% per month on the amounts not paid
within terms of the Agreement.

*       There will be a minimum monthly charge of $750.00 assessed to Customer for the Base Service as set forth
        in Section 2.1.1 of the Agreement.
**      If Customer utilizes AdvancePCS Mail and Retail services, this $.13 fee will not apply.
***     If Managed Access record is entered by Customer "on-line", this $2.50 fee will not apply.
****    Rebate Guarantee: AdvancePCS guarantees that Customer's share of Rebates shall be three dollars and
        thirty cents ($3.30) per rebateable paid Retail Claim and eight dollars and fifty cents ($8.50) per rebateable
        paid Mail Claim (the "Guaranteed Rebate Amount"). In the event that Rebates collected are less than the
        Guaranteed Rebate Amount, AdvancePCS shall pay to Customer the amount of any deficiency; provided,
        however, that if at any time during the term of this Agreement, AdvancePCS' ability to collect Rebates under
        its Rebate contracts with Manufacturers, either currently in existence or entered into after the date of this
        Agreement, is materially adversely impacted by legislative, regulatory, judicial action, or a change in drug
        industry practice, AdvancePCS shall be released from its obligation to pay the Guaranteed Rebate Amount
        hereunder and shall be required to pay Customer only Customer's share of the actual Rebates collected. This
        Rebate guarantee will be in effect for the period beginning July 1, 2001, and ending June 30, 2002, and is
        contingent upon Customer's acceptance of and continued participation in AdvancePCS Mail and
        AdvancePCS' intervention program for both retail and mail along with Customer's current Plan design
        parameters. For subsequent years, any Rebate guarantee will be determined by annual negotiation by the
        parties of a mutually acceptable Guaranteed Rebate Amount based on projected market estimates.

All prices are contingent upon Customer's current Plan design, full adoption of AdvancePCS' Performance Drug List,
and formulary management and intervention programs, as well as representations made by Customer regarding
Member enrollment and utilization of pharmacy services.

Customer is in all events responsible for any postage costs or other mailing and handling-related costs (including,
without limitation, mailing charges associated with Explanation of Benefits or Requests for Information) incurred by
AdvancePCS in connection with the provision of Services or additional services.

The pricing proposal shall become effective at the later of the Effective Date above or the first of the month
following the client's execution of this document.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a
relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

PIRELLI-FDB 0000188
CONFIDENTIAL

# Exhibit K

CONFIDENTIAL

# AGREEMENT
## FOR
## PRESCRIPTION DRUG MANAGEMENT SERVICES
### BETWEEN
## NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
### AND
## DC37 HEALTH & SECURITY PLAN

**THIS AGREEMENT** is made by and between National Prescription Administrators, Inc. ("NPA"), a New Jersey corporation, located at 711 Ridgedale Avenue, East Hanover, New Jersey 07936 and DC37 Health & Security Plan ("Sponsor").

## WITNESSETH THAT:

**A.** NPA is engaged in the business of managing prescription drug programs, including claims processing and related services, for sponsors, their cardmembers and eligible dependents.

**B.** Sponsor desires to provide a prescription drug program in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants contained herein, NPA and Sponsor agree as follows:

### ARTICLE 1
### DEFINITIONS

The following capitalized terms, including their single and plural forms, shall have the meanings set forth below:

**"Agreement"** means this Agreement for Prescription Drug Management Services, including all appendices hereto, as may be amended from time to time.

**"AWP"** means the average wholesale price of the prescription drug dispensed, as established by reference to *Drug Topics' Redbook*.

**"Cardmember"** means an Eligible Person in whose name and to whom an Identification Card is issued.

**"CFI"** means Central Fill, Inc. and/or CFI of New Jersey, Inc.        **D37 0480**

**"Claim"** means a request for reimbursement of prescription drugs dispensed by a Participating Provider and submitted to NPA in an electronic form through the *NPAS*® Electronic Claims Management System or other format acceptable to NPA.

**"Direct Reimbursement Claim"** means a request for reimbursement of prescription drugs dispensed by a Provider and submitted by a Cardmember in a pre-printed form acceptable to NPA.


EXHIBIT
DC-3
11/6/06 EF
PENGAD 800-631-6989

CONFIDENTIAL

**"Eligible Person"** means each participant and dependent identified by Sponsor in accordance with the terms and conditions of this Agreement as eligible to receive prescription drug benefits.

**"Identification Card"** means a card containing specific information related to the Cardmember and Sponsor's plan. An Identification Card is not intended and shall not be construed to create proof of an individual's eligibility for prescription drug benefits.

**"Local Participating Provider"** means a Participating Provider located in the geographical area of the Cardmember.

**"Participating Provider"** means a Provider that has entered into a written agreement with NPA to participate in one or more networks.

**"Provider"** means a corporation or other legal entity that owns or operates a licensed, retail pharmacy.

**"Sponsor"** means DC37 Health & Security Plan.

**"Sponsor's Plan Description"** means a description of the benefits available to Eligible Persons and limitations thereto, provided by Sponsor in a form acceptable to NPA or confirmed by NPA in writing and otherwise amended and updated from time to time in accordance with the provisions of this Agreement.

## ARTICLE 2
## PRESCRIPTION DRUG PROGRAM SERVICES

**A. Program Materials.** NPA will provide Identification Cards, NPA and CFI standard descriptive brochures, the Q&A Formulary, Q&A Generics and Direct Reimbursement Claim forms to Sponsor or Cardmembers, as Sponsor may elect. All costs of distributing and mailing such materials to Cardmembers and producing Identification Cards shall be the responsibility of Sponsor.

**B. Prescription Drug Program.** Eligible Persons may, subject to the provisions of this Agreement and each Participating Provider's agreement with NPA, purchase prescription drugs from Participating Providers upon presentation of their Identification Cards and payment of their copayments or deductibles.

    **1. Provider Solicitations and Classification.** NPA will solicit Local Participating Providers to assure that an adequate number are available to furnish Cardmembers prescription service. A form of Participating Provider Agreement is attached as Appendix A. NPA also will classify each Participating Provider according to the professional services available to Eligible Persons through the use of the NPA Profile Classification Plan, a sample of which is attached as Appendix B.

    **2. Provider Manual.** Local Participating Providers will be furnished with a Provider manual, which will include Sponsor's plan information and applicable reimbursement information from Appendix C.

**D37 0481**

CONFIDENTIAL

**3. Provider Directory.** NPA will provide Sponsor with a current list including all Local Participating Providers.

**4. Toll-Free Pharmacy Line.** NPA will maintain a toll-free telephone line available to Participating Providers.

**5. Provider Peer Review.** NPA will maintain a Provider Peer Review structure to serve as a review and appeal medium available to Providers.

**6. Provider Audits.** NPA will audit Participating Providers to verify claim payments and report to Sponsor material areas of discrepancy. NPA will return all Sponsor moneys recovered. NPA shall not be required to commence litigation for the collection of such discrepancies.

**C. Claims Processing.** Subject to Sponsor's funding of claims in accordance with this Agreement, NPA will accept and process all Claims and Direct Reimbursement Claims and reimburse Participating Providers and Cardmembers according to the Sponsor's Plan Description and the Reimbursement Fee Schedule in Appendix C. NPA will forward Direct Reimbursement Claims in excess of $100 to Sponsor for review prior to payment. NPA will transmit to submitting Participating Providers brief explanations of the reason or reasons for denial of Claims and within thirty (30) days of receipt, report to submitting Cardmembers the status of all pended or denied Direct Reimbursement Claims. If any person is overpaid or underpaid on one or more Claims or Direct Reimbursement Claims, then NPA will take reasonable steps to recover any such overpayments and adjust any such underpayments. NPA shall not be required to commence litigation to recover any such overpayments.

**D. Formulary.** The *NPASelect*<sup>SM</sup> Formulary is a list of drug products that physicians and other health care providers may use to prescribe, subject to their professional medical judgment and applicable law.

1. Sponsor agrees to participate in the *NPASelect*<sup>SM</sup> Formulary, cooperate with NPA and use its best efforts to facilitate Eligible Persons' utilization of the *NPASelect*<sup>SM</sup> Formulary and related formulary management programs. Sponsor further agrees not to enter or participate in any other formulary, rebate or discount program or contract related to drug products dispensed to Eligible Persons in connection with this Agreement.

2. NPA will maintain and update the *NPASelect*<sup>SM</sup> Formulary through its Pharmacy and Therapeutics Committee and implement formulary management programs, such as the *Preferred Dispensing*<sup>SM</sup> and *Patient Direct*<sup>SM</sup> Programs, through physician, pharmacy and patient analysis, communication and intervention. NPA also will distribute and update formulary materials and submit to manufacturers detailed experience reports and billings on Sponsor's behalf.

3. Rebates are received from certain drug manufacturers as a result of the inclusion of their products in the *NPASelect*<sup>SM</sup> Formulary and potentially on other drug products not included in the *NPASelect*<sup>SM</sup> Formulary and are based upon the dispensing of each manufacturer's formulary drugs under Sponsor's program. NPA will provide Sponsor one hundred percent (100%) of such rebates received by NPA. Sponsor's share of such rebates may be setoff by NPA against Sponsor's overdue, outstanding balances. NPA

D37 0482

CONFIDENTIAL

and its associated mail order pharmacies receive and retain additional non-rebate chargebacks, credits, discounts, fees and reimbursements from certain drug manufacturers as a result of various commitments, services and programs.

4. NPA guarantees Sponsor shall receive the rebates specified in Appendix E, for claims approved for rebate during the initial term of this Agreement; provided, the manufacturer programs and agreements existing as of September 1, 2001 remain in full force and effect. Sponsor acknowledges that NPA has relied upon Sponsor's plan design as of September 1, 2001 including, but not limited to, its mandatory generic reimbursement program and three-tier copayment, and further agrees that if such plan design is changed by Sponsor in a manner that materially affects NPA's duties or obligations or cost of performance in connection with such rebate guarantee, then the parties will discuss such changes and renegotiate the guarantee if necessary. Subject to these acknowledgements and covenants and the performance by Sponsor of all its obligations under this Agreement, NPA agrees to such rebate guarantee.

5. Sponsor agrees that NPA shall not have any liability or obligation to Sponsor or its Eligible Persons for any failure by any manufacturer to pay any rebates, any breach of an agreement related to the transactions contemplated by this Agreement by any manufacturer, or any negligence or willful misconduct of any manufacturer.

**E. Patient Health Management Program.**

1. Sponsor agrees to participate in NPA's Patient Health Management Program so long as there are demonstrable cost savings to Sponsor and as determined by Sponsor. This program will include components of risk assessment, member education, physician education and intervention, and outcomes analysis.

2. NPA will provide an evaluation, under the risk assessment component of this program, of Eligible Persons who have conditions identified in Portfolios I and II below, or additional diseases or conditions introduced over the course of this Agreement. The risk assessment evaluation will determine those Eligible Persons with the conditions in Portfolios I and II and assess various aspects of their health status and pharmaceutical care. As a result of the risk assessment component of this program, NPA will mail Eligible Persons educational brochures and related literature with the intent of enhancing their health status and awareness for those Eligible Persons from whom Sponsor has obtained their consent to participate. Sponsor will be made aware of the member mailings prior to their distribution. NPA will also, as a component of this program, contact physicians regarding the treatment plan identified through the pharmacy claims data or health status information obtained in the risk assessment component of this program, for purposes of educating the physician concerning the program or recommendations which are intended to enhance the health status or pharmaceutical care of the Eligible Person.

**D37 0483**

3. NPA agrees to provide Sponsor periodic status reports. NPA further agrees to provide Sponsor an *Outcomes Analysis*, in which NPA will develop disease state baselines and analyze the effect of NPA's intervention activities upon prescription drug utilization,

CONFIDENTIAL

medical cost savings and quality of patient care. NPA will utilize data reported by Eligible Persons in addition to medical claims data, if any, provided by Sponsor in NPA's preparation of the *Outcomes Analysis*. Sponsor agrees to provide NPA medical claims data with ICD diagnosis codes, to the extent such data is readily available and in a format acceptable to NPA, subject to data and format limitations of Sponsor's third party providers. NPA will provide Sponsor the *Outcomes Analysis* within six (6) months after the close of the first program year and each program year thereafter. NPA and its representatives may publish NPA's findings in benefits, medical or pharmacy journals. Subject to confidentiality and other limitations of federal and state law, the *Outcomes Analysis* and articles will include de-identified patient information from Eligible Persons.

4. Conditions and Portfolios, which apply, include the following:

| Portfolio I | Portfolio II |
|---|---|
| Low-Back Pain | Allergic rhinitis |
| Benign prostatic hyperplasia | Depression |
| Cardiovascular Risk Reduction | Pain/migraine management |
| Hypercholesterolemia | Women's health |
| Hypertension | SilverCare |
| Ulcer/gastro-esophageal reflux disorder | |

**F.  Clinical Communications.** THE CLINICAL AND EDUCATIONAL INFORMATION PROVIDED IN ALL WRITTEN AND ORAL COMMUNICATIONS IS INTENDED ONLY AS A SUPPLEMENT TO, AND NOT A SUBSTITUTE FOR, THE KNOWLEDGE, SKILL, AND JUDGMENT OF THE PHYSICIANS AND PHARMACISTS PROVIDING ELIGIBLE PERSONS HEALTH CARE. SUBJECT TO SPONSOR'S PLAN DESIGN, THE DECISIONS TO PRESCRIBE AND DISPENSE ANY DRUG WILL BE MADE SOLELY BY THE PHYSICIAN AND PHARMACIST, RESPECTIVELY.

**G.  Toll-Free Customer Service Line.** NPA will maintain a toll-free telephone line available to Eligible Persons.

**H.  On-Line Access.** NPA will provide Sponsor on-line access to NPA's eligibility and claim databases regarding Sponsor's Eligible Persons for the purpose of allowing Sponsor to access and update eligibility records and access claims data. Sponsor shall comply with any and all policies and procedures established by NPA with respect to such access.

**I.  Reports.** NPA will provide Sponsor not less frequently than monthly the standard reports described below:

- Valid Prescription by Member Report
- Prescription Summarized by Member Report

**D37 0484**

Sponsor agrees to review each such report and notify NPA in writing of any errors or objections within thirty (30) days of receipt of each such report except that Sponsor may later correct or reconcile such information. Until Sponsor notifies NPA of any errors or objections, NPA shall have the right to rely upon the information contained in the report. NPA will provide Sponsor,

CONFIDENTIAL

upon request, reports regarding patterns of utilization, costs and quality control and, at a cost to be agreed upon by the parties in writing, optional or specialty reports.

**J. Performance Guarantees.** Sponsor agrees that damages for breach of items 1, 2, and 3 of the performance standards described in Appendix E are not readily ascertainable and all monies assessed against NPA in accordance with such paragraphs in Appendix E are liquidated damages, which shall be accepted in lieu of any other relief (whether in contract, tort, equity or otherwise). Sponsor further agrees that for purposes of Appendix E, "annual fees" means NPA's per claim administrative fees and, further, that liquidated damages for any contract year shall not exceed such fees for such year. Sponsor acknowledges that NPA has relied upon Sponsor's plan design as of September 1, 2001, including, but not limited to, its mandatory generic reimbursement program and three-tier copayment, and further agrees that if such plan design is changed by Sponsor in a manner that materially affects NPA's duties or obligations or cost of performance in connection with such performance standards, then the parties will discuss such changes and renegotiate the performance guarantees if necessary. Subject to these acknowledgements and covenants and the performance by Sponsor of all its obligations under this Agreement, NPA agrees to such performance standards through the initial term of this Agreement.

## ARTICLE 3
## SPONSOR INFORMATION AND RESPONSIBILITIES

**A. Eligibility.** Sponsor will provide NPA complete listings in a format mutually agreeable to NPA and Sponsor: (1) of the individuals to become Cardmembers and Eligible Persons on the effective date for the commencement of benefits; and (2) on a continuing basis, of all new Cardmembers and Eligible Persons and all individuals who become ineligible together with effective dates.

**B. Eligible Person Authorizations.** Sponsor represents and warrants that it shall obtain all Eligible Person authorizations necessary for NPA to perform the services under this Agreement.

**C. Plan Information.** Sponsor agrees to provide NPA all information that NPA may reasonably require to fulfill its duties and obligations under this Agreement. Sponsor represents and warrants that all such information shall be true, accurate and complete and consistent with the benefits available to Eligible Persons.

**D. Change in Benefits.** Sponsor agrees to notify NPA in writing of all changes in prescription drug benefits, including, but not limited to, changes in copayments, covered drugs and exclusions, by notifying NPA's account executive in writing of such changes and providing a new or updated Plan Description. NPA will advise Sponsor of the anticipated implementation dates of the proposed benefit changes, and such benefit changes, which are so implemented, shall be deemed incorporated into this Agreement as of the date of implementation.

**E. Control of Plan.** Sponsor is the plan administrator for purposes of this Agreement. Sponsor shall control its plan and retain the sole, discretionary authority to review the denial of prescription drug claims disputed by Providers or Eligible Persons and referred to Sponsor by NPA, which shall refer all such disputes to Sponsor and may rely upon its instructions.

**D37 0485**

CONFIDENTIAL

## ARTICLE 4
## CLAIMS PAYMENTS AND ADMINISTRATIVE CHARGES

**A. Claims Payments.** Sponsor shall fund all prescription drug claims and services as provided in this Agreement, including, but not limited to, Appendix C, and together with its Eligible Persons, shall have sole financial responsibility for all such claims and services and all applicable sales, use and similar taxes assessed at the point of sale. NPA will reimburse Participating Providers and Cardmembers for all valid Claims and Direct Reimbursement Claims three (3) times monthly from funds transferred by Sponsor to NPA's claims payment account. Sponsor agrees to have cleared funds in NPA's possession on the date(s) checks are mailed, in amounts sufficient to cover all such checks. On or about the seventeenth (17th) working day of the first and each succeeding month, NPA will submit a statement to Sponsor which will reconcile the funds sent by Sponsor with the actual disbursements made by NPA. The parties will establish the procedure by which such cleared funds will be received by NPA.

**B. Administrative Charges.** On or about the seventeenth (17th) working day of each month, NPA will submit to Sponsor an invoice setting forth the administrative charges pursuant to Appendix D covering services for the month. Sponsor will pay this invoice prior to the end of the month the invoice is dated.

## ARTICLE 5
## TERM OF AGREEMENT AND TERMINATION

**A. Term.** This Agreement shall become effective September 1, 2001 and continue in full force and effect for an initial term of three (3) years, and shall continue for additional terms of one (1) year each unless either party terminates this Agreement upon not less than ninety (90) days' written notice prior to the expiration of any term.

**B. Termination.** Either Sponsor or NPA may terminate this Agreement, at any time, if either:

(1) Upon not less than sixty (60) days' written notice if the other party makes an assignment for the benefit of creditors, is the subject of a voluntary or involuntary petition for bankruptcy or is adjudged to be insolvent or bankrupt, or a receiver or trustee is appointed for any portion of its property; or

(2) Upon not less than sixty (60) days' written notice if the other party commits a material breach (including, but not limited to, NPA's failure to pay claims or provide services) under this Agreement, unless the breach is cured prior to the expiration of such notice. Notwithstanding the foregoing, Sponsor may terminate this Agreement with or without cause, upon providing not less than ninety (90) days' written notice after the first year of this Agreement.

Notwithstanding the foregoing, Sponsor may terminate this Agreement with or without cause, upon providing not less than ninety (90) days' written notice after the first year of this Agreement.

The rights and remedies set forth in this paragraph are in addition to the rights and remedies available to each party under law or in equity.

**D37 0486**

CONFIDENTIAL

**C. Effect of Termination.** The rights and obligations of the parties arising as a result of services provided prior to termination shall remain in full force and effect following termination.

**D. Claims Processing after Termination; Return of Deposit.** Subject to Sponsor's funding of claims and payment of administrative charges and expenses in accordance with this Agreement, NPA will process and pay Claims and Direct Reimbursement Claims covering prescriptions dated prior to the effective termination of this Agreement for a period of six (6) months following such termination.

ARTICLE 6
RECORDS, INFORMATION AND OWNERSHIP

**A. Maintenance of Records and Audits.** NPA shall maintain true and correct records for a period of seven (7) years from the date of each claim under this Agreement. Sponsor or its agent may, at its expense, examine and audit eligibility and claims records, and such agent may review specifically requested rebate contract information and rebate submissions maintained pursuant to this Agreement, subject to confidentiality and other limitations of federal and state law, confidentiality agreements with third parties and execution of a mutually acceptable confidentiality agreement by Sponsor, such accounting firm and NPA. Such examinations and audits may be conducted at a mutually convenient time and during NPA's normal business hours. Sponsor agrees to pay NPA at a reasonable hourly rate for the time its personnel dedicate to support an audit in excess of forty (40) hours per audit.

**B. Ownership and Use of Records.** All records developed, prepared or maintained by a party shall be the sole property of that party. NPA shall provide Sponsor a copy of NPA's Sponsor records at Sponsor's request.

**C. NPA's Programs and Procedures.** NPA's programs, operations, procedures, software, reporting packages, user documentation and related information shall remain the sole and exclusive property of NPA. Sponsor shall not use or disclose any such items to any third party, during or after the term of this Agreement, without NPA's express written consent. Sponsor agrees to return all such items to NPA upon termination of this Agreement.

**D. Trademarks and Service Marks.** NPA retains all rights, title, interest and license in and reserves the right to use and control the use of the words "APPROVED INDICATIONS," "BRANDSELECT," "NATIONAL PRESCRIPTION ADMINISTRATORS, INC.," "NPA," "NPAS," "NPASELECT," "PATIENT DIRECT," "PREFERRED DISPENSING," and all other symbols, trademarks, logotypes, service marks and domain names hereafter established by NPA. No other right, title, interest or license with respect to such items shall be created or granted except by a written agreement executed by both parties.

**E. Patient Information.** Sponsor and NPA agree to treat as confidential all patient-identifying information.

**F. Cardmember Communications.** While this Agreement is in full force and effect and for a period of twelve (12) months following its termination, NPA will not contact, engage in direct marketing, provide educational material or communicate with Cardmembers, except to respond

D37 0487

CONFIDENTIAL

to Cardmember inquiries regarding individual medical claim or member services issues or as expressly contemplated by this Agreement or allowed by law.

**G. Development of Programs and Services.** Subject to the foregoing restrictions set forth in this Article, NPA may use and adapt all information obtained in connection with this Agreement for the purposes of submitting sales or marketing proposals, rendering services to prospective and existing clients and developing ancillary data for programs complementary to the programs and services provided hereunder or new products and services that may be outside the scope of this Agreement.

ARTICLE 7
NON-LIABILITY; INDEMNIFICATION; INSURANCE

**A. Non-Liability; Indemnification.** NPA shall not have any liability or obligation whatsoever (whether in contract, law, equity or otherwise) for any negligence, wrongful act, error or omission of any health care provider, practitioner, physician, pharmacy, pharmaceutical manufacturer or distributor of pharmaceuticals or any of their officers, directors, partners, employees or agents receiving or providing goods or services pursuant to this Agreement, nor shall NPA have any such liability or obligation for any injury, loss or damage sustained as a result of any such person's providing or failure to provide medical or pharmaceutical goods or services pursuant to this Agreement. This provision shall survive the termination of this Agreement.

**B. Indemnification.** Subject to paragraph A above, NPA shall defend, indemnify and hold harmless Sponsor against any and all claims, liabilities, losses and damages caused by NPA's failure to pay prescription drug benefits, claims or services timely funded by Sponsor or from NPA's negligence. Sponsor shall defend, indemnify and hold harmless NPA against any and all claims, liabilities, losses and damages caused by Sponsor's failure to fund timely prescription drug benefits, claims or services or from Sponsor's negligence. Each party agrees to notify the other party in writing as soon as possible after the notification of such claims and cooperate in the defense of any lawsuit or adversary proceeding.

**C. Insurance.** NPA agrees to maintain commercial general liability and employee dishonesty coverage in amounts not less than $1 million per occurrence and in the aggregate and excess umbrella coverage in amounts not less than $15 million per occurrence and in the aggregate and to name Sponsor as an additional insured of such coverage. NPA further agrees to require its exclusive mail service provider to maintain commercial general liability (including druggist liability) coverage in amounts not less than $1 million per occurrence and in the aggregate and excess umbrella coverage in amounts not less than $30 million per occurrence and in the aggregate and to name Sponsor as an additional insured of such coverage. NPA further agrees to provide Sponsor certificates of insurance within thirty (30) days of execution of this Agreement and from time to time thereafter upon request.

ARTICLE 8
GENERAL PROVISIONS

**D37 0488**

**A. Notices.** All notices related to this Agreement shall be in writing and shall be deemed given if sent by certified mail, return receipt requested postage prepaid, or by recognized overnight delivery service, addressed to National Prescription Administrators, Inc. at 711 Ridgedale



CONFIDENTIAL

Avenue, East Hanover, New Jersey 07936, attention: Richard O. Ullman, President; or DC37 Health & Security Plan, 125 Barclay Street, New York, New York 10007-2179, attention: Roslyn Yasser, Administrator; or any other address designated by Sponsor or NPA by like notice to the other party. Any notice given in the manner set forth in this paragraph shall be deemed received on the date evidenced on the return receipt card or, in the case of overnight delivery service, other proof of delivery.

**B. Exclusivity; Similar Services.** NPA shall be Sponsor's exclusive provider of prescription drug programs while this Agreement is in full force and effect. NPA may perform similar services for other organizations and this Agreement shall not prevent NPA from performing such similar services.

**C. Relationship of Parties.** The parties acknowledge that NPA is an independent contractor providing services, and no provision in this Agreement is intended to create or shall be construed to create any employment relationship, partnership, joint venture or agency relationship between the parties.

**D. No Third Party Beneficiaries.** This Agreement is not a third party beneficiary contract. No provision of this Agreement is intended to create or shall be construed to create any third party beneficiary rights in any person, including, but not limited to, any Participating Provider or Eligible Person.

**E. Change in Law.** In the event of any change in state or federal laws or regulations, including any judicial or administrative interpretation thereof, which materially alters the rights, duties or obligations of either party under this Agreement, the parties will work in good faith toward mutually acceptable modifications of this Agreement. If the parties are unable to agree upon mutually acceptable modifications, then either Sponsor or NPA may terminate this Agreement upon not less than six (6) months' written notice.

**F. Force Majeure.** No party will be considered as having breached this Agreement or be held liable for any failure or delay in the performance of any or all of its duties or obligations under this Agreement if prevented from doing so by a cause or causes beyond its control. Such causes may include acts of God or public enemy; fires; floods; storms; earthquakes; riots; strikes; boycotts; lock-outs; war and war operations; restraints of government; failure of common or contract carriers; failure or fluctuations of power, heat, air conditioning or communication equipment or lines; software failures; or other circumstances beyond such party's control.

**G. Assignment.** Neither party may assign this Agreement without the other party's express written consent.

**H. Waiver.** The waiver of any breach of any term or provision of this Agreement shall not constitute a waiver of any subsequent breach of the same term or provision or any other term or provision hereof.

**I. Invalidity.** If any term or provision of this Agreement is found or held invalid or unenforceable by any court or agency of competent jurisdiction, such invalidity or lack of enforceability shall not affect the remainder of such term or provision or any other term or provision of this Agreement.

**D37 0489**

CONFIDENTIAL

**J.  Governing Law; Selection of Forum; Venue; Personal Jurisdiction.**  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to choice-of-law principles.  All actions in connection with this Agreement shall be brought in and before a federal or state court located in New York.  The parties waive all objections to such actions or a forum based upon venue or personal jurisdiction.

**K.  Headings.**  Article and paragraph headings are included for convenience only and shall not be used in any way to construe this Agreement.

**D37 0490**

CONFIDENTIAL

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.

SPONSOR: DC37 HEALTH & SECURITY PLAN

BY: _____

     Print or Type Name        Title

_____

     Authorized Signature

This Agreement is accepted by NPA this _15th_ day of January, 2002 at East Hanover, New Jersey.

NPA: NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

BY: _____

     Allan Zimmerman
     Senior Executive Vice President and General Manager

**D37 0491**

CONFIDENTIAL

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.

SPONSOR: DC37 HEALTH & SECURITY PLAN

BY: *ELLIOT SEIDE, Chairman / Board / Trustees*

     Print or Type Name        Title

*[signature]*

     Authorized Signature

This Agreement is accepted by NPA this *15* day of ~~September, 2001~~ *January 2002* at East Hanover, New Jersey.

NPA: NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

BY: _____

     Allan Zimmerman
     Senior Executive Vice President and General Manager

**D37 0492**

CONFIDENTIAL

IN WITNESS WHEREOF, and intending to be legally bound, the parties have executed this Agreement as of the day and year of acceptance written below.

**SPONSOR: DC37 HEALTH & SECURITY PLAN**

BY: _____

    Print or Type Name              Title


    _____

    Authorized Signature

This Agreement is accepted by NPA this _15 th_ day of January, 2002 at East Hanover, New Jersey.

**NPA: NATIONAL PRESCRIPTION ADMINISTRATORS, INC.**

BY: _____

    Allan Zimmerman
    Senior Executive Vice President and General Manager

**D37 0493**

CONFIDENTIAL

APPENDIX A

## PROVIDER AGREEMENT

**NPA**®     Provider Account No.

FOR OFFICE USE

AGREEMENT FOR PROVIDER PARTICIPATION
BETWEEN
NATIONAL PRESCRIPTION ADMINISTRATORS, INC.
AND

*Please print or type:*

NAME _____

ADDRESS _____

CITY _____

STATE _____ ZIP _____

PHARMACY LICENSE NO. _____

IRS NUMBER _____

DEA NUMBER _____

PROPRIETORSHIP ☐     PARTNERSHIP ☐     CORPORATION ☐

OWNER(S)/PRINCIPAL(S) _____

_____

_____

_____

This Agreement is made and dated as of this _____ day of
_____, 00 ___, by and between NATIONAL PRE-
SCRIPTION ADMINISTRATORS, INC., a New Jersey corporation and the
undersigned Participating Provider named above.

**D37 0494**                    -1-

CONFIDENTIAL

APPENDIX B

NPA PROFILE CLASSIFICATION PLAN



NATIONAL PRESCRIPTION ADMINISTRATORS, INC.

PROVIDER

PROFILE CLASSIFICATION PLAN

D37 0495

APPENDIX C

## REIMBURSEMENT FEE SCHEDULE

**A. Drug Program.** Reimbursement for each prescription dispensed by a Pa[r] will be based upon the lower of (1) Participating Provider's usual and custo[m] posted price and (2) the ingredient cost, plus a dispensing fee.

1. The ingredient cost for generic drugs subject to maximum allowable cost limits will be NPA's Generic Maximum Price. The annual average composite discount will be a computed AWP, less 62%

2. The ingredient cost for all brand and other drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| INGREDIENT COST | DISPENSING FEE |
|---|---|
| AWP, less a minimum of 13%, with an effective annual computed average rate of AWP, less 16% | An average of $2.00 for Participating Providers located in New York and an amount not in excess of the Medicaid rate for Participating Providers located in all other states |

Participating Providers also will be eligible to receive an additional dollar ($1.00) for each prescription that is compounded. NPA will guarantee the effective rates as long as market conditions remain static and the current participating pharmacies and pharmacy chains remain in operation.

NPA will provide reports reflecting compliance with the above effective discounts within sixty (60) days after each anniversary of this Agreement.

**B. Mail Order Program.** Reimbursement for each mail order prescription dispensed by CFI will be based upon the ingredient cost, plus a dispensing fee. The ingredient cost for Betaseron and other brand drugs available on a restricted basis will be based upon CFI's usual and customary price. The ingredient cost for all drugs (except Betaseron and other drugs available on a restricted basis) and the dispensing fee will be:

| | |
|---|---|
| Brand Drugs<br>    Single source discount from 100% AWP<br>    Dispensing Fee/Rx | 18%<br>$1.50 |
| Generic Drugs<br>    Composite Discount from<br>    Average AWP of All Generics in Class<br>    Dispensing Fee/Rx | 50% or<br>MAC<br>$1.50 |

**D37 0496**

If rates for postage or delivery increase during the term of this Agreement, the dispensing fee will be increased accordingly.

CONFIDENTIAL

## APPENDIX D

### ADMINISTRATIVE CHARGES

The administrative charges for the contract services **DC37 HEALTH & SECURITY PLAN** will pay **NATIONAL PRESCRIPTION ADMINISTRATORS, INC.** are as follows:

| SERVICE | 7/1/2001 FEES | 7/1/2002 FEES | 7/1/2003 FEES |
|---|---|---|---|
| 1. (a) Basic Retail Administrative Fee - Option 1 | | | |
| Includes *Patient Direct Program | | | |
| Per Rx Paid -- Network | $0.47/Rx | $0.47/Rx | $0.47/Rx |
| Per Rx Paid - Non-Network (Paper) | $1.25/Rx | $1.25/Rx | $1.25/Rx |
| Basic Fee - Option 2* | | | |
| Per Rx Paid – Network | $0.57/Rx | $0.57/Rx | $0.57/Rx |
| Per Rx Paid - Non-Network (Paper) | $1.25/Rx | $1.25/Rx | $1.25/Rx |
| 1. (b) Basic Mail Order Administrative Fee | | | |
| Per Rx Paid | *$0.47/$0.57 | *$0.47/$0.57 | *$0.47/$0.57 |
| 2. Customer Service | | | |
| Toll Free Phone Line (Member Service) | Included | Included | Included |
| Toll Free Phone Line (Mail Service) | Included | Included | Included |
| Toll Free Phone Line (Pharmacy Help Desk) | Included | Included | Included |
| On-Line CRT Interface (see notes) | | | |
| Internet Access | Included | Included | Included |
| 3. Drug Utilization Review | | | |
| Prospective/Concurrent | Included | Included | Included |
| Retrospective | Included | Included | Included |
| Prior Authorization (Standard) | Included | Included | Included |
| 4. Data Reporting | | | |
| Standard Reports | Included | Included | Included |
| Ad Hoc Reports | $100/hour | $100/hour | $100/hour |
| On-Line Access –Ad Hoc Reports | $0.05 per Rx | $0.05 per Rx | $0.05 per Rx |
| 5. MAC Program Administration | Included | Included | Included |
| 6. Formulary Administration | $0.30pmpm | $0.30pmpm | $0.30pmpm |
| 7. ID Cards | | | |
| Original | $0.30/card | $0.30/card | $0.30/card |
| Each Additional | $0.00/card | $0.00/card | $0.00/card |
| **Optional Services** | | | |

**D37 0497**

CONFIDENTIAL

| | $0.50/letter | $0.50/letter | $0.50/letter |
|---|---|---|---|
| Patient education letters<br>♦ Explanation of Prescription Benefits Letter (EOPB).<br>♦ Central Fill Notification Letter (CFN)<br>♦ Coordination of Benefits Letter<br>♦ Targeted employee listing of non-formulary medications | | | |
| COB Adjudication | $0.05 per Rx | $0.05 per Rx | $0.05 per Rx |
| Disease Management (per portfolio) | $0.10/life/mth | $0.10/life/mth | $0.10/life/mth |
| Physician Practice Pattern Analysis (optional) | $0.15 pmpm | $0.15 pmpm | $0.15 pmpm |
| Standard paid claims tape | $150.00 | $150.00 | $150.00 |
| Destruction of card stock | $100.00 per thousand | $100.00 per thousand | $100.00 per thousand |
| Customization of plastic ID Cards | $150.00 per color per side | $150.00 per color per side | $150.00 per color per side |
| Customization of back side of plastic ID Cards | $500.00 plate charge | $500.00 plate charge | $500.00 plate charge |
| Programming requests | $100.00 per hour | $100.00 per hour | $100.00 per hour |

*Utilization of *Patient Direct*[SM] Program. The *Patient Direct*[SM] Program employs discount coupons, drug cost comparisons and other products to encourage member use of formulary medications. Selection of this program allows NPA to contact patients directly through the mail encouraging them to discuss preferred drug selection with their physician.

Special requests to provide additional services, including, but not limited to, the customization of enrollment materials and on-line access, will be charged as agreed by both parties, in writing. All postage will be billed at actual cost.

**D37 0498**

CONFIDENTIAL

APPENDIX E

## PERFORMANCE STANDARDS

1.  **On-Line Claims Processing:**
    a.  **Financial Accuracy** – The dollar amount of claims paid accurately divided by total dollars paid
    Standard:    99% Financial Accuracy

    | Penalty: | Percent Accurate | % of Annual Fees |
    |---|---|---|
    | | 98% or greater | 0% |
    | | 95.1% - 97.9% | 5% |
    | | Less than 95% | 10% |

    b.  **Coding Accuracy**
    Standard:    98% of claims should be processed without procedural or payment errors

    | Penalty: | Error Rate | % of Annual Fees |
    |---|---|---|
    | | Less than 3% | 0% |
    | | Between 3% and 5% | 5% |
    | | Over 5% | 10% |

2.  **Membership Satisfaction:**
    a.  **Telephone Response Time**
    Standard:    On average, 95% or more of eligible persons' calls received during each calendar year will be answered within 20 seconds.

    Penalty:    1% of annual fees for each 1% below 95% prorata [1]

    b.  **Problem Resolution:**
    Standard:    Ninety-five percent or more of all eligible persons' written inquiries received during each calendar year will be responded to by NPA within 5 business days. One hundred percent of all eligible persons' written inquiries received during each calendar year will be responded to by NPA within 7 business days.

    Penalty:    1% of annual fees for each 1% below 95% prorata [1]

    c.  **General Member Survey Results**
    Standard:    Ninety-five percent or more of surveyed eligible persons will provide NPA a satisfactory rating. Such a survey will be conducted by NPA annually.

    Penalty:    1% of annual fees for each 1% below 95% prorata [1]

[1] The total annual penalty for 2a,b,c shall not exceed 5% of annual fees

D37 0499

CONFIDENTIAL

3.  <u>Date Reporting:</u>

    a.  **Deliver standard reports within 45 days of end of reporting period**

        Standard:    Ninety-five percent of standard utilization reports will be mailed within 45 days after the end of each reporting period.

        Penalty:    2.5% annual fees

    b.  **Deliver annual reports, regulatory documentation within 90 days of plan year**

        Standard:    Ninety-five percent of annual reports will be mailed within 90 days after the end of each plan year.

        Penalty:    2.5% annual fees

4.  <u>Network Utilization Management</u>

        a.  **UR Savings Results**

        Standard:    Sponsor will save not less than 10.0% of an amount equal to its contracted net ingredient costs on an annual basis so long as Sponsor facilitates the implementation of NPA's current DUR programs, including the concurrent, retrospective, prior authorization and Patient Health Management Programs.

        Penalty:    Dollar for Dollar guarantee

5.  <u>Rebate Management</u>

        Standard:    $1.80 per each paid retail prescription
                      $2.80 per each paid mail prescription
                      $1.90 combined paid retail/mail prescription

        Penalty:    Dollar for Dollar guarantee

**D37 0500**

Exhibit L

Filed Under Seal

# Exhibit M

# RECAP<sup>sm</sup> SYSTEM
# AGREEMENT

THIS AGREEMENT entered into this First day of September, 1990, between PCS, Inc. ("PCS"), a corporation with its principal place of business at 9501 East Shea Boulevard, Scottsdale, Arizona 85260-6719, and MASSACHUSETTS STATE CARPENTERS, with its principal place of business at 250 Everett Street, Allston, MA 02134 hereinafter referred to as ("SPONSOR").

WHEREAS SPONSOR has agreed to provide a Prescription Drug Plan ("PLAN") for its eligible participants (and their qualified dependents);

WHEREAS PCS has established a remote electronic claims adjudication and processing system known as the RECAP<sup>sm</sup> system ("RECAP SYSTEM"), for verifying, processing and paying claims and furnishing other related services through a nationwide system of pharmacies and other facilities for the purpose of the administration of the PLAN; and

WHEREAS SPONSOR desires to engage PCS to administer the PLAN on its behalf through the RECAP SYSTEM and PCS desires to furnish such services;

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

I.    PLAN TO BE ADMINISTERED

1.    Within a reasonable time prior to the effective date of the PLAN, SPONSOR shall furnish PCS with a written statement of the

N.E. CARPENTERS
Exhibit No. 4 for I.D.
Date: 10/20/06
Reporter: K.A. Smith

details of the PLAN to be administered on its behalf by PCS setting forth at least the following:

    (a)  The effective date of the PLAN;

    (b)  The classes of dependents covered, including any age limits applicable to dependent children;

    (c)  The estimated number of insureds by geographical location;

    (d)  The prescription drugs covered by and the exclusions under the PLAN;

    (e)  The basis for determining payments where prescription drugs are furnished by PCS Member Pharmacies and by non-member Pharmacies;

    (f)  The expiration date of the PLAN;

    (g)  The amount of the deductible or co-payment, if any;

    (h)  The manner of distribution of PCS cards to the SPONSOR.

    2.  Within sufficient time to allow for initiation and application of the RECAP SYSTEM, SPONSOR shall arrange to have PCS furnished with:

    (a)  A listing of the names of all persons to be covered as of the effective date of the PLAN;

    (b)  The status of each person relative to coverage of his or her qualified dependents and such other information as may reasonably be required for the effective operation of the PLAN via the RECAP SYSTEM and;

CARP-00004

(c)  Any additions to or deletions from this information as they occur.

3.   If the PLAN provides for the reimbursement to employees of the cost of prescription drugs purchased at non-member pharmacies, then the PLAN shall provide for such reimbursement only upon the submission of a claim for direct reimbursement in a form approved by the SPONSOR and PCS, together with the employee's proof of payment for the prescription drugs.  The PLAN shall also provide that the benefits payable under the PLAN with respect to reimbursement to employees dealing with non-member pharmacies are not assignable and any assignment or attempted assignment thereof shall be void.

4.   Prior to the issuance by PCS of RECAP identification cards to participants in the PLAN, SPONSOR shall provide to PCS the deposit referred to in Section IV hereof and/or such security as PCS, in its judgement reasonably exercised, deems to be required.

II.  <u>RECAP SYSTEM</u>

1.   The eligibility information received by PCS from SPONSOR shall be entered into the PCS computer and RECAP identification cards will be produced and distributed to all covered persons. Claims will be submitted by Member Pharmacies via the RECAP SYSTEM to PCS.

2.   From time to time SPONSOR will provide new eligibility lists to PCS showing additions and deletions.  Each time PCS receives and enters into its computer a new eligibility list from SPONSOR, PCS shall deliver to SPONSOR a hard copy printout (or other media as mutually agreed upon) of the additions as entered into the computer.  The printout shall be deemed correct until PCS is

CARP-00005

otherwise notified by SPONSOR by mail that corrections are required to the printout. Any errors brought to the attention of PCS will be promptly corrected.

    3. RECAP identification cards shall not bear an expiration date and shall continue in effect until:

        (a)  PCS is notified that the PLAN has been terminated or that a covered person or dependent of such person is no longer eligible for benefits under the plan and;

        (b)  PCS has entered the information set forth in the notification into its computer and will make PCS Member Pharmacies aware of such information when PCS Member Pharmacies access the RECAP SYSTEM.

## III. PCS SERVICES

PCS shall perform the following services:

    1.  Take the necessary steps to ensure that an adequate number of Member Pharmacies are continuously available to dispense medication on behalf of insured persons under the PLAN in the various geographical areas where insured persons are located.

    2.  Furnish each Member Pharmacy for inclusion in its PCS Operations Manual a description of the PLAN, as approved by SPONSOR, including SPONSOR'S payment schedule for covered prescriptions.

    3.  Require Member Pharmacies to abide by the terms of the PCS Member Pharmacy Agreement.

    4.  Process claims received from Member Pharmacies; and process claim forms received from insured persons for covered prescription drugs which have been furnished by non-member pharmacies; and determine whether such claims qualify for

reimbursement in accordance with the terms of the PLAN and the payment applicable to them; and return unacceptable claim forms to the submitting PLAN.

5. Advise SPONSOR by means of a biweekly Statement of Account of the amount of payments which have become due on valid claims processed by PCS during the applicable period.

6. Furnish SPONSOR, as soon after the fifth day of each calendar month as is practicable, with a computer produced summary of claim payments made by PCS under the PLAN during the preceding period. The printout shall show the total of such payments by group unit and shall contain such other data and be in such form, compatible with the RECAP SYSTEM, as is agreed upon by the parties.

7. Provide the additional services, supplies and reports listed in Exhibit A.

IV. **PAYMENTS DUE PCS**

1. Upon receipt of advice from PCS as to the amount of each biweekly Statement of Account, the SPONSOR shall wire that amount within 48 hours to the bank account designated by PCS and established for that purpose.

2. For the various services, supplies and reports provided by PCS, as well as the auditing, approval and payment of claims, SPONSOR shall pay to PCS the amounts specified in Exhibit A. Such amounts shall be payable within ten (10) days following receipt by SPONSOR of the summary of claims processed by PCS.

3. Any additional charge for the services other than those specified in Exhibit A, shall be remitted by SPONSOR within ten (10) days after receipt of a billing from PCS.

CARP-00007

4.    Failure by SPONSOR to pay on or prior to the date due, any amount owing to PCS hereunder shall result in the imposition by PCS of "Finance Charges" to SPONSOR on the "Unpaid Balance", in addition to any other remedies available to PCS.  Finance charges will begin to accrue on the due date.  In computing the Unpaid Balance, PCS will take the beginning balance (including billed but unpaid Finance Charges) each day, subtract any credit received during such day and add any other charges provided in the Agreement.  Then PCS will add all daily balances for the billing cycle together and divide the total by the number of days in the billing cycle (the "Average Daily Balance").  PCS will then multiply the Average Daily Balance by the "Periodic Rate" appearing on Exhibit A or any replacement thereto.

5.    If at any time during the term of the Agreement, PCS shall determine, in its sole judgement, that there are reasonable grounds for insecurity on the part of PCS as to the ability of SPONSOR to meet its financial commitments hereunder as they become due, PCS shall have the right to require SPONSOR to provide security in such amount and form as PCS deems necessary.

6.    If at any time during the term of the Agreement, SPONSOR shall fail to pay PCS, when due, any amount required to be paid to PCS hereunder, PCS shall have the right, in addition to any other remedies available to PCS, to decline to issue or reissue cards to SPONSOR'S clients (or their eligible employees); to suspend eligibility of cardholders until such time as SPONSOR'S account with PCS has been brought current; and to advise Member Pharmacies, as they access the RECAP SYSTEM, that cards are no longer valid.

CARP-00008

V.  <u>RECORDS</u>

PCS shall maintain, in the original form or on electronic
media, the claims and claim forms supporting the printouts. PCS
shall also maintain adequate records to establish payments made to
Member Pharmacies. These records shall remain accessible to SPONSOR
for examination and audit by SPONSOR throughout the calendar year in
which they were established and for seven (7) calendar years
thereafter.  Such audit may be conducted, upon prior written notice,
at reasonable intervals during the regular business hours of PCS.
All records pertaining to the administration of the PLAN and the
RECAP SYSTEM are the property of PCS and all information derived by
PCS from said records pertaining to the administration of the PLAN
through the RECAP SYSTEM shall be the property of PCS.

VI.  <u>ASSIGNMENT</u>

This Agreement or any of the functions to be performed
hereunder may be assigned by PCS to another person or organization
but only with the prior written consent of SPONSOR, which consent
shall not be unreasonably withheld, provided however that any such
assignment shall not relieve PCS of its obligations hereunder.

VII. <u>TERM OF AGREEMENT</u>

This Agreement shall be for a term of one (1) year, commencing
on the date hereof and shall continue subject to the provision of
Paragraph VIII below.  PCS shall also have the right, after the
initial term of one (1) year, to change the fees applicable to the
PLAN referred to in this Agreement by giving the SPONSOR sixty (60)
days prior written notice.  The fees for each group will then change

7

CARP-00009

on the first of the month following the sixty (60) day period and shall remain in effect for a period of one (1) year thereafter. SPONSOR may object to any increase in such fees by giving written notice thereof to PCS at least thirty (30) days prior to the expiration of the sixty (60) day period. In such event, if the parties cannot agree on an appropriate fee, this Agreement shall terminate at the end of the sixty (60) day period.

VIII. TERMINATION OF AGREEMENT

This Agreement may be terminated as follows:

(a)  By either party on sixty (60) days prior written notice to the other, given at any time;

(b)  By either party in the event they are unable to agree on a fee increase as provided in Section VII hereof;

(c)  By either party if the other shall default in the performance of this Agreement or any covenant or condition thereof, on thirty (30) days written notice to the other, specifying the nature of the default, unless such other party shall cure that default within the thirty (30) day period;

(d)  Notwithstanding the preceding Subparagraph (c), by PCS in the event SPONSOR fails to pay any deposit or any sum payable hereunder when the same becomes due or fails to provide the security required by PCS pursuant to Section IV (4) hereof, unless such payment is made in full or such security is provided within ten (10) days following notice of the default or request for security, as the case may be.

8

CARP-00010

(e) By either party on written notice to the other, if the other party shall make an assignment for the benefit of creditors, file a petition in bankruptcy, is adjudicated insolvent or bankrupt, a receiver or trustee for a substantial part of its property or a proceeding is commenced against it which will substantially impair its ability to perform hereunder.

In the event of a termination hereunder,

(i) PCS shall have the right to advise its Member Pharmacies that, effective on the termination date, RECAP identification cards issued for any PLANS covered by this Agreement shall no longer be valid; and

(ii) The liability of SPONSOR for obligations incurred prior to the date of termination of this Agreement shall survive that termination.

IX.  NOTICES

All notices provided for in this Agreement shall be in writing and shall be sent by certified mail, return receipt requested, addressed to the other party at the address shown on this Agreement, or such other address as may be provided to the other party in the same manner as that provided for the giving of any notice. All notices shall be deemed to have been received on the fifth day after the date said notice was mailed.

CARP-00011

X.   MISCELLANEOUS

1.   All computer programs, software or other data generated or utilized by PCS in the course of its performance under this Agreement, shall be and remain the property of PCS.

2.   The prevailing party in any litigation or arbitration concerning this Agreement or any term or condition hereof, or any default hereunder, shall be entitled to reasonable attorney's fees as fixed by the court or arbitrators.

3.   If any term or provision of this Agreement is held by any court to be illegal or in conflict with the laws of the state where made, the validity of the remaining terms and provisions hereof shall not be affected thereby.

4.   In the event any fees payable to PCS hereunder are computed on a per capita basis, PCS shall have the right to audit the books and records of SPONSOR to the extent necessary to verify the amount of such fees.

5.   If any court, Department of Insurance, or other regulatory agency shall issue to SPONSOR an order or finding of impairment or insolvency or an order to cease and desist from writing business, notice thereof shall be given to PCS by SPONSOR within two (2) business days thereafter and upon receipt of such notice PCS shall have the option to terminate this Agreement immediately.

6.   SPONSOR assigns to PCS all of its right, title and interest in and to any sum(s) due to SPONSOR pursuant to any agreements of reinsurance to which SPONSOR is a party, to the extent claims paid by PCS hereunder have not been reimbursed and SPONSOR

10

CARP-00012

authorizes the reinsurer(s) to make payments thereof directly to PCS.

7.    "Any disagreement between the parties to the interpretation, application or meaning of any provision of the Agreement, shall, after discussion between the parties, be submitted to the American Arbitration Association, in Boston, Massachusetts, to be resolved under its rules for commercial disputes.

Each party shall bear its own costs in such a proceeding and shall share the fee for the arbitrator.

Any decision rendered by the arbitrator shall be final and binding upon the parties."

This Agreement shall be governed by the laws of the State of Arizona without regard to the conflict of law rules of that State. The provisions of this Agreement shall bind and inure to the benefit of the parties hereto and their heirs, legal representatives, successors and assigns.  This Agreement constitutes the entire understanding between the parties hereto with respect to the subject matter of this Agreement.  This Agreement may be amended only by a written agreement executed by SPONSOR and PCS.

11

CARP-00013

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers or representatives duly authorized so to do.

PCS, Inc.

By: _____

Title: Vice President, Marketing

Date: October 12, 1990

MASSACHUSETTS STATE CARPENTERS

By: _____

Title: James W. Buckley, Jr.
Director and Field Representative

Date: October 9, 1990

12

CARP-00014

**Exhibit A**

**ADMINISTRATIVE FEES**

**SELF-FUNDED SCHEDULE**

| | |
|---|---|
| Per Valid Processed Claim | $ .74 |
| Per $MAJOR_x$ (Valid Processed) Claim | 1.20 |
| Per $MAJOR_x$ II (Processed) Claim | |
| Per On-Line Transaction | .75 |
| Per Paper Claim Submission | 1.75 |
| Paper Claim Submission | 1.50/Claim |
| Preprocessing Required | 2.50/Claim |

| Optional Services | Cost Per Valid Processed Claim |
|---|---|
| MAC | $ .04 |
| QUANTUM Alert (on-line DUR) | .10 |
| Paper Eligibility Submission | .02 |
| Decentralized Administration | .02 |
| CIL Detail – Paper | .02 |
| Each card reissuance within a 24 month period | .50/card |
| Case Set-Up | 20.00/Group Number |
| CAT Tapes | 100.00 Each |
| New Pharmacy Plan | 1,000.00 Each Plus Postage & Handling |
| Client Specific Programming | 150.00/Hour |
| Ad Hoc Reports | See Schedule |

Finance Charge: Invoices are assessed finance charges at the rate of 1.5% per month on the amounts not paid within terms of the contract.

*Charges not identified above will be quoted upon request.

ADF 0490

CARP-00015

## PCS BASIC PER CLAIM SERVICES

Services provided in the valid processed claim fee include:

* **RECAP**[SM] – A fully automated on-line, real-time claims processing system, RECAP provides greater ability to tailer prescription drug plans to maximize benefits and to utilize a range of proven cost management approaches.

* **NETWORK MANAGEMENT** – PCS maintains a Help Desk with 800 number service for the pharmacies to facilitate the point-of-service processing available through the RECAP system.

* **AUDIT OPERATIONS** – Irregularities or abuses are detected during post-payment data analysis and on-site audits are scheduled in order to examine procedures, eliminate misunderstandings, and maintain the integrity of the system.

* **COMPREHENSIVE REPORT PACKAGE** – A standard package of reports includes relevant cost, utilization control data and savings information related to the specific benefit designs selected.

* **ACTUARIAL STUDIES** – PCS contract with national actuarial consulting firms to provide analyses to assist clients in such areas as renewal rating and other cost management issues.

* **DEDICATED ACCOUNT MANAGEMENT** – PCS clients are assigned dedicated Client Service representatives who work closely with the local sales representatives and you.

* **EMPLOYEE EDUCATION** – PCS will provide information to assist you in development of educational materials for the covered employees. A national directory of PCS Member Pharmacies will be provided for each new group.

CARP-00016

# Exhibit N



**Jill Parsons**
Contract Specialist
Phone: 480-661-2226
Facsimile: 480-314-8231

July 3, 2002

Mr. James W. Buckley, Jr.
Massachusetts State Carpenters
P. O. Box 7075
Wilmington, MA  01887-7075

Dear Mr. Buckley:

Enclosed is a fully executed original of the "Managed Pharmaceutical Benefit Agreement" between Massachusetts State Carpenters and AdvancePCS for your files.

Thank you for your help in finalizing this agreement.

Sincerely,

Jill Parsons

jp/kg

Enclosures

cc:    Sara Sullivan
       Thomas Snyder, 019
       Michal Caley, 019
       Kathi Grosvenor, 05-3
       Amy Companik, 025
       Summer Moore, 500
       Rhonda Jones, 019

*9501 East Shea Boulevard*
*Scottsdale, Arizona 85260-6719*
*ph 480.391.4600*

N.E. CARPENTERS
Exhibit No. 6 for I.D.
Date: 10/20/06
Reporter: K.A. Smith

CARP-00025

ADVANCEPCS HEALTH, L.P.

MANAGED PHARMACEUTICAL BENEFIT AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of April 1, 2001 (the "**Effective Date**") by and between MASSACHUSETTS STATE CARPENTERS ("**Customer**") and AdvancePCS Health, L.P., a Delaware limited partnership, as an indirect wholly owned subsidiary of AdvancePCS, a Delaware corporation, together with its affiliates ("**AdvancePCS**"), for the purpose of delineating the terms and conditions under which AdvancePCS will provide certain managed pharmaceutical benefit services to Customer. All capitalized terms will have the meanings given in this Agreement or in Section 11 of this Agreement.

## A G R E E M E N T

**1.     STATEMENT OF SERVICES/ADVANCEPCS OBLIGATIONS**

1.1.     **Services.**  AdvancePCS will provide Customer the services, including the Base Services (those Services described in Exhibit A—Sections 1, 3, 4 (other than 4B and 4E), 5, 6, 9, 10 (other than 10B), 11A, 12 and 13E) and such other services listed in Exhibit A hereto which are selected by Customer pursuant to the implementation documents (collectively the "**Services**").  AdvancePCS may change the Services upon 30 days' prior written notice to Customer, subject to Customer's right to terminate under Section 8.2.2 of this Agreement.  Services will not be discontinued or materially reduced except upon the mutual agreement of the parties.  Customer acknowledges that AdvancePCS may upgrade and make minor modifications to the Services without notice to Customer.

1.2.     **Compliance with Law.**  AdvancePCS will comply with all Laws applicable to it and the Services it provides under this Agreement.  Customer has no responsibility to advise AdvancePCS regarding its compliance with any applicable Law. AdvancePCS makes no representation or warranty that the Plan Design selected by Customer is in compliance with any Law that applies to Customer.

1.3.     **AdvancePCS Indemnity.**  Subject to the limitations set forth in Section 6.4 of this Agreement, AdvancePCS will indemnify and hold harmless Customer for, from and against any and all costs, losses or damages Customer may incur as a result of AdvancePCS' failure to perform any of its obligations under this Agreement.

1.4.     **Performance Standards.**  AdvancePCS shall provide Services consistent with the performance standards listed in Exhibit C.  If AdvancePCS fails to perform in accordance with the standards listed in Exhibit C, Customer shall give written notification to AdvancePCS.

**2.     FEES AND PAYMENT**

2.1.     **Fees.**  Customer will pay to AdvancePCS the Administrative Fees listed in Exhibit B, as applicable.  AdvancePCS will invoice Customer for such Administrative Fees monthly, and payment is due within 10 days of Customer's receipt of the invoice.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00026

2.2.    **Rates for Prescription Claims.** Customer will pay for Covered Items dispensed to Members by the mail service pharmacy or the Network Providers, as the case may be, at the rates set forth in Exhibit B attached hereto, unless otherwise previously or hereafter hardcoded for different pricing at Customer's request.

2.2.1.  AdvancePCS has established a payment cycle for payments to Network Providers or Members for Covered Items, and following each cycle, AdvancePCS will invoice Customer for the amount due based on Claims submitted. AdvancePCS may change this payment cycle during the term of this Agreement, to a period determined by AdvancePCS in its sole discretion, upon 10 days' prior written notice to Customer.

2.2.2.  Within two (2) days of receipt of such invoice, Customer will wire transfer the invoiced amount to such account as AdvancePCS may designate from time to time.

2.2.3.  The amount that Customer pays to AdvancePCS under this Section 2.2 is not an asset of Customer's prescription benefit plan. AdvancePCS has no obligation to Customer or Customer's prescription benefit plan with respect to the interest or other earnings, if any, received by AdvancePCS with respect to these amounts.

2.2.4.  When Customer has made payment to AdvancePCS in full as described in this Section 2.2: (i) AdvancePCS will release Customer from any responsibility for the payment of any amounts owing to Network Providers or Members; and (ii) AdvancePCS will indemnify, defend and hold harmless Customer for, from and against any claims or demands from Network Providers or Members arising out of AdvancePCS' failure to remit amounts to Network Providers or Members as payment for Covered Items dispensed.

2.3.    **Certain Remedies.** Notwithstanding Section 9 of this Agreement, if Customer fails to pay AdvancePCS by the due date any amount owing hereunder, AdvancePCS, after making a good faith effort to collect and upon immediate written notice to Customer via facsimile to the facsimile number provided in this Agreement, may do any or all of the following:

2.3.1.  Suspend performance of any and all of AdvancePCS' obligations under or in connection with this Agreement, including AdvancePCS' obligation to process Claims using the RECAP System;

2.3.2.  Immediately advise Network Providers that the RECAP System is not available in connection with the Plan Design;

2.3.3.  Apply all or any portion of any security posted by Customer with AdvancePCS to Customer's delinquent account; or

2.3.4.  Set off against any amounts otherwise payable to Customer under this Agreement (including, if AdvancePCS is providing Formulary Services to Customer, any Rebates AdvancePCS receives from a Manufacturer on behalf of Customer) any amounts due from Customer under this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00027

2.4.  **Security.** If at any time during the term of this Agreement AdvancePCS reasonably determines, based on Claims volume, payment record or Customer's latest financial information, that Customer may have difficulty meeting its financial commitments under this Agreement, AdvancePCS may require Customer to provide security in an amount and form that AdvancePCS deems necessary provided that the amount is reasonable in relationship to the Claims volume. Customer will provide such security within 10 days of AdvancePCS' request. Additionally, Customer will furnish audited financial statements to AdvancePCS upon AdvancePCS' request. AdvancePCS will keep these audited financial statements confidential and will use them solely for internal review purposes to determine credit requirements.

2.5.  **Pricing Changes.**

  2.5.1.  After the Initial Term of this Agreement, AdvancePCS may change the Administrative Fees applicable to the Plan Design after giving Customer 60 days' written notice. Any change will take effect on the first day of the month following the 60 day notice period. Customer may object to an increase in Administrative Fees by providing written notice to AdvancePCS at least 30 days before the expiration of the 60 day notice period. If the parties cannot agree on an appropriate Administrative Fee, the Agreement will terminate at the end of the 60 day notice period. If Customer does not timely object, Customer will have no right to terminate this Agreement based on the pricing change.

  2.5.2.  The rates provided to Customer in this Agreement are subject to certain Plan Design requirements. If there occurs a material change in drug industry practice which materially alters the rights and obligations of AdvancePCS under this Agreement, the parties will attempt to equitably adjust the pricing under this Agreement. If the parties are unable to agree upon an equitable adjustment, this Agreement will terminate on 60 days after notice by either party of such termination.

3.  **CUSTOMER OBLIGATIONS**

  3.1.  **Plan Design Information; Member Eligibility.** Throughout the term of this Agreement, Customer, at its expense, will provide AdvancePCS all information concerning Customer's Plan Design and Members needed to perform the Services, including, without limitation, processing parameters and Member enrollment and eligibility updates. This information must be complete and accurate, provided timely and in a format and media approved by AdvancePCS. (Member enrollment and eligibility information is collectively referred to as "**Eligibility Information**").

  3.2.  **Reports.** AdvancePCS may provide Customer with reports showing (i) all or some portion of the Plan Design information submitted to AdvancePCS, (ii) Member enrollment or eligibility data, (iii) Claims or billing activity during a specific period, or (iv) any action(s) taken by AdvancePCS in performing Services. Customer will review all such reports and notify AdvancePCS in writing of any errors or objections within 45 days of receipt of the report. Until Customer notifies AdvancePCS of any errors or objections, AdvancePCS will be entitled to rely on the information contained in the report. If Customer does not notify AdvancePCS of any errors or objections within the

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00028

45 day period, the information contained in the report will be deemed accurate, complete and acceptable to Customer.

**3.3.    Drug Classification.** Customer agrees to accept the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference that AdvancePCS may select from time to time as the source for purposes of classifying drugs (e.g., legend vs. over the counter, brand vs. generic) in connection with this Agreement.

**3.4.    Member Authorizations.**   Customer has obtained, or will obtain, all Member authorizations required by Law, for AdvancePCS to perform the Services (including, without limitation, AdvancePCS audits of Network Providers and the Services required by Exhibit A Sections 5(B), 5(C), 6 and 11(C)).

**3.5.    Customer Indemnity.**   Subject to the limitations of Section 6.4 of this Agreement, Customer will indemnify and hold harmless AdvancePCS for, from and against any and all costs, losses or damages that AdvancePCS may incur as a result of Customer's failure to perform any of its obligations under this Agreement.

**3.6.    Compliance with Law.**   Customer will comply with all Laws applicable to its prescription drug benefit plan.  AdvancePCS has no responsibility to advise Customer about Customer's compliance with any applicable Law including, without limitation, the Employee Retirement Income Security Act ("ERISA") or the Americans with Disabilities Act ("ADA").  Customer will also disclose to Members any and all matters relating to the Plan Design that are required by Law to be disclosed, including information relating to the calculation of copayments, coinsurance amounts, deductibles or any other amounts that are payable by a Member in connection with the Plan Design; and Rebates or other discounts on pharmaceutical products if Customer has selected Formulary Services, irrespective of whether Customer retains or allows AdvancePCS or others to retain all or a portion of any Rebates or discounts.

## 4.    USE AND ACCESS TO INFORMATION

**4.1.    Use of Information.** Subject to Section 5 of this Agreement, AdvancePCS and Customer may use the information obtained in connection with Claims ("Claims Information"), as well as Eligibility Information, in any manner they deem appropriate; except that each party and its agents, employees and contractors must maintain the confidentiality of this information (including the identity of any Member or Customer) to the extent required by applicable Law, and may not use this information in any manner prohibited by Law. Each party is responsible for its own use of the Claims Information and Eligibility Information, and will indemnify and hold harmless the other party for, from and against any and all costs, losses and damages incurred as a result of such use, including any claim by an employee or former employee of Customer or any of its affiliates under Law that protects the rights of such employees or their beneficiaries, including, without limitation, ERISA and the ADA.

**4.2.    Access to Records.**  AdvancePCS will maintain records of the Claims Information for 7 years after the dispensing date.   These records will be in a format and media deemed appropriate by AdvancePCS. Customer may audit, review and duplicate the Claim billing information used by AdvancePCS to invoice Customer under this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00029

AdvancePCS may audit, review and duplicate the Claims Information, and any other records Customer may have regarding the Claims Information made in connection with this Agreement. Reasonable prior written notice must be provided before an audit to the party holding the applicable information or records. All audits will be at the auditing party's expense, must occur during regular business hours at the place of business of the holder of the information, are subject to all Laws regarding confidentiality, and are subject to the provisions of Section 5 of this Agreement. The party requesting duplication will pay the other party its reasonable duplicating costs.

**4.3.     Third Party Records Request.**

4.3.1.  If a Member or a Member's agent or designee requests to review or duplicate any Records, AdvancePCS will refer the requestor to Customer, and Customer may then request the Records in accordance with Section 4.2 of this Agreement.

4.3.2.  If either party receives a court order, subpoena or governmental request for Records, the party will use its best efforts to timely notify the other party of the receipt of such request and provide an opportunity to respond. The receiving party may comply with such order, subpoena or request. If such order, subpoena or request relates directly to the other party's business (or in the case of Customer to a Member's Records) and not to the complying party's business generally, the complying party is entitled to reimbursement from the other party for its reasonable compliance costs.

**4.4.     Product Development.** Subject to Section 4.1 of this Agreement, AdvancePCS, its agents, employees and contractors may use, reproduce, or adapt any information obtained under this Agreement or any prior agreement with Customer, to render services to clients and to develop new products and services which may be outside the scope of this Agreement. Any work, compilation, processes, or inventions developed by AdvancePCS or its agents, employees or contractors under this Section 4.4 is deemed AdvancePCS' Confidential Information under Section 5.1 of this Agreement.

**5.     INTELLECTUAL PROPERTY**

**5.1.     Proprietary Information.** In connection with this Agreement, each party may disclose to the other party certain proprietary or confidential technical and business information, databases, trade secrets, and innovations belonging to the disclosing party (**"Confidential Information"**), the value of which might be lost if the proprietary nature or confidentiality of such Confidential Information is not maintained. Each party agrees to the following provisions:

5.1.1.  For the purposes of this Section 5, this Agreement and any exhibits, amendments or addenda attached hereto are deemed Confidential Information.

5.1.2.  Each party reserves all rights to its Confidential Information, including all proprietary and novel features. Neither party will disclose any of the other party's Confidential Information nor use any of the other party's Confidential Information to benefit itself or others except to the extent expressly authorized in this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00030

**5.1.3.** Each party will treat all Confidential Information as confidential; will disclose Confidential Information only to its employees who have a need to know in order to accomplish the purpose permitted in this Agreement and who themselves agree not to disclose it to anyone; will not (except to the extent expressly authorized by this Agreement) disclose Confidential Information to anyone outside of AdvancePCS or Customer; and will not copy or reproduce any written materials or tangible items provided by the other party unless expressly authorized to do so in writing. AdvancePCS and Customer each will take at least all measures it employs with respect to information of its own that it regards as confidential and proprietary, to preserve and protect the confidentiality or proprietary nature of any Confidential Information and to prevent it from falling into the public domain or into the possession of persons not bound to maintain its confidentiality.

**5.1.4.** All Confidential Information will remain the property of the disclosing party. The receiving party will return all written or tangible materials, and all copies thereof, upon request of the disclosing party.

**5.1.5.** The receiving party will not be liable for any disclosure or use of any Confidential Information if the Confidential Information is publicly available or later becomes publicly available other than through a breach of this Agreement, or if the Confidential Information is shown by written documentation to be known to the receiving party on the date of execution of this Agreement. Confidential Information may be disclosed pursuant to a bona fide subpoena if the party receiving the bona fide subpoena has given the other party immediate written notice of receipt of the subpoena so that the other party can objection or otherwise intervene as it deems proper.

**5.2.** **RECAP.** AdvancePCS owns the compilations of information contained in: (i) AdvancePCS' RECAP System, including, but not limited to, all printouts and copies, as well as any prior or future versions by any name; (ii) all other databases developed by AdvancePCS or its designees in connection with performing drug benefit services or utilization review; or (iii) the Services. In addition, these compilations are protected by copyright owned by AdvancePCS.

**5.3.** **Remedies.** Any unauthorized disclosure or use of Confidential Information would cause AdvancePCS or Customer immediate and irreparable injury or loss. Accordingly, if either party fails to comply with this Section 5, the other party will be entitled to specific performance including immediate issuance of a temporary restraining order or preliminary injunction enforcing this Agreement, and to judgment for damages (including reasonable attorneys' fees) caused by the breach, and to any other remedies provided by Law.

# 6. WARRANTY, LIMITATION OF LIABILITY

**6.1.** **Warranty.** This Agreement is not a contract for the sale of goods. AdvancePCS will perform the Services in a good and workmanlike manner in accordance with the customs, practices and standards of providers skilled in the industry. EXCEPT AS WARRANTED IN THIS SECTION 6.1, ADVANCEPCS DISCLAIMS ALL EXPRESS AND ALL IMPLIED WARRANTIES OF ANY KIND, INCLUDING THE

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00031

SUITABILITY FOR ANY PARTICULAR PURPOSE OF THE DATA GENERATED THROUGH THE RECAP SYSTEM.

6.2.   **Force Majeure.**  Except for obligations set forth in Section 2 of this Agreement, the parties are excused from performance under this Agreement to the extent such party is prevented from performing any obligation, in whole or in part, as a result of causes beyond its reasonable control, including, acts of God, war, civil disturbance, court order, governmental intervention, Change in Law, nonperformance by the other party or any third party, failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment.  Any nonperformance under this Section 6.2 will not constitute a default or a ground for termination of this Agreement.

6.3.   **Change in Law.** The parties will attempt to equitably adjust the terms of this Agreement to take into account any Change in Law that materially alters the rights or obligations of either party under this Agreement.  If the parties are unable to agree upon an equitable adjustment within 60 days after either party notifies the other of a Change in Law, this Agreement will automatically terminate.

6.4.   **Limitations of Liability.**

6.4.1. Neither Customer nor AdvancePCS (nor any of their affiliates, directors, employees, agents, successors or assigns) will be liable to the other under this Agreement:

6.4.1.1.   for any claim, demand, loss, attorneys' fees, costs, expenses, or liabilities of any kind arising from the acts or omissions of any pharmacy, pharmacist or provider that performs any Services in connection with this Agreement; or

6.4.1.2.   for any indirect, special, incidental or consequential damages, even if informed of their possibility.

6.4.2. AdvancePCS (or any of its affiliates, directors, employees, agents, successors or assigns) will not be liable to Customer under this Agreement for any amount, arising out of one or more claims, except for actual or compensatory damages.

6.4.3. Neither Customer nor AdvancePCS (nor any of their affiliates, directors, employees, agents, successors or assigns) will be liable for any claim which is asserted by the other party more than 180 days after the other party is or reasonably should have been aware of such claim.  Providing the other party with written notice, setting forth in sufficient detail the bases for such claim, constitutes asserting the claim under this Section.

6.4.4. If Customer has chosen not to receive those reports described in Section 3.2 or Exhibit A of this Agreement, AdvancePCS (or any of its affiliates, directors, employees, agents, successors or assigns) will not be liable for any claim which Customer reasonably would have been aware of if Customer had been receiving such reports.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00032

7.    **FORMULARY SERVICES.**  If Customer selects Formulary Services, the provisions of this Section 7 will apply.

7.1.    **Formulary Fees.**  Customer will pay to AdvancePCS a fee in an amount equal to the percentage set forth in Exhibit B multiplied by the Rebates collected by AdvancePCS in connection with this Agreement.  In lieu of billing Customer for these fees, AdvancePCS may retain the amount due from the Rebates collected by AdvancePCS on behalf of Customer.

7.2.    **Formulary Limitations.**  As used herein and in Exhibit A, **"Manufacturer"** means a pharmaceutical company that has contracted with AdvancePCS (or its affiliate or agent) to offer discounts for pharmaceutical products in connection with AdvancePCS' Formulary Services.

7.2.1.  Customer and AdvancePCS waive, release, and forever discharge each other from any claims, demands, losses, attorneys' fees, costs, expenses and liabilities of any nature, whether known or unknown, arising from:

7.2.1.1.    a Manufacturer's failure to pay any Rebate;

7.2.1.2.    a Manufacturer's breach of an agreement related to this Agreement; or

7.2.1.3.    a Manufacturer's negligence or misconduct.

7.2.2.  AdvancePCS may receive fees or other compensation from Manufacturers, including, without limitation, administrative fees not exceeding 3% of the cost of the pharmaceutical products dispensed to Members, and fees for property provided or Services rendered to a Manufacturer (which may include providing physicians clinical messages consistent with the Performance Drug List).  The term Rebates as used in this Agreement does not include these fees, which belong exclusively to AdvancePCS.  In addition, AdvancePCS Mail, a mail service program provided by an affiliated mail service facility (**"AdvancePCS Mail"**) may negotiate on its own behalf directly with Manufacturers for discounts, including rebated discounts based on market share or other factors. The term Rebates as used in the Agreement does not include these discounts which belong exclusively to AdvancePCS Mail.

7.3.    **Formulary Ownership.** The AdvancePCS Formulary contains AdvancePCS proprietary information and AdvancePCS owns all rights to the AdvancePCS Formulary, including but not limited to, rights associated with publication, trade secrets, copyrights, trademarks and patents.  Any rights that Customer may have in the AdvancePCS Formulary are hereby assigned to AdvancePCS.  Accordingly, copies of the AdvancePCS Formulary in any medium distributed to Customer and its participating physicians remain the property of AdvancePCS and may be used only by Customer and such participating physicians for the purposes and transactions contemplated by this Agreement.  Other than as expressly authorized in this Agreement, Customer may not distribute or disclose copies of the AdvancePCS Formulary to anyone, except as reasonably necessary for performance of this Agreement.  Customer may not distribute or disclose copies of the AdvancePCS Formulary to any competitor of AdvancePCS.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00033

7.4. **Formulary Renegotiation.** If, after the Effective Date of this Agreement, there occurs any Change in Law which materially affects AdvancePCS' ability to perform Formulary Services; or a change in drug industry practice which causes a substantial reduction in the Rebates available under this Agreement, either party may renegotiate the Formulary Services and Formulary Fees by providing written notice to the other party. For purposes of this Section 7.4, a "substantial reduction" of Rebates means that Rebates available for a particular year, after AdvancePCS attempts diligent collection of Rebates, are less than 80% of the actual Rebates paid or payable during the initial year of this Agreement. Termination of Formulary Services will not terminate this Agreement as a whole.

## 8. TERM AND TERMINATION OF AGREEMENT

8.1. **Term.** This Agreement is for an initial term of 3 years from the Effective Date (the "Initial Term"), and will automatically continue in effect for successive 3 year terms thereafter, subject to the remaining provisions of this Section 8.

8.2. **Termination.** This Agreement may be terminated as follows:

8.2.1. By either party, with or without cause, at the end of the Initial Term or any renewal term, by giving written notice to the other party 60 days prior to the end of such Initial Term or renewal term;

8.2.2. By Customer, at its option, if AdvancePCS changes the Services under Section 1.1 of this Agreement, such termination to be effective on the proposed date the change would take effect;

8.2.3. Automatically, if the parties are unable to agree on (i) changes in Administrative Fees under Section 2.5.1 of this Agreement, (ii) an equitable adjustment under Section 2.5.2 of this Agreement; or (iii) an equitable adjustment under Section 6.3 of this Agreement;

8.2.4. By either party if the other party defaults in its performance of this Agreement. The terminating party must provide the defaulting party 30 days' prior written notice, specifying the nature of the default. This Agreement will not terminate under this subsection if the defaulting party cures the default within the 30 day period;

8.2.5. By AdvancePCS (notwithstanding subsection 8.2.4 of this Agreement) on 2 days' prior written notice to Customer, if Customer fails (i) to timely make any payment required under this Agreement, unless Customer cures that default within the two-day period, or (ii) to provide or maintain security under Section 2.4 of this Agreement;

8.2.6. By either party, at its option, if any court, governmental or regulatory agency issues to the other party an order or finding of impairment or insolvency, or an order to cease and desist from writing business. The party receiving notice of an order or finding must provide the other party written notice within 2 business days of receipt; or

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00034

8.2.7. By either party if the other party or Customer's guarantor: (i) makes an assignment for the benefit of creditors; (ii) has a petition filed (whether voluntary or involuntary) under Title 11 of the United States Code, or any other similar statute now or hereafter in effect; (iii) has a receiver, custodian, conservator or trustee appointed with respect to all or a substantial part of its property; or (iv) has a proceeding commenced against it which substantially impairs performance hereunder.

8.3. **Survival.** Sections 4, 5 and 6 of this Agreement, and obligations arising under this Agreement prior to the effective date of termination will survive termination.

8.4. **Pre-Termination Claims.** In the event this Agreement terminates for any reason, Customer, at its option, may elect to have AdvancePCS continue to provide Services for up to 12 months with respect to Claims incurred but not reported as of the effective date of termination. AdvancePCS' compensation for these Services will be in accordance with the terms in effect as of the effective date of termination.

## 9.    NOTICES

All notices under this Agreement must be in writing, delivered in person, sent by certified mail, delivered by air courier, or transmitted by facsimile and confirmed in writing (by air courier or certified mail) to a party at the facsimile number and address shown in this Agreement. A party may notify the other party of any changes in the listed address or facsimile number in accordance with the provisions of this Section 9. The parties may also transmit notices electronically, when proper arrangements are made in advance to facilitate such communications and provide for their security and verification. All notices are effective upon receipt.

Notices to AdvancePCS must be addressed as follows:

Chief Executive Officer
AdvancePCS
5215 North O'Connor Boulevard, Suite 1600
Irving, Texas 75039
Fax No.: (469) 420-6109

And With A Copy To:

General Counsel
AdvancePCS Health, L.P.
9501 East Shea Boulevard
Scottsdale, AZ 85260-6719
Fax No.: (480) 314-8231

Notices to Customer must be addressed as follows:

Massachusetts State Carpenters
350 Fordom Road
Wilmington, MA 01887
Attn: James W. Buckley, Jr.
Fax No.: (617) 783-1836

MSC-6 3.doc (04/04/2002)                          10

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

10.   **MISCELLANEOUS**

10.1.  **Interpretation; Amendment; Counterparts.**  This Agreement (including exhibits, schedules, attachments, implementation documents, any addendum to this Agreement or such other documents AdvancePCS may require from time to time to implement Services, all collectively referred to as **"Implementation Documents"**) constitutes the entire understanding and obligation of the parties with respect to the Services and supersedes any prior agreements, writings, or understandings, whether oral or written. The headings in this Agreement are used only for convenience of reference and do not affect the meaning or interpretation of any provision.  The parties may amend this Agreement only through a properly executed writing authorized by both parties.  This Agreement may be executed in several counterparts, all of which taken together constitute a single agreement between the parties.

10.2.  **Binding Effect; Assignment.**  This Agreement is binding on the parties and their respective successors and permitted assigns.  Neither party may assign this Agreement, in whole or in part, without the prior written consent of the other (which consent will not be unreasonably withheld); except that AdvancePCS may assign this Agreement, in whole or in part, to any entity that controls, is controlled by, or is under common control with AdvancePCS, provided it gives Customer 30 days written notice of the assignment.

10.3.  **Independent Contractor; Third Parties.**  The parties to this Agreement are independent contractors, and have no other legal relationship under or in connection with this Agreement.  No term or provision of this Agreement is for the benefit of any person who is not a party hereto (including, without limitation, any Member or broker), and no such party will have any right or cause of action hereunder.

10.4.  **Waivers.**  Any failure by a party to comply with any covenant, agreement or condition herein or in any other agreements or instruments executed and delivered hereunder may be waived in writing by the party in whose favor such obligation or condition runs; except that failure to insist upon strict compliance with any such covenant, agreement or condition will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.5.  **Severability.**  In the event any term or provision of this Agreement is declared to be invalid or illegal for any reason, this Agreement will remain in full force and effect and will be interpreted as though such invalid or illegal provision were not a part of this Agreement.  The remaining provisions will be construed to preserve the intent and purpose of this Agreement and the parties will negotiate in good faith to modify any invalidated provisions to preserve each party's anticipated benefits.

10.6.  **Enforcement Costs.**  If either party institutes an action or proceeding to enforce any rights arising under this Agreement, the party prevailing in such action or proceeding will be paid all reasonable attorneys' fees and costs to enforce such rights by the other party, such fees and costs to be set by the court, not by a jury, and to be included in the judgment entered in such proceeding.

10.7.  **Authority.**  Each party represents and warrants that it has the necessary power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00036

10.8. **Governing Law.** This Agreement must be governed and construed in accordance with the laws of the Commonwealth of Massachusetts without regard to applicable conflicts of law rules.

## 11. DEFINITIONS

The following terms and phrases, when capitalized, have the meanings set forth below.

11.1. **"AdvancePCS"** shall mean the corporation AdvancePCS and any subsidiaries or affiliates thereof.

11.2. **"AWP"** means the average wholesale price of the drug dispensed as set forth in the latest edition of the First DataBank Blue Book (with supplements) or any other similar nationally recognized reference that AdvancePCS may select from time to time. The applicable AWP for Claims submitted by retail Network Providers is based on the average AWP for each drug.

11.3. **"Covered Items"** means the prescription drug benefits for which Members are eligible pursuant to Customer's drug benefit plan.

11.4. **"Change in Law"** means any (i) change in or adoption of any Law, (ii) change in the judicial or administrative interpretation of any Law, or (iii) change in the enforcement of any Law, occurring after the date Customer is implemented or the Effective Date, whichever is earlier.

11.5. **"Claims"** means those claims processed through the RECAP® System or otherwise transmitted or processed in accordance with the terms of this Agreement in connection with the Plan Design.

11.6. **"Law"** means any federal, state, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

11.7. **"Maximum Allowable Cost (MAC).** AdvancePCS will use one or more of its proprietary maximum allowable cost pricing schedules ("MAC Lists") to establish an upper limit reimbursement price for certain multiple-source drugs dispensed under the Plan without regard to the specific manufacturer whose product is dispensed. The MAC Lists shall include generic drugs based on their common substitution, bioequivalency rating, and general availability. Customer agrees to accept any one of AdvancePCS' MAC Lists, as amended from time to time in AdvancePCS' discretion, for the purpose of pricing drugs in connection with this Agreement. Customer acknowledges that certain of AdvancePCS' national provider networks may utilize one or more of AdvancePCS' MAC Lists.

11.8. **"Member"** means an individual that Customer has designated in writing (or by electronic, tape or other means approved by AdvancePCS) to AdvancePCS as eligible for Covered Items under the terms of the Plan Design.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00037

**11.9.** **"Network Provider"** means a provider which has agreed to provide certain pharmacy Services to Members in accordance with the terms of its agreement with AdvancePCS.

**11.10.** **"Plan Design"** means the processing parameters and other information concerning Customer's drug benefit plan, which Customer has disclosed to AdvancePCS pursuant to Section 3.1 of this Agreement, and which AdvancePCS will use to process Claims under this Agreement.

**11.11.** **"Rebate(s)"** means, for any period, all rebates, reimbursements, or other discounts received under a pharmaceutical manufacturer's discount program with respect to pharmaceutical products dispensed to a Member under the Plan Design for such period.

**11.12.** **"RECAP®"** or **"RECAP System"** means AdvancePCS' proprietary remote electronic claims adjudication process.

[This space intentionally left blank.]

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00038

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or agents as of the date first above written.

**MASSACHUSETTS STATE CARPENTERS**

**ADVANCEPCS HEALTH, L.P.**
By:   AdvancePCS Health Systems, LLC, its General Partner

By: _Thomas Harrington_

By: _David A. George_
David A. George

Title: _EST_

Title: ___President___

Date: _4-25-02_

Date: _6-28-02_

Legal
Pricing

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00039

*DESCRIPTION OF SERVICES*

Below is a listing of Services provided under the base administrative fee or available for an additional fee. The Services are subject to change, at AdvancePCS' discretion, as provided in the Agreement. Capitalized terms not defined herein will have the meanings used in the Agreement.

1.    **PHARMACY MANAGEMENT**

A.    **Network Providers.**  AdvancePCS has created a network of pharmacies (Network Providers) that Members will have access to, which have agreed to perform pharmacy Services for Members in accordance with the Plan Design and the terms of the Network Provider Agreement.  As provided for in the Network Provider Agreement, Network Providers may choose, in certain limited circumstances, not to perform pharmacy Services for Members under this Agreement; however, no Network Provider may serve only some Members or provide only certain drugs unless (i) such Network Provider does not provide such drugs to any Members, or (ii) such Network Provider deems the provisions of pharmacy Services to a given Member contrary to the Network Provider's professional judgment. AdvancePCS may provide Network Providers with Plan Design information in such format and media as AdvancePCS deems appropriate for the purpose of assisting such Network Providers in providing Covered Items to Members.

B.    **Retail Network Auditing.**  AdvancePCS will perform the following audits of retail Network Providers on behalf of Customer.   Customer will not have the right to independently audit Network Providers.

–    **Statistical Auditing.**  AdvancePCS will perform a periodic computerized analysis of those retail Network Providers handling a significant number of Claims which compares their Claims activity to the Claims activity of similar pharmacies. From this analysis, AdvancePCS will select pharmacies for, among other things, field audits.

–    **Field Auditing.**  Each year during the term of the Agreement, AdvancePCS will perform field audits of retail Network Providers selected by AdvancePCS, to examine a retail Network Provider's compliance with its retail Network Provider Agreement. Any additional audit by AdvancePCS of any pharmacies selected by Customer will be additional services subject to additional charges.

–    **Audit Discrepancies.**  To the extent AdvancePCS determines, as the result of its auditing procedures, that amounts have been overpaid to pharmacies for Claims submitted (**"Audit Discrepancies"**), AdvancePCS will make reasonable attempts to collect such Audit Discrepancies and any Audit Discrepancies so collected will be returned to Customer; provided, however, that AdvancePCS will retain 10% of such collected Audit Discrepancies to cover AdvancePCS' collection costs.  AdvancePCS will notify Customer of any audit discrepancy that is greater than $1,000 after AdvancePCS determines such audit discrepancy to be reasonably uncollectible by AdvancePCS.  AdvancePCS will not be required to institute litigation to collect any Audit Discrepancies. AdvancePCS' obligation to attempt collection will be AdvancePCS' sole obligation and liability with respect to remedying such Audit Discrepancies.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00040

C.    **Pharmacy Help Desk and Voice Response Unit.**  AdvancePCS will provide assistance to Network Providers through the RECAP Pharmacy Help Desk and AdvancePCS' voice response unit during those hours of operation established by AdvancePCS.

2.    **MEMBER SERVICE/TOLL FREE MEMBER SERVICES**

AdvancePCS will make available to Members a toll free number during those hours of operation established by AdvancePCS from time to time.  Staff will be available to answer Members' questions on Plan Design eligibility, Plan Design guidelines, deductible status and required copay levels, maximum benefit status, status of an identification card order, instructions for completing a Direct Claim (as defined in Section 4B below) form and status of Direct Claims.

3.    **ELIGIBILITY SERVICES**

A.    **Identification Cards.**  AdvancePCS will design one identification card layout and provide Customer with a proof of final design layout.  Customer will provide AdvancePCS with camera-ready artwork for the logo or logos that Customer wants to appear on the identification card.  All identification cards will include the AdvancePCS or RECAP name and logo.  For each Member, AdvancePCS will generate standard AdvancePCS cards in such final design.

B.    **Eligibility File.**  Based upon the information provided by Customer to AdvancePCS pursuant to Section 3.1, AdvancePCS will maintain an eligibility file identifying current Members and certain other information regarding such Members.

4.    **CLAIMS PROCESSING**

A.    **Provider Submitted Point of Sale ("POS") Claims.**  AdvancePCS will accept Claims submitted by Network Providers to AdvancePCS via the RECAP System (or as otherwise permitted under the Network Provider Agreement) and process such Claims in accordance with this Section 4A as follows:

-    AdvancePCS will enter into the RECAP System those portions of the Plan Design information as are necessary for AdvancePCS to perform automated Claims processing Services in accordance with this Agreement, including information regarding deductibles, copays, Member or Customer out-of-pocket maximums, benefit maximums and other features of the Plan Design to be used in processing Claims (collectively, **"Processing Parameters"**).

-    AdvancePCS will instruct Network Providers to transmit certain prescription, eligibility, and Plan Design information to AdvancePCS when the Member presents a Plan identification card, and if the RECAP System is unavailable, as soon as possible after the system becomes available.  If the RECAP System is unavailable, the Network Providers may submit the prescription at a later time and/or call the AdvancePCS RECAP Help Desk to verify eligibility.

-    AdvancePCS will perform RECAP System edits and transmit to such Network Provider the Claim status, the copay/coinsurance/deductible amount (if applicable), and any applicable DUR (as defined in Section 5A below) or other messages.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00041

- Customer acknowledges that Network Providers will collect from the Member at the point of sale the lesser of the applicable copay/coinsurance/deductible amount or the usual and customary price of that pharmacy.

- Certain drugs that become available on the market from time to time will be priced separately from, and thus not subject to the contracted rate for prescription Claims due to, among other things, specialized manufacturer processes, limited availability or extraordinary shipping requirements. Such drugs presently include biotechnology drugs, such as Betaseron and Avonex, compounds, and injectables. AdvancePCS will provide Customer with a list of such drugs, and their corresponding rates (which are generally no less than full AWP), upon request. Network Providers, subject to the exceptions previously set forth in Section 1-A of this Exhibit A, Description of Services, will dispense these drugs to Members unless Customer's Plan Design would otherwise exclude these drugs or Customer notifies AdvancePCS in writing of its objection.

B.    **Member Submitted Claims.** AdvancePCS will accept Claims submitted by Members directly to AdvancePCS when such Members submit Claims properly completed on AdvancePCS' standard paper claim form (**"Standard Claim Form"**) together with proof of payment. AdvancePCS will process such Claims (**"Direct"** or **"Paper"** Claims) as follows:

- Receive, microfilm and assign a sequential, unique document number to each Standard Claim Form;

- Data-enter the information from the Standard Claim Form;

- Perform the system edits described below to the extent information has been made available to AdvancePCS, except that DUR and provider validation edits will not be performed;

- Produce and mail: Explanation of Benefits ("EOBs") to Members for allowable claims, together with checks for the agreed upon reimbursement amounts; and

- Produce and mail: Requests for Information ("RFIs") for Claims that are rejected because they are ineligible for payment.

- Direct or Paper Claims which are not properly completed and require additional processing by AdvancePCS will be subject to the Preprocessed Direct Claims fee set forth in Exhibit B.

C.    **System Edits.** For Claims submitted, except as otherwise provided herein, AdvancePCS will perform the following claim edits or such other claim edits as AdvancePCS shall deem proper from time to time:

- Member Eligibility
- Ineligible Drug
- Duplicate Prescriptions
- Provider Validation
- Incorrect Price

MSC-6 3.doc (04/04/2002)                17

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

*EXHIBIT A*
*DESCRIPTION OF SERVICES*

- Plan Design Eligibility
- Missing/Invalid Data
- Managed Access® (if applicable)
- DUR (if applicable)
- Stale Date
- Claim Cost
- Excluded Drug

**D.**  **Taxes.** Customer will pay to AdvancePCS such tax amounts as submitted by pharmacies for Covered Items dispensed to Members.

**E.**  **Medicaid Processing.** Customer acknowledges that Medicaid agencies may submit Claims for, on behalf of and/or in the name of a Member and such Claims will be treated as any other Claims from Members; provided, however, that (i) the amount paid to such Medicaid agency will be the lesser of the amount invoiced by the agency or the amount AdvancePCS would have reimbursed a Member for such Claim in accordance with the Plan Design, and (ii) the Administrative Fee for processing Claims submitted by Medicaid agencies will be invoiced at the rate set forth in Exhibit B. Any amounts paid by AdvancePCS to Medicaid agencies will be deemed benefits under the Plan Design, and Customer will pay AdvancePCS for such amounts in accordance with Section 2.2 of the Agreement.

**5.**  **DRUG UTILIZATION REVIEW ("DUR")**

**A.**  **QUANTUM Alert® Services.** AdvancePCS will provide its QUANTUM Alert automated concurrent DUR Services for POS transactions. The QUANTUM Alert system currently includes edits relating to excessive utilization; drug-drug interactions; therapeutic duplications; insufficient drug doses; excessive drug doses; drug-age conflicts; drug-pregnancy advisories; drug-disease contraindications; late refills; and controlled substance issues.

If a POS transaction fails the excessive utilization edit, AdvancePCS will send to the pharmacist an on-line message indicating Claim denial and an "Excessive Utilization" alert.

In certain instances, a Claim that is denied for excessive utilization may actually represent appropriate drug therapy as determined by the applicable physician or pharmacist in his/her professional judgment. For example, the early refill may be necessary because of an increase in dose, change in prescribing instructions, etc. In these instances, the pharmacist will exercise his/her professional judgment to either (i) dispense the prescribed drugs and instruct the Member to submit a Direct Claim for reimbursement or (ii) call AdvancePCS and direct AdvancePCS to override the denial edit.

Clinical and quality of care issues detected by the other DUR edits do not affect Claim payment, but result in transmission of a warning or alert message transmitted at the time of dispensing to the pharmacist as part of the paid Claim response from AdvancePCS. Network Providers are directed to review the Quantum Alert messages as they are received and to use their professional judgment as to whether action is required.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00043

**B.**    **Retrospective DUR Services.**  AdvancePCS will provide to Customer AdvancePCS' retrospective DUR services, including RxReview® and Clinical Consulting.  Such services are designed to provide useful clinical information to physicians, and include written communications as well as personal visits with physicians by AdvancePCS' Clinical Specialists. These communications to physicians include summaries of current clinical studies, formulary recommendations, and may include patient profiles and targeted interventions. Customer has or will obtain any authorizations required by Law, and will make all disclosures required by Law, for AdvancePCS to perform the retrospective DUR services.

**C.**    **Rebate Related Services.**  To obtain Rebates from Manufacturers, AdvancePCS will provide, on behalf of Customer, AdvancePCS' Retrospective DUR Services as described in Section 5B. AdvancePCS also will make available its quarterly physician newsletter for distribution to physicians by Customer. At Customer's request, Customer's logo or other identification may be incorporated into the newsletters. If Customer adopts a Custom Formulary, Customer will be responsible for distributing these newsletters, and completing and returning to AdvancePCS a Verification of Distribution form, which may be required by certain Manufacturers as a condition of paying Rebates. If Customer adopts AdvancePCS' National Formulary, AdvancePCS will be responsible for the distribution of these newsletters to physicians, and to provide Manufacturers with verification of such distribution, as may be necessary.

In addition to these Services, AdvancePCS may propose other interventions that are designed to increase Rebates and/or reduce the costs of Covered Items under this Agreement. Customer may decline to allow such interventions, but AdvancePCS will not be responsible for any loss of economic benefit that results from the failure to implement the proposed interventions.  Nor will AdvancePCS be liable if any Manufacturer refuses to pay Rebates as a result of Customer's failure to distribute physician newsletters or other communications recommended by AdvancePCS, or Customer's failure to complete and return to AdvancePCS a Verification of Distribution form.

**D.**    **Limitations.** The information generated in connection with DUR Services is intended as an economical supplement to, and not a substitute for, the knowledge, expertise, skill, and judgment of physicians, pharmacists, or other health care providers in patient care. Providers are individually responsible for acting or not acting upon information generated and transmitted through the DUR Services, and for performing Services in each jurisdiction consistent with the scope of their licenses. Except as set forth in Section 5B above, in performing DUR Services, AdvancePCS will not, and is not required by this Agreement to deny Claims or require physician, pharmacist or patient compliance with any norm or suggested drug regimen, or in any way substitute AdvancePCS' judgment for the professional judgment or responsibility of the physician or pharmacist.

AdvancePCS' DUR Services are highly automated.  Any focused professional review would also be based upon automated analysis of Member's profiles. Therefore, the DUR Services are necessarily limited by the amount and type of patient information available to AdvancePCS.   Meaningful patient information which may not be available to AdvancePCS includes, but is not limited to, patient diagnoses, utilization of drugs obtained without utilizing the RECAP System or otherwise not included in the patients'

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00044

profile or Claim data. AdvancePCS will have no obligation to acquire information concerning any patient beyond the information that is included in Customer's eligibility records or the Claim data submitted by Network Providers in connection with the Plan.

AdvancePCS will update DUR databases on a reasonable basis to reflect changes in available standards for pharmaceutical prescribing; provided, however, no database will contain all currently available information on accepted medical practice or prescribing practices.

6.    **PERFORMANCE RX® PROGRAM**

Under AdvancePCS' Performance Rx® prescription management program, AdvancePCS and the Network Providers will work together to encourage the use of Preferred Drugs by (i) identifying appropriate opportunities for converting a prescription from a non-Preferred Drug to a Preferred Drug, and (ii) contacting the Member and the prescriber to request that the prescription be changed to the Preferred Drug. A Preferred Drug is one on the Performance Drug List, which has been developed by AdvancePCS as a clinically appropriate and economically advantageous subset of the AdvancePCS clinical formulary, as revised by AdvancePCS from time to time.

7.    **MANAGED ACCESS® MANAGED DRUG LIMITATIONS**

A.    **Rejection of Claims Requiring Prior Authorization.** Under AdvancePCS' Managed Access program, for those drug/Member situations, which are identified as requiring a coverage override, AdvancePCS will reject all Claims submitted unless a Managed Access record has been entered into AdvancePCS' system. The Managed Access record will allow for overrides of:

–    Plan Design parameters
–    Drugs requiring prior authorization

B.    **Limitation of Dispensing to Specific Providers.** Under AdvancePCS Managed Access program, for those drug/Member situations that are identified as requiring an access limitation, AdvancePCS will authorize only those Claims submitted by specified providers for which a Managed Access record has been entered into AdvancePCS' system.

The Managed Access record will allow for lock-ins to:

–    A specific physician
–    A specific pharmacy
–    A specific chain

The Managed Access record will allow for lock-ins to these specific providers for:

–    All drugs
–    Drugs at:
    –    The GC (Generic Class Number)
    –    The UC (Uniform System of Classification)
    –    The ND (National Drug Code)
    –    The LS (Legal Structure)

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00045

**C.**   **Managed Access/Record.** Customer will notify AdvancePCS of Members for whom an authorization has been made by completing a Managed Access enrollment form.  Upon the establishment of prior authorization record for a Member and payment of applicable fees, future Claims for that Member and the specified drug or drug class, as the case may be, will be processed and paid until the expiration of the authorization record.

**D.**   **Managed Drug Limitations.**   Under AdvancePCS' Managed Drug Limitations ("MDL") program, limitations on drug coverage may be established for categories of drugs, which are otherwise included in the Plan Design or are included subject to coverage override, as described above.  Claims for these drugs will be rejected if dispensing the drugs would cause any applicable MDL to be exceeded.  MDLs may be established by various criteria, including specified time periods, accumulations, and/or Claims types.

**E.**   **Limitation on Services.** Customer acknowledges that AdvancePCS' Managed Access and Managed Drug Limitations programs are automated non-discretionary processing techniques intended to provide better management of Customer's drug benefits based on objective criteria and the limited amount of patient information available to AdvancePCS.   AdvancePCS will not undertake, and is not required hereunder, to determine medical necessity, appropriateness of therapies, to make diagnoses or substitute AdvancePCS' judgment for the professional judgment and responsibility of the physician.  Any action taken by AdvancePCS authorizing or denying Claims for those drugs requiring coverage override will be pursuant to written instructions received from Customers.

**8.   PRIOR AUTHORIZATION/FORMULARY EXCEPTION ("PA/FE")**

AdvancePCS agrees to provide Customer with a form of prospective drug utilization review known as the PA/FE Program.  AdvancePCS will supply a list of suggested criteria for review, modification and/or adoption by Customer.  Customer will have final approval over the criteria to be utilized, which will be evidenced by a writing signed by Customer.  AdvancePCS will administer the criteria as approved by Customer.  If Customer does not wish to accept the proposed changes to the PA criteria, Customer agrees to notify AdvancePCS in writing within ten (10) business days and may terminate this Agreement, pursuant to Section 8.2.2 of this Agreement or adopt the customized criteria for a mutually agreed upon fee.  Customer shall be deemed to have approved any proposed changes to the criteria unless it notifies AdvancePCS in writing of its objection.

AdvancePCS will accept PA/FE requests from physicians and will approve or deny such requests in accordance with the PA/FE criteria approved by Customer.  AdvancePCS will make clinical pharmacists available to provide professional support to the PA/FE unit as AdvancePCS determines necessary to evaluate PA/FE requests and clarify Customer's PA/FE criteria. AdvancePCS' PA/FE unit will notify the physician who submitted the PA/FE request of the coverage determination for such request.

Approvals will be entered in the appropriate AdvancePCS claim management system. AdvancePCS' clinical pharmacists will review denials on a regular basis, to assist Customer in determining whether PA/FE criteria and/or processes warrant modification.  Denial reports will be furnished to Customer upon request for decisions regarding updates to PA/FE criteria.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00046

*DESCRIPTION OF SERVICES*

Reports of approvals and denials will be produced on a quarterly basis and included in quarterly reporting to Customer.

9.    **MAC SELECTION**

Customer may choose from among various options for the administration of Customer's MAC program. Depending upon the option selected, Customer may specify whether or not the Member will pay the difference in cost (in addition to any applicable copayment) when the Member request to have a brand dispensed when a generic equivalent in available. Customer may also specify whether Customer or the Member will pay the difference in cost when a brand is dispensed because the prescribing physician has indicated "dispense as written".

10.    **MANAGEMENT REPORTING**

A.    **Standard Management Reports.**    AdvancePCS will provide Customer with AdvancePCS' standard management reports in connection with the Services provided hereunder, which reports may change from time to time at AdvancePCS' discretion. Customer may elect to receive some or all of the standard management reports made available by AdvancePCS.

B.    **On-Line Data Reporting/Editing.**    AdvancePCS will make available to Customer AdvancePCS' Client On-Line Inquiry System, pursuant to which Customer will have on-line access to inquire, update Plan Design information, and, if applicable, input Claims. Customer is responsible for providing any hardware necessary for access to the Client On-Line Inquiry System and for paying all fees for telecommunication access.

Customer agrees that AdvancePCS may rely on information entered into the Client On-Line Inquiry System through the use of a Log-On ID. Customer further agrees to indemnify AdvancePCS for, from and against any and all costs, losses or damage that arise, or are alleged to arise, (i) as a result of such reliance by AdvancePCS or (ii) out of Customer's use of the Client On-Line Inquiry System.

Customer will comply with all rules AdvancePCS establishes from time to time in connection with the On-Line Services and sign any addendum required by AdvancePCS for the use of such Services. Direct or Paper Claims submitted On-Line will be subject to the Paper Claim Direct Submission fee set forth in Exhibit B.

11.    **FORMULARY SERVICE**

Upon request from Customer, AdvancePCS will perform the following Services (the "**Formulary Services**") for the fees set forth on Exhibit B attached hereto.

A.    **Establishment of Formulary.**    AdvancePCS will work with Customer to effect the adoption, distribution and implementation of a drug formulary based on the AdvancePCS formulary (the "**Formulary**"). AdvancePCS and Customer will use diligent efforts to ensure the prompt adoption and distribution of the Formulary. Charges for AdvancePCS' production and distribution or shipping of Formulary are set forth in Exhibit A.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00047

EXHIBIT A
*DESCRIPTION OF SERVICES*

    –    **AdvancePCS' Clinical Formulary and Prescribing Guidelines ("National Formulary").** For customers adopting AdvancePCS' National Formulary as the Formulary, AdvancePCS will distribute each edition of the Formulary and updates to its providers.

    –    **Custom Formulary.** For customers utilizing a custom formulary, AdvancePCS will ship the custom formularies to Customer. Customer will use diligent, good faith efforts to ensure the prompt distribution of the formulary and updates to its chosen providers. The cost of postage and distribution of the formulary and any subsequent updates thereto or reports hereunder, to Customer's chosen providers, will be borne by Customer. If Customer fails to distribute such formulary updates in a timely manner, Customer will be liable to AdvancePCS for any loss of Rebates and will hold AdvancePCS harmless for, from and against the same.

**B.**    **Updating of Formulary.** AdvancePCS will work with Customer to provide for the annual review, updating, and distribution of the Formulary, to address changes to the Formulary made desirable by changes in the pharmaceutical industry, new legislation and regulations, the experience of Customer and its providers with the Formulary, current medical literature and new recommendations developed by AdvancePCS based on its research and experience.

**C.**    **Rebate Related Utilization Review.** To obtain Rebates from Manufacturers, AdvancePCS will perform on behalf of Customer, AdvancePCS' Retrospective DUR program as described in Section 5C.

    In addition to the Retrospective DUR Program, AdvancePCS may propose other interventions from time to time which are designed to increase Rebates and/or reduce the costs of Covered Items under this Agreement. Customer may decline to allow such interventions, but in such event AdvancePCS will not be responsible for any loss of economic benefit which results from the failure to implement the proposed interventions.

**D.**    **Rebate Contracts.** AdvancePCS will attempt to contract with certain Manufacturers for Rebate programs. Customer acknowledges that whether and to what extent Manufacturers are willing to provide Rebates to Customers will depend upon the Plan Design adopted by Customer, and other aspects of Customer's Plan Design, as well as AdvancePCS receiving sufficient information regarding each Claim submitted to Manufacturers for Rebates.

**E.**    **Other Rebate Arrangements.** With respect to Members covered under this Agreement, Customer will not participate in any other formulary or similar discount program (including any such program which may be available through a mail order pharmacy designated by Customer) during the term of the Agreement and will not itself create any formulary during the term of the Agreement. Also, with respect to such Members, Customer agrees not to enter into any direct or indirect contracts with pharmaceutical Manufacturers for discounts during the term of the Agreement or any extension thereof. Nothing in this section will prohibit Customer from entering into arrangements with other pharmaceutical management companies offering formulary Services after the term of the Agreement.

**F.**    **Rebates.**

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00048

- On behalf of Customer, AdvancePCS will receive the Rebates paid by Manufacturers to Customer. AdvancePCS will make payments of such Rebates once each calendar quarter as follows: within 60 days of the beginning of each quarter, AdvancePCS will pay to Customer all Rebates received by AdvancePCS during the prior quarter, if any, net of the fees retained by AdvancePCS pursuant to Section 2.

- Along with each payment of Rebates, AdvancePCS will provide a report to Customer that includes the Manufacturer's name, the number of prescriptions and/or amount of dollar purchases for each Manufacturer, and the total amount of Rebates paid by each Manufacturer.

- Upon reasonable prior written notice, AdvancePCS agrees that an independent third party, at Customer's expense, will have the right, subject to reasonable business limitations, to audit volume discount contracts from Manufacturers from time to time, provided that Customer will give AdvancePCS adequate assurance, which may include at AdvancePCS' option the signing of a confidentiality agreement by Customer and the independent third party, that Customer and such third party will hold in confidence any information obtained through the audit. AdvancePCS will make the contracts available for such auditing purposes at its offices during normal hours of operation.

- As consideration for the Formulary, the negotiation, collection and distribution of Rebates and other Services provided by AdvancePCS under this Agreement, Customer will pay to AdvancePCS a fee in an amount equal to the percentage set forth in Exhibit B multiplied by the Rebates collected by AdvancePCS in connection with this Agreement. In lieu of billing Customer for the fees provided for in this section, AdvancePCS may retain those amounts from any Rebates collected by AdvancePCS on behalf of Customer in connection with this Agreement.

12. **PERFORMANCE MAIL OR OTHER STANDARD ADVANCEPCS MAIL PROGRAM**

Services. AdvancePCS will provide to Customer AdvancePCS' Performance Mail Program or other standard AdvancePCS Mail Program that includes mail order pharmacy Services which are provided by AdvancePCS Mail. AdvancePCS may make changes to such program from time to time so long as such changes do not materially alter any of the provisions of this document.

AdvancePCS will provide to Customer, and Customer will distribute to Members, program start-up kits which explain to Members how to use the program, and such other materials as Members will require to begin using the program.

AdvancePCS Mail will receive prescriptions from Members via the U.S. mail or commercial carrier at an address(es) specified by AdvancePCS from time to time. Subject to and in accordance with the Plan Design and applicable Law, AdvancePCS Mail will dispense Covered Drugs in accordance with those prescriptions and mail the Covered Drugs to Members at addresses designated by such Members, so long as such addresses are located in the United States.

AdvancePCS Mail will provide to Members toll-free telephone access to a pharmacist and

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00049

customer service representative. Access to a pharmacist pursuant to the foregoing will be available to Members twenty-four (24) hours per day, seven (7) days per week. The fee for this toll-free telephone access is included in the base fee for AdvancePCS Mail Service, when applicable.

For Covered Items provided by AdvancePCS through the AdvancePCS Performance Mail Program or other standard AdvancePCS Mail Program, Customer will pay to AdvancePCS the amount set forth on Exhibit B hereto. Certain drugs that become available on the market from time to time will not be subject to the contracted rate for prescription Claims due to, among other things, specialized manufacturer processes, limited availability or extraordinary shipping requirements and may not be available through AdvancePCS Mail. Such drugs presently include biotechnology drugs such as Betaseron and Avonex and compounds. AdvancePCS will provide Customer with a list of such drugs, and their corresponding rates (which are generally no less than full AWP), upon request. AdvancePCS Mail will dispense these drugs to Members unless Customer's Plan Design would otherwise exclude these drugs or Customer notifies AdvancePCS in writing.

Customer acknowledges that AdvancePCS Mail may from time to time engage in therapeutic interchanges in accordance with applicable Law.

AdvancePCS Mail will dispense drugs even if the prescription is not accompanied by the correct copay/deductible/coinsurance amount and Customer will be liable to AdvancePCS for such amounts if reasonable collection efforts by AdvancePCS fail.

**13. OTHER ADDITIONAL SERVICES**

Upon request from Customer, AdvancePCS will perform the following Services for the fees set forth on Exhibit B attached hereto.

A. **Paper Eligibility Submission.** AdvancePCS will maintain eligibility information regarding Members submitted by Customer in a manual form (other than tape or telecommunication) from time to time.

B. **Decentralized Administration.** AdvancePCS will provide Customer with client service support to more than one Customer contact or location.

C. **Claim Detail Report via Paper.** AdvancePCS will provide Customer with a printout of AdvancePCS' standard Claims Detail Report.

D. **Card Reissuance.** AdvancePCS will reissue cards for Members upon request. If cards are reissued, Customer will pay the fee set forth in Exhibit B.

E. **CAT/BAT.** AdvancePCS will provide Customer with detailed Claim and/or administrative billing information through AdvancePCS' standard claims activity transmission or tape ("CAT") and/or AdvancePCS' standard billing activity transmission or tape ("BAT"). Charge for recreated/historic tapes will be quoted upon request.

F. **Custom CAT/BAT.** If Customer requests a custom CAT/BAT, AdvancePCS will charge Customer the standard hourly rate set forth in Exhibit B for such custom CAT/BAT.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00050

*EXHIBIT A*
*DESCRIPTION OF SERVICES*

**G.**   **Case Set-Up.** Customer may submit a written request to establish one or more new groups under Customer's Plan Design. Customer will pay AdvancePCS the Case Set-Up fee for each new group that AdvancePCS establishes for Customer.

**H.**   **Carrier/Group Rebate Reports on Tape.** AdvancePCS will provide Customer with a detailed Carrier/Group Rebate tape through AdvancePCS' standard Carrier/Group layout.

**I.**   **Customer-Specific Programming.** If Customer will request Services or changes to Services that require customized programming or systems work, AdvancePCS will attempt to estimate to Customer the time and cost for completion of such work. If Customer authorizes AdvancePCS to perform such work, Customer will pay AdvancePCS the cost of performing such work at the programming rate set forth on Exhibit B.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00051

*EXHIBIT B*
*ADMINISTRATIVE FEES*

**Massachusetts State Carpenters**
**Effective April 1, 2001**

As consideration for the Services selected by Customer pursuant to the Implementation Documents and described in Exhibit A, Customer will pay to AdvancePCS the fees set forth below:

| | | |
|---|---|---|
| Base Services - Per Paid POS Claim | | $0.19[1] |
| | Performance or other standard AdvancePCS Mail Program | $0.00[1] |

Retail Claim Rates[2]
Brand:     AWP-15% + $2.00 dispensing fee
Generic:   AWP-15% + $2.25 dispensing fee or MAC + $2.25 dispensing fee, whichever is applicable

Mail Service Claim Rates
Brand:     AWP- 18% + $0.00 dispensing fee
Generic:   AWP- 40% + $0.00 dispensing fee

Member Submitted Claim Rates (Unless specified otherwise in Implementation Documents)
Brand:     AWP-15% + $2.50 dispensing fee
Generic:   AWP-15% + $2.50 dispensing fee or MAC, whichever is applicable

| Additional Services | | Fee |
|---|---|---|
| Section 2 | - Member Service/Toll Free Member Services | $.13/Claim[3] |
| Section 4B | - Paper Claim Direct Submission | $1.50/Claim |
| Section 4B | - Preprocessed Direct Claims | $2.50/Claim |
| Section 4E - | Medicaid Claim tape submission | $1.50/Claim |
| | Medicaid Claim paper submission | $2.50/Claim |
| Section 7 | - Managed Access/Managed Drug Limitations | $2.50 Per Authorization[4] |
| Section 8 | - Prior Authorization/Formulary Exception (PA/FE) | $30.00/Request[5] |
| Section 10B | - Paper Claim Direct Submission (on-line) | $.80/Claim |
| Section 11A - | Production, Postage, and Distribution Costs for Formulary Booklets and Physician Newsletters | Included in Base |
| Section 11F | - AdvancePCS' Rebate Percentage | Anything over $1.15[6] |
| Section 12 | - Mail Service Claims | See above |
| Section 13A | - Paper Eligibility Submission | $.02/Claim |
| Section 13B | - Decentralized Administration | $.02/Claim |
| Section 13C | - Claim Detail Report via Paper | $.02/Claim |
| Section 13D | - Card Reissuance | $.50/Card |
| Section 13F | - Custom CAT/BAT Tapes | Subject to Customer Specific Programming charge |
| Section 13G | - Case Set-Up | $20.00/Group |
| Section 13H | - Carrier/Group Rebate Reports on Tape | $100.00/Each |
| Section 13I | - Customer Specific Programming | $110.00/Hour |

Note: Charges not identified above will be quoted upon request.

Finance Charges: Invoices are assessed finance charges at the rate of 1.5% per month on the amounts not paid within terms of the Agreement.

**[Continued on Next Page]**

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00052

**Additional Payment Terms:**

1. New Base Administrative Fee to be effective January 1, 2001.

2. The retail rates represent the overall network rates delivered for groups with plan designs that do not require hardcoding.

3. If Customer utilizes AdvancePCS Mail and Retail services, this $.13 fee will not apply.

4. If Managed Access record is entered by Customer "on-line", this $2.50 fee will not apply.

5. AdvancePCS will provide the first 200 requests for Prior Authorization at no charge to the client. Upon completion of the first 200 requests, AdvancePCS will charge Customer $30.00 per request as set forth above.

6. **Rebate Guarantee:** AdvancePCS guarantees that Customer's share of Rebates shall be one dollar and fifteen cents ($1.15) per paid Retail and Mail Claim (the "Guaranteed Rebate Amount"). In the event that Rebates collected are less than the Guaranteed Rebate Amount, AdvancePCS shall pay to Customer the amount of any deficiency; provided, however, that if at any time during the term of this Agreement, AdvancePCS' ability to collect Rebates under its Rebate contracts with Manufacturers, either currently in existence or entered into after the date of this Agreement, is materially adversely impacted by legislative, regulatory, judicial action, or a change in drug industry practice, AdvancePCS shall be released from its obligation to pay the Guaranteed Rebate Amount hereunder and shall be required to pay Customer only Customer's share of the actual Rebates collected. This Rebate guarantee will be in effect for the period beginning April 1, 2001, and ending March 31, 2002, and is contingent upon Customer's acceptance of and continued participation in AdvancePCS Mail with Customer's current Plan design parameters. For subsequent years, any Rebate guarantee will be determined by annual negotiation by the parties of a mutually acceptable Guaranteed Rebate Amount based on projected market estimates.

All prices are contingent upon Customer's current Plan design, full adoption of AdvancePCS' Performance Drug List, and formulary management and intervention programs, as well as representations made by Customer regarding Member enrollment and utilization of pharmacy services.

Customer is in all events responsible for any postage costs or other mailing and handling-related costs (including, without limitation, mailing charges associated with Explanation of Benefits or Requests for Information) incurred by AdvancePCS in connection with the provision of Services or additional services.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00053

EXHIBIT C

*PERFORMANCE STANDARDS*

<u>Definitions and Limitations Applicable to the Performance Standard</u>

The proposed performance standards are subject to the definitions and limitations set forth in Definitions and Limitations descriptions below.

**Definitions:**

For purposes of the performance standards herein, (i) *Agreement* shall mean that certain agreement between a given Customer and AdvancePCS regarding the provision of pharmacy benefit management services, (ii) *Business Day* shall mean AdvancePCS' Normal Business Hours on any day other than (x) a Saturday or Sunday or (y) a day on which AdvancePCS' Scottsdale Location is closed for general business purposes, (iii) a *Force Majeure Event* shall mean an event that prevents AdvancePCS from satisfying a performance standard, in whole or in part, as a result of causes beyond AdvancePCS' reasonable control including, without limitation, acts of God, war, civil disturbance, court order, governmental intervention, Change in Law, nonperformance by Customer's or any third party , failures or fluctuations in electrical power, heat, light, air conditioning or telecommunications equipment, (iv) *Minneapolis Location* shall mean 5701 Green Valley Drive, Minneapolis, Minnesota 55437 or such address that AdvancePCS may notify Customer from time to time, (v) *Normal Business Hours* shall mean 7:00 a.m. Scottsdale, Arizona time through 5:00 p.m. Scottsdale, Arizona time on any given Business Day, which hours may change from time to time in AdvancePCS' discretion and (vi) *Scottsdale Location* shall mean 9501 East Shea Boulevard, Scottsdale, Arizona 85260.

**Limitations:**

AdvancePCS shall diligently attempt to maintain its performance at the levels represented herein; <u>provided, however</u>, that failure to achieve or maintain the levels set forth herein shall not constitute a default for purposes of the termination provisions set forth in the Agreement. The proposed performance standards will be equitably adjusted by the parties to the extent AdvancePCS has suffered a Force Majeure Event during the applicable measurement period.

AdvancePCS shall not be liable to Customer for any failure to satisfy a performance standard during any time that there was no agreement between AdvancePCS and Customer even if a subsequent written agreement between the parties provides that the effective date of the Agreement is prior to the time that such written agreement was actually executed by the parties.

Notwithstanding AdvancePCS' failure to satisfy a performance standard that is measured on an *all AdvancePCS customer* basis, AdvancePCS shall be deemed to have satisfied a performance standard with respect to Customer if it satisfies such standard with respect to Customer only.

AdvancePCS' obligations to meet the performance standards herein are subject to the terms and conditions set forth in the Agreement, and in the event of any conflict between the terms hereof and the terms of the Agreement, the terms of the Agreement shall control and govern the obligations of the parties with respect to such matters.

The maximum amount of penalties that AdvancePCS shall have at risk for any plan year shall be 30% of the total administrative fees for such plan year. The total amount at risk shall be allocated equally among the performance standards. AdvancePCS shall have no liability for any penalty which is asserted by Customer or any third party for AdvancePCS' failure to meet a performance standard more than one (1) year after the end of the relevant measurement period. For purposes of this Exhibit C, Administrative

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00054

EXHIBIT C
PERFORMANCE STANDARDS

Fees shall mean the Base Fee as listed in Exhibit B. Charges for additional services selected shall not be included in the calculation of penalties.

If AdvancePCS fails to meet the proposed standards, the penalties described herein shall be the sole and exclusive remedy available to Customer for such failure. To the extent permitted by law, any statutory remedies that are inconsistent with the provisions hereof are waived. If any period covered by the Agreement is less than the period covered by the proposed performance standard, and AdvancePCS has not met such performance standard for such period, the penalty associated with such failure shall be prorated to reflect the actual period during which the Agreement was in effect. If requested, AdvancePCS will submit a measurement report to Customer within ninety (90) days after the end of the calendar year. If financial penalties are involved, payment must be requested by Customer in writing within ninety (90) days of receiving the end of year performance guarantee report, and AdvancePCS will make reasonable efforts to pay within ninety (90) days thereafter.

Unless otherwise indicated with respect to a specific performance standard, AdvancePCS' satisfaction of the proposed performance standards shall be (i) monitored internally by AdvancePCS on a monthly basis for all of AdvancePCS' customers in the aggregate which are on the same computer system platform as Customer, (ii) measured by AdvancePCS on a calendar year basis for all of AdvancePCS' customers in the aggregate which are on the same computer system platform as Customer and (iii) reported to customers annually upon customers' prior written request.

## SERVICE OPERATIONS

1. **Member Services.** For customers that elect AdvancePCS' Member Services, telephone inquiries made during Member Services hours from plan members will be answered, on average, in thirty (30) seconds or less by either a representative or an Interactive Voice Response. No more than two percent (2%) of all telephone inquiries during these hours will be abandoned by plan members. Additionally, no more than two percent (2%) of all telephone inquiries during these hours from plan members will be blocked due to AdvancePCS' failure to maintain its system. For purposes of this standard, telephone inquiries shall be deemed abandoned if plan members terminate the call prior to being connected to either a representative or an Interactive Voice Response. Telephone inquiries shall be deemed blocked if plan members are not able to connect to a representative or an Interactive Voice Response.

2. **Member Satisfaction Survey.** Customer satisfaction surveys shall be conducted annually among a random sample of AdvancePCS' entire base of clients, prescription drug benefit participants and participating pharmacists who have contacted an AdvancePCS call center during the survey period. Based upon the respondents' experiences with AdvancePCS call centers, combined overall satisfaction ratings of at least 90% shall be guaranteed.

   Surveys shall be conducted by independent market research firms specializing in customer satisfaction issues. AdvancePCS shall be responsible for selection of vendors, survey design, and all costs associated with conducting the surveys.

## IMPLEMENTATION

3. **Implementation.** AdvancePCS will implement customers on its system as of the effective date of the Agreement provided that AdvancePCS receives, within the time frames reasonably requested

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00055

*EXHIBIT C*
*PERFORMANCE STANDARDS*

by AdvancePCS, complete and accurate implementation information from its customers, including, without limitation, any documents signed by its customers that AdvancePCS may reasonably request.

## ADVANCEPCS MAIL SERVICE

4. **AdvancePCS Mail Service Shipping; Clean. Prescriptions.** Ninety-five percent (95%) of all pharmacist-approved Clean Prescriptions (non-Exception Prescriptions) will be shipped within two (2) Business Days after the Business Day such prescription is received. Exception Prescriptions may include, among other things, follow up activities related to drug utilization review issues, and calls to prescribers to clarify or question a prescription order or request approval for a generic substitution or a therapeutic interchange.

5. **AdvancePCS Mail Service Shipping, Exception Prescriptions.** Ninety-five percent (95%) of all pharmacist-approved Exception Prescriptions will be shipped within five (5) Business Days after the Business Day such prescription is received. Exception Prescriptions may include, among other things, follow up activities related to drug utilization review issues, and calls to prescribers to clarify or question a prescription order or request approval for a generic substitution or a therapeutic interchange.

6. **AdvancePCS Mail Service Prescription Accuracy Rate.** The accuracy rate for all mail order prescriptions dispensed to plan members will be at least ninety-nine and ninety-five one-hundredths of a percent (99.95%). Notwithstanding the foregoing, an error will not include immaterial matters such as generic substitution not addressed, incorrect spelling of a plan member's name on label, or incorrect spelling of a physician's name. An error will be deemed to include incorrect patient, inappropriate directions, incorrect strength or incorrect medication in the container.

## ENROLLMENT

7. **Tape, Cartridge, Diskette, Telecom, Positive File**

   Eligibility information submitted to AdvancePCS by its customers in a machine-readable form via a 3420 tape reel, 3480 or 3490 cartridge, or diskette, for the purpose of maintaining the eligibility file will become effective, on average, within two (2) Business Days following the Business Day that AdvancePCS has received complete and accurate information from its customers.

   Eligibility information submitted to AdvancePCS by its customers in a machine readable form via telecommunications prior to 1:00 p.m. Scottsdale, Arizona time for the purpose of maintaining the eligibility file will become effective, on average, within two (2) Business Days (which two (2) Business Days shall include the Business Day that such eligibility information is submitted by its customers) after receipt of complete and accurate information by AdvancePCS. For eligibility information submitted in a machine-readable form via telecommunications after 1:00 p.m. Scottsdale, Arizona time on a given Business Day, such eligibility information will become effective, on average, within two (2) Business Days following the Business Day that AdvancePCS has received complete and accurate information from its customers.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00056

EXHIBIT C
PERFORMANCE STANDARDS

With respect to eligibility counts of four hundred thousand (400,000) or less, AdvancePCS will compare, if requested, customers' eligibility information as represented in AdvancePCS' database against a submission of customers' entire eligibility file. Such comparison will be completed and any required changes implemented, on average, within two (2) Business Days following the Business Day that AdvancePCS has received complete and accurate information in a machine-readable form from its customers. If the eligibility count is (400,001) or more, AdvancePCS will schedule and perform the compare of customers' eligibility information during non-peak system hours. Such comparison will be completed and any required changes implemented, on average, within four (4) Business Days following the Business Day that AdvancePCS has received complete and accurate information in a machine-readable form from its customers.

AdvancePCS will be excused from its obligation to meet this standard with respect to any submission of eligibility information which (i) is not submitted in a format mutually agreed to by the parties, (ii) is not readable, in whole or in part, due to circumstances beyond the control of AdvancePCS or (iii) includes incomplete, inaccurate or other information which causes questions to arise with respect to the submission.

## PHARMACY

8.  **Pharmacy Audits.** Each calendar year AdvancePCS will perform field audits of not less than four percent (4%) of the pharmacies that have entered into a provider agreement with AdvancePCS (Advance*PCS Pharmacies*). AdvancePCS will determine the aggregate number of AdvancePCS Pharmacies on January 1 of the calendar year to be measured; such number will only include AdvancePCS Pharmacies that submitted claims for reimbursement to AdvancePCS in December of the preceding calendar year. Such audits will be in accordance with AdvancePCS' current standard targeting and auditing processes, the terms of the Agreement, and the terms of the provider agreement.

## NETWORK UTILIZATION MANAGEMENT

9.  **Concurrent DUR Savings.** AdvancePCS guarantees that Customer's savings as a result of The Concurrent DUR program (Quantum Alert®) will be no less than 2% of Customer's drug spend based on the Quantum Alert DUR Cost Savings Report. This guarantee is contingent upon Customer's continuation of PCS' Concurrent DUR program (Quantum Alert®). In the event that the savings achieved are less than 2%, the penalty will be the resulting deficiency.

    This guarantee shall be (i) monitored by AdvancePCS quarterly on a Customer-specific basis; and (ii) reported and reconciled to Customer annually upon Customer's written request.

## CLAIMS PROCESSING

10. **Standard Electronic Claims Processing.** One hundred percent (100%) of the claims submitted electronically through the RECAP® system will be priced in accordance with customers' plan guidelines as entered into the RECAP system.

## CARD PRODUCTION

11. **Card Production.** In connection with eligibility updates to bulk and general purpose orders under seven thousand five hundred (7,500) cards, and individual mail orders under three thousand (3,000) cards, AdvancePCS will produce identification cards and deposit such cards in the United States

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00057

*EXHIBIT C*
*PERFORMANCE STANDARDS*

mail, or with another nationally recognized carrier, within, on average, three (3) Business Days following the Business Day that AdvancePCS has received complete and accurate eligibility updates information from its customers and such information has been inputted or updated in AdvancePCS system.

The applicable performance period shall not commence until customers have (i) provided AdvancePCS with the appropriate member addresses and mailing supplies, and (ii) approved the cardstock to be used by AdvancePCS. For purposes of this standard, a bulk order involves mailing identification cards to customers, a general purpose order involves mailing identification cards to customers' groups, and an individual mail order involves mailing identification cards to individual plan members.

AdvancePCS will be excused from its obligation to meet this standard with respect to any identification cards if the corresponding eligibility information (i) is not submitted in a format mutually agreed to by the parties, (ii) is not readable, in whole or in part, due to circumstances beyond the control of AdvancePCS or (iii) includes incomplete, inaccurate or other information which causes questions to arise with respect to the corresponding eligibility information.

## STANDARD REPORTING

12. **Standard Customer Reporting**. AdvancePCS will mail Customer its standard cycle reports, on average, within fifteen (15) Business Days following the last Business Day of each of AdvancePCS' standard claims processing cycles. AdvancePCS will mail Customer its standard month end reports, on average, within (15) Business Days following the close of the first standard claims processing cycle of the following month. For purposes of these standards, AdvancePCS shall be deemed to have satisfied this standard if AdvancePCS deposits such reports, addressed to Customer, into the United States mail or with another nationally recognized carrier within the applicable time period.

This document contains proprietary information of AdvancePCS, and may not be used for any purpose other than to evaluate entering into a relationship with AdvancePCS, nor may it be duplicated or disclosed to others for any purpose.

CARP-00058

# Exhibit O

**EXECUTION COPY**

## INTEGRATED
## PRESCRIPTION DRUG PROGRAM
## MASTER AGREEMENT

**THIS AGREEMENT** is entered into as of July 1, 2005 (the "Effective Date"), between Medco Health Solutions, Inc., located at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417 and The National Labor Alliance of Health Care Coalitions, Inc., located at 91 Fieldcrest Avenue, Raritan Plaza II, P. O. Box 6858, Edison, New Jersey 08818-6858 (hereinafter "ALLIANCE" or "NLAHCC").

**WHEREAS,** the NLAHCC desires for prescription drug benefit services to be provided to Member Funds under separate agreements to be executed between Medco Health Solutions, Inc., and the applicable Member Fund; and

**WHEREAS,** Medco Health Solutions, Inc. provides prescription drug benefits programs and, in connection therewith, has established networks of participating retail pharmacies and operates a system for the processing, fulfillment, and payment of claims for prescription drugs furnished by such pharmacies; and

**WHEREAS,** Medco Health Solutions, Inc.'s Medco By Mail mail order pharmacy subsidiaries are licensed pharmacies which provide prescription drugs via a mail order service; and

**WHEREAS,** NLAHCC and Participating Member Funds desire to retain the services of Medco Health Solutions, Inc. and its subsidiaries, including Medco, L.L.C., as applicable, which holds TPA licenses in certain states (collectively, "Medco"), to provide a prescription drug benefit program (the "Program") including, but not limited to, retail, mail order, and specialty pharmacy services for eligible persons, point-of-care, physician office communications, and cost containment initiatives developed and implemented by Medco, which may include communications with prescribers, patients and/or participating pharmacies, and financial incentives to participating pharmacies for their participation in such initiatives (collectively, "PBM Services").

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

## 1.    DEFINITIONS

1.1.    "AWP" means the average wholesale price of the Covered Drug, as set forth in the current price list in recognized sources such as First DataBank's National Drug Data File, or other nationally recognized source determined by Medco, or the direct cost listed in those instances in which only the direct cost is listed.  Under the Retail Pharmacy Program, AWP is based on the package size submitted and for Compound Prescriptions is 1.25 times the AWP of the submitted Covered Drug. Under the Mail Order Pharmacy Program, AWP is based on package sizes of 100 units for capsules and tablets, 16 oz. quantities for liquids and the manufacturer's smallest available package size for injectable Covered Drugs (or the next closest package size if such quantities or sizes are not available), and all other Covered Drugs will be priced as individual units or smallest package size available (e.g., per vial, per suppository, etc.).  If First DataBank or other applicable source changes the methodology for calculating AWP in a way that materially changes the economics of the Program, the parties agree to modify the Program Pricing Terms to preserve the parties' relative economics before such changed methodology.

1.2.    "Brand Name Drugs" means all single-source drugs and multisource brand drugs as set forth in First Databank's National Drug Data File (or such other nationally recognized source reasonably determined by Medco).

1.3.    "Coalition" means one of the member organizations that comprise the NLAHCC.

N.E. CARPENTERS
Exhibit No. 8 for I.D.
Date: 10/20/06
Reporter: K.A. Smith

CARP-00059

1.4.    "Compound Prescription" means a prescription that meets the following criteria: two or more solid, semi-solid, or liquid ingredients, at least one of which is a Covered Drug, that are weighed or measured then prepared according to the prescriber's order and the pharmacist's art.

1.5.    "Contract Year" means the full twelve (12) month period commencing on the Effective Date, and each full consecutive twelve (12) month period thereafter that this Agreement remains in effect.

1.6.    "Copayment" and/or "Coinsurance" means the amount to be paid by an Eligible Person for each prescription or authorized refill as determined in accordance with the Plan Design(s).

1.7.    "Covered Drugs" means drugs which, under state or federal law, require a prescription, including Compound Prescriptions. Excluded from Covered Drugs are: (i) cosmetic drugs; (ii) appliances, devices, bandages, heat lamps, braces, splints, and artificial appliances; (iii) health and beauty aids, cosmetics and dietary supplements ("Exclusions"); and (iv) OTC products. Additional Covered Drugs and/or Exclusions applicable to any Participating Member Fund shall be designated by the Participating Member Fund in its applicable Plan Design.

1.8.    "Dispensing Fee" means the amount payable by each Participating Member Fund through Union Labor Life pursuant to Sections 1, 2, or 3 of Schedule A of this Agreement for a Participating Pharmacy or Medco to dispense a prescription or authorized refill to an Eligible Person.

1.9.    "Eligible Person" means each person who, through affiliation with a Participating Member Fund of the NLAHCC, is eligible for prescription drug benefits pursuant to this Agreement and the Member Fund Addendum with Medco, and such person's qualified dependents.

1.10.    "Generic Drug" means a multisource generic drug as set forth in First Databank's National Drug Data File, or such other nationally recognized source, as reasonably determined by Medco), that is available in sufficient supply from multiple manufacturers.

1.11.    "Group" means a corporation, association, or other entity or group of individuals that is a subset of or is the Member Fund that has a contract or other arrangement in effect with NLAHCC through which the Eligible Persons covered under such Group are entitled to prescription drug benefits pursuant to this Agreement.

1.12.    "Mail Order Pharmacy Program" means the program described in Section 5 in which Eligible Persons may submit a prescription along with the applicable Copayment/Coinsurance to Medco for dispensing via mail order.

1.13.    "Integrated Program" means a program in which Eligible Persons enrolled in such program may have prescriptions dispensed either (i) by a Participating Pharmacy under the Retail Pharmacy Program or (ii) by Medco under the Mail Order Pharmacy Program. Reference to the Retail Pharmacy Program and/or Mail Order Pharmacy Program herein will include services performed by Medco for Eligible Persons enrolled in the Integrated Program.

1.14.    "MAC" or the "Maximum Allowable Cost" consists of a list of off-patent drugs subject to maximum allowable cost payment schedules developed or selected by Medco. The payment schedules specify the maximum unit ingredient cost payable by a Participating Member Fund through Union Labor Life for drugs on the MAC list. The MAC list and payment schedules are frequently updated.

1.15.    "Member Fund" means any Taft Hartley Welfare Fund or other Group as may be permissible under the by-laws of the NLAHHC which is or may be accepted into the NLAHCC as a member by virtue of its association with or membership in a member organization that comprises the NLAHCC.

CARP-00060

1.16.   "Member Fund Addendum" means the executed addendum, in the form attached as Schedule C, between Medco and a Participating Member Fund pursuant to which Eligible Persons affiliated with such Member Fund receive prescription drug benefits from Medco.

1.17.   "Member Fund Contract Year" means the full twelve (12) month period commencing on the effective date of the Member Fund Addendum, and each full consecutive twelve (12) month period thereafter that the Member Fund Addendum remains in effect.

1.18.   "Participating Member Fund" means a Member Fund that has executed a Member Fund Addendum.

1.19.   "Participating Pharmacy" means a retail pharmacy that has entered into an arrangement with Medco that specifies the terms and conditions of the pharmacy's participation in Medco's retail networks servicing NLAHCC's Program, including the rates that Medco will pay the pharmacy. .

1.20.   "Plan Design" means Program drug coverage, days supply limitation, Copayment/Coinsurance, Formulary (including Formulary drug selection and relative cost indication) and other Program specifications applicable to the Program designated by NLAHCC as set forth in this Agreement or Member Fund Addendum or otherwise documented between the parties.

1.21.   "Primary Eligible Participant" means each Eligible Person, excluding Eligible Persons who are qualified dependents.

1.22.   "Program Pricing Terms" means the (i) financial or pricing terms set forth in this Agreement, and (ii) Formulary management fee, Formulary Rebates, Formulary Savings, and the Guaranteed Savings set forth in Section 6 of this Agreement.

1.23.   "Retail Pharmacy Program" means the program described in Section 4 in which Eligible Persons may purchase Covered Drugs from a Participating Pharmacy upon verification of Program eligibility and payment of the applicable Copayment/Coinsurance, and the claim is submitted by the Participating Pharmacy to Medco for payment in accordance with this Agreement and the applicable Medco Participating Pharmacy agreement.

1.24.   "TelePAID® System" or "TelePAID®" means Medco's real time, on-line system for adjudicating prescription drug claims submitted by retail pharmacies.

## 2.     MEMBER FUND PARTICIPATION

NLAHCC has selected Medco to provide prescription drug benefit services to its Member Funds. NLAHCC has selected Union Labor Life to offer to its Member Funds the services provided by Medco under this Agreement, including Schedule D (Participating Member Funds Criteria), including Union Labor Life coordinating with Member Funds all eligibility and Program Service issues and communicating those issues and that information to Medco. Upon execution of a Member Fund Addendum by Medco and the applicable Member Fund, Medco will provide prescription drug services to Eligible Persons in the Participating Member Fund through Union Labor Life.

## 3.     FURNISHED INFORMATION

Each Participating Member Fund will promptly furnish to Union Labor Life, in a format acceptable to Medco, all information necessary for Medco to render the services set forth herein. Such information will include, but is not limited to:

3.1.    The name of each Group and whether such Group will be enrolled under the Retail Pharmacy Program, Mail Order Pharmacy Program or Integrated Program.

CARP-00061

3.2.   The commencement date and termination date of coverage for each Group.

3.3.   A file of each Group's Eligible Persons, and subsequent timely additions and deletions to such file as changes occur. Each Participating Member Fund through Union Labor Life will pay for any Covered Drug dispensed to a person reported by the Participating Member Fund to Union Labor Life as no longer an Eligible Person, if such notification is not received by Medco at least two (2) full business days prior to the dispensing date of such prescription.

3.4.   Designation, in writing, of those Plan Design features to be determined by each Participating Member Fund through Union Labor Life for each Group.

3.5.   The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program.

3.6.   The type, number and description of Medco identification cards ("Identification Cards") required for each Group enrolled in the Retail Pharmacy Program.

## 4.   RETAIL PHARMACY PROGRAM

The specific features of the Retail Pharmacy Program are as follows:

4.1.   Program Coverage - The Program coverage (Covered Drugs/Exclusions) and days supply limitation for each Group covered under the Retail Pharmacy Program will be as set forth in each Group's applicable Plan Design designated by each Participating Member Fund in its Member Fund Addendum. Up to a thirty (30) day supply of Covered Drugs per prescription or refill may be dispensed under the Retail Pharmacy Program.

4.2.   Participating Pharmacy Networks - Medco Health will maintain a Participating Pharmacy Network reasonably necessary to provide services under the Retail Pharmacy Program. Medco will assume the risks associated with negotiating pricing terms with Participating Pharmacies. Medco will be responsible for any amounts that it owes to Participating Pharmacies that exceeds the reimbursement it receives from Union Labor Life on behalf of Member Funds as specified in Section 1 of Schedule A. Medco will retain any reimbursement that it receives from Union Labor Life on behalf of Member Funds, as specified in Section 1 of Schedule A that is in excess of the amounts it is obligated to pay to Participating Pharmacies.

4.3.   Identification Cards - Medco will (i) produce Identification Cards for those Eligible Persons designated by each Participating Member Fund, with an accompanying explanatory brochure, and (ii) make direct reimbursement claim forms available through the www.medco.com internet site for use by Eligible Persons who have not received their Identification Cards, or have had them lost or stolen. Medco will distribute Identification Cards and claim forms to the designated Eligible Persons. All costs associated with distributing and/or mailing such materials are the responsibility of each Participating Member Fund.

4.4.   Claim Adjudication - Medco will adjudicate claims for prescription drug benefits in accordance with Medco's TelePAID System and the applicable Plan Design. Disapproved claims will be transmitted via TelePAID to the submitting pharmacy with a brief explanation of the cause or causes for disapproval. Should a Participating Member Fund determine that a previously disapproved claim should be approved, and so direct Medco, adjudication of the claim will be accomplished promptly by Medco. Medco is obligated to pay Participating Pharmacies for all claims adjudicated through the TelePAID System. Union Labor Life on behalf of each Participating Member Fund will pay Medco for these claims pursuant to Schedule A, Section 1. Medco will promptly refer to Participating Member Fund all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

CARP-00062

4.5.   <u>Administrative Services</u> - Medco will provide, as applicable, the Base Administrative Services and the Additional Administrative Services set forth in Schedule A.

4.6.   <u>Pricing</u> -The Program Pricing Terms applicable to the Retail Pharmacy Program are set forth in Schedule A, in addition to the Total Rebates and Guaranteed Rebates set forth in Section 6 of this Agreement.

## 5.    MAIL ORDER PHARMACY PROGRAM

5.1.   <u>Program Coverage</u>

5.1.1.   The Program coverage (Covered Drugs/Exclusions) and days supply limitation for each Group covered under the Mail Order Pharmacy Program will be as set forth in each Group's applicable Plan Design designated by the Participating Member Fund in its Member Fund Addendum.

5.1.2.   Medco's mail order pharmacies will not be required to dispense prescriptions for greater than a ninety (90) day supply of Covered Drugs per prescription or refill, subject to the professional judgment of the dispensing pharmacist, limitations imposed on controlled substances, and manufacturer's recommendations. Prescriptions may be refilled providing the prescription so states. Prescriptions will not be filled: (i) more than twelve (12) months after issuance; (ii) more than six (6) months after issuance for controlled drug substances, or (iii) if prohibited by applicable law or regulation.

5.2.   <u>Dispensing Procedures</u>

5.2.1.   Medco's mail order pharmacies will dispense Covered Drugs to Eligible Persons, and dispense generic drugs when authorized, in accordance with (i) applicable law and regulations in the state in which Medco's mail order pharmacy is located, and (ii) the terms of this Agreement, the Member Fund Addendum and Plan Design(s).

5.2.2.   All matters pertaining to the dispensing of Covered Drugs or the practice of pharmacy, in general, are subject to the professional judgment of the dispensing pharmacist.

5.2.3.   Any drug which cannot be dispensed in accordance with Medco's mail order pharmacy dispensing protocols, or which requires special record-keeping procedures, may be excluded from coverage by Medco.

5.2.4.   If it becomes impracticable, for reasons of a force majeure or otherwise, for a specific Medco Health home delivery pharmacy to dispense prescriptions to Eligible Persons under the Program, Medco Health will use reasonable efforts to have Program prescriptions dispensed from an affiliated home delivery pharmacy, subject to applicable laws and regulations.

5.3.   <u>Claim Adjudication</u> - Medco will adjudicate and pay approved claims for prescription drug benefits in accordance with Medco's TelePAID System and the applicable Plan Design. Should a Participating Member Fund determine that a previously disapproved claim should be approved, and so direct Medco, adjudication of the claim will be accomplished promptly by Medco. Union Labor Life on behalf of a Participating Member Fund will pay Medco for claims adjudicated through the TelePAID System, pursuant to Schedule A, Section 2. Medco will promptly refer to a Participating Member Fund all non-routine inquiries by insurance departments, attorneys, claimants, or other persons following the denial of any claims.

CARP-00063

5.4.   <u>Pricing</u> - The Program Pricing Terms applicable to the Mail Order Pharmacy Program are set forth in Schedule A, in addition to the Total Rebates and Guaranteed Rebates set forth in Section 6 of this Agreement.

# 6.   FORMULARY

Effective January 1, 2003, NLAHCC will be a participating plan sponsor in Medco's Preferred Prescriptions® Formulary as set forth below for the term of this Agreement. Each Participating Member Fund through Union Labor Life will provide Medco with advance notice of each Group that will participate in the Preferred Prescriptions Formulary.

6.1.   <u>Formulary</u> - The Preferred Prescriptions® Formulary is a prescription drug formulary administered by Medco which lists FDA approved drugs that have been evaluated for inclusion on the Preferred Prescriptions® Formulary. The drugs included on the Preferred Prescriptions® Formulary will be modified by Medco from time to time as a result of factors including, but not limited to, medical appropriateness, manufacturer rebate arrangements and patent expirations. Medco will implement Medco's formulary management programs, which may include cost containment initiatives, communications with Eligible Persons, Participating Pharmacies and/or physicians (including communications regarding generic substitution programs), and financial incentives to Participating Pharmacies for their participation. Compliance with the Preferred Prescriptions Formulary and Medco's Formulary management program will result in the Formulary Rebate Payment as set forth below. Medco reserves the right to modify or replace the Preferred Prescriptions® Formulary (including any modification or replacement, the "Formulary") and formulary compliance methods and cost containment initiatives consistent with good pharmacy practice. The NLAHCC and each Participating Member Fund agrees that Medco will be the exclusive formulary administrator for the NLAHCC and each Participating Member Fund's prescription drug benefit programs during the term of the Agreement. The NLAHCC and each Participating Member Fund is authorized to use the Formulary only for its own Eligible Persons and only as long as the Program is in effect and administered by Medco.

6.2.   <u>Formulary Rebates</u> – Medco's contracts with pharmaceutical manufacturers provide Medco with rebates and fees for prescription drugs dispensed through Medco's mail order pharmacies and Medco's retail network pharmacies, as well as discounts for prescription drugs purchased and dispensed from Medco's mail order pharmacies. These contracts typically provide for two types of rebates:

(1)   rebates which are generally based on inclusion of the pharmaceutical manufacturer's products on clients' formularies and these products not being subject to restrictions that are not applicable to competing branded products are called "Formulary Rebates;" and

(2)   performance based rebates, which are typically based on various factors, including the utilization of certain drugs within their respective therapeutic categories for Medco's aggregate book of business.

Rebates are predominantly equal to a percentage of the aggregate dollar value of a particular drug that Medco dispensed, based on the manufacturer's published wholesale acquisition cost for that drug. Rebates are typically invoiced to the manufacturer and paid to Medco on a quarterly basis. Although most rebates are payable on a product basis, some manufacturers have agreed to pay rebates only if all of the specified products of the manufacturer are included on that client's formulary. Medco also receives certain fees from manufacturers for various commitments, services, and programs, which amounted to approximately $200 million in the last reported fiscal year. Rebates and fees other than Formulary Rebates, excluding (i) mail order purchase discounts, and (ii) payments or fees from certain manufacturers that offset drug-specific dispensing, shipping, and handling and other operational costs associated with Specialty Drugs dispensed by Medco,

CARP-00064

will be deemed "Additional Rebates and Fees" under this Agreement. Formulary Rebates and Additional Rebates and Fees will be jointly referred to as "Total Rebates."

Medco's annual reported revenues exceed $30 billion. Medco discloses rebates, rebate percentages, and fees from manufacturers in its quarterly and annual public financial filings and will also disclose these amounts quarterly to NLAHCC as part of its policy of transparency. NLAHCC may request a cost and savings analysis regarding the interchange program; the interchange returns policy; and formulary additions, deletions, and rebates.

6.3.     <u>Total Rebates</u> - Medco will provide the NLAHCC Participating Member Funds in aggregate with the greater of (i) 60% of the Total Rebates received by Medco based on the dispensing of each manufacturer's formulary drugs under all Participating Member Fund's Program, or (ii) the Guaranteed Rebates (as defined below). Total Rebates will be credited against future billings to the Participating Member Funds under the Program one hundred eighty (180) days after the end of each calendar quarter. Rebates due Participating Member Funds under this Agreement that are received by Medco within eighteen (18) months after termination or expiration of this Agreement will be paid to the Participating Member Funds. Rebates received thereafter will be retained by Medco.

6.4.     The Total Rebates due to the Participating Member Funds shall be further reduced by an amount equal to 10% of such Total Rebates as a Participating Member Fund access fee, which amount shall be paid by Medco through Union Labor Life from Total Rebates as follows: 5% to NLAHCC and 5% to the Coalition to which the Participating Member Fund belongs.

6.5.     <u>Guaranteed Rebates</u> - After each Contract Year during the Initial Term, Medco will calculate Total Rebates during such Contract Year for all Participating Member Funds. Provided NLAHCC and the Participating Member Funds comply fully with the Formulary and with the Formulary management programs implemented by Medco, if the percentage share of Total Rebates for any Contract Year during the Initial Term for all Participating Member Funds participating in the Formulary are less than the sum of (i) $2.45 times the total number of prescriptions billed and paid for under NLAHCC's Retail Pharmacy Program during such Contract Year for all Participating Member Funds, plus (ii) $9.30 times the total number of prescriptions billed and paid for under NLAHCC's Mail Order Pharmacy Program during the same Contract Year for all Participating Member Funds (collectively the "Guaranteed Rebates"), Medco will credit such difference against future billings to the Participating Member Funds under the program one hundred eighty (180) days after the end of each Contract Year.

6.6.     Any lines of any Participating Member Fund's business, or any Group of Eligible Persons, for which any Participating Member Fund funds less than 50% of the costs of Covered Drugs under the Plan Design will not be entitled to Formulary Rebate Payment. Calculations and payments under Section 6.3 will not include prescriptions dispensed for any such lines of business or Groups.

6.7.     If a government action, change in law or regulation, change in the interpretation of law or regulation, or action by any drug manufacturer or by the NLAHCC, Union Labor Life or any Participating Member Fund has a material adverse effect on the availability of Formulary Rebate Payments, Medco may modify the Program Pricing Terms.

## 7.    <u>BILLING/PAYMENT</u>

Each Participating Member Fund will be responsible to pay Medco through Union Labor Life for services provided by Medco to Eligible Persons in such Participating Member Fund in accordance with the terms in Schedules A, B, C and D.

CARP-00065

## 8.     RECORDS

8.1.     Medco will maintain all claims records relating to services performed under this Agreement as required by applicable law. Such claims records will be in their original form, on microfilm, microfiche, or other form determined by Medco. The NLAHCC's collective claims records may be audited, based on statistical sampling, or up to eight individual NLAHCC Participating Member Funds may perform individual claims audits, either directly or by a representative approved by Medco, subject to execution of a confidentiality agreement, for a maximum period of twenty-four (24) months prior to the agreed upon audit date, subject to applicable confidentiality provisions and legal requirements. Any audit by the NLAHCC or Participating Member Funds may be conducted once annually upon adequate prior written notice, and during regular business hours. Subject to Section 9.1 Medco may retain copies of such claims records for its own use, Medco's costs for any additional audits beyond the one collective audit or eight individual audits will be paid by NLAHCC or the Participating Member Funds.

8.2.     Medco's agreements with pharmaceutical manufacturers are subject to confidentiality agreements. The NLAHCC will be entitled to one collective audit, based on statistical sampling, under this Section 1.2 on behalf of all NLAHCC member funds, or up to eight individual NLAHCC Participating Member Funds may perform individual manufacturer agreement audits. Any audit of Medco's agreements with pharmaceutical manufacturers will be conducted by (a) a Big 4 public accounting firm approved by Medco whose audit department is a separate stand alone function of its business, or (b) a national CPA firm approved by Medco whose audit department is a separate stand alone function of its business. The organization that will be performing the audit must carry insurance for professional malpractice of at least $2,000,000. The audit will include only those portions of such pharmaceutical manufacturer agreements as necessary to determine Medco's compliance with Section 6 above in respect to Total Rebates. The audit will be conducted once annually, during normal business hours, at Medco's offices as scheduled by agreement of the parties, but not sooner than ninety (90) days after execution of Medco's confidentiality agreement. Medco's costs for any additional audits beyond the one collective audit or eight individual audits will be paid by NLAHCC or the Participating Member Funds.

8.3.     Any auditor performing an audit under Section 0 or 8.2 above will be required to warrant and represent that it is not providing services to any person, company, or other entity (such as plan sponsors and law firms) in connection with any lawsuit, investigation, or other proceeding that is currently pending or contemplated against Medco. Such services include, but are not limited to (a) examining pharmacy claims or any other data, documents, information or materials or (b) providing advice, analysis, assessments, and/or opinions as a disclosed or undisclosed expert or consultant (collectively "Litigation Services"), in connection with any lawsuit, investigation, or other proceeding pending or contemplated against Medco. The auditor must agree that, for a period of one (1) year after completion of the audit, it will not provide Litigation Services in any lawsuit, investigation, or other proceeding brought against Medco, except for Litigation Services to the NLAHCC in any proceeding against Medco.

8.4.     Each Participating Member Fund will furnish its most recent audited financial statement to Medco Health prior to the Effective Date of this Agreement and thereafter will furnish its annual audited financial statement to Medco Health within ninety (90) days after the end of each fiscal year of each Participating Member Fund that this Agreement is in effect.

## 9.     CONFIDENTIAL INFORMATION

9.1.     The Confidential Information of a party (the "disclosing party") which is disclosed to the other party (the "receiving party") will be held by the receiving party in strictest confidence at all times and will not be used by the receiving party (or its affiliates, employees, officers, directors or limited liability company managers and agents ("Representatives")) for any purpose not previously authorized by the disclosing party, except as necessary for Medco to perform the

CARP-00066

services under this Agreement. The Confidential Information of the disclosing party will not be disclosed or divulged by the receiving party to anyone, except as required by law or regulation, or with the prior written permission of the disclosing party and on the condition that the party to whom the Confidential Information is disclosed agrees in writing in advance to be bound by these terms and conditions. The receiving party may disclose the Confidential Information to those of its employees or advisors who need to review the Confidential Information for the purposes authorized by the disclosing party but only after the receiving party has informed them of the confidential nature of the Confidential Information and directs them to treat the Confidential Information in accordance with the terms of this Agreement. The disclosing party retains all right, title and interest in and to its Confidential Information.

The term "Confidential Information " includes, but is not limited to, any information of either the receiving or disclosing party (whether oral, written, visual or fixed in any tangible medium of expression), relating to either party's services, operations, systems, programs, inventions, techniques, suppliers, customers and prospective customers, contractors, cost and pricing data, trade secrets, know-how, processes, plans, reports, designs and any other information of or relating to either party's business, including its therapeutic, disease management, and health education programs, but does not include information which (a) was known to the receiving party before it was disclosed to the receiving party by the disclosing party, (b) was or becomes available to the receiving party from a source other than the disclosing party, provided such fact is evidenced in writing and the source is not bound by a confidentiality obligation to the disclosing party, or (c) is developed by the receiving party independently of the disclosing party's Confidential Information, provided that such fact can be documented. Each party will also keep the terms of this Agreement confidential as Confidential Information, except as required by law or regulation.

If the receiving party is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand, any informal or formal investigation by any government or governmental agency or authority, law or regulation, or otherwise) to disclose any of the Confidential Information, the receiving party will notify the disclosing party promptly in writing so that the disclosing party may seek a protective order or other appropriate remedy or, in its sole discretion, waive compliance with the terms of this Agreement. The receiving party agrees not to oppose any action by the disclosing party to obtain a protective order or other appropriate remedy. If no such protective order or other remedy is obtained, or the disclosing party waives compliance with the terms of this Agreement, the receiving party will furnish only that portion of the Confidential Information which it is advised by counsel is legally required and will exercise its reasonable best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information.

9.2.     NLAHCC and Medco may not utilize the service marks, trademarks, or trade names of any other party to this Agreement, or any service marks, trademarks, or trade names so similar as likely to cause confusion, without express written approval of such other party. The programs implemented by Medco will remain the sole property of Medco and will only be used by NLAHCC in connection with the Program and so long as Medco administers the Program.

9.3.     Medco, NLAHCC and each Participating Member Fund will comply with all applicable laws and regulations regarding patient confidentiality. Medco will not furnish any patient identifiable or Participating Member Fund identifiable data or information to any third party without the written consent of that Participating Member Fund, except as reasonably necessary to implement and operate the Program and fulfill its obligations pursuant to this Agreement or as required by applicable law. The restrictions set forth in this Section 9 will not apply to claims data or information which is not identifiable on a Participating Member Fund or patient basis.

CARP-00067

## 10.    TERM OF AGREEMENT

10.1.    This Agreement will remain in effect for an initial term of three (3) years (the "Initial Term") and thereafter will automatically renew for successive one (1) year terms unless either party gives written notice, at least one hundred eighty (180) days prior to the end of any such term, to the other party of its intent to terminate this Agreement as of the end of the then current term. Notwithstanding the termination of this Agreement or Member Fund Addendum, Medco agrees to continue to render services hereunder and each Participating Member Fund through Union Labor Life agrees to pay for services of Medco in accordance with the terms of this Agreement and the Member Fund Addendum for any claims incurred for prescription drug benefits by Eligible Persons while this Agreement and the Member Fund Addendum was in force.

10.2.    In the event of a material breach of this Agreement or Member Fund Addendum, the party alleging such breach will give written notice thereof to the other parties. If such breach is not cured within sixty (60) days of receipt of such notice, the non-breaching party may terminate this Agreement or Member Fund Addendum upon written notice to the other party.

10.3.    The NLAHCC and each Participating Member Fund acknowledge that in the event of expiration or termination, inability to agree on the terms of that agreement to reflect the terms of this Agreement, of Medco's agreement with Union Labor Life that the Agreement between Medco and the NLAHCC and each Participating Member Fund shall survive any such termination and be amended by Medco and the NLAHCC and each Participating Member Fund to address the obligations of and the services that Union Labor Life had been providing to the NLAHCC and its Participating Member Funds pursuant to this terms of this Agreement.

## 11.    FORCE MAJEURE

Neither Medco, a Participating Member Fund, nor NLAHCC will be deemed to have breached this Agreement or Member Fund Addendum or be held liable for any failure or delay in the performance of all or any portion of its obligations under this Agreement or Member Fund Addendum if prevented from doing so by a cause or causes beyond its control. Without limiting the generality of the foregoing, such causes include acts of God or the public enemy, fires, floods, storms, earthquakes, riots, strikes, boycotts, lock-outs, acts of terrorism, acts of war or war-operations, restraints of government, power or communications line failure or other circumstances beyond such party's control, or by reason of the judgment, ruling or order of any court or agency of competent jurisdiction, or change of law or regulation (or change in the interpretation thereof) subsequent to the execution of this Agreement or Member Fund Addendum.

## 12.    INDEMNIFICATION/LIMITATION OF LIABILITY

12.1.    Medco will indemnify and hold NLAHCC, its officers, directors and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from services rendered by Medco pursuant to this Agreement to the extent the claim or cause of action arises out of Medco's negligence or willful misconduct, provided that (a) NLAHCC has given reasonable notice to Medco of the claim or cause of action, and (b) no Indemnified Party has, by act or failure to act, compromised Medco's position with respect to the resolution or defense of the claim or cause of action.

12.2.    NLAHCC will indemnify and hold Medco, its subsidiaries and affiliates, and their respective officers, directors and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from (i) negligence or willful misconduct of NLAHCC, including without limitation, the disclosure and/or use of Program data or information provided by Medco to NLAHCC, or (ii) the provision of patient identifiable data by Medco or its subsidiaries to NLAHCC or NLAHCC's designees, provided that (a) the Indemnified Party has given reasonable notice to NLAHCC of the claim or cause of action, and (b) no Indemnified Party

CARP-00068

has, by act or failure to act, compromised NLAHCC's position with respect to the resolution or defense of the claim or cause of action.

12.3.   Medco will maintain, during the term of this Agreement, liability coverage with limits not less than $1,000,000 per occurrence and in the aggregate per policy year, with excess liability coverage in an amount not less than $5,000,000 per policy year. Evidence thereof will be furnished to NLAHCC upon request.

12.4.   Except as provided in Section 12.1 above, Medco or any affiliated company, or their directors, officers or employees, will not be responsible for any claim, loss or damage sustained as a result of the provision of or failure to provide pharmaceutical goods or services or any other action or failure to act by any retail pharmacy, pharmaceutical manufacturer or other pharmaceutical providers pursuant to this Agreement.

12.5.   The liability of Medco to NLAHCC for any negligent or willful misconduct by Medco in the performance of its obligations hereunder will be limited to the liability insurance amounts set forth in Section 12.3.

12.6.   Medco, NLAHCC or each Participating Member Fund will not be liable to each other for incidental, consequential or exemplary damages.

## 13.   EXCLUSIVITY

Medco will be the exclusive provider and administrator of PBM Services to NLAHCC and each Participating Member Fund while this Agreement and Member Fund Addendum are in effect. Nothing contained herein, however, will prohibit Medco or any affiliated entity from providing or administering PBM Services and related programs and services to any other entity while this Agreement or Member Fund Addendum are in effect.

## 14.   GENERAL

14.1.   <u>Independent Contractor</u> - The relationship between Medco and NLAHCC will solely be that of independent contractors engaged in the operation of their own respective businesses.

14.2.   <u>Assignment</u> - This Agreement may not be assigned by any party without the written approval of the other parties provided, however, that services to be performed by Medco hereunder may be performed by its subsidiaries, affiliates, divisions and/or designees. The duties and obligations of the parties will be binding upon, and inure to the benefit of, successors, assigns, or merged or consolidated entities of the parties.

14.3.   <u>No Third-Party Beneficiary</u> - This Agreement has been entered into solely for the benefit of NLAHCC and Medco, and is not intended to create any legal, equitable, or beneficial interest in any third party or to vest in any third party any interest as to enforcement or performance.

14.4.   <u>Notices</u> - All notices required under this Agreement will be in writing and sent by certified mail, return receipt requested, hand delivery or overnight delivery by a nationally recognized service addressed as follows:

    If to NLAHCC:        Health Care Payers Coalition of New Jersey
                         91 Fieldcrest Avenue
                         Raritan Plaza II, P. O. Box 6858
                         Edison, NJ  08818
                         Attention:  Mr. Edward M. Geisler

55825.1 (06/03/05)                                                                11

CARP-00069

| If to Medco: | Medco Health Solutions, Inc. |
| | 100 Parsons Pond Drive |
| | Franklin Lakes, NJ 07417 |
| | Attention: Thomas M. Moriarty |
| | Vice President and Managing Counsel |
| | Commercial Transactions |

To each Participating
Member Fund:        As set forth in each Member Fund Addendum

14.5.  **Amendments** - This Agreement or Member Fund Addendum may be amended only in writing when signed by a duly authorized representative of each party.

14.6.  **Financial Responsibility** - If Medco has reasonable grounds to believe that a Participating Member Fund may not meet its payment obligations under this Agreement as they become due, Medco may request information and/or reasonable assurances (including a deposit) from such Participating Member Fund as to its financial responsibility. If the information or assurances are not furnished to Medco within five (5) days, or are not satisfactory in Medco's reasonable judgment, Medco may immediately terminate the specific Participating Member Fund.

14.7.  **Plan Design** - The Program Pricing Terms set forth in this Agreement or Member Fund Addendum are based upon the Plan Designs, Minimum Enrollment and Program specifications agreed to between the parties as reflected in this Agreement or Member Fund Addendum and as otherwise hereafter agreed to by the parties in writing. The Program Pricing Terms are also based upon each Participating Member Fund funding 50% or greater of the costs of Covered Drugs for its Eligible Persons. Any modification of the Plan Design or Program specifications, failure to maintain Minimum Enrollment, or inclusion of Eligible Persons or Groups with Covered Drugs funded less than 50% by any Participating Member Fund, may result in a retroactive modification by Medco of the Program Pricing Terms. Each Participating Member Fund will provide Eligible Persons with at least thirty (30) days prior notice of approved Plan Design changes.

14.8.  **Interpretation of Plan** - NLAHCC will not name or represent that Medco, is, and Medco will not be, a Plan Administrator or a fiduciary of NLAHCC's prescription drug benefit plan (the "Plan"), as those terms are used in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., and the regulations promulgated under ERISA. NLAHCC will have complete discretionary, binding and final authority to construe the terms of the Plan, to interpret ambiguous Plan language, to make factual determinations regarding the payment of claims or provisions of benefits, to review denied claims and to resolve complaints by Eligible Persons.

14.9.  **Tax** - Any applicable sales, use, or other similarly assessed and administered tax imposed on items dispensed, or services provided hereunder, will be the sole responsibility of NLAHCC or Participating Member Fund. If Medco is legally obligated to collect and remit sales, use, or other similarly assessed and administered tax in a particular jurisdiction, the tax will be reflected on the applicable invoice or subsequently invoiced at such time as Medco becomes aware of such obligation.

14.10.  **Governing Law** - This Agreement will be construed and governed in accordance with the laws of the State of New Jersey. However, all matters relating to the Mail Order Pharmacy Program operations of Medco will be governed by the laws of the state in which Medco's mail order pharmacy is located.

14.11.  **Enforceability** - The invalidity or unenforceability of any of the terms or provisions hereof will not affect the validity or enforceability of any other term or provision.

14.12.  **Section Headings** – Section headings are inserted for convenience only and will not be used in any way to construe the terms of this Agreement.

CARP-00070

14.13.   Waiver - The waiver of any breach or violation of any term or provision hereof will not constitute a waiver of any subsequent breach or violation of the same or any other term or provision.

14.14.   Approvals - Whenever approval of any party is required under this Agreement, such approval will not be unreasonably withheld.

14.15.   Organization – Each party is duly organized, validly existing and in good standing, and has the power to own its property and to carry on its business as now being conducted by it.

14.16.   Authorization - The execution and delivery of this Agreement and the consummation of the transactions contemplated herein on its part, has been duly authorized by all necessary action by each party.

14.17.   No Conflict of Interest or Other Restrictions - No party has a conflict of interest which would impact its ability to perform fairly its obligations under this Agreement, and no party is subject to any restrictions, contractual or otherwise, which prevent or would prevent it from entering into this Agreement or carrying out its obligations hereunder.

14.18.   No Violation - Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will be a violation or default of any term or provision of the party's governance documents (e.g., its certificate of incorporation or bylaws or operating agreement) or of any material contract, commitment, indenture, or other agreement or restriction to which it is a party or by which it is bound.

14.19.   Binding Effect - This Agreement has been duly executed and delivered by each party, and is a valid and binding obligation of each party, enforceable against such party in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and general principles of equity.

14.20.   Original Agreement/Counterparts - The parties will execute two identical originals of this Agreement. Each party will retain one of the originals. This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one party, but all counterparts taken together will constitute one instrument.

14.21.   Public Announcement - Except as required by law or regulation, neither party will make any public announcement nor issue any press release relating to this Agreement without the written consent of the other party. This provision does not restrict either party from submitting necessary or appropriate filings with the SEC.

14.22.   Dispute Resolution - Except for those matters subject to emergent or injunctive relief, in the event that any dispute relating to this Agreement arises between NLAHCC or Participating Member Fund and Medco, either party may, by written notice, demand a meeting regarding the dispute, to be attended by executive officers of each party, who will attempt in good faith to resolve the dispute. If the dispute cannot be resolved through executive negotiations within thirty (30) business days after the date of the initial notice, each party will retain all rights to bring an action regarding such matter in accordance with law.

14.23.   Entire Agreement - This Agreement, together with the Schedules and Member Fund Addenda hereto, embodies the entire understanding of the parties in relation to the subject matter hereof, supersedes any prior agreement among the parties in relation to the subject matter hereof, and no other agreement, understanding, or representation, verbal or otherwise, relative to the subject matter hereof exists among the parties at the time of execution of this Agreement.

14.24.   Survival - The provisions of Sections 7, 9, 12 and the last sentence of 10.1 will survive the termination of this Agreement.

CARP-00071

14.25.  <u>Most Favored Pricing</u> - Medco will extend a "most favored pricing" ("MFP") provision to NLAHCC. The aggregate pricing terms provided by Medco to NLAHCC for all NLAHCC Member Funds written through the NLAHCC, or by Medco or Systemed directly, will be no less favorable than the aggregate pricing terms provided by Medco or Systemed to any other health and welfare funds, or benefit and welfare coalitions, of the same or smaller size that has similar programs, services, plan designs and mail utilization ("Comparison Account"). The value of all rebates paid under Section 6.4 is included in the aggregate calculation of Medco's pricing to the NLAHCC. This provision is subject to the following conditions:

14.25.1.  All existing Medco PBM clients are excluded from being Comparison Accounts and cannot be used as a basis for this MFP provision, with the exception of VEBA and GOLD COAST/SCEET which will become Comparison Accounts when they become Participating Member Funds under this Agreement.

14.25.2.  Groups that are, or become, Medco or Systemed clients on or after July 1, 2005 that subsequently become NLAHCC Member Funds would also be excluded from being Comparison Accounts.

14.25.3.  It is the responsibility of the NLAHCC to provide an accurate and up to date listing of NLAHCC Member Funds to Medco.

14.26.  <u>Compensation Disclosure</u> - The only compensation that Medco shall receive pursuant to the terms of this Agreement with the NLAHCCHCC and its Member Funds shall be the fees described herein, the Total Rebates as defined herein, fees received from retail pharmacies for access to Medco's TelePAID system, a fee in an amount agreed to by the parties for any additional services authorized by the NLAHCC and its Member Funds, and any fees or payments received from third parties for aggregated (non-NLAHCC, non-Member Fund, or non-Eligible Person identification basis) claims data pursuant to Section 9.3. All other amounts received directly or indirectly by Medco, no matter how described or characterized, from third parties, whether by cash, by a credit, or by in kind contribution, shall be disclosed and forwarded to the NLAHCC and its Member Funds except as described herein.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date indicated below.

**MEDCO HEALTH SOLUTIONS, INC.**

**THE NATIONAL LABOR ALLIANCE OF HEALTH CARE COALITIONS, INC.**

BY: _____
     (Signature)

BY: _____
     (Signature)

NAME: _____Thomas M. Moriarty_____

NAME: _____Edward Geisler_____
            (type or print name)

TITLE: _Vice President and Managing Counsel_
        _Commercial Transactions_

TITLE: _President_

DATE: _7/5/05_

DATE: _6/15/05_

55825.1 (06/09/05) gsm
(Original 26456.13 - 2/19/03)

55825.1 (06/03/05)                                                                 14

CARP-00072

## SCHEDULE A
## PROGRAM PRICING TERMS

Effective February 7, 2003, each Participating Member Fund through Union Labor Life will pay Medco for services provided by Medco under the Program as follows:

## 1.    RETAIL PHARMACY PROGRAM CLAIMS

Each Participating Member Fund through Union Labor Life will pay Medco Health for Covered Drugs dispensed and submitted by Participating Pharmacies in an amount equal to the lowest of (i) the pharmacy's usual and customary price, as submitted ("U&C") plus applicable taxes, (ii) the maximum allowable cost ("MAC"), where applicable, plus the Dispensing Fee set forth below, plus applicable taxes, or (iii) AWP minus (-)15.5%, plus the Dispensing Fee set forth below, plus applicable taxes. Payment by each Participating Member Fund through Union Labor Life is subject to the applicable Copayment/Coinsurance or other coverage features set forth in the Plan Design designated by each Participating Member Fund through Union Labor Life under the Retail Pharmacy Program.

1.1    Dispensing Fee - The Dispensing Fee per prescription or authorized refill will be $1.75 for Brand Name Drugs without MAC pricing, and $1.75 for Generic Drugs and Brand Name Drugs that are billed at MAC, consistent with the applicable Plan Design.

1.2    Copayment/Coinsurance - The Copayment/Coinsurance amount for each prescription or authorized refill will be as designated in the applicable Plan Design(s).

1.3    Minimum Charge at Retail - Each Participating Member Fund through Union Labor Life agrees there may be a minimum charge at retail for a Covered Drug of the lower of (a) the U&C or (b) the applicable Copayment. For prescriptions or refills where this minimum charge applies, there will be no charge/credit to such Participating Member Fund under this Section 1.

1.4    Direct Claims - The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program will be the same as the terms set forth in this Section 1, unless otherwise provided in writing by the Participating Member Fund to Medco.

1.5    Generic Drug Guarantee

1.5.1    Medco guarantees that, as a result of the Medco network management programs, the average effective AWP discount for Generic Drugs, as billed to Participating Member Funds, in aggregate, dispensed and submitted by Participating Pharmacies, in the aggregate, for each Contract Year during the Initial Term will be minus (-) 50% (the "Guaranteed Generic Discount"). In the event of a material Plan Design modification, an increase or decrease in the total number of Participating Pharmacies by greater than five (5) percent, or a change in ownership of five (5) percent or more of Participating Pharmacies, Medco may modify the Guaranteed Generic Discount on an equitable basis.

1.5.2    Within one hundred eighty (180) days after the end of each Contract Year during the Initial Term, Medco will calculate and report the actual average Generic Drug AWP discount achieved for all Generic Drugs as billed to Participating Member Funds, in aggregate, dispensed, and submitted by Participating Pharmacies, in the aggregate, for such Contract Year (the "Actual Generic Discount"). If the Actual Generic Discount for any such Contract Year is less than the Guaranteed Generic Discount, Medco will credit the full dollar amount of such shortfall against future billings to the Participating Member Funds under the Program.

CARP-00073

1.5.3   So long as the guarantee set forth in this Section 1.5 is in effect, Medco will have no separate liability for Generic Drugs under the Retail Pharmacy Program pricing set forth in Section 1 of this Schedule A.

## 2.    MAIL ORDER PHARMACY PROGRAM CLAIMS

Each Participating Member Fund through Union Labor Life will pay Medco for Covered Drugs dispensed by Medco under the Mail Order Pharmacy Program in an amount equal to an Ingredient Cost plus Dispensing Fee for each Covered Drug dispensed, less the applicable Copayment/Coinsurance amount, as such terms are defined below:

2.1   Ingredient Cost - The Ingredient Cost is AWP minus (-) 23% for Brand Name Drugs and AWP minus (-) 55% for Generic Drugs.

2.2   Dispensing Fee - The Dispensing Fee per prescription or authorized refill is $0.00. Dispensing Fees are inclusive of postage. If postage rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the Dispensing Fee will be increased to reflect such increase(s).

2.3   Copayment/Coinsurance - The Copayment/Coinsurance amount for each prescription or refill dispensed by Medco under the Home Delivery Pharmacy Program shall be as designated for each Group of each Participating Member Fund in the applicable Plan Design(s). If the amount of the applicable Copayment/Coinsurance paid by an Eligible Person for a prescription or refill dispensed by Medco exceeds the Ingredient Cost (as defined in 2.1 above) plus Dispensing Fee (as defined in Section 2.2 above) plus any applicable sales tax, then Medco shall return to the Eligible Person an amount equal to the Copayment/Coinsurance amount, less the sum of the applicable Ingredient Cost plus Dispensing Fee plus any applicable sales tax, for the prescription or refill. Eligible Persons must pay the applicable Copayment or Coinsurance amount to Medco for each prescription or authorized refill under the Home Delivery Pharmacy Program. Medco may suspend Home Delivery Pharmacy Program services to an Eligible Person who is in default of any Copayment or Coinsurance amount due Medco. The applicable Participating Member Fund will be responsible for any unpaid Eligible Person Copayment or Coinsurance amounts if payment has not been received from the Eligible Person of that Participating Member Fund within one hundred twenty (120) days of dispensing. The Participating Member Fund will be billed following the one hundred twenty (120) day collection period, with payment due in accordance with the payment terms set forth in Section 7 of this Agreement and Section 2.2 of the applicable Member Fund Agreement.

## 3.    SPECIALTY DRUG CLAIMS

Notwithstanding anything to the contrary in Section 2 above and elsewhere in the Agreement, effective July 1, 2005, NLAHCC will pay Medco for those Covered Drugs designated as Specialty Drugs in Schedule B under the Mail Order Pharmacy Program on a separate ingredient cost basis (provided in Schedule B) plus applicable Dispensing Fee (provided in Schedule B), subject to the Copayment/Coinsurance in the applicable Plan Design. Under the Retail Pharmacy Program, NLAHCC will pay Medco for the Specialty Drugs in Schedule B according to the pricing set forth in Section 1 of Schedule A. Specialty Drugs may be provided by Medco or other third-party specialty pharmacy that has a written arrangement with Medco. Medco may add or delete products, or modify pricing terms, in Schedule B on written notice to NLAHCC. Specialty Drugs are excluded from calculations, guarantees, credits, and payments regarding Total Rebates under the Mail Order Pharmacy Program and the Retail Pharmacy Program set forth in this Agreement.

Services for Specialty Drugs under the Mail Order Pharmacy Program consist of:

CARP-00074

- Clinical support that provides, according to Medco's procedures:
  - Eligible Person counseling
  - Care management, including information and support directly to the Eligible Person
  - Coordination of care with the Eligible Persons case manager and/or home care agency

- Specialty Drug educational materials and product information
  - Standard communications notifying Eligible Persons of changes in plan coverage
  - Personalized mailings and outbound phone calls by Medco Special Care Pharmacy to Eligible Persons purchasing, at retail pharmacies, Specialty Drugs that are clinically appropriate for maintenance use

- Toll-free telephone line for Eligible Persons using Specialty Drugs

- Express delivery to physician's office or Eligible Person's home
  - Standard two (2) day delivery
  - Overnight delivery as physician required (excluding Sundays)

- Logistics coordination of delivery to Eligible Person's home or physician's office

- Analysis of integrated pharmacy and medical claims databases to identify utilizers, if applicable and agreed upon

- Ancillary supplies provided with each injectable medication

- Drug Utilization Review applied to specialty pharmacy related prescription claims and, when available from Medco, medical claims

- Enhanced Physician services, consisting of communication materials, forms and informational hotline

Additional communications to Eligible Persons or physicians beyond these listed above will be quoted upon request.

4.    **ADMINISTRATIVE FEES**

4.1      Each Participating Member Fund through Union Labor Life will pay to Medco a Base Administrative Fee in the amount of $0.00 per transaction processed by Medco under the Retail Pharmacy Program or Mail Order Pharmacy Program for the following Base Administrative Services, as applicable:

**Claim Adjudication**
- Administration of each Participating Member Fund through Union Labor Life Plan Design
- In-network claims adjudication via TelePAID® on-line claims adjudication system
- Primary Coordination of Benefits (COB) (when flagged on eligibility records)
- Twelve (12) months on-line claims history retention (for use in claims processing)
- Processing associated with Mail Order Pharmacy Program prescriptions

**Member Communication Materials**
- Medco Welcome Package for new designated Eligible Persons, consisting of:
  - Announcement letter (not to exceed one page)
  - Medco descriptive brochure (not to exceed eight pages)
  - Pre-addressed mail order order form/envelope
  - Patient health profile questionnaire
  - One Medco Identification Card per Primary Eligible Participant (two per family)

CARP-00075

     –   Information on access to major Participating Pharmacy network chains
- Other available standard Medco materials, consisting of:
  - Direct reimbursement claim form (also available via www.medco.com)
  - Coordination of Benefits (COB) claim form

- TDD-TTY services for hearing impaired to access Member Service Department

## Drug Utilization Review/Clinical/Formulary Programs
- Integrated Concurrent Drug Utilization Review (DUR) via TelePAID®, including plan management alerts and clinical alerts

## Reporting
- Medco's Prescription Drug Plan Report Package

## Retail Pharmacy Network
- Establish, maintain, credential and contract an adequate panel of Participating Pharmacies
- Development and distribution of communication materials to Participating Pharmacies regarding the Program
- Toll-free access to Help Desk for eligibility/claims processing assistance
- Toll-free access for Participating Pharmacies to obtain DUR assistance
- Monitor Participating Pharmacy performance and compliance, including generic substitution rates, formulary program conformance, and DUR intervention conformance through Retail Network Management initiatives and reporting
- Toll-free telephone access to voice response unit for location of Participating Pharmacies in zip code area
- Medco Pharmacy Audit Program

## Member Service
- Toll-free telephone access to Member Service for the Program for use by Eligible Persons, NLAHCC benefits personnel and physicians
- Gatekeeper Program
- 24 hour access to a Medco pharmacist via toll-free telephone service

## medco.com
- Standard Medco website capabilities, including:
  - online prescription ordering and status
  - prescription pricing information
  - coverage and benefit plan information
  - health news information
  - health assessment tools and resources

4.2     Each Participating Member Fund through Union Labor Life will also pay for Additional Administrative Services requested by each Participating Member Fund and provided by Medco under the Program as follows:

## Eligibility
- Hard copy eligibility submission                      Data entry charges

CARP-00076

<u>Claim Adjudication</u>

- Direct reimbursement (under Retail Pharmacy Program)/out-of-network claims adjudication (including check and EOB to Eligible Person) — $1.00 per claim

- Coordination of Benefits (COB)
  - Secondary Coordination of Benefits
    - Eligible Person-submitted paper claim — $2.50 per claim
    - Retail Pharmacy-submitted electronic claim — $1.00 per claim
  - Medicare Part B Recovery (Mail Order Pharmacy Program only) — $25.00 per claim submitted to Medicare for processing
  - Adjudication of government reimbursement claims (unless responsibility is otherwise assigned by NLAHCC) — $3.00 per paid claim

- On-line claims history retention (for use in claims processing) in excess of twelve (12) months — $0.05 per claim

<u>Drug Utilization Review/Clinical/Formulary Programs</u>

- Set-up and load of historical records from prior vendor, supplied in Medco format — $0.07 per claim[1]

- Medco's Coverage Authorization Program, consisting of: prior authorization, step therapy, quantity duration/ dose duration, quantity per dispensing event capabilities, and dose optimization (coverage option) — $40.00 per case

- Pre-Notification Eligible Person Mail Campaign — Quoted upon request

- Authorization renewal Eligible Person notification — Quoted upon request

- High Utilization Management Program (Level II - Intervention) — $0.05 per claim

- Retrospective DUR — $0.10 per claim

- Customized Physician Practice Summary Program — Quoted upon request

- Optimal Therapeutics[SM] – Medco's academic detailing program for physicians — Quoted upon request

- Retail Brand to Generic Patient Education Program — $3.00 per letter

<u>Reviews and Appeals Management</u>

- Reviews and Appeals Management
  - Administrative — $15.00 per case
  - Clinical – conditions of coverage reported by physician (not associated with Coverage Management Programs) — $40.00 per case

---

[1]  Fee waived for the first six months after the Effective Date if a Participating Member Fund implements Retrospective DUR at $0.10 per claim on the Effective Date.

55825.1 (06/03/05)

19

CARP-00077

| | |
|---|---|
| • Reviews and Appeals Management for Medco's Coverage Management Programs | No additional charge beyond the charge for Medco's Coverage Management Program[2] |

### Reporting

| | |
|---|---|
| • Ad-hoc report production, reprogramming and testing of non-standard NLAHCC requirements | Quoted upon request |
| • Each Participating Member Fund's requests through Union Labor Life for claims data and production files for itself or its designees (pricing varies based on required turnaround time and is subject to execution of Medco's confidentiality agreement) | Quoted upon request |

### Member Communication Materials

| | |
|---|---|
| • Replacement of any Member Communication Materials or Identification Cards upon an Eligible Person's request | Actual replacement cost |
| • Customization, re-issuance or replacement of Member Communication Materials or Identification Cards on a Group or Participating Member Fund-wide basis, if requested by each Participating Member Fund | Quoted upon request |
| • Periodic Explanation of Benefits to Eligible Persons providing informational and cost savings messages, account summaries, and cost share per claim | Quoted upon request |
| • Eligible Person communications describing the benefit or changes to the benefit, except for initial Welcome Package for new designated Eligible Persons | Quoted upon request |
| • Customized, targeted Eligible Person mailings for closed/custom formulary | Quoted upon request |
| • Retail Refill Allowance Program Member Communications Materials | Quoted upon request |
| • Mailings direct to Eligible Persons, physicians or each Participating Member Fund's location | Postage charges |

Note:    Charges for additional services not listed above will be determined by Medco and quoted upon request.

---

[2]    Additional charges may be incurred for non-standard Participating Member Fund specific requirements, processing and/or communications.

55825.1 (06/03/05)                                                                                          20

CARP-00078

## SCHEDULE B
## SPECIALTY DRUGS

| THERAPEUTIC CLASS | BRAND NAME | AWP DISCOUNT % | DISPENSING FEE* |
|---|---|---|---|
| Alpha-1 Proteinase Deficiency | ARALAST | 15.00% | $1.75 |
| Alpha-1 Proteinase Deficiency | ZEMAIRA | 15.00% | $1.75 |
| Anemia/Neutropenia | ARANESP | 15.00% | $1.75 |
| Anemia/Neutropenia | EPOGEN | 15.00% | $1.75 |
| Anemia/Neutropenia | LEUKINE | 15.00% | $1.75 |
| Anemia/Neutropenia | NEULASTA | 15.00% | $1.75 |
| Anemia/Neutropenia | NEUMEGA | 15.00% | $1.75 |
| Anemia/Neutropenia | NEUPOGEN | 15.00% | $1.75 |
| Anemia/Neutropenia | PROCRIT | 15.00% | $1.75 |
| Anti-infective | CYTOVENE | 15.00% | $1.75 |
| Asthma | XOLAIR | 15.00% | $1.75 |
| Cancer | AVASTIN | 15.00% | $1.75 |
| Cancer | ELIGARD | 15.00% | $1.75 |
| Cancer | GLEEVEC | 15.00% | $1.75 |
| Cancer | HERCEPTIN | 15.00% | $1.75 |
| Cancer | IRESSA | 15.00% | $1.75 |
| Cancer | PROLEUKIN | 15.00% | $1.75 |
| Cancer | RITUXAN | 15.00% | $1.75 |
| Cancer | SANDOSTATIN | 15.00% | $1.75 |
| Cancer | TARCEVA | 15.00% | $1.75 |
| Cancer | TEMODAR | 15.00% | $1.75 |
| Cancer | VIDAZA | 15.00% | $1.75 |
| Cancer | XELODA | 15.00% | $1.75 |
| Cancer | ZOLADEX | 15.00% | $1.75 |
| Cancer | LEUPROLIDE | 17.00% | $1.75 |
| Cancer | LUPRON | 17.00% | $1.75 |
| Cystic Fibrosis | PULMOZYME | 16.00% | $1.75 |
| Cystic Fibrosis | TOBI | 16.00% | $1.75 |
| DVT/Anticoagulation | ARIXTRA | 15.00% | $1.75 |
| DVT/Anti-Coagulation | FRAGMIN | 15.00% | $1.75 |
| DVT/Anti-Coagulation | INNOHEP | 15.00% | $1.75 |
| DVT/Anti-Coagulation | LOVENOX | 15.00% | $1.75 |
| Fabray Disease | FABRAZYME | 10.00% | $1.75 |
| Gaucher's | CEREZYME | 15.00% | $1.75 |
| Growth Hormone | GENOTROPIN | 16.00% | $1.75 |
| Growth Hormone | GEREF | 16.00% | $1.75 |
| Growth Hormone | HUMATROPE | 16.00% | $1.75 |
| Growth Hormone | NORDITROPIN | 16.00% | $1.75 |
| Growth Hormone | NUTROPIN | 16.00% | $1.75 |
| Growth hormone | NUTROPIN AQ | 16.00% | $1.75 |
| Growth hormone | NUTROPIN DEPOT | 16.00% | $1.75 |
| Growth Hormone | PROTROPIN | 16.00% | $1.75 |
| Growth Hormone | SAIZEN | 16.00% | $1.75 |
| Growth Hormone | SEROSTIM | 16.00% | $1.75 |
| Growth Hormone | ZORBTIVE | 16.00% | $1.75 |
| Hemophilia | ADVATE | 20.00% | $1.75 |
| Hemophilia | ALPHANATE | 20.00% | $1.75 |

CARP-00079

| THERAPEUTIC CLASS | BRAND NAME | AWP DISCOUNT % | DISPENSING FEE* |
|---|---|---|---|
| Hemophilia | ALPHANINE SD | 20.00% | $1.75 |
| Hemophilia | AUTOPLEX | 20.00% | $1.75 |
| Hemophilia | BEBULIN VH IMMUNO | 20.00% | $1.75 |
| Hemophilia | BENEFIX | 20.00% | $1.75 |
| Hemophilia | FEIBA VH IMMUNO | 20.00% | $1.75 |
| Hemophilia | GENARC | 20.00% | $1.75 |
| Hemophilia | HELIXATE FS | 20.00% | $1.75 |
| Hemophilia | HEMOFIL-M | 20.00% | $1.75 |
| Hemophilia | HUMATE-P | 20.00% | $1.75 |
| Hemophilia | HYATE:C | 20.00% | $1.75 |
| Hemophilia | KOATE-DVI | 20.00% | $1.75 |
| Hemophilia | KOGENATE FS | 20.00% | $1.75 |
| Hemophilia | MONARC-M | 20.00% | $1.75 |
| Hemophilia | MONOCLATE-P | 20.00% | $1.75 |
| Hemophilia | MONONINE | 20.00% | $1.75 |
| Hemophilia | NOVOSEVEN | 20.00% | $1.75 |
| Hemophilia | PROFILNINE | 20.00% | $1.75 |
| Hemophilia | PROPLEX T | 20.00% | $1.75 |
| Hemophilia | RECOMBINATE | 20.00% | $1.75 |
| Hemophilia | REFACTO | 20.00% | $1.75 |
| Hemophilia | STIMATE | 20.00% | $1.75 |
| Hepatitis | COPEGUS | 16.00% | $1.75 |
| Hepatitis | INFERGEN | 16.00% | $1.75 |
| Hepatitis | INTRON A | 16.00% | $1.75 |
| Hepatitis | PEGASYS | 16.00% | $1.75 |
| Hepatitis | PEG-INTRON | 16.00% | $1.75 |
| Hepatitis | REBETOL | 16.00% | $1.75 |
| Hepatitis | REBETRON | 16.00% | $1.75 |
| Hepatitis | ROFERON-A | 16.00% | $1.75 |
| Hepatitis | RIBAVIRIN | 45.00% | $1.75 |
| Hereditary Tyrosinemia | ORFADIN | 0.00% | $1.75 |
| HIV | FUZEON | 15.00% | $1.75 |
| Hyperparathyroidism | SENSIPAR | 15.00% | $1.75 |
| Immune Deficiency | ACTIMMUNE | 16.00% | $1.75 |
| Immune Deficiency | BAYGAM | 16.00% | $1.75 |
| Immune Deficiency | BAYRHO-D | 16.00% | $1.75 |
| Immune Deficiency | CARIMUNE | 16.00% | $1.75 |
| Immune Deficiency | CYTOGAM | 16.00% | $1.75 |
| Immune Deficiency | FLEBOGAMMA | 16.00% | $1.75 |
| Immune Deficiency | GAMIMUNE N | 16.00% | $1.75 |
| Immune Deficiency | GAMMAGARD | 16.00% | $1.75 |
| Immune Deficiency | GAMMAR-P I.V. | 16.00% | $1.75 |
| Immune Deficiency | GAMUNEX | 16.00% | $1.75 |
| Immune Deficiency | IMMUNE GLOBULIN | 16.00% | $1.75 |
| Immune Deficiency | IVEEGAM | 16.00% | $1.75 |
| Immune Deficiency | MICRHOGAM | 16.00% | $1.75 |
| Immune Deficiency | OCTAGAM | 16.00% | $1.75 |
| Immune Deficiency | PANGLOBULIN | 16.00% | $1.75 |
| Immune Deficiency | POLYGAM S/D | 16.00% | $1.75 |
| Immune Deficiency | RESPIGAM | 16.00% | $1.75 |
| Immune Deficiency | RHOGAM | 16.00% | $1.75 |

CARP-00080

| THERAPEUTIC CLASS | BRAND NAME | AWP DISCOUNT % | DISPENSING FEE* |
|---|---|---|---|
| Immune Deficiency | RHOPHYLAC | 16.00% | $1.75 |
| Immune Deficiency | VENOGLOBULIN-S | 16.00% | $1.75 |
| Immune Deficiency | WINRHO SDF | 16.00% | $1.75 |
| Impotency | CAVERJECT | 15.00% | $1.75 |
| Impotency | EDEX | 15.00% | $1.75 |
| Impotency | MUSE | 15.00% | $1.75 |
| Infertility | ADAGEN | 0.00% | $1.75 |
| Infertility | A.P.L. | 17.00% | $1.75 |
| Infertility | ANTAGON | 17.00% | $1.75 |
| Infertility | BRAVELLE | 17.00% | $1.75 |
| Infertility | CETROTIDE | 17.00% | $1.75 |
| Infertility | CHOREX-10 | 17.00% | $1.75 |
| Infertility | CHORIONIC GONADOTROPIN | 17.00% | $1.75 |
| Infertility | FERTINEX | 17.00% | $1.75 |
| Infertility | FOLLISTIM/ANTAGON | 17.00% | $1.75 |
| Infertility | FOLLISTIM/AQ | 17.00% | $1.75 |
| Infertility | GANIRELIX ACETATE | 17.00% | $1.75 |
| Infertility | GONAL-F | 17.00% | $1.75 |
| Infertility | HUMEGON | 17.00% | $1.75 |
| Infertility | LUVERIS | 17.00% | $1.75 |
| Infertility | NOVAREL | 17.00% | $1.75 |
| Infertility | OVIDREL | 17.00% | $1.75 |
| Infertility | PERGONAL | 17.00% | $1.75 |
| Infertility | PREGNYL | 17.00% | $1.75 |
| Infertility | PROFASI | 17.00% | $1.75 |
| Infertility | REPRONEX | 17.00% | $1.75 |
| MS | AVONEX | 15.00% | $1.75 |
| MS | BETASERON | 15.00% | $1.75 |
| MS | COPAXONE | 15.00% | $1.75 |
| MS | NOVANTRONE | 15.00% | $1.75 |
| MS | REBIF | 15.00% | $1.75 |
| MS | TYSABRI | 15.00% | $1.75 |
| Mucopolysaccharidosis | ALDURAZYME | 10.00% | $1.75 |
| Osteo-Arthritis | HYALGAN | 15.00% | $1.75 |
| Osteo-Arthritis | ORTHOVISC | 15.00% | $1.75 |
| Osteo-Arthritis | SUPARTZ | 15.00% | $1.75 |
| Osteo-Arthritis | SYNVISC | 15.00% | $1.75 |
| Osteoporosis | FORTEO | 15.00% | $1.75 |
| Psoriasis | AMEVIVE | 15.00% | $1.75 |
| Psoriasis | RAPTIVA | 15.00% | $1.75 |
| Pulmonary Hypertension | FLOLAN | 0.00% | $1.75 |
| Pulmonary Hypertension | REMODULIN | 0.00% | $1.75 |
| Pulmonary Hypertension | TRACLEER | 10.00% | $1.75 |
| Rheumatoid Arthritis | ENBREL | 15.00% | $1.75 |
| Rheumatoid Arthritis | HUMIRA | 15.00% | $1.75 |
| Rheumatoid Arthritis | KINERET | 15.00% | $1.75 |
| Rheumatoid Arthritis | REMICADE | 15.00% | $1.75 |
| RSV | SYNAGIS | 15.00% | $1.75 |

* If postage rates (i.e., U.S. mail and/or applicable commercial courier services) increase during the term of this Agreement, the Dispensing Fee will be increased to reflect such increase(s).

CARP-00081

# SCHEDULE C
## SAMPLE MEMBER FUND ADDENDUM

**THIS ADDENDUM** is entered into as of the ___ day of _____, _____, (the "Member Fund Addendum Effective Date") between Medco Health Solutions, Inc., located at 100 Parsons Pond Drive, Franklin Lakes, New Jersey 07417 ("Medco") and _____, located at _____ ("Member Fund").

**WHEREAS,** pursuant to the Integrated Prescription Drug Program Master Agreement (the "Agreement") dated as of July 1, 2005, between Medco Health Solutions, Inc., and The National Labor Alliance of Health Care Coalitions, Inc. ("NLAHCC"), those parties desire for prescription drug benefit services to be provided to Member Fund under this separate agreement addendum to be executed between Medco and the Member Fund; and

**WHEREAS,** Medco Health Solutions, Inc. provides prescription drug benefits programs and, in connection therewith, has established networks of participating retail pharmacies and operates a system for the processing, fulfillment and payment of claims for prescription drugs furnished by such pharmacies; and

**WHEREAS,** Medco Health Solutions, Inc.'s Medco By Mail mail order pharmacy subsidiaries are licensed pharmacies which provide prescription drugs via a mail order service; and

**WHEREAS,** NLAHCC and Participating Member Funds desire to retain the services of Medco Health Solutions, Inc. and its subsidiaries, including Medco, L.L.C., as applicable, which holds TPA licenses in certain states (collectively, "Medco"), to provide a prescription drug benefit program (the "Program") including, but not limited to, retail and mail order, and specialty pharmacy services for eligible persons, point-of-care, physician office communications, and cost containment initiatives developed and implemented by Medco, which may include communications with prescribers, patients and/or participating pharmacies, and financial incentives to participating pharmacies for their participation in such initiatives (collectively, "PBM Services").

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

1.      Member Fund agrees to be bound by all the terms of the Agreement (which is incorporated by reference), except as modified herein.

2.      <u>Notices</u> - All notices required under this Addendum shall be in writing and sent by First Class mail, postage paid, facsimile or overnight delivery addressed as follows:

        If to Medco:        Medco Health Solutions, Inc.
                                100 Parsons Pond Drive
                                Franklin Lakes, NJ  07417
                                Attention:  Thomas M. Moriarty
                                Vice President and Managing Counsel
                                Commercial Transactions

        If to the Participating
        Member Fund:

3.      Except as specifically modified by this Addendum, all of the terms of the Agreement will remain in effect.  All capitalized terms used herein shall be defined as set forth in the Agreement, unless otherwise defined herein.

CARP-00082

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date indicated below.

| MEDCO HEALTH SOLUTIONS, INC. | PARTICIPATING MEMBER FUND |
|---|---|
| BY:_____ | BY:_____ |
| (signature) | (signature) |
| NAME:_____Thomas M. Moriarty_____ | NAME:_____ |
| | (type or print name) |
| Vice President and Managing Counsel | |
| TITLE:_____Commercial Transactions_____ | TITLE:_____ |
| DATE:_____ | DATE:_____ |

CARP-00083

## SCHEDULE D
## PARTICIPATING MEMBER FUNDS CRITERIA

### 1.    PARTICIPATING MEMBER FUND INFORMATION

Each Participating Member Fund shall promptly furnish to Union Labor Life, who shall forward to Medco, in a format acceptable to Medco, all information necessary for Medco to render the services set forth herein for each Participating Member Fund. Such information shall include, but is not limited to:

1.1.    A file of Eligible Persons, and subsequent timely additions and deletions to such file as changes occur. Each Participating Member Fund shall pay for any Covered Drug dispensed to a person reported by the Participating Member Fund to Union Labor Life as no longer an Eligible Person if such notification is not received by Medco from Union Labor Life at least two (2) full business days prior to the dispensing date of such prescription.

1.2.    Designation, in writing, of those Plan Design features to be determined by each Participating Member Fund. The Plan Design, and any modifications thereto, are subject to the prior approval of Medco, which approval shall not be unreasonably withheld.

1.3.    The reimbursement terms applicable to direct reimbursement claims submitted by Eligible Persons under the Retail Pharmacy Program.

1.4.    The type, number and description of Identification Cards required for the Retail Pharmacy Program.

### 2.    BILLING/PAYMENT

2.1.    Union Labor Life shall provide each Participating Member Fund with a bi-weekly consolidated invoice for services provided by Medco Health under the Program, in accordance with the Program Pricing set forth in Schedule A. All invoices shall be paid in full by Union Labor Life to Medco Health within two (2) business days of receipt by wire transfer, electronic debit or other method approved by Medco Health in writing.

2.2.    Each Participating Member Fund shall pay to Medco Health through Union Labor Life for administrative products and services provided by Medco Health under the Program in accordance with the Administrative Fee provisions set forth in Schedule A. Union Labor Life will provide each Participating Member Fund with an Administrative Fee invoice in accordance with Medco Health's four (4) week Administrative Fee cycle. Union Labor Life shall pay Administrative Fee invoices in full within fifteen (15) days of the invoice date.

2.3.    Medco may revise the Program Pricing Terms set forth in Schedule A during the term of this Agreement upon sixty (60) days prior written notice to the NLAHCC and each Participating Member Fund. If any such Program Pricing Terms revision is unacceptable to the NLAHCC or such Participating Member Fund, the NLAHCC and the Participating Member Fund shall notify Medco, in writing, within fifteen (15) days of the NLAHCC and such Participating Member Fund's receipt of notice of the pricing revision. If the parties are unable to agree on mutually acceptable pricing, any party may terminate this Agreement upon sixty (60) days prior written notice to the other parties, provided such notice is given prior to the effective date of the proposed pricing revision.

2.4.    Each Participating Member Fund through Union Labor Life shall pay to Medco, on or before its Member Fund Addendum Effective Date, a deposit equal to one (1) claims cycle's anticipated claims experience, which amount may be periodically modified by Medco based on each

CARP-00084

Participating Member Fund's actual claims experience and enrollment. This deposit may be used by Medco to offset the failure by the Participating Member Fund, for any reason, to make any payments pursuant to the terms of this Agreement and does not, in any way, limit other remedies available to Medco. The deposit, to the extent not utilized to offset any payment default by that Participating Member Fund under this Agreement, shall be returned to that Participating Member Fund within one hundred eighty (180) days following termination of this Agreement.

2.5.    Failure by any Participating Member Fund or Union Labor Life to make any payments in accordance with the terms of this Agreement shall constitute a payment default. Notwithstanding Section 10.2 of this Agreement, if the Participating Member Fund or Union Labor Life fails to cure any such payment default within two (2) days, in addition to other available remedies, Medco may terminate this Agreement upon notice to the Participating Member Fund. There shall be a late payment fee of 1% per month on the balance due on all late payments over two (2) days past due. A Participating Member Fund shall reimburse Medco for all collection costs incurred by Medco as a result of any payment default by that Participating Member Fund under this Agreement.

## 3.    RECORDS

3.1.    Medco will maintain all claims records relating to services performed under this Agreement as required by applicable law. Such claims records will be in their original form, on microfilm, microfiche, or other form determined by Medco. The NLAHCC's collective claims records may be audited, based on statistical sampling, or up to eight individual NLAHCC Participating Member Funds may perform individual claims audits, either directly or by a representative approved by Medco, subject to execution of a confidentiality agreement, for a maximum period of twenty-four (24) months prior to the agreed upon audit date, subject to applicable confidentiality provisions and legal requirements. Any audit by the NLAHCC or Participating Member Funds may be conducted once annually upon adequate prior written notice, and during regular business hours. Subject to Section 9.1 Medco may retain copies of such claims records for its own use. Medco's costs for any additional audits beyond the one collective audit or eight individual audits will be paid by NLAHCC or the Participating Member Funds.

3.2.    Each Participating Member Fund shall furnish its most recent audited financial statement to Medco prior to its Member Fund Addendum Effective Date, and thereafter shall furnish its annual audited financial statement to Medco within ninety (90) days after the end of each fiscal year of each Participating Member Fund that this Agreement is in effect.

## 4.    INDEMNIFICATION/LIMITATION OF LIABILITY

4.1.    Medco agrees to indemnify and hold the NLAHCC and/or each Participating Member Fund, their officers, directors and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from services rendered by Medco pursuant to this Agreement to the extent the claim or cause of action arises out of Medco's, negligence or willful misconduct, provided that (a) the NLAHCC and/or the Participating Member Fund has given reasonable notice to Medco of the claim or cause of action, and (b) no Indemnified Party has, by act or failure to act, compromised Medco's position with respect to the resolution or defense of the claim or cause of action.

4.2.    The NLAHCC and each Participating Member Fund agree to indemnify and hold Medco, its affiliates and their respective officers, directors and employees (each an "Indemnified Party") harmless from claims or causes of action asserted against an Indemnified Party arising from negligence or willful misconduct of the NLAHCC or any Participating Member Fund, including without limitation, the disclosure and/or use of Program data or information provided by Medco to the NLAHCC or any Participating Member Fund, provided that (a) the Indemnified Party has given reasonable notice to the NLAHCC and/or the Participating Member Fund of the claim or

CARP-00085

cause of action, and (b) no Indemnified Party has, by act or failure to act, compromised the NLAHCC's or any Participating Member Fund's position with respect to the resolution or defense of the claim or cause of action.

4.3.   Medco shall maintain, during the term of this Agreement, liability coverage with limits not less than $1,000,000 per occurrence and in the aggregate per policy year, with excess liability coverage in an amount not less than $5,000,000 per policy year. Evidence thereof shall be furnished to the NLAHCC or each Participating Member Fund upon request.

4.4.   Except as provided in Section 4.1 above, in no event shall Medco or any affiliated company, or their directors, officers or employees be responsible in any manner for any claim, loss or damage sustained as a result of the provision of or failure to provide pharmaceutical goods or services or any other action or failure to act by any retail pharmacy or pharmaceutical providers pursuant to this Agreement.

4.5.   The liability of Medco to each Participating Member Fund for any acts or omissions by Medco in the performance of their obligations hereunder shall be limited to the insurance amounts listed in Section 4.3 above.

4.6.   In no event shall Medco, the NLAHCC or each Participating Member Fund be liable to each other for incidental, consequential or exemplary damages.

## 5.    GENERAL

5.1.   <u>Independent Contractor</u> - The relationship between Medco and each Participating Member Fund shall solely be that of independent contractors engaged in the operation of their own respective businesses.

5.2.   <u>Assignment</u> - This Agreement may not be assigned by any party without the express prior written consent of the other parties which consent shall not be unreasonably withheld provided, however, that services to be performed by Medco hereunder may be performed by their subsidiaries, affiliates and/or designees.

5.3.   <u>No Third Party Beneficiary</u> - This Agreement has been entered into solely for the benefit of each Participating Member Fund and Medco and is not intended to create any legal, equitable or beneficial interest in any third party or to vest in any third party any interest as to enforcement or performance.

5.4.   <u>Financial Responsibility</u> - In the event Medco has reasonable grounds to believe that any Participating Member Fund may not meet its payment obligations under this Agreement or Member Fund Addendum as they become due, Medco may request information and/or reasonable assurances (including a deposit) from the Participating Member Fund as to its financial responsibility. In the event that such information or assurances are not furnished to Medco within five (5) days, or are not satisfactory in Medco's reasonable judgment, Medco may immediately terminate its Member Fund Addendum with that specific Participating Member Fund.

5.5.   <u>Plan Design</u> - The Program Pricing Terms and the performance standards set forth in this Agreement and/or Member Fund Addendum are based upon the Plan Designs and Program specifications agreed to between the parties as reflected in this Agreement and/or Member Fund Addendum and as otherwise hereafter agreed to by the parties in writing. Any modification of the Plan Designs or Program specifications is subject to Medco's prior approval, which approval shall not be unreasonably withheld. Any such modification may result in a retroactive modification by Medco of the Program Pricing Terms and/or the performance standards. Each Participating Member Fund shall provide Eligible Persons with at least thirty (30) days prior notice of approved Plan Design changes.

CARP-00086

5.6.  <u>Tax</u> - Any applicable sales, use, or other similarly assessed and administered tax imposed on items dispensed, or services provided hereunder, will be the sole responsibility of the Participating Member Fund.  If Medco is legally obligated to collect and remit sales, use, or other similarly assessed and administered tax in a particular jurisdiction, the tax will be reflected on the applicable invoice or subsequently invoiced at such time as Medco becomes aware of such obligation.

CARP-00087

## SCHEDULE E
## NLAHCC MARKETING LANGUAGE

- Medco, through its partnership with ULLICO, will support the branding of the NLAHCC relationship through the marketing of the *NLA Rx* prescription program.

- During the Initial Term of the Agreement, Medco will provide a marketing plan with committed resources for the sales and marketing of *NLA Rx* to the union marketplace.

- A $100,000.00 allowance will be available for the documented cost of communication materials over three (3) year term.

- Medco (and its subsidiary Systemed) will commit to an expanded non-compete provision for NLAHCC identified groups up to 21,000 Eligible Persons.

- In further support of the partnership the *NLA Rx* product will be included as part of the Systemed portfolio during the Initial Term of this Agreement.

CARP-00088

Exhibit P

Filed Under Seal

Exhibit Q

Filed Under Seal

# Exhibit R

# Filed Under Seal

# Exhibit S

# Filed Under Seal

# Exhibit T



DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN

*Analysis of Prescription Drug Benefit Managers*
*December 17, 2004*

✶SEGAL

EXHIBIT
DC-12
11/6/06



SEGAL/NEC 12743

**DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN**

*Analysis of Prescription Drug Benefit Managers*
*December 17, 2004*

Copyright © 2004

THE SEGAL GROUP, INC.,
THE PARENT OF THE SEGAL COMPANY
ALL RIGHTS RESERVED

SEGAL/NEC 12744

**District Council 37 Health & Security Plan**
**Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date**

## INTRODUCTION

This report provides an executive summary and supporting details of our evaluation of the proposals submitted by national Pharmacy Benefit Managers (PBMs) to administer the prescription benefit program on behalf of District Council 37 Health & Security Plan (the Plan). The Request for Proposal and supporting documentation was submitted to 22 prescription management vendors on September 20, 2004. The following 15 vendors submitted proposals:

1. Express Scripts (incumbent vendor)
2. CIGNA HealthCare
3. Empire BlueCross and BlueShield / Caremark, Inc (joint proposal)
4. General Prescription Programs, Inc. (GPP)
5. Group Health, Inc. (GHI)
6. HIP Health Plan of New York
7. Medco Health Solutions
8. MedImpact Pharmaceutical
9. National Medical Health Card Systems (NMHC)
10. Pharmacare
11. Prescription Solutions
12. RxAmerica
13. SavRx Prescription Services
14. SunRx
15. Ullicare

The following vendors did not submit a response to the Request for Proposal:

1. AETNA Health Care
2. Caremark, Inc. (submitted a joint proposal with Empire BlueCross and BlueShield)
3. Integ (purchased by NMHC)
4. Oxford Health Plans (contracts with Medco for PBM services, does not bid if Medco bids)
5. PCN Pharmaceutical Care Network (currently unable to provide proposal for group of this size)
6. United HealthCare (contracts with Medco for PBM services, does not bid if Medco bids)
7. Walgreens Health Initiatives, Inc.

1

SEGAL/NEC 12745

District Council 37 Health & Security Plan

Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

Through an initial evaluation process, we reviewed several key areas of each proposal and reported our findings to the Trustees. Based on this review, the list of vendors to be included in the full analysis report was reduced to six main competitors. Significant issues reviewed included: guarantees of discounts provided in the proposals, vendor's ability to provide on-line systems capabilities that are currently in place, contracting/subcontracting to firms with non-US based employees, audit provisions.

The balance of this report details our findings of the following six vendors: Express Scripts (the incumbent), HIP, Medco, Medimpact, Rx America and Ullicare (using the Medco network). In addition to these vendors, the Trustees requested that we solicit a proposal from Navitus Health Solutions, which recently expanded to a national network.

The evaluation presents the findings of the initial proposals for the six vendors, based on the information provided by each PBM. Our analysis is segmented into the following seven (7) categories:

1. Financial Competitiveness (overall expected costs);
2. Network Access (member access to network pharmacies);
3. Experience and Organization Stability;
4. Administrative Services (claims paying services, account management, data reporting);
5. Network Management (provider support, quality assurance, audits);
6. Formulary Management; and
7. Clinical Programs and Drug Utilization Review

Ranking or scores by category are presented for comparative assessments of each bid. In addition, highlights of the strengths and weaknesses of each proposal are provided to support the rankings and scores. The financial and network access sections are ranked on objective criteria and results. Subjective rankings/scoring is provided for all other categories.

*Scoring Criteria* is provided for selected features/responses within each proposal. The comparative exhibits indicate what features were scored by category. Scoring methods are based on scale from 0% to 100%, incorporating expectations of optimal, average and below average performance. We recommend that the Trustees focus on the relative differences between each vendor rather than the absolute score of each bidder.

SEGAL/NEC 12746

District Council 37 Health & Security Plan

Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*Program Effective Date* – We requested that all proposals include an effective date of March 1, 2005 to ensure that each proposal provides equivalent pricing assumptions. Each vendor was also requested to agree to a three-year contract, granting the Plan the right to terminate the contract, for any reason, upon 60-days advance written notice. These provisions provide the Plan with the benefit guaranteed discounts, fees, and rebates while retaining the ability to consider other proposals if there is a significant change in the competitiveness of the PBM marketplace.

## EXECUTIVE SUMMARY - OVERALL RESULTS OF PROPOSAL ANALYSIS

The following table represents a summary of the responses from the six vendors for each of the categories of the analysis. The overall results reflect that most of the proposals are relatively close, with strengths and weaknesses in specific categories

The scoring of each section is based on a weighted average score of the individual questions within the category. Financial scores are based on ingredient costs, dispensing fees, rebates and administrative fee costs proposed by each vendor. Access is based on standard pharmacy networks using the criteria of one pharmacy within 2 miles.

| PBM | Financial | Network Access | Experience & Stability | Administrative Services | Network Management | Formulary Management | Clinical DUR |
|---|---|---|---|---|---|---|---|
| Express Scripts | 92.6% | 90.0% | 70.5% | 84.3% | 52.5% | 75.0% | 90.5% |
| HIP | 89.9% | 90.0% | 65.0% | 78.7% | 83.5% | 70.0% | 72.5% |
| Medco | 97.3% | 95.0% | 65.5% | 89.5% | 77.3% | 90.0% | 81.5% |
| Medimpact | 80.1% | 85.0% | 69.3% | 81.5% | 52.5% | 90.0% | 77.5% |
| RxAmerica | 65.4% | 85.0% | 77.5% | 86.3% | 45.0% | 65.0% | 55.5% |
| Ullicare | 87.5% | 100.0% | 60.0% | 76.0% | 75.0% | 80.0% | 89.0% |

As can be seen in the table above, no single vendor consistently scored highest across all categories. Express Scripts and Medco were among the three highest scores in 5 and 6 of the categories, respectively. RxAmerica scored low in several areas, particularly financial. Based on these results, we would recommend that the Trustees select 3 or 4 vendors for continued negotiations, plus review the proposal being submitted by Navitus Health Solutions.

3



SEGAL/NEC 12747

**District Council 37 Health & Security Plan**
**Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date**

FINANCIAL COMPETITIVENESS

One of the objectives of the Plan's prescription drug benefit program is to control costs. The financial evaluation is designed to compare projected drug benefit costs under the financial terms proposed by each vendor.

As part of the specifications sent to each of the bidders, the financial information included a combination of Federal Upper Limit (FUL) pricing and Average Wholesale Price (AWP) for medications without an FUL price. This pricing methodology was utilized in combination with actual claim history experience of the Plan to estimate the financial impact of each of the vendor's proposed pricing.

The following factors contributed to the program cost as follows:

- PBM discount terms – discounts from FUL and AWP for brand and generic drugs;

- Effective discount guarantees regarding Maximum Allowable Cost (MAC) price lists, which ensure a guaranteed minimum discount on generic drugs;

- PBM administrative fee levels;

- Guaranteed Retail and Mail Order pharmacy dispensing fees for generic and brand drugs; and

- Amount and level of drug manufacturer rebate amounts guaranteed by the PBM to be returned to the Plan.

Each of these factors has been incorporated into our financial evaluation. The following table reflects the estimated cost under the proposed financial arrangements for each of the vendors: Medco, Express Scripts, HIP, Medimpact, Ullicare and Rx America. The proposed financial arrangements are compared to the current prescription drug program administered by Express Scripts.

Differences in effectiveness of vendor Drug Utilization Review (DUR), formulary drug mix and other cost control efforts are not captured in the financial projections and require more in-depth and verifiable information from each vendor. The financial section is based upon estimated costs utilizing actual Plan's claim historical experience. The methodology used for scoring the financial section includes 90 percent weight to estimated costs with responses to financial questions weighted at 10 percent.

4

SEGAL/NEC 12748

## District Council 37 Health & Security Plan
### Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

The Financial Exhibits contained in the appendix of this report provide a detailed comparison of the various financial components mentioned above, which contribute to the total prescription benefit cost. The following table summarizes the savings for each vendor under the requested plan parameters, using the incumbent as the base line for comparison.

| Vendor | Gross Cost (Before Discounts) | Discounted Cost | Dispensing Fees | Rebates | Claim Cost | Administrative Fees | Net Cost to Plan Before Copays | Change from Current |
|---|---|---|---|---|---|---|---|---|
| Express Scripts-Current Terms | $314,327,000 | $233,763,000 | $2,285,000 | $9,890,000 | $226,158,000 | $0 | $226,158,000 | N/A |
| Medco | $314,327,000 | $231,188,000 | $2,192,000 | $13,986,000 | $219,394,000 | $0 | $219,394,000 | ($6,764,000) |
| Express Scripts | $314,327,000 | $230,799,000 | $2,181,000 | $12,612,000 | $220,367,000 | $0 | $220,367,000 | ($5,791,000) |
| HIP | $314,327,000 | $225,844,000 | $3,317,000 | $7,876,000 | $221,285,000 | $438,000 | $221,723,000 | ($4,435,000) |
| Medimpact | $314,327,000 | $236,153,000 | $2,192,000 | $11,466,000 | $226,879,000 | $0 | $226,879,000 | $721,000 |
| Ullicare | $314,327,000 | $237,383,000 | $2,192,000 | $12,437,000 | $227,138,000 | $0 | $227,138,000 | $980,000 |
| RxAmerica | $314,327,000 | $236,984,000 | $2,192,000 | $9,990,000 | $229,185,000 | $125,000 | $229,310,000 | $3,152,000 |

*[Handwritten annotations: "SAVINGS of $6M", "Improved 153,000", "2,999,000"]*

Based upon the analysis of the overall program costs, the financial proposals provided by Medco, Express Scripts and HIP are projected to reduce the Plan's prescription costs over the current Express Scripts pricing. Medco provided the most competitive proposal with respect to financial pricing with estimated savings of $6.8 million over the current Express Scripts pricing. The revised Express Scripts pricing is estimated to save $5.8 million. The HIP proposal is estimated to produce savings of $4.4 million. Medimpact and Ullicare provided proposals that would be slightly higher costs than the current plan. The RxAmerica proposal is projected to result in costs significantly higher than the current arrangement with Express Scripts. The figures shown reflect the cost to the Plan before any copayments by the members.

While the dollar amount of the difference between the vendors' expected costs is significant, it is worth noting that the difference between the three most competitive financial offers is less than 1.0%.

5

SEGAL/NEC 12749

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

Financial Offering Highlights

*Medco*

- Offered the most competitive rebate guarantees of $3.19 per retail script and $10.01 per mail order script (80% of rebate dollars).

- Minimum guaranteed rebates will be remitted to the Plan monthly, payable 30 days after month-end. If actual rebates exceed the minimum guarantee, the additional rebates will be returned to the Plan following an annual reconciliation.

- Guaranteed discounts for retail estimated as follows: for single source brand name drugs–16.5 percent off AWP, multi source brand and generic drugs with FUL pricing 18.0 percent off of FUL, and multi source brand and generic drugs without FUL – 30 percent off of AWP. For mail order: single source brand name drugs – 24.5 percent off of AWP, multi source brand drugs with FUL pricing 24.5 percent off of FUL, generic with FUL pricing 55.0 percent of of FUL, multi source brand name and generic drugs without FUL pricing – 55.0 percent off of AWP.

- Dispensing fees of $1.75 per retail script and no dispensing fees at mail order.

- No administrative fee per claim cost.

- Providing only flat discount guarantee, no provision for pass through pricing. Under this arrangement, Medco will be responsible for any deficit if a negotiated retail discount is less than the guarantee, and retain any margin if a negotiated retail discount is better than the discount guaranteed in the proposal.

- Will not grant full disclosure of rebate contracts; applicable rebate contract provisions will be available for review only by an approved accounting firm for auditing purposes.

*Express Scripts*

- Rebate guarantees of $2.50 per retail script and $9.50 per mail order script (100% of rebate dollars). Although Express Scripts notes that guaranteed rebate per prescription equals 100% of rebates, they indicate in another response that they do retain "manufacturer's data fees".

- Rebates remitted to the Plan after an estimated 5-month lag; Express Scripts did not agree to monthly funding of minimum rebate guarantees.

6

SEGAL/NEC 12750

**District Council 37 Health & Security Plan**
**Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date**

- Guaranteed discounts for retail estimated as follows: for single source brand name drugs-16 0 percent off AWP, multi source brand and generic drugs with FUL pricing 17.0 percent off of FUL, and multi source brand and generic drugs without FUL – 31 percent off of AWP. For mail order: single source brand name drugs – 25.0 percent off AWP, multi source brand and generic drugs with FUL pricing- 28.0 percent off of FUL, multi source brand and generic without FUL pricing – 32.0 percent off of AWP.

- Proposed lowest dispensing fees of $1.65 per brand script and $1.85 per generic script at retail. No dispensing fees at mail order.

- No administrative fee per claim cost.

- Limitations on scope of audit proposed in Audit Protocol. Includes limitations on period which may be reviewed (2 calendar quarters during most recent 12-month period), audit limited to 50% of rebate dollars, and limited to 5 rebate contracts.

- If actual discounts are greater than the contracted rate, Express Scripts will retain any spread between the discount realized and the discount guaranteed to the Plan.

*HIP*

- Rebate guarantees of $3.50 per retail and mail order script. The proposal did not provide the percentage of total rebates.

- Rebates remitted to the Plan after an estimated 120-day lag; HIP did not agree to monthly funding of minimum rebate guarantees.

- Guaranteed discounts for retail estimated as follows: for single source brand name drugs-16 0 percent off AWP, multi source brand and generic drugs with FUL pricing 23.0 percent off of FUL, and multi source brand and generic drugs without FUL – 43.1 percent off of AWP. For mail order: single source brand name drugs – 24.0 percent off AWP, multi source brand and generic drugs with FUL pricing- 20.9 percent off of FUL, multi source brand and generic without FUL pricing – 65.0 percent off of AWP.

- Dispensing fees of $2.25 per retail script and $0.50 per mail order script.

- An administrative fee per retail claim of $0.35 per script.

- Does not keep a spread between the discount realized and the discount given to the Plan.

- HIP provided liberal auditing rights to the Plan. Will permit an audit of the rebate terms, subject to compliance with disclosure requirements of agreements with manufacturers.

SEGAL/NEC 12751

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*Medimpact*

- Rebate guarantees of $2.70 per retail script and $8.10 per mail order script (95 – 100% of total rebates).

- Proposed monthly payment of guaranteed rebates beginning 6 months after implementation. Indicated that they would be willing to discuss further if selected as a finalist.

- Guaranteed discounts for retail estimated as follows: for single source brand name drugs–15.5 percent off AWP, multi source brand and generic drugs with FUL pricing 18.8 percent off of FUL, and multi source brand and generic drugs without FUL – 25.0 percent off of AWP. For mail order: single source brand name drugs – 23.0 percent off AWP, multi source brand and generic drugs with FUL pricing- 0.0 percent off of FUL, multi source brand and generic without FUL pricing – 50.0 percent off of AWP.

- Dispensing fees of $1.75 per brand and generic retail prescriptions. No dispensing fee for mail order.

- There will be no administrative fee per prescription.

- If actual discounts are greater than the contracted rate, MedImpact will retain any spread between the discount realized and the discount guaranteed to the Plan.

- Will permit an audit of the rebate terms.

*Ullicare*

- Ullicare has proposed coalition pricing through the National Labor Alliance (NLA). Ullicare stated that the addition of a client the size of DC37 would improve the financial offering of the NLA program, but were unable to provide a guarantee or estimate on potential savings.

- Rebate guarantees of $2.83 per retail script and $8.91 per mail order script (90% of total rebates).

- Guaranteed discounts for retail estimated as follows: for single source brand name drugs–15.5 percent off AWP, multi source brand and generic drugs with FUL pricing 0.0 percent off of FUL, and multi source brand and generic drugs without FUL – 15.5 percent off of AWP. For mail order: single source brand name drugs – 23.0 percent off AWP, multi source brand and generic drugs with FUL pricing- 0.0 percent off of FUL, multi source brand and generic without FUL pricing – 60.0 percent off of AWP.

- Dispensing fees of $1.75 for retail. No dispensing fees for mail order.

- There will be no administrative fee per script.

8

SEGAL/NEC 12752

District Council 37 Health & Security Plan

Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

- Providing only flat discount guarantee, no provision for pass through pricing. Under this arrangement, Ullicare will be responsible for any deficit if a negotiated retail discount is less than the guarantee, and retain any margin if a negotiated retail discount is better than the discount guaranteed in the proposal.

- Rebate payments expected to begin 6 to 9 months after implementation and 180 days after the end of each quarter thereafter. Will not remit minimum rebate guaranteed amounts monthly.

- Did not provide specific rights to audit rebate contracts.

RxAmerica

- Rebate guarantees of $2.00 per retail prescription and $7.50 per mail order prescription (75% of total rebates).

- Guaranteed discounts estimated for retail as a percentage off of AWP as follows: single source brand drugs at 16.0 percent off of AWP, multi source brand drugs at 26.1 percent off AWP and generic at 49.8 percent off AWP. For mail order the discounts are: for single source brand 23.0 percent off of AWP, for multi source brand 8.1 percent off of AWP and for generic drugs 24.1 percent off of AWP. Rx America did not provide pricing in the FUL format requested.

- Dispensing fees of $1.75 per retail script. No dispensing fees at mail order.

- There will be an administrative fee of $0.10 per retail prescription. This fee applies to any claim adjudicated through the RxAmerica system, except for transmission errors and processing errors.

- RxAmerica agrees to remit the guaranteed rebate amounts monthly. Although they stated that they would perform a quarterly reconciliation, there rebate is a fixed guarantee (RxAmerica retains any rebates above the guarantee) so there would be no need for a reconciliation.

- Rebate contracts would not be available for auditing purposes, since the guarantee is for a fixed dollar rebate level.

- Retains spread between negotiated retail pharmacy discounts and discounts guaranteed to the Plan, difference between rebates negotiated with manufacturers and guaranteed to the Plan, and difference between acquisition cost and guaranteed discounts through the mail order facility.

9

SEGAL/NEC 12753

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## NETWORK ACCESS

Access to network pharmacies was measured by member access to each network's standard panel of participating pharmacies using the following measurements:

- The total number of pharmacies in the network
- The number of pharmacies in the network with 24-hour access
- The number of pharmacies within 2 miles of a member residence
- The number of pharmacies within 5 miles of a member residence

The following summarizes the responses from each of the bidders:

| Vendor | Primary Strength |
|---|---|
| Ullicare | 60,275 total pharmacies in national network, 19,508 with 24-hour access<br>23,908 pharmacies within 2 miles of participants residence<br>35,421 pharmacies within 5 miles of participants residence<br>Average travel distance of 0.2 miles to a network pharmacy |
| Medco | 51,042 total pharmacies in national network, 18,231 with 24-hour access<br>20,670 pharmacies that meet the standard within 2 miles<br>30,118 pharmacies that meet the standard within 5 miles<br>Average travel distance of 0.3 miles to a network pharmacy |
| Express Scripts | 57,051 total pharmacies in national network, 1,652 with 24-hour access<br>19,579 pharmacies that meet the standard within 2 miles<br>31,706 pharmacies that meet the standard within 5 miles<br>Average travel distance of 0.5 miles to a network pharmacy |

10

SEGAL/NEC 12754

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

[handwritten: within of Hrt w/Cantives HP Cantives]

| HIP | 35,387 total pharmacies in national network; 1,062 with 24-hour access<br>18,424 pharmacies that meet the standard within 2 miles<br>91,744 pharmacies that meet the standard within 5 miles<br>Average travel distance of 0.5 miles to a network pharmacy |
| Rx America | 53,450 total pharmacies in national network; 2,102 with 24-hour access<br>17,678 pharmacies that meet the standard within 2 miles<br>29,382 pharmacies that meet the standard within 5 miles |
| MedImpact | 59,000 total pharmacies in national network; 2,000 with 24-hour access<br>Additional access information has been requested |

Based on the initial responses from the vendors, we have requested additional information from the vendors. The response from MedImpact did not provide all of the information requested, and we are requesting clarification on the information provided by HIP. The remaining vendors reported networks of approximately 50,000 to 60,000 pharmacies. We are also obtaining data from the vendors required to produce access information by county in New York, New Jersey, and Florida.

11

SEGAL/NEC 12755

District Council 37 Health & Security Plan
Analysis of Prescription/Benefit Manager Proposals – March 1, 2005 Effective Date

Sun reimputated - Murph in pharmacy
ESI-They services at of us

## ORGANIZATIONAL STABILITY

The Organizational Stability section of the analysis is somewhat subjective relative to the scoring of other sections of the report. Organizations that have positive but not overwhelming growth in membership, experienced staff, strong financials and no known threats to their organization via pending litigation or major changes in ownership received favorable scores.

Some highlights of the bidders ranked by overall scoring are provided below:

### Rx America

- Relatively small membership base of 5.2 million members, which may affect negotiating leverage with manufacturers and retail pharmacies.
- Manageable membership growth rate of 10.8 percent.
- Mail order services supplied through Walgreens.
- Reported that there have been no judgements or ongoing litigation in excess of $1 million during the past 10 years.
- Account management turnover rate of less than one percent in the past twelve months.
- No expansions or reorganizations have occurred within the last 12 months.
- Account Executive, Account Manager and Customer Service Representatives have 1.5, 2 and 2 years experience with the RxAmerica, respectively. Although this is relatively low compared with the other vendors, the total years of experience is comparable to other vendors.

### Express Scripts

- Large membership base of 49.8 million in 2003, and 51.9 million as of July, 2004.
- Manageable growth rate of 5 percent in 2003 over 2002.
- Proposal states that Express Scripts is occasionally a party to legal actions, but did not provide the requested specifics for litigation with a liability in excess of $1 million. Express Scripts stated that any proceedings now pending are not, in their opinion, material to the provision of services under their proposal.

12

SEGAL/NEC 12756

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

- In 2004 the PBM purchased CuraScript Pharmacy Inc. and CuraScript PBM Services (operates six specialty drug pharmacies).

- Reported account management turnover rate of 7 percent in the past twelve months.

- Account Executive, Account Manager and Customer Service Representatives have 3, 4 and 2 years experience with the firm, respectively.

*Medimpact*

- Large membership base of 27 million members.

- Manageable annual membership growth rate of 8.7 percent.

- Reported that there have been no judgements in excess of $1 million during 15-year history. MedImpact identified one pending case with the potential liability in excess of $1 million; Irwin v. AdvancePCS et. al. consolidated with AFSCME v. AdvancePCS, Caremark, Express Scripts and Medco.

- No expansion or organizational changes in the last 12 months.

- Account Executive, Account Manager and Customer Service Representatives have 3, 2 and 3 years experience with the firm, respectively.

- Account management turnover rate for the past 12 months of 8 percent.

*Medco*

- Annual membership base of approximately 64.0 million.

- Reported that there have been no judgements in excess of $1 million during the past 10 years. Identified several ongoing matters with potential liability in excess of $1 million and stated that these legal actions would not disrupt business operations.

- No expansion or organizational changes in the last 12 months

- Account Executive, Account Manager and Customer Service Representatives have 10, 11 and 3.9 years experience with the firm, respectively.

- Negative annual growth rate of 1.5 percent (prior period).

- States that the account management turnover rate various by position but ranges from 0 percent to 10.9 percent.

13

SEGAL/NEC 12757

District Council 37 Health & Security Plan

Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*HIP*

- Manageable retail membership growth rate of 7.4 percent (mail order services supplied through Express Scripts).

- Small membership base of approximately 875,000 covered under HIP in retail. The mail figures represent the Express Scripts network at 46 million.

- HIP indicated involvement in a number of legal actions, stating that no pending legal actions that would impact the financial viability of the firm. Did not address claims in excess of $1 million in the past 10 years or potential liability in ongoing litigation cases.

- No expansions or reorganizations in the last 12 months.

- Indicated account management turnover rate of one percent in the past twelve months.

- Account Executive, Account Manager and Customer Service Representatives have 3, 9 and 11 years experience with the firm, respectively.

*Ullicare*

- Network offered through Ullicare utilizes retail and mail networks through Medco.

- Large membership base with 64.0 million members (reported Medco information).

- Negative annual growth rate of 1.5 percent (reported Medco information).

- Identified several ongoing matters and stated that these legal actions would not disrupt business operations.

- No expansion or organizational changes in the last 12 months.

- There has been no account management turnover for ULLICO in the last twelve months, reported 9.5% account management turnover with Medco.

- Account Executive, Account Manager, and Customer Service Representatives all have been with the firm for over 20 years.

14

SEGAL/NEC 12758

District Council 37 Health & Security Plan
Analysis of Prescription/Benefit Manager Proposals – March 1, 2005 Effective Date

## ADMINISTRATIVE SERVICE

The administrative service section is based upon the combined total evaluation and scoring of account services, membership services, claims paying ability and data reporting. For many of the items that were evaluated, all of the vendors had strong consistent responses and scores. Common strengths shared by the vendors include:

- Customer service representatives have online access to claims.
- Provide toll free numbers with adequate hours of operation.
- Have multi-lingual capabilities.
- Have extensive website capabilities.
- Operating at 99 percent or greater on financial accuracy of claim payments.
- Have the ability to allow the Plan online access to reports.
- Have comprehensive and high quality automatic claims edits in place.
- Have in-depth reporting mechanisms and a high quality of reports

*Medco*

- Telephone statistics: Abandonment rate of less than 1.63 percent and speed answer of 21.11 seconds.
- Customer Service Representatives do not have the authority to approve claims.
- Will provide two ID cards. Additional cards will include a fee to be determined (implementation credit may be used to offset charge).
- Claims coding accuracy of 100%.
- Latest member satisfaction results show 91.9 percent as satisfied for 2003. Survey is performed by an independent third party.
- Has a formal claims recovery process and returns 100 percent of the monies to the Plan.
- Can administer COB and has been chosen to administer the Medicare Part D program – will work with Plan on design and transition.

15

SEGAL/NEC 12759

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## Rx America

- Telephone statistics: Abandonment rate of less than 1.0 percent and speed answer of 16 seconds.
- The authority of the customer service representatives to approve claims will be determined in conjunction with the Plan
- Initial ID cards are included in the fee. Additional cards will have a cost of $1.00 per card.
- Claims coding accuracy of 99.9%.
- Will not disclose the results of membership surveys – considers the information proprietary.
- Has a formal claims recovery process and returns 100% of the monies to the Plan.
- Can administer COB. Currently reviewing what role will be with Medicare Part D program.

## Express Scripts

- Telephone statistics: Abandonment rate of 4.1 percent and speed of answer of 29 seconds.
- Does not specify if customer service representatives will have authority to approve claims.
- Initial and replacement ID cards are included in the fee.
- Claims coding accuracy of 98 %.
- Latest member satisfaction survey results reflect overall 96.6 percent as satisfied.
- Has a formal process in place for claims recovery and returns 80 percent to the client.
- Can administer COB and is working closely with CMS on the Medicare Part D program.

## Medimpact

- Telephone statistics: Abandonment rate of 1.0 percent and speed of answer of 4 seconds.
- Customer service representatives have the authority to approve claims.
- 2 Initial ID cards are included. Additional cards will be $0.50 per card.

16

SEGAL/NEC 12760

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

- Claims coding accuracy of 99.9 %.
- Does not do membership satisfaction surveys.
- Has a formal process in place for claims recovery and returns 75 percent to the client.
- Can administer COB and is has begun preparation to handle the Medicare Part D program.

## HIP

- Telephone statistics: Abandonment rate of 1.3 percent and speed of answer less than 13 seconds.
- Customer service representatives have the authority to approve claims.
- Initial ID cards are $1.09 per card with replacements at $1.31 per card. This fee increases in year three.
- Claims coding accuracy of 99.0 %.
- Latest membership satisfaction survey result reflect 97.9 percent satisfied.
- Has a formal process in place for claims recovery and returns 70 percent to the client.
- Can administer COB and is prepared to provide actuarial equivalents with respect to the Medicare Part D program.

## Ullcare

- Telephone statistics: Abandonment rate of 4.0 percent and speed of answer of 29.5 seconds.
- Customer service representatives do not have the authority to approve claims.
- 2 Initial ID cards are included in the fee. Each additional card is $0.50 per card.
- Claims coding accuracy of 99.67 %.
- Does not perform member satisfaction surveys.
- Has a formal process in place for claims recovery and returns 100 percent to the client.
- Can administer COB and has been chosen to administer the Medicare Part D program – will work with Plan on design and transition.

17

SEGAL/NEC 12761

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## NETWORK MANAGEMENT

Network management measures the organizational efforts related to the selection and monitoring of network pharmacies, termination rates, incentives to increase generic dispensing and formulary compliance, the return to stock process and the comprehensiveness of audits.

The vendors were consistent in the following areas:

- Network pharmacy termination rates of 1 percent or less.

- Extensive provider support and provider relations.

- Pharmacy contracts include the right for the PBM to perform an audit.

- All have a return to stock process in place (process to ensure that the Plan is credited for prescriptions that are filled, but not obtained by the participant).

- All bidders have a fraud detection program.

The following are the highlights of the bidders for this category:

### *HIP*

- Met all minimum criteria for pharmacy credentialing.

- Performs desktop audits on 20.0 percent of network pharmacies annually, and on-site audits on 80.0 annually.

- For return to stock, after 31 days the pharmacy puts a reversal through on the system.

- Does not have any affiliation with retail providers.

- Does not currently have a Network Pharmacy Report Card Process in place.

18

SEGAL/NEC 12762

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*Medco*

- Met all minimum criteria for pharmacy credentialing.
- Performs desktop audits on 85.2 percent of network pharmacies annually, and on-site audits on 4.6 percent annually.
- For return to stock, formal process in place to ensure a credit to client if script not picked up by member in 14 days.
- Has Network Pharmacy Report Card Process in place.
- Has an affiliation with a number of independent retail pharmacies to encourage member compliance with prescriptions, and with familymeds.com that provides non-prescription health supplies.

*Ulticare*

- Met all minimum criteria for pharmacy credentialing.
- Performs desktop audits on 95.2 percent of network pharmacies annually, and on-site audits of 4.8 percent annually.
- For return to stock, pharmacy can remit reversal within 45 days.
- Has Network Pharmacy Report Card Process in place
- Has an affiliation with CVS pharmacy and a number of other retailers.

*Medimpact*

- Does not meet minimum criteria for pharmacy credentialing – does not do review of onsite appearance and location.
- Performs desktop audits on 25.0 percent of network pharmacies annually, and on-site audits on 5.0 percent annually.
- For return to stock, reversals made if not picked up within 7 to 14 days.
- Has Network Pharmacy Report Card Process in place.
- Offers Choice90Rx: under this program, members have the ability to fill a 90-day prescription at retail, and the Plan will receive the mail order discounts.

19

SEGAL/NEC 12763

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*Express Scripts*

- Does not meet minimum criteria for pharmacy credentialing – does not do review of onsite appearance and location.
- Performs desktop audits on 69.0 percent of network pharmacies annually, and on-site audits on 21.0 percent annually.
- For return to stock, reversals made if not picked up within 14 days.
- Has Network Pharmacy Report Card Process in place.
- Has no affiliation with retail providers.

*Rx America*

- Does not meet minimum criteria for pharmacy credentialing – does not do review of onsite appearance and location.
- Performs desktop audits on 3.0 percent of network pharmacies annually, and on-site audits on 3.0 percent annually.
- For return to stock, initial claim will be reversed and credited to the client.
- Has Network Pharmacy Report Card Process in place.
- Retail pharmacy affiliation: owned by Long Drug Stores (a chain in CA) but operates independently.

20

SEGAL/NEC 12764

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## FORMULARY MANAGEMENT

Effective management of a formulary is essential to managing costs under the any drug program. Effective formulary management is defined as: 1) frequency of Pharmacy and Therapeutic (P&T) Committee Meetings, 2) ability to make custom formulary changes, 3) willingness to reimburse on a dollar for dollar basis for formulary switches which are not ingredient cost justified, 4) the percentage of the manufacturer rebate contracts that include bundling, 5) successful formulary compliance due to comprehensive formulary support, education and promotion, 6) performance of outcome studies tied to the formulary, and 7) the willingness to allow the Plan to audit the manufacturer's rebate contracts.

### Frequency of P&T Committee Meeting

All bidders, with the exception of HIP, state that the P&T committees meet quarterly (HIP notes that the P&T Committee meets regularly). The P&T committees are generally responsible for reviewing the available clinical data, assessing the safety and efficacy and making a determination of the overall clinical merits of the overall clinical merits of drug products–thus responding to market demands and FDA changes, etc. Throughout the process, drugs may be then added to the formulary listing. With the pace of new drugs on the market, more frequent meetings of the P&T committees are desirable.

### Ability to Support Custom Formularies

All of the bidders indicate that they are willing to work with District Council 37 to manage a unique formulary for its members. Express Scripts states that a unique formulary requires the Plan to have its own P&T committee.

### Dollar for Dollar Reimbursement for Formulary Switches

The bidders were asked whether or not they would guarantee that any formulary switches which are not economically advantageous to the Plan on an ingredient cost basis would be reported and reimbursed to the Plan on a dollar for dollar basis using the least expensive, therapeutically equivalent alternative drug as reimbursement. The purpose of this question was to ensure the most financially advantageous position for the Plan. Medimpact and Ullicare agreed to this guarantee. Express Scripts, HIP, Medco and RxAmerica did not indicate that they would agree to this guarantee.

### Percentage of Manufacturer Rebate Contracts Which Include Bundling

Bundling refers to rebate agreements that require medications to be included in a PBMs formulary in order for another medication to be eligible for a rebate. Although bundling is a common practice, the preference in the analysis of the manufacturer rebate agreements is for the percentage of the contracts that include bundling to account for less than 25 percent of the total number of contracts. Express Scripts and HIP indicated that

21

SEGAL/NEC 12765

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

they have no contracts tied to bundling. Medimpact indicates that they have less than 3 percent tied to bundling. RxAmerica states that 25 percent of their rebate agreements include bundling while Medco and Ullicare state that one to two manufacturers are bundled.

*Comprehensiveness of Formulary Support, Education and Promotion*

All bidders use multiple mediums to promote their formularies and to educate patients, providers and pharmacies, which were very extensive.

*Open Communication of Rebate Arrangements*

Express Scripts, Medco, Medimpact and HIP will permit the Plan to audit manufacturer rebate contracts with limitations on the scope of the audit. Many vendors now require that an accounting firm perform rebate contract audits.

Ullicare did not provide an indication of the Plan's right to audit rebate contracts. RxAmerica provided a flat guarantee on rebates, and responded that an audit of the rebate contracts is not applicable.

Ranking
Based on the responses to the individual questions, the ranking of the vendors in this category was as follows: Medco, Ullicare, Medimpact, Express Scripts, HIP and RxAmerica. Details of responses to specific questions can be found in the appendix.

22

SEGAL/NEC 12766

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## CLINICAL PROGRAMS/DRUG UTILIZATION REVIEW (DUR)

Effective clinical programs depend on several factors including: the focus of PBM drug utilization review programs, comprehensiveness of automated clinical edits, overall reported program savings, ability to track savings based upon the Plan's actual claims data, edits in place to signal drug addictions, flags for potential adverse liver affects based upon therapy, logic of flagging and managing high cost claimants and the quality and depth of drug utilization reporting.

Below are highlights of each of the criteria we reviewed with notes and ranking by vendor. See the clinical programs detail exhibit for additional information.

### Comprehensiveness of Automated Edits

Automated edits are controls built into the online claim adjudication systems between the PBM and pharmacy. These edits are designed to verify member eligibility and to identify instances where a prescription is being refilled too soon, may cause an interaction with another medication, and to ensure that the proper dosage and supply is dispensed. All bidders with the exception of Rx America meet the minimum criteria of automated edits incorporated within their clinical programs. RxAmerica does not currently have an edit for contracted price of a drug.

### Overall Reported Program Savings/Use of Actual Claim by Claim Plan Data

The bidders were asked to provide estimated saving attributable to various clinical programs: concurrent DUR, retrospective DUR and prior authorization as a percentage of ingredient costs. Three providers submitted the information in the requested format – Medimpact, RxAmerica and Ullicare. The details of the response for each are provided in the detail sheet for clinical programs. Although savings through these programs vary greatly between plans, the greatest reported savings were reported Rx America.

### Edits for Drug Addiction and Adverse Liver Effects

All of the bidders provide edits that will flag possible drug addiction. Medimpact stated that currently have edits in place that will flag patents for potential adverse liver effects that can be caused by certain medications, while Medco and RxAmerica state they would be willing to work with the Plan to develop flags for these patients. The other carriers state that no flags are in place for adverse liver effects.

### Logic of Flagging and Managing High Cost Claimants

All of the bidders have developed logic and programs to flag and monitor high cost claimants.

23

SEGAL/NEC 12767

**District Council 37 Health & Security Plan**
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

*Quality of DUR Reporting*
Based on a subjective review of the sample reports provided, all bidders provide some level of DUR reports.

Ranking
The ranking of the vendors in this category was as follows: Express Scripts, Medimpact, Ullicare, Medco HIP, and RxAmerica.

24

SEGAL/NEC 12768

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

## ADDITIONAL CONSIDERATIONS

### Pass Through Pricing

We also requested that each vendor provide 100% pass-through pricing as a option for consideration. Although several of the vendors did provide this pricing methodology as well as a flat discount level, the pass through pricing generally provided the same guaranteed discount levels with a higher administrative fee. Without improved guaranteed discount levels associated with pass-through pricing, a valid comparison of relative costs can not be determined. We recommend that each of the vendors given further consideration be requested to provide pass through pricing with discount guarantees that take into account the effect of the pass through agreement.

### Implementation Allowances

Some PBMs offer prospective clients an allowance to cover expenses related to a transition from another PBM organization. In this report, we use the term "Implementation Allowance", however various terms are used by the PBMs including Pharmacy Management Fund, Service Allowance, etc. Since proposals do not generally provide an adequate description of what costs can be allocated towards these allowances or consistent reimbursement details, we do not include these offers in the financial analysis section of this report. For those PBMs that are proposing an allowance, we have provided below a summary of the dollar amounts indicated in the proposals.

   Medco - $600,000

   Express Scripts - $200,000

If a vendor providing an allowance is selected as one of the finalists, we will request formal details and terms of the allowance as part of the finalist negotiation process.

### Limited Networks

The vendors were requested to provide pricing based on their broad network, and on a restricted network. The restricted network would exclude those retail pharmacies with less competitive discounts and dispensing fees, resulting in a higher overall discount to the Plan.

Express Scripts and RxAmerica proposed a limited network with a 1% improved retail brand discount. The improved discount would result in a reduction in annual costs of approximately $910,000.

25

SEGAL/NEC 12769

District Council 37 Health & Security Plan
Analysis of Prescription Benefit Manager Proposals – March 1, 2005 Effective Date

Medco and MedImpact both proposed limited networks with a 1% improved retail brand discount and a reduction in the dispensing fees of $0.10 per prescription. Each of these proposals results in annual savings of approximately $1,040,000. HIP stated that they have the ability to provide a restricted network, but would need to discuss specific requirements to develop a proposal. Ullicare did not provide any information on restricted networks.

Although a limited retail network would generate savings to the Plan, the proposals did not specify which pharmacies or pharmacy chains would be excluded from their network. Based on overall network size reported by the vendors, the number of pharmacies would be reduced by 12% with Medco's restricted network, 30% through RxAmerica, and 43% through Express Scripts.

We recommend that the vendors be requested to provide full access reports for their restricted networks, and a listing of pharmacies that are not included in their restricted network.

## RECOMMENDATIONS AND NEXT STEPS

We recommend that the Trustees select 3 or 4 vendors from the 6 included in this analysis for further review and negotiation, in addition to the proposal being provided by Navitus Health Solutions. After these vendors are selected, we propose to:

- Follow-up with any questions or clarifications requested by Trustees;

- Negotiate improved financial terms;

- In-depth comparison of formulary listing;

- Provide a detailed review of network by area of major concentration (by county for New York and New Jersey).

26

5498300173.001

SEGAL/NEC 12770

## DISTRICT COUNCIL 3,   ALTH SECURITY FUND
### Financial Analysis
(Does Not Include Adjustment for Member Copayment)

| Retail | Current $ | Express Scripts | Medco Health | ULLICO • Medco | Rxamerica | HP | MedImpact |
|---|---|---|---|---|---|---|---|
| **Gross Costs (AWP)** | | | | | | | |
| Singl | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 |
| Multi | $279,228 | $279,228 | $279,228 | $279,228 | $279,228 | $279,228 | $279,228 |
| Gene | $27,232,169 | $27,232,169 | $27,232,169 | $27,232,169 | $27,232,169 | $27,232,169 | $27,232,169 |
| Total | $119,374,174 | $119,374,174 | $119,374,174 | $119,374,174 | $119,374,174 | $119,374,174 | $119,374,174 |
| **Guaranteed Discounts (AWP BASIS)** | | | | | | | |
| Singl | 15.2% | 16.0% | 16.0% | 15.5% | 16.0% | 16.0% | 15.5% |
| Multi | 5.7% | 32.4% | 31.5% | 17.2% | 26.1% | 43.8% | 25.9% |
| Gene | 37.8% | 40.6% | 40.6% | 28.0% | 32.7% | 45.5% | 38.4% |
| **Retail Reprod Ingredient Costs** | | | | | | | |
| Singl | $77,945,507 | $77,164,733 | $77,164,733 | $77,624,047 | $77,164,733 | $77,164,733 | $77,624,047 |
| Multi | $264,605 | $188,662 | $191,370 | $231,131 | $206,472 | $156,906 | $204,249 |
| Gene | $16,933,374 | $16,168,454 | $16,168,454 | $16,537,090 | $18,337,090 | $14,071,178 | $16,764,299 |
| Total | $95,148,547 | $93,472,415 | $93,434,597 | $97,457,534 | $96,708,295 | $91,313,616 | $94,592,896 |
| **Gross Costs (AWP and FUL)** | | | | | | | |
| Singl | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 | $91,862,777 |
| Multi | $11,799 | $11,799 | $11,799 | $11,799 | $11,799 | $11,799 | $11,799 |
| Gene | $5,345,148 | $5,345,148 | $5,345,148 | $5,345,148 | $5,345,148 | $5,345,148 | $5,345,148 |
| Multi | $225,564 | $225,564 | $225,564 | $225,564 | $225,564 | $225,564 | $225,564 |
| Gene | $13,316,590 | $13,316,590 | $13,316,590 | $13,316,590 | $13,316,590 | $13,316,590 | $13,316,590 |
| **Guaranteed Discounts** | | | | | | | |
| Singl | 15.2% | 16.0% | 15.5% | 15.5% | 16.0% | 16.0% | 15.5% |
| Multi | -367.7% | 17.0% | 19.0% | 0.0% | 0.0% | 23.0% | 18.8% |
| Gene | 11.5% | 17.0% | 18.0% | 0.0% | 0.0% | 23.0% | 18.8% |
| Multi | 14.8% | 31.0% | 30.0% | 15.5% | 25.0% | 43.1% | 25.0% |
| Gene | 26.3% | 31.0% | 30.0% | 15.5% | 25.0% | 43.0% | 25.0% |
| **Retail Reprod Ingredient Costs (FUL)** | | | | | | | |
| Singl | $77,945,507 | $77,164,733 | $76,705,419 | $77,164,733 | $77,164,733 | $77,164,733 | $77,624,047 |
| Multi | $43,379 | $9,799 | $9,675 | $11,799 | $11,799 | $9,799 | $9,976 |
| Multi | $7,296,045 | $5,928,882 | $8,845,481 | $8,345,148 | $5,427,229 | $5,427,229 | $16,775,337 |
| Gene | $5,221,227 | $178,089 | $181,696 | $210,332 | $194,673 | $147,832 | $194,673 |
| Gene | $3,548,429 | $3,199,827 | $3,323,013 | $11,254,209 | $13,586,542 | $37,584,507 | $19,388,942 |
| Total | $55,148,647 | $92,472,415 | $93,565,263 | $97,457,534 | $85,104,295 | $91,313,615 | $94,562,595 |
| **Rx Counts** | | | | | | | |
| Singl | 675,643 | 675,643 | 675,643 | 675,643 | 675,643 | 675,643 | 675,643 |
| Multi | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 | 2,257 |
| Gene | 574,450 | 574,450 | 574,450 | 574,450 | 574,450 | 574,450 | 574,450 |
| Total | 1,252,350 | 1,252,350 | 1,252,350 | 1,252,350 | 1,252,350 | 1,252,350 | 1,252,350 |
| **Dispensing Fees Per Rx** | | | | | | | |
| Singl | $1.65 | $1.65 | $1.75 | $1.75 | $1.75 | $2.25 | $1.75 |
| Multi | $1.74 | $1.65 | $1.75 | $1.75 | $1.75 | $2.25 | $1.75 |
| Gene | $1.90 | $1.65 | $1.75 | $1.75 | $1.75 | $2.25 | $1.75 |
| Total | $2,284,913 | $2,941,287 | $2,191,612 | $2,191,612 | $2,191,612 | $2,817,787 | $2,191,612 |
| **Guaranteed Rebate** | | | | | | | |
| Reba | $2.00 | $2.50 | $3.10 | $2.83 | $2.00 | $3.50 | $2.70 |
| Total | $2,504,699 | $3,130,874 | $3,884,985 | $3,544,149 | $2,504,699 | $4,383,224 | $3,381,344 |
| **Administrative Fee Per Rx** | | | | | | | |
| AllRx | $0.00 | $0.00 | $0.00 | $0.00 | $0.10 | $0.35 | $0.00 |
| Total | $0 | $0 | $0 | $0 | $125,235 | $438,322 | $0 |
| **Projected** | $84,628,560 | $87,622,988 | $91,721,214 | $91,104,994 | $94,529,643 | $95,256,720 | $93,402,661 |

SEGAL/NEC 12771

DISTRICT COUNCIL 3 — ALTH SECURITY FUND

Financial Analysis

(Does Not Include Adjustment for Member Copayment)

| | Current ESI | Express Scripts | Medco Health | ULLICO - Medco | RxAmerica | HIP | Medimpact |
|---|---|---|---|---|---|---|---|
| **Mail Order** | | | | | | | |
| **Gross Costs (AWP)** | | | | | | | |
| Singl | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 |
| Multi | $312,960 | $312,960 | $312,960 | $312,960 | $312,960 | $312,960 | $312,960 |
| Gene | $40,384,446 | $40,384,446 | $40,384,446 | $40,384,446 | $40,384,446 | $40,384,446 | $40,384,446 |
| Total | $194,952,343 | $194,952,343 | $194,952,343 | $194,952,343 | $194,952,343 | $194,952,343 | $194,952,343 |
| **Guaranteed Discounts (AWP BASIS)** | | | | | | | |
| Singl | 22.0% | 25.0% | 24.0% | 23.0% | 23.0% | 24.0% | 23.0% |
| Multi | 22.0% | 37.0% | 24.0% | 55.9% | 37.3% | 67.5% | 46.0% |
| Gene | 53.5% | 46.5% | 50.0% | 46.0% | 43.0% | 57.5% | 44.0% |
| **Mail Order Repriced Ingredient Costs** | | | | | | | |
| Singl | $120,316,951 | $115,691,203 | $117,233,752 | $118,776,302 | $118,776,302 | $117,233,752 | $118,776,302 |
| Multi | $244,109 | $197,060 | $237,849 | $137,864 | $133,679 | $117,432 | $162,920 |
| Gene | $18,051,847 | $21,437,697 | $20,192,223 | $21,011,462 | $22,211,445 | $17,159,435 | $22,621,065 |
| Total | $138,614,907 | $137,326,199 | $137,642,819 | $139,925,427 | $141,121,427 | $134,516,620 | $141,666,186 |
| **Gross Costs (AWP and PLU)** | | | | | | | |
| Singl | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 | $154,254,937 |
| Multi | $38,040 | $38,040 | $38,040 | $38,040 | $38,040 | $38,040 | $38,040 |
| Gene | $14,573,050 | $14,573,050 | $14,573,050 | $14,573,050 | $14,573,050 | $14,573,050 | $14,573,050 |
| Multi | $249,960 | $249,960 | $249,960 | $249,960 | $249,960 | $249,960 | $249,960 |
| Gene | $16,066,031 | $16,066,031 | $16,066,031 | $16,066,031 | $16,066,031 | $16,066,031 | $16,066,031 |
| **Guaranteed Discounts** | | | | | | | |
| Singl | 21.9% | 25.0% | 24.5% | 23.0% | 23.0% | 24.0% | 23.0% |
| Multi | -22.3% | 28.0% | 24.5% | 55.9% | 11.0% | 28.0% | 0.0% |
| Gene | -5.6% | 28.0% | 55.0% | 0.0% | 7.0% | 20.0% | 0.0% |
| Gene | 21.9% | 32.0% | 55.0% | 60.0% | 60.0% | 65.0% | 50.0% |
| Total | 52.7% | 32.0% | 55.0% | 60.0% | 60.0% | 65.0% | 50.0% |
| **Mail Order Repriced Ingredient Costs (PLU)** | | | | | | | |
| Singl | $115,691,203 | $115,691,203 | $116,462,476 | $118,776,302 | $118,776,302 | $117,233,752 | $118,776,302 |
| Multi | $64,764 | $27,389 | $28,720 | $38,040 | $33,855 | $30,096 | $38,040 |
| Gene | $15,442,360 | $10,462,596 | $6,557,872 | $114,578,050 | $13,152,936 | $11,525,825 | $14,573,050 |
| Minimize | $194,583 | $193,703 | $193,703 | $135,724 | $156,624 | $169,760 | $175,200 |
| Gene | $7,819,283 | $10,645,301 | $7,243,214 | $46,439,412 | $46,438,412 | $55,631,611 | $46,048,015 |
| Gene | $142,782,612 | $137,326,199 | $120,404,595 | $139,925,627 | $139,501,300 | $134,510,620 | $141,560,185 |
| **Rx Counts** | | | | | | | |
| Singl | 592,959 | 592,959 | 592,959 | 592,959 | 592,959 | 592,959 | 592,959 |
| Multi | 1,047 | 1,047 | 1,047 | 1,047 | 1,047 | 1,047 | 1,047 |
| Gene | 404,056 | 404,056 | 404,056 | 404,056 | 404,056 | 404,056 | 404,056 |
| Total | 998,061 | 998,061 | 998,061 | 998,061 | 998,061 | 998,061 | 998,061 |
| **Dispensing Fees Per Rx** | | | | | | | |
| Singl | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.50 | $0.00 |
| Multi | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.50 | $0.00 |
| Gene | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.50 | $0.00 |
| Total | $0 | $0 | $0 | $0 | $0 | $499,031 | $0 |
| **Guaranteed Rebate** | | | | | | | |
| Rebate | $7.40 | $9.50 | $10.01 | $3.91 | $7.50 | $3.50 | $8.10 |
| Total | $7,385,655 | $9,461,554 | $9,980,391 | $3,893,728 | $7,485,461 | $3,493,215 | $8,084,294 |
| **Administrative Fee Per Rx** | | | | | | | |
| All Rx | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Total | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Projected I** | $131,228,162 | $127,444,605 | $127,672,228 | $151,032,900 | $133,535,865 | $131,516,435 | $133,475,888 |
| Total Proje | $226,167,615 | $225,387,413 | $218,384,446 | $227,137,846 | $229,186,406 | $221,723,138 | $226,874,791 |
| $ Difference | $7,385,655 | ($81,780,100) | ($4,783,067) | $995,384 | $998,965 | ($4,444,423) | $673,218 |
| % Difference | | -2.64% | -2.69% | 0.44% | 1.33% | -1.99% | 3.32% |

SEGAL/NEC 12772

**Exhibit 2**
District Council 37 Health and Security Plan
ADMINISTRATIVE COST COMPONENT SUMMARY

| Effective 1/1/2005 | ESI | HIP | Medco | Medimpact | Pharmacare | UlliCare |
|---|---|---|---|---|---|---|
| **Basic Retail Cost** | | | | | | |
| Basic Fee | | | | | | |
| Per Rx Paid-Network | $0.00/Rx | $0.35/Rx | $0.00/Rx | $0.00/Rx | $0.00/Rx | $0.00/Rx |
| Per Rx Paid-Non-Network (Paper) | $1.50/Rx | $1.90/Rx | $1.60/Rx | $1.50/Rx | $0.00/Rx | $1.50/Rx |
| PMPM (Alternate) | N/A | N/A | N/A | N/A | $0.00/Rx | $0.00/Rx |
| | | | | | | |
| **Basic Mail Order Cost** | | | | | | |
| Basic Fee | | | | | | |
| Per Rx Paid-Network | $0.00/Rx | included in Retail | $0.00/Rx | $0.00/Rx | $0.00/Rx | $0.00/Rx |
| Per Rx Paid-Non-Network (Paper) | N/A | included in Retail | $0.00/Rx | $1.50/Rx | $0.00/Rx | $1.50/Rx |
| PMPM (Alternate) | | | N/A | N/A | $0.00/Rx | $0.00/Rx |
| **Services** | | | | | | |
| Customer Service | | | | | | |
| Toll Free Phone Line (Member Service) | √ | √ | √ | √ | √ | √ |
| Toll Free Phone Line (Mail Service) | √ | √ | √ | √ | √ | √ |
| Toll Free Phone Line (Pharmacy Help Desk) | √ | √ | √ | √ | √ | √ |
| Online CRT Interface | √ | √ | √ | √ | √ | √ |
| Internet Access | √ | √ | √ | √ | √ | √ |
| Drug Utilization Review | | | | | | |
| Prospective/Concurrent | √ | √ | √ | √ | √ | √ |
| Retrospective | √–$0.03 per claim; $0.02 per claims for Seniors | √ | √ | 1-per qtr included with Med Dividend | √ | √ |
| Data Reporting | | | | | | |
| Standard Reports | √ | √ | √ | 15 standard reports included | √ | √ |
| Ad Hoc Reporting | $150/hour with a minimum of $500 | $100 per hour | Available upon request | Med Manager included | √ | √ |
| Online Access | √ | √ | √ | 2 users included | √ | √ |
| Formulary Administration | √ | √ | √ | Included with Med Dividend | √ | √ |
| ID Cards | | | | | | |
| Original | √ | $1.00/card | √ | √–2 per family | √–2 per family | |
| Each Additional | √ | $1.31/card | Quoted upon request | $0.50/card | $1.00 per card | $1.25 per card $0.50 per card |
| Total Basic Fee (Option I) | | | | | | |
| Per Rx | $0.00/Rx | Not Quoted | $0.00/Rx | $0.00/Rx | $0.00/Rx | Not Quoted |
| PMPM (Alternative) | Not Quoted | Not Quoted | Not Quoted | Not Quoted | Not Quoted | Not Quoted |
| Optional Services | | | | | | |
| EOB Statements | √ | Not Quoted | √ | √ | $2.00 per letter | √ |
| COB Adjudication | √ | Not Quoted | √ | √ | TBD | |
| Disease Management | Various options presented | Not Quoted | Quoted upon request | Varies based on program selection | TBD | √ |

SEGAL/NEC 12773

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
### PBM BID ANALYSIS- FINANCIAL SUPPLEMENT

| Category | ESI | HIP | Medco | Medimpact | Rx America | WHI/Care |
|---|---|---|---|---|---|---|
| **Administration Fees** | | | | | | |
| Pricing Contingencies: 1) Minimum Enrollment 2) Participation in any supplemental programs 3) Direct communication with patients | ESI reserves the right to modify or amend the relevant portion of the Agreement | Fees quoted are not contingent on these stated conditions | Medco reserves the right to modify or amend the financial portion of the Agreement, for eg. If mail and retail is awarded to different vendors | Fees quoted are not contingent on these stated conditions | Fees quoted are not contingent on these stated conditions | Fees quoted are not contingent on these stated conditions |
| **Prescription Drug Reimbursement** | | | | | | |
| % of Retail Contracts w/ Lesser of Provision | 100% | 100% | 100% | 100% | 100% | 100% |
| **Pricing Formula Guarantee Length** | 3 years | 3 years (within for reds) | 3 years | 3 years | 3 years | 3 Years |
| Guarantee Pricing Formula Components on $ for $ Basis | Yes | Yes | Yes | Yes | Yes | Yes |
| 100% Pass through of Retail Discounts (no Spread) | No | Yes | No | No | No | No |
| Annual Audit of Proposed Proposal Pricing | Yes - Provided a Fund of up to $500,000 that the client can utilize for this request. Did state restrictions such as a signed contract, signed confidentiality agreement and acceptance of auditor | Yes - requests that the auditor chosen be bound by a confidentiality agreement with HIP | Permit audits with prior notification at the cost of the Fund | Yes | Yes at the Fund's cost with an agreed upon third party | Yes |
| Excess Copayment Retention at Retail or Mail Order ? (Y/N) | No | No | Yes. May have at Retail | No | No | No |
| Internal Financial Incentives Offered ? (Y/N) | No | A percentage of the savings will be offered but need utilization statistics to finalize | Medco by Mail Discount Incentive and the internal usage incentive program is offered | No | None | None |
| Number of Distinct MAC Lists Administered | Maintain multiple lists | One | Administers several lists | Several lists | 4 distinct MAC lists | One |
| Guaranteed MAC Discount (Generics) | Retail - 51 percent, mail - 59 percent | Yes - Retail 50% not indicated at mail order | Retail - 56.5% - not guaranteed at mail-order | Retail - 60.0%, Mail Order -60.0% | Retail - 60%, Mail - 60% | Yes |
| % of Available Generic Drugs on Suggested MAC List | 95% | 50% | 60-100% | 90% | 83% | 95-99% |
| % of Available Multi Source Brand Drugs on Suggested MAC List | Not indicated | 95.0% | 96% - 97% | 95.0% | 10.0% | 98.0% |
| Average Realized MAC Discount (Multi-Source) | Not answered | AWP -55% | AWP - 54.6% | 34% | Yes | AWP - 50% to 52% |

SEGAL/NEC 12774

**DISTRICT COUNCIL 37 HEALTH SECURITY PLAN**
PBM BID ANALYSIS - FINANCIAL SUPPLEMENT

| Category | ESI | HIP | Medco | MedImpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| Multi-Source Brand Savings Shared With Client? (Y/N) | Not answered | Yes | Yes | Yes | Yes | Yes |
| MAC List Can Be Customized? (Y/N) | Does not recommend | Yes | If the Fund wants to maintain its own list then Medco will administer | If necessary, they can customize | Yes, but not recommended | No |
| **Formulary Savings and Rebates** | | | | | | |
| Guaranteed Rebate Per Retail Rx (Based on ALL Rx's) | $2.50 | $3.50 | $3.19 | $2.72 | $2.60 | $.25 (guaranteed for 2 years) |
| Guaranteed Rebate Per Mail Order Rx (Based on ALL Rx's) | $9.50 | $3.50 | $10.01 | $8.10 | $7.50 | 15 (guaranteed for 2 years) |
| Percentage of Actual Rebates Returned | 100% | Not specified | 80% | 95-100% | 75% | 90% |
| Non-Rebate Drug Switching Manufacturer Revenues Received? (Y/N) | No | No | Yes - a few contracts | Yes | No | Sits exist in a few contracts |
| Formulary Drug Switching Success Rate at Retail and Mail Order | Not provided | Not available | Nonstarts -Retail 54%; Mail 31% | Retail and mail nonstarts at patient level 16%; physician 31%. States N/A. | Rates and mail therapy start - 11%; Retail and mail therapy non-starts 33% | Does not track |
| Rebates Received and Shared on Generic Drugs? (Y/N) | No | No | No | No | No | No |
| AWP Per Day Guarantees Offered | Will guarantee once plan design and supporting clinical programs are implemented | No | No | Open to discussion | No | No |
| **Formulary and Rebate Management** | | | | | | |
| % of Mfr Contracts with Bundled Rebate Arrangements | None | None | Limited to one manufacturer and only a few products | <3% are bundled | 25% are bundled | Limited to two manufacturers |
| Frequency of Rebate Payments | Within 150 days of each calendar quarter (quarterly) | Within 90 days after the close of the quarter | Monthly | Monthly after the first four months of the quarter | 270 days after the end of each quarter (quarterly) | 180 days after the end of each quarter |
| Rebate Contracts Made Available to 3rd Party for Audit Purposes | Yes, subject to contributions (initial audit of two quarters of data, 5 small manufacturers of 50 percent of total dollars. Charges may apply.) | Yes | Yes - through "Big 4" accounting firm - any cost associated with audit is the Fund's responsibility - 60 days advance written notice required | Yes | Did not answer question properly | Not specified |

SEGAL/NEC 12775

**DISTRICT COUNCIL 37 HEALTH SECURITY PLAN**
PBM BID ANALYSIS - ADMINISTRATIVE CLAIMS PAYING ABILITIES

| Feature | ESI | HIP | Medco | Medimpact | Rx America | UACare |
|---|---|---|---|---|---|---|
| **Account Services** | | | | | | |
| Sales office handling general serv. org | East Hanover, NJ | New York, NY 8:00 - 6:00 EST Monday through Friday | Franklin Lakes, NJ 8:30 - 5:00 EST Monday through Friday | St. Louis, Missouri - Sales; San Diego CA acct mgt | Salt Lake City, UT - Mon - Frid 8 - 5 MST | New York, NY |
| Telephone abandonment rate | 4.1% | 1.35% | 1.63% | 1.00% | 7.00% | 4.00% |
| Number of seconds to reach live customer service representative | 29 | 13 seconds or less | 21.11 | All calls received by the IVR and # member opt-out average speed is 4 seconds | 16 | 29.5 |
| CSR—Online access to claims | Yes | Yes | yes | Yes | Yes | Yes |
| CSR—Authority to approve claims | Not specified | Yes | No | Yes | Will work with Fund to determine level of authorization to approve claims | No |
| Quality of Communications material | Into packets include 2 ID cards, ID carrier, mailer for mail service. Other items include educational pieces, online catalog | Network enrollment & Utilization; participating pharmacy directory, HIP drug formulary pamphlet, mail order forms, claim reimbursement forms, sample formulary update, pharmacy & therapeutics newsletter | Into packet with announcement letter; descriptive brochure; ID cards and network information | Into packets, educational pieces | Will work with Fund to create member and provide educational materials that meet specific notification needs. Samples include educational pieces, and On formulary | Letters to physicians/patients/pharmacies into packets |
| | | | | | | |
| **Member Services** | | | | | | |
| Claims: Toll free # and hours | Yes, 24 Hours via live agent, with services, or IVR | Single line for Fund; Separate line for mail order; Lines staffed from 8:00 - 6:00 pm; Mail Order staffed | Single line for the Fund; available 24 hours 7 days a week to the exception of Thanksgiving and | Utilizes on phone lines, customer service is available 24 hours a day 7 days a week | Toll free number staffed 24 hours a day; 7 days a week | Single toll-free number staffed 24 hours a day 7 days a week |
| Multilanguage Capabilities | AT&T Language Line | English primary language, Spanish will be secondary and other language | AT&T Language Line | Speak Spanish and 9 other languages | Spanish. AT&T Language Line | AT&T Language Line |
| Member satisfaction surveys - Latest Results - List percent of member satisfied or highly satisfied - [provide date] | 56.5% overall satisfaction in 2003 | 97.9%, satisfied for 2003 | 91.9% overall satisfaction rate for 2003. Done by a third party | Does not recommend hard copy membership surveys | Proprietary information | Does not do surveys |
| Frequency of pharmacy directory update and distribution to members | Online monthly | Pharmacy directories are updated and distributed annually at a fee TBD with Fund; online updates are done immediately as changes occur | Does not recommend hard copy directories; members should go online to locate pharmacies. Does not specify freq. Or updates | Does not recommend - unless a shift of more than 5%, a revised directory will be issued. Available online with realtime updates | Network pharmacy directories are distributed with the welcome packet. Or go online which is updated continuously | Are available via internet only and updated quarterly |
| ID card policy | Initial and replacement cards are included in base fee | ID cards are distributed to all members of the family; cost for additional ID cards increase after year 2 | 2 ID cards per family - additional cards are quoted upon request; Medco's $600,000 service allowance can be utilized for this service | 2 ID cards per family, each additional is $0.50 | Initial ID card to each member at no cost - each additional is $1.00 | 2 ID cards per family - $0.50 per additional card |

SEGAL/NEC 12776

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
### PBM BID ANALYSIS - ADMINISTRATIVE CLAIMS PAYING ABILITIES

| Feature | ESI | HIP | Medco | Medimpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| Website Functions Available to Members | Online prescription order, price check, formulary look-up, pharmacy locator, benefit information, express preview, drug & health information, OTC products, customer service, personal reminders, transferring prescriptions, check order status | verify personal data, request ID cards, fill prescriptions online, view prescription history, check formulary status of medications | Order new and refill prescriptions, view prescription history, review drug information, access formulary information, compare medication pricing and coverage information, view and pay account balances, review annual prescription costs, view benefit highlights, locate a participating pharmacy, order forms | Health and wellness information, benefit highlights, personal health, formulary look-up, pharmacy locator | Online pharmacy services, pharmacy locator, online mail order refills, claims history, formulary information, benefit information, disease management information, new drug releases, clinical newsletter | Claims inquiry, status, and member services |
| Name of website | www.express-scripts.com | www.hipusa.com | www.medco.com | www.medimpact.com | www.rxamerica.com | www.medco.com |
| **Claim Processing Service** | | | | | | |
| Claim paying Capacity | 379 million, 23 million mail. Has capacity to adequately service District Council 37 | 409,224 retail, 225,919 (HIP mail). Has capacity to adequately service District Council 37 | Has capacity to adequately service District Council 37 | 165 million retail, 7 million mail. Has capacity to adequately service District Council 37 | 14.3 million mail. Has capacity to adequately service District Council 37 | 550 million. Has capacity to adequately service District Council 37 |
| Percent paper submit claims paid within 10 days | average of 4 business days | 100% | 100% | 90% | 100% | 99.9% |
| Financial Accuracy | 99% | 100% | 100% | 99.9% | 99.6% | 99.67% |
| Coding Accuracy | 98% | 99% | 100% | 99.9% | 99.9% | 99.67% |
| Claim Recovery Process | Formal process through edits and audits. Returns 80 percent to the client | Duplicate payment is avoided because claims are paid online through the QCAP system, which verifies duplication of payment. Does not specify. Returns 70 percent of the monies | Claim Adjudication System has edits to prevent duplicate claims. 100 percent returned to Fund | Concurrent DUR edits & Duplicate Rx edits - blocks claim runs and credited back to the client. Returns 75 percent to the client | Routinely performs desktop analysis of pharmacy claim payments, corrections are credited to client. 100 percent returned | Tele-Paid utilizes automated controls to guard against duplicate payment and rejects duplicate claims. 100% returned to Fund |
| Client On-line Access to Reports | yes | yes | yes | Yes | yes | yes |
| Client Access to claim making available? Eligibility Maintenance (A) Acceptable mediums, B) Frequency of Updates; C) On-line Client tracking and maintenance | Yes. Preferred methods is through electronic file transfer or via their client portal eligibility file submission tool. The Fund can make updates and inquiries as needed. Real time for online and up to 4 days for other mediums | Yes. QCAP can interface with the Plan's eligibility file or current eligibility status. Does not specify mediums or frequencies | Yes. Online updates and tracking. Multiple mediums include tapes and cartridges. Multiple frequencies | Yes. Fund can add, update and terminate records in real time. Eligibility is preferred to be received in their standard layout - daily, weekly or monthly | Yes. Mediums - disk or tape. Accepts eligibility via the internet, FTP, user site manual entry, or on-site data entry, updated eligibility is available online to access | Yes. Tele-Paid verifies eligibility through master files which contain up-to-date individual members, and any claims processing information specific to the member |

**DISTRICT COUNCIL 37 HEALTH SECURITY PLAN**
PBM BID ANALYSIS - ADMINISTRATIVE CLAIMS PAYING ABILITIES

| Feature | ESI | HIP | Medco | Medimpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| Ability to handle pik-splitting, lost Rxs | Does not administer pik-splitting unless directed to do so through the client | Does not promote or encourage pik-splitting; Does not cover lost scripts | Does not split tablets. Member should call-Medco will track prescription, if lost will reship Rx at no abuse/overuse | Recommends pik-splitting as a cost effective approach, if lost will reship medication | Will support clients desire regarding pik-splitting but does not make such a program mandatory; for lost meds - implemented a tracing procedure and if lost will Rx's | Does not split tablets - Did not answer how they would handle lost Rx's |
| Ability to Administer COB, Medicare Part D | Can administer COB. Involved with coordinating with Medicare Part D. Is working with Medicare Part D on plan design and other issues | Will work with Fund to develop client specific COB procedures. Will convey the entire actuarial value of any Medicare Part D benefits to the Plan | Can administer COB. Is approved as an administrator to Medicare Part D program. Will provide Fund support in decisions with respect to the program and design as well as the transition of the system | Can administer COB. Preparing to support the Fund with respect to the Medicare Advantage Products | Can administer COB. is currently evaluating what role will be with Medicare Part D | Can administer COB. Medco was chosen as one of the approved vendors to administer the discount card and program. Will work with Fund on design issues and transition |
| | Yes | Yes | Yes | Yes | Yes | Only answered yes to 3-tier co-pay structures and closed formularies |
| Will transfer Claim into and any registry to another vendor at no cost | Yes | Yes | Yes | Yes | Yes | Yes |
| *Information Services/Data Reporting* | | | | | | |
| Comprehensiveness and Quality of Reports | All can be provided, by submission, on demand or bi-monthly. Does not include a paid summary report | All can be provided except for Therapeutic Interchange Report. Rpts are available with varying frequencies (weekly, monthly, quarterly as requested) | All can be provided either quarterly or monthly. Formulary savings report and paid summary w/need to be developed at a cost. (cost can be offset by allowance) | All can be provided. Currently does not have cost sharing rpt but will develop and charge at cost. Frequencies vary | All can be provided on either a monthly or quarterly basis. A couple rated rpts are not currently available - would need to be created. If part of std pkg - no charge | All except "Formulary savings and Rebate Report and Paid claims summary" on a quarterly or bi-weekly basis |
| Comprehensiveness and Quality of Automated Claim Edits | Administrative, clinical, and DUR edits | Administrative, clinical, and DUR edits | Administrative, clinical, and DUR edits - extensive | Administrative, clinical, and DUR edits | Administrative, clinical, and DUR edits | Administrative, clinical, and DUR edits |
| Annual Report Provided | Yes | Can be customized | Yes | Yes | Yes | No |

SEGAL/NEC 12778

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
### PBM BID ANALYSIS - ORGANIZATIONAL STABILITY

| Feature | ESI | HIP | Medco | MedImpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| Current ratio | 0.91 | 1.87 | 1.57 | 0.68 | 1.87 | Not provided |
| Debt to equity ratio | 0.64 | N/A | 23.80% | N/A | 0.00% | Not provided |
| Year PBM was established | 1986 | Retail - 1969; Mail Order - 1994 | 1983 | Retail - 1989; Mail Order - 1984 | Retail - 1994; Mail 2003 | Retail - 1985; Mail 1985 |
| Total annual (1 yr prior) | 49.8 million | 827084 retail; 46 million mail (ESI) | 64 million | 25 million | 4.1 million | 64 million |
| 2 Years Prior | 47.5 million | 770010 retail; 43.5 million mail (ESI) | 65 million | 23 million | 3.7 million | 65 million |
| % Change over prior year | 5% | 7.4% | -1.5% | 8.7% | 10.8% | -1.50% |
| % Current from MCO/HMO Plans | 37.4% | 58.6% | Proprietary | 64.0% | 35.96% | Proprietary |
| Total AWP Dollars Processed (Most recent 12 Months) Retail Mail Order | Not provided | Not Provided | Retail - $30.9 billion Mail Order - $16.8 billion | Retail and Mail Order $104 million | Retail - $783 million Mail - $349 million | Retail - over $1 billion Mail - $50 billion |
| Number of group plans added past 12 months past 24 months | 356 171 | 5123 (For retail) 9491 (For retail) | not answered | 23 35 | 22 24 | 24 52 |
| Number of group plans terminated past 12 months past 24 months | 5% terminated | 4045 7966 Retail figures | not answered | 12 20 | 19 15 | 55 139 |
| Own or lease retail networks contracts? | Own | Contracts | Contracts. No leasing | Own | Own | Own |
| Own or Contract with 3rd party vendor to provide Mail Order? | Own | Contracts | Own | Contracts | Own | Own |

SEGAL/NEC 12779

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
PBM BID ANALYSIS - ORGANIZATIONAL STABILITY

| Feature | ESI | HIP | Medco | MedImpact | Rx America | UlliCare |
|---|---|---|---|---|---|---|
| Pending legal action (include judgements in excess of $1 million in the last 10 years) | Is occasionally party to legal proceedings | Involved in several allegations although will not disrupt business operations Does not specify with respect to cases over $1 million | Involved in several allegations although will not disrupt business operations Has not had any judgements in excess of $1 million in the past 10 years | One case pending. No claims in excess of $1 million in last 10 years | Has not been party to any judgements or ongoing litigation. No claims in excess of $1 million in last 10 years | Involved in several allegations although will not disrupt business operations. Does not specify with respect to cases over 1 million |
| Expansion or reorganization | December 2002 - purchased Managed Pharmacy Benefits, January 2004 - acquired CuraScript | December 2001 - purchased Vytra | none | No | No | No |
| Overall Acct. Mgmt. Turnover Rate (Past 12 Months) | 7.0% | 1.0% | Provided turnover by position ranging from 0 - 10.9 percent | 8.0% | <1% | 0 % for Ullico and 9.5 % for Medco |
| Account Executive = Yrs with PBM | 3 | 3 | 10 | App 3 | 1.5 | 33 |
| Account Manager = Yrs w/ PBM | 4 | 9 | 11 | App 2 | 2 | 29 |
| Customer Service Staff = Avg # Yrs w/PBM | 2 | 11 | 3.9 | 3 | 2 | 22 |
| Director of Pharmacy Services | 17 | 18 | 16 | 9 | 6.5 | Not answered |

SEGAL/NEC 12780

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
### PBM BID ANALYSIS - NETWORK MANAGEMENT

| Feature | ESI | HP | Medco | Medimpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| Meet all Minimum Criteria (Y/N) | No | Yes | Yes | No | No | Yes |
| Significant Omissions | Does not do on-site review of pharmacy location and experience | None | None | On-site pharmacy location and experience | On-site review of pharmacy location and experience | None |
| Recredentialing Process | Automatic renewals | Automatic renewals | Renew automatically from year to year | Will review and re-credential all pharmacies every three years | Automatic Renewals | Automatic renewals |
| Malpractice Liability Requirements | $1 million per occurrence | $1 mil per occurrence, $5 mil aggregate | $1 mil per occurrence, $3 mil in aggregate | $1 mil per person, $2 mil per occur | $1 mil per occurrence, $2 mil in aggregate | $1 mil per occurrence $3 mil in aggregate |
| Termination Rules | 0.02% by organization, 0.02 % by pharmacy | 0% by organization, 0.002% by pharmacy | 0.02% (does not track terminations by the pharmacy) | 0.0003% by organization, 0% by pharmacy | 1% pharmacy by organization, 0% by pharmacy | 1% pharmacy by organization, Not indicated by pharmacy |
| Provider Support/Relations | A provider relations department with 4 division - audit and compliance, network management, pharmacy services and retail finance and reporting. Extensive | 2005, plan to initiate a pilot program with select network providers to implement a real-time transaction system - event on pharmacy relations | Meet regularly with pharmacy community, participate in conferences | Monthly conference calls with key pharmacy chains, participates in conferences, pharmacy network dev. Team in place to troubleshoot | Pharmacy Relations Department is responsible for the education, training, servicing and problem resolution for all network pharmacies | Have a Provider Relations Group responsible for negotiating and delivering contract information to the pharmacy community, working with Medco to identify and resolve issues impacting the delivery of retail pharmacy benefits |
| Return to Stock Process | Credited back to the client if not picked up in 14 days | After 21 days the pharmacy submits a reversal for the prescription | 14 days from date originally billed | 7 to 14 days after prescription has been filled but not picked up | Initial claim is reversed and credited to the plan | Pharmacies may submit reversal up to 45 days after initial claim, reversal is automatically made |
| Fraud Detection | Audit program in place. Use of reports and retrospective clinical programs, POS clinical and benefit design tools to spot misuse | A daily review of high cost claims, desktop audits and field audits. Not much clinical provided | Maintains an aggressive fraud detection program through auditing tools | Numerous built-in edits to automatically detect patient and pharmacist inappropriate utilization or fraud | Uses a technologically advanced online claims processing system, AmeriRx to check for member or pharmacy prescription fraud. Extensive | Have a program in place but does not provide specifics |
| Other Affiliations (with Retail Providers (Y/N)) | No | No | Yes | Yes | Yes | Yes |
| Nature of affiliation and participants | N/A | N/A | Strategic alliance with a number of independent pharmacy organizations and with familywell.com | Click&Rx is a retail pharmacy based program that provides flexibility to manage drug spend | Owned by Long Drug Stores (a pharmacy chain in Cal) but operates independently | CVS/Pharmacy and a number of independent pharmacies |
| Quality Improvement Initiatives | Cross functional approach. Uses Six Sigma process. Customer "focused" | Core state of management works in conjunction with the software vendor to implement improvements to the level of accuracy and efficiency to the OSCAR system's claims and expand member services | Customer focused and use Six Sigma process | MedImpact's Quality Improvement and Assurance Program | Utilize a four-step approach, 1) Plan, 2) Implement, 3) Check and 4) Evaluate | Customer focused and use Six Sigma process |

SEGAL/NEC 12781

DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
PBM BID ANALYSIS - NETWORK MANAGEMENT

| Feature | ESI | HIP | Medco | Medimpact | Rx America | UniCare |
|---|---|---|---|---|---|---|
| **Network Pharmacy Audits** | | | | | | |
| Percent of On-Site Audits | 2.10% | 80.00% | 4.60% | 5.00% | <3% | 4.80% |
| Desk Audits | 69% | 20% | 85.2% | 25.0% | <3% | 95.20% |
| Independent Auditor of Operations | 0% | 95% | 0% | 0% | <1% | 0% |
| Include Right to Audit | Yes | Yes | Yes | Yes | Yes | Yes |
| **Provider Profiling** | | | | | | |
| Physician Profiling | If the Fund provides ESI with a defined physican network during eligibility submission ESI will provide access to several template reports to review group prescribing patterns | Physician reports that determines under and over utilization of medications, therapeutic duplication, drug-to-drug interaction. | Communicates with physicians through a collection of initiatives that work to increase generic prescribing and formulary adherence, improve quality of care and reduce drug expenditures. Offers a physician practice summary program that compares its norms in specialty, geography and utilization management. | MedPreferred is a program that aids Medimpact to query claims history to identify prescribing behavior which results in improved formulary prescribing and lower cost | Physician Report Card allows comparisons to other providers and provides an ongoing profiling process | Monitors prescribing patterns by utilizing several intervention methods to communicate with physicians to improve their compliance |
| Mail Order Audits Performed (Y/N) | Not Answered | Yes | Not specified | Yes | Not specified | No |
| Network Pharmacy Report Card Process in Place (Y/N) | Yes | No | Yes | Yes | Yes | Yes |
| Key Scoring Items and Improvement Initiatives | Identify audit risks and pharmacies in need of educational guidance regarding generic substitution, DAW code use, etc. | Monitoring of improper billing practices, testing of the online claims adjudication system and identification of audit targets | has aware of any issues | Generic utilization review which identifies under performing pharmacies. This results in incentives for the client | none | Not aware of any issues |

SEGAL/NEC 12782

District Council 37 Health Security Plan
PBM Bid Analysis - Clinical Drug Utilization Review (DUR)

| Feature | ESI | HIP | Medco | MedImpact | Rx Amedra | UltiCare |
|---|---|---|---|---|---|---|
| Comprehensiveness of automated edits | Meets all minimum | Meets all minimum | Meets at minimum | Meets at minimum | No | Meets at minimum |
| Significant Omissions | None | None | None | None | Contract Price of Drug | None |
| Post ped Claim Review (Retrospective DUR) | Retrospective DUR and CUR for seniors. Include drug-drug, drug-disease etc. Utilization collection before drug therapy, etc | Edits center more around prospective and concurrent DUR. Less detail on retro | Retro. Guidelines for patient profiles to compliance to clinical guidelines. Include drug, drug-disease, therap Duplication, etc. | Std retro. Prog identifier inappropriate drug utilization patients Focuses include asthma, pain management and infectious diseases. Enhanced product provides more services | Information provided on concurrent and prospective but lacked detail on retrospective programs available | Retro. Guidelines for patient profiles to compliance to clinical guidelines. Include drug, drug-disease, therap Duplication, etc. |
| Program Savings A) Concurrent DUR B) Retrospective DUR C) Prior Authorization D) Other | A) 11% B) NA C) NA Not provided in requested format | Not available | A) 10.5% B) 1.1% C) 1.8%. Provided as a percentage of net cost. Does not track by total ingredient cost as requested | A) 2-4% B) 0.25-1% C) 3-5% | A) 10%, B) 20% C) 15% | A) 4-5%, B) 1-5.2% C) 3% |
| Client savings calculated using actual claim by claim client data. | Yes | Yes | Yes | No | Yes | Yes |
| Edits in place to signal and address potential drug duplication | Yes | Yes | Yes | Yes | Yes | Yes |
| Edits in place to flag patients for potential adverse liver effects based upon therapy | No | No | Will work with Fund | Yes | No, but can customize | No |
| Formulary Grievance Process in Place? | Yes, formal process | Yes, formal process | IUA Recommending the Preferred Prescription Formulary which does not require a grievance process | Yes, formal process | Yes, formal process | Yes, formal process |
| High cost element programs | High Utilizer and Case Management reports that identify patients with inherent disease states | Pharmacy Case Management program, identifies top 100 utilizers based on annual prescription cost | High Utilization Management Standard Analysis Modules identifies patients meeting criteria indicative of excessive or abusive utilization; various reports available | Offers several reports that identify high cost claimants, Fund can monitor and review patients taking high volumes of drugs, high risk drugs, potential adverse outcome | Depending on plan design can identify claims over "x" dollars and reject the claims and adjudicate against DUR edits and prior authorization | High Utilization Management Standard Analysis Modules identifies patients meeting criteria indicative of excessive or abusive utilization; various reports available |
| Integrate with Medical Plan/UR | Will provide the Plan timely, accurate reporting needed to monitor program performance and evaluate cost | Will provide the data to medical plan to integrate | Can integrate - details to be worked out with client | With written authorization from the Fund, MedImpact can integrate | Can integrate | Can integrate |
| CUR reports | Not at patient level, did not indicate frequency of reports | Detailed reports which are included in the fee | Extensive and easy to follow. Does not have patient detail, included in cost | On demand report from the Fund can provide at the patient level, bi-weekly provides a report on the Fund | Member detail provided. Easy to understand. There will be a charge for rpt - cost will vary | Extensive and easy to follow, included in cost |

SEGAL/NEC 12783

## DISTRICT COUNCIL 37 HEALTH SECURITY PLAN
### PBM BID ANALYSIS - FORMULARY MANAGEMENT

| Feature | ESI | HIP | Medco | Medimpact | RxAmerica | UllCare |
|---|---|---|---|---|---|---|
| Frequency of P&T Committee Meetings | Quarterly | Not stated | Quarterly | Quarterly | Quarterly | Quarterly |
| Will support custom formulary requests? | Clients who tailor formulary content must have their own P&T committees. Can tailor a formulary to meet client cost objectives | Yes | Yes | Yes | Yes. At a possible charge to the client | Yes |
| Dollar for dollar Reimbursement for formulary switches which are not ingredient cost justified? | No | Not applicable if a HIP formulary. IF not HIP formulary, then no | No | Yes | No | Yes |
| Open Formulary Compliance | 92% | 92.6% | 91% | 75-95% | 95.0% | 87.0% |
| % Manufacturer Rebate Contracts with "bundling" | None | 0% | One manufacturer and only a few products | Less than 3% | 25% are bundled | 2 manufacturers and only a few products |
| Tools used to promote formulary compliance? | Communication designed to educate members, physicians and pharmacies. Includes formulary kits and lookups, drug choice management, physician consultation, report card and pharmacy help desk. Extensive | Employs both telephone intervention and mailings; also has programs improving formulary compliance & implement drug alerts and overrides in network pharmacies | Communications to members, physicians, and pharmacies. Extensive tools | Several programs in place: System edits, Patient Choice - to educate members on the benefits of generics, and MedPreferred - promotes the utilization of preferred products in retail, mail-order, internet and specialty pharmacies. | Through communication and reporting to members, physicians and pharmacies. Includes educational seminars, mailings to physicians, web capabilities | Communications to patients, physicians, and pharmacists are conducted via telephone, direct mail, fax and internet. Communications are designed to ensure high quality prescribing through the Therapeutic Interchange program |
| Quality of educational material? | Samples not provided | Sample ID Card, network enrollment & utilization, and pharmacy directory. No real samples of educational pieces | Use of generics first program, direct mailings to physicians, patient education. Extensive | Samples not provided | extensive | Use of generics first program, direct mailings to physicians, patient education. Extensive |
| Performed Outcomes studies tied directly to formulary? | Yes, no specifics | Initiative in 2005 | Yes | Yes | Yes | Yes |
| Allow Client to audit manufacturer rebate contracts? | Yes, for two manufacturers or 50 percent of total rebate dollars | Yes | Yes, by an third party big 4 accounting firm with 60 days notice and cost to the fund | Yes, with signed confidentiality agreement and agreed upon independent accounting firm | Not specified | Not specified |

SEGAL/NEC 12784

# Exhibit U



☆ SEGAL

# New England Carpenters Health Benefits Fund

*Prescription Benefit Manager (PBM)*
*Marketing Analysis*

February 2004

N.E. CARPENTERS
Exhibit No. 24 for I.D.
Date: 11/7/06
Reporter: K.A. Smith

CARP 02148

✷ SEGAL |

# Table of Contents

| | |
|---|---|
| Introduction | 3 |
| Financials | 9 |
| Network Access | 15 |
| Organizational Experience & Stability | 18 |
| Administrative Service | 21 |
| Network Management | 24 |
| Formulary Management | 27 |
| Clinical/DUR Programs | 30 |
| Conclusion | 33 |
| Next Steps | 40 |
| Appendix | 42 |

2

CARP 02149



*Introduction*

☆ SEGAL

3

CARP 02150

☆ SEGAL |

# Introduction

☐ On behalf of the New England Carpenters Health Benefits Fund, The Segal Company solicited proposals for Prescription Benefit Manager (PBM) services for the Fund's active, COBRA and retired members based on the current plan design.

☐ Currently, AdvancePCS provides PBM services under a self-insured arrangement.

☐ The Fund's objective was to assess the market to determine if another PBM could provide savings through prescription drug discounts and lower administration fees as well as education and information strategies to enhance the cost-effective use of the prescription drug plan.

4

CARP 02151



☀ SEGAL |

# Introduction

☐ Request for Proposals (RFPs) were sent and received from nine PBMs:

> AdvancePCS

> EHS

> Express Scripts

> MedImpact

> NMHCRx

> Pharmacare

> Prescription Solutions

> Systemed

> ULLICO

5

CARP 02154

✱ SEGAL |

6

# Introduction

☐ After reviewing the financial competitiveness and network access of each proposal the following plans were eliminated:

➢ MedImpact

➢ Pharmacare

➢ Prescription Solutions

➢ ULLICO

☐ Although AdvancePCS had the least competitive financial proposal, we have provided a thorough analysis of their proposal because they are the incumbent.

CARP 02153

✻ SEGAL |

## Introduction

☐ This report provides a comprehensive assessment of each bidder's proposal. The report focuses on:

> The financial competitiveness of each proposal in terms of overall expected costs

> Network access

> Organizational experience and stability

> Administrative and claims paying ability (account management and data reporting)

> Network management (provider support, quality assurance, audits)

> Formulary management

> Clinical programs and Drug Utilization Review (DUR)

7

CARP 02152

✻ SEGAL |

# Introduction

☐ For comparative assessments, response have been scored and ranked. The financial and network access sections are ranked on objective criteria and results. Subjective rankings and score were provided for all other categories.

8

CARP 02155



CARP 02156

☆ SEGAL

# Financials: Projected Costs Effective April 1, 2004

| | Current Plan AdvancePCS | Alternative PBMs | | | | |
|---|---|---|---|---|---|---|
| | | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
| Rate Guarantee | | 2 years | 3 years | 2 years | 3 years | 3 years |
| Projected Retail Cost | $8,881,000 | $8,577,000 | $8,141,000 | $8,017,000 | $7,949,000 | $7,963,000 |
| Projected Mail Cost | $1,406,000 | $1,252,000 | $1,196,000 | $1,214,000 | $1,253,000 | $1,229,000 |
| Total Claim Costs | $10,287,000 | $9,829,000 | $9,337,000 | $9,231,000 | $9,202,000 | $9,192,000 |
| Administration Fees | $36,000 | $36,000 | $0 | $19,000 | $20,000 | $0 |
| Projected Total Costs | $10,323,000 | - $9,865,000 | $9,337,000 | $9,250,000 | $9,222,000 | $9,192,000 |
| Savings from Current Costs | | $458,000 | $986,000 | $1,073,000 | $1,101,000 | $1,131,000 |
| Score | | 41% | 87% | 95% | 97% | 100% |
| PBM Rank | | 9 | 4 | 3 | 2 | 1 |

*Cost projections are based on the following:
- claims experience from March 1, 2003 through November 30, 2003 adjusted for inflation and trend
- assumes 9,100 covered members
- 188,442 retail prescription and 9,724 mail order prescriptions
- average cost-sharing of $16.26 for retail and $34.16 for mail order

10

CARP 02157

☆ SEGAL |

11

# Financials: Projected Costs

☐ Cost projections for the year beginning April 1, 2004 reflect the following:

  ➢ PBM pricing formulas - discounts from average wholesale price (AWP) for brand and generic drugs for both retail and mail order

  ➢ Pharmacy dispensing fees

  ➢ Vendor administrative fees

  ➢ Guaranteed drug manufacturer rebates returned to the Fund

☐ Differences in DUR, formulary drug mix, and other cost control factors are not captured in the financial projections.

CARP 02158

✳ SEGAL |

# Financials: Projected Costs

□ Projected prescription drug expenses for the year beginning April 1, 2004 based on the current contract are projected to be $10.3 million

□ Systemed, NMHCRx, and Express Scripts present the most financially competitive proposals with estimated savings of $1.1 million

□ Systemed, NMHCRx and EHS provided 3-year proposals while the RFP requested 2-year proposals

□ Detailed pricing information for all PBMs can be found in the Appendix

12

CARP 02159

☀ SEGAL |

# Financials: Financial Terms

13

| Category | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| **Administration Fees** | | | | | |
| Pricing Contingencies: 1) Minimum Enrollment 2) Participation in any supplemental programs 3) Direct communication with patients | Fees contingent upon enrollment & participation in supp. programs | Fees contingent upon enrollment | Fees contingent upon enrollment | Fees are not contingent on specified criteria | Fees contingent upon enrollment |
| **Prescription Drug Reimbursement** | | | | | |
| % of Retail Contracts w/ Lesser of Provision | 100% | 100% | 100% | 100% | 100% |
| Pricing Formula Guarantee Length | Initial term | Life of contract | Not specified | Life of contract | Life of contract |
| Guarantee Pricing Formula Components on $ for $ Basis | Yes | Yes | Yes | Yes | Yes |
| 100% Pass through of Retail Discounts (no Spread) | No | No | No | No | No |
| Annual Audit of Proposed Proposal Pricing | Yes | Yes | Yes | Yes | Yes |
| Excess Copayment Retention at Retail or Mail Order (Y/N) | No | No | No | No | Yes |
| Internet Financial Incentives Offered? (Y/N) | Yes | No | No | No | Willing to discuss |
| % of Available Generic Drugs on Suggested MAC List | 75% | 74%-77% | 90% | 97% | 80% |
| % of Available Multi Source Brand Drugs on Suggested MAC List | 35% | Not tracked | Not tracked | 0% | 0% |
| **Formulary Savings and Rebates** | | | | | |
| Guaranteed Rebate Per Retail Rx (Based on ALL Rx's) | $2.00 | $2.20 | $2.00 | $1.60 | $1.90 |
| Guaranteed Rebate Per Mail Order Rx (Based on ALL Rx's) | $6.00 | $7.00 | $7.00 | $3.00 | $6.50 |
| Percentage of Actual Rebates Returned | Did not answer | Did not answer | Did not answer | 90% | Did not answer |
| Non-Rebate Drug Switching Manufacturer Revenues Received? | Yes | No | No | No | Yes |
| **Formulary and Rebate Management** | | | | | |
| Formulary Drug Switching Success Rate at Retail and Mail Order | Does not track | Does not track retail; mail order- 73% | Therapy Starts: 65% Non-Starts : 15% retail, 26% mail order | N/A | Therapy Starts: 62% Non-Starts: 11% retail, 6% mail order |
| Rebates Received and Shared on Generic Drugs? (Y/N) | Yes | No | No | No | No |
| % of Mfr. Contracts with Bundled Rebate Arrangements | Bundling exists, did not indicate % | 15-20% | 0% | Bundling exists, did not indicate % | Bundling exists, did not indicate % |
| Frequency of Rebate Payments | Quarterly | Quarterly | Quarterly | Quarterly | Quarterly |
| Rebate Contracts Made Available to 3rd Party for Audit Purposes | Yes | Yes | Yes | Yes | No |
| **Score** | 67% | 67% | 88% | 70% | 66% |
| **PBM Rank** | 3 | 3 | 2 | 1 | 5 |

☆ SEGAL |

# Financials: Financial Terms

☐ Observations on PBM financial terms:

➤ NMHCRx ranks the highest for favorable financial terms
  – NHMCRx has the highest percentage of generic drugs on its MAC
  – NHMCRx's proposal is not based on any specified criteria

➤ AdvancePCS and EHS have the lowest percentage of generic drugs on their MAC list

➤ EHS is offering the highest guaranteed rebates for retail and mail order prescription drugs

➤ Systemed will not allow their rebate contracts to be reviewed in an audit

14

CARP 02161



CARP 02162

✳ SEGAL |

# Network Access

| Access Standard | Advance PCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| Total number of pharmacy locations | 56,008 | 55,048 | 55,883 | 52,618 | 60,406 |
| Total number of pharmacy locations in member zipcodes | 2,025 | Did not answer | Did not answer | Did not answer | 2,124 |
| **Network Access:** | | | | | |
| 1 network pharmacy within 5 miles | 97.3% | 96.8% | 96.0% | 95.6% | 97.9% |
| 2 network pharmacies within 8 miles | 98.4% | 98.0% | 97.3% | 97.3% | 98.4% |
| **Average Travel Distance (Miles):** | | | | | |
| Distance to nearest pharmacy within 5 miles | 1.1 | 1.3 | 1.3 | 1.0 | 0.8 |
| Distance to nearest pharmacy within 8 miles | 1.2 | 1.4 | 1.4 | 1.1 | 0.9 |
| Score | 80% | 80% | 80% | 90% | 100% |
| PBM Rank | 3 | 3 | 3 | 2 | 1 |

16

☼ SEGAL |

# Network Access

☐ All PBMs provided strong network access results

☐ Systemed ranked the highest for network access followed by NMHCRx

17

CARP 02164



Organizational Experience & Stability

CARP 02165

# ☆ SEGAL

# Organizational Experience & Stability

| Category | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| Year PBM was established | 1969 | 1994 | 1986 | 1981 | 1997 |
| Total Annual ('1 yr prior) | 75,000,000 | 9,525,000 | Not available | 750,000 | 3,645,000 |
| 2 Years Prior | 75,600,000 | 9,116,700 | 52,000,000 | 500,000 | 4,279,000 |
| % Change over Prior Year | -0.8% | 4.5% | Not available | 50% | -15% |
| % Current from MCO/HMO Plans | 26.2% retail, 27.8% mail | 2% retail, 20% mail order | 49.5% | 20% | 0.10% |
| Total AWP Dollars Processed (Most recent 12 months) | | | | | |
| Retail | $27.3 billion retail | $2.7 billion retail | Did not provide. | $425 million retail, | Did not answer |
| Mail Order | $2.2 billion mail | $2.4 million mail | | $86 million mail | |
| Number of group plans added | | | | | |
| past 12 months | Did not answer. | 12mo-117 | 12mo-355 | 12mo-39 | Approx. 20 per year |
| past 24 months | | 24mo-173 | 24mo-881 | 24mo-60 | |
| Number of group plans terminated | | | | | |
| past 12 months | Did not answer. | <1% | 5% | <1% | Approx. 10-15 per year |
| past 24 months | | | | | |
| Own or lease retail networks contracts? | Own | Own | Own | Own | Own |
| Own or contract with 3rd party vendor to provide Mail Order? | Own | Own | Own | Own | Own |
| Pending legal action | Several, but feels that material damages would not have an affect on financial position | None | Not material to provision of services in this proposal | One | Several |
| Expansion or reorganization | Caremark Merger, Priority Healthcare, Accordant Health | Not recently | Yes, CuraScript acquired 1/2004 | Yes, Integrail and Portland Professional Pharmacy | No |
| Overall Acct. Mgmnt. Turnover Rate (Past 12 Months) | 21.03% overall | 0% | 6.7% | Did not answer | 11.7% |
| Account Executive = Yrs with PBM | 2 | 1 | 6 | 5 | 3 |
| Account Manager = Yrs with PBM | 4 | 5 | 7 | 2 | 2 |
| Customer Service Staff = Avg # Yrs with PBM | 5 | 5 | 2 | 5 | Not available |
| Director of Pharmacy Services | 2 | 9 | 17 | 5 | 6 |
| Score | 34% | 79% | 64% | 58% | 57% |
| PBM Rank | 5 | 1 | 2 | 3 | 4 |

19

CARP 02166

☆ SEGAL |

# Organizational Experience & Stability

☐ Organizations that have positive but not overwhelming growth in membership, experience staff, strong financials, and no known threats to their organization via pending litigation or major changes in ownership, received favorable scores.

☐ Total membership also counts as a factor in the scoring because greater membership means a greater ability to negotiate deeper discounts, and manufacturer rebates.

20

CARP 02167



Administrative Service

✦ SEGAL

21

CARP 02168

✶ SEGAL

# Administrative Service

22

| Category | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| **Account Services** | | | | | |
| Telephone abandonment rate | 2.50% | 3.6% after 10 seconds | 12% | <4% | 2.10% |
| # of seconds to reach live customer service rep. | 26 seconds | 25 seconds | 51 seconds | <30 seconds | 20 seconds |
| CSR--Online access to claims | Yes | Yes | Yes | Yes | Yes |
| CSR--Authority to approve claims | No | Yes, defined by client | Did not answer | No | No |
| **Member Services** | | | | | |
| Claims: Toll free # | | | | | |
| Multilanguage Capabilities | Toll-free / Multi | Toll-free / Multi | Toll-free / Multi | Toll-free / Multi | Toll-free / Multi |
| Member satisfaction surveys - Latest Results - List percent of member satisfied or highly satisfied | 95-97% | 95% | 95.2% | Did not answer | 93.4% |
| Frequency of pharmacy directory updates | | | | | |
| ID card policy | Internet, daily | Did not answer | Internet, monthly | Internet, daily | Internet, daily |
| Website Functions Available to Members | Replacement cards $0.50/card + shipping | Replacement cards $0.50/card + shipping | No cost for replacement cards | No cost for replacement cards | Replacement cards $0.35/card |
| | Meets all requirements | Meets all requirements except product recall warnings and formulary listing | Meets all requirements except product recall warnings | Meets all requirements except product recall warnings | Meets all requirements except product recall warnings |
| Name of website | www.advancerx.com | www.ehs.com | www.express-scripts.com | www.nmhcrx.com | www.medcohealth.com |
| **Claim Processing Service** | | | | | |
| Percent paper submit claims paid within 10 days | 99.9% | 100% | 100% | 99.0% | 100.0% |
| Financial Accuracy | Not tracked | Did not answer | 99.5% | 99.5% | 99.9% |
| Coding Accuracy | 100% | Did not answer | 98% | 99.5% | 98% |
| Client access to claim tracking available? | Yes | Yes | Yes | Yes | No |
| Eligibility Maintenance (A) Acceptable medium, B) Frequency of updates C) On-line client tracking and maintenance | Meets all requirements | Meets all requirements | Meets all requirements except ability to accept daily updates | Meets all requirements | Meets all requirements |
| Ability to administer COB | | | | | |
| Will transfer claim info and eligibility to another vendor at no cost | Yes / Yes | Yes / Yes | Yes / Yes | Yes / Yes | Yes / Yes |
| **Information Services/Data Reporting** | | | | | |
| Comprehensiveness and Quality of Reports | All reports at no cost | All reports at no cost except cost sharing report | All at no cost except for paid claims summary which can be built upon request for a fee | All reports at no cost | All reports at no cost |
| Annual Report Provided | Yes | Yes | Yes | Yes | Yes |
| Score | 86% | 71% | 73% | 79% | 82% |
| PBM Rank | 1 | 5 | 4 | 2 | 3 |

CARP 02169

⋆ SEGAL |

23

# Administrative Service

☐ The administrative service section is based upon the combined total evaluation and scoring of the account and membership services, claims paying ability and data reporting. The items evaluated include:

➢ Account and member services

➢ Online access to claims

➢ Multi-lingual capabilities

➢ Frequency/availability of pharmacy updates

➢ Claims processing services

➢ Eligibility maintenance

➢ Comprehensiveness and quality of reports

CARP 02170



Network Management

24

☆ SEGAL

CARP 02171

※ SEGAL

# Network Management

| Category | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| Meets at Minimum Criteria (Y/N) | Yes | No, does not include on-site review of pharmacy location & appearance | No, does not include on-site review of pharmacy location & appearance | Yes | Yes |
| Recredentialing Process | Extensive list of specific credentials and standards | Brief description of requirements | Extensive list of specific credentials and standards | Brief description of requirements | Extensive list of specific credentials and standards |
| Termination Rates | <1% | <0.005% | 0.03% | <1% | 0.025% |
| Provider Support/Relations | Comprehensive, supportive approach | Newsletters and continuing education to ensure positive relations with pharmacies | Meetings & services to ensure positive relations with pharmacies | Did not clearly answer | Meetings to ensure positive relations and to resolve grievances. |
| Return to Stock Process | Yes | Yes | Yes | Yes | Yes |
| Fraud Detection | Two-level audit process: daily review of high dollar claims and desk audits | Several tools to detect patient fraud and pharmacist fraud | Pharmacy audit program, member fraud detection, interventions in place | Pharmacy edits result in intervention until all issues resolved | Numerous tools including pharmacy audits and patient utilization review |
| Other Affiliations (with Retail Providers) | No | Yes | No | No | No |
| Nature of affiliation and participants | N/A | Affiliate of Eckerd Corp. | N/A | N/A | N/A |
| Quality Improvement Initiatives | Several monitoring programs and compliance standards | Several monitoring programs and compliance standards | Several monitoring programs and initiatives includes task forces and quality objectives | Consistently reviewed and revised | Steering committee, testing, and customer scorecard |
| **Network Pharmacy Audits** | | | | | |
| Percent of On-Site Audits | 4.9% | 2.2% | 2.1% | 5.0% | 4.8% |
| Desk Audits | 29.4% | 1.8% | 65.0% | 10.0% | 82.3% |
| Independent Audit at Operations | 0% | 0% | 0% | 0% | 0% |
| Include Right to Audit | Yes | Yes | Yes | Yes | Yes |
| **Provider Profiling** | | | | | |
| Physician Profiling | Clinical consultings, mailings through DUR programs, physician calling intervention unit | Physician prescribing patterns, review physician info. | Extensive list of physician intervention programs | Analyzes utilization patterns, cost of prescribed therapies, drug selection, results of interventions, etc. | Extensive list of specific physician review programs |
| Mail Order Audits Performed (Y/N) | N/A-own and operate | N/A-own and operate | N/A-own and operate | N/A-own and operate | N/A-own and operate |
| Network Pharmacy/Report Card Process in Place (Y/N) | No | Yes | Yes | Yes | Yes |
| Key Scoring Items and Improvement Initiatives | N/A | Monitor claims reject rate, avg cost per claim, avg. quantity per claim | Brand/generic dispensing rates, DAW code rates, overall %, formulary compliance, etc. | Comparison to benchmarks, participation in intervention programs, level of customer service | Generic substitution rate, pricing |
| Score | 63% | 49% | 57% | 71% | 84% |
| PBM Rank | 3 | 5 | 4 | 2 | 1 |

25

CARP 02172

✳ SEGAL

# Network Management

☐ Network management measures the organizational efforts related to selecting and monitoring network pharmacies, provider profiling, provider surveys and feedback, comprehensiveness of audits, termination rates, and the ability to detect fraud.

26

CARP 02173



Formulary Management

27

✶SEGAL

CARP 02174

☀ SEGAL |

# Formulary Management

| Category | AdvancePCS | EHS | Express Scripts | NMHCRx | Systemed |
|---|---|---|---|---|---|
| Frequency of P&T Committee Meetings | Quarterly | Quarterly | Quarterly | Did not answer | Quarterly |
| Will support custom formulary requests? | Yes | Willing to discuss | Yes | Yes | Yes, based on therapies. |
| Dollar for dollar reimbursement for formulary switches which are not ingredient cost justified? | No | No | No | Yes | No. |
| Open Formulary Compliance | 91% retail 94% mail | 94.1% retail 92.5% mail | 85% of all medications dispensed | 80-90% retail 85-95% mail | 87% retail 91% mail |
| % Manufacturer Rebate Contracts with "bundling" | "Vast majority not bundled" | 15-20% | 0% | "Generally not bundled; some exceptions" | "Limited" |
| Tools used to promote formulary compliance? | Several tools for patients, physicians and pharmacists to encourage formulary use | Several tools to introduce and encourage formulary use | Formulary benefit design, prospective and retrospective programs | Physician interventions, patient interventions, pharmacy interventions | Physician, member and pharmacist mailings via telephone, direct mail, fax and the internet. |
| Performed outcomes studies tied directly to formulary? | Yes-represented savings | Yes, % of cost savings provided | Yes, evidence on website | No | No. |
| Allow Fund to audit manufacturer rebate contracts? | Yes; must be approved; subject to confidentiality agreement | Yes; must be approved; subject to confidentiality agreement | Yes | Yes | No. |
| Score | 75% | 72% | 88% | 76% | 47% |
| PBM Rank | 2 | 4 | 1 | 2 | 5 |

28

CARP 02175

✶ SEGAL

# Formulary Management

☐ It is essential that any PBM selected be able to effectively manage a formulary. We define effective formulary management as:

➢ the ability to make custom changes,

➢ diligence with updating and maintaining the formulary list to respond to external changes,

➢ comprehensiveness of formulary support, education and promotion,

➢ efforts to study the clinical outcomes of key formulary drugs and therapy classes, and

➢ flexibility to enable the Fund to authorize its own formulary overrides.

29

CARP 02176



# Clinical/DUR Programs

☆ SEGAL

30

CARP 02177

# ☀ SEGAL

# Clinical DUR/Programs

| Category | AdvancePCS | EHS | Express Scripts | NMIICRx | SystemEd |
|---|---|---|---|---|---|
| Comprehensiveness of automated edits | Meets all | Meets all | Meets all | Meets all | Meets All |
| Significant Omissions | None | None | None | None | None |
| Post Paid Claim Review (Retrospective DUR) | Conducted quarterly to identify high cost claimants. Targeted mailings for several disease states. | Conducted on every claim within hours of dispensing. Includes drug to drug interaction, high utilization, therapeutic dublication, retail to mail opportunities and acute frequency. | Programs to identify inappropriate prescribing, dispensing and prescription use. Includes a program for seniors. | Pharmacists review reports monthly on drug to drug interactions, drug to disease state, therapeutic duplications, review of controlled substances, number of prescriptions, duration of therapy, excessive cost of Rxs and regimens, over-utilization, peer competition, generic utilization | Severe edits occur retrospectively to identify inappropriate prescribing and use. |
| Program Savings: A) Concurrent DUR B) Retrospective DUR C) Other | A) 5%-6% B) 2%-4% C) 2%-4% Total 9%-14% | A) 1.5%-3% B) 2.2%-4.9% C) not available Total 3.7%-7.8% | Did not answer | A) 4.5% B) 3.6% C) 0.4% Total 8.7% | A) 10.3% B) 2.5% C) 3.0% Total 15.8% |
| Prior Authorization | Yes | No | Yes | Yes | Yes |
| Client savings calculated using actual claim by claim client data. | Yes | Yes | Yes | Yes | Yes |
| Edits in place to signal and address potential drug addiction. | No | Yes | No | No | No |
| Edits in place to flag patients for potential adverse liver effects based upon therapy. | Yes | Yes | Yes | Yes | Yes |
| Formulary Grievance Process in Place? | Audits are performed on 100% of the pharmacies and reports are produced on a quarterly basis | Defined process through retrospective DUR program which evaluates high utilization and includes intervention | Plan sponsor can use High Utilizer report to guide members into case management programs | Tracked with reports identifying member claim history by dollar amount, patients over $500, Rxs over $500, and drug utilization by dollar amount | Identified through high abuse drugs, excessive physician or pharmacy utilization, high claim volume, and drug costs |
| High cost claimant programs | | | | | |
| Integrate with Medical Plan/UR | Yes | Willing, flexible, at no additional charge | Yes | Willing and flexible | Willing and flexible, currently work with over 100 medical |
| DUR reports | Easy to read and understand, not provided at patient level | Easy to read and understand | Case management report not easy to understand, add'l cost of $150/quarter for High Utilizer and Case Management Report | Did not provide reports | Easy to read and understand, not provided at patient level |
| Score | 83% | 90% | 63% | 73% | 83% |
| PBM Rank | 2 | 1 | 5 | 4 | 2 |

31

CARP 02178

☆ SEGAL |

# Clinical/DUR Programs

☐ Effective clinical and drug utilization review (DUR) programs depend on several factors including:

> the focus of PBM drug utilization review programs,

> comprehensiveness of automated clinical edits,

> logic of flagging and managing high cost claimants,

> ability to manage pre-authorization, and

> the quality and depth of drug utilization reporting and the responsiveness of clinical support staff.

32

CARP 02179



33

*SEGAL*

# Conclusion

CARP 02180

☀ SEGAL |

# Conclusion

☐ After review of the financial and qualitative criteria, we found several competitive proposals that warrant further consideration.

☐ Systemed ranked first overall, EHS followed close behind, while Express Scripts placed third.

| PBM | Financial - Discounts, Fees & Rebates. | Financial Terms | Organizational Experience | Admin. & Claims Paying Services | Network Management | Clinical and DUR | Formulary Management | Network Access | Overall | Ranking |
|---|---|---|---|---|---|---|---|---|---|---|
| Weighting | 45.0% | 5.0% | 10.0% | 10.0% | 7.5% | 7.5% | 7.5% | 7.5% | 100.0% | |
| Systemed | 100% | 56% | 57% | 82% | 84% | 83% | 47% | 100% | 85.3% | 1 |
| NMHCRx | 97% | 70% | 58% | 79% | 71% | 73% | 75% | 90% | 84.1% | 2 |
| Express Scripts | 95% | 68% | 64% | 73% | 57% | 63% | 89% | 80% | 81.4% | 3 |
| EHS | 87% | 67% | 79% | 71% | 49% | 90% | 72% | 80% | 79.4% | 4 |
| Advance PCS | 40% | 67% | 34% | 85% | 63% | 83% | 75% | 80% | 56.0% | 5 |

34

*(handwritten notes):* weighted  45.5%  N.H. 24.5  94.5% dump

☆SEGAL |

35

# Conclusion

☐ Systemed:

> Strengths:

 – Financials, network access, administration and claims paying services, network management, and clinical/DUR programs

> Weaknesses:

 – Ranked near the bottom on organizational stability due to loss in membership and the experience of their staff with Systemed

 – Ranked near the bottom on formulary management because they do not allow Funds to audit their rebate contracts

   – Offered a 3-year contract

CARP 02182

✷ SEGAL |

# Conclusion

☐ NMHCRx:

› Strengths:

– Financials, network access, administrative and claims paying services, and network management

› Weaknesses:

– NMHCRx's clinical and DUR programs did not appear to be as comprehensive as other PBMs and NMHCRx did not provide examples of their clinical and DUR reporting

– Ranked near near the bottom for formulary management because they do not perform outcome studies based on their formulary and they did not answer one question regarding the frequency of their formulary committee meetings

– Offered a 3-year contract

36

CARP 02183

✶ SEGAL |

# Conclusion

☐ Express Scripts:

> Strengths:

– Financials, organizational experience, and formulary management

– Offered a 2-year contract

> Weaknesses:

– Ranked near the bottom for administration and claims paying ability for their telephone responsiveness, the inability of their customer service representatives to approve claims, and the quality of their reports

– Ranked near the bottom for network management because they do not conduct on-site reviews of network pharmacies and they only perform a limited number of pharmacy audits each year

– Express Scripts' clinical and DUR program do not appear to be as strong as other PBMs – they don't seem to track savings for their programs or provide quality reporting

37

CARP 02184

✳ SEGAL |

# Conclusion

□ EHS:

> Strengths:

– Financials, organization stability, and clinical/DUR programs

> Weaknesses:

– Ranked near at the bottom on administration and claims paying services because they did not respond to questions regarding the frequency of pharmacy directory updates, as well as their financial and coding accuracy.

– Ranked at the bottom for network management because they do not conduct on-site reviews of network pharmacies and they only perform a limited number of pharmacy audits each year

– Offered a 3-year contract

38

CARP 02185

※ SEGAL |

# Conclusion

☐ AdvancePCS:

> Strengths:

– Administration and claims paying services, clinical and DUR programs, and formulary management

> Weaknesses:

– Ranked at the bottom out of all nine proposal for their financials

– True discount on generics not known due to structure of pricing (not guaranteed)

– Ranked at the bottom for organizational stability due to their recent acquisition by Caremark, their loss in membership, and the high turnover rate of their staff

39

CARP 02186



Next Steps

SEGAL

40

CARP 02187

✶ SEGAL |

# Next Steps

□ Request "Best and Final Offers" from AdvancePCS, Express Scripts, NMHCRx and Systemed, including:

  › Request improved and guaranteed pricing terms from AdvancePCS

  › Request 2-year contract for NMHCRx and Systemed

□ Select finalists based on revised proposals

□ Finalist meetings (up to four), if necessary

□ Award contract

□ Implementation

41

CARP 02188



42

**Appendix**

✳ SEGAL |

CARP 02189

# ⋆ SEGAL

# Financials - Detail

| Retail | AdvancePCS Current Plan | AdvancePCS | EHS | Express Scripts | MedImpact | NMHCRx | PharmaCare | Prescription Solutions | Systemed | ULLICO |
|---|---|---|---|---|---|---|---|---|---|---|
| **Discounts** | | | | | | | | | | |
| Single Source Brand | Brand: AWP-14% Generic: MAC/AWP-14% | Brand: AWP-15% Generic: MAC/AWP-15% | Brand: AWP-15% Generic: AWP-50% | 14.0% / 38.0% | 14.0% / 25% | All Brand: 15% Generics only. | 15.0% | Brand: AWP-15% Generic: MAC/AWP-15% | 15.0% / 35% | 15.5% / 20% |
| Single Source Brand & Generic (without HCFA-FUL prices) | | | | | | | | | | |
| Multi Source Brand & Generic (with HCFA-FUL prices) | | | | | | | | | | |
| **Dispensing Fees** | | | | | | | | | | |
| Single Source Brand | Brand $2.00 Generic $2.25 | $2.00 / $2.00 | $2.15 / $2.15 | $1.75 / $2.00 | $1.90 / $1.90 | $0.00 / $0.00 | $1.75 / $1.75 | $2.50 / $2.50 | $1.90 / $1.90 | $1.90 / $1.90 |
| Multi Source Brand & Generic (with HCFA-FUL prices) | | | | | | | | | | |
| Rebates | $2.00 / $2.00 | $2.00 / $2.00 | $2.15 / $2.20 | $2.00 / $2.00 | $1.90 / $1.30 | $0.00 / $1.50 | $1.75 / $1.25 | $2.50 / $2.34 | $1.90 / $1.90 | $1.90 / $2.00 |
| **Mail** | | | | | | | | | | |
| **Discounts** | | | | | | | | | | |
| Brand Generic | 21% / 50% | 21% / 50% | 23% / 52% | 22% / 52% | 20% SS / 67.6% Tier 1 / 25% Tier 2 | 20% / 58% | 22% / 50% | 20% / 55% | 21% SS / 62% Tier 1 / 35% Tier 2 | 23% SS / 60% Tier 1 / 55% Tier 2 |
| **Dispensing Fees** | | | | | | | | | | |
| Brand | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Generic | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Rebates | $1.15 | $1.15 | $6.00 | $7.00 | $7.00 | $3.90 | $3.00 | $5.00 | $8.14 | $6.50 |
| **Total Claim Costs** | $10,626,000 | $10,153,000 | $9,645,000 | $9,535,000 | $9,814,000 | $9,506,000 | $9,919,000 | $9,669,000 | $9,494,000 | $9,713,000 |
| Administration Fees | $37,000 | $37,000 | $0 | $19,000 | $37,000 | $20,000 | $20,000 | $49,000 | $0 | $0 |
| Projected Total Costs | $10,663,000 | $10,190,000 | $9,645,000 | $9,554,000 | $9,851,000 | $9,526,000 | $9,939,000 | $9,718,000 | $9,494,000 | $9,713,000 |
| Savings from Current Costs | | ($473,000) | ($1,018,000) | ($1,109,000) | ($812,000) | ($1,137,000) | ($724,000) | ($945,000) | ($1,169,000) | ($950,000) |
| PBM Rank | | 9 | 4 | 3 | 7 | 2 | 8 | 6 | 1 | 5 |

43

Exhibit V

Filed Under Seal

Exhibit W

Filed Under Seal

# Exhibit X

# Filed Under Seal

# Exhibit Y

# Filed Under Seal

# Exhibit Z

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

NEW ENGLAND CARPENTER HEALTH
BENEFITS FUND, ET AL.,

        PLAINTIFF,

      vs.              Case No. 05-CV-11148-PBS

                               **CERTIFIED COPY**

FIRST DATABANK, INC. AND
MCKESSON CORP.,

        DEFENDANTS.

_____ /

Deposition of

FRANK SCORPINITI

_____

Thursday, May 17, 2007

REPORTED BY: KATHLEEN WILKINS, RPR, CRR, CSR 10068

CERTIFIED REPORTING SERVICES
(888)747-9674

email: Info@certifiedreportingservices.com

www.certifiedreportingservices.com

1

**DEPOSITION OF FRANK SCORPINITI**

1    A.    Yes.

2    Q.    -- in the past, what time period were you

3 referring to?

4    A.    Oh, as far as I can recollect, I have been

5 managing any aspect of the pharmacy when margins as a

6 whole have been downward.

7    Q.    When you refer to "margins as a whole," does

8 that include margins for prescription drugs?

9    A.    Yes.  And thank you for that.

10          In clarification, my oversight has only been

11 in prescription sales.

12    Q.    All right.  And during what time period have

13 you had responsibility for oversight of sales of

14 prescription drugs?

15    A.    In one capacity or another from 2000 until

16 today.

17    Q.    And has the trend in profit margin for

18 prescription drugs earned by Longs been declining

19 throughout that whole period, 2000 to today?

20    A.    To the best of my recollection, yes.

21    Q.    Do you have an understanding as to why profit

22 margins earned by Longs on prescription drugs have been

23 declining in that time period?

24    A.    Yes.  Aggressive reduction of reimbursement

25 rates from managed care have driven the downward trend

32

DEPOSITION OF FRANK SCORPINITI

1    for the industry and for Longs.

2        Q.   And when you refer to aggressive -- actually,

3    let me withdraw that.

4             So in your last answer you referred to managed

5    care.

6        A.   Yes.

7        Q.   What did you mean by that?

8        A.   I mean any -- what we call third party.

9    Anyone other than a patient paying for their

10   prescription, be it a -- I think the lay public would

11   call it insurance.  We might call it managed care or PBM

12   reimbursement.

13       Q.   So by insurance, you're referring to a company

14   like Blue Cross?

15       A.   Yes.

16       Q.   And you also mentioned a PBM.  What is a PBM?

17       A.   Pharmacy benefit management company.  And they

18   could -- many insurance companies use a PBM to

19   administer their drug plan, and those -- those PBMs

20   reimburse Longs for pharmacy services.

21       Q.   What percentage, if you know, by dollar volume

22   of Longs revenue on prescription drug sales in this

23   period that we're talking about comes from these third

24   party reimbursements?

25             MS. MAHONEY:  Objection.  Vague.

33

**DEPOSITION OF FRANK SCORPINITI**

1          THE WITNESS:  Would you please restate your

2   question.

3          MR. FLUM:  Q.  Of course.

4      A.   Or repeat it.

5      Q.   Of course.

6          I'm focusing on the period where you've been

7   familiar with profit margins on prescription drug sales,

8   which I believe you said was 2000 to the present.

9      A.   Okay.

10     Q.   In that period, can you tell me what

11  percentage of the total reimbursements for prescription

12  drug sales to Longs come from third party payors?

13         MS. MAHONEY:  Objection.  Foundation.

14         THE WITNESS:  On the aggregate from the period

15  of 2000 until today, it's in the 90 percent range.

16         MR. FLUM:  Q.  All right.

17     A.   And increasing.

18     Q.   And over that same time period, what

19  mechanisms have the third party payors used to reduce

20  their reimbursements to Longs for prescription drugs?

21         MS. MAHONEY:  Objection.  Foundation.

22         THE WITNESS:  My general understanding is that

23  they use -- they reduce network rates.  They can --

24  actually, I'm going to ask you to be more specific in

25  your question, because I want to make sure that I

                                                          34

1  understand what you're asking me.

2          MR. FLUM:  Q.  Sure.  What I want to know is

3  how third party payors have gone about reducing the

4  amounts that they reimburse to Longs in the period from

5  2000 to the present for purchases of prescription drugs.

6          MS. MAHONEY:  Objection.  Foundation and

7  assumes facts not in evidence.

8          THE WITNESS:  The -- my general understanding

9  is that our network rates have been reduced from managed

10  care insurance PBM, and that has caused our margins to

11  continue to decline.

12          MR. FLUM:  Q.  All right.  When you refer to

13  "network rates," what do you mean?

14      A.   Well, the network rate in the -- the

15  reimbursement percentage that we get paid for particular

16  products have been reduced.  Dispensing fees have been

17  reduced in some instances.  And an implement called

18  MACs, or maximum allowable costs, have been reduced.

19      Q.   And the reimbursement percentage that you just

20  referred to in your answer is a percentage of what?

21      A.   AWP, typically speaking.

22      Q.   And is -- what was the relationship between

23  AWP and the reimbursement percentage that you mentioned?

24      A.   Please.  I'm not sure I understand your

25  question.

                                                        35

1    Q.    All right.  I will rephrase it.

2    A.    Thank you.

3    Q.    When you say that the reimbursement percentage

4  based on AWP has been reduced by managed care over the

5  years --

6    A.    Yes.

7    Q.    -- does that mean that the amount that's

8  reimbursed -- actually, let me withdraw that.

9         When you say that the reimbursement percentage

10  in relation to AWP has been reduced by managed care over

11  the years, how has managed care implemented that

12  reduction?

13         MS. MAHONEY:  Objection.  Foundation.

14         THE WITNESS:  I can't speak to the specifics

15  because it's an area that is another part of our

16  company.  But my general understanding is that the

17  formulas are structured as AWP minus, AWP minus X, Y or

18  Z.  And that X, Y and Z has gotten larger.  So the

19  resulting amount of revenue generated has declined as

20  that number has changed.

21         MR. FLUM:  Q.  So in your answer when you talk

22  about AWP minus X, Y or Z --

23    A.    Right.

24    Q.    -- do X, Y or Z refer to percentage amounts?

25    A.    Yes.

36

**DEPOSITION OF FRANK SCORPINITI**

```
 1        Q.   And is it your understanding that the
 2   reimbursement rates paid by managed care over the years
 3   have used increasingly larger discounts off AWP?
 4        A.   Yes.
 5             MS. MAHONEY:  Objection.  Foundation.
 6             MR. FLUM:  I have nothing further.  Thank you.
 7             THE WITNESS:  You're welcome.
 8             MS. MAHONEY:  I have one follow-up question.
 9             THE VIDEOGRAPHER:  All right.  Time is 11:01.
10   Off the record.
11             (Whereupon, a recess was taken.)
12             THE VIDEOGRAPHER:  Time is 11:02.  On the
13   record.
14             FURTHER EXAMINATION BY MS. MAHONEY
15             MS. MAHONEY:  Q.  Mr. Scorpiniti, you
16   testified earlier that you -- you and others at Longs
17   noticed an impact in profit margins with respect to
18   certain products?
19        A.   Yes.
20        Q.   You testified in response to some questions by
21   plaintiff that profit margins have steadily declined in
22   your experience at Longs?
23        A.   Yes.
24        Q.   In the --
25        A.   Let me clarify.
```

37

## DEPOSITION OF FRANK SCORPINITI

```
 1              THE VIDEOGRAPHER:  Shall we conclude?
 2              MR. FLUM:  Let's go off the record for a
 3   minute, please.
 4              THE VIDEOGRAPHER:  The time is 11:10.  Off the
 5   record.
 6              (Whereupon, a recess was taken.)
 7              THE VIDEOGRAPHER:  Time is 11:11.  On the
 8   record.
 9              FURTHER EXAMINATION BY MR. FLUM
10              MR. FLUM:  Q.  Mr. Scorpiniti, Ms. Mahoney was
11   asking you questions about the difference in profit
12   margins between brand prescription drugs and generics.
13              Do you recall those questions?
14        A.    Yes, I do.
15        Q.    Does Longs generally make money -- excuse me.
16   Does Longs generally make more money on generic
17   prescription drugs than on brand drugs?
18        A.    Yes.
19        Q.    And are Longs' profit margins higher on
20   generic prescription drugs than on brand prescription
21   drugs?
22        A.    Yes.
23        Q.    Now, is it correct, based on your observations
24   of the relationships between WAC AWP markups and managed
25   care reimbursements in the period from 2000 to the
```

42

**DEPOSITION OF FRANK SCORPINITI**

1  present, that the overall rate of reimbursements by

2  managed care in that period were declining at a rate

3  faster than any increases in the WAC to AWP ratio?

4      A.    That's a very specific question.  Not being

5  from that part of the organization, I cannot answer that

6  question with any certainty.

7      Q.    All right.  And is it also correct that, not

8  being from that part of the organization, you really

9  can't say with any certainty whether the profit margins

10  for brand prescription drugs were improving relative to

11  reimbursements for managed care during any part of that

12  period?

13      A.    I can -- yes.  I can say that, to the best of

14  my knowledge, the profit margins -- not specific to this

15  discount versus AWP, as you phrased your prior question,

16  but the resulting margins, for whatever the reason, have

17  declined over this period on brand drugs.

18          MR. FLUM:  Thank you.  I have nothing further.

19          MS. MAHONEY:  I have nothing further.

20          THE VIDEOGRAPHER:  The original videotape used

21  today in today's proceedings will be retained by

22  Benchmark Video.  Thank you.  We are off the record.

23  The time is 11:14.

24          (Deposition concluded at 11:14 a.m.)

25                  -o0o-

           43

1    CERTIFICATE OF REPORTER

2        I, KATHLEEN A. WILKINS, RPR, CRR, A Certified

3    Shorthand Reporter of the State of California, hereby

4    certify that the witness in the foregoing deposition was

5    by me duly sworn to tell the truth, the whole truth and

6    nothing but the truth in the within-entitled cause; that

7    said deposition was taken at the time and place therein

8    stated; that the testimony of the said witness was

9    reported by me in shorthand writing and was thereafter

10   transcribed by computer, under my direction and

11   supervision; that the foregoing is a full, complete, and

12   true record of said testimony; and that the witness was

13   given an opportunity to read and correct said deposition

14   and to subscribe the same.  Should the signature of the

15   witness not be affixed to the original deposition, the

16   witness shall not have availed him or herself of the

17   opportunity to sign or the signature has been waived.

18       I further certify that I am not of counsel or

19   attorney for any of the parties in the foregoing

20   deposition, nor in any way interested in the outcome of

21   the cause named in said caption.

22

23   DATED: May 30_____, 2007

24   _Kathleen Wilkins_____

25       KATHLEEN WILKINS, RPR, CRR, CSR 10068

DEPOSITION OF FRANK SCORPINITI

1

2  _____

3  FRANK SCORPINITI

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

# Exhibit AA

<pre>
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2
    NEW ENGLAND CARPENTERS HEALTH  )
 3  BENEFITS FUND, PIRELLI         )
    ARMSTRONG RETIREE MEDICAL      )        OR  NAL
 4  BENEFITS TRUST, TEAMSTERS      )
    HEALTH & WELFARE FUND OF       )
 5  PHILADELPHIA AND VICINITY,     )
    PHILADELPHIA FEDERATION OF     )
 6  TEACHERS HEALTH AND WELFARE    )
    FUND, and DISTRICT COUNCIL 37  )
 7  HEALTH & SECURITY PLAN         )
                                   )
 8                Plaintiffs,      )  Civil Action
                                   )
 9       -vs-                      )  No. 1:05-CV-11148-PBS
                                   )
10  FIRST DATABANK, INC., a        )
    Missouri Corporation; and      )
11  McKESSON CORPORATION, a        )
    Delaware Corporation,          )
12                                 )
                  Defendants.      )
13
</pre>

14          The videotaped deposition of SUSAN ALLENE HAYES,

15   called for examination, taken pursuant to the Federal

16   Rules of Civil Procedure of the United States District

17   Courts pertaining to the taking of depositions, taken

18   before NANCY L. BISTANY, a Notary Public within and for

19   the County of Cook, State of Illinois, and a Certified

20   Shorthand Reporter of said state, CSR No. 84-1857, at

21   200 North Columbus Drive, Chicago, Illinois, on

22   October 26, 2006, at 9:29 a.m.

23              C O N F I D E N T I A L

24         PURSUANT TO PROTECTIVE ORDER

1     yourself and swear in the witness.

2          THE REPORTER:  My name is Nancy Bistany from

3     Bistany Reporting.

4                    (WHEREUPON, the witness was duly sworn.)

5                    SUSAN ALLENE HAYES,

6     called as a witness herein, having been first duly sworn,

7     was examined and testified as follows:

8                         EXAMINATION

9     BY MR. GOLDMAN:

09:30:59AM  10          Q.     Ms. Hayes, would you state your full name for

11     the record, please.

12          A.     Susan Allene Hayes.

13          Q.     And where do you reside?

14          A.     In Lake Zurich, Illinois.

09:31:07AM  15          Q.     And how long have you resided there?

16          A.     About a year.

17          Q.     Before coming here today, did you sign what

18     you understood to be a certification regarding

19     confidentiality?

09:31:15AM  20          A.     Yes, sir.

21          MR. GOLDMAN:  I'm going to have marked as

22     Exhibit 1 a document entitled "Protective Order," and

23     refer you to page 13 where your name appears to be signed.

24     We'll mark that, please.

1          Q.    Well, we're talking about the discounts now

2     between the payor and the PBM, correct?

3          A.    Correct.

4          Q.    And would you say that one reason for the

02:25:45PM  5     increase in the discount has to do with growing

6     competition between the PBMs?

7          A.    No, because all the PBMs have lowered their

8     retail network discounts.

9          Q.    Can you think of any other reason why the

02:26:01PM  10     discounts have gotten larger over time other than the fact

11     that the cost of drugs went up?

12          A.    Well, I think now looking back on it, I think

13     it was because the spread between WAC and AWP has

14     increased.

02:26:13PM  15          Q.    Because of the allegations in the complaint?

16          A.    Yes.

17          Q.    All right.  But do you know of any other

18     reason?  You say you don't believe it's due to

19     competition.

02:26:23PM  20               You believe it's due to costs of drugs

21     increasing, which would include the allegation in the

22     complaint?

23          A.    Right.

24          Q.    Can you think of any other reasons why the

# Exhibit BB

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, et al,            )
                                 )
            Plaintiffs           )
                                 )
        -VS-                      ) CA No. 05-11148-PBS
                                 ) Pages 1 - 65
FIRST DATABANK, INC.,            )
a Missouri Corporation;          )
and McKESSON CORPORATION,        )
a Delaware Corporation,          )
                                 )
            Defendants           )

MOTION/STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 22, 2007, 2:05 p.m.

LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 46

1    PBMs all knew it.  They knew this difference occurred.  They

2    told the TPPs this.  I want to emphasize that they told them

3    that.  Just the way Dr. Hartman said they never would do

4    that, they would never tell them that, they told them that,

5    just the way Dr. Berndt said they would do.

6            THE COURT:  So but I have a question for you.

7            MR. GOLDMAN:  And so they got back, and this is our

8    proposition:  We're going to show and we're going to prove

9    that, is it ten?  No, it's not ten.  If it was one ESI

10   dealing with one, what, are they going to just deal with one

11   person out there?  We're not going to infer they dealt with

12   hundreds of their customers, their best clients out there?

13   We're going to show at trial that the TPPs have a leverage

14   vis-a-vis the PBMs to recoup all of that difference.

15           Now, did every single one?  Did that happen to

16   every single one?  No.  Do I know how many exactly?  No.  We

17   won't know that until we know -- if we have a trial, if

18   you're going to have a class trial, we'd have to take each

19   person on the stand, and we'd have to test their credibility

20   because we've had people tell us, "We never heard about it,"

21   and only later to find documents to show they did.

22           THE COURT:  The big question is what the "it" is.

23   In other words --

24           MR. GOLDMAN:  The "it" is this:  Was there

25   impact --

1                    C E R T I F I C A T E

2

3

    UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9   Reporter, do hereby certify that the foregoing transcript,

10  Pages 1 through 65 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 05-11148-PBS, New England Carpenters Health

13  Benefits Fund V. First Databank, Inc., et al, and thereafter

14  by me reduced to typewriting and is a true and accurate

15  record of the proceedings.

16           In witness whereof I have hereunto set my hand this

17  24th day of May, 2007.

18

19

20

21

22

23  _____
    LEE A. MARZILLI, CRR
24  OFFICIAL FEDERAL COURT REPORTER

25

# Exhibit CC

# Filed Under Seal

# Exhibit DD

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   NEW ENGLAND CARPENTERS HEALTH )
     BENEFITS FUND, et al,         )
 4                                 )
                       Plaintiffs  )
 5                                 )
                 -VS-              ) CA No. 05-11148-PBS
 6                                 ) Pages 1 - 30
     FIRST DATABANK, INC.,         )
 7   a Missouri Corporation;       )
     and McKESSON CORPORATION,     )
 8   a Delaware Corporation,       )
                                   )
 9                     Defendants  )

10

11                        STATUS HEARING

12
                BEFORE THE HONORABLE PATTI B. SARIS
13                 UNITED STATES DISTRICT JUDGE

14

15
                             United States District Court
16                           1 Courthouse Way, Courtroom 19
                             Boston, Massachusetts
17                           September 20, 2007, 9:10 a.m.

18

19

20

21

22                       LEE A. MARZILLI
23                    OFFICIAL COURT REPORTER
                    United States District Court
24                  1 Courthouse Way, Room 3205
                        Boston, MA  02210
25                       (617)345-6787
```

1    being optimistic.

2              THE COURT:  I'm learning as I'm sitting here.

3              MR. GOLDMAN:  We know that you take these matters

4    under submission, but if I may lay out our position.  This is

5    based on having looked at their papers and over 300 new pages

6    of new Hartman and other expert material that we received the

7    other day.

8              If you may recall, your Honor's order established

9    two classes.  Now, that order in August didn't give either

10   side what they asked for.  Our position, as you may recall,

11   that there should be no class at all.  Your Honor certified

12   two classes.

13             THE COURT:  Although you didn't really spend that

14   much time on the consumer end.

15             MR. GOLDMAN:  There wasn't a lot devoted to the

16   consumer side of this --

17             THE COURT:  Right.

18             MR. GOLDMAN:  -- in the papers or the argument.

19   But your Honor certified two classes.  We were disappointed

20   because we thought your earlier decision in Pharm III was in

21   point, but your Honor did not feel that way.  Okay, that was

22   your Honor's decision.

23             They, on the other hand, didn't get everything they

24   wanted.  They wanted a damage action for the third-party

25   payors for three and a half years, and your Honor said, "No,

1        Then there were experts.  They had Dr. Hartman and

2    Susan Hayes, and we had Dr. Willig.  The Court gave ample

3    opportunity for the parties to depose each of the experts in

4    this case.  We took advantage of that.  We took the

5    deposition of Dr. Hartman for two days over his lengthy

6    material.  We took Susan Hayes's deposition.  She turned out

7    to be on our side.  That's why she got fired.  They chose not

8    to take the deposition of Dr. Willig, the person they're

9    attacking.  They took the position.  They didn't need to have

10    his deposition.  The Court allowed vast amounts of

11    discovery --

12        THE COURT:  Now, here's my problem.  You're

13    passionately arguing right now, and I haven't even read all

14    the stuff that they just submitted.  I tend not to read these

15    things until there's an opposition.  You know, I don't sit

16    and read everything that comes in.

17        MR. GOLDMAN:  I understand.

18        THE COURT:  I invited a certain response.  I find

19    class certification probably the hardest thing that I do on

20    the civil side anyway, and I frequently go through at least

21    two iterations trying to figure out what's there and what's

22    not.  So I don't know if I'm going to allow a whole new

23    theory to come in, but I did invite him to come in and see if

24    there's anything that can be proven because even your expert

25    didn't disagree there would be a snapshot period of time

1                    C E R T I F I C A T E

2

3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7

8          I, Lee A. Marzilli, Official Federal Court

9    Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 30 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 05-11148-PBS, New England Carpenters Health

13   Benefits Fund, et al Vs. First Databank, Inc., et al, and

14   thereafter by me reduced to typewriting and is a true and

15   accurate record of the proceedings.

16          In witness whereof I have hereunto set my hand this

17   27th day of September, 2007.

18

19

20

21

22
           /s/ Lee A. Marzilli
23        _____
          LEE A. MARZILLI, CRR
24        OFFICIAL FEDERAL COURT REPORTER

25

# Exhibit EE

# PERCENTAGE CO-PAY CLASS IS <u>DERIVATIVE OF TPP CLASS</u>

- **Individual issues affecting TPP class must be addressed for co-pay class**

- **Co-pay class reimbursements are subject to the same TPP-PBM contracts**

- **These two classes were treated the same in *Pharm. III***

28