UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plaintiffs, <br><br>  v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Civil Action:  1:05-CV-11148-PBS <br><br> Judge Patti B. Saris |

**DEFENDANT MCKESSON CORPORATION'S OPPOSITION TO CLASS PLAINTIFFS' AMENDED MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION....................................................................................................................1

THE PROPOSED CHANGES TO THE COMPLAINT ........................................................2

ARGUMENT ...........................................................................................................................7

I.    PLAINTIFFS MUST MEET A HIGH BURDEN TO EXCUSE THEIR DELAY
      IN SEEKING LEAVE TO AMEND AFTER THE CLOSE OF DISCOVERY ...............7

II.   PLAINTIFFS HAVE FAILED TO EXCUSE THEIR NEARLY TWO AND
      ONE-HALF YEAR DELAY IN SEEKING TO AMEND THE COMPLAINT ...............9

III.  MCKESSON WOULD BE SEVERELY PREJUDICED BY INJECTING A
      NEW U&C CLASS, ANTITRUST CLAIMS, AND A NEW RICO THEORY
      INTO THE CASE .........................................................................................................11

      A.    The Claims Asserted on Behalf of the Proposed New U&C Class Present a
            Host of Disputed Issues That Have Not Been the Subject of Discovery .............11

      B.    McKesson Has Not Taken the Discovery Necessary to Respond to
            Plaintiffs' New Federal and State Antitrust Claims .............................................14

      C.    Plaintiffs Should Not be Permitted to Make Substantial Changes to Their
            RICO Allegations Three Months After the Close of Discovery .........................17

CONCLUSION ......................................................................................................................19

## TABLE OF AUTHORITIES

### CASES

*Adams v. Gould, Inc.*,
739 F.2d 858 (3d Cir. 1984) .................................................................................................. 8

*Addamax Corp. v. Open Software Found., Inc.*,
152 F.3d 48 (1st Cir. 1998) ................................................................................................. 14

*Albanese v. Bergen County, New Jersey*,
991 F. Supp. 410 (D.N.J. 1998) .......................................................................................... 11

*Augusta News Co. v. Hudson News Co.*,
269 F.3d 41 (1st Cir. 2001) ........................................................................................... 14, 15

*Bay State HMO Mgmt., Inc. v. Tingly Systems, Inc.*,
152 F. Supp. 2d 95 (D. Mass. 1995) ..................................................................................... 9

*Bell Atlantic Corp. v. Twombley*,
127 S. Ct. 1955 (2007) ................................................................................................... 16, 17

*Bodne v. The Geo A. Rehman Co.*,
811 F. Supp. 218 (D.S.C. 1993) ........................................................................................... 8

*California v. ARC Am. Corp.*,
490 U.S. 93 (1989) .............................................................................................................. 16

*CCBN.Com Inc. v. Thomson Financial, Inc.*,
270 F. Supp. 2d 146 (D. Mass. 2003) ................................................................................ 16

*Checker Taxi Co. v. Nat'l Prod. Workers Union*,
113 F.R.D. 561 (N.D. Ill. 1986) ......................................................................................... 10

*Chicago Prof'l Sports Ltd. P'Ship v. NBA*,
95 F.3d 593 (7th Cir. 1996) ................................................................................................. 16

*Continental Airlines, Inc. v. United Airlines, Inc.*,
277 F.3d 499 (4th Cir. 2002) ............................................................................................... 15

*Daraee v. Microsoft Corp.*,
No. 0004 03311, 2000 WL 33187306 (Or. Cir. Ct. June 27, 2000) .................................. 16

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Services Ass'n, Inc.*,
357 F.3d 1 (1st Cir. 2004) ................................................................................................... 15

*Euromodas, Inc. v. Zanella, Ltd.*,
368 F.3d 11 (1st Cir. 2004) ........................................................................................... 14, 16

*Grant v. News Group Boston, Inc.*,
55 F.3d 1 (1st Cir. 1995) ................................................................................................. 8, 10

*Hayes v. New England Millwork Distributors, Inc.*,
602 F.2d 15 (1st Cir. 1979) ................................................................................................ 17

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................................................... 16

*In re Pharm. Indus. Average Wholesale Price Litig.*,
307 F. Supp. 2d 196 (D. Mass. 2004) ......................................................................... 5, 17, 18

*In re Relafen Antitrust Litig.*,
225 F.R.D. 14 (D. Mass. 2004) ......................................................................................... 16

*Johnson v. Sales Consultants, Inc.*,
61 F.R.D. 369 (N.D. Ill. 1973) ...................................................................................... 16, 18

*Kansas v. Utilicorp United Inc.*,
497 U.S. 199 (1990) ........................................................................................................... 16

*Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*,
329 F.3d 216 (1st Cir. 2003) ............................................................................................. 10

*Kennedy v. Josephthal & Co.*,
814 F.2d 798 (1st Cir. 1987) ............................................................................................... 7

*Larocca v. Borden*,
276 F.3d 22 (1st Cir. 2002) ................................................................................................. 8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
127 S. Ct. 2705 (2007) ...................................................................................................... 15

*NHL Players Ass'n v. Plymouth Whalers Hockey Club*,
419 F.3d 462 (6th Cir. 2005) ............................................................................................. 16

*Quaker State Oil Refining Corp. v. Garrity Oil Co.*,
884 F.2d 1510 (1st Cir. 1989) ........................................................................................... 7, 8

*Safeway Transp. Inc. v. West Chambers Transp., Inc.*,
100 F. Supp. 2d 442 (S.D. Tex. 2000) ................................................................................. 8

*Steir v. Girl Scouts of the USA*,
383 F.3d 7 (1st Cir. 2004) ................................................................................... 7, 10, 11, 14

*Stepanischen v. Merchants Despatch Transp. Corp.*,
722 F.2d 922 (1st Cir. 1983) ............................................................................................... 8

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*,
373 F.3d 57 (1st Cir. 2004) ........................................................................................... 14, 15

*Texaco Inc. v. Dagher*,
126 S. Ct. 1276 (2006) ....................................................................................................... 15

*Tiernan v. Blyth, Eastman, Dillon & Co.*,
719 F.2d 1 (1st Cir. 1983) ................................................................................................... 8

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
   986 F.2d 589 (1st Cir. 1993) ........................................................................................ 15

*Wolf v. Reliance Standard Life Ins. Co.*,
   71 F.3d 444 (1st Cir. 1995) ......................................................................................... 17

## RULES

Fed. R. Civ. P.
   15(a) ................................................................................................................................ 7
   15(b) ......................................................................................................................... 10, 11

## OTHER AUTHORITIES

*Manual for Complex Litig.*
   § 30 (4th ed. 2004) ...................................................................................................... 17

## INTRODUCTION

Two and one-half years after this action was brought, and months after the close of fact discovery, plaintiffs seek to amend their complaint for a third time. Plaintiffs' proposed amendments are sweeping and would alter the fundamental nature of this case. They would: (1) add a new nationwide class of consumers paying "usual and customary" prices ("U&C") with a longer class period; (2) add a Sherman Act claim on behalf of all classes; (3) add an antitrust claim on behalf of all classes based on California law (or the laws of eighteen other states and the District of Columbia); (4) add two new individual plaintiffs; and (5) present a new RICO claim and theory that is different from the one they have been pursuing since the beginning of this case.

While plaintiffs quote the "freely given" standard generally governing requests for leave to amend, that is not the applicable standard here. To the contrary, where discovery has closed and the legal issues in the case have been developed, the First Circuit places an onerous burden on the moving party to excuse a late request to amend. Plaintiffs have utterly failed to meet that burden here. They do not claim that the proposed amendments are warranted because they recently became aware of new facts that could not have been discovered earlier. In fact, plaintiffs acknowledge that they could have brought these claims long ago. Plaintiffs admit that they "originally intended" to bring their U&C class claim in 2005, but chose not to do so. They assert that the antitrust claims are "based on the same set of facts" underlying their RICO claim, and therefore could have been filed before. And they make no effort to explain why they are adding an alternative RICO claim and theory three months after the discovery cut-off, other than to vaguely allege that it is "to conform to the evidence," a standard that has no application here.

Not only have plaintiffs failed to offer a legitimate excuse for their eleventh-hour request, McKesson would also be severely prejudiced if the request were granted — another ground for denying plaintiffs' motion. McKesson has spent literally tens of thousands of attorney hours in discovery, based on the claims that were made. If plaintiffs' motion were to be granted, discovery would not just be expanded; much of it would have to be repeated — documents re-

1

reviewed, witnesses re-deposed — because plaintiffs' new claims raise significant new issues that have never been the subject of discovery in the past.

For example, plaintiffs' new U&C class claim turns on the critical new allegation that U&C prices are "tied" to published AWPs. That claim has not been the focus of any discovery in this case. The limited discovery that has been conducted suggests that retailer pricing practices are highly individualized, and that discovery on plaintiffs' new class claims would be extensive. In addition, there has been no discovery at all regarding the issues unique to plaintiffs' proposed new antitrust claims, such as relevant market, market power, competitive consequences, or economic efficiencies. Discovery on these issues would be time-consuming and expensive. Moreover, plaintiffs' proposed new RICO allegations, undoubtedly asserted because of an obvious failure of proof on plaintiffs' original RICO "enterprise" theory, raise extensive new issues not previously addressed in this case. Not only would plaintiffs' proposed amendments greatly (and unfairly) increase the cost of discovery, they would require significant additional motion practice and would substantially delay the trial.

For each of these reasons, and those set forth below, McKesson respectfully requests that plaintiffs' motion to amend be denied.

## THE PROPOSED CHANGES TO THE COMPLAINT

Plaintiffs filed their original complaint on June 2, 2005. Since then they have twice sought leave to amend their complaint, on July 17, 2006, and again on October 31, 2006. McKesson did not oppose either of plaintiffs' previous requests. The parties have litigated a motion to dismiss, and the Court has spent a year on class certification issues already. The Court issued its class certification ruling on August 27, 2007. The fact discovery cut-off date, which was already extended several times, was July 31, 2007, well before this motion was filed. Expert discovery is about to begin, and the Court has expressed an interest in setting the case for trial.

The discovery record in this case and the related MDL has been, to say the least, extensive. McKesson has devoted tens of thousands of attorney hours to reviewing millions of documents produced in hard copy, on optical disks and on hard drives, to defend itself against

plaintiffs' current claims. In addition, in response to seven sets of document requests propounded by plaintiffs, McKesson reviewed hundreds of thousands of documents and produced to plaintiffs over 100,000 pages of documents from over forty custodians' files. Between the parties, fifty-three third-party document subpoenas and eleven sets of interrogatories were served. Thirty-seven witnesses, including many third parties, were deposed. Six motions to compel discovery were litigated, and several other discovery disputes were negotiated and resolved informally. Fact discovery closed on July 31, 2007.[1]

After all of this, the plaintiffs now ask to amend their complaint for a third time to add new claims, new parties, and new legal theories. *First*, plaintiffs propose to add a new class of cash-paying consumers who bought Appendix A drugs from retail pharmacies at "usual and customary" prices. (Pls.' Prop. Third Am. Compl. ("Proposed TAC") ¶ 131.) Plaintiffs admit that they were aware of the existence of this class at the time they filed the original complaint and the two intervening amendments, but decided not to assert these claims until now. (Pls.' Mem. in Supp. of Am. Mot. For Leave to File Third Am. Compl. 6 ("Pl. Br."), Oct. 9, 2007.) [Docket No. 324.][2] The claims of the new U&C class rest on the dubious proposition that U&C charges are formulaically tied to AWP — a claim that has not been tested in discovery and that McKesson vigorously disputes.

*Second*, plaintiffs want to add both federal and state antitrust claims on behalf of all three classes. Plaintiffs move to amend the complaint to add a cause of action for treble damages under the federal Sherman Act. (Proposed TAC ¶¶ 174-80.) In the alternative, plaintiffs seek to add a separate count for treble damages under California's antitrust law, or for violations of the

---

[1] Beyond that, McKesson has conducted its own extensive due diligence in preparing to defend plaintiffs' stated claims at trial.

[2] Plaintiffs' first request for leave to amend was to specifically limit the class "to third-party payors." (Pls.' Mem. in Supp. of Mot. For Leave to File First Am. Compl. 1, July 17, 2006.) [Docket No. 81.] Plaintiffs stated that the new class "*excludes consumers*." (*Id.* at 16 (emphasis added).) Plaintiffs then changed their minds again, and sought leave to add a class of individuals who paid "*a percentage co-payment*" for Appendix A drugs. (Second Am. Compl. ("SAC"), ¶ 153, Nov. 30, 2006 (emphasis added).) [Docket No. 174.] Neither of these classes included cash paying customers who paid U&C charges.

antitrust laws of eighteen other states and the District of Columbia. (*Id.* ¶¶ 211-14.) As with the new U&C class, plaintiffs acknowledge that they were aware of the basis for asserting these antitrust claims at the time they filed their original complaint in 2005.

*Third*, under the below-radar heading of "Other changes to the Complaint," plaintiffs seek leave to add "more detailed" allegations to their RICO claim. (Pl. Br. 4.) These proposed changes, to which plaintiffs dedicate a mere four lines in their brief (*id.*), would add an alternative new claim and theory under RICO that was not the subject of prior discovery or motion practice.

To date, plaintiffs have litigated their RICO claim on the theory that McKesson and First DataBank ("FDB") shared a common purpose in engaging in the alleged fraud: Namely, to directly benefit themselves financially by artificially increasing the AWPs published by FDB. For FDB, the primary purpose of artificially inflating its published AWPs was to create "a greater demand for [its] reporting services," thereby increasing its revenue and profits. (SAC ¶ 138(a).) For McKesson, one alleged purpose it had for increasing published AWPs included profiting directly through its own retail chain. (*Id.* ¶ 137(e).)[3] As for the means by which this RICO enterprise was implemented, plaintiffs alleged that there was a secret agreement between McKesson and FDB, that FDB would only survey McKesson, and would not survey any other national wholesaler regarding markups, but say they did so, all the while using only McKesson's markups in setting FDB's published AWPs. (*Id.* ¶ 124.)

At the outset of this lawsuit, McKesson moved to dismiss the plaintiffs' RICO claim on the ground that plaintiffs had failed to plead a RICO enterprise because they had not pled a "common purpose" to artificially increase AWPs. McKesson relied on the Court's earlier opinion that dismissed with prejudice similar RICO claims brought against drug manufacturers, holding that FDB was "indifferent as to whether the AWP spread exists or not; their financial

---

[3] Plaintiffs also allege that McKesson benefited indirectly by means of currying favor with its retailer clients. (*Id.* ¶ 137(a)-(d).)

interest lies in earning money through selling books listing numbers. The spread is irrelevant to their financial well being." *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 204 (D. Mass. 2004) ("*Pharm II*"). The Court also ruled that the alleged common purpose of "perpetuating the use of AWP's as a benchmark for reimbursement in the pharmaceutical industry" would "not support a claim of a RICO enterprise." *Id.* at 204-05.

In response to McKesson's motion to dismiss and McKesson's reliance on the Court's decision in *Pharm II*, plaintiffs successfully argued that this case was different, because McKesson and FDB shared a common purpose to benefit themselves from inflated AWPs. (Pls.' Opp'n to McKesson's Mot. to Dismiss 4, Nov. 2, 2005.) [Docket No. 10.] For FDB, plaintiffs argued that it had a common purpose different from what plaintiffs had alleged in the MDL, because here, FDB was alleged to have directly benefited from the scheme by "increas[ing] the demand for its business," through the inflated AWPs it published. (*Id.* at 5.) For McKesson, plaintiffs argued that, in addition to benefiting its retail clients, McKesson directly benefited by increasing profits "at its own pharmacy-related business." (*Id.* at 4.)[4]

Plaintiffs are now proposing an alternative alleged scheme and common purpose. *First*, the proposed complaint now alleges in the alternative that FDB's purpose for participating in the scheme was to "perpetuat[e] AWPs as an industry price bench[.]" (Proposed TAC ¶ 113(c).) As

---

[4] Since 2005, plaintiffs have continued to rely upon these same allegations in their representations to the Court regarding the necessary elements of the alleged shared common purpose, as well as the means by which the scheme was implemented. For example, in their class certification brief, plaintiffs represented to the Court that, in late 2001, FDB "limited its purported 'surveys' to McKesson and did not 'survey' other wholesalers[.]" (Pls.' Am. Mem. in Support of Class Cert. 5, Dec. 20, 2006.) [Docket No. 179.] Plaintiffs also told the Court that the alleged RICO scheme "directly benefited McKesson's pharmacy business, a nationwide network of 275 independent pharmacies in 35 states[.]" (*Id.*) In addition, just three weeks ago, plaintiffs represented in their brief to the First Circuit that McKesson participated in the scheme to "provide a greater spread" at its "own pharmacy related businesses." (Pls.' Opp'n to McKesson's Pet. to Appeal 7, Oct. 1, 2007; Schechter Decl., Ex. A.) And Dr. Hartman, in arguing that the Court erred in its class certification order, repeats the allegation that McKesson realized increased profits in its retail business in his most recent report to the Court. (Expert Report of Hartman 5, ¶ 14, Sep. 14, 2007 ("Hartman Report"); Ex. A to Decl. of Paul Flum in Supp. of McKesson's Response to Dr. Hartman's Sep. 14, 2007 Submission.) [Docket No. 329.]

for McKesson, plaintiffs want to delete altogether the baseless allegation that McKesson profited directly from the scheme through its retail business.  (*Id.* ¶ 112(e).)

*Second*, the proposed complaint alleges different means by which the alleged scheme was supposed to have been implemented.  The complaint alleges that, *even if* FDB surveyed other wholesalers during the class period, as FDB represented, FDB *intentionally ignored* the information that it gathered from them, and relied on information supplied solely by McKesson. (Proposed TAC ¶¶ 8, 130.)[5]  In other words, whereas before, plaintiffs have alleged that the McKesson-FDB agreement would only survey McKesson and not other wholesalers, *now*, plaintiffs want to allege that FDB were in fact surveyed before, but the secret agreement was that FDB would intentionally ignore information it received from other wholesalers.  This new allegation regarding the nature of the FDB-McKesson agreement is wholly inconsistent factually with plaintiffs' previous allegations.[6]

Quite simply, the reason plaintiffs are proposing these changes to their RICO claim at this late stage is because they have suffered a failure of proof with respect to many of their original allegations.  Just for example, the uncontradicted evidence confirms that McKesson was *never informed that it was* "*the only wholesaler that [FDB was] surveying for purposes of the mark-up.*"  (Morgan Dep. 273:24-274:3, June 28, 2007; Schechter Decl., Ex. H (emphasis added)).)  Most recently, Kay Morgan, who was in charge of the FDB survey process throughout the class period, testified unequivocally that she did not tell McKesson when the other

---

[5] Specifically, the proposed amended complaint alleges that "[t]*o the extent FDB did receive material from other wholesalers*," that information "was *not the basis for the FDB published AWP*, only McKesson's information was."  (*Id.* ¶ 8 (emphasis added).)  Elsewhere plaintiffs allege that "*irrespective of when exactly it stopped 'surveying' other wholesalers*, First Data agreed to utilize for markup purposes data received from McKesson."  (*Id.* ¶ 99 (emphasis added).)

[6] These are not the only changes to plaintiffs' RICO allegations.  In an obvious effort to bolster its attempt to reverse the Court's decision on class certification, plaintiffs also allege that the scheme was perpetrated to benefit PBMs who operated mail order business, "allowing them to make a substantial profit off the spread."  (*Id.* ¶ 111.)

wholesalers stopped participating in the survey because "*if I had told them, they would not participate in the survey, either*." (*Id.* at 274:22-275:8 (emphasis added).)

## ARGUMENT

### I.     PLAINTIFFS MUST MEET A HIGH BURDEN TO EXCUSE THEIR DELAY IN SEEKING LEAVE TO AMEND AFTER THE CLOSE OF DISCOVERY.

Two and one-half years into the case — and several months after discovery has closed — plaintiffs have moved for permission to make sweeping amendments to their complaint. While plaintiffs invoke the "liberal" and "freely given" standards typically governing amendments under Rule 15(a), the standard applicable to this case is a rigorous one, which places on plaintiffs the burden to make an affirmative showing why amendment should be permitted at this late date. As the First Circuit has repeatedly admonished, "the longer a plaintiff delays, the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (the longer the delay, the "more exacting" the moving party's burden becomes). Where, as here, "discovery would have to be reopened after the accumulation of an extensive and expensive record and after the legal issues involved have already been developed," denial of leave to amend is particularly appropriate. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 806 (1st Cir. 1987).

In *Steir*, *supra*, the First Circuit upheld the district court's denial of leave to amend because the amended complaint would have injected a "new theory of relief" into the litigation after the close of discovery that would have required reopening one deposition and obtaining additional medical records. 383 F.3d at 12-13. According to the First Circuit, the prejudice in such a situation "goes without saying." *Id.* at 12. Likewise, here, as detailed below, plaintiffs' proposed amendments would interject significant new issues requiring substantial additional discovery far beyond the need to reopen one deposition. On that ground, the court in *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517-18 (1st Cir. 1989), upheld the denial of leave to amend, where the defendant sought to add an additional counterclaim for

*quantum meruit.* As the court explained, although two months remained in the discovery period, "virtually all discovery had been undertaken, or at least noticed," and the defendant "never proffered a satisfactory explanation for its delay." *Id.*

Denial of a motion to amend is particularly appropriate for a request coming after the close of discovery, where the moving party seeks to add new theories of liability based on facts that it previously knew about. Thus, in *Grant v. News Group Boston, Inc.*, 55 F.3d 1 (1st Cir. 1995), the First Circuit upheld denial of leave to amend to add new claims arising out of the plaintiff's allegedly wrongful discharge, finding that the plaintiff "clearly possessed the knowledge to make the claims he sought to assert in the amended complaint." *Id.* at 6. Despite that knowledge, the plaintiff in *Grant* waited fourteen months after filing the action and moved for leave to amend only "after the close of discovery." *Id.* *See also Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 4-5 (1st Cir. 1983) (proposed amendments "do not involve precisely the same issues or facts" and "may well have affected defendants' planned trial strategy and tactics").

Plaintiffs in this case have already amended their complaint twice in the 2½ years since this action was filed. Both times, plaintiffs could have sought to add the new claims, classes, and legal theories presented by this motion, but chose not to. Now that discovery has closed, and with trial in the offing, plaintiffs' motion to amend must be denied unless they demonstrate good cause for their neglect and delay. *Stepanischen v. Merchants Despatch Transp. Corp*, 722 F.2d 922, 933 (1st Cir. 1983); *see also Larocca v. Borden*, 276 F.3d 22, 32 (1st Cir. 2002) (denying leave to amend the complaint where plaintiffs "were given leave twice earlier to amend their complaint"). Plaintiffs have not and cannot do so.[7]

---

[7] Plaintiffs virtually ignore the First Circuit precedent governing late requests to amend, and instead rely on out of circuit precedent, none of which is remotely on point. *Adams v. Gould, Inc.*, 739 F.2d 858 (3d Cir. 1984), involved a denial of a motion to alter or amend a judgment pursuant to Rule 59(e), and a denial of leave to amend the complaint in that context. The court specifically noted the "unusual situation" presented, and the fact that, because the original complaint had been tied up on an interlocutory appeal, the parties had not had to litigate the facts underlying the original complaint. *Bodne v. The Geo A. Rehman Co.*, 811 F. Supp. 218 (D.S.C. 1993), involved a request for leave to amend after the court granted a motion to dismiss the

(Footnote continues on next page.)

## II.     PLAINTIFFS HAVE FAILED TO EXCUSE THEIR NEARLY TWO AND ONE-HALF YEAR DELAY IN SEEKING TO AMEND THE COMPLAINT.

Plaintiffs have failed to meet their burden of excusing their neglect and delay in seeking to amend at this late date.  Plaintiffs do not, for example, claim that their amendments are justified by new facts unearthed during discovery.  *See, e.g.*, *Bay State HMO Mgmt., Inc. v. Tingly Systems, Inc.*, 152 F. Supp. 2d 95, 116 (D. Mass. 1995) (new facts uncovered during discovery are "a valid basis for delay in filing a motion to amend").  To the contrary, the very reasons that plaintiffs present to the Court for why they delayed only serve to demonstrate that plaintiffs could have amended the complaint earlier.

Specifically, plaintiffs insinuate amendment is appropriate because, in its class certification order, the Court "dropped a footnote excluding cash payors from the Class."  (Pl. Br. 2.)  This is, at best, disingenuous.  As the Court noted, "plaintiffs have not requested that the class include" U&C retail purchasers.  (Class Order 13 n.5.)  Indeed, plaintiffs' own brief expressly concedes that they "originally intended to bring claims" on behalf of the U&C class, but made a conscious choice not to bring those claims.  (Pl. Br. 6.)

Plaintiffs also claim that, while they initially decided not to bring claims on behalf of a U&C class because it would "potentially complicate the notice process," they became "encouraged" by this Court's ruling on August 16, 2007 in *Gov't Employees Hosp. Ass'n v. Serono, S.A. et al*.  (*Id.* at 6.)  In fact, class counsel was aware of, and had used, these same notice procedures *long before the initial complaint in this action was filed*.  The notice procedures in *Serono* involved issuing subpoenas to retail pharmacies under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), to identify potential members of a consumer class.  In the *Relafen Antitrust Litigation*, involving the same class counsel as this case,

---

(Footnote continued from previous page.)
original complaint without prejudice.  The court noted that the amendment would not have altered "the relevant facts or discovery" in the case.  *Id.* at 220.  And in *Safeway Transp. Inc. v. West Chambers Transp., Inc.*, 100 F. Supp. 2d 442 (S.D. Tex. 2000), the court granted a request to amend, rejecting the defendants' argument that the amendment was legally insufficient under Texas law.

Judge Young authorized the issuance of HIPAA subpoenas to retail pharmacies for notice purposes on November 24, 2004, seven months before this case was filed.  (*In re Relafen Antitrust Litig.* No. 01-CV-12239-WGY, Order Granting Preliminary Approval of Settlement 7, 13, Nov. 24, 2004; Schechter Decl., Ex. B.)[8]

Turning to plaintiffs' proposed new antitrust claims, plaintiffs make no attempt to excuse their delay in asserting these claims either.  They do not suggest that the claims are warranted by new facts unearthed during discovery.  To the contrary, they assert that the antitrust claims are "based on the same set of facts" as the RICO claims.  (Pl. Br. 8.)  Thus, based on their own argument, plaintiffs were "unquestionably aware of a potential cause of action under the antitrust laws" when they filed their original complaint.  *Checker Taxi Co. v. Nat'l Prod. Workers Union*, 113 F.R.D. 561, 569 (N.D. Ill. 1986) (denying leave to amend to add antitrust claims after 14-month delay).  The First Circuit routinely affirms denials of motions for leave to amend where the plaintiff "clearly possessed the knowledge necessary to make the claims" when the original complaint was filed.  *Grant*, 55 F.3d at 6.  That is exactly the case here.

Finally, plaintiffs do not explain why they waited until three months after the discovery cut-off to present a new RICO enterprise theory.  The only basis cited in plaintiffs' motion for allowing them leave to amend the complaint to change their RICO claim and theory is to "conform with the evidence."  (Pl. Br. 4.)  Plaintiffs provide no facts whatsoever to support this claim, and it is the wrong standard in any event.  Motions for leave to amend a complaint to "conform with the evidence" are governed by Rule 15(b).  This standard only applies where evidence has been admitted at trial with the opposing party's "express or implied consent." *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 232 (1st Cir. 2003) (quoting

---

[8] Plaintiffs also suggest that their late amendment is necessitated because their expert, Dr. Hartman, "recently reviewed [] IMS data," and found a number of retail cash transactions. (Pl. Br. 6.)  IMS data are not "new" information.  *See Steir*, 383 F.3d at 13-14 (denying relief to amend where plaintiff could have discovered information earlier).  Indeed, plaintiffs received IMS data, including data on consumer cash transactions, as early as October 2005 from defendants in the MDL.  (*See* Oct. 18, 2005 Letter to Hagens Berman enclosing IMS Data; Schechter Decl., Ex. C.)

Fed. R. Civ. P. 15(b)). Since "no trial has occurred," plaintiffs "can find no solace in Rule 15(b)." *Albanese v. Bergen County, New Jersey*, 991 F. Supp. 410, 421 (D.N.J. 1998).

Because plaintiffs have failed to present any legitimate excuse justifying a two and one-half year delay in amending the complaint, the Court should deny their motion.

## III.    McKESSON WOULD BE SEVERELY PREJUDICED BY INJECTING A NEW U&C CLASS, ANTITRUST CLAIMS, AND A NEW RICO THEORY INTO THE CASE.

Plaintiffs' failure to explain their delay in seeking leave to amend is, in and of itself, a sufficient ground to deny their request. But the insertion of a new class, new claims, and new legal theories at this late juncture would also be severely prejudicial to McKesson. *See Steir*, 383 F.3d at 7 (requests to amend "whose timing prejudices the opposing party" are "particularly disfavored"). Thus, leave to amend should be denied for this additional reason.

### A.    The Claims Asserted on Behalf of the Proposed New U&C Class Present a Host of Disputed Issues That Have Not Been the Subject of Discovery.

Plaintiffs seek leave to add a new class of cash-paying consumers who bought Appendix A drugs from retail pharmacies at U&C prices. While plaintiffs assert that adding the U&C class would require only "[l]imited class discovery of a couple of representative plaintiffs," (Pl. Br. 7), that self-serving claim completely misses the critical issue presented by plaintiffs' claims on behalf of the new U&C class — whether, as a matter of fact and economic theory, U&C prices are formulaically linked to AWP.

The linchpin of plaintiffs' proposed new U&C claim is the allegation that prices charged by retailers to cash-paying customers are "tied to the reported AWPs, and are usually set at a price above AWP. Hence an . . . increase in the AWP uniformly impacts such class members." (Proposed TAC ¶ 51.) McKesson vigorously disputes plaintiffs' characterization of U&C pricing. Indeed, McKesson's investigation to date strongly suggests that U&C pricing varies retailer-to-retailer and product-to-product, and that U&C prices often have nothing to do with AWP. Of course, none of these matters has been tested in discovery. If the Court grants leave to

amend to add a U&C class, discovery into how U&C prices are set would need to be pursued from scratch.[9]

The limited evidence available so far suggests that retailer pricing practices for cash-paying customers are highly individualized:

- A consultant to TPPs, Ron Lyon, testified in the MDL that there are "***many, many ways of figuring out cash price . . . . I don't believe there's a single way of setting the usual and customary***." (Lyon Dep. 93:5-21, Nov. 17, 2004; Schechter Decl., Ex. D (emphasis added).)

- PBM Express Scripts explained in a report to named plaintiff and TPP class representative District Council 37 that "***U&C is driven solely by the competitiveness of the pharmacy provider's marketplace for a specific drug at a specific time in order to create walk-in business in their store***." (DC37 06973-90 at 06975; Schechter Class Opp'n Decl. Ex. 5L, Mar. 2, 2007 (emphasis added).) [Docket No. 206-18.]

- A Rite Aid representative, the only retailer to give any testimony on usual and customary pricing in this lawsuit, testified that its U&C prices are "***unique to Rite Aid and no one else***." (Vucurevich Dep. 23:5-16, May 16, 2007; Schechter Decl. E (emphasis added).)

- Even within individual retail chains, U&C prices will vary by geographic location: a witness in the MDL testified that at K-Mart, "***[e]ach store had its own usual and customary prices***." (Polley Dep. 132:8-11, May 4, 2006; Schechter Decl., Ex. F (emphasis added).)

---

[9] Moreover, the class period for the proposed new U&C class is from 2001 to "the present" because cash payors allegedly had no knowledge or bargaining leverage to push back against higher U&C prices. (*Id.* ¶ 132.) By contrast, discovery regarding the claims asserted on behalf of the TPP class and the co-pay class was conducted only through March 15, 2005 — the date when plaintiffs allege that FDB publicly disclosed it had stopped surveying other wholesalers.

Given the highly individualized nature of U&C pricing, plaintiffs' proposed new complaint would require extensive new third-party discovery.

It also appears that U&C prices are generally set in relation to WAC rather than AWP. Plaintiffs try to suggest otherwise by citing to a 2004 GAO report, which, according to plaintiffs, shows that retail cash prices are "tied" to AWP prices. (Pl. Br. 2-3.) The 2004 GAO report shows no such thing, reporting at most that retail prices rose during some part of the class period. More to the point, another report by the GAO on the same subject, issued one year later, refutes plaintiffs' claim that there is a formulaic relationship between published AWPs and retail cash prices.[10] The 2005 GAO report concludes that for 50 frequently used brand-name drugs, including many on Appendix A, "*AWPs increased at a faster rate than . . . U&C prices*" between 2000 and 2004. (2005 GAO Report at 11; Schechter Decl., Ex. G (emphasis added).) If, as plaintiffs claim, U&C prices are "tied to the reported AWPs," then any increase in AWP should result in a corresponding increase in U&C prices. The 2005 GAO report shows just the opposite. According to the figures reported by the 2005 GAO report, U&C prices closely tracked the increase in WAC, ***and the full increase in U&C prices from 2000 to the end of 2004 can be explained by increases in WAC alone***.[11]

The key point here is that whether or not cash prices charged by retailers are "tied" to AWPs is a *new* issue, *not* previously addressed in this case, that is fact intensive and will be hotly disputed by the parties. Plaintiffs' decision to wait until the last minute before injecting this issue into the case will necessarily lead to substantial and costly new discovery, costly new

---

[10] Even though plaintiffs chose not to cite to the 2005 GAO report in their proposed amended complaint, there is no question that they know about it. Dr. Hartman cites to and relies extensively on the 2005 GAO report in the section of his September 14, 2007 Expert Report devoted to the U&C class. (Hartman Report at 4-5.)

[11] The GAO uses the term AMP instead of WAC, but they are essentially the same. The report shows that WAC and U&C prices "for the 50 brand drugs increased *at similar rates*, but AWPs increased at a faster rate." (Schechter Decl., Ex. G at 11.) "Over the entire period" U&C prices increased at an average annual rate of 5.2%, closely following a 5.4% increase in the WAC. (*Id.*) This is not surprising since plaintiffs themselves affirmatively allege, correctly, that "retailers *buy* pharmaceuticals on the basis of WAC," and not AWP. (Proposed TAC ¶ 2 (emphasis in original).)

expert reports, new class certification briefing, and inevitable delay. *See Steir*, 383 F.3d at 12 (denying as prejudicial leave to amend a complaint that would have required one additional deposition).

> **B.      McKesson Has Not Taken the Discovery Necessary to Respond to Plaintiffs' New Federal and State Antitrust Claims.**

Plaintiffs simply gloss over the severe prejudice that McKesson will suffer if plaintiffs were to be permitted to add antitrust claims on behalf of all three classes at the eleventh-hour. Plaintiffs erroneously assert that "no additional discovery" will be required on the antitrust claims. (Pl. Br. 7-8.) While plaintiffs may be willing to forego any new discovery, the same cannot be said of McKesson. Indeed, plaintiffs' "no new discovery" contention ignores critical differences between the antitrust claims under Section 1 of the Sherman Act (and state law) and the existing RICO claim.

Plaintiffs' proposed antitrust claim alleges that FDB and McKesson conspired to increase AWP/WAC spreads for certain brand name prescription drugs. "There are two prerequisites for a successful section 1 claim. First, there must be concerted action. Second, the actors' agreement must involve either restrictions that are [1] *per se* illegal or [2] restraints of trade that fail scrutiny under the rule of reason." *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004) (citations omitted). While whether or not plaintiffs' alleged facts comprise a *per se* claim or a rule of reason claim is a legal question for the court ultimately to resolve, *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57, 61 (1st Cir. 2004), here it is quite clear that the rule of reason will apply.

In fact, the "legality of most kinds of agreements" is "tested by the rule of reason." *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001). The "per se rules under section 1 of the Sherman Act have left only a couple of 'serious candidates' for per se treatment." *Addamax Corp. v. Open Software Found., Inc.*, 152 F.3d 48, 51 (1st Cir. 1998). The "***only*** important categories of agreements that reliably deserve this label today are ***those among competitors*** that amount to 'naked' price fixing, output restriction, or division of customers or

territories." *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Services Ass'n, Inc.*, 357 F.3d 1, 4 (1st Cir. 2004) (emphases added). All other types of agreements are subject to the rule of reason, including alleged vertical price fixing arrangements. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2710 (2007).[12] Here, no horizontal price-fixing is alleged. Therefore, plaintiffs' claim must be analyzed under the rule of reason. *Leegin*, 127 S. Ct. at 2710.[13]

To support a claim under the rule of reason, the plaintiffs will be required to make "a **burdensome multi-part showing**: [1] that the alleged agreement involved the exercise of power in a relevant economic market, [2] that this exercise had anti-competitive consequences, and [3] that those detriments outweighed efficiencies or other economic benefits." *Stop & Shop Supermarket Co.*, 373 F.3d at 61 (emphasis added). Establishing a Section 1 Sherman Act claim is "***a demanding and fact-intensive process***." *Eastern Food Servs., Inc.*, 357 F.3d at 5 (emphasis added); *see also Augusta News Co.*, 269 F.3d at 49 (establishing a Sherman Act claim "is a difficult task").

---

[12] Moreover, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue." *Leegin*, 127 S. Ct. at 2710. Plaintiffs have not cited a single case applying a *per se* analysis under the circumstances presented in this case.

[13] Plaintiffs' claim that they are entitled to a "quick look" analysis under the rule of reason is both incorrect and irrelevant. (Pl. Br. 10.) It is incorrect because the quick look analysis only applies in cases involving presumptively *per se* restraints, but where "procompetitive justifications for it also exist." *Continental Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002); *see e.g., Texaco Inc. v. Dagher*, 126 S. Ct. 1276, 1280 n.3 (2006) (refusing to apply quick look analysis "for the same reasons that *per se* liability is unwarranted"); U.S. *Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 595 (1st Cir. 1993) (refusing to apply quick look analysis to exclusive dealing agreement between HMO and physicians). As explained above, there is no presumptive *per se* restraint alleged. *See Leegin*, 127 S. Ct. at 2720 (holding that the "rule of reason . . . applies to vertical price restraints"). Plaintiffs' claim that a "quick look" applies here is also irrelevant, because even if that were true, it still would not obviate the need for expensive and time-consuming additional discovery. *See Continental Airlines, Inc.*, 277 F.3d at 511 (court or parties could not find "a single case in which the Supreme Court has approved a quick-look analysis in which the parties received *less than a full evidentiary hearing*") (emphasis added). Whether or not plaintiffs are entitled to a quick look analysis is an issue more properly addressed on summary judgment, *see id.*, and does not obviate the need for discovery on the unique issues raised by plaintiffs' antitrust claims.

Hence, properly understood, the insertion at this late stage of antitrust claims that plaintiffs could have brought over two years ago would inject difficult and complicated new issues into the case. Assuming the proposed complaint could survive a motion to dismiss,[14] new discovery and costly expert opinions would be required on the proper definition of a relevant market; the presence or absence of power within that market; whether the conduct plaintiffs complain of had "significant anti-competitive effects" within that market, *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 469 (6th Cir. 2005),[15] and whether the conduct complained of realized economic benefits or efficiencies.

None of the necessary discovery on issues unique to plaintiffs' antitrust claims has been undertaken. McKesson did not pursue party and third party document or deposition discovery on these complex matters, nor did it review the millions of pages of documents from the MDL with an eye toward any of these issues. The additional discovery on plaintiffs' antitrust claims would be "lengthy, complex and expensive." *Johnson v. Sales Consultants, Inc.*, 61 F.R.D. 369, 371

---

[14] If amendment is permitted, McKesson will move to dismiss on the grounds that the complaint fails to state a cause of action under the Sherman Act. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1967 (2007) (discussing new fact pleading standards for Sherman Act claims); *CCBN.Com Inc. v. Thomson Financial, Inc.*, 270 F. Supp. 2d 146, 156 (D. Mass. 2003) (Saris, J.) (dismissing antitrust claims because plaintiffs failed to make factual "allegations concerning market share or market power"). Moreover, the Supreme Court has consistently held that "only direct purchasers" have standing to sue for treble damages under the Sherman Act. *California v. ARC Am. Corp.*, 490 U.S. 93, 103 (1989); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 723-24 (1977). So-called "indirect purchasers," those who, "[i]n the distribution chain, . . . are not the immediate buyers from the alleged antitrust violators," lack standing to pursue a treble damages claim. *Kansas v. Utilicorp United Inc.*, 497 U.S. 199, 207 (1990). Plaintiffs' alternative claims under state antitrust law suffer from similar defects. Indeed, one of the new proposed class representatives is from Oregon, (Proposed TAC ¶ 29), a state that does not permit "indirect purchaser" claims. *See In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 25 (D. Mass. 2004); *Daraee v. Microsoft Corp.*, No. 0004 03311, 2000 WL 33187306, *1 (Or. Cir. Ct. June 27, 2000) ("The indirect purchaser rule of *Illinois Brick* . . . applies to Oregon's Antitrust Act.").

[15] Simply because the plaintiffs have alleged an increase in AWP/WAC spreads does *not* mean they have alleged anti-competitive injury. The touchstone for assessing whether conduct has anti-competitive consequences is whether output has decreased in the relevant market. "The core question in antitrust is output." *Chicago Prof'l Sports Ltd. P'Ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996). Unless the conduct complained of "reduces output in some market, to the detriment of consumers, there is no antitrust problem. A high price is not itself a violation of the Sherman Act." *Id.* Plaintiffs' case is about an alleged fraud, not "harm to the competitive process." *Euromedas, Inc.*, 368 F.3d at 21.

(N.D. Ill. 1973) (refusing leave to amend complaint to add Sherman Act claim after a 14-month delay); *see also Bell Atlantic Corp.*, 127 S. Ct. at 1967 (discussing the "unusually high cost of discovery in antitrust cases"); *Manual for Complex Litig.* § 30 (4th ed. 2004) (describing extensive scope of discovery in antitrust cases).

### C. Plaintiffs Should Not be Permitted to Make Substantial Changes to Their RICO Allegations Three Months After the Close of Discovery.

Finally, McKesson will also be severely prejudiced if the Court permits plaintiffs to present an alternative RICO claim and theory after the close of discovery. Courts do not permit plaintiffs to propose an amendment that "'substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation.'" *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 450 (1st Cir. 1995) (quoting Wright, Miller & Kane, *Federal Practice & Procedure* § 1487, at 623); *see also Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 17, 20 (1st Cir. 1979) (refusing to allow amendment after the close of discovery that added charges "not contemplated by the original complaint"). That is precisely what plaintiffs seek to do here.

Plaintiffs have litigated this case for the past 2½ years on the theory that FDB and McKesson shared a "common purpose" for the scheme – to artificially increase published AWPs in order for each to benefit themselves. FDB allegedly profited through increased subscriptions, and McKesson allegedly profited directly through its own network of pharmacies, and indirectly through its retail pharmacy customers. The alleged means by which this scheme was implemented was a secret agreement by which FDB would *not* survey other wholesalers, and only use McKesson's markup in setting AWPs. This is the RICO claim that was presented to the Court at the motion to dismiss phase, and this is the theory that the Court found distinguishable from the scheme to increase AWPs in the MDL, which the Court held was insufficient under RICO. *See Pharm II*, 307 F. Supp. 2d at 204-05.

With respect to its RICO enterprise allegations, plaintiffs now propose to allege in the alternative that FDB's purpose in participating in the scheme was to perpetuate "AWPs as an

industry price bench." (Proposed TAC ¶ 113(c).)  Nowhere in any of plaintiffs' three prior complaints did plaintiffs allege that FDB's purpose in participating in the scheme was to perpetuate AWPs as an industry price bench.  (*Id.*)  Indeed, this is *exactly* the alleged purpose that the Court held was insufficient in *Pharm II*.  *See* 307 F. Supp. 2d at 205 (rejecting as insufficient under RICO the "objective of using AWP as a published benchmark").  The reason for this alternative new "purpose" allegation is obvious:  Plaintiffs are simply trying to fudge the issue at the last minute because there has been a failure of proof that higher AWPs somehow led to increased sales of services by FDB, as alleged originally.  Moreover, plaintiffs now seek to drop the demonstrably false allegation that McKesson benefited directly from the scheme by realizing increased profits through it own retail pharmacies.  (Proposed TAC ¶ 112(e).)[16]

In addition, plaintiffs would also allege new means for implementing the alleged scheme. Plaintiffs now propose to allege that *even if* FDB did *in fact* survey the other wholesalers, FDB and McKesson secretly agreed to use *only* information supplied by McKesson.  (*Id.* ¶¶ 8, 99.) These new "means" allegations are irreconcilable with plaintiffs' original theory that the defendants secretly agreed that FDB stop surveying other wholesalers in 2001.  McKesson submits that there simply is no proof of any agreement by McKesson and FDB to inflate AWPs. This is the real reason why plaintiffs are now seeking to add these nebulous new amendments to their RICO claim.

Plaintiffs should not be permitted to make these amendments having proceeded on its original allegations for well over two years, through a motion to dismiss, extensive discovery, and class certification.  Courts do not allow plaintiffs to "completely change the theory of the case after the case has been submitted to the Court on another theory without some showing of lack of knowledge, mistake or inadvertence or some change of conditions over which [plaintiffs] had no knowledge."  *Johnson*, 61 F.R.D. at 371.  Moreover, allowing such amendments at this

---

[16] As noted earlier, even while seeking to delete this allegation from the complaint, they continue to affirmatively advance this claim in the First Circuit and in Dr. Hartman's new report. (Schechter Decl. Ex. A; Hartman Report at 5.)

late stage would by highly prejudicial to McKesson, who has conducted discovery, indeed its entire defense, on the RICO claim alleged originally, and not on the RICO claim plaintiffs now propose.

Accordingly, the Court should deny plaintiffs' request to make these changes to their RICO allegations after the close of discovery.

## CONCLUSION

Plaintiffs have failed to offer a legitimate reason justifying their delay in seeking leave to amend, and granting the request would substantially prejudice McKesson. For the foregoing reasons, McKesson respectfully requests that the Court deny the motion for leave to amend.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)                     John Kiernan
Tiffany Cheung (*pro hac vice*)                Nicole Johnson
Morrison & Foerster LLP                        Bonner Kiernan Trebach & Crociata
425 Market Street                              One Liberty Square
San Francisco, CA 94105-2482                   Boston, MA 02109
Telephone: (415) 268-7000                      Telephone: (617) 426-3900
Facsimile: (415) 268-7522                      Facsimile: (617) 426-0380

Dated: October 25, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 25, 2007.

/s/ Lori A. Schechter
Lori A. Schechter