UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**DECLARATION OF LORI A. SCHECHTER IN OPPOSITION TO CLASS PLAINTIFFS' AMENDED MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

I, Lori A. Schechter, declare as follows:

1.      I am a partner in the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action.  I submit this declaration in Opposition to Class Plaintiffs' Amended Motion for Leave to File Third Amended Complaint.

2.      A true and correct excerpt of Plaintiffs' Opposition to McKesson's Appeal from Class Certification, October 1, 2007, is attached hereto as Exhibit A.

3.      A true and correct copy of the Order Granting Preliminary Approval of Settlement in *In re Relafen Antitrust Litigation*, No. 01-CV-12239-WGY, November 24, 2004, is attached hereto as Exhibit B.

4.      A true and correct copy of the letter from Hoa Hoang to Robert Lopez, October 18, 2005, enclosing IMS Data, is attached hereto as Exhibit C.

5.      A true and correct excerpt of the November 17, 2004 deposition of Ron Lyon of Towers Perrin, taken in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-12257 (D. Mass.) ("AWP MDL"), is attached hereto as Exhibit D.

6.      A true and correct excerpt of the May 16, 2007 deposition of David Vucurevich of Rite Aid is attached hereto as Exhibit E.

7.      A true and correct excerpt of the May 4, 2006 deposition of Catherine Polley of National Association of Chain Drug Stores, taken in the AWP MDL, is attached hereto as Exhibit F.

8.      A true and correct copy of the GAO Report, *Prescription Drugs: Price Trends for Frequently Used Brand and Generic Drugs from 2000 through 2004*, August 2005, is attached hereto as Exhibit G.

9.      True and correct excerpts of the transcript of Patricia Kay Morgan's June 28, 2007 deposition is attached hereto as Exhibit H.

Executed this 25th day of October, 2007, in San Francisco, California.

By:  /s/ Lori A. Schechter
Lori A. Schechter

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 25th, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

# Exhibit A

Appeal No. 07-8030

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI
ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS
HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE
FUND; DISTRICT COUNCIL 37, AFSCME – HEALTH & SECURITY
PLAN; JUNE SWAN; MAUREEN COWIE; AND BERNARD GORTER

*Respondents/Plaintiffs,*

vs.

FIRST DATABANK, INC.; MCKESSON CORPORATION,

*Petitioner/Defendants.*

Petition to Appeal an Order of the United States District Court
for the District of Massachusetts
The Honorable Patti B. Saris, Judge Presiding
(Case No. 1:05-CV-11148-PBS)

CLASS PLAINTIFFS' ANSWER IN OPPOSITION TO MCKESSON CORPORATION'S
PETITION TO APPEAL AN ORDER GRANTING CLASS CERTIFICATION

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone:  (206) 623-7292
Facsimile No.:  (206) 623-0594

For a real life example, according to McKesson's documents, the markup increased the profit on Lipitor (70 mg 90s) from $6.86 to $17.18.[7]

McKesson communicated these new WAC to AWP markups to First DataBank, which then published AWPs with those markups. First DataBank published the 25% spreads despite receipt of information, in some instances, directly from manufacturers specifying or suggesting a 20% markup as appropriate. When some manufacturers like Johnson & Johnson questioned this markup because it would "increase the cost of prescription drugs to the commercial and public payers, putting additional pressure particularly on the state budgets,"[8] First DataBank refused to change the published AWP. Nor did McKesson stop working with First DataBank to fully implement the scheme.

McKesson had economic reasons for engaging in this alleged markup scheme. A major part of McKesson's business comes from large pharmaceutical retail chains and other retail pharmaceutical clients. McKesson implemented this scheme in order to provide a greater spread to those important retail pharmacy clients like Rite Aid and Walmart as well as its own pharmacy related businesses.

---

[7] CP Appx. at 59.

[8] CP Appx. at 55.

001821-13 196335 V1

showing that the defendants engaged in a scheme to increase AWP/WAC markups on brand-name drugs, that the price of the subject drugs increased consistent with this scheme and that class members purchased the subject drugs at an inflated price consistent with the scheme. McKesson does not contend otherwise.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny McKesson's petition.

DATED: October 1, 2007

By_____
      Steve W. Berman
      Nicholas Styant-Browne
      Barbara A. Mahoney
      Hagens Berman Sobol Shapiro LLP
      1301 Fifth Avenue, Suite 2900
      Seattle, WA 98101
      Telephone: (206) 623-7292
      Facsimile: (206) 623-0594

      Thomas M. Sobol (BBO #471770)
      Edward Notargiacomo (BBO #567636)
      Hagens Berman Sobol Shapiro LLP
      One Main Street, 4th Floor
      Cambridge, MA 02142
      Telephone: (617) 482-3700
      Facsimile: (617) 482-3003

      Jeffrey Kodroff
      John Macoretta
      Spector, Roseman & Kodroff, P.C.
      1818 Market Street, Suite 2500
      Philadelphia, PA 19103
      Telephone: (215) 496-0300
      Facsimile: (215) 496-6611

- 21 -

001821-13 196335 V1

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN 37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13  196335 V1

# Exhibit B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE RELAFEN ANTITRUST LITIGATION | Master File No. 01-CV-12239-WGY |
| THIS DOCUMENT RELATES TO END-PAYOR ACTIONS: | |
| *Lynch v. SmithKline Beecham Corp.* | No. 02-CV-10163-WGY |
| *A.F. of L. - AGC Building Trades Welfare Plan v. SmithKline Beecham Corp.* | No. 02-CV-10205-WGY |
| *Twin Cities Bakery Workers Health and Welfare Fund v. SmithKline Beecham Corp.* | No. 02-CV-985 (E.D. Pa.) |
| *Houchins v. SmithKline Beecham Corp.* | No. 02-CV-10424-WGY |
| *Teamsters Local No. 35 Health Plans v. SmithKline Beecham Corp.* | No. 02-CV-10487-WGY |
| *Smithfield Foods, Inc. v. SmithKline Beecham Corp.* | No. 02-CV-10589-WGY |
| *Franklin v. SmithKline Beecham Corp.* | No. 02-CV-10671-WGY |
| *Fox v. SmithKline Beecham Corp.* | No. 02-CV-11543-WGY |
| *Kravitz v. SmithKline Beecham Corp.* | No. 02-CV-11806-WGY |

**ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT, CERTIFYING CLASS FOR PURPOSES OF SETTLEMENT, DIRECTING NOTICE TO THE CLASS AND SCHEDULING FAIRNESS HEARING**

WHEREAS, this matter has come before the Court pursuant to *End-Payor Plaintiffs' Motion for Preliminary Approval of Proposed Settlement, Certification of Class for Purposes of Settlement, and Approval of Form and Manner of Notice* (the "Motion"); and

WHEREAS, the Court finds that it has jurisdiction over these actions and each of the parties; and

WHEREAS, this Court has conducted a hearing on November 10, 2004 and is otherwise fully advised in the premises;

IT IS HEREBY ORDERED THAT:

### Preliminary Approval of Settlement Agreement

1.     The terms of the Fourth Amended Stipulation and Agreement of Settlement dated November 18, 2004, including all Exhibits thereto (the "Stipulation"), attached to the Motion, are hereby preliminarily approved, subject to further consideration thereof at the Fairness Hearing provided for below. This Order incorporates herein and makes a part hereof, the Stipulation, including the Exhibits thereto. Unless otherwise provided herein, the terms defined in the Stipulation shall have the same meanings herein. The Stipulation between the End-Payor Plaintiffs, and defendants GlaxoSmithKline PLC, SmithKline Beecham Corporation, d/b/a GlaxoSmithKline, Beecham Group PLC and SmithKline Beecham, PLC (collectively "GSK" and/or "Defendants"), was entered into at arm's-length by experienced counsel. The Court finds that the settlement embodied in the Stipulation (the "Settlement") is sufficiently within the range of reasonableness so that notice of the Settlement should be given as provided in paragraphs 5 through 10 of this Order.

2.     The Court preliminarily finds that the proposed End-Payor Class, for the purpose of this Settlement only, meets all the applicable requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil

2

Procedure, and hereby conditionally certifies the following Class for settlement purposes only:

> All persons or entities in the United States who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003 for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

The class conditionally certified for settlement purposes only includes the following states or group of states:

> Group I States:  All person or entities in District of Columbia and the states of Arizona, California, Illinois, Iowa, Massachusetts, Nebraska, Nevada, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin, as well as the State Employment and Retiree Health and Welfare Benefit Program of Maryland, who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries. .

> Group II States:  All persons or entities in the territories of the United States and the states of Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Missouri, New Hampshire, New Jersey, Ohio, Oregon, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Washington and Wyoming who purchased Relafen during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

> Group III States:  All persons in the states of Florida, Maine, Michigan, Minnesota, North Carolina and North Dakota who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

> Hawaii:  All persons in the State of Hawaii who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

> New York:  All persons in the State of New York who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

3

New Mexico: All persons in the State of New Mexico who purchased Relafen and/or its generic alternatives (known as nabumetone) during the period of September 1, 1998 through June 30, 2003, for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

Excluded from the class are governmental entities (provided, however, a governmental entity is included only to the extent it makes prescription drug purchases as part of a health benefit plan for its employees); Defendants and their officers, directors, management, employees, subsidiaries, and affiliates; persons or entities who purchased Relafen or its generic alternatives for purposes of resale; any person or entity whose only purchase(s) of Relafen were made directly from Defendants or its affiliates and/or whose only purchases of generic nabumetone were made directly from the manufacturer thereof; and persons or entities who suffered no economic harm as a result of Defendants' alleged conduct (the collectively, the "End-Payor Class").

3.    The Court hereby conditionally finds that the following End-Payor Plaintiffs are adequate representatives of the End-Payor Class:

(a)    Louise Houchins;

(b)    Elliot Franklin;

(c)    Tyler Fox;

(d)    Jennifer Kravitz;

(e)    Emily Feinberg;

(f)    Jacob Koivisto;

(g)    Patrick J. Lynch as Trustee for the Health and Welfare Fund and Retiree Health & Welfare Fund of the Patrolmen's Benevolent Association of the City of New York ("PBA Funds");

(h)    A.F. of L. – AGC Building Trades Welfare Plan;

(i)    Sheet Metal Workers Local 441 Health & Welfare Plan;

(j)    IBEW-NECA Local 505 Health & Welfare Plan;

(k)    Teamsters Local No. 35 Health Plans;

(l)    Twin Cities Bakery Workers Health & Welfare Fund;

(m)    Smithfield Foods, Inc.; and

(n)    Great Lakes Health Plan, Inc.

If the Stipulation is terminated or is not consummated for any reason whatsoever, the certification

of the End-Payor Class shall be void, and End-Payor Plaintiffs and Defendants shall be deemed to have

4

reserved all of their rights to propose or oppose any and all class certification.

4.      The Court further finds that the following attorneys fairly and adequately represent the

interests of the End-Payor Class and hereby appoints them as Class Counsel pursuant to Rule 23(g):

Thomas M. Sobol
HAGENS BERMAN, LLP
One Main Street, 4th Floor
Cambridge, MA 02142

J. Douglas Richards
MILBERG WEISS BERSHAD
& SCHULMAN, LLP
One Pennsylvania Plaza
New York, NY 10119-0165

Eugene A. Spector
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

Samuel Heins
HEINS, MILLS & OLSON PLC
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Patrick E. Cafferty
MILLER FAUCHER AND CAFFERTY LLP
101 North Main Street, Suite 450
Ann Arbor, MI 48104

### Notice to Potential Class Members

5.      On or before February 21, 2005, Class Counsel shall: (a) cause the Summary Notice of

Pendency of Class Action, Proposed Settlement and Fairness Hearing ("Summary Notice") in the form

attached as Exhibit 2 hereto to be published in accordance with the Plan of Notice; (c) cause the Summary

Notice to be published on the website established for purposes of this Settlement; and (d) otherwise

implement the Plan of Notice

6.      On or before February 7, 2005, Class Counsel shall cause copies of the Notice of

Pendency and Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Hearing,

substantially in the form attached as Exhibit 1 hereto (the "Notice"), as well as the Third-Party Payor Proof

of Claim Form and Third Party Payor Notice of Exclusion, attached as Exhibit 3 and Exhibit 4 hereto, to

be mailed by first-class mail, postage pre-paid, to all potential Third-Party Payor members of the End-Payor Class, to the extent that they can be identified with reasonable diligence. In addition, Class Counsel shall cause copies of the Notice and the Consumer Claim Form, attached as <u>Exhibit 5</u> hereto, to be mailed to all members of the End-Payor Class who request a copy of the Notice, as set forth in the Plan of Notice.

7.     On or before May 11, 2005, Class Counsel shall serve and file or cause to be served and filed a sworn statement attesting to compliance with the provisions of paragraphs 5 and 6 of this Order.

8.     The Court appoints Complete Claim Solutions, Inc. as the Claims Administrator. Responsibilities of the Claims Administrator shall include the following: (a) establishing a post office box and toll-free phone number (to be included in the Notices to the Class) for purposes of communication with End-Payor Class members; (b) disseminating notice to the End-Payor Class; (c) establishing a website for purposes of posting the Notice, Stipulation and related documents; (d) accepting and maintaining documents sent from End-Payor Class members, including claim forms, exclusion requests and other documents relating to claims administration; and (e) administering claims for the allocation of damages among End-Payor Class members.

9.     After review of the proposed revised Plan of Notice submitted to the Court on November 18, 2004, the Court approves the expenditure of actual notice and administrative costs reasonably incurred for the purpose of providing notice to the End-Payor Class in accordance with the Notice Plan and in connection with the administration of this Settlement. The Escrow Agent is directed to pay such costs with notice to End-Payor Lead Counsel and GSK.

10.    The notice to be provided as set forth in paragraphs 5 through 9 of this Order (the "Notice Provisions") is hereby found to be the best practicable notice under the circumstances and, when

6

completed, shall constitute due and sufficient notice of the Settlement and the Fairness Hearing to all persons affected by and/or entitled to participate in the Settlement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure and due process.

### Subpoena of Consumer Information

11.     The Court finds that the efforts of Plaintiffs to provide the most efficient administration of the settlement with respect to consumer members of the Class may be enhanced by providing direct payment to individual consumers for co-pays or cash payments they have made for Relafen or nabumetone during the Class period.  End-Payor plaintiffs are hereby authorized, pursuant to 45 C.F.R. § 164.512(e)(1), to issue subpoenas to the ten largest providers of retail pharmacy services in the United States as well as the mail-order pharmacies associated with the five largest providers of pharmaceutical benefit management in the United States, to obtain access to electronic files of the names and addresses of any consumers of Relafen and/or nabumetone as well as information concerning the consumer's expenditures (net of any amount paid for or on behalf of the consumer by insurance or some other source) during the Class period, *provided that*:

(a)     The Claims Administrator shall obtain only the names, addresses and payment information necessary to identify users of Relafen and/or nabumetone and to calculate their total out-of-pocket expenditures for Relafen and nabumetone, and shall not seek access to any other Protected Health Information as that term is defined by the regulations implementing the Health Insurance Portability and Accountability Act of 1996 (HIPAA).  The information obtained shall be held confidential and shall not be released to any other person or entity except for a Business Associate of the Claims Administrator necessary to administer the settlement..

7

    (b)      Any names, addresses or payment information obtained through this paragraph shall be used only for the purpose of administering the settlement in this litigation, and not for any other purpose;

    (c)      The Claims Administrator shall maintain the information received pursuant to this paragraph for a period of five (5) years or as otherwise ordered by the Court. At the end of five (5) years, or as ordered by the Court, it shall destroy any and all originals and copies of the information obtained through this paragraph, including electronic and hard copies; and shall ensure that any Business Associates do the same.

### Requests for Exclusion from the End-Payor Class

12.      Any member of the End-Payor Class who wishes to be excluded from the End-Payor Class shall mail a written notice of exclusion to the Claims Administrator, to be postmarked no later than April 15, 2005, and clearly state the following: the name, address, taxpayer identification number, telephone number and fax number (if any) of the entity that wishes to be excluded from the End-Payor Class. The notice of exclusion form included with the Notice can be used for this purpose. For commercial entities, the notice of exclusion must also include a signed certification containing the following language:

> The undersigned individual hereby represents that he/she has authority to sign and submit this notice of exclusion on behalf of the above-named class member. If the undersigned individual is not a duly authorized officer, director or employee of the above named class member (if a corporation), or a general partner or duly authorized employee of the above-named class member (if a partnership), he/she must attach written evidence of the class member's specific grant of authority to him/her to execute this notice of exclusion on its behalf.
>
> The undersigned also certifies that he/she has not received any advice from the parties to this litigation concerning his/her or the class member's fiduciary obligations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1100, et seq., or other laws governing their obligations to any class member. The undersigned understands that by submitting this notice of exclusion, the class member identified above will not be entitled to

8

receive any proceeds of the Settlement Fund. By affixing my signature below, I certify under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

13.     If the person providing a certification in the notice of exclusion is not a duly authorized officer, director or employee of the Third-Party Payor requesting exclusion (if a corporation), or a general partner or duly authorized employee of the Third-Party Payor requesting exclusion (if a partnership), he/she must attach written evidence of the Third-Party Payor's grant of authority to him/her to execute the notice of exclusion on its behalf.

14.     In addition, for purposes of implementing the Stipulation, including the calculation of the amount of any Settlement reduction and whether the termination contingency referenced in the Stipulation has been met, each Third-Party Payor requesting exclusion shall set forth in the Exclusion Form, by state or group of states, the amounts paid for Relafen and/or generic nabumetone purchases during the period September 1, 1998 through June 30, 2003.

15.     Such End-Payor Class members that submit valid and timely notices of exclusion shall not be bound by the Stipulation, the Settlement, or the Final Order and Judgment.

16.     Upon receipt, the Claims Administrator shall promptly provide copies of each notice of exclusion to Class Counsel and Counsel for Defendants.

17.     Any potential member of the End-Payor Class that does not properly and timely mail a notice of exclusion as set forth in paragraphs 11 through 15 above shall be automatically included in the End-Payor Class and shall be bound by all the terms and provisions of the Stipulation, whether or not such potential member of the End-Payor Class shall have objected to the Settlement and whether or not such potential member of the End-Payor Class makes a claim upon or participates in the Settlement Fund.

9

### Proofs of Claim

18.     To effectuate the Settlement and the Notice Provisions, the Claims Administrator shall be responsible for the receipt of all notices of exclusion and Proofs of Claim. The Claims Administrator shall preserve all notices of exclusion, Proofs of Claim, and any and all other written communications from members of the Class in response to the Notice Provisions for a period of five (5) years, or pursuant to further order of the Court. All written communications received by the Claims Administrator from members of the Class relating to the Stipulation shall be available at all reasonable times for inspection and copying by Counsel to the Settling Parties.

19.     In order to be entitled to participate in the Settlement if it is effected in accordance with all of the terms and conditions set forth in the Stipulation, each member of the End-Payor Class shall take the following actions and be subject to the following requirements:

(a)     Each End-Payor Class Member that wishes to receive a distribution from the Settlement Fund must mail a properly executed Proof of Claim to the Claims Administrator at the address indicated in the Mail Notice, to be postmarked by the Claims Administrator on or before July 29, 2005 (subject to sub-paragraph 19(e) below). If a proof of claim is transmitted to the Claims Administrator by a method other than by use of the United States Postal Service, such Proof of Claim shall be deemed to have been submitted when actually received by the Claims Administrator;

(b)     Each Proof of Claim must satisfy the following conditions: (i) the Proof of Claim must be properly completed in accordance with the instructions thereon and submitted in a timely manner in accordance with subparagraph (a) of this paragraph; (ii) the Proof of Claim must be signed and certified under penalty of perjury; (iii) if the person executing the Proof of Claim is acting in a representative

10

capacity, certification of such person's authority to act on behalf of the claimant must be furnished with the

Proof of Claim; and (iv) the Proof of Claim must be complete and contain no material deletions or

modifications of any of the printed matter contained therein;

(c)    Each Proof of Claim shall be submitted to and reviewed by the Claims

Administrator, who shall make a recommendation to End-Party Lead Counsel about which claims should

be allowed;

(d)    The Claims Administrator will notify each member of the End-Payor Class that filed

a Proof of Claim of any recommendation of disallowance, in whole or in part, of the Proof of Claim

submitted by such End-Payor Class member and will set forth the reasons for any such disallowance. End-

Payor Class members shall be permitted a reasonable period of time to cure any deficiency with respect

to their respective Proofs of Claim.  A copy of such notification shall also be sent by the Claims

Administrator to Class Counsel;

(e)    All members of the End-Payor Class that do not submit timely Proofs of Claim,

or submit Proofs of Claim that are disallowed, shall be barred from participating in the Settlement Fund

(except to the extent that a Proof of Claim may be partially allowed or to the extent the Court orders

payment to consumers based on information obtained pursuant to Paragraph 11 hereof) but otherwise shall

be bound by all of the terms and provisions of the Stipulation; and

(f)    Each member of the End-Payor Class that submits a Proof of Claim and/or accepts

any payment as part of the settlement, shall thereby expressly submit to the jurisdiction of the Court with

respect to the claims submitted and/or paid, and shall (subject to final approval of the Settlement) be bound

by all the terms and provisions of the Stipulation.

11

### Confidentiality

20.     Any information received by the Claims Administrator in connection with this Settlement that pertains to a particular member of the End-Payor Class, or information submitted in conjunction with a notice of exclusion (other than the identity of the entity requesting exclusion), shall not be disclosed to any other person or entity other than Counsel to the Settling Parties, and the Court, or as otherwise provided in the Stipulation.

### The Fairness Hearing

21.     A hearing on final settlement approval (the "Fairness Hearing") will be held on May 4, 2005 at 2:00 PM before the Honorable William G. Young, United States District Court for the District of Massachusetts, One Courthouse Way, Boston, Massachusetts 02210, to consider, *inter alia*, the following: (a) whether the End-Payor Class should be finally certified, for settlement purposes only; (b) the fairness, reasonableness and adequacy of the Settlement, the dismissal with prejudice of this action as to the Defendants, and the entry of final judgment in the action; (c) whether Class Counsels' application for attorneys' fees, expenses and incentive awards for the named plaintiffs ("the Fee Petition") should be granted; and (d) whether to approve the proposed plan of allocation and distribution.

22.     On or before April 25, 2005, Class Counsel shall file with the Court: (i) any memoranda or other materials in support of final approval of the Settlement; and (ii) any Fee Petition.

23.     Any member of the End-Payor Class that has not filed a notice of exclusion in the manner set forth above may appear at the Fairness Hearing in person or by counsel and may be heard, to the extent allowed by the Court, either in support of or in opposition to the fairness, reasonableness and adequacy of the Settlement, the dismissal with prejudice of the action as to Defendants, the entry of final judgment,

and/or the Fee Petition; provided, however, that no person shall be heard in opposition to the Settlement, dismissal and/or entry of final judgment or the Fee Petition, and no papers or briefs submitted by or on behalf of any such person shall be accepted or considered by the Court, unless submitted to the Court and served upon Counsel for the Settling Parties on or before April 25, 2005. Such person must (a) file with the Clerk of the Court a notice of such person's intention to appear as well as a statement that indicates the basis for such person's opposition and any documentation in support of such opposition, and (b) serve copies of such notice, statement and documentation, as well as any other papers or briefs that such person files with the Court, either in person or by mail, and upon all Counsel to the Settling Parties on or before April 25, 2005. Persons who fail to object as provided herein shall be deemed to have waived and shall forever be foreclosed from raising any such objections.

24.    Counsel for the Settling Parties entitled to service of documentation described above are as follows:

<u>Liasion Counsel for End-Payor Plaintiffs</u>

Thomas M. Sobol
HAGENS BERMAN, LLP
One Main Street, 4th floor
Cambridge, MA 02142

<u>Counsel for Defendants</u>

Christine C. Levin
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

25.     The date and time of the Fairness Hearing shall be set forth in the Notice and Summary Notice, but shall be subject to adjournment by the Court without further notice to the members of the Class other than that which may be posted at the Court and on the Court's website.

26.     All discovery and other pretrial proceedings in this action among the Settling Parties are stayed and suspended, pending the Effective Date of the Settlement ("Final Approval"), except such proceedings as are provided for in the Stipulation, or which may be necessary to implement the terms of the Stipulation, the Settlement, or this Order.

27.     Any End-Payor Class Member may hire an attorney at his or her or its own expense to appear in the action. Such attorney shall serve a Notice of Appearance on the Counsel for the Settling Parties and file it with the Court on or before April 15, 2005.

28.     Pending Final Approval, no Class member, either directly, representatively, or in any other capacity (other than a Class Member who validly and timely elects to be excluded from the Class), shall commence or prosecute against any or all Releasees, any action or proceeding in any court or tribunal asserting any of the matters, claims or causes of action that are to be released by the Stipulation upon Final Approval, and, upon Final Approval, all Class members that do not file a timely notice of exclusion shall be forever enjoined and barred from asserting any of the matters, claims or causes of action released by the Stipulation, and any such Class member shall be deemed to have forever released any and all such matters, claims and causes of action as provided for in the Stipulation.

## Other Provisions

29.     The Court hereby approves the terms of the Escrow Agreement, attached as Exhibit C to the Stipulation.

14

30.     The Court preliminarily approves the allocation and distribution of the Settlement Fund, as described in the Stipulation.

31.     Upon Final Approval, each and every term and provision of the Stipulation shall be deemed incorporated herein as if expressly set forth and shall have the full force and effect of an Order of the Court.

32.     In the event the Settlement is terminated with respect to Defendants or in accordance with the provisions of the Stipulation, the Settlement and all proceedings had in connection therewith shall be null and void, except insofar as expressly provided in the Stipulation, and without prejudice to the *status quo ante* rights of End-Payor Plaintiffs, Defendants, and the members of the End-Payor Class.

33.     All proceedings in the action against Defendants are hereby stayed until such time as the Court renders a final decision regarding the approval of the Settlement and, if it approves the Settlement, enters final judgment as provided in the Stipulation. Neither this Order nor the Stipulation shall constitute any evidence or admission of liability by any Defendant, nor shall they be offered in evidence in this or any other proceeding except to consummate or enforce the Stipulation or the terms of this Order, or by any Releasee in connection with any action asserting Released Claims.

### Qualified Settlement Fund

34.     The Court finds that the Settlement Fund is a "qualified settlement fund" as defined in section 1.468B-1(c) of the Treasury Regulations in that it satisfies each of the following requirements:

(a)     The Settlement Fund is established pursuant to an order of this Court and is subject to the continuing jurisdiction of this Court;

15

     (b)    The Settlement Fund is established to resolve or satisfy one or more claims that have resulted or may result from an event that has occurred and that has given rise to at least one claim asserting liabilities; and

     (c)    The assets of the Settlement Fund are segregated from other assets of GSK, the transferor of payments to the Settlement Fund.

35.    Under the "relation-back" rule provided under section 1.468B-1(j)(2)(i) of the Treasury Regulations, the Court finds that:

     (a)    The Settlement Fund met the requirements of paragraphs 11(b) and 11(c) of this Order prior to the date of this Order approving the establishment of the Settlement Fund subject to the continued jurisdiction of this Court; and

     (b)    GSK and the Claims Administrator may jointly elect to treat the Settlement Fund as coming into existence as a "qualified settlement fund" on the later of the date the Settlement Fund met the requirements of paragraphs 11(b) and 11(c) of this Order or January 1 of the calendar year in which all of the requirements of paragraph 11 of this Order are met. If such relation-back election is made, the assets held by the Settlement Fund on such date shall be treated as having been transferred to the Settlement Fund on that date.

SO ORDERED this 21ˢᵗ day of *November* 2004.

 

WILLIAM G. YOUNG
CHIEF JUDGE

16

# Exhibit C

# HOGAN & HARTSON
### L.L.P.

**Writer's Direct Dial:**
**(212) 918-3640**

875 THIRD AVENUE
NEW YORK, NEW YORK 10022
TEL (212) 918-3000
FAX (212) 918-3100
WWW.HHLAW.COM

October 18, 2005

*VIA UPS OVERNIGHT*

Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

Re:    AWP MDL Litigation

Dear Mr. Lopez:

   Enclosed please find a CD containg IMS data responsive to Plaintiffs' Request for Production of Documents to All Defendants Relating to IMS Data.  The CD does not contain Avapro data, which will follow shortly.  The CD is designated highly confidential and is Bates stamped BMS/AWP/001512118.

   Please contact me if you have any questions.

   Yours truly,

*Hoa S. S. Hoang*

Hoa T.T. Hoang

HTTH/htth
Enc.

WASHINGTON, DC

BERLIN  BRUSSELS  LONDON  PARIS  BUDAPEST  PRAGUE  WARSAW  MOSCOW  BEIJING  TOKYO
NEW YORK  BALTIMORE  McLEAN  MIAMI  DENVER  BOULDER  COLORADO SPRINGS  LOS ANGELES

# Exhibit D

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4    IN RE:  PHARMACEUTICAL

5    INDUSTRY AVERAGE WHOLESALE

6    PRICE LITIGATION

7    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

8    THIS DOCUMENT RELATES TO ALL ACTIONS

9

10

11        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12                  Deposition of RON LYON

13                    (Taken by Defendant)

14                      Atlanta, Georgia

15

16         Deposition of RON LYON, taken by the Defendant,

17   at 1230 Peachtree Street, Promenade II, Suite 1900,

18   Atlanta, Georgia, on the 17th day of November, 2004, at

19   10:30 a.m., before Kendra R. Bridges, Registered

20   Professional Reporter and Notary Public.

21

22

Ron Lyon                    Highly Confidential    November 17, 2004
                                Atlanta, GA

Page 93

1    know, if they were filing an electronic claim, they can

2    put almost any number they want there.  If I was right

3    behind that person paying cash, it may be an entirely

4    different price.

5        Q.  How does that pharmacy then figure out what its

6    U and C is?

7        A.  U and C -- I mean, I would say that there's

8    many, many ways of figuring out cash price.  I will go

9    all the way back to my internships before I even got my

10   degree when I worked in a retail pharmacy.  And it was --

11   at that point it was -- I would look at you and decide

12   how much money I thought you could pay for the product

13   and charge you that.

14           Too, chains may have defined to if they know

15   it's going to be of benefit to set certain usual and

16   customaries on a card program, they may set it that way.

17   I don't believe there's a single way of setting the usual

18   and customary.  It's also if you call in and you sound

19   like you're shopping around, they may quote you a

20   different price than if you just walked in, dropped it

21   off, and went shopping.

22       Q.  But when payers switched from the indemnity

Page 180

1                         C E R T I F I C A T E

2
      STATE OF GEORGIA:
3     COUNTY OF FULTON:

4     I hereby certify that the foregoing

5     deposition was stenographically recorded by me, as
      stated in the caption.  The deponent was duly sworn
6     to tell the truth, the whole truth, and nothing but
      the truth.  The colloquies, statements, questions,
7     and answers thereto were reduced to typewriting

8     under my direction and supervision; that the

9     deposition is a true and correct record of the

10    testimony/evidence given by the deponent.
      I further certify that I am not a relative,
11    an employee of attorney or counsel of the parties,

12    nor am I financially interested in the action.

13                        This, the 17th day of November, 2004.

14

15                        _____

16                        KENDRA R. BRIDGES

17                        Certified Court Reporter

18                        (B-2194) and Notary Public

19                        My commission expires on the

20                        5th day of August 2008.

21

22

# Exhibit E

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


* * * * * * * * *

NEW ENGLAND CARPENTER HEALTH*

BENEFITS FUND, et al.,          *

    Plaintiffs          *    No. US-CV-11148-PBS

      VS.                *

FIRST DATABANK, INCORPORATED*

and MCKESSON CORPORATION,    *    **Certified Copy**

    Defendants          *

* * * * * * * * *

MAY 16, 2007

DEPOSITION

OF

DAVID VUCUREVICH, taken on behalf of the Plaintiffs

herein by Cynthia Piro Simpson, a Court Reporter and

Notary Public in and for the Commonwealth of

Pennsylvania, at the law offices of Hangley,

Aronchick, Segal & Pudlin, 30 North Third Street,

Suite 700, Harrisburg, Pennsylvania, on Wednesday,

May 16, 2007, at 9:59 a.m.

Vucurevich, David     HIGHLY CONFIDENTIAL - PURSUANT TO THE PROTECTIVE ORDER     May 16, 2007

Harrisburg, PA

23

1    Q. If I misunderstood, I apologize.

2    **A. No.  We receive the information from Verispan ---**

3    Q. Correct.

4    **A. --- that is an aggregate average of classes of**

5    **trade.  We establish Rite Aid's cash price, which is**

6    **unique to Rite Aid and no one else, based on the**

7    **decisions that we make internally around where our**

8    **competitors' prices are in aggregate and where our**

9    **prices are.  That usual customary price is established**

10   **in our system.  When we fill a prescription for drug**

11   **X, 30 count with a usual and customary price of $2,**

12   **that's part of the transaction record that goes to**

13   **Verispan.**

14   Q. You said usual and customary price, and we were

15   talking about the cash price.  Are they the same?

16   **A. Yes.**

17   Q. That was my misunderstanding.

18   **A. Okay.**

19   Q. I thought they were two separate numbers.

20   **A. No.**

21   Q. Do you know whether Rite Aid charges Verispan for

22   that data?

1

2    COMMONWEALTH OF PENNSYLVANIA )

3    COUNTY OF CAMBRIA            )

4

5            C E R T I F I C A T E

6

7        I, Cynthia Piro Simpson, a Notary Public in

8    and for the Commonwealth of Pennsylvania, do

9    hereby certify:

10       That the witness whose testimony appears in

11   the foregoing deposition, was duly sworn by me on

12   said date and that the transcribed deposition of

13   said witness is a true record of the testimony

14   given by said witness;

15       That the proceeding is herein recorded fully

16   and accurately;

17       That I am neither attorney nor counsel for,

18   nor related to any of the parties to the action in

19   which these depositions were taken, and further

20   that I am not a relative of any attorney or

21   counsel employed by the parties hereto, or

22   financially interested in this action.

23

24

     Cynthia Piro Simpson, Reporter

25

NOTARIAL SEAL
CYNTHIA PIRO SIMPSON, Notary Public
Johnstown, Cambria County, PA
...res Sept. 12, 2008

# Exhibit F

Polley, Catherine M.    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    May 4, 2006
Washington, DC

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MASSACHUSETTS

3                        ---oOo---

4       ----------------------------:

5       In Re:  PHARMACEUTICAL         :    MDL Docket No.

6       INDUSTRY AVERAGE WHOLESALE     :    CIVIL ACTION

7       PRICE LITIGATION               :    01CV12257-PBS

8                                      :

9       ----------------------------:

10

11                                     Washington, D.C.

12                                     May 4th, 2006

13

14      Deposition of:

15                  CATHERINE M. POLLEY,

16          Called for oral examination by counsel for

17      AstraZeneca Pharmaceuticals, pursuant to notice, at

18      the offices of Davis Polk & Wardwell, 1300 I Street,

19      N.W., 10th Floor, Washington, D.C., beginning at

20      10:00 a.m, before Teague Gibson in association with

21      Henderson Legal Services, a Notary Public.

22

Polley, Catherine M.    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    May 4, 2006
Washington, DC

Page 132

1    themselves.

2        Q.    How did they do that at Kmart?

3        A.    At Kmart I wasn't the person who was

4    setting the prices, that was done in another area

5    but it was -- you looked at competition, you looked

6    at certainly markup, you looked at the whole mix of

7    business.

8        Q.    Was there a list of usual and customary

9    prices for products at Kmart?

10       A.    Each store had its own usual and customary

11   prices.

12       Q.    Do your members provide to any state

13   government a list of their usual and customary

14   prices now?

15       A.    Yes.

16       Q.    Do you know if those prices are typically

17   above or below the AWP price for the drugs?

18       A.    I don't know the ratio.

19       Q.    Show you what we'll mark as Exhibit Polley

20   014.

21            (Exhibit Polley 014 was marked)

22       Q.    We've just marked as Exhibit Polley 014

Page 173

1          I, TEAGUE GIBSON, the officer before whom the

2    foregoing deposition was taken, do hereby certify

3    that the witness whose testimony appears in the

4    foregoing deposition was duly sworn by me; that the

5    testimony of said witness was taken by me in

6    stenotypy and thereafter reduced to typewriting

7    under my direction; that said deposition is a true

8    record of the testimony given by said witness; that

9    I am neither counsel for, related to, nor employed

10   by and of the parties to the action in which this

11   deposition was taken; and, further, that I am not a

12   relative or employee of any counsel or attorney

13   employed by the parties hereto, nor financially or

14   otherwise interested in the outcome of this action.

15

16                    Teague Gibson

17              Notary Public in and for

18                 the District of Columbia

19

20

21   My commission expires:

22   June 14, 2010

# Exhibit G

**United States Government Accountability Office**

# GAO

Report to Congressional Requesters

*August 2005*

# PRESCRIPTION DRUGS

# Price Trends for Frequently Used Brand and Generic Drugs from 2000 through 2004



**G A O**

Accountability * Integrity * Reliability

August 2005

**G A O**
Accountability · Integrity · Reliability

# Highlights

Highlights of GAO-05-779, a report to congressional requesters

# PRESCRIPTION DRUGS

# Price Trends for Frequently Used Brand and Generic Drugs from 2000 through 2004

## Why GAO Did This Study

Prescription drug spending has been the fastest growing segment of national health expenditures. As the federal government assumes greater financial responsibility for prescription drug expenditures with the introduction of Medicare part D, federal policymakers are increasingly concerned about prescription drug prices. GAO was asked to examine the change in retail prices and other pricing benchmarks for drugs frequently used by Medicare beneficiaries and other individuals with health insurance from 2000 through 2004.

To examine the change in retail prices from 2000 through 2004, we obtained usual and customary (U&C) prices from two state pharmacy assistance programs for drugs frequently used by Medicare beneficiaries and non-Medicare enrollees in the 2003 Blue Cross and Blue Shield (BCBS) Federal Employee Program (FEP). The U&C price is the price an individual without prescription drug coverage would pay at a retail pharmacy. Additionally, we compared the change in U&C prices for brand drugs from 2000 through 2004 to the change in two pricing benchmarks: average manufacturer price (AMP), which is the average of prices paid to manufacturers by wholesalers for drugs distributed to the retail pharmacy class of trade, and average wholesale price (AWP), which represents the average of list prices that a manufacturer suggests wholesalers charge pharmacies.

www.gao.gov/cgi-bin/getrpt?GAO-05-779.

To view the full product, including the scope and methodology, click on the link above. For more information, contact Marjorie Kanof at (202) 512-7114 or kanofm@gao.gov.

## What GAO Found

We found the average U&C prices at retail pharmacies reported by two state pharmacy assistance programs for a 30-day supply of 96 drugs frequently used by BCBS FEP Medicare and non-Medicare enrollees increased 24.5 percent from January 2000 through December 2004. Of the 96 drugs:

- Twenty drugs accounted for nearly two-thirds of the increase in the U&C price index.
- The increase in average U&C prices for 75 prescription drugs frequently used by Medicare beneficiaries was similar to the increase for 76 prescription drugs frequently used by non-Medicare enrollees.
- The average U&C prices for 50 frequently used brand prescription drugs increased three times as much as the average for 46 generic frequently used prescription drugs.

AWPs increased at a faster rate than AMPs and U&C prices for the 50 frequently used brand drugs from first quarter 2000 through fourth quarter 2004. Ten drugs in each index accounted for almost 50 percent of the increase for AMP, AWP, and U&C prices. Eight of these 10 drugs were consistent across the three price indexes.

The Centers for Medicare & Medicaid Services (CMS), two state pharmacy assistance programs, and BCBS FEP reviewed a draft of this report. While CMS noted that U&C and AWP do not reflect discounts in a drug's price, this report's focus was to examine price trends rather than price levels. Technical comments were incorporated as appropriate.

**Average Annual Percentage Change of AMP, AWP, and U&C Price Indexes for 50 Brand Drugs Frequently Used by Enrollees in BCBS FEP, from First Quarter 2000 through Last Quarter 2004**



Percentage change

| | AMP | AWP | U&C |
|---|---|---|---|
| | 5.4 | 6.0 | 5.2 |

Source: GAO analysis of data from CMS, First DataBank, New York's Elderly Pharmaceutical Insurance Coverage program, Pennsylvania's Pharmaceutical Assistance Contract for the Elderly program, and BCBS FEP.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---:|
| **Letter** | | 1 |
| | Results in Brief | 4 |
| | Background | 5 |
| | Retail Prices Increased from 2000 through 2004, with Larger Increases for Brand Than Generic Drugs | 6 |
| | AWPs Increased at a Faster Rate Than AMPs and U&C Prices for 50 Brand Drugs from 2000 through 2004 | 11 |
| | Concluding Observations | 13 |
| | Agency and Other External Comments | 14 |
| **Appendix I** | **Scope and Methodology** | 16 |
| **Appendix II** | **Drugs Included in Analyses** | 20 |
| **Appendix III** | **GAO Contact and Staff Acknowledgments** | 24 |
| **Table** | | |
| | Table 1: Ninety-Six Drugs Included in U&C Price Indexes, by Month, January 2000 through December 2004 | 20 |
| **Figures** | | |
| | Figure 1: Drug Prices for Different Buyers and Sellers | 6 |
| | Figure 2: Index of Average U&C Prices for 96 Drugs Frequently Used by BCBS FEP Enrollees, by Month, 2000 through 2004 | 7 |
| | Figure 3: Annual Change in U&C Price Index for 96 Drugs Frequently Used by BCBS FEP Enrollees, 2000 through 2004 | 8 |
| | Figure 4: Indexes of Average U&C Prices for Drugs Frequently Used by BCBS FEP Medicare and Non-Medicare Enrollees, by Month, 2000 through 2004 | 10 |
| | Figure 5: Indexes of Average U&C Prices for 50 Brand and 46 Generic Drugs Frequently Used by BCBS FEP Enrollees, by Month, 2000 through 2004 | 11 |

Figure 6: Indexes of AMPs, AWPs, and Average U&C Prices for 50
Brand Drugs Frequently Used by BCBS FEP Enrollees, by
Quarter, 2000 through 2004                                          12
Figure 7: Comparison of 10 Drugs Accounting for the Largest
Portions of Changes in AMP, AWP, and U&C Price
Indexes for 50 Brand Drugs Frequently Used by BCBS
FEP Enrollees, by Quarter, 2000 through 2004                        13

**Abbreviations**

| | |
|---|---|
| AMP | average manufacturer price |
| AWP | average wholesale price |
| BCBS | Blue Cross and Blue Shield |
| BLS | Bureau of Labor Statistics |
| CMS | Centers for Medicare & Medicaid Services |
| EPIC | Elderly Pharmaceutical Insurance Coverage |
| FEP | Federal Employee Program |
| NDC | National Drug Code |
| PACE | Pharmaceutical Assistance Contract for the Elderly |
| U&C | usual and customary |

This is a work of the U.S. government and is not subject to copyright protection in the
United States. It may be reproduced and distributed in its entirety without further
permission from GAO. However, because this work may contain copyrighted images or
other material, permission from the copyright holder may be necessary if you wish to
reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

August 15, 2005

The Honorable Olympia J. Snowe
Chair
Committee on Small Business and Entrepreneurship
United States Senate

The Honorable Ron Wyden
United States Senate

Prescription drug spending as a share of national health expenditures increased from 5.8 percent in 1993 to 10.7 percent in 2003 and was the fastest growing segment of health care expenditures.[1] In addition to increasing utilization and the introduction of newer drugs, rising prescription drug prices are a key component of increasing drug expenditures. Increasing drug prices can affect consumers, employers, and federal and state governments. Policymakers are increasingly concerned about drug prices as the federal government will assume greater financial responsibility for prescription drug expenditures with the introduction of a prescription drug benefit to Medicare beneficiaries in January 2006, known as Medicare part D. Medicare beneficiaries also will continue to be responsible for a large share of drug costs under Medicare part D.

Tracking prescription drug prices can be complicated by the different prices that different purchasers, such as consumers, insurers and other third-party payers, and wholesalers, pay for the same drug. Several price benchmarks represent these differing amounts paid by different purchasers. For example, individuals without prescription drug coverage, including Medicare beneficiaries who do not currently have drug coverage, may pay the full retail price at the pharmacy, known as the usual and customary (U&C) price. Insurers and other third-party payers, including state Medicaid programs, typically pay negotiated prices with retail pharmacies, often receiving discounts from the average wholesale price (AWP), commonly referred to as a list price.[2] Retail pharmacies may obtain

---

[1]Our calculations are based on data from the national health accounts prepared by the Centers for Medicare & Medicaid Services, Office of the Actuary, National Health Statistics Group.

[2]The AWP is the average of the list prices that a manufacturer suggests wholesalers charge pharmacies.

drugs directly from pharmaceutical manufacturers or through wholesalers. The average manufacturer price (AMP) represents the average of prices paid to manufacturers by wholesalers for drugs distributed to the retail pharmacy class of trade, and is used by the Centers for Medicare & Medicaid Services (CMS) to determine rebates due by law to Medicaid programs. Prices also substantially vary depending on whether drugs are marketed as brand or generic, with some third-party payers encouraging the use of less expensive generic drugs through lower cost sharing for consumers and other strategies.

To provide a baseline of prescription drug prices before the implementation of the Medicare part D drug benefit, you asked GAO to review drug price changes from 2000 through 2004, including drugs frequently used by seniors. Specifically, we examined the following questions.

1.  How have retail prices for prescription drugs frequently used by Medicare beneficiaries and other individuals with health insurance changed from 2000 through 2004?

2.  How does the change in retail prices for brand drugs frequently used by Medicare beneficiaries and other individuals compare to other drug pricing benchmarks from 2000 through 2004?

To examine the change in retail prices for prescription drugs frequently used by Medicare beneficiaries and other individuals with health insurance, we selected the 100 most frequently dispensed retail prescriptions in 2003 for Medicare beneficiaries and for non-Medicare enrollees in the Blue Cross and Blue Shield (BCBS) Federal Employee Program (FEP).[3] Combined, these two lists of 100 frequently used drugs represented a total of 133 unique drugs. Of these 133 drugs, we analyzed 96 drugs (50 brand and 46 generic) for which we were able to obtain U&C prices at retail pharmacies for every month from January 2000 through

---

[3] We used data of frequently dispensed prescriptions from BCBS FEP because they represent a large number of retail prescriptions dispensed and could provide data for drugs used by FEP enrollees who were Medicare beneficiaries and those who were not Medicare eligible. Of the nearly 55 million retail prescriptions dispensed to BCBS FEP enrollees in 2003, 21 million were for FEP enrollees who were also Medicare beneficiaries.

December 2004.[4] These 96 drugs included 75 drugs that were frequently used by BCBS FEP Medicare enrollees and 76 drugs that were frequently used by BCBS FEP non-Medicare enrollees, with 55 of these drugs overlapping the Medicare and non-Medicare frequently used lists. To calculate a price index, we weighted each drug using the number of prescriptions dispensed to BCBS FEP enrollees in 2003. We collected the average monthly U&C prices for a typical 30-day supply from two large state programs that assist low-income Medicare beneficiaries in purchasing prescription drugs: Pennsylvania's Pharmaceutical Assistance Contract for the Elderly (PACE) program from January 2000 through December 2004, and New York's Elderly Pharmaceutical Insurance Coverage (EPIC) program from August 2000 through December 2004.[5]

To compare the change in U&C prices at retail pharmacies with other drug-pricing benchmarks, we examined changes in the AMP and AWP for the 50 brand drugs frequently used by BCBS FEP enrollees. We calculated a quarterly AMP index for a 30-day supply for the 50 brand drugs based on data we collected from CMS from the first quarter of 2000 through the fourth quarter of 2004. We calculated a quarterly AWP index for a 30-day supply for the same 50 brand drugs based on data we collected from First DataBank for the same period. We determined that the data from BCBS FEP, PACE, EPIC, CMS, and First DataBank were sufficiently reliable for our purposes. Our analyses are limited to drugs most frequently used by Medicare beneficiaries and non-Medicare enrollees in the 2003 BCBS FEP, and our analyses using U&C prices are limited to prices reported by retail pharmacies in Pennsylvania to the PACE program and by retail pharmacies in New York to the EPIC program. See appendix I for more information about our selected drugs and detailed information on our

---

[4]For the purpose of this report, we refer to single-source and multisource drugs that are marketed under a proprietary, trademark-protected name as brand drugs. Single-source drugs include those brand drugs that have no generic equivalent on the market and are generally available from only one manufacturer. Brand multisource drugs include those brand drugs that have generic equivalents available from multiple manufacturers and are marketed under their brand name. Generic drugs include multisource drugs that are chemically identical to their branded counterparts and are generally marketed by multiple manufacturers under a non-proprietary name.

[5]We used data from PACE and EPIC because they were two of the largest state pharmaceutical assistance programs, collected data from pharmacies on U&C prices for drugs, and had historical price data available from 2000.

methodology. We performed our work from April 2004 through July 2005 in accordance with generally accepted government auditing standards.[6]

## Results in Brief

From January 2000 through December 2004, based on our analysis of data from PACE and EPIC, the average monthly U&C prices for a 30-day supply of 96 prescription drugs frequently used by BCBS FEP Medicare and non-Medicare enrollees increased 24.5 percent. Twenty of the 96 drugs accounted for nearly two-thirds of the increase in the U&C price index. The average U&C prices for 75 prescription drugs frequently used by BCBS FEP Medicare beneficiaries and the average U&C prices for 76 prescription drugs frequently used by BCBP FEP non-Medicare enrollees increased at similar rates of 24.0 percent and 24.8 percent, respectively. The average U&C prices for 50 brand prescription drugs increased 28.9 percent, three times as much as the average U&C price increase of 9.4 percent for 46 generic prescription drugs.

The AWP index increased by 31.6 percent for the 50 frequently used brand drugs from the first quarter of 2000 through the fourth quarter of 2004—about 3 to 4 percentage points more rapidly than the AMP and U&C price indexes. Ten drugs in each index accounted for nearly 50 percent of the increase for the AMP, AWP, and U&C indexes, with 8 of these top 10 drugs consistent for all three prices. As a result of AWP's faster rate of increase, AWP as a percentage of U&C price increased from an average of about 91 percent in the first quarter of 2000 to about 94 percent in the last quarter of 2004. AMP stayed about 72 percent of the U&C price during this period.

We provided a draft of this report to CMS, PACE, EPIC, and BCBS FEP. CMS noted that U&C and AWP do not reflect discounts in a drug's price. While our analysis does not reflect these discounts, our focus was to examine price trends rather than price levels and U&C and AWP are consistent measures used to examine price trends. CMS also suggested that we examine the effect on prices when generic alternatives are introduced, but such an analysis was beyond the scope of this report.

---

[6]We also reported on trends in U&C prices for 99 drugs from January 2000 through June 2004 in GAO, *Prescription Drugs: Trends in Usual and Customary Prices for Drugs Frequently Used by Medicare and Non-Medicare Enrollees*, GAO-05-104R (Washington, D.C.: Oct. 6, 2004). This report includes 3 fewer drugs than our earlier analysis because pricing data were not available for these 3 drugs through December 2004.

PACE and BCBS provided technical comments that we incorporated as appropriate; EPIC stated that it did not have any comments.

# Background

Several measures of price are commonly used within the health care sector to measure the price of prescription drugs. These varying price measures are due to the different prices that drug manufacturers and retail pharmacies charge different purchasers, and drug prices can vary substantially depending on the purchaser. (See fig. 1.)

- The U&C price, the retail price for a drug, is the price an individual without prescription drug coverage would pay at a retail pharmacy. The U&C price includes the acquisition cost of the drug paid by the retail pharmacy and a markup charged by the pharmacy.
- AWP is the average of the list prices or sticker price that a manufacturer of a drug suggests wholesalers charge pharmacies. AWP is typically less than the U&C price, which includes the pharmacy's own markup. AWP is not the actual price that large purchasers normally pay. Nevertheless, AWP is part of the formula used by many state Medicaid programs and private third-party payers to reimburse retail pharmacies.[7]
- AMP is the average of prices paid to a manufacturer by wholesalers for a drug distributed to the retail pharmacy class of trade, after subtracting any account cash discounts or other price reductions.[8] CMS uses AMP in determining rebates drug manufacturers must provide, as required by the Omnibus Budget Reconciliation Act of 1990, to state Medicaid programs as a condition for the federal contribution to Medicaid spending for the manufacturers' outpatient prescription drugs.[9] For brand drugs, the

---

[7]Before 2005, Medicare reimbursement for prescription drugs covered under Medicare part B was based on AWP. The average sales price generally replaced AWP as the basis for outpatient drug reimbursement under Medicare part B beginning in 2005. The average sales price is defined for each drug as a manufacturer's sales to all purchasers in a given quarter, net of discounts and rebates and excluding certain government and other purchasers, divided by the number of units of the drug sold by the manufacturer in that quarter. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 303(c), 117 Stat. 2066, 2239-2245 (to be codified at 42 U.S.C. § 1395w-3a).

[8]AMP does not include prices to government purchasers based on the Federal Supply Schedule, which are prices for prescription drugs negotiated with manufacturers by the Department of Veterans Affairs. AMP also does not include prices from direct sales to health maintenance organizations and hospitals or prices to wholesalers when they relabel drugs they purchase under their own label.

[9]Pub. L. No. 101-508, § 4401, 104 Stat. 1388, 1388-156 (codified as amended at 42 U.S.C. § 1396r-8(k) (2000)).

minimum rebate amount is the number of units of the drug multiplied by 15.1 percent of the AMP.

**Figure 1: Drug Prices for Different Buyers and Sellers**



Source: GAO.

[a]U&C is the price an individual without prescription drug coverage would pay at a retail pharmacy.

[b]When an insured consumer purchases a drug at a retail pharmacy, the pharmacy collects from the insured consumer the appropriate cost-sharing amount and then submits a claim to the third-party payer for reimbursement.

[c]Third-party payers often negotiate a discount off AWP, the average of the list prices that a manufacturer suggests wholesalers charge pharmacies. However, third-party payers may pay other negotiated rates not based on AWP.

[d]Retail pharmacies can also purchase prescription drugs directly from manufacturers.

[e]AMP represents the average of prices paid to manufacturers by wholesalers for drugs distributed to the retail pharmacy class of trade.

## Retail Prices Increased from 2000 through 2004, with Larger Increases for Brand Than Generic Drugs

From January 2000 through December 2004, the average U&C prices for a typical 30-day supply of 96 prescription drugs frequently used by BCBS FEP Medicare and non-Medicare enrollees increased 24.5 percent. The average U&C prices for 75 prescription drugs frequently used by Medicare beneficiaries and for 76 prescription drugs frequently used by non-Medicare enrollees increased at similar rates. The average U&C prices for 50 frequently used brand drugs increased three times faster than the average U&C prices for 46 frequently used generic drugs.

## U&C Prices for Frequently Used Drugs Increased 24.5 Percent

From January 2000 through December 2004, the average U&C price collected from retail pharmacies by PACE and EPIC for a 30-day supply for 96 prescription drugs frequently used by BCBS FEP Medicare beneficiaries and non-Medicare enrollees increased 24.5 percent, a 4.6 percent average annual rate of increase. (See fig. 2.) During the same period, using nationwide data from the Bureau of Labor Statistics (BLS), prices for prescription drugs and medical supplies for all urban consumers increased 21.3 percent, a 4.0 percent average annual rate of increase. Additionally, using BLS data, prices for all consumer items for all urban consumers—the Consumer Price Index—increased 12.7 percent, a 2.5 percent average annual rate of increase from January 2000 through December 2004.

**Figure 2: Index of Average U&C Prices for 96 Drugs Frequently Used by BCBS FEP Enrollees, by Month, 2000 through 2004**



Source: GAO analysis of data from BCBS FEP, EPIC, and PACE.

While U&C prices increased each year from 2000 through 2004, the greatest annual rate of increase—6.1 percent—occurred from January 2002 to January 2003. (See fig. 3.) Since then, annual rates of increase have

been less, increasing 5.2 percent from January 2003 to January 2004 and 4.2 percent from January 2004 to December 2004.[10]

**Figure 3: Annual Change in U&C Price Index for 96 Drugs Frequently Used by BCBS FEP Enrollees, 2000 through 2004**



Source: GAO analysis of data from BCBS FEP, EPIC, and PACE.

Note: The change in average U&C prices from January 2004 through December 2004 is expressed as an annual percentage change.

Twenty drugs, representing 33 percent of BCBS FEP prescriptions for the 96 drugs we reviewed, accounted for 64 percent of the total increase in the U&C price index from January 2000 through December 2004.[11] The drug with the largest effect on the price index was Lipitor 10mg, which accounted for 6.6 percent of the total increase. Nineteen of the 20 drugs were brand drugs and 1 was a generic drug, Hydrocodone/Acetaminophen 5/500mg. The twenty drugs accounting for the largest changes in the U&C price index are listed below.

---

[10]The change in average U&C prices from January 2004 through December 2004 is expressed as an annual percentage change.

[11]We measured the share each drug contributed to the overall index by comparing the ratio of (1) each drug's price change from January 2000 through December 2004 multiplied by its weight based on BCBS FEP prescriptions, to (2) the sum of all drugs' price changes multiplied by their associated weights.

- Lipitor 10mg
- Celebrex 200mg
- Plavix 75mg
- Prevacid 30mg
- Lipitor 20mg
- Ambien 10mg
- Zocor 20mg
- Levaquin 500mg
- Hydrocodone/Acetaminophen 5/500mg
- Flonase 0.05mg
- Zithromax 250mg
- Wellbutrin SR 150mg
- Singular 10mg
- Premarin 0.625mg
- Celexa 20mg
- Zoloft 50mg
- Evista 60mg
- Norvasc 5mg
- Neurontin 300mg
- Aciphex 20mg

## U&C Prices for Drugs Frequently Used by Medicare Beneficiaries and by Non-Medicare Enrollees Increased at Similar Rates

From January 2000 through December 2004, the average U&C prices collected by PACE and EPIC for 75 prescription drugs frequently used by BCBS FEP Medicare beneficiaries increased at a similar rate as the average U&C prices for 76 prescription drugs frequently used by BCBS FEP non-Medicare enrollees.[12] (See fig. 4.) The prices of 75 Medicare drugs increased 24.0 percent, a 4.5 percent average annual rate of increase. The prices of 76 non-Medicare drugs increased 24.8 percent, a 4.6 percent average annual rate of increase.[13]

---

[12]While 55 drugs were used in calculating both the Medicare and non-Medicare U&C price indexes, each drug had a different weight in each index depending on the frequency of prescriptions dispensed to BCBS FEP Medicare enrollees or BCBS FEP non-Medicare enrollees.

[13]We found the non-Medicare index rose slightly faster than the Medicare index, in part because drugs that treat depression were present to a larger extent in the non-Medicare index. The U&C prices for the eight drugs that treat depression increased at an average rate of 31.1 percent from January 2000 through December 2004. Excluding the eight drugs that treat depression from our analysis resulted in a 24.0 percent rate of increase for both the Medicare and non-Medicare index.



**Figure 4: Indexes of Average U&C Prices for Drugs Frequently Used by BCBS FEP Medicare and Non-Medicare Enrollees, by Month, 2000 through 2004**

Source: GAO analysis of data from BCBS FEP, EPIC, and PACE.

## U&C Prices Increased Three Times Faster for Brand Drugs Than for Generic Drugs

From January 2000 through December 2004, the average U&C price (based on PACE and EPIC data) for 50 frequently used brand drugs rose three times faster than the average U&C price for 46 frequently used generic drugs. (See fig. 5.) Specifically, the average U&C price for brand drugs increased 28.9 percent, a 5.3 percent average annual rate of increase, whereas U&C prices for generic drugs increased 9.4 percent, a 1.8 percent average annual rate of increase.



**Figure 5: Indexes of Average U&C Prices for 50 Brand and 46 Generic Drugs Frequently Used by BCBS FEP Enrollees, by Month, 2000 through 2004**

Source: GAO analysis of data from BCBS FEP, EPIC, and PACE.

## AWPs Increased at a Faster Rate Than AMPs and U&C Prices for 50 Brand Drugs from 2000 through 2004

From the first quarter of 2000 through the fourth quarter of 2004, AMPs and U&C prices for the 50 brand drugs increased at similar rates, but AWPs increased at a faster rate. The quarterly AWPs for 50 brand prescription drugs increased 31.6 percent, a 6.0 percent average annual rate of increase. For these same 50 drugs, the quarterly AMPs increased 28.2 percent, a 5.4 percent average annual rate of increase, while the average quarterly U&C prices increased 27.5 percent, a 5.2 percent average annual rate of increase.[14] Over the entire period, the AWP index increased about 3 to 4 percentage points more than the AMP or U&C price indexes. (See fig. 6.)

---

[14]The quarterly U&C price index increased at a slightly lower rate of increase than the monthly U&C price index because the base and end periods differ. Whereas the base period for the monthly U&C index is January 2000, the base period for the quarterly index is January through March 2000. Similarly, the end period for the monthly index is December 2004 and for the quarterly index is October through December 2004.

**Figure 6: Indexes of AMPs, AWPs, and Average U&C Prices for 50 Brand Drugs Frequently Used by BCBS FEP Enrollees, by Quarter, 2000 through 2004**



Index (base = 1st Quarter 2000)

Source: GAO analysis of data from CMS, First DataBank, EPIC, PACE, and BCBS FEP.

The difference between the levels of AWP and U&C prices for brand drugs narrowed slightly during the time period we analyzed. Whereas in the first quarter of 2000 AWP was on average about 91 percent of the U&C price for the same drug, by the fourth quarter of 2004 AWP was on average about 94 percent of the U&C price. In contrast, AMP stayed a similar portion of U&C in first quarter 2000 and fourth quarter 2004, with the AMP on average about 72 percent of the U&C price.

Ten brand drugs in each index, representing one-third or more of the prescriptions for the 50 brand drugs, accounted for almost 50 percent of the increase for the quarterly AMP, AWP, and U&C price indexes. Eight of these 10 drugs were the same across all three price indexes. The drug accounting for the largest portion of the change in the AMP and AWP indexes was Celebrex 200mg, accounting for 8.6 percent of the increase for AMP and 7.5 percent for AWP. Lipitor 10mg was the drug accounting for the largest portion of the change in the quarterly U&C price index and

accounted for 7.2 percent of the increase for the 50 brand drugs. (See fig. 7.)

**Figure 7: Comparison of 10 Drugs Accounting for the Largest Portions of Changes in AMP, AWP, and U&C Price Indexes for 50 Brand Drugs Frequently Used by BCBS FEP Enrollees, by Quarter, 2000 through 2004**

| AMP | AWP | U&C |
|---|---|---|
| Celebrex 200mg | Celebrex 200mg | Lipitor 10mg |
| Plavix 75mg | Plavix 75mg | Celebrex 200mg |
| Lipitor 10mg | Lipitor 10mg | Plavix 75mg |
| Ambien 10mg | Ambien 10mg | Prevacid 30mg |
| Lipitor 20mg | Prevacid 30mg | Lipitor 20mg |
| Prevacid 30mg | Lipitor 20mg | Ambien 10mg |
| Levaquin 500mg | Levaquin 500mg | Levaquin 500mg |
| Zocor 20mg | Zocor 20mg | Zocor 20mg |
| Zithromax 250mg | Wellbutrin Sr 150mg | Zithromax 250mg |
| Singulair 10mg | Flonase 0.05mg | Flonase 0.05mg |

| | | |
|---|---|---|
| Percentage of 50 brand drug prescriptions: **36%** | Percentage of 50 brand drug prescriptions: **33%** | Percentage of 50 brand drug prescriptions: **37%** |
| Percentage of price index's increase: **49%** | Percentage of price index's increase: **48%** | Percentage of price index's increase: **46%** |

Source: GAO analysis of data from CMS, First DataBank, EPIC, PACE, and BCBS FEP.

## Concluding Observations

From 2000 through 2004, retail prices for drugs frequently used by Medicare beneficiaries increased 24.0 percent—an average rate of 4.5 percent per year. In general, higher drug prices mean higher spending by consumers and health insurance sponsors, including employers and federal and state governments. With brand drug prices increasing three times as fast as generic drug prices, public and private health insurance sponsors will likely continue to focus on strategies to encourage increased use of generic drugs when available. Starting in 2006, with the introduction of the Medicare prescription drug benefit, Medicare will be paying claims for a wider array of drugs and, as a result, the federal government will be affected more than previously by rising drug prices.

We found that from 2000 through 2004, on average the AWPs for 50 frequently used brand drugs rose 0.8 percent per year faster than the retail prices for these same drugs. A continuation of this difference between AWP and retail prices increases could affect many Medicaid programs and private third-party payers that base their reimbursement of drug claims on AWPs.

## Agency and Other External Comments

We provided a draft of this report to CMS, PACE, EPIC, and BCBS FEP. In commenting on this report, CMS highlighted the discounts and price information tools that will be available under the Medicare drug benefit. CMS also stated that neither the U&C price nor AWP reflect discounts, such as manufacturers' discount programs, or other price concessions affecting a drug's price. We noted in the report that U&C represents the retail pharmacy price paid by consumers without insurance. The U&C does not reflect prices available from other sources, such as mail order pharmacies. We also noted that AWP is a list price that is not the actual price paid by large purchasers. We agree that consumers may be able to obtain lower prices than reflected by the U&C and AWP. However, the focus of our analysis was to examine price trends rather than price levels, and U&C and AWP are consistent measures used to assess price trends. Further, increases in the published AWP may increase what many public or private third-party purchasers pay for prescription drugs because AWP is often included in the formula to calculate payments to pharmacies.

Additionally, CMS suggested that we examine the effect on prices when generic alternatives are introduced. We agree that the introduction of generic drugs can reduce consumer payments for drugs. Examining changes in consumer spending for drugs, which are also affected by changes in utilization and the introduction of new drug alternatives, would be useful, but was beyond the scope of this report in examining price trends for frequently-used brand and generic drugs.

PACE and BCBS provided technical comments that we incorporated as appropriate; EPIC stated that it did not have any comments.

As agreed with your offices, unless you publicly announce the contents earlier, we plan no further distribution of this report until 30 days after its date. We will then send copies of this report to the Administrator of CMS and other interested parties. We will also provide copies to others upon request. In addition, the report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staffs have any questions about this report, please call me at (202) 512-7114 or kanofm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix III.

Marjorie Kanof
Managing Director, Health Care

# Appendix I: Scope and Methodology

To examine the change in retail prices for prescription drugs frequently used by Medicare beneficiaries and other individuals with health insurance, we used data from the Blue Cross and Blue Shield (BCBS) Federal Employee Program (FEP) to select the 100 prescription drugs most frequently dispensed through retail pharmacies in 2003 for BCBS FEP Medicare enrollees and the 100 most frequently dispensed for BCBS FEP non-Medicare enrollees.[1] Combined, these two lists included 133 unique drugs.[2]

We obtained average monthly usual and customary (U&C) prices reported by retail pharmacies to Pennsylvania's Pharmaceutical Assistance Contract for the Elderly (PACE) program from January 2000 through December 2004 and New York's Elderly Pharmaceutical Insurance Coverage (EPIC) program from August 2000 through December 2004.[3,4] We collected prices based on a specific strength, dosage form, and common number of units (such as pills), typically for a 30-day supply.[5] Based on combined PACE and EPIC data, 96 of the 133 drugs we selected had prices reported for every month from January 2000 through December 2004. We

---

[1] BCBS FEP covered nearly 55 million prescriptions dispensed to enrolled federal employees, retirees, and their dependents at retail pharmacies in 2003, including 21 million prescriptions for FEP enrollees who were also Medicare beneficiaries. The 96 drugs that we included in our analyses represented about 32 percent of total prescriptions dispensed to BCBS FEP enrollees in 2003. Of these 96 drugs, 50 were brand drugs and represented about 17 percent of total prescriptions dispensed to BCBS FEP enrollees in 2003.

[2] Drugs with the same name but with different forms (such as capsules or tablets) or number of units dispensed were counted separately as unique drugs.

[3] PACE covered more than 9 million prescriptions and EPIC covered nearly 10 million prescriptions dispensed to mostly low-income seniors in 2003. As of June 2005, PACE officials reported that approximately 2,800 retail pharmacies—95 percent of pharmacies in Pennsylvania—participated in PACE, while EPIC officials reported approximately 4,150 retail pharmacies—87 percent of pharmacies in New York—participated in EPIC.

[4] We merged price data from PACE and EPIC for August 2000 through December 2004, but report price data from PACE alone for January 2000 through July 2000. Because the average of the U&C prices reported by PACE and by EPIC were nearly identical, we do not believe that including the EPIC data beginning in August 2000 notably affected the price trend.

[5] The Department of Veterans Affairs Pharmacy Benefits Management Strategic Healthcare Group provided the most common number of units for a retail prescription for a 30-day supply.

Appendix I: Scope and Methodology

analyzed price trends on a monthly basis from January 2000 through December 2004 for these 96 drugs.[6]

Of the 96 drugs, 75 were among those most frequently used by BCBS FEP Medicare enrollees, and 76 were among those most frequently used by BCBS FEP non-Medicare enrollees. Fifty-five of the 96 drugs were frequently used by both BCBS Medicare enrollees and non-Medicare enrollees.[7] We first determined the total number of prescriptions in 2003 for the drugs we selected dispensed to BCBS FEP Medicare enrollees and the total number of prescriptions dispensed to BCBS FEP non-Medicare enrollees. Separately for drugs frequently used by Medicare and by non-Medicare enrollees, we calculated the share of the total number of BCBS FEP prescriptions attributed to each drug. The price of each drug was then weighted by its relative share of total Medicare or total non-Medicare prescriptions in 2003 to calculate the average price for frequently used Medicare drugs and the average price for frequently used non-Medicare drugs for each month from January 2000 through December 2004.[8,9] We standardized these averages to create a Medicare price index and a non-Medicare price index, each with a value of 100 as of January 2000.

We also separately analyzed monthly trends in U&C prices for brand and generic drugs frequently used by BCBS FEP enrollees. Of the 96 drugs, 50 were brand drugs and 46 were generic drugs. Similar to our calculation of

---

[6]We also analyzed price trends for 117 drugs that had prices reported for every month from January 2002 through December 2004, which had an average annual rate of increase of 5.2 percent. For the 96 drugs that had reported prices for every month from January 2000 through December 2004, the average annual rate of increase from January 2002 through December 2004 was also 5.2 percent.

[7]While these 55 drugs were used in calculating both the Medicare and non-Medicare U&C price indexes, they had different weights in each index depending on the frequency of prescriptions dispensed to BCBS FEP enrollees who were either Medicare beneficiaries or not Medicare eligible.

[8]BCBS FEP retail prescriptions represent various days supply (such as 34- or 90-day supply), while PACE and EPIC price data we obtained are limited only to retail prescriptions for a typical 30-day supply. Over half of BCBS FEP retail prescriptions are for a 30-day supply.

[9]The 2003 BCBS FEP retail prescription drug weights applied to PACE and EPIC retail prices for 96 drugs from January 2000 to December 2004 were held constant throughout the entire period of the analysis. We also obtained 2004 BCBS FEP retail prescription data for 89 of the 96 drugs and found almost no difference in the change in the U&C price index for the 89 drugs using constant 2003 or 2004 BCBS FEP drug weights throughout the period of analysis.

Medicare and non-Medicare price indexes, we calculated indexes for brand drugs and generic drugs based on each drug's share of the total number of brand or generic prescriptions dispensed to BCBS FEP enrollees in 2003.

To examine the change in retail prices for frequently used drugs compared to other drug price benchmarks, we compared an index based on the U&C prices reported by PACE and EPIC for 50 brand drugs to indexes based on the average manufacturer prices (AMP) and average wholesale prices (AWP) for these 50 drugs on a quarterly basis from the first quarter of 2000 through the fourth quarter of 2004.[10] The Centers for Medicare & Medicaid Services (CMS) requires manufacturers to report AMP within 30 days of the end of each calendar quarter. Manufacturers submit AWPs on a periodic basis to publishers of drug-pricing data, such as First DataBank. Using the National Drug Codes (NDC)[11] reported by PACE and EPIC for the U&C prices for the 50 brand drugs, we obtained per unit AMPs from CMS and per unit AWPs from First DataBank associated with each NDC.[12] For each drug, we calculated a quarterly AMP and a quarterly AWP by multiplying the per unit price by the most common number of units for a 30-day supply.[13] We created an AMP and AWP index by weighting the 50 brand drugs by the number of prescriptions in 2003 from BCBS FEP.

---

[10] These 50 brand drugs were frequently used by Medicare beneficiaries and non-Medicare enrollees in the BCBS FEP in 2003 and had reported U&C prices to PACE and EPIC for every month from January 2000 through December 2004.

[11] NDCs are three segment numbers that are the universal product identifiers for drugs for human use; the U.S. Food and Drug Administration assigns the first segment of the NDC, which identifies the firm that manufacturers, repackages, or distributes a drug. The second segment identifies a specific strength, dosage form, and formulation for a particular firm and the third segment identifies package size. A single drug can have multiple NDCs associated with it. For example, a drug made by one manufacturer, in one form or strength, but in three package sizes would have three NDCs.

[12] We obtained quarterly AMPs from CMS for each two-segment NDC, represented by 9 digits (not accounting for package size), associated with the 50 brand drugs from the first quarter of 2000 through the fourth quarter of 2004. Similarly, we obtained monthly AWPs from First DataBank for each three-segment NDC, represented by 11 digits, associated with the 50 brand drugs from first quarter 2000 through fourth quarter 2004. Specifically, we obtained the AWP effective on the last day of each month for each 11-digit NDC.

[13] For brand drugs with multiple 9-digit NDCs, we calculated an average quarterly AMP for the drug weighted by the number of PACE and EPIC prescriptions for each 9-digit NDC during that quarter. For brand drugs with multiple 11-digit NDCs, we calculated an average monthly AWP for the drug weighted by the number of PACE and EPIC prescriptions during that month. We created a quarterly AWP by taking a simple average of the three monthly prices in each quarter.

**Appendix I: Scope and Methodology**

Similarly, we recalculated the U&C price for the 50 brand drugs on a quarterly basis to make comparisons to AMP and AWP.

We also determined how much each drug's change in price contributed to the overall change in price for the 50 brand drugs for AMPs, AWPs, and U&C prices. We measured the share each drug contributed to the overall index by comparing the ratio of (1) each drug's price change from January 2000 through December 2004 multiplied by its weight based on BCBS FEP prescriptions, to (2) the sum of all drugs price changes multiplied by their associated weights.

Our analyses are limited to drugs most frequently used by Medicare beneficiaries and by non-Medicare enrollees in the 2003 BCBS FEP. Additionally, our analyses using U&C prices are limited to prices reported by retail pharmacies in Pennsylvania to the PACE program and by retail pharmacies in New York to the EPIC program. We reviewed the reliability of data from BCBS FEP, CMS, First DataBank, EPIC, and PACE, including screening for outlier prices in the PACE and EPIC data and ensuring that the price trends and frequently used drugs were consistent with other data sources. We determined that these data were sufficiently reliable for our purposes. We performed our work from April 2004 through July 2005 in accordance with generally accepted government auditing standards.

# Appendix II: Drugs Included in Analyses

Table 1 lists the 96 drugs used in constructing monthly U&C price indexes from January 2000 through December 2004. Fifty of the 96 drugs are brand drugs and were also used in examining price changes in AMP, AWP, and U&C on a quarterly basis from first quarter 2000 through fourth quarter 2004. Of the 96 drugs, 75 were frequently used by Medicare beneficiaries and 76 were frequently used by non-Medicare enrollees, with 55 of these drugs frequently used by both Medicare beneficiaries and non-Medicare enrollees.

**Table 1: Ninety-Six Drugs Included in U&C Price Indexes, by Month, January 2000 through December 2004**

| Drug name and strength | Units dispensed and dosage form for a typical 30-day supply | Brand or generic | Medicare or non-Medicare |
|---|---|---|---|
| Acetaminophen/Codeine 30/300mg | 60 tablets | Generic | Both |
| Aciphex 20mg | 30 tablets delayed release | Brand | Both |
| Albuterol 90mcg | 17gm aerosol | Generic | Both |
| Allegra-D 60-120 mg | 60 tablets extended release | Brand | Non-Medicare |
| Allopurinol 300mg | 30 tablets | Generic | Medicare |
| Alprazolam 0.25mg | 60 tablets | Generic | Both |
| Alprazolam 0.5mg | 60 tablets | Generic | Both |
| Ambien 5mg | 30 tablets | Brand | Medicare |
| Ambien 10mg | 30 tablets | Brand | Both |
| Amoxicillin 500mg | 21 capsules | Generic | Both |
| Aricept 10mg | 30 tablets | Brand | Medicare |
| Atenolol 25mg | 30 tablets | Generic | Both |
| Atenolol 50mg | 30 tablets | Generic | Both |
| Carisoprodol 350mg | 90 tablets | Generic | Non-Medicare |
| Celebrex 200mg | 60 capsules | Brand | Both |
| Celexa 20mg | 30 tablets | Brand | Both |
| Cephalexin 500mg | 30 capsules | Generic | Both |
| Cipro 500mg | 20 tablets | Brand | Non-Medicare |
| Clonazepam 0.5mg | 60 tablets | Generic | Non-Medicare |
| Combivent 103-18mcg | 14.7gm aerosol | Brand | Medicare |
| Cosopt 2-0.5% | 5mL solution | Brand | Medicare |
| Coumadin 5mg | 30 tablets | Brand | Medicare |
| Cozaar 5mg | 30 tablets | Brand | Medicare |
| Cyclobenzaprine HCl 10mg | 60 tablets | Generic | Non-Medicare |

Appendix II: Drugs Included in Analyses

| Drug name and strength | Units dispensed and dosage form for a typical 30-day supply | Brand or generic | Medicare or non-Medicare |
|---|---|---|---|
| Doxycycline Hyclate 100mg | 30 capsules | Generic | Non-Medicare |
| Effexor XR 75mg | 30 capsules extended release | Brand | Non-Medicare |
| Effexor XR 150mg | 30 capsules extended release | Brand | Non-Medicare |
| Evista 60mg | 30 tablets | Brand | Both |
| Flomax 0.4mg | 30 capsules | Brand | Both |
| Flonase 0.05mg | 16gm spray | Brand | Both |
| Folic Acid 1mg | 30 tablets | Generic | Both |
| Furosemide 20mg | 60 tablets | Generic | Both |
| Furosemide 40mg | 60 tablets | Generic | Both |
| Hydrochlorothiazide 25mg | 30 tablets | Generic | Both |
| Hydrocodone/Acetaminophen 5/500mg | 90 tablets | Generic | Both |
| Hydrocodone/Acetaminophen 7.5/500mg | 90 tablets | Generic | Both |
| Hydrocodone/Acetaminophen 7.5/750mg | 90 tablets | Generic | Non-Medicare |
| Ibuprofen 800mg | 90 tablets | Generic | Non-Medicare |
| Isosorbide Mononitrate 30mg | 30 tablets extended release | Generic | Medicare |
| Isosorbide Mononitrate 60mg | 30 tablets extended release | Generic | Medicare |
| Klor-Con 10 10mEq | 30 tablets extended release | Generic | Medicare |
| Lanoxin 125mcg | 30 tablets | Brand | Medicare |
| Lanoxin 250mcg | 30 tablets | Brand | Medicare |
| Levaquin 500mg | 10 tablets | Brand | Both |
| Lipitor 10mg | 30 tablets | Brand | Both |
| Lipitor 20mg | 30 tablets | Brand | Both |
| Lipitor 40mg | 30 tablets | Brand | Non-Medicare |
| Lorazepam 0.5mg | 60 tablets | Generic | Both |
| Lorazepam 1mg | 60 tablets | Generic | Both |
| Meclizine HCl 125mg | 90 tablets | Generic | Medicare |
| Methylprednisolone 4mg | 30 tablets | Generic | Non-Medicare |
| Metoprolol Tartrate 50mg | 60 tablets | Generic | Both |
| Miralax 17gm | 255gm powder | Brand | Medicare |
| Naproxen 500mg | 60 tablets | Generic | Non-Medicare |
| Nasacort AQ 55mcg | 16.5gm spray | Brand | Non-Medicare |
| Nasonex 50mcg | 17gm spray | Brand | Non-Medicare |

Appendix II: Drugs Included in Analyses

| Drug name and strength | Units dispensed and dosage form for a typical 30-day supply | Brand or generic | Medicare or non-Medicare |
|---|---|---|---|
| Neurontin 300mg | 90 capsules | Brand | Both |
| Norvasc 5mg | 30 tablets | Brand | Both |
| Norvasc 10mg | 30 tablets | Brand | Both |
| Oxycodone/Acetaminophen 5/325mg | 90 tablets | Generic | Non-Medicare |
| Paxil 20mg | 30 tablets | Brand | Both |
| Penicillin V Potassium 500mg | 30 tablets | Generic | Non-Medicare |
| Plavix 75mg | 30 tablets | Brand | Both |
| Potassium Chloride 10mEq | 60 capsules extended release | Generic | Medicare |
| Potassium Chloride 10mEq | 30 tablets extended release | Generic | Medicare |
| Pravachol 20mg | 30 tablets | Brand | Medicare |
| Pravachol 40mg | 30 tablets | Brand | Both |
| Prednisone 5mg | 30 tablets | Generic | Medicare |
| Prednisone 10mg | 35 tablets | Generic | Both |
| Prednisone 20mg | 30 tablets | Generic | Non-Medicare |
| Premarin 0.625mg | 30 tablets | Brand | Both |
| Prevacid 30mg | 30 capsules delayed release | Brand | Both |
| Promethazine HCl 25mg | 60 tablets | Generic | Non-Medicare |
| Propoxyphene Napsylate/Acetaminophen 100/650mg | 90 tablets | Generic | Both |
| Ranitidine HCl 150mg | 60 tablets | Generic | Both |
| Singulair 10mg | 30 tablets | Brand | Both |
| Spironolactone 25mg | 30 tablets | Generic | Medicare |
| Sulfamethoxazole/Trimethoprim 800/160mg | 20 tablets | Generic | Both |
| Synthroid 50mcg | 30 tablets | Brand | Both |
| Synthroid 75mcg | 30 tablets | Brand | Both |
| Synthroid 100mcg | 30 tablets | Brand | Both |
| Toprol XL 50mg | 30 tablets extended release | Brand | Both |
| Toprol XL 100mg | 30 tablets extended release | Brand | Both |
| Trazodone HCl 50mg | 90 tablets | Generic | Both |
| Triamterene/Hydrochlorothiazide 37.5/25mg | 30 capsules | Generic | Both |
| Triamterene/Hydrochlorothiazide 37.5/25mg | 30 tablets | Generic | Both |
| Warfarin Sodium 5mg | 30 tablets | Generic | Medicare |
| Wellbutrin SR 150mg | 60 tablets extended release | Brand | Non-Medicare |

Appendix II: Drugs Included in Analyses

| Drug name and strength | Units dispensed and dosage form for a typical 30-day supply | Brand or generic | Medicare or non-Medicare |
|---|---|---|---|
| Xalatan 0.005% | 2.5mL solution | Brand | Both |
| Zithromax 200mg/5mL | 30 suspension | Brand | Non-Medicare |
| Zithromax 250mg | 6 tablets | Brand | Both |
| Zocor 20mg | 30 tablets | Brand | Both |
| Zocor 40mg | 30 tablets | Brand | Both |
| Zoloft 50mg | 30 tablets | Brand | Both |
| Zoloft 100mg | 30 tablets | Brand | Both |
| Zyrtec 10mg | 30 tablets | Brand | Both |

Source: GAO analysis of data from BCBS FEP, EPIC, and PACE.

# Appendix III: GAO Contact and Staff Acknowledgments

## GAO Contact

Marjorie Kanof (202) 512-7114 or kanofm@gao.gov

## Acknowledgments

In addition to the contact named above, John E. Dicken, Director; Rashmi Agarwal; Jessica L. Cobert; Martha Kelly, Matthew L. Puglisi; and Daniel S. Ries made key contributions to this report.

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:   Voice:   (202) 512-6000<br>                                    TDD:     (202) 512-2537<br>                                    Fax:      (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON  RECYCLED PAPER

# Exhibit H

Page 143

1              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3     ——————————————————————————
                                        )
4     NEW ENGLAND CARPENTERS HEALTH     )
      BENEFITS FUND, PIRELLI            )
5     ARMSTRONG RETIREE MEDICAL         )
      BENEFITS TRUST; TEAMSTERS         )
6     HEALTH & WELFARE FUND OF          )
      PHILADELPHIA AND VICINITY;        )
7     PHILADELPHIA FEDERATION OF        )
      TEACHERS HEALTH AND WELFARE       )   C.A. No.
8     FUND; DISTRICT COUNCIL 37,        )     1:05-CV-11148-PBS
      AFSCME-HEALTH & SECURITY PLAN;    )
9     JUNE SWAN; MAUREEN COWIE and      )
      BERNARD GORTER,                   )
10                                      )
               Plaintiffs,             )
11                                      )
      v.                                )
12                                      )
      FIRST DataBank, INC., a           )
13    Missouri corporation; and         )
      McKESSON CORPORATION, a           )
14    Delaware corporation,             )
                                        )
15             Defendants.             )
      ——————————————————————————        )
16

17

18                  -  VOLUME II  -

19      VIDEOTAPED DEPOSITION OF PATRICIA KAY MORGAN

20                JUNE 28th, 2007
                2:10 p.m. - 6:06 p.m.
21                 Tampa, Florida

22

23

24

25    **COPY**           Pages 143-292

Gravity Court Reporting

Page 273

1    had reviewed these depositions after they were taken?

2         A.   Yes.

3         Q.   And you made no corrections?  Did you make any

4    corrections?

5         A.   Yes.

6              MR. KERN:  I can represent she just made the

7         normal set of typographical corrections, and they were

8         submitted and are included within the official copies

9         of the transcript that are generally circulated now.

10   BY MR. GOLDMAN:

11        Q.   I'd like to direct your attention to the second

12   volume at Page 537.  There's some questions that were

13   asked of you, I believe by Mr. Sobol, am I correct about

14   that?  Mr. Carroll?  Maybe it's Mr. Carroll.  I'm not sure

15   who asked the questions.

16             If you look at Page 537, I want to run through

17   several of the questions that were asked between Line 6

18   and Line 19.  No, it is Mr. Sobol.  Mr. Sobol is one of

19   the plaintiff's counsel in this case.

20             So I'd like to read what question was asked of

21   you, and if you would, if you would just respond what you

22   answered that time, all right?

23        A.   Okay.

24        Q.   "Does McKesson know that it is the only

25   wholesaler that you are surveying for purposes of the

Page 274

1    mark-up?"

2             And what was your answer?

3        A.    "No, I have not told them that."

4        Q.    "Have you had any conversation with people at

5    McKesson regarding the fact that some other wholesalers

6    are no longer providing information in response to survey

7    questions?"

8        A.    "No, I have not."

9        Q.    So these are questions that you were asked of

10   plaintiffs' counsel, and these are the answers that you

11   gave at that time?

12       A.    That's correct.

13       Q.    And this was back in 2005, approximately -- a

14   little more than two years ago?

15       A.    That's correct.

16       Q.    And the answers you gave were truthful and

17   honest, to the best of your recollection, at the time that

18   you gave them?

19       A.    Yes.

20       Q.    And do they remain so today, Ms. Morgan?

21       A.    Yes, they do.

22       Q.    So the fact is, as you were asked by plaintiff's

23   counsel this morning, you didn't tell anyone outside of

24   FDB that -- after you were not getting regular information

25   from ABC or regular information from Cardinal, you didn't

Page 275

1    tell them that McKesson was the only one you were getting

2    regular information from; am I correct?

3        A.    Correct.  And that includes the Hearst people

4    that would be responsible for FDB.

5        Q.    And what was the reason you didn't tell McKesson

6    what had happened?

7        A.    My concern was if I had told them, they would not

8    participate in the survey, either.

9            MR. GOLDMAN:  All right.  I have no further

10            questions.

11            MR. KERN:  Mel, did you want to mark these as

12            exhibits or just use them for a reference in your line

13            of questioning?

14            MR. GOLDMAN:  Well, since we referred to them,

15            why don't we mark them.

16            I'm going to mark as Exhibits 63, the

17            January 11th transcript.

18            Now, if there were corrections, these are tote

19            scripts, and they would not reflect corrections, so I

20            want to say that.

21                (January 11th, 2005 transcript of

22                Patricia Kay Morgan marked as Exhibit

23                Number 63, January 12th, 2005

24                transcript of Patricia Kay Morgan

25                marked as Exhibit Number 64, and both

Gravity Court Reporting

Page 291

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA              :

4    COUNTY OF HILLSBOROUGH        :

5

6              I, YVETTE J. BARRETT, Registered Professional

7    Court Reporter, Certified LiveNote Reporter, in and for

8    the State of Florida, do hereby certify that I was

9    authorized to and did stenographically report the

10   foregoing deposition, Pages 6-289, that a review of the

11   transcript was not requested; and that the foregoing pages

12   constitute a true and complete computer-aided

13   transcription of my original stenographic notes to the

14   best of my knowledge, skill and ability.

15             I FURTHER CERTIFY that I am not a relative,

16   employee, attorney, or counsel of any of the parties, nor

17   am I a relative or employee of any of the parties'

18   attorney or counsel connected with the action, nor am I

19   financially interested in the action.

20             IN WITNESS WHEREOF, I have hereunto set my hand

21   at Tampa, Hillsborough County, Florida this 28th day of

22   June 2007.

23

             YVETTE J. BARRETT, RPR, CLR, FPR
24           Notary Public
             State of Florida
25           My Commission Expires 1/12/08
             Commission No. DD 280703