UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | C.A. No. 1:05-CV-11148-PBS |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**[REDACTED] CLASS PLAINTIFFS' REPLY TO MCKESSON'S OPPOSITION TO AGGREGATE DAMAGES FOR THE TPP CLASS AND MCKESSON'S <u>MOTION TO DECERTIFY THE CONSUMER CLASS</u>**

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ..................................................................................................1

II.     DR. HARTMAN'S AND DR. MCDONOUGH'S LIABILITY REPORTS......................4

      A.      Analysis of Millions of Transactions During the Class Period
             Demonstrates that the Scheme Caused Persistent Price Inflation...........................5

      B.      TPP Claims Data Confirms the Continuing Impact of the Scheme........................7

      C.      Though There is no Evidence of Push Back Dr. Hartman's Model
             Accounts for Changes in Variables.........................................................................8

      D.      The PBMs Were Not Motivated to Claw-Back the Price Increase.........................8

III.    ARGUMENT .......................................................................................................11

      A.      Plaintiffs Need Only Prove That Their Proposed Method of Calculating
             Damages is "Plausible," *i.e.*, "Not Fundamentally Flawed"..................................11

      B.      Plaintiffs Have Presented a Strong and Plausible Damages Model......................13

             1.      IMS data reveals that TPPs contract renegotiations had no
                    measurable impact on the increased drug reimbursement
                    caused by Defendants' Scheme ................................................................13

             2.      Dr. Hartman's model accounts for any "push back" and the
                    results of individual negotiations ...............................................................15

      C.      The Court Recognizes That the Use of Aggregate Damage Models
             is Consistent with the Remedial Purposes of RICO and Consumer
             Protection Laws ....................................................................................................16

      D.      McKesson Has Utterly Failed to Demonstrate that Plaintiffs'
             Methodology is Fundamentally Flawed..................................................................17

             1.      McKesson's criticisms merely go to the weight of
                    Dr. Hartman's testimony.............................................................................17

             2.      McKesson's anecdotal evidence does not refute Dr. Hartman's
                    conclusion that competition in the PBM market did not safeguard
                  TPPs against the effect of Defendants' collusion .....................................19

      E.      At a Minimum, a Two-Year Class Period is Appropriate .....................................20

      F.      McKesson's Motion to Decertify the Consumer Class Should be Denied............21

IV.     CONCLUSION....................................................................................................22

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ....................................................................12, 20

*In re Carbon Black Antitrust Litig.*,
2005 U.S. Dist. Lexis 660 (D. Mass. Jan. 18, 2005)....................................12, 21

*Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*,
175 F.3d 18 (1st Cir. 1999)....................................................................................20

*Dukes v. Wal-Mart, Inc.*,
474 F.3d 1214 (9th Cir. 2007) ..............................................................12, 16

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ........................................................................12

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002), *cert. denied*, 538 U.S. 977 (2003)......................12

*In re Mid-Atlantic Toyota Antitrust Litig.*,
560 F. Supp. 760 (D. Md. 1983) ........................................................................17

*Moore v. Jas. H. Matthews & Co.*,
682 F.2d 830 (9th Cir. 1982) ............................................................................21

*In re Neurontin Mktg. & Sale Practices Litig.*,
2007 U.S. Dist. Lexis 63898 (D. Mass. Aug. 29, 2007)......................12, 16, 17

*New York v. Julius Nasso Concrete Corp.*,
202 F.3d 82 (2d Cir. 2000).....................................................................................20

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)...........................................................3, 12, 13

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555 (1931)..............................................................................................20

*Telecor Communs., Inc. v. Southwestern Bell Tel. Co.*,
305 F.3d 1124 (10th Cir. 2002) ......................................................................20, 21

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000)................................................................................3

001821-13 203370 V2

# STATUTES

15 U.S.C. § 15d...................................................................................................................................13

## I.    INTRODUCTION

The Court has requested that Plaintiffs address the Court's following concerns regarding Plaintiffs' damages model:  (1) whether the damages model fails to account for purported "pushbacks" and thus overstates TPP damages; and (2) whether the Court's proposed modifications to Plaintiffs' damages model present feasible alternatives.  In this filing, Plaintiffs explain that Dr. Hartman's aggregate damages calculations, do not overstate TPP damages because there is no evidence of a systematic "claw-back" of the Scheme's effects and, in any event, ***the model accounts any changes in pricing that occurred in reaction to the Scheme***.[1] And although the evidence does not support any truncation of the damages period that Plaintiffs have proposed, Plaintiffs present feasible alternatives pursuant to the Court's request.

In most class certification battles, the plaintiffs' expert opines on how class-wide damages ***could*** be modeled at a later date.  Here, Dr. Hartman has analyzed millions of transactions on a month-by-month, drug-by-drug basis and ***actually*** calculated aggregate damages.  This analysis reveals no evidence of a systemic "TPP pushback" that would render the aggregate damages model unreliable.  The conclusions generated by Dr. Hartman's empirical model are confirmed by numerous ancillary sources, including:  (1) testimony from virtually every TPP that they were unaware of the Scheme and would have fully pushed back if made aware; (2) the absence of evidence that PBMs specifically negotiated with their clients to mitigate the effects of the price hike; (3) the strong economic motivation of the PBMs to keep for themselves the profits the Scheme generated for their own mail order and retail operations;

---

[1] At the time of the Court's class certification opinion, it did not have the benefit of Dr. Hartman's full analysis because it was incomplete.  Dr. Hartman's conclusions are now supported by robust, "real world" data based on millions of transactions that ***took place in the actual marketplace***.  Plaintiffs submit that this vitally important analysis, previously unavailable until the completion of Dr. Hartman's liability report, demonstrates the appropriateness of certification of a TPP class for both liability and damages purposes.

(4) dozens of McKesson internal emails acknowledging the Scheme's impact as late as 2004; and

(5) by the scant testimony that TPPs were even aware of any change in the AWP-WAC formula.

Dr. Hartman's model is also supported by the testimony of Dr. McDonough who witnessed *no* TPP pushback during the Class Period.[2] As both a fact witness and industry expert, Dr. McDonough rebuts with ***actual real world experience and observations*** Dr. Willig's speculation as to what occurred in the market during contract renegotiations.

McKesson's keystone opposition is the unfounded assertion that Plaintiffs' aggregate damages model simply assumes a constant rate of inflation and does not capture the impact of "renegotiations." ***McKesson is dead wrong.*** To the extent there were changes in dispensing fees or in discounts off AWP for some drugs, and without regard to whether these charges occurred in reaction to the Scheme (and there is little evidence that they were), such changes are explicitly included in Dr. Hartman's damage calculations and result in nothing more than a "dimunition in damages."[3] In other words, all of the variables that Dr. Willig interjects, even if true, merely reduce damages and are accounted for in the model.[4]

McKesson's push back or renegotiation argument is premised on its claim that the PBMs were freely and fully disclosing the change in the WAC-AWP markup. Again, of the 40 PBMs in the country McKesson could only find one PBM, ESI, that even made a vague disclosure to TPPs. A recent document produced by ESI confirms that Dr. Hartman is correct that PBMs were not motivated to make meaningful disclosures because ESI noted that the Scheme "██████

████████████████████████████" and thus ESI decided to "████████████████

██████." ESI did in fact not make it a big deal and this explains why there is virtually no

---

[2] *See* Tutorial Presentation & Demonstratives of Dr. Kimberly McDonough ("McDonough Tutorial) at 5, 9-10.

[3] Report of Dr. Hartman Regarding Aggregate Damages ("Hartman 10/29 Report") p. 2 at ¶ 3(vi).

[4] *Id.* p. 3 at ¶ 3(vii).

"push back" evidence.[5]  Thus, the PBM evidence is fully in accord with the results of

Dr. Hartman's real world model.  There is thus no "overstatement" of damages.  Given this

incredibly strong showing, the Court should accept the aggregate damage model, or at a

minimum, choose any of the alternate time periods for which Dr. Hartman has calculated

damages.

Although McKesson submits a contrary opinion from Dr. Willig, as the Court has

recognized on several occasions, the Court's role is not to resolve conflicting expert testimony,

but to find whether Plaintiffs' expert testimony offers a means to prove the Class's claims with

common evidence.[6]  In *AWP*, the Court found that Dr. Hartman's approach was viable, and it

should do so again here, reserving the right to "fine-tune" its order in response to how the issues

play out at trial – a procedure expressly endorsed by the First Circuit.  *Waste Mgmt. Holdings,*

*Inc. v. Mowbray*, 208 F.3d 288, 294 (1st Cir. 2000).  This approach is superior to eliminating

TPP damages and – according to McKesson – consumer class damages based on the untested

assertions in the declaration of McKesson's expert.  The Court, when faced with an aggregate

damage model that is admissible, well-constructed and actually completed, and which is

supported by documentary evidence and an industry expert/participant, should not allow

Dr. Willig's ivory-tower speculations to defeat the use of an aggregate model by TPPs and

consumers.

In the alternative, before precluding the Class members from recovering the full measure

of damages suffered throughout a broader class period, the Court should hold an evidentiary

hearing so that each expert's conclusions can be tested under the klieg lights of cross

---

[5] *See also* Rebuttal Report of Dr. McDonough.

[6] *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 87 (D. Mass. 2005).

- 3 -

examination.  Plaintiffs respectfully submit that Dr. Willig's conclusions will not withstand such scrutiny and that, at the end of the day, the Court will be satisfied with Dr. Hartman's approach.[7]

Finally, there is no basis to drastically pare the consumer co-pay class as McKesson now suggests.  The Court deferred the aggregate damage issue for TPPs because of a concern that, at some point, TPPs reacted and mitigated damages.  However there is **no** evidence, not a scintilla, to suggest that consumers were even remotely aware of the McKesson-FDB Scheme, the change in the WAC-AWP markup or that TPPs as a class mitigated the co-pay impact on consumers.  Regardless of what the Court decides with respect to the TPP class, the scant (we believe non-existent) evidence of TPP mitigation does not support depriving consumers of recovery.  There is no evidence that any purported "trade offs" that the Court was concerned with on the TPP side trickled down to benefit consumers.  If anything, the consumer Class Period is conservative in ending in March 2005.  Although FDB announced a change in how AWP was calculated in March 2005, it did not reveal the Scheme itself, and the impact of the Scheme continues to the present.  The notion advanced by McKesson that the consumer class aggregate damage model must be married to the TPP class is unsupportable and is an untimely motion to reconsider.

## II.     DR. HARTMAN'S AND DR. MCDONOUGH'S LIABILITY REPORTS

The Court was not yet persuaded that the aggregate damage methodology was appropriate for the TPP class.  August 27, 2007 Memorandum and Order ("8/27 Order") at 25 (Dkt. No. 317).  Subsequently, Dr. Hartman submitted his expert report[8] addressing the Court's concerns, as did Dr. McDonough.

---

[7] Or, because this is a bench trial, the Court could decide the aggregate damage issue after a trial in which the Court will have the benefit of evaluating the expert testimony against the backdrop of testimony from members of the TPP community.

[8] *See* Ex. 1 (Dr. Hartman's Liability Report).  All exhibits referenced herein unless otherwise indicated are attached to the Declaration of Steve W. Berman in Support of Class Plaintiffs' Reply to McKesson's Opposition to Aggregate Damages for the TPP Class and McKeeson's Motion to Decertify the Consumer Class and Class

- 4 -

**A.    Analysis of Millions of Transactions During the Class Period Demonstrates that the Scheme Caused Persistent Price Inflation**

Dr. Hartman analyzed IMS actual transaction data for each NDC and was able to determine based on that data whether:  (1) TPPs paid more as a result of the FDB-McKesson price hike; (2) that inflation continued throughout the Class Period; and (3) there is evidence in the actual prices paid by TPPs of a "claw-back" of the price hike as a result of purported renegotiations of contracts.  The ***actual data*** shows an increase in price ***throughout*** the Class Period as a result of the Scheme and no systemic "claw-back" of that impact."[9]  As Dr. Hartman explains:

> My methodology provides an accurate calculation of damages because it incorporates data summarizing millions of real world transactions in the marketplace over several years.  The methodology demonstrates that (i) the Mark-Up Scheme immediately increased the amount that consumers and TPPs paid for the drugs at issue, and (ii) the Mark-Up Scheme had an enduring impact, that is, there was no "systematic claw back" or mitigation of the markup Scheme through contract renegotiations.  ***Because my methodology uses actual payment data, it incorporates by drug all reductions in reimbursement over time due to any reason.***  It therefore does not overstate damages.[10]

Table 1[11] to Dr. Hartman's Liability Report examines four "bellwether" drugs that McKesson focused on in opposing class certification:  Lipitor, Plavix, Prevacid and Wellbutrin. For each drug there was a price change one to six months after the markup that did not decrease throughout the Class Period:

---

Plaintiffs' Proffer of Evidence Common to the Class Containing Admission by McKesson as to the Scheme's Impact on the Class ("Berman Decl.").

[9] Hartman 10/29 Report p. 2 at ¶ 3(v), and subsection III. pp. 4-5 at ¶¶ 5-14.

[10] *See* Tutorial Presentation & Demonstratives of Dr. Raymond S. Hartman ("Hartman Tutorial") at 1.  (A transcript of the video tutorial has been created and is filed as a separate filing.); Hartman 10/29 Report p. 17 at ¶¶ 29 & 30 (the effects of "tradeoffs" are accounted for in the IMS transactional data, including discounts off AWP and all other variable cites by Willig).

[11] Table 1 is attached to the Berman Decl. at Ex. 2.

With the implementation of the Scheme in January 2002 for these four drugs, reimbursement amounts paid by Class members relative to WAC (AA/WAC) *increased immediately*, by the following amounts: Lipitor 10mg by 3.94%, Lipitor 20mg by 4.22%, Plavix 75mg by 4.38%, Prevacid 30mg by 4.75%, and Wellbutrin SR 150mg by 3.92%. If I measure the inflation in months 2-7 after implementation of the Scheme, the mark-ups for these five drug/dosages increased by the following amounts: 4.04%, 4.31%, 4.52%, 4.86% and 3.94%.

With each increase in WAC after January 2002 through the end of 2004 for these five drug/dosages, reimbursement rates (AA) increased by the amount of the WAC *plus the incrementally inflated mark-up induced by the Scheme*. The pattern of these increases is summarized on a monthly basis in Figures 1.a)-1.e) and for each of five six-month periods after January 2002 in Table 1. In both cases, *there is evidence of a uniformly inflated mark-up over two years. There is no mathematical or economic evidence of a push-back or mitigation of the inflation*.[12]

As Dr. Hartman explains in his video, *"[h]ad there been . . . a "claw back," both the AA-to-WAC and AA-to-AWP ratios would decrease. But they do not.*[13]

Dr. Hartman then went beyond the bellwether drugs reviewed by Willig and examined a broad cross section of drugs in the case. He found that the inflated mark-up in the reimbursement paid by Class members relative to costs of the drugs to the retailers (WAC) remained quite constant and equaled on average 3.8% to 4% over the two years as follows:

| Increase in reimbursement relative to WAC | Time from Implementation of the 5% Scheme |
|---|---|
| 3.82% | 1-6 months |
| 3.78% | 7-12 months |
| 3.83% | 13-18 months |
| 3.99% | 19-24 months[14] |

In other words, prices were inflated and remained so throughout the Class Period.[15]

---

[12] Ex. 1 (Hartman Liability Report at ¶¶ 32-33) (emphasis in original); Hartman 10/29 Report pp. 5-7 at ¶¶ 8-11.

[13] Hartman Tutorial at 4.

[14] Hartman 10/29 Report pp. 7-8 at ¶ 11.

[15] As a cross check Dr. Hartman analyzed drugs not subject to the Scheme and found no price inflation. Hartman 10/29 Report p. 8 at ¶ 11(c).

**B.    TPP Claims Data Confirms the Continuing Impact of the Scheme**

Dr. Hartman confirmed his aggregate conclusion by analyzing actual claims data for two large TPP class members, GE Group Life Insurance ("GE") and CIGNA.  Dr. Willig asserts that claims data for these two TPPs shows a claw-back of the Scheme, but a proper analysis reinforces Dr. Hartman's conclusion that the Scheme had an immediate and enduring impact.[16] Dr. Hartman reviewed GE and CIGNA claims data for five NDCs and found that (1) changes in both discounts off of AWP and in dispensing fees were minimal for both mail order and retail pharmacy claims over the Class Period, when analyzed separately, and were insufficient to mitigate injury from the Scheme[17]; and (2) as a result, both TPPs paid increased costs for their drugs due to the Scheme.[18]  Given that these two TPPs are large and sophisticated, we should have seen a quick dissipation in the Scheme's impact on GE and CIGNA if McKesson's arguments were correct.  But we do not.  Through the first quarter of 2004, the last quarter for which GE claims data was made available, GE incurred damages of $32,047 for just five NDCs resulting from the Scheme.[19]

In sum, according to McKesson's theory of PBM competition, the claims data for all or substantially all TPPs surveyed in the IMS data should have revealed that the impacts of the Mark-Up Scheme were quickly mitigated since contracts would have been renegotiated with increased discounts off AWP and decreased dispensing fees.  ***No such mitigation is revealed in***

---

[16] Dr. Willig erred by aggregating retail and mail order claims together.  Because discounts off of AWP and dispensing fees differ between the two, retail and mail order claims data ***must*** be analyzed separately.  *See* Hartman 10/29 Report pp. 10-11 at ¶ 19.

[17] There was no mitigation at all through increased discounts off AWP or decreased dispensing fees until a full year-and-a-half after the Scheme was implemented.  Thereafter, changes in these cost measures were very small except for a larger decrease in the dispensing fee or mail order claims, which turns out to be *de minimus* compared to the overcharges induced by the Scheme.  Hartman 10/29 Report pp. 13-14 at ¶ 23-25.

[18] Hartman 10/29 Report at Section B pp. 10-14 and Attachment C.

[19] Hartman 10/29 Report p. 14 at ¶¶ 24-26.

*the IMS data or in the TPP data*.  The TPP data confirms Dr. Hartman's conclusions using IMS data, thereby undermining Willig's attacks on the use of IMS data.[20]

## C.    Though There is no Evidence of Push Back Dr. Hartman's Model Accounts for Changes in Variables

McKesson claims that aggregate damages must account for changes in discount rates and other variables that Willig asserts occurred in response to knowledge of the Scheme.  As discussed throughout there is no evidence of any TPP knowing of the Scheme and scant evidence that TPPs knew of the change in the WAC-AWP markup.  But assuming there were changes in discounts, dispensing fees and other variables, Dr. Hartman's model, based on real transaction data, accounts for such changes.[21]

## D.    The PBMs Were Not Motivated to Claw-Back the Price Increase

A critical component of McKesson's opposition is its assertion that PBMs discovered the Scheme, revealed it to thousands of TPP clients, and instigated a wave of recoupment efforts.  Of the 40-plus PBMs in the United States, McKesson produced evidence from just *one* PBM – ESI – that discussed with TPPs the change in the WAC to AWP markup (not the Scheme itself).

In response to McKesson's opposition and the Court's concerns, Dr. Hartman has analyzed the PBM industry in the context of the issues in this case.[22]  He has compiled powerful economic evidence elucidating why PBMs did not inform TPPs of the Scheme or "claw-back" the price increase.  Simply put, PBMs make more money on the spread via their mail order business than they do from services offered to TPPs and therefore had no motive to renegotiate

---

[20] *See* Hartman 10/29 Report p. 15 at ¶ 25.

[21] Hartman 10/29 Report p. 1 at ¶ 3(iii), p. 2 at ¶ 3(vi); p. 5 at ¶ 7; p. 8 at ¶ 12(e); and pp. 15-16 at ¶¶ 29-30.

[22] Hartman Tutorial at 2-5 analyzing the substantial profits PBMs make off the Scheme; 10/29 Report at p. 25 at ¶ 46(e).

and a strong incentive to remain silent.[23]  For example, ESI, the PBM which McKesson asserts

revealed the Scheme to TPPs and mitigated its impact, receives 35% of its revenue from mail

order operations compared to 1% from services offered to TPPs.[24]  Thus, in its mail order

capacity, ESI stands in the same shoes as McKesson's retail pharmacy clients by profiting from

the WAC-AWP increase.[25]  In a very recently produced document that was initially withheld,

ESI explicitly admits that "███████████████████████████████████████

███████████████████████████."[26]  And ESI recognized that its TPP clients will

not be sympathetic if they found out "███████████████████████████████

███████████████████████."[27]  The author, the President of ESI, then confirms the

impact of the price increase and the impact on TPPs: "████████████████████

███████████████████."  *Id.*  Why would client drug trends be "██████" if ESI had or

was going to mitigate the impact of the Scheme on its clients?  And if ESI was aggressively

acting to hurt its own profits for the benefit of TPPs, why in reaction to the rollback envisioned

by the FDB settlement, does ESI warn that the settlement "███████████████████

██████████████████████████"?[28]  So what was ESI's response: "████

████████████████"[29]

---

[23] *Id.*

[24] *Id.* and Demonstrative Slides 1-4.

[25] ESI filled 39.1 million mail order prescriptions in 2004, generating $11 billion in income. *See* McDonough Tutorial at 7.

[26] Ex. 5 (ESI-414-00005439).

[27] *Id.*

[28] Hartman Tutorial at 4. *See also* McDonough Tutorial at 8 (describing how PBM executive told her they benefited from the Scheme).

[29] Ex. 5 (attaching ESI document and the translation of the handwriting by ESI). Putting a "██████" is a far cry from the robust behavior McKesson counsel asserted had occurred "I want to emphasize they [PBMs] told them that" referring not to the Scheme but to the change in the WAC-AWP markup. Transcript at 44-46.

- 9 -

The foregoing explains why PBMs did not act as Willig postulates, why ESI sent but a very vague letter to a few of its TPP clients about the price increase (which failed to reveal the Scheme) and why no other PBMs notified their client of the reasons for the price change.[30]

Added to this new work of Dr. Hartman is the report of Dr. McDonough, a pharmacy consultant for TPPs. Dr. McDonough was personally involved with several of the contracts that Willig claims were "renegotiations reacting to knowledge of the Scheme." She, both as an expert and *as an industry participant*, refutes the existence of such knowledge or that she saw any evidence of renegotiations based on the knowledge of the Scheme during the Class Period. According to Dr. McDonough, "[n]ot a single client" received any reimbursement or payment from a PBM "as a result of the Scheme."[31]

Dr. McDonough put it emphatically as to whether TPPs reacted to the Scheme "*they did not*." This real world observation flatly contradicts Willig's ivory tower declarations and confirms Dr. Hartman's model. Her experience is supported by industry analysis.[32] Dr. Willig from his ivory tower cites as a prime example of renegotiation the Ohio PERS contract. *But Dr. McDonough, a real participant in the negotiation of this specific contract, factually refutes and destroys his assertions in that regard.*[33]

McKesson's theory is also undercut by the real world in which TPPs do not typically look at AWP-WAC but look to overall price trends. As explained by Dr. McDonough TPPs do not look at NDCs or compare AWP-WAC, all they saw here was a general increase in prices.[34]

---

[30] Note that ESI refuses to produce for examination its analysis that McKesson claims shows a claw-back for its clients. Ex. 4 (Deposition of William F. Kiefer (July 24, 2007) at 90:2-6, 137:22-138:9 (claiming analysis is protected by attorney-client privilege)). A claim that is suspect in light of the email cited to above.

[31] McDonough Tutorial at 9-10 and 5.

[32] *Id*. at 9.

[33] *Id*. at 10.

[34] *See* McDonough Tutorial at 3-5.

As Dr. McDonough observes with her real world lens:

> Your Honor, I hope that you found it helpful to hear about what was happening in the real world, or my real world, at least, as a result of McKesson's conduct.  Until the filing of this litigation, I was unaware of the potential collusion between First DataBank and McKesson related to the changes in AWP pricing methodology.  My clients, likewise, didn't know.
>
> In all the work that I have done with my third-party payer clients, I have seen nothing to indicate that third-party payers got anything back to compensate them for their increased drug costs during that period.  Certainly, no PBM has ever approached my client and offered to give them anything back.  ***The effect of the change in AWP to WAC ratio resulted in measurable and sustained added costs to my clients.***[35]

## III.   ARGUMENT

**A.**   **Plaintiffs Need Only Prove That Their Proposed Method of Calculating Damages is "Plausible," *i.e.*, "Not Fundamentally Flawed"**

At this stage in the litigation, Plaintiffs have the limited burden of demonstrating that their expert's method of calculating damages is "plausible" and not "fundamentally flawed." 8/27 Order at 24.  Plaintiffs have done so.

In its Order the Court proposed that Dr. Hartman develop an aggregate damages model for TPPs that would take into account when TPP contracts were renegotiated.  While there is no database available to form the basis for developing such a methodology,[36] Dr. Hartman's work since this Court's Order has established that there are other ways of addressing the Court's concerns and he has done so by accounting for any possible "pushback" in this damages model.

Responding to the Court's request in the 8/27 Order, Dr. Hartman has now presented an aggregate damages methodology that, as the Court requested, "works with respect to the proposed class of TPPs."  8/27 Order at 25.  In his recently filed and detailed liability report, Dr. Hartman explains, among other things, how the economic evidence – based on millions of

---

[35] *Id*. at 11.

[36] Dr. Hartman explains that no database exists that would track TPP contracts by date of renegotiation. Hartman 10/29 Report p. 18 at ¶ 34.

- 11 -

transactions in the actual marketplace – demonstrates that damages for the TPP class can be

calculated in the aggregate and accounts for "tradeoffs" in the negotiation process that "are

explicitly reflected in the IMS transaction data."  Although the defense submits a contrary

opinion from Dr. Willig, as the Court recognized in AWP, the Court's role is not to weigh

whether Plaintiffs' proffered expert testimony is persuasive or to resolve conflicting expert

testimony.  Instead, the Court's role at the class certification stage is to find whether Plaintiffs'

expert testimony offers a means to prove the Class's claims with common evidence.  *In re*

*Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 87 (D. Mass. 2005) ("AWP").[37]

> As this Court has stated in other litigation:

>> On a motion for class certification, a court need not plunge into the weeds
>> of an expert dispute about potential technical flaws in an expert
>> methodology.  *See Smilow*, 323 F.3d at 40-41 ("If later evidence disproves
>> [the expert's proposed methods], the district court can at that stage modify
>> or decertify the class, or use a variety of management devices.").  "The
>> important question in a class certification context is whether after a sneak
>> preview of the issues, the expert approach appears fundamentally flawed --
>> an issue usually vetted more fully at a Daubert hearing based on a more
>> detailed record."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230
>> F.R.D. 61, 90 (D. Mass. 2005) (Saris, J.).

*In re Neurontin Mktg. & Sale Practices Litig.*, 2007 U.S. Dist. Lexis 63898, at *69 (D. Mass.

Aug. 29, 2007).  It is therefore "inappropriate at this stage of the proceedings to determine on the

merits whether [Willig's] analysis of the quality of the data or the market is better than

Hartman's."  *AWP*, 230 F.R.D. at 90.  The sole question is whether, "[b]ased on the current cold

---

[37] *See also In re Carbon Black Antitrust Litig.*, 2005 U.S. Dist. Lexis 660, at *71 (D. Mass. Jan. 18, 2005); *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), *cert. denied*, 538 U.S. 977 (2003); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003); *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004); *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1229 (9th Cir. 2007) (district court correctly disregarded defendant's challenge to plaintiffs' experts' decision to conduct his research on the regional level, rather than analyzing the data store-by-store; holding that "it was appropriate for the court to avoid resolving 'the battle of the experts' at this stage of the proceedings."). The First Circuit has already rejected the "battle of the experts" that McKesson proffers in order to defeat certification here, and it's ruling on the interlocutory appeal in *AWP* applies with equal to the instant dispute. General Docket Order, Nov. 25, 2005 attached as Ex. 26 to the Berman Decl.; *see also Dukes*, 474 F.3d at 1229 (court is not permitted to weigh conflicting evidence from defendant's expert against plaintiffs' expert in determining whether the Rule 23 requirements are satisfied).

record[,] Hartman's . . . methodology for calculating damages on an aggregate class-wide basis, while preliminary, is not so insubstantial as to preclude class certification." *Id*. Given the thoroughness of Dr. Hartman's work, Plaintiffs have satisfied this standard.

In *AWP*, the Court found that Dr. Hartman's approach was viable, and it should do so again here, reserving the right to "fine-tune" its order in response to how the issues play out at trial – a procedure expressly endorsed by the First Circuit when it denied the Track 1 Defendants' interlocutory appeal of the Court's class certification order.[38] This approach is far preferable than literally eliminating ***TPP and consumers*** damages based on the conjecture contained in the untested declaration of Dr. Willig, especially since Willig is contradicted by real world actors like Dr. McDonough.[39]

**B.     Plaintiffs Have Presented a Strong and Plausible Damages Model**

**1.     IMS data reveals that TPPs contract renegotiations had no measurable impact on the increased drug reimbursement caused by Defendants' Scheme**

As discussed in greater detail above, Dr. Hartman analyzed the IMS sales data to determine what, if any, adjustment for purported push backs by TPPs would be necessary to address the Court's concerns and has concluded that ***no adjustment is appropriate*** because the data reveals no evidence of a systematic claw-back of the Scheme's effects:

---

[38] As the First Circuit stated:

> [W]e deny the petition and "allow[] the district court an opportunity to fine-tune its class certification order," . . . if necessary, as the case progresses. That approach is particularly appropriate here, where the alleged weaknesses in plaintiffs' expert's methodology relate primarily to the individual damages phase of this case. The district court recognized that the methodology may not work to the individual damages phase but concluded that ***such an eventuality did not preclude class certification for purposes of delivering liability and aggregate damages***.

Ex. 26 (Nov. 25, 2005 General Docket Order at 3).

[39] McKesson's argument on mitigation or "push back" is also flatly contradicted by their own documents. *See* Class Plaintiffs' Proffer of Evidence Common to the Class Containing Admission by McKesson of Impact on the Class, filed on October 29, 2007. Much of this evidence the Court has previously seen but is compiled in one place for the Court's convenience. Again, like Dr. McDonough's submission, it is ***real world*** evidence that contradicts Dr. Willig.

> Using standard and correct trend analysis, I demonstrated there was no measurable change in the time patterns of discounts off AWP (d) and dispensing fees (df) induced by the Scheme. Since these two determinants of reimbursement are **the first line of defense for TPPs to push-back or mitigate increases in AWPs**, there is no observable measure of push-back or recoupment by TPPs in their first line of defense. If there had been a measurably increased push-back by TPPs to the measurably larger growth rate of AWP for the challenged drugs, as Dr. Willig asserts, we should see a distinct change in trend in d and df. **We do not see any such change.**[40]

Attachment F to Dr. Hartman's report demonstrates in detail that there was no systematic push-back for the Appendix A drugs. By way of illustration, he notes that the data for Lipitor (one of four drugs identified by Dr. Willig as significant for the purposes of monitoring prescription drug prices) shows that

> once the Scheme is implemented in January 2002, the mark-up of AA above WAC (AA/WAC) increases almost immediately and remains increased throughout the Class Period. This is the measure of interest to the Court for a finding of impact and injury – the increased mark-up of drug payments (AA) above drug costs (WAC). The ratio of AA/AWP remains essentially constant. This is the measure of interest to the Court for a finding of mitigation or push-back by the TPPs. The same results are found for the other three drugs (see Figures 1.c) to 1.e)).

Ex. 1 (Hartman Liability Report ¶ 31).

**Dr. Willig actually agrees.** Demonstrative Slide 16 to the Hartman Tutorial compares the Hartman and Willig calculations and **shows that both approaches find an impact that endured throughout the Class Period**. For example, on Lipitor 20 mg, Willig finds prices increased 3.63% in reaction to the Scheme and remained inflated by 3.29% 24 months after the Scheme.[41]

---

[40] Ex. 1 (Hartman Liability Report at ¶ 22) (emphasis added); *see also* Hartman Tutorial at 13-14 and Demonstrative Slides 14 and 16.

[41] Hartman Tutorial Demonstrative Slide 16 and *see also* Hartman 10/29 Report pp. 11-12 at ¶¶ 20-21.

- 14 -

McKesson's conjecture that TPPs would eventually discover the harm and take steps to recoup their losses is ***not borne out by the data*** and therefore does not warrant a modification of Plaintiffs' proposed damages model:

> While there was certainly contract renegotiation during the period in which the Scheme was in effect, there is no evidence that such renegotiation systematically pushed-back or recouped the inflation. Such renegotiation has been a part of the TPP/PBM interaction since 1990. It did not have measurable impact on increased drug reimbursement induced by the Scheme.

Ex. 1 (Hartman Liability Report ¶ 36(h)).

Because the evidence disproves McKesson's push-back hypothesis, Plaintiffs do not believe that any modification of their damages method is needed.

### 2.    Dr. Hartman's model accounts for any "push back" and the results of individual negotiations

Perhaps most damaging to McKesson is the fact that, ***if*** there were changes in discounts or dispensing fees in reaction to the Scheme, ***they would be accounted for in the model resulting in a dimunition in damages for that drug – hence there is no overstatement***. Indeed, the model nets out "all of the variables that Dr. Willig argues must be analyzed at the individual TPP level."[42]

As Dr. Hartman explains:[43]

> Since I use actual real-world transactions data, ***I can ascertain whether mitigation did occur, and I net out of my damage calculation any mitigation or "push-back" that actually did occur.*** If mitigation is only partial, my calculation of damages will be reduced, since I observe the effect of the push-back in the reimbursement data (in $(AA/WAC)_a$). If mitigation is complete, Damages = $(AA/WAC)_a – (AA/WAC)_{bf} = (AA_a – AA_{bf})/WAC = 0$. If the TPPs are made better off by the competitive responses, Damages = $(AA/WAC)_a – (AA/WAC)_{bf} = (AA_a – AA_{bf})/WAC < 0$.

---

[42] Hartman 10/29 Report p. 2 at ¶ 3(vi)-(vii); p. 6 at ¶ 3(b); and p. 17 at ¶¶ 29-30.

[43] *Id.* p. 7 at ¶ 12(b) and p. 8 at ¶ 12(e) (emphasis added).

Or as he opines elsewhere:

> [The IMS Data] accurately summarize the amounts paid by TPPs over millions of transactions. While it is true that "PBMs and TPPs typically have complex highly individualized negotiated contracts which involve a bundle of trade-offs," the effects of all of these tradeoffs on drug payments by Class member TPPs before and after the implementation of the Mark-Up Scheme ***are explicitly reflected in the IMS transactions data***. If there are complex renegotiations that reduce the impact of the Scheme, those negotiations are reflected in the IMS transactions data and incorporated in my damage calculation as reduced damages ("pushed-back" or "mitigated" damages).[44]

## C. The Court Recognizes That the Use of Aggregate Damage Models is Consistent with the Remedial Purposes of RICO and Consumer Protection Laws

In reaching its preliminary conclusion, the Court acknowledged that "Plaintiffs have a persuasive argument that the alleged fraud had a class-wide impact because the AWP baseline for negotiation of new contracts was fraudulently increased." 8/27 Order at 24. The Court has also recognized that RICO and consumer protection statutes do not require absolute precision as to damages, and that an aggregate calculation is a plausible method of determining class-wide damages:

> Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages and have allowed damages to be proven by reference to the class as a whole, rather than by reference to each individual class member. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury rights to contest each member's claim individually, will not withstand analysis.

*In re Neurontin*, 2007 U.S. Dist. Lexis 63898, at *75 (quoting 3 CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS, § 10:5 (2002)); *accord Dukes*, 474 F.3d at 1241. The Court further held that an aggregate computation of class monetary relief "would effectuate the policies underlying the civil RICO statute" and "the broad remedial goals of state consumer protection laws." *In re*

---

[44] Hartman 10/29 Report pp. 15-16 at ¶ 29 (emphasis added).

*Neurontin*, 2007 U.S. Dist. Lexis 63898, at *75-76.  This flexibility and these remedial goals apply here as well.[45]

**D.    McKesson Has Utterly Failed to Demonstrate that Plaintiffs' Methodology is Fundamentally Flawed**

**1.    McKesson's criticisms merely go to the weight of Dr. Hartman's testimony**

McKesson's criticisms of Dr. Hartman's testimony represent precisely the type of disputes over "potential technical flaws" that are best reserved for trial and are not appropriate for consideration on class certification.  *In re Neurontin*, 2007 U.S. Dist. Lexis 63898, at *69.  For example, McKesson decries Hartman's reliance on IMS data instead of actual TPP data.  IMS is the data set commonly used by experts, including Dr. Berndt, in analyzing pharmaceutical transactions.[46]  Willig claims that, because this data is PBM transaction data and not TPP transaction data, it is inaccurate.  However, the payments made by PBMs to pharmacies reflect actual costs paid by TPPs because there is a constant relationship between what the PBMs pay pharmacies and what TPPs pay PBMs, and there is no evidence that this relationship changed during the Class Period (and, in fact, ample evidence that it did not).[47]

---

[45] The aggregate damages approach is supported by analogous law.  In antitrust cases, the application of Plaintiffs' proposed method is well established.  Antitrust law recognizes that purchasers are harmed by schemes to fix the baseline prices of negotiation to the extent that the purchasers are overcharged by the difference between (1) the amount they actually paid for the product and (2) the amount they would have paid if the defendants had not agreed to raise the starting price.  *See, e.g., In re Mid-Atlantic Toyota Antitrust Litig.*, 560 F. Supp. 760, 785 (D. Md. 1983).  This is essentially Dr. Hartman's approach, but it is even more supportable here because Dr. Hartman is using real-world "before" and "after" data.  Despite individual differences relating to a purchaser's bargaining power or negotiation skills and the fact that the specific overcharge amount may vary from purchaser to purchaser, the Clayton Act nonetheless permits flexibility in proving price fixing damages through the use of statistical or sampling methods, by the computation of alleged overcharges, or by such other reasonable system of estimating aggregate damages as the court in its discretion may permit.  15 U.S.C. § 15d.

[46] Hartman 10/29 Report p. 2 at ¶ 3(iii); Attachment B; Attachment D pp. 7-9 at ¶¶ 17-23; and Hartman Tutorial at 15-16.

[47] Hartman 10/29 Report p. 5 at ¶ 6 and Attachment D pp. 7-9 at ¶¶ 17-23.

- 17 -

Dr. Willig, also takes issue with Dr. Hartman's drug-by-drug analysis, arguing that the results would be different if the data were combined. Here it is Dr. Willig who has erred.[48]

Next, McKesson complains that Dr. Hartman did not include administrative fees and rebate pass-through percentages in his analysis of the IMS data. However, Dr. Willig does not dispute that the terms Dr. Hartman does track – discounts off of AWP and the pharmacy dispensing fees – are the first line of defense for TPPs responding to rising AWPs and thus critically important in determining whether push back occurred.[49]

McKesson also falsely represents that both of Plaintiffs' experts, Dr. Hartman and Dr. McDonough, agree with McKesson's theory that PBMs recouped TPP losses by renegotiating with pharmacies. McK at 6. Both Dr. Hartman and Dr. McDonough flatly contradict McKesson's representation throughout their presentations, expressly stating that there was no systematic pushback and offer documentary and economic evidence as to why: PBMs made money off the Scheme.

Nor is Willig's theory that clients would have dissipated the Scheme's effects by renegotiating contract terms during the middle of the contract viable. It is simplistic and ignores the realities of PBM contracting – realities that sharply limit a TPP's ability to change pricing terms mid-stream. In order for a renegotiation to result in more favorable pricing to the TPP, a string of events must occur, including (1) garnering the PBM's agreement to negotiate to change a contract during its term, contrary to the PBM's financial incentives; (2) the development by the TPP of a Request for Proposal ("RFP") to be submitted to multiple PBMs; (3) a period of

---

[48] Hartman 10/29 Report pp. 9-10 at ¶ 19.

[49] 10/29 Report pp. 15-16 at ¶¶ 29-30. Moreover, most TPPs do not negotiate rebates but rely on their PBM to negotiate manufacturer rebate contracts on the TPPs' behalf. McDonough Rebuttal at 4. Because manufacturers cannot pay rebates that exceed the federally-mandated Medicaid rebate without increasing what they pay to Medicaid, manufacturers are reluctant to increase rebates paid in the private sector. *Id.* at 5. In any event, rebates are typically paid on the basis of WAC and not AWP. *Id.*

negotiation followed by: (4) retention of the current PBM under changed terms or conversion to

a new PBM. McDonough Rebuttal at 2. This process takes a year to complete. Given PBM

resistance to changing contracts, and the time and resources required by the TPP to engage in

this process, *it rarely happens. Id.* at 3. Indeed, Dr. McDonough saw *no* increase in the number

of TPPs seeking to renegotiate contracts or change PBMs during 2002 or 2003. It is therefore

not surprising that Dr. Hartman's empirical data reflect no systematic renegotiation of pricing

terms; it simply did not occur. Given the substantial depth of her real world experience in PBM

contracting, the Court should accord Dr. McDonough's conclusion significant weight, and

should not accept at face value the inexperienced conjecture of Dr. Willig.

> **2.    McKesson's anecdotal evidence does not refute Dr. Hartman's conclusion that competition in the PBM market did not safeguard TPPs against the effect of Defendants' collusion**

McKesson's anecdotal evidence adds little to the discussion. McKesson points to ESI's

proposal to DC 37 to increase its mail order discount, the contract Teachers entered into with ESI

in 2002, and Blue Shield's renegotiations with ESI after discovering the bump. McKesson fails

to advise the Court that both DC 37 and Teachers originally contracted with NPA. When ESI

acquired NPA in 2002, it promptly switched the AWP source for its NPA clients from RedBook

to First DataBank *without informing them that First DataBank had substantially higher AWPs*

*than Redbook.*[50]

---

[50] *See* Ex. 7 (Deposition of Rosaria Esperon (Nov. 6, 2007) at 144:12-145:9). The mass letters ESI sent to NPA clients to announce the switch to First DataBank confirm that ESI did not disclose to them the consequence of changing sources of AWPs. Ex. 8 (ESI-414-00001883). McKesson's reference to ESI's renegotiations with Blue Shield of California is similarly misleading. After discovering the bump, Blue Shield renegotiated with ESI, who provided its mail order service. ESI agreed to increase its discount but did not entirely make up the difference associated with the price changes at First DataBank:

" ████████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████
  ████████████████████████ " [Ex. 6 (Stalker Dep. at 114:18-115:1) (emphasis added)].

### E.    At a Minimum, a Two-Year Class Period is Appropriate

Dr. Hartman has calculated damages on a yearly basis.[51]  If there is to be a shorter class period for the aggregate damage part of the TPP class, Plaintiffs suggest that it should end in March 2004.  There is in our view only one TPP that engaged in clear mitigation behavior – Blue Shield.  However, it took Blue Shield until 2004 to mitigate by changing to *Redbook*.[52]  Thus, putting aside that McKesson has failed to produce similar evidence from other TPPs, two years is the second most logical alternative, although the evidence continues to demonstrate that there should be not cut-back of the damage period.  Two years also conforms to McKesson's own admission as to the continuing impact of the Scheme.[53]

McKesson argues that choosing two years or even one year is arbitrary, but the law does not require the precision McKesson demands.  It is also well-established in antitrust law, which is instructive here as well, that a plaintiff need not "establish the amount of damages with mathematical precision."  *Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 33 (1st Cir. 1999).  "[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).[54]  There is no reason why this case law should not apply to the price fixing Scheme at issue here.

---

[51] A discussion of Blue Shield's actions is set forth in Corrected Plaintiffs' Amended Supplement to the Class Certification Record at pp. 11-12 (filed July 27, 2007).  Despite McKesson's outright lie to Blue Shield about the reason for the price increase, Blue Shield switched to Redbook's AWP in 2004.  *Id.*  This single switch, by just one of the thousands of TPPs, hardly justifies the rejection of an aggregate damages model.

[52] *See* Ex. 25 (Summary of Damages By Year from Hartman Liability Report).  If the Court rejects the full Class Period or two year period, Hartman has calculated damages for one year.

[53] *See* Proffer of Evidence Common to the Class Containing Admissions by McKesson as to the Scheme's Impact on the Class.

[54] *See also Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d at 303 ("[E]stablishing market prices in the 'but for' world free of anticompetitive conduct could be made difficult by the dearth of market information unaffected by the collusive actions of the defendants."); *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88-89 (2d Cir. 2000) (quotation, citation omitted) ("[E]stimates and reasonable inferences of [antitrust] damages are sufficient."); *Telecor*

**F.    McKesson's Motion to Decertify the Consumer Class Should be Denied**

McKesson now argues that, if the Court refuses to certify a TPP class for damage purposes, then it must do so for co-pay consumers because their injury is derivative of the TPPs. This is essentially an untimely motion to reconsider, because the August 27 Order did not give any party leave to make further submission as to the consumer class.  As to the merits, if McKesson's argument prevails, then the Court's refusal to certify the TPP claims for aggregate damage purpose dooms consumers to no recovery even where McKesson's flip of the price switch cost consumers hundreds of millions in excess payments.

But McKesson is not correct.  A consumer's payment is tied to the AWP.  Dr. Hartman and even Dr. Willig agree that the Scheme caused the AWP to increase.  There is no evidence that in reaction to the Scheme a TPP was able to reduce the impact *to zero* at any point during the Class Period.  And, as explained above, Dr. Hartman's model uses data that accounts for reductions in discounts off AWP or dispensing fees at the TPP level and would necessarily do so at the consumer level as well.  Hence, there is no overstatement for the consumer class.

Furthermore, the Court observed that TPPs are engaged in negotiation that "involve a bunch of trade offs."  8/27 Order at 24.  There is no evidence that any purported trade offs occurring in reaction to the Scheme (and McKesson offers no such evidence) were passed down to the benefit of consumers.  None.  Hence, since price is accurately accounted for by Dr. Hartman, and it demonstrates harm throughout the Class Period, the Court properly certified the consumer class for the entire period.  And unlike the large TPPs who the Court found can

---

*Communs., Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1151 (10th Cir. 2002) ("[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations."); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *see also In re Carbon Black Antitrust Litig.*, 2005 U.S. Dist. Lexis 660, at *77 ("[N]o precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so unsubstantial as to amount to no method at all.") (quotation, citation omitted).

"protect their own interests" if one year of damages is not enough, consumers will be powerless without certification.

## IV.    CONCLUSION

For the foregoing reasons, the Court should certify the TPP class for damages.  Plaintiffs respectfully submit that they have more than met their burden of demonstrating that their damages calculation is not fundamentally flawed.  The accuracy of the aggregate damages model is supported by witnesses in the real world and McKesson's own documents admitting continuing impact.  And the Court should not decertify the consumer class.


DATED:  October 29, 2007                    By  /s/ Steve W. Berman
                                                Steve W. Berman
                                                Sean R. Matt
                                                Nick Styant-Browne
                                                Barbara A. Mahoney
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Thomas M. Sobol (BBO #471770)
                                            Edward Notargiacomo (BBO #567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

                                            Jeffrey Kodroff
                                            John Macoretta
                                            Spector, Roseman & Kodroff, P.C.
                                            1818 Market Street, Suite 2500
                                            Philadelphia, PA  19103
                                            Telephone: (215) 496-0300
                                            Facsimile: (215) 496-6611

001821-13  203370 V2

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

## CERTIFICATE OF SERVICE

I, Steve W. Berman, hereby certify that a true and correct copy of the above document was served on the attorney of record for each party via the Court's electronic filing system this 29th day of October, 2007.

By_____/s/ Steve W. Berman_____
        Steve W. Berman
        **HAGENS BERMAN SOBOL SHAPIRO LLP**
        1301 Fifth Avenue, Suite 2900
        Seattle, WA 98101
        (206) 623-7292

001821-13 203370 V2