UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>                Plaintiffs,<br><br>                v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                Defendants. | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' PROFFER OF EVIDENCE COMMON TO THE CLASS CONTAINING ADMISSIONS BY MCKESSON AS TO THE <u>SCHEME'S IMPACT ON THE CLASS</u>**

The centerpiece to McKesson's opposition to certification of aggregate damages is Willig and his speculation as to what occurred in the pharmaceutical market. Anecdotal and factual evidence is often used to cross check the plausibility of an expert opinion. Here we summarize in an offer of proof McKesson's own documents that corroborate Dr. Hartman's findings and undercut Dr. Willig and McKesson's litigation made arguments.

These seventeen documents demonstrate that McKesson's unswerving insistence that the market self-corrected any impact of the scheme *ignores* the plethora of McKesson's own documents *throughout the Class Period* admitting, *if not boasting*, about the on-going benefit to McKesson's retail customers.

### I. STATEMENT OF FACTS IN SUPPORT OF DAMAGES MODEL

#### A. McKesson's Internal Documents Admit Causation and Contradict Willig

While the scheme was still in its infancy in September 2001, McKesson realized that it would have a profound effect on their customer's profitability:

> In August we were able to get the Concerta (formerly an Alza product now JOM) AWP spread raised to 20% from the previous 16 ⅔%. Last week we got agreement with First Data Bank on raising the Searle Products, which are now part of Pharmacia, to a 20% spread as well as Genotropin which was a Pharmacia product (with a 16 ⅔% spread). This may not seem like a big deal but it has a huge positive impact on the profitability of our customers.[1]

Clearly, if McKesson had believed that the increases were only short-term, it would not have bragged about a "huge positive impact on the profitability of our customers," as is confirmed in the following e-mail from January 2002, when McKesson's Director of Brand Pharmaceutical

---

[1] Ex. 9 (MCKAWP 0065885 (September 18, 2001 e-mail from Bob James to Greg Yonko)). All exhibits referenced in Class Plaintiffs' Proffer are attached the Declaration of Steve W. Berman filed herewith.

- 2 -

Product Management, Bob James, explained that McKesson expected their customers to hold onto the "gift" of the increased markups well into the future:

> A couple of years ago I was pulled into a conference call with Steve somebody (I think) and our McKesson MHS sales person, about how we were hurting them with our AWPs. He came on very strong and was going to call John Hammergren, etc. We calmed him down by explaining our process and tried to make him understand that we were really their advocates and were doing everything possible to "raise AWP's when appropriate. I haven't heard anything since.
>
> Here is an idea. Two years later, and having had some recent success in raising AWP's, I think this could be presented to him positively in this way:
>
> Omnicare is looking for . . . . say $500,000 in benefit from year end deals, even though this was not part of their contract. We need to ask them to roll up or recalculate their reimbursements for last year based on the new AWP's with a 20% spread. And *this is not just a one time benefit*. They will receive this now and each year going forward until their renegotiate contracts with third parties (and hopefully do not give up this gift).[2]

Although McKesson now claims that PBMs discovered the markup increases by early 2002 and promptly recouped TPPs' losses, contemporary McKesson documents express the opposite view. Throughout 2002 McKesson expresses its conviction that the scheme is having a positive impact on its customers.

For example, April 12, 2002, Bob James writes of the increased markups on Avonex and Copaxone and observes:

> This should make a significant contribution to your profitability as illustrated by the following example[s] using a reimbursement of AWP – 15%, plus $2.00 fee.
>
> Avonex at 16 ⅔% spread, profit would be $18.42 . . . . . .and now at a 20% spread, profit would be $51.31 . . . . .not bad!

---

[2] Ex. 10 (MCKAWP 0065895 (January 7, 2002 e-mail from Bob James to Greg Yonko, *et al.*) (emphasis in original)).

>Copaxone at 16 ⅔% spread, profit would be $19.72 . . . . .and now at a 20% spread, profit would be $57.39 . . . . pretty good!
>
>This is an increase of $37.67 per script.[3]

On April 25, 2002, James notes the impact of the scheme **on the largest selling drug in the world**:

>19. Also, ***few people seem to understand the positive impact on our customers' profitability***....including some of them. This is extremely significant and people need to understand this impact. Just one example with Lipitor 20mg 90s: with the old 16 2/3% spread a customer would make $6.86 profit, with the new 20% spread a customer will enjoy $17.18 profit..... and that is awesome!![4]

Given Lipitor's prominence, McKesson knew that the change would impact millions of consumers who take and pay for this drug on a daily basis, as well as TPPs who also pay for its use. ***There is no suggestion that McKesson believed that this "awesome" change would be short-lived.***

In June 2002 McKesson noted that the scheme was particularly helpful to one of McKesson's major retail clients, Albertsons:

>I know that Albertsons both recognizes and appreciates our efforts with the AWP situation. ***This has most likely had a very positive impact on their gross profits.*** On their insurance based business this equates to lowering cost of goods about 3 1/3% on those items that previously had a 16 2/3% spread…… which previously had been about 80% of the Rx products. I am wondering if this can be leveraged in any way. Worst case, it should be no less than a tie-breaker if the situation gets to that point.[5]

---

[3] Ex. 11 (MCKAWP 0084327 (April 12, 2002 e-mail from Bob James to Karl Lirette, *et al.*)).

[4] Ex. 12 (MCKAWP 0069616 (April 25, 2002 e-mail from Bob James to Greg Yonko) (emphasis added)).

[5] Ex. 13 (MCKAWP 0084485 (June 17, 2002 e-mail from Bob James to Greg Yonko, *et al.*) (emphasis added)).

- 3 -

***This positive impact for Albertsons, a national chain that would have transactions with hundreds of TPPs, cannot occur without a corresponding negative impact on payors.***  Again, the positive impact on McKesson's retail pharmacy chain clients went beyond Albertsons and extended to all chains:

> I believe that we have an opportunity to "normalize" the AWP spreads on brand pharmaceuticals at a 25% markup (or 20% spread) and most customers would love it.  ***The chains certainly are aware of this and are very appreciative of our efforts because they understand the profitability associated with higher AWP's***.[6]

McKesson's customers also agreed with its assessment of the increases.  In late May, Jeff Wallis, reports that a customer was very pleased with McKesson's efforts to expand AWPs:

> I had a real nice meeting with Med-X Corp. last week.  They are a 22 store chain of ours doing about 50M per year with us.  Jerry Howard, the director of operations, mentioned his margins on Rx have increased recently for the first time in a LONG time.  He was very ex[c]ited about it when I mentioned we had been working on AWP expansion with some success [and] he was even more happy that McKesson was looking out for our customers.  He was very glad that McKesson was doing this and would love to talk more about it.[7]

Certainly, if TPPs had already countered McKesson's "expansion of AWPs" through contract renegotiations, McKesson's customer would not have been so excited about its activities.  In late November Larry Secrest reports that he received a call from a "customer in OH," who had previously stopped dispensing "certain drugs because the AWP/Cost spread were in the 15-16% range and it was not feasible for him to try to make any money at it," and now "found that the spread appears to have increased significantly on most of these items to the area of about 20-21%."  The customer "wondered if we had any part in doing this, and if so, he wanted to let us

---

[6] Ex. 14 (MCKAWP 0068514 (September 18, 2001 e-mail from Bob James to Larry Secrest, *et al*.) (emphasis added)).

[7] Ex. 15 (MCKAWP 0069726 (May 21, 2002 e-mail string, beginning with e-mail from Jeff Wallis to Bob James)).

know that he really appreciated our efforts."[8]  This evidence stands in direct contradiction to McKesson's assertion of ongoing recapture.

And the list goes on.  In an October 2002 e-mail to Dan Connolly of Bartell's James advises of the latest markup increases and boasts of their potential impact:

> Just wanted you to know that Clarinex AWP spreads went to 20% this week.  A few weeks ago Celexa went to 20% as well.
>
> Fat cat status is just around the corner.[9]

At this same time he writes to David Vucurevich of Rite Aid:  "P.S. latest AWP changes . . . . Celexa and Clarinex, working on Lilly and Novo."[10]  Why would James bother unless he understood that retail pharmacies were still benefiting from the scheme?

Consistent with his understanding that the scheme was still benefiting its customers, McKesson's monthly status report, entitled "Rx Brand Product Management General Overview October 2002" reports:

> We have had some recent success in getting some AWP issues resolved by requesting that new surveys be done on Celexa and Clarinex.  Both items had AWP spreads increased to 20% from 16 ⅔% last month.  ***This is a huge boost in profitability for our retail customers.***[11]

Similarly, McKesson's *December 2002* status report for Rx Brand Product Management states:

> We have had some recent success in getting some movement in AWP's on Lilly and Novo products.  ***Our retail customers should***

---

[8] Ex. 16 (MCKAWP 0069513 (November 27, 2002 e-mail from Larry Secrest to Bob James)).

[9] Ex. 17 (MCKAWP 0069901 (October 11, 2002 e-mail from Bob James to Dan Connolly)).

[10] Ex. 18 (MCKAWP 0069911 (October 25, 2002 e-mail from Bob James to David Vucurevich)).

[11] Ex. 19 (MCKAWP 0066191-92 (Rx Brand Product Management General Overview October 2002 at 66192) (emphasis added)).

> ***begin seeing huge improvement in profitability when dispensing these products over the next few months.*** Both companies have had AWP spreads increased to 20% from 16 ⅔%, which will be realized as price increases, occur.[12]

Each of these documents belies McKesson's assertion that TPPs had recaptured retail pharmacies' excess profits by the end of 2002.

**B.     Three Years Into the Scheme – Long After McKesson/Willig Claim the Impact is Gone – McKesson Still Believes that It is Working**

Perhaps most damaging to McKesson's current no impact position is the fact that as many as ***three years*** after the scheme has been implemented McKesson employees are still internally congratulating each other about its success. For example, ***in a July 30, 2004*** e-mail, McKesson's John Bonner acknowledged the impact of the scheme on payors, and the corresponding benefit to McKesson's clients:

> *We try to "push" the AWP up to 25% above WAC rather than 20%. This may cause your customer some short term reimbursement pain with the payors but in the long run, if AWP at First Data Bank goes from 20% to 25%, your customer will benefit.*[13]
>
> *Most payors reimburse pharmacies at AWP minus 15 to 17%.* ***<u>The higher AWP markup percentage, the more they are paid by the insurance company</u>.*** *Pharmacies barely break even on items with 20% AWPs.*[14]

Again in July 2004, long after McKesson claims that TPPs recaptured the excess costs, McKesson was calculating how much the price increase at Johnson & Johnson had earned one of their clients: "Please see below for the work up of what the impact has been for Omnicare on JOM products relative to the change in AWP spread. Three years ago J & J products were all

---

[12] Ex. 20 (MCKAWP 0071671 (Rx Brand Product Management General Overview December 2002 at 2) (emphasis added)).

[13] The "customer" here is a McKesson retail client.

[14] Ex. 21 (MCKAWP 0076289 (e-mail string, including July 29, 2004 e-mail from John Bonner to Benjamin Coppolo) (underlining & bold emphasis added)).

- 6 -

16 ⅔% AWP spread products.  Today, almost all of them are 20% spread.  Procrit just changed last month."[15]  McKesson concluded that for Procrit alone, profits tripled and taking all JOM products together, the effect is "*more than 3 times the profit as before*."  Again, this analysis does not mention or discuss the effects of any recapture by TPPs as Dr. Willig now postulates.

Similarly, in April 2004, when writing to a manufacturer to decline it request to set its markup at 20%, James explains:

> [T]hings have pretty much normalized at a 20% spread (1.25 markup) for Brand Rx, which has been extremely beneficial for our customers. . . . .  Why do you want to take the profitability away from the retail pharmacies by trying to use a spread of 16 ⅔% when almost all other companies are getting a 20% spread.  If you have any doubts about what I am saying, please contact Scott Johnson at Albertsons, Dave Vucurevich or Greg Drew at Rite Aid, Frank Seagraves at Wal Mart, or Frank Scorpiniti at Longs.[16]

If McKesson was correct and the price increase had been negotiated away by bigger discounts, why would James be touting its benefits to Albertsons, Rite Aid, Longs and Wal-Mart in 2004?

Finally, *in September 2004*, McKesson participated in a conference call with Aetna, in which the insurance giant complained about rising AWPs and requested that McKesson "provide a guarantee against the spread."[17]  McKesson declined, stating that it could not control AWPs.[18]  Surely if McKesson's assumptions were correct, a sophisticated TPP like Aetna would have been able to counter the effects of the scheme on its own accord without looking to third parties, like McKesson.

---

[15] Ex. 22 (MCKAWP 0068131-32 (e-mail string, including July 28, 2004 e-mail from Bob James to Andrew Stubbs, *et al*.)).

[16] Ex. 23 (MCKAWP 0071694 (April 20, 2004 e-mail from Bob James to Chad Lucero)).

[17] Ex. 24 (MCKAWP 0078652 (September 28, 2004 e-mail from David Silko to Frank Han, *et al*.)).

[18] *Id.*  At his deposition Mr. Silko testified that he believed that the discussion was limited to generics but the document itself does not reflect this limitation.

In sum, McKesson's own documents, generated throughout the time the scheme was in place, uniformly admit to a class-wide impact and are contrary to any notion that TPPs became alert to the scheme and acted to negate its impact.

## II.    CONCLUSION

The foregoing facts will be used to prove the claims of Plaintiffs and all Class members.

DATED:  October 29, 2007

By  /s/ Steve W. Berman
   Steve W. Berman
   Sean R. Matt
   Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

>
> Kenneth A. Wexler
> Jennifer Fountain Connolly
> Wexler Toriseva Wallace LLP
> One North LaSalle Street, Suite 2000
> Chicago, IL  60602
> Telephone: (312) 346-2222
> Facsimile: (312) 346-0022
>
> George E. Barrett
> Edmund L. Carey, Jr.
> Barret, Johnston & Parsley
> 217 Second Avenue, North
> Nashville, TN  37201
> Telephone: (615) 244-2202
> Facsimile: (615) 252-3798

- 9 -

## CERTIFICATE OF SERVICE

I, Steve W. Berman, hereby certify that a true and correct copy of the above document was served on the attorney of record for each party via the Court's electronic filing system this 29th day of October, 2007.

By  /s/ Steve W. Berman
Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
(206) 623-7292

- 10 -

001821-13 205081 V1