UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |

**[REDACTED]**
**TUTORIAL PRESENTATION AND DEMONSTRATIVES**
**OF DR. RAYMOND S. HARTMAN**

Hello.  Plaintiffs' counsel, have asked me to address the Court's concern with the aggregate damage methodology for third party payers that I had previously submitted to the Court.  More particularly, in it's Class Certification Decision, the Court questioned whether my methodology would lead to an overstatement of aggregate damage to the third party payer class, because as Defense alleges third party payers would have dissipated the effects of the markup scheme through the renegotiation of contracts with PBMs.

In this presentation, which is based on the reports that I have submitted in this case, I demonstrate that my formulaic methodology to calculate aggregate damages is reasonable, it incorporates the realities of competition in the industry and the relevant markets, and it provides an accurate measure of aggregate damages.  An overarching conclusion of my analysis is that competitive behavior among PBMs has been insufficient to dissipate the impact of the markup scheme.

First, PBMs do compete for TPP business via RFPs or Requests for Proposals from TPPs to PBMs.  A variety of contract terms, including discounts, dispensing fees and rebate sharing agreements are offered in the PBMs' proposals.  However, the ultimate terms of the TPP/PBM contracts are subject to negotiations in which information is crucial for the negotiating parties to strike a profitable bargain.  In such situations, there is no competitive incentive for PBMs to provide proprietary information to third party payers.  Likewise, PBM compliance with negotiated contract terms is hard to monitor.  When PBM compliance is difficult to monitor or measure, and proprietary information benefits PBMs, it is highly unlikely that PBM competition will be fierce.  Second, and more importantly, because PBMs have their own mail order and retail pharmacy operations, they made money on the markup spread just like the large chain pharmacies creating a disincentive to pass any knowledge of the markup along to TPPs and to renegotiate contracts.  For the PBMs, the revenues earned on their mail order business far exceed their earnings from third party payers.

My methodology provides an accurate calculation of damages because it incorporates data summarizing millions of real world transactions in the marketplace over several years.  The methodology demonstrates the following.  First, that the markup scheme immediately increased the amount that consumers and third party payers paid for the drugs at issue.  And second, that the markup scheme had an enduring impact.  That is there was no systematic clawback or mitigation of the markup scheme through contract renegotiations.  Because my methodology uses actual payment data, it incorporates by drug, all reductions and reimbursement over time due to any reason.  Hence, if there is any mitigation or any clawback for any specific drug, it will be accounted for in my damage calculation.  As a result, my damage calculation therefore, does not overstate damages.

I turn first to why the PBMs have an economic incentive to simply pass through the AWP markup.  I first would like a brief, to do a brief background on PBM competition.  The Court has found in the AWP case that in general, the PBMs engage in "fierce" competition for the business of TPPs.  Competition is usually characterized as fierce

when it is unconstrained and based upon full information with the goal of profit maximization. While it is true that PBMs compete with each other to serve TPPs, there are important limitations on the extent to which such competition was fierce and mitigated the impact of the markup scheme.

PBM competition takes various forms, including designing and implementing drug formularies, offering drugs through the mail, and offering drug pricing at a discount from AWP. The PBMs own economic motives necessarily impact and constrain this competition. For example, the largest PBMs have affiliated mail order and retail pharmacy operations. The economic incentives of these operations will be aligned with those of traditional retail and chain pharmacies. Profit maximization will occur when large PBMs take profit from these operations and do not compete fiercely for the business of the TPPs. As a result, the PBMs benefited from the scheme. The Court has recognized at Page 5, of its Class Certification Order, that the profit to retail and chain pharmacies increases as the difference between AWP and WAC increases. The same is true for a PBM's own mail order and retail pharmacy operations as they make money on the spread just like large chain pharmacies would. Several examples from the evidence demonstrate this.

Express Scripts, Inc. or "ESI" a large PBM, has very significant mail order pharmacy operations. Indeed in 2005, 35% of ESI's revenue was attributable to home delivery or mail order operations. As shown in the pie chart published in ESI's 2006 Annual Report.



FIGURE E.2
SOURCES OF NET REVENUES FOR EXPRESS SCRIPTS, INC. (ESI)

**Express Scripts Revenue Sources (2005)**

Service 1%

Home Delivery (Mail-Order) 35%

Network 64%

Source:
Express Scripts 2005 Annual Report, p. 43.

Indeed, a recently produced internal ESI email recognized the benefit that ESI enjoyed from the markup scheme.

**[REDACTED]**

It states as follows, the " ███████████████████████████████████████████████ " And it recognizes that clients will not be ███████████████████████████████ sympathetic if they find out that we " ███████████████████████████████ ." This admitted profitability and understanding of adverse client response, certainly explains the non-specific letter sent out by ESI to only some of the third party payers, which I identify in Exhibit D-1 of my September 2007 Declaration and the fact, that McKesson has put forward no evidence that any third party payer learned of the markup scheme from ESI.

ESI's most recent Annual Report indicates that the roll back of AWP resulting from the settlement with First DataBank would adversely impact ESI. But that ESI has the negotiating power to overcome that adverse impact. As is stated in that Annual Report, "In the absence of any mitigating action on our part, the proposed reduction in First DataBank's AWP would have a material adverse affect on the margin we earned on home delivery transactions. It may also create disruption in our retail networks due to the adverse impact on AWP based retail pharmacy pricing. However, most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse affect of this proposed reduction in First DataBank's reported AWP."

## ESI Annual Report 2006
### (at page 21)

"In the absence of any mitigating action on our part, the proposed reduction in FDB's AWP would have a material adverse effect on the margin we earn on home delivery transactions. It may also create disruption in our retail networks due to the adverse impact on AWP-based retail pharmacy pricing. However, most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse effect of this proposed reduction in FDB's reported AWP."

This statement is a stark recognition by ESI of several facts.  First, ESI is threatened economically by a decrease in AWPs published by First DataBank.  For this to be the case, ESI had to benefit from the increase in the AWPs published by First DataBank after the implementation of the scheme.  Secondly, ESI has the market power to mitigate the adverse affect of this proposed reduction in First DataBank's reported AWP.  If PBM competition were fierce, ESI would have no "excess margin on home delivery transactions."  If PBM competition were fierce, ESI would not have the power to "mitigate the adverse affect of this proposed reduction" because TPPs would have all of the competitive power.  Again, this demonstrates the economic disincentive for ESI to have revealed or mitigated the scheme's impact for its TPP clients.

We find similar results for another large PBM, Medco.



It also benefited from the markup scheme as 37% of its revenue in 2005 was derived from mail order operations. This pie chart was taken from Medco's 2005 Annual Report. The Annul Reports for both ESI and Medco and the evidence demonstrate the following. Revenue streams of the large sophisticated PBMs are dominated by payments from mail order product and retail or network pharmacy product. The markup scheme increased the margin on mail order business or revenue. The markup scheme also increased the margin on retail or network pharmacy revenue, as I demonstrated in my September 2004 Declaration in the AWP MDL matter, in Attachment E.

In light of the foregoing, we must very carefully scrutinize Defense arguments that PBMs mitigated the markup scheme's impact on consumers and third party payers. That is that the so-called invisible hand of PBM competition counteracted the affects of the scheme. Because those PBMs most likely to notice the effects of the markup scheme benefited from it, they had a powerful disincentive to bring the markup scheme to the attention of the TPPs. To date, Defense has only hypothesized that PBM competition counteracted the affects of the scheme. They have not tested this hypothesis. They have not proved this assertion. As a matter of economics, they must.

To test this hypothesis, we examined millions of transactions to see whether there was any evidence of systematic mitigation. We found none. The markup scheme had an enduring impact on consumers and third party payers. The evidence shows no systematic clawback or mitigation of the markup scheme. When First DataBank increased the

markup by 5% this immediately caused consumers and third party payers to pay more for the drugs.  The reason is that PBMs bill class members at AWP less X% plus a dispensing fee.  When the AWP component of that equation increases, the overall cost increases.  The evidence shows that this impact endured.

Aggregate market wide pricing data reveal a constant trend without systematic deviation during the relevant time period.  For instance, average discounts off AWP for brand name drugs increased at a constant trend from 1995 through 2004, as I would show in Figure 1.a.



As you can see from this graph, there is no systematic increase in the trend of the discount off AWP after the markup scheme was implemented in 2001 and 2002.  Over this same period, average retail dispensing fees decreased, by a consistent trend amount which I presented in Figure 1.b.



As you can see from this graph, there is no systematic decrease in the trend in the dispensing fee after the markup scheme was implemented in 2001 and 2002.

If there had been some systematic clawback or mitigation in reaction to the AWP bump, as the Defense claims occurred, we would see a systematic increase above trend in the AWP discount line in Figure 1.a and/or a substantial downward deviation from the market trend in dispensing fees in Figure 1.b. We do not. There simply were no substantial deviations from the market wide trends in these metrics that would support the Defense assertion that there was a measurably increased attempt by TPPs to systematically clawback or mitigate the markup.

Actually acquisition cost data for four Bellwether Drugs, also shows no clawback of the markup scheme. Dr. Willig introduced four drugs as "important" pricing signals, Lipitor, Plavix, Prevacid, and Wellbutrin. We reviewed in detail the pricing histories of these drugs using real world transaction data from the most comprehensive surveys of reimbursements paid by TPPs, uninsured cash payers and Medicaid, in other words, monthly micro-data summarizing millions of transactions by drug and dosage. We merged that data with NDC specific list price data. I have confirmed that the ratio of actual acquisition costs to AWP for these drugs is essentially constant over the class period after implementation of the markup scheme. If there had been a clawback or mitigation, this ratio would not remain constant.

Here's an example for the 10 milligrams version of Lipitor, which comes from Figure F-1.a in my report.



The top panel plots three lines.



The top red line is the AWP, which you'll note it increases in a step function over time. The middle black line represents the average actual acquisition cost in the marketplace. And the bottom dashed blue line is the WAC which also increases in step function with the AWP. After the markup scheme was implemented in January 2002, reimbursement amounts paid by class members increased immediately, relative to WAC, i.e. the cost of

the drug, and in consort with AWP. Thereafter actual cost in the marketplace for this drug tracks consistently with AWP.

The bottom panel summarizes and reinforces the conclusions to be drawn.



IMS Allowed Amount (AA) at Retail As Percent of AWP and WAC

The top dotted line charts the ratio of average acquisition cost or allowed amount, which we designate as AA to WAC. The bottom solid red line charts the ratio of average acquisition cost or allowed amount to AWP. Both ratios can be interpreted as markups. As you can see, after the markup scheme was implemented in January 2002, the markup of the acquisition cost above WAC increased immediately and dramatically and remained essentially constant. The ratio acquisition cost to AWP remained essentially constant throughout also.

What does this all mean? It shows that for this particular dose and drug, one of Dr. Willig's, Bellwether's there was an immediate cost increase to all payers relative to WAC. There is no evidence of any systematic clawback of the January 2002 cost increase to mitigate that injury. Had there been such a clawback, both the AA to WAC and the AA to AWP ratios would decrease. But they do not.

Another thing to notice in this graph is that there is some variation, some slight variation, month-to-month in these ratios because these ratios reflect real data, for real transactions in the market.



These are the data that I will be using in my damage model, so my damage model will proceed drug-by-drug, taking into account any changes that occur over time in these ratios.

And by examining millions of real life transactions in the market for Dr. Willig's three other Bellwether's, we reach the same conclusion. I present these results for Plavix 75 milligrams, and for Prevacid 30 milligrams, and for Wellbutrin SR 150 milligrams.



## Figure F.1.c
## Plavix 75MG

- With each increase in AWP, the allowed amount paid at retail increases in consort
- The 5% Scheme has an immediate and marked impact
- As a percent of AWP and WAC, the allowed amount is nearly constant once Scheme was implemented



## Figure F.1.d
## Prevacid 30mg

- With each increase in AWP, the allowed amount paid at retail increases in consort
- The 5% Scheme has an immediate and marked impact
- As a percent of AWP and WAC, the allowed amount is nearly constant once Scheme was implemented



To reiterate for these drugs which the Defense admits are important markers to test real world price effects, there is simply no evidence of any systematic clawback. Instead, the mathematical evidence shows that the uniformly inflated markup of drug costs, above WAC, as a result of the scheme, endured for over two years or the entire period for which data were available. What these figures also demonstrate is that the pattern differed slightly from drug-to-drug, even though there is uniform impact and injury. My damage methodology uses drug-by-drug data and accounts for those variations and therefore provides an accurate estimate of damages and does not overstate damages.

The next thing we did to test Defense' clawback hypothesis is to look at a much broader cross section of drugs at issue in the case. We went beyond Dr. Willig's Bellwethers and examined similar, real world pricing data for the following drugs involved in the case, Allegra, Celebrex, Celexa, Neurontin, Nexium, Prilosec, Respidol, Seroquel, and Zyprexa.



Upon examining the data for these drugs over time, we reached the same conclusions as we did for the Bellwether drugs. There was an immediate inflation in the markup of the drug reimbursement paid by class members, relative to its cost or WAC. This impact endured for years following the implementation of the scheme and there was absolutely no evidence of any systematic clawback of the markup scheme.

To be sure, the data reveal some slight decreases in the AA to AWP ratios and some slight increases. But such slight variations appear to reflect drug specific competitive formulary responses rather than any response to the scheme. One example, the launch of Nexium induced greater discounts by its therapeutic competitor Prilosec. My damage methodology accounts for that therapeutic competition. I won't go over all of these graphs now, but the Court can find them at Figures F-3A through F-3Q of Attachment F to my most recent Declaration.

We also examined the data at an aggregate level and charted increases in reimbursement relative to WAC for a large basket of Appendix A drugs, i.e. those drugs subject to this litigation for which comparable data was available. We calculated average inflation for drugs that account for 87% of sales of all drugs in the case and expressed these as average increases in reimbursement relative to WAC. We did this at different snapshots in time for each drug dosage, one-half year after the scheme was implemented, one year thereafter, one and a half years thereafter, and then two years. The result of this analysis demonstrates that the inflated markup and the reimbursement paid by class members relative to the costs of the drugs to the retailers remain quite constant and equalled on average 3.8% to 4% over the two years as follows.



As the Court will notice, the increase in the markup was 3.82% in the first six months, following the implementation of the scheme and remained at approximately 3.8% for the next two periods.  By the fourth period, the inflation in the markup was nearly 4%.  What this tells us is that looking at data averaged over hundreds of third party payers, many PBMs, and millions of uninsured payers, we are seeing that the average markup for all of these drugs increased over time rather then decreased over time.  Hence, there is no evidence of any clawback on average, across all of these drugs, across all of these payers.

We then broaden the analysis even further as a sort of reasonability check and examined real world pricing data for nine brand name drugs that were not subject to the markup scheme.  Because these drugs were not subject to this scheme, we did not expect to find, nor did we find the immediate and lasting increases in the markup of acquisition costs relative to WAC.  However, we found that just like for the drugs subject to the markup scheme the measure of AA to AWP was essentially constant, demonstrating no clawback for these drugs.  The ratio for drugs in the case behaved similarly to those that were not in the case with respect to mitigation.  Neither group revealed any evidence of the Defense's clawback theory.

Here is one example, the drug Zoloft.



The Court will notice that while there is some variation in the ratios over time, there is no demonstrable increase in the markup of the AA to WAC, just as we would expect and that the ratios are fairly constant over time for both ratios, again, demonstrating no mitigation or clawback. I won't go through all of the other graphs now for the other drugs. But the Court can find them at Figures F-4A through F-4S of Attachment F to my most recent Declaration. These figures show no support for McKesson's conjecture that clawback on lawsuit drugs which we have shown did not occur, also caused clawbacks on other drugs not involved in this suit, thereby benefiting the classes.

Prior to Dr. Willig's latest Declaration of October 2007, he performed no statistical analysis using micro-data measuring the amounts paid by class members for drugs at retail. We did, as discussed above. In doing so, we used IMS data which is one of the most widely respected and widely used data sources for measuring reimbursement in pharmaceutical markets. Dr. Willig notes that the IMS data reports payments made to pharmacies by PBMs and not payments made by third party payers. Dr. Willig then asserts that the IMS data are not accurate measures of the actual acquisition costs paid by third party payers. While it is well known that IMS data summarized payments made at retail by PBMs for their client TPPs, his conclusion that IMS data are inaccurate measures of drug acquisition costs paid by TPPs, is incorrect.

The payments made by PBMs to pharmacies reflect actual costs paid by the TPPS because there is a constant relationship between what the PBMs pay the pharmacies and

what the third party payers pay the PBMs. There is no evidence that this relationship changed after the markup scheme occurred and in fact, there's ample evidence that it did not change. Our use of the IMS data is the functional equivalent of using actual third party payer claims data for many third party payers, data which were simply not available to me. For precisely this reason, IMS data are used almost universally by academics and the industry as measures of third party payer payments at retail.

Indeed Dr. Willig has provided analytic results in his most recent October 2007 Declaration comparable to and corroborative of mine, using claims data for one of the largest third party payers in the country, Cigna for his four Bellwether drugs. I present the results in the following slide.

## Inflated Mark-Up in Drug Reimbursement: Willig Results Corroborate Hartman

| Period | Lipitor 10MG | | Lipitor 20MG | | Plavix 75MG | |
|---|---|---|---|---|---|---|
| In Months | Hartman | Willig | Hartman | Willig | Hartman | Willig |
| 1-6 | 3.43 | 3.22 | 3.74 | 3.63 | 3.83 | 4.91 |
| 7-12 | 3.65 | 3.15 | 3.93 | 3.75 | 3.97 | 5.23 |
| 13-18 | 3.29 | 2.85 | 3.98 | 3.26 | 3.85 | 4.51 |
| 19-24 | 3.56 | 2.38 | 4.17 | 3.29 | 3.69 | 4.48 |

Source: Hartman, Expert Report of Raymond S. Hartman, dated September 14, 2007, Table 1, Summary of the Scheme Impact for Selected Drugs and Strengths Identified by Dr. Willig (%); Willig, Expert Declaration of Robert D. Willig, dated October 15, 2007, Table 2, Percentage Change in Price Paid/WAC After Ratio Change, Cigna.

Note the following. Dr. Willig's results demonstrate that the impact of the markup scheme was immediate and enduring for Cigna. The IMS data summarized average reimbursement patterns over hundreds of TPPs and PBMs and millions of uninsured cash payers. Dr. Willig's results summarize average reimbursement for Cigna, admittedly a large insurer, but not the only insurer. Therefore, we expect that Cigna's reimbursements will deviate from the average.

For examples, Cigna's markup of reimbursement above WAC increased more than average for Plavix, but less than average for Lipitor. In many cases, the measured inflation is quite similar. The appropriate measure for the calculation of aggregate to class wide damages is an average calculated over the broadest sample of third party payers, PBMs, and other payers, possible. And that is found in the IMS data. Because

my damage methodology takes a massive sample of actual reimbursement rates and actual inflated markups, and the changes that occur from any contract renegotiations, it accurately calculates aggregate damages over time, accounting for all such changes on a drug-by-drug basis.

These real world data demonstrate that third party payers were generally unaware of the markup and uniformly unaware of the scheme since there is no demonstrable, systematic reaction to the scheme in the contract pricing.  These real world data reinforce the utter lack of testimony evidence demonstrating that third party payers were aware of the markup or the scheme and therefore took action to eliminate its effects.  We reviewed the testimony of a cross-section of third party payers that had their depositions taken by the Defense.  The testimony of these third party payers shows the following.  First, none of them knew about the scheme.  Secondly, only one was aware of increased spreads and it did not learn of the increase from it's PBM, and finally, large, sophisticated third party payers had no better knowledge regarding the increased spreads than did the smaller, unsophisticated plans.

There must have been some contract renegotiations between third party payers and PBMs during this period but there is no testimony demonstrating that such negotiations systematically clawed-back the inflation resulting from the scheme.  And there is no evidence that any renegotiations were conducted with the knowledge by the relevant TPPs, that the AWPs and the related acquisition costs on the Appendix A drugs had been increased relative to WAC.

I would like to make a brief comment on how my approach differs from Dr. Willig's May 2007 approach and why Dr. Willig's econometric methodology and conclusions are incorrect.

At the outset, there is a problem with the data that Dr. Willig used.  Instead of using real claims or transactions data, as we did in our analysis, Dr. Willig uses aggregate indices that he created.  These indices are simply not as accurate as transactions data.  And as a result, Dr. Willig's approach is subject to what is known as "measurement error," which leads to biased and inconsistent that is, wrong parameter estimates.

Dr. Willig confounds his data problem with a problem of analytic design.  Specifically, because Dr. Willig observes that AWP and discounts off AWP increased simultaneously over time, he specifies a model that assumes that the increases in AWP caused the increases in the rate of discounts.  An economist, an econometrician cannot make such an assumption.  It must be tested empirically.  By assuming such a conclusion without statistically testing for it, Dr. Willig has fallen victim to what we call a "simultaneity error," a basic error in econometric analysis.

A classic formulation of the simultaneity error that I often gave my undergraduate econometric students, relates to the worldwide influenza epidemic that occurred in the wake of World War I.  Doctors in Russia were sent to help rural villages to combat the disease.  Unfortunately, the villagers associated the onset of the disease with the doctors'

arrival. And they blamed the doctors for causing it. Their policy conclusion, kill the doctors. Relating this example to the case at hand, while AWP and discounts off of AWP occur simultaneously and are positively correlated, just as the incidents of the flu, was positively correlated with the presence of doctors in rural Russia, one cannot conclude as Dr. Willig has improperly done in his analytic methodology, that an increase in AWP causes an increase in the discounts off AWP.

Other variables affecting price must be considered, such as supply factors determining the availability of all therapeutically competitive drugs, demand factors such as the prescribing patterns of doctors, distribution of illnesses in the population, and actions of managed care organizations, and the pattern of PBM formulary designs, the structure, conduct and performance of distribution entities like PBMs, and the conduct of regulatory authorities. In his aggregate statistical analysis, Dr. Willig ignores all of these factors. We don't. They are reflected in the actual reimbursement data that we analyze and include in our models. You can't just look at an aggregate index of all AWPs and an aggregate measure of discounts off AWP, as Dr. Willig has done. We must consider actual prices paid for a large random sample of prescriptions in the marketplace and compare that to AWP and to WAC. That is what we have done with our calculations in comparison of AA to AWP and AA to WAC ratios over millions of prescriptions.

Let me summarize my evidentiary-based conclusions thus far. After the markup scheme was implemented, reimbursement amounts paid by all class members increased immediately. The class members were overcharged for almost all drugs subject to this scheme. Absent the scheme, the reimbursement rates paid by the class members would have been less. This immediate increase in the markup remains for the several years following the implementation of the scheme for which we were able to obtain data. There is no evidence of a systematic clawback through increases in the discounts off AWP and/or decreased dispensing fees. Certainly, there were contract renegotiations between TPPs and PBMs during this period. But there is no, I repeat no evidence that such negotiations systematically clawed-back the inflation resulting from the scheme.

Indeed, there is no evidence that the regular periodic renegotiations were conducted with the knowledge by the relevant TPPs, that the AWPs and the related acquisition costs on the Appendix A drugs had been increased relative to WAC. Since my damage analysis uses actual data on drug reimbursement for a large sample of payers, it reflects whatever changes there were in the determinants of reimbursement. If there was some mitigation for some drugs, for some periods, my damage calculation accounts for that mitigation. If there were some changes in reimbursement due to competitive factors, my damage calculations account for those competitive factors. Therefore, my damage calculation does not overstate damages.

Dr. Willig has consistently mischaracterized my damage analysis stating that I assume a constant markup inflation over three and a half years. I do not. I allow the IMS data to inform me of changes in the markup inflation over time. Indeed, in the data analysis presented above we observed some differences in the effect of the markup scheme by drug. My use of actual claims data to calculate damages for each and every drug

explicitly incorporates increases and/or decreases in the markup induced by these factors. To the extent that there was any non-systematic, drug specific mitigation, my use of actual reimbursement data adjusts the damages downward to reflect that drug specific mitigation. As a result, my damage methodology does not overstate aggregate damages.

Finally, and in conclusion, the real world pricing evidence demonstrates that McKesson's clawback theory of defense is simply wrong.

Thank you, your Honor.


*[End of Audio]*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 29, 2007.

/s/ Steve W. Berman
Steve W. Berman



FIGURE E.2
SOURCES OF NET REVENUES FOR EXPRESS SCRIPTS, INC. (ESI)

Express Scripts Revenue Sources (2005)

Home Delivery
(Mail-Order)
35%

Service
1%

Network
64%

Source:

Express Scripts 2005 Annual Report, p. 43.

SLIDE 1

# Hartman Demonstrative Slide 2

# [FILED UNDER SEAL]

# ESI Annual Report 2006

## (at page 21)

"In the absence of any mitigating action on our part, the proposed reduction in FDB's AWP would have a material adverse effect on the margin we earn on home delivery transactions. It may also create disruption in our retail networks due to the adverse impact on AWP-based retail pharmacy pricing. However, most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse effect of this proposed reduction in FDB's reported AWP."

SLIDE 3

# FIGURE E.1

## SOURCES OF NET REVENUES FOR MEDCO HEALTH SOLUTIONS



**Medco - Revenue Sources (2005)**

- Retail Product
- Mail Order
- Client/Other Services
- Manufacturer Services

37.0%
0.5%
0.6%
61.9%

**Source:**

Medco Health Solutions Inc., 2005 Annual Report, p. 22

SLIDE 4



Figure 1.a
Average Retail Reimbursement Discount off AWP
for Brand Drugs (1995-2004)

y = 0.0033x + .1169
R² = 0.9829

SLIDE 5



Figure 1.b
Average Retail Dispensing Fee for Brand Drugs
(1995-2004)

$y = -0.0561x + 2.5113$
$R^2 = 0.9357$

SLIDE 6

# Figure F.1.a

## Lipitor 10MG

- With each increase in AWP, the allowed amount paid at retail increases in consort

- The 5% Scheme has an immediate and marked impact

- As a percent of AWP and WAC, the allowed amount is nearly constant thereafter





Case 1:05-cv-11148-PBS    Document 348-2    Filed 10/29/2007    Page 8 of 18



IMS Allowed Amount (AA) at Retail versus AWP and WAC

SLIDE 8



IMS Allowed Amount (AA) at Retail As Percent of AWP and WAC

SLIDE 9

# Figure F.1.c
# Plavix 75MG

- With each increase in AWP, the allowed amount paid at retail increases in consort

- The 5% Scheme has an immediate and marked impact

- As a percent of AWP and WAC, the allowed amount is nearly constant once Scheme was implemented





# Figure F.1.d
## Prevacid 30mg

- With each increase in AWP, the allowed amount paid at retail increases in consort

- The 5% Scheme has an immediate and marked impact

- As a percent of AWP and WAC, the allowed amount is nearly constant once Scheme was implemented





# Figure F.1.e
## Wellbutrin SR
## 150MG

- With each increase in AWP, the allowed amount paid at retail increases in consort

- The 5% Scheme has an immediate and marked impact

- As a percent of AWP and WAC, the allowed amount is nearly constant once Scheme was implemented





A Broader Test:

| | | |
|---|---|---|
| Allegra | Celebrex | Celexa |
| Neurontin | Nexium | Prilosec |
| Risperdal | Seroquel | Zyprexa |

SLIDE 13

# The Inflated Mark-Up in the Reimbursement Relative to Drug Costs Remained Constant

| Time from Implementation of the 5% Scheme | Increase in reimbursement relative to WAC |
|---|---|
| 1-6 months | 3.82% |
| 7-12 months | 3.78% |
| 13-18 months | 3.83% |
| 19-24 months | 3.99% |

SLIDE 14

## Figure F.4.s
# Zoloft 100MG

■ Non-Appendix A drugs reveal no evidence of systematic reductions in the ratio of cost to AWP or to WAC

■ There is no evidence of "claw-backs" or mitigation for these drugs





# Inflated Mark-Up in Drug Reimbursement: Willig Results Corroborate Hartman

| Period in Months | Lipitor 10MG | | Lipitor 20MG | | Plavix 75MG | |
|---|---|---|---|---|---|---|
| | Hartman | Willig | Hartman | Willig | Hartman | Willig |
| 1-6 | 3.43 | 3.22 | 3.74 | 3.63 | 3.83 | 4.91 |
| 7-12 | 3.65 | 3.15 | 3.93 | 3.75 | 3.97 | 5.23 |
| 13-18 | 3.29 | 2.85 | 3.98 | 3.26 | 3.85 | 4.51 |
| 19-24 | 3.56 | 2.38 | 4.17 | 3.29 | 3.69 | 4.48 |

Source: Hartman, Expert Report of Raymond S. Hartman, dated September 14, 2007, Table 1; Summary of the Scheme Impact for Selected Drugs and Strengths Identified by Dr. Willig ¶ 9; Willig, Expert Declaration of Robert D. Willig, dated October 18, 2007, Table 2, Percentage Change in Price Paid: WAC After Rate Change, C-5-20.

SLIDE 16