UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS |

**TUTORIAL PRESENTATION AND DEMONSTRATIVES
OF DR. KIMBERLY MCDONOUGH**

Good afternoon, Your Honor.  My name is Kimberly McDonough.  I am the president of Advanced Pharmacy Concepts, a pharmacy consulting firm that works with self-insured employers, government agencies and managed care organizations to help them get the most out of their pharmacy programs.

 I started APC after having a full career in pharmacy.  I obtained a doctor of pharmacy degree from Purdue University School of Pharmacy, and I'm currently licensed as a registered pharmacist in the states of Michigan and Rhode Island.  Prior to founding APC in 1997, I worked as director of pharmacy and vice president of clinical services for a regional hospital pharmacy service corporation.  I was a pharmacist for Harbor Community Health Plan, and I served as the direct of clinical operations and director of product development for MIM Health Plans, a national pharmacy benefit management company.

I've served on various committees of the American Pharmaceutical Association, the Academy of Managed Care Pharmacy, the State of Rhode Island's Drug-Use Review Board and other professional organizations.  I served as a subject-matter expert to CMS regarding pharmaceutical benefit practices during the planning and implementation of the Medicare Part D program.  I recently authored a chapter on PBMs in the *Handbook of Pharmaceutical Policy*, a textbook for use in schools of pharmacy.

During the past ten years, APC has provided services to over 200 employers, health plans and government agencies regarding the administration of their pharmacy benefits.  Our list of clients includes managed care organizations, Blue Cross plans, Fortune 1,000 companies and other PBM consultants.

In providing services to our clients, I have become intimately familiar with the PBM industry and its participants.  Specifically, I have directly participated in and supervised the following activities for our clients: measuring PBM compliance with contract terms, projecting pharmacy benefit costs, negotiating on behalf of our clients during PBM contract negotiations; including: evaluating pharmacy network discount rates, rebate sharing provisions and administrative fees, and advising clients about pharmaceutical pricing terms including: AWP, WAC, ASP and AMP.

In the course of negotiating contracts or evaluating pharmacy benefits for my clients, I have reviewed over 100 contracts between PBMs and third-party payers.  Specifically, I have reviewed contracts from each of the three major PBMs.

In addition to doing these types of tasks, I routinely rely on the pricing files of First DataBank, MediSpan and Red Book.  APC subscribes to electronic versions of First DataBank and MediSpan pricing files.  When we audit PBMs for our clients, we compare the AWP prices in the pharmacy claim databases provided by the PBMs against First DataBank and MediSpan files for consistency and accuracy.  My staff also periodically compares the prices between those two databases for consistency.

I was retained by plaintiffs to explain the use of AWP and how this affects pharmacy costs of third-party payers, to describe the nature of the relationship between third-party payers and PBMs and to address some of the claims made by McKesson's expert, Dr. Willig. I view my role today to explain to the court the effects of the defendant's changes in AWP pricing methodology to organizations like my clients. I am not an economist, but I can tell you from my personal experience what my clients faced when they saw their drug costs dramatically increase in 2002.

It is my understanding, from speaking with plaintiffs' counsel, that this court does not require much education on AWP or the fact that AWP is the standard used by third-party payers for the payment of claims for brand-name pharmaceuticals. It, likewise, probably does not surprise the court that all major PBMs, including Medco, Caremark and Express Scripts use the AWPs published either by First DataBank or MediSpan for the pricing of their pharmacy claims. Red Book is not widely used by the PBM industry.

In addition, because these AWP file formats are a structural component of the claim processing systems used by each PBM, once a PBM selects a given source for AWP, it does not usually change that source because it would be difficult and time-consuming to do so.

Further, immediately prior to what I understand to be the class period in this case, the AWPs from First DataBank and MediSpan were substantially identical because those two companies merged in 1998. First DataBank subsequently sold MediSpan to Wolters Kluwer in January 2002. I personally spoke to representatives of First DataBank and MediSpan in late 2002, and they told me that First DataBank was conducting the pricing activities of both companies.

Given that AWP is the standard for payments in pharmacy benefit programs, when AWP increases, drug costs incurred by third-party payers also increase. That equation is as simple as it sounds and it is supported by my experiences in counseling my clients when they began to discover the degree to which AWP price increases drove inflation in their pharmacy benefit programs.

Although I know of no one who attributed the sudden increase in drug costs to collusion between First DataBank and McKesson, my clients learned that AWP price increases were higher than normal in 2002 and 2003. For example, both Medco and Express Scripts published drug trend benefit reports, and they provide them to their clients. In their 2003 and 2004 reports, issued after the change in AWP pricing methodology began, Medco, Express Scripts and Caremark all reported a higher-than-normal increase in AWP inflation of drug costs.

Lets look at what my clients and other third-party payers who had Medco as their PBM saw in 2003.



Figure 3. Changes in trend drivers over the last year
Source: Medco Health data

Much of the increase in unit costs can be attributed to inflationary increases in unit prices charged by pharmaceutical manufacturers. Based on average wholesale price (AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

Medco explained that based on average wholesale price, drug price inflation increased by 33 percent from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

It's important to note that what this chart is showing is increases in drug costs on a PEPM basis. PEPM stands for per employee per month. These figures are not divided by drug or NDC, nor do they compare WACs and AWPs. All my clients knew was that their drug costs were increasing and that price inflation was the predominant factor attributing to this increase. One year later, in 2004, this is what clients who had Express Scripts as their PBM saw.

Exhibit 9

**Components of Unmanaged PMPY Cost Trend 1998 to 2003\***

|  | 1998 v 1999 | 1999 v 2000 | 2000 v 2001 | 2001 v 2002 | 2002 v 2003 | 2002 v 2003 (EXCLUDING SPECIALTY) |
|---|---|---|---|---|---|---|
| Inflation | 5.4% | 5.4% | 5.6% | 7.5% | 6.9% | 6.6% |
| x Units per Rx | 0.2% | 1.0% | 0 | -0.1% | -0.1% | 0.3% |
| x Brand/Generic Mix |  |  | -1.4% | -2.3% | -2.5% | -2.6% |
| x Therapeutic Mix | 3.1% | 5.1% | 4.4% | 5.3% | 3.2% | 2.6% |
| x Utilization | 6.2% | 3.7% | 6.3% | 6.3% | 6.8% | 6.8% |
| = Common Drugs | 15.6% | 15.9% | 15.6% | 17.5% | 14.8% | 14.0% |
| + New Drugs | 1.8% | 0.3% | 1.0% | 1.0% | 0.7% | 0.5% |
| = All Drug | 17.4% | 16.2% | 16.7% | 18.5% | 15.5% | 14.5% |

\* The percentage contribution of each factor does not total to the All Drug percentage increase. The calculation takes the base cost for a given year and multiplies it by one times the percentage contributed by the first factor (inflation). The resulting total is then multiplied by the percentage contributed by the second factor (number of units dispensed) and so on for each Common Drug factor. The percentage contribution of the New Drugs is then added to the total Common Drug percentage to yield an All Drug percentage increase. The final results may differ due to rounding.

That same year, in 2004, my clients who had Caremark as their PBM were told that manufacturer price increases had caused the 2002 bump. As you can see, Caremark explained that AWP inflation was the predominant factor affecting drug price increases in 2002.



Figure 1

But even though Caremark knew that AWP increases in 2002 were abnormally high, it never attributed those increases to fraud. Even though my clients could not tell what was causing the price increases, and even though their PBMs didn't tell them, they felt that – they felt the affects of the price increases. As this Medco drug trend benefit report for 2006 shows, 2001 and 2002 were watershed years for so-called price increases in prescription drugs.

I understand the court has been particularly interested in whether and to what degree third-party payers were able to get back the increased drug costs as caused by this scheme. As an initial matter, not a single one of my clients got any kind of reimbursement or back payment from any PBM to compensate them for the increased drug costs incurred in 2002 or 2003 as a result of the AWP price increases. Therefore, we have to look at whether third-party payers, like my clients, could have negotiated in order to get these costs back.

It is my expert opinion that third-party payers were not able to do this. Here is why. Dr. Willig's theory assumes that third-party payers knew that AWP price increases were effected through a scheme between First DataBank and McKesson. I personally, as an expert in this field, did not learn of this scheme until I heard about the filing in this case in the summer of 2006. Indeed, to the best of my knowledge, none of APC's clients

knew about the scheme before that time either. While they did notice the increases in their drug costs, generally, even those increases weren't noticed until late 2002. In fact, that's when my company noticed the changes.

When APC noticed the changes in AWP drug costs in the absence of a similar change in WAC drug costs, we contacted representatives from First DataBank. These individuals told us that AWP prices were determined through a proprietary survey of national wholesalers. They said that the increase in the AWP to WAC ratio was made by wholesalers in response to recent investigations by the Department of Justice. First DataBank claimed that during these investigations, the Department of Justice had inquired why some manufacturer WAC prices were increased by 20 percent, while others were increased by 25 percent.

First DataBank further indicated that wholesalers had increased the markets to 25 percent to achieve consistency in the marketplace. They also said that price increases for the blockbuster drugs, Lipitor and Neurontin, occurred as a result of the takeover of Parke-Davis, a 20 percent company, by Pfizer, a 25 percent company.

Dr. Willig assumes that PBMs always act solely in the best interest of their third-party payer clients. While it is true that third-party payers often rely on PBMs to negotiate contracts with their retail pharmacies on their behalf, in reality, because PBMs use pharmacy payment margins, or spread, or as a source of income, they're not necessarily motivated to modify client contracts to compensate for the AWP price changes that resulted from an increase in the AWP to WAC ratio. In addition, all major PBMs own mail-order facilities that are compensated by third-party payers based on AWP. These facilities are major sources of revenue for PBMs and are significantly more profitable than the PBMs claim processing related services.

In its 2003 annual report, Medco indicates that 15 percent of the prescriptions processed by Medco originated from its mail-order facilities, accounting for $11.3 billion in revenue for that year alone.

## RESULTS OF OPERATIONS

The following table presents selected comparative results of operations and volume performance:

| FOR FISCAL YEARS ENDED ($ in millions) | DECEMBER 27, 2003 | INCREASE (DECREASE) | | DECEMBER 28, 2002 | INCREASE (DECREASE) | | DECEMBER 29, 2001 |
|---|---|---|---|---|---|---|---|
| **Net Revenues** | | | | | | | |
| Retail product[1] | $22,661.1 | $ 600.2 | 2.7% | $22,060.9 | $2,200.5 | 11.1% | $19,860.4 |
| Mail order product | 11,252.0 | 739.9 | 7.0% | 10,512.1 | 1,663.2 | 18.8% | 8,848.9 |
| Total product[1] | 33,913.1 | 1,340.1 | 4.1% | 32,573.0 | 3,863.7 | 13.5% | 28,709.3 |
| Service | 351.4 | (34.1) | (8.8%) | 385.5 | 24.2 | 6.7% | 361.3 |
| Total net revenues[1] | $34,264.5 | $1,306.0 | 4.0% | $32,958.5 | $3,887.9 | 13.4% | $29,070.6 |
| **Cost of Net Revenues** | | | | | | | |
| Product[1] | $32,552.7 | $1,068.8 | 3.4% | $31,483.9 | $3,882.8 | 14.1% | $27,601.1 |
| Service | 189.7 | 15.9 | 9.1% | 173.8 | (11.8) | (6.4%) | 185.6 |
| Total cost of net revenues[1] | $32,742.4 | $1,084.7 | 3.4% | $31,657.7 | $3,871.0 | 13.9% | $27,786.7 |
| **Gross Margin[2]** | | | | | | | |
| Product | $ 1,360.4 | $ 271.3 | 24.9% | $ 1,089.1 | $ (19.1) | (1.7%) | $ 1,108.2 |
| Product gross margin percentage | 4.0% | 0.7% | | 3.3% | (0.6%) | | 3.9% |
| Service | $ 161.7 | $ (50.0) | (23.6%) | $ 211.7 | $ 36.0 | 20.5% | $ 175.7 |
| Service gross margin percentage | 46.0% | (8.9%) | | 54.9% | 6.3% | | 48.6% |
| Total gross margin | $ 1,522.1 | $ 221.3 | 17.0% | $ 1,300.8 | $ 16.9 | 1.3% | $ 1,283.9 |
| Gross margin percentage | 4.4% | 0.5% | | 3.9% | (0.5%) | | 4.4% |
| **Volume Information** | | | | | | | |
| Retail | 453.9 | (12.6) | (2.7%) | 466.5 | 4.0 | 0.9% | 462.5 |
| Mail order | 78.1 | (3.6) | (4.4%) | 81.7 | 7.0 | 9.4% | 74.7 |
| Total volume | 532.0 | (16.2) | (3.0%) | 548.2 | 11.0 | 2.0% | 537.2 |
| Generic dispensing rates | 43.8% | 3.3% | | 40.5% | 2.0% | | 38.5% |

(annotation: **15%** pointing to mail order volume 78.1)

(1) Includes retail co-payments of $6,850 million for 2003, $6,457 million for 2002 and $5,537 million for 2001.
(2) Defined as net revenues minus cost of net revenues.

Express Scripts, likewise, filled over 39.1 million prescriptions through its mail-order pharmacy in 2004, almost 10 percent of its processed prescriptions.

**Financial Highlights**

| (In thousands, except per share data) | 2004 | 2003 | % Change |
|---|---|---|---|
| **Statement of Operations** | | | |
| Revenues | $ 15,114,728 | $ 13,294,517 | 14% |
| Income before income tax | 450,643 (1) | 405,302 (2) | 11% |
| Net income | 278,207 (1) | 249,600 (2) | 11% |
| **Per Diluted Share Data** | | | |
| Net income | 3.59 (1) | 3.16 (2) | 14% |
| **Average Diluted Shares Outstanding** | 77,516 | 78,928 | -2% |
| **Balance Sheet Data:** | | | |
| Cash | $ 166,054 | $ 396,040 | -58% |
| Working capital | (348,338) | (66,273) | -426% |
| Total assets | 3,600,086 | 3,409,174 | 6% |
| Total debt, including current maturities | 434,113 | 455,018 | -5% |
| Stockholders' equity | 1,196,314 | 1,193,993 | -% |
| **Net Cash Provided by Operating Activities** | 496,230 | 457,924 | 8% |
| **Selected Data:** | | | |
| Network pharmacy claims processed | 398,756 | 378,927 | 5% |
| Home delivery pharmacy prescriptions filled | 39,080  *10%* | 32,337 | 21% |

(1) Includes net charges of $35.4 million ($21.9 million net of tax), or $0.28 per diluted share, for early retirement of debt in the first half of the year, legal defense costs in the third quarter, and a contract termination payment received in the first quarter.

(2) Includes charges of $4.9 million ($3.0 million net of tax), or $0.04 per diluted share, for early retirement of debt.

These numbers are necessarily greater for the brand-name drugs at issue in this case because PBM-owned mail-order pharmacies dispense a higher percentage of brand prescriptions when compared to retail pharmacies.

According to an August 2005 Federal Trade Commission report that investigated prescriptions dispensed in 2003, 56 percent of prescriptions dispensed by retail pharmacies were for brand-name drugs, while 61 percent of prescriptions dispensed by mail-order pharmacies were for brand-name drugs.

Indeed, executives from the PBM industry told me that they recognize that the change in AWP to WAC ratio was beneficial to their organization.  During a conversation about the AWP changes in early 2003, a vice president from Advance PCS commented to me that the change in ratio was very beneficial to his organization.  In fact, he indicated that the company identified an increase in their mail pharmacy profit margin, learning later that the added profit was attributed to changes in the AWP to WAC ratio.

I've reviewed Dr. Willig's report where he says that third-party payers would have reacted to the effects of AWP to WAC pricing changes by negotiating greater discounts off AWP.  This theory ignores the reality of PBM contracting and my own experiences and observations.  Of all of the PBM contracts I have reviewed, the vast majority of them are for a term of three years.  In addition, these contracts often have automatic renewal provisions so they may not really be renegotiated every contract term, as Dr. Willig suggests.  Although a contract might be renewed during the contract term, in my experience this is rare.

It's also important to understand the amount time necessary for a third-party payer to renegotiate or change PBMs. To change PBMs and often to renegotiate a PBM contract, a third-party payer will issue a written request for proposal and encourage several PBMs to make proposals. It commonly takes four to six months to draft and issue an RFP, evaluate the responses and choose the best candidate among the responding PBMs. It would then take several more months for a third-party payer to convert to the new PBM. Thus, a third-party payer that desired better contract rates would still need a year to search for, locate, negotiate with and change over to a new PBM.

PBMs want the contracts to be longer for their own financial stability and to offset implementation costs. Thus, the vast majority of PBM contracts do not permit termination prior to the expiration of these contracts unless one party breaches the contract. There are often significant financial penalties for early termination. In my 11 years of experience as a consultant, I have only seen one PBM contract that was terminated prior to its full term.

It's not just that third-party payers could not, theoretically, have renegotiated their reimbursement rates to compensate for the AWP price increases during 2002. As a matter of fact, they did not. The prescription drug benefit cost and design survey reported brand reimbursement levels for the ten-year period from 1995 through 2006. This report showed that the rate of change in AWP discounts, achieved by third-party payers, was modest and was consistent over time.



If third-party payers had really been able to renegotiate greater percentages off of AWP, this charge would show a dramatic drop sometime after 2002. Such a drop just isn't there.

This fact is confirmed by my own experiences. A large part of my business is helping TPPs issue and manage the RFPs and negotiate contracts with PBMs. I saw no increase

in the number of third-party payers wanting to renegotiate or change PBMs during 2002 or 2003. Indeed, as a practical matter, most third-party payers were working on HIPAA compliance at that time, and they had decreased resources for other pharmacy initiatives.

I have also read Dr. Willig's report where he says that increases in AWPs would have had no effects on third-party payers with pass-through contracts. Pass-through contracts are contracts where the rate paid to the pharmacy is passed through to the third-party payer at the actual cost. In my experience with my clients, very few PBMs were willing to enter into this type of arrangement during the time that the change in AWP to WAC pricing occurred.

Among my clients, only one group successfully negotiated and operated under a pass-through contract during this time period. Indeed, since 2002, Express Scripts has language in its contracts specifically acknowledging that it will keep the spread between pharmacy and third-party reimbursement.

In his report, Dr. Willig uses the 2001 contract negotiations between Medco and the Public Employment Retirement System of Ohio (PERS). He suggests that PERS obtained greater pass-through rebates after the scheme. My company served as the consultant to PERS during those negotiations. I know from my experience that the changes to the rebate part of the agreement predated changes in the AWP pricing methodology and were, instead, due to competitive negotiation during the RFP process based on the result of audit findings. The PERS negotiation do not support Dr. Willig's theory that third-party payers recoup their losses by getting a larger share of the manufacturer rebates.

Finally, I have read the part of Dr. Willig's report that says that third-party payers could have negotiated for greater manufacturer rebates to offset the effects of the scheme. This theoretical suggestion is also contradicted by actual real-world experience. First, Dr. Willig ignores that most third-party payers don't negotiate rebates, but they rely on their PBM to negotiate manufacturer rebate contracts on behalf of the third-party payers. These rebate contracts are proprietary to the PBM and the terms are not known to the third-party payer.

In addition, rebates are earned by virtue of a product's placement on the PBM or the third-party payer's formulary. Therefore, rebates can only be earned on drugs placed on formulary. Most importantly, rebates are typically paid based on WAC, not AWP. The reason for this is quite simple. Manufacturers want to pay rebates based on their list prices rather than on inflated AWPs.

Under the provisions of the Omnibus Reconciliation Act of 1990, which is known as OBRA '90, manufacturers must report to CMS the value of their rebates and other price concessions given to the private sector. If manufacturers provide rebates to a third-party payer or a PBM that exceed the federally mandated Medicaid rebate, the manufacturer must extend these same higher rebates to Medicaid under the best-price provisions of

OBRA '90. As a practical matter, few manufacturers are willing to supply rebates that exceed the mandated Medicaid rebate.

Finally, Dr. Willig ignores that this proposed clawback doesn't work as a matter of math. In general, rebates offer reductions equal to 2 to 8 percent of the total drug cost. Even if third-party payers had immediately renegotiated their agreements to get a greater amount of rebates, itself unlikely and something I have not observed. That amount would never have given third-party payers for recoupment from the effects of the AWP price increases.

Your Honor, I hope that you found it helpful to hear about what was happening in the real world, or my real world, at least, as a result of McKesson's conduct. Until the filing of this litigation, I was unaware of the potential collusion between First DataBank and McKesson related to the changes in AWP pricing methodology. My clients, likewise, didn't know.

In all the work that I have done with my third-party payer clients, I have seen nothing to indicate that third-party payers got anything back to compensate them for their increased drug costs during that period. Certainly, no PBM has ever approached my client and offered to give them anything back. The effect of the change in AWP to WAC ratio resulted in measurable and sustained added costs to my clients.

*[End of Audio]*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 29, 2007.

/s/ Steve W. Berman
Steve W. Berman



Figure 3. Changes in trend drivers over the last year
Source: Medco Health data

Much of the increase in unit costs can be attributed to inflationary increases in unit prices charged by pharmaceutical manufacturers. Based on average wholesale price (AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

SLIDE 1

*Exhibit 9*

**Components of Unmanaged PMPY Cost Trend 1998 to 2003***

| | 1998v1999 | 1999v2000 | 2000v2001 | 2001v2002 | 2002v2003 | 2002v2003 (EXCLUDING SPECIALTY) |
|---|---|---|---|---|---|---|
| Inflation | 5.4% | 5.4% | 5.6% | 7.5% | 6.9% | 6.6% |
| x Units per Rx | 0.2% | 1.0% | 0 | -0.1% | -0.1% | 0.3% |
| x Brand/Generic Mix | | | -1.4% | -2.3% | -2.5% | -2.6% |
| x Therapeutic Mix | 3.1% | 5.1% | 4.4% | 5.3% | 3.2% | 2.6% |
| x Utilization | 6.2% | 3.7% | 6.3% | 6.3% | 6.8% | 6.8% |
| = Common Drugs | 15.6% | 15.9% | 15.6% | 17.5% | 14.8% | 14.0% |
| + New Drugs | 1.8% | 0.3% | 1.0% | 1.0% | 0.7% | 0.5% |
| = All Drug | 17.4% | 16.2% | 16.7% | 18.5% | 15.5% | 14.5% |

* The percentage contribution of each factor does not total to the All Drug percentage increase. The calculation takes the base cost for a given year and multiplies it by one times the percentage contributed by the first factor (inflation). The resulting total is then multiplied by the percentage contributed by the second factor (number of units dispensed) and so on for each Common Drug factor. The percentage contribution of the New Drugs is then added to the total Common Drug percentage to yield an All Drug percentage increase. The final results may differ due to rounding.

SLIDE 2

# 2003 Gross Trend: 9.3%

Trend management for our clients is our primary goal at Caremark. For 2003, clients responded to our recommendations for aggressive management measures, and they—and we—ended the year with one of the lowest trend numbers in the industry.

Our **single-digit trend in 2003** reflects a number of factors.

- Most importantly, **growth in utilization**, at 1.6%, was minimal compared to the 2002 number, 5.3%
- The introduction and utilization of **generics and OTC versions** of brand blockbusters helped to slow trend.
- **Price increases**, the dominant driver in 2002, reverted to more normal levels, although they are still higher than inflation in the US.
- Anticipated **blockbuster drug introductions** didn't meet expectations, reducing the impact of new brand drugs.
- **Biotech trend** continued to grow; management measures helped to hold spend in this category for Caremark clients.
- **Plan sponsors** made significant changes in plan design, increasing the use of both mail service and generics, successfully driving **behavior shifts** in their overall participant populations.

> At 9.3%, pharmacy benefit trend in the Caremark Book of Business for 2003 is among the lowest reported in the industry.



figure 1

9.3% Trend
← 3.5% Price
  - Inflation
    • Price Increases
    • Delivery Systems
    • New Generics
  - New Drugs Drug Mix
    • Brand    • Generics
    • Biotechs • Brands
              • Biotechs
← 4.2% Product
← 1.6% Utilization
  • Participants
  • Prescribers
  • Plan Sponsors
  • Politics

## RESULTS OF OPERATIONS

The following table presents selected comparative results of operations and volume performance:

| ($ in millions) | For fiscal years ended December 27, 2003 | December 28, 2002 | Increase (Decrease) | % Increase (Decrease) | December 29, 2001 |
|---|---|---|---|---|---|
| **Net Revenues** | | | | | |
| Retail product(1) | $22,661.1 | $ 600.2 | 2.7% | $22,060.9 | $ 2,200.5 | 11.1% | $19,860.4 |
| Mail order product | 11,252.0 | 739.9 | 7.0% | 10,512.1 | 1,663.2 | 18.8% | 8,848.9 |
| Total product(1) | 33,913.1 | 1,340.1 | 4.1% | 32,573.0 | 3,863.7 | 13.5% | 28,709.3 |
| Service | 351.4 | (34.1) | (8.8%) | 385.5 | 24.2 | 6.7% | 361.3 |
| Total net revenues(1) | $34,264.5 | $1,306.0 | 4.0% | $32,958.5 | $3,887.9 | 13.4% | $29,070.6 |
| **Cost of Net Revenues** | | | | | | | |
| Product(1) | $32,552.7 | $1,068.8 | 3.4% | $31,483.9 | $3,882.8 | 14.1% | $27,601.1 |
| Service | 189.7 | 15.9 | 9.1% | 173.8 | (11.8) | (6.4%) | 185.6 |
| Total cost of net revenues(1) | $32,742.4 | $1,084.7 | 3.4% | $31,657.7 | $3,871.0 | 13.9% | $27,786.7 |
| **Gross Margin(2)** | | | | | | | |
| Product | $ 1,360.4 | $ 271.3 | 24.9% | $ 1,089.1 | $ (19.1) | (1.7%) | $ 1,108.2 |
| Product gross margin percentage | 4.0% | 0.7% | | 3.3% | (0.6%) | | 3.9% |
| Service | 161.7 | (50.0) | (23.6%) | 211.7 | 36.0 | 20.5% | 175.7 |
| Service gross margin percentage | 46.0% | (8.9%) | | 54.9% | 6.3% | | 48.6% |
| Total gross margin | $ 1,522.1 | $ 221.3 | 17.0% | $ 1,300.8 | $ 16.9 | 1.3% | $ 1,283.9 |
| Gross margin percentage | 4.4% | 0.5% | | 3.9% | (0.5%) | | 4.4% |
| **Volume Information** | | | | | | | |
| Retail | 453.9 | (12.6) | (2.7%) | 466.5 | 4.0 | 0.9% | 462.5 |
| Mail order | 78.1 | (3.6) | (4.4%) | 81.7 | 7.0 | 9.4% | 74.7 |
| Total volume | 532.0 | (16.2) | (3.0%) | 548.2 | 11.0 | 2.0% | 537.2 |
| Generic dispensing rates | 43.8% | 3.3% | | 40.5% | 2.0% | | 38.5% |

*Mail order product* row highlighted, with **15%** annotation pointing to 78.1.

(1) Includes retail co-payments of $6,850 million for 2003, $6,457 million for 2002 and $5,537 million for 2001.
(2) Defined as net revenues minus cost of net revenues.

SLIDE 4

# Financial Highlights

*(In thousands, except per share data)*

| | 2004 | 2003 | % Change |
|---|---|---|---|
| **Statement of Operations** | | | |
| Revenues | $ 15,114,728 | $ 13,294,517 | 14% |
| Income before income tax | 450,643 (1) | 405,302 (2) | 11% |
| Net income | 278,207 (1) | 249,600 (2) | 11% |
| **Per Diluted Share Data** | | | |
| Net income | 3.59 (1) | 3.16 (2) | 14% |
| **Average Diluted Shares Outstanding** | 77,516 | 78,928 | -2% |
| **Balance Sheet Data** | | | |
| Cash | $ 166,054 | $ 396,040 | -58% |
| Working capital | (348,338) | (66,273) | -426% |
| Total assets | 3,600,086 | 3,409,174 | 6% |
| Total debt, including current maturities | 434,113 | 455,018 | -5% |
| Stockholders' equity | 1,196,314 | 1,193,993 | -% |
| **Net Cash Provided by Operating Activities** | 496,230 | 457,924 | 8% |
| **Selected Data:** | | | |
| Network pharmacy claims processed | 398,756 | 378,927 | 5% |
| Home delivery pharmacy prescriptions filled | 39,080 | 32,337 | 21% |

← 10%

(1) Includes net charges of $35.4 million ($21.9 million net of tax), or $0.28 per diluted share, for early retirement of debt in the first half of the year, legal defense costs in the third quarter, and a contract termination payment received in the first quarter.

(2) Includes charges of $4.9 million ($3.0 million net of tax), or $0.04 per diluted share, for early retirement of debt.

SLIDE 5

