UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN, JUNE SWAN, MAUREEN COWIE and BERNARD GORTER,<br><br>           Plaintiffs,<br><br>      v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>           Defendants. | Civil Action: 1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**MCKESSON'S RESPONSE TO PLAINTIFFS' PROFFER OF EVIDENCE IN SUPPORT OF DR. HARTMAN'S DAMAGES MODEL**

**[REDACTED VERSION]**

## TABLE OF CONTENTS

Page

INTRODUCTION ..........................................................................................................1

    A.    The Collusive 5% Scheme Alleged in the Complaint Is Far-Fetched On Its Face ..........................................................................................2

    B.    Overwhelming Evidence Demonstrates That There Was No Collusion Between McKesson and FDB ..................................................5

    C.    Dr. Hartman's Own Opinion Refutes The Collusion Plaintiffs Allege ...............................................................................................................8

    D.    The Conduct of the Alleged Co-Conspirators Is Inconsistent with the Existence of the Far-Fetched Collusive Scheme Alleged ...........................................................................................................11

    E.    Documents Relied Upon by Plaintiffs Undermine Rather Than Support The Alleged Conspiracy..................................................11

        1.    Plaintiffs' Attempt to Document "An Agreement" and When It Began ......................................................................................12

        2.    Plaintiffs' Attempt to Suggest the Existence of "Smoking Guns." ............................................................................................................13

        3.    Plaintiffs' Attempt to Omit Evidence That Mr. James Believed Multiple Wholesalers Were Surveyed to Derive FDB AWPs ...................................................................................................14

        4.    Plaintiffs Attempt to Misrepresent What McKesson and FDB Were Actually Conferring About.................................................15

    F.    There Is Nothing Improper About McKesson's Unilateral Decision to Standardize Its Markups .........................................................16

CONCLUSION............................................................................................................17

## INTRODUCTION

For the tenth time since this case was filed, plaintiffs present to the Court the same group of McKesson documents culled by plaintiffs, along with counsel's characterization of them as demonstrating collusion between McKesson and FDB to raise published AWPs.[1] In each of the past instances, the merits of plaintiffs' conspiracy claim were not at issue, yet plaintiffs put forth one excuse or another to cite these documents, doubtless in an attempt to improperly influence a pending motion or decision. This time is no exception. Now, in support of their motion to reconsider class certification, plaintiffs file their second so-called "Proffer" of evidence containing these same documents, ostensibly to demonstrate a common issue of "impact."[2] Of course, there is nothing in plaintiffs' class reconsideration motion that implicates any issue of impact, nor did the Court seek further briefing on this issue.[3] The stated purposed of the Second Proffer is purely pretextual.

---

[1] *See, e.g.*, Pls.' Mem. in Support of Mot. for Leave to File First Am. Compl. (July 21, 2006) [Docket No. 92]; Pharmacy Outcome Specialists' [Susan Hayes] Opp'n to McKesson's Mot. to Compel and Cross-Motion to Quash (N.D. Ill. Oct. 6, 2006) [Docket No. 19]; Ex. 2 [Attachment B] to Mem. in Support of Jt. Mot. for Prelim. Approval of Prop. First DataBank Class Settlement (Nov. 1, 2006) [Docket No. 151]; Pls.' Am. Mem. and Proffer in Support of Class Certification (Dec. 20, 2006) [Docket Nos. 179 and 182]; Pls.' Reply in Support of Mot. for Class Certification (March 19, 2007) [Docket No. 216]; Pls.' Corrected Suppl. of the Class Certification Record (July 27, 2007) [filed under seal; *see* Docket No. 297]; Pls.' Answer in Opp'n to McKesson's [23(f)] Pet. to Appeal an Order Granting Class Certification (1st Cir. Oct. 1, 2007); Pls.' Proffer of Evidence Regarding "Impact" (Oct. 29, 2007) [Docket No. 344]; Pls.' Reply Mem. in Support of Mot. for Leave to File a Third Am. Compl. (Nov. 1, 2007) [Docket No. 353.]

[2] *See* Class Plaintiffs' Proffer of Evidence Common to the Class Containing Admissions by McKesson As to the Scheme's Impact on the Class, October 29, 2007 ("Second Proffer"). [Docket No. 344.]

[3] Even plaintiffs' expert, Dr. Hartman, noted in his September report that lack of impact was not the basis on which the Court denied a TPP damage class. (Expert Report of Raymond S. Hartman, Sept. 14, 2007 ("September Report") ¶ 20 & n.15; Ex. 1 to Decl. of Steve Berman in Support of Class Pls.' Reply to McKesson's Opp'n to Aggregate Damages for the TPP Class.) [Docket No. 345-2.] (*See also*, Class Certification Hr'g. Tr. 22:18-23:1, May 22, 2007, where the Court stated: "in terms of impact, I think plaintiffs have put forward enough to show that it caused damages to some people who never did adjust or couldn't adjust from internally. Now,

(Footnote continues on next page.)

In the past, McKesson has refrained from responding to plaintiffs' false allegations because the merits of plaintiffs' alleged liability claims have not been before the Court. After all this, however, McKesson believes it is time to respond — however, briefly — to these false accusations and mischaracterizations of documents.

As set forth below, plaintiffs' theory of conspiracy is far-fetched at best. Moreover, overwhelming evidence refutes plaintiffs' collusion allegations, and plaintiffs' efforts to mischaracterize the evidence to prove otherwise are unavailing. As we have said time-and-again, the selective excerpts of documents that plaintiffs quote and purport to summarize are taken out of context, and belied by a reading of the documents in full. The fact is, when read in their entirety, McKesson's documents actually undermine, and certainly do not support, any notion of collusion that plaintiffs have attempted to portray.

### A. The Collusive 5% Scheme Alleged in the Complaint Is Far-Fetched On Its Face.

Before addressing the documents plaintiffs repeatedly cite as their evidence of collusion, we first demonstrate how contrived the claimed scheme is to begin with — both the claimed "means" by which it was carried out as well as the claimed motive of the alleged co-conspirators. Let's first look at the asserted means.

Plaintiffs' core claim is that McKesson conspired with FDB to artificially raise the AWPs published by FDB by increasing the WAC-AWP spread from 20% to 25% through a sham wholesaler survey that included only McKesson. (Third Am. Compl., Nov. 6, 2007 ("TAC") ¶¶ 8-10.) [Docket No. 359.] According to plaintiffs, FDB represented that its AWPs were derived from a survey of the three national wholesalers' own markups for their list prices. (*Id.* at ¶ 6; Class Certification Order, August 27, 2007 ("Class Order") 7.) [Docket No. 317.] In reality, plaintiffs claim, FDB and McKesson entered into a secret agreement whereby FDB "limited its

---

(Footnote continued from previous page.)

whether or not I can actually as part of a giant national class action actually assess damages is a different story . . . .")

2

purported 'surveys' to McKesson and did not 'survey' other wholesalers." (TAC ¶¶ 123-29). The survey would thereby include only McKesson's markups — markups which McKesson had standardized for its own list prices at 25%. Plaintiffs thus charge that as a result of the defendants' conspiracy, the AWPs on hundreds of brand name drugs that used to have a 20% markup over WAC were raised to a 25% markup over WAC, thereby causing TPPs to pay more for reimbursement on those drugs. (*Id.* ¶¶ 17, 123-29.)

The means asserted by plaintiffs for achieving higher AWPs are contrived and far-fetched on their face. To begin with, if FDB wanted to raise its own published AWPs or increase the WAC-AWP spread by 5%, it obviously did not need McKesson to do so. FDB could publish higher AWPs on its own, claiming that they were the product of a multiple-wholesaler survey (just as plaintiffs allege here), and no one, including McKesson, would know otherwise.

Indeed, the fact that FDB did not need McKesson to achieve higher AWPs is all the more obvious given Dr. Hartman's testimony, as noted by the Court in the Class Order, that "FDB was a monopolist that could use its position to raise the spread between AWP and WAC." (Class Order 7-8.) Thus, based upon the opinion of plaintiffs' own expert, if FDB wanted to inflate AWPs, it did not need to involve McKesson or anyone else.

Second, if there really had been an agreement between FDB and McKesson to raise the WAC-AWP spread by exactly 5%, why would FDB continue to survey McKesson at all? Plaintiffs' repeated reference to the notion of "hundreds" of email communications and "weekly comparisons" of data between the two entities in furtherance of the "scheme" over a several year period is wholly at odds with the alleged scheme itself. (TAC ¶¶ 177, 188, 191(c).) Of course, no such communications would be necessary if McKesson and FDB had an agreement to raise AWPs by a set amount, as alleged.

Next, the claimed means for achieving higher AWPs have been made even more outlandish by plaintiffs' recent amendment to the complaint. Now plaintiffs claim that if FDB did survey other wholesalers, *FDB did not look at the markup information other wholesalers gave it.* (TAC ¶¶ 8, 129.) This allegation is factually inconsistent with plaintiffs' previous

3

allegation (which plaintiffs continue to press) that FDB limited its survey to just McKesson. More to the point, it is simply absurd to think that FDB and McKesson would agree that FDB would represent that it is conducting a survey of three wholesalers, actually conduct the survey, and then turn a blind-eye to the survey results from all but one survey participant.

Turning to plaintiffs' claims of the participants' motives in conspiring, we find equally implausible assertions. Plaintiffs have never come forward with *any* plausible explanation of why FDB would seek to artificially raise AWPs. At first, plaintiffs claimed that FDB was motivated to reduce the administrative costs of doing surveys. (Original Compl., June 2, 2005 ¶ 125(a).) [Docket No. 1.] Plaintiffs then abandoned this accusation (actually deleted this allegation from their complaint) when the facts revealed that periodic phone surveys required only an insignificant portion of FDB's time.

This left plaintiffs with the assertion that FDB was motivated to raise its published AWPs because it would "incentivize[] other powerful forces in the distribution chain to use [its] AWP . . . and thereby create[] greater demand for [its] reporting services." (Second Am. Compl., Nov. 30, 2006 ("SAC") ¶ 138(a).) [Docket No. 174.] In other words, plaintiffs claim that FDB stood to profit from higher AWPs through greater sales of its services. This proposition is wholly inconsistent with plaintiffs' other assertion that nearly all of the participants in the chain of drug reimbursement already relied upon FDB data before the alleged conspiracy even began. (Updated Decl. of Raymond S. Hartman in Support of Pls.' Mot. for Class Certification, Dec. 20, 2006 ¶ 14(b).) [Docket No. 181.] In fact, Dr. Hartman opines in his class certification declaration that, by the end of the 1990s, FDB had essentially a monopoly over the publication market. (*Id.* ¶ 14(a).) Thus, it is simply nonsensical for plaintiffs to contend that FDB was motivated to conspire with McKesson to raise AWPs in order to gain additional subscriptions to its database service.

No doubt realizing this, plaintiffs have most recently offered still another "alternative" conspiracy motive in their Third Amended Complaint, now asserting that FDB "agreed to this Scheme because it had an interest in perpetuating AWPs as an industry price bench." (TAC

4

¶ 143(c).) There is, however, no reason to believe that higher AWPs would perpetuate AWPs as a price bench, and, again, no explanation of why FDB would need McKesson to accomplish this "perpetuation" in any event.[4] To the contrary, higher AWPs could well lead to the end of AWPs as a benchmark, as is turning out to be the case.

### B. Overwhelming Evidence Demonstrates That There Was No Collusion Between McKesson and FDB.

Which witnesses do plaintiffs rely upon to prove their conspiracy? If plaintiffs' claims were true, there should be dozens of witnesses who would have been aware that FDB's survey representations were a sham. After all, plaintiffs' collusion claim rests on the proposition that FDB only surveyed McKesson for markups and no other wholesaler. Or else, FDB surveyed other wholesalers but ignored the information received. Either way, all of this purportedly occurred over a 3½-year period. Certainly, someone would have known that the FDB editorial process for calculating AWPs, that FDB said it followed, was not really how the company calculated its published AWPs; that, by agreement, FDB only relied on McKesson for McKesson's markups, and that McKesson knew all this. Yet plaintiffs have pointed to no witness to substantiate their collusion claim.[5] To the contrary, the percipient witnesses all deny plaintiffs' claim.

---

[4] Plaintiffs' proof of motive to conspire is equally deficient with respect to McKesson. Indeed, while plaintiffs originally alleged that higher AWPs "directly benefited McKesson's own pharmacy business" (SAC ¶ 137(e)), and trumpeted this motive in their class papers (*see* Class Order at 8 repeating this motive), plaintiffs have now dropped this claim entirely knowing full well that there is no evidence that McKesson benefited financially from higher AWPs. (*See* Pls.' Mem. in Support of Mot. for Leave to File Third Am. Compl., Ex. A at ¶ 112(e).) [Docket No. 324.] Nor is there any evidence that McKesson was able to keep more customers, obtain new customers, or improve payments from existing customers as a result of its markup standardization process. Indeed, even if McKesson's standardization of its markups at 25% contributed to the increase in AWPs at FDB, any increase would benefit all retail pharmacies, including pharmacies that bought drugs from the other two national wholesalers, not just those who purchased from McKesson.

[5] Nor any witness who supports plaintiffs' claim that McKesson knew it was the only wholesaler surveyed; or else knew that other wholesalers were surveyed but that their markups were ignored by FDB.

5

In particular, at the core of plaintiffs' conspiracy claim is the contention that McKesson *knew* that FDB was surveying only McKesson and not the other two national wholesalers, Cardinal and AmerisourceBergen.[6] Yet Kay Morgan, the FDB employee responsible for conducting or supervising all the FDB surveys during the Class Period, has consistently testified under oath that FDB did survey other wholesalers past 2002 and into 2003, well after the time period that this Court termed, "the dramatic bump in AWP pricing in 2002." (Class Order 19.) According to Ms. Morgan, FDB only began having "problems acquiring information for surveys" from ABC "[s]ometime mid-to-late 2003."[7] Ms. Morgan also testified that Bergen continued to respond to her surveys well after its merger with Amerisource. (Morgan Dep. 62:25-64:13; Morgan Dep. Exs. 46; 53; Flum Surreply Decl. Exs. 8, 12, 13.) Even when Ms. Morgan became unable to obtain data from Cardinal and ABC, she testified that FDB had sufficient information from these wholesalers to determine the "consensus" average wholesaler markup because each of these wholesalers informed FDB of its default policies for setting list prices. (Morgan Dep. 254:23-255:11, 238:12-239:1; 287:7-288:11.)[8]

---

[6] Wholesalers Bergen and Amerisource merged in mid 2001, but each pricing department continued to operate independently for approximately a year. (*See* Dennis Lindell MDL Dep. (ABC), July 27, 2006 ("Lindell MDL Dep."), 101:5-19; Decl. of Paul Flum in Support of McKesson Corp.'s Surreply in Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order ("Flum Surreply Decl.") Ex. 6.) The merged entity is called AmerisourceBergen Corporation ("ABC").

[7] Kay Morgan MDL Dep., January 12, 2005 ("Morgan MDL Dep."), 402:5-13; Kay Morgan Dep., June 28, 2007 ("Morgan Dep."), 243:2-21 (FDB stopped receiving survey responses from Amerisource not long before October 2003); Flum Surreply Decl. Exs. 7, 8.) Prior to that, however, there are numerous contemporaneous FDB documents reflecting surveys of multiple wholesalers. (*See, e.g.*, Morgan Dep. Exs. 31, 34, 42, 46; Flum Surreply Decl. Exs. 9, 10, 11, 12.)

[8] Wholesaler markups are hardly state secrets. They're known by a vast number of people including wholesaler employees and wholesalers' retail pharmacy customers. (Dennis Lindell Dep. (ABC), Oct. 23, 2007 ("Lindell Dep.") 122:15-123:19; 124:2-20; Flum Surreply Decl. Ex. 22; MCKAWP 0069616, cited in First Proffer at 7, Ex. 24 (noting that McKesson customers can receive McKesson's list prices, also known as "suggested sell prices").)

Of course, if FDB was surveying other wholesalers, as Ms. Morgan and her chief assistant, Alisha Nielsen have testified, how could McKesson have known that FDB was not? Glaringly absent from plaintiffs' Proffer is this evidence of FDB surveys and the testimony of FDB principals. Nor have plaintiffs put forth evidence to refute the evidence that FDB's surveys of other wholesalers continued into 2003. It thus comes as no surprise that plaintiffs' new complaint seeks to mask their failure of proof by concocting a brand new theory that FDB did survey others, but simply ignored the survey data from all except McKesson.

Beyond that, if FDB's surveys of others had discontinued, there is no evidence that McKesson knew that. To the contrary, all of the FDB employees involved in the publication of AWPs unequivocally testified that they did not tell anyone at McKesson of their difficulties in obtaining survey responses, or that at times, FDB received survey data only from McKesson. FDB's Kay Morgan first testified to this in 2005 during her MDL deposition *before any lawsuit was filed against FDB*, and then confirmed it again during her deposition in this case. (Morgan Dep. 273:24-274:21; Flum Surreply Decl. Ex. 8.) Alisha Nielsen, who assisted Ms. Morgan with the wholesaler surveys and dealt directly with McKesson throughout the Class Period, likewise denied under oath ever telling McKesson that it was the only wholesaler surveyed, or ever entering into an agreement with McKesson regarding raising the WAC-AWP spread. (Alisha Nielsen Dep. 95:12-96:4; 100:20-101:2; 102:6-9; 102:18-25, May 18, 2007; Flum Surreply Decl. Ex. 14.)

Most recently, in her June 2007 deposition in this case, after repeating her testimony from her MDL deposition, Ms. Morgan was asked why, when other wholesalers declined to be surveyed, did she not tell McKesson that fact. In response, Ms. Morgan forthrightly explained that she did not tell McKesson out of concern that if McKesson were told, it would stop providing survey information to FDB as well:

> Q.  So the fact is, as you were asked by plaintiff's counsel this morning, you didn't tell anyone outside of FDB that — after you were not getting regular information from ABC or regular information from Cardinal, you didn't tell them that

7

> McKesson was the only one you were getting regular information from; am I correct?
>
> A. Correct. And that includes the Hearst people that would be responsible for FDB.
>
> Q. And what was the reason you didn't tell McKesson what had happened?
>
> A. **My concern was if I had told them, they would not participate in the survey, either.** [9]

(Morgan Dep. 274:22-275:8; Flum Surreply Decl. Ex. 8.)

In the face of such testimony, plaintiffs cannot say that McKesson *knew* it was the only wholesaler surveyed, and in their First Proffer they candidly did not. Here is what plaintiffs did say:

> McKesson was also **likely aware that its competitors were not sharing information with First Data**. It knew, for example, that '[c]urrent legal issues have brand manufacture[r]s running away from meddling with AWP.' [Citing MCKAWP 0067439.] In any case, the active role it took to ensure that First Data published AWPs consistent with McKesson's own pricing policy dispels any illusion that McKesson believed it was involved in fair and objective calculation of AWPs.

(Pls.' Proffer of Evidence Common to the Class in Support of Class Certification, Dec. 20, 2006 ("First Proffer") 9.) [Docket No. 182.] Thus, after several years of discovery in this case (and considerably more in the MDL), the best face plaintiffs can put on this indispensable underpinning of their conspiracy claim is not that McKesson knew, but only that it was "likely aware" that other wholesalers were not surveyed.[10]

---

[9] Unless otherwise noted, all emphasis appearing in quotations has been added.

[10] What's more, the sole document cited by plaintiffs for this point, MCKAWP 0067439, does not even support plaintiffs' watered-down "likely aware" contention. (First Proffer at 9, Ex. 33.) This document is a November 5, 2004, email from McKesson's John Bonner stating that "*manufacturers* don't set AWP." The document says nothing at all about *wholesaler* surveys. Indeed, Mr. Bonner's email confirms that FDB represented all along to McKesson, and to the drug industry as a whole, that FDB's published AWPs are based upon wholesaler surveys and not the dictates of manufacturers. (*See* Morgan Dep. Exs. 21 and 22; Morgan Dep. 172:17-174:11; Flum Surreply Decl. Exs. 15, 16.)

### C.  Dr. Hartman's Own Opinion Refutes The Collusion Plaintiffs Allege.

The fact is that, plaintiffs' own expert refutes the collusive scheme that plaintiffs claim. Specifically, Dr. Hartman's opinion is that McKesson and FDB would not have risked legal liability by engaging in the alleged 5% scheme if they knew that "all relevant market entities in the industry would have used all available price information to render the Scheme unprofitable." (Hartman September Report Attachment D at ¶ 9.) In other words, if McKesson and FDB knew that TPPs and PBMs would "push-back" in the face of increased WAC- AWP spreads and higher AWPs, and thus render any increased profitability to retail pharmacies short-lived, McKesson and FDB would never have engaged in the alleged unlawful conspiracy in the first place.

But this is precisely the understanding of the market realities held by Mr. James, the McKesson employee plaintiffs claim was at the heart of the conspiracy. In multiple contemporaneous documents (written in early 2002 and shared with his superiors and colleagues), Mr. James considered what could happen if McKesson's decision to "normalize" all of its brand markups at 25% was prevalent in the industry and used in published AWPs. For example, in January of 2002, Mr. James observed that "normalized" AWPs at a 25% markup would make it *easier* for managed care (PBMs and TPPs) to negotiate deeper discounts with retail pharmacies on *all* drugs, thereby eliminating any financial benefit that pharmacies could achieve. As Mr. James stated at that time:

> Another 'unintended consequence' is that it would give Managed Care a potential opportunity to contract deeper……..in other words, **take the AWP minus 15% contracts to AWP minus 19%.** They can't do that today because of the mixed AWP spreads.

(MCKAWP 0065895, cited in First Proffer at 10, Ex. 38.) Plaintiffs cite this document in their Second Proffer, but studiously avoid ever referring to this passage so that they could mischaracterize the document as showing that "McKesson expected their customers to hold onto the 'gift' of the increased markups well into the future." (Second Proffer 2.) Yet when read in its entirety, the document actually refutes plaintiffs' characterization as it expressly states that the "gift" that Mr. James spoke of was only available "until they renegotiate contracts with third

9

parties."[11] (*Id.*) (This is just one example of plaintiffs' many mischaracterizations of documents through highly selective quotations, as discussed below.)

The anticipated push-back of "managed care" was also set forth in another of Mr. James' contemporaneous documents, written in February 2002. In this document, Mr. James sets forth his belief that if a spread of 25% over WAC for published brand AWPs became the standard it would likely lead to elimination of the use of AWPs as a benchmark altogether. As Mr. James' document titled "AWP Discussion" noted about the effects of AWP spread normalization:

> There are some unintended consequences. First, customers may potentially benefit because this process provides the opportunity for increased profitability if managed care contracts remain as they are today. **Please note that just because McKesson increases markups to 25% does not mean that the AWP will increase. Remember, McKesson does not set AWP. This is an average that is determined by a FDB survey.**
>
> Secondly, **as this normalization process gains momentum there is a possibility that managed care will begin to negotiate contracts deeper than AWP minus 15%.** It's likely they may attempt to go to AWP minus 19%, which they cannot do today because of the mixed spreads of 16 2/3% and 20%. **Most likely the industry will see a move to negotiate third party reimbursement based on WAC plus a fee and get away from AWP altogether.**

(MCKAWP 0069611-613) (first emphasis in original) (document cited in plaintiffs' First Proffer at 2, Ex. 3.) This document reflects the understanding that if the WAC-AWP spread increased, "managed care" (*i.e.* PBMs and TPPs) would take away any resulting profit to retailers, and AWP would likely cease to be used at all. This understanding is the very antithesis of the motive claimed by plaintiffs for the alleged conspiracy.

---

[11] Plaintiffs also mischaracterize a later document in 2004 in which Mr. James again discussed what could happen to this same customer's profits *"assuming"* all third party contracts remained at AWP-15%. If all things remained constant, then the retailer would experience "more than 3 times the profit as before." (MCKAWP 0068131-32, cited in Second Proffer at 7, Ex. 22; *see also* Class Order 8.) Nothing in this document, however, suggested that this is what actually happened, *i.e.*, that no contract provision changed over the course of 3 years for this retailer, or any other.

10

In sum, plaintiffs' own expert's testimony refutes plaintiffs' claim of collusion.

### D. The Conduct of the Alleged Co-Conspirators Is Inconsistent with the Existence of the Far-Fetched Collusive Scheme Alleged.

There is also a wealth of other evidence demonstrating that FDB's and McKesson's conduct was inconsistent with a scheme to engage in a sham survey process to ensure a 25% WAC-AWP spread. For example, in late 2003 and thereafter, when Ms. Morgan testified FDB began having difficulty obtaining information from wholesalers other than McKesson, FDB aggressively pressed ABC and Cardinal to supply it with markup data. After phone calls and meetings with these other wholesalers, FDB even considered paying for the data. (Morgan Dep. 241:22-243:4, 249:17-250:9, 251:23-252:9 & Dep. Exs. 19, 54, 55, 57; CH/MCK000937; Flum Reply Surreply Exs. 8, 17, 18, 19, 20, 21.) Why would FDB have taken such aggressive action to obtain other wholesaler markups if it had an agreement with McKesson, indeed an agreement purportedly dating back to 2001, to use only McKesson's markups? FDB's considerable efforts to obtain markup information from other wholesalers are wholly at odds with plaintiffs' conspiracy claims.

McKesson's conduct was likewise inconsistent with participation in any secret agreement with FDB to raise WAC-AWP spreads by 5%. In fact, McKesson's decision to move to a standard 25% markup had hardly been kept secret. McKesson openly discussed its internal standardization process with industry participants, including manufacturers. (MCKAWP 0071694, cited in Second Proffer at 7, Ex. 23.) Indeed, McKesson even informed members of the purported class, such as Blue Shield of California, of McKesson's 25% standardization process. (*See, e.g.,* ████████████████████████; Flum Reply Decl. Ex. █.)

### E. Documents Relied Upon by Plaintiffs Undermine Rather Than Support The Alleged Conspiracy.

With this background we now turn to plaintiffs' patent mischaracterization of McKesson documents in their Proffers.

At almost every turn of this case, plaintiffs have chosen to rely almost exclusively on McKesson's documents, without elucidating testimony, in order to support their collusion

11

accusations. To do so, plaintiffs have repeatedly mischaracterized documents, taken them out-of-context, or intentionally omitted from their quotations, key passages that undermine the false conclusions they seek to have drawn. Set forth below are just a few examples of how plaintiffs' selective quotations have led to the complete mischaracterization of the facts.

1.  **Plaintiffs' Attempt to Document "An Agreement" and When It Began.**

Plaintiffs have claimed that they have uncovered a memo that actually "documents" the collusion between McKesson and FDB to increase spreads, and further, which "documents" that such collusion occurred "as early as August 2001." (MCKAWP 0069608-09, cited in First Proffer at 5, Ex. 9.) The document plaintiffs rely on is a memo from Mr. James to his superior, Greg Yonko, dated March 22, 2002. Plaintiffs quote the following two sentences in their Proffer, which they have offered the Court to support their collusion accusation:

> After a discussion with FDB last August, **we mutually agreed** to standardize[] the Searle (16 2/3% spread) product line because it had been acquired earlier by Pharmacia (20% spread).
>
> \* \* \*
>
> In December, after several discussions with FDB about our business efficiency improvement strategy **we began to move many of the manufacturers** with mixed AWP spreads (16 2/3% and 20% products in the same line) to a consistent 25% markup.

(*Id.* ¶ 5.)

What plaintiffs in effect assert is that the word "we" in the above two sentences must mean McKesson *and* FDB, not just McKesson. This distorted reading of these isolated sentences is directly contradicted by a reading of the entirety of the memo where Mr. James throughout plainly uses the word "we" to mean the McKesson employees involved in updating McKesson's pricing database.[12] Moreover, just before the sentences quoted by plaintiffs, Mr. James makes abundantly clear that FDB only sets AWP based upon wholesaler surveys:

---

[12] *See, e.g.,* paragraph one ("we looked at . . . the number of manual overrides [to the McKesson database]"); paragraph four ("[w]e began to set [McKesson's] suggested Sell Prices"); and paragraph five ("[w]e also changed the markups to 25%").

12

> We huddled and made the decision to change all Parke-Davis products to a 25% markup to match the Pfizer products. This meant that our Suggested Sell prices for both product lines used the 25% markup. **This had no immediate impact on the AWP. However, 12 months** later **when the next price increase was expected, FDB re-surveyed the line and this resulted in increased AWP's** on all of the Parke Davis products . . . ."

(*Id.* ¶ 4.) Then, immediately after the excised quotation in plaintiffs' Proffer, Mr. James again confirms the necessity of an FDB wholesalers survey in order for FDB to establish published AWPs:

> **First DataBank re-surveyed most of these companies** during January and February when price increases occurred. **Many of the AWP's have been increased by FDB.** Because a large number of price increases occurred, some AWP's were affected twice, once when the price increase took effect and then a second time when FDB raised the AWP after the survey process. **I am told by FDB that 90% of the brand Rx companies are now listed as 1.25 factor or 25% markup companies.** Not all products in these companies have had AWP increases at this point in time. However, as price increases occur **FDB will re-survey those products and make their determination.**

(*Id.* ¶ 6.) By omitting these immediately surrounding statements in the document, plaintiffs wholly misconstrue the document's true meaning.

### 2. Plaintiffs' Attempt to Suggest the Existence of "Smoking Guns."

As with the previously discussed document, plaintiffs distort other documents to support the "smoking gun" label they ascribe to them. Another key example of this is a March 14, 2002, internal email by Erlinda Thomas, Manager of McKesson's data entry group responsible for maintaining McKesson's pricing database. (MCKAWP 0035460, cited in First Proffer at 5, Ex. 19.) Plaintiffs quote the following from Ms. Thomas' email: "FDB have been changing their markup to match with our markup." Plaintiffs contend that this document confirms their claim that McKesson dictated AWPs to FDB. It does not.

In their Proffer to the Court, plaintiffs inexcusably omit the rest of the email string of which Ms. Thomas' email is only the beginning. Specifically, as shown in the complete email string left out of plaintiffs' Proffer, the very next day, after he had received Ms. Thomas' email, March 15, 2002, Mr. James corrected Ms. Thomas as follows:

13

> [I]ts really happening the other way around. McKesson is normalizing our Sugg Sell or Retail List, and AWP increases usually happen **when FDB re-surveys the wholesalers** after price increases. They set the AWP where 2 out of 3 of the national wholesalers are using the same mark up.[13]

(MCKAWP 0042663-68, Ex. 27 to Decl. of Steve Berman in Support of Class Certification.) [Docket No. 180.] Here, again, a document advanced by plaintiffs as proof of conspiracy actually proves the opposite.

### 3. Plaintiffs' Attempt to Omit Evidence That Mr. James Believed Multiple Wholesalers Were Surveyed to Derive FDB AWPs.

Numerous other McKesson documents likewise confirm that Mr. James believed FDB's representations regarding its surveys of multiple wholesalers throughout the Class Period, and that he repeatedly told his superiors and others of this fact as reflected in contemporaneous documents. But when plaintiffs have cited these documents to the Court, they have systematically excised those portions where Mr. James reiterates this understanding. These documents include the following:

- MCKAWP 0068514-15, dated September 18, 2001, (cited in plaintiffs' First Proffer at 3-4, Ex. 15), where Mr. James tells McKesson's Mr. Secrest: "McKesson keeps this differential in our system in hopes that if one of the other wholesalers happens to raise their markup . . . and **FDB happens to resurvey the items, the AWP will be increased . . . .**"

- MCKAWP 0068599, dated October 9, 2001, (cited in plaintiffs' First Proffer at 3, Ex. 14), where Mr. James advises Mr. Yonko: "**Remember, McKesson does not set AWP**, we set List Price or Sugg Sell Price. AWP by definition is an 'average wholesale price.' **This is arrived at by FDB by doing a phone survey** . . . following a new product introduction or a price increase."

- MCKAWP 0065895, dated January 7, 2002, (cited in plaintiffs' First Proffer at 10, Ex. 38), where Mr. James advises Mr. Yonko (and others) in the sentence preceding plaintiffs' quote: "Of course, **we are not solely responsible for this 'normalizing'** of AWP's but we have done our part . . . ."

---

[13] Ms. Thomas testified at her deposition that her email was incorrect, and that she learned of her mistake when Mr. James corrected her in the subsequent email string. (Erlinda Thomas Dep. 109:6-111:5, March 13, 2007; Flum Surreply Decl. Ex. 24.)

14

- MCKAWP 0069615-16, dated April 25, 2002, (cited in plaintiffs' First Proffer at 7, Ex. 24), where Mr. James tells Mr. Yonko and other McKesson employees: "Actual AWP changes have been occurring around price increases and **FDB re-surveying the market.**"

- MCKAWP 0069942, dated Dec. 2, 2002, (only Mr. Secrest's inquiry to Mr. James, but not this response, cited in Second Proffer at 5, Ex. 16) where Mr. James writes to McKesson's Mr. Secrest: "I would like for McKesson to be able to take credit for this phenomena but **this is something that happened as a result of the First Databank survey process.** However, we did play a role (indirectly) by raising all of our suggested sell or retail list prices for most all of the brand Rx products to a 25% markup or 20% spread. **When price increases occurred and FDB did their survey, many of these AWP spreads increased as a result.**"

- MCKAWP 0057171, dated May 3, 2004, (cited in plaintiffs' First Proffer at 3, Ex. 7), where Mr. James states: "McKesson has been using a 25% markup on brand Rx items for the past four years. This is used to get **our List Price or Suggested Sell price, which is the price that is surveyed by FDB to determine the average or AWP.**"

4. **Plaintiffs' Attempt to Misrepresent What McKesson and FDB Were Actually Conferring About.**

One final example of plaintiffs' more egregious mischaracterizations is their citation of documents they claim evidence conspiratorial communications by McKesson and FDB to set AWPs, when the actual documents they rely on involve discussions about WAC, not AWP. Indeed, plaintiffs have cited such documents as proof of "weekly comparisons" of AWP data to ensure that FDB's AWPs mirrored McKesson's list prices. (Pls.' Reply Mem. in Support of Mot. for Leave to File a Third. Am. Compl. 8-9.) But the truth is that these documents involve sharing of WACs published by manufacturers and supplied by wholesalers to FDB in order to assist FDB in arriving at accurate and timely WAC data in FDB's published database.[14] By

---

[14] As FDB witnesses explained, at some point, FDB was facing difficulty in obtaining WAC prices from the manufacturers (i.e., "*problem suppliers*") who nevertheless continued to provide WAC prices to wholesalers. FDB turned to McKesson and other wholesalers to supply or confirm the WACs set by manufacturers because without them, FDB could not publish AWPs (which are percentage markups to WAC) or WACs themselves. (Morgan Dep. 179:12-181:7, 265:18-267:20; Flum Surreply Decl. Ex. 8.) Other wholesalers testified that they too supplied
(Footnote continues on next page.)

misdescribing these documents as AWP discussions, plaintiffs wrongfully attempt to bolster false collusion claims.

### F.  There Is Nothing Improper About McKesson's Unilateral Decision to Standardize Its Markups.

A thread running through plaintiffs' discussion of McKesson's documents is the insinuation that there was something improper with Mr. James' decision to standardize McKesson's brand drug markups at 25%. Some manufacturers suggested 25% markups to wholesalers, while others suggested 20%, and then at some point many did not suggest any markups.[15] In the end, Mr. James' independent business decision to settle on a uniform 25% markup was wholly consistent with applicable law. Nor do plaintiffs allege anything to the contrary. That is why plaintiffs' conspiracy accusation — as far-fetched as it is— is so essential to their claims.

---

(Footnote continued from previous page.)

WACs to FDB for such purposes. (███████████████████████████████████████;
Flum Surreply Decl. Ex. ██.)

[15] Professor Berndt explained the historical origin of the two markups — 20% and 25% — suggested by most brand name drug manufacturers: "By convention, wholesalers added 20% to the price of products from companies following a wholesaler-only policy while adding 25% to the prices of products from those companies who chose to 'compete' with the wholesalers." (Report of Independent Expert Professor Ernst R. Berndt, February 9, 2005, ¶ 22, submitted herewith) (citations omitted). Although industry dynamics changed, Professor Berndt noted that manufacturers understandably continued to set their suggested AWPs with one of these two markups. *(Id.* ¶ 24.)

## CONCLUSION

For reasons set forth above, and others that will be elaborated upon when the issue of liability is legitimately before the Court, plaintiffs' conspiracy claim is, in a word, false.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
200 Portland Street
Suite 400
Boston, MA 02114
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: November 8, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 8, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

17