UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN, JUNE SWAN, MAUREEN COWIE and BERNARD GORTER, | Civil Action: 1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**MCKESSON CORPORATION'S SURREPLY IN RESPONSE
TO DR. HARTMAN'S SEPTEMBER 14, 2007 SUBMISSION
REGARDING THE COURT'S CLASS CERTIFICATION ORDER**


**[REDACTED VERSION]**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................... 3

I.    DR. HARTMAN'S ASSERTION THAT IMS DATA ACCOUNTS FOR ANY
      POSSIBLE MITIGATION BY TPPS IS FUNDAMENTALLY FLAWED. ................. 3

      A.    Dr. Hartman Offers No Basis for His Assumption That What TPPs Paid
            PBMs Is Virtually Identical to What PBMs Paid Pharmacies. ........................... 4

      B.    Dr. Hartman Has No Basis for Claiming a "Constant Relationship"
            Between What TPPs Pay PBMs and What PBMs Pay Pharmacies. ...................... 5

II.   THE GE AND CIGNA CLAIMS DATA DO NOT SUPPORT
      DR. HARTMAN'S ASSERTION OF ZERO MITIGATION. .......................................... 8

III.  THE IMS DATA DO NOT CONTRADICT THIS COURT'S FINDING THAT
      PBMS FIERCELY COMPETE FOR TPP BUSINESS. ................................................ 11

IV.   DR. HARTMAN'S ASSERTIONS THAT TPPS AND PBMS WERE NOT
      AWARE OF THE MARKUP INCREASES CANNOT REHABILITATE HIS
      AGGREGATE DAMAGES MODEL. ........................................................................ 13

V.    DR. HARTMAN'S RESPONSE DOES NOT SATISFY THE CLASS ORDER'S
      REQUEST FOR A FEASIBLE AGGREGATE DAMAGES MODEL OR MEET
      THE STANDARDS FOR RECONSIDERATION. ....................................................... 16

      A.    Dr. Hartman Does Not Offer a Feasible Aggregate Damage Model Under
            Either of the Two Options Permitted by the Court. ........................................... 16

      B.    Dr. Hartman's Analysis Offers No Basis for This Court to Reconsider Its
            Findings That Dr. Hartman's Aggregate Damages Model Is Insufficient. ........... 18

VI.   THE PERCENTAGE CO-PAY DAMAGES CLASS SHOULD NOT BE
      CERTIFIED. ......................................................................................................... 19

CONCLUSION ................................................................................................. 21

CERTIFICATE OF SERVICE .......................................................................... 22

i

## TABLE OF AUTHORITIES

### CASES

*Air Line Pilots Ass'n v. Precision Valley Aviation,*
    26 F.3d 220 (1st Cir. 1994)..................................................................18

*Allapattah Servs. v. Exxon Corp.,*
    333 F.3d 1248 (11th Cir. 2003) .............................................................19

*Bell v. Ascendant Solutions, Inc.,*
    422 F.3d 307 (5th Cir. 2005) ................................................................17

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) ................................................................18

*Davis v. Lehane,*
    89 F. Supp. 2d 142 (D. Mass. 2000) .................................................18, 19

*In re Neurontin Marketing & Sales Practices Litig.,*
    No. 04-10981, 2007 U.S. Dist. LEXIS 63898 (D. Mass. Aug. 27, 2007) ................18

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    230 F.R.D. 61 (D. Mass. 2005)..............................................................20

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    No. 01-12257, 2007 U.S. Dist. LEXIS 81102 (D. Mass. Nov. 1, 2007) ............16, 17

*Pastula v. Lane Constr. Corp.,*
    No. 05-133-B-W, 2006 U.S. Dist. LEXIS 15714 (D. Me. March 17, 2006)..............19

*West v. Prudential Securities, Inc.,*
    282 F.3d 935 (7th Cir. 2002) ................................................................18

### OTHER

Thomas R. Fulda, *et al.*, HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY,
    Chapter 14: Pharmaceutical Benefit Managers (2007)............................................5, 7

# INTRODUCTION

The Court's Class Order declined to certify a TPP damages class because plaintiffs had failed to present a methodology that satisfied the minimum requirements for calculating aggregate damages. The Court rejected Dr. Hartman's damages model because it does not account for mitigation through renegotiation and contract renewals. The Court provided plaintiffs one final opportunity to cure these defects.

Plaintiffs' proposed solution was Dr. Hartman's September Report wherein Dr. Hartman argued that use of IMS data makes his previously rejected damages model sound. McKesson's response to that report showed the ways in which Dr. Hartman failed to cure the defects under either option outlined in the Class Order.[1] Among other things, McKesson showed that, contrary to Dr. Hartman's claims, IMS data reports payments by PBMs to retailers rather than reimbursements by TPPs to PBMs. As Dr. Willig explained, that fundamental mismatch, as well as limitations in the IMS data itself, means that the IMS data cannot be used to calculate aggregate damages that exclude reimbursements under renegotiated TPP contracts, as ordered by the Court.

Confronted with the limitations of the IMS data, plaintiffs and Dr. Hartman have now responded with the same zero knowledge–zero mitigation arguments that they have been advancing from the beginning. Dr. Hartman asserts that his aggregate damages model based on IMS data meets the Court's criteria because there is purportedly a "constant relationship" between TPP reimbursements to PBMs and the point of sale payments reported by IMS. Dr. Hartman goes on to assert that because the IMS data purportedly shows no pushback at retail for Appendix A drugs, there was zero mitigation at the PBM level. As shown in Dr. Willig's Rebuttal Declaration, Dr. Hartman's constant relationship-zero pushback hypothesis finds no support in economic theory or in fact. To the contrary, Dr. Hartman's aggregate damages

---

[1] *See* McKesson Corporation's Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order, October 15, 2007 ("McKesson's Response"). [Docket No. 327.]

methodology overstates harm and understates mitigation by ignoring both the effects of market responses through contractual changes that apply to *non*-Appendix A drugs, as well as market responses other than changes in the discount and dispensing fee contained in PBM contracts with retail pharmacies.

The other problem that Dr. Hartman faces is that his constant relationship-zero pushback hypothesis contradicts the Court's finding that "[c]ompetition among PBMs for the business of TPPs is fierce." (Class Certification Order, August 27, 2007 ("Class Order") 5.) [Docket No. 317.] Dr. Hartman's response is that, "as a matter of economics and evidence," he's right and the Court is wrong. (Report of Raymond S. Hartman Regarding Aggregate Damages, Oct. 29, 2007 ("Hartman October Report") Attachment D at ¶ 12.) [Docket No. 346.] As discussed below and in Dr. Willig's Rebuttal Declaration, it is Dr. Hartman's analysis that is flawed, not the Court's. Plaintiffs have failed to present any basis for reconsidering the Court's decision in the Class Order not to certify a TPP damages class.

Dr. Hartman's failure to develop an aggregate damages model that excludes reimbursements under TPP-PBM contracts that were renegotiated or renewed during the class period also applies to the percentage co-pay damages class. Dr. Hartman conceded in his September Report that the claims of the percentage co-pay class are derivative of the claims of the TPP Class. Because Dr. Hartman has not presented an aggregate damages model that meets the requirements of the Class Order, McKesson respectfully submits that the Court cannot certify a damages class for either the TPP or the percentage co-pay classes, and accordingly requests that the Court modify the Class Order to limit certification of the percentage co-pay class to liability only.[2]

---

[2] In addition to Dr. Hartman's October Report, plaintiffs have submitted a "Proffer of Evidence" purportedly showing the "class-wide impact" of higher AWP markups. Plaintiffs' proffer says nothing about how TPPs were able to mitigate the impact of higher AWP markups over the class period, and is therefore irrelevant to the Court's determination that Dr. Hartman's aggregate damages model fails to take that mitigation into account. Even though irrelevant to the issues at hand, plaintiffs' one-sided presentation of evidence is inaccurate and misleading. McKesson addresses plaintiffs' selective use of a few dozen statements, culled from the hundreds of

*[Footnote continued on following page.]*

# ARGUMENT

## I.  DR. HARTMAN'S ASSERTION THAT IMS DATA ACCOUNTS FOR ANY POSSIBLE MITIGATION BY TPPS IS FUNDAMENTALLY FLAWED.

Dr. Hartman's latest report acknowledges that he cannot comply with the Court's explicit instructions to exclude from his aggregate damages model reimbursement under TPP-PBM contracts that were "renegotiated in response to the increase," because he has no database or other source of information that would allow him to identify those contracts.  (Hartman October Report ¶ 34.)  Instead, Dr. Hartman asserts that he need not do so because the payments at retail reported by IMS that he uses in his aggregate damages model are the *"functional equivalent"* of TPP reimbursements.  (*Id.* ¶ 6.)[3]  Accordingly, he claims that any mitigation achieved through renegotiated TPP-PBM contracts is already captured in the IMS data used by his model, and he need not exclude reimbursements under contracts that were amended or renegotiated during the class period.  (*Id.* ¶¶ 3(b), 29, 54.)

Exactly how does Dr. Hartman support his new "functional equivalent" theory?  He offers two explanations.

First, he asserts that TPPs reimburse PBMs the same amount that PBMs pay pharmacies. Accordingly, because the point of sale transactions reported by IMS are equal to TPP reimbursements to PBMs, the IMS data are the "functional equivalent" of TPP reimbursements. (*See id.* ¶¶ 6-7 (IMS *"reports the amount allowed . . . by TPPs . . . for reimbursement to retail pharmacies"*; *id.* Attachment E at p. 2 (*"TPPs pay PBMs what the PBMs pay retailer"*); *id.* Attachment D at ¶ 21(a) (the *"amounts paid by the TPPs to PBMs* to make the PBMs whole for those retail transactions *are almost identical* for branded drugs").)

---

*[Footnote continued from previous page.]*

thousands of documents produced in discovery, in a separate Response to Plaintiffs' Proffer of Evidence, filed herewith.

[3] Unless otherwise noted, all emphasis in quotations has been added.

Second, Dr. Hartman claims, apparently in the alternative, that even if reimbursements by TPPs are not identical to what IMS reports that PBMs pay pharmacies, there is a *"constant relationship* between what the PBMs pay pharmacies and what the TPPs pay the PBMs for brand name drugs." (*Id.* ¶ 6.) Under the "conservative" assumption that any concessions that PBMs obtained from pharmacies (as reported by IMS) were passed through dollar-for-dollar to TPPs, Dr. Hartman claims that there is no need to exclude reimbursements under renegotiated contracts because they are already accounted for in the IMS data. (*Id.*Attachment E at pp.1-2.)

As discussed below and in the accompanying Rebuttal Declaration of Dr. Willig, Dr. Hartman is wrong on both counts.

### A.    Dr. Hartman Offers No Basis for His Assumption That What TPPs Paid PBMs Is Virtually Identical to What PBMs Paid Pharmacies.

Dr. Hartman offers no basis for the first leg of his "functional equivalent" hypothesis — that TPPs pay PBMs the same amount that PBMs pay pharmacies. First, Dr. Hartman appears to suggest that his assumption is correct because the IMS data substantiates it. As Dr. Hartman asserts, IMS data "accurately summarize the amounts paid by TPPs over millions of transactions." (*Id.* ¶ 29.) But according to IMS, its data do not measure TPP payments at all, and thus IMS data cannot possibly be the basis for Dr. Hartman's assumption. As the IMS representative stated:

> For transactions where the pharmacy receives reimbursement from a PBM, the pharmacy reports what the pharmacy received from the PBM, and IMS records this amount as a payment from a private payor. *IMS data does not capture any information on the amounts paid by a third party payor to a PBM, and these payments are not reflected in data provided through the NPA or any other service offered by IMS.*

(Decl. of Darrell Philpot of IMS Health Inc., Oct. 15, 2007 ("Philpot Decl.") ¶¶ 4-5.) [Docket No. 328.] Thus, Dr. Hartman's claim that IMS "reports the amount allowed . . . by TPPs . . . for reimbursement to retail pharmacies" (Hartman October Report ¶ 7) is at odds with IMS's description of its services. Not surprisingly, Dr. Hartman cites no authority for his unfounded assertion to the contrary.

Second, plaintiffs' new industry expert, Dr. Kimberly McDonough, directly contradicts Dr. Hartman's claim that TPPs pay PBMs exactly what PBMs pay retailers. In a chapter she recently authored on PBMs, Dr. McDonough states that PBMs contract to pay pharmacies "an amount that is different, and typically lower, than the amount that is billed to the [TPP] client." According to Dr. McDonough, the effect of this arrangement is to "generate a differential, or *network spread*, in the pricing," whereby the PBM *"retains the difference between the payment and billing rate as additional revenues."* (Thomas R. Fulda, *et al.*, HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY, Chapter 14: Pharmaceutical Benefit Managers, p. 260 (2007) ("PHARMACY HANDBOOK"),[4] attached as Decl. of Paul Flum in Support of McKesson Corp.'s Surreply in Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order ("Flum Surreply Decl.") Ex. 1).

Finally, as Dr. Willig points out, Dr. Hartman's zero profit-margin thesis for PBMs is inconsistent with his theory of limited PBM competition. (Rebuttal Expert Decl. of Robert D. Willig, filed herewith ("Willig Rebuttal Decl.") ¶ 24.) If, as Dr. Hartman states, PBMs charge TPPs exactly what PBMs pay retailers for prescription drugs, then Dr. Hartman has no basis to claim that the Court erred in finding that PBM competition for TPP business is fierce and that TPPs were able to mitigate the impact of higher AWP markups by amending or renegotiating their PBM contracts.

In sum, Dr. Hartman has no basis for the first leg of his functional equivalent argument.

**B.    Dr. Hartman Has No Basis for Claiming a "Constant Relationship" Between What TPPs Pay PBMs and What PBMs Pay Pharmacies.**

Dr. Hartman's fallback position — that there is a "constant relationship" between PBM payments to pharmacies and TPP reimbursements to PBMs — is similarly groundless.

---

[4] The authorities cited in Dr. Hartman's October Report make the same point. *See* S. Schondelmeyer and M. Wrobel, Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices p. 13 (Aug. 30, 2004) ("Other major sources of [PBM] revenue include revenue from pharmacy discounts not passed on to the end payor.") (cited in Hartman October Report n.35).

Dr. Hartman never identifies the source for his constant relationship theory (*cf.* Hartman October Report ¶ 6), but implies that it is recognized in the scholarly literature cited in Attachment B to his October Report. (*Id.* Attachment D at ¶ 18.) As Dr. Willig states, none of the scholarly articles that Dr. Hartman cites in the October Report use IMS data to analyze TPP reimbursements or say that PBM payments are the functional equivalent of TPP reimbursements through a constant relationship or otherwise. (Rebuttal Expert Decl. of Robert D. Willig, Nov. 8, 2007 ("Willig Rebuttal Decl.") ¶ 21 & Table 1.) Dr. Hartman's own description of how IMS data are used by academics, government, the pharmaceutical industry, and others underscores the point. According to Dr. Hartman, IMS data are used by knowledgeable industry observers:

- to "predict product penetration at *retail* and effects of alternative *retail* pricing strategies";

- to measure, design, and implement "*drug pricing strategies*" and "*campaigns to gain market share*";

- "in legal cases focusing on *prices at retail*"; and

- to develop "statutory strategies to improve *drug pricing* and availability."

(Hartman October Report Attachment D at ¶ 18.) As Dr. Hartman concedes, the focus of all these studies is *retail* pricing and product penetration in *retail markets*, and *retail* market share, not TPP reimbursements. Contrary to Dr. Hartman's suggestion, none of the articles purports to describe the relationship between point of sale pharmacy payments and TPP reimbursements to PBMs, much less says that it can be derived from IMS data.[5]

---

[5] The Court need look no further than the titles of the articles themselves to confirm the point. For instance, Dr. Hartman cites several articles co-authored by Dr. Berndt that address topics such as "Pharmaceuticals in U.S. Health Care: Determinants of Quantity and Price;" "Information, Marketing, and Pricing in the U.S. Antiulcer Market;" and "Prescription Drug Prices for the Elderly." None of these articles use IMS data to make predictions about TPP reimbursements to PBMs or states that IMS data would be suitable for that purpose. Indeed, Dr. Berndt criticizes one of the articles Dr. Hartman cites for its *misuse* of IMS and other data. (*See* Report of Independent Expert Professor Ernst R. Berndt, Feb. 9, 2005 ("Berndt Report"), submitted herewith, ¶¶ 169-76) (criticizing Langenfeld, James and Robert Maness, "The Cost of PBM 'Self-Dealing' Under Medicare Prescription Drug Benefit," Sept. 9, 2003, and noting that the "analysis is seriously deficient").

Moreover, IMS itself disclaims use of its standard data products for purposes other than *market research*. As IMS states, using its "syndicated information services" in litigation is "*problematic*" and "*not support[ed]*" because IMS's published data products are based on

> techniques that are *susceptible to error and variance that cannot be easily quantified*, while the data overall and in the aggregate are very *valuable and useful when used for its intended purpose (e.g., marketing, research)*.

(Philpot Decl. ¶ 7.) Dr. Hartman offers no response to these admonitions.

Dr. McDonough offers another reason why Dr. Hartman's assumption of a constant relationship is unsupportable. Because PBMs operate in a competitive environment, Dr. McDonough observes that "PBMs do not typically advertise" their practice of paying the pharmacy less than they charge their TPP clients. To the contrary, "*the scope of the spread is rarely disclosed.*" (PHARMACY HANDBOOK at p. 260; Flum. Surreply Decl. Ex. 1.) The problem for Dr. Hartman is that his claim of a constant relationship between reimbursements by TPPs and PBM payments to pharmacies depends on a showing that PBM spreads never change. Since he has no evidence of the actual spreads earned by PBMs and how they may have varied over the class period, Dr. Hartman's constant relationship claim is nothing more than unsubstantiated conjecture.

In addition, as Dr. Willig points out, Dr. Hartman's claim of a constant relationship between pharmacy payments as reported by IMS and the amounts that TPPs reimburse PBMs assumes "that the only parameter which can change in response to the increased AWP/WAC ratio is the discount off AWP." (Willig Rebuttal Decl. ¶ 16.) But Dr. Hartman is looking at just the tip of the iceberg — discounts off AWP and dispensing fees for Appendix A drugs at retail — and ignores many other attributes of the TPP-PBM relationship that are not captured by his IMS data. These other attributes include the ability of TPPs and PBMs to negotiate for:

- larger discounts on mail order reimbursements for Appendix A drugs (*id.* ¶ 17);
- larger discounts on retail reimbursements to meet competition from other PBMs (*id.* ¶ 18);

- reductions in fees for contract administration, utilization review, formulary management, audits, or other ancillary services (*id.* ¶¶ 19, 46);

- increases in the amount of manufacturer rebates shared with TPPs (*id.* ¶¶ 19, 47-48);

- changes to risk-sharing terms that cause PBMs to bear a greater share of the financial exposure for the pharmacy benefit (*id.* ¶¶ 19, 49); and

- larger discounts off AWP at both mail order and retail for ***non***-Appendix A drugs (*id.* ¶¶ 25, 40-43).

Changes in any or all of these other contract terms could result in increased savings off the amounts paid by TPPs to PBMs that ***exceed*** the increases in the discounts in PBM-retail pharmacy contracts reflected in the IMS data. (Willig Rebuttal Decl. ¶¶ 16-20.) Because Dr. Hartman's claim of a constant relationship between TPP reimbursements to PBMs and PBM payments to retail pharmacies fails to account for these other contract terms, his reliance on IMS data fails to meet the requirements for aggregate damages set out in the Class Order.[6]

## II.    THE GE AND CIGNA CLAIMS DATA DO NOT SUPPORT DR. HARTMAN'S ASSERTION OF ZERO MITIGATION.

In the face of the Court's finding that "[c]ompetition among PBMs for the business of TPPs is fierce," and that "TPPs directly pushed back against the price increases by renegotiating their contracts with the PBMs" (Class Order 4, 16), Dr. Hartman claims that the IMS data actually show no pushback by PBMs at retail and, as a result, zero mitigation or recoupment by TPPs. (Expert Report of Raymond S. Hartman, Sept. 14, 2007 ("Hartman September Report") ¶ 5 & Attachment F at ¶ 33, submitted as Ex. 1 to Decl. of Steve Berman in Support of Class Pls.' Reply to McKesson's Opp'n to Aggregate Damages for the TPP Class ("Berman Reply Decl.") [Docket No. 345-2.]; Hartman October Report ¶¶ 14, 48, 52(e) & Attachment E at p. 2.)

---

[6] These same problems infect the rest of Dr. Hartman's opinions based on his use of IMS data, including his opinions about the purported lack of competition among PBMs for TPP business and the purported absence of mitigation or recoupment by TPPs. (Willig Rebuttal Decl. ¶¶ 31-33.)

Dr. Hartman also claims that GE and CIGNA claims data "confirm my use of the IMS data." (Hartman October Report ¶ 16.)[7] Dr. Hartman's no-pushback/zero-mitigation hypothesis is wrong for all the following reasons.

First of all, a broad cross-section of knowledgeable industry participants, including representatives of major retail chains and industry trade groups, contradict Dr. Hartman's claim that excess profits from higher AWP spreads were not squeezed out of retail pharmacies. For example, a June 19 letter submitted on behalf of the National Community Pharmacists Association in response to the proposed FDB settlement states:

> Since FDB increased the markup factors between AWP and WAC, plan sponsors have increased the discounts from the AWP and thus decreased the reimbursements made to our pharmacies. The result was that *the potential increase in profit margins of NCPA pharmacies was eviscerated by the contemporaneous and subsequent reductions in payments* to our pharmacies by plan sponsors.

(Letter from NCPA to Judge Saris regarding FDB Settlement, June 20, 2007; Flum Surreply Decl. Ex. 2.) A designated representative of Longs Drug Stores made the same point during his deposition in this case: "Aggressive reduction of reimbursement rates from managed care have driven the downward trend for the industry and for Longs." (Frank Scorpiniti Dep. 32:17-34:17; 42:23-43:17, May 17, 2007, submitted as Ex. J to McKesson Corp.'s First Suppl. of the Class Certification Record [Docket No. 282-11.]; *see also* David Vucurevich Dep. 48:22-50:6, May 16, 2007; submitted as Ex. Y to Decl. of Paul Flum in Support of McKesson's Response to Dr. Hartman's September 14, 2007 Submission Regarding the Class Certification Order (managed care squeezed retailer margins during the class period); Letter from PCMA to Judge Saris regarding FDB Settlement, dated June 20, 2007; Flum Surreply Decl. Ex. 3 (same).)

Second, as noted in McKesson's Response to Dr. Hartman's aggregate damages model, plaintiffs' current and former industry experts — Dr. McDonough and Susan Hayes — agreed

---

[7] As Dr. Willig points out, TPP mitigation does not depend on whether IMS data show a retailer squeeze that eliminated higher profits associated with increased AWP markups. (Willig Rebuttal Decl. ¶¶ 16-20.) Dr. Hartman's assertion that IMS point of sale data, or GE or CIGNA claims data, show no pushback at retail is therefore irrelevant.

that TPPs and PBMs successfully pushed back in response to higher AWP markups. (Expert Report of Kimberly P. McDonough, Sept. 14, 2007 ("McDonough Report") 13, submitted as Ex. B to Flum Decl.) (stating that PBMs "were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for increased profit margins"); Susan Hayes Dep. 221:9-16, Oct. 26, 2006, submitted as Ex. AA to Flum Decl. (TPPs "pushed back" and got better pricing in response to AWP spread increases).)

Third, Dr. Hartman has it backwards when he claims that the GE and CIGNA data show no TPP mitigation and no retailer squeeze. As Dr. Willig explained in his October Declaration, the IMS data used by Dr. Hartman under report the impact of squeeze at the retail level due to problems of mismeasurement and dilution. (Expert Decl. of Robert D. Willig, Oct. 16, 2007 ("Willig October Decl.") ¶¶ 40-42.) [Docket No. 326.][8] Dr. Willig accordingly ran GE and CIGNA claims data, which do not suffer from these reporting problems, through Dr. Hartman's statistical model. (Willig Rebuttal Decl. ¶ 35.) The results showed a statistically significant drop in the ratio of TPP reimbursements to AWP. (*Id.* ¶ 36; Willig October Decl. ¶¶ 52-55 & App. 4.)

Dr. Hartman does not dispute those findings. Indeed, Dr. Hartman concedes that the claims data show that *GE partially mitigated the impact of higher AWP spreads by renegotiating its PBM contract 1-1/2 years into the class period*. (Hartman October Decl. ¶ 20(d)-(e).) Instead, he criticizes Dr. Willig for not separating mail order transactions from retail transactions. (*Id.* ¶ 19.) As Dr. Willig explains, that criticism is unfounded (Willig Rebuttal Decl. ¶ 37) and makes no difference. A disaggregated analysis of mail order and retail reimbursements shows the same statistically significant declines in the ratio of TPP reimbursements to AWP as does analysis of the combined data. (*Id.*) Indeed, as Dr. Willig

---

[8] These include IMS's acknowledgement that 30% of the pharmacies responding to its NPA survey report AWP rather than the actual point of sale receipts, as well as the fact that the IMS data commingle payments by PBMs with Medicare and Medicaid payments and payments by cash payors. (*Id.*)

points out, Dr. Hartman's October Report includes tables that show the same thing. (Hartman October Report, Attachment C Tables 6-7.)

Finally, Dr. Hartman's claim that the IMS data shows no pushback at retail is based on statistical sleight of hand. Dr. Hartman bases his no pushback claim on his observation that, for many individual drugs, changes in the ratio between pharmacy reimbursements and AWP are not statistically different from zero. But, as Dr. Willig explains, that observation does not mean that the ratio of reimbursements to AWP did not decline over time. It just means that Dr. Hartman did not have enough data, looking at each drug in isolation, to draw any statistically valid conclusions. When payments for all the drugs in Dr. Hartman's sample are combined in a single analysis, however, the IMS data show a statistically significant average decline in the ratio of pharmacy reimbursements to AWP over the class period. (Willig October Decl. ¶¶ 43-49.) Buried in one of his Attachments, Dr. Hartman's September Report actually documents the same conclusion. (Hartman September Report Attachment F at Ex. F.1.a; *see* Willig October Decl. ¶ 48.)

Dr. Hartman's refusal to give credit for pushback at retail is yet another reason why his aggregate damages model fails to properly account for mitigation in TPP-PBM contracts. Retail payments by PBMs, as reported by IMS, are the foundation for Dr. Hartman's aggregate damages model. Because Dr. Hartman's methodology improperly ignores the substantial markup reductions that PBMs extracted from retailers in response to the AWP spread increase, his model cannot account for the full impact of mitigation at the TPP-PBM level.

### III.    THE IMS DATA DO NOT CONTRADICT THIS COURT'S FINDING THAT PBMS FIERCELY COMPETE FOR TPP BUSINESS.

Dr. Hartman's latest report reiterates his assertions that competition among PBMs for TPP business would be insufficient to lead to any mitigation of higher AWP markups. (Hartman October Report ¶¶ 41-50.) As Dr. Hartman acknowledges, he made the very same arguments in the related MDL and in the prior reports he submitted in this case. (*See, id.* Attachment D at

¶ 13(a) ("My theory is not new; I have always found PBM competition for TPPs' business to be nuanced and compromised by a variety of profit-maximizing motives and opportunities.").)

The Court's appointed expert in the MDL, Dr. Berndt, rejected Dr. Hartman's position, concluding that competition among PBMs for the business of TPPs is "vigorous," a view also shared by the FTC. (Berndt Report ¶¶ 162, 200.)[9] The Court's Class Order does as well. (Class Order 5.) Dr. Hartman's response to the overwhelming consensus against his view is revealing. According to Dr. Hartman, "I do not reject the Court's statement [that competition is 'fierce']; rather *I respectfully disagree* as a matter of economics and the evidence." (Hartman October Report Attachment D at ¶ 12.)

Dr. Hartman's disagreement with the Court's findings rests on the erroneous view that "vigorous" or "fierce" competition is the same as perfect competition. As Dr. Willig explains:

> Perfect competition is not necessary for there to be mitigation of the impact of the alleged scheme. Instead, *any mitigation caused by competition makes the determination of damages an individualized fact question.* Dr. Hartman now admits that given the limited competition among PBMs, the determination of whether there was mitigation is an empirical question. .... As I have explained above, limitations of Dr. Hartman's data and his methodology imply that he would not be able to determine whether there had been mitigation on the part of TPPs even if there had been complete mitigation.

(Willig Rebuttal Decl. ¶ 57.)

McKesson and Dr. Willig have never claimed that competition among PBMs resulted in 100% recoupment by all TPPs, as Dr. Hartman continues to misleadingly assert. (Hartman October Report Attachment D at ¶¶ 4-5.) Rather, it is Dr. Hartman who has insisted throughout these proceedings that there was zero mitigation. (*See, id.* ¶ 41) ("it is highly unlikely that PBM

---

[9] Dr. Berndt's conclusion bears repeating in full: "In summary, the Plaintiffs' theory in the context of self-administered drugs requires that competition among PBMs be insufficient to prevent injury and damage to third party payors. *In my judgment Plaintiffs have not put forward a convincing argument supporting the notion that competition among PBMs is inadequate.* Plaintiffs' contention is also at variance with conclusions reached by the FTC." (Berndt Report ¶ 209.)

competition was sufficiently 'fierce' to have 'pushed-back' or mitigated the impacts of the 5%
Mark-Up Scheme;" *id.* ¶ 48 ("We simply do not find evidence of any meaningful mitigation.").
The Court's Class Order was right and Dr. Hartman is wrong. The presence of fierce
competition among PBMs for TPP business, and the mitigation that occurred as a consequence
of that competition, is an independent reason why Dr. Hartman cannot use IMS data to calculate
aggregate damages.

### IV.    DR. HARTMAN'S ASSERTIONS THAT TPPS AND PBMS WERE NOT AWARE OF THE MARKUP INCREASES CANNOT REHABILITATE HIS AGGREGATE DAMAGES MODEL.

Although the Court did not base its rejection of Dr. Hartman's aggregate damage model
on PBM or TPP knowledge of the AWP spread increase, Dr. Hartman continues to argue that
few PBMs were aware of it, and that those that were had no incentive to adequately inform
TPPs. (Hartman October Report ¶ 43 & n.33.) Dr. Hartman persists on this point because
knowledge would lead TPPs, in Dr. Hartman's words, to employ "heat seeking missiles" to
negotiate the increase away. That, in turn, would be fatal to Dr. Hartman's zero mitigation
damages model.[10] Neither Dr. Hartman's nor plaintiffs' arguments regarding knowledge,
however, rehabilitate Dr. Hartman's aggregate damages model. To the contrary, they confirm
that knowledge and response are individual issues that cannot be addressed in a class trial.

In his October Report, Dr. Hartman concedes that two of the largest PBMs — ESI and
Caremark — knew of the increased AWP spread, but complains that similar evidence of
knowledge has not yet been introduced for the more than 48 other PBMs who contracted with the
TPP class. (*Id.* ¶ 43.) That assertion alone underscores the need for a TPP-by-TPP analysis to

---

[10] McKesson has previously demonstrated that Dr. Hartman's "knowledge" conclusions are
irrelevant to the Court's criticism of his aggregate damage model, and that the evidence of TPP
knowledge is far more abundant than Dr. Hartman suggests. (*See* McKesson's Response to Dr.
Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order,
Oct. 16, 2007 ("McKesson's Response") [Docket No. 327] 10-14 and App. A.) Dr. Hartman's
October Report does not alter these facts in any way.

answer the question: which PBMs knew, what did they tell each TPP, and when did they tell them?[11]

Dr. Hartman also claims that even if PBMs knew of the spread increase, there is "no evidence that ESI or Caremark systematically or even selectively renegotiated and/or improved TPP reimbursement contracts, *based on the knowledge of the increased mark-ups*." (*Id.*) But here, too, only an individual analysis of each contract renegotiation during the class period would reveal whether any contract changes were "based on the knowledge of the increased mark-ups."

The only other new point plaintiffs make on the knowledge front is their citation to a recently obtained ESI email dated April 2002. (Berman Reply Decl. Ex. 5.) The email notes that ESI's mail order business benefited from the increased AWP markups, an unremarkable fact acknowledged in other ESI documents produced earlier in this case. (*See, e.g.*, ESI 414-00001827 and ESI-414-00001762, submitted as Exs. 6N and 6H to Decl. of Lori A. Schechter in Opp'n to Class Certification, Mar. 2, 2007 [Docket Nos. 206-19 & 206-20.) The email also predicts that ESI clients will likely ███████████████████████████ (Berman Reply Decl. Ex. 5.) This "pushback," of course, is the very reason the Court rejected Dr. Hartman's aggregate damage model in the Class Order. The email also contains handwritten notes of an ESI executive, acknowledging that ████████████████████ of the FDB spread increase and ██████████████████████████████ ██████████████ (*Id.*)

Plaintiffs assert that this document demonstrates that "PBMs were not motivated to make meaningful disclosures" because of the "very favorable impact on mail margins," and that ESI, for example, "put a lid" on such information. (Class Pls.' Reply to McKesson's Opp'n to Aggregate Damages to the TPP Class, Oct. 29, 2007 ("Reply Br.") 2.) [Docket No. 343.] But nothing in this document alters the fact that ████████████████████████████

---

[11] Dr. Hartman actually supplies additional instances of knowledge among PBMs when he asserts that PBMs with mail order operations all had knowledge of the spread increases.

████████████████ about FDB spread increases, as well as follow up information, analyses, and price concessions, even after the notes on the document were drafted. Thus, as ESI's corporate designee William Kiefer testified, ESI was ████████████████████████████

████████████████████████████████ (William Kiefer Dep. 69:23-70:19, July 24, 2007; Flum Surreply Decl. Ex. 4.) After the April 2002 Alert to clients went out, ████████████████

████████████████████████████████████ " (*Id.*) The AWP spread increase also ████████

████████████████████ in the May, June, and July time frame after the April 2002 notification was sent. (*Id.* at 74:20-75:17.) Thus, regardless of whatever benefits the spread increases may have bestowed on ESI's mail order business, ESI continued to ████████

████████████████████

Beyond that, there can be no real dispute that individual TPPs learned about increased spreads and higher AWPs from multiple sources other than PBMs. (*See* McKesson's Response, App. A (cataloguing evidence that TPPs learned of higher markups from manufacturers, claims administrators, industry publications and other TPPs.) Indeed, plaintiffs' own industry expert reveals another likely source of information about AWP spread increases for TPPs — pharmacy benefit consultants. Dr. McDonough, who runs a pharmacy benefit consulting business, admits that she learned during conversations with FDB in 2002 that there was an increase in the AWP to WAC ratio. (Tutorial Presentation of Kimberly P. McDonough. Oct. 29, 2007 ("McDonough Tutorial") 7, [Docket No. 349]; McDonough September Report 11.) She also spoke with "executives from the PBM industry" in early 2003 who told her that "the change in AWP to WAC ratio was beneficial" to PBMs. (McDonough Tutorial 9.) Dr. McDonough tells us that her company has been a consultant to more than 200 TPPs, that she has directly participated in PBM contract negotiations for her TPP clients, and that she has advised her TPP clients about

pharmaceutical pricing terms, including AWP and WAC. (*Id.* at 2.)[12] As this Court has

recognized, consultants, such as Dr. McDonough, played a significant role in assisting and

advising less sophisticated TPPs in contract negotiations. *In re Pharm. Indus. Average*

*Wholesale Price Litig.*, No. 01-12257, 2007 U.S. Dist. LEXIS 81102 at *17 (D. Mass. Nov. 1,

2007). Surely, Dr. McDonough must have shared the information she learned about FDB's

spread increases with clients who relied upon her for assistance in negotiating the best possible

contract terms with their PBMs. Plaintiffs and Dr. Hartman, however, simply ignore the

pervasive role of consultants, and indeed, the testimony of Dr. McDonough regarding her own

first-hand knowledge of the spread increases learned in early 2002.

## V.     DR. HARTMAN'S RESPONSE DOES NOT SATISFY THE CLASS ORDER'S REQUEST FOR A FEASIBLE AGGREGATE DAMAGES MODEL OR MEET THE STANDARDS FOR RECONSIDERATION.

### A.     Dr. Hartman Does Not Offer a Feasible Aggregate Damage Model Under Either of the Two Options Permitted by the Court.

The Class Order holds that a "feasible" aggregate damages methodology for the TPP

class needs to identify and exclude damages for reimbursements of drugs under contracts that

were "renegotiated or amended during the class period to provide price adjustments." (Class

Order 18, 25.) In other words, a "feasible" damages methodology must identify and exclude

reimbursements by TPPs that were able to mitigate the impact of higher AWP spreads by

renegotiating their contracts with their PBMs or through some other means. The Court

suggested two ways for Dr. Hartman to meet that standard. Dr. Hartman could propose a new

---

[12] In her tutorial, Dr. McDonough takes issue with Dr. Willig's observation that CalPERS obtained a larger percentage rebate pass-through when it renegotiated a new PBM contract in 2001. According to Dr. McDonough, her company "served as a consultant to PERS during those negotiations," and the changes to rebate pass-through were "due to competitive negotiation during the RFP process based on the result of audit findings." (McDonough Tutorial p.11.) But Dr. McDonough is referring to a different TPP and a different contract than Dr. Willig. *Compare* Expert Report of Robert D. Willig, Jan. 24, 2007 ¶ 85 [Docket No. 193] and Willig October Decl. App. 2 at ¶ 15 (discussing *CalPERS* contract) *with* McDonough Tutorial p. 11 (discussing her firms' contract negotiations on behalf of the *Public Employment Retirement System of Ohio*). In any event, Dr. Willig did not claim that the new CalPERS rebate pass-through percentage was in response to the scheme, as Dr. McDonough misleadingly asserts. (*See* Willig October Decl. App. 2 ¶ 15.)

methodology that "includes only those contracts in effect when the scheme took place and excludes reimbursements under contracts renegotiated in response to the increase." (*Id.* at 25.) In the alternative, he could propose a methodology to capture "damages for one year after the large increase in 2002 took effect." (*Id.*)

Dr. Hartman has not met either alternative prong of the Court's test because his aggregate methodology does not capture mitigation of TPP losses through contract renegotiation or renewal and thereby fails to prevent overstatement of TPP damages on a class-wide basis. Dr. Hartman *concedes* that he cannot satisfy the first alternative because he cannot identify which TPP-PBM contracts were renegotiated or amended during the class period. (Hartman October Report ¶ 34.) Instead, he offers up the same aggregate damages methodology based on IMS data that the Court has already rejected, and then tells this Court that it was wrong to reject his methodology in the first place.

Dr. Hartman fares no better with the Court's second alternative. He proposes to use his IMS data analysis and the constant relationship assumption to calculate damages for periods less than the full 3½-year class period. Since the IMS data do not report TPP reimbursements and the constant relationship assumption does not account for TPP mitigation, his damages methodology is not feasible. As Dr. Willig explains, Dr. Hartman's methodology overstates damages no matter what time period is used. (Willig Rebuttal Decl. ¶¶ 44-55.) Because Dr. Hartman's model cannot account for mitigation resulting from renegotiation, his model "overstates damages for any time period, whether it be 3.5 years, two years, one year, or six months." (*Id.* ¶ 63.)

In their reply, plaintiffs seek to brush aside these defects as "potential technical flaws" that can be sorted out at trial. (Reply Br. 17.) To the contrary, because the record establishes and the Court has found that Dr. Hartman's aggregate damages methodology is fundamentally flawed, there is no reason to wait for trial to decide whether plaintiffs have met their burden of certifying an aggregate damages class. *See, e.g., Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) (where plaintiffs have relied principally on their expert's report and that expert's opinion has been found to be methodologically unsound, plaintiffs should not get "a

second bite at the class certification apple"); *Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005) (in determining whether plaintiffs have satisfied their burden under Rule 23, the court must resolve all relevant legal and factual disputes, including "the resolution of expert disputes concerning the import of evidence"); *West v. Prudential Securities, Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (court "may not duck hard questions by observing that each side has some support" as "[t]ough questions must be faced and squarely decided").[13]

**B.     Dr. Hartman's Analysis Offers No Basis for This Court to Reconsider Its Findings That Dr. Hartman's Aggregate Damages Model Is Insufficient.**

Because Dr. Hartman cannot satisfy either prong of the Court's instructions for a feasible aggregate damages model, Dr. Hartman contends that the Court's Class Order erred "as a matter of economics and the evidence," and that plaintiffs should therefore be allowed to proceed on his previously rejected damages model. Neither Dr. Hartman nor the plaintiffs, however, have offered sufficient grounds for this Court to reconsider its Order so as to allow use of the very aggregate damages model that the Court already found was fundamentally flawed.

It is well-established in this Circuit that "a trial court, having considered the parties' arguments and ruled on them, is under no obligation to repastinate well-ploughed soil simply because an unsuccessful litigant balks at taking 'no' for an answer." *Air Line Pilots Ass'n v. Precision Valley Aviation*, 26 F.3d 220, 227 (1st Cir. 1994). Nor is a motion for reconsideration "intended to allow a party to make arguments already presented to, and rejected by, the court." *Davis v. Lehane*, 89 F. Supp. 2d 142, 148 (D. Mass. 2000). Rather, a court should grant a motion

---

[13] *In re Neurontin Marketing & Sales Practices Litig.*, No. 04-10981, 2007 U.S. Dist. Lexis 63898, at *69 (D. Mass. Aug. 27, 2007) does not compel a different result. In *Neurontin*, discovery was ongoing, and the court had received only a "sneak preview of the issues" based on a "preliminary record." *Id.* at *70-*71. Here, by contrast, discovery is closed, Dr. Hartman has ventilated his aggregate damages model in four separate reports and a tutorial spanning over 600 pages, and plaintiffs have submitted Dr. Hartman's full blown aggregate damages calculations for the Court's review. This case is well past the "sneak preview" stage. While we believe that the defects in Dr. Hartman's aggregate damages model are manifest, if the Court has doubts, McKesson respectfully submits that the Court should ask Dr. Berndt to review Dr. Hartman's methodology, as it did in the related MDL.

for reconsideration of "an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Id.* at 147. *See also Pastula v. Lane Constr. Corp.*, No. 05-133-B-W, 2006 U.S. Dist. LEXIS 15714 at *1-*3 (D. Me. March 17, 2006) ("A motion for reconsideration should not give the losing party the opportunity to simply reargue its losing points and authorities.").

Plaintiffs have not met that burden. If anything, plaintiffs and their expert have demonstrated that the Court was correct in refusing to certify a TPP damages class. As the Class Order recognized, "[i]ndividualized trials or hearings on damages for renewed or renegotiated contracts in the proposed individualized allocations with aggregate damages would be a morass." (Class Order 24.) Indeed, where as here damage awards to class members are subject to a variety offsets depending on each class member's particular circumstances, there is no practical benefit to an aggregate damages award. *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003) (affirming court's refusal to award aggregate damages). As the Eleventh Circuit explained:

> *individualized proof of claims would be necessary regardless of whether an aggregate judgment was entered,* and the considerations that must be taken into account to calculate the correct amount of damages during the claims process reveal the obstacles to entering an aggregate judgment for the class.

*Id.* at 1257. Among the list of factors noted by the Eleventh Circuit was the necessity of "determining whether the dealers' claims are subject to further reduction by set-off claims asserted by Exxon." *Id.* Here, as in *Allapattah,* the question of each TPP's ability to mitigate the effect of higher AWP markups will need to be tested in 11,000 individual damages or claims hearings, rendering an aggregate damages award inappropriate.

## VI.    THE PERCENTAGE CO-PAY DAMAGES CLASS SHOULD NOT BE CERTIFIED.

In the Class Order, the Court assumed that, unlike the "bundle of adjustments" that had to be considered with respect to TPP class damages, "a simple formula" could apply to determine

damages for the percentage co-pay class. (Class Order 24.) Dr. Hartman's September Report

explains why the Court's assumption was wrong. In *unequivocal terms*, Dr. Hartman states that

any damages incurred by the percentage co-pay class depend on calculation of the damages of

the TPP class:

> I note also that calculation of damages to Class 1 requires the
> calculation of damages to Class 2, since the damages to Class 1 are
> simply a percentage of the damages (paid as coinsurance) to the
> TPPs/insurers that insure those consumers. *In order for Class 1 to
> be certified for liability and damages, I (and any economist)
> require calculation of the damages to the TPPs insuring those
> consumers.*

(Hartman September Report ¶ 12.)  Plaintiffs' other expert, Dr. McDonough, confirms the same:

"[u]nder a co-insurance program, the member's cost is reflected as a percentage of the health

plan's total pharmacy cost for each prescription." (McDonough Report 9.)

Yet plaintiffs now seek to run from these concessions in order to escape the inevitable

conclusion that Dr. Hartman's aggregate damages model does not work for the percentage co-

pay class either.  Thus, plaintiffs' reply makes no reference to their experts' statements, and

instead responds with the ambiguous assertion that "a consumer's payment is tied to the AWP."

(Reply Br. 21.)  This assertion, however, glosses over the fact that the actual amount a consumer

pays for a percentage co-pay is a function of the particular contract between the TPP offering

drug benefits to the consumer and the PBM with which the TPP contracts.  Thus, a consumer's

payment is *not* "tied to the AWP" in any formulaic way.[14]

Plaintiffs also argue, albeit inconsistently, that the calculation of the percentage co-pay

damages will not be problematic because the IMS data Dr. Hartman's uses "accounts for

reductions in discounts off AWP or dispensing fees at the TPP level and would necessarily do so

at the consumer level as well." (Reply Br. at 21.)  But for all the reasons noted above, the IMS

---

[14] In this regard, the percentage co-pay class here differs from the Medicare co-pay class certified
in the MDL because under Medicare, "a typical consumer *by statute* simply pays a percentage of
AWP as a co-pay," *i.e.*, 20% of 95% of AWP.  *In re Pharm. Indus. Average Wholesale Price
Litig.*, 230 F.R.D. 61, 82 (D. Mass. 2005).

data cannot account for "pushback" at the TPP-PBM level; to the contrary, measuring the extent of mitigation will require a TPP-by-TPP analysis.  (Willig Rebuttal Decl. ¶ 4.)

Plaintiffs have no feasible model to calculate aggregate damages for either the TPP or the percentage co-pay class.  McKesson therefore respectfully requests that the Class Order be modified to limit certification of the percentage co-pay class to liability only, as the Court did with the TPP class.

## CONCLUSION

Dr. Hartman's latest report fails to offer anything new, much less a feasible methodology for certifying a TPP damages class.  There is accordingly no reason for this Court to revisit its decision in the Class Order to deny certification of a TPP damages class.  Dr. Hartman's September Report does, however, confirm that the alleged damages sustained by the percentage co-pay class are derivative of those sustained by the TPP class.  Since Dr. Hartman has failed to propose a viable methodology for determining aggregate damages to the TPP class, McKesson respectfully requests that the Class Order be modified to limit certification of the percentage co-pay class and the TPP class to liability only.


Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
James P. Bennett (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
200 Portland Street
Suite 400
Boston, MA 02114
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated:  November 8, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 8, 2007.

/s/ Lori A. Schechter
Lori A. Schechter