UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Civil Action:  1:05-CV-11148-PBS <br><br><br> Judge Patti B. Saris |

**SURREPLY DECLARATION OF PAUL FLUM IN SUPPORT OF MCKESSON CORPORATION'S RESPONSE TO DR. HARTMAN'S SEPTEMBER 14, 2007 SUBMISSION REGARDING THE COURT'S CLASS CERTIFICATION ORDER**

I, Paul Flum, declare as follows:

1.       I am a partner of the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action.  I am familiar with the record in this case and with the discovery that has been conducted.  I submit this declaration in support of

McKesson Corporation's Reply In Support Of Response To Dr. Hartman's September 14, 2007 Submission Regarding The Court's Class Certification Order.

    2.    True and correct copies of documents and deposition transcript excerpts produced to McKesson in this action are attached as exhibits to this declaration as follows:

| Exhibit No. | Description |
|:---:|:---|
| 1 | Title pages, Table of Contents, and Chapter 14 (authored by plaintiffs' expert Kimberly McDonough) of Handbook of Pharmaceutical Public Policy (Thomas R. Fulda & Albert I. Wertheimer eds., 2007) |
| 2 | Letter from NCPA to Judge Saris regarding FDB Settlement filed June 20, 2007 |
| 3 | Letter from PCMA to Judge Saris regarding FDB Settlement filed June 20, 2007 |
| 4 | Deposition excerpt of William Kiefer of Express Scripts dated July 24, 2007 |
| 5 | Class Certification Hearing transcript excerpt dated May 22, 2007 |
| 6 | Deposition excerpt of Dennis Lindell of ABC dated July 27, 2006 taken in *In re Pharmaceutical Industry Average Wholesale Price Litig.*, No. 01-12257 (D. Mass.) ("MDL") |
| 7 | Deposition excerpt of Kay Morgan of FDB dated January 12, 2005, taken in MDL |
| 8 | Deposition excerpts of Kay Morgan of FDB dated June 28, 2007 |
| 9 | Emails between Elaine Kiso of FDB and Kay Morgan of FDB dated April 25, 2000 (FDB-AWP 046953; Kay Morgan Dep. Ex. 31) |
| 10 | FDB Drug Product Information cover sheet regarding pricing for Glaxo Wellcome products, effective October 1, 2000 (FDB-AWP 046440-41; Kay Morgan Dep. Ex. 34) |
| 11 | FDB Drug Product Information cover sheet regarding pricing for Lilly products, effective May 15, 2001 attaching email from Kay Morgan of FDB to Alisha Nielsen and LaGreta Cosey of FDB, dated May 14, 2001 (FDB-NEC 015318-20; Kay Morgan Dep. Ex. 42) |
| 12 | Email from Howard Imatomi of Bergen to Alisha Nielsen of FDB, dated May 9, 2001 (FDB/NEC 040017; Kay Morgan Dep. Ex. 46) |
| 13 | Email from Julie Rosling of Bergen to Kay Morgan of FDB, dated August 28, 2008 (FDB-NEC 041041; Kay Morgan Dep. Ex. 53) |
| 14 | Deposition excerpts of Alisha Nielsen of FDB dated May 18, 2007 |

| 15 | Document titled "Average Wholesale Price" (FDB-AWP 02023; Kay Morgan Dep. Ex. 21) |
| 16 | Emails between Kay Morgan of FDB and Hank Slomowski of Novartis dated July 23, 2003 (NPC0029768-69; Kay Morgan Dep. Ex. 22) |
| 17 | Email from Kay Morgan of FDB to Jim Breen of FDB dated October 8, 2003 (FDB/NEC 032851; Kay Morgan Dep. Ex. 19) |
| 18 | Email from Jim Breen of FDB to Steve Lefebrue of AmerisourceBergen dated October 14, 2003 (FDB/NEC 032870; Kay Morgan Dep. Ex. 54) |
| 19 | Email from Jim Breen of FDB to Steve Lefebure of AmerisourceBergen dated October 17, 2003 (FDB-NEC 040946; Kay Morgan Dep. Ex. 55) |
| 20 | Email from Bill Wright of Hearst to Dave Kuehl of AmerisourceBergen enclosing Kay Morgan letter (ABC(AWP)001954-66; Kay Morgan Ex. 57) |
| 21 | Email from Jody Taylor of Cardinal to Jim Scott of Cardinal dated November 10, 2006 (CH/MCK000937) |
| 22 | Deposition excerpt of Dennis Lindell of AmerisourceBergen dated October 23, 2007 |
| 23 | Deposition excerpt of Nancy Stalker of Blue Shield of California dated July 17, 2007 |
| 24 | Deposition excerpt of Erlinda Thomas of McKesson dated March 13, 2007 |
| 25 | Deposition excerpt of Jody Taylor of Cardinal dated July 20, 2007 |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of November, 2007, in San Francisco, California.

By:   /s/ Paul Flum
        Paul Flum

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 8, 2007.

/s/Lori A. Schechter
Lori A. Schechter

# Exhibit 1

Case 1:05-cv-11148-PBS    Document 294-4    Filed 09/06/2007    Page 2 of 39

# HANDBOOK OF
# PHARMACEUTICAL
# PUBLIC POLICY




Thomas R. Fulda, BA, MA
Albert I. Wertheimer, PhD, MBA
Editors



*Thomas R. Fulda, BA, MA*
*Albert I. Wertheimer, PhD*
*Editors*

# Handbook of Pharmaceutical Public Policy



*Pre-publication*
REVIEW . . .

*"Pharmaceutical Public Policy,* edited by Thomas Fulda and Albert Wertheimer, is a comprehensive collection of essays on a wide range of policy issues associated with the development, regulation, use, and reimbursement of pharmaceuticals, mostly in the United States. The 30 chapters comprising this encyclopedic resource (over 600 pages) are generally well-written by academic and other experts in their respective fields. This extensive collection of articles illuminates many important, often complex issues. It enables 'one-stop shopping' in the pharmaceutical policy literature and will be a valuable addition to the bookshelves of both students and researchers."

**Richard Levy, PhD**
*Senior Research Consultant,*
*National Pharmaceutical Council*

# Handbook
## of Pharmaceutical
## Public Policy

## NOTES FOR PROFESSIONAL LIBRARIANS AND LIBRARY USERS

This is an original book title published by Pharmaceutical Products Press®, an imprint of The Haworth Press, Inc. Unless otherwise noted in specific chapters with attribution, materials in this book have not been previously published elsewhere in any format or language.

## CONSERVATION AND PRESERVATION NOTES

All books published by The Haworth Press, Inc., and its imprints are printed on certified pH neutral, acid-free book grade paper. This paper meets the minimum requirements of American National Standard for Information Sciences-Permanence of Paper for Printed Material, ANSI Z39.48-1984.

## DIGITAL OBJECT IDENTIFIER (DOI) LINKING

The Haworth Press is participating in reference linking for elements of our original books. (For more information on reference linking initiatives, please consult the CrossRef Web site at www.crossref.org.) When citing an element of this book such as a chapter, include the element's Digital Object Identifier (DOI) as the last item of the reference. A Digital Object Identifier is a persistent, authoritative, and unique identifier that a publisher assigns to each element of a book. Because of its persistence, DOIs will enable The Haworth Press and other publishers to link to the element referenced, and the link will not break over time. This will be a great resource in scholarly research.

PHARMACEUTICAL PRODUCTS PRESS®
Pharmaceutical Health Policy
Albert I. Wertheimer, PhD, RPh, MBA
Editor

*Pharmacy Law Desk Reference* edited by Delbert D. Konnor

*Pharmaceutical Economics and Public Policy* by Ronald J. Vogel

*Handbook of Pharmaceutical Public Policy* edited by Thomas R. Fulda and Albert I. Wertheimer

# Handbook of Pharmaceutical Public Policy

Thomas R. Fulda, BA, MA
Albert I. Wertheimer, PhD
Editors

PPP

Pharmaceutical Products Press®
An Imprint of The Haworth Press, Inc.
New York

For more information on this book or to order, visit
http://www.haworthpress.com/store/product.asp?sku=5733

or call 1-800-HAWORTH (800-429-6784) in the United States and Canada
or (607) 722-5857 outside the United States and Canada

or contact orders@HaworthPress.com

Published by

Pharmaceutical Products Press®, an imprint of The Haworth Press, Inc., 10 Alice Street,
Binghamton, NY 13904-1580.

© 2007 by The Haworth Press, Inc. All rights reserved. No part of this work may be reproduced or
utilized in any form or by any means, electronic or mechanical, including photocopying, microfilm,
and recording, or by any information storage and retrieval system, without permission in writing
from the publisher. Printed in the United States of America.

PUBLISHER'S NOTE
The development, preparation, and publication of this work has been undertaken with great care.
However, the Publisher, employees, editors, and agents of The Haworth Press are not responsible
for any errors contained herein or for consequences that may ensue from use of materials or
information contained in this work. The Haworth Press is committed to the dissemination of ideas
and information according to the highest standards of intellectual freedom and the free exchange of
ideas. Statements made and opinions expressed in this publication do not necessarily reflect the
views of the Publisher, Directors, management, or staff of The Haworth Press, Inc., or an
endorsement by them.

Cover design by Marylouse E. Doyle.

Library of Congress Cataloging-in-Publication Data

Handbook of pharmaceutical public policy / [edited by] Thomas R. Fulda, Albert I. Wertheimer.
    p. ; cm.
Includes bibliographical references.
ISBN: 978-0-7890-3058-0 (hard : alk. paper)
ISBN: 978-0-7890-3059-7 (soft : alk. paper)
    1. Pharmaceutical policy—United States. I. Fulda, Thomas R. II. Wertheimer, Albert I.
    [DNLM: 1. Drug and Narcotic Control—legislation & jurisprudence—United States. 2. Drug
Industry—legislation & jurisprudence—United States. 3. Economics, Pharmaceutical—legislation
& jurisprudence—United States. 4. Health Policy—United States. QV 33 AA1 H236 2007]
    RA401.A3H36 2007
    362.17′82—dc22
                                                    2007000495

To our spouses, Martha Fulda and Joaquima Wertheimer,
our mentors the late Dr. Irene Till and Dr. Larry Weaver,
and to Dr. Hans Hogerzeil, T. Donald Rucker,
and the contributing authors without whom this book
could not have happened.

# CONTENTS

About the Editors                                                                    xi

Contributors                                                                         xiii

Foreword                                                                             xvii

    *Hans V. Hogerzeil*

Preface                                                                              xxi

Chapter 1. Policy, Law, and Regulation                                                1
    *Susan Winckler*

Chapter 2. The Political Evolution of Medicare                                        9
and Prescription Drug Coverage
    *Thomas R. Oliver        Susan P. Canny*
    *Philip R. Lee           Helene L. Lipton*
    *Sarah B. Schulman*

Chapter 3. Evolution of the FDA Drug Approval Process                                25
    *Syed Rizwanuddin Ahmad*

Chapter 4. The Market for Pharmaceuticals:                                           43
The Big Picture
    *David H. Kreling*

Chapter 5. Medicare's Prescription Drug Benefit                                      65
    *David J. Gross*

Chapter 6. Prescription Drugs Under Medicaid                                         87
    *Linda Elam*

Chapter 7. Public Health Pharmacy                                                   109
    *Theodore P. Chiappelli*

Chapter 8. Department of Veterans Affairs Pharmacy                                  121
Programs
    *Michael A. Valentino*
    *Jonathan B. Perlin*

Chapter 9. The Department of Defense Pharmacy
Programs
  *W. Mike Heath* ........................................ 137

Chapter 10. Outside the Pill Box: Innovative State
Prescription Drug Program Practices
  *Brendan Krause*
  *Kimberly Fox* ........................................ 149

Chapter 11. State versus Federal Regulation of Pharmacy
  *Melissa Madigan*
  *Ed Rickert* .......................................... 171

Chapter 12. Evolution and Future Prospects
of Pharmaceutical Industry Regulation
  *William Wardell*
  *William Vodra*
  *Judith K. Jones*
  *Richard N. Spivey* ................................... 191

Chapter 13. Managed Care Pharmacy: The Past
and Present
  *John D. Jones* ....................................... 227

Chapter 14. Pharmaceutical Benefits Managers
  *Kimberly P. McDonough* .............................. 247

Chapter 15. Risk Minimization: A New Regulatory
Directive
  *Louis A. Morris*
  *Eva Lydick* .......................................... 283

Chapter 16. Drug Importation and Reimportation
  *Albert I. Wertheimer*
  *Thomas Santella* ..................................... 303

Chapter 17. Structure and Dynamics
of the Pharmaceutical Industry
  *Earlene Lipowski*
  *Patrick McKercher* ................................... 327

Chapter 18. Health Policy and Economic Issues
in Biotechnology and Pharmacogenetics
  *Louis P. Garrison, Jr.* .............................. 351

Chapter 19. Promoting Pharmaceutical Products
  *Alan Lyles* .......................................... 371

Chapter 20. Competition: Brand-Name versus Generic
Drugs
  *Jeff J. Guo*
  *Christina M.L. Kelton* ............................... 395

Chapter 21. Drug Insurance Design
  *Earle "Buddy" Lingle* ................................ 417

Chapter 22. Evidence-Based Preferred Drug Lists
  *John Santa* .......................................... 431

Chapter 23. Recent Developments in the Health
Technology Assessment Process
  *Paul C. Langley* ..................................... 457

Chapter 24. Why Is Medication Use Less Than Appropriate?
  *David P. Nau*
  *Duane Kirking* ....................................... 477

Chapter 25. Diversion, Abuse, and Other Nonmedical
Use of Prescription Drugs
  *Bonnie B. Wilford*
  *Robert L. Dupont* .................................... 499

Chapter 26. Drug Utilization Review: Dealing
with Complexity
  *Thomas R. Fulda*
  *Theodore M. Collins* ................................. 531

Chapter 27. Pharmaceutical Care and Payment
for Medication Management Services
  *Dale B. Christensen* ................................. 545

Chapter 28. Patient Compliance    565
  *Jon C. Schommer*
  *Reshmi L. Singh*

Chapter 29. Electronic Technology    589
  *Gordon Schiff*
  *Bill G. Felkey*

Chapter 30. Health Care Systems and Health Insurance
from a European Perspective    621
  *Marion Schaefer*
  *Katja Borchardt*

Index    645

## ABOUT THE EDITORS

**Thomas R. Fulda, BA, MA,** a federal civil servant for 30 years, held positions at the Social Security Administration and the Health Care Financing Administration. He conducted research on prescription drug pricing, participated in the development and implementation of the Federal Maximum Allowance Program planning for the implementation of the prescription drug provisions of the Medical Catastrophic Coverage Act of 1988, and had lead responsibilities for implementation of the Medicaid Drug Utilization Review provisions of the Omnibus Budget Reconciliation Act of 1990. He has published articles in the *Journal of Managed Care Pharmacy, Journal of the American Pharmacist Association,* and other journals. In 1995 he was made an honorary pharmacist by APhA (American Pharmacy Association).

**Albert I. Wertheimer, PhD, RPh, MBA,** is Professor and Research Center Director at Temple University School of Pharmacy. He is a former Director of Outcomes Research and Management at Merck & Co., Inc., in West Point, Pennsylvania, and a former Vice President of Pharmacy Managed Care at First Health Service Corporation in Glen Allen, Virginia. Prior to his work with pharmaceutical companies, he held academic appointments at the University of Minnesota and the Philadelphia College of Pharmacy where he served as Dean. He has also served as a consultant to governmental and international agencies, such as the World Health Organization, United States Congress, and the World Bank, as well as to pharmaceutical manufacturers, managed care organizations, and professional societies. He is the author or co-editor of 13 books and the author or co-author of 300 journal articles as well as being a reviewer or editorial board member of 13 journals. Dr. Wertheimer has lectured and consulted in more than 40 countries. His current research interests are pharmacoeconomics and outcomes related to disease state management.

*Handbook of Pharmaceutical Public Policy*
© 2007 by The Haworth Press, Inc. All rights reserved.
doi:10.1300/5733_a

9. PBM Medicaid Programs Show Promise. *Drug Cost Management Report*.

0. Medicaid Plan Programs Cited for Improving Care Quality While Control-
Rx Costs. (2003). *News and Strategies for Managed Care Medicare and*
icaid. May 12: 11,13.

# Chapter 14

# Pharmaceutical Benefits Managers

Kimberly P. McDonough

Pharmaceutical benefits managers (PBMs), or as they are sometimes classified, pharmaceutical benefits administrators (PBAs), represent a widely diverse business sector that serves as an operational intermediary to the health insurance industry for the processing of prescription drug claims in insurance benefits. Some PBMs offer a wide option of services, ranging from claim processing to clinical intervention programs, whereas others are more focused on limited services. PBMs offer services to insurance compa- nies, as well as to governmental programs or directly to self-insured em- ployers. Although they are widely unrecognized outside of the health insur- ance industry, as of 2004, approximately two-thirds of all U.S. prescriptions are processed by PBMs.[1] The implementation of a Medicare prescription drug benefit program in 2006 will likely increase that number.

The anticipated goal of a quality pharmaceutical benefits management program is to control cost of drug treatment and to increase the safety and quality of care beneficiaries to the program. To facilitate these services, em- ployers, health plans, and government benefit programs will often contract with pharmaceutical benefits management (PBM) firms, organizations that specialize in pharmacy claim and distribution services. PBMs typically of- fer their potential clients a variety of clinical and administrative services, but the services offered and administration methods vary significantly across PBMs. Examples of services that are typically offered in the industry include:

- Claims processing and adjudication
- Point-of-service (POS) online edits, including concurrent and pro- spective drug utilization review
- Retail and mail-order pharmacy network management
- Pharmacy network auditing program
- Reporting tools, including standard and query tools

*Handbook of Pharmaceutical Public Policy*
© 2007 by The Haworth Press, Inc. All rights reserved.
doi:10.1300/5733_14

247

- Rebate program, consisting of monies obtained from pharmaceutical manufacturers and discounts negotiated with the network
- Clinical services provided by PBMs include formulary development and management and drug utilization management involving physician intervention, client initiated management initiatives, disease management programs, and treatment guidelines. Outcomes management and patient education are also provided by the more clinically focused and managed care experienced PBMs.

## HISTORY OF THE PBM INDUSTRY

Although the PBM industry did not evolve until the early 1990s, predecessors to the industry have been in existence for many years. PBMs have their roots in one of three different areas: administrators of prescription drug cards, mail-service pharmacies, and prescription management groups within managed care organizations. In fact, the technology associated with prescription claim processing is comparable to technology used in credit card transactions for commercial sales. Several early claims transaction companies provided services to both industries.

Electronic transaction for pharmacy claims offered employers and health plans significant savings in operational costs. Prior to the advent of electronic claim adjudication capabilities, the processing of pharmacy claims was labor intensive and time consuming. Individuals would typically purchase their prescriptions, saving the receipts for submission to their insurance carrier. Considerable paperwork was necessary for the completion of these claims, and the complexity of this paperwork made completion of this function difficult for many individuals. Likewise, the level of paperwork for the processing of pharmacy claims created significant operational costs for health insurers. Paper claims were received by the health plan, and each claim was manually reviewed by a claim adjuster against individual's insurance benefit. Because of the extensive amount of manual intervention throughout the claim process, the potential for error was quite high, requiring follow-up or possibly even resubmission of the forms. However, after the claims were successfully completed and processed, individuals received reimbursement for a portion of their out-of-pocket costs, depending on their level of insurance coverage.

Pharmacy claim processing for Medicaid programs was equally labor intensive. When a pharmacy dispensed a medication to a Medicaid beneficiary, claims were typically submitted through a paper claim process. The pharmacist, or the pharmacist's assistant, completed a series of forms that provided information regarding the prescription, including the patient in-

formation, drug dispensed, quantity, and cost. Often, Medicaid forms were structured to permit the billing of multiple prescriptions on each form, often completed in duplicate or triplicate. As with the paper claims submitted by patients, Medicaid forms were completed manually and were subject to high potential for simple transcription errors or omissions, both by the individuals completing the forms as well as by the staff that were charged with processing of the forms within the Medicaid department. As a result of the manual process employed for the processing of claims, the turnaround time for compensation for Medicaid claims could take several months or more, creating cash-flow problems for pharmacies.

The advent of claim adjudication services, and the birth of what was to become the PBM industry, offered an efficient and consistent method to process pharmacy claims and facilitate the claim payment process. The industry emerged in the early 1980s as state Medicaid programs mandated electronic processing of prescriptions for improved efficiency and greater accountability. As electronic claim processing became more universally available in pharmacies, the industry evolved to provide pharmacy networks with negotiated discounts for drugs and dispensing fees.

In the early 1990s, the PBM industry experienced significant growth that was fueled by expanded adoption of prescription drug benefits as part of an insured health plan program. At this time, expansion of services to include claim processing, clinical interventions and mail-order prescription services resulted in what is now recognized as the PBM industry.

## SERVICES PROVIDED BY THE PBM INDUSTRY

### Claim Adjudication

The primary function of the PBM industry has historically been, and continues to be, the industry's ability to provide electronic claim processing services to clients. Claim processing functions are similar across the industry and provide the single greatest source of administrative efficiency to the health insurance industry with regard to pharmacy benefit administration. PBMs typically charge their clients a claim processing fee, ranging from $0.15 to $1.25 per claim for each claim that is adjudicated. Lower claim processing fees may be offered by the PBM, but this lower fee is typically offset by revenues that are retained in other services offered by the PBM. However, the claim processing fee charged by PBMs is more than offset by the savings generated through the elimination of the manual claim adminis-tration process.

## Claim Processing Standards

Pharmacy claims are processed electronically in accordance with standards that have been established by the National Council for Prescription Drug Programs, Inc. (NCPDP). NCPDP is a not-for-profit ANSI–Accredited Standards Development Organization that creates and promotes standards for the transfer of data within the pharmacy sectors of the health care industry.[2] The organization is governed by its membership, which represents virtually every sector of the pharmacy services industry, including pharmacies, government, insurers, manufacturers, wholesalers, and telecommunication vendors.

NCPDP's claim transmission standards establish the requirements for the submission of electronic claims within the United States. Factors that are addressed within the claim standards include telecommunication procedures for claim submission, standards for fields that are maintained in the claim transaction process, and unit standards for quantities that are dispensed.[3] NCPDP claim transaction standards were adopted as the required format for pharmacy claim transactions under the Health Insurance Portability and Accountability Act of 1996.[4] NCPDP also provides guidelines to the processing of pharmaceutical rebates, the format of prescription cards that are issued to beneficiaries, enrollment processes, procedures for the implementation of prior authorization requirements, and professional services implementation.

## Electronic Data Interchanges

The electronic processing of claims greatly improved the efficiency of the claim submission and payment process. However, in any given pharmacy, prescriptions and services may be provided to patients with a wide variety of third party coverage. If the number of patients with a particular level of coverage is great, the pharmacy may establish a direct transmission line, through a T1 or comparable interface, to the third party payer. However, the cost of these lines can be prohibitive, particularly if the volume of claims submitted to a single source is low. To facilitate the transfer of claims to the appropriate resource for payment, electronic data interchanges (EDI) are utilized.

Electronic data interchanges (EDI) serve to route the pharmacy claim from the pharmacy, where the claim is being generated, to the appropriate payer.[5],[6] This process is completed in the same manner as many forms of

electronic claim transmission for credit card and banking procedures through direct managed network connection options, frame relay, and virtual private networking (VPN) technology.[7] A list of organizations that provide EDI services is included in Exhibit 14.1.[8-13] These companies typically offer connectivity to more than 1,000 payers nationally, providing pharmacies with a single interface for all claim transactions. Services are provided twenty-four hours per day, seven days per week.

Pharmacy claims are submitted to the EDI electronically, where the claim is electronically routed to the appropriate payer. The claim adjudicates against the claim processing system of the payer, and is evaluated for a number of edits, including the eligibility status of the individual; coverage of the applicable drug; assignment of any prescription edits or messages; determination of the individual's copay, coinsurance, or deductible; and designation of the approved payment amount. These transactions are completed in nanoseconds, permitting point-of-sale transactions in the pharmacy.

In addition to claim routing services, EDI vendors offer a variety of services that are designed to improve efficiency in pharmacy operations and in the claim adjudication process. One example is electronic claim editing that uses client-determined edits to test claims prior to submission to the appropriate payer. This testing process is designed to reduce the number of claim transmission errors and to maximize reimbursement opportunities for the pharmacy. Other services that are offered by EDI vendors include electronic signature capture, integrated response voice (IVRU) systems for prescription renewal, refill reminder systems, as well as a variety of electronic systems designed to improve work flow and prescription processing within the pharmacy.

### EXHIBIT 14.1.
### Some major companies that provide electronic data interface services

ERx Network
Freedom Data Services (FDS)
Per-Sé Technologies (formerly NDCHealth)
QS/1
Rx Linc
Emdeon (formerly WebMD)

252    HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY

## NDC Codes

When prescriptions are submitted for adjudication, either in electronic or paper form, a national drug code (NDC) is used to identify the medication that is being dispensed. The NDC serves as a universal product identifier for prescription and selected over-the-counter, insulin, domestic, and foreign drug products that are in commercial distribution in the United States. The national drug code system was established by Congress under the Drug Listing Act of 1972, an amendment to the Federal Food, Drug, and Cosmetic Act.[14] The purpose of the development of this coding system was to facilitate out-of-hospital drug reimbursement under the Medicare program. The coding system provides the commissioner of the Food and Drug Administration (FDA) with a current list of all drugs manufactured, prepared, propagated, compounded, or processed by a drug establishment registered under the Federal Food, Drug, and Cosmetic Act.[15] The act requires submission of information on commercially marketed drugs and is used in the enforcement of the Federal Food, Drug, and Cosmetic Act.

Under the coding system, each drug product is assigned a unique ten-digit, three-segment number that identifies the labeler/vendor, product, and trade package size. Segments may be divided into one of three configurations: 4-4-2, 5-3-2, or 5-4-1. The first segment, the labeler code, is assigned by the FDA. A labeler is any firm that manufactures, repacks, or distributes a drug product. The second segment, the product code, identifies a specific strength, dosage form, and formulation for a particular firm. The third segment, the package code, identifies package sizes. Both the product and package codes are assigned by the firm.

The NDC directory is updated quarterly within five working days after the end of March, June, September, and December. Reasons why certain drug products may not be included in the NDC directory include the following: (1) the firm has not submitted the listing information to the FDA, (2) the product is no longer being marketed, or (3) the firm has not complied fully with the listing process. Commercial drug pricing sources such as First DataBank or Medispan will frequently maintain discontinued NDC codes in their listing for a period of time to facilitate claim processing transactions.

The FDA publishes a Drug Registration and Listing System (DRLS) Instruction Booklet that describes in detail the registration and listing process and also contains the applicable code of federal regulations (CFR).

Government agencies other than the FDA may display the NDC in an eleven-digit format for purposes of consistency. For example, the Centers for Medicare and Medicaid Services (CMS) displays the labeler code as five digits with leading zeros, the product code as four digits with leading zeros, and the package size as two characters with leading zeros.

## Provider and Pharmacy Identification

In addition to claim transmission standards, NCPDP develops provider and pharmacy identification systems. Working with the National Association of Boards of Pharmacy (NABP), NCPDP established and maintains a unique, national identifying number that would assist pharmacies in their interactions with federal agencies and third party providers. The NCPDP Provider Identification Number, formerly the NCPDP/NABP numbering list, is assigned to every licensed pharmacy qualified Alternate Site Enumeration Program (ASEP) sites in the United States and contains over 70,000 pharmacies. It is a seven-digit numbering system NCPDP currently maintains and updates this database, and it is available for processing and reference purposes.

NCPDP has also established HCIdea, a provider identification system with unique coding for a wide variety of individual health care providers for the purpose of identification in claim transactions. Providers that are identified in the HCIdea database include physicians, pharmacists, and other health practitioners who are licensed to prescribe pharmaceuticals. The database uniquely identifies each individual prescriber with an HCIdea and provides information on practice addresses, DEA numbers, demographic information, specialty, and other identifiers.

## PHARMACY NETWORK MANAGEMENT

One of the primary services that is provided by the PBM industry is the provision of a pharmacy network that will provide prescription services to designated beneficiaries. All major PBMs offer a wide variety of network options, including both chain and independent community pharmacy and mail service (home delivery) pharmacy. Increasingly, PBMs are able to offer specialized networks that include pharmacies that specialize in infusion or biotechnology therapies, long-term care services, and compounding services.

Contracted negotiation with pharmacy networks generates savings to the health care purchaser. In a 2003 report to Congress, the General Accounting Office evaluated the impact of PBM contract negotiations on pharmacy costs, compared to the fee-for-service prices that would have been paid by individuals. In this study, the average retail prescription price negotiated by the PBM was approximately 18 percent below the average cash prescription cash price for both brand and generic medications.[16]

A similar evaluation of savings associated with PBM-administered prescription drug discount cards in California, North Dakota, and Washington,

Pharmacy Benefit Managers    253

DC, showed variable savings when compared to cash prices paid by senior citizens for the top nine medications used by this population.[17] The variable level of savings obtained through PBM-sponsored discount cards is probably attributable to a variety of factors. Whereas the original GAO study evaluated all drug prices, the second study reviewed only a select group of drugs that excluded generic products that offer a greater potential for discounted prices. The second study also limited its review to pricing in three states, one of which was California. However, California Medicaid regulations already provided a clause that allowed senior citizens to purchase drugs at the Medicaid-negotiated rate. This regulation minimized the added value of a PBM-sponsored discount card in that state. Finally, it is reasonable to assume that pharmacies may be willing to accept a higher level of discount for an insured product that comprises a significant portion of their business, whereas a discount card does not offer the same level of volume increase and may reduce overall revenue from prescriptions. Regardless, these studies demonstrated that negotiation with pharmacy networks can generate modest savings in pharmaceutical costs when compared to the fee-for-service costs for prescriptions.

## Community Pharmacy Networks

PBMs offer community pharmacy networks that are very broad or fairly restrictive, depending on the client's needs and the desired cost of the pharmacy services. Typically, PBMs offer a wide network that includes most community pharmacies nationwide. This offers a distinct advantage to beneficiaries who may have prescription needs while they are away from their primary residences. Examples include students who are attending colleges at a location that is not proximal to their home, individuals who maintain multiple residences in different parts of the country, or for individuals on vacation or business travel. In fact, pharmacy choice is a primary consideration for many employers, government plans, and insurers as they consider PBM options.

To obtain more favorable pricing terms, PBMs may contract with a limited number of pharmacies in a more restrictive pharmacy network. Usually restrictions affect the number of chain pharmacies that are included in a network, while preserving the availability of independent pharmacies. Not surprisingly, restrictive pharmacy networks are promoted aggressively by PBMs that are owned by retail pharmacy chains or by health maintenance organizations that own and operate in-house pharmacies.

Although restrictive networks decrease the pharmacy options that are available to the beneficiary, they theoretically offer the potential for both clinical and financial benefits. For example, pharmacies that participate in a small network may be willing to provide deeper discounts in exchange for a higher volume of prescription business. Likewise, clinical initiatives might be more easily implemented in a limited, localized pharmacy network as compared with a broad, diverse pharmacy network. In reality, very little objective information is published about the benefits or limitations of a restrictive pharmacy network.

Several states have enacted "any willing provider" regulations, which prevent PBMs or health plans from restricting access to pharmacies, provided that the pharmacy is willing to accept the reimbursement level that is offered to any other pharmacy. The Federal Trade Commission has expressed an opinion that any willing provider regulations may decrease the willingness of pharmacies to offer deep discounts to insurer and PBMs.[18] Considerable opposition is given by the health insurance and PBM industry to these regulations,[19-21] out of a concern that any willing provider regulations will increase pharmacy costs. However, the regulations appear to have little impact on the actual cost of pharmaceuticals that are negotiated by PBMs or health plans.[22]

## Mail-Order Services

PBMs often offer mail pharmacy services as a convenience to the client's beneficiaries and to provide added savings to the pharmacy program. Typically, the PBM will contract with a single mail-service vendor in an exclusive arrangement that offers deep discounts on the purchase of pharmaceuticals.

Mail-order pharmacies typically centralize their pharmacy distribution operations into a small number of locations that serve a wide geographic region. Prescriptions are received via mail, fax, or electronic transfer, and are delivered to the patient through mail or other courier services. Typically, patients obtain a ninety-day supply of medication, a convenience for patients who take maintenance medications. The mail-order pharmacy is also able to distribute prescriptions to varying locations for a single patient. This offers a tremendous advantage to patients who live in different locations throughout the year. By using the mail order pharmacy, the patient eliminates the need to obtain multiple prescriptions that are filled in different pharmacies.

By centralizing the location of the mail-order pharmacy, the volume of prescriptions within the pharmacy is increased, offering cost savings opportunities. Increased volume allows the pharmacy to negotiate aggressively for prescriptions drug purchase prices, particularly for generic medications.

256        HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY

Furthermore, the pharmacy is able to take advantage of automated systems for the fulfillment of prescriptions. In fact, in very sophisticated mail-order pharmacies, prescriptions are processed using robotic equipment with electronic record keeping. Finally, because prescriptions are filled for a ninety-day supply, dispensing fees and professional costs for handling of the prescription are minimized.

The focus of mail-order pharmacies varies based on the business model. Some pharmacies, such as AARP and Liberty Medical may offer discounted prescriptions to cash paying patients. More typically, mail pharmacies contract with PBMs to provide services to insured patients. Several major PBMs own mail-order pharmacy services, including CareMark, Express Scripts, and Medco. For these organizations, the mail pharmacy provides services for covered beneficiaries, but the pharmacies are also used by the PBMs for the purpose of enhanced patient management initiatives of the PBMs. All of these mail-order pharmacies just described essentially compete with community pharmacies for prescription volume.

Mail pharmacy services can also be used to enhance the efficiency of community service pharmacy. Kaiser Health Plan maintains two mail-order pharmacies in California.[23] The purpose of these pharmacies is to provide refills for maintenance prescriptions that have been originally filled in Kaiser's clinic pharmacies. The use of the centralized pharmacy for refills greatly enhances the efficiency of Kaiser's operation and reduces the number of pharmacists needed for prescription fulfillment. This enhanced efficiency has allowed Kaiser's pharmacists to engage in more clinically focused activities with patients and has eased concerns for pharmacist shortages in the region.

Mail-order pharmacies can also be used effectively for implementation of clinical services. In theory, targeted drug programs can be easily coordinated in a single pharmacy as opposed to across a large pharmacy network. For example, Medco maintains a targeted program that promotes conversion of prescriptions to generic when a product loses patent protection. In 2004, Medco reported a generic substitution rate of 93 percent within the first month following the introduction of new generic products.[24] Although generic penetration is high nationally following the introduction of a generic product, a rapid conversion process offers savings to clients.

Because mail-order processing is more profitable than claim processing, PBMs have a significant incentive to promote their own pharmacies' services. Although retail sales have increased steadily over the past decade, the percentage of prescriptions that have been filled in mail order pharmacies has grown at almost twice the retail rate.[25] Use of mail-order pharmacies is greater in the Medicare-eligible population,[26] which is consistent with the higher utilization of long-term maintenance medications in this population.

Furthermore, many self-insured employers promote mail pharmacy use, often through reductions in copay levels which offer savings to patients, particularly for branded medications that have higher copayment levels. For example, a patient may be able to obtain three months' supply of medication for only two months' copayment. Other plan sponsors may implement mandatory mail order programs by limiting benefit coverage in community pharmacies for maintenance medications, forcing the use of the mail-order pharmacy.

In contrast to the savings provided to patients, it is unclear if mail-order pharmacy actually generates substantial savings for health plans and self-insured plan sponsors. Mail-order pharmacies provide prescriptions at a greater discount than is typically provided in the retail pharmacy setting.[27] In addition, mail pharmacies often offer lower dispensing fees and, because the drug is dispensed less frequently throughout the year, dispensing fees are incurred at a lower rate than would be in the retail setting. These lower product costs are a significant factor in the adoption of mail incentives or mandates by plans' sponsors. However, some significant offsets to the product savings are offered by mail pharmacies. In order to promote mail-order pharmacy use, employers and health plans will often offer a lower copayment. The copayment reduction may exceed the savings associated with the drug, particularly as copayments have risen in recent years. Furthermore, the dispensing of prescriptions in large quantities may result in wasted medication, particularly when a drug is discontinued or the patient's eligibility for coverage ceases.

## Specialty Pharmacy Services

Recently, several PBMs have focused significant efforts on the acquisition of specialty pharmacies as a product extension. Specialty pharmacies limit their drug dispensing activities to those medications that require unique handling or patient monitoring. These pharmacies may service a specific patient population, such as HIV patients or provide fertility services, or they may offer a broader range of products. Services tend to be provided over a larger geographic region than is common with community pharmacies.

Most specialty pharmaceuticals are injectable, and many are designed using biotechnology methods. Specialty pharmaceuticals are typically very high cost and are targeted treatments for diseases that are less prevalent in the population, but for which adequate treatment options do not otherwise exist. Examples of diseases for which specialty pharmaceuticals are available include multiple sclerosis, rheumatoid arthritis, growth hormone defi-

ciency, and Crohn's disease. Specialty pharmaceuticals may be self-administered by the patient, but many that provide these medications are administered in clinic settings or by home health care agencies.

It is, as yet, unclear the extent of benefit that the PBM industry provides with regard to specialty pharmaceuticals when compared to a localized pharmacy network. PBMs do offer savings on these pharmaceuticals, particularly when compared the prices that have been paid for these drugs when they are submitted to the medical benefit program. In large part, the savings are due to the enhanced pricing accountability that can be achieved through the POS pharmacy claim system, as compared to medical billing systems that utilize HPCPS codes. However, billing of specialty products through the pharmacy benefit is as opposed to the medical benefit may result in cost shifting that could result in higher costs to the plan sponsor. For example, a self-insured employer who provides pharmacy benefits to retirees may actually see costs increase if specialty medications are billed to the pharmacy program as opposed to Medicare Part B. In contrast, patients may benefit from pharmacy program coverage of these expensive medications because pharmacy copayment levels may be less than the deductible and coinsurance required under medical benefits.

PBMs that own specialty pharmacies tend to promote the use of these pharmacies by offering discounted prices on the products. However, it is unclear if the discounts offered exceed what is provided in the community pharmacy setting. Because the cost of specialty pharmaceuticals is far higher than typical medications, any added waste that might occur from a centralized distribution operation could very quickly offset any savings associated with product discounts.

Some operational considerations significantly impact the success of a PBM-managed specialty pharmacy program. Because many of these medications, including chemotherapy agents, are administered within a physician's office or clinic setting, the billing of the product raises concerns. Most physician office billing systems are unable to process claims in accordance with NCPDP standards. As a result, many physicians who purchase and administer pharmaceuticals will bill these products exclusively to the medical claim system of the patient's insurer. PBMs promote an alternative process through which the specialty pharmacy would supply the drug to the physician's office and bill directly to the PBM. This process has received only lukewarm reception from physicians out of concern for a lack of timeliness for receipt of the drug in relation to the patient's office visit and due to the loss of revenue to the office practice. However, Medicare reductions in physician payments for drugs administered in their office settings may result in increasing acceptance of these medications being supplied by specialty pharmacies.

## Network Management As a Revenue Source

Pharmacy network management services are a prime source of revenue for the pharmacy benefit industry. Some of these revenues are fairly straightforward, whereas others are less easily identified and are a source of controversy within the industry. As is typical of all prominent industries, PBMs utilize the float of pharmacy revenues for investment purposes in short-term financial markets. PBMs typically batch pharmacy claims in a two-week cycle period. At the end of the prescription cycle, claims are summarized and plans sponsors are billed for the cost of the prescriptions. Typically payment is required, through electronic transfer of funds, within 24 to 72 hours of billing. Simultaneously, PBMs summarize pharmacy remittances in preparation for payment of the pharmacies. Pharmacy payments are often made using paper checks that are generated and mailed to pharmacies, typically five to seven days following the end of the pharmacy cycle. During the lag between the time that funds are received by the PBM and the time that a check is cashed by a pharmacy, the funds are maintained in an account that is used by the PBM to generate revenues. Use of this type of short-term financial investment is a sound practice that is universally accepted within the business industry.

Less commonly recognized as a source of revenues are funds that are retained by the PBM in the event that a pharmacy does not cash a check that it has received as remuneration for prescriptions dispensed. Although no studies have been documented to address the value of uncashed checks, privately, insurance companies have estimated the value at approximately one percent of prescription costs. PBMs may reasonably be reluctant to credit these amounts to their plan sponsors for several reasons, including that the check could be presented at a later date and the costs of stopping payment on any given check could be considerable. Although many organizations place limits on the amount of time a check is valid, systems for enforcing these limits in the banking community are not consistently reliable.

PBMs also generate significant revenues from the pharmacy network when the PBM has an ownership stake in the pharmacy. Many PBMs have some level of common corporate ownership with a pharmacy. When the PBM's benefit programs are structured to promote the use of their own pharmacy, additional profits are generated from the sale of the pharmaceutical.

## Controversies Regarding Network Management

Because PBMs control the contracts and reimbursement levels to the network pharmacies, differing expectations exist regarding the role that the

PBM plays in providing this service. Although many drug benefit purchasers expect that the PBM is conducting network negotiations and payments on behalf of the purchaser, the PBM may actually be conducting services on their own behalf. Furthermore, when a PBM has an ownership relationship with a pharmacy, a potential exists for a conflict of interest that can arise in the services that are being provided.

One of the most common controversies related to pharmacy network management is in the payments that are made to the pharmacies on behalf of the client. Typically, a PBM will contract with a client for pharmaceuticals with a guaranteed discount for brand pharmaceuticals and a discounted rate or maximum allowable cost (MAC) price structure for generic products. However, when negotiating these contracts, the PBM may generate a differential, or network spread, in the pricing. In this case, the PBM is paying the pharmacy an amount that is different, and typically lower, than the amount that is billed to the client. The PBM retains the difference between the payment and billing rate as additional revenues. Although PBMs do not typically advertise this practice, some PBMs do provide some disclosure that, when contracting with pharmacies, they are acting on their own behalf, and not on behalf of the client. However, this is not a universal practice in the industry, and the scope of the spread is rarely disclosed.

Investigations into pharmacy network spreads have yielded some disturbing findings. In an investigation into PBM pricing practices, the *Wall Street Journal* reported excessive profits through network spreads on selected prescriptions for generic medications at Express Scripts and AdvancePCS.[28] The article cited a profits ranging from $18.00 to $200.00 on individual prescriptions for generic medications and an average profit margin of 22 percent related to network spreads at one PBM. (See Exhibit 14.2.)[29] Although focusing on individual prescriptions may inflate the extent of pharmacy network spreads, the presence of this practice and the extent to which it may occur remain a source of significant controversy and legal action.[30]

Ownership relationships between the PBM and a pharmacy have also created conflicts of interest. In 1998, Eagle Managed Care, a wholly owned subsidiary of Rite Aid Corporation, initiated new pharmacy contracts within the Philadelphia area. The rates, which were accepted by Rite Aid, but viewed as too low by many pharmacies, were essentially viewed as an attempt by the PBM to limit the pharmacy network to its own pharmacies.[31] The practice was eliminated under an investigation by the Pennsylvania Attorney General.

Likewise, the United States District Court in Massachusetts found PharmaCare and CVS guilty of colluding to circumvent that Massachusetts's Any Willing Provider regulation through its reimbursement prac-

tices.[32] PharmaCare, a wholly owned subsidiary of CVS Corporation, initiated a capitated reimbursement program for pharmacies that were providing services on behalf of Harvard Pilgrim Health Plan (HPHP). The capitation rate was considered to be too risky by the community pharmacies in the state, and most could not accept the contract, essentially creating an exclusive network for CVS. However, the amount that PharmaCare invoiced HPHP for services offset any financial risk to CVS Corporation associated with the capitated pharmacy reimbursement program. Essentially, CVS was being made whole, while community pharmacies were at significant financial risk. Because of the premeditated nature of the actions, the judge viewed the entire arrangement as fraudulent and awarded treble damages to the plaintiffs.

Similar ownership concerns have been raised regarding the relationship between a PBM and its own mail-service pharmacy.[33] When the PBM owns a mail-service pharmacy, it is effectively serving in a capacity in which it is policing its own services. Consequently, when engaging in product selec-

## EXHIBIT 14.2. Generic profits

How generic drugs yield big profits
Example: A thirty-day prescription of generic Prozac

| | |
|---|---|
| Patient's copayment to pharmacy | $5.00 |
| Pharmaceutical benefits manager's payment to pharmacy | $2.50 |
| What the manufacturer charges pharmacy for the prescription | $1.50 |
| **Pharmacy's profit** (Patient's copayment plus PBM's payment minus manufacturer's price) | **$6.00** |
| PBM bill to patient's employer | $13.00 |
| **PBM's profit** (PBM bill to employer minus Payment to pharmacy) | **$10.50** |

*Source:* Martinez, B. (2003). Hired to Cut Costs, Firms Find Profits in Generic Drugs. *Wall Street Journal*, March 31. Reprinted with permission from Dow Jones and Company, Inc.

tion and pricing, a risk exists that the PBM will act in its own interest, in conflict to the interest of its client, when it comes to the oversight of the mail facility.

PBMs have been accused of engaging in a variety of practices with regard to the oversight of the PBM's own pharmacy. For example, it is possible that the mail pharmacy will use inflated AWPs, either through selective use of NDC codes for billing or through the use of repackaged products with inflated NDC price codes.[34] Because AWP has little or no correlation to the price actually paid by the pharmacy, inflation of the AWP raises the revenues and profitability of the PBM's mail pharmacy. PBM-owned pharmacies may also engage in drug-switching activities to profit the PBM. For example, when a PBM retains a portion of the rebates on medications, or is paid a drug-switch fee by a manufacturer, the pharmacy may engage in drug-switch activities. Upon receipt of a prescription for a target medication, the mail-pharmacy staff will contact the prescribing physician to obtain approval to make a change in drug therapy. Unfortunately, this drug switch may actually result in increased costs to the client, but higher manufacturer revenues to the PBM.[35]

Although an ownership relationship between a PBM and a pharmacy is not an absolute conflict, the potential will always exist for the PBM to provide preferential pricing arrangements to its own pharmacy. Diligent evaluation of pricing methodology and contracting practices is essential to assure that the client's needs are being met without a conflict of interest to the client or its beneficiaries.

## PHARMACEUTICAL BENEFITS ADMINISTRATION

Because claim processing systems used by the PBM industry are highly automated, PBMs are able to administer a wide range of benefit designs on behalf of client. Benefit designs may include parameters surrounding patient copays or coinsurance rates, benefit exclusions and limitations, and clinical edits, depending on the population being served and the desires of the plan sponsor.

### Out-of-Pocket Expenses

The level of out-of-pocket expense that a patient will incur when obtaining his or her pharmacy benefits is the primary focus of the pharmacy benefit. Patient expenses can range from no cost to 100 percent of the discounted cost of the medication, depending on the program focus. Furthermore, the level of discount may vary based on the type of drug that is being obtained

and its formulary status. Out-of-pocket expenses are typically divided into one of three categories: copays, coinsurance, and deductibles. Furthermore, pharmacy benefit may be limited to a maximum coverage level, or capitation. These programs are outlined in more detail in the following paragraphs.

### Copayments

By far the most common pharmacy benefit design calls for the use of copayments. A copayment is a predetermined dollar amount that is applied to the purchase of each prescription, regardless of the prescription cost. Although originally copayments were a single amount for any prescription, throughout the 1990s two-tier copayment programs were most commonly used. In a two-tier program, the patient typically pays a low copay for a generic medication, with a higher copayment for brand prescriptions. Since the turn of the century, the use of three- and four-tier copayment programs has gained popularity as a method to promote the use of preferred medications and to address cost-sharing for very high-cost medications. In 2002, average copayments ranged from $8.33 for generic medications to $33.23 for third-tier medications.[36] These values are expected to grow, especially for branded medications, as prescription drug costs increase. Although a copayment program allows patients to know, in advance, their out-of-pocket cost for prescriptions, it does minimize the patients' true understanding of drug costs. Many a patient has been shocked when, upon losing drug coverage, they learned that a medication for which they typically paid a low copay actually costs one hundred dollars or more.

### Coinsurance

Of increasing interest to plan sponsors are programs that employ the use of coinsurance. In coinsurance benefits, patients pay a set percentage, typically 20 to 25 percent of the drug cost, regardless of drug type. The advantage of a coinsurance program is that patients are more aware of the true cost of their medications, and they save when they use less expensive medications. This knowledge of drug pricing may influence patients to seek lower cost therapies, when appropriate. Coinsurance also offers an advantage to plan sponsors in that the patient's contribution to their pharmaceutical costs remains current with inflation. The disadvantage of a coinsurance program is that the patient's cost for medications is not predictable, and may vary from month to month, or from pharmacy to pharmacy depending on the PBM's contract with that pharmacy. Nonetheless, coinsurance pro-

grams are gaining in popularity and the use as a component of benefits programs is predicted to increase.[37]

## Deductibles

Deductibles are fixed amounts of expenditures that must be incurred by the patient, or the patient's representative, before the patient is eligible for insurance coverage. The use of deductibles has been a common feature in major medical benefits of health insurance programs for many years. The interest in using deductibles for pharmacy programs has increased in recent years as a way to increase patient awareness of drug prices. Deductibles are typically applied on an annual basis. As a result it is not uncommon to see patients stockpiling medication at the close of their annual period so as to defer the cost of the deductible for a period of time.

## Capitation

Capitation, or maximum out-of-pocket programs, limit the total amount of drug coverage that is available in a set time period. These programs have been a common feature in Medicare Plus Choice program over the past several years and a variation of a capitation program is included in the Medicare Prescription Drug Benefit program.[38] Capitation allows a plan sponsor to provide modest pharmacy benefits, but to reduce the financial exposure and thus maintain affordable premiums for the coverage.

Early drug capitation benefits were based on a maximum for each plan year. For example, a patient might have a maximum benefit of $1,000 beginning in January and extending for the year. If the patient submitted claims totaling $1,000 in only three months, additional resources were not applied until the next year. Under this type of plan, many plan sponsors experienced significant patient disenrollment as soon as the maximum was reached, resulting in adverse selection for the benefit. Consequently, many plan sponsors apply a smaller capitation on a quarterly basis. An example would be a benefit in which $250 of coverage is provided every quarter.

## Prescription Limits

A key feature of pharmaceutical benefits programs implemented by the PBM industry is the availability and use of limits on the quantity of medications that can be obtained. Quantity limits serve a wide range of purposes from prevention of drug diversion to promotion of clinical appropriateness

of drug use. Following are examples of commonly used quantity limits and examples of their uses.

## Days Supply

Specifies the number of days supply of medication that can be obtained at any given time. Typically the number of days supply is thirty to thirty-four days at retail and ninety days at mail, although some programs permit up to ninety days at retail. This edit is used to prevent drug stockpiling and waste of pharmaceuticals.

## Refill Too Soon

Establishes a time limit between the refill of prescriptions. Using the date of filling of the prescription and the number of days supply submitted by the pharmacist, an edit is applied requiring that a certain number of days of therapy must have elapsed prior to the payment for a subsequent supply of medication. This edit is commonly used to prevent drug misuse, particularly for those medications that are subject to abuse.

## Quantity Limits

This restricts the quantity of medication that is covered under insurance benefit during a specified time period. Quantity limits often are applied to medications of a lifestyle or controversial nature. For example, many employers provide coverage for erectile dysfunction, but limit the number of courses of therapy to four to six doses per month. State mandates for coverage of fertility therapy may be restricted to a certain number of attempts per lifetime.[39] Quantity limits can also be used to promote appropriate clinical utilization. For example, many health plans limit triptan coverage to two courses of therapy per month, in accordance with guidelines for the use of migraine abortive therapy. Health plans may limit the cumulative doses of combination narcotic analgesics (Percocet, Vicodin, etc.) to prevent overuse of acetaminophen, a common component of these therapies.

## Restrictions

A drug restriction is a benefit limitation that excludes the coverage of certain medications or classes of medications. Drug restrictions are applied to pharmacy benefits based on a wide variety of reasons that are typically unique to the concerns of the plan sponsor. Drugs that are often excluded

from standard pharmaceutical benefits include products for cosmetic uses, over-the-counter agents, and investigational drugs. Drugs for uses that are lifestyle in nature may or may not be covered, depending on the plan sponsor. These may include drugs for weight control, erectile dysfunction, cough and cold therapies, and drugs for smoking cessation. Medicaid programs preclude coverage of many of these products, as well as drugs that have a DESI designations from the FDA and drugs that are used for fertility purposes.[40]

Drug restrictions can be controversial, particularly when they could be viewed by some groups as discriminatory. For many years, employers excluded coverage of contraceptives from prescription benefit programs, in part due to religious affiliations of the employer. In response to these restrictions, a majority of states have implemented mandates requiring the coverage of contraceptives when a pharmaceutical benefit is offered to employees.[41] However, many organizations oppose these regulations, and ongoing pressure exists to permit greater flexibility for drug coverage decisions by employers.[42,43]

## CLINICAL PROGRAMS

### Drug Utilization Review

Because of the vast amount of drug utilization information in their databases, PBMs are in a prime position to conduct drug utilization review, on behalf of an individual's drug plan sponsors as well as to review drug utilization trends regionally or even nationally. Drug utilization review programs help to manage costs as well as provide quality assurance and fraud prevention functions. (See also Chapter 27.)

### Concurrent DUR

The first line for drug utilization review is the concurrent review edit. Concurrent drug utilization review (DUR) functions are provided at the point-of-service (POS) and include real-time system edits that can impact prescribing patterns. When a claim is submitted by the pharmacy, it is assessed against patient demographics and prior drug utilization that is maintained in the pharmacy claim database. Electronic messages are sent to the pharmacy, during the adjudication process, to inform the pharmacist of the potential drug problem.

In state Medicaid programs, concurrent DUR edits have been in place since the adoption of the Omnibus Budget Reconciliation Act (OBRA) of

1990.[44] (See Table 14.1.)[45] These edits are designed to prevent inappropriate drug utilization and to reduce drug interactions. (See Table 14.2.)[46] These same tools are also features of drug utilization management programs administered by private pharmaceutical benefits managers.

Unfortunately, the PBM and pharmacy claim database do not have critical items that would make these edits more valid, such as patient diagnosis and over-the-counter drug therapy (unless covered under the benefit). As a result, drugs are used as markers for disease, resulting in many false positive warnings. For example, prenatal vitamins are used as a marker indicating pregnancy. However, these vitamins are often prescribed for the elderly population because, unlike general multivitamins, prenatal products are provided as a covered benefit in most prescription programs. Thus an edit will be activated for any patient taking a prenatal vitamin in combination with a drug, such as an ACE inhibitor, that is contraindicated in pregnancy. This limitation is compounded by the criteria behind the data possibly identifying drug interactions or contraindications that are of little clinical significance in the majority of the patient population. Finally, when a pharmacist receives notice of a drug-related problem, he or she may not have access to all of the drug history of the patient, particularly if the patient uses more than one pharmacy for prescription needs. As a result, many electronic communications are viewed as "false" messages, and pharmacies have simply disabled these features in their computer system or they routinely override PBM messaging without review.

TABLE 14.1. Savings from a prior authorization program for selected drugs/drug categories, 2000.

| Drug category | Percent decrease in use** | Mean PMPM Costs (Range Across Plan Sponsors) | | Mean PMPM savings*** |
|---|---|---|---|---|
| | | Prior authorization | Drug covered | |
| Erectile dysfunction | 39 | $0.10 ($0.01-$0.34) | $0.25 ($0.05-$0.76) | $0.15 |
| Sporanox® & Lamisil®* | 54 | $0.10 ($0.03-$0.20) | $.24 ($0.07-$0.78) | $0.14 |
| Anti-obesity | 59 | $0.07 ($0.02-$0.20) | $0.15 ($0.01-$0.25) | $0.08 |
| Smoking cessation | 80 | $0.01 ($0.00-$0.03) | $0.06 ($0.01-$0.15) | $0.05 |
| Wellbutrin SR® 150mg | 29 | $0.13 ($0.05-$0.17) | $0.17 ($0.00-$0.67) | $0.04 |

* Includes oral formulations only
** = (Average utilization if covered)— average utilization if on PA/ average utilization if covered
*** Includes charge to plan sponsor for PA calls

Source: Express Scripts (2003), Express Scripts Drug Benefit Guide 2003. Maryland Heights, MO: Express Scripts, Inc.

TABLE 14.2. OBRA requirements for state Medicaid DUR.

| Guidelines | Description |
| --- | --- |
| Concurrent (prospective) DUR elements | Establishment of screening mechanisms to identify the following: <br> • Therapeutic duplication <br> • Drug-disease contraindication to detect for potential undesirable or adverse events <br> • Incorrect drug dosage <br> • Incorrect duration of drug treatment <br> • Drug-allergy interactions <br> • Clinical abuse/misuse related to over or underutilization |

Source: Code of Federal Register, 42 CFR456.7.

## Retrospective DUR

Retrospective drug utilization programs involve an evaluation of drug utilization after the drug adjudication process is complete. This review can be focused on individuals' claims for patients or on the drug therapy trends over a large number of patients. When individual claims are reviewed, the DUR process is focused on identifying circumstances in which drug utilization patterns might be improved for a given patient or for a group of patients being seen by a specific provider. When an opportunity is identified, a letter or fax is sent to the provider, informing that individual of the opportunity. This type of retrospective DUR is common in state Medicaid programs and is used to a lesser degree in commercial drug benefit programs. Recognizing the inherent limitations of retrospective drug review, PBMs have expanded follow-on activities to increase this program's effectiveness. Some of these enhancements include telephone follow-up with providers, incorporating community pharmacists into the intervention process, the issuance of actionable and precisely written letters, and the addition of academic detailing programs.

Because of the extensive volume and history of drug utilization that is maintained in their databases, PBMs are in a prime position to evaluate and monitor drug utilization trends on a larger scale. Within the PBM industry, all three major PBMs produce a report of drug utilization that analyzes trends and cost drivers for prescription benefits nationally on an annual basis.[47-49] Researchers from these PBMs have also published findings from retrospective analysis of drug utilization of a variety of therapies, based on the utilization patterns of their entire populations. This information can be useful as a benchmark to plan sponsors and to provide guidance regarding future pharmaceutical benefits management initiatives. For example, results from a recent utilization study reported that, over a four year period, users of sildenafil were typically younger males and females, without an underlying etiologic reason for use of the drug.[50] This information could be used by PBMs and plan sponsors to quantify the cost of inappropriate drug utilization and to adjust coverage limitations to promote appropriate drug utilization.

## Step Therapy Edits

Step therapy edits are employed by PBMs for the purpose of promoting the use of a certain drug or class of drugs prior to the use of a second drug. In many cases, the use of step therapy edits is designed to reduce overall drug expenditures in circumstances in which many drugs of similar efficacy, but with very different costs, exist. For example, a step-therapy edit may require a trial therapy with over-the-counter loratadine prior to the coverage of a prescription nonsedating antihistamine.

The step-therapy edit is implemented in the claim-processing system electronically. When a prescription is presented for a medication that is subject to a step therapy requirement (Drug A), the claim adjudication system searches the patient's recent drug history to determine if the prerequisite medication (Drug B) has been used. If a match is found for Drug B, the claim for Drug A will adjudicate at the patient's copay level. If a match for Drug B is not found, the claim will reject for coverage. The step-therapy edit can typically be appealed through a call to the PBM for patients with unique medical considerations (e.g., an allergy) that would preclude use of the prerequisite drug.

## Prior Authorization

Prior authorization (PA) is a process of obtaining certification or authorization from the insurer or from the PBM acting on behalf of the insurer for the coverage of a specific drug or quantity of medication. Prior authorization is often utilized for high-cost medications, which may be indicated for very specific purposes and for which a potential exists for medication misuse. The request for coverage of the drug is assessed against predetermined criteria that have usually been approved by the pharmacy and therapeutics (P & T) committee or other physician practice committee. PBMs often offer a variety of PA programs for use by employers of health plans.

An example of a drug that often is subjected to prior authorization review is human growth hormone. Growth hormone is an effective therapy for the treatment of growth hormone deficiency, Turners Syndrome, and HIV-wasting. However, it is also used for sports enhancement or cosmetic purposes. Prior authorization is applied to growth hormone to assure that when the drug is covered under an insured program it is being used for approved medical purposes.

Prior authorization can also be used as a method to manage the formulary that is selected by the health plan in a closed formulary benefit. In a closed benefit, a formulary of preferred medications is covered under the prescription drug plan, whereas any nonformulary medications are covered only when approved through a PA process. The approval is often based on clinical criteria that may be unique to the patient, such as an allergy to the formulary drug or excipient, or failure with a trial of therapy with the formulary agent. PA management of a closed formulary is very effective in moving medication use to preferred agents and in managing pharmaceutical benefit costs. However, widespread PA for formulary management purposes is disruptive to patients and providers, and for this reason is not often promoted or utilized by commercial pharmacy benefit programs.

A leading PBM reported significant savings in additional drug categories that featured prior authorization. The average percent decrease in usage among those drug categories surveyed was 52 percent and the mean per member per month (PMPM) savings, $0.09.

## Dose Optimization

Similar to quantity limits, "dose optimization" edits, although not a typical industry practice, have been shown to reduce costs in targeted drug categories. Dose optimization edits target drug utilization that is suggestive of multiple daily dosing of a low dose of a medication when single daily dosing of a higher dose is clinically appropriate.[51] This circumstance occurs often as providers are adjusting medication doses in patients. For example, a patient taking 10 mg of Lipitor daily may be instructed by the physician to increase the dose to two tablets daily. If the cost of a 20 mg tablet is lower than that of two 10 mg tablets, a dose efficiency edit might encourage adoption of a 20 mg tablet taken once a day. Through the dose optimization process, the PBM will notify the pharmacy or provider of the opportunity to change therapy. In some cases, claim edits may be applied to these situations, prompting the pharmacist to consult with the prescriber regarding a change in therapy. Through this process, the patient's drug and daily dose are maintained, but at a lower cost to the plan sponsor.

# FORMULARY MANAGEMENT

The PBM industry provides formulary management as a basic component of the services that it provides to its clientele. A formulary is a list of medications that is preferred for use in a patient population. Based on recommendations used by hospitals and required by the Joint Commission for the Accreditation of Healthcare Organizations (JCAHO), PBMs utilize the service of pharmacy and therapeutics (P & T) committees for the development of the formulary.

The P & T Committee of a PBM is comprised of experts in medical and drug therapy from throughout the Unites States. Depending on the PBM, the P & T committee may include representatives from their clientele as well as employees of the PBM, although PBM employees are often nonvoting members. The P & T committee evaluates new and existing drug therapies to select medications that offer superior drug therapy benefits for the populations. Depending on the needs of the PBM's clients, several formularies may be developed. For example, a PBM might develop a more restrictive formulary focused on generic medication for a Medicaid population, while offering a more extensive, but more costly, formulary for its commercial customers. The P & T committee bases its recommendations primarily of the clinical merits of a drug. A medication that is clearly superior to any existing therapies would be readily accepted onto a formulary, whereas a product that offers little benefit or is inferior to existing therapies would probably be excluded from the formulary. Cost of drugs, and rebate levels, are not typically considered by the P & T committee unless marginal differences between therapies exist and cost is the only clear distinguishing factor applied by a separate formulary committee, after the P & T has determined that two or more products offer comparable effects.

Although the PBM industry offers and maintains a formulary of preferred medications, clients are not obligated to use the PBM's formulary. Many health plans operate their own P & T committee that conducts formulary evaluations and makes independent decisions regarding formulary status of a product. However, the health plans' P & T committees often feature the formulary recommendations of the PBM and tend to concur with the recommendations on many occasions. In contrast, self-insured employers often accept the decisions of the PBM's P & T committee without revision. Many employers do not have the internal medical expertise to independently assess drug therapies. In addition, many employers are hesitant to engage in clinical decisions that may be viewed as intrusive to their employees.

The PBM maintains a preferred formulary for all clients and encourages the client to adopt pharmacy benefit management techniques that promote utilization of the preferred drug items. Examples of such activities include the use of restrictive formularies or tiered formulary benefits. Restrictive formularies exclude coverage of nonformulary products, except for those cases in which the patient is unable to tolerate or does not respond to a formulary product. Tiered benefit programs establish higher copayments for nonformulary products, thus encouraging patients to discuss formulary alternatives with their physician. Furthermore, if the PBM maintains a mail pharmacy, this pharmacy may also engage in activities that are designed to promote utilization of the formulary agent.

## REBATE ADMINISTRATION

Negotiation for and allocation of rebates is one the primary services that the PBM industry offers to its clients. Simply stated, a rebate is a discount on the cost of the drug, provided after the drug has been dispensed. The concept of rebates originated from drug discounting negotiations that were common in hospitals. Hospitals, as direct purchasers of medications, negotiated with manufacturers to obtain discounts on the medications that they provided to patients. To improve their negotiating leverage, many hospitals coordinated the management of their formulary in conjunction with rebate contracting, particularly for medications that offer similar therapeutic effects.

The concept of using a formulary and negotiating discounts for drugs was embraced by the managed care industry in the late 1980s. In 1990 the Omnibus Budget Reconciliation Act (OBRA) required payments of rebates for drugs provided to Medicaid beneficiaries. The use of these practices evolved first in health maintenance organizations where close working relationships existed between physicians and in-house pharmacy services. As with hospitals, these in-house pharmacies were able to negotiate purchase discounts in exchange for preferred utilization of certain medications.

As the concept of drug discounts expanded to the traditional insurance industry, the method for issuing the discount also required revision. Although a managed care organization (MCO) is the ultimately purchaser of the medications, most MCOs never take physical possession of a medication, but instead contract for a discount that is paid after the prescription has been adjudicated, essentially creating the rebate.

Historically rebate contracts were based on the formulary status of a drug. If the drug was maintained on a client's formulary, rebates were provided by the manufacturer. Rebates were paid on a fixed amount for each

unit of medication that was dispensed. Additional discounts could be offered based on the volume of purchases that were made by the health plan or PBM. However, in 1995, a group of pharmacies banned together to raise concerns about rebate contracting activities as a possible violation of the Robinson-Patman Act. In this suit, the pharmacies alleged that the payment of rebates to some purchasers, such as a PBM with a mail pharmacy, but not to all purchasers, created unfair competition within the prescription drug sector. Manufacturer's countered that the mail pharmacies were working on behalf of health plans that had the ability to control drug utilization for their members. The case was ultimately settled by most manufacturers. As a function of that settlement, manufacturers have adopted performance-based contracting in which higher rebates are paid based on sales of their medications as a share of the market within a therapeutic category. Thus, if several drugs are in a market category, and the utilization of Drug A is 25 percent, a higher rebate will be paid to the PBM by the manufacturer of Drug A if utilization is increased to 35 percent of the market.

## PBMs and Rebate Contracting Services

The PBM industry embraces rebate contracting as a method to provide additional services to their clients, and most PBMs engage in rebate contracting with the vast majority of pharmaceutical manufacturers. Although some HMOs and MCOs have sufficient staffing and expertise to engage in rebate contracting, many smaller health plans and self-insured employers do not have this level of expertise or are too small to justify the administration associated with rebate contracting functions. For these organizations, PBMs are able to provide rebate contracting that generates pharmaceutical cost reductions for their clients. The PBM can centralize this service for all clients, thus creating operation efficiencies for the service. The large patient populations served by a PBM can also provide leverage for pharmaceutical contracting, particularly if the PBM has proven successful in working with its clients to move market share to the preferred formulary products.

In the commercial market, rebates are paid to PBMs almost exclusively on branded products, with little or no rebate paid on generic products. Rebates or discounts for generic products are typically offered at the pharmacy level, including to those pharmacies that have an ownership relationship with a PBM.

PBMs typically submit for rebates on a quarterly basis at the end of each calendar quarter. Using the adjudicated claim files, the PBM identifies all prescriptions that are eligible for rebate and summarizes the utilization by the number of units dispensed. Certain claims may be excluded from the re-

bate submission based on manufacturer requirements. Examples include prescriptions that are filled for Medicaid-eligible individuals and prescriptions filled from hospital or military pharmacies. In these cases, the manufacturers may already be supplying a discount or rebate to the other entity. Manufacturers may also exclude 100 percent copay (discount-only) prescriptions that are not insured, or prescriptions from certain states for political reasons. Manufacturers review the rebate submissions and may adjust the rebate payment based on the manufacturer's internal criteria for data integrity. A rebate payment is made, typically 90 to 120 days following the receipt of the rebate invoice.

Once the PBM receives the rebate from the manufacturer, the PBM must review and validate any rebate adjustments that were made by the manufacturer. Rebates are then allocated to individual clients.

Rebate allocations are based on a wide variety of criteria, depending on the terms of the contract between the PBM and its clients. In some cases, the PBM may pay a basic guaranteed rebate amount on a per-claim basis. Other contracts call for a sharing of percentage of the rebates that are received, with the PBM retaining 10 percent to 20 percent of the rebate as an administrative fee. Express Scripts offers a "bid grid" system that provides a predetermined level of rebate, depending on formulary and benefit decisions that are chosen by the client. PBMs may use rebate revenues to lower administrative fees or other costs that are paid by the client. In some cases, PBMs use rebate revenues to buy down the cost of the medication or pharmacy dispensing fees that are charged to their clients.

In general, rebates can offer reductions equal to 2 to 8 percent of the total drug cost, depending on the benefit design and formulary utilization of the PBM's client. Higher levels of rebates are received by those plans that have higher utilization of selective brand medications within a therapeutic category. However, rebate revenues do not offset savings that could be achieved through the use of generic medications, where they are available. Consequently, PBM clients must balance the diversity of medications on their benefit programs with the financial impact of generic use and the revenues from rebates when making benefit design decisions.

## CONTROVERSIES IN THE PBM INDUSTRY

The PBM industry has been under considerable scrutiny with regard to their business practices. Although many clients contract with PBMs under the expectation that the PBM is acting on behalf of the client, recent disclosures regarding the industry suggest that this may not always be the case. As

a result, investigations into PBM business practices and litigation against the industry has been common in recent years.

Nowhere has this scrutiny been more evident than in the relationship between PBMs and pharmaceutical manufacturers. The concern regarding PBM business practices was originally fueled by the purchase of several large PBMs by pharmaceutical manufacturers. In 1993, Merck purchased Medco Containment Services, while SmithKline Beecham purchased Diversified Pharmacy Services (DPS). These acquisitions were followed very quickly by the purchase of PCS by Eli Lilly & Company. The appeal of a manufacturer owning a company that exerted significant influence on insurance benefit programs and drug-use patterns was apparent. Following the acquisition of Medco, distribution of Merck products by Medco increased approximately 50 percent.[52] However, these acquisitions very quickly raised concerns regarding the potential for anticompetitive activities within the industry. The Federal Trade Commission stepped in, forcing firewalls in business practices and ultimately entering into consent agreements with the manufacturers in question.[53]

Following the investigations by the FTC, both Eli Lilly and SmithKline Beecham divested their ownership in the PBM industry. Merck retained ownership of Medco until 2003. However, the influence of pharmaceutical manufacturers in PBM decisions was not necessary lost. In January 2002, David Halbert, Chairman of AdvancePCS, reported to stockholders that the majority of the company's profits would come from pharmaceutical manufacturers rather than from its clients.[54] These revenues were paid as administrative fees for rebate contracting, switch programs, academic detailing to physicians, and for other clinical interventions by the PBM.

The shifting of corporate revenues from plan sponsors to manufacturers has raised significant concerns regarding the intended focus of PBM business practices. These drug interventions may provide savings to a plan sponsor, but it is also quite possible that the interventions could result in decisions that are not in the interest of the health plan, particularly when the activities are a significant source of the PBM's profits. The inherent conflict of interest within the industry became apparent. Furthermore, many of these relationships were not disclosed by the PBM when contracting with a client.[55]

As early as 1997, business practices of the PBM industry were under scrutiny and litigation was filed, alleging that Medco engaged in a variety of practices that were undisclosed, and adverse to the interests of their clients. Alleged inappropriate practices included failure to pass on negotiated discounts on medications, side deals with manufacturers to promote use of certain medications, drug switching that resulted in higher costs to clients, and refusal to provide financial accounting of transactions.[56]

At the same time, James Sheehan, a U.S. assistant attorney in Philadelphia, identified irregularities in PBM and manufacturer relationships as part of his investigation into Medicaid pricing activities. He ultimately filed suit against Medco, alleging that "to enhance its revenue regardless of health plan costs, or of any potential adverse or life threatening clinical outcomes to patients." Medco engaged in drug switching to Merck products, for which Medco was paid $440 million in 2001.[57] A Merck regulatory filing in March of 2002 noted that Merck products' market share among Medco clients "exceeded" the national market share, but Merck declined to say by how much.[58]

Subsequent cases were filed by Mr. Sheehan against Express Scripts and AdvancePCS.

Not surprisingly, the litigation and corresponding publicity has generated a large interest by others regarding PBM practices. Additional litigation has been failed against the PBM industry. Medco ultimately settled several large cases, without admission of guilt. However, the settlements included agreements for changes in Medco's rebate contracting and drug switching activities. In addition, the agreements require disclosure of manufacturer revenues to clients on an annual basis.[59] Whether these agreements will improve that accountability of PBM industry to its health plan and employer clients is unknown. Concerns about drug dispensing and pricing practices in PBM-owned pharmacies and pharmacy network management activities remain unresolved.

## LEGAL AND REGULATORY OVERSIGHT

Historically, the PBM industry has been largely free from regulatory oversight. Although a pharmacy operation is subject to state pharmacy laws and any publicly traded companies were subject to SEC regulations, the actual business practices of the PBM were not subject to regulation. Unlike a health insurance company that is subject to considerable regulatory oversight, the PBM industry, as a claim processor, was viewed as a service vendor, subject only to contractual obligations to its clients.

However, through the evolution of its services, the PBM industry evolved into a role that is viewed as more comprehensive than its roots as a claim processor. PBMs act on behalf of clients to negotiate drug prices and discounts, an activity that is viewed by some as a fiduciary role. Clinical activities, such a prior authorization, are viewed in some states as potentially subject to utilization review regulations.

In 2003, the Office of the Inspector General for the U.S. Department of Health and Human Services issued a guidance for pharmaceutical manufac-

turers that outlines their relationships in drug pricing and marketing activities.[60] Included in this guidance are requirements related to manufacturer relationships with PBMs. Failure to comply with the requirements of the guidance could leave a manufacturer open to allegations of fraud in government contracting and sales, with penalties of treble damages. Although not a direct regulation of the PBM industry, the implications to pharmaceutical manufacturers are sufficiently high as to influence their contracts and relationships with PBMs.

Individual states have also initiated legislation to address PBM activities.[61] Proposed regulations require a wide range of business practice oversight and disclosure, including licensure with a state, and disclosure of financial and business accounting practices. The regulations also mandate definitions of certain pricing and rebate terms, with disclosure to clients. The State of Maine was the first state to enact laws that oversee the PBM industry. These regulations were immediately challenged by the PBM industry as a threat to trade secrets. Although an attempt to enact a stay of implementation of these regulations was refused by the courts, the State of Maine has delayed implementation of the regulations, pending the outcome of the case.[62]

To address increasing concerns about the PBM industry practices, Congress included an investigation of the PBM industry as a portion of the Medicare Prescription Drug and Improvement Act. This investigation, which will be conducted by the Federal Trade Commission, will assess whether PBMs make decisions on a variety of matters that increase the PBM's profits while increasing expenses to their clients.

Average wholesale price (AWP) reform may also have a significant impact on the PBM industry. Currently, AWP is the basis of payments that are made to pharmacies as well as invoices to customers of the PBM industry. AWP is also the source of most Medicaid payments to pharmacies. In an evaluation of AWP pricing, the Office of the Inspector General for the U.S. Department of Health and Human Services determined that significant variations exist between AWP and the manufacturer sales price that is reported to Medicaid, the average manufacturer price (AMP) or the average sales price (ASP).[63] As a result, HHS recommends that methodology for reimbursing drug expenditures be changed from AWP to AMP/ASP. Because of the ambiguity associated with AWP prices, a considerable interest in the publication of AMP/ASP and its use as a basis of pharmaceutical pricing in the commercial section exists. This change could affect the PBM's ability to generate network spreads that represent a portion of their company profits. However, use of ASP/AMP would provide greater accountability to clients as they assess their PBM's performance and compare administrative costs of using different PBM vendors.

## FUTURE OF THE PBM INDUSTRY

As with the entire health care industry, considerable change is occurring within the PBM industry. Changes in electronic capabilities, enhanced oversight, and industry competition will all play a role in the scope of services offered by the industry in the future. The implementation of prescription benefits for the Medicare populations will have an enormous effect on the industry as well. Finally, overriding concerns about prescription drug prices will lead to a revised emphasis in evaluating PBM performance.

Without a doubt, the electronic capabilities of the industry are essential for efficient adjudication and payment of claims in the health care industry. This capability will increase over the next decade. Technology that supports electronic transmission of prescriptions exists and will be implemented under the new Medicare prescription drug benefit program. By electronically transmitting prescriptions, physicians will be able to identify other medications that the patient is receiving, regardless of the source of this prescription. Feedback regarding cost-effective alternatives and clinical literature will be available to the prescriber when initiating the prescription. Information regarding patient compliance and potential drug interactions will also be made available. Clinical information and diagnosis can be captured during the prescription transmission, providing the patient for the purpose of counseling patients regarding their drug therapy.

Technology improvements will also permit enhanced analysis of drug outcomes within a patient population. Rather than a focus of drug discounts and rebates, a savvy PBM will be able to demonstrate changes in patient outcomes over time compared to the cost of the drug therapy. This information will give all health care providers better information from which to make clinical and financial decisions regarding drug therapies. Ultimately, a PBM may not be evaluated based on the discounts that it offers, but on a global perspective, with costs associated with managing key diseases based on patient outcomes.

Regulation of the PBM industry is almost guaranteed given the significant controversies that have arisen over business practices. However, a desire for profitability and competition within the PBM industry will also have a profound effect on business operations. Over the past several years, a new generation of PBM has emerged in the market place. These companies offer complete transparency with regard to drug pricing and rebate management activities. Rather than retaining revenues through undisclosed revenues and margins in business practices, these newer PBMs offer flat-rate pricing of services, with a complete pass-through of all discounts and rebates. Whether these companies can offer better prices than existing PBMs

remains to be seen, but the transparency that is offered has already forced changes toward greater disclosure in the existing industry.

The health care industry will also look toward having greater flexibility with regard to their prescription drug programs. Rather than centralizing all pharmacy benefit services with a single company, health plans and potentially employers will break up services into individual segments, possibly retaining some activities to be managed in-house. Already this trend is apparent in the health insurance industry. With very inexpensive access to claim processing capabilities, many health plans have in-sourced their rebate contracting and formulary activities to give a greater level of focus on the health plan's individual needs.

Finally, the introduction of the Medicare prescription drug program will have overwhelming impact on the industry. As a result of this program, millions of individuals will be added to the existing lives that are served by the PBM industry. With this program comes significant potential for oversight and enhanced level of services. Unlike the current commercial market, the Medicare program will require coordination of pharmacy benefits to other government programs as well as with commercial insurance programs. The Medicare program will also result in a higher level of scrutiny into services and comparative drug pricing within the program. Although the PBM industry remained free of significant oversight for many years, participation in this new government program will impart new expectations on the industry. Ultimately any expectation of the Medicare program is likely to be required for commercial insurance as well.

Whenever change occurs, the opportunity for growth and development exists. No greater example of this philosophy is the current PBM industry. Although long and sometimes turbulent history to this industry exists, components of the industry will continue to evolve and provide a valuable contribution to the health care system in the future.

## NOTES

1. CareMark (2005). *2005 Trends Rx Report*. Northbrook, IL: CareMark, pg 5.
2. http://www.ncpdp.org.
3. National Council for Prescription Drug Programs (2005). *NCPDP Basic Guide To Standards*. May. Scottsdale, AZ: NCPDP.
4. 45 C.F.R. Parts 160-64.
5. Available at: http://www.webmdenvoy.com/pages/pharmacies/pharm.html.
6. Available at: http://www.ndchealth.com/pharmacy/pharmacy.htm.
7. Available at: http://www.erxnetwork.com/Connect.aspx.
8. Available at: http://www.gs1.com.
9. Available at: http://www.erxnetwork.com.

10. Available at: http://www.webmdenvoy.com.

11. Available at: http://www.ndchealth.com/pharmacy.

12. Available at: http://www.freedomdrugstores.com/products/z_eznet.htm.

13. Available at: http://www.rxline.com/site/index.htm.

14. 21 C.F.R. Part 207.

15. U.S. Food and Drug Administration, Center for Drug Evaluation and Research (2005), Federal Food, Drug, and Cosmetic Act, Bethesda, MD: U.S. Department of Health and Human Services.

16. General Accounting Office (1997), *Pharmacy Benefit Managers: FEHBP Plans Satisfied with Savings and Services, but Retail Pharmacies Have Concerns.* Report to congressional requesters. GAO/HEHS-97-47. February. Washington, DC: GAO.

17. General Accounting Office (2003), *Prescription Drug Discount Cards: Savings Depend on Pharmacy and Type of Card Used.* Report to congressional requesters. GAO 03-912. Washington, DC: GAO.

18. Federal Trade Commission (2004), Rhode Island Bills Would Raise Prices for Pharmaceuticals, FTC File V040013. Available at: http://www.ftc.gov/opa/2004/04/ribills.htm.

19. Academy of Managed Care Pharmacy (2003), Position Statement, Any Willing Provider Legislation: Revised. October 15. AMCP.

20. Kentucky Association of Health Plans v. Miller, 123 S. Ct. 1471 (2003).

21. Texas Pharmacy Association v. Prudential Insurance Corporation of America, 105 F.3d 1035 (5th Cir. 1997).

22. (2002). *Journal of Health Politics and Law* 27(6): 927-945.

23. (1997). *Am J Health-Syst Pharm* 54 (Mar 1): 520-523.

24. *Drug Trend Report* Vol. 7, Medco Health Solutions, Franklin Lakes, NJ, May 2005, p. 32.

25. Lawrence, J. (1998). Does Mail-Order Pharmacy Really Deliver the Goods? *Managed Care* June.

26. Novartis (2002). *Novartis Pharmacy Benefit Report: Facts and Figures, 2002* edition. East Hanover, NJ: Novartis, pp. 15-16.

27. Takeda Pharmaceuticals (2003). The Prescription Drug Benefit Cost and Plan Design Survey Report, Takeda Pharmaceuticals, pp. 6-7.

28. Martinez, B. (2003). Hired to Cut Costs, Firms Find Profits in Generic Drugs. *Wall Street Journal*, March 31.

29. Martinez, B. (2003).

30. New York State Office of the Attorney General (2004), Express Scripts Accused of Defrauding State and Consumers Millions of Dollars. Available at: http://fairchild.oag.state.ny.us/fx/consumer_info/aud4a_04.html, August 2004

31. Geller, J. (1998), RiteAid's Role in Managed Care Riles Competitors. *Philadelphia Inquirer* August.

32. J.E. Pierce Apothecary et al. v. Harvard Pilgrim, CVS Corporation, Pharma-Care Management Services, Inc., United State District Court, District of Massachusetts, Civil Action No. 98-12635-WGY, March 31, 2005.

33. Langenfeld, J. and Maness, R. (2003), The Cost of PBM "Self-Dealing" Under a Medicare Prescription Drug Benefit. Available at: http://www.mpaginc.com/news/pbmreport.pdf.

34. Langenfeld, J. and Maness, R. (2003).

35. Consumers Union. Disclosing Relationships Between Pharmacy Benefit managers and Drug Companies. Available at: http://www.consumersunion.org/campaigns/learn_more/0018121indiv.html.

36. Takeda Pharmaceuticals (2003).

37. Takeda Pharmaceuticals (2003).

38. Medicare Prescription Drug, Improvement, and Modernizations Act of 2003, 108th Congress, H.R. 1, 2003.

39. The Family Building Act (A1862,S1076) State of New Jersey, 209th Legislature, 2001.

40. Colorado Medical Assistance Program (2003), *Pharmacy Requirements and Benefits.* December. Colorado Medical Assistance Program.

41. Center for Contraceptive Rights (2003), *Contraceptive Equality Laws in the United States.* July. Center for Contraceptive Rights.

42. Pennsylvania Catholic Conference (2005). Know the Facts About a Contraceptive Mandate. Harrisburg, PA: Pennsylvania Catholic Conference. Available at: www.pacholic.org.

43. Illinois Right to Life Committee (2003). Invoke Conscience Act. July 7. Available at: http://www.illinoisrighttolife.org/InvokeConscienceAct.htm.

44. Code of Federal Register, 42 CFR456.7.

45. Express Scripts (2003), *Express Scripts Drug Benefit Guide 2003.* Maryland Heights, MO: Express Scripts, Inc.

46. Code of Federal Register, 42 CFR456.7.

47. Medco Health (2005), *DrugTrend Report, Volume 7.* May. Franklin Lakes, NJ: Medco Health.

48. Express Scripts (2005), *Express Scripts Drug Benefit Guide 2005* Maryland Heights, MO: Express Scripts, Inc.

49. CareMark and Thompson Financial Services (2005), Benefits Barometer. New York: CareMark, Inc. and Thompson Financial Services.

50. Delate, T., Simmons, V.A., Motheral, B.R. (2004), Patterns of Use of Sildenafil Among Commercially Insured Adults in the United States: 1998-2002. *Int J Impot Res* 16(4): 313-318.

51. Delate, T. et al. (2004). Randomized Controlled Trial of a Dose Consolidation Program. *J Manage Care Pharm* 10(6): 564-565.

52. McCarthy, R. (1999), Managed Care Matters—Vertical Integration from the Bottom. *Drug Benefit Trends* 11(1): 10.

53. Eli Lilly (1995), Press Release: FTC Gives Final Approval to Lilly Order; Pledges Continued Monitoring for Anticompetitive Practices. July 31. Available at http://www.ftc.gov/opa/1995/07/lilly22.htm.

54. AdvancePCS Tapping Into Rx Marketing Budgets For Revenues, *The Pink Sheet*, Jan 14, 2002, p. 25.

55. Consumers Union.

56. United States District Court, Southern District of New York, 97 Civ. 9167 (CLB).

57. Vardi, N. (2005), Rx for Fraud, *Forbes Magazine.* Available at: http://www.forbes.com/forbes/2005/0620124_2.html.

282    *HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY*

58. Available at: http://www.josmc.org/pipermail/mednews/2003-January/000280.html.

59. Kaiser Network Daily Reports (2004). Medco reaches $29M Settlement with States Over Allegations of Unethical Drug Switching; Not Passing Along Savings. April 27. Available at: http:www.kaisernetwork.org/daily_reports/rep_index.cfm?hine=3&DR_ID=23411.

60. Federal Register, Vol. 68, No. 86, May 5, 2003, pp. 23731-23743.

61. South Carolina General Assembly, 116th Session, 2005-2006, Chapter 71, Title 38 of the 1976 Code, Article 16.

62. First Circuit Refuses to Stay Maine PBM Law's Implementation Pending Appeal (2005). *Pharmaceutical Law & Industry Report* 3(27).

63. Office of Inspector General (2005). *Medicaid Drug Price Comparisons: Average Manufacturer Price to Published Prices.* Publication OEI-05-05-00240. June. Washington, DC: U.S. Department of Health and Human Services.

# Chapter 15

# Risk Minimization: A New Regulatory Directive

Louis A. Morris
Eva Lydick

## THE NEW ERA OF RISK MANAGEMENT

Drugs are approved only if they are determined to be safe to use for the conditions described in their label. This basic tenet of the Food, Drug, and Cosmetic Act has not changed. What has changed in recent years is interpretation of the term *safe*. Modern concepts of pharmaceutical risk management are based on the premise that drug manufacturers, health care professionals, and patients have a responsibility to minimize the risks of using pharmaceutical products. It is not enough to make drugs minimally safe, they must be as safe as possible over the life cycle of the product's use.[1,2,3]

Historically, the Food and Drug Administration (FDA) has interpreted the requirement that a drug must be safe to mean that the benefits of a drug outweigh its risks. The determination was made on a categorical basis, on which the totality of risks was weighed against the totality of benefits when considered for the purposes outlined in the drug product's labeling. If a drug did not meet this criterion, it was not approved or its label was rewritten to narrow the conditions for use. This logic was endemic in the FDA for most of the twentieth century. On average, two to four drugs over each five-year period were withdrawn from the marketplace after postmarketing data underscored new risks.[4] On occasion, the FDA would require some special tool or intervention to improve a product's safety profile. For example, patient package inserts were used to warn women about the risk of birth control pills, and a special distribution system was used to limit the dispensing of Clozaril (clozapine) to patients who undertook blood tests that demonstrated that they were not having a serious adverse reaction. However, starting in the early 1990s, this philosophy started to change as the FDA began

*Handbook of Pharmaceutical Public Policy*
© 2007 by The Haworth Press, Inc. All rights reserved.
doi:10.1300/5733_15

# Exhibit 2



June 19, 2007

Via Federal Express

The Honorable Patti B. Saris
United States District Court
 for the District of Massachusetts
Courtroom 19, 7th Floor
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, MA 02210

Re: *New England Carpenters Health Benefits Fund, et al. v. FirstData Bank, Inc., et al.*
Civic Action No. 1:05-CV-11148-PBS

Dear Judge Saris:

The National Community Pharmacists Association (NCPA), founded in 1898 as the
National Association of Retail Druggists, represents the nation's non-publicly held or
"independent" pharmacies and the 60,000 pharmacists that practice in these 24,000
pharmacies. The nation's independent pharmacies, independent pharmacy franchises,
and independent chains dispense half of the nation's retail prescription medicines. The
NCPA pharmacies and pharmacists have repeatedly been found to be the preferred choice
of American consumers.

We are aware that during the recent hearing on the amended FirstData Bank (FDB)
proposed settlement that your Honor expressed an interest as to how others assessed the
FDB and now the Medi-Span proposed settlement.

NCPA opposes approval of the proposed settlements for a variety of reasons including
the failure to properly compensate the settlement class; the unsubstantiated and unjust
burden imposed on non-party NCPA pharmacies, pharmacists and the consumers they
serve; and the flawed economic analysis.

The Settlement Agreements and the Memoranda offered in support of approval of the
Settlement Agreements present the flawed premise that Average Wholesale Price
("AWP") and Wholesale Acquisition Cost ("WAC") are the only factors that determine
pricing of pharmaceuticals in the marketplace. To the contrary, when pharmacies enter
into contracts, for the major of prescriptions, with insurance companies, plan sponsors
and PBMs, pharmacies are "reimbursed" at a fixed rate of AWP minus a substantial
discount.

100 Daingerfield Road
Alexandria, VA 22314-2888
(703) 683-8200 **PHONE**

THE VOICE OF THE COMMUNITY PHARMACIST

(703) 683-3619 **FAX**

The Honorable Patti B. Saris
June 19, 2007
Page 2

Since FDB increased the markup factor between AWP and WAC, plan sponsors have increased the discounts from the AWP and thus decreased the reimbursements made to our pharmacies. The result was that the potential increase in profit margins of NCPA

pharmacies was eviscerated by the contemporaneous and subsequent reductions in payments to our pharmacies by plan sponsors.

We will oppose the proposed FDB settlement in conjunction with the hearing scheduled for November 14, 2007 and we will also oppose the Medi-Span proposed settlement. We intend to file timely briefs and possibly related consumer and pharmacy affidavits.

If the proposed settlements are approved without corresponding reductions in the "discounts" set by health plans for our pharmacies payment, their already narrow profit margins will be radically reduced or eliminated with catastrophic consequences for the pharmacies, pharmacists and the consumers that they serve.

NCPA does not intend to intervene formally in this matter but requests to be heard on the important issues raised by these proposed settlements as a friend of the court and as an affected, interested party.

Because I am not counsel of record, I respectfully request that this letter be docketed, filed of record and distributed to counsel of record.

Thank you for your time concerning this matter and please do not hesitate to contact me should I be able to assist the court further.

Respectfully,

John M Rector

John M. Rector, Esq.
General Counsel
National Community Pharmacists Association

# Exhibit 3



PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION

June 20, 2007

Honorable Patti B. Saris
United States District Judge
United States District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Re: **New England Carpenters Health Benefits Fund, et al. v. First DataBank, Inc. and McKesson Corporation, Civil Action No. 05-11148-PBS; District Council 37 Health and Security Plan v. Medi-Span, Civil Action No. 07-CV-10988**

Dear Judge Saris:

    We are writing on behalf of Pharmaceutical Care Management Association (PCMA) to share our substantial concerns regarding the proposed settlement in the above case proposed by Plaintiffs and Defendants First DataBank ("FDB") and Medi-Span. PCMA is the national association representing America's pharmacy benefit managers (PBMs), which administer prescription drug plans for more than 210 million Americans with health coverage provided through Fortune 500 employers, health insurance plans, labor unions, and Medicare Part D. We are writing in anticipation of the preliminary fairness hearing now scheduled for June 21, 2007.

    We intend this short letter to be helpful to the Court with regard to the fairness and reasonableness of the Proposed Settlement. In particular, the Settlement as currently structured (1) represents an overreaction to a largely non-existent problem which will impose unnecessary transaction costs on numerous entities, including much of the proposed Private Payor Class (the "Class"); (2) contains an unrealistic and unworkable definition of the Class that would require examination of individual PBM contracts to determine membership; and (3) requires PBMs to engage in unnecessary and potentially inappropriate pricing discussions with competitors and suppliers.

    As this Court correctly noted at the May 22nd hearing, the Proposed Settlement here is "very unusual." (Trans. at p. 58)  Plaintiffs allege a RICO "conspiracy" that they claim has cost 11,000 third party-payors billions of dollars; yet, for no monetary payment whatsoever by the defendants, the Proposed Settlement would grant FDB – and now Defendant Medi-Span -- a general release of the very claims that are at the core of this alleged fraudulent scheme. In short, the Proposed Settlement requires nothing of the principal alleged conspirators, FDB and Medispan. Instead, the Proposed Settlement appears designed to make public policy and "fix" a problem that market participants have already addressed.

                    *                    *                    *

### 1. The Proposed Settlement Attempts to Address an Issue that Has Been Largely Dealt With by the Marketplace

Thus, Plaintiffs make the simplistic, but incorrect, assumption that a "static" marketplace over the seven years since the Class Period began on January 1, 2000, failed to take account of alleged higher AWPs. Far from static, the PBM industry and its clients, the Class members, are highly sophisticated, operating in a competitive and dynamic marketplace.[1] Price changes – let alone the significant price changes alleged by the Plaintiffs -- do not go unnoticed or unaddressed by PBM clients, which include health benefit plans, self-insured employers, third-party administrators (TPA), and union-sponsored plans. No less an authority than the Federal Trade Commission has noted on many occasions the industry's "highly competitive" nature, with PBMs competing on both price dimensions (such as the reimbursement rate and dispensing fee paid to pharmacies, rebates paid to plan sponsors and mail order pricing), as well as non-price dimensions, such as plan design, how extensive the PBM's retail network is, and the availability and extent of mail order services. Federal Trade Commission and U.S. Department of Justice, "Improving Health Care: A Dose of Competition," ch. 7, at 15 (July 2004), ("Healthcare Report"), available at www.ftc.gov/reports/healthcare/040723/healthcarerpt.pdf. [2]

In this competitive marketplace, PBM clients – many in the Class -- are well aware of their numerous choices among the 40 to 50 PBMs operating in the country today, as they search for lower prescription drugs prices and additional services for plan members. Those sophisticated clients, often advised by consultants, possess an ongoing ability to bargain for contractual provisions regarding various discounts, rebates, fees and reimbursement formulas available. Although PBM contracts sometimes have a term of as long as three years, they often contain terms that allow pricing factors to be adjusted during that period; in any event, as a practical matter, clients are able to demand pricing concessions in response to market developments at any time. The result is that, over the Class Period, PBMs have been able to provide – and Class members have benefited from – increasingly deeper discounts in the mail service and retail channels, lower administrative and dispensing fees, and higher levels of manufacturer rebate-sharing. It is a fallacy to assume that AWP increases occurring in 2002 and 2003 have not been substantially, if not entirely, offset by marketplace forces in this highly competitive setting.

In short, PBM clients and other industry participants focus intently on prescription drug pricing, and adjust their contract terms accordingly. In this way, the marketplace for PBM services has already reacted to the changes effected over the course of the Class Period. As this Court recognized during the May 22, 2007, hearing on Plaintiffs' Motion for Class Certification

---

[1] During the seven-year Class Period, in fact, the highly competitive PBM industry has been extremely successful in keeping costs down for their clients *in the midst of Plaintiffs' alleged conspiracy to inflate drug prices*. As found in a recent Federal study, prescription drug-spending slowed to its lowest growth rate in 2005 in over a decade, with the 5.8% prescription–drug growth rate in 2005 representing a 33% reduction from the 2004 growth rate of 8.6%. The study credits some of the tools employed by PBMs, including tiered co-payment benefit plans and formularies, a continued shift to the use of generic drugs, and continued strong growth in mail-service pharmacies. Catlin, A., Cowan, C., et al., "National Health Spending in 2005: The Slowdown Continues," Health Affairs 142 (Jan. 2007). The authors are all with the Centers for Medicare and Medicaid Services, Office of the Actuary.

[2] This Court's own expert report from Dr. Ernst R. Berndt in the underlying AWP case also challenged the assumption that PBM competition was inadequate, and highlighted the "vigorous" competition among PBMs for the business of third-party payors. Report at 112-113.

in this matter, "as we all know, the PBMs and the consulting contracts all give a huge amount of knowledge and leverage to do push back. So within a year or two of the bump-up of the price, you've already seen adjustments." Transcript of May 22, 2007 Hearing, p.8, lines 6-10. Five years later, the fact of the increase in WAC to AWP spread has inevitably been part of contract negotiations between PBMs and their clients, as well as among other market participants, since that time. The increase has, in short, been bargained away.

While failing to remedy any existing injury or harm, the Proposed Settlement will only lead to yet another round of contract and pricing re-negotiations among marketplace participants – this time in response to the arbitrary and across-the-board price change effected by the Proposed Settlement. And with one of two results: (1) either the contract and pricing re-negotiations will be protracted and costly, with PBMs and retail pharmacies – who are not alleged to have participated in the alleged conspiracy – bearing the brunt of the costs of the reduction in the WAC to AWP spread; or (2) the re-negotiations will be relatively efficient, perhaps because existing contracts may allow for pricing modifications in response to an event like the Proposed Settlement, with class members receiving little to no benefit from the Proposed Settlement as a consequence. Either way, what is assured is that, while the Defendants – and alleged wrongdoers in the case – will pay nothing under the terms of this Proposed Settlement, industry participants who have done nothing wrong, who relied in good faith on AWP as a valid pricing benchmark in many of their contracts, and who have long since re-negotiated their contracts in response to the pricing changes that occurred in 2002 and 2003, will be forced to bear unnecessary transaction costs reacting to the Proposed Settlement. Such a result makes no sense.

## 2. Contract-by-Contract Review is Required to Determine Which PBM Contracts are Included in the Proposed Settlement Class

The Plaintiffs have demonstrated their misunderstanding of the PBM industry in defining the Class to include only those PBMs which are either "the fiduciary of the Third Party Payors" or which "by contract assumed, in whole or in part, the insurance risk of that prescription pharmaceutical benefit." (Updated Order Granting Preliminary Approval, dated June 6, 2007.)

Under this proposed definition, an individual PBM cannot simply be included or excluded as a whole from the Class. Rather, whether a particular PBM is within the scope of the new PBM carve-out depends on a relationship-by-relationship review of *every PBM contract with every client*. Thus, PBMs are not normally deemed "fiduciaries" for their external customers,[3] but in their role as plan sponsors are "fiduciaries" for their own employee benefit plans, including for administration of the prescription drug benefit. They can also in certain cases assume limited "fiduciary" responsibilities (for claims administration) by contract for a particular customer.[4]

---

[3] See *PCMA v. Rowe*, 429 F.3d 294 (1st Cir. 2005).

[4] We are assuming that Plaintiffs intend to define "fiduciary" consistently with the Employee Retirement Income Security Act (ERISA), which requires exercise of "any discretionary authority or discretionary control respecting management of such plan. .." 29 U.S.C. § 1002(21)(A).

Finally, since both health insurers and retail pharmacies are considered Class members without the exceptions created for PBMs, the result will be that a parent health insurer that has a subsidiary or affiliated PBM will be considered a member of the class but the affiliated PBM may not be except as to certain contracts. Thus, a given health insurer itself may be included [5] but not its subsidiary PBM, unless for particular contracts that PBM meets the criteria specified in the Settlement, namely acting as a "fiduciary" or "assum[ing] the insurance risk." Since the definition makes no distinction between risk-bearing and non-risk bearing health insurance contracts, the result will be to include TPAs which receive administrative fees for performing services to a benefit plan without bearing any "insurance risk."

In sum, in order to determine whether its contracts are within the scope of the proposed settlement class, each PBM must engage in a contract-by-contract determination as to whether it is included in the proposed Class with respect to particular contracts. That determination may be cumbersome and costly; adding additional concerns regarding the burden imposed by what PBMs believe is an unnecessary and counter-productive Settlement.

## 3. The Proposed Settlement Inappropriately Mandates that PBMs Engage in Court-Ordered Pricing Discussions with Competitors and Suppliers

The difficulties created for PBMs by the Proposed Settlement are further illustrated by an additional provision in the document which purports to require PBMs to participate in highly sensitive pricing discussions with competitors, suppliers, and customers alike. That provision, in section (5), entitled "Mediation," asks this Court to order the multiple entities engaged in the pharmaceutical chain, whether as manufacturers, buyers, or sellers, to participate:

*in a Settlement Court-approved mediation process meant to facilitate the establishment of a sustainable benchmark for pharmaceutical reimbursement.*

In essence, this provision seeks to transform this Court into a regulator and imposes a one-size-fits all standard that would make the marketplace less rather than more competitive. It is especially inappropriate as applied to PBMs, which relied in good faith on the AWPs as reported by Defendant FDB and other publishers, and are nowhere alleged to have engaged in any manner in the claimed RICO conspiracy. The PBM industry is as successful as it is in lowering prices of pharmaceuticals because it bargains aggressively with both pharmaceutical manufacturers of brand-name and generic drugs as well as with retail pharmacy networks for distribution of those drugs. The marketplace already has made room for myriad measures of pharmaceutical pricing, measures which allow the many competitors to work with customers to choose measures and alternatives that work for them.

\*                          \*                          \*

PCMA believes that any drug price benchmark, whether AWP, AMP, WAC or any other measure, should be both an accurate reflection of pharmaceutical sales transactions, as well as

---

[5] This analysis is equally applicable to health insurers which contract on an "administrative services only" basis, assuming no pricing risk, as is often the case with self-insured customers.

broad enough to protect the highly individualized nature of drug price negotiations between both PBMs and their customers as well as between PBMs and pharmaceutical manufacturers. We also believe that benchmark should be flexible enough to foster the enormous variety and contractual diversity that now exists in the PBM industry, thus allowing what the FTC terms "vigorous competition" in the PBM market sector to flourish. This Proposed Settlement meets none of those tests, and instead seriously disrupts the industry while imposing unjustifiable costs and burdens on both PBMs and their clients – the class members – who are not alleged to have participated in the alleged unlawful conduct.

We thank the Court for considering our comments.

Respectfully,

Mark Merritt
CEO and President
Pharmaceutical Care Management Association

c:   *Counsel for Plaintiffs*

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street
Cambridge, MA 02142

*Counsel for Medi-Span*

Sheldon Zenner
Katten Muchin
525 West Monroe Street
Chicago, IL 60661-3693

Kevin E. Sharkey
66 Bay Street
Manchester, NH 03104

*Counsel for First DataBank*

Sheila L. Birnbaum
Skadden Arps Slate Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

Letter to Judge Saris
Page 6 of 6

*Counsel for McKesson*

Lori A. Schechter
Morrison & Forrester
425 Market Street
San Francisco, CA 94105-2482

# Exhibit 4
# Filed Under Seal

# Exhibit 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, et al,          )
                               )
             Plaintiffs        )
                               )
        -VS-                    ) CA No. 05-11148-PBS
                               ) Pages 1 - 65
FIRST DATABANK, INC.,          )
a Missouri Corporation;        )
and McKESSON CORPORATION,      )
a Delaware Corporation,        )
                               )
             Defendants        )



MOTION/STATUS HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
May 22, 2007, 2:05 p.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   bumped up across the industry 5 percent.  I don't even know

2   what that involves.

3           MS. SCHECHTER:  So let's talk about your contract

4   question, which is, are they locked into contracts?  First

5   answer, no.  We have evidence from one of the named

6   plaintiffs, District Council 37, that they were feeling cost

7   pressure.  They went to their PBM.  Mid-contract, they said,

8   "I want to renegotiate."  And what does Express-Scripts do,

9   Express-Scripts, who knows about the change in the spread,

10  who's recaptured that from the retailers in renegotiation?

11  They offered Express-Scripts a better deal right

12  mid-contract.

13          In order to know the time period that you would

14  have to try, you're going to have to look at every single

15  TPPs contracts with their PBM.  They're all starting and

16  ending at different points.  Some of them are getting

17  amended.

18          THE COURT:  That's one of your strong points for

19  damages, but in terms of impact, I think plaintiffs have put

20  forward enough to show that it caused damages to some people

21  who never did adjust or couldn't adjust from internally.

22  Now, whether or not I can actually as part of a giant

23  national class action actually assess damages is a different

24  story, and that's where I'm going to have to roll up my

25  sleeves and walk through the record, but there's enough there

Page 23

1    to make a showing of damages.

2         Now, as you know, we're at a preliminary stage

3    here.  I haven't seen motions for summary judgment,

4    whatever.  I can always rethink it if the evidence doesn't

5    prove it up.  But they've got enough.  They've got an expert

6    opinion that shows impact, and I think that's enough to get

7    you a class.  Whether it's for damages, that's where I'm

8    struggling with the issue.

9         MS. SCHECHTER:  Okay, and we can turn to what their

10   expert says in a moment, but I think the fundamental

11   question, though, is, have they really shown impact for

12   purposes of RICO?  Because under RICO, there's no requirement

13   of an instantaneous impact.  To the contrary, if you suffer a

14   loss on day one and you recoup that on day two, you cannot

15   sue under RICO on day three.  And that's exactly what the

16   Milken case says in the Second Circuit.  If you can recoup,

17   then there is no impact, and I submit to you, your Honor,

18   that some of the TPPs were able to recoup.  And let's put up

19   Slide 11 just to give you an example of that.

20        THE COURT:  Let's assume that that's true.  I'm

21   assuming, you represented it.  That doesn't necessarily mean

22   that's the typical TPP, and it also doesn't mean that there's

23   classwide impact.  That has to do with who can collect

24   damages and who can't.

25        MS. SCHECHTER:  Well, but the question of impact,

1                    C E R T I F I C A T E

2

3

     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9    Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 65 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 05-11148-PBS, New England Carpenters Health

13   Benefits Fund V. First Databank, Inc., et al, and thereafter

14   by me reduced to typewriting and is a true and accurate

15   record of the proceedings.

16           In witness whereof I have hereunto set my hand this

17   24th day of May, 2007.

18

19

20

21

22

23   _____
     LEE A. MARZILLI, CRR
24   OFFICIAL FEDERAL COURT REPORTER

25

# Exhibit 6
# Filed Under Seal

# Exhibit 7

Page 319

1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

2               IN THE UNITED STATES DISTRICT COURT

3               FOR THE DISTRICT OF MASSACHUSETTS

4       ----------------------------x

5    In Re: PHARMACEUTICAL           )
                                     )
6    INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
                                     )
7    PRICE LITIGATION                ) CIVIL ACTION NO.
                                     )  01-CV-12257-PBS
8       ----------------------------)
                                     )    Vol. 2
9    THIS DOCUMENT RELATES TO        )
     ALL ACTIONS                     )
10      ----------------------------x

11

     IN THE SUPERIOR COURT FOR THE STATE OF ARIZONA
12        IN AND FOR THE COUNTY OF MARICOPA

13   ------------------------------------
     ROBERT J. SWANSTON, Individually and )
14   on behalf of himself and all others  )
     Similarly situated,                  )
15                                         )
                        Plaintiff,         )   Case No.
16   v.                                    ) CV2002-004988
                                           )
17   TAP PHARMACEUTICAL PRODUCTS,          )
     INC., et al.,                         )
18                                         )
                        Defendants.        )
19   ------------------------------------

20

           CONTINUED VIDEOTAPED DEPOSITION OF
21              PATRICIA KAY MORGAN
                New York, New York
22           Wednesday, January 12, 2005

Page 402

1    Pennsylvania, once -- well, who were you reaching

2    out to in Pennsylvania?

3        A.    Denny Lindell actually transferred

4    there.

5        Q.    And what's your best recollection as

6    to when the problems with acquiring information

7    for surveys started with ABC?

8        A.    Sometime mid-to-late 2003.

9        Q.    Is it your recollection that in early

10   2002 you were still getting survey information

11   from AmeriSource or Bergen or ABC, depending upon

12   where it was in its merger?

13       A.    Correct.

14       Q.    Drawing your attention to Deposition

15    Exhibit No. 3, on the fourth paragraph there's a

16   discussion regarding Weighting, W-e-i-g-h-t-i-n-g,

17   certain information that's acquired.  Do you see

18   that?

19       A.    Yes, I do.

20       Q.    During what period of time was this

21   practice in place at First Data Bank?

22       A.    I'm just going to preface this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
New York, NY

Page 586

```
 1                  C E R T I F I C A T E

 2     STATE OF NEW YORK        )

 3                              ) ss.:

 4     COUNTY OF SUFFOLK        )

 5              I, FRANK J. BAS, a Registered

 6     Professional Reporter and Notary Public

 7     within and for the State of New York, do

 8     hereby certify:

 9              That I reported the proceedings in

10     the within-entitled matter, and that the

11     within transcript is a true record of such

12     proceedings.

13              I further certify that I am not

14     related by blood or marriage, to any of the

15     parties in this matter and that I am in no

16     way interested in the outcome of this

17     matter.

18              IN WITNESS WHEREOF, I have hereunto

19     set my hand this 14th day of January, 2005.

20

21                    FRANK J. BAS, RPR

22
```

# Exhibit 8

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND, PIRELLI )<br>ARMSTRONG RETIREE MEDICAL )<br>BENEFITS TRUST; TEAMSTERS )<br>HEALTH & WELFARE FUND OF )<br>PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, )<br>AFSCME-HEALTH & SECURITY PLAN; )<br>JUNE SWAN; MAUREEN COWIE and )<br>BERNARD GORTER, )<br> )<br>        Plaintiffs, )<br> )<br>v. )<br> )<br>FIRST DATABANK, INC., a )<br>Missouri corporation; and )<br>McKESSON CORPORATION, a )<br>Delaware corporation, )<br> )<br>        Defendants. )<br> ) | C.A. No.<br>  1:05-CV-11148-PBS |

-  VOLUME I  -

VIDEOTAPED DEPOSITION OF PATRICIA KAY MORGAN

JUNE 28th, 2007
9:24 a.m. - 1:59 p.m.
Tampa, Florida

Pages 1-142

**COPY**

Page 62

1    Q.   Okay.  Tell me about that instance.

2    A.   I'd have to see the document again.

3    Q.   So obviously this was before the merger between

4    Amerisource and Bergen?

5    A.   That would be the assumption, yes.

6    Q.   And I take it that other than that document that

7    you don't recollect, you don't recollect any other

8    occasions on which you contacted Amerisource for the

9    purpose of the wholesaler surveys prior to the merger with

10   Bergen?

11   A.   I do not recall.

12   Q.   And is it also the case that you don't recall any

13   persons with whom you had contacted Amerisource prior to

14   the merger with Bergen for the purpose of conducting the

15   wholesaler surveys?

16        MR. KERN:  Object to the lack of foundation

17        because she stated she didn't know when the merger

18        took place.

19   BY MR. STYANT-BROWNE:

20   Q.   You can answer.

21   A.   You're asking if I know who I called at

22   Amerisource?

23   Q.   Yes.

24   A.   Yes, I do.

25   Q.   Who did you call at Amerisource prior to the

1    merger with Bergen?

2        A.    Denny Lindell.

3        Q.    And did you also speak to him after the merger

4    with Bergen?

5        A.    I know I had left messages.  He generally had

6    someone on his staff return my calls.  So we did get

7    responses from them after the merger.

8        Q.    Was he the principal contact for the purpose of

9    conducting the surveys after the merger with

10   Amerisource-Bergen?

11       A.    That gets awfully confusing because there was

12   still some people down in Orange County for Bergen that

13   would still answer, and then there were some people at

14   Amerisource that would still answer.

15            So I wouldn't say that he was definitely the

16   primary contact.  It was easier for me to reach Orange

17   County than it was back to -- well, he was actually in

18   Minnesota.

19       Q.    Do you recollect anyone else from Amerisource

20   besides Denny Lindell with whom you contacted for the

21   purpose of the surveys?

22       A.    I do not recall their name.

23       Q.    Who do you recollect from Bergen you contacted

24   prior to the merger with Amerisource?

25       A.    It was Howard Imatomi, I-M-A-T-O-M-I.

Page 64

1    Q.   And was there anyone else?

2    A.   Julie Rosling.

3    Q.   And did you -- you said that after the merger

4    with Amerisource, you continued to have contact with

5    people in Orange County.  Were they the two individuals in

6    Orange County you're referring to?

7    A.   At some point Howard retired and Julie became the

8    primary contact.

9    Q.   And you can't recollect whether that was prior to

10   or after the Amerisource merger?

11   A.   His retirement or contacting Julie or --

12   Q.   Contacting Julie.

13   A.   I know contacting her was still after the merger.

14   Q.   So is it your recollection that you contacted

15   Mr. Imatomi and Ms. Rosling, at least on some occasions

16   both prior to and after the merger with Amerisource?

17   A.   I don't recall exactly when Howard retired, and

18   it might have been coincidental with the merger.

19   Q.   Do you recollect anyone else you spoke to from

20   Bergen, either before or after the merger with

21   Amerisource, for the purpose of conducting these surveys?

22   A.   No, I do not recall.

23   Q.   Now, at McKesson, who were the persons you dealt

24   with for the purpose of the conduct of the surveys?

25   A.   The primary person was Ramon Crusit.

Page 143

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3        ——————————————————————————
                                          )
4    NEW ENGLAND CARPENTERS HEALTH        )
     BENEFITS FUND, PIRELLI               )
5    ARMSTRONG RETIREE MEDICAL            )
     BENEFITS TRUST; TEAMSTERS            )
6    HEALTH & WELFARE FUND OF             )
     PHILADELPHIA AND VICINITY;           )
7    PHILADELPHIA FEDERATION OF           )
     TEACHERS HEALTH AND WELFARE          )   C.A. No.
8    FUND; DISTRICT COUNCIL 37,           )     1:05-CV-11148-PBS
     AFSCME-HEALTH & SECURITY PLAN;       )
9    JUNE SWAN; MAUREEN COWIE and         )
     BERNARD GORTER,                      )
10                                        )
                 Plaintiffs,              )
11                                        )
     v.                                   )
12                                        )
     FIRST DataBank, INC., a             )
13   Missouri corporation; and           )
     McKESSON CORPORATION, a             )
14   Delaware corporation,               )
                                          )
15               Defendants.              )
     ——————————————————————————          )
16

17

               -   VOLUME II   -
18

     VIDEOTAPED DEPOSITION OF PATRICIA KAY MORGAN
19

                    JUNE 28th, 2007
20                2:10 p.m. - 6:06 p.m.
                    Tampa, Florida
21

22

23

24

25   **COPY**                Pages 143-292

Page 172

1      A.    Correct.

2            MR. GOLDMAN:  And then if you could look at

3      Exhibit 23.  This looks like one we marked, but I

4      think it's different.  This is frequently-asked

5      questions, so this is not -- that's one we've already

6      done?

7            THE DEPONENT:  23 is the frequently-asked e-mail.

8            (Document numbered FDB/NEC 041070

9             marked as Exhibit Number 23 and

10            filed as a part of this record.)

11   BY MR. GOLDMAN:

12     Q.    And in this one, can you tell us what is being

13   attached to this e-mail and why?

14     A.    This is a document that was drafted by CMS, then

15   sent to us.  And what's attached is what Pat, Diane and I

16   corrected on their attachment.

17     Q.    So what I wanted to know is this:  In terms of

18   communicating to people what -- how First DataBank arrived

19   at the blue book AWP, one of the ways you did that is you

20   communicated that in writing, right?

21     A.    Correct.

22     Q.    You would have it in a Price Alert, a

23   publication, correct?

24     A.    Correct.

25     Q.    Or you might have it in a single-page description

Gravity Court Reporting

Page 173

1    like you see in 21 and 22?

2         A.    Correct.

3         Q.    Or you might have it editorialized?  You might

4    have some editorial you've written that deals with that

5    subject?

6         A.    Correct.

7         Q.    And we also saw it on your website of the

8    company?

9         A.    Correct.

10        Q.    And would this be true, too, Ms. Morgan, that how

11   AWP -- blue book AWP was arrived at was also communicated

12   by you and others at First DataBank orally to people?

13        A.    Correct.

14        Q.    If people asked, they were told how you did it?

15        A.    Correct.

16        Q.    And you would have meetings, there would be your

17   annual convention?

18        A.    Correct.

19        Q.    The topic would come up, how do you arrive at a

20   blue book AWP; am I correct?

21        A.    Correct.

22        Q.    In other words, there was nothing you were hiding

23   about how you did it.  You were letting people know?

24        A.    Correct.

25        Q.    And that included the government.  If they asked,

Page 174

1    you told them?

2        A.    Correct.

3        Q.    And what you told them is basically what you have

4    in 21 and 22?

5        A.    Correct.

6        Q.    And also -- and we'll see later, you could be at

7    a meeting like with Cardinal or ABC, or have an e-mail

8    with them where they asked you and you would tell them?

9        A.    Correct.

10       Q.    In other words, maybe more of one-on-one'ish?

11       A.    Absolutely.

12            MR. GOLDMAN:  And then the last exhibit I gave is

13       24.

14            (Document numbered MCKAWP 0058371

15             marked as Exhibit Number 24 and

16             filed as a part of this record.)

17   BY MR. GOLDMAN:

18       Q.    And would 24 be the new policy that you told

19   plaintiff's counsel about this morning that was arrived at

20   sometime in March?

21       A.    Yes, it is.

22       Q.    And do you recall whether it was around

23   March 15th when people were notified of it?

24            MR. KERN:  Just for clarification, 2005.

25            MR. GOLDMAN:  2005.  This is dated April 1, 2005.

Gravity Court Reporting

1    Q.    And how -- how do you know what would go into

2    that category, 1 times suggested?

3    A.    Before 2005 or after?

4    Q.    Before 2005.

5    A.    Basically we're using the information that we had

6    calling McKesson or e-mailing McKesson, relying on what

7    the other two said and deciding, you know, is that what we

8    use or do we use the mark-up?

9    Q.    So it was like WAC, plus mark-up?  That is, it

10    was part of the survey?

11    A.    Correct.

12    Q.    Now, were there instances anytime between '99 and

13    March of 2005 where there were manufacturers who were slow

14    to give you WAC, a WAC price?

15    A.    Yes.

16    Q.    Let me back up.  What was the primary source for

17    you getting WAC?

18    A.    Based on my understanding of WAC, it should come

19    from the manufacturer.  We did get permission at one point

20    to get them from wholesalers so we could -- because people

21    wanted WACs populated.  But primarily WAC was a

22    manufacturer's supplied price.

23    Q.    And how would you get that information from the

24    manufacturer?

25    A.    They would send it by mail, e-mail.

Page 180

1    Q.    And that's how you populated the WAC field?

2    A.    Correct.

3    Q.    But there were times when the manufacturer was

4    slow to give it to you or you didn't get it from the

5    manufacturer?

6    A.    Correct.

7    Q.    Without a WAC, in other words, where there is a

8    WAC and the mark-up is over WAC, you couldn't have an AWP

9    unless you had the WAC?

10   A.    That's correct.

11   Q.    So looking at some documents, is it correct that

12   there were times when you received WAC from wholesalers?

13   A.    Correct.

14   Q.    Now, did you say something earlier about getting

15   permission?

16   A.    Yes.

17   Q.    Can you tell me what you're referring to?

18   A.    I didn't make that decision without talking to --

19   I was looking at some prep documents yesterday.  I said

20   our CEO gave us permission to get -- obtain the WACs from

21   wholesalers.

22   Q.    And you did get some from McKesson; am I correct?

23   A.    That's correct.

24   Q.    Was McKesson the only wholesaler you got WACs

25   from?

Gravity Court Reporting

Page 181

1    A.    No.

2    Q.    Did you get some from Cardinal?

3    A.    Yes.

4    Q.    Did you get them from ABC?

5    A.    Yes.

6    Q.    Amerisource-Bergen, ABC?

7    A.    Correct.

8    Q.    And was that true even at the point where for

9    surveying, you said you lost contact with those two.  Were

10   they still giving -- providing you with WAC?

11   A.    It generally didn't come through a direct

12   contact, like we were surveying through it.  It usually

13   came through customer service as here's some WACs we

14   noticed you didn't have.

15   Q.    So it might be Mike Nelson, for example?

16   A.    Correct.

17   Q.    Or Kevin Roth might be one of those people?

18   A.    Possible.

19   Q.    Each of them had a contact with either ABC or

20   with Cardinal?

21   A.    Correct.

22   Q.    On the customer service side?

23   A.    Correct.

24   Q.    You mentioned in response to some questions by

25   plaintiff's counsel that those people didn't work for you,

Page 238

1        Q.    Now, was there a person there by the name of

2    Steve Lefebure, L-E-F-U-B-U-R-E?    (Sic)

3        A.    Yes, there was.

4        Q.    Is he a person you talked to after the -- after

5    you stopped talking to people at Bergen, when that was all

6    shut down eventually, was he someone you spoke to at

7    ABC --

8        A.    Yes, he was.

9        Q.    -- as part of the survey?

10       A.    No.   He was the one we spoke to to attempt to get

11   Amerisource-Bergen to participate in the survey.

12       Q.    There was a point in time when ABC, after the

13   merger and after you're no longer dealing with Orange

14   County, when -- I understand from what you're saying --

15   you were unable to get regular -- any regular information

16   from them?

17       A.    Correct.

18       Q.    Did I understand you to say -- it was said

19   quickly -- that you did get something from them about what

20   they would do in the absence of an SWP?

21       A.    Yes, I did.

22       Q.    Tell me what -- because I didn't quite get that

23   this morning -- what is it you heard?

24       A.    They would use a 25-percent mark-up.

25       Q.    If there was no SWP for the -- for what?

Page 239

1    A.    For the product -- or for the company.

2    Q.    Can you recall today who told you that?

3    A.    No, I cannot.

4    Q.    Now, I want to see if you are -- how able you are

5    to say when exactly it was you were unable to get survey

6    information from ABC anymore.  Whether -- if you can pin

7    down the year when that was done.

8         MR. STYANT-BROWNE:  Objection.  Asked and

9    answered.

10        THE DEPONENT:  At this point, I cannot.

11   BY MR. GOLDMAN:

12   Q.    You were shown this morning some documents, and

13   I'll show them to you, as well, of Mr. Breen, who you said

14   was your boss?

15   A.    Correct.

16   Q.    And in the fall of 2003, talking to ABC about

17   participating in a survey -- let me see if I can mark some

18   documents to show you that.

19        Before I do, I wanted to ask you whether you

20   recognize the name Jack Paden, P-A-D-E-N?

21   A.    No, I do not.

22   Q.    Was there a point where -- a point whenever it

23   occurred, when you were not getting the survey information

24   from ABC, where Mike Nelson was the customer relation with

25   ABC?

Gravity Court Reporting

Page 241

1    of wholesalers?

2        A.    Correct.

3        Q.    So was this just a little effort on your part or

4    was it a mighty effort on your part to get the

5    information?

6        A.    It would wax and wane depending upon how busy we

7    were.

8        Q.    Were you -- you looked for opportunities?

9        A.    Correct.

10        Q.    Now, I'm going to turn to the period in the end

11    of '03 where you were shown some documents where Mr. Breen

12    is talking to ABC about getting survey information.

13            Let me -- there's a document I think may have

14    been marked already, October 8th, 2003?

15            MR. KERN:  Can we go off the record for a second?

16            MR. GOLDMAN:  Sure.

17            THE VIDEOGRAPHER:  We're off the record at 4:11.

18                (Off-the-record discussion.)

19                (Brief recess observed.)

20            THE VIDEOGRAPHER:  We are back on the record at

21        4:23.

22            MR. GOLDMAN:  I'm going to show you what I've

23        marked as Exhibit 54, an e-mail from Jim Breen to

24        George Robinson, dated October 15.

25                (Document numbered FDB/NEC 032870

Gravity Court Reporting

Page 242

1          marked as Exhibit Number 54 and

2          filed as a part of this record.)

3  BY MR. GOLDMAN:

4      Q.    Is this an e-mail that -- you see it's shown as

5  cc'd on the October 14, 2003 e-mail?

6      A.    Yes.

7      Q.    Does this -- see where it says, Steve, thank you

8  for taking the time to meet with Kay and myself the other

9  day regarding possible participation of future pricing

10 surveys?  Does this at all refresh your recollection that

11 you were involved in this time period, fall of '03,

12 talking with ABC people, possibly Steve Lefebure, about

13 their providing survey information to FDB?

14     A.    Yes.

15     Q.    Do you remember being at such a meeting?

16     A.    It was by phone.

17     Q.    Do you recall in this time period -- I'll ask you

18 about in '04 -- whether part of the discussion about FDB

19 would actually pay ABC money if they would -- for their

20 information?

21     A.    I was not party to those conversations.

22     Q.    Did you ever hear that that was one of the ideas?

23     A.    That was mentioned.

24     Q.    That one of the obstacles for getting information

25 from ABC was they wanted to be paid for it?

Page 243

1        A.    I heard that mentioned, yes.

2        Q.    So by October 2003, would it be -- would you --

3   would it be correct that by this time you were not getting

4   any regular survey information from ABC, or do you recall?

5        A.    That's correct.  We would not be getting

6   responses to phone inquiries.

7        Q.    And do you recall that the time between which

8   that happened and trying to get them to give you the

9   information was not a long interval in between?

10       A.    Not that I recall.

11       Q.    In other words, that's your recollection?

12             MR. KERN:  I'm sorry.  Thank you.

13             THE DEPONENT:  I'm sorry?

14   BY MR. GOLDMAN:

15       Q.    Is it your recollection that the time interval

16   between when you were having difficulty -- or actually not

17   getting information from ABC for survey, and this effort

18   that we see in Exhibit 54 to meet with them and get the

19   information, that interval was not a long period of time?

20       A.    Right.  I don't recall the precise dates, but I

21   do not recall it being a long time.

22             MR. GOLDMAN:  Let me mark as Exhibit 55 an e-mail

23        from Jim Breen to Steve Lefebure -- I don't pronounce

24        his name correctly, I'm sure -- with a copy to you.

25        So that's 55.

Gravity Court Reporting

Page 249

1          (E-mail dated June 25, 2004 marked

2              as Exhibit Number 57 and filed as

3              a part of this record.)

4          MR. GOLDMAN:  I've got a cramp.

5          MR. STYANT-BROWNE:  It happens to me all the

6      time.

7          MR. GOLDMAN:  I have to walk it off.

8          MR. KERN:  No problem.

9          THE VIDEOGRAPHER:  We're off the record at 4:33.

10             (Brief recess observed.)

11         THE VIDEOGRAPHER:  We are back on the record at

12     4:43.

13 BY MR. GOLDMAN:

14     Q.   So, Ms. Morgan, you have in front of you Exhibit

15     57.  It's -- as I mentioned, it's not addressed to you,

16     nor are you shown that it's -- you have been copied on it.

17         So I'm going to ask you, if you look at the

18     second page where there's a letter to Dave Kuehl, list --

19     the data elements we would like to receive electronically

20     are:  List price to customers, list price effective date.

21         Does that refresh your recollection at all as to

22     whether among the pricing data that was being discussed in

23     2004 -- and I appreciate you were not in the middle of

24     that at all -- but was the mark-up information?

25     A.   Well, there's no request for mark-up, but there's

Page 250

1    a request for the prices.  So you could infer the mark-up

2    on them.

3        Q.    What is referred to by list prices to customers

4    at FDB?

5        A.    The list price, as it's referred to here, would

6    be what the wholesaler would equate to their AWP.

7        Q.    So had you heard that that information was being

8    requested of ABC in the 2004 time frame?

9        A.    Yes.

10       Q.    All right.  Now I'm going to switch from -- we've

11   been talking about Bergen and ABC, and I want to switch to

12   Cardinal and the surveying of Cardinal.

13           And if you can get in front of you Exhibit 4,

14   which we have marked, some handwritten notes with the

15   June 7th, 2000 date on it.

16           And just to be clear, you've not -- aside from

17   being shown this for your deposition, you've not seen this

18   before, these notes?

19       A.    That's correct.

20       Q.    This does not refresh your recollection about any

21   meeting or telephone conversation, am I correct?

22       A.    That's correct.

23       Q.    You don't know whose handwriting this is?

24       A.    No, I do not.

25       Q.    And by looking at what's being referred to here,

Gravity Court Reporting

Page 251

1    it doesn't refresh your recollection about any meeting or

2    conversation you had with people at Cardinal?

3        A.    No, it does not.

4        Q.    You were directed to look at a portion of this

5    document, despite the fact you didn't know of it, where it

6    says -- the page that has a 3 at the top and a circle.

7    It's FDB-AWP 28340.

8        A.    Yes.

9        Q.    You were referred to the line at the top, Steve

10    is saying that Cardinal doesn't want to participate in

11    survey?

12        A.    Yes.

13        Q.    But I want to refer you to the line right after

14    it.  It says, Kay wants to continue to include Cardinal;

15    do you see that?

16        A.    Yes.

17        Q.    My question is, after you were told by Tom --

18    after you were told by -- let me ask you this:  Is the

19    person you first learned about Cardinal not wanting to

20    proceed with the survey was from Kevin Roth?

21        A.    Kevin had mentioned they did not want to

22    participate.

23        Q.    And was it -- so let me ask this question:  When

24    you had heard from Tom he didn't want to be surveyed, did

25    you respond, but we do want to survey you?

Page 252

1    A.    Yes.

2    Q.    In other words, you weren't taking no for an

3   answer, were you?

4    A.    That's correct.

5    Q.    And I was looking at my notes from this morning's

6   examination by plaintiff's counsel.  And correct me if I'm

7   wrong, what I read that you had testified to is after Tom

8   Sartori had said that, you continued to call him?

9    A.    That's correct.

10         MR. GOLDMAN:  And I'm going to mark an e-mail of

11        April 9, 2004, that's Exhibit 59.

12             (E-mail dated April 9, 2004 marked

13              as Exhibit Number 59 and filed as

14              a part of this record.)

15  BY MR. GOLDMAN:

16   Q.    And can you tell me whether this is an e-mail you

17  sent on or about April 9th, 2004?

18   A.    Yes, it is.

19   Q.    Now, can you tell me, Ms. Morgan, at some point

20  in after Tom Sartori had said he didn't want to be

21  surveyed, FDB had set up a process with Cardinal where

22  there were monthly meetings between the two?

23   A.    That's correct.

24   Q.    That you did not attend.

25   A.    I did attend some, not all.

Gravity Court Reporting

Page 254

1    their file.

2        Q.    So, again, I want to say, based upon -- try to

3    capsulate a lot of documents that I saw -- that there was

4    a lot of -- this was going on continuously in 2004, and

5    even into 2005 where Cardinal was asking for verification

6    of pricing data?

7            MR. STYANT-BROWNE:    Objection.    Misstates the

8        testimony.

9    BY MR. GOLDMAN:

10       Q.    Am I correct?

11       A.    They were asking us to update or confirm the

12   price we had was correct.

13       Q.    Were you aware as to whether Cardinal, like ABC,

14   wanted verification of AWP numbers because their customers

15   were contacting them and asking them to verify AWPs?

16       A.    The information I was asked was that the AWP they

17   had did not match ours, so could I please try to confirm

18   or update or do what was necessary.

19       Q.    And whether it was because a customer of theirs

20   had contacted them or not, you don't recall knowing?

21       A.    On some instances, they mentioned that their

22   customers had contacted them.

23       Q.    I just want to say, Cardinal was not shy about

24   asking people at FDB in this period, after Tom says he

25   doesn't want to take phone calls, to be asking FDB to

Page 255

1    confirm data contained in your pricing fields, am I right?

2        A.   That's correct.

3        Q.   Were you able to divine from those communication

4    where they were asking for confirmation of numbers, what

5    their mark-up likely was?

6        A.   From some of the documents, yes.

7        Q.   How did you divine that?

8        A.   Because they would include a field that said what

9    their AWP was in their file.

10       Q.   And that's true into 2004, am I correct?

11       A.   That's correct.

12       Q.   Now, was there ever a time when -- you mentioned

13   Amy Malone; am I right?

14       A.   That's correct.

15       Q.   She was with Cardinal?

16       A.   Correct.

17       Q.   Let's set the stage here.  At the April '04

18   convention, FDB convention, someone at FDB announced --

19   made an announcement about what may occur to the future as

20   far as reporting blue book AWP; am I right?

21       A.   That's correct.

22       Q.   Tell us what was said on that subject, and if you

23   can recall, by whom?

24       A.   Bill Wright made the announcement.  And I don't

25   remember the time frame he said, but he announced we were

Page 265

1    being or meeting with Bob James?

2        A.    We went to McKesson on at least two occasions to

3    discuss their file and how we did things and how they

4    might do things better.

5        Q.    Yes.

6        A.    I do not recall if Bob was in those meetings or

7    not.

8        Q.    So you can recall three times?

9        A.    Well, I was at NACDS.  From that year, I've seen

10   him every year since at the NACDS meeting.

11       Q.    You see him there?

12       A.    Yes.

13       Q.    Have you discussed business with him?

14       A.    No, we have not.

15       Q.    I think I read you discussed their families or

16   something?

17       A.    That's correct.

18       Q.    Now, was there a -- can you recall after 2000

19   into 2001 going forward, there were efforts by McKesson to

20   make sure that the numbers that they had, the AWP numbers

21   that were being published by First DataBank, and the WAC

22   numbers that were being published by First DataBank, were

23   accurate, that McKesson had accurate numbers?

24       A.    Correct.

25       Q.    Was there also a desire by First DataBank to make

Page 266

1    sure its numbers were accurate?

2        A.   Yes.

3        Q.   Now, is one way that the numbers could not be

4    accurate is if First DataBank had a different WAC number

5    than McKesson?

6        A.   That's correct.

7        Q.   And I know it's obvious, but how would that give

8    rise to a discrepancy?

9        A.   A WAC could result in a different AWP being

10   calculated.  It was a calculated AWP.

11       Q.   Was another way in which a discrepancy could

12   occur between First DataBank and McKesson is because

13   McKesson was not willing to go to a daily feed?

14       A.   Correct.

15       Q.   A media -- a daily media, whatever?

16       A.   Correct.

17       Q.   Okay.  And that was McKesson's fault?

18       A.   Correct.

19       Q.   And as a result of these kinds of discrepancies,

20   was there an effort made by Bob James and/or by you to

21   exchange information to make sure the numbers that you

22   had, First DataBank had, were accurate at McKesson?

23       A.   There was an effort to make sure we both had

24   accurate numbers.

25       Q.   Yes.  Okay.  So there was exchange of data, of

Page 267

1    historical data, am I correct?

2        A.    Correct.

3        Q.    And I want to be very clear about this because

4    there have been some insinuations made about that exchange

5    of documents.

6              Was that exchange of documents ever used at all

7    by you for any purpose to arrive at what AWP should be?

8    Was that the purpose of that exchange?

9        A.    No, it was not.

10       Q.    What was the purpose?

11       A.    To make sure we were getting current updates,

12   they were getting current updates.

13       Q.    And were they the only ones who -- because I

14   looked at Cardinal giving you lots and lots of data.  Was

15   McKesson the only one trying to make sure their numbers

16   squared with First Databank's numbers?

17       A.    No.  Clearly Cardinal was, also.

18       Q.    How about ABC?

19       A.    We would get some requests from them, but not

20   nearly the intensity from the other two.

21             MR. GOLDMAN:  So I think this might be a good

22        place to take a break and then I can go into the home

23        stretch.

24             THE VIDEOGRAPHER:  We are off the record at 5:09.

25             (Brief recess observed.)

Page 273

1    had reviewed these depositions after they were taken?

2         A.   Yes.

3         Q.   And you made no corrections?  Did you make any

4    corrections?

5         A.   Yes.

6         MR. KERN:  I can represent she just made the

7         normal set of typographical corrections, and they were

8         submitted and are included within the official copies

9         of the transcript that are generally circulated now.

10   BY MR. GOLDMAN:

11        Q.   I'd like to direct your attention to the second

12   volume at Page 537.  There's some questions that were

13   asked of you, I believe by Mr. Sobol, am I correct about

14   that?  Mr. Carroll?  Maybe it's Mr. Carroll.  I'm not sure

15   who asked the questions.

16        If you look at Page 537, I want to run through

17   several of the questions that were asked between Line 6

18   and Line 19.  No, it is Mr. Sobol.  Mr. Sobol is one of

19   the plaintiff's counsel in this case.

20        So I'd like to read what question was asked of

21   you, and if you would, if you would just respond what you

22   answered that time, all right?

23        A.   Okay.

24        Q.   "Does McKesson know that it is the only

25   wholesaler that you are surveying for purposes of the

Page 274

1    mark-up?"

2              And what was your answer?

3        A.    "No, I have not told them that."

4        Q.    "Have you had any conversation with people at

5    McKesson regarding the fact that some other wholesalers

6    are no longer providing information in response to survey

7    questions?"

8        A.    "No, I have not."

9        Q.    So these are questions that you were asked of

10   plaintiffs' counsel, and these are the answers that you

11   gave at that time?

12       A.    That's correct.

13       Q.    And this was back in 2005, approximately -- a

14   little more than two years ago?

15       A.    That's correct.

16       Q.    And the answers you gave were truthful and

17   honest, to the best of your recollection, at the time that

18   you gave them?

19       A.    Yes.

20       Q.    And do they remain so today, Ms. Morgan?

21       A.    Yes, they do.

22       Q.    So the fact is, as you were asked by plaintiff's

23   counsel this morning, you didn't tell anyone outside of

24   FDB that -- after you were not getting regular information

25   from ABC or regular information from Cardinal, you didn't

Page 275

1    tell them that McKesson was the only one you were getting

2    regular information from; am I correct?

3        A.    Correct.  And that includes the Hearst people

4    that would be responsible for FDB.

5        Q.    And what was the reason you didn't tell McKesson

6    what had happened?

7        A.    My concern was if I had told them, they would not

8    participate in the survey, either.

9            MR. GOLDMAN:  All right.  I have no further

10           questions.

11           MR. KERN:  Mel, did you want to mark these as

12           exhibits or just use them for a reference in your line

13           of questioning?

14           MR. GOLDMAN:  Well, since we referred to them,

15           why don't we mark them.

16           I'm going to mark as Exhibits 63, the

17    January 11th transcript.

18           Now, if there were corrections, these are tote

19    scripts, and they would not reflect corrections, so I

20    want to say that.

21           (January 11th, 2005 transcript of

22           Patricia Kay Morgan marked as Exhibit

23           Number 63, January 12th, 2005

24           transcript of Patricia Kay Morgan

25           marked as Exhibit Number 64, and both

Page 287

1   when you were being asked questions by McKesson's counsel,

2   that even after Mr. Sartori said that Cardinal no longer

3   wanted to participate in the survey process and not to

4   call him, you still endeavored on a number of occasions to

5   make calls to him?

6       A.   That's correct.

7       Q.   Now, my understanding of your testimony when you

8   were answering questions from me was that after

9   Mr. Sartori put a stop, or said that he wanted to put a

10  stop to Cardinal's participation in the survey process,

11  there were three different scenarios whereby you would

12  input a figure from Cardinal in certain circumstances; do

13  you recollect that testimony?

14      A.   Yes, I do.

15      Q.   And one was that if there was a manufacturer's

16  suggested AWP, then that would be used; is that correct?

17      A.   That would be the Cardinal input for that, yes.

18      Q.   If there was a consensus between the other

19  wholesalers?

20      A.   Correct.

21      Q.   And then the second was that there was a figure

22  that they gave where there was no suggested AWP, which was

23  either 22 or 25 percent, you can't recollect which; is

24  that correct?

25      A.   That's correct.

Page 288

1      Q.   And then there was a third category where if

2  Cardinal was the only wholesaler that wanted the

3  particular drug listed, then you would call Ms. Malone; is

4  that correct?

5      A.   I did not contact -- call Ms. Malone; no, that's

6  not correct.

7      Q.   Well, if Cardinal approached you with wanting a

8  particular dug listed that the other wholesalers didn't

9  want listed, was it the case that you would get a specific

10  mark-up for that drug from Cardinal?

11      A.   We would request it from them, yes.

12      Q.   Now, I'm confused, therefore, as to why it is

13  that if in those three scenarios, that's the way you put

14  the Cardinal input into the survey process, that you would

15  still be calling Mr. Sartori on a regular basis regarding

16  the survey process?  Can you clarify that?

17          MR. KERN:  Misstated testimony.

18          THE DEPONENT:  I believe I said that the

19          attempts would come and go depending upon how much

20          other things I had to do.  But I still continued to

21          try to call him periodically.

22  BY MR. STYANT-BROWNE:

23      Q.   Even though, on your previous testimony, there

24  were three scenarios where you understood you had clear

25  instructions from Cardinal as to how you were to use their

Page 291

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA            :

 4   COUNTY OF HILLSBOROUGH      :

 5

 6           I, YVETTE J. BARRETT, Registered Professional

 7   Court Reporter, Certified LiveNote Reporter, in and for

 8   the State of Florida, do hereby certify that I was

 9   authorized to and did stenographically report the

10   foregoing deposition, Pages 6-289, that a review of the

11   transcript was not requested; and that the foregoing pages

12   constitute a true and complete computer-aided

13   transcription of my original stenographic notes to the

14   best of my knowledge, skill and ability.

15           I FURTHER CERTIFY that I am not a relative,

16   employee, attorney, or counsel of any of the parties, nor

17   am I a relative or employee of any of the parties'

18   attorney or counsel connected with the action, nor am I

19   financially interested in the action.

20           IN WITNESS WHEREOF, I have hereunto set my hand

21   at Tampa, Hillsborough County, Florida this 28th day of

22   June 2007.

23
                     YVETTE J. BARRETT, RPR, CLR, FPR
24                   Notary Public
                     State of Florida
25                   My Commission Expires 1/12/08
                     Commission No. DD 280703
```

Gravity Court Reporting

# Exhibit 9

Change to 20% per survey on NDDF & MDDB | Zeneca |

**Kiso, Elaine**
**To:**         Morgan, Kay
**Subject:**    RE: Astra Labeler 00186

It looks like astra merck is 1.2 x w but astra pharm is 1.25 x w
I will make the changes on the table
Elaine Kiso
First DataBank Inc.
Email: elaine_kiso@firstdatabank.com

-----Original Message-----
**From:**     **Morgan, Kay**
**Sent:**     Tuesday, April 25, 2000 11:52 AM
**To:**       Kiso, Elaine; Ngau, Peter; Dimitshteyn, Inna
**Subject:**  Astra Labeler 00186

Please change the mark-up on Astra to 1.20 X WAC. This labeler looks like a mixed bag,
but based on the survey, it should be 1.20.  Save a copy of this for the file.

TOM      WAC 67.07  (20%)
          AMP 86.48

done NDDF 4/25

4/26 left msg Ramon
Howard — 20%
Tom

1) survey Zeneca
00310

NDDF Report from
Jimmy

all = 1.20

1.20

00186

00310
61113 Merck - 0%

EXHIBIT
31

FDB-AWP 046953
HIGHLY CONFIDENTIAL

# Exhibit 10

| 1ST | 2ND | 3RD |
|-----|-----|-----|

(nxm)

JOB# _3218_

# FIRST DATABANK
## DRUG PRODUCT INFORMATION - COVER SHEET

### NEED TO BE COMPLETED BY:

- TODAY _____
- WEEKLY _10/5/2000_
- MONTHLY _____
- OTHER _____

DATE RECEIVED: _10/3/2000_

MANUFACTURER: _GLAXO_ Ph: _____

LABLER ID: _600173_ DUMMY _____

EFFECTIVE DATE: _10/1/2000_

PROJECT:

- PRICING
- ADDS
- OBSOLETES
- PREV/REP
  - COMPLETE SYN TABLE _____
- CSR # _____
- LABELER ID CHANGE
- FIX
- FACTOR
- NEW CODE
- NEW MANUFACTURER        *Life Cycle Ventures*
- EZT REPORT
- CONTACT MFG RE: _____

PRICES TO KEY:

| NDDF | MDDB |
|------|------|
| WAC | WAC |
| DIR | DP |
| SWP | SWP |

COMMENTS:

( user nxm )

MDDB: ENTRY_____PRICE MAIN_____MERGE_____ADD?_____PASS_____TRACK_____LOG# _42544_
     FORMAT_____SCENARIO_____DPPF#_____WAPF#_____
ADD TO ST. LOUIS? YES_____NO_____COMPLETED_____

| DATE | FILE NAME | DESCRIPTION | DATE | CHK BY | ON DB |
|------|-----------|-------------|------|--------|-------|
| 11/27 | MUNSDAY4 | LABER ID | 11/27 | L.H | |
| | | | | | |
| | | | | | |

EXHIBIT
34

FDB-AWP 046440
HIGHLY CONFIDENTIAL

# GlaxoWellcome

October 2, 2000

Dear Customer:

Effective October 1, 2000 Life Cycle Ventures, Inc. has acquired the products listed below from Glaxo Wellcome Inc. Accordingly, effective immediately Life Cycle Ventures, Inc. will establish all terms and conditions of sale with respect to these products, including pricing.

| Product | NDC |
|---|---|
| CEFTIN® Tablets (cefuroxime axetil ) 125mg 60's | 0173-0395-01 |
| CEFTIN® Tablets (cefuroxime axetil ) 250mg 20's | 0173-0387-00 |
| CEFTIN® Tablets (cefuroxime axetil ) 250mg 60's | 0173-0387-42 |
| CEFTIN® Tablets (cefuroxime axetil ) 250mg 100's UD | 0173-0387-01 |
| CEFTIN® Tablets (cefuroxime axetil ) 500mg 20's | 0173-0394-00 |
| CEFTIN® Tablets (cefuroxime axetil ) 500mg 50's UD | 0173-0394-01 |
| CEFTIN® Tablets (cefuroxime axetil ) 500mg 60's | 0173-0394-42 |
| CEFTIN® for Oral Suspension (cefuroxime axetil powder) 125mg/5ml 100ml | 0173-0406-00 |
| CEFTIN® for Oral Suspension (cefuroxime axetil powder) 250mg/5ml 50ml | 0173-0554-00 |
| CEFTIN® for Oral Suspension (cefuroxime axetil powder) 250mg/5ml 100ml | 0173-0555-00 |

All orders should be placed and inquiries made through:

Mail:      Life Cycle Ventures, Inc.
           220 Lake Drive
           Newark, DE 19702
           Attention: Customer Service

Phone:     Customer Service Phone  1-866-645-4528
           Customer Service Fax    1-302-266-7658

Returns for these products will continue to be accepted by Glaxo Wellcome, Inc. until September 30, 2001 through the normal return goods policy. Credits for products sent to Glaxo Wellcome, Inc. on or after October 1, 2001 will be administered and processed by Life Cycle Ventures, Inc.

Separately, Glaxo Wellcome has agreed to provide contract administration services on behalf of Life Cycle Ventures, Inc. through March 31, 2001. Glaxo Wellcome Inc. will process chargebacks for the above listed products with a wholesaler invoice date through March 31, 2001. Chargebacks with wholesaler invoice dates after March 31, 2001 will not be processed by Glaxo Wellcome, Inc

For pricing and other pertinent information, contact your Life Cycle Ventures, Inc. representative.

Sincerely,

Anne M. Faul
Director, Trade Services

Al L. Goeken
Director, Trade Development

CC: Life Cycle Ventures, Inc.

**Glaxo Wellcome Inc.**

Five Moore Drive          Telephone
PO Box 13398              919 483 2100
Research Triangle Park
North Carolina 27709-3398

FDB-AWP 046441
HIGHLY CONFIDENTIAL

# Exhibit 11

| 1ST | 2ND | 3RD |
|-----|-----|-----|
|     | X   |     |

JOB# _____

# FIRST DATABANK
## DRUG PRODUCT INFORMATION - COVER SHEET

### NEED TO BE COMPLETED BY:

- TODAY _____
- WEEKLY _____
- MONTHLY _____
- OTHER _____

DATE RECEIVED: _5/10/01_

MANUFACTURER: _Lilly_                    Ph: _____

LABLER ID: _00002_                    DUMMY _____

EFFECTIVE DATE: _05/15/01_

*[handwritten note box:]* DISTA = 1 XS  5/14/01
Lilly = 1 20 x W =
X
alone change

PROJECT:
- PRICING
- ADDS
- OBSOLETES
- PREV/REP
  - COMPLETE SYN-TABLE _____
- CSR # _____
- LABLER ID CHANGE
- FIX
- FACTOR
- NEW CODE
- NEW MANUFACTURER
- EZT REPORT
- CONTACT MFG RE: _____

PRICES TO KEY:

| NDDF | MDDB |
|------|------|
| (WAC) | (WAC) |
| DIR | DP |
| (SWP) | (SWP) |

COMMENTS: _Re-Key due to Laws Wholesaler Survey_
_See attached_

MDDB ENTRY _____ PRICE MAIN _____ MERGE _LH_ ADD? _____ PASS _____ TRACK _____ LOG# _41945_
FORMAT _____ SCENARIO _____ DPPF# _____ WAPF# _____
ADD TO ST. LOUIS? YES _____ NO _____ COMPLETED _____

| DATE | FILE NAME | DESCRIPTION | DATE | CHK BY | ON DB |
|------|-----------|-------------|------|--------|-------|
| 5/17 | LILLPC | Pricing / chg Mkup list | 5/17 | LH | |
| 5/21 | | | | | |

EXHIBIT
42

HIGHLY CONFIDENTIAL

FDB NY-OAG 009125
CONFIDENTIAL: FOI - EXEMPT
FDB/NEC 015318

| 1ST | 2ND | 3RD |
|-----|-----|-----|
|     |     |     |

JOB#_____

# FIRST DATABANK
## DRUG PRODUCT INFORMATION - COVER SHEET

### NEED TO BE COMPLETED BY:

- TODAY_____
- (WEEKLY)_____
- MONTHLY_____
- OTHER_____

DATE RECEIVED: _5/15/01_____

MANUFACTURER: _Lilly_____  Ph:_____

LABLER ID: _00002_____  DUMMY_____

EFFECTIVE DATE: _05/15/01_____

PROJECT:
- (PRICING)
- ADDS
- OBSOLETES
- PREV/REP
  - COMPLETE SYN-TABLE_____
- CSR #_____
- LABELER ID CHANGE
- FIX
- FACTOR
- NEW CODE
- NEW MANUFACTURER
- EZT REPORT
- CONTACT MFG RE:_____

PRICES TO KEY:

| NDDF | MDDB |
|------|------|
| (WAC) | (WAC) |
| DIR | DP |
| (SWP) | (SWP) |

COMMENTS: _Rekeyed due to new wholesaler survey;_
_see attached._

MDDB: ENTRY_____ PRICE MAIN_____ MERGE_____ADD?_____PASS_____TRACK_____LOG#_44/945_
FORMAT_____SCENARIO_____DPPF#_____WAPF#_____
ADD TO ST. LOUIS? YES_____NO_____COMPLETED_____

| DATE | FILE NAME | DESCRIPTION | DATE | CHK BY | ON DB |
|------|-----------|-------------|------|--------|-------|
| 5/17 | LilPC | Pricing /Chg Mkup fact | 5/17 | LH | |
| 5/21 | | | | | |

HIGHLY CONFIDENTIAL

FDB NY-OAG 009126
CONFIDENTIAL: FOI - EXEMPT
FDB/NEC 015319

**Cosey, LaGreta**

| | |
|---|---|
| **From:** | Morgan, Kay |
| **Sent:** | Monday, May 14, 2001 10:18 PM |
| **To:** | Alisha Nielsen (E-mail); LaGreta Cosey (E-mail) |
| **Subject:** | Lilly |

Alisha please change the mark-up on 00002 to 1 times S.  LaGreta, the scenario on MDDB needs to be changed to key AWP and WAC.  This needs to be listed in Editorial Facts with the current date.  Reason for change, new wholesaler survey.  Survey said:
McKesson - 1.20
Bergen - Use AWP provided by Lilly, let us know if you think we should reconsider this.
Cardinal - Uses manufacturer suggested AWP
Amerisource - Unusual.  We have 1.20 for 00002, but the NDCs in question are 1.25

It is PEN products that are 1.25 times WAC, but I do not want to put factors on the NDCs. So, the prices on my desk will need to be re-keyed.  Sorry about that.  Please have this done before this week's database.

Danka.

*Re-Key price list of 11/31/00   — Per Kay Use 5/13/01*
*Date due to New Wholesaler Survey!*

1

FDB NY-OAG 009127
CONFIDENTIAL: FOI - EXEMPT
**FDB/NEC 015320**

**HIGHLY CONFIDENTIAL**

# Exhibit 12

| | |
|---|---|
| **From:** | Howard.Imatorni@bergenbrunswig.com |
| **Sent:** | Wednesday, May 09, 2001 3:43 PM |
| **To:** | Alisha_Nielsen@firstdatabank.com |
| **Subject:** | RE:New Manufacturers ~ What's your mark-up |

```
Sirius Labs       markup 1.25
Granard we don't carry at this time
```

EXHIBIT
46

FDB-NEC 040017
HIGHLY CONFIDENTIAL

# Exhibit 13

From:          Julie.Rosling@bergenbrunswig.com
Sent:          Wednesday, August 28, 2002 2:07 PM
To:            Kay_Morgan@firstdatabank.com
Subject:       RE:FW: PT# 181128 / RE: Price

Hi Kay,

Howard's not here anymore (he's retired at last!), so you get me instead.
Guess we'll try to take care of it on this end.  All of our vendor files are now in Valley
Forge, PA.  If they don't have the newer pricing there, then they can contact the
manufacturer.  Maybe we can talk the vendor into responding to you as well.  Some just
don't get it.  Keep in touch...I'll be here until January 2003 for sure.  Thanks for all
your help.  Julie Rx

Julie K. Rosling, R.Ph.

Data Specialist
Pricing/Data Management
Tel: (714) 385-6962
Fax: (714) 385-8856
e-mail: julie.rosling@bergenbrunswig.com

7

EXHIBIT
53

FDB-NEC 041041
HIGHLY CONFIDENTIAL

# Exhibit 14

Page 1

1

2      UNITED STATES DISTRICT COURT

3        DISTRICT OF MASSACHUSETTS

4

        ------------------------------x
5    NEW ENGLAND CARPENTERS              )

     BENEFITS FUND, et al.,              )
6                                        )

                                         )
7                    Plaintiffs,         )

                                         )  No. 1:05-CV-11148-PBS
8            vs.                         )

                                         )
9    FIRST DATABANK and MCKESSON         )

     CORPORATION,                        )
10                                       )

                                         )
11                   Defendant.          )

     ------------------------------x
12

13

14

15        VIDEOTAPED DEPOSITION OF ALISHA NIELSEN

16              Irvine, California

17           Friday, May 18, 2007

18           HIGHLY CONFIDENTIAL

19

20

21

22

23   Reported by:

24   SUSAN A. SULLIVAN, CALIFORNIA CSR 3522, RPR, CRR

25   JOB NO. 11077

ALISHA NIELSEN - HIGHLY CONFIDENTIAL

1

2      A     We generally did it together.

3      Q     Okay.  Was there a reason for that?  Was

4  there a reason for your doing it together?

5      A     Just so that we knew what we were doing, we

6  were on the same page.

7      Q     Now you described during the period 2001

8  through 2005 looking to the three wholesalers for

9  surveys leading to the markup, and I wanted to ask

10  some specific questions about your conversations with

11  Bob James.

12          Was there ever a time you told him that you

13  were not doing that, you were not looking to other

14  wholesalers, you were just looking to McKesson to

15  derive markups?

16      A     No.

17      Q     You never did that?

18      A     No, I never did.

19      Q     And, to your knowledge, did Kay Morgan ever

20  do that?

21      A     I don't know if Kay Morgan did tell him or

22  not.  I don't know what she would have said.

23      Q     Well, to the extent that you have

24  knowledge, did you ever hear her do that?

25      A     No.

Page 96

ALISHA NIELSEN - HIGHLY CONFIDENTIAL

1

2    Q    Or did she ever tell you that she had done

3    that?

4    A    No.

5    Q    And that would not have been correct, am I

6    right?  It sounds like you were surveying other

7    wholesalers throughout that period.

8    A    We were trying to get information from

9    other manufacturers or other wholesalers for a

10   period.

11   Q    And did feel you had received sufficient

12   information for purposes of your markup?

13   A    During the Bergen/Amerisource acquisition

14   and layoff time period, no.

15   Q    And when would that have occurred?

16   A    I don't exactly remember the date.

17   Q    But you were still getting information from

18   Cardinal and from McKesson?

19   A    No.

20   Q    Okay.  And when were you not getting

21   information from Cardinal?

22   A    I don't recall the exact timeframe when

23   that was.

24   Q    Did you feel that you were obtaining survey

25   information one way or the other from the three?

Page 100

                    ALISHA NIELSEN - HIGHLY CONFIDENTIAL

1

2       A       Correct.

3       Q       Did you feel yourself, Ms. Nielsen, that

4    nevertheless the information you were receiving was

5    adequate for purposes of publishing a Bluebook AWP?

6               MR. KERN:  Asked and answered.

7               Go ahead, you may answer it again.

8       A       Yes.

9       Q       And tell me why you felt that way.

10      A       Because we had reached out to other

11   companies, we were not getting information from them,

12   we addressed it as being an issue.  Kay had taken it

13   up.  We knew that the policy was going to be

14   eventually changed into the new pricing policy that

15   is in place today.  So until that had changed, we

16   acquired information from the company that we could

17   receive it from.

18      Q       And that was McKesson.

19      A       Correct.

20      Q       And did you or Kay Morgan tell Bob James

21   that there was lack of consistency from the

22   information from other wholesalers?

23      A       No.

24      Q       Was there any discussion by you and Kay as

25   to whether to tell Mr. James that?

1          ALISHA NIELSEN - HIGHLY CONFIDENTIAL

2       A    No.

3       Q    Did Kay Morgan tell you that she, despite

4   getting information that was not consistent, she had

5   some ideas of what Cardinal was doing by way of

6   markups?

7       A    I believe that there was a consistent

8   markup in place for Cardinal, a statement made to the

9   effect that Cardinal's markup would always be the

10  same particular markup; however, I do not know what

11  that markup was and I do not know the name of the

12  person that would have provided that to us.

13      Q    And in the case of Bergen when the layoffs

14  occurred and things changed, it wasn't consistent,

15  did Kay Morgan also indicate that she had information

16  about what their markup was?  For example, did she

17  say anything about in the absence of a suggested

18  wholesale price Bergen had a position?

19      A    No.

20      Q    Did she tell you it could be anything along

21  those lines, if you can recall?

22      A    Not that I can recall.

23      Q    At the dinner meeting at Aqua, was there

24  business discussed there?

25      A    No.

Page 102

ALISHA NIELSEN - HIGHLY CONFIDENTIAL

1

2      Q      It was a social event?

3      A      Yes.

4      Q      Let me come back to your discussions with

5  Mr. James; just a few more questions.

6            Did you ever tell him or did Kay ever tell

7  him whatever McKesson's markup would be would become

8  your AWP?

9      A      No.

10     Q      Now there's a claim in this case, Ms.

11 Nielsen, that McKesson conspired with First DataBank

12 for First DataBank to publish just, as AWP, the

13 Bluebook AWP, just what they got from McKesson.  To

14 your knowledge based, upon your experience, is that

15 true, was there ever any conspiracy between First

16 DataBank and McKesson?

17     A      No.

18     Q      Did you -- and from what you could see did

19 Kay Morgan ever do or say anything that would lead

20 you to believe that she was ever involved in any

21 conspiracy with McKesson?

22     A      No.

23     Q      Would you have allowed yourself to be in

24 any conspiracy with McKesson, Ms. Nielsen?

25     A      Absolutely not.

Page 199

1           ALISHA NIELSEN - HIGHLY CONFIDENTIAL

2     State of California      )

                              )   ss.

3     County of Los Angeles )

4           I, SUSAN A. SULLIVAN, CALIFORNIA CSR No.

5     3522, RPR, CRR, do hereby certify:

6           That prior to being examined ALISHA NIELSEN,

7     the witness named in the foregoing deposition, was,

8     before the commencement of the deposition, duly

9     administered an oath in accordance with C.C.P.

10    Section 2094;

11          That the said deposition was taken before me

12    at the time and place therein set forth, and was

13    taken down by me in shorthand and thereafter

14    transcribed into typewriting under my direction and

15    supervision; that the said deposition is a true and

16    correct record of the testimony given by the witness;

17          I further certify that I am neither counsel

18    for, nor in any way related to any party to said

19    action, nor in any way interested in the outcome

20    thereof.

21          IN WITNESS WHEREOF, I have subscribed my

22    name on this 21st day of May, 2007.

23

24

                    _____

25                          CSR

# Exhibit 15

iewItem [https://www.lextranet.com/lcs/search/prodDocs/viewItem.lcs?docID=6799eDocID=0tableID=1183]

Page 1 of 1

DEPOSITION EXHIBIT
1-11-05
Magan 003
spherion

## Average Wholesale Price

I have many conversations regarding what is "AWP" and how does FDB determined it. There is much folklore and misunderstanding as to the determination of AWP and where we get the data.

AWP is the average wholesale price. That is, AWP is the average of the prices charged by the national drug wholesalers for a given product(NDC). The operative word is *average*. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.

In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files. We contact the wholesalers to determine what the markup should be for a new company or to confirm that the markup that we are applying is current. A survey may be performed on a single NDC number or for a manufacturer's entire line of products. In either case, each national wholesaler is surveyed on a number of products from each manufacturer.

The number of surveys performed is increasing. First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume. The markup that First DataBank utilizes is representative of wholesalers on a national level. Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated. That is, the market share held by the wholesalers surveyed affects the markup proportionally. Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup. Thus, a higher degree of certainty is achieved. We also consider the manufacturer's suggested wholesale price (SWP) in our determination.

Many are under the impression that the manufacturer sets the AWP. FDB considers the wholesale price suggested by the manufacturer a "Suggested Wholesale Price (SWP)" and has a different data element called "SWP' on the NDDF file for those customers who chose to use SWP instead of AWP. Frequently, the SWP and AWP are the same; however, we are having more instances where they are differing. We will populate the SWP with the new mark-up, but will survey the national wholesalers to determine AWP. The AWP will be populated with the wholesaler survey price even if it disagrees with the SWP.

In most cases, the results from surveys match what First DataBank is using. In the instances that they do not, it is policy that First DataBank will change the markup to report marketplace reality.

**EXHIBIT**
**21**

**HIGHLY CONFIDENTIAL**

**FDB-AWP 02023**

1

# Exhibit 16

*FL AWP*

Redacted for Privilege

------------------- Forwarded by Hank Slomkowski/PH/Novartis on 07/23/2002 03:46 PM -------------------

     "Morgan, Kay" <Kay_Morgan@firstdatabank.com> on 07/23/2002 03:14:22 PM

To:      Hank Slomkowski/PH/Novartis@PH
cc:
Subject:   RE: AWP Pricing


Hank,

I have attached a document on how we determine AWP.  Manufacturers can
suggest an AWP but we use the wholesaler survey method to determine the
First DataBank AWP.

Kay

-----Original Message-----
From: hank.slomkowski@pharma.novartis.com
[mailto:hank.slomkowski@pharma.novartis.com]
Sent: Tuesday, July 23, 2002 11:29 AM
To: Kay_Morgan@firstdatabank.com
Subject: AWP Pricing


Hi Kay,

I see that First Data Bank's listed AWP's for Novartis Pharmaceutical
products are different from the AWP's that our Customer Service Group
submitted to you.  Does FDB change the AWP and /or WAC information that is
submitted by Novartis?  Why isn't the information published the same as
that Novartis submitted?

Thanks
Hank


 - AWP.doc



Confidential

# Average Wholesale Price

I have many conversations regarding what is "AWP" and how does FDB determined it.  There is much folklore and misunderstanding as to the determination of AWP and where we get the data.

AWP is the average **wholesale** price.  That is, AWP is the average of the prices charged by the national drug wholesalers for a given product(NDC). The operative word is **average**. AWP was developed to provide a price which all parties could agree upon for electronic processing to be possible.

In order to determine the AWP, First DataBank surveys national wholesalers to ascertain what they use as a price basis in their AWP files.  We contact the wholesalers to determine what the markup should be for a new company or  to confirm that the markup that we are applying is current.  A survey may be performed on a single NDC number or for a manufacturer's entire line of products.  In either case, each national wholesaler is surveyed on a number of products from each manufacturer.

The number of surveys performed is increasing.  First DataBank surveys drug wholesalers that represent over two-thirds of the wholesaler total dollar volume.  The markup that First DataBank utilizes is representative of wholesalers on a national level.   Because individual wholesalers may mark up each manufacturer differently, a weighted average, not a consensus average, is calculated.  That is, the market share held by the wholesalers surveyed affects the markup proportionally.  Wholesalers with higher drug dollar volumes have more weight in the determination of the final markup.  Thus, a higher degree of certainty is achieved.  We also consider the manufacturer's suggested wholesale price (SWP) in our determination.

Many are under the impression that the manufacturer sets the AWP. FDB considers the wholesale price suggested by the manufacturer a "Suggested Wholesale Price (SWP)" and has a different data element called "SWP' on the NDDF file for those customers who chose to use SWP instead of AWP. Frequently, the SWP and AWP are the same; however, we are having more instances where they are differing. We will populate the SWP with the new mark-up, but will survey the national wholesalers to determine AWP.  The AWP will be populated with the wholesaler survey price even if it disagrees with the SWP.

In most cases, the results from surveys match what First DataBank is using.  In the instances that they do not, it is policy that First DataBank will change the markup to report marketplace reality.

**Confidential**

NPC0029769

# Exhibit 17

**From:** Morgan, Kay

**Sent:** Wednesday, October 08, 2003 9:10 AM

**To:** Breen, Jim

**Subject:** Participation in Wholesaler Survey

DRAFT –

Jim, please review and add/change anything.

Steve,

Thank you for taking the time to talk to Jim Breen and me today regarding AmerisourceBergen participating in our wholesaler survey to determine AWP. Per your request, the following information should help answer your questions:

First DataBank definition of AWP
The definitions of our pricing fields are given on our web site at: http://www.firstdatabank.com/customer_support/faqs/. For AWP, the following information is provided:

First DataBank defines the "Blue Book Average Wholesale Price," which is commonly used as AWP, as the average of prices published by wholesalers to their customers for a given product. To determine Blue Book AWP, First DataBank typically identifies the Net Wholesale Price (or, in some cases, the Direct Price) of a product and then surveys the full-line national wholesalers to determine the average mark up applied to the manufacturer's line of products or a specific product. Such surveys may be conducted at the request of our customers or when a change in the marketplace occurs (such as a merger of manufacturers) which might occasion a change in prices. First DataBank does not include regional wholesalers or specialty distributors in its surveys.
First DataBank's Blue Book AWP is not intended to represent the wholesale price suggested by the manufacturer. Instead, First DataBank reports the manufacturer's suggested wholesale prices in a separate data field known as "SWP." Thus, the Blue Book AWP field will be populated with a price determined by the wholesaler survey, even if it is different from the SWP. In some cases, if manufacturers do not sell to wholesalers or if wholesalers agree with the manufacturer's suggested wholesale price, the Blue Book AWP and SWP may be the same.

How we would like to proceed:
We would like the name and phone number of two people that we can call to determine the mark-up being applied by your company to a supplier's product line. For example, we would call and ask what mark-up is being applied to 00002, Lilly. We would receive the mark-up you are applying and incorporate that into the information we receive from the other national full line wholesalers for determining an average mark-up to be applied to that supplier's wholesale acquisition cost or direct price to determine the price that will be used in our Blue Book Average Wholesale Price field.

Confidentiality:
The only information that we ever release regarding who we survey is "full-line national wholesalers". We do not reveal the name of the wholesaler or any person at the wholesaler. We also do not have any data fields for a specific wholesaler mark-up; rather we have only a field for the mark-up and this field is not provided to customers.

Please let me know if you need any further information.

Kay Morgan
Manager, Editorial Services
First DataBank
650=872-4529



**FDB/NEC 032851**

**HIGHLY
CONFIDENTIAL**

# Exhibit 18

**From:** Robinson, George
**Sent:** Wednesday, October 15, 2003 5:52 AM
**To:** Breen, Jim
**Subject:** RE: Survey

thanks

-----Original Message-----
**From:** Breen, Jim
**Sent:** Tuesday, October 14, 2003 6:51 PM
**To:** Robinson, George
**Subject:** FW: Survey

This is what I sent.

-----Original Message-----
**From:** Breen, Jim
**Sent:** Tuesday, October 14, 2003 2:10 PM
**To:** 'slefebure@amerlsoucebergen.com'
**Cc:** Morgan, Kay
**Subject:** RE: Survey

Steve:

Thank you for taking the time to meet with Kay and myself the other day regarding possible participation in future pricing surveys. At this time, we are coordinating with First DataBank executive management the documentation of a proposed process and procedure. Once this has been accomplished, we will contact you to initiate further discussion.



EXHIBIT
5Y

FDB/NEC 032870

**HIGHLY
CONFIDENTIAL**

# Exhibit 19

| | |
|---|---|
| From: | Breen, Jim |
| Sent: | Friday, October 17, 2003 5:31 PM |
| To: | 'slefebure@amerisoucebergen.com' |
| Cc: | Morgan, Kay |
| Subject: | Participation in Wholesaler survey |

Steve,

Thank you for taking the time to talk to Kay Morgan and me regarding AmerisourceBergen's participation in our wholesaler survey to determine AWP. I hope you find the following information helpful.

The definitions of our pricing fields are given on our web site at: http://www.firstdatabank.com/customer_support/faqs/ <http://www.firstdatabank.com/customer_support/faqs/> . For AWP, the following information is provided:

First DataBank defines the "Blue Book Average Wholesale Price," which is commonly used as AWP, as the average of prices published by wholesalers to their customers for a given product. To determine Blue Book AWP, First DataBank typically identifies the Net Wholesale Price (or, in some cases, the Direct Price) of a product and then surveys the full-line national wholesalers to determine the average mark up applied to the manufacturer's line of products or a specific product. Such surveys may be conducted at the request of our customers or when a change in the marketplace occurs (such as a merger of manufacturers) which might occasion a change in prices. First DataBank does not include regional wholesalers or specialty distributors in its surveys.

First DataBank's Blue Book AWP is not intended to represent the wholesale price suggested by the manufacturer. Instead, First DataBank reports the manufacturer's suggested wholesale prices in a separate data field known as "SWP." Thus, the Blue Book AWP field will be populated with a price determined by the wholesaler survey, even if it is different from the SWP. In some cases, if manufacturers do not sell to wholesalers or if wholesalers agree with the manufacturer's suggested wholesale price, the Blue Book AWP and SWP may be the same.

The only information that we publish regarding who we survey is "full-line national wholesalers". We do not publish the name of the wholesaler or any person at the wholesaler. We also do not publish a specific wholesaler mark-up.

We would very much like to have further conversations regarding your participation in our survey process. If possible, Kay and I would like to schedule a telephone call between the appropriate managers at AmerisourceBergen and First DataBank. Kay and I will call you within the next few days to discuss this with you

Jim Breen, Pharm.D.
Senior Director, Knowledgebase Services
First DataBank
650-872-4515

Kay Morgan
Manager, Editorial Services
First DataBank
650-872-4529



EXHIBIT
55

EXHIBIT

FDB-NEC 040946
HIGHLY CONFIDENTIAL

# Exhibit 20

**From:** bwright@hearst.com [mailto:bwright@hearst.com]
**Sent:** Friday, June 25, 2004 11:00 AM
**To:** Kuehl, Dave
**Subject:** revised letter

Dear Dave:

Please disregard my earlier e-mail. Please see my attached revised letter along with the NDA and Drug Pricing Policy (Exhibit A). I apologize for any inconvenience

(EXHIBIT A)





ABC(AWP)001954
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

June 24, 2004

Mr. Dave Kuehl
AmerisourceBergen
1300 Morris Drive Suite 100
Chesterbrook, PA  19087

Dear Dave:

Thank you for your cooperation in providing AmerisourceBergen's list drug wholesale prices to First DataBank.  Listed below are the ideal specifications for the transfer of data.  If any of the requested data elements, or procedures, are problematic - please advise.

The data elements that we would like to receive electronically are:

- NDC Number (11 digit format)
- Product Name
- Package Size
- Case Pack Quantity
- List Price to Customers
- List Price Effective Date
- Wholesale Acquisition Cost (WAC)
- WAC Effective Date

The systems support staffs of AmerisourceBergen and First DataBank will determine the media and transmission format of the data.  Additionally, we were unsure how you indicate prices for new product additions for which the pricing has not been confirmed. If the designation of unconfirmed pricing could be a standard designation such as $99,999.99 that would be very helpful to us.

If possible, we would like to receive a one time electronic full file in advance of the on-going data transfers for system design. After receipt of this file, we would like to receive:

- Daily file of price changes electronically
- Weekly file of all products electronically

First DataBank personnel that will be involved with the data are:
    Content
        Kay Morgan
        Manager, Product Knowledge Base Services
        (650) 872-4529
        kay_morgan@firstdatabank.com
        Alisha Nielsen
        Research Associate IV
        (650) 246-2819

ABC(AWP)001955
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Alisha_nielsen@firstdatabank.com
First DataBank
Suite 350
1111 Bayhill Drive
San Bruno, CA 94066
Systems Support:
  Todd Alexander
  Director, Information Systems Development
  First DataBank
  500 East 96th Street
  Indianapolis, IN 46240
  317-571-721
  todd_alexander@firstdatabank.com

As discussed, attached is a Confidentiality Agreement. Also attached is a current draft of
our Drug Price Policy. As you will see, it strongly emphasizes that AWP is based on list
prices, not actual transaction prices.

Again, I appreciate your cooperation. We would like to move ahead as soon as possible.
Once you have reviewed this material, we can discuss timing.

Sincerely,

ABC(AWP)001956
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

# CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

Agreement dated June ___, 2004, by and between AmerisourceBergen Corporation ("**Company**"), and First DataBank, Inc., a California Corporation ("**FDB**").

1.    Background. FDB and Company intend to engage in discussions and concerning the exchange and publication of drug pricing information (the "Transaction"). In the course of such discussions, it is anticipated that either party (including its affiliates, controlling persons, representatives and agents) may disclose (the "Disclosing Party") or deliver to the other party (including its affiliates, controlling persons, representatives and agents) (the" Receiving Party") certain confidential or proprietary information for the purpose of enabling the parties to evaluate the feasibility of such Transaction. Company and FDB are entering into this Agreement in order to assure the confidentiality of such information in accordance with the terms of this Agreement.

2.    Information. As used in this Agreement, the term "Information" shall mean all drug pricing information (whether or not marked confidential or proprietary) and all other confidential or proprietary information designated as such in writing by the Disclosing Party, whether by letter or by the use of an appropriate confidential stamp or legend, prior to or at the time any such confidential or proprietary information is disclosed to the Receiving Party. Notwithstanding the foregoing, information which is orally or visually disclosed to the receiving party by the disclosing party, or is disclosed in writing without an appropriate letter, proprietary stamp or legend, shall also constitute confidential Information if the Disclosing Party states to the Receiving party, prior to or at the time of disclosure, that the information is confidential or proprietary or if the receiving party knows or should reasonably know that the information is confidential or proprietary. The term "Information" will not, however, include information which (i) is or becomes publicly available other than as a result of a disclosure by the Receiving Party, (ii) is or becomes available to the Receiving Party on a nonconfidential basis from a source (other than the Disclosing Party) which, to the knowledge of the Receiving Party, is not prohibited from disclosing such information to the Receiving Party by a legal, contractual or fiduciary obligation, (iii) is independently developed by the Receiving Party without the use of any Information, or (iv) is in the possession of the Receiving Party prior to disclosure by the Disclosing Party.

3.    Disclosure of Information. Each party (i) will use reasonable care, but no less than the same degree of care that it uses to protect its own confidential and proprietary information of similar importance, to keep the Information confidential and will not (except as required by legal process, and only after compliance with paragraph 4 below), with out the prior written consent of the other party, disclose any Information in any manner whatsoever, and (ii) will not use any Information other than in connection with the evaluation of the proposed Transaction; provided, however, that the Receiving Party may reveal the Information to its affiliates, controlling persons, representatives and agents (a) who need to know the Information for the purpose of evaluating the proposed

ABC(AWP)001957
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

Transaction, (b) who are informed by the Receiving Party of the confidential nature of the Information and (c) who agree to act in accordance with the terms of this Agreement. Each party will cause its affiliates, controlling persons, representatives and agents to observe the terms of this Agreement, and will be responsible for any breach of this Agreement by any of its affiliates, controlling persons, representatives and agents. Notwithstanding the foregoing, Company acknowledges and agrees that FDB may use drug pricing information provided to it by Company in connection with the publishing of drug databases and related services. FDB agrees, however, that the Company's drug pricing information shall not be published by FDB in a form in which it is directly attributable to Company. Company acknowledges and agrees that the drug pricing policy process of FDB, substantially described in Exhibit A to this Agreement, does not violate the terms and conditions set forth in this paragraph 3.

4.    Limitation on Obligations. In the event that the Receiving Party is requested pursuant to, or required by, applicable law, regulation or legal process to disclose any of the Information, the Receiving Party will notify the Disclosing Party promptly (and in any event in advance of providing any Information) so that the Disclosing Party may seek a protective order or other appropriate remedy or, in the sole discretion of the Disclosing Party, waive compliance with the terms of this Agreement. In the event that no such protective order or other remedy is obtained, or that the Disclosing Party waives compliance with the terms of this Agreement, the Receiving Party will furnish only that portion of the Information which it reasonably believes is required.

5.    Return of Documents. If either party determines not to proceed with the proposed Transaction, Receiving Party will either (i) promptly destroy all copies of the written Information in its possession or in the possession of its affiliates, controlling persons, representatives and agents and confirm such destruction to the Disclosing Party in writing, or (ii) promptly deliver to Disclosing Party at its own expense all copies of the written Information in its possession or in the possession of its affiliates, controlling persons, representatives and agents. Any non-written or intangible information will continue to be subject to the terms of this letter agreement and shall be appropriately safeguarded.

6.    Term. The obligations set forth in this Agreement shall continue for a term of five (5) years from the date first set forth above.

7.    Miscellaneous.

(a)  This Agreement supersedes all prior agreements, written or oral, between the Disclosing Party and the Receiving Party relating to the subject matter of this Agreement. This Agreement may not be modified, amended or discharged, in whole or in part, except by an agreement in writing signed by the parties hereto.

(b) This Agreement will be binding and inure to the benefit of the parties

2

ABC(AWP)001958
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

hereto and their respective heirs, successors and assigns. This Agreement shall be construed and interpreted in accordance with the laws of the State of California, without regard to the principles of conflict of laws.

(c) The provisions of this Agreement are necessary for the protection of the business and goodwill of the Disclosing Party and are considered by each party to be reasonable for such purpose. Each party agrees that any breach of this Agreement will cause Disclosing Party substantial, immediate and irreparable damages for which monetary damages alone would not be sufficient compensation, and, therefore, in the event of any such breach or threatened breach, in addition to other remedies which may be available, all of which shall be cumulative, the Disclosing Party shall have the right to seek specific performance and other injunctive and equitable relief.

(d) Each party agrees that no failure or delay by the other party in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right power or privilege hereunder.

This Agreement is executed as of the day and year first set forth above.

AmerisourceBergen Corporation            First DataBank, Inc.

By:_____          By:_____
        Name:                                         Name:
        Title:                                        Title:

ABC(AWP)001959
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

3

Draft – June 2, 2004

<u>CONFIDENTIAL</u>
<u>(EXHIBIT A)</u>
**First DataBank**
**Drug Price Policy**

First DataBank, Inc. (FDB) publishes several drug price data fields, including Net Wholesale Price, Direct Price, Suggested Wholesale Price and Blue Book AWP.

Net Wholesale Price (commonly referred to as wholesale acquisition cost or WAC) as published by FDB represents the manufacturer's published *catalog* or *list* price for the sale of a drug product to wholesalers. Net Wholesale Price does not represent actual transaction prices and does not reflect volume discounts, prompt pay discounts, cash discounts, chargebacks, rebates or other price concessions or similar benefits. FDB does not perform any independent investigation or analysis of actual transaction prices for purposes of reporting Net Wholesale Price. FDB relies on manufacturers to report or otherwise make available the values for the Net Wholesale Price data field.

Direct Price as published by FDB represents the manufacturer's published *catalog* or *list* price for the sale of a drug product to non-wholesalers. Direct Price does not represent actual transaction prices and does not reflect volume discounts, prompt pay discounts, cash discounts, chargebacks, rebates or other price concessions or similar benefits. FDB does not perform any independent investigation or analysis of actual transaction prices for purposes of reporting Direct Price. FDB relies on manufacturers to report or otherwise make available the values for the Direct Price data field.

Suggested Wholesale Price (SWP) as published by FDB represents the manufacturer's *suggested* price for the sale of a drug product from wholesalers to their customers (i.e., retailers, hospitals, physicians and other buying entities). SWP is a suggested price and does not represent actual transaction prices. FDB relies on manufacturers to report or otherwise make available the values for the SWP data field.

Blue Book AWP (BBAWP) as published by FDB represents an average of wholesalers' published *catalog* or *list* prices for the sale of a drug product to their customers (i.e., retailers, hospitals, physicians and other buying entities). BBAWP does not represent actual transaction prices and does not reflect volume discounts, prompt pay discounts, cash discounts, chargebacks, rebates or other price concessions or similar benefits. FDB does not perform any independent investigation or analysis of actual transaction prices for purposes of reporting BBAWP. FDB relies on wholesalers to report or otherwise make available their catalog or list prices for purpose of publishing the BBAWP data field. FDB periodically surveys full-line national wholesalers to obtain such wholesalers' catalog or list prices on a National Drug Code (NDC) specific basis. For each NDC, FDB averages the catalog or list price of the wholesaler(s) responding to the survey, which average value populates the BBAWP data field. Currently, FDB surveys three (3) full-line national wholesalers which collectively represent approximately [90]% of the drug wholesaler market in the United States. FDB does not survey regional wholesalers

ABC(AWP)001960
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

or specialty distributors. Further, FDB does not guarantee that all, or any, of the full-line national wholesalers will participate in the BBAWP survey process and, for purposes of publishing the BBAWP data field, FDB will factor only the wholesaler(s) providing catalog or list prices in response to the survey. BBAWP will be based on a single wholesaler's prices if only one wholesaler responds to the survey. BBAWP is not intended to represent a manufacturer's suggested wholesale price (*see above* for Suggested Wholesale Price).

FDB relies on manufacturers and wholesalers to report or otherwise make available the values for the above referenced drug price data fields and, as a result, such data fields are subject to the availability of the relevant information from manufacturers and wholesalers. FDB reserves the right, in its sole discretion, to change this Drug Price Policy without notice. Please check back and refer to First DataBank's Drug Price Policy as you review and utilize the pricing information contained in FDB's products.

2

ABC(AWP)001961
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

AmerisourceBergen                                    Pricing & Data Management

# AWP STANDARDS

The AWP calculations are different for certain categories between Distrack and Star.  There are four hierarchy methods used to determine the AWP.

1. Vendor · AWP given by the vendor.  This may occur when a new product is created or at any time of a price change
2. First Data Bank · FDB tracks AWP for a large number of items in the industry.  The FDB figure originates with the manufacturers and an equation is used to create the AWP.
3. Vendor Profile · A suggested mark-up or historical mark-up exists for many suppliers entered in the vendor profile instructions for a specific multiplier.
4. Calculated AWP — A mark-up of "Cost x 1.25".

Generic Items — Distrack and Star
1. Vendor
2. First Data Bank
3. Vendor Profile
4. Calculated AWP

Branded Items — Distrack and Star
1. Vendor
2. First Data Bank
3. Vendor Profile
4. Calculated AWP

OTC, HB, GM & MS Items — Distrack only
1. Vendor
2. First Data Bank
3. Vendor Profile
4. Calculated AWP

OTC, HB, GM & MS Items — Star only
- This is the list price to STAR customers.
- It is calculated from the gross profit percent set at the supplier level.
- If the supplier does not have a gross profit percent preset, then the value will need to be calculated.
  o Current WAC divided by the current BBCWP = value($)
  o New WAC x value($) = new BBCWP
- This is not to be confused with the **First Data Bank's** AWP.

Private Label — GNP, BL, FP — Distrack only
- The Category Manager provides the AWP.

Private Label — GNP, BL, FP — Star only
- The BBWP is the same as the net

ABC(AWP)001962
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

AmerisourceBergen                                      Pricing & Data Management

## AWP UPDATING PROCESS

There are two queries in Distrack, Price26 and Price27, which show the items that have a First Data Bank markup greater then the Distrack markup. After these reports are generated an item's AWP is manually updated in the system to clear the item off of the reports. The manufacturer listed AWP is no longer the preferred AWP to use. It has been decided that our AWP markup % should match the First Data Bank markup % instead.

### Updating the AWP's:
- To begin, you must run the Distrack queries
  - Price 26 – Generic Items
  - Price27 – Branded Items
- Next, run the Prep Data button in the AWP database that can be found at X:/Procurement/Teams/PDM/AWP.

### Rules for Changing AWP's:
The rules for this report process apply to only the Generic and Branded items in Distrack and Star.

- First, check the standard price change date
  - If the date is over 7 days old or blank, then the AWP must be adjusted.
- Next, check the FDB markup %.
  - If it is between 1.16667 and 3.0 then multiply that FDB markup % by the WAC to calculate the new AWP.
  - If the FDB markup % is below 1.16667 or over 3.0 then the manufacturer must be called to determine the correct AWP.

This report should be work weekly to help maintain the AWP discrepancies.

ABC(AWP)001963
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

## Price Changes
### 6-1-98

1.  Fix Program where Retail is not staying the same when price changes are
    done on RX items.

2.  When new Gross Profit Percent is entered, calculate a new A.W.P. and
    Retail.

3.  Warning Flag is not working that compares Vendor Gross Margin Percent
    to Vendor profit margin.

4.  Calculate a new Retail, when the A.W.P. is changed.



6.  Add Cmd-10 to update immediately instead of having to fill in all date
    fields.

7.  User "edits" do not coincide with person that made changes.

8.  Does not calculate differential between Replacement Cost and Bill Cost
    when doing Price Changes.

pricechg.lwp

ABC(AWP)001964
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

## Plan to fix AWP on items where
## <u>Net Bill amount equals AWP</u>

1) Identify items (8,950 items)
2) Where items match First Data Bank, compare ATG AWP to First Data
3) If First Data AWP is greater than ATG AWP by at least 5% but not by more than 50% (indicating a unit of sale difference), replace ATG AWP with that from First Data
4) If First Data AWP is less than ATG AWP, but does not vary by more than 50% up or down, calculate a new AWP by extending net times 120%
5) If item does not match FDB and net sell markup is less than or equal to 20%, calculate ATG AWP by extending replacement cost times 134%
6) If item does not match FDB and net sell markup is greater than 20%, calculate ATG AWP by extending net sell times 120%
7) Remaining items (primarily FDB matches where AWPs differ by more than 50 %) will need to be printed and reviewed manually.

ABC(AWP)001965
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

# AmeriSource
## Programming Request

SUBMITTED BY: Denny Lindell

DATE:    9/1/99

DEPARTMENT: Purchasing

SUPV. APPROVAL:

---

**REQUEST DESCRIPTION**  Please note priority of request:  ( HIGH )  MEDIUM  LOW

(Attach program names, screen prints, report layouts, specifications, and describe in detail.)

**PRICE CHANGES**

1. Fix Program where Retail is not saying the same when price changes are done on RX items.

2. When new Gross Profit Percent is entered, calculate a new A.W.P. and Retail

3. Warning Flag is not working that compares Vendor Gross Margin Percent to Vendor profit margin.

4. Calculate a new Retail, when the A.W.P. is changed.

5. Add Cmd.-10 to update immediately instead of having to fill in all date fields.

6. User "edits do not coincide with person that made changes.

7. Does not calculate differential between Replacement Cost and Bill Cost when doing Price Changes.

---

**PRIORITY JUSTIFICATION / BENEFITS**

---

ABC(AWP)001966
HIGHLY CONFIDENTIAL-
ATTORNEYS' EYES ONLY

# Exhibit 21
# Filed Under Seal

# Exhibit 22
# Filed Under Seal

# Exhibit 23
# Filed Under Seal

# Exhibit 24

## Golden Gate Reporting

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3                      --oOo--

 4

 5   NEW ENGLAND CARPENTERS HEALTH
     BENEFITS FUND, PIRELLI ARMSTRONG
 6   RETIREE MEDIC CAL BENEFITS TRUST;
     TEAMSTERS HEALTH & WELFARE FUND OF
 7   PHILADELPHIA FEDERATION OF TEACHERS
     HEALTH AND WELFARE FUND; DISTRICT
 8   COUNCIL 37, AFSCME-HEALTH & SECURITY
     PLAN; JUNE SWAN; MAUREEN COWIE and
 9   BERNARD GORTER,

10             Plaintiffs,
        vs.                        C.A. No. 1:05-
11                                 CV-11148-PBS
     FIRST DATABANK, INC., a Missouri
12   corporation; and MCKESSON
     CORPORATION, a Delaware corporation,
13
             Defendants.
14   _____

15

16      VIDEOTAPED DEPOSITION OF ERLINDA THOMAS

17

18
     DATE:            March 13, 2007
19
     TIME:            9:30 a.m.
20
     LOCATION:        GOLDEN GATE REPORTING
21                    Corporate Office Center
                      101 California, Suite 2450
22                    San Francisco, CA

23   REPORTED BY:     VEENA MARIE PUCCINELLI
                      Certified Shorthand Reporter
24                    License Number 7652

25
                                        Page 1
```

| | | |
|---|---|---|
| 1 | Q.  Ms. Thomas, could you go back to where we | 11:38:07a |
| 2 | were.  About halfway down the page of page 2 of | 11:38:09a |
| 3 | Exhibit 5, your e-mail to Ms. Puccetti, amongst | 11:38:13a |
| 4 | others, dated March 14th, 2002. | 11:38:17a |
| 5 | A.  Uh-huh.  Okay. | 11:38:20a |
| 6 | Q.  Do you see in the paragraph immediately | 11:38:22a |
| 7 | below the one we have just been reading, you say, | 11:38:24a |
| 8 | "Product Management is working closely with FDB to | 11:38:28a |
| 9 | adjust their markup.  FDB had been changing their | 11:38:31a |
| 10 | markup to match with your markup.  Eventually our | 11:38:36a |
| 11 | list price will equal to FDB's AWP." | 11:38:40a |
| 12 | Do you see that? | 11:38:44a |
| 13 | A.  Yes, I do. | 11:38:45a |
| 14 | Q.  And is that an accurate statement at that | 11:38:46a |
| 15 | time? | 11:38:48a |
| 16 | A.  No.  It's not an accurate statement. | 11:38:49a |
| 17 | Q.  And why -- could you say that the | 11:38:52a |
| 18 | statement you made at that time in March of 2002 is | 11:38:54a |
| 19 | not an accurate statement? | 11:38:57a |
| 20 | A.  Because there is a lot of confusion about | 11:38:58a |
| 21 | this one, about this price sticker and all that, so | 11:39:01a |
| 22 | I was corrected -- with my statement, I was | 11:39:08a |
| 23 | corrected by Bob James in the next e-mail. | 11:39:09a |
| 24 | Q.  Okay, before you get to that -- | 11:39:13a |
| 25 | A.  Okay | 11:39:15a |

Page 109

# Golden Gate Reporting

| | | |
|---|---|---|
| 1 | Q.  -- where you were corrected, how did you | 11:39:15a |
| 2 | get your understanding -- I'm sorry, strike that. | 11:39:17a |
| 3 | It was the case that at the time you | 11:39:20a |
| 4 | wrote this e-mail addressed to all of these | 11:39:22a |
| 5 | individuals, you thought that statement was | 11:39:26a |
| 6 | correct; did you not? | 11:39:27a |
| 7 | A.  Yes. | 11:39:28a |
| 8 | Q.  Okay.  How did you get your understanding | 11:39:29a |
| 9 | that that statement was correct? | 11:39:30a |
| 10 | A.  Because there are a lot of stickers | 11:39:32a |
| 11 | problem.  And, you know, the customers -- in some | 11:39:36a |
| 12 | cases, the stickers is getting the higher of the | 11:39:39a |
| 13 | two, and so the customer is probably getting the | 11:39:42a |
| 14 | McKesson list price, okay? | 11:39:47a |
| 15 | So maybe what my understanding at the | 11:39:49a |
| 16 | time is, Bob James is working with FDB to fix that, | 11:39:52a |
| 17 | but I was wrong in that assumption. | 11:39:56a |
| 18 | Q.  Okay.  So is it your testimony that when | 11:39:59a |
| 19 | you said FDB had been changing their markup to | 11:40:01a |
| 20 | match with our markup, that was an incorrect | 11:40:06a |
| 21 | assumption that you made? | 11:40:08a |
| 22 | A.  Correct. | 11:40:09a |
| 23 | Q.  Okay.  And then you previously testified | 11:40:10a |
| 24 | that that assumption was corrected by Mr. James in | 11:40:13a |
| 25 | the following e-mail? | 11:40:16a |

Page 110

## Golden Gate Reporting

| | | |
|---|---|---|
| 1 | A.  Correct. | 11:40:17a |
| 2 | Q.  Okay.  And could you tell us, please, | 11:40:18a |
| 3 | where it is that he corrects that assumption? | 11:40:20a |
| 4 | A.  Well, it says here, "Joy, it is really | 11:40:24a |
| 5 | happening the other way around." | 11:40:27a |
| 6 | Q.  Could you tell us where you are reading | 11:40:28a |
| 7 | from? | 11:40:30a |
| 8 | A.  Okay.  This is from Bob James of | 11:40:31a |
| 9 | March 15, 2002. | 11:40:32a |
| 10 | Q.  Okay. | 11:40:34a |
| 11 | A.  It says:  Joy, it is really happening the | 11:40:34a |
| 12 | other way around.  McKesson is normalizing our | 11:40:38a |
| 13 | suggested sale or retail list, and AWP increases | 11:40:42a |
| 14 | usually happen when FDB re-surveys the wholesaler | 11:40:47a |
| 15 | after the price increase.  They set the AWP where | 11:40:53a |
| 16 | two out of three national wholesaler are using the | 11:40:57a |
| 17 | same markup.  We just happen to be improving our | 11:41:03a |
| 18 | process to eliminate the need of overriding AWP | 11:41:06a |
| 19 | with its price activity in the future. | 11:41:10a |
| 20 | And then it says:  I spoke with FDB | 11:41:12a |
| 21 | earlier this week, and they stated that about | 11:41:16a |
| 22 | 90 percent of the vendors have been changed to 25 | 11:41:19a |
| 23 | percent markup and use a 1.25 factor (times the | 11:41:22a |
| 24 | WAC). | 11:41:26a |
| 25 | That is -- you know, it was Bob James | 11:41:26a |

Page 111

**Golden Gate Reporting**

1              CERTIFICATE OF DEPOSITION OFFICER

2

3        I, VEENA MARIE PUCCINELLI, duly

4    authorized to administer oaths pursuant to Section

5    2093 (b) of the California Code of Civil Procedure,

6    hereby certify that the witness in the foregoing

7    deposition was by me sworn to testify to the truth,

8    the whole truth and nothing but the truth in the

9    within-entitled cause; that said deposition was

10   taken at the time and place therein stated; that

11   the testimony of the said witness was thereafter

12   transcribed by means of computer-aided

13   transcription; that the foregoing is a full,

14   complete and true record of said testimony; and

15   that the witness was given an opportunity to read

16   and correct said deposition and to subscribe the

17   same.

18        I further certify that I am not of

19   counsel or attorney for either or any of the

20   parties in the foregoing deposition and caption

21   named, or in any way interested in the outcome of

22   this cause named in said caption.

23

24   _____

25   VEENA MARIE PUCCINELLI, CSR 7652

Page 162

# Exhibit 25
# Filed Under Seal