UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Civil Action: 1:05-CV-11148-PBS <br><br> Judge Patti B. Saris |

## MCKESSON CORPORATION'S RESPONSE
## TO THE COURT'S INQUIRIES AT THE NOVEMBER 13, 2007
## HEARING ON CLASS CERTIFICATION ISSUES

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

I. THE ANSWERS TO THE COURT'S QUESTIONS DEMONSTRATE THAT THE COURT HAS SUFFICIENT INFORMATION TO REJECT DR. HARTMAN'S "CONSTANT RELATIONSHIP" THEORY AND HIS METHODOLOGY FOR CLASS-WIDE DAMAGES. ................................................ 2

    A. Dr. Hartman Offered No Empirical Evidence To Support His "Constant Relationship" Theory. ............................................................... 3

    B. The Empirical Evidence Refutes Dr. Hartman's "Constant Relationship" Theory. ............................................................................. 5

        1. Dr. Willig Demonstrates With "Real World" TPP Data That Dr. Hartman Is Wrong About His "Constant Relationship" Theory. ......... 5

        2. Knowledgeable Industry Witnesses Refute Dr. Hartman's "Constant Relationship" Theory. ................................................ 7

        3. Plaintiffs' Own Consultants Refute Dr. Hartman's "Constant Relationship" Theory. ................................................................. 8

    C. The Record Substantially Supports The Court's Rejection of a Damages Class Based on IMS Data and the Constant Relationship Theory. ........................ 9

II. AGGREGATE DAMAGES FOR THE CONSUMER CO-PAY CLASS ALSO DEPEND ON THE "CONSTANT RELATIONSHIP" THEORY. ............................... 11

III. MCKESSON'S PROPOSED GAME PLAN IF THE COURT DETERMINES THAT IT DOES NOT HAVE A SUFFICIENT RECORD TO RULE ON DR. HARTMAN'S AGGREGATE DAMAGES MODEL. .................................................. 12

IV. TRIAL DATE. ......................................................................................................... 14

# TABLE OF AUTHORITIES

## CASES

*Hayes v. Douglas Dynamics*,
 8 F.3d 88 (1st Cir. 1993)..................................................................................................4

*In re Initial Public Offering Sec. Litig.*,
 471 F.3d 24 (2d Cir. 2006) ............................................................................................10

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*,
 877 F.2d 1333 (7th Cir. 1989) ........................................................................................4

*Olson v. Montana Rail Link, Inc.*,
 227 F.R.D. 550 (D. Mont. 2005) ....................................................................................5

*United States v. Batchelor-Robjohns*,
 No. 03-20164, 2005 U.S. Dist. LEXIS 13552 (S.D. Fla. June 3, 2005) .........................5

## STATUTES

Fed. R. Civ. P.
 Rule 23(c)(1)(C) Adv. Comm. Notes 2003 ...................................................................10

## OTHER

Robert I. Garis and Bartholomew E. Clark, *The Spread: Pilot Study of an Undocumented Source of Pharmacy Benefit Manager Revenue*, Journal of the American Pharmacists Association, January 2004, Vol. 44, No. 1 .........................................................................4

Thomas R. Fulda, *et al.*, HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY,
 Chapter 14: Pharmaceutical Benefit Managers (2007).................................................9

Stephen W. Schondelmeyer and Marion V. Wrobel, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices* (Aug. 30, 2004) ....................................9

## INTRODUCTION

Plaintiffs' request for the Court to reconsider its Class Order rejecting Dr. Hartman's methodology for aggregate TPP damages has now been boiled down to a single issue. At the November 13, 2007 hearing, the Court indicated that whether there is evidence to support Dr. Hartman's newly asserted "constant relationship" assumption will determine whether a TPP damage class will be certified. (*See* Hr'g Tr. 58:16-18, Nov. 13, 2007.) The Court asked several questions to determine if the issue could be decided on the current record (*id.* at 47:23-48:14), what process would be necessary if the record were insufficient (*id.* at 58-60), and what game plan the parties proposed to resolve class issues and set the case for trial. (*Id.* at 61:3-6.) The Court also asked for further explanation of how a percentage co-pay works, and whether aggregate damages for the percentage co-pay class raise the same problems the Court identified in rejecting Dr. Hartman's damages methodology in the Class Order. (*Id.* at 48:20-49:14.) McKesson submits this supplemental filing to respond to the Court's questions.

Specifically, the answers to the Court's questions demonstrate that the Court can resolve the outstanding class issues right now based on the current record as supplemented by the parties' responses to the Court's questions. That is because Dr. Hartman has failed to produce any empirical evidence supporting his "constant relationship" assumption, even though that obligation falls squarely on the party proposing the theory in the first place. There is no evidence to support Dr. Hartman's new theory that what TPPs paid their PBMs is the same as what PBMs paid retail pharmacies, or that the relationship between these two payments is constant over time. This is not surprising given Dr. Hartman's previous testimony at his deposition in this case that there is *no correlation* at all between these two payments.

Not only is there no evidence to support Dr. Hartman's theory, but the empirical evidence shows there is no constant relationship. Dr. Willig's prior submissions directly refuted Dr. Hartman's "constant relationship" assumption as a matter of economics. In response to the Court's questions about what the empirical evidence shows, Dr. Willig has now compared "real world" TPP data, the only TPP claims data that Dr. Hartman cites in his reports, with the IMS

1

retail data that Dr. Hartman intends to use. That comparison shows that Dr. Hartman's assumption of zero PBM spread or a constant relationship is dead wrong — the empirical data shows spreads varied by TPP and by drug, and changed over time. This too, is not surprising because industry participants with direct knowledge of the PBM business — people who would "actually know" (Hr'g Tr. 28:24-25) — all witnessed reimbursement payments directly contrary to Dr. Hartman's "constant relationship" assumption. Given all of the evidence at odds with Dr. Hartman's "constant relationship" theory, the record is ripe to reject it now.

In the alternative, McKesson proposes a process with a limited discovery component and input from an independent expert, if necessary, to assist the Court in resolving the remaining aggregate damages issues.

### I. THE ANSWERS TO THE COURT'S QUESTIONS DEMONSTRATE THAT THE COURT HAS SUFFICIENT INFORMATION TO REJECT DR. HARTMAN'S "CONSTANT RELATIONSHIP" THEORY AND HIS METHODOLOGY FOR CLASS-WIDE DAMAGES.

At the November 13 hearing, the Court distilled plaintiffs' motion for reconsideration to a single issue: is there evidence to support Dr. Hartman's "constant relationship" theory sufficient for plaintiffs to meet their obligations under Rule 23 for certification of a TPP class for damages? (*See* Hr'g Tr. 58:16-18.) In particular, the Court asked: "What's the foundation for Dr. Hartman saying that what the TPPs pay the PBMs is the same as what the PBM was paying the pharmacy?" (*Id.* at 44:15-17.) The Court also asked where Dr. Willig says that the amount TPPs pay PBMs is *not* the same as what PBMs pay the pharmacy. (*Id.* at 26:12-27:5, 28:6-8.) And is there "something in the record," or "someone who actually knows" whether Dr. Hartman's constant relationship theory is right? (*Id.* at 27:23-24, 28:24-25.)

The answer is ***there is no empirical evidence in the record to support Dr. Hartman's newly asserted theory that TPP payments to PBMs were the same or constant with PBM payments to retail pharmacies.*** And, although this theory was raised *for the first time* in Dr. Hartman's October 2007 report, well after discovery had closed, ***all of the record evidence is***

2

*to the contrary*. Even Dr. Hartman in his deposition in this case effectively testified that there is no foundation for the "constant relationship" theory. Dr. Hartman thus has no basis for using IMS's retail point-of-sale data as a proxy for TPP payments, and no feasible methodology to capture and eliminate TPP mitigation from his aggregate damages calculation.

### A. Dr. Hartman Offered No Empirical Evidence To Support His "Constant Relationship" Theory.

Dr. Hartman's "constant relationship" theory is not based in fact. None of the charts, analyses or attachments set forth in the 600 pages of reports he has submitted discuss any "evidence" that proves that what TPPs pay PBMs is equal to, or remains in constant relationship with, what PBMs pay retailers. As the Court correctly noted at the November 13 hearing, Dr. Hartman's theory was put forth in "just . . . one sentence of the whole [October 29, 2007] report," the last of five reports submitted by Dr. Hartman. (Hr'g Tr. 44:21-22.)

It is not surprising that Dr. Hartman has failed to come forward with any support for his eleventh hour "constant relationship" theory because earlier in this case, he was asked whether there is any correlation between TPP payments to PBMs and PBM payments to retailers and he testified that *no correlation exists*:

> Q: Is there any correlation between what we find to be the discounts in the contracts between the PBMs and the retailers on the one hand, and what we find them to be between the PBM and the third-party payor on the other?
>
> A: By a correlation, what a statistician would say is I take -- actually, *a correlation wouldn't even work*.

(Raymond Hartman Dep. 156:16-157:5, Oct. 4, 2006.)[1] Rather, as Dr. Hartman testified, PBMs earn a spread on what they charge TPPs versus what they pay pharmacies and the size of that spread varies according to the relative bargaining clout of the TPP. (*Id.* at 156:5-161:6, 170:23-172:8.)[2]

---

[1] Unless noted otherwise, all emphasis appearing in quotations is added.
[2] Dr. Hartman likewise confirmed in the MDL that the spread earned by PBMs was not zero, as his new theory now contends. *See, e.g.*, Decl. of Raymond S. Hartman in Support of Pls.' Mot. for Class Certification, Sept. 3, 2004

3

Dr. Hartman also made statements contrary to his new "constant relationship" theory in his MDL report where he wrote that PBMs "can make money on the spread between TPP reimbursement and the payments to retailers." (Hartman MDL Decl. Attachment E, pp. 3-4; Schechter Decl. Ex. 7.) In fact, for this proposition, Dr. Hartman cited empirical evidence contained in a study that analyzed the spreads earned by PBMs. This study found that PBM spreads "varied considerably and seemingly erratically for both single-source and generic drug products." *See* Robert I. Garis and Bartholomew E. Clark, *The Spread: Pilot Study of an Undocumented Source of Pharmacy Benefit Manager Revenue*, Journal of the American Pharmacists Association, January 2004, Vol. 44, No. 1. Thus, in contrast to the utter lack of support Dr. Hartman put forward for his claim of zero PBM spread or constant relationship over time, Dr. Hartman previously put forth evidence of just the opposite.[3]

Plaintiffs attempt to gloss over the glaring absence of factual support and contradictory statements by asserting that Dr. Hartman's damages methodology and constant relationship theory are based on his "experience." (Hr'g Tr. 44:18.) Such assertions, however, cannot replace facts and reason. *See, e.g., Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (criticizing an expert's declaration that was "full of assertion but empty of facts and reasons," and requiring the judge to "'look behind [the expert's] ultimate conclusion . . . and analyze the adequacy of its foundation.'") (citation omitted).[4] Nor can Dr. Hartman rely on confidential data from another case, the unknown contents of which may or may not support his otherwise unsupported theory, as plaintiffs' counsel suggested at the

---

("Hartman MDL Decl.") Attachment C, ¶ 26; Decl. of Lori A. Schechter in Support of McKesson Corp.'s Response to the Court's Inquiries at the Nov. 13, 2007 Hearing on Class Certification Issues ("Schechter Decl.") Ex. 7 ("PBM revenue will be related to the AWP of a drug and the difference between the average discounts off AWP paid by TPPs and paid to network retail pharmacies.")

[3] At the November 13 hearing, the Court suggested that both sides have changed their theories in light of the Court's Class Order. (Hr'g Tr. 13:1-5.) While that is clearly true for plaintiffs, that is not the case for McKesson. McKesson has consistently argued from day one that TPP mitigation creates individual issues that cannot be captured in an aggregate damage model, and that the consumer percentage co-pay class is derivative of the TPP class and likewise presents individual damage issues that cannot be resolved on a class-wide basis.

[4] As the First Circuit concluded when citing the Seventh Circuit's *Mid-State Fertilizer* opinion, where an expert presents "nothing but conclusions — no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected," such testimony will be insufficient. *Hayes v. Douglas Dynamics*, 8 F.3d 88, 92 (1st Cir. 1993).

November 13 hearing with respect to data from PBM ESI. (Hr'g Tr. 60:10-20.)[5]   It was plaintiffs' obligation to come forward with a feasible methodology that met Rule 23's rigorous analysis and plaintiffs have failed to do so. The Court therefore has a sufficient basis, right now, to conclude that no damages class can be certified.

> B.   **The Empirical Evidence Refutes Dr. Hartman's "Constant Relationship" Theory.**
>
>> 1.   **Dr. Willig Demonstrates With "Real World" TPP Data That Dr. Hartman Is Wrong About His "Constant Relationship" Theory.**

Although it is not McKesson's burden to disprove an unsupported theory that plaintiffs raised to meet their obligations under Rule 23, the substantial empirical evidence in the record demonstrates that Dr. Hartman's "constant relationship" theory is wrong. In response to the Court's question at the November 13 hearing, Dr. Willig has shown that the empirical data contradicts Dr. Hartman's "constant relationship" assumption. Using the same TPP data cited by Dr. Hartman in his reports, Dr. Willig, in the accompanying declaration, has documented that the relationship between what TPPs paid PBMs and what the IMS data show retailers were paid is not constant over time.

Using claims data for GE, CIGNA, and named plaintiffs Teachers, Teamsters, and Pirelli, Dr. Willig compared reimbursements per dose paid by these TPPs to the retail prices reported by IMS.[6]   Specifically, Dr. Willig looked at whether the per dose prices and effective discounts off AWP reported in the TPP claims data are different from what is reported in the IMS data. The answer, as shown by the data, is that TPP payments and effective discounts ***differ materially***

---

[5] *Olson v. Montana Rail Link, Inc.*, 227 F.R.D. 550, 552-53 (D. Mont. 2005) (prohibiting expert from relying in any way upon data that was not timely provided with the expert report and striking "any opinion or evidence based on undisclosed data or testing"); *United States v. Batchelor-Robjohns*, No. 03-20164, 2005 U.S. Dist. LEXIS 13552 at *11-*12 (S.D. Fla. June 3, 2005) (excluding expert's report where plaintiff failed to provide the "proprietary" models and curves underlying its expert's calculations because "the Court, like Defendants, is unable to test the reliability of [the expert's] opinion" without this information).

[6] These are the same claims data that Dr. Hartman cites in his reports. In conducting his comparison, Dr. Willig looked at the 25 largest drug/dose combinations by dollar volume reported in the IMS data. These drugs included the five "bellwether" drugs that Dr. Hartman focused on in his last two reports. (Expert Decl. of Robert D. Willig Nov. 28, 2007 ("Willig Nov. 28 Decl.") ¶ 3 & n.3.)

5

from what IMS reports, and that those *differences increase over time*. (Willig Nov. 28 Decl. ¶ 2.) This increased difference means that there is not a constant relationship between IMS prices and TPP prices over time. Instead, the IMS data systematically understate the increasing discounts that TPPs were able to get throughout the class period. (*Id.* ¶ 4.) Moreover, as Dr. Willig points out, these errors vary substantially across TPPs. Therefore, "using IMS data does not obviate the need for individual inquiries for each TPP." (*Id.* ¶¶ 1, 5.)

In addition, Dr. Willig notes that the IMS retail prices are *greater* than the TPP prices for every TPP and virtually every drug he looked at. (*Id.* ¶ 6.) That observed fact flatly contradicts Dr. Hartman's assertion that the IMS data accurately measure PBM payments to retailers and that PBMs earn a zero or positive profit margin on TPP transactions. As Dr. Willig explains, if PBMs "earned a zero or positive profit margin,"

> this would imply that TPPs' payments to PBMs would be greater than or equal to PBMs' payments to retailers. The apparent negative spread is consistent with my observation that the IMS data are diluted, as discussed in the October Willig Declaration, at ¶¶ 40-42, and the November Willig Declaration, at ¶¶ 28-29, and therefore do not accurately measure PBM transactions at retail. Consequently, even if Dr. Hartman's constant relationship assumption were valid, the IMS data that he uses do not show actual PBM payments and hide any decreases in those payments that were responses to the increased AWP/WAC ratio. *As a result, using Dr. Hartman's IMS data to calculate aggregate damages will necessarily lead to a systematic overstatement of damages.*

(*Id.*)

Dr. Willig's analysis is consistent with the opinions he put before the Court immediately after Dr. Hartman raised his "constant relationship" theory for the first time last month. As Dr. Willig stated in his November 8, 2007 Rebuttal Declaration, "[t]*here is no theoretical or empirical support for Dr. Hartman's constant relationship assumption*." (Rebuttal Expert Decl. of Robert D. Willig, Nov. 8, 2007 ("Willig Rebuttal Decl.") ¶ 17.)) [Docket No. 365.] He further explained that "[d]etermining whether Dr. Hartman's critical [constant relationship] assumption is correct therefore would require an examination of the market responses at the TPP level in order to compare those responses with market responses at the retail level. Such an

6

examination requires collection of data at the individualized TPP level in addition to data at the retail level." (*Id.* ¶ 20.) Using the same TPP-level data Dr. Hartman relied on, Dr. Willig has shown that Dr. Hartman cannot sweep over the individual issues of mitigation, which can only be revealed on a TPP-by-TPP level examination.

### 2. Knowledgeable Industry Witnesses Refute Dr. Hartman's "Constant Relationship" Theory.

Dr. Hartman's theory is also rejected by those with first-hand knowledge of the prices paid both by TPPs to PBMs and by PBMs to retail pharmacies. In the MDL, for example, witnesses from ███████████ were asked if the prices charged by ███████████ ███████████ to its TPP clients were always the same as the payments made to retail pharmacies, or whether a spread could be earned by the PBM. These witnesses said that TPP contracts all differed and that varying spreads could be earned.[7]

This was true of other PBMs as well.[8] A former employee of PBM NMHC who reviewed and approved contracts with its retail pharmacy networks and contracts with its TPP clients during the class period, definitively states in an accompanying declaration that "*[t]here was no constant relationship* or other fixed margin between what NMHC paid to pharmacies and what NMHC charged its TPP clients." (Decl. of James F. Smith, Nov. 28, 2007 ¶ 5; Schechter Decl. Ex. 3.) The spreads NMHC earned "varied from contract-to-contract and over time"; at times, NMHC would accept a "negative spread" on reimbursement rates due to "competitive pressures." (*Id.* ¶¶ 4-5.) Contrary to Dr. Hartman's theory, this PBM's "contracts with TPPs were individually negotiated, and financial terms, including discounts off AWP, dispensing fees, rebate pass through provisions, and other fees, differed from one TPP to the

---

[7] *See, e.g.,* ███████████
███████████

[8] McKesson did not pursue document or other discovery from PBMs or other industry witnesses on the issue of the "constant relationship" theory because the theory was raised for the first time months after discovery closed, and Dr. Hartman had already denied that any correlation existed. McKesson also did not attempt to obtain testimony from percipient witnesses to "disprove" an unsupported, one-line theory for which plaintiffs bear the burden of proof during the 10 days it had to file a response after learning of Dr. Hartman's theory. In response to the Court's inquiry at the November 13 hearing for "someone who actually knows" whether Dr. Hartman's constant relationship theory is right, McKesson made efforts to identify knowledgeable PBM witnesses to answer the Court's question.

next." (*Id.* ¶ 4.) Similarly, its "contracts with retail pharmacies were individually negotiated, with resulting financial terms that varied contract by contract." (*Id.*)[9]

This was obvious to industry consultants as well, as is shown in the accompanying declaration of Dr. Arthur Shinn. Dr. Shinn is a pharmacy benefit consultant who has worked both with TPPs and at a PBM, and has negotiated, audited, consulted about and reviewed hundreds of contracts between TPPs and PBMs over the course of his career. From his experience, he knows that "PBMs earn a 'spread' or profit margin on the difference between what they pay pharmacies and what they receive from TPPs." (Decl. of Arthur F. Shinn, Nov. 27, 2007 ("Shinn Decl.") ¶ 5; Schechter Decl. Ex. 4.) Moreover, the spreads that PBMs earn are the result of tens of thousands of individually negotiated contracts. Accordingly, "*there is no constant relationship* or other fixed margin between what the PBM pays the pharmacy and what the PBM charges the TPP. Rather, the amount of the PBM's markup varies contract by contract and over time, depending on a variety of factors including the relative bargaining strength and sophistication of the parties involved in negotiating the contract." (*Id.* ¶ 6.)

### 3.   Plaintiffs' Own Consultants Refute Dr. Hartman's "Constant Relationship" Theory.

Finally, as McKesson previously pointed out, plaintiffs' own industry experts provide further support for rejecting Dr. Hartman's "constant relationship" theory. Dr. Hartman takes his "constant relationship" theory, and applies it to his IMS retail data. In so doing, Dr. Hartman contends that he finds no squeezing of retailers by PBMs over the class period, and thus no mitigation by TPPs. Plaintiffs' industry experts refute the validity of the theory because they contradict the results it produces. Dr. McDonough, for example, states in her report that retailers were squeezed by PBMs as a result of the change in the AWP to WAC ratio: "As the PBM industry learned of the change in AWP to WAC ratio, they were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for the

---

[9] Mr. Smith has personal knowledge of these contracts because he "reviewed and signed hundreds of contracts" between the PBM and TPPs and "approved hundreds of contracts" between the PBM and retail pharmacies. (*Id.* ¶ 3.)

8

increased profit margins." (Expert Report of Kimberly P. McDonough, Sept. 14, 2007 at 13, submitted under seal as Ex. B to Flum Decl. in Support of McKesson Corp.'s Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order.) [Docket No. 329-3.][10]

Also contrary to Dr. Hartman's conclusions from his "constant relationship" theory, Susan Hayes, whom Dr. McDonough replaced, testified that TPPs did mitigate when they "pushed back" and got better pricing in response to AWP spread increases. (Susan Hayes Dep. 221:9-16, Oct. 26, 2006, submitted as Ex. AA to Flum Decl.) [Docket No. 329-29.]

### C. The Record Substantially Supports The Court's Rejection of a Damages Class Based on IMS Data and the Constant Relationship Theory.

Dr. Hartman's September Report was his second attempt to convince the Court that his class-wide aggregate damages methodology was legally sufficient after the Court rejected the first effort. In this September Report, Dr. Hartman attempted to fix the flaw in his first try by saying that his methodology was based on "real world" TPP data that already accounted for TPP mitigation. When McKesson, Dr. Willig and IMS itself made clear that IMS data was not "real world" *TPP data*, Dr. Hartman came back with another theory. Disavowing his earlier testimony in this case, Dr. Hartman now claims that IMS data can be used to calculate aggregate damages because what TPPs paid PBMs is the same as (or in constant relationship with) what PBMs paid retailers, as purportedly reported by IMS. Thus, Dr. Hartman's aggregate damages methodology, as this Court noted, is entirely dependent on his newly minted theory of a constant

---

[10] Dr. McDonough also refutes Dr. Hartman's assumption of zero PBM spread. As Dr. McDonough published in her chapter on PBMs, PBMs contract to pay pharmacies "an amount that is different, and typically lower, than the amount that is billed to the [TPP] client." According to Dr. McDonough, the effect of this arrangement is to "generate a differential, or network spread, in the pricing," whereby the PBM *retains the difference between the payment and billing rate as additional revenues.*" (Thomas R. Fulda, *et al.*, HANDBOOK OF PHARMACEUTICAL PUBLIC POLICY, Chapter 14: Pharmaceutical Benefit Managers, p. 260 (2007) ("PHARMACY HANDBOOK") submitted as Ex. 1 to Decl. of Paul Flum in Support of McKesson Corp.'s Surreply in Response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order.) [Docket No. 364-2.] The authorities cited in Dr. Hartman's October Report make the same point. *See* Stephen W. Schondelmeyer and Marion V. Wrobel, *Medicaid and Medicare Drug Pricing: Strategy to Determine Market Prices*, p. 13 (Aug. 30, 2004) ("Other major sources of [PBM] revenue include revenue from pharmacy discounts not passed on to the end payor.") (cited in Hartman October Report n.35). [Docket No. 346.]

9

relationship. But plaintiffs have failed to offer *any* empirical evidence to support it, and plaintiffs have cited no industry or economic literature that acknowledges it. Indeed, Dr. Hartman's own prior testimony, reports and cited evidence contradict it. That alone should be enough to reject Dr. Hartman's "constant relationship" theory. Yet there is more. McKesson has offered empirical, eyewitness and economic evidence that refutes it. Plaintiffs thus cannot meet any of the standards courts have applied for the rigorous analysis Rule 23 requires.[11]

Even if the Court were to determine that there was "some evidence" to support the "constant relationship" theory, Dr. Hartman's aggregate damage model would still "significantly overstate damages" because Dr. Hartman offered no response to the *other* fundamental flaws inherent in his model. These include the dilution of the IMS data with data from Medicaid and U&C customers and from pharmacies that report AWP rather than actual receipts, as well as mitigation realized by TPPs from increasing discounts on non-Appendix A drugs. (Rebuttal Expert Decl. of Robert D. Willig, Nov. 8, 2007 ¶¶ 25-29, 40-55; Expert Decl. of Robert D. Willig, Oct. 16, 2007 ¶¶ 30-37, 40-42.) [Docket Nos. 365 & 326.] These problems, all of which lead to overstatement of damages, are not resolved even if the Court accepts the unsupported "constant relationship" theory. Dr. Willig's analysis shows just how significant the dilution problem is. IMS data reports effective discounts off AWP in the range of 4%-7%, which is well below the effective discount at either the PBM or the TPP level. (Willig Nov. 28 Decl. ¶ 7 & n.4.) Indeed, Dr. Hartman himself estimated that TPPs generally reimburse for brand drugs in the range of 13%-17% off AWP. (Hartman MDL Decl. ¶ 30(g); Schechter Decl. Ex. 7.)

Accordingly, the Court should conclude the class certification proceedings, and allow certification of liability issues only.

---

[11] The Second Circuit recently repudiated the standard that classes could be certified so long as they were supported by an expert report that was not "fatally flawed." *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) ("Obviously, we can no longer continue to advise district courts that . . . an expert's report will sustain a plaintiff's burden so long as it is not 'fatally flawed'"). The "fatally flawed" standard was abandoned in part due to the 2003 changes to the text of Rule 23. *Id.* at 39. The Rule now requires that "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met." Fed. R. Civ. P. 23(c)(1)(C) Adv. Comm. Notes 2003. That ultimate determination is akin to resolving jurisdictional issues, and "is really a mixed question of fact and law." *In re IPO*, 471 F.3d at 40.

10

## II. AGGREGATE DAMAGES FOR THE CONSUMER CO-PAY CLASS ALSO DEPEND ON THE "CONSTANT RELATIONSHIP" THEORY.

At the November 13 hearing, the Court asked the parties to explain the basis for calculating the dollar amount of percentage co-payments by members of the consumer class. (Hr'g Tr. 49:5-6 ("I want to understand what the copay is based on"); *see also id.* 20:1-2 ("So most consumers pay a percentage copay of what? Percent of what?").)

The answer is straightforward. Consumer co-payments are coinsurance. Like the other terms of private prescription drug plans, they are governed by contract. Under the typical contract, the consumer's percentage co-payment obligation is based on what the TPP pays the PBM under the TPP's contract with its PBM, calculated using the discounts off AWP and dispensing fees that the TPP and PBM have negotiated.  Dr. Shinn's experience is the same. (Shinn Decl. ¶ 11; Schechter Decl. Ex. 4 ("the consumer pays the pharmacy a specified percentage of what the TPP is obligated to pay the PBM").)[12] So is Dr. McDonough's. (Expert Report of Kimberly P. McDonough, at 9, submitted as Ex. B to Flum Decl. ("[u]nder a co-insurance program, the member's cost is reflected as a percentage of the health plan's total pharmacy cost for each prescription").) [Docket No. 329-3.]

Accordingly, as Dr. Hartman stated in his September Declaration:

---

[12] As Dr. Shinn states, "[i]n each instance where one of my TPP clients has adopted a percentage co-pay for its members, the co-payment has been based on the TPP's total contractual reimbursement obligation to its PBM. When the PBM processes the claim on behalf of its TPP client, the PBM calculates the total amount owed by the TPP under the terms of the contract, including ingredient discounts and dispensing fees, and then applies the percentage co-pay to that amount. The PBM informs the pharmacy of the member's co-pay obligation through the PBM's on-line claims adjudication system." (Shinn Decl. ¶ 10; Schechter Decl. Ex. 4.)

11

> [the] calculation of damages to Class 1 [the consumer co-pay class] requires the calculation of damages to Class 2 [the TPP class], since *the damages to Class 1 are simply a percentage of the damages (paid as coinsurance) to the TPPs/insurers that insure those consumers*. In order for Class 1 to be certified for liability and damages, I (and any economist) require calculation of the damages to the TPPs insuring those consumers.

(Expert Report of Raymond S. Hartman, Sept. 14, 2007 ¶ 12, submitted as Ex. 1 to Decl. of Steve Berman in Support of Class Pls.' Reply to McKesson's Opp'n to Aggregate Damages for the TPP Class.) [Docket No. 345-2.] That observation continues to hold.

Thus, in order to calculate aggregate damages for the percentage co-pay class, Dr. Hartman must first accurately calculate damages for the TPP class, including accurately capturing and eliminating any mitigation TPPs achieved through improved discounts off AWP and dispensing fees in the contracts between TPPs and PBMs. But using IMS data to calculate aggregate damages for both classes can only be done if IMS data accurately reflects what TPPs paid PBMs. In other words, calculation of aggregate damages for the co-pay class is just as dependent on Dr. Hartman's "constant relationship" assertion as is the TPP aggregate damages model. Because the discounts off AWP and the dispensing fees at the TPP level do not mirror the discounts and dispensing fees reflected in the IMS data at the retail level, Dr. Hartman's "constant relationship" theory fails. Therefore, Dr. Hartman cannot use IMS retail data to calculate aggregate damages for either class.[13]

### III. MCKESSON'S PROPOSED GAME PLAN IF THE COURT DETERMINES THAT IT DOES NOT HAVE A SUFFICIENT RECORD TO RULE ON DR. HARTMAN'S AGGREGATE DAMAGES MODEL.

The record contains substantial evidence to support the Court's prior determination that Dr. Hartman's aggregate damages model cannot be used. Plaintiffs have been given multiple opportunities to show otherwise, but have failed to meet that burden. If, however, the Court

---

[13] This holds true irrespective of the fact that TPPs also stood to offset the impact of higher AWP markups by receiving a greater share of manufacturer rebates and other offsets. That TPPs had additional sources of mitigation not available to consumers does not cure the other problems inherent in Dr. Hartman's use of IMS data, which does not accurately report either retail payments or discounts and dispensing fees at the TPP level.

determines it does not have a sufficient record to evaluate Dr. Hartman's "constant relationship" theory, it should permit both sides to take discovery from PBMs solely on this issue. Plaintiffs have identified data that they would like to use from another case to which McKesson is not a party. If plaintiffs are given the right to handpick discovery from that case, McKesson requests the opportunity to also seek any relevant material from that case, and to take targeted depositions of three or four PBMs to resolve this dispute in short order. All of this discovery is unnecessary, however, if the Court agrees with McKesson that plaintiffs' failure to provide empirical evidence to support their theory, and the record evidence refuting the theory, is sufficient to resolve this issue now.

If the Court concludes that the matter cannot be resolved on the basis of empirical evidence, and that instead the issue turns on which of the competing experts is correct, McKesson submits that the last-resort option of retaining an independent expert makes the most sense. An evidentiary hearing that merely rehashes the contested views of experts retained by the parties will not add anything to the extensive briefing and expert reports that have already been submitted. Accordingly, McKesson proposes that the Court select an expert of its own, as it did in the MDL when it appointed Professor Ernst Berndt to fulfill a similar role.

At the November 13 hearing, plaintiffs proposed Professor Joseph Newhouse of the Kennedy School at Harvard. After looking into Professor Newhouse's professional experience, McKesson discovered that Professor Newhouse, from 2001 to the present, has been a member of the Board of Directors and its Executive Committee of one of the larger TPPs in the class, Aetna. (The Court may recall that at the November 13 hearing, plaintiffs' counsel called attention to the fact that representatives of Aetna were in the courtroom (Hr'g Tr. 49:19-22).) As a result, on November 26, McKesson informed plaintiffs that Professor Newhouse's conflict appeared to disqualify him from serving as an independent expert to the Court. Plaintiffs have not yet identified any alternatives.

McKesson proposed four alternatives to plaintiffs on November 26, but plaintiffs indicated that they did not have sufficient time to evaluate any of them other than Professor

13

Berndt. Plaintiffs have indicated that Professor Berndt has been retained by a PBM adverse to TPPs, but McKesson has been unable to confirm this and is unaware of any case in which this adversity has been disclosed. McKesson assumes the Court can easily determine if Professor Berndt is adverse to plaintiffs in any case. In addition to Professor Berndt, the other experts McKesson identified to plaintiffs are:

- Professor Robert Pindyck of MIT
- Professor Mark Pauly of the University of Pennsylvania, and
- Professor Patricia Danzon of the University of Pennsylvania

All are economists who have done some analysis of the pharmaceutical industry and should be well-qualified to consider the contrasting views of Dr. Hartman and Professor Willig. In order to preserve the integrity of the process, McKesson has not contacted any of these potential experts to determine their availability.

If the Court determines that additional process is necessary, the Court should set a date by which plaintiffs must identify up to three experts in addition to Professor Newhouse to serve as the Court's appointed expert. The parties should then have one week to evaluate the other side's experts and submit any arguments for disqualification to the Court. The Court can then determine the availability and appropriateness of the names submitted.

### IV.    TRIAL DATE.

Plaintiffs have proposed a ten-day trial commencing June 2, 2008 for Classes 1 and 2, with five days per side, inclusive of opening and closing arguments. According to plaintiffs, this trial date assumes notice is disseminated on February 1, 2008, with sixty days to opt out.

McKesson informed plaintiffs that June 2 does not present vacation problems, but that it seems unrealistic given the uncertainty of the schedule for determination of the class, the possibility of Rule 23(f) petitions, and class notice following thereafter. A date in July is therefore more realistic.

14

On the trial length, McKesson believes a liability-only trial, inclusive of opening and closing, and rebuttal (with time split evenly between the parties) would take fifteen trial days, and up to five more days if class-wide damages are also certified for trial.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

John Kiernan
Nicole Johnson
Bonner Kiernan Trebach & Crociata
200 Portland Street
Suite 400
Boston, MA 02114
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: November 28, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 28, 2007.

/s/ Lori A. Schechter
Lori A. Schechter