UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>     Plaintiffs,<br><br>  v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>     Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF LORI A. SCHECHTER IN SUPPORT OF MCKESSON CORPORATION'S RESPONSE TO THE COURT'S INQUIRIES AT THE NOVEMBER 13, 2007 HEARING ON CLASS CERTIFICATION ISSUES**

I, Lori A. Schechter, declare as follows:

  1.  I am a partner of the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action. I submit this declaration in Support of McKesson Corporation's Response to the Court's Inquiries at the November 13, 2007 Hearing on Class Certification Issues.

  2.  Attached hereto are true and correct copies of the following exhibits:

| Exhibit No. | Description |
|---|---|
| 1 | Deposition excerpts of Geoffrey Kilgore's August 14, 2005 deposition taken in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, No. 01-12257 (D. Mass.) ("*Pharm. III*") [filed under seal] |
| 2 | Deposition excerpt of Gregory Madsen's August 26, 2004 deposition taken in *Pharm. III* [filed under seal] |
| 3 | Declaration of James F. Smith, formerly of National Medical Health Card Systems, Inc., dated November 28, 2007 |
| 4 | Declaration of Arthur F. Shinn of Managed Pharmacy Consultants LLC, dated November 27, 2007 |
| 5 | Second Amendment to Express Scripts Managed Pharmacy Program Agreement, effective January 1, 2002 (ESI 277 00009398 - 9423) [filed under seal] |
| 6 | Excerpts from Medco's Response to United Food and Commercial Workers Union Request for Proposal, dated August 3, 2002 (MHS A_0000001; 0000004 - 5; 0000236) [filed under seal] |
| 7 | Excerpts from Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification in *Pharm. III*, dated September 3, 2004 [filed under seal] |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of November, 2007, in San Francisco, California.

By:  /s/ Lori A. Schechter
     Lori A. Schechter

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 28, 2007.

/s/Lori A. Schechter
Lori A. Schechter

# Exhibit 1
# Filed Under Seal

# Exhibit 2
# Filed Under Seal

Case 1:05-cv-11148-PBS     Document 372-3     Filed 11/28/2007     Page 1 of 1

# Exhibit 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br>Plaintiffs, <br><br>v. <br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br>Defendants. | Civil Action: 1:05-CV-11148-PBS <br><br>Judge Patti B. Saris |

### DECLARATION OF JAMES F. SMITH

I, James F. Smith, declare as follows:

1. I have been a pharmacy/healthcare consultant since July 2007. From August 2004 through May 2007, I was the President and CEO of National Medical Health Card Systems, Inc. ("NMHC"). NMHC is a publicly-traded pharmacy benefits management ("PBM") company. It offers a variety of services to third party payor ("TPP") clients, such as managed care organizations, Taft-Hartley and multi-employer union groups, third-party administrators, self-

insured employer groups, workers' compensation plans, school districts and municipalities. Among other things, NMHC offers access to established or customized networks of retail pharmacies throughout the United States that fill drug prescriptions for the individual members of NMHC's TPP clients. In my position as CEO at NMHC, I had full responsibility for the company's profits and losses, which were largely driven by the terms of NMHC's contracts with its retail pharmacy networks and contracts with its TPP clients.

2.  My previous experience includes overseeing negotiations of pharmacy network contracts and negotiations of client contracts for another PBM, Eckerd Health Services. From 2000-2004, I was responsible for negotiating or overseeing negotiations of all retail pharmacy contracts with PBMs on behalf of CVS/Pharmacy.

3.  At NMHC, I reviewed and signed hundreds of contracts between third party payors and NMHC and approved hundreds of contracts between NMHC and retail pharmacies. NMHC negotiated a branded and generic drug discount rate, plus dispensing fee per prescription, in its contracts with TPP clients that could be higher or lower than the branded and generic drug reimbursement rate it paid to the pharmacy that filled the prescription. In other words, NMHC, like other PBMs, often earned a "spread" or profit margin on the difference between what it paid pharmacies and what it received from TPPs for branded or generic drugs. At times, because of competitive pressures, NMHC would accept a negative spread on the reimbursement rate for branded or generic drugs if other portions of the contract provided a positive margin.

4.  NMHC's contracts with TPPs were individually negotiated, and financial terms, including discounts off AWP, dispensing fees, rebate pass through provisions, and other fees, differed from one TPP to the next. Similarly, NMHC's contracts with retail pharmacies were individually negotiated, with resulting financial terms that varied contract by contract.

5.  The spreads earned by NMHC varied from contract-to-contract and over time. The amount paid to the pharmacies was determined by individually negotiated pharmacy contracts, and the amount paid by TPPs was determined by a separately negotiated contract. There was no constant relationship or other fixed margin between what NMHC paid to

pharmacies and what NMHC charged its TPP clients. Even when NMHC contracted to "pass-through" to the TPP the reimbursement rate NMHC paid to pharmacies, there was not always a constant relationship between what NMHC paid to pharmacies and what NMHC charged its TPP clients. Because the vast majority of "pass-through" contracts protected TPPs with minimum guaranteed reimbursement rates, NMHC would take losses of varying degrees if NMHC's negotiated pharmacy reimbursement rate was higher than the TPP's guaranteed reimbursement rate.

    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

    Executed this 28th day of November in Smithtown, New York.

                                      _____
                                               James F. Smith

# Exhibit 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br>　　　　　　Plaintiffs, <br><br>v. <br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br>　　　　　　Defendants. | Civil Action: 1:05-CV-11148-PBS <br><br>Judge Patti B. Saris |

### DECLARATION OF ARTHUR F. SHINN

I, Arthur F. Shinn, declare as follows:

#### Professional Experience

1. I am the President of Managed Pharmacy Consultants LLC ("MPC"). MPC provides a variety of services relating to pharmacy benefit programs to third party payors ("TPPs" or "payors") such as employer groups and trust funds, to managed care companies, and to benefit providers and pharmaceutical companies. These services include operational

1

competitive assessment/evaluation of PBM services, competitive bidding for PBM services (RFP development and analysis), PBM contract negotiations, implementation and oversight of pharmacy programs, financial analysis of PBM contracts, financial audits of adjudicated pharmacy claims, review of pharmacy programs, modeling of pharmacy benefits, and rebate contracting. My recent experience includes assignments for providers such as BlueCross/BlueShield organizations, Harvard Pilgrim Health Care, Neighborhood Health Plan, Health New England, Local Government Center ("LGC"), various pharmaceutical companies, various PBMs, and several employers such as Clark County Education Association, Vulcan Materials, Eastman Kodak, Gillette, and Harris Corporation.

2. Prior to founding MPC in 2001, I was a Principal in William M. Mercer's New York Health Care and Group Benefits Practice, where I consulted on pharmaceutical management services to national clients and was the clinical leader of the core managed pharmacy group from 1996 to 2001.

3. My previous experience includes being Vice President and General Manager of Managed Prescription Services, Inc. ("MPS"), from 1989 through 1996, a national pharmacy benefit management company located in St. Louis, Missouri. MPS was one of the major PBMs when the PBM industry started in the mid-1980s. I have held numerous academic appointments both in St. Louis, Missouri and Detroit, Michigan and have worked as Director in the Medical department of a major pharmaceutical company from 1978 to 1982.

4. I earned a BS from Long Island University's Brooklyn College of Pharmacy and a PharmD from the University of Michigan College of Pharmacy. I have held a fellowship in the American Society of Consultant Pharmacists from 1990 to the present.

**PBM Margins on Pharmacy Benefits Vary by Individual Contract and Over Time**

5. Over the course of my career, I have negotiated, audited, consulted about, and reviewed hundreds of contracts between third party payors and PBMs. As a result of that experience, as well as my representation of PBMs and employment by MPS, I know that a PBM typically negotiates a branded drug reimbursement rate in its contracts with TPP clients that is

2

higher than the branded drug reimbursement rate it pays to the pharmacy that fills the prescription. In other words, PBMs earn a "spread" or profit margin on the difference between what they pay pharmacies and what they receive from TPPs.

6. The spreads that PBMs earn are the result of tens of thousands of individually negotiated contracts. There is no constant relationship or other fixed margin between what the PBM pays the pharmacy and what the PBM charges the TPP. Rather, the amount of the PBM's markup varies contract by contract and over time, depending on a variety of factors including the relative bargaining strength and sophistication of the parties involved in negotiating the contract.

7. I have seen this variability play itself out in several different ways. For instance, some of my TPP clients have had contracts in force with the same PBM at the same time. Even though each TPP had a contract with the same PBM, the financial terms of these contracts, including discounts off AWP, dispensing fees, rebate pass through arrangements, and other fees, have differed from one TPP to the next. There is no fixed or standard set of financial terms or markups that apply to all TPP contracts with the same PBM. Different financial terms apply even when different TPPs contract with the same PBM to use the same retail pharmacy network.

8. Similarly, some of my TPP clients have had contracts with different PBMs that permit their members to use the same retail pharmacy network, such as Walgreens or Duane Reade. Even though each TPP uses the same network, the financial terms of the pharmacy benefit, including discounts off AWP and dispensing fees, vary according to the particular terms of each TPP's individual PBM contract. There is no fixed or standard set of financial terms or markups that each TPP pays, even though they have all contracted for their members to use the same pharmacy network.

9. It has also been my experience in assisting clients with RFPs for new PBM contracts that the financial terms for equivalent services vary from PBM to PBM. Even where coverage terms and network access are the same, different bidders will offer different packages of financial terms, including different discounts off AWP, dispensing fees, and other financial terms. That's the reason why many of my clients choose to conduct RFPs — they want to test

3

the market because they know that PBMs' responses are not subject to a rigid formula and instead will vary.

### Percentage Co-Payments by Consumers Are Based on the TPP's Payment To Its PBM

10. While most prescription benefit plans call for a flat co-pay from the plan's members, some of my TPP clients have had plans that use a percentage co-payment. In each instance where one of my TPP clients has adopted a percentage co-pay for its members, the co-payment has been based on the TPP's total contractual reimbursement obligation to its PBM. When the PBM processes the claim on behalf of its TPP client, the PBM calculates the total amount owed by the TPP under the terms of the contract, including ingredient discounts and dispensing fees, and then applies the percentage co-pay to that amount. The PBM informs the pharmacy of the member's co-pay obligation through the PBM's on-line claims adjudication system.

11. I have seen approximately a dozen prescription drug plans or PBM contracts with percentage co-payments structured in this matter, i.e., the consumer pays the pharmacy a specified percentage of what the TPP is obligated to pay the PBM. I have never seen a prescription drug plan or a PBM contract calling for a percentage co-payment based on the amount the PBM pays the pharmacy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of November in Lake Worth, Florida.

_____
Arthur F. Shinn

4

# Exhibit 5
# Filed Under Seal

# Exhibit 6
# Filed Under Seal

# Exhibit 7
# Filed Under Seal