UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME - )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; BERNARD GORTER, SHELLY )<br>CAMPBELL and CONSTANCE JORDAN )<br>)<br>                              Plaintiffs, )<br>)<br>          v.                   )<br>)<br>FIRST DATABANK, INC., a Missouri )<br>corporation; and McKESSON )<br>CORPORATION, a Delaware corporation, )<br>)<br>                              Defendants. )<br>_____ ) | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' POST-HEARING SUBMISSION IN
RESPONSE TO THE COURT'S QUESTIONS**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT .......................................................................................................3

    A.    The Court Should Maintain Its Certification Of The Consumer
        Co-Insurance Class ....................................................................................3

        1.    The calculation of a co-pay........................................................3

        2.    The co-pay class cannot protect itself........................................4

        3.    The co-pay class should continue to the present.........................5

    B.    The IMS Data Provides A Reasonable Estimate Of TPP Damages .......................5

        1.    McKesson shifts its opposition .................................................5

        2.    IMS is the benchmark used in this industry.................................6

        3.    The IMS data reflects a combination of TPP and PBM transactions .........8

        4.    Dr. Hartman double checked that relationship with claims data ...............10

        5.    The TPP-PBM contracts do not evidence a change in the TPP-PBM
            relationship................................................................................11

    C.    The Court Should Not Appoint an Independent Expert...........................................12

        1.    Plaintiffs have met their burden, and there is no need for an
            independent expert ...................................................................12

        2.    Due to the huge dollars offered by defense work, there are no
            "independent experts"................................................................15

            a.    Patricia Danzon.............................................................15

            b.    Robert Pindyck..............................................................16

            c.    Mark Pauly....................................................................16

            d.    Ernst Berndt ..................................................................16

        3.    If not convinced at this stage, the Court can defer the aggregate
            damages issue until after the liability trial .................................17

    D.    Plaintiffs' Proposed Schedule ................................................................19

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Barr Labs., Inc. v. Abbott Labs.*,
1991 U.S. Dist. Lexis 17690 (D.N.J. Nov. 29, 1991),
*aff'd*, 978 F.3d 98 (3d Cir. 1992) ........................................................................7

*Bell Atlantic Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ...........................................................................17

*In re Brand Name Prescription Drugs Antitrust Litig.*,
1999 U.S. Dist. Lexis 12936 (N.D. Ill. Aug. 6, 1999) .......................................7

*In re Cardizem CD Antitrust Litig.*,
218 F.R.D. 508 (D. Mich. 2003) .........................................................................7

*Carnegie v. Household Int'l, Inc.*,
376 F.3d 656 (7th Cir. 2004) ...........................................................................17

*Chisolm v. TranSouth Fin. Corp.*,
194 F.R.D. 538 (E.D. Va. 2000) ..................................................................17, 18

*Hilao v. Estate of Marcos*,
103 F.3d 767 (9th Cir. 1996) ...........................................................................18

*IMS Health, Inc. v. Ayotte*,
490 F. Supp. 2d 163 (D.N.H. 2007) ...................................................................7

*Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*,
777 F. Supp. 330 (D. Del. 1991), *aff'd*, 972 F.2d 1354 (Fed. Cir. 1992) ...........7

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
2005 U.S. Dist. Lexis 11676 (S.D. Ohio June 13, 2005),
*aff'd*, 485 F.3d 880 (6th Cir. 2007) ...................................................................7

*In re Lorazepam & Clorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002) ...........................................................................7

*Merck & Co. v. Teva Pharms. USA, Inc.*,
288 F. Supp. 2d 601 (D. Del. 2003) ...................................................................7

*In re Neurontin Mktg. & Sale Practices Litig.*,
244 F.R.D. 89 (D. Mass. 2007) .....................................................................7, 13

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) ....................................................................6, 7

*University of Colo. Found., Inc. v. America Cyanamid Co.*,
      216 F. Supp. 2d 1188 (D. Colo. 2002),
      *aff'd*, 342 F.3d 1298 (Fed. Cir. 2003) ...............................................................................7

*In re Visa Check/MasterMoney Antitrust Litig.*,
      280 F.3d 124 (2d Cir. 2001)............................................................................................17

## MISCELLANEOUS

3 CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 9:53 (4th ed. 2002) ................................18

7B CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE
AND PROCEDURE § 1781 (2d ed. 1986)........................................................................................18

001821-13  210387 V2

## I.    INTRODUCTION

The Court asked the parties to address the following:  (1) how consumer co-pays are calculated; (2) for further information on the relationship between TPP payments and the amounts reported in IMS data; (3) whether an independent expert would be useful and suggestions for the same; and (4) a trial schedule.  Plaintiffs address each item below.

The evidence clearly demonstrates that the consumer co-insurance obligation is calculated after the AWP discount is applied, and that the co-payment does not include any post-transaction discounts such as rebates.  Support for this comes from the declarations of Dr. McDonough, pharmacist Donald C. Hoscheit, and a report by the Kaiser Family Foundation.  Thus, the co-insurance consumer class damages are not simply derivative of the TPP class damages.  And because Dr. Hartman's model accounts for the impact of changes in the AWP discount and dispensing fee over time, this class should be certified for damages purposes throughout the class period, *if not to the present*.

The evidence is likewise clear that IMS data is a reasonable proxy for TPP payments.  Based on IMS data, Dr. Hartman's damage model calculates payments to retailers and accounts for any diminution in the impact of the Scheme due to the alleged "pushback" or the "squeezing the profits out of retailers."  Thus, the model is not a "zero mitigation" model as McKesson claimed.

Having had its arguments destroyed by operation of the actual model, McKesson shifted position and now asserts that the "real" problem with Dr. Hartman's analysis is that payments reflected in the IMS data do not accurately reflect TPP payments.  But McKesson's new theory fares no better than its old ones.  Numerous courts have relied on IMS data, and the pharmaceutical industry itself uses that data to make billion dollar marketing strategy decisions.  And with good reason.  Although IMS data does contain payments made by PBMs to retailers on

behalf of TPPs, McKesson failed to tell the Court the rest of the story.  Namely, ***IMS data also contains actual TPP payments to retailers because not all TPPs pay retailers through a PBM***. Furthermore, to the extent some of the IMS data includes PBM payments for TPPs, McKesson submits no facts suggesting that, if the IMS data shows that retailers were paid more as a result of the Scheme, that TPPs did not pay more as well.  McKesson has failed to introduce testimony from any of the forty-plus PBMs describing a change in the TPP-PBM relationship that mitigated the impact of the Scheme on TPPs.  Indeed, McKesson's own admissions as to the continuing impact of the Scheme belie such a change.[1]

Plaintiffs have met their burden in proposing an aggregate damage model that is based on reliable data and which reflects changes in the impact of the Scheme as a result of changes in discounts and dispensing fees and rebates.  Hence, Dr. Hartman's proposed damage methodology does not overstate damages, and he has addressed the concerns that the Court articulated in its August 27 Certification Order.

Turning to the issue of an independent expert, for two reasons Plaintiffs do not believe an independent expert should be appointed.  First, it is difficult to find a truly independent expert. For example, all of the individuals submitted by McKesson are deeply committed to the pharmaceutical industry and are anti-plaintiff.  Indeed, although McKesson disingenuously claimed that it had not spoken to these proposed candidates, several of those candidates are members of a consulting firm that advertises McKesson as a client.[2]  There is no way any of these experts are truly unbiased or could afford to support a class certification damages model given the lucrative defense work to which each McKesson candidate is committed.  Second,

---

[1] *See* Plaintiffs' Proffer of Evidence (Dkt. No. 344).

[2] Hopefully, McKesson will be more candid in disclosing other such entanglements in its court filings.

because Plaintiffs have gone further in terms of expert proof than is required by the First Circuit

on a class certification motion, no independent expert is needed.

As to a trial date, Plaintiffs suggest May 5, 2008. If the Court does not certify aggregate

damages, Plaintiffs suggest a possible period of limited supplemental discovery on the aggregate

damage issue after the liability trial, and that a second damages trial should occur in October

2008. Under this proposal there would be no need for a *Daubert* hearing.

## II.    ARGUMENT

**A.    The Court Should Maintain Its Certification Of The Consumer Co-Insurance Class**

**1.    The calculation of a co-pay**

The Court inquired as to how a co-insurance calculation works. Dr. McDonough answers

that question as follows:

> [F]or the purpose of the co-insurance calculation, the health
> plan's total pharmacy cost for a given prescription included the
> AWP discount paid by the TPP and the dispensing fee. However,
> it did **not** include any post-transaction discounts such as rebates.
> For example, if the AWP for a given brand name drug is $100 and
> the TPP was paying AWP-15% plus a $2.00 dispensing fee per
> prescription, and a consumer was making a 20% coinsurance
> payment, that consumer would have paid 20% of $87.00, or
> $17.40. A pharmacist . . . receives a point-of-sale transmission
> from the PBM telling the pharmacist how much to charge.
>
> The reason that co-insurance calculation does not include
> rebates or other post-transaction adjustments is simple: the value
> of the rebate is not known at the time that the prescription claim is
> adjudicated. PBMs invoice manufacturers for rebates on a
> quarterly basis. The rebate value will fluctuate based on factors
> such as the market share of the drug utilization in comparison with
> its competitors and formulary considerations. As such, the exact
> value of the rebate is not known at the time of the claim
> transaction. Therefore, in most cases, rebates could not and are not
> included in calculating what a consumer pays.[3]

---

[3] Declaration of Kimberly McDonough Regarding Various Issues Raised by the Court
During the November 13, 2007 Hearing ("McDonough 11/27 Report"), at ¶¶ 2-3.

Her opinion is corroborated by the Henry J. Kaiser Family Foundation's report entitled

*Cost Containment Strategies for Prescription Drugs: Assessing the Evidence in the Literature*

(March 2005). Section 3e of that report describes co-insurance payments as follows:

> ***An issue with coinsurance is that it is likely to be based on a price that may not be the final transaction price. Coinsurance is based on the retail transaction price before any rebates are taken into effect.*** If the final amount paid is reduced by rebates or other considerations outside the retail transaction, then the beneficiary's share of the payment is actually higher than the nominal coinsurance amount. [Emphasis added.][4]

This opinion is also supported by Donald C. Hoscheit, a pharmacist who has been in the

business since 1972. Mr. Hoscheit concurs with Dr. McDonough and knows of no "case where a

manufacturer's rebate directly impacted the co-pay paid by the patient."[5] Mr. Hoscheit opines

that, if AWP increased as a result of the Scheme, the effect was to increase the class members'

co-payment. Mr. Hoscheit has modeled how this would work.[6]

The bottom line is that, to the extent TPP damages were mitigated by rebates as claimed

by Willig, damages for the consumer co-pay class are not simply derivative of the TPP damages

as Willig asserts. And because Dr. Hartman's model accounts for any changes in the AWP

discount and dispensing fees reflected in the IMS data, there is no reason to decertify this class.

### 2.    The co-pay class cannot protect itself.

In its August 27 Certification Order, the Court observed that, if a TPP damage class was

certified for a one- or two-year period, the large TPPs could protect themselves for the balance.

---

[4] *Id.* (citing report, a copy of which is attached to the Declaration of Steve W. Berman In Support Of Class Plaintiffs' Submission In Response To The Court's Questions ("Berman Decl.") as Ex. 1).

[5] Declaration of Donald C. Hoscheit In Support Of Plaintiffs' Motion For Class Certification at ¶ 4.

[6] *Id.* at ¶¶ 5-6.

This might be true for some TPPs, but certainly not the small and Taft Hartley Fund TPPs. Furthermore, it is not true for the consumer class, and, absent complete class certification, McKesson will retain the benefits of the $200 million plus in single damages that McKesson's Scheme inflicted on consumers.

###    3.    The co-pay class should continue to the present

Class Counsel initially proposed a class period cut-off of March 2005, the date FDB announced it was no longer conducting surveys.  However, this cut-off was proposed prior to discovery.  Discovery has proven that FDB's "disclosure" did not alert TPPs to the Scheme or to the artificial inflation of AWP.  There is little evidence to suggest that a roll-back of the increase has occurred even as of today.  ESI's Annual Report, discussed below, suggests it has not.[7]  And there is no knowledge consumers were aware of the Scheme.  Thus, consumer co-pay damages continue to the present, and the certified consumer class period should end on the date of the Certification Order, or August 27, 2007.[8]

## B.    The IMS Data Provides A Reasonable Estimate Of TPP Damages

###    1.    McKesson shifts its opposition

McKesson's opposition to aggregate damages now rests on a new tactic.  Dr. Hartman has indicated from his *first* report that he would use IMS data as a proxy for TPP payments.  In opposing class certification, McKesson did not challenge the use of IMS data and instead asserted that "TPPs received full recoupment,"[9] that "many TPPs" discovered "the mark up," and, most importantly, that vigorous PBM competition "squeezed all of the profit out of

---

[7] One reason for this is a lack of transparency.  Another is that even if a TPP knew of the Scheme in 2005, the Scheme involved just some of the thousands of drugs in the marketplace, and contracts are not negotiated on a drug-by-drug basis.

[8] If the Court chooses August 27 as the end date, Dr. Hartman will promptly update the damage model.

[9] *See*, *e.g.*, McKesson's Second Supplement to the Class Certification Record at p. 2.

retailers" and that "PBMs recouped" and passed that money to TPPs "**sure as shooting**."

5/22/07 Hearing Tr.  Each of these points turned out to be demonstrably false, as evidenced in

part by ESI's admission in its Annual Report that, if AWPs are rolled back as a result of the FDB

settlement, it would have an adverse impact on mail order margins as well as retail pharmacy

pricing.[10]  Plaintiffs submit that this ESI admission simply eviscerates the recoupment assertions

made by McKesson and Willig.  Consequently, and after three years of litigation and hundreds of

pages of class certification papers, McKesson turned to attacking Dr. Hartman's use of IMS data.

The Court therefore inquired as to the "foundation" for Dr. Hartman's opinion.  The

foundation is as follows.

### 2.    IMS is the benchmark used in this industry

IMS is the "gold standard" used by experts inside and outside the industry and by courts

to analyze transactions in the pharmaceutical industry.  Indeed, just two days after the class

certification hearing, Dr. Richard Frank of the Harvard School of Public Health analyzed market

penetration of generic drugs using the same IMS-NPA data.[11]

The use of IMS data to measure TPP damage has been approved by other courts.  In *In re*

*Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685, (S.D. Fla. 2004), the Court noted:

> In the Fourth Amended Complaint, Plaintiffs allege that between
> October 1995 and August 1999, Hytrin was the highest-margin
> product of Abbott's Pharmaceutical Products Division, with total
> sales of Hytrin exceeding $1.75 billion.  *See* Compl. at ¶ 10.
> ***Based on these sales figures, and using IMS data***, Indirect
> Purchaser Plaintiffs have posited that in each of the seventeen
> remaining **classes**, the most conservative estimate of the number of
> **class** members ranges from roughly 3,200 (North Dakota) to nearly
> 150,000 (California).  *See* Supplemental Measures of Class

---

[10] *See* ESI annual report summarized in Class Plaintiffs' illustratives for the November 13, 2007 Hearing at Slide 27.

[11] Report of Raymond Hartman Regarding the Reliability of IMS Data For Calculating Aggregate Class Damages ("Hartman 11/28 Report") at ¶ 3.

Damages, attached to IPPs' Pre-Argument Submission on Class
Certification as Ex. K.

In a footnote the *Terazosin* Court described IMS data as follows:

IMS monitors prescriptions, compiling data by product and by
distribution channel for a number of customers, including
pharmaceutical companies. As Indirect Purchaser Plaintiffs noted
at the March 12, 2004 oral argument, Abbott itself also relied on
IMS data to predict the impact that generic entry would have on
the market. Abbot has not disputed this. [*Id*. at n.20.]

In *Terazosin*, both experts relied upon IMS data and ***the defense expert was a partner of***

***Dr. Willig***.[12]  In numerous recent cases involving the pharmaceutical industry, IMS data has been

used to establish market share, impact or damages, including damages for third-party payor

classes.[13]

---

[12] Hartman 11/28 Report at ¶ 3 & n.5.

[13] *See*, *e.g.*, *In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 110 (D. Mass.
2007); *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 2005 U.S. Dist. Lexis 11676, at *14 (S.D.
Ohio June 13, 2005), *aff'd*, 485 F.3d 880 (6th Cir. 2007); *In re Terazosin Hydrochloride
Antitrust Litig.*, 220 F.R.D. at 685; *Merck & Co. v. Teva Pharms. USA, Inc.*, 288 F. Supp. 2d
601, 630 (D. Del. 2003); *University of Colo. Found., Inc. v. Am. Cyanamid Co.*, 216 F. Supp. 2d
1188, 1196 (D. Colo. 2002), *aff'd*, 342 F.3d 1298 (Fed. Cir. 2003); *In re Lorazepam &
Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 384 (D.D.C. 2002); *Barr Labs., Inc. v. Abbott
Labs.*, 1991 U.S. Dist. Lexis 17690, at *14 (D.N.J. Nov. 29, 1991), *aff'd*, 978 F.3d 98 (3d Cir.
1992); *Imperial Chem. Indus., PLC v. Danbury Pharmacal, Inc.*, 777 F. Supp. 330, 367 (D. Del.
1991), *aff'd*, 972 F.2d 1354 (Fed. Cir. 1992).

Courts consistently recognize the reliability of IMS data. *See*, *e.g.*, *In re Cardizem CD
Antitrust Litig.*, 218 F.R.D. 508, 526 (D. Mich. 2003) (describing IMS as "the recognized
industry leader in data collection for the pharmaceutical industry"); *In re Brand Name
Prescription Drugs Antitrust Litig.*, 1999 U.S. Dist. Lexis 12936, at *6 (N.D. Ill. Aug. 6, 1999)
(describing IMS as the "leading provider of pharmaceutical purchase and sales information" and
acknowledging that the IMS database "tracks almost every unit of sales-through wholesalers,
mail service distributors, warehousing claims, re-packagers and manufacturer direct sales-for
more than 90 pharmaceutical companies"); *IMS Health, Inc. v. Ayotte*, 490 F. Supp. 2d 163, 165
(D.N.H. 2007) (describing IMS and Verispan as "the world's leading providers of information,
research, and analysis to the pharmaceutical and health care industries," and stating that
collectively the two entities "acquire and analyze data from billions of prescription transactions
per year throughout the United States").

As Dr. Hartman observes, his foundation for relying on IMS data as an accurate estimate of TPP expenditures includes use of IMS data over a ten-year period in a variety of contexts while never encountering a claim that the IMS data did not serve as a reflection of TPP payments.[14]

### 3.     The IMS data reflects a combination of TPP and PBM transactions

As part of its new challenge to the damage model, McKesson boldly asserted that "IMS is telling us the data does not reflect TPP payments."  11/13/07 Hearing Tr. at 26.  McKesson is wrong and has seriously misled the Court in this respect.

As Dr. Hartman notes, IMS itself represents that its sources for its National Prescription Audit ("NPA") data includes sources such as "3rd Party" payment data.  While McKesson continues to incorrectly maintain that all of this "3rd Party" data reflects *only* PBM transactions at the retail level, this is not the case.  The IMS manual describes the NPA data relied upon by Dr. Hartman as follows:

> The retail survey activity generating the NPA data also generates the Retail Method of Payment Report, which is the basis for the classification of retail transactions.  According to IMS, Information Services Manual 2002, Chapter 30:  Retail Method-of-Payment Report, pp. 30-32:
>
>> Retail Method-of-Payment (RMOP) Report is designed to provide insight into the size and characteristics of the managed care industry.  ***The product reports dispensed prescription data on all cash, third party, and Medicaid transactions through retail pharmacies....***  The universe for RMOP includes all retail pharmacies (approximately 51,000) in the entire United States....  The RMOP Report

---

[14] Hartman 11/28 Report at ¶ 9.  Compare Dr. Hartman's extensive experience that is the foundation for his opinion, in addition to the other work described in his report, with Dr. Willig, who from his resume has no special expertise in this area and makes no mention of working on any matters involving IMS data.  *See* Willig resume attached as Ex. 6 to the Berman Decl.

is a benchmark tool that you can use to determine the
impact of managed care on your business.[15]

The IMS manual does not claim the TPP data is exclusively derived from PBM-
pharmacy transactions.  ***Nor could it since not all TPPs use PBMs***.  Simply put, part of the IMS
data used in the damage model is in fact from actual TPP-pharmacy direct transactions.  Once
again, McKesson has over-reached in claiming that the IMS data reflects only payments by
PBMs to pharmacies.

As Dr. Hartman explains, the IMS data summarizes sales by three distinct groups:  TPPs,
uninsured cash payees and Medicaid beneficiaries.[16]  The TPP database includes direct payments
by TPPs because not all TPPs use PBMs:

> Some payors included in the TPP aggregate do not use a PBM;
> many do.  ***While asserting that the IMS data represents PBM
> rather than TPP reimbursements, McKesson makes no
> affirmative showing of the percentage of total reimbursements
> accounted for by PBMs for the TPP payor group***.  IMS
> aggregates these data over all three groups; their basic NPA survey
> product is this aggregation.[17]

A certain portion of the PBM payment data that IMS relies on would also include
payments made by PBMs acting strictly as claims administrators.  In that instance, PBMs would
pay precisely what the TPPs contracted with the retailers to pay because the reimbursement
agreement is between the TPP and the retailer, and not between the PBM and the retailer.[18]

---

[15] Hartman 11/28 Report at ¶ 4 n.6.

[16] Hartman 11/28 Report at ¶ 4.

[17] *Id*. at ¶ 4 (emphasis in original).  *See also id.* at ¶ 11, where Dr. Hartman explains how McKesson's reliance on the Philpot Declaration either misses or misrepresents what that declaration ***does not*** say about IMS data.

[18] Berman Decl., Ex. 7 (Deposition of Matthew A. Gibbs at 64:9 – 65:12 (noting that some TPPs use PBMs as claims administrators, and some PBMs, like Argus, generally only provide claims administration)).

Thus, there are two portions of the IMS database that without question reflect direct TPP payments to retailers. McKesson did not reveal this to the Court and did not quantify what portion of the data is in fact a PBM payment for a TPP. Nonetheless, the model is reliable even though *some* unidentified portion of the IMS data being used reflects prices paid by PBMs on behalf of TPP clients. As Dr. Hartman demonstrates, the IMS retail data shows that, at the aggregate level, the prices paid for the Scheme-impacted drugs rose in response to the Scheme and remain elevated throughout the class period.[19] Based on his considerable experience in using IMS data, and corroborated by a cross-check on actual claims data (discussed below), Dr. Hartman concluded that IMS data is therefore a reasonable proxy for TPP payments. He bases this opinion, in part, on the lack of any evidence to suggest that the TPP-PBM relationship changed in this period in response to the Scheme such that the portion of the IMS data based on PBM payments is not an accurate reflection of TPP payments. The reliability of the PBM data as a proxy is corroborated by Dr. McDonough, who opines that the TPP-PBM relationship did not change.[20] Hence, the rise in prices reflected in the IMS data (which consists of both TPP and PBM transactions) is an accurate reflection of the Scheme's impact on the Class.

###    4.    Dr. Hartman double checked that relationship with claims data

To further test the reliability of the IMS data as a proxy for the impact of the Scheme on TPPs, Dr. Hartman ran an analysis of the claims data of Cigna and GE. This data showed the same impact on Cigna and GE that he observed from analyzing the IMS data.[21] More

---

[19] *See* Class Plaintiffs illustratives for the November 13, 2007 Hearing on Aggregate Damages at 11.

[20] McDonough 11/27 Report at ¶¶ 6-10.

[21] Hartman 11/28 Report at ¶¶ 15-18.

specifically, the average inflation in reimbursement rates found in the IMS data was mirrored by

inflation for these two specific TPPs, or as Dr. Hartman states:

a)  As expected, for each drug the average monthly amount
    reimbursed by Cigna and booked in their claims data was
    less than the amount reflected by the IMS data.  However,
    ***this amount was nearly constant over time for each drug
    and quite similar across drugs***.  Specifically, the average
    amount paid by Cigna in its claims ***for all*** drugs was 88%-
    92% of the average IMS reimbursement amount.  For each
    drug, the proportion was more constant than the proportion
    over all drugs.  *See* Attachment B.1.

b)  ***This finding certainly undermines McKesson's strong
    assertions that there is no constant relationship between
    TPPs payments to PBMs and IMS measures of
    reimbursement at retail.  This finding certainly
    contradicts McKesson's assertions that I am wrong.  This
    finding certainly indicates to the Court that there is a
    correlation between IMS reimbursement data and the
    TPP claims data. . . .***

    • There is essentially a ***constant relationship*** between the
      Cigna claims data and the IMS data.  The Cigna claims
      data and the IMS data are ***consistently correlated***.  If
      Dr. Willig has opined that constancy "***can't be the
      case***," he is wrong in the case of Cigna.  If the
      "***constant relationship theory makes no sense,***" why
      do we find a constant relationship in the real world?

    • If there were significant mitigation on the part of Cigna
      relative to all other payors, the ratios of the average
      Cigna claim amount relative to the average IMS
      reimbursements at retail should systematically and
      measurably decline over time over all drugs.  ***They do
      not.***[22]

5.    **The TPP-PBM contracts do not evidence a change in the TPP-PBM
      relationship**

At this point, Dr. Hartman has demonstrated a price response in the IMS data that

continues throughout the class period.  If McKesson is correct in representing that the IMS data

---

[22] Hartman 11/28 Report at ¶ 15(a) and (b) (emphasis in original).

is not an accurate proxy for TPP payments (even though some of the data comes from TPPs), this has to be due to a change in the TPP-PBM relationship during the class period. But such a change did not occur. Bear in mind that, over a ten-year period, there was a linear progression in discounts off of AWP.[23] With the IMS data showing a price increase in reaction to the Scheme, the only way the IMS data does not reflect TPP damages is if TPPs reacted out of the ordinary to claw back the increase. But as Dr. McDonough confirms, this did not happen in the real world.[24] Moreover, an examination of actual TPP-PBM contracts shows there was no change in the relationship outside of the linear pre-Scheme progression. For example, Harvard Pilgrim's contract is at AWP-15% for retail brand from 2000 until 2004 despite periodic renegotiations to the contract in the period.[25] After four years, the discount increased by only 1%. The reimbursement rates at Preferred Health, Masters Mates & Pilots, MVP Health Plan, and PRAM remained constant throughout the class period. This real evidence, as opposed to Willig's speculation, confirms the reasonableness of relying on IMS data as a proxy for TPP payments.

**C.    The Court Should Not Appoint an Independent Expert**

**1.    Plaintiffs have met their burden, and there is no need for an independent expert**

It is important to remember where this started. McKesson and Willig originally opposed class certification by asserting that PBMs, in order to compete for TPP business, exposed the Scheme and recouped the damages. McKesson was unable to prove recoupment, and the damages model based on real data shows that this did not occur. Willig also asserted that TPPs vigorously responded, even though that he has no experience with TPPs or PBMs, and no special

---

[23] McDonough 11/27 Report at ¶ 9.

[24] McDonough 11/27 Report at ¶¶ 6-10.

[25] Berman Decl., Ex. 2.

expertise in the health care industry. McKesson could not prove Willig's theory despite years of discovery of the TPPs, and Dr. McDonough, a real world participant, opines to the contrary. This led McKesson to attack the IMS data, but, as set forth in great detail above, this attack also fails.

Given the foregoing, Plaintiffs have satisfied their burden of proffering a means by which to prove aggregate damages, and there are "no fundamental flaws" in the model as McKesson suggests. An independent expert is not warranted in these circumstances. All McKesson has done is to speculate that the model is unreliable. Such speculation should not defeat certification.[26] This is particularly true when one looks at all the evidence supporting Dr. Hartman, including:

1. Testimony from TPPs that they were unaware of the Scheme and did not push back.

2. McKesson's 2004 admissions of the Scheme's impact – (summarized in Plaintiffs' Proffer of Evidence, Dkt. No. 344).

3. The real world experience of Dr. McDonough, who did not witness any of the events that Willig now speculates occurred.

4. McKesson's inability to present a comprehensive contract- and data-based analysis demonstrating a reaction to the Scheme and a claw-back of its effects.

And Plaintiffs urge the Court to examine McKesson's arguments with skepticism for the following reasons:

1. There are over 40 PBMs in the country. If recoupment was central to McKesson, why did they only depose one PBM,

---

[26] The proper touchstone with which to evaluate Dr. Hartman's model is the well-recognized rule that courts have not required absolute precision as to damages and have allowed damages to be proven by reference to the class as a whole. *In re Neurontin Mktg. & Sales Practices Litig.*, 244 F.R.D. 89 (D. Mass. 2007).

(ESI), who refuses to turn over its purported "recoupment" analysis?

2.   Why did McKesson not subpoena the TPP-PBM relationship data from PBMs?

3.   Why did McKesson not provide the Court with TPP data showing any change in the TPP–PBM relationship which would corroborate its attack on use of the portion of IMS data that is from PBM payments?

4.   Why did McKesson, the 18th largest company in the U.S. with unlimited resources at its disposal, not find a fact witness/expert similar to Dr. McDonough?

5.   Why did McKesson procure declarations that obscure the truth?  For example, the Caremark declaration saying the price increase was "taken to account."  What does that mean?  It does not say that this PBM changed its relationships with TPPs or in any way squeezed retailers for the benefit of TPPs.  Why does this declaration not address squarely the assertions made by Willig/McKesson?

Instead, McKesson relies on Dr. Willig, whose resume indicates no prior expertise with

TPPs or PBMs, and limited pharmaceutical experience, and whose partner in another case relied

upon the IMS data McKesson now attacks![27]  McKesson has not shown that the model is flawed,

and its constantly shifting and unfounded assertions do not warrant engaging an independent

expert so that this process can continue to drag out in the hopes that someone – anyone – can

come up with evidence that McKesson, with all of its resources, has been unable to introduce

thus far.   Plaintiffs submit that an independent expert – even if one can be found – is not needed.

---

[27] Hartman 11/28 Report at ¶ 3, n.5.

**2.    Due to the huge dollars offered by defense work, there are no "independent experts"**

Although they do not believe an independent expert is needed, Plaintiffs suggested Professor Joe Newhouse.[28]  McKesson objected to his appointment on the grounds that he serves on a class member's Board of Directors.

Plaintiffs have made an attempt to identify a truly "independent" expert.  However, we have been unable to do so.  There are vast sums of money to be made by experts testifying on behalf of the industry.  Each candidate that McKesson proposes has deep ties to the pharmaceutical industry or the defense bar and, therefore, makes it highly unlikely that they could opine in an unbiased fashion on the issue of class certification.

**a.    Patricia Danzon**

Ms. Danzon consults for Pfizer, Merck and Aventis all of whom have proposed class actions pending against them.  Testifying in favor of a certified class would endanger these consulting contracts, as well as the consulting relationship she has had with the industry trade group Pharmaceutical Research and Manufacturers of America.  Further, she is a member of the American Enterprise Institute, an organization opposed to class actions.[29]  Ms. Danzon is so biased in favor of the industry that, in an August 2002 presentation on AWP, she claimed that pharmaceutical companies do not profit from inflated AWPs[30] – a position contrary to Dr. Berndt's opinion and the findings of this Court in the AstraZeneca and BMS trials.  This certainly evidences her strong industry bias.

---

[28] His resume is attached as Ex. 5 to the Berman Decl.  Further, Ms. Danzon is affiliated with Wharton.  Wharton proudly highlights McKesson in its "sponsor profiles."  Both Danzon and Pauly thus work at an institution with economic ties to McKesson.

[29] Berman Decl., Ex. 4.

[30] Berman Decl., Ex. 3.

### b.     Robert Pindyck

McKesson tendered Pindyck claiming it had not been in contact with him.  However, Mr. Pindyck works for the Analysis Group, which lists on its website **McKesson** as a client. Members of this group are thus hardly independent with respect to McKesson.  In addition, the group's clients include a virtual "Who's Who" of pharmaceutical companies, all of whom have opposed class certification in various cases on a regular basis.

### c.     Mark Pauly

Mr. Pauly's clients include Amgen, Merck and Glaxo according to the rather limited information listed on his website.  Again, each of these companies have cases pending against them in which TPPs and consumers seek a class and the company opposes class certification. Mr. Pauly can hardly be unbiased when an opinion in plaintiffs' favor in this case would run counter to his economic interests.[31]

### d.     Ernst Berndt

It would be unfair to appoint Dr. Berndt.  McKesson has embraced his AWP opinions, and he in effect would be called upon to review his prior opinions about purported competition among PBMs.  He would thus enter the fray with a built-in bias.  Moreover, since opining in the AWP matter, Dr. Berndt has been a frequent and well paid consultant to the pharmaceutical industry and, as such, cannot afford to render an opinion in favor of a certified class, particularly when he serves as the opposing expert in the *Zyprexa MDL* on class certification, a case where Hagens Berman is co-lead counsel.

---

[31] Although the hearing was on November 13, McKesson waited until late on November 26 to suggest so-called "independent" experts, giving Plaintiffs limited time to check these persons' backgrounds.  Plaintiffs would welcome the opportunity for further input should the Court be considering any of the experts proposed by McKesson.

**3.     If not convinced at this stage, the Court can defer the aggregate damages issue until after the liability trial**

Plaintiffs have demonstrated the feasibility of an aggregate damages trial.  But if the Court is not yet ready to certify the TPP class for aggregate damages, Plaintiffs suggest that the parties proceed to the liability trial in May, followed by a separate, and shorter trial on aggregate damages if a liability verdict results.

Under this alternative proposal, class members would be provided two opt out opportunities – one prior to the liability trial and another prior to a damage trial if damages were certified.  This in no way would offend due process, and if McKesson prevails at the liability trial, the class would be bound by the judgment, thereby eliminating entirely the need for a remedial stage.  The benefits to proceeding in this manner are that it would pave the way for a prompt liability trial without any Rule 23(f) delays and would allow the parties, after the liability trial, to focus on any further data that could be gathered on aggregate damages.

It is common for courts to try class actions in two phases, with a second phase resolving damage claims (either in the aggregate or on a class member-by-class member basis).  *See, e.g., Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (commenting that Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues, including (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va.

- 17 -

2000); *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996); 3 CONTE & NEWBERG, NEWBERG

ON CLASS ACTIONS, § 9:53 at 429-30 (4th ed. 2002) (collecting cases); 7B CHARLES A. WRIGHT,

ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1781 (2d ed.

1986); *see also* Fed. R. Civ. P. 23(e)(4) ("When appropriate . . . an action may be brought or

maintained as a class action with respect to particular issues[.]").  Thus, the Court can certify a

damages class now or wait to address that issue until after a liability determination.  If Plaintiffs

prevail on liability, the Court can certify an aggregate damages class or hold individual damages

proceeding under the auspices of a special master.

       And Rule 23(d)(2) contemplates multiple notices if necessary:  "In the conduct of actions

to which this rule applies, the court may make appropriate orders . . . requiring, for the protection

of the members of the class or otherwise for the fair conduct of the action, that notice be given in

such manner as the court may direct to some or all of the members *of any step in the action*, or

of the proposed extent of the judgment, or of the opportunity of members to signify whether they

consider the representation fair and adequate, to intervene and present claims or defenses, or

otherwise to come into the action. . . ."  (Emphasis added.)  As the comments to Rule 23(d)(2)

highlight, "Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its

availability and invokes the court's discretion."  In other words, the Court has the discretion to

direct notice to the class at different stages of the litigation if need be.

       Case law also supports the deployment of two notices to the class in a bifurcated trial.  In

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996), which involved a bifurcated trial, the

district court in 1991 certified a class composed of all citizens of the Philippines who, between

1972 and 1986, were tortured, summarily executed or disappeared by the Philippine military or

paramilitary groups.  *Id.* at 771.  Certain plaintiffs opted out of the class and continued to pursue

their cases directly alongside the class action. A liability trial was held in September 1992, resulting in a verdict in favor of the class. *Id.* at 772. A second notice was then provided to class members advising that they must file a proof of claim form in order to opt into the class. Approximately 10,000 claim forms were filed. *Id.* A punitive damages trial in February 1994 was held before the same jury that determined liability, followed by a compensatory damages trial in January 1995 before, again, the same jury. *Id.* The jury awarded compensatory damages in the aggregate based on a random sample of plaintiffs as representative of the injuries suffered by those in the class. *Id.* at 784.

**D.    Plaintiffs' Proposed Schedule**

Plaintiffs propose that the trial start either May 5 or June 2, 2008. If the Court does not certify aggregate damages, the notice to the class can go out immediately because the Court has already certified the class. Assuming the Court decided by January 1 or February 1, Plaintiffs propose a 60-day notice period with an opt-out deadline of March 1 or April 1. Under this proposal, the parties could be ready for trial in May or June. Plaintiffs propose that each side receive five trial days.

McKesson suggests a July trial. Plaintiffs' counsel is unavailable June 23 through July 11, but otherwise believe that a July trial after this is too late if the Court's law clerks are to leave the end of August and if the Court allows McKesson 20 days of trial for its defense alone.

DATED:  November 28, 2007

By  /s/ **Steve W. Berman**

    Steve W. Berman
    Sean R. Matt
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile:  (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Assocsiates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 20 -

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13 210387 V2

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 28, 2007.


/s/ Steve W. Berman
Steve W. Berman