UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,<br><br>                  Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                  Defendants. | Civil Action No.: 1:05-CV-11148-PBS |

**DECLARATION OF KIMBERLY PLY MCDONOUGH, R.PH.
REGARDING VARIOUS ISSUES RAISED
BY THE COURT DURING NOVEMBER 13, 2007 HEARING**

1.    I have reviewed the transcript of the November 13, 2007 hearing before the Court. I submit this Declaration to respond to various questions posed by the Court at that hearing.

**Consumer Coinsurance Payments**

2.    I understand that the Court wanted to know on what number consumer coinsurance payments are based. Under a co-insurance program, the member's cost is usually reflected as a percentage of the health plan's total pharmacy cost for each prescription.

3.    During the class period, for the purpose of the co-insurance calculation, the health plan's total pharmacy cost for a given prescription included the AWP discount paid by the TPP and the dispensing fee. However, it did *not* include any post-transaction discounts such as

rebates. For example, if the AWP for a given brand name drug was $100 and the TPP was paying AWP-15% plus a $2.00 dispensing fee per prescription, and a consumer was making a 20% coinsurance payment, that consumer would have paid 20% of $87.00, or $17.40. A pharmacist knows how much to charge a consumer because the pharmacist receives a point-of-sale transmission from the PBM telling the pharmacist how much to charge.

      4.      The reason that co-insurance calculation does not include rebates or other post-transaction adjustments is simple: the value of the rebate is not known at the time that the prescription claim is adjudicated. PBMs invoice manufacturers for rebates on a quarterly basis. The rebate value will fluctuate based on factors such as the market share of the drug utilization in comparison with its competitors and formulary considerations. As such, the exact value of the rebate is not known at the time of the claim transaction. Therefore, in most cases, rebates could not and are not included in calculating what a consumer pays.

      5.      I have reviewed The Henry J. Kaiser Family Foundation's report entitled *Cost Containment Strategies for Prescription Drugs: Assessing the Evidence in the Literature* (March 2005). Section 3e of that report describes co-insurance payments as follows:

> **3e. Coinsurance**
> In contrast to copayment systems, where a flat dollar amount (or series of different amounts based on tiers) is established for a drug claim, a coinsurance system establishes a percentage of the allowed drug cost as the patient's responsibility. The Medicare Modernization Act established a coinsurance system for the new Medicare Part D benefit. According to a 2003 survey of employers, the percentage using coinsurance increased from 22 percent in 2001 to 30 percent in 2003. Some plans use coinsurance only for second-tier or third-tier drugs, while using a flat copayment for the generic drugs in the first tier. In addition, some plans cap the amounts for the coinsurance-based cost sharing (PBMI).
>
> . . . .

> ***An issue with coinsurance is that it is likely to be based on a price that may not be the final transaction price. Coinsurance is based on the retail transaction price before any rebates are taken into effect.*** *If the final amount paid is reduced by rebates or other considerations outside the retail transaction, then the beneficiary's share of the payment is actually higher than the nominal coinsurance amount. In addition, coinsurance may be less popular for patients because the amount owed is unpredictable.*

(Emphasis added.) I agree with the statements quoted above and believe they support my assertions of how consumer coinsurance payments are calculated.

### TPP "Renegotiation"

6. I also understand that this Court wanted to know whether IMS data from retailers is an appropriate proxy for TPP payments. I am not familiar with IMS data and, because it is so expensive, have not used it in working with my clients. I do know from my experience as a pharmacist as well as a consultant that it is not uncommon for PBMs to pay pharmacies at rates lower than what they charge TPPs.

7. However, as I have previously opined in my Expert and Rebuttal Reports, as well as my Tutorial, I have seen no evidence that PBMs renegotiated their TPP contracts in response to the AWP to WAC increase. I have likewise seen no evidence that TPPs got anything back to compensate them for their increased drug costs after the AWP to WAC increase occurred.

8. This general observation is also consistent with my knowledge, set forth in my opening and rebuttal reports, that none of my TPPs knew that the AWP to WAC ratio had increased because of fraud and with my previous opinions that PBMs would *not* have been motivated to renegotiate their contracts with TPPs because their mail order divisions made money off the increase in AWP to WAC ratio.

9. The 2006 *Prescription Drug Benefit Cost and Plan Design Survey* prepared by Takeda Pharmaceuticals and cited in my opening report, reported that brand reimbursement

levels, expressed as a percentage of the AWP price, dropped at a steady and consistent level for a 10-year period, from 1995 through 2006. This data is reflected in the chart below:



**Brand Reimbursement by TPPs**

If a price correction to compensate for the AWP inflation of 2002 had occurred, it would have been reflected in the prices reported for this survey, either as a one-time dramatic drop in 2002 or as an increase in the rate of price reduction after 2002. Neither event is apparent in the data.

10.     Indeed, had my TPP clients managed to recover their increased drug costs after the AWP to WAC ratio increased they would not be coming to me, as I described in my October 29, 2007 Rebuttal Report, to ask me to review First DataBank pricing files to respond to certain PBMs' proposals that TPPs agree to preserve the relative economic relationship of the parties in the event of a change in the methodology used to determine AWP – due to Plaintiffs' settlement with First DataBank or otherwise.

**The PBM "Squeeze"**

11.     I read in the November 13 hearing transcript that McKesson claims I admitted that the PBMs had "squeezed" the retailers after the AWP to WAC price increase. That is not accurate. The part of my September 14, 2007 Declaration that McKesson is quoting says: "[a]s the PBM industry learned of the change in AWP to WAC ratio, they were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for the increased profit margins." Page 13.

12.     I do not have any direct knowledge of whether any specific PBM "squeezed" profits out of the pharmacies and, if so, to what degree they did so. PBM contracts with TPPs rarely require this level of disclosure and PBMs closely guard this information as confidential to their business operations. However, to the extent that PBMs were able to renegotiate contract rates with pharmacies, with rare exceptions, those renegotiated rates were **not** passed through to my TPP clients.

Executed on this 27th day of November, 2007.

*Kimberly P. McDonough*
_____
Kimberly P. McDonough, Pharm. D.

## CERTIFICATE OF SERVICE

      I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on November 28, 2007.

                                          /s/ Steve W. Berman
                                          Steve W. Berman