UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN, Plaintiffs, v. FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, Defendants. | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' MOTION FOR LEAVE TO FILE REPLY TO McKESSON'S RESPONSE TO THE COURT'S INQUIRIES AT THE NOVEMBER 13, 2007 HEARING ON CLASS CERTIFICATION ISSUES**

At the November 13, 2007, hearing, the Court requested additional submissions on, among other things, the issue of whether the IMS data underpinning Dr. Hartman's damages model is correlated to the prices paid by TPPs for drugs. The parties made their submissions on November 28th.

Plaintiffs seek leave to file a short reply to McKesson's submission. Plaintiffs believe that a short reply without adding any declarations new expert declarations would be helpful to the Court for several reasons. First, Plaintiffs just received a new document sent by PBM Express Scripts, Inc. ("ESI") to clients that once again impeaches McKesson's illusory claw-

back defense.  As described more fully in the accompanying memorandum, this ESI letter demonstrates that ESI will seek to adjust the terms of its contracts with TPPs in order to preserve ESI's profits in the face of the changes flowing from the *First Databank* settlement.  This adds to the evidence showing why PBMs did not inform TPPs of the Scheme or seek to claw back the price increase resulting from the Scheme:  simply put, PBMs made more money on the increased spread.

Second, McKesson's post-hearing submission seeks to shift the focus of the debate from whether the IMS data underpinning Dr. Hartman's damages model is correlated to the prices paid by TPPs for drugs and place it instead on a very narrow issue:  whether there is a perfect, 100% "constant relationship" between what the PBMs pay retailers and what the TPPs pay the PBMs.  McKesson Br. at 2-10.  In other words, instead of focusing on whether the IMS data is generally correlated to TPP payments – which is the overriding issue that the Court asked be addressed and which should be addressed when evaluating an aggregate damages model – McKesson seeks to alter the terms of the debate by seeking to prove something that is uncontested.[1]  Plaintiffs' proposed reply addresses this new shift by McKesson, as well as other material submitted by McKesson that goes beyond the scope of the Court's question.

Third, Plaintiffs wish two respond to new material submitted by Dr. Willig and the two new declarations that McKesson submitted from industry participants James Smith and Arthur Shinn.  Given that this testimony is new (even though McKesson has had years to submit it but previously failed to), and that Plaintiffs bear the burden on the motion for class certification, it is only fair that Plaintiffs have an opportunity to address these new submissions.

---

[1] Dr. Hartman and Plaintiffs *never* claimed that a ***perfect*** correlation existed, and Dr. Hartman did not opine that a perfect correlation exists in every TPP-PBM relationship.  Rather, Dr. Hartman concludes that the IMS data, in the aggregate, is generally correlated to TPP payments.

Fourth, McKesson submitted an alternative "game plan," which was not the subject of any pre-filing discussion with class counsel and which proposes very truncated additional discovery of PBMs. Plaintiffs have not yet had an opportunity to respond to McKesson's alternative plan and its unfair discovery proposal.

For the foregoing reasons, Plaintiffs respectfully request leave to file a reply brief, a copy of which is attached hereto as Exhibit 1.

DATED: December 5, 2007

By  /s/ Steve W. Berman
    Steve W. Berman
    Sean R. Matt
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile:  (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Assocsiates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 5, 2007.


/s/ Steve W. Berman
Steve W. Berman

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN | C.A. No. 1:05-CV-11148-PBS |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

**CLASS PLAINTIFFS' REPLY TO McKESSON'S RESPONSE TO THE COURT'S INQUIRIES AT THE NOVEMBER 13, 2007 HEARING ON <u>CLASS CERTIFICATION ISSUES</u>**

# TABLE OF CONTENTS

I.      NEW EVIDENCE FROM EXPRESS SCRIPTS SHOWS THAT PBMS SEEK
        TO PROTECT THEIR PROFITS WHEN AWPS CHANGE AND
        UNDERSCORES WHY PBMS DID NOT RECOUP FOR TPPS THE
        SCHEME'S EFFECTS ...................................................................................1

II.     THE IMS DATA IS A REASONABLE PROXY FOR TPP PAYMENTS.......................3

        A.      A General Correlation Exists Between The IMS Data And The Amounts
                That TPPs Pay For Drugs .......................................................................3

        B.      McKesson's Remaining Arguments Again Miss The Mark...................................4

                1.      The inclusion of Medicaid and U&C payments in the IMS data does not
                        invalidate the aggregate damages model. ....................................................4

                2.      Willig's claims data analysis confirms that TPP payments correlate with
                        the IMS transaction data. ...........................................................................5

                3.      Dr. Hartman and other industry experts, including Dr. McDonough, agree
                        that PBMs earn spreads; but this does not vitiate correlation.....................6

                4.      Variations in spreads, if any, that are not picked up by the aggregate
                        damages calculation will be adjusted for at the allocation phase. ...............8

        C.      The Model Is A Reasonable Estimate Of Aggregate Damages..............................8

III.    MCKESSON'S ALTERNATIVE "GAME PLAN" SHOULD BE AMENDED ............10

## I.    NEW EVIDENCE FROM EXPRESS SCRIPTS SHOWS THAT PBMS SEEK TO PROTECT THEIR PROFITS WHEN AWPS CHANGE AND UNDERSCORES WHY PBMS DID NOT RECOUP FOR TPPS THE SCHEME'S EFFECTS

Plaintiffs previously drew the Court's attention to the following excerpt from ESI's 2006

Annual report, which demonstrates that, absent any mitigating action by ESI, its margins would

decrease as a result of the *First Databank* settlement:

> In the absence of any mitigating action on our part, the proposed reduction in FDB's AWP would have a material adverse effect on the margin we earn on home delivery transactions. It may also create disruption in our retail networks due to the adverse impact on AWP-based retail pharmacy pricing. However, most of our contracts with clients and retail pharmacies contain terms we believe will enable us to mitigate the adverse effect of this proposed reduction in FDB's reported AWP.[1]

Plaintiffs have newly-obtained evidence received today that ESI is now following

through with an effort "to mitigate the adverse effect of this proposed reduction in FDB's

reported AWP" as ESI promised its shareholders that it would do. Attached to the

accompanying Supplemental Declaration of Steve Berman are letters sent by Express Scripts,

Inc. ("ESI") to a plan sponsor.[2] The letters advise that ESI will seek to adjust the terms of its

contracts with TPPs in order to preserve ESI's profits in the face of the changes flowing from the

*First Databank* settlement:

> [O]ur agreement incorporates the concept that if there is change caused by a law or court that materially changes a term or condition of the agreement, we have the right to discuss with you a modification in order to bring the contract back into its intended scope. This letter is intended to confirm our agreement on the steps necessary to maintain pricing stability as intended and not to advantage either party to the detriment of the other.

---

[1] *See* Class Plaintiffs' illustratives for the November 13, 2007 Hearing at Slide 27.

[2] These particular letters were provided to Plaintiffs' counsel by a plan sponsor that does business with ESI.

More specifically, effective as of October 8, 2007 if ESI (i)
maintains AWP as the pricing index with an appropriate
adjustment in the event the AWP methodology and/or its
calculation is changed, whether by the existing or alternative
sources; and/or (iii) transitions the pricing index from AWP to
another index or benchmark (e.g., to Wholesale Acquisition Cost),
Participating Pharmacy, CuraScript and Mail Service Pharmacy
rates, rebates and guarantees, as applicable, will be modified as
reasonably and equitably necessary to maintain each parties'
relative economics before such change is effective.[3] **Should ESI
undertake any of the above, any changes would have the effect
of bringing the parties back to the intended economic position
("price neutrality") under the Agreement such as not to
advantage either party to the detriment of the other**.
[Emphasis in original.]

A critical component of McKesson's defense in this case has been its and Willig's

assertion that PBMs discovered the Scheme, revealed it to thousands of TPP clients, and

instigated a wave of recoupment efforts such that the circumstances of each TPP-PBM contract

must be reviewed to account for this recoupment.  McKesson has failed to present any evidence

that this wave of recoupment occurred, and the foregoing demonstrates additional evidence as to

why:  ESI, like other PBMs, is motivated ***to protect its own profits*** when any changes to the

AWP pricing benchmark occur.[4]

This newly obtained evidence also serves as an example of what ESI could have done,

***but did not do***, when the select AWP increases occurred as a result of the Scheme.  ESI could

have retained Milliman to conduct a pricing review and inform TPPs that they would pay

increased prices as a result of the Scheme's price bump and that, consequently, ESI would

---

[3] An earlier letter from ESI included an additional factor that would impel ESI to change the contract, to wit, if ESI "maintains AWP as the pricing index with an appropriate adjustment as described below, in the event the AWP methodology and/or its calculation is changed, whether by the existing or alternative sources[.]"  *See* the June 22, 2007 letter.

[4] The Court may also recall the ESI internal memorandum acknowledging that the price bump resulting from the Scheme increased ESI's margins.  *See* Ex. 5 to the Declaration of Steve W. Berman in Support of Class Plaintiffs' Reply to McKesson's Opposition to Aggregate Damages for the TPP Class and McKesson's Motion to Decertify the Consumer Class (Dkt. No. 345).

"bring[] the parties back to the intended economic position ("price neutrality") under the Agreement such as not to advantage either party to the detriment of the other." But ESI did not take such action because it benefited from the Scheme, and that fact that it is doing so now shows on a class-wide basis that there was no shift in the TPP-PBM relationship during the class period that would render unreliable the use of IMS retail price data as a proxy for prices paid by TPPs.

## II.    THE IMS DATA IS A REASONABLE PROXY FOR TPP PAYMENTS

### A.    A General Correlation Exists Between The IMS Data And The Amounts That TPPs Pay For Drugs

At the November 13, 2007, hearing, the Court requested additional submissions on, among other things, the issue of whether the IMS data underpinning Dr. Hartman's damages model is correlated to the prices paid by TPPs for drugs. Hearing Trans. at 26. Highlighting the appropriate standard that Plaintiffs need only "produce some evidence" supporting certification, *id.* at 27, the Court properly recognized that Dr. Hartman's "analysis made sense. I mean, this is a critical link [referring to correlation], but if he's right, he shows a certifiable class." *Id.* at 30; *see also id.* at 58 ("And if there's evidence to support the assumption [of correlation], it's likely that the class will be able to be certified.").

Dr. Hartman *is* "right." In their November 28th post-hearing submission, Plaintiffs once again demonstrated that the TPP data is a reasonable proxy for TPP payments – that is, that ***the data is correlated to the prices that TPPs pay for drugs***. Plaintiffs thus answered the Court's correlation question directly, clearly and in the affirmative.

In contrast, McKesson's post-hearing submission dissembles, seeking to shift the focus of the debate from this general correlation and place it instead on a very narrow issue:  whether there is a perfect, 100% "constant relationship" between what the PBMs pay retailers and what

the TPPs pay the PBMs.  McKesson Br. at 2-10.  In other words, instead of focusing on whether

the IMS data is generally correlated to TPP payments – which is the overriding issue that the

Court asked be addressed – McKesson seeks to alter the terms of the debate by seeking to prove

something that is uncontested.[5]  But Dr. Hartman and Plaintiffs ***never*** claimed that a ***perfect***

correlation existed, and Dr. Hartman did not opine that a perfect correlation exists in every TPP-

PBM relationship.  Rather, Dr. Hartman concludes that the IMS data, in the aggregate, is

generally correlated to TPP payments.  Of course, there can be variations between actual

payments and what appears in the IMS database for a particular TPP.  However, based on Dr.

Hartman's extensive experience in this arena, and the fact that other experts rely on IMS data for

these very purposes in litigation, the relationship in the aggregate between what a TPP pays a

PBM for a brand-name drug and what the PBM pays the retailer for that brand name drug is

consistent.

McKesson's brief is simply an attempt to divert the Court from determining the real issue

relating to aggregate damages, to wit, whether the IMS data generally correlates to the prices

paid by TPPs for drugs.

**B.     McKesson's Remaining Arguments Again Miss The Mark**

**1.     The inclusion of Medicaid and U&C payments in the IMS data does not
invalidate the aggregate damages model**

McKesson decided to address issues beyond the scope of the Court's question by

reasserting that the Medicaid and U&C payments included in the IMS transaction data dilute the

data set and contribute to an overstatement of aggregate damages.  McKesson Br. at 10.  Dr.

Hartman has already called the Court's attention to this fact:

---

[5] This is thus the latest iteration of the "McKesson Shift," a defense strategy in which McKesson and Willig throw out hypothetical roadblocks and then shift to a new one each time an old tactic proves incorrect.

> Since the IMS NPA data include all reimbursements by TPPs
> (some portion of which is paid by PBMs), cash payors and
> Medicaid, I expect that the average reimbursement rate in the IMS
> will be greater than the average TPP claims amount, since TPPs
> generally will be better able to negotiate discounts than cash
> payors.  This is to be expected with an average measure over all
> payors.

Nov. 28 Hartman Decl. at ¶ 14 (Dkt. No. 378).

But McKesson fails to tell the Court that Dr. Hartman has already minimized the impact

of Medicaid and U&C payments by subtracting out the aggregate damages attributable to

reimbursement on behalf of Medicaid and all other governmental beneficiaries using data

published by Novartis.  Nov. 28 Hartman Decl. at ¶ 6 (Dkt. No. 378).  Moreover, Dr. Hartman

recently learned that IMS can produce a special data run that would provide the transaction data

by each payor group (TPP, Medicaid and cash payors) beginning with the year 2001.  Despite the

substantial expense associated with obtaining data broken out in this manner, Dr. Hartman can

and will obtain the data to enhance the accuracy of the aggregate damages model.  *Id.* at ¶ 3 n.8,

¶ 22.  Consequently, although the dilution is minimal in the current calculations, dilution

resulting from the presence of Medicaid and cash payor transactions in the data pool will be

eliminated entirely after Dr. Hartman obtains the segregated data and updates the damages

calculations.

    **2.**    **Willig's claims data analysis confirms that TPP payments correlate with the IMS transaction data**

Dr. Willig presents a brief analysis of claims data for GE and CIGNA and concludes that

payments made by these TPPs "differ materially" from what IMS reports and that, therefore, the

IMS data is not reliable and overstates damages.  McKesson Br. at 5-6.  But it is Willig who

overstates his case.  Although the GE and CIGNA claims data do not correlate perfectly with the

IMS transaction data, Dr. Hartman never claimed it did.  Rather, Dr. Hartman explained that ***the***

*correlation was consistent over time and similar across all drugs*.  More specifically, the average amount paid by CIGNA in its claims for all drugs during the time period analyzed was 88%-92% of the average IMS reimbursement amount.  Nov. 28 Hartman Decl. at ¶ 15(a) (Dkt. No. 378).  Tellingly, Willig never disputes these figures.  Dr. Hartman's "spot analysis" of GE and CIGNA claims data reveals a substantial correlation with IMS and hardly constitutes a material difference vitiating application of the model.  And that correlation will only improve when Dr. Hartman updates the model to eliminate any dilution caused by the presence of government and cash payor transactions in the IMS data.

> **3.    Dr. Hartman and other industry experts, including Dr. McDonough, agree that PBMs earn spreads; but this does not vitiate correlation**

After years of litigation, McKesson suddenly brings forward two new witnesses that have purportedly "new" evidence that spreads can be earned by PBMs.  *See* McKesson Br. at 7-9 (citing new declarations submitted by James Smith and Arthur Shinn).  This is hardly revelatory and not new; of course PBMs can earn a spread on the difference between what they pay pharmacies and what they receive from TPPs.  Dr. Hartman already explained this to the Court in showing how PBMs earn significant revenues based on such a spread.  *See, e.g.,* Oct. 29, 2007 Hartman Decl., Attach. E (Dkt. No. 376) (explaining that PBMs earn a spread and showing how an increase in AWP has the immediate effect of increasing the spread that the PBM earns); *id.* at n.1 ("The PBM pockets the difference between what it receives from its client and what it pays the pharmacy . . . .") (quoting from this Court's class certification ruling in AWP); *see also* Raymond Hartman Dep. 156-57 (explaining differences between what TPPs pay PBMs and what PBMs pay retailers).[6]

---

[6] Referencing these same pages of Hartman testimony, McKesson claims that Hartman disavowed that there was any correlation between discounts in the contracts between the PBMs and the retailers and discounts in the contracts between TPPs and PBMs.  McKesson Br. at 3.  But in that slice of testimony, Dr. Hartman was merely

However, these spreads, which are minimal or sometimes non-existent for brand-name drugs, do not impeach the reliability of the IMS data for purposes of showing TPP payments in cases where a differential exists between what the TPP pays the PBM and what the PBM pays the pharmacy. As Dr. Hartman explains, in this context an immediate impact of the Scheme would be to increase PBM margins if, as McKesson claims, the PBMs "squeezed" the retailers in response. Oct. 29, 2007 Hartman Decl., Attach. E at 2 (Dkt. No. 346). Although there is no evidence supporting McKesson's "squeeze" theory, if true this would mean that the IMS data would actually *understate* damages to the TPPs unless there was TPP push back specific to the Scheme. And any TPP claw-backs would shrink the margin, thereby narrowing any gap between the TPP payment to the PBM and the PBM payment to the retailer. *Id.* Further still, there will be many TPP-PBM relationships in which, for competitive reasons, the PBM will not earn a margin on brand-name drugs sold through a retail pharmacy.[7] For these encounters, as well as for those in which the TPP does not use a PBM, the IMS data reflects direct TPP payments to retailers.

---

referring to the fact that a statistician would not be able to calculate a correlation coefficient for the relationship. Such an observation is distinct from opining, as Dr. Hartman has done, that the relationship between the two generally correlates. In other words, it makes little sense to discuss calculating correlation coefficients over time in *contract discount terms* for a TPP and its PBM, but it does make sense to discuss correlation of *claim amounts paid* by a TPP and in turn its PBM. The claims data for GE and CIGNA show a high correlation with the IMS data. This reinforces Dr. Hartman's conclusion that, as AWP increases, the amounts paid by all PBMs, all cash payors and the TPPs paying the PBMs are highly correlated.

[7] For instance, Greg Madsen of PBM Caremark confirmed that, "in some cases" Caremark charges its clients the same price that it pays retailers. *See* Schechter Decl. (Dkt. No. 372) at Ex. 2; *see also* Oct. 29, 2007 Hartman Decl., Attach. E at 2 (Dkt. No. 346).

McKesson's newly submitted Smith declaration states that PBMs can have a "negative" spread on drug prices. There is, however, no indication in the evidence that "negative" spreads are common. Smith does not claim that it is; Mr. Shinn's new declaration does not mention it; and the issue did not arise in the PBM discovery taken in the AWP litigation. Moreover, and once again, the declarations are more interesting for what they do not say. For instance, these witnesses do not testify that the IMS data is inaccurate due to changes in the TPP-PBM relationship, and they do not say that the PBMs "squeezed" on behalf of TPPs in reaction to the Scheme or that the PBMs knew of the Scheme.

- 7 -

4.     **Variations in spreads, if any, that are not picked up by the aggregate damages calculation will be adjusted for at the allocation phase**

McKesson asserts that pricing variations defeat an aggregate damages model.  McKesson Br. at 7-9.  Plaintiffs have never disputed that there will be some variation in pricing terms in contracts between TPPs and PBMs.  Those variations, however, are not substantial enough to defeat an aggregate damages model here.  The model will largely account for any variations and, to the extent that claims for particular TPPs diverge from averages implicit in the aggregate damages model, the specific amount recovered by a TPP will be adjusted in the damages *allocation or claims administration* phase, assuming that a liability and damages verdict is rendered.  TPPs will submit their claims data and prove up damages, allowing for whatever mitigation, if any, they were able to receive of the Scheme's effects that was not already reflected in the aggregate damages model.[8]  Consequently, the procedure will be similar to the allocation that will be made of the Court's damages award in the AWP trial.

C.     **The Model Is A Reasonable Estimate Of Aggregate Damages**

Plaintiffs have demonstrated that the IMS data is correlated to the prices that TPPs pay for drugs and, therefore, that data forms a reasonable foundation on which to construct an aggregate damages model.  Factors supporting this conclusion include:

- The IMS data is derived in part from payments by TPPs to retailers directly, in addition to payments from PBMs to retailers.  (Thus, the "TPP direct" portion of the data correlates perfectly, a very inconvenient truth completely ignored by McKesson and Willig.)

- The IMS data includes payments to retailers by PBMs acting strictly as claims administrators.  In these instances, the PBMs pay precisely what the TPPs contracted with the retailers to pay because the reimbursement agreement is between the TPP

---

[8] However, McKesson has failed to demonstrate any claw-backs in specific reaction to the Scheme.  Willig shows that discounts off AWP increased over time from 1995 through 2005, but this was simply a continuing trend, which the aggregate damages model takes into consideration.  If McKesson presents evidence at trial of any additional claw-back achieved by particular TPPs due to the Scheme, this will be accounted for in the allocation phase.

and the retailer, and not between the PBM and retailer.  (Another portion of the IMS data that correlates perfectly.)

- The portion of the IMS data reflecting payments by PBMs to retailers on behalf of TPP clients generally and consistently correlates to the payments made by the TPPs to the PBMs.  This is demonstrated by, *inter alia*:

  (i)    the industry's reliance on the data for strategic planning and marketing campaigns;

  (ii)   near universal reliance by experts and courts on the IMS data as a proxy for TPP payments in drug pricing litigation;[9]

  (iii)  a "spot check" of the GE and CIGNA claims data which reveals a consistent, although not perfect, correlation;

  (iv)   McKesson's failure to present comprehensive claims data showing that there is not a general correlation;

  (iv)   the many contracts submitted by Plaintiffs and revealing no evidence of a change in the TPP-PBM pricing relationship;

  (v)    the dearth of contractual evidence submitted by McKesson showing such a change; and

  (vi)   Dr. McDonough's testimony based on real world experience that she saw no claw-back.

Dr. Hartman's damages model is a reasonable estimate of aggregate damages.  It is not perfect, but it does not have to be.[10]  Plaintiffs have brought forth enough information for the

---

[9] Even a partner in Dr. Willig's consulting firm has relied on this data in a drug antitrust case.

[10] It is well established in antitrust law that a plaintiff need not "establish the amount of damages with mathematical precision." *Coastal Fuels, Inc. v. Caribbean Petroleum Corp*., 175 F.3d 18, 33 (1st Cir. 1999).  "[I]t will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 563 (1931).  "The greater flexibility described in *Story Parchment* recognizes the difficult task of "quantifying the difference between what actually happened and what would have happened in a hypothetical free market." *Coastal Fuels*, 175 F.3d at 33.  Damage issues in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co. v. Chrysler Motors Corp*., 451 U.S. 557, 566 (1981).  "The nature of an antitrust claim means that some plaintiffs can only hypothesize about what the state of their affairs would have been absent the wrong . . . and we have, therefore, declined to hold antitrust plaintiffs to the same burden of proof of damages as demanded of plaintiffs in other civil cases[.]" *Bell Atl. Corp. v. AT&T Corp*., 339 F.3d 294, 303 (5th Cir. 2003).  "[E]stablishing market prices in the 'but for' world free of anticompetitive conduct could be made difficult by the dearth of market information unaffected by the collusive actions of the defendants." *New York v. Julius Nasso Concrete Corp*., 202 F.3d 82, 88-89 (2d Cir. 2000) (quotation, citation omitted).  "Estimates and reasonable inferences of [antitrust] damages are sufficient." *Telecor Communs., Inc. v. Southwestern Bell Tel. Co*., 305 F.3d 1124, 1151 (10th Cir. 2002).  "[A]n antitrust plaintiff is only obligated to

Court to conclude that the IMS data generally correlates to TPP payments, especially since that

data is built, in part, from direct TPP-to-retailer payments.  McKesson and Willig have failed to

bring forth sufficient evidence of a fundamental flaw; they cannot show an absence of general

correlation.  Certification of aggregate damage classes is, therefore, appropriate *now*.  McKesson

will have another opportunity to challenge the methodology during the bench trial, although its

efforts will once again prove unavailing.

### III.     MCKESSON'S ALTERNATIVE "GAME PLAN" SHOULD BE AMENDED

Plaintiffs have proposed an alternative game plan in the event that the Court does not

believe it has a sufficient record to evaluate Dr. Hartman's aggregate damages model.  Under

Plaintiffs' alternative plan, the trial would be bifurcated into an initial liability trial, followed by

either (i) a shorter trial on aggregate damages or (ii) a remedial phase involving the presentation

of individual TPP claims under the auspices of a special master.  The Class would receive notice

of the liability certification and then a second notice, if Plaintiffs prevail at trial on liability and

the Court later certifies a damages class.

Additional discovery into damages is contemplated under Plaintiffs' bifurcated proposal.

Because the trial would be bifurcated, there would be ample time to complete this discovery

without impeding the resolution at trial of the liability claims.  The discovery would entail

obtaining information from the major PBMs for the relevant time period, including a sampling of

---

provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982); *see also In re Carbon Black Antitrust Litig.*, 2005 U.S. Dist. Lexis 660, at *62 (D. Mass. July 18, 2005) ("[N]o precise damage formula is needed at the certification stage of an antitrust action; the court's inquiry is limited to whether the proposed methods are so unsubstantial as to amount to no method at all.") (quotation, citation omitted).

claims data.  Depositions of relevant PBM personnel may be necessary in order to confirm the authenticity and completeness of the data.[11]

Although McKesson's alternative game plan also calls for a liability trial, McKesson advocates only limited discovery of PBMs into the narrow "constant relationship" issue. McKesson Br. at 13.  As detailed above, the viability of the IMS data generally as a foundation for proving aggregate class damage is the real issue, and any additional PBM discovery should be directed to this larger inquiry.  Another reason that the limited discovery contemplated by McKesson is unfair is that it would likely leave a host of questions unanswered to the prejudice of Plaintiffs.  "Limited" discovery of the sort proposed by McKesson will only provide McKesson and the PBMs with an opportunity to tell only the parts of the story that they want to – that is, a storyline serving their narrow litigation and economic interests.  The Court should bear in mind that the PBMs will vigorously contest any discovery into their contracts and pricing.  Not only do the PBMs consider such information highly proprietary, the PBMs are the subject of other class suits by TPPs alleging, among other things, that the PBMs breached fiduciary duties to classes of TPP plaintiffs and otherwise failed to provide to the TPPs discounts owed.

For these reasons, *if* the Court defers the damages certification decision, Plaintiffs should not be artificially hamstrung in their aggregate damages discovery efforts of the PBMs.  If there is going to be any additional discovery of the PBMs, it should be broader than that proposed by McKesson and should be crafted to fully elucidate the appropriateness of using IMS data in an aggregate damages model.  Plaintiffs submit that their alternative game plan accomplishes this goal; McKesson's does not.

---

[11] We do not believe that the content of such depositions should go beyond issues relating to the data.  In other words, this would not be an invitation for McKesson to reopen wholesale discovery into the PBMs.

DATED:  December 5, 2007

By  /s/ **Steve W. Berman**
    Steve W. Berman
    Sean R. Matt
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO#471770)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
820 North Boulevard, Suite B
Oak Park, IL  60302
Telephone: (708) 776-5600
Facsimile:  (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Assocsiates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 5, 2007.


/s/ Steve W. Berman
Steve W. Berman