UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | Civil Action:  1:05-CV-11148-PBS <br><br><br> Judge Patti B. Saris |

**DECLARATION OF LORI A. SCHECHTER IN SUPPORT OF McKESSON CORPORATION'S REPLY TO PLAINTIFFS' NOVEMBER 28, 2007 SUBMISSIONS REGARDING CLASS CERTIFICATION ISSUES**

I, Lori A. Schechter, declare as follows:

1.      I am a partner of the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action.  I submit this declaration in support of McKesson Corporation's Reply to Plaintiffs' November 28, 2007 Submissions Regarding Class Certification Issues.

2.    Attached hereto is a true and correct copy of the following exhibit:

| Exhibit No. | Description |
|:---:|:---|
| 1 | Excerpts of Raymond Hartman's October 4, 2006 deposition |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of December, 2007, in San Francisco, California.

By:   /s/ Lori A. Schechter
     Lori A. Schechter

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 13, 2007.

/s/Lori A. Schechter
Lori A. Schechter

# Exhibit 1

Page 1

1              RAYMOND S. HARTMAN

2          UNITED STATES DISTRICT COURT

3        FOR THE DISTRICT OF MASSACHUSETTS

4                                    **ORIGINAL**

5    ------------------------------x

6    NEW ENGLAND CARPENTERS HEALTH

7    BENEFITS FUND, ET AL.,

8                Plaintiffs

9                                  Civil Action

10   vs.                          No. 1:05-CV-11148-PBS

11

12   FIRST DATABANK, INC., and

13   McKESSON CORPORATION,

14                Defendants

15   ------------------------------x

16          DEPOSITION OF RAYMOND S. HARTMAN, a

17      witness called by and on behalf of the

18      Defendant McKesson Corporation, taken pursuant

19      Federal Rules of Civil Procedure, before

20      Nicole E. Guilbert, a Notary Public in and for

21      the Commonwealth of Massachusetts, at Bonner,

22      Kiernan, Trebach & Crociata, on Wednesday,

23      October 4, 2006, commencing at 9:46 a.m.

24

25                    VOLUME I

1                        RAYMOND S. HARTMAN

2    negotiations with their retail pharmacy network members; am

3    I right?

4        A.    You are right.

5        Q.    And I'm asking whether there's any -- that has any

6    bearing on what turns out to be the discount negotiated

7    between the PBM and the TPP?

8        A.    They are -- the PBM, in those negotiations, is

9    certainly interested in if they are -- if the

10   reimbursements to them reflect a discount such that they're

11   losing money when they turn around and the payments go to

12   the retailer, they're going to be interested in the

13   discounts offered to retail pharmacies versus what they're

14   -- what is being paid to the pharmacies under the contracts

15   with the retail network.

16       Q.    Is there any correlation between what we find to

17   be the discounts in the contracts between the PBMs and the

18   retailers on the one hand, and what we find them to be

19   between the PBM and the third-party payor on the other?

20       A.    By a correlation, what a statistician would say is

21   I take -- actually, a correlation wouldn't even work.

22       Q.    Is there a 2 percent -- as the judge referred to a

23   2 percent general difference between the two?

24       A.    There are differences, yeah.  I mean there are

25   differences, yeah, and I don't -- that's not quite a

RAYMOND S. HARTMAN

1

2  correlation but, yes, on average there are going to be

3  differences between the reimbursements that are paid under

4  the discounts paid to the PBMs from third-party payors and

5  what is paid to the retailer.

6      Q.    Well, in other words, what the PBM receives from

7  -- pays to the retailer by way of reimbursement --

8      A.    Mm-hmm.

9      Q.    -- versus what it receives from the third-party

10 payor, that differential is sometimes referred to as a

11 spread or profit achieved by the PBM in conducting its

12 business, correct?

13     A.    That's a profit center for a PBM, that's correct.

14     Q.    Now, my question is, having that in mind, in the

15 negotiations that occur between the third-party payor and

16 the PBM, is the -- the discounts that the PBM has or has

17 achieved with its retail network a factor that bears upon

18 its negotiation of that discount with the third-party

19 payor?

20     A.    Are you saying to me does each -- does each third

21 party -- does PBMs negotiating with third-party payor A --

22     Q.    No.  I'm asking, generally, the cost structure for

23 the PBM is it has to pay its network a certain amount of

24 money based upon negotiated discounts?

25     A.    Mm-hmm.

1                      RAYMOND S. HARTMAN

2      Q.    And I'm taking that collectively and I'm asking

3   does that have a bearing upon what a PBM is seeking by way

4   of discount in its negotiation with a third-party payor?

5      A.    Well, what you will see is, just as you've said,

6   there's a range of discounts off of an AWP that all of

7   these participants refer to in their negotiations; and

8   there's a range of reimbursements that we've recognized and

9   the judge has recognized and Dr. Berndt has recognized and

10  Mr. Young has recognized that is the range of the discounts

11  off of AWP that third-party payors pay or are able to

12  negotiate.  What gets paid to the retailers, as some

13  deponents like, say, Nancy Roland of -- I can't remember

14  the third-party payor for which she was a deponent in the

15  MDL matter -- but there's going to be a range of payments

16  to the -- to the retailers such that they -- they're able

17  to make a certain amount of profit and the PBM will profit

18  from the difference between what they paid -- what gets

19  paid to the retailers.

20          So there will be a spread that will be a little

21  different for the retailer such that the PBM can earn a

22  profit on that, all of which -- all of these discounts, the

23  retailer side, the TPP side, are negotiated off of an AWP.

24  All of these kinds of negotiations are taken as given to

25  what has been alleged in this matter, which is directed at

1                          RAYMOND S. HARTMAN

2    the anchor around which these negotiations take place.

3        Q.   I guess I'm -- it's my fault I'm not being clear

4    enough.  What the PBM has to reimburse its network is a

5    cost to the PBM, correct?

6        A.   That's correct.

7        Q.   Does that -- is that taken into account by the PBM

8    when it negotiates the discount with the third-party payor?

9        A.   For the PBM to stay in business, it has to make

10   money.  It can't earn less --

11       Q.   Sounds like I got a yes there?

12       A.   Well, it has to -- yeah.  It has to take that into

13   account, that's right.

14       Q.   So if the PBM is able to decrease the discounts,

15   in other words, reimburse less to the retailer PBM, okay,

16   will it take that into account when it's negotiating with

17   the third-party payor?  It's now less than it was before,

18   will that be a factor in the willingness of the PBM to

19   adjust the discount it has with the PBM -- with the TPP

20   rather?  Let me state it different.  I'll strike that.

21            If the cost to the PBM goes down in terms of what

22   it has to pay its retailers, will that affect what the PBM

23   is willing to accept in its -- in the discount it

24   negotiates with a third-party payor?

25       A.   We're speaking -- we're speaking broadly now --

1                      RAYMOND S. HARTMAN

2      Q.   Yeah, broadly.

3      A.   -- outside of the context of this matter?

4      Q.   Correct.  That's right.

5      A.   And just the general business practices of this

6  industry?

7      Q.   Yeah.

8      A.   And we have a PBM who's negotiating with retailers

9  and with third-party payors, and if the costs -- if their

10  costs go down, they have -- they'd like to keep their

11  revenues at what they were, so they're making more money,

12  but they may have more -- they might be able to negotiate

13  more aggressively versus another PBM, if we're talking

14  about a single PBM here, or the costs will among -- you

15  know, PBMs are providing data processing, a whole variety

16  of -- of costs and are making money from a whole variety of

17  sources.

18          So this is just one of many costs, but it will

19  enter into the negotiation.

20      Q.   And why -- and is it partly because they do

21  compete with -- forget intense -- it's because they compete

22  with other PBMs for the business of TPPs?

23      A.   A given PBM, the -- there are -- there is enough

24  competition among PBMs such that a PBM cannot go out and

25  just impose whatever it wants in terms of its terms and

RAYMOND S. HARTMAN

1

2  negotiation.  It has to have an eye toward other players in

3  the market.  Whether this gets negotiated and competed to

4  razor thin margins as, say, the wholesaler competition has

5  been argued to be, is -- that's a different matter but

6  there is -- there will be a concern for those costs.

7      Q.   All right.  Now I want to focus on the 13 to 18

8  percent range that we talked about this morning and we

9  talked about where you derived it from Young's declaration

10  and from Judge Saris's opinion were two places you looked,

11  correct?

12     A.   Well, I didn't look there.  That corroborated what

13  I found throughout industry sources, discovery materials

14  that I've seen from PBMs as they're giving presentations to

15  third-party payors to try and -- to sell their services.

16  I've -- I saw that on my own and came to that conclusion on

17  my own.  It was confirmed, as I think I mentioned in the

18  footnote here, what -- what was put forward by Mr. Young

19  and Judge Saris and Mr. -- Dr. Berndt; it corroborated what

20  I'd seen on my own.

21     Q.   Now, in your calculations, we looked at pages 11

22  and 12 of your declaration.  You saw that you used 15

23  percent, and it struck me that 15 percent was halfway

24  between 13 and 18, and I want to see if that's why you used

25  15?

1                    RAYMOND S. HARTMAN

2    mean I'd have to think more about it.

3        Q.    Would the T -- would the third-party payor's

4    projection of what it's going to cost in the future have a

5    bearing on its renegotiation of a different discount?

6        A.    I've not studied the negotiations closely enough

7    to say how much that would have an affect, and it hasn't

8    been relevant to what I've had to address here.

9        Q.    Now, you've mentioned a range of 13 to 18 percent.

10   Is that something third-party payors are aware of, that

11   there's a range?

12       A.    I would assume that this is something that --

13       Q.    It's not a secret?

14       A.    Well, it's -- there's two things:  One, as one

15   looks at depositions and one -- of third-party payors that

16   negotiate contracts or administer reimbursement, some of

17   them really have little idea of really what's -- what the

18   state of affairs is and what the state of play is.  It's

19   not a secret.  People can read this but a lot of them

20   don't, and that's part of the inertia in this --

21       Q.    A lot don't but some do?

22       A.    Some would.

23       Q.    What accounts for the fact that some people get a

24   13 percent discount and some got an 18 percent discount?

25       A.    All of the factors that would account for that are

1                    RAYMOND S. HARTMAN

2    orthogonal to and are relevant to what I'm focussing on

3    here.

4         Q.   Would it bear -- would it be explainable, at least

5    in part, by the respect of negotiating positions of the

6    third-party payor and the PBM?

7         A.   That would be a factor.

8         Q.   You were beginning to tell me a little while ago

9    about the number of members and so forth, that the larger

10   of the third-party payor, the more leverage it may have,

11   correct?

12        A.   That's correct.

13        Q.   More leverage to adapt a more favorable discount

14   than a smaller -- the smaller third-party payor, correct?

15        A.   Well, let me put it this way --

16        Q.   If you answer my question, then you can go and say

17   all the rest you want.

18        A.   Well, I'm going to answer your question and that

19   is that given an AWP that these -- these groups are

20   negotiating off of, then if I'm a -- if I'm a large -- if

21   I'm Cigna and I come to the table and I want to negotiate

22   with a -- and maybe Cigna already has a PBM, so let's just

23   -- let's just keep it nonspecific.  We've got a large

24   insurer, one of the largest numbers of insured lives.  They

25   come to a PBM.  They say we're bringing all these insured

1                          RAYMOND S. HARTMAN

2     lives.

3             They will prob -- and they'll say, okay, well, I

4     want, you know, I want 17 percent, 18 percent off of AWP.

5     They will have the leverage to move in that direction

6     rather than the PBM will have a more difficult time saying,

7     oh, no.  We're only going to give you 13 percent.  Go walk

8     and see if you can get a better deal somewhere else.

9             Now, again, that's -- those are negotiations and

10    they take place with TPPs but they're all off of the same

11    AW -- that's irrelevant to the impact of what we're talking

12    about here, because what we're talking about here is the

13    AWP from whence all of that -- that occurs and that

14    variation is -- is irrelevant to what we're dealing with

15    here.

16        Q.   Now I want to deal with the "R" word, rebates, and

17    I want to ask you what do the contracts typically provide

18    between the third-party payor and the PBM regarding rebates

19    received by the manufacturer during the class period?

20    What's a typical provision?

21        A.   The -- I couldn't tell you what a typical

22    provision is.  I can tell you what general categories of

23    rebates there are.

24        Q.   No.  Just what typically is provided, do they all

25    provide the pass-throughs of the rebates, pass for some of

1              RAYMOND S. HARTMAN

2   COMMONWEALTH OF MASSACHUSETTS              MIDDLESEX, SS.

3

4           I, NICOLE E. GUILBERT, a Certified
    Shorthand Reporter and Notary Public duly
5   commissioned and qualified in and for the
    Commonwealth of Massachusetts, do hereby
6   certify that there came before me on the 4th
    day of October, 2006, at 9:46 a.m., the person
7   hereinbefore named, RAYMOND S. HARTMAN, who
    provided satisfactory evidence of
8   identification as prescribed by Executive
    Order 455 (03-13) issued by the Governor of
9   the Commonwealth of Massachusetts, was by me
    duly sworn to testify to the truth and nothing
10  but the truth of his knowledge concerning the
    matters in controversy in this cause; that he
11  was thereupon examined upon his oath, and his
    examination reduced to typewriting under my
12  direction; and that this is a true record of
    the testimony given by the witness to the best
13  of my ability.
            I further certify that I am neither
14  attorney or counsel for, nor related to or
    employed by, any of the parties to the action
15  in which this deposition is taken, and
    further, that I am not a relative or employee
16  of any attorney or counsel employed by the
    parties hereto or financially interested in
17  the action.

18

19  My Commission Expires:  May 7, 2010

20

21

22

23                  Nicole E. Guilbert
                    CSR/Notary Public

24

25