UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND; PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND OF
PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND; DISTRICT
COUNCIL 37, AFSCME - HEALTH &
SECURITY PLAN; JUNE SWAN; BERNARD
GORTER; SHELLY CAMPBELL and
CONSTANCE JORDAN,

                    Plaintiffs,

     v.

FIRST DATABANK, INC., a Missouri corporation,
and McKESSON CORPORATION, a Delaware
corporation,

                    Defendants.

Civil Action:  1:05-CV-11148-PBS

Judge Patti B. Saris

**MCKESSON CORPORATION'S REPLY TO PLAINTIFFS' NOVEMBER 28, 2007
SUBMISSIONS REGARDING CLASS CERTIFICATION ISSUES**

*[Leave to File Reply Granted on December 6, 2007]*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................ii

TABLE OF ABBREVIATIONS...............................................................................................iii

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.    AFTER THREE TRIES TO COMPLY WITH THE CLASS ORDER,
DR. HARTMAN HAS STILL NOT SHOWN THAT HIS AGGREGATE
DAMAGES MODEL ACCOUNTS FOR TPP MITIGATION........................................2

    A.    The Statistical Analysis of IMS Data in Dr. Hartman's September Report
Failed to Account for TPP Mitigation.....................................................................3

    B.    Dr. Hartman Has Disavowed the "Constant Relationship" Theory
Presented in His October Report............................................................................4

    C.    The "General Correlation" Theory Presented in Dr. Hartman's November
Report Does Not Account for TPP Mitigation.......................................................5

II.    DR. HARTMAN'S FAILURE TO CAPTURE CHANGES IN DISCOUNTS
AND DISPENSING FEES IN TPP-PBM CONTRACTS PRECLUDES
CERTIFICATION OF THE PERCENTAGE CO-PAY DAMAGES CLASS.................8

III.    PLAINTIFFS' POST-HEARING BRIEFS CONFIRM THAT THERE IS NO
REASON TO DEFER RULING ON DAMAGES CLASSES. ...................................10

    A.    Plaintiffs Have Not Met Their Burden for Certification of Any Damages
Class. .....................................................................................................................10

    B.    An Independent Expert Is Not Necessary, But One Can Be Identified. ..............11

    C.    Plaintiffs' Last-Ditch Rationales for Deferring the Damages Class
Determination Should Be Rejected.......................................................................12

CONCLUSION .....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allapattah Servs. v. Exxon Corp.*,
   333 F.3d 1248 (11th Cir. 2003) ................................................................. 14

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003) .................................................................... 13

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) .................................................................... 13

*Chisolm v. TranSouth Fin. Corp.*,
   194 F.R.D. 538 (E.D. Va. 2000) ........................................................... 13, 14

*Hilao v. Estate of Marcos*,
   103 F.3d 767 (9th Cir. 1996) .................................................................... 14

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ....................................................................... 13

*In re Pharm. Industry Average Wholesale Price Litig.*,
   230 F.R.D. 61 (D. Mass. 2005) .................................................................. 3

*In re Visa Check/Master Money Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001) ..................................................................... 13

## TABLE OF ABBREVIATIONS

## COURT FILINGS

Declaration of Steve W. Berman in Support of Class Plaintiffs' Post-Hearing
Submission in Response to the Court's Questions
(Nov. 28, 2007) [Docket No. 377-3] …...................................................."Berman Post-Hr'g Decl."

Supplemental Declaration of Steve W. Berman in Support of Class
Plaintiffs' Reply to McKesson's Response to the Court's Inquiries
at the November 13, 2007 Hearing on Class Certification Issues
(Dec. 5, 2007) [Docket No. 382] .................................................................. "Berman Suppl. Decl."

Class Certification Order
(Aug. 27, 2007) [Docket No. 317] ............................................................................"Class Order"

Declaration of Paul Flum in Support of McKesson Corp.'s
Response to Dr. Hartman's September 14, 2007 Submission
Regarding the Court's Class Certification Order
(Oct. 15, 2007) [Docket No. 329] .............................................................................."Flum Decl."

Expert Report of Raymond S. Hartman [submitted as Exhibit 1 to
Declaration of Steve Berman in Support of Class Plaintiffs' Reply to
McKesson's Opposition to Aggregate Damages for the TPP Class
(Sept. 14, 2007)] [Docket No. 345-2].. ......................................................... "Hartman Sept. Rep."

Report of Raymond S. Hartman Regarding Aggregate Damages
(Oct. 29, 2007) [Docket No. 346] ................................................................... "Hartman Oct. Rep."

Report of Raymond S. Hartman Regarding the Reliability of
IMS Data for Calculating Aggregate Class Damages
(Nov. 28, 2007) [Docket No. 378] ................................................................ "Hartman Nov. Rep."

Expert Report of Kimberly P. McDonough [submitted as Exhibit B
to Declaration of Paul Flum in Support of McKesson Corp.'s Response
to Dr. Hartman's September 14, 2007 Submission Regarding the Court's
Class Cert. Order (Sept. 14, 2007)] [Docket No. 329-3] ................................."McDonough Rep."

McKesson Corp.'s Response to Dr. Hartman's September 14, 2007
Submission Regarding the Court's Class Certification Order
(Oct. 15, 2007) [Docket 327] ...................................................................."McKesson Oct. 15 Br."

McKesson's Response to Plaintiffs' Proffer of Evidence in
Support of Dr. Hartman's Damages Model
(Nov. 8, 2007) [Docket No.362] ......................................................... "McKesson Proffer Resp."

McKesson Corp.'s Response to the Court's Inquiries at the
November 13, 2007 Hearing on Class Certification Issues
(Nov. 28, 2007) [Docket No. 371] ..............................................................."McKesson Nov. 28 Br."

Declaration of Darrell Philpot of IMS Health Incorporated
(Oct. 15, 2007) [Docket No. 328] .............................................................."Philpot Decl."

Class Plaintiffs' Post-Hearing Submission in Response to the Court's
Questions (Nov. 28, 2007) [Docket No. 376]….. ..............................................."Pls. Nov. 28 Br."

Class Plaintiffs' Reply to McKesson's Response to the Court's
Inquiries at the November 13, 2007 Hearing on Class Certification
Issues (Dec. 6, 2007) [Docket No. 386]…............................................................ "Pls. Dec. 6 Br."

Declaration of Lori A. Schechter in Support of McKesson Corp.'s
Memorandum in Opposition to Class Certification
(March 2, 2007) [Docket No. 206]................................................. "Schechter Class Opp'n Decl."

Declaration of Lori A. Schechter in Support of McKesson Corp.'s
Reply to Plaintiffs' November 28, 2007 Submissions Regarding Class
Certification Issues (Dec. 13, 2007)............................................................"Schechter Reply Decl."

Declaration of Arthur F. Shinn [submitted as Exhibit 4 to Declaration
of Lori A. Schechter in Support of McKesson Corp.'s Response
to the Court's Inquiries at the November 13, 2007 Hearing Regarding
Class Certification Issues (Nov. 28, 2007) [Docket No. 372-5] ................................"Shinn Decl."

Declaration of James F. Smith [submitted as Exhibit 3 to Declaration
of Lori A. Schechter in Support of McKesson Corp.'s Response
to the Court's Inquiries at the November 13, 2007 Hearing Regarding
Class Certification Issues (Nov. 28, 2007)] [Docket No. 372-4]................................"Smith Decl."

Expert Declaration of Robert D. Willig
(Oct. 16, 2007) [Docket No. 326] ..............................................................."Willig Oct. 16 Decl."

Rebuttal Expert Declaration of Robert D. Willig
(Nov. 8, 2007) [Docket No. 365] ..............................................................."Willig Nov. 8 Decl."

Expert Declaration of Robert D. Willig
(Nov. 28, 2007) [Docket No. 373] ..............................................................."Willig Nov. 28 Decl."

Third Amended Complaint (Nov. 6, 2007) [Docket No. 359]..............................................."TAC"

## DEPOSITION AND HEARING TRANSCRIPTS

Rosaria Esperon Deposition [submitted as Exhibit P to
Declaration of Paul Flum in Support of McKesson Corp.'s Response
to Dr. Hartman's September 14, 2007 Submission Regarding the Court's
Class Cert. Order (Jan. 8, 2007)] [Docket No. 329-18] ..........................................."Esperon Dep."

Raymond Hartman Deposition [submitted as Exhibit 1 to
Declaration of Lori A. Schechter in Support of McKesson Corp.'s
Reply to Plaintiffs' November 28, 2007 Submission Regarding Class
Certification Issues (Oct. 4, 2006)] ........................................................................"Hartman Dep."

Susan Hayes Deposition [submitted as Exhibit AA to Declaration of
Paul Flum in Support of McKesson Corp.'s Response to Dr. Hartman's
September 14, 2007 Submission Regarding the Court's Class Cert. Order]
(Oct. 26, 2006)] [Docket No. 329-29]........................................................................"Hayes Dep."

Hearing Transcript (Nov. 13, 2007) ................................................................................ "Hr'g Tr."

Nancy Stalker Deposition [submitted as Exhibit Q to
Declaration of Paul Flum in Support of McKesson Corp.'s Response
to Dr. Hartman's September 14, 2007 Submission Regarding the Court's
Class Cert. Order (July 17, 2007)] [Docket No. 329-19]..........................................."Stalker Dep."

## INTRODUCTION

From the start, Dr. Hartman's methodology for calculating class-wide damages has been flawed since it failed to account for TPPs' mitigation of increased AWP spreads through renegotiation of contract price terms. Dr. Hartman at first argued that there was no TPP mitigation to account for because of his "zero knowledge-zero mitigation" theory. McKesson demonstrated, however, that TPPs did know of the increase and, moreover, that many — including the named plaintiffs themselves — renegotiated improved price terms in response to increased AWPs.

In its Class Order, the Court ruled that the failure of Dr. Hartman's methodology to account for TPP mitigation made his damages model unacceptable. Nevertheless, the Court afforded plaintiffs and Dr. Hartman the opportunity to provide a feasible methodology that would account for TPP mitigation and thus prevent the overstatement of damages and the "morass" of individual damages hearings. In response, plaintiffs and Dr. Hartman have offered three different theories, none of which meets the Class Order's requirements, and each of which is at odds with the empirical evidence.

Specifically, Dr. Hartman argued that IMS data itself would capture TPP mitigation and, once analyzed, that the IMS data showed zero mitigation. But the IMS data is retail data; it shows what PBMs paid retailers, not what TPPs paid PBMs. As IMS's own declaration stated, the data shows nothing regarding TPP payments to PBMs. Accordingly, Dr. Hartman erred in arguing that IMS data could measure TPP mitigation and that it was zero.

Undaunted, Dr. Hartman next turned to the "constant relationship" theory. Under this theory, Dr. Hartman argued that there is a "constant relationship" between what PBMs pay retailers, on the one hand, and what TPPs pay PBMs, on the other. Dr. Hartman claimed that the IMS retail data could be used to precisely measure TPP mitigation, and again asserted that there was none. The "constant relationship" theory has now been totally debunked, to the point that plaintiffs deny that Dr. Hartman espoused it in the first place.

All of this has led to Dr. Hartman's third and last damages argument: the "general correlation" theory. This theory simply holds that there is a correlation between prices paid by PBMs to retailers and the prices paid by TPPs to PBMs. Of course, since both are based upon the same AWP, there would be a correlation between the two. The critical point, however, is that a "general correlation" doesn't measure TPP mitigation, nor do plaintiffs contend that it does. To the contrary, plaintiffs acknowledge that statistically it cannot be done.

After all this, McKesson respectfully submits that it is now time for the Court to finalize its Class Order denying a damages class for TPPs. Since the consumer co-pay damages claim is derivative of TPP damages, a damages class should be denied for this class on the same ground. Although it certainly can be done, there is no need for the Court to appoint an independent expert to resolve any Hartman-Willig differences, because on its face, the "general correlation" theory obviously fails to meet the standard in the Class Order. After more than a year of debate, it is time to conclude the class issues, as the parties now move forward to trial.

## ARGUMENT

### I.   AFTER THREE TRIES TO COMPLY WITH THE CLASS ORDER, DR. HARTMAN HAS STILL NOT SHOWN THAT HIS AGGREGATE DAMAGES MODEL ACCOUNTS FOR TPP MITIGATION.

In its Class Order, the Court found that "Dr. Hartman's methodology for calculating aggregate damages would lead to a significant overstatement because it fails to consider key provisions in contracts that are renegotiated and renewed." (Class Order 24.) The Court declined to certify a TPP damages class, but permitted Dr. Hartman to present a new model that excludes "contracts that were renegotiated after the large bump-up in early 2002." (*Id.* at 25.)

Since then, Dr. Hartman has submitted three new reports presenting a series of shifting explanations for why his model does not need to be materially revised. In September, Dr. Hartman asserted that the Court erred in requiring him to account for TPP mitigation because pharmacy sales data reported by IMS conclusively prove that TPPs did not "push back" against higher AWP spreads. In October, Dr. Hartman claimed that his model captured TPP mitigation

because there purportedly was a "constant relationship" between the pharmacy payments reported by IMS and TPP reimbursements to PBMs.  Last month, Dr. Hartman retooled that theory as well.  He now claims only that there is a general "correlation" between IMS data and TPP reimbursements — a theory that, even if correct, does not account for TPP mitigation. Three months and three theories later, Dr. Hartman has still failed to present an aggregate damages model that excludes contracts that were amended or renegotiated during the class period.

> ### A.   The Statistical Analysis of IMS Data in Dr. Hartman's September Report Failed to Account for TPP Mitigation.

Dr. Hartman first tried to respond to the Class Order by presenting a statistical analysis using IMS data, which he claimed showed that TPPs did not offset any of the impact of higher AWP spreads.  (Hartman Sept. Rep. ¶¶ 25-36 & Attachment F.)  Dr. Hartman based that assertion on his analysis of IMS retail data, which he described as "one of the most comprehensive surveys of reimbursement *paid by TPPs*, uninsured cash payers and Medicaid…."  (*Id.* at ¶ 26.)[1]  According to Dr. Hartman, because the IMS data purportedly showed no TPP push-back, there was no need to revise his model to exclude reimbursements under contracts that were amended or renegotiated during the class period.

In response, McKesson demonstrated that Dr. Hartman's no push-back assertion rested on a fundamental error in interpreting the IMS data.  McKesson submitted a declaration from IMS explaining that for prescriptions covered by PBMs — the vast majority of the transactions at issue in this case[2] — IMS reports "what the pharmacy received from the PBM," and "does not capture any information on the amounts paid by a third party payor to a PBM . . . ."  (Philpot Decl. ¶ 5.)  IMS data therefore says nothing about TPP reimbursement rates or whether TPPs

---

[1] All emphasis appearing in quotations has been added, unless otherwise noted.

[2] As this Court noted in its *Pharm. III* decision, PBMs' role is "pervasive."  *In re Pharm. Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 71-72 (D. Mass. 2005) (citing Dr. Young's testimony that 95% of patients with drug coverage obtain benefits through a PBM).

recouped any of the costs from higher AWPs. That observation is borne out by Dr. Willig's comparison of Dr. Hartman's IMS data to GE and CIGNA claims data, which show increasing discounts for the TPPs over the class period relative to what IMS reports. (Willig Oct. 16 Decl. ¶¶ 52-55 & App. 4.) This directly refuted the no push-back hypothesis in Dr. Hartman's September Report.[3]

### B.   Dr. Hartman Has Disavowed the "Constant Relationship" Theory Presented in His October Report.

Dr. Hartman's answer was to change theories. In his October Report, Dr. Hartman abandoned his blanket assertion that IMS reports TPP payments for prescription drugs. (Hartman Oct. Rep. Attachment D, ¶ 21(a).) Instead, he offered a new theory — IMS data was the "functional equivalent" of TPP reimbursements to PBMs either because (i) TPPs paid PBMs *exactly* what PBMs paid pharmacies, *i.e.,* there was zero spread,[4] or (ii) there was a "***constant relationship***" between what TPPs paid PBMs and what PBMs paid pharmacies.[5] Either way, Dr. Hartman asserted that IMS data mirrored TPP reimbursements so precisely that his aggregate damages model based on IMS data captured and excluded any TPP push-back without the need for further adjustment. (Hartman Oct. Rep. ¶¶ 13, 29, 33.)

McKesson showed that Dr. Hartman's new theory fared no better than its predecessor.

---

[3] The further assertion by plaintiffs' counsel and Dr. Hartman that IMS data are regularly cited by academics and used in litigation misses the point. (Pls. Nov. 28 Br. 6-7.) Dr. Willig showed that none of the academic literature previously cited by Dr. Hartman used IMS data as a measure of TPP reimbursements for prescription drugs. (Willig Nov. 8 Decl. Table 1.) Appendix A to this brief shows the same thing for plaintiffs' latest citations to court proceedings and academic literature that make reference to IMS data.

[4] *See* Hartman Oct. Rep. Attachment E at p. 2; *id.* Attachment D at ¶ 21(a). As plaintiffs' counsel succinctly put it at the November 13 hearing, Dr. Hartman opined that "TPPs pay the PBMs *exactly* what the PBMs pay the retailers." (Hr'g Tr. 11:1-3.)

[5] *See, e.g.,* Hartman Oct. Rep. ¶ 6 ("payments made by PBMs to pharmacies reflect actual costs paid by the TPPs because there is a ***constant relationship*** between what the PBMs pay the pharmacies and what the TPPs pay the PBMs for brand name drugs"); Class Plaintiffs' Illustratives for November 13, Slide 24 (TPPs pay what "PBMs pay the retailers," but even "if the PBM earned a spread . . . , there is nothing to suggest that the spread did not remain constant.").

Based on an analysis of TPP claims data and other evidence, Dr. Willig demonstrated that there is no theoretical or factual support for Dr. Hartman's zero spread/constant relationship theory. (Willig Nov. 8 Decl. ¶¶ 15, 17, 20, 25, 26, 59, 68.)  Witnesses with direct knowledge of the PBM business rejected Dr. Hartman's zero spread/constant relationship assertion (Smith Decl. ¶¶ 3-5; Shinn Decl. ¶¶ 5-9), as did plaintiffs' own industry experts, Susan Hayes and Dr. McDonough. (McDonough Rep. 13; Hayes Dep. 221:9-16.)  And McKesson submitted a substantial body of third party evidence showing retailer squeeze — that PBMs squeezed greater discounts off AWP from retailers, and showing TPP mitigation — that PBMs made contractual concessions to TPPs in response to higher AWPs.  (Flum Decl. ¶¶ 6-8, 10-11; McKesson Oct. 15 Br. App. A.)[6] Dr. Hartman was thus left where he started — with a damages model that did not satisfy the Class Order because it failed to account for TPP mitigation.

Indeed, McKesson so thoroughly refuted Dr. Hartman's zero spread/constant relationship theory that plaintiffs now claim that Dr. Hartman never invoked the theory in the first place. Incredibly, they now assert that "Dr. Hartman and Plaintiffs *never* claimed" that a "100% '*constant relationship*'" or "*perfect correlation*" exists in every TPP-PBM relationship."  (Pls. Dec. 6 Br. 3-4; emphasis in original.)

### C.   The "General Correlation" Theory Presented in Dr. Hartman's November Report Does Not Account for TPP Mitigation.

Having disavowed the constant relationship theory, Dr. Hartman now says in his November 28 Report that all he needs to calculate aggregate damages is a "consistent

---

[6] The "new" ESI documents cited in plaintiffs' reply brief are not to the contrary.  (*See* Pls. Dec. 6 Br. 1-3, citing ESI's 2006 Annual Report and an October 8, 2007 letter to an unidentified TPP.)  Both documents merely refer to provisions in ESI's TPP contracts that permit ESI to adjust discounts off AWP "*as reasonably and equitably necessary to maintain each parties' relative economics*" if AWP markups are rolled back under the proposed FDB settlement. (Berman Suppl. Decl. Ex. A at 1.)  The fact that ESI has proposed procedures to preserve the status quo if AWP markups are reduced across the board does not contradict the substantial evidence showing that ESI granted concessions to TPPs in response to the increase in AWP spreads, including concessions to named plaintiff DC 37 and Blue Shield of California. (Schechter Class Opp'n Decl. Ex. 5F at D37 0836; Esperon Dep. 316:12-318:21; Stalker Dep. 115:24-119:8.)

correlation" between payments to pharmacies and TPP reimbursements.  (Hartman Nov. Rep. ¶¶ 15, 17.)  According to plaintiffs, Dr. Hartman's damages model rests on his conclusion that "the IMS data, in the aggregate, is *generally correlated* to TPP payments."  (Pls. Dec 6 Br. 4.) But Dr. Hartman does not claim that a general correlation between IMS data and TPP payments will account for TPP mitigation.  Nor could it.  As plaintiffs acknowledge, after aggregate damages are calculated using Dr. Hartman's model, TPPs will still need to "submit their claims data and prove up damages, *allowing for whatever mitigation . . . that was not already reflected in the aggregate damages model*."  (Pls. Reply 8 & n.8.)

The fatal flaw in Dr. Hartman's analysis is his failure to distinguish between discounts and dollars.  Dr. Hartman has already conceded that he cannot correlate the *discounts* off AWP in contracts between TPPs and PBMs with the *discounts* in contracts between PBMs and retail pharmacies.  As Dr. Hartman testified at his deposition in this case, "*a correlation wouldn't even work*."  (Hartman Dep. 156:16-21; Schechter Reply Decl. Ex. 1.)  But plaintiffs assert that Dr. Hartman's "observation" that the discounts can't be correlated is "distinct from opining, as Dr. Hartman has done, that the relationship between the two generally correlates."  (Pls. Dec. 6 Br. 6 n.6.)  According to plaintiffs, "it makes little sense to discuss calculating correlation coefficients over time in *contract discount terms* for a TPP and its PBM, but it does make sense to discuss correlation of *claim amounts paid* by a TPP and in turn its PBM."  (*Id.*; emphasis in original.)  *But measuring changes in TPP discounts is the only way to test whether IMS data captures TPP mitigation*.

So what do Dr. Hartman and plaintiffs mean when they say that pharmacy payments are generally or consistently correlated with TPP reimbursements?  The answer is simple.  They mean that the price for a pill paid by a TPP and the price for that same pill charged by a pharmacy both move in the same direction over time.  That is, of course, exactly what any knowledgeable industry observer would expect, since payments for the brand name prescription drugs involved in this case are calculated as a discount off AWP, which in turn is tied to WAC. As WAC and AWP increase over time, so do TPP reimbursements and pharmacy charges.

6

But the general correlation noted in Dr. Hartman's November Report does not speak to the key issue raised by the Class Order — whether Dr. Hartman's aggregate damages model accounts for TPP mitigation. To answer that question, Dr. Hartman would need to analyze how the changes in the discounts off AWP in TPPs' contracts with PBMs correlate with changes in the discounts used to calculate pharmacy charges as reported by IMS — something he concedes he cannot do.

Dr. Willig's November 28 declaration shows why a general correlation between TPP reimbursements and pharmacy charges is not enough. Using claims data for GE, CIGNA, and named plaintiffs Teachers, Teamsters, and Pirelli, Dr. Willig compared the effective discounts off AWP to the retail prices reported by IMS. That comparison shows that TPP payments and effective discounts ***differ substantially*** from what IMS reports, and that those differences ***increase over time***. (Willig Nov. 28 Decl. ¶ 2 & Figures 2A-2E.) In other words, the effective discounts in the TPP data got larger, faster, than the effective discounts in the IMS data as TPPs pushed back against higher AWP spreads.[7]

Dr. Willig's November 28 Report also shows that the IMS data systematically understate the increasing discounts that TPPs were able to get throughout the class period, and that those differences are material. (*Id.* ¶ 4 & App. 2.) Using Lipitor 10mg as an example, Dr. Willig shows that the effective discount in the IMS data increased only slightly from 2001 to 2004 — from 4.4% to 4.7%, just three tenths of a percentage point. During that same period, GE's effective discount increased by 2.2 percentage points from 9.2% to 11.4%, Cigna's increased by 2.0 percentage points from 13.9% to 15.9%, Pirelli's increased by 1.1 percentage points from 6.0% to 7.1%, and Teamsters' increased by 1.6 percentage points from 10.0% to 11.6%. (*Id.*

---

[7] Plaintiffs make the unfounded assertion that PBM contracts for twelve TPPs selected from discovery in other cases show no mitigation. Of that group, there is no contractual information during the class period reported for two TPPs. Of the remaining ten, plaintiffs' summary shows that eight were able to obtain more favorable reimbursement terms. (Berman Post-Hr'g Decl. Ex. 2.) McKesson previously made the same showing for all five named plaintiffs. (Flum Decl. ¶ 4 & Exs. C-O.)

App. 2.)[8]  Calculating TPP damages using IMS data, as Dr. Hartman proposes, wholly fails to capture the impact of these increases in effective discount rates.[9]

Dr. Hartman's November Report (his sixth to date) does not contend that his model captures and excludes reimbursements under TPP-PBM contracts that were renewed during the class period.  What then is Dr. Hartman's rationale for using his model to calculate aggregate damages?  According to Dr. Hartman's November Report:

> there is a consistent correlation and reasonably constant relationship between the aggregate IMS NPA retail data and the claims of individual TPPs and that IMS data provides a reasonable proxy for TPP claims data for the purpose of calculating the impacts of the Mark-Up Scheme upon TPP reimbursements rates.

(Hartman Nov. Rep. ¶ 17.)  But merely showing that prices (rather than discounts) are correlated is not sufficient to prove that the IMS data are a reasonable proxy for the TPP data necessary to show damages.  No wonder plaintiffs suggest that the Court defer ruling on the adequacy of Dr. Hartman's aggregate damages model.  Because Dr. Hartman has failed to satisfy the requirements of the Class Order, certification of the TPP damages class should be denied.

## II.    DR. HARTMAN'S FAILURE TO CAPTURE CHANGES IN DISCOUNTS AND DISPENSING FEES IN TPP-PBM CONTRACTS PRECLUDES CERTIFICATION OF THE PERCENTAGE CO-PAY DAMAGES CLASS.

At the November 13 hearing, the Court asked the parties what the percentage co-pay is based on:

---

[8] Teachers produced claims data covering only 2002 and 2003.  Teachers' effective discount increased by 0.2 percentage points, from 18.3% to 18.5%, during that period.  (*Id.*)

[9] The comparison of GE and CIGNA claims data to IMS data in Dr. Hartman's November Report is fully consistent with that analysis.  Dr. Hartman calculated the ratio between GE and CIGNA reimbursements to pharmacy charges as reported by IMS for a subset of the same drugs that Dr. Willig used.  Although the full extent of the trend is masked by Dr. Hartman's decision to round his results to the nearest whole number, his calculations show that ***these ratios were not constant, but declined over time***.  For example, Dr. Hartman reports that the ratio between GE's reimbursements for Lipitor 10mg and the IMS data declined by two percentage points — from 91% to 89% — between 2001 and 2004.  (Hartman Nov. Rep. Attachment B.)  That decline tracks Dr. Willig's analysis.

> Is it a percentage simply of the AWP minus the 15 percent, or does it somehow take into account push-backs and rebates and dispensing fees?  Is it really somehow net-cost based?
> ….
> Because if it is, if you lost — I'm not saying you are — on Class 2, you might lose on Class 1.  ***Whereas, if it's really independent completely of any net pricing, then you could get Class 1.***

(Hr'g Tr. 49:5-14.)

Both sides' post-hearing briefs agree that the calculation of any damages for consumers who made percentage co-payments must be based on the discounts off AWP and the dispensing fees negotiated by each class member's TPP.  (Pls. Nov. 28 Br. 3; McKesson Nov. 28 Br. 11.)  Thus, consistent with the Class Order, Dr. Hartman's aggregate damages model for the ***consumer*** co-pay class must account for changes in AWP discounts and dispensing fees in ***TPP-PBM*** contracts, just as the Court required for the TPP class.  Dr. Hartman has recognized as much.  His September Report acknowledges that "***I (and any economist) require calculation of the damages to the TPPs insuring those consumers***" in order for the consumer co-pay class "to be certified for liability and damages."  (Hartman Sept. Rep. ¶ 12.)

The problem is that Dr. Hartman's aggregate damages model does not account for TPP mitigation achieved through changes in AWP discounts and dispensing fees, as discussed above.  Thus, Dr. Hartman's aggregate damages model will necessarily lead to a "significant overstatement" of damages for ***both*** the TPP class and the percentage co-pay class — a flaw this Court previously held unacceptable.  (Class Order 24.)

Plaintiffs do not dispute that just like the TPP class, consumer co-pay damages are dependent on Dr. Hartman's ability to account for changes in AWP discounts and dispensing fees in TPP contracts.  Instead, they argue that the consumer co-pay class need not also account for TPP mitigation occurring through other, changing terms in TPP contracts, such as rebate sharing provisions or post-transaction adjustments.  (Pls. Nov. 28 Br. 3.)  This is beside the point.  It means only that there are additional reasons, on top of the failure of Dr. Hartman to account

for TPP mitigation from changes in AWP discounts and dispensing fees, to decline to certify a damages class for the TPPs.

Plaintiffs make two additional arguments regarding the percentage co-pay class that are easily dismissed. First, they argue that without certification of a damages class, McKesson will retain the millions of dollars plaintiffs claim these consumers paid as a result of the 5% increase in the WAC to AWP spread. (*Id.* at 5.) But as plaintiffs' own allegations make clear, ***the alleged overcharges were paid by class members to PBMs and retail pharmacies, not to McKesson***. (TAC ¶¶ 13, 63.) Plaintiffs have come forward with no evidence that McKesson gained financially from higher AWPs or the alleged 5% increase in the WAC to AWP spread. (*See* McKesson Proffer Resp. 5 & n.4.) Second, plaintiffs argue that the percentage co-pay class should run to the present because "there is no knowledge consumers were aware of the Scheme." (Pls. Nov. 28 Br. 5.) Dr. Hartman has already conceded, however, that consumer co-pay damages are a function of the contracts between the consumers' TPPs and their PBMs, not between consumers and anyone else. It is thus the TPPs' knowledge and changing contracts and renegotiations that matter. Consumers' purported lack of knowledge of the Scheme is irrelevant, even under Dr. Hartman's analysis.

### III. PLAINTIFFS' POST-HEARING BRIEFS CONFIRM THAT THERE IS NO REASON TO DEFER RULING ON DAMAGES CLASSES.

#### A. Plaintiffs Have Not Met Their Burden for Certification of Any Damages Class.

Plaintiffs claim they have met their legal burden of proffering a means to prove aggregate damages because Dr. Hartman's general correlation theory "forms a reasonable foundation on which to construct an aggregate damages model." (Pls. Dec. 6 Br. 8; *see also* Pls. Nov. 28 Br. 13.) Plaintiffs also argue that the standard is not "perfection," and that McKesson has not shown that plaintiffs' model contains "fundamental flaws." (Pls. Nov. 28 Br. 13.) But the Court itself identified the "fundamental flaw" in Dr. Hartman's aggregate damages model, and plaintiffs, in their three successive attempts since the Court's Class Order, failed to cure it.

Specifically, the Court rejected Dr. Hartman's methodology because it "would lead to a significant overstatement." (Class Order 24.) The Court was quite specific about how the methodology failed: "it fails to consider key provisions in contracts that are renegotiated and renewed." (*Id.*) And the Court was clear about what needed to be done for plaintiffs' aggregate damages methodology to meet the test: it must "include[] only those contracts in effect when the scheme took place and exclude[] reimbursements under contracts renegotiated in response to the increase." (*Id*. at 25.) Dr. Hartman has been up at bat three times in an attempt to address the flaw identified by the Class Order and has struck out each time. Plaintiffs are no closer to meeting their burden now than they were before the Class Order. Accordingly, now that discovery is closed and the Court is poised to set the trial date and disseminate notice to the class, the Court should conclude the class certification proceedings and proceed with certified classes for liability only.

### B.    An Independent Expert Is Not Necessary, But One Can Be Identified.

When the idea of an independent expert was first raised, the purpose was to help the Court resolve the dispute between Dr. Willig and Dr. Hartman regarding plaintiffs' assertion of a constant relationship between what TPPs pay their PBMs and what PBMs pay retailers. Dr. Hartman has now abandoned his "constant relationship" position, and instead claims only that there is a "general correlation" between these two payments. Because a mere correlation between prices cannot account for TPP mitigation, there is no need for an independent expert to assist in resolving a dispositive issue. The Court may nevertheless determine that after the extensive briefing and expert reports, an independent expert would be helpful. Plaintiffs' new position that *no* independent expert exists, is simply not credible. (Pls. Nov. 28 Br. 16.)

Plaintiffs attack as biased any expert that has ever done work for a drug manufacturer or the defense bar. Surely that can't be the bias test for this case. McKesson is a drug *wholesaler*, not a drug *manufacturer*, and plaintiffs' own allegations assert that McKesson disregarded the wishes of drug manufacturers when it decided — unilaterally as will be shown — to raise its

own list price by 5% on drugs that had previously reflected a 20% markup over WAC.  This is hardly a basis to disqualify Professors Pauly and Danzon of the University of Pennsylvania.[10]

Plaintiffs also claim Professor Pindyck of MIT is biased because, according to the Analysis Group's website, he is listed as an "external expert" while another expert affiliated with Analysis Group — a consulting group that works with 137 experts from approximately 75 schools — at some point in time performed consulting work for McKesson.  But that cannot be a valid test of bias either.  Indeed, Professor Newhouse, **plaintiffs'** proposed independent expert, is **also** listed as an "external expert" on the Analysis Group website.  While an expert like Professor Newhouse, who sits on the board of directors of a major TPP (Aetna) obviously has a disabling conflict, there is no reason to reject a candidate simply because he or she is affiliated with an entity whose other affiliates worked for one of the parties on unrelated matters.  Indeed, under plaintiffs' view, the entire faculty of MIT and Harvard could not qualify as independent because Dr. Hartman and Dr. Rosenthal are working for class counsel in this case and/or the related AWP MDL.  In sum, McKesson is prepared to have its positions tested by an independent expert.  Plaintiffs apparently are not.  There is no reason why the Court cannot now contact Professor Pindyck, or a whole host of other academics, should it decide that an independent expert would be helpful.

### C.    Plaintiffs' Last-Ditch Rationales for Deferring the Damages Class Determination Should Be Rejected.

Recognizing the vulnerability of their aggregate damages model, plaintiffs propose a series of alternatives for punting the decision on the certification of damages classes.  After the parties have briefed class issues for nearly 18 months, and after plaintiffs have been given three tries to correct the flaws identified in the Class Order, there are no valid grounds for deferring this decision any longer.  Indeed, it would be fundamentally unfair to McKesson to give

---

[10] At the November 13 hearing, plaintiffs said Professor Berndt was biased because he was retained by a PBM in litigation against TPPs.  When McKesson noted that it had been unable to identify any PBM that had retained Professor Berndt, plaintiffs revealed that Professor Berndt had been retained in the *Zyprexa MDL* — a suit against manufacturer Eli Lilly.

plaintiffs yet another chance.  In any event, plaintiffs' deferral proposals are unsupported and unavailing.

First, plaintiffs suggest that the Court defer deciding the aggregate damages issue until after the liability trial, but they cite no legal authority allowing this procedure.  (Pls. Nov 28. Br. 17-19.)  While their brief cites five cases (*id.*), **none** supports or even discusses the idea that a court can defer the decision to certify a damages class until after liability is tried.  At most, these cases stand for the unremarkable proposition that a court can bifurcate for trial damages from liability, and later determine that the damages phase must be decertified, or that cases with unmanageable damages issues should not be certified at all.

For example, in *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306, 307 (5th Cir. 2003), the Fifth Circuit affirmed denial of class certification for any part of the case, noting that even though damages could be bifurcated from liability, the individualized nature of damages was great enough to trump common liability issues and render class certification inappropriate.  In *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001), the Second Circuit recognized the possibility that at a later date, the district court might find it necessary to bifurcate damages from liability in order to ***decertify*** the damages class and try damages on an individual basis.  The court did not, however, approve or even discuss postponement of the decision to ***certify*** damages until after liability was determined.[11]  There is likewise no discussion of deferring the damages class determination in *Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004), *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000)*, or *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996).[12]

---

[11] The Second Circuit has since repudiated the analysis in *Visa Check*, finding the "fatally flawed" standard for testing expert reports in support of class certification to be inadequate.  *In re Initial Public Offering Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) ("Obviously, we can no longer continue to advise district courts that . . . an expert's report will sustain a plaintiff's burden so long as it is not 'fatally flawed'").

[12] While damages in *Hilao* were bifurcated for trial, and a second notice was used for class members to ***opt into*** the damages phase of the case, that procedure was not challenged on appeal.  *Hilao*, 103 F.3d at 772.  There is also no indication that the court decided to initially certify the class for liability only and postpone its decision on certifying damages until after the liability

Second, plaintiffs suggest that the individual issues of damages that are not picked up by Dr. Hartman's aggregate damages model could be "adjusted for at the allocation phase," apparently "involving the presentation of individual TPP claims under the auspices of a special master." (Pls. Dec. 6 Br. 8, 10.) The Class Order already rejected this precise solution — individual hearings for up to 25,000 TPPs — as "*a morass*." (Class Order 24 ("Individualized trials or hearings on damages for renewed and renegotiated contracts in the proposed individualized allocations with aggregate damages would be a morass.").) Indeed, courts reject the use of aggregate damages entirely where, as here, damages awards to class members are subject to a variety of offsets depending on each class member's particular circumstances. *Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1257 (11th Cir. 2003) (affirming refusal to award aggregate damages because "***individualized proof of claims would be necessary regardless of whether an aggregate judgment was entered***").

Finally, plaintiffs propose taking additional discovery, but such discovery will not cure the deficiencies in Dr. Hartman's methodology. Discovery closed in July. Plaintiffs now suggest they need discovery to "fully elucidate the appropriateness of using IMS data in an aggregate damages model." (Pls. Dec. 6 Br. 11.) If that discovery was necessary, plaintiffs should have done it long ago. More importantly, there is no need for additional discovery to test the accuracy of Dr. Hartman's general correlation theory, since a general correlation between IMS data and TPP reimbursements is not sufficient to account for TPP mitigation.

Accordingly, the Court should deny damages class certification now for both classes, and set this case for a liability class trial.[13]

___

phase concluded, as plaintiffs here propose. Moreover, in *Hilao*, the proposed class consisted of citizens of the Philippines who sought compensation for torture, summary execution, or "disappearances" during the reign of Ferdinand Marcos. *Id*. at 771. Under these facts, the procedure in *Hilao* of trifurcating the trial over multiple years was justified by the "extraordinarily unusual nature of this case." *Id*. at 787.

[13] With respect to the trial, McKesson notes that plaintiffs have misstated the trial length proposed by McKesson. (Pls. Nov. 28 Br. 19 (incorrectly stating McKesson seeks 20 days just for its defense to liability).) McKesson proposed a total liability trial length of 15 days (with time split evenly between the parties), and up to five more days if class-wide damages are also

## CONCLUSION

Plaintiffs have failed to meet their burden to certify damages claims asserted by TPP and percentage co-pay classes.  The Court should accordingly deny certification of both damages classes.

Respectfully submitted,

McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)        John Kiernan
Lori A. Schechter (*pro hac vice*)        Nicole Johnson
Paul Flum (*pro hac vice*)                Bonner Kiernan Trebach & Crociata
Tiffany Cheung (*pro hac vice*)           200 Portland Street
Morrison & Foerster LLP                   Suite 400
425 Market Street                         Boston, MA 02114
San Francisco, CA 94105-2482              Telephone: (617) 426-3900
Telephone:  (415) 268-7000                Facsimile: (617) 426-0380
Facsimile:  (415) 268-7522

Dated:  December 13, 2007


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 13, 2007.

/s/ Lori A. Schechter
Lori A. Schechter

---

certified.  The setting of this trial will also have to take into account the timing of notice to the U&C class, if a U&C class is certified.