FILED
IN CLERKS OFFICE
2007 DEC 21 P 12: 31
U.S. DISTRICT COURT
DISTRICT OF MASS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST, TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY, PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, and DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN,

Plaintiffs,

v.

FIRST DATABANK, INC., a Missouri corporation, and MCKESSON CORPORATION, a Delaware corporation,

Defendants.

Case No. 1:05-CV-11148-PBS

DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN,

Plaintiff,

v.

MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC.,

Defendant.

Case No. 07-CV-10988-PBS

**MEMORANDUM OF THE NATIONAL ASSOCIATION OF CHAIN DRUG STORES AND THE FOOD MARKETING INSTITUTE IN OPPOSITION TO PLAINTIFFS' MOTION FOR APPROVAL OF PROPOSED FIRST DATABANK AND MEDI-SPAN CLASS SETTLEMENTS**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 1

II. LEGAL ANALYSIS ........ 2

A. Standard for Fairness Hearing ........ 2

III. ARGUMENT ........ 5

A. The Settlements Provide No Meaningful Relief to the Class ........ 5

B. The Settlements are Punitive to Community Pharmacies, PBMs and Others in the Industry ........ 7

C. The Victims of the Alleged Wrongdoing Receive No Money ........ 8

D. The "Data Room" Involves Troubling Issues ........ 8

E. The Medi-Span Settlement Adds Nothing ........ 8

F. The Hartman Declaration is Fundamentally Flawed and Does Not Support Approval of the Proposed FDB Settlement. ........ 8

1. Not all Drug Payments are Proportional to AWP. ........ 9

2. Many Insured Plans Will See Little or No Benefit From the Proposed FDB Settlement ........ 9

3. Much of the Alleged Benefit Does Not Go to the Class ........ 10

4. Pharmacies Can Not Take a 4% "Hit" ........ 10

5. Dispensing Fees Have Nothing to do With AWP ........ 10

G. The Proposed Settlements Would be Grossly Unfair to Community Pharmacies ........ 11

H. Dr. Hartman Has Included "Savings" on 7,000 More Drugs Than are Implicated by the Complaint. ........ 11

IV. CONCLUSION ........ 12

# TABLE OF AUTHORITIES

## CASES

*Amchem Products, Inc. v. Windsor,*
*521 U.S. 591 (1997)* .......... 4

*Barboza v. Ford Consumer Finance Co., Inc.,*
*1998 WL 148832 (D. Mass. Jan. 30, 1998)* .......... 3

*Facio v. Jones,*
929 F.2d 541 (10th Cir. 1991) .......... 6

*Grant v. Cohen,*
630 F. Supp. 513 (E.D. Pa. 1985) .......... 6

*In re Compact Disc Minimum Advertised Price Antitrust Litigation,*
*216 F.R.D. 197 (D. Me. 2003)* .......... 3

*In re Masters Mates & Pilots Pension Plan and IRAP Litigation,*
*957 F.2d 1020 (2nd Cir. 1992)* .......... 4

*In re Relafen Antitrust Litigation,*
*231 F.R.D. 52 (D. Mass. 2005)* .......... 2

*Molski v. Gleich,*
*318 F.3d 937 (9th Cir. 2003)* .......... 3

*Norman v. McKee,*
*431 F.2d 769 (9th Cir. 1970)* .......... 4

*O'Shea v. Littleton,*
414 U.S. 488 (1974) .......... 6

*Sylvester v. Cigna Corp.,*
*369 F. Supp. 2d 34 (D. Me. 2005)* .......... 3-4

*United States v. Charles George Trucking,*
34 F.3d 1081 (1st Cir. 1994) .......... 5

## STATUTES, RULES & REGULATIONS

Federal Rule of Civil Procedure 23(e) .......... 2

*R.C.P. 23(e)(1)(A)* .......... 2

*R.C.P. 23(e)(1)(C)* .......... 2

# I. INTRODUCTION

The National Association of Chain Drug Stores ("NACDS") consists of nearly 200 chain community pharmacy companies whose community pharmacies fill over 71% of the more than 3.2 billion prescriptions dispensed annually in the United States. The Food Marketing Institute ("FMI") represents 1,500 member companies -- food retailers and wholesalers -- who operate approximately 26,000 retail food stores. More than one-third of these stores have in-store pharmacy departments. NACDS and FMI each appear as both self-insured members of the settlement class and as representatives of community pharmacies.

FMI and NACDS oppose approval of the proposed settlements because they provide no meaningful relief to the settlement class, they provide no relief to the victims of the alleged wrongdoing, they are grossly unfair to community pharmacies, pharmacy benefit managers and other innocent bystanders, and they are based upon a distorted, false and misleading economic analysis.

First, the proposed settlements are unnecessary because the marketplace quickly and efficiently adjusted to the AWP spike in 2002. Second, the settlements are unfair to the settlement class because the class will receive no money from the defendants. The central feature of the proposed settlements -- the proposed rollback of the AWP markup factor and then abandonment of publishing AWP data -- at best, addresses only a portion of the class and may not even benefit those class members. Third, the proposed settlements will work unfairly to punish thousands of community pharmacies in this country as well as other industry participants, by imposing transactional costs on them in reacting to an arbitrary and unnecessary across-the-board AWP re-definition. Finally, the economic analysis offered by Plaintiffs in support of the proposed settlements is fundamentally flawed. The Hartman Declaration grossly exaggerates the benefit of the settlement to the class by ignoring demonstrable marketplace activity that will

eliminate or substantially offset the impact of the proposed settlements. The Hartman Declaration also makes a number of serious errors, some as fundamental as calculating benefits from a decreased AWP on 7,000 drugs that are not even a subject of Plaintiffs' Complaint and conspiracy theory.

For the reasons that follow, the proposed settlements should not be approved.

## II. LEGAL ANALYSIS

### A. Standard for Fairness Hearing

Pursuant to Federal Rule of Civil Procedure 23(e), the court must review any class settlement. *F.R.C.P. 23(e)(1)(A)*. The court may approve the settlement only after a hearing and a finding that the settlement is "fair, reasonable, and adequate." *F.R.C.P. 23(e)(1)(C)*. Judicial review of a proposed class settlement involves a two stage procedure. First, the court reviews the proposal preliminarily to determine whether it is sufficient to warrant public notice and a hearing. *In re Relafen Antitrust Litigation, 231 F.R.D. 52, 57 (D. Mass. 2005) (citing Manual for Complex Litigation, Fourth § 13.14 at 171)*. If the court so finds (which this court recently did), the next step is to hold a hearing to determine whether the settlement is fair, reasonable and adequate. *Id.*

To determine whether a settlement is fair, reasonable, and adequate, the court must examine "whether the interests of the class are better served by the settlement than by further litigation." *In re Relafen, 231 F.R.D. at 58 (citing Manual for Complex Litigation, at 309-10)*. Even if there are no objections to a proposed settlement, the court must make an independent analysis of the settlement terms. *Id.*

There is no single test in the First Circuit for determining whether a proposed class settlement is fair, reasonable, and adequate. Instead, courts "generally consider the negotiating process by which the settlement was reached and the substantive fairness of the terms of the

settlement compared to the result likely to be reached at trial." *In re Compact Disc Minimum Advertised Price Antitrust Litigation, 216 F.R.D. 197, 206 (D. Me. 2003).* Specifically, courts in the First Circuit consider some or all of the following factors:

- Comparison of the proposed settlement with the likely result of litigation;
- Reaction of the class to the settlement;
- Stage of the litigation and the amount of discovery completed;
- Quality of counsel;
- Conduct of the negotiations; and
- Prospects of the case, including risk, complexity, expense, and duration.

Id. at 206.

Where there is a conflict of interest present, the settlement is rendered "suspect." *Id. at 1044.* A conflict of interest may exist where the majority of the settlement funds are allocated to attorneys. *See Sylvester v. Cigna Corp., 369 F. Supp. 2d 34 (D. Me. 2005)* (rejecting settlement in which attorneys received the majority of the settlement funds and the class only received 10%).

A proposed settlement which is reached prior to formal class certification requires "a higher standard of fairness." *Molski v. Gleich, 318 F.3d 937, 954 (9th Cir. 2003).* The reason for this heightened standard is that an order certifying a class for litigation is always subject to modification if the facts as they develop do not support the original certification. *Barboza v. Ford Consumer Finance Co., Inc., 1998 WL 148832 (D. Mass. Jan. 30, 1998).* Thus, a court can refine and alter a class definition as needed during litigation. This ability to modify, however, is foreclosed once there has been a settlement. As such, heightened scrutiny is needed to "ensure that the compromise involved in the settlement is one between plaintiffs and defendants, and not among members of the class." *Id. at *3.*

Courts are primarily concerned with protecting the interests of class members and, in particular, unnamed class members. In *Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)*, the United States Supreme Court noted that the fairness hearing "protects unnamed class members from 'unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise.'" *Id. at 623*. The Court went on to state that judicial review of proposed class settlements "assure[s] the class cohesion that legitimizes representative action in the first place." *Id.*

In *Sylvester*, the court noted that in determining whether a settlement is fair, reasonable, and adequate, the court has the "judicial duty to protect the members of a class in class action litigation from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class." *369 F. Supp. 2d at 44.* In *Norman v. McKee, 431 F.2d 769 (9th Cir. 1970)*, the court noted the trial court was to act as "guardian" to persons who are parties to an action only through their representative. *Id. at 774.*

Although courts primarily focus on whether the proposed settlement is fair to the class members, the rights of third parties should also be considered. In *In re Masters Mates & Pilots Pension Plan and IRAP Litigation, 957 F.2d 1020 (2nd Cir. 1992)*, the court noted that "[w]here the rights of third parties are affected . . . their interests too must be considered." *Id. at 1026.* Thus, "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id.* Where non-parties object to a settlement, the court cannot simply "brush their complaints aside." *Id.*

As noted by this court in its opinion granting preliminary approval of the settlement, the settlement merely provides injunctive and declaratory relief to class members, not monetary relief. In fact, the only monetary payments will be made to class attorneys, to maintain the FDB

Data Room for three years, and for expenses expended by FDB for notice to class members and costs associated with administration of the settlement.

In addition, the proposed settlement will have a huge effect on members of FMI and NACDS, who represent more than 70% of community pharmacy drug dispensing in the United States. The Hartman Declaration, if it were credible (which it is not), indicated that the redefinition of AWP would result in a reduction of payments to retail pharmacies by about $3.7 billion in 2007. The supposed "savings" would come right out of the economic hide of community pharmacies, if Dr. Hartman is correct (and he is not).

Hence, some of the factors relevant to this court's "fairness" inquiry strongly disfavor court approval of the proposed settlement.

## III. ARGUMENT

### A. The Settlements Provide No Meaningful Relief to the Class

The Court should decline to give approval to the proposed settlement agreements and enter the requested injunction because prospectively changing the AWP markup to 20% does not redress the misconduct alleged in the complaint. Because plaintiffs allege that the scheme ended on March 15, 2005, the proposed injunctive relief -- which would be almost three years after that date -- does nothing to redress the alleged misconduct.

Plaintiffs do not allege that the standardized markups reported by FDB after March 15, 2005 were fraudulent, nor could they, given First DataBank's full disclosure to its customers on that date. In order to show that injunctive relief after March 15, 2005 is appropriate, plaintiffs would be required to show that using a standardized markup and fully disclosing that practice to its customers after that date somehow was fraudulent and resulted in a fraudulently reported markup which FDB continues to report to this day. *See United States v. Charles George Trucking,* 34 F.3d 1081, 1089 (1st Cir. 1994) (settlement cannot be approved unless it "comes

within the general scope of the case made by the pleadings, and "furthers the objectives upon which the complaint was based"). Obviously, no such allegation has ever been made, and it is fundamentally inconsistent with plaintiffs' theory of the case.

Because the alleged scheme ended on March 15, 2005, the Court has no basis for awarding injunctive relief beginning at least two years after that date, which is well outside the class period. The Supreme Court held long ago that injunctive relief cannot be awarded for conduct that has ended. *See O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974) (holding that past exposure to illegal conduct does not demonstrate a case or controversy regarding injunctive relief); *Grant v. Cohen,* 630 F. Supp. 513, 516 (E.D. Pa. 1985) (same). Any entry by the Court of an injunction in these circumstances would be reversible error. *Facio v. Jones,* 929 F.2d 541, 545 (10th Cir. 1991) (vacating and remanding on the basis that the plaintiff had suffered only past harm).

More important than whether prospective injunctive relief is moot, the proposed AWP rollback is now virtually meaningless to any class of payor. First, the marketplace has already largely incorporated the revelations regarding how FDB reported AWP. FDB reported this information to its clients in March of 2005. As FTC studies demonstrate, the industry -- including PBMs, TPPs and retail drug stores -- is highly sophisticated and competitive. As a result, during the past two years, the marketplace completed its absorption and reaction to this information regarding how AWP was calculated. This reactive process began almost immediately in 2002 when the AWP spike was noticed by many in the industry. By 2005, when FDB came clean, a substantial portion of the industry had already taken actions to preserve the original economics of their deals. Some PBMs have contracts with TPPs that provide that if there is a change in the methodology for calculating AWP, the parties will take whatever actions are necessary to preserve the original economics of the deal. There is a specific

acknowledgement of this in a 2005 FTC report on PBMs. By invoking these provisions, PBMs negated any economic effect of the proposed settlement. As a result, the prices paid by TPPs will remain unaffected by the proposed settlement.

Retail pharmacy chains generally operate at low profit margins and would be economically unable to bear the costs of this proposed settlement agreement. Retail drug chains generally have at-will contracts with PBMs. Of necessity, these retail drug chains have been renegotiating their contracts with PBMs in order to preserve the original economics of their contracts. As a result, the settlement is unlikely to change retail drug prices. At least two retail drug chains have issued public statements announcing that if there is a change in the methodology for calculating AWP, they will renegotiate their at-will contracts with PBMs.

**B. The Settlements are Punitive to Community Pharmacies, PBMs and Others in the Industry**

The economically necessary steps that PBMs and retail drug chains will take if this settlement is approved will result in very substantial transaction costs for PBMs, TPPs, and retail drug chains that, in an economically efficient marketplace, will be passed along to consumers, adding economic insult to uncompensated injury. In addition, the settlements will inject great uncertainty into the marketplace. The whole point of having an AWP is to provide a stable, predictable benchmark for pricing transactions involving pharmaceutical drugs. This settlement will destroy that predictability. First, the fate of AWP in the short run will depend upon whether another data reporting service such as Redbook decides to continue the current methodology for calculating AWP. In the not-so-long-run (two years for FDB, three years for Medi-Span), there may be no reported AWP to use as a pricing benchmark. This will cause tremendous uncertainty in the marketplace because no one has any idea as to what type of pricing benchmark will succeed it. This uncertainty is not likely to benefit the class, or, for that matter, anyone else.

Further, the settlement provisions regarding industry "mediation" to establish a new reimbursement benchmark raise strong antitrust concerns related to competitors discussing and possibly agreeing on pricing components.

**C. The Victims of the Alleged Wrongdoing Receive No Money**

The proposed settlements are truly unique. Research fails to uncover a single federal class action settlement where the settlement class received no money and no meaningful injunctive relief -- and the economic brunt of the settlement was borne by innocent non-parties. Further, the Class (payers today) includes individuals and entities who were not payers when AWPs were increased years ago. The benefit of the settlement goes to payers not harmed while payers harmed receive no benefit.

**D. The "Data Room" Involves Troubling Issues**

The "Data Room" proposed in these settlements may contain proprietary and confidential data of pharmacies and it should not be constructed as a fishing hole for plaintiffs' attorneys to look for new lawsuits to file. This Data Room is another part of the compensation to plaintiffs' attorneys -- they are the only beneficiaries, not members of the class.

**E. The Medi-Span Settlement Adds Nothing**

Dr. Hartman's analysis was originally prepared when just the FDB settlement existed and it was resubmitted when the Medi-Span settlement was proposed with no additional benefit beyond the "benefit" that comes from the FDB settlement -- which is none.

**F. The Hartman Declaration is Fundamentally Flawed and Does Not Support Approval of the Proposed FDB Settlement.**

FMI and NACDS have attached to this Memorandum the report and curriculum vitae of Dr. Gale Mosteller, a University of Chicago Ph.D. (economics) graduate and currently an economics consultant in Washington, D.C. The associations asked Dr. Mosteller to review and comment upon the Declaration of Raymond S. Hartman previously submitted by plaintiffs in

support of approval of the proposed FDB settlement. Dr. Mosteller has reached the following conclusions regarding Mr. Hartman's opinion that the proposed settlement will yield cost savings to the class of $3.7 billion on retail brand-name drugs in 2007.

**1. Not all Drug Payments are Proportional to AWP.**

According to Dr. Hartman, in most drug reimbursement contracts, drug payments are proportional to AWP. Indeed, this is the linchpin to Dr. Hartman's conclusion regarding a savings of $3.7 billion. However, cash paying customers will not receive the $392 million forecasted by Dr. Hartman – it is almost certain that they will receive $0. Cash payers are not tied to AWP as the prices of their cash drug purchases are set by the cash market price. No cash payer is charged at the cash register "AWP – 13%." Pharmacies have broad discretion to charge cash customers what the market will bear, which, not surprisingly, they do. Because insured plans/managed care negotiate lower prices for drug reimbursement, pharmacies may attempt to offset these lower prices by charging cash customers higher prices. If AWP is rolled back by 4% and Dr. Hartman is correct (which he is not) that insured plans will pay pharmacies even less, basic economics dictates that the pharmacies will attempt to make some (or all) of it up with cash paying customers by holding or even increasing their cash prices.

Cash customers, who will be class members, will not only get nothing from this settlement but they may actually be harmed, yet their rights will be extinguished.

**2. Many Insured Plans Will See Little or No Benefit From the Proposed FDB Settlement**

Dr. Hartman assumes that a rollback of the AWP margin will mean, automatically, a rollback in payments by third party payers to drug providers. Dr. Hartman is wrong. Health plans and other third-party payors almost always contract with "pharmacy benefit managers" to manage their drug benefits. The plans pay PBMs for drugs and the PBMs pay the pharmacies. The three largest PBMs have standard contract language that specifically anticipate AWP margin

changes. Those contracts provide that if the method of calculating AWP changes then the reimbursement rates will be revised to preserve the absolute dollars involved. If AWP changes, as proposed by these settlements, under these PBM contracts, the dollars nevertheless remain the same. The plans that contract with these PBMs will not spend less money.

Finally, Dr. Hartman ignores co-pays. The average co-pay should be deducted from his "savings" analysis because the people who pay co-pays are not class members.

**3. Much of the Alleged Benefit Does Not Go to the Class**

Dr. Hartman states that Medicaid will save $502 million. However, the federal and state government payers are specifically excluded from the class. Similarly, the Medicare Part D drug benefit (which cost $30 billion in 2006) is excluded from the class. Accordingly, since Medicare Part D drug benefits are offered through private plans, there needs to be a further reduction in Dr. Hartman's savings analysis.

**4. Pharmacies Can Not Take a 4% "Hit"**

Community pharmacies operate, on average, on a 2% net margin on drug sales. It is simply not economically possible for those pharmacies to reduce that profit by 4% -- it will put those pharmacies in the red. Either the pharmacies will go out of business or they will re-negotiate reimbursement rates at something other than the 4% reduction anticipated by Dr. Hartman. If pharmacies drop out of plans then both consumers and plans are harmed.

**5. Dispensing Fees Have Nothing to do With AWP**

Dr. Hartman, in his Declaration, assumes that the "dispensing fee" paid to pharmacies will be reduced by 4% (because of a reduction in AWP). However, dispensing fees have nothing to do with AWP and are not effected by AWP.

**G. The Proposed Settlements Would be Grossly Unfair to Community Pharmacies**

Dr. Hartman's underlying assumption is that pharmacies received a windfall beginning in 2002 when AWP was increased as a result of some illegal conspiracy. However, Dr. Hartman has not provided any evidence that the pharmacies received a 4-5% windfall increase in drug prices – because there isn't any such evidence. Publicly available information rejects the notion that pharmacies' average net profit of 2% all of the sudden experienced a substantial spike in 2002 and which remained for the last four years. PBMs compete fiercely for the business of plans by negotiating pharmacy reimbursement prices that leave pharmacies with razor-thin margins on drug sales. The marketplace would not – and did not – simply allow pharmacies to enjoy some increased tripling of net profit margin on drug sales.

Regardless of the proposed settlement's impact on pharmacies' bottom lines because of a decrease in AWP, that decrease will certainly result in enormous transactional costs to pharmacies (renegotiating reimbursement contracts and making computer programming and other administrative expenses) that may be passed along to plans and PBMs.

**H. Dr. Hartman Has Included "Savings" on 7,000 More Drugs Than are Implicated by the Complaint.**

Plaintiffs' complaint alleges a conspiracy theory involving about 1400 drugs, the AWP-based prices of which were raised in 2002. However, Dr. Hartman's "savings" analysis addresses AWP rollbacks for over 8,400 drugs. This means that over 7,000 of these drugs did not experience a price increase in 2002 because of an artificial AWP spike and, therefore, Dr. Hartman's "savings" analysis is overstated by a factor of five. More importantly, the proposed settlements decrease AWP for 7,000 prescription drugs more than the plaintiffs claim were involved in inappropriate AWP increases. The settlements should not reduce AWPs for drugs not involved in wrongful AWP increase alleged by Plaintiffs.

There is no "case or controversy" over the 7,000 drugs not alleged by Plaintiffs in their Complaint to be affected by the conspiracy. In a real sense, the Court has no jurisdiction over any claims relating to those drugs -- because they have not been made -- and therefore the court cannot and should not approve a settlement that involves those drugs.

## IV. CONCLUSION

The proposed settlements should not be approved. The benefit to this class is virtually non-existent. No class member will get a dime and it is extremely unlikely that any class members will realize any material "savings". Further, even if Dr. Hartman's analysis is correct (which it is not), an unfair punishment will thrust upon this country's community pharmacies and other innocent bystanders in the prescription drug delivery marketplace.

Respectfully submitted,

Philip G. Kircher

COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000

Counsel for Objectors Food Marketing Institute and The National Association of Chain Drug Stores

Dated: December 20, 2007

# REPORT OF GALE MOSTELLER, PhD ON THE EXAGGERATED COST SAVINGS FROM THE FIRST DATABANK AND MEDI-SPAN SETTLEMENTS AS REPORTED BY RAYMOND S. HARTMAN



My name is Gale Mosteller. I have a Ph.D. in Economics from the University of Chicago with a focus on industrial organization. In 1985-89, I worked at the Federal Trade Commission initially as a staff economist on antitrust matters, particularly mergers and acquisitions, and later as an advisor to Commissioner Strenio. After that, I joined Economists Incorporated, an economic consulting firm in Washington, DC, and have worked on cases involving many industries, including several involving the pharmaceutical industry. I have attached my *curriculum vitae*.

The National Association of Chain Drug Stores has asked me to review and comment on Raymond S. Hartman's declaration on the impact and cost savings of the proposed First DataBank Settlement Agreement.[1] Dr. Hartman calculates that the settlement will yield $3.3 billion in cost savings on retail brand-name drugs to the Class of private third-party payers in 2007.[2] He also calculates that the settlement will yield $0.9 billion savings to parties outside the Class (Medicaid and cash customers). Dr. Hartman indicates that cost savings from the settlement will accrue in the short run (such as a year).[3] I disagree with Dr. Hartman's assessment of the potential savings from the settlement because he relies on erroneous facts and assumptions.

According to Dr. Hartman, the reimbursement for retail brand-name drugs in most contracts with private third-party payers is proportional to the AWP[4] (a list price, rather than a transaction price). Dr. Hartman argues that reducing AWPs as proposed in the settlement will automatically reduce reimbursements on retail brand-name drugs by 4%. I disagree with Dr. Hartman's assessment because many reimbursements will not automatically decline with AWP reductions. Dr. Hartman fails to consider that large PBMs[5] have contracts that would adjust the reimbursement to offset the decline in AWPs. I also disagree with Dr. Hartman's assessment because the significant reduction in profits

[1] Declaration of Raymond S. Hartman: Impact and Cost Savings of the First DataBank Settlement Agreement, Sept. 27, 2006.

[2] Hartman Declaration at 7.

[3] Hartman Declaration at fn. 19.

[4] AWP stands for average wholesale price. Professor Berndt discusses AWP in his Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, February 9, 2005 at 10-60.

[5] PBM refers to pharmacy benefit manager. PBMs contract with third-party payers to provide administration and claims processing for prescription benefit plans. To service the plans, PBMs establish a network of retail pharmacies and negotiate reimbursement contracts with them.

of those entities whose reimbursements would decline would generate strong incentives to renegotiate the reimbursement contracts. I identify several additional errors and oversights that inflate Dr. Hartman's cost savings calculation. For all these reasons, Dr. Hartman seriously overstates the cost savings from the proposed settlement.

# I. THE MARKETPLACE WILL OFFSET THE IMPACT OF THE PROPOSED SETTLEMENT ON CLASS MEMBERS

The proposed settlement will reduce the AWP published by First DataBank ("FDB") on many brand-name drugs. According to Dr. Hartman's calculations, in most contracts with private third-party payers, drug reimbursements are proportional to AWPs, so that reducing AWPs will automatically reduce reimbursements by 4%.[6] Dr. Hartman calculates that private third-party payers will save $3.3 billion in one year.

Many private third-party payers will not benefit from the proposed settlement. First, most contracts of the three largest PBMs protect the reimbursement dollar amounts from reductions in AWPs so that Class Members' payments will not change. Second, entities whose reimbursements would decline have strong incentives to renegotiate their contracts with third-party payers in response to the significant reduction in profits. Indeed, the proposed FDB settlement, with the announced AWP rollback, is now more than a year old. As that proposed settlement has aged, it is likely that more pharmacies have anticipated the AWP rollback and have renegotiated accordingly. Due to protections in existing contracts as well as renegotiations, changes in FDB's AWPs will not automatically reduce drug reimbursements.

## A. The Largest PBMs Have Contracts that Offset an AWP Adjustment.

The three largest PBMs have confirmed that most of their contracts permit them to make offsetting changes if the AWP declines. Medco, a large PBM, has indicated that the vast majority of its contracts have explicit language that keeps the economic relationship with its clients net neutral when a benchmark or methodology changes. "The proposed

[6] See Hartman Declaration, fn. 13. Dr. Hartman states that for drugs with an AWP of 1.25 WAC, the settlement will reduce the AWP to 1.20 WAC. If the reimbursement amount is proportional to AWP by a discount factor, the reimbursement will change by (Discount Factor)(1.25 WAC) – (Discount Factor)(1.20 WAC). The change in reimbursement is 4% of the original reimbursement.

4% = (1.25-1.20) / 1.25 =

[(Discount Factor)(1.25 WAC) – (Discount Factor)(1.20 WAC)] / (Discount Factor)(1.25 WAC).

FDB settlement does not change the economics of our drug purchasing." … "Any new benchmark would be adjusted with discounts to keep the numbers similar for clients."[7] As a result, after the settlement, the discounts would automatically change in most of Medco's contracts to keep the reimbursement dollar amount for brand-name drugs the same after the proposed settlement.

Similarly, Caremark, another large PBM, has indicated that "roughly 90% of our contracts either give us the ability to use a data source other than First DataBank or carry a reservation of rights language clause that would allow us to modify or preserve pricing terms if there is a change in the methodology, in calculating AWP, or both."[8] Express Scripts, a third large PBM, has also indicated that about 92% of its contracts have terms that would mitigate the effect of changes in AWP due to implementing the settlement.[9]

To take into account potential contract renegotiations and shifts to Medi-Span, Dr. Hartman assumed that a third of the reimbursements by private third-party payers would not be reduced as a result of the proposed settlement, and noted, "I believe this to be a larger shift than will actually occur."[10] Medco, Caremark, and Express Scripts processed roughly 47% of drug prescriptions made by private third-party payers in 2005.[11] Assuming that 90% of their reimbursements are contractually protected, then roughly 42% of the Class's reimbursements will not change because of these three PBMs alone. Thus, the contractually protected reimbursements of these three companies have exceeded Dr. Hartman's assumed reduction without resorting to any renegotiations or shifts to Medi-

---

[7] Brooke McManus. November 13, 2006. "Medco Contracts Will Minimize Impact of Pricing Changes, PBM Says." *The Pink Sheet 68*(046): 9.

According to Medco's Integrated Prescription Drug Program Master Agreement, "If First DataBank or other applicable source changes the methodology for calculating AWP in a way that materially changes the economics of the Program, the parties agree to modify the Program Pricing Terms to preserve the parties' relative economics before such changed methodology."

[8] Ibid.

[9] Ibid. Express Scripts Press Release. "Express Scripts Provides 2007 Earnings Guidance." November 14, 2006.

[10] Hartman Declaration at fn. 14.

[11] Medco, Caremark, and Express Scripts processed 34.2% of total retail prescription volume (excluding mail order prescriptions) in 2005, and private third-party payers processed 72.8%. [National Association of Chain Drug Stores Foundation. *The Chain Pharmacy Industry Profile 2006.* Table 42 (Market Share and Volume of Top 10 PBMs, 2005)]. Thus, Medco, Caremark, and Express Scripts processed roughly 47% of private third-party payers' prescriptions (= 34.2% / 72.8%). Share of prescription volume is closely related to share of prescription dollars (but not identical).

Span. Due to the contractual protections of these three PBMs, $2.1 billion of cost savings, calculated by Dr. Hartman, will not materialize.[12]

**B. Pharmacies Have Strong Incentives to Renegotiate Plan Contracts to Offset the AWP Adjustment.**

If reimbursements to retail pharmacies for brand-name drugs did decline as calculated by Dr. Hartman, retail pharmacies would have strong incentives to renegotiate their reimbursement contracts to raise their reimbursements. According to Dr. Hartman's calculations, the proposed settlement will reduce payments to retail pharmacies for brand-name drugs included in the settlement by 4%. If so, total revenues of retail pharmacies would decline about 2.2%.[13] Such a revenue decline (with no reduction in costs) would have a severe impact on retail pharmacy profits. Before-tax overall retail pharmacy profits are roughly 3.5% to 4.5% of revenues,[14] but, using Dr. Hartman's calculations, the settlement would cut before-tax overall profits roughly a half to two-thirds or 1.3% to 2.3% of revenues. In after-tax terms, overall retail pharmacy profits would decline from 2.3% to 2.9% of revenues to 0.8% to 1.5%. This substantial profit decline would generate strong incentives for retail pharmacies to renegotiate their reimbursement contracts.

Drug and supermarket chains, such as CVS and Ahold USA, plan to re-negotiate their contracts, if the settlement is implemented. According to CVS, "In the event AWPs were suddenly reduced in a material way for particular products, obviously we would

---

[12] Dr. Hartman estimates that retail spending on the drugs in the settlements would be $158 billion in 2007 and that private third-party payers account for 78.8% or $125 billion (Declaration at ¶ 11 and Table 2). Using 42% as the portion of Medco's, Caremark's, and Express Scripts's reimbursements that will not change should AWPs decline yields $52.5 billion. A 4% cost savings on these reimbursements would generate $2.1 billion.

[13] About 71.7% of chain drug stores' pharmacy revenues came from prescriptions in 2005. [National Association of Chain Drug Stores Foundation. *The Chain Pharmacy Industry Profile 2006.* Table 2 (Type of Store and Store Characteristics, 2005)] About 77.7% of those prescription revenues came from brand-name drugs. [Wolters Kluwer Health Pharmaceutical Audit Suite] Hence, 56% of retail pharmacy revenues come from brand-name drugs. According to Dr. Hartman, the proposed settlement applies to 96.6% of retail brand-name drugs sales. If so, the proposed settlement would apply to 54% of retail pharmacy revenues. If retail revenues from the brand-name drugs in the proposed settlement declined 4%, retail pharmacy revenues would decline 2.2% (= 54% x 4%).

According to Dr. Hartman's declaration (fn. 8), the settlement also includes generic drugs and physician-administered drugs. If reimbursements on these drugs are proportional to AWP, Dr. Hartman's cost savings calculation would be even larger and the implied reduction in pharmacy profits would be even greater.

[14] "Executive Summary," *NCPA-Pfizer Digest* for 2005 at 8; National Association of Chain Drug Stores Foundation. *The Chain Pharmacy Industry Profile 2006.* Table 17 (Financials by Industry for Publicly Held Companies).

renegotiate the discount or dispensing fee. Virtually all of our commercial agreements are 'at-will' agreements, which can be renegotiated freely."[15] According to Ahold USA, "Because we base all of our third-party contracts on AWP, we will have to re-negotiate those."[16]

In sum, a substantial share of the Class's benefits would not materialize because reimbursements are protected in many PBM contracts, and because pharmacies whose reimbursements would decline have strong incentives to renegotiate their contracts.

## II. OTHER ERRORS IN DR. HARTMAN'S CALCULATION

In addition to the marketplace responses described above that will offset the impact of the proposed settlement, Dr. Hartman's calculations inflate the expected cost savings for other reasons. His data source overstates reimbursements paid by the Class. Dr. Hartman does not take into account dispensing fees and declining sales of brand-name drugs whose patents expired in 2005, 2006, and 2007 and will expire in the future. All these errors exaggerate the cost savings from the proposed settlement.

### A. Erroneous Use of Cash/Uninsured Retail Prices Inflates Purported Savings Under the Proposed Settlement.

Dr. Hartman uses 2005 retail spending data published in *Drug Topics* that is not appropriate for his calculation. These data come from Verispan's Vector One National Audit. Verispan computes "retail dollars" using the full price (meaning the cash/uninsured price) the pharmacy charges a customer for a prescription.[17] In other words, these "retail dollars" do not reflect what pharmacies actually receive for prescription drugs. The cash/uninsured price typically exceeds the reimbursement received from third-party payers. As a result, Dr. Hartman applies his 4% cost savings to an inflated retail sales base, overestimating the benefits from the proposed settlement.

---

[15] CVS Press Release. "CVS Corporation Statement Regarding AWP." October 6, 2006.

[16] Wendy Toth. "The Specifics on Generics; An Influx of Brand-Name Drugs Going Off Patent, Medicare Part D and Wal-Mart's $4 Plan Have Made Generics the Hottest Pharmacy Topic Today." *Supermarket News*, October 31, 2006. (http://www.pharmasentry.com/news/newsletter.cfm?linkid= A2997A33-1372-54C2- 612943A76CA231E7)

[17] Email dated Nov. 28, 2006 from Sandy Dang of Verispan.

Assuming that cash/uninsured customers pay 15% more than the reimbursement paid by third-party coverage,[18] Dr. Hartman has overestimated the retail spending of private third-party payers by roughly $15 billion.[19] Consequently, he has overestimated savings by $600 million.

**B. Erroneous Inclusion of Dispensing Fee Inflates Purported Savings Under Proposed Settlement.**

Dr. Hartman applies his 4% cost savings to the total reimbursement made by third-party payers. Reimbursements from third-party payers typically include a flat fee per prescription called a dispensing fee as well as another component to cover the ingredient costs. While the reimbursement on ingredient costs may be based on AWP,[20] the proposed settlement does not affect the dispensing fee. By applying his 4% cost savings to the total reimbursement, Dr. Hartman calculates a 4% savings on dispensing fees, overestimating the benefits from the proposed settlement.

Reimbursements by private third-party payers averaged $114 per brand-name prescription in 2005,[21] while the dispensing fee component was about $2 to $3. Consequently, Dr. Hartman has overstated the portion of retail spending of private third-party payers based on AWP by roughly $2 to $3 billion.[22] As result, he has overestimated savings by $100 million.

---

[18] U.S. Department of Health & Human Services, Report to the President: Prescription Drug Coverage, Spending, Utilization, and Prices, April 2000 at 96.

[19] Dr. Hartman estimated that the settlement pertains to $158 billion of retail spending on brand-name prescription drugs in 2007, and private third-party payers's share is 78.8% or $125 billion (Declaration at ¶ 11, Table 2). Private and public third-party payer's share of retail prescriptions is 90.7% (Declaration at Table 2), but Verispan's data uses cash/uninsured prices which are assumed to be 15% higher than third-party reimbursements. Hence, the $158 billion is assumed to overstate retail spending by 13.6% (= 1.15x0.907 + .093). After adjusting for the overstatement, the settlement pertains to $139 billion of retail spending on brand-name prescription drugs, and private third-party payer's share is 78.8% or $110 billion. The difference is $15 billion (= $125 - $110).

[20] In some cases, payers reimburse pharmacies at either a discount from AWP or at the pharmacy's cash/uninsured price, whichever is lower. To the extent that pharmacies receive cash/uninsured prices, these reimbursements would not be relevant to the settlement. See also V.B. below.

[21] Wolters Kluwer Health Pharmaceutical Audit Suite.

[22] The dispensing fee accounts for 1.8% to 2.6% (= 2/114 or 3/114) of each brand-name prescription or $2 billion to $3 billion of $110 billion of private third-party payer's reimbursements (see fn. 19). Applying 4% to these fees yields roughly $100 million.



### C. Failure to Adjust for Drugs Going Off Patent Inflates Purported Savings under Proposed Settlement.

The sales volume of some brand-name drugs in the proposed settlement will decline as generic entry occurs and patients substitute generic drugs for brand-name drugs. The FDA has granted generic approval for drugs that will compete with about 32.4% of the 2005 retail brand-name drug sales included in Dr. Hartman's calculation. See Appendix Table 1. In addition, patents on other brand-name drugs in the proposed settlement expired during 2005-2007 or will expire in 2008. These patent expirations and generic approvals together account for about 47.5% of the 2005 retail brand-name drug sales included in Dr. Hartman's calculation. See Appendix Table 1. If generic substitution causes the sales of these brand-name drugs to shrink, say, 60% within a year,[23] then 28.5% of the brand-name drug sales targeted by the settlement will be eliminated in 2008. Dr. Hartman has overestimated the retail spending by private third-party payers on brand-name prescription drugs by $30.5 billion.[24] This means he has overestimated savings by $1.2 billion.

### D. Adjustments to Dr. Hartman's Calculation Dramatically Lower the Estimate.

Combining all of the adjustments discussed earlier reduces the Class's retail spending and associated cost savings substantially, as shown in the following table. Dr. Hartman's estimate of total retail spending on brand-name prescription in 2007 of $158 billion is reduced by $19 billion because cash/uninsured prices exceed third-party reimbursements, but Dr. Hartman's data uses these higher prices for all payers. This leaves $139 billion, and the Class's portion is 78.8% or $110 billion (see fn. 19). This amount is reduced by $3 billion (see fn. 22) to $107 billion because dispensing fees would not change when AWPs change. The $107 billion is reduced by 28.5% or $30.5 billion (see fn. 24) because of generic substitution between 2005 and 2008. The remaining $77 billion is reduced by 42% or $32 billion because Medco's, Caremark's, and Express Scripts's contracts will not reduce reimbursements when AWPs decline and is reduced a

[23] In a study of generic drug entry between 1992 and 2000, generics sold 59% of extended units at retail 12 months after entry, 70% 24 months after entry, and 77% 36 months after entry. (Sachin Gupta, Yu Yu, and Rahul Guha, "Pioneering Advantage in Generic Drug Competition," Cornell University, Johnson School Research Paper Series #37-06, August 2006, Table 2.)

[24] A 28.5% reduction in $107 billion of private third-party payer's reimbursements ($110 - $3 = $107; see fn. 22) is $30.5 billion.

third, using Dr. Hartman's assumption, or $26 billion because of contract renegotiations. This leaves $19 billion of retail spending. A 4% reduction of this spending would yield cost savings of $0.76 billion for the Class, less than a quarter of the savings estimated by Dr. Hartman.

Retail Spending on Brand-Name Prescription Drugs in 2007 ($ billions)

| | | |
|---|---|---|
| 1) | Dr. Hartman's estimate of total spending (Declaration at ¶ 11) | $158 |
| 2) | Adjusted for pricing overstatement | $139 |
| 3) | Class Portion (private third-party payers) | $110 |
| 4) | Adjusted for dispensing fees | $107 |
| 5) | Adjusted for brand-name loss to generics | $77 |
| 6) | Adjusted for Medco's, Caremark's, Express Scripts's contracts | $45 |
| 7) | Reduced by a third of row 5 for renegotiations, per Dr. Hartman | $19 |
| 8) | 4% cost savings for Class | $0.76 |

Even this calculation likely overstates the Class's cost savings. As explained earlier, to avoid losing reimbursements due to a reduction in AWPs from the settlement, companies will have strong incentives to renegotiate their contracts, if their reimbursements do not adjust automatically. For this reason, Dr. Hartman's adjustment of a third is probably too small and the associated cost savings too large.

## III. DR. HARTMAN'S ANALYSIS OVERLOOKS THE ESSENCE OF SUPPLY AND DEMAND ECONOMICS

An economic analysis typically discusses the demand and supply conditions that produce pricing in the marketplace. Dr. Hartman's analysis differs because he focuses on contractual terms in drug reimbursement contracts and takes the position that reimbursement formulas will not change in the short run (within a year).[25] As discussed above, many contracts have greater flexibility than Dr. Hartman suggests. Some reimbursement formulas will change automatically: most of the contracts of the three largest PBMs include adjustments that eliminate the impact of changes in AWPs. Other contracts can be re-negotiated or terminated without penalty: CVS's contracts are "at will." Some contracts have other forms of protection against changes that substantially impact profitability.

[25] Hartman Declaration at fn. 19.

Even when contracts have rigid terms, there are other sources of flexibility. Contracts can be renegotiated or cancelled at the end of their terms without penalty. The longer the delay between the announcement of the settlement and its terms on October 6, 2006 and the implementation of the settlement, the greater the number of drug reimbursement contracts that will come up for renegotiation. These renegotiations are likely to include terms that will offset the cost savings expected by Dr. Hartman. For contracts renewed annually, one would expect renegotiations to have eliminated potential cost savings by late 2007.

These renegotiations will establish reimbursements based on demand and supply conditions. Although the settlement reduces AWPs, it does not alter underlying demand and supply conditions. In particular, the settlement does not reduce drug acquisition costs or pharmacy operating costs.

Pharmacies need a competitive return to cover their costs, including wages, inventory costs, rent, and electricity. If pharmacies lose part of their profit margin, they will need to recover it or stop participating in plans that do not yield a competitive return. Because of competition in drug reimbursement contracting, pharmacies are not likely to earn supracompetitive profits from their reimbursement contracts. Consequently, renegotiated contracts are likely to offset the reduction in AWPs to yield a competitive return to pharmacies. Prescription plans cannot drive retail margins below competitive levels without losing their network of pharmacies to service customers. Hence, it is not in the interest of third-party payers to lower reimbursements too far.

Another source of flexibility is breaching an inflexible contract. Contract breaches usually require compensation payments to the other party. If the cost of settling the breach appears lower than the profit loss from adhering to the contract for the duration of its term, pharmacies may prefer to breach and settle their contracts.

Dr. Hartman premises his calculation on the alleged inability to adjust reimbursement rates rapidly. However, the delay in implementing the settlement has likely eliminated the need to adjust rapidly. Reimbursement negotiations will reflect demand and supply conditions and take into account potential changes from future adoption of the settlement.



## IV. UNRECOGNIZED COSTS RELATED TO SETTLEMENT APPROVAL

It may be tempting to approve the settlement on the outside chance that some cost savings may accrue. However, to do so would ignore the fact that renegotiations and computer reprogramming are time consuming and costly. According to plaintiffs, the Class includes over 10,000 third-party payers.[26] As a result, the settlement could potentially impose costs on class members, pharmacies, and others while failing to produce costs savings for Class members.

## V. THE PROPOSED SETTLEMENTS EXTEND BEYOND THE COMPLAINT

### A. Dr. Hartman's Calculation Includes Entities Outside the Class

The Class bringing this lawsuit does not include Medicaid or cash/uninsured customers. However, in calculating the benefits from the proposed settlement, Dr. Hartman explicitly includes $0.5 billion in cost savings to Medicaid and $0.4 billion to cash/uninsured customers. These savings do not redound to the Class.

### B. Cash/Uninsured Customers Are Unlikely to Realize Any Savings Under the Proposed Settlement.

Dr. Hartman's theory that reductions in the AWP will automatically lower reimbursements is not applicable to cash/uninsured customers. The latter make out-of-pocket payments for their drugs and have no contract with pharmacies or plans. Pharmacies quote prices to cash/uninsured customers in dollars without any reference to AWP. Pharmacies themselves establish the prices paid by cash/uninsured retail customers and, if they choose, can retain the same prices despite reductions in AWPs. Dr. Hartman offers no evidence that cash/uninsured prices are related to AWPs. The prices charged by pharmacies depend on underlying demand and supply conditions in the marketplace, and the settlement does not change those conditions. Pharmacies have no obligation or incentive to lower cash/uninsured prices as AWP declines. Indeed, if profits from other customers declined, pharmacies would have a disincentive to lower the prices paid by

[26] First Amended Class Action Complaint at ¶153.

Economists
INCORPORATED

cash/insured retail customers. As a result, the $0.4 billion cost savings to cash/insured customers calculated by Dr. Hartman should not be expected to materialize.[27]

**C. The Settlement Covers Substantially More Drugs than the Complaint**

The Complaint pertains to about 1,400 NDCs[28] for brand-name drugs, whereas the settlement includes 8,486 NDCs.[29] Based on the 2005 sales data used by Dr. Hartman, the drugs in the complaint correspond to roughly 49.7% of retail brand-name drug sales, while the drugs in the settlement correspond to roughly 96.6% of retail brand-name drug sales, as shown in the Appendix Table 1. Hence, the settlement covers almost twice as much 2005 drug sales volume as the complaint.

Plaintiffs have estimated that in 2002 the alleged scheme to raise AWPs impacted $46.3 billion of brand-name prescription retail dollars reimbursed by private third-party payers.[30] Assuming, for the sake of argument, that the alleged scheme inflated reimbursements on all these drugs, reimbursements would have included an extra 4% or $1.85 billion. The impact on reimbursements, if any, would not persist because competition among PBMs for contracts with third-party payers and competition among pharmacies for contracts with PBMs would drive reimbursement rates back to competitive levels when contracts came up for renewal, if not sooner. If the settlement had been implemented in 2005, it would have impacted $109.1 billion of brand-name prescription retail dollars reimbursed by private third-party payers, based Dr. Hartman's calculations. Assuming, for the sake of argument, that the settlement deflated reimbursements on all these drugs by 4%, reimbursements in 2005 would have decreased by $4.36 billion or more than double the amount of the assumed harm in 2002.

---

[27] Dr. Hartman appears to recognize the weakness of his position when he states: "If retailers ignore the lower AWPs imposed by the settlement and merely keep U&C at the pre-settlement level (related to pre-settlement AWPs) for all cash transactions, then no cash payers will benefit from the settlement." (Hartman Declaration at fn. 14)

[28] The Food and Drug Administration maintains 10-digit NDCs (National Drug Codes) that identify each medication's labeler/vendor, product, and trade package size.

[29] Appendix A Drugs by NDC attached to the Complaint. Hartman Declaration, Attachment B, note 1.

[30] Attachment A to Class Plaintiff's Amended Memo, November 3, 2006. According to Attachment A, in 2002 the total brand-name retail dollars subject to damages was $58.4 billion, and the third-party payer percentage was 79.3%. $58.4 billion x 79.3% = $46.3 billion.

Brand-Name Prescription Retail Dollars ($ billions)

| | | Top 200 Drugs | All Drugs | Drugs Reimbursed by Private Third-Party Payers |
|---|---|---|---|---|
| 2002 | In Complaint | $48.1 | $58.4 | $46.3 |
| | Total | $111.0 | $134.7 | $106.8 |
| 2005 | In Complaint | $59.5 | $71.3 | $56.2 |
| | In Settlement | $115.6 | $138.4 | $109.1 |
| | Total | $119.7 | $143.3 | $112.9 |

Source: 2002 data from Attachment A to Class Plaintiff's Amended Memo, November 3, 2006. 2005 data for top 200 drugs (in first column of numbers) from Appendix Table 1. 2005 data in bottom row of first two columns of numbers from "Top 200 Brand-Name Drugs by Retail Dollars in 2005," *Drug Topics*, March 6, 2006. Dollar figures in the complaint and the settlement in the second column of numbers have the same proportion of the total as the corresponding figures in the first column of numbers. Drugs reimbursed by third-party payers were computed as 79.3% of all drugs (in second column of numbers) in 2002 and 78.8% in 2005, based on Attachment A to Class Plaintiff's Amended Memo, November 3, 2006.

Gale Mosteller

Gale Mosteller

December 20, 2007


APPENDIX TABLE 1

| Rank | Product | Total retail Dollars* ($ billions) | Complaint | Settlement | Patent Expiration | Generic Approval |
|---|---|---|---|---|---|---|
| 1 | Lipitor | 6.320522 | 1 | 1 | | |
| 2 | Nexium | 3.436794 | 1 | 1 | | |
| 3 | Prevacid | 3.327919 | 1 | 1 | 2007 | |
| 4 | Zocor | 3.106628 | | 1 | 23-Jun-06 | 23-Jun-06 |
| 5 | Advair Diskus | 2.830047 | 1 | 1 | 12-Aug-08 | |
| 6 | Zoloft | 2.561069 | | 1 | 30-Jun-06 | 30-Jun-06 |
| 7 | Plavix | 2.480042 | 1 | 1 | | 20-Jan-06 |
| 8 | Effexor XR | 2.219469 | | 1 | 13-Jun-08 | |
| 9 | Singulair | 2.089348 | | 1 | | |
| 10 | Norvasc | 2.060364 | | 1 | 31-Jan-07 | 03-Oct-05 |
| 11 | Protonix | 1.957950 | 1 | 1 | | 02-Aug-07 |
| 12 | Ambien | 1.932940 | 1 | 1 | 21-Oct-06 | 23-Apr-07 |
| 13 | Lexapro | 1.849528 | | 1 | | 22-May-06 |
| 14 | Seroquel | 1.718988 | 1 | 1 | | |
| 15 | Actos | 1.605016 | 1 | 1 | | |
| 16 | Zyprexa | 1.577159 | 1 | 1 | | |
| 17 | Fosamax | 1.484088 | | 1 | 06-Feb-08 | |
| 18 | Risperdal | 1.472597 | 1 | 1 | 29-Jun-08 | |
| 19 | Avandia | 1.381777 | | 1 | | |
| 20 | Levaquin | 1.348110 | 1 | 1 | | |
| 21 | Wellbutrin XL | 1.326323 | | 1 | 28-Aug-06 | 14-Dec-06 |
| 22 | Pravachol | 1.315013 | | 1 | 20-Apr-06 | 24-Apr-06 |
| 23 | Toprol XL | 1.294098 | 1 | 1 | 2006 | 31-Jul-06 |
| 24 | OxyContin | 1.285922 | | | | |
| 25 | Topamax | 1.267766 | 1 | 1 | | 11-Sep-06 |
| 26 | Celebrex | 1.241574 | 1 | 1 | | |
| 27 | Enbrel | 1.130642 | 1 | 1 | | |
| 28 | Lotrel | 1.109867 | 1 | 1 | 31-Jan-07 | 18-May-07 |
| 29 | Abilify | 1.098379 | | 1 | | |
| 30 | Zithromax Z-Pak | 1.096414 | | 1 | | 14-Nov-05 |
| 31 | Zyrtec | 1.057152 | | 1 | 25-Dec-07 | |
| 32 | Aciphex | 1.048377 | 1 | 1 | | 21-Feb-07 |
| 33 | Flonase | 1.044160 | 1 | 1 | 2006 | 22-Feb-06 |
| 34 | Lamictal | 1.031307 | 1 | 1 | | 21-Jun-06 |
| 35 | Adderall XR | 1.007855 | 1 | 1 | | |
| 36 | Valtrex | 0.978443 | 1 | 1 | | 31-Jan-07 |
| 37 | Allegra | 0.957152 | 1 | 1 | | 13-Jul-05 |
| 38 | Mobic | 0.916397 | 1 | 1 | | 19-Jul-06 |
| 39 | Zetia | 0.904129 | | 1 | | |
| 40 | Concerta | 0.865873 | 1 | 1 | | |
| 41 | Coreg | 0.846802 | | 1 | 05-Sep-07 | 05-Sep-07 |
| 42 | Imitrex Oral | 0.820211 | 1 | 1 | 28-Jun-07 | |
| 43 | Diovan | 0.810581 | | 1 | | |
| 44 | Actonel | 0.792582 | 1 | 1 | | 05-Oct-07 |
| 45 | Tricor | 0.788761 | | 1 | | |
| 46 | Lantus | 0.774711 | | 1 | | |

Economists INCORPORATED

| | | | | | | |
|---|---|---|---|---|---|---|
| 47 | Viagra | 0.772235 | | 1 | | |
| 48 | Diovan HCT | 0.723998 | | 1 | | |
| 49 | Vytorin | 0.715174 | | 1 | | |
| 50 | Altace | 0.700630 | | 1 | | 24-Oct-05 |
| 51 | Crestor | 0.676848 | | 1 | | |
| 52 | Aricept | 0.651887 | | 1 | | |
| 53 | Strattera | 0.642113 | | 1 | | |
| 54 | Synthroid | 0.640179 | | 1 | | |
| 55 | Nasonex | 0.621728 | 1 | 1 | | |
| 56 | Premarin Tabs | 0.616478 | | 1 | | |
| 57 | Lamisil Oral | 0.608718 | 1 | 1 | 30-Dec-06 | |
| 58 | Omnicef | 0.607482 | | 1 | | 19-May-06 |
| 59 | Flomax | 0.583267 | | 1 | | |
| 60 | Cozaar | 0.580627 | | 1 | | |
| 61 | Cymbalta | 0.570421 | | 1 | | |
| 62 | Duragesic | 0.569671 | 1 | 1 | | 23-Jan-07 |
| 63 | Depakote | 0.563228 | 1 | 1 | 29-Jul-08 | |
| 64 | Zofran | 0.554898 | 1 | 1 | 24-Dec-06 | 26-Dec-06 |
| 65 | Detrol LA | 0.534795 | | 1 | | |
| 66 | Evista | 0.505134 | 1 | 1 | | |
| 67 | Combivent | 0.501603 | 1 | 1 | | |
| 68 | Provigil | 0.496944 | | 1 | 24-Jun-06 | |
| 69 | Pulmicort Respules | 0.486297 | | 1 | 27-Aug-06 | |
| 70 | Humalog | 0.484931 | | 1 | | |
| 71 | Lidoderm | 0.470692 | | 1 | | |
| 72 | Cellcept | 0.461825 | 1 | 1 | | |
| 73 | Trileptal | 0.458425 | 1 | 1 | | 09-Oct-07 |
| 74 | Hyzaar | 0.448157 | | 1 | | |
| 75 | Skelaxin | 0.445377 | | 1 | | |
| 76 | Yasmin 28 | 0.441299 | | 1 | | |
| 77 | Lovenox | 0.438815 | | 1 | | |
| 78 | Prograf | 0.431631 | | 1 | | |
| 79 | Depakote ER | 0.428334 | | 1 | 29-Jul-08 | |
| 80 | Ortho Evra | 0.424662 | | 1 | | |
| 81 | Geodon Oral | 0.424003 | | 1 | 02-Sep-07 | |
| 82 | Xalatan | 0.409031 | | 1 | 28-Jul-06 | |
| 83 | Allegra-D 12 Hour | 0.398013 | 1 | 1 | | |
| 84 | Humira | 0.394981 | | 1 | | |
| 85 | Procrit | 0.393527 | | 1 | | |
| 86 | Combivir | 0.392859 | 1 | 1 | | |
| 87 | Niaspan | 0.380690 | 1 | 1 | | |
| 88 | Keppra | 0.379564 | | 1 | | |
| 89 | Actiq | 0.370704 | | 1 | 05-Feb-07 | 27-Sep-06 |
| 90 | Zithromax | 0.358460 | | 1 | 01-Nov-05 | 14-Nov-05 |
| 91 | Clarinex | 0.353325 | 1 | 1 | 01-Oct-07 | |
| 92 | Avapro | 0.350899 | 1 | 1 | | |
| 93 | Arimidex | 0.347891 | 1 | 1 | | |
| 94 | Zithromax Susp | 0.342532 | | 1 | | 05-Jul-06 |
| 95 | Ortho Tri-Cyclen Lo | 0.339177 | | 1 | | |
| 96 | Asacol | 0.339046 | 1 | 1 | | |

Economists INCORPORATED

| | | | | | | |
|---|---|---|---|---|---|---|
| 97 | Spiriva | 0.337827 | | 1 | | |
| 98 | Paxil CR | 0.332100 | | 1 | | 04-Dec-06 |
| 99 | Truvada | 0.326641 | | 1 | | |
| 100 | Zelnorm | 0.318220 | | 1 | | |
| 101 | Reyataz | 0.313778 | | 1 | | |
| 102 | Nasacort AQ | 0.311467 | 1 | 1 | | |
| 103 | Sustiva | 0.309140 | 1 | 1 | | |
| 104 | Rhinocort Aqua | 0.296463 | | 1 | | |
| 105 | Ditropan XL | 0.296169 | | 1 | | 09-Nov-06 |
| 106 | Cialis | 0.295191 | | 1 | | |
| 107 | Xopenex | 0.293131 | | | | |
| 108 | Avonex | 0.292545 | | 1 | | |
| 109 | Flovent HFA | 0.289630 | | 1 | | |
| 110 | Copaxone | 0.285940 | | 1 | | |
| 111 | Kaletra | 0.284892 | | 1 | | |
| 112 | Namenda | 0.283270 | | 1 | | |
| 113 | Patanol | 0.277489 | | 1 | | |
| 114 | Viread | 0.271732 | 1 | 1 | | |
| 115 | Gleevec | 0.270904 | 1 | 1 | | |
| 116 | Avalide | 0.268019 | 1 | 1 | | |
| 117 | Lunesta | 0.264331 | | | | |
| 118 | Forteo | 0.263801 | | 1 | | |
| 119 | Amaryl | 0.262732 | 1 | 1 | 06-Oct-05 | 06-Oct-05 |
| 120 | Avandamet | 0.261746 | | 1 | | |
| 121 | AndroGel | 0.260799 | | | | |
| 122 | Avelox | 0.259386 | | 1 | | |
| 123 | Neurontin | 0.255121 | 1 | 1 | | |
| 124 | Biaxin XL | 0.255017 | | 1 | | |
| 125 | Trizivir | 0.253825 | 1 | 1 | | |
| 126 | Benicar | 0.251486 | | 1 | | |
| 127 | Elidel | 0.250284 | 1 | 1 | | |
| 128 | Proscar | 0.238949 | | 1 | 19-Jun-06 | 19-Jun-06 |
| 129 | Budeprion SR | 0.234441 | | | | |
| 130 | Norvir | 0.231111 | | 1 | | |
| 131 | Benicar HCT | 0.227455 | | 1 | | |
| 132 | Aldara | 0.226878 | 1 | 1 | | |
| 133 | Fuzeon | 0.221322 | | 1 | | |
| 134 | Thalomid | 0.217960 | | 1 | | |
| 135 | Cefzil | 0.216930 | 1 | 1 | | 08-Dec-05 |
| 136 | Zofran ODT | 0.214014 | 1 | 1 | 24-Dec-06 | 26-Dec-06 |
| 137 | Coumadin Tabs | 0.209652 | 1 | 1 | | |
| 138 | Lescol XL | 0.208515 | 1 | 1 | | |
| 139 | Augmentin XR | 0.206072 | | 1 | | |
| 140 | BenzaClin | 0.198676 | 1 | 1 | | |
| 141 | Humalog Mix 75/25 Pn | 0.192707 | | 1 | | |
| 142 | Levoxyl | 0.191394 | | 1 | | |
| 143 | Cosopt | 0.190408 | | 1 | | |
| 144 | Trinessa | 0.186951 | | | | |
| 145 | Zyrtec Syrup | 0.186643 | | 1 | | |
| 146 | RenaGel | 0.185001 | | 1 | | |

Economists
INCORPORATED

| | | | | | | |
|---|---|---|---|---|---|---|
| 147 | Prilosec | 0.183953 | 1 | 1 | | |
| 148 | Alphagan P | 0.183302 | | 1 | | |
| 149 | Tussionex | 0.181586 | | 1 | | 24-Sep-07 |
| 150 | Endocet | 0.181043 | | | | |
| 151 | Miacalcin Nasal | 0.178198 | 1 | 1 | | |
| 152 | Inderal LA | 0.177720 | | 1 | | 26-Jan-07 |
| 153 | Klor-Con | 0.175720 | | | | |
| 154 | Femara | 0.173406 | 1 | 1 | | |
| 155 | Mirapex | 0.171769 | | 1 | | |
| 156 | Differin | 0.168877 | | 1 | | |
| 157 | Flovent | 0.168481 | 1 | | | |
| 158 | Humulin N | 0.168427 | | | | |
| 159 | Temodar | 0.168278 | 1 | 1 | | |
| 160 | Ortho Tri-Cyclen | 0.168080 | 1 | 1 | | |
| 161 | Lumigan | 0.167889 | | 1 | | |
| 162 | Casodex | 0.167447 | 1 | 1 | 01-Oct-08 | |
| 163 | Arthrotec | 0.164596 | 1 | 1 | | |
| 164 | Pegasys | 0.164472 | | 1 | | |
| 165 | Zyrtec-D | 0.163573 | | 1 | 25-Dec-07 | |
| 166 | Famvir | 0.163368 | | 1 | | 24-Aug-07 |
| 167 | Catapres-TTS | 0.163076 | 1 | 1 | | |
| 168 | Zyvox | 0.162318 | | 1 | | |
| 169 | Relpax | 0.162058 | | 1 | | |
| 170 | Xeloda | 0.162024 | 1 | 1 | | |
| 171 | DuoNeb | 0.161270 | | | | |
| 172 | Prozac | 0.158240 | 1 | 1 | | |
| 173 | Tamiflu | 0.157488 | 1 | 1 | | |
| 174 | Tobradex | 0.155102 | | 1 | | |
| 175 | NovoLog Mix 70/30 | 0.155049 | | 1 | | |
| 176 | Amnesteem | 0.153534 | | | | |
| 177 | Ultracet | 0.152802 | 1 | 1 | | |
| 178 | Betaseron | 0.152108 | | 1 | | |
| 179 | Arava | 0.151574 | 1 | 1 | | 13-Sep-05 |
| 180 | Imitrex Inj | 0.149914 | | 1 | | |
| 181 | Tarceva | 0.149525 | | 1 | | |
| 182 | Neupogen | 0.148760 | | 1 | | |
| 183 | Atacand | 0.148636 | 1 | 1 | | |
| 184 | Bextra | 0.148370 | | | | |
| 185 | Ketek Pack | 0.148321 | | 1 | | |
| 186 | Vigamox | 0.147501 | | 1 | | |
| 187 | Aranesp | 0.147016 | | 1 | | |
| 188 | Restasis | 0.146559 | | 1 | | |
| 189 | Zomig | 0.146078 | 1 | 1 | | |
| 190 | Pulmozyme | 0.146004 | | 1 | | |
| 191 | Serevent Diskus | 0.144773 | 1 | 1 | 12-Aug-08 | |
| 192 | Astelin | 0.144217 | | | | |
| 193 | Humulin 70/30 | 0.142436 | | | | |
| 194 | Levitra | 0.141573 | | 1 | | |
| 195 | Zonegran | 0.140681 | | 1 | | 22-Dec-05 |
| 196 | DDAVP | 0.140623 | | 1 | | 01-Jul-05 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 197 | Caduet | 0.139305 | | 1 | | |
| 198 | Prempro | 0.136658 | | 1 | | |
| 199 | Epivir | 0.135595 | 1 | 1 | | |
| 200 | Avinza | 0.135037 | | | | |
| | | $119.696616 | $59.542955 | $115.592506 | $54.909626 | $37.452470 |
| | % top 200 drugs | 100% | 49.7% | 96.6% | | |
| | % settlement | | | 100% | 47.5% | 32.4% |

Source: Retail dollars from "Top 200 Brand-Name Drugs by Retail Dollars in 2005," *Drug Topics*, March 6, 2006. Drugs in Complaint identified from Appendix A Drugs by NDC attached to the Complaint. Drugs in Settlement identified from Exhibit A to Settlement Agreement. Patent expirations identified from Express Scripts, *2004 Drug Trend Report*, June 2005; Rx News "2006 Patent Expiration" and "10/2006: Primary Patent Expirations for Selected High Revenue Drugs." Generic approvals identified from the FDA's Center for Drug Evaluation and Research website (www.fda.gov/cder/ogd/approvals/default.htm). Barr launched a generic version of Actiq under a license agreement pursuant to an FTC order (Barr press release, 9/27/2006).

*According to Verispan, total retail dollars are computed using the full price (meaning the cash/uninsured price) the pharmacy charges a customer for a prescription. This price generally exceeds the reimbursement from third-party payers.

# CURRICULUM VITÆ

## Gale Mosteller

**Office**

Economists Incorporated
1200 New Hampshire Avenue, NW, Suite 400
Washington, DC 20036
(202) 223-4700
mosteller.g@ei.com

**Home**

3830 N. 13th Street
Arlington, VA 22201
(703) 527-3085

**Background**

Born in 1953 in Boston, Massachusetts.
Married in 1987 to Keith Reynolds.
One child: Hobart (1990).

**Education**

Ph.D. in Economics, University of Chicago, 1985

M.A. in Economics, University of Chicago, 1979

M.A. in Public Policy, University of Chicago, 1978

B.A. in Economics, Mathematics and Psychology
Bates College 1975

**Honors**

PEW Teaching Fellow, Fall 1983

HEW Public Service Education Fellow and Public Policy Fellowship, 1977-78

Hillman Fellowship, 1976-77

Knight, Hillman, and Field Fellowships, 1975-76

Phi Beta Kappa, Dana Scholar, Bates Key, summa cum laude with high honors in mathematics, 1975

**Positions**

*Present Position* - Senior Economist, Economists Incorporated

Economic advisor to Commissioner Andrew J. Strenio, Jr., Federal Trade Commission (April 1988 to November 1989)

Antitrust Economist, Bureau of Economics, Federal Trade Commission (June 1985 to March 1988)

**Positions (Continued)**

Instructor, University of Chicago, "The Economics of the Family and Human Resources" (Fall 1983)

Research Assistant to Gary S. Becker, University of Chicago (November 1976 to May 1985)

**Experience**

My antitrust experience includes analyzing allegations of cross-subsidization by regulated firms, sham litigation, collusion, and Robinson-Patman Act violations, as well as assessing the competitive effects and efficiencies of proposed acquisitions and joint ventures in a variety of industries. I focus particularly on quantifying effects, such as computing the expected gain/loss in profits from price rises. I have also assessed the impact of legislation, evaluated the pricing of unbundled network elements and of common cost markups in state telecommunication proceedings, gauged whether rates for telephone subscriber listings were reasonable, modeled and computed data compensation payments under FIFRA, and testified before the Postal Rate Commission about access costs and cross-subsidization. My economic damage analyses have covered collusion, false advertising, the Exxon Valdez oil spill, securities fraud, contract breach, and the theft of confidential information, and I have written about when to discount damages. Having worked on transfer pricing matters, I published an article about "Comparability in the U.S. Steel Transfer Pricing Case," whose analysis was implicitly adopted in Section 1.482-3(e) of the U.S. transfer pricing regulations. Industries that I have analyzed include: chemicals, oil, natural gas, fisheries, converted paper products, major home appliances, electrical distribution equipment, hardware, defense, automobiles, pharmaceuticals, telecommunications, rental companies, title insurance, tobacco, and postal delivery.

**Testimony and Investigation**

Insurance investigation report (co-authored) giving economic analysis of employee theft claim, 2007.

Expert reports (co-authored) on competitive effects of regulations in *Certain Softwood Lumber Products from Canada*, International Trade Administration, 2004.

Expert report on the financial performance of Hanover Foods Corporation in *Michael A. Warehime v. John A. Warehime*, 1997.

Expert report and live cross-examination about cross-subsidization before the Postal Rate Commission, Docket no. MC95-1, 1995.

**Testimony and Investigation (cont'd)**

Expert report and deposition on front pay in *Kenneth F. Hickey v. Bakery and Confectionery Union and Industry International Pension Fund, et al.*, 1995.

Expert report on the competitive effects of a proposed merger in *Federal Trade Commission v. Rhone-Poulenc Inc., Rhone-Poulenc Basic Chemical Co., Olin Corporation*, 1990.

**Publications**

The Economics of a Disaster: The Exxon Valdez Oil Spill, Quorum Books, 1995, with B. Owen et al.

"Comparability in the U.S. Steel Transfer Pricing Case," Tax Notes, June 1, 1992, 55(9): 1251-1258.

"Should the U.S. Department of Justice deviate from the 5% price test for market definition on a case-by-case basis?" International Merger Law, April 1992, 20: 20-23, with J. Morris.

"Defining Markets for Merger Analysis," Antitrust Bulletin, Fall 1991, 36(3): 599-640, with J. Morris.

Solutions Manual to accompany Mosteller, Fienberg, and Rourke's Beginning Statistics with data analysis, Addison-Wesley, 1983, with Diane L. Griffin.

"New Statistical Methods in Public Policy Part I: Experimentation", Journal of Contemporary Business, Summer 1979, 8(3), with F. Mosteller.

"New Statistical Methods in Public Policy Part II: Exploratory Data Analysis", Journal of Contemporary Business, Summer 1979, 8(3), with F. Mosteller.

"A Review of The Enduring Effects of Education by H. Hyman, C. Wright, and J. Reed", School Review, Feb. 1976, 84(2), with F. Mosteller and K. Soper.