# Allegaert Berger & Vogel LLP

ATTORNEYS

111 Broadway, 18th Floor
New York, New York 10006
212.571.0550
212.571.0555 Fax

475 Wall Street
Princeton, New Jersey 08540
609.688.9700
609.688.9701 Fax

www.ABV.com

December 20, 2007

FILED
IN CLERK'S OFFICE
2007 DEC 21 P 12: 23
U.S. DISTRICT COURT
DISTRICT OF MASS.

**BY FEDERAL EXPRESS**

The Honorable Patti B. Saris
United States District Court
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

<u>New England Carpenters Health Benefits Fund et al. v. First DataBank et al.</u>,
No. 1:05-CV-11148-PBS
<u>D.C. 37 Health & Security Plan v. Medi-Span,</u>
No. 07-CV- 10988- PBS

Dear Judge Saris:

We represent the New York City Pharmacists Society, ("NYCPS"), a trade association of some 1,000 community pharmacists in the New York City area. We write to voice NYCPS's strong opposition to the applications for preliminary approval of the proposed settlement agreements (the "Settlement Agreements") submitted by First Databank, Inc. ("FDB") and Medi-Span.

In support of the objections of NYCPS to the Settlement Agreements, enclosed please find affidavits from three senior officers of NYCPS. Russell Gellis, R. Ph. is the current Chairman of the Board of NYCPS and was previously the president. James E. Detura, R. Ph. is the current president of NYCPS. William Scheer R. Ph. is currently the NYCPS treasurer and has previously served as president, and chairman of the board. Mr. Scheer has also served as president and chairman of the board of the Pharmacists Society of the State of New York and has been a member of the New York State Department of Health Medicaid Pharmaceutics and Theraputics Committee for the past several years, to which he currently serves as the committee Co-Chairman.

As you can see from the enclosed Affidavits, the Settlement Agreements and the Memorandum offered in support of preliminary approval of the Settlement Agreements offers the false premise that Average Wholesale Price ("AWP") and Wholesale Acquisition Cost ("WAC") are the only factors that determine the pricing of pharmaceuticals in the marketplace.

Allegaert Berger & Vogel LLP

The Honorable Patti B. Saris
December 20, 2007
Page 2


To the contrary, when pharmacies enter into contracts with insurance companies and plan sponsors, pharmacies are "reimbursed" at a rate of AWP <u>minus a substantial discount</u>. Over the period of time since FDB increased the markup factor between AWP and WAC, and also during the corresponding time that Medi-Span followed that pricing strategy, plan sponsors have increased the discounts from the AWP and thus decreased the reimbursements made to pharmacies. The result is that the temporary increased profit margins for pharmacies that arose from the increase in AWP, has been eviscerated by the ensuing decreases in reimbursements by plan sponsors. If the FDB and Medi-Span proposals are accepted and AWP is decreased without corresponding decreases of the discounts from AWP demanded by the insurance companies and plan sponsors, there will be further significant decreases in reimbursements to pharmacies.[1] Thus, if the proposed settlements offered by FDB and Medi-Span are implemented it will essentially destroy the profit margins of pharmacies and cause catastrophic harm to the industry.

Very truly yours,

James R. Schiffer

cc:  John Rector,
     National Community Pharmacists Association

---

[1] In fact, the majority of pharmacies nationwide have little control over the reimbursements paid to them for nearly 97% of the pharmaceuticals dispensed annually. This is due, in part, to the implementation of the new Medicare Part D prescription drug benefit in January 2006 which resulted in a sharp decrease, to as low as 2% for many pharmacies, of patients who pay cash for their pharmaceuticals. Thus rollback of the AWP spread to pre-2000 levels will place many of the current pharmacy reimbursement contracts at or below the pharmacies' actual drug cost.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE
2007 DEC 21 P 12: 23

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME- HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>Plantiffs,<br><br>v.<br><br>FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS<br><br>**AFFIDAVIT OF WILLIAM P. SCHEER** |

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF BRONX    )

I, William P. Scheer, being duly sworn, deposes and says:

1. I am the owner of Scheer Drugs Inc., located at 1343 E. Gunhill Road, Bronx, New York 10469. Scheer Drugs Inc. serves the northeast Bronx, an urban area of predominantly Afro American and Hispanic demographic.

2. I have operated this pharmacy since October of 1978.

3. As a large segment of the population served by Scheer Drugs Inc. is elderly and unable to travel to a pharmacy for prescriptions, we deliver to a large number of these homebound patients. Many of these patients have multiple disease states and require extra care. Scheer Drugs Inc. provides medication and care to over 4,000 patients within a three mile radius of the pharmacy.

4. Prescription drugs account for about 80% of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers ("PBMs") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Only a very small portion of my pharmaceutical sales are to cash customers. The remaining patients pay for their prescriptions through state or federal programs.

6. The PBMs and PDPs pay Scheer Drug Inc. for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a nominal dispensing fee which does not even cover my operating costs.

7. Because Scheer Drug Inc. is a community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Scheer Drug Inc. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Scheer Drug Inc.

8. Based on the current level of reimbursement from PBMs and PDPs, Scheer Drug Inc. actually loses money on the dispensing of certain branded medications. Scheer Drug Inc., as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Scheer Drug Inc. received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10. To the extent that Scheer Drug Inc. can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, extended hours, etc. Such cutbacks will impose a hardship not only on me and other employees of Scheer Drug Inc. but also on the approximately 4,000 patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Scheer Drug Inc. were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Scheer

Drug Inc. (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

12. Scheer Drug Inc. was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Scheer Drug Inc. and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Scheer Drug Inc. for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Scheer Drug Inc. will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Scheer Drug Inc. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Scheer Drug Inc.

14. I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Scheer Drug Inc. does not determine the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, will increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider.

_William P. Scheer_
William P. Scheer

Sworn before me the 20th day of
December, 2007

_Notary Public_

JAMES R. SCHIFFER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SC4507979
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES OCTOBER 31, 200_7_

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME- HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br>Plantiffs, <br><br>v. <br><br>FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation <br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS <br><br><br>**AFFIDAVIT OF** <br>**JAMES A. DETURA** |

STATE OF NEW YORK    )
                    ) ss.:
COUNTY OF BRONX     )

I, James A. Detura, being duly sworn, deposes and says:

1. I am the owner of 666 Drug Inc. d/b/a Melrose Pharmacy, ("Melrose Pharmacy"), located at 666 Courtlandt Avenue, Bronx New York 10451. My pharmacy serves the urban, low-income neighborhood of the South Bronx. Our patients are primarily African American and Hispanic.

2. I have worked in this pharmacy since 1976 and took over ownership and operation of the in 1989.

3. Melrose Pharmacy serves the a diverse patient demographic including patients who are elderly, disabled, handicapped, pediatric, unemployed, etc. The approximate breakdown of insurance coverage for our patients is: 65% Medicaid, 25% Medicare and 10% other. We strive to serve our patients in every possible way, including offering delivery services to those who are unable to come into the pharmacy, advocating for patients, assisting patients in navigating prescription plans, and assisting them in securing

special needs pharmaceutical items. Melrose Pharmacy fills over 3,000 prescriptions a week, serving thousands of patients in the South Bronx community.

4.      Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5.      The majority of my pharmaceutical sales are through pharmacy benefit managers ("PBMs") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6.      The PBMs and PDPs pay Melrose Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a nominal dispensing fee which does not even cover my operating costs.

7.      Because Melrose Pharmacy is a community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Melrose Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Melrose Pharmacy.

8.      Based on the current level of reimbursement from PBMs and PDPs, Melrose Pharmacy actually loses money on the dispensing of certain branded medications. Melrose Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9.      The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Melrose Pharmacy received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10.     To the extent that Melrose Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, extended hours, etc. Such cutbacks will impose a hardship not only on me and other employees of Melrose Pharmacy but also on the thousands of patients we serve.

11.     I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the

reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Melrose Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Melrose Pharmacy (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

12. Melrose Pharmacy was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Melrose Pharmacy and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Melrose Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Melrose Pharmacy will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Melrose Pharmacy. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Melrose Pharmacy.

14. I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Melrose Pharmacy does not determine the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, will increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider

James A. Detura

Sworn before me the 19th day of December, 2007

_____
Notary Public

RACHEL G. LUKE
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Jan 22 2008

3

FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2007 DEC 21  P 12: 23

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME-HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER,<br><br>Plantiffs,<br><br>v.<br><br>FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS<br><br>**AFFIDAVIT OF RUSSELL GELLIS** |

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NEW YORK   )

I, Russell Gellis, being duly sworn, deposes and says:

1. I am the owner of RG Drug Corp., d/b/a Apthorp Pharmacy, located at 2201 Broadway, New York, New York 10024. My pharmacy serves the upper west side of Manhattan, to an urban and mixed population.

2. I have operated this pharmacy since early 1993.

3. We service a mixture of middle to upper middle class patients in their various pharmacy services, which includes compounding, specializes fertility medications and we offer delivery throughout the greater Manhattan area. Apthorp Pharmacy provides medication and care to over 20,000 patients in the upper west side of Manhattan.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at small profit margins.

Word 45666806.1

5. The majority of my pharmaceutical sales are through pharmacy benefit managers ("PBMs") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Less than ten percent of my pharmaceutical sales are to cash paying patients. The remaining patients pay for their prescriptions through state or federal programs.

6. The PBMs and PDPs pay Apthorp Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a nominal dispensing fee which does not even cover my operating costs.

7. Because Apthorp Pharmacy is a independent community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Apthorp Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Apthorp Pharmacy.

8. Based on the current level of reimbursement from PBMs and PDPs, Apthorp Pharmacy actually works on very thin gross profit margins on the dispensing of certain branded medications. Apthorp Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications as well.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Apthorp Pharmacy received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10. To the extent that Apthorp Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I may need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community. Such cutbacks will impose a hardship not only on myself and other employees of Apthorp Pharmacy but also on the Apthorp patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Apthorp Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Apthorp Pharmacy (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

12. Apthorp Pharmacy was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Apthorp Pharmacy and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4% - - in reality a 50% drop in our profit margins on those drugs - - with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Apthorp Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Apthorp Pharmacy will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Apthorp Pharmacy. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Apthorp Pharmacy.

14. I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Apthorp Pharmacy will not lower the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, may increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

_____
Russell Gellis, R. Ph.

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF _NY___     )

FRANCES DEL VALLE
Notary Public, State of New York
No. 01DE6033298
Qualified in New York County
Commission Expires November 15, 20__

_____
Notary Public

3

45666806.2