FILED
IN CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2007 DEC 21  A 11: 53

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; and DISTRICT 37 HEALTH AND SECURITY FUND,<br><br>      Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and MCKESSON CORPORATION, a Delaware corporation,<br><br>      Defendants. | C.A. No. 1:05-CV-11148-PBS |

**BRIEF OF INDEPENDENT PHARMACY COOPERATIVE**
*AMICUS CURIAE* **REGARDING THE PARTIES' PROPOSED SETTLEMENT**

KATHLEEN M. MCCARTHY
MCCARTHY & GORDON, LLC
701 Washington Street, Suite 100
Newton, MA 02458
Phone: 617.332.1633
Fax:    617.332.3872
E-mail: kmmlaw@aol.com

MICHAEL F. FEELEY
ISAACSON ROSENBAUM P.C.
633 17th Street, Suite 2200
Denver, CO 80203
Phone: 303.292.5656
Fax:    303.292.3152
E-mail: mfeeley@ir-law.com

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | SUMMARY OF THE ARGUMENT | 1 |
| II. | INTEREST OF *AMICUS CURIAE* | 2 |
| III. | ARGUMENT | 3 |
| | A. Consideration of Special Interests of *Amicus Curiae* | 3 |
| | B. The Impact of the Proposed Settlement Upon IPC and its Members | 4 |
| | C. Alleviating the Potential Adverse Impacts of the Proposed Class Settlement | 7 |
| IV. | CONCLUSION | 8 |

# TABLE OF AUTHORITIES

**Rules**

Federal Rules of Appellate Procedure, Rule 29

**Case Law**

Alliance of Automobile Mfgrs. v. Gwadowsky, 297 F.Supp.2d 305, 307-08 (D. Me. 2003)

Animal Protection Institute v. Martin, 2007 U.S. Dist. LEXIS 13378 (D. Me. February 23, 2007)

Bryant v. Better Business Bureau of Greater Maryland, Inc., 923 F.Supp. 720, 728 (D. Md. 1996)

Liberty Resources, Inc. v. Philadelphia Housing Authority, 395 F.Supp.2d 206, 209-10 (E.D. Pa. 2005)

Marisol A. v. Giuliani, 185 F.r.D. 152, 161 (S.D.N.Y. 1999)

Sierra Club v. Fed. Emergency Management Agency, 2007 U.S. Dist. LEXIS 84230 (S.D. Texas November 14, 2007)

Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970)

Stewart v. Rubin, 948 F.Supp. 1077, 1104-05 (D.D.C. 1996)

Waste Management of Pennsylvania, Inc. v. City of York, 162 F.R.D. 34, 36 (M.D. Pa. 1995)

Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 525 n. 8 (1st Cir. 1991)

**Other Authority**

Declaration of Raymond S. Hartman re Impact and Cost Savings of the First DataBank Settlement Agreement (Sept. 27, 2006)

Tutorial Presentation of Dr. Kimberly McDonough dated October 29, 2007

Independent Pharmacy Cooperative ("IPC"), through its undersigned counsel, respectfully submits the following Brief *Amicus Curiae* regarding the proposed class action settlement in this matter.

## I. SUMMARY OF THE ARGUMENT

The purpose of this Brief *Amicus Curiae* is not to argue the merits of the parties' claims or positions in support or opposition to the proposed class settlement. For reasons presented in objections filed by other parties, IPC does not support the proposed class settlement. IPC and its members hold a special interest that will be directly impacted by a significant element of the proposed class settlement, independent of the merits of the parties' claims and defenses and independent of the positions advocated by the parties. IPC seeks to advise the Court of that interest and to request the Court -- if it approves a class settlement resembling the one presently proposed -- condition the settlement upon a sufficient phase-in period to allow the prescription pharmaceutical market to adjust in a manner that will not imperil the survival of its most vulnerable members.

Adoption of the proposed class settlement in its current form would have a substantially negative, if not devastating, impact upon independent pharmaceutical retailers and small chains, as well as the retail market for, and availability to consumers of, prescription pharmaceuticals. This impact may be alleviated, in part, by a delay or phase-in of the effective dates of any such settlement to allow for market adjustments to address precipitated reductions in retail reimbursement rates.

This Brief *Amicus Curiae* is respectfully tendered per IPC's Motion for Leave, which submitted concurrently herewith.

## II.    INTEREST OF *AMICUS CURIAE*

IPC is the nation's largest group purchasing organization for independent pharmacies. It is owned by and represents approximately 3200 primary members, all small, rural and/or independent pharmacies, spread throughout the fifty states. IPC was organized as a cooperative organization under Wisconsin law in 1984, and its members' wholesale purchases of pharmaceuticals presently exceed $7 billion.

IPC's mission is to assist independent pharmacies and small pharmacy chains in competing with mass merchandisers and large chain stores. It maintains a 75,000 square foot distribution facility and multi-million dollar inventory that enables its members to purchase pharmaceuticals at competitive wholesale prices and participate in various competitive purchasing programs.

IPC assists its members with access to competitive and comprehensive generic purchasing programs, a strong consumer brand identity program, attractive rebates, and superior automation services and programs. As an advocate and policy advisor for its members, IPC seeks to assure that these programs and processes function smoothly, efficiently, and fairly. When they do not, or when the parameters driving the analysis and determination of reimbursement rates are altered abruptly or unpredictably, the profitability of pharmaceutical providers is invariably impacted and the financial survival of independent and small chain retailers may be imperiled.

IPC's members negotiate contractual reimbursement rates on their own or through secondary companies working in the market. As presently proposed, the settlement will abruptly adjust the calculation and reporting of Average Wholesale Price ("AWP") or Blue Book Average Wholesale Price ("BBAWP") published by Defendant First DataBank, Inc. ("First DataBank").

The adjustment will immediately impact existing reimbursement rates to retail providers of prescription pharmaceuticals, including IPC's members. These independents and small chains will suffer an immediate, dramatic and perhaps fatal impact if the adjustments contemplated by the proposed settlement are allowed to take place in a precipitous fashion.

### III.  ARGUMENT

#### A.  Consideration of Special Interests of *Amicus Curiae*

While consideration of *amicus curiae* submissions at the District Court level rests solely within the sound discretion of the Court, persons with special interests in the issues to be addressed may be of assistance to the Court in evaluating the practical impact of an adjudication of those issues or approval of a proposed settlement. Bryant v. Better Business Bureau of Greater Maryland, Inc., 923 F.Supp. 720, 728 (D. Md. 1996).

This is particularly the case where, as here, an *amicus* holds a special interest independent of, and not represented nor adequately addressed by, any of the parties, and its submission is timely and – hopefully – useful. *See* Animal Protection Institute v. Martin, 2007 U.S. Dist. LEXIS 13378 (D. Me. February 23, 2007); Liberty Resources, Inc. v. Philadelphia Housing Authority, 395 F.Supp.2d 206, 209-10 (E.D. Pa. 2005); Alliance of Automobile Mfgrs. v. Gwadowsky, 297 F.Supp.2d 305, 307-08 (D. Me. 2003); Bryant, *supra*, at 728; Waste Management of Pennsylvania, Inc. v. City of York, 162 F.R.D. 34, 36 (M.D. Pa. 1995). *Accord,* Strasser v. Doorley, 432 F.2d 567, 569 (1st Cir. 1970). *Cf.,* Sierra Club v. Fed. Emergency Management Agency, 2007 U.S. Dist. LEXIS 84230 (S.D. Texas November 14, 2007) (leave denied absent special interest).

The usefulness and appropriateness of special interest *amicus* submissions is no less in the context of class action litigation and Fed.R.Civ.P. 23(e) fairness hearings. *See, e.g.*, Weinberger v. Great Northern Nekoosa Corp., 925 F.2d 518, 525 n. 8 (1st Cir. 1991) (attorney general); Marisol A. v. Giuliani, 185 F.r.D. 152, 161 (S.D.N.Y. 1999) (legal aid society); Stewart v. Rubin, 948 F.Supp. 1077, 1104-05 (D.D.C. 1996) (allowing multiple intervenor applicants to participate as *amici*).

**B.    The Impact of the Proposed Settlement Upon IPC and its Members**

The proposed class settlement would require Defendant First DataBank to reduce the markup factor that it applies in its calculation of published Average Wholesale Price ("AWP") or Blue Book Average Wholesale Price ("BBAWP") for thousands of prescription pharmaceuticals over Wholesale Acquisition Cost ("WAC") data reported to it by pharmaceutical wholesalers. Further, under the terms of the class settlement, First DataBank would cease to publish AWP or BBAWP data altogether within two years of approval of the proposed settlement.

AWP and BBAWP data published by First DataBank has become the industry standard for the calculation and processing of pharmaceutical reimbursement claims. Declaration of Raymond S. Hartman re Impact and Cost Savings of the First DataBank Settlement Agreement (Sept. 27, 2006) ("Hartman Declaration"), at ¶ IV(6). Over time, this data has come to serve as the benchmark for the formulas used to calculate the amount of reimbursements paid by third party insurance companies, health plans, and PBMs to retail pharmaceutical providers. Id. at n. 7. Almost all single source brand pharmaceuticals are contractually reimbursed using AWP. Id. Thus, the proposed class settlement will have the immediate effect of reducing not only the WAC to AWP markup, but also the third party reimbursement amounts paid to retail providers based upon First DataBank's published AWP/BBAWP. Id at ¶ 7.

The Hartman Declaration estimates that the class settlement will result in a "cost savings" to third party reimbursement payers of approximately 4%, or an amount in excess of $4.2 billion. Hartman Declaration, Table 2. Stated differently, the settlement will result in a reduction in formulaic reimbursement amounts paid to retail pharmaceutical providers at a reflective level. If retail providers are reimbursed at AWP minus X plus dispensing fee, an overnight 5% reduction in published AWP will substantially squeeze the reimbursement amounts payable to the retail providers. The 2006 NCPA Pfizer Digest reports Independent Pharmacy Net Operating Income at 2.8%. Obviously, at that margin many IPC members and other retail pharmacies cannot absorb a 4-5% reduction in reimbursement for brand name pharmaceuticals, approximately 80% of prescription sales. Many pharmacies will not survive and will not be able to provide pharmacy services in their communities.

A critical component of a market adjustment is the ability of the retail pharmaceutical providers to renegotiate their reimbursement formula contracts with the PBMs. The PBMs, in turn, will need to renegotiate their reimbursement contracts with the third party payers. The Tutorial Presentation of Dr. Kimberly McDonough dated October 29, 2007 ("McDonough Tutorial") notes that the vast majority of contracts between PBMs and third party payers are for terms of three years with automatic renewal provisions, contain significant penalties for early termination, and would take over six months to a year to renegotiate or replace with a new PBM. McDonough Tutorial at pp. 9-10. The inelasticity of these contracts is illustrated by the apparent inability of the third party payers to react in the first place to the alleged markup factor that is the subject of the within litigation. Id. at 10. At the same time, or sequentially, the retail providers would need to renegotiate their own reimbursement contracts with the PBMs. This would involve literally hundreds of renegotiations that would require, in IPC's best estimate,

5

somewhere between six months to eighteen months for the independents and small chains to accomplish.

In support of the Plaintiffs' position, Dr. Hartman acknowledges the inability of the market to adjust within the time frame outlined in the proposed settlement.

> Inherent in this analysis is the assumption that the reimbursement formulae negotiated market-wide (including those for retail pharmacies, private TPPs and other market participants) will not adjust in the short-run (over 2007) to defeat the impact of the *FDB Settlement Agreement* and FDB's reduction of the WAC to AWP markup. This assumption is reasonable for the following reasons, some of which have been introduced in footnote 14 above. First, the relationships governing reimbursement practices and procedures, market-wide, are complex and slow to change and will be subject to very public scrutiny after this settlement. Second, established reimbursement contracts and statutes have fixed durations. Third, the costs associated with implementing changes to the overall reimbursement structure and individual reimbursement algorithms used by market participants are substantial. Fourth, strategies developed by individual market participants to reverse the effects of the settlement will be developed individually and over time, as different market participants assess their strategic alternatives, observe the strategies of other market participants and ultimately implement their consequential strategies. As a result, it is fair to assume that inertia in the retail market and among market participants will allow for the substantial cost savings calculated in this Declaration. It is highly unlikely that the interested market participants will be able to reverse and defeat the effects of the settlement within one year, with possible exceptions discussed in footnote 14. Since I am only estimating the benefits of a settlement, the effects of which may have impacts lasting for many years, *for a single year under conservative assumptions,* I believe my calculation of savings to be conservative.

*See* Hartman Declaration, Page 6, Footnote 19.

Contrary to Plaintiff's allegations, it is unlikely that IPC's members realized any benefit from the supposed 2002-2004 price mark-ups. The industry is simply too dependent on the present AWP pricing structure to react quickly to the adjustments proposed in the settlement.

The proposed adjustment – if precipitously imposed and absorbed in significant part by the retail providers without allowing sufficient time for renegotiation of reimbursement formulas and/or applicable WAC – will squeeze the operating margins of independent and small chain

6

retail providers to a point where, predictably, a large percentage will cease to realize a profit and many may simply be forced to close their doors. This would be particularly unfair as this segment of the retail market realized virtually no financial benefit from the alleged inflated markup factors which are the subject of the within litigation. Further, the failure of independents and small chain pharmacies in rural communities would reduce the availability of prescription pharmaceuticals to critical and needy areas of the country.

These concerns, as severe as they are, do not mean that a settlement – along the lines of the current proposed class settlement or otherwise – will not be implemented. But, if any such settlement or resolution is approved, it should be phased in over a sufficient period of time to avoid inflicting severe damage upon the retail pharmaceutical market. The market must be afforded the time it needs to adjust.

### C.    Alleviating the Potential Adverse Impacts of the Proposed Class Settlement

If the Court determines to approve the proposed class settlement, IPC respectfully submits that it is essential to provide sufficient time for the market adjustments discussed above. This may be done by delaying the effective date of the proposed reductions and ultimate elimination of the First DataBank AWP/BBAWP markup factors for a period of at least eighteen months. Alternatively, or in conjunction therewith, the Court may establish an effective date for the markup factor reductions (conservatively at approximately eighteen months) and retain jurisdiction to accelerate that date dependent upon periodic status reports by the parties and *amici* regarding the status of reimbursement contract renegotiations. Such a delayed implementation or phase-in would alleviate the potentially severe impact upon third parties and the retail pharmaceutical market that would otherwise result from an abrupt adoption of the proposed class

settlement in its current form. Failure to allow adequate time for such market adjustment would, IPC respectfully submits, assure a devastating impact upon both providers and consumers.

### IV. CONCLUSION

For the reasons set forth above, IPC respectfully requests the Court to delay or phase in the effective date of any settlement of the this class action litigation for a period of at least eighteen months or such other period as the Court may determine, through appropriate post-settlement monitoring, to be sufficient to accommodate the outlined market adjustments.

Respectfully Submitted,

s/ Kathleen M. McCarthy
Kathleen M. McCarthy
McCarthy & Gordon, LLC
701 Washington Street, Suite 100
Newton, MA 02458
Phone:      617.332.1633
Fax:        617.332.3872
E-mail:     kmmlaw@aol.com

Michael F. Feeley
Isaacson Rosenbaum P.C.
633 17th Street, Suite 2200
Denver, CO 80203
Phone: 303.292.5656
Fax:   303.292.3152
E-mail: mfeeley@ir-law.com

8

## CERTIFICATE OF SERVICE

I, Kathleen M. McCarthy, Esq. hereby certify that on the 21st day of December, 2007 I filed the Brief of Independent Pharmacy Cooperative Amicus Curiae Brief with the Clerk of Court and served a true copy of the same upon counsel of record via first class postage prepaid mail to:

Thomas M. Sobol, Esq.
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
*Class Counsel*

Jeffrey Kodroff, Esq.
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
*Class Counsel*

Steve W. Berman, Esq.
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*Class Counsel*

Shelia L. Birnbaum, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036
*Counsel for First DataBank, Inc.*

Kathleen M. McCarthy, Esq.
McCarthy & Gordon, LLC
701 Washington Street, Suite 100
Newton, MA 02458
Telephone: (617) 332-1733
Facsimile: (617) 332-3872