UNITED STATES DISTRICT COURT FILED
DISTRICT OF MASSACHUSETTS ERKS OFFICE

|  | 2007 DEC 21 P 4: 38 |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) BENEFITS FUND; PIRELLI ARMSTRONG RETIREE U.S. DISTRICT COURT MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH DISTRICT OF MASS. & WELFARE FUND OF PHILADELPHIA AND ) VICINITY; PHILADELPHIA FEDERATION OF ) TEACHERS HEALTH AND WELFARE FUND; ) DISTRICT COUNCIL 37, AFSCME-HEALTH & ) SECURITY PLAN; JUNE SWAN; BERNARD GORTER, ) SHELLY CAMPBELL and CONSTANCE JORDAN, ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | CIVIL ACTION NO. 05-CV-11148 PBS |
| FIRST DATABANK, INC., a Missouri Corporation; and ) McKESSON CORPORATION, a Delaware Corporation, ) ) | |
| Defendants. ) ) | |
| ) DISTRICT COUNCIL 37 HEALTH AND SECURITY ) PLAN, ON BEHALF OF ITSELF AND ALL OTHERS ) SIMILARLY SITUATED, ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CIVIL ACTION NO. 07-CV-10988-PBS |
| MEDI-SPAN, a division of WOLTERS KLUWER ) HEALTH, INC., ) ) | |
| Defendant. ) ) | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEVILLE PHARMACIES,
LONG-TERM CARE PHARMACY ALLIANCE AND THE AMERICAN SOCIETY OF
CONSULTANT PHARMACISTS TO INTERVENE AND IN OPPOSITION TO THE
PROPOSED SETTLEMENTS

DeVille Pharmacies, Inc. ("DeVille"), the Long-Term Care Pharmacy Alliance ("LTCPA") and the American Society of Consultant Pharmacists ("ASCP") (together, "Movants"), by and through their undersigned counsel, respectfully submit this memorandum of law (a) in support of their motion to intervene in this action pursuant to Federal Rule of Civil Procedure 24 for the limited purpose of opposing the proposed settlements between Plaintiffs and Defendants First DataBank, Inc. ("FDB"), dated August 3, 2006 and Medi-Span, dated May 22, 2007 (together, the "Proposed Settlements"), and (b) in opposition to the Proposed Settlements.

Movants are a community-based long-term care pharmacy, a trade association of long-term care pharmacies, and a professional association of over 8,000 long-term care pharmacists. They represent thousands of pharmacies specializing in the service of over 1.6 million nursing home residents, as well as those in other long-term care settings (the "LTC Pharmacies"). Their residents are generally elderly and/or handicapped, have multiple concurrent illnesses, are dependent upon eight or more prescription medications, and rely upon the ready access to care and the consulting and drug regimen review services that long-term care pharmacists provide. Movants submit that the Proposed Settlements will have significant adverse consequences on LTC Pharmacies who are dependent on Average Wholesale Price ("AWP")-based reimbursement and, by extension, on the quality and availability of care to the elderly and infirm patients they serve. As more fully set forth below, Movants seek to intervene in this action for the limited purpose of objecting to the fundamentally flawed Proposed Settlements on the grounds that it is unfair and unreasonable for long-term care patients and pharmacies to bear the burden of these adverse consequences so that two corporate enterprises can avoid exposure in matters in which they disclaim liability.

## PRELIMINARY STATEMENT

The Proposed Settlements are fundamentally flawed and should be rejected by the Court. *First*, as this Court is by now well aware, the Proposed Settlements' central feature is that the entire cost of the relief (approximately $4 billion per year) will be borne not by settling Defendants but, rather, by nonparties – including LTC pharmacies such as Movant DeVille, whose existing contracts with third-party payors ("TPPs") and others provide for reimbursement based upon AWP. The proposed unilateral reduction in AWP will cause an immediate and direct reduction in pharmacy reimbursements, which in turn will impact the extent and quality of services that LTC Pharmacies are able to provide. In some instances, the financial well-being and survival of smaller LTC pharmacies is at risk.[1]  In contrast, in exchange for a complete release of liability in a nationwide class action, FDB and Medi-Span will only pay Plaintiffs' attorneys' fees and certain administrative costs. Not a single penny of the purported $4 billion in annual savings to TPPs will be borne by FDB or Medi-Span, as both companies are merely publishers of AWP. Such an arrangement is unfair, unreasonable, evidently collusive and fatally defective.

*Second*, the AWP "adjustment" contemplated by the Proposed Settlements is inappropriate and arbitrary. FDB maintains that it is merely "a reporter and publisher of drug related information that is collected from third parties" and that it "does not set drug prices."[2] Hence, it would not be appropriate for FDB to systematically reduce AWP as part of an arrangement whereby Plaintiffs, FDB and Medi-Span collude to cause a shift in AWP and,

---

[1] The reduction in reimbursement that would be imposed by the Proposed Settlements comes after market forces – such as the renegotiation of reimbursement contracts or regulatory reductions in the reimbursement levels by state Medicaid agencies – have already accounted for significant amounts of any price increases complained of in this action. Thus, the suggestion that LTC Pharmacies received a windfall during the class period and are able to absorb the unilateral decrease in price on over 8,000 drugs is unsustainable. *See infra* II.A.1.

[2] *See* http://www.firstdatabank.com/support/rcs/communications/awp.

thereby, prices throughout the entire pharmacy market. Moreover, the adjustment would be arbitrary because FDB and Medi-Span deny the underlying allegations in the operative complaints in these cases, *i.e.*, that they ever improperly manipulated reported AWP. If there was no wrongful manipulation, then any systematic, court-sanctioned reduction in AWP reported by FDB and/or Medi-Span would be an arbitrary manipulation of AWP, which could have wide-ranging effects that mirror those alleged by Plaintiffs in this litigation. In effect, FDB, Medi-Span and Plaintiffs are seeking this Court's imprimatur to settle this case by doing *exactly* what Plaintiffs allege – and FDB and Medi-Span deny – FDB and Medi-Span were impermissibly doing in the first place: artificially and arbitrarily altering AWP.

*Third*, there is a marked asymmetry between those who were allegedly harmed by FDB and Medi-Span and those who stand to benefit from artificially reduced AWP figures. Many of the TPPs that would benefit from the prospective reduction in AWP proposed by the settlements first came into existence on January 1, 2006, and thus did not exist during the Class Period (which ended on March 15, 2005), or are specifically excluded from the defined settlement class (such as state Medicaid programs). Similarly, there is marked asymmetry between the number and type of drugs allegedly inflated and the number and type of drugs for which published AWP would be reduced pursuant to the Proposed Settlements, which provide for such a reduction with respect to *more than five times* the number of drugs for which AWP was allegedly inflated.

*Fourth,* while the settling parties trumpet the Proposed Settlements as benefiting consumers, they would do so, if at all, only circuitously. While TPPs paying reimbursements based on AWP will undoubtedly see a financial benefit from the Proposed Settlements, insured consumers covered by TPPs generally pay a flat co-payment for their drugs and consequently

3

would not necessarily see any reduction in the prices they pay as a result of the Proposed Settlements.

Movants seek to intervene in this action for the limited purpose of opposing the Proposed Settlements for the reasons outlined above. As explained below, Movants are entitled to intervene in this action as a matter of right pursuant to Federal Rule of Civil Procedure 24(a) because this motion is timely, they have a compelling interest relating to the subject of this action, the Proposed Settlements threaten to significantly impair that interest, and their interests are not adequately represented by the existing parties.

## STATEMENT OF FACTS[3]

### A.    The Movants

DeVille is a LTC pharmacy located in Dillsboro, Indiana. Declaration of V. Thomas DeVille ("DeVille Decl.") ¶ 3. It serves residents of 4 nursing homes and 22 group homes for the mentally handicapped, providing prescription drugs as well as specialized services for the residents and the institutions in which they reside.[4] *Id.* ¶ 5. Deville does not maintain pharmacies in nursing or group homes, but dispenses drugs to residents from a central pharmacy facility. *Id.* ¶ 4. Many of the contracts under which DeVille (as well as other similar LTC pharmacies) provides drugs contain reimbursement formulae based on a discounted FDB- or Medi-Span-reported AWP price ("AWP-x%"), plus a dispensing fee. In addition, DeVille during the class period purchased a number of its drugs at AWP-based

---

[3] The facts referred to in this section are set forth in greater detail in the accompanying Declarations of V. Thomas DeVille and Thomas Clark. "[A] district court is required to accept as true the non-conclusory allegations made in support of an intervention motion." *Fernandez & Hnos., Inc. v. Kellogg USA, Inc.,* 440 F.3d 541 (1st Cir. 2006).

[4] These specialized services include medication therapy and drug regimen review, packaging and tracking systems aimed at error reduction, specialized 24/7 "on demand" formulary and delivery services to fill the needs of patients admitted during off-hours or facing acute and emergent needs, and the development and implementation of unique geriatric drug usage guidelines tailored to the physiological and metabolic characteristics of older and sicker people. Fees for these services are built into the pharmacies' AWP-based reimbursement rates.

A/72360958.1

prices, and is thus a direct member of the class defined in the Proposed Settlements. *Id.* ¶ 3.

ASCP is a national association representing the interests of thousands of consultant and senior care pharmacists, such as Mr. DeVille, who own and work for LTC pharmacies. Declaration of Thomas Clark ("Clark Decl.") ¶ 5. Many of these LTC pharmacies provide services exclusively to the patients of long-term care facilities, such as nursing homes. *Id.* ¶ 7. ASCP's members play a critical role in serving elderly and disabled citizens residing in nursing homes, assisted living and state-run specialty care facilities. *Id.* ¶ 9.[5] ASCP's core mission as an association is to protect the interests of LTC pharmacies and the facility residents they serve. *Id.* ¶ 5; *see also* ASCP homepage available at http://www.ascp.com/about.

LTCPA is a national association that advocates for the interests of the country's LTC pharmacies, which ultimately affects the daily care of the many men and women currently living in long-term care settings. *See* Declaration of Darrell McKigney ("McKigney Decl.") ¶ 4. LTCPA members serve more than 1.2 million people – three out of every five residents of long-term care facilities – by providing prescription medication, drug therapy, and specialized pharmacy services through networks of nearly 500 pharmacies nationwide. *Id.* ¶ 4; *see also* LTCPA homepage available at http://www.ltcpa.org/mission.

ASCP and LTCPA appear in this action in their representational and associational capacities on behalf of their members, all of whom are similarly situated with respect to the

---

[5] Today's nursing home residents are older (average age 83) and sicker (averaging three or more concurrent illnesses) and, accordingly, have far greater medication needs (typically eight or more simultaneous prescriptions) than either a typical elderly person or a typical non-elderly Medicaid beneficiary. In turn, these residents consume a greater percentage of prescriptions than the typical American consumer. Bernabei, R. *et al., Characteristics of the SAGE Database: A New Resource for Research on Outcomes in Long-term Care*; J. Gerontol. A. Biol Sci. Med. Sci. 54:M25-33 (1999).

impact an arbitrary reduction in published AWP would have upon them.[6]

## B.    **AWP-Based Reimbursement System**

Today, and for the foreseeable future, the vast majority of LTC pharmacy reimbursement contracts with third party payors are fixed multi-year contracts. Many continue to include pricing terms that are expressly based upon reported AWP. *See, e.g.,* DeVille Decl. ¶ 10; McKigney Decl. ¶ 6; Clark Decl. ¶ 12. Specifically, since January 1, 2006, the LTC Pharmacies and other LTC pharmacies have been reimbursed for the vast majority of customers they serve by: (1) newly-created Prescription Drug Plans ("PDPs") participating in the new Medicare Part D Prescription Drug Program ("Part D"), which likely account for almost two thirds of the entire long-term care pharmacy payor community; (2) state Medicaid programs; (3) private insurers; and/or (4) the long-term care facilities themselves, for residents covered by Medicare Part A.

Many of these payors contract to reimburse the LTC Pharmacies based on a discount to the FDB- or Medi-Span-reported AWP price ("AWP-x%"), plus a dispensing fee intended to cover a portion of the costs of specialized packaging, delivery, and administrative services. *See* Clark Decl. ¶ 12.[7] The existing AWP-x% reimbursement rates have been reached through arms-length contract negotiations between pharmacies and Medicare PDPs or long-term care facilities (or, in the case of Medicaid for non-Medicare patients, through statutory or rulemaking procedures). These reimbursement rates reflect rigorous negotiations and market forces, or terms

---

[6] *See Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333 (1977). This Court has recognized the rights of associations to participate on behalf of their members in class actions like this one involving claims for non-monetary relief. *In re Pharmaceutical Industry Average Wholesale Price Litigation,* 230 F.R.D. 61, 79 (D. Mass. 2005) (recognizing the "substantial advantages" of associations participating in class action setting). Given the injunctive nature of the Proposed Settlements, association intervention is particularly appropriate in this case.

[7] The dispensing fee, designed to cover the additional costs of servicing LTC Pharmacies' frail and elderly patients is typically between $3.00 and $6.00. Clark Decl. ¶ 13. It is widely recognized that the dispensing fee is inadequate to cover actual dispensing costs (reported by one 2002 industry survey to average $11.32). *See* www.ltcpa.org/pdf/BDO.pdf. As such, the drug price reimbursement component of the pricing formula (AWP-x%) is relied upon by both Medicaid and service providers to offset the inadequate dispensing fee component. *See id.*

6

imposed by PDPs, and have resulted in significant price discounts to consumers and other TPPs that are consistently below private insurer TPP rates. *See, e.g.*, Center for Medicare and Medicaid Services, Fact Sheet, *Large Negotiated Price Discounts Continue in Medicare Part D* (June 20, 2006).[8] An arbitrary reduction of AWP would directly undermine, and further reduce, these already low reimbursement rates, dropping them to sub-market levels.[9] This may, in turn, require certain small pharmacies to curtail, if not eliminate, some of the dispensing services they currently provide to long-term care residents across the country. *See* Clark Decl. ¶ 19; DeVille Decl. ¶ 15. In addition, it may well put some of the small LTC pharmacies out of business altogether. *See* Clark Decl. ¶ 19.

## C.    Proposed Settlement Terms and Objections

The Proposed Settlements contemplate, *inter alia*, that (1) FDB and Medi-Span will unilaterally reduce prospectively the AWP prices they report for 8,487 drugs[10] by 4 percent (which Plaintiffs claim represents 95% of the branded drugs sold in the market and is more than *five times* the number of branded drugs for which reported AWP was alleged to have been artificially inflated); and (2) FDB and Medi-Span will pay attorneys' fees to Plaintiffs' counsel (up to $1 million for FDB and $100,000 for Medi-Span), as well as certain notice and administrative costs necessary to effectuate the Proposed FDB Settlement. *See*

---

[8] Available at http://www.cms.gov/apps/media/press/release.asp?counter=1885 (last visited Dec. 20, 2007).

[9] While certain Part D contracts contain so-called "price adjustment" provisions that would mitigate or negate the effects of the forced reduction in AWP contemplated by the Proposed Settlements, such provisions are certainly not the norm for smaller and rural pharmacies such as DeVille.

[10] Although the pleadings challenge the inflation of AWP only with respect certain brand-name drugs, and the Court's order preliminary approving the Proposed Settlements specifically notes that the drugs at issue are exclusively brand-name drugs, Movants note that the list of drugs to be included in the settlement contains a number of generic drugs, including acetic acid, ampicillin, azithromycin, cefoxitin, and ciprofloxacin. *See* Order, Docket No. 317, at 2 ("The 'Marked Up Drugs' identified in the class definition are brand-name, self-administered drugs sold through retail pharmacies, including mail order."); 26 ("The marked up drugs include all of the drugs identified in Exhibit A to the Second Amended Complaint and consist of certain brand-name drugs only."); Proposed Settlement Agreement and Release, Docket No. 120, ex. A (listing drugs to be included in the settlement).

Settlement Agreement and Release, Docket No. 120, at 19, 25, & 26 (the "FDB Settlement Agreement"); Settlement Agreement and Release, Civil Action No. 07-cv-19888-PBS, Docket No. 5, at 16-23 (the "Medi-Span Settlement Agreement").

The parties assert that the Proposed Settlements will provide an estimated drug cost savings of over $4 billion over the first year, including $3.3 billion in estimated savings to private third party payors, even though neither the Plaintiffs nor any of the Defendants are providing such funds. Amended Memorandum of Law In Support of Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement ("Amended Joint Motion"), Docket No. 151, at 10. Indeed, the parties have proposed this "creative solution" because, they state, "FDB has little financial ability to pay a substantial judgment or cash settlement." *Id.* at 6-7 & n.3.

On November 14, 2006, this Court expressed concerns about the fact that the Proposed FDB Settlement provides no monetary relief and, as a result, found class certification inappropriate under Rule 23(b)(3). *See* Order, Docket No. 168. In so doing, the Court recognized that the absence of monetary damages raises a "vermillion flag":

> Of significance, the third-party payors and consumers will receive no money damages under the settlement.
>
> * * *
>
> Essentially, plaintiffs seek to extinguish the rights of past class members in exchange for providing benefits to future class members, particularly third-party payors.

*Id.* at 2-4. The Court again noted, at a May 22, 2007 hearing, that "not one cent crosses hands" by virtue of the Proposed Settlements. *See* Transcript, Docket No. 264. The Court pointed out that "it's basically shifting from one class of people who may have been injured to a future class, the benefits, and so it's very unusual, and I'm still not sure what I'm going to do with it ultimately." *Id.*

8

The attorneys general of seven states (Wisconsin, Illinois, Idaho, Kentucky, Alaska, Iowa and Minnesota) have also expressed their concern with the Proposed Settlements. They submitted a letter to the Court stating that the states "strongly oppose the class action settlement with First DataBank." *See* Letter, Docket No. 239. Among several concerns expressed therein, the attorneys general take issue with the relief proposed by the settlement, which "agrees to sanction the publishing of a fictitious price whether or not that price is identified as an average wholesale price, a wholesale acquisition cost, 'suggested wholesale price,' or some other name." *Id.* The attorneys general observe that "sanctioning that activity is inconsistent with requiring pharmaceutical companies to report the plain meaning of the average wholesale price," as "any published price should be an authentic representation of what it is labeled, and should purport to be consistent with the plain meaning of its name." *Id.*

In addition, several constituencies of the pharmacy industry, including Movants, have written to the Court to express their objections to the Proposed Settlements. The National Association of Chain Drug Stores, an organization consisting of nearly 200 chain community pharmacy companies, submitted a letter to the Court "vigorously oppos[ing]" the Proposed Settlements. *See* Letter, Docket No. 275. The National Community Pharmacists Association ("NCPA") also submitted a letter objecting, among other things, to the "failure [of the Proposed Settlements] to properly compensate the settlement class," and the "unsubstantiated and unjust burden imposed [by the Proposed Settlements] on non-party NCPA pharmacies, pharmacists and the consumers they serve." *See* Letter, Docket No. 276. The Pharmaceutical Care Management Association also has shared its "substantial concerns" regarding the Proposed Settlements, including the burdens and transaction costs that they impose on numerous entities. *See* Letter, Docket No. 278. In addition, Movants filed a letter expressing the concerns set forth in greater

9

detail herein and indicating their intent to intervene at the appropriate time. *See* Letter, Docket

No. 277.

## ARGUMENT

## I.    MOVANTS SHOULD BE PERMITTED TO INTERVENE

### A.    Movants Are Entitled to Intervene as a Matter of Right

Federal Rule of Civil Procedure 24(a) provides, in pertinent part, that:

Upon timely application anyone shall be permitted to intervene in an action: . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a). Hence, intervention is warranted where: (1) the application for

intervention is timely; (2) the applicant claims an interest in the subject matter of the action;

(3) disposition of the action in the absence of the applicant may, as a practical matter,

impair the applicant's ability to protect the claimed interest; and (4) the applicant's interest

will not be adequately represented by existing parties. *See Conservation Law Found. of*

*New England, Inc. v. Mosbacher*, 966 F.2d 39, 41 (1st Cir. 1992).

District courts have wide latitude in determining whether to permit intervention as of

right, and the First Circuit has endorsed a "holistic rather than reductionist approach." *See*

*Pub. Serv. Co. of New Hampshire v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998). This is

because "[t]he inherent imprecision of Rule 24(a)(2)'s individual elements dictates that they

be read not discretely, but together, and always in keeping with a commonsense view of the

overall litigation" and the diverse factual circumstances of individual cases. *Id.* (citations

and quotations omitted). Accordingly, "the various components of the Rule are not bright

lines, but ranges" that must be "pragmatic[ally] balance[d]" against each other in the

A/72360958.1

10

specific context in which they arise. *See Int'l Paper Co. v. Town of Jay*, 887 F.2d 338, 344 (1st Cir. 1989).[11] Here, there can be little doubt that the interests of Movants implicated by the Proposed Settlements warrant intervention.

## 1. The Motion Is Timely

The timeliness requirement "is of first importance" in analyzing the propriety of intervention, and courts consider the following four factors in determining whether a motion to intervene is timely:

(i) the length of time the prospective intervenors knew or reasonably should have known of their interest before they petitioned to intervene; (ii) the prejudice to existing parties due to the intervenor's failure to petition for intervention promptly; (iii) the prejudice the prospective intervenors would suffer if not allowed to intervene; and (iv) the existence of unusual circumstances militating for or against intervention.

*Caterino v. Barry*, 922 F.2d 37, 40 (1st Cir. 1990). *See also Culbreath v. Dukakis*, 630 F.2d 15, 17, 20-24 (1st Cir. 1980) ("[T]he purpose of the basic requirement that the application to intervene be timely is to prevent last minute disruption of painstaking work by the parties and the court.").

First, the length of time during which Movants have known of their interest in this litigation is not substantial enough to preclude intervention. The contractual rights and economic interests of the LTC Pharmacies were not implicated until the Proposed Settlements were preliminarily approved on November 22, 2006 and August 21, 2007, and Movants have filed their Motion to Intervene within a reasonable amount of time thereafter. Furthermore, this motion is presumptively timely, as it was made within the time period set by this Court for objection and exclusion from the class. *See* Order, Docket No. 314

---

[11] *See also Daggett v. Commission on Governmental Ethics and Election Practices*, 172 F.3d 104, 113 (1st Cir. 1999) ("courts have moved from formalistic restrictions to a practical 'interest' requirement for intervention as of right").

11

(setting deadline for objections and exclusions as December 21, 2007); *see also In re Cmty Bank of N. Va.,* 418 F.3d 277, 314 (3d Cir. 2005) (motion to intervene is presumptively timely if made within the opt-out period).

Second, the timeliness of this motion cannot be disputed by any legitimate argument that the settling parties will be prejudiced by the proposed intervention at this stage of litigation, as the settlement has only *preliminarily* been approved, and these objections are being filed within the designated time period. *See, e.g., In re Acushnet River & New Bedford Harbor,* 712 F. Supp. 1019, 1025 (D. Mass. 1989) (analysis of timeliness "generally focuses on how the untimely entry of an intervenor into the fray may undo the work the parties have already done"). Indeed, as counsel for Plaintiffs expressly recognized at the preliminary approval hearing:

> this is only the beginning of a process, of course . . . . If there are parties who wish to intervene in these [sic] litigation, then they have, obviously, the rules available to themselves to file motions to intervene and participate in the final hearing process.

*See* Transcript, Docket No. 158.[12] The settling parties cannot be said to be prejudiced by the very process that Rule 23 – and they themselves – contemplate for the orderly intervention and assertion of objections to the Proposed Settlements.

Third, Movants would suffer great prejudice if not allowed to intervene. If the Proposed Settlements are approved, the reimbursement to which Movants are entitled under

---

[12] In addition, Plaintiffs previously asserted that the challenge of non-settling defendant McKesson to preliminary approval of the Proposed FDB Settlement was *premature* and should await the final fairness hearing. Plaintiffs' Amended Memorandum of Law In Support of Joint Motion for Preliminary Approval of Proposed Settlement, Docket No. 152, at 13 (stating that "the Court should only hear. . . objections at the same time and in the same manner that it hears other objections – *i.e.*, at the fairness hearing. There simply is no justifiable reason to . . . permit [McKesson] to object in the context of the preliminary approval hearing, which is not the purpose of the preliminary approval hearing"). *See also In re New Motor Vehicles Canadian Export Antitrust Litig.* 236 F.R.D. 53 (D. Me. 2006) (court's only function at the preliminary approval stage is to decide whether the settlement is adequate to warrant submission to the class for consideration without making any indication or expression as to its fairness).

existing contracts will be adversely affected on a massive scale. While such collusive conduct by FDB and Medi-Span might be actionable under other circumstances, Movants will have no real viable recourse against FDB and/or Medi-Span, whose compliance with an order finally approving the Proposed Settlements would provide a strong defense in any future action by Movants against them.

Fourth, the unusual circumstances presented here strongly militate in favor of intervention because Movants, whose financial interests the Proposed Settlements implicate, were excluded from the underlying settlement negotiations that preceded the Proposed Settlements. Having intentionally carved LTC pharmacy out of the settlement process on the front end, the settling parties cannot now be heard to complain that Movants' request to intervene to protect their interests is somehow "untimely." *See Atlantic Mut. Ins. Co. v. Northwest Airlines, Inc.*, 24 F.3d 958, 960 (7th Cir. 1994) (settlement "not conclusive if a third party possessing an interest in the property or transaction which is the subject of the action has been excluded from the negotiations"; court can "annul" settlement if settling parties "beat the intervenor to the punch"). As the Seventh Circuit has observed:

> We may assume that settlement of litigation by the original parties is not conclusive if a third party possessing an interest in the property or transaction which is the subject of the action has been excluded from the negotiations. ***Intervention permits such an entity to prevent the original litigants from bargaining away its interests.***

*Id.* (citations and quotations omitted) (emphasis added).

### 2.  Movants Have A Compelling Interest In The Subject Matter Of The Litigation

The type of "interest" that is sufficient to justify intervention has been broadly defined. *See Daggett v. Comm. on Governmental Ethics and Election Practices*, 172 F.3d 104 (1st Cir. 1999). It is well-settled that where (a) the intervenor's "contractual rights may

13

be affected by a proposed remedy" or (b) the ongoing litigation "directly threatens an economic right or benefit presently enjoyed by the intervenor," the intervenor has a sufficient stake in the litigation to warrant intervention as a matter of right. *See, e.g., B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 545 (1st Cir. 2006) (contractual rights); *Pub. Serv. Co. of New Hampshire*, 136 F.3d at 205 (economic rights or benefits); *New York Public Interest Research Group v. Regents of the University of State of New York*, 516 F.2d 350, 351-352 (2d Cir. 1975) (granting intervention to protect economic interests of members of pharmacy association).[13] Here, there can be no question that the impaired contractual and economic rights of the LTC Pharmacies implicated by the Proposed Settlements – including a substantial share of the cost of a settlement which the parties value at $4 billion annually – gives Movants a compelling interest in the subject matter of the Proposed Settlements. Movants satisfy both of the above tests.

Because the LTC Pharmacies' contracts with PDPs, other TPPs, long-term care facilities and the other customers they serve are directly tied to reported AWP, their existing right to reimbursement under those contracts will be significantly impaired by the proposed AWP reduction. That, by definition, "threatens the economic benefits" that Movants' contracts currently envision. Furthermore, the impairment of Movants' contractual and economic interests is not speculative or contingent – it is immediate and unavoidable.[14] The parties have stated that the Proposed Settlements will "effectuate a national 4%

---

[13] *See also Conservation Law Found.*, 966 F.2d at 42-43 (granting intervention to protect economic interests of commercial fishing groups in connection with proposed regulation to eliminate overfishing); *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) ("significantly protectable interest" is demonstrated when "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable" contract expectations); *NYNEX Corp. v. FCC*, 153 F.R.D. 1, 3 (D. Me 1994) (permitting intervention to protect economic interest of members of cable operator association).

[14] *See, e.g., Walgreen*, 6 Fed. Appx. at 28 (potential economic harm must be more than "overly contingent").

14

reimbursement reduction in almost all retail branded drug transactions reconciled through the FDB database," and that they will cause a \$4 billion savings in the first twelve months of the rollback. Amended Joint Motion, Docket No. 151, at 10. The savings are only realized, however, when they are extracted, by means of the Proposed Settlements, dollar-for-dollar out of the "pockets" of LTC and other pharmacies.

The proposed AWP reduction will undoubtedly force LTC pharmacy service providers to reduce operations and cut back vital services, and may threaten the overall continued viability of smaller local LTC pharmacies such as DeVille. Clark Decl. ¶ 19. The threat of such "economic injury from the outcome of the litigation undoubtedly gives a petitioner the requisite interest" to intervene as a matter of right. *See New York Public Interest Research Group*, 516 F.3d at 351-52 (intervention permitted to protect interest of small local pharmacies where intervenors had sufficient interest in protecting against a measure that "might well lead to significant changes in the profession and in the way pharmacists conduct their business"); *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) ("The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest.").

### 3. Movants' Interests Will Be Significantly Impaired By The Proposed Settlements

As the foregoing discussion establishes, the arbitrary reduction in published AWP contemplated by the Proposed Settlements will significantly and potentially irreparably, impair Movants' economic interests and contractual rights vis-à-vis TPPs and others. This is "more than sufficient to satisfy the 'practical impediment' requirement" of Rule 24(a)(2). *See Kellogg*, 440 F.3d at 545 (where contractual rights would be affected, "the same rationale that satisfies the 'interest' test satisfies the 'practical impediment test'"); *Walgreen*

A/72360958.1

*Co. v. de Melecio*, 194 F.R.D. 23 n.2 (D.P.R. 2000) ("Because the second and third factors [for intervention of right] are so related, they may be considered together"), *citing Daggett,* 172 F.3d at 110.

### 4.    Movants Are Not Adequately Represented In These Proceedings

The fourth prong of the intervention as of right analysis provides that intervention is appropriate "*unless* the applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a) (emphasis added). Generally, a party may intervene when its interests "may be" inadequately represented by the parties, which is a "minimal" standard. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (D.C. Cir. 1972). Indeed, the burden may fall on any party opposing intervention to show that the existing representation is, in fact, adequate to protect the proposed intervenor's interests. *See Caterino*, 922 F.2d at 42 n.4 (1st Cir. 1990) ("the burden of persuasion that representation is adequate appears to rest on the party *opposing* intervention"); C. Wright, A. Miller & M. Kane, 7C Federal Practice & Procedure § 1909 (1997) (stating that "it seems entirely clear" that the burden of persuasion as to inadequate representation falls on the party opposing intervention).

Here, the settling parties do not include any pharmacies, any parties whose interests are aligned with those of pharmacies, or even any parties who have economic interests in the reported level of AWP similar to the LTC Pharmacies or who are reimbursed based on AWP-based contractual pricing terms.[15] The settling parties have been all too willing to negotiate away Movants' contractual and economic rights by proposing to reduce AWP, not at their own expense, but at the expense of, *inter alia,* the LTC Pharmacies. Movants'

---

[15] *See Kellogg*, 440 F.3d at 546 ("One way for the intervenor to show inadequate representation is to demonstrate that its interests are sufficiently different in kind or degree from those of the named party."); *Conservation Law Found.*, 966 F.2d at 44-45 (concluding that interests of regulated fishing groups were not adequately represented by federal agency in suit filed by public interest organization seeking more extensive regulation by that agency and reversing district court order denying intervention as of right).

16

A/72360958.1

interests are, therefore, not represented, much less adequately represented, in these proceedings. *See, e.g., Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 35 (1st Cir. 2000) (finding that "enough likelihood of conflict or divergence of interest" defeats any claim that "the applicant's interest is adequately represented by existing parties"); *United States v. Stringfellow*, 783 F.2d 821, 828 (9th Cir. 1986) (finding intervention warranted when "there exists a genuine possibility that, in the absence of intervention, the existing parties will 'bargain away' the third party's interest").

As this Court has noted:

[I]ntervention permits another voice and set of concerns to participate in the resolution of an extremely complex matter, both factually and legally – that necessarily is taking this Court and these parties into the heretofore largely uncharted waters of a relatively new [area of law]. The further guidance of an additional entity, especially one with some expertise in the subject at hand, is therefore not lightly to be shunned.

*In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB*, 712 F. Supp. at 1025. Intervention is particularly appropriate in a complex case such as this, where the Proposed Settlements would have profound and far-reaching implications for countless parties the majority of whom are not currently before the Court.

## B. In The Alternative, Movants Should Be Permitted To Intervene Permissively

If the Court does not find that Movants are entitled to intervene as a matter of right, permissive intervention under Federal Rule of Civil Procedure 24(b) should be authorized. Rule 24(b) provides, in pertinent part, that permissive intervention is warranted where "an applicant's claim or defense and the main action have a question of law or fact in common."

17

Fed. R. Civ. P. 24(b)(2).[16] As with intervention of right under Rule 24(a)(2), Rule 24(b) vests the Court with broad discretion in granting permissive intervention and, as the First Circuit has observed, the bar for such interventions is "low." *See, e.g., Mass. Food Ass'n v. Mass. Alcoholic Beverages Control*, 197 F.3d 560, 568 (1st Cir. 1999). Indeed, in making the determination, a district court may "consider almost any factor rationally relevant." *Dagget*, 172 F.2d at 113.

The required degree of factual or legal commonality depends on the nature of the requested intervention. *See* 6 James W. Moore et al., Moore's Federal Practice § 24.11 at 24-63 (3d ed. 2003). A less stringent standard applies where, as here, an applicant seeks intervention for a very limited purpose (*i.e.*, to oppose approval of the Proposed Settlements) rather than full participation in the litigation. *Id; see also In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB*, 712 F. Supp. at 1025 (stating that the request to argue and appeal with respect to settlements is "quite limited"). Indeed, "the requisite commonality is met by virtue of the fact that the applicant seeks to challenge the validity of an order entered in the action." *Id.*[17] Accordingly, Movants are entitled to intervene in this action both permissively and as of right.

## II. THE PROPOSED SETTLEMENTS ARE UNFAIR, UNREASONABLE, AND SHOULD NOT BE APPROVED

It is axiomatic that, before approving a class action settlement, a court must determine that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C). Critically,

---

[16] A party seeking permissive intervention must also show, as with intervention as of right, that such request is timely and will not "unduly prejudice or delay the adjudication of the rights of the original parties." *Id.* For the reasons set forth in Sec. I.A.1, *supra*, those requirements are met here.

[17] If the Court were to conclude that there must be an independent jurisdictional basis for Movants' claim, notwithstanding the narrow purpose for which intervention is being sought, it is satisfied by the federal question presented by Movants: whether the Proposed Settlements are unfair, inadequate and should be rejected under Rule 23 of the Federal Rules of Civil Procedure.

18

in assessing such fairness, the court must not only consider the rights of the parties before it, but, "where the rights of third parties are affected . . . their interests too must be considered." *In re Masters Mates & Pilots Pension Plan Litig.*, 957 F.2d 1020, 1026 (2d Cir. 1992). In such cases, "the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *Id*; *see also Williams v. Vukovik*, 720 F.2d 909, 921 (6th Cir. 1983) ("In making the reasonableness determination the court is under the mandatory duty to consider the fairness of the decree to those affected.").

## A. The Proposed Settlements Would Allow FDB And Medi-Span To Avoid Potential Liability By Using "Other People's Money"

As Plaintiffs' Amended Joint Motion lays bare, the Proposed Settlements were fashioned to avoid a single problem – that the settling defendants purportedly have "little financial ability to pay a substantial judgment or cash settlement." *See* Amended Joint Motion, Docket No. 151, at 7 & n.3. The result was a so-called "creative solution" that would supposedly "afford the class enormous financial and other benefits while being cognizant of the comparatively limited resources available to FDB." *Id.* at 6. In reality, however, the Proposed Settlements are collusive and unfair agreements that should be not be approved by this Court.

Movants' primary objection to the Proposed Settlements is that the "enormous financial benefits" they claim to confer, valued at $4 billion per year, would be extracted from the LTC Pharmacies and the rest of the pharmacy industry – not from the defendants in this action – by virtue of the artificial reduction of published AWP, figures upon which the LTC Pharmacies' reimbursement contracts are based. The "benefits" provided by the Proposed Settlements would reduce pharmacies' already meager margins, which have been shaped by market forces and negotiations that have adjusted, and do adjust, for unusual price fluctuations.

In contrast, all FDB and Medi-Span have to do in exchange for a complete release of

19

liability in nationwide class action settlements that will bind thousands (if not millions) of class members is to artificially manipulate reported AWP downward (at no cost to itself),[18] pay Plaintiffs' counsel, and pick up the tab for the administrative costs of the settlements. Remarkably, when all is said and done, the Proposed Settlements will cost the settling defendants less than $2 million in costs and fees.[19] Because the Proposed Settlements will not enhance efficiency or otherwise cause prescription drugs to be less costly overall (*see infra*), the $4 billion annual savings touted as the benefit of the Proposed Settlements must come at the expense of someone, and in this case the expense will be imposed upon third parties, such as the LTC Pharmacies.

## B. Reimbursement Rates Based Upon AWP Have Decreased Since 2001

The damaging effect of the artificial across-the-board reduction in reimbursement contemplated by the Proposed Settlements is further compounded by the fact that market forces – chiefly reductions in the "AWP-x%" levels paid by State Medicaid programs and TPP or PBM contracts that were either renegotiated or had cost-savings procedures deployed – have already forced down the level of reimbursement pharmacy entities such as the LTC Pharmacies over the class period. Thus, even assuming, *arguendo*, that AWP was inflated in the past decade, the market has already corrected for such inflation.

---

[18] FDB and Medi-Span's revenues are not tied to the AWP values they report, but to the circulation of their publications. Furthermore, the agreement to cease publishing AWP after two years will not have any financial impact on FDB and Medi-Span, because if the Proposed Settlements are approved, the industry will in all likelihood – over time – move away from AWP in favor of some new benchmark (such as Wholesale Acquisition Cost, or "WAC"), which FDB and Medi-Span are already (or will soon be) publishing. Accordingly, their profits are unlikely to be meaningfully impacted if, two years down the line, they stop publishing AWP pursuant to the Settlement Agreements. The provisions of the Proposed Settlements purporting to set up an industry-wide mediation process aimed at determining a new benchmark are equally illusory, since, *inter alia*, the Court does not have jurisdiction to require many of the critical participants, who simply are not before it, to take part.

[19] Class counsel readily admits in its filings in support of the Proposed Settlements that the alleged financial benefit the proposed AWP reduction would effectuate "will vastly exceed the recoverable and distributable amount of dollars that might be associated with any judgment that could be obtained against FDB as a result of continued litigation." *See* Docket No. 151 at 10.

An annual publication tracking prescription drug benefit costs reveals that nationally, the average reimbursement formula fell from AWP-13.5% plus a dispensing fee of $2.31 in 2000 to AWP-16.1%, plus a dispensing fee of $1.88 in 2007.[20] Further, over the class period, nearly 30 state-run Medicaid programs using AWP-based rates (some states used WAC-based method) to reimburse pharmacies adjusted their reimbursement formulae downward to account for increased drug costs.[21] Over a third of these states reduced their "AWP-x%" formulae by 3-6% between 2001 and 2005 accounting for virtually all (or more) of the increase in AWP alleged by Plaintiffs.[22] Indeed, this trend in market pressure has continued for pharmacy service providers such as the LTC Pharmacies who provide benefits to Part D participants. "Ongoing analysis conducted by the Centers for Medicare & Medicaid Services (CMS) shows that the Medicare prescription drug benefit continues to provide large discounts on prescription drugs, with savings from [PDP] negotiated price discounts that have increased over time." Center for Medicare and Medicaid Services, Fact Sheet, *Large Negotiated Price Discounts Continue in Medicare Part D* (June 20, 2006).[23] Thus, even as a large percentage of Movants' reimbursements shifted from State Medicaid programs to Part D in 2006, market pressures and "strong competition among Medicare prescription drug plans" continued to keep participating pharmacy reimbursement levels lower than "'third party' prices negotiated by insurance companies and pharmacy benefit

---

[20] Pharmacy Benefits Management Institute and Takeda Pharmaceuticals, *Prescription Drug Benefit Cost and Plan Design Report* at 21, table 29 (2007), available at http://www.pbmi.com/2007report/ (last visited Dec. 20, 2007).

[21] These trends were derived from the annual *Pharmaceutical Benefits* publications released by the National Pharmaceutical Council for the years 2001-2005 (2001 data at section 4, page 57; 2002 data at section 4, page 45; 2003 data at section 4, page 41; 2004 data at section 4, page 41; and 2005 data at section 4, page 56. Each of these publications is available at http://www.npcnow.org/resources/PharmBenefitsMedicaid.asp.

[22] *See id.*

[23] Available at http://www.cms.gov/apps/media/press/release.asp?counter=1885.

A/72360958.1

managers (PBMs) for populations other than Medicare beneficiaries." *Id.*

This Court is not unfamiliar with this trend, recognizing in its recent ruling addressing problems with Plaintiffs' aggregate damages theory concerning Defendant McKesson that "the record supports defendant's contention that [PBMs] knew about the dramatic bump in AWP pricing in 2002 and had the power and financial incentive to institute contract pricing mechanisms with pharmacies to bring reimbursement costs back to the status quo for client TPPs." Memorandum and Order on Class Certification, Docket No. 317, at 19. This finding was supported by voluminous submissions by both expert and fact witnesses demonstrating the broad availability and impact of market influences and contract mechanisms available to control any alleged inflation in AWP. McKesson expert Robert D. Willig observed that even in the absence of the alleged scheme, his analysis revealed that "during the period of 1995-2004, annual average discounts off of AWP negotiated by TPPs increased over time while dispensing fees decreased." Expert Report of Robert D. Willig, Docket No. 193, ¶ 49.

As part of his expert analysis, Willig examined numerous PBM-TPP contracts covering the class period to rebut the assumption of Plaintiffs' expert, Dr. Hartman, "that that discounts off AWP were unaffected by the alleged scheme." *Id.* at ¶ 48. Willig found, consistent with the industry study cited by Movants, that the rate of discount off of AWP increased over the class period. *Id.* As an example, one three-year contract signed in January 2001 with a rate of AWP-14% and a dispensing fee of \$2 was amended in 2003 with a new reimbursement rate of AWP-16% and a \$1.50 dispensing fee. *Id.* (describing additional contracts with changes in discounts off of AWP over the class period). Plaintiffs' now-former expert confirmed the trend of increasing discounts off AWP over the class

22

period:

> Q. Can you think of any other reason why the discounts have gotten larger over time other than the fact that the cost of drugs went up?
>
> A. Well, I think now looking back on it, I think it was because the spread between WAC and AWP has increased.
>
> Q. Because of the allegations in the complaint?
>
> A. Yes.

Rebuttal Expert Declaration of Robert D. Willig, Docket No. 249, ¶ 69 (quoting testimony of Plaintiffs' expert Susan Hayes).

In sum, to the extent AWP was allegedly inflated at operative points in time, whether in direct response or otherwise, reimbursement levels based on AWP have declined markedly over the class period. This point, which negates the gratuitous arguments that pharmacies benefited form the alleged AWP inflation, is validated by, *inter alia*, industry studies, CMS, and the record in this litigation. Nonetheless, Plaintiffs seek to impose, further, the burdens of the Proposed Settlements upon LTC (and other) pharmacies.

Plaintiffs, further, despite the adverse and potentially severe effects that an artificial reduction in AWP could have on pharmacies such as Movants, herald the Proposed Settlements as "bold" and "unique." But "boldness" and "uniqueness" are not the criteria for approval of a class action settlement under Rule 23 of the Federal Rules of Civil Procedure. Fairness and reasonableness are. So, while undeniably "bold," and quite possibly "unique," there is nothing remotely fair, reasonable or even permissible about burdening unrepresented parties with the $4 billion annual cost of the Proposed Settlements. While the threat of bankruptcy may be unpalatable to FDB and Medi-Span, it is clearly inequitable for the settling parties to subject some of the non-party pharmacies who would bear the burden of the Proposed Settlements to the same threat of insolvency.

23

A/72360958.1

Where, as here, a proposed settlement would unfairly burden third parties, the settlement should not be approved. *See, e.g., Schwartz v. Dallas Cowboys, et al.*, 157 F. Supp. 2d 561, 572 (E.D. Pa. 2001) (rejecting settlement that was unfair and offended "sound notions of public policy" because it failed to properly balance interests of the settling class with others involved); *Black Fire Fighters Assoc. of Dallas, et al. v. Dallas Fire Fighters Assoc.*, 805 F. Supp. 426, 428 (rejecting settlement that overcompensated plaintiffs and "unreasonably and unlawfully" burdened a third party).

## C.    As A Publisher Of AWP, FDB And Medi-Span Should Not Have The Power To Unilaterally "Rollback" Or Otherwise Fix AWP

FDB and Medi-Span overtly state that they are merely providers of "drug database products" that publish prices collected from their parties, and that as a reporter and publisher it does not set prices.[24] Thus, by their own admission, FDB and Medi-Span should not be in a position, whether through agreement with this group of plaintiffs or otherwise, to arbitrarily reduce AWP.

Furthermore, there has never been any judicial determination that FDB or Medi-Span improperly manipulated reported AWP, and FDB and Medi-Span adamantly deny that they ever did so.[25] If that is true, any reduced AWP numbers reported by FDB and/or Medi-Span pursuant to the Proposed Settlements would themselves be *arbitrary and inappropriate*. Thus, to approve the Proposed Settlements would be to countenance the very conduct that was alleged to be improper in this case, resulting in arbitrarily reduced reimbursement for

---

[24] *See* http://www.firstdatabank.com/support/rcs/communications/awp and
http://www.medispan.com/marketing/ContentPage.aspx?contentId=56b1b2df-0daf-4843-b9da-f95e4dc02033 (each last visited on Dec. 21, 2007).

[25] In particular, the Settlement Agreement between FDB and Plaintiffs states that FDB "denies any wrongdoing or liability whatsoever." Settlement Agreement and Release, Docket No. 120, at 2; *see also id.* at 3 (stating that FDB believes "that it has valid and complete defenses to the claims asserted against them [sic] in the Class Action").

24

Movants and other LTC pharmacies. It would indeed be perverse for Plaintiffs, FDB and Medi-Span to be permitted to settle this case by doing *exactly* what Plaintiffs allege – and FDB and Medi-Span deny – they were impermissibly doing in the first place: *artificially altering AWP.*

## D.    The Proposed Settlements Stand To Have Radical Adverse Consequences For Long-Term Care Pharmacies And The Nursing Home Patients They Serve

As discussed above, LTC pharmacies provide a host of specialized services to the elderly and disabled residents in the long-term care facilities. Clark Decl. ¶ 8; DeVille Decl. ¶ 5. The cost of vital services, such as specialized 24-hour pharmacy operations, is covered by a combination of two price components – the "AWP-x%" figure and a nominal "dispensing" fee that does not actually cover the dispensing and other costs associated with providing and/or administering the drugs. Clark Decl. ¶ 15; DeVille Decl. ¶ 11.    The reduction in AWP contemplated by the Proposed Settlements, if implemented, will thus lead to a reduction, particularly by the smaller, independent and rural pharmacies, in critical services provided to patients residing in long-term care facilities and a concomitant interruption in patient access to pharmacy services. Clark Decl. ¶ 20; DeVille Decl. ¶ 19.

More troubling still is the fact that the Proposed Settlements put the viability of many smaller LTC pharmacies (and thus their ability to provide *any* services to the elderly and disabled patients they serve) in serious jeopardy. Unlike some retail pharmacies, which can depend to some degree upon revenues generated by the "front end" sale of non-pharmacy goods (toiletries, over the counter products, food, greeting cards, etc.) to meet their bottom line, LTC pharmacies focus on the provision of highly specialized pharmacy services and do not have other sources of revenue. Clark Decl. ¶ 8. In an environment in

25

which the increased cost of health care services already produces very small profit margins, with no retail or other revenue to soften the blow, smaller LTC pharmacy providers may be forced not only to cut services, but to simply close their doors altogether if the proposed AWP reduction is allowed by this Court to go into effect. Clark Decl. ¶ 19.

At greatest risk are the smaller community LTC pharmacies that: (a) do not serve large numbers of institutions; (b) have limited reserves; (c) are located in smaller communities throughout the country; and (d) do not have the economic stability and support of a national level company. Thus, arguably the most essential pharmacies to consider are the small practitioners who operate out of these community-level pharmacies. And their closure would, of course, ultimately harm not only the pharmacists, but the end consumers, *i.e.,* the frail and elderly nursing home residents – ironically, a group whose interests Plaintiffs purport to represent.

Indeed, while the Proposed Settlements may have been portrayed as benefiting consumers, the reality is that they only benefit Defendants by giving them a "free pass," and certain of the TPPs who actually existed during the class period. As noted, consumers whose prescriptions are paid for by TPPs and who generally pay a flat co-payment for their drugs, while included within the settlement classes, will not see any reduction in their co-payment prices as a result of the Proposed Settlements. Moreover, uninsured consumers, who generally purchase their prescriptions at the usual and customary prices set by pharmacies, may actually *expect to pay more*, since pharmacies may be forced to raise such prices in an effort to recoup some small portion of the lost revenues from TPPs. In sum, while FDB and Medi-Span would receive a release from *all* consumers, most of them (save only the small percentage of consumers who pay a percentage based co-payment) –

26

including long-term care pharmacy patients, the uninsured, and insured patients who receive a flat co-payment – should expect to receive *no benefit* from the Proposed Settlements. They should, however, expect the settlement to inure to their detriment in terms of the quality and availability of care.

## E.   There Is A Disconnect Between Those Class Members Alleged To Have Been Harmed And The Entities That Stand To Benefit From The Prospective Relief

There is also a disconnect in the Proposed Settlements between the class members who were allegedly harmed and the entities that stand to benefit from the Proposed Settlements, such that many class members may receive nothing while non-class members, such as Part D PDPs that were not even in existence during the class period, would receive a windfall. As the Court remarked during the preliminary approval hearing and in its November 14 Order, "the third-party payors and consumers will receive no money damages under the settlement." *See* Docket No. 168 at 2. Instead, the settling parties propose a 4% AWP reduction for *future* drug purchases. This, of course, means that all class members who were allegedly harmed in connection with drugs paid for during the class period, but who do not make any future payments, will receive *no benefit* from the Proposed Settlements, whereas others, like Part D PDPs, who did not purchase *any* drugs during the class period – in other words, parties who are not class members at all – will receive a windfall. Indeed, to a large extent, the notion that the proposed prospective relief extends to the "class" is somewhat illusory, given that the AWP reduction will apply to: (a) *any* entities – whether they fall within the class definition or not – who continue to use AWP as a benchmark and make reimbursement payments after the effective date of the Proposed Settlements; and (b) *only* those class members who continue to do so (and no others).[26] In the

---

[26] For example, state Medicaid programs are excluded from the class (and so theoretically should not be entitled to relief), but would nevertheless benefit from the forced AWP reduction contemplated by the Proposed

27

case of LTC pharmacies, where most payors (the Part D Plans) either did not even exist during the class period or are otherwise excluded from the class (the Medicaid programs) the disparity is even more significant. These parties, nonetheless, are the ones who will realize the windfall from the settlements at the expense of Movants and other LTC pharmacies.

## F.    The Proposed Settlement Purports To Reduce AWP For Five Times The Number Of Drugs At Issue In The Complaint

Finally, the Proposed Settlements' unilateral AWP reduction applies to more than *five times* the number of drugs for which AWP was even allegedly inflated to begin with, and there is no logical explanation for this overinclusion. This renders the Proposed Settlements unfair and inadequately tailored to the harms alleged. The reduction also applies to certain generic drugs despite representations to the Court that only branded drug prices are to be affected. To date, neither Plaintiffs, FDB or Medi-Span have explained what legitimate basis there could possibly be for FDB and Medi-Span unilaterally to reduce reported AWP for drugs as to which it is not even alleged to have manipulated AWP in the first place. In addition to gratuitously – and exponentially – increasing the harm to the LTC Pharmacies and the other parties who would bear the cost of the Proposed Settlements, reducing AWP for a population of drugs where there is not even any allegation (much less evidence) that it was inflated in the first place would under any scenario, necessarily set AWP at an inaccurate, depressed level for those drugs. The expansion of the scope of covered drugs, without any justification, exacerbates the harm caused to Movants and non-parties by the Proposed Settlements.

---

Settlements. Moreover, while the Court has conditionally certified the class on a Rule 23(b)(2) basis, because it has also afforded class members an opt-out right, the Proposed Settlements will, anomalously, benefit individuals and entities who opt out and are not bound by the judgment.

28

## CONCLUSION

For all of the foregoing reasons, Movants respectfully request that (a) they be permitted to intervene in this action for the limited purpose of opposing the Proposed Settlements, and that (b) the Court decline to approve the Proposed Settlements.

Respectfully submitted,

DEVILLE PHARMACY, INC.,
AMERICAN SOCIETY OF
CONSULTANT PHARMACISTS, and
LONG-TERM CARE PHARMACY
ALLIANCE

By their attorney

Daniel S. Savrin, BBO # 555434
Angela J. Neal, BBO # 661603
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA 02110
Tel: (617) 951-8000
Fax: (617) 951-8736
daniel.savrin@bingham.com
angela.neal@bingham.com

*Of Counsel*:

David J. Farber
Edward D. Gehres, III
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037

Dated: December 21, 2007

29

A/72360958.1

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail on December 21, 2007, as follows:

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main St., 4th Floor
Cambridge, MA 02142

Jeffrey L. Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

Sheldon T. Zenner, Esq.
Katten Muchin Roseman LLP
525 West Monroe Street
Chicago, IL 60661-3693

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Sheila L. Birnbaum
Skadden, Arps, Slate, Meagher, & Flom LLP
4 Times Square
New York, NY 10036

Dated: December 21, 2007

Angela J. Neal