UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2007 DEC 21  P 4: 39

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER<br><br>            Plaintiffs,<br><br>vs.<br><br>FIRST DATABANK, INC., a Missouri Corporation; and MCKESSON CORPORATION, a Delaware Corporation,<br><br>            Defendants. | C.A. No. 1:05-CV-11148-PBS<br><br><br><br>**NATIONAL COMMUNITY PHARMACISTS ASSOCIATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO SETTLEMENT** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. FACTUAL BACKGROUND ................................................................................................2

III. ARGUMENT .........................................................................................................................3

    1. Standing to Object and Standard of Review ...................................................................3

    2. Independent Pharmacies' Prescription Drug Sales are Subject to Non-Negotiable Contracts with PBMs .......................................................................................................5

    3. If the Settlement is Approved, the Independent Pharmacies will be Financially Devastated ........................................................................................................................6

    4. The Independent Pharmacies are Already Suffering Financially by Virtue of the Downward Adjustment to AWP Implemented by PBMs in 2001 or 2002 ....................9

    5. The Reduced AWP will Harm Consumers as well as Independent Pharmacies ...........11

    6. In the Alternative, the Court should Revise the Settlement to Eliminate the Reduction to AWP and to Discontinue Publication of AWP and BBAWP No Earlier Than Two Years after the Settlement is Effective .......................................................................................12

IV. CONCLUSION ....................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                                                                     **Page**

*Eichenholtz v. Brennan*,
    52 F.3d 478, 483 (3rd Cir. 1995)..........................................................................................4

*In re Relafen Antitrust Litigation*,
    360 F. Supp.2d 166 (D. Mass. 2005)..................................................................................3

*Krangel v. Golden Rule Resources, LTD.*,
    194 F.R.D. 501, (E.D. Pa. 2000) .........................................................................................3

*Masters Mates & Pilots Pension Plan and IRAP Litigation v. Riley*,
    957 F.2d 1020 (2nd Cir. 1992) .......................................................................................3, 4

## I. INTRODUCTION

National Community Pharmacists Association ("NCPA") respectfully submits this memorandum of law in support of its objection to the Settlement Agreement and Release filed with the Court in the above captioned action on November 1, 2006 (the "Settlement"). The proposed settlement will be devastating to the more than 24,000 independently owned community pharmacies (the "Independent Pharmacies" or "Community Pharmacies") that are represented by NCPA and the millions of consumers that they serve. If the Average Wholesale Price ("AWP") is substantially reduced, Independent Pharmacies will be forced to dispense hundreds of branded drugs at a significant loss driving hundreds of pharmacies out of business and harming the communities they serve. The result is inequitable, unfair and harmful to consumers: Independent Pharmacies were never accused of any wrongdoing in this suit; reimbursement to Independent Pharmacies decreased significantly after the alleged AWP inflation in 2001 or 2002; and the Settlement places no financial burden upon the alleged wrongdoers. As demonstrated by the numerous affidavits of independent pharmacists submitted herein and a comprehensive study of independent pharmacy contracts, the proposed Settlement will drive many Independent Pharmacies out of business or force them to significantly reduce services, harming all consumers, especially those in underserved low income or rural areas that are heavily dependent upon Independent Pharmacies.

As such, NCPA requests that the Court decline to approve the Settlement, or, in the alternative, revise the terms of the Settlement to allow time for independent pharmacy buying groups and cooperatives to attempt to renegotiate contracts with pharmacy benefit managers ("PBMs") under the extraordinary circumstances brought about by the Settlement.

1

## II. FACTUAL BACKGROUND OF NCPA AND ITS MEMBER PHARMACIES

NCPA, founded in 1898 as the National Association of Retail Druggists (NARD), represents the pharmacist owners, managers, and employees of more than 24,000 independent community pharmacies across the United States. The nation's Independent Pharmacies, independent pharmacy franchises, and independent chains dispense nearly half of the nation's retail prescription medicines.

The nation's Independent Pharmacies and their pharmacist owners are small business entrepreneurs and multifaceted health care providers who represent a vital part of the United States' health care delivery system. Unlike many chain drug stores and mass merchants, Independent Pharmacies serve underserved areas such as rural and inner city communities. Independent Pharmacies also offer a broader range of services than their larger rivals, such as counseling, drug compounding and home delivery, which delivery is especially important to the elderly and disabled. Consumer surveys demonstrate that consumers strongly prefer the personal attention and strong level of services they receive from an Independent Pharmacy. (*See* http://www.ncpanet.org/media/releases/2003/independent_pharmacies_take_top_honors_in_09-10-2003.php, last visited December 20, 2007.)

The Independent Pharmacies play a vital role in drug distribution and dispense over 41% of all drugs in the United States annually. (*See* http://www.ncpanet.org/aboutncpa/ipt.php, last visited December 20, 2007.) Independent Pharmacies generated $84 billion in revenues in 2006, $78 billion of which were from the sale of prescription medications. (*Id.*) On average, each Independent Pharmacy fills 61,087 prescriptions per year, for a total of 1.6 billion prescriptions filled by all Independent Pharmacies in 2006. (*Id.*) In fact, Independent Pharmacies make up the majority of all pharmacies in over half the states and U.S. territories. (Map of Retail Pharmacies

by State at Ex. C.[1]) As shown by affidavits from owners of Independent Pharmacies that are filed herewith, Independent Pharmacies make vital contributions to their communities by serving tens of thousands of patients in their geographic areas. (Owner Affs.[2])

### III. ARGUMENT

#### 1. Standing to Object and Standard of Review.

The obligation of a court in reviewing a proposed settlement is to determine that the settlement is both fair and adequate to resolve the concerns raised in the litigation. Both the United States Supreme Court as well the First Circuit Court of Appeals "have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23e prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litigation*, 360 F. Supp.2d 166, 192 (D. Mass. 2005) (noting the court's "fiduciary duty" to scrutinize a proposed settlement agreement) *Id.* at 195 (citations omitted).

In reviewing a class action settlement, the Court's normal focus is upon the fairness and adequacy of the settlement to the plaintiff class; however, "[w]here the rights of third parties are affected, ... their interests too must be considered." *Masters Mates & Pilots Pension Plan and IRAP Litigation v. Riley*, 957 F.2d 1020,1026 (2nd Cir. 1992) (approval of settlement reversed upon objection of non-settling defendant) (citation omitted); *see also, Krangel v. Golden Rule Resources, LTD.*, 194 F.R.D. 501, (E.D. Pa. 2000) ("[T]he court must decide whether the proposed settlement itself is fair to settling parties and relevant third parties"). *Id.*

As such, fairness to the settling parties is not enough to warrant the Court's approval of the settlement:

---

[1] Exhibits B-E are appended to "Yaffe Aff." which refers to the Affidavit of Eric L. Yaffe in Support of National Community Pharmacists Association's Objection to Settlement, which affidavit is served and filed herewith.
[2] Citations to "Owner Affs." refer to the Affidavits of Independent Pharmacy owners, which affidavits are found at Exhibit A to Yaffe Aff. The owner affidavits include 22 affidavits from independent pharmacies in 16 states. Each of these affidavits express the concerns of these Independent Pharmacies about the impact of the proposed settlement.

3

> [W]here the rights of one who is not a party to a settlement are at stake, the fairness of a settlement to the settling parties is not enough to earn the judicial stamp of approval.

*Master Mates*, 957 F.2d at 1026.

Moreover, where contract rights are affected, as they are here, there is standing to object:

> There is consensus that a non-settling defendant has standing to object to a partial settlement which purports to strip it of a legal claim or cause of action, ... or to invalidate its contract rights.

*Eichenholtz v. Brennan*, 52 F.3d 478, 483 (3rd Cir. 1995) (citation and quotation omitted). While NCPA is not a non-settling defendant in this suit, the Independent Pharmacies will bear the brunt of the Settlement as their rights under their contracts with PBMs will be invalidated and arbitrarily changed to reflect the reduced AWP.

Ultimately, the Court must evaluate the impact of the Settlement on consumers. As explained below, the impact on Independent Pharmacies will ultimately harm consumers. The lost revenue brought about by reduced AWP will force numerous Independent Pharmacies to cut services or close their doors, ultimately harming consumers by reducing access to pharmacies and the services that they deliver.

### 2. Independent Pharmacies' Prescription Drug Sales are Subject to Non-Negotiable Contracts with PBMs.

The vast majority of the payments to Independent Pharmacies for their prescription drug sales come through PBMs. (Owner Affs. ¶ 4; Berryman Aff. ¶ 4.[3]) PBMs' payments to Independent Pharmacies for dispensing prescription medications are based upon a percentage reduction from AWP, plus a nominal dispensing fee (the "Reimbursement Rate"). (Heckman Dec. ¶ 10.[4]) The Reimbursement Rate is non-negotiable and often does not cover the Independent Pharmacies' costs of the drugs. (FTC Baulks at Antitrust Exemption for Pharmacies at Ex. D; Owner Affs. ¶7.) Because Independent Pharmacies do not have bargaining power with the PBMs, the Reimbursement Rate, AWP and other contract terms are offered to the Independent Pharmacies on a "take it or leave it" basis. (Id.) As a result, Independent Pharmacies have seen steadily declining Reimbursement Rates since the late 1990s. (Id.; Heckman Dec. ¶¶ 18-22.) In fact, in 2006, 1,152 Independent Pharmacies closed their doors because they could not survive financially the PBMs' continued, lowered Reimbursement Rates. (FTC Baulks at Antitrust Exemption for Pharmacies at Ex. D)

If AWP is lowered as set forth in the Settlement, the Independent Pharmacies will have neither the opportunity nor the ability to negotiate with PBMs for an upward adjustment to the new lowered AWP. PBMs will instead unilaterally adjust their contracts to reduce the Reimbursement Rates to Independent Pharmacies. Based on the extensive analysis of hundreds of Independent Pharmacy contracts conducted for the NCPA, it is clear that PBMs have unilaterally and severely decreased reimbursement in the past. (Heckman Dec. ¶¶ 18-22;

---

[3] Citations to "Berryman Aff" refer to the Affidavit of Patrick M. Berryman, which affidavit is served and filed herewith.
[4] Citations to "Heckman Dec" refer to the Declaration of H. Edward Heckman: Fairness of the Economic Impact of the First Databank Settlement Agreement, which declaration is served and filed herewith. Heckman is a consultant to Independent Pharmacies with over 20 years of experience. His affidavit provides an extensive study of hundreds of PBM contracts with Independent Pharmacies.

5

Graph 1.) As one Independent Pharmacist, Richard J. Hartig, a third generation independent pharmacist, testifies:

> Because Hartig Drug is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to us. The reimbursement formulas and other contractual terms are simply offered on a "take-it or leave-it" basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Hartig Pharmacies.

(Hartig Aff.[5] ¶ 7; *see also* Owner Affs. ¶ 7.) Even if Independent Pharmacists had the bargaining power to renegotiate with PBMs, renegotiation within the 60-day period set forth in the Settlement would be impossible. (Berryman Aff. ¶ 11.)

Independent Pharmacies are simply not like the chain pharmacies and mass merchants on which the parties may focus their arguments. Chain pharmacies and mass merchants can negotiate with PBMs; Independent Pharmacies, on the other hand, lack the power to engage in those negotiations and are instead given contracts by the PBMs on a "take it or leave it" basis. (Owner Affs. ¶ 7) Moreover, chain pharmacies and mass merchants have substantial sales in other products, such as food and other goods, and thus will be harmed to a far smaller degree by a reduction in AWP. (Sales Volume Summary at p. 16 at Ex. E.) In contrast, pharmaceuticals account for 92.4% of Independent Pharmacies' profits. (Heckman Dec. ¶ 4C; 2007 NCPA-Pfizer Digest at p. 26 at Ex. B; http://www.ncpanet.org/aboutncpa/ipt.php; Berryman Aff. ¶ 1.) Thus, any reduction in AWP will be devastating to the viability of hundreds of Independent Pharmacies.

### 3. If the Settlement is Approved, the Independent Pharmacies will be Financially Devastated.

---

[5] Citations to "Hartig Aff" refer to the Affidavit of Richard J. Hartig, found at Exhibit A to Yaffe Aff.

By far the largest percentage of the Independent Pharmacies' revenues is derived from prescription drug sales. In fact, as noted above, in 2006, prescription drug sales, on average, comprised 92.4% of the Independent Pharmacies' annual sales. Branded prescription medications – those drugs most directly affected by the Settlement's reduced AWP – comprise 88% of the total prescription drug revenues of the Independent Pharmacies. (Heckman Dec. ¶ 41; Table 5; Ex. F to Heckman Dec.)

Because the Independent Pharmacies are financially dependent upon revenues from branded drugs, the Settlement's reduced AWP will devastate the Independent Pharmacies, as shown by the Declaration of H. Edward Heckman a consultant to Independent Pharmacies:

> Some factions may argue that the majority of prescriptions dispenses are generic drugs whose compensations are not AWP dependent. ... But the impact of generic drugs is minor because the average brand prescription is much more expensive. Brand drugs account for 88% ... of the total prescription revenues for independent pharmacies. Factor these settlement reductions in AWP over a pharmacy's total prescription revenues (brand and generic prescriptions), and the financial impact will be near a 3.2% over reduction in gross profit
>
> Based upon the reported net operating incomes [for Community Pharmacies] in the 2007 NCPA-Pfizer Digest, **this settlement if not mitigated will certainly drive a majority of the community pharmacies – potentially over 50% -- in this country out of business.**

(Heckman Dec. ¶¶ 41-42.) (Emphasis added.)

The impact of a reduced AWP on Independent Pharmacies becomes even more striking when it is understood that, **under the current AWP**, Independent Pharmacies today sell certain prescription medications below cost:

> Based on the current level of reimbursement from PBMs, Gloucester Pharmacy actually loses money on the dispensing of certain branded medications.

7

(Hodges Aff. ¶ 8;[6] *see also* Hartig Aff ¶ 8 (currently dispensing "many branded medications" at a loss); Berryman Aff. ¶ 7 (losing money on certain branded and generic drugs); *see also* Owner Affs. ¶8.) In fact, the average net operating income for Independent Pharmacies was just 2.8% in 2006 (Heckman Dec. ¶ 38.) with certain Independent Pharmacies, of course, operating below the national average:

> Prescription drugs account for a very large portion (over 80%) of my pharmacy's overall revenue. My pharmacies operate at a very small single digit profit margin (1.4% of sales in our most recently completed year).

(Hartig Aff. ¶ 4; *see also* Owner Affs. ¶ 4.)

This dramatic decrease in reimbursement will be devastating to Independent Pharmacies. Many will be forced to close their doors. To remain in operation, other Independent Pharmacies will be forced to reduce their hours and other valuable services, such as counseling and delivery, to remain even marginally profitable. (Heckman Dec. ¶ 44; Owner Affs. ¶10) Even with such cost cutting measures, some Independent Pharmacies will not be able to remain viable if AWP is reduced. Mr. Hartig's affidavit is particularly telling:

> Hartig Pharmacies **cannot remain viable** if there is a reduction in the published AWP upon which our reimbursement rates are based. Even implementing drastic cost-cutting measures such as cutting back on the hours of service, eliminating vital services that we provide to our communities, e.g. delivery, compounding, and staffing the pharmacies part-time with licensed pharmacists and technicians **will not allow us to operate profitably**.

(Hartig Aff. ¶ 10.) (Emphasis added.)

Hundreds of Independent Pharmacies will close because of the reduction in AWP, harming consumers by reducing access and valuable services. Such closures will be particularly

---

[6] Citations to "Hodges Aff." refer to the Affidavit of M. Keith Hodges, found at Ex. A to Yaffe Aff.

devastating to the underserved rural and inner city communities where an Independent Pharmacy is the sole pharmacy for the community. (Hartig Aff. ¶ 1.)

To add insult to injury, it appears that the Independent Pharmacies – together with perhaps other entities not party to the litigation – will bear the entire financial burden of the Settlement. Defendants will pay no damages and will be liable only for certain of plaintiffs' attorneys' fees and costs, while the Independent Pharmacies – who were never accused of anything untoward – may suffer reduced profits to the point of closing their doors.

### 4. The Independent Pharmacies are Already Suffering Financially by Virtue of the Downward Adjustment to AWP Implemented by PBMs in 2001 or 2002.

The underlying concern in this litigation is an alleged inflation in AWP. Even though the "spread" – in other words, the difference – between the Wholesale Average Cost ("WAC") and AWP allegedly increased in or about 2001 or 2002, Independent Pharmacies did not benefit from the increase. (Owner Affs. ¶ 12; Berryman Aff. ¶ 10.) The study of hundreds of independent pharmacy contracts confirms that contemporaneously with the increased spread between WAC and AWP, PBMs unilaterally revised the Reimbursement Rate in their contracts with Independent Pharmacies and reduced the AWP. (Heckman Dec. ¶¶ 17-22, Graph 1.) The Independent Pharmacies confirm that occurred. (Owner Affs. ¶ 11). Not only did this revised Reimbursement Rate offset any increase to the spread in 2001 or 2002 – and any possible benefit to the Independent Pharmacies -- PBMs and managed care plans "more than made up for any gain in AWPs from the calculation changes by First DataBank." (Heckman Dec. ¶ 22.) Mr. Heckman's extensive study of hundreds of Independent Pharmacy contracts demonstrates the dramatic reduction to AWP after the 2002 changes to the Reimbursement Rates:

> In 2003, the first full year after the change in AWP calculations by First DataBank, the average AWP compensation for brand name prescription drugs decreased 23.0% from AWP minus 10.40% to AWP minus 12.79% and the corresponding median values for

9

> 2003 decreased 21.3% from AWP minus 10.84% to AWP minus 13.15%. ...
>
> [I]n 2005 the average AWP compensation to community pharmacies for brand name prescription drugs steeply decreased by 26.8% from AWP minus 12.32% to AWP minus 15.62% while the median value cascaded downward 37.0% from AWP minus 12.41% to AWP minus 17.00%.

(*Id.* ¶¶ 20-21.) Indeed, the Court has recognized that PBMs used their market power to "institute contract pricing mechanisms with pharmacies to bring reimbursement costs back to the status quo for client TPPs." (Order of Aug. 27, 2007, Doc. # 317, at 4.)

As such, the reduced AWP contemplated in the Settlement will crush the Independent Pharmacies by compounding the PBMs' earlier reductions to the Reimbursement Rate and continue, with devastating effect, a nearly decade-long decline in the Reimbursement Rate:

> I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, hundreds of PBM contracts for my pharmacies were revised, resulting in a reduction in over a 5% reduction in the percentage of AWP that PBMs would reimburse to Hartig pharmacies (so that actual reimbursement amounts would remain at or about prior levels).

(Hartig Aff. ¶ 11; *see also* Owner Affs. ¶ 11.)

Gross profits for Independent Pharmacies in 2006 were at a ten-year low. (2007 NCPA-Pfizer Digest at pp. 4-5 at Ex. B.) To foist the reduced AWP contemplated in the Settlement upon the Independent Pharmacies after nearly a decade of declining Reimbursement Rates will clearly exacerbate the already tenuous financial status of many of the Independent Pharmacies.

### 5. The Reduced AWP will Harm Consumers as well as Independent Pharmacies.

While the Independent Pharmacies do not have the bargaining power of the behemoths of the pharmacy world – e.g., Walgreens, Wal-Mart or CVS – they are nevertheless critically important to communities across the United States. In fact in 2006, 1.6 billion prescriptions -- 41% of all prescriptions filled in the United States that year -- were filled by Independent Pharmacies. (*See* http://www.ncpanet.org/aboutncpa/ipt.php, last visited December 20, 2007.)

Independent Pharmacies are present in every state and U.S. territory and comprise the majority of all pharmacies in over half the states and U.S. territories. (2007 Map of Retail Pharmacies by State at Ex. C.) The customers of many Independent Pharmacies reside in underserved rural and urban areas. (Heckman Dec. ¶¶ 2, 43; 2007 NCPA-Pfizer Digest at p. 9 at Ex. B.) In some cases – particularly rural and inner city areas --the Independent Pharmacy is the only pharmacy in the community. (Hartig Aff. ¶ 1.)

As such, the reduction of AWP will not happen in a vacuum. If, as a result of the reduced AWP, the Independent Pharmacies are forced to cut hours and services or discontinue business altogether, a large number of consumers across the United States will be directly and negatively effected. As Mr. Heckman observes based on his extensive study:

> The terms of the settlement will force pharmacies to cut their expenses by reducing store hours, reducing the number of employees on staff and cutting important services such as deliveries and compounding prescriptions. In some communities, especially in critical underserved areas the local independent pharmacy is the only health resource in the area.
>
> Ultimately these changes will force more and more pharmacies out of business, patients will suffer as the result of reduced access to pharmacy services. The remaining pharmacies will be bogged down with high prescription volumes causing unreasonably long wait times.

> Given these circumstances there is a risk that many patients may miss getting their prescriptions. If this occurs, the overall cost of health care will increase with more frequent and longer hospital stays, more frequent visits to physician offices, more emergencies, greater morbidities and decreased quality of life.

(Heckman Dec. ¶¶ 44-46.)

### 6. In the Alternative, the Court should Revise the Settlement to Eliminate the Reduction to AWP and to Discontinue Publication of AWP and BBAWP No Earlier Than Two Years after the Settlement is Effective.

Under the terms of the Settlement, AWP will be reduced to 1.2 no later than 60 days after the effective date of the agreement. As such, the Settlement "would cause a nearly immediate reduction in the amount of reimbursement" that Independent Pharmacies receive from PBMs. (Berryman Aff. ¶ 8.) In addition, as set forth in the Settlement, First DataBank need not wait two years to discontinue publishing AWP and BBAWP but could do so as early as two months after the Settlement is effective. (*Id.* ¶ 11.) Both terms may be extremely harmful to Independent Pharmacies.

We strongly believe that the Court should reject the proposed settlement. In the event that the Court does not withhold approval of the Settlement, we suggest that the Settlement should be revised in two key ways.

First, the initial step of the Settlement – that is, the reduction of AWP to 1.2 – should be eliminated entirely. This will help ensure the continued viability of Independent Pharmacies and provide to Independent Pharmacy buying groups, at least to a certain extent, some opportunity to renegotiate contracts with PBMs. (*Id.* ¶ 13.) If AWP is to be reduced within 60 days, it will be a nearly impossible task for any entity in the market to renegotiate hundreds of contracts within those 60 days. (*Id.* ¶ 11.) Moreover, PBMs have shown no interest in even discussing – let alone renegotiating – AWP in advance of the Settlement because the Settlement will allow them to show their payor clients a 4% decrease in costs without taking any action whatsoever. (*Id.*) In

addition, if AWP is reduced to 1.2, PBMs will be in an even more powerful bargaining position than they are today. In subsequent contract renegotiations, Independent Pharmacies and independent buying groups will have "virtually no opportunity to recover" the losses brought about by the reduced AWP. (*Id.*)

Second, rather than ordering First DataBank to cease publishing AWP and BBAWP <u>within</u> two years of the Settlement effective date, the Court should instead order that First DataBank cease publishing AWP and BBAWP <u>no earlier than</u> two years after the Settlement effective date. By delaying the implementation for two years, the Court will provide a greater opportunity for pharmacies to attempt to renegotiate agreements with PBMs. (Berryman Aff. ¶13.) Particularly in light of their current limited bargaining power of Independent Pharmacies and the long term nature of PBM contracts a two-year period is necessary to engage in meaningful negotiations.

NCPA joins in the concerns raised in the Brief of Independent Pharmacy Cooperative *Amicus Curiae* Regarding the Parties' Proposed Settlement. Independent Pharmacy Cooperative ("ICP") correctly identifies the nuances in the retail pharmacy market that demonstrate that the industry will be unable to quickly respond to the reduced AWP and the discontinuation of AWP and BBAWP. As ICP so well articulates, because Independent Pharmacies and independent buying groups will not – along with the rest of the market – be able to timely, if at all, renegotiate contracts with PBMs, their profit margins will be squeezed to the point of closing their doors. (*See* ICP Amicus Brief pp.5-8.)

In addition, NCPA believes that the PBMs themselves are not ready to convert their contracts and claims processing systems to reflect the reduced AWP and eliminated AWP and BBAWP. (Berryman Aff. ¶ 11) Prescriptions will not be able to be processed and patients will

13

not be able to receive services at pharmacies if the "literally hundreds" of contracts with Reimbursement Rates derived from AWP cannot be renegotiated within the time frames set by the Settlement. (*Id.*) Ultimately consumers will be harmed if the time frames are not changed.

## IV. CONCLUSION

For all of the reasons articulated herein, NCPA respectfully requests that the Court decline to approve the Settlement or, in the alternative, alter the terms of the Settlement as set forth herein.

Dated: December 21, 2007

GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.

By _____
Eric L. Yaffe (MA # 548185)
Julie L. Boehmke (MN #317330)
2600 Virginia Avenue, NW
Suite 1111 -- The Watergate
Washington, DC 20037-1931
Telephone: (202) 295-2200
Telecopier: (202) 295-2250


David A. Balto
LAW OFFICES OF DAVID BALTO
2600 Virginia Avenue, NW
Suite 1111 -- The Watergate
Washington, DC 20037-1931
Telephone: (202) 295-2200
Telecopier: (202) 295-2250


John M. Rector
General Counsel
National Community Pharmacists Association
100 Daingerfield Road
Alexandria, Virginia 22314
Telephone: (703) 683-8200
Telecopier: (703) 683-3619


ATTORNEYS FOR NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION

GP:2299307 v4

15

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by Federal Express on December 21, 2007, as follows:

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main St., 4th Floor
Cambridge, MA 02142

Jeffrey L. Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103

Sheldon T. Zenner, Esq.
Katten Muchin Roseman LLP
525 West Monroe Street
Chicago, IL 60661-3693

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Sheila L. Birnbaum
Skadden, Arps, Slate, Meagher, & Flom LLP
4 Times Square
New York, NY 10036

Dated: December 21, 2007

_____
Eric L. Yaffe (MA #548185)
Julie L. Boehmke (MN #317330)
GRAY, PLANT, MOOTY,
MOOTY & BENNETT, P.A.
2600 Virginia Avenue, NW
Suite 1111 -- The Watergate
Washington, DC 20037-1931
Telephone: (202) 295-2200
Telecopier: (202) 295-2250

David A. Balto
LAW OFFICES OF DAVID BALTO
2600 Virginia Avenue, NW
Suite 1111 -- The Watergate
Washington, DC 20037-1931
Telephone: (202) 295-2200
Telecopier: (202) 295-2250

John M. Rector
General Counsel
National Community Pharmacists
Association
100 Daingerfield Road
Alexandria, Virginia 22314
Telephone: (703) 683-8200
Telecopier: (703) 683-3619

ATTORNEYS FOR NATIONAL
COMMUNITY PHARMACISTS
ASSOCIATION

2