UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2007 DEC 21  P 4: 39

NEW ENGLAND CARPENTERS )
HEALTH BENEFITS FUND; PIRELLI )
ARMSTRONG RETIREE MEDICAL )
BENEFITS TRUST; TEAMSTERS )
HEALTH & WELFARE FUND OF )
PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, )
AFSCME HEALTH & SECURITY PLAN; )
JUNE SWAN; MAUREEN COWIE and )
BERNARD GORTER )
)
            Plaintiffs, )
)
vs. )
)
FIRST DATABANK, INC., a Missouri )
Corporation; and MCKESSON )
CORPORATION, a Delaware Corporation, )
)
            Defendants. )
_____ )

C.A. No. 1:05-CV-11148-PBS

U.S. DISTRICT COURT
DISTRICT OF MASS.

**AFFIDAVIT OF ERIC L. YAFFE IN**
**SUPPORT OF NATIONAL**
**COMMUNITY PHARMACISTS**
**ASSOCIATION'S OBJECTION TO**
**SETTLEMENT**

WASHINGTON, )
                    ) ss.
DISTRICT OF COLUMBIA )

Eric L. Yaffe, being first duly sworn, deposes and says on oath as follows:

1.     I am one of the attorneys representing National Community Pharmacists

Association ("NCPA"), and I submit this affidavit in support of NCPA's objection to settlement

in the above captioned action.

2.     Attached hereto as **Exhibit A** are true and correct copies of affidavits submitted

by independent community pharmacists that are members of NCPA.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the 2007 NCPA-Pfizer Digest.

4.      Attached hereto as **Exhibit C** is a true and correct copy of a document entitled "Retail Pharmacies by State," depicting the numbers and types of retail pharmacies in each state and territory, the source for which document is the 2007 NCPA-Pfizer Digest.

5.      Attached hereto as **Exhibit D** is a true and correct copy of an article entitled "FTC baulks at antitrust exemption for pharmacies" and dated November 17, 2007, found at the Internet website of Global Competition Review.

6.      Attached hereto as **Exhibit E** is a true and correct copy of a document entitled "Sales Volume Summary," the source for which is the 2007 NCPA-Pfizer Digest.

Signed under the pains and penalties of perjury on this the 20th day of December, 2007.

Eric L. Yaffe

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) | C.A. No. 1:05-CV-11148-PBS |
| BENEFITS FUND, PIRELLI ARMSTRONG ) | |
| RETIREE MEDICAL BENEFITS TRUST; ) | |
| TEAMSTERS HEALTH & WELFARE FUND ) | |
| OF PHILADELPHIA AND VICINITY; ) | |
| PHILADELPHIA FEDERATION OF ) | |
| TEACHERS HEALTH AND WELFARE ) | |
| FUND; DISTRICT COUNCIL 37, AFSCME- ) | |
| HEALTH & SECURITY PLAN; JUNE ) | |
| SWAN; MAUREEN COWIE and BERNARD ) | |
| GORTER, ) | |
| ) | |
| Plantiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRSTDATABANK, INC. a Missouri ) | |
| Corporation; and McKESSON ) | |
| CORPORATION, a Delaware corporation ) | |
| ) | |
| Defendants. ) | |

I, Patrick M. Berryman do swear and affirm:

1. I am the Executive V.P. of EPIC Pharmacy Network, Inc., located at 6501 Mechanicsville Tnpk., Ste. 103, Mechanicsville, VA 23111.

EPIC Pharmacy Network ("EPN") is a pharmacy services administrative organization ("PSAO") which represents approximately 1477 independently owned pharmacies in 25 states and the District of Columbia. The majority of EPN's pharmacy customers would be considered as servicing rural or inner city areas. EPN contracts, on behalf of its pharmacy customers, with pharmacy benefit managers ("PBM's) to provide prescription drugs and related services to patients of the PBM's prescription programs. Prescription drugs represent 90%-95% of a typical EPN pharmacy location's sales.

2. EPN has been in business since 1992.

3. EPN independent pharmacy locations not only service underserved rural and inner city markets, but many also provide services that are not available from other pharmacy locations in the areas they serve. For example, many of our pharmacy customers provided home delivery services that are critical to a large number of elderly patients and others with limited physical or financial ability to commute, including a disproportionate number of Medicare and Medicaid patients. Additionally, a substantial number of EPN pharmacy locations provide specialty drugs, drug compounding, and other value added services that are not otherwise available to patients in those areas.

4. On average, over 90% of EPN pharmacies' total pharmaceutical sales are through PBMs and state or federal programs. There is very little cash customer sales left in the typical pharmacy.

5. PBMs contract with EPN to pay pharmacies for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP ") plus a minimal dispensing fee.

6. Though EPN represents approximately 1477 pharmacy locations, EPN and other PSAOs still have an extremely limited ability to negotiate any significant changes to reimbursement and other terms of PBM contracts. This is due mainly to anti-trust constraints that are imposed on groups of independent pharmacies, but do not apply to chain drug stores and others.

7. Based on the current level of reimbursement from PBMs, EPN pharmacy locations actually lose money on the dispensing of certain branded and generic medications. They realize limited profits on the dispensing of other branded and generic medications.

8. Thus, the level of published AWP, has a significant impact on EPN pharmacy customers' ability to operate and remain in business. The proposed reduction in published AWP as part of the settlements before the Court would cause the nearly immediate reduction in the amount of reimbursement that EPN pharmacies received from PBMs. That would threaten their ability to continue to stay in business and provide needed prescription and counseling outlets to patients in underserved areas.

9. To the extent that EPN pharmacy locations can remain viable if there is a reduction in the published AWP upon which reimbursement rates are based, they would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services provided to communities. Such cutbacks will impose a hardship not only on the business owners, but on the thousands of employees and the patients they serve.

10. Any notion that the reduction in published AWP will not harm pharmacies because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe is simply false. EPN takes into account many factors when determining whether a PBM contract provides enough profit margin. The current spread between WAC and AWP is a significant factor in that decision.

11. The current proposed settlement before the Court causes two problems for our organization and the pharmacies we represent. First, the proposed spread change to be implemented within 2 months of the final settlement will cause immediate and unrecoverable harm to our independent pharmacy customers. Neither EPN, nor the individual pharmacies, will have ability at that time to renegotiate their contracts with PBM's to recover this loss. Additionally, EPN has made attempts to be proactive and approach PBM's about renegotiating contracts now, in anticipation of the change, and nearly all PBM's have simply declined to even address the issue at this time. It is not surprising that PBM's would choose to wait and see, as they are in a position to potentially show their clients a 4% decrease in cost on the 8000+ affected items without doing anything. PBMs will be able to exploit this situation for a significant period of time because contracts will not come up for renegotiation for up to two years.

Second, if the immediate reduction in spread is implemented within two months, and the publishing of AWP will be eliminated within two years of the final settlement, EPN and individual pharmacies will be in an even more vulnerable position. After having been forced to absorb a 4% loss for up to two years on the affected products, EPN pharmacies will have virtually no opportunity to recover those losses in a contract renegotiation for a new reimbursement base other than AWP.

It is EPN's understanding that FirstDataBank also would not necessarily have to wait two years in order to stop publishing AWP, they could do it as early as two months after the settlement. From an operations standpoint, the timelines set in the proposed settlement for the initial spread change and the date to stop publishing AWP are not adequate for the industry. For example, EPN has approximately a hundred PBM's with which it contracts on behalf of pharmacies. Each of those PBM's generally have many network contracts that they administer for clients. Thus, there are literally hundreds of contracts based on AWP reimbursement formulas that would need to be renegotiated between EPN and PBM's. If this cannot be completed within the timelines currently set, prescriptions will not be able to be processed and patients will not be able to receive service at pharmacies. EPN does not believe the PBM industry can be ready for an efficient conversion contractually or with their prescription claims processing systems in the time frames outlined in the current settlement proposal. This will harm commercial as well as Medicare and Medicaid programs.

2

45666806.2

There has been a steady decline in the reimbursement rates since the late 1990s, at or about the time of the alleged increase in the spread between WAC and AWP, and as indicated previously, the current spread at the time was taken into consideration by the pharmacy community in reviewing contracts with PBM's.

12.    Pharmacies were not enriched as the result of an alleged increase in the WAC-AWP spread, as this was factored into reimbursement negotiations with PBMs as we continued to experience reduced reimbursement rates and generally declining margins. EPN pharmacies and their patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, as it will result in an immediate and unrecoverable reduction in reimbursements to pharmacies by PBM's.

13.    If published AWP levels are artificially reduced as a result of the settlements, I do not believe EPN, on behalf of its participating pharmacies, will be able to renegotiate equitable contracts with PBM's on any time frame.    For this reason, EPN respectfully suggests that the Court do away entirely with the first step of the Settlement, that is, eliminate the requirement that, within 60 days, AWP must be reduced to 1.2. This will help ensure continued viability of independent pharmacies and provide to the pharmacies, at least to a certain extent, some bargaining power to renegotiate contracts with PBMs.

In addition, EPN proposes that the settlement provide for a cooling off period in which pharmacies and PBMs can renegotiate their agreements to find an alternative to AWP. Thus, EPN suggests that rather than ordering FirstDataBank to cease publishing AWP within two years of the Settlement effective date, the Court instead order that FirstDataBank cease publishing AWP no earlier than two years after the Settlement effective date. The two year period will be a concrete time frame within which PBMs must renegotiate contracts with pharmacies and will provide adequate time within which to do so.

14.    I also believe the proposed settlements of the FirstDataBank litigation will potentially harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, EPN's pharmacy customers do not generally determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursements from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force some consumers to spend more money at fewer pharmacies.

15.    I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on EPN's participating pharmacies and their consumers.

12/19/07

45666806.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH ) C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE )
SWAN; MAUREEN COWIE and BERNARD )
GORTER, )
                                                      )
                                 Plaintiffs, )
                                                      )
                    v.                            )
                                                      )
FIRST DATABANK, INC. a Missouri        )
Corporation; and McKESSON              )
CORPORATION, a Delaware corporation )
                                                      )
_____ Defendants. )

I.  Richard J Hartig,  do swear and affirm:

1.  I am the owner and sole shareholder of Hartig Drug Stores, with offices at 703 Main Street, Dubuque, Iowa, and pharmacies in Iowa, Illinois and Wisconsin.

I operate a total of 16 pharmacies, three of which are the only pharmacy in the town in which they are located (Fennimore, Wisconsin, Stockton, Illinois and Prophetstown, Illinois). I employ over 350 people.

2.  Our family has owned and operated this pharmacy company since 1904.  I am a third generation pharmacist, having graduated from Drake University with a BS in Pharmacy and an MBA.  We are America's second oldest continuously operated family owned pharmacy chain.  My son is a 5th year pharmacy student, and I have been in practice for nearly 35 years.

3.  Our patient population consists of rural and urban ambulatory and elderly patients who rely on our company pharmacists for primary health care services, including vaccinations, compounding, delivery service, and consultation and referrals to physicians in communities within a 100 miles radius of Dubuque, Iowa.  We serve Medicaid and Medicare patients in all of our pharmacies in addition to most insurance plans.  Hartig pharmacies serve more than 10,000 patients every day.

4.  Prescription drugs account for a very large portion (over 80%) of my pharmacy's overall revenue.  My pharmacies operate at very small single digit profit margin (1.4% of sales in our most recently completed year).



Page 2

5. The majority of my pharmaceutical sales are to a "third" party transacted by way of pharmacy benefit managers (" PBMs "). A very small portion of my pharmaceutical sales are to cash customers (currently less than 7%). The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Hartig Pharmacies for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Hartig Drug is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to us. The reimbursement formulas and other contractual terms are simply offered on a "take-it or leave-it" basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Hartig Pharmacies.

8. Based on the current level of reimbursement from PBMs, Hartig Drug actually loses money on the dispensing of many branded medications and realizes limited profits on the dispensing of all other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy company and continue to remain in business. The proposed reduction in published AWP (calculated at somewhere near 4%) as part of the settlement before the Court would cause the reduction in the amount of reimbursement that Hartig Pharmacies receives from PBMs and threatens my ability to stay in business and serve my communities.

10. Hartig Pharmacies can not remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based. Even implementing drastic cost-cutting measures such as cutting back on the hours of service, eliminating vital services that we provide to our communities – e.g., delivery, compounding, and staffing the pharmacies part time with licensed pharmacists and technicians would not allow us to operate profitably.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, hundreds of PBM contracts for my pharmacies were revised, resulting in over a 5% reduction in the percentage of AWP that PBMs would reimburse to Hartig pharmacies (so that actual reimbursement amounts would be less than or remain at or about prior levels).

12. Hartig pharmacies were not enriched as the result of an alleged increase in the WAC-AWP spread, as we have experienced reduced reimbursement rates and generally declining margins since at least 2000. My pharmacies and patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to us for our services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Hartig pharmacies will be able to re-negotiate our contracts with PBMS to increase the percentage of AWP that PBMs would reimburse us based on my 35 years of experience in the practice of pharmacy. In fact, I have NEVER successfully negotiated an increase in reimbursement since my licensure in 1973. As noted above, PBMs have not been interested or willing to engage in any individual negotiations of their contracts with Hartig Pharmacies.

Page 3

14. I also believe the proposed settlement of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Hartig pharmacies do not determine the charge to cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including the few cash paying customers that remain, will all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to privately owned independent pharmacies such as mine, it will drive many independent pharmacies out of business. The closure of these pharmacies would devastate many consumers and the communities they serve and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that the settlements. if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies, incur significant transportation costs to get to their nearest pharmacy and add significant "wait" times when seeking medications for acute and chronic life threatening illnesses.

15. I truly hope the court considers the devastating effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Signature: _____

Richard J. Hartig, R., Ph., M.B.A.
Chief Executive Officer and Owner
Hartig Drug Stores
703 Main Street
Dubuque, Iowa 52001

Jurat (Verification)

State of Iowa

County of Dubuque

Signed and sworn to me on:

_____ By: Richard J. Hartig

_____, Notary

My commission expires on _____

(Seal)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) | C.A. No. 1:05-CV-11148-PBS |
| BENEFITS FUND, PIRELLI ARMSTRONG ) | |
| RETIREE MEDICAL BENEFITS TRUST; ) | |
| TEAMSTERS HEALTH & WELFARE FUND ) | |
| OF PHILADELPHIA AND VICINITY; ) | |
| PHILADELPHIA FEDERATION OF ) | |
| TEACHERS HEALTH AND WELFARE ) | |
| FUND; DISTRICT COUNCIL 37, AFSCME- ) | |
| HEALTH & SECURITY PLAN; JUNE ) | |
| SWAN; MAUREEN COWIE and BERNARD ) | |
| GORTER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRST DATABANK, INC. a Missouri ) | |
| Corporation; and McKESSON ) | |
| CORPORATION, a Delaware corporation ) | |
| ) | |
| Defendants. ) | |

I, Anton P. Welder, do swear and affirm:

1. I am the owner of Dakota Pharmacy of Bismarck, Inc., located at 705 E. Main Ave., Bismarck, ND 58501, a city of approximately 60,000 people, predominately a rural area.

2. I have operated this pharmacy since 1983.

3. Dakota Pharmacy serves a diverse patient population, in age and income. We provide services for insured, Medicaid and Medicare patients and self-pay patients. Approximately 75 to 80% of our patients are covered by third party payers. We provide mail-service, delivery service, compounding of prescription drugs, health screenings to the community for osteoporosis, blood pressure and blood-glucose levels, PSA's, flu shots and prescription consultations. We provide this care to thousands of families in the area.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. Compared to many other retail businesses, my pharmacy's prescription department operates at very small profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Dakota Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Dakota Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Dakota Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Dakota Pharmacy.

DEC-19-2007(WED) 09:51    DAKOTA Pharmacy    (FAX)701 C55 1CCO    P.003/003

8. Based on the current level of reimbursement from PBMs, Dakota Pharmacy actually loses money on the dispensing of certain branded medications. Dakota Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Dakota Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Dakota Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service  and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc.  Such cutbacks will impose a hardship not only on myself and other employees of Dakota Pharmacy but on the many patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Dakota Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Dakota Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. Dakota Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Dakota Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Dakota Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Dakota Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Dakota Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Dakota Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, many insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Dakota Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs is reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Anton P. Welder

*AP Welder 12-19-07*

2



# STANDARD
# MY NEIGHBORHOOD
# PHARMACY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) <br> BENEFITS FUND, PIRELLI ARMSTRONG ) <br> RETIREE MEDICAL BENEFITS TRUST; ) <br> TEAMSTERS HEALTH & WELFARE FUND ) <br> OF PHILADELPHIA AND VICINITY; ) <br> PHILADELPHIA FEDERATION OF ) <br> TEACHERS HEALTH AND WELFARE ) <br> FUND; DISTRICT COUNCIL 37, AFSCME- ) <br> HEALTH & SECURITY PLAN; JUNE ) <br> SWAN; MAUREEN COWIE and BERNARD ) <br> GORTER. ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> FIRST DATABANK, INC. a Missouri ) <br> Corporation; and McKESSON ) <br> CORPORATION, a Delaware corporation ) <br> ) <br> Defendants. ) | C.A. No. 1:05-CV-11148-PBS |

I, Thomas Cory, RPh., do swear and affirm:

1.  I am the owner of _Standard Pharmacy,_located at , 246 East Main Street, Fall River, Massachusetts._____.
an inner city neighborhood pharmacy.

2.  I have operated this pharmacy since May of 2006, but I have been employed here by the previous owners since
October of 1988, and this pharmacy has been in operation since 1919.  It is the oldest continuous operating
pharmacy in the city of Fall River.

3.  We serve a large elderly population where about 50% of the patients do not speak English as the primary
language.  We are a full service neighborhood pharmacy ,not only providing prescriptions, , but also free delivery,
blood pressure monitoring, immunization services, insurance consultation, in house charges, and we participate in
many community health programs.  Standard Pharmacy provides medication and care to over 1000_patients in the
immediate area.

4.  Prescription drugs account for a very large portion (ninety nine %) of my pharmacy's overall income.  My
pharmacy operates at very small single digit profit margins.

5.  The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs ").  Only a very small
portion of my pharmaceutical sales are to cash customers.  The remaining customers pay for their prescriptions
through state or federal programs.

6.  The PBMs pay Standard Pharmacy for dispensing branded and generic medications based on a reimbursement
formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a
minimal dispensing fee.



**STANDARD
MY NEIGHBORHOOD
PHARMACY**

7. Because Standard_Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Standard Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Standard Pharmacy.

8. Based on the current level of reimbursement from PBMs, Standard Pharmacy actually loses money on the dispensing of certain branded medications. Standard Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Standard Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Standard Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Standard_Pharmacy but on the thousand patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in th reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Standard Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Standard_Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. *I, as the present owner of Standard Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Standard Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Standard Pharmacy for its services.*

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Standard Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Standard Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Standard or any other neighborhood Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Standard Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many neighborhood pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the neighborhood pharmacy is the only available



**STANDARD
MY NEIGHBORHOOD
PHARMACY**

service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15.  I truly hope the court considers the entire effects of the proposed settlements on independent neighborhood pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Thomas Cory, R.Ph.
Pharmacy Manager/ Owner

246 East Main Street, Fall River
In the Great State of Massachusetts, 02724-3232
Tel: (508) 672-6911  Fax: (508) 677-2952

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) | C.A. No. 1:05-CV-11148-PBS |
| BENEFITS FUND, PIRELLI ARMSTRONG ) | |
| RETIREE MEDICAL BENEFITS TRUST; ) | |
| TEAMSTERS HEALTH & WELFARE FUND ) | |
| OF PHILADELPHIA AND VICINITY; ) | |
| PHILADELPHIA FEDERATION OF ) | |
| TEACHERS HEALTH AND WELFARE ) | |
| FUND; DISTRICT COUNCIL 37, AFSCME- ) | |
| HEALTH & SECURITY PLAN; JUNE ) | |
| SWAN; MAUREEN COWIE and BERNARD ) | |
| GORTER, ) | |
| ) | |
| Plantiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRST DATABANK, INC. a Missouri ) | |
| Corporation; and McKESSON ) | |
| CORPORATION, a Delaware corporation ) | |
| ) | |
| Defendants. ) | |

I, Steven Grossman do swear and affirm:

1. I am the owner of J.E.Pierce Apothecary, Inc. located at 1180 Beacon Street, Brookline, Ma.. We are an urban medical center pharmacy, the only full service independent in Brookline, a town of 76000 people.

2. I have operated this pharmacy since 1981.

3. We are full service community pharmacy, offering compounding, home delivery, medication management and complete computerized prescription filling and counseling.. We are the only Brookline pharmacy that delivers to senior residences, and offer home bound individuals. We also offer influenza immunization in our pharmacy. Pharmacy provides medication and care to over 10000 patients in the Brookline area.

4. Prescription drugs account for more than 85% of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Less than 15% of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs, and government pay a gross reimbursement below the cost of doing business, to our Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because J.E.Pierce Apothecary is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide.. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with J.E.Pierce Apothecary or any other independent pharmacy.

Word 46666806.1

8. Based on the current level of reimbursement from PBMs, J.E.Pierce Apothecary actually loses money on the dispensing of certain branded medications. J.E.Pierce Apothecary, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that J.E.Pierce Apothecary received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that J.E.Pierce Apothecary can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of J.E.Pierce Apothecary but on the 10,000 patients we serve.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for J.E.Pierce Apothecary were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to J.E.Pierce Apothecary (so that actual reimbursement amounts would remain at or about prior levels).

12. J.E.Pierce Apothecary was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. J.E.Pierce Apothecary and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to J.E.Pierce Apothecary for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe J.E.Pierce Apothecary will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to J.E.Pierce Apothecary. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with J.E.Pierce Apothecary.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, J.E.Pierce Apothecary does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Steven L Grossman    owner    J.E.Pierce Apothecary Inc

2

45666806.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) | C.A. No. 1:05-CV-11148-PBS |
| BENEFITS FUND, PIRELLI ARMSTRONG ) | |
| RETIREE MEDICAL BENEFITS TRUST; ) | |
| TEAMSTERS HEALTH & WELFARE FUND ) | |
| OF PHILADELPHIA AND VICINITY; ) | |
| PHILADELPHIA FEDERATION OF ) | |
| TEACHERS HEALTH AND WELFARE ) | |
| FUND; DISTRICT COUNCIL 37, AFSCME- ) | |
| HEALTH & SECURITY PLAN; JUNE ) | |
| SWAN; MAUREEN COWIE and BERNARD ) | |
| GORTER, ) | |
| ) | |
| Plantiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRST DATABANK, INC. a Missouri ) | |
| Corporation; and McKESSON ) . | |
| CORPORATION, a Delaware corporation ) | |
| ) | |
| Defendants. ) | |

I, Lisa Strucko do swear and affirm:

I am one of the owners of Leesburg Pharmacy, located at 36-C Catoctin Cir SE, Leesburg, VA 20175. Leesburg Pharmacy has been in business for over 30 years. We are located 45 miles northeast of Washington, DC. The majority of our patients have prescription coverage through a third party where the AWP formula affects reimbursement for their prescriptions.

Leesburg Pharmacy has been in business since 1976 and we provide medication and care to over 30,000 patients in the Loudoun and Fairfax County areas. We care for patients both young and old. We service the local Hospice organizations and provide pharmacy services to many local assisted living facilities. Our pharmacy has an on-site Compounding Center where we customize medications to meet patient's unique needs. Many of our patients have prescription insurance through Medicaid or Medicare. We offer delivery or shipping to those patients who are unable to visit our store themselves.

Prescription drugs account for approximately 93% of my pharmacy's overall sales. Due to the already low reimbursement for prescription drugs, Leesburg Pharmacy currently operates at less than a 3% profit margin. Over 96% of my pharmaceutical sales are billed through pharmacy benefit managers ("PBMs"). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

The PBMs pay Leesburg Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a minimal dispensing fee.

Because Leesburg Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to our pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with our pharmacy.

Based on the current level of reimbursement from PBMs, Leesburg Pharmacy actually loses money on the dispensing of certain branded medications, and realizes limited profits on the dispensing other branded medications.

Word 45666806.1

The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursements at that Leesburg Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

To the extent that Leesburg Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and the other 55 employees of Leesburg Pharmacy but on the thousands of patients we serve.

I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Leesburg Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Leesburg Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

Leesburg Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Leesburg Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Leesburg Pharmacy for its services.

If published AWP levels are artificially reduced as a result of the settlements, I do not believe Leesburg Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Leesburg Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Leesburg Pharmacy.

I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Leesburg Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Lisa Strucko, Pharm D
Clinical Pharmacist
Leesburg Pharmacy, Inc
36-C Catoctin Cir SE
Leesburg, VA 20175
703-777-5333

45666806.2

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH ) C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE )
SWAN; MAUREEN COWIE and BERNARD )
GORTER. )
                          )
                   Plaintiffs. )
                          )
                v.           )
                          )
FIRST DATABANK, INC. a Missouri )
Corporation; and McKESSON )
CORPORATION, a Delaware corporation )
                          )
                   Defendants. )

I, M. Keith Hodges do swear and affirm:

1. I am the owner of Gloucester Pharmacy, located at 7453 Hargett Blvd Gloucester, VA 23061.

[Describe nature of community where the pharmacy is located - - rural, urban, etc.]mixed urban/rural.

2. I have operated this pharmacy since September 1998.

3. [Describe the patient population that the pharmacy serves (e.g., rural, urban, underserved, elderly, AIDS patients, etc.) and describe the nature of any special value added services that the pharmacy provides (e.g., delivery, compounding, community health programs)]. Gloucester Pharmacy is a full service independent pharmacy providing additional the additional services of immunizations, compounding, patient counseling, compliance programs and clinical pharmacy services. Pharmacy provides medication and care to over 23,000 patients in the Gloucester Virginia area.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Gloucester Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Gloucester Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Gloucester Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Gloucester Pharmacy.

Word 45666806.1

8.  Based on the current level of reimbursement from PBMs, Gloucester Pharmacy actually loses money on the dispensing of certain branded medications. Gloucester Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9.  The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Gloucester Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10.  To the extent that Gloucester Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc.  Such cutbacks will impose a hardship not only on myself and other employees of Gloucester Pharmacy but on the 23,000 patients we serve.

1.  I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe.  From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Gloucester Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Gloucester Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12.  Gloucester Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Gloucester Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Gloucester Pharmacy for its services.

13.  If published AWP levels are artificially reduced as a result of the settlements, I do not believe Gloucester Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Gloucester Pharmacy.  This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Gloucester Pharmacy.

14.  I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Gloucester Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive  many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider.  In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15.  I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Myron Keith Hodge
President Gloucester Pharmacy

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME-HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br> Plantiffs, <br><br> v. <br><br> FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |

I, John Dennis Musil do swear and affirm:

2. I am the owner of twelve (12) privately held, independent pharmacies with locations at:

The Apothecary Shop of Scottsdale, Inc.
9777 North 91st Street, Suite 102
Scottsdale, AZ 85258

The Apothecary Shop of Tempe, Inc.
2155 Conference Center Drive, Suite 101
Tempe, AZ 85284

The Apothecary Shop of Phoenix, Inc.
1701 E. Thomas Road, Suite 203
Phoenix, AZ 85016

The Apothecary Shop of Phoenix II, Inc.
5040 N. 15th Avenue, Suite 102
Phoenix, AZ 85015

The Apothecary Shop of Phoenix III, Inc.
1144 E. McDowell, Suite 402
Phoenix, AZ 85006

The Apothecary Shop of Grayhawk, Inc.
20201 N. Scottsdale Healthcare Drive, Suite 100
Scottsdale, AZ 85255

Word 45666806.1

The Apothecary Shop of Gilbert, Inc.
2450 E. Guadalupe Drive, Suite 110
Gilbert, AZ 85234

The Apothecary Shop of Tucson, Inc.
4512 E. Camp Lowell Drive
Tucson, AZ 85712

The Apothecary Shop of Arrowhead, Inc.
17612 N. 59th Avenue
Glendale, AZ 85308

The Apothecary Shop of Tucson II, Inc.
2181 W. Orange Grove Road, Suite 135
Tucson, AZ 85741

The Apothecary Shop of Las Vegas, Inc.
10050 Banburry Cross Drive, Suite
Las Vegas, NV 89144

The Apothecary Shop of Columbus, Inc.
262 Neil Avenue, Suite 130
Columbus, OH 43215

2. I have operated this pharmacy company since May 1, 1996.

3. We are a group of pharmacies that specialize in the treatment of: veterinary, ophthalmology, pain management, oncology, women's health, sports health, HIV/AIDS, transplant, fertility and custom-made compounded medications. We service a very unique patient population, many of whom require extensive medication therapy management, home delivery of medications and off-hour assistance with their medication needs. We are also the designated pharmacy for the AIDS Drugs Assistance Program (ADAP) for the state of Arizona.

The Apothecary Shops provides medication and care to over 100,000 patients every year.

4. Prescription drugs account for a very large portion (99%) of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay The Apothecary Shops for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because The Apothecary Shops is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to The Apothecary Shops. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with The Apothecary Shops.

8. Based on the current level of reimbursement from PBMs, The Apothecary Shops actually loses money on the dispensing of certain branded medications. The Apothecary Shops, as indicated, realizes limited profits on the dispensing of other branded medications. This is most prevalent when manufacturers raise

2

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that The Apothecary Shops received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that The Apothecary Shops can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of The Apothecary Shops but on the thousands of patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for The Apothecary Shops were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to The Apothecary Shops (so that actual reimbursement amounts would remain at or about prior levels).

12. The Apothecary Shops was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. The Apothecary Shops and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to The Apothecary Shops for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe The Apothecary Shops will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to The Apothecary Shops. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with The Apothecary Shops.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, The Apothecary Shops does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

John D. Musil, Pharm.D.
President, The Apothecary Shops

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH     )   C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG  )
RETIREE MEDICAL BENEFITS TRUST;   )
TEAMSTERS HEALTH & WELFARE FUND   )
OF PHILADELPHIA AND VICINITY;     )
PHILADELPHIA FEDERATION OF        )
TEACHERS HEALTH AND WELFARE       )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE      )
SWAN; MAUREEN COWIE and BERNARD   )
GORTER,                           )
                                  )
                      Plaintiffs, )
                                  )
              v.                  )
                                  )
FIRST DATABANK, INC. a Missouri   )
Corporation; and McKESSON         )
CORPORATION, a Delaware corporation )
                                  )
                      Defendants. )

I, Jay Gill do swear and affirm:

I am one of the owners of Leesburg Pharmacy, located at 36-C Catoctin Cir SE, Leesburg, VA 20175. Leesburg Pharmacy has been in business for over 30 years. We are located 45 miles northeast of Washington, DC. The majority of our patients have prescription coverage through a third party where the AWP formula affects reimbursement for their prescriptions.

Leesburg Pharmacy has been in business since 1976 and we provide medication and care to over 30,000 patients in the Loudoun and Fairfax County areas. We care for patients both young and old. We service the local Hospice organizations and provide pharmacy services to many local assisted living facilities. Our pharmacy has an on-site Compounding Center where we customize medications to meet patient's unique needs. Many of our patients have prescription insurance through Medicaid or Medicare. We offer delivery or shipping to those patients who are unable to visit our store themselves.

Prescription drugs account for approximately 93% of my pharmacy's overall sales. Due to the already low reimbursement for prescription drugs, Leesburg Pharmacy currently operates at less than a 3% profit margin. Over 96% of my pharmaceutical sales are billed through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

The PBMs pay Leesburg Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

Because Leesburg Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to our pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with our pharmacy.

Based on the current level of reimbursement from PBMs, Leesburg Pharmacy actually loses money on the dispensing of certain branded medications, and realizes limited profits on the dispensing other branded medications.

Word 45666806.1

Dec-11-2007 02:41 PM    2/2

The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Leesburg Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

To the extent that Leesburg Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and the other 55 employees of Leesburg Pharmacy but on the thousands of patients we serve.

I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Leesburg Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Leesburg Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

Leesburg Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Leesburg Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Leesburg Pharmacy for its services.

If published AWP levels are artificially reduced as a result of the settlements, I do not believe Leesburg Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Leesburg Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Leesburg Pharmacy.

I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Leesburg Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

12/11/07

Jay Gil, Pharm D
VP of Operations
Leesburg Pharmacy, Inc
36-C Catoctin Cir SE
Leesburg, VA 20175
703-777-5333

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH ) C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE )
SWAN; MAUREEN COWIE and BERNARD )
GORTER. )
 )
                               Plaintiffs, )
 )
              v.                        )
 )
FIRST DATABANK, INC. a Missouri        )
Corporation; and McKESSON             )
CORPORATION, a Delaware corporation   )
 )
                           Defendants. )

I, Diana Courtney, do swear and affirm:

1. I am the owner of Lake Shore Pharmacy, located at 1399 SW McVey Avenue, Lake Oswego, OR 97034.

2. I started this business from the ground up, after years of being asked by residents of the community to offer those services that were otherwise unavailable, or not provided at the time. I have operated this pharmacy since October of 2004.

3. Lake Shore Pharmacy provides medication and care to patients in the greater metro Portland area, as well as all over the state of Oregon. We provide bio-injectable medications to disease states ranging from rheumatoid and psoriatic arthritis, to hepatitis C, to diabetes. We provide compounding services to infants, children, men, women and domestic animals. We provide delivery services to the local community, including several nursing homes, skilled care facilities, and elderly patients who are home bound. We offer mailing services to patients throughout the entire state. We have a heavy population of retirees in the area, as well.

4 Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Lake Shore Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Lake Shore Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to _ Lake Shore Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Lake Shore Pharmacy.

8. Based on the current level of reimbursement from PBMs, Lake Shore Pharmacy actually loses money on the dispensing of certain branded medications. Lake Shore Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Lake Shore Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Lake Shore Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Lake Shore Pharmacy but on the Lake Shore patients we serve.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Lake Shore Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Lake Shore Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. Lake Shore Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Lake Shore Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Lake Shore Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Lake Shore Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Lake Shore Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Lake Shore Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Lake Shore Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Richard Ginsburg
Dec 17 2007

Dec-19-2007 03:29 PM    1/2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME- HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, <br><br>                          Plaintiffs,<br><br>             v.<br><br>FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation<br><br>                          Defendants. | ) C.A. No. 1:05-CV-11148-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

I.   Robert J. Greenwood do swear and affirm:

1.   I am the owner of Greenwood Drug, Inc. , located in Waterloo, Iowa. Waterloo, is a community with a population of 72,000 people. I own one of the 4 independent pharmacies in Waterloo

2.   I have operated this pharmacy since 1988. We employ 10 people.

3.   Greenwood Drug providers pharmacy services to the Waterloo community, we serve many elderly patients, we have a close relationship with Black Hawk-Grundy Mental Health Center serving many chronic mentally ill patients, we provide immunizations and medication therapy to seniors involved in the Medicare Part D program.

4.   Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins, 2007 is 3 % after all expenses paid.

5.   The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6.   The PBMs pay Greenwood Drug for dispensing branded and generic medications based on a reimbursement formula that is promised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7.   Because Greenwood Drug is a small community based business. I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Greenwood Drug. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Greenwood Drug.

Word 45666806.1

8. Based on the current level of reimbursement from PBMs, Greenwood Drug actually loses money on the dispensing of certain branded medications. Greenwood Drug, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Greenwood Drug received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Greenwood Drug can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community. We have staff that volunteer on the city planning and zoning board, I serve on the Waterloo City Council, we donate to the schools, Churches, and other community activities that main street business support in small town Iowa. Such cutbacks will impose a hardship not only on myself and employees of Greenwood Drug, but on the many patients that we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Greenwood Drug were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Greenwood Drug (so that actual reimbursement amounts would remain at or about prior levels).

12. Greenwood Drug was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Greenwood Drug and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Greenwood Drug for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Greenwood Drug will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Greenwood Drug. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Greenwood Drug.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Greenwood Drug does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBM's are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

2

Sincerely,

Robert J Greenwood
President, Greenwood Drug, Inc.
Waterloo, IA

3

DEC-17-2007  16:24

P.03/05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF
TEACHERS HEALTH AND WELFARE
FUND; DISTRICT COUNCIL 37, AFSCME-
HEALTH & SECURITY PLAN; JUNE
SWAN; MAUREEN COWIE and BERNARD
GORTER,

Plaintiffs,

v.

FIRST DATABANK, INC. a Missouri
Corporation; and McKESSON
CORPORATION, a Delaware corporation

Defendants.

C.A. No. 1:05-CV-11148-PBS

I, _Joseph P. LECH RPh_ do swear and affirm:

1.  I am the owner of _LECH's_ pharmacy located at

    7 TROY ST CANTON, PA 17724
    1 KINN Ave TUNKhaNNock, PA 18657
    218 S. German ST DUShore PA 18614
    56 MAIN ST Nicholson PA 18446
    104 MAIN ST, LACEYville PA 18623

[Describe nature of community where the pharmacy is located - - rural, urban, etc.] _RURAL_

2.  I have operated this pharmacy since _1983_.

3.  [Describe the patient population that the pharmacy serves (e.g., rural, urban, underserved, elderly, AIDS patients, etc.) and describe the nature of any special value added services that the pharmacy provides (e.g., delivery, compounding, community health programs)]. _LECH's_ Pharmacy provides medication and care to over _~15,000_ patients in the _A_ area. _WYOMING, BRADFORD & SUSQUEHANNA, SULLIVAN, TIOGA counties - all rural_

4.  Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5.  The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6.  The PBMs pay _LECH's_ Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7.  Because _LECH's_ Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to _LECH's_ Pharmacy. The reimbursement formulas and

Word 45866806.1

DEC-17-2007  16:24

P.04/05

other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with LECH's Pharmacy.

8. Based on the current level of reimbursement from PBMs, LECH's Pharmacy actually loses money on the dispensing of certain branded medications. LECH's Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that LECH's Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that LECH's Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g. delivery, compounding, etc.. Such cutbacks will impose a hardship not only on myself and other employees of LECH's Pharmacy but on the 25,000 patients we serve. *(we employ ≈ 40 employees)*

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for LECH's Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to LECH's Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. LECH's Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. LECH's Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to LECH's Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe LECH's Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to LECH's Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with LECH's Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, LECH's Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Joseph P. LECH R.Ph., owner
2    LECH's pharmacy

45666806.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) C.A. No. 1:05-CV-11148-PBS<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME- )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br>　　　　　　　　　　　　　　　　　　 )<br>　　　　　　　　　　　　　Plantiffs, )<br>　　　　　　　　　　　　　　　　　　 )<br>　　　　　　v.　　　　　　　　　　　 )<br>　　　　　　　　　　　　　　　　　　 )<br>FIRST DATABANK, INC. a Missouri )<br>Corporation; and McKESSON )<br>CORPORATION, a Delaware corporation )<br>　　　　　　　　　　　　　　　　　　 )<br>　　　　　　　　　　　　Defendants. ) | |

I, Gerald Shapiro do swear and affirm:

1. I am the owner of Uptown Drug & Gift Shop, located at 444 S.Flower St #100 Los Angeles, California 90071.

My pharmacy is located in an urban setting. Actually in downtown Los Angeles, where I have been for the past three years. Before that I was in the Mid-Wilshire area.

2. I have operated this pharmacy since 1976.

3. While my Pharmacy is in an urban setting the bulk of my prescription business is dedicated to providing care to an aging population of shut ins. Most of my prescriptions are delivered to peoples homes with the average age of 76 years. Uptown Pharmacy provides medication and care to over 5000 patients in the South Central area of Los Angeles. This area includes Inglewood, Compton, Lynwood, Bell Gardens, Downey, Culver City and Long Beach just to name a few of the many areas that we deliver to.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6.　　The PBMs pay Uptown Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Uptown Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Uptown Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Uptown Pharmacy.

8. Based on the current level of reimbursement from PBMs, Uptown Pharmacy actually loses money on the dispensing of certain branded medications. Uptown Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Uptown Pharmacy received from PBMs and threatens my ability to stay in business and serve my community, especially the dual eligible patients that I serve who are on various Part D plans.

10. To the extent that Uptown Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Uptown Pharmacy but on the many patients we serve who fall under the safety net and are home bound.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Uptown Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Uptown Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. Uptown Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Uptown Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Uptown Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Uptown Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Uptown Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Uptown Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Uptown Pharmacy does not determine the charge to its cash paying customers (an insignificant amount left) based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Gerald Shapiro, PharmD
CEO Uptown Drug & Gift Shop
444 S. Flower St #100
Los Angeles, California 90071
(213) 612-4300

12/07/2007   04.55   716/353351                          MIDDLE UNIT FLME II HLEAL              PAGE   02

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) C.A. No. 1:05-CV-11148-PBS<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME- )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br> )<br>                    Plantiffs, )<br> )<br>          v.                )<br> )<br> )<br>FIRST DATABANK, INC. a Missouri )<br>Corporation; and McKESSON )<br>CORPORATION, a Delaware corporation )<br> )<br>                    Defendants. ) | |

I, _Stephen L Giroux___ do swear and affirm:

1. I am the owner of ___Moden-Giroux, INC d/b/a Middleport Family Health Center, Transit Hill Pharmacy and Thee Barker Store_____, located at ____81 Rochester Rd. Middleport,NY 14105, 6344 Transit Rd Depew,NY 14043 and 8671 Main St Barker,NY respectively_____.

___Middleport and Barker are very rural communities. The Village of Middleport has a population of 1900, the village of Barker approx. 500 and Depew,NY is a suburb of Buffalo, NY_____

2. I have operated this pharmacy since __1983_____.

3. __Our Pharmacy serves many elderly and low income folks as our rural region is economically challenged  Our Pharmacies provides medication and care to over 10,000 patients in these communities. We provide delivery services,compounding of specialty prescriptions, patient counseling, blood pressure screening, diabetic and asthma training as well as convenient hours and charge accounts.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Middleport Family Health Center and Transit Hill Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

Word 45666806.1

7. Because Middleport Family Health Center and Transit Hill Pharmacy are small community based businesses, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Middleport Family Health Center and Transit Hill Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Middleport Family Health Center and Transit Hill Pharmacy.

8. Based on the current level of reimbursement from PBMs, Middleport Family Health Center and Transit Hill Pharmacy actually lose money on the dispensing of certain branded medications. Middleport Family Health Center and Transit Hill Pharmacy, as indicated, realize limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacies and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Middleport Family Health Center and Transit Hill Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Middleport Family Health Center and Transit Hill Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc.  Such cutbacks will impose a hardship not only on myself and other employees of our Pharmacies but on the many patients we serve.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Middleport Family Health Center and Transit Hill Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Middleport Family Health Center and Transit Hill Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. Middleport Family Health Center and Transit Hill Pharmacy was not enriched as the result of an alleged increase in          the          WAC-
AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Middleport Family Health Center and Transit Hill Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to Middleport Family Health Center and Transit Hill Pharmacy for its services.

13.  If published AWP levels are artificially reduced as a result of the settlements, I do not believe Middleport Family Health Center and Transit Hill Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Middleport Family Health Center and Transit Hill Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Middleport Family Health Center and Transit Hill Pharmacy.

14.  I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP.  Second, Middleport Family Health Center and Transit Hill Pharmacy do not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15.  I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

2

45666806.2

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Stephen L. Giroux

President of Moden-Giroux,INC D/B/A Middleport Family Health Center and Transit Hill Pharmacy

**3**

DEC-28-2007 11:17H FROM:                          TO:12125712555          P.1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME- HEALTH & SECURITY PLAN; JUNE SWAN; MAUREEN COWIE and BERNARD GORTER, | C.A. No. 1:05-CV-11148-PBS<br><br>AFFIDAVIT OF WILLIAM P. SCHEER |
| Plantiffs, | |
| v. | |
| FIRST DATABANK, INC. a Missouri Corporation; and McKESSON CORPORATION, a Delaware corporation | |
| Defendants. | |

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF BRONX   )

I, Willam P. Scheer, being duly sworn, deposes and says:

1.     I am the owner of Scheer Drugs Inc., located at 1343 E. Gunhill Road, Bronx, New York 10469. Scheer Drugs Inc. serves the northeast Bronx, an urban area of predominantly Afro American and Hispanic demographic.

2.     I have operated this pharmacy since October of 1978.

3.     As a large segment of the population served by Scheer Drugs Inc. is elderly and unable to travel to a pharmacy for prescriptions, we deliver to a large number of these homebound patients. Many of these patients have multiple disease states and require extra care. Scheer Drugs Inc. provides medication and care to over 4,000 patients within a three mile radius of the pharmacy.

DEC-20-2007 11:17 FROM:                                    TO: 12123112033          P.2

4.      Prescription drugs account for about 80% of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5.      The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs ") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Only a very small portion of my pharmaceutical sales are to cash customers. The remaining patients pay for their prescriptions through state or federal programs.

6.      The PBMs and PDPs pay Scheer Drug Inc. for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP ") plus a nominal dispensing fee which does not even cover my operating costs.

7.      Because Scheer Drug Inc. is a community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Scheer Drug Inc. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Scheer Drug Inc.

8.      Based on the current level of reimbursement from PBMs and PDPs, Scheer Drug Inc. actually loses money on the dispensing of certain branded medications. Scheer Drug Inc., as indicated, realizes limited profits on the dispensing of other branded medications.

9.      The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Scheer Drug Inc. received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10.     To the extent that Scheer Drug Inc. can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community -- e.g., delivery, compounding, extended hours, etc.   Such cutbacks will impose a hardship not only on me and other employees of Scheer Drug Inc. but also on the approximately 4,000 patients we serve.

11.     I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Scheer Drug Inc. were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Scheer

2

Drug Inc. (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

12.     Scheer Drug Inc. was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Scheer Drug Inc. and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Scheer Drug Inc. for its services.

13.     If published AWP levels are artificially reduced as a result of the settlements, I do not believe Scheer Drug Inc. will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Scheer Drug Inc. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Scheer Drug Inc.

14.     I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Scheer Drug Inc. does not determine the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, will increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider.

_William P. Scheer_
William P. Scheer

Sworn before me the 20th day of December, 2007

_____
Notary Public

JAMES R. SCHIFFER
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01SC4507979
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES OCTOBER 31, 200_

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, PIRELLI ARMSTRONG )
RETIREE MEDICAL BENEFITS TRUST; )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE )
SWAN; MAUREEN COWIE and BERNARD )
GORTER, )
                             )
             Plantiffs, )
                             )
                 v. )
                             )
FIRST DATABANK, INC. a Missouri )
Corporation; and McKESSON )
CORPORATION, a Delaware corporation )
                             )
            Defendants. )

C.A. No. 1:05-CV-11148-PBS

**AFFIDAVIT OF
RUSSELL GELLIS**

STATE OF NEW YORK )
                    ) ss:
COUNTY OF NEW YORK )

I, Russell Gellis, being duly sworn, deposes and says:

1. I am the owner of RG Drug Corp., d/b/a Apthorp Pharmacy, located at 2201 Broadway, New York, New York 10024. My pharmacy serves the upper west side of Manhattan, to an urban and mixed population.

2. I have operated this pharmacy since early 1993.

3. We service a mixture of middle to upper middle class patients in their various pharmacy services, which includes compounding, specializes fertility medications and we offer delivery throughout the greater Manhattan area. Apthorp Pharmacy provides medication and care to over 20,000 patients in the upper west side of Manhattan.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at small profit margins.

Word 45666806.1

5. The majority of my pharmaceutical sales are through pharmacy benefit managers ("PBMs") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Less than ten percent of my pharmaceutical sales are to cash paying patients. The remaining patients pay for their prescriptions through state or federal programs.

6. The PBMs and PDPs pay Apthorp Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a nominal dispensing fee which does not even cover my operating costs.

7. Because Apthorp Pharmacy is a independent community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Apthorp Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Apthorp Pharmacy.

8. Based on the current level of reimbursement from PBMs and PDPs, Apthorp Pharmacy actually works on very thin gross profit margins on the dispensing of certain branded medications. Apthorp Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications as well.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Apthorp Pharmacy received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10. To the extent that Apthorp Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I may need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community. Such cutbacks will impose a hardship not only on myself and other employees of Apthorp Pharmacy but also on the Apthorp patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Apthorp Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Apthorp Pharmacy (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

2

45666806.2

12. Apthorp Pharmacy was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Apthorp Pharmacy and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4% - - in reality a 50% drop in our profit margins on those drugs - - with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Apthorp Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Apthorp Pharmacy will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Apthorp Pharmacy. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Apthorp Pharmacy.

14. I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Apthorp Pharmacy will not lower the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, may increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

_____

Russell Gellis, R. Ph.

STATE OF NEW YORK )
                  ) ss.:
COUNTY OF _NY_     )

FRANCES DEL VALLE
Notary Public, State of New York
No. 01DE8033298
Qualified in New York County
Commission Expires November 16, 20__

_____
Notary Public

45666806.2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH ) | |
| BENEFITS FUND, PIRELLI ARMSTRONG ) | |
| RETIREE MEDICAL BENEFITS TRUST; ) | C.A. No. 1:05-CV-11148-PBS |
| TEAMSTERS HEALTH & WELFARE FUND ) | |
| OF PHILADELPHIA AND VICINITY; ) | |
| PHILADELPHIA FEDERATION OF ) | |
| TEACHERS HEALTH AND WELFARE ) | |
| FUND; DISTRICT COUNCIL 37, AFSCME- ) | **AFFIDAVIT OF** |
| HEALTH & SECURITY PLAN; JUNE ) | **JAMES A. DETURA** |
| SWAN; MAUREEN COWIE and BERNARD ) | |
| GORTER, ) | |
| ) | |
| Plantiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| FIRST DATABANK, INC. a Missouri ) | |
| Corporation; and McKESSON ) | |
| CORPORATION, a Delaware corporation ) | |
| ) | |
| Defendants. ) | |

STATE OF NEW YORK )
) ss.:
COUNTY OF BRONX )

I, James A. Detura, being duly sworn, deposes and says:

1.   . I am the owner of 666 Drug Inc. d/b/a Melrose Pharmacy, ("Melrose Pharmacy"), located at 666 Courtlandt Avenue, Bronx New York 10451. My pharmacy serves the urban, low-income neighborhood of the South Bronx. Our patients are primarily African American and Hispanic.

2.   I have worked in this pharmacy since 1976 and took over ownership and operation of the in 1989.

3.   Melrose Pharmacy serves the a diverse patient demographic including patients who are elderly, disabled, handicapped, pediatric, unemployed, etc. The approximate breakdown of insurance coverage for our patients is: 65% Medicaid, 25% Medicare and 10% other.   We strive to serve our patients in every possible way, including offering delivery services to those who are unable to come into the pharmacy, advocating for patients, assisting patients in navigating prescription plans, and assisting them in securing

special needs pharmaceutical items. Melrose Pharmacy fills over 3,000 prescriptions a week, serving thousands of patients in the South Bronx community.

4.      Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5.      The majority of my pharmaceutical sales are through pharmacy benefit managers ("PBMs") for my commercial patients, and prescription drug plans ("PDPs") associated with my Medicare patients. Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6.      The PBMs and PDPs pay Melrose Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price ("AWP") plus a nominal dispensing fee which does not even cover my operating costs.

7.      Because Melrose Pharmacy is a community based business, I have no opportunity to negotiate with PBMs or PDPs concerning the level of reimbursement that they provide to Melrose Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs and PDPs are unwilling to negotiate the terms of their contracts on an individual basis with Melrose Pharmacy.

8.      Based on the current level of reimbursement from PBMs and PDPs, Melrose Pharmacy actually loses money on the dispensing of certain branded medications. Melrose Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9.      The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court -- which would cause the reduction in the amount of reimbursement that Melrose Pharmacy received from PBMs and PDPs -- threatens my ability to stay in business and serve my community.

10.     To the extent that Melrose Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, extended hours, etc. Such cutbacks will impose a hardship not only on me and other employees of Melrose Pharmacy but also on the thousands of patients we serve.

11.     I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between the Wholesale Acquisition Cost ("WAC") and AWP in the 2001-2002 timeframe. From my personal experience, there has been a steady decline in the

2

reimbursement rate. The decline started in the early 1990s, and continued with greater intensity around the time of the alleged increase in the spread between WAC and AWP, which was also around the time several PBM contracts for Melrose Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Melrose Pharmacy (so that actual reimbursement amounts would remain at or about prior levels). Although PDPs did not become participants in pharmacy activity until the beginning of 2006 when Medicare Part D commenced, they are now a major part of my current business.

12.     Melrose Pharmacy was not enriched as a result of the alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Melrose Pharmacy and its patients, however, will experience severe hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBMs and PDPs as well as others' reimbursements to Melrose Pharmacy for its services.

13.     If published AWP levels are artificially reduced as a result of the settlements, I do not believe Melrose Pharmacy will be able to re-negotiate its contracts with PBMs and PDPs to increase the percentage of AWP that PBMs will reimburse to Melrose Pharmacy. This is because, as noted above, PBMs and PDPs have not been interested in any individual negotiations of their contracts with Melrose Pharmacy.

14.     I also believe that the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Melrose Pharmacy does not determine the charge to its cash paying patients based on published AWP figures, but rather bases the charge on the acquisition cost of the drug. To the extent that reimbursement from PBMs and PDPs is reduced, charges to other patients, including cash paying patients, will increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, the change will force many independent pharmacies out of business. The closure of these pharmacies will inconvenience many consumers, and impose severe hardships on others who depend upon independent pharmacies for delivery and other services, or for whom the independent pharmacy is their only available service provider

James A. Detura

Sworn before me the /7th day of
December, 2007

Notary Public

RACHEL G. LUKE
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Jan 22, 2008

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH    )  C.A. No. 1:05-CV-11148-PBS
BENEFITS FUND, PIRELLI ARMSTRONG  )
RETIREE MEDICAL BENEFITS TRUST;   )
TEAMSTERS HEALTH & WELFARE FUND )
OF PHILADELPHIA AND VICINITY;     )
PHILADELPHIA FEDERATION OF        )
TEACHERS HEALTH AND WELFARE       )
FUND; DISTRICT COUNCIL 37, AFSCME- )
HEALTH & SECURITY PLAN; JUNE      )
SWAN; MAUREEN COWIE and BERNARD )
GORTER,                           )
                                  )
                    Plaintiffs,   )
                                  )
            v.                    )
                                  )
FIRST DATABANK, INC. a Missouri   )
Corporation; and McKESSON         )
CORPORATION, a Delaware corporation )
                                  )
                    Defendants.   )

I, Richard Brisson do swear and affirm:

1. I am the owner of Pharmahealth Pharmacy, located at 458 Dartmouth St New Bedford MA 02740. New Bedford is an urban community of about 100,000 residents and it is surrounded by towns of 10 to 20 thousand residents.

2. I have operated this pharmacy since October of 1977.

3. Our patient base is mainly elderly, underserved, with specialty needs like AIDS patients, brittle diabetics, and severe COPD cases. Some of the special value added services that the pharmacy provides: delivery, charge accounts, sterile and non-sterile compounding, flu clinics, a speaker's bureau, medication management services, consulting in BHRT, pain management, diabetes, nutrition, autism, Pharmahealth Pharmacy provides medication and care to over 3000 patients in the greater New Bedford area.

4. Prescription drugs account for more than 98% of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Pharmahealth Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Pharmahealth Pharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to Pharmahealth Pharmacy. The reimbursement

Word 45666806.1

formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with Pharmahealth Pharmacy. Anything that the PBMs say to the contrary is an outright lie.

8. Based on the current level of reimbursement from PBMs,PharmaHealth actually loses money on the dispensing of certain branded medications. PharmaHealth, as indicated, realizes limited profits on the dispensing of other branded medications. Indeed, the OIG did a published study which determined the cost to fill a prescription in the Northeast is about $10.50. Most if not all of our PBMs have a dispensing fee of less than $2.00, and some have NO dispensing fee at all.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Pharmahealth received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Pharmahealth can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Pharmahealth but on the 3000 plus patients we serve.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Pharmahealth Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to Pharmahealth (so that actual reimbursement amounts would remain at or about prior levels).

12. PharmaHealth was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Pharmahealth and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to PharmaHealth for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Pharmahealth will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to Pharmahealth. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with with independent pharmacies such as Pharmahealth.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Pharmahealth does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies. In fact, I own three other pharmacies in the greater New Bedford area and we will be closing one at the end of January 2008 because of the adverse affects of reimbursement under the new Medicare Part D program. If any one is getting rich with the Part D program it

2

certainly is not the independent pharmacist. All you have to do is read the newspapers financial sections to see that the PBMs are recording all time high profits

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Richard Brisson R Ph, CEO

12-19-07

45666806.2

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

## C.A. NO 1:05-CV-11148-PBS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLIS ARMSTRONG
RETIREE MEDICAL BENEFITS FUND OF
PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND; DISTRICT
COUNSIL 37, AFSCME HELATH & SECURITY
PLAN; JUNE SWAN; MAUREEN COWIE AND
BERNARD GORTER
                    PLANTIFFS,
                 V,
FIRST DATA BANKS, INC. A MISSOURI
CORPORATION; AND MCKESSON CORP.,
A DELAWARE CORPORATION
                    DEFENDANTS,

I, William E Osborn do swear and affirm,

1. I am an owner of Osborn Drugs No. 4, dba Langley Drug, located in Langley, Oklahoma, a rural community.

2. I have operated this pharmacy since 2007.

3. The pharmacy serves a rural community population of an estimated 3,000 patients in the Langley, Oklahoma community. The pharmacy provides compounding and delivery for special added services.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margin of 3-5%.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers. Only small portions of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through the state or federal programs.

6. The PBM's pay Osborn Drugs No. 4, dba Langley Drug, for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage from the published Average Wholesale Price ("AWP") plus a minimal dispensing fee.

7. Because Osborn Drugs No. 4, dba Langley Drug, is a small community based business, I have no opportunity to negotiate with PBM's concerning the level of reimbursement that they provide to Osborn Drugs No. 4, dba Langley Drug,,. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBM's are unwilling to negotiate the terms of their contracts on an individual basis with Osborn Drugs No. 4, dba Langley Drug,,, Inc.

8. Based on the current level of reimbursement from PBM's, Osborn Drugs No. 4, dba Langley Drug, actually loses money on the dispensing of certain branded medications. Osborn Drugs No. 4, dba Langley Drug,,, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court, which would cause the reduction in the amount of reimbursement that Osborn Drugs No. 4, dba Langley Drug, received from PBM's and threatens my ability to stay in business and my community.

10. To the extent that Osborn Drugs No. 4, dba Langley Drug, can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back hours and service and reducing other vital services that

1

we provide to our community, eg. Delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Osborn Drugs No. 4, dba Langley Drug, but on the 3,000 patients we serve.

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 time frame. From my experience, there has been a steady decline in the reimbursement rate since the late 1990's and, at or about the time of the alleged increase in the spread between WAC and AWP, sever PBM contracts for Osborn Drugs No. 4, dba Langley Drug, were revised, resulting in a reduction in the percentage of AWP that PBM's have not been interested in any individual negotiations of their contracts with Osborn Drugs No. 4, dba Langley Drug,,,.

12. Osborn Drugs No. 4, dba Langley Drug, was not enriched as the result of an alleged increase n the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Osborn Drugs No. 4, dba Langley Drug, and its patients will, however, experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others reimbursements to Osborn Drugs No. 4, dba Langley Drug, for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Osborn Drugs No. 4, dba Langley Drug, will be able to re-negotiate contracts with PBM's to increase the percentage of AWP that PBM's would reimburse to Osborn Drug. This is because, PBM's have not been interested in any individual negotiations of their contracts with Osborn Drugs No. 4, dba Langley Drug,,,

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Osborn Drugs No. 4, dba Langley Drug, does not determine the charge to its cash paying consumers based on published AWP figures. To the extent that reimbursements from PBMs are reduced, charges to other customer, including cash paying customers, will likely increase. Third, because the change in AWP envisioned in the settlements wills severely reduced compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose sever hardships on others who are dependent on independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements in independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

## C.A. NO 1:05-CV-11148-PBS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLIS ARMSTRONG
RETIREE MEDICAL BENEFITS FUND OF
PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND; DISTRICT
COUNSIL 37, AFSCME HELATH & SECURITY
PLAN; JUNE SWAN; MAUREEN COWIE AND
BERNARD GORTER

PLANTIFFS,

V.

FIRST DATA BANKS, INC. A MISSOURI
CORPORATION; AND MCKESSON CORP.,
A DELAWARE CORPORATION

DEFENDANTS,

I, William E Osborn do swear and affirm,

1.  I am an owner of Bowen Pharmacy, located in Parsons, Kansas a rural community.

2.  I have operated this pharmacy since 2003.

3.  The pharmacy serves a rural community population of an estimated 15,000 patients in the Parsons, Kansas community. The pharmacy provides compounding and delivery for special added services.

4.  Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margin of 3-5%.

5.  The majority of my pharmaceutical sales are through pharmacy benefit managers. Only small portions of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through the state or federal programs.

6.  The PBM's pay Bowen Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage from the published Average Wholesale Price ("AWP") plus a minimal dispensing fee.

7.  Because Bowen Pharmacy is a small community based business, I have no opportunity to negotiate with PBM's concerning the level of reimbursement that they provide to Bowen Pharmacy,. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBM's are unwilling to negotiate the terms of their contracts on an individual basis with Bowen Pharmacy,, Inc.

8.  Based on the current level of reimbursement from PBM's, Bowen Pharmacy actually loses money on the dispensing of certain branded medications. Bowen Pharmacy,, as indicated, realizes limited profits on the dispensing of other branded medications.

9.  The level of published AWP, thus has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court, which would cause the reduction in the amount of reimbursement that Bowen Pharmacy received from PBM's and threatens my ability to stay in business and my community.

10. To the extent that Bowen Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back hours and service and reducing other vital services that we provide to our community, eg. Delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Bowen Pharmacy but on the 15,000 patients we serve.

1

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 time frame. From my experience, there has been a steady decline in the reimbursement rate since the late 1990's and, at or about the time of the alleged increase in the spread between WAC and AWP, sever PBM contracts for Bowen Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBM's have not been interested in any individual negotiations of their contracts with Bowen Pharmacy,.

12. Bowen Pharmacy was not enriched as the result of an alleged increase n the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Bowen Pharmacy and its patients will, however, experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others reimbursements to Bowen Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Bowen Pharmacy will be able to re-negotiate contracts with PBM's to increase the percentage of AWP that PBM's would reimburse to Osborn Drug. This is because, PBM's have not been interested in any individual negotiations of their contracts with Bowen Pharmacy,.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Bowen Pharmacy does not determine the charge to its cash paying consumers based on published AWP figures. To the extent that reimbursements frum PBMs are reduced, charges to other customer, including cash paying customers, will likely increase. Third, because the change in AWP envisioned in the settlements wills severely reduced compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose sever hardships on others who are dependent on independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements in independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

45666806.2

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### C.A. NO 1:05-CV-11148-PBS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLIS ARMSTRONG
RETIREE MEDICAL BENEFITS FUND OF
PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND; DISTRICT
COUNSIL 37, AFSCME HEALTH & SECURITY
PLAN; JUNE SWAN; MAUREEN COWIE AND
BERNARD GORTER
                            PLANTIFFS,
                  V.
FIRST DATA BANKS, INC. A MISSOURI
CORPORATION; AND MCKESSON CORP.,
A DELAWARE CORPORATION
                            DEFENDANTS,

I, William E Osborn do swear and affirm,

1.  I am an owner of Austin Drugs, located in Gravette, Arkansas a rural community.

2.  I have operated this pharmacy since 1983.

3.  The pharmacy serves a rural community population of an estimated 1,500 patients in the Gravette, Arkansas community. The pharmacy provides compounding and delivery for special added services.

4.  Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margin of 3-5%.

5.  The majority of my pharmaceutical sales are through pharmacy benefit managers. Only small portions of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through the state or federal programs.

6.  The PBM's pay Austin Drugs for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage from the published Average Wholesale Price ("AWP") plus a minimal dispensing fee.

7.  Because Austin Drugs is a small community based business, I have no opportunity to negotiate with PBM's concerning the level of reimbursement that they provide to Austin Drugs,. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBM's are unwilling to negotiate the terms of their contracts on an individual basis with Austin Drugs,, Inc.

8.  Based on the current level of reimbursement from PBM's, Austin Drugs actually loses money on the dispensing of certain branded medications. Austin Drugs,, as indicated, realizes limited profits on the dispensing of other branded medications.

9.  The level of published AWP, thus has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court, which would cause the reduction in the amount of reimbursement that Austin Drugs received from PBM's and threatens my ability to stay in business and my community.

10. To the extent that Austin Drugs can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back hours and service and reducing other vital services that we provide to our community, eg. Delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Austin Drugs but on the 1,500 patients we serve.

1

11. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 time frame. From my experience, there has been a steady decline in the reimbursement rate since the late 1990's and, at or about the time of the alleged increase in the spread between WAC and AWP, sever PBM contracts for Austin Drugs were revised, resulting in a reduction in the percentage of AWP that PBM's have not been interested in any individual negotiations of their contracts with Austin Drugs,.

12. Austin Drugs was not enriched as the result of an alleged increase n the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. Austin Drugs and its patients will, however, experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others reimbursements to Austin Drugs for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Austin Drugs will be able to re-negotiate contracts with PBM's to increase the percentage of AWP that PBM's would reimburse to Osborn Drug. This is because, PBM's have not been interested in any individual negotiations of their contracts with Austin Drugs,.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Austin Drugs does not determine the charge to its cash paying consumers based on published AWP figures. To the extent that reimbursements from PBMs are reduced, charges to other customer, including cash paying customers, will likely increase. Third, because the change in AWP envisioned in the settlements wills severely reduced compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose sever hardships on others who are dependent on independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements in independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

45666806.2

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME- )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br> )<br>Plantiffs, )<br> )<br>v. )<br> )<br>FIRST DATABANK, INC. a Missouri )<br>Corporation; and McKESSON )<br>CORPORATION, a Delaware corporation )<br> )<br>Defendants. ) | C.A. No. 1:05-CV-11148-PBS |

I, _Stephen Bernardi___ do swear and affirm:

1. I am the owner of____Johnson Drug_____, located at _____577 Main St, Waltham, Mass 02452.

   A suburb of Boston, Mass_____

2. I have operated this pharmacy since November 1987                    _____.

3. Johnson Drug Pharmacy provides medication and care to over 10,000 patients in the metrowest suburban area. Delivery, compounding, medical equipment and nutritional consultation are provided.

4. Prescription drugs account for a very large portion of my pharmacy's overall income. My pharmacy operates at very small single digit profit margins.

5. The majority of my pharmaceutical sales are through pharmacy benefit managers (" PBMs "). Only a very small portion of my pharmaceutical sales are to cash customers. The remaining customers pay for their prescriptions through state or federal programs.

6. The PBMs pay Johnson Drug Pharmacy for dispensing branded and generic medications based on a reimbursement formula that is premised upon a percentage reduction from the published Average Wholesale Price (" AWP ") plus a minimal dispensing fee.

7. Because Johnson DrugPharmacy is a small community based business, I have no opportunity to negotiate with PBMs concerning the level of reimbursement that they provide to the Pharmacy. The reimbursement formulas and other contractual terms are simply offered on a take-it or leave-it basis and the PBMs are unwilling to negotiate the terms of their contracts on an individual basis with thePharmacy.

Word 45666806.1

8. Based on the current level of reimbursement from PBMs, Johnson Drug Pharmacy actually loses money on the dispensing of certain branded medications. Johnson Drug Pharmacy, as indicated, realizes limited profits on the dispensing of other branded medications.

9. The level of published AWP, thus, has a significant impact on my ability to operate my pharmacy and remain in business. The proposed reduction in published AWP as part of the settlements before the Court which would cause the reduction in the amount of reimbursement that Johnson Drug Pharmacy received from PBMs and threatens my ability to stay in business and serve my community.

10. To the extent that Johnson Drug Pharmacy can remain viable if there is a reduction in the published AWP upon which our reimbursement rates are based, I would need to implement cost-cutting measures which could include, among other measures, cutting back on the hours of service and reducing other vital services that we provide to our community – e.g., delivery, compounding, etc. Such cutbacks will impose a hardship not only on myself and other employees of Johnson Drug Pharmacy but on the over 10,000 patients we serve.

1. I am informed that it has been argued that the reduction in published AWP will not harm pharmacies like mine because of an allegedly significant and arbitrary increase in the spread between WAC and AWP in the 2001-2002 timeframe. From my experience, there has been a steady decline in the reimbursement rate since the late 1990s and, at or about the time of the alleged increase in the spread between WAC and AWP, several PBM contracts for Pharmacy were revised, resulting in a reduction in the percentage of AWP that PBMs would reimburse to JOHNSON DRUG Pharmacy (so that actual reimbursement amounts would remain at or about prior levels).

12. Johnson Drug Pharmacy was not enriched as the result of an alleged increase in the WAC-AWP spread, as it has experienced reduced reimbursement rates and generally declining margins since at least 2000. The Pharmacy and its patients, however, will experience serious hardships if the published AWP is artificially reduced by 4%, with a resulting reduction in the PBM and others' reimbursements to the Pharmacy for its services.

13. If published AWP levels are artificially reduced as a result of the settlements, I do not believe Johnson Drug Pharmacy will be able to re-negotiate its contracts with PBMS to increase the percentage of AWP that PBMs would reimburse to the Pharmacy. This is because, as noted above, PBMs have not been interested in any individual negotiations of their contracts with Johnson Drug Pharmacy.

14. I also believe the proposed settlements of the First DataBank litigation will harm consumers. First, most insured consumers pay a flat co-pay and will not benefit from a reduction in the published AWP. Second, Johnson Drug Pharmacy does not determine the charge to its cash paying customers based on published AWP figures. To the extent that reimbursement from PBMs are reduced, charges to other customers, including cash paying customers, will likely all increase. Third, because the change in AWP envisioned in the settlements will severely reduce compensation to independent pharmacies, it may well drive many independent pharmacies out of business. The closure of these pharmacies would inconvenience many consumers and impose severe hardships on others who are dependent upon independent pharmacies for delivery and other services or for whom the independent pharmacy is the only available service provider. In the end, I believe that settlements, if allowed, would among other hardships, force consumers to spend more money at fewer pharmacies.

15. I truly hope the court considers the entire effects of the proposed settlements on independent pharmacies and the many patients for whom they are essential care providers, and that it does not approve the proposed settlements.

I certify under the penalty of perjury that the foregoing is true and correct and reflects my assessment of the impact of the settlements on my pharmacy and our consumers.

Stephen Bernardi owner Johnson Drug Pharmacy 577 Main St. Waltham, Mass 02452 781-893-3870 email steve@johnsondrug.com_____

NATIONAL COMMUNITY PHARMACISTS ASSOCIATION

# 2007
# *NCPA-Pfizer* Digest



*The* Face *of*
## INDEPENDENT PHARMACY





*NCPA-Pfizer* Digest · 2007

**Project Editor**

Donna S. West, RPh, PhD
Associate Professor, Division of Pharmaceutical Evaluation and Policy
Department of Pharmacy Practice
University of Arkansas for Medical Sciences College of Pharmacy
Little Rock, Arkansas

**Financial Editor**

Barbara Carper, CPA
Business Resource Services
Seattle, Washington

**Contributors**

Noel Wilkin, RPh, PhD
Chair and Associate Professor, Department of Pharmacy Administration
Director, Center for Pharmaceutical Marketing and Management
School of Pharmacy
The University of Mississippi

Bryan Ziegler, PharmD, MBA
Pharmacy Consultant
Lexington, South Carolina

**Project Director**

Stacey Swartz, PharmD
Senior Director, Pharmacy Affairs
National Community Pharmacists Association
Alexandria, Virginia

Copyright © 2007 National Community Pharmacists Association, Alexandria, VA, USA.
All Rights Reserved. No right of reproduction without the prior written consent of the
National Community Pharmacists Association.

[*October* 2007]

**Dear Reader:**

This 75th anniversary publication of the *NCPA-Pfizer Digest* comes at a time of critical change for independent community pharmacists. The impact of Medicare Part D on the pharmacy industry cannot be understated and is well-documented throughout this year's *Digest*. The bottom line: after years of continued growth, in 2006 independent revenues, margins and operating income were all either flat or declined.

However, this year's *Digest* is not about bad news. To the contrary, the *Digest* has shown that independent pharmacists continue to embrace and excel in the areas of patient care services, technology adoption, and customer satisfaction. This is an important continuing trend. From our perspective, for pharmacy to successfully evolve and adapt to current marketplace challenges, it will have to embrace a new business model that changes much of what goes on behind the pharmacy counter.

As trusted medication experts, pharmacists must step back from the dispensing role and take a more proactive role in the total health care of their patients. Pharmacists must be central to the solution of rising health care costs—not just rising prescription drug costs, but to overall health care costs. Pharmacists are uniquely positioned to improve adherence to life-saving pharmaceuticals that will ultimately limit the more costly expenditures of unnecessary physician visits, hospitalizations, and lost work days. By embracing this vital role, the future of pharmacy will be one in which no one will question the essential value of the community pharmacist to our health care system. Read more about NCPA's vision about the future of pharmacy on page 19.

We hope that the resilient nature of independent pharmacy shines through the pages of the *Digest*. It is important to remember that the economic doldrums of 2006 is not unprecedented in our industry. Independent pharmacists have proven over and over again throughout the last 75 years that they are resilient and will modify and reinvent their practices to adapt to economic challenge.

Independent pharmacists are laying the groundwork for this future even today as exemplified by the information contained in the *NCPA-Pfizer Digest*. NCPA, with the support of Pfizer, is pleased to continue the *Digest's* tradition of providing insightful information about independent pharmacy to the pharmacy marketplace. We are confident that you will find the information contained in the *Digest* an excellent resource on independent pharmacy.

Sincerely,

**Bruce Roberts, RPh**
Executive Vice President & CEO
National Community Pharmacists Association

**Tom McPhillips**
Vice President, U.S. Trade Group
Pfizer Inc

**Note to NCPA members:** The financial data of the *Digest*, including all benchmarking tables stratified by sales volume, geographic area, population size, and third party utilization, are available online at www.ncpanet.org/digest.



*NCPA-Pfizer* DIGEST · 2007

## TABLE OF CONTENTS

4 Foreward

5 Executive Summary

8 Methodology

9 The Independent Pharmacy Marketplace

12 Patient Care Services

- Medication therapy management
- Disease state management
- Interactions with other health care professionals
- Adherence monitoring
- Long term care services

19 Vision Statement for the Future of Pharmacy
Practice *by Bruce T. Roberts, RPh*

26 Front-End Offerings

27 Technology Trends

28 Third-Party Prescriptions







## Figures

1. Average annual sales (in thousands) per pharmacy location, 10-year trend • **6**
2. Pharmacy marketplace by pharmacy sales • **9**
3. Pharmacy locations (since 2003) • **9**
4. Retail pharmacies by state • **10**
5. Average hourly wages • **11**
6. Percentage of generic prescriptions dispensed • **11**
7. Summary of patient care services offered, 3-year trend • **12**
8. Summary of disease state management services, 3-year trend — Frequency of services offered in pharmacies that offer at least one disease state management service • **14**
9. Percentage of pharmacies charging a fee for disease state management services offered, 2006 • **15**
10. Pharmacist interactions with other health care professionals — Discussion with physician or other health care professional regarding patient's drug therapy • **16**
11. Pharmacist interactions with other health care professionals — Percentage of pharmacists offering recommendation for brand to generic drug change • **17**
12. Pharmacist interactions with other health care professionals — Percentage of pharmacists offering recommendation for therapeutic interchange • **17**
13. Type of adherence intervention offered by pharmacist performing adherence monitoring, 2006 • **22**
14. Actions taken by pharmacist with non-adherent patients, 2006 • **22**
15. Percentage of long term care (LTC) services offered (by type of service), 2006 • **24**
16. Average pharmacy sales — Prescription sales vs. all other sales, 3-year trend • **26**
17. Front end products offered, 3-year trend • **26**
18. Internet usage by pharmacies, 3-year trend • **27**
19. Percentage of pharmacies utilizing workflow technology, 2006 • **27**
20. Summary of third-party prescription activity, 5-year trend • **28**

## Tables

1. Independent pharmacy at-a-glance • **5**
2. Averages of pharmacy operations, 10-year trend • **6**
3. Pharmacy staff positions • **10**
4. Medication therapy management in independent pharmacy • **13**
5. Payment for medication adherence programs, 2006 • **22**
6. Long-term care beds served per facility • **24**
7. Technological capabilities • **27**
8. Third-party prescription activity, 5-year trend • **28**

# DIGEST FOREWORD

For 75 years, the *NCPA-Pfizer Digest* has provided a comprehensive report of the state of independent community pharmacy in the United States to the pharmacy marketplace and other interested stakeholders. Over the past seven decades, the *Digest* has grown and matured alongside the accompanying progress of independent pharmacy practice. Today, the *Digest* is looked to as more than just a resource for independent pharmacy owners; it is relied upon to demonstrate the economic vibrancy and innovative services found only in independent pharmacies to a variety of interested parties including the media, government, and lawmakers. We are proud that this year's *Digest* has grown again to become a more user-friendly and comprehensive industry snapshot of independent pharmacy for its variety of audiences.

This year's *Digest* is reflective of the technological advances reshaping our industry. The hard copy that you are now reading is accompanied by a complementary website for NCPA members that allows members to customize financial information for their pharmacy. Together, they are packed with more vital marketplace information than ever before. Designed in an easy-to-read format, the 2007 *NCPA-Pfizer Digest* provides extensive independent pharmacy facts and figures including:

- Average **independent pharmacy statistics,** pharmacy marketplace characteristics, historical trend analysis, store demographics and pharmacy employee information

- Key facts on the **patient care services** found in independent pharmacies including an in-depth look at disease state management programs and patient adherence programs as well as the emergence of medication therapy management services

- Expanded information on other **value-added services** in the nation's independent pharmacies including long term care, durable medical equipment/home health care, compounding and front end services

- New **technology trends** including electronic prescribing

- An in-depth look at **third-party trends** including Medicaid and Medicare Part D

This year's *Digest* is the first comparative look at the impact of Medicare Part D on the financial state of independent community pharmacy since the program's inception in January 2006. A detailed analysis of the new prescription drug benefit can be found on page 28. Also new this year is expanded information on the implementation of medication therapy management (MTM) by independent pharmacists, including participation opportunities and revenues generated. You can take a look at this interesting report on page 13.

Throughout its history, the *Digest* has always included a retrospective analysis of the financial state of independent pharmacy and has been the primary source of benchmarking data for community pharmacy owners. This critical functionality continues with an expanded arsenal of tools. NCPA members can obtain full financial information including comparison income statements and balance sheets online at www.ncpanet.org.

The *NCPA-Pfizer Digest* could not be published without the cooperation of hundreds of community pharmacists across the United States who confidentially complete the *Digest* surveys. NCPA would like to thank these pharmacists for providing the financial and demographic data to make the 2007 *Digest* possible. *NCPA-Pfizer Digest* information is obtained through mail and electronic surveys sent to all independent pharmacies across the United States. Survey data were compiled by the independent financial consulting firm, Business Resource Services, Inc., based in Seattle, Washington, and NCPA. The results were assessed for accuracy by the researchers at the University of Arkansas for Medical Sciences (UAMS) College of Pharmacy. The 2007 *NCPA-Pfizer Digest* is provided through the support of Pfizer Inc.



# EXECUTIVE SUMMARY

The *NCPA-Pfizer Digest* provides an annual overview of independent community pharmacy to the health of patients in the United States, including a comprehensive review of the financial operations of the nation's independent pharmacies for 2006.

An overview of the average independent pharmacy is provided at right. In general, the average independent community pharmacy location dispensed 61,087 prescriptions (196 per day) in 2006, up slightly from 61,071 in 2005. Interestingly, although other indicators in the pharmacy marketplace point to increased prescription volume in all sectors, the average prescription volume in independent pharmacies in 2006 did not show substantial growth. One possible reason for the plateau in average prescription volume dispensed per location could be increased scrutiny by pharmacy operators about which contracts from pharmacy benefit managers (PBM) they choose to sign. Another possible reason is the shift in the percentage of stores with sales over $6.5 million, which are traditionally higher prescription volume outlets. The percent of generic prescriptions dispensed increased to 58 (up from 56 percent in 2005).

Additionally, independents continue to operate multiple pharmacies. Thirty percent of independent owners have ownership in two or more pharmacies and the average number of pharmacies in which each independent owner has ownership is 1.69.

The *NCPA-Pfizer Digest* data have been collected for 75 years, providing the opportunity to look at long-term trends for independent pharmacies. While gross margins have fallen sharply over the last 10 years due to pressures from PBMs and government reimbursement reductions, average sales per pharmacy location have increased each year through 2005, for a 160 percent increase since 1996. For 2006, sales fell 3 percent as shown in Figure 1. Notable trends include:

- For the first time in the last 10 years, sales per location actually declined. Average sales per location for 2006 were $3.6 million, down 3.5 percent from 2005.
- Gross profit was at its lowest level of the past 10 years during 2004 at 22.1 percent. For 2005, average gross profit increased but declined again in 2006 to 22.8 percent.

## TABLE 1 · INDEPENDENT PHARMACY AT-A-GLANCE

| | 2006 |
|---|---|
| Average number of pharmacies in which each independent owner has ownership | 1.69 |

**Average number of prescriptions dispensed per pharmacy location**

| | | |
|---|---|---|
| New prescriptions | 28,089 | 46% |
| Renewed prescriptions | 32,998 | 54% |
| **Total prescriptions** | **61,087** | **100%** |

| Average prescription charge | $58.58 |
|---|---|

**Number of hours and days open per week per location**

| | |
|---|---|
| Hours open per week | 54 |
| Days open per week | 6 |

**Percentage of total prescriptions covered by:**

| | |
|---|---|
| Government programs (Medicaid or Medicare Part D) | 39% |
| Other third-party programs | 52% |

| Percentage of prescriptions dispensed generic | 58% |
|---|---|

- Payroll expenses as a percentage of sales increased slightly by 0.2 percent in 2006 to 13.6 percent, their highest level in the past 10 years.
- Operating expenses decreased slightly since 2005 (6.4 vs. 6.5 percent) after reaching their lowest level of 6.3 percent in 2004.

It is important to note that this year's *Digest* data reflect the marketplace in 2006, the implementation year for the Medicare Part D prescription drug benefit. During 2006, 24 percent of prescriptions in independent pharmacies were covered by Medicare Part D.

In 2006, independent pharmacies faced many challenges: both old and new. However, even in the most challenging times, independent community pharmacies continue to lead the way in community pharmacy practice and define the future of pharmacy practice. The industry has responded by expanding and diversifying their businesses to include enhanced patient care services, such as long-term care services, providing access to durable medical equipment products and training, and other valuable com-



**FIGURE 1** · AVERAGE ANNUAL SALES (IN THOUSANDS) PER PHARMACY LOCATION, 10-YEAR TREND

munity services. For years, independent pharmacies have been the nation's leaders in providing disease management services to patients with chronic health conditions such as diabetes, asthma, hypertension, and hyperlipidemia. Recently, thousands of independent pharmacies have embraced the concept of medication therapy management (MTM) services and integrated these services into their practices. Other pertinent information about the independent pharmacist's professional interactions include the following.

- Fifty-two percent of independent pharmacies indicate that they provide MTM and 48 percent have received reimbursement for their MTM services under Medicare Part D.

- Thirty-four percent of independent pharmacies perform adherence monitoring for their patients.

- Independent pharmacists consult with physicians 7.8 times daily on prescription drug therapy. This includes generic product recommendations and therapeutic interchange recommendations. Physicians in turn accept pharmacists' generic product recommendations 86 percent of the time and 75 percent of the time for other therapeutic recommendations.

Independent pharmacists have proven over and over again throughout the last 75 years that they are resilient and will modify and reinvent their practices to adapt to every economic challenge. They will continue to define the future of pharmacy by timely innovation and exceptional customer service. Most important, they continue to be vital health care providers to patients in communities of every shape and size including key locations in rural and underserved areas who bring dynamic leadership to their communities.

| **TABLE 2** · AVERAGES OF PHARMACY OPERATIONS, 10-YEAR TRENDS | | | | | | | | | |
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Cost of goods sold | 74.4% | 75.1% | 76% | 76.7% | 77% | 76.5% | 76% | 77.9% | 76.4% | 77.2% |
| **Gross profit** | **25.6%** | **24.9%** | **24%** | **23.3%** | **23%** | **23.5%** | **24%** | **22.1%** | **23.6%** | **22.8%** |
| Payroll expenses | 13.1% | 13.2% | 12.8% | 12.2% | 12.5% | 13.1 | 13.2% | 12.2% | 13.4% | 13.6% |
| Other operating expenses | 9.4% | 8.6% | 7.6% | 7.9% | 6.9% | 6.6% | 6.8% | 6.3% | 6.5% | 6.4% |
| **Total expenses** | **22.5%** | **21.8%** | **20.4%** | **20.1%** | **19.4%** | **19.7%** | **20%** | **18.5%** | **19.9%** | **20%** |
| **Net operating income** | **3.1%** | **3.1%** | **3.6%** | **3.2%** | **3.5%** | **3.8%** | **4%** | **3.6%** | **3.7%** | **2.8%** |

## *Profile* GARY GLISSON, RPh



"We get two comments almost always from our patients who pay for consults. They will either say: (1) Why has my doctor not told me about this before? or (2) Nobody's ever spent this much time talking to me about my health care or about my problems. That's why they place so much value on it."

—*Gary Glisson*

**WARD DRUG COMPANY**
*Nashville,*
*North Carolina*

lthough Ward Drug Company dates back to the turn of the century, owner Gary Glisson is continuously reinventing his pharmacy practice to promote patient care in Nashville, North Carolina. The pharmacy fills regular prescriptions, compounds veterinary and biomedical hormone replacement therapy (HRT) prescriptions, has a nutritional supplement practice, rents and sells medical equipment, fits diabetes shoes, fits some orthotics as a result of the certified pedorthotist (CPED) certification, counsels HRT and conducts heath and wellness consults. Many of his services offered such as diabetes shoe fitting and medical equipment sales, are recent patient care offerings that Glisson introduced because of a need to update his pharmacy's practice with the changing times.

The primary factor that leads Glisson to innovate his practice is the recognition of an established need. **The goal of the services is to meet patient need, improve profitability, and distinguish their pharmacy from their competition.**

| TOWN DEMOGRAPHICS | |
|---|---|
| Total Population | 15,345 |
| **Education** | |
| Less than High School | 2,955 |
| High School Grad or Higher | 6,785 |
| College Grad or Higher | 1,979 |
| Income (Median 1999) | $38,521 |

Glisson is open to new ideas, and when opportunity arises they take advantage of it.

One such opportunity has been patient consultations on various topics such as HRT, diabetes, and health and wellness. The pharmacy charges for consultations and they offer a money-back guarantee on those consultations. "On all of our consultations, we offer a 100% money-back guarantee—if you're not satisfied, we won't charge you," Glisson says. **"We've never had anyone ask for their money back."**

# METHODOLOGY

Independent pharmacy owners, having completed at least one entire year of operations, were invited to participate in this study. The study consisted of a mailed and an electronic survey. The mail survey focused on financial information, including income statement and balance sheet questions. The electronic survey focused on demographics and non-financial information. Pharmacy owners or their designees were asked to complete the surveys. We have exercised the utmost professional care compiling the information received. While we have tested the information for clerical accuracy, the data supplied were not necessarily based on audited financial statements. Neither NCPA nor Business Resource Services, Inc. makes any assurances, representations, or warranties with respect to the data upon which the contents of this report were based. The information upon which the 2006 portion of the study is based was from fiscal years of December 31, 2005 through April 30, 2007, with 83 percent of the responses reporting for the year ending December 31, 2006. Results from prior issues of the *Digest* have been incorporated with the 2006 results to facilitate assessing industry trends.



# THE INDEPENDENT PHARMACY MARKETPLACE

Independent pharmacies are all pharmacist-owned, privately-held businesses but they vary in practice setting. They include single-store operations, and other independent, pharmacist-owned operations (such as chain, franchise, compounding, long-term care (LTC), specialty, and supermarket pharmacies). At the end of 2006, there were 23,348 independent pharmacies. 2006 marks the first decline in independent pharmacy store locations in over five years.

It is important to note that while 1,152 independent pharmacies closed during 2006, the independent pharmacy industry still represents 40 percent of all retail pharmacies in the US and an $84 billion marketplace.

Other notable characteristics about independent pharmacies:

- Over 58 percent of independent pharmacies are located in an area with a population of less than 20,000.
- In 2006, 19 percent of pharmacies had total sales over $6.5 million, 30 percent with sales between $3.5 and $6.5 million, 22 percent with sales between $2.5 and $3.5 million, and 29 percent under $2.5 million.
- The average independent pharmacy is open six days a week and 54 hours overall per week.
- While over 80 percent of independent pharmacies are considered small businesses according to criteria set by



**FIGURE 2** · PHARMACY MARKETPLACE BY PHARMACY SALES

- Independent (23,348)
- Traditional Chain (18,709)
- Supermarket (8,988)
- Mass Merchant (7,433)

**Note:** Mail order pharmacy represents $50B but was not considered as retail sales in this figure

the Small Business Administration (SBA), on average, they employ 13.4 employees per location (an increase of 0.6 FTE in 2006).

- Staff pharmacist wages increased 6 percent to $47.04 (compared to $44.37 in 2005) and pharmacy technician wages increased 1.4 percent to $12.51.
- The 2007 *Digest* pharmacy's cost of dispensing for all pharmacies is $10.63, up from $10.53 last year.
- As shown in Figure 6, generic dispensing increased again in 2006 to 58 percent of total prescriptions.

**FIGURE 3** · PHARMACY LOCATIONS (SINCE 2003)



● Independents | ◈ Traditional Chain | ● Supermarket | ◉ Mass Merchant

**TABLE 3 · PHARMACY STAFF POSITIONS**

|                                                  | 2004                | 2005                | 2006                |
|--------------------------------------------------|---------------------|---------------------|---------------------|
| Non-owner pharmacists                            | 1.5                 | 1.7                 | 1.9                 |
| Technicians                                      | 3.5                 | 4.3                 | 4.6                 |
| Other positions                                  | 4.5                 | 5.7                 | 5.6                 |
| **Total non-owner employees**                    | **9.5**             | **11.7**            | **12.1**            |
| Working owners—pharmacists and other positions   | 1.1                 | 1.1                 | 1.3                 |
| **Total workforce**                              | **10.6 FTE Employees** | **12.8 FTE Employees** | **13.4 FTE Employees** |

**FIGURE 4 · RETAIL PHARMACIES BY STATE**



LEGEND
- **C** Traditional Chain
- **S** Supermarket
- **M** Mass Merchant
- **I** Independent

**Washington**
- C 301  S 262
- M 160  I 334

**Montana**
- C 13
- S 39
- M 32
- I 136

**North Dakota**
- C 30
- S 0
- M 0
- I 50

**Oregon**
- C 119
- S 127
- M 111
- I 221

**Idaho**
- C 38
- S 47
- M 44
- I 128

**Wyoming**
- C 9
- S 25
- M 24
- I 40

**South Dakota**
- C 23
- S 15
- M 27
- I 80

**Nevada**
- C 182
- S 118
- M 69
- I 68

**Utah**
- C 52
- S 107
- M 76
- I 149

**Colorado**
- C 150
- S 282
- M 128
- I 191

**Nebraska**
- C 69  S 32
- M 59  I 262

**Hawaii**
- C 35
- S 6
- M 21
- I 106

**California**
- C 1,960
- S 686
- M 486
- I 2,117

**Kansas**
- C 95  S 93
- M 93  I 307

**Alaska**
- C 0
- S 23
- M 22
- I 38

**Arizona**
- C 355
- S 271
- M 159
- I 168

**New Mexico**
- C 56
- S 50
- M 58
- I 98

**Oklahoma**
- C 150
- S 56
- M 123
- I 452

**Texas**
- C 1,102
- S 715
- M 553
- I 1,305



**FIGURE 5** · AVERAGE HOURLY WAGES

**FIGURE 6** · PERCENTAGE OF GENERIC PRESCRIPTIONS DISPENSED

# PATIENT CARE SERVICES

Independent community pharmacists are leaders in providing patient care. One of the hallmarks of independent community pharmacy has long been the service that patients receive. As Medicare Part D continues to be implemented, independent pharmacists are positioned best to provide medication therapy management (MTM) services to patients. As shown on pages 12–15, the number of independent community pharmacists that are providing patient care services and disease state management services continues to increase.

## HIGHLIGHTS OF PATIENT CARE SERVICES IN INDEPENDENT PHARMACIES:

- ◈ The most offered service is nutrition, followed by patient charge accounts and delivery.

- ◉ Similar to last year, 79 percent of pharmacies indicated that they provide compounding services, compounding five to six prescriptions per day.

- ◈ As sales volume increases, generally more specialty services are offered.

- ◈ The top two services experiencing the largest growth in 2006 were scheduling patient appointments (23 percent increase) and pain management (20 percent increase).



**FIGURE 7** · SUMMARY OF PATIENT CARE SERVICES OFFERED, 3-YEAR TREND

● 2006 | ◐ 2005 | ● 2004

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Nutrition** | 91% | 88% | 89% |
| **Delivery** | 86% | 88% | 87% |
| **Patient Charge Accounts** | 86% | 84% | 85% |
| **Compounding** | 79% | 68% | 71% |
| **Herbal Medicine** | 75% | 63% | 72% |
| **Speak for Local Organization** | 67% | 58% | 52% |
| **Hospice** | 62% | 49% | 47% |
| **Durable Medical Goods** | 61% | 74% | 64% |
| **Schedule Patient Appointments** | 60% | 37% | 29% |
| **Health Screenings** | 58% | 55% | 51% |
| **Ostomy** | 52% | 54% | 55% |
| **Conduct Patient Education Programs** | 50% | 54% | 47% |
| **Assisted Living** | 48% | 53% | 42% |
| **Pain Management** | 45% | 25% | 25% |
| **Long-term Care** | 30% | 37% | 31% |
| **Home Infusion** | 11% | 9% | 8% |

⊢ 0%         50%         100% ⊣

## Medication Therapy Management

Medication therapy management (MTM) programs are designed to optimize the benefits of prescribed drugs, improve medication use, reduce the risk of adverse drug events and drug interactions, and increase patient adherence to prescribed regimens. Pharmacists are ideally positioned to administer MTM programs for their patients at the community pharmacy—the most accessible health care resource. The Medicare Part D prescription drug benefit requires most participating insurers to develop MTM programs for certain high risk beneficiaries. These programs may or may not involve community pharmacists. In 2006, the majority did not include the services of community pharmacists.

Preliminary data on the first year of MTM implementation are included in Table 4:

**TABLE 4** · Medication Therapy Management in Independent Pharmacy

|  | 2006 |
|---|---|
| Percentage of pharmacies offering MTM | 52% |
| Average charge for MTM | $40 |
| Percentage of pharmacies receiving MTM reimbursement under Medicare Part D | 48% |



## DISEASE STATE MANAGEMENT

In the pharmacy community, there is a great deal of attention being focused on the issue of compensating pharmacists for pharmacy-related services such as disease state management services. Numerous studies have documented that pharmacist intervention can significantly reduce overall health care costs. As documented on pages 14 and 15, independent pharmacists continue to lead the industry by providing these valuable services regularly and nationwide.

### HIGHLIGHTS OF DISEASE STATE MANAGEMENT IN INDEPENDENT PHARMACIES:

- In 2006, 40 percent of independent pharmacies offered at least one disease state management service.

- The top three disease state management services offered are blood pressure monitoring, diabetes training, and immunizations.

- To provide these services, a pharmacist is often required to use diagnostic machines and supplies. For the pharmacy to cover the expense of the machines and supplies, the pharmacist is likely to charge the patient. A majority of pharmacists bill separately for lipid monitoring, osteoporosis services, asthma management, immunizations and anticoagulation monitoring.

- Pharmacists bill both patients and third-party providers, charging based on service provided, time needed to perform the intervention, and value of service.

- Seventeen percent of pharmacies indicate they perform under a collaborative practice agreement — for services like pain management, immunizations, hormone replacement therapy, strep throat testing, emergency contraception, diabetes monitoring, and lipid monitoring.



**FIGURE 8** · SUMMARY OF DISEASE STATE MANAGEMENT SERVICES, 3-YEAR TREND— *Frequency Services Offered in Pharmacies that Offer at Least One Disease State Management Service*



● 2006 | ● 2005 | ● 2004

| | |
|---|---|
| **Blood Pressure Monitoring** | 69% / 64% / 62% |
| **Diabetes Training** | 50% / 51% / 51% |
| **Immunizations*** | 43% |
| **Lipid Monitoring** | 19% / 15% / 14% |
| **Weight Management*** | 14% |
| **Smoking Cessation*** | 14% |
| **Osteoporosis** | 11% / 9% / 10% |
| **Asthma Management*** | 10% |
| **HIV/AIDS Services** | 1% / 4% / 5% |
| **Anticoagulation Monitoring** | 1% / 3% / 3% |
| **Cancer Awareness Education*** | 1% |

0%        50%        100%

*Note: Data not available for 2004 and 2005.

**FIGURE 9** · PERCENTAGE OF PHARMACIES CHARGING A
FEE FOR DISEASE STATEMENT MANAGEMENT
SERVICES OFFERED, 2006

## INTERACTIONS WITH OTHER HEALTH CARE PROFESSIONALS

An independent community pharmacist is a vital link between the patient and the entire health care system. Pharmacists fulfill a major need in most communities because of the unique accessibility and the knowledge about medications that these professionals possess and share with their patients. Pharmacists also fulfill an important role on the health care team by serving as a link between the physician and patient. Physicians and other health care providers continue to trust and value the recommendations offered by independent pharmacists.

**FIGURE 10** · PHARMACIST INTERACTIONS WITH OTHER HEALTH CARE PROFESSIONALS—
*Discussion with Physician or other Health Care Professional Regarding Patient's Drug Therapy*







**FIGURE 11** • PHARMACIST INTERACTIONS WITH
OTHER HEALTH CARE PROFESSIONALS—
*Percentage of Pharmacists Offering Recommendation for
Brand to Generic Drug Change*



**FIGURE 12** • PHARMACIST INTERACTIONS WITH
OTHER HEALTH CARE PROFESSIONALS—
*Percentage of Pharmacists Offering Recommendation
for Therapeutic Interchange*



## HIGHLIGHTS OF INTERACTIONS WITH OTHER HEALTH CARE PROFESSIONALS IN INDEPENDENT PHARMACIES:

- Independent pharmacists consult with physicians or other health care professionals 7.8 times daily regarding prescription drug therapy.

- Over 90 percent of independent pharmacists recommend brand to generic drug changes to other health care professionals.

- 86 percent of these recommendations were accepted by other health care providers and a change to a less expensive generic medication was made.

- A 75 percent acceptance rate demonstrates that these pharmacist recommendations are highly valuable and trusted by other health care professionals.



## *Profile* JOHN SHERRER, RPh





"When someone comes to us with a challenge or a problem, we turn it into an opportunity."

—*John Sherrer*

**HOWELL MILL PHARMACY**
·····················
*Atlanta, Georgia*

ndependent pharmacists are known for thinking outside the box. John Sherrer, RPh has taken that to heart as owner of Howell Mill Pharmacy in Atlanta, Georgia. Howell Mill Pharmacy offers traditional pharmacy services along with immunizations, compounding services, dyslipidemia services, prescription delivery, unit-dose packaging, and patient counseling services. Howell Mill Pharmacy also offers more progressive services, which are not common to most community pharmacies. These services include the preparation of ambulance boxes for local ambulance services, contract services, emergency boxes for physician's offices, residential treatment, and consulting work to maintain joint commission requirements for facilities.

One of the most innovative is the emergency medical service. Howell Mill Pharmacy has contracts to supply ambulance drug boxes for the City of Atlanta fire department and Fulton County fire department. These ambulance boxes contain the supply of medications necessary to have aboard emergency medical vehicles. Sherrer recalls that the opportunity presented itself when one of his friends approached him years ago about the problems emergency medical technicians were having with ambulance boxes. Howell Mill Pharmacy figured out a way to remedy the problems that existed in stocking these boxes.

According to Sherrer, **"It was a learning process...a work in progress."** The ambulance box service was not fully de-

| TOWN DEMOGRAPHICS | |
|---|---|
| Total Population | 53,591 |
| **Education** | |
| Less than High School | 11,776 |
| High School Grad or Higher | 18,811 |
| College Grad or Higher | 10,310 |
| Income (Median 1999) | $28,589 |

veloped before implementation. Steps in the learning curve included gaining knowledge about the regulations and the ambulance business. Howell Mill Pharmacy has been supplying the ambulance boxes for over 15 years now.

Sherrer's approach to implementing new services is based on the premise that "We don't have customers, we have patients." Many of the services that they provide are community service driven. For Sherrer, it is not financial pressures that are their main reason for change or innovation. **Instead, it is the drive of the owner and employees to provide services to patients and the community.**

# VISION STATEMENT

_for the_

# FUTURE OF PHARMACY PRACTICE

## _by_ BRUCE T. ROBERTS, RPH.



"The U.S. health care system is broken," is a statement made repeatedly by policy makers and pundits. Total health care costs are growing at unsustainable rates. Most experts agree: Something's got to give. That's not a newsflash that most are hearing for the first time. Pharmaceuticals have been a lightning rod for criticism from the government and from the public mostly due to the perception that prices are too high and that something needs to be done to contain the amount paid for pharmaceuticals. **Ironically, one of the keys to lowering health care costs is to** _increase_ **the appropriate use of pharmaceuticals.** The cost of pharmaceuticals is a bargain relative to the costs of surgery or a stay in a hospital or long term care facility. Rather than limiting access to medications, the dialogue should center on how appropriate mediation use is increased so that quality of life is improved and unnecessary hospitalizations are reduced — even if that means increasing our investment in medications in order to decrease overall health care costs.

Pharmacists are well-positioned to align activities between the consumer, the pharmacist, the payor, and the pharmaceutical manufacturer. Though most pharmacists have a minimum six years of university level training focused on medications and its effect on the body, our financial incentives are too often focused heavily on the medication dispensing process. Technology advances and the commoditization of pharmaceutical products threaten a reward system strictly based on product distribution. Recognizing the pharmacist's expertise and strategic placement as the last health care provider the patient sees before they take their medicine are keys to realizing our value as pharmacists, as well as the pharmaceutical product being dispensed.

Simply put, the health care system is not broken but instead has lost its way. At over 2 trillion dollars in total spending, the issue is not necessarily the amount of money _being_ spent, it's more about how the money can be _best_ spent. The key to curing our country's health care illness is to develop business models that align incentives that drive better health care for the patient, and improve health outcomes.

For years the U.S. health care system has suffered from misaligned incentives. Fiscal pain is one stimulus for change and the pain level is intensifying. Pharmacies are feeling enough pain to put them on the edge of triggering a tipping point that will define the profession for decades to come. Pressure for change from consumers, payors,



and government also continues to mount everyday on the pharmaceutical industry. Perhaps because of their deeper resources, the pain threshold for the pharmaceutical industry will be much higher than that of pharmacy but at some point the price pressure will escalate to the point where the industry must have a new model. Both sectors have the option of doing nothing and letting government and others decide their fate, or we can step forward now to develop and articulate a clear vision for pharmacy and the use of pharmaceuticals that achieves greater results for the payor, and patient.

## QUALITY COUNTS

The health care system spends more on the _inappropriate_ use of prescription medications than it does on the medications themselves. Positively affecting this dynamic has the potential to single handedly save the health care system hundreds of billions of dollars and improve the health of millions of patients. Pharmacists are an integral

part to making sure that patients use their medications as prescribed. Where do the overwhelming majority of patients go to obtain their prescriptions? What health care provider is trained to be a specialist in the use and effect of medications? Of course the answer to both of these questions is the community pharmacist. However, pharmacists have allowed themselves to be a forgotten link in the health care distribution system. As different distribution models have developed, the pharmacist is at risk of their role being reduced by technology or other healthcare providers. At too many community pharmacies and chain drugstores, a consistent, quality experience at the pharmacy counter is missing from the patient pharmacy visits. This is at least partially due to time occupied navigating various PBM plans taking away valuable time that could be spent with patients. Managing the patient while in and after they have left the pharmacy is a golden opportunity for the health care system that has largely been ignored. A reactive approach to managing the consumer's use of medications has produced less than optimal results as too many patients have not taken or not used their medication appropriately leading to higher costs and mortality. Reaching out to the consumer after they have left the pharmacy with their prescriptions is vital to increasing the value of the medication. The pharmacist can be a centerpiece to reaching out to the consumer. Pharmacists have the knowledge and training to help patients use their medication most effectively. They see the patient on a regular basis, in many instances they have a relationship with the patient, and they have the patient's medication profile and contact information. There is too much on the line to rely on happenstance that the full value of the medication will be realized after it leaves the pharmacy. The time is now to consider ways in which retail pharmacy and the pharmaceutical industry can work together to reach out to consumers. Together, we have the products, information, and training necessary to maximize medication value.

ucts provide, minimized the value of the expertise of the pharmacist and made both sectors vulnerable to increased government regulation and/or decreased reimbursement. Reversing this perception is essential for the value of medications to be recognized and respected for its positive quality of life impact they can have when used appropriately.

Retail pharmacy has contributed to the perception of medications as a commodity by not leveraging the education of the pharmacist as a purveyor of medication expertise, and a provider of wellness and health care. Pharmacy has a decision to make going forward: Will it adopt a pharmacist-centric business model that leverages the pharmacist's unique expertise or, will it get deeper into the zero-sum game of trying to be the low cost provider of commodities? For pharmacists to continue to have a role in retail pharmacy, there is only one answer — pharmacy must use the pharmacist as the differentiator; one that features a highly educated, licensed health care provider in a retail environment providing access and expertise to consumers.

## COMMODITIZATION OF PHARMACEUTICALS

The commoditization of medications by consumers and payors has decreased the perceived value that these prod-

## TRANSPARENCY

Perhaps one of the most surprising developments in the pharmaceutical industry during the last decade is the evolution of consumer attitudes toward that industry. Instead of being highly respected and held in high esteem, multiple surveys show that consumers view the industry in the same lowlight as politicians and used car salesman. This surprising perception seems ironic at a time when patients are living longer, more active lives in no small part due to advances in medications. Prescription costs are more under the microscope of public perception than other health care costs is because even though most patients have some type of prescription insurance, they pay more out of pocket for medications than any other health care expenditure. Despite these medication expenditures, medications account for less than one-sixth of health care costs.

While pharmacists are consistently rated number one or two as being the most trusted health care provider, they have

been the focus for much of the cost cutting actions taken by government. Medicare Part D and changes to Medicaid along with draconian PBM reimbursement have forced the margins of pharmacies to new lows. Pharmacy margins were already micro-thin and can sustain very few additional cuts. Rather than be looked at as a source of costs, pharmacists should be looked at as cost savers who save the health system dollars and improve patient outcomes.

The pharmaceutical industry must gain back the trust it has lost with the American people. Pharmacy, conversely, has the trust of the people but has faced withering government policies. Together the two sectors can help each other be recognized for the value they provide, but their presentation must be perfectly clear and open to the scrutiny to all who have questions about their business practices and the impact they have on the health outcomes of consumers.

## CONCLUSION

There is little debate that the health care system and the business models of the pharmaceutical industry and pharmacy will change. We can help to influence that change, or resist change and have the conversion forced upon us. While the casual observer in the public may perceive the industry and pharmacy as interchangeable or at least tightly linked, ironically, we are too often not speaking with one voice. Moving forward it is only through aligning the incentives of everyone in the health care system that the pharmaceutical industry and pharmacy will assure control of their own destinies. Working together with



mutually beneficial incentives, the industry can continue to discover unique and innovative pharmaceuticals and recognition of its value must be better quantified in order to gain greater acceptance by consumers. Transparency in the industry is important for consumers to regain the trust they once had in pharmaceutical research

manufacturers. Likewise, pharmacy must also dramatically change its business model. Technology enabling the dispensing of prescriptions at a low cost in a community pharmacy is available and inevitable. Pharmacists are trained to be medication experts but now — in a classic 'chicken or the egg' scenario — must use that knowledge to make sure patients are using their prescription medication appropriately. Importantly, pharmacists must begin being paid for these services they are distinctively able to provide because of their unique knowledge and placement as the

last health care provider the patient sees before taking their medication.

The pharmaceutical industry and pharmacy have naturally aligned objectives and desires — to help the patient achieve better outcomes. Pharmacy must establish their value in making sure the consumer uses the medication appropriately, and the pharmaceutical industry must make sure that all of their research does not go for naught when it comes time for the patients to take their medications. Long term success is available for our industries that will echo throughout all of health care if incentives are aligned and we are willing to collaboratively act upon the need for change.



## MEDICATION ADHERENCE

Nearly three out of every four consumers admit they do not always take their prescription medications as directed. The economic impact of patient non-adherence has been estimated at nearly $100 billion per year in increased hospitalizations, doctor visits, lab tests, and nursing home admissions. Community pharmacists are uniquely positioned to improve medication adherence. New this year, the *Digest* investigated the prevalence and characteristics of pharmacy-based medication adherence monitoring services.

### HIGHLIGHTS OF MEDICATION ADHERENCE PROGRAMS IN INDEPENDENT PHARMACIES:

- ◇ Over one third of pharmacies indicate they perform adherence monitoring as a value-added service for their patients.

  - ◉ Thirty-nine percent of pharmacies perform adherence checks on a monthly basis, which correlates closely with the fact that a majority of maintenance medications are dispensed for 30-day supplies.

  - ◉ Fifty-five percent of pharmacies perform adherence checks on a patient-by-patient basis, individualizing the service based on the needs of the particular patient.

- ◇ Over two thirds of pharmacists offering adherence monitoring utilize face-to-face interactions with the patient as a means of intervention.

- ◇ Twenty six percent of pharmacies offer special packaging (such as blister packs or pill reminders) as a solution to some non-adherence problems.



**FIGURE 13** · TYPE OF ADHERENCE INTERVENTION OFFERED BY PHARMACIST PERFORMING ADHERENCE MONITORING, 2006



**FIGURE 14** · ACTIONS TAKEN BY PHARMACIST WITH NON-ADHERENT PATIENTS, 2006

| TABLE 3 · PAYMENT FOR MEDICATION ADHERENCE PROGRAMS, 2006 | |
| --- | --- |
| Percentage of pharmacies charging for adherence monitoring | 13% |
| Price range charged | $10–30 |
| Percentage paid by third-party provider for adherence services | 9% |

## *Profile* STANLEY DEVINE, RPh and ROGER BEARDAIN, RPh



"The pharmacy essentially shifts the onus of compliance from a patient responsibility to a patient-pharmacist interaction. It is the pharmacy team leading the compliance with drug therapy. Our first priority is to make sure patients had their prescriptions when they needed them."

*—Stanley Devine and Roger Beardain*

**PHARM NET**

Winona, Mississippi

tanley Devine and Roger Beardain, were practicing chain pharmacy prior to opening Pharm Net in 2000. When working as retail pharmacists for a chain pharmacy, the two owners recognized the hectic pace at which they worked, the sporadic refilling of prescriptions, and the inability of patients to visit the pharmacy regularly to have prescriptions filled and refilled. **It was the sporadic refilling of prescriptions that led to the recognition of a need.** There were rural patients who were unable to get to the pharmacy to get their medications in a timely manner to allow for continued compliance of proper drug therapy.

Stanley Devine and Roger Beardain are now striving to improve patient compliance with drug therapy. In fact, compliance enhancement is central to the business model for their pharmacy, Pharm Net, located in Winona, MS. The pharmacy offers the traditional service of filling prescriptions but with an extensive compliance enhancement service. To track the compliance with all of the prescriptions filled, they put patients on a regular monthly schedule of filling prescriptions.

| TOWN DEMOGRAPHICS | |
|---|---|
| **Total Population** | 7,964 |
| **Education** | |
| Less than High School | 2,151 |
| High School Grad or Higher | 2,797 |
| College Grad or Higher | 864 |
| Income (Median 1999) | $25,724 |

Pharm Net fills very few walk-in prescriptions and do not sell any OTCs unless a physician writes a prescription for it. The prescriptions are delivered to the patients, using a contract delivery service. A boon for the pharmacy is the decrease in required on-hand inventory. By lining up the patient's prescriptions so that they are refilled at the same time, it increases the efficiency of the filling process and decreases the need for on-hand inventory. The pharmacy team is able to fill 200-300 prescriptions per day by around 1:00 PM and then work on patient issues and diabetes disease state management services (another service provided) the rest of the day. Devine says they are **filling 30 percent more prescriptions than they did in the chain setting in half the time and with very few of the headaches.**

## LONG-TERM CARE SERVICES

Independent community pharmacists play an important role in caring for the nation's 37 million seniors. They provide pharmacist care for seniors in nursing homes, assisted living facilities, hospice, and home-based care. They also provide many specialty services for seniors like nutrition assessment and support, intravenous therapy, durable medical equipment, ostomy, and pain management. By thinking innovatively, independent community pharmacists provide needed services and improve their business financially.

### HIGHLIGHTS OF LONG-TERM CARE SERVICES IN INDEPENDENT PHARMACIES

- ☞ Hospice and assisted living are the most offered long-term care services offered by independent pharmacies.

- ☞ Thirty percent of independents service a long-term care facility, occupying on average 166 beds.

- ☞ The average number of pharmacy consulting hours is nine hours per month.

**TABLE 6 · LONG-TERM CARE BEDS SERVED PER FACILITY**

| Type of Facility | Average Number of Beds |
|---|---|
| LTC Facility | 166 |
| Assisted Daily Living | 96 |
| Senior Care | 69 |
| Correctional Facility | 293 |
| Hospice | 29 |



**FIGURE 15** · PERCENTAGE OF LONG-TERM CARE SERVICES OFFERED (BY TYPE OF SERVICE), 2006



80% —

60% —

48%    48%

40% —

30%

20% —    12%    11%

Assisted Daily Living    Hospice    LTC Facility    Senior Care    Correctional Facility

0% —

## *Profile* GUY WILSON, RPh



"A major reason for offering the services we do is because we find it very satisfying to take care of our patients."

—*Guy Wilson*

**WILSON PHARMACY**

*Johnson City, Tennessee*

wenty years ago Wilson Pharmacy was a rock solid traditional pharmacy, until its introduction into the intravenous (IV) infusion business. Today, the pharmacy, located in Johnson City, occupies 10,000 square feet of space with an additional 7,000 square feet for office space in a building adjacent to the pharmacy. The modern Wilson Pharmacy offers comprehensive health care with a wide range of products and services available for patients in their home, nursing home, or assisted living facility.

The services offered to these long-term care facilities include formulary management, automated medication packaging, drug regimen reviews, and process improvement and quality assurance activities. Wilson Pharmacy provides infusion services for total parenteral nutrition, chemotherapy, antibiotics, hydration, blood modifiers, pain management, and respiratory therapy. This service complements the home health services, in which they provide skilled nursing care, home health aids, occupational therapy, physical therapy, speech therapy, medical social work, and private-duty services.

Three Wilson Pharmacy locations employ 16 full-time pharmacist positions and 40 technicians. In addition to

| TOWN DEMOGRAPHICS | |
|---|---|
| Total Population | 31,603 |
| **Education** | |
| Less than High School | 5,212 |
| High School Grad or Higher | 12,221 |
| College Grad or Higher | 7,876 |
| Income (Median 1999) | $30,951 |

pharmacists and technicians, the pharmacies' professional staff includes a variety of **health care clinical specialists, customer service representatives, case managers, and reimbursement specialists.**

According to Wilson, "A major reason for offering the services we do is because we find it very satisfying to take care of our patients. The long-term-care services grew out of relationships with nursing homes. **Other services grew out of relationships with the business community.** Our involvement in the community, (eg, the Chamber of Commerce, people, other pharmacists, and doctors) allowed us to see the need that people and organizations have for the services that we offer."

# FRONT-END OFFERINGS

Independent community pharmacies not only provide prescription products and services, but they also offer an array of nonprescription products and services, including cough and cold medications, antacids, vitamins, smoking cessation products, and ear and eye products.

## HIGHLIGHTS OF FRONT-END SALES IN INDEPENDENT PHARMACIES:

- In 2006, most independent pharmacies have limited OTC sales — accounting for only 7.6 percent of total sales overall.

- Of the categories measured, greeting cards are the most common non-prescription front-end offering.

- Greeting cards, snacks, seasonal merchandise, diabetes food, and ATM services have experienced an increase since 2005.

**FIGURE 16** · AVERAGE PHARMACY SALES—PRESCRIPTION SALES VS. ALL OTHER SALES, THREE-YEAR TREND



● Prescription Sales | ● All Other Sales

**FIGURE 17** · FRONT-END PRODUCTS OFFERED, THREE-YEAR TREND



● 2006 | ● 2005 | ● 2004

| | |
|---|---|
| Greeting Cards | 81% / 75% / 77% |
| Snacks* | 80% / 77% / 78% |
| Seasonal Merchandise | 63% / 58% / 58% |
| Diabetes Food | 54% / 50% / 54% |
| Gift Department | 54% / 58% / 60% |
| Cosmetics | 32% / 39% / 44% |
| Photo Processing | 18% / 37% / 44% |
| ATM Machine | 9% / 6% / 5% |

**Note:** Snacks figure for 2006 includes beverages and snacks. Figures for 2004 and 2005 only account for snacks.

# TECHNOLOGY TRENDS

In order to remain competitive in today's marketplace, the use of technology in independent community pharmacy practice continues to increase. More and more, independents are taking advantage of new and emerging technology to enhance pharmacy efficiency, reduce costs, improve patient care, and boost profits.

## HIGHLIGHTS OF TECHNOLOGY TRENDS IN INDEPENDENT PHARMACIES:

- ◌ Independents most often access the Internet and e-mail at the pharmacy.

- ◌ Over half of independent pharmacies have a Web site, with some offering the option of ordering prescription refills or OTC products on-line.

- ◌ Up from last year, over half of independent pharmacies indicate that they are connected for electronic prescribing, with almost two percent of their prescriptions received electronically.

**TABLE 7** · TECHNOLOGICAL CAPABILITIES

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| **Internet Connectivity** | | | |
| Have Internet access | 99% | 100% | >99% |
| Have e-mail access | 97% | 99% | >99% |
| **Electronic Prescribing Use** | | | |
| Connected to receive electronic prescriptions | *** | 44% | 51% |
| Percent of prescriptions received electronically | *** | *** | 1.9% |



**FIGURE 18** · INTERNET USAGE BY PHARMACIES, THREE-YEAR TREND

● 2006 | ◉ 2005 | ◎ 2004

| | |
|---|---|
| Order Rx Items from Primary Wholesaler | 85% / 77% / 63% |
| Read Personal e-mail | 79% / 68% / 63% |
| Read Professional Newsletters | 79% / 61% / 59% |
| Complete CE | 59% / 59% / 52% |
| Order Non-Rx items from Vendors | 57% / 51% / 39% |
| Order Rx Items from Generic Wholesaler | 38% / 38% / 27% |

├ 0%        50%        100% ┤



**FIGURE 19** · PERCENTAGE OF PHARMACIES UTILIZING WORKFLOW TECHNOLOGY, 2006

80% —

60% —

49% — Point of Sale

40% — 39% Telephone IVR

20% — 19% Automated Dispensing Counter

**Automated Dispensing Robotics** 9%

0% —

# THIRD-PARTY PRESCRIPTIONS

The most significant external pressure on the business of independent pharmacy is third party prescription coverage and the plans that administer drug coverage, pharmacy benefit managers (PBMs). Prescription drug coverage continues to grow yearly, significantly increasing over the last five years. For community pharmacies, public and private third-party payers often dictate prescription drug reimbursement payments and introduce additional operational and financial challenges on the pharmacy. However, the majority of consumers are satisfied with their prescription drug coverage and the cost savings realized by employer and government coverage. For most community pharmacies, achieving a functional and fair working relationship with third-party payers is essential to attain long-term profitability and overall business survival.

## HIGHLIGHTS OF THIRD-PARTY TRENDS IN INDEPENDENT PHARMACIES:

- ◌ Over 90 percent of prescriptions are covered by third-party contracts—39 percent are covered by government programs (Medicare and Medicaid).

- ◌ Implemented in January 2006, Medicare Part D now covers 24 percent of prescriptions filled in the average independent pharmacy.

- ◌ Over 6 million Medicaid patients moved to Medicare Part D in January 2006, dropping the percentage of Medicaid-covered prescriptions to 15 percent.

- ◌ A larger percentage of independent pharmacies accept all Medicare plans than normally observed with private third-party plans — 30 percent versus 11 percent.



**FIGURE 10** • SUMMARY OF THIRD-PARTY PRESCRIPTION ACTIVITY, FIVE-YEAR TREND

- ● Medicaid
- ◉ Medicare Part D
- ◉ Other Third-Party
- ● Non Third-Party

**TABLE 8** • THIRD-PARTY PRESCRIPTION ACTIVITY, FIVE YEAR TREND

|      | Medicaid | Medicare Part D | Other Third-Party | Total Third-Party Prescriptions |
|------|----------|-----------------|-------------------|---------------------------------|
| 2002 | 25%      | --              | 55%               | 80%                             |
| 2003 | 24%      | --              | 56%               | 80%                             |
| 2004 | 27%      | --              | 58%               | 85%                             |
| 2005 | 23%      | 5%*             | 59%               | 87%                             |
| 2006 | 15%      | 24%             | 52%               | 91%                             |

**\*Note:** 2005 Medicare Part D percentage equals Medicare Drug Discount Card percentage of prescriptions filled







Retail Pharmacies by State



## FTC baulks at antitrust exemption for pharmacies

**12 November 2007**

**A law that would give small independent pharmacies immunity from US antitrust laws is facing concerted opposition in Congress.**

The law, introduced by New York Democratic representative **Anthony Weiner**, would give independent pharmacists the same basic powers as US labour unions - including the right to bargain collectively with health plans for drugs and other services. Independent pharmacists claim drug companies and pharmacy benefit managers charge high prices which force them to sell drugs at a loss.

The Federal Trade Commission has opposed the bill, labelled House Resolution 971, saying at a congressional hearing on 18 October that the bill would give health care providers a licence to engage in price fixing and boycotts to extract higher payments from insurance companies. "The exemption threatens to raise prices to consumers, especially seniors, for much-needed medicine," FTC deputy director David Wales said at the hearings.

The FTC has consistently rejected such measures in the past, Wales said, because such exemptions would have only benefited a small group while passing on the larger costs to consumers and the government. The Antitrust Modernisation Commission, which has evaluated the application of antitrust laws, has cautioned Congress against approving such exemptions, Wales said.

A consortium representing some of the largest drug companies, pharmacy benefit managers and insurers in the US has also asked Congress to deny the bill. The group, led by private insurer Blue Cross Blue Shield, pharmacy chain CVS and several major US drug companies, told Congress that if the legislation passes, consumers and the government could pay US$29 billion more in drug costs. "This legislation would establish an unprecedented exemption to antitrust laws for independent pharmacies," the group said in a letter to Congress. "It would give pharmacies the legal authority to collude among themselves to set prices for the Medicare [state health care] programme as well as commercial payers."

The US$29 billion figure was the product of a study conducted by economics consultant CRA International, which considered only the cost increases related to the drug reimbursements. The study claims that if small pharmacies could collectively bargain, it would increase the amount benefit managers would have to pay.

The study assumed those costs would be passed down to health plans and employers, who would likely pass the costs along to individuals.

**Peter Rankin**, principal at CRA, says that the figure represents the equivalent of the additional cost if every consumer paid in cash, rather than through private insurance or a government programme. It also didn't include pharmacy participation in cost-control techniques.

"It represents a reasonable upper bound based on rates without waivers," Rankin says.

The study was paid for by the Pharmaceutical Care Management Association, a conglomerate of some of the largest pharmaceutical companies, retail pharmacists and pharmacy benefit managers in the US, including CVS Pharmacies, CIGNA Pharmaceutical Management and Medco Heath Solutions.

Pharmaceutical benefit managers act as middlemen, negotiating reimbursement fees between pharmacists and drug companies. If the legislation passes, the power to set reimbursement rates for independent pharmacies would be greatly reduced.

The bill has gained favour with some independent-pharmacist coalitions, however, including the Association of Community Pharmacies. **Mike James**, vice president of the association, told members of the House Judiciary Committee's antitrust task force that if prices for consumers increased, the blame would be on the benefit managers, not pharmacists.

According to James's testimony, the benefit managers now set reimbursement rates for close to 95 per cent of independent pharmacies in the US - often at prices that do not cover costs.

"This has resulted in the closing of 1,152 independent pharmacies in 2006," James says. He says the goal of benefit managers is not to foster the pharmacy-patient relationship, but to undermine small pharmacists and force patients into profitable mail-order programmes in order to receive the drugs they need.

Many benefit managers operate their own mail-order services, where customers get drugs directly from the benefit managers rather than pharmacists.

James acknowledged the US$29 billion figure CRA presented, but told Congress that price increase was the decision of benefit managers, because they can shift the cost to patients and taxpayers. "If the cost goes up, it will be because the pharmacy benefit managers raised cost, not because the

pharmacies were allowed to negotiate," James says.

**Bernard Nigro**, partner at Willkie Farr & Gallagher LLP in Washington, DC, says that antitrust agencies such as the FTC generally oppose these types of exemptions, because the exemptions have the ability to hinder competition.

"The antitrust laws are flexible and already permit cooperative enterprises that are pro-competitive," Nigro says.

Plus, Nigro says there are processes in place that allow firms to seek regulators' opinions on proposed conduct. If they received a favourable opinion, it wouldn't be the same as antitrust immunity, but firms could "derive substantial comfort from such an opinion," he says.

The bill, the fourth of its kind introduced in the past several years, remains in the House Judiciary Committee. A similar bill was introduced in October in the Senate.

*RK*

# SALES VOLUME SUMMARY

Sales indicate the size of the pharmacy and can influence financial performance. To determine how a pharmacy's ratios change as sales increase, we sorted the pharmacies into four separate groups based on their annual sales.

- Less than $2.5 million
- $2.5 million to $3.5 million
- $3.5 million to $6.5 million
- More than $6.5 million

The three basic statements (common-sized [average] income statement, median financial benchmarks, and common-sized balance sheet) for these sales categories appear in Tables 5, 6, and 7. This information shows some significant trends. Our observations follow.

## PRODUCTIVITY

### Sales Per Employee



Staff productivity, as measured by the sales per employee ratio, improved as sales increased. However, pharmacies with more than $6.5 million in sales were slightly less productive than those with just under $6.5 million.

Pharmacies with sales between $3.5 million and $6.5 million had the highest productivity with 25 percent higher sales per employee than pharmacies with sales under $2.5 million. This high employee productivity is a significant driver of the industry's profitability.

Pharmacies Have Higher Staff Cost Per Employee As Sales Grow



The additional productivity comes at a higher cost. Median staff costs per employee for pharmacies with sales over $6.5 million were the highest of all the sales categories, and were 39 percent higher than costs for pharmacies with sales under $2.5 million. This is likely due to the additional management and administrative staff required to operate larger pharmacies. Also, 62 percent of the pharmacies earning total sales over $6.5 million did so by operating more than one location and must therefore employ more pharmacists.

### Pharmacy Productivity Per Square Foot

| | Under $2.5M | $2.5M to $3.5M | $3.5M to $6.5M | Over $6.5M |
|---|---|---|---|---|
| Prescription sales per prescription square foot | $2,777 | $3,601 | $4,501 | $5,515 |
| All other sales per square foot | $67 | $71 | $80 | $123 |
| Overall sales per square foot | $854 | $1,112 | $1,326 | $1,586 |
| Average overall square feet | 2,399 | 3,168 | 4,122 | 10,715 |

Productivity of floor space increased substantially as sales increased, even though the average size of the pharmacies in each sales category grew drastically.

## PROFITABILITY

The table below shows sales mix and gross margins for pharmacies in the four sales categories.

|  | Under $2.5M | $2.5M to $3.5M | $3.5M to $6.5M | Over $6.5M |
|---|---|---|---|---|
| Prescription sales | 91.5% | 94.3% | 92.7% | 91.4% |
| All other sales | 8.5% | 5.7% | 7.3% | 8.6% |
| Total sales | 100% | 100% | 100% | 100% |
| Average cost of goods sold | 76.3% | 78.2% | 77.5% | 76.9% |
| **Average Gross Margin** | **23.7%** | **21.8%** | **22.5%** | **23.1%** |

Generally speaking, higher volume pharmacies earn a greater portion of their total sales from other sales (over the counter medicines, sundries, gifts and durable medical equipment). Sales mix between prescription sales and other sales varied among the sales groups.

The highest average gross margins were earned by pharmacies with under $2.5 million in sales at 23.7 percent. While the margins are higher, since the volume is low, the net dollars to the pharmacy are significantly lower when compared to larger pharmacies.

### Inventory Control

|  | Under $2.5M | $2.5M to $3.5M | $3.5M to $6.5M | Over $6.5M |
|---|---|---|---|---|
| Inventory turnover (annual) | 8.2 | 10.2 | 11 | 11.5 |
| Inventory turnover (days) | 44 days | 36 days | 33 days | 32 days |
| Prescription inventory turnover (annual) | 9.5 | 11.3 | 12.9 | 13.5 |
| Prescription inventory turnover (days) | 38 days | 32 days | 28 days | 27 days |

Inventory turns increased as sales increased, yet the pharmacies with sales over $6.5 million were only slightly more efficient than those with sales just under $6.5 million. Pharmacies with sales over $6.5 million turned their inventory the fastest, with stock staying on hand for only 32 days. Smaller pharmacies (having sales under $2.5 million) held stock almost 38 percent longer for a total of 44 days. Efficient management of prescription inventory had a significant impact on the trend of increasing overall inventory turnover as sales increased.

### Expense Management

The charts show how payroll expenses and other operating expenses change as sales increase. In 2006, the payroll expenses (including owners) as a percentage of sales was highest in pharmacies with sales under $2.5 million.



**PAYROLL EXPENSES**



**OTHER OPERATING EXPENSES**

In general, other operating expenses (overhead) decreased (as a percentage of sales) as sales increased. The downward trend as sales grow is due to the effect of fixed expenses on profits. Fixed expenses do not grow in relation to sales. Instead, they stay the same as sales increase and over the long-term will stair-step up. As sales grow and costs stay the same, costs as a percentage of sales decrease. Again we find that companies with sales over $6.5 million become less efficient as they step up their costs to support the larger pharmacies, 62 percent of which operate multiple locations.

## Net Operating Income Before Tax

The group of pharmacies with sales between $3.5 million and $6.5 million showed the highest net operating income as a percentage of sales. For pharmacies with sales over $6.5 million, profits as a percentage of sales were lower due to higher payroll expenses and other operating expenses.



**AVERAGE NET OPERATING INCOME PERCENTAGE**

| TABLE 8 — 2006 COMMON-SIZED (AVERAGE) INCOME STATEMENT, PERCENTAGE OF TOTAL SALES — BY SALES CATEGORY | | | | |
|---|---|---|---|---|
| | Under $2.5 M | $2.5 M to $3.5 M | $3.5 M to $6.5 M | Over $6.5 M |
| **Sales** | | | | |
| Prescription sales | 91.5% | 94.3% | 92.7% | 91.4% |
| All other sales | 8.5% | 5.7% | 7.3% | 8.6% |
| **Total Sales** | 100% | 100% | 100% | 100% |
| **Cost of Goods Sold** | | | | |
| Prescriptions costs | 71.3% | 74.3% | 73.2% | 71.4% |
| All other costs | 5% | 3.9% | 4.3% | 5.5% |
| **Total Cost of Goods Sold** | 76.3% | 78.2% | 77.5% | 76.9% |
| **Gross Profit** | 23.7% | 21.8% | 22.5% | 23.1% |
| **Operating Expenses** | | | | |
| Payroll expenses | | | | |
| Salaries, wages | 12.6% | 11.1% | 11.6% | 12.1% |
| Payroll taxes, workers' comp, employee benefits | 1.8% | 1.5% | 1.6% | 1.9% |
| **Payroll Expenses** | 14.4% | 12.6% | 13.2% | 14.1% |
| **Other Operating Expenses** | | | | |
| Advertising | 0.5% | 0.4% | 0.5% | 0.5% |
| Insurance | 0.5% | 0.5% | 0.4% | 0.4% |
| Store supplies, containers, labels | 0.5% | 0.4% | 0.4% | 0.5% |
| Office postage | 0.1% | 0.1% | 0.1% | 0.1% |
| Delivery service | 0.4% | 0.2% | 0.2% | 0.3% |
| Pharmacy computer expense | 0.4% | 0.3% | 0.3% | 0.3% |
| Rent | 1.4% | 1.1% | 1.2% | 1.2% |
| Utilities, telephone | 0.6% | 0.4% | 0.4% | 0.4% |
| All other operating expenses | 2.8% | 2.7% | 2.5% | 3.0% |
| **Total Other Operating Expenses** | 7.2% | 6.2% | 6% | 6.8% |
| **Total Operating Expenses** | 21.6% | 18.8% | 19.2% | 20.8% |
| **Net Operating Income** | 2.1% | 3.1% | 3.2% | 2.3% |

| TABLE 6 · 2006 MEDIAN FINANCIAL BENCHMARKS — BY SALES CATEGORY | | | | |
|---|---|---|---|---|
| | Under $2.5M | $2.5M to $3.5M | $3.5M to $6.5M | Over $6.5M |
| **Profitability Ratios** | | | | |
| Net operating income percentage | 1.8% | 2.6% | 2% | 1.7% |
| Net operating income dollars before tax | $25,941 | $76,201 | $88,923 | $166,273 |

| **Productivity Ratios** | | | | |
|---|---|---|---|---|
| Sales per employee | $343,229 | $412,496 | $428,252 | $413,244 |
| Staff costs per employee | $36,168 | $40,634 | $43,830 | $50,293 |
| Prescription sales per square foot | $2,777 | $3,601 | $4,501 | $5,515 |
| All other sales per square foot | $67 | $71 | $80 | $123 |
| Total sales per square foot | $854 | $1,112 | $1,326 | $1,586 |
| Median sales | $1,693,425 | $2,956,366 | $4,414,251 | $9,257,937 |

| **Financial Position Ratios** | | | | |
|---|---|---|---|---|
| Sales to assets | 5.14 | 5.61 | 5.78 | 5.01 |
| Return on investment | 11.5% | 19.8% | 19.6% | 17.3% |
| Debt to worth | 0.40 | 0.56 | 0.47 | 1.04 |

| **Cash Flow Ratios** | | | | |
|---|---|---|---|---|
| Current ratio | 4.49 | 3.81 | 3.90 | 2.37 |
| Quick ratio | 1.70 | 1.63 | 1.67 | 1.26 |
| Inventory turnover (annual) | 8.2 | 10.2 | 11 | 11.5 |
| Inventory turnover (days) | 44 days | 36 days | 33 days | 32 days |
| Prescription inventory turnover (annual) | 9.5 | 11.3 | 12.9 | 13.5 |
| Prescription inventory turnover (days) | 38 days | 32 days | 28 days | 27 days |
| Accounts receivable turnover (annual) | 19.9 | 18.1 | 20.9 | 14.9 |
| Accounts receivable collection (days) | 18 days | 20 days | 17 days | 23 days |
| Accounts payable turnover (annual) | 25.6 | 25.5 | 26.7 | 20.6 |
| Accounts payable turnover (days) | 14 days | 14 days | 14 days | 18 days |

| TABLE 7 · 2006 COMMON-SIZED (AVERAGE) BALANCE SHEET, PERCENTAGE OF TOTAL ASSETS — BY SALES CATEGORY | | | | |
|---|---|---|---|---|
| | Under $2.5M | $2.5M to $3.5M | $3.5M to $6.5M | Over $6.5M |
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash and cash equivalents | 14.4% | 18.8% | 15.8% | 14.1% |
| Accounts receivable | 19% | 23.2% | 23% | 29.2% |
| Inventory | 50.3% | 42.9% | 40.9% | 35.6% |
| Other current assets | 4.7% | 3.7% | 5.7% | 4.5% |
| **Total Current Assets** | **88.4%** | **88.5%** | **85.4%** | **83.4%** |
| | | | | |
| Net fixed assets | 8.1% | 8.6% | 10.5% | 11.8% |
| Other assets | 3.5% | 2.9% | 4.1% | 4.8% |
| **Total Assets** | **100%** | **100%** | **100%** | **100%** |
| **Liabilities and Owners' Equity** | | | | |
| **Current Liabilities** | | | | |
| Notes payable (within one year) | 4.1% | 4.4% | 4.5% | 10.3% |
| Accounts payable | 15.2% | 18.5% | 16.3% | 21.3% |
| Other current liabilities | 5.7% | 5.2% | 5.8% | 8% |
| **Total Current Liabilities** | **25%** | **28.1%** | **26.7%** | **39.5%** |
| **Long-Term Liabilities** | | | | |
| Notes payable to owner(s) | 12.8% | 12.1% | 5.4% | 7.7% |
| Other long-term liabilities | 8.8% | 7.6% | 8.6% | 11.5% |
| **Total Long-Term Liabilities** | **21.6%** | **19.7%** | **14.1%** | **19.1%** |
| | | | | |
| Total Liabilities | 46.7% | 47.8% | 40.7% | 58.7% |
| Total Owners' Equity | 53.3% | 52.2% | 59.3% | 41.3% |
| **Total Liabilities and Owners' Equity** | **100%** | **100%** | **100%** | **100%** |