UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND, PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE
FUND OF PHILADELPHIA AND
VICINITY; and PHILADELPHIA
FEDERATION OF TEACHERS HEALTH
AND WELFARE FUND; DISTRICT
COUNCIL 37, AFSCME-HEALTH &
SECURITY PLAN; JUNE SWAN;
MAUREEN COWIE; BERNARD GORTER;
SHELLY CAMPBELL and CONSTANCE
JORDAN,

                  Plaintiffs,

           v.

FIRST DATABANK, INC., a Missouri
corporation, and McKESSON
CORPORATION, a Delaware
corporation,

                  Defendants.

CIVIL ACTION: 1:05-CV-11148-PBS

## DECLARATION OF H. EDWARD HECKMAN: FAIRNESS OF THE ECONOMIC IMPACT OF THE FIRST DATABANK SETTLEMENT AGREEMENT

U.S. DISTRICT COURT
DISTRICT OF MASS.
2007 DEC 21  P 4: 39
FILED
IN CLERKS OFFICE

## Contents

Declaration of H. Edward Heckman ....................................................................................... 3

*EXECUTIVE SUMMARY* .......................................................................................................... 3

I.    QUALIFICATIONS ................................................................................................................ 5

II.   ANALYSIS: DECLINE OF COMMUNITY PHARMACY REIMBURSEMENTS 6

   A.   Background ........................................................................................................................ 6

   B.   Assumptions and Methodology ...................................................................................... 7

   C.   Findings and Opinions ..................................................................................................... 9

III.   ACTUAL FINANCIAL IMPACT ANALYSIS ........................................................... 13

   A.   Background ...................................................................................................................... 13

   B.   Assumptions and Methodology .................................................................................... 14

   C.   Findings and Opinions ................................................................................................... 17

IV.   IMPACT ON PATIENTS, CONSUMERS AND THE ECONOMY .................... 20

V.   ATTESTATION OF FACT ............................................................................................... 22

## Declaration of H. Edward Heckman

# *EXECUTIVE SUMMARY*

1. I have been asked by the National Community Pharmacists Association to examine the economic impact of the First Databank proposed settlement agreement and provide an opinion on the impact to independent pharmacies. I do so to provide expert opinion and guidance to her Honor in examining the issue of remedy in this matter.

Summary of Major Findings:

2. The proposed settlement will significantly reduce reimbursements to Community Pharmacies. Patients will be disadvantaged from decreased access to pharmacy services and scarcer availability of prescription drugs. This will cause significant harm to consumers, especially in underserved areas (e.g., low income and rural).

3. Community Pharmacy reimbursement formulas for brand drugs are based on the AWP value of the drug dispensed. Community Pharmacies never benefited from the alleged First Data Bank changes in AWP. Based upon my review of hundreds of Community Pharmacy contracts I found that from 2003 through 2005, Pharmacy Benefits Managers (PBMs) and managed care plans more than made up for AWP values purportedly increased by First Data Bank in 2001 and 2002. Compensation from Managed Care Plans to Community Pharmacies steadily declined from 2000 through 2005. For example:

   A. In 2003 Brand Drug compensation declined on average 23.0% from AWP minus 10.40% to AWP minus 12.79%.

B.      In 2005 Brand Drug compensation declined on average 26.8% from AWP minus 12.32% to AWP minus 15.62%. The median values decreased from AWP minus 12.41% to AWP minus 17.00%.

4.      In 2006 Independent Community Pharmacies averaged $3,612,000 in sales and Net Operating Incomes of $101,136.00 (2.8%). The effects of the proposed settlement will be:

A.      Based upon the actual drug utilization of 564 pharmacies, Community Pharmacies will lose on average 3.59% in reduced gross profit margin on Brand Name Prescriptions.

B.      On a per pharmacy basis over the course of a year, community pharmacies will suffer a $105,000.00 reduction in gross profit.

C.      Community Pharmacies sales are comprised 92.4% from prescription drugs. Most of the remaining 7.6% of sales are from over-the-counter health care items. They have minimal sales of non-health goods such as food, household goods, appliances and sundries.

D.      This reduction in profit will force Community Pharmacies to close their doors as Net Operating Incomes (Profits) for the past ten years range as low as 2.8% in 2006 to a high of only 4.0% in 2003.

E.      The settlement could cause 50% of independent pharmacies to operate at a profit loss and close their doors. If that happens 156,432 employees of Community Pharmacies will lose their jobs and $6.6 Billion in salaries will be removed from our economy.

5.      The PBMs nor managed care entities were never harmed from the alleged AWP changes as they reduced reimbursement compensation to community pharmacies. As a

result of the reduced reimbursements community pharmacies were not enriched by the changes in AWP values. And now, the PBMs plan to pass the cost of the reduced AWP values down to their customers—the plan sponsors who ultimately pay for prescriptions.

# I.    QUALIFICATIONS

6.    I am a pharmacist licensed in Michigan, Illinois and Wisconsin, a pharmacy consultant, owner/president of PAAS National, Inc. a consultancy offering assistance to community pharmacies in dealing with managed care prescription benefit business activities, third-party reimbursements, third-party audits and third-party contracts; and CEO of Compliant Pharmacy Alliance Cooperative, a 564 pharmacy purchasing cooperative. I render the following opinions as an independent consultant.

7.    I have over 40 years of diversified community pharmacy experience encompassing all aspects of management, marketing and operations including billing and payment for pharmacy claims to managed care programs as well as assessing and forecasting the economic impact of such programs. My areas of responsibility in the past and present include managed care programs, a.k.a. third-party payment programs, in which I review reimbursement offers and their impact, audits of pharmacy claims, assist clients to provide documentation to resolve discrepancies in audits, and advise clients on third-party contracts that include provider agreements and managed care programs. I also have experience advising and consulting plan sponsors on prescription benefits designs.

8.    I have served as a litigation consultant and expert witness in several civil and criminal cases. Recently, in 2006 and 2007, I served the Washtenaw County Circuit Court

in Ann Arbor, Michigan as its expert witness in the *Dexter Pharmacy, Inc. et al. vs. Express Scripts, Inc.* litigation heard by Judge Donald Shelton. Judge Shelton decided he wanted his own expert witness and required the prosecution and defense to submit recommendations. Both the prosecution and defendant submitted my name to the court and I subsequently served the Washtenaw Circuit Court as Judge Shelton's expert witness in this matter. That case consisted of over 42,000 prescription claims discrepancies. An expanded version of my Qualifications and Background are included as Exhibit A, a copy of my CV is Exhibit B and a list of my publications is attached as Exhibit C.

## II.   ANALYSIS: DECLINE OF COMMUNITY PHARMACY REIMBURSEMENTS

### A.   Background

9.      Community Pharmacies who are members of PAAS National®[1] call upon PAAS for services to review language and reimbursements found in various third-party contracts. The information in the collection of contracts accumulated from providing these services is the foundation for this analysis.

10.     Community pharmacy reimbursement formulas are comprised of two components, the ingredient cost and a dispensing fee. The ingredient cost in the case of brand name prescription drugs—those drugs that are single-sourced with one manufacturer who holds market exclusivity—is valued at a percentage discount from Average Wholesale Price (AWP) and is therefore dynamic as AWP changes. Total compensation includes a dispensing fee which is a constant or static value—independent of the cost of the drug.

---

[1] PAAS National, Inc., 160 Business Park Circle, Stoughton, WI 53589, 888-870-7227, www.paasnational.com.

Table 1—"Sample Network for Provider Pharmacies," is a typical example of a network and

reimbursement formula that a community pharmacy may receive from a Pharmacy Benefit

Manager.

**Table 1    Sample Network for to Provider Pharmacies**

| TOPIC | DISCUSSION |
|---|---|
| **Compensation** | *A pharmacy receives a solicitation to become a participating provider for a network that offers a reimbursement formula for brand name drugs at AWP – 16% plus \$1.50.*<br>*If the AWP value of a drug and quantity is \$10.00 the pharmacy would be paid in total \$9.90. If the AWP value of a different drug and quantity is \$100.00 the pharmacy would be paid \$85.50.* |
| **Impact of Dispensing Fees** | *From the above example, assume that the average AWP value of a brand prescription is \$50.00. The impact of the dispensing fee would be a 3% reduction in the AWP discount or the net effect on total reimbursement of AWP – 13%.* |

11.    At question are the trends in compensation to community pharmacies since 1998;

and in particular, would these trends be associated with the First Data Bank changes in

calculating AWPs?

### B.    Assumptions and Methodology

12.    To analyze the potential impact of the proposed settlement actual reimbursement

proposals in the library of contracts accumulated by PAAS National® were reviewed. Over

410 contracts offered to community pharmacies spanning the years 1998 through 2005

were included in the review. The compilation of this data is found in Exhibit D—"Pharmacy

Provider Contracting Trends—Master Sort by PBM/Sponsor."

13.    To measure trends from one year to the next, the data was aggregated by year in

Exhibit E—"Pharmacy Provider Contracting Trends—Master Sort by Offer Date."

14.    To create a fair comparison, the impact of dispensing fees was included in the total

reimbursement calculations. The dispensing fees were normalized to AWP discounted

ingredient costs by comparing the fee to the average AWP value of a brand drug prescription and then converting the result to a percentage. This rationale is validated as it is based upon the aggregate of all prescriptions within a given universe and time (example: all brand prescriptions in the year 2001). The impact of a dispensing fee is less dramatic as ingredient costs increase. A discussion of this rationale is found in Table 1 in the "Impact of Dispensing Fees" section of the table.

15.    Each year's average AWP value of a brand drug prescription in this analysis was determined from an aggregate of resources, including the Pharmacy Benefit Management Institute[2], National Community Pharmacy Association[3], various government reports and internal records and calculations from PAAS National®. The challenge and goal in the selection of the average AWP value of a brand drug was one of equality in considering variances from one source to another. Table 2—"Average AWP of Brand Prescriptions by Year" lists the values used.

**Table 2—Average AWP of Brand Prescriptions by Year**

| YEAR | AVERAGE AWP VALUE | FEE TO % FACTOR* |
|------|-------------------|------------------|
| 1998 | $52.57 | 1.90% |
| 1999 | $60.38 | 1.66% |
| 2000 | $69.75 | 1.43% |
| 2001 | $80.59 | 1.24% |
| 2002 | $92.89 | 1.08% |
| 2003 | $107.33 | 0.93% |
| 2004 | $118.00 | 0.85% |
| 2005 | $130.00 | 0.77% |

\* The effect of each $1.00 of dispensing fee. As an example, a plan with a $2.50 dispensing fee in 2001 would decrease the AWP discount by 3.1%. If the plan offered to pay AWP minus 15% for ingredient cost, the total reimbursement with the dispensing fee would be AWP minus 11.9%.

[2] Pharmacy Benefit Management Institute, 8679 East San Alberto Drive, Suite 101, Scottsdale, AZ 85258-4368, www.pbmi.com.

[3] National Community Pharmacists Association, 100 Daingerfield Road, Alexandria, VA 22314, www.ncpanet.org.

## C.    Findings and Opinions

16.    The results of this analysis are found in Table 3—"Average AWP Brand Discounts by

Year" shown below.

### Table 3—Average AWP Brand Discounts by Year

| YEAR | AVERAGE AWP DISCOUNT | MEDIAN AWP DISCOUNT | HIGH RANGE** | LOW RANGE** |
|------|----------------------|---------------------|--------------|-------------|
| 1998 | -11.54% | -10.02% | -11.25% | -11.84% |
| 1999 | -10.02% | -9.68% | -9.85% | -10.19% |
| 2000 | -9.65% | -10.96% | -9.21% | -10.09% |
| 2001 | -11.67% | -11.68% | -11.55% | -11.80% |
| 2002 | -10.40% | -10.84% | -10.13% | -10.67% |
| 2003 | -12.79% | -13.15% | -12.31% | -13.28% |
| 2004 | -12.32% | -12.41% | -12.14% | -12.51% |
| 2005 | -15.62% | -17.00% | -15.04% | -16.20% |

** The High and Low Range were calculated as one standard deviation above and below the Average AWP Discount.

17.    In general, reimbursement formulas on brand prescription drugs steadily decreased

from the year 2000, with a slight plateau in 2002. Graph 1—"Community Pharmacy

Reimbursement Trends 1998—2005," below illustrates the average and median AWP

discounts from one year to the next. While the average and median values track close to

each other, the median values demonstrate a more drastic rate of change. A trend line (the

dashed line) based on 2-year rolling averages was added to Graph 1 to better represent the

downward trends.

Graph 1—Community Pharmacy Reimbursement Trends 1998—2005



| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|
| AVERAGE AWP DISCOUNT | -11.54% | -10.02% | -9.65% | -11.67% | -10.40% | -12.79% | -12.32% | -15.62% |
| MEDIAN AWP DISCOUNT | -10.02% | -9.68% | -10.96% | -11.68% | -10.84% | -13.15% | -12.41% | -17.00% |

18.    I understand that part of this litigation involves concerns over alleged increases in

AWP by First Data Bank in 2001 and 2002. If there was such an increase evidence proves

that Pharmacy Benefit Managers (PBMs) and managed care plans more than made up for

any increase by substantially decreasing the compensation paid to community pharmacies.

The two most precipitous decreases occurred after the alleged First Data Bank AWP

adjustments, in years 2003 and 2005.


**Is this coincidence or an opportunity for PBMs from First Data Bank's actions?**

19.    While the PBMs may be unwilling to attest that the alleged First Data Bank AWP

changes allowed them to ratchet down the compensation they pay pharmacies for

prescriptions, they were much more aggressive than the past. The reality whether by coincidence or by design, PBMs simply reduced reimbursement to community pharmacies to make up any increased cost.

20.     In 2003, the first full year after the change in AWP calculations by First Data Bank, the average AWP compensation for brand name prescription drugs decreased 23.0% from AWP minus 10.40% to AWP minus 12.79% and the corresponding median values for 2003 decreased 21.3% from AWP minus 10.84%, to AWP minus 13.15%. At the average AWP value of a brand name prescription in 2003 of $107.33 (see Table 3) the average reduction translates to $2.56 per prescription.

21.     While 2004 stabilized 2005 was a different story. In 2005 the average AWP compensation to community pharmacies for brand name prescription drugs steeply decreased by 26.8% from AWP minus 12.32% to AWP minus 15.62% while the median value cascaded downward 37.0% from AWP minus 12.41% to AWP minus 17.00%. In 2005 at an average AWP of $130.00 (see Table 3) for a brand name prescription, this translates to a revenue loss on average of $4.29 and a median value of $5.97 per prescription.

22.     As stated, the general trends over 2002 to 2005 more than made up for any gain in AWPs from the calculation changes by First Data Bank. AWP discounts on brand drugs paid by managed care plans, increased by a 5.22% reduction, from AWP minus 10.40% in 2002 to AWP minus 15.62% in 2005. The reimbursement drop in median values was even more remarkable, an increase of 6.16% in AWP discounts from 10.84% in 2002 to 17.00% in 2005.

23.    Community pharmacy owners are unique as they operate in an environment where they cannot set their own prices they sell services; prices are unilaterally dictated by PBMs in a take it or leave it fashion. This economic model is known as an oligopsony. In an oligosony the sellers are small and weak in comparison to the buyers who are very large and strong. The buyers in an oligopsony control all the terms of sale including prices. This economic model runs contrary to most businesses that are able to establish prices at a level to cover their operating costs and generate a profitable return. In an oligopsony, unbridled buyers can monopolize sellers. This is the case with independent pharmacy owners with over 91%[4] of total prescription volume billed to third parties—the PBMs and managed care entities.

24.    The proposed settlement in its present state is unfair and devastating to community pharmacies. They will be forced give up money that was unilaterally taken from them long ago by the PBMs. Losing near another 4% of gross margin coupled against the 5 to 6% previously lost will certainly force many pharmacies to close their doors. On a $150.00 brand drug prescription, independent pharmacy owners would give up an additional $6.00 of gross profit. Taking money from community pharmacies when they never realized an appreciable advantage is tacitly unfair.

25.    The PBMs are already approaching their customers, the plan sponsors who hire PBMs to manage their prescription benefits. PBMs are empowered by virtue of their contracts with plan sponsors to increase prices to protect themselves. The plan sponsors who pay the bills are being informed that in the event the AWP calculations are rolled back,

---

[4] 2007 NCPA-Pfizer Digest Members Edition. "Third-Party Prescriptions, National Community Pharmacists Association, page 21.

PBMs will increase the prices they charge to keep themselves whole in terms of profit dollars. In fact, the Declaration of Steve W. Berman[5], of Hagens Berman Sobol Shapiro LLP submitted to her Honor on December 5, 2007 offers proof of such activity by the PBM, Express Scripts, Inc. Express Scripts plans to exercise this contractual option. The take it or leave it provider agreements given by PBMs to community pharmacies do not afford this same luxury to pharmacies.

26.     Unless the PBMs and managed care prescription plans were required to pass on concessions in their payments from plan sponsors down to community pharmacies, the PBMs will be the only entities to profit from the settlement.

## III.    ACTUAL FINANCIAL IMPACT ANALYSIS

### A.    Background

27.     I project the financial impact of the proposed settlement in the following manner. The First Data Bank proposed settlement requires the roll-back of AWP on a listing of over 8,600 drugs (by National Drug Code—NDC number). The roll-back changes the AWP multiplier factor from WAC (Wholesale Acquisition Cost) x 1.25 to WAC x 1.20. The net difference in this change is a 4% decrease in AWP values. Considering an universe of over 100,000 unique NDC numbers (prescription drugs) in the United States, the question is the overall impact on community pharmacies of the reductions in the settlement drugs.

---

[5] Supplemental Declaration of Steve W. Berman filed on Dec. 5, 2007, in support of class plaintiff's reply to McKesson's response to the court's inquiries at the November 13, 2007 hearing on class certification issues, New England Carpenter's Health Benefits Fund, et. al. v. First Data Bank and McKesson, C.A. No. 105-CV-11148-PBS.

28.     This measure, to be truly accurate must be based upon the actual utilization of drugs

purchased and dispensed by community pharmacies. This type of an analysis is commonly

referenced as a weighted mix analysis. While 8,600 drugs seems small in comparison to

over 100,000 drugs available, the true metric is the amounts of these drugs dispensed and

their corresponding AWP reductions compared to the total cost of all drugs dispensed.

### B.     Assumptions and Methodology

29.     The Compliant Pharmacy Alliance Cooperative (CPA) was selected as a

representative sampling of independent community pharmacies. One year of purchase

data available for the Compliant Pharmacy Alliance Cooperative became the basis of this

second analysis. Actual purchases from December 2006 through November 2007 were

reviewed.

30.     The Compliant Pharmacy Alliance Cooperative is a significant sampling of

community pharmacies, as they represent about 3% of independent community

pharmacies in the United States. Their members are widely dispersed throughout the

country operating in 23 States. CPA pharmacies purchased over $1.6 Billion of drugs

during this time period.[6]

---

[6] In conducting this analysis it is necessary to view generic drugs separately from brand drugs as the ingredient cost valuation paid by managed care for generic prescriptions in most instances is based upon a Maximum Allowable Cost valuation rather than AWP. Maximum Allowable Cost (MAC) prices are unilaterally established and changed at will by PBMs, managed care plans, plan sponsors and the government. Their values vary from one plan to the next and have no relationship other than happenstance to AWPs. Generic drugs are also referenced as multi-source drugs. These are drugs designated by the Food and Drug Administration as bioequivalently identical and therapeutically equivalent to the original brand product. The same generic drug can be produced by several manufacturers after the brand manufacturer loses their patent on market exclusivity of that drug. Some of the drugs included in the First Data Bank Settlement are multi-source or generic drugs. The proposed AWP reductions in these drugs were not considered in calculating losses that community pharmacies will experience from the rollbacks. For the most part the AWP reductions will only effect actual reimbursements on brand or single source drugs.

31. The settlement list of drugs evaluated was obtained from Medispan in a Test File supplied in Excel format on November 30, 2007. This Test File is attached in a printed hard-copy version as Exhibit F. An assumption made in this analysis is that the settlement lists of drugs of Medispan and First Data Bank are near identical and any aberration would be statistically insignificant. The data fields supplied in the test file included NDC Number, Product Name, Strength/Unit of Measure, AWP Package Price, Price Effective Date, Multisource Code, Labeler, and Revised AWP Package Price.

32. The purchase history for all of the test file drugs for CPA was queried by month along with total drug purchases of generic and brand name drugs. The rationale for the month by month queries was to search for any seasonal variances or abnormalities that might be embedded within the mix of the settlement drugs. The WAC values of the purchases of the brand drugs obtained from the queries were converted to AWP by multiplying by the current factor of 1.25. The full results of this analysis are found in Exhibit G.

33. The Multisource Code field designations were useful to accurately separate the multi-source generic drugs in the test file. The codes and their interpretations are listed in Table 4—"Medispan Multi-Source Codes" below.

### Table 4—Medispan Multi-Source Codes

| CODE | EXPLANATION |
|---|---|
| N | Single-Source drug, no generic equivalent available. |
| O | Original Product (Brand), generics available |
| M | Single-Source, Co-licensed. |
| Y | Generic Drugs, Multiple Sources Available |

34.     The drugs designated as "N," "O," and "M" were categorized as brand drugs, and the

"Y" drugs were separated as generic. While those drugs with an "O" designation have

generic equivalents available in the market, an assumption is made that a physician who

would authorize a prescription for an "O" coded drug made a decision to prevent generic

substitution and require the original brand be dispensed-as-written (DAW). In these

instances a pharmacy may be required to obtain prior approvals to dispense the brand, but

once approved, reimbursement would be AWP based. Table 5 represents a recap of the

CPA Purchase Data from November 2007.

**Table 5—CPA Purchase Data November 2007**

| Nov-07 | Brand | Brand % | Generics | Monthly Total | Current Brand AWP | Settlement Brand AWP | % Diff |
|--------|-------|---------|----------|---------------|-------------------|----------------------|--------|
| N | 93,827,926 | 86.3% | - | 93,827,926 | 117,284,907 | 112,593,511 | 3.45% |
| O | 4,352,483 | 4.0% | - | 4,352,483 | 5,440,604 | 5,222,980 | 0.16% |
| M | 578,872 | 0.5% | - | 578,872 | 723,590 | 694,646 | 0.02% |
| Y | - | 0.0% | 396,862 | 396,862 | - | - | |
| Non Adj | 9,931,223 | 9.1% | 13,834,570 | 23,765,793 | 12,414,029 | 12,414,029 | |
| Total | 108,690,504 | 100.0% | 14,231,432 | 122,921,936 | 135,863,131 | 130,925,166 | 3.63% |
| | 88.4% | | 11.6% | | 1.25 | 1.2 | |

35.     To understand these findings the following explanations are offered:

   A.     The values in the "Brand", "Generics" and "Monthly Total" columns are

          reported at WAC.

   B.     The total CPA purchases for the month of November were $122,921,936

          ("Total" row, at the bottom of the "Monthly Total" column).

   C.     There was $93,827,925 of drugs in the Test File classed as "N" or single-

          source brand, no generics available; $4,352,483 classed as "O" original

          product, generics available; $578,872 classed as "M" single-sourced, co-

          licensed; and $396,862 classed "Y" multi-source generic drugs.

D.   Outside of the Test File of settlement drugs, the CPA stores purchased an
     additional $9,932,223 classed as "Non-Adj" (Non-Adjusted), brand drugs
     that will not be adjusted by the settlement and $13,834,570 in generic drugs.

E.   In the "Current Brand AWP" column the purchases of N, O, M and Non-Adj
     were converted to AWP via the current 1.25 multiplier factor. Their values
     total $135,863,131 ("Total" row, near the bottom of "Current Brand AWP"
     column).

F.   In the "Settlement Brand AWP" column the N, O and M purchases were
     recalculated at the reduced 1.20 multiplier factor. These values were
     summed with the Non-Adj purchases and the result was $130,925,166
     ("Total" row, near the bottom of "Settlement Brand AWP" column).

G.   The lost profit as a result of the settlement, in terms of real dollars for the
     actual purchases of 564 community pharmacies for the month of November
     2007 would be $4,937,965 or 3.63% of the brand purchases.

### C.   Findings and Opinions

36.   The impact of the reductions was relatively stable from month to month, not
showing any apparent deviations for seasonality

37.   The actual net reduction in gross profit for Compliant Pharmacy Alliance
Cooperative member pharmacies as a result of the proposed settlement for November
2007 data is $4,937,965 or 3.63% of the total brand purchases. On a per store basis, the
average reduction per month calculates to $8,771.00 in lost profits. Projected over the
course of a year, a community pharmacy will suffer a reduction in gross profit of over
$105,000.00.

**What does losing $105,000.00 in annual profit mean to a Compliant Pharmacy**
**Alliance Cooperative independent pharmacy?**

38.    The *2007 NCPA-Pfizer Digest*[7] states that in 2006, average independent pharmacy

sales were $3,612,000.00. In addition the *2007 NCPA-Pfizer Digest*[8] reports that in 2006

the average net operating income for an independent pharmacy was 2.8% of sales or a net

profit of $101,136.00. Based upon these findings, the settlement rollbacks would force the

average Compliant Pharmacy Alliance Cooperative member to lose $3,864.00.

39.    The *2007 NCPA-Pfizer Digest*[9] reports the average net operating income for

independent pharmacies over the past ten years. See Figure 1 below. Over the past ten

years the net operating income for independent community pharmacies ranged from 2.8%

in 2006 to the high of 4% in 2003. It is reasonable to believe that the impact of the

settlement would prevent independent pharmacies from operating at as high profit levels

in the future.

---

[7] *2007 NCPA-Pfizer Digest Member Edition,* "Figure 1 – Average Annual Sales Per Pharmacy Location, 10-Year Trend." National Community Pharmacists Association, page 5.

[8] *2007 NCPA-Pfizer Digest Member Edition,* "Table 2 – Averages of Pharmacy Operations, 10-Year Trends." National Community Pharmacists Association, page 6.

[9] Ibid.

**TABLE 1 · AVERAGES OF PHARMACY OPERATIONS, 10-YEAR TRENDS**

| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Sales | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Cost of goods sold | 74.4% | 75.1% | 76% | 76.7% | 77% | 76.5% | 76% | 77.9% | 76.4% | 77.2% |
| Gross profit | 25.6% | 24.9% | 24% | 23.3% | 23% | 23.5% | 24% | 22.1% | 23.6% | 22.8% |
| Payroll expenses | 13.1% | 13.2% | 12.8% | 12.2% | 12.5% | 13.1% | 13.2% | 12.2% | 13.4% | 13.5% |
| Other operating expenses | 9.4% | 8.6% | 7.6% | 7.9% | 6.9% | 6.6% | 6.3% | 6.3% | 6.5% | 6.4% |
| Total expenses | 22.5% | 21.8% | 20.4% | 20.1% | 19.4% | 19.7% | 20% | 18.5% | 19.9% | 20% |
| Net operating income | 3.1% | 3.1% | 3.6% | 3.2% | 3.5% | 3.8% | 4% | 3.6% | 3.7% | 2.8% |

Figure 1 extracted from the *2007 NCPA-Pfizer Digest* [10]

40. The mix of business for an independent community pharmacy is all about prescriptions. In 2006, 92.4%[11] of sales were attributed to prescriptions. Without prescriptions there would not be community pharmacies. Without prescriptions with enough gross profit to cover expense costs of $10.63[12] per prescription, community pharmacies will not remain viable.

41. Some factions may argue that the majority of prescriptions dispensed are generic drugs whose compensations are not AWP dependent. Indeed, 58%[13] of prescriptions in 2006 were for generic pharmaceuticals. But the impact of generic drugs is minor because the average brand prescription is much more expensive. Brand drugs account for 88% (see Exhibit F and also Table 5) of the total prescription revenues for independent pharmacies. Factor these settlement reductions in AWP over a pharmacy's total prescription revenues

[10] Ibid.

[11] Ibid, page 8.

[12] Ibid, page 20.

[13] Ibid, page 4.

(brand and generic prescriptions) and the financial impact will be near a 3.2%[14] overall reduction in gross profit

42.     Based upon the reported net operating incomes in the *2007 NCPA-Pfizer Digest*[15] this settlement if not mitigated will certainly drive a majority of the community pharmacies—potentially over 50%—in this country out of business. This settlement as proposed leaves no room for community pharmacies to move in a pressured business environment.

## IV.   IMPACT ON PATIENTS, CONSUMERS AND THE ECONOMY

### Will patients be disadvantaged?

43.     Community pharmacies are a critical component in the overall health care delivery system. Consumers value the high levels of service they receive at community pharmacies. Community pharmacies literally service hundreds of underserved areas such as low population rural areas and low income inner city communities. As described above community pharmacies operate at very low, eroding profit margins. I envision peril for many patients who depend upon community pharmacies to provide medication management and prescription drug services. For many residents of the United States, community pharmacies and dedicated pharmacists are the first contact point for access health care. Pharmacists see their patients more often than any other member of the

---

[14] This calculation is based upon 88% of prescription revenues are from brand drugs that community pharmacies would received 3.63% less gross profits from the AWP rollbacks. The math equation is 0.88 x 3.63% = 3.1944% reduced gross profit in total prescription revenues.

[15] Ibid, page 5.

health care team, including physicians. Access to lifesaving drugs will be greatly reduced as a result of the settlement going into effect as proposed.

44. The terms of the settlement will force pharmacies to cut their expenses by reducing store hours, reducing the number of employees on staff and cutting important services such as deliveries and compounding prescriptions. In some communities, especially in critical underserved areas the local independent pharmacy is the only health resource in the area.

45. Ultimately these changes will force more and more pharmacies out of business, patients will suffer as the result of reduced access to pharmacy services. The remaining pharmacies will be bogged down with high prescription volumes causing unreasonably long wait times.

46. Given these circumstances there is a risk that many patients may miss getting their prescriptions. If this occurs, the overall cost of health care will increase with more frequent and longer hospital stays, more frequent visits to physician offices, more emergencies, greater morbidities and decreased quality of life.

### Will consumers be disadvantaged?

47. With the PBMs planning to pass any negative financial impact of the proposed settlement down to their customers, it is extremely doubtful that any real reduction in prescription costs will occur. The settlement will just shift more profit to the PBMs and away from community pharmacies.

### Will the Economy be disadvantaged?

48. If 50% of the independent pharmacies are forced out of business as a result of the settlement, the economy would see a loss of 156,432 community pharmacy jobs carrying a

median cost of $42,255[16] each or $6.6 Billion per year in wages. When coupling these projections for independent pharmacies with the negative impact on chain pharmacies, the United States economy will suffer a big blow.

## V.    ATTESTATION OF FACT

49.    All opinions contained herein are my own, offered as an independent consultant. I certify under penalty of perjury that the foregoing is true and correct.

Executed December 19, 2007, by

H. EDWARD HECKMAN, RPh.
PRESIDENT/OWNER PAAS NATIONAL, INC.
CEO COMPLIANT PHARMACY ALLIANCE COOPERATIVE

---

[16] Ibid, page 9.