

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *New England Carpenters Health Benefits Fund et al. v. First DataBank, Inc., et al.*, | No. 1:05-CV-11148-PBS |
| *D.C. 37 Health & Security Plan v. Medi-Span* | No. 07-CV-10988-PBS |

## BLUE CROSS AND BLUE SHIELD OF MICHIGAN'S OBJECTIONS TO THE PROPOSED CLASS SETTLEMENTS

Blue Cross and Blue Shield of Michigan ("BCBSM"), as a third-party payor class member of the Settlement Classes preliminarily certified by this Court in the above-styled cases, files this Objection to the proposed Third-Party Payor Class Settlements (the "Proposed Settlements").

### BACKGROUND

1.  BCBSM is engaged in the business of providing health care coverage, including prescription-drug coverage, to members of the public through various contractual arrangements. Either directly or through its pharmacy benefits managers, BCBSM has agreements with and pays benefits for prescription drugs for its members at thousands of participating pharmacies in Michigan and throughout the United States. BCBSM provides this coverage as either a claims administrator for self-funded employers, through union plans, or other employer arrangements and in some instances through insurance coverage.

2.  BCBSM is a member of the Settlement Classes preliminarily certified by this Court by virtue of the fact that it is an "entity who, during the Class Period, made purchases and/or paid,

whether directly, indirectly, or by reimbursement for all or part of the purchase price of prescription pharmaceuticals, including, but not limited to, those pharmaceuticals listed on the attached Exhibit A, where any or all of the purchase price, reimbursement or payment amount was based in any part on the Average Wholesale Price, Blue Book Average Whosesale Price, or similar data published or disseminated by First DataBank, Inc., or Medi-Span, electronically or otherwise, in whole or part, was based on a FDB wholesale survey."

3. During the proposed class periods, January 1, 2000 to the date of final Court approval (FirstData Bank settlement) and December 19, 2001 to the date of final Court approval (Medi-Span Settlement), BCBSM has paid millions of dollars to U.S. pharmacies for the Exhibit A prescriptions for their members.

4. BCBSM covers close to five million lives; as such, it is a substantial portion of the private U.S. health care market.

## THE PROPOSED SETTLEMENT AGREEMENTS

5. The Proposed Settlements are styled as for prospective injunctive relief only and do not require that the Settling Defendants provide any cash to a fund for the settlement of the "substantial" damage claims by class members. Relevant hereto, the Proposed Settlements provide as follows.

6. In return for a broad full and final release of all claims, known and unknown, by the class members, the Settling Defendants agree to a "roll-back" of the published mark-up from WAC to AWP for 8,487 NDCs for retail branded drugs from 1.20 to 1.25. This "roll-back" is prospective only, and is not triggered until Final Approval, if it occurs, and then on the later of (1) sixty days

following the Effective Date of the final judgment, or (2) 270 days from entry of preliminary approval.

7. The Settling Defendants have also agreed to stop the compilation and publication of the AWP and BBAWP fields in their databases. This obligation only becomes effective no later than two years after the date of Final Approval, if it occurs, and then only if there are no competitors (there are none at present) then using those fields.

## OBJECTIONS

8. BCBSM objects to the Proposed Settlements on two separate grounds. First, the settlements do not confer a benefit upon class members. No monetary payments are made by the defendants as a result of their wrongdoing and in return for their release from liability. It is unclear that the proposed "roll-back" of the present mark-up on certain drugs provides any real benefit at all to class members, despite class counsels' claimed over "a billion dollars ... in just one single 12-month period," or in any way redresses the losses and wrongs class members have suffered by the actions of the Settling Defendants.

9. Second, BCBSM, as other TPP class members, is investigating alternative means of paying for prescription drugs for its members, but remains party to contracts based on AWP or BBAWP pricing. BCBSM is concerned over the disruption attendant on the discontinuance of AWP and BBAWP by Settling Defendants, the sole sources of pricing information in the marketplace. This is especially true in light of the fact that no alternative uniform pricing mechanism is being adopted.

I. **The Proposed Settlements Do Not Confer A Benefit Upon Class Members.**

10. The Settlement Proponents have failed to provide any credible estimate of the value of the class damage claims in this case, instead relying on an aggregate damages formula devised by their class expert, Raymond Hartman, yielding a claimed $8 billion in single damages. Without such an estimate, it is impossible to evaluate their claims that the prospective relief is a benefit to the class, much less better than a claimed uncollectible verdict against the Settling Defendants.

11. As this Court found in refusing to certify a damages class against McKesson based on this formula, Hartman's "'zero knowledge - zero mitigation' damages model proceeds on the flawed assumptions that when McKesson and First Databank changed the AWP markup, no other contract terms or market conditions changes." Order of August 27, 2007, Dkt # 317. For this reason, "Dr. Hartman's methodology for calculating aggregate damages would lead to a signficant overstatement because it fails to consider key provisions in contracts that are renegotiated and renewed." *Id.* at 24.

12. This is not an insolvable problem: "Dr. Hartman may submit an aggregate damage methodology which includes only those contracts in effect when the scheme took place and excludes reimbursements under contracts renegotiated in response to the increase. Another alternative would be to include damages for one year after the large increase in 2002 took effect." *Id.* at 25. "The Court can address the predominance concerns flagged by McKesson by defining the class to include only those TPPs which had contracts based on AWP before the start of the scheme, and would not include any damages for drug reimbursements for drugs under contract, renegotiated or amended during the class period to provide price adjustments." *Id.* at 18.

13.     And yet, the Settlement Proponents nonetheless fail to provide a credible estimate of possible damages in this case. This lack is compounded by the fact that their valuation of the "roll-back" relief is fatally flawed for this, and one more, reason.

14.     First, the same aggregate methodology used to calculate the classes' damages' claim by Dr. Hartman is also used by the same expert to project the value of the "roll-back." Again, this methodology significantly overstates the value because it fails to reflect actual market conditions.

15.     More fundamentally, the damages suffered by the class took place in late 2001 and early 2002 and should have been adjusted for by 2005 -- the McKesson class period. As this Court noted, the defendants' class expert, Dr. Willig, "emphasizes that 'there will be 'market adjustments to a change in an artificial price measurement such as AWP,' ... but he does not dispute that most of these adjustments would take time." *Id.* at 17. Indeed, two examples are of a three year contractual price adjustment, again coinciding with the ending of the McKesson class period.

16.     There is simply no link given by the Settlement Proponents between the damages/injury/harm periods of 2001 - 2005 and the prospective "relief" of a roll-back of prices in 2008. It simply cannot be presumed, as the Settlement Proponents do, that economic injury from an illegal price-hike in 2001 - 2002 can be resolved not by 2008 payments, but by a 2008 price reduction in a very different market. A 4% effective reduction in AWP may not translate into a price savings for TPPs that now pay based on WAC, ASP or other mechanisms that adjusted in 2005 for the 2002 price hike.

17.     Further, without a credible damages estimate, it is impossible to evaluate the Settlement Proponents' claims that FDB is financially unable to fund a settlement. Tellingly, class certification and settlement is not sought on a limited-fund basis.

18. The Settlement Proponents bear the burden of establishing the reasonableness of the settlement, whether for legal or injunctive relief. With all due respect, on the present record, they have utterly failed to establish that a 2008 "roll-back" provides any benefit to the class for damages suffered in 2001 - 2005; instead, the Proposed Settlements provide full releases for a seven year period of time with no benefit to class members.

## II. The Discontinuance of AWP and BBAWP, Without an Alternative, Is Disruptive and Not a Benefit to Class Members.

19. For the industry and many class members, AWP and BBAWP are pricing standards. It is unclear from the settlement what benefit the Settling Defendants' agreement to discontinue those fields in their electronic data provide to the class, especially since no alternative has been proposed.

20. It can be argued in fact that instead of a benefit to many class members, this aspect of the settlement may be a detriment, and, at a minimum, is disruptive.

## CONCLUSION

For the foregoing reasons, the BCBSM urges this Court to reject the Proposed Settlements as presently structured.

Respectfully submitted, this the 21st day of December, 2007.

_____
Kimberly R. West
Attorney for Blue Cross and Blue
Shield of Michigan

Of Counsel:
Wallace, Jordan, Ratliff & Brandt, LLC
Post Office Box 530910
Birmingham, Alabama 35253
Telephone: (205) 870-0555
Facsimile: (205) 871-7534

6

## CERTIFICATE OF SERVICE

I certify that I have, on this 21st day of December, 2007, served a copy of the foregoing document on the following by United States mail, first class, postage prepaid, and addressed as follows:

Mr. Thomas S. Sobol, Esq.
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

_____
Of Counsel