UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN, <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, <br><br> Defendants. | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' OPPOSITION TO MCKESSON'S MOTION
TO DISMISS THE RICO CLAIM OF THE U&C CLASS AND
FOR JUDGMENT ON THE PLEADINGS ON THE
RICO CLAIMS OF CLASSES 1 AND 2**

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

McKesson has requested oral argument.  Plaintiffs do not believe McKesson's motion deserves such.  For example, McKesson urges the Court to overturn First Circuit law and to impose a reliance requirement for RICO.  Plaintiffs do not believe oral argument would assist the Court on this or other issues raised by the motion.

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ................................................................................................1

II. FACTS ...............................................................................................................1

III. ARGUMENT .....................................................................................................3

    A.    McKesson's Motion to Dismiss Should be Denied Because Plaintiffs Have Alleged Facts that Satisfy the RICO Causation Element ..............................3

        1.    Rule 9(b) specificity requirement does not extend to causation allegations ..................................................................................................3

        2.    Plaintiffs allege facts sufficient to establish proximate cause ...................6

        3.    McKesson severely understates its role in the scheme ...............................8

        4.    Uninsured consumers were targeted and directly harmed by McKesson's price fixing scheme .................................................................10

        5.    Plaintiffs are entitled to the presumption that there is a correlation between the U&C and AWP ....................................................................12

    B.    McKesson's Motion for Judgment on the Pleadings Should be Denied Because, Under the Law of the First Circuit, Reliance is not a Necessary Element of a RICO Fraud Claim ....................................................................14

        1.    *Systems Management's* refusal to impose a reliance requirement for RICO fraud claims is the holding of the case, not dicta.....................14

        2.    Rules of statutory construction do not require the importation of a specialized condition for common law civil fraud where a civil RICO claim is predicated on a violation of a criminal statute.................16

        3.    McKesson conflates "reliance" and "causation" .......................................19

IV. CONCLUSION.................................................................................................20

EXHIBIT A: CAUSATION ALLEGATIONS...........................................................22

EXHIBIT B: ALLEGATIONS THAT THE SCHEME AND ITS IMPACT WAS NOT BASED ON THE FDB SURVEY OR FDB REPRESENTATIVES BUT WAS DRIVEN BY THE ACTIONS OF MCKESSON ...............................25

# TABLE OF AUTHORITIES

<u>**PAGE**</u>

**CASES**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451, 126 S. Ct. 1991 (2006)...................................................................10, 17, 18

*Aulson v. Blanchard*,
    83 F.3d 1 (1st Cir. 1996)........................................................................................3

*BCS Servs. v. Heartwood 88, Inc.*,
    2007 U.S. Dist. LEXIS 58600 (N.D. Ill. Aug. 10, 2007) ............................................8, 17

*Brown v. Cassens Transp. Co.*,
    492 F.3d 640 (6th Cir. 2007) ..................................................................................16, 18

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001) ............................................................................6

*In re Commercial Tissue Prods.*,
    183 F.R.D. 589 (N.D. Fla. 1998) ..............................................................................6

*Doyle v. Hasbro, Inc.*,
    103 F.3d 186 (1st Cir. 1996)....................................................................................4

*Field v. Mans*,
    157 F.3d 35 (1st Cir. 1998)......................................................................................14

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994).......................................................................................5

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Pa. 1999) ..............................................................................6

*George Lussier Enters. v. Subaru of New Eng., Inc.*,
    393 F.3d 36 (1st Cir. 2004)......................................................................................6

*Globe Wholesale Tobacco Distribs., Inc. v. Worldwide Wholesale Trading, Inc.*,
    2007 U.S. Dist. LEXIS 72656 (S.D.N.Y. Sept. 28, 2007)...............................................12

*Grider v. Keystone Health Plan Cent., Inc.*,
    2006 U.S. Dist. LEXIS 93085 (E.D. Pa. Dec. 21, 2006)................................................18

*Gross v. New Balance Athletic Shoe, Inc.*,
    955 F. Supp. 242 (S.D.N.Y 1997).............................................................................12

*Hamm v. Rhone-Poulenc Rorer Pharms.*,
    187 F.3d 941 (8th Cir. 1999) ................................................................12

*Hanover Shoe v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ..........................................................................13

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992) ............................................................................6

*Hydrogen Peroxide Antitrust Litig.*,
    240 F.R.D. 163 (E.D. Pa. 2007) ..........................................................6

*In re Indus. Diamonds Antitrust Litig.*,
    167 F.R.D. 374 (S.D.N.Y. 1996) ........................................................6

*In re Linerboard Antitrust Litig.*,
    203 F.R.D. 197 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002)................6

*Longmont United Hosp. v. St. Barnabas Corp.*,
    2007 U.S. Dist. LEXIS 48187 (D.N.J. June 22, 2007) ......................13

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ..............................................7, 13

*Marrero-Gutierrez v. Molina*,
    491 F.3d 1 (1st Cir. 2007).................................................................14

*McConaghy v. Sequa Corp.*,
    294 F. Supp. 2d 151 (D.R.I. 2003)...................................................14

*Medgar Evers Houses Tenant Ass'n v. Medgar Evers Houses Assocs., L.P*,
    25 F. Supp. 2d 116 (E.D.N.Y. 1998) ................................................10

*Meng v. Schwartz*,
    116 F. Supp. 2d 92 (D.D.C. 2000) ...................................................12

*Morales-Vallellanes v. Potter*,
    339 F.3d 9 (1st Cir. 2003).................................................................4

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001).........................................................19, 20

*Pasquantino v. United States*,
    544 U.S. 349 (2005)..........................................................................17

*In re Pharm. Indus. Average Wholesale Price Litig.* (*"AWP"*),
    2007 U.S. Dist. LEXIS 26242 (D. Mass. Apr. 2, 2007) ...................................................5

*Phoenix Bond & Indem. Co. v. Bridge*,
    477 F.3d 928 (7th Cir. 2007) ...................................................................................8, 18

*Phoung Luc v. Wyndham Mgmt. Corp.*,
    496 F.3d 85 (1st Cir. 2007)..............................................................................................3

*Pillsbury, Madison & Sutro v. Lerner*,
    31 F.3d 924 (9th Cir. 1994) ...........................................................................................13

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ...................................................................................16, 19

*Rodi v. S. New Eng. Sch. of Law*,
    389 F.3d 5 (1st Cir. 2004)................................................................................................3

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ....................................................................................6

*Schnell v. Conseco, Inc.*,
    43 F. Supp. 2d 438 (S.D.N.Y. 1999)...............................................................................4

*Sikes v. Teleline, Inc*,
    281 F.3d 1350 (11th Cir. 2002) .....................................................................................12

*Systems Mgmt. v. Loiselle*,
    303 F.3d 100 (1st Cir. 2002)...............................................................................14, 15, 19

*United States v. Texas*,
    507 U.S. 529 (1993)........................................................................................................16

*In re Vitamins Antitrust Litig.*,
    2001 U.S. Dist. LEXIS 12114 (D.D.C. June 29, 2001) ...................................................13

*In re Vitamins Antitrust Litig.*,
    209 F.R.D. 251 (D.D.C. 2002).........................................................................................6

*Walters v. First Tennessee Bank, N.A.*,
    855 F.2d 267 (6th Cir. 1988) ...........................................................................................8

## STATUTES

18 U.S.C. § 1964(c) .............................................................................................................6

## I.    INTRODUCTION

McKesson claims that Plaintiffs have not pled causation as to a class of uninsured and underinsured consumers who pay cash for brand-name drugs.  As McKesson acknowledges, Plaintiffs have pled throughout the complaint that a major purpose of the Spread Scheme was to inflate AWPs.  McKesson Br. at 6 (citing Third Amended Complaint ("TAC"), ¶¶ 172-201).  Plaintiffs further allege that the Usual & Customary ("U&C") charge is "tied" to AWP and that AWPs are used by retail pharmacies as the basis for cash pricing decisions.  TAC, ¶¶ 81, 115.  Taken as a whole, these allegations establish causation.  There is no 9(b) requirement as to the causation aspects of RICO that requires additional allegations as to causation.

Having asserted a non-existent 9(b) standard, in a further effort to construct a lack of causation argument for the claims of cash payors, McKesson relies on allegations not found in the complaint, and thus asserts that "there is no equivalent formulaic relationship between AWP and U&C," as a basis for dismissal.  McKesson Br. at 13.  Yet, the complaint alleges such a "tie" and McKesson's unsupported factual arguments as to how the U&C price is established must await discovery.

McKesson next seeks to dismiss the entire RICO claims for Class 1 and 2 by asserting that reliance is required and that the complaint fails to allege reliance.  The First Circuit does not require pleading of reliance.  Even if it did, proof of reliance can come in many forms.  Here the complaint alleges that Classes 1 and 2 relied on AWP as a pricing benchmark and that benchmark was artificially manipulated by McKesson.  If reliance is required, it has been adequately pled.

## II.    FACTS

After the Court certified Classes 1 and 2, Plaintiffs amended their complaint to add claims on behalf of consumers who paid cash for the brand-name drugs inflated by the

- 1 -

McKesson scheme. In the motion seeking to amend the complaint, Plaintiffs submitted evidence to the Court that AWP serves as the basis for the cash (also called the "U&C") charge prices, including a publication from the Academy of Managed Care Pharmacy, stating that "[p]harmacies often use AWP as a cost basis for pricing prescriptions to patients, the Retail or Usual and Customary Price," (MCKAWP 0065867), as well as documentary evidence from the *AWP* litigation defining the U&C prices as "AWP + x."[1] Accordingly, the Third Amended Complaint alleges that, like the members of the certified classes, members of the class of uninsured and underinsured cash paying consumers were overcharged for their purchases when they purchased drugs based on inflated AWPs.

The complaint alleges that at the heart of the scheme was an agreement to fix the price of certain brand-name drugs by using the fictitious markup provided by McKesson which in return raised AWPs on brand-name drugs. TAC, ¶¶ 8-11, 12, 17. This resulted in an increase in prices paid by cash consumers. TAC, ¶ 17. By 2004, McKesson boasted that the Spread Scheme had converted 99% of all brand-name drugs to the 25% markup. The complaint further alleges that end payors (which include U&C customers) pay based upon an "AWP reimbursement formula" and that "retail pharmacies . . . charges" are based on the published AWP. TAC, ¶ 63. U&C payments are tied to reported AWPs and are usually set at a price above AWP. TAC, ¶ 81. Hence, an increase in AWP "impacts" class members. TAC, ¶¶ 17, 81.[2]

---

[1] Previously submitted to this Court as Exhibit 1 to the Declaration of Steve Berman in Support of Plaintiffs' Reply in Support of Motion for Leave to File Third Amended Complaint, Dkt. No. 355.

[2] The allegations most pertinent to causation and McKesson's role in raising prices are contained in Exhibits A and B, attached hereto.

## III.    ARGUMENT

### A.    McKesson's Motion to Dismiss Should be Denied Because Plaintiffs Have Alleged Facts that Satisfy the RICO Causation Element

In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiffs. *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007). However, the court will not credit "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" when evaluating the complaint's allegations. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996). There are no such defects in this complaint.

### 1.    Rule 9(b) specificity requirement does not extend to causation allegations

McKesson argues that Plaintiffs' RICO claim on behalf of the cash paying consumers must be dismissed because Plaintiffs allegedly failed to plead particularized facts to show how the increase in AWPs caused harm to the uninsured consumer class. McKesson Br. at 6. This argument is without merit because "the specificity requirement" of Rule 9(b) "extends only to the particulars of the allegedly misleading statement itself," and "is satisfied by an averment of the who, what, where, and when of the allegedly false or fraudulent representation." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 14, 15 (1st Cir. 2004).

Plaintiffs provide a detailed account of "the who, what, where, and when of" Defendants' false statements and material omissions arising in their scheme to inflate AWPs. McKesson does not contend otherwise. Rule 9(b) has no application to Plaintiffs' remaining allegations including those relating to causation. The other elements of fraud may be averred in general terms. *Rodi*, 389 F.3d at 15. Under the liberal "notice pleading" requirements of Rule 8 a "complaint sufficiently raises a claim . . . as long as relief is possible under any set of facts that

could be established consistent with the allegations." *Morales-Vallellanes v. Potter*, 339 F.3d 9, 14 (1st Cir. 2003).

None of the cases cited by McKesson support the proposition that Rule 9(b) applies to allegations of causation.  For example, McKesson quotes *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438 (S.D.N.Y. 1999) out of context.  As the full quotation makes clear, *Schnell* does not expand Rule 9(b) requirements; it merely stands for the uncontroversial proposition that ***conclusory allegations*** are insufficient to support any necessary elements of a claim:

> With respect to the first type of injury alleged, although the complaint asserts proximate causation in a conclusory fashion, our Court of Appeals requires that a plaintiff allege loss causation with enough particularity to permit a determination whether the factual basis for a claim, if proven, could support an inference of proximate cause.  Here, plaintiff's RICO claims contain no facts that, if proven, would establish a nexus between the loss in share price alleged and Conseco's conduct.

*Id.* at 447 (citations omitted).  The *Schnell* court did not require 9(b) particularity, it required some basis to support an inference of causation.  Here that basis has been provided through the combined allegations of the effect of the Spread Scheme on AWP and the tie between cash prices and AWP.  *See, e.g.*, TAC, ¶¶ 8-11, 17, 63, 140, 124, 127, 128-29, 132, 134, 137, 138.[3]

Similarly, *Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996), also cited by McKesson in its attempt to apply 9(b) to the causation requirement, merely recites the rule that Rule 9(b) applies to the particulars of the false representation:  "Rule 9 requires specification of the time, place, and content of an alleged false representation. . . ." *Id.* at 194 (citations omitted).

*Doyle* dismissed the complaint because there was no specification of the "time, place and content" of an alleged false representation.  *Id.*  However, a "false representation" and causation

---

[3] The allegations in the complaint dealing with causation are in the charts attached as Exhibits A & B.

are not the same.  As to causation, *Doyle* held that a complaint must establish causation but did

not impose 9(b) as to this element.

McKesson likewise misrepresents *In re Pharm. Indus. Average Wholesale Price Litig.*

("*AWP*"), 2007 U.S. Dist. LEXIS 26242 (D. Mass. Apr. 2, 2007) and *First Nationwide Bank v.*

*Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994).  Neither case imposes additional pleading

requirements to support causation.  In *AWP*, the Court rejected the defendant manufacturers'

contention that to satisfy Rule 9, plaintiffs would have to identify the specific spread that each

defendant set for each drug.  The Court concluded that the plaintiffs had provided enough other

details to specifically identify a scheme to inflate AWPs.  2007 U.S. Dist. LEXIS 26242, at

*122-23.  This argument has no relevance in this case where the plaintiffs have specifically

identified the inflation for each drug and the specifics as to the time, place and content of the

false representations at issue.

*First Nationwide* is also distinguishable.  There the plaintiff loaned money to the

defendant mortgage broker based on the value of certain commercial properties in the New York

Metropolitan area that were pledged as collateral.  The plaintiff claimed that it was forced to

foreclose loans that were secured by properties, whose values the defendants had significantly

overstated.  The court dismissed the complaint because the plaintiff could not provide a reliable

measure to estimate the actual value of the properties at the time that the loans were made and

thus had no reliable basis for claiming that the defendants had made overstatements and because

the complaint failed to account adequately for the possibility that its losses were caused instead

by a general decline in the area real estate market.  27 F.3d at 770-71.  It did not impose a 9(b)

requirement.

By contrast, Plaintiffs have alleged a sufficient nexus between McKesson's scheme to inflate AWPs and uninsured consumers loss of property in the form of excess payments for cash purchases of brand drugs based on the AWP benchmark. *See* Exhibit A & B. These allegations are sufficient to show actual causation.

### 2. Plaintiffs allege facts sufficient to establish proximate cause

McKesson also contends that Plaintiffs have failed to allege "but for" proximate cause. To have standing in a civil RICO claim, a plaintiff must allege injury to "business or property by reason of" the claimed RICO violations. 18 U.S.C. § 1964(c). In order to satisfy this requirement, a plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). This requires a showing of proximate cause: "plaintiffs may not recover in a civil RICO claim if their injuries are so far removed from the defendant's acts that they are indirect and derivative." *George Lussier Enters. v. Subaru of New Eng., Inc.*, 393 F.3d 36, 51 (1st Cir. 2004).

None of McKesson's arguments on proximate causation have any merit. McKesson claims that Plaintiffs have not alleged proximate cause because the complaint focuses primarily on the effect of pharmacies on third-party reimbursement. But McKesson conveniently disregards allegations that a purpose of the scheme was to increase the retail price of brand drugs, *see*, *e.g.*, TAC, ¶¶ 8, 9, 124, 127-29, 137-38, and that such an increase directly impacted the uninsured class, whose payments are also tied to AWP. *Id.*, ¶¶ 11, 6-17, 80-82, 114. These allegations are sufficient to establish proximate cause based on a manipulation of benchmark prices.[4]

---

[4] *See*, *e.g.*, *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 595 (N.D. Fla. 1998); *In re Hydrogen Peroxide Antitrust Litig.*, 240 F.R.D. 163, 174 (E.D. Pa. 2007); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 353 (N.D. Cal. 2005); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 266 (D.D.C. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 317-18 (E.D. Mich.

To defeat causation, McKesson ignores these allegations and asserts that there is "no correlation between an increase in AWP and a corresponding increase in the U&C price." McKesson Br. at 7. That may be a fact McKesson attempts to prove in opposition to class certification or at trial, but it cannot defeat the obvious causation that is pled – that an increase in AWPs led to an increase in price to the cash consumer because cash prices are "AWP +" or tied to AWP. *See* Exhibit A.

McKesson also claims that Plaintiffs cannot establish proximate cause because pharmacies and not McKesson set the U&C charge. But McKesson is not relieved of liability for manipulating AWPs simply because pharmacies set the final price that uninsured consumers pay:

> A proximate cause need not be a precipitating or "but for" cause, in the sense of being the last cause in a chain of events leading to the harm, but need only be a substantial cause of a succession of events that in a logical sequence ultimately causes a plaintiff injury. Here it was defendants who instigated both the culpable and the innocent intermediaries to commit acts that were not only foreseeable but intended. By way of analogy, a company that issues its stock at a fraudulently inflated price is not insulated from liability by the intervening acts of the brokers, transfer agents, and financial analysts who promote the sales of its stock, execute trades on behalf of injured investors, and report the company's falsified financial statements. Plaintiffs' allegations that as a result of the Lupron(R) marketing scheme they were induced to make many millions of dollars in overpayments for the drug is more than sufficient to satisfy RICO's causation requirement at the pleading stage.

*In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 175 (D. Mass. 2003) (internal citation omitted).

Even if the pharmacies were "innocent intermediaries," it was McKesson's conduct in implementing the scheme that had a foreseeable impact on any person or entity that paid based

---

2001); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 219 (E.D. Pa. 2001), *aff'd*, 305 F.3d 145 (3d Cir. 2002); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996).

on AWP.  This is sufficient to establish proximate cause.  It is immaterial that pharmacies set the

actual price for uninsured consumers as long as that price, like the price defined by the TPP

reimbursement contract, is tied to or influenced by inflated AWPs.

### 3.    McKesson severely understates its role in the scheme

McKesson tries to avoid this result by intentionally overstating the role of First

DataBank's misrepresentations in the scheme to raise AWPs and minimizing its own role.

Under McKesson's reformulation of Plaintiffs' RICO claim, the fraud depends entirely on First

DataBank's false representation that it surveyed wholesalers other than McKesson to calculate

AWP.  McKesson Br. at 9.  But, as this Court recognized in its Order on certification of Classes

1 and 2, the chief harm lies not in the dissembling by FDB, but in the price manipulation that

occurred behind the scenes.

> [A] clear and distinct relationship exists between the injury to the
> named plaintiffs and the conduct [a]ffecting the two classes.  In
> other words, all members of the two classes . . . suffered harm
> resulting from the across the board 5% markup of drugs.

Aug. 27, 2007 Order at 12 (Dkt. No. 317); *see also Phoenix Bond & Indem. Co. v. Bridge*, 477

F.3d 928, 932 (7th Cir. 2007) (*discussed infra*) ("The mail fraud statute, 18 U.S.C. § 1341,

defines a ***fraudulent scheme***, rather than a particular false statement, as the crime.  It is illegal to

obtain money by a scheme that entails fraud, if use of the mail is integral to the scheme.")

(emphasis added); *BCS Servs. v. Heartwood 88, Inc.*, 2007 U.S. Dist. LEXIS 58600, at *20 (N.D.

Ill. Aug. 10, 2007) (explaining that "[t]he mailings need not be fraudulent themselves, rather the

'use of the mail' must be 'integral to the scheme [to defraud].'") (quoting *Phoenix Bond*, 477

F.3d at 932).[5]

---

[5] *Walters v. First Tennessee Bank, N.A.*, 855 F.2d 267 (6th Cir. 1988), cited by McKesson as
contrary authority, actually supports Plaintiffs' claim for fraud based on inflated prices.  *Walters*
dismissed the plaintiffs' RICO claim against the defendant bank because the plaintiff, an

First DataBank's misrepresentations were just a part of the plan to hide McKesson's price fixing scheme. McKesson's motion ignores critical allegations that McKesson conceived of the scheme to inflate AWP/WAC markups (its self-described "AWP expansion" or "normalization" project), to create better profit margins for retail pharmacies and that it sought out First DataBank to carry out the scheme because it recognized that First DataBank had a virtual hold on the market. TAC, ¶¶ 122- 37. McKesson's argument thus ignores that the heart of the scheme was the "collaboration to raise the WAC-to-AWP spreads," a collaboration that went beyond the FDB survey issue. TAC, ¶¶ 9-10. *See also* Exhibit B, which contains some of the key allegations regarding McKesson's role in raising AWPs. And it was this scheme that caused the injury to cash paying customers. TAC, ¶ 17.

McKesson also falsely claims that its decision to increase the markup on its list prices to 25% is not part of the Spread Scheme. Not true. The Third Amended Complaint makes clear that this was the first step in a scheme to publish artificially inflated AWPs. *See*, *e.g.*, TAC, ¶¶ 13, 122, 125, 127-28; *see also* Exhibit B. McKesson's internal documents testify to the importance of this step:

> McKesson "is doing our part" by raising our markup to 25% on brand products to establish our Suggested Sell or Retail List Price which is the price FDB surveys. ***Without us doing this, the AWP's most likely would not change.***

MCKAWP 0069732 (emphasis added). McKesson's decision to alter the brand drug markups rather than relaying the manufacturers' established markups was unprecedented, as is evident from the responses of several of the largest drug manufacturers who vigorously objected to

---

experienced businessman and member of the board of another national bank, negotiated the loan on the basis of his own assumption of what "prime rate" meant. *Id.* at 272. The court specifically acknowledged that a fraud claim might have been warranted if the bank had actually published a false interest rate. *Id*. By contrast, Plaintiffs' RICO claim ***is*** based on the publication and dissemination of fraudulently inflated AWPs.

FDB's changes to their markups but chose, for whatever reason, not to go public with the information.  TAC, ¶¶ 9, 145, 152-56, 178.  It was also inconsistent with the conduct of the other wholesalers who refused to engage in price setting.[6]  Throughout this affair McKesson acted deceptively and with the acknowledged intent of artificially raising brand drug prices.  For example, an internal McKesson e-mail states:

> Our successes recently and during this past year includes raising AWP spreads to 20% (markup of 25%) include Parke Davis (division of Pfizer), Searle (division of Pharmacia), GlaxoSmithKline (Glaxo was at 16 2/3%), AstraZeneca, TAP, Berlex, JOM including Alza and Centocor, parts of Merck and BMS where things were mixed between 16 2/3% and 20%, and more to come.  Some of our friends in retail that I have spoken with are pretty overwhelmed that we would be "driving" this process on their behalf.  Of course, we are not solely responsible for this "normalizing" of AWP's but we have done our part as I have discussed with your previously.

TAC, ¶ 182.

### 4.    Uninsured consumers were targeted and directly harmed by McKesson's price fixing scheme

This Court has previously held that Plaintiffs have stated allegations respecting the Certified Classes that meet RICO's causation requirement by showing that the Defendants engaged in a scheme to increase AWP/WAC markups on brand-name drugs; that the price of the subject drugs increased consistent with this scheme; and that Class members purchased the subject drugs at an inflated price consistent with the scheme.  This applies equally to the uninsured Class, where uninsured consumer Plaintiffs have alleged that they, too, purchased drugs based on AWPs inflated by McKesson.

---

[6] Jody Taylor (7.20.07) Dep. at 27:6-13 (testifying that Cardinal's list prices reflect manufacturer's suggested AWPs or their standard markup); Dennis Lindell (10.23.07) Dep. at 75:7-17 (testifying that AmeriSourceBergen's list prices reflect the manufacturer's suggested AWP or its historic markup).

None of the cases discussed by McKesson suggest a different result. *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 126 S. Ct. 1991 (2006) and *Medgar Evers Houses Tenant Ass'n v. Medgar Evers Houses Assocs, L.P*, 25 F. Supp. 2d 116 (E.D.N.Y. 1998) merely stand for the proposition that only the direct victims of a fraudulent scheme have standing to bring a RICO claim.

In *Anza* the plaintiff was a competitor of the defendant, who allegedly charged its cash paying customers a lower price because it did not include sales tax. The Court concluded that the allegations were too attenuated to support a claim under § 1962(c) because the State of New York, to whom the taxes were owed, was the only direct victim and the derivative nature of the injury would result in difficulties of proof because it would be difficult to establish what part of the plaintiff's loss of business was attributed to the defendant's alleged tax fraud as opposed to other market factors. 126 S. Ct. at 1997-98. Here, there will be no such difficulty in proof and Dr. Hartman has already calculated damages for the uninsured class. No other entity suffered these damages, unlike the case in *Anza*.

In *Medgar Evers Houses Tenant Ass'n v. Medgar Evers Houses Assocs, L.P*, 25 F. Supp. 2d 116 (E.D.N.Y. 1998), the tenants of a federally subsidized low-income housing project sued their landlords for allegedly fraudulent representations made to the Department of Housing and Urban Development ("HUD") regarding the condition of the project. The plaintiffs argued that defendants' fraudulent practices enabled defendants to get and keep federal funds that could have been expended on the plaintiffs. The court dismissed the claim, reasoning that by the plaintiffs' own admissions HUD was the defendants' sole target of the misrepresentation and it was HUD, not plaintiffs, who lost the funds. *Id.* at 122-23.

By contrast McKesson's scheme was directed at increasing the cost of brand drugs at retail and thus directly affected consumer purchasers. Because the uninsured consumers purchased drugs that were inflated based on fraudulently inflated AWPs, they were both the direct victims of McKesson's scheme.[7]

5.    **Plaintiffs are entitled to the presumption that there is a correlation between the U&C and AWP**

Lastly, McKesson argues that the complaint should be dismissed because Plaintiffs have not specifically alleged how U&C prices are tied to AWP and because McKesson claims there is no formulaic relationship between U&C and AWP and thus no basis for establishing McKesson's liability. Obviously, McKesson's conclusory allegation has no weight on a motion to dismiss, and the Court is required to assume the truth of the facts asserted in the Third Amended Complaint and draw all inferences in favor of the Plaintiffs. While the parties have not yet conducted focused discovery on this issue, evidence has already surfaced to indicate that AWPs serve as a benchmark for the U&C (*see* TAC, ¶ 11), and Plaintiffs have a good faith basis

---

[7] None of the other decisions cited to support its argument that uninsured consumers were not the intended victims of McKesson's Scheme is any way remarkable. For example, in *Globe Wholesale Tobacco Distribs., Inc. v. Worldwide Wholesale Trading, Inc.*, 2007 U.S. Dist. LEXIS 72656 (S.D.N.Y. Sept. 28, 2007), the court found *Anza* controlling and dismissed a RICO claim brought by a plaintiff tobacco wholesaler, who accused its competitor of selling products at lower prices by providing illegal rebates, falsifying tax returns and selling contraband products. And the decisions cited in footnote 5, *Sikes v. Teleline, Inc*, 281 F.3d 1350 (11th Cir. 2002); *Hamm v. Rhone-Poulenc Rorer Pharms.*, 187 F.3d 941 (8th Cir. 1999) and *Meng v. Schwartz*, 116 F. Supp. 2d 92 (D.D.C. 2000) are merely cited as further support for the uncontroversial proposition that RICO claimants must be the intended victim of the racketeering activity. Similarly, McKesson relies on the antitrust lawsuit, *Gross v. New Balance Athletic Shoe, Inc.*, 955 F.Supp. 242 (S.D.N.Y 1997), for the same proposition.

Unlike the plaintiffs in those cases, the uninsured consumers lost money as a result of purchasing drugs at a price fraudulently inflated by McKesson's scheme. Because McKesson's scheme sought to increase the price of brand drugs at retail, uninsured consumers of brand drugs were both McKesson's targeted victim and directly harmed by its scheme.

for their allegation.  At this stage in the litigation, Plaintiffs are entitled to the inference that this is a general industry practice.

McKesson's claim that the independent pricing discretion of the pharmacies prevents a finding of proximate cause is inconsistent both with the definition of proximate cause in *In re Lupron*, 295 F. Supp. 2d at 175 and with the antitrust cases involving the manipulation of baseline prices.  Plaintiffs have alleged that McKesson engaged in a scheme to inflate AWPs knowing and, in fact, intending that pharmacies would charge excess prices at retail based on the inflated benchmark prices.  Assuming that Plaintiffs can prove that AWP is a benchmark for the prices that the uninsured consumers paid, they will be able to satisfy proximate cause.[8]

---

[8] The cases McKesson relies on to support its proposition that pharmacies' independent pricing discretion breaks the causal link between McKesson's misconduct and Plaintiffs' injury are inapposite.  The issue never arises because in each case the plaintiffs were found not to be the direct victim of the fraud.  For example, in *Longmont United Hosp. v. St. Barnabas Corp.*, 2007 U.S. Dist LEXIS 48187 (D.N.J. June 22, 2007), the plaintiffs sued their competitor, alleging that it had submitted inflated claims to the federal government and received excessive payments from the government that eventually resulted in the government awarding plaintiffs lower Medicare reimbursements than they otherwise would have received.  Citing the *Anza* decision, the court dismissed the claim, reasoning that the government, not the plaintiffs was the direct victim of the defendant's allegedly fraudulent claims.  Similarly in *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924 (9th Cir. 1994), the court dismissed the subtenant plaintiff's claim against the building owner for fraudulent transfer to inflate the ostensible value of the property because the tenant from whom the plaintiff rented the property was the direct victim and the plaintiff's claim was merely derivative.  And in *In re Vitamins Antitrust Litig*, 2001 U.S. Dist. LEXIS 12114 (D.D.C. June 29, 2001) the court dismissed the plaintiffs' antitrust claims because "[r]egardless of how plaintiffs phrase it, they bought their pre-mix products from companies other than the defendants in this case; therefore, their relationship to these defendants is, by definition, indirect."  *Id.* at *20.  None of these decisions involves discretionary decisions by third-parties or otherwise invokes the doctrine of intervening cause.

Nor did *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (quoted in McKesson Br. fn. 6) address third-party pricing decisions as intervening acts.  *Hanover Shoe* holds that a plaintiff may recover damages arising from an antitrust injury even if it has already passed on the costs associated with the overcharge to its customers.  In the passage McKesson quoted, the Court rejected the defendant's request to modify the rule to require the plaintiff to prove that it could or would not have raised its prices absent the overcharge by its supplier, reasoning that there may be many economic factors leading to a price increase and that the suggested defense was neither equitably nor economically justified.

**B.    McKesson's Motion for Judgment on the Pleadings Should be Denied Because, Under the Law of the First Circuit, Reliance is not a Necessary Element of a RICO Fraud Claim**

"The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 5 (1st Cir. 2007). McKesson's motion for judgment on the pleadings, is a reiteration of the reliance argument in its rejected petition for appeal to the First Circuit. Plaintiffs opposed the petition both on procedural grounds – McKesson's failure to argue the issue before this Court – and on the merits – because reliance is not a required element of a RICO fraud claim under *Systems Mgmt. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002).

McKesson argues that the First Circuit's denial on procedural grounds implies a disavowal of the *Systems Management* decision. Such a strained reading is contrary to appellate procedure. "A court that refuses to address an issue on procedural grounds cannot reasonably be said to have decided the merits of that issue, even implicitly." *Field v. Mans*, 157 F.3d 35, 42 (1st Cir. 1998). *Systems Management* remains good law and requires dismissal of McKesson's motion for judgment on the pleadings.

**1.    *Systems Management's* refusal to impose a reliance requirement for RICO fraud claims is the holding of the case, not dicta**

McKesson argues that the First Circuit's refusal to import a common law reliance requirement into the RICO statute in *Systems Management* is "dicta," and that it would be error for this Court to follow it. "Dicta constitutes 'opinions of a judge which do not embody the resolution or determination of the specific case before the court.'" *McConaghy v. Sequa Corp.*, 294 F. Supp. 2d 151, 160 (D.R.I. 2003) (quoting BLACK'S LAW DICTIONARY 454 (6th ed. 1990)). There can be no question that *Systems Management's* interpretation of the RICO statute and

analysis of the reliance issue was central to the determination of the case and therefore

constitutes its holding, not dicta.

In *Systems Management*, the defendant sought a reversal on two grounds:  first, that the

district court erred in rejecting his reliance argument and secondly because RICO's "pattern of

racketeering" requirement was not satisfied.  303 F.3d at 103.  The First Circuit reviewed his

reliance argument first:  "But, says [defendant] Loiselle, and this is his first argument on appeal,

the essence of civil fraud is reliance on deception, and there is no proof here that Loiselle ever

made false statements to his workers or that they relied on his false statements to the college."

*Id*.  The First Circuit rejected the argument:

> [U]nder a literal reading of RICO – the presumptive choice in
> interpretation – nothing more than the criminal violation and
> resulting harm is required.
>
> This is not a conclusive argument; common law (and other)
> concepts can often be imported to flesh out a federal statute.
> Indeed, we assume here that Congress intended to require not only
> "but for" but also "proximate cause" to link the criminal act with
> the harm to the plaintiff, even though the statute says nothing
> specific on this point.  But proximate cause – largely a proxy for
> foreseeability – is not only a general condition of civil liability at
> common law but is almost essential to shape and delimit a rational
> remedy:  otherwise the chain of causation could be endless.
>
> By contrast, reliance is a specialized condition that happens to
> have grown up with common law fraud. Reliance is doubtless the
> most obvious way in which fraud can cause harm, but it is not the
> only way:  Loiselle does not deny that a reasonably predictable
> consequence of his mailings was, by deceiving the college, to
> enable him to continue to underpay his workers.  There is no good
> reason here to depart from RICO's literal language by importing a
> reliance requirement into RICO.

*Id*. at 104.  Once the court considered and rejected the reliance argument, it then turned to the

defendant's alternate argument, which it found to be a sufficient ground for reversal.  Because

- 15 -

the reliance argument was considered first and on the merits, it was decisive for the resolution of the appeal and thus not dicta.

Courts interpreting *Systems Management* have recognized that its reliance analysis is the holding of the case, not mere dicta. *See*, *e.g.*, *Brown v. Cassens Transp. Co.*, 492 F.3d 640, 644 n.3 (6th Cir. 2007) ("[W]e acknowledge that the First Circuit has taken a different approach to civil RICO liability, . . . holding that 'under a literal reading of RICO-the presumptive choice in interpretation-nothing more than the criminal violation and resulting harm is required[.]'"); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 (9th Cir. 2004) (describing the holding of *Systems Management* as not requiring reliance "to prove civil RICO claim predicated on mail fraud").

> **2.    Rules of statutory construction do not require the importation of a specialized condition for common law civil fraud where a civil RICO claim is predicated on a violation of a criminal statute**

Asking this Court to overturn First Circuit law, McKesson argues that cannons of statutory construction require the Court to impose the common law reliance requirement for civil RICO fraud claims because most states require reliance to prove civil fraud. However, the cases on which McKesson relies do not support that proposition. *United States v. Texas*, 507 U.S. 529, 534 (1993) holds that when federal statutes "invade the common law" they are to be interpreted consistent with common law principles. But as Justice Thomas points out in his dissenting opinion in *Anza*, there is no common law equivalent of a civil action based on mail or wire fraud. 126 S. Ct. at 2008. "Nor is there any reason to believe that Congress would have defined 'racketeering activity' to include acts indictable under the mail and wire fraud statutes, if it intended fraud-related acts to be predicate acts under RICO only when those acts would have been actionable under the common law." *Id.*

McKesson's reliance on the criminal case, *Pasquantino v. United States*, 544 U.S. 349 (2005), for the proposition that the wire fraud statute incorporates civil common law principles is also unavailing.  The question before *Pasquantino* was whether a particular common law principle – the revenue rule barring courts from enforcing foreign tax laws – restricted the government's authority to prosecute a scheme conducted in the United States to evade the Canadian alcohol import taxes.  *Pasquantino* did not reach any ruling about the general applicability of common law to the wire fraud statute.  More to the point, *Pasquantino* was a criminal case and did not reach any conclusions about common law fraud requirements applied to a civil RICO claim predicated on wire fraud.[9]

Moreover, the number of circuit courts currently requiring proof of reliance to prevail on a RICO fraud case, may change in the future.  Notably, in *Anza*, the only Justice to address the issue (Justice Thomas) wrote separately to express his conclusion that reliance is not an element of a civil RICO claim.

> Here, by contrast, the civil action provision cannot be read to always require that the plaintiff have relied on the defendant's action.  Reliance is not a general limitation on civil recovery in tort; it "is a specialized condition that happens to have grown up with common law fraud." [citing *Systems Management*]  For most of the predicate acts underlying RICO violations, it cannot be argued that the common law, if it even recognized such acts as civilly actionable, required proof of reliance.  *See* § 1961 (2000 ed., Supp. III).  In other words, there is no language in § 1964(c) that could fairly be read to add a reliance requirement in fraud cases only.  Nor is there any reason to believe that Congress would have defined "racketeering activity" to include acts indictable under the mail and wire fraud statutes, if it intended fraud-related acts to be predicate acts under RICO only when those acts would have been actionable under the common law.

---

[9] McKesson's interpretation is also inconsistent, for example, with *BCS Servs. v. Heartwood 88, Inc.*, 2007 U.S. Dist. LEXIS 58600, at *20 (holding that in a RICO fraud case it was not necessary for the plaintiffs to prove that the mailings themselves be fraudulent, rather that the use of the mail be integral to the scheme to defraud).

126 S. Ct. at 2007-08 (Thomas, J., dissenting in part).

The Sixth Circuit recently considered the issue in *Brown v. Cassens Transp. Co.*, 492 F.3d at 643 and, while the plurality upheld prior Sixth Circuit precedent requiring reliance, all agreed that the First Circuit took a reasonable approach to the reliance issue and two of the judges, who opined that the First Circuit had reached the better decision on reliance, recommended en banc review on the issue.[10]

In the Third Circuit the court in *Grider v. Keystone Health Plan Cent., Inc.*, 2006 U.S. Dist. LEXIS 93085 (E.D. Pa. Dec. 21, 2006) conducted an exhaustive review of all the pertinent authority on the issue of whether reliance is an element of a RICO fraud action, *id.* at *53-64, and, in light of no apparent precedent from the Third Circuit, concluded that the reasoning of both the First Circuit in *Systems Management* and of Justice Thomas' dissent in *Anza* was the most persuasive on this issue.  The court "specifically reject[ed] the decisions of the Second, Fourth, Fifth, Sixth, Eighth and Eleventh Circuits and the district courts within [the Third] circuit that have imposed a reliance element as part of RICO mail and wire fraud claims."  *Id.* at *63.  And although the precise issue was not before the Seventh Circuit in *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007), the court's holding suggests that it, too, sides with the First Circuit on the reliance issue.

---

[10] Writing for the plurality, Judge Gibbons acknowledged that:

> [T]he First Circuit has taken a different approach to civil RICO liability. . . .  While we believe the First Circuit's position is legitimate, as a subsequent panel applying the law of this circuit, we are not empowered to disregard our own precedent in favor of the views of other circuits.

*Brown v. Cassens Transp. Co.*, 492 F.3d at 646 n.3.

*Systems Management* is not only good law, but a reasoned opinion, followed by some circuits and cited favorably in a concurring Supreme Court opinion. The Court should therefore decline McKesson's invitation to issue a ruling directly contrary to the First Circuit decision.

### 3.  McKesson conflates "reliance" and "causation"

To meet the causation requirement McKesson would require Class members prove that they were aware of First DataBank's false statements about the way that it calculated AWPs and that they specifically relied on those statements when purchasing the subject drugs. According to McKesson, any Plaintiffs (including a consumer), who lacked industry knowledge about industry price setting mechanisms, would be unable to establish causation. Since McKesson knows consumers cannot possibly know how prices are set – no consumer could seek redress for a scheme like McKesson's – even though thousands of fraudulent wires and mails were used.

But causation does not require proof of reliance. *Systems Management* expressly recognized that in cases involving fraud, reliance is a sufficient but not necessary or only means of proving causation. 303 F.3d at 104. The Ninth Circuit reached the same decision in *Poulos v. Caesars World, Inc.*, where it held that "to prove proximate causation" in the case before it "an individualized showing of reliance [was] required," but "[b]ecause it is neither necessary nor prudent to reach the issue of whether reliance is the ***only way*** plaintiffs can establish causation in a civil RICO claim predicated on mail fraud, we decline to do so." 379 F.3d at 666 (emphasis added).

*Systems Management* and *Poulos* make sense. For example, individualized reliance is not needed to prove causation in price fixing cases. "[A]n illegal price-fixing scheme presumptively damages all purchasers of a price-fixed product in an affected market." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 n.21 (3d Cir. 2001) (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir. 1977)). Thus, in "overcharging cases

that warrant a presumption of reliance," plaintiffs meet the causation element where "they

sustain economic loss by reason of the alleged conduct."  *Newton*, 259 F.3d at 179.  It is likewise

sufficient for Plaintiffs to show here that McKesson participated in a scheme to disseminate false

AWPs, intending that the industry would rely on them, and that Plaintiffs purchased drugs at

prices based on those inflated AWPs.  It is not necessary that Plaintiffs prove that they were

aware of the AWP benchmarks, or Defendants' false representations about them, or of FDB's

role in the purported surveys.

## IV.    CONCLUSION

For the foregoing reasons the Court should deny McKesson's motion on the pleadings

and motion to dismiss.


DATED:  January 15, 2008                        By **/s/ Steve W. Berman**
                                                      Steve W. Berman
                                                      Sean R. Matt
                                                      Nicholas Styant-Browne
                                                     Barbara A. Mahoney
     Hagens Berman Sobol Shapiro LLP
     1301 Fifth Avenue, Suite 2900
     Seattle, WA  98101
     Telephone: (206) 623-7292
     Facsimile: (206) 623-0594

     Thomas M. Sobol (BBO#471770)
     Hagens Berman Sobol Shapiro LLP
     One Main Street, 4th Floor
     Cambridge, MA  02142
     Telephone: (617) 482-3700
     Facsimile: (617) 482-3003

     Elizabeth Fegan
     Hagens Berman Sobol Shapiro LLP
     820 North Boulevard, Suite B
     Oak Park, IL  60302
     Telephone: (708) 776-5600
     Facsimile:  (708) 776-5601

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13 213779 V2

**EXHIBIT A**

**CAUSATION**
**RELATED ALLEGATIONS**

8.     In late 2001, First Data and McKesson reached agreement on how the WAC to AWP markup would be established for hundreds of brand-name drugs. ***The result of this was an agreement to artificially raise and fix the price on brand name drugs and therefore artificially raise prices in that market.*** As part of this agreement, First Data, to the extent it relied upon information other than that provided directly from various drug manufacturers for certain drugs, used the WAC-to-AWP markup provided only by McKesson as the basis for its published AWP and did not "survey" any other wholesalers. To the extent FDB did receive material from other wholesalers, such material was not the basis for the FDB published AWP, only McKesson's information was.

9.     ***And at the same time, McKesson and First Data, without any economic justification, raised the WAC-to-AWP spread to 25% for over four hundred brand-name drugs that previously had received only the 20% markup amount***. To conceal the scheme, McKesson and First Data agreed to typically effectuate price changes only when some other WAC-based price announcement was made by a drug manufacturer. This camouflaged both the associated increase in the WAC to AWP markup and WAC-to-AWP spread and McKesson as the source of the increased markup. McKesson then communicated these new WAC-to-AWP spreads to First Data. First Data, without regard to any change in the actual average wholesale prices occurring in the pharmaceutical marketplace, and without reference to the manufacturers' suggested AWPs (or WACs) for these drugs, and without surveying other wholesalers, ***then published new AWPs with the new WAC-to-AWP markup. First Data's action had the effect of raising the WAC-to-AWP spread by additional percentage points so as to have a 25% difference between pharmaceutical companies' reported WAC and the First Data published AWP***. First Data did so despite receipt of information, in some instances, directly from manufacturers specifying or suggesting a 20% markup as appropriate. On some occasions, some of the manufacturers secretly questioned this increase, but First Data refused to change the published AWP and the manufacturers failed to take any action to remedy defendant's unjustified raise in AWP.

10.     This collaboration between First Data and McKesson to raise the WAC-to-AWP spreads is referred to as the "Five Percent Spread Scheme" or "Spread Scheme." ***The dramatic nature of the Spread Scheme is illustrated by the following chart depicting the hundreds of drugs whose WAC-to-AWP spread was raised as part of the Spread Scheme. The spike in 2002 reflects implementation of the Spread Scheme***:

- 22 -



**Number of NDCs with Spread Change from 20% to 25%, Jan 1999 - Oct 2004**

**Note**: "NDC" means National Drug Code and refers to a number assigned to each drug.

11.   *The spike resulting from the McKesson-FDB Scheme is reflected in a recent GAO study of the prices paid for drugs purchased by elderly cash customers.*



**Annual Percentage Change in Average Usual and Customary Prices for Drugs Frequently Used by Medicare Enrollees, January 2000 through June 2004**

Source: GAO analysis based on data from PACE, EPIC, and BCBS FEP.

Notes:  Prices from PACE and EPIC are for 77 prescription drugs frequently used by Medicare enrollees in BCBS FEP in 2003. Drugs with the same name but different dosages and forms (such as tablets or capsules) were counted as unique drugs.

ªThe change in average usual and customary prices from January 2004 through June 2004 is extrapolated as an annual percentage change.

- 23 -

17.    *As a result of this artificial increase in the markup of the WAC-to-AWP spread from 20% to 25%, thousands of third-party payors and consumers have had their drug prices increased by the Scheme*.

63.    Although retail pharmacies *purchase* pharmaceutical products based upon pricing formulae that employ the WAC, retail pharmacies *get paid* (*i.e.* receive reimbursement) from plan sponsors and consumers based upon an AWP reimbursement formula plus a dispensing fee. This is a fundamental anomaly of the retail distribution channel for drug products – that retail pharmacies' *purchases* are based on prices pegged to the published WAC, but retail pharmacies' *reimbursements* or charges are based on the published AWP.

140.    Before 2000 McKesson estimated that only 20% of the prescription drug manufacturers were 25% mark-up companies.[11] *By early 2002, however, McKesson estimated that through defendants' efforts 90% of the industry had turned to the 25% markup*.[12]  By late 2002, McKesson estimated that the number had increased to 95%.[13]  *In 2004, McKesson estimated that 99% of the prescription drugs were set at a 25% markup*.[14]  McKesson acknowledged that without its efforts, "the AWP's most likely would not change"[15] and that the industry shift "probably speaks to First Data Bank's willingness to work with us to normalize the brand product AWPs."[16]

199.    The defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused plaintiffs and members of the Class to be injured in their business or property because plaintiffs *and members of the Class have paid many hundreds of millions of dollars in inflated reimbursements or other payments for drugs whose AWP was artificially raised as described herein.*

---

[11] MCKAWP 0069502.

[12] MCKAWP 0069609.

[13] MCKAWP 0069502.

[14] MCKAWP 0069766.

[15] MCKAWP 0069732.

[16] MCKAWP 0068599.

**EXHIBIT B**

**Allegations that the Scheme and its Impact
Was Not Based on the FDB Survey or
FDB Representations But was
Driven by the Actions of McKesson**

124.     Shortly after his September 2001 e-mail, ***Roberts approached FDB to discuss FDB's willingness to "normalize the brand product AWPs***." MCKAWP 0068599 (marked "Highly Confidential"). "Normalization" eventually become one of the buzzwords used by McKesson and FDB to describe their manipulation of the WAC-AWP spreads on hundreds of brand name drugs.

127.     In August 2001, despite McKesson's knowledge that AWPs were supposed to be the result of publisher's surveys of actual wholesale prices, McKesson and FDB "***mutually agreed" to move the AWP or WAC-to-AWP spread on all Searle products from 20% to 25%. Thereafter, McKesson and First Data agreed to implement a fundamental change in the WAC-to-AWP markups for branded drugs of all of the major manufacturers***.

128.     That defendants' collusion began as early as August 2001 is documented by an internal memorandum drafted by Bob James, McKesson's Director of Brand Pharmaceutical Production Management, stating:

> After a discussion with FDB last August [2001], ***we mutually agreed to standardize Searle (16⅔% spread) product line because it had been acquired earlier by Pharmacia (20% spread)***. There seemed to be momentum in the industry to move to a normalized markup of 25% on brand Rx products.  In December [2001], after several discussions with FDB about our [normalization] strategy we began to move many of the manufacturers with mixed spreads (16⅔ and 20% products in the same line) to a consistent 25% markup.  These were companies like GlaxoSmithKline,[17] AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novertis, Roche, Schering and several others. These were mixed product lines and we just set their Suggested Sell Prices at a consistent 25% markup.
>
> First DataBank re-surveyed most of these companies during January and February when price increases occurred.  Many of the AWP's have been increased by FDB.  Because a large number of price increases occurred, some AWP's were affected twice, once when the price increase[] took effect and then a second time when

---

[17] GlaxoSmithKline ("GSK") wrote on March 1, 2002 to First Data asking it to explain the "unexpected change" which led First Data to list GSK products with a 25% markup.  (FDB-AWP 053695).

- 25 -

> FDB raised the AWP after the survey process. . . . . Not all
> products in these companies have had AWP increases at this point
> in time.  However, as price increases occur FDB will re-survey
> those products and make their determination.[18]

129.    Beginning sometime in late 2001 or early 2002, First Data, by agreement with McKesson, limited its' purported "surveys" to McKesson and did not "survey" other wholesalers.  *And, irrespective of when exactly it stopped "surveying" other wholesalers, First Data agreed to utilize for markup purposes data received from McKesson.  At the same time and as part of a common plan, McKesson implemented a 5%[19] increase in the WAC-to-AWP markup for hundreds of brand-name drugs that it distributed*.  This increase was from 20% above WAC to 25% above WAC for the affected drugs.  As part of the agreement and following their agreed course of conduct and common plan, First Data then published the new figures for hundreds of brand-name drugs without contacting any other wholesaler, in spite of publicly stating it contacted more than one wholesaler to obtain a "weighted average."  First Data knew that this increase across the board from 20% to 25% was not due to any real economic change in the average wholesale price, and that by publishing this increase, it was not providing "reliable" and "accurate" information as it had promised.  McKesson for its part knew that the 5% increase was not justified by any change in the price of drugs or other change in the marketplace.  Rather, this 5% increase was implemented by McKesson solely to benefit its own pharmaceutical business and the business of its prominent retail pharmacy clients.

132.    *In December 2001, FDB and McKesson engaged in "discussions" that resulted in an increase in the markups of companies "like GlaxoSmithKline, AstraZeneca, Aventis, Berlex, Bristol Myers Squibb, Merck, JOM, and 3M, Forest, Novartis, Roche, Schering and several others*."  MCKAWP 0069608.

134.    An increase in the WAC-to-AWP spread directly results in higher prices to plaintiffs and members of the Class.  For example, in the case of AstraZeneca's Prilosec (as reflected in the chart below), the AWP spread increase raised the AWP for that drug by $295.72.  The following chart reflects, for a single drug manufactured by certain companies, the AWP spread increase and related AWP increase:

---

[18] MCKAWP 69608-09.

[19] Sometimes the increase was more than 5%, as the intent was to raise all markups to 25%. So if a drug was at 18%, it was moved up to 25%.

| Defendant | Drug | AWP Before 2000 | WAC Before 2000 | AWP Spread Before 2000 | AWP After 2000 | WAC After 2000 | AWP Spread After 2000 |
|---|---|---|---|---|---|---|---|
| **Abbott** | Biaxin 500 mg #60 | $396.72 | $334.08 | 18.8% | $437.98 | $350.38 | 25% |
| **AstraZeneca** | Prilosec 40 mg #1000 | $6,171.66 | $5,143.05 | 20% | $6,621.67 | $5,297.34 | 25% |
| **Aventis** | Allegra 60 mg #100 | $118.36 | $98.63 | 20% | $123.29 | $98.63 | 25% |
| **BMS** | Tequin 400 mg #100 | $818.86 | $682.27 | 20% | $895.48 | $716.38 | 25% |
| **GSK** | Combivir #100 | $1,241.26 | $1,034.38 | 20% | $1,370.55 | $1,096.44 | 25% |
| **J&J (Janssen)** | Risperdal 2 mg #500 | $2,320.10 | $1,933.42 | 20% | $2,535.20 | $2,028.16 | 25% |
| **Novartis** | Exelon 2 mg/ml | $246.96 | $205.80 | 20% | $267.29 | $213.83 | 25% |

137. The dramatic across the board increase in the spread on hundreds of brand-name drugs was implemented pursuant to the joint Scheme between McKesson and First Data. As noted, McKesson reported the across the WAC-to-AWP increase to First Data, and First Data in turn agreed to report the new AWPs.

138. First Data was aware that the markups McKesson reported were inflated to improve relations with McKesson's customers – the pharmacies – by increasing their profits. In February 2002 Bob James sent Kay Morgan a document he drafted entitled, "AWP Discussion," which explained that 20% markups "had a negative impact on McKesson's customers' profitability" and that "McKesson has chosen to 'normalize' the markups in the Brand Rx area resulting in a consistent 25% markup or use of the 1.25 factor."[20] Later, on May 1, 2002, he writes to her about the "normalizing process," the term McKesson coined to refer to its efforts to impose a uniform 25% markup on all brand prescription drugs.[21] In an e-mail sent to Alicia Nielson, Senior Research Associate, Product Knowledge Base Services, First Data, in July 2002 Bob James enclosed a prior internal communication in which he explained that McKesson had "been normalizing all Brand Rx mark ups at 25% for the suggested sell price."[22] First Data enthusiastically embraced the "normalization" program, as reported in the following Aventis e-mail dated March 11, 2002 from Guerdon Green, Director of Trade Administration & Development at Aventis:

> First Data Bank has advised me after surveying the wholesalers, they feel that there are very few manufacturers that still have a 20% AWP to WAC spread [sic, markup]. As a result, First Data Bank has determined to employ a higher 25% AWP to WAC [markup] for all Aventis products. This will be implements as we

[20] MCKAWP 0069613.

[21] MCKAWP 0069642.

[22] MCKAWP 0069775.

- 27 -

have price increases.  Immediately ***the entire Allegra line will be moved to a 25% [markup] from its current 20%.***  This will be effective immediately.  The most noticeable impact will be that it will be more profitable to the retail pharmacist to dispense Allegra.

001821-13  213779 V2

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 15, 2008.

/s/ Steve W. Berman
Steve W. Berman

001821-13 213779 V2