# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | CIVIL ACTION: 1:05-cv-11148-PBS |
| Plaintiffs, | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| Defendants. | |

|  |  |
|---|---|
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated, | CIVIL ACTION:  No. 07-CV-10988 |
| Plaintiff, | |
| v. | |
| MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC., | |
| Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF THE FDB/MEDI-SPAN SETTLEMENTS

**TABLE OF CONTENTS**

<u>PAGE</u>

I.    INTRODUCTION ..................................................................................................1

II.   SETTLEMENT SUMMARY ..............................................................................4

     A.    The Settlement Agreement and its Benefits..............................................4

     B.    The Class Has Received Proper Notice .....................................................7

     C.    Exclusions and Objections ........................................................................8

III.  ARGUMENT ......................................................................................................8

     A.    A Settlement Class is Appropriate............................................................9

     B.    The Settlement Agreement Benefits Even Those Consumer Class
          Members Who Stopped Purchasing the Drugs for Which They
          Were Overcharged .....................................................................................9

     C.    If Not Certified Under Rule 23(b)(3), Class Members' Injunctive
          and Monetary Claims Should Be Certified, Settled, and Released
          Under Rule 23(b)(2)................................................................................15

     D.    The Settlement Is Reasonable and Should Be Approved .......................16

          1.    The factors to consider when determining the fairness, adequacy
               and reasonableness of a settlement all favor approval here......................19

               a.    Comparison of proposed Settlement with the likely
                    result of litigation..........................................................20

                    (1)    Class Members will receive valuable consideration
                           for the release of their monetary claims under the
                           proposed Settlement..........................................21

                    (2)    Risks of establishing liability...........................22

                    (3)    Other risks of continuing the litigation .............22

                b.    Stage of the litigation and the amount of discovery
                    completed..........................................................................24

                c.    Quality of counsel..........................................................25

                d.    Conduct of the negotiations ...........................................26

|  | 2. | The absence of significant requests for exclusion further reveal the fairness, reasonableness and adequacy of the settlement | 26 |

|  | 3. | Affirmative support for the Settlement | 27 |

| E. |  | Attorneys' Fees and Expenses are Reasonable | 29 |

| IV. | CONCLUSION | | 30 |

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*In re "Agent Orange" Prod. Liab. Litig.*,
    996 F.2d 1425 (2d Cir. 1993)..........................................................................14

*Agretti v. ANR Freight Sys.*,
    982 F.2d 242 (7th Cir. 1992) ....................................................................12, 13

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)....................................................................................12, 14

*Bell Atl. Corp. v. Bolger*,
    2 F.3d 1304 (3d Cir. 1993)..................................................................................12

*Bussie v. Allmerica Fin. Corp.*,
    50 F. Supp. 2d 59 (D. Mass. 1999) ..................................................................25

*Callahan v. Commonwealth Land Title Ins. Co.*,
    1990 U.S. Dist. LEXIS 14524 (E.D. Pa. Oct. 29, 1990)............................15, 16

*In re Cincinnati Radiation Litig.*,
    187 F.R.D. 549 (S.D. Ohio 1999) ...............................................................15, 16

*City Pshp. Co. v. Atlantic Acquisition Ltd. Pshp.*,
    100 F.3d 1041 (1st Cir. 1996)......................................................................16, 17

*In re Compact Discount Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003) ....................................................17, 19, 20, 29

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) .............................................................................25

*In re Cuisinart Food Processor Antitrust Litig.*,
    1983 WL 153 (D. Conn. Oct. 24, 1983) ..........................................................21

*Cusack v. Bank United of Texas FSB*,
    159 F.3d 1040 (7th Cir. 1998) ..........................................................................21

*Durrett v. Housing Auth. of Providence*,
    896 F.2d 600 (1st Cir. 1990)..............................................................................17

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    177 F.R.D. 54 (D. Mass. 1997)....................................................................20, 25

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    183 F.3d 1 (1st Cir. 1999)........................................................................17

*E.E.O.C. v. Hiram Walker & Sons, Inc.*,
    768 F.2d 884 (7th Cir. 1985) ..................................................................17

*In re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)......................................................................18

*Giusti-Bravo v. United States Veterans Admin.*,
    853 F. Supp. 34 (D,P.R. 1993) ...................................................... *passim*

*Greenspun v. Bogun*,
    492 F.2d 375 (1st Cir. 1974)...............................................................9, 20

*Hawkins v. Commissioner of New Hampshire Dep't of Health & Human Servs.*,
    No.  Civ. 99-143-JD, 2004 WL 166722 (D.N.H. Jan. 23, 2004).......................17

*In re Ikon Office Solutions, Inc.*,
    194 F.R.D. 166 (E.D. Pa. 2000)................................................................13

*Isby v. Bayh*,
    75 F.3d 1191 (7th Cir. 1996) ...................................................................17

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
    671 F. Supp. 819 (D. Mass. 1987) ............................................................17

*Mitchell v. Dutton*,
    865 F.2d 1268, 1989 U.S. App. LEXIS 34 (6th Cir. 1989) .............................12

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ..............................................................22

*Newby v. Enron Corp.*,
    394 F.3d 296 (5th Cir. 2004) ...................................................................13

*Patterson v. Stovall*,
    528 F.2d 108 (7th Cir. 1976) ...................................................................17

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998)...............17

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992).........................................................20

*In re Rite Aid Corp. Sec. Litig.*,
  146 F. Supp. 2d 706 (E.D. Pa. 2001) ...............................................................13

*Rodi v. Ventetuolo*,
  941 F.2d 22 (1st Cir. 1991)...............................................................................12

*Rolland v. Cellucci*,
  191 F.R.D. 3 (D. Mass. 2000)......................................................................19, 25

*In re Thirteen Appeals Arisong Out of the San Juan Dupont Plaza Hotel Fire Litig.*,
  56 F.3d 295 (1st Cir. 1995)...............................................................................29

*Waller v. Financial Corp. of Am.*,
  828 F.2d 579 (9th Cir. 1987) ............................................................................13

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)..............................................................................22

*In re Washington Pub. Power Supply Sys. Sec. Litig. ("WPPSS")*,
  720 F. Supp. 1379 (D. Ariz. 1989) ..............................................................12, 13

*Williams v. GE Cap. Auto. Lease*,
  No. 94 C 7410, 1995 WL 765266 (N.D. Ill. Dec. 26, 1995) .............................22

Plaintiffs and the Settlement Class through their undersigned counsel, respectfully submit

this Memorandum of Law in support of their Motion for Final Approval of the Settlement

Agreements with each respective Defendant.[1]

## I.    INTRODUCTION

This Settlement is between the class of consumers and third-party payors (self-insured

employers, health and welfare plans, health insurers and other third-party payors of prescription

drugs ("TPPs")) and two defendants:  First DataBank (hereinafter "FDB") and Medi-Span.[2]

On June 6, 2007, this Court entered an Order preliminarily approving the FDB Settlement

Agreement as amended and certifying the Settlement Class.[3]  The Settlement Agreement

provides for FDB to:  (i) make changes to its pharmaceutical database by rolling back the

markup factor between WAC and AWP on certain brand-name drugs, from a markup of about

1.25 down to a markup of 1.20 (a decrease of AWP of about 4%), and (ii) cease the compilation

and publication of AWP and Blue Book AWP ("BBAWP") fields of data as the industry pricing

standard within two (2) years from the date of final court approval of the Settlement (subject to

certain conditions).

On August 20, 2007, this Court also entered an Order preliminarily approving the Medi-

Span Settlement Agreement and certifying the Settlement Class.[4]  The Medi-Span Settlement

mirrors the Settlement with FDB, and provides for Medi-Span to cease the compilation and

---

[1] *See* Settlement Agreement with FDB and Settlement Agreement with Medi-Span

[2] The term Defendants as used herein includes both FDB and Medi-Span.

[3] Dkt. No. 270.

[4] *See* Order granting Preliminary Settlement Approval with Defendant, Medi-Span (Dkt. No. 21, Civil Action No. 07-CV-10988).

publication of AWP fields of data as the industry pricing standard within three (3) years from the

date of final court approval of the Settlement (subject to certain conditions).

There can be little doubt from the reaction of the non-parties opposing the settlement that in 2002

and during the Class Period FDB and McKesson did cause an increase in drug prices. These

entities now claim that rolling back prices to pre-conspiracy levels will injure them – claims that

confirm the existence of the scheme and its impact on the class, as more fully described in Class

Plaintiffs' Memorandum in Response to Non-Party Filings Opposing First DataBank and Medi-

Span Settlements filed herewith.

At its core, and no one disputes this, the Settlement brings value to the class by

effectuating a rollback of unlawfully inflated WAC-to-AWP markups. It also provides

transparency for both present and future negotiations on a going forward basis because TPPs are

now aware of the artificial WAC-to-AWP inflation for many branded drugs and can enter

negotiations armed with knowledge that the markup will be, and remain, at 1.20. The benefit of

this transparency is evident from the reactions of the PBMs to the settlement. PBMs are **now**

writing to clients indicating that if prices are rolled back, PBMs will take action to offset the

impact. The PBMs may try to do so but at least TPPs now know what the economic issues are

going into the negotiations as opposed to being the victims of a clandestine price increase

perpetuated by FDB and McKesson.[5]

Plaintiffs believe that the Settlements are fair, adequate, reasonable and in the best

interests of the Class. The relief afforded to the Class – relief through an effective 4% rollback

of the published FDB and Medi-Span AWP for certain retail branded drugs – will have

---

[5] *See* Section III. E., *infra* discussing reaction of class representatives to the Settlement.

substantial financial benefit which greatly outweighs a potential damages recovery at trial from these defendants.

Though the non-party objectors claim the benefit of the rollback is not as great as Dr. Hartman originally estimated, even assuming all of their economic contentions are correct, their expert admits to a benefit of $.76 billion, a sum no one contends can be recovered from FDB and Medi-Span.[6]

In fact, there is little chance of meaningful damage recoveries as to both FDB and Medi-Span. FDB has minimal means to fund any type of settlement or judgment. Because FDB has comparatively little assets, were Plaintiffs able to prove wrongdoing by the company (the existence of which is disputed, of course, by FDB), any eventual litigation judgment against FDB would net the Class far, far less than the projected savings from the rollback even on the worst case scenario for the Class of $.76 billion. Furthermore, the known evidence against Medi-Span for the claim of negligent misrepresentation is not strong. Given Medi-Span's relatively limited role with FDB and McKesson in relation to establishing the five percent WAC-to-AWP scheme, a successful showing of wrongdoing by Medi-Span (the existence of which is again, of course, disputed by the company) would also net the Class far less than the projected savings from the roll-back.

Since the announcement of the preliminary approval of the Settlement Agreement, some non-party PBM and pharmacy interests oppose the Settlements and are attempting to offset any gains that Class Members might obtain by the Settlement. As laid out in detail in a separate filing, the protests of the non-parties should not give rise to any concern by this Court about the

---

[6] *See* Report of Gale Mosteller at p. 8 (Dkt. No. 408-2).

fairness, reasonableness or benefits of the Settlement. These non-parties do not attack any benefits of the settlement besides the roll-back aspect. Moreover, only one consumer has objected to the settlement. Only one TPP has objected to the settlement. Therefore, the bulk of opposition to the Settlement is simply from those who profited from the unlawfully inflated AWP.

Accordingly, Class Plaintiffs move this Court to approve their Motion for Final Approval of the Class Action Settlement.

## II.     SETTLEMENT SUMMARY

### A.     The Settlement Agreement and its Benefits

The proposed resolution achieves benefits for consumers and TPPs. The key aspects of the Settlement Agreement with FDB and Medi-Span include: (1) an effective 4% rollback of the AWP for most widely used prescription pharmaceuticals; (2) the cessation of the publishing of AWP; and (3) access to FDB and Medi-Span data and witnesses as Plaintiffs continue prosecuting litigation against McKesson.

*First*, FDB and Medi-Span have agreed to rollback the markup factor for thousands of formulations of drugs from 1.25 to 1.20. The provisions of the Settlements, therefore, apply to more NDCs than set forth in the respective Complaints. A detailed estimation has been prepared by Plaintiffs' expert healthcare economist of the potential cost savings that might be realized from the rollback. That analysis estimates that the drug coverage represented by the drugs at issue represent approximately 96% of the retail branded drug transactions in the United States. *See* 10/4/06 Declaration of Raymond S. Hartman: Impact & Cost Savings of the First Databank Settlement Agreement, ¶¶ 9-12 (Dkt. No. 123). A reduction in the markup factor of 0.05 off the 1.25 which applies to virtually all these drugs represents a 4% reduction in the stated AWP.

Accordingly, the rollback could effectuate a national 4% reimbursement rate reduction in almost all retail branded drug transactions reconciled through the FDB and Medi-Span databases. This projected savings to all end payors by reason of the relief effectuated by this settlement could reach as high as $4 billion. Admittedly this savings does not compensate the Class for damages during the 2002-2005 Class Period, but it does mitigate the continuing effects of the Scheme because the mark-up effectuated by the Scheme was not rolled back in 2005 when the litigation class period ends but continues in the marketplace.

Dr. Hartman qualified his savings estimate by noting that following the public announcement of the rollback those in the reimbursement chain could attempt to "reverse the effects of the settlement." *Id*. at n.19. This is indeed exactly what ESI, for example, has announced it intends to do. But as Dr. Hartman notes, even if the renegotiation occurs, it will take some time and the disclosure of the Scheme and its rollback may allow TPPs to fight back.[7]

Of course, Class Counsel recognizes that this is an estimate, and that there are a variety of factors that may lead to an appreciable increase, or appreciable decrease, in the total amount of savings effectuated through the rollback. Be that as it may, Class Counsel is of the opinion that the savings effectuated through the rollback will vastly exceed the recoverable and distributable amount of dollars that might be associated with any judgment that could be obtained against FDB and Medi-Span as a result of continued litigation.

***Second***, FDB agreed to cease the publication of the AWP and BBAWP fields within two years after the effective date of the judgment, but only in the event that significant competitors in

---

[7] Declaration of Raymond S. Hartman: Impact & Cost Savings of the First DataBank Settlement Agreement: Response to Interested Parties' Comment at ¶¶ 13-19 ("Hartman Resp. Decl.").

the area of electronic intergratable pharmaceutical databases have ceased the publication of similar fields. Medi-Span has agreed to cease the publication of the AWP field within three years after the effective date of the judgment. In effect, as part of the Settlement both FDB and Medi-Span will not perpetuate the dissemination of AWP and BBAWP information if others are no longer doing so. These institutional reforms add to the growing legislative and policy movements (*see*, *e.g.*, the Medicare Modernization Act of 2003, phasing out the use of AWPs for Medicare part B reimbursements) that are underway. This prospective relief feature helps reduce arbitrary abuse of the WAC-to-AWP markup, whereby aiding in the prevention of further unwanted overpayments for consumers whose co-payments are based upon coinsurance.

*Third*, settlements with FDB and Medi-Span leave the claims of the Class remaining as against the remaining Defendant McKesson, a defendant of far larger financial wealth and ability to pay on the substantial judgment Class Counsel seek to litigate.

*Finally*, because it appears that co-insurance consumer contributions are growing as a form of consumer contribution to prescription drug expenditures, the forward-looking rollback plays a greater, direct benefit to consumers. This is particularly the case since the settlement effectuates a rollback for more than the number of drugs that are at issue in the litigation itself (*i.e.*, could be proven to have been wrongfully inflated during the Class Period). Most consumers who have used drugs in the past and were damaged are likely to use drugs in the future and thus will benefit from lower AWPs. A consumer claim rate for pharmaceutical settlements is typically less than 10%. Therefore, more consumers will benefit from this potential settlement. Moreover, the number of consumers who receive no financial benefit from the future rollback provisions in the Settlements (damaged from past utilization but will not get any benefit from future relief) is inherently small. This group all had the opportunity to opt out

of the Settlement and seek damages, but only 12 consumers have chosen to do so. Such a minute

group of people heavily favors allowing the Settlement and conveying the significant benefits it

conveys to a much larger class.

**B.    The Class Has Received Proper Notice**

In its August 20, 2007 Order preliminarily approving the Settlement, the Court directed

that Kinsella Communications act as the Notice Agent (as defined in the Settlement Agreement

and Release) and directed the Notice Agent to disseminate the Notice as set forth in the Joint

FDB/Medi-Span Settlement Notice Program, which was designed to achieve a reasonable reach

and frequency commensurate with the reach and frequency sought in other pharmaceutical

pricing litigation and which satisfied the requirements of Rule 23 and due process.[8] The Court's

Order required:

> (a)    Publication of the Form of Notice for Publication on dates
> and in publications substantially as set forth in the Exhibits
> to the Declaration of Katherine Kinsella dated August 6,
> 2007 based on Court approval by August 15, 2007;
>
> (b)    Distribution by direct mail of the Form of Notice for
> Mailing to all TPP Class Members that can be identified by
> reasonable means or who have requested a copy, which
> mailing shall be placed in the mail no later than
> September 10, 2007;
>
> (c)    Distribution by direct mail of the Form of Notice for
> Mailing to the Attorney General of each State of the United

---

[8] Two demographic targets were selected to direct and measure media against – Drug
Consumer Adults 35+ and All Drug Consumers. The Adult 35+ target represents 76% of all
consumers who use branded or generic prescription drugs. Print media was selected because it is
the most cost-effective media to obtain reaches above 80%. The paid media program is designed
to deliver the following estimated reach and frequency measurements: An estimated 82.4 % of
Drug Consumer Adults 35+ will be reached with an average estimated frequency of 3.4 times,
delivering 192,957,000 gross impressions. An estimated 81.2% of All Drug Consumers will be
reached with an average estimated frequency of 3.4 times, delivering 246,276,000 gross
impressions.

States;

(d)     Development and management of a toll free number with an automated system providing information about the Proposed Settlement, with the ability to request copies of the Notice or the PSA, during the period from September 10, 2007 until the Final Approval; and

(e)     Development and management of a website to provide information and permit the review and downloading of the Notice, PSA and exhibits, during the period from September 10, 2007 until Final Approval.

Kinsella Communications implemented and completed this Notice Plan as approved by the Court.[9]

## C.     Exclusions and Objections

In the more than fourteen months since the Settlement Agreement was preliminarily announced in October 2006, only one putative consumer class member has objected to the Settlement.  Only one TPP has objected to the Settlement.[10]  This response shows support for the Settlement.  The protests come not from the Class but from those who benefited from the Scheme.

## III.     ARGUMENT

The Settlement Agreement represents a fair, adequate and reasonable resolution in the best interests of the putative settlement class in this litigation.  As such, class certification should be granted for the purposes of settlement and the Settlement should be approved.

---

[9] *See* Declaration of Katherine Kinsella in Support of Joint Notice Program.

[10] The exclusions are contained in the Declaration of Thomas R. Glenn, Regarding Mailing and Publication of Notice to Class Members ("Glenn Decl.").

A.    **A Settlement Class is Appropriate**

A class action cannot be compromised or settled without the approval of the Court. Fed. R. Civ. P. 23(e).[11] On August 27, 2007, this Court certified a class of consumers and TPPs as to defendant McKesson and deferred ruling on the TPP damage claim. *See* Dkt. No. 317.

The Court has received a great deal of briefing on the class certification issues and already certified the Class for liability purposes. The Settlement Class is certifiable for the same reasons and does not raise any of the damage issues that the Court is still considering with respect to McKesson.

B.    **The Settlement Agreement Benefits Even Those Consumer Class Members Who Stopped Purchasing the Drugs for Which They Were Overcharged**

At the hearing on preliminary approval of the FDB settlement the Court observed that the proposed Settlement primarily provides prospective relief. The Court asked counsel to address the issue of the benefit of the Settlements to those consumers who have stopped buying the drugs that they once purchased at inflated rates, since those consumers might not benefit from the future-oriented rollback provisions. Counsel are of the opinion that the Settlements provide meaningful relief even to those consumers who will not in the future buy drugs they previously overpaid for by reason of the FDB/McKesson Scheme, and that these benefits certainly far outweigh the relief that reasonably might be expected to be extracted from either FDB or Medi-Span through contentious litigation and judgment.

---

[11] Plaintiffs have the burden of showing that the proposed Class comports with Rule 23 and the burden of establishing that the Settlement should be approved. *Greenspun v. Bogun*, 492 F.2d 375, 378 (1st Cir. 1974). *See also* MANUAL FOR COMPLEX LITIGATION, FOURTH § 21.631 (2004) ("That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint").

First, it is important to put this issue in perspective. Many of the drugs whose prices were inflated from the Scheme are maintenance products – if consumers took an anti-inflammatory prescription for chronic pain, or if they took a statin to reduce HDL levels, they are likely to continue to do so. Because the rollback provisions of the Settlements apply to a far larger number of drugs (about 8,400 NDCs) than are implicated in the underlying litigation (about 1600 NDCs), consumers who were overcharged in the past for one drug might benefit by the reduced co-insurance in the future for another drug. Many elderly patients who suffered one condition several years ago, might suffer another in the future, and still benefit. And this is particularly the case because the rollback provisions apply to most widely-used branded drugs. Moreover, co-insurance as a form of cost containment for employers and other prescription benefit payors has grown; there are more consumers paying co-insurance than there was in the past. As a result, in general there are more individuals now in the group of potentially benefiting co-insurance consumers. In summary, the segment of consumers who paid inflated charges in the past, but who will not have any opportunity for benefit in the future from the rollback provisions , is a very small segment of all the impacted consumers.

Second, none of the members of this segment have objected to the Settlements.[12] While the Settlements are arguably complicated from a lay perspective, the notice to the Class quite clearly indicated that all claims against FDB and Medi-Span will be released, and that there will be no immediate, lump sum benefit. This Court can and should exercise independent fiduciary protectionism to this segment of the Class, but in doing so it may properly observe that it does

---

[12] It is unclear from the lone consumer objection what current prescription drug payments are made by him.

not have before it a segment of the Class that has voiced loud objection to the prospective nature of some aspects of the Settlements.

Third, all consumer Class Members (whether they are in this small segment or not) benefit from other features of the Settlements. The Settlements do not bar the prosecution of consumer claims against McKesson. At the same time, the financial contribution of $950,000 to be made by FDB will all be spent toward litigation (and to a much smaller extent data room) expenses in prosecuting the consumer and TPP claims against McKesson. Because these payments aid the prosecution of consumer claims and would, if a settlement or judgment were reached against McKesson, offset the financial obligations of the Class at that time, all consumers benefit from the Settlements.

Fourth, even though a small segment of consumers might not benefit from the rollback provisions, the other non-monetary relief inures to their benefit. Consumers whose prescription drug provider switched to a flat co-payment system will still benefit from the cost-savings passed onto them by the TPPs who provide their benefits. Further, the Settlement benefits consumers in general by phasing out the AWP-based reimbursement system to make way for a more transparent pricing system

Fifth, there is the reality of what it would mean for any of the plaintiff litigants to continue to pursue litigation through to a judgment against FDB. FDB's limited assets make a substantial litigation "win" hollow. Even if the Class could recover a full year of FDB profits (approximately $20 million), after the payment of expenses, fees, class notice expenses and a fair allocation to the much larger claims of TPPs, the net recovery check to the hundreds of thousands of impacted consumers might well be less than the cost of administering a process to print and mail it to them. This issue was addressed partly in counsel's amended motion for

preliminary approval, wherein counsel demonstrated that the cost of adjudicating the consumer

claims alone far outweighed the amount Plaintiffs would be likely to obtain from FDB in

satisfaction of a judgment.  *Compare In re Washington Pub. Power Supply Sys. Sec. Litig.*

*("WPPSS")*, 720 F. Supp. 1379, 1390 (D. Ariz. 1989) (approving settlement; noting that the

prohibitive cost of continued litigation and attendant risks meant that "even a verdict for

Plaintiffs might have proven to be a Pyrrhic victory for many Bondholders").[13]

As a general rule a global settlement should provide a "structural assurance of fair and

adequate representation for the diverse groups and individuals affected."  *Amchem Prods. v.*

*Windsor*, 521 U.S. 591, 627 (1997).  While a global settlement that provides no benefits to a

subgroup is generally unfair because it requires class members to waive rights without any

valuable consideration, a fairness assessment of a partial settlement must also take into

consideration the benefit of an early settlement that better enables plaintiffs to pursue damages

claims against the only defendant with the means to satisfy class claims for past damages.  "In

complex litigation with a plaintiff class, 'partial settlements often play a vital role in resolving

class actions.'"  *Agretti v. ANR Freight Sys.*, 982 F.2d 242, 247 (7th Cir. 1992) (quoting 1-PART

A MANUAL FOR COMPLEX LITIGATION SECOND, MOORE'S FEDERAL PRACTICE § 30.46 (1986)).

---

[13] Monetary claims may be released for non-monetary consideration.  For example, in
*Mitchell v. Dutton*, the Sixth Circuit held that prison inmates' suit for money damages based on
alleged racial discrimination was barred by a prior class action settlement that "in extinguishing
all monetary claims, alternatively provided for broad injunctive relief. . . ."  *Mitchell v. Dutton*,
865 F.2d 1268, 1989 U.S. App. LEXIS 34, at *14 (6th Cir. 1989).  *Cf Bell Atl. Corp. v. Bolger*, 2
F.3d 1304, 1311-15 (3d Cir. 1993) (in shareholder derivative action, court applied class action
fairness considerations to approve a settlement that provided only non-monetary relief).
Similarly, the First Circuit has noted the validity of a prior agreement in which "[prison] inmates
agreed to drop their class action against prison officials and abandon their damage claims in
exchange for the State's agreement to institute, and thereafter abide by [certain disciplinary
procedures]."  *Rodi v. Ventetuolo*, 941 F.2d 22, 27 (1st Cir. 1991).

For example, in the *Agretti* case the court approved the class' partial settlement with the

defendant union for declaratory relief and an agreement to cooperate in the case against the

defendant even though the partial settlement provided no monetary relief to the class. *Id*. at 245.

*See also Waller v. Financial Corp. of Am.*, 828 F.2d 579 (9th Cir. 1987) (recognizing the value

of a partial settlement in a securities action with a defendant who agreed to cooperate with

plaintiffs in the ongoing litigation and share in the proceeds obtained from the non-settling

defendant); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (settlement

providing 5-8% of the claimed damages approved in part because of the "non-monetizable value

of the settlement's provision for cooperation between Ikon and the plaintiffs against the non-

settling defendant"); *In re Rite Aid Corp. Secs. Litig*., 146 F. Supp. 2d 706 (E.D. Pa. 2001)

(settlement approved where defendant paid 5-6% of the claimed damages and agreed to

cooperate in the prosecution of the non-settling defendants).

     Additionally, courts recognize that litigation is expensive and attorneys do not have

unlimited funds to pursue complex litigation. *WPPSS*, 720 F. Supp. at 1390. Class members

benefit from settlements that provide funds to support further litigation against the non-settling

defendants. For example, in *Newby v. Enron Corp*., 394 F.3d 296 (5th Cir. 2004), the court

approved a partial class settlement that provided that a little more than a third of the settlement

amount would be set aside to offset the cost of further litigation against the remaining

defendants. *Id.* at 300 n.8.

     FDB and Medi-Span are defendants either with limited means or whose known

involvement was quite limited. The sole remaining defendant, McKesson, is the 18th largest

company in the United States and the only defendant capable of satisfying a judgment for past

damages. By settling with FDB and Medi-Span before trial, Plaintiffs not only receive a partial

payment of their fees and costs but also reduce the cost and attendant risk of litigating against multiple defendants.  This is a valuable benefit to all Class Members.

Moreover, this is not a case like *Amchem*, where there were inherent conflicts between "currently-injured" plaintiffs who sought generous immediate payments and "exposure-only" plaintiffs who sought preservation of ample funds for the future.  521 U.S. at 626.  Because the proposed Settlement in this case provides prospective relief to all Class Members across the board on precisely the same basis, it is more closely analogous to *In re "Agent Orange" Prod. Liab. Litig.*, 996 F.2d 1425 (2d Cir. 1993).  There, the supposed conflict between present and future Class Members was deemed "nonexistent" because plaintiffs whose injuries manifested after settlement approval were eligible for compensation from the same fund, and were thus treated the same as all other class members.  *Id*. at 1435-36.  Also, history suggests that only a small percentage of consumers in pharmaceutical litigation who have claims, actually make claims.  Thus, the number of consumers who have past damages, gain no savings from future relief, fail to opt-out and would have made a claim if damages were obtained from FDB and Medi-Span, is inherently small.  While there is a possibility here that some Class Members will have more significant past damages, but a limited need to purchase prescription pharmaceuticals in the future, these Class Members can simply opt out of the Class and bring individual claims for money damages.

Consequently, there is no procedural or substantive basis precluding the ultimate certification and approval of the proposed Settlement Class with FDB and Medi-Span under Rule 23(b)(3) as being fair, reasonable, and in the best interests of the Class under all of the circumstances.  Thus, for the reasons set forth above and in the prior submissions in support, this Court should grant final approval of the proposed Settlements, including under Rule 23(b)(3).

C.     **If Not Certified Under Rule 23(b)(3), Class Members' Injunctive and Monetary Claims Should Be Certified, Settled, and Released Under Rule 23(b)(2)**

If this Court declines to certify the Settlement Class under Rule 23(b)(3), this Court may certify the proposed Settlement Class pursuant to Rule 23(b)(2) since the notice in these cases provide opt-out rights pursuant to Rule 23(d)(2) to protect absent Class Members' interests with respect to the Settlement and dismissal with prejudice of their claims for monetary relief as part of the proposed settlement. *See Callahan v. Commonwealth Land Title Ins.* Co., 1990 U.S. Dist. LEXIS 14524 (E.D. Pa. Oct. 29, 1990); *In re Cincinnati Radiation Litig.*, 187 F.R.D. 549 (S.D. Ohio 1999).

In *Callahan v. Commonwealth Land Title Insurance Co.*, the district court certified a settlement class under both rule 23(b)(l)(A) and 23(b)(2) and approved a class settlement that abandoned monetary claims in favor of injunctive relief.  The *Callahan* plaintiffs brought a class action alleging consumer protection and conspiracy claims stemming from a title insurer's allegedly excessive Notary Public fees.  The putative class members sought both monetary and injunctive relief.  However, the parties negotiated a proposed settlement providing only for injunctive relief, fees and costs.  The court certified the settlement class under both Rule 23(b)(l)(A) and 23(b)(2), noting that plaintiffs had abandoned their claim for monetary damages. *Callahan*, 1990 U.S. Dist. LEXIS 14524, at *20.  After certifying the class, the court examined the reasonableness of the settlement and stated that:

> In lieu of monetary damages, the settlements provide for injunctive relief.  Although the potential aggregate liability facing the defendants is significant, equitable relief is more than appropriate given the risks inherent in proceeding to judgment and the minimal sum [notary fees] each class member stands to receive if successful.  Moreover, the award of counsel fees provided for in the settlements is reasonable in that the abuses which the settlements are aimed to cure were exposed through the efforts of

> plaintiffs' counsel in advancing such a novel case. Given the
> uncertainty of the outcome of this litigation, the court finds the
> equitable relief and provision for counsel fees and reimbursement
> of notice expenditures to be reasonable.

*Id.* at *54.

In *In re Cincinnati Radiation Litig.*, the court certified a settlement class of cancer

patients who were allegedly exposed to radiation during research studies. The proposed

settlement included both equitable and monetary components. The court determined that

certification pursuant to Rule 23(b)(2) was appropriate with regard to the equitable relief, but

that the monetary claims could not be certified and settled without providing a right to notice and

opt out. 187 F.R.D. at 554-55. Rather than certifying a 23(b)(3) class, the court found that its

provision of notice and opt-out rights pursuant rule 23(d)(2) adequately protected the absent

Class Members, such that certification under 23(b)(2) was appropriate. *Id.* at 555. This is also

what occurred in the case at bar. The Court approved notice, provided adequate protection to

absent Class Members by giving notice that included opt-out rights and thereby permitting the

release and dismissal with prejudice of Class Members' claims for both injunctive and monetary

damages as part of the overall settlement.

**D.    The Settlement Is Reasonable and Should Be Approved**

In determining whether to approve a settlement, the First Circuit, as required by Rule

23(e)(1)(C) has held that "[a] district court can approve a class action settlement only if it is fair,

adequate and reasonable." *City Pshp. Co. v. Atlantic Acquisition Ltd. Pshp.*, 100 F.3d 1041,

1043 (1st Cir. 1996). The Court must undertake a detailed assessment of the terms of the

Settlement, the interests of the Class Members as well as any third parties that might be affected

by the Settlement, and the circumstances of the litigation and the proposed Settlement. *See*

*Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 2, 7 (1st Cir. 1999); *Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *Hawkins v. Commissioner of New Hampshire Dep't of Health & Human Servs.*, No. Civ. 99-143-JD, 2004 WL 166722, at *3 (D.N.H. Jan. 23, 2004).

The First Circuit has given great deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion." *Durrett*, 896 F.2d at 603; *City Pshp. Co.*, 100 F.3d at 1043-44. A court reviewing a settlement "is not to decide whose assertions are correct, but merely to ascertain whether the district court clearly abused its discretion in approving the settlement." *City Pshp. Co.*, 100 F.3d at 1043-44.[14]

In this Circuit, a presumption in favor of settlement is to be found "[w]hen sufficient discovery has been provided and the parties have bargained at arms-length." *City Pshp. Co.*, 100 F.3d at 1043; *In re Compact Disc*, 216 F.R.D. at 207; *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987); *see also* NEWBERG § 11.41 at 453.

---

[14] Also, as a general rule, courts will not substitute their own thoughts for the parties' business judgment in arriving at a settlement. *Patterson v. Stovall*, 528 F.2d 108, 114 (7th Cir. 1976). Accordingly, the Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether Class Members will receive as much from a settlement as they might have recovered from victory at trial. *See Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993) (In evaluating proposed class action settlement, "courts are required to make an inquiry to determine whether the proposal, taken as a whole, is fair, adequate, reasonable and in the best interest of all those who will be affected by it."); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211 (D. Me. 2003) (Judge notes that "[a]s supervising judge [he is] not to prejudge the merits of the case . . . and [is not] to second-guess the settlement, [but is] only to determine if the parties' conclusion is reasonable."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 534 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Courts challenged with evaluating a proposed class action settlement recognize that the "essence of settlement is compromise" and will not represent a total win for either side. *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996) (quoting *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 315 (7th Cir. 1980)).

This settlement was the result of arms-length negotiation between counsel. The negotiations were lengthy and detailed, conducted in several sessions over the course of years. There are simply no allegations of inappropriate conduct by counsel during the settlement negotiation process. There was no collusion, and all the negotiations were conducted at arms length. Therefore the Class Plaintiffs are entitled to a presumption that the Settlement is fair.

As to the adequacy of discovery, this factor is important to determine whether counsel negotiating the settlement is sufficiently aware of the strengths and weaknesses of their case. *See In re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995) (trial court should consider whether counsel participating in the settlement negotiations "had access to *sufficient information* to appreciate the merits of the class's case.") (emphasis added). The Plaintiffs were fully aware of the value of their claims before the case was settled.

Both before and after litigation was commenced, significant discovery was obtained from many sources including those directly from FDB and Medi-Span. Prior to the litigation and in the context of *In Re Pharms. Indus. Average Wholesale Price Litig.*, MDL No. 1456, Class Counsel obtained from FDB records regarding manufacturer and wholesaler communications, drug specific documentation, changes to price data fields, copies of the FDB database (known as the "NDDF") and deposed the senior manager at FDB responsible for the FDB database.

Furthermore, Plaintiffs' Counsel researched the claims against Medi-Span for many months prior to the filing of the original complaint against FDB. Counsel reviewed and analyzed (with health care economists) enormous amounts of pharmaceutical pricing information in order to conduct a forensic analysis of pharmaceutical price markups over time. Counsel also obtained financial information from both FDB and Medi-Span on possible insurance coverage and other documentation regarding the financial and corporate circumstances. In summary, Counsel has

been able to conduct discovery and extensive forensic analysis in order to fully investigate the pertinent legal and factual issues against FDB and Medi-Span.  Class Counsel had conducted sufficient discovery to be intimately familiar with the strengths and weaknesses of their case.

### 1.    The factors to consider when determining the fairness, adequacy and reasonableness of a settlement all favor approval here

Although there is no single test in the First Circuit for determining whether a proposed class action settlement is fair, adequate and reasonable, other Circuits generally have considered "the negotiating process by which the settlement was reached and the substantive fairness of the terms of the settlement compared to the result likely to be reached at trial."  *In re Compact Disc*, 216 F.R.D. at 206; *Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000) ("The fairness determination is not based on a single inflexible litmus test, but, instead, reflects [the court's] studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation.").  Specifically, courts consider some or all of the following factors:

(1)    comparison of the proposed settlement with the likely result of litigation;

(2)    stage of the litigation and the amount of discovery completed;

(3)    quality of counsel;

(4)    conduct of the negotiations; and

(5)    prospects of the case, including risk, complexity, expense and duration.

*In re Compact Disc*, 216 F.R.D. at 206.  Applying these five factors to the proposed Settlement in this case clearly indicates that the Settlement is more than adequate and should be approved.

### a.      Comparison of proposed Settlement with the likely result of litigation

This factor involves the question of "how the value of the settlement compares to the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense." *In Re Compact Disc*, 216 F.R.D. at 207; *Giusti-Bravo*, 853 F. Supp. at 36 (noting that if settlement were rejected, "plaintiffs could very well face a long and winding road toward trial and almost unsurmountable obstacles in attempting to obtain a more comprehensive relief than the one provided"); MANUAL FOR COMPLEX LITIGATION, FOURTH § 13 ("The high stakes in complex cases increase the incentive to avoid the risk of trial, and the burgeoning cost of pretrial activity places a premium on settling early in litigation.").

In making this assessment, a court is cautioned not to "decide the merits of the case or resolve unsettled legal questions." *Giusti-Bravo*, 853 F. Supp. at 36; *Greenspun v. Bogan*, 492 F.2d at 381 (district court should not "engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial"); *Ressler v. Jacobson*, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992) (courts should limit inquiry to "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement").

Also, the Court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim. Nor should the court consider cases of particular individual class members to determine whether each and every member of the class receives the fullest possible compensation." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 68 (D. Mass. 1997).

As part of their settlement negotiations, and the ultimate decision to accept the conditions of the Settlement, Plaintiffs analyzed various risks of continuing litigation. These included risks related to establishing liability at trial and risks relating to the amount of damages that could be

recovered at trial.  A consideration of all the various risk factors and potential recovery reveals

that the Settlement is more than adequate.

> **(1)** **Class Members will receive valuable consideration for the release of their monetary claims under the proposed Settlement**

The proposed rollback provisions of the proposed Settlement will permit Class Members

to purchase a large group of pharmaceutical drugs at lower prices.  *See* Declaration of

Raymond S. Hartman (Dkt. No. 157).[15]  As such, the rollback confers a benefit similar to other

approved class settlements that utilize a means of distributing a prospective benefit to the class

other than the creation of a settlement fund from which to seek individual cash payments.  *See*,

*e.g.*, *In re Cuisinart Food Processor Antitrust Litig.*, 1983 WL 153, at *7 (D. Conn. Oct. 24,

1983).  Class settlements utilizing alternative vehicles for distributing the settlement relief to the

class take into account many of the practical hurdles that the Plaintiffs face in this litigation,

including that the identity of Class Members is difficult to ascertain, the value of individual

damages is minimal, and that neither FDB nor Medi-Span have the financial wherewithal to

provide an equivalent value in cash.  Moreover, courts approving class settlements utilizing fluid

or prospective recoveries recognize that many class members will not avail themselves of the

prospective relief, and will therefore not derive a benefit from the settlement.  *See*, *e.g.*, *Cusack*

*v. Bank United of Texas FSB*, 159 F.3d 1040, 1041 (7th Cir. 1998) ("The credits have a potential

maximum value to the class exceeding $29,000,000.  If not used in their entirety, as they almost

certainly will not be, their value is less, but still not negligible.").  Nevertheless, "the fact that

some objectors would have preferred cash cannot be determinative of the issue whether the

settlement before the court is reasonable."  *In re Cuisinart*, 1983 WL 153, at *7; *see also*

---

[15] *See also* Hartman Resp. Decl. at ¶¶ 10-22, pp. 13-17.

*Williams v. GE Cap. Auto. Lease*, No. 94 C 7410, 1995 WL 765266, at *9 (N.D. Ill. Dec. 26,

1995) (rejecting class members' objection and approving class settlement using certificates for

prospective discounts on either new automobile leases or early termination of current leases by

class members in the future).

(2)     <b>Risks of establishing liability</b>

The Plaintiffs recognize that they faced substantial risks in establishing their case at trial.

While the documentary evidence against FDB and Medi-Span strongly supported a finding of

liability, the issues were nevertheless very complex and the potential results are unpredictable.[16]

(3)     <b>Other risks of continuing the litigation</b>

Another important factor considered by the Class Plaintiffs in evaluating the

reasonableness of the Settlement was the value to Class Members of receiving value as soon as

possible, as opposed to litigating through trial and the almost certain appeals.  Many of the

Consumer Class Members are elderly and ill, and the prospect of a payment years in the future is

of little value to them.  Of course any victory at trial would be subject to many months of appeals

to the First Circuit and the Supreme Court.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

516, 536 (3d Cir. 2004) ("[I]t was inevitable that post-trial motions and appeals would not only

further prolong the litigation but also reduce the value of any recovery to the class.").

Because of the uncertainty surrounding the outcome of this litigation, approval of this

Settlement will afford the entire Class "the quickest, surest remedy to their claims."  The

Settlement will provide Class Members with "benefits fully commensurate with any results

---

[16] As the court in *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) recognized, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *Id.* at 475 (citation omitted).

reasonably attainable after protracted litigation." *Giusti-Bravo*, 853 F. Supp. at 38. Weighing all of the risks the Plaintiffs faced, the Settlement is reasonable.

Therefore, in the case at bar, the Settlement is more beneficial and in the best interests of the Class Members since they will be receiving their recovery much more quickly than if this matter were to proceed to trial.

There is also no guarantee that FDB and Medi-Span would be able to pay any eventual substantial judgment that in any way approximates the estimate of single damages.[17]

FDB is a private subsidiary of Hearst Corporation. Pre-tax profits of FDB are orders of magnitude less than that of McKesson, and orders of magnitude less than potential single damages sought in the case. Because FDB is a private company, the financial condition of FDB is confidential and competitively sensitive. In the event that this matter proceeded to trial, any recovery against FDB would likely be nullified by FDB declaring bankruptcy, thus depriving Class Members of any benefit. Furthermore, there is no evidence for piercing the corporate veil.

An analysis of FDB's ability to pay is set forth in the previously filed Declaration of Thomas M. Sobol, filed under seal with this Court. After notice and administrative costs (especially for a Class this large), the allocation of the settlement fund would literally result in pennies for individual Class Members.

---

[17] FDB and Medi-Span are unlike McKesson, the final defendant. McKesson is a large public corporation based in San Francisco, California. In its SEC Form 10K (for fiscal year ending March 31, 2006), McKesson reported net revenues of $88.1 billion, $8 billion higher than the net revenues reported for the prior fiscal year. Annual Report 2006, Form 10K, McKesson Corporation, 31 March 2006, p. 3 (retrieved September 18, 2006 from http://www.mckesson.com/en_us/McKesson.com/Investors/Annual+Reports/Annual+Reports.html). McKesson also has the ability to withstand payment of a large judgment. For example, on January 12, 2005, McKesson announced a $960 million cash settlement to resolve pending securities litigation. *Id.* at 32.

As for Medi-Span, it has limited involvement in relation to the creation of the 5% WAC-to-AWP Spread Scheme, and thus it will be difficult to prove the claim of negligent misrepresentation against it at trial. In 1998, Medi-Span merged with FDB. This merger was short-lived as the Federal Trade Commission ordered a divestiture of the merger in 2001. As part of this divestiture, the government required FDB to provide Medi-Span with its pricing data for a number of years. Medi-Span, in turn, published the data alongside FDB. There is no strong evidence to date that Medi-Span had knowledge of the 5% markup of the AWP by FDB and McKesson. Its publication of the AWP data that it obtained from FDB would require a showing of some knowledge on the part of Medi-Span that there was an improper inflation starting in late 2001 and early 2002. There has been no evidence to date that suggests this. Thus, Medi-Span, unlike McKesson or First Data Bank, had a limited role in the Scheme and any liability against it arises from its negligent misrepresentation of various pharmaceutical prices by relying on and publishing the WAC-to-AWP markup factor wrongfully manipulated by First Data Bank and McKesson as well as publishing inflated AWPs after FDB no longer provided the data. Therefore, the Plaintiffs' case against Medi-Span is weaker than against FDB and is based upon one count of negligent misrepresentation. Therefore, to proceed to trial against Medi-Span is a risky proposition, with a strong likelihood of zero recovery.

Consequently, comparing the very conservative estimate of settlement value of $.76 billion to the potential value of damage recoveries from FDB and Medi-Span establishes that the current Settlement is in the best interest of the Class.

### b.    Stage of the litigation and the amount of discovery completed

The Court is also required to evaluate whether the amount of evidence obtained through discovery is sufficient to determine the Settlement's adequacy. *Giusti-Bravo*, 853 F. Supp. at 38.

(finding that although it is probable substantial discovery still remains, the amount of discovery already conducted was sufficient to permit "an accurate assessment of each party's chances at trial"); *Rolland*, 191 F.R.D. at 8 (finding discovery to be sufficient given that the parties had a voluminous amount of information at the time as well as the advice and reports of their experts).[18]  In addition, courts have taken into consideration the stage of litigation at which settlement is reached "because it indicates how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."  *Duhaime*, 177 F.R.D. at 67 (citing *Armstrong v. Board of Sch. Dir.*, 616 F.2d 305, 325 (7th Cir. 1980)).

At the time settlement was reached in the fall of 2006, Plaintiffs had created a roadmap of how their case would be proven and presented at trial.

### c.     Quality of counsel

As stated above, "[w]hen the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight."  *Rolland*, 191 F.R.D. at 10; *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999).  With respect to the quality of counsel, Courts look at a variety of factors, including "the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation." *Giusti-Bravo*, 853 F. Supp. at 40.  The Court has already found that Plaintiffs' counsel is clearly competent to represent the interests of the Plaintiffs and the members of the Class and that counsel is comprised of experienced litigators in handling consumer protection and fraud class

---

[18] Settlements have been supported with far less discovery.  *See*, *e.g.*, *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (where no formal discovery was taken, access to other information such as indictments, documents produced to Grand Jury and leadings was deemed adequate).

actions.  Furthermore, Plaintiffs' counsel has been involved in this case from the beginning,

having created and filed the original Class Action Complaint in this Court.

> ### d.    Conduct of the negotiations

Settlement negotiations were conducted over the course of over one year by experienced

counsel.

> ### 2.    The absence of significant requests for exclusion further reveal the fairness, reasonableness and adequacy of the settlement

Compelling evidence that the Settlement is fair, adequate and reasonable is that there are

very few consumers and relatively few TPPs wishing to be excluded from the Class, despite the

broad notice program implemented, and virtually ***no*** objection!

Although Class Members were given the opportunity to opt-out of the Settlement and

seek monetary damages, only nineteen (19) consumers have elected to do so.  In addition, only

656 TPPs have requested exclusion from the Settlement.[19]  Counsel for one of the TPPs

requesting exclusion, Vista Healthplan, has informed Plaintiffs' counsel that it has "no current

plans to sue the defendants and that it is Vista's practice to opt out of all non-monetary

settlements."[20]

The vast number of Class Members that include thousands of TPPs are willing to release

their retrospective damage claims, acknowledging that the injunctive relief proposed, is fair,

---

[19] *See* Glenn Decl. at ¶¶ 20-21.

[20] *See* Declaration of Jeffrey Kodroff in Connection With Motion for Final Approval of the FDB/Medi-Span Settlement.

reasonable and adequate, Class Members understand the prospective relief that will benefit them in the future in the form of lower pharmaceutical costs.[21]

To date, **one consumer** objection to the Settlement has been filed.  By letter dated October 8, 2007, Kenneth Delafrange requested that the Court rule against the Settlement.  Mr. Delafrange's objection was based upon future consumers and companies being compensated for the present classes losses.  Plaintiffs' counsel addressed Mr. Delafrange's concerns by letter dated October 18, 2007.  Both FDB and Medi-Span simply lack the assets to pay a fraction of the damages in this case.  The proposed rollback is the only effective way to address the retrospective losses suffered by consumers and TPPs.  Moreover, it is highly probable that Mr. Delafrange in addition to the vast majority of the current class will receive prospective relief from the rollback.  In addition, this Settlement does not mark the end of the road for the Class Members.  The action is proceeding against McKesson who has assets capable of paying the damages that Mr. Delafrange is seeking.

### 3.    Affirmative support for the Settlement

The Plaintiffs support the Settlement, and do not agree with the opposing parties' suggestions that it has no value.  For example, the Pirelli Armstrong Tire Corporate Retiree Medical Benefits Trust has been advised by its benefits administrator that it will pay less when the rollback is effectuated.  Its contract with Caremark is not up until 2010 and it does not intend to accept Caremark's efforts to change the pricing formula in response to the Settlement.[22]

---

[21] *See* Letter from Steve Berman to Kenneth Delafrange dated October 18, 2007 and attached hereto as Exhibit H to the Declaration of Steve W. Berman Regarding Final Approval of the FDB/Medi-Span Settlement ("Berman Decl.").

[22] Declaration of Earl Seymour in Support of Plaintiffs' Settlements with First DataBank, Inc. and Medi-Span at ¶ 104.

DC 37, the second largest public-employee labor union in New York City, believes that the

Settlement has value because it reinstates the markups to their pre-scheme levels and now offers

a chance for DC 37 to negotiate on an informed basis.[23]

Plaintiff Philadelphia Federation of Teachers Health and Welfare Fund ("PFTHW") is the

largest public employee labor union in Philadelphia.  In support of the Settlement, PFTHW notes

that the Settlement changes the position of TPPs.  PFTHW describes its knowledge of the

Scheme in 2002:

> While we were aware of an increase in the overall expenditures for
> prescription drugs by DC 37, we were unaware of an increase in
> the WAC-AWP ratio in 2002.  No one at DC 37 had access to the
> FDB database that reflects FDB's published AWPs.  No one at DC
> 37 has access to AWP and/or WAC information on a drug-by-drug
> basis for the drugs that are included in DC 37's prescription drug
> benefit.[24]

> Because PFTHWF was unaware of the scheme, it was not in a
> position to "protect" itself from the increase in reimbursement that
> resulted from the scheme.[25]

PFTHW then describes the benefit of the Settlement as follows:

> We have not been contacted by ESI and have not been asked to
> proportion the risk of the rollback.  We do not expect that the
> benefit of the settlement will be negotiated away from us.

> Plaintiffs' settlements will help the PFTHWF save our members
> money.  If our drug costs decreased, or at least do not increase,
> PFTHWF will be able to provide our members with a more
> comprehensive benefits package.[26]

---

[23] Declaration of Audrey Browne in Support of Class Action Settlement at ¶¶ 4-8.

[24] Declaration of Arthur Steinberg, Administrator of the Philadelphia Federation of Teachers Health & Welfare Fund, In Support of the FDB/Medi-Span Settlement at ¶ 7.

[25] *Id.* at ¶ 10.

[26] *Id.* at ¶¶ 14-15.

Thus, it is clear that Class Representatives believe there is value to the Settlement from a variety of perspectives.

Thus, the claim of no value to the Settlement by the opposing parties is contradicted by the views of well-informed Class Members.

**E.      Attorneys' Fees and Expenses are Reasonable**

A cross-check with the lodestar confirms the reasonableness of the requested percentage fee and expense award.  In the First Circuit, "[t]he lodestar approach (reasonable hours spent times reasonable hourly rated, subject to a multiplier or discount for special circumstances, plus reasonable disbursements) can be a check or validation of the appropriateness of the percentage of funds fee, but is not required."  *In re Thirteen Appeals Arisong Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Compact Disc,* 216 F.R.D. at 215-16; *see also* MANUAL FOR COMPLEX LITIGATION § 14.122 ("the lodestar is . . . useful as a cross-check on the percentage method by estimating the number of hours spent on the litigation and the hourly rate, using affidavits and other information provided by the fee applicant.  The total lodestar estimate is then divided into the proposed fee calculated under the percentage method.  The resulting figure represents the lodestar multiplier to compare to multipliers in other cases.").

The total lodestar accumulated by Plaintiffs' counsel as of January 1, 2008 was $5.8 million.  Additionally, Class Counsel has expended $1,266,820 in litigation related expenses.[27]

The attorneys' fees requested will not even compensate counsel for the expert expenses and future notice costs.  Class Counsel intend to take the entire fee and expense award and place

---

[27] Berman Decl. at ¶ 8.

it into a trust account to be used solely for the prosecution of the case against McKesson.  This will benefit the Class and is a procedure approved by other courts.[28]

## IV.    CONCLUSION

The Settlement Agreement, a result of hard fought litigation and negotiation, provides an excellent result for the proposed Class and all purchasers of prescription drugs.  Plaintiffs and Defendants jointly and respectfully request that the Court grant final approval to the Settlement Agreement.


Dated:  January 17, 2008                    By    /s/ Steve W. Berman
                                                Thomas M. Sobol (BBO#471770)
                                                Edward Notargiacomo (BBO# 567636)
                                            Hagens Berman Sobol Shapiro LLP
                                            One Main Street, 4th Floor
                                            Cambridge, MA  02142
                                            Telephone: (617) 482-3700
                                            Facsimile: (617) 482-3003

                                            Steve W. Berman
                                            Sean R. Matt
                                            Barbara A. Mahoney
                                            Hagens Berman Sobol Shapiro LLP
                                            1301 Fifth Avenue, Suite 2900
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile: (206) 623-0594

                                            Elizabeth Fegan
                                            Hagens Berman Sobol Shapiro LLP
                                            60 W. Randolph Street, Suite 200
                                            Chicago, IL  60601
                                            Telephone: (312) 762-9235
                                            Facsimile: (312) 762-9286

---

[28] Berman Decl. at ¶ 9.

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 17, 2008.


                                        /s/ Steve W. Berman
                                        Steve W. Berman