UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | ) ) ) ) ) ) ) ) | CIVIL ACTION: 1:05-cv-11148-PBS |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) ) | |
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated, | ) ) ) ) | CIVIL ACTION:  No. 07-CV-10988 |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

**CLASS PLAINTIFFS' MEMORANDUM IN RESPONSE TO NON-PARTY FILINGS OPPOSING FIRST DATABANK AND MEDI-SPAN SETTLEMENTS**

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ........................................................................................................1

II.   WITH REGARD TO POTENTIALLY AFFECTED NON-PARTIES, THIS
      COURT NEED ONLY DETERMINE THAT THE SETTLEMENTS ARE
      NOT UNREASONABLE OR LEGALLY IMPERMISSIBLE...........................................4

III.  ARGUMENT ..............................................................................................................7

      A.   The Settlements Are Not Unreasonable or Legally Impermissible
           Because the Settlements Will Result In Savings to TPP and
           Consumer Class Members .............................................................................7

      B.   The Settlements Are Not Unreasonable or Legally Impermissible
           Because, Even Accepting the Objectors' Representations as True,
           the Settlements Will Not Devastate Independent Pharmacies ...............................10

           1.   The Heckman Report not only fails to substantiate that the
                Settlements will put thousands of independent pharmacies
                out of business, but actually supports the Settlements...............................11

           2.   Information from independent sources belies the claims of
                independent pharmacies that they will be financially ruined
                by the Settlements .............................................................................14

      C.   It Is Not Unreasonable or Legally Impermissible to Reverse the Effects
           of Fraud .........................................................................................................17

           1.   Pharmacies benefited from the 2001-2002 mark-ups ...............................18

           2.   That there *may be* transaction costs associated with the rollback
                provision of the Settlements does not mitigate against approving
                them...............................................................................................21

           3.   The effects of Defendants' conduct have not been negotiated away.........22

      D.   It Is Not Unfair or Legally Impermissible to Improve Transparency in
           Pharmaceutical Pricing or to Facilitate the Use of a Reliable Pricing
           Benchmark in the Marketplace .............................................................................22

IV.   CONCLUSION........................................................................................................25

001821-13  217908 V1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Black Fire Fighters Assoc. of Dallas v. Dallas Fire Fighters Assoc.,
 805 F. Supp. 426 (N.D. Tex. 1992) ........................................................... 6

College Sav. Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,
 527 U.S. 666 (1999) ................................................................................. 6

Durrett v. Hous. Auth. of the City of Providence,
 896 F.2d 600 (1st Cir. 1990) .................................................................... 4

Eichenholtz v. Brennan,
 52 F.3d 478 (3d Cir. 1995) ....................................................................... 6

Greenspun v. Bogan,
 492 F.2d 375 (1st Cir. 1974) .................................................................... 5

In re Brand Name Prescription Drugs Antitrust Litig.,
 94 C 897, MDL No. 997, 1996 U.S. Dist. LEXIS 4359 (N.D. Ill. Apr. 4, 1996) .................. 1, 2

In re Masters Mates & Pilots Pension Plan and IRAP Litig.,
 957 F.2d 1020 (2d Cir. 1992) .................................................................. 5

Kirkland v. The New York State Dep't of Correctional Servs.,
 711 F.2d 1117 (2d Cir. 1983) .................................................................. 7

Krangel v. Golden Rule Res., Ltd.,
 194 F.R.D. 501 (E.D. Pa. 2000) ............................................................... 6

Rolland v. Cellucci,
 191 F.R.D. 3 (D. Mass. 2000) ............................................................... 4, 5

Schwartz v. Dallas Cowboys,
 157 F. Supp. 2d 561 (E.D. Pa. 2001) ...................................................... 6

Vanguards of Cleveland v. City of Cleveland,
 753 F.2d 479 (6th Cir. 1985) .................................................................. 7

Vladmir v. United States Bank Note Corp.,
 976 F. Supp. 266 (S.D.N.Y. 1997) .......................................................... 6

Williams v. Vukovik,
 720 F.2d 909 (6th Cir. 1983) .................................................................. 6

York Hosp. v. Maine Health Care Fin. Comm.,
 719 F. Supp. 1111 (D. Me. 1989) ........................................................... 6

# I.    INTRODUCTION

This Memorandum responds to the submissions filed by certain non-parties opposing Plaintiffs' settlements with Defendant First DataBank, Inc. ("FDB") and Medi-Span (collectively "the Settlements").[1]

The non-parties that oppose the Settlements are largely trade associations representing pharmacies (including chain, independent and long-term care pharmacies), buying groups for independent and community pharmacies, and PBMs. These non-parties represent for the most part the very entities that benefited from the WAC-to-AWP mark-up scheme, which the rollback provisions of the Settlements will reverse. While the non-party opponents express no outrage about the WAC-to-AWP mark-ups that injured the Class and which benefited them, they now oppose the part of the Settlements that seek to correct those mark-ups.

That this industry can organize vocal opposition to a class action settlement was noted by at least one other federal court. *In re Brand Name Prescription Drugs Antitrust Litig.*, 94 C 897,

---

[1] Specifically, this Memorandum responds to the following filings: Letter to Judge Saris from Philip G. Kircher dated June 18, 2007 ("NACDS Letter") [Dkt. No. 275]; Letter to Judge Saris from John M. Rector. Esq. dated June 19, 2007 ("NCPA Letter") [Dkt. No. 276]; Letter to Judge Saris from David J. Farber dated June 19, 2007 ("Deville Letter") [Dkt. No. 277]; Letter to Judge Saris from Mark Merritt dated June 20, 2007 ("PCMA Letter") [Dkt. No. 278]; Opposition to the Proposed FDB and Medi-Span Settlements By Pharmaceutical Care Management Association As *Amicus Curiae* ("PCMA Brief") [Dkt. No. 400-2]; Memorandum of the National Association of Chain Drug Stores and the Food Marketing Institute in Opposition to Plaintiffs' Motion for Approval of Proposed First DataBank and Medi-Span Class Settlements ("NACDS Brief") [Dkt. No. 408], including Mosteller Report filed therewith; Letter to Judge Saris from James R. Schiffer dated December 20, 2007 ("NYCPS Letter") [Dkt. No. 410] and affidavits filed therewith; Brief of Independent Pharmacy Cooperative *Amicus Curiae* Regarding the Parties' Proposed Settlement ("IPC Brief") [Dkt. No. 411]; Memorandum of Law in Support of Motion by Deville Pharmacies, Long-Term Care Pharmacy Alliance and the American Society of Consultant Pharmacists to Intervene and in Opposition of the Proposed Settlements ("Deville Brief") [Dkt. No. 416] and Deville, Clark and McKigney Declarations filed therewith; and National Community Pharmacists Association's Memorandum of Law in Support of Its Objection to Settlement ("NCPA Brief") [Dkt. No. 421] and Yaffe and other affidavits submitted therewith. Although some of these documents have likewise been filed on the Medi-Span docket, Document Numbers refer to the FDB docket.

MDL No. 997, 1996 U.S. Dist. LEXIS 4359, at *3 (N.D. Ill. Apr. 4, 1996) (noting plaintiffs'

claim that many of the 3,371 objections to settlement were "boilerplate" and "in a form solicited

by trade associations such as the National Association of Retail Druggists ("NARD") [now

NCPA] and the Pharmacy Freedom Fund ("PFF")" as well as the "massive effort undertaken by

the opponents of the settlement to solicit objections," but rejecting "nearly all" of those

objections).  While their filings here are voluminous, the arguments within them are factually

unsupported and often contradicted by the more candid admissions obtained in discovery in

Plaintiffs' continued litigation with McKesson.

The trade associations who have appeared here were not subject to discovery.  However,

Plaintiffs sought documents from many of the pharmacies and PBMs who are members of those

associations.  Plaintiffs' requests sought, among others, documents related to the mark-ups and

the effects of those mark-ups.  Even though the opponents here claim that the 2001-2002

markups were negotiated away and therefore did not benefit them, in the McKesson litigation

their members did not submit *a single document* in response to discovery requests by Defendant

or the Plaintiffs that would support such an assertion.  In fact, the evidence is legion that

Plaintiffs and the Class did *not* learn of Defendants' secret mark-up scheme until massive

damage had been inflicted, the fruits of which were reaped by objectors' members.  *See*

Declaration of Raymond S. Hartman regarding Impact and Cost Savings of the First DataBank

Settlement Agreement:  Responses to Interested Parties' Comments ("Hartman Rebuttal") ¶ 6.

One of the non-party's experts shows that there has been no change in the historical trend of

decreasing discounts off AWP, confirming what Plaintiffs have stated throughout – that the

effects of the FDB/McKesson scheme have not yet been negotiated away.

The non-party opponents portray themselves as victims of alleged collusion between Plaintiffs and the Settling Defendants and say that they are being unfairly asked to bear the burdens of the Settlements.[2]  Of course, acknowledging that there is a financial burden to bear implicitly admits that the Settlements will financially benefit the Class.  Indeed, despite their shared objection to the rollback provisions of the Settlements, none of the non-party opponents dispute that the Settlements will provide members of the Class with at least some relief from the effects of the WAC-to-AWP mark-ups that led to the filing of this litigation.

This Court is, of course, required to consider the views of the non-party opponents. However, those views may only be the basis to deny approval of the Settlements if the Settlements are "unreasonable" or "legally impermissible" as to those third parties.  That standard is not met here.  At core, the non-party opponents complain that they will be deprived of profits derived from a marketwide fraud.  Those profits are not an interest that this Court is required to protect.  Nor should it.  This is particularly true where only a single consumer class member and a single TPP class member have filed objections to the Settlements.[3]

FDB and Medi-Span have limited financial resources.  Especially given this undisputed reality, the Settlements provide relief to the Class that is fair, adequate and reasonable.  Nothing submitted by the non-party opponents, should, as a matter of law, change that determination. Indeed, materials submitted by these third-parties support that:  (1) at minimum, the Settlements will result in ***three-quarters of a billion dollars*** in class member savings and (2) the parties who

---

[2] The non-party opponents' claim that they are being asked to bear the burden of the Settlements is, not surprisingly, the same argument made on their behalf by McKesson in its Memorandum Opposition to Joint Motion for Preliminary Approval of Proposed First DataBank Class Settlement and Certification of Settlement Class [Dkt. No. 135], at 16.

[3] Blue Cross Blue Shield of Michigan has submitted an amended objection to the Settlements that withdraws portions of its initial objection. [Dkt. No. 431]

benefited from the effects of FDB's and McKesson's actions will fairly bear the burden of the reversal of those effects.

Finally, the non-party submissions support final approval of the Settlements because they all attest to the broad impact on the pharmaceutical industry inflicted by FDB's and McKesson's manipulations of AWP. The Settlements' rollback provisions, as well as the provisions that eventually eliminate the publication of AWP, not only further transparency in pharmaceutical pricing, but expose the unreliability of AWP as a benchmark and prevent future WAC-to-AWP abuse. These Settlements may send TPP class members and the entities represented by the non-party opponents back to the negotiating table, but it will, this time, be a table of equally knowledgeable participants. In light of what we have learned about AWP manipulation in this and other litigation, this benefit itself warrants approval of the Settlements.

## II.     WITH REGARD TO POTENTIALLY AFFECTED NON-PARTIES, THIS COURT NEED ONLY DETERMINE THAT THE SETTLEMENTS ARE NOT UNREASONABLE OR LEGALLY IMPERMISSIBLE

As NACDS acknowledges, in determining whether to approve a class action settlement, "[c]ourts are primarily concerned with protecting the interests of class members and, in particular, unnamed class members." NACDS Brief at 4. While this Court may consider the potential impact on others, it need only determine that the Settlements are not "unreasonable" to such non-parties and that they are not "legally impermissible *as to them*." *Durrett v. Hous. Auth. of the City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (emphasis added); *Rolland v. Cellucci*, 191 F.R.D. 3, 13 (D. Mass. 2000) (The "court must assure that, if third parties will be affected, the agreement will not be unreasonable or legally impermissible as to them.") (citations and quotations omitted).[4] Notably, the non-party opponents are not and cannot be proxies for

---

[4] PCMA claims that the Court must determine that the Settlements are in the "best interests" of *all* who are affected by them. *See* PCMA Brief, at 14. This is not correct. PCMA relies on

members of the Class, who can and have or could have spoken by filing their own objections and/or by opting out of the Settlements.[5] Thus, while the Court must consider the arguments presented by non-party opponents regarding the extent to which they may be affected by the Settlements, it need not consider their arguments regarding the purported effects of the Settlements on members of the Class.

In determining whether a settlement is unreasonable or legally impermissible to non-parties, the Court's only role is to ensure that *legally protected interests* of those third parties are not compromised. For example, in *Rolland*, the Court addressed the question of whether a settlement of claims of mental health patients in nursing facilities might have an unfair impact on similar claims in separate litigation brought by non-nursing facility mental health patients. In approving the settlement, the court found that the resolution of the former's claims "does not, directly or indirectly, affect the rights of [non-party] class with the terms of the final order entered in [a different] case." *Rolland*, 191 F.3d at 13. The Court viewed its task to make sure the settlement was not unreasonable or legally impermissible to the protectible interests of the non-parties. *See also In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020 (2d Cir. 1992) (cited in NACDS Brief at 7, Deville Brief at 19 and NCPA Brief at 3) (refusing to approve settlement in ERISA class action that barred third parties from asserting claims against settling defendants).

---

*Greenspun v. Bogan*, 492 F.2d 375, 378 (1st Cir. 1974), but that case was a shareholder derivative action in which the First Circuit merely reiterated that, in approving a proposed settlement in a derivative case, the Court must consider the interests of all shareholders of the corporation, not just the shareholders who originally filed the action. An unnamed shareholder is similarly situated to an absent class member, the interests of which this Court must, as a fiduciary to the Class, consider. The non-party opponents are not so situated.

[5] The NACDS Brief purports to be written on behalf of self-insured members of the settlement class (*see id.* at 1), but raises no arguments on behalf of that portion of the Class.

In contrast, in *Vladmir v. United States Bank Note Corp.*, 976 F. Supp. 266 (S.D.N.Y. 1997), the Court approved a settlement of a securities fraud class action that provided for a jury verdict to be vacated, even though a third party who had another action against the settling defendant wanted to use collateral estoppel to bar relitigation of the jury's findings. In rejecting the intervenor third party's arguments, the Court held that the third party "was not a member of the plaintiff class and has ***no cognizable interest*** in the judgment in this case." *Id.* at 267 (emphasis added). Likewise here, while the non-party opponents might be heard, they have no cognizable interest in the Settlements.[6]

The right to profits, particularly profits generated by fraud, is not a legally-protected interest that this Court is obligated to protect. *See, e.g., College Sav. Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 675 (1999) ("The assets of a business . . . unquestionably are property . . . . But business in the sense of *the activity of doing business, or the ability of making a profit*, is not property in the ordinary sense.") (emphasis in original); *York Hosp. v. Maine Health Care Fin. Comm.*, 719 F. Supp. 1111, 1121 (D. Me. 1989) ("It is not, however, the intangible nature of Medicare profits, but rather Plaintiffs' characterization of such

---

[6] One other case NCPA on which relies, *Eichenholtz v. Brennan*, 52 F.3d 478, 483 (3d Cir. 1995) (NCPA Br. at 4) applies only to the rights of a non-settling defendant, and therefore has no relevance here. Another case relied on by Deville, *Schwartz v. Dallas Cowboys*, 157 F. Supp. 2d 561, 579 (E.D. Pa. 2001), did not even address the interests of third parties and instead held that "in class action litigation, the court must ensure that the Settlement Agreement fairly accommodates the conflicting interests of the class members, the lawyers for the class, and the defendants, and that it does so in a manner consistent with public policy." (Cited in Deville Brief at 24.) In a second case relied on by Deville, *Black Fire Fighters Assoc. of Dallas v. Dallas Fire Fighters Assoc.*, 805 F. Supp. 426, 428 (N.D. Tex. 1992), the Court specifically stated that "the court is not disapproving the proposed settlement agreement solely because of intervenor's opposition." (Cited in Deville Brief at 24.)

Other cases cited by non-party opponents simply set forth, without discussion, that the Court must "consider" whether the settlement is fair to third-parties. *See Williams v. Vukovik*, 720 F.2d 909, 921 (6th Cir. 1983) (cited in Deville Brief at 19); *Krangel v. Golden Rule Res., Ltd.,* 194 F.R.D. 501 (E.D. Pa. 2000) (where no third parties opposed settlement) (cited in NCPA Brief at 3). As set forth above, Plaintiffs do not dispute this point.

- 6 -

profits as "property," that presents the more serious issue. . . . [T]he Court finds no entitlement

on the part of Plaintiffs to "profits" from its administration of care under the Medicare Act.").

This is especially true where the profits were obtained by virtue of illegal conduct.  *See also*

*Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 485 (6th Cir. 1985) (in approving

class settlement that adopted relatively sweeping affirmative action provisions for hiring of

Cleveland firefighters, holding that because "non-minorities do not have a legally protected

interest in promotions which could only be made pursuant to discriminatory employment

practices," they would "not be adversely effected by reasonable and lawful race-conscience

hiring or promotional remedies."); *Kirkland v. The New York State Dep't of Correctional Servs.*,

711 F.2d 1117, 1126 (2d Cir. 1983) ("Non-minorities do not have a legally protected interest in

the *mere* expectation of appointments which could only be made pursuant to presumptively

discriminatory employment practices.") (emphasis in original).  The non-party opponents have

identified no interest this Court *must* protect.

## III.     ARGUMENT

### A.     The Settlements Are Not Unreasonable or Legally Impermissible Because the Settlements Will Result In Savings to TPP and Consumer Class Members

Even though various non-party opponents take issue with the figures set forth in

Dr. Hartman's September 27, 2006 Declaration regarding Impact and Cost Savings of the First

Databank Settlement Agreement [Dkt. No. 157] ("September 2006 Hartman Declaration") not a

single objection disputes that the Settlements will result in *some* savings to the Class.  Indeed,

the one expert proffered by a non-party opponent has concluded that the savings to third-party

payors and consumers is quite substantial.

With its brief, NACDS submitted the report of Gail Mosteller, Ph.D.  *See* Attachment A

to NACDS Brief ("Mosteller Report") [Dkt. No. 408-2].  The Mosteller Report suggests a series

of modifications to Dr. Hartman's September 2006 Declaration regarding the projected savings that might accrue by reason of Plaintiffs' settlement with FDB.  Assuming, hypothetically, that all of her modifications were valid – which Plaintiffs do not concede – Dr. Mosteller still concludes that the FDB Settlement alone will result in cost savings of *over three quarters of a billion dollars*.  Mosteller Report at 8.  Other non-party opponents have, without attempting to quantify those savings, agreed with Dr. Mosteller that the Settlements will, indeed, result in savings of some type.  *See* Deville Br. at 3 ("TPPs paying reimbursements based on AWP will undoubtedly see a financial benefit from the Proposed Settlements").  In addition, non-party opponents' arguments that the benefits of the Settlements will be "extracted" from them impliedly concedes that there will, indeed, be financial benefits to the Settlements for class members.

Dr. Mosteller's conclusion is particularly startling because many of her assumptions that lead her to her calculation of three-quarters of a billion dollars in savings are not and cannot be supported, suggesting that her conclusion is quite conservative.  Consider three examples.  First, Dr. Mosteller believes Dr. Hartman failed to consider that "large PBMs have contracts that would adjust the reimbursement to offset the decline in AWPs."  Mosteller Report at 1.  But Dr. Hartman did consider that the market might act to counteract some of the effects of the FDB Settlement.  *See* September 2006 Hartman Declaration at 6 n.19 ("Fourth, strategies developed by individual market participants to reverse the effects of the settlement will be developed individually and over time, as different market participants assess their strategic alternatives, observe the strategies of other market participants and ultimately implement their consequential strategies.").  Second, Dr. Mosteller did not quantify the impact that purported modifications to PBM contracts might have on settlement value; instead, she merely points to vague and often

- 8 -

contradictory public statements made by PBMs regarding their ability to renegotiate contracts.

And in doing so she ignores public statements by some of those same PBMs that they will be

adversely affected by the Settlements. ESI represented in its 2006 Annual Report that, absent

any mitigating action by ESI, its margins would decrease as a result of the FDB Settlement:

> In the absence of any mitigating action on our part, the proposed
> reduction in FDB's AWP would have a material adverse effect on
> the margins we earn on home delivery transactions. It may also
> create disruption in our retail networks due to the adverse impact
> on AWP-based retail pharmacy pricing. However, most of our
> contracts with clients and retail pharmacies contain terms we
> believe will enable us to mitigate the adverse effect of this
> proposed reduction in FDB's reported AWP.

*See* Ex. A to Declaration of Steve W. Berman Regarding Final Approval of the FDB/Medi-Span

Settlement ("Berman Declaration"). *See also* [Redacted] Tutorial Presentation and

Demonstratives of Dr. Raymond S. Hartman, at 5-6 [Dkt. No. 348], setting forth additional

examples of PBM statements about impact. Finally, while Dr. Mosteller criticizes Dr. Hartman

for purportedly failing to consider that entities whose reimbursements would decline would have

strong incentives to renegotiate their contracts, she fails to consider whether those same entities

would have the ***power*** to renegotiate those contracts.

Finally, Dr. Mosteller's timetable by which these purported renegotiations will or will not

occur is fatally flawed. She says that due to the amount of time that has passed since the

Settlements were initially announced, "it is likely" that pharmacies have renegotiated their

contracts and that therefore changes in FDB's AWP "will not automatically" reduce drug

reimbursements. Mosteller Report at 2. Despite her inability to be more specific, she broadly

concludes that "one would expect negotiations to have eliminated potential cost savings by late

2007." *Id.* at 9.[7]  It is difficult to believe Dr. Mosteller's rhetoric that there is only an "outside chance" (Mosteller Report at 10) that the Settlements will result in some savings when she offers no support for her assertions and her own calculations find otherwise.

Given these deficiencies with the Mosteller Report, it is more likely that the proposed savings from the Settlements (Dr. Mosteller does not consider the effect of Plaintiffs' settlement with Medi-Span) fall somewhere in between the $4 billion number proffered by Dr. Hartman[8] and the $.76 billion number proffered by Dr. Mosteller.  Whatever that number is, it reflects real savings to TPPs and consumers resulting from settlements with one defendant otherwise unable to pay damages and one defendant whose only known involvement in the FDB/McKesson scheme was to publish the inflated mark-ups.  This supports final approval of the Settlements.

**B.**    **The Settlements Are Not Unreasonable or Legally Impermissible Because, Even Accepting the Objectors' Representations as True, the Settlements Will Not Devastate Independent Pharmacies**

Many of the non-party opponents claim that the rollback aspect of the Settlements will put some number of independent pharmacies out of business.  However, those claims are not supported by the "evidence" submitted by those objectors or by the evidence produced in this litigation.

---

[7] Dr. Mosteller further takes issue with Dr. Hartman's inclusion of U&C payors in his cost savings analysis because she claims that "[p]harmacies quote prices to cash/uninsured customers in dollars without any reference to AWP."  Plaintiffs do not address this argument here but, during the U&C track of their continuing case against McKesson, Plaintiffs will establish that pharmacies use AWP to set U&C prices for cash payors.  In addition, the class definition will be appropriately tailored to reflect only those charges based on AWP.

[8] Admittedly, Dr. Hartman's analysis assumed, pursuant to the request of Class Counsel, that the effective date of the FDB Settlement would be the spring of 2007 and is therefore likely overstated given that additional time has passed.  *See id.* ¶ 2.  However, that estimate is also to some degree understated because Dr. Hartman was not considering the effect of the Medi-Span settlement and therefore assumed that only two-thirds of the retail transactions he calculated would be calculated with reference to FDB's AWP.  *See* Hartman Rebuttal ¶¶ 11, 12.

1.    **The Heckman Report not only fails to substantiate that the Settlements will put thousands of independent pharmacies out of business, but actually supports the Settlements**

In support of its claim that the Settlements will financially "devastate" 50% of all independent pharmacies, NCPA has submitted the Declaration of H. Edward Heckman ("Heckman Report") [Dkt. No. 424]. That report does not support the claims of NCPA or the similarly-situated pharmacies.

As an initial matter, although he was retained as an "independent consultant" to opine on "the impact [of the Settlements] to independent pharmacies" (Heckman Report ¶ 1), Mr. Heckman is neither an economist, accountant nor statistician. *Id.* ¶ 6. Moreover, his analysis, characterized repeatedly by the NCPA in its Brief as an "extensive study," is superficial. While he claims that he reviewed "hundreds of Community Pharmacy Contracts," (*id.* ¶ 3), Mr. Heckman actually reviewed a database of contracts voluntarily provided by members of a group of which Mr. Heckman is owner and president, PAAS National, Inc. *See id.* ¶ 12. Nowhere in his Report does Mr. Heckman make a representation about the completeness or extent of this "database." Using the information from these self-selected contracts, Mr. Heckman compiles a chart showing the average AWP value per year using an "aggregate of resources" to determine that average AWP. *Id.* ¶ 15. While Mr. Heckman observes that those averages show that community pharmacies have, on average, experienced decreasing levels of reimbursement, the analysis simply shows a long terms trend that preceded the FDB/McKesson Scheme by many years. Mr. Heckman does not, as he cannot, correlate that long term trend to the later, purported PBM renegotiations of pharmacy contracts in reaction to the FDB/McKesson scheme.

From the unremarkable observation of a long term trend in decreasing AWP discounts, Mr. Heckman then attempts to show that ***many or most*** community pharmacies will be forced to

exit the business if the Settlements are approved. To do this, he uses financial data from the

Compliant Pharmacy Alliance Cooperative ("CPA") as a "representative sampling" of

community pharmacies. *Id.* ¶ 29. Mr. Heckman says relatively nothing about the composition of

the cooperative other than that it consists of 564 community pharmacies who operate in 23 States

and represent 3% of independent community pharmacies in the United States. *Id.* ¶ 30. He takes

those actual CPA sales numbers from December 2006 through November 2007 and compares

them to ***average*** net profit numbers in the 2007 NCPA/*Pfizer* Digest to conclude that the CPA

cooperative pharmacies would collectively lose $4,937,965 in profits. *Id.* ¶ 29.

Despite these failures in his apples-and-oranges analysis, Mr. Heckman concludes that

the rollback provisions of the Settlements will cause the "average" community pharmacy to lose

$3,864.00 in net profits per year. *Id.* ¶ 38. In other words, the average net operating income for

an independent pharmacy will decrease by less than four thousand dollars, from $101,136.00

average per year to an average net income of over $97,000, a decrease of less than four percent.

*Id.* ¶ 39. These figures do not support the conclusion that the Settlements will force half of the

community pharmacies out of business, or that the Settlements impose an "unreasonable" or

"legally impermissible" burden on community pharmacies.

While Mr. Heckman's analysis regarding the purportedly inevitable demise of 50% of

community pharmacies is deficient in many respects, other parts of his Report, like

Dr. Mosteller's Report, actually support final approval of the Settlements. Specifically:

- Mr. Heckman shows that, although from 1998-2005 AWP discounts generally increased over time, "the median AWP discount" in 2002 ***decreased*** by 8%, showing the profits made by community pharmacies from the WAC-to-AWP mark-ups. *See* ¶ 16. Likewise, during that same time period the "average AWP discount" to the pharmacies ***decreased*** nearly 10%. ***This means, then, that just after FDB/McKesson effectuated their scheme, even small independent pharmacies received formulaic reimbursements higher than they had received the previous year.***

- Heckman's report also demonstrates, mathematically, that the full effects of the WAC-to-AWP mark-ups were never negotiated away. In 2001, the average AWP discount was -11.67%. Mathematically, in order to offset the effects of a 5-point increase in the WAC-to-AWP markup, the AWP discount would need to be raised by almost 4 percentage points over the historical trend. *However, the Heckman report shows essentially no changes in the historical trend through 2004, thus confirming what Plaintiffs have stated throughout – that there were no effective changes in historical trends for AWP discounts.*

- Indeed, Mr. Heckman seems to acknowledge that, if there was a "squeeze" of community pharmacies by PBMs, that squeeze occurred in 2005. *See id.* ¶ 21. That supports that there was no immediate renegotiation or recoupment that negated the effects of the FDB/McKesson scheme.

At core, neither Mr. Heckman's conclusions about the lack of harm to Class members from the mark-up increases nor his dire predictions about the future of community pharmacies can be believed. Even though nearly every non-party opponent has characterized pharmaceutical industry participants as sophisticated,[9] Heckman assumes that none of the independent pharmacies will be able to undertake any renegotiations of reimbursements even though the Settlements have received significant publicity for well over a year. It assumes that PBMs, who require extensive and diverse pharmacy networks to distinguish themselves from their competitors, will take no action to ensure independent pharmacy survival. Even Dr. Mosteller, the expert retained by NACDS, concludes that "[p]rescription plans cannot drive retail margins below competitive levels without losing their network of pharmacies to service customers. Hence, it is not in the interest of third-party payers to lower reimbursements too far." Mosteller Report at 9.[10] Especially because large portions of the Heckman Report actually support

---

[9] *See, e.g.*, NACDS Brief at 6 ("[T]he industry – including PBMs, TPPs and retail drug stores – is highly sophisticated and competitive"); PCMA Letter, at 2 ("[T]he PBM industry and its clients, the Class members, are highly sophisticated, operating in a competitive and dynamic marketplace."); PCMA Brief at 5 (describing "dynamic nature of pricing in the pharmaceutical marketplace").

[10] Similarly, Eric Cannon of Select Health testified in this litigation that rural pharmacies have "greater competitive leverage" than chains and non-rural independent pharmacies in

- 13 -

Plaintiffs' positions about the effects of Defendants' conduct, showing the need for the rollback provisions of the Settlements, Mr. Heckman's "analysis" should be given little weight.

### 2. Information from independent sources belies the claims of independent pharmacies that they will be financially ruined by the Settlements

In addition to the problems with the Heckman Report, other independent sources – both inside and outside this litigation – belie the contention that large numbers of independent pharmacies will go out of business if the rollback provisions of the Settlements are implemented. The independent pharmacies argue that if margins are even modestly reduced (as envisaged by the rollback provided for in the Settlements), they either will be "forced" to make overhead cutbacks, or charge higher prices to the extremely small number of cash payers, or otherwise change business. These arguments do not withstand scrutiny by independent sources.

Earlier this month, the Inspector General of the United States Department of Health & Human Services (the "HHS IG") issued a review that comprehensively analyzed the adequacy of prescription drug reimbursements under Medicare Part D to local, community pharmacies. *See* January 3, 2008 HHS IG report, attached as Exhibit B to the Berman Declaration. The HHS IG review was prompted by independent pharmacy lobbying efforts complaining of the sufficiency of the reimbursements and of purportedly narrow margins those entities were receiving for prescription drugs. The HHS IG concluded that Medicare Part D payments, excluding

---

negotiating reimbursement rates. Whereas SelectHealth was able to negotiate a 15% discount for chains and a 13.5% discount for independent pharmacies, the best it could get from rural pharmacies was 10%. *See* Deposition of Eric Cannon (Oct. 11, 2006), at 79:2 - 81:16, Ex. C to Berman Declaration. *See also* Hartman Rebuttal ¶ 8 (describing independent pharmacies' use of GPOs to aggregate bargaining power). Similarly, the 2007 NCPA-Pfizer Digest estimates that the decrease in prescription volume dispensed per location could be caused by "increased scrutiny by pharmacy operators about which contracts from pharmacy benefit managers (PBM) they choose to sign." *Id.* at 5. This contradicts the language of the form declarations submitted with, for example, the NCPA Brief that independent pharmacies must accept PBM contract terms on a "take it or leave it" basis.

dispensing fees, to local, community pharmacies exceeded the pharmacies' drug acquisition costs by an estimated *18.1%* when rebates that drug wholesalers paid to pharmacies were included.  Excluding rebates, Part D payments exceeded drug acquisition cost by an estimated *17.3%*.  On average, the estimated difference between Part D payments and drug acquisition costs was $9.13 per prescription including rebates.

In addition, the claims of the independent pharmacies are not supported by any evidence gathered during discovery of Plaintiffs' claims against McKesson.  In a July 30, 2004 e-mail, Robert James, the architect of the FDB scheme at McKesson, writes with regard to a retail client that:

> We try to "push" the AWP up to 25% above WAC rather than 20%.  This may cause your customer some short term reimbursement pain with the payors but in the long run, if AWP at First Data Bank goes from 20% to 25%, your customer will benefit.
>
> Most payors reimburse pharmacies at AWP minus 15% to 17%.  The higher AWP markup percentage, the more they are paid by the insurance company.

MCKAWP 0076289.  Similarly, in discussing McKesson and FDB's "recent success" in raising AWPs, he states that "AWP really has no impact on our wholesale business but certainly does on our customers' third party reimbursements."  MCKAWP 0068599.  McKesson also reported a "huge improvement in profitability" as a result of the 2002 increase in the AWPs on Eli Lilly and Novo products.  *See* MCKAWP 0071671.  Robert James again explained that the impact of McKesson and FDB's scheme was "a very positive impact on our customers [*sic*] profitability."  MCKAWP 0042663.[11]  There are many more internal McKesson documents that support that, contrary to the claim of the non-party opponents here that they received no benefit from

---

[11] All McKesson documents are attached as Group Exhibit D to the Berman Declaration.

McKesson's scheme with FDB, McKesson certainly believed it was benefiting its retail customers.

Further, both Plaintiffs and Defendant McKesson Corporation ("McKesson") subpoenaed numerous pharmacies and PBMs. Those subpoenas sought, among other things, the following:

| Issuing Party | Name of Non-Parties Subpoenaed[12] | Relevant Requests Made |
|---|---|---|
| **PBMs** | | |
| Plaintiffs | Caremark<br>ESI<br>Medco | Documents reflecting communications with McKesson or FDB regarding the mark-ups of the subject drugs; Meetings with McKesson or FDB regarding the mark-ups of the subject drugs; Internal analyses regarding the mark-ups of the subject drugs; and the discovery of McKesson's role in the mark-up increases |
| McKesson | Argus Health Systems<br>Caremark<br>ESI (McKesson took one deposition)<br>General Prescription Program<br>Medco<br>National Medical Health Card | <u>For Caremark</u>: Documents concerning its relationships with the named plaintiffs<br><br><u>For remaining PBMs</u>: Communications with publishers regarding AWP or the AWP/WAC spread; TPP contracts, Communications with TPPs about AWPs, formulary changes, and cost saving devices; Documents regarding contracts with retail pharmacies; Documents regarding contracts with drug manufacturers; Internal reports or publications about AWP and the AWP/WAC mark-ups; Transaction records |
| **PHARMACIES** | | |
| Plaintiffs | Bartell's<br>CVS<br>Omnicare<br>Safeway<br>Supervalu | Communications with FDB or McKesson regarding AWP; Documents relating to any meetings with FDB or McKesson regarding AWP or reimbursement of brand drugs; Documents relating to negotiations with McKesson; McKesson's marketing efforts and revenues McKesson received from subpoena recipients. |

---

[12] Plaintiffs also took the depositions of representatives from Long's, Supervalu and Rite Aid. McKesson took the deposition of one representative from ESI.

| Issuing Party | Name of Non-Parties Subpoenaed[12] | Relevant Requests Made |
|---|---|---|
| McKesson | CVS Walgreens | Documents related to mark-up changes; Communications with PBMs or TPPs regarding mark-up changes; Internal analyses regarding reimbursement rates for brand name prescription drugs and documents supporting that discounts increased after 2001. |

*See* Group Ex. E to Berman Declaration**.**

These targeted requests, even if only partially responded to, clearly would have resulted in the production of voluminous documents if PBMs and pharmacies had actually renegotiated billions of dollars worth of transactions.  ***Yet not a single subpoenaed party produced any such document***.  Indeed, many of these parties claimed they had no responsive documents whatsoever to either of the parties' requests.  Especially given that the non-party opponents have all chosen to present their interests through trade associations, thereby avoiding discovery on their members, the fact that the claims made about the effects of the Settlements are not supported by the documents produced by the members of the non-parties in the underlying litigation suggest that the claims of the independent pharmacies should be viewed with suspicion.

**C.    It Is Not Unreasonable or Legally Impermissible to Reverse the Effects of Fraud**

The foregoing demonstrates that the non-party opponents vastly overstate the potential adverse effects of the Settlements on community pharmacies.  Yet, regardless of whether some independent pharmacies may not be able to survive if the rollback provisions of the Settlements are implemented, the independent pharmacies' position that their continued financial viability should be propped up by allowing the effects of a marketwide fraud to continue to persist cannot be supported.  A worthy charity may be subsidized with money from embezzlement, but the embezzlement, once discovered, must be stopped and the funds returned.

### 1.     Pharmacies benefited from the 2001-2002 mark-ups

Mr. Heckman's unsubstantiated claim that "Community Pharmacies never benefited from the alleged First Data Bank changes in AWP" (Heckman Report ¶ 3) is demonstrably false.  The 2007 NCPA/*Pfizer* Digest [Dkt. No. 422-5] shows that, from 2001 to 2004, average annual sales per pharmacy location increased from $2.48 million to $3.58 million per location from 2001 to 2004, an increase of more than 44%.  Exhibit B to Yaffee Affidavit, submitted with the NCPA Brief, at 6.  The chart below, using figures taken from the Yaffee Affidavit, shows these significant increases.

**Average Annual Sales**
**(In Thousands) Per Pharmacy Location**

|  | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|
| August Annual Sales Per Location | $2,480 | $2,855 | $3,244 | $3,850 |
| Increase Sales over 2001 | - | $375 | $764 | $1,100 |
| % Increase Sale over 2001 | - | 15.12% | 30% | 44.3% |

Similarly, net operating income for independent pharmacies ***increased*** following implementation of the FDB/McKesson scheme.  According to the NCPA's own submission and annual report, net operating income increased in 2002 (from 3.5% to 3.8%) and yet again in 2003 (up to 4%).  These figures are likewise supported by Dr. Hartman's findings regarding the immediate and enduring impact of the scheme on retail prices.  *See* Hartman Rebuttal ¶ 6b.  Far from experiencing any significant decline in margin from operating income, independent pharmacies enjoyed significant increases in sales and operating income in the aftermath of the FDB/McKesson scheme.[13]

---

[13] Again these increases belie the notion that the effects of the Scheme have been "clawed back."

To the extent that pharmacies have, over time, experienced declining margins, even the non-party submissions acknowledge that there are a variety of factors that have contributed to this decline. *See* Deville Letter at 3 ("These pharmacies operate on razor-thin margins and ***are already*** reeling from the failure of numerous TPPs to make payments on a timely basis, particularly under the new Medicare Part D drug benefit."); NYCPS Letter at 2 n.1 (stating that pharmacies have little control over reimbursements paid to them partially because of Medicare Part D); Deville Brief at 20 (stating that reductions in reimbursements from state Medicaid programs have contributed to decreased margins); 2007 NCPA-Pfizer Digest [Doc No. 422-6] at 21 ("Medicare Part D and changes to Medicaid along with draconian PBM reimbursement  have forced the margins of pharmacies to new lows.  Pharmacy margins were already micro-thin and can sustain very few additional cuts.").  Stating that large numbers of pharmacies will go out of business if the rollback provisions of the Settlements are implemented ignores that other market factors are at play.  *See generally* Hartman Rebuttal ¶ 8.

Submissions of some of the other non-party opponents likewise implicitly concede that their members profited from Defendants' actions.  *See, e.g.,* NYCPS Letter (acknowledging that there was a "temporary increased profit margins for pharmacies that arose from the increase in AWP."); NCPA Letter at 2 (acknowledging "potential increase in profit margins of NCPA pharmacies"); PCMA Brief at 12 (stating that it was six years until the marketplace had "adjusted substantially" for increases in AWP occurring in 2002 and 2003); NACDS Brief at 6 (stating that after six years "the marketplace has already largely incorporated the revelations regarding how FDB reported AWP").  Two submissions, those on behalf of the NCPA and the IPC, are completely silent on the issue of whether or not their members received tremendous gains.  *See* IPC Brief at *passim*; NCPA Brief at *passim*.

This is not surprising:  the evidence produced in Plaintiffs' case against McKesson shows that McKesson sought to benefit the retailers who the Scheme did, in fact, benefit.  *See* Section II(B)(2), *infra*.  An internal ESI memorandum characterizes the network pharmacies as the "big winners" because "their reimbursement from PBMs has been superficially increased."  ESI-414-00001762-1763, Ex. F to Berman Declaration.  This Court itself found that "McKesson implemented this scheme in order to provide a greater spread to those important retail pharmacy clients like Rite Aid and Wal-Mart as well as its own pharmacy related business.  McKesson boasted that the increase in AWP resulted in 'more than 3 times the profit as before.'" Memorandum and Order (Aug. 27, 2007), at 8.

But the money did not just appear in the pharmacies' coffers without a cost to someone else.  In contrast to the pharmacies who benefited from Defendants' conduct, other than Mr. Heckman's comment that "the PBMs nor managed care entities were never harmed from the alleged AWP changes" (Heckman Report ¶ 5), ***not a single non-party opponent has denied that end payors – consumers and third party payors – paid markedly higher drug reimbursements for widely used brand name drugs for many years following the fraudulent increases that began in late 2001 and early 2002.***[14]  While the NCPA's Brief attempts to quantify the impact to *pharmacies*, none of the submissions attempts to re-quantify the impact to *end-payors* who paid billions of dollars more for drug costs by reason of the Scheme.  Dr. Hartman concludes that the

---

[14] These opponents in particular could not credibly do so.  For example, ESI itself acknowledged that the FDB/McKesson scheme would impact its clients "above what we normally expect ingredient costs to be."  ESI said:

> To date the increases should result in an additional increase in trend to our clients of 0.7 to 0.9% (above what we normally expect ingredient cost increases to be).  If these increases are applied to ALL drugs that currently are WAC +16% (they would be raised to WAC + 20%) then the trend impact would be in the 1.2 to 1.5% range (again, meaning trend increase above and beyond what we would normally expect.  [ESI-414-0001875].

- 20 -

entities who will lose profits as a result of the Settlements are the same entities who benefited

from the Scheme.  *See* Hartman Rebuttal ¶ 5(d).  This is neither unreasonable nor legally

impermissible.

> **2.    That there *may be* transaction costs associated with the rollback provision of the Settlements does not mitigate against approving them**

Certain non-party opponents argue that the industry will incur significant administrative

costs to implement the rollback provision of the Settlements and ultimately the discontinuance of

the publication of AWP.  *See* PCMA Brief at 13-17; NACDS Brief at 7-8, 11.  Not only does this

argument lack merit but, even if it were true, it would not be grounds to deny approval of the

Settlements.

This argument is inconsistent with the claims of those same third-parties that when the

FDB/McKesson scheme was first implemented, the increases were negotiated away without

similar administrative headaches even though those increases, unlike the rollback provisions of

the Settlements, were accomplished secretly, without advanced notice, and without a public

forum.[15]  And some of the claims that these adjustments must be done on a contract-by-contract

basis is inconsistent with the claims of other industry participants that, nearly immediately after

the Scheme, PBMs renegotiated *all* their contracts with pharmacies.  *See* NACDS Brief at 1;

NCPA Brief at 9.

---

[15] *See* PCMA Letter, at 2 ("It is a fallacy to assume that AWP increases occurring in 2002 and 2003 have not been substantially, if not entirely, offset by marketplace forces in this highly competitive setting.") and at 3 ("The increase has, in short, been bargained away."); PCMA Brief at 4-5 ("any inflation in AWP caused by the alleged scheme has already been accounted for by sophisticated TPPs, their PBMs, and other market participants.") (emphasis in original) and 11-13.

3.      **The effects of Defendants' conduct have not been negotiated away**

The NACDS and the PCMA also argue that the prospective relief envisioned by the Settlements is no longer necessary because the underlying misconduct engaged in by FDB (and thereby Medi-Span) ended as of March of 2005. To be sure, after AWP Plaintiffs' Counsel learned of the illegal activities by First DataBank and McKesson, FDB changed its AWP publication system in March 2005 in order to fix the AWP markup mathematically, thereby discontinuing the fiction of its so-called wholesaler surveys. Although FDB therefore "came clean" – at least in terms of its AWP markup policies – the illegal markups put into place as of that time remained in place. Furthermore, neither FDB nor McKesson admitted the scheme which gave rise to those increased markups preceding March of 2005. The net result of all this, then, has been that end-payors, including third party payors and consumers whose reimbursements are based upon AWP, ***have continued to pay the inflated amounts that have existed by reason of the scheme both before and since March of 2005***.

D.      **It Is Not Unfair or Legally Impermissible to Improve Transparency in Pharmaceutical Pricing or to Facilitate the Use of a Reliable Pricing Benchmark in the Marketplace**

Because they focus nearly all of their objections on the potential effects of the rollback aspect of the Settlements, the non-party opponents do not meaningfully address the impact of phasing out the publication of AWP, a pricing benchmark that has proven in both this litigation and in others to be subject to both manipulation and abuse, nor do those objectors acknowledge that by virtue of the publicity these Settlements have received, TPPs will be armed with more knowledge in the event industry participants do attempt to "push back" the effects of the Settlements.

Nearly every opponent acknowledges that markets operate more efficiently and benefit consumers when pricing signals are truthful, not inflated, and transparent. *See* PCMA Letter, at

4-5 ("***PCMA believes that any drug price benchmark, whether AWP, AMP, WAC or any other measure, should be both an accurate reflection of pharmaceutical sales transactions . . .***") (emphasis added); PCMA Brief at 3 ("The private (and public) pharmaceutical reimbursement systems ***have at their core critical dependence upon accurate and timely publication of the current AWP for every active formulation of drugs dispensed by retail pharmacies***.") (citing Second Am. Compl. ¶ 78) (emphasis added); IPC Brief at 2 ("[W]hen the parameters driving the analysis and determination of reimbursement rates are altered abruptly or unpredictably, the profitability of pharmaceutical providers is invariably impacted and the financial survival of independent and small chain retailers may be imperiled."). Likewise, the NCPA annual report observes:

> There is little debate that the healthcare system and the business models of the pharmaceutical industry and pharmacy will change. We can help to influence that change, or resist change and have the conversion forced upon us.… Transparency in the industry is important for consumers to regain the trust they once had in pharmaceutical research manufacturers.

NCPA Brief at 21. That is what the Settlements will achieve. Having confirmed the need for an accurate AWP these entities can hardly complain about Settlements that reverse the fraud perpetrated by McKesson and FDB.

A number of the briefs filed by the PBM and pharmacy trade associations suggest that should the Settlements be approved, PBMs will attempt (if they have not done so already) to renegotiate the AWP discounts in place with TPPs. This supposition, true or not, misses the long-term benefit of the Settlements. Under their terms, all TPPs ***will have the opportunity*** to take advantage of the proposed markup rollback, and of course all TPPs will benefit by the features in the Settlements that prevent future abuse in the WAC-to-AWP artificial numerical markups for retail branded drugs. Regardless of whether all TPPs are ultimately successful in

- 23 -

those negotiations, they will still benefit from the transparency achieved in the Settlements

through the disclosure of the artificial nature of the WAC-to-AWP markups in the First

DataBank and Medi-Span databases and they will benefit by the eventual obsolescence of the use

of AWP generally for retail branded drug reimbursements.  As Dr. Hartman explains:

> Finally, the public nature of the ***Settlement Agreements*** has made
> it clear to TPPs that they have been overcharged to the advantage
> of retailers by the 5% Scheme.  This awareness will make it much
> less likely that TPPs will accept new contract terms that
> immediately give back the benefit of the ***Settlement Agreements***
> without a fight.  Since many retailers believe that it will take 6-18
> months to renegotiate their contracts; since the PBMs will be less
> interested in renegotiating their retail network pharmacy
> reimbursement contracts than their mail-order contractual terms;
> and since TPPs will finally be quite attentive to any renegotiations
> because they were substantially injured economically over 2002-
> 2005; I believe that the calculation of savings that I put forward . . .
> is still conservative.

Hartman Rebuttal ¶ 21.  These Settlements have received regular and vocal publicity since the

announcement of the FDB Settlement in November 2006.  As evidenced by the wide variety of

industry participants represented in the filings by non-party opponents, notice of the Settlements

has reached everywhere from the industry 800-pound gorillas to the community pharmacies that

serve poor and rural populations.  Given this remarkable reach, it is simply untenable to contend

that the Settlements will impose upon such knowledgeable participants the devastating financial

consequences, whatever their form, predicted by the objectors.[16]  Instead, the Settlements have

---

[16] Indeed, the PCMA Brief suggests that the uncertainty and instability in the marketplace
purportedly caused by these Settlements is ***not*** due to this Court's potential approval of the
Settlements, but instead due to "uncertainty regarding how and when they will be implemented,
if and when they will be blown up, and what will happen in the inevitably frantic period in
between."  *Id*. at 17-18.  This suggests that it is time to give the marketplace such certainty by
granting final approval of the Settlements.

001821-13  217908 V1

paved the way for a series of negotiations where all participants, regardless of their actual

bargaining power, will be armed with knowledge.[17,18]

## IV.    CONCLUSION

For all of the reasons set forth above, Plaintiffs respectfully request that the Court

overrule the objections the non-party opponents, and enter an order approving the proposed

Settlements.

DATED:  January 17, 2008                          By **/s/ Steve W. Berman**
                                                     Steve W. Berman
                                                     Sean R. Matt
                                                     Nicholas Styant-Browne
                                                     Barbara A. Mahoney
                                                     Hagens Berman Sobol Shapiro LLP
                                                     1301 Fifth Avenue, Suite 2900
                                                     Seattle, WA  98101
                                                     Telephone: (206) 623-7292
                                                     Facsimile: (206) 623-0594

                                                     Thomas M. Sobol (BBO#471770)
                                                     Hagens Berman Sobol Shapiro LLP
                                                     One Main Street, 4th Floor
                                                     Cambridge, MA  02142
                                                     Telephone: (617) 482-3700
                                                     Facsimile: (617) 482-3003

                                                     Elizabeth Fegan
                                                     Hagens Berman Sobol Shapiro LLP
                                                     820 North Boulevard, Suite B
                                                     Oak Park, IL  60302
                                                     Telephone: (708) 776-5600
                                                     Facsimile:  (708) 776-5601

---

[17] For this reason the Court should deny the request of the IPC and the NCPA to delay implementation of the rollback provisions even longer. *See* IPC Brief at 7-8 (requesting 18-month delay); NCPA Brief at 12-14 (requesting two-year delay).

[18] Finally, several of the non-party opponents claim that the Settlements should not be approved because they will not benefit consumers who have since stopped buying the drugs that they once purchased at inflated rates. *See* PCMA Brief at 7-11; Deville Brief at 27-28.  Plaintiffs address this argument in their memorandum in support of final approval.

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

George E. Barrett
Edmund L. Carey, Jr.
Barrett, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

001821-13  217908 V1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of ***Class Plaintiffs' Memorandum in Response to Non-Party Filings Opposing First Databank and Medi-Span Settlements*** was served upon the attorney of record for each other party through the Court's electronic filing service on January 17, 2008.

**/s/ Steve W. Berman**

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

001821-13 217908 V1