# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND, | CIVIL ACTION: 1:05-cv-11148-PBS |
| **Plaintiffs,** | |
| v. | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | |
| **Defendants.** | |
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated, | CIVIL ACTION:  No. 07-CV-10988 |
| **Plaintiff,** | |
| v. | |
| MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC., | |
| **Defendant.** | |

# DECLARATION OF RAYMOND S. HARTMAN
## IMPACT AND COST SAVINGS OF THE FIRST DATABANK SETTLEMENT AGREEMENT: RESPONSE TO INTERESTED PARTIES' COMMENTS

## Declaration of Raymond S. Hartman

## Impact and Cost Savings of the First Databank Settlement Agreement: Response to Interested Parties' Comments

### Executive Summary

In September 2006, I submitted a Declaration that analyzed the economic impact of the First Databank Settlement Agreement. I found the impact of the Settlement to be substantial. If the Settlement was approved shortly thereafter such that it became effective in early 2007, I concluded that during the first year of implementation, total cost savings to end-payers could be as high as $4 billion.

A variety of parties representing pharmacies and PBMs have filed briefs and motions opposing the Settlement. I have been asked by Counsel for the Class to review these briefs, motions and supporting analysis.

There is no question that the Settlement will benefit the Class. The opposition to the Settlement comes from those parties that were the beneficiaries of the McKesson-FDB Scheme. The Settlement will now roll back the price increase caused by the Scheme. I estimated in September 2006 that the benefits might exceed $4 billion. To be clear, I have opined that the damages during the period July 2001 through March 2005 exceed $7 billion (with pre-judgment interest). Since there has been no evidence put forward that the impacts of the Scheme have been mitigated since March 2005, the benefit of the Settlement will be to reduce any continuing impacts of the Scheme since that time. However in my September 2006 Declaration, I did discuss possible market forces that might impact that benefit. The question about whether the passage of time and the public nature of the Settlement may alter my earlier calculation of Class-wide benefits is relevant and I address this question in Section IV.

### I.    Qualifications

1.    My name is Raymond S. Hartman. I have presented my qualifications to this Court in this matter in a variety of Declarations.[1] In performing this analysis, I have

---

[1] Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, July 14, 2006; Declaration of Raymond S. Hartman: Impact and Cost Savings of the First Databank Settlement Agreement, September 27, 2006; Updated Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, December 20, 2006; Rebuttal Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, March 18, 2007; Expert Report of Raymond S. Hartman, September 14, 2007; Report of Raymond S. Hartman Regarding Aggregate Damages, October 29, 2007; Report of Raymond S. Hartman Regarding the Reliability of IMS Data for Calculating Aggregate Class Damages, November 28, 2007; all *In Re New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS.

relied upon all materials developed and presented in this matter to date.  I have reviewed the submissions of the interested parties listed in Attachment A.

## II.    Overview of Interested Parties' Objections and the Failure of Those Objections

2.    In September 2006, I was asked by Counsel for the Class to assess the possible impact of the Settlement outlined in First DataBank's Settlement Agreement and Release (*FDB Settlement Agreement*).[2]  I was asked to perform a preliminary calculation of the savings that would be realized as a result of the Settlement for a one-year period commencing in the spring of 2007, if the *Settlement Agreement* were approved by the Court.[3]

3.    Given reasonable assumptions and data,[4] I found that the aggregate reduction in pharmaceutical payments at retail, that is the reduction in the payments by uninsured cash payors and third-party payors, would equal approximately 4% of aggregate spending by the payors for the relevant NDCs.  At request of Counsel, I allocated total retail spending and savings to three different end-payer groups using accepted industry data:[5] Private Third-Party Payers (TPPs), Medicaid and Uninsured Cash Payers. I disaggregated the calculation for Medicaid payments, in order to indicate the extent to which exclusion of such payments and savings was related to aggregate calculations.  At request of Counsel, I included savings to uninsured cash payors, understanding that such savings were relevant to the analysis of the economic impact of the *Settlement Agreement* and could become relevant to the FDB McKesson litigation.  As developed in the FDB McKesson litigation, each of these payor groups reimburses, based on contracts, statutes and/or retail practices, in relation to AWP, and will therefore realize savings when FDB adjusts the

---

[2] Settlement Agreement and Release, *New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, August 2006 (hereafter *"FDB Settlement Agreement"*).

[3] The *FDB Settlement Agreement* outlines a process by which FDB will "adjust, i.e., change, the WAC to AWP Markup it utilizes for all pharmaceuticals listed on Exhibit A to 1.20" (*FDB Settlement Agreement*, p. 19). Exhibit A was generated by FDB and contains 8,486 unique NDCs, the majority of which (more than 94%) had an AWP/WAC mark-up of *at least* 1.25.  I was directed by Counsel to assume that the effective date of the Settlement would be the spring of 2007. I note therefore that Interested Parties' assertion **is simply incorrect** that my analysis of savings "is overstated by a factor of five" because the number of NDCs subject to the *Settlement Agreement* (8,486) is larger than the number of NDCs included in the original Complaint (1,491) and the Second Amended Complaint (1,442); see *Memorandum of the National Association of Chain Drug Stores and the Food Marketing Institute In Opposition to Plaintiffs' Motion for Approval of Proposed First DataBank and Medi-Span Class Settlements* (at p. 11).  I was asked to calculate savings induced by the reduction of the AWP-to-WAC spread for the 8,484 NDCs subject to the *Settlement Agreement*, not the savings induced by the reduction of the spread for the NDCs included in the Complaint.  The appropriateness of this request is a legal matter.  See ¶¶ 2 & 3 and footnotes 3-6 of the September 2006 Hartman Settlement Declaration.

[4] See ¶¶ 9-12 and the related footnotes of my September 2006 Settlement Declaration.

[5] Novartis, *Pharmacy Benefit Report: Facts & Figures*, 2004 edition, Figure 1: Retail Market Share by Payer Type: 2003, p. 23.

AWP/WAC markup according to the *FDB Settlement Agreement*.[6] The estimated savings calculated for each of these end-payer groups is reiterated in Table 1.[7]

**Table 1**
**Calculation of Cost Savings by Payer Type (2007$)**

| Payer Type | Payer % | Retail Spending | Savings % | Savings Amount |
|---|---|---|---|---|
| Private TPPs | 78.8% | $83,236,653,205 | 4.0% | $3,329,466,128 |
| Medicaid | 11.9% | $12,570,002,197 | 4.0% | $502,800,088 |
| Cash/Uninsured | 9.3% | $9,823,615,163 | 4.0% | $392,944,607 |
| Totals | | $105,630,270,565 | | $4,225,210,823 |

4.     Certain entities opposing the Settlement have now come forward and argue that these savings calculations should be rejected by the Court. Their purported reasons are the following:

- Retail pharmacies ("Retailers") *will be financially impacted* – immediately, adversely and significantly – when the AWP-to-WAC *spread is reduced* from 1.25 to 1.20. Yet, inexplicably, the Interested Parties argue these same retail pharmacies *were not financially impacted* (that is, did not benefit financially) when the *spread was increased* from 1.20 to 1.25. In other words, these pharmacies claim that they did not benefit when the AWP-WAC spread was increased as a result of the Scheme but will be impacted if the effects of the Scheme are rolled back. Their claim is suspect as a matter of economic theory and is contrary to the business practices in this market.

---

[6] The relationship of the usual and customary (U&C) allowed amount reimbursed by uninsured cash payors to AWP is being addressed by submissions to the Court. I have already addressed it in my FDB McKesson declarations; September 2007 Hartman Declaration, ¶¶ 10 & 11 and footnote 6. I understand that CMS has passed a final ruling to switch Medicaid from an AWP/WAC reimbursement framework to one based on AMPs; however, it is not clear when or if this will be implemented due to an injunction obtained by NACDS and NCPA preventing implementation of the CMS final ruling.

[7] Source: Table 2, September 2006 Hartman Settlement Declaration. As discussed in Attachment B to the September 2006 Declaration, TPP rebates may be affected by the *FDB Settlement Agreement*. Assuming conservatively that *all* managed care rebates are calculated as 5% of AWP and that *all* rebates paid to PBMs are passed through to TPPs, total TPP saving would decrease by approximately $166 million to $3,163 billion.

In that Declaration, I estimated total retail spending on the drugs listed in Exhibit A of the *FDB Settlement Agreement* to be of $138 billion dollars in 2005, and assuming a conservative annual growth rate of 7% for such spending total retail spending conservatively equals $158 billion in 2007 (see footnote 17 of that Declaration). I assumed **two-thirds** of these expenditures were reimbursed **with reference to the FDB AWPs**, reducing total retail dollars subject to the markup adjustment to the $106 billion in Table 1. I had assumed that the other third reflected primarily reimbursement made with reference to Medi-Span AWPs. **Since Medi-Span became part of the settlement process after the submission of my September 2006 Declaration, my reduction by 1/3 is highly conservative.**

- o According to Retailers' theory of retail pharmaceutical markets, the formulaic relationship between AWP and pharmacy revenue and profit works only in one direction – downward.

- o According to Retailers' theory of retail pharmaceutical markets, the formulaic relationship between AWP and pharmacy revenue and profit does not work when AWPs are increasing. That is, when AWPs are increased, revenue and profit of retail pharmacies do not increase.

- Many small community pharmacies will be impacted to such a degree as to be driven out of business.

- Others opposed to the settlement claim that fully-informed rapidly-implemented competitive behavior among the important participants of the industry negates any possible formulaic relationship between changes in AWP and pharmacy revenue (and profit).

  - o This assertion is predicated on the notion that Retailers did not benefit from the 5% Scheme, because the increased amounts that they would have been paid at retail were rapidly (indeed "immediately") competed away through increased discounts off AWP imposed upon retailers by PBMs. They do not put forward an analysis that these increased retail discounts were passed on to TPPs or consumers. And it is the TPPs and consumers who are in the Class.

  - o TPPs will not benefit from a reversal of the 5% Scheme. The potential benefits to Class members instead will be captured by the PBMs through their competitive power to alter contractual terms.

- The Settlement will provide very little benefit to the Class of consumers and third party payors and the economic onus of the Settlement will fall not upon the Defendants but rather upon "nonparty pharmacies."

5.    As I develop more fully in Section III below, these assertions are often contrary to the facts developed in the litigation and are incorrect. They fail for the following reasons:

  a) **As a matter of economic theory and business practices, it is impossible for retail pharmacies to be economically injured by the Settlement if they did not benefit from the 5% Scheme the *Settlement Agreement* is designed to reverse.**

  - The amount paid at retail by any payor to any pharmacy is formulaically related to AWP by contract, statute and/or retail marketing practices. This formulaic relationship is not asymmetric; it does not hold only when prices move in one direction. It holds when AWPs increase and when they decrease. It holds until it is renegotiated, and such renegotiations take considerable time, even when there is full information regarding changes in the AWP-to-WAC Spread.

  - Retail pharmacies will be impacted adversely by the Settlement, because AWPs related to the WACs of the relevant NDCs will be reduced by 4% from 1.25 to 1.20.

- Since the amount allowed for reimbursement by TPPs and most state Medicaid agencies is at this time formulaically related to AWP,[8] the allowed amount will decrease for each prescription filled.

- The effect of the implementation of the 5% Scheme on retail pharmacies was just the opposite – AWPs and the reimbursement rates related to AWPs increased immediately, increasing revenue and profit. This was documented by the numerous internal emails produced by McKesson which indicate the views of McKesson and certain retailers that retailers were profiting from the Scheme.

b) **Not only was the 5% Scheme implemented specifically to benefit retail pharmacies with increased revenue and profit, it succeeded in doing so**. This intention; the understanding of this intention by the few nonparty market participants that recognized the implementation of the 5% Scheme; and the success of this intention are confirmed by the following evidence, which I have previously detailed for the Court.

- The FDB McKesson litigation discovery materials for McKesson and selected sales persons dealing with selected retailers.

- The discovery materials for one of the three major PBMs to which Interested Parties appeal.

- The IMS data summarizing the average amounts paid at retail by all payors – TPPs, uninsured cash payors and Medicaid eligibles – for the drugs subject to the McKesson FDB litigation.

- Claims data for selected TPPs.

- Accounting data put forward by Interested Parties revealing average net operating income due to pharmacy operations over the 1997-2006 decade was the highest for the four years subject to the Complaint (2002-2005).

c) Retail and mail-order pharmacies were "the big winners." PBMs benefited to a lesser degree on a percentage basis.[9]

d) **The Settlement is designed to attempt to reverse the retail and mail order windfall that resulted from the Scheme.**

- Essentially, the retailers, who were the big financial winners from the Scheme, are being forced by the Settlement to return some of those financial gains to those payors that were the source of the illicit financial gains.

- As a legal matter, retailers are indeed "nonparties" to the FDB litigation.[10] As a matter of economics, they were certainly not nonparties to the challenged

---

[8] My preliminary analysis of claims data summarizing U & C pharmacy charges demonstrate that they move formulaically with AWP.

[9] See Attachment E to my October 2007 Declaration

[10] *Interested Parties who have filed objections to the settlement represent essentially all groups of retailers* – small independent pharmacies; a GPO for small independent pharmacies (the Independent

conduct. All retailers benefited immediately and significantly from the Scheme.

- Interested Parties' (DeVille, ASCP and LTCPA) assert[11] that the "Proposed Settlement is fundamentally flawed [because] ... the third-party payors and consumers will receive no money damages under the settlement." The form in which relief is provided may be subtle (reduced drug prices) but it is real. Their assertion that "plaintiffs seek to extinguish the rights of past class members in exchange for providing benefits to future class members, particularly third party payors" is essentially wrong. The preponderance of entities is the same over both time periods. It is unlikely that there is a large or significant group of class members, particularly TPPs, who bought drugs in the past who will not also buy drugs that are now subject to a potential price roll back.

e) **These conclusions hold for large retail chain pharmacies, pharmacy operations of mass merchandisers and small community pharmacies.**

- Small pharmacies may have less bargaining power with their PBMs than large retail chains, and as a result, may have been offered less generous discounts off AWP in their reimbursement contracts.

- Regardless, small pharmacies benefited from the 5% Scheme in the same fashion as the large retail chains or mass merchandisers. Since AWP increased relative to WAC as a result of the 5% Scheme, reimbursement for the ingredient cost of the drug $(AA = (1-d)*AWP)$ increased by the same percentage, regardless of the discount off AWP (d).[12]

- If the 5% Scheme was the only economic factor supporting the economic existence of some small local pharmacies and if the reversal of the Scheme causes them to fail, this failure will mirror the economic consolidation throughout the markets for health care delivery services, products and devices. Over the past ten years, smaller regional wholesale distributors have become marginal and have been acquired by larger national wholesalers. The same

---

Pharmacy Cooperative or IPC, which represents approximately 3,200 independent pharmacies which currently account for wholesale pharmaceutical purchases of more than $7 billion); the National Association of Retail Druggists (NARD), which represents 24,000 independent community pharmacies dispensing "nearly half of the nations retail prescription medicines (*NCPA Memorandum of Law*, p. 2);" the association for large retail chains (the National Association of Chain Drug Stores (NACDS), which account for 71% of all scripts filled, *Memorandum*, p. 1); and the association for the pharmacy operations of mass merchandisers (the Food Marketing Institute (FMI), which represents 1,500 members – food retailers and wholesalers – who operate 26,000 retail food stores).

[11] Letter from David Farber of Patton Boggs on behalf of "DeVille Pharmacies, Inc. …, the American Society of Consultant Pharmacists ('ASCP') and the Long Term Care Pharmacy Alliance ('LTCPA'), representatives of a major segment of the healthcare industry that would be directly and adversely affected" at page 1. David Farber characterizes these flaws as "inextricably related to the 'vermillion flag' identified by the Court … that the settlement provides no monetary damages" at page 2 and footnote 2 of the letter.

[12] In my September 2006 Settlement Declaration, I demonstrated that the savings were 4% if d = 15%. The savings are 4% for any value of d.

pattern is found in drug manufacture, chain pharmacy operations and mass merchandisers with pharmacy operations. The same trend toward consolidation and the demise of small independent local retailers is found in all retail trades generally. Implementation of a price-fixing Scheme to fraudulently increase the revenue and profits of economically-marginal, small community pharmacies and failure to injunctively eliminate that Scheme and compensate those economic entities damaged by the Scheme makes no sense as a matter of economic policy. However, it is important to note that many of these small pharmacies were in business prior to the Scheme and did not go out of business at that time.[13]

### III.    Supporting Evidence

6.    The evidence put forward to date in the FDB McKesson litigation demonstrates the following economic impacts of the 5% Scheme.

   a)   Specific large chain retail pharmacies were the primary impetus for the Scheme.[14] The Scheme benefited these retailers with increased revenue, and with profit that increased threefold by some estimates.[15] Analogous benefits were experienced by **all retail and mail-order pharmacy** operations, regardless of size.[16]

   b)   The primary market effect of the Scheme was an undeniable immediate increase in the amounts paid at retail by Class members for prescription drugs. When the

---

[13] Indeed, the 2007 National Community Pharmacists Association, Pfizer Digest, *The Face of Independent Pharmacy*, submitted as Exhibit B to the National Community Pharmacists Association's Memorandum, notes the following: "In 2006, independent pharmacies faced many challenges: both old and new. However, even in the most challenging times, independent community pharmacies continue to lead the way in community pharmacy practice and define the future of pharmacy practice. The industry has responded by expanding and diversifying their businesses to include enhanced patient care services, … , and other valuable community services." (pp. 5-6)

[14] For example, see the September 2007 Hartman Declaration, Attachment D, ¶ 7 which identifies the variety of retailers pressuring drug manufacturers and McKesson for the Spread increase, including Walgreens, Wal-Mart, Eckerd, Rite-Aid, CVS, Kroger, Albertsons, Meijer, and Target.

[15] For example, this Court notes in its August 27, 2007 *Memorandum and Order* (at p. 8): "McKesson implemented this scheme in order to provide a greater spread to those important retail pharmacy clients like Rite Aid and Wal-Mart **as well as its own pharmacy related businesses**. McKesson boasted that the increase in AWP resulted in ' **more than 3 times the profit as before.**' (Pl.'s Mem Supp. Class Cert. Ex. 39, Ex. 9 (giving examples of increased profits for its customers **'now and into the future'**).)" (**emphasis added**).

[16] As recognized by large PBMs such as ESI; see September 2007 Hartman Declaration, Attachment D, ¶¶ 12-15. According to an internal strategic memorandum (¶¶ 12-13), ESI concluded:

   a) Pharmacy profits would increase for both network pharmacies ("the big winners in the situation") and for ESI mail order pharmacy ("PBM will receive additional income for their mail order prescriptions").
   b) "ESI will see an increase in margin per script and rebate."
   c) The reimbursement rates paid by Class members TPPs for the relevant pharmaceuticals will increase. "The client will see an increased trend in direct relation to the increase in AWP. … The client will see an increase in drug costs. Members will pay more for % copay plans, they will meet their deductibles and caps sooner."

AWP-to-WAC Spread increased by 5 percentage points, the preponderance of related retail drug prices increased by 3-5% within a month, relative to WAC.

- This immediate and enduring increase in the mark-up of the retail price above WAC is revealed by IMS retail survey data, which summarize the precise measure of interest – prices paid at retail pharmacies – for the preponderance of the drugs subject to the Complaint and for the entirety of the Class Period.[17] This immediate and enduring retail market benefit is confirmed by discovery materials in the FDB McKesson litigation, some of which have been cited specifically by this Court (see footnote 15).

c) The assertions that there was an immediate competitive market response that defeated this price increase and negated any benefit to retail pharmacies are contradicted by the facts summarized below.[18]

- The evidence demonstrates that ***no TPPs or consumers knew of the Scheme; almost no one knew of the resulting 5% increase in Spread;***[19] ***and that informed market-wide competitive responses did not occur.*** Indeed, the few market entities that did reveal some delayed awareness of the impacts of the Scheme responded in ways to optimize their profitability, rather than defeat the Scheme.[20]

- The Defendants implemented the Scheme with particular regard to maintaining secrecy. The point was that no one **was to know**, except those benefiting from the Spread increase. Spread increases were implemented with stealth, at the same time that WAC increases were reported. If a drug manufacturer somehow noted that Spreads had changed and objected to the change, they were told by FDB that the manufacturers had no say in the matter.[21]

---

[17] See September 2007 Hartman Declaration, ¶¶ 25-33, 35-36; Table 1; and Attachment F, ¶¶ 18-24, Figures F.2.a)-F.2.e), F.2.a')-F.2.e'), F.3.a)-F.3.q), and Exhibit F.1.d.

[18] Selective examples of their incorrect assertions are the following:

At pages 1 & 6 of their Memorandum, the NACDS incorrectly asserts: "[t]he proposed settlements are unnecessary because the marketplace quickly and efficiently adjusted to the AWP spike in 2002" (p. 1). … "[t]he marketplace has already largely incorporated the revelations regarding how FDB reported AWP … This reactive process began almost immediately in 2002 when the AWP spike was noticed by many in the industry" (p. 6). Note that the evidence demonstrates that the AWP spike *was not* noticed by many in the industry, as corroborated by the materials cited in the next footnote.

At pages 6-7 of their Brief, the IPC incorrectly asserts: "Contrary to Plaintiff's allegations, it is unlikely that IPC's members realized any benefit from the supposed 2002-2004 price mark-ups. … this segment of the retail market realized virtually no financial benefit from the alleged inflated markup factors which are the subject of the within litigation."

[19] See ¶¶ 42-51 of the September 2007 Hartman Declaration and Attachment D to that Declaration, particularly ¶¶ 11-45.

[20] *Ibid*, Attachment D, ¶¶ 12-15, 26-33.

[21] *Ibid*, Attachment D, footnote 14.

- Since no economic entities, outside the Defendants and certain retailers, knew of the implementation of the Scheme immediately and since very few ever understood the impacts of the Scheme, there were no specific initiatives undertaken or that could have been undertaken to eliminate the increased retail profitability.

- As a result, the mark-up of the prices paid at retail as "allowed amounts" *remained inflated* relative to WAC on all purchases by TPPs, uninsured cash payors and Medicaid eligibles. This fact is documented by the IMS retail prescription survey data and corroborated by TPP claims data.

- Publicly available survey data introduced by opposing entities demonstrate that profitability (net operating income) on retail pharmacy operations (sales revenue) increased in 2002 above levels attained in the preceding 5 years and through 2005 remained at the highest levels over the 1997-2006 decade.[22]

d) There is no evidence that Class member TPPs were able to systematically mitigate the economic injury they incurred in the form of increased drug payments.

- Discovery materials document that only a handful of TPPs out of thousands of managed care payor groups understood that a systematic increase in the AWP-to-WAC Spread had occurred.[23]

- All other TPPs had no idea that the Spread had been systematically increased for the group of challenged drugs. They therefore did not attempt to initiate contract renegotiations to mitigate the specific financial injuries of the Scheme.[24]

- Available claims data for selected TPPs demonstrate that the Spread inflation induced by the Scheme was not systematically mitigated.[25]

- TPPs have asserted in sworn testimony that had they known of the Scheme and its attendant inflation in the AWP-to-WAC Spread and in their drug payments relative to WAC, they would have renegotiated more aggressively to mitigate.[26]

e) Retail pharmacies increased their revenues and profits; mail-order pharmacies increased their revenues and profits; PBMs increased their revenue and margins, particularly when the PBM also owned mail-order and/or retail pharmacies.[27]

7.  As a matter of economic theory and the evidence put forward in this matter, the economic impacts of the *Settlement Agreement* will be the following:

---

[22] See NCPA-Pfizer Digest, *op cit.*, Table 2, page 6.

[23] See footnote 2 and ¶¶ 39-42 of Attachment D of the September 2007 Hartman Declaration.

[24] *Ibid.*

[25] See ¶¶ 16-26 of the October 2007 Hartman Declaration.

[26] See ¶¶ 39-42 of Attachment D of the September 2007 Hartman Declaration.

[27] See the September 2007 Hartman Declaration, Attachment D ¶¶ 12-15 and Attachment E ¶¶ 10-11 & 18-19.

a) Revenues and profits at retail and mail-order pharmacy will *fall immediately* with the reduction in AWP, given the formulaic relationship between retail drug prices/reimbursement and AWP.[28]  This decrease attempts to reverse the *immediate increase* in revenue and profit at retail and mail-order pharmacy that occurred with the Scheme.[29]  It is possible, although not demonstrated conclusively, that some small independent pharmacies may be impacted, as some of the Interested Parties argue.  I turn to this issue in ¶ 8 below.

b) Rather than bear this economic injury in silence (that is rather than maintain strict secrecy, as they did with the implementation of the Scheme) the variety of representatives for retail pharmacies are now quite publicly pleading with the Court for relief.

c) The change in the Spreads induced by the *Settlement Agreement* is very public. **All economic entities know.**  As a result, all economic entities will be able to act immediately and affirmatively upon the changes in reimbursement rates paid at retail induced by the Settlement.

- The public nature of market information regarding this alteration in the relationship between these two very important list prices is in stark contrast to the private nature of the Scheme.

- Despite the fact that **everyone knows;** despite the fact that everyone can therefore begin renegotiating contractual terms immediately, they claim that it will take 6-18 months to fully renegotiate[30] and that the renegotiations are sufficiently arduous as to cause transactions costs for retailers.[31]

---

[28] **Interested Parties correctly characterize the impact of economic forces when they are injured**.  For example, the IPC Brief states (at pages 3 & 4): "The adjustment [induced by the *Settlement*] will immediately impact existing reimbursement rates to retail providers of prescription pharmaceuticals, including IPC's members. … The proposed class settlement will have the immediate effect of reducing not only the WAC to AWP markup, but also the third party reimbursement amounts paid to retail providers."

The Memorandum of the NACDS and FMI states (at page 5):  "The proposed settlement will have a huge effect on members of FMI and NACDS, who represent more than 70% of community pharmacy drug dispensing in the US.  The Hartman Declaration, if it were credible (which it is not), indicated that the redefinition of AWP would result in a reduction of payments to retail pharmacies by about $3.7 billion in 2007.  The supposed 'savings' would come right out of the economic hide of community pharmacies, if Dr. Hartman is correct (and he is not)."

The logic of the NACDS/FMI Memorandum argument is unclear to me.  If I am not correct, as they state, I would conclude that the redefinition of AWP **will not** "result in a reduction of payments to retail pharmacies" and the savings **will not** "come right out of the hide of community pharmacies."  Indeed, if I am wrong, as they state, it would seem that retail pharmacies will have no problem accommodating to the *Settlement* world.

I highlight some additional mischaracterizations in the NACDS/FMI Memorandum in Attachment B.

[29] As I have discussed above, **Interested Parties incorrectly characterize the impact of economic forces when they benefited from the Scheme**.  The economic forces are symmetric.

[30] IPC Memorandum at pages 5-6.

[31] Memorandum of NACDS and FMI at page 1: "The proposed settlements will work unfairly to punish thousands of community pharmacies in this country as well as other industry participants, by imposing

d) These last two assertions by Retailers reveal the extent to which Retailers' assertions are economically inconsistent. The *Settlement Agreement* makes a ***very public policy announcement*** concerning the reduction of a variety of AWP-to-WAC Spreads from 1.25 to 1.20. Every economic entity in the market knows of the change and can begin to strategically renegotiate as deemed optimal. ***The Settlement Agreement merely runs the 5% Scheme in reverse, but with much public fanfare***. Under the Scheme, the AWP-to-WAC Spreads were increased from 1.20 to 1.25, with **great secrecy and little to no market knowledge.** Yet they claim that the market response to the *Settlement Agreement* will take 6-18 months and be subject to substantial transactions costs, while the market response to the Scheme, which required an extraordinarily greater amount of information gathering and analyzing, occurred immediately and costlessly.[32]

8.    Retail and mail order pharmacies benefited from the Scheme over 2002-2005 and they will be financially impacted, to the extent that their revenue and profit stream is reduced, by repeal of the AWP-to-WAC inflation under a *Settlement Agreement*, whenever that Settlement is effectuated. I have been asked by Counsel to assess the extent to which such economic injury may be harmful to small local community pharmacies. Without conducting a formal analysis, I believe this impact can be characterized as follows:

a) While I have not reviewed or performed a survey of small community pharmacies stratified by size and/or geography, in this age of computers, web commerce and pharmacies networks, I believe that even small single-store independent community pharmacies are linked by computerized access to AWP information and PBM pharmacy networks. Certainly, the Interested Parties in this matter seem to represent almost all of the retail pharmacies in the market and some pharmacies seem to be represented by more than one Interested Party. To the extent that small pharmacies are represented by large GPOs (the IPC, with 3,200 members "all small, rural and/or independent pharmacies") and/or associations (the NCPA, founded as NARD, which "represents 24,000 independent community pharmacies"), they may collectively have the same aggregate purchasing power as intermediate and large chains.[33]

b) If a small pharmacy is not so characterized or not part of a GPO and/or association, it probably will not remain competitive in the future and will have been only marginally competitive in the past. Such pharmacies will require consolidation within larger entities, in the same way that consolidation has characterized much of the health care services delivery entities, medical device manufacturers, drug manufacturers and medical distribution/wholesale entities.

---

transactional costs on them in reacting to an arbitrary and unnecessary across-the-board AWP re-definition." At page 7 the Memorandum continues, "The economically necessary steps that PBMs and retail drug chains will take if this settlement is approved will result in very substantial transaction costs for PBMs, TPPs and retail drug chains."

[32] See the quotations from the NACDS and IPC in footnote 18.

[33] See footnote 13 above.

Such pharmacies will not remain competitive regardless of whether the 5% Scheme is left in place or the *Settlement Agreement* is implemented.[34]

9.    Opponents make the same broad and general arguments regarding PBM competition as made in the FDB McKesson litigation. They argue, *incorrectly*, that PBM competition is so aggressive and "perfect" that the market impacts of the Scheme were competed away immediately[35] and that the ameliorative effects of the *Settlement Agreement* will be competed away by the PBMs and therefore will not compensate the payor classes, particularly the TPPs. These arguments fail for the same reasons they failed in the FDB McKesson litigation.

   a)   While PBMs do compete for TPP business, the competition is far from fierce and was certainly insufficient to defeat the Scheme. The FDB McKesson litigation evidence reveals that those PBMs with knowledge of the inflated AWP-to-WAC Spreads recognized that the increased Spreads would benefit their mail-order pharmacy operations and would increase their "margin per script and rebate." As a result, the extent to which such PBMs competitively communicated information was remarkably limited, rather than aggressively fierce.[36]

   b)   The fact is that competition among PBMs is much more nuanced and constrained than asserted by Defendants and Interested Parties.[37] Specifically, the largest PBMs were most likely to observe the changes in list price relationships (Spreads);[38] given their size one might expect that they would wield the greatest

---

[34] If there exist local pharmacies, for example, in some very rural location serving a very small population, then that pharmacy should be subsidized explicitly for the services it provides, rather than financially maintained though a price-fixing agreement. However, such subsidies may be unnecessary because such rural pharmacies tend to have a geographic monopoly which they can use in negotiating with PBMs.

[35] At page 6 of their Memorandum, Counsel for NACDS/FMI assert, incorrectly, "As FTC studies demonstrate, the industry – PBMs, TPPs, and retail drug stores– is highly sophisticated and competitive. As a result, during the past two years, the marketplace completed its absorption and reaction to this information regarding how AWP was calculated. This reactive process began almost immediately in 2002 when the AWP spike was noticed by many in the industry."

   At page 4-5 of their Motion, Counsel for the Pharmaceutical Care Management Association (PCMA) assert, incorrectly, "Any inflation in AWP caused by the alleged scheme has already been accounted for by sophisticated TPPs, their PBMs and other market participants (emphasis in original)."

[36] See the September 2007 Hartman Declaration, Attachment D, ¶¶ 12-15. The quotation comes from ESI internal memoranda cited in ¶¶ 12-13 of Attachment D.

[37] The evidence for this fact is developed in the September 2007 Hartman Declaration, Attachment E and the October 2007 Hartman Declaration, ¶¶ 41-49. Furthermore, Interested Parties' appeal to the FTC (see footnote 35 above) must be balanced against the analytic finding of other FTC reports, one of which has found the following: "Competitive concerns have arisen in the PBM market – a highly concentrated industry in which the four largest firms hold about a combined 80% market share. The market for full-service PBM providers capable of bidding on Medicare contracts is even more concentrated. … The situation is one in which PBMs can act opportunistically – easily increasing prices or decreasing service. … The FTC found that 1) there was a national market of PBMs with very few competitors; 2) PBMs had the ability and incentive to engage in exclusionary conduct; [and] 3) there was the potential for collusion among PBMs;" see ¶ 15 Attachment E, September 2007 Hartman Declaration.

[38] The evidence reveals that only ESI and Caremark understood that the Spread systematically was increased; see September 2007 Hartman Declaration, Attachment D, ¶¶ 11-23.

market power for competitive renegotiations and revelation of the increased Spreads. However, these PBMs are found to be substantially integrated into mail-order pharmacy, which benefited from the Scheme. The conglomeration of these activities constrained the competitive behavior of PBMs to reveal the extent of the 5% Scheme, even if they realized the Spreads had been systematically increased (most did not realize this).

c) The evidence in the FDB McKesson litigation reveals that only 2 of more than 50 PBMs knew of the increased Spreads,[39] and that they were unsure of the extent to which all Spreads were increased.

d) Aggregate drug reimbursement rates at retail do not reveal any systematic push-back or mitigation. Given all the constraints on PBM competition, it is not surprising that the retail drug price increases, attributable to the increases in AWPs relative to their WACs, were not competed away over the entire damage period through March 2005.[40]

## IV.  The Extent to Which My Savings Estimate will be Altered by Intervening Events

10.     As reiterated in ¶¶ 2 & 3 above, in my original September 2006 Declaration estimating aggregate benefits of the *FDB Settlement Agreement*, I calculated a total of $105.6 billion of prescription payments at retail pharmacies as being the relevant starting point for the estimation of savings. I estimated that 4% of that total, $4.225 billion, would be the aggregate savings induced by the *FDB Settlement Agreement*, of which $3.329 billion were savings to TPPs, gross of rebate adjustments, and $392.9 million were savings to uninsured cash payors. Given an assumption that all rebate dollars are passed on to TPPs, I calculated that the savings to TPPs net of rebates would be $3.164 billion. While I calculated the savings to Medicaid for completeness, that savings is attributable to a payor group not included among Plaintiffs.

11.     The point of departure for my calculation, total spending at retail for the branded drugs identified as subject to the Settlement (in Exhibit A of the *Settlement Agreement*), was derived from standard data sources summarizing aggregate US retail prescription spending.[41] The NDCs included are strictly brand-name self-administered drugs; no generic drugs or physician-administered drugs were included. It is my understanding that the source of spending data (*Drug Topics*) summarizes retail pharmacy alone; mail order pharmacy is not included. The estimate of total retail spending that I used was actually 2/3 of actual total retail expenditures of prescriptions.[42] I reduced the actual total by 1/3, in order to conservatively allow for prescriptions where Medi-Span AWPs were used; the remaining 2/3 were assumed to not be subject to the *FDB Settlement Agreement*.

---

[39]  See ¶ 43, October 2007 Hartman Declaration.

[40]  These constraints are discussed in detail at ¶¶ 44-47 of October 2007 Hartman Declaration.

[41]  Verispan's *Drug Topics*, derived from their National Retail Survey; see footnote 15 of the September 2006 Hartman Declaration.

[42]  September 2006 Hartman Declaration, footnote 14 and ¶ 11.

Declaration of Dr. Hartman on Impact and Cost Savings of FDB Settlement Agreement
Privileged and Confidential: Subject to Protective Order
Page 13

12.     Since the filing of my September 2006 Declaration, the *Settlement Agreement* terms have been extended to Medi-Span.  Hence, this earlier reduction by 1/3 is unnecessarily conservative, since the settlement now includes drugs for which the computerized AWP information came from either FDB or Medi-Span.  That total was $158 billion in spending, 4% of which would be $6.32 billion.[43]   The TPP portion, prior to correction for rebates, would be $4.98 billion and the consumer portion would be $588 million.

13.     The question now arises: Will the original savings estimates be realized by the members of the TPP Class and the Uninsured Cash Payor Class, given the passage of time, the public nature of the Settlement and the public nature of some statements by market participants (e.g., PBMs) that they will not allow themselves to be affected by the Settlement?  Will the larger amounts calculated in the preceding paragraph be realized? Or will no savings be realized, because according to Interested Parties, the industry is so "highly sophisticated and competitive" that the original impacts of the Scheme were immediately and completely negated?

14.     The evidence reviewed and presented in the FDB McKesson litigation to date demonstrates that all of the industry assertions that "fierce" PBM competition defeated the Scheme immediately and completely are incorrect.  Drug mark-ups above cost (WAC) and drug prices at retail increased immediately upon implementation of the Scheme by NDC remained inflated throughout that portion of the Damage Period for which I had IMS and FDB data (through November 2004).  Retailers benefited (as they were intended to); PBMs benefited in their PBM activities on margin-per-script filled at retail and more importantly in their mail-order pharmacy; TPPs were injured by increased costs.  PBMs did not compete the injury to TPPs away.

15.     *The Settlement Agreements merely run the Scheme scenario in reverse for a larger group of drugs*.  Precisely for that reason, many representatives for retail pharmacies are pleading for relief.  Certainly, if the Settlement was not going to take money from retail pharmacies, we would not find such an outpouring of legal briefing by so many groups and/or associations of pharmacies.  Indeed, some pharmacies are represented by multiple associations.  I therefore think we can conclude that retail pharmacies expect to lose significant revenue and profit from the Settlement.  I calculated that damages over the full damage period (through March 2005) to be $7.9 billion in 2007 dollars.  Over two years from the first quarter of aggressive Spread increases (Q1:2002 through March 2004), damages were $5.3 billion.[44]  The *Settlement Agreement* Period is shorter but the number of drugs included is larger.  So, a total impact of damages of $3.56-$5.3 billion[45] for a one year *Settlement Agreement*, **everything else equal**, seems to be a reasonable calculation.

---

[43]  *Ibid*, ¶¶ 10-11.

[44]  See September 2007 Hartman Declaration, ¶¶ 70-73.

[45]  These are the damages to TPPs and uninsured cash payors, netting out from TPP damages an approximate estimate of rebates.  I use my original estimate in Table 1 above for the lower bound.  For the upper bound, I use the same starting point in Table 1; I do not reduce sales by 1/3 since Medi-Span is now included; and I increase my deductions for rebate credits.  See ¶ 12.

16.     Of course, the **major question is whether everything else will remain equal**.  The IPC believes the "important things" will remain equal for most of the *Settlement Period*; that is it argues that renegotiation of contractual discounts and prices will take 6-18 months once the Settlement terms and time are set;[46] this would imply that contractual arrangements would allow the terms of the *Settlement Agreement* to last for 6-12 months from the time of its initiation.  The Memorandum of the NACDS/FMI asserts that such renegotiation can and will be done at will, basing that assertion in part upon an FTC study their interpretation of which I have demonstrated in ¶ 19 below is overstated. Indeed, according to the arguments made by the NACDS/FMI, the *Settlement Agreement* impacts will be immediately "negotiated away" whenever the *Settlement* is implemented, exactly as the effects of the 5% Scheme were "competitively negotiated away," apparently in both cases by PBMs.  However, since the NACDS/FMI are completely incorrect in their summary of the market responses to the 5% Scheme, I find no reason to believe that their analysis of the market responses to the *Settlement Agreement* is more accurate.

17.     Certainly an important determinant of the market accommodation to the terms of the *Settlement Agreement* will be the response of the PBMs.  As I have discussed at some length in my September and October 2007 Declarations, the competitive behavior of the PBMs in the provision of TPP contractual design is nuanced by the fact that large PBMs are usually part of large health-care-services conglomerates, which have operating divisions providing a variety of goods and services.  The most important division for the purpose of evaluating PBM responses to the Scheme and the Settlement is mail-order pharmacy.  The fact that the large PBMs were financially benefited by the 5% Scheme at mail order, conditioned the extent to which they competed the Spread away and did not reveal the extent to which Spreads were inflated.  The most important behavior to evaluate in determining the market-wide impacts of the Settlement Agreements is the response of the PBMs.

18.     As I have noted in my Tutorial to this Court,[47] PBMs such as ESI, have reported to their shareholders in their Annual Reports that while the *Settlement Agreement* will initially adversely affect them, they will be able to effectively eliminate the negative effects through renegotiating contractual terms. Two points are important here. First, the amount of money made by the PBMs from the Scheme on prescriptions filled at retail network pharmacies is small,[48] compared to what the network retail pharmacy earned. Second, the PBM with mail-order pharmacy earned the full increased revenue from the Scheme.  The converse is true for the *Settlement Agreement*.  PBMs will lose very little money as a result of the decreased reimbursements at retail.  The line of business which will be substantially negatively affected by the reduction in AWPs induced by the *Settlement Agreement* is mail-order pharmacy.  The PBMs have told their shareholders that they can renegotiate their contracts to negate such adverse effects.  That will alter the

---

[46]  Brief of the IPC, at page 6.

[47]  Raymond Hartman Video Presentation, *In Re New England Carpenters Health Benefits Fund, et al. v. First Databank, Inc., and McKesson Corporation*, United States District Court District of Massachusetts, C.A. No. 1:05-CV-11148-PBS, October 19, 2007.

[48]  Attachment E, October 2007 Hartman Declaration.

contractual terms of mail-order pharmacy; however, renegotiating the terms of retail network pharmacies will be much less important to PBMs as a matter of business economics.

19.    As a result, I would expect that the primary competitive response of PBMs to the *Settlement Agreement* will be to protect and renegotiate the terms of their mail-order pharmacy. Such renegotiation will take some time, because as the IPC recognizes, the relevant contracts generally do have a 3-year duration.[49] The FTC Report cited by the NACDS/FMI does not support a finding that a substantial number of PBMs have contractual terms that can be renegotiated at will, if the AWP basis is altered. That Report suggests that such contracts are the exception, rather than typical.

20.    I conclude that PBM renegotiations of the contractual terms governing retail network pharmacy reimbursement in the face of the implementation of the *Settlement Agreement* will be of second-order or third-order importance to their overall business strategies. PBMs will take care of shareholder business by focusing primarily on renegotiating contracts for mail-order pharmacy.

21.    Finally, the public nature of the *Settlement Agreements* has made it clear to TPPs that they have been overcharged to the advantage of retailers by the 5% Scheme.[50] This awareness will make it much less likely that TPPs will accept new contract terms that immediately give back the benefit of the *Settlement Agreements* without a fight. Since many retailers believe that it will take 6-18 months to renegotiate their contracts; since the PBMs will be less interested in renegotiating their retail network pharmacy reimbursement contracts than their mail-order contractual terms; and since TPPs will finally be quite attentive to any renegotiations because they were substantially injured economically over 2002-2005; I believe that the calculation of savings that I put forward in Table 1 above is still conservative for the following reasons:

   a)  The estimation is based upon only 66.67% of all retail pharmacy sales. Since the *Settlement Agreement* now include Medi-Span AWPs, 100% of those retail sales become relevant.

   b)  The sales revenue subject to savings does not include mail-order sales, which will be the primary focus of initial PBM renegotiation efforts.[51]

---

[49]  IPC Brief, at page 5, citing the McDonough Tutorial.

[50]  I have already addressed the issue in footnote 14 of my September 2006 Settlement Declaration.

[51]  When the Expert (Report of Dr. Mosteller, pages 7-8) for the NACDS/FMI adjusts my savings calculation downward, her primary adjustments are the following: the 1/3 reduction that I used principally for reliance upon Medi-Span pricing; a 42% for adjustment for PBM competition; a reduction of $19 billion for "Verispan pricing overstatement;" and a reduction of $29 billion for Medicaid and uninsured cash payors. None of these adjustments is reasonable. Since the *Settlement Agreement* now includes Medi-Span AWPs, my 1/3 reduction is no longer necessary. For the reasons discussed in the text above and in ¶ 10 above, Dr. Mosteller's reduction by 42% is extreme and factually baseless. Dr. Mosteller bases her reduction of $19 billion on a November 28, 2006 email from Sandy Dang of Verispan, which I have not reviewed and which calls into question the reliability of the Verispan data. My colleagues at the Harvard School of Public Health and I have used Verispan data in academic and consulting research for years without ever being told that Verispan's "'retail dollars' do not reflect what pharmacies actually receive for prescription drugs (as asserted by the Mosteller Report, page 5)." I have seen no industry research using

c) To the extent that retailers and PBMs attempt to renegotiate the existing terms of TPP contracts to eliminate the immediate benefits of the reduction in AWP, TPPs will know the reason and will resist.

d) These forces should be sufficient to retain the economic benefits of the Settlements for the TPPs for at least one year.

22.    It is possible that retailers will attempt to pass off some of their loss in revenue and profit to uninsured cash payors. Since cash payors account for less than 10% of retail pharmacy network revenue, cash prices would need to increase by approximately 40% (assuming no demand responses) in order to compensate retailers for the loss in 4% due to the Settlement. It is highly unlikely that uninsured cash payors could increase their drug expenditures to that extent. Certainly, the Court should put in place protection for cash payors so that the loss of retail revenues is not shifted to the uninsured cash payors.

I declare that this declaration is true and correct.

_Raymond S. Hartman_
Raymond S. Hartman
Executed on January 16, 2008

---

Verispan data that reflects such an understanding. Until I have been able to more closely review Dr. Mosteller email and its underlying information, I will continue to take as accurate the retail pharmacy dollars put forward by Verispan and used in the standard industry data publication *Drug Topics*, "Top 200 Brand-Name Drugs by Retail Dollars," published annually. Finally, since I was asked to include saving to uninsured cash payors, the reduction of $29 billion is incorrect. Certainly, about half (56% or $16.3 billion) of that would be Medicaid expenditures, for which savings will be experienced but for which Class damages are not considered compensable. Her remaining "adjustments" include an adjustment for dispensing fees and an adjustment for the penetration of generic drugs. It is true that some of the drugs that are included in my savings calculation could go generic by the time the Settlement is implemented; the savings I have attributed to them should be reduced. However, I have not been able to adequately analyze whether Dr. Mosteller has accurately characterized the number of such drugs and their dollar amount. I have not been able to analyze the extent to which her dispensing fee adjustment is plausible or accurate.

However, eliminating her adjustments that are clearly baseless and/or incorrect, the possible but still uncorroborated adjustments (at her page 8) to my point of analytic departure (retail expenditures of $158 billion) are the following: $3 billion for dispensing fees; $30 billion for the launch of generic substitutes; and $16.3 billion for savings on Medicaid expenditures. As a result, the retail expenditures to which savings to TPPs and uninsured cash payors can be attributed are $108.7 billion. 4% of that amount is $4.33 billion. This amount is greater than the amount presented in Table 1 above, the total of which includes Medicaid savings.

**Attachment A: Filings of Interested Parties Reviewed**

DeVille Pharmacies, *et al.*, Letter from David Farber of Patton Boggs on behalf of DeVille Pharmacies, Ins., the American Society of Consultant Pharmacists (ASCP) and the Long Term Care Pharmacy Alliance (LTCPA), June 19, 2007.

Independent Pharmacy Cooperative Brief of Independent Pharmacy Cooperative *Amicus Curiae* Regarding the Parties' Proposed Settlement, December 21, 2007.

National Association of Chain Drug Stores and the Food Marketing Institute, Memorandum of the National Association of Chain Drug Stores and the Food Marketing Institute In Opposition to Plaintiffs' Motion for Approval of Proposed First DataBank and Medi-Span Class Settlements, December 20, 2007.

National Community Pharmacists Association's Memorandum of Law in Support of its Objection to Settlement, December 21, 2007.

New York City Pharmacists Society, affidavits, December 20, 2007.

Pharmaceutical Care Management Association, Opposition to the Proposed FDB and Medi-Span Settlements by Pharmaceutical Care Management Association as *Amicus Curiae*, December 19, 2007.

**Attachment B: Selected Errors and Mischaracterizations by Interested Parties**

*The Memorandum of the National Association of Chain Drug Stores (NACDS) and the Food Marketing Institute (FMI)*

The Memorandum of the NACDS and FMI is filled with errors in economic principles and mischaracterizations of the relevant markets and competitive behaviors in the relevant markets.

- At page 1, the Memorandum asserts: "the proposed settlements … provide no meaningful relief to the settlement class; they provide no relief to the victims of the alleged wrongdoing; they are grossly unfair to community pharmacies, pharmacy benefit managers and other innocent bystanders."

  o As discussed in this Declaration, the proposed settlements benefit the classes that were economically injured as a result of the Scheme (the TPPs and the uninsured cash payors) at the expense of the economic entities that made substantial profits (were the "big winners" of) from the Scheme. The settlements are not grossly unfair to community pharmacies or any retail pharmacies; the entities must return some portion (albeit not all) of the economic profits they earned.

  o Since the NACDS and FMI quote the PBMs as being able to fend for themselves, it is not clear how the proposed settlements are grossly unfair to them.

  o It is not clear just who the "other innocent bystanders" are.

- At page 1, the Memorandum asserts: "The proposed settlements are unnecessary because the marketplace quickly and efficiently adjusted to the AWP spike in 2002."

  o All evidence demonstrates that this assertion is wrong; the marketplace did not quickly and efficiently adjust.

- At page 1, the Memorandum asserts: "The proposed settlements will work unfairly to punish thousands of community pharmacies in this country as well as other industry participants, by imposing transactional costs on them in reacting to an arbitrary and unnecessary across-the-board AWP re-definition."

  o This assertion is incongruous. If the "marketplace quickly and efficiently adjusted to the AWP spike in 2002" (as stated by the Memorandum several sentences earlier), when that change was essentially unknown to almost all market participants, why will the transaction costs be so much higher when everyone knows? Why won't that response be quick and efficient too?

  o If, instead, community pharmacies will be punished by the *Settlements* because they cannot "quickly and efficiently adjust," then those community pharmacies did indeed earn substantial increased revenue and profits from the Scheme, since the AWP changes were secret and the

transaction costs of uncovering them and responding to them were much higher. If this is the case, the Class members were damaged and the Settlement merely begins to make them whole.

- At pages 1-2, the Memorandum asserts "The Hartman Declaration grossly exaggerates the benefit of the settlement to the class by ignoring demonstrable marketplace activity that will eliminate or substantially offset the impact of the proposed settlements."

  o As discussed throughout this Declaration, this assertion is incorrect. It ignores and/or is contrary to the substantial empirical and factual record of the FDB McKesson litigation. It is based upon incorrect economic theory.

- At page 5, the Memorandum asserts "Plaintiffs do not allege that the standardized markups reported by FDB after March 15, 2005 were fraudulent, nor could they, given First DataBank's full disclosure to its customers on that date."

  o I find no evidence supporting this assertion. On March 15, 2005, FDB admitted to the marketplace that it would discontinue providing AWP data because it claimed that it had come to realize that its surveys were not representative. That is all. I have found no mention in disclosures at that time and through October 2006 that ever admit to the fact that AWP-to-WAC Spreads were increased systematically from 1.20 to 1.25 as a result of the challenged behavior.[1] Without such an explicit admission, FDB's disclosure was not "full" or it did not fully alert the market to the actual impact of the Scheme upon Spreads.

- At page 6, the Memorandum asserts: "The marketplace has already largely incorporated the revelations regarding how FDB reported AWP. FDB reported this information to its clients in March of 2005. … During the past two years, the marketplace completed its absorption and reaction to this information regarding how AWP was calculated. This reactive process began almost immediately in 2002 when the AWP spike was noticed by many in the industry."

  o The preponderance of the evidence and facts put forward in the FDB McKesson litigation demonstrate that almost no one knew of the Spread inflation; no one knew of it until 9-15 months after the first increases in Spreads resulting from the Scheme; there is no evidence of the absorption of the information regarding increased Spreads during the period through March 2005; the Interested Parties have put forward no evidence of the provision by FDB or absorption by the market of such information since March 2005 through October 2006.

---

[1] Specifically, they announced a change in how they will report AWP, moving away from surveys and going to a regime where they fix the existing markups and arbitrarily pick 1.25 as the markup for all future new NDCs.

- At pages 6-7, the Memorandum asserts: "Some PBMs have contracts with TPPs that provide that if there is a change in the methodology for calculating AWP, the parties will take whatever actions are necessary to preserve the original economics of the deal. There is a specific acknowledgement of this in a 2005 FTC report on PBMs. By invoking these provisions, PBMs negated any economic effect of the proposed settlement. … By 2005, when FDB came clean, a substantial portion of the industry had already taken actions to preserve the original economics of their deals."

  o These assertions appear to summarize the content of the following quote:[2]

    "Contracts between PBMs and plan sponsors **sometimes** specify the package size that will be used to determine the drug's AWP for both mail and retail prices. Most contracts the Commission staff reviewed defined AWP, some with more specificity than others. For example, **one PBM's contract with a plan sponsor** defined AWP as: the average wholesale price of the Covered Drug dispensed, determined as of the date the Prescription is dispensed, as set forth in (i) the First Databank's National Drug Data File; or (ii) the direct cost of the Covered Drug in those instances in which only the direct cost of the Covered Drug is listed in First Databank's National Drug Data File; or (iii) the Medi-Span Prescription Pricing Guide. Under the Retail Pharmacy Program, AWP is based on the pharmacy's package size as submitted to PBM. Under the Mail Service Program, AWP is based on package sizes of 100 units or 16 oz. Quantities, or smaller quantities if such sizes are not available. All other Covered Drugs will be priced as individual units or smallest package size available (*e.g.*, per vial, per suppository, etc.). *If Medi-Span or other applicable pricing source changes the methodology for calculating AWP in a way that materially changes the economics of the Program, the parties agree to modify the Program Pricing Terms to preserve the parties' relative economics before such changed methodology*" (***emphasis added***) (p. 38).

  o This is the only mention of a modification of pricing terms to "preserve the parties' relative economics" in response to changes in reported AWPs that I have found in the Report. It would seem therefore that the NACDS bases its sweeping market-wide assertion on **one PBM contract**.

  o Indeed, these Interested Parties fail to cite a variety of other findings in this FTC Report that undermine their sweeping interpretation and speculation.[3]

---

[2] The only FTC Report I can find that may be the source, unidentified by the Memorandum, is FTC, "Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies", August 2005.

[3] For examples:

  A "repackaging company assigns a new national drug code (NDC) number to the repackaged drug, and reports an Average Wholesale Price (AWP) for the new NDC. Repackagers often report AWPs that differ substantially from the original manufacturer's AWP" (p. xiii). To the extent that mail-order pharmacies

- o I conclude that there is much less support for Interested Parties' assertions in this FTC Report than they imply.

- Likewise, the expert to the NACDS/FMI (Dr. Mosteller) asserts (at page 3 of her Expert Report), with no empirical evidence besides very limited statements of the three largest PBMs, that "roughly 42% of the Class's reimbursements … are contractually protected." She assumes, without, any empirical support, that this represents 90% of their reimbursements for TPPs.

  - o This conclusion for Medco and Caremark is based upon a 2006 interview of Medco appearing in *The Pink Sheet*, and for ESI a 2006 corporate Press Release. Both sources should be viewed as self-serving and self-promotional. Neither source would be relied upon by an academic economist as the basis for an empirical finding of an actual market result.

  - o Based upon the FTC Report cited by related Counsel, it would appear that the number of contracts, in which such automatic contractual protection is guaranteed, is limited.

  - o Dr. Mosteller has put forward no evidence of the extent to which these "contractual protections" apply to network pharmacy rather than mail order pharmacy. Her assertions are baseless, without a more substantial empirical showing.

- At page 7, the Memorandum asserts: "The settlement is unlikely to change retail drug prices."

  - o I have demonstrated throughout this Declaration and my earlier September 2006 Declaration that this assertion is incorrect.

- At page 7, the Memorandum asserts: "This settlement will destroy that predictability … [and] is not likely to benefit the class, or, for that matter, anyone else."

  - o There is no basis for these assertions. Analogous claims were made against the Medicare Prescription Drug Improvement and Modernization Act and the OIG Compliance Program Guidelines when these regulations moved pricing from an AWP basis to an ASP basis.

---

repackage drugs to extend 1-month prescriptions to 3 months, such strategic alterations in AWPs are possible for PBMs with affiliated mail order pharmacy.

"Some allege that various **PBM business practices with retail pharmacies manipulate the prices plan sponsors pay for retail dispensing in order to inflate the PBM's profits.** For example, some object to PBMs retaining the difference between the amount plan sponsors pay the PBM for the dispensed drug product and the amount the PBM reimburses retail pharmacies to dispense the drug. Others allege that PBMs generate overpayments from their plans and underpayments to retail pharmacies by differentially timing the implementation of price increases to plans and retail pharmacies." (**emphasis added**) (p. xviii)

"One complexity in any comparison of pharmaceutical prices is that PBMs do not necessarily use the same set of reference prices to charge their plan sponsor clients" (p. 24).

- o Those claims have proven groundless. Those regulations have been felt to be beneficial to consumers and payors.[4]

- At page 8, the Memorandum asserts that "the economic brunt of the settlement [will be] borne by innocent non-parties. … The benefit of the settlement goes to payers not harmed while payers harmed receive no benefit … The Data Room is another part of the compensation to plaintiffs' attorneys – they are the only beneficiaries, not members of the class."

  - o The economic brunt of the settlement will be borne by retailers, as demonstrated by economic theory, the business practices of the entities in the relevant markets and certainly the briefs of the Interested Parties for the retailers. These retailers were retailers five years ago; they are reimbursed by TPPs which were TPPs five years ago.

  - o Neither of these groups are non-interested or innocent bystanders; they are either plaintiffs or non-party yet interested entities that benefited from the Scheme.

- At page 8, the Memorandum asserts: "Dr. Hartman's analysis was originally prepared when just the FDB settlement existed and it was resubmitted when the Medi-Span settlement was proposed with no additional benefit beyond the "benefit" that comes for the FDB settlement – which is none."

  - o My initial September 2006 Declaration calculated the savings that could be expected from the *FDB Settlement Agreement*, assuming that Medi-Span was not part of the Settlement and therefore that some PBMs and retailers could strategically switch from FDB to Medi-Span **if** Medi-Span did not lower its Spreads from 1.25 to 1.20 when FDB did.

  - o In order to be very conservative in my estimation, I allowed 1/3 of retail pharmacy drug reimbursements to shift to Medi-Span and/or to renegotiate contract terms; see footnote 14 of my September 2006 Declaration.

  - o If Medi-Span had been included in my earlier analysis, I would not have allowed for such a deduction, since Medi-Span's 1.25 Spreads would have been subject to the same reduction as those of FDB.

  - o Hence, inclusion of Medi-Span in the settlements ***must increase the benefits of the settlements***, since it eliminates a possible computer-accessible source of AWP information that might still have offered AWPs calculated as 1.25*WAC. The benefits of the *FDB Settlement* are certainly not "none;" the inclusion of Medi-Span increases those benefits.

- At page 9, the Memorandum asserts: "However, cash paying customers will not receive the $392 million forecasted by Dr. Hartman – it is almost certain

---

[4] See, for example, Statement of Mark E. Miller, Executive Director, Medicare Payment Advisory Commission, "Medicare Part B Drugs and Oncology," and the Testimony of Robert A. Vito, Regional Inspector General for Evaluation and Inspections, Office of Inspector General, United States Department of Health and Human Services, Before the Subcommittee on Health, Committee on Ways and Means, July 13, 2006.

that they will receive $0. Cash payers are not tied to AWP as the prices of their cash drug purchases are set by the cash market price."

- o This incorrect assertion reveals a fundamental lack of understanding of the business practices found in retail pharmacy markets.

- o Retail pharmacies sell to uninsured cash payors at the price that is found to be "usual and customary (U&C)" in their immediate markets. However, retail pharmacies do not renegotiate U&C prices every day for their cash customers, as if they were selling fish on the New York piers. The cash business is too small to bother; the retail pharmacies use available focal point pricing methods based upon AWP. As recognized by standard governmental research sources,[5] U&C prices are usually greater than AWP by some standard amount.

- o Preliminary empirical research which I have conducted in the FDB McKesson litigation demonstrates that U&C prices track AWP list prices and changes in AWP list prices by pharmacy and over time.

- o Certainly, this Court has recognized the necessity of revisiting the reliance of retail pharmacies upon AWP for setting U&C prices.

- At page 9, the Memorandum asserts: "If AWP is rolled back by 4% and Dr. Hartman is correct (which he is not) that insured plans will pay pharmacies even less, basic economic dictates that the pharmacies will attempt to make some (or all) of it up with cash paying customers by holding or even increasing their cash prices."

- o I continue to find it strange for the Memorandum to object strenuously to the *FDB Settlement* while claiming that my analysis of its effects is incorrect. If I am incorrect, then the *Settlement* will not have any adverse impact upon chain drug stores and food mass merchandisers. If that is the case, why bother objecting?

- o In any case, I agree with the Interested Parties that cash payors could be exploited by retail pharmacies (chains and independents) and the retail pharmacies of mass merchandisers, since their prices are related to AWP through retail practices not subject to contract.

- o If retailers attempt to make themselves whole for the entire loss of revenue (4% of total) on the cash payments, which, according to my original analysis, amounted to somewhat less than 10% of total, then U&C prices would need to increase approximately 40% over the settlement year, *assuming* all cash payors *continued to purchase all pharmaceuticals* prescribed, which is unlikely.[6]

---

[5] See September 2007 Hartman Declaration, ¶¶ 10-11 and footnote 6.

[6] My understanding is that the distribution of payors have changed since the implementation of Medicare Part D. I have not conducted a sufficient analysis of these changes but can undertake such an analysis at the request of the Court. Note, however, that the changes in the distribution of payors would not affect the total impact of the Settlement for all end payors as discussed in Section IV of this Declaration.

    o  If there is a possibility for cash payors to be so affected, it would be sensible to consider enhancing the FDB Settlement provisions with some "watch-dog" procedures to prevent retail pharmacies from shifting the incidence of their class-wide compensation to cash payors, who themselves should receive compensation.

- At page 10, the Memorandum asserts: "Dr. Hartman states that Medicaid will save $502 million. However, the federal and state government payers are specifically excluded from the class."

    o  It is true that payments made for Medicaid eligibles are excluded from the Class definition and damages subject to the FDB McKesson litigation. Nevertheless, my Medicaid savings estimate was reasonable and accurate and appropriate, from an economic perspective, to have been included.

    o  As an economist, I was asked to calculate savings. It is a legal question whether those savings estimated for each payor group are relevant to this Court.

- At page 11, the Memorandum asserts: "Dr. Hartman has not provided any evidence that the pharmacies received a 4-5% windfall increase in drug prices – because there isn't any such evidence. Publicly available information rejects the notion that pharmacies' average net profit of 2% all of the sudden experienced a substantial spike in 2002 and which remained for the last four years."

    o  In the FDB McKesson litigation, I have presented a substantial body of millions of reimbursement claims and cash payments at retail pharmacies by Class members, based upon a well-recognized and universally-accepted publicly-available source of drug payment survey data (IMS NPA data), showing this windfall increase in drug prices relative to WAC.

    o  The second sentence is contrary to evidence put forward in Exhibit B of the Memorandum of the National Community Pharmacists Association (at Table 2) which shows precisely such a spike in average net profits.

I note in passing that the *Settlement Agreement* process to which the NACDS and FMI Memorandum refers to (at page 2) for "a finding that the settlement is 'fair, reasonable and adequate'" was based upon my Declaration calculating damages and addressing the fairness and adequacy of the Settlement.[7]

---

[7] See Declaration of Raymond S Hartman in Support of Class Certification, March 27, 2003; Rebuttal Declaration of Raymond S. Hartman In Support of the Certification of the Class of End Payers, August 28, 2003; Declaration of Raymond S. Hartman, Calculation of Damages to Class of End Payers, September 5, 2003; and Declaration of Raymond S. Hartman in Support if End-Payor Plaintiffs' Motion for Preliminary Approval of Settlement, July 1, 2004; all *In re Relafen Antitrust Litigation, 231 F.R.D. 52, 57 (D. Mass. 2005)*. Specifically, see *September 28, 2005 Relafen Settlement Memorandum* (pp. 14, 45-46, 48-49) and *May 12, 2004 Relafen Settlement Memorandum* (pp. 25, 27, 54-57, 70-71).

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 17, 2008.

                                              **/s/ Steve W. Berman**
                                              STEVE W. BERMAN