UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS |

**DECLARATION OF AUDREY BROWNE IN SUPPORT OF CLASS ACTION SETTLEMENT**

I, Audrey Browne, declare under penalty of perjury under the laws of the United States of America that:

1.  I am the Director of Regulatory Compliance & Contract Procurement for the AFSCME, Health and Security Plan of District Counsel 37, located at 125 Barclay Street, New York, NY. ("DC 37"). I have held this position at DC 37 since 2004.

2.  DC 37 is a non-ERISA welfare plan that provides health and welfare benefits to the members of District Counsel 37 (the "Union"). The Union represents over 120,000 New York City employees and is the second largest public-employee labor union in New York City. DC 37 provides prescription drug benefits to nearly 350,000 beneficiaries, residing in every state in the United States and Puerto Rico.

3. I am familiar with the terms and conditions of the settlement agreement with First DataBank ("FDB") and Medi-Span, including the proposed rollback. I understand that Plaintiffs claim that beginning in 2001 McKesson and FDB conspired to artificially increase the WAC-AWP ratio from 20% to 25% on hundreds of brand name drugs, and that this increase did not reflect any change in the actual price of the drugs but was done solely to benefit McKesson and FDB. I further understand that the settlement agreement would rollback these artificial increases to their pre-scheme ratios of 20% and that both FDB and Medi-Span have agreed to cease publishing AWP data within two and three years respectively of the Court's approval of the settlement.

4. Both of these provisions are highly valuable. In my position as Director of Regulatory Compliance & Contract Procurement at DC 37 I have participated in several contract negotiations with PBMs over the cost of providing prescription drug benefits. Invariably, PBMs have offered us a reimbursement rate based on a discount off of AWP. Typically negotiations focused on the amount of the discount.

5. Before this class action was filed no one at DC 37 was aware of the McKesson/FDB conspiracy to artificially inflate AWPs, nor did we have access to AWP and/or WAC information on a drug-by-drug basis for the drugs that are included in DC 37's prescription drug benefit. Had we been aware of the conspiracy and the scope of its effects, we could have negotiated a recoupment of our losses and demanded a reimbursement plan based on WAC, or some other benchmark, to avoid further damages associated with the inflated AWPs.

6. In my opinion the provision requiring FDB and Medi-Span to cease publishing AWPs within two years of the Court's approval of the settlement agreement is highly beneficial because it encourages greater transparency in the marketplace. Under the old AWP-based

reimbursement system DC 37 was blindsided by hidden costs associated with defendants' manipulation of AWP/WAC markups. With the demise of AWP we anticipate that the industry will move to a more reliable benchmark, which will prevent predatory conduct like defendants' from recurring. This should benefit TPPs and consumers alike.

7.  At DC 37 we also believe that the rollback is appropriate because it reinstates the historical markups that would have been in effect, had defendants not manipulated the market. It is also a highly valuable provision of the settlement agreement because we currently purchase drugs based on AWP and a reduction in the brand drug AWPs will result in substantial savings for us. This, in turn, benefits our beneficiaries as well. If we can decrease our drug costs, or at least slow down their rate of increase, DC 37 will be able to avoid raising costs to our members.

8.  I understand that there have been objections to the rollback provision, especially from retail pharmacies, who predict that it will not result in any significant savings to TPPs or consumers because the market will adjust in response to the rollback. While this might happen in the long run, it does not alter the immediate benefit of the settlement to DC 37 and other TPPs and their members. Furthermore, in my experience adjustments are made through negotiation, not by fiat. Given the various competitive elements in the market and the drive to replace AWP with a more reliable benchmark, I am confident that when DC 37 renegotiates its reimbursement contract in the future, it will be able to retain some of benefits of the settlement.

Dated: January 14, 2008.                                    *Cerdey G. Browne* (signature)

## CERTIFICATE OF SERVICE

     I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 17, 2008.

                                                     **/s/ Steve W. Berman**
                                                     STEVE W. BERMAN