UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; and PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND,<br><br>Plaintiffs,<br><br>v<br><br>FIRST DATABANK, INC., a Missouri Corporation; and McKESSON CORPORATION, a Delaware Corporation,<br><br>Defendants. | Case No 05-cv-11148<br><br>Judge Patti B Saris |

**DECLARATION OF EARL SEYMOUR SUPPORT OF PLAINTIFFS' SETTLEMENTS WITH FIRST DATABANK, INC. AND MEDISPAN**

I, Earl Seymour, pursuant to 28 U S C § 1746, on oath, depose and state as follows:

1     I am Chairman of the Board of Trustees for Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust ("the Trust"). I submit this Declaration in support of Plaintiffs' settlements with Defendants First DataBank, Inc ("FDB") and MediSpan, Inc ("MediSpan")

2.     The Trust is a voluntary employee benefits association maintained pursuant to the federal Employee Retirement Security Act, 29 U S C §§ 1132, *et seq*, and to the settlement of an action brought in the 1990s by many Pirelli retirees against

Pirelli Armstrong Tire Corporation in the United States District Court for the Middle District of Tennessee (Case No. 3:94-0573) to ensure the provision of health and medical benefits to eligible participants and beneficiaries.

3.    The Trust's members are former Pirelli Armstrong Tire Corporation workers who retired from that company prior to November 1, 1994. Currently, approximately 2,000 lives are covered by the Trust.

4.    Because of the relatively small size of the Trust, we rely on the expertise of both our third party administrator, Southern Benefit Administrators, Inc ("Southern Benefit") and our PBM, Caremark, to advise the Trust regarding the cost of prescription drugs.

5.    Until approached by counsel regarding the possibility of filing this lawsuit, the Trust had no knowledge that, in approximately 2001-2002, Defendants McKesson Corporation ("McKesson") and First DataBank, Inc. ("FDB") conspired to increase the WAC to AWP mark-up on brand prescription drugs 1.20 to 1.25 (hereinafter "the Scheme"). We likewise did not know that the WAC to AWP mark-up had been increased on so many drugs.

6.    At no time from 2001 through today has the Trust received any type of report from either Southern Benefit or Caremark that included or analyzed WAC-to-AWP mark-ups. Instead, we receive reports that list the drugs on which the Trust is spending the most money so that the trustees can explore whether to increment cost-saving measures directed at those drugs. Therefore, there was no way that the Trust could have learned of the Scheme on its own investigation.

7       Because we did not know about the Scheme, or about the increased mark-ups, the Trust did not attempt to negotiate a greater discount off AWP for our reimbursement for prescription drugs. Had the Trust known about the Scheme or about the increase in mark-ups, we would have acted to eliminate as much of the increase as possible.

8.      Our contract with Caremark dated May 1, 2001 provided for most claims to be reimbursed at AWP-14% plus a $2.00 dispensing fee. That agreement was effective until the Board recently approved the Trust's new agreement, which provides for brand drugs to be reimbursed at AWP – 15.5% plus a $1.85 dispensing fee. To the best of my knowledge, the one percent change in our AWP discount had nothing to do with any "renegotiation" that occurred after the Scheme was revealed as a result of this lawsuit. Instead, that change was simply the result of a trend of increasing discounts that have occurred over time.

9       I am familiar with the general terms of Plaintiffs' settlement agreements with First DataBank and MediSpan. I understand that the settlement agreements would rollback the artificial increases in the WAC-to-AWP ratio caused by the Scheme and that both FDB and MediSpan has agreed to stop publishing AWP within two (FDB) and three (MediSpan) years of the Court's approval of those settlement agreements.

10.     I understand that certain members of the drug distribution chain have submitted papers to the Court contending that Plaintiffs' settlements with FDB and MediSpan will have no value to the Class. I do not believe this is true. Southern Benefit has advised us that the rollback of the WAC-to-AWP mark-up from 1.25 to 1.20 provided for by Plaintiffs' settlements will reduce the amount the Trust pays for the drugs whose

3

mark-ups are being rolled back. If Caremark proposes that we "share the risk" of the results of Plaintiffs' settlement with FDB with Caremark, we will not consider that proposal until our contract is up for renewal until 2010. Therefore, even if the benefit of the settlements is "negotiated away," there will be some period of time when they will benefit the Trust.

11.    I believe that Plaintiffs' settlements will also help the Trust save our members money as well. If our drug costs decrease, or at least do not increase, the Trust will be able to provide benefits to our members for a longer period of time without having to increase costs to our members.

12.    Finally, I believe that the provisions requiring FDB and MediSpan to stop publishing AWP will benefit the Trust as well. If the marketplace is no longer using AWP, a pricing benchmark that has proven to be subject to manipulation in this lawsuit as well as others, it is our hope that the industry will move to a more reliable benchmark.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 15, 2008

*/s/ Earl Seymour*
Earl Seymour

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on January 17, 2008.

                                              **/s/ Steve W. Berman**
                                              STEVE W. BERMAN