UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | C.A. No. 1:05-CV-11148-PBS |

**PLAINTIFFS' SURREPLY OPPOSING MCKESSON'S MOTIONS
TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS**

## STATEMENT REGARDING ORAL ARGUMENT

Having filed two briefs totaling 40 pages McKesson claims it needs oral argument to (1) discuss the impact of a decision not yet made by the U.S. Supreme Court and (2) have the motion be resolved on a "fully developed record." Plaintiffs submit that there is little to be gained arguing about what the Supreme Court might do. Second, this is a motion attacking the pleadings and there is no record to "fully" develop at oral argument. Although Plaintiffs always welcome the opportunity to appear before the Court, we do not believe argument is required.

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ................................................................................................1

II.  PLAINTIFFS ADEQUATELY ALLEGE CAUSATION FOR
     INJURIES SUFFERED BY THE U&C CLASS PURCHASERS ....................................2

     A.   Rule 9(b) Does Not Apply to the Causation Element of
          Plaintiffs' RICO Claim ........................................................................2

     B.   Plaintiffs Satisfy Rule 8 .......................................................................5

     C.   Uninsured Plaintiffs Allege Facts Showing That They Were
          Directly Injured by McKesson's Scheme ..............................................6

     D.   The Predicate Scheme Meets the Requirements of the RICO Statute ....................9

     E.   *Anza* and McKesson's other Authorities are Easily Distinguishable....................11

III. MCKESSON'S MOTION FOR JUDGMENT ON THE PLEADINGS
     AS TO ALL CLASSES FAIL ...........................................................................12

     A.   Reliance is Not Required in the First Circuit.........................................12

     B.   Even if Reliance Were a Required Element of a Federal RICO
          Fraud Claim, Plaintiffs Establish Reliance Through Their Purchase
          of Overpriced Drugs .............................................................................13

IV.  CONCLUSION...................................................................................................18

001821-13 221858 v1

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Alvarado Aguilera v. Negron*,
    509 F.3d 50 (1st Cir. 2007)...........................................................................5

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006).....................................................................................11

*Arista Records, LLC v. Does 1-27*,
    2008 U.S. Dist. LEXIS 6241 (D. Me. Jan. 25, 2008) ....................................5, 6

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................................................5

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir. 1998)...........................................................................9

*Donovan v. City of Haverhill*,
    311 F.3d 74 (1st Cir. 2002).........................................................................12

*Edens v. Goodyear Tire & Rubber Co.*,
    858 F.2d 198 (4th Cir. 1988) ................................................................15, 16

*Eulitt v. Me. Dep't of Educ.*,
    386 F.3d 344 (1st Cir. 2004)........................................................................12

*Field v. Mans*,
    157 F.3d 35 (1st Cir. 1998)..........................................................................12

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)............................................................................3

*Hayduk v. Lanna*,
    775 F.2d 441 (1st Cir. 1985).........................................................................4

*Hernandez v. Ciba-Geigy Corp. USA*,
    200 F.R.D. 285 (S.D. Tex. 2001)...................................................................3

*Hoxworth v. Blinder, Robinson & Co.*,
    903 F.2d 186 (3d Cir. 1990)........................................................................17

*Longmont United Hosp. v. Saint Barnabas Corp.*,
    2007 U.S. Dist. LEXIS 48187 (D. N.J. 2007) ...........................................11, 12

- ii -

*In re Lupron Mktg. & Sales Practices Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003) ...................................................................10, 11

*MCM Partners v. Andrews-Bartlett & Assocs.*,
  62 F.3d 967 (7th Cir. 1995) .........................................................................................10

*In re Managed Care Litig.*,
  298 F. Supp. 2d 1259 (S.D. Fla. 2003) .........................................................................10

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) .........................................................................................3

*Midwest Commerce Banking Co. v. Elkhart City Ctr.*,
  4 F.3d 521 (7th Cir. 1993) .............................................................................................3

*Munoz-Mendoza v. Pierce*,
  711 F.2d 421 (1st Cir. 1983).........................................................................................4

*Newcal Indus. v. Ikon Office Solution*,
  2008 U.S. App. LEXIS 1257 (9th Cir. Jan. 23, 2008) .....................................................10

*Omega Eng'g v. Eastman Kodak Co.*,
  908 F. Supp. 1084 (D. Conn. 1995) ...............................................................................3

*Phoenix Bond & Indem. Co. v. Bridge*,
  477 F.3d 928 (7th Cir. 2007), *cert. granted*, 169 L. Ed. 2d 625 (2008) .......................2, 12

*Rodi v. S. New Eng. Sch. of Law*,
  389 F.3d 5 (1st Cir. 2004).............................................................................................3

*Schwab v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) .......................................................................14, 15

*Studio & Partners., s.r.l. v. KI*,
  2006 U.S. Dist. LEXIS 93497 (E.D. Wis. Dec. 27, 2006)..................................................3

*Systems Mgmt. v. Loiselle*,
  303 F.3d 100 (1st Cir. 2002)........................................................................................12

*Teachers' Ret. Sys. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .........................................................................................3

*Williams v. WMX Techs.*,
  112 F.3d 175 (5th Cir. 1997) .........................................................................................3

- iii -

## I.     INTRODUCTION

McKesson claims that the complaint of the U&C class fails to allege causation.  Drawing on sources outside of the complaint, McKesson cites to a GAO Report (McKesson Reply at 6 n.3) claiming that it demonstrates that there is no tie between AWP and cash prices.  McKesson plays games with this Court.  Having referred to sources outside of the complaint McKesson had a duty to be candid to the Court – a duty McKesson breached.  McKesson owns Auto-Rx-Net, which helps pharmacies set prices on brand-name drugs.  Auto-RX-Net sets cash prices at "1% above the third party price."  By the express terms of its own manual, Auto-Rx-Net sets third-party prices based on AWP.  Thus, McKesson knows from its own experience that the U&C price is tied to AWP, and that the complaint's allegations are plausible in that regard.

If the Court examines the complaint itself, the claims of the U&C class pass muster. First, it painstakingly alleges the manner in which the McKesson-FDB scheme raised the AWPs and thus the prices for hundreds of brand-name drugs.  These allegations satisfy the 9(b) requirement and as opposed to matters outside the complaint, no such requirement applies to the causation allegations.  The complaint's allegations as to causation are adequate and sensible and were not denied by the PBMs, pharmacies and other associations that protested the proposed FDB settlement.

To overcome these allegations, McKesson asserts that Plaintiffs "concede" that the cash price is within a retailer's discretion and therefore there is no causation.  Plaintiffs however make no such concession and the complaint alleges otherwise, namely that the cash price is tied to AWP.  McKesson's repetition of its prior argument based on *Anza* and *Longmont* also fails.  In these RICO causation cases, courts found a lack of causation because other more direct victims of the fraud could step forward to vindicate the wrong.  Here there are no other direct victims –

the only parties to pay higher prices are those who pay based on AWP – cash payors.  McKesson fails to identify any other victim, a necessary step to defeat causation under its own authorities.

Next McKesson seeks dismissal of the entire case by claiming that the First Circuit, in denying McKesson's Rule 23(f) petition, "intimated" that its opinion in *Systems Management* that reliance is not required in a RICO case, is mere dicta.  Not only is this a fanciful reading of the First Circuit's order, but it ignores authorities cited in Plaintiffs' opposition that find the First Circuit opinion not to be dicta.

In its reply brief McKesson advises the Court that between the time McKesson filed its motions and Plaintiffs filed their opposition brief the Supreme Court granted review of a Seventh Circuit decision to evaluate whether reliance is a required element of RICO fraud claims.[1]  Even if the Supreme Court were to overturn *Systems Management*, Plaintiffs have alleged facts to support reliance.  Where a cash payor pays for a brand-name drug, it is logical to presume that he or she relied on the fact that the price being charged had not been artificially inflated due to the McKesson-FDB scheme.  And, completely ignored by McKesson are the complaint's allegation of reliance by TPPs on the integrity of AWPs.

## II.     PLAINTIFFS ADEQUATELY ALLEGE CAUSATION FOR INJURIES SUFFERED BY THE U&C CLASS PURCHASERS

### A.     Rule 9(b) Does Not Apply to the Causation Element of Plaintiffs' RICO Claim

McKesson's obstinate insistence that Rule 9(b)'s particularity requirement applies to the causation element of Plaintiffs' fraud claim does not change the state of the law.  Rule 9(b) provides:  "In alleging fraud or mistake, a party must state with particularity the circumstances

---

[1] McKesson suggests that Plaintiffs intended to mislead the Court about the status of *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007), *cert. granted*, 169 L. Ed. 2d 625 (2008).  Plaintiffs' omission of this important additional case history was due to the lag time between the Supreme Court's decision and Lexis' update of the case history on Shepard's.

constituting fraud or mistake."  Fed. R. Civ. P. 9 (b).  "It is important to note that the rule

requires the plaintiff to plead with particularity the 'circumstances' of fraud, *not the elements of*

*fraud*."  *Studio & Partners., s.r.l. v. KI*, 2006 U.S. Dist. LEXIS 93497, at *6-7 (E.D. Wis.

Dec. 27, 2006) (emphasis added); *see also Omega Eng'g v. Eastman Kodak Co.*, 908 F. Supp.

1084, 1100 (D. Conn. 1995) ("[E]lements of fraud are not the 'circumstances' that Rule 9(b)

requires to be pled with particularity.") (quoting 5 CHARLES A. WRIGHT & ARTHUR R. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 1297, at 590 (2d ed. 1990)); *Midwest Commerce Banking*

*Co. v. Elkhart City Ctr.*, 4 F.3d 521, 523 (7th Cir. 1993) ("Rule 9(b) does not require that the

complaint explain the plaintiff's theory of the case, but only that it state [with particularity] the

misrepresentation, omission, or other action or inaction that the plaintiff claims was

fraudulent."); *see also* 2-9 MOORE'S FEDERAL PRACTICE § 9.03 (b) (listed requirements of the

particularity provision do not include causation).  "[T]he specificity requirement" of Rule 9(b)

"extends only to the particulars of the allegedly misleading statement itself," and "is satisfied by

an averment of the who, what, where, and when of the allegedly false or fraudulent

representation."  *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 14, 15 (1st Cir. 2004).[2]

---

[2] McKesson cites to decisions in other jurisdictions that ostensibly construe the particularity requirement to apply to all elements of a fraud claim.  These decisions are unpersuasive.  For example, *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) is inapposite because the pleading requirements of securities fraud are governed by both Rule 9(b) and the pleading requirements of the Private Securities Litigation Reform Act.  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) does not even discuss Rule 9(b) and is otherwise factually distinguishable as discussed in Plaintiffs' opposition brief.  And although *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 291 (S.D. Tex. 2001) does state that all elements of fraud except mental states must be pled with particularity, that statement is inconsistent with the authority on which it relies to support the proposition.  *See Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997) (noting the elements of fraud, but explaining that "[p]leading fraud with particularity in this circuit requires 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby.'") (quotations, citation omitted); *accord Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994).  But even under *Hernandez*, Plaintiffs have satisfied the pleading standard for their

The purpose of the particularity requirement is "to apprise the defendant of fraudulent claims and of the acts that form the basis for the claim." *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985). It is intended to prevent claimants from engaging in fishing expeditions by filing suit first and then searching for a cause of action later, not to discourage them from pursuing valid fraud claims. *Id*.

McKesson does not contend that Plaintiffs have failed to provide a detailed account of Defendants' misrepresentations and fraudulent conduct and the Court has seen for itself that this is not a "fishing expedition" but a case that arises from a serious wrong impacting all types of payors who paid for brand-name drugs. Plaintiffs have therefore satisfied the requirements of Rule 9(b).

McKesson claims that "in sum *Plaintiffs must allege that the price they paid increased in response to the scheme*. McKesson Reply at 3. Plaintiffs allege *exactly that:*

> ¶ 4    Consumers "use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices."
>
> ¶ 8    McKesson and FDB agreed to raise prices.
>
> ¶ 9    McKesson-FDB did raise the spread.
>
> ¶ 10   This collaboration did raise the price in a dramatic nature.

---

causation element. In *Hernandez* the court dismissed the plaintiffs' claim against the American Psychiatric Association for their role in the publication of a diagnostic manual that led to incorrect diagnoses of ADD/ADHD and inappropriate prescriptions because the plaintiffs failed to allege that their doctors had used the manual to diagnose their disorders. The court concluded that the absence of any causal link was fatal to the claim. *Id*. at 291. By contrast, Plaintiffs allege facts that directly correlate McKesson's manipulation of AWPs with inflated U&C prices.

Finally, the statement from the First Circuit decision, *Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) that "[w]here 'injury' and 'cause' are not obvious, the plaintiff must plead their existence in his complaint with a fair degree of specificity," adds nothing to the argument. Plaintiffs' losses and their connection to McKesson's fraudulent scheme are not obscure and are adequately alleged to advise McKesson of the claim against it.

¶ 11     The spike in cash prices to elderly consumers is reflected in a GAO study.

¶ 12     The spread remains in effect.

¶ 16     Cash payors' prices are tied to AWP.

¶ 17     As a result of this artificial increase . . . consumers have had their drug prices increased by the scheme.

¶ 18     Specifies the impact of the scheme on prices of a few drugs.

¶ 81     U&C payments are tied to AWP, hence an artificial increase impacts class members.

These paragraphs, ignored by McKesson, amply demonstrate causation under 9(b) or any standard.

**B.      Plaintiffs Satisfy Rule 8**

McKesson next claims that if 9(b) is inapplicable Plaintiffs fail to satisfy Rule 8 because the complaint's allegations are too cursory.  McKesson Reply at 4.  The paragraphs identified above satisfy Rule 8 and provide logical and plausible allegations of causation.

"To survive a motion to dismiss, a complaint must establish 'a plausible entitlement to relief.'" *Alvarado Aguilera v. Negron*, 509 F.3d 50, 53 (1st Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).  In other words, the complaint must allege facts that give rise to "a reasonable expectation" of relief, *Twombly*, 127 S. Ct. at 1965, and the claims in the complaint must be specific enough to cross the line "from conceivable to plausible," *id*. at 1974.  "Nothing in *Twombly* forbids lower courts from drawing inferences or accepting conclusory recitations as true for purposes of a motion to dismiss, so long as the factual content that is supplied in the complaint demonstrates the plausibility of any necessary inferences.  *Arista Records, LLC v. Does 1-27*, 2008 U.S. Dist. LEXIS 6241, at *13-14 (D. Me. Jan. 25, 2008).

001821-13 221858 V1

In *Arista Records*, defendants moved to dismiss, arguing that plaintiffs failed to set forth any plausible, non-speculative basis to infer that the Doe Defendants' mere usage of the peer to peer network was unlawful. The court denied the motion, noting that the plaintiffs'

> allegations of reproduction and distribution of the Plaintiffs' copyrighted song recordings are factual allegations that the Court must take as true for purposes of a motion to dismiss . . . To be sure, it is conceivable that the Doe Defendants only used the Gnutella P2P software to download copyrighted song recordings that they already owned or to distribute song recordings exclusively to people who already owned them in the CD format. Nevertheless, it is a perfectly plausible inference that the alleged reproduction and distribution of the Plaintiffs' copyrighted song recordings over the peer-to-peer network constituted infringement.

*Id.* at *17-18.

Like the plaintiffs in *Arista Records*, the U&C class plaintiffs have alleged a plausible entitlement to relief. Plaintiffs claim that they were directly harmed by McKesson's RICO enterprise because they paid excess charges for drugs that were inflated by McKesson's fraudulent scheme to raise AWP/WAC markups. For the purposes of this motion, the Court is required to treat this statement as true, provided it is plausibly supported by other factual allegations. The Third Amended Complaint ("TAC") does provide plausible support for this statement with allegations that McKesson fraudulently manipulated AWPs and that U&C prices are correlated to AWPs. *See* ¶¶ 4, 8, 9, 10, 12, 17, 18, 81. *Twombly* does not require anything further. While it is conceivable that McKesson's scheme left the U&C prices unscathed, it is a perfectly plausible inference that the scheme affected the U&C prices. At this stage in the litigation the Court is required to construe this inference in Plaintiffs' favor.

**C.      Uninsured Plaintiffs Allege Facts Showing That They Were Directly Injured by McKesson's Scheme**

McKesson reiterates the argument of its opening brief that the U&C class plaintiffs were not directly injured by its scheme to raise AWPs without adding anything new. However the

TAC alleges a direct relationship. McKesson's scheme to increase AWP/WAC markups was directed at retail purchasers of brand drugs. The U&C price that Uninsured Consumer Plaintiffs paid is correlated with the AWP and therefore they were directly injured as a result of this scheme. Thus each time a consumer paid a cash price he or she were directly injured. *See* ¶¶ 4, 8, 9, 10, 12, 17, 18, 81.

At this stage in the litigation U&C discovery is just beginning and Plaintiffs are not required to allege a specific formula correlating the AWP with the U&C or to detail causation any further. Nonetheless McKesson's own Auto-Rx service, ***offered to its customers to help them set price tables for their cash customers, directly contradicts its denial of the correlation between the AWP price index and U&C prices***.

McKesson owns RelayHealth,[3] a subsidiary that processes "almost six billion" claims from "more than 90 percent of US pharmacies" to "over 1,000 payers."[4] As a result of RelayHealth's critical position in the industry McKesson has access to cash pricing and reimbursement information from the vast majority of pharmacies in the United States. Along with its partner, Rx-Net, McKesson provides a service to its customers, called Auto-Rx, that uses the pricing information gathered by RelayHealth to help McKesson customers set their U&C prices competitively with the major chains or mass merchandizing stores in the same region and to increase third-party reimbursement.[5]

---

[3] http://www.mckesson.com/en_us/McKesson.com/Our+Businesses/RelayHealth/RelayHealth.html.

[4] https://www.relayhealth.com/rh/specific/pharmacies/chain/intelligentNetwork.aspx.

[5] www.mckesson.com/static_files/McKesson.com/MPT/Documents/AutoRxNet.pdf (fact sheet on McKesson's website regarding its Auto-Rx service and its alliance with Rx-Net to provide the service). The Auto-Rx demo identifies RelayHealth as the source of its pricing information. http://www.rx-net-inc.com/rxnet01.htm.

According to the Rx-Net website, the objective of U&C pricing is to match or beat local competition without undercutting third-party reimbursement levels.[6] To achieve this, the pricing tables generated by Auto-Rx are based on AWP,[7] and its instructions advise its clients to reset their U&C prices to be current with changes to FDB AWPs.[8] The vast majority of pharmacy purchases are paid through third-party reimbursement.[9] Because most reimbursement contracts set the cost of brand drugs at the lower of the AWP-based formula or the U&C, pharmacies lose money on their third-party reimbursement contracts if they set the U&C below the available third-party reimbursement formula.[10] To ensure that their cash prices are competitive but without giving up higher reimbursement rates available through third-party reimbursement,

---

[6] http://www.rx-net-inc.com/html/info-mckesson.htm (**"*9) How do you ensure our pricing will be competitive and maximize our 3rd party reimbursements?*** We edit the pricing on Brand and Or Brand and Generics to ensure that your pricing is above the median 3rd party pricing we have for the area. We then use the 3rd party price plus 1%"; "***10) What about competitive pricing for higher ranking drugs?*** On higher ranking drugs when there is no cash pricing we will use the 3rd party pricing if the gross profit of the brand drug is greater than AWP-10%. . . . If we use the 3rd party price it is multiplied by 101% to achieve the cash price."). The third-party price is set at AWP.

[7] http://www.rx-net-inc.com/html/info-mckesson.htm ("5) How do you base the Brand drug Pricing? Brand drug pricing is based on the AWP of the most used package size."); *accord* http://www.rx-net-inc.com/html/info-other.htm (service for non-McKesson customers "3) How do you base the Pricing? Brand and Generic drug pricing is based on the AWP."); and http://www.rx-net-inc.com/manual.pdf at 3 (stating the requirement of the service that all prices in the pharmacy's database "must be priced using AWP at the item level.").

[8] http://www.rx-net-inc.com/manual.pdf at 8; Auto-Serv provides automatic updates; Sure-Rx (for non-McKesson customers) provides three-month AWP/Retail comparison reports. http://www.rx-net-inc.com/manualsurerx.pdf.

[9] *See, e.g.*, http://www.rx-net-inc.com/html/info-mckesson.htm ("***11. We only do 20% cash business. How can your system still benefit us?*** We have customers with as little as 3% cash that have achieved gross profit increases of 3%. If you have had your Pharmaserv System more than 1 year we will guarantee a gross increase or refund your original deposit.").

[10] *See* http://www.rx-net-inc.com/html/references.htm (Auto-Rx testimonials noting that Auto-Rx prevents pharmacies from setting U&C prices too low, allowing pharmacies to capture more revenue not only from their cash customers but more importantly from third-party reimbursement.).

McKesson's Auto-Rx service allows pharmacies to set their U&C prices for each drug at 1% above the average third-party (AWP-based) reimbursement amount for the region.[11]

Because it is in their economic interest to set U&C prices above third-party reimbursement levels so that they do not undercut third-party reimbursement maximums, as McKesson's own documents demonstrate, it stands to reason that pharmacies generally set the U&C prices in relation to AWP.

McKesson makes much of the fact that because U&C payments are made to a pharmacy their injuries are "indirect." McKesson Reply at 11-12. But unlike the cases cited by McKesson, Plaintiffs here allege a direct relationship between McKesson's inflation of AWP and the cash price paid. This injury is direct because the complaint in effect alleges that there is no intervening choice made by pharmacies. At this stage, those allegations are controlling and allege a direct injury.

**D.     The Predicate Scheme Meets the Requirements of the RICO Statute**

McKesson seeks to distort the predicate fraud scheme so as to downplay its own role in the conspiracy. To further this end, it creates a false dilemma: either the predicate scheme consists wholly of FDB's misrepresentations about the method of calculating AWPs or the predicate scheme is an antitrust violation and thus not an applicable predicate for RICO claims. McKesson Reply at 9-10.

First, as a matter of law, McKesson is incorrect. False representations are only one means to satisfy the requirement that the defendant in a RICO mail or wire fraud suit engaged in "deceptive conduct." *Bonilla v. Volvo Car Corp*., 150 F.3d 62, 66 (1st Cir. 1998). Nor is it uncommon to allege RICO and antitrust claims arising from the same course of conduct. *See*,

---

[11] http://www.rx-net-inc.com/html/info-mckesson.htm.

001821-13 221858 V1

*e.g.*, *Newcal Indus. v. Ikon Office Solution*, 2008 U.S. App. LEXIS 1257 (9th Cir. Jan. 23, 2008)

(reversing dismissal of RICO, Lanham Act and antitrust claims based on allegations that

defendant competitors shielded their customers from competition in the machine leasing market

by amending their lease agreements with their customers without disclosing that the amendments

would lengthen the term of the original agreement); *MCM Partners v. Andrews-Bartlett &*

*Assocs.*, 62 F.3d 967, 969 (7th Cir. 1995) (vacating dismissal of antitrust and RICO claims

arising from allegations that defendant competitor conspired with exhibition contractors to

monopolize the market for the services to set up exhibitions and to exclude plaintiff as a

competitor in that market); *see also In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1276 (S.D.

Fla. 2003) (rejecting motion to dismiss on grounds that the plaintiffs' RICO claims have

antitrust implications; "Defendants urge the Court to adopt some sort of antitrust preemption, but

none has been statutorily authorized by Congress.").

       The current action is a RICO lawsuit, predicated on wire fraud, not antitrust law.[12]

Indeed if it were otherwise McKesson's motion for judgment on the pleadings would be

meaningless, inasmuch as there is no colorable argument that reliance is an element of federal

antitrust claims.  Like the *AWP* litigation and *In re Lupron Mktg. & Sales Practices Litig.*, 295 F.

Supp. 2d 148 (D. Mass. 2003), this is a case about publishing artificially inflated AWPs for the

purpose of driving up retail prices.  As stated by the *Lupron* court this is precisely the type of

fraudulent conduct that is actionable under the federal mail and wire fraud statutes:

> defendants trumpeted a lie by publishing the inflated AWPs,
> knowing (and intending) them to be used as instruments of fraud.
> Whether one views the defendants' actions as involving the
> dissemination of information that was wholly false, or false

---

[12] Whether these allegations alternatively support a violation of federal and/or state antitrust law will be decided by the Court in a separate motion to dismiss by McKesson in the related antitrust lawsuit.

because of an incomplete depiction of the truth, they are actionable under the mail and wire fraud statutes.

*Id.* at 167-68.  McKesson's attempt to escape RICO liability is unavailing.

**E.     *Anza* and McKesson's other Authorities are Easily Distinguishable**

McKesson devotes an entire section of its reply on the proposition that *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) mandates dismissal.  *Anza* actually confirms the opposite – that causation has been adequately alleged.

In *Anza*, plaintiffs' theory was that *Anza* failed to pay taxes to the State of New York and thus was able to offer lower prices, which in turn allowed *Anza* to gain market share at plaintiffs' expense.  The Supreme Court noted that plaintiffs' harms were distinct from *Anza*'s fraud on the state.  In this case, however, McKesson's acts of fraud, which raised AWPs, is directly related to the cash payors injury of paying higher prices.

The court in *Anza* then analyzed the premise behind the directness requirement and the analysis supports a finding of causation in this case.  The Court noted that the less direct an injury the more difficult it is to ascertain the amount of damages attributable to the violation.  Here, Dr. Hartman has calculated such damages without difficulty, and a regression analysis can isolate out if other factors were the cause of the price increase paid by cash payors.  The difficulties of proof present in *Anza* are not present here where the scheme has a direct and calculable impact on the cash class.

McKesson also relies heavily on *Longmont United Hosp. v. Saint Barnabas Corp.*, 2007 U.S. Dist. LEXIS 48187 (D.N.J. 2007).  There, in granting a dismissal motion, the court found that plaintiffs' injuries were derivative of the injuries sustained by CMS and that the government was the party directly injured by the practice.  In the instant case, Plaintiffs ***are the only parties***

- 11 -

*injured* by the raise in AWPs. The concerns in *Longmont* are not present here. Instructive on the inapplicability of *Longmont* is the following passage:

> Defendant persuasively argues that when the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims, proximate cause is lacking. [*Id.* at *18.]

McKesson fails to answer the injury by the *Longmont* court: who are the immediate victims that are stepping forward to redress an injury. It's not the PBMs or pharmacies – *they benefitted from the scheme*. Here, the only party that can step forward are the Plaintiffs.

### III.    MCKESSON'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO ALL CLASSES FAIL

**A.    Reliance is Not Required in the First Circuit**

Under First Circuit law, reliance is not a required element of a RICO fraud claim. *Systems Mgmt. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002). Some courts in other jurisdictions have held otherwise. Recently, the Supreme Court granted review of a Seventh Circuit to settle the matter. *Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928 (7th Cir. 2007), *cert. granted*, 169 L. Ed. 2d 625 (2008). Unless or until the Supreme Court overturns *Systems Management* this Court is bound by that decision and should not require Plaintiffs to prove unnecessary elements. *Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004).[13]

---

[13] Perversely, McKesson argues that the First Circuit's denial of its petition for review on the reliance issue should be interpreted as the Appellate Court's misgivings about the decision it reached in *Systems Mgmt. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002). There is nothing to this contention and it should be treated as what it is – wishful thinking. Where procedural grounds are relatively straight-forward, as in the case of a party who fails to argue the issue on which it seeks review, appellate courts typically will resolve on the procedural grounds, rather than reaching the merits of a claim. *See, e.g.*, *Donovan v. City of Haverhill*, 311 F.3d 74, 76 (1st Cir. 2002) ("We need not reach the merits of this claim because plaintiffs failed to develop their argument and, consequently, have waived it for purposes of appeal."). "A court that refuses to address an issue on procedural grounds cannot reasonably be said to have decided the merits of that issue, even implicitly." *Field v. Mans*, 157 F.3d 35, 42 (1st Cir. 1998). The First Circuit's

**B.      Even if Reliance Were a Required Element of a Federal RICO Fraud Claim, Plaintiffs Establish Reliance Through Their Purchase of Overpriced Drugs**

Nonetheless, even if the Supreme Court were to conclude that reliance is a required element of RICO fraud claims, Plaintiffs have alleged facts to establish reliance.  The complaint alleges such reliance:  "Consumers . . . use and rely on AWP as a reasonable and accurate indicator of the underlying transaction prices for almost all drugs."  ¶ 4.

And, although this part of McKesson's motion is also directed at the claims of TPPs, McKesson fails to mention the numerous allegations of TPP reliance in the complaint:

> ¶ 4      Consumers, health and welfare plans . . . rely on AWP as a reasonable and accurate indicator . . .
>
> ¶ 5      End Payors utilize AWP as a pricing benchmark.
>
> ¶ 8      The result of the FDB-McKesson Agreement was to raise prices.
>
> ¶ 9      Without economic justification McKesson-FDB raised prices.
>
> ¶ 13     A higher WAC-to-AWP spread results in larger profits.
>
> ¶ 12     The spread remains in effect.
>
> ¶ 16     TPP contracts are tied to AWP.
>
> ¶ 17     The result of the scheme was "an artificial increase" in prices for third party payors.

Taken as a whole these allegations establish reliance on AWP as an accurate benchmark and the impact on payors when there is an artificial inflation of that benchmark.

Courts in jurisdictions that require reliance to show causation for RICO fraud claims recognize that "'the nature of the reliance is not a constant'" and reliance may be presumed in cases of broad-based schemes intended to defraud the public as a whole or in instances where

---

denial was simple:  McKesson never made the argument to this Court, therefore the issue did not merit the First Circuit's review.  No other conclusions are permissible.

001821-13 221858 V1

consumer expectations are uniform. *Schwab v. Philip Morris USA, Inc*., 449 F. Supp. 2d 992,

1115 (E.D.N.Y. 2006), *appeal pending* No. 06-4666 (2d Cir. argued July 10, 2007) (quoting

*Falise v. American Tobacco Co*., 94 F. Supp. 2d 316, 335 (E.D.N.Y. 2000)).  Where

> the fraudulent scheme is targeted broadly at a large proportion of
> the American public the requisite showing of reliance is less
> demanding.  Such sophisticated, broad-based fraudulent schemes
> by their very nature are likely to be designed to distort the entire
> body of public knowledge rather than to individually mislead
> millions of people.  From the perspective of the fraudulent actors,
> clear efficiencies are gained by co-opting the media and other
> outlets of information as unwitting tools for the pervasive scheme.
> To require reliance on specific misrepresentations where indirect
> channels of communication were integral to the success of the
> scheme would produce the perverse result of having the most
> massive and sinister fraudulent schemes be the ones that must
> escape civil[]RICO liability.

*Id.* at 1116 (quoting *Falise*, 94 F. Supp. 2d at 335).  Both *Schwab* and *Falise* dealt with large-

scale RICO fraud claims, where the defendants intended to mislead the public about the dangers

associated with cigarette smoking.  Both courts held that the plaintiffs were entitled to a

presumption of reliance.  *Schwab* reasoned that other areas of law recognized a presumption of

reliance in similar circumstances:

> Similar adjustments have been made in other areas of the law.
> While neither binding in this case, nor identical in reasoning,
> securities fraud and antitrust actions provide illuminating examples
> of how federal courts have interpreted the standard of proof for
> reliance involved in broad-based schemes of fraud.
>
> \* \* \* \*
>
> The fraud-on-the-market presumption of reliance amounts to an
> acceptably objective standard of what constitutes reliance, where
> reliance may be inferred from the materiality of the misstatements
> or omissions that constitute the fraud.  Professor Samuel
> Issacharoff cogently argues that this is essentially the same
> standard of proof as is found in defective product claims based on
> strict liability, implied warranty of merchantability, or breach of
> express warranty, where subjective reliance need not be
> established because "consumer expectations can be fairly

presumed."  Samuel Issacharoff, *The Vexing Problem of Reliance
in Consumer Class Action*s, 74 TUL. L. REV. 1633, 1635 (2000).

*Id.* at 1116-17.  The court noted that "[t]he law is willing to adjust the standard of proof in such

fraud cases, using notions of common sense and fairness to effectuate the overall purpose of the

statutory scheme."  *Schwab*, 449 F. Supp. 2d at 1117.  *Schwab* concluded that the presumption of

reliance was appropriate on the facts before it, noting that the "central question of whether a

purchaser, given two identical cigarettes, taste identical, cost the same, everything, would prefer

one that had less risk or more risk [is] a question that only a suicidal person could answer in the

negative, or someone who didn't understand the question."  *Id.*

     Similarly, Plaintiffs are entitled to a presumption of reliance.  Defendants engaged in a

broad-based fraud (referred to by Defendants as the "AWP normalization plan") intended to

change the entire brand prescription drug market.  McKesson collaborated with FDB to ensure

that the principal sources of AWP information for brand drugs would be uniformly manipulated.

As a matter of common sense, no payor would willingly pay excess charges for prescription

purchases.  Had they known that the prices were manipulated, payors would have demanded a

correction.  Reliance should be presumed or inferred on the basis of Class members' conduct.

     *Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198 (4th Cir. 1988) is also an example

of an instance in which a presumption of reliance is applied outside the context of securities

fraud.  There the Fourth Circuit applied a presumption of reliance in action for fraudulent breach

of contract.  To prove this claim the plaintiff was required to show that the contract was

"accomplished with fraudulent intent and accompanied by a fraudulent act."  *Id.* at 206.  The

parties entered into a lease agreement which required the defendant to deliver final building

plans and the plaintiff to complete construction of the store by a specified time.  However, the

parties could not agree on certain aspects of the building plan and the defendant had insisted that

- 15 -

the plaintiff not begin construction until all of the issues were resolved.  During negotiations over

the final plans the plaintiff requested an extension of the completion date.  The defendant drafted

an amendment for an extension, which the plaintiff signed.  The defendant informed the plaintiff

that the amendment was subject to approval of its main office.  Unbeknownst to the plaintiff the

defendant signed the amendment but did not return an executed copy to the plaintiff.  In the

interim the defendant concluded that the site was not economically viable and sought to

terminate the contract by any available means.

A jury found for the plaintiff and the defendant appealed.  The Fourth Circuit held that

evidence that the defendant granted an extension of the completion date but intentionally

concealed that fact, and cancelled the lease several months before the extended completion date,

using the excuse that the plaintiff failed to complete the building by the initial completion date

was sufficient to support a jury finding of dishonesty or unfair dealing and an award of punitive

damages.  On the issue of reliance, the court found that reliance could be presumed.  "[T]he

actionable independent fraudulent act here was not Goodyear's misrepresentation of its reason

for cancellation, but rather its affirmative concealment of the extension of the completion date.

And, direct proof of reliance on the concealment was not required for it was practically

impossible to prove, by direct evidence, reliance on that which had been intentionally

concealed."  Further, the court held that reliance (*i.e.*, the plaintiff being deceived about the

contract extension) could be inferred from the plaintiff's conduct.  *Id*. at 207 n.5.

Similarly, the crux of Plaintiffs' claims is that McKesson engaged in a fraudulent course

of conduct to inflate the retail price of brand prescription drugs by secretly collaborating with

FDB to increase AWP/WAC markups on those drugs.  FDB's false representations about the

means by which it calculated AWPs is merely a facet of Defendants' concealment and not the

original source of Plaintiffs' injury.  To require Plaintiffs to provide direct proof of reliance on an intentionally concealed scheme to manipulate prices is essentially impossible.  That Plaintiffs were deceived by Defendants' falsely inflated benchmarks should be presumed on the grounds that Plaintiffs purchased drugs at falsely inflated prices.

*Hoxworth v. Blinder, Robinson & Co*., 903 F.2d 186, 202 (3d Cir. 1990) also suggests that reliance can be inferred when the alleged fraud is a fraudulent course of conduct aimed at overcharging class members.  In *Hoxworth* the plaintiffs brought a class action RICO lawsuit, predicated on violations of 10b-5, in which the plaintiffs alleged that the defendant charged excess fees on the purchase and sale of penny stocks and intentionally withheld information about these charges that would lead its clients to realize that the charges were excessive.  *Id*. at 193.  The court held that the alleged practice was the type of fraudulent conduct, to which the burden-shifting rationale of the fraud on the market theory "is fully applicable."

Like the defendant in *Hoxworth* who charged excess fees on securities transactions, McKesson caused markups on brand drugs to increase, which in turn inflated retail prices. Additionally, like the *Hoxworth* defendant, McKesson engaged in fraud by intentionally concealing or withholding information that would have led the Plaintiffs to realize the charges were artificially increased.  Accordingly, even if reliance were an element of RICO fraud, it should not be necessary for Plaintiffs to show that each class member was aware of FDB's false statements about its alleged practice of surveying all the national wholesalers to calculate the AWP or even that each was aware that AWP formed the benchmark of the prices they paid for prescription drugs.  Plaintiffs should be entitled to the inference that they paid an excess cost in reliance on the integrity of the prices and on the reasonable assumption that the prices had not been manipulated by McKesson's fraudulent scheme.

## IV.    CONCLUSION

For the foregoing reasons the Court should deny McKesson's motions to dismiss the claims of the uninsured consumer class and for judgment on the pleadings.


Dated:  February 12, 2008                    By_____/s/ Steve W. Berman_____
                                                          Thomas M. Sobol (BBO#471770)
                                                          Edward Notargiacomo (BBO# 567636)
                                                    Hagens Berman Sobol Shapiro LLP
                                                    One Main Street, 4th Floor
                                                    Cambridge, MA  02142
                                                    Telephone: (617) 482-3700
                                                    Facsimile: (617) 482-3003

                                                    Steve W. Berman
                                                    Sean R. Matt
                                                    Barbara A. Mahoney
                                                    Hagens Berman Sobol Shapiro LLP
                                                    1301 Fifth Avenue, Suite 2900
                                                    Seattle, WA  98101
                                                    Telephone: (206) 623-7292
                                                    Facsimile: (206) 623-0594

                                                    Elizabeth Fegan
                                                    Hagens Berman Sobol Shapiro LLP
                                                    60 W. Randolph Street, Suite 200
                                                    Chicago, IL  60601
                                                    Telephone: (312) 762-9235
                                                    Facsimile: (312) 762-9286

                                                    Jeffrey Kodroff
                                                    John Macoretta
                                                    Spector, Roseman & Kodroff, P.C.
                                                    1818 Market Street, Suite 2500
                                                    Philadelphia, PA  19103
                                                    Telephone: (215) 496-0300
                                                    Facsimile: (215) 496-6611

                                                    Marc H. Edelson
                                                    Edelson & Associates
                                                    45 West Court Street
                                                    Doylestown, PA  18901
                                                    Telephone: (215) 230-8043
                                                    Facsimile: (215) 230-8735

001821-13 221858 V1

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 West Monroe, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 19 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on February 12, 2008.

/s/ Steve W. Berman
Steve W. Berman

001821-13  221858 V1