UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                            )
NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, et al.        )
        Plaintiffs,          )
                            )
        v.                   )  CIVIL ACTION NO. 05-11148-PBS
                            )
FIRST DATABANK, INC. and     )
McKESSON CORPORATION,        )
        Defendants.          )
_____ )
```

**MEMORANDUM AND ORDER**

March 19, 2008

Saris, U.S.D.J.

**INTRODUCTION**

In this proposed national class action, Plaintiffs allege
that First DataBank, Inc. and McKesson Corporation engaged in a
racketeering enterprise (the "Scheme") to fraudulently state the
"average wholesale price" ("AWP") for numerous prescription
pharmaceuticals beginning in late 2001, in violation of 18 U.S.C.
§ 1964 and California state law.  The Scheme allegedly jacked up
the AWP by five percent for over 400 brand-name, self-
administered drugs sold through retail pharmacies, including mail
order (the "Marked Up Drugs").  This allegedly fraudulent price
hike caused damages to consumers and 11,000 third party payors
("TPPs") across the nation.

Plaintiffs move to certify nationwide classes of consumers
and TPPs that purchased or made reimbursements for the Marked Up

Drugs.  McKesson[1] vigorously opposes.  Both parties have filed an
avalanche of submissions.  Since the Court's August 27, 2007
Memorandum and Order allowing-in-part Plaintiffs' Motion for
Class Certification, New England Carpenters Health Benefits Fund
v. First DataBank, Inc., 244 F.R.D. 79 (D. Mass. 2007) ("McKesson
I"), Plaintiffs have filed four briefs (Docket Nos. 319, 343,
376, 386) three expert declarations and a tutorial from its
damages expert, Dr. Raymond Hartman (Docket Nos. 329 Ex. A, 346,
348, 378), three expert declarations and a tutorial from its
industry expert, Kimberly McDonough (Docket Nos. 329 Ex. B, 347,
349, 380), and the declaration of an expert on the calculation of
percentage-based co-pays, Donald C. Hoscheit (Docket No. 379),
among other countless documents.  Not to be outdone, McKesson has
also filed four briefs (Docket Nos. 327, 363, 371, 395), three
expert declarations from its damages expert, Dr. Robert D. Willig
(Docket Nos. 326, 365, 373), an expert declaration from IMS data
expert Darrell Philpot (Docket No. 328), the resubmission, as a
tutorial, of an independent report prepared by Dr. Ernst Berndt
for the related multidistrict litigation (Docket No. 366), expert
declarations from industry experts James F. Smith and Arthur F.
Shinn (Docket No. 372 Exs. 3 & 4), and numerous other declaration
excerpts, deposition excerpts, charts, and other documents.

---

[1] Defendant First Databank has entered into settlement
negotiations with the Plaintiffs.  On January 22, 2008, the Court
denied without prejudice approval of a proposed national
settlement.  The parties have not submitted a revised settlement.

(See, e.g., Docket Nos. 327 app. A, 329, 364).  On top of all
this, the parties had what the Court dubbed a "cat fight" over
Plaintiffs' motion for leave to file a reply to McKesson's
Response to the Court's Inquiries at the November 13, 2007
hearing.  (See Docket Nos. 381, 382, 383, 384, 385, & orders
entered December 6, 2007).

After hearing, and a review of the extensive submissions,
the motion is **ALLOWED**, but not to the full extent sought by
Plaintiffs.

## PROCEDURAL BACKGROUND

In its previous Memorandum and Order, the Court certified a
class of consumers who, pursuant to a TPP plan, paid a percentage
co-pay for the Marked Up Drugs ("Class 1," or the "Co-Pay Class")
for a period covering August 1, 2001 to March 15, 2005.[2]
McKesson I at 89.

The Court also found that Plaintiffs satisfied the
requirements of Rule 23(a) with respect to a proposed class of
TPPs ("Class 2," or the "TPP Class") for the same class period.
Id. at 81, 84-85.  The Court indicated it would certify the TPP
Class for liability and equitable relief, but deferred making a

---

[2] Plaintiffs have also filed their Third Amended Complaint
to include a third class of consumers who paid the "usual and
customary" price for the Marked Up Drugs ("Class 3," or the "U&C
Class").  (Docket No. 359).  Plaintiffs have not yet moved to
certify the U&C Class, and on January 2, 2008, the Court issued
an order on a briefing schedule for certification of the U&C
Class.

decision on certification with respect to damages because the
Plaintiffs failed to satisfy the predominance and superiority
requirements of Rule 23(b)(3).  Id. at 89.

With respect to predominance, the Court described the issue
as follows:

> McKesson's better argument is that each TPP
> in the proposed class had unique contracts
> with its [Pharmacy Benefit Managers] for
> pharmaceuticals, and that these variations in
> how TPPs purchased and reimbursed for drugs
> would render any common inquiry into
> causation or damages fruitless.  In the
> related multi-district litigation,
> plaintiffs' expert Dr. Hartman testified that
> some TPPs employed "heat seeking missiles" in
> their contracts to automatically reduce their
> costs in the event that AWPs increased.  Dr.
> Willig refers to these contracts as "self-
> adjusting" or "pass throughs."  According to
> defendant, for example, some plans have
> rebates which increased as AWP increased, or
> had reimbursement caps.  Dr. Willig states
> that "the TPPs had a wide variety of
> mechanisms to protect themselves from an
> artificial rise in some AWP levels, and that
> individual TPPs used different means to
> counteract artificial rise in some AWP levels
> resulting from the alleged Scheme."  (Willig
> Exp. Report 5.)
>
> Other TPPs directly pushed back against the
> price increases by renegotiating their
> contracts with the PBMs.  ESI testified that
> in renegotiating, amending, and renewing
> contracts, the FDB spread increases were
> important factors considered, and that other
> PBMs were acting in similar manner.  As such,
> McKesson argues that some TPPs were able to
> recoup losses through aggressive pricing re-
> negotiations, by obtaining additional
> discounts, increasing rebate pass-through
> provisions, lower dispensing fees, and
> changing to a reimbursement formula of (WAC +
> %) rather than an (AWP - %) benchmark.

4

> Defendant's expert, Dr. Willig, supported
> this position by stating that as AWPs rose
> the discounts off AWPs paid by TPPs increased
> over the class period. (Willig Exp. Report ¶
> 48, ¶ 8.)  Some TPPs shifted costs to
> consumers, increasing their co-pays.  Still
> others did nothing, perhaps unaware of the
> AWP markup or contractually unable to
> mitigate the price increase.  Due to all of
> these variables, McKesson argues that class
> certification is inappropriate here because
> issues of damages and causation are governed
> by substantially different contracts over the
> entire class period of 3.5 years, and
> plaintiffs would require an individualized
> calculation of damages for each TPP.

Id. at 86.  The Court gave Plaintiffs the opportunity to address

the Court's predominance concerns by redefining the proposed

class to include only TPPs which had contracts based on AWP

before the start of the Scheme, and to exclude reimbursements for

renegotiated contracts.  See id. at 87.

    With respect to the related issues of superiority and

manageability, the Court found that the methodology proposed by

Plaintiffs to determine aggregate damages for the TPP Class was

inadequate because it did not sufficiently take into account

individual TPP mitigation of damages through renegotiation of

contract price terms with Pharmacy Benefit Managers ("PBMs").

Plaintiff's expert, Dr. Raymond Hartman, had calculated damages

based on a "zero-knowledge -- zero-mitigation" damages model,

which would likely have resulted in a significant overstatement

of damages if there were subsequent pushbacks by the PBMs and/or

TPPs in a way not captured by the model.  Moreover, the Court was

concerned that individualized trials or hearings on damages for those TPPs with renewed or renegotiated contracts would be unmanageable.  The Court gave Plaintiffs' expert the opportunity to submit an aggregate damage methodology alternative to address these concerns.  Id. at 87-89.

McKesson sought leave to file an interlocutory appeal pursuant to Fed. R. Civ. P. 23(f), which was denied on November 16, 2007 because McKesson had not developed its reliance argument and this Court's certification order did not "turn on" any question of law preserved by the petition.

Plaintiffs now set forth (1) their full, revised aggregate TPP damage calculation for different class periods, addressing the Court's concerns, and also propose, as alternatives, (2) limiting the class period or (3) simply certifying the TPP class as to liability and equitable relief only.  In response, McKesson contends that no TPP Class should be certified, and that the Co-Pay Class should be decertified because Plaintiffs rely upon the same flawed methodology to determine the Co-Pay Class's aggregate damages.

## FACTUAL BACKGROUND

The Court assumes familiarity with its previous Memorandum and Order, as well as certain facts established during the related multidistrict litigation.  See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005)

6

("Pharm. I"); In re Pharm. Industry Average Wholesale Price
Litig., 491 F. Supp. 2d 20 (D. Mass. 2007). The Court also
relies on the newly filed Third Amended Complaint and the
extensive submissions provided by both parties, including the
multiple expert declarations by Dr. Raymond Hartman,[3] plaintiffs'
expert, and Dr. Robert D. Willig,[4] defendant's expert.

To recap the allegations, beginning in late 2001, First
DataBank, a drug pricing publisher, and McKesson, a drug
wholesaler, reached a secret agreement to raise the Wholesale
Acquisition Cost ("WAC") to AWP spread from 20% to 25% for the
over four hundred Marked Up Drugs. McKesson communicated these
new 25% WAC to AWP markups to First DataBank, which then
published AWPs with the new markup. To conceal the Scheme,
McKesson and First DataBank agreed to effectuate price changes
only when some other WAC-based price announcement was made by a
drug manufacturer. By 2002, McKesson estimated that 95% of all
prescription drug manufacturers used the inflated 25% markup, and
that, by 2004, 99% of all prescription drug manufacturers did so.
The Scheme ended on March 15, 2005, when First DataBank disclosed

_____

[3] Plaintiffs' expert Hartman is the Director and President
of Greylock McKinnon Associates, an economic consulting and
litigation support firm located in Cambridge, Massachusetts. He
specializes in healthcare economics, and he has participated in
many of the AWP cases before this Court.

[4] Defendant's expert Willig is a Professor of Economics and
Public Affairs at the Woodrow Wilson School and the Economics
Department at Princeton University.

that it had ceased to conduct surveys of the market to obtain AWP information, contradicting prior statements.

The Scheme resulted in higher profits for retail pharmacies that purchase drugs on the basis of WAC, but get reimbursed on the basis of AWP. McKesson implemented the Scheme in order to provide this greater AWP "spread" to important retail pharmacy clients like Rite Aid and Walmart as well as its own pharmacy related businesses.

A hotly disputed factual issue is the extent to which TPPs mitigated any damage caused by the inflated AWP promulgated by the Scheme through renegotiation of the TPPs' contracts with PBMs. Nearly all TPPs contract with PBMs to assist in the reimbursement process. PBMs are the "800-pound gorillas of pharmaceutical reimbursement" and their relationships with TPPs are heavily negotiated and highly individualized. See Pharm. I at 71. TPPs negotiate drug pricing discounts with PBMs based on AWP, and PBMs in turn, negotiate discounts with the pharmacy networks based on AWP, although TPPs sometimes negotiate discounts with pharmacy networks directly. Typically, TPPs enter into contracts with PBMs to reimburse pharmacies for drugs at AWP minus 15 to 17 percent plus a dispensing fee. Sometimes PBMs earn a spread or profit margin between what they pay a retailer and what a TPP pays the PBM. Sometimes, though, TPPs use PBMs only as claims administrators and there is no such "spread." Very few TPPs track AWP and WAC prices over time. Contracts

between a TPP and PBM typically have three year terms.

**DISCUSSION**

**A.    TPP Mitigation**

McKesson vigorously argues that individual issues
predominate because some TPPs gained knowledge of the AWP
inflation caused by the Scheme (though not of the Scheme itself)
during the proposed class period, and adjusted their contracts
terms with PBMs or retailers accordingly.  The Court found that
factual premise persuasive in <u>McKesson I</u>.  Now, with the benefit
of a much expanded record, Plaintiffs argue that the premise is
wrong for two reasons.

<u>First</u>, they point to evidence that very few TPPs had
knowledge of the increased AWP spreads caused by the Scheme.  Dr.
Hartman opines that the depositions, declarations and other
evidence submitted by TPPs[5] in this matter showed that only one
TPP, ConnectiCare, "knew of the increased Spreads reported by"
First DataBank.  (Hartman Decl. ¶ 50).  He also says that IMS
data does not indicate any pushback through 2004.  (<u>Id.</u> ¶ 22 &
attach. C.II. ¶ 9).

Moreover, Plaintiffs have submitted expert declarations and
a tutorial from Kimberly P. McDonough, an expert on TPP/PBM

---

[5] These TPPs are BCBS of Montana, DC-37, Harvard Pilgrim
Health Plan, Humana, Philadelphia Federation of Teachers Health
and Welfare Fund (PFTHW), Pirelli Armstrong Retirees Medical
Benefits Plan, Select Health, The Teamsters Health and Welfare
Fund of Philadelphia, and ConnectiCare.  (Docket No. 329 Ex. A
("Hartman Decl.") ¶ 50).

contracting who is the President of Advanced Pharmacy Concepts, an independent pharmacy benefit consulting and audit firm.  Dr. McDonough states that during the Class Period she witnessed no TPP pushback.  (Docket No. 349 ("McDonough Tutorial") at 9-11). She also states that none of her clients received any reimbursement or payment from a PBM to mitigate for the damages incurred by TPPs as a result of the Scheme.  (Docket No. 329 Ex. B ("McDonough Report") at 14-15).

McKesson responds that it does not claim that every TPP had knowledge of the increased AWP spreads, only that some had knowledge, and thus any proof of impact or damage would necessarily have to be individualized.  (See Docket No. 326 ("Willig Decl.") ¶ 11).  To support its claim, McKesson submitted a chart of evidence showing "knowledge" of the increased AWP spreads by various TPPs and PBMs.  Some TPPs found out about these increases from an April 2002 letter sent by a large PBM, Express Scripts, Inc. ("ESI").  (See Docket No. 327 app. A; see also Hartman Decl. ¶ 46 (quoting contents of the letter)).  There is a factual dispute over how many TPPs received this letter.[6]

Second, Plaintiffs dispute McKesson's contention -- and the Court's prior finding -- that PBM competition for TPP business

---

[6] McKesson relies on the deposition testimony of William Kiefer, Vice President and General Manager of the Commercial Division of ESI, who testified that "hundreds and hundreds of clients I'm sure, if not thousands" received the letter.  (See Docket No. 327 app. A).  Dr. Hartman argues that only 26 TPPs actually received the ESI letter.  (Hartman Decl. ¶ 46).

was "fierce" or "vigorous."  McKesson also argues that PBMs
"squeezed" out of retailers any financial benefit they obtained
by the spread increase.  As Plaintiffs' industry expert Kimberly
McDonough says, "As the PBM industry learned of the change in AWP
to WAC ratio[s], they were able to renegotiate pharmacy contract
rates, reducing the prices paid to pharmacies to compensate
wholly or partially for increased profit margins."  (McDonough
Report at 13).  In McKesson's view, TPPs were able to "clawback"
against the increase by renegotiating their contracts with PBMs
competing for their business.

      In response, Plaintiffs point to the fact that some PBMs
either owned or were vertically integrated with mail order and
other retail pharmacies.  Because these PBMs benefitted from the
increased AWP spreads perpetuated by the Scheme, Plaintiffs argue
that they had no incentive to inform TPPs of the inflated AWP,
let alone fiercely compete to mitigate any damage.  As proof,
Plaintiffs quote an April 26, 2002 internal ESI e-mail, sent
around the same time as the ESI letter, that states that "the AWP
increases being pushed through by First Data Bank [are] having a
very favorable impact on our mail margins."  (Docket No. 345 Ex.
5, at ESI-414-00005439).  The e-mail goes on to state, "Our
clients will not be sympathetic to our financial situation since
we [will have benefitted] from the AWP increase in the mail and
they hired us to control drug trend."  (Id.).  The e-mail
includes a handwritten note, in response, "Let's put a lid on it

11

and not make it a big deal."  (Id.).

        The predominance hurdle can only be addressed by redefining
the class period.  Plaintiffs have presented sufficient evidence
(albeit disputed) that common issues predominate over individual
ones through the end of 2003.  The bulk of the allegedly
fraudulent increase in drug prices happened by 2002, when the
inflated spread caused by the Scheme applied to approximately 95%
of all drug manufacturers.  McKesson provided a chart of evidence
showing PBM and TPP knowledge of spread increases, which
indicates that PBMs and TPPs began to learn about the spread
increases beginning in April 2002.  (See Docket No. 327 app. A).
However, the typical TPP did not renegotiate its contract with a
PBM based on knowledge of the AWP increase in mid-stream in the
contract.  For example, Plaintiffs claim that Blue Cross of
California, which learned of the increases in early 2002, maybe
even late 2001, took two years after discovery of the price hike
to mitigate.[7]  (See Docket No. 345 Ex. 6, at 114-15; Docket No.
296 Ex. 7, at 166-67 (switching from First DataBank to Redbook
for pricing data in December 2003)).  Dr. McDonough further
states that the process of renegotiating a contract with a PBM
takes a year, which is consistent with the evidence in the

_____

        [7] However, as McKesson points out, Blue Cross of California
did renegotiate its mail order agreement with ESI in December
2002 that "gave [Blue Cross] a slightly deeper discount."
However, as Plaintiffs point out, "[i]t did not make up for th[e]
difference" caused by the Scheme.  (Docket No. 345 Ex. 6, at 114-
15).

record.[8]  (Docket No. 347 ("McDonough Rebuttal") at 2; McDonough
Tutorial at 10).  For example, Blue Cross, the only TPP for which
there is clear evidence of mitigation, was only able to fully
mitigate in December 2003, by changing from First DataBank to
Redbook.

Accordingly, the Court finds that the typical TPP did not
successfully negotiate contract terms to "clawback" against the
hike until 2004.  Beginning in 2004, individual issues of TPP
knowledge and renegotiation would predominate.  Thus, the Court
finds that common issues predominate from August 2001 to December
2003.

**B.    IMS DATA**

The newest debate concerns the use of IMS National
Prescription Audit ("NPA") data to determine aggregate TPP
damages.  IMS data "tracks the total retail method of payment for
each NDC, arranged by method of payment and party of payment."
McKesson I at 88.  The database summarizes unit sales and dollar
sales (by month, by drug, and by drug dosage) for transactions
reimbursed at retail by (1) TPPs; (2) uninsured payors; and (3)
Medicaid.  Plaintiffs' proposed methodology for calculating TPP
aggregate damages relies on IMS data, which they tout as the

---

[8] In fact, during the fairness hearing for the proposed
First Databank settlement, which proposed a unilateral reduction
of AWP for approximately eight thousand NDCs, many trade groups
for small pharmacies, PMBs, and at least one TPP (Blue Cross Blue
Shield Michigan) objected to the settlement in part because of
the difficulties and costs in renegotiating contract terms.

"gold standard" in data.  They argue that any individual TPP
mitigation would be captured by the IMS data, and thus aggregated
damages will not be overstated.

The reliability of the methodology for calculating aggregate
damages on a classwide basis matters not only to the TPP Class,
but to the certified Co-Pay Class as well.  As put by Dr.
Hartman, "since damages to Class 1 are simply a percentage of the
damages (paid as coinsurance) to the TPPs/insurers that insure
those consumers," aggregate damages for Class 1 would "require
calculation of the damages to the TPPs insuring those consumers."
(Hartman Decl. ¶ 12).  As McKesson's expert, Arthur F. Shinn,
President of Managed Pharmacy Consultants LLC, puts it, the co-
pay is not a percentage of AWP but of the net cost to the TPP in
reimbursing drug costs, i.e., "the consumer pays the pharmacy a
specified percentage of what the TPP is obligated to pay the
PBM."  (Docket No. 372 Ex. 4 ("Shinn Decl.") ¶ 11).  Evidence
provided by both parties[9] confirm that what the Co-Pay Class paid
as co-insurance[10] for the Marked Up Drugs is "a percentage of the
[TPP]'s total pharmacy cost for each prescription."  (McDonough
Report at 9; Shinn Decl. ¶ 11).  Consequently, whether a member

---

[9] McKesson submitted the details of one TPP plan that
determines the co-pay "based on the [TPP]'s guaranteed price,
which is the lesser of U&C, MAC plus the dispensing fee, or the
guaranteed AWP plus the dispensing fee."  (Docket No. 372, Ex. 6,
at MHS A_0000236).

[10] Dr. Hartman concludes that co-insurance accounts on
average for 25% of the reimbursement (Ex. C. ¶58).

of the Co-Pay Class who paid based on a percentage of AWP had damages will depend on the extent that member's TPP was damaged. However, the co-payment is calculated by the PBM at the point of sale and does <u>not</u> include post-transaction rebates, as Plaintiffs' expert on co-pay calculations, Donald C. Hoscheit, President of Hoscheit Consultants, Ltd., attests. (Docket No. 379 ("Hoscheit Decl.") ¶ 4 ("I have never seen, nor do I know of a case where a manufacturer's rebate directly impacted the co-pay paid by the patient.")).

While not challenging the accuracy of this database for other commercial purposes like market research, McKesson argues that IMS data does not measure TPP mitigation, as IMS data reports payments made to pharmacies by PBMs, <u>not</u> payments made by TPPs to pharmacies. As such, IMS data only reflect PBM/pharmacy contractual terms, and fail to capture TPP/PBM terms that would have mitigated any damage. (Docket No. 328 ("Philpot Decl.") ¶¶ 4-5; Willig Decl. ¶¶ 31-32). For example, McKesson argues that IMS data include only changes in discounts off AWP and dispensing fees in PBM/pharmacy contracts, and the database would not capture changes in discounts, administrative fees and/or rebate pass-through percentages in contracts between TPPs and PBMs that would have mitigated the damage caused by the Scheme. (Willig Decl. ¶¶ 35-37; <u>see also</u> Docket No. 365, ("Willig Rebuttal Decl.") ¶¶ 16-20). For this reason, McKesson argues that Plaintiffs cannot assume a "constant relationship" or

15

"correlation" between what PBMs paid the retailers and what TPPs actually paid for the drugs between the two.  In addition, McKesson argues that IMS data includes reimbursements made by Medicaid and uninsured consumers, further obfuscating the relationship between pharmacy-PBM reimbursement and PBM-TPP reimbursement.

In response, Plaintiffs argue that IMS data is a reasonable proxy of TPP reimbursements for drugs.  To show that IMS data is a reasonable proxy (and to show that no mitigation occurred), Dr. Hartman compared IMS data to _actual_ TPP reimbursement figures provided by GE Group Life Insurance ("GE") and Cigna for bellwether drugs (Lipitor, Pavix, Prevacid, and Wellbutrin) that were used by Dr. Willig to determine TPP mitigation.  Dr. Hartman found a close relationship between the IMS data and the TPP data with respect to the market inflation in reimbursement amounts. He also states: "There is no evidence of systematic mitigation by Cigna over all drugs that the IMS data obscures or neglects over the period for which I have data."  (Docket No. 378 ("Hartman IMS Decl.") ¶ 15(d)).  Instead, he argues that there is "evidence of a uniformly inflated mark-up over two years.  There is no mathematical or economic evidence of pushback or mitigation of the inflation."  (Hartman Decl. ¶¶ 32-33).

Moreover, according to Dr. Hartman, IMS data "is one of the most, if not the most, frequently used sources of data summarizing a variety of business transactions, strategic

behavior and corporate activity of pharmaceutical manufacturers."
(Hartman IMS Decl. ¶ 2).  Peer-reviewed journals have relied on
IMS NPA data.  (Id.)  Many courts have relied on IMS data in
litigation involving the pharmaceutical markets.  See, e.g., In
re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 526 (E.D. Mich.
2003) (holding, for settlement purposes, the Plaintiffs used IMS
data to "make an informed judgment of . . . the potential
damages arising" from the alleged antitrust violation); see also
Neurontin, 244 F.R.D. at 110-11.  In Hartman's words, IMS data
have been considered the "gold standard for reasonable
measurement of reimbursement by end payors, including TPPs."
(Hartman IMS Decl. ¶ 3).

     With respect to McKesson's argument that the reliance on the
IMS data leads to an overstatement of aggregate damages, Dr.
Hartman states that one can carve out third party payor data in
the IMS data set from Medicaid and uninsured data.  (Hartman IMS
Decl. ¶ 4 & n.6).  He points out that not all TPPs use PBMs and
that some PBMs are claims administrators that simply pass through
reimbursements to retailers.[11]  Thus, a portion of the third

---

     [11] Plaintiffs agree that PBMs earn spreads on some drugs,
but claim they are minimal or sometimes non-existent for brand
name drugs.  In light of the dense record and expert declarations
that sail past each other like ships in the night, it is not
clear to me how many drugs involve a PBM-pharmacy spread.  In
fact, under McKesson's squeeze theory, Plaintiffs argue that IMS
data may actually understate damages to TPPs unless there was
mitigation to "clawback" some of the profits the PBM squeezed
from pharmacies.

party payor subset of the IMS data would directly reflect TPP reimbursement.  Finally, in rebuttal to Dr. Willig's point that the IMS data does not include market responses to the inflation like rebate pass-through percentages, Dr. Hartman states that he "adjusted the aggregate TPP damage calculations for aggregate changes in the rebates they received."  (Hartman IMS Decl. ¶ 6).[12]  In other words, he adjusted damages downward by 2.7% or $151 million to account for increases in the amount of manufacturer rebates shared with TPPs (Hartman Decl. attach. F ¶¶ 60-61).

This debate is largely beside the point once the class is redefined to include only the period of time when the typical PBM and TPP were not renegotiating to "clawback" against the inflation caused by the Scheme.  Even if the IMS data do not exactly capture that payments by TPPs for drugs, Hartman can reasonably account for mitigation by discounts, dispensing fees, and rebates in his aggregate methodology.  While it is true that there may be other ways in which TPPs may have begun to mitigate in the redefined class, McKesson has not pointed to any evidence of significant pushback prior to 2004.

For RICO claims, "Where injury is established, damages need not be demonstrated with precision."  In re Zyprexa Prods. Liab. Litig., 493 F. Supp. 2d 571, 578 (E.D.N.Y. 2007) (quoting Schwab

---

[12] He explains how he calculates the increased rebates and McKesson does not appear to challenge this methodology.

v. Philip Morris, Inc., 449 F. Supp. 2d 992, 1065 (E.D.N.Y.
2006)).  This is also true of antitrust actions that involve, as
in this case, "the difficult task of 'quantifying the difference
between what actually happened and what would have happened in a
hypothetical free market.'"  See Coastal Fuels, Inc. v. Caribbean
Petroleum Corp., 175 F.3d 18, 33 (1st Cir. 1999) (quoting Fishman
v. Estate of Wirtz, 807 F.2d 520, 550 (7th Cir. 1986); see also
Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S.
555, 563 (1931) (holding that in antitrust cases "Where the tort
itself is of such a nature as to preclude the ascertainment of
the amount of damages with certainty," that "it will be enough if
the evidence show the extent of the damages as a matter of just
and reasonable inference, although the result be only
approximate.").  With respect to aggregate damage calculations in
the RICO context, "Courts have not required absolute precision .
. . and have allowed damages to be proven by reference to the
class as a whole, rather than by reference to each individual
class member."  Neurontin, 244 F.R.D. at 112 (quoting 3 Herbert
B. Newberg & Alba Conte, Newberg on Class Actions § 10.5 (4th ed.
2002)).

     After a rigorous review of the expert analysis for purposes
of class certification, Plaintiffs have demonstrated that the IMS
data is a reasonable proxy for what TPPs paid at retail during
the redefined class period.  It is also a reasonable proxy for
assessing aggregate damages for the entire consumer class period.

With respect to the Co-Pay Class, McKesson urges the Court to certify for liability and equitable relief only and to decertify the damage class.  However, damage distribution can be readily accomplished.  As one treatise notes:

> If the only issue is to determine the amount of damages which class members are entitled to receive and this determination can be accomplished almost mechanically, simple proofs similar to those used for summary judgment are often appropriate, or otherwise very simple, informal requirements and plain-English forms will do, especially when individual claims are small or relatively modest.

See 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 9:64, at 457-58 (4th ed. 2002).  Members of the Co-Pay Class purchased the Marked Up Drugs based upon a point of sale determination by a PBM, and there is no evidence that co-pays were affected by post-transaction adjustments such as rebates or other form of pushback.  (Docket No. 380 ("McDonough Suppl. Decl.") ¶¶ 2-4; Hoscheit Decl. ¶ 4).  Thus, it is feasible to calculate individual damages as to the Co-Pay Class by determining the price paid and the point-of-sale formula that determined their co-pay.  Accordingly, any individual issues posed by Co-Pay Class damage allocation poses no predominance or manageability problems.

Damage allocation with respect to TPPs is a pricklier issue because some are large insurers while others are small Taft-Hartley plans.  For example, there was some mitigation by GE and

20

Cigna through increased discounts off AWP and decreased
dispensing fees a year and a half after the Scheme was
implemented. (Docket No. 346 ("Hartman Damages Decl.") ¶ 20(a)-
(c)).  If the entire class period were certified through 2005,
questions of individual mitigation would certainly loom large
with McKesson disputing any claim of no mitigation by an
individual TPP in the later years.  This is precisely the
"morass" of individualized trials that the Court seeks to avoid,
and could not be handled by a claim administrator.  Because the
record demonstrates that de minimis or no mitigation occurred for
the typical TPP through 2003, any individual issues as to
mitigation would not disrupt the mechanical calculation of
damages for nearly all of the TPP Class.

      Therefore, the Court will certify the TPP Class for damage
purposes through December 2003.  With respect to the remaining
years, the Court will certify for liability and equitable relief
only.

## ORDER

      Plaintiffs' motion to certify the TPP Class (Docket No. 178)
is **ALLOWED** pursuant to Fed. R. Civ. P. 23(b)(3) for damages for a
period covering August 1, 2001 to December 31, 2003.  The Court
certifies the TPP Class through May 15, 2005 for liability and
equitable relief only pursuant to Fed. R. Civ. P. 23(b)(2).
Pursuant to Fed. R. Civ. P. 23(b)(3), the Court will certify the

Co-Pay Class for the entire proposed class period through May 15, 2005.  The Court **DENIES** the motion for further discovery, and defers the decision of whether to bifurcate the trials of liability and damages.

Accordingly, the Court certifies the following class for a period beginning August 1, 2001 and ending on May 15, 2005 for all purposes:

> Class 1, Consumer Purchasers: All individual persons who paid, or incurred a debt enforceable at the time of judgment in this case to pay, a percentage co-payment for the Marked Up Drugs during the Class Period based on AWP, pursuant to a plan, which in turn reimbursed the cost of brand-name pharmaceutical drugs based on AWP. The Marked Up Drugs include all of the drugs identified in Exhibit A to the Third Amended Complaint and consist of certain brand-name drugs only.

The Court also certifies the following class for a period beginning August 1, 2001 and ending on December 31, 2003 for the purpose of damages, and for a period beginning August 1, 2001 and ending on May 15, 2005 for purposes of liability and equitable relief:

> Class 2, Third-Party Payors:  All third-party payors (1) the pharmaceutical payments of which were based on AWP during the Class Period; (2) that made reimbursements for drugs based on an AWP that was marked up from 20 to 25% during the term of its contract with its PBM or with another entity involved in drug reimbursement; and (3) that used First DataBank or Medispan for determining the AWP of the marked up drugs.  The Marked Up Drugs are all drugs identified in Exhibit A and consist of brand-name drugs only.

22

Excluded from both classes are (a) each defendant and any entity in which any defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors; (b) any co-conspirators; and (c) any governmental entities that purchased such drugs during the class period.


**S/PATTI B. SARIS**
United States District Judge