UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>          Plaintiffs,<br><br>        v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>          Defendants. | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' SUBMISSION REGARDING A SCHEDULE TO TRIAL**

At the March 19, 2008 status conference, the Court asked the parties to submit a scheduling proposal one week after the deadline for any Rule 23(f) filing.  As a preliminary matter, Plaintiffs note that the Court has been trying for some time to get this case to trial.  At the September 20, 2007 scheduling conference, the Court suggested a trial date of May or June 2008 and asked the parties to reach an agreement on a date.  Although Plaintiffs were ready, willing and able to schedule such a trial, no agreement could be reached.  At the March 19 conference, the Court again expressed its desire to have a trial this year, and Plaintiffs concur in that approach.

## PLAINTIFFS' PROPOSED SCHEDULE

### 1.    Rule 23(f) Resolution

McKesson filed its petition on April 2, and Plaintiffs responded on April 11.[1]  In *AWP* and *McKesson I*, the First Circuit took less than 90 days to decide.  Target Date for resolution is July 2.

### 2.    Class Notice

Plaintiffs are confident that the First Circuit will deny the petition and, therefore, propose submitting a form of class notice and notice plan by May 23, 2008 so that notice can issue as soon as the First Circuit rules.

Assuming the First Circuit rules no later than July 2, notice can commence and the opt out period conclude by September 15, 2008.

---

[1] A copy is attached as Exhibit A.

### 3.    State Law Issues

Because this case arises from the unlawful conduct of two California companies, Plaintiffs believe that California law applies on a nationwide basis.  McKesson is quick to point out the difficulties with proving RICO, raising now the Supreme Court's upcoming RICO reliance decision.  For this reason, it is important that the benefits of either California law, or other state laws if they apply, should be available to class members at trial.  This is a bench trial, which will make more manageable the application of multi-state law at trial.

Knowing that the Court has one of the heaviest dockets in the land, Plaintiffs respectfully suggest that, if possible, the Court might try to rule on the state law claims by July 2, 2008, so the claims can be included in the notice.

### 4.    Trial Date

Plaintiffs suggest November 10, 2008, with each side receiving five trial days including opening, cross and direct and closing.

### 5.    Other Dates Relevant to Trial

| | |
|---|---|
| Plaintiffs' Final Damages Report | May 15, 2008 |
| Plaintiffs' Rebuttal to McKesson's Liability Expert | June 1, 2008 |
| McKesson's Damage Report | July 15, 2008 |
| Plaintiffs' Reply on Damages | September 15, 2008 |

Plaintiffs suggest that once a trial date is set that the parties should be directed to propose deadlines relating to the trial itself such as exhibit lists, deposition designations and the like, within ten days of the new scheduling order.

**6.     RICO Developments**

McKesson will argue that nothing much should occur until the Supreme Court's RICO reliance decision, which McKesson believes will issue before June 30, 2008.  Anticipating how or even if that decision will impact the case is akin to fortune telling, even though everyone is aware of the potential importance of the decision.  Plaintiffs suggest that each side be permitted to file a brief and supporting material on the impact of the decision on certification, class notice, and the trial schedule within two weeks of its issuance.

The briefs should not exceed 20 pages.  Thereafter the Court can direct the parties as to the need for further briefing, hearings or a change in schedule or if notice should not proceed.

DATED:  April 11, 2008

By  **/s/ Steve W. Berman**
     Thomas M. Sobol (BBO#471770)
     Edward Notargiacomo (BBO# 567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Steve W. Berman
Sean R. Matt
Nicholas Styant-Browne
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Co-Lead Counsel for Plaintiffs

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

Attorneys for Plaintiffs

001821-15  233488 V1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 11, 2008.


**/s/ Steve W. Berman**
Steve W. Berman

001821-15  233488 V1

# Exhibit A

No. 08-8017

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND,
PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS
TRUST; TEAMSTERS HEALTH & WELFARE FUND
OF PHILADELPHIA AND VICINITY; PHILADELPHIA
FEDERATION OF TEACHERS HEALTH AND WELFARE
FUND; DISTRICT COUNCIL 37, AFSCME – HEALTH &
SECURITY PLAN; JUNE SWAN; BERNARD GORTER;
SHELLY CAMPBELL AND CONSTANCE JORDAN,

*Respondents/Plaintiffs,*

vs.

FIRST DATABANK, INC.; MCKESSON CORPORATION,

*Petitioner/Defendants.*

Petition to Appeal an Order of the United States District Court
for the District of Massachusetts
The Honorable Patti B. Saris, Judge Presiding
(Case No. 1:05-CV-11148-PBS)

**CLASS PLAINTIFFS' ANSWER IN OPPOSITION
TO MCKESSON'S SECOND PETITION TO APPEAL
AN ORDER GRANTING CLASS CERTIFICATION**

Steve W. Berman
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone (206) 623-7292
Facsimile No.: (206) 623-0594

## TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ...................................................................................... 1

II.    PROCEDURAL BACKGROUND ............................................................ 2

III.   ARGUMENT ............................................................................................ 4

    A.    Standard of Review ......................................................................... 4

    B.    The Size of the Potential Damages Award is not a Sufficient
          Basis to Warrant this Court's Review .................................................. 5

    C.    The District Court's Order Complies With Prevailing First
          Circuit Law ...................................................................................... 8

          1.     Contract renegotiations that did nothing to eliminate
                TPP reliance on tainted AWPs are irrelevant .......................... 10

          2.     The district court properly declined to limit the damages
                class for consumer co-pays to the shorter class period ........... 14

          3.     The district court evaluated the evidence on IMS data
                and properly found that it approximated actual damages ........ 15

    D.    Clarifying the Court's Certification Standard is not Necessary,
          and the Order Satisfies *Motor Vehicles* ............................................. 17

IV.    CONCLUSION ....................................................................................... 20

001821-15 232504 V1

# TABLE OF AUTHORITIES

## FEDERAL CASES

<u>**PAGE**</u>

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla,*
    490 F.3d 1 (1st Cir. 2007)........................................................................ 8, 9

*Coastal Fuels, Inc. v. Caribbean Petroleum Corp.,*
    175 F.3d 18 (1st Cir. 1999)....................................................................... 16

*McKenna v. First Horizon Home Loan Corp.,*
    475 F.3d 418 (1st Cir. 2007)....................................................................... 6

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
    2008 U.S. App. LEXIS 6483 (1st Cir. Mar. 28, 2008)......................... *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.,*
    230 F.R.D. 61 (D. Mass. 2005).................................................................... 3

*Republic Tobacco Co. v. N. Atlantic Trading Co.,*
    381 F.3d 717 (7th Cir. 2004) ...................................................................... 3

*Tardiff v. Knox County,*
    365 F.3d 1 (1st Cir. 2004)............................................................................ 6

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000)................................................................ *passim*

*In re Xcelera.com Sec. Litig.,*
    430 F.3d 503 (1st Cir. 2005)........................................................................ 8

001821-15 232504 V1

# I.    INTRODUCTION

As a general rule, it is a rare Rule 23(f) petition that merits interlocutory review because such review is generally "disruptive, time-consuming, and expensive." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 293-94 (1st Cir. 2000). Consequently, Rule 23(f) appeals are generally only allowed when "the need is sufficiently acute." *Id*. at 293.

McKesson claims that the size of the potential damages that may be awarded warrants review. Putting aside the fact that McKesson's SEC filings claim the opposite, that the case presents no "material" threat; a large potential damage award justifies review only when there is some perceived weakness in the certification order. No such weakness exists here. As demonstrated by the opening pages of the certification order, as well as throughout the body of the order, Judge Saris conducted an exhaustive and far reaching examination of the facts to reach her decision. Her decision was "very, very fact specific" and not "so much law based as much as understanding this very complex record." McKesson might not like the factual conclusions reached, but McKesson fails to demonstrate any clear error in the decision that would support review of the district court's conclusions.

- 1 -

McKesson then tries to argue that a review would provide an opportunity to define the standards governing class certifications. However, this Court recently restated the standards to be applied on class certification motions.[1] Additionally, Judge Saris did not use a "*fundamentally flawed*" yardstick as McKesson falsely claims. Judge Saris originally rejected certification of a damages class and certified the class only after a "*rigorous review of the expert analysis*" based on an "*expanded record*" that included multiple opinions from six different experts. The district court itself referred to "*a rigorous review*" and as such is fully consistent with *Motor Vehicles*. Judge Saris' order, unlike the class certification order in *Motor Vehicles*, came after discovery in the case was over and was based upon expert opinion's that were substantially complete and were subject to "*essentially … a Daubert hearing to even get me to class cert.*"[2]

Plaintiffs respectfully request that this Court deny review.

## II.    PROCEDURAL BACKGROUND

In her previous certification order in this case Judge Saris certified two classes, one for consumers and one for third-party payors ("TPPs"). The consumer

---

[1] *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 2008 U.S. App. LEXIS 6483 (1st Cir. Mar. 28, 2008) ("*Motor Vehicles*").

[2] *See* Appendix in Support of Class Plaintiffs' Answer in Opposition to McKesson's Second Petition to Appeal An Order Granting Class Certification ("APP.") at 55 (3/19/08 Status Conf. Tr. at 7) (emphasis added).

- 2 -

class was certified for liability and damages, and the TPP class for liability.  In

drafting that order, Judge Saris drew on both the extensive submissions of the

parties as well as her experience in the AWP MDL.[3]  This Court denied

McKesson's Rule 23(f) petition of the district court's August 27 order.[4]

Judge Saris deferred her decision to certify a TPP damages class until

March 19, 2008.  Before issuing the order, Judge Saris held a hearing to scrutinize

Plaintiffs' proposed damages methodology, and she poured over the parties'

extensive submissions on this matter, including eight briefs and over a dozen

expert declarations; DVD tutorials of Plaintiffs' experts; McKesson's resubmission

of the report of the court-appointed expert used in the AWP MDL litigation;

deposition excerpts; charts and other documents.[5]  In addition, many trade

---

[3] APP. 2-27.  Judge Saris is presiding over the massive Multi-District Litigation ("MDL") involving manipulation of the Average Wholesale Price ("AWP"), which is a benchmark used to price virtually all drugs sold in the United States. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ("AWP MDL").

[4] The sole issue addressed by the March 19, 2008 order is whether to certify the Class for damages.  To the extent McKesson also attempts to challenge the district court's entry of its finding of class-wide impact in the August 27 order, it is precluded by this Court's order denying review of McKesson's previous 23(f) petition. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 728 (7th Cir. 2004) ("Appellate review is not designed to serve as an unsuccessful party's second bite at the apple – an opportunity to raise issues and arguments that were not brought forth below.").

[5] APP. 30-31 (summarizing the material the Court considered).

associations representing pharmacies and pharmacies benefits managers ("PBMs") submitted briefs and expert testimony prior to the district court's January 22, 2008 hearing on final approval on Plaintiffs' proposed settlement with McKesson's co-defendant, First DataBank.  These briefs and testimony also informed the district court's understanding of the prescription drug market.[6]  After a "***rigorous review***" (App. 47) of the "expanded record" and "extensive submissions" Judge Saris certified the TPP class for damages, but for a period 15 months shorter than that requested by Plaintiffs.

### III.    ARGUMENT

### A.    Standard of Review

While this Court has broad discretion to grant or deny a Rule 23(f) petition, Rule 23(f) appeals are the exception, not the norm, and are allowed only when "the need is sufficiently acute" because such review is generally "disruptive, time-consuming, and expensive."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 293-94 (1st Cir. 2000).  This Court instead exercises restraint, choosing to "err, if at all, on the side of allowing the district court an opportunity to fine-tune its class certification order."  *Id.* at 294.

---

[6] APP. 41.  To provide this Court an understanding of the full extent of the materials that were the subject of Judge Saris' rigorous review, they are compiled and identified in Appendix D (APP. 58-67).

Two factors guide consideration of a Rule 23(f) petition.  The first is whether a ***doubtful*** class-certification decision "would virtually compel a party to abandon a potentially meritorious claim or defense before trial." *Id.* at 293.  This factor encompasses both where the decision would effectively end the case (as in a denial where plaintiffs' individual claims would be too small to warrant the costs of stand-alone litigation) or where a grant of certification raises the stakes of the litigation so substantially that defendant feels irresistible pressure to settle.  *Id.* ***Petitioners who seek to fit within the contours of this category also must demonstrate "significant weakness" in the certification decision.*** *Id.* at 295.

The second factor is whether the case raises a novel or unsettled question that is "important to the particular litigation as well as important in itself." *Id.* at 294.  The unsettled question additionally must be "likely to escape effective review" if not immediately addressed. *Id.* McKesson's petition does not fit these guidelines.

**B.   The Size of the Potential Damages Award is not a Sufficient Basis to Warrant this Court's Review**

McKesson attempts to justify its 23(f) petition on the ground that the district court's order subjects McKesson to a "$21 billion dollar" judgment, but a large potential damages award alone does not warrant this Court's review.  "[N]o matter how strong the economic pressure to settle, a Rule 23(f) application, in order to

- 5 -

succeed, also must demonstrate some ***significant weakness*** in the class
certification decision." *Mowbray*, 208 F.3d at 295 (emphasis added).[7]  As an
example of a significant weakness, *Mowbray* referred to a district court's
erroneous assumption that statute of limitations defenses should not be considered
at the class certification stage.  *Id.* at 295-96.  As demonstrated below Judge Saris
undertook a painstaking and "rigorous review" of an "avalanche" of submissions
and reached a conclusion based on a "complex factual record."  McKesson cannot
demonstrate an abuse of discretion in the district court's decision and there is no
novel issue of law presented.

Contrary to McKesson's representation, the size of the potential damages
award was not the sole ground for review in *Motor Vehicles*; the Court also

_____

[7] *See also Motor Vehicles*, 2008 U.S. App. LEXIS 6483, at *2-3 (interlocutory
review may be appropriate "where a ***doubtful*** class certification results in financial
exposure to defendants so great as to provide substantial incentives for defendants
to settle non-meritorious cases in an effort to avoid both the risk of liability and
litigation expense.") (emphasis added).  *McKenna v. First Horizon Home Loan
Corp.*, 475 F.3d 418 (1st Cir. 2007), cited by McKesson, is consistent with this
standard.  *See id.* at 421 (granting review "[b]ecause of the important and unsettled
legal issues involved and the substantial financial impact that the order
portended[.]").  Although *Tardiff v. Knox County*, 365 F.3d 1, 3 (1st Cir. 2004),
suggests that a large potential judgment may be grounds for review, its reliance on
*Mowbray*, 208 F.3d at 293, makes clear that the petitioner must also demonstrate a
significant weakness in the class certification order.  If any doubt existed as to the
necessity of demonstrating a significant weakness, *Motor Vehicles*, 2008 U.S. App.
LEXIS 6483, at *2 lays it to rest.

- 6 -

perceived a significant weakness in the certification order.  This Court reversed an order certifying a class for injunctive relief under the Clayton Act of new car purchasers who allegedly were prevented from benefiting from the export of less expensive Canadian cars.  This Court observed that in the two years since the district court had entered its order the exchange rates and trade restrictions between Canada and the United States had changed dramatically, and there was no longer an imminent threat of harm to satisfy the standing requirement for injunctive relief. *Motor Vehicles*, 2008 U.S. App. LEXIS 6483, at *21-22.  Because jurisdiction was predicated on the existence of a Clayton Act claim, the Court remanded the case to the district court to determine whether federal jurisdiction exists over the remaining state law claims and, if so, whether it should reconsider its preliminary certification of the state law damages classes in light of the fully developed record. *Id.* at *4.

Finally, the size of a potential damages judgment only matters if it gives rise to an "irresistible pressure to settle." *Mowbray*, 208 F.3d at 293.  McKesson ranks 18th in the Fortune 500 with annual revenues of $88 billion.  Although McKesson opens its petition by asserting it is exposed to a $21 billion award that creates undue pressure to settle, it tells a far different story to its shareholders. McKesson's most recent 10-Q (filed on February 1, 2008) discusses this litigation

001821-15 232504 V1

and confidently concludes that "*such litigation and proceedings will not have a material adverse effect on our financial position, results of operations or cash flows.*"[8]

## C.    The District Court's Order Complies With Prevailing First Circuit Law

The extent of this Court's review of a district court's class certification decision lies on a continuum, with pure issues of law reviewed under an abuse of discretion standard on one end and "deferential clear-error review" reserved for "fact-dominated" determinations on the other end. *Motor Vehicles*, 2008 U.S. App. LEXIS 6483, at *29 (relying on *In re PolyMedica Corp. Secs. Litig.*, 432 F.3d 1, 5 (1st Cir. 2005)); *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512 (1st Cir. 2005) (deferring to the district court's finding that the market conditions justified a presumption of reliance because the court based its findings on an extensive review of briefs, testimony and other evidence). This standard is consistent with the degree of deference this Court gives to the factual determinations of trial courts in other contexts. *See, e.g., Asociacion de Educacion*

---

[8] APP. 71 (SEC Form 10-Q) (emphasis added). Such duplicity of positions raises the age-old lawyer's question: Is McKesson lying to the Court or to its shareholders about the threat of a large damage award from this case? In addition, McKesson has shown no interest in settlement and thus there is no evidence that it is under undue pressure to settle this case.

*Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007) (reviewing district court's findings of fact for clear error).

As made clear by Judge Saris' order, the class certification decision in this case is a fact-dominated one. At the outset of the order, Judge Saris observed that she had received "an avalanche" of submissions, referring to Plaintiffs' submission of four briefs, three expert reports and a tutorial from the damage experts, three expert declarations and a tutorial from an industry expert, and a declaration of an industry expert as well as "countless documents." APP. 30. Judge Saris then noted that McKesson, "not to be outdone," filed the same types and volume of responsive materials, which were "extensive." Judge Saris' Order actually understates the extent of the submissions that she reviewed in dealing with class certification issues. As illustrated in Appendix D (APP. 58-67), ***a total of 120 submissions*** totaling thousands of pages as well as DVD materials were made relating to class certification.

The conclusion that this case falls in the category of the deferential, clear-error review reserved for "fact dominated" determinations is supported by Judge Saris' comments about the order at a status conference the day she issued her class certification opinion:

- 9 -

> *It's very, very fact specific*, and it was difficult walking through this record on what actually happened in the marketplace but I did it to the best of my ability. *It turns out to be not so much law-based as much as understanding this very complex record, which was essentially was dramatically different from the first time around....*[9]

As demonstrated below, McKesson fails to show any "clear error" or weakness that warrants review of this fact-based decision.

### 1. Contract renegotiations that did nothing to eliminate TPP reliance on tainted AWPs are irrelevant

McKesson contends that a class action is an inappropriate vehicle to adjudicate TPP claims because each renegotiation of the TPPs' reimbursement contracts provided an opportunity to avoid the impact of the fraud. Therefore, McKesson contends the district court would be required to analyze each contract for each TPP within the class period. McKesson claims that the district court erred in concluding that there is *de minimis* or no mitigation by the TPPs in the August 2001 through December 2003 period.

The district court's preliminary acceptance of this premise,[10] expressed in its previous August 27, 2007 certification order, was in turn based on its assumption

---

[9] APP. 56 (3/19/08 Status Conf. Tr. at 21) (emphasis added). The record was "dramatically different" given the completion of discovery and evolution of the expert work since the district court's initial August 27, 2007 Order.

[10] *See* APP. 37.

- 10 -

that PBMs adequately protected TPPs and would have discovered the spread

increases, squeezed out of retailers any benefit they would have obtained as a

result of the spread increases, and passed the savings on to their TPP clients.[11]  But

the district court also gave Plaintiffs an opportunity to dispute these premises and,

based on "much expanded record" (APP. 37), the district court was persuaded that

McKesson's theory was incorrect.  Plaintiffs pointed out that despite its broad

assurances that TPPs, acting through their PBMs, would have promptly adjusted to

the spread increases caused by the fraud and pushed back by demanding lower

reimbursement levels to offset their losses, McKesson was only able to identify a

small handful of the 40,000 TPPs who were even informed of the spread increase

(but not the underlying fraud).[12]

     The district court also relied on Plaintiffs' economic expert, Dr. Hartman,

who demonstrated that although over time TPPs were gradually able to obtain

---

[11] APP. 38-39.

[12] There is no record that any TPPs or even PBMs were aware that the spread
increases were the result of McKesson's fraudulent scheme.  McKesson relied on
the testimony of one official at Express Scripts, Inc. ("ESI"), who claimed to have
notified hundreds, if not thousands of clients, but despite a diligent search of its
records, ESI produced only a couple dozen e-mail notifications.  APP. 38.  An
internal ESI e-mail from the same period indicates that ESI recognized that it
personally benefited from the spread increases while its clients were adversely
affected and counseled to downplay its relevance in discussions with its clients.
APP. 39-40.  No such evidence was produced from the other 40-plus PBMs in the
U.S.

001821-15 232504 V1

lower AWP-based reimbursement rates, this rate of decrease remained steady ***both before and during the scheme***, countering McKesson's theory that TPPs adjusted to the spread increases by demanding greater price concessions for pharmacies to compensate for losses caused by the spread (*i.e.* the "pushback").[13] Dr. Hartman also explained that the damages model relies on IMS data, which is based on ***actual*** payments by class members, and thus to the extent that the TPPs were able to mitigate their damages through lower reimbursement rates, those adjustments would be reflected in the data.[14] The court also found credible the testimony of Plaintiffs' market expert, Dr. McDonough, who testified that she had not witnessed any TPP pushback, and was not aware of any reimbursement payments by PBMs to mitigate for the damages the TPPs incurred as a result of the scheme.[15]

Additionally, the district court found convincing the Plaintiffs' argument and supporting evidence that PBMs lacked the incentive to protect TPPs against spread increases because many of the PBMs either owned or were vertically integrated

---

[13] APP. 37.

[14] *See* McKesson Petition at 11.

[15] APP. 38.

with mail order or other retail pharmacies.[16]  Particularly persuasive to the district

court was an explosive internal e-mail from PBM giant ESI acknowledging how

the spread increase benefited ESI to the detriment of its TPP clients and concluding

"*Let's put a lid on it and not make it a big deal*."[17]  This important document had

not been produced at the time of the first class certification hearing.  Had it been, it

is doubtful the district court would have been bothered by the PBM pushback

theory at the outset.

Thus, the district court provided McKesson every opportunity to counter

Plaintiffs' evidence with its own expert affidavits, documentary evidence and

summaries of the evidence.  On the "expanded record," Judge Saris appropriately

concluded that there was little or no evidence that any TPPs had avoided the

impact of the scheme until 2004 and, therefore, "common issues predominate from

August 2001 to December 2003."[18]

---

[16] The district court's March 19 order contradicts McKesson's assertion that the
district court's earlier finding regarding the role of PBMs was "undisturbed" by the
court's current order.  APP. 39-41.

[17] APP. 39-40.

[18] APP. 37-41.  Contrary to McKesson's representations to this Court, the district
court did grasp the significance McKesson places on the contract renegotiations
that occurred during the 2001-2003 period (for example, GE), but found in light of
all the evidence that these renegotiations did not support "significant pushback
prior to 2004."  APP. 46.  Because there was no measurable market pushback
through the end of 2004, and any incremental adjustments (*i.e. de minimis*

- 13 -

2.    **The district court properly declined to limit the damages class for consumer co-pays to the shorter class period**

McKesson's argument that the district court should have shortened the

damages period for the Consumer Co-pay Class relies on assumptions that are

contrary to the evidence and points to no clear error by Judge Saris.  IMS data

demonstrates that there was no market-wide evidence of pushback through 2004.[19]

McKesson countered that there are a panoply of other contract changes that could

be made, which would require an individualized inquiry into each contract for each

TPP to discover whether the TPP had avoided the impact of the scheme.  Even if

this were relevant, the only components that determine a consumer co-pay are the

discount off AWP and the negotiated dispensing fee.  Any other contractual

changes the TPP might have negotiated would not affect either of these

components[20] and, therefore, would not justify a shortened damages period for the

---

mitigation by TPPs) would have already been accounted for in the IMS data, the district court could easily have authorized an aggregate damages calculation throughout the entire liability period.  However, in the interest of caution, the district court shortened the damages period for TPPs to December 2003 because "the only TPP for which there is clear evidence of mitigation, was only able to fully mitigate in December 2003, by changing from First DataBank to Redbook." APP. 41.

[19] APP. 41.

[20] APP. 43 (citing expert testimony to this effect).

Consumer Co-pay Class. Thus, Judge Saris' order was based on a careful and rational consideration of the evidence rejecting McKesson's position.

**3.    The district court evaluated the evidence on IMS data and properly found that it approximated actual damages**

McKesson next argues that the district court failed to adequately address its objections to Plaintiffs' use of IMS data to calculate aggregate damages. On the contrary, the district court requested that the parties ***submit supplementary*** briefs on this precise issue, again demonstrating the district court's desire to conduct a rigorous review on all issues. McKesson argued that the IMS data is based on what retail pharmacies report to have been paid and, therefore, may be an overstatement of what TPPs actually paid. But this argument suggests that, if anything, this data may ***understate*** the Class' actual damages because of the discrepancy between what the TPPs pay their PBMs (to pay to pharmacies) and what the PBMs actually pay pharmacies.[21] Plaintiffs' expert also testified that in his experience IMS data is the gold standard in the prescription drug industry and referred the district court to numerous cases to demonstrate its frequent use for damages assessments.[22] He further demonstrated the close proximity of IMS data to actual claims data from GE and CIGNA and testified that any concerns that IMS

---

[21] APP. 45.

[22] *See* APP. 45.

- 15 -

data overstate damages by its inclusion of Medicaid and uninsured data are eliminated by carving out this data from the IMS data set.[23]

Thus, Judge Saris carefully considered this issue (APP. 43-46) and accepted Plaintiffs' proffer after conducting "essentially a *Daubert*" review,[24] noting in doing so that IMS data is used by peer reviewed journals, courts and had become the "gold standard" for measuring payments by TPPs. APP. 45. The Court then eliminated any concerns by limiting the class period to a period of time for which "McKesson has not pointed to any evidence of a significant pushback...." APP. 46.

As the district court properly observed, where injury is established under RICO, damages need not be demonstrated with precision.[25] This is particularly true in cases like this that measure the difference between what happened and what would have happened in a hypothetically free market. *See Coastal Fuels, Inc. v. Caribbean Petroleum Corp.*, 175 F.3d 18, 33 (1st Cir. 1999). Thus, it concluded:

> After a rigorous review of the expert analysis for
> purposes of class certification, Plaintiffs have
> demonstrated that the IMS data is a reasonable proxy for
> what TPPs paid at retail during the redefined class

---

[23] *Id.*

[24] APP. 55 (3/19/08 Status Conf. Tr. at 7).

[25] APP. 46.

- 16 -

period.  It is also a reasonable proxy for assessing aggregate damages for the entire consumer class period.[26]

**D.    Clarifying the Court's Certification Standard is not Necessary, and the Order Satisfies *Motor Vehicles***

In its first petition for review, McKesson asked this Court to find that the district court had erred in concluding that reliance is not an element of RICO fraud claims even though McKesson never argued the issue to the district court. McKesson is back at its old game, now asking the Court to review this case in order to clarify whether the "fundamentally flawed" standard to evaluate expert testimony on a class certification motion is still current, even though this standard is ***not mentioned*** in the certification order.  As set forth above, the district court subjected the motion to a thorough and "rigorous" analysis, addressing each of the concerns raised by McKesson, and eventually partially accommodating such concerns by shortening the damages period.  The district court noted itself that its decision came "***after a rigorous review of expert analysis for purposes of class certification.***"[27]

McKesson's claim that Judge Saris applied a low threshold or "fundamentally flawed" standard to the motion is disingenuous if not misleading

---

[26] APP. 47.

[27] *Id.*

- 17 -

given the wording of the Order and Judge Saris' statements at the status

conference.

> THE COURT: In a way, this case is highly
> unusual because – well, for me, and maybe it's
> happening to you all in the rest of the country – *I
> essentially had to do a Daubert hearing to even get me
> to class cert.  This is the most expansive record I've ever
> seen coming through, and it took me forever to go
> through.  I'm not sure I need a separate Daubert
> hearing.  So I'm ready to go.*[28]

The scrutiny applied by Judge Saris to Plaintiffs' damage model is fully

consistent with *Motor Vehicles*.  In fact, there is a compelling similarity between

the approach advocated by this Court in *Motor Vehicles* and the rigorous analysis

that Judge Saris applied in her class certification approval.

A central issue posed by this Court in *Motor Vehicles* was "how far a district

court should go in testing legal and factual premises at the class certification

stage."  2008 U.S. App. LEXIS 6483, at *29.  This Court reiterated *Smilow*'s well-

known rule that a rigorous analysis is required, as well as *Mowbray*'s admonition

that "a district court must formulate some prediction as to how specific issues play

out."  *Id.* at *37 (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288,

295 (1st Cir. 2000)).  Where the facts are disputed and the theory of injury

---

[28] APP. 55 (3/19/08 Status Conf. Tr. at 7) (emphasis added).

complex or novel, the district court must also "engage in a searching inquiry into the viability of that theory and the existence of the facts necessary for the theory to succeed." *Id.* at *56.

Applying these standards to the case before it, this Court was troubled by the incompleteness of the expert work and, therefore, the inability of the district court to evaluate the plaintiffs' ability to prove causation through common evidence. Plaintiffs' expert had not yet "fully answered such potentially relevant questions as how the size of the but-for influx of cars would be established or how large that influx would have to be to affect the national market sufficiently to raise effective dealer invoice prices and MSRPs." *Id.* at *60-61. Nor had the expert segregated the effects, if any, due to permissible vertical restrains from the effects of the allegedly unlawful horizontal conspiracy. *Id.*

As to damages, this Court was skeptical that the plaintiffs could measure damages on an aggregate basis based on data that defendants' purportedly possessed showing the consumer-level impact of the scheme. *Id.* at *64-65. Notwithstanding the intuitive appeal of the inference that upward pressure on national pricing would raise prices paid by individual consumers, the expert had not yet completed his damages modeling. *Id.* at *67. This Court held that such a proffer did not suffice when assessing a complex theory of injury. Given the

- 19 -

magnitude of the alleged damages, and the fact that the discovery period had concluded since the district court issued its certification opinion, this Court ordered the district court to more closely examine the end-product of the expert's work.[29]

Here, Judge Saris conducted a searching inquiry into the viability of Plaintiffs' causation and damages theory and the existence of the facts necessary for the theory to succeed.[30] And the damage model came at a stage where discovery was complete, Plaintiffs' expert liability report was complete and Plaintiffs' expert used actual transaction data to measure the impact of the scheme at issue.[31] The district court evaluated the expert submission of all parties, essentially applied the *Daubert* standard and upheld Plaintiffs' theory of causation and damages. It is indeed difficult, if not impossible, to envision a more rigorous review short of holding a merits trial.

## IV.   CONCLUSION

Judge Saris undertook an extensive and rigorous class certification process, her decision is based on an exhaustive factual determination, and no showing of any grounds for granting a 23(f) petition has been made. For the foregoing reasons, this Court should deny McKesson's second petition.

---

[29] *Id.* at *68.

[30] *See* APP. 34-48 and the August 27, 2007 Order (APP. 2-27).

[31] *See* APP. 41-48.

- 20 -

DATED:  April 11, 2008                    By

                                          Steve W. Berman
                                          Nicholas Styant-Browne
                                          Barbara A. Mahoney
                                   Hagens Berman Sobol Shapiro LLP
                                   1301 Fifth Avenue, Suite 2900
                                   Seattle, WA  98101
                                   Telephone: (206) 623-7292
                                   Facsimile: (206) 623-0594

                                   Thomas M. Sobol (BBO #471770)
                                   Edward Notargiacomo (BBO #567636)
                                   Hagens Berman Sobol Shapiro LLP
                                   One Main Street, 4th Floor
                                   Cambridge, MA  02142
                                   Telephone: (617) 482-3700
                                   Facsimile: (617) 482-3003

                                   Jeffrey Kodroff
                                   John Macoretta
                                   Spector, Roseman & Kodroff, P.C.
                                   1818 Market Street, Suite 2500
                                   Philadelphia, PA  19103
                                   Telephone: (215) 496-0300
                                   Facsimile: (215) 496-6611

                                   Marc H. Edelson
                                   Edelson & Associates
                                   45 West Court Street
                                   Doylestown, PA  18901
                                   Telephone: (215) 230-8043
                                   Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

George E. Barrett
Edmund L. Carey, Jr.
Barret, Johnston & Parsley
217 Second Avenue, North
Nashville, TN  37201
Telephone: (615) 244-2202
Facsimile: (615) 252-3798

- 22 -

001821-15 232504 V1

# CERTIFICATE OF SERVICE

I, Steve W. Berman, hereby certify that on April 11, 2008, I caused Class Plaintiffs' Answer in Opposition to McKesson's Second Petition to Appeal an Order Granting Class Certification to be filed and served in the following matter:

The original and three (3) paper copies of the Answer, and one (1) copy of the entire brief on a computer readable disk 3½ inch disk in WordPerfect for Windows), were delivered by hand to:

> Clerk of the Court
> United States Court of Appeal for the First Circuit
> John Joseph Moakley United States Courthouse
> One Courthouse Way, Suite 2500
> Boston, MA  02210

Two (2) paper copies were sent by UPS Next Day Air to the parties listed below:

Mark Redman
Office of General Counsel
The Hearst Corporation
959 Eighth Avenue
New York, NY 10019-3737

*Counsel for Petitioner/Defendant First Databank, Inc.*

Lori A. Schechter
Paul Flum
Morrison & Foerster
425 Market Street
San Francisco, CA 94105-2482

*Counsel for Petitioner/Defendant McKesson Corporation*

_____
Steve W. Berman

- 23 -