UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                              Defendants. | C.A. No. 1:05-CV-11148-PBS |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**CLASS CERTIFICATION OF THE U&C CLASS**

**[REDACTED]**

## TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................... 1

II.   PROCEDURAL HISTORY ..................................................................................... 3

III.  FACTS ................................................................................................................... 3

    A.    U&C Class .................................................................................................... 3

    B.    The Primary Disputed Issue on this Motion is the Correlation of U&C
        Prices with AWP ............................................................................................ 4

        1.    Retailers have no incentive to impair 90% of their revenue base by
            competing based on U&C price ..................................................... 4

        2.    As a result of these financial incentives, retailers set U&C based
            on AWP .......................................................................................... 6

        3.    Data demonstrates that U&C prices are typically above AWPs ................. 6

            a.    GAO analysis correlating AWP and U&C prices ........................... 7

            b.    TPP claims data ............................................................................. 8

            c.    Publicly reported U&C prices ......................................................... 9

        4.    McKesson Sets U&C Prices Based on AWP or Higher than the
            TPP Price ...................................................................................... 9

    C.    Dr. Hartman Can Prove Impact on a Class-Wide Basis ......................................... 12

IV.   ARGUMENT ......................................................................................................... 12

    A.    Rule 23 Standards in the First Circuit ................................................................ 12

    B.    Plaintiffs Satisfy the Rule 23(a) Requirement ...................................................... 14

        1.    The U&C Class meets the numerosity requirement because joinder
            of all members is impracticable ................................................... 14

        2.    The Commonality requirement is met because questions of law
            and fact are common to all Class members .................................. 14

        3.    Plaintiffs meet the typicality requirement because their claims arise
            from the same course of conduct alleged by the Class ............................. 15

           4.      Plaintiffs meet the adequacy requirement because their interests will not conflict with those of other Class members and because they have chosen, qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation ............................................................ 15

    C.    Plaintiffs Meet the Requirement of Rules 23(b)(3)............................................. 16

           1.      Common questions predominate over individual issues........................... 16

           2.      Class treatment is superior to other forms of litigation.............................. 18

           3.      Plaintiffs do not require an individualized calculation of damages .......... 19

           4.      The state law claims are amenable to certification ................................... 20

V.    CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**PAGE**

### FEDERAL CASES

*Andrews v. Bechtel Power Corp.,*
   780 F.2d 124 (1st Cir. 1985) ................................................................................. 15, 16

*In re Cardizem CD Antitrust Litig.,*
   200 F.R.D. 326 (E.D. Mich. 2001) ............................................................................. 13

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004) ...................................................................................... 19

*Coffin v. Bowater Inc.,*
   228 F.R.D. 397 (D. Me. 2005) .................................................................................... 16

*Eisenberg v. Gagnon,*
   766 F.2d 770 (3d Cir. 1985) ....................................................................................... 13

*Forbush v. J.C. Penney Co.,*
   994 F.2d 1101 (5th Cir. 1993) .................................................................................... 15

*Grace v. Perception Tech. Corp.,*
   128 F.R.D. 165 (D. Mass. 1989) ................................................................................ 18

*Hawkins v. Commissioner,*
   2004 U.S. Dist. Lexis 807 (D.N.H. Jan. 23, 2004) ................................................... 14

*Kirby v. Cullinet Software, Inc.,*
   116 F.R.D. 303 (D. Mass. 1987) ................................................................................ 13

*Lessard v. Metropolitan Life Ins. Co.,*
   103 F.R.D. 608 (D. Me. 1984) .................................................................................... 13

*McCuin v. Secretary of Health & Human Servs.,*
   817 F.2d 161 (1st Cir. 1987) ...................................................................................... 14

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
   2008 U.S. App. Lexis 6483 (1st Cir. Mar. 28, 2008) ........................................... 17, 18

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   259 F.3d 154 (3d Cir. 2001) ....................................................................................... 15

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   230 F.R.D. 61 (D. Mass. 2005) ................................................................. 14, 16, 19, 20

001821-13 235408 V1

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985) .......................................................................................... 18

*In re Relafen Antitrust Litig.,*
    221 F.R.D. 260 (D. Mass. 2004) ................................................................. 14, 18

*Smilow v. Southwestern Bell Mobile Sys.,*
    323 F.3d 32 (1st Cir. 2003) ........................................................................ 13, 16

*Tardiff v. Knox County,*
    365 F.3d 1 (1st Cir. 2004) ................................................................................. 14

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) ............................................................................. 13

001821-13 235408 V1

## I.    INTRODUCTION

McKesson's scheme to raise markups on brand-name drugs had massive consequences in the prescription drug market. This Court has previously recognized that a class action is an appropriate vehicle to remedy the wide-spread injury caused by McKesson's misconduct for the TPP and co-pay classes. Plaintiffs now move to include a class of the most vulnerable purchasers of all, consumers who were required to pay the full cash price (the "usual and customary" or "U&C" price) of such drugs out of pocket and thus absorbed the entire excess charge themselves.

The question before the Court, therefore, is whether there is something about the U&C Class that makes it different from the other certified classes such that certification for this class is not appropriate. The answer is no. All of the Rule 23(a) elements are satisfied. As to Rule 23(b), the same common issues predominate that are present in the other certified classes and a class action is a superior way of proceeding as it is the only vehicle by which this class can recover.

Plaintiffs assume that McKesson will assert that individual issues will predominate. McKesson is, once again, wrong. First, individual knowledge issues are not implicated here as McKesson claimed they were for the TPP class. No cash payor had knowledge of the scheme. There are no individual issues of reliance, as reliance is not an element of Plaintiffs' claim and, if it becomes so by a change in the law, proof of the reliance on a class-wide basis is satisfied by the payments made by each class member without knowledge that their cash payment had been artificially rigged by McKesson.

Contrary to McKesson's representations to the Court, the U&C price is directly tied to AWP, such that the scheme's impact on AWP had a direct impact on the class. How can we prove this? In part from McKesson's own documents. McKesson has an entire business whose

purpose is to help McKesson's pharmacy clients maximize profit. McKesson in explaining to
pharmacies "How items are priced" makes clear that cash payments for its retail clients are
"██████████████████." Thus, when McKesson and FDB implemented their scheme
and raised AWP, cash prices also increased in a quantifiable fashion.

Contrary to McKesson's representations to the Court, competition for U&C consumers
has little impact on U&C prices, which are directly responsive to changes to AWP and third-
party AWP-based reimbursement rates. U&C purchases account for only a small percentage of
pharmacies' prescription drug sales; the bulk of their sales are based on third-party
reimbursement contracts, which uniformly set reimbursement rates at the *lesser of* the U&C
price or the negotiated AWP-based reimbursement rate.[1] There is no economic reason for
pharmacies to risk losing a reduction in the vast bulk of their revenues by competition for the
U&C business, which would trigger the lesser clause of TPP reimbursement. For this reason the
pharmacies, like Safeway, RiteAid and others, are careful to set prices so that "█████████
██████████████████." Again, because pharmacies set the cash prices
based on AWP, the scheme had a measurable impact on cash payors. Class-wide impact is
confirmed by Dr. Hartman's analysis of TPP claims data – when the TPP price increased as a
result of the scheme, the cash price increased in tandem. Federal government survey information
and other available claims data demonstrate that U&C prices are directly related to AWPs. The
data further demonstrates that when McKesson's markup increases were implemented, primarily
in 2002 and 2003, U&C prices increased relative to the AWPs (as opposed, for example, to the
underlying WACs prices). The evidence on record therefore supports a finding of class-wide
impact which can be measured for damage calculations on an aggregate basis.

---

[1] Declaration of Raymond S. Hartman in Support of Certification of the Class of Uninsured Cash Payers Paying
U&C ("4.21.08 Hartman Decl."), n.8.

## II.    PROCEDURAL HISTORY

This Court has already certified two classes, one for insured consumer co-payors and one for third-party payors ("TPPs").  Initially, the Court certified the insured consumer co-pay class for liability and damages, and the TPP class for liability only.  The Court deferred ruling on certification of the TPP Class for damages until after it had conducted an additional hearing and detailed review of the record and specifically of Plaintiffs' method of calculating aggregate damages.  After a "rigorous review" of the "expanded record" and "extensive submissions," the Court also certified the TPP class for damages, but for a period 15 months shorter than that requested by Plaintiffs.  None of the concerns that resulted in a reduced damages period for the TPP Class (TPP knowledge of the spread increases and ability to mitigate) apply to the U&C Class, as its members can hardly be expected to know about AWP/WAC ratios, let alone mitigate against rising AWP/WAC markups.

## III.    FACTS[2]

### A.    U&C Class

The U&C Class consists of consumers who do not have insurance coverage for purchases of the brand-name drugs that are the subject of this lawsuit.  According to the U.S. Census Bureau, there are an estimated 47 million Americans without health insurance.[3]  The U&C Class therefore forms a group many times larger than either the Consumer Co-pay or TPP Classes.  These purchasers pay the cash or "usual and customary" ("U&C") charge.  U&C purchasers are the most vulnerable consumers because they pay higher prices, have little or no bargaining power and have to absorb the full impact of price increases.  Dr. Hartman observes:

---

[2] The factual basis for this motion is also predicated on the proffers of evidence previously submitted as well as previous exhibits which were the basis for the Court's prior rulings.

[3] DeNavas-Walt, C.B. Proctor, and J. Smith. Income, *Poverty, and Health Insurance Coverage in the United States: 2006.* U.S. Census Bureau., August 2007 at 18, available at: http://www.census.gov/prod/2007pubs/p60-233.pdf.

> As a group, uninsured cash payors account for the smallest
> percentage of retail pharmacy revenue; they are arguably the least
> informed individuals purchasing pharmaceuticals. Uninsured cash-
> payors are least likely to have the resources to "shop" the
> competition and use competitive information on U&C prices across
> retailers. These payors have the least market power; they have no
> ability to negotiate volume discounts. These payors are most likely
> to come into a pharmacy and inquire as to the cost of a script,
> which they might compare across several pharmacies. However, I
> have seen no evidence demonstrating that pharmacies
> systematically alter their prices in response to such "shopping" of
> alternative pharmacies. Rather, the evidence indicates that the cash
> prices charged by competitive pharmacies are related to AWP and,
> for the most part, are higher than AWP. As a result, any
> "shopping" of one pharmacy against another most likely leads to a
> comparison of two U&C prices that are greater than AWP, resulting
> in small savings and continued injury from the 5% Spread Scheme.
> Furthermore, as discussed below, the financial incentives of retail
> pharmacies and PBMs make it irrational for retail pharmacies to
> compete meaningfully on prices to uninsured cash payors.[4]

**B.    The Primary Disputed Issue on this Motion is the Correlation of U&C Prices with AWP**

Plaintiffs will be able to show at trial that the FDB-McKesson scheme impacted the U&C

Class. This evidence will come from many sources including (1) reimbursement contracts for

pharmacies; (2) the practices of retailers to use AWP as a cash price benchmark; (3) TPP and

pharmacy claims data; (4) publicly available data; and (5) McKesson's own documents. Each of

these categories of proof demonstrate a tie between AWP and cash price.

**1.    Retailers have no incentive to impair 90% of their revenue base by competing based on U&C price**

McKesson has consistently argued that U&C prices are unrelated to AWP, that they

instead reflect diverse competitive conditions faced by individual pharmacies, which differ from

location to location, as the pharmacies compete on price for the business of apparently well-

---

[4] 4.21.08 Hartman Decl., ¶ 7.

informed, competitively-assertive uninsured cash payors.[5] This is contrary to the economic

reality that uninsured consumers lack the competitive information and market power to compel

pharmacies to reduce cash prices for prescription drugs.[6] Moreover, uninsured cash payors

account for less than 10% of all retail pharmacy drug reimbursement.[7] Due to the prevalence of

third-party reimbursement contracts, setting payment at the *lesser* of the U&C price or the AWP-

based reimbursement rate,[8] pharmacies are hard-pressed to drop their U&C prices below the

highest third-party reimbursement rates:

> As a matter of economics, the incentive structure introduced by the
> PBM/TPP reimbursement contracts using the *lesser of* AWP –
> XX% and U&C for TPP reimbursement motivate pharmacies and
> PBMs to constrain U&C to be greater than AWP – XX%. Indeed,
> in order to constrain U&C prices from inadvertently upsetting third
> party reimbursement, U&C is frequently formulaically-related to
> AWP in a predictable fashion[.][9]

As Dr. Hartman observes, it is implausible that a retailer would risk lowering the vast

bulk of reimbursement by setting U&C at a price below AWP-based reimbursement amounts:

> Given the terms of most brand-name drug reimbursement contracts
> between PBMs and TPPs for scripts filled at network pharmacies,
> the financial incentives of retail pharmacies and PBMs make it
> unlikely that retail pharmacies would allow U&C to fall below
> AWP – XX%. If they did, the retail pharmacies would risk being
> paid U&C for the large share of scripts reimbursed by TPPs (79%
> of revenue; see footnote 7 above). If the PBMs allowed retail
> pharmacies to set U&C below AWP – XX%, they would be forced
> to allow TPPs to reimburse them at U&C for the relevant drugs. In
> such a case, the prices of most scripts filled for the relevant drugs

---

[5] *See* Defendant McKesson Corporation's Opposition to Class Plaintiffs' Amended Motion for Leave to File Third Amended Complaint (Dkt. No. 338), at 12-13; Memorandum in Support of McKesson Corporation's Motion to Dismiss the RICO Claim of the Proposed U&C Class and Motion for Judgment on the Pleadings (Dkt. No. 392), at 7.

[6] 4.21.08 Hartman Decl., ¶ 9.

[7] 4.21.08 Hartman Decl., ¶ 9.

[8] *See, e.g.*, S. P. DESSELLE AND D.P. ZGARRICK, PHARMACY MANAGEMENT: ESSENTIALS FOR ALL PRACTICE SETTINGS (McGraw Hill, 2005) at 279 ("It is customary for third parties to require that the pharmacy charge the third party their U&C price if it is lower than the third party's reimbursement formula price."); *see also* 4.21.08 Hartman Decl. at n.8 (discussing contracts in the AWP-MDL matter).

[9] 4.21.08 Hartman Decl., ¶ 16.

would be set by the negotiations of the smallest and economically least powerful group of payers. In such a case, *retailers and PBMs would allow a single uninsured "walk-in" cash payer to set the price for all TPPs' reimbursements* for that drug where the TPPs' contracts had the "lesser of AWP – XX% and U&C" language for a specific period.[10]

### 2.    As a result of these financial incentives, retailers set U&C based on AWP

Thus, to protect against a loss in insurance reimbursement, retailers tie the U&C price to

AWP.[11] The tie between U&C and AWP is clearly stated in the pricing policies of large

pharmacies.



Thus, the rise in TPP reimbursement rate which resulted from the McKesson scheme

drove up the cash price as well.[16]

### 3.    Data demonstrates that U&C prices are typically above AWPs

An analysis of available data indicates that both at the start of the Class Period and even

in the present U&C prices are above third-party reimbursement rates and are generally set at or

above AWP. Thus, when TPP rates rose as a result of the scheme so did cash prices.[17]

---

[10] 4.21.08 Hartman Decl., ¶¶ 11-13.

[11] 4.21.08 Hartman Decl., ¶ 14.

[12] 4.21.08 Hartman Decl., ¶ 15(a).

[13] Class Plaintiffs Proffer of Evidence Common to the U&C Class Concerning the Impact of the McKesson Scheme on the Class ("U&C Proffer") at pp. 6-7.

[14] U&C Proffer at p. 7; 4.21.08 Hartman Decl., ¶ 16(a).

[15] U&C Proffer at p. 7.

[16] 4.21.08 Hartman Decl., ¶ 35.

[17] 4.21.08 Hartman Decl., ¶¶ 22(e), 23(b), 30 (data showing formulaic tie to AWP).

### a.    GAO analysis correlating AWP and U&C prices

The United States Government Accountability Office ("GOA") has studied U&C prices over the August 2000 through December 2004 period, which partly coincides with the Damage Period of this litigation.  The GAO analyzed data summarizing monthly U&C prices from two of the largest state pharmaceutical assistance programs which had data from 2000:  Pennsylvania's Pharmaceutical Assistance Contract for the Elderly ("PACE") program and New York's Elderly Pharmaceutical Insurance Coverage ("EPIC") program.[18]  The study identified and collected data for the 50 brand-name drugs[19] prescribed most frequently to enrollees in the Blue Cross Blue Shield (BCBS) Federal Employee Program (FEP).  The results of the study provide further support of class-wide impact.  Additionally, the study indicates that U&C prices are typically above AWP.

The study noted that "*[w]hile U&C prices increased each year from 2000 through 2004, the greatest annual rate of increase – 6.1 percent – occurred from January 2002 to January 2003.*"[20]  This period coincides with the timing of the increased markups for the preponderance of challenged drugs (by NDC).[21]  Moreover, four out of the five NDCs the study identified as having the greatest effect on the U&C price index are various dosages of Dr. Willig's (McKesson's former expert) bellwether drugs (*i.e.*, Plavix 75 mg, Prevacid 30 mg and Lipitor 10 and 20 mg).[22]  Further, the average U&C price for the top 50 brand-name drugs increased three times faster than the average for the 46 generics drugs sampled, which also suggests that

---

[18] 4.21.08 Hartman Decl., ¶ 18.

[19] An additional 46 generic drugs were sampled and analyzed.  Those results are reported in the study but are not relevant to this analysis.  For both brand name and generic drugs, U&C prices were sampled and reported for a typical 30-day supply.

[20] 4.21.08 Hartman Decl., ¶ 18.

[21] 4.21.08 Hartman Decl., ¶ 18; *see* Third Amended Complaint ¶¶ 135-36, showing spike in prices during this time period.

[22] 4.21.08 Hartman Decl., ¶¶ 18-19.

McKesson's scheme impacted U&C prices for brand drugs. Finally, over the entire 2000-2004 period, on average U&C was greater than AWP, generally in the range of AWP +10% to AWP +6%.[23] Thus, a neutral and independent party, the GAO, confirms the impact of the McKesson scheme on the U&C Class.

### b.    TPP claims data

Dr. Hartman also analyzed claims data for the Teamsters Health and Union Fund and Philadelphia Federated Teachers Health and Welfare Fund. The Teamsters data includes the January 2002 period, in which the markup for the four bellwether drugs identified by Dr. Willig increased to 25%. The Teamsters' data demonstrates the immediate impact of McKesson's scheme upon U&C/WAC for all four drugs (five NDCs), *i.e.*, the U&C price was immediately inflated relative to WAC, while the ratio of the U&C to the AWP remained reasonably stable.[24] And although the Teacher's data only dated back to May 2002, after the implementation of the 5% Spread Scheme for the four bellwether drugs (*i.e.*, January 2002), the claims data for these drugs still demonstrate that U&C prices move formulaically with AWP by pharmacy after the implementation of the 5% Spread Scheme, confirming the pattern found with the Teamsters claims[25]:

> • Despite the small samples and some resulting variability, the conclusions are apparent and consistent with those found for TPPs. There was an immediate impact of the 5% Spread Scheme upon U&C/WAC for all four drugs (five NDCs); the cash price was immediately inflated relative to WAC; the ratio of U&C/AWP remained reasonably stable.

> e)    Based upon these results, I conclude that the impact of the 5% Spread Scheme upon uninsured cash payers was identical to that upon the other two Classes. I am confident

---

[23] 4.21.08 Hartman Decl., ¶ 18-19.

[24] 4.21.08 Hartman Decl., ¶ 22(d) and Attachment E.1 and E.2.

[25] 4.21.08 Hartman Decl., ¶ 23 and Attachment E.

that the substantial data base provided by IMS and retail
pharmacies will allow for a much more precise
measurement of the impact.[26]

      c.      **Publicly reported U&C prices**

Other data confirms that U&C prices are typically higher than AWPs. The State of New

Jersey has created the online New Jersey Prescription Drug Retail Price Registry to help

consumers compare the retail prices charged by pharmacies for the 150 most-frequently

prescribed prescription drugs.[27] Dr. Hartman's analysis of this data indicates that U&C is greater

than AWP for almost all pharmacies for all four bellwether drugs.[28] For example, the U&C for

Lipitor 10 mg averages 111.5% higher than AWP.[29] Dr. Hartman also notes that the U&C/AWP

markup for the major chains tends to be the same, regardless of the location (within New Jersey),

for example all four Rite Aids and both Eckerds had the same 111.07% mark-up, while the only

pharmacy to post prices below AWP is a small, non-national pharmacy.[30] This is consistent with

the expectation that small non-national pharmacies are less reliant on national third-party

reimbursement rates.[31] Thus, an analysis of the New Jersey data leads to the conclusion that

"The average U&C rate is formulaically tied to AWP" such that when "the AWP is inflated

relative to WAC ... the entire distribution of cash prices is inflated."[32]

      4.      **McKesson Sets U&C Prices Based on AWP or Higher than the TPP Price**

Another source of data documenting the relationship between AWP and cash price comes

from McKesson. One of the services McKesson offers to independent retail pharmacies is Auto-

Rx-Net, an Automatic Competitive Pricing Service for McKesson's Pharmaserv. Auto-Rx-Net

---

[26] 4.21.08 Hartman Decl., ¶ 22(d)-(e).

[27] https://www6.state.nj.us/LPSCA_DRUG/index.jsp.

[28] 4.21.08 Hartman Decl., ¶ 29, and Attachment F.

[29] 4.21.08 Hartman Decl., ¶ 29(b).

[30] 4.21.08 Hartman Decl., ¶ 29, pp. 14-15.

[31] 4.21.08 Hartman Decl., ¶ 29.

[32] 4.21.08 Hartman Decl., ¶ 30.

is an exclusive Pharmaserv service made available through an alliance between McKesson

Pharmacy Systems and Rx-Net Inc.[33]  Rx-Net is an "█████████████████████████

██████"[34]  McKesson has offered a pricing service from Rx-Net for its customers since 2000.[35]

The Auto-Rx service is an ████████████████████████████████████████████████████

██████████████████████████████[36]  The Auto-Rx service uses pricing

information gathered by RelayHealth to help McKesson customers set their U&C prices

consistent with the major chains or mass merchandizing stores in the same region and to increase

cash purchases and third-party reimbursement.[37]  This pricing service ████████████████

█████████[38] ████████████████████████████████████████████████████

████████████████[39], █████████████████████████████████████████████

███████.[40]  The third-party rate is always based on AWP. ████████████████████

██████████████████[41]

In its Auto-Rx-Net Pricing, Getting Started Guide, McKesson explains:



---

[33] U&C Proffer at pp. 4-5.

[34] U&C Proffer at pp. 4-5.

[35] U&C Proffer at pp. 4-5.

[36] U&C Proffer at pp. 4-5.

[37] www.mckesson.com/static_files/McKesson.com/MPT/Documents/AutoRxNet.pdf (fact sheet on McKesson's website regarding its Auto-Rx service and its alliance with Rx-Net to provide the service).  The Auto-Rx demo identifies RelayHealth as the source of its pricing information.  http://www.rx-net-inc.com/rxnet01.htm.

[38] U&C Proffer at p. 5.

[39] U&C Proffer at p. 5.

[40] Id.

[41] Id.

001821-13 235408 V1



Again, McKesson's own practice via Auto-Rx-Net is ████████████████

████████," the later of which the Court has already found to be formulaically tied to AWP.

Any doubt on this pricing relationship is removed when one examines a recent McKesson

powerpoint describing its services:



Indeed the effect of the automatic audit is to effectively eliminate competition at the cash

price level, as documented in the following customer testimonial:



---

[42] *Id.*

[43] U&C Proffer at p. 5 (citing MCKAWP 0151703).

[44] U&C Proffer at p. 6 (citing MCKAWP 0151707, citing Wayne MacArdy, owner and RPh, Phillips Pharmacies) (emphasis added).

C.    **Dr. Hartman Can Prove Impact on a Class-Wide Basis**

Absent the scheme, AWPs for the Marked Up Drugs would have been 4.167% lower.[45]

Like the TPP and Consumer Co-pay Classes, U&C purchasers were directly impacted by

McKesson's scheme to increase AWP/WAC markups because they paid higher prices than they

otherwise would have paid but for the AWP increases:

> U&C payments by uninsured cash payers are, on average, related
> to and greater than AWP over the Class Period. These sources can
> be used to calculate how U&C payments have been related to
> AWP in a formulaic way. Therefore, as a matter of economics,
> uninsured cash payers were impacted, injured and damaged on a
> Class-wide basis by the inflation of AWP. Indeed, the bulk of
> consumer damages are in this group, and these are the most
> vulnerable of payors.[46]

Dr. Hartman concludes that calculation of aggregate damages can be done on a

class-wide basis:

> The formulaic relationship between U&C and AWP implies that
> the 5% Spread Scheme had the same effect upon the Class of Cash
> Payors that I demonstrated in my prior declarations in this matter
> for the other Classes (see footnote 1 above). Specifically, the
> reimbursement rates (U&C) paid the class-wide were inflated
> immediately and lastingly as a direct result of the Scheme. The
> formulaic relationship makes calculation of aggregate class-wide
> damages straightforward. I conclude that the amount of damages
> were substantial.[47]

## IV.    ARGUMENT

A.    **Rule 23 Standards in the First Circuit**

Class actions have long been recognized by the courts as an essential tool for adjudication

of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries,

and for which individual recovery might be too modest to warrant prosecution of the case on an

---

[45] *See* Declaration of Steve W. Berman in Support of Certification of the U&C Class and Plaintiffs' Proffer of Evidence Common to the U&C Class ("Berman Decl."), Ex. 30 (Dr. Raymond Hartman, Expert Report of September 14, 2007, Attachment F at ¶ 6).

[46] *Id.* at ¶ 10.

[47] 4.21.08 Hartman Decl., ¶ 48.

individual basis. The policies underlying the need for class action litigation require that

certification under Rule 23 be "liberally construed." *Lessard v. Metropolitan Life Ins. Co.*, 103

F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to

undermine the policies underlying the class action rule."); *see also Smilow v. Southwestern Bell*

*Mobile Sys.*, 323 F.3d 32, 41-42 (1st Cir. 2003) (classes of consumers "are especially likely to

satisfy the predominance requirement"); *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)

(citations omitted) ("The interests of justice require that in a doubtful case, ... any error, if there

is to be one, should be committed in favor of allowing a class action.").

On a motion for class certification, "[a] district court must conduct a rigorous analysis of

the prerequisites established by Rule 23." *Smilow*, 323 F.3d at 38 (denial of class certification

reversed) (citing *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982)).

However, in doing so, the court does *not* determine whether plaintiffs will prevail on the merits.

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (citing *Eisen v.*

*Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)); *Kirby v. Cullinet Software, Inc.*, 116 F.R.D.

303, 307 (D. Mass. 1987) ("A motion for class certification is not the appropriate point at which

to resolve the merits of the plaintiffs' claim.") (citing *Eisen*).

Instead, in weighing whether the Rule 23 factors are satisfied, the Court "must formulate

some prediction as to how specific issues will play out in order to determine whether common or

individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d at

298. In other words, the court undertakes "an analysis of the issues and the nature of required

proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are

principally individual in nature or *are susceptible of common proof* equally applicable to all

class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001)

(emphasis added) (quoting *Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich.

- 13 -

1997)); *see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 265 (D. Mass. 2004) (Young, J.)

(the "analysis should not involve a 'preliminary hearing into the merits,' ... but rather an inquiry

into 'whether the requirements of Rule 23 are met'") (quoting *Eisen*); *Hawkins v. Commissioner,*

2004 U.S. Dist. Lexis 807, at *6 (D.N.H. Jan. 23, 2004) ("the court focuses on the requirements

of Rule 23, and the factual issues raised by those requirements, [but] not on the merits of the

plaintiffs' claims").[48]

## B.    Plaintiffs Satisfy the Rule 23(a) Requirement

### 1.    The U&C Class meets the numerosity requirement because joinder of all members is impracticable

Numerosity is established if the size of a proposed class, even if inexactly determined, is

sufficiently large as to make joinder impracticable, given the relevant circumstances. *In Re*

*Relafen Antitrust Litig.*, 221 F.R.D. at 267.  Precise quantification of class members is not

necessary; the Court may make common sense assumptions to support a finding of numerosity.

*McCuin v. Secretary of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987).  Plaintiffs

estimate that there are millions of consumers who meet the U&C Class definition. *See infra* n.3.

This is more than enough to satisfy Rule 23(a)(1).

### 2.    The Commonality requirement is met because questions of law and fact are common to all Class members

Generally, the commonality requirement is easily met, provided that at least one common

question of law or fact exists. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D.

61, 78 (D. Mass. 2005).  This Court has already determined that the numerous common factual

and legal issues to be decided in the class action lawsuit on behalf of the TPP and Consumer Co-

pay Class easily establish the existence of commonality required by Rule 23.  The same common

issues are raised here as well as common issues relating to the correlation between U&C prices

---

[48] Further, the existence of common disputed issues "weighs in favor of class action status." *Tardiff v. Knox County*, 365 F.3d 1, 5 (1st Cir. 2004).

and AWP. For the same reasons the Court previously found that the Class met the commonality element, it should also find commonality exists here.

### 3. Plaintiffs meet the typicality requirement because their claims arise from the same course of conduct alleged by the Class

Typicality is not a demanding test, *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993), and can be met when class members' claims are based on the same legal theory as the representative plaintiffs and when class members allege to have been injured by the same course of conduct as that which allegedly injured the representatives. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 184 (3d Cir. 2001). Plaintiffs have met both elements. U&C Plaintiffs have each paid for or incurred a debt for the cost of one or more of the drugs identified in Exhibit A to the Third Amended Complaint and were uninsured at the time of the purchases. ¶¶ 29-30.[49] Plaintiffs and absent Class members alike made excessive payments as a result of McKesson's scheme. The types of claims and the manner in which Plaintiffs will prove liability and damages will be the same or essentially the same for any member of the proposed Class. These similarities establish a sufficient nexus for the purposes of Rule 23(a)(3).

### 4. Plaintiffs meet the adequacy requirement because their interests will not conflict with those of other Class members and because they have chosen, qualified, experienced counsel, who are capable of vigorously conducting the proposed litigation

The adequacy requirement has two parts: the moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced, and able to vigorously conduct the proposed litigation. *Andrews v. Bechtel Power Corp.*, 780

---

[49] The drug purchases for Plaintiff Shelly Campbell include in addition to the Wellbutrin purchases identified in the complaint, purchases of Clarinex 5 mg and Adderall XG 10 mg. Berman Decl., Ex. 31 (CAMPBELL 000001-22). Although Plaintiff Jordan did take Prevacid, as stated in the Third Amended Complaint, she obtained samples of the drug and did not purchase it until much later. Ms. Jordan does have records of two other purchases of the Marked Up drugs that occurred in September 2007, Analpram-HC and Analpram-HC 1%. Berman Decl., Ex. 32 (JORDAN 000004-10).

F.2d 124, 130 (1st Cir. 1985). Plaintiffs meet both prongs. They have retained counsel with

substantial experience in prosecuting nationwide consumer class actions. Plaintiffs and their

counsel are committed to vigorously prosecuting this action on behalf of the proposed Class, and

have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest

adverse to those of the Class.

## C.    Plaintiffs Meet the Requirement of Rules 23(b)(3)

The standard set forth in Rule 23(b)(3) is not overly burdensome on plaintiffs seeking

class certification and should be freely granted. *Coffin v. Bowater Inc.*, 228 F.R.D. 397, 406

(D. Me. 2005).

### 1.    Common questions predominate over individual issues

"The Rule 23(b)(3) predominance test does not require "that all issues be common to the

class," *Smilow*, 323 F.3d at 39, but rather that the proposed class is "sufficiently cohesive to

warrant adjudication by representation." *In re AWP*, 230 F.R.D. at 81. As with the TPP and

Consumer Co-pay classes, the existence of numerous legal and factual issues common to the

Plaintiffs and the proposed U&C Class members alike cannot be reasonably doubted, and the

Court has identified these in its prior orders on class certification. Defendants engaged in one

single scheme over the course of the Class Period to defraud hundreds of thousands of uninsured

consumers.

McKesson will challenge the correlation of U&C prices with AWP and will argue that

common issues do not predominate because of a purported need to examine each pharmacy's

U&C pricing methodology. But Dr. Hartman has already demonstrated that the U&C-AWP link

can and will be established via common, class-wide proof. Dr. Hartman's work, which is not

complete yet substantially advanced, has already revealed that major retailers set U&C based on

AWP ***as a matter of policy*** so that U&C's do not result in claims that are lower than the

prevalent AWP-based formulas employed by most TPPs and PBMs. *See supra* Section III.B.1-2.

Indeed, McKesson itself sets U&C prices based on AWP or higher than the TPP reimbursement

price. *See supra* Section III.B.4. And a sampling of actual data – from the GAO's analysis of

Pennsylvania and New York pharmacy programs, claims data from two of the named Plaintiffs,

and data from New Jersey's Prescription Drug Retail Price Registry (based on prices reported by,

among other pharmacies, Rite Aid and Eckerd – confirms Dr. Hartman's conclusions. *See supra*

Section III.B.3.

     The foregoing also demonstrates that aggregate damages can be calculated on a class-

wide basis. As Dr. Hartman explains:

> The formulaic relationship between U&C and AWP implies that
> the 5% Spread Scheme had the same effect upon the Class of Cash
> Payors that I demonstrated in my prior declarations in this matter
> for the other Classes (see footnote 1 above). Specifically, the
> reimbursement rates (U&C) paid the class-wide were inflated
> immediately and lastingly as a direct result of the Scheme. The
> formulaic relationship makes calculation of aggregate class-wide
> damages straightforward.[50]

     This is not surprising given the common impact that is also the hallmark of the TPP and

consumer co-pay classes. It is also consistent with the First Circuit's recognition that class-wide

impact is often presumed in price-fixing cases. *See, e.g., In re: New Motor Vehicles Canadian

Exp. Antitrust Litig.*, 2008 U.S. App. Lexis 6483, at *66 (1st Cir. Mar. 28, 2008) (citing cases).[51]

---

[50] 4.21.08 Hartman Decl., ¶ 48.

[51] A cautionary word about *New Motor Vehicles* is in order. McKesson will likely cite this case for the
exaggerated proposition that the First Circuit requires Plaintiffs to shoulder a heavy burden here on class
certification. However, *New Motor Vehicles* only requires the Court to "engage in a searching inquiry into the
viability of [plaintiff's] theory and the existence of the facts necessary for the theory to succeed" in cases where the
facts are disputed and the theory of injury complex or novel. 2008 U.S. App. Lexis 6483, at *56. Here, Plaintiffs'
theory of injury is neither complex nor novel. Nonetheless, in "performing this predictive function and in
'[e]xercising its broad discretion, … the district court must evaluate the plaintiff's evidence … critically without
allowing the defendant to turn the class-certification proceeding into an unwieldy trial on the merits.'" *Id.* at *30
(quoting *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 17 (1st Cir. 2005)). In other words, the First Circuit does
not require merits-based decisions – or what it terms "hard factual proof" – at the class certification stage. Rather, in
cases involving novel or complex theories of causation, the court requires "a more thorough explanation of *how* the
pivotal evidence behind plaintiff's theory can be established." *Id.* at *67 (emphasis in original). Dr. Hartman has
done so.

Further, Dr. Hartman has identified the sources that allow proof of impact based upon common proof[52] and that he can model damages precisely using IMS and sampling data.[53] This meets the requirement of *New Motor Vehicles*: "We are looking here not for hard factual proof but for a more thorough explanation of how the pivotal evidence behind plaintiffs' theory can be established." *Id.* at *67. Dr. Hartman has supplied facts and explanations to demonstrate that class-wide impact and damages can be established at trial.

### 2.    Class treatment is superior to other forms of litigation

The non-exclusive "superiority" factors identified by Fed. R. Civ. P. 23(b)(3)[54] also favor class treatment in this case. The interest in proceeding as a class generally prevails over the interest of individual class members proceeding alone when a denial of certification would prevent some class members having their day in court. The small damages claims available to the U&C Plaintiffs "suggests that class members' "interest ... in individually controlling the prosecution or defense of separate actions,' Fed. R. Civ. P. 23(b)(3)(A), is limited – if not nonexistent." *In re Relafen Antitrust Litig.*, 221 F.R.D. at 288. Nearly all of the individual putative class members in this case have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages. Thus, "most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). *See also Grace v. Perception Tech. Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989) ("the benefits to the large number of class members, many of whose claims are so small that their size does not provide the impetus to bring

---

[52] 4.21.08 Hartman Decl., ¶ 47.

[53] *Id.* at ¶ 40.

[54] Fed. R. Civ. P. 23(b)(3) identifies the following nonexclusive factors "pertinent" to evaluating superiority: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

individual actions, clearly outweigh any problems which may arise in the management of the

class action") (quoting *Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D. Mass. 1987)).  The

very size of the class favors class certification: "[T]he more claimants there are, the more likely

a class action is to yield substantial economics in litigation." *Carnegie v. Household Int'l, Inc.*,

376 F.3d 656, 661 (7th Cir. 2004).  Thus, the interest in proceeding as a class prevails over the

interest of any potential class members, who wish to proceed individually and who may opt out

of the class if they so wish.

The second and third superiority factors (*i.e.*, the extent and nature of any litigation

concerning the controversy already commenced by or against members of the Class, and the

desirability or undesirability of concentrating the litigation of the claims in the particular forum)

also support certification.  This lawsuit is the first, and to Plaintiffs' knowledge only, existing

lawsuit concerning the controversy at hand.  This Court is intimately familiar with many of the

factual and legal issues involved in this action and is best suited to preside over the current case.

The fourth factor, manageability, is easily met here based on the constellation of common facts

and proof required by each Class member.

### 3.    Plaintiffs do not require an individualized calculation of damages

"[W]here damages can be computed according to some formula, statistical analysis, or

other easy or essentially mechanical methods, the fact that damages must be calculated on an

individual basis is no impediment to class certification." *In re AWP*, 230 F.R.D. at 86.  Plaintiffs

will be able to calculate the aggregate damages of the U&C Class by applying a formula set forth

by Plaintiffs' expert, Dr. Raymond Hartman.[55]  Aggregate damages can be calculated using

industry-wide survey information available from IMS.[56]  Once aggregate liability is determined

---

[55] "[A]ggregate damages can be calculated using the average U&C rate or average U&C/AWP ratio ($\beta_{avg}$) times AWP."  4.21.08 Hartman Decl., ¶¶ 36-48.

[56] 4.21.08 Hartman Decl., ¶¶ 25, 37, 40.

in a single, class-wide adjudication; allocation of the award is made later, administratively, upon the submission of claims, according to a court-approved formula. In any event, "the need for individualized proceedings on damages does not necessarily defeat class certification because the Court has the authority to certify a class for liability only pursuant to Rule 23(c)(4)(A) and decertify the class for damages," as needed. *In re AWP*, 230 F.R.D. at 91.[57]

### 4. The state law claims are amenable to certification

Plaintiffs understand that the Court does not want to rule on the state law claims at the present. Plaintiffs thus will address certification of those claims at the appropriate time and reserve their right to do so.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their motion to certify the proposed U&C Class.

DATED: April 21, 2008

By___/s/ Steve W. Berman_____
    Steve W. Berman
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

---

[57] *See also Smilow*, 323 F.3d at 40 ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where, as here, common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.").

001821-13 235408 V1

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

001821-13 235408 V1

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 21, 2008.

/s/ Steve W. Berman
Steve W. Berman