UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>  Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>  Defendants. | C.A. No. 1:05-CV-11148-PBS |

**PLAINTIFFS' PROFFER OF EVIDENCE COMMON TO THE U&C CLASS CONCERNING THE IMPACT OF THE MCKESSON SCHEME ON THE CLASS**

**[REDACTED]**

I.  **INTRODUCTION**

In support of their previous motion to certify the TPP and Consumer Co-pay Classes, Plaintiffs presented the Court with a Proffer of evidence to support liability.[1] McKesson's primary objection to the U&C class is that Plaintiffs would be unable to prove a causal connection between the scheme and increased U&C prices because U&C prices are allegedly not tied to AWP. Accordingly, the Proffer is solely limited to this disputed issue.

Discovery is ongoing. Plaintiffs have received documents from only five of the 28 retail pharmacies on whom the parties served document subpoenas. The documents from four of these pharmacies demonstrate the direct relationship between U&C and AWP.[2] Evidence from the pharmacies in the AWP MDL litigation also supports Plaintiffs' position. Additionally, Plaintiffs have also received documents from McKesson and third party Rx-Net, Inc. which demonstrate that the *very service McKesson offers* to its customers to create U&C price tables not only sets U&C prices relative to third-party reimbursement rates but specifically sets the prices for brand drugs as a *percentage of AWP*.

Furthermore, Plaintiffs sought transaction data from pharmacies to test for themselves the correlation between U&C prices and AWP or AWP-based reimbursement rates in the pharmacies' actual claims data. McKesson immediately sought to block such discovery by filing a motion for a protective order to bar discovery of data involving third-party reimbursement. In the meantime, pharmacies declined to produce any claims data, noting that the data was available

---

[1] Plaintiffs' Proffer of Evidence Common to the Class in Support of Class Certification (Dkt. No. 182).

[2] One of the five pharmacies, Long's, has produced documents, which do not definitively state whether AWP-based third-party reimbursement rates determine U&C prices. However, McKesson has scheduled a deposition to allow further discovery of Long's pricing procedure. Additionally, Plaintiffs received an affidavit from Gary McFerrin, Fred's Stores of Tennessee, which supports Plaintiffs' position (discussed *infra*).

directly from McKesson's subsidiary RelayHealth Corporation.[3] Plaintiffs then requested the data from McKesson, who has balked at providing the data necessary for Plaintiffs to conduct their analysis. Plaintiffs, who had hoped to be able to submit an analysis of the data in support of their class certification motion, are now forced to bring a motion to compel. Plaintiffs intend to seek sanctions if McKesson submits any analysis that relies on data it refused to provide to Plaintiffs.

## II.    STATEMENT OF FACTS SUPPORTING THE CORRELATION BETWEEN U&C PRICES AND AWP

### 1.    Third-Party Contracts Compel Pharmacies to set U&C Prices Above the Negotiated AWP-Based Third-Party Rate

Contract provisions in third-party contracts, requiring pharmacies to provide brand drugs at the lesser of the negotiated AWP-based third-party rate or the U&C, drive the prices that pharmacies set for their cash customers, ensuring that U&C prices are higher than third-party rates. For example, as a condition of participating in the Medicaid program, the federal government requires pharmacies to "provide the lower of the negotiated price or usual and customary price." 42 C.F.R. § 403.806(7). Private third-party contracts also typically set the rate of reimbursement for brand drugs as the lesser of the negotiated AWP-based reimbursement or U&C. For example, Medco and ESI's standard contracts have this lesser of AWP-x% or U&C clause.[4] PBMs Caremark, its predecessor AdvancePCS and National Medical Health Card

---

[3] RelayHealth operates as a switch, allowing pharmacies and payors to conduct electronic claims transactions. RelayHealth "maintain[s] connections to more than 90% of the nation's pharmacies." https://www.relayhealth.com/rh/general/news/newsRecent/news105.aspx.

[4] Ex. 1 (ESI 277-00000486 at 502); Ex. 2 (MHS A_0000310 at 322) (Medco's contract states "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." In other words, Medco collects from pharmacies the lesser of U&C or the negotiated rate but charges the TPP the negotiated rate.). All exhibits referenced herein are attached to the Declaration of Steve W. Berman in Support of Certification of the U&C Class and Plaintiffs' Proffer of Evidence Common to the U&C Class submitted herewith.

- 2 -

also include this clause in its contracts,[5] as do the Plaintiff TPPs' agreements with their PBMs.[6] PBM or TPP provider contracts with retail pharmacies also typically include this clause.[7] Textbooks on pharmacy management confirm the prevalence of the "lesser of" contract terms. For example, PHARMACY MANAGEMENT: ESSENTIALS FOR ALL PRACTICE SETTINGS states: "It is customary for third parties to require that the pharmacy charge the third party their U&C price if it is lower than the third party's reimbursement formula price."[8]

As explained by Dr. Hartman, the lesser of clause ensures that pharmacies set U&C prices above third-party rates or risk significant losses from their third-party reimbursement contracts, which make up the bulk of their business:

> Given the terms of most brand-name drug reimbursement contracts between PBMs and TPPs for scripts filled at network retail pharmacies, the financial incentives of retail pharmacies and PBMs make it unlikely that retail pharmacies would allow U&C to fall below AWP – XX%. If they did, the retail pharmacies would risk being paid U&C for the large share of scripts reimbursed by TPPs (79% of revenue; see footnote 7). If the PBMs allowed retail pharmacies to set U&C below AWP – XX%, they would be forced to allow TPPs to reimburse them at U&C for the relevant drugs. In such a case, the prices of most scripts filled for the relevant drugs would be set by the negotiations of the smallest and economically least powerful group of payors. In such a case, ***retailers and PBMs would allow a single uninsured "walk-in" cash payor to set the price for all TPPs' reimbursements*** for that drug where the TPPs' contracts had the "lesser of AWP – XX% and U&C" language for a specific period.

---

[5] *See, e.g.*, Ex. 3 (NMHC/NEC 00432 at 449); Ex. 11 (CMK-AWP 001684-1706 at 1689).

[6] Ex. 4 (CARP-00317 at 328); Ex. 5 (DC 37 0447); Ex. 6 (PFTHW 0046 at 65); Ex. 7 (PIRELLI-FDB 0001574 at 1591).

[7] *See* Ex. 8 (MHS A_0005589 (May 30, 2003 Coordinated Pharmaceutical Care Network Agreement between Medco and Target)); Ex. 9 (RA-AWP-000001-16 at RA-AWP 000016 (March 1998 Pharmaceutical Services Agreement between California Physicians' Service dba Blue Shield of California and Rite Aid Incorporated)); Ex. 10 (ESI-414-00001072 at 1083 (August 26, 2005 Express Scripts PERx Managed Care Pharmacy Provider Agreement with Walgreen's)).

[8] 4.21.08 Hartman Decl. at 4 n.8.

> As a matter of economics, it is implausible that any retailer would take that risk; it is implausible that the PBM of whose network the retail pharmacies were members would let them take that risk.[9]

Recognizing this economic reality, pharmacies take steps to ensure that their U&C prices are set high enough that they do not lose revenues based on their negotiated third-party reimbursement rate. As a matter of practice, this drives pharmacies to set U&C prices as a percentage plus or minus AWP,[10] or alternatively to set U&C equal to or greater than the highest third-party AWP-based reimbursement rate. In either event, U&C prices track AWP and thus any changes to AWPs result in changes to U&C prices.

### 2. McKesson's Auto-Rx-Net Pricing Service

One of the portfolio of services McKesson offers to independent retail pharmacies is Auto-Rx-Net, an Automatic Competitive Pricing Service for McKesson's Pharmaserv. Auto-Rx-Net is an exclusive Pharmaserv service made available through an alliance between McKesson Pharmacy Systems and Rx-Net, Inc.[11] Rx-Net is an "█████████████████████ █████."[12] McKesson has offered a pricing service from Rx-Net for its customers since 2000.[13] The Auto-Rx service is ████████████████████████████████████████ ████████████████████████████████.[14] The Auto-Rx service uses pricing information gathered by RelayHealth to help McKesson customers set their U&C prices competitively with the major chains or mass merchandizing stores in the same region and to

---

[9] 4.21.08 Hartman Decl., ¶¶ 11-12 (emphasis in original).

[10] *See, e.g.,* Ex. 21 (SFWY 000006) ("████████████████████████████████ █████████").

[11] Ex. 12 (MCKAWP 0152030 (McKesson PowerPoint)).

[12] Ex. 13 (MCKAWP 0151701 at 151702 (McKesson PowerPoint presentation, Las Vegas 2006)).

[13] Ex. 14 (MCKAWP 0151565 (March 30, 2000 letter from McKesson to its customers)).

[14] Ex. 15 (MCKAWP 0151641 (Minutes of Meeting, dated June 13, 2005)); *see also* Ex. 16 (MCKAWP 0151676-77 ([Rx-Net] Proposed Automation Plan, dated July 8, 2004) (automation described as a process of deleting the previous pricing table and creating a new one based on any changes to the list of top drugs or the markup for these drugs)).

increase cash purchases and third-party reimbursement.[15]  U&C prices are set ███████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████[17]  This allows customers to receive higher third party reimbursement levels.[18]

In its AUTO-RX-NET PRICING, GETTING STARTED GUIDE (McKesson 2006) McKesson explains:



---

[15] www.mckesson.com/static_files/McKesson.com/MPT/Documents/AutoRxNet.pdf (fact sheet on McKesson's website regarding its Auto-Rx service and its alliance with Rx-Net to provide the service).  The Auto-Rx demo identifies RelayHealth as the source of its pricing information.  http://www.rx-net-inc.com/rxnet01.htm.

[16] Ex. 12 (MCKAWP 0152030 at 152036 (McKesson powerpoint)) and Ex. 13 (MCKAWP 0151701 at 151703 (McKesson PowerPoint presentation, Las Vegas 2006)).

[17] Ex. 17 (MCKAWP 0151683 at 151686).

[18] Ex. 12 (MCKAWP 0152030 at 152036 (McKesson powerpoint)).

- 5 -



Indeed the effect of the automatic audit is to effectively eliminate competition at the cash price level, as documented in the following customer testimonial:



### 3. Stop and Shop

The correlation between U&C prices and AWP or AWP-based reimbursement rates is also borne out in the pricing policies of the larger pharmacies. For example, Stop and Shop's pricing policy memo[21] states that its ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:



---

[19] Ex. 17 (MCKAWP 0151683 at 151686-87).

[20] Ex. 13 (MCKAWP 0151707, citing Wayne MacArdy, owner and RPh, Phillips Pharmacies) (emphasis added).

[21] Ex. 18 (Stop and Shop Pricing Philosophy, Stop & Shop 001).



### 4. Safeway

Safeway also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Its pricing policy document states:



Recent internal e-mails confirm:



### 5. GeriMed

GeriMed is a group buying organization for pharmacies providing long term care. GeriMed's Consultant Pharmacist Software recommends ▮▮▮▮▮▮▮▮▮▮▮▮▮. It states that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"[25] According to the GeriMed presentation materials, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Usual and Customary is

---

[22] Ex. 19 (SFWY 000005).

[23] Ex. 20 (SFWY 000049).

[24] Ex. 21 (SFWY 000006).

[25] Ex. 22 (GM02041-70 at GM02061).

defined as "█████████████████████████████████████████████████████
████",26

### 6. Voshell's Pharmacy

According to the deposition testimony of Joseph Dorsch, President, Owner and Manager of Voshell's Pharmacy, ████████████████████████████████
████████████████████████████████████████████████████████27

### 7. Fred's Stores of Tennessee

In response to the parties' subpoena, Fred's Stores of Tennessee provided an affidavit stating that ██████████████████████████████████████████████████████:

28

### 8. Rite Aid

Rite Aid employs the following methods ████████████████████████████
████████████████████████████████████:

29

---

[26] Ex. 23 (GM02270-87 at GM02271 and GM02273).

[27] Ex. 24 (Deposition of Joseph Dorsch (AWP-MDL December 8, 2004) at 57:4-10; 117:1-3).

[28] Ex. 25 (March 17, 2008 Affidavit of Gary McFerrin, Vice President of Pharmacy, Fred's Stores of Tennessee, Inc.) (attachments not produced). Fred's also sets "████████" for high volume drugs, which may be set "█
████████████████████████████████████████████." *Id.*

[29] Ex. 26 (RA-AWP-000022).



### 9. Shopko

Shopko also advises its pharmacies ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮:



---

[30] Ex. 27 (RA-AWP-000024).

[31] Ex. 28 (RA-AWP-000034).

[32] Ex. 29 (Shopko's Monitoring Price Tables (unnumbered document, produced by Shopko March 2008)).

- 9 -

The Shopko documents also indicate that McKesson grossly overstates the relevance of



[33]

#### 10. Pharmacy Healthcare Solutions

Finally, in a recent article, Michael Bunns, consultant with Pharmacy Healthcare Solutions, a pharmaceutical consulting agency, writes:

> Traditional usual and customary (U&C) pricing for many retail pharmacies is established based on maximizing reimbursement from third-party payers, since they typically account for over 90% of a pharmacy's prescriptive business.
>
> For most brand drugs, U&C is set equal to or more comfortably above the most profitable pharmacy network rate. Cash prices are set in this manner to avoid the "lower than U&C clauses in PBM contracts, which dictate that a PBM will not reimburse more than the cash price for any drug.[34]

This evidence collectively supports Plaintiffs' allegations that U&C prices are tied to AWP. Additionally, as discussed in Plaintiffs' Memorandum in Support of Certification of the U&C Class, Dr. Hartman's analysis of claims data demonstrates that U&C prices are directly affected by AWP increases.

---

[33] *Id.*

[34] Ex. 33 (Michael Bunns, *Picking a Cash Pricing Strategy*, COMPUTERTALK (January/February 2007) at 50); *see also* Desselle & Zgarrick, *supra* at 279 ("As noted earlier, the [third party] reimbursement rate is usually less than the pharmacy's U&C price[.]").

### III.   CONCLUSION

The foregoing will be used to prove the claims of the U&C Plaintiffs and members of the U&C Class.

DATED: April 21, 2008            By     /s/ Steve W. Berman
    Steve W. Berman
    Nicholas Styant-Browne
    Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

- 12 -

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 21, 2008.

                                                          /s/ Steve W. Berman
                                                        Steve W. Berman