UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>                Plaintiffs,<br><br>   v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>                Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris<br><br>Referred to Magistrate Robert B. Collings By Order Dated May 8, 2008 |

**MCKESSON'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RELAYHEALTH DATA**

**TABLE OF CONTENTS**

                                                                                                                                      **Page**

TABLE OF AUTHORITIES .................................................................................................. ii
INTRODUCTION .................................................................................................................. 1
BACKGROUND ................................................................................................................... 2
ARGUMENT ......................................................................................................................... 7
I.     MCKESSON HAS MADE A GOOD FAITH EFFORT TO PRODUCE RELEVANT INFORMATION FROM THE DATABASE CONSISTENT WITH ITS CONTRACTUAL DUTIES TO RELAYHEALTH CUSTOMERS ......................... 7
II.    PLAINTIFFS' REMAINING REQUESTS SEEK DOCUMENTS THAT RELAYHEALTH DID NOT CREATE AND DOES NOT RETAIN .............................. 9
       A.     The U&C Reports Plaintiffs Demand Do Not Exist .......................................... 10
       B.     Plaintiffs Did Not Request Documents Concerning RelayHealth's Rebate Program ................................................................................................. 11
CONCLUSION ................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*American Standard Inc. v. Humphrey*,
    No. 3:06-cv-893-J-32MCR, 2007 U.S. Dist. LEXIS 28880 (M.D. Fla. Apr. 19, 2007) ........... 9

*Snowden v. Connaught Laboratories, Inc.*,
    136 F.R.D. 694 (D. Kan. 1991) ........................................................................................... 9

**INTRODUCTION**

Plaintiffs moved last October for leave to amend their complaint to add a class of uninsured consumers who paid usual and customary prices for prescription drugs. In support of that motion, plaintiffs represented to the Court that "only limited discovery will be required and such discovery can be completed rapidly." (Motion for Leave to Amend at 3 [Docket 324].) What plaintiffs later sought, however, was production by McKesson of the full contents of a massive database of prescription drug claims data maintained by its RelayHealth subsidiary — hardly "limited discovery" that can be produced "rapidly." The RelayHealth database contains detailed claims data regarding *billions* of prescriptions filled at retail in the United States since 2001. The entries for each prescription include hundreds of discrete fields, most of which have nothing to do with U&C pricing.

On February 21, 2008, McKesson served timely responses and objections to plaintiffs' request for production of the RelayHealth database. While objecting to wholesale production of the database, McKesson offered to produce "mutually agreed upon U&C pricing data," subject to notice to and consent from the third parties that supplied the data and an agreement with plaintiffs to share the cost of data extraction and production. McKesson offered repeatedly to meet and confer to work out the details. To get the ball rolling, McKesson identified six fields that would permit calculation at the transaction level of U&C prices reported by retailers and recorded in the RelayHealth database. McKesson also provided plaintiffs with the detailed data field dictionary applicable to RelayHealth's database.

Over the ensuing two months, plaintiffs refused to narrow their request for the entire database by identifying particular fields that they believed are relevant to their U&C claims. Accordingly, McKesson sought retailer consents to extract and produce, at its own expense, the fields it had previously identified. That extraction took weeks. McKesson produced that data — consisting of over 2.8 billion individual transactions and over 117 gigabytes of uncompressed data — to plaintiffs on May 6, 2008.

1

As shown below, plaintiffs' present motion to compel production of the entire RelayHealth database (or, in the alternative, whatever portions plaintiffs may choose to designate) should be denied. Plaintiffs' demand for wholesale production of the RelayHealth database is manifestly overbroad and exceeds the scope of permissible U&C discovery in this case. Beyond that, the retail claims data recorded in the RelayHealth database are governed by contracts that require RelayHealth to obtain the retailers' consent before RelayHealth can produce their claims data to third parties. McKesson sought and obtained retailer consents before producing the U&C pricing data provided to plaintiffs to date. As a condition to that consent, the retailers asked McKesson to identify the particular elements from the RelayHealth database that McKesson was proposing to produce. Plaintiffs have repeatedly refused to identify the additional NCPDP data fields they are interested in receiving. Thus, any logjam in producing additional discrete fields contained in the RelayHealth database is of plaintiffs' own making.

In addition, the Court should deny plaintiffs' motion to compel production of two RelayHealth "reports" briefly discussed by ShopKo's 30(b)(6) witness during his April 29, 2008 deposition. If, instead of filing their motion just hours after the deposition had concluded, plaintiffs had contacted us, they would have learned that the "reports" the witness was referring to are not reports at all, but online database queries run by ShopKo and other individual RelayHealth subscribers of their own data stored in the RelayHealth database. The results of those queries are not recorded or otherwise memorialized by RelayHealth. While individual subscribers are free to print or download the results of these queries, there are no documents responsive to plaintiffs' request for RelayHealth to produce.

**BACKGROUND**

**RelayHealth's Switch Business**. RelayHealth acts as a "switch" in the submission and adjudication of electronic pharmacy claims between retail pharmacies and health insurance companies, pharmacy benefit managers, or government benefit providers like Medicaid and Medicare (collectively "payers"). When an insured customer fills a prescription at a retail

2

pharmacy, the pharmacy submits a claim to the customer's payer to be reimbursed for the transaction.  Data regarding submission and adjudication of that claim flows through and is recorded by the RelayHealth switch.  RelayHealth currently acts as a switch for transactions between over 50,000 retail pharmacies and 1,800 payers, which represent over 70% of the retail pharmacy claims in the country.  (Sloman Decl. ¶ 3.)[1]

The RelayHealth database holds a massive amount of information.  RelayHealth annually processes approximately 9.7 billion insured transactions.  The typical reimbursement transaction contains data in approximately 160 standardized NCPDP fields.  This data is stored and accessed using thirty specialized servers and an array of hard drives that contain more than 33 terabytes of data, representing more than 39 billion individual transactions.  (Picard Decl. ¶¶ 4-6.)

Use of this data is governed by contracts between RelayHealth and the approximately 4,000 retailers that subscribe to the service.  Each contract is individually negotiated, and the provisions governing use of subscriber data vary from agreement to agreement.  None of these contracts authorize RelayHealth to produce transaction-level claims data to third parties without the subscriber's express consent.  (Sloman Decl. ¶¶ 4-7.)

**Plaintiffs' U&C Document Requests**.  Plaintiffs served the document requests that are the subject of this motion on January 22, 2008.  Request No. 2 sought:

> All documents concerning pharmacy U&C prices for brand drugs, *including without limitation, the RelayHealth database*.  This includes any documents analyzing or discussing how cash prices are set and/or the relationship between cash prices and U&C.

(Flum Decl. Ex. B at 4; emphasis added.)[2]

---

[1] Evidence regarding RelayHealth's business and prescription drug claims database is set forth in the Declarations of Jay Sloman (Chief Counsel), Thomas Picard (Senior Director of Data Services), and Roger Pinsonneault (Senior Director of Product Management), filed herewith.  A summary of McKesson's efforts to accommodate plaintiffs' demands for production of the RelayHealth database, along with supporting documents, is set forth in the Declaration of Paul Flum, also filed herewith.

[2] The January 22, 2008 request was the first time that plaintiffs sought production of any claims data from McKesson or RelayHealth from the inception of this case.  (Flum Decl. ¶ 6.)  Thus,

(Footnote continues on next page.)

Despite the manifest problems of burden and overbreadth presented by Request No. 2, when McKesson responded on February 21, 2008, it offered to produce "mutually agreed upon pricing data" subject to contractually-required notice to and consent from the third parties who supplied the data, and an agreement with plaintiffs to share the costs of extracting and producing the data. (Flum Decl. ¶¶ 10-13 & Ex. B.)[3]

McKesson met and conferred with plaintiffs over the next two months to attempt to define the parameters of that production. McKesson identified and offered to produce to plaintiffs the fields in the RelayHealth database that would permit analysis of U&C pricing at the transaction level. McKesson also provided plaintiffs with the detailed NCPDP Data Dictionary to assist them in identifying any additional RelayHealth fields that they believed were properly discoverable. (Flum Decl. ¶¶ 15-16 & Exs. D-E.)

On April 2, 2008, plaintiffs rejected McKesson's offer to produce U&C pricing data from the RelayHealth database at the transaction level, but did not identify any additional fields or categories of claims data that they or their experts had identified as being necessary to their U&C pricing analysis. (Flum Decl. ¶ 23 & Ex. G.) Instead, plaintiffs asked for a "sample" containing all fields for all sales by all retailers of Lipitor 10 mg pills for a five year period, from 2001 to 2005, ostensibly because the detailed field fields in the NCPDP Data Dictionary were too "generic." (*Id.* Ex. G.)

---

(Footnote continued from previous page.)

plaintiffs' suggestion that McKesson intentionally withheld such data at the TPP class certification stage is absurd. Moreover, in opposing certification of the TPP class, McKesson challenged plaintiffs' reliance on IMS data to prove whether TPPs renegotiated contracts with PBMs on the ground that IMS data reflects transactions and contracts between PBMs and retailers, not between TPPs and PBMs. The RelayHealth data likewise shows only transactions between PBMs and retailers and would therefore not address McKesson's objection to IMS data.

[3] As stated in the Declaration of RelayHealth's Chief Counsel, plaintiffs' request for production of the entire RelayHealth database "is unprecedented — never before has such an enormous and broad-sweeping body of RelayHealth data at the individual transaction level been demanded by third parties or produced by RelayHealth." (Sloman Decl. ¶ 8.)

4

McKesson renewed its offer to produce U&C pricing data at the transaction level twice more — first on April 8 and again on April 15. (Flum Decl. ¶¶ 24-26.) Plaintiffs did not identify additional NCPDP fields that they wanted extracted from the RelayHealth database in response to either offer. Indeed, through the date of the filing of this opposition brief, plaintiffs have failed to identify any additional NCPDP fields that they want produced from the RelayHealth database. (*Id.* ¶ 28.)[4]

**McKesson's Production of U&C Pricing Data.** McKesson began soliciting retailer consent to production of the specific fields of de-identified U&C pricing data shortly after the initial meet and confer exchanges with plaintiffs. None of the retailers McKesson contacted would agree to wholesale production of their raw claims data; all conditioned their consent on identification of the specific fields McKesson proposed to produce. (Flum Decl. ¶¶ 19-20.)[5]

At the same time that McKesson was seeking consent from RelayHealth subscribers, McKesson began extracting, at its own expense, the U&C pricing fields from the RelayHealth database that it had offered to produce to plaintiffs. This was an expensive and time-consuming

---

[4] Moreover, plaintiffs are seeking production of NCPDP fields relating to insured reimbursements beyond the period covered by the Third Party Payor ("TPP") damages class — August 15, 2001 to December 31, 2003. Judge Saris's March 19, 2008 class order refused to certify a TPP damages class after 2003, because "[b]eginning in 2004, individual issues of knowledge and renegotiation would predominate." [Docket No. 466 at 13.] While plaintiffs assert that they can prevail on their U&C claims by "showing that U&C prices are set relative to third-parties' AWP-based reimbursement formula" (Mot. 1), the Court's March 19 class order establishes that a purported link to TPP reimbursements will not support certification of a U&C class for periods after 2003.

[5] Plaintiffs misleadingly state that McKesson "specifically asked third parties to limit their 'consent' solely to U&C prices and not to include third-party reimbursement rates and AWP-related fields," citing the Declaration of Steve Meyer, General Counsel for Hy-Vee, Inc. (Mot. 9-10.) Tellingly, although plaintiffs apparently drafted the Meyer Declaration, they did not submit it with their moving papers. A copy of the Meyer Declaration is attached as Exhibit F to the Flum Declaration. As this Court's review will confirm, Mr. Meyer does not state that McKesson asked him to limit the scope of Hy-Vee's consent, as plaintiffs falsely contend.

process that was still ongoing when plaintiffs filed their motion to compel.  (Picard Decl. ¶ 7; Flum Decl. ¶ 19.)[6]

As of May 2, 2008, twenty-one of RelayHealth's largest subscribers had consented to production of the U&C pricing data that McKesson had previously offered to produce to plaintiffs.  On May 6, McKesson advised plaintiffs that this data was available for production and asked them to provide a public encryption key so that the data could be securely delivered.  Upon receipt of the key, a hard drive containing over 2.8 billion individual transactions and over 117 gigabytes of uncompressed data was sent to plaintiffs' counsel.  (Flum Decl. ¶¶ 29-30.)

**The Expense and Disruption of Extracting Additional Claims Data.**  Extracting the data that plaintiffs seek by their motion would be a costly undertaking.  Based on past experience, the head of RelayHealth's Data Services department estimates that if the project were requested by a RelayHealth customer, the charge would be approximately $250,000, plus an additional $30,000-$50,000 in fees to outside consultants to certify that the data do not contain "Personal Health Information" under HIPAA.  (Picard Decl. ¶ 10.)

Moreover, extraction of the amount of data that plaintiffs have requested on the time frame they have demanded would be extremely disruptive of RelayHealth's ordinary business operations.  To meet plaintiffs' proposed schedule, RelayHealth would need to defer substantial existing business commitments and devote all of its computer database resources to plaintiffs' extraction project, until it is completed.  (*Id.* ¶¶ 5-8.)

---

[6] After plaintiffs moved to compel, McKesson contacted these 21 retailers again to determine whether they objected to production of the data sought by plaintiffs' motion.  While not all the retailers had responded before this brief was filed, some of the largest retailers in the country, including Walgreens, Wal-Mart, Rite Aid, CVS, Target, Costco, Hannaford, Kmart, Hy-Vee, Albertsons, Giant Eagle, and Safeway, have stated that they object to production of the claims data that is the subject of plaintiffs' motion.  Only one retailer, Shop & Stop, stated that it did not object to production of all its claims data, provided the data was designated as "highly confidential" under the protective order.  (Flum Decl. ¶ 34 & Ex. P.)

## ARGUMENT

I. **MCKESSON HAS MADE A GOOD FAITH EFFORT TO PRODUCE RELEVANT INFORMATION FROM THE DATABASE CONSISTENT WITH ITS CONTRACTUAL DUTIES TO RELAYHEALTH CUSTOMERS.**

Among other things, plaintiffs' documents requests seek production of the entire RelayHealth database. McKesson objected to that request on several grounds. (Flum Decl. Ex. B at 4.) First, the request is overbroad and exceeds the scope of the Court's January 2, 2008 Scheduling Order because, rather than target "new issues raised by the Usual & Customary Class in the Third Amended Complaint," plaintiffs seek *all* data fields for *all* transactions regarding the drugs at issue in this case. Second, the request is unduly burdensome because production of the data sought by plaintiffs would result in enormous costs to McKesson and would greatly disrupt its operations. (Picard Decl. ¶¶ 5-10.) Third, the request seeks data submitted by RelayHealth customers that is subject to contracts restricting the use and disclosure of that data. (Sloman Decl. ¶¶ 6-7.)[7]

Notwithstanding those objections, McKesson has made a good faith effort to reach an agreement with plaintiffs that would allow production of relevant RelayHealth data. Plaintiffs have thwarted those efforts, however, by refusing to identify the NCPDP data fields that are relevant to their U&C claims. In their motion, plaintiffs argue that McKesson's offer to produce data from six fields relating to U&C pricing is inadequate because it "carefully eliminate[s] any third-party AWP-based reimbursement amounts or other AWP information." (Mot. 8.) McKesson recognizes that, under the Court's April 18, 2008 Order — which was entered well after McKesson' offer — insured reimbursement data from RelayHealth's database is discoverable. But plaintiffs have not identified which fields in the database represent the insured reimbursement data that they claim to need, despite having been provided the data field

---

[7] McKesson also objected that the request seeks Person Health Information protected by HIPAA. Plaintiffs have agreed that the RelayHealth data can be de-identified before production.

7

definitions that would allow them to readily do so. (Flum Decl. ¶ 15.) Nor have plaintiffs explained why they need production of the contents of *all* database fields — consisting of approximately 160 fields for a typical transaction (Picard Decl. ¶ 3) — when it is evident that only a fraction of them relate to either U&C pricing or insured reimbursements.[8] Plaintiffs' demand for the contents of every field in the database, including numerous fields that have no relevance to their U&C claims, makes the request overbroad and well beyond the scope of the U&C discovery permitted by Judge Saris's Scheduling Order.

Similarly, plaintiffs' blanket request has blocked any further attempts by McKesson to secure the required consent of the RelayHealth subscribers whose data would be disclosed. As noted, McKesson is contractually obligated to obtain such consent before producing information from the database. With one exception, *none* of the retailers contacted so far by McKesson's counsel about this motion would consent to wholesale disclosure of their claims data, although many of them have previously consented to production of specific data fields relating to U&C pricing. (Flum Decl. ¶¶ 20, 29, 34.) Safeway's objection letter illustrates the retailers' concerns:

> Because the AWP-based reimbursement rates and formulas are privately negotiated between Safeway and PBMs/payers, releasing this information would invariably provide Plaintiffs, PBMs/payers, and other pharmacies a competitive advantage in the marketplace and a snapshot of Safeway's industry strategy.
>
> \*   \*   \*   \*   \*
>
> Safeway vigorously opposes any release of AWP-based reimbursement formulas and urges McKesson to do the same for the foregoing reasons.

(Flum Decl. Ex. P.)

---

[8] For instance, claims reported by pharmacies through the RelayHealth switch include fields for the number of refills authorized, whether the physician has ordered the drug to be "dispensed as written," the reason for the service covered by the claim, the prescription's expiration date, various injury and therapeutic codes, and scores of other entries that have nothing to do with plaintiffs' U&C claims. (*See* Flum Decl. Ex. E.)

8

McKesson has *already* produced to plaintiffs the U&C pricing data that the retailers have authorized RelayHealth to produce. McKesson has also provided plaintiffs a representative sample of data across all fields for Lipitor 10 mg tablet transactions, which will allow plaintiffs to see how the raw data is laid out. (*Id.* ¶¶ 30-31.)[9] McKesson can make no further disclosures without the consent of its RelayHealth customers, and McKesson cannot obtain their consent until plaintiffs identify specific additional fields that are relevant to their claims. Having refused to identify such fields, plaintiffs cannot reasonably criticize McKesson for honoring its contractual duties to its customers by refusing wholesale production of their confidential claims data. *See, e.g.*, *Snowden v. Connaught Laboratories, Inc.*, 136 F.R.D. 694, 699-700 (D. Kan. 1991) (sustaining objection to production of data that was subject to confidentiality agreement with nonparty); *American Standard Inc. v. Humphrey*, No. 3:06-cv-893-J-32MCR, 2007 U.S. Dist. LEXIS 28880, at *5, *11 (M.D. Fla. Apr. 19, 2007) (party had reasonable basis for objecting to discovery requests seeking documents protected by confidentiality agreements with nonparties).

Plaintiffs' motion to compel production of additional RelayHealth data should accordingly be denied.

## II.     PLAINTIFFS' REMAINING REQUESTS SEEK DOCUMENTS THAT RELAYHEALTH DID NOT CREATE AND DOES NOT RETAIN.

Plaintiffs also move to compel "reports or services that RelayHealth provides concerning U&C prices." (Mot. 3.) Plaintiffs make that demand based on their interpretation of testimony given at the deposition of ShopKo's FRCP 30(b)(6) witness, which took place on the very day plaintiffs filed this motion. (*Id.* at 10-11.) In their rush to the courthouse, plaintiffs did not meet

---

[9] In providing the data regarding Lipitor 10 mg transactions, McKesson has addressed plaintiffs' request for sample data relating to that NDC, and thus that request is now moot. Although some of the identifying information has been redacted to comply with McKesson's contractual obligations, the produced raw data reflects over a million transactions, which is more than sufficient for plaintiffs to "examine the data fields for themselves." (Mot. 9.)

9

and confer with McKesson to inquire about the nature and existence of such documents. As a consequence, they misconstrue the testimony given at the deposition, and are now asking the Court to order McKesson to produce documents that do not exist, some of which would not be within the scope of plaintiffs' Rule 34 requests even if they did.

### A.     The U&C Reports Plaintiffs Demand Do Not Exist.

As plaintiffs would have learned had they asked before filing this motion, the "report" that the ShopKo witness described is not a document or file prepared by RelayHealth, nor does RelayHealth send it to ShopKo.[10] The extent of RelayHealth's role in the creation of such "reports" is merely to place a filter (or "edit") on the stream of claims data it receives for the particular customer, so that a copy of each transaction that gets filled at the retailer's U&C price will get dumped into a separate electronic "bucket," where it is kept as a snapshot on a rolling 90-day basis. (Pinsonneault Decl. ¶¶ 5-6.)

The data segregated into the U&C "bucket" can become a "report" through one of two ways. (*Id.* ¶ 5.) Some subscribers have their RelayHealth account configured so that the data is automatically tabulated and placed into a file for the customer to download when it logs onto its account. (*Id.* ¶ 6.) Others, such as ShopKo, must specifically direct their RelayHealth account software to prepare a report to download. (*Id.* ¶ 5.) Either way, RelayHealth does not keep a copy of these reports in its files, and the data in the "bucket" are a snapshot of the most recent 90 days. (*Id.* ¶¶ 5-6.) Accordingly, RelayHealth has none of the reports plaintiffs now seek to compel.

---

[10] Although the ShopKo witness evidently believed that the reports were generated by RelayHealth, he did not have first-hand knowledge of the reports' origins and did not regularly see them. (Mahoney Decl. Ex. 3 at 65:18-68:5.) Through a review of its own records after the deposition, RelayHealth was able to confirm that it does not generate or send these reports to ShopKo; instead, ShopKo conducts online queries of the claims data that it has previously reported to RelayHealth and downloads the results to its own computers. RelayHealth does not receive a copy of these results. (Pinsonneault Decl. ¶¶ 5-6.)

### B. Plaintiffs Did Not Request Documents Concerning RelayHealth's Rebate Program.

The ShopKo witness also testified that ShopKo participates in a rebate program facilitated by RelayHealth. (Mahoney Decl. Ex. 3 at 86:15-89:9.) Plaintiffs seize on this testimony, asking the Court to compel McKesson to produce all documents related to that program. (Mot. 10-11.) Like the issue of the U&C reports, plaintiffs' demand for these documents rests on an unfounded assumption, and could have been cleared up by a short phone call or email.

RelayHealth does offer a product called the "Preferred PatientRx" program, but as with its switching service for insured claims, RelayHealth operates only as a middleman in the transaction, passing transactional data back and forth between individual pharmacies and the manufacturers who pay the rebates. (Pinsonneault Decl. ¶¶ 7-10.) Regardless, documents related to that program are not within the scope of any of plaintiffs' Rule 34 requests.[11] Rebate claims by retail pharmacies do not "concern[] pharmacy U&C prices,"[12] the Preferred PatientRx program does not "analyz[e] or discuss[] how cash prices are set," and it does not "assist pharmacies in setting their U&C prices." (*Id.*) Moreover, as with the U&C data "buckets" described above, the data that passes through the Preferred Patient Rx program is not unique to the program — it is simply a subset of the U&C pricing entries contained in the full database. These U&C pricing data have already been produced to plaintiffs. (Pinsonneault Decl. ¶ 10; Flum Decl. ¶ 30.)

---

[11] Plaintiffs do not identify which of their requests would require production of documents concerning the Preferred PatientRx program, as required by Local Rule 37.1(b).

[12] As plaintiffs' own counsel elicited at the deposition, ShopKo's rebates under the Preferred PatientRx program are not tied to the U&C price paid by the consumer. (Mahoney Decl. Ex. 3 at 86:21-22; 88:17-20.)

11

## CONCLUSION

For the reasons set forth above, McKesson respectfully requests that the Court deny plaintiffs' motion to compel.

Respectfully submitted,

McKesson Corporation

/s/ Paul Flum
| | |
|---|---|
| Melvin R. Goldman (*pro hac vice*) | John Kiernan |
| Lori A. Schechter (*pro hac vice*) | Stephen E. Hughes |
| Paul Flum (*pro hac vice)* | Bonner Kiernan Trebach & Crociata |
| Tiffany Cheung (*pro hac vice*) | 200 Portland Street |
| Morrison & Foerster LLP | Suite 400 |
| 425 Market Street | Boston, MA 02114 |
| San Francisco, CA 94105-2482 | Telephone: (617) 426-3900 |
| Email: PaulFlum@mofo.com | Facsimile: (617) 426-0380 |
| Telephone: (415) 268-7000 | |
| Facsimile: (415) 268-7522 | |

Dated: May 13, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on May 13, 2008.

/s/ Paul Flum
Paul Flum