UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | Civil Action: 1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF JAY SLOMAN**

I, Jay Sloman, declare as follows:

1. I am offering this declaration in the matter of *New England Carpenters v. First Databank*, Case No. 1:05-CV-11148-PBS, pending in the United States District Court for the District of Massachusetts. If called as a witness in that case, I could and would truthfully testify to the following.

2. I am employed as Chief Counsel, Pharmacy Solutions, for RelayHealth, a division of McKesson Corporation. I have held my current position since January 26, 2007. Prior to that,

beginning January 6, 2006, I was employed as Senior Attorney for the Pharmacy Solutions division of Per-Se Technologies, Inc. (which was acquired by McKesson Corporation on January 26, 2007). Before that, beginning March 1, 2005, I was employed as Senior Attorney by NDCHealth Corporation (which was acquired by Per-Se Technologies, Inc. on January 6, 2006).

## RELAYHEALTH'S SWITCH BUSINESS

3. A major part of RelayHealth's business is to act as a "switch" in the submission and adjudication of electronic pharmacy claims between retail pharmacies (referred to as "subscribers") and health insurance companies, pharmacy benefit managers, or government benefit providers like Medicaid and Medicare (collectively "payers"). In broad outline, when a pharmacy customer with some form of insurance coverage has a prescription filled at a retail pharmacy, the pharmacy submits a claim to the customer's payer to be reimbursed for the cost of the drug it dispensed to the customer. Data regarding submission and adjudication of that claim flows through RelayHealth, which facilitates the data transmission. RelayHealth currently acts as a switch for transactions between over 50,000 retail pharmacies and 1,800 payers, which represent over 70% of the retail pharmacy claims in the country.

## RELAYHEALTH'S SUBSCRIBER CONTRACTS RESTRICT OUR ABILITY TO PRODUCE THE CLAIMS DATA PLAINTIFFS HAVE REQUESTED

4. The relationship between RelayHealth and each of its subscribers is governed by a contract called a Service Agreement. Part of my role as Chief Counsel is to negotiate and oversee the administration of the Service Agreements and the numerous addenda that are added to them over time. In total, RelayHealth has Service Agreements with approximately 4,000 different subscribers. Many of these agreements are subject to multiple addenda.

5. Each Service Agreement is individually negotiated, and the provisions governing use of subscriber data vary from agreement to agreement. In particular, the Service Agreements and addenda are not uniform with regard to how RelayHealth may use the subscribers' data, and to whom and under what circumstances it may disclose that data.

6. The majority of Service Agreements and their addenda require RelayHealth to obtain subscriber consent before using their claims data or releasing it to third parties for uses other than claim submission and adjudication. Indeed, some Service Agreements require explicit written consent before RelayHealth can access the subscriber's data in any way, and an addendum to at least one subscriber's Service Agreement enforces the strict non-disclosure of its data with a $2 million liquidated damages clause. Other subscriber contracts require advance notice before data can be produced. Excerpts of relevant contract language are attached as Exhibit A to this declaration.

7. While a minority of Service Agreements and/or their addenda permit RelayHealth to use the subscribers' data for specified purposes (in compliance with Health Insurance Portability and Accountability Act ("HIPAA") and other applicable laws and regulations), I do not believe that any of our Subscriber Agreements authorize RelayHealth to make a wholesale production of the raw, transaction-level data that runs through the switch, such as what plaintiffs have requested in this case, without first obtaining the subscribers' consent.

### RELAYHEALTH'S RETAIL PHARMACY PRODUCTS DO NOT REPORT TRANSACTION LEVEL CLAIMS DATA

8. I understand that plaintiffs in this case have requested production of the entire RelayHealth database for over 1400 NDCs. That request is unprecedented — never before has such an enormous and broad-sweeping body of RelayHealth data at the individual transaction level been demanded by third parties or produced by RelayHealth.

9. Other than products directed to a subscriber regarding the subscriber's own data, none of the RelayHealth products provided to the retail pharmacy industry that make use of subscriber data report it at the individual transaction level, reproduce all data fields, or identify the retail chain or payer that are parties to the transaction. Instead, such commercial products disclose industry averages by broad market segment, such as products that report average pharmacy prices by zip code, without identifying particular pharmacies or payers. RelayHealth

3

discloses individual transactions only with specific consent of the subscriber that supplied the information in the first place.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 12th day of May, 2008 in Atlanta, Georgia.

_____
Jay Sloman

# Exhibit A

RelayHealth Service Agreement
Non-Disclosure Provision – Sample 1

# AMENDMENT TO
# SERVICE AGREEMENT

WHEREAS, NATIONAL DATA CORPORATION ("NDC"), with offices at National Data Plaza, Atlanta, GA 30329 and ▮▮▮▮▮ with offices at ▮▮▮▮▮ are parties to a Service Agreement dated October 12, 1993 (the "Agreement"); and

WHEREAS, the parties desire to amend certain of the terms of the Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto acknowledge that the Agreement is hereby amended as follows:

1.  Paragraph 7 ("Proprietary Information") shall be modified by the addition of a new subparagraph (e) to read in its entirety:

    "All information/data transmitted by ▮▮▮▮▮ to NDC hereunder is considered private and confidential and is the property of ▮▮▮▮▮ Such information/data is to be used only in the process of switching claims to designated third party carriers for processing or for third party processing at NDC. No rights are given to NDC under this Agreement to use such information/data in any other way, individually, collectively, nor in statistical summaries, nor to divulge or make public such information/data in any way without the express written consent of ▮▮▮▮▮

Except as modified hereby, the terms and conditions of the Agreement shall remain in full force and effect; provided, however, that if any term or condition of the Agreement conflicts with or is inconsistent with any term or condition of this Amendment, such terms and conditions hereof shall prevail and be controlling.

IN WITNESS WHEREOF, ▮▮▮▮▮ and NDC have caused this Addendum to be duly executed by an officer of their respective companies.

|  | NATIONAL DATA CORPORATION |
|---|---|
| By: ▮▮▮ | By: [signature] |
| Typed Name: ▮▮▮ | Typed Name: E. MICHAEL INGRAM |
| Title: ▮▮▮ | Title: SECRETARY |
| Date: ▮▮▮ | Date: 29-Dec-98 |

Document # 6759

Approved as to legal terms only
▮▮▮▮▮
Date: 12-22-98

RelayHealth Service Agreement
Non-Disclosure Provision – Sample 2

# AMENDMENT NO. 2 TO SERVICE AGREEMENT

WHEREAS, National Data Corporation ("NDC") and ▮▮▮▮▮▮ ("Subscriber) are parties to a Service Agreement dated as of November 15, 1995, as amended on September 22, 1999 (the "Agreement"); and

WHEREAS, NDC and Subscriber desire to amend certain of the terms of the Agreement, including the renewal terms thereof and charges for services thereunder;

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto acknowledge that the Agreement is hereby amended as follows:

1. The parties hereto acknowledge and agree that in the Agreement or in this Amendment thereto, any references to "Section 1" shall refer to the cover page of the original Agreement containing the signatures of the parties; references to "Section 2" shall refer to the contractual terms and conditions as stated in the original Agreement and as subsequently amended; "Section 3" shall refer to the Service Description in the original Agreement and as subsequently modified; and "Section 4" shall refer to the Statement of Charges in the original Agreement and as subsequently modified.

2. Paragraph 3(a) of the Agreement shall be modified to read in its entirety as follows:

    "This Agreement shall extend from January 1, 2001 through December 31, 2005. The Agreement shall be automatically extended thereafter for successive one (1) year periods on the same terms and conditions expressed herein, or as may be amended, unless either party gives the other party written notice of termination at least ninety (90) days prior to the expiration date for the renewal period (as determined by this paragraph 3(a)), or any subsequent extensions or renewals thereof. Termination of this Agreement shall not terminate Subscriber's obligation to pay NDC for all services performed under the Agreement prior to discontinuance of performance by NDC due to termination."

3. Paragraph 4 (a) of the Agreement shall be modified to read in its entirety as follows:

    "At any time on or after the expiration of the renewal period of this Agreement, (December 31, 2005), NDC shall have the right to change the prices for any of the Services upon not less than sixty (60) days prior written notice to Subscriber. If any such change results in an increase in charges greater than five percent (5%) per any individual transaction, Subscriber

11984.04

may, by giving written notice to NDC within sixty (60) days after receipt of such notice of change at the notice address as specified in Item 2 of this Amendment, terminate this Agreement either as of the effective date of such change or as of a later specified date. Failing such notice, this Agreement shall remain in full force and effect. In any event, the increased charges shall apply to Services performed by NDC after the effective date of the change. Such new price shall be guaranteed to remain at the same level for a period of one (1) year from the effective date of change."

4. Paragraph 7(e) of the Agreement shall be modified by adding the words "and as further amended by the parties from time to time" after the words "and NDCHISAZ" in the last sentence and by then adding the following language:

"In the event of a breach by NDC of the data usage provisions of this paragraph 7(e), NDC shall be liable to Subscriber for liquidated damages in the amount of $2,000,000; provided, however, that in no event shall NDC be liable for such liquidated damages if a breach is due solely to incremental data associated with a store of Subscriber as to which NDC has not received prior notification from Subscriber. Notwithstanding anything in this Agreement to the contrary and in addition to the liquidated damages set forth above, NDC hereby agrees to indemnify, defend and hold Subscriber harmless against any and all claims, damages, liabilities and expenses arising from NDC's actions or failure to act hereunder."

5. Section 4 (Statement of Charges) of the Agreement shall be deleted and replaced by a new Section 4, attached hereto and incorporated hereby.

6. <u>Compliance</u>. Each party agrees that it shall comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and regulations issued thereunder including Standards for Privacy of Individually Identifiable Health Information, and all other applicable law. As of the effective date for such regulations, this Agreement shall be deemed to incorporate the requirements for contracts between covered entities and business associates as set forth in the regulations promulgated by the Department of Health and Human Services. The parties agree to cooperate with each other in good faith as shall reasonably be necessary from time to time to modify the Agreement in order to comply therewith."

Except as modified hereby, the terms and conditions of the Agreement shall remain in full force and effect; provided, however, that if any term or condition of the Agreement conflicts with or is inconsistent with any term or condition of this Amendment, the terms and conditions of this Amendment shall prevail and be controlling.

11984.04

RelayHealth Service Agreement
Non-Disclosure Provision – Sample 3



# NATIONAL DATA CORPORATION
## SERVICE AGREEMENT
### SECTION 1

Subscriber: ███████████
Address: ███████████
City: ███████ State: ███ Zip: ████

Subject to the Terms and Conditions of this Service Agreement, Service Description, Statement of Charges and such other exhibits or attachments as may now or hereafter be attached hereto by mutual agreement, please enter my order for NDC's electronic data processing Services or System for an initial term of Five (5) years.

It is agreed that, during the initial and any renewal term of this agreement, NDC will be the exclusive provider of such electronic data processing services provided hereunder.

THE TERMS AND CONDITIONS OF THIS AGREEMENT ARE CONTAINED IN PARAGRAPHS ONE THROUGH EIGHT ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.

Subscriber:



NATIONAL DATA CORPORATION
By: _____
Typed Name: E. Michael Ingram
Title: Senior Vice President
Date: 2-14-92
Address:
National Data Plaza
Atlanta, GA 30329-2010
Attention: Office of Corporate Secretary

is alleged to have occurred, but if this Agreement has not been in effect for twelve (12) months preceding such date, then over such fewer number of preceding months that this Agreement has been in effect.

7. **PROPRIETARY INFORMATION:**

   a. All proprietary information disclosed by either party to the other in connection with this Agreement shall be identified as such in writing if not already identified as such herein, and shall be protected by the recipient party from disclosure to others. All standard software logic provided by NDC under this Agreement is herein identified as proprietary to NDC and may not be copied or used in any way other than as specifically authorized in this Agreement. Any software or data furnished by Subscriber to NDC in connection with this Agreement is identified as proprietary to Subscriber, but may be retained by NDC until performance under this Agreement is completed or until this Agreement is terminated, at which time such information and all copies thereof shall be returned to Subscriber upon request.

   b. NDC and Subscriber acknowledge that all proprietary information disclosed by either party to the other party for the purpose of work, or which comes to the attention of one of the parties, its employees, officers, and agents during the course of such work, constitutes a valuable asset. Therefore, NDC and Subscriber agree to hold such information in confidence and shall not, except in the performance of the duties under this Agreement or with the express prior written consent of the other party, disclose or permit access to any such information to any person, firm or corporation other than persons, firms or corporations authorized by that party, and NDC and Subscriber shall cause their officers, employees, agents, and representatives to take such action as shall be necessary or advisable to preserve and protect the confidentiality of such information.

   c. NDC's and Subscriber's obligations and agreements under this paragraph shall not apply to any information supplied that:

      (1) was known to either party prior to the disclosure by the other, or

      (2) is or becomes generally available to the public other than by breach of this Agreement, or

      (3) otherwise becomes lawfully available on a nonconfidential basis from a third party who is not under an obligation of confidence to either party.

   d. It is further understood and agreed that the terms and conditions of this Agreement, including, but not limited to, the charges set forth in Section 4 (Statment of Charges), are confidential and shall be maintained as such by both NDC and Subscriber.

8. **MISCELLANEOUS:**

   a. This Agreement shall be construed in all respects under the laws of the State of Georgia.

   b. This Agreement contains the full understanding of the parties with respect to the subject matter hereof, and no waiver, alteration or modification of any of the provisions hereof, except for revised Statement(s) of Charges shall be binding unless in writing and signed by officers of both parties. In the event Subscriber issues a purchase order or memorandum or other instrument covering the Services herein offered and provided, it is hereby specifically agreed and understood that such purchase order or memorandum or instrument is for Subscriber's internal purposes only and any and all terms and conditions contained therein, whether printed or written, shall be of no force or effect.

   c. If any part of this Agreement shall be held to be void or unenforceable, such part will be treated as severable, leaving valid the remainder of this Agreement notwithstanding the part or parts found to be void or unenforceable.

   d. Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be effective when received, and shall be sufficient if given in writing and hand delivered, sent by telegraph or First Class United States Mail, postage prepaid and addressed to the appropriate party at the address set forth on the cover page hereof. The parties hereto may change at any time the name and address of the person to whom all notices or other documents required under this Agreement must be sent by giving written notice to the other party.

   e. Neither party to this Agreement may assign its rights or obligations under this Agreement without the express written consent of the other party, except that the obligations of NDC under this Agreement may be provided or fulfilled by any parent, subsidiary, affiliate, successor corporation or subcontractor of NDC so long as NDC assumes full responsibility for such obligations; Subscriber may assign this Agreement to a successor in interest to substantially all of the assets of Subscriber, provided such assignee agrees to be bound by the terms and conditions of this Agreement as though an original signatory thereto and Subscriber remains fully responsible for such obligations.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized officers and to be effective as of the date executed by NDC.