UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF THOMAS PICARD**

I, Thomas Picard, declare as follows:

1.    I am offering this declaration in the matter of *New England Carpenters v. First Databank*, Case No. 1:05-CV-11148-PBS, pending in the United States District Court for the District of Massachusetts.  If called as a witness in that case, I could and would truthfully testify to the following.

2.    I am employed as Senior Director of Data Services for RelayHealth, a division of McKesson Corporation.  I have held my current position since 2000.  During my tenure in my

current position, I have been responsible for overseeing the creation and maintenance of the RelayHealth database that is the subject of plaintiffs' motion to compel. I am responsible for all of RelayHealth's data assets, and oversee a team of 30 individuals charged with acquiring and maintaining that data, and building products and services for RelayHealth's customers.

## RELAYHEALTH'S BUSINESS

3.     RelayHealth operates as a "switch" in the processing of payment claims to retail pharmacies from pharmacy benefit managers, health insurance companies, and government benefit providers like Medicaid and Medicare (collectively "payers"). Claims data is reported to RelayHealth using standardized fields known as NCPDP fields. All together there are hundreds of fields in the NCPDP protocol, but the number of fields that contain data in each transaction is governed by the terms of the reimbursement contracts between the pharmacies and the payers. The typical NCPDP transaction contains data in approximately 160 fields. RelayHealth annually processes approximately 9.7 billion such transactions, which flow between 50,000 pharmacies and more than 1,800 payers.

4.     There is a massive amount of data stored in our database. All told more than 39 billion individual transactions are contained there, constituting more than 33 terabytes of data (one terabyte is equal to 1,024 gigabytes). The data resides on a Storage Area Network ("SAN") in our offices outside Atlanta, Georgia, and is comprised of an array of 210 separate hard drives.

## THE EXTREME SIZE OF PLAINTIFFS' DATA REQUEST IS DISRUPTIVE OF RELAYHEALTH'S ORDINARY DATA OPERATIONS

5.     I understand that plaintiffs are asking the Court to order RelayHealth to produce an unspecified set of transaction-level detail for more than 1400 NDCs for a period dating from 2001 to the present. I also understand that plaintiffs are asking that this data be produced on 30 days notice. Production of the amount of data contemplated by plaintiffs' request (which I estimate as 3.6 terabytes of data contained in 6.2 billion individual transactions) in the timeframe they propose would be extremely disruptive of RelayHealth's ordinary business operations.

6.     First, although we operate 30 servers to manipulate the data stored on the SAN, we rarely if ever are tasked with searching and extracting such large proportions of the data stored there. The estimated time to perform the data extraction would vary depending on the number of NCPDP fields that plaintiffs request. Although the entire database must be searched no matter how many fields are sought for each transaction, the time required to write additional fields increases with the number that are extracted.

7.     The recent extraction that we performed and produced to plaintiffs is illustrative: We produced six fields relating to U&C prices for each transaction, and the entire process required 10 days of computer time, using all of the available capacity.

8.     We have designed and built the RelayHealth data processing backbone to service the ordinary demands of our business, with a reasonable margin for downtime and routine maintenance. We typically use roughly 75% of our data processing capacity to fulfill our existing obligations in the ordinary course of our business. Assuming no unexpected downtime, the balance would be available for identifying and extracting the data that plaintiffs have requested. In light of our ongoing obligations with regard to customer production processing, the data extraction project plaintiffs are proposing could be completed in approximately 60 days. Compliance with the 30-day timeframe that plaintiffs have proposed would be at the expense of work that my group is already committed to perform for existing RelayHealth customers and projects. To meet that timeframe, we would need to defer existing business commitments and devote all of our computer database resources to plaintiffs' proposed extraction project, until it is completed.

9.     In addition, as we extract the requested data from our SAN, we will need to temporarily store the data before it can be copied onto whatever data storage devices the plaintiffs provide for shipping the data. The easiest way of doing so would be for us to purchase at least an additional terabyte of storage capacity, but doing so requires approximately 30 days of lead time.

**PLAINTIFFS' DATA REQUEST IS A $250,000 TO $300,000 PROJECT**

10.     Extracting and producing the amount of data that plaintiffs seek is a costly undertaking.  Based on my past experience with data extraction and the associated charges, I estimate that if billed to a regular RelayHealth customer, the charge for the extraction process would be approximately $247,000 ($189,000 for the computing process, $10,000 to acquire the additional disk space necessary to temporarily store the data, and $48,000 in staff time).  The process of HIPAA review and seeking the necessary HIPAA certification (i.e., certification that the production contains no "Personal Health Information," or data sufficient to trace back to any particular individual) by our outside statisticians at Cornell University is a separate charge that would cost an additional $30,000-$50,000.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 13th day of May, 2008 in Atlanta, Georgia.

Thomas Picard