UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>　　　　　　　Defendants. | Civil Action: 1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

### DECLARATION OF ROGER PINSONNEAULT

I, Roger Pinsonneault, declare as follows:

1.　　I am offering this declaration in the matter of *New England Carpenters v. First Databank*, Case No. 1:05-CV-11148-PBS, pending in the United States District Court for the District of Massachusetts. If called as a witness in that case, I could and would truthfully testify to the following.

2.　　I am employed as Senior Director of Product Management for RelayHealth, a division of McKesson Corporation. I have held my current position since December 2007. In

my current role, I am responsible for overseeing the entire life cycle of the various network based pharmacy products offered by RelayHealth, including collaborating on their development, identifying enhancements, supporting customer demonstrations, and supporting the sales team. Prior to this position, going back to March 2005, I ran a consulting company called Total Pharmacy Solutions, through which I offered consulting services in the field of pharmacy technology to such clients as Target and the Blue Cross Blue Shield Association. Before that, from 1998 to 2003, I worked for a predecessor of RelayHealth called NDCHealth. My title at that time was Vice President of Product Management. From 1983 through 1998, I worked for Eckerd in various positions, ending as the Director of Third Party Administration.

3. I understand that plaintiffs have asked RelayHealth to produce documents that analyze or discuss how U&C prices are set; documents that concern the "correlation" between U&C prices and AWP, third-party reimbursement amounts, or WAC; and documents that suggest U&C prices to pharmacies. Except as described below, I am not aware of any RelayHealth products that do any of those things. In particular, none of the RelayHealth products directs retailers how to set their retail prices, analyzes or discusses retailers' pricing strategies for U&C transactions, or provides programs or algorithms that calculate U&C prices.

## U&C EDITS

4. I understand that plaintiffs are requesting "reports" that they contend RelayHealth prepares for its subscribers that list transactions reimbursed at U&C rather than at the subscriber's contracted rates. I understand that plaintiffs have identified ShopKo as the recipient of the type of "reports" that they are seeking.

5. The reports plaintiffs are referring to are not actual documents or files. They consist of an "edit" of the subscriber's data that takes the transactions that are filled at U&C and dumps them into a "bucket" of data. For the subscribers who elect this edit, the results are made available in either of two ways. Some subscribers choose to access the U&C edit results online by logging into the RelayHealth system and submitting an online request to the computer to

generate a file that allows the customer to view the details of the transactions that appear in the "bucket." The data in the "bucket" is a rolling 90-day snapshot that is updated (additions and deletions) daily. The customer has the ability to print the file output. The "reports" referred to by the witness for ShopKo in its April 29, 2008 deposition fall into this category, where no actual "report" is retained by RelayHealth.

6. Alternatively, other customers are able to configure the system to automatically create the file and place it on the RelayHealth network for subsequent customer download. In this latter scenario, the customer electronically accesses the RelayHealth network to pick up its files. Again, the edit data in the "bucket" is a rolling 90-day snapshot that is updated (additions and deletions) daily. Any customer files that are left on the network are purged after 90 days. Like the previous option, the customer has the ability to print the file output. RelayHealth does not retain copies of these files. RelayHealth accordingly has no reports of the U&C payments that are responsive to plaintiffs' request.

## PREFERRED PATIENT RX

7. Another product I oversee is called Preferred PatientRx, which facilitates the process by which retail pharmacies receive rebate payments from drug manufacturers for prescriptions they dispense to cash-paying customers. I understand that plaintiffs contend that this product is somehow responsive to their requests.

8. The Preferred Patient Rx tool was first deployed in February 2006. Like its role in facilitating payment for insured transactions, RelayHealth's role in the administration of rebates through Preferred PatientRx is as a middleman, conveying the transaction from the dispensing pharmacy to a third party called a "rebate aggregator," who then compiles a large body of transactions and obtains rebates from the appropriate drug manufacturer. Analogous to the switch services for insured claims, RelayHealth then conveys a portion of the rebate back from the "rebate aggregator" to the dispensing pharmacy.

9. The Preferred PatientRx product merely records the price reported by the pharmacy. It does not calculate or suggest a U&C price or analyze the reported price or its relationship to U&C, AWP, or any other pricing benchmark.

10. All of the transactions under the Preferred Patient Rx program are recorded in the main RelayHealth database just like insured transactions. I understand that plaintiffs have already asked us to extract all transactions for the drugs at issue in this litigation from that database and that the U&C pricing reported for those drugs has been produced to plaintiffs. The data pulled in that extraction would have included transactions we process as part of the Preferred Patient Rx program.

11. RelayHealth also offers three other products — the Pharmacy Market Analyzer, the Prescription Price Analyzer, and the Prescription Price Reporter — that allow subscribers to run database queries or pre-defined reports that generate average U&C prices by NDC within market segments designated by the user, for example a metropolitan statistical area or a three digit zip code. Subscribers access these products online. The results of subscriber queries are not recorded or memorialized by RelayHealth. These products do not calculate or suggest a U&C price or analyze the reported price or its relationship to U&C, AWP, or any other pricing benchmark.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __th day of May, 2008 in Atlanta, Georgia.

*Roger Pinsonneault*
Roger Pinsonneault
05-13-2008