UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS      .CIVIL ACTION NO. 05-11148-PBS
HEALTH BENEFITS FUND, et al.
  Plaintiffs                .
                          .
  V.                        .      BOSTON, MASSACHUSETTS
                          .      APRIL 17, 2008
FIRST DATABANK, INC., et al.
  Defendants                .
. . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the plaintiffs:     Jennifer Fountain Connolly, Esq.
                        Wexler Toriseva Wallace LLP
                        55 West Monroe Street
                        Suite 3300
                        Chicago, IL  60603
                        312-346-2222
                        jfc@wtwlaw.com


For McKesson Corp.:     Paul Flum, Esquire
                        Lori Schechter, Esquire
                        Morrison & Foerster LLP
                        425 Market Street
                        San Francisco, CA  94105
                        415-268-7000
                        paulflum@mofo.com




Court Reporter:

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

*MARYANN V. YOUNG*
Certified Court Transcriber
Wrentham, MA  02093
(508) 384-2003

1                        **I N D E X**

2    Proceedings                                        3

3

1                    **P R O C E E D I N G S**

2    (COURT CALLED INTO SESSION)

3           THE CLERK:  The Honorable Robert B. Collings

4    presiding.

5           THE COURT:  All right.  You may be seated.

6           THE CLERK:  In the case of New England Carpenters v.

7    First Databank, Civil Action No. 05-11148 will now be heard

8    before this Court.  Will counsel please identify themselves for

9    the record.

10          MS. CONNOLLY:  Good afternoon, Your Honor, Jennifer

11   Connolly, Wexler Toriseva Wallace on behalf of the plaintiffs.

12          THE COURT:  Okay.  Good afternoon.

13          MR. FLUM:  Good afternoon, Your Honor, Paul Flum from

14   Morrison & Foerster representing McKesson.

15          THE COURT:  Hold on just a second.

16   PAUSE

17          THE COURT:  Okay.  Good afternoon and?

18          MS. SCHECTER:  Lori Schechter also from Morrison &

19   Foerster for McKesson.

20          THE COURT:  Okay.  I'll hear the moving party.

21          MR. FLUM:  Your Honor, this is a motion for a

22   protective order that McKesson has filed.  It's a motion that

23   he has directed at one request out of four requests, just the

24   last request in a series of third-party subpoenas that the

25   plaintiff served in this case on major national retailers,

4

1  pharmacy retailers and those subpoenas were served at the end

2  of January.  The grounds for the order or for our protective

3  order motion, Your Honor, is that this discovery that

4  plaintiffs seek in the fourth request violates a scheduling

5  order that Judge Saris entered in this case on January 2nd,

6  2008, and, specifically, that scheduling order provides that

7  discovery is being reopened for a limited purpose relating to a

8  new series of claims that are being advanced on behalf of a

9  proposed new class of uninsured consumers, and it goes on to

10  order that that discovery is allowed only as to new issues

11  raised by the usual and customary class, that's the class of

12  uninsured consumers in a third amended complaint.  So it's a

13  limited grant of discovery and the discovery that's the subject

14  of Request No. 4 in the subpoenas and of this motion goes

15  beyond the scope of what Judge Saris has permitted.

16         Now, the scheduling order that this motion is based

17  on resulted from a motion that the plaintiffs filed last fall

18  to amend their complaint to add this new uninsured class who

19  pay what's called usual and customary or U&C cash prices for

20  prescription drugs.  At the point of that motion was made for

21  leave to amend discovery had closed.  All discovery on the rest

22  of the case relating to a class of insurance companies and

23  other third party payers as well as a class of consumers who

24  had the insurance had been completed in July of last year.  The

25  plaintiffs came forward and said we want to add a new class of

5

1  uninsured consumers and they said that they wanted to do that

2  because their complaint alleges that the prices, these usual

3  and customary cash prices, uninsured consumers pay, are tied to

4  AWP and AWP is the pricing benchmark that is the subject of the

5  claims that are being brought on behalf of the existing two

6  classes, and this is right out of their complaint, paragraph 81

7  of the third amended complaint where they say U&C payments are

8  tied to the reported AWPs and are usually set at a price above

9  AWP.  Hence, an artificial increase in the AWP uniformly

10  impacts such class members.  That's the allegation, and they

11  represented to Judge Saris when they moved for leave to add

12  that class that at most limited discovery would be required for

13  these new claims, and I'm looking at their motion for leave to

14  amend.  It was filed on October 2nd, 2007.  It's docket number

15  322 in this case.  They made that representation on page 2 and

16  they made it again on page 4 and on page 4 they went on to say

17  only limited discovery will be required and such discovery can

18  be completed rapidly.  So based on those representations, based

19  on the allegation that AWPs, I'm sorry, that U&C prices are

20  tied to AWP, Judge Saris granted the motion for leave to amend

21  and entered a scheduling order re-opening discovery for a

22  limited purpose.  And when we were negotiating that scheduling

23  order, both sides agreed that the discovery going forward on

24  this new U&C claim should be limited and should not be the

25  basis to open up a back door to redo discovery relating to

6

1   other parts of the case since that discovery had closed back

2   in July and we submitted to Your Honor the correspondence back

3   and forth between the parties sort of discussing the need to

4   put these limits in.  In fact, it was the plaintiffs who

5   proposed first that we have a backdoor limitation and we agreed

6   and we stand on that.  We think that discovery should be

7   focused on the new claims going forward and that correspondence

8   is Exhibit 1 to the Flum Declaration that was filed in support

9   of this motion.

10          So as I said, after the entry of that scheduling

11  order at the beginning of January, plaintiffs served subpoenas

12  on eight national retail chains, K-Mart, Wal*Mart, you know,

13  retailers of that type, and the subpoenas have four requests in

14  them.  They're all identical.  We submitted copies with my

15  declaration.  The one to K-Mart is attached as Exhibit 5, and

16  if Your Honor turns to the request which is at the end of the

17  subpoena, you'll see that they're asking for four categories.

18          THE COURT:  Hold on just a second.

19          MR. FLUM:  Sure.

20  PAUSE

21          THE COURT:  I got it.

22          MR. FLUM:  All right.  So under the documents to be

23  produced, there are four numbered paragraphs, and the firs

24  three we have no problem with.  The first paragraph is asking

25  for documents concerning your store policies and formula to

7

1  generate or determine your U&C prices for brand drugs.  We

2  have absolutely no problem.  That's exactly in the four corners

3  of what Judge Saris ordered.  We're pursuing similar discovery

4  ourselves.  Request No. 2 is asking for documents concerning

5  the relationship between U&C prices and AWP.  And, again, it's

6  within the four corners of what Judge Saris ordered.  Request

7  number 3, and we don't object to number 2.  Request No. 3 is

8  asking for a lot of specific claims data.  There's a long list

9  you see of the particular items they want, but it's all tied to

10 U&C prices, the prices paid by the members of this new class

11 for the group of brand named drugs that are at issue in the

12 case, and it's 1,442 specific drug doses that are involved.

13 It's a lot of information because it's asking for particular

14 transactions over a 10-year-period, but it's tied to the U&C

15 price.  And again, we have no problem with that.  Request No. 4

16 is the one that is the subject of the motion and that request

17 is again asking for electronic claims data, very

18 particularized, on a transaction by transaction level with lots

19 of detail, and is specifically tied to documents or

20 electronically stored information concerning payments by

21 institutional payers which are defined as managed care entities

22 or insurance companies for prescriptions for the brand drugs

23 attached in Appendix A sold to individuals with private

24 insurance coverage.  So this--

25            THE COURT:  And your argument is that the result are

8

1  just for people who are uninsured?

2       MR. FLUM:  Exactly.  Judge Saris ordered that

3  discovery going forward is limited to new issues raised by the

4  U&C class and pled in the complaint.  So--

5       THE COURT:  U&C stands for underinsured class?

6       MR. FLUM:  No, it stands for usual and customary.

7       THE COURT:  Oh, usual and customary.

8       MR. FLUM:  So the way this works, Your Honor, is--

9       THE COURT:  But the class is composed or purported

10  class is composed of uninsured individuals?

11       MR. FLUM:  Correct.  And because they don't have

12  insurance, they don't have the benefit of any special rates

13  that insurance companies will negotiate with retailers and

14  instead--

15       THE COURT:  All right.

16       MR. FLUM:  --they pay, you know, whatever the cash

17  price is that the pharmacy charges when they walk into the

18  store, and as I said, we started taking this discovery and what

19  we are finding is there are many different ways that the

20  pharmacies set the U&C cash price.  Some base it on cost.  Some

21  base it on the prices that competitors are charging.

22  Plaintiffs allege some of them are basing it on the AWP, but

23  the pricing benchmark that is at issue in the case, but there's

24  tremendous variation.  Now, plaintiffs, you know, when raised

25  before bringing motion, when we raised our objection to Request

1  No. 4, which is specifically targeted to insured claims data,

2  not the prices that are being paid by the uninsured members of

3  the class, plaintiffs came back and argued, well, that

4  discovery is proper under the scheduling order because the U&C

5  prices are tied or connected or related in some unspecified way

6  to insured reimbursements.  That's the position that plaintiffs

7  kept taking and they offered a convoluted theory that really is

8  not articulated very fully in their briefs or the theory seems

9  to be that these U&C prices are somehow related to the payments

10  that are being made under the insurance contracts and

11  plaintiffs have jumped around about exactly what that

12  relationship may be.  But whatever it's, it's a different

13  theory than the one that they pled in their complaint in

14  paragraph 81 where they said that the U&C prices are tied to

15  reported AWPs.  That's the theory that the judge allowed them

16  to go forward on.  Now, they're proposing to take some very

17  intrusive discovery related to a whole new theory of cash

18  prices, U&C prices being tied to some other measure, apparently

19  what the insurance companies are paying.  And, again, on its

20  face, this insured discovery is not directed to the U&C cash

21  prices so it's not within the four corners of the discovery

22  that Judge Saris ordered the plaintiffs could pursue in her

23  January 2nd scheduling order.  It is extremely intrusive and

24  burdensome on the third parties that are being subpoenaed.

25           THE COURT:  Have they complained?

10

1          MR. FLUM:  Pardon me?

2          THE COURT:  Have these been served on the third

3  parties?

4          MS. CONNOLLY:  Yes.

5          MR. FLUM:  Yes.

6          THE COURT:  And have they complained about anything?

7          MR. FLUM:  They, my understanding is they've objected

8  and I think they're waiting on the outcome of this motion to

9  see whether this discovery--

10          THE COURT:  Do they specifically object to No. 4?

11          MR. FLUM:  The objections I've seen were all asserted

12  in response to No. 4 and some of the other categories as well.

13          THE COURT:  Okay.

14          MR. FLUM:  And the fact of the matter is I mean this

15  discovery is extremely burdensome and intrusive.  The subpoena

16  is asking for 10 years of claims data and it's very detailed

17  information on those claims.  You know, literally we're talking

18  about hundreds of millions of transactions if the third parties

19  were to comply with the subpoenas, and we think that Your Honor

20  should grant our motion and order the plaintiffs to withdraw

21  this request because, again, it violates--

22          THE COURT:  I'm not going to order anyone to withdraw

23  a request.  If I grant your motion I'll order it stricken and

24  that there be no need for a compliance.

25          MR. FLUM:  All right.  Then we would welcome that

11

1  relief because if this discovery is permitted to proceed, what

2  we're going to end up with then is another round of motion

3  practice by all of these third parties who will be asserting

4  their own objections based on burden and privacy and many other

5  issues.  So, I mean, as it stands, Your Honor, this discovery

6  is not tied to the issue--

7          THE COURT:  Okay.  I think you've made your point and

8  I understand what you're saying and I think you're starting to

9  repeat yourself.

10         MR. FLUM: All right.

11         THE COURT:  Let me let the plaintiffs speak and then

12  you can say anything you want in rebuttal.

13         MR. FLUM:  Thank you, Your Honor.

14         THE COURT:  Ms. Connolly.

15         MS. CONNOLLY:  Thank you, Your Honor.

16         There's not a lot of disagreement about the language

17  of our third amended complaint, what it says about U&C prices

18  or what Judge Saris' orders says.  Where there is

19  disagreement--

20         THE COURT:  Is this a written order or an electronic

21  order?

22         MS. CONNOLLY:  It's a written order.

23         THE COURT:  It is.

24         MR. FLUM:  It's provided to Your Honor as Exhibit 3

25  to the Flum declaration.

12

1          THE COURT:  Okay.

2          MS. CONNOLLY:  So that the discrete issue--

3          THE COURT:  On the issue, the date it was issued,

4    please?

5          MR. FLUM:  The date it was issued was--

6          THE COURT:  January 8th.

7          MS. CONNOLLY:  January 2nd.

8          MR. FLUM:  January 2nd.

9          THE COURT:  Would you pull up, print that out,

10   please, January 2nd, Judge Saris' scheduling order, please.

11          Okay.  Go ahead.

12          MS. CONNOLLY:  So because there isn't much dispute

13   about the language of our third amended complaint and there's

14   no dispute that the scheduling order says that we're not

15   entitled to new discovery, the discrete issue that you're faced

16   with today is whether this is indeed new discovery, and we

17   contend that it is and that it relates to our U&C claims for

18   this reason.  Third party reimbursement or institutional pay or

19   data which we're seeking in that fourth request is always tied

20   to AWP.  That very issue was the subject of the entire AWP

21   litigation that was before Judge Saris.  There's never--

22          THE COURT:  Yeah, but their amended complaint says

23   that the U&C is tied to AWP.

24          MS. CONNOLLY:  Right, but it's tied to AWP because

25   third-party reimbursement data is, reimbursement are benchmark

13

1  to AWP.  So for example, a third-party payer is going to be

2  paying AWP minus 15%.

3          THE COURT:  All right.

4          MS. CONNOLLY:  So what we're seeking to do through

5  this discovery is to analyze the relationship between U&C

6  prices and third-party reimbursement data.

7          THE COURT:  Why should you just be analyzing it

8  between U&C and AWP?

9          MS. CONNOLLY:  Because it's our theory that the

10  relationship between U&C and AWP is reflected in the

11  relationship between U&C and this third-party reimbursement

12  data, which by definition is based on AWP.  So you can see the

13  relationship between U&C and AWP by looking at the

14  relationship--

15          THE COURT:  Why can't you just look at the two of

16  them?  Why do you have to look at anything beyond AWP and U&C?

17          MS. CONNOLLY:  Because you want to look at the,

18  that's what we have explained in our papers.  You want to look

19  at the actual reimbursements made because there are times there

20  are other--

21          THE COURT:  Well, wait a minute, wait a minute, hold

22  on just a second.  Why do you, we're talking about uninsured as

23  class.

24          MS. CONNOLLY:  Right.

25          THE COURT:  This is what they paid?

14

1          MS. CONNOLLY:  Right.

2          THE COURT:  Okay.  Now, and you're saying that they

3  pay usual and customary price which you say is tied to AWP.

4          MS. CONNOLLY:  It's tied to AWP and also tied to

5  third-party reimbursement for this reason, Your Honor.  When--

6          THE COURT:  Well, that theory is not expressed in

7  the, in your third amended complaint.  You've got it only tied

8  to AWP.

9          MS. CONNOLLY:  Yes, and it is tied to AWP by virtue

10  of being tied to--

11          THE COURT:  I know but what I'm getting at is it

12  appears that by neglecting to put that other theory in there

13  that it's tied to this other thing.  You know, Judge Saris

14  allowed the amended complaint based on the theory that you put

15  forward and allow discovery based on the theory that you put

16  forward.  Now, if you were adding to that theory that Judge

17  Saris was unaware of, it seems to me that you've got problems.

18          MS. CONNOLLY:  I don't think it's a new theory, Your

19  Honor, because by virtue of U&C being tied to AWP, it's by

20  definition going to be tied to reimbursements that are based on

21  AWP.

22          THE COURT:  What do you mean by definition it's going

23  to be tied to reimbursements?

24          MS. CONNOLLY:  Because if the reimbursement is AWP

25  based--

1          THE COURT:  Yeah.

2          MS. CONNOLLY:  --and we have said that U&C is tied to

3  AWP--

4          THE COURT:  Yeah.

5          MS. CONNOLLY:  --then U&C is going to be tied to

6  the--

7          THE COURT:  Don't you always know what AWP is?

8          MS. CONNOLLY:  Well, what do you mean do we always

9  know what it is?

10          THE COURT:  I mean, maybe that it's just that I don't

11  fully understand, but it seems to me that, I thought AWP, the

12  average wholesale price of given drugs at given times is known,

13  in other words, or that you've already discussed that.

14          MS. CONNOLLY:  Right.

15          THE COURT:  You know what the AWP is.

16          MS. CONNOLLY:  Right.

17          THE COURT:  And then you know what the usual and

18  customary is.

19          MS. CONNOLLY:  That's right, but let me tell you

20  where the third-party reimbursement is important, Your Honor.

21          THE COURT:  Yeah, I'm not getting it--

22          MS. CONNOLLY:  Okay.

23          THE COURT:  --frankly.

24          MS. CONNOLLY:  Here's the reason, when pharmacies set

25  U&C prices, people who are paying U&C prices, obviously the

16

1   vast majority of Americans have insurance, so they're not

2   paying a cash price, so when pharmacies set U&C, they are

3   always looking to the third-party reimbursement amount in order

4   to set their U&C prices because they obviously don't want to

5   set it at a price that's lower than their third-party

6   reimbursement amount or else they're going to lose money.  So

7   they're looking at that amount and that--

8           THE COURT:  So what you're looking for is documents

9   that go into what documents that reflect or documents that are

10  relative to how the U&C price is set or what the U&C price is

11  set at?

12          MS. CONNOLLY:  That's primarily going to be the

13  dispute in the second phase of the case.  You know, we're

14  almost ready for trial in the main part of the case.  In the

15  second part of the case the only dispute between the parties,

16  setting aside all the disputes that are in the main case is how

17  U&C is related to third-party reimbursement and how U&C is set.

18  Judge Saris said today in a status conference--

19          THE COURT:  Well, why wouldn't that be, why wouldn't

20  that all have been discovered without this problem with respect

21  or this addition with respect to uninsureds?  Why wouldn't this

22  have all be discovered earlier?

23          MS. CONNOLLY:  Because we didn't need to prove the

24  relationship between U&C and third-party reimbursement or AWP

25  in the first part of the case because there was no allegation

17

1  with regard to U&C payers.  So now that there is this

2  allegation, what McKesson is really seeking to do is to

3  prohibit us from proving our theory of the U&C part of the case

4  and our theory is that a pharmacy is determining it's U&C price

5  by reference to the third-party reimbursement which is--

6          THE COURT:  The U&C price had no relevance to any

7  other claims in the case?

8          MS. CONNOLLY:  That's right, Your Honor.  It's a

9  completely new class and that's why she put us on a separate

10 discovery track because the U&C plaintiffs were entirely

11 separate, different group of plaintiffs than the third-party

12 payers and percentage pay consumers that were part of the main

13 case.

14         THE COURT:  Okay.

15         MS. CONNOLLY:  Let me just add something else.  You

16 ask about the third parties.  The third parties obviously

17 haven't come before you with motions to quash but there's

18 another reason--

19         THE COURT:  I don't think they would.  Wouldn't they

20 have to bring them in the district in which they're located?

21         MS. CONNOLLY:  Right, but they likewise haven't filed

22 them there, Your Honor.  I'll represent that to you.  But

23 there's another reason why they haven't done that and the

24 reason for that is those third parties have all told us, Your

25 Honor, I don't know - they're saying, Ms. Connolly, I don't

18

1  know why you're bothering me about this data because

2  McKesson's subsidiary, Relay Health, which we discuss in our

3  papers, has all of this data.  By virtue of being a switching

4  service, that subsidiary maintains the AWP data, the U&C data,

5  the third-party reimbursement data.  So we've told them, well,

6  we don't want to harass you with all of these requests if we

7  can go get them from McKesson so that we're in the process of

8  negotiating with McKesson regarding the data that we're looking

9  for and that's why they haven't come in and talked about burden

10 because from McKesson--

11          THE COURT:  Why didn't you ask them from McKesson to

12 begin with?

13          MS. CONNOLLY:  Because we found out about Relay

14 Health in our own investigation.

15          THE COURT:  Oh, later on?

16          MS. CONNOLLY:  It wasn't anything that McKesson

17 disclosed to us during the process of discovery.  So once we

18 learned of it and once third parties starting telling us you

19 really should go talk to McKesson to get this data, that's when

20 we started raising these issues with them.  So when we're

21 talking about burden from McKesson, we're literally talking

22 about adding another few fields to a database that we're

23 already seeking through discovery anyway.  This isn't even

24 going to be an issue with our going after third parties for

25 electronic data because we don't need to, because McKesson's

1    own subsidiary has it.

2            THE COURT:  Okay.

3            MS. CONNOLLY:  So for that reason, Your Honor, we

4    would request that you deny the motion.

5            THE COURT:  You can reply.

6            MR. FLUM:  Briefly, Your Honor.  You know, Ms.

7    Connolly is admitting that this is a new theory that's not pled

8    and we--

9            THE COURT:  Well, no, no, she's not.  She's saying

10   that in order, in the case there hasn't been any discovery as

11   to how the usual and customary was set because it wasn't, how

12   it was related to AWP because that wasn't an issue in any of

13   the other classes and that they need to show how it's set and

14   how the, this information they're seeking in discovery with

15   respect to the reimbursement factors in to how the U&C is set.

16   So it's not really a new theory.  It's a subset, it seems to be

17   a corollary of what needs to be proved in order to prove the

18   allegation.

19           MR. FLUM:  Well, I think that, the corollary point is

20   the key one because the first three requests in their subpoena

21   for these retailers, we're not objecting to, it's not the

22   subject of this motion, are asking directly how do you set your

23   U&C prices?  Are your U&C prices related to AWP?  That's

24   request No. 1 and 2, and request No. 3 is asking the retailer

25   to turn over all of their claims data on cash prices and the

1    plaintiffs can sit down with that claims data and with the

2    AWPs that they already have, as Your Honor was correctly

3    surmising, and they can make that comparison themselves.  Their

4    expert can make that comparison, but what Request 4 is saying,

5    is trying to bootstrap a new theory that is alleging that the

6    U&C prices are now really set in relation to the insured

7    reimbursement.  Not only is it new it contradicts what they

8    alleged in their complaint.  I mean, their complaint says that

9    the U&C prices are tied report to AWPs and are usually set at a

10   price above AWP, above AWP, Your Honor, not tied to some

11   discounted price below AWP that insurance companies pay.  So

12   this really is a new theory and of course there's going to be a

13   relationship between the insured re-imbursement and AWP.  It's

14   an indirect relationship.  I mean, they can make the direct

15   comparison between U&C and AWP with the information they've

16   already got on AWP and the additional discovery that they're

17   seeking in Requests No. 1 through 3.  And, you know, in terms

18   of Ms. Connolly's point regarding Relay Health data, we have

19   told the plaintiffs the same thing I'm saying here today.  To

20   the extent you are asking us to produce Relay Health data

21   showing U&C prices, we'll do that, and we have been negotiating

22   with plaintiffs about the exact parameters of what we're going

23   to produce.  But we've also said, because plaintiffs are asking

24   us to turn over the entire Relay Health database, which

25   involves massive amounts of information, terabytes, 30-40

1  terabytes of data that fill large warehouses full of

2  computers, we told plaintiffs, we're not going to produce data

3  on insured transactions because of what Judge Saris ordered.

4  You're just trying to go back through the back door and redo

5  discovery.

6        THE COURT:  Well, how is this, how are they doing

7  that because what plaintiffs' counsel is representing to me is

8  that they didn't have to do this discovery with respect to the

9  allegations as to the other classes that are involved in this

10  litigation?  So to what, how are you saying that what they're

11  doing is trying to get more discovery on claims other than the

12  new ones that are contained in the amended complaint?

13        MR. FLUM:  Your Honor, they chose back when they had

14  unrestricted discovery on the insured claims that are the

15  subject of Classes 1 and 2, they chose not to go to the

16  retailers and subpoena this data--

17        THE COURT:  They're saying that it wasn't pertinent

18  to those claims where it is pertinent to these claims.  And

19  what I'm asking you is how is it pertinent to the old claims?

20  In other words, how are they getting discovery that is useable

21  in the claims that existed before the complaint was amended?

22        MR. FLUM:  Because the subject of the old claims is

23  the amount that was being paid on those insured transactions.

24  That's exactly what those old claims are about.  The way they

25  chose to do it when they were developing a record for those old

22

1   claims is to go to a service called IMS which surveys all of

2   the retailers, not just a small group that they've subpoenaed

3   here that does a national survey and IMS reports on the retail

4   prices that are being charged by all of these retailers and

5   paid by the insurance companies for these claims, that's the

6   data they presented to Judge Saris in support of their class

7   certification motions, the data their expert chose to stand on,

8   and in fact the expert called it the gold standard for data on

9   retail reimbursements.  And, you know, plaintiffs made that

10  choice to proceed that way for whatever reason, perhaps because

11  they think that there are problems with what their expert did

12  the first time around, they're now coming back and saying, no,

13  we want to go and redo the discovery.  We've changed our mind.

14  We now aren't satisfied with the IMS data.  We want to get

15  detailed transactional data on insured claims, which are not

16  the subject of the U&C class.

17          THE COURT:  All right.  Do you want to respond to

18  that because I'm not quite sure - I mean, I hear what he's

19  saying. I'm not sure I fully understand the ramifications of

20  it--

21          MS. CONNOLLY:  Yes.

22          THE COURT:  --but respond.

23          MS. CONNOLLY:  We're certainly not seeking to use

24  this data to go back and redo the work that our expert has

25  done, which--

23

1          THE COURT:  Why isn't the work that your expert has

2     done enough to give you the information you need with respect

3     to this, the amended claims?

4          MS. CONNOLLY:  Because that data doesn't have the U&C

5     data, and more specifically, the transactional data doesn't

6     have the relationship on a transaction-by-transaction basis of

7     a U&C claim to a third party reimbursement claim because keep

8     in mind we're looking on a transaction basis between the

9     relationship between the class price and a third-party

10    reimbursement price, and that's what we're looking for in this

11    set and that's why we need it for the U&C part of the case.

12    It's completely different than the reason that we were using

13    IMS data in the main part of the case, which was to show--

14         THE COURT:  Are you using any of this data in the

15    main part of the case?

16         MS. CONNOLLY:  The main part of the case is over.

17    This--

18         THE COURT:  Well, it's not over in the sense that--

19         MS. CONNOLLY:  Well, discovery is closed.

20         THE COURT:  I know, and so my question is would you

21    be using any of the data that you got in response to Section 4

22    of these subpoenas in support of your claims that have not yet

23    been tried but as to which discovery is closed?

24         MS. CONNOLLY:  there's no way we could, Your Honor.

25    The expert reports have already been submitted by our experts

24

1    and Judge Saris has basically said she believes she's

2    conducted what she believes to be in effect a Daubert hearing

3    in connection with class certification and she's ready to go to

4    trial in that part of the case.

5            MR. FLUM:  Actually, Your Honor, their expert has not

6    finished submitting his reports.  There's a new report coming

7    from the damages expert.

8            THE COURT:  Well, regardless.  I mean, that's not

9    neither here nor there.

10           MR. FLUM:  But it is here or there because their

11   expert will be using this data.  It's the same expert.

12           THE COURT:  No one is going to - if I deny this

13   motion, none of this discovery that you're going to get I'll

14   order is to be used with respect to any claims other than the

15   claim that's contained in the amended complaint.

16           MS. CONNOLLY:  I understand that.

17           THE COURT:  So I take care of that--

18           MR. FLUM:  All right.

19           THE COURT:  --pretty easily.  All right.  Let me take

20   the matter under advisement.

21           MR. FLUM:  Your Honor, could I respond briefly just

22   as to the new point that Ms. Connolly made?  She said that they

23   don't have the U&C data they need to do this comparison.  Well

24   that's what they've subpoenaed in Request No. 3.  We're not

25   objecting to it.  They're going to get that from the retailers.

25

1  She also said they need to do a transaction-by-transaction

2  comparison.  That's not going to show anything about how U&C

3  prices were set.  I mean, suppose that the insured price for a

4  30-day supply of Lipitor is $80 and pharmacy A responds and

5  says, you know, on the date that we dispense that $80

6  prescription, we charged a cash price of $100, and pharmacy B

7  says, on that same day we charged a cash price of $85 for a 30-

8  day supply of Lipitor and pharmacy C says, we charge $75.

9  That's not going to show you how any of those pharmacies set

10 the U&C price.  It's just going to show that they were

11 different.  The way that the plaintiffs are going to show how

12 the U&C price was set and whether it relates to AWP is by using

13 the information that they've subpoenaed in the first three

14 requests and having their expert do the analysis.  So I again

15 submit, Your Honor, this new discovery is irrelevant and

16 outside the scope of what the judge ordered.

17       THE COURT:  All right.  As I say, I'm going to have

18 to study this because it's pretty complex.  Do you want to

19 respond as to why what you're getting in 1-3 isn't going to

20 give you what you need?

21       MS. CONNOLLY:  Yes, Your Honor, because it doesn't

22 have the third-party reimbursement data in it.  So the whole

23 purpose of seeking it from a third party or as I've suggested

24 earlier from Relay Health is to be able to see it on a

25 transaction-by-transaction basis, because again, we're looking

26

1    for the relationship.  McKesson keeps saying that we aren't

2    going to be able to prove how they set U&C prices, but we

3    submit that we believe that can be established mathematically,

4    and I don't mean that algebraically, but through our expert's

5    analysis of the data, and that's how we want to do it.

6           THE COURT:  I'll take it under advisement.  Thank

7    you, very much.

8           MR. FLUM:  Thank you, Your Honor.

9           MS. CONNOLLY:  Thank you, Your Honor.

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

27

1                              CERTIFICATION

2          I, Maryann V. Young, court approved transcriber, certify

3      that the foregoing is a correct transcript from the official

4      digital sound recording of the proceedings in the

5      above-entitled matter.

6

7      /s/ Maryann V. Young                    May 19, 2008

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**(508) 384-2003**