UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH
BENEFITS FUND; PIRELLI ARMSTRONG
RETIREE MEDICAL BENEFITS TRUST;
TEAMSTERS HEALTH & WELFARE FUND OF
PHILADELPHIA AND VICINITY;
PHILADELPHIA FEDERATION OF TEACHERS
HEALTH AND WELFARE FUND; DISTRICT
COUNCIL 37, AFSCME - HEALTH &
SECURITY PLAN; JUNE SWAN; BERNARD
GORTER; SHELLY CAMPBELL and
CONSTANCE JORDAN,

        Plaintiffs,

   v.

FIRST DATABANK, INC., a Missouri corporation,
and McKESSON CORPORATION, a Delaware
corporation,

        Defendants.

Civil Action: 1:05-CV-11148-PBS

Judge Patti B. Saris

## MCKESSON CORPORATION'S MEMORANDUM IN OPPOSITION TO CERTIFICATION OF THE U&C CLASS

### [REDACTED]

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

TABLE OF ABBREVIATIONS AND RECORD CITATIONS ................................ iv

INTRODUCTION ............................................................................................... 1

I.   HOW PHARMACIES SET THEIR CASH PRICES IS PREDOMINANTLY AN
     INDIVIDUAL ISSUE.................................................................................... 2

     A.   Pharmacy Evidence Shows Cash Prices Are Set in Varying Ways. ..................... 2

          1.   Many Pharmacies Set Their Cash Prices for Brand Name Drugs
               Based Upon Their Acquisition Cost or WAC............................................ 3

          2.   Many Pharmacies Use Price Competition as the Primary or
               Ultimate Driver in Setting Cash Prices. .................................................... 4

          3.   Many Pharmacists Weigh a Multitude of Factors in Determining
               Their Cash Prices for Branded Drugs. ...................................................... 6

          4.   Third Party Reimbursement Rates Can Also Be a Factor in Setting
               Cash Prices for Branded Drugs................................................................. 7

     B.   RelayHealth Data Shows No Formulaic Relationship Between AWPs and
          Cash Prices Reported by the Largest Pharmacies in the Country...................... 8

II.  DR. HARTMAN FAILS TO PROVE A FORMULAIC LINK BETWEEN AWP
     AND CASH PRICES..................................................................................... 10

     A.   Dr. Hartman's Empirical Data Do Not Support His "Formulaically
          Related" Conclusion. .................................................................................... 10

     B.   Dr. Hartman's Reading of AWP MDL Discovery Fails to Support His
          "Formulaic" Conclusion. ............................................................................... 12

     C.   The Auto-Rx Tool Shows That Multiple Factors Affect U&C Pricing............. 13

III. PLAINTIFFS CANNOT MEET THEIR BURDEN FOR CLASS
     CERTIFICATION UNDER RULE 23. ........................................................... 14

     A.   Whether Each Class Member Who Paid the Cash Price was Injured by the
          Alleged Scheme Cannot be Answered with Common Proof.............................. 15

     B.   Dr. Hartman's Model Cannot Rely on Averages to Paper-Over His
          Inability to Determine Whether Each Class Member Was Impacted. ................. 16

     C.   Adjudication of the U&C Class Claims Poses Insurmountable
          Manageability Problems. .............................................................................. 18

CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ..................................................................................................15

*Bell Atlantic Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) .......................................................................17, 18, 20

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ...................................................................................17

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ...................................................................................17

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ...................................................................................20

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) .....................................................................................14

*Chisolm v. TranSouth Fin. Corp.*,
    194 F.R.D. 538 (E.D. Va. 2000) ..............................................................................20

*In re Methionine Antitrust Litig.*,
    204 F.R.D. 161 (N.D. Cal. 2001) .............................................................................17

*In re New Motor Vehicles Canadian Export Antitrust Litig.*
    No. 07-2257, 2008 U.S. App. LEXIS 6483 (1st Cir. Mar. 28, 2008) ...........14, 15, 16, 17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005) ...............................................................................18

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    214 F.R.D. 614 (W.D. Wash. 2003) ........................................................................18

*In re PolyMedica Corp. Sec. Litig.*,
    432 F.3d 1 (1st Cir. 2005) .......................................................................................15

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ...............................................................................20

*McLaughlin v. American Tobacco Co.*,
    No. 06-4666-cv, 2008 U.S. App. LEXIS 7093 .................................................15, 16

*Simer v. Rios,*
    661 F.2d 655 (7th Cir. 1981) ......................................................................................................18

*Smilow v. Sw. Bell Mobile Sys.,*
    323 F.3d 32 (1st Cir. 2003) ...............................................................................................14, 18

## STATUTES

18 U.S.C.
    § 1964(c) ...............................................................................................................................15

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(b)(3) ...............................................................................................................16

## TABLE OF ABBREVIATIONS AND RECORD CITATIONS

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| Burnett Decl. | Declaration of Charles Burnett, dated April 17, 2008 | Costco | Flum Ex. 1 | N/A |
| Page Decl. | Declaration of Robin Page, dated April 23, 2008 | Pathmark | Flum Ex. 2 | N/A |
| May Dep. | Deposition excerpts of Jamie N. May, dated April 24, 2008 | Rite Aid | Flum Ex. 3A | N/A |
| May Ex. 3 | Exhibit 3 marked at April 24, 2008 Deposition of Jamie N. May | Rite Aid | Flum Ex. 3B | N/A |
| May Ex. 5 | Exhibit 5 marked at April 24, 2008 Deposition of Jamie N. May | Rite Aid | Flum Ex. 3C | N/A |
| Bettiga Dep. | Deposition excerpts of Michael J. Bettiga, dated April 29, 2008 | ShopKo | Flum Ex. 4A | N/A |
| Bettiga Ex. 3 | Exhibit 3 marked at April 29, 2008 Deposition of Michael J. Bettiga | ShopKo | Flum Ex. 4B | N/A |
| Bettiga Ex. 4 | Exhibit 4 marked at April 29, 2008 Deposition of Michael J. Bettiga | ShopKo | Flum Ex. 4C | N/A |
| Bettiga Ex. 5 | Exhibit 5 marked at April 29, 2008 Deposition of Michael J. Bettiga | ShopKo | Flum Ex. 4D | N/A |
| LaFrance Decl. | Declaration of Jason Lafrance, dated May 20, 2008 | USA / Super D Drugs | Flum Ex. 5 | N/A |
| Kinsey Decl. | Declaration of Sandra K.B. Kinsey, dated April 25, 2008 | Wal-Mart | Flum Ex. 6A | N/A |

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| WMT 000001-8 | Wal-Mart's production letter to McKesson enclosing its "Prescription Pricing Guidelines | Wal-Mart | Flum Ex. 6B | N/A |
| Meijer 01-04 | Document entitled "Summary of General Pricing Guidelines For Key 63," dated May 29, 2007 | Meijer, Inc. | Flum Ex. 7A | N/A |
| Meijer 09-18 | Document entitled "Pharmacy Competition," dated March 6, 2008 | Meijer, Inc. | Flum Ex. 7B | N/A |
| Meijer 19-24 | Document entitled, "Top RX List 2006" | Meijer, Inc. | Flum Ex. 7C | N/A |
| Johnson Decl. | Declaration of Stacie Johnson, dated May 7, 2008 | Target | Flum Ex. 8 | N/A |
| Unlabeled Hannaford document | Hannaford production document | Hannaford Bros. | Flum Ex. 9 | N/A |
| Wells Decl. | Declaration of Susan Wells, dated May 8, 2008 | Longs Drug Stores | Flum Ex. 10 | N/A |
| WAL004927-4930 | Document entitled, "Rx Pricing Frequently Asked Questions" | Walgreen Co. | Flum Ex.11 | N/A |
| SFWY 000052-54 | Email chain, dated December 11-19, 2006 | Safeway | Flum Ex.12 | N/A |
| Egeland Decl. | Declaration of Robert Egeland, dated May 9, 2008 | Hy-Vee, Inc. | Flum Ex. 13 | N/A |
| ESI-414-00005442; ESI-414-00005491; ESI-414-00005520; ESI-414-00005523 | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Anthony Hutchinson in *Beeman v. TDI* | Finley's Rexall Drug | Flum Ex. 14 | N/A |

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| ESI-414-00005442; ESI-414-00005492. | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Charles Miller in *Beeman v. TDI* | Medicine Shoppe | Flum Ex. 15 | N/A |
| ESI-414-00005442; ESI-414-00005493; ESI-414-00005546; ESI-414-00005553 | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Bill Pearson in *Beeman v. TDI* | Pearson's Medical Group Pharmacy | Flum Ex. 16 | N/A |
| Cannata Decl. | Declaration of Michael C. Cannata, dated May 20, 2008 | Rx-Net, Inc. | Flum Ex. 17 | N/A |
| Dorsch Dep. | Deposition excerpts of Joseph U. Dorsch, Jr. taken in *In re AWP Litig.*, dated Dec. 8, 2004 | Voshell's Pharmacy | Flum Ex. 18 | N/A |
| ABT 277679-714 | Document reflecting Abbot Laboratories' bid in response to a Geri-Med request for proposal, dated March 26, 1998 | Abbott Labs. | Flum Ex. 19A | N/A |
| BR02151-62 | Document entitled, "Item File Data Elements" for CHIP software, draft dated October 12, 1999 | Abbott Labs. | Flum Ex. 19B | N/A |
| Rodman Dep. | Deposition excerpts of Bruce Rodman taken in *Pharm. III*, dated Aug. 29, 2007 | Abbott Labs. | Flum Ex. 19C | N/A |

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| Picard Decl. | Declaration of Thomas Picard in Opposition to Plaintiffs' Motion for Certification of the U&C Class, dated May 20, 2008 | RelayHealth | Flum Ex. 20 | N/A |
| Campbell Dep. | Excerpts from the deposition of plaintiff Shelly Cambpell, dated March 24, 2008 | U&C Plaintiff | Flum Ex. 21 | N/A |
| Berman Decl. | Declaration of Steve W. Berman in Support of Plaintiffs' Memorandum in Support of Certification of the U&C Class and Plaintiffs' Proffer of Evidence Common to the Class | Plaintiffs | N/A | 489 |
| Berman Decl. Ex. 12 | McKesson PowerPoint bates labeled MCKAWP 0152030 | Plaintiffs | Berman Ex. 12 | N/A |
| Berman Decl. Ex. 13 | McKesson PowerPoint – Las Vegas, 2006 (MCKAWP 0151701-09) | Plaintiffs | Berman Ex. 13 | N/A |
| Stop & Shop 001 | Document entitled, "Stop & Shop Pricing Philosophy | Stop & Shop | Berman Ex. 18 | N/A |
| SFWY 00005 | Safeway production document | Safeway | Berman Ex. 19 | N/A |
| Berman Decl. Ex. 22 | GeriMed Consultant Pharmacist Software (GM02041-70) | Plaintiffs | Berman Ex. 22 | N/A |
| Berman Decl. Ex. 23 | GeriMed Presentation Materials (GM02270-87) | Plaintiffs | Berman Ex. 23 | N/A |
| McFerrin Aff. | Affidavit of Gary McFerrin, dated March 17, 2008 | Fred's Inc. | Berman Ex. 25 | N/A |
| Berman Decl. Ex. 33 | Bunn, *Picking a Cash Pricing Strategy* | Plaintiffs | Berman Ex. 33 | N/A |

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| Aug. 27, 2007 Order | Class Certification Order (Aug. 27, 2007) | Court | N/A | 317 |
| Detura Aff. | Affidavit of James A. Detura (Dec. 21, 2007) | Melrose Pharmacy | N/A | 422-4 |
| Gellis Aff. | Affidavit of Russell Gellis (Dec. 21, 2007) | Apthorp Pharmacy | N/A | 422-3 |
| Hartman Decl. | Declaration of Raymond S. Hartman in Support of Certification of the Uninsured Cash Payers Paying U&C (April 21, 2008) | Plaintiffs' Expert | N/A | N/A |
| Mar. 19, 2008 Order | Class Certification Order, dated March 19, 2008 | Court | N/A | 466 |
| Orig. Compl. | Class Action Complaint, dated June 2, 2005 | Plaintiffs | N/A | 1-1 |
| Pls.' Mem. | Plaintiffs' Memorandum in Support of Class Certification of the U&C Class, dated April 21, 2008 | Plaintiffs | N/A | 487 |
| Proffer | Plaintiffs' Proffer of Evidence Common to the U&C Class Concerning the Impact of the McKesson Scheme on the Class, dated April 21, 2008 | Plaintiffs | N/A | 488 |
| Scheer Aff. | Affidavit of William P. Scheer (Dec. 21, 2007) | Scheer Drugs, Inc. | N/A | 422-3 |
| TAC | Third Amended Complaint, dated Nov. 6, 2007 | Plaintiffs | N/A | 359 |
| Trial Plan | Plaintiffs' Proposed Trial Plan for Trial of U&C Class Claims Against McKesson Asserted in the Third Amended Complaint, dated April 21, 2008 | Plaintiffs | N/A | 490 |

| Abbreviation | Description | Producing Party or Witness Affiliation | Decl. Ex. No. | Dkt. No. |
|---|---|---|---|---|
| Willig Decl. | Declaration of Robert D. Willig (May 21, 2008) | McKesson's Expert | N/A | N/A |

## INTRODUCTION

Retail pharmacies set their own cash prices for uninsured customers. These prices are not governed by any contract term or requirement but rather are the product of each individual pharmacy's independent pricing decisions. In many cases, these prices are based on the pharmacy's drug acquisition cost (WAC). In others, cash prices based upon a number of factors weighed by the pharmacy, including cost, price competition, the ability of the customer to pay, and insured reimbursement terms. Each of these may be looked at by a pharmacy daily to produce different and continually changing cash prices. In no event, however, are cash prices invariably set by some rigid percentage of AWP, a formula argued for by plaintiffs to support class certification.

Not surprisingly, despite all the evidence to the contrary, plaintiffs' expert, Dr. Hartman, claims that pharmacies' cash prices and published AWPs are in fact "formulaically related," allowing for common class-wide proof for both impact and damages. To reach this unsupportable conclusion, Dr. Hartman (1) ignores the overwhelming evidence from the pharmacies themselves that do not use AWPs to drive cash prices; (2) misreads discovery documents that actually undermine his thesis; (3) misapplies transactional data in a quest to show a relationship; and (4) incorrectly interprets this Court's earlier class certification opinions as supporting his conclusions when just the opposite is true.

The plain facts are that the individual decisions of pharmacies in setting cash prices present overwhelmingly individual fact issues of impact as well as create manageability nightmares in arriving at class-wide damages. Dr. Hartman's model indisputably cannot determine *which* cash customers, if any, were injured, let alone the extent of any such injury. Plaintiffs seek to paper-over these insurmountable obstacles by relying on aggregate average damages and asserting that the U&C class presents the very same issues this Court addressed when it certified the TPP class. However, numerous cases reject plaintiffs' average aggregate damage approach, and the Court's prior class decisions counsel against certification here, not for it. Unlike the AWP-based TPP contracts in place at the time of FDB's 5% markup increase, relied upon by the Court in certifying Classes 1 and 2, at

1

no time during the class period were the 59,000 individual pharmacies that exercise their own independent judgments required to tie their cash prices to AWP. In fact, a substantial number did not. Because cash pricing involves a host of individual decisions made daily for different drugs and different locations, certification of the U&C class should be denied.

ARGUMENT

## I.   HOW PHARMACIES SET THEIR CASH PRICES IS PREDOMINANTLY AN INDIVIDUAL ISSUE.

Plaintiffs claim that "the U&C price is directly tied to AWP" (Pls.' Mem. 1), but the overwhelming empirical evidence proves otherwise. The evidence shows that pharmacies set U&C prices based on a variety of factors, and the cash price charged for a single drug may vary from pharmacy to pharmacy, and even within the very same pharmacy chain.[1] Even when AWP is a cash-price consideration, it is generally not the determinative one, as when pharmacies set prices to meet competition. Thus, the impact of AWP, *if any,* on the actual price charged to each purported class member is decidedly an individual issue. Contemporary claims data reflecting what retail pharmacies report to PBMs as their U&C prices also confirm what retailers revealed in depositions, declarations and documents: cash prices are not "tied to AWP," and no "formulaic" relationship between U&C and AWP exists.

### A.   Pharmacy Evidence Shows Cash Prices Are Set in Varying Ways.

The parties sent 28 subpoenas to pharmacies seeking documents that reveal how each retailer sets its cash prices. More than half provided responsive evidence. McKesson followed up with depositions of some, and obtained declarations from others. Plaintiffs did not notice *any* pharmacy depositions. (Flum Decl. ¶ 13.) The pharmacy evidence shows why plaintiffs' "theory" of U&C pricing is wrong.

---

[1] The terms "cash price" and "U&C price" are used interchangeably throughout, as they are in the evidence. As reflected in the Table of Abbreviations and Record Citations, other than the Willig Declaration, all cited evidence not previously submitted is attached to the Flum Declaration. In addition to their brief and declarations, plaintiffs also discuss the evidence in a Proffer. McKesson responds to plaintiffs' brief and Proffer in this single memorandum.

1.     **Many Pharmacies Set Their Cash Prices for Brand Name Drugs Based Upon Their Acquisition Cost or WAC.**

A significant number of pharmacies, including some of the country's largest mass merchandisers, national pharmacy chains and supermarkets, base their cash prices for branded drugs on the acquisition cost of each drug. That means *cash prices are a function of WAC not AWP*, because retailers typically purchase drugs based upon WAC. (TAC ¶¶ 38, 57.) For example,

Similarly, the cash prices for ███████████████████████ use the acquisition cost of each drug, not AWP, as their cash-price driver.

Acquisition cost, not AWP, is the basis for cash prices at █████████████████████ as well as at

2 █████████████████████████

3 █████████████████████████

4 █████████████████████████

3



testified that its U&C prices are based on its acquisition cost, not AWP, as indicated in its documents. Although Dr. Hartman, wearing his fact-finder hat, impugned the veracity of

Significantly, these large volume drug retailers testified that an increase in the markup of AWP over WAC has *no* effect on the cash prices they charge.

### 2. Many Pharmacies Use Price Competition as the Primary or Ultimate Driver in Setting Cash Prices.

Price competition, rather than AWP, is the driver in setting cash prices for a significant percentage of branded drugs at many pharmacies. For example,



---

[6] The setting of cash prices based on acquisition cost is not limited to high volume sellers of prescription drugs. Independent pharmacists submitted declarations in opposition to the proposed FDB settlement stating that they based their cash prices on WAC, not AWP. (*See* Scheer Aff., Gellis Aff., and Detura Aff.)

██████████████████████████████ uses a competition-based methodology for the brand

drugs that constitute 75% of its cash sales. ████████████████████████████████

Likewise, although plaintiffs characterize Fred's Stores of Tennessee as basing its cash prices on

AWP ██████ that is true for only a certain unspecified number of NDCs.  Another unspecified

number of brand drugs are priced by ████ using a competitive methodology, and ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

    Even when U&C prices are set based upon other drivers, price competition often determines

the cash price actually charged because most pharmacies allow individual pharmacists to exercise

discretion to deviate from previously set U&C prices in order to meet competition. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



Indeed, the very same pharmacy evidence that plaintiffs rely on actually proves that price competition can override even AWP-based pricing policies.

[9] Plaintiffs' unsupported assertion that "competition for U&C consumers has little impact on U&C prices" (Pls.' Mem. 2) is, thus, wholly at odds with the evidence.

### 3. Many Pharmacists Weigh a Multitude of Factors in Determining Their Cash Prices for Branded Drugs.

Not only do individual pharmacies differ in the primary drivers they use to set cash prices, some pharmacies use a multitude of drivers depending upon the drug, the customer, the competitive landscape, and other cost-based factors.

there is no required pricing policy for setting cash prices.

[8]

[9] Plaintiffs' (and Dr. Hartman's) select quoting also hides the role of competition at

██████████████████████████████████████ Factors that are considered include ██

████████████████████████████████████████████

Testimony of independent pharmacists in other litigation, produced by PBM Express Scripts in response to the parties' subpoenas, reveals additional factors influencing what cash customers are ultimately charged. Those factors include the amount the pharmacist thinks the customer can afford, the pharmacist's overhead, the age of the customer, whether the customer is a medical professional or an employee of a local business, and how popular the drug at issue is. (*See, e.g.*, ESI-414-00005491-93, 5523, 5553.)[10] In fact, the desire by some pharmacies to offer discount prices to certain types of customers, such as senior citizens, has led to the creation of "loyalty" or "discount" programs that enable certain customers to pay lower cash prices than the pharmacy charges other uninsured customers. ███████████████████████████████████████████████

### 4. Third Party Reimbursement Rates Can Also Be a Factor in Setting Cash Prices for Branded Drugs.

Some pharmacies seek to keep U&C prices above third party reimbursement contract prices to avoid a reduction in insured reimbursement on any contract that allows reimbursement based upon the "lesser of" the U&C price or the AWP-based reimbursement. This, however, is hardly a bright line rule, as pharmacies set U&C prices below third party reimbursement rates when other factors warrant it. For example, ████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████[11]

---

[10] That individual pharmacies apply a multitude of factors in varying ways is consistent with what has been reported in the literature, including an article plaintiffs mistakenly suggest supports their theory of a formulaic tie between AWP and U&C prices. Bunn, *Picking a Cash Pricing Strategy*, Berman Decl. Ex. 33 (noting cost, competition, and network reimbursement rates as factors).

[11] Indeed, the Auto-Rx-Net software program that plaintiffs discuss in their moving papers confirms that large retailers in practice set cash prices *below* third party reimbursements 5%-10% of the time. (Willig Decl. ¶ 23 & n.22.)

Moreover, many pharmacies fulfill their goal of keeping U&C prices above third party contract prices, not by basing U&C prices on AWP, but rather by maintaining healthy margins over acquisition cost. For example, █████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████ Thus, as a practical matter, increases in the reimbursed amount would not have necessitated an increase in U&C prices. To the contrary, ████████████████████████ ███████████████████████████████████████████████████

It is not surprising that a pharmacy would rarely need to raise its U&C prices to keep them above *discounted AWP* formulas in insured contracts. As Dr. Hartman noted, U&C prices are typically higher than *AWP*; they were so before the increase in the AWP markup, and they remained so after. (*See* Willig Decl. Ex. 3.) As a result, the assertion that the "lesser of" language in network contracts creates a formulaic tie is nonsense. As the abundant evidence directly from pharmacies confirms, of the many factors considered in setting U&C prices, AWP has no uniform impact on, or formulaic relationship with, the cash price that is ultimately charged.

### B.    RelayHealth Data Shows No Formulaic Relationship Between AWPs and Cash Prices Reported by the Largest Pharmacies in the Country.

U&C prices reported by retail pharmacies through the RelayHealth "switch" bear out exactly what the pharmacy evidence revealed. RelayHealth is a company that offers a "switch" service to process prescription drug claims between pharmacies and the PBMs and other payers who reimburse pharmacies for dispensing prescription drugs to insured consumers. Pharmacies submit electronic claims to the switch, which then routes the data to the appropriate payer. The fields submitted with these claims, including reported U&C prices, are recorded and stored by RelayHealth exactly as they are submitted. The data in these fields can be searched and retrieved, provided that RelayHealth has been authorized to do so by the pharmacy that submitted the data. (Picard Decl. ¶¶ 3-6.)[12]

---

[12] The RelayHealth switch does not handle reimbursement claims between TPPs and PBMs. TPPs' reimbursements to PBMs are therefore not recorded in the database.

Using transaction level claims data as reported by 23 large retail chains for multimillions of prescriptions, Dr. Willig analyzed U&C prices for the five "bellwethers" and six other drugs. In particular, Dr. Willig compared the ratio between U&C prices and WAC for each drug before and after the AWP markup increase, to test whether the ratio held steady or increased with the AWP markup increase. If the ratio held steady, then increases in AWP markups did not contribute to higher cash prices for these drugs at these pharmacies. Only if the ratio increased would there be a basis for Dr. Hartman to claim a formulaic tie between U&C and AWP. (Willig Decl. ¶¶ 24-31.)

Dr. Willig's analysis confirmed what the discovery record has revealed — that many pharmacies, including most of the largest in the country, do not tie cash prices to AWP. As Dr. Willig states:

> These data show clearly that ***there are a substantial number of pharmacies who did not increase their U&C prices relative to WAC*** for many drugs during the period when the AWP/WAC ratio increased from 1.2 to 1.25. These results provide strong evidence refuting Dr. Hartman's theory of a formulaic relationship.

(*Id.* ¶ 24, emphasis added.)

Dr. Willig's findings are illustrated by his analysis of U&C prices reported to RelayHealth by

In particular, the RelayHealth data show:

- *no impact* on *any* of ███████ U&C prices for *any* of the drugs;
- *no impact* on ███████ U&C prices for *ten out of eleven* of the drugs;
- *no impact* on ███████ U&C prices for *eight* and *next to none for the rest*; and
- *no impact* on ███████ prices for *five* of the drugs and *next to none for two others*.

(*Id.* ¶¶ 33-36 & Ex. 3.)

Nor are these observations unique to the largest chains. Dr. Willig's analysis of RelayHealth U&C data for ████████████████████ all showed the same

pattern — reported cash prices did not increase with AWP when markups of AWP over WAC increased. (*Id.* ¶ 39 & Ex. 4.) These results flatly contradict Dr. Hartman's theory of a formulaic relationship between cash prices and AWP, and provide "strong evidence that there is no basis for his theory." (*Id.* ¶ 40.)

## II.    DR. HARTMAN FAILS TO PROVE A FORMULAIC LINK BETWEEN AWP AND CASH PRICES.

### A.    Dr. Hartman's Empirical Data Do Not Support His "Formulaically Related" Conclusion.

Dr. Hartman's declaration purports to offer a basis for his theory that AWP and U&C are formulaically related, in contrast to what pharmacies' actual data shows. In truth, none of his analyses proves his theory.

First, using data from the GAO, Dr. Hartman asserts that a 6.1% increase in U&C prices between January 2002 and January 2003 establishes that U&C prices rose due to the alleged scheme. (Hartman Decl. ¶ 19(a).) As Dr. Hartman himself recognizes, he cannot evaluate the effect of the alleged scheme on U&C prices by analyzing price increases alone. (*Id.* ¶ 22(c).) Instead, it is necessary to determine whether U&C prices increased at a higher rate than WAC during that period. (*Id.*; Willig Decl. ¶¶ 76, 78.) Dr. Hartman fails to include that crucial step. His omission is telling, because the data shows that, *in 2002, WAC rose at a higher rate than U&C prices on an aggregated basis*. (*Id.* ¶ 77.) Thus, the 6.1% U&C price increase in 2002 noted by the GAO can be entirely explained by increases in WAC.[13]

Second, Dr. Hartman asserts that claims data provided by the Philadelphia Teamsters demonstrates a formulaic relationship between U&C prices and AWP. (Hartman Decl. ¶ 22.) For

---

[13] Dr. Hartman also points to other GAO data showing that, on average, AWP was 94 % of U&C prices in the first quarter of 2000, and that this ratio fell to 91% by the fourth quarter of 2004. (Hartman Decl. ¶ 19(e).) That evidence undermines plaintiffs' theory, because it shows that AWP rose faster than U&C prices. Dr. Hartman attempts to explain away that inconvenient trend by contending that U&C prices declined sharply relative to AWP between January 2000 and June 2001, after which the trends became "quite similar." (*Id.* at n.31.) Even if true, this explanation only confirms that AWP and U&C prices were not formulaically tied to each other. (Willig Decl. ¶¶ 71-75.)

each of the five "bellwether" drugs, Dr. Hartman analyzes U&C prices reported by just three pharmacy locations. He does not explain (nor can he) why the results of that small sample are representative of the U&C class as a whole. Without such an evidentiary foundation, the Teamsters data sample offers no support for a class-wide formulaic relationship between U&C pricing and AWP. (Willig Decl. ¶¶ 66-67.) Indeed, analysis of a far broader data sample from the RelayHealth database confirms that there was no such class-wide relationship. (*Id.* ¶¶ 68-69.)

Equally important, even for the limited purpose of analyzing U&C prices charged by the three pharmacies studied by Dr. Hartman, the Teamsters data is unreliable because it does not match the claims data that those pharmacies reported to RelayHealth for these drugs. When the Teamsters reimbursement claims are analyzed using RelayHealth pricing data for these relevant drugs and pharmacies, the data shows that U&C prices track WAC not AWP. (*Id.* ¶ 69 & Ex. 7)

Finally, the data set provided by the Philadelphia Teachers refutes Dr. Hartman's claim of a formulaic tie between U&C prices and AWP.[14] Dr. Hartman acknowledges that this data, which only covers transactions going back to May 2002, cannot be used to analyze the effect of the alleged scheme on U&C prices for the five "bellwether" drugs because the increase in mark-ups for those drugs occurred in January 2002. (Hartman Decl. ¶ 23.) Yet he focuses on those drugs anyway and ignores Teachers data for drugs that were marked up after May 2002 — the very data that would be relevant to his theory. Analysis of that data reveals why it was useless to Dr. Hartman. Of the five best-selling drugs included in the Teachers data with markup increases after May 2002, four had U&C price increases (as reported by the three pharmacies with the highest sales for those drugs) that tracked with WAC, not AWP. (Willig Decl. ¶¶ 63-64 & Ex. 5.) For the remaining drug, the U&C price rose at a *slower* rate than WAC. (*Id.*) That evidence confirms not only that there was no formulaic relationship between U&C prices and AWP, but also that the alleged scheme did not affect

---

[14] In contrast to the Teamsters data, the Teachers data generally matches the data contained in the RelayHealth database. (Willig Decl. n.44.)

U&C prices across the proposed class.[15]

### B.   Dr. Hartman's Reading of AWP MDL Discovery Fails to Support His "Formulaic" Conclusion.

In addition to misreading of discovery in this case, Dr. Hartman claims that discovery from the AWP MDL supports his claim that "U&C is frequently formulaically-related to AWP in a predictable fashion." (Hartman Decl. ¶ 16.)  The discovery, however, does not prove this claim.



First, Dr. Hartman cites two PowerPoint presentations, prepared by pricing method is thus irrelevant.

Second, Dr. Hartman cites what appears to be an instruction manual for however, is only used by pharmacies supplying Abbott's Home Infusion drugs, not those who sold to the purported class.

---

[15] Dr. Hartman also relies on data from the State of New Jersey regarding drug prices as of January 11, 2008.  Although he concedes that the data is irrelevant to establishing any impact on U&C prices from the alleged scheme (Hartman Decl. ¶ 26), he asserts that the data confirms a formulaic relationship between U&C prices and AWP. (Id. ¶ 30.)  Dr. Hartman is wrong.  To discern such a relationship, it is necessary to look at data from the period of the markup increase and determine whether *at that time* U&C prices increased at a higher rate than WAC. (Willig Decl. ¶¶ 57-60.)  After the mark up increase, any apparent link between U&C prices and AWP can be just as plausibly explained as a link between U&C prices and WAC. (Id.)  While Dr. Hartman also contends that the New Jersey data supports his theory that U&C prices are almost always higher than AWP (Hartman Decl. ¶ 29), that theory says nothing about whether U&C prices move "formulaically" in response to AWP changes. (Willig Decl. ¶¶ 21, 60.)

16



added.)  Thus, an increase in the Redbook-based cash price at pharmacies using ███ could not have been triggered by increases in FDB's AWP markups.  Importantly, the use of Redbook AWPs by this software presents a separate individual issue even if plaintiffs' central theory — that U&C prices are tied to AWP on a class-wide basis — were true.

Third, Dr. Hartman cites the 2004 MDL deposition transcript of the owner of ███ ███  Dr. Hartman takes the liberty to "concatenate" (*i.e.*, link together) several unconnected statements of ███ to create a quotation which never appears in the actual transcript.  (Hartman Decl. ¶ 16(d).)  In truth, ███ clearly stated that ███ ███[17]  Notably, plaintiffs cite no other pharmacy testimony to support their theory about how pharmacies set U&C prices, and after scouring the MDL record, resort instead to a "concatenated" misquotation from an inadmissible deposition.

### C.    The Auto-Rx Tool Shows That Multiple Factors Affect U&C Pricing.

Plaintiffs devote several pages of their brief, Proffer, and Dr. Hartman's report to describe a pricing tool that can be licensed by pharmacies called Auto-Rx.  Auto-Rx was developed and is sold by Rx-Net, a company with whom McKesson has a contractual relationship.  (Cannata Decl. ¶ 6.)  Although plaintiffs quote promotional literature describing Rx-Net as an "industry leader in price consulting services" (Pls.' Mem. 10), they ignore from the same literature the fact that Auto-Rx tool was not invented until 2005, and that at most it has been used by less than 1% of the country's

---

[17] ███ ███

59,000 pharmacies. (Berman Decl. Ex. 13.)

More important, Auto-Rx does not set cash prices based on AWP, as plaintiffs misleadingly suggest. (Pls.' Mem. 10-11.) Auto-Rx is designed to assist pharmacists who seek to set prices in line with local competition. Indeed, the Rx document plaintiffs cite plainly says the product provides "automatic price schedule updates based on competitors in your area." (Berman Decl. Ex. 12 (MCKAWP 0152030).) Auto-Rx works by generating suggested cash prices equal to the average amount charged by the local competition for each of the 2,100 NDCs tracked by the program. (Cannata Decl. ¶¶ 8-9.) After the pharmacist decides whether to accept or to modify the competitive target price suggested by the program, the software converts the competitive target price into a percentage of AWP. (*Id.* ¶¶ 11-12.) Auto-Rx thereafter conducts monthly reviews of competitive prices in the local market and updates suggested cash prices and converted AWP percentages accordingly. (*Id.* ¶¶ 13-14.) The software does not use a rigid, formulaic tie to AWP; *the prices generated by Auto-Rx are those that prevail in the local market.*[18]

## III.    PLAINTIFFS CANNOT MEET THEIR BURDEN FOR CLASS CERTIFICATION UNDER RULE 23.

The evidence regarding the variability in cash pricing demonstrates that plaintiffs cannot carry their class certification burden.[19] Individual issues of impact and injury predominate, and the calculation of class member damages would present insurmountable manageability problems.

---

[18] Auto-Rx also has a function that compares the average cash price charged by competitors to the average third party reimbursements they receive. If the cash price is less than the average reimbursement, Auto-Rx adjusts the suggested cash price upward. This adjustment happens infrequently. Indeed, Auto-Rx's developer estimates that *90%-95% of the prices suggested by the software are based on prices in the local market.* (Cannata Decl. ¶ 16.)

[19] For class certification, plaintiffs bear the burden of setting forth evidence establishing that each of Rule 23's requirements is satisfied. *See, e.g., Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003). To test plaintiffs' showing, the Court must examine "the claims, defenses, relevant facts, and applicable substantive law" and consider how a trial on the merits would be conducted. *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.* ("*New Motor Vehicles*"), No. 07-2257, 2008 U.S. App. LEXIS 6483, at *29 (1st Cir. Mar. 28, 2008) (on motion for class certification, courts must "formulate some prediction as to how specific issues will play out").

A.    **Whether Each Class Member Who Paid the Cash Price was Injured by the Alleged Scheme Cannot be Answered with Common Proof.**

A plaintiff cannot recover under RICO unless he proves that he was "injured . . . by reason of" the alleged RICO violation under 18 U.S.C. § 1964(c). *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). If the question of impact or fact of injury requires individualized proof unique to each class member, no class can be certified. *See McLaughlin v. American Tobacco Co.*, No. 06-4666-cv, 2008 U.S. App. LEXIS 7093, at *28 (ordering decertification of RICO class where proof of injury would require individualized analysis).

In *New Motor Vehicles*, for example, the First Circuit vacated a class certification order where the plaintiffs failed to offer "some means of determining that *each member of the class* was in fact injured." 2008 U.S. App. LEXIS, at *62 (emphasis added). There, the consumer plaintiffs alleged that a conspiracy among automobile manufacturers to restrict the importation of lower-priced Canadian cars increased two key prices in the U.S. market: the Manufacturer's Suggested Retail Price ("MSRP") and the dealer invoice price. *Id.* at *4-*8. The court rejected the plaintiffs' apparent reliance "on an inference that any upward pressure on national pricing would necessarily raise the prices actually paid by individual consumers" because that inference did not show that *all* consumers paid higher prices. *Id.* at *65-*66.

Plaintiffs attempt to satisfy their "duty to prove each [class member] was harmed by defendants' practice" (*id.* at *64), by asserting that U&C prices are "formulaically tied to AWP," resulting in injury to every class member when the AWP spread was increased. But the Court cannot accept plaintiffs' theory at face value. It must "make whatever legal and factual inquiries are necessary" to reach an informed evaluation of the empirical validity of plaintiffs' theory. *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 5 (1st Cir. 2005).

As noted, the overwhelming empirical evidence demonstrates that all U&C prices are *not* tied to AWP. Dr. Hartman's damage model does not, however, "establish, without need for individual determinations for the many millions of potential class members, which customers were impacted by the alleged antitrust violation and which were not." *New Motor Vehicles*, 2008 U.S. App. LEXIS

6483, at \*63. Indeed, the only way to determine whether any class member was in fact impacted by the alleged scheme is to examine, on an individual basis, which prescription drug the payor purchased, which pharmacy filled the payor's prescription, and what pricing policies or practices were followed by that pharmacy on that day for that payor. Under these circumstances, individual issues concerning impact will predominate, and class certification would be improper. *See* Fed. R. Civ. P. 23(b)(3); *see also McLaughlin*, 2008 U.S. App. LEXIS 7093, at \*39-\*40, \*42-\*43 (noting that class certification would be contrary to the Rules Enabling Act and the Due Process Clause where plaintiffs cannot prove injury to each class member).

Contrary to plaintiffs' and Dr. Hartman's assertions, the issues for certification of the U&C class are entirely different than those addressed by the Court's prior class orders. The Court's basis for concluding that impact on the TPP and related consumer class would be amenable to common proof does not exist with respect to the purported U&C class. In certifying Classes 1 and 2, the Court relied upon long-term contractual provisions which contained AWP-based formula in existence at the time of the 5% markup increase. With cash prices, by contrast, there are no such contracts and no required tie to AWP during any of the class period. Instead, there are 59,000 pharmacies making independent pricing judgments on a transactional-level basis in determining what to charge. Thus, contrary to plaintiffs' contention, "there *is* something about the U&C Class that makes it different from the other certified classes such that certification of this class is not appropriate." (Pls.' Mem. 1, emphasis added.)

**B.      Dr. Hartman's Model Cannot Rely on Averages to Paper-Over His Inability to Determine Whether Each Class Member Was Impacted.**

Rather than address the host of individual issues that would be raised by any attempt to identify which purported class members were impacted and which were not, Dr. Hartman ignores real-world cash payors altogether and instead purports to calculate the "average" injury sustained by the "average" cash customer. But plaintiffs do not cite a single case that certified a class based on an abstract, mathematically derived proffer of "average" injury in the face of concrete evidence that

large numbers of proposed class members were not affected by the alleged violation.[20]  To the

contrary, plaintiffs seeking class certification cannot circumvent their duty to prove harm to each

class member through resort to averages, presumptions, and inferences.  *See, e.g., Blades v.*

*Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005).

    For example, in *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003), the Fifth

Circuit affirmed the denial of class certification where the plaintiffs argued, among other things, that

class member businesses were injured by incurring higher labor costs due to AT&T's refusal to

allow them access to caller identification services.  Plaintiffs proposed to calculate damages using

the "average number of seconds" that the businesses would have saved per call had caller ID been

available and the average wage rate for a "typical employee answering and processing telephone

calls."  *Id.* at 300.  The Fifth Circuit rejected that approach, finding that "[n]umerous factors that

would have affected the amount of damages, if *any*, suffered by any given class member denied

caller ID are not accounted for in the proposed formula."  *Id.* at 302-04 (individual issues

predominate where "fact of damage cannot be established *for every class member* through proof

common to the class") (emphasis added).

    Similarly, in *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998),

the plaintiffs' expert "purported to calculate the lost profits damages of all class members on a

'global' basis," through calculation of average lost sales and average profit margins.  *Id.* at 336.  In

denying class certification, the Fourth Circuit forcefully rejected plaintiffs' expert's reliance on

"abstract analysis of 'averages'" and focus on the "fictional 'typical franchisee operation,'" rather

---

[20] Plaintiffs disingenuously cite *New Motor Vehicles* for the proposition that "class-wide impact is often presumed in price-fixing cases." (Pls.' Mem. 17.) As discussed above, *New Motor Vehicles* expressly *refused* to infer class-wide impact from the alleged price-fixing scheme. 2008 U.S. App. LEXIS 6483, at *65-*66. Moreover, this Court has recognized that antitrust principles regarding class-wide impact from increased baseline prices are not applicable to the TPP class because of the role played by third party PBMs in mitigating any price increases. (*See* Aug. 27, 2007 Order 17, 19.) That same logic applies to the U&C class, where third party pharmacies make individual determinations in setting cash prices, without any requirement to base those prices on AWP. Thus, this case is more analogous to the antitrust indirect purchaser cases where a presumption of impact is not allowed. *See, e.g., In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164-65 (N.D. Cal. 2001).

than calculating the damages that individual franchisees suffered. *Id.* at 343. The First Circuit's rejection of plaintiffs' "inference of upward pressure" in *New Motor Vehicles* is no different. 2008 U.S. App. Lexis 6483 at *65-*66.

Like the rejected injury theories in *New Motor Vehicles*, *Bell Atlantic*, and *Broussard*, the injury model here improperly relies on an "abstract analysis of averages," ignoring the host of disparate methods and factors used by pharmacies to determine prices for cash transactions. Indeed, plaintiffs' model is even more untenable than the models proffered in those cases — a large number of the proposed U&C class never suffered any injury because the cash prices they paid had nothing to do with AWP.[21] Under these circumstances, plaintiffs' model neither establishes the fact of injury for *every* proposed class member nor presents an "adequate approximation of any single class member's damages." *Bell Atlantic*, 339 F.3d at 304. Accordingly, individual issues of impact will predominate, making the proposed class unsuitable for certification. *See, e.g., In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 619 (W.D. Wash. 2003).[22]

### C.   Adjudication of the U&C Class Claims Poses Insurmountable Manageability Problems.

Rule 23's manageability inquiry "focuses on pragmatic concerns" and is "[a] key factor" in determining whether to certify a proposed class. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 90 (D. Mass. 2005); *see also Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981) (manageability inquiry involves an assessment of "the form that trial on the[] issues would take"). Plaintiffs offer only a single sentence on how trial here would proceed, proposing that after a liability

---

[21] Named U&C plaintiff Shelly Campbell is a case in point. She purchased Wellbutrin from ████ ████ (Campbell Dep. 6:22-7:4; 11:21-12:3), which sets its cash prices based on acquisition cost.

[22] Relying on *New Motor Vehicles*, plaintiffs argue that the Court need not conduct a "searching inquiry" into their theory because it is neither novel nor complex. (Pls.' Mem. 17 n.51.) Yet plaintiffs' theory that cash prices are tied to AWP was apparently too novel or complex to pursue either in the MDL AWP case, where plaintiffs abandoned this argument, or earlier in this case, when cash customers first appeared in the class definition. (Orig. Compl. ¶ 138.) But even if plaintiffs' theory were not novel and complex, a "rigorous analysis" is still required. *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003).

determination, "allocation of the award is made later, administratively, upon the submission of claims, according to a court-approved formula."[23] (Pls.' Mem. 19-20.) But to separate out and identify any injured cash payors from those who are not, and to accurately apportion damages to any injured payor, the Court will have to determine the varying extent to which the AWP markup increase may have influenced the cash price charged by each dispensing pharmacist on each drug on a particular day to a particular class member. The notion that this could be distilled into a single "court approved formula," rather than requiring a formula for each of 59,000 pharmacies, or even more, given the variability of cash prices within a single store, is absurd.

Apportioning damages for a U&C class thus presents the same "morass" of "individualized trials or hearings" that defeated certification of the TPP class for the time period when mitigation issues loom large. (Aug. 27, 2007 Order 24; Mar. 19, 2008 Order 21.) Indeed, the manageability concerns relating to the U&C class are even more daunting. While the Court found that an individualized impact and damages analysis was not required for the "typical TPP" for transactions before 2004, the evidence shows that U&C prices paid by the proposed class members were the product of each individual pharmacy's independent pricing decisions from day one of the class period and for each day thereafter.

Moreover, the Court will be unable to rely on Dr. Hartman's model to allocate damages because Dr. Hartman assumes that every U&C price increase in excess of a WAC increase was due to FDB's AWP markup increase. Analysis of the pricing data for Appendix A drugs reveals, however, that on numerous occasions during the class period, the U&C/WAC ratio increased without any corresponding increase in the AWP spread. (Willig Decl. ¶ 88.) Thus, in each of those instances, the Court will still need to determine whether the increase in U&C resulted from an increase in the AWP markup, from changes in local market conditions, from increased overhead

---

[23] Plaintiffs also submit a "Trial Plan" but it simply restates the trial plan submitted with their TPP certification papers. It does not even mention the U&C class. (Trial Plan.)

costs at the store level, or from other factors. This presents the very "morass" of individualized proceedings that weigh against certification.[24]

## CONCLUSION

Rule 23 cannot be met for a purported class of consumers who paid cash prices that were set based on the independent judgment of individual pharmacies who were under no contractual or other requirement even to consider AWP in the pricing decision. Class certification should accordingly be denied.

Respectfully submitted,
McKesson Corporation
By its attorneys:

/s/ Lori A. Schechter
Melvin R. Goldman (*pro hac vice*)
James P. Bennett (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Email: LSchechter@mofo.com
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

John Kiernan
Stephen E. Hughes
Bonner Kiernan Trebach & Crociata
200 Portland Street
Suite 400
Boston, MA 02114
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: May 21, 2008

---

[24] The cases cited in the Trial Plan also provide no support for class certification. *Bell Atlantic* denied class certification because individual damages could not be determined through a class-wide "mathematical or formulaic calculation." 339 F.3d at 306-07. Equally unavailing is *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004), where the manageability issue dealt only with the size of the class. *Id.* at 660. *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000), is also unlike this case because there the court held that individual issues raised by a class of approximately 2,500 members could be heard by a Special Master, who would then submit a report on those issues to the trier of fact. Here, such an approach would plainly be unworkable, given the vastly larger size of the proposed class, and the existence of 59,000 pharmacies who individually set the relevant prices. Lastly, plaintiffs cite *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004). In that case, the court rejected the defendants' manageability arguments because they "failed to point to any specific management problems — aside from the obvious ones that are intrinsic in large class actions." *Id.* at 1273. That is not the case here.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on May 21, 2008.

/s/ Lori A. Schechter
Lori A. Schechter