UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN, | Civil Action: 1:05-CV-11148-PBS <br><br> Judge Patti B. Saris |

                    Plaintiffs,

        v.

FIRST DATABANK, INC., a Missouri corporation,
and McKESSON CORPORATION, a Delaware
corporation,

                    Defendants.

### DECLARATION OF PAUL FLUM

    I, Paul Flum, declare as follows:

    1.    I am a partner in the law firm of Morrison & Foerster and one of the attorneys of record for McKesson Corporation ("McKesson") in this action.  I submit this declaration in support of McKesson's Memorandum in Opposition to Plaintiffs' Motion for Certification of the U&C Class.

**Claims Data From McKesson's RelayHealth Database**

2.     In an email dated March 13, 2008, McKesson offered to produce to plaintiffs the six NCPDP fields from the RelayHealth database that Dr. Willig relies on and which permit the calculation of reported U&C prices at the individual prescription level.

3.     By letter dated April 2, 2008, plaintiffs' counsel rejected McKesson' offer to produce de-identified U&C pricing data from the RelayHealth database at the transaction level.

4.     On April 8, 2008, I emailed plaintiffs' counsel and renewed McKesson's offer to produce U&C pricing data at the transaction level data for the six fields identified in my March 13 email, and attached a sample of that data to permit plaintiffs' expert to confirm that these fields are sufficient to conduct a transactional analysis of reported U&C prices.

5.     On April 15, 2008, I again wrote plaintiffs' counsel to renew McKesson's offer to produce the specific U&C-related fields identified in my March 13 email.

6.     Meanwhile, on March 14, 2008, McKesson began soliciting retailer consent to production of the specific fields of U&C pricing data which is required under numerous individual contracts.  This process took over a month.  In all, twenty-one of RelayHealth's largest retail chain subscribers consented to production on behalf of themselves and their affiliates of the U&C pricing data identified in my March 13 email.

7.     After consents were obtained, I requested that RelayHealth extract the data from the U&C fields identified in my March 13 email.

8.     On May 6, 2008, McKesson provided Dr. Willig with the RelayHealth U&C pricing data for the first time.  Dr. Willig thus had approximately two weeks to analyze the U&C pricing data before submitting his declaration in support of McKesson's memorandum in opposition to plaintiffs' motion for class certification of the U&C class.

9.     Also on May 6, 2008, I advised plaintiffs that the RelayHealth U&C pricing data was available and asked counsel to provide a public encryption key so the data could be securely delivered.  Plaintiffs provided me with their public encryption key on May 8, 2008.  A hard drive containing these data was sent to plaintiffs' counsel on May 9, for delivery on Saturday, May 10.

10.     On May 14, 2008, plaintiffs' counsel sent me a letter identifying technical problems accessing the information on the hard drive.  On May 16, 2008, I sent plaintiffs' counsel a replacement hard drive containing another encrypted copy of the U&C pricing data for consenting retailers.

11.     On May 20, 2008, plaintiffs counsel emailed me, requesting a password to open the hard drive.  That same day, I provided plaintiffs' counsel with the necessary passwords to access the data.

12.     Also on May 20, plaintiffs requested, for the first time, a deposition of the person most knowledgeable about the RelayHealth database.

**Pharmacy Subpoenas**

13.     The parties sent 28 subpoenas to pharmacies seeking documents regarding how they set U&C prices:  Costco Wholesale Corporation, Pathmark Stores, Inc., Rite Aid Corp., ShopKo Stores, Inc., USA / Super D Drugs, Wal-Mart Stores, Inc., Fred's Inc., Meijer, Inc., Target Corporation, Hannaford Bros., Longs Drug Stores Corporation, Walgreen Co., Safeway, Inc., Stop & Shop Supermarket Co., Hy-Vee, Inc., Brooks Pharmacy, CVS Corporation, Duane Reade, Inc., Giant Eagle, Inc., Kerr Drug, Inc., Kinney Drugs, Inc., Kmart Corporation, Kroger Co., H.E. Butt Grocery Co., Medicine Shoppe International, Inc., Publix Super Markets, Inc., SuperValu, Inc., and Winn-Dixie Stores, Inc.  Fifteen of the pharmacies provided responsive evidence.  McKesson also took the depositions of some of the pharmacies and obtained declarations from others.  Plaintiffs did not notice any pharmacy depositions.

14.     Most of the pharmacies made objections to the subpoenas, and the following thirteen pharmacies provided no documents in response:  Brooks Pharmacy, CVS Corporation, Duane Reade, Inc., Giant Eagle, Inc., Kerr Drug, Inc., Kinney Drugs, Inc., Kmart Corporation, Kroger Co., H.E. Butt Grocery Co., Medicine Shoppe International, Inc., Publix Super Markets, Inc., SuperValu, Inc., and Winn-Dixie Stores, Inc.

**Documents and Deposition Testimony**

15.    True and correct copies of deposition transcript excerpts and documents produced

in this action are attached as exhibits to this declaration as follows:

| Exhibit No. | Producing Party or Witness Affiliation | Description |
|---|---|---|
| 1 | Costco Wholesale Corporation | Declaration of Charles Burnett of Costco, dated April 17, 2008. |
| 2 | Pathmark Stores Inc. | Declaration of Robin Page of Pathmark, dated April 23, 2008. |
| 3A | Rite Aid Corp. | Excerpts from the deposition of Jamie N. May of Rite Aid, dated April 24, 2008. |
| 3B | Rite Aid Corp. | Document entitled, "New Item Price Assignments: Brand Items Only," bates labeled RA-AWP-000021-23, and marked as Exhibit 3 at the deposition of Jamie N. May on April 24, 2008. |
| 3C | Rite Aid Corp. | Document entitled, "Rx Batch Processing," bates labeled RA-AWP-000033-34, and marked as Exhibit 5 at the deposition of Jamie N. May on April 24, 2008. |
| 4A | ShopKo Stores, Inc. | Excerpts from the deposition of Michael J. Bettiga of ShopKo, dated April 29, 2008. |
| 4B | ShopKo Stores, Inc. | ShopKo's production letter to McKesson, dated March 3, 2008, and marked as Exhibit 3 at the deposition of Michael J. Bettiga on April 29, 2008. |
| 4C | ShopKo Stores, Inc. | Responsive Document No. 1, marked as Exhibit 4 at the deposition of Michael J. Bettiga on April 29, 2008. |
| 4D | ShopKo Stores, Inc. | Responsive Document No. 2, marked as Exhibit 5 at the deposition of Michael J. Bettiga on April 29, 2008. |
| 5 | USA / Super D Drugs | Declaration of Jason LaFrance of USA / Super D Drugs, dated May 20, 2008. |
| 6A | Wal-Mart Stores, Inc. | Declaration of Sandra K.B. Kinsey of Wal-Mart, dated April 25, 2008. |
| 6B | Wal-Mart Stores, Inc. | Wal-Mart's production letter to McKesson enclosing its "Prescription Pricing Guidelines," bates numbered WMT 000001-8. |
| 7A | Meijer, Inc. | Document entitled, "Summary of General Pricing Guidelines For Key 63," dated May 29, 2007 and bates labeled 01-04. |
| 7B | Meijer, Inc. | Document entitled, "Pharmacy Competition," dated March 6, 2008 and bates labeled 09-18. |
| 7C | Meijer, Inc. | Document entitled, "Top RX List 2006," bates labeled 19-24. |
| 8 | Target Corporation | Declaration of Stacie Johnson of Target, dated May 13, 2008. |

| Exhibit No. | Producing Party or Witness Affiliation | Description |
|---|---|---|
| 9 | Hannaford Bros. | Hannaford's production letter to McKesson, enclosing an unlabeled document entitled, "Pharmacy Pricing Strategy." |
| 10 | Longs Drug Stores Corporation | Declaration of Susan Wells of Longs, dated May 8, 2008. |
| 11 | Walgreen Co. | Document entitled, "Rx Pricing Frequently Asked Questions," and bates labeled WAL004927-4930. |
| 12 | Safeway, Inc. | Email chain, dated December 11-19, 2006, and bates labeled SFWY 000052-54. |
| 13 | Hy-Vee, Inc. | Declaration of Robert Egeland of Hy-Vee, dated May 9, 2008. |
| 14 | Finley's Rexall Drug | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Anthony Hutchinson in *Beeman v. TDI Managed Care Services*, No. EDCV 02-1327, and bates labeled ESI-414-00005442; 00005491; 00005520; 00005523. |
| 15 | Medicine Shoppe | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Charles Miller in *Beeman v. TDI Managed Care Services*, No. EDCV 02-1327, and bates labeled ESI-414-00005442; 00005492. |
| 16 | Pearson's Medical Group Pharmacy | Excerpts from Defendants' Opposition to Motion for Class Certification, dated June 14, 2004, identifying deposition testimony of Bill Pearson in *Beeman v. TDI Managed Care Services*, No. EDCV 02-1327, and bates labeled ESI-414-00005442; 00005493; 00005546; 00005553. |
| 17 | Rx-Net, Inc. | Declaration of Michael Cannata of Rx-Net, dated May 20, 2008. |
| 18 | Voshell's Pharmacy | Excerpts from the deposition of Joseph Dorsch of Voshell's, dated December 8, 2004, taken in *In re Pharmaceutical Industry Average Wholesale Price Litig.*, No. 01-12257 (D. Mass.) ("*Pharm. III*"). |
| 19A | Abbott Laboratories | Document reflecting Abbot Laboratories' bid in response to a Geri-Med request for proposal, dated March 26, 1998, and bates labeled ABT 277679-714. |
| 19B | Abbott Laboratories | Document entitled, "Item File Data Elements" for CHIP software, draft dated October 12, 1999, and bates labeled BR02151-62. |
| 19C | Abbott Laboratories | Excerpts from the deposition of Bruce Rodman of Abbott, dated August 29, 2007, taken in *Pharm. III*. |
| 20 | RelayHealth | Declaration of Thomas Picard of RelayHealth in Opposition to Plaintiffs' Motion for Certification of the U&C Class, dated May 20, 2008. |

| Exhibit No. | Producing Party or Witness Affiliation | Description |
|---|---|---|
| 21 | U&C Plaintiff | Excerpts from the deposition of plaintiff Shelly Campbell, dated March 24, 2008. |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 21st day of May 2008, in San Francisco, CA.

/s/ Paul Flum
Paul Flum

# Exhibit 1
# Filed Under Seal

# Exhibit 2
# Filed Under Seal

# Exhibit 3A
# Filed Under Seal

# Exhibit 3B
# Filed Under Seal

# Exhibit 3C
# Filed Under Seal

# Exhibit 4A
# Filed Under Seal

# Exhibit 4B
# Filed Under Seal

# Exhibit 4C
# Filed Under Seal

# Exhibit 4D
# Filed Under Seal

# Exhibit 5
# Filed Under Seal

# Exhibit 6A
# Filed Under Seal

# Exhibit 6B
# Filed Under Seal

# Exhibit 7A
# Filed Under Seal

# Exhibit 7B
# Filed Under Seal

# Exhibit 7C
# Filed Under Seal

# Exhibit 8
# Filed Under Seal

# Exhibit 9
# Filed Under Seal

# Exhibit 10
# Filed Under Seal

# Exhibit 11
# Filed Under Seal

# Exhibit 12
# Filed Under Seal

# Exhibit 13
# Filed Under Seal

# Exhibit 14

1   LAWRENCE P. RIFF (State Bar No. 104826)
    JASON LEVIN (State Bar No. 161807)
2   STEPTOE & JOHNSON LLP
    633 West Fifth Street, Suite 700
3   Los Angeles, CA 90071
    Telephone: 213-439-9400
4   Facsimile:  213-439-9599

5   MARTIN D. SCHNEIDERMAN (admitted *pro hac vice*)
    STEPTOE & JOHNSON LLP
6   1330 Connecticut Avenue, NW
    Washington, D.C. 20036
7   Telephone: 202-429-3000
    Facsimile:  202-429-3902

8

9   Attorneys for Defendant,
    ADVANCEPCS

10            UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                EASTERN DIVISION

13

| | |
|---|---|
| 14   JERRY BEEMAN AND PHARMACY SERVICES, INC., dba BEEMAN'S PHARMACY; ANTHONY HUTCHINSON AND ROCIDA, INC., dba FINLEY'S REXALL DRUG; CHARLES MILLER dba MEDICINE SHOPPE; JIM MORISOLI AND AMERICAN SURGICAL PHARMACY, INC., dba AMERICAN SURGICAL PHARMACY; BILL PEARSON AND PEARSON AND HOUSE, dba PEARSON'S MEDICAL GROUP PHARMACY, on behalf of themselves and all others similarly situated and on behalf of the general public, | Case No.: EDCV 02-1327 VAP (SGL) [Filed December 5, 2002] Honorable Virginia A. Phillips **OPPOSITION TO MOTION FOR CLASS CERTIFICATION; DECLARATION OF JASON LEVIN** Hearing Date: July 12, 2004 Hearing Time: 10:00 a.m. Hearing Place: Courtroom of the Hon. Virginia A. Phillips |
| Plaintiffs, | |
| vs. | |
| ~~CAREMARK INC.;~~ TDI MANAGED CARE SERVICES, INC. dba ECKERD HEALTH SERVICES; MEDCO HEALTH SOLUTIONS, INC.; EXPRESS SCRIPTS, INC.; and ADVANCE PCS, | |
| Defendants. | |

1

DOC. #125579

ESI-414-00005442

1  a certain predetermined net profit. *Id.* at 37:23-38:9.  He stated that the fee was

2  intended to compensate him for all costs — not just dispensing services but all

3  other costs such as overhead. *Id.* at 38:18-39:6, 130:12-18.  He could not identify

4  what portion of the flat fee represented the value of his dispensing services

5  (arguably, an amount lower than the contractual dispensing fee he receives through

6  his PBM network agreements). *Id.* at 131:22-132:17.  He also testified that he

7  doesn't distinguish the services he provides in dispensing prescription drugs from

8  other pharmacy services such as consulting with the customer about the drug. *Id.*

9  *at* 129:16-130:18.  The fee charged cash-paying customers is also the same

10 regardless of the labor involved (the number of pills dispensed) or the amount of

11 time, if any, Mr. Beeman spends providing consultation to the customer. *Id.* at

12 42:4-16, 138:9-21.  Although he sets what he views to be a competitive pricing

13 structure, he does not accept offers to match competitors' prices or research the

14
15 prices competitors are actually charging. *Id. at* 45:1-13, 49:23-50:2, 131:8-12.

16     *Anthony Hutchinson*

17     In direct contrast to Mr. Beeman, Mr. Hutchinson testified that the value of

18 his dispensing services varies depending on the acquisition cost of the drug.

19 Hutchinson, Exh. G, 102:6-11.  He sets prices by adding a fixed mark-up to his

20 acquisition cost and then adding what he considers to be an appropriate fee. *Id.* at

21 94:8-25, 95:23-96:17.  The more expensive the drug, the greater the dispensing fee.

22 *Id.* at 97:18-98:6.  Hutchinson emphasized that he was also very flexible in the

23 prices he charges and considers, among other things, who the customer is, the

24 prices charged by his competition and his perception of the ability of the customer

25 to pay.  *Id.* at 35:2-8, 42:10-20, 92:15-93:6, 96:23-97:7, 98:7-22, 99:22-25.

26 Competition from local chain stores plays a significant role in what he charges. *Id.*

27 at 100:1-3, 101:18-20.  There are several chain stores less than a mile away from

28 his pharmacy, and he has some of his staff regularly call on the chains to determine

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

DOC. #125579

ESI-414-00005491

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY BEEMAN AND PHARMACY SERVICES, INC., et al.,     } <br><br> Plaintiffs,     } <br> vs.     } <br><br> TDI MANAGED CARE SERVICES, INC., et al.,     } <br><br> Defendants.     } | Case No. EDCV 02-1327 VAP (SGLx) <br><br><br> CERTIFIED COPY |

DEPOSITION OF ANTHONY LEONARD HUTCHINSON

Riverside, California

June 2, 2004

# SYLVIA BECKER & ASSOCIATES, INC.

Certified Court Reporters & Legal Videographers
4727 Wilshire Boulevard, Suite 401
Los Angeles, CA 90010
(888) 425-1010 Toll Free    (323) 857-0911 Fax
E-Mail:  scheduling@sbecker.com
Web Site:  www.sbecker.com

| | | |
|---|---|---|
| 1 | usual and customary charge for one of your uninsured | 03:20:58PM |
| 2 | customers? | 03:21:02PM |
| 3 |      MR. MANSFIELD:  I'm sorry, when you say go | 03:21:09PM |
| 4 | into, go into in terms of setting a particular U and | 03:21:11PM |
| 5 | C? | 03:21:15PM |
| 6 |      MR. LEVIN:  Let me -- | 03:21:16PM |
| 7 |      MR. MANSFIELD:  Objection, the question was | 03:21:17PM |
| 8 | vague, I just want to -- | 03:21:18PM |
| 9 |      MR. LEVIN:  Let me rephrase the question. | 03:21:19PM |
| 10 | Q    What factors do you consider in deciding the | 03:21:23PM |
| 11 | price that you will charge an uninsured customer for | 03:21:28PM |
| 12 | one of your drugs? | 03:21:33PM |
| 13 | A    What I think they can afford. | 03:21:34PM |
| 14 | Q    Anything else? | 03:21:46PM |
| 15 | A    The competition price. | 03:21:52PM |
| 16 | Q    Do you also consider what price you were | 03:22:00PM |
| 17 | charged for the drug? | 03:22:10PM |
| 18 | A    What price I would charge? | 03:22:11PM |
| 19 | Q    No, what price you were charged. | 03:22:12PM |
| 20 | A    Yes. | 03:22:14PM |
| 21 | Q    Do you also consider your overhead? | 03:22:15PM |
| 22 | A    Yes. | 03:22:24PM |
| 23 | Q    Do you also consider the demographics of the | 03:22:25PM |
| 24 | San Bernardino area whose customers come to your | 03:22:49PM |
| 25 | pharmacy? | 03:22:56PM |

# Exhibit 15

1  LAWRENCE P. RIFF (State Bar No. 104826)
   JASON LEVIN (State Bar No. 161807)
2  STEPTOE & JOHNSON LLP
   633 West Fifth Street, Suite 700
3  Los Angeles, CA 90071
   Telephone: 213-439-9400
4  Facsimile:  213-439-9599

5  MARTIN D. SCHNEIDERMAN (admitted *pro hac vice*)
   STEPTOE & JOHNSON LLP
6  1330 Connecticut Avenue, NW
   Washington, D.C. 20036
7  Telephone: 202-429-3000
   Facsimile:  202-429-3902
8
   Attorneys for Defendant,
9  ADVANCEPCS

                    UNITED STATES DISTRICT COURT
10
                    CENTRAL DISTRICT OF CALIFORNIA
11
                           EASTERN DIVISION
12

13
   JERRY BEEMAN AND PHARMACY          )  Case No.: EDCV 02-1327 VAP (SGL)
14 SERVICES, INC., dba BEEMAN'S       )  [Filed December 5, 2002]
   PHARMACY; ANTHONY HUTCHINSON       )
15 AND ROCIDA, INC., dba FINLEY'S     )  Honorable Virginia A. Phillips
   REXALL DRUG; CHARLES MILLER dba    )
16 MEDICINE SHOPPE; JIM MORISOLI AND  )
17 AMERICAN SURGICAL PHARMACY,        )  OPPOSITION TO MOTION FOR CLASS
   INC., dba AMERICAN SURGICAL        )  CERTIFICATION; DECLARATION OF
18 PHARMACY; BILL PEARSON AND         )  JASON LEVIN
   PEARSON AND HOUSE, dba PEARSON'S   )
19 MEDICAL GROUP PHARMACY, on behalf  )
20 of themselves and all others similarly situated )
   and on behalf of the general public, )  Hearing Date:   July 12, 2004
21                                     )  Hearing Time:   10:00 a.m.
                                       )  Hearing Place:  Courtroom of the Hon.
22        Plaintiffs,                  )                  Virginia A. Phillips
                                       )
23     vs.                             )
                                       )
24 ~~CAREMARK INC.;~~ TDI MANAGED CARE )
25 SERVICES, INC. dba ECKERD HEALTH    )
   SERVICES; MEDCO HEALTH             )
26 SOLUTIONS, INC.; EXPRESS SCRIPTS,  )
   INC.; and ADVANCE PCS,            )
27                                     )
28        Defendants.                 )

                                    1
            OPPOSITION TO MOTION FOR CLASS CERTIFICATION
                                                              DOC. #125579

ESI-414-00005442

1  what they are charging. *Id*. at 40:24–41:21. He adjusts his mark-up and the

2  dispensing fee accordingly. *Id*. at 101:18-102:11.

3  ## *Charles Miller*

4  Mr. Miller defines "dispensing fee" as any amount above his acquisition

5  costs, and stated that this amount varies on a drug-by-drug basis for each of the

6  700-800 pharmaceuticals that he stocks in his pharmacy. Miller, Exh. K, 100:25-

7  101:17, 61:10-23. Even for a single prescription drug, there are five payment tiers

8  in Mr. Miller's pricing schedule: (i) people over 65; (ii) people under 7; (iii)

9  people between 7 and 65; (iv) medical professionals; and (v) employees of local

10 businesses. *Id*. at 94:17-95:13, 96:24-97:14. Thus, there may be 4,000 variations

11 on the dispensing fee within Mr. Miller's pharmacy alone. He conceded that there

12 is no discernible "pattern" that explains his pricing schedule. *Id*. at 100:11-24.

13 Mr. Miller does not account separately for the dispensing fee component of the

14 price that he charges to cash-paying customers. *Id*. at 101:19-102:4. Among other

15 things, his pricing is based on profitability, the potential for repeat business, and

16 competitors' pricing. *Id*. at 95:16-96:18. Unlike Mr. Beeman, but like Mr.

17 Hutchinson, Mr. Miller actively seeks to determine competitors' prices. *Id*. at

18 96:19-23.

19

20 ## *Jim Morisoli*

21 Mr. Morisoli derives his pricing structure through a calculation intended to

22 allow him to recoup the cost of doing business, *i.e.* overhead, rent, employees'

23 salaries. Morisoli, Exh. E, 112:11-15. He sells thousands of prescription drugs and

24 prices vary by drug. *Id*. at 29:23-32:2. This amount is fixed and does not vary

25 according to the acquisition cost of the drug. Unlike Messrs. Hutchinson and

26 Miller, in setting retail prices to cash customers, he does not consider what his

27 competition charges. *Id*. at 34:21-24.

28

DOC. #125579

ESI-414-00005492

# Exhibit 16

1    LAWRENCE P. RIFF (State Bar No. 104826)
     JASON LEVIN (State Bar No. 161807)
2    STEPTOE & JOHNSON LLP
     633 West Fifth Street, Suite 700
3    Los Angeles, CA 90071
     Telephone: 213-439-9400
4    Facsimile:  213-439-9599

5    MARTIN D. SCHNEIDERMAN (admitted *pro hac vice*)
     STEPTOE & JOHNSON LLP
6    1330 Connecticut Avenue, NW
     Washington, D.C. 20036
7    Telephone: 202-429-3000
     Facsimile:  202-429-3902

8

     Attorneys for Defendant,
9    ADVANCEPCS

10               UNITED STATES DISTRICT COURT

11             CENTRAL DISTRICT OF CALIFORNIA

12                 EASTERN DIVISION

13

| | |
|---|---|
| 14   JERRY BEEMAN AND PHARMACY | )   Case No.: EDCV 02-1327 VAP (SGL) |
| 15   SERVICES, INC., dba BEEMAN'S | )   [Filed December 5, 2002] |
|      PHARMACY; ANTHONY HUTCHINSON | ) |
| 16   AND ROCIDA, INC., dba FINLEY'S | )   Honorable Virginia A. Phillips |
|      REXALL DRUG; CHARLES MILLER dba | ) |
| 17   MEDICINE SHOPPE; JIM MORISOLI AND | ) |
|      AMERICAN SURGICAL PHARMACY, | )   **OPPOSITION TO MOTION FOR CLASS** |
| 18   INC., dba AMERICAN SURGICAL | )   **CERTIFICATION; DECLARATION OF** |
|      PHARMACY; BILL PEARSON AND | )   **JASON LEVIN** |
| 19   PEARSON AND HOUSE, dba PEARSON'S | ) |
| 20   MEDICAL GROUP PHARMACY, on behalf | ) |
|      of themselves and all others similarly situated | )   Hearing Date:   July 12, 2004 |
| 21   and on behalf of the general public, | )   Hearing Time:   10:00 a.m. |
| | )   Hearing Place:   Courtroom of the Hon. |
| 22 | )                     Virginia A. Phillips |
|               Plaintiffs, | ) |
| 23           vs. | ) |
| | ) |
| 24   ~~CAREMARK INC.;~~ TDI MANAGED CARE | ) |
| 25   SERVICES, INC. dba ECKERD HEALTH | ) |
|      SERVICES; MEDCO HEALTH | ) |
| 26   SOLUTIONS, INC.; EXPRESS SCRIPTS, | ) |
|      INC.; and ADVANCE PCS, | ) |
| 27 | ) |
|               Defendants. | ) |
| 28 | ) |

OPPOSITION TO MOTION FOR CLASS CERTIFICATION

DOC. #125579

ESI-414-00005442

*Bill Pearson*

Mr. Pearson has a computer programmed with 35 different cash prices for the thousands of prescription drugs he carries. Pearson, Exh. I, 58:20-60:7. These prices are assigned to different types of medications and different customers. In some instances, he "low balls" the prices of popular drugs to attract customers. *Id.* at 146:15-147:5. He seeks to obtain higher gross margins on his fastest selling prescription drugs. *Id.* at 154:23-155:7. Not every cash-paying customer pays the same price for the same drug. His pricing is very flexible and subjective. *Id.* 149:4-149:22. There is no "handy formula" that he uses. *Id..* at 147:24-148:1. Among other things, Mr. Pearson assesses whether the customer is potentially a repeat customer and his ability to pay. *Id.* at 151:11-20 He also tries to discourage certain customers who he believes are abusing drugs from frequenting his store by charging them more than he would normally charge. *Id.* at 152:10-16; Beeman, Exh. J, 50:17-20. Unlike Mr. Beeman's flat fee approach or Mr. Hutchinson's fluctuating markup plus fee approach, Mr. Pearson identified his dispensing fee to be the difference between his actual acquisition cost and the price he charged — an amount he identified as his gross margin. Pearson, Exh. F, 159:8-3; 159:24-161:2.

As demonstrated above, cash-customer dispensing fees vary dramatically even among the small group of named Plaintiffs in this case — all of whom are located in the same California county. The overall variation in dispensing service valuations will undoubtedly increase as the Plaintiffs attempt to establish service values for each member of a geographically dispersed, state-wide class consisting of owners of thousands of pharmacies. Pearson, Exh. F, 152:1-5. Plaintiffs' formula simply ensures rather than overcome the need for detailed, individualized proof. Moreover, as Mr. Beeman's flat-fee approach confirms, the prices charged to cash paying customers do not necessarily correspond to the actual services performed as prices are derived independent of the quality and nature of the

46

DOC. #125579

ESI-414-00005493

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JERRY BEEMAN AND PHARMACY SERVICES, INC., et al., | } } } | Case No. EDCV 02-1327 VAP (SGLx) |
| Plaintiffs, | } } | |
| vs. | } } | |
| TDI MANAGED CARE SERVICES, INC., et al., | } } } | CERTIFIED COPY |
| Defendants. | } } } } | |

DEPOSITION OF WILLIAM ARNOLD PEARSON

Riverside, California

June 2, 2004

## SYLVIA BECKER & ASSOCIATES, INC.

Certified Court Reporters & Legal Videographers
4727 Wilshire Boulevard, Suite 401
Los Angeles, CA 90010
(888) 425-1010 Toll Free     (323) 857-0911 Fax
E-Mail: scheduling@sbecker.com
Web Site: www.sbecker.com

EXHIBIT I
PAGE 234

1      Q    Okay.                                                    13:02:51

2      A    When managed care hit, I did some homework.              13:02:51

3           About 1989, 1990 we did 64 percent cash.  We            13:02:54

4   just did this last week, this study.  And then you              13:03:04

5   can -- if you take each year, you just see it go down.          13:03:08

6      Q    Now, with respect to these cash-only                    13:03:15

7   transactions that we've defined, who sets the price            13:03:18

8   for the prescription drug?                                     13:03:22

9      A    I do.                                                   13:03:23

10     Q    Can you describe for me how you do that?               13:03:28

11     A    I take an old benchmark from 30 years ago and          13:03:33

12  then I read in some of my journals, you'll get the top         13:03:39

13  200 drugs -- and I used to use a pricing service, that         13:03:43

14  I don't use it, but I use their basic philosophy.              13:03:50

15          You take your top ten sellers and you lowball          13:03:53

16  those.  This is basically what a discount -- or the            13:03:56

17  chains would do.  And then you have sort of a                  13:04:00

18  bell-shaped figure that is as the price goes up, and           13:04:03

19  then the other factors is the total volume of that             13:04:07

20  item you sell.  Something like maintenance medications         13:04:10

21  have a lower markup than, say, antibiotics.  It used           13:04:16

22  to be that way.                                                13:04:20

23     Q    This pricing service that you used, when did           13:04:21

24  you stop using them?                                           13:04:24

25     A    I probably stopped using that 15 years ago.            13:04:26

**EXHIBIT I**
**PAGE 253**

146

# Exhibit 17

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>            Plaintiffs,<br><br>    v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>            Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF MICHAEL C. CANNATA**

I, Michael C. Cannata, declare as follows:

1.      I am the president, CEO, and sole shareholder of Rx-Net, Inc.  Rx-Net is an

Illinois corporation, located outside Chicago, that develops and sells computerized products to

help pharmacies in setting competitive cash prices for prescription drugs.  Rx-Net's target

customers are independent pharmacies.

1

2.      I am actively involved in Rx-Net's day-to-day business activities, am familiar with the operation of Rx-Net's products, and have played a leading role in their design and development.

**Overview of Auto-Rx-Net**

3.      Rx-Net's products are intended to give independent and smaller chain pharmacies the ability to use some of the same strategies for setting cash prices for uninsured customers that are used by national chains with dedicated pricing departments.  One of these products is called Auto-Rx-Net.  Auto-Rx-Net is a software product that automates portions of the process for setting cash prices.

4.      Auto-Rx-Net was first introduced in April 2005, and is currently being used at approximately 300 individual pharmacies located around the country, most of which are independently owned.  Because I believe that satisfied customers help grow my business, I list the names and contact information for Auto-Rx-Net customers on the Rx-Net website, at http://www.rx-net-inc.com/scan.pdf.  As shown on the website, there were 266 customers using Auto-Rx-Net as of September 12, 2007 — the last time I updated the page.

5.      I charge my pharmacy customers a $300 monthly license fee for the Auto-Rx-Net software.  The license includes use of the software, monthly updates, and technical support.

6.      Auto-Rx-Net is sold exclusively by my company.  I have a contract with McKesson, under which McKesson helps market Auto-Rx-Net on its website and at trade shows. McKesson does not act as a reseller; instead, McKesson refers Auto-Rx-Net leads to my company and receives commissions on any resulting sales.

7.      I am in the process of revising the Auto-Rx-Net software for use with non-McKesson pharmacy software.  I expect to offer Auto-Rx-Net for use with non-McKesson pharmacy systems later this year.

## How Auto-Rx-Net Generates Competitive Cash Prices

8.      Auto-Rx-Net is a plug-in that adds features that are not present in the Pharmaserve (or other third party) software. The Pharmaserve software includes a field for the cash price, i.e., the usual and customary price charged to uninsured customers, but that price must be independently calculated by the pharmacist and then manually keyed into the computer. Pharmaserve does not include a feature that suggests cash prices.

9.      Auto-Rx-Net works on top of the Pharmaserve software to automatically generate suggested cash prices for 2,100 top selling drugs at the NDC level — brand and generic — handled by the pharmacy. Auto-Rx-Net allows a pharmacist to customize pricing based on the pharmacy's individual local competitive mix. Auto-Rx-Net does this by suggesting a competitive cash price that is equal to the average cash prices charged by other pharmacies in the same two digit zip code, as downloaded from RelayHealth. The competitive cash price suggested by Auto-Rx-Net for each drug is updated monthly, based on changes in the average competitive price reports.

10.      When using Auto-Rx-Net, the pharmacist can specify the local market segment to use for the pricing comparison, i.e., local retail chains, local mass merchandisers, other local independents, or a combination.

11.      After Auto-Rx-Net generates a competitive cash price based on the criteria selected by the pharmacist, the software translates that price into a pricing table, which is used by the pharmacy software to generate the cash price. The Pharmaserve program, as an example, offers several different options for generating cash prices, including prices generated as a percentage off AWP, a percentage of MAC, or a flat dollar amount. By default, the pricing tables generated by Auto-Rx-Net are based on AWP, although the pharmacist can override the default and create pricing tables using any of the available benchmarks.

12.      Assuming the pharmacist uses the default, Auto-Rx-Net backs into the percentage of AWP that will yield the competitive cash price previously determined for the pharmacist's particular local market. Auto-Rx-Net creates a separate pricing table for each of the 2,100 NDCs

3

covered by Auto-Rx-Net. The percentage used in the pricing table can be a markup or markdown from AWP, as the average local market price dictates, and will vary from table to table.

### Auto-Rx-Net Updates Cash Prices in Response to Changes in the Marketplace

13.    The percentages that Auto-Rx-Net assigns to each pricing table are not static, but change over time. That's because Auto-Rx-Net monitors the average local competitive price that the pharmacist has selected as the benchmark as part of a monthly update process. If the average competitive price has changed, Auto-Rx-Net recalculates the percentage of AWP necessary to generate the new target price and revises the pricing table accordingly. This is one of the key features of the software — Auto-Rx-Net regularly and automatically adjusts cash prices to stay abreast of the local competition.

14.    For example, if the suggested competitive price for a drug in the local market is $105 and the AWP for that drug is $100, Auto-Rx-Net will, by default, set-up the pricing table as 105% of AWP. If, one month later, the suggested competitive price is still $105 but the AWP has increased to $105, Auto-Rx-Net will, by default, reduce the percentage used in the pricing table for that drug from 105% to 100% of AWP. Similarly, Auto-Rx-Net will reduce the percentage used in the pricing table if the local competition lowers their average cash price — for instance, by running a special — even if AWP doesn't change.

### The Third Party Price Override Feature

15.    There is another step in Auto-Rx-Net that compares the cash price suggested by the program based on the local competitive survey with the reported median third party price, which I understand represents the average price received by the competing group of pharmacies on insured transactions. If the suggested cash price is lower than the median third party price, Auto-Rx-Net will substitute a suggested cash price that is 101% of the median third party price. If not, the program will proceed with the original suggested cash price. This aspect of the program is referred to as the Third Party Override feature.

4

16.   In my experience, the Third Party Override feature rarely comes into play.  The Third Party Override feature will suggest a cash price that is higher than the competitive price for at most 5% to 10% of the pricing tables created by Auto-Rx-Net.  The other 90% to 95% of the pricing tables suggested by the program reflect the average market price based on the results of the competitive market survey.

### Individual Pharmacists Can Override the Prices Suggested by Auto-Rx-Net

17.   The Auto-Rx-Net software is flexible and customizable.  In particular, the prices generated by Auto-Rx-Net are suggestions only.  As with all features of the program, the pricing suggestions can be overridden by the individual pharmacist.

18.   For example, some pharmacists modify the competitive cash price suggested by Auto-Rx-Net by adding a mark-up, sometimes as much as an additional 10% to 20%.  A pharmacist also has the ability to create discounts off the suggested cash price that apply to particular patients or classes of patients, such as seniors or customers that participate in loyalty programs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _20_ day of May 2008, in _BLOOMINGDALE_, Illinois.

_____
Michael C. Cannata

# Exhibit 18
# Filed Under Seal

# Exhibit 19A
# Filed Under Seal

# Exhibit 19B
# Filed Under Seal

# Exhibit 19C
# Filed Under Seal

# Exhibit 20

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>        Plaintiffs,<br><br>  v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>        Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris |

## DECLARATION OF THOMAS PICARD IN OPPOSITION TO PLAINTIFFS' MOTION FOR CERTIFICATION OF THE U&C CLASS

I, Thomas Picard, declare as follows:

1.      I am the Senior Director of Data Services for RelayHealth, a division of McKesson Corporation.  I have held my current position since 2000.  I am responsible for all of RelayHealth's data assets, including the creation and maintenance of the RelayHealth pharmacy claims repository, and oversee a team of 30 individuals charged with acquiring and maintaining that data, and building products and services for RelayHealth's customers.

2.     I am offering this declaration in connection with McKesson's opposition to plaintiffs' motion to certify a U&C class.

## RELAYHEALTH'S SWITCH BUSINESS

3.     RelayHealth operates as a "switch" in the processing of payment claims to retail pharmacies from pharmacy benefit managers, health insurance companies, and government benefit providers like Medicaid and Medicare (collectively "payers"). In broad outline, when a pharmacy customer with some form of insurance coverage has a prescription filled at a retail pharmacy, the pharmacy submits a claim to the customer's payer to be reimbursed for the cost of the drug it dispensed to the customer. The payer uses the data submitted through the RelayHealth switch to adjudicate the customer's claim.

4.     Claims data is reported to RelayHealth using standardized fields known as NCPDP fields. All together there are hundreds of fields in the NCPDP protocol, but the number of fields that contain data in each transaction is governed by the terms of the reimbursement contracts between the pharmacies and the payers. The typical NCPDP transaction contains data in approximately 160 fields. Last year, RelayHealth processed approximately 9.7 billion such transactions, which flowed between 50,000 pharmacies and more than 1,800 payers.

5.     RelayHealth records and stores in a repository the electronic claims data submitted by pharmacies and the electronic claims adjudication data returned by payers exactly as they are reported to RelayHealth. No normalization or scrubbing is performed during the storage of the data in RelayHealth's repository, and RelayHealth does not endeavor to clean up the data after it is received by the switch before being stored.

6.     There is a massive amount of data stored in our repository. All told, the repository contains more than 39 billion individual transactions, covering the time period from April 2001 to the present. The RelayHealth repository currently holds more than 33 terabytes of data (one terabyte is equal to 1,024 gigabytes). These data can be searched and retrieved from

the repository, provided that RelayHealth has been authorized to do by the subscriber that submitted the data.

**THE U&C PRICING DATA EXTRACTED FOR THIS LITIGATION**

7.    At the request of McKesson's attorneys, the Data Services group extracted for use in this litigation the following six fields from the RelayHealth repository for claims paid during the time period April 2001 through December 2005 that show reported U&C prices.

| Field Description | | NCPDP Field Identifier |
|---|---|---|
| B1 | D1 date of service | 401-D1 |
| B1 | D7 product service id | 407-D7 |
| B1 | DQ usual and customary charge | 426-DQ |
| B1 | E7 quantity dispensed | 442-E7 |
| | Pharmacy ID (converted to NABP) | N/A |
| | Pharmacy ZIP | N/A |

These fields permit identification of the U&C per unit price based on the data reported by the pharmacy and recorded in the RelayHealth repository, without revealing protected personal health information about individual consumers.

8.    Data were extracted for the following list of subscribers, including retailers and non-retailers, who had consented to production of this data, as reported by our legal counsel: Ahold USA, Albertson's/Osco, Brooks, Costco, CVS, Duane Reade, Eckerd, Envoy, Hannaford, H.E. Butt, Giant Eagle, Health Business Systems, Hy-Vee, Interactive Systems Management, K-mart, Kroger, Longs, McKesson Pharmacy Systems, Meijer, Pacific Pharmacy Computers, Publix, Rite Aid, RNA, Safeway, ShopKo, Target, TechRx/NDC Pharmacy Rx, TechRx Datastat, Transaction Data Systems, Walgreens, Wal-Mart, and Winn-Dixie.

9.    The data appearing in the extracted fields were copied to a hard drive exactly as extracted from the RelayHealth repository, except that, at Wal-Mart's request, all NABP numbers for Wal-Mart stores were replaced with "9999999." That hard drive contained over 2.8

billion individual transactions, which I estimate represents 113 gigabytes of data when uncompressed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20 day of May, 2008 in Atlanta, Georgia.

Thomas Picard

# Exhibit 21
# Filed Under Seal