UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND; PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER; SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>      Plaintiffs,<br><br> v.<br><br>FIRST DATABANK, INC., a Missouri corporation, and McKESSON CORPORATION, a Delaware corporation,<br><br>      Defendants. | Civil Action:  1:05-CV-11148-PBS<br><br>Judge Patti B. Saris<br><br>[Leave to File Granted on June 2, 2008] |

**DEFENDANT MCKESSON CORPORATION'S SURREPLY IN OPPOSITION TO MOTION TO COMPEL RELAYHEALTH DATA**

McKesson's opposition established that plaintiffs' initial demand for wholesale production of the RelayHealth database was overbroad, unduly burdensome, beyond the scope of discovery authorized by Judge Saris's January 2, 2008 Scheduling Order, and inconsistent with McKesson's contractual obligations to its retail pharmacy customers. Despite those concerns, McKesson has from the outset made a good faith effort to accommodate plaintiffs' request for data relevant to their U&C claims. Among other things, McKesson has: (1) produced RelayHealth data relating to U&C pricing for all Appendix A drugs; (2) produced a detailed data dictionary that would allow plaintiffs to specify additional fields for production, including fields related to insured reimbursements; (3) produced a data sample sufficient to show all fields contained in the database; and (4) offered to seek the contractually-required consent of its RelayHealth customers to disclose further data fields specified by plaintiffs.

Plaintiffs do not dispute any of those points. Instead, in an effort to create the illusion that McKesson has failed to comply with its discovery obligations, they resort to shrill distortions of the record and outright fabrications, including the following:

- Plaintiffs falsely assert that McKesson led them on a "wild goose chase" by encouraging them to issue subpoenas to retailers for claims data. (Reply 1, 5.) [Docket No. 503.] To the contrary, plaintiffs chose to serve those subpoenas almost immediately after their initial request to McKesson for RelayHealth data on January 22. Thus, far from being prompted by McKesson, plaintiffs were clearly following a strategy of pursuing claims data *simultaneously* from McKesson *and* retailers. (*See* Flum Decl. ¶¶ 4, 6, 7; Plaintiffs' Mot. to Modify the U&C Scheduling Order 4 (representing that plaintiffs began "diligently" pursuing claims data from retailers even before turning to McKesson for such data).) [Docket Nos. 499 & 513.] Any resulting burden on plaintiffs or the retailers is entirely the fault of plaintiffs, not McKesson.

- Plaintiffs falsely assert that McKesson engaged in unfair "gamesmanship" by withholding RelayHealth data at the class certification stage for plaintiffs' TPP claims

1

while at the same time challenging plaintiffs' reliance on IMS data. (Reply 1-2.) It is plaintiffs who are playing games. Plaintiffs did not even ask for RelayHealth data until January 22, 2008, long after the close of discovery and class certification briefing for the TPP claims. (Flum Decl. ¶ 6.) Moreover, McKesson's arguments against using IMS data to determine whether TPPs mitigated their losses (if any) through renegotiated PBM contracts apply with equal force to using RelayHealth data for that purpose. (*See* Opp'n n.2.) [Docket No. 498.] Just like IMS data, RelayHealth claims data show only transactions between retailers and PBMs, not payments from TPPs, and thus cannot be used to show the cost-shifting behavior of TPPs in response to the alleged scheme.

- Plaintiffs falsely claim that the Lipitor sample of RelayHealth provided by McKesson was "corrupted," preventing them from using the data to identify fields relevant to their U&C claims. (Reply n.3, n.9.) The data sample is not corrupt. (Flum Surreply Decl. Exs. B-C.) Any difficulties experienced by plaintiffs in reading the data, which is stored in a standard pharmacy industry format, are due to their misunderstanding of that format and their apparent unwillingness to engage the services of an industry specialist familiar with the format. (*Id*. Ex. D.)

- Plaintiffs falsely claim that McKesson "exaggerated" the cost and time required to produce the requested RelayHealth data. (Reply 2, 6-7.) Plaintiffs offer no factual basis for this accusation or for their contention that costs would be "greatly diminished" after they select which fields they want (assuming they ever do). (*Id*. at 7.) To the contrary, even if plaintiffs narrow the number of data fields, there will not be a significant reduction in McKesson's costs, because the entire RelayHealth database will need to be searched regardless of the number of fields that are chosen for production. (Picard Decl. ¶ 6.) [Docket No. 501.]

- Plaintiffs falsely assert that McKesson represented that it could produce claims data from the RelayHealth database without the consent of the affected retailers. (Reply

2

5.) Plaintiffs cite no evidence supporting this assertion. Nor can they, given that McKesson made it clear from the outset that production of RelayHealth data was subject to resolution of any objections from the retailers who had submitted the data. (Flum Decl. Ex. B at 5.)

- Plaintiffs falsely assert that McKesson offered to produce data from any RelayHealth fields chosen by plaintiffs. (Reply 6.) Again, the record flatly contradicts plaintiffs' version of events, confirming that McKesson's counsel repeatedly offered to produce data from "mutually agreed upon" fields. (Flum Decl. Ex. B at 5; *id*. Ex. C.)

The Court should disregard the fictitious alternate history spun by plaintiffs and deny their motion to compel.

## ARGUMENT

In their reply, plaintiffs advance five arguments in support of their motion. None of them have merit.

First, plaintiffs argue that their motion should be granted because McKesson disavows any obligation to produce data relating to insured reimbursements. (Reply 3-4.) To the contrary, McKesson's opposition explicitly acknowledged that such data is discoverable in light of the Court's April 18 Order. (Opp'n 7.) It is plaintiffs who have impeded production of this data by refusing (even as of this date) to identify fields in the RelayHealth database relating to insured reimbursements, despite having the data dictionary and the Lipitor data sample that they previously claimed they needed to make such an identification.[1]

---

[1] As noted, on May 12, McKesson provided plaintiffs with a de-identified sample from the RelayHealth database containing *all* fields for over one million Lipitor 10 mg transactions. (Flum Decl. ¶ 31.) Since then, McKesson has continued its efforts to accommodate plaintiffs' purported need for insured reimbursement data, and plaintiffs have continued to drag their feet. Although plaintiffs represented that they would be able to identify additional fields within seven days of getting the sample, plaintiffs did not do so. (Flum Surreply Decl. ¶ 3.) McKesson sent a follow-up query to plaintiffs on May 23, asking when they would identify any additional fields so that McKesson could start seeking the necessary consent from RelayHealth subscribers. (*Id*. Ex. D.) Plaintiffs responded that their expert was still unable to identify any more fields he was interested in receiving. (*Id*.) On May 27, to avoid further delays, McKesson advised plaintiffs

(Footnote continues on next page.)

3

Moreover, plaintiffs' professed need for reimbursement data is at odds with the work of their own damages expert, Dr. Hartman. At the April 17, 2008 hearing on McKesson's motion for protective order, plaintiffs represented to the Court that Dr. Hartman requires reimbursement data to establish a connection between U&C pricing and AWP. (Tr. 25:21-26:5.) Plaintiffs failed to submit a declaration from Dr. Hartman attesting to any such need, however. Then, just four days later, plaintiffs submitted testimony from Dr. Hartman that fatally undermines their claim that reimbursement data is relevant to U&C pricing. In his declaration in support of certifying the U&C class, Dr. Hartman sought to demonstrate the impact of the alleged scheme on U&C payors by analyzing data sets provided by two named TPP plaintiffs, the Philadelphia Teamsters and the Philadelphia Teachers. Although those data sets included insured reimbursement data, Dr. Hartman ignored that data altogether in favor of tracking the same data (WAC, AWP, and U&C prices) relied on by McKesson's expert, Dr. Willig. (Hartman Decl. ¶ 22, Flum Surreply Decl. Ex. A.)[2] Dr. Hartman's decision to spurn the very data which is the primary focus of plaintiffs' motion speaks volumes about plaintiffs' sincerity, candor, and need for that data.[3]

Second, plaintiffs argue that they are entitled to RelayHealth data relating to insured reimbursements beyond December 2003. (Reply 4.) As explained in McKesson's opposition,

---

(Footnote continued from previous page.)
that it had identified seven data fields that, when produced, would allow plaintiffs to carry out their proposed analysis of third party reimbursements. (*Id*.) As of the date of this submission, plaintiffs have not responded to McKesson's offer to seek retailer consents to production of these fields. (*Id*. ¶ 6.)

[2] Plaintiffs criticize McKesson for not anticipating from the start that plaintiffs' damages analysis would "include[], indeed *highlight*[], the correlation between U&C prices and third-party reimbursement amounts." (Reply n.4 (emphasis in original).) Dr. Hartman is apparently guilty of the same lapse, having neglected to include, let alone highlight, that purported correlation in his analysis.

[3] Plaintiffs' asserted need for insured reimbursement data is further undermined by deposition testimony they themselves have elicited since filing this motion. In response to plaintiffs' questioning, the developer of a software program that assists independent pharmacies in setting U&C prices testified that **U&C prices are "*rarely*" related to insured reimbursements — at most, "five percent or less" showed any such connection based on a study he conducted**. (Flum Surreply Decl. Ex. E at 44:21-45:15, emphasis added.)

4

Judge Saris's March 19, 2008 Order disposes of that issue. That Order held that there is no class-wide, uniform relationship between AWP and insured reimbursements after 2003 due to TPP-specific efforts to mitigate the effects of increased AWP mark-ups. (Docket No. 466 at 13.) It necessarily follows that plaintiffs cannot use insured reimbursements after 2003 to indirectly establish a tie between U&C pricing and AWP, regardless of any correlation between U&C pricing and insured reimbursements. That aside, claims data after 2003 has no relevance to whether U&C payors were affected by the AWP markup increases, which occurred for the most part in the first quarter of 2002. (TAC ¶ 136.) Dr. Hartman recognizes as much, admitting that Walgreens data after December 2003 is "fairly unhelpful" to him and that the Teachers data set, which reflects claims after May 2002, cannot show the impact of the alleged scheme for drugs that were marked-up earlier. (Hartman Decl. ¶¶ 23-24, Flum Surreply Decl. Ex. A.) Thus, even if plaintiffs' interpretation of the March 19 Order is correct, the utility and probative value of reimbursement data after 2003 would be far outweighed by the burden imposed on McKesson in producing that data. (S*ee* Picard Decl. ¶¶ 5-10.)

Third, plaintiffs argue that their motion to compel is somehow supported by the fact that McKesson did not move for a protective order regarding the RelayHealth data. (Reply 5.) McKesson did not move for a protective order because the parties were still meeting and conferring when this motion was filed. McKesson had made a proposal to plaintiffs on April 15 (Flum Decl. ¶ 26 and Ex. J) and was waiting for a response when plaintiffs chose to litigate rather than negotiate. In particular, on the day this motion was filed, McKesson had already offered to produce the data fields relating to U&C pricing and was in the final stages of obtaining the required consent of the affected retailers. (*Id.* ¶ 29.) McKesson was also taking steps to help plaintiffs identify additional data fields that may be relevant to their U&C claims. McKesson can hardly be faulted for not foreseeing that, rather than make a good faith effort to identify such fields, plaintiffs would short circuit the meet and confer process by bringing their motion.[4]

---

[4] Plaintiffs also insinuate that, because retail pharmacies have not moved to intervene regarding the requested production of their insured claims data, the pharmacies would not be troubled if

(Footnote continues on next page.)

5

Fourth, plaintiffs assert that their motion should be granted because they "anticipate they will only need a small number of additional fields." (Reply 7.) There is no reason the Court should credit plaintiffs' "anticipated" needs when they are fully capable right now of identifying any and all additional fields they seek. Plaintiffs have had the data dictionary explaining the fields in the RelayHealth database for over two months. (Flum Decl. ¶ 15.) For over two weeks they have had an *uncorrupted* data sample showing all fields for all April 2008 purchases of Lipitor 10 mg tablets. (*Id*. ¶ 31.) Under these circumstances, plaintiffs can and should do what McKesson has repeatedly asked them to do for months: identify the RelayHealth data fields that they want produced. Without that, McKesson cannot seek the retailers' consent for disclosure of that data.

Finally, plaintiffs argue that they are entitled to documents, such as marketing materials, describing "services" offered to RelayHealth subscribers allowing them to generate reports compiled from their claims data. (Reply 7-8.) Such documents are not called for by any of plaintiffs' U&C document requests. (*See* Flum Decl. Ex. B.) Moreover, plaintiffs fail to explain how a description of RelayHealth's services could shed light on the methods used by its customers to set U&C prices. Nor do plaintiffs explain how such materials would be of any use to them when the services purportedly described by the materials relate to reports that do not exist at RelayHealth. (*See* Opp'n 10; Pinsonneault Decl. ¶¶ 3, 6, 11.) The Court should decline to compel production of those materials.

## CONCLUSION

For the reasons set forth above, McKesson respectfully requests that the Court deny plaintiffs' motion to compel.

---

(Footnote continued from previous page.)
McKesson disregarded its contractual obligations and produced the data without their consent. (Reply 6.) That speculative leap is entitled to no weight whatsoever given that, with one exception, none of the retailers contacted by McKesson would consent to wholesale disclosure of their claims data. (Flum Decl. ¶ 20.)

6

McKesson Corporation
By its attorneys:

/s/ Paul Flum
Melvin R. Goldman (*pro hac vice*)
Lori A. Schechter (*pro hac vice*)
Paul Flum (*pro hac vice*)
Tiffany Cheung (*pro hac vice*)
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
PaulFlum@mofo.com

John Kiernan
Stephen E. Hughes
Bonner Kiernan Trebach & Crociata
200 Portland Street
Suite 400
Boston, MA 02114
Telephone: (617) 426-3900
Facsimile: (617) 426-0380

Dated: May 30, 2008

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on June 2, 2008.

/s/ Paul Flum
Paul Flum