**PCMA**
PHARMACEUTICAL CARE MANAGEMENT ASSOCIATION

June 24, 2008

Honorable Patti B. Saris
United States District Judge
United States District Court for the District of Massachusetts
1 Courthouse Way
Boston, MA 02210

Re:   **New England Carpenters Health Benefits Fund, et al. v. First DataBank, Inc. and McKesson Corporation, Civil Action No. 05-11148-PBS**

**District Council 37 Health and Security Plan v. Medi-Span, Civil Action No. 07-CV-10988**

Dear Judge Saris:

We are writing on behalf of Pharmaceutical Care Management Association (PCMA) to note our substantial concerns regarding the Amended and Restated Settlement Agreement and Release filed by Plaintiffs and Defendant First DataBank ("FDB") on May 29, 2008, and applicable as well to Defendant Medi-Span. PCMA, the national association representing America's pharmacy benefit managers (PBMs), submitted a formal opposition as *amicus curiae* to the former versions of the Settlements on December 19, 2007, Document #400-2, and appeared at the Fairness Hearing on January 22, 2008 to voice its objections to their fairness, reasonableness and adequacy. PCMA plans to file a formal objection to the Amended Settlement, as even this attempt by the Settling Parties suffers from significant legal and practical defects.

For now, however, we request that the Court consider the following three points:

First, the Amended Settlement's requirement that the AWP rollback take place 90 days after this Court grants final approval specifically and effectively precludes any appellate review of that issue. This term is both impractical and may be legally (perhaps constitutionally) defective. At a minimum, the inclusion of this term will cause unnecessary motion practice before the First Circuit, specifically the inevitable request by an objector for a stay of the Court's final approval order until the issues are resolved on appeal. In reality, this term essentially requires the implementation of a class action settlement that a higher court may rule is defective under Rule 23 or otherwise.

There is no compelling reason to proceed in such an unorthodox manner here. This issue can and should be corrected in any order granting preliminary approval and certainly prior to the time notices are sent to Class Members.

601 Pennsylvania Avenue, NW • Seventh Floor • Washington, DC 20004 • 202.207.3610 • www.pcmanet.org

{W1082724.1}

Second, neither the Amended Settlement nor the parties' briefing even begins to suggest how some of the most significant concerns regarding the fairness and reasonableness of the parties' proposal are to be addressed.

At the Fairness Hearing, the Court expressed significant concern regarding the effect of any settlement – including one with a "limited" rollback – on non-parties, such as independent pharmacies. The settling parties offer no guidance on that issue. Although PCMA anticipates additional filings on this issue, it is the settling parties' burden to demonstrate the *fairness* of the settlement to those affected, not the other way around.

In addition, the Court raised questions regarding the extent to which the marketplace corrected for the 2002 price increases that resulted from the alleged unlawful conduct. As PCMA and others have suggested, the proposition that a prospective price adjustment *six or seven years later* (and particularly one where many other entities that were not harmed or even existed at the time of the alleged fraud) is necessary or appropriate to compensate for alleged harm or alleged benefits realized *by non-parties accused of no wrongdoing* is fundamentally flawed. It is based on notions that turn basic market economics and fairness on their head.

The Court has made the prudent suggestion on more than one occasion of retaining an independent expert to assist in a fuller understanding of these issues. PCMA urges the Court to pursue that avenue in connection with the fairness hearing.

Third, the Amended Settlement does little if anything to allay the Court's very real concerns about becoming an industry regulator.

The Court should bear in mind that even approval of the Amended Settlement places it squarely in that role. Even a more "limited" rollback effects a pricing methodology change on a significant number of products for which the entire pharmaceutical marketplace has relied on for years. Many millions of dollars will be spent by everyone involved – TPPs, PBMs, retail pharmacies, and others – trying to figure out how to adjust to this. In addition, FDB has already announced that when the more "limited" rollback occurs, it is going to roll back AWP on all 8000+ NDCs involved in the original settlement. *See* letter dated June 3, 2008 from Donald Nielsen (emphasis added), attached as Exhibit A.

The contention that FDB could do this "on its own" misses the point. The issue is that, "on its own," an action to change the methodology for calculating AWP in the manner suggested by the original or the Amended Settlement is an irresponsible action that wreaks havoc on the entire pharmaceutical marketplace, with no corresponding benefit except to private litigants. This is the hallmark of a collusive settlement. At bottom, the Settling Parties are simply asking the Court to take part and there is little question that, as a practical matter, the Court is acting very much as an industry regulator.

{W1082724.1}

Honorable Patti B. Saris
June 24, 2008
Page 3

      We most appreciate the Court's consideration of PCMA's comments in this important matter.

Yours truly,

/s/ Stephanie W. Kanwit

Stephanie W. Kanwit, Special Counsel PCMA
601 Pennsylvania Avenue, NW
Washington, DC 20004
202-207-3610

{W1082724.1}



June 3, 2008

Re: Update Regarding AWP Litigation

Dear First DataBank Customer:

In October 2006, First DataBank announced certain proposed changes in our drug pricing reporting practices that may impact your use of First DataBank's National Drug Data File Plus™ database and other related products. These changes relate to the publishing of the Blue Book Average Wholesale Price (Blue Book AWP) and the proposed settlement of a class action litigation concerning the publication of Blue Book AWP.

I would like to share with you some very important developments regarding this proposed settlement and other changes in our drug pricing reporting practices.

I can now report that negotiations in this case have resulted in amendments to the proposed settlement. These amendments are necessary as the original proposed terms did not receive court approval in January 2008. The amended settlement was filed with the court at the end of last week.

If the terms of the amended settlement are approved by the court, First DataBank will be required to (1) adjust its reporting of Blue Book AWP for those prescription drugs identified in the plaintiffs' previously filed complaint (approximately 1400 NDCs in number) by reducing the mark-up factor utilized in connection with the calculation of the Blue Book AWP data field to 1.20 times the WAC or Direct Price for those NDCs that are on a mark-up basis; (2) establish a centralized data repository to facilitate reasonable access to discoverable material from First DataBank concerning its drug price reporting practices, (3) make a one million dollar contribution into a court-supervised fund for the benefit of the settlement class members, and (4) pay certain settlement-related notice and other expenses and fees.

The adjustments to Blue Book AWP will become effective on or about ninety days after final court approval of the amended settlement agreement. The approval process will, again, require a preliminary approval by the court, notification to the class, and final approval by the court. At this time, no dates have been set by the court.

Independent of the settlement and on the same schedule as the Blue Book AWP adjustment noted above, First DataBank intends to apply the same 1.20 markup factor to all other NDCs whose Blue Book AWP is set based upon a markup to WAC or Direct Price in excess of 1.20. First DataBank will also independently discontinue publishing the Blue Book AWP data field for all drugs no later than two years following the date that the Blue Book AWP adjustments noted above are implemented.

First DataBank will continue to publish other available drug pricing information including WAC, Direct Price, Suggested Wholesale Price, Federal Financing Participation Upper Limits (FFPUL), as well as our clinical drug information.

In the recognition that these changes to the NDDF Plus database may impact many of our customers, we are implementing them on a schedule that will provide sufficient notice and an opportunity for customers to plan accordingly.

First DataBank remains committed to providing our customers with the best available drug and drug-related information, including pricing data. We will continue to work with the public and private sector to gather and publish additional drug pricing data elements, as available, and to facilitate the establishment of sustainable drug reimbursement benchmarks.

If you have any questions, please feel free to call Customer Relations at 1-800-428-4495 ext. 220.

Very truly yours,

Donald M. Nielsen, M.D.
President