# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS )
HEALTH BENEFITS FUND, PIRELLI )
ARMSTRONG RETIREE MEDICAL )
BENEFITS TRUST; TEAMSTERS )
HEALTH & WELFARE FUND OF )     Case No. 05-cv-11148
PHILADELPHIA AND VICINITY; )
PHILADELPHIA FEDERATION OF )     Hon. Patti B. Saris
TEACHERS HEALTH AND WELFARE )
FUND; DISTRICT COUNCIL 37, )
AFSCME - HEALTH & SECURITY )
PLAN; JUNE SWAN; BERNARD )
GORTER, SHELLY CAMPBELL and )
CONSTANCE JORDAN, )
            )
            Plaintiffs, )
            )
    v. )
            )
FIRST DATABANK, INC., a Missouri )
corporation; and McKESSON )
CORPORATION, a Delaware corporation, )
            )
            Defendants. )

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MCKESSON CORPORATION'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA <u>TO KIMBERLY MCDONOUGH</u>

### I.     INTRODUCTION

On August 18, one-week after conducting a meet-and-confer that lasted ten minutes, and without notifying Plaintiffs of its intention to file such a motion, McKesson filed its Motion to Compel Compliance With Subpoena to Kimberly McDonough ("Motion to Compel"). Even though Dr. McDonough filed her first report on September 14, 2007, nearly a year ago, McKesson now claims to need thousands of pages of documents that were not the basis of her expert opinions, but instead were documents that Dr. McDonough either negotiated, drafted or reviewed in the course of her career advising her clients. McKesson now claims to need these

documents for Dr. McDonough's deposition previously scheduled for September 4,[1] three months before trial.

Dr. McDonough, who owns a business that provides pharmaceutical consulting to third-party payors ("TPPs"), was retained by Plaintiffs as an expert witness to opine regarding various aspects of pharmaceutical reimbursement and relevant industry facts to refute McKesson's expert, Dr. Willig, an academic who opined regarding how the pharmaceutical industry purportedly worked without having any actual experience in that industry.

Through its Motion to Compel, McKesson improperly seeks the purported basis of Dr. McDonough's expertise in the form of hundreds of PBM contracts and hundreds of Request for Proposals ("RFPs") as well as pricing analyses conducted by Dr. McDonough for her own clients.

McKesson's Motion should be denied outright for its disregard of Local Rule 7.1(A)(2), which required McKesson to confer in good faith before filing its Motion. Notably, had McKesson completed the meet-and-confer process, it would have learned of the difficulties in producing the documents it seeks that are described in Dr. McDonough's Declaration.

But even setting aside McKesson's procedural maneuverings, its Motion should be denied because it seeks documents which Dr. McDonough never considered in forming her expert opinions. Simply because an expert relies on her experience does not mean that she has to produce every document that led to the development of that experience. Moreover, the documents McKesson seeks would be not only burdensome, if not impossible, to locate, but producing them would require Dr. McDonough to notify all her clients and her clients' PBMs of the possibility that the documents might be produced and give them the opportunity to object to

---

[1]   Due to a medical emergency, Dr. McDonough's deposition set for September 4 has been postponed indefinitely.

their production.  Even the suggestion of their production would irreparably and irretrievably damage the trust Dr. McDonough and APC have built with their clients over the past eleven years.  All of this would be done for seemingly no purpose, other than McKesson's apparent desire to indirectly obtain discovery from class members that it did not – and may no longer – seek directly in the course of discovery.  This Court should not permit such harassment; McKesson's motion should be denied.

## II.    FACTUAL BACKGROUND

### A.    <u>McKesson Never Previously Requested Documents From Dr. McDonough</u>

On September 14, 2007, Plaintiffs served Dr. McDonough's first expert report.  *See* Ex. A to Declaration of Jennifer Fountain Connolly ("Connolly Decl."), Ex. 1 to this Motion.  On September 24, 2007, Plaintiffs produced all of the materials on which Dr. McDonough relied in drafting that report to McKesson.  *See* Letter to Lori Schechter from John A. Macoretta, Ex. B to Connolly Decl.  On October 29, 2007, Plaintiffs served her rebuttal report.  Ex. C to Connolly Decl.  On that same day, Dr. McDonough also provided the Court a tutorial.  Ex. D to Connolly Decl.  During this time period McKesson never raised any concerns about any purported deficiencies in Dr. McDonough's production of documents.  Connolly Decl. ¶ 2.

Most recently, on June 30, 2008 McKesson submitted its status conference statement for a July 2, 2008 Conference (Docket #549).  In that document, although McKesson insisted it needed various items of expert discovery, namely depositions, it never asked for the materials it now seeks from Dr. McDonough.  Thus, at the July 2, 2008 status conference, where Judge Saris set various dates for the approaching trial, including expert deposition deadlines, she did not order any further document production from Dr. McDonough.  As recently as two months ago, McKesson did not take the opportunity to complain that it did not have sufficient documents from Dr. McDonough.

**B.**    <u>McKesson's Failure to Meet-and-Confer in Good Faith</u>

On July 28, 2008 McKesson served a subpoena on Dr. McDonough.  *See* Ex. B to Declaration of Paul Flum (filed with McKesson's Motion to Compel).  This is the first time McKesson ever asked for the materials they now demand.  On July 30, Class Counsel, on behalf of Dr. McDonough, served objections to that Subpoena.  *See* Ex. C to Flum Declaration.

On August 7, 2008 McKesson's counsel contacted Class Counsel to ask when the parties could confer regarding Dr. McDonough's objections.  *See* Connolly Decl. ¶ 4.  The parties thereafter conducted their meet-and-confer on August 11.  *Id*.

The meet and confer lasted just over ten minutes.  Connolly Decl. ¶ 5.  During that meet-and-confer Class Counsel advised McKesson's counsel that, in response to Request No. 3 of McKesson's Subpoena, which sought "[t]he "over 100 PBM contracts and RFPs" referenced on page 10 of the September 14, 2007 Expert Report of Kimberly P. McDonough," Plaintiffs would not produce any documents.  *Id*.  Class Counsel further informed McKesson's counsel that Dr. McDonough had not reviewed hundreds of contracts in order to prepare her expert report; rather, she had relied on her experience in negotiating and reviewing those contracts in order to form her expert opinions.  Therefore, those contracts were not considered by her in forming her expert opinions under Fed. R. Civ. P. 26(a)(2)(B).  *Id*.

During that meet-and-confer Class Counsel also represented that in response to Request No. 4 of McKesson's Subpoena, which seeks "[a]ll documents concerning all analyses or evaluations you or Advanced Pharmacy Concepts has conducted concerning WAC to AWP ratios, including the assessment referenced in the Rebuttal Report of Dr. Kimberly P. McDonough at pages 3-4," Class Counsel would determine (1) whether the requested analyses were done for a particular client and, if so, whether Plaintiffs would produce them; and

(2) whether Plaintiffs would produce the requested analyses if McKesson agreed to redact the names of the clients for whom the analyses were conducted. Connolly Decl. ¶ 6.

At the end of the meet and confer Class Counsel promised to get back to McKesson on several issues. *See* Connolly Decl. ¶ 7. Class Counsel immediately contacted Dr. McDonough to ask her to investigate the questions McKesson had about her responses to the Subpoena. *Id.* ¶ 8. Dr. McDonough was in the process of getting back to Class Counsel when McKesson filed its Motion to Compel. Connolly Decl. ¶ 8; Declaration of Kimberly Ply McDonough ("McDonough Decl.") ¶ 3, Ex. 2 to this Motion.

In between the time of our August 11 meet-and-confer and the August 18 filing of its Motion to Compel, McKesson's counsel did not attempt to contact Class Counsel regarding the status of its inquiries to Dr. McDonough. Plaintiffs had no notice that McKesson intended to file its Motion to Compel. Connolly Decl ¶ 10.

## C.    McKesson's Motion to Compel

Through its Motion to Compel, McKesson seeks two things. First, McKesson wants Dr. McDonough to produce the "over 100 PBM contracts and RFPs" referenced on page 10 of her September 14, 2007 expert report. Second, McKesson wants copies of any analyses referenced in her Rebuttal Report that Dr. McDonough performed for her clients regarding AWP to WAC ratios.

## III.    ARGUMENT

## A.    McKesson's Motion Should Be Denied As Untimely

McKesson's Motion should be denied as untimely. Dr. McDonough's first report is dated almost a year ago. Plaintiffs similarly produced her reliance materials nearly a year ago. It is now three months before trial and McKesson is demanding the production of hundreds and potentially thousands of documents. Such eleventh-hour requests are routinely denied and

appropriately denied. *See Bloom v. AGFA Corp.*, No. 94-2033, 1995 U.S. App. LEXIS 8983, at

*3 (1st Cir. Apr. 18, 1995) (affirming the trial court's entry of judgment for the defendant and

denying plaintiff's belated motion to reopen discovery because "[p]arties who, like [plaintiff],

have easily foreseeable needs for pretrial discovery cannot wait until the district court is

performing rites of interment before attempting to secure necessary facts."); *Fusco v. Gen.*

*Motors Corp.*, 11 F.3d 259, 266 (1st Cir. 1993) (affirming district court's denial of appellant's

eve-of-trial motion to compel production when appellant knew a year earlier that appellee

intended to offer evidence on the issue and noting that "the discovery deadline had long since

passed and the district court had no automatic obligation to reopen the discovery period."). *See*

*also McKesson Info. Solutions, Inc. v. Bridge Med., Inc.*, 434 F. Supp. 2d 810, 813 (E.D. Cal.

2006) (denying defendant's request to depose additional witnesses on the eve of trial should the

court deny its motion in limine because "[t]he parties are fully engaged in trial preparation and at

this late juncture, there are no grounds to delay that preparation by re-opening discovery.'");

*Lingo Corp. v. Topix, Inc.*, 218 F.R.D. 385, 387 (S.D.N.Y. 2003) (denying plaintiff's request to

reopen discovery because it was untimely, and "A further reopening months after the discovery

cutoff is inappropriate."(citing *Colletti v. Fagin*, 1999 U.S. Dist. LEXIS 2635, No. 90 Civ. 4591,

1999 WL 126461, at *3 (S.D.N.Y. Mar. 10, 1999) (denying request to "reopen discovery on the

eve of trial" where party had prior opportunity to conduct the same discovery and "chose not to

do so")); *Fournier v. McCann Erickson*, 242 F. Supp. 2d 318, 334 (S.D.N.Y. 2003) (denying

plaintiff's motion to compel response to untimely requests to admit because "the Court has been

presented with no compelling reason to do so, especially where, as here, the request is made

more than one year after the discovery deadline and on the eve of trial.").

**B.** **McKesson's Motion Should Be Dismissed For Failure to Meet and Confer**

McKesson's Motion should be likewise be dismissed for failure to meet and confer in good faith as required by Fed. R. Civ. P. 37(a)(2) and Local Rule 7.1(A)(2). *See Creative Solutions Group, Inc. v. Pentzer Corp.* 199 F.R.D. 443, 444 n.2 (D. Mass. 2001) (Collings, J.) ("Although plaintiffs have complaints about the sufficiency of the defendant's answers and responses, I shall not issue an Order compelling discovery. Rather, the Order I issue herein denying the motion, to the extent it seeks an Order compelling discovery, is without prejudice to filing a motion to compel specific discovery after counsel have engaged in good faith negotiations to resolve their disagreements as required both by Rule 37(a)(2), Fed.R.Civ.P. and Local Rule 7.1(A)(2)."). As set forth above, McKesson conducted a telephonic meet-and-confer with Plaintiffs' counsel approximately three weeks ago that lasted ten minutes. Even though McKesson knew that Dr. McDonough was investigating its requests, McKesson filed its Motion to Compel without providing Plaintiffs notice of its intention to do so.

Such tactics subvert the very purpose of meet-and-confer requirements, which is to provide the Court with a dispute the parties have in good faith attempted to resolve, but have been unable to do so. *See Hasbro, Inc. v. Serafino*, 168 F.R.D. 99, 101 (D. Mass. 1996) ("As Plaintiff correctly asserts, Defendant's motion to compel fails to comply with these requirements. This deficiency is particularly problematical here for two reasons. First, at least one purpose of the rules is to avoid premature motions. It appears from the documents of record, that counsel had been conferring about the document request and had not yet reached an impasse in the discussions before the motion was filed – at least as far as Plaintiff was aware."). As Judge Lindsay explained in imposing a fine of $15,000 to "send the appropriate message that Rule 7.1 is no trifle:" "[t]he purpose of Rule 7.1 is to conserve judicial resources by encouraging parties to narrow the contours of disagreement before bringing their dispute to the court. Rule 7.1 does

not have a "no harm, no foul" escape clause." *Converse, Inc. v. Reebok Int'l, Ltd.*, 328 F. Supp.2d 166, 170-71 (D. Mass. 2004). McKessson made no such good faith effort here.

**C.     Dr. McDonough Did Not Use Hundreds of PBM Contracts and RFPs in Forming Her Expert Opinions**

As Dr. McDonough explains in her attached Declaration (Ex. 2), she cannot produce the PBM contracts and RFPs sought by McKesson. First, and most importantly, she did not consider any specific contracts in forming her expert opinion. McDonough Decl. ¶ 5. Rather, she relied on her industry experience, which involved the review and negotiation of such contracts and RFPs, in forming those opinions. The language McKesson quotes in its Motion simply refers to the fact that, <u>in her experience</u>, Dr. McDonough reviewed these documents. This is made clear by the sentence that McKesson quotes, where Dr. McDonough says "I have reviewed <u>and/or negotiated</u> over a hundred contracts . . . ." Cited at Motion to Compel, at 2 (emphasis added). Clearly Dr. McDonough did not mean that she had negotiated over a hundred contracts in her capacity as an expert in this case.

The Federal Rules specifically provide for the qualification of an expert based on her experience. Rule 702 of the Federal Rules of Evidence provides in pertinent part that a "witness [may be] qualified as an expert by knowledge, skill, experience, training, or education…." *See also Levin v. Dalva Bros.*, 459 F.3d 68, 79 (1st Cir. 2006) (affirming ruling allowing testimony of an antique expert on certain topics but not on others for which he had insufficient experience and noting that "expert witnesses need not have overly specialized knowledge to offer opinions," and  "[e]xpert testimony on industry standards is common fare in civil litigation."); *Peterson v. Scotia Prince Cruises Ltd.,* 323 F. Supp. 2d 128, 130 (D. Mass. 2004) (citing *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (peer review, publication, potential error rate are not applicable factors when reliability of proposed expert testimony depends heavily on

knowledge and experience of expert, rather than methodology or theory behind it)); *First Tennessee Bank Nat'l Assoc. v. Barreto*, 268 F.3d 319 (6th Cir. 2001) (opinions formed through years in an industry can be admitted and the court can use its discretion in doing so). Simply because an expert is qualified by virtue of her experience does not make every document she reviewed in acquiring that experience discoverable.

**D.    It Would Be Unduly Burdensome and Damaging to Dr. McDonough's Business to Produce Every Contract or RFP She Has Ever Seen**

Moreover, it would be simply impossible for Dr. McDonough to produce every PBM contract or RFP she has reviewed in her career. Even relevant discovery – which Plaintiffs do not acknowledge McKesson seeks here – need not be produced when the burden of producing it is undue. *See Liberty Mut. Ins. Co. v. Diamante*, 194 F.R.D. 20, 23 (D. Mass. 2000) (Collings, J.) (quashing subpoenas and noting that even if a subpoena is issued in good faith, it may still "be improper if the party serving the subpoena has failed to 'take reasonable steps to avoid imposing undue burden or expense on the person subject to the subpoena.'") (quoting Fed. R. Civ. P. 45 (c)(1)).[2]  Over the past five years, APC has provided services to over 200 commercial and state government clients with total pharmacy expenditures in excess of three billion dollars. McDonough Decl. ¶ 5.  Dr. McDonough herself has been a consultant for the past eleven years.

---

[2]  McKesson cites to cases where the assertion of burden was conclusory. Motion to Compel at 3-4. Those cases do not apply here. First, Dr. McDonough specifically articulated the burden in her objections to McKesson's Subpoena. See General Objection No. 6 ("Dr. McDonough objects to Documents Requests that seek documents from her client files, when those documents were not considered by her in forming her opinions. Reviewing those documents would not only be unduly burdensome and oppressive, but would also require Dr. McDonough to provide written notice of the production to hundreds of clients, including nearly every PBM in the United States."). Second, had McKesson continued to meet-and-confer with Plaintiffs' counsel in good faith, it would have learned more specifically the basis for her objection, as Dr. McDonough has set forth in her Declaration.

*Id.* It would be nearly impossible for her to gather and produce all the contracts and RFPs she has reviewed during that time period.

But not only would it be impossible for Dr. McDonough to locate all of those documents, doing so would implicate the individual contracts she or APC has with every one of those clients. McDonough Decl. ¶ 6. RFP negotiations between TPP clients and their PBMs, and the resulting contracts memorializing the results of those negotiations, are some of the most sensitive commercial negotiations in this industry. *Id.* Under contracts with her past and present clients, Dr. McDonough would have to provide notice and those clients would be given the opportunity to object to production of those documents. *Id.* In short, even producing a small sample of these documents would be a massive undertaking that would not only disrupt APC's business, but would cause Dr. McDonough and APC irreparable harm by damaging the trust and confidence they have established with past and present clients. *Id.*

**E.**     **McKesson Should Not Be Entitled To Seek Discovery From Class Members Indirectly When It Did Not and Can No Longer Seek That Discovery Directly**

McKesson seeks contracts between TPPs – members of the certified Class – and their PBMs, as well as the highly confidential negotiations between those TPPs and their potential and actual PBMs. This is discovery that McKesson has had available to it in the form of hundreds of contracts produced in the AWP litigation. To the extent McKesson deemed that production inadequate it could have directly sought it – but did not – from Class members.[3] Discovery closed July 31, 2007, over a year ago. It is simply improper for McKesson to seek to evade that deadline by improperly seeking discovery from an expert that it cannot now seek from those

---

[3] Thus, McKesson's assertion that "some contracts between TPPs and PBMs were produced in this case and by other sources," is an exaggeration. The defendants in the AWP litigation sought documents from and deposed every major national TPP and nearly every major regional TPP in the country.

Class members themselves.[4]  This is especially true where the information sought was not reviewed by Dr. McDonough in preparing her expert opinions and where it would be unduly burdensome to require her to even attempt to respond to McKesson's Subpoena.

**F.     Dr. McDonough Did Not Rely On The Pricing Analyses McKesson Seeks and They Would Be Unduly Burdensome to Produce**

Finally, this Court should not order Dr. McDonough to produce the second thing McKesson seeks in its Motion to Compel – Dr. McDonough's pricing analyses for her clients. First, like the PBM contracts and RFPs McKesson seeks, Dr. McDonough did not rely on any specific analysis in forming her expert opinion.  McDonough Decl. ¶ 7.  Rather, she relied on the collective experience she obtained by doing those analyses.  *Id.*  A close review of Dr. McDonough's Rebuttal Report confirms this.  Dr. McDonough does not speak of these analyses in order to establish that, in fact, AWP-to-WAC ratios increased.  Plaintiffs' economic expert, Dr. Hartman, establishes that.  Rather, Dr. McDonough discusses them in order to explain that she saw no evidence of an increase in TPPs attempting to renegotiate their PBM contracts in 2002 or 2003.  Rather, that did not occur until recently, in response to, for example, Express Script's request to revise its contracts, when Dr. McDonough's clients asked her to do the pricing analyses to which she refers in her Rebuttal Report.  *See id.* at 3.

Moreover, as set forth in significant detail in Dr. McDonough's Declaration, it would be unduly burdensome for her to produce these documents.  First, because Dr. McDonough does all types of pricing analyses for her clients, it would take a significant amount of time for her to review her files to locate the analyses that she did on the specific issue McKesson seeks. McDonough Decl. ¶ 7.  Once she located those analyses, because those analyses relied on

---

[4]  McKesson claims that there is no basis for this objection because McKesson only seeks the contracts relied upon by Dr. McDonough in forming her expert opinions.  If this is the case then there are no contracts to produce.

confidential client pricing data usually obtained from a client's PBM, she would have to provide notice and the opportunity to object, in every instance, to (a) her client and (b) her client's PBM. *Id.* ¶ 8. She anticipates that the vast majority, if not every one, of those parties would object to the production of their data, even if the data were redacted in some way. *Id.* Further, because her pricing analyses were done from different datasets for each client, any redaction would have to be done on a client-by-client basis and would be very time-consuming.

Dr. McDonough estimates that such a production would take at least six months, and likely far longer, and would cost at least $75,000 in labor. McDonough Decl. ¶ 9. These are significant sums to a small business that lacks the resources of McKesson. In any event, she could not produce anything sought by McKesson in time for her deposition previously scheduled for September 4. *Id.*

These are, of course, all things McKesson could have and would have learned had it continued to meet-and-confer in good faith.

## IV.    CONCLUSION

For the foregoing reasons Plaintiffs respectfully request that the Court deny McKesson's motion to compel, or in the alternative strike the motion for failure to comply with Local Rule 7.1(A)(2), and all other relief that this Court deems just and appropriate.


DATED:  September 2, 2008              By:  /s/ Jennifer Fountain Connolly
                                            Kenneth A. Wexler
                                            Jennifer Fountain Connolly
                                            Wexler Toriseva Wallace LLP
                                            55 W. Monroe, Suite 3300
                                            Chicago, IL  60603
                                            Telephone:  (312) 346-2222
                                            Facsimile:  (312) 346-0022

Steve W. Berman
Nicholas Styant-Browne
Barbara A. Mahoney
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Thomas M. Sobol (BBO #471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Jeffrey Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Edelson & Associates
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2008 a copy of the foregoing **Plaintiffs' Response in Opposition to McKesson Corporation's Motion to Compel Compliance With Subpoena to Kimberly McDonough** was filed electronically.  Those attorneys who are registered with the Electronic Court Filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's system.  Those attorneys who are not registered with the Electronic Court Filing system will be served by First Class United States Mail, with proper postage prepaid, on this 2nd day of September, 2008.


/s/ Jennifer Fountain Connolly
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
55 W. Monroe, Suite 3300
Chicago, IL  60603
Telephone:  (312) 346-2222
Facsimile:  (312) 346-0022

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS | ) | |
| HEALTH BENEFITS FUND, PIRELLI | ) | |
| ARMSTRONG RETIREE MEDICAL | ) | |
| BENEFITS TRUST; TEAMSTERS | ) | |
| HEALTH & WELFARE FUND OF | ) | Case No. 05-cv-11148 |
| PHILADELPHIA AND VICINITY; | ) | |
| PHILADELPHIA FEDERATION OF | ) | Hon. Patti B. Saris |
| TEACHERS HEALTH AND WELFARE | ) | |
| FUND; DISTRICT COUNCIL 37, | ) | |
| AFSCME - HEALTH & SECURITY | ) | |
| PLAN; JUNE SWAN; BERNARD | ) | |
| GORTER, SHELLY CAMPBELL and | ) | |
| CONSTANCE JORDAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST DATABANK, INC., a Missouri | ) | |
| corporation; and McKESSON | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JENNIFER FOUNTAIN CONNOLLY**
**IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**MCKESSON CORPORATION'S MOTION TO COMPEL COMPLIANCE**
**WITH SUBPOENA TO KIMBERLY MCDONOUGH**

I, Jennifer Fountain Connolly, declare as follows:

1.      I am a partner at Wexler Toriseva Wallace LLP.  My firm is co-lead counsel for the Plaintiffs in this action.  I have been responsible for negotiating Dr. McDonough's response to McKesson's subpoena duces tecum ("Subpoena") and I submit this Declaration in Opposition to McKesson Corporation's Motion to Compel Compliance with Subpoena to Kimberly McDonough.

2.      On September 14, 2007, Plaintiffs served Dr. McDonough's first expert report.  A true and correct copy of that report is attached as Exhibit A to this Declaration.  On

September 24, 2007, Plaintiffs produced all of the materials on which Dr. McDonough relied in drafting that report to McKesson. Attached as Exhibit B to this Declaration is a true and correct copy of the September 24, 2007 letter to Lori Schechter from John A. Macoretta enclosing those materials. On October 29, 2007, Plaintiffs served Dr. McDonough's rebuttal report. A true and correct copy of that report is attached as Exhibit C to this Declaration. On that same day, Dr. McDonough also provided the Court a tutorial. A true and correct copy of that tutorial is attached as Exhibit D.

3.     On July 28, 2008 McKesson served a subpoena on Dr. McDonough. Prior to that time McKesson had neither requested any documents from Plaintiffs or raised any concerns about Dr. McDonough's prior production of reliance materials. On July 30, Class Counsel, on behalf of Dr. McDonough, served objections to that Subpoena. Those objections are attached as Exhibit C to the declaration of Paul Flum attached to McKesson's Motion to Compel.

4.     On August 7, 2008 McKesson's counsel wrote me an e-mail to ask when the parties could confer regarding Dr. McDonough's objections. I made myself available on August 11, 2008 for such a meet-and-confer – less than two business days after Mr. Flum's request.

5.     The August 11 meet-and-confer lasted just over ten minutes. During that meet-and-confer I advised Mr. Flum and his colleague, Tiffany Cheung, that, in response to Request No. 3 of McKesson's Subpoena, which sought "The "over 100 PBM contracts and RFPs referenced on page 10 of the September 14, 2007 Expert Report of Kimberly P. McDonough," Plaintiffs would not produce any documents. I informed Mr. Flum and Ms. Cheung that Dr. McDonough had <u>not</u> reviewed hundreds of contracts in order to prepare her expert report; rather, she had relied on her experience in negotiating and reviewing those contracts in order to

form her expert opinions.  Therefore, those contracts were not considered by her in forming her expert opinions under Fed. R. Civ. P. 26(a)(2)(B).

6.       During that meet-and-confer I also represented that in response to Request No. 4 of McKesson's Subpoena, which seeks "[a]ll documents concerning all analyses or evaluations you or Advanced Pharmacy Concepts has conducted concerning WAC to AWP ratios, including the assessment referenced in the Rebuttal Report of Dr. Kimberly P. McDonough at pages 3-4," that I would determine (1) whether the requested analyses were done for a particular client and, if so, (2) whether Plaintiffs would produce the requested analyses if McKesson agreed to redact the names of the clients for whom the analyses were conducted.  At the time of the meet-and-confer I did not even know if such analyses were still within Dr. McDonough's possession, custody or control.

7.       At the end of the meet-and-confer I promised to get back to McKesson on several issues.  First, although McKesson has not moved on this issue, during the meet-and-confer Mr. Flum told me that McKesson wanted all communications Dr. McDonough had with First DataBank regarding the 2001 WAC-to-AWP mark-up.  I informed Mr. Flum that I believed those communications to be oral, but advised him that I would confirm that fact with Dr. McDonough.  Second, I told him that I would advise him whether Dr. McDonough's analyses requested in Request No. 4 of McKesson's Subpoena, if they still existed, were done for a particular client and, if so, whether Plaintiffs would produce them if the clients' names were redacted.

8.       I immediately contacted Dr. McDonough to ask her to investigate the questions McKesson had about her responses to the Subpoena.  She was in the process of getting back to me when McKesson filed its Motion to Compel.

9.      At the end of our meet-and-confer I advised McKesson's counsel that, because Dr. McDonough's company is in the busiest part of its year, it might take a little time for Dr. McDonough to be able to investigate McKesson's questions.  Mr. Flum was also aware of Dr. McDonough's extensive commitments this month because I advised him several times of those commitments in negotiating the date of Dr. McDonough's September 4 deposition.  A true and correct copy of an example of this correspondence is attached as Exhibit E to this Declaration.

10.     In between the time of our August 11 meet-and-confer and the August 18 filing of its Motion to Compel, McKesson's counsel did not even attempt to contact me regarding the status of its inquiries to Dr. McDonough.  I likewise had no notice that it intended to file a motion to compel.  This was true even though during this time Plaintiffs produced documents pursuant to McKesson's subpoena to Dr. McDonough.  The enclosure letters for that production are attached as Exhibit F to this Declaration.

Dated this 2nd day of September 2008.


/s/ Jennifer Fountain Connolly
Jennifer Fountain Connolly

# Exhibit A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH | ) | |
| BENEFITS FUNDS, PIRELLIARMSTRONG | ) | CIVIL ACTION NO. 1:05-CV-11148-PBS |
| RETIREE MEDICAL BENEFITS TRUST, | ) | |
| TEAMSTERES HEALTH & WELFARE | ) | Judge Patti B. Saris |
| FUND OF PHILADELPHIA AND VICINITY, | ) | |
| PHILDELPHIA FEDERATION OF | ) | |
| TEACHERS HEALTH AND WELFARE | ) | |
| FUND, DISTRICT COUNCIL 37, AFSCME – | ) | |
| HEALTH & SECURITY PLAN; JUNE SWAN; | ) | |
| MAUREEN COWIE AND BERNARD | ) | |
| GORTER, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FIRST DATABANK, INC., a Missouri | ) | |
| corporation , and McKESSON | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| Defendants. | | |

**EXPERT REPORT OF KIMBERLY P. McDONOUGH**

**I.      QUALIFICATIONS AND SCOPE OF WORK**

I am President of Advanced Pharmacy Concepts, an independent pharmacy

benefit consulting and audit firm that provides services to employers, health plans, and

government agencies regarding the administration of pharmacy benefits and

implementation of clinical benefit programs. Advanced Pharmacy Concepts employs 28

individuals devoted entirely to the assessment of pharmacy benefit programs, drug

pricing, and clinical utilization.  Over the past five years, we have provided services to

over 200 commercial and state government clients with total pharmacy expenditures in

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

excess of three billion dollars. Advanced Pharmacy Concepts is the sole contractor to the Centers for Medicare and Medicaid Services (CMS) as the compliance auditor of the Medicare Part D, Part C, and PACE programs.

I have served as a member and Chairperson for committees of the American Pharmaceutical Association (APhA), the Academy of Managed Care Pharmacy (AMCP), and the Pharmacy Quality Alliance (PQA). I am a member and served on the Board of Directors for the Rhode Island Pharmacist Association. I served as the Chairperson for the State of Rhode Island's Drug Use Review Board from 1992 until 2000.

I am a graduate of the Purdue University School of Pharmacy with a Doctor of Pharmacy Degree. I am currently licensed as a registered pharmacist in the States of Michigan and Rhode Island. I have previously been employed as a Director of Pharmacy in several hospitals and as Vice President of Pharmacy Operations for a Regional Hospital Pharmacy Service Corporation. I have been employed as a Clinical Pharmacist for Harvard Community Health Plan, a regional health maintenance organization located in New England. I served as Director of Clinical Operations and Director of Product Development for MIM Health Plans, a national pharmacy benefit management company. In addition to these positions, I have provided long-term care consulting services to local nursing homes and dispensed medications in community pharmacies.

In my role as Director of Pharmacy, I was directly responsible for the purchase of medications for use in the hospitals, and for evaluating and negotiating contracts with wholesalers, group purchase organizations and pharmaceutical manufacturers. While

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

employed in the PBM and HMO industries, I worked closely with contracting personnel to evaluate drug prices and costs incurred on behalf of our clients.

I have evaluated pharmacy benefit costs on behalf of numerous clients, for the purpose of determining pharmacy benefit manager (PBM) compliance with contract terms and to assist with benefit cost projections. I have advised organizations and individuals about pharmacy pricing terms including average wholesale prices (AWP), wholesale acquisition price (WAC), average sales price (ASP) and average manufacturer price (AMP). I have been directly involved in providing analysis of the financial relationships between these pricing standards. My company, Advanced Pharmacy Concepts, subscribes to electronic First Databank and Medispan pricing files and to printed versions of RedBook. I routinely use these pricing files as reference and for analytical purposes.

I have been directly involved in a number of contract negotiations involving a wide range of clients and PBMs. In this capacity I evaluated pricing terms, including pharmacy network discounts rates, rebate sharing provisions, and administrative fees. I am knowledgeable about business practices of the PBM industry. Working as a subcontractor to a national firm, I served as a subject matter expert to CMS regarding commercial pharmacy benefit practices during the planning and implementation of the Medicare Part D program. I have recently authored a chapter about the PBM industry in a textbook for use in schools of pharmacy. A complete summary of my professional experience, presentations and publications is outlined in my resume, which is enclosed as Exhibit A.

3

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

I have been retained on behalf of Plaintiffs to provide testimony explaining the use of AWP as a reference for calculating pharmacy costs to third party payors (TPPs), to describe the impact of AWP changes on the costs incurred by TPPs for pharmacy benefits, to describe the contractual relationship between TPPs and PBMs, to clarify the relationship of AWP to rebate revenues, and to address claims made by Defendant's experts relating to the impact of AWP price changes to TPPs benefit costs.

My report is based on my vast professional experiences as a clinician and administrator in the health insurance and PBM industries, my review of relevant industry publications, as well as the experience and knowledge that I have gained over the past eleven years as a consultant. I have reviewed and/or negotiated over a hundred contracts between pharmacy benefit managers (PBMs) and TPPs for audit or RFP purposes and use this first-hand knowledge of these contracts in reaching my conclusions. The materials I rely on are cited in this report or identified in the attached Exhibit B.

 I have testified as an expert in deposition in the following cases: *Duramed Pharmaceuticals, Inc. vs. Wyeth-Ayerst, Inc*. Civil Action No. C-1-00-735, *J.B.D.L Corp. d/b/a Beckett Apothecary, et al. vs. Wyeth-Ayerst, Inc*. Civil Action No. C-1-01-704, and *CVS Meridien, Inc. and Rite Aid Corp vs. Wyeth-Ayerst, Inc*. Civil Action No. C-1-03-781. Each of these cases was filed in the United States District Court for the Southern District of Ohio.  I am being compensated at the rate of three hundred and seventy-five dollars ($375) per hour for my services.

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## II.     AWP AS A PRICING REFERENCE

AWP has long been used as the primary resource for calculating payments for brand pharmaceutical claims and in determining the maximum allowable costs (MAC) for payment of generic drug prescriptions.   At one time, AWP represented the approximate price paid by community pharmacies when purchasing drugs from a wholesaler.  However, as competition in the pharmacy distribution industry increased, pharmacies entered into contractual relationships with wholesalers, using a wholesaler as a prime vendor in exchange for discounts on purchases.  Over time, the pricing standard for drug purchases evolved from AWP to the wholesaler acquisition cost (WAC).

While the pricing standard for the purchase of pharmaceuticals gradually changed, the standard used by third party payors (TPPs) and self-insured employers for the payment of claims did not.  AWP has been, and continues to be, the pricing standard for ambulatory pharmacy claims.  Government agencies, including Medicare and many Medicaid programs, use AWP as the basis for payment for pharmacy claims.  Contracts between TPPs, PBMs, and pharmacies use AWP as the basis for calculating claim costs.  Point-of-service pharmacy claim systems are programmed using AWP as the pricing reference.  A change from AWP to WAC as a pricing standard would require operational modifications in all of these areas, a cumbersome process with little perceived benefit to the parties involved.

All major PBMs, including Medco, CareMark and Express Scripts, use AWP published by either First Databank or Medispan for the pricing of claims.  Although

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

RedBook remains an accepted pricing standard, and is used often for medical claim payment purposes, it has not been widely used by the PBM industry.

The choice of pricing file can be influenced by many factors, including the therapeutic drug classification codes offered in the database and the methods for designating generic or brand therapies. Because the proprietary data file formats developed by First Databank and Medispan differ, a PBM or TPPs will use the chosen pricing file for all transactions in any given claim processing platform. Because of programming changes required, transition between pricing files is difficult and would be costly.

Although First Databank and Medispan offer different pricing file formats, sometime after the merger of these companies in 1998, the AWP published by these companies has been substantially identical[1,2]. At that time, First Databank purchased Medispan, its primary competitor in for pharmaceutical pricing databases, and consolidated its pricing survey process for both publications. In April 2001, the FTC charged the Hearst Corporation, owner of First Databank with violation of anti-trust regulations, stating in their court filing that the merger of these two competitors could allow First Databank "to monopolize the market, resulting in "drastic" price increases for such databases.[3] In response to this litigation, First Databank sold Medispan to Wolters

---

[1] During our audit process, Advanced Pharmacy Concepts compares AWP prices in pharmacy claim databases provided by PBMs against First Databank and Medispan files to assure consistency and accuracy of this information. Furthermore, APC's staff compares prices between the two databases periodically to validate the consistency.

[2] During telephone conversation late in 2002, representatives of First Databank and Medispan verified to Dr. McDonough that all pricing activities were being performed by First Databank on behalf of both companies. The First Databank representative also indicated that these services were being overseen by the FTC to assure consistency between companies.

[3] FTC Press Release, *FTC Charges Hearst Trust with Acquiring Monopoly In Vital Drug Information Market,* April 4, 2001.

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Klewer in January 2002, but continued to provide pricing calculations under the supervision of the FTC.

**III.     CHANGES IN AWP PRICES RESULTED IN HIGHER COSTS TO TPPS AND SELF-INSURED EMPLOYERS.**

Sometime in late 2001 or early 2002, First Databank changed the methodology used to establish AWP.  This change resulted in an increase in the markup between WAC and AWP from 20% to 25% for a large number of medications.   The impact of this change on the amounts that TPPs and self-insured employers paid for drugs dispensed under their benefit programs was immediate and significant.

Pharmacy benefit costs are comprised of three major factors:  drug utilization, drug mix, and drug cost.  Drug utilization is measured by the number of beneficiaries who use medications, the average number of prescriptions obtained by each beneficiary, and the number of units in each prescription.  Drug mix refers to the selection of drug products: brand versus generic medication or the use of newer, more costly medications instead of medications that have been on the market for a number of years.  Drug benefit costs are impacted by the change in AWP price of existing products from one year to the next: pharmaceutical inflation.[4]

Since the mid 1990's, inflation in pharmacy benefit costs has been directly associated with increases in drug utilization and the prescribing of newer, more costly medication.  AWP cost increases remained fairly constant and generally lower than the consumer price index (CPI) during this time.  However, in 2002, both Medco and

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Express Scripts reported pharmacy inflation was the predominate factor driving pharmacy benefit costs.[5, 6]

The impact to Medco's clients of AWP pricing changes compared to other trend drivers between 2001 and 2002 is clearly demonstrated in the table below.[7, 8]

**Changes in Pharmacy Benefit Trend Drivers**



Similarly, Express Scripts' clients experienced benefit cost increases driven by drug inflation, rather than utilization and mix.  Between 1998 and 2001, AWP inflation accounted for 5.4% increase in pharmacy costs[9].  In 2002 and 2003, however, AWP price increases pushed pharmacy benefit costs up by 7.5%, an increase of 38%, and became the single largest factor in pharmacy benefit inflation for that time.

CareMark also reported inflation as the predominate factor affecting drug benefit price increases in 2002[10].  Inflation contributed 5.9% to cost of pharmacy benefit programs between 2001 and 2002.  As was reported by both Medco and Express Scripts,

---

[4] Medco Drug Trend Report, vol. 5, issue 1, May 2003, pg.7 "Based on average wholesale price (AWP), drug price inflation increased by 33 percent, from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past."
[5] "Drug utilization was much less a factor in 2002 than in the past, reflecting efforts on the part of Medco Health's clients to manage utilization more aggressively.  Unit costs, on the other hand, played a larger role, accounting for 64 percent of trend in 2002, up from 41 percent in 2001".  *Medco Drug Trend Report*, May 2003, pg.7.
[6] *2003 Drug Trend Benefit Report*, Express Scripts, June 2004.
[7] *Medco Drug Trend Report*, May 2003, pg.7. *PEPM is "per employee per month"
[8] *Medco Drug Trend Report* 2006, pg. 7.
[9] *2003 Drug Trend Benefit Report*, Express Scripts, June 2004, pg. 26.

8

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

this increase was substantially higher than in previous years and subsequently.  In 2000 and 2001 respectively, CareMark reported AWP inflation of 3.2% and 2.5%.  After the high level of increase in 2002, drug inflation returned to 3.5% in 2003, which is consistent with previous years.

The increase in AWP prices for existing products was the single greatest factor influencing pharmacy benefit cost inflation in 2002, and offset significant efforts on the part of employers and TPPs to rein in costs.  Prior to 2002, utilization and new product introductions drove benefit cost inflation.  To address these factors, PBMs and TPPs implemented a number of programs to control benefit costs including formularies, tiered copay programs and utilization controls.  By 2002, the impact of these programs was being realized.  Had it not been for the change in AWP pricing methods, the inflationary trend for pharmacy benefits in 2002 would have been below 10% for the first time in many years.

AWP prices increases also affected consumers with co-insurance programs.  Under a co-insurance program, the member's cost is reflected as a percentage of the health plan's total pharmacy cost for each prescription.  For example, if the member has a 20% co-insurance and the drug cost to the health plan was $100, the member's out-of-pocket costs would be $20.  Because TPP costs are based on AWP prices, an increase in AWP raises the prescription cost to the TPP and would result in a proportional increase in cost to the beneficiary.

---

[10] *2004 Trend Report*, Caremark TrendsRx 2004 Series, pg. 4.

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## IV.    THE CONTRACTUAL RELATIONSHIP BETWEEN TPPS AND PBMS

Pharmacy benefit programs are a common component of the health care benefit offered by TPPs and employers.  Although some TPPs administer pharmacy benefits directly, the vast majority contract with pharmacy benefit managers (PBMs) for these services.  Employers purchase pharmacy benefits through a TPP, or directly from a PBM under a self-insured arrangement.  The advantages of working with a PBM include administrative cost efficiencies, purchasing power, and access to a wide pharmacy network.   Contracts between TPPs or employers and the PBM dictate the financial terms of the relationship, including the AWP discounts applicable to pharmacy claim transactions.

In his report, Mr. Willig contends that TPPs would have compensated for AWP price increases by seeking lower reimbursements.[11]  Although price changes might be possible, this option was not readily available to TPPs due to contract terms.  In the course of my experience in have reviewed over 100 PBM contracts and RFPs, so I am intimately familiar with the terms of such contracts.  Overwhelmingly, contracts between TPPs and PBMs are written for a term of three years[12], often with automated renewal provisions. PBMs typically would prefer an even longer contract term, up to 5 years. PBMs insist on long term contracts due to the substantial costs associated with starting a claims program with a new customer and to promote the financial stability of their organizations. Although contracts may be terminated prior to their full term, most

---

[11] Expert Report of Robert D. Willig, item #57.

[12] "CalPERS awarded its current contract to Caremark Inc. three years ago"  CalPERS Plans Innovative Contract Terms For Pharmacy Benefits Manager press release, May 18, 2005,

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

contracts limit this option to circumstances in which a party fails to perform or engages in an activity that constitutes breach. In those rare contracts permitting early termination, significant financial penalties apply or long notices are required, limiting this option. In my experience, I have only seen one contract that was terminated prior to their full term.

Although some TPPs have contracts with PBM that are effective on July 1 of any given year, most PBM contracts renew in January, corresponding with the TPP's fiscal year and in coordination with Medicare contract years. Because contract terms are static for the three year terms of the contract, any pharmacy discount rates implemented on January 1, 2002 would continue until December 31, 2005 before an opportunity arose for changes to offset the AWP price increases. Although the significant increases in AWP price started to become apparent to the PBM industry in 2002, TPPs were not generally aware of these changes until a much later date, and certainly there is no evidence in 2002 to suggest that TPPs were aware of the fraud scheme alleged by plaintiffs. None of the TPPs I dealt with were immediately aware of the bump-up in AWP prices. Sometime in late 2002 when my company discovered a change in the relationship between AWP and WAC prices published by First Databank, we contacted the company. During that call, representatives from First Databank indicated that AWP prices were determined through a propriety survey of pharmaceutical wholesalers nationally. They further indicated that the recent change in AWP to WAC ratio was in response to recent investigations by the U.S. Department of Justice (DOJ) into pharmaceutical pricing practices in which the DOJ questioned why wholesalers increased some manufacturer WAC prices by 20%, while others manufacturer prices were increased by 25%. The representative from First Databank indicated that wholesalers changed pricing policies for the 20% companies to

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

achieve consistency in the market.  The representative from First Databank further indicated that price increases for Lipitor and Neurontin occurred as a result of the take-over of Parke-Davis, a 20% mark-up company, by Pfizer, a 25% mark-up company in late 2001.

Additionally, I note that TPPs, especially employers and smaller health plans, do not usually subscribe to pharmacy pricing sources.  Nor are these organizations knowledgeable about other pricing terms, including WAC.

Third party payors and employers rely on their PBM for critical information that affects their pharmacy benefit costs.  In their annual trend reports provided to TPPs and consultants , Medco and Express Scripts acknowledged that AWP prices increased in 2002 at a rate that was far greater than in previous years.  However, explanations for this change are not provided, leaving many organizations to assume that the price increases were solely the result of increases at the manufacturer level.  In later reports, PBMs indicate a return to lower inflationary levels.  Caremark reported "As a driver of trend in 2003, average wholesale price (AWP) increases accounted for just 3.5% of our Book of Business total 9.3%.  As can be seen in figure 8, this is much closer to the historical norm than the abnormally large increases in 2002".[13]

Employers and health plans have long complained about drug prices, and by 2002, the pharmaceutical industry was under considerable scrutiny regarding its drug pricing practices.  Although TPPs are continually seeking methods to rein in drug costs, price increases from a manufacturer affect the TPPs as well as the pharmacy, making price concession difficult to obtain from pharmacies.  As drug prices from manufacturers increased, efforts to reduce the cost of the pharmacy benefit program focused on

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

formulary selection and rebate negotiations.   In contrast, a change in the ratio of AWP to WAC resulted in price increases to the TPPs without a corresponding price increase to the pharmacy, thus increasing pharmacy margins.

In his report, Mr. Willig indicates that it is not necessary for a firm to know the supplier's costs or margins when seeking to obtain cost concessions.  However, the presence of the PBM between the TPPs and the pharmacy network adds a unique complicating factor to this situation.  Third party payors rely on their PBM to negotiate aggressive contracts on their behalf.   However, as was previously discussed, the contracts between the PBM and TPPs are not generally open to price changes during the term of the contract.  Consequently, the changes in AWP that occurred in 2002 created a substantial profit opportunity for the PBM industry.

As the PBM industry learned of the change in AWP to WAC ratio, they were able to renegotiate pharmacy contract rates, reducing the prices paid to pharmacies to compensate wholly or partially for the increased profit margins.   However, as is acknowledged by Mr. Willig in his expert report[14], most PBMs use pharmacy payment margins as a substantial source of income.  As the PBM industry renegotiated pharmacy discounts, the differential between the amounts paid to the pharmacy and revenues from the client rose, improving PBM profit margins.  In the absence of market pressure from the TPP, there would be little incentive on the part of the PBM industry to disclose improvement in pharmacy rates to their TPPs customers.

Furthermore, all major PBMs own mail order pharmacy facilities that are compensated by TPPs based on AWP prices.  The change in AWP to WAC ratio

---

[13] *2004 Trend Report*, TrendsRx 2004 Series, Caremark, pg. 11.

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

increased profit margins in these facilities as well. Mail pharmacy operations are a significant source of revenue to PBMs.  In its 2003 annual report, Medco indicates 15% of the prescriptions processed by the PBM originated from Medco's mail services facilities, accounting for 11.3 billion dollars in revenue for the year.[15]  Over the previous 5 years, Medco filled over 360 million prescriptions in its mail pharmacy.  In 2004, Express Scripts' mail pharmacy filled over 39.1 million prescriptions.[16]  PBM-owned mail service pharmacies dispense a higher percentage of brand prescriptions when compared to retail pharmacies.  In December 2003, 61% of all prescriptions dispensed by mail pharmacies were for brand products, compared with 56% brand dispensing at retail pharmacies.[17]

## V.     TPPs DID NOT RECEIVE OFFSETS TO COVER THE AWP BUMP.

            The fact that third party payors and employers did not receive pricing discounts to offset the AWP price increases in 2002 is evidenced through a survey of retail brand reimbursement rates.  The *Prescription Drug Benefit Cost and Plan Design Survey* reported brand reimbursement levels for a 10 year period, from 1995 through 2006.[18]  Retail brand reimbursements dropped from 88.2% of AWP to 84.7% of AWP during this time period, wile mail pharmacy reimbursements dropped from 85% of AWP to 78.1% of AWP.  Although discounts improved steadily at both pharmacy venues during this time period, the rate of change was modest and consistent throughout the time period.

---

[14] Expert Report of Robert D. Willig, pg 8 "PBMs receive compensation primarily through some combination of three principal methods……."

[15] Medco 2003 Annual Report to Stockholders.

[16] Express 2004 Annual Report to Stockholders

[17] *Pharmacy Benefit Managers: Ownership of Mail Order Pharmacies*, Federal Trade Commission, August 2005.

[18] *The Prescription Drug Benefit Cost and Plan Design Survey Report*, 2006 Edition, Takeda Pharmaceuticals, pg.4

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



If a price correction to compensate for the AWP inflation of 2002 had occurred, it would have been reflected in the prices reported for this survey, either as a one-time dramatic drop in 2002 or as an increase in the rate of price reduction after 2002. Neither event is apparent in this data. In reality, employers and TPPs absorbed the price increases through their benefit costs.

Mr. Willig also contends that changes in the AWP/WAC price ratio and the resulting increased costs to TPPs could be offset by increases in the AWP discount, using an example in which the AWP discount is increased to 17%. Although this might be true, AWP discounts of 17% are far greater than the average discount of 15.3% reported by employers in 2005[19].

Mr. Willig also indicates that changes in AWP/WAC ration resulting in increased AWP prices would have no effect on those clients that have "pass-through" contracts. A "pass-through" contract is one in which the rate paid to the pharmacy is passed through to the TPP or employer, at the actual cost. In such a situation, the PBM does not retain any

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

revenues from the pharmacy reimbursement and contracting process. In my experience with hundreds of clients, very few PBMs are willing to provide pass-through contracts to their clients, and this type of arrangement is the exception rather than the rule. For example, during 2002 and to the present, Express Scripts, one of the largest PBMs in the country, explicitly includes the following statements in its contract with clients:

"ESI contracts with Participating Pharmacies at various rates that are negotiated from time to time, and charges Client or Sponsor (as applicable) at a uniform rate that may be greater or less than the actual negotiated rate paid to Participating Pharmacies. In negotiating such fees and rates, ESI acts on its own behalf and not for the benefit of or as an agent for the Sponsors, the Client, a Member or any employee welfare benefit plan in which a Member may participate."[20]

This clause clearly indicates that Express Scripts does not intend to provide pass-through pricing to its clients. Even in the event that a PBM were willing to provide a pass-through pricing arrangement, there is little or no incentive on the part of the PBM to renegotiate contracts with pharmacies to achieve higher discounts, particularly if the PBM is already meeting its contractual obligation to the third-party payor.

## VI.    RELATIONSHIP OF AWP TO REBATE REVENUES

In his report, Mr. Willig indicates that increases in AWP prices were accompanied by corresponding increases in rebate payments, thus offsetting the impact of the AWP price. This argument is not supported by current rebate contracting procedures. Rebates are earned on select brand products based on that product's placement on the PBM or TPP's formulary. As such, there is no assurance that for every product for which the AWP price

---

[19] *The Prescription Drug Benefit Cost and Plan Design Survey Report*, 2006 Edition, Takeda Pharmaceuticals, pg.4

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

increased, a corresponding rebate will be earned.   Secondly, rebates are typically paid based on WAC prices, not based on AWP.  The reason for this practice is quite simple: rebates are paid by manufacturers based on their list prices for sales to wholesalers, rather than on an inflated price that is unrelated to the manufacturer's revenues.  Manufacturers must report rebates paid to the Department of Health and Human Services for use in determining the average manufacturer price (AMP) that is used to determine mandatory rebates under Medicaid.  Paying rebates on the higher AWP price could increase the likelihood of increasing the level of rebates owed to the federal government for the Medicaid program.

In his report, Mr. Willig indicates "TPPs and PBMs negotiate changes in the rebate pass-through percentage in response to changes in market conditions", suggesting that AWP changes could affect rebate revenue sharing.[21]  He further describes a change in the agreement between Medco and Public Employees Retirement System (PERS), in which the percent of rebates pass-through to PERS increased between August 1, 1995 and January 1, 2001.  Advanced Pharmacy Concepts served as a consultant to PERS during the 2001 contact negotiations.  Changes in the rebate language were driven by the competitive offers received during an RFP process and the results of audit findings, and pre-dated the change in ration between AWP and WAC,

In my experience, some PBM contracts provide for rebates based on a flat dollar amount per prescription, or per branded prescription, based on prescription volume.  In such cases, an increase in AWP prices would have no impact on the rebates receive by the TPP.

---

[20] ESI contract for services SXF612,terms and Conditions, item 6..
[21] Expert report of Robert D. Willig, pgs 55-57.

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.  Executed on September 14, 2007.

*Kimberly P. McDonough*

Kimberly P. McDonough

RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit A

6899 Post Road                401-295-7660
N. Kingstown, RI 02852   kmcdonough@apc-rx.com

# Kimberly Ply McDonough

**Accomplishments**

### Administrative

- Founder, and current President, of a successful corporation providing clinical support and pharmacy audit services to employers, managed care organizations, and physician practice organizations.
- Twenty-five years of administrative experience, at a Director level or higher, in a variety of pharmacy venues including managed care, hospital, and long term care. Direct employee supervision for fifteen of these years with responsibilities that included clinical activities, provider support, drug utilization analysis and management, and quality assurance.
- Small Business Assocaition Entrepreneur of the Year for the State of Rhode Island, awarded by the U.S. Small Business Assocaition
- Rhode Island Minority Business Enterprise of the Year, 2006, presented by Governor Carcieri and the Rhode Island Economic Development Corporation
- Clinical management of pharmacy expenditures in Medicaid, Medicare and commercial populations for managed care insurers. Employers, and physician practice management organizations.
- Testified on healthcare issues before hearings on behalf of U.S. Representatives of Congress, state legislative oversight committees, other state administrative organizations, and professional organizations.
- Active in national and state professional organizations, including serving as Chair of the Rhode Island Drug Use Review Board, Chairman of Legislative Committee for AMCP, and committee member for AMCP, APhA and Member and Board of Directors for Rhode Island Pharmaceutical Association.

### Clinical

- Developed, from baseline, the clinical pharmacy programs within managed care organizations, including establishment of policies and procedures, formulary analysis and process, and clinical outcome measuring of programs.
- Designed and implemented multiple pharmacy and provider based clinical management programs, including clinical treatment guidelines, pharmacy based asthma management programs, and clinical management of long term care patients
- Extensive publications and presentations, nationally and regionally, with focus on clinical management medication use in patients, outcomes of clinical programs, and bridging roles of healthcare providers to enhance clinical management of patients.

### Marketing

- Developed and organized clinical products options for corporate marketing efforts of several healthcare organizations, including operational organization of product offerings, development of marketing materials, and providing clinical support and training to the marketing department.
- Instrumental in the initial marketing efforts to support the initial public

Exhibit A

offering through the Security and Exchange Commission for MIM Corporation.
- Actively participated in major marketing initiatives in public and private corporations, providing personal clinical support and follow-up for clients.

| Experience | |
|---|---|

1997-present            Advanced Pharmacy Concepts          N. Kingstown, RI

**President**
- Incorporated and established a successful new business
- Oversaw all aspects of company growth including personnel management, product development and financial performance.

1994-1997                MIM Health Plans                      Peace Dale, RI

**Director of Product Development**
- Coordinated clinical program development in support of, and following an corporate IPO
- Provided clinical product orientation to national sales staff
- Provided clinical sales support to national sales staff

**Director of Clinical Programs**
- Developed all aspect of PBM clinical programs, including formulary development, prior authorization services, and utilization review activities.
- Supervised growth of staff from eight to greater than 35 professional employee
- Served as clinical representative to clients and regulatory agencies

1990-1994                Harvard Community Health Plan          Brookline, MA

**Clinical Coordinator and TQM Facilitator**
- Developed and oversaw all clinical pharmacy programs for the New England Division of Harvard Community Health Plan, in Providence, RI
- Received company's highest award service
- Served as TQM facilitator for corporate quality improvement activities.
- 
- 1986-1990                Pharmacy Systems, Inc.                Dublin, OH
- Vice President    1987-1990
- Director of Pharmacy  1986-1987
- 
- 1982-1986                White County Memorial Hospital        Monticello, I

| Education and Credentials | |
|---|---|

1976-1982                Purdue University                      West Lafayette, IN
- Doctor of Pharmacy degree,
- Licensed in  Rhode Island, Indiana and Michigan.

Exhibit A

| **Appointments** | |
|---|---|

- Board Member, Rhode Island Pharmacist Association
  June 2003 to present.
- Adjunct Assoc. Professor of Clinical Pharmacy, University of Rhode Island, Kingston, Rhode Island 1991 to present
- Rhode Island Drug Use Review Board
  1993 to 1999, Chairperson 1995 to 1999.
- Academy of Managed Care Pharmacy
  Alexandria, VA,
  Legislative Committee
        Member 1995 to 1999
        Vice Chairperson 1997 - 1998.
        Chairperson 1998 - 1999.
  Strategic Marketing Committee
        Chairperson 2000 – 2001
        Vice Chairperson 1999 – 2000
  Managed Care Model Development Committee
        Facilitator 1999 – 2002.
- American Pharmaceutical Association- Washington, DC.
  Member, Strategic and Tactical Committee 1995 to 1999.

**Publications and Presentations**

Facilitated various presentations, and has several articles published. A complete list can be provided by request.

**Awards Received**

- Small Business Association Entrepreneur of the Year for the State of Rhode Island, awarded by the U.S. Small Business Assocaition
- Rhode Island Minority Business Enterprise of the Year, 2006, presented by Governor Carcieri and the Rhode Island Economic Development Corporation
- Recipient of Harvard Community Health Plan's Diamond Award for outstanding services in establishing cost effective management of pharmacy benefits for members.
- Recipient of the 1999 Baxter Laboratories/National Pharmacy Technician Board award for Innovations in Pharmaceutical Care.
- Recipient of 2003 Elan Pharmaceuticals Innovative Pharmacy Practice Award from the Rhode Island Pharmacy Association

Exhibit B

Materials Relied Upon for the Expert Report of Kimberly McDonough

1. First Databank Prescription Drug Price Files
2. Medispan Prescription Drug Price Files
3. FTC Press Release, *FTC Charges Hearst Trust with Acquiring Monopoly In Vital Drug Information Market,* April 4, 2001
4. *Medco Drug Trend Report*, vol. 5, issue 1, May 2003
5. *2003 Drug Trend Benefit Report*, Express Scripts, June 2004
6. *2004 Trend Report*, Caremark TrendsRx 2004 Series
7. Expert Report of Robert D. Willig
8. CalPERS Plans Innovative Contract Terms For Pharmacy Benefits Manager; press release May 18, 2005
9. Medco 2003 Annual Report to Stockholders
10. Express 2004 Annual Report to Stockholders
11. *Pharmacy Benefit Managers: Ownership of Mail Order Pharmacies*, Federal Trade Commission, August 2005.
12. *The Prescription Drug Benefit Cost and Plan Design Survey Report*, 2006 Edition, sponsored by Takeda Pharmaceuticals
13. ESI contract for services, document number SXF612

**RESTRICTED HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

# Exhibit B

# SRK SPECTOR ROSEMAN & KOJROFF

A PROFESSIONAL CORPORATION

1818 Market Street, Suite 2500, Philadelphia, Pennsylvania 19103 • (215) 496-0300 • Fax (215) 496-6611
www.srk-law.com • email: classaction@srk-law.com

Direct E-Mail:
JMacoretta@srk-law.com

September 24, 2007

**VIA UPS NEXT DAY AIR**
Lori A. Schechter
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

Re:    *In re New England Carpenters Health Benefit Fund v. First DataBank, et al.*
C.A. No. 05-11148 (D. Mass.)

Dear Lori:

As promised, enclosed please find a CD with the various reliance materials of Plaintiffs' Expert, Dr. Kim McDonough.  Also enclosed is a revised Exhibit "B" to Dr. McDonough's report, which accurately lists the materials she relied upon.

Included on the CD are items 3, 4, 5, 6, 7, 9, 10, 11, 12 and 13 from Dr. McDonough's Exhibit "B".   We are not providing you copies of the First DataBank and MediSpan drug pricing files, Dr. Willig's Expert Report or the ESI Contract, which was produced in discovery.

Feel free to call my office if you have any further questions.

Sincerely,

JOHN A. MACORETTA

Enclosures

cc:    Steve Berman, Esquire (w/ enclosures)

Exhibit B

Materials Relied Upon for the Expert Report of Kimberly McDonough

1. First Databank Prescription Drug Price Files
2. Medispan Prescription Drug Price Files
3. FTC Press Release, *FTC Charges Hearst Trust with Acquiring Monopoly In Vital Drug Information Market,* April 4, 2001
4. *Medco Drug Trend Report*, vol. 5, issue 1, May 2003
5. *Medco Drug Trend Report,* May 2006
6. *2003 Drug Trend Benefit Report*, Express Scripts, June 2004
7. *2004 Trend Report*, Caremark TrendsRx 2004 Series
8. Expert Report of Robert D. Willig
9. CalPERS Plans Innovative Contract Terms For Pharmacy Benefits Manager; press release May 18, 2005
10. Medco 2003 Annual Report to Stockholders
11. Express 2004 Annual Report to Stockholders
12. *Pharmacy Benefit Managers: Ownership of Mail Order Pharmacies*, Federal Trade Commission, August 2005.
13. *The Prescription Drug Benefit Cost and Plan Design Survey Report*, 2006 Edition, sponsored by Takeda Pharmaceuticals
14. ESI contract for services,  document number SXF612

# Exhibit C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH | ) | |
| BENEFITS FUNDS, PIRELLIARMSTRONG | ) | CIVIL ACTION NO. 1:05-CV-11148-PBS |
| RETIREE MEDICAL BENEFITS TRUST, | ) | |
| TEAMSTERES HEALTH & WELFARE | ) | Judge Patti B. Saris |
| FUND OF PHILADELPHIA AND VICINITY, | ) | |
| PHILDELPHIA FEDERATION OF | ) | |
| TEACHERS HEALTH AND WELFARE | ) | |
| FUND, DISTRICT COUNCIL 37, AFSCME – | ) | |
| HEALTH & SECURITY PLAN; JUNE SWAN; | ) | |
| MAUREEN COWIE AND BERNARD | ) | |
| GORTER, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| FIRST DATABANK, INC., a Missouri | ) | |
| corporation , and McKESSON | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| Defendants. | | |

## REBUTTAL REPORT OF DR. KIMBERLY P. MCDONOUGH

I am submitting this rebuttal report to address claims made by Defendant's expert Dr. Willig in Appendix 2 of his supplemental report, titled *Comments on Various Claims in the McDonough Report*. Although Dr. Willig says that he has not chosen to respond to all aspects of my report, I, of course, can only respond to the points that he has offered at this point.

### I.   PBM contracting

Dr. Willig alleges that my claims about the prevalence of three year contracts between PBMs and TPPs are unsubstantiated. He indicates that of the twelve contracts submitted in this case, only five were written for a period of three years.[1]  Dr. Willig

---

[1] It is interesting to note that in his review of the same twelve contracts, Mr. Flum, an attorney of record for McKesson, indicates that six of these contracts were issued for a term of three years. Declaration of Paul Flum in Support of McKesson Corporation's

further indicates that my citation of the CalPERS contract is insufficient evidence of the prevalence of three-year contracts. These comments are misleading because they ignore the full basis for my expert opinion on this subject.

My testimony regarding the duration of PBM contracts is based on my ten years of consulting experience, my previous experience working in the PBM industry and my review of contracts and proposed contract terms through the services I provide to my clients. My clients include MCOs, Blues plans, Fortune 1000 companies and other PBM consultants. In the course of negotiating contracts or evaluating pharmacy benefit services for my clients, I have reviewed over 100 contracts between PBMs and TPPs. I have reviewed contracts from each of the 3 major PBMs.

Mr. Willing suggests that clients should have renegotiated contract terms during the middle of their contract to compensate for the increases in AWP prices resulting from the change in AWP to WAC ratio. However, Dr. Willig ignores the reality of contracting within the PBM industry. To effect a change during the term of the contract, both parties would have to agree to open these negotiations. Although renegotiation of contract terms might have been beneficial to the TPP, there was no financial incentive for a PBM to open contract negotiations, particularly, as discussed in my initial report, if the PBM was generating higher profit margins through pharmacy network spreads and in its mail pharmacy operations.

It is also important to understand the amount of time necessary for a TPP to renegotiate or to change PBMs. To change PBMs, and often to renegotiate a PBM contract, a TPP will issue written Request for Proposals (RFPs) and encourage several PBMs to make proposals. It commonly takes four to six months to draft and issue RFPs, evaluate the responses and choose the best candidate among the responding PBMs. It would then take several more months for a TPP to convert to a new PBM. Thus, a TPP that desired better contract rates would still need a year to search for, locate, negotiate with and change over to a new PBM.

---

response to Dr. Hartman's September 14, 2007 Submission Regarding the Court's Class Certification Order.

Dr. Willig claims that, although I have discussed the unlikelihood that a TPP would be permitted to terminate its PBM contract, I have not discussed whether a TPP could renegotiate its PBM contract. I have worked with a few clients for whom the contract was renegotiated during the term of the contract. In each case, the renegotiation was the result of an RFP evaluation process in which the incumbent PBM accelerated the terms contract in an effort to retain the client and terminate the RFP process. Thus, the analysis of how difficult it would be for a TPP to renegotiate a PBM contract is similar to the analysis of how difficult it would be to terminate one.

I saw no increase in the number of TPPs wanting to renegotiate or change PBMs during 2002 or 2003. At most TPPs, internal resources for contracting are limited and prioritized in coordination with strategic initiatives for each year. As a matter of practical items, most TPPs were working on HIPAA compliance in 2002 and 2003 and resources for other pharmacy initiatives were not often available.

However I have recently seen an example of a PBM wishing to renegotiate its contracts with TPPs. Express Scripts ("ESI") has been requesting a contract revision to preserve the relative economic relationship of the parties in the event of a change in the methodology used to determine AWP. ESI will seek to reduce TPPs' AWP discounts to maintain the same spread and profit levels as currently exist. ESI is saying it will seek to do this even though ESI certainly did not offer to increase AWP discount levels in 2002 when the AWP bump-up occurred.

This shows that PBMs can correct for a change in AWP/WAC spread when they have the motivation to do so. After the AWP to WAC increases in 2002, they did not seek to do so.

In response to this contact revision request by ESI, several of my clients have requested an evaluation of the relative value of AWP to WAC, both currently and in 2001, prior to the change in AWP to WAC ratio. Because my staff has access to First Databank pricing files dating to 1997, we are able to conduct this assessment. By using the NDC-level drug indicators, my staff is able to compare the current AWP to WAC ratio for drugs expenditures to the AWP to WAC ratios for these same drugs in 2001. By doing so we are able to determine if the AWP discounts currently offered by the PBM

sufficiently offset the AWP price increases incurred as a result of the change in AWP to WAC ratio at issue in this case.

    II.      TPPs' ability to recoup increased costs due to the change in AWP methodology

Mr. Willing suggests that TPPs are able to use formularies, tiered copays, and utilization controls to completely offset the increased AWP costs incurred as a result in the change in AWP to WAC ratio. This position is naïve and is contradicted by what I have seen in over 17 years in the managed care industry. If a TPP were able to unilaterally adjust contract terms to compensate for price increases, pharmacy benefit cost inflation would have been non-existent for the past 17 years. This is certainly not the case.

Dr. Willig suggests that the AWP price increases could have been completely offset by the drug management tools indicated above. In fact, while drug management tools help to slow the trend of inflation in pharmacy benefits, they do not completely offset this trend. For example, a TPP could have theoretically raised the copay of Neurontin and Lipitor in response to the AWP changes that occurred in 2002. However, doing so would have resulted in a loss of rebate payments for all Pfizer products. In the case of a health plan, the change in benefit would also likely require approval by the Department of Insurance in each state where the health plan provides benefits. In the case of a collectively bargained benefit, changes would not be possible during the contract term. Formularies and utilization controls are subject to similar administrative limitations. These real life limitations would have substantially restricted any TPP in efforts to offset the price increases that resulted from the change in AWP to WAC ratio.

Similarly, Dr. Willig indicates that the lack of change in the rate of AWP price reported by PBMI ignores potential changes in rebates that could offset the AWP price increases. First, Dr. Willig ignores that most TPPs don't negotiate rebates, but rely on their PBM to negotiate manufacturer rebate contracts of the TPPs' behalf. These rebate contracts are proprietary to the PBM and the terms are not known to the TPP. Rebates are earned by virtue of a product's preferred placement on the PBM's or TPP's formulary. Therefore, rebates can only be earned on drugs placed on formulary.

Most importantly, rebates are typically paid based on WAC, not AWP.  The reason for this is quite simple:  manufacturers want to pay rebates based on their list prices rather than inflated AWPs.

Under the provisions of the Omnibus Reconciliation Act of 1990 (OBRA90), manufacturers must report to CMS the value of rebates and other price concessions given to the private sector.  If manufacturers provide rebates to a TPP or PBM that exceed the federally-mandated Medicaid rebate, the manufacturer must extend these same, higher rebates to Medicaid under the "best price" provisions of the OBRA90.  As a practical matter, few manufacturers are willing to supply rebates that exceed the mandated Medicaid rebate.

Dr. Willig also suggests that changes in dispensing fees paid to pharmacies could also have offset the impact of AWP increases.  Dr. Willig ignores that this proposed offset doesn't work as a matter of math. In my experience, PBM contracts offer retail pharmacy dispensing fees that rarely exceed $2.00 per prescription, while PBMs offer mail pharmacy services with no dispensing fee.  In contrast, a 5% increase in a month's supply of Lipitor would exceed $5.00 per prescription.  Given the financial reality, a change in dispensing fee could not offset the AWP price increases incurred as a result in the change in AWP to WAC ration that occurred in 2002.

Dr. Willig's argument assumes that PBMs always act solely in the best interests of their TPP clients.  While it is true that TPPs often rely on PBMs to negotiate aggressive contracts with retail pharmacies on their behalf, in reality, because PBMs use pharmacy payment margins, or spread, as a source of income, they are not necessarily motivated to modify client contracts to compensate for the AWP price changes that resulted from an increase in the AWP-to-WAC ratio.

In addition, all major PBMs own mail order facilities that are compensated by TPPs based on AWPs.  These facilities are major sources of revenue for PBMs and are significantly more profitable than the PBM's claims processing-related services.  In its 2003 annual report, Medco indicates that 15% of the prescriptions processed by Medco originated from its mail order facilities, accounting for $11.3 billion in revenue for that

5

year alone.  Express Scripts likewise filled over 39.1 million prescriptions through its mail order facility in 2004, almost 10% of its processed prescriptions.

III.      Availability of pass-through contracts

In my report, I indicate that very few PBMs are willing to provide pass-through contracts to their clients.  Dr. Willig contends that my testimony in this case differs from my textbook chapter in which I indicate "a new generation of PBM has emerged in the market place" which offers pass-through contracting. What Dr. Willig fails to recognize is the change in the PBM market between the time of the AWP pricing methodology change at issue in this case, and the publication of this textbook.  In fact, the emergence of these new PBMs is an industry response to litigation against the PBM industry regarding undisclosed revenues.

Despite the presence of these new PBMs in the marketplace, pharmacy network spread continues to be commonplace.  In fact, due to the continuing and widespread use of pharmacy network spread in contracts between PBMs and Plan Sponsors, the Centers for Medicare Services recently revised the methodology required for the submission of pharmacy costs incurred by Medicare Part D plans and under the rules of the Retiree Drug Subsidy payments to address the issue of spread. [2]

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Executed on this 29th day of October, 2007.

*Kimberly P. McDonough*

_____

Kimberly P. McDonough, Pharm. D.

---

[2] 2008 Part D Payment Notification, CMS Memo, April 2, 2007, page 5.

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 29, 2007.

/s/ Steve W. Berman
Steve W. Berman

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| )<br>NEW ENGLAND CARPENTERS HEALTH )<br>BENEFITS FUND, PIRELLI ARMSTRONG )<br>RETIREE MEDICAL BENEFITS TRUST; )<br>TEAMSTERS HEALTH & WELFARE FUND )<br>OF PHILADELPHIA AND VICINITY; )<br>PHILADELPHIA FEDERATION OF )<br>TEACHERS HEALTH AND WELFARE )<br>FUND; DISTRICT COUNCIL 37, AFSCME - )<br>HEALTH & SECURITY PLAN; JUNE )<br>SWAN; MAUREEN COWIE and BERNARD )<br>GORTER, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>FIRST DATABANK, INC., a Missouri )<br>corporation; and McKESSON )<br>CORPORATION, a Delaware corporation, )<br>)<br>Defendants. ) | C.A. No. 1:05-CV-11148-PBS |

**TUTORIAL PRESENTATION AND DEMONSTRATIVES
OF DR. KIMBERLY MCDONOUGH**

Good afternoon, Your Honor.  My name is Kimberly McDonough.  I am the president of Advanced Pharmacy Concepts, a pharmacy consulting firm that works with self-insured employers, government agencies and managed care organizations to help them get the most out of their pharmacy programs.

 I started APC after having a full career in pharmacy.  I obtained a doctor of pharmacy degree from Purdue University School of Pharmacy, and I'm currently licensed as a registered pharmacist in the states of Michigan and Rhode Island.  Prior to founding APC in 1997, I worked as director of pharmacy and vice president of clinical services for a regional hospital pharmacy service corporation.  I was a pharmacist for Harbor Community Health Plan, and I served as the direct of clinical operations and director of product development for MIM Health Plans, a national pharmacy benefit management company.

I've served on various committees of the American Pharmaceutical Association, the Academy of Managed Care Pharmacy, the State of Rhode Island's Drug-Use Review Board and other professional organizations.  I served as a subject-matter expert to CMS regarding pharmaceutical benefit practices during the planning and implementation of the Medicare Part D program.  I recently authored a chapter on PBMs in the *Handbook of Pharmaceutical Policy*, a textbook for use in schools of pharmacy.

During the past ten years, APC has provided services to over 200 employers, health plans and government agencies regarding the administration of their pharmacy benefits.  Our list of clients includes managed care organizations, Blue Cross plans, Fortune 1,000 companies and other PBM consultants.

In providing services to our clients, I have become intimately familiar with the PBM industry and its participants.  Specifically, I have directly participated in and supervised the following activities for our clients: measuring PBM compliance with contract terms, projecting pharmacy benefit costs, negotiating on behalf of our clients during PBM contract negotiations; including: evaluating pharmacy network discount rates, rebate sharing provisions and administrative fees, and advising clients about pharmaceutical pricing terms including: AWP, WAC, ASP and AMP.

In the course of negotiating contracts or evaluating pharmacy benefits for my clients, I have reviewed over 100 contracts between PBMs and third-party payers.  Specifically, I have reviewed contracts from each of the three major PBMs.

In addition to doing these types of tasks, I routinely rely on the pricing files of First DataBank, MediSpan and Red Book.  APC subscribes to electronic versions of First DataBank and MediSpan pricing files.  When we audit PBMs for our clients, we compare the AWP prices in the pharmacy claim databases provided by the PBMs against First DataBank and MediSpan files for consistency and accuracy.  My staff also periodically compares the prices between those two databases for consistency.

I was retained by plaintiffs to explain the use of AWP and how this affects pharmacy costs of third-party payers, to describe the nature of the relationship between third-party payers and PBMs and to address some of the claims made by McKesson's expert, Dr. Willig. I view my role today to explain to the court the effects of the defendant's changes in AWP pricing methodology to organizations like my clients. I am not an economist, but I can tell you from my personal experience what my clients faced when they saw their drug costs dramatically increase in 2002.

It is my understanding, from speaking with plaintiffs' counsel, that this court does not require much education on AWP or the fact that AWP is the standard used by third-party payers for the payment of claims for brand-name pharmaceuticals. It, likewise, probably does not surprise the court that all major PBMs, including Medco, Caremark and Express Scripts use the AWPs published either by First DataBank or MediSpan for the pricing of their pharmacy claims. Red Book is not widely used by the PBM industry.

In addition, because these AWP file formats are a structural component of the claim processing systems used by each PBM, once a PBM selects a given source for AWP, it does not usually change that source because it would be difficult and time-consuming to do so.

Further, immediately prior to what I understand to be the class period in this case, the AWPs from First DataBank and MediSpan were substantially identical because those two companies merged in 1998. First DataBank subsequently sold MediSpan to Wolters Kluwer in January 2002. I personally spoke to representatives of First DataBank and MediSpan in late 2002, and they told me that First DataBank was conducting the pricing activities of both companies.

Given that AWP is the standard for payments in pharmacy benefit programs, when AWP increases, drug costs incurred by third-party payers also increase. That equation is as simple as it sounds and it is supported by my experiences in counseling my clients when they began to discover the degree to which AWP price increases drove inflation in their pharmacy benefit programs.

Although I know of no one who attributed the sudden increase in drug costs to collusion between First DataBank and McKesson, my clients learned that AWP price increases were higher than normal in 2002 and 2003. For example, both Medco and Express Scripts published drug trend benefit reports, and they provide them to their clients. In their 2003 and 2004 reports, issued after the change in AWP pricing methodology began, Medco, Express Scripts and Caremark all reported a higher-than-normal increase in AWP inflation of drug costs.

Lets look at what my clients and other third-party payers who had Medco as their PBM saw in 2003.

Figure 3. Changes in trend drivers over the last year

Source: Medco Health data



Much of the increase in unit costs can be attributed to inflationary increases in unit prices charged by pharmaceutical manufacturers. Based on average wholesale price (AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

Medco explained that based on average wholesale price, drug price inflation increased by 33 percent from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

It's important to note that what this chart is showing is increases in drug costs on a PEPM basis. PEPM stands for per employee per month. These figures are not divided by drug or NDC, nor do they compare WACs and AWPs. All my clients knew was that their drug costs were increasing and that price inflation was the predominant factor attributing to this increase. One year later, in 2004, this is what clients who had Express Scripts as their PBM saw.

Exhibit 9

## Components of Unmanaged PMPY Cost Trend 1998 to 2003*

| | 1998 v1999 | 1999 v2000 | 2000 v2001 | 2001 v2002 | 2002 v2003 | 2002 v2003 (EXCLUDING SPECIALTY) |
|---|---|---|---|---|---|---|
| Inflation | 5.4% | 5.4% | 5.6% | 7.5% | 6.9% | 6.6% |
| x Units per Rx | 0.2% | 1.0% | 0 | -0.1% | -0.1% | 0.3% |
| x Brand/Generic Mix | | | -1.4% | -2.3% | -2.5% | -2.6% |
| x Therapeutic Mix | 3.1% | 5.1% | 4.4% | 5.3% | 3.2% | 2.6% |
| x Utilization | 6.2% | 3.7% | 6.3% | 6.3% | 6.8% | 6.8% |
| = Common Drugs | 15.6% | 15.9% | 15.6% | 17.5% | 14.8% | 14.0% |
| + New Drugs | 1.8% | 0.3% | 1.0% | 1.0% | 0.7% | 0.5% |
| = All Drug | 17.4% | 16.2% | 16.7% | 18.5% | 15.5% | 14.5% |

* The percentage contribution of each factor does not total to the All Drug percentage increase. The calculation takes the base cost for a given year and multiplies it by one times the percentage contributed by the first factor (inflation). The resulting total is then multiplied by the percentage contributed by the second factor (number of units dispensed) and so on for each Common Drug factor. The percentage contribution of the New Drugs is then added to the total Common Drug percentage to yield an All Drug percentage increase. The final results may differ due to rounding.

That same year, in 2004, my clients who had Caremark as their PBM were told that manufacturer price increases had caused the 2002 bump. As you can see, Caremark explained that AWP inflation was the predominant factor affecting drug price increases in 2002.



**2003 Gross Trend: 9.3%**

Trend management for our clients is our primary goal at Caremark. For 2003, clients responded to our recommendations for aggressive management measures, and they—and we—ended the year with one of the lowest trend numbers in the industry.

Our **single-digit trend in 2003** reflects a number of factors.

- Most importantly, **growth in utilization**, at 1.6%, was minimal compared to the 2002 number, 5.3%.
- The introduction and utilization of **generics and OTC versions** of brand blockbusters helped to slow trend.
- **Price increases**, the dominant driver in 2002, reverted to more normal levels, although they are still higher than inflation in the U.S.
- Anticipated **blockbuster drug introductions** didn't meet expectations, reducing the impact of new brand drugs.
- **Biotech trend** continued to grow; management measures helped to hold spend in this category for Caremark clients.
- **Plan sponsors** made significant changes in plan design, increasing the use of both mail service and generics, successfully driving **behavior shifts** in their overall participant populations.

> At 9.3%, pharmacy benefit trend in the Caremark Book of Business for 2003 is among the lowest reported in the industry.

*Figure 1*

But even though Caremark knew that AWP increases in 2002 were abnormally high, it never attributed those increases to fraud. Even though my clients could not tell what was causing the price increases, and even though their PBMs didn't tell them, they felt that – they felt the affects of the price increases. As this Medco drug trend benefit report for 2006 shows, 2001 and 2002 were watershed years for so-called price increases in prescription drugs.

I understand the court has been particularly interested in whether and to what degree third-party payers were able to get back the increased drug costs as caused by this scheme. As an initial matter, not a single one of my clients got any kind of reimbursement or back payment from any PBM to compensate them for the increased drug costs incurred in 2002 or 2003 as a result of the AWP price increases. Therefore, we have to look at whether third-party payers, like my clients, could have negotiated in order to get these costs back.

It is my expert opinion that third-party payers were not able to do this. Here is why. Dr. Willig's theory assumes that third-party payers knew that AWP price increases were effected through a scheme between First DataBank and McKesson. I personally, as an expert in this field, did not learn of this scheme until I heard about the filing in this case in the summer of 2006. Indeed, to the best of my knowledge, none of APC's clients

knew about the scheme before that time either.  While they did notice the increases in their drug costs, generally, even those increases weren't noticed until late 2002.  In fact, that's when my company noticed the changes.

When APC noticed the changes in AWP drug costs in the absence of a similar change in WAC drug costs, we contacted representatives from First DataBank.  These individuals told us that AWP prices were determined through a proprietary survey of national wholesalers.  They said that the increase in the AWP to WAC ratio was made by wholesalers in response to recent investigations by the Department of Justice.  First DataBank claimed that during these investigations, the Department of Justice had inquired why some manufacturer WAC prices were increased by 20 percent, while others were increased by 25 percent.

First DataBank further indicated that wholesalers had increased the markets to 25 percent to achieve consistency in the marketplace.  They also said that price increases for the blockbuster drugs, Lipitor and Neurontin, occurred as a result of the takeover of Parke-Davis, a 20 percent company, by Pfizer, a 25 percent company.

Dr. Willig assumes that PBMs always act solely in the best interest of their third-party payer clients.  While it is true that third-party payers often rely on PBMs to negotiate contracts with their retail pharmacies on their behalf, in reality, because PBMs use pharmacy payment margins, or spread, or as a source of income, they're not necessarily motivated to modify client contracts to compensate for the AWP price changes that resulted from an increase in the AWP to WAC ratio.  In addition, all major PBMs own mail-order facilities that are compensated by third-party payers based on AWP.  These facilities are major sources of revenue for PBMs and are significantly more profitable than the PBMs claim processing related services.

In its 2003 annual report, Medco indicates that 15 percent of the prescriptions processed by Medco originated from its mail-order facilities, accounting for $11.3 billion in revenue for that year alone.

### RESULTS OF OPERATIONS

The following table presents selected comparative results of operations and volume performance:

| FOR FISCAL YEARS ENDED ($ in millions) | DECEMBER 27, 2003 | INCREASE (DECREASE) | | DECEMBER 28, 2002 | INCREASE (DECREASE) | | DECEMBER 29, 2001 |
|---|---|---|---|---|---|---|---|
| **Net Revenues** | | | | | | | |
| Retail product[1] | $22,661.1 | $ 600.2 | 2.7% | $22,060.9 | $2,200.5 | 11.1% | $19,860.4 |
| Mail order product | 11,252.0 | 739.9 | 7.0% | 10,512.1 | 1,663.2 | 18.8% | 8,848.9 |
| Total product[1] | 33,913.1 | 1,340.1 | 4.1% | 32,573.0 | 3,863.7 | 13.5% | 28,709.3 |
| Service | 351.4 | (34.1) | (8.8%) | 385.5 | 24.2 | 6.7% | 361.3 |
| Total net revenues[1] | $34,264.5 | $1,306.0 | 4.0% | $32,958.5 | $3,887.9 | 13.4% | $29,070.6 |
| **Cost of Net Revenues** | | | | | | | |
| Product[1] | $32,552.7 | $1,068.8 | 3.4% | $31,483.9 | $3,882.8 | 14.1% | $27,601.1 |
| Service | 189.7 | 15.9 | 9.1% | 173.8 | (11.8) | (6.4%) | 185.6 |
| Total cost of net revenues[1] | $32,742.4 | $1,084.7 | 3.4% | $31,657.7 | $3,871.0 | 13.9% | $27,786.7 |
| **Gross Margin[2]** | | | | | | | |
| Product | $ 1,360.4 | $ 271.3 | 24.9% | $ 1,089.1 | $ (19.1) | (1.7%) | $ 1,108.2 |
| Product gross margin percentage | 4.0% | | 0.7% | 3.3% | | (0.6%) | 3.9% |
| Service | $ 161.7 | $ (50.0) | (23.6%) | $ 211.7 | $ 36.0 | 20.5% | $ 175.7 |
| Service gross margin percentage | 46.0% | | (8.9%) | 54.9% | | 6.3% | 48.6% |
| Total gross margin | $ 1,522.1 | $ 221.3 | 17.0% | $ 1,300.8 | $ 16.9 | 1.3% | $ 1,283.9 |
| Gross margin percentage | 4.4% | | 0.5% | 3.9% | | (0.5%) | 4.4% |
| **Volume Information** | **15%** | | | | | | |
| Retail | 453.9 | (12.6) | (2.7%) | 466.5 | 4.0 | 0.9% | 462.5 |
| Mail order | 78.1 | (3.6) | (4.4%) | 81.7 | 7.0 | 9.4% | 74.7 |
| Total volume | 532.0 | (16.2) | (3.0%) | 548.2 | 11.0 | 2.0% | 537.2 |
| Generic dispensing rates | 43.8% | | 3.3% | 40.5% | | 2.0% | 38.5% |

*(1) Includes retail co-payments of $6,850 million for 2003, $6,457 million for 2002 and $5,537 million for 2001.*

*(2) Defined as net revenues minus cost of net revenues.*

Express Scripts, likewise, filled over 39.1 million prescriptions through its mail-order pharmacy in 2004, almost 10 percent of its processed prescriptions.

## Financial Highlights

| (in thousands, except per share data) | | 2004 | | 2003 | % Change |
|---|---|---|---|---|---|
| **Statement of Operations** | | | | | |
| Revenues | $ | 15,114,728 | $ | 13,294,517 | 14% |
| Income before income tax | | 450,643 (1) | | 405,302 (2) | 11% |
| Net income | | 278,207 (1) | | 249,600 (2) | 11% |
| **Per Diluted Share Data** | | | | | |
| Net income | | 3.59 (1) | | 3.16 (2) | 14% |
| **Average Diluted Shares Outstanding** | | 77,516 | | 78,928 | -2% |
| **Balance Sheet Data:** | | | | | |
| Cash | $ | 166,054 | $ | 396,040 | -58% |
| Working capital | | (348,338) | | (66,273) | -426% |
| Total assets | | 3,600,086 | | 3,409,174 | 6% |
| Total debt, including current maturities | | 434,113 | | 455,018 | -5% |
| Stockholders' equity | | 1,196,314 | | 1,193,993 | -% |
| **Net Cash Provided by Operating Activities** | | 496,230 | | 457,924 | 8% |
| **Selected Data:** | | | | | |
| Network pharmacy claims processed | | 398,756 | | 378,927 | 5% |
| Home delivery pharmacy prescriptions filled | | 39,080 | **10%** | 32,337 | 21% |

(1) Includes net charges of $35.4 million ($21.9 million net of tax), or $0.28 per diluted share, for early retirement of debt in the first half of the year, legal defense costs in the third quarter, and a contract termination payment received in the first quarter.

(2) Includes charges of $4.9 million ($3.0 million net of tax), or $0.04 per diluted share, for early retirement of debt.

These numbers are necessarily greater for the brand-name drugs at issue in this case because PBM-owned mail-order pharmacies dispense a higher percentage of brand prescriptions when compared to retail pharmacies.

According to an August 2005 Federal Trade Commission report that investigated prescriptions dispensed in 2003, 56 percent of prescriptions dispensed by retail pharmacies were for brand-name drugs, while 61 percent of prescriptions dispensed by mail-order pharmacies were for brand-name drugs.

Indeed, executives from the PBM industry told me that they recognize that the change in AWP to WAC ratio was beneficial to their organization. During a conversation about the AWP changes in early 2003, a vice president from Advance PCS commented to me that the change in ratio was very beneficial to his organization. In fact, he indicated that the company identified an increase in their mail pharmacy profit margin, learning later that the added profit was attributed to changes in the AWP to WAC ratio.

I've reviewed Dr. Willig's report where he says that third-party payers would have reacted to the effects of AWP to WAC pricing changes by negotiating greater discounts off AWP. This theory ignores the reality of PBM contracting and my own experiences and observations. Of all of the PBM contracts I have reviewed, the vast majority of them are for a term of three years. In addition, these contracts often have automatic renewal provisions so they may not really be renegotiated every contract term, as Dr. Willig suggests. Although a contract might be renewed during the contract term, in my experience this is rare.

It's also important to understand the amount time necessary for a third-party payer to renegotiate or change PBMs. To change PBMs and often to renegotiate a PBM contract, a third-party payer will issue a written request for proposal and encourage several PBMs to make proposals. It commonly takes four to six months to draft and issue an RFP, evaluate the responses and choose the best candidate among the responding PBMs. It would then take several more months for a third-party payer to convert to the new PBM. Thus, a third-party payer that desired better contract rates would still need a year to search for, locate, negotiate with and change over to a new PBM.

PBMs want the contracts to be longer for their own financial stability and to offset implementation costs. Thus, the vast majority of PBM contracts do not permit termination prior to the expiration of these contracts unless one party breaches the contract. There are often significant financial penalties for early termination. In my 11 years of experience as a consultant, I have only seen one PBM contract that was terminated prior to its full term.

It's not just that third-party payers could not, theoretically, have renegotiated their reimbursement rates to compensate for the AWP price increases during 2002. As a matter of fact, they did not. The prescription drug benefit cost and design survey reported brand reimbursement levels for the ten-year period from 1995 through 2006. This report showed that the rate of change in AWP discounts, achieved by third-party payers, was modest and was consistent over time.



If third-party payers had really been able to renegotiate greater percentages off of AWP, this charge would show a dramatic drop sometime after 2002. Such a drop just isn't there.

This fact is confirmed by my own experiences. A large part of my business is helping TPPs issue and manage the RFPs and negotiate contracts with PBMs. I saw no increase

in the number of third-party payers wanting to renegotiate or change PBMs during 2002 or 2003. Indeed, as a practical matter, most third-party payers were working on HIPAA compliance at that time, and they had decreased resources for other pharmacy initiatives.

I have also read Dr. Willig's report where he says that increases in AWPs would have had no effects on third-party payers with pass-through contracts. Pass-through contracts are contracts where the rate paid to the pharmacy is passed through to the third-party payer at the actual cost. In my experience with my clients, very few PBMs were willing to enter into this type of arrangement during the time that the change in AWP to WAC pricing occurred.

Among my clients, only one group successfully negotiated and operated under a pass-through contract during this time period. Indeed, since 2002, Express Scripts has language in its contracts specifically acknowledging that it will keep the spread between pharmacy and third-party reimbursement.

In his report, Dr. Willig uses the 2001 contract negotiations between Medco and the Public Employment Retirement System of Ohio (PERS). He suggests that PERS obtained greater pass-through rebates after the scheme. My company served as the consultant to PERS during those negotiations. I know from my experience that the changes to the rebate part of the agreement predated changes in the AWP pricing methodology and were, instead, due to competitive negotiation during the RFP process based on the result of audit findings. The PERS negotiation do not support Dr. Willig's theory that third-party payers recoup their losses by getting a larger share of the manufacturer rebates.

Finally, I have read the part of Dr. Willig's report that says that third-party payers could have negotiated for greater manufacturer rebates to offset the effects of the scheme. This theoretical suggestion is also contradicted by actual real-world experience. First, Dr. Willig ignores that most third-party payers don't negotiate rebates, but they rely on their PBM to negotiate manufacturer rebate contracts on behalf of the third-party payers. These rebate contracts are proprietary to the PBM and the terms are not known to the third-party payer.

In addition, rebates are earned by virtue of a product's placement on the PBM or the third-party payer's formulary. Therefore, rebates can only be earned on drugs placed on formulary. Most importantly, rebates are typically paid based on WAC, not AWP. The reason for this is quite simple. Manufacturers want to pay rebates based on their list prices rather than on inflated AWPs.

Under the provisions of the Omnibus Reconciliation Act of 1990, which is known as OBRA '90, manufacturers must report to CMS the value of their rebates and other price concessions given to the private sector. If manufacturers provide rebates to a third-party payer or a PBM that exceed the federally mandated Medicaid rebate, the manufacturer must extend these same higher rebates to Medicaid under the best-price provisions of

OBRA '90.  As a practical matter, few manufacturers are willing to supply rebates that exceed the mandated Medicaid rebate.

Finally, Dr. Willig ignores that this proposed clawback doesn't work as a matter of math.  In general, rebates offer reductions equal to 2 to 8 percent of the total drug cost.  Even if third-party payers had immediately renegotiated their agreements to get a greater amount of rebates, itself unlikely and something I have not observed.  That amount would never have given third-party payers for recoupment from the effects of the AWP price increases.

Your Honor, I hope that you found it helpful to hear about what was happening in the real world, or my real world, at least, as a result of McKesson's conduct.  Until the filing of this litigation, I was unaware of the potential collusion between First DataBank and McKesson related to the changes in AWP pricing methodology.  My clients, likewise, didn't know.

In all the work that I have done with my third-party payer clients, I have seen nothing to indicate that third-party payers got anything back to compensate them for their increased drug costs during that period.  Certainly, no PBM has ever approached my client and offered to give them anything back.  The effect of the change in AWP to WAC ratio resulted in measurable and sustained added costs to my clients.

*[End of Audio]*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on October 29, 2007.

/s/ Steve W. Berman
Steve W. Berman

Source: Medco Health data

Figure 3. Changes in trend drivers over the last year



Much of the increase in unit costs can be attributed to inflationary increases in unit prices charged by pharmaceutical manufacturers. Based on average wholesale price (AWP), drug price inflation increased 33 percent, from 4.9 percent in 2001 to 6.5 percent in 2002, a level significantly higher than in years past.

## Exhibit 9

### Components of Unmanaged PMPY Cost Trend 1998 to 2003*

| | 1998 v 1999 | 1999 v 2000 | 2000 v 2001 | 2001 v 2002 | 2002 v 2003 | 2002 v 2003 (EXCLUDING SPECIALTY) |
|---|---|---|---|---|---|---|
| Inflation | 5.4% | 5.4% | 5.6% | 7.5% | 6.9% | 6.6% |
| x Units per Rx | 0.2% | 1.0% | 0 | -0.1% | -0.1% | 0.3% |
| x Brand/Generic Mix | 3.1% | 5.1% | -1.4% | -2.3% | -2.5% | -2.6% |
| x Therapeutic Mix | 6.2% | 3.7% | 4.4% | 5.3% | 3.2% | 2.6% |
| x Utilization | | | 6.3% | 6.3% | 6.8% | 6.8% |
| = Common Drugs | 15.6% | 15.9% | 15.6% | 17.5% | 14.8% | 14.0% |
| + New Drugs | 1.8% | 0.3% | 1.0% | 1.0% | 0.7% | 0.5% |
| = All Drug | 17.4% | 16.2% | 16.7% | 18.5% | 15.5% | 14.5% |

* The percentage contribution of each factor does not total to the All Drug percentage increase. The calculation takes the base cost for a given year and multiplies it by one times the percentage contributed by the first factor (inflation). The resulting total is then multiplied by the percentage contributed by the second factor (number of units dispensed) and so on for each Common Drug factor. The percentage contribution of the New Drugs is then added to the total Common Drug percentage to yield an All Drug percentage increase. The final results may differ due to rounding.

# 2003 Gross Trend: 9.3%

Trend management for our clients is our primary goal at Caremark. For 2003, clients responded to our recommendations for aggressive management measures, and they—and we—ended the year with one of the lowest trend numbers in the industry.

Our **single-digit trend in 2003** reflects a number of factors.

- Most importantly, **growth in utilization**, at 1.6%, was minimal compared to the 2002 number, 5.3%.

- The introduction and utilization of **generics and OTC versions** of brand blockbusters helped to slow trend.

- **Price increases**, the dominant driver in 2002, reverted to more normal levels, although they are still higher than inflation in the US.

- Anticipated **blockbuster drug introductions** didn't meet expectations, reducing the impact of new brand drugs.

- **Biotech trend** continued to grow, management measures helped to hold spend in this category for Caremark clients.

- **Plan sponsors** made significant changes in plan design, increasing the use of both mail service and generics, successfully driving **behavior shifts** in their overall participant populations.

At 9.3%, pharmacy benefit trend in the Caremark Book of Business for 2003 is among the lowest reported in the industry



Figure 1

**9.3% Trend**

- 1.6% Utilization
  - Participants
  - Prescribers
  - Plan Sponsors
  - Politics

- 4.2% Product
  - New Drugs
    - Brand
    - Biotechs
  - Drug Mix
    - Generics
    - Brands
    - Biotechs

- 3.5% Price
  - Inflation
    - Price Increases
    - Delivery Systems
    - New Generics

## RESULTS OF OPERATIONS

The following table presents selected comparative results of operations and volume performance:

| FOR FISCAL YEARS ENDED ($ in millions) | DECEMBER 27, 2003 | INCREASE (DECREASE) | | DECEMBER 28, 2002 | INCREASE (DECREASE) | | DECEMBER 29, 2001 |
|---|---|---|---|---|---|---|---|
| **Net Revenues** | | | | | | | |
| Retail product(1) | $22,661.1 | $ 600.2 | 2.7% | $22,060.9 | $2,200.5 | 11.1% | $19,860.4 |
| Mail order Product | 11,252.0 | 739.9 | 7.0% | 10,512.1 | 1,663.2 | 18.8% | 8,848.9 |
| Total product(1) | 33,913.1 | 1,340.1 | 4.1% | 32,573.0 | 3,863.7 | 13.3% | 28,709.3 |
| Service | 351.4 | (34.1) | (8.8%) | 385.5 | 24.2 | 6.7% | 361.3 |
| Total net revenues(1) | $34,264.5 | $1,306.0 | 4.0% | $32,958.5 | $3,887.9 | 13.4% | $29,070.6 |
| **Cost of Net Revenues** | | | | | | | |
| Product(1) | $32,552.7 | $1,068.8 | 3.4% | $31,483.9 | $3,882.8 | 14.1% | $27,601.1 |
| Service | 189.7 | 15.9 | 9.1% | 173.8 | (11.8) | (6.4%) | 185.6 |
| Total cost of net revenues(1) | $32,742.4 | $1,084.7 | 3.4% | $31,657.7 | $3,871.0 | 13.9% | $27,786.7 |
| **Gross Margin(2)** | | | | | | | |
| Product | $ 1,360.4 | $ 271.3 | 24.9% | $ 1,089.1 | $ (19.1) | (1.7%) | $ 1,108.2 |
| Product gross margin percentage | 4.0% | | 0.7% | 3.3% | | (0.6%) | 3.9% |
| Service | $ 161.7 | $ (50.0) | (23.6%) | $ 211.7 | $ 36.0 | 20.5% | $ 175.7 |
| Service gross margin percentage | 46.0% | | (8.9%) | 54.9% | | 6.3% | 48.6% |
| Total gross margin | $ 1,522.1 | $ 221.3 | 17.0% | $ 1,300.8 | $ 16.9 | 1.3% | $ 1,283.9 |
| Gross margin percentage | 4.4% | | 0.5% | 3.9% | | (0.5%) | 4.4% |
| **Volume Information** | | | | | | | |
| Retail | 453.9 | (12.6) | (2.7%) | 466.5 | 4.0 | 0.9% | 462.5 |
| Mail order | 78.1 | (3.6) | (4.4%) | 81.7 | 7.0 | 9.4% | 74.7 |
| Total volume | 532.0 | (16.2) | (3.0%) | 548.2 | 11.0 | 2.0% | 537.2 |
| Generic dispensing rates | 43.8% | 3.3% | | 40.5% | 2.0% | | 38.5% |

**15%** (arrow pointing to 78.1)

(1) Includes retail co-payments of $6,850 million for 2003, $6,457 million for 2002 and $5,537 million for 2001.

(2) Defined as net revenues minus cost of net revenues.

# Financial Highlights

*(in thousands, except per share data)*

| | | 2004 | | 2003 | % Change |
|---|---|---|---|---|---|
| **Statement of Operations** | | | | | |
| Revenues | $ | 15,114,728 | $ | 13,294,517 | 14% |
| Income before income tax | | 450,643 (1) | | 405,302 (2) | 11% |
| Net income | | 278,207 (1) | | 249,600 (2) | 11% |
| **Per Diluted Share Data** | | | | | |
| Net income | | 3.59 (1) | | 3.16 (2) | 14% |
| **Average Diluted Shares Outstanding** | | 77,516 | | 78,928 | -2% |
| **Balance Sheet Data:** | | | | | |
| Cash | $ | 166,054 | $ | 396,040 | -58% |
| Working capital | | (348,338) | | (66,273) | -426% |
| Total assets | | 3,600,086 | | 3,409,174 | 6% |
| Total debt, including current maturities | | 434,113 | | 455,018 | -5% |
| Stockholders' equity | | 1,196,314 | | 1,193,993 | -% |
| **Net Cash Provided by Operating Activities** | | 496,230 | | 457,924 | 8% |
| **Selected Data:** | | | | | |
| Network pharmacy claims processed | | 398,756 | | 378,927 | 5% |
| Home delivery pharmacy prescriptions filled | | 39,080 ←10% | | 32,337 | 21% |

(1) Includes net charges of $35.4 million ($21.9 million net of tax), or $0.28 per diluted share, for early retirement of debt in the first half of the year, legal defense costs in the third quarter, and a contract termination payment received in the first quarter.

(2) Includes charges of $4.9 million ($3.0 million net of tax), or $0.04 per diluted share, for early retirement of debt.

**SLIDE 5**



# Exhibit E

**Lynette M. Vazquez**

| | |
|---|---|
| **From:** | Jennifer F. Connolly |
| **Sent:** | Monday, August 18, 2008 9:57 PM |
| **To:** | Lynette M. Vazquez |
| **Subject:** | FW: Kim McDonough availability |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Red |

**From:** Flum, Paul [mailto:PaulFlum@mofo.com]
**Sent:** Monday, July 28, 2008 2:14 PM
**To:** Jennifer F. Connolly
**Subject:** RE: Kim McDonough availability

Jennifer,

I makes sense to agree on a firm date.  Let's schedule the deposition for September 4.  Will you accept service of an amended subpoena?

Paul

**From:** Jennifer F. Connolly [mailto:JFC@wtwlaw.us]
**Sent:** July 28, 2008 7:48 AM
**To:** Flum, Paul
**Subject:** Kim McDonough availability

Paul -

Dr. McDonough is not available for a deposition on August 19.  As I previously expressed, July and August are the busiest months in her business.  The only dates she is available in the near future are August 25-26 and September 3-5.  In addition, she wanted me to let you know that, should we schedule the August dates, she could have to cancel without notice.  Her firm is currently bidding to provide services for CMS.  If her firm is a finalist CMS must do an on-site inspection that can be done any time in August without notice.  So we offer those dates with a significant caveat.

We will be sending you objections to your subpoena soon.  In the meantime, feel free to call with any questions.

Jennifer

Jennifer Fountain Connolly
**WEXLER | TORISEVA | WALLACE**
*A Limited Liability Partnership*
55 W. Monroe, Suite 3300

8/19/2008

Chicago, IL 60603
312-346-2222
312-589-6274 (direct)
312-589-6275 (direct facsimile)
www.wtwlaw.com

CONFIDENTIALITY NOTICE: This e-mail message contains information belonging to the law firm of Wexler Toriseva Wallace LLP, which may be privileged, confidential and/or protected from disclosure. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please contact us immediately at 312-346-2222.

======================================================================

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to
http://www.mofo.com/Circular230.html

======================================================================

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @mofo.com, and delete the message.
======================================================================

8/19/2008

# Exhibit F

# W E X L E R | T O R I S E V A | W A L L A C E

Limited Liability Partnership
Chicago, IL • Wheeling, WV • Sacramento, CA

August 18, 2008

***<u>Via Electronic Mail</u>***

Paul Flum
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA 94105-2482

      Re:    *New England Carpenters, et al. v. First DataBank, Inc., et al.*
            Case No. 05-cv-11148 (D. Mass.)

Dear Paul:

Enclosed pursuant to McKesson's subpoena to Dr. McDonough in the above-referenced matter are McDonough 0854-0871.

Please call with any questions.

Very truly yours,

      /s/

Jennifer Fountain Connolly

JFC/lmv
Enclosures

cc:    John A. Macoretta

Contact Information:    Jennifer Fountain Connolly    55 West Monroe Street    (312) 346-2222
    (312) 589-6274 Direct Dial    Suite 3300    (312) 346-0022 fax
    (312) 589-6275 Direct Fax    Chicago, IL  60603    www.wtwlaw.com
    jfc@wtwlaw.com

# W E X L E R | T O R I S E V A | W A L L A C E

Limited Liability Partnership
Chicago, IL • Wheeling, WV • Sacramento, CA

August 18, 2008

**_Via Electronic Mail_**

Paul Flum
Morrison & Foerster, LLP
425 Market Street
San Francisco, CA 94105-2482

Re:     *New England Carpenters, et al. v. First DataBank, Inc., et al.*
Case No. 05-cv-11148 (D. Mass.)

Dear Paul:

I recently realized that Plaintiffs' previous production pursuant to McKesson's subpoena to Dr. McDonough inadvertently contained material that we intended to redact. Therefore, please replace the documents I previously provided you with the enclosed documents.

Very truly yours,

/s/

Jennifer Fountain Connolly

JFC/lmv
Enclosures

cc:     John A. Macoretta

Contact Information:    Jennifer Fountain Connolly      55 West Monroe Street      (312) 346-2222
(312) 589-6274 Direct Dial      Suite 3300      (312) 346-0022 fax
(312) 589-6275 Direct Fax      Chicago, IL  60603      www.wtwlaw.com
jfc@wtwlaw.com

# Exhibit 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 05-cv-11148 Hon. Patti B. Saris |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF KIMBERLY PLY MCDONOUGH, R.PH. IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO MCKESSON CORPORATION'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA TO KIMBERLY MCDONOUGH

I, Kimberly Ply McDonough, pursuant to 28 U.S.C. §1746, on oath, depose and state as follows:

1.     I am President of Advanced Pharmacy Concepts ("APC"), an independent pharmacy benefit consulting and audit firm that provides services to employers, health plans, and government agencies regarding the administration of pharmacy benefits and implementation of clinical benefit programs. I have been retained by Plaintiffs as an expert witness in this matter to opine regarding various aspects of pharmaceutical reimbursement and the role of certain industry

players, including pharmacies and PBMs. I submit this Declaration in Opposition to McKesson Corporation's Motion to Compel Compliance with Subpoena to Kimberly McDonough.

A.     **McKesson's Subpoena**

2.     On July 28, 2008 McKesson served a subpoena on me requesting my attendance at a deposition and requesting the production of various documents. I objected to the scope of several of McKesson's requests for documents and, accordingly, expressed those objections to Class Counsel. I thereafter reviewed Class Counsel's objections to those requests and suggested some edits to the objections Class Counsel had prepared based on our discussions. I fully approved of the objections Class Counsel prepared before they were served on McKesson.

3.     On August 11, 2008 Jennifer Connolly contacted me to say that she had she just concluded a meet-and-confer with McKesson. She therefore asked me to answer a few questions that had arisen during that telephone conversation. First, McKesson wanted all communications I had had with First DataBank regarding the 2001 WAC-to-AWP mark-up. I informed Ms. Connolly that those communications were, as she suspected, oral. Second, she asked me whether my analyses of WAC-to-AWP changes were done for particular clients and requested that, if that were the case, I let her know if I would be willing to produce the analyses with my clients' names redacted. I was in the process of investigating that issue when I received notice that McKesson had filed a motion to compel seeking this information.

B.     **McKesson's Motion to Compel**

4.     It is my understanding that McKesson's Motion to Compel seeks two things. First, McKesson wants me to produce the "over 100 PBM contracts and RFPs" referenced on page 10 of my September 14, 2007 expert report. Second, McKesson wants copies of any analyses I performed for my clients regarding the AWP to WAC ratios that are referenced in my Rebuttal Report.

5.      <u>PBM contracts and RFPs</u>.  I cannot produce the PBM contracts and RFPs sought by McKesson.  First, I did <u>not</u> consider or rely on any specific contracts in forming my expert opinion.  Rather, I relied on my experience, which involved the review and negotiation of such contracts and RFPs, in forming my opinion.  Over the past five years, APC has provided services to over 200 commercial and state government clients with total pharmacy expenditures in excess of three billion dollars.  In addition, I personally have been a consultant for the past eleven years.  It would be impossible for me to produce every PBM contract or RFP I have reviewed during that time period.

6.      Not only would it be impossible for me to locate all of those documents, but doing so would implicate the individual contracts I, or APC, have with every single one of those clients and their PBMs.  RFP negotiations between my TPP clients and their PBMs, and the resulting contracts memorializing the results of those negotiations, are some of the most sensitive commercial negotiations in this industry.  Therefore, under my contracts, I would have to provide notice to every single one of my past or present clients and each PBM or supplier that was included in the RFP or contracting process.  Those clients and suppliers would then have to be given the opportunity to object to production of those documents.  In short, even producing a small sample of these documents would be a massive undertaking that would not only disrupt APC's business, but would cause me and APC irreparable harm by damaging the trust and confidence I have established with my past and present clients.

7.      <u>Analyses of AWP to WAC ratios</u>.  McKesson's second request is similarly unreasonable.  Again, I did not consider or rely on any specific analysis in preparing my expert reports; rather, I relied on my collective experience.  In the section of my rebuttal report that McKesson references, I was describing pricing analyses that I did for my clients based on their

3

own data.  I have done a substantial amount of pricing analyses for my clients, addressing a wide range of pricing concerns:  sometimes those analyses compare AWPs to AMP (Average Manufacturers Price, the benchmark used by the Medicaid program); sometimes those analyses compare AMPs to ASPs (Average Sales Price, the benchmark used by the Medicare program since 2004), or other types of comparisons.  In order to locate the specific analyses McKesson references, I would first have to review all of those files to determine the subset of analyze AWP to WAC ratios.  In many cases, I would then have to segregate the analyses that McKesson seeks from other pricing analyses I did in order to extract relevant information.

8.      In addition to the burden of locating the analyses McKesson seeks, after I determined the clients for whom I did such analyses I would have to provide notice, in every case, to both (a) the client and (b) the client's PBM.  It is a virtual certainty that many if not all of those entities would object to the production of the data McKesson seeks and that I would then have to resolve those objections.  Resolving them would be a significant disruption and embarrassment to my business.  Further, some of the client data I analyzed contained Patient Health Information, the disclosure of which would implicate HIPAA.  None of these concerns would be resolved by redacting the information as McKesson suggests because it is the data itself that is sensitive to the parties involved.

9.      I estimate that obtaining the documents McKesson seeks in a manner I have described would take at least six months, and likely far longer, and in any event could never be accomplished anywhere close to my September 4 deposition.  It would also cost my firm at least $75,000 in labor, and likely far more.  I am not pulling this number out of thin air:  we recently provided a client similar labor estimate that merely involved producing documents pursuant to a Freedom of Information Act request.  Pulling the analyses McKesson has requested here, on the

other hand, would be far more labor-intensive and would have to be completed by more senior level personnel.

10.     If the Court requires I will make myself available to further explain the bases for my objections to McKesson's Subpoena.   These issues are very important to me and my business.

Dated this 27th day of August 2008.

Kimberly Ply McDonough, R.Ph.