**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC. and McKESSON CORPORATION, <br><br> Defendants. | CIVIL ACTION <br> NO. 05-11148-PBS |
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC., <br><br> Defendant. | CIVIL ACTION <br> NO. 07-10988-PBS |

**DEVILLE PHARMACIES,**
**THE LONG TERM CARE PHARMACY ALLIANCE AND**
**THE AMERICAN SOCIETY OF CONSULTANT PHARMACISTS**
**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION TO STAY IMPLEMENTATION OF SETTLEMENTS PENDING APPEAL</u>**

1

DeVille Pharmacies ("DeVille"), in its capacity as a class member, the Long Term Care Pharmacy Alliance ("LTCPA"), a national association advocating for the needs of specialized pharmacies and over 1.5 million people in long-term care ("LTC") facilities, and the American Society of Consultant Pharmacists ("ASCP"), a national association representing the interests of thousands of consultant and senior care pharmacists who work in and own LTC pharmacies (collectively the "LTC Objectors"), pursuant to Federal Rule of Civil Procedure 62(d), submit this Memorandum of Law in support of their Motion to Stay Implementation of the Settlements pending appeal.

## I.   INTRODUCTION

A stay pending appeal is warranted by the very text of the settlements. Paragraph 7 clearly states that the settlements only become effective after the expiration of all appeals periods or the denial of all pending appeals. Thus, a stay would be consistent with the bargained-for and agreed-upon language clearly set forth by the parties in their Settlement Agreements, ensuring that the settlements are not implemented while appellate review of their approval is ongoing. Moreover, even if the explicit language of the settlements did not demand such a result, a stay pending appeal is warranted because the LTC Objectors can demonstrate the presence of serious and novel legal issues on appeal, the presence of irreparable harm without a stay, and the absence of any meaningful harm to the settling parties.

## II.   ARGUMENT

This Court unquestionably has the power to stay the Order pending appeal to preserve the status quo. *See, e.g.*, *Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4, 9-10 (1942) ("It has always been held . . . that, as part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal."). A

stay is appropriate here both because the terms of the settlement require it, and because the LTC Objectors satisfy the traditional four-factor test established by the Supreme Court.  With a stay, the LTC Objectors will be able to pursue their appeal before the First Circuit without facing the prospect of having to undo any measures taken by the parties in furtherance of the settlements should the LTC Objectors prevail on appeal.  Moreover, preservation of the status quo during the appeal will pose a minimal risk of harm to any parties favoring the settlement, and is in the public interest.

### A.     The Stay Is Required by the Terms of the Settlement

Paragraph 7 of the Settlement Agreements states that the Effective Date of the settlements is "the first day after" all pending appeals and writs of certiorari to the United States Supreme Court are resolved.

> Effective Date of Settlement.  The settlement detailed in this Class Agreement shall be effective on the first day after all of the following events have occurred:….(4) the expiration of any time for appeal or review of such order and Final Judgment, or, if any appeal is filed and not dismissed, after such Order and Final Judgment is upheld on appeal in all material respects and is no longer subject to review upon appeal or review by writ of certiorari…..

*See* Settlement Agreements ¶ 7.  Given the impending appeals to the First Circuit, the settlements' plain terms justify a stay so that the parties do not take any action in furtherance of the not yet effective Settlement Agreements until after the appeals process is fully completed.

The settling parties likely will urge the Court to construe its March 17, 2009 Memorandum and Order and paragraph 9 of the Settlements (which the Court has essentially modified) as together requiring FDB and Medi-Span to reduce AWP prices within 180[1] days "after the entry by the Settlement court of the Final Order and Judgment in substantially the form

---

[1] The Settlement Agreements actually state that AWP reductions will be implemented within 90 days of the Court entering its Orders.  Settlement Agreements at ¶ 9.  This time period was subsequently adjusted to 180 days by the Court's March 17, 2009 Order.  Memorandum and Opinion, Docket No. 720, at 15 & 17.

3

attached hereto as Exhibit B…." *See id.* ¶ 9; *see also* Memorandum and Order, Docket No. 720, at 17.  But this provision should not be deemed effective until the Settlement Agreements themselves are effective, which, pursuant to paragraph 7, is only following the exhaustion of an appeals period.

The Final Order and Judgment submitted by the settling parties and signed by the Court confirms the parties' intent to act in contravention of the bargained-for effective date language contained in paragraph 7 of the Settlement Agreements.  Final Order and Judgment, Docket No. 722 at ¶ 12 ("First DataBank and Medi-Span will each make the adjustment referred to above 180 days from the entry of this judgment, regardless of whether a notice of appeal of this Final Order and Judgment is filed.").  In contrast, the Final Order and Judgment also explicitly approves the Amended and Restated Settlements – including the paragraph 7 language establishing the Effective Date.  *Id.* at ¶ 8.

To implement the key terms of the settlements before they are legally effective would be to render the phrase "the settlement detailed in this Class Agreement shall be effective only the first date after all of the following events have occurred" superfluous, and would effectively moot the LTC Objectors' pending appeal.  Settlement Agreements at ¶ 7.  Accordingly, the Court should stay the implementation of the settlements pending the expiration of the appeals period and the issuance of an order that would render the Settlement Agreements effective according to their own terms.

### B. A Stay is Further Warranted Because This Case Raises Complex Legal Issues And The Motion Satisfies The Supreme Court's Four-Factor Test.

It is well settled in this Circuit that Courts considering a motion for stay must assess: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance

of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F. Supp. 58, 59 (D. Mass. 1997) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)), *rev'd on other grounds*, 118 F.3d 841 (1st Cir. 1997) (reversing district court's decision on the merits).  Each factor is met here.

The *Hilton* test does not require the Court to weigh each factor equally, nor is it a rigid test.  *See Hilton*, 481 U.S. at 777 ("Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules.").  Rather, it is a fact-bound inquiry, "depend[ing] on whether the harm caused movant without the stay, in light of the movant's likelihood of eventual success on the merits, outweighs the harm the stay will cause the non-moving party." *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16-17 (1st Cir. 2002); *see also United States v. Kenney*, No. CR-07-66-B-W, 2008 WL 3285891 (D. Me. Aug. 5, 2008) (granting stay based on the absence of harm to the non-movant).

      **1.**     **The LTC Objectors have Made a Strong Showing of Likelihood of Success on the Merits.**

The Court has commented regularly in opinions and hearings about the complex and novel legal issues presented by these Settlement Agreements.  In November 2006, the Court recognized that the unique nature of this settlement raised a "vermillion flag" because "[e]ssentially, plaintiffs seek to extinguish the rights of past class members in exchange for providing benefits to future class members, particularly third-party payors."  Order, Docket No. 168 at 2-4.  Subsequently, in a May 2007 hearing, the Court again expressed skepticism, recognizing that "it's basically shifting from one class of people who may have been injured to a future class, the benefits, and so it's very unusual, and I'm still not sure what I'm going to do with it ultimately."  5/22/07 Tr. at 58:9-12.  On January 22, 2008, this Court ultimately rejected

the first iteration of the settlement, in part, because they posed a very real threat to smaller pharmacy operations and their patients, many of whom were situated in underserved communities, or were elderly or disabled and in need of specialized services. 1/22/08 Tr. at 75:16-76:24 ("[t]he second major issue that I have is understanding the impact on independent pharmacies . . ."). Indeed, the Court suggested that an independent court-appointed expert was needed to provide analysis of whether the settlements' impact on smaller independent pharmacies was unreasonable.

> But then I've got to worry about what's the impact on the nonparties; in particular here for me, it's the independent pharmacies. . . . And maybe the way to go – I floated this once before, and I let it drop, and I shouldn't have, and nobody picked it up – is getting some sort of independent expert to do an evaluation of, if I just did the 1,400 NDCs, am I really putting people out of business?

*Id.* at 55:16-18 & 55:25-56:5. Ultimately, the Court chose not to seek independent expert analysis in granting final approval.

In the context of this contentious and complex settlement approval process, the LTC Objectors amply satisfy the required showing for likelihood of success on the merits. The LTC Objectors contend that the terms of the settlements do not satisfy the fairness inquiry under Rule 23 because they accomplish precisely the market impact that the Court found objectionable before: (1) that past consumers receive miniscule benefits in comparison to those really benefiting from the AWP reductions; and (2) the settlements unfairly and inequitably impact small pharmacies (both as non-parties and absent class members). In this case, the Court itself acknowledged that it had great difficulty deciding to ultimately approve the settlements. At the very least, this appeal raises "serious and difficult questions of law in an area where the law is somewhat unclear." *See Exxon Corp.*, 963 F. Supp. at 60 (quoting *Mamula v. Satralloy, Inc.*,

578 F. Supp. 563, 580 (S.D. Ohio 1983) (in turn quoting *Evans v. Buchanan*, 435 F. Supp. 832, 842 (D. Del. 1977)).[2]

The impact is compounded by the fact that at virtually the same time the "amended and restated" settlements were announced and submitted to the Court, both FDB and Medi-Span announced their intent to implement two other key terms the Court rejected in January 2008 – the reduction of AWP for more than 7,000 additional NDCs and an agreement to cease publishing AWP no later than two years after these artificial price adjustments occur. These allegedly "independent" corporate actions are identical to what the Court rejected in January 2008 and are contingent upon the execution of reductions contained in the settlement. Put simply, the "vermillion flag" that the Court identified at the outset of the process continues to waves high.

"It is the burden of the proponents of the settlement to prove that the proposed settlement is fair, reasonable and adequate" as required by Rule 23(e)(2). *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 44 (D. Me. 2005). The LTC Objectors respectfully contend that the moving parties have failed to meet that burden – a point the Court implicitly acknowledged at hearings and which the First Circuit likely will strongly consider on appeal. Yet, even if the settling parties had met their burden of proof, where, as here, a case concerns unique and complex issues (as this Court has readily recognized), the possibility that the court of appeals might resolve the case differently than the district court is itself enough to present a substantial question warranting a stay pending appeal. *Miller v. Brown*, 465 F. Supp. 2d 584, 596 (E.D. Va. 2006) ("Because the

---

[2] *See also Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass. 1998) ("'[O]n motions for stay pending appeal the movant need not always show a probability of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay.'") (quoting *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir.1981) (internal quotation marks omitted)); *Action for Boston Cmty. Dev., Inc. v. Shalala*, 983 F. Supp. 222, 244 (D. Mass. 1997) ("Although plaintiff must show that its case has merits, if the requested injunction would only slightly harm defendant, plaintiff does not have to show an absolute probability of success on appeal."), *aff'd*, 136 F.3d 29 (1st Cir. 1998).

Fourth Circuit may resolve the issue differently, Defendants have at least demonstrated a 'substantial case on the merits.'"), *aff'd*, 503 F.3d 360 (4th Cir. 2007).

The Court recognized during the January 2008 and December 2008 fairness hearings that this settlement has been hotly contested, and has raised complex and novel legal issues that needed to be addressed – particularly in respect to the settlement's impact on third parties. *See, e.g.* 12/17/08 Tr. at 51:21-53:17.  The LTC Objectors respectfully submit that a stay is both prudent and necessary to ensure that the required exacting and thorough review of these issues of first impression can be undertaken by the First Circuit. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.61 (2004) (judicial review of the settlement must be exacting and thorough).

### 2. Without Such Relief the LTC Objectors will be Irreparably Injured.

A rapid implementation of AWP reduction prior to the full adjudication of all appeals will essentially render moot the appellate rights of long-term care pharmacies. *See Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir.1979) ("Where . . . denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay.").

*First*, this rapid adjustment in AWP is likely to put smaller pharmacies with already paper-thin margins and less contracting power out of business entirely before any appeal is adjudicated.[3]  Once a pharmacy closes its doors, vindication on appeal will do no good for the business or the patients it serves.

---

[3] *See* Second Declaration of H. Edward Heckman, Docket No. 610-2, at 6 & 11-13 (stating that 40 percent of the nearly 24,000 small and independent pharmacies may go out of business) ("Heckman Second Decl."); DeVille Decl. ¶ 17; *see also* Declaration of Raymond Hartman, Impact and Cost Savings of the First Databank Settlement Agreement: Response to Interested Parties' Objections, Docket No. 642, at 6-8 ( acknowledging that some smaller pharmacies will be driven out business and "consolidated" with larger operations)("Hartman Decl.").

*Second,* allowing the reduction of AWP prior to the actual effective date of the settlements places pharmacies in all sectors of the market in the inequitable position of trying to "unring the bell" should they prevail on appeal. Recapturing reimbursement shortfalls incurred by the rapid reduction in AWP will prove virtually impossible, and at the very least will require financial resources not readily available to pharmacies on already thin margins and facing a badly failing economy.

The risk of irreparable harm mandates a stay even when a court may not believe that the movant stands any likelihood of success on appeal. *See, e.g.*, *EEOC v. Quad/Graphics, Inc.*, 875 F. Supp. 558, 560 (E.D. Wis. 1995) ("In my opinion, Quad/Graphics does not have a likelihood of succeeding on appeal. . . ." Nevertheless, "I believe that Quad/Graphics would be irreparably harmed if the court's order is not stayed, as its appeal would effectively be rendered moot in the absence of a stay."). Thus, whatever the Court's views of the merits of appeal, because the LTC Objectors' appeal would be virtually meaningless if the parties were able to reduce the reported AWP before the First Circuit has the opportunity to consider the LTC Objectors' arguments, a stay is warranted.

### 3. Issuance of the Stay would not Substantially Harm other Parties Interested in the Proceedings.

There can be no serious argument that a stay to permit the LTC Objectors to pursue the court-approved right of appeal contained in the Settlement Agreements will substantially harm the parties. The settling parties have taken a significant amount of time to revise, amend and reportedly renegotiate the Settlement Agreements after their rejection by this Court and, in doing so, actually bargained for and agreed to a term that places the effective date of the Settlement Agreements after the adjudication of <u>all</u> appeals. Several more months will not materially impact matters for them at all (particularly given that the movants are not the entities being

burdened with the costs of the settlement). Implementing the settlements will not be made more difficult by a delay either. The settling parties in this case have made abundantly clear that it is easy to "flip the switch on 90 days" and that "we want to get the rollback going as soon as we can." 12/17/08 Tr. at 23:1-3. The balance of harms tips decidedly in favor of the LTC Objectors, which is yet another factor counseling in favor of a stay. "In essence, the issuance of a stay depends on whether the harm caused movant without the stay, in light of the movant's likelihood of eventual success on the merits, outweighs the harm the stay will cause the non-moving party." *See, e.g.*, *Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13 (1st Cir. 2002). *See also United States v. Kenney*, No. CR-07-66-B-W, 2008 WL 3285891 at *2-3 (D. Me. Aug. 5, 2008) (granting a stay pending Supreme Court review despite the virtual certainty that the Supreme Court would refuse to accept the case, stating "in the absence of any discernable injury to the [non-movant] other than the generalized harm that inevitably arises from delay, the Court grants the Defendant's motion for stay.")

In this case, the nature of the settlements is such that the parties' legal and economic interests are not at all affected by implementation of the settlement now or after appeal. The settlements' legal release is prospective, and their value is realized when the case is resolved after appeal. *See* Settlement Agreement ¶ 7. The unique nature of reducing AWPs for over 1,400 NDCs, and the practical effect on over 8,000 drugs, has no effect on the named plaintiffs or defendants. Reducing the AWPs later in time would defer but not materially alter the impact. Indeed, Plaintiffs' own expert argues that the planned AWP reductions will have little true financial impact on TPPs because the relevant TPP-PBM contracts she has examined each contain provisions that will "preserve the relative economic relationship of the parties." Declaration of Kimberly Ply McDonough, Docket No. 644, at ¶ 6. Thus, the status quo for the

settling parties will be preserved whether the case is on appeal or the settlements are being implemented. As discussed above, implementing the AWP reduction only calls for the parties to "flip a switch." This switch can be flipped after appeal as easily as during appeal, without harming the parties to the case, if that is what the First Circuit deems appropriate.

Further, the purported beneficiaries of the settlement will not be deprived during the stay. As described in the LTC objectors' previously-filed objection to the settlement, the vast majority of consumers pay a flat co-payment for their drugs. Docket No. 416, at 3 & 27. If the settlement is implemented these consumers will not see any reduction in what they pay because their co-payments will almost certainly remain the same. *See* Heckman Second Decl., Docket No. 610-2, at 40-41 (demonstrating stability of fixed co-payments over time). Additionally, the TPP class members also face little threat of measurable harm if a stay is implemented. According to the settling parties' own arguments, the great benefit of this settlement to TPPs is that they can negotiate going forward with transparency on AWP. *See* 12/17/08 Tr. at 17:4-11. However, TPP class members already have the transparency they need because they have knowledge that the WAC to AWP mark-ups at issue in this settlement are .25 rather than .20. Thus, with this knowledge, TPPs are, from a negotiating standpoint, in precisely the same position as they will be at the conclusion of an appeal.

Given that the settling parties will face minimal harm (beyond inherent delay) during the pendency of the Settlement Agreement-prescribed appeal, this Court should grant the stay.

### 4.     **The Public Interest would be Served by Granting a Stay.**

The final *Hilton* factor – service of the public interest – is easily satisfied by the facts of this case. The specialized services that long-term care pharmacies provide to a highly vulnerable and largely elderly nursing home population are at the core of the public interest that will be served by a stay. LTC pharmacies provide a host of consulting services and "24/7" operations

which ensure, for example, that frail patients with complex drug regimens receive important intravenous medicines and dosage adjustments at their bedside rather than increasing costs and patient discomfort through hospitalization. Clark Decl. ¶ 8. In an environment in which the increased cost of health care services already produces very small profit margins, with no retail or other revenue to soften the blow, smaller LTC pharmacy providers may be forced not only to cut services, but to simply close their doors altogether if the proposed AWP reduction is allowed by this Court to go into effect. Clark Decl. ¶ 19. The fact that pharmacies will go out of business as a result of the Settlement Agreements is uncontroverted, even by the settling parties' own expert. *See* Hartman Decl. at 7.

Granting this stay is consistent with the Court's oft-stated desire to protect small community pharmacies. *See* 12/17/08 Tr. at 61:22-23, 62:14-15 (Court discussing "the kind of drugstore we went to as kids," and noting that "I've always worried about them, and I'm not here to destroy a huge segment of the industry"). Because of the demonstrated adverse effect the denial of a stay would have on the LTC Objectors, their patients and public at large, this Court should grant a stay for the duration of any appeal, including an appeal to the U.S. Supreme Court.

The public interest is further served by ensuring that due process is observed within the judicial system. That notion applies with equal, if not greater, force here, where the interests of numerous third-parties and absent class members, including the LTC Objectors, will be adversely impacted prior to the legal effective date of the settlement contract. The final *Hilton* factor—public interest—thus tips in favor of granting a stay.

Further, it is axiomatic that the public benefits where parties are afforded appellate review of their claims. *See, e.g.*, *Simon Prop. Group, Inc. v. Taubman Centers, Inc.*, 262 F.

Supp. 2d 794, 799 (E.D. Mich. 2003) (granting stay where "[t]he Court finds that it is in the public interest to preclude efforts to either advance or impede [plaintiff's] takeover bid until legal issues that impact upon the manner in which the bid can proceed, and whether the [defendants] will be allowed to vote all or any portion of their shares, are resolved by the Sixth Circuit"), *vacated on other grounds*, 373 F.3d 656 (6th Cir. 2004). The *Simon* rationale should control here, and the LTC Objectors should be permitted to seek appellate relief from the court of appeals unencumbered by the settling parties' efforts to short-circuit such review by completing AWP reductions contemplated by the settlements.

>   C.   **Alternatively, This Court Should Grant A Temporary Stay To Permit Time For The First Circuit To Rule on Petitioners' Motion To Stay.**

Should the Court deny the stay, the LTC Objectors respectfully request that the Court grant a temporary stay to permit time for them to submit a request to the First Circuit. *See, e.g.*, *Doe v. Gonzales*, 386 F. Supp. 2d 66, 83 (D. Conn. 2005) (granting temporary stay to permit movant to seek stay from the court of appeals); *United States v. Judicial Watch*, 241 F. Supp. 2d 15, 16 (D.D.C. 2003) (same). Such a temporary stay would leave in place the status quo and would not harm the parties, but it would give the LTC Objectors an opportunity to seek relief from the court of appeals.

>   D.   **No Appeal Bond Is Necessary Under Rule 62(d) Because The Other Parties Will Not Be Harmed During The Resolution Of The Motion.**

Should this Court grant a stay pending appeal, LTC Objectors should not be required to post a bond contemplated in Rule 62(d) of the Federal Rules and Local Rule 62.2. This Court "has discretion whether or not to require a successful applicant to post a bond to secure the appellee's interests pending appeal." *Exxon Corp.*, 963 F. Supp. at 60. However, where, as here, there is no risk of harm to the appellee, "the court need not require a bond." *See id.* ("Although

13

the posting of a bond is the 'usual rule,' the court need not require a bond if it would be unnecessary to protect the interests of the appellee.") (internal citation omitted).[4]

A bond would not serve any party's interest in this case. Should the LTC Objectors fail to secure appellate relief, the settling parties will be permitted to consummate the settlement upon completion of all appeals, as is contemplated by Paragraph Seven of the Settlement Agreement. *See, e.g.*, 12 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 62.03, at 13-14 (3d ed. 2007) (noting that an appealing party need not post a bond if no harm results to the opposing parties); *see also Simon Prop. Group*, 262 F. Supp. 2d at 799 (declining to order a bond where non-movant would not suffer any damages with a stay). Indeed, at the December 2008 fairness hearing, the parties and the Court noted the ease with which the settlement could be completed. *See* 12/17/08 Tr. at 22:22 – 23:7 (noting that it is not difficult to implement the AWP reductions, "[a]nd so if you flip the switch on 90 days, it's not that complicated. There's just a new number out in the marketplace.").

Therefore, because it is clear from the record that implementation of the settlement will not be more difficult after the appeal period and the LTC Objectors are not appealing a money judgment for which they are liable, the Court should dispose of the bond requirement in Rule 62(d).

---

[4] Further, "the special nature of suits to enforce important federal rights or 'public interests' arising 'out of comprehensive federal health and welfare statutes'," often dictates that no bond need be posted. *Temple Univ. v. White,* 941 F.2d 201, 220 (3d Cir. 1991), *quoting Crowley v. Local No. 82*, 69 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 502 U.S. 1032 (1992). Such is the case here. The waiver of a bond not only applies to public interest groups, but to entities like pharmacies as well. *Temple Univ. supra.* LTCPA's and ASCP's status as trade associations is further cause to exempt them from the bond requirements in this case. *Pharmaceutical Soc. of State of New York v. New York State Dep't of Social Services,* 50 F.3d 1168, 1174-75 (2d Cir. 1995) (noting that Society's litigation was to pursue a public purpose of ensuring adequate rates so that providers did not "drop out of the Medicaid program"). So too, Deville Pharmacy's status as a small local community pharmacy argues against imposing any bond upon it.

### III. CONCLUSION

For the foregoing reasons, the LTC Objectors respectfully request that the Court grant a stay pending appeal of the Order approving the Settlement. The LTC Objectors respectfully request that the stay be granted without requiring Plaintiff to post bond. Alternatively, should the Court deny a stay, the LTC Objectors request a more limited stay to permit them to request a stay from the First Circuit.

### IV. ORAL ARGUMENT REQUESTED

LTCPA and ASCP respectfully request to present oral argument on their motion to stay pending appeal.

**DEVILLE PHARMACIES, AMERICAN SOCIETY OF CONSULTANT PHARMACISTS, and LONG-TERM CARE PHARMACY ALLIANCE,**

By their attorneys,

*Of Counsel*:

David J. Farber
Edward D. Gehres, III
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037

Dated: April 2, 2009

/s/ Angela J. Neal
Daniel S. Savrin, BBO #555434
daniel.savrin@bingham.com
Angela J. Neal, BBO #661603
angela.neal@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
617.951.8000

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 2, 2009.

/s/ Angela J. Neal, BBO #661603
angela.neal@bingham.com