## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> FIRST DATABANK, INC. and McKESSON CORPORATION, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION <br> NO.  05-11148-PBS |
| DISTRICT COUNCIL 37 HEALTH AND SECURITY PLAN, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MEDI-SPAN, a division of WOLTERS KLUWER HEALTH, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> CIVIL ACTION <br> NO. 07-10988-PBS |

## NATIONAL ASSOCIATION OF CHAIN DRUG STORES'
## AND FOOD MARKETING INSTITUTE'S JOINT
## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
## TO STAY IMPLEMENTATION OF SETTLEMENTS PENDING APPEAL

**NATIONAL ASSOCIATION OF CHAIN DRUG STORES & FOOD MARKETING INSTITUTE**

Daniel S. Savrin, BBO #555434
daniel.savrin@bingham.com
Francesca Lucia Miceli, BBO #663925
francesca.miceli@bingham.com
Angela J. Neal, BBO #661603
angela.neal@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
617.951.8000

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.  NACDS AND FMI HAVE STANDING TO SEEK A STAY AS CLASS
    MEMBERS ................................................................................................................. 2

II.  ALL FACTORS BALANCE IN FAVOR OF A STAY PENDING APPEAL OF
     THE SETTLEMENT AGREEMENT ......................................................................... 4

     A.  The Appeal Presents Serious and Difficult Legal Questions and is Likely
         to Succeed on the Merits .............................................................................. 4

         1.  The acknowledged absence of material financial benefits to the
             TPP class raises serious issues on appeal concerning the Court's
             factual and legal findings and application of legal standards under
             Rule 23 ............................................................................................. 6

         2.  The Order's adverse "findings" and conclusions with respect to
             non-party pharmacies present serious and difficult questions of law
             that have not, as yet, been addressed by the First Circuit ..................... 10

     B.  The Class, The Pharmacies Relied Upon By The Class, And The Public
         Will Be Irreparably Injured Without A Stay ................................................ 13

     C.  A Stay Will Not Cause Substantial Harm To The Settling Parties .................... 17

     D.  Stay Of Enforcement Pending Appeal Is In The Public Interest ....................... 18

III.  STAY WITHOUT BOND IS APPROPRIATE UNDER FED. R. CIV. P. 62(D)
      BECAUSE THE SETTLING PARTIES WILL NOT BE HARMED DURING
      THE RESOLUTION OF THE APPEAL ..................................................................... 19

CONCLUSION ................................................................................................................. 19

A/72910040.7/3005546-0000322819

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Buntzman v. Springfield Redevelopment Authority,*
918 F. Supp. 29 (D. Mass. 1996) ........................................................................... 17

*Canterbury Liquors & Pantry v. Sullivan,*
999 F. Supp. 144 (D. Mass. 1998) ......................................................................... 4

*Carvel Corp. v. Eisenberg,*
1988 WL 120135 (S.D.N.Y. Oct. 31, 1988) ........................................................ 13

*C.B.S. Employees Federal Credit Union v.*
*Donaldson, Lufkin & Jenrette Securities Corp.,*
716 F. Supp. 307 (W.D. Tenn. 1989) ................................................................... 4

*Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.,*
933 F. Supp. 107 (D.N.H. 1995) ........................................................................... 17

*Devlin v. Scardelletti,*
536 U.S. 1 (2002) ................................................................................................... 3

*Exxon Corp. v. Esso Worker's Union, Inc.,*
963 F. Supp. 58 (D. Mass. 1997) .......................................................................... 4

*Florida Businessmen for Free Enterprise v. City of Hollywood,*
648 F.2d 956 (5th Cir. 1981) ......................................................................15, 16, 17

*Hilton v. Braunskill,*
481 U.S. 770 (1987) ...................................................................................... passim

*Holiday Inns of America, Inc. v. B.B. Corp.,*
409 F.2d 614 (3d Cir. 1969) .................................................................................. 16

*In re Masters Mates and Pilots Pension Plan and IRAP Lit.,*
957 F.2d 1020 (2d Cir. 1992) ................................................................................ 10

*Managed Pharmacy Care, et al. v. David Maxwell Jolly,*
Order Granting Plaintiff's Motion for Preliminary Injunction,
Dkt. No. CV 09-382 (C.D. Cal. Feb. 27, 2009) ................................................... 18

*Marino v. Ortiz,*
484 U.S. 301 (1988) .............................................................................................. 16

*Northern Laminate Sales, Inc. v. Davis,*
403 F.3d 14 (1st Cir. 2005) ............................................................................... 3, 13

ii

*Parklane Hosiery Co. v. Shore,*
  439 U.S. 322 (1979).............................................................................................11, 13

*Pharmaceutical Industry Average Wholesale Price Litigation,*
  520 F. Supp. 2d 274 (D. Mass. 2007).................................................................... 3

*Phillips Exeter Academy v. Howard Phillips Fund,*
  196 F.3d 284 (1st Cir. 1999) ................................................................................ 13

*Providence Journal Co. v. Federal Bureau of Investigation,*
  595 F.2d 889 (1st Cir. 1979) ............................................................................ 4, 17

*Provident Tradesman B&T v. Patterson,*
  390 U.S. 102 (1968)............................................................................................. 12

*Public Service Co. of NH v. Town of West Newbury,*
  835 F.2d 380 (1st Cir. 1987) ............................................................................... 15

*Staton v. Boeing Co.,*
  327 F.3d 938 (9th Cir. 2003)............................................................................ 9, 10

*The Washington Post v. Dep't of Homeland Security,*
  459 F. Supp. 2d 61 (D.D.C. 2006)...................................................................... 16

*United States v. Kenney,*
  2008 WL 3285891 (D. Me. Aug. 5, 2008).......................................................... 18

*World Duty Free Americas, Inc. v. Summers,*
  94 F. Supp. 2d 61 (D.D.C. 2000)........................................................................ 15

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
  395 U.S. 100 (1969)............................................................................................. 13

## OTHER AUTHORITIES

Fed. R. Civ. P. 19 ...........................................................................................12, 13, 15

Fed. R. Civ. P. 23 ........................................................................................... 1, 3, 5, 6, 9

Fed. R. Civ. P. 62 .....................................................................................................  19

D. Mass. Local Rule 62.2 ......................................................................................... 19

A/72910040.7/3005546-0000322819

The National Association of Chain Drug Stores ("NACDS") and the Food Marketing Institute ("FMI") (collectively "Appellants"), third party payor ("TPP") members of the settlement class that objected to the settlements, submit this memorandum in support of their Joint Motion to Stay Implementation of the Settlements Pending Appeal. As set forth herein and in the pleadings filed by the LTC Objectors, the Court should grant a stay of enforcement of the settlements pending appeal.[1]

## INTRODUCTION

As explained in detail below, NACDS and FMI are objecting members of the TPP settlement class. NACDS and FMI, as well as other organizations and pharmacies, intend to pursue an appeal challenging the approved settlements as fundamentally unfair, unreasonable, inadequate, and inconsistent with Fed. R. Civ. P. 23. NACDS and FMI will also challenge the Order as a product of judicial overreaching that is fundamentally unfair to non-party pharmacies that were not named in the litigation and were not parties to any of its proceedings. This Court has improperly deemed pharmacies liable in its Order for harm allegedly caused to Plaintiffs by Defendants and has imposed upon non-party pharmacies the overwhelming majority of the costs of the settlements. The Order raises serious and difficult questions of law surrounding, among other things, the federal rules of joinder and the due process rights of non-parties resulting from approval of settlements that deliberately and punitively impose the costs of the settlements upon those non-parties.

If a stay is not entered while these and other serious legal issues concerning the Order are addressed by the First Circuit, the average wholesale price ("AWP") reductions will go into effect one hundred eighty (180) days from the date of final judgment (i.e., March 30, 2009).

---

[1] As set forth in NACDS and FMI's Motion, NACDS and FMI join in the arguments set forth in the Motion to Stay Approval of the Settlements Pending Appeal filed by DeVille Pharmacies, the Long Term Care Pharmacy Alliance and the American Society of Consultant Pharmacists (collectively the "LTC Objectors") and incorporate those arguments as if set forth herein.

Those AWP reductions, for reasons discussed herein, will engender disruption to TPP class members without material benefit to them.   Further, many non-party pharmacies (and their patients and employees) face the genuine risk that they will be unable to sustain their businesses and/or provide essential health care services.   Those harms cannot be reasonably remediated if the appeal is successful.   Notably, the settlement agreement has already been extended *sua sponte* by the Court and will not go into effect for six months following its approval.   Further extension thereof pending appeal would cause only limited further delay to allow the First Circuit time to hear and rule on the appeal and would cause, at most, limited harm given the absence of merit to the settlement outlined herein and reflected in both the Order and the settling parties' earlier submissions to the Court.

Given the significant legal questions involved, the potential irreversible harm to class members and the pharmacies they rely on to provide covered drugs and services, and the obvious harm to the public interest by pharmacy cutbacks and closings across the country, any incremental harm a stay might cause the settling parties is far outweighed.   For these reasons, as detailed further herein, the Court should enter a stay preserving the status quo so that the AWP reductions do not become effective until all appellate rights are exhausted.

## ARGUMENT

### I.      NACDS And FMI Have Standing To Seek A Stay As Class Members.

While the Court inexplicably failed to acknowledge NACDS' and FMI's status as class members in its Memorandum and Order approving the settlements (the "Order"), NACDS and FMI have identified themselves as objecting TPP class members in both their submissions to the Court and at oral argument.   *See* NACDS & FMI Memorandum in Opposition to Plaintiffs' Motion for Approval of Proposed Amended FDB and Medi-Span Class Settlements ("NACDS & FMI Opp.") at 2 [Dkt. No. 619]; Settlement Approval Hearing Transcript (Dec. 17, 2008) ("Settlement Tr.") at 8:8-18 (THE COURT: "So are you objecting as a class member or as a nonclass member who's being impacted?" MR. BELL: "We do wish to preserve our rights as class members.").

2

As NACDS and FMI have been, and are, self-insured employer TPPs, they are, by definition, TPP class members.  *See* Declaration of R. James Huber on behalf of the NACDS ("Huber Decl.") at ¶ 3, attached hereto as <u>Exhibit 1</u>; Declaration of Salvatore Di Carlo on behalf of FMI ("Di Carlo Decl.") at ¶¶ 3, 4, attached hereto as <u>Exhibit 2</u>.  NACDS' status as a class member is not merely uncontested -- it has been expressly acknowledged by plaintiffs' counsel who have, among other things, classified NACDS as a class member.  *See* Huber Decl. at ¶¶ 4-7 (NACDS received a "Notice of FDB/Medi-Span Settlement" which identifies NACDS as Claimant ID No. 00018283).

As members of the TPP class bound by the judgment of the Court, NACDS and FMI have independent standing to appeal, and to seek to stay, the Court's final approval of the class action settlement.  *See Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002) ("Because petitioner is a member of the class bound by the judgment, there is no question that he satisfies [the] . . . requirements" for standing.); *see also Pharmaceutical Industry Average Wholesale Price Litigation*, 520 F. Supp. 2d 274, 278 (D. Mass. 2007) (Saris, J.) (citing *Devlin* and concluding that a "non-named member of the class whose objection at the fairness hearing was overruled generally has standing to appeal . . . to protect her interests.").  In their capacity as TPP members of the class, NACDS and FMI intend to challenge the settlements on appeal on the grounds that, *inter alia*, as a matter of fact and law, AWP reductions that the Court and the settling parties have recognized will engender business disruption for class members, but will not afford material financial benefits to class members and cannot be sustained as fair, adequate and reasonable to class members under Fed. R. Civ. P. 23.[2]

---

[2] Legal challenges to the Court's Order are reviewed *de novo*.  *See Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 23 (1st Cir. 2005).

II.    **All Factors Balance In Favor Of A Stay Pending Appeal Of The Settlement Agreement.**

As outlined in the LTC Objectors' Memorandum of Law in Support of Motion to Stay Approval of Settlements Pending Appeal ("LTC Objectors' Memo."), the test the Court must apply in considering a motion to stay pending appeal is not a rigid inquiry.  *See Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).   Instead, the Court must assess and balance four factors:  (1) whether Appellants have made a strong showing that they are likely to succeed on the merits or have raised serious and difficult questions of law in an area where the law is somewhat unclear;  (2) whether Appellants' interests will face irreparable harm absent a stay;  (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.  *See Exxon Corp. v. Esso Worker's Union, Inc.*, 963 F. Supp. 58, 59 (D. Mass. 1997) (citing *Hilton*, 481 U.S. at 776).  As discussed herein, the equities weigh far in favor of a stay pending appeal of the settlement agreement by NACDS and FMI.

A.    **The Appeal Presents Serious and Difficult Legal Questions and is Likely to Succeed on the Merits.**

The first prong of the *Hilton* test requiring a showing of likelihood of success on the merits of the appeal has "not been interpreted or applied literally" by the Courts of the First Circuit.  *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 149 (D. Mass. 1998); *see also Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979); *Exxon Corp.*, 963 F. Supp. at 60.  Since it is "unlikely that a district court would ever be able to find that . . . it erred . . . and that the court of appeals is likely to reverse its decision," *C.B.S. Employees Federal Credit Union v. Donaldson, Lufkin & Jenrette Securities Corp.*, 716 F. Supp. 307, 309 (W.D. Tenn. 1989), "the movant must only establish that the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear," *Canterbury Liquors*, 999 F. Supp. at 150.  *See also Exxon Corp.*, 963 F. Supp. at 60 (same); *Canterbury Liquors*, 999 F. Supp. at 150 ("When the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on

appeal."), *id*. ("[O]n motions for stay pending appeal…the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay.").

NACDS and FMI will demonstrate on appeal that the settlements, which this Court has characterized as "novel" and "unique," do not (based on the Courts' own findings) meet either the factual or legal standards required to establish that they are fair, adequate and reasonable to the TPP class members under Fed. R. Civ. P. 23(e). The appellants will also demonstrate that the Court has repeatedly acted in excess of its jurisdictional authority. Specifically, the Court lacked subject matter jurisdiction to issue rulings regarding unjust enrichment claims that were never asserted by any party in this litigation. The Court also lacked personal jurisdiction over every pharmacy in the country, which the Court improperly determined were liable for unjust enrichment. Even if the Court somehow could have asserted jurisdiction over unasserted claims against non-party pharmacies, the Court lacked the authority to impose a punishment -- much less a one-size-fits-all punishment -- upon them.[3] The fact that the Court recognized the unusual nature of the settlements further affirms the "serious and difficult" nature of the legal issues to be presented on appeal. Thus, for all these reasons, NACDS and FMI satisfy the first requirement of the *Hilton* test warranting a stay of the settlements pending appeal.

---

[3] In addition, the Court exceeded the bounds of its subject matter jurisdiction in this action in approving the creation of data rooms specifically designed to enable Plaintiffs' counsel to conduct discovery on behalf of other parties for use in other lawsuits. Likewise, the Court exceeded its jurisdiction when it condoned First DataBank ("FDB") and Medi-Span's planned reduction of AWPs not covered by the settlements. As no claims were asserted concerning the future unilateral reductions of those AWPs, the Court plainly lacked jurisdiction over such claims. Further, while the Court did undertake to condone these plans -- at the same time acknowledging that those actions were beyond the scope of the issues before the Court -- the Court's commentary cannot insulate those actions from separate claims by affected parties for, *inter alia*, tortious interference with their contractual and business relationships. It was improper for the Court to prejudge the validity of such actions and if FDB and Medi-Span follow through on their threats to reduce AWPs not covered by the settlements it should be expected that numerous lawsuits will be commenced by pharmacies seeking redress for FDB and Medi-Span's actions.

1.      <u>The acknowledged absence of material financial benefits to the TPP class raises serious issues on appeal concerning the Court's factual and legal findings and application of legal standards under Rule 23.</u>

The Order approves AWP reductions which the Court acknowledges may provide little or no financial benefit to the TPP class.  Order at 9-11.  The prospect of a financial benefit, the Court acknowledges, is dependent upon the members of the TPP class being able to obtain better rates from the pharmacy benefit managers ("PBMs") with whom they contract to arrange for the provision of pharmacy services to their members or employees.  It is undisputed, however, that all or nearly all of the contracts between PBMs and TPPs have "revenue neutrality" clauses which preserve the original economic terms of their contracts upon a change in the methodology for calculating AWPs.  *See* Declaration of Kimberly Ply McDonough submitted on behalf of all Plaintiffs (Dec. 12, 2008) ("McDonough Decl.") at ¶ 6 [Dkt. No. 644] ("In 100% of the PBM contracts I have witnessed during the past year, there are provisions to restate the reimbursement discounts to preserve the relative economic relationship of the parties."); *see also* Report of Prof. Frank A. Sloan submitted on behalf of PCMA (Nov. 14, 2008) ("Sloan Report") at 38 [Dkt. No. 612] ("Most of the PBMs that I interviewed reported that the vast majority (i.e., 90+ percent) of their contracts contain adjustment provisions."); Expert Report of Gale Mosteller, PhD submitted on behalf of NACDS (Dec. 20, 2007) ("Mosteller Report") at 2-3 [Dkt. No. 408] ("The three largest PBMs have confirmed that most of their contracts [with the TPP class] permit them to make offsetting changes if the AWP declines.  Medco, a large PBM, has indicated that the vast majority of its contracts have explicit language that keeps the economic relationship with its clients net neutral when a benchmark or methodology changes.").

The Order reflects that there may be a fundamental misunderstanding by the Court concerning the distinction between the terms of the contracts between TPPs and PBMs, and the very different set of contracts between PBMs and the pharmacies that actually provide the medications and services to the TPP members.  *See* Order at 14.  In contrast to the TPP-PBM contracts, which have revenue neutrality provisions, the record reflects that the PBM-pharmacy contracts, in large measure, do not have revenue neutrality clauses.  *See* Declaration of H.

6

Edward Heckman on behalf of NCPA (Nov. 17, 2008) ("Heckman Decl.") at 55 [Dkt. No. 610] ("PBMs issue contracts with different terms to pharmacies [from those with TPPs] and then make payments to pharmacies based upon those terms."), *id*. at 57 ("While the larger drug chains . . . are of size and importance to PBMs to force them to the negotiating table, independent pharmacies do not have this advantage."), *id*. at 58 ("PBMs have no motivation to renegotiate to elevate reimbursement formulas to pre-Settlement terms for independent pharmacies."). *See also* Declaration of Clark Matthews of Louis & Clark Pharmacies ("Louis & Clark Decl.") at ¶ 10, attached hereto at <u>Exhibit 3</u>; Declaration of Gary W. Boehler of Thrifty White Drug ("Thrifty White Decl.") at ¶ 9, attached hereto at <u>Exhibit 4</u>.  Without revenue neutrality provisions, a reduction in AWP will cause a reduction in the reimbursement to pharmacies pursuant to their contracts with the PBMs.  While this reduction in compensation to the pharmacies provides no benefit to the TPP class, it does cause immediate harm to pharmacies and leaves them to deal with the PBMs (which the Court termed "800-pound gorillas of pharmaceutical reimbursement") to try to mitigate the harms the settlements will inflict upon them.  Order at 6.

As a consequence of the revenue neutrality clauses in the TPP-PBM contracts, any potential financial benefit that could have been realized by the TPP class from the AWP reduction, as a matter of contract, has been negotiated away.  With regard to the small minority (10% or less) of contracts between TPPs and PBMs that do not contain this revenue neutrality language, the Court, failing to recognize the import of the revenue neutrality terms of the TPP-PBM contracts, presumes that "the rollback will have short term benefits until the contracts are renegotiated" yet acknowledges that "the renegotiations will dissipate the value of the settlement."  Order at 9, 11.  Since TPPs and PBMs have already, by contract, agreed to neutralize the impact of any reduction in reported AWP, the reduction in the AWP that would be imposed by the settlement would have no net benefit to TPPs as, post settlement, the dollar amounts paid by TPPs to PBMs will ultimately have to remain the same.

The TPPs will, however, as a result of the settlements, have to engage in the contractually mandated exercise of determining how to achieve revenue neutrality and will bear the associated

transaction costs.  *See* Sloan Report at 125 ("Most PBMs reported that the cost involved with renegotiating a contract is generally between $10,000 and $50,000 . . . . Three of the five PBMs asked about contract amendments stated that contract amendments can cost between $10,000 and $50,000."); Mosteller Report at 10 [Dkt. No. 408] ("[R]enegotiations and computer reprogramming are time consuming and costly. . . . [T]he settlement could potentially impose costs on class members, pharmacies and others while failing to produce costs savings for [c]lass members.").  In sum, as the Order and the record before the Court makes clear, the TPPs will realize no net financial benefit from the settlements but will incur the unnecessary costs and burdens associated with their implementation.

In an explicit recognition of the fact that the TPPs may realize little or no direct financial benefit from the settlements, the Order identifies "greater transparency in drug pricing" as a motivating "benefit" behind the approval of the class settlement.  Order at 9-10 ("[E]ven assuming the renegotiations will dissipate the value of the settlement, the rollback will have the added advantage of righting a wrong and providing greater transparency in drug pricing, a notoriously opaque business.").[4]  There is no value to the TPPs from the "righting" of the perceived but unproven wrong because any infraction has been nullified by the revenue neutrality clauses ubiquitous in their contracts with PBMs and the purported "benefit" of greater transparency is illusory.

---

[4] To the extent that the Court perceives that greater transparency will arise from the Defendants' announced plans to, simultaneously with implementation of the settlements, reduce the reported AWPs for certain other medications, the Court has made clear that it regards that reduction as beyond its purview and as conduct that cannot be used to justify the settlements' approval or rejection.  Order at 13 ("Even if the Court infers that this rollback is the product of the earlier agreement between the parties, it was disclosed to the Court, and the Court has no interest in interfering with it. . . . [T]his decision is not part of the settlement agreement."). Further, on the separate ground that the Defendants' planned conduct outside the approved settlements is not Court authorized and remains subject to separate challenges by affected parties, *i.e.*, potential anti-trust and/or tortious interference claims by all injured pharmacies, it cannot be relied upon to justify any part of the Court's decision to issue the Order.

A/72910040.7/3005546-0000322819

At present, there is transparency in pharmacy pricing in terms of the manner in which published AWP is calculated. The reality today is that parties can readily determine the spread between WAC and AWP.[5] The settlements will not achieve greater transparency in pharmacy pricing, they will simply change the spread for 1,442 NDCs to 1.20 from 1.25. Shifting the spread for certain NDCs does not increase transparency, it simply rearranges the spread from one transparent number to another transparent number. Industry participants will now know that their published AWP is 1.20 times reported WAC as opposed to knowing now that the published AWP is 1.25 times reported WAC for a certain minority of branded drugs. That knowledge neither creates greater transparency nor justifies approval of settlements that impose burdens with no related financial benefits upon TPP class members. *See, e.g.*, Declaration of Laura Miller on behalf of NACDS ("Miller Decl.") at ¶¶ 4-8, attached hereto at Exhibit 5.

Since the Court's Order and the record below reflect that implementation of the settlements will provide no genuine benefit to NACDS, FMI or other members of the TPP class, NACDS and FMI submit that their appeal raises serious issues of both fact and law as to whether the Court's determination that the settlements were fair, reasonable and adequate can be upheld on appeal, even under abuse of discretion review. *See* Fed. R. Civ. P. 23(e)(2) (The Court may approve a settlement that would bind class members "only after . . . finding that it is fair, reasonable and adequate."). *See also Staton v. Boeing Co.*, 327 F.3d 938, 962 (9th Cir. 2003) (indicating that a settlement in which "certain groups of class members [are] treated more favorably than others for purposes of future relief" would be unfair and approval thereof an abuse of discretion). In fact, the very acceptance by Plaintiffs of settlements that are devoid of any tangible benefit to the TPP class[6] raises serious suspicions of outside influences and ulterior

---

[5]   The underlying premise of transparency is also illusory because the derivation of published WAC remains unclear.

[6]   The payment of $2.67 million is intended for the millions of consumer class members, not the TPP member class. Settlement Tr. at 16.

motivations by Plaintiffs' counsel, particularly in light of the Plaintiffs' strong likelihood of success on the merits (as noted by the Court), which would compel reversal on appeal.[7]  *See Staton*, 327 F.3d at 960 ("[C]lass representatives have their own incentives to advance their interests at the expense of the class. . . . We have characterized these inherent dangers of class settlements as encompassing the possibility that 'the agreement . . . is the product of fraud or overreaching by, or collusion between, the negotiating parties . . . .'") (citing *Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982)).

      2.      <u>The Order's adverse "findings" and conclusions with respect to non-party pharmacies present serious and difficult questions of law that have not, as yet, been addressed by the First Circuit.</u>

The Court's Order raises "serious and difficult" legal questions surrounding, *inter alia*, the Court's jurisdictional authority to approve settlements that (1) impose the central remedial burden upon non-party pharmacies (2) based upon the Court's unsubstantiated finding, (3) without any participation by the non-parties in the underlying litigation, (4) that every single pharmacy, large or small, profited and was unjustly enriched as the result of a "secret agreement" to which they, too, were non-parties.  While the Court rightly recognizes that fairness to the non-party pharmacies "should be weighed" in the consideration of the proposed class settlement, the Order fails to cite authority for the ability of the Court, without (at a minimum) affording due process rights to the non-parties and establishing its jurisdiction over those parties, to make adverse factual and legal conclusions with respect to non-parties and then to approve settlements that are intentionally designed to impose a punishment upon those non-parties based on those adverse conclusions.  Order at 14; *see also In re Masters Mates and Pilots Pension Plan and IRAP Lit.*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("[W]here the rights of one who is not a party to a

---

    [7]  The fact that the data room is of no value to the class Plaintiffs and is little more than a thinly disguised vehicle for a fishing expedition for the benefit of Plaintiffs' attorneys is a "convincing indication[] that the incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of the negotiations and that the district court was wrong in concluding otherwise."  *Staton v. Boeing Co.*, 327 F.3d 938, 962 (9th Cir. 2003).

settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval.").[8]   In short, while the Court recognizes the general standard, in the context of this novel and unique settlement, the Court's Order provides no legal foundation (and none appears to exist under First Circuit precedent) for, among other things, the trespass on due process and the extension of the bounds of the Court's jurisdictional authority by explicitly judging and punishing unrepresented non-parties for the conduct of the Defendants.

The Order's factual and legal conclusions include that all of the tens of thousands of non-party pharmacies in the United States that were reimbursed on the basis of AWP were "unjustly enriched" as a result of the Defendants' "secret agreement" and received a "windfall[]" therefrom.   Order at 14.   The Court, without any consideration of due process or its own lack of jurisdiction with respect to any or all of the non-party pharmacies, assigns culpability to the *non-party* pharmacies for unjust enrichment.   It then exacts its punishment on them by approving AWP reductions.

The intended purpose of the reductions, as the Court acknowledges, is to have the non-party pharmacies (rather than the Defendants) bear the costs and the burdens of the settlements. Order at 9-10.[9]   The imposition of penalties upon the non-party pharmacies is all the more troubling because it is based on the inaccurate premise, addressed above, that the reduction in

---

[8] As the Court acknowledges, its approval of the settlements reflected in the Order is motivated, in large measure, by its concern that it "can't get blood from a stone" (referring to FDB's limited finances and questionable insurance coverage) and, thus, need to approve an alternative remedy.   Order at 9, 11.   The absence of a remedy from the parties before the Court does not, however, empower the Court to right the wrong it perceives by exacting punishment upon non-parties that are not before the Court.   *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who is not a party or privy and, therefore, never had an opportunity to be heard.").

[9] The Court's determination to penalize the non-party pharmacies regardless of whether it had the authority to do so is underscored by the fact that the Order not only issued the adverse findings, but the Court also reached outside the settlement to condone the Defendants' plan to further harm the non-party pharmacies by reducing reported AWP on thousands of NDCs beyond the 1,442 directly required by the proposed settlement, offering the gratuitous statement that "even if [it] could stop FDB and Medi-Span, [it] would not do so."   Order at 13.

11

AWP will redound to the benefit of the TPP class members -- it will not.  Further, it enables a vast number of non-class payors who also reimburse pharmacies based on AWP and who were not parties to this action (*e.g.*, Medicare Part D plans) to pay reduced reimbursement to the pharmacies, thereby inflicting further burdens and costs upon these non-party pharmacies.

NACDS and FMI intend to demonstrate on appeal that the settlements and the Order violate the rights of their member non-party pharmacies under, *inter alia*, the Federal Rules of Civil Procedure and the Constitution.  As a consequence, the settlement terms, including the AWP reduction therein, directly impact additional numerous legal rights and interests of the non-party pharmacies.  The rights and interests of NACDS' and FMI's member pharmacies implicated by the extraordinary nature of the Order and the settlements include: (1) the member pharmacies' financial interests in AWP-based reimbursement; (2) their contractual rights in reimbursement contracts tied to AWP for payment calculations; (3) their legal rights to AWP-based reimbursement rates under applicable Medicaid, Medicare and other government programs' statutes and rules; and (4) their rights with respect to taking legal action against the settling defendants for reducing reported AWPs.  While the Order attempts to address the class action settlement principles of fairness, it provides no authority (and none appears to exist) for the Court's undertaking to try *de facto*, judge, and penalize the non-party pharmacies *in absentia*.

Given the myriad interests of the non-party pharmacies, the Court was required under the principles and standards set forth in Rule 19 to either (a) join every pharmacy in the country, if feasible, (b) dismiss the case, or (c) "shape the relief" by adding protective provisions or other measures that eliminate the impact on the pharmacies.[10]  The Court's undisputed failure, as a

---

[10] While it may not have been feasible for the Court to join thousands of pharmacies across the country as parties to the litigation, the Court should have taken particular care to "shap[e] the relief" to avoid harm to the pharmacies, as required by Rule 19(b).  This end could have been readily achieved without resort to reduction of AWPs by, among other means, requiring larger cash payments by the settling defendants to the Plaintiff class, as in the McKesson settlement.  *See Provident Tradesman B&T v. Patterson*, 390 U.S. 102, 111-12 (1968) (suggesting modifying judgment instead of dismissing judgment when a necessary party is not joined).

A/72910040.7/3005546-0000322819

matter of law, to follow Rule 19 is subject to review *de novo* on appeal.  *See, e.g., Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 23 (1st Cir. 2005).

In sum, the Court's Order approving the AWP reductions in the settlement for the explicit purpose of punishing non-party pharmacies raises serious and difficult questions of law for appeal concerning, among other matters, (1) the Court's jurisdictional authority to make liability determinations and to impose penalties against tens of thousands of non-parties, *see, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 109 (1969) (finding that a court cannot "adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant"), and (2) non-parties' constitutional due process rights, *see, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who is not a party or privy and, therefore, never had an opportunity to be heard.").

On appeal, NACDS and FMI expect to prevail on the argument that the Court may not exact the remedy contemplated in the Order from non-party pharmacies outside its jurisdiction. *See Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 23 (1st Cir. 2005) (legal conclusions relating to personal jurisdiction are reviewed *de novo* on appeal); *Phillips Exeter Academy v. Howard Phillips Fund*, 196 F.3d 284, 287 (1st Cir. 1999) (same).  At a minimum, it is evident, that the issues raised by the novel and unique settlements and the Court's approval thereof raise serious and difficult legal issues which have not previously been addressed by the First Circuit, warranting a stay pending appeal.  *See, e.g., Carvel Corp. v. Eisenberg*, 1988 WL 120135, *2 (S.D.N.Y. Oct. 31, 1988) (granting motion for stay pending appeal where case presented difficult question law regarding federal procedure).

## B.   The Class, The Pharmacies Relied Upon By The Class, And The Public Will Be Irreparably Injured Without A Stay.

Denial of a stay pending appeal will have serious and irreversible consequences upon NACDS and FMI (and similarly situated TPPs), the pharmacies that TPPs rely upon to provide

the medications and services covered by TPPs, and the clients, communities and employees that TPPs and pharmacies serve.

The Court's cavalier comment that "pharmacies seem to have survived prior to the start of this fraudulent scheme, making it seem likely that they will survive after it has been undone" is an unsupported and unsustainable non sequitor.   Order at 14.   Not only did the Court acknowledge that there will be an "effect of the rollback on pharmacies" when the Court extended the implementation of the AWP reduction provision for six months (Order at 15), the undisputed record before the Court flatly contradicts the assumption that all pharmacies will survive and thrive post-settlement.

The expert relied upon by Plaintiffs and Defendants to support the settlements directly refutes the Court's assumption when he acknowledges that there is no question that many pharmacies will be driven out of business and others forced to consolidate.  *See* Declaration of Dr. Raymond S. Hartman on behalf of all Plaintiffs (Dec. 15, 2008) ("Hartman Decl.") at 7 [Dkt. No. 642] (acknowledging that many pharmacies "may not remain competitive" and "will require consolidation within larger entities"); *see also* Heckman Decl. at 6 [Dkt. No. 610] ("The Proposed Settlement may drive almost 40% of the Community Pharmacies from the market."). The record before the Court made clear that there is no dispute that pharmacies will close, pharmacy services will be cut and patient care will suffer as a result of the settlements.

Every party before the Court acknowledged these consequences of the settlements' approval; the only open issue is the severity of these adverse consequences.  *See, e.g.*, NACDS & FMI Opp. at 2, 5, 8 (indicating that the settlements "threaten the viability of certain pharmacies"); Hartman Decl. at 7; Heckman Decl. at 12 ("Independent community pharmacies are not as diversified as chain pharmacies and their entire mix of business is dependent on

14

prescriptions. . . . Without prescriptions that generate the gross profit to cover expense . . ., community pharmacies will not remain viable.").[11]

It is indisputable that going out of business constitutes irreparable harm.  *See, e.g., World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000) ("economic loss may constitute irreparable harm where the loss threatens the very existence of the movant's business.").  Such irreparable harm would not only be realized by the closed pharmacies themselves, but also by NACDS and FMI who would, as a result of such closings, lose access to pharmacies for their covered staff members and would lose unrecoverable membership and revenues.  *See, e.g., Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 957-58 (5th Cir. 1981) (finding lost revenues and business constitutes irreparable harm and supports a stay).  *See also* Huber Decl. at ¶¶ 2, 3; Di Carlo Decl. at ¶¶ 2, 3.  Further, the loss of unrecoverable revenues, such as monies that pharmacies cannot recover as a result of sovereign immunity from Medicaid or other government programs (which reimburse based on AWP), represents irreparable harm.  *See Florida Businessmen for Free Enterprise*, 648 F.2d at 957-58.

In addition to irreparable harm of a financial nature, pharmacies would irreparably suffer a loss of legal and statutory rights if the AWP reductions were not stayed pending appeal.  First, allowing the AWP reductions to be implemented in violation of pharmacies' due process rights and their rights under Rule 19 to be joined in any case in which they have a "substantial interest" constitutes irreparable harm.  *See, e.g., Public Service Co. of NH v. Town of West Newbury*, 835

---

[11]   The net 4% reduction in 1,442 AWPs that would result upon implementation of the settlement could cause cuts in prescription reimbursement to pharmacies of over $1 billion in the first year alone. *See* Order at 9 ("Dr. Raymond S. Hartman has predicted that the rollback will provide as much as $1.03 billion in prospective savings to TPPs. . . ."); Hartman Decl. at 3. Since many pharmacies cannot absorb such a reduction in reimbursement and lack revenue neutrality clauses or negotiating power, the impact will be severe. *See* Louis & Clark Decl. at ¶¶ 10, 14-15. No pharmacies, however, will be able to avoid automatic Medicaid reimbursement reductions which are set by statute and regulations (and measured by the published AWPs). Medicaid reimbursement reductions are projected to reach almost $25 million each year. *See* Miller Decl. at ¶ 12; *see also* Louis & Clark Decl. at ¶ 16 (indicating plans to terminate participation in Medicaid due to unsustainable reimbursement reductions).

A/72910040.7/3005546-0000322819

F.2d 380, 382 (1st Cir. 1987) (indicating that a denial of procedural due process rights could constitute irreparable harm), *Florida Businessmen for Free Enterprise*, 648 F.2d at 957-58 (infringement of constitutional right is irreparable harm).  Second, reducing AWPs automatically reduces Medicaid reimbursements which pharmacies cannot recoup, irreparably harming the pharmacies' statutory rights to adequate Medicaid compensation.  *See The Washington Post v. Dep't of Homeland Security*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) (finding irreparable harm for plaintiff where statutory right to expedited FOIA review would be lost without injunction); *see also Holiday Inns of America, Inc. v. B.B. Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) (irreparable injury may stem from an immediate injury to "those rights protected by statute or the common law").  Third, the settlements will cause irreparable harm to pharmacies because they may be misused as a shield to block lawsuits by pharmacies against FDB and Medi-Span for tortiously interfering with pharmacy contracts and business relationships.  *See Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (concluding that for a non-intervening non-party to later sue settling parties over settlement terms is an impermissible collateral attack).

The risk of harm to NACDS and FMI and their members is real, certain and impossible to reverse in the event NACDS and FMI prevail on appeal.  Once reductions are implemented, pharmacies will take remedial measures to deal with those losses, "including reducing patients' services, reducing store hours, terminating employees and closing stores."  Louis & Clark Decl. at ¶ 14; Thrifty White Decl. at ¶ 12; Declaration of Mark Dumouchel of Eaton Apothecary ("Eaton Decl.") at ¶ 12 (same), attached hereto as <u>Exhibit 6</u>.  After pharmacies are closed or driven from the market, there is no way to bring them back and, for those that do survive, recapturing losses will prove virtually impossible.  *See, e.g.,* Louis & Clark Decl. at ¶ 18 ("If the reported AWP was reduced but the Court-authorized reduction was overturned, Louis & Clark does not expect to be able to recoup funds or otherwise reverse the measures it would have to implement to address the initial reduction in reported AWP."); Thrifty White Decl. at ¶¶ 18-19; Eaton Decl. at ¶ 17.

A/72910040.7/3005546-0000322819

Moreover, NACDS and FMI (and the entire class of TPPs) will be harmed by having to incur the administrative burden and transaction costs associated with AWP reductions and contract renegotiations that cannot be recouped.  *See* Mosteller Report at 10 ("[R]enegotiations and computer reprogramming are time consuming and costly.").  Therefore, since NACDS' and FMI's appeal essentially would be rendered meaningless by an AWP reduction prior to a ruling by the First Circuit on the merits of its appeal, a stay is warranted.  *See, e.g., Providence Journal Co. v. Federal Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979) ("Where . . . denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay."); *Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 107, 121 (D.N.H. 1995) (allowing motion for stay pending appeal based on irreparable injury prong of *Hilton* test) (overruled on other grounds); *see also Buntzman v. Springfield Redevelopment Authority*, 918 F. Supp. 29, 30-31 (D. Mass. 1996) (recognizing that the appeal being mooted is irreparable harm).

### C.    A Stay Will Not Cause Substantial Harm To The Settling Parties.

The only conceivable harm to the settling parties is the possibility of delay -- a consideration which, in itself, should not prevent an otherwise reasonable stay.  *See, e.g., Florida Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 957-59 (5th Cir. 1981) (delay of enforcement of city ordinance through a stay pending appeal to determine constitutionality of same is not a substantial harm).  Since the data room and class payment provision of the settlement, per the terms thereof, do not go into effect until after an appeal of the settlement is determined, the only term of the settlement that would be delayed by a stay pending appeal are the AWP reductions.

Not only have settlement negotiations and approval proceedings been ongoing for over two years, the Court, *sua sponte* in its Order approving the settlement, extended the start date on which the AWP reductions in the settlements will take effect by an additional 90 days, resulting in a combined total of six months following its approval.  Order at 17.  Given the time that has

already passed and the little effort it would take for the Defendants to immediately implement the AWP reductions in the event the settlements are upheld on appeal, it would not work a meaningful injustice to maintain the status quo for a few additional months, in order to avoid the significant irreversible harm that would result upon enforcement so as to allow for a final determination on appeal.

Moreover, since the settling class is not genuinely benefited from the AWP reduction (*see supra* § II.A.1) or the data room provision of the settlement (*see supra* note 6), delay in the enforcement thereof will not cause them "substantial" harm.  Thus, harm to the settling parties is, at most, limited and largely a factor of time, and does not counterbalance the other *Hilton* factors which weigh in favor of a stay.  *See, e.g., United States v. Kenney*, 2008 WL 3285891, *1-4 (D. Me. Aug. 5, 2008) (utilizing *Hilton* factors and granting motion for stay pending appeal based on lack of any discernable harm to other interested parties in granting motion).

### D.       Stay Of Enforcement Pending Appeal Is In The Public Interest.

Finally, the fact that pharmacies will close stores and cut valuable services as a result of the AWP reimbursement cuts mandated by the settlements is uncontroverted.  *See* Heckman Decl. at 11-13; Hartman Decl. at 7.  It hardly warrants explaining that the loss of community pharmacies and cut backs in access to care across the country as a result of the settlements would cause harm to the general public.  *See Managed Pharmacy Care, et al. v. David Maxwell Jolly*, Order Granting Plaintiff's Motion for Preliminary Injunction, Dkt. No. CV 09-382 CAS (MANx), Slip Op. at 17 (C.D. Cal. Feb. 27, 2009), attached hereto as Exhibit 7 (recognizing "the public interest in ensuring access to health care" when enjoining planned state reimbursement cuts to pharmacies).  *See also* Heckman Decl. at 13 ("This substantial decrease in compensation will disrupt a fragile balance in those areas where community pharmacies are needed most, in both rural areas and inner cities that are traditionally underserved by chain pharmacies.").  "In some communities the pharmacist is the only live link to health care with physicians, clinics and hospitals located many miles distant." *Id. See also* Thrifty White Decl. at ¶ 4.

As a result of reimbursement reductions, pharmacies will begin reducing store hours, terminating employees, cutting back on services and, in many cases, closing stores.  *See id.*; *see also* Louis & Clark Decl. ¶ 14; Thrifty White Decl. at ¶ 12; Eaton Decl. at ¶ 12, 19. Accordingly, services to the elderly, assisted living or homebound patients including prescription delivery, specialized programs for home care, customized patient packaging, and specialized systems to promote medication adherence, reduce medication errors, reduce the risk of medication misuse, and improve overall patient health and medication care will discontinue. *See, e.g.*, Eaton Decl. at ¶¶ 5, 6.  Many pharmacies will also terminate unprofitable Medicaid services.  *See, e.g.*, Louis & Clark Decl. ¶ 16.

Moreover, the public interest is further served by the guarantee and enforcement of due process and proper respect for jurisdictional limitations.  Accordingly, the final *Hilton* factor, the public interest, also strongly support this Court's grant of a stay pending appeal.

**III.    Stay Without Bond Is Appropriate Under Fed. R. Civ. P. 62(d) Because The Settling Parties Will Not Be Harmed During The Resolution Of The Appeal.**

While NACDS and FMI join in all the arguments raised by the LTC Objectors in their brief, NACDS and FMI specifically incorporate herein the procedural argument that an appeal bond is not required in this case under Fed. R. Civ. P 62(d) and Local Rule 62.2.  LTC Objectors' Memo. at § II.D.

**CONCLUSION**

For the foregoing reasons and those discussed in the brief filed by the LTC Objectors, the balance of the *Hilton* factors strongly favor entry of a stay pending appeal.  Therefore, NACDS and FMI respectfully request that the Court grant a stay pending appeal of the Order approving the Settlements without bond.

19

**NATIONAL ASSOCIATION OF CHAIN DRUG STORES & FOOD MARKETING INSTITUTE,**

By its attorneys,


/s/ Daniel S. Savrin
Daniel S. Savrin, BBO #555434
daniel.savrin@bingham.com
Francesca Lucia Miceli, BBO #663925
francesca.miceli@bingham.com
Angela J. Neal, BBO #661603
angela.neal@bingham.com
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA  02110-1726
617.951.8000

Dated: April 2, 2009


## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 2, 2009.


/s/ Daniel S. Savrin, BBO #555434
daniel.savrin@bingham.com

A/72910040.7/3005546-0000322819