UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CARPENTERS HEALTH BENEFITS FUND, PIRELLI ARMSTRONG RETIREE MEDICAL BENEFITS TRUST; TEAMSTERS HEALTH & WELFARE FUND OF PHILADELPHIA AND VICINITY; PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND; DISTRICT COUNCIL 37, AFSCME - HEALTH & SECURITY PLAN; JUNE SWAN; BERNARD GORTER, SHELLY CAMPBELL and CONSTANCE JORDAN,<br><br>                 Plaintiffs,<br><br>    v.<br><br>FIRST DATABANK, INC., a Missouri corporation; and McKESSON CORPORATION, a Delaware corporation,<br><br>                 Defendants. | C.A. No. 1:05-CV-11148-PBS |

**CLASS PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
UNOPPOSED MOTION FOR APPROVAL OF PARTIAL DISTRIBUTION
<u>OF THE MCKESSON SETTLEMENT FUND</u>**

## TABLE OF CONTENTS

## I. INTRODUCTION

This action was brought by third-party payors ("TPPs"), *i.e.*, health plans, employee benefit plans, and commercial insurers, and consumers who purchased any of the drugs that are the subject of this litigation ("Subject Drugs"). The Class alleges that McKesson violated federal racketeering laws and state law when it colluded with co-defendant First DataBank to raise AWPs, causing TPPs and consumers to pay more for the Subject Drugs than they otherwise would have paid.

In November 2008, the parties reached a settlement, under which McKesson agreed to pay $350 million for the benefit of the Class. The Court granted final approval of the Settlement, including the proposed Plan of Allocation, on August 3, 2009.[1] Additionally, pursuant to the FDB and Medi-Span Settlements, an additional $2.2 million was added to the Fund.[2] Pursuant to the Court's approved Plan of Allocation, Funds are to be distributed according to the following formula:

|                |          |
|----------------|----------|
| Cash Payors    | 11.55%   |
| Co-payor       | 5.97%    |
| TPPs           | 82.48%[3] |

---

[1] Dkt. No. 810.

[2] Supplemental Order Regarding Final Approval of the First Databank & Medi-Span Settlement Class (Dkt. No. 882).

[3] The percentage distribution amounts are based on an agreed gross allocation by Allocation Counsel of $40,425,000 to the Cash Payor Subclass (11.55% of $350 million); $20,900,000 to the Co-payor Subclass (5.97% of $350 million); and $288,675,000 (82.48% of $350 million) to the TPP Subclass, with each Subclass bearing its share of costs and fees. Notice of Amended [Proposed] Order in Connection with Motion for Preliminary Approval of the Proposed Settlement Agreement (Dkt. No. 718), Ex. J, ¶ 2. The Plan of Allocation agreement erroneously describes the allocation parenthetically to the Cash Subclass as 11.52% and to the TPP Subclass as 82.52% of the total. Class Counsel has confirmed with Allocation Counsel that the corrected percentage breakdown accurately represents the parties' intent. Declaration of Steve W. Berman in Support of Class Plaintiffs' Unopposed Motion to Approve Partial Distribution of the Settlement Fund to the Cash Payor Subclass ("Berman Decl."), ¶ 4.

The Court retained jurisdiction for purposes of supervising and approving any matters relating to the distribution of the settlement.[4]

Pursuant to the Court's Order, Class Counsel then subpoenaed the largest retail and online pharmacies to request cash payor data to expand the number of cash payor claimants.[5] The Class obtained data from nine pharmacies, which was sent directly to Rust. Rust then used that data to expand the number of Cash Payor claimants from a few thousand individually filed claims to over 24 million total claimants.[6]

Other than the Proposed Plan of Allocation, there are no provisions in the Settlement Agreement or this Court's previous orders specifying how the Claims Administrator may or must distribute Settlement Funds, leaving the final details to the Court's discretion. The Claims Administrators are still processing the TPP and Co-payor claims,[7] but the Cash Subclass is ready for distribution. Because the Settlement Funds are already allocated pursuant to the Plan of Allocation approved by this Court, the delay in processing TPP and Co-payor claims should not affect the distribution of the Cash Payor settlement funds. Accordingly, Class Plaintiffs now seek approval of a partial distribution of the McKesson Settlement Fund to members of the Cash Payor Subclass.

---

[4] August 31, 2009 Order and Final Judgment (Dkt. No. 829), ¶ 16.

[5] Berman Decl., ¶ 2.

[6] *Id.*; Affidavit of Eric J. Miller Regarding Allocation and Distribution of the Net Settlement Fund to Consumer Claimants and Third-Party Payors ("Miller Aff."), ¶¶ 17-19.

[7] Rust is still processing TPP claims. Because the TPPs provided the Co-payor data along with the TPPs' own claims, Co-Claims Administrator CASS, who is charged with processing the Co-payor claims, did not receive the data from Rust, who is charged with processing the TPP claims, until November of this year. Miller Aff., ¶ 15, filed concurrently with Class Plaintiffs' Motion. Additionally, CASS has encountered a large number of discrepancies in the Co-payor data provided by the TPPs but anticipates that the Co-payor Subclass will be ready for distribution early next quarter. Berman Decl., ¶ 3.

## II.     CLAIMS PROCESSING AND AUDITING ACTIVITIES

Rust mailed Notice Packets to more than 17,000 potential Consumer Class Members.[8] Over the course of several months, Rust received and processed 9,759 paper claims from potential Consumer Class Members (including both Cash and Co-payor class members).[9] Rust applied several levels of review to the submissions it received, by both its data entry staff and its auditing staff.[10]

Rust's data entry department identified certain claims that, as submitted, were deemed to be deficient in that they failed to include information or records required to calculate the claimant's *pro rata* share but which, if corrected, would make the claim eligible for inclusion in the settlement. Rust followed up extensively with such claimants to obtain the required data.[11]

Similarly, Rust's auditors identified certain claims filed by claimants who appeared to be ineligible to participate in the settlement because they had purchased outside the class period, or for some other reason. Rust followed up extensively to afford these claimants an opportunity to explain or correct their claims.[12] Additionally, as it became clear whether claimants were members of the Cash or Co-payor classes, Rust separated the claims and transferred the Co-payor claims to Co-Administrator CASS for further processing.[13]

In response to subpoenas issued by Class Counsel, nine of the largest providers of retail or online pharmacy services in the United States provided electronic files of the names and addresses of consumers who paid cash (that is, without the benefit of insurance) for the Subject

---

[8] Miller Aff., ¶ 5.

[9] *Id*. at ¶ 6.

[10] *Id.* at ¶¶ 6-8.

[11] *Id.* at ¶¶ 9-13.

[12] *Id.*

[13] *Id.* at ¶ 15.

Drugs during the Cash Payor claim period. In total, the nine pharmacies provided over 82.6 million records.[14] Rust reviewed, analyzed, scrubbed, and de-duped the data, specifically to be assured that only Subject Drugs for purchase dates within the Cash Payor claim period were included. Rust then aggregated multiple transactions into one "Pharmacy Claim" record if a distinct individual or members of the same household could reasonably be determined. In total, Rust created 24,353,335 unique Pharmacy Claims totaling $7,042,540,151.26 in purchases.[15] Rust then ran an audit to eliminate any duplicate claims between the created pharmacy claims and the individually filed ones, giving each claimant the benefit of the higher claim.[16]

### III. REQUEST FOR APPROVAL OF LATE-FILED CLAIMS

Rust received 213 Cash claims representing a total recognized loss of $23,518.03 that were postmarked after the filing deadline of July 9, 2009, but which were otherwise valid claims.[17] Plaintiffs respectfully request that the Court allow late-filers to participate in the settlement.

### IV. DISTRIBUTION OF THE SETTLEMENT FUND

The Class incurred a total of $1,859,456.00 in notice costs.[18] Additionally, the Court awarded Class Counsel $70 million in attorney's fees and $24,685 as incentive awards to the representative plaintiffs.[19] Current administrative costs of the settlement, including escrow fees and expenses, taxes, claims administration, costs incurred by the pharmacies pursuant to the

---

[14] *Id.* at ¶ 17.

[15] *Id.* at ¶ 18.

[16] *Id.* at ¶ 18.

[17] *Id.* at ¶ 16.

[18] Berman Decl., Ex. A.

[19] *Id.*; Dkt. No. 810, ¶ 16.

Subpoena Project is $1,593,022.91.[20]  Future administrative costs, including escrow costs, costs of distributing checks to all three Subclass are estimated to be $2,330,618.00.[21]  The total settlement amount available to the entire Class for distribution, net of attorney fees and reasonable expenses related to notice and administration, including estimated future costs, is $276,954,624.16[22].  Of that amount $31,988,259.09 (11.55%) is available for the Cash Payor Subclass.[23]  Class Plaintiffs therefore seek that amount for distribution to Members of the Cash Payor Subclass.

Due to the vast number of Cash Payors claims derived from pharmacy data, the total number of claims exceeds 24 million and the total claimed amount exceeds $280 million.  A simple pro rata distribution would be inefficient and would not provide meaningful compensation.[24]  Class Plaintiffs therefore recommend that the Court authorize $25, $50 or $100 minimum payments.  Further, to encourage participation in future class actions Class Plaintiffs recommend that approximately 3,400 individually-filed claims be given first priority and be awarded at the greater of i) their Recognized Loss (*i.e.* 4% of their total expenditure on the Subject Drugs) or ii) the minimum payment selected by the Court.  Payment to the Individually-Filed Claims at this rate would represent only 2% or less of the total amount available for distribution to the Cash Payor Class.

---

[20] Berman Decl., Ex. A.

[21] Miller Aff., ¶ 23.

[22] *Id.*

[23] Miller Aff., ¶ 24.

[24] Miller Aff., ¶ 25.

- 5 -

The Claims Administrator estimates that if the pharmacy-created claims were paid out under this same formula, it would increase distribution by only about 57,000 checks.[25] To increase distribution, Class Plaintiffs recommend that the Court pay the pharmacy-created claims at a flat rate equal to the minimum payment selected by the Court. This would result in the distribution of approximately 250,000 to about 1.06 million checks, depending on the minimum amount designated by the Court.[26] To ensure that the consumers who were hardest hit are guaranteed payment, the pharmacy-created claims would be ranked according to their Recognized Loss, with the highest Recognized Loss being given the highest priority.

Distribution would proceed as follows:

(a) For all individually filed claims, claimants would receive the greater of their Recognized Claim or the minimal payment; and

(b) For all pharmacy created claims, these claims will be ranked from highest to lowest Recognized Claim amount; beginning with the highest claims, claimants would receive the minimal payment until the funds are exhausted.[27]

## V. CONCLUSION

Plaintiffs respectfully request that the Court enter an order approving distribution of the settlement fund. Plaintiffs submit herewith a proposed order for the convenience of the Court.

---

[25] *Id.* at ¶ 26(b).

[26] *Id.* at ¶ 27.

[27] *Id.* at ¶ 26(b).

| | |
|---|---|
| DATED:  December 22, 2010 | By:   /s/ Steve W. Berman<br>         Thomas M. Sobol (BBO#471770)<br>Hagens Berman Sobol Shapiro LLP<br>55 Cambridge Parkway, Suite 301<br>Cambridge, MA  02142<br>Telephone:  (617) 482-3700<br>Facsimile:  (617) 482-3003<br><br>Steve W. Berman<br>Sean R. Matt<br>Nicholas Styant-Browne<br>Barbara A. Mahoney<br>Hagens Berman Sobol Shapiro LLP<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA  98101<br>Telephone:  (206) 623-7292<br>Facsimile:  (206) 623-0594<br><br>Jennifer Fountain Connolly<br>Hagens Berman Sobol Shapiro LLP<br>1629 K St. NW, Suite 300<br>Washington, D.C.  20006<br>Telephone:  (202) 355-6435<br>Facsimile:  (202) 355-6455<br><br>Kenneth A. Wexler<br>Wexler Wallace LLP<br>55 W. Monroe Street, Suite 3300<br>Chicago, IL  60603<br>Telephone:  (312) 346-2222<br>Facsimile:  (312) 346-0022<br><br>Jeffrey Kodroff<br>John Macoretta<br>Spector, Roseman, Kodroff & Willis, PC<br>1818 Market Street, Suite 2500<br>Philadelphia, PA  19103<br>Telephone:  (215) 496-0300<br>Facsimile:  (215) 496-6611<br><br>Marc H. Edelson<br>Edelson & Associates<br>45 W. Court Street<br>Doylestown, PA  18901<br>Telephone:  (215) 230-8043<br>Facsimile:  (215) 230-8735 |

- 8 -

        George E. Barrett
        Edmund L. Carey, Jr.
        Barrett, Johnston & Parsley
        217 Second Avenue, North
        Nashville, TN  37201
        Telephone:  (615) 244-2202
        Facsimile:  (615) 252-3798

        ***Counsel for Plaintiffs and the Classes***

- 9 -

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on December 22, 2010.

                                                                   s/ Steve W. Berman
                                                                  Steve W. Berman